**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (*pro hac vice* pending)
Alice Belisle Eaton (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Sean A. Mitchell (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTORS TO ASSUME AND PERFORM UNDER THE CONSULTING**
**AGREEMENT, (II) AUTHORIZING AND APPROVING THE SALE OF CLOSING**
**LOCATION ASSETS, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL**
**LIENS, CLAIMS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>" or the "<u>Merchant</u>") respectfully state the following in support of this motion:[2]

### <u>Relief Requested</u>

1.     The Debtors seek entry of orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>"):  (a) authorizing the Debtors to assume and perform under that certain consulting agreement dated as of April 3, 2025, by and among New Rite Aid, LLC, on the one hand, and SB360 Capital Partners, LLC ("<u>SB360</u>") and Hilco Merchant Resources, LLC ("<u>Hilco</u>," and, together with SB360, the "<u>Consultants</u>"),[3] on the other hand, attached as **Schedule 1** to the Interim Order (as may be modified from time to time in accordance with its terms, the "<u>Consulting Agreement</u>"); (b) (i) authorizing and approving the continuation or initiation of store closing or similar themed sales (the "<u>Initial Location Closings</u>") at the stores and distribution centers identified on **Schedule 2** to the Interim Order (collectively, the "<u>Initial Closing Locations</u>"), (ii) authorizing the Debtors to conduct store closing or similar themed sales at additional stores and distribution centers (the "<u>Additional Location Closings</u>" and, together with the Initial Location Closings, the "<u>Location Closings</u>") at a later date or dates pursuant to the procedures set forth herein (collectively, the "<u>Additional Closing Locations</u>," if any, and together with the Initial Closing

---

[2]   A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to these chapter 11 cases, is set forth in the First Day Declaration (as defined below), filed contemporaneously herewith and incorporated herein by reference.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

[3]   Pursuant to their rights under the Consulting Agreement, on April 8, 2025 (the "<u>JV Formation Notice</u>"), the Consultants delivered written notice to the Debtors of their formation of a contractual joint venture the national liquidator firms listed on Exhibit C to the Consulting Agreement, Gordon Brothers Retail Partners, LLC, GA Group (aka GA Retail Solutions, LLC) and Tiger Capital Group, LLC to serve as Consultants under the Consulting Agreement (collectively, with SB360 and Hilco, the "<u>Contractual Joint Venture</u>").  This JV Formation Notice also confirmed that pursuant to the terms of the Contractual Joint Venture and the Consulting Agreement, SB360 and Hilco shall remain the lead consultants in the Contractual Joint Venture and the terms and scope of the engagement remain as set forth in the Consulting Agreement.

Locations, the "<u>Closing Locations</u>"), and (iii) authorizing the Debtors to continue sales and internal transfers of Pharmacy Assets (as defined below), with all such sales to be free and clear of all liens, claims, and encumbrances (the sales described in clauses (i)– (iii), collectively, the "<u>Sales</u>"), in each case, in accordance with the store closing sale guidelines (the "<u>Sale Guidelines</u>") attached as **Schedule 4** to the Interim Order; (e) authorizing and approving the payment of fees and reimbursement of expenses to the Consultants in accordance with the provisions of the Consulting Agreement; and (f) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing (the "<u>Final Hearing</u>") within approximately thirty (30) calendar days after the commencement of these chapter 11 cases to consider entry of the Final Order.

2.      In support of this motion, the Debtors respectfully submit the (a) *Declaration of Marc Liebman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Authorizing and Approving the Sale of Closing Location Assets, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief* (the "<u>Liebman Declaration</u>"), and (b) *Declaration of Elise S. Frejka in Support of Debtors' Motions for Entry of Orders (I) Approving Bidding Procedures and Related Relief, and (II) Authorizing and Approving the Conduct of Location Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances and Related Relief* (the "<u>Frejka Declaration</u>"), each filed contemporaneously herewith and incorporated herein by reference.

## <u>Jurisdiction and Venue</u>

3.      The United States Bankruptcy Court for the District of New Jersey (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The statutory bases for the relief requested herein are sections 105, 363, 365, and 554 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 9013-2 and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## Background

6.    On May 5, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

7.    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

I.      **The Location Closing Process and Ordinary Course Pharmacy Asset Sales**

8.      Following an extensive prepetition marketing process, the Debtors commenced these chapter 11 cases to efficiently complete an orderly sale, divest or monetize any assets not sold in auctions, and facilitate an orderly transition for Rite Aid pharmacy customers with minimal disruption in continuity of care, while maximizing recoveries for the benefit of creditors. By continuing to operate their stores throughout the sale and wind down period, the Debtors will be able to continue filling prescriptions for millions of customers, many of whom rely on the Debtors for their essential medications and health care needs. Following the sale of all or substantially of their assets, including the Sales contemplated herein, the Debtors expect to close all of its remaining, existing retail pharmacy store locations.

9.      As described in the First Day Declaration, Rite Aid Corporation and certain of its subsidiaries (collectively, "Rite Aid") filed for chapter 11 in 2023 (the "2023 Cases") to address various operational issues and their unsustainable capital structure. During the 2023 Cases, the Debtors sold or wound down approximately 800 Rite Aid store locations and consummated hundreds of prescription file sales in connection therewith.[4]  In the ordinary course of business, both prior to and following the 2023 Cases, the Debtors analyze performance on a store-by-store basis and where advantageous, complete internal transfers or sales of Pharmacy Assets and close

---

[4]     During the 2023 Cases, the Debtors sold Pharmacy Assets in the ordinary course and pursuant to the authority granted by the Court's orders approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 37], Case No. 23-18993 (MBK) (Bankr. D.N.J.), including the (a) *Interim Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 121], Case No. 23-18993 (MBK) (Bankr. D.N.J.) (Oct. 17, 2023), (b) *Final Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 709], Case No. 23-18993 (MBK) (Bankr. D.N.J.) (Nov. 20, 2023), and (c) *Amended Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 1648], Case No. 23-18993 (MBK) (Bankr. D.N.J.) (Jan. 29, 2024),

the associated store location.  Since 2022, the Debtors or their predecessors have sold more than $500 million of Pharmacy Assets.

10.    In the ordinary course of the Debtors' business, both prior to and following the 2023 Cases, the Debtors actively analyze and evaluate their retail store portfolio in the ordinary course of business, including factors such as financial performance, rent relative to market, supply chain, and other operational and geographic considerations influencing the competitive landscape and profitability of a retail store.  Based on such analysis, the Debtors may determine to close an underperforming store.  In connection with closing a store location, the Debtors will generally transfer (or "pour") prescription files and related records (collectively, "Pharmacy Assets") to nearby Rite Aid store locations or sell such Pharmacy Assets to a third-party (non-Rite Aid) pharmacy, thereby maintaining continuity of care and minimizing disruptions to critical health services provided to pharmacy customers.  With respect to sales to third parties, the Debtors generally solicit and award bids to and from applicable pharmacies based on geographic location of the applicable Rite Aid pharmacy.

11.    Since emerging from the 2023 Cases, the Debtors have sold and/or transferred Pharmacy Assets associated with (and closed) approximately 29 retail stores.  As of the Petition Date, in the ordinary course of business, the Debtors have awarded bids for sales of Pharmacy Assets associated with approximately 63 store locations, which sales are expected to close on a rolling basis in the weeks following the Petition Date.  Certain of these transactions are subject to final documentation and/or pending final regulatory approvals and waiting periods, and thereafter, the Debtors expect to consummate such sales of Pharmacy Assets and close the associated store locations.  The Debtors anticipate that approximately 27 of such transactions will close within 30 days following the Petition Date.

12.     By this motion, the Debtors seek authority to continue sales and internal transfers of Pharmacy Assets, including on a confidential basis where advisable, consistent with the Debtors' historical practice.  While the Debtors believe that Sales of Pharmacy Assets are in ordinary course of the Debtors' business, the Debtors nonetheless request authorization to complete such sales out of an abundance of caution.  As discussed in the First Day Declaration, due to the practical realities of transferring prescription files and pharmacy care, as well as the scale of the Debtors' pharmacy business, the Debtors believe that an orderly process is necessary to facilitate successful transitions for their millions of pharmacy customers.  The Debtors believe that consummation of ordinary course Pharmacy Asset sales without delay will maximize the chance that *all* customers at the associated Closing Locations will have their prescriptions and services successfully transferred to another provider without interruption to care.

13.     Prior to the Petition Date, and within the context of the Debtors' ongoing sale and marketing context, the Debtors identified a set of 47 Initial Closing Locations comprising store locations where the closing process started prepetition and is ongoing, or is planned to start soon after the Petition Date, including in connection with ordinary course Pharmacy Asset sales or otherwise.  The resources required to continue to maintain these locations exceeds the value that would be received in any expected bid for them.  To the extent that certain of the Debtors' other locations are unlikely, or fail, to receive a value-maximizing bid, the Debtors will deem such locations "Additional Closing Locations" and effectuate their closure as described herein.

14.     The Debtors' overall sale strategy and store closure plan focuses on facilitating successful transitions for customers and maximizing the value of the Debtors' assets, including, without limitation, through the sale of (a) Pharmacy Assets, (b) store inventory, including front-end retail inventory (collectively, the "Inventory"), and (c) store fixtures, furniture, and equipment (collectively, "FF&E," and together with the Inventory, the "Non-Pharmacy Assets") as described

herein.  With respect to the Inventory, the Debtors' strategy for maximizing store proceeds consists of either (a) conducting a strategic mark-down plan followed by a clearance sale, and/or (b) transferring Inventory at Closing Locations to other store locations that would remain open for a longer duration during these chapter 11 cases.  The Debtors also intend to sell any marketable, owned FF&E in the Closing Locations.

15.     After the completion of these asset dispositions, the Debtors would then vacate the Closing Location premises and address the applicable leases for such premises in such manner as deemed appropriate by the Debtors in their business judgment.  With respect to the Closing Locations and any leased stores vacated prepetition, the Debtors anticipate that they will either reject the applicable leases for such premises or assume and assign them to one or more third-party buyers, consistent with their business judgment.[5]

## II.     The Consulting Agreement.

16.     To facilitate the Location Closings and maximize the value of the proceeds from the Debtors' ongoing marketing process, the Debtors seek to assume and continue performing under the Consulting Agreement.  The Debtors have concluded in their business judgment that the relief requested herein and the services provided by the Consultants pursuant to the Consulting Agreement are necessary for a seamless and efficient store closing process, to avoid immediate and irreparable harm to the Debtors' estates, and to maximize the value of the Debtors' saleable assets for the benefit of their estates.

---

[5]     Contemporaneously herewith, the Debtors filed [(a) the *Debtors' Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and Unexpired Leases and (B) Abandonment of any Personal Property, Each Effective as of the Rejection Date, and (II) Granting Related Relief* and (b) the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases, and (II) Granting Related Relief*].

17. Pursuant to the Consulting Agreement, the Consultants will serve as consultants to the Debtors in connection with the Sales at Closing Locations. Authorizing the assumption of the Consulting Agreement will allow the Debtors to utilize the logistical capabilities, experience, and resources of the Consultants in performing large-scale store closures in a format that allows the Debtors to retain control over the process. The Consultants assisted the Debtors in connection with the successful closure of over 430 stores in the 2023 Cases, and the Debtors believe that the Consultants' historical knowledge, expertise, and experience position them to deliver the best possible results to the Debtors for the benefit of their estates. A summary of the material terms of the Consulting Agreement is set forth below.[6] A copy of the Consulting Agreement is attached as Schedule 1 to the Interim Order.

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Merchandising Services Provided by Consultants** | During the Sale Term, the Consultants shall provide the Merchant with the following services (collectively, the "Merchandising Services") with respect to all of the Merchant's retail store locations, subject to final Merchant approval and full Merchant discretion (in consultation with the Senior Credit Facility Agent and the DIP Agent):[7] <ul><li>advance planning for any additional location closings, including by conducting operational preparation and assessing initial discount cadence, marketing creative, system implementation, and personnel and budget requirements;</li><li>prepare a monetization model for store closings which can be modified by the inclusion or deletion of retail store locations and compare that model with the results of closures of retail store locations which were completed prior to the Agreement Effective Date to project the differential monetary recovery;</li><li>analyze any sale offers and their impact to collateral value;</li><li>coordinate weekly financial reporting package for the Merchant, its advisors, the Senior Credit Facility Agent, the DIP Agent, and other constituents;</li><li>conduct weekly update calls with Merchant's management and advisors, the Senior Credit Facility Agent, the DIP Agent, and other applicable constituents;</li></ul> |

---

[6]   The following summary chart is for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects. Capitalized terms used in the summary chart have the meanings ascribed to them in the Consulting Agreement.

[7]   "DIP Agent" shall mean Bank of America, N.A., as administrative agent and collateral agent under the Debtors' debtor in possession financing facility (the "DIP Facility").

| TERM | CONSULTING AGREEMENT |
|---|---|
| | • assist the Merchant with marketing initiatives for relocating customers to nearby store locations; |
| | • make recommendations to sell through merchandise to mitigate transfer of back-end merchandise; |
| | • make marketing recommendations, which are subject to the Merchant's approval, to increase sell through and reoccurring traffic for prescription refills; |
| | • maintain the confidentiality of all proprietary or non-public information regarding the Merchant or the Designated Closing Locations of which the Consultants or their respective representatives become aware, except for information that is public as of the Agreement Effective Date or which becomes public through no fault of any Consultant or any of their respective representatives; |
| | • review the Merchant's open orders and availability under its open-to-buy and supply planning and make merchandising planning recommendations to the Merchant; and |
| | • such other services as are approved by the Merchant in writing and agreed to by the Consultants. |
| **Inventory Services Provided by Consultants** | During the Sale Term, Consultants shall, with respect to all Sales, provide the Merchant with the following services (collectively, the "Inventory Services"): |
| | • oversee the monetization and disposal of the Inventory from the closing stores and coordinate with Merchant to maximize the sale of Inventory to be shipped to/from the closing stores, including but not limited to providing Supervisors and where necessary subcontractors; |
| | • recommend and implement appropriate point of purchase, point of sale and external advertising (including signage) to effectively sell the Inventory during the Sale, consistent with the sale themes to be approved by the Merchant (in consultation with the Senior Credit Facility Agent and the DIP Agent), the Sale Guidelines, and any Approval Order; |
| | • maximize the proceeds of the Inventory while protecting and promoting the Merchant's trade name and goodwill in the marketplace; |
| | • coordinate with the Merchant regarding an advertising and signage program to direct customers to the Merchant's e-commerce platform and go-forward locations (if any); |
| | • coordinate accounting functions, including evaluation of Sales of Inventory by category, Sales reporting, and monitoring of the Sale expenses using the Merchant's IT systems, daily reporting to the Merchant of Sales and weekly reporting and reconciliation of Sale proceeds and Sale expenses; |
| | • recommend appropriate staffing levels for Designated Closing Locations (including store employees) and appropriate bonus and incentive programs for store employees; |
| | • maintain the confidentiality of all proprietary or non-public information regarding the Merchant and the Designated Closing Locations of which Consultants or their respective representatives become aware, except for information that is public as of the Agreement Effective Date or becomes public through no fault of any Consultant or either of their respective representatives; |
| | • develop a Sales plan to communicate to the Senior Credit Facility Agent, the DIP Agent, and other constituents and report budget to actuals on a weekly basis; and |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | • conduct weekly update calls with Merchant's management and advisors, the Senior Credit Facility Agent, the DIP Agent, and other applicable constituents. |
| **Disposition of FF&E** | Subject to final Merchant approval, Consultants shall sell FF&E located at the applicable Designated Closing Locations during the applicable Sale Term (which Sale Term, as it relates to any distribution center that is a Designated Closing Location, shall factor in a reasonable time period for the disposition of the FF&E located in such distribution centers). |
| **Additional Consultant Goods; Additional Consultants Goods Fee[8]** | Subject to the Merchant's, the Senior Credit Facility Agent's, and the DIP Agent's prior written approval, the Consultants may, at the Consultants' sole cost and expense, supplement the Inventory in the Designated Closing Locations with additional goods procured by the Consultants which are of like kind and no lesser quality to the Inventory in the Designated Closing Locations (such additional goods, "<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by the Consultants and delivered to the Designated Closing Locations at the Consultants' sole cost and expense (including as to labor, freight and insurance related to shipping such Additional Consultant Goods to the Designated Closing Locations).<br><br>*Additional Consultants Goods Fee.* Merchant shall retain an amount equal to seven percent (7%) of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Consultant Goods. |
| **Expenses of Consultants** | Merchant shall reimburse the Consultants for their reasonable, documented out-of-pocket expenses approved by Merchant that are incurred in connection with providing the Merchandising Services.<br><br>The Consultants and the Merchant shall agree on a pro forma budget of Consultant Controlled Expenses relating to each Tranche of Designated Closing Locations that are designated to be closed, which budget shall be satisfactory to the Senior Credit Facility Agent and the DIP Agent. Merchant shall be responsible for payment of Consultant Controlled Expenses to the Consultants.<br><br>"<u>Consultants Controlled Expenses</u>" means, as set forth in the Budget, the aggregate amount of (I) Supervisor Costs (as defined herein), (II) advertising expenses, and (III) the Consultants' reasonable and documented legal fees and expenses (limited to one external counsel and one local counsel for all Consultants) incurred in connection with (x) preparing the Consulting Agreement and obtaining an Approval Order, (y) negotiating any "side letters" with the landlords of the applicable Designated Closing Locations, or (z) enforcing the terms of the Consulting Agreement. For the avoidance of doubt, any expenses related or allocable to the sale of Additional Consultant Goods shall not constitute Consultant Controlled Expenses.<br><br>"<u>Supervisor Costs</u>" means the following customary costs and expenses incurred by Consultants with respect to Supervisors, in each case, in accordance with the Budget: (I) the weekly compensation paid during the applicable Sale Term per Supervisor (which in each case represents the Consultants' actual costs); (II) reasonable and documented travel expenses of the Supervisors between Designated Closing Locations during the applicable Sale Term and to and from such Designated Closing Locations at the commencement and conclusion of the corresponding Sale (including reasonable travel to |

---

[8] The Debtors, Consultant and DIP Agent have agreed not to utilize Additional Consultant Goods during these chapter 11 cases.

| TERM | CONSULTING AGREEMENT |
|---|---|
|  | and from the Supervisors' homes at such times); and (III) Supervisor deferred compensation as provided in the Budget. |
| Sale Advance[9] | Within two (2) business days after the Merchant's designation of a Tranche of Designated Closing Locations, or such other date as the Merchant, the Consultants, the Senior Credit Facility Agent and the DIP Agent may mutually agree in writing, the Merchant, the Consultants, the Senior Credit Facility Agent and the DIP Agent shall mutually agree upon the amount of a sale advance to be remitted to an account designated by the Consultants, which amount shall serve as an advance deposit in respect of the following: (a) an amount sufficient for the Consultants to pay for the Advertising Materials to be used in connection with the Sales at the Designated Closing Locations, or to the extent the Merchant elects, all of the Merchant's locations to take advantage of timing and volume discounts (the "Signage Advance"); (b) an agreed-upon amount as an advance payment towards the legal fees incurred and to be incurred by the Consultants in connection with negotiating, implementing, and obtaining Bankruptcy Court approval of the Consulting Agreement (the "Legal Fee Advance"); and (c) an agreed-upon amount to secure the Merchant's obligation to reimburse the Consultants for the Consultant Controlled Expenses (the "Consultant Expense Advance" and, collectively with the Signage Advance and the Legal Fee Advance, the "Sale Advance"). The Consultant Expense Advance, any portion of the Signage Advance not used to purchase signage, and any portion of the Legal Fee Advance not used to pay legal fees, in each case in accordance with the Budget, shall be retained by the Consultants until the Final Reconciliation; *provided* that such amounts shall be taken into account when determining the agreed-upon Sale Advance with respect to each subsequent Tranche of Designated Closing Locations.<br><br>Notwithstanding the Consultants' receipt of the Consultant Expense Advance, nothing contained herein shall be deemed to waive, modify or limit the Merchant's obligations to remit timely payment of the Fees and Expenses due to the Consultants, or to remit payment of the proceeds from the sale of any Additional Consultant Goods as part of the Weekly Reconciliations. To the extent the Merchant fails to timely remit payment of Fees, reimbursement of Expenses, or Additional Consultant Goods Proceeds that are due and owing to the Consultants (collectively, if any, the "Past Due Consultant Expenses"), the Consultants may apply such Past Due Consultant Expenses against the Consultant Expense Advance, in which case, no less than one (1) business day after the Merchant's receipt of notice from the Consultants of such application, the Merchant shall replenish the Consultant Expense Advance to the full amount previously agreed to by the Parties. As each new Tranche (if any) of Designated Closing Locations is identified by the Merchant, the Merchant, the Consultants, the Senior Credit Facility Agent and the DIP Agent shall mutually agree upon an increase to the Sale Advance, taking into account unused portions of Sales Advances from prior Tranches of Designated Closing Locations. No later than seven (7) business days after completion of the Final Reconciliation and upon receipt by the Consultants of all amounts due to them under the Consulting Agreement, any unused portion of the Sale Advance shall be returned by the Consultants to the DIP Agent for application in accordance with the DIP Orders. |
| Compensation for Consultants | *Merchandising Services Fee.* The Consultants shall provide the Merchandising Services during the period between the Agreement Effective Date and the earlier of (a) the date that is four (4) months after the Agreement Effective Date unless extended by mutual agreement of the Merchant and the Consultants, or (b) the date that the Merchant designates all of its remaining retail store and distribution center locations as Designated Closing |

---

[9]   As of the Petition Date, the Consultants had received a Sale Advance in the aggregate amount of $20,000 in connection with the Initial Location Closings all of which was allocated as a Consultant Expense Advance.

| TERM | CONSULTING AGREEMENT |
|---|---|
| | Locations (the "Sale Term").   For each month that the Consultants are providing Merchandising Services, the Merchant shall pay the Consultants a monthly fee of $25,000 for the performance of the Merchandising Services.<br><br>*Inventory Services Fee.*  As compensation for providing the Inventory Services, the Consultants shall receive a commission equal to (A) two percent (2.00%) of Gross Proceeds from the sale of Inventory at each Designated Closing Locations, *plus* (B) one-half of one percent (0.50%) of the Gross Proceeds from the sale of Saleable Non-Merchandise, which is comprised of the categories of goods identified on Exhibit B to the Consulting Agreement that are sold in the ordinary course by the Merchant, but are not included as Inventory in the Merchant's books and records.<br><br>*Incentive Fee.*  For each Tranche of Designated Closing Locations, to the extent that the aggregate amount of Gross Proceeds from the sale of Inventory at such Tranche of Designated Closing Locations exceeds a stipulated initial threshold, then, the Consultants shall be entitled to an additional incentive fee in an amount equal to thirty-five one-hundredths of one percent (0.35%) of Gross Proceeds from the Sale of Inventory and Saleable Non-Merchandise at such Tranche of Designated Closing Locations.   The threshold shall be stipulated by, and subject to the consent of, the Merchant, the Senior Credit Facility Agent, and the DIP Agent.<br><br>*FF&E Fee.*  Consultants shall be paid a fee equal to fifteen percent (15.0%) of the proceeds (net of sales tax) received from sales of FF&E located at the applicable Designated Closing Location during the applicable Sale Term, which fee shall be paid from the proceeds of such sales. |
| **Merchant and Consultants' Insurance Obligations** | Throughout the Sale Term, the Merchant shall maintain casualty and liability insurance policies covering injuries to persons and property at or in connection with the applicable Designated Closing Locations (including, but not limited to, products liability/completed operations, contractual liability, comprehensive public liability, and auto liability insurance) on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000.  Merchant shall cause the Consultants to be named as additional insureds with respect to all such policies. Additionally, throughout the Sale Term, Merchant shall maintain, in such amounts as it currently has in effect, workers' compensation insurance in compliance with all applicable statutory requirements.<br><br>Throughout the Sale Term, the Consultants shall maintain (at the Consultants' expense) casualty and liability insurance policies covering injuries to persons and property at or in connection with the Designated Closing Locations (including, but not limited to, products liability/completed operations, contractual liability, comprehensive public liability, and auto liability insurance) on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000. The Consultants shall name Merchant as an additional insured and loss payee under each such policy.   Additionally, throughout the Sale Term, the Consultants shall maintain workers' compensation insurance in compliance with all applicable statutory requirements. Further, if the Consultants employ or engage third parties to perform any of the Consultants' undertakings with regard to the Consulting Agreement, the Consultants will ensure that such third parties are covered by the Consultants' insurance or maintain all of the same insurance as the Consultants are required to maintain pursuant to section 4(b) of the Consulting Agreement and name the Merchant as an additional insured and loss payee under each policy for such insurance. |

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Indemnification by Consultants** | Each Consultant shall indemnify, defend, and hold Merchant and its directors, officers, members, managers, partners, employees, attorneys, advisors, representatives, lenders, principals, and affiliates (other than such Consultants or its Consultants Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to:  (i) the willful or negligent acts or omissions of such Consultants or such Consultants Indemnified Parties; (ii) such Consultants' breach of any provision of, or the failure to perform any obligation under, the Consulting Agreement; (iii) any liability or other claims made by such Consultants Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to such Consultants' conduct of the Sales or provision of Services, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (iv) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any Merchant Indemnified Parties, or of Merchant's customers, by such Consultants or any of such Consultants Indemnified Parties; (v) any claims made by any party engaged by such Consultants as an employee, agent, representative, or independent contractor arising out of such engagement; and (vi) sales of Additional Consultant Goods. |
| **Indemnification by Merchant** | Merchant shall indemnify and hold Consultants and its officers, directors, principals, shareholders, affiliates, members, Consultants, advisors, and employees (collectively, "<u>Consultants Indemnified Parties</u>") harmless from and against all losses, liabilities, claims, demands, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to: (i) the negligence, intentional or unlawful acts or omissions of the Merchant or his Consultants, advisors, employees, representatives, and principals (other than Consultants Indemnified Parties); (ii) Merchant's breach of any provision of, or the failure to perform any obligation under the Consulting Agreement; (iii) Merchant's failure to (A) timely pay any taxes required under applicable law to be paid by Merchant in connection with the Services and/or Sales at Designated Closing Locations, or (B) timely file with the requisite taxing authorities all related reports and other documents required by applicable law to be filed with or delivered to such taxing authorities; (iv) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of either Consultants or the Consultants Indemnified Parties by Merchant or any Merchant Indemnified Parties; and (v) any consumer warranty or products liability claims relating to any Merchant-owned assets sold pursuant to sections 2(c) or 2(e) of the Consulting Agreement. |

## III.    The Sale Guidelines.

18.    To maximize the value of Pharmacy Assets and Non-Pharmacy Assets (together, the "<u>Closing Location Assets</u>") and effectuate the Store Closings, the Debtors seek approval of streamlined procedures to sell the Closing Location Assets free and clear of all liens, claims, and encumbrances.

19.    As set forth below, the Sale Guidelines are substantially similar to sale guidelines approved in pharmacy and/or retail bankruptcies across the United States, including in the 2023

Cases.[10]  The Debtors also seek approval of the Sale Guidelines to procure newspaper and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales, as applicable, in compliance with applicable law and with the Court's approval.  The Debtors seek interim approval of the Sale Guidelines to allow the continuation and commencement of the Sales at the Closing Locations.

20.    The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Closing Location Assets and, as a result, will maximize value to the estates.

**IV.    Liquidation Sale Laws and Dispute Resolution Procedures.**

21.    Certain jurisdictions in which the Debtors operate stores and/or distribution centers have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other Inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws").  The Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions that would otherwise apply to the Location Closings or the Sales.  Such requirements and limitations hamper the Debtors' ability to maximize value in selling the Closing Location Assets.  Subject to the Court's approval, the Debtors intend to conduct

---

[10]    *See Interim Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and, (II) Granting Related Relief,* No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 17, 2023) [Docket No. 121]; *Final Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and, (II) Granting Related Relief,* No. 23-18993 (MBK) (Bankr. D.N.J. Nov. 20, 2023) [Docket No. 709]; and *Amended Final Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and, (II) Granting Related Relief,* No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 29, 2024) [Docket No. 1648].

the Location Closings in accordance with the Sale Guidelines, and to the extent the Sale Guidelines conflict with any Liquidation Sale Laws, the Sale Guidelines shall control.

22.    For the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the application of the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court approve and authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Interim Order and the Final Order:

    i.    Provided that the Sales are conducted in accordance with the Interim Order, the Final Order, and the Sale Guidelines, the Debtors, the Consultants, and the Debtors' landlords shall be deemed to be in compliance with any requirements of any and all county, parish, municipal, or other local government and state Liquidation Sale Laws that would otherwise apply to the Closing Location, the Location Closings, or the Sales; *provided* that the term "Liquidation Sale Laws" shall not include any public health or safety laws of any state (collectively, the "Safety Laws"), and the Debtors and the Consultants shall continue to be required to comply with applicable Safety Laws and applicable General Laws (as defined in the Interim Order and the Final Order), subject to any applicable provisions of the Bankruptcy Code and federal law, and nothing in the Interim Order or the Final Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

    ii.    Within five (5) business days after entry of the Interim Order, the Debtors will serve by first-class mail copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the Board of Pharmacy's office for each state where a Closing Location is located; (c) the county consumer protection agency or similar agency for each county where the Sales are being held; (d) the division of consumer protection for each state where the Sales are being held; (e) the landlords, and known counsel for the landlords if any, for the Closing Locations; and (f) the subtenants (if any) under the leases with respect to the Closing Locations (collectively, the "Dispute Notice Parties").

    iii.    With respect to any Additional Closing Locations, within five (5) business days after filing any Additional Closing Location List (as defined below) with the Court, the Debtors will serve copies of the Additional Closing Location List, the Interim Order or the Final Order (if entered), the Consulting Agreement, and the Sale Guidelines on the applicable Dispute Notice Parties.

iv.    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, the Final Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve such Reserved Dispute.  Any time within ten (10) calendar days following entry of the Interim Order or the service of an Additional Closing Location List, any Governmental Unit may assert that a Reserved Dispute exists by serving a notice (a "Dispute Notice") explaining the nature of the dispute on:  (a) the Debtors' proposed co-counsel, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn:  Alice Belisle Eaton (aeaton@paulweiss.com); Christopher Hopkins (chopkins@paulweiss.com); and Nick Krislov (nkrislov@paulweiss.com)) and (ii) Cole Schotz, P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601 (Attn:  Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (FYudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com)); (b) the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn:  Jeffrey M. Sponder and Lauren Bielskie; (c) counsel to the Senior Credit Facility Agent and the DIP Agent, (i) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: John F. Ventola (jventola@choate.com), Jonathan D. Marshall (jmarshall@choate.com) and Mark D. Silva (msilva@choate.com)) and (ii) Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, NJ 07932 (Attn: Alan J. Brody (brodya@gtlaw.com) and Julia Frost-Davies (julia.frostdavies@gtlaw.com)); (d) counsel to the Consultants, (i) Leichtman Law PLLC, 185 Madison Avenue, 15th Floor, New York, NY 10016 (Attn:  Maura I. Russell (mrussell@leichtmanlaw.com)) and (ii) Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn:  Jeffrey Cohen (jcohen@lowenstein.com) and Andrew Behlmann (abehlmann@lowenstein.com)); (e) counsel to any statutory committee appointed in these chapter 11 cases; and (f) the affected landlord(s) or their known counsel (collectively, the "Dispute Resolution Notice Parties").  If the Debtors and a Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) calendar days after service of the Dispute Notice on the Dispute Resolution Notice Parties, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (such motion, a  "Dispute Resolution Motion").

v.    If a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (a) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (b) that neither the terms of the Interim Order nor the Final Order, nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws.  The filing of a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct any Sales or Location Closings pursuant to the Interim Order or the Final Order, as applicable, absent further order of the Court.  Upon entry of the Interim Order or Final Order, the Debtors and the

Consultants shall be authorized to conduct the Sales and Location Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines, and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.   If, at any time, a dispute arises between the Debtors and/or the Consultants and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## V.   Fast Pay Laws.

23.   Several states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (such laws and regulations, collectively, the "Fast Pay Laws," and together with the Liquidation Sale Laws, the "Applicable State Laws").  These Fast Pay Laws often require payment to occur immediately or within a period of only a few days from the date an employee's employment is terminated.

24.   The nature of the contemplated Location Closings is expected to result in the termination of certain Closing Location employees' employment during the Store Closings.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and in accordance with their ordinary course payroll procedures.  The Debtors' payroll systems, however, may be unable to process the payroll information associated with these terminations in a manner compliant with applicable Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final payments to coincide with an employee's final day of work where required by applicable law.  This process requires the Debtors' payroll

department to calculate individual payments upon termination, prepare each termination payment,

obtain authorization for each such payment, and then prepare each such payment for disbursement.

Given the number of employees who will be terminated during the Store Closings, this process

could easily take several days, making compliance with the Fast Pay Laws burdensome to the

Debtors' estates, if not impossible.  Accordingly, the Debtors request a waiver of compliance with

the applicable Fast Pay Laws to the extent the Debtors' payroll systems limit their ability to comply

with the same.

**VI.    Contractual Restrictions.**

25.    The Debtors also respectfully request a waiver of any contractual restrictions that

could otherwise inhibit or prevent the Debtors from maximizing value through the Location

Closings and Sales.  In certain cases, the contemplated Location Closings and Sales may be

inconsistent with certain provisions of leases, subleases, licenses, or other agreements or

documents applicable to the premises in or upon which the Debtors operate, including (without

limitation) reciprocal easement agreements, agreements containing covenants, conditions, and

restrictions (*e.g.*, "go dark" provisions and landlord recapture rights), or other similar agreements,

documents, or provisions or may otherwise impact the Debtors' ability to effectuate the Location

Closings and Sales (collectively, "Contractual Restrictions").  Such Contractual Restrictions may

also hamper the Debtors' ability to maximize value in selling Closing Location Assets.

26.    The Debtors also request that no person or entity, including, without limitation, any

utility providers, landlords, shopping center managers and personnel, licensors, creditors, and all

persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the

Location Closings or the Sales, or institute any action against the Debtors in any court (other than

in this Court) or before any administrative body that in any way, directly or indirectly, interferes

with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales, or the

advertising and promotion (including through the posting of signs) of the Location Closings and Sales.

**VII.    Abandonment.**

27.    The Debtors respectfully request that the Court authorize the abandonment of certain Debtor owned Non- Pharmacy Assets remaining in the Closing Locations.  The Debtors intend to sell any marketable Debtor owned Non-Pharmacy Assets present in the Closing Locations.  In certain cases, however, the Debtors may determine that the costs associated with holding or selling such property exceeds the value of the proceeds that will be realized from its sale—or that such property may not be saleable at all.  In such cases, retaining such Non-Pharmacy Assets would be burdensome to the Debtors' estate and the disposition of such property would be of inconsequential value.  For the avoidance of doubt, the Debtors will not sell any personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, bank account number, and credit or debit card number) as part of the Store Closings, and all personal identifying information will be removed from any Non-Pharmacy Assets prior to the abandonment of the same.  Accordingly, the Debtors respectfully submit that abandonment of such non-saleable or limited value property is in the best interests of their estates and request that the Court authorize the Debtors to do so where the Debtors determine in their business judgment that abandonment is the appropriate course of action.

## Basis for Relief

**I.    The Debtors Have a Valid Business Justification to Assume and Perform Under the Consulting Agreement.**

28.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Glob. Holdings. Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was a product of bad faith, whim, or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

29.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp,* v. *West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984)).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co.* v. *Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

30.     Assumption of and performance under the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment.  In consultation with their advisors, the Debtors have determined that the Initial Closing Locations are unlikely to receive a value-maximizing bid, and further, that the Closing Location Assets should be efficiently monetized for the benefit of the Debtors' estates and their creditors.  The Debtors believe the store-closing process contemplated by the Consulting Agreement and the Sale Guidelines will maximize the value of the Closing Location Assets.  Further, after arm's-length

negotiations, the Consulting Agreement contains the most favorable terms available under the circumstances.

31.     By continuing the engagement of the Consultants, the Debtors determined that they could capitalize on the knowledge and expertise of consultants already familiar with the Debtors' stores and operations, as well as the process of monetizing the Debtors' unique inventory and store assets, in order to ultimately deliver the best results for the Debtors' estates and creditors.  The Consultants have extensive expertise in conducting similar sales and can oversee, and assist in the management and implementation of, the Sales in an efficient and cost-effective manner. Assumption and performance under the Consulting Agreement will enable the Debtors to utilize the Consultants' skills and resources to efficiently conduct the Sales for the benefit of all stakeholders.

32.     If the Debtors are not authorized to assume and perform under the Consulting Agreement on an interim basis, their stakeholders could be substantially harmed.  For example, the Debtors' estates would lose the benefit of the momentum and preparation that has already been started by the Consultants in preparation for the Sales, and the Sales would lose the benefit of the Consultants' oversight and might be delayed, leading to the loss of additional liquidity and increased administrative expenses.  Further, given the number of stores and the Consultants' knowledge of the Debtors' business operations and prepetition preparation for the Sales, the Debtors believe the Consultants are best suited to conduct the process efficiently and effectively. Accordingly, the Debtors respectfully request that the Court authorize their assumption of the Consulting Agreement.

## II.    The Sale of Closing Location Assets Should Be Approved.

33.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession may enter into transactions, including the use, sale, or lease of property in the ordinary

course of business, without notice or a hearing.  11 U.S.C. § 363(c)(1).  With respect to Sales of

Pharmacy Assets, the Debtors submit that such Sales are authorized without notice or hearing

pursuant to section 363(c) of the Bankruptcy Code as sales in the "ordinary course of business,"

given the Debtors' well-established prepetition practices described above.  *See* 11 U.S.C. § 363(c).

The Debtors are nonetheless requesting authority to conduct Sales of Pharmacy Assets by this

motion out of an abundance of caution.

34.    In the alternative, "[t]he [debtor in possession], after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C.

§ 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor must

articulate a valid business justification to obtain court approval.  *See, e.g.*, *Myers* v. *Martin*

*(In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788

F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re*

*Lionel Corp.*, 722 F.2d 1063 and requiring good faith).  When a debtor demonstrates a valid

business justification for a decision, a strong presumption arises "that in making [the] business

decision the directors of [the company] acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company."  *Off. Comm. of Subordinated*

*Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1992) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11).[11]

---

[11]    To the extent that Sales of Pharmacy Assets described herein may constitute private sales, Bankruptcy Rule
6004(f) permits a debtor to conduct a private sale pursuant to section 363 of the Bankruptcy Code.  Fed. Bankr.
P. 6004(f)(1). *See In re MTE Holdings LLC*, No. 19-12269 (CTG), 2021 WL 3743201, at *6 (Bankr. D. Del.
Aug. 17, 2021) ("While the Bankruptcy Code requires court approval of a sale of estate property outside the
ordinary course of a debtor's business . . . it does not by its terms require an auction."); *see also In re The Great
Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are
. . . conditioned on such a requirement [a formal auction], which does not appear in the Bankruptcy Code or
Bankruptcy Rules."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) (noting
that "there is no prohibition against a private sale . . . and there is no requirement that the sale be by public
auction"); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15,
2007) ("[s]ales of property rights outside the ordinary course of business may be by private sale or public

35.     Store closing or asset monetization processes are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *In re Rite Aid Corporation, et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Nov. 20, 2023) (authorizing procedures for store closing sales); *see also In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Liberated Brands LLC, et al.*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 5, 2025) (same); *In re Party City Holdco Inc., et al.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. June 7, 2023) (same).[12]

36.     Sufficient business justification exists to approve the proposed Sales of the Closing Location Assets under section 363(b)(1).[13]    First, the Debtors believe that permitting the continuation and completion of ordinary course Pharmacy Asset sales will allow the Debtors to transfer prescriptions in bulk in an orderly and efficient manner that minimizes the risk of compromising an individual customer's access to medications and, more generally, disrupting

---

auction."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 (N.D. Ill. 1988) ("[s]ection 363(b) is not limited to sales involving competitive bidding. Bankruptcy Rule 6004, which sets forth procedures for section 363(b) transfers, expressly provides for private sales."). Accordingly, in light of Bankruptcy Rule 6004(f) and the case law regarding section 363 sales, a debtor may conduct a private sale if a business reason exists. *See In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"). Indeed, courts in this and other districts have approved private sales of estate property pursuant to section 363(b)(1) of the Bankruptcy Code when there has been a valid business reason for not conducting an auction, including in the 2023 Cases. *See In re Rite Aid Corporation, et al.*, No. 2318993 (MBK) (Bankr. D.N.J. Aug. 29, 2024) (Order) (approving private sale of real estate); *In re J. C. Penney Company, Inc.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. Oct. 20, 2020) [Docket No. 1814] (approving private sale of debtors operating business, after debtors' market test indicated a public auction would not yield a better outcome); *In re Watertech Holdings, LLC*, 619 B.R. 324, 335 (Bankr. D.S.C. 2020) (explaining sales outside the ordinary course of business may be conducted through either a public auction or a private sale, provided that there is a sound business justification); *In re GSC, Inc.*, 453 B.R. 132, 164 (Bankr. S.D.N.Y. 2011) (the court approved a quick sale of assets used in the investment management business in a "melting ice cube" situation to prevent further losses, emphasizing the need to preserve the going-concern value).

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

[13]    With respect to sales of Inventory and Pharmacy Assets, the Debtors submit that such sales are authorized without notice or hearing pursuant to section 363(c) of the Bankruptcy Code as sales in the "ordinary course of business," given the Debtors' well-established prepetition store closing process. *See* 11 U.S.C. § 363(c). The Debtors are nonetheless requesting authority to conduct sales of Inventory and Pharmacy Assets by this motion out of an abundance of caution.

pharmacy healthcare systems across the country.  As discussed in the First Day Declaration, due to the practical realities of transferring prescription files and pharmacy care, as well as the scale of the Debtors' pharmacy business, the Debtors believe that an orderly process is necessary to facilitate successful transitions for their millions of pharmacy customers.  The Debtors believe that consummation of ordinary course Pharmacy Asset sales without delay will maximize the chance that *all* customers at the associated Closing Locations will have their prescriptions and services successfully transferred to another provider without interruption to care.

37.     In addition, the Debtors, with the assistance of their advisors, have determined that the Sales represent the best alternative to monetize the Closing Location Assets and maximize the value received by the Debtors on account thereof for several reasons.  First, the Initial Closing Locations consist of underperforming store locations that the Debtors have determined are unlikely to form part of any value-maximizing bids from potential third-party acquirors for all of substantially all of the Debtors' remaining assets.  In addition, any delay or interruption in the closing of the Initial Closing Locations could cause the Debtors to incur incremental costs including those related to rent, labor, spoilage, and shrinkage, and defer the Debtors' ability to generate cash from the monetization of Closing Location Assets, whereas the timely continuation and completion of the closing of the Initial Closing Locations will improve near-term liquidity and allow the Debtors to focus on other initiatives.  Finally, uninterrupted and orderly Sales will allow the Debtors to timely reject or assume and assign leases associated with the Closing Locations and, therefore, avoid the accrual of millions of dollars of unnecessary administrative expenses for rent and related costs.

### III.    The Court Should Approve the Sale Guidelines.

38.     The Court may authorize the Debtors to consummate the Location Closings pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 105(a) codifies the

Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Third Circuit has recognized that section 105(a) of the Bankruptcy Code confers bankruptcy courts with broad authority to enter orders to carry out other provisions of the Bankruptcy Code, provided the bankruptcy court does not authorize an action prohibited elsewhere in the Bankruptcy Code. *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010). Under section 105(a), courts may authorize any action that is essential to the continued operation of a debtor's businesses. *See, e.g.*, *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (holding that a court may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (same). Further, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store Closings, the Debtors need only show a legitimate business justification for the proposed action. *See, e.g.*, *In re Martin*, 91 F.3d at 395 (citation omitted).

39.     The relief requested by this motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The major premise of chapter 11 is the continued and uninterrupted operation of the debtor in possession and the maximization of the value of the estate. Thus, the relief requested herein furthers the provisions of the Bankruptcy Code. *See Gillman* v. *Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 211 (3d Cir. 2000) (stating that section 105(a) supplements specifically enumerated bankruptcy court powers). Moreover, the Debtors believe that the Sale Guidelines represent the most efficient and

26

appropriate means of maximizing the value of the Closing Location Assets, while balancing the potentially competing concerns of landlords and other parties in interest.

40.     Furthermore, ample business justification exists to conduct the Store Closings. Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of their store footprint to identify specific store locations for near-term closure to eliminate their ongoing negative impact on the Debtors' financial performance and to improve the Debtors' liquidity. This process has resulted in the Debtors' identification of the Initial Closing Locations and is ongoing with respect to the identification of any Additional Closing Locations.

41.     Delay in consummating the Location Closings would diminish the value realized through monetization of the Closing Location Assets for a number of reasons, chief among them that the Closing Locations are a drain on liquidity. Thus, the Debtors will realize a near-term liquidity improvement upon the sale of the Closing Location Assets and the termination of operations at the Closing Locations. Further, the swift and orderly consummation of the Location Closings will allow the Debtors to timely reject or assume and assign the applicable leases for such premises, and therefore avoid the accrual of unnecessary administrative expenses for rent payment. Delaying the Location Closings may cause the Debtors to incur postpetition rent obligations at many of these stores. Additionally, given the Debtors' current section 365(d)(4) deadline, there is a finite number of days that the Sales can run without obtaining further consents from landlords (or further relief from the Court).

42.     Courts in this and other districts have routinely approved sale guidelines in chapter 11 cases, including for assets such as the Pharmacy Assets, and numerous courts have granted retail debtors authority to implement such guidelines. *See, e.g.*, *In re Rite Aid Corporation, et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Nov. 20, 2023) (authorizing the debtors, pursuant to sections 105(a) and 363(b), to conduct store closings in accordance with

court-approved sale guidelines); *see also In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Liberated Brands LLC, et al.*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 5, 2025) (same); *In re Party City Holdco Inc., et al.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) (same); *In re David's Bridal, LLC, et al.*, No. 23-13131 (CMG) (Bankr. D.N.J. July 14, 2023) (same).[14]   The Sale Guidelines are substantially similar to sale procedures approved in the foregoing cases.

IV.   **The Court Should Approve the Sale of Closing Location Assets Free and Clear of All Liens, Encumbrances, and Other Interests Under Section 363(f) of the Bankruptcy Code.**

43.     The Debtors request approval to sell the Closing Location Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:   (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc.* v. *Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).   Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.   *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

---

[14]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed co-counsel.

44.     Although the term "any interest" is not defined in the Bankruptcy Code, the Third

Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

other obligations that may flow from ownership of the property." *Folger Adam Security,*

*Inc.* v. *DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth Circuit

held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval

by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests

in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of

successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d

at 258.

45.     To the extent there are any liens on the Closing Location Assets, the Debtors

anticipate that all holders of such liens will consent to the Sales because they provide the most

effective, efficient, and timely approach to realizing proceeds for, among other things, the

repayment of amounts due to such parties.  Subject to the terms of the DIP Orders, any and all

liens on the Closing Location Assets sold through the Sales would attach to the remaining net

proceeds of such sales with the same force, effect, and priority as such liens currently have on such

assets, subject to the rights and defenses, if any, of the Debtors and of any other party in interest

with respect thereto.

46.     Moreover, all identified lienholders will receive sufficient notice and will be given

sufficient opportunity to object to the relief requested on a final basis.  Any such entity that does

not object to the applicable Sale should be deemed to have consented.  *See FutureSource LLC* v.

*Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the

conditions under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course there is

notice) counts as consent.").

47.     Accordingly, the Sales of the Closing Location Assets satisfy the requirements of

section 363(f) of the Bankruptcy Code and should, therefore, be free and clear of any liens, claims,

encumbrances, and other interests.

**V.      The Court Should Waive Compliance with Applicable State Laws and Approve the
Dispute Resolution Procedures.**

48.     The Debtors' ability to conduct the Sales in accordance with the Sale Guidelines

and without complying with Liquidation Sale Laws is critical to the Sales' success.  Although the

Debtors intend to comply with state and local health and safety laws and consumer protection laws

in conducting the Sales (including with respect to sales of Pharmacy Assets), many

Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and

other procedures for store closing, liquidation, or similar sales.  Additionally, compliance with

Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that

likely would be detrimental to the conduct of these chapter 11 cases.  These restrictions would

impair the value realizable through the Sales.

49.     To eliminate the time, delay, and expense associated with the administrative actions

and procedures necessary to comply with Liquidation Sale Laws, the Debtors propose to use the

Sale Guidelines to streamline the administrative burdens on their estates, while still adequately

protecting the broad and varied interests of both landlords and applicable governmental agencies

charged with enforcing any Liquidation Sale Laws that may apply to the Location Closings or the

Sales.  The Debtors believe the Sale Guidelines mitigate any concerns that their landlords or any

governmental agencies may raise with respect to the Location Closings or the Sales, and therefore,

submit that the requested relief complies with Liquidation Sale Laws.

50.     Creditors and the public interest are adequately protected by notice of this motion

and the ongoing jurisdiction and supervision of this Court because the Debtors are only seeking

interim relief, and parties in interest will be able to raise any further issues at the final hearing. Moreover, 28 U.S.C. § 959, which requires debtors to comply with state and other laws in performance of their duties, does not apply to the Sales. *See, e.g.*, *In re Borne Chemical Co.*, 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is only applicable when property is being managed or operated for the purpose of continuing operations). As such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords, other creditors, or governmental agencies may raise with respect to the Sales, and therefore, the waiver of certain state and local laws and lease provisions is appropriate.

51.    There is strong support for granting the Debtors the authority to not comply with Liquidation Sale Laws, subject to the Sale Guidelines. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with Liquidation Sale Laws. *See, e.g.*, N.Y. Gen. Bus. Law § 584(a) (so providing); 53 Pa. Stat. § 4471-5(a)(1) (same). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Location Closings to proceed notwithstanding any contrary Liquidation Sale Laws as they are essential to the continued operation of the Debtors' business. *Third*, this Court will be able to supervise the Location Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. Accordingly, creditors and the public interest are adequately protected by notice of this motion and the ongoing jurisdiction and supervision of the Court.

52.    Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See In re Shenango Grp., Inc.*, 186 B.R. 623, 625 (Bankr. W.D. Pa. 1995), *subsequently aff'd sub nom. Belcufine* v. *Aloe*, 112 F.3d 633 (3d Cir. 1997) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy

31

code. . . . [A] state statute . . . cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

53. Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc.* v. *Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that the Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). Nevertheless, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety.").

54. Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the Bankruptcy Code's fundamental value-maximization imperative by placing constraints on the Debtors' ability to maximize the value of estate assets for the benefit of creditors. Accordingly, authorizing the Sales without the delays and burdens associated with compliance with Liquidation Sale Laws is necessary and appropriate. The Debtors do not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Sales. Moreover, with the exception of the limited waivers and accommodations requested herein, the Debtors will comply with applicable state and local public health and safety laws (including with respect to sales of Pharmacy Assets), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an orderly means for resolving any disputes

32

arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

55.     Courts in this district, and in other districts, have recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *In re Rite Aid Corporation, et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 29, 2024) (authorizing debtors to conduct store closing sales under the terms of the order and finding that "no further approval, license, or permit of any Governmental Unit shall be required"); *see also In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Liberated Brands LLC, et al.*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 5, 2025) (same); *In re Party City Holdco Inc., et al.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) (same); *In re David's Bridal, LLC, et al.*, No. 23-13131 (CMG) (Bankr. D.N.J. July 14, 2023) (same).[15]

56.     Courts have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances. *See, e.g.*, *In re Rite Aid Corporation, et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 29, 2024) (granting relief from federal, state, or local laws including "any fast pay laws" in connection with store closing sales); *see also In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Liberated Brands LLC, et al.*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 5, 2025) (same); *In re Party City Holdco Inc., et al.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. June 7, 2023) (same).[16]

---

[15]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

[16]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## VI.     The Court Should Waive Compliance with Contractual Restrictions.

57.     Certain of the Debtors' leases governing the premises of the Closing Locations and other contracts may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (determining that enforcement of such lease restrictions would "contravene overriding federal policy requiring [the debtor] to maximize estate assets"); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in a chapter 11 case where the debtor sought to conduct a liquidation sale).

58.     Courts in this district and others have held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re  Rite Aid Corporation, et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Nov. 20, 2023) (ordering that restrictive lease provisions shall not be enforceable in conjunction with store closings); *see also In re Joann Inc., et al.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Liberated Brands LLC, et al.*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 5, 2025) (same); *In re Party City Holdco Inc., et*

*al.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) (same); *In re Bed Bath & Beyond Inc.*,

No. 23-13359 (VFP) (Bankr. D.N.J. June 7, 2023) (same).

59.     Thus, to the extent that such provisions or restrictions exist in any of the leases of

the Closing Locations or other contracts, the Debtors request that the Court authorize the Debtors

to conduct the Sales at the Closing Locations without interference by any landlords or other

persons affected, directly or indirectly, by the Sales.

**VII.    The Court Should Approve the Abandonment of Certain Property in Connection
with Any Store Closings.**

60.     After notice and a hearing, a debtor "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C.

§ 554(a); *see also Hanover Ins. Co.* v. *Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating

that a trustee "may abandon his claim to any asset, including a cause of action, he deems less

valuable than the cost of asserting that claim").   The right to abandon property is virtually

unfettered, unless:   (a) abandonment of the property will contravene laws designed to protect

public health and safety; or (b) the property poses an imminent threat to the public's welfare.  *See*

*In re Midlantic Nat'l Bank*, 474 U.S. 494, 501 (1986).  Neither of these limitations is relevant here.

61.     The Debtors are seeking to sell all Debtor-owned Non-Pharmacy Assets in the

Closing Locations.  In certain cases, however, the Debtors may determine that the costs associated

with holding or selling certain Non-Pharmacy Assets exceeds the proceeds that will be realized

upon their sale, or that such property is not sellable at all.   In such event, such property is of

inconsequential value and benefit to the estates and/or may be burdensome to retain.

62.     To maximize the value of the Debtors' assets and to minimize the costs to the

estates, the Debtors respectfully request authority to abandon any of remaining Non-Pharmacy

Assets located at any of the Closing Locations without incurring liability to any person or entity,

including to the extent the owner of any applicable FF&E does not seek to reclaim it on or before the date on which the Debtors vacate the Closing Location at which any such FF&E is located. The Debtors further request that the landlord of each Closing Location with any abandoned Non-Pharmacy Assets be authorized to dispose of such property without liability to any third parties.

63.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, bank account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VIII.    The Court Should Approve the Procedures Relating to Additional Closing Locations.

64.     The Debtors request that the Sale Guidelines, the Interim Order, and the Final Order apply to any Additional Closing Locations.  In order to provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Locations, to the extent that the Debtors seek to conduct closings (and related Sales) at any Additional Closing Location, the Debtors will file a list of such Additional Closing Locations with the Court (each such list, an "Additional Closing Location List"), and serve a notice of their intent to conduct the applicable Sales at the Additional Closing Locations on the applicable Dispute Notice Parties, including applicable landlords (the "Additional Closing Location Landlords"), and any other interested parties by email (to the extent available to the Debtors), or overnight mail within five (5) business days of filing the Additional Closing Location List.  With respect to any Additional Closing

Location Landlords, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Location (or at the last known address available to the Debtors).

65.    The Debtors propose that the Additional Closing Location Landlords (each of whom will have already been served with this motion, the Interim Order, and the Final Order) and any interested parties have five (5) calendar days after service of the applicable Additional Closing Location List to object to the application of the relevant order to their Closing Locations.  If no timely objections are filed with respect to the application of the relevant order to an Additional Closing Location, then the Debtors should be authorized, pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code to proceed with conducting the Location Closing and Sales at the Additional Closing Location in accordance with the relevant order and the Sale Guidelines.  If any objections are filed with respect to the application of the Interim Order or Final Order to an Additional Closing Location, and such objections are not resolved, such objections and the application of the relevant order to the Additional Closing Location will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of the Debtors to seek relief on an emergency basis on shortened notice, to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders.

**IX.    The Sale of Personally Identifiable Information Does Not Require, and Should Be Allowed Without, the Appointment of a Consumer Privacy Ombudsman.**

66.    Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" ("Personally Identifiable Information") as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual.  11 U.S.C. § 101(41A).

Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") only when a debtor seeks to sell or transfer Personally Identifiable Information in contravention of the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information.  *See* 11 U.S.C. § 363 (b)(1)(A).

67.    As explained in the Frejka Declaration, the contemplated Sales of Closing Location Assets, including Pharmacy Assets, are consistent with the Debtors' applicable privacy policies and therefore do not necessitate appointment of an Ombudsman under section 332 of the Bankruptcy Code.

68.    The Debtors' umbrella privacy policy, which is publicly available on the Debtors' website at:  https://www.riteaid.com/legal/privacy-policy, and would be applicable to Personally Identifiable Information transfers in connection with Store Closings, provides, in pertinent part, as follows:

> We also may disclose information about you in certain unusual circumstances, including (1) if we are required to do so by law or legal process; (2) in response to requests by government agencies, such as law enforcement authorities; (3) to establish, exercise, or defend our legal rights; (4) when we believe disclosure is necessary or appropriate to prevent physical or other harm or financial loss; (5) in connection with an investigation of suspected or actual fraud or other illegal activity; or (6) in the event we sell or transfer (or contemplate the sale or transfer of) all or a relevant portion of our business or assets (including in the event of a merger, acquisition, joint venture, reorganization, divestiture, dissolution, or liquidation).

Additionally, the Debtors have a specific patient privacy policy, also publicly available on the Debtors' website at:  https://www.riteaid.com/legal/patient-privacy-policy, that provides, in pertinent part:

> We will use your protected health information to carry out health care operations. These uses and disclosures are necessary to run the pharmacy and to make sure that all of our patients receive quality care.  For example, we may use your protected health information to monitor the quality of pharmacist performance and to train pharmacy personnel.  Your protected health information may also be transferred

for the purposes of carrying out pharmacy services if we buy or sell pharmacy locations.

69.     Based on the language of these privacy policies, section 363(b)(1) is not implicated because the Debtors do not disclose to any "individual a policy *prohibiting* the transfer of personally identifiable information."  *See* 11 U.S.C. § 363(b)(2) (emphasis added).  Indeed, the Debtors' privacy policies expressly permit transfer and disclosure of Personally Identifiable Information in connection with assets sales and buying and selling pharmacy locations.  But even if section 363(b)(1) were implicated, the Court may authorize the proposed Sales without appointing an Ombudsman because the transfer of the "personally identifiable information" through the Sales is consistent with the Debtors' privacy policies as provided in 11 U.S.C § 363(b)(1).

70.     The transfer of Personally Identifiable Information is further consistent with the Debtors' privacy policies even to the extent the Debtors' privacy policies import requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") relating to transfers of medical information.  The Debtors' patient privacy policy describes how the Debtors maintain and share medical information and is publicly available, as discussed above.  This policy provides that such "protected health information" ("PHI") will not be used or disclosed unless as provided for under the policy, "or as otherwise permitted or required by law."

71.     HIPAA privacy regulations permit the sale of PHI in circumstances where such information is sold by one "covered entity" to another.  *See*, 45 C.F.R. § 164.502(a)(5)(ii) (2014); 45 C.F.R. § 160.103 (2014) (defining "covered entity" as "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.");  *see also In re Great Atl. and Pac. Tea Co, Inc.*, Case No. 15-23007 (Bankr. S.D.N.Y Aug. 23, 2015) (Report of Consumer Privacy Ombudsman) ("The proposed sale of the Pharmacy

Records is therefore permitted by law and consistent with the Debtors' privacy practices") (*citing* 45 C.F.R. § 164.502(a)(5)(ii) (2014)). The Debtors expect that, where applicable, buyers of Closing Location Assets containing PHI, such as buyers of Pharmacy Assets, will be "covered entities," such as other pharmacies, under the applicable HIPAA regulations. In turn, because the sale of PHI is permitted under applicable HIPAA regulations, the sale of such personal identifiable information (which may also include PHI) is therefore permissible and consistent with the Debtors' patient privacy policy as provided in section 363(b)(1) of the Bankruptcy Code. Accordingly, the contemplated Sales of Closing Location Assets, including Pharmacy Assets, do not necessitate the appointment of an Ombudsman in these chapter 11 cases.

### The Requirements of Bankruptcy Rule 6003(a) Are Satisfied

72.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) calendar days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this motion, the Debtors' continuation and timely commencement of the Sales and Store Closings, as well as assumption and performance under the Consulting Agreement, are critical to maximizing the value of the Debtors' saleable assets, and any delay in granting the relief requested could result in material erosion of such value and cause irreparable harm to the Debtors' estates. Furthermore, failure to receive the requested relief during the first thirty (30) calendar days of these chapter 11 cases entails the same risk. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

73.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

## Waiver of Memorandum of Law

74.    The Debtors respectfully request that the Court waive the requirement to file a

separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon

which the Debtors rely is set forth herein and the motion does not raise any novel issues of law.

## Reservation of Rights

75.    Nothing contained in this motion or any order granting the relief requested in this

motion, and no action taken pursuant to the relief requested or granted (including any payment

made in accordance with any such order), is intended as or shall be construed or deemed to be:

(a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under

the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any

other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to

pay any particular claim; (d) an implication, admission, or finding that any particular claim is an

administrative expense claim, other priority claim, or otherwise of a type specified or defined in

this motion or any order granting the relief requested by this motion; (e) a request or authorization

to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the

Bankruptcy Code (other than the Consulting Agreement); (f) an admission as to the validity,

priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on

property of the Debtors' estates other than the first priority lien and security interests being granted

to the Consultants under the Consulting Agreement; or (g) a waiver or limitation of any claims,

causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

**No Prior Request**

76.     No prior request for the relief sought in this motion has been made to this or any other court.

**Notice**

77.     The Debtors will provide notice of this motion to the following parties and/or their respective counsel, as applicable:  (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the Senior Credit Facility Agent and counsel thereto; (d) the DIP Agent and counsel thereto; (e) the trustees for the Senior Secured Notes and counsel thereto; (f) the United States Attorney's Office for the District of New Jersey; (g) the Internal Revenue Service; (h) the attorneys general in the states where the Debtors conduct their business operations; (i) the Consultants and counsel thereto; (j) the landlords for the Initial Closing Locations; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  May 6, 2025

/s/  Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:        msirota@coleschotz.com
                 wusatine@coleschotz.com
                 fyudkin@coleschotz.com
                 svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (*pro hac vice* pending)
Alice Belisle Eaton (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Sean A. Mitchell (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  arosenberg@paulweiss.com
aeaton@paulweiss.com
                 chopkins@paulweiss.com
                 smitchell@paulweiss.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

[*To be filed in advance of hearing*]

## Schedule 1

**Consulting Agreement**

 

April 3, 2025

Steven Bixler
Chief Financial Officer
New Rite Aid, LLC
200 Newberry Commons
Etters, PA 17319

Re:  Consulting Engagement/Agreement

Dear Mr. Bixler:

    This consulting agreement (together with all exhibits hereto, this "Agreement") confirms the understanding and agreement (a) among SB360 Capital Partners, LLC ("SB360") and Hilco Merchant Resources, LLC ("Hilco," and, together with SB360, the "Consultants"), on the one hand, and New Rite Aid, LLC (on behalf of itself and its wholly-owned direct and indirect subsidiaries) (collectively, the "Merchant"), on the other hand, and (b) regarding the Merchant's engagement of the Consultants as the exclusive providers of certain consulting services, on the terms and conditions set forth in this Agreement (the "Consulting Engagement").  Capitalized terms used in this Agreement have the meanings ascribed to them in this Agreement.  This Agreement refers to the Merchant, SB360, and Hilco each, as a "Party" and collectively, as the "Parties."

    In accordance with the contractual joint venture between the Consultants, (a) principals of SB360 will lead the Consulting Engagement and (b) principals of each of the Consultants will collaborate to provide all services necessary for the Consulting Engagement, with the assistance of additional personnel of the Consultants possessing the requisite skills and experience necessary to achieve the objectives of the Consulting Engagement in the most expeditious and effective manner.  For the avoidance of doubt, the Merchant will have full decision-making authority with respect to all matters within the scope of this Agreement.

1. **Certain Defined Terms.**

    (a)    "Additional Consultant Goods" shall have the meaning set forth in Section 2(g) of this Agreement.

    (b)    "Additional Consultant Goods Proceeds" shall have the meaning set forth in Section 2(g) of this Agreement.

    (c)    "Advertising Materials" shall have the meaning set forth in Section 7(d).

    (d)    "Agreement Effective Date" means April 3, 2025.

(e)    "Approval Order" shall have the meaning set forth in Section 7(c) of this Agreement.

(f)    "Bankruptcy Code" shall have the meaning set forth in Section 7(c) of this Agreement.

(g)    "Bankruptcy Court" shall have the meaning set forth in Section 7(c) of this Agreement.

(h)    "Base Inventory Fee" shall have the meaning set forth in Section 2(d)(i) of this Agreement.

(i)    "Consultant Controlled Expenses" shall have the meaning set forth in Section 2(d) of this Agreement.

(j)    "Consultant Expense Advance" shall have the meaning set forth in Section 7(b) of this Agreement.

(k)    "Cost Value" means, with respect to each item of Inventory sold during the Sale Term, the lowest per unit vendor cost for such item of Inventory in the Merchant's Cost File or in the Merchant's books and records, maintained in the ordinary course consistent with the Merchant's historic practices.

(l)    "Designated Closing Locations" means any Merchant-owned retail store or distribution center locations that are designated in writing for closure by the Merchant pursuant to Section 7(a)(i) of this Agreement.

(m)    "Expenses" means the Consultant Controlled Expenses and any other expenses to be reimbursed by the Merchant to the Consultants pursuant to the terms of this Agreement.

(n)    "Fees" means, collectively, the Merchandising Services Compensation, the Base Inventory Fee, the Incentive Fee (if any), and the FF&E Fee (each as defined herein).

(o)    "FF&E" means all furniture, fixtures, and equipment owned by the Merchant.

(p)    "FF&E Fee" shall have the meaning set forth in Section 2(e)(ii) of this Agreement.

(q)    "Gross Proceeds" shall have the meaning set forth in Section 2(d)(ii) of this Agreement.

(r)    "Gross Recovery Percentage" means the result, expressed as a percentage, of (i) the Gross Proceeds, *divided* by (ii) the sum of the aggregate Cost Value of all of the Inventory sold during the Sale Term at the Designated Closing Locations.

(s)    "Incentive Fee" shall have the meaning set forth in Section 2(d)(i) of this Agreement.

2

(t)     "Inventory" means, as to any Designated Closing Location, all Merchant-owned inventory of such location, excluding any (i) Pharmacy Assets, (ii) Saleable Non-Merchandise, (iii) No Fee Goods, and (iv) Additional Consultant Goods.

(u)     "Inventory Disposition Services" means the services described in Section 2(c) of this Agreement.

(v)     "Legal Fee Advance" shall have the meaning set forth in Section 7(b) of this Agreement.

(w)     "Merchandising Services" means the services described in Section 2(a) of this Agreement.

(x)     "Merchandising Services Compensation" shall have the meaning set forth in Section 2(b) of this Agreement.

(y)     "Merchant's Cost File" means, with respect to each Tranche of Designated Closing Locations, a document prepared by the Merchant setting forth the per unit vendor cost for each applicable item of Inventory to be sold during the applicable Sale Term, which shall be delivered to the Consultants by no later than the Sale Commencement Date applicable to such Tranche of Designated Closing Locations.

(z)     "Merchant's Lease" means any unexpired lease agreement pursuant to which Merchant occupies or uses a retail store or distribution center premises.

(aa)    "No Fee Goods" shall have the meaning set forth in Section 2(c)(ii) of this Agreement.

(bb)    "Pharmacy Assets" means, as to any Merchant-operated retail store, the following Merchant-owned assets of such retail store: (i) all pharmacy inventory that is dispensed as a prescription behind the pharmacy counter and (ii) any prescription files and all related records.

(cc)    "Sale" means the sale of (i) Inventory, Saleable Non-Merchandise, and FF&E at any Designated Closing Locations, and (ii) to the extent any Additional Consultant Goods are sold at any Designated Closing Locations, sales of such Additional Consultant Goods.

(dd)    "Sale Advance" shall have the meaning set forth in Section 7(b) of this Agreement.

(ee)    "Sale Assets" means the Inventory, Saleable Non-Merchandise, FF&E, and Additional Consultant Goods.

(ff)    "Sale Commencement Date" means, as to each Designated Closing Location, the fourteenth (14th) day after the Consultants' receipt of the Merchant's written designation of such location as a "Designated Closing Location", or such earlier date as the Consultants and the Merchant may otherwise agree.

(gg)   "Sale Guidelines" means the sale guidelines attached hereto as Exhibit A, which shall govern the conduct of any Sale.

(hh)   "Sale Term" means, as to each Designated Closing Location, the period between the applicable Sale Commencement Date and the applicable Sale Termination Date.

(ii)   "Sale Termination Date" means, as to each Designated Closing Location, such date as is mutually agreed upon by the Merchant and the Consultants (with the consent of the Senior Credit Facility Agent).

(jj)   "Saleable Non-Merchandise" means the merchandise set forth in Exhibit B attached to this Agreement.

(kk)   "Senior Credit Facility" means the credit facilities made available to the Merchant pursuant to that certain Credit Agreement, dated as of August 30, 2024, among (i) Rite Aid Corporation, as borrower, (ii) the Lenders (as defined therein) from time to time party thereto, (iii) Bank of America, N.A., in its capacity as administrative agent and collateral agent for the Lenders and the other Secured Parties (each as defined therein), and (iv) the other agents party thereto, as the same may be amended, amended and restated, restated, restructured, supplemented or otherwise modified from time to time, and including as the same may be refinanced or replaced, in whole or in part, pursuant to any debtor-in-possession financing provided by the Senior Credit Facility Agent and/or one or more of the Lenders.

(ll)   "Senior Credit Facility Agent" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the Senior Credit Facility.

(mm)  "Services" means the services described in Section 2 of this Agreement.

(nn)   "Signage Advance" shall have the meaning set forth in Section 7(b) of this Agreement.

(oo)   "Supervisor" means a qualified supervisor engaged by the Consultants to provide Inventory Disposition Services pursuant to this Agreement.

(pp)   "Tranche of Designated Closing Locations" shall have the meaning set forth in Section 2(f)(i) of this Agreement.

**2.   Scope of Consulting Engagement.**

(a)   Merchandising Services.  The Consultants shall provide the Merchant with the following services (collectively, the "Merchandising Services") with respect to all of the Merchant's retail store locations, subject to final Merchant approval and full Merchant discretion (in consultation with the Senior Credit Facility Agent):

   (i)   advance planning for any additional location closings, including by conducting operational preparation and assessing initial discount cadence,

4

marketing creative, system implementation, and personnel and budget requirements;

(ii) prepare a monetization model for store closings which can be modified by the inclusion or deletion of retail store locations and compare that model with the results of closures of retail store locations which were completed prior to the Agreement Effective Date to project the differential monetary recovery;

(iii) analyze any sale offers and their impact to collateral value;

(iv) coordinate weekly financial reporting package for the Merchant, its advisors, the Senior Credit Facility Agent, and other constituents;

(v) conduct weekly update calls with Merchant's management and advisors, the Senior Credit Facility Agent, and other applicable constituents;

(vi) assist the Merchant with marketing initiatives for relocating customers to nearby store locations;

(vii) make recommendations to sell through merchandise to mitigate transfer of back-end merchandise;

(viii) make marketing recommendations, which are subject to the Merchant's approval, to increase sell through and reoccurring traffic for prescription refills;

(ix) maintain the confidentiality of all proprietary or non-public information regarding the Merchant or the Designated Closing Locations of which the Consultants or their respective representatives become aware, except for information that is public as of the Agreement Effective Date or which becomes public through no fault of any Consultant or any of their respective representatives;

(x) review the Merchant's open orders and availability under its open-to-buy and supply planning and make merchandising planning recommendations to the Merchant; and

(xi) such other services as are approved by the Merchant in writing and agreed to by the Consultants.

(b) <u>Compensation for Merchandising Services</u>.  The Consultants shall provide the Merchandising Services during the period between the Agreement Effective Date and the earlier of (i) the date that is four (4) months after the Agreement Effective Date unless extended by mutual agreement of the Merchant and the Consultants, or (ii) the date that the Merchant designates all of its remaining retail store and distribution center locations as Designated Closing Locations.  For each month that the Consultants are providing Merchandising Services, the Merchant shall (x) pay

12617011v5

to the Consultants a monthly fee of $25,000 for the performance of the Merchandising Services and (y) reimburse the Consultants for their reasonable and documented out-of-pocket expenses, provided that such expenses (i) are approved by the Merchant, (ii) are incurred in connection with providing the Merchandising Services, and (iii) do not exceed the amounts set forth in any applicable Budget (as defined herein) (clauses (x) and (y) together, the "Merchandising Services Compensation"), in each case, subject to Section 7 of this Agreement.  The Consultants shall provide the Merchant with invoices for the Merchandising Services Compensation on a monthly basis, and each such invoice shall be due and payable no later than five (5) business days following the Merchant's receipt of such invoice pursuant to Section 3(a) of this Agreement.  In the event the term through which the Consultants provide the Merchandising Services includes a partial month of service, the monthly fee for Merchandising Services shall be pro-rated accordingly.

(c)     Inventory Disposition Services.  Subject to Section 2(f) of this Agreement, with respect to all sales at the Designated Closing Locations, the Consultants shall provide the Merchant with the following services (collectively, the "Inventory Disposition Services"):

   (i)     oversee the monetization and disposal of the Sale Assets from the Designated Closing Locations and coordinate with Merchant to maximize the realized value of the Sale Assets, including but not limited to providing Supervisors and where necessary subcontractors;

   (ii)    recommend and implement appropriate point of purchase, point of sale and external advertising (including signage) to effectively sell the Inventory during the Sale, consistent with the sale themes to be approved by the Merchant (in consultation with the Senior Credit Facility Agent), the Sale Guidelines, and any Approval Order; provided however, that, unless otherwise directed by the Merchant, the goods identified in the Merchant's Cost File as "non-merchandise" that do not otherwise constitute Saleable Non-Merchandise located in the Designated Closing Locations (the "No Fee Goods") may be sold during the Sale, without discount and the Merchant shall retain all proceeds attributable to such sales and no fee shall be payable to the Consultants with respect thereto;

   (iii)   maximize the proceeds of the Inventory while protecting and promoting the Merchant's trade name and goodwill in the marketplace; provided, however, that the Merchant shall advise and work with the Consultants in connection with compliance with applicable state and local health and safety laws and regulations governing the sale and disposal of tobacco and alcohol products; provided, however that the implementation and execution of the disposal of any unsold tobacco and/or alcohol inventory at the conclusion of the Sale at each of the Designated Closing Locations in accordance with applicable health and safety state and local laws shall be the obligation and expense of the Merchant;

(iv)    coordinate with the Merchant regarding an advertising and signage program to direct customers to the Merchant's e-commerce platform and go-forward locations (if any); provided, however, that in the event of a full-chain liquidation, the Consultants shall, with the consent of the Merchant and the Senior Credit Facility Agent, have the right to use the Merchant's e-commerce platform solely to promote the Sale at the Designated Closing Locations;

(v)    coordinate accounting functions, including evaluation of Sales of Inventory by category, Sales reporting, and monitoring of the Sale expenses using the Merchant's IT systems, daily reporting to the Merchant of Sales and weekly reporting and reconciliation of Sale proceeds and Sale expenses;

(vi)    recommend appropriate staffing levels for Designated Closing Locations (including store employees) and appropriate bonus and incentive programs for store employees;

(vii)    maintain the confidentiality of all proprietary or non-public information regarding the Merchant and the Designated Closing Locations of which Consultants or their respective representatives become aware, except for information that is public as of the Agreement Effective Date or becomes public through no fault of any Consultant or either of their respective representatives;

(viii)    develop a Sales plan to communicate to the Senior Credit Facility Agent and other constituents and report budget to actuals on a weekly basis; and

(ix)    conduct weekly update calls with the Merchant's management and advisors, the Senior Credit Facility Agent, and other applicable constituents.

(d)    Compensation for Inventory Disposition Services.

(i)    As compensation for providing the Inventory Disposition Services, the Consultants shall receive a commission equal to the sum of (A) two percent (2.00%) of Gross Proceeds from the Sale of Inventory at each Designated Closing Location, plus (B) one-half of one percent (0.50%) of the Gross Proceeds from the sale of Saleable Non-Merchandise (collectively, the "Base Inventory Fee"), which shall be paid in accordance with Section 3 of this Agreement. In addition to the Base Inventory Fee, for each Tranche of Designated Closing Locations, to the extent that the aggregate amount of Gross Proceeds from the Sale of Inventory at each such Tranche of Designated Closing Locations exceeds a stipulated initial threshold (agreed to by the Merchant and the Consultants prior to the commencement of the Sales at such Tranche of Designated Closing Locations), then in addition to receiving the Base Inventory Fee attributable to the applicable Sales at such Tranche of Designated Closing Locations, the Consultants shall be entitled to an additional incentive fee (the "Incentive Fee") in an amount equal to

7

thirty-five one-hundredths of one percent (0.35%) of Gross Proceeds from the Sale of Inventory and Saleable Non-Merchandise at such Tranche of Designated Closing Locations.

(ii)    As used herein, "Gross Proceeds" means the aggregate of (A) the total amount (in dollars) of all Sales of Inventory and, without duplication, Saleable Non-Merchandise at the applicable Designated Closing Location(s), in each case, during the Sale Term for such Designated Closing Location(s) and exclusive of sales taxes (but inclusive of any amounts credited against the listed sale price of such Inventory that are attributable to gift cards, coupons, and/or customer rewards honored in connection with the sale of such Inventory) and (B) all proceeds of the Merchant's insurance for loss of or damage to Inventory at each applicable Designated Closing Location arising from events occurring during the Sale Term relating to such Inventory.

(iii)   The Consultants and the Merchant shall agree on a pro forma budget of Consultant Controlled Expenses relating to each Tranche of Designated Closing Locations that are designated to be closed (each a "Budget"), which Budget shall be satisfactory to the Senior Credit Facility Agent.  Merchant shall be responsible for the reimbursement of the Consultant Controlled Expenses to the Consultants, in an amount not to exceed the amount set forth in the applicable Budget, which amount shall be paid in accordance with Section 3 of this Agreement.

(A)    As used herein, "Consultant Controlled Expenses" means, as set forth in the Budget, the aggregate amount of (I) Supervisor Costs (as defined herein), (II) advertising expenses and (III) the Consultants' reasonable and documented legal fees and expenses (limited to one external counsel and one local counsel for all Consultants) incurred in connection with (x) preparing this Agreement and obtaining an Approval Order, (y) negotiating any "side letters" with the landlords of the applicable Designated Closing Locations, or (z) enforcing the terms of this Agreement.  For the avoidance of doubt, any expenses related or allocable to the sale of Additional Consultant Goods shall not constitute Consultant Controlled Expenses.

(B)    As used herein, "Supervisor Costs" means the following customary costs and expenses incurred by Consultants with respect to Supervisors, in each case, in accordance with the Budget:  (I) the weekly compensation paid during the applicable Sale Term per Supervisor (which in each case represents the Consultants' actual costs); (II) reasonable and documented travel expenses of the Supervisors between Designated Closing Locations during the applicable Sale Term and to and from such Designated Closing Locations at the commencement and conclusion of the corresponding Sale (including reasonable travel to and from the

8

Supervisors' homes at such times); and (III) Supervisor deferred compensation as provided in the Budget.

(e)     Disposition of FF&E.

(i)     Subject to final Merchant approval, the Consultants shall sell FF&E located at the applicable Designated Closing Locations during the applicable Sale Term (which Sale Term, as it relates to any distribution center that is a Designated Closing Location, shall factor in a reasonable time period for the disposition of the FF&E located in such distribution centers). The Consultants shall provide supervision and shall procure other goods and services as may be necessary to sell such FF&E within and subject to a budget to be approved by the Merchant (with budgeted expenses to be funded with the proceeds received from such FF&E sales). The Consultants will conduct all such FF&E sales in a manner designed to maximize the return to the Merchant, including where appropriate retaining subcontractors to assist in the sale of the FF&E.

(ii)     In consideration of such services, the Consultants shall be paid a fee equal to fifteen percent (15.00%) of the proceeds (net of sales taxes) received from sales of FF&E located at the applicable Designated Closing Locations during the applicable Sale Term ("FF&E Fee"), which fee shall be paid from the proceeds of such sales in accordance with Sections 3(a) and 3(b) of this Agreement.

(f)     Additional Provisions Relating to Inventory Disposition Services.

(i)     The provision of Inventory Disposition Services in respect of any Designated Closing Locations shall be determined upon the written designation by the Merchant (after consultation with the Senior Credit Facility Agent); provided however, that such designation may be made by Merchant (after consultation with the Senior Credit Facility Agent) on a rolling basis, in multiple weekly tranches (each grouping of designated stores for closure, a "Tranche of Designated Closing Locations").

(ii)     The Consultants shall not provide any Inventory Disposition Services with respect to any retail store or distribution center location of the Merchant, unless such location is a Designated Closing Location. Nothing in this Agreement requires the Merchant to designate a retail store or distribution center location for closure, but to the extent that any retail store or distribution center location is designated for closure, it shall constitute a Designated Closing Location and such closure shall be governed by this Agreement (and any Approval Order that may be entered).

(iii)     During the Sale Term for any Designated Closing Location, the Consultants shall have no obligation with respect to the operation of any pharmacy departments located within such Designated Closing Location

(the "Pharmacy Departments"), or with respect to any Pharmacy Assets located in such Designated Closing Location; provided however, that during the Sale Term for each Designated Closing Location, the Merchant may continue to operate the Pharmacy Departments located therein for its own account; provided, further, that, to the extent that the disposition of any Sale Assets are processed through the point-of-sale systems located within the Pharmacy Departments, such disposition of Sale Assets shall be deemed to be included in the Sale and shall be entitled to any Fees and Expenses and, in the case of the disposition of any Addition Consultant Goods, the Consultants shall be entitled to the identifiable proceeds thereof in accordance with this Agreement.

(iv)     During the Sale Term for any Designated Closing Location, unless otherwise directed in writing by the Merchant, the Sale of the Sale Assets shall be "as is" and "final." Conspicuous signs stating that "all sales are final" and "as is" will be posted at the cash register areas at all Designated Closing Locations.

(v)      During the Sale Term for any Designated Closing Location, the Consultants shall accept gift cards, gift certificates and/or coupons, and shall honor returns of merchandise sold by the Merchant prior to the applicable Sale Commencement Date at such Designated Closing Location, until such date as (A) the Merchant (with the consent of the Senior Credit Facility Agent) otherwise directs the Consultants in writing to cease accepting such payment methods or honoring such returns, or (B) may be provided in any Approval Order or other order of the Bankruptcy Court.

(g)     Additional Consultant Goods.

(i)      Subject to the Merchant's and the Senior Credit Facility Agent's prior written approval, the Consultants may, at the Consultants' sole cost and expense, supplement the Inventory in the Designated Closing Locations with additional goods procured by the Consultants which are of like kind and no lesser quality to the Inventory in the Designated Closing Locations (such additional goods, "Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by the Consultants and delivered to the Designated Closing Locations at the Consultants' sole cost and expense (including as to labor, freight and insurance related to shipping such Additional Consultant Goods to the Designated Closing Locations). The sale of Additional Consultant Goods shall be processed through the Merchant's point-of-sale systems; provided, however, that the Consultants shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Inventory. The Consultants and the Merchant shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchant

10

goods. The Consultants shall provide signage in the Designated Closing Locations notifying customers that the Additional Consultant Goods have been included in the Designated Closing Locations.

(ii)    The Merchant shall retain an amount equal to seven percent (7.00%) percent of the gross proceeds (excluding sales taxes) from the Sale of the Additional Consultant Goods (the "Additional Consultant Goods Fee"). The remaining ninety three percent (93%) of such gross proceeds from the Sale of the Additional Consultant Goods shall be remitted by the Merchant to the Consultants, in accordance with Sections 3(a) and 3(b) of this Agreement.

(iii)    The Consultants and the Merchant intend that any transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from the Consultants to the Merchant in all respects and not a consignment for security purposes. Subject solely to the Consultants' obligations to pay to the Merchant the Additional Consultant Goods Fee, at all times and for all purposes, the Additional Consultant Goods and their identifiable proceeds shall be the exclusive property of the Consultants, and no other person or entity shall have any claim against any of the Additional Consultant Goods or the identifiable proceeds of the Additional Consultant Goods. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultants. Furthermore, the Parties and the Senior Credit Facility Agent agree that, regardless of which Designated Closing Location receives and/or sells the Additional Consultant Goods, all such Additional Consultant Goods are to be delivered on a true consignment basis, to and sold by (or on behalf of) New Rite Aid, LLC (and such other of its affiliates as may be agreed in writing by the Consultants and the Merchant (in consultation with the Secured Credit Facility Agent)), who shall be deemed the consignee in all such consignments, with the Consultants constituting the consignors in all such consignments. It is further understood and agreed by the Senior Credit Facility Agent that the amount of Additional Consignment Goods Proceeds received by the Senior Credit Facility Agent shall be remitted to the Consultants (which amounts may be remitted through the Merchant) as and when required by the terms of this Agreement.

(iv)    The Merchant shall, at the Consultants' sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proof of loss with regard to any Additional Consultant Goods with the Merchant's insurers. The Consultants shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

(v)    The Merchant acknowledges, and the Approval Order shall provide, that the Additional Consultant Goods shall be consigned to the Merchant as a true consignment to New Rite Aid, LLC (and/or such other of its affiliates as

mutually agreed by the Consultants and the Merchant (in consultation with the Secured Credit Facility Agent) under Article 9 of the Uniform Commercial Code. The Consultants are hereby granted a first-priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the identifiable proceeds of the Additional Consultant Goods, *less* the Additional Consultant Goods Fee (the "Additional Consultant Goods Proceeds"). The Consultants are hereby authorized to file all necessary financing statements and amendments thereof under the applicable Uniform Commercial Code (each, a "UCC Filing") and to deliver all required notices to secured creditors (each, a "Consignment Notice"), identifying (A) the Consultants' interest in the Additional Consultant Goods as consigned goods and the Merchant as the consignee with respect to such consigned goods and (B) the Consultants' security interest in and lien upon such Additional Consultant Goods and the identifiable proceeds thereof. The Consultants' security interest and lien shall be deemed perfected on the earlier of (x) the Consultants' filing of the required UCC Filings and delivery of the Consignment Notices or (y) entry of the Approval Order (in which case the Consultants' security interest and lien shall be deemed perfected without the need to make a UCC Filing or to deliver a Consignment Notice).

(vi)    Promptly following the Sale Termination Date, the Consultants shall remove any remaining Additional Consultant Goods (if any) from the applicable Designated Closing Location.

3.    **Accounting & Payment Matters.**

(a)    Weekly Reconciliations. The Merchant shall collect all proceeds from the Sale of Sale Assets. The Merchant shall, upon request, deliver to the Consultants account statements and such other information relating to the Sales as reasonably requested by the Consultants. On Wednesday of each week, commencing on the first Wednesday following the commencement of the applicable Sale Term, the Merchant and the Consultants shall reconcile the results of the applicable sales of the Sale Assets for the prior week, including, without limitation, the Fees and Expenses (the "Weekly Reconciliation"), and the Merchant shall pay all amounts due to the Consultants pursuant to this Agreement for such prior week no later than seven (7) business days after completion of such Weekly Reconciliation.

(b)    Final Reconciliation. The Parties shall complete a final reconciliation of the sale of the Sale Assets no later than forty-five (45) calendar days following the end of the applicable Sale Term (the "Final Reconciliation"). The Parties shall cooperate in good faith to resolve any disputes with regard to such Final Reconciliation. Upon completion of the Final Reconciliation, the Parties shall pay or be paid all undisputed amounts payable to them no later than seven (7) business days after completion of the Final Reconciliation.

(c)    Bankruptcy Court Authorization for Payment.  Notwithstanding anything herein to the contrary, if the Merchant commences proceedings under chapter 11 of the Bankruptcy Code, then the Merchant shall not pay nor reimburse any amounts to the Consultants under this Agreement, unless and until the Bankruptcy Court enters the Approval Order.

4.    **Insurance.**

(a)    Merchant Insurance.  Throughout the Sale Term, the Merchant shall maintain casualty and liability insurance policies covering injuries to persons and property at or in connection with the applicable Designated Closing Locations (including, but not limited to, products liability/completed operations, contractual liability, comprehensive public liability, and auto liability insurance) on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000.  The Merchant shall cause the Consultants to be named as additional insureds with respect to all such policies. Additionally, throughout the Sale Term, the Merchant shall maintain, in such amounts as it currently has in effect, workers' compensation insurance in compliance with all applicable statutory requirements.  No later than the date that the Approval Order is entered, the Merchant shall provide the Consultants with a certificate or certificates evidencing the insurance coverage required hereunder.

(b)    Consultants Insurance.  Throughout the Sale Term, the Consultants shall maintain (at the Consultants' expense) casualty and liability insurance policies covering injuries to persons and property at or in connection with the Designated Closing Locations (including, but not limited to, products liability/completed operations, contractual liability, comprehensive public liability, and auto liability insurance) on an occurrence basis in an amount of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and umbrella coverage of at least $5,000,000. The Consultants shall name the Merchant as an additional insured and loss payee under each such policy.  No later than the date that the Approval Order is entered, the Consultants shall provide the Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  Additionally, throughout the Sale Term, the Consultants shall maintain workers' compensation insurance in compliance with all applicable statutory requirements.  Further, if the Consultants employ or engage third parties to perform any of the Consultants' undertakings with regard to this Agreement, the Consultants will ensure that such third parties are covered by the Consultants' insurance or maintain all of the same insurance as the Consultants are required to maintain pursuant to this Section 4(b) and name the Merchant as an additional insured and loss payee under each policy for such insurance.

5.    **Representations & Warranties; Certain Covenants**

(a)    Each entity comprising the Merchant warrants, represents, covenants and agrees that (i) it is duly organized, validly existing and in good standing under the laws of its state of organization, and (ii)(A) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and (B) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of the Merchant and this Agreement constitutes a valid and binding obligation of the Merchant enforceable against the Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for the Merchant to fully perform all of its obligations herein.

(b)    The Merchant shall provide such services as are reasonably necessary or appropriate for the Sales. Without limiting any other term or provision of this Agreement, during the Sale Term, the Merchant shall provide the Consultants with (i) employees at the applicable Designated Closing Locations as may be necessary or appropriate to implement and conduct the applicable of the Sale at such Designated Closing Locations, and (ii) peaceful use and occupancy of, and reasonable access (including reasonable before and after-hours access and normal utilities/phone service) to, such Designated Closing Locations.

(c)    The Merchant shall prepare and process all reporting forms, certificates, reports, and other documentation required under applicable law in connection with taxation of or relating to the Sale of the Sale Assets. The Consultants shall provide all assistance reasonably required or requested by the Merchant in connection with the preparation and processing of any such reporting forms, certificates, reports, or other documentation.

(d)    Each Consultant warrants, represents, covenants and agrees that (i) such Consultant is duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the addresses set forth herein, and (ii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of such Consultant and this Agreement constitutes a valid and binding obligation of such Consultant enforceable against such Consultant in accordance with its terms and conditions, and the consent of no other entity or person is required for such Consultant to fully perform all of its obligations herein.

6.    **Indemnification.**

(a)    Consultant Indemnification. Each Consultant shall indemnify, defend, and hold the Merchant and its directors, officers, members, managers, partners, employees, attorneys, advisors, representatives, lenders, principals, and affiliates (other than such Consultant or its Consultant Indemnified Parties (as defined herein)) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses

(including reasonable attorneys' fees) arising from or related to (i) the willful or negligent acts or omissions of such Consultant or such Consultant Indemnified Parties; (ii) such Consultant's breach of any provision of, or the failure to perform any obligation under, this Agreement; (iii) any liability or other claims made by such Consultant Indemnified Parties or any other person (excluding the Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to such Consultant's conduct of the Sale or provision of Services, except claims arising from the Merchant's negligence, willful misconduct, or unlawful behavior; (iv) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any Merchant Indemnified Parties, or of the Merchant's customers, by such Consultant or any of such Consultant Indemnified Parties; (v) any claims made by any party engaged by such Consultant as an employee, agent, representative or independent contractor arising out of such Consulting Engagement; and (vi) sales of Additional Consultant Goods.

(b)   <u>Merchant Indemnification</u>.   The Merchant shall indemnify and hold each Consultant and its respective officers, directors, principals, shareholders, affiliates, members, consultants, advisors, and employees (collectively, "<u>Consultant Indemnified Parties</u>") harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (i) the negligence, intentional or unlawful acts or omissions of the Merchant or the Merchant's consultants, advisors, employees, representatives and principals (other than Consultant Indemnified Parties); (ii) the Merchant's breach of any provision of, or the failure to perform any obligation under this Agreement; (iii) the Merchant's failure to (A) timely pay any taxes required under applicable law to be paid by the Merchant in connection with the Services and/or Sales at Designated Closing Locations or (B) timely file with the requisite taxing authorities all related reports and other documents required by applicable law to be filed with or delivered to such taxing authorities; (iv) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of either Consultant or the Consultant Indemnified Parties by the Merchant or any Merchant Indemnified Parties; and (v) any consumer warranty or products liability claims relating to any Merchant-owned assets sold pursuant to <u>Sections 2(c)</u> or <u>2(e)</u> of this Agreement.

**7.    Designation of Closing Locations, Expense Advance, Assumption of Agreement**

(a)   <u>Store Designations</u>.

(i)   Any time on or after the Agreement Effective Date, the Merchant may designate any Merchant-operated store or distribution center as a Designated Closing Location by providing the Consultants with fourteen (14) calendar days' prior written notice of such designation, with each grouping of designations being a Tranche of Designated Closing Locations. During such fourteen (14) calendar day notice period, the Merchant and the Consultant shall work together to: (A) prepare such newly designated

Tranche of Designated Closing Locations for closure; (B) agree upon an updated Budget to include such Tranche of Designated Closing Locations, including the number of additional Supervisors that may be needed and/or in the case of a distribution center being included as a Designated Closing Location, the costs of any subcontractors sourced by the Consultants to assist in the closure of such distribution centers; (C) order and pay for any additional Advertising Materials (above what has been previously purchased using the Signage Advance) that may be needed; provided, however, that the Consultants have advised that in the current environment printing of sign packages could take as long as four (4) weeks; and (D) agree upon a Gross Recovery Percentage threshold as contemplated by Section 2(d) of this Agreement.

    (ii)    It is anticipated and agreed that once a Merchant-owned retail store or distribution center location becomes a Designated Closing Location in accordance with the terms of this Agreement, such Designated Closing Location shall not be subsequently removed from the Sale once the Sale has commenced at such Designated Closing Location; provided, however, to the extent the Merchant notifies the Consultants that a Designated Closing Location must be removed from the Sale (in the reasonable, good faith determination of the Merchant, including, in any event, because a buyer of any of the Merchant's assets relating to such Designated Closing Location wishes to purchase and continue operating the applicable retail store or distribution center location), such Designated Closing Location shall be removed from the Sale and the Parties (in consultation with the Senior Credit Facility Agent) shall negotiate in good faith reasonable adjustments to Fees and Expenses to account directly for the removal of any such Designated Closing Location from the Sale, including, to the extent the Consultants do not elect to reclaim such Additional Consultant Goods, payment to the Consultants for the cost of goods sold for any Additional Consultant Goods (if any) located in such removed Designated Closing Location (or, if less, the cost of moving such Additional Consultant Goods to another Designated Closing Location).

(b)    Sale Advance. Within two (2) business days after the Merchant's designation of a Tranche of Designated Closing Locations, or such other date as the Merchant and the Consultants may mutually agree in writing, the Merchant and the Consultants (after consultation with the Senior Credit Facility Agent) shall mutually agree upon the amount of a sale advance to be remitted to an account designated by the Consultants, which amount shall serve as an advance deposit in respect of the following: (i) an amount sufficient for the Consultants to pay for the Advertising Materials to be used in connection with the Sales at the Designated Closing Locations, or to the extent the Merchant elects, all of the Merchant's locations to take advantage of timing and volume discounts (the "Signage Advance"); (ii) an agreed upon amount as an advance payment towards the legal fees incurred and to be incurred by the Consultants in connection with negotiating, implementing, and obtaining Bankruptcy Court approval of this Agreement (the "Legal Fee

Advance"); and (iii), an agreed upon amount to secure the Merchant's obligation to reimburse the Consultants for the Consultant Controlled Expenses (the "Consultant Expense Advance" and, collectively with the Signage Advance and the Legal Fee Advance, the "Sale Advance"). The Consultant Expense Advance, and any portion of the Signage Advance not used to purchase signage or the Legal Fee Advance not used to pay legal fees, in each case in accordance with the Budget, shall be retained by the Consultants until the Final Reconciliation. Notwithstanding the Consultants' receipt of the Consultant Expense Advance, nothing contained herein shall be deemed to waive, modify or limit the Merchant's obligations to remit timely payment of the Fees and Expenses due to the Consultants, or to remit payment of the proceeds from the sale of any Additional Consultant Goods as part of the Weekly Reconciliations. To the extent the Merchant fails to timely remit payment of Fees, reimbursement of Expenses, or Additional Consultant Goods Proceeds that are due and owing to the Consultants (collectively, if any, the "Past Due Consultant Amounts"), the Consultants may apply such Past Due Consultant Amounts against the Consultant Expense Advance, in which case, no less than one (1) business day after the Merchant's receipt of notice from the Consultants of such application, the Merchant shall replenish the Consultant Expense Advance to the full amount previously agreed to by the Parties. As each Tranche of Designated Closing Locations is identified by the Merchant (if any), the Merchant and the Consultants (after consultation with the Senior Credit Facility Agent) shall mutually agree upon an increase to the Signage Advance and the Sale Advance. No later than seven (7) business days after completion of the Final Reconciliation and upon receipt by the Consultants of all amounts due to it under this Agreement, any unused portion of the Sale Advance shall be returned by the Consultants to the Merchant.

(c)     Bankruptcy Filing/Assumption of Agreement.  If the Merchant commences a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"):

(i)     the Merchant shall promptly file an expedited motion to assume sections of this Agreement under section 363 and/or 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved on an expedited basis either by an interim and final order, or just by a final order, that is, in each case reasonably acceptable to the Consultants, that approves, among other things, as follows (each, an "Approval Order"):  (A) the payment of all Fees and reimbursement of all Expenses due to the Consultants under this Agreement is approved without further order of the court; (B) all such payments of Fees and reimbursement of Expenses related to this Agreement shall be made without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (C) the payment of all Fees and reimbursement of all Expenses to the Consultants related to this Agreement, as well as the remittance of the Additional Consultant Goods Proceeds, to the Consultants shall be included and accounted for in any approved debtor-in-possession, cash collateral, or other post-petition financing budget as a condition to the assumption of this Agreement; (D) the conduct of the sale without the necessity of complying with state and

local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the sale; (E) the conduct of the Sale notwithstanding any restrictions in leases, reciprocal easement agreements, or other contracts that purport to restrict the Sale or that otherwise purport to require any third party consents; (F) the conduct of the Sale as a "store closing," "sale on everything," "everything must go," "liquidation sale," or similar themed sale, and in the event of a full-chain liquidation, as a "going out of business" sale through the posting of signs (including the use of exterior banners at any non-enclosed mall, and at any enclosed mall, to the extent the applicable store entrance does not require entry into the enclosed mall common area), use of sign-walkers, A-frames and other street signage, in accordance with this Agreement and the Sale Guidelines; (G) the sale of Additional Consultant Goods in accordance with the terms and conditions set forth in this Agreement; and (H) the Merchant taking all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

(ii) The Bankruptcy Court shall have exclusive jurisdiction to resolve any issues arising under this Agreement. In such event, any legal action, suit, or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Merchant, and each Party waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the applicable Approval Order, the Consultants shall conduct the Sale in accordance with the terms of such Approval Order in all material respects. If any objections are received prior to entry of an Approval Order, the Consultants will use commercially reasonable efforts to assist the Merchant in negotiating a consensual resolution of such objection with the objecting party.

(d) <u>Advertising Materials/Signage</u>. The Consultants shall procure (at the sole cost and expense of the Merchant, which cost is to be paid by using the Signage Advance to be delivered by the Merchant to the Consultants pursuant to <u>Section 7(b)</u> of this Agreement) all necessary point of purchase, point of sale, and external advertising (including signage) to effectively sell the Inventory during any prospective Sale at all of the Merchant's Designated Closing Locations, consistent with the sale themes outlined in the Inventory Disposition Services set forth in <u>Section 2(b)</u> of this Agreement and approved by Merchant in consultation with the Senior Credit Facility Agent (the "<u>Advertising Materials</u>"). The Consultants shall so procure the Advertising Materials by no later than such date as is separately agreed to in writing by the Merchant, the Consultants, and the Senior Credit Facility Agent. All Advertising Materials shall remain the property of the Merchant.

(e) <u>Periodic Status Updates</u>. The Consultants shall provide the Merchant and its advisors, the Senior Credit Facility Agent and their advisors, and any other constituents requested by the Merchant, with periodic updates regarding the Sale.

18

(f)     <u>Termination</u>.  The Merchant shall (in consultation with the Senior Credit Facility Agent) have the right to terminate this Agreement for cause upon written notice to the Consultants, and the Consultants shall have the right to terminate this Agreement for cause upon written notice to the Merchant.  Termination for "cause" shall mean any termination as a result of a Party's fraud, misrepresentation, gross negligence, willful misconduct or material breach of any of the terms of this Agreement.  Upon termination of this Agreement, the Consultants shall:  (i) immediately discontinue all Services; and (ii) deliver to the Merchant all information, reports, papers, and other materials prepared or obtained by the Consultants in performing the Services, whether completed or in process.  Upon termination of this Agreement, the Merchant shall be liable for payment of all accrued and unpaid Fees and Expenses of the Consultants as of the effective date of the termination.  Notwithstanding any of the foregoing, the provisions of <u>Section 6</u> of this Agreement shall survive any termination of this Agreement.

(g)     <u>Consultants Not Liable for Employee Wages/Benefits</u>.  The Parties expressly acknowledge and agree that the Consultants shall have no liability to the Merchant or to any employee of the Merchant for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from the Merchant's employment, hiring, or retention of its employees, and such employees shall not be considered employees of the Consultants.

(h)     <u>Notice</u>.  Any correspondence and any notice required or permitted to be given under this Agreement may be sent by email, shall be addressed as set forth below, and shall be deemed given on the same date on which it is sent if sent by email.

> If to Consultants:     SB360 Capital Partners, LLC
> 75 Second Avenue
> Needham, MA  02494
> Attn: Aaron S. Miller, President
> E-mail:  amiller@sb360.com
>
> - and -
>
> Hilco Merchant Resources, LLC
> 5 Revere Drive, Suite 206
> Northbrook, IL 60062
> Attn:  Ian Fredericks, Chief Executive Officer
> E-mail:  ifredericks@hilcoglobal.com

19

| | |
|---|---|
| With a copy to: | Leichtman Law PLLC<br>185 Madison Avenue - 15th Floor<br>New York, NY 10016<br>Attn:  Maura I. Russell<br>E-mail:  mrussell@leichtmanlaw.com |
| | - and - |
| | Lowenstein Sandler LLP<br>One Lowenstein Parkway<br>Roseland, NJ 07068<br>Attn:  Jeffrey Cohen and Andrew Behlmann<br>E-mail:  jcohen@lowenstein.com;<br>     abehlmann@lowenstein.com |
| If to the Merchant: | New Rite Aid, LLC<br>200 Newberry Commons<br>Etters, PA 17319<br>Attn:  Steven Bixler<br>E-mail: sbixler@riteaid.com |
| With a copy to: | Paul, Weiss, Rifkind, Wharton & Garrison, LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attn:   Alice Belisle Eaton<br>     Christopher Hopkins<br>E-mail:  aeaton@paulweiss.com<br>     chopkins@paulweiss.com |

(i)     Exclusivity.  The Consultants shall, with respect to all of the Merchant's retail stores and distribution centers, be the exclusive consultants for the Services set forth in this Agreement.

(j)     Construction.  This Agreement shall be deemed drafted by each Party hereto, and there shall be no presumption against either Party in the interpretation of this Agreement.  By executing this Agreement, the Merchant and each Consultant acknowledges and represent that it is represented by and has consulted with independent legal counsel with respect to the terms and conditions contained herein.  All headings and captions in this Agreement are for convenience only and shall not be interpreted to enlarge or restrict the provisions of this Agreement.

(k)     Independent Contractor.  The Consultants will be providing the Services to the Merchant as independent contractors.  For greater certainty, this Agreement does not create any relationship of employer and employee, or of joint ventures between the Merchant and the Consultants.

(l)     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this

Agreement, which shall remain in full force and effect, and the invalid or unenforceable provision shall be reformed to the minimum extent required to render it valid and enforceable and to effectuate the intent of this Agreement.

(m)   Assignment.   Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party hereto without the prior written consent of the other Party.   This Agreement, including, without limitation, the obligation of the Merchant to compensate the Consultants for the Services, shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, legal representatives, successors and permitted assigns. Notwithstanding the foregoing, the Consultants are authorized to form a contractual joint venture with the other national liquidator firms identified on Exhibit C attached hereto, on written notice to the Merchant, provided that the Consultants remain the lead in such joint venture and the terms of the Consulting Engagement remain as set forth herein.

(n)   Modifications.   No modification, amendment, or waiver of any of the provisions contained in this Agreement, or any future representation, promise, or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  The failure by a Party to enforce, or the delay by a Party in enforcing, any of said party's rights under this Agreement shall not be construed as a continuing waiver of such rights, and said Party may, within such time as is provided by applicable law, commence suits, actions, or proceedings to enforce any or all of such rights.  A waiver by a Party of a default in one or more instances shall not be construed as a waiver in other instances.

(o)   Entire Agreement.   This Agreement, together with all exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.   No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party to this Agreement except as specifically set forth in this Agreement.   All prior agreements, discussions, and negotiations are entirely superseded by this Agreement.

(p)   Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference or regard to choice of law provisions.   THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR PROCEEDING RELATED TO OR ARISING OUT OF THE SERVICES, ANY TRANSACTION, OR CONDUCT IN CONNECTION THEREWITH OR THIS AGREEMENT.

*[Signatures Pages Follow]*

12617011v5

## Exhibit A

**Sale Guidelines**

**EXHIBIT A**

**Sale Guidelines**[1]

1.    The Sales shall be conducted so that the Designated Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective Merchant Lease for the applicable Designated Closing Stores.

2.    The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Store on a Sunday prior to the commencement of the Sales.

3.    On "shopping center" property, the Merchant and the Consultants shall not distribute handbills, leaflets or other written materials to customers outside of any Designated Closing Stores' premises, unless permitted by the applicable Merchant Lease for such premises or if distribution is customary in the "shopping center" in which such Designated Closing Store is located; *provided* that the Merchant and the Consultants may solicit customers in the Designated Closing Stores themselves.  On "shopping center" property, the Merchant and the Consultants shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable Merchant Lease or otherwise agreed to by the landlord.

4.    At the conclusion of the Sale, the Merchant and the Consultants shall vacate the Designated Closing Stores; *provided* that the Merchant may abandon any Merchant owned Sale Assets not sold in the Sales following the Sale Termination Date, without cost or liability of any kind to the Merchant and the Consultants.  The Merchant shall notify the applicable landlord (and if known, such landlord's counsel) of its intention to abandon any Merchant owned Sale Assets at least two (2) calendar days prior to the Sale Termination Date.  The Merchant will have the option to remove any Merchant owned Sale Assets, at its own cost prior to the Sale Termination Date.  Any abandoned Merchant owned Sale Assets left in a Designated Closing Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant and the Consultants.  For the avoidance of doubt, as of the Sale Termination Date, the Merchant and the Consultants may abandon, in place and without further responsibility or liability of any kind, any Merchant owned Sale Assets.

5.    The Merchant and the Consultants may advertise the Sales as "store closing", "sale on everything," "everything must go," "everything on sale," "going-out-of-business," or similar-themed sales.  The Merchant and the Consultants may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  All

---

[1]    Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Agreement to which these Sale Guidelines are attached as <u>Exhibit A</u>.

signs, banners, ads and other advertising material, promotions, and campaigns will be approved by the Merchant, prior to purchase, in accordance with these Sale Guidelines.

6.      The Merchant and the Consultants shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Consultants shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Consultants shall be permitted to utilize exterior banners at (a) non-enclosed mall Designated Closing Stores and (b) enclosed mall Designated Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, *however*, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store. In addition, the Merchant and the Consultants shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Merchant and the Consultants any additional restrictions not contained in the applicable lease agreement.

7.      Conspicuous signs shall be posted in the cash register areas of each of the affected Designated Closing Stores to effect that "all sales are final."

8.      Except with respect to the hanging of exterior banners, the Merchant and the Consultants shall not make any alterations to the storefront or exterior walls of any Designated Closing Stores, except as authorized by the applicable lease.

9.      The Merchant and the Consultants shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease. No property of the landlord of a Designated Closing Store shall be removed or sold during the Sales. The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Designated Closing Store.

10.     The Merchant shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

11.     The Merchant and the Consultants (in consultation with the Merchant) are authorized to enter into "side letters" with the landlord of any Designated Closing Store without further order of the Court, provided that such agreements do not have a material adverse effect on the Sale Assets or the Sales.

12.     The Merchant and the Consultants may advertise the sale of the Merchant owned Sale Assets in a manner consistent with these Sale Guidelines. The purchasers of any of the Merchant owned Sale Assets during the sale shall be permitted to remove such Sale Assets either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however*, that the foregoing shall not apply to

*de minimis* sales of Merchant owned Sale Assets made whereby the item can be carried out of the Designated Closing Store in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Merchant and the Consultants may abandon, in place and without further responsibility, any Merchant owned Sale Assets.

13.  At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Designated Closing Stores shall have reasonable access to the Designated Closing Stores' premises as set forth in the applicable Merchant Lease.  The Merchant and its agents and representatives shall continue to have access to the Designated Closing Stores pending assumption or rejection of applicable leases.

14.  The rights of landlords against Merchant for any damages to a Designated Closing Store shall be reserved in accordance with the provisions of the applicable Merchant Lease.

15.  The Merchant is authorized to conduct and consummate sales and internal transfers of Prescription Assets consistent with its historical practices, in accordance with applicable law.

16.  If and to the extent that the landlord of any Closing Store affected hereby contends that the Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant as follows:

| | |
|---|---|
| If to Consultants: | SB360 Capital Partners, LLC<br>75 Second Avenue<br>Needham, MA  02494<br>Attn: Aaron S. Miller, President<br>Email:  amiller@sb360.com |
| | - and - |
| | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn:  Ian Fredericks, Chief Executive Officer<br>Email:  ifredericks@hilcoglobal.com |
| With a copy to: | Leichtman Law PLLC<br>185 Madison Avenue - 15th Floor<br>New York, NY 10016<br>Attn:    Maura I. Russell<br>Email:  mrussell@leichtmanlaw.com |
| | - and - |
| | Lowenstein Sandler LLP<br>One Lowenstein Parkway<br>Roseland, NJ 07068 |

|  | Attn:  Jeffrey Cohen and Andrew Behlmann |
|  | Email:  jcohen@lowenstein.com; |
|  | abehlmann@lowenstein.com |
| If to the Merchant: | New Rite Aid, LLC |
|  | 200 Newberry Commons |
|  | Etters, PA 17319 |
|  | Attn:  Matthew Schroeder |
|  | Email: MSchroeder@riteaid.com |
| With a copy to: | Paul, Weiss, Rifkind, Wharton & Garrison, LLC 1285 Avenue of the Americas |
|  | New York, NY 10019 |
|  | Attn:   Alice Belisle Eaton, Christopher Hopkins, Alice Nofzinger |
|  | Email:aeaton@paulweiss.com,chopkins@paulweiss.com, anofzinger@paulweiss.com |

## **Exhibit B**

**Saleable Non-Merchandise**

**Rite Aid - SB360/Hilco
Consulting Agreement**

| Dept | Dept Desc | cat | catdesc | Type | Merch/Non-Merch |
|---|---|---|---|---|---|
| 13 | GREETING CARDS/GIFTS | 431 | GREETING CARDS/GIFT ACC | FE | Non-Merch |
| 31 | GENERAL | 6 | OTHER SALES | FE | Non-Merch |
| 43 | PHONE CARD | 37 | PREPAID CREDIT CARD | FE | Non-Merch |
| 43 | PHONE CARD | 400 | GIFT CARDS/GPR PRODUCTS | FE | Non-Merch |
| 43 | PHONE CARD | 409 | PREPAID PHONE CARDS | FE | Non-Merch |
| | | | | | |
| | | | | | |
| | Notes: | | | | |
| | For avoidance of doubt, no Rite Aid GIFT CARDS/GPR PRODUCTS, will be sold in the Sales | | | | |
| | Dept 13 is specific reference to Company file / "Other" is not to capture anything captured in another dept. | | | | |

**Exhibit C**

**List of National Liquidation Firms**

**EXHIBIT C**

**List of National Liquidation Firms**

Gordon Brothers Retail Partners, LLC

GA Group (aka Great American Group, LLC)

Tiger Capital Group, LLC

## **Schedule 2**

**Initial Closing Locations**

| # | Store # | Location Code | Address | City | State | Zip |
|---|---------|---------------|---------|------|-------|-----|
| 1 | 5733 | 05733-02 | 211 EAST 17TH STREET | COSTA MESA | CA | 92627 |
| 2 | 721 | 00721-02 | 304 MARKET STREET | HARRISBURG | PA | 17101 |
| 3 | 10284 | 10284-01 | 354 WINCHESTER STREET | KEENE | NH | 03431 |
| 4 | 4873 | 04873-02 | 55-60 MYRTLE AVENUE | RIDGEWOOD | NY | 11385 |
| 5 | 11169 | 11169-01 | 23 NORTH ELM STREET | KUTZTOWN | PA | 19530 |
| 6 | 5388 | 05388-02 | 2521 SOUTH SIXTH STREET | KLAMATH FALLS | OR | 97601 |
| 7 | 10424 | 10424-01 | 75 SOUTH MAIN STREET | NEPTUNE | NJ | 07753 |
| 8 | 4288 | 04288-01 | 3773 PETERS MOUNTAIN RD. | HALIFAX | PA | 17032 |
| 9 | 5391 | 05391-01 | 700 S.E. 3RD STREET | BEND | OR | 97702 |
| 10 | 10463 | 10463-01 | 403 SICKLERVILLE ROAD | SICKLERVILLE | NJ | 08081 |
| 11 | 10577 | 10577-01 | 8222 18TH AVENUE | BROOKLYN | NY | 11214 |
| 12 | 11093 | 11093-01 | 1039 2ND STREET PIKE | RICHBORO | PA | 18954 |
| 13 | 10285 | 10285-04 | 19 WILTON ROAD STE 1A | PETERBOROUGH | NH | 03458 |
| 14 | 3766 | 03766-01 | 5901 BAY PARKWAY | BROOKLYN | NY | 11204 |
| 15 | 5357 | 05357-03 | 514 NE 181ST AVENUE | PORTLAND | OR | 97230 |
| 16 | 10891 | 10891-01 | 843 ROSTRAVER ROAD | BELLE VERNON | PA | 15012 |
| 17 | 1087 | 01087-02 | 180 MAIN STREET | CHESHIRE | CT | 06410 |
| 18 | 10600 | 10600-01 | 50-15 ROOSEVELT AVENUE | WOODSIDE | NY | 11377 |
| 19 | 11073 | 11073-01 | 400 WEST SECOND STREET | BERWICK | PA | 18603 |
| 20 | 3304 | 03304-02 | 75 PORTSMOUTH AVENUE UNIT 1 | EXETER | NH | 03833 |
| 21 | 5334 | 05334-01 | 1400 WEST 6TH STREET | THE DALLES | OR | 97058 |
| 22 | 6347 | 06347-01 | 250 BASIN STREET SW | EPHRATA | WA | 98823 |
| 23 | 10384 | 10384-01 | 113-115 MILL PLAIN RD. | DANBURY | CT | 06811 |
| 24 | 10601 | 10601-01 | 60-26 WOODSIDE AVENUE | WOODSIDE | NY | 11377 |
| 25 | 1375 | 01375-02 | 56 RUBBER AVENUE | NAUGATUCK | CT | 06770 |
| 26 | 10084 | 10084-02 | 1031 MAIN ST. | CLINTON | MA | 01510 |
| 27 | 6917 | 06917-01 | 248 BENDIGO BLVD S | NORTH BEND | WA | 98045 |
| 28 | 5488 | 05488-01 | 1331 WILSHIRE BOULEVARD | SANTA MONICA | CA | 90403 |
| 29 | 5430 | 05430-01 | 446 EAST WASHINGTON BLVD. | LOS ANGELES | CA | 90015 |
| 30 | 5480 | 05480-01 | 23 PENINSULA CENTER | ROLLING HILLS ESTS | CA | 90274 |
| 31 | 5520 | 05520-01 | 3300 EAST ANAHEIM STREET | LONG BEACH | CA | 90804 |
| 32 | 5928 | 05928-02 | 1203 WEST IMOLA AVENUE | NAPA | CA | 94559 |
| 33 | 5988 | 05988-01 | 1550 HAMILTON AVENUE | SAN JOSE | CA | 95125 |
| 34 | 5513 | 05513-01 | 501 SOUTH GAFFEY STREET | SAN PEDRO | CA | 90731 |
| 35 | 5647 | 05647-01 | 4840 NIAGARA AVENUE | SAN DIEGO | CA | 92107 |
| 36 | 5423 | 05423-01 | 1534 EAST FLORENCE AVENUE | LOS ANGELES | CA | 90001 |
| 37 | 6481 | 06481-01 | 32450 CLINTON KEITH ROAD | WILDOMAR | CA | 92595 |
| 38 | 6089 | 06089-02 | 720 SUTTON WAY | GRASS VALLEY | CA | 95945 |
| 39 | 5709 | 05709-01 | 34420 YUCAIPA BOULEVARD | YUCAIPA | CA | 92399 |
| 40 | 6448 | 06448-01 | 2751 DEL PASO ROAD | SACRAMENTO | CA | 95835 |
| 41 | 10941 | 10941-01 | PITTSBURGH INTL AIRPORT | PITTSBURGH | PA | 15231 |
| 42 | 6255 | 06255-02 | 1038 EAST COLORADO BOULEVARD | PASADENA | CA | 91106 |
| 43 | 272 | 00272-01 | 209 ATWOOD STREET | PITTSBURGH | PA | 15213 |
| 44 | 5712 | 05712-01 | 6150 VAN BUREN BOULEVARD | RIVERSIDE | CA | 92503 |
| 45 | 6094 | 06094-01 | 220 WEST EAST AVENUE | CHICO | CA | 95926 |
| 46 | 6510 | 06510-01 | 4774 WEST LANE | STOCKTON | CA | 95210 |
| 47 | 5714 | 05714-02 | 4920 LA SIERRA AVENUE | RIVERSIDE | CA | 92505 |

## **Schedule 3**

**Sale Guidelines**

**Sale Guidelines[1]**

1. The Sales shall be conducted so that the Designated Closing Locations in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective Merchant Lease for the applicable Designated Closing Locations .

2. The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Location on a Sunday prior to the commencement of the Sales.

3. On "shopping center" property, the Merchant and the Consultants shall not distribute handbills, leaflets, or other written materials to customers outside of any Designated Closing Locations' premises, unless permitted by the applicable Merchant Lease for such premises or if distribution is customary in the "shopping center" in which such Designated Closing Location is located; *provided* that the Merchant and the Consultants may solicit customers in the Designated Closing Locations themselves.  On "shopping center" property, the Merchant and the Consultants shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable Merchant Lease or otherwise agreed to by the landlord.

4. At the conclusion of the Sale, the Merchant and the Consultants shall vacate the Designated Closing Locations ; *provided* that the Merchant may abandon any Merchant owned Sale Assets not sold in the Sales following the Sale Termination Date, without cost or liability of any kind to the Merchant and the Consultants.  The Merchant shall notify the applicable landlord (and if known, such landlord's counsel) of its intention to abandon any Merchant owned Sale Assets at least two (2) calendar days prior to the Sale Termination Date.  The Merchant will have the option to remove any Merchant owned Sale Assets, at its own cost prior to the Sale Termination Date.  Any abandoned Merchant owned Sale Assets left in a Designated Closing Location after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant and the Consultants.  For the avoidance of doubt, as of the Sale Termination Date, the Merchant and the Consultants may abandon, in place and without further responsibility or liability of any kind, any Merchant owned Sale Assets.

5. The Merchant and the Consultants may advertise the Sales as "store closing", "sale on everything," "everything must go," "everything on sale," "going-out-of-business," or similar-themed sales.  The Merchant and the Consultants may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  All signs, banners, ads, and other advertising material, promotions, and campaigns will be approved by the Merchant, prior to purchase, in accordance with these Sale Guidelines.

---

[1] Capitalized terms used but not defined in these sale guidelines (the "Sale Guidelines") have the meanings given to them in that certain consulting agreement dated as of April 3, 2025, by and among New Rite Aid, LLC, on the one hand, and SB360 Capital Partners, LLC and Hilco Merchant Resources, LLC, on the other hand.

6.  The Merchant and the Consultants shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Merchant and the Consultants shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Consultants shall be permitted to utilize exterior banners at (a) nonenclosed mall Designated Closing Locations, and (b) enclosed mall Designated Closing Locations to the extent the entrance to the applicable Closing Location does not require entry into the enclosed mall common area; *provided, however*, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Merchant and the Consultants shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Merchant and the Consultants any additional restrictions not contained in the applicable lease agreement.

7.  Conspicuous signs shall be posted in the cash register areas of each of the affected Designated Closing Locations to effect that "all sales are final."

8.  Except with respect to the hanging of exterior banners, the Merchant and the Consultants shall not make any alterations to the storefront or exterior walls of any Designated Closing Locations, except as authorized by the applicable lease.

9.  The Merchant and the Consultants shall not make any alterations to interior or exterior Closing Location lighting, except as authorized by the applicable lease.  No property of the landlord of a Designated Closing Location shall be removed or sold during the Sales.  The hanging of exterior banners or in-Closing Location signage and banners shall not constitute an alteration to a Designated Closing Store.

10. The Merchant shall keep Closing Location premises and surrounding areas clear and orderly consistent with present practices.

11. The Merchant and the Consultants (in consultation with the Merchant) are authorized to enter into "side letters" with the landlord of any Designated Closing Location without further order of the Court, *provided* that such agreements do not have a material adverse effect on the Sale Assets or the Sales.

12. The Merchant and the Consultants may advertise the sale of the Merchant owned Sale Assets in a manner consistent with these Sale Guidelines.  The purchasers of any of the Merchant owned Sale Assets during the sale shall be permitted to remove such Sale Assets either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however*, that the foregoing shall not apply to *de minimis* sales of Merchant owned Sale Assets made whereby the item can be carried out of the Designated Closing Location in a shopping bag.  For the avoidance of doubt, as of

the Sale Termination Date, the Merchant and the Consultants may abandon, in place and without further responsibility, any Merchant owned Sale Assets.

13. At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Designated Closing Locations shall have reasonable access to the Designated Closing Locations' premises as set forth in the applicable Merchant Lease.  The Merchant and its agents and representatives shall continue to have access to the Designated Closing Locations pending assumption or rejection of applicable leases.

14. The rights of landlords against Merchant for any damages to a Designated Closing Location shall be reserved in accordance with the provisions of the applicable Merchant Lease.

15. The Merchant is authorized to conduct and consummate sales and internal transfers of Pharmacy Assets consistent with its historical practices, in accordance with applicable law.

16. If and to the extent that the landlord of any Closing Location affected hereby contends that the Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant as follows:

| | |
|---|---|
| If to Consultants: | SB360 Capital Partners, LLC<br>75 Second Avenue<br>Needham, MA  02494<br>Attn: Aaron S. Miller, President<br>Email:  amiller@sb360.com |
| | - and - |
| | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn:  Ian Fredericks, Chief Executive Officer<br>Email:  ifredericks@hilcoglobal.com |
| With a copy to: | Leichtman Law PLLC<br>185 Madison Avenue - 15th Floor<br>New York, NY 10016<br>Attn:   Maura I. Russell<br>Email:  mrussell@leichtmanlaw.com |
| | - and - |
| | Lowenstein Sandler LLP<br>One Lowenstein Parkway<br>Roseland, NJ 07068<br>Attn:  Jeffrey Cohen and Andrew Behlmann<br>Email:  jcohen@lowenstein.com;<br>      abehlmann@lowenstein.com |

If to the Merchant:    New Rite Aid, LLC
200 Newberry Commons
Etters, PA 17319
Attn:  Matthew Schroeder
Email: MSchroeder@riteaid.com

With a copy to:    Paul, Weiss, Rifkind, Wharton & Garrison, LLC
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alice Belisle Eaton, Christopher Hopkins, Nick Krislov
Email: aeaton@paulweiss.com, chopkins@paulweiss.com, nkrislov@paulweiss.com

## Exhibit B

**Proposed Final Order**

[*To be filed in advance of hearing*]