**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

In re:

NEW RITE AID, LLC, *et al.*,

Debtors.[1]

Chapter 11

Case No. 25-14861 (MBK)

(Jointly Administered)

**Re: Docket Nos. 17 & 473**

## NOTICE OF (I) SUCCESSFUL BIDDERS AND BACKUP BIDDER, AND (II) ADJOURNMENT OF REMAINING ASSETS AUCTION

**PLEASE TAKE NOTICE** that on May 21, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* [Docket No. 473] (the "Bidding

---

[1]  The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

Procedures Order") by which the Court approved procedures (such procedures, the "Bidding Procedures") for the sale or sales of all, substantially all, or any portion of the Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that on May 16, 2025, the Debtors filed the *Notice of Sale by Auction and Sale Hearing for Debtors' Remaining Assets* [Docket No. 342] (the "Sale Notice"), served the Sale Notice on the Notice Parties, and posted the Sale Notice on their case website.  The Sale Notice notified interested parties of the Debtors' intention to solicit offers for Sale Transactions and provided that an Auction of the Remaining Assets (the "Remaining Assets Auction") may be held on June 20, 2025 at 9:00 a.m. (prevailing Eastern Time) by videoconference.

**PLEASE TAKE FURTHER NOTICE** that on June 23, 2025, the Debtors filed the *Notice of (I) Sale by Auction and Sale Hearing for Debtors Thrifty Assets and (II) Adjournment of Auction with Respect to the Debtors Other Remaining Assets* [Docket No. 1062] (the "Remaining Assets Auction Notice"), notifying parties the Debtors would be holding an auction for the Thrifty Ice Cream business and related assets (the "Thrifty Assets") on June 24, 2025 at 11:00 a.m. (prevailing Eastern Time) by videoconference.

**PLEASE TAKE FURTHER NOTICE** that the Debtors, in consultation with the Consultation Parties, have selected Hilrod Holdings L.P. as the successful bidder with respect to the Thrifty Assets and KPH Healthcare Services, Inc. as a successful bidder with respect to certain of the Pharmacy Assets which are Remaining Assets (each a "Successful Bidder" and such bid, a "Successful Bid").  The final form of the purchase agreements (each an "APA") are attached hereto as **Exhibit A** and **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors, in consultation with the Consultation Parties, have determined that Optimal Investment Group Inc. has submitted the next highest or otherwise best Qualified Bid (the "Backup Bid") and has been selected as the backup bidder (the "Backup Bidder") with respect to the Thrifty Assets.  The form of APA between the Debtors and the Backup Bidder is attached hereto as **Exhibit C**.

**PLEASE TAKE FURTHER NOTICE** that the Remaining Assets Auction has been adjourned *sine die*.  The Debtors can reconvene the Remaining Assets Auction at any time upon notifying the applicable Qualified Bidders.

**PLEASE TAKE FURTHER NOTICE** that the proposed Sales of the Assets pursuant to each of the APAs is consistent with the Debtors' existing privacy policies regarding the transfer of personally identifiable information ("PII") and protected health information ("PHI").  The sale, conveyance, assignment, and transfer of PII and PHI, if any, will be consistent with the Debtors' policies regarding the transfer of such PII and PHI as of the Petition Date.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek entry of one or more orders approving the Sale Transactions (the "Sale Order") at a hearing scheduled on **June 30, 2025, at 11:30 a.m. (prevailing Eastern Time)** (the "Sale Hearing"), before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State

---

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

Street, Courtroom 8, Trenton, New Jersey 08608 or by videoconference or such other form of remote communication established by the Court.

PLEASE TAKE FURTHER NOTICE that on June 24, 2025 the Debtors filed the *Notice of Filing of Proposed Orders Authorizing and Approving the Sale of Certain of the Debtors' Assets, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 1068], attaching the proposed forms of Sale Order.

PLEASE TAKE FURTHER NOTICE that, at the Sale Hearing, the Debtors may seek the Court's approval of the Successful Bids and the Backup Bid and entry of the Sale Orders. Unless the Court orders otherwise or as agreed to by the applicable parties, the Sale Hearing shall be an evidentiary hearing on matters relating to each Sale.

PLEASE TAKE FURTHER NOTICE that objections, if any, to consummation or approval of each Sale must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before June 27, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") by (i) the Bid Notice Parties, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) counsel to the Official Committee of Unsecured Creditors, Willkie Farr & Gallagher LLP, (iv) the Successful Bidders and Backup Bidder, and (v) any other party that has filed a notice of appearance in these chapter 11 cases.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the proposed assumption and assignment of any executory contract or unexpired lease to a Successful Bidder or Backup Bidder and/or the related proposed cure amount will be subject to a separate objection deadline as set forth in the Cure Notice served on each applicable contract or lease counterparty and do not need to be filed on or before the Sale Objection Deadline.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALES ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALES, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR SALE ORDER, AS APPLICABLE.**

PLEASE TAKE FURTHER NOTICE that copies of the Bidding Procedures, the Bidding Procedures Orders, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retainer in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930-4577; (b) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

3

Dated:  June 26, 2025

/s/ *Michael D. Sirota*
_____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990
Email:      arosenberg@paulweiss.com
            aeaton@paulweiss.com
            chopkins@paulweiss.com
            smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**Hilrod Holdings L.P. APA**

---

## ASSET PURCHASE AGREEMENT

### BY AND AMONG

### THRIFTY PAYLESS, INC.

### AND

### HILROD HOLDINGS L.P.

Dated as of June 24, 2025

---

# TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF PURCHASED ASSETS ........................................... 2

Section 1.1    Purchased Assets and Excluded Assets .................................................... 2

Section 1.2    Assumed Liabilities and Excluded Liabilities ..................................................... 2

Section 1.3    Assignment and Cure Amounts ........................................................... 2

ARTICLE II PURCHASE AND SALE TRANSACTION ................................................ 3

Section 2.1    Purchase Price; Allocation of the Purchase Price .............................................. 3

Section 2.2    Closing; Closing Date ................................................................. 3

Section 2.3    Seller Closing Deliverables ............................................................ 4

Section 2.4    Buyer Closing Deliverables ............................................................ 4

Section 2.5    Withholding ........................................................................... 4

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ...................... 5

Section 3.1    Organization and Qualification .......................................................... 5

Section 3.2    Authorization; Enforceability ........................................................... 5

Section 3.3    No Violation ........................................................................... 5

Section 3.4    Consents .............................................................................. 6

Section 3.5    Taxes ................................................................................. 6

Section 3.6    Property; Assets ....................................................................... 7

Section 3.7    Intellectual Property ................................................................... 7

Section 3.8    Employees and Labor Matters ......................................................... 8

Section 3.9    Brokers ............................................................................... 9

Section 3.10   Litigation ............................................................................. 9

Section 3.11   Contracts ............................................................................. 9

Section 3.12   Other Matters ........................................................................ 9

Section 3.13   No Other Representations and Warranties .................................................... 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER ...................... 10

Section 4.1    Organization and Qualification ........................................................ 10

Section 4.2    Authorization; Enforceability ......................................................... 10

Section 4.3    No Consents .......................................................................... 11

Section 4.4    Litigation ............................................................................ 11

Section 4.5    No Violation ......................................................................... 11

Section 4.6    Sufficiency of Funds .................................................................. 11

Section 4.7    No Brokers ........................................................................... 11

Section 4.8    Independent Investigation ............................................................. 11

ARTICLE V COVENANTS ......................................................................................... 12

Section 5.1    Conduct of Business ............................................................. 12

Section 5.2    Employee Matters ................................................................ 12

Section 5.3    No Third-Party Beneficiaries ............................................... 12

Section 5.4    Additional Agreements of the Parties ................................... 13

Section 5.5    Tax Matters ......................................................................... 13

Section 5.6    Shared Contracts Efforts ...................................................... 14

Section 5.7    Bulk Sale Laws .................................................................... 14

Section 5.8    Access to Information ........................................................... 14

Section 5.9    Licenses and Permits ........................................................... 15

ARTICLE VI BANKRUPTCY COURT MATTERS ............................................... 15

Section 6.1    Bankruptcy Actions ............................................................. 15

Section 6.2    Bankruptcy Filings .............................................................. 15

Section 6.3    Cure Notices ....................................................................... 16

Section 6.4    Sale Free and Clear ............................................................. 16

ARTICLE VII CONDITIONS TO CLOSING ........................................................ 16

Section 7.1    Conditions Precedent to the Obligations of the Parties ................. 16

Section 7.2    Conditions Precedent to the Obligations of the Buyer .................. 16

Section 7.3    Conditions Precedent to the Obligations of the Seller .................... 17

ARTICLE VIII DEFINITIONS ............................................................................... 17

Section 8.1    Definitions .......................................................................... 17

ARTICLE IX MISCELLANEOUS .......................................................................... 25

Section 9.1    Termination of Agreement. ................................................... 25

Section 9.2    Survival of Terms ................................................................ 25

Section 9.3    No Liability; Release. .......................................................... 26

Section 9.4    Non-Recourse ..................................................................... 27

Section 9.5    Specific Performance ........................................................... 27

Section 9.6    No Setoff. ........................................................................... 27

Section 9.7    Fiduciary Obligations .......................................................... 28

Section 9.8    Press Releases and Communications ...................................... 28

Section 9.9    Expenses ............................................................................. 28

Section 9.10   Notices, Consents, etc ......................................................... 28

Section 9.11   Severability ......................................................................... 29

Section 9.12   Successors; Assignment ....................................................... 29

Section 9.13   Counterparts; Facsimile Signatures ....................................... 29

Section 9.14    Governing Law; Forum ................................................................. 30

Section 9.15    Table of Contents and Headings..................................................... 31

Section 9.16    Entire Agreement............................................................................ 31

Section 9.17    Third Parties ................................................................................... 31

Section 9.18    Disclosure Generally ...................................................................... 31

Section 9.19    Interpretive Matters ....................................................................... 32

Section 9.20    Construction.................................................................................... 32

## INDEX OF SCHEDULES AND EXHIBITS

Schedule 1.1(a)        Purchased Assets

Schedule 1.1(b)        Excluded Assets

Schedule 1.2(a)        Assumed Liabilities

Schedule 1.2(b)        Excluded Liabilities

Schedule 8.1           Cure Amount

Exhibit A              Form of Bill of Sale

Exhibit B              Form of IP Assignment Agreement

Exhibit C              Allocation Schedule

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "*Agreement*") is made and entered into as of June 24, 2025, by and between Hilrod Holdings L.P., a Delaware limited partnership (the "*Buyer*"), Thrifty PayLess, Inc., a California corporation (the "*Seller*") and, solely for purposes of Section 3.7, Name Rite, L.L.C., a Delaware limited liability company ("*Name Right*") and Thrifty Corporation, a California corporation (together with Name Rite, the "***Other IP Sellers***"). Each of the parties named above may be referred to herein as a "*Party*" and collectively as the "*Parties*." Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in ARTICLE VIII below.

### RECITALS

WHEREAS, the Seller is engaged in the business of manufacturing, selling and distributing ice cream, including under the "Thrifty" brand (and certain ancillary services related thereto, collectively, the "***Thrifty Business***");

WHEREAS, on August 30, 2024, the Seller and certain of its Affiliates emerged from voluntary cases (the "***Prior Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of New Jersey ("***Bankruptcy Court***"), and in connection therewith entered into an internal reorganization;

WHEREAS, on May 5, 2025 (the "***Petition Date***"), the Seller, together with certain of its Affiliates, filed voluntary petitions for relief commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "***Bankruptcy Cases***");

WHEREAS, the Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities from the Seller, and the Seller desires to sell, convey, assign, and transfer to the Buyer the Purchased Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

WHEREAS, the Parties acknowledge and agree that the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller or its Affiliates;

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the Transactions are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 363 and 365 of the Bankruptcy Code; and

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows.

# ARTICLE I
## PURCHASE AND SALE OF PURCHASED ASSETS

Section 1.1    <u>Purchased Assets and Excluded Assets</u>.

(a)    <u>Purchased Assets</u>. At the Closing, on the terms and subject to the conditions set forth in this Agreement, and in consideration of the Purchase Price to be paid by the Buyer to the Seller, and the Buyer's assumption of the Assumed Liabilities, on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Buyer will purchase and acquire from the Seller and the Seller will sell, convey, assign, transfer and deliver to the Buyer, all of the Seller's right, title and interest in and to the assets listed on <u>Schedule 1.1(a)</u> (collectively, the "***Purchased Assets***"), which for the sake of clarity includes all assets, machinery, equipment, transportation equipment, and inventory used for and in connection with the operation of the business, whether expressly listed or not in <u>Section 1.1(a)(ii)</u> of the Disclosure Schedule, free and clear of all Adverse Claims other than Assumed Liabilities and Permitted Liens. For purposes of this <u>Section 1.1</u>, references to "Seller" shall be deemed to include the applicable Affiliate of Seller to the extent required to convey, assign, transfer and deliver any Purchased Asset or Assumed Liability hereunder.

(b)    <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained in this Agreement, all of the assets, properties, rights and interests of the Seller not expressly described in or covered by <u>Section 1.1(a)</u> above are expressly excluded from the Transactions, and as such are not included in the Purchased Assets and shall remain the property of the Seller after the Closing, including the assets, properties, rights and interests of the Seller listed on <u>Schedule 1.1(b)</u> (collectively, the "***Excluded Assets***").

Section 1.2    <u>Assumed Liabilities and Excluded Liabilities</u>.

(a)    <u>Assumed Liabilities</u>. At the Closing, the Buyer shall assume, and following the Closing shall pay, perform and discharge when due, in accordance with their respective terms and subject to their respective conditions, only the Liabilities of the Seller arising out of or relating to the Thrifty Business or the Purchased Assets from and after the Closing, including the Liabilities listed on <u>Schedule 1.2(a)</u>, but excluding the Excluded Liabilities (the "***Assumed Liabilities***").

(b)    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary contained herein and except as set forth in <u>Section 1.2(a)</u>, the Buyer shall not assume and have no responsibility or obligation whatsoever for any Liabilities of the Seller, including all Liabilities associated with the Excluded Assets and any of the Liabilities listed on <u>Schedule 1.2(b)</u> (collectively, the "***Excluded Liabilities***").

Section 1.3    <u>Assignment and Cure Amounts</u>. Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to section 365 of the Bankruptcy Code, the Seller shall assume and assign to the Buyer, and the Buyer shall take assignment from the Seller of, the Assigned Contracts and the Assumed Lease. Buyer shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully

with the Seller in seeking such approval from the Bankruptcy Court, including the Buyer providing the necessary evidence required in connection with any hearing to approve entry of the Sale Order to approve this Agreement and the Transactions.

## ARTICLE II
## PURCHASE AND SALE TRANSACTION

Section 2.1    Purchase Price; Allocation of the Purchase Price.

(a)    The aggregate consideration (the "*Purchase Price*") to be paid by the Buyer for the purchase of the Purchased Assets shall be equal to Nineteen Million Two Hundred Thousand Dollars ($19,200,000). In addition to the payment of the Purchase Price by Buyer in accordance with the terms of this Agreement, Buyer shall also assume the Assumed Liabilities at the Closing.

(b)    On or before 5:00 PM Eastern Standard Time on June 26, 2025 (the "*Initial Deposit Deadline*"), Buyer shall deposit Four Million Dollars ($4,000,000) in immediately available funds into an account designated by the Seller (the "*Initial Deposit*"). The Initial Deposit shall be non-refundable. If the Closing occurs, the Initial Deposit shall be applied towards the Purchase Price to be paid by the Buyer at the Closing.

(c)    On or before 5:00 PM Eastern Standard Time on July 2, 2025 (the "*Subsequent Deposit Deadline*"), Buyer shall deposit an amount equal to the Purchase Price *minus* the Initial Deposit (the "*Subsequent Deposit*") in immediately available funds into an account designated by the Seller. In the event that this Agreement is terminated for any reason and the Closing shall not occur, the Subsequent Deposit shall be released to the Buyer within two (2) Business Days following the termination of this Agreement.

(d)    The Parties agree that at the Closing, the Initial Deposit and the Subsequent Deposit will be deemed paid in full in respect of the Purchase Price.

(e)    The Parties agree that the Purchase Price and all other items required by the Code (including, without limitation, the Assumed Liabilities) shall be allocated among the Purchased Assets in accordance with the allocations set forth on Exhibit C hereto and made a part hereof (the "*Allocation Schedule*"). The Parties acknowledge and agree that the Allocation Schedule was prepared in accordance with Section 1060 of the Code and the regulations promulgated thereunder. The Parties agree to file their respective IRS Forms 8594 and all federal, state and local tax returns in accordance with the Allocation Schedule and to not take any action inconsistent with the foregoing unless otherwise required by a final determination within the meaning of Section 1313(a) of the Code.

Section 2.2    Closing; Closing Date. The closing of the Transactions (the "*Closing*") shall take place remotely by exchange of documents and signatures (or their electronic counterparts) by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, NY 10019-6064) at 10:00 a.m. Eastern Time, following the satisfaction or waiver of the conditions set forth in ARTICLE VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to

3

satisfaction or waiver of such conditions), on July 22, 2025, or such other date, time or place as agreed to in writing by the Buyer and the Seller (the "***Closing Date***").

Section 2.3    Seller Closing Deliverables. At the Closing, the Seller shall deliver, or cause to be delivered, to the Buyer:

(a)    Bill of Sale. A bill of sale, assignment and assumption agreement, to be dated the Closing Date, substantially in the form attached hereto as Exhibit A (the "***Bill of Sale***"), duly executed by the Seller;

(b)    Sale Order. A copy of the Sale Order entered by the Bankruptcy Court;

(c)    IRS Form W-9. A duly executed IRS Form W-9 from the Seller, dated as of the Closing Date; and

(d)    IP Assignment Agreement. An Intellectual Property assignment agreement, to be dated the Closing Date, substantially in the form attached hereto as Exhibit B (the "***IP Assignment Agreement***"), duly executed by the Seller and the Other IP Sellers.

Section 2.4    Buyer Closing Deliverables. At the Closing, the Buyer shall deliver, or cause to be delivered, to the Seller:

(a)    Purchase Price. An amount equal to Purchase Price in immediately available funds to an account designated by the Seller at least two (2) Business Days prior to the Closing Date;

(b)    Bill of Sale. The Bill of Sale duly executed by the Buyer;

(c)    IRS Form W-9. A duly executed IRS Form W-9 from the Buyer or the Buyer's regarded owner for U.S. federal income tax purposes, dated as of the Closing Date; and

(d)    IP Assignment Agreement. The IP Assignment Agreement duly executed by the Buyer.

Section 2.5    Withholding. Notwithstanding any other provision of this Agreement, the Buyer, its Affiliates and any other applicable withholding agent shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement any such amounts as it is required to deduct and withhold under applicable Tax law with respect to the making of such payment. To the extent that amounts are so withheld and remitted to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made by the Buyer, its Affiliates or any other applicable withholding agent. The Buyer shall provide prior written notice to the Seller of any intention to make such deduction or withholding to the Seller in reasonable detail at least five (5) days prior to such amount being withheld, and shall cooperate in good faith with the Seller to mitigate, reduce or eliminate any such deduction or withholding.

4

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court in connection with the Prior Cases or the Bankruptcy Cases, or (ii) set forth in the Disclosure Schedules and subject to Section 9.18, the Seller, and solely for purposes of Section 3.7, each Other IP Seller, hereby represents and warrants to the Buyer as of the date hereof as follows (it being understood that in case any representation or warranty set forth in this ARTICLE III speaks, or refers, to an earlier date or period, such period or date shall be, or commence on, as applicable, the Emergence Date, as applicable, and in no event will any such representation or warranty be construed to speak of or refer to an earlier date):

Section 3.1    Organization and Qualification. The Seller is a legal entity duly organized, validly existing and in good standing (where such status is recognized) under the Laws of the state of its formation or incorporation (as applicable), in all material respects. The Seller has the requisite power and authority to conduct the Thrifty Business as it is now being conducted, in all material respects. The Seller is duly qualified to engage in the Thrifty Business and is in good standing in every jurisdiction in which ownership of its properties or the conduct of the Thrifty Business requires it to be so qualified, in all material respects, except where the failure to be so qualified would not reasonably be expected to materially and adversely hinder or impair the consummation of the Transactions or the Transaction Agreements.

Section 3.2    Authorization; Enforceability. Subject to the entry of the Sale Order, the Seller has the requisite power and authority, or capacity, as the case may be, to execute and deliver this Agreement and the Transaction Agreements to which it is a party, to perform its obligations under this Agreement and the Transaction Agreements to which it is a party and to consummate the Transactions and the Transaction Agreements to which it is a party, in all material respects. The execution and delivery of, and performance by the Seller under, this Agreement and the Transaction Agreements to which the Seller is a party, and the consummation by the Seller of the Transactions and the Transaction Agreements to which it is a party, have been duly authorized by all requisite corporate actions, in all material respects, and no other corporate action on the part of the Seller is necessary to authorize the execution and delivery of, and performance by, the Seller under this Agreement and the Transaction Agreements to which the Seller is a party and the consummation by it of the Transactions and the Transaction Agreements to which it is a party. This Agreement has been duly and validly executed and delivered by the Seller, and the Transaction Agreements to which the Seller is a party have been duly executed and delivered, and this Agreement and the Transaction Agreements, assuming the due authorization, execution and delivery in each case by the Buyer and the parties thereto, will constitute, upon such execution and delivery in each case thereof, the legal, valid and binding obligations of the Seller, enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions or as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.3    No Violation. Except as set forth on Section 3.3 of the Disclosure Schedules, neither the execution and delivery of this Agreement or the Transaction Agreements to which the Seller is a party nor the performance by the Seller of its obligations hereunder or thereunder, or the consummation of the Transactions, will (a) violate, conflict with or constitute

a default in any material respect under the Organizational Documents of the Seller, (b) violate in any material respect, conflict with in any material respect or result in a material breach of, constitute a material default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Assigned Contract to which the Seller is bound, and the Assumed Lease, or result in the creation or imposition of any Lien on any of the Purchased Assets or (c) violate any Laws applicable to the Seller or by which any of the Purchased Assets are bound or result in a material violation or revocation of any required license, permit, authorization or approval in connection with the Thrifty Business from any Governmental Authority, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.4    Consents. Except as set forth on Section 3.4 of the Disclosure Schedules, neither the execution and delivery of this Agreement or the Transaction Agreements to which the Seller is a party nor the performance by the Seller of its obligations hereunder or thereunder or the consummation of the Transactions will (with or without the passage of time or the giving of notice) require any Consent (collectively, the "***Third Party Consents***") from (i) any Governmental Authority or (ii) any party to (x) the Assumed Lease or (y) an Assigned Contract with any customer (except as would not be material to the Thrifty Business, taken as a whole), except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.5    Taxes. Except as would not be materially adverse to the Thrifty Business taken as a whole:

(a)    The Seller has (or has caused to be) timely filed (taking into account available extensions of time to file) all material Tax Returns required to be filed by or with respect to the Thrifty Business or the Purchased Assets, and all such Tax Returns are true, complete and correct in all material respects. All material Taxes due and owing by the Seller with respect to the Purchased Assets, whether or not reflected or otherwise shown as due on such Tax Returns, have been or will be fully and timely paid when due. The Seller has withheld, collected and timely paid over to the appropriate Taxing Authority all material Taxes required by Law to be withheld or collected by it from or with respect to any employee, consultant, shareholder, creditor or any other Person, in each case, in connection with the operation of the Thrifty Business.

(b)    No material Tax assessment, deficiency or adjustment has been assessed with respect to the Purchased Assets by any Taxing Authority that has not been fully and timely settled, paid or withdrawn and, with respect to the Purchased Assets, the Seller (or any of its Affiliates) has not been notified in writing, of any current material Tax audit by any Taxing Authority or that any Taxing Authority intends to conduct such an audit, and no material action, suit, investigation, claim or assessment is pending or, to the Seller's Knowledge, proposed with respect to any alleged material deficiency in Taxes.

(c)    The Seller has not waived any statute of limitations on assessment or collection in respect of any material Taxes or agreed to, or is the beneficiary of, any extension of time with respect to a material Tax assessment, deficiency, audit, claim or examination, and no such waiver or extension is in effect with respect to any of the Purchased Assets.

(d)      There are no Liens for Taxes on any of the Purchased Assets other than Permitted Liens.

(e)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.5</u> shall constitute the sole representations and warranties in this Agreement with respect to Taxes and no representation or warranty set forth in this <u>Section 3.5</u> shall be deemed to apply directly or indirectly with respect to the Seller combined, consolidated, affiliated, or unitary Tax Return. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

Section 3.6      <u>Property; Assets</u>.

(a)      Except as set forth on <u>Section 3.6(a)</u> of the Disclosure Schedules, (i) the Seller has good and marketable title to or a valid and enforceable leasehold interest in, or a valid and enforceable license or other right to use, the Purchased Assets, free and clear of any Liens other than Permitted Liens and (ii) the Purchased Assets, whether owned or otherwise contracted for by the Seller, are in a state of reasonable maintenance and repair (ordinary wear and tear excepted) and are adequate and suitable for the purposes for which such Purchased Assets are presently being used, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)      (i) The Seller has a good and valid leasehold interest in the real property leased pursuant to the Assumed Lease, free and clear of all Liens other than Permitted Liens. A true and correct copy of the Assumed Lease has been made available to the Buyer, (ii) the Assumed Lease is a valid and binding agreement of the Seller, and, to the Seller's Knowledge, each of the other parties thereto, except as may be limited by the General Enforceability Exceptions and is in full force and effect, and (iii) as of the date hereof, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or default under the Assumed Lease by the Seller, nor to the Seller's Knowledge, on the part of any of the other parties thereto, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(c)      Except as would not be materially adverse to the Thrifty Business taken as a whole or as set forth on <u>Section 3.6(c)</u> of the Disclosure Schedules, the Purchased Assets include all material assets used by Seller in the conduct of the Thrifty Business as of the date of this Agreement.

Section 3.7      <u>Intellectual Property</u>.

(a)      To the Seller's Knowledge, <u>Section 3.7(a)</u> of the Disclosure Schedules sets forth a true, correct and complete list of all registered or applied for Intellectual Property included in the Owned Thrifty Business Intellectual Property. To the Seller's Knowledge, all of the registrations, issuances and applications set forth on <u>Section 3.7(a)</u> of the Disclosure Schedules are valid, in full force and effect and have not expired or been cancelled, abandoned or otherwise terminated, and payment of all renewal and maintenance fees and expenses in respect

thereof, and all filings related thereto, have been duly made, except as would not be materially adverse to the Thrifty Business taken as a whole.

(b)     To the Seller's Knowledge, the Seller and the Other IP Sellers exclusively own all right, title and interest in or to the Owned Thrifty Business Intellectual Property, free and clear of all Liens other than Permitted Liens, except as would not be materially adverse to the Thrifty Business taken as a whole.

(c)     To the Seller's Knowledge, (i) the conduct of the Thrifty Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and there is no Legal Proceeding pending or, to the Knowledge of the Seller, threatened in writing alleging any such infringement or violation or challenging the Seller's or any of its Affiliates' rights in or to any Owned Thrifty Business Intellectual Property and, to the Knowledge of the Seller, there is no existing fact or circumstance that would be reasonably expected to give rise to any such Legal Proceeding, and (ii) no Person is infringing or otherwise violating any Owned Thrifty Business Intellectual Property or any rights of the Seller in any Owned Thrifty Business Intellectual Property, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(d)     Section 3.7(d) of the Disclosure Schedules sets forth a correct and complete list of all Contracts to the Knowledge of the Seller (i) pursuant to which the Seller and its Affiliates use any Licensed Intellectual Property (excluding (x) non-exclusive licenses entered in the Ordinary Course of Business and purchase orders thereof and (y) licenses for Open Source Software) or (ii) pursuant to which the Seller or any of its Affiliates have granted to a third party any exclusive right in or to any Owned Thrifty Business Intellectual Property (excluding any rights granted in the Ordinary Course of Business).

Section 3.8     Employees and Labor Matters.

(a)     Section 3.8(a) of the Disclosure Schedules sets forth the following in regard to each employee serving the Thrifty Business as of the date hereof (each, a "*Scheduled Employee*"): his or her date of hire, position or job title and exempt or non-exempt classification under applicable wage and hour Laws.

(b)     Section 3.8(b) of the Disclosure Schedules sets forth all collective bargaining agreements with any labor union representing any Scheduled Employee to which the Seller (with respect to the Scheduled Employees) is a party (each, along with any side letters, memorandums of understanding, or related agreements, a "*Collective Bargaining Agreement*"). The Seller has made available copies of all Collective Bargaining Agreements to which the Seller is a party with respect to the Scheduled Employees. In regard to the Thrifty Business, (i) there is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any Scheduled Employees by the Seller and (ii) there is no pending or, to the Seller's Knowledge, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Scheduled Employees located at or whose work involves the Thrifty Business, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

8

Section 3.9    Brokers. Except for Guggenheim Securities, LLC ("**Guggenheim Securities**"), the fees and expenses of which will be paid by the Seller, no broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions or similar payments in connection with the Transactions or the Transaction Agreements based upon arrangements made by or on behalf of the Seller.

Section 3.10    Litigation. Except as set forth on Section 3.10 of the Disclosure Schedules, there is no, and there has not been:

(a)    any, judicial, administrative or other suits, actions, charges, mediations, arbitrations, inquiries, proceedings, investigations, audits, claims, alternative dispute resolution procedures, hearings, examinations or orders of any nature involving or relating to the Thrifty Business or the Purchased Assets (collectively, "**Legal Proceedings**") pending or, to the Seller's Knowledge, threatened in writing, involving the Seller or the Thrifty Business or any Legal Proceeding which questions the legality, validity, propriety or enforceability of the Transactions which would be materially adverse to the Thrifty Business taken as a whole; or

(b)    any judgment, Order or decree of any court or Governmental Authority to which the Seller or any of the Purchased Assets is subject, which would be materially adverse to the Thrifty Business taken as a whole.

Section 3.11    Contracts.

(a)    (i) Each Assigned Contract, and the Assumed Lease, is in full force and effect and is valid, binding and enforceable in accordance with its terms, with respect to the Seller (or its Affiliates party thereto) and to the Seller's Knowledge, with respect to the other parties thereto, and (ii) Seller is not, and to the Seller's Knowledge, any other party to an Assigned Contract, or the Assumed Lease, is not, in default or breach of any provision thereunder that would permit termination, modification or acceleration thereunder (except as rendered unenforceable by the Bankruptcy Code), except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)    Section 3.11(b) of the Disclosure Schedules sets forth a complete and accurate list of all Shared Contracts.

Section 3.12    Other Matters.

(a)    (i) The Seller is, and has been, in compliance with all applicable Laws relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emissions, discharges, releases or threatened releases of Hazardous Substances into the air, surface water, ground water or lands or otherwise relating to protection of the environment or human health and safety (as it relates to exposure to Hazardous Substances) (including, but not limited to, ambient air, surface water, ground water, land surface or subsurface strata) (collectively, "**Environmental Laws**"); (ii) there is no action under or pursuant to any Environmental Law that is pending or, to the Knowledge of Seller, threatened against the Seller, and the Seller has no Knowledge that any such action is reasonably likely to be forthcoming and (iii) neither the Seller nor any of the Purchased Assets is not subject to any Order imposed by any Governmental Authority pursuant to Environmental Laws under which

there are uncompleted, outstanding or unresolved obligations on the part of the Seller, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)    Seller is, and has, been operating the Thrifty Business, in compliance with all applicable Food and Drug Administration (FDA) Laws and regulations, except as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.13    No Other Representations and Warranties. Except for the representations and warranties set forth in ARTICLE III, the Seller is not making any other representations or warranties, written or oral, statutory, express or implied, concerning the Seller, the Thrifty Business, the Purchased Assets, the Assumed Liabilities or the Transactions, and it is understood that the Buyer, with such exceptions, takes the Purchased Assets "as is" and the Buyer acknowledges that except as expressly provided in this Agreement, the Seller has not made, and the Seller hereby expressly disclaims and negates, and the Buyer hereby expressly waives, any representation or warranty, express, implied, at common law, by statute or otherwise relating to, and the Buyer hereby expressly waives and relinquishes any and all rights, claims and causes of action against the Seller and its Affiliates and each of their respective Representatives in connection with the accuracy, completeness or materiality of any information, data or other materials (written or oral) heretofore furnished to the Buyer or its Representatives by or on behalf of the Seller or any of its Affiliates or any of their respective Representatives in connection therewith. Without limiting the foregoing, the Seller is not making any representation or warranty to the Buyer with respect to any financial projection or forecast relating to the Thrifty Business, the Purchased Assets or the Assumed Liabilities. For purposes of this Section 3.13, "Seller" shall include the Other IP Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows:

Section 4.1    Organization and Qualification. The Buyer is an entity duly organized, validly existing and in good standing under the Laws of the state of its formation or incorporation (as applicable).

Section 4.2    Authorization; Enforceability. The Buyer has the requisite power and authority to execute and deliver this Agreement and the Transaction Agreements to which it is a party, to perform its obligations under this Agreement and the Transaction Agreements to which it is a party and to consummate the Transactions and the Transaction Agreements to which it is a party. The execution and delivery of, and performance by the Buyer under this Agreement and the Transaction Agreements to which the Buyer is a party, and the consummation by the Buyer of the Transactions and the Transaction Agreements to which it is a party, have been duly authorized by all requisite corporate action, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of, and performance by, the Buyer under this Agreement and the Transaction Agreements to which the Buyer is a party and the consummation by it of the Transactions and the Transaction Agreements to which it is a party. This Agreement has been duly and validly executed and delivered by the Buyer, the Transaction Agreements to which the Buyer is a party will be duly executed and delivered by the Buyer at the Closing and,

assuming the due authorization, execution and delivery by the Seller and the parties thereto, will constitute, upon such execution and delivery in each case thereof, legal, valid and binding obligations of the Buyer, enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 4.3    No Consents. Neither the execution and delivery of this Agreement or the Transaction Agreements to which the Buyer is a party nor the performance by the Buyer of its obligations hereunder or thereunder or the consummation of the Transactions will (with or without the passage of time or the giving of notice) require any Third Party Consents from any Governmental Authority.

Section 4.4    Litigation. There are no Legal Proceedings pending or, to the Buyer's knowledge, threatened in writing, against the Buyer, nor is the Buyer subject to any judgment, Order or decree of any court or Governmental Authority, in each case, which would seek to prevent, delay or burden any of the Transactions.

Section 4.5    No Violation. Neither the execution and delivery of this Agreement or the Transaction Agreements to which the Buyer is a party, nor the performance by the Buyer of the Transactions will (a) constitute a default under the Organizational Documents of the Buyer, (b) result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which the Buyer is a party or (c) conflict with or violate any Laws applicable to the Buyer or by which any of its properties is bound; except, in the case of clauses (b) and (c) above, for violations, conflicts, defaults or Consent, that in the aggregate would not reasonably be expected to materially hinder or impair the consummation of the Transactions or the entry into any Transaction Agreements.

Section 4.6    Sufficiency of Funds. Buyer will have access to sufficient funds as of the Closing to pay the Purchase Price to Seller, on the terms and conditions contained in this Agreement, and will not require external third-party financing in order to pay the Purchase Price.

Section 4.7    No Brokers. No broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission from the Buyer in connection with the Transactions.

Section 4.8    Independent Investigation. The Buyer hereby acknowledges and affirms that it has conducted and completed its own investigation, analysis and evaluation of the Thrifty Business, that it has made all such reviews and inspections of the financial condition, business, results of operations, properties, assets and prospects of the Thrifty Business as it has deemed necessary or appropriate, that it has had the opportunity to request all information it has deemed relevant to the foregoing from the Seller or its Representatives and has received responses it deems adequate and sufficient to all such requests for information. The Buyer is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of independently evaluating the merits, risks and suitability of entering into this Agreement and to consummate the Transactions, and is able to bear the risks inherent to the Transactions. In making its decision to enter into this Agreement and to consummate the Transactions, the Buyer has relied solely on (i) its own investigation, analysis and evaluation of

11

the Thrifty Business and (ii) the representations, warranties and covenants of the Seller, or the Other IP Sellers, as applicable, contained in this Agreement.

## ARTICLE V
## COVENANTS

Section 5.1    Conduct of Business. From the date of this Agreement until the Closing Date, except as otherwise provided in this Agreement or approved in writing by the Buyer (such approval to not be unreasonably withheld, delayed or conditioned), the Seller shall use commercially reasonable efforts to carry on and maintain the Thrifty Business in the Ordinary Course of Business. Notwithstanding anything herein to the contrary (a) the Buyer acknowledges that the Seller (or its Affiliates) may be winding down its business and as such, the operating hours, inventory and staffing levels may change accordingly and any such changes shall not be deemed a breach of this Section 5.1 and (b) nothing in this Agreement shall restrict the Seller (or its applicable Affiliates) from modifying, amending, altering or terminating any Shared Contract.

Section 5.2    Employee Matters.

(a)    The Seller acknowledges that, following the date hereof, the Buyer shall have the right to interview before the Closing Date and, following the Closing Date, hire the Seller's current Scheduled Employees, in the Buyer's sole discretion. Any pre-Closing Date interviews shall be conducted outside such employees' work shifts with the Seller and in a manner that would not reasonably be expected to materially disrupt the operations or business of the Thrifty Business, in each case as advised by the Seller. For the avoidance of doubt, the Buyer may not hire any of the Seller's employees with a start date prior to the Closing Date. Where applicable and required by Law or the terms of a Collective Bargaining Agreement, the Buyer shall use commercially reasonable efforts to hire the applicable Scheduled Employees.

(b)    With regard to any employee of the Seller who shall be employed by the Buyer in connection with the Closing (each an "*Eligible Employee*"), the Buyer shall have no contractual obligation with regard to such employment, unless otherwise required by Law or by the applicable Collective Bargaining Agreement, except that, for purposes of the participation of any such Eligible Employees in the Buyer's 401(k) and applicable welfare plans, the Buyer shall cause such plans to take into account, for purposes of eligibility thereunder, the pre-Closing service of such Eligible Employees as if such service was with the Buyer or its affiliates to the same extent such service was recognized by the Seller immediately prior to the Closing under the comparable employee benefit plan of the Seller, in all cases to the extent allowed under the Employee Retirement Income Security Act of 1974 ("*ERISA*"), the Internal Revenue Code and other applicable law. The Buyer shall notify the Seller in a reasonably prompt timeframe of acceptances of employment offers by Eligible Employees.

(c)    As of the Closing, the Buyer shall assume the Collective Bargaining Agreements and all Liabilities thereunder arising on and after the Closing and the Seller will no longer be a party thereto.

Section 5.3    No Third-Party Beneficiaries. Nothing in this Agreement (including Section 5.2), express or implied, shall: (i) confer upon any Person other than the Parties any

rights or remedies of any nature whatsoever, including any third-party beneficiary rights; (ii) be construed to: (1) establish, amend, terminate or modify any compensation or benefit plan, program, policy, Contract, agreement or arrangement and (2) limit the ability of the Buyer or any of its Affiliates to amend, modify or terminate any compensation or benefit plan, program, policy, Contract, agreement or arrangement; or (iii) create any right in any Scheduled Employee or any other Person to any employment or service with the Buyer or any of its Affiliates or to any particular term or condition of employment or service with the Buyer or any of its Affiliates, or to limit the ability of the Buyer or any of its Affiliates to terminate the employment or service of any Person at any time and for any or no reason.

Section 5.4    Additional Agreements of the Parties.

(a)    The Buyer, or the Seller, as applicable, will, and will cause its respective Affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by Buyer or Seller, as applicable, under any applicable laws for the consummation of the Transactions, if any.

(b)    Each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver (at the expense of the requesting Party) such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.

Section 5.5    Tax Matters.

(a)    The Seller shall prepare all Tax Returns for any Straddle Period (such Tax Returns, "***Straddle Period Returns***") and shall provide the Buyer with a draft of such Straddle Period Returns thirty (30) days prior to the filing of the relevant Straddle Period Return, or as soon as reasonably practical thereafter, and shall consider in good faith any reasonable comments made by the Buyer with respect thereto. The Seller shall, without duplication of any other obligations hereunder, be responsible for paying any Taxes reflected on any Straddle Period Return relating to any Pre-Closing Tax Period.

(b)    Any Liability for Taxes attributable to a Straddle Period required to be apportioned under this Agreement shall be apportioned as follows: (i) the amount of property, ad valorem, intangible and other periodic Taxes allocable to the pre-Closing portion of any Straddle Period shall be equal to (A) the amount of such Taxes for the entire Straddle Period *multiplied by* (B) a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the pre-Closing portion of such Straddle Period and the denominator of which is the number of calendar days in the entire Straddle Period and (ii) all Taxes not allocated under clause (i) above shall be allocated to the pre-Closing portion of any Straddle Period on the basis of a "closing of the books," as if such taxable period ended as of the end of the day on the Closing Date; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period beginning after the Closing Date in proportion to the number of calendar days in each period.

13

(c)    Liability for the amount of any Transfer Taxes shall be borne equally by Buyer and Seller and both Parties shall cooperate in good faith to pay on or as soon as practicable following the Closing Date all Transfer Taxes associated with the transfer of the Purchased Assets pursuant this Agreement and shall prepare (at their sole cost and expense) and timely file all related Tax Returns regarding such Transfer Taxes or the Transactions and the Transaction Agreements. Each of the Parties shall cooperate to file, or cause to be filed, all necessary Tax Returns and other documentation with respect to any Transfer Taxes and shall otherwise reasonably cooperate in good faith with such other Party to minimize, to the extent permitted under applicable Law, the amount of any such Transfer Taxes.

(d)    The Seller shall take all actions as may be necessary to terminate all Tax sharing agreements or arrangements (other than customary financial or commercial contracts entered into in the Ordinary Course of Business), if any, to which any Purchased Assets are subject, in each case, in a manner such that after the applicable termination, the Buyer will have no past, present or future Liability thereunder.

Section 5.6    <u>Shared Contracts Efforts</u>. During the period commencing on the date hereof and ending thirty (30) days following the Closing Date, the Seller shall use commercially reasonable efforts to assist the Buyer, at Buyer's sole expense, to reasonably support Buyer in its discussions with any third party, which is a party to a Shared Contract, in order to enable the Buyer to negotiate a separate contractual arrangement with such third parties. For the avoidance of doubt, this <u>Section 5.6</u> shall not in any way be deemed to impose any Liability or obligation of any kind on the Seller or its Affiliates.

Section 5.7    <u>Bulk Sale Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens in the Purchased Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Liens, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 5.8    <u>Access to Information</u>. From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Section 9.1</u>), Seller will provide Buyer and its authorized representatives with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller (solely to the extent they relate to the Purchased Assets or the Thrifty Business), in order for Buyer and its authorized representatives (provided that such authorized representatives shall execute, and be subject to, a nondisclosure agreement in favor of Seller in a form reasonably acceptable by Seller) to access such information regarding the Purchased Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of any Seller or the Thrifty Business, (ii) such access will occur in such a manner, and to such extent, as Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions, and (iii) all requests for access will be directed to Guggenheim Securities or such other Person(s) as Seller may designate in writing from time to time. Buyer acknowledges and agrees that any information obtained by Buyer (or its authorized representatives pursuant to the terms hereof) shall be subject to the nondisclosure

agreement entered into by Buyer (or its Affiliates) and Seller (or its Affiliates) in connection with the Thrifty Business sale process.

Section 5.9    Licenses and Permits. During the period commencing on the date hereof and ending on the Closing Date, the Seller shall use commercially reasonable efforts to assist the Buyer, at Buyer's sole expense, in its efforts to obtain any licenses and permits required to conduct the Thrifty Business (as currently being conducted). For the avoidance of doubt, this Section 5.9 shall not in any way be deemed to impose any Liability or obligation of any kind on the Seller or its Affiliates.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

Section 6.1    Bankruptcy Actions.

(a)    The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Seller, including through its Representatives, is and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(b)    The Parties shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)    Each of the Seller and the Buyer shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including upon reasonable request promptly furnishing the other with copies of notices or other communications received by the Seller from the Bankruptcy Court with respect to the Transactions.

(d)    The Seller and the Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher or better bids and Bankruptcy Court approval. The Buyer acknowledges that the Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, entertaining higher or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction (as such term is defined in the Bidding Procedures Order).

(e)    Nothing in this Section 6.1 shall prevent the Seller from modifying the bidding procedures as necessary or appropriate to maximize value for the Seller's estate in accordance with the Seller's fiduciary obligations.

Section 6.2    Bankruptcy Filings. From and after the date that the Buyer is selected as the winning bidder and until the Closing Date, to the extent reasonably practicable, the Seller shall deliver to the Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports, and other papers to be filed or submitted in connection with the

Agreement and the operation of the Seller for the Buyer's prior review and comment prior to the filing or submission thereof, and such filings shall be reasonably acceptable to the Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of the Buyer's obligations under the Agreement.

Section 6.3    Cure Notices. To the extent not already provided, the Seller shall serve a cure notice (the "**Cure Notice**") by first class mail on all non-debtor counterparties to the Assigned Contracts and the Assumed Lease. The Cure Notice shall inform each recipient that its respective Assigned Contract or Assumed Lease may be designated as assumed and assigned to the Buyer, and shall specify the timing and procedures relating to such designations, and, to the extent applicable, (i) the title of the Assigned Contract or Assumed Lease, (ii) the name of the counterparty to the Assigned Contract or Assumed Lease, (iii) the Seller's good faith estimates of the Cure Amounts required in connection with such Assigned Contract or Assumed Lease, (iv) the identity of the Buyer, (v) the deadline by which any such Assigned Contract or Assumed Lease counterparty may file an objection to the proposed assumption and assignment, or cure, as applicable, and the procedures relating thereto, and (vi) that such Assigned Contract or Assumed Lease counterparty's failure to object timely to the proposed assumption or Cure Amount will be deemed to be consent to such assumption or Cure Amount.

Section 6.4    Sale Free and Clear. The Seller acknowledges and agrees, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to the Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities and Permitted Liens), pursuant to section 363 of the Bankruptcy Code. The Seller shall use commercially reasonable efforts to provide that the Sale Order becomes effective immediately upon entry thereof and that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) shall be waived for cause.

# ARTICLE VII
# CONDITIONS TO CLOSING

Section 7.1    Conditions Precedent to the Obligations of the Parties. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of each of the following conditions:

(a)    no Governmental Authority or court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) or Law restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

Section 7.2    Conditions Precedent to the Obligations of the Buyer. The obligations of the Buyer to consummate the Closing are subject to the satisfaction (or to the extent permitted by

Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of the following condition: the representations and warranties made by the Seller in <u>ARTICLE III</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (a) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (b) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a material adverse effect on the Thrifty Business.

Section 7.3    <u>Conditions Precedent to the Obligations of the Seller</u>. The obligations of the Seller to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of the following condition: the representations and warranties made by the Buyer in <u>ARTICLE IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that (a) any such representation and warranty that is qualified by materiality shall be true and correct in all respects and (b) representations and warranties that are made as of a specified date need be true and correct only as of such date.

## ARTICLE VIII
## DEFINITIONS

Section 8.1    <u>Definitions</u>. As used in this Agreement:

"***Adverse Claim***" means a Lien, Claim, Liability, or other claim in, of or on any Person's assets or properties in favor of any other Person.

"***Affiliate***" means, (i) as to any Person (other than the Buyer), any other Person that, directly or indirectly, controls, or is controlled by or is under common control with, such Person, and (ii) as to the Buyer, any entity controlling, controlled or under common control by the Buyer. For this purpose, "***control***" (including, with its correlative meanings, "***controlled by***" and "***under common control with***") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***Alternative Transaction***" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Buyer and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) a material portion of the Purchased Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, neither a liquidation or wind-down of Seller's estates nor a reorganization of Seller that permits the Transactions to be consummated in accordance with the terms hereof shall be an Alternative Transaction.

"***Assigned Contracts***" means the Contracts listed on <u>Section 1.1(a)(i)</u> of the Disclosure Schedules.

"***Assumed Lease***" means that certain Lease Agreement dated as of July 14, 2020 by and between Gardena Rose No. 1 LLC, 3225 Pico Boulevard, LLC, Megdal Green, LLC and the Seller.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 1.2(a)</u>.

"***Assumed Licenses and Permits***" means any licenses, permits, operating authorities, certificates, certifications, notifications, exemptions, classifications, registrations, franchises, approvals, consents, orders or similar authorizations, or any waivers of the foregoing, issued by any Governmental Authority exclusively related to the Thrifty Business or for the exclusive ownership or exclusive use of the Purchased Assets, to the extent assignable under applicable Law.

"***Bankruptcy Cases***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bidding Procedures Order***" means the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale Of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* Docket No. 473.

"***Bill of Sale***" has the meaning set forth in <u>Section 2.3(a)</u>.

"***Business Day***" means any day other than a Saturday, a Sunday or other day on which banks in New York are permitted or required by applicable Law to close.

"***Buyer***" has the meaning set forth in the Preamble.

"***Buyer Group***" has the meaning set forth in <u>Section 9.6</u>.

"***Claim***" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"***Closing***" has the meaning set forth in <u>Section 2.2</u>.

"***Closing Date***" has the meaning set forth in <u>Section 2.2</u>.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended.

"***Consent***" means any approval, consent, ratification, waiver, permit or other authorization designation, declaration, filing or notice.

"*Contract*" means any written or binding oral contract, agreement, loan or credit agreement, note, bond, guaranty, mortgage, indenture, instrument, lease, sublease or license or other legally binding commitment, arrangement, obligation, undertaking or understanding of any nature.

"*Cure Amount*" means all amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Assigned Contracts and Assumed Lease. The Cure Amount, as of June 20, 2025, and as estimated by the Seller in good faith, is set forth on Schedule 8.1, subject to, in each case, final determination by the Bankruptcy Court of such amounts and passage of time.

"*Disclosure Schedules*" has the meaning set forth in Section 9.18.

"*Emergence Date*" means August 30, 2024.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excluded Assets*" has the meaning set forth in Section 1.1(b).

"*Excluded Contracts*" means all Contracts other than the Assigned Contracts.

"*Excluded Liabilities*" has the meaning set forth in Section 1.2(a).

"*Excluded Licenses and Permits*" means all Licenses and Permits of the Seller, other than the Assumed Licenses and Permits.

"*Final Order*" means an Order that (a) is not stayed, and (b) as to which the time to file an appeal, has expired and no such appeal is pending.

"*Fraud*" means actual and intentional fraud that constitutes common law fraud under the Laws of the State of Delaware with respect to the making of the representations and warranties contained in ARTICLE III (as qualified by the Disclosure Schedules) of this Agreement, ARTICLE IV of this Agreement or in any Transaction Agreement, in each case made with the actual knowledge or belief (as opposed to imputed or constructive knowledge or belief) of a Party that such Party's representations and warranties were inaccurate when made, with the intention to deceive or another Party to consummate the Transactions.

"*General Enforceability Exceptions*" means those exceptions or limitations to enforceability due to (i) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity.

"*Governmental Authority*" means the United States or any state, provincial, county, municipal, city, local or foreign government, or any instrumentality, division, subdivision, department, agency, court, legislature, executive or regulatory authority, administrative regulatory or judicial agency or commission, or other governmental entity or authority of any thereof, or any court of competent jurisdiction, mediator, arbitrator or arbitral body (public or

private), department, commission, bureau or tribunal, self-regulatory body or authority or other governmental authority, domestic or foreign, including any instrumentality or entity designed to act for or on behalf of any of the foregoing.

"*Guggenheim Securities*" has the meaning set forth in <u>Section 3.9</u>.

"*Hazardous Substances*" means any and all substances, wastes, pollutions, contaminants, chemicals and materials regulated, defined or designated hazardous, dangerous or toxic under any Environmental Law.

"*Initial Deposit*" has the meaning set forth in <u>Section 2.1(b)</u>.

"*Initial Deposit Deadline*" has the meaning set forth in <u>Section 2.1(b)</u>.

"*Intellectual Property*" means all of the following, as they exist anywhere in the world: (a) patents and industrial designs (including utility model rights, design rights and industrial property rights), patent and industrial design applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, divisionals, extensions and reexaminations thereof, (b) trademarks, service marks, trade dress, logos, designs, slogans, trade names, corporate names, social media identifiers (such as a Twitter® Handle) and related accounts, and all other indicia of origin, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all internet domain names and internet addresses, (d) copyrightable works, all copyrights, works of authorship (whether or not copyrightable), and all applications, registrations and renewals in connection therewith, (e) trade secrets and confidential information (including know-how, recipes and formulas), and (f) all other intellectual property or proprietary rights of a similar nature.

"*IRS*" means the Internal Revenue Service of the United States Department of the Treasury.

"*Law*" means all law (including common law), statute, ordinance, Order, code, rule, writ, decree, treaty or regulation enacted, promulgated, imposed or enforced by the United States, any foreign country or any domestic or foreign state, province, county, city or other political subdivision of any Governmental Authority.

"*Legal Proceeding*" has the meaning set forth in <u>Section 3.10(a)</u>.

"*Liability*" means any debt, liability, obligation or deficiency, of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, choate or inchoate due or to become due), including any liability for Taxes.

"*Licensed Intellectual Property*" means all Intellectual Property used exclusively in or exclusively related to the operation of the Thrifty Business by the Seller or its Affiliates pursuant to a valid license Contract.

"***Lien***" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, right of first offer, or charge, other than restrictions on the offer and sale of securities under federal and state securities Laws.

"***Open Source Software***" means any software that is distributed (i) as "free software" (as defined by the Free Software Foundation), (ii) as "open source software" or pursuant to any license identified as an "open source license" by the Open Source Initiative (opensource.org/licenses) or other license that substantially conforms to the Open Source Definition (opensource.org/osd), (iii) under any similar licensing or distribution model or (iv) under a license that requires disclosure of source code or requires derivative works created based on the licensed software to be made publicly available under the same license.

"***Order***" means any decree, determination, injunction, judgment, order, ruling, award, consent or writ of any Governmental Authority.

"***Ordinary Course of Business***" means with respect to an action taken by a Person, that such action is substantially consistent with the ordinary and usual course of operations of the Thrifty Business, taken as a whole, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases.

"***Organizational Documents***" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws, (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity, and (c) any amendment to any of the foregoing.

"***Outside Date***" has the meaning set forth in Section 9.1(a)(iii).

"***Owned Thrifty Business Intellectual Property***" means all of the Seller's and the Other IP Sellers' right, title and interest in and to any Intellectual Property owned by the Seller and exclusively used in the Thrifty Business, together with all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof.

"***Party***" and "***Parties***" has the meanings set forth in the Preamble.

"***Permitted Liens***" means (i) Liens for utilities and Taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary liens or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets in any material respect and, in the case of the Assumed Lease, which do not, individually or in the aggregate, adversely affect the use or occupancy of the Assumed Lease in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated in any material respect by the current use or occupancy

21

of the Assumed Lease, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) licenses granted on a non-exclusive basis in the Ordinary Course of Business, (vi) such other Liens or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Purchased Assets, (vii) matters that would be disclosed by an accurate survey or inspection of the applicable real property, (viii) with respect to any leased real property, (a) any Liens to which the fee or any superior leasehold is subject and any (b) Lien in favor of the lessor on the Purchased Assets located at such leased real property, or (ix) solely prior to the Closing, any Liens that will be removed or released by operation of the Sale Order.

"*Person*" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Pre-Closing Tax Period*" means (i) each taxable period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending at the end of the Closing Date, as determined pursuant to Section 5.5(b).

"*Prior Cases*" has the meaning set forth in the Recitals.

"*Purchase Price*" has the meaning set forth in Section 2.1(a).

"*Purchase Price Allocation*" has the meaning set forth in Section 2.1(d).

"*Purchased Assets*" has the meaning set forth in Section 1.1(a).

"*Purchased Inventory and Owned Business Assets*" means all of the Seller's inventory and owned business assets used in connection with the Thrifty Business and listed on Section 1.1(a)(ii) of the Disclosure Schedules.

"*Representative*" means, with respect to any Person, any director, manager, officer, agent, advisor, Affiliate, employee or similar person acting in a representative capacity for such Person.

"*Retained Tax Liabilities*" means, without duplication, (i) any and all Liabilities for Taxes of the Seller and its Affiliates for any Tax period (including, for clarity, any Taxes arising in, or in respect of, the consolidated tax group including the Seller, including pursuant to Treasury Regulation section 1.1502-6, and any Taxes arising out of the disposition of the Purchased Assets pursuant to this Agreement), (ii) any and all Liabilities for Taxes for any Pre-Closing Tax Period of any Person other than the Seller and its Affiliates arising as a result of successor or transferee liability, (iii) any and all Liabilities for Taxes based upon or measured by, or imposed on or with respect to, the Purchased Assets (or the ownership or operation thereof) for any Pre-Closing Tax Period, and (iv) any Liabilities arising from any Liens for Taxes on any of the Purchased Assets (whether or not Permitted Liens).

22

"***Sale Order***" means an Order of the Bankruptcy Court that is reasonably acceptable to the Buyer and the Seller, approving the Seller's entry into the Agreement and all of its terms and conditions pursuant to sections 363 and 365 of the Bankruptcy Code, and authorizing the Seller to consummate the Transactions. The Sale Order must, among other things, (a) approve, under sections 105, 363, 365, or 1123 of the Bankruptcy Code, as applicable, the execution, delivery, and performance by the Seller of the Agreement, the sale of the Purchased Assets to the Buyer free and clear of all Adverse Claims (except those included in the Assumed Liabilities or Permitted Liens), and the Seller's performance of its obligations, (b) authorize and empower the Seller to transfer the Assigned Contracts and the Assumed Lease to the Buyer, consistent with the Bidding Procedures Order, as set forth in the Agreement, (c) find that the Buyer is a "good faith" buyer under section 363(m) of the Bankruptcy Code and grant the Buyer the protections of that section, and (d) find that the Buyer has provided adequate assurance of future performance necessary for the assumption and assignment of the Assigned Contracts and the Assumed Lease, consistent with the Bidding Procedures Order.

"***Seller***" has the meaning set forth in the Preamble.

"***Seller Group***" means (i) the Seller, (ii) the lenders and agents under the indebtedness of the Seller, (iii) the Statutory Committee of Unsecured Creditors of the Seller in its Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (iv) with respect to those parties in the foregoing (i)–(iii), any of their respective agents, attorneys, investment bankers, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in section 15 of the Securities Act of 1933 (as amended) or section 20 of the Securities Exchange Act of 1934 (as amended), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such.

"***Seller's Knowledge***" or "***Knowledge of the Seller***" means the actual knowledge following reasonable inquiry, as of the date hereof, of Scott G. Becsi, not individually but solely in his capacity as the general manager of the Thrifty Business' manufacturing facility.

"***Shared Contract***" means any Contracts entered into by Seller, or its Affiliates, with one or more third parties that benefit both (i) the Thrifty Business or the Purchased Assets and (ii) any Excluded Assets.

"***Straddle Period***" means any taxable period beginning on, or prior to, and ending after, the Closing Date.

"***Straddle Period Returns***" has the meaning set forth in <u>Section 5.5(a)</u>.

"***Subsequent Deposit***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Subsequent Deposit Deadline***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Tax***" or "***Taxes***" means (a) any and all U.S. federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, escheat, unclaimed property, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, ad

valorem, personal property, sales, use, highway use, fuel, transfer, registration, vehicle registration, value-added, alternative or add-on minimum, estimated and any other taxes, levies, imposts, fees, assessments or charges of any kind whatsoever, including any interest, penalty or addition thereto and (b) any amounts described in clause (a) for which any Person may be jointly or severally liable under applicable Law by virtue of its status as a member of a consolidated, affiliated, combined or unitary group of taxpayers or (c) any amount described in clause (a) or clause (b) that is imposed on a Person as transferee or successor, by contract, by operation of Law, under a theory of a de facto merger or similar legal theory, or otherwise (including any such amount payable pursuant to any tax sharing agreement or any other agreement or arrangement relating to the sharing, indemnification or payment of any such amount), and in each case whether disputed or not.

"*Tax Returns*" means any return (including any information return), report, statement, schedule, notice, form, election, claim for refund or other document or information filed with or submitted to, or required to be filed with or submitted to, any Taxing Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to Taxes (including any schedule or attachment thereto or amendment thereof).

"*Taxing Authority*" means any Governmental Authority, domestic or foreign, having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"*Third Party Consents*" has the meaning set forth in Section 3.4.

"*Thrifty Business*" has the meaning set forth in the Recitals.

"*Transaction Agreements*" means each agreement, document, certificate and instrument being executed or delivered pursuant to this Agreement.

"*Transactions*" means the transactions contemplated by this Agreement and the Transaction Agreements.

"*Transferred Personnel Records*" means the personnel records of Eligible Employees, to the extent readily available and transferable under applicable law.

"*Transfer Taxes*" means any and all transfer, documentary, sales, use, gross receipts, stamp, value-added, recording, registration, escrow and other similar Taxes and fees (including any penalties and interest) imposed or assessed as a result of the Transactions and by the Transaction Agreements (including recording and escrow fees and any real property or leasehold interest transfer or gains Tax and any similar Tax).

"*Treasury Regulation*" means the regulations of the U.S. Department of the Treasury promulgated under the Code, as such Treasury Regulations may be amended from time to time. Any reference herein to a particular Treasury Regulation means, where appropriate, the corresponding successor provision.

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.1   Termination of Agreement.

(a)   This Agreement may be terminated at any time prior to Closing only in accordance with this Section 9.1:

(i)   by the mutual written consent of the Seller and the Buyer;

(ii)   by either the Seller or the Buyer, upon written notice to the other, if there is a material breach of an obligation of the other Party (including under the Sale Order) and such breach is not remedied within thirty (30) calendar days after receipt by such breaching Party of notice in writing from the non-breaching Party, specifying the nature of such breach and requesting that it be remedied;

(iii)   by either the Seller or the Buyer, if the Closing shall not have been consummated on or before August 15, 2025 (such date, the "***Outside Date***"); provided that the right to terminate this Agreement pursuant to this Section 9.1(a)(iii) shall not be available to the Party whose breach of any provision of this Agreement has caused or resulted in the failure of the Closing to be consummated by the Outside Date;

(iv)   by written notice from the Seller to the Buyer, if the Seller or its board of directors (or similar governing body) of the Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(v)   by the Seller, upon written notice to the Buyer, in the event the Buyer does not make the Initial Deposit by the Initial Deposit Deadline; and

(vi)   by the Seller, upon written notice to the Buyer, in the event the Buyer does not make the Subsequent Deposit by the Subsequent Deposit Deadline.

(b)   In the event of the termination and abandonment of this Agreement pursuant to Section 9.1(a), this Agreement shall become void and have no effect, without any liability on the part of any Party, except that the provisions of this Section 9.1(b) and the other provisions of ARTICLE IX shall survive in accordance with their respective terms; provided, however, a termination of this Agreement shall not defeat or impair the right of any Party to pursue such relief as may otherwise be available to it on account of any willful breach of this Agreement or any of the representations, warranties, covenants or agreements contained in this Agreement.

Section 9.2   Survival of Terms. The representations and warranties set forth in this Agreement or in any certificate or documents delivered pursuant to this Agreement, and the covenants and agreements of the Seller or Buyer that contemplate performance prior to the Closing, shall terminate at, and will not survive, the Closing. The covenants and agreements of Seller or Buyer contained in this Agreement that contemplated performance at or after the

Closing shall survive the Closing until they are performed in accordance with their respective terms.

Section 9.3      No Liability; Release.

(a)      The Seller, on behalf of itself and on behalf of its Affiliates (each, a "**Seller Releasing Party**" and, collectively, the "**Seller Releasing Parties**"), hereby releases and forever discharges Buyer and any individual, joint or mutual, past, present and future Representatives, agents, employees, officers, directors, managers, equityholders, partners, members, controlling persons, subsidiaries, Affiliates, successors and assigns of the Buyer (individually, a "**Buyer Releasee**" and, collectively, "**Buyer Releasees**"), from any and all claims, demands, actions, causes of action, orders, obligations, debts and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Seller Releasing Party or any of its Affiliates, or any of their respective heirs, executors, administrators or assigns, now has or has ever had against any Buyer Releasee arising on or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring on or prior to the Closing Date in respect of matters relating to the Seller's, or any of its Affiliates', direct or indirect ownership, control, management or operation of the Thrifty Business and the Purchased Assets (all of the foregoing collectively referred to herein as the "**Seller Released Claims**"); provided, however, that nothing contained herein shall operate as a release of any rights or obligations arising under this Agreement or any other Transaction Agreement, any claim based on Fraud or any other rights or obligations that cannot be waived by virtue of applicable Law. Each Seller Releasing Party represents that it has not made any assignment or transfer of any Seller Released Claim or any other matter covered by this Section 9.3(a). Each Seller Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Seller Released Claim, or commencing, instituting or causing to be commenced, any action of any kind against any Buyer Releasee, based upon any matter released hereby.

(b)      The Buyer, on behalf of itself and on behalf of its Affiliates (each a "**Buyer Releasing Party**" and, collectively, the "**Buyer Releasing Parties**" and, together with the Seller Releasing Parties, the "**Releasing Parties**"), hereby releases and forever discharges the Seller and any individual, joint or mutual, past, present and future Representatives, agents, employees, officers, directors, managers, equityholders, partners, members, controlling persons, subsidiaries, Affiliates, successors and assigns of the Seller (individually, a "**Seller Releasee**" and, collectively, "**Seller Releasees**"), from any and all claims, demands, actions, causes of action, orders, obligations, debts and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Buyer Releasing Party or any of its controlled Affiliates, or any of their respective heirs, executors, administrators or assigns, now has or has ever had against any Seller Releasee arising on or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring on or prior to the Closing Date in respect of matters relating to the Seller's, or any of its Affiliates', direct or indirect ownership, control, management or operation of the Thrifty Business and the Purchased Assets (all of the foregoing collectively referred to herein as the "**Buyer Released Claims**" and, together with the Seller Released Claims, the "**Released Claims**"); provided, however, that nothing contained herein shall operate as a release of any rights or obligations arising under this Agreement or any other Transaction Agreement, any claim based on Fraud or any other rights or obligations that cannot be waived by virtue of applicable Law. Each Buyer Releasing Party represents that it has

not made any assignment or transfer of any Buyer Released Claim or any other matter covered by this Section 9.3(b). Each Buyer Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Buyer Released Claim, or commencing, instituting or causing to be commenced, any action of any kind against any Seller Releasee, based upon any matter released hereby.

(c)   Each Buyer Releasing Party and each Seller Releasing Party hereby acknowledges and intends that this release shall be effective as a bar to each and every one of the applicable Released Claims hereinabove mentioned. Each Buyer Releasing Party and each Seller Releasing Party expressly agrees and acknowledges that this release shall be given full force and effect in accordance with each and every express term or provision, including those (i) relating to any applicable Released Claims hereinabove mentioned or (ii) relating to unknown and unsuspected claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated claims).

(d)   Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 9.3 do not extend to (i) Fraud or (ii) any rights, interests or obligations of the Parties and the parties under any agreement, document or instrument contemplated hereby.

Section 9.4   Non-Recourse. This Agreement may be enforced only against, and any claim or cause of action based upon, arising out of or related to this Agreement or the Transactions may be brought only against, the entities that are expressly named as Parties and then only with respect to the specific obligations set forth herein with respect to such Party. With respect to each named Party, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, Affiliate, agent, attorney, advisor, Representative or Affiliate of any of the foregoing Persons shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of such named Party set forth in this Agreement or for any claim based on, arising out of or related to this Agreement, the Transaction Agreements or the Transactions.

Section 9.5   Specific Performance. The Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise breached, irreparable harm would occur, no adequate remedy at law would exist and damages would be difficult to determine. Accordingly, it is agreed that the Party or Parties not in breach shall be entitled to an injunction or injunctions to prevent breaches of this Agreement, and to the remedy of specific performance of the terms and conditions hereof, in addition to any other remedies that may be available, at law or in equity, by reason of such breach without the requirement of posting of a bond or other security.

Section 9.6   No Setoff. The Buyer, on its own behalf and on behalf of any of its Affiliates and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns (collectively, the "***Buyer Group***"), hereby waives any rights of set-off, netting, offset, recoupment or similar rights that the Buyer, any member of the Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by the Buyer pursuant to this Agreement or any other document or instrument delivered by the Buyer in connection herewith.

Section 9.7      Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require the Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, the Seller retains the right to pursue any transaction or restructuring strategy that, in the Seller's business judgment, will maximize the value of their estates.

Section 9.8      Press Releases and Communications. The Parties agree that no Party shall produce (i) any press releases or other advertising or (ii) issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets, at any time prior to or after the Closing Date, unless (x) otherwise agreed upon in writing by the Parties or required in connection with the Bankruptcy Cases, including in accordance with the Sale Order or (y) in the reasonable judgment of the Buyer or the Seller, disclosure is otherwise required by applicable Law or any Governmental Authority in connection with this Agreement or the Transaction Agreements.

Section 9.9      Expenses. Except as otherwise expressly provided in this Agreement (including in respect of Transfer Taxes), each of the Parties shall pay its own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the Transaction Agreements. Notwithstanding the above, if either Party takes legal action in relation to the interpretation or enforcement of this Agreement, the reasonable attorneys' fees and court costs incurred by the party prevailing in such legal action shall be borne by the non-prevailing party, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing party will be the party that is awarded judgment as a result of trial or arbitration, or the party that receives a payment of money from the other party in settlement of claims asserted.

Section 9.10      Notices, Consents, etc Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party:

**If to the Seller**:

c/o New Rite Aid, LLC
200 Newberry Commons
Etters, PA 17319
Attention: Legal Department

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Megan Spelman; Andrew Rosenberg; Alice Eaton; Sean Mitchell
Email: mspelman@paulweiss.com; arosenberg@paulweiss.com;
aeaton@paulweiss.com; smitchell@paulweiss.com

**If to the Buyer:**

Hilrod Holdings L.P.
2390 Anselmo Dr.
Corona, CA 92879
█████████████████████████████████████

Section 9.11    <u>Severability</u>. The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision. Upon such determination that any term or other provision is unenforceable or invalid, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a legally acceptable manner in order to ensure that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.12    <u>Successors; Assignment</u>. This Agreement will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by either Party without the other Party's prior written consent; provided, however, Buyer may assign this Agreement (in whole or part) to (a) a wholly owned subsidiary of Buyer or (b) one or more entities controlled or owned directly or indirectly (i.e., through one or more entities) by one or more of Hilton H. Schlosberg, Rodney C. Sacks, a parent or a lineal descendant of a parent of Hilton H. Schlosberg or Rodney C. Sacks, a spouse of any of the foregoing individuals, a lineal descendant of any such spouse, or a trust established by or for the benefit of one or more of the foregoing individuals (provided, further, in no event shall such assignment release Buyer from any liability or obligation hereunder).

Section 9.13    <u>Counterparts; Facsimile Signatures</u> This Agreement, the Transaction Agreements, and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party or party thereto, as applicable, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement, the Transaction Agreements, or any other agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement, the Transaction Agreements, or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any Party or pursuant to any such Contract, each other Party or party thereto, as applicable, will re-execute original forms thereof and deliver them to all other Parties or parties thereto, as applicable. No Party or party to any such Contract,

as applicable, will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of a .PDF or other electronic transmission as a defense to the formation of a Contract and each such Party or party, as applicable, forever waives any such defense.

Section 9.14    Governing Law; Forum.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     Each of the Parties irrevocably agrees that any Legal Proceeding of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "**Agreement Dispute**") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validity taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Legal Proceeding, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "**Chosen Courts**"), and each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Legal Proceedings in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that the venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.10. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A

COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE
CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO
TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER
PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER
PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO
ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE
OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS
SECTION 9.14(c).

Section 9.15    Table of Contents and Headings. The table of contents and section
headings of this Agreement are included for reference purposes only and shall not affect the
construction or interpretation of any of the provisions of this Agreement.

Section 9.16    Entire Agreement. This Agreement, the recitals, the Schedules and the
Exhibits attached hereto and the Transaction Agreements (all of which shall be deemed
incorporated in this Agreement and made a part hereof) set forth the entire understanding of the
Parties with respect to the Transactions, supersede all prior discussions, understandings,
agreements and representations and shall not be modified or affected by any offer, proposal,
statement or representation, oral or written, made by or for any Party in connection with the
negotiation of the terms hereof. This Agreement may be amended or modified only by
subsequent instruments signed by the Parties.

Section 9.17    Third Parties. Nothing herein expressed or implied is intended or shall be
construed to confer upon or give to any Person, other than the Parties and their respective
successors and permitted assigns, any rights or remedies under or by reason of this Agreement.
This Agreement and all provisions and conditions hereof are intended to be, and shall be, for the
sole and exclusive benefit of such Persons and for the benefit of no other Person.

Section 9.18    Disclosure Generally. With respect to all disclosure schedules delivered in
connection herewith (the "**Disclosure Schedules**"), such Disclosure Schedules have been
arranged for purposes of convenience in separately numbered sections corresponding to the
sections of this Agreement; provided, that each section disclosed of the Disclosure Schedules will be
deemed to incorporate by reference all information disclosed in any other section of the
Disclosure Schedules, and any such disclosure in the Disclosure Schedules will be deemed a
disclosure against any representation or warranty set forth in this Agreement; provided, that, in
each case, the relevance of such disclosure to such other section of the Disclosure Schedules is
reasonably apparent on its face or cross-referenced. Capitalized terms used in the Disclosure
Schedules and not otherwise defined therein have the meanings given to them in this Agreement.
The specification of any dollar amount or the inclusion of any item in the representations and
warranties contained in this Agreement, the Disclosure Schedules or the attached Exhibits is not
intended to imply that the amounts, or higher or lower amounts, or the items so included, or other
items, are or are not required to be disclosed (including whether such amounts or items are
required to be disclosed as material or threatened) or are within or outside of the Ordinary
Course of Business, and no Party will use the fact of the setting of the amounts or the fact of the
inclusion of any item in this Agreement, the Disclosure Schedules or Exhibits in any dispute or
controversy between the Parties as to whether any obligation, item or matter not set forth or

included in this Agreement, the Disclosure Schedules or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. The information contained in this Agreement, in the Disclosure Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 9.19   <u>Interpretive Matters</u>. Unless the context otherwise requires, (a) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections, Schedules or Exhibits in this Agreement, (b) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, (c) the term "including" shall mean "including without limitation" (i.e., by way of example and not by way of limitation), all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (d) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto), (e) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), and (f) whenever this Agreement refers to a number of days, such number shall refer to calendar days, unless such reference is specifically to "Business Days."

Section 9.20   <u>Construction</u>. Each of the Parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it is of no application and is hereby expressly waived by the Parties.

[Signature Pages Follow]

**<u>Exhibit B</u>**

**KPH Healthcare Services APA**

**Asset Purchase Agreement**

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into effective as of June 17, 2025, by and between **KPH Healthcare Services, Inc.,** a New York corporation ("**Buyer**"), and **Maxi Green, Inc.,** a Vermont corporation ("**Seller**"). Buyer and Seller may be collectively referred to herein as the "**Parties,**" and individually as a "**Party**," as the circumstances require.

1.  <u>**Sale of Assets.**</u> Seller agrees to sell and Buyer agrees to purchase the "**Purchased Assets**" (defined below) owned by Seller in connection with Seller's retail drug store and pharmacy business located at the address set forth on **Schedule 1** (each, a "**Pharmacy**"), pursuant to the terms hereof. "**Purchased Assets**" shall collectively refer to all of the following:

    A.  All files, prescription records, customer records, lists and profiles, pharmacy records, patient profiles, physician files, documents, instruments, papers, books, computer files and records of prescriptions filled by the applicable Pharmacy, and all other records of Seller for the three (3) years (or such time period mandated by State and Federal laws) immediately preceding the Closing (defined below) in any media relating to the patients, doctors, pharmaceuticals, controlled substances or prescriptions therefor administered or filled by the applicable Pharmacy, which shall include a list of the top five (5) prescribers for each Highly Diverted Controlled Substances ("**HDCS**") and top ten (10) prescribers for all HDCS, number of prescriptions and dosages, number of pills per prescription, prescriber name, DEA number, and address, and prescriber specialty (collectively, the "**Records**"), which will allow Buyer to derive Protected Health Information ("**PHI**"), as that term is defined in the Health Insurance Portability and Accountability Act of 1996, P. L. 104-191, and its implementing rules and regulations (collectively, "**HIPAA**"); for purposes of this Agreement "**Highly Diverted Controlled Substances**" shall mean: (i) oxycodone, (ii) hydrocodone, (iii) hydromorphone, (iv) tramadol, (v) oxymorphone, (vi) morphine, (vii) methadone, (viii) carisoprodol, (ix) alprazolam, and (x) fentanyl. Seller warrants that the Records shall contain, at a minimum, all of the information included in **Exhibit "A"** attached hereto and incorporated herein by reference, and Seller further warrants that the information contained in the Records is complete, accurate and current. The Records shall be transferred to Buyer exclusively, shall not be shared with any third parties (other than as contemplated by this Agreement), and shall not be diminished or removed from the applicable Pharmacy between the date of execution of this Agreement and the Transfer Date (as defined below).

    B.  (i) All items in stock of prescription pharmaceutical inventory of the applicable Pharmacy pursuant to the terms hereof (the "**Purchased Pharmacy Inventory**"), and (ii) all accompanying transaction history, transaction information, and transaction statements (the "**3T Documentation**") as required pursuant to the Drug Supply Chain Security Act (the "**DSCS Act**").

    C.  To the extent in hard copy format, originals of any and all controlled substance invoices, used DEA 222 forms (blue copies for orders placed or executed originals for received single-page forms, as applicable, with each statement attached), and, to the extent dated within the two (2) years prior to the applicable Closing Date, annual controlled substance inventory logs (collectively, the "**DEA Documentation**"); provided, for the avoidance of doubt, that, to the extent such materials (i) are in electronic format, (ii) consist of unused DEA 222 forms or blue copies for unaccepted or defective forms, or (iii) are records of controlled substances disposed of, such materials shall be deemed as Excluded Assets and the applicable Seller shall retain such materials.

**D.**     All leases governing the real property listed on **Schedule 1** (the "**Leases**") pursuant to which the applicable Seller holds leased real property for the applicable Pharmacy (such Leases, the "**Assigned Leases**", and such real property, the "**Purchased Leased Real Property**").

**E.**     Solely to the extent assignable or transferable under applicable law, all of the rights, interests and benefits (if any) accruing under those licenses, franchises, permits, certificates and governmental approvals and authorizations listed or described on **Schedule 2** for the operation of the applicable Pharmacy and all pending applications therefor as well as the rights to all data and records held by governmental bodies in connection therewith (collectively, the "**Purchased Permits**").

**F.**     All telephone and facsimile numbers used in connection with the applicable Pharmacy as listed on **Schedule 1** (the "**Telephone and Fax Numbers**") pursuant to the provisions in Section 18.

**2.**     <u>**Excluded Assets.**</u> Notwithstanding the foregoing, the following assets of Seller (the "**Excluded Assets**") will be retained by Seller and are specifically excluded from the Purchased Assets: (a) inventory and supplies that are (i) not Purchased Pharmacy Inventory (including, for the avoidance of doubt, front-end store inventory and over-the-counter inventory), (ii) expired, outdated or otherwise untransferable under applicable laws, or (iii) otherwise excluded pursuant to the terms of Section 8, (b) cash and cash equivalents in bank accounts and cash registers, (c) accounts receivable in any form, (d) any and all licenses, franchises, permits, certificates and governmental approvals and authorizations, other than the Purchased Permits, (e) contracts and understandings, other than the Assigned Leases, (f) leased or other real property, other than the Assigned Leases, and (g) intangible rights. Buyer does not assume any of Seller's liabilities or debts whatsoever. Without limiting the generality of the foregoing, in no event shall Buyer assume (i) any type of successor liability with respect to any law relating to the licensure or regulation of health care providers, suppliers, professionals, facilities, pharmacies, or payors, including state pharmacy laws and any other requirements of federal and state law relating to the provision of, and litigation or any other claim or dispute arising from, opioid treatment services and pharmacy or physician services, including the Federal Controlled Substance Act, 21 U.S.C. § 801 et seq., (ii) any obligations of Seller under HIPAA or other applicable laws or regulations, including the HIPAA privacy standard requiring accounting of certain disclosures of PHI made by Seller prior to the Transfer Date, (iii) any type of successor liability as to trade creditors, unemployment, income, property, sales or other taxes, or otherwise, or (iv) any of Seller's third party provider numbers or licenses, including, without limitation, any and all obligations and/or liabilities of Seller, the applicable Pharmacy or the Purchased Assets with respect to all such third party provider numbers and licenses, other than the Purchased Permits, it being understood that all such liabilities are "**Excluded Liabilities**". The phrase "liabilities" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured. Furthermore, Buyer shall have no liability for the continued employment or any compensation of employees of Seller or the applicable Pharmacy.

**3.**     <u>**Assignment of Assigned Leases; Cure Costs.**</u>

**A.**     **Schedule 3** sets forth, with respect to each Assigned Lease, the estimated amounts payable, or obligations that must be satisfied, in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of each Assigned Lease (collectively, the "**Cure**

Costs") as of the date hereof. In accordance with the Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice with Respect Thereto, and (VII) Granting Related Relief, as it may be amended or modified (the "**Bidding Procedures Order**") [Docket No. 473], (i) Seller shall notify non-Seller counterparties to such Assigned Leases as of the date hereof of the deadline to object to the Cure Costs, if any, and (ii) unless otherwise agreed by the non-Seller counterparty and Seller or as provided by the Bidding Procedures Order, the Bankruptcy Court shall determine the Cure Costs with respect to any Assigned Lease entered into prior to the Petition Date (as defined below).

B.      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 3B, Buyer agrees to promptly following the date hereof satisfy all Cure Costs in accordance with the Bidding Procedures Order in respect of Assigned Leases for which Bankruptcy Court approval to assign has been obtained; provided, however, that on each applicable Closing Date, Buyer shall have paid or otherwise satisfied the Cure Costs for which Bankruptcy Court approval to assign the applicable Assigned Leases has been obtained on or prior to each such Closing Date, except as otherwise provided for by the Bidding Procedures Order. In accordance with the Bidding Procedures Order, Seller shall assign to Buyer the Assigned Leases pursuant to section 365 of the Bankruptcy Code and the order of the Bankruptcy Court authorizing and approving, among other things, the Seller's entry into and performance under this Agreement (the "**Sale Order**"), subject to the provision of adequate assurance by Buyer in respect of the Assigned Leases as may be required under section 365 of the Bankruptcy Code as determined by the Bankruptcy Court.

C.      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 3C, at each Closing, Seller shall, pursuant to the terms of the Sale Order assume and assign to Buyer all Assigned Leases corresponding to such Closing that may be assigned by Seller to Buyer pursuant to sections 363 and 365 of the Bankruptcy Code.

4.      **Inspection/Transfer Date.** Seller shall, prior to the Transfer Date (at such date and time as Buyer elects, provided it is during normal Pharmacy business hours and following reasonable prior notice), give Buyer reasonable access to the Records and allow Buyer to examine the Purchased Assets and the Pharmacies subject to the Assigned Lease. The transfer of the Purchased Assets shall occur on such date as mutually agreed between Seller and Buyer following the date of this Agreement (the "**Transfer Date**").

5.      **Notice to Seller's Customers.** As of the date of this Agreement, Buyer may utilize Seller's list of the applicable Pharmacy's customers (including names and addresses) from the prior one hundred eighty (180) days for customer outreach purposes, which form shall be mutually agreed upon by the Parties in advance via email. As of the date of this Agreement, Seller shall permit Buyer, at Buyer's discretion, to place signs in the applicable Pharmacy and on the windows of the applicable Pharmacy advising Seller's customers that Buyer has arranged to purchase Seller's Pharmacies. Buyer shall have the right to advertise that Buyer is purchasing or has purchased Seller's Pharmacies.

6.      **Transfer of Purchased Assets.**

3

A.      The Parties agree that Seller will engage InfoWerks Data Services, LLC (the "**Data Converter**") to convert Seller's prescription file and Record data (the "**Record Data**") to a format specified by Buyer. Buyer will be responsible for all of the Data Converter's fees, costs and expenses incurred in connection with the Record Data conversion services. Seller agrees to provide such access, information and cooperation to the Data Converter as may be required to enable the Data Converter to deliver the Record Data to Buyer's Information Services representative at least ten (10) business days  prior to the Transfer Date, or such other period as mutually agreed upon between the Parties, for the purpose of testing the data's conversion to Buyer's format. In the event that the Record Data is not or cannot be delivered to Buyer as of such date or is not successfully converted, Buyer, at Buyer's sole discretion, may either (i) delay the Transfer Date until the Record Data is delivered to Buyer, or the conversion is successful or (ii) following commercially reasonable efforts to effect the conversion, terminate this Agreement upon written notice to Seller.

B.      **Transfer of Possession.** Seller shall deliver possession of the electronic Records and the other Purchased Assets to Buyer at a time mutually agreed upon by the Parties on the Transfer Date. Seller shall deliver possession of the hard copy Records and the other Purchased Assets to Buyer on the Transfer Date. Risk of loss shall transfer to Buyer at the time Buyer takes possession of the Purchased Assets. Concurrently with the transfer of the Purchased Assets to Buyer, Seller shall deliver to Buyer (i) a duly executed and acknowledged Bill of Sale in respect of the applicable Purchased Assets in substantially the same form attached hereto as **Exhibit "B"** and incorporated herein by reference ("**Bill of Sale**"), (ii) with respect to the applicable Purchased Leased Real Property, an Assignment and Assumption of Lease Agreement in substantially the same form attached hereto as **Exhibit "C"** ("**Lease Assignment**"), (iii) with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (as defined below) (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price (as defined below)), signed by a representative of Seller, and (iv) complete copies of Seller's 3T Documentation and DEA Documentation, as applicable, as required for the applicable Purchased Pharmacy Inventory. Seller shall, upon request of Buyer, perform such further acts, assignments, transfers, and assurances as may be reasonably required to convey and transfer all of Seller's right and title in the Purchased Assets to Buyer. Concurrently with the transfer of the Purchased Assets to Buyer, Buyer shall deliver to Seller (i) the applicable Lease Assignment, duly executed by Buyer, and (ii) with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price), signed by a representative of Buyer.  Seller understands that the landlord for each respective Lease and Buyer have agreed upon amended terms to be included as part of each Lease.  Each Party shall also deliver to the other such additional documents as are reasonably required by law or the terms of this Agreement to complete the sale of the Purchased Assets to Buyer. **Subject to the representations in Section 7 below and the other provisions of this Agreement, Buyer further agrees and acknowledges that Buyer shall accept the Purchased Assets "as is, where is."**

C.      **Fire or Other Casualty.** If there is a fire or other casualty which results in damage to or destruction of any portion of the Purchased Assets prior to the Transfer Date, then Buyer may, in its sole election, (i) terminate this Agreement or a portion of the Agreement in respect of the impacted Purchased Assets by written notice to Seller, or (ii) proceed to acquire the remaining portion of the Purchased Assets, in which event the Purchase Price shall be proportionately reduced to reflect the fair market value of the remaining Purchased Assets after the fire or other casualty.

4

**D.**   **Request by Pharmacy Customers.** Buyer agrees in the event that, prior to the Transfer Date, Seller receives from any Pharmacy customer any objection to the transfer of the Pharmacy customer's prescription records to Buyer and/or any instruction from the Pharmacy customer to transfer said Pharmacy customer's prescription records to a pharmacy other than the location to which Buyer intends to transfer the Records, Seller shall be relieved of its obligation to transfer the applicable Pharmacy's customer's prescription records to Buyer except to the extent that such a transfer is required by law. Buyer further agrees that in the event a Pharmacy customer objects, after the Transfer Date, to the transfer of the applicable Pharmacy's customer's prescription records to Buyer, Buyer shall immediately transfer the applicable Pharmacy's customer's prescription records to the location designated by the applicable Pharmacy's customer and shall further purge said applicable Pharmacy's customer's prescription records from Buyer's files except to the extent Buyer is required by law to retain such Records. The provisions of this Section 6D shall survive the Transfer Date.

**E.**   **W-9s**. Seller shall, on or before the Transfer Date, deliver to Buyer a completed form W-9 Request for Taxpayer Identification Number.

**F.**   **DSCS Act**. Seller agrees to provide Buyer with all readily available product tracing information and other information required by the DSCS Act for the Purchased Pharmacy Inventory, including the 3T Documentation. Seller shall reasonably cooperate and assist Buyer, in such Buyer's efforts to effect a transfer of such 3T Documentation on the applicable Closing Date. Such cooperation may include Seller taking such acts as may be reasonably necessary, including executing a release or authorization for the benefit of any third parties that are maintaining any such 3T Documentation on behalf of Seller, as may be reasonably necessary to facilitate the transfer of all such 3T Documentation to Buyer.

**G.**   **Powers of Attorney**. Seller shall, on or before the Transfer Date, deliver to Buyer duly executed Powers of Attorney in substantially the same forms attached hereto as **Exhibit "D"** ("**Powers of Attorney**").

**7.**   **Purchase Price.**

**A.**   The Purchase Price shall consist of:

(i)   the amount listed on **Schedule 1** for the Records (the "**Records Purchase Price**");

(ii)   the Inventory Purchase Price (as defined below), subject to **Exhibit "E"** (including Annex I thereto) (the "**Inventory Instructions**"); and

(iii)   the purchase price listed in **Schedule 1** with respect to the Purchased Leased Real Property (the "**Purchased Leased Real Property Purchase Price**"), which shall be allocated in the manner provided therein.

The Purchased Leased Real Property Purchase Price, the Inventory Purchase Price and the Records Purchase Price, collectively, the "**Purchase Price**".

**B.**   Notwithstanding above, with respect to the Records, in the event that Seller's averaged weekly prescription count for the thirteen (13) week period immediately preceding the Transfer Date (the "**Prescription Count**"), which weeks do not include a nationally recognized holiday (in such case the week prior to the week excluded shall be used in the

calculation) (the "**Transfer Date Volume**"), falls below the current volume shown on **Schedule 1** ("**Current Volume**") by more than ten percent (10%) (the "**Prescription Rate Threshold**"), Buyer shall have the right to decrease the Records Purchase Price proportionately per prescription by which the Transfer Date Volume is less than the Prescription Rate Threshold, except the first five percent (5%) shall not be included in such reduction calculation. For purposes of illustration, if the "Current Volume" of a Pharmacy location fell by fifteen percent (15%) then Buyer shall have the right to decrease the applicable Records Purchase Price for such Pharmacy location by ten percent (10%); if the "Current Volume" of a Pharmacy location fell by nine (9%) then Buyer shall have no right to decrease the applicable Records Purchase Price for such Pharmacy location. Further, if the Prescription Count falls below the Current Volume by fifty percent (50%) or more for such thirteen (13) week period, Buyer may choose not to purchase such Purchased Assets from Seller in respect of such Pharmacy and shall provide Seller with notice of its intent not to acquire such Purchased Assets. For the purposes of determining the Transfer Date Volume, Seller shall deliver to Buyer a written statement evidencing the Prescription Count at least five (5) days prior to the Transfer Date.

8.      **Inventory Matters and Valuation.**  The Parties agree that Buyer will purchase, and the Purchased Assets will include, only those items of inventory that are determined to be Purchased Pharmacy Inventory according to the Inventory Instructions and that Buyer will not purchase any Excluded Inventory. The Parties shall commission WIS International or another mutually acceptable inventory valuation firm (the "**Inventory Service**") to conduct a full review and valuation of the Purchased Pharmacy Inventory at the Pharmacies on the day immediately prior to the respective Closing Date using the Inventory Instructions (such review at an individual Pharmacy, the "**Inventory Review**" and the amount determined pursuant to the Inventory Review at an individual Pharmacy, which shall automatically be reflected on **Schedule 1** thereafter, the "**Inventory Purchase Price**"). The cost and expense of the Inventory Service for all purposes hereunder shall be borne solely by Buyer.

9.      **Closing.** Unless otherwise agreed in writing by the Parties, the closing of the sale of Purchased Assets to Buyer (each a "**Closing**" and the date of each Closing, a "**Closing Date**") shall occur on each applicable Transfer Date at a time mutually acceptable to the Parties. On the first business day immediately following such Transfer Date, Buyer shall wire the applicable Purchase Price to Seller by a wire transfer of immediately available funds. Seller's wiring instructions are attached hereto as **Exhibit "F"**.

10.     Intentionally omitted.

11.     **Representations and Warranties.**

        A.      **Liens**. Seller represents and warrants that it has good and marketable title to and is the sole owner of all of the Purchased Assets and that the Purchased Assets shall, as of the Transfer Date, be free and clear of all "**Liens**" as herein defined. Seller further represents and warrants that all suppliers and creditors of the Purchased Assets shall be paid in the normal course of business. The term "**Liens**" shall collectively refer to all liens, charges, restrictions, claims, judgments, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, taxes (presently due or due at any time in the future related to the Purchased Assets and/or this transaction), assessments or other encumbrances (whether secured or unsecured) with respect to any item of the Purchased Assets or the applicable Pharmacy and includes, without limitation, any claim or charge of any creditor or supplier of the Purchased Assets.

6

B.      **Title to Purchased Leased Real Property.** Seller has a good and valid leasehold interest to the applicable Purchased Leased Real Property free and clear of any lien, mortgage, or encumbrance except for those that will be removed by operation of the Sale Order. **Schedule 3** sets forth the Lease for each Purchased Leased Real Property along with the address, name of landlord entity and the lease expiration date. Seller has made available to Buyer or to Buyer's advisors copies of each such Lease.

C.      **Authority.** Seller and Buyer represent and warrant that each Party has taken all necessary corporate action and, subject to the entry of the Sale Order, has the full and sole right, power and authority to enter into this Agreement to sell and buy the Purchased Assets, respectively, and that the individual signing below for Seller and Buyer is duly authorized to sign on behalf of Seller's and Buyer's entity. The sale of the Purchased Assets and all of the other obligations of Seller agreed to hereunder do not conflict with or result in a breach of the terms of any agreement or instrument to which Seller is a party or by which it is, or may be, bound or which would constitute a default thereunder, or result in a claim against Buyer, or result in the creation or imposition of any lien, charge or encumbrance on, or give to others any interest in or right to the Purchased Assets.

D.      **Parties Are in Good Standing.** Seller represents and warrants that it is a duly organized corporation in good standing with the state in which the applicable Pharmacy is located and will continue to be so as of the Transfer Date. Buyer represents and warrants that it is a duly organized corporation in good standing with state in which the applicable Pharmacy is located. Seller and Buyer have full power and authority to enter into and perform this Agreement.

E.      **No Brokers.** Except for Guggenheim Securities, LLC, the fees and expenses of which will be paid by Seller, Buyer and Seller each represent and warrant to the other that all negotiations relative to this Agreement and the transactions contemplated herein have been carried on in such manner so as not to give rise to any valid claim against either Buyer or Seller for any brokerage, commission or finder's fees. In the event any action or inaction by either Buyer or Seller with respect to this transaction has given or shall hereafter give rise to any brokerage, commission or finder's fee, all such fees shall be paid solely and exclusively by the responsible Party and the other Party shall have no obligation or liability therefor.

F.      **HIPAA Compliance.** To the best of its knowledge and belief, Seller is currently in full compliance with the requirements of HIPAA. Without limiting the generality of the foregoing, Seller has implemented a HIPAA compliance program, including but not limited to employee training, provision of Privacy Notices to pharmacy customers, and adoption of privacy policies and security features. After the Transfer Date, Buyer shall use all reasonable efforts to make Seller's prescription data available for access to all eligible parties in accordance with HIPAA Privacy Standards and applicable state law. However, in no event shall Buyer assume any legal obligations of Seller under HIPAA including, but not limited to, the HIPAA Privacy Standard requiring accounting of certain disclosures of Patient's PHI made prior to the Transfer Date. All inquiries for accountings or other patient rights under HIPAA relating to disclosures made prior to the Transfer Date shall be forwarded to Seller or its appointed agent.

G.      **Controlled Substance Act.** Buyer shall comply with all applicable laws and regulations that may relate to the maintenance and confidentiality of Records transferred hereunder and with respect to the applicable Pharmacy's operations in general. Seller (with the

7

assistance of Buyer) shall notify the appropriate governmental agencies, including the State Board of Pharmacy and the regional DEA office, of the transfer described herein.

**H.**    That, to Seller's reasonable knowledge, the Records are accurate in all material respects and were created or obtained in the ordinary course of Seller's operation of the applicable Pharmacy.

**I.**    There are no (i) claims, actions, suits, labor disputes, arbitration, legal or administrative proceedings or investigations, including, without limitation, by the DEA, OIG, CMS, FDA, applicable Board of Pharmacy or other governmental body, pending against Seller or, to the knowledge of Seller, threatened against Seller, or otherwise pending or, to the knowledge of Seller, threatened with respect to Seller's operations, the Purchased Assets or any affiliate, director, officer or employee of Seller, and no such actions, disputes, proceedings or investigations are contemplated, except to the extent any such claim, action, dispute, arbitration, proceeding or investigation would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder or (ii) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or governmental body to which Seller is a party or is subject with respect to the applicable Pharmacy or to which any of the Purchased Assets is subject, except to the extent any such judgment, decree, order, writ, injunction, ruling, decision or reward would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. During the two (2) years to the date of this Agreement, Seller has not received any notice of complaints filed against Seller under HIPAA or applicable patient privacy and data protection laws and, to Seller's knowledge, there has not been any violation of such laws, except to the extent any such complaint or violation would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller, any parent, subsidiary or other affiliate of Seller, nor any director, manager, officer or pharmacy employee of Seller has not been disciplined or sanctioned, or has had a discipline or sanction proposed, by any governmental body, except to the extent any such discipline or action would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller is not excluded from participation in any government healthcare payment program, including Medicare or Medicaid, nor does Seller have knowledge of any pending or threatened discipline, sanction, inquiry, investigation or government action that would be reasonably expected to lead to such exclusion.

**J.**    The prescriptions filled at the applicable Pharmacy have arisen from bona fide, legal transactions. Seller's Records have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with local, state and federal laws, statutes, ordinances, regulations, rules, codes, decisions, decrees, and orders, and are consistent with industry standards and clinical guidelines applicable to pharmacists and licensed prescribers. All information regarding the Records provided to Buyer to date is true and correct in all material respects

**K.**    Except as set forth on **Schedule 4**, none of the prescriptions filled at the applicable Pharmacy result from any Non-standard Business. As used in this Agreement, "**Non-standard Business**" means (1) delivering prescriptions by mail, courier, automobile or

8

other delivery system (in each case, including prescriptions filled via the Internet), (2) compounding, including both sterile and non-sterile compounding, (3) filling prescriptions that involve any unique, customized or non-standard packaging, including prescriptions filled for patients in assisted or independent living facilities, nursing homes, long-term care facilities or hospice facilities, (4) any business conducted pursuant to Section 340B of the Public Health Service Act, (5) any non-prescription business (including durable medical equipment) done through the pharmacy computer and included in the prescription count, (6) any prescriptions filled pursuant to any contract, agreement or understanding (other than a standard contract agreement or understanding with any third party payor or government payor providing health care coverage to individuals), or (7) any other business outside the scope of a customary pharmacy or retail drug-store business.

L.      The transactions contemplated hereunder (a) are the result of a sale process led by Seller, its affiliates, and its advisors, pursuant to which Buyer submitted an offer for the Purchased Assets, such offer has been accepted and Buyer has been awarded the right to acquire the Purchased Assets, no other person or entity or group of persons or entities has submitted a higher or better offer to purchase the Purchased Assets, and (b) may not be avoided under Section 363(n) or any other section of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"). The Purchase Price for the Purchased Assets (i) was negotiated and is undertaken at arm's length without collusion or fraud and in good faith within the meaning of and otherwise consistent with Sections 363, 365, and 548 of the Bankruptcy Code and (ii) constitutes reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia. Seller represents and warrants that (x) the auction process, as contemplated herein, is in compliance with the Bidding Procedures Order, and (y) subject to the entry of the Sale Order, Seller has authority and approval under the Sale Order to consummate the sale of the Purchased Assets to Buyer .

M.      This Agreement has not been entered into for the purposes of hindering, delaying or defrauding creditors of Seller under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable law and none of the Parties hereto have entered into this Agreement or are consummating the sale of the Purchased Assets with any fraudulent or otherwise improper purpose.

N.      Seller has timely and properly filed all federal, state and local tax returns and reports and forms which it is or has been required to file, either on its own behalf or on behalf of its employees or other persons or entities including but not limited to all sales and use and employment tax returns, all such returns and reports being true, correct and complete in all respects and has paid all taxes which have become due.

O.      The provisions of this Section 11 shall survive the Closing.

12.   **Regulatory Notices and Clearances.**

A.      Buyer and Seller (where applicable) will, and will cause their respective affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by Buyer under any applicable laws for the consummation of the transactions contemplated herein, if any.

9

**B.**    In the event that any Purchased Permits shall not have been effectuated to the benefit of Buyer as of the applicable Transfer Date, Seller shall allow Buyer the right to use such Purchased Permits pursuant to a Power of Attorney to allow Buyer to utilize the Purchased Permits, to the extent permitted under applicable law, in Buyer's ownership or operation of the Pharmacies. Such Power of Attorney shall be delivered by Seller on or before the applicable Transfer Date and shall be effective until the aforementioned is effectuated by the appropriate governmental body or Buyer obtains new authority directly from such governmental body in the name of Buyer; provided, that the term of such Power of Attorney shall end no later than ninety (90) days following the issuance of such Power of Attorney.

**13.**    **Conditions to Closing.** The Closing of the sale transactions set forth herein is subject to all of the following conditions in favor of Buyer and, if any of the following conditions are not satisfied or waived in writing by Buyer as of the Transfer Date, Buyer may terminate this Agreement in respect of such sale transaction without any liability to Seller.

**A.**    **Representations Are True.** Seller's representations are true and correct in all respects on and as of the date of this Agreement and through each Transfer Date with the same force and effect as though made on and as of such date, and Seller shall have performed all of its obligations under this Agreement through the Transfer Date.

**B.**    **Records Successfully Converted.** The Records contained within Seller's computer system have been successfully converted to a reasonably acceptable format through the Data Converter in a form that is acceptable to and usable by Buyer in conducting Buyer's business in its normal course.

**C.**    **Rx Customer Data Deactivated in Seller's System.** The Records contained within Seller's computer system will be deactivated and placed in "transfer mode" within Seller's mainframe. After the Transfer Date, such data will remain in Seller's possession but will be limited to those purposes set forth herein. Seller will provide written verification of the deactivation of the files and records within five (5) business days after the Transfer Date.

**D.**    **Bankruptcy Order.** Rite Aid Corporation and certain of its affiliates, including Seller (collectively, the "**Debtors**"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") on May 5, 2025 (the "**Petition Date**"), at Case No. 25-14861 (the "**Bankruptcy Cases**"). On May 9, 2025, the Bankruptcy Court entered the Bidding Procedures Order. Prior to the last Closing, the Sale Order shall remain unstayed and in full force and effect which (a) authorizes and approves the sale of the Purchased Assets, such that Seller will have the authority and approval from the Bankruptcy Court to consummate the sale of the Purchased Assets to Buyer free and clear of all liens, claims, security interests and encumbrances whatsoever, (b) authorizes Seller to enter into and consummate such sales of such Purchased Assets on the terms and condition, including non-monetary terms and conditions, set forth in this Agreement, which terms and conditions shall be approved, and (c) which includes a finding that the Buyer shall be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded by such provision.

**E.**    **No Licenses.** No Party (i) has been debarred or excluded from federal health care programs or (ii) has had the licenses necessary to carry out its business operations contemplated or

required by this Agreement revoked or has been disciplined in such a manner that performance cannot occur or would be substantially impaired.

F.  **Evidence of Lien Termination.** Except in the case of entry of the Sale Order (in each case which has not been stayed and remains in full force and effect), on or prior to the Transfer Date, Seller shall deliver to Buyer evidence of the release of any and all Liens encumbering any of the Purchased Assets (including any required UCC termination statements, bank release letters or similar documents).

G.  **Liens and Other Encumbrances.**

(a)  Seller represents and warrants that the Purchased Assets, as of each applicable Transfer Date, shall not be subject to any lien, mortgage, or encumbrance, and said Records shall be conveyed free and clear of any right, title or interest of any entity or person.

(b)  Buyer may conduct Uniform Commercial Code searches of state and county records. Any liens or encumbrances disclosed by any such search shall be released in full by Seller, and Buyer may hold all payments due hereunder pending Buyer's receipt of evidence that releases have been filed.

(c)  Seller hereby indemnifies and saves and holds Buyer harmless (including reasonable attorneys' fees and costs) from and against any (i) breach by Seller of any of its representations, warranties, covenants, agreements or obligations in this Agreement or any agreement or document required to be delivered by Seller hereunder, (ii) liability of Seller with respect to the Purchased Assets arising prior to the applicable Closing Date, and (iii) any claim by any creditor of Seller or any third party related to the Purchased Assets arising prior to the applicable Closing Date.

14.  **Exclusive Dealing.** From the date hereof until the date of the Closing hereunder or the earlier termination of this Agreement, Seller shall deal exclusively and in good faith with Buyer with regard to the transactions contemplated by this Agreement and shall not, and shall cause its affiliates, representatives, advisors and agents not to (a) solicit submission of any acquisition proposal of the Purchased Assets at the applicable Pharmacy, (b) participate in any discussions or negotiations regarding, or furnish any non-public information to any other person regarding the Purchased Assets other than Buyer and its representatives or otherwise cooperate in any way or assist, facilitate, or encourage the acquisition proposal of the Purchased Assets at the applicable Pharmacy by any person other than Buyer, or (c) enter into any agreement or understanding, whether in writing or oral, that relates to an acquisition proposal of the Purchased Assets at the applicable Pharmacy or would have the effect of preventing the consummation of the transactions contemplated by this Agreement. Seller shall, and Seller shall cause its affiliates, representatives, advisors and agents to (i) immediately cease any discussions or negotiations of the nature described in this Section 14 that were conducted prior to the date hereof, (ii) promptly notify any party which such discussions or negotiations were being held of such termination, and (iii) promptly request in writing that all persons to whom nonpublic information concerning the Purchased Assets has been distributed on or prior to the date of this Agreement return or destroy such information to Seller as soon as possible. If, notwithstanding the foregoing, Seller or its affiliates, representatives or agents should receive any acquisition proposal of the Purchased Assets at the Pharmacies or any inquiry regarding any such proposal from any person, such persons shall promptly inform Buyer and its counsel in writing of the facts and terms thereof.

11

15.    **Confidentiality.** From and after the date of this Agreement, Seller and Buyer shall keep the transaction contemplated hereby strictly confidential except as may be required by law (and if so required by law, the party with the obligation to so disclose shall provide the other party with advance notice of the required disclosure). Seller shall keep all information about the Purchased Assets and the transactions contemplated by this Agreement confidential both before and after the transfer thereof (except that Seller may release to an individual customer any records belonging to said customer upon the customer's request). Seller shall have absolutely no right to use any of the Records or information included in the Purchased Assets after the transfer thereof to Buyer, except as may be required by law or in connection with pending litigation, third party claims or resolving outstanding accounts receivable, or other reasonable purpose provided that (i) such information is used only for the limited purposes specified herein, and (ii) access to such information is at Buyer's store at such times and under such supervision as Buyer deems appropriate. In addition to, and without limiting the foregoing, Buyer agrees to coordinate with Seller, as applicable, (and vice versa), in gathering audit information required and providing responses to desk audits within audit response timeframes for any Claims (as defined in Section 19). The provisions of this Section 15 shall survive Closing and shall be binding on each Party's legal representatives, successors and assigns. The Purchased Assets are being transferred to Buyer for Buyer's sole and exclusive use. Seller acknowledges that any information obtained by Buyer relating to the applicable Pharmacy's customers is owned solely by Buyer and may not be sold or transferred to any other person or company by Seller. Buyer will submit any advertising copy regarding its purchase of the Purchased Assets to Seller for prior approval, which approval shall not be unreasonably withheld. If Seller does not contact Buyer within three (3) business days of receipt of said copy, Seller shall be deemed to have approved it. Other than as set forth in this Section 15 neither Buyer nor Seller shall issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets by Seller to Buyer without the prior written consent of the other Party.

16.    **Normal Business Operations.** Seller shall, at all times prior to the Transfer Date, operate the applicable Pharmacy's business in the ordinary course, consistent with prior practice (including, without limitation, like pricing, hours, customer service, advertising, and business standards) as Seller maintained prior to this Agreement and Seller shall not take any action that results in a reduction to Seller's volume of prescriptions. Seller shall not conduct any closing, going out of business, last chance or other sales outside of the ordinary course, consistent with past practice at the Pharmacies. Prior to the Transfer Date, Seller shall not sell, transfer, assign, lease, encumber or otherwise dispose of any of the Purchased Assets. Seller shall not subject any of the Purchased Assets to lien, security interest or any other encumbrance, which lien, security interest or other encumbrance must be discharged of record prior to Buyer's payment to Seller. Prior to the Transfer Date, Seller shall not sell, remove or dispose of any of the Purchased Assets (other than in the ordinary and normal course of business) and will not purchase for the Pharmacies any further merchandise or supplies other than in the ordinary course of business. Notwithstanding anything herein to the contrary, Buyer acknowledges that Seller may be winding down the business at the Pharmacies and as such, the operating hours, inventory and staffing levels may change accordingly and any such changes shall not be deemed a breach of this Section 16.

17.    **Taxes.** Seller agrees to be responsible and pay for any tax or similar charge or assessments on the sale or transfer of the Purchased Assets at Closing; provided, however, that Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws. Seller shall forever indemnify and hold harmless Buyer against any and all expense, loss, damage or liability, including reasonable attorneys' fees and court costs, which Buyer may suffer as a result of claims asserted by third parties against Buyer due to any noncompliance by Seller and Buyer with applicable bulk transfer laws. Personal property taxes on the Purchased Assets shall be prorated between Buyer and

Seller as of the Transfer Date. Seller shall pay any other taxes on the Purchased Assets prior to the Transfer Date.

18.   **Signs; Telephone and Facsimile Numbers.** Seller shall transfer to Buyer the exclusive right to use the Telephone and Fax Numbers on the Transfer Date. If Seller is unable to complete the transfer of the Telephone Fax Numbers on the Transfer Date, Seller shall remote call forward the Telephone and Fax Numbers for ████████████ until the transfer of the Telephone and Fax Numbers is complete. Seller shall pay all charges relating to the Telephone and Fax Numbers prior to the Transfer Date. Seller shall pay all yellow pages advertising for the applicable Pharmacy prior to the Transfer Date and cancel the same at its sole expense, if applicable. Seller agrees to, as of the Transfer Date and ending ████████████ after the Transfer Date, post appropriate signs in the applicable Pharmacy and/or the front of the applicable store notifying customers that the Purchased Assets will be relocating to Buyer's store and referring customers to such store, subject to landlord consent (if such landlord consent is required) and provided that Buyer provides such signage to Seller.

19.   **Indemnity.** Seller shall indemnify, defend and hold Buyer, its directors, officers, shareholders, employees and agents harmless from and against all liabilities, losses, deficiencies, claims, damages, expenses (including, without limitation, reasonable costs and attorneys' fees, reasonable costs and attorneys' fees on appeal), judgments, proceedings, and causes of action of any kind (collectively, "**Claims**") arising out of, resulting from, relating to or in any way connected with (i) Seller's possession, ownership, sale, disposal and/or use of the Purchased Assets, (ii) Seller's breach of any representation or warranty, (iii) Seller's material breach, default, misrepresentation or omission with respect the performance of any of its covenants and obligations under this Agreement, (iv) related to any Liens on the Purchased Assets prior to the time at which such Purchased Assets, or any of them, are transferred to Buyer, (v) related to any matter that is an Excluded Liability and (vi) any losses that are suffered, sustained, incurred or required to be paid by Buyer relating to Seller's use of the applicable Purchased Assets and/or the operation of the applicable Pharmacy prior to and including the Transfer Date. Buyer shall indemnify, defend and hold Seller, its directors, officers, shareholders, employees and agents harmless from and against all Claims arising out of, resulting from or relating to Buyer's possession, ownership, sale, disposal, use of the Purchased Assets on or after the time at which such Purchased Assets, or any of them, are transferred to Buyer and/or Buyer's breach, misrepresentation or omission under this Agreement. The provisions of this Section 19 shall survive Closing.

20.   **Miscellaneous.**

   A.   **Notices.** All notices given hereunder shall be in writing and shall be given by personal delivery, U.S. Mail (return receipt requested), United States Express Mail (postage or delivery charge prepaid), or other established express delivery service (such as Federal Express or DHL), addressed to the appropriate Party as follows:

   Seller:   c/o Rite Aid Corporation
   200 Newberry Commons, Etters, PA 17319 (street address)
   P.O. Box 3165, Harrisburg, PA 17105 (mailing address)
   Attn: Secretary

   Buyer:   KPH Healthcare Services, Inc.
   6333 Route 298
   ████████████████████

Copy to:      Warren D. Wolfson, Esq.
Hancock Estabrook, LLP
100 E. Washington Street, Suite 206
Syracuse, NY  13202

All notices shall be deemed given upon receipt or refusal.

**B.**    **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties and supersedes all other prior agreements, oral or written, with respect to this transaction. This Agreement may not be modified or otherwise amended, unless in writing and duly authorized by Buyer and Seller.

**C.**    **Successors and Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their successors and assigns.

**D.**    **Attorneys' Fees.** If either Party takes legal action to enforce the terms of this Agreement, the prevailing Party in such action shall recover its reasonable costs and attorneys' fees, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing Party will be the Party that is awarded judgment as a result of trial or arbitration, or the Party that receives a payment of money from the other Party in settlement of claims asserted.

**E.**    **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**F.**    **Severability.** If any of the terms of this Agreement are held by any court of competent jurisdiction to be unenforceable, such provisions shall be severed from the Agreement and the remainder of the Agreement shall be given effect by the Parties as if such provision(s) never had been part of the Agreement.

**G.**    **Further Assurances**. Each Party will, and will cause it's respective affiliates to, cooperate in good faith with the other Party and from time to time do and perform such additional acts and execute and deliver such additional documents, instruments, conveyances and assurances as may be required by applicable governmental rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement. Without limiting the generality of the foregoing, each Party agrees to endorse, if necessary, and deliver to the other, promptly after its receipt thereof, any Purchased Asset, payment, or document which it receives after Closing and which is the property of the other.

**H.**    **Survival of Terms.** All of the provisions of this Agreement which impose continuing or new obligations or liabilities on Seller and/or Buyer after the Transfer Date shall survive the date and the delivery of the Bill of Sale and the Purchased Assets to Buyer. Without limiting the foregoing, all representations, warranties, and indemnities shall all survive the Transfer Date and the delivery of the Bill of Sale and the Purchased Assets to Buyer.

**I.**    **Default.** In the event of any default by any Party to this Agreement, the non-defaulting Party may:

14

i.      if such default occurs prior to the Transfer Date, terminate this Agreement upon written notice to the defaulting Party, and recover from the defaulting Party all damages incurred by the non-defaulting Party; provided, however, that if Seller is the defaulting Party and such default relates to one or more, but not all, Pharmacies, Buyer shall not be obligated to terminate the Agreement but instead may choose not to purchase the Purchased Assets from Seller in respect of any such Pharmacy subject to default;

ii.     Seek specific performance of this Agreement and/or injunctive relief and, in addition, recover all damages incurred by the non-defaulting Party. The Parties intend that this Agreement may be specifically enforced;

iii.    Perform or pay any obligation or encumbrance necessary to cure the default and offset the cost thereof from monies otherwise due the defaulting Party or recover said monies from the defaulting Party; and

iv.    Pursue all other remedies available at law, the Parties intending that remedies be cumulative and liberally enforced so as to adequately and completely compensate the non-defaulting Party. The allocation of the Purchase Price is not intended to serve as a measure of damages, and the Parties agree that the breach of any provision of this Agreement may result in damages to the other Party in an amount in excess of any consideration paid for any particular asset.



**J.**     **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state in which the applicable Pharmacy is located.

**K.**     **Counterparts.** This Agreement may be executed by facsimile or pdf copies in two or more counterparts and once so executed by the Parties hereto, each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute one agreement. Facsimile and e-mail signatures shall be deemed originals for purposes of enforcement.

**L.**     **No Third Party Beneficiaries.** It is the intention of the Parties that no individual or entity be construed or considered to be an intended or implied third-party beneficiary under this Agreement.

**M.**    **Time of the Essence.** All times provided for in this Agreement for the performance of any act will be strictly construed, time being of the essence.

**N.**    **Incorporation of Exhibits.** All exhibits are incorporated into this Agreement as if set forth in full herein.

**O.**    **Waiver.** No covenant, term or condition, or breach thereof, shall be deemed waived except by written consent of the Party against whom the waiver is claimed. Any claim of the

breach of any covenant, term or condition of this Agreement shall not be deemed a waiver of any other covenant, term or condition herein.

P.    **No Damages.** In no event shall either Party be responsible for punitive, exemplary, incidental or consequential damages, and each Party agrees, regardless of cause, not to assert any claim whatsoever against the other Party for such damages.

Q.    **Bankruptcy.** Seller shall use commercially reasonable efforts to respond to any questions Buyer may have related to the Bankruptcy Cases.

21.    **Marketing to Pharmacy's Customers.** For a period of five (5) years from and after the date of this Agreement, Seller shall not (directly or indirectly):

A.    Advertise, encourage or solicit the transfer by customers of the applicable Pharmacy of their records and/or prescriptions to any stores/pharmacies operated by Seller or its subsidiaries. Notwithstanding the foregoing, general mass advertising that does not mention the applicable Pharmacy by name or location is permitted and may be used by Seller.

B.    Send letters or other communications in any form to the customers of the applicable Pharmacy, other than general mass advertising not directed to customers of the applicable Pharmacy. In no event shall Seller send letters, any form of incentives or other communications to the applicable Pharmacy's customers to solicit or encourage the relocation of such customers' prescription information or files to another store or pharmacy operated by Seller or its subsidiaries.

C.    Advertise or communicate publicly the fact that a pharmacist previously working in the applicable Pharmacy has transferred to another pharmacy operated by Seller or its subsidiaries in the same trade area as the applicable Pharmacy.

From the date of this Agreement until the date of Closing, Seller will encourage the transfer of the prescriptions and records of the applicable Pharmacy's customer to the Buyer's store except as otherwise provided in Section 6D of this Agreement. The Parties hereby recognize, acknowledge and agree that the limitations contained in this Agreement are reasonable and properly required for the adequate protection of the business of the applicable Pharmacy, as it will be conducted by Buyer after the Transfer Date.

## Exhibit C

**Optimal Investment Group Inc. APA**

---

**ASSET PURCHASE AGREEMENT**


**BY AND AMONG**

**THRIFTY PAYLESS, INC.**

**AND**

**OPTIMAL INVESTMENT GROUP, INC.**


Dated as of June 24, 2025

---

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF PURCHASED ASSETS ........................................... 2

Section 1.1    Purchased Assets and Excluded Assets ..................................... 2

Section 1.2    Assumed Liabilities and Excluded Liabilities ................................. 2

Section 1.3    Assignment and Cure Amounts ................................................ 2

ARTICLE II PURCHASE AND SALE TRANSACTION ........................................................ 3

Section 2.1    Purchase Price; Allocation of the Purchase Price ........................... 3

Section 2.2    Closing; Closing Date .......................................................... 3

Section 2.3    Seller Closing Deliverables .................................................... 3

Section 2.4    Buyer Closing Deliverables .................................................... 3

Section 2.5    Withholding ....................................................................... 4

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ...................... 4

Section 3.1    Organization and Qualification ................................................ 4

Section 3.2    Authorization; Enforceability ................................................. 5

Section 3.3    No Violation ..................................................................... 5

Section 3.4    Consents .......................................................................... 5

Section 3.5    Taxes .............................................................................. 5

Section 3.6    Property; Assets ................................................................. 6

Section 3.7    Intellectual Property ........................................................... 7

Section 3.8    Employees and Labor Matters ................................................ 8

Section 3.9    Brokers ........................................................................... 8

Section 3.10   Litigation ........................................................................ 8

Section 3.11   Contracts ......................................................................... 8

Section 3.12   Other Matters ................................................................... 9

Section 3.13   No Other Representations and Warranties ................................. 9

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER ..................... 10

Section 4.1    Organization and Qualification .............................................. 10

Section 4.2    Authorization; Enforceability ............................................... 10

Section 4.3    No Consents ..................................................................... 10

Section 4.4    Litigation ........................................................................ 10

Section 4.5    No Violation ..................................................................... 10

Section 4.6    Sufficiency of Funds ........................................................... 11

Section 4.7    No Brokers ....................................................................... 11

Section 4.8    Independent Investigation ..................................................... 11

ARTICLE V COVENANTS.................................................................................................... 11

    Section 5.1    Conduct of Business ................................................................................ 11

    Section 5.2    Employee Matters ................................................................................... 11

    Section 5.3    No Third-Party Beneficiaries.................................................................. 12

    Section 5.4    Additional Agreements of the Parties..................................................... 12

    Section 5.5    Tax Matters ............................................................................................ 12

    Section 5.6    Shared Contracts Efforts......................................................................... 13

    Section 5.7    Bulk Sale Laws ...................................................................................... 14

    Section 5.8    Access to Information.............................................................................. 14

ARTICLE VI BANKRUPTCY COURT MATTERS ....................................................... 14

    Section 6.1    Bankruptcy Actions ............................................................................... 14

    Section 6.2    Bankruptcy Filings ................................................................................. 15

    Section 6.3    Cure Notices .......................................................................................... 15

    Section 6.4    Sale Free and Clear ................................................................................ 15

ARTICLE VII CONDITIONS TO CLOSING ................................................................. 15

    Section 7.1    Conditions Precedent to the Obligations of the Parties ......................... 16

    Section 7.2    Conditions Precedent to the Obligations of the Buyer ......................... 16

    Section 7.3    Conditions Precedent to the Obligations of the Seller........................... 16

ARTICLE VIII DEFINITIONS ........................................................................................ 16

    Section 8.1    Definitions .............................................................................................. 16

ARTICLE IX MISCELLANEOUS ................................................................................... 24

    Section 9.1    Termination of Agreement. .................................................................... 24

    Section 9.2    Survival of Terms .................................................................................. 24

    Section 9.3    No Liability; Release. ............................................................................. 25

    Section 9.4    Non-Recourse ........................................................................................ 26

    Section 9.5    Specific Performance.............................................................................. 26

    Section 9.6    No Setoff................................................................................................. 26

    Section 9.7    Fiduciary Obligations ............................................................................ 27

    Section 9.8    Press Releases and Communications....................................................... 27

    Section 9.9    Expenses ................................................................................................ 27

    Section 9.10    Notices, Consents, etc............................................................................ 27

    Section 9.11    Severability............................................................................................ 28

    Section 9.12    Successors; Assignment ......................................................................... 28

    Section 9.13    Counterparts; Facsimile Signatures ........................................................ 28

    Section 9.14    Governing Law; Forum .......................................................................... 29

Section 9.15      Table of Contents and Headings.................................................................... 30

Section 9.16      Entire Agreement........................................................................................ 30

Section 9.17      Third Parties ............................................................................................. 30

Section 9.18      Disclosure Generally ................................................................................. 30

Section 9.19      Interpretive Matters .................................................................................. 31

Section 9.20      Construction............................................................................................... 31

## INDEX OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule 1.1(a) | Purchased Assets |
| Schedule 1.1(b) | Excluded Assets |
| Schedule 1.2(a) | Assumed Liabilities |
| Schedule 1.2(b) | Excluded Liabilities |
| Schedule 8.1 | Cure Amount |
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of IP Assignment Agreement |
| Exhibit C | Allocation Schedule |

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "*Agreement*") is made and entered into as of June 24, 2025, by and between Optimal Investment Group, Inc. or its assignee, including, Thrifty Ice Cream LLC, a California limited liability company (the "*Buyer*"), Thrifty PayLess, Inc., a California corporation (the "*Seller*") and, solely for purposes of Section 3.7, Name Rite, L.L.C., a Delaware limited liability company ("*Name Right*") and Thrifty Corporation, a California corporation (together with Name Right, the "*Other IP Sellers*"). Each of the parties named above may be referred to herein as a "*Party*" and collectively as the "*Parties*." Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in ARTICLE VIII below.

## RECITALS

WHEREAS, the Seller is engaged in the business of manufacturing, selling and distributing ice cream, including under the "Thrifty" brand (and certain ancillary services related thereto, collectively, the "*Thrifty Business*");

WHEREAS, on August 30, 2024, the Seller and certain of its Affiliates emerged from voluntary cases (the "*Prior Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of New Jersey ("*Bankruptcy Court*"), and in connection therewith entered into an internal reorganization;

WHEREAS, on May 5, 2025 (the "*Petition Date*"), the Seller, together with certain of its Affiliates, filed voluntary petitions for relief commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "*Bankruptcy Cases*");

WHEREAS, the Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities from the Seller, and the Seller desires to sell, convey, assign, and transfer to the Buyer the Purchased Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

WHEREAS, the Parties acknowledge and agree that the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller or its Affiliates;

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the Transactions are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 363 and 365 of the Bankruptcy Code; and

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF PURCHASED ASSETS

Section 1.1    Purchased Assets and Excluded Assets.

(a)    Purchased Assets. At the Closing, on the terms and subject to the conditions set forth in this Agreement, and in consideration of the Purchase Price to be paid by the Buyer to the Seller, and the Buyer's assumption of the Assumed Liabilities, on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Buyer will purchase and acquire from the Seller and the Seller will sell, convey, assign, transfer and deliver to the Buyer, all of the Seller's right, title and interest in and to the assets listed on Schedule 1.1(a) (collectively, the "***Purchased Assets***"), free and clear of all Adverse Claims other than Assumed Liabilities and Permitted Liens. For purposes of this Section 1.1, references to "Seller" shall be deemed to include the applicable Affiliate of Seller to the extent required to convey, assign, transfer and deliver any Purchased Asset or Assumed Liability hereunder.

(b)    Excluded Assets. Notwithstanding anything to the contrary contained in this Agreement, all of the assets, properties, rights and interests of the Seller not expressly described in Section 1.1(a) are expressly excluded from the Transactions, and as such are not included in the Purchased Assets and shall remain the property of the Seller after the Closing, including the assets, properties, rights and interests of the Seller listed on Schedule 1.1(b) (collectively, the "***Excluded Assets***").

Section 1.2    Assumed Liabilities and Excluded Liabilities.

(a)    Assumed Liabilities. At the Closing, the Buyer shall assume, and following the Closing shall pay, perform and discharge when due, in accordance with their respective terms and subject to their respective conditions, only the Liabilities of the Seller arising out of or relating to the Thrifty Business or the Purchased Assets from and after the Closing, including the Liabilities listed on Schedule 1.2(a), but excluding the Excluded Liabilities (the "***Assumed Liabilities***").

(b)    Excluded Liabilities. Notwithstanding anything to the contrary contained herein and except as set forth in Section 1.2(a), the Buyer shall not assume and have no responsibility or obligation whatsoever for any Liabilities of the Seller, including all Liabilities associated with the Excluded Assets and any of the Liabilities listed on Schedule 1.2(b) (collectively, the "***Excluded Liabilities***").

Section 1.3    Assignment and Cure Amounts. Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to section 365 of the Bankruptcy Code, the Seller shall assume and assign to the Buyer, and the Buyer shall take assignment from the Seller of, the Assigned Contracts and the Assumed Lease. Buyer shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with the Seller in seeking such approval from the Bankruptcy Court, including the Buyer providing the necessary evidence required in connection with any hearing to approve entry of the Sale Order to approve this Agreement and the Transactions.

2

## ARTICLE II
## PURCHASE AND SALE TRANSACTION

Section 2.1    <u>Purchase Price; Allocation of the Purchase Price</u>.

(a)    The aggregate consideration (the "***Purchase Price***") to be paid by the Buyer for the purchase of the Purchased Assets shall be equal to $19,126,000. In addition to the payment of the Purchase Price by Buyer in accordance with the terms of this Agreement, Buyer shall also assume the Assumed Liabilities at the Closing.

(b)    The Parties agree that the Purchase Price and all other items required by the Code (including, without limitation, the Assumed Liabilities) shall be allocated among the Purchased Assets in accordance with the allocations set forth on <u>Exhibit C</u> hereto and made a part hereof (the "***Allocation Schedule***"). The Parties acknowledge and agree that the Allocation Schedule was prepared in accordance with Section 1060 of the Code and the regulations promulgated thereunder. The Parties agree to file their respective IRS Forms 8594 and all federal, state and local tax returns in accordance with the Allocation Schedule and to not take any action inconsistent with the foregoing unless otherwise required by a final determination within the meaning of Section 1313(a) of the Code.

Section 2.2    <u>Closing; Closing Date</u>. The closing of the Transactions (the "***Closing***") shall take place remotely by exchange of documents and signatures (or their electronic counterparts) by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, NY 10019-6064) at 10:00 a.m. Eastern Time, following the satisfaction or waiver of the conditions set forth in <u>ARTICLE VII</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver of such conditions), on July 22, 2025, or such other date, time or place as agreed to in writing by the Buyer and the Seller (the "***Closing Date***").

Section 2.3    <u>Seller Closing Deliverables</u>. At the Closing, the Seller shall deliver, or cause to be delivered, to the Buyer:

(a)    <u>Bill of Sale</u>. A bill of sale, assignment and assumption agreement, to be dated the Closing Date, substantially in the form attached hereto as <u>Exhibit A</u> (the "***Bill of Sale***"), duly executed by the Seller;

(b)    <u>Sale Order</u>. A copy of the Sale Order entered by the Bankruptcy Court;

(c)    <u>IRS Form W-9</u>. A duly executed IRS Form W-9 from the Seller, dated as of the Closing Date; and

(d)    <u>IP Assignment Agreement</u>. An Intellectual Property assignment agreement, to be dated the Closing Date, substantially in the form attached hereto as <u>Exhibit B</u> (the "***IP Assignment Agreement***"), duly executed by the Seller and the Other IP Sellers.

Section 2.4    <u>Buyer Closing Deliverables</u>. At the Closing, the Buyer shall deliver, or cause to be delivered, to the Seller:

3

(a)    Purchase Price. An amount equal to Purchase Price in immediately available funds to an account designated by the Seller at least two (2) Business Days prior to the Closing Date;

(b)    Bill of Sale. The Bill of Sale duly executed by the Buyer;

(c)    IRS Form W-9. A duly executed IRS Form W-9 from the Buyer or the Buyer's regarded owner for U.S. federal income tax purposes, dated as of the Closing Date; and

(d)    IP Assignment Agreement. The IP Assignment Agreement duly executed by the Buyer.

Section 2.5    Withholding. Notwithstanding any other provision of this Agreement, the Buyer, its Affiliates and any other applicable withholding agent shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement any such amounts as it is required to deduct and withhold under applicable Tax law with respect to the making of such payment. To the extent that amounts are so withheld and remitted to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made by the Buyer, its Affiliates or any other applicable withholding agent. The Buyer shall provide prior written notice to the Seller of any intention to make such deduction or withholding to the Seller in reasonable detail at least five (5) days prior to such amount being withheld, and shall cooperate in good faith with the Seller to mitigate, reduce or eliminate any such deduction or withholding.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court in connection with the Prior Cases or the Bankruptcy Cases, or (ii) set forth in the Disclosure Schedules and subject to Section 9.18, the Seller, and solely for purposes of Section 3.7, each Other IP Seller, hereby represents and warrants to the Buyer as of the date hereof as follows (it being understood that in case any representation or warranty set forth in this ARTICLE III speaks, or refers, to an earlier date or period, such period or date shall be, or commence on, as applicable, the Emergence Date, as applicable, and in no event will any such representation or warranty be construed to speak of or refer to an earlier date):

Section 3.1    Organization and Qualification. The Seller is a legal entity duly organized, validly existing and in good standing (where such status is recognized) under the Laws of the state of its formation or incorporation (as applicable), in all material respects. The Seller has the requisite power and authority to conduct the Thrifty Business as it is now being conducted, in all material respects. The Seller is duly qualified to engage in the Thrifty Business and is in good standing in every jurisdiction in which ownership of its properties or the conduct of the Thrifty Business requires it to be so qualified, in all material respects, except where the failure to be so qualified would not reasonably be expected to materially and adversely hinder or impair the consummation of the Transactions or the Transaction Agreements.

Section 3.2    Authorization; Enforceability. Subject to the entry of the Sale Order, the Seller has the requisite power and authority, or capacity, as the case may be, to execute and deliver this Agreement and the Transaction Agreements to which it is a party, to perform its obligations under this Agreement and the Transaction Agreements to which it is a party and to consummate the Transactions and the Transaction Agreements to which it is a party, in all material respects. The execution and delivery of, and performance by the Seller under, this Agreement and the Transaction Agreements to which the Seller is a party, and the consummation by the Seller of the Transactions and the Transaction Agreements to which it is a party, have been duly authorized by all requisite corporate actions, in all material respects, and no other corporate action on the part of the Seller is necessary to authorize the execution and delivery of, and performance by, the Seller under this Agreement and the Transaction Agreements to which the Seller is a party and the consummation by it of the Transactions and the Transaction Agreements to which it is a party. This Agreement has been duly and validly executed and delivered by the Seller, and the Transaction Agreements to which the Seller is a party have been duly executed and delivered, and this Agreement and the Transaction Agreements, assuming the due authorization, execution and delivery in each case by the Buyer and the parties thereto, will constitute, upon such execution and delivery in each case thereof, the legal, valid and binding obligations of the Seller, enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions or as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.3    No Violation. Except as set forth on Section 3.3 of the Disclosure Schedules, neither the execution and delivery of this Agreement or the Transaction Agreements to which the Seller is a party nor the performance by the Seller of its obligations hereunder or thereunder, or the consummation of the Transactions, will (a) violate, conflict with or constitute a default in any material respect under the Organizational Documents of the Seller, (b) violate in any material respect, conflict with in any material respect or result in a material breach of, constitute a material default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Assigned Contract to which the Seller is bound, and the Assumed Lease, or result in the creation or imposition of any Lien on any of the Purchased Assets or (c) violate any Laws applicable to the Seller or by which any of the Purchased Assets are bound or result in a material violation or revocation of any required license, permit, authorization or approval in connection with the Thrifty Business from any Governmental Authority, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.4    Consents. Except as set forth on Section 3.4 of the Disclosure Schedules, neither the execution and delivery of this Agreement or the Transaction Agreements to which the Seller is a party nor the performance by the Seller of its obligations hereunder or thereunder or the consummation of the Transactions will (with or without the passage of time or the giving of notice) require any Consent (collectively, the "***Third Party Consents***") from (i) any Governmental Authority or (ii) any party to (x) the Assumed Lease or (y) an Assigned Contract with any customer (except as would not be material to the Thrifty Business, taken as a whole), except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.5    Taxes. Except as would not be materially adverse to the Thrifty Business taken as a whole:

(a)      The Seller has (or has caused to be) timely filed (taking into account available extensions of time to file) all material Tax Returns required to be filed by or with respect to the Thrifty Business or the Purchased Assets, and all such Tax Returns are true, complete and correct in all material respects. All material Taxes due and owing by the Seller with respect to the Purchased Assets, whether or not reflected or otherwise shown as due on such Tax Returns, have been or will be fully and timely paid when due. The Seller has withheld, collected and timely paid over to the appropriate Taxing Authority all material Taxes required by Law to be withheld or collected by it from or with respect to any employee, consultant, shareholder, creditor or any other Person, in each case, in connection with the operation of the Thrifty Business.

(b)      No material Tax assessment, deficiency or adjustment has been assessed with respect to the Purchased Assets by any Taxing Authority that has not been fully and timely settled, paid or withdrawn and, with respect to the Purchased Assets, the Seller (or any of its Affiliates) has not been notified in writing, of any current material Tax audit by any Taxing Authority or that any Taxing Authority intends to conduct such an audit, and no material action, suit, investigation, claim or assessment is pending or, to the Seller's Knowledge, proposed with respect to any alleged material deficiency in Taxes.

(c)      The Seller has not waived any statute of limitations on assessment or collection in respect of any material Taxes or agreed to, or is the beneficiary of, any extension of time with respect to a material Tax assessment, deficiency, audit, claim or examination, and no such waiver or extension is in effect with respect to any of the Purchased Assets.

(d)      There are no Liens for Taxes on any of the Purchased Assets other than Permitted Liens.

(e)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.5</u> shall constitute the sole representations and warranties in this Agreement with respect to Taxes and no representation or warranty set forth in this <u>Section 3.5</u> shall be deemed to apply directly or indirectly with respect to the Seller combined, consolidated, affiliated, or unitary Tax Return. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

Section 3.6    <u>Property; Assets</u>.

(a)      Except as set forth on <u>Section 3.6(a)</u> of the Disclosure Schedules, (i) the Seller has good and marketable title to or a valid and enforceable leasehold interest in, or a valid and enforceable license or other right to use, the Purchased Assets, free and clear of any Liens other than Permitted Liens and (ii) the Purchased Assets, whether owned or otherwise contracted for by the Seller, are in a state of reasonable maintenance and repair (ordinary wear and tear excepted) and are adequate and suitable for the purposes for which such Purchased Assets are presently being used, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)      (i) The Seller has a good and valid leasehold interest in the real property leased pursuant to the Assumed Lease, free and clear of all Liens other than Permitted Liens. A true and correct copy of the Assumed Lease has been made available to the Buyer, (ii) the Assumed Lease is a valid and binding agreement of the Seller, and, to the Seller's Knowledge, each of the other parties thereto, except as may be limited by the General Enforceability Exceptions and is in full force and effect, and (iii) as of the date hereof, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or default under the Assumed Lease by the Seller, nor to the Seller's Knowledge, on the part of any of the other parties thereto, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(c)      Except as would not be materially adverse to the Thrifty Business taken as a whole or as set forth on Section 3.6(c) of the Disclosure Schedules, the Purchased Assets include all material assets used by Seller in the conduct of the Thrifty Business as of the date of this Agreement.

Section 3.7      Intellectual Property.

(a)      To the Seller's Knowledge, Section 3.7(a) of the Disclosure Schedules sets forth a true, correct and complete list of all registered or applied for Intellectual Property included in the Owned Thrifty Business Intellectual Property. To the Seller's Knowledge, all of the registrations, issuances and applications set forth on Section 3.7(a) of the Disclosure Schedules are valid, in full force and effect and have not expired or been cancelled, abandoned or otherwise terminated, and payment of all renewal and maintenance fees and expenses in respect thereof, and all filings related thereto, have been duly made, except as would not be materially adverse to the Thrifty Business taken as a whole.

(b)      To the Seller's Knowledge, the Seller and the Other IP Sellers exclusively own all right, title and interest in or to the Owned Thrifty Business Intellectual Property, free and clear of all Liens other than Permitted Liens, except as would not be materially adverse to the Thrifty Business taken as a whole.

(c)      To the Seller's Knowledge, (i) the conduct of the Thrifty Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and there is no Legal Proceeding pending or, to the Knowledge of the Seller, threatened in writing alleging any such infringement or violation or challenging the Seller's or any of its Affiliates' rights in or to any Owned Thrifty Business Intellectual Property and, to the Knowledge of the Seller, there is no existing fact or circumstance that would be reasonably expected to give rise to any such Legal Proceeding, and (ii) no Person is infringing or otherwise violating any Owned Thrifty Business Intellectual Property or any rights of the Seller in any Owned Thrifty Business Intellectual Property, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(d)      Section 3.7(d) of the Disclosure Schedules sets forth a correct and complete list of all Contracts to the Knowledge of the Seller (i) pursuant to which the Seller and its Affiliates use any Licensed Intellectual Property (excluding (x) non-exclusive licenses entered in the Ordinary Course of Business and purchase orders thereof and (y) licenses for Open Source

7

Software) or (ii) pursuant to which the Seller or any of its Affiliates have granted to a third party any exclusive right in or to any Owned Thrifty Business Intellectual Property (excluding any rights granted in the Ordinary Course of Business).

Section 3.8    Employees and Labor Matters.

(a)    Section 3.8(a) of the Disclosure Schedules sets forth the following in regard to each employee serving the Thrifty Business as of the date hereof (each, a "***Scheduled Employee***"): his or her date of hire, position or job title and exempt or non-exempt classification under applicable wage and hour Laws.

(b)    Section 3.8(b) of the Disclosure Schedules sets forth all collective bargaining agreements with any labor union representing any Scheduled Employee to which the Seller (with respect to the Scheduled Employees) is a party (each, along with any side letters, memorandums of understanding, or related agreements, a "***Collective Bargaining Agreement***"). The Seller has made available copies of all Collective Bargaining Agreements to which the Seller is a party with respect to the Scheduled Employees. In regard to the Thrifty Business, (i) there is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any Scheduled Employees by the Seller and (ii) there is no pending or, to the Seller's Knowledge, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Scheduled Employees located at or whose work involves the Thrifty Business, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.9    Brokers. Except for Guggenheim Securities, LLC ("***Guggenheim Securities***"), the fees and expenses of which will be paid by the Seller, no broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions or similar payments in connection with the Transactions or the Transaction Agreements based upon arrangements made by or on behalf of the Seller.

Section 3.10    Litigation. Except as set forth on Section 3.10 of the Disclosure Schedules, there is no, and there has not been:

(a)    any, judicial, administrative or other suits, actions, charges, mediations, arbitrations, inquiries, proceedings, investigations, audits, claims, alternative dispute resolution procedures, hearings, examinations or orders of any nature involving or relating to the Thrifty Business or the Purchased Assets (collectively, "***Legal Proceedings***") pending or, to the Seller's Knowledge, threatened in writing, involving the Seller or the Thrifty Business or any Legal Proceeding which questions the legality, validity, propriety or enforceability of the Transactions which would be materially adverse to the Thrifty Business taken as a whole; or

(b)    any judgment, Order or decree of any court or Governmental Authority to which the Seller or any of the Purchased Assets is subject, which would be materially adverse to the Thrifty Business taken as a whole.

Section 3.11    Contracts.

(a)    (i) Each Assigned Contract, and the Assumed Lease, is in full force and effect and is valid, binding and enforceable in accordance with its terms, with respect to the

Seller (or its Affiliates party thereto) and to the Seller's Knowledge, with respect to the other parties thereto, and (ii) Seller is not, and to the Seller's Knowledge, any other party to an Assigned Contract, or the Assumed Lease, is not, in default or breach of any provision thereunder that would permit termination, modification or acceleration thereunder (except as rendered unenforceable by the Bankruptcy Code), except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)      Section 3.11(b) of the Disclosure Schedules sets forth a complete and accurate list of all Shared Contracts.

Section 3.12   Other Matters.

(a)      (i) The Seller is, and has been, in compliance with all applicable Laws relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emissions, discharges, releases or threatened releases of Hazardous Substances into the air, surface water, ground water or lands or otherwise relating to protection of the environment or human health and safety (as it relates to exposure to Hazardous Substances) (including, but not limited to, ambient air, surface water, ground water, land surface or subsurface strata) (collectively, "***Environmental Laws***"); (ii) there is no action under or pursuant to any Environmental Law that is pending or, to the Knowledge of Seller, threatened against the Seller, and the Seller has no Knowledge that any such action is reasonably likely to be forthcoming and (iii) neither the Seller nor any of the Purchased Assets is not subject to any Order imposed by any Governmental Authority pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of the Seller, except, in each case, as would not be materially adverse to the Thrifty Business taken as a whole.

(b)      Seller is, and has, been operating the Thrifty Business, in compliance with all applicable Food and Drug Administration (FDA) Laws and regulations, except as would not be materially adverse to the Thrifty Business taken as a whole.

Section 3.13   No Other Representations and Warranties. Except for the representations and warranties set forth in ARTICLE III, the Seller is not making any other representations or warranties, written or oral, statutory, express or implied, concerning the Seller, the Thrifty Business, the Purchased Assets, the Assumed Liabilities or the Transactions, and it is understood that the Buyer, with such exceptions, takes the Purchased Assets "as is" and the Buyer acknowledges that except as expressly provided in this Agreement, the Seller has not made, and the Seller hereby expressly disclaims and negates, and the Buyer hereby expressly waives, any representation or warranty, express, implied, at common law, by statute or otherwise relating to, and the Buyer hereby expressly waives and relinquishes any and all rights, claims and causes of action against the Seller and its Affiliates and each of their respective Representatives in connection with the accuracy, completeness or materiality of any information, data or other materials (written or oral) heretofore furnished to the Buyer or its Representatives by or on behalf of the Seller or any of its Affiliates or any of their respective Representatives in connection therewith. Without limiting the foregoing, the Seller is not making any representation or warranty to the Buyer with respect to any financial projection or forecast relating to the Thrifty Business, the Purchased Assets or the Assumed Liabilities. For purposes of this Section 3.13, "Seller" shall include the Other IP Sellers.

9

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows:

Section 4.1    <u>Organization and Qualification</u>. The Buyer is an entity duly organized, validly existing and in good standing under the Laws of the state of its formation or incorporation (as applicable).

Section 4.2    <u>Authorization; Enforceability</u>. The Buyer has the requisite power and authority to execute and deliver this Agreement and the Transaction Agreements to which it is a party, to perform its obligations under this Agreement and the Transaction Agreements to which it is a party and to consummate the Transactions and the Transaction Agreements to which it is a party. The execution and delivery of, and performance by the Buyer under this Agreement and the Transaction Agreements to which the Buyer is a party, and the consummation by the Buyer of the Transactions and the Transaction Agreements to which it is a party, have been duly authorized by all requisite corporate action, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of, and performance by, the Buyer under this Agreement and the Transaction Agreements to which the Buyer is a party and the consummation by it of the Transactions and the Transaction Agreements to which it is a party. This Agreement has been duly and validly executed and delivered by the Buyer, the Transaction Agreements to which the Buyer is a party will be duly executed and delivered by the Buyer at the Closing and, assuming the due authorization, execution and delivery by the Seller and the parties thereto, will constitute, upon such execution and delivery in each case thereof, legal, valid and binding obligations of the Buyer, enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 4.3    <u>No Consents</u>. Neither the execution and delivery of this Agreement or the Transaction Agreements to which the Buyer is a party nor the performance by the Buyer of its obligations hereunder or thereunder or the consummation of the Transactions will (with or without the passage of time or the giving of notice) require any Third Party Consents from any Governmental Authority.

Section 4.4    <u>Litigation</u>. There are no Legal Proceedings pending or, to the Buyer's knowledge, threatened in writing, against the Buyer, nor is the Buyer subject to any judgment, Order or decree of any court or Governmental Authority, in each case, which would seek to prevent, delay or burden any of the Transactions.

Section 4.5    <u>No Violation</u>. Neither the execution and delivery of this Agreement or the Transaction Agreements to which the Buyer is a party, nor the performance by the Buyer of the Transactions will (a) constitute a default under the Organizational Documents of the Buyer, (b) result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which the Buyer is a party or (c) conflict with or violate any Laws applicable to the Buyer or by which any of its properties is bound; except, in the case of clauses (b) and (c) above, for violations, conflicts, defaults or

10

Consent, that in the aggregate would not reasonably be expected to materially hinder or impair the consummation of the Transactions or the entry into any Transaction Agreements.

Section 4.6    Sufficiency of Funds. Buyer will have access to sufficient funds as of the Closing to pay the Purchase Price to Seller, on the terms and conditions contained in this Agreement, and will not require external third-party financing in order to pay the Purchase Price.

Section 4.7    No Brokers. No broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission from the Buyer in connection with the Transactions.

Section 4.8    Independent Investigation. The Buyer hereby acknowledges and affirms that it has conducted and completed its own investigation, analysis and evaluation of the Thrifty Business, that it has made all such reviews and inspections of the financial condition, business, results of operations, properties, assets and prospects of the Thrifty Business as it has deemed necessary or appropriate, that it has had the opportunity to request all information it has deemed relevant to the foregoing from the Seller or its Representatives and has received responses it deems adequate and sufficient to all such requests for information. The Buyer is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of independently evaluating the merits, risks and suitability of entering into this Agreement and to consummate the Transactions, and is able to bear the risks inherent to the Transactions. In making its decision to enter into this Agreement and to consummate the Transactions, the Buyer has relied solely on (i) its own investigation, analysis and evaluation of the Thrifty Business and (ii) the representations, warranties and covenants of the Seller, or the Other IP Sellers, as applicable, contained in this Agreement.

## ARTICLE V
## COVENANTS

Section 5.1    Conduct of Business. From the date of this Agreement until the Closing Date, except as otherwise provided in this Agreement or approved in writing by the Buyer (such approval to not be unreasonably withheld, delayed or conditioned), the Seller shall use commercially reasonable efforts to carry on and maintain the Thrifty Business in the Ordinary Course of Business. Notwithstanding anything herein to the contrary (a) the Buyer acknowledges that the Seller (or its Affiliates) may be winding down its business and as such, the operating hours, inventory and staffing levels may change accordingly and any such changes shall not be deemed a breach of this Section 5.1 and (b) nothing in this Agreement shall restrict the Seller (or its applicable Affiliates) from modifying, amending, altering or terminating any Shared Contract.

Section 5.2    Employee Matters.

(a)    The Seller acknowledges that, following the date hereof, the Buyer shall have the right to interview before the Closing Date and, following the Closing Date, hire the Seller's current Scheduled Employees, in the Buyer's sole discretion. Any pre-Closing Date interviews shall be conducted outside such employees' work shifts with the Seller and in a manner that would not reasonably be expected to materially disrupt the operations or business of the Thrifty Business, in each case as advised by the Seller. For the avoidance of doubt, the Buyer

11

may not hire any of the Seller's employees with a start date prior to the Closing Date. Where applicable and required by Law or the terms of a Collective Bargaining Agreement, the Buyer shall use commercially reasonable efforts to hire the applicable Scheduled Employees.

(b)    With regard to any employee of the Seller who shall be employed by the Buyer in connection with the Closing (each an "*Eligible Employee*"), the Buyer shall have no contractual obligation with regard to such employment, unless otherwise required by Law or by the applicable Collective Bargaining Agreement, except that, for purposes of the participation of any such Eligible Employees in the Buyer's 401(k) and applicable welfare plans, the Buyer shall cause such plans to take into account, for purposes of eligibility thereunder, the pre-Closing service of such Eligible Employees as if such service was with the Buyer or its affiliates to the same extent such service was recognized by the Seller immediately prior to the Closing under the comparable employee benefit plan of the Seller, in all cases to the extent allowed under the Employee Retirement Income Security Act of 1974 ("*ERISA*"), the Internal Revenue Code and other applicable law. The Buyer shall notify the Seller in a reasonably prompt timeframe of acceptances of employment offers by Eligible Employees.

(c)    As of the Closing, the Buyer shall assume the Collective Bargaining Agreements and all Liabilities thereunder arising on and after the Closing and the Seller will no longer be a party thereto.

Section 5.3    No Third-Party Beneficiaries. Nothing in this Agreement (including Section 5.2), express or implied, shall: (i) confer upon any Person other than the Parties any rights or remedies of any nature whatsoever, including any third-party beneficiary rights; (ii) be construed to: (1) establish, amend, terminate or modify any compensation or benefit plan, program, policy, Contract, agreement or arrangement and (2) limit the ability of the Buyer or any of its Affiliates to amend, modify or terminate any compensation or benefit plan, program, policy, Contract, agreement or arrangement; or (iii) create any right in any Scheduled Employee or any other Person to any employment or service with the Buyer or any of its Affiliates or to any particular term or condition of employment or service with the Buyer or any of its Affiliates, or to limit the ability of the Buyer or any of its Affiliates to terminate the employment or service of any Person at any time and for any or no reason.

Section 5.4    Additional Agreements of the Parties.

(a)    The Buyer, or the Seller, as applicable, will, and will cause its respective Affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by Buyer or Seller, as applicable, under any applicable laws for the consummation of the Transactions, if any.

(b)    Each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver (at the expense of the requesting Party) such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.

Section 5.5    Tax Matters.

(a)    The Seller shall prepare all Tax Returns for any Straddle Period (such Tax Returns, "***Straddle Period Returns***") and shall provide the Buyer with a draft of such Straddle Period Returns thirty (30) days prior to the filing of the relevant Straddle Period Return, or as soon as reasonably practical thereafter, and shall consider in good faith any reasonable comments made by the Buyer with respect thereto. The Seller shall, without duplication of any other obligations hereunder, be responsible for paying any Taxes reflected on any Straddle Period Return relating to any Pre-Closing Tax Period.

(b)    Any Liability for Taxes attributable to a Straddle Period required to be apportioned under this Agreement shall be apportioned as follows: (i) the amount of property, ad valorem, intangible and other periodic Taxes allocable to the pre-Closing portion of any Straddle Period shall be equal to (A) the amount of such Taxes for the entire Straddle Period *multiplied by* (B) a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the pre-Closing portion of such Straddle Period and the denominator of which is the number of calendar days in the entire Straddle Period and (ii) all Taxes not allocated under clause (i) above shall be allocated to the pre-Closing portion of any Straddle Period on the basis of a "closing of the books," as if such taxable period ended as of the end of the day on the Closing Date; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period beginning after the Closing Date in proportion to the number of calendar days in each period.

(c)    Liability for the amount of any Transfer Taxes shall be borne equally by Buyer and Seller and both Parties shall cooperate in good faith to pay on or as soon as practicable following the Closing Date all Transfer Taxes associated with the transfer of the Purchased Assets pursuant this Agreement and shall prepare (at their sole cost and expense) and timely file all related Tax Returns regarding such Transfer Taxes or the Transactions and the Transaction Agreements. Each of the Parties shall cooperate to file, or cause to be filed, all necessary Tax Returns and other documentation with respect to any Transfer Taxes and shall otherwise reasonably cooperate in good faith with such other Party to minimize, to the extent permitted under applicable Law, the amount of any such Transfer Taxes.

(d)    The Seller shall take all actions as may be necessary to terminate all Tax sharing agreements or arrangements (other than customary financial or commercial contracts entered into in the Ordinary Course of Business), if any, to which any Purchased Assets are subject, in each case, in a manner such that after the applicable termination, the Buyer will have no past, present or future Liability thereunder.

Section 5.6    Shared Contracts Efforts. During the period commencing on the date hereof and ending thirty (30) days following the Closing Date, the Seller shall use commercially reasonable efforts to assist the Buyer, at Buyer's sole expense, to reasonably support Buyer in its discussions with any third party, which is a party to a Shared Contract, in order to enable the Buyer to negotiate a separate contractual arrangement with such third parties. For the avoidance of doubt, this Section 5.6 shall not in any way be deemed to impose any Liability or obligation of any kind on the Seller or its Affiliates.

Section 5.7    Bulk Sale Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens in the Purchased Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Liens, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 5.8    Access to Information. From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Section 9.1), Seller will provide Buyer and its authorized representatives with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller (solely to the extent they relate to the Purchased Assets or the Thrifty Business), in order for Buyer and its authorized representatives (provided that such authorized representatives shall execute, and be subject to, a nondisclosure agreement in favor of Seller in a form reasonably acceptable by Seller) to access such information regarding the Purchased Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller or the Thrifty Business, (ii) such access will occur in such a manner, and to such extent, as Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions, and (iii) all requests for access will be directed to Guggenheim Securities or such other Person(s) as Seller may designate in writing from time to time. Buyer acknowledges and agrees that any information obtained by Buyer (or its authorized representatives pursuant to the terms hereof) shall be subject to the nondisclosure agreement entered into by Buyer (or its Affiliates) and Seller (or its Affiliates) in connection with the Thrifty Business sale process.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

Section 6.1    Bankruptcy Actions.

(a)    The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Seller, including through its Representatives, is and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(b)    The Parties shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)    Each of the Seller and the Buyer shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including upon reasonable request promptly furnishing the other with copies of notices or other communications received by the Seller from the Bankruptcy Court with respect to the Transactions.

(d)     The Seller and the Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher or better bids and Bankruptcy Court approval. The Buyer acknowledges that the Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, entertaining higher or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction (as such term is defined in the Bidding Procedures Order).

(e)     Nothing in this Section 6.1 shall prevent the Seller from modifying the bidding procedures as necessary or appropriate to maximize value for the Seller's estate in accordance with the Seller's fiduciary obligations.

Section 6.2     Bankruptcy Filings. From and after the date that the Buyer is selected as the winning bidder and until the Closing Date, to the extent reasonably practicable, the Seller shall deliver to the Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports, and other papers to be filed or submitted in connection with the Agreement and the operation of the Seller for the Buyer's prior review and comment prior to the filing or submission thereof, and such filings shall be reasonably acceptable to the Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of the Buyer's obligations under the Agreement.

Section 6.3     Cure Notices. To the extent not already provided, the Seller shall serve a cure notice (the "**_Cure Notice_**") by first class mail on all non-debtor counterparties to the Assigned Contracts and the Assumed Lease. The Cure Notice shall inform each recipient that its respective Assigned Contract or Assumed Lease may be designated as assumed and assigned to the Buyer, and shall specify the timing and procedures relating to such designations, and, to the extent applicable, (i) the title of the Assigned Contract or Assumed Lease, (ii) the name of the counterparty to the Assigned Contract or Assumed Lease, (iii) the Seller's good faith estimates of the Cure Amounts required in connection with such Assigned Contract or Assumed Lease, (iv) the identity of the Buyer, (v) the deadline by which any such Assigned Contract or Assumed Lease counterparty may file an objection to the proposed assumption and assignment, or cure, as applicable, and the procedures relating thereto, and (vi) that such Assigned Contract or Assumed Lease counterparty's failure to object timely to the proposed assumption or Cure Amount will be deemed to be consent to such assumption or Cure Amount.

Section 6.4     Sale Free and Clear. The Seller acknowledges and agrees, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to the Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities and Permitted Liens), pursuant to section 363 of the Bankruptcy Code. The Seller shall use commercially reasonable efforts to provide that the Sale Order becomes effective immediately upon entry thereof and that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) shall be waived for cause.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.1    Conditions Precedent to the Obligations of the Parties. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of each of the following conditions:

(a)    no Governmental Authority or court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) or Law restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

Section 7.2    Conditions Precedent to the Obligations of the Buyer. The obligations of the Buyer to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of the following condition: the representations and warranties made by the Seller in ARTICLE III shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (a) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (b) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a material adverse effect on the Thrifty Business.

Section 7.3    Conditions Precedent to the Obligations of the Seller. The obligations of the Seller to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Seller and the Buyer) on or prior to the Closing Date, of the following condition: the representations and warranties made by the Buyer in ARTICLE IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that (a) any such representation and warranty that is qualified by materiality shall be true and correct in all respects and (b) representations and warranties that are made as of a specified date need be true and correct only as of such date.

**ARTICLE VIII**
**DEFINITIONS**

Section 8.1    Definitions. As used in this Agreement:

"*Adverse Claim*" means a Lien, Claim, Liability, or other claim in, of or on any Person's assets or properties in favor of any other Person.

"*Affiliate*" means, (i) as to any Person (other than the Buyer), any other Person that, directly or indirectly, controls, or is controlled by or is under common control with, such Person, and (ii) as to the Buyer, any entity controlling, controlled or under common control by the Buyer. For this purpose, "*control*" (including, with its correlative meanings, "*controlled by*" and "*under common control with*") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

16

"***Agreement***" has the meaning set forth in the Preamble.

"***Alternative Transaction***" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Buyer and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) a material portion of the Purchased Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, neither a liquidation or wind-down of Seller's estates nor a reorganization of Seller that permits the Transactions to be consummated in accordance with the terms hereof shall be an Alternative Transaction.

"***Assigned Contracts***" means the Contracts listed on Section 1.1(a)(i) of the Disclosure Schedules.

"***Assumed Lease***" means that certain Lease Agreement dated as of July 14, 2020 by and between Gardena Rose No. 1 LLC, 3225 Pico Boulevard, LLC, Megdal Green, LLC and the Seller.

"***Assumed Liabilities***" has the meaning set forth in Section 1.2(a).

"***Assumed Licenses and Permits***" means any licenses, permits, operating authorities, certificates, certifications, notifications, exemptions, classifications, registrations, franchises, approvals, consents, orders or similar authorizations, or any waivers of the foregoing, issued by any Governmental Authority exclusively related to the Thrifty Business or for the exclusive ownership or exclusive use of the Purchased Assets, to the extent assignable under applicable Law.

"***Bankruptcy Cases***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bidding Procedures Order***" means the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale Of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* Docket No. 473.

"***Bill of Sale***" has the meaning set forth in Section 2.3(a).

"***Business Day***" means any day other than a Saturday, a Sunday or other day on which banks in New York are permitted or required by applicable Law to close.

"***Buyer***" has the meaning set forth in the Preamble.

"***Buyer Group***" has the meaning set forth in Section 9.6.

"***Claim***" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"***Closing***" has the meaning set forth in <u>Section 2.2</u>.

"***Closing Date***" has the meaning set forth in <u>Section 2.2</u>.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended.

"***Consent***" means any approval, consent, ratification, waiver, permit or other authorization designation, declaration, filing or notice.

"***Contract***" means any written or binding oral contract, agreement, loan or credit agreement, note, bond, guaranty, mortgage, indenture, instrument, lease, sublease or license or other legally binding commitment, arrangement, obligation, undertaking or understanding of any nature.

"***Cure Amount***" means all amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Assigned Contracts and Assumed Lease. The Cure Amount, as of June 20, 2025, and as estimated by the Seller in good faith, is set forth on <u>Schedule 8.1</u>, subject to, in each case, final determination by the Bankruptcy Court of such amounts and passage of time.

"***Disclosure Schedules***" has the meaning set forth in <u>Section 9.18</u>.

"***Emergence Date***" means August 30, 2024.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Excluded Assets***" has the meaning set forth in <u>Section 1.1(b)</u>.

"***Excluded Contracts***" means all Contracts other than the Assigned Contracts.

"***Excluded Liabilities***" has the meaning set forth in Section 1.2(a).

"***Excluded Licenses and Permits***" means all Licenses and Permits of the Seller, other than the Assumed Licenses and Permits.

"***Final Order***" means an Order that (a) is not stayed, and (b) as to which the time to file an appeal, has expired and no such appeal is pending.

"***Fraud***" means actual and intentional fraud that constitutes common law fraud under the Laws of the State of Delaware with respect to the making of the representations and warranties contained in <u>ARTICLE III</u> (as qualified by the Disclosure Schedules) of this Agreement, <u>ARTICLE IV</u> of this Agreement or in any Transaction Agreement, in each case made with the actual knowledge or belief (as opposed to imputed or constructive knowledge or belief) of a

Party that such Party's representations and warranties were inaccurate when made, with the intention to deceive or another Party to consummate the Transactions.

"***General Enforceability Exceptions***" means those exceptions or limitations to enforceability due to (i) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity.

"***Governmental Authority***" means the United States or any state, provincial, county, municipal, city, local or foreign government, or any instrumentality, division, subdivision, department, agency, court, legislature, executive or regulatory authority, administrative regulatory or judicial agency or commission, or other governmental entity or authority of any thereof, or any court of competent jurisdiction, mediator, arbitrator or arbitral body (public or private), department, commission, bureau or tribunal, self-regulatory body or authority or other governmental authority, domestic or foreign, including any instrumentality or entity designed to act for or on behalf of any of the foregoing.

"***Guggenheim Securities***" has the meaning set forth in Section 3.9.

"***Hazardous Substances***" means any and all substances, wastes, pollutions, contaminants, chemicals and materials regulated, defined or designated hazardous, dangerous or toxic under any Environmental Law.

"***Intellectual Property***" means all of the following, as they exist anywhere in the world: (a) patents and industrial designs (including utility model rights, design rights and industrial property rights), patent and industrial design applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, divisionals, extensions and reexaminations thereof, (b) trademarks, service marks, trade dress, logos, designs, slogans, trade names, corporate names, social media identifiers (such as a Twitter® Handle) and related accounts, and all other indicia of origin, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all internet domain names and internet addresses, (d) copyrightable works, all copyrights, works of authorship (whether or not copyrightable), and all applications, registrations and renewals in connection therewith, (e) trade secrets and confidential information (including know-how, recipes and formulas), and (f) all other intellectual property or proprietary rights of a similar nature.

"***IRS***" means the Internal Revenue Service of the United States Department of the Treasury.

"***Law***" means all law (including common law), statute, ordinance, Order, code, rule, writ, decree, treaty or regulation enacted, promulgated, imposed or enforced by the United States, any foreign country or any domestic or foreign state, province, county, city or other political subdivision of any Governmental Authority.

"***Legal Proceeding***" has the meaning set forth in Section 3.10(a).

"***Liability***" means any debt, liability, obligation or deficiency, of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, choate or inchoate due or to become due), including any liability for Taxes.

"***Licensed Intellectual Property***" means all Intellectual Property used exclusively in or exclusively related to the operation of the Thrifty Business by the Seller or its Affiliates pursuant to a valid license Contract.

"***Lien***" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, right of first offer, or charge, other than restrictions on the offer and sale of securities under federal and state securities Laws.

"***Open Source Software***" means any software that is distributed (i) as "free software" (as defined by the Free Software Foundation), (ii) as "open source software" or pursuant to any license identified as an "open source license" by the Open Source Initiative (opensource.org/licenses) or other license that substantially conforms to the Open Source Definition (opensource.org/osd), (iii) under any similar licensing or distribution model or (iv) under a license that requires disclosure of source code or requires derivative works created based on the licensed software to be made publicly available under the same license.

"***Order***" means any decree, determination, injunction, judgment, order, ruling, award, consent or writ of any Governmental Authority.

"***Ordinary Course of Business***" means with respect to an action taken by a Person, that such action is substantially consistent with the ordinary and usual course of operations of the Thrifty Business, taken as a whole, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases.

"***Organizational Documents***" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws, (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity, and (c) any amendment to any of the foregoing.

"***Outside Date***" has the meaning set forth in <u>Section 9.1(a)(iii)</u>.

"***Owned Thrifty Business Intellectual Property***" means all of the Seller's and the Other IP Sellers' right, title and interest in and to any Intellectual Property owned by the Seller and exclusively used in the Thrifty Business, together with all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof.

"***Party***" and "***Parties***" has the meanings set forth in the Preamble.

"***Permitted Liens***" means (i) Liens for utilities and Taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary liens or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets in any material respect and, in the case of the Assumed Lease, which do not, individually or in the aggregate, adversely affect the use or occupancy of the Assumed Lease in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated in any material respect by the current use or occupancy of the Assumed Lease, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) licenses granted on a non-exclusive basis in the Ordinary Course of Business, (vi) such other Liens or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Purchased Assets, (vii) matters that would be disclosed by an accurate survey or inspection of the applicable real property, (viii) with respect to any leased real property, (a) any Liens to which the fee or any superior leasehold is subject and any (b) Lien in favor of the lessor on the Purchased Assets located at such leased real property, or (ix) solely prior to the Closing, any Liens that will be removed or released by operation of the Sale Order.

"***Person***" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Pre-Closing Tax Period***" means (i) each taxable period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending at the end of the Closing Date, as determined pursuant to Section 5.5(b).

"***Prior Cases***" has the meaning set forth in the Recitals.

"***Purchase Price***" has the meaning set forth in Section 2.1(a).

"***Purchase Price Allocation***" has the meaning set forth in Section 2.1(b).

"***Purchased Assets***" has the meaning set forth in Section 1.1(a).

"***Purchased Inventory and Owned Business Assets***" means all of the Seller's inventory and owned business assets used in connection with the Thrifty Business and listed on Section 1.1(a)(ii) of the Disclosure Schedules.

"***Representative***" means, with respect to any Person, any director, manager, officer, agent, advisor, Affiliate, employee or similar person acting in a representative capacity for such Person.

"***Retained Tax Liabilities***" means, without duplication, (i) any and all Liabilities for Taxes of the Seller and its Affiliates for any Tax period (including, for clarity, any Taxes arising

in, or in respect of, the consolidated tax group including the Seller, including pursuant to Treasury Regulation section 1.1502-6, and any Taxes arising out of the disposition of the Purchased Assets pursuant to this Agreement), (ii) any and all Liabilities for Taxes for any Pre-Closing Tax Period of any Person other than the Seller and its Affiliates arising as a result of successor or transferee liability, (iii) any and all Liabilities for Taxes based upon or measured by, or imposed on or with respect to, the Purchased Assets (or the ownership or operation thereof) for any Pre-Closing Tax Period, and (iv) any Liabilities arising from any Liens for Taxes on any of the Purchased Assets (whether or not Permitted Liens).

"***Sale Order***" means an Order of the Bankruptcy Court that is reasonably acceptable to the Buyer and the Seller, approving the Seller's entry into the Agreement and all of its terms and conditions pursuant to sections 363 and 365 of the Bankruptcy Code, and authorizing the Seller to consummate the Transactions. The Sale Order must, among other things, (a) approve, under sections 105, 363, 365, or 1123 of the Bankruptcy Code, as applicable, the execution, delivery, and performance by the Seller of the Agreement, the sale of the Purchased Assets to the Buyer free and clear of all Adverse Claims (except those included in the Assumed Liabilities or Permitted Liens), and the Seller's performance of its obligations, (b) authorize and empower the Seller to transfer the Assigned Contracts and the Assumed Lease to the Buyer, consistent with the Bidding Procedures Order, as set forth in the Agreement, (c) find that the Buyer is a "good faith" buyer under section 363(m) of the Bankruptcy Code and grant the Buyer the protections of that section, and (d) find that the Buyer has provided adequate assurance of future performance necessary for the assumption and assignment of the Assigned Contracts and the Assumed Lease, consistent with the Bidding Procedures Order.

"***Seller***" has the meaning set forth in the Preamble.

"***Seller Group***" means (i) the Seller, (ii) the lenders and agents under the indebtedness of the Seller, (iii) the Statutory Committee of Unsecured Creditors of the Seller in its Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (iv) with respect to those parties in the foregoing (i)–(iii), any of their respective agents, attorneys, investment bankers, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in section 15 of the Securities Act of 1933 (as amended) or section 20 of the Securities Exchange Act of 1934 (as amended), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such.

"***Seller's Knowledge***" or "***Knowledge of the Seller***" means the actual knowledge following reasonable inquiry, as of the date hereof, of Scott G. Becsi, not individually but solely in his capacity as the general manager of the Thrifty Business' manufacturing facility.

"***Shared Contract***" means any Contracts entered into by Seller, or its Affiliates, with one or more third parties that benefit both (i) the Thrifty Business or the Purchased Assets and (ii) any Excluded Assets.

"***Straddle Period***" means any taxable period beginning on, or prior to, and ending after, the Closing Date.

"***Straddle Period Returns***" has the meaning set forth in the <u>Section 5.5(a)</u>.

"***Tax***" or "***Taxes***" means (a) any and all U.S. federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, escheat, unclaimed property, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, ad valorem, personal property, sales, use, highway use, fuel, transfer, registration, vehicle registration, value-added, alternative or add-on minimum, estimated and any other taxes, levies, imposts, fees, assessments or charges of any kind whatsoever, including any interest, penalty or addition thereto and (b) any amounts described in clause (a) for which any Person may be jointly or severally liable under applicable Law by virtue of its status as a member of a consolidated, affiliated, combined or unitary group of taxpayers or (c) any amount described in clause (a) or clause (b) that is imposed on a Person as transferee or successor, by contract, by operation of Law, under a theory of a de facto merger or similar legal theory, or otherwise (including any such amount payable pursuant to any tax sharing agreement or any other agreement or arrangement relating to the sharing, indemnification or payment of any such amount), and in each case whether disputed or not.

"***Tax Returns***" means any return (including any information return), report, statement, schedule, notice, form, election, claim for refund or other document or information filed with or submitted to, or required to be filed with or submitted to, any Taxing Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to Taxes (including any schedule or attachment thereto or amendment thereof).

"***Taxing Authority***" means any Governmental Authority, domestic or foreign, having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"***Third Party Consents***" has the meaning set forth in <u>Section 3.4</u>.

"***Thrifty Business***" has the meaning set forth in the Recitals.

"***Transaction Agreements***" means each agreement, document, certificate and instrument being executed or delivered pursuant to this Agreement.

"***Transactions***" means the transactions contemplated by this Agreement and the Transaction Agreements.

"***Transferred Personnel Records***" means the personnel records of Eligible Employees, to the extent readily available and transferable under applicable law.

"***Transfer Taxes***" means any and all transfer, documentary, sales, use, gross receipts, stamp, value-added, recording, registration, escrow and other similar Taxes and fees (including any penalties and interest) imposed or assessed as a result of the Transactions and by the Transaction Agreements (including recording and escrow fees and any real property or leasehold interest transfer or gains Tax and any similar Tax).

"***Treasury Regulation***" means the regulations of the U.S. Department of the Treasury promulgated under the Code, as such Treasury Regulations may be amended from time to time. Any reference herein to a particular Treasury Regulation means, where appropriate, the corresponding successor provision.

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.1    <u>Termination of Agreement.</u>

(a)    This Agreement may be terminated at any time prior to Closing only in accordance with this <u>Section 9.1</u>:

(i)    by the mutual written consent of the Seller and the Buyer;

(ii)    by either the Seller or the Buyer, upon written notice to the other, if there is a material breach of an obligation of the other Party (including under the Sale Order) and such breach is not remedied within thirty (30) calendar days after receipt by such breaching Party of notice in writing from the non-breaching Party, specifying the nature of such breach and requesting that it be remedied;

(iii)    by either the Seller or the Buyer, if the Closing shall not have been consummated on or before the fifth (5th) Business Day following the satisfaction or waiver of the conditions to Closing set forth in <u>Article VII</u> (such Business Day, the "***Outside Date***"); provided that the right to terminate this Agreement pursuant to this <u>Section 9.1(a)(iii)</u> shall not be available to the Party whose breach of any provision of this Agreement has caused or resulted in the failure of the Closing to be consummated by the Outside Date; or

(iv)    by written notice from the Seller to the Buyer, if the Seller or its board of directors (or similar governing body) of the Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

(b)    In the event of the termination and abandonment of this Agreement pursuant to Section <u>9.1(a)</u>, this Agreement shall become void and have no effect, without any liability on the part of any Party, except that the provisions of this Section <u>9.1(b)</u> and the other provisions of <u>ARTICLE IX</u> shall survive in accordance with their respective terms; <u>provided</u>, <u>however</u>, a termination of this Agreement shall not defeat or impair the right of any Party to pursue such relief as may otherwise be available to it on account of any willful breach of this Agreement or any of the representations, warranties, covenants or agreements contained in this Agreement.

Section 9.2    <u>Survival of Terms</u>. The representations and warranties set forth in this Agreement or in any certificate or documents delivered pursuant to this Agreement, and the covenants and agreements of the Seller or Buyer that contemplate performance prior to the Closing, shall terminate at, and will not survive, the Closing. The covenants and agreements of Seller or Buyer contained in this Agreement that contemplated performance at or after the

Closing shall survive the Closing until they are performed in accordance with their respective terms.

Section 9.3    No Liability; Release.

(a)    The Seller, on behalf of itself and on behalf of its Affiliates (each, a "**Seller Releasing Party**" and, collectively, the "**Seller Releasing Parties**"), hereby releases and forever discharges Buyer and any individual, joint or mutual, past, present and future Representatives, agents, employees, officers, directors, managers, equityholders, partners, members, controlling persons, subsidiaries, Affiliates, successors and assigns of the Buyer (individually, a "**Buyer Releasee**" and, collectively, "**Buyer Releasees**"), from any and all claims, demands, actions, causes of action, orders, obligations, debts and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Seller Releasing Party or any of its Affiliates, or any of their respective heirs, executors, administrators or assigns, now has or has ever had against any Buyer Releasee arising on or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring on or prior to the Closing Date in respect of matters relating to the Seller's, or any of its Affiliates', direct or indirect ownership, control, management or operation of the Thrifty Business and the Purchased Assets (all of the foregoing collectively referred to herein as the "**Seller Released Claims**"); provided, however, that nothing contained herein shall operate as a release of any rights or obligations arising under this Agreement or any other Transaction Agreement, any claim based on Fraud or any other rights or obligations that cannot be waived by virtue of applicable Law. Each Seller Releasing Party represents that it has not made any assignment or transfer of any Seller Released Claim or any other matter covered by this Section 9.3(a). Each Seller Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Seller Released Claim, or commencing, instituting or causing to be commenced, any action of any kind against any Buyer Releasee, based upon any matter released hereby.

(b)    The Buyer, on behalf of itself and on behalf of its Affiliates (each a "**Buyer Releasing Party**" and, collectively, the "**Buyer Releasing Parties**" and, together with the Seller Releasing Parties, the "**Releasing Parties**"), hereby releases and forever discharges the Seller and any individual, joint or mutual, past, present and future Representatives, agents, employees, officers, directors, managers, equityholders, partners, members, controlling persons, subsidiaries, Affiliates, successors and assigns of the Seller (individually, a "**Seller Releasee**" and, collectively, "**Seller Releasees**"), from any and all claims, demands, actions, causes of action, orders, obligations, debts and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Buyer Releasing Party or any of its controlled Affiliates, or any of their respective heirs, executors, administrators or assigns, now has or has ever had against any Seller Releasee arising on or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring on or prior to the Closing Date in respect of matters relating to the Seller's, or any of its Affiliates', direct or indirect ownership, control, management or operation of the Thrifty Business and the Purchased Assets (all of the foregoing collectively referred to herein as the "**Buyer Released Claims**" and, together with the Seller Released Claims, the "**Released Claims**"); provided, however, that nothing contained herein shall operate as a release of any rights or obligations arising under this Agreement or any other Transaction Agreement, any claim based on Fraud or any other rights or obligations that cannot be waived by virtue of applicable Law. Each Buyer Releasing Party represents that it has

not made any assignment or transfer of any Buyer Released Claim or any other matter covered by this Section 9.3(b). Each Buyer Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Buyer Released Claim, or commencing, instituting or causing to be commenced, any action of any kind against any Seller Releasee, based upon any matter released hereby.

(c)    Each Buyer Releasing Party and each Seller Releasing Party hereby acknowledges and intends that this release shall be effective as a bar to each and every one of the applicable Released Claims hereinabove mentioned. Each Buyer Releasing Party and each Seller Releasing Party expressly agrees and acknowledges that this release shall be given full force and effect in accordance with each and every express term or provision, including those (i) relating to any applicable Released Claims hereinabove mentioned or (ii) relating to unknown and unsuspected claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated claims).

(d)    Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 9.3 do not extend to (i) Fraud or (ii) any rights, interests or obligations of the Parties and the parties under any agreement, document or instrument contemplated hereby.

Section 9.4    Non-Recourse. This Agreement may be enforced only against, and any claim or cause of action based upon, arising out of or related to this Agreement or the Transactions may be brought only against, the entities that are expressly named as Parties and then only with respect to the specific obligations set forth herein with respect to such Party. With respect to each named Party, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, Affiliate, agent, attorney, advisor, Representative or Affiliate of any of the foregoing Persons shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of such named Party set forth in this Agreement or for any claim based on, arising out of or related to this Agreement, the Transaction Agreements or the Transactions.

Section 9.5    Specific Performance. The Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise breached, irreparable harm would occur, no adequate remedy at law would exist and damages would be difficult to determine. Accordingly, it is agreed that the Party or Parties not in breach shall be entitled to an injunction or injunctions to prevent breaches of this Agreement, and to the remedy of specific performance of the terms and conditions hereof, in addition to any other remedies that may be available, at law or in equity, by reason of such breach without the requirement of posting of a bond or other security.

Section 9.6    No Setoff. The Buyer, on its own behalf and on behalf of any of its Affiliates and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns (collectively, the "**Buyer Group**"), hereby waives any rights of set-off, netting, offset, recoupment or similar rights that the Buyer, any member of the Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by the Buyer pursuant to this Agreement or any other document or instrument delivered by the Buyer in connection herewith.

Section 9.7    Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require the Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, the Seller retains the right to pursue any transaction or restructuring strategy that, in the Seller's business judgment, will maximize the value of their estates.

Section 9.8    Press Releases and Communications. The Parties agree that no Party shall produce (i) any press releases or other advertising or (ii) issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets, at any time prior to or after the Closing Date, unless (x) otherwise agreed upon in writing by the Parties or required in connection with the Bankruptcy Cases, including in accordance with the Sale Order or (y) in the reasonable judgment of the Buyer or the Seller, disclosure is otherwise required by applicable Law or any Governmental Authority in connection with this Agreement or the Transaction Agreements.

Section 9.9    Expenses. Except as otherwise expressly provided in this Agreement (including in respect of Transfer Taxes), each of the Parties shall pay its own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the Transaction Agreements. Notwithstanding the above, if either Party takes legal action in relation to the interpretation or enforcement of this Agreement, the reasonable attorneys' fees and court costs incurred by the party prevailing in such legal action shall be borne by the non-prevailing party, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing party will be the party that is awarded judgment as a result of trial or arbitration, or the party that receives a payment of money from the other party in settlement of claims asserted.

Section 9.10    Notices, Consents, etc Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party:

**If to the Seller**:

c/o New Rite Aid, LLC
200 Newberry Commons
Etters, PA 17319
Attention: Legal Department

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Megan Spelman; Andrew Rosenberg; Alice Eaton; Sean Mitchell
Email: mspelman@paulweiss.com; arosenberg@paulweiss.com;
aeaton@paulweiss.com; smitchell@paulweiss.com

**If to the Buyer**:

c/o Optimal Investment Group, LLC
15301 Ventura Blvd. Bldg B #350
Sherman Oaks, CA 91403
███████████████████████████

with a copy (which shall not constitute notice) to:

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067-6017
Attention: Saul S. Rostamian
Email: SRostamian@sheppardmullin.com

Section 9.11    Severability. The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision. Upon such determination that any term or other provision is unenforceable or invalid, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a legally acceptable manner in order to ensure that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.12    Successors; Assignment. This Agreement will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by either Party without the other Party's prior written consent; provided, however, Buyer may assign this Agreement (in whole or part) to a wholly owned or controlled subsidiary of Buyer (provided, further, in no event shall such assignment release Buyer from any liability or obligation hereunder).

Section 9.13    Counterparts; Facsimile Signatures This Agreement, the Transaction Agreements, and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party or party thereto, as applicable, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement, the Transaction Agreements, or any other agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement, the

Transaction Agreements, or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any Party or pursuant to any such Contract, each other Party or party thereto, as applicable, will re-execute original forms thereof and deliver them to all other Parties or parties thereto, as applicable. No Party or party to any such Contract, as applicable, will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of a .PDF or other electronic transmission as a defense to the formation of a Contract and each such Party or party, as applicable, forever waives any such defense.

Section 9.14    Governing Law; Forum.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    Each of the Parties irrevocably agrees that any Legal Proceeding of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "*Agreement Dispute*") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validity taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Legal Proceeding, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "*Chosen Courts*"), and each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Legal Proceedings in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that the venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.10. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED

BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.13(c).

Section 9.15    Table of Contents and Headings. The table of contents and section headings of this Agreement are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

Section 9.16    Entire Agreement. This Agreement, the recitals, the Schedules and the Exhibits attached hereto and the Transaction Agreements (all of which shall be deemed incorporated in this Agreement and made a part hereof) set forth the entire understanding of the Parties with respect to the Transactions, supersede all prior discussions, understandings, agreements and representations and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any Party in connection with the negotiation of the terms hereof. This Agreement may be amended or modified only by subsequent instruments signed by the Parties.

Section 9.17    Third Parties. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement. This Agreement and all provisions and conditions hereof are intended to be, and shall be, for the sole and exclusive benefit of such Persons and for the benefit of no other Person.

Section 9.18    Disclosure Generally. With respect to all disclosure schedules delivered in connection herewith (the "*Disclosure Schedules*"), such Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided, that each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules, and any such disclosure in the Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement; provided, that, in each case, the relevance of such disclosure to such other section of the Disclosure Schedules is reasonably apparent on its face or cross-referenced. Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedules or the attached Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are

required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedules or Exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedules or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. The information contained in this Agreement, in the Disclosure Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 9.19   <u>Interpretive Matters</u>. Unless the context otherwise requires, (a) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections, Schedules or Exhibits in this Agreement, (b) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, (c) the term "including" shall mean "including without limitation" (i.e., by way of example and not by way of limitation), all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (d) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto), (e) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), and (f) whenever this Agreement refers to a number of days, such number shall refer to calendar days, unless such reference is specifically to "Business Days."

Section 9.20   <u>Construction</u>. Each of the Parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it is of no application and is hereby expressly waived by the Parties.

[Signature Pages Follow]

31