**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel for Debtors*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NEW RITE AID, LLC, *et al.*,[1] | ) Case No. 25-14861 (MBK) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' EMERGENCY MOTION TO ENFORCE THE SALE ORDER AND COMPEL PERFORMANCE BY CVS PHARMACY, INC. UNDER THE CVS ASSET PURCHASE AGREEMENTS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above captioned debtors and debtors in possession (collectively, "Debtors")

respectfully state the following in support of this motion (this "Motion"):

---

[1]   The last four digits of New Rite Aid, LLC's tax identification number are 1483.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at [https://restructuring.ra.kroll.com/RiteAid2025].  The location of Debtor New Rite Aid LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

**Introduction**

1.      New Rite Aid LLC ("Rite Aid") and the other Debtors bring this motion to enforce Rite Aid's clear contractual rights and hold CVS Pharmacy, Inc. ("CVS") to its promises.  As part of these Chapter 11 cases, Rite Aid and CVS entered into a series of asset purchase agreements ("APAs") whereby, among other things, CVS agreed to purchase certain assets from Rite Aid, including—as relevant to this dispute—prescription files, records and data utilized and maintained by Rite Aid in the course of operating the licensed pharmacies in its stores ("RX Assets"), in a series of transactions that are set to close in the coming days, weeks and months.

2.      The APAs include a mechanism for adjusting the purchase price of the RX Assets based on Rite Aid's certification of ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (the "Lookback Period").  The parties have previously used this same contractual purchase price adjustment mechanism in prior transactions (albeit with slight differences in the number of weeks' worth of data used in the formula) for many years without any dispute as to the meaning or operation of this process.  But in a transparent effort to evade its contractual obligations, and pay substantially less than the parties agreed to for the RX Assets—to the tune of more than $40 million in the aggregate—CVS has manufactured three baseless contract interpretation disputes, all of which are contrary to the plain meaning of the language used in the APAs and inconsistent with the parties' extensive course of dealing.

3.      *First*, CVS disputes the number of weeks to be included in the Lookback Period if any of the four calendar weeks before the transactions close includes a nationally recognized holiday.  Although the plain words of the contract make clear that the certification is based on ***four weeks of data***, with the parenthetical clarifying which four weeks Rite Aid should use, CVS now

argues that the Lookback Period should be less than four weeks if any of the four weeks immediately preceding the closing date include a national holiday.  In particular, the four calendar weeks preceding the certification for the first set of closings pursuant to the APAs includes the Juneteenth holiday week and the Memorial Day holiday week, both of which Rite Aid excluded from the Lookback Period, looking instead to two additional weeks from May 2025 to arrive at the requisite four weeks of data for use in its calculation.  CVS claims that the weeks including Juneteenth and Memorial Day should be excluded, and the Lookback Period should be limited to only *two* weeks of data.

4.     The effect of CVS's spurious reading of the contract would be to limit the data set to fewer weeks that are closer in time to the closing—during which time attrition was continually increasing and the number of prescriptions filled continually decreasing—which would in turn reduce the amount that CVS is obligated to pay for the RX Assets by more than $20 million over the course of the various transactions set to close in the coming weeks.

5.     CVS's construction is not only contrary to the contract's plain language—which expressly provides that the Lookback Period will be "four (4) calendar weeks"—but is also inconsistent with the parties' course of dealing over many years involving substantially identical contractual provisions, including in APAs between the parties in the prior bankruptcy proceeding before this Court.  In those prior circumstances, CVS has always agreed with Rite Aid's approach—namely using the number of weeks specified in the agreement after excluding any holiday weeks, and looking back further in time for data to arrive at a data set based on the required number of weeks.

6.     As just one example, in February 2024, CVS purchased two stores from Rite Aid pursuant to purchase agreements with an eight-week lookback period with similar language

regarding exclusion of holiday weeks.  In calculating the eight-week average number of prescriptions filled, Rite Aid excluded the weeks of Christmas and New Years and included two additional weeks from December 2023 so there would be eight weeks of data, as the contract required.  Rite Aid then presented that data to CVS, and CVS expressly "agree[d] with [Rite Aid's] calculation."  (Declaration of George Zhushma ("Zhushma Decl.") ¶ 6.)

7.      It is no secret why CVS is advancing a different contractual construction now.  By baselessly asserting that the agreed-to four-week Lookback Period should be read to mean only three weeks (or possibly only two weeks), CVS is playing a numbers game, trying to maximize the number of Rite Aid customers transferring to CVS stores while paying Rite Aid substantially less than the bargained-for purchase price.

8.      *Second*, CVS disputes the meaning of the term "prescriptions filled" as used in the Lookback Period.  Although the plain meaning of the term clearly refers to the completed process of actually *filling* a prescription, with the last step being dispensing (*i.e.*, selling) the prescribed medication to the patient, CVS argues that the term should be read to refer to an earlier point in time, before the final (and crucially important) step in that process.

9.      CVS's construction of the term "prescriptions filled" is not only contrary to the plain language of the contract, but also—yet again—inconsistent with the parties' course of dealing over many years involving substantially identical contractual provisions, including in APAs between the parties in the prior bankruptcy proceeding before this Court.  In those prior circumstances, Rite Aid has always calculated prescriptions filled based on the number of prescriptions actually dispensed to patients, and CVS has never questioned those calculations. Indeed, in the APAs at issue here, Rite Aid included an exhibit that shows the baseline number of "prescriptions filled," and the numbers in that exhibit are based on when prescriptions were

actually dispensed to patients.   CVS never disputed or sought clarification as to how those filled prescriptions were calculated.  Yet CVS now seeks to apply an entirely different meaning to the contractual term, and modify the calculation using numbers from an earlier point in time before the prescribed medication is dispensed to the patient.  This approach is nonsensical on its face and would lead to an apples-to-oranges comparison of the baseline "prescriptions filled" numbers to the an entirely different "prescriptions filled" measurement during the Lookback Period.  This ruse is completely incoherent as a matter of basic contract interpretation.

10.    The gamesmanship of CVS's position is underscored by the fact that in its own public filings, CVS defines "prescriptions filled" as "the number of prescriptions *dispensed*."  CVS Form 10-K as of December 31, 2024 at p. 84 (emphasis added).  There simply is no good faith basis for CVS's attempt to read "prescriptions filled" as meaning something entirely different here.

11.    The motivation for CVS's contrary reading of the term "prescriptions filled" here is transparent:  CVS's construction would substantially reduce the number of prescriptions filled during the Lookback Period, allowing CVS to pay substantially less than the bargained-for purchase price.  That is because there is a lag between when a prescription is prepared and when it is dispensed to the patient, and calculating "prescriptions filled" at an earlier point in time results in many of those prescriptions falling outside the Lookback Period.  In addition, as each store gets closer to closing, fewer people call in new prescriptions, but previously prepared prescriptions remain on the shelf ready to be dispensed to patients.

12.    *Third*, based on the calculations CVS has provided, it appears that CVS also is not properly crediting Rite Aid for prescriptions that were transferred to CVS during the Lookback Period.  It's failure to do so is a clear breach of the APAs, which expressly provide that ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

13.     Although CVS may now wish that it had agreed to pay less for Rite Aid's RX Assets, its transparent gamesmanship in no way alters its contractual commitments.  By advancing its specious interpretations of the APAs, CVS is attempting to escape its agreement to pay Rite Aid the full amounts owed for its purchase of Rite Aid's RX Assets—with an estimated total impact of $50 to $60 million across all three disputes.

14.     The Court can resolve these disputes by applying the plain language of the APAs, as consistent with the parties' course of dealing, and entering an order confirming that:  (i) the parties' contract requires a full four-week lookback period, which excludes any week that contains a national holiday, in which case the parties will look to the immediately preceding non-holiday week(s) to ensure that four full weeks of data is collected and certified; (ii) the term "prescriptions filled" in the Lookback Period provision refers to the final dispensing of the prescribed medication to the patient; and (iii) CVS is obligated to credit Rite Aid for any and all prescriptions that were transferred to CVS during the Lookback Period.

15.     The outcome of these disputes will have a material impact on the 2025 Cases.  Of particular urgency is the Debtors' post-petition financing and the budget that underpins the Debtors' source of funding for these cases.  Specifically, the DIP budget contemplates CVS paying the entire amount owed under the plain terms of the APAs.  An emergency resolution of this motion is a necessary precursor before the hearing on the DIP motion can proceed.  As this Court is well aware, final approval of the DIP financing has been adjourned and the Debtors have exhausted all applicable milestones.  In addition to the DIP lenders, the UCC and numerous other stakeholders—

including Rite Aid's customers, employees and suppliers—are relying on the DIP budget and continued financing for these cases to proceed. Accordingly, all parties in interest have a right to know, as soon as possible, the status of the sale proceeds underpinning the DIP budget. The Debtors therefore respectfully request that the Court grant this motion on an expedited basis and enter the Order as proposed herewith.

## Jurisdiction and Venue

16.     The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to (1) 28 U.S.C §§ 157 and 1334, the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); (2) paragraph 44 of the Sale Order ("the Bankruptcy Court shall retain exclusive jurisdiction with respect to the enforcement and interpretation of this Sale Order and the terms and provisions thereof"); (3) section 11.12 of the CVS PNW APA and paragraph 21(q) of the CVS National File Buy APAs (stating that disputes regarding the interpretation of the CVS APA "will be brought and determined only in [] the Bankruptcy Court); and (4) the Court's jurisdiction to interpret and enforce its own orders, *see Travelers Indem. Co.* v. *Bailey*, 557 U.S. 137, 151 (2009); *see also Denunzio* v. *Ivy Holdings, Inc (In re E. Orange Gen. Hosp., Inc.)*, 587 B.R. 53, 73 (D.N.J. 2018) (finding that bankruptcy court had jurisdiction over proceedings to enforce a sale order). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.     Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

18.     The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code and rules 2002, 6004, and 9013 of the Federal Rules of Bankruptcy Procedure.

## Background

### A.     The Parties' Asset Purchase Agreements

19.     On May 15, 2025, CVS entered into an asset purchase agreement to acquire certain assets associated with Rite Aid's retail locations in the Pacific Northwest region (the "PNW APA"), as well as separate asset purchase agreements to acquire certain assets associated with Rite Aid's retail locations in Pennsylvania, New York, California and other states (the "National File Buy APAs," and together with the PNW APA, the "APAs").  (Zhushma Decl. ¶ 4 and Exs. A-B.) On May 21, 2025, the Bankruptcy Court approved the APAs via a Sale Order. (Docket No. 470.)

20.     The PNW APA includes a "Lookback Period" where the price paid by CVS for the various assets—including the RX Assets—can be adjusted.  In particular, Section 2.3(b)(i) of the PNW APA states that Rite Aid must ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ (Zhushma Decl. ¶ 5 and Ex. A.)

21.    The National File Buy APAs contain a similar "Lookback Period" provision. Section 6(b) of the National File Buy APAs states that the purchase price agreed upon ████

████████████████████████████████████████████████████████████████

████████████████████████████████████ This price decrease is calculated by Section 6(b)(i) and Section 6(b)(ii).  Section 6(b)(i) provides that ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Similar to the PNW APA, Section 6(b)(ii) contains the price adjustment provision where, if the average weekly prescription count measured within three business days prior to the closing date is less than the current volume listed in the APA ████████████████ then the purchase price for the RX Assets ████████████████ ████████████ (Zhushma Decl. ¶ 6 and Ex. B.)

22.    Each APA includes an exhibit that sets forth the baseline number of prescriptions filled for each store, which is the number to be used in determining whether the corresponding number of prescriptions filled during the Lookback Period is low enough to merit a purchase price adjustment.  (Zhushma Decl. ¶ 7 and Exs. A-B.)

23.    The APAs are an integral part of the Court's Sale Order and the anticipated proceeds from the sale of the RX Assets under the APAs are a critically important component of the DIP budget.

**B.    CVS's Gamesmanship Regarding the Lookback Period Provision in the APAs**

24.    The methodology for certifying the number of prescriptions filled, calculating the Lookback Period, and determining any purchase price adjustment, was not new to the parties. Indeed, Rite Aid and CVS had entered into numerous such agreements prior to the 2025 Cases,

and there had never been any disagreement between the parties as to the meaning and application of those similar provisions, either with respect to the calculation of the Lookback Period or the meaning of the term "prescriptions filled." (Zhushma Decl. ¶ 8.)

25.     With respect to the calculation of the Lookback Period, both parties have long understood and agreed that if the lookback period includes a week containing a national holiday, that week is excluded from the lookback period, and replaced with the first preceding non-holiday week. (Zhushma Decl. ¶ 9.) Thus, for example, if the agreement provides for a four-week lookback period ending on Saturday, November 30, then the week of Thanksgiving (11/24-11/30) is excluded from the calculation, and replaced with the week of 10/27-11/2, so as to ensure that the lookback period includes the requisite four weeks of data.

26.     However, in an effort to evade its contractual obligations and pay substantially less than it agreed, CVS now advances a different construction of the Lookback Period in the APAs. Although the APAs expressly provide that the Lookback Period shall consist of "four (4) calendar weeks," CVS now claims that the Lookback Period should be *less* than four weeks if any of the preceding four weeks include a national holiday. In other words, CVS now claims that if the four-week Lookback Period includes a week containing a national holiday, that week is excluded and the four-week Lookback Period is converted to a three-week—or in some cases even a two-week—Lookback Period.

27.     Only a few days before for the first store closings were expected to occur, CVS raised its construction in an email about the closing certification under the Lookback Period provision, the mechanism by which the parties agree to attrition calculation and any associated purchase price adjustment. (Declaration of Megan Spelman ("Spelman Decl.") Ex. A.) The Lookback Period for those stores included the weeks of Juneteenth and Memorial Day, and thus—

consistent with the plain language of the contract and the parties' past practice—Rite Aid certified

the number of prescriptions filled at those stores for the four weeks prior to the closing date,

excluding the weeks of Juneteenth and Memorial Day, and pushing the start of the certification

period back two weeks to make up for the excluded weeks.  (Spelman Decl. Ex. A.)

28.     On June 25, 2025, in response to Rite Aid's certification, counsel for CVS stated

that "it seems [Rite Aid] had some confusion as to the lookback a week contains a national

holiday."  (*Id*.)  CVS's counsel went on to state that "it looks like [Rite Aid] excluded the week

that included Juneteenth (which is fine), but then pushed the start of the certification period back

a week, such that the lookback is actually 5 calendar weeks."  (*Id*.)

29.     Not so.  Counsel for Rite Aid promptly responded and explained that "[t]he plain

words of the contract make clear that the certification is based on four weeks of data, and the

parenthetical, or the appositive, modifies which four weeks Rite Aid should use.  (*Id*.)  This is

industry-standard, has always been the language used in Rite Aid's APAs, and has always been

how Rite Aid has operated."  (*Id*.)  Rite Aid's counsel also provided an example of the parties'

longstanding course of conduct:

> Further, our clients have been doing this for many years and CVS
> has *always* agreed with Rite Aid's approach. For example, in
> February 2024, CVS purchased stores 10454 and 10464 from Rite
> Aid pursuant to purchase agreements with an 8-week lookback with
> similar language regarding exclusion of holiday weeks from the
> lookback period. In calculating the 8-week average number of
> scripts, Rite Aid excluded the weeks of Christmas and New Years
> and included two additional weeks from December 2023 so there
> would be 8 weeks of data. That was not a secret; Rite Aid's audit
> made clear precisely which weeks were included and which were
> excluded.  CVS responded: "Thank you for the audit. I agree with
> your calculation."  This is just one example demonstrating the
> practice that has been agreed upon and ongoing for years.

(*Id*.)

30.     CVS's subsequent response (the "Response Email") does not dispute that Rite Aid and CVS have been using the same language and same approach for many years. (*Id.*) Instead, counsel for CVS simply claims that the understanding and approach should be different because the Lookback Period is shorter under the APAs than it had been in prior agreements before the 2025 Cases. (*Id.*) But CVS has not identified—and cannot identify—anything in the actual contract language that supports such an arbitrary and nonsensical distinction.

31.     CVS's interpretation of the term "prescriptions filled" is equally misguided. The plain meaning of the term clearly refers to the completed process of actually *filling* a prescription, the final step of which is dispensing the prescribed medication to the patient. By attempting to measure when a prescription is filled based on an earlier point in time, before the prescription is actually dispensed to the patient, CVS is effectively seeking to rewrite the parties' contract.

32.     CVS's newly asserted construction of the term "prescriptions filled" is not only contrary to the plain language of the contract, but also—again—inconsistent with the parties' course of dealing over many years involving substantially identical contractual provisions. In those prior circumstances, Rite Aid has always calculated prescriptions filled based on the number of prescriptions actually dispensed to patients, and CVS has never questioned those calculations. (Zhushma Decl. ¶ 10.)

33.     In the week leading up to the first closings under the APA, CVS has raised an apparent "discrepancy" between Rite Aid's calculation of "prescriptions filled" and data that CVS obtains from its data conversion vendor, TwoPoint. (Spelman Decl. Ex. B.) But TwoPoint is not tracking "prescriptions filled" to their completion—that is, to when the prescribed medicine is dispensed to the patient. CVS's attempt to measure "prescriptions filled" based on an earlier point in time, before the medication is dispensed and thus before the prescription actually is *filled*, makes

no sense given that the very purpose of the Lookback Period provision is to compare a baseline number of prescriptions filled with the number of prescriptions filled during the Lookback Period. Because the baseline number of prescriptions was calculated using the time stamp of when prescriptions were dispensed to patients (Zhushma Decl. ¶ 10), the number of prescriptions filled during the Lookback Period also must be calculated using that same point in time, otherwise it would not be an apples-to-apples comparison.

34.     CVS's revisionist interpretation of the contracts' plain and unambiguous language is particularly disingenuous considering that even after sending its Response Email, CVS continued to make payments under other (pre-petition) APAs based on the very same approach CVS now disclaims—namely, adding additional non-holiday weeks to make up for excluded holiday weeks, and calculating "prescriptions filled" based on the number of prescriptions actually dispensed by Rite Aid's pharmacists.

35.     Nonetheless, on the day before the first set of closings under the APAs, counsel for CVS notified Rite Aid that it "intends to make wire transfers tomorrow (July 3, 2025) in the aggregate amount of $28,409,569," which amount is "based upon (i) data provided by Rite Aid to TwoPoint, CVS' data conversion vendor, and (ii) a 4-week 'lookback' that excludes holiday weeks." (Spelman Decl. Ex. B.)  When it came time for CVS to make its first payment pursuant to the APAs, CVS refused to pay the full amount owed as calculated by Rite Aid and consistent with the APAs and the parties' past practices ($33,064,124).  CVS has indicated that it intends to continue withholding monies owed to Debtors with respect to transactions set to close in the coming weeks.

36.     In other words, by reducing the length of the Lookback Period, and deliberately misapplying the term "prescriptions filled," CVS is paying—and threatening to pay—far less than the parties agreed to under the APAs.

37.     Based on the purchase price calculations CVS has provided to Rite Aid in connection with the first round of store closings, it appears that CVS also is not properly crediting Rite Aid for prescriptions that were transferred to CVS during the Lookback Period.  It's failure to do so is directly contrary to the plain wording of the APAs, which expressly provides that ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  The result of CVS's failure to credit Rite Aid for prescriptions transferred to CVS is a further unwarranted reduction in the purchase price CVS is paying for the RX Assets.

38.     Rite Aid estimates that the magnitude of CVS's underpayments is likely to total approximately $50-60 million across all of the transactions set to close pursuant to the APAs, an amount that will materially impact the 2025 Cases and the DIP budget.

39.     CVS's bad faith attempt to withhold monies owed to Debtors should not be permitted.  The fate of the Debtors' post-petition financing hangs in the balance of this gambit by CVS to impose a restatement of the purchase price, contrary to what the APAs require.  Without certainty as to how to calculate the proceeds under the APA, the Debtors' post-petition financing is likely to be in default and the Debtors would not be able to progress these cases.

## ARGUMENT

40.     The disputed payments at issue in this Motion are core to the Court-approved bargain that was struck between Debtors and CVS.  By advancing clearly erroneous and bad faith

interpretations of key parts of the APAs' Lookback Period provisions, CVS is improperly attempting to change the economics of the deal it struck. The Court therefore should enforce the APAs by confirming that: (i) the parties' contract requires a full four-week lookback period, which excludes any week that contains a national holiday, in which case the parties will look to the immediately preceding non-holiday week(s) to ensure that four full weeks of data is collected and certified; (ii) the term "prescriptions filled" in the Lookback Period provision refers to the final dispensing of the prescribed medication to the patient; and (iii) CVS is obligated to credit Rite Aid for any and all prescriptions that were transferred to CVS during the Lookback Period.

## I.    The Agreed Lookback Period Is Four Weeks

41.    In a transparent effort to evade its contractual obligations, and avoid paying Rite Aid the full amount it is owed under the APAs for its RX Assets, CVS unilaterally seeks to shorten the agreed-upon Lookback Period by arguing that the Lookback Period should be *less* than four weeks if any of the preceding four weeks include a national holiday.   In other words, in the event that one or more of the four weeks includes a national holiday, it is CVS's position that the holiday weeks shall be excluded from the certification and the parties shall instead use only three—or possibly only two—weeks of prescription data.[2]

42.    CVS's position is contrary to the plain words of the contract, which expressly provides that the Lookback Period for certifying RX Assets is based on "four (4) calendar weeks" of data, excluding any weeks that include national holidays.  In other words, in the event that one of the four weeks includes a national holiday, the holiday week shall be excluded from the certification and the parties shall instead look to the immediately preceding non-holiday week(s)

---

[2]    Indeed, under CVS's construction of the Lookback Period, if all four weeks included a national holiday, then the Lookback Period would be zero weeks.  The absurdity of that result further illustrates why CVS's interpretation makes no sense and should be rejected by this Court.

to ensure that *four full weeks* of data is collected and certified.  Where, as here, the words of a contract are clear and unambiguous, the plain meaning controls.  *See, e.g., Johnston* v. *Garden State Med. Grp. P.A.*, 144 F. Supp. 2d 324, 335 (D.NJ. 2000) ("Courts look to the objective intent manifested in the language of a contract and the words used in a contract must be given their plain and ordinary meaning."); *D.R. by M.R.* v. *E. Brunswick Bd. of Educ.*, 838 F. Supp. 184, 190 (D.N.J. 1993) (because the agreement at issue is "clear and unambiguous," it must "be constructed to mean what it says").

43.    CVS's position also is inconsistent with the parties' course of dealing over many years involving substantially identical contractual provisions.  In those prior circumstances, CVS has always agreed with Rite Aid's approach—namely using the number of weeks specified in the agreement after excluding any holiday weeks, and looking back further in time for data to arrive at a data set based on the required number of weeks.  This well-established course of conduct corroborates the plain language of the contract and is compelling evidence of the parties' intent. *See, e.g.,  Teamsters Indus. Emps. Welfare Fund* v. *Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 137 (3d Cir. 1993) ("The past dealings of contracting parties pursuant to an agreement are probative of the parties' intent, and "[e]vidence of a course of conduct is particularly compelling when it occurs over a substantial time period.").

44.    If CVS sought to deviate from that well-established course of conduct with respect to the APAs at issue here, it had ample opportunity to do so during the negotiation of the relevant contract language.  For example, CVS could have pressed for language making clear that the Lookback Period may be shorter than four weeks in the event that one of the weeks during the period includes a national holiday.  But it never did so, and it should be barred from attempting to rewrite the parties' agreements now, especially given that Rite Aid's acceptance of CVS's bid was

based on this longstanding framework. *See McGrath* v. *Poppleton*, 550 F. Supp. 2d 564, 571 (D.N.J. 2008) ("A proposed modification by one party to a contract must be accepted by the other to constitute mutual asset to modify. Unilateral statements or actions made after an agreement has been reached or added to a competed agreement clearly do not serve to modify the original terms of a contract.").

45.     The financial impact of CVS's bad faith reading of the parties' contracts is substantial and highly material. That is because the Lookback Period is calculated backwards from the date that each Rite Aid store is scheduled to close, and as a store gets closer to shuttering, fewer customers are seeking to fill prescriptions at that store. Rite Aid estimates that the magnitude of CVS's underpayments based on its deliberate miscalculation of the Lookback Period is likely to be more than $20 million across all of the transactions set to close pursuant to the APAs.

46.     This Court therefore should enter an Order confirming that the APAs require a full four-week lookback period, which excludes any week that contains a national holiday, in which case the parties will look to the immediately preceding non-holiday week(s) to ensure that four full weeks of data is collected and certified.

## II.     The Term "Prescriptions Filled" in the Lookback Period Provision Refers to the Final Dispensing of the Prescribed Medication to the Patient

47.     In a further attempt to evade its contractual obligations, and avoid paying Rite Aid the full amount it is owed under the APAs for its RX Assets, CVS claims that "prescriptions filled" refers to a point in time prior to the actual dispensing of the prescribed medication to the patient. That position is contrary to the plain words of the contract, as well as the parties' course of dealing over many years, both of which make clear that the words "prescriptions filled" mean the completed process of actually *filling* a prescription, the final step of which is actually dispensing the prescribed medication to the patient. Indeed, CVS's most recent 10-K confirms its

understanding that the term "prescriptions filled" means "the number of prescriptions *dispensed*" (CVS 10-K as of December 31, 2024 at p. 84 (emphasis added)), which only further demonstrates that this dispute has been contrived in bad faith by CVS to try to drive down the purchase price it previously agreed to.

48.     Moreover, the entirely different interpretation that CVS advances now would render the entire Lookback Period provision nonsensical.  The very purpose of that provision is to compare a baseline number of prescriptions filled with the number of prescriptions filled during the Lookback Period.  Because the baseline number of prescriptions filled was calculated based on the time stamp of when prescriptions were dispensed to patients, the comparator number of prescriptions filled during the Lookback Period necessarily must be calculated the same way.  Otherwise, it is a meaningless apples-to-oranges comparison.  It is well-settled that contract interpretations that create such absurd results should be avoided.  *See, e.g., Munich Reinsurance Am., Inc.* v. *Am. Nat. Ins. Co*., 999 F. Supp. 2d 690, 753 (D.N.J. 2014) ("[A] court should endeavor to give meaning to all provisions of a contract, and avoid interpretations that lead to absurd results.") (internal citations omitted); *In re Rite Aid Corp,* 2024 WL 3165950 at *7 n.3 (Bankr. D.N.J. June 25, 2024) (Kaplan, J.) (rejecting buyer's contract interpretation because "[w]ere the court to accept [buyer's] interpretation, impermissible absurd results would follow").

49.     Not only would CVS's meritless reading of the term "prescriptions filled" result in an apples-to-oranges comparison against the baseline number of prescriptions, it also would substantially reduce the number of prescriptions filled during the Lookback Period for purposes of that comparison.  That is because there is a lag between when a prescription is prepared and when it is dispensed to the patient, and calculating "prescriptions filled" at an earlier point in time results in many of those prescriptions falling outside the Lookback Period.  In addition, as each store gets

closer to closing, fewer people call in new prescriptions, but previously prepared prescriptions remain on the shelf ready to be picked up by patients. CVS also benefits from the final dispensing of a prescription to a patient because during that interaction the pharmacist informs the patient that his/her next prescription fill will be available at CVS.

50.     The result, according to Rite Aid's estimates, is that CVS's meritless interpretation of the term "prescriptions filled" is likely to lead to CVS withholding an additional $20-25 million in payments that otherwise would be due across all of the transactions set to close pursuant to the APAs.

51.     This Court therefore should enter an Order confirming that the term "prescriptions filled" in the Lookback Period provision refers to the final dispensing of the prescribed medication to the patient.

## III.    CVS Is Obligated to Credit Rite Aid for Prescriptions That Were Transferred to CVS During the Lookback Period

52.     The purchase price calculations CVS has provided to Rite Aid in connection with the first round of store closings suggest that CVS also is attempting to pay less than the parties bargained for by not properly crediting Rite Aid for prescriptions that were transferred to CVS during the Lookback Period. CVS's failure to account for those transferred prescriptions is directly contrary to the plain wording of the APAs, which expressly provides that "any prescriptions transferred from any Store to Purchaser during the period commencing on the date hereof and ending on the date on which a Rx Certification is delivered, shall be counted towards the aforementioned calculation for the applicable Store from which such prescriptions were transferred."

53.     According to Rite Aid's estimates, CVS's failure to credit Rite Aid for prescriptions transferred to CVS is likely to result in CVS withholding an additional $11 million in payments that otherwise would be due across all of the transactions set to close pursuant to the APAs.

54.     This Court therefore should enter an Order confirming that CVS is obligated to credit Rite Aid for any and all prescriptions that were transferred to CVS during the Lookback Period.

## Conclusion

55.     For the foregoing reasons, the Court should enter an order enforcing the APAs and confirming that:  (i) the parties' contract requires a full four-week lookback period, which excludes any week that contains a national holiday, in which case the parties will look to the immediately preceding non-holiday week(s) to ensure that four full weeks of data is collected and certified; (ii) the term "prescriptions filled" in the Lookback Period provision refers to the final dispensing of the prescribed medication to the patient; and (iii) CVS is obligated to credit Rite Aid for any and all prescriptions that were transferred to CVS during the Lookback Period.

Dated:  July 3, 2025

/s/ *Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
               wusatine@coleschotz.com
               fyudkin@coleschotz.com
               svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)

Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990
Email:    arosenberg@paulweiss.com
          aeaton@paulweiss.com
          chopkins@paulweiss.com
          smitchell@paulweiss.com
          abenedon@paulweiss.com

*Counsel for Debtors*