<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
dbruck@greenbaumlaw.com
Attorneys for creditor, State Street Partners LLC

</td></tr>
</table>

| In re: | Chapter 11 |
|---|---|
| **NEW RITE AID, et al.,** | **Case No.: 25-14861 (MBK)** |
| Debtors. | **(Jointly Administered)** |

**SUPPLEMENTAL OBJECTION OF STATE STREET PARTNERS LLC TO DEBTORS'
NOTICE OF POTENTIALLY ASSUMED UNEXPIRED LEASES.**

State Street Partners LLC (State Street or Landlord) by and through its undersigned

counsel, Greenbaum Rowe Smith & Davis LLP submits this supplemental objection (The

Supplemental Objection) to the Debtor's proposed assumption and assignment of Landlord's

lease for premises at 1515 West State Street, Boise, Idaho (the Lease). In further support of the

Supplemental Objection, Landlord states as follows:

## PRELIMINARY STATEMENT

1. State Street is the owner and landlord of premises at 1515 West State Street, Boise, Idaho.

State Street has leased the premises to 1515 West State Street Boise Idaho LLC which is an affiliate

of New Rite Aid and a debtor in these proceedings. The Lease is dated August 2020 and is attached

as **Exhibit A**.

2. State Street received a Notice of Potentially Assumed Unexpired Lease (May 19, 2025) on

or about May 27, 2025 advising State Street that the Debtors" may assume and assign the Lease

to the successful bidder." Based on information and belief the successful bidder is CVS Pharmacy
(CVS).

3.   On May 29, 2025 State Street filed an Objection (the Objection) to the Debtors' Notice of
Potentially Assumed Unexpired Leases (ECF 575). A copy of the Objection is attached as **Exhibit
B**. No response to the Objection has been filed by either the Debtor or CVS.

## STATEMENT OF FACTS AND REQUEST FOR RELIEF

4.   As set forth in the Objection the Debtor was and remains in default of various monetary
and non-monetary provisions in the Lease, including (1) default in its failure to comply with the
Lease pertaining to the maintenance of required insurance, (2) failure to reimburse Landlord for
the cost of premiums paid by Landlord for compliant insurance for the 2024-2025 period at
$75,058.00 (3) failure to pay Landlord the interest at the default rate of 6% above the commercial
lending rate ($9,007.00) (as specified in Paragraph 19 (iv) of the Lease) on the premiums paid by
Landlord as required in the Lease; (4) failure to reimburse Landlord for attorney fees in the amount
of $40,000 incurred through May 29, 2025 as a result of Debtor's default. To date no effort has
been made by the Debtor to cure the defaults.

5.   In addition to the defaults set forth in paragraph 4 above, all of which remain in effect, the
Debtor has subsequently further defaulted in the Lease as follows: (1) failure to pay for the
premium for insurance as required in the Lease for the period June 2025 through June 2026 which
failure required Landlord to incur such expense in the amount of $9629.00; (2) failure and refusal
to pay real estate taxes on the premises as required in the Lease as "additional rent" in the amount
of $26,569.00  requiring Landlord to pay said taxes and  incur such expense; (3) failure to pay
interest at the default rate on the continuing and new expenses incurred by Landlord as a result of

Tenant's defaults as set forth in the Lease; (4) failure to reimburse Landlord for continuing attorney's fees ($8,500.00) incurred as a result of Debtor's continued and new defaults.

6.    To date the total monetary defaults in the Lease aggregate no less than $168,763.00

7.    Landlord advised and notified the Debtor multiple times of each of the specified defaults, but Debtor refuses to comply with the terms of the Lease; yet Debtor states that it may seek to assume the Lease and assign it to CVS. The Landlord remains in limbo given Debtor's intransigence.

8.    This saga which is prejudicial to Landlord's rights and business has continued since September 2023. The defaults remain uncured.   The serial bankruptcy filings have stymied Landlord's attempts to remedy its situation. The cure costs for permitting assumption and assignment exceed $168,763.00 and continue to mount. No financial information has been provided by Debtor regarding the entity to whom it seeks to assign the lease. Under the Lease there was a Rite Aid guaranty. While CVS is a large and supposedly financially capable entity, Debtor has not advised that CVS will be the assignee rather than a single asset entity. The Debtor has not proposed that CVS guarantee the Lease.

9.    Landlord is entitled to relief from the continued failure and refusal by the Debtor to comply with the Lease. The Debtor's notice of its intent to assume and assign the Lease makes no mention of its intent or ability to cure the monetary and non-monetary defaults that exist. Prolonging this sag is inequitable to Landlord. The Debtor should either be compelled to cure the defaults and otherwise comply with the provisions of Bankruptcy Code 365 so as to justify its intention to assume and assign the Lease; or reject the Lease so that Landlord can market the same in the

9892650.1

pursuit of its business without further interference and delay from the Debtor.

GRENBAUM ROWE SMITH & DAVIS LLP
Attorneys for Landlord State Street Partners LLC

By:_____
    David L. Bruck Esq.

Dated: July 24, 2025

-4-

# EXHIBIT A

LEASE

THIS LEASE AGREEMENT made as of the __ day of August, 2000, by and between STATE STREET PARTNERS, LLC, a Colorado limited liability company, having an office at 1444 Wazee Street, Suite 120, Denver, CO 80202 ("Landlord"), and 1515 WEST STATE STREET BOISE IDAHO, LLC, a Delaware limited liability company, having its principal office at 30 Hunter Lane, Camp Hill, PA 17011 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant, intending to be legally bound, hereby covenant and agree as follows:

WHEREAS, Landlord is the current landlord under that certain lease (the "Master Lease") dated November 30, 1962, with SunWest N.O.P., Inc., of the leased premises defined hereinafter as the "Leased Premises" the term of which (taking into account all exercised option periods) expires on December 31, 2002 (the "Master Lease Expiration").

WHEREAS, SunWest N.O.P., Inc., is the current sublessor under that certain Sublease Agreement (the "Sublease") dated June 18, 1979, as amended, with Thrifty Payless, Inc., as tenant regarding the Leased Premises demised by the Master Lease the term of which (taking into account all option periods) expires on November 30, 2002.

WHEREAS, Thrifty Payless, Inc. has or is about to assign its interest as Sublessee under the Sublease to Tenant pursuant to that certain Assignment of Sublease of even date herewith (the "Sublease Assignment") and Tenant shall simultaneously assign its rights as Sublessee under the Sublease to Landlord, and Landlord shall simultaneously enter into this Lease with Tenant.

WHEREAS, Landlord and Tenant desire to enter into this Lease in order to set forth the terms and conditions of Tenant's occupancy of the Leased Premises effective as of the date hereof.

WHEREAS, this Lease shall be deemed to be a sub-sublease under the Sublease, with Landlord as sub-sublessor and Tenant as sub-sublessee, until the expiration or earlier termination of the Sublease, which shall automatically, upon the occurrence of the earlier of (i) the date of the Master Lease Expiration or (ii) the earlier termination of the Sublease by mutual written agreement of SunWest N.O.P., Inc. and Tenant and the contemporaneous automatic termination of the Master Lease pursuant to the Amendment to Master Lease (the "Master Lease Termination"), become a direct

1

Lease between the Landlord and Tenant. Prior to expiration or earlier termination of the Sublease, Tenant shall continue to be solely responsible for all obligations as Sublessee under the Sublease, including, but not limited to, the payment of rent and percentage rent to SunWest N.O.P. Inc. as provided in Paragraph 35 below.

WHEREAS it is the parties' desire that Tenant shall from and after the date hereof lease the Leased Premises for a period of twenty (20) years effective as of the date hereof (the "Term") (which may be extended pursuant to the renewal option periods set forth herein), acknowledging that (i) until such time as the Sublease shall have expired or is earlier terminated as set forth herein, Tenant's rights in and to the Leased Premises shall be as a sub-sublessee pursuant to and in accordance with the Sublease, except that Tenant shall also be obligated under all of the terms and conditions of this Lease (the "Subtenancy Term Portion") and (ii) after termination or expiration of the Sublease, Tenant's rights in and to the Leased Premises shall be held as a direct tenant with Landlord pursuant to the terms and conditions hereof.

1.    Demise of Premises. Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term and upon the provisions hereinafter specified the following described property ("Leased Premises"): (i) the lot or parcel of land described in Exhibit "A" attached hereto and made a part hereof, together with the easements, rights and appurtenances thereunto belonging or appertaining ("Land"); (ii) the buildings, structures and other improvements on the Land (collectively, the "Improvements"); and (iii) the machinery and equipment which is attached to the Improvements in such a manner as to become fixtures under applicable law, together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease (collectively, the "Equipment"), excepting therefrom the Trade Fixtures, as provided below.

2.    Certain Definitions.

"Additional Rent" shall mean Additional Rent as defined in Paragraph 32.

"Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining the Leased Premises.

"Alteration" or "Alterations" shall mean any or all changes, additions (whether or not adjacent to or abutting any then existing buildings), expansions (whether or not adjacent to or abutting any then existing buildings), improvements, reconstructions, removals or replacements of any of the Improvements or Equipment, both interior or exterior, and ordinary and extraordinary.

"Basic Rent" shall mean Basic Rent as defined in Paragraph 6.

"Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 6.

2

CO_DOCS_A #63782 v3 WORD97

"Commencement Date" shall mean the Commencement Date as defined in Paragraph 5.

"Condemnation" shall mean a Taking and/or a Requisition, as defined below.

"Default Rate" shall mean the Default Rate as defined in Paragraph 19(b)(iv).

"Equipment" shall mean the Equipment as defined in Paragraph 1.

"Event of Default" shall mean an Event of Default as defined in Paragraph 19(a).

"Impositions" shall mean the impositions as defined in Paragraph 8.

"Improvements" shall mean the Improvements as defined in Paragraph 1.

"Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when (i) the estimated cost of the Work in any one instance exceeds the sum of Two Hundred Thousand ($200,000.00) Dollars or (ii) reasonably required by Landlord's Lender, and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord or Landlord's Lender.

"Land" shall mean the Land as defined in Paragraph 1.

"Law" shall mean any constitution, statute or rule of law.

"Leased Premises" shall mean the Leased Premises as defined in Paragraph 1.

"Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency

3

(but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions now of record which may be applicable to Tenant, Landlord (with respect to the Leased Premises) or to all or any part of or interest in Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the Americans with Disabilities Act of 1999, as amended, and similar state laws) or results in interference with the use or enjoyment of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

"Lender" shall mean an entity identified as such in writing to Tenant which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of the Mortgage and Note as a result of an assignment thereof.

"Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

"Mortgage" shall mean a first priority mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender of which Tenant has prior written notice.

"Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any reasonable expenses incurred by Landlord in collecting such award.

"Net Proceeds" shall mean the entire proceeds of any insurance required under clauses (i), (iv), (v) or (vi) of Paragraph 14 (a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

"Note" or "Notes" shall mean a promissory note or Notes hereafter executed from Landlord to Lender, which Note or Notes will be secured by a Mortgage and an assignment of leases and rents.

"Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of the date of Landlord's acquisition thereof, excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord), but including any Mortgage or Loan or security documents thereunder between Landlord and Lender.

"Replaced Equipment" or "Replacement Equipment" shall mean the Replaced Equipment and Replacement Equipment, respectively, as defined in Paragraph 11(d).

4

"Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"Restoration" shall mean the Restoration as defined in Paragraph 13(c)(i).

"State" shall mean the State or Commonwealth in which the Leased Premises is situated.

"Taking" shall mean any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

"Term" shall mean the Term as defined in Paragraph 5.

"Termination Date" shall mean the Termination Date as defined in Paragraph 13(b)(i)(A).

"Trade Fixtures" shall mean all fixtures, equipment and other items of personal property (whether or not attached to the Improvements) which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

3.    Title and Condition.

(a)    The Leased Premises are demised and let subject to (i) the Permitted Encumbrances, (ii) all Legal Requirements and Insurance Requirements, including any existing violation of any thereof, and (iii) the condition of the Leased Premises as of the commencement of the Term; without any representation or warranty by Landlord; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b)    LANDLORD HAS NOT MADE AND WILL NOT MAKE ANY INSPECTION OF ANY OF THE LEASED PREMISES, AND LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES "AS IS", AND TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO ITS FITNESS FOR USE OR PURPOSE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, AS TO THE QUALITY OF

5

THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, AS TO LANDLORD'S TITLE THERETO, OR AS TO VALUE, COMPLIANCE WITH SPECIFICATIONS, LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. Tenant acknowledges that the Leased Premises are of its selection and to its specifications, and that the Leased Premises have been previously occupied by and inspected by Tenant and are satisfactory to it. In the event of any defect or deficiency in any of the Leased Premises of any nature, whether patent or latent, Landlord shall not have any responsibility or liability with respect thereto or for any incidental or consequential damages (including strict liability in tort). The provisions of this Paragraph 3 (b) have been negotiated, and the foregoing provisions are intended to be a complete exclusion and negation of any warranties by Landlord, express or implied, with respect to any of the Leased Premises, arising pursuant to the uniform commercial code or any other Law now or hereafter in effect or otherwise.

(c) Tenant acknowledges and agrees that Tenant has examined the title to the Leased Premises prior to the execution and delivery of this Lease and has found such title to be satisfactory for the purposes contemplated by this Lease.

(d) Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of any of the Leased Premises, including, but not limited to, any rights and remedies existing under contract or pursuant to the Uniform Commercial Code (collectively, the "guaranties"). Such assignment shall remain in effect until the termination of this Lease. Landlord shall also retain the right to enforce any guaranties assigned in the name of Tenant upon the occurrence of an Event of Default. Landlord hereby agrees to execute and deliver at Tenant's expense such further documents, including powers of attorney, as Tenant may reasonably request in order that Tenant may have the full benefit of the assignment effected or intended to be effected by this Paragraph 3 (d). Upon the termination of this Lease, the guaranties shall automatically revert to Landlord. The foregoing provision of reversion shall be self-operative and no further instrument of reassignment shall be required. In confirmation of such reassignment Tenant shall execute and deliver promptly any certificate or other instrument which Landlord may request. Any monies collected by Tenant under any of the guaranties after the occurrence of and during the continuation of an Event of Default shall be held in trust by Tenant and promptly paid over to Landlord.

(e) Landlord agrees to enter into, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or properties adjacent thereto (collectively, "Easements") as reasonably requested by Tenant, subject to Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld or delayed; provided, however, that no such Easement shall result in any diminution in

6

CO_DOCS_A #63782 v3 WORD97

the value or utility of the Leased Premises for use as a retail site and further provided
that no such Easement shall render the use of the Leased Premises dependent upon
any other property or condition the use of the Leased Premises upon the use of any
other property, each of which Tenant shall certify to Landlord and Lender in writing
delivered with Tenant's request with respect to such Easement.  Tenant's request shall
also include Tenant's written undertaking acknowledging that Tenant shall remain liable
hereunder as principal and not merely as a surety or guarantor notwithstanding the
establishment of any Easement. Tenant shall be obligated to pay any costs incurred by
Landlord or Lender to review such Easements.  If Landlord or Lender shall fail to
approve or disapprove the form of any such Easements, within a period of thirty (30)
days from their respective receipt of same, then Landlord or Lender, shall be deemed to
have approved the form of any such Easement.

(f)     Tenant agrees that Tenant is obligated to and shall perform all obligations
of the owner of the Leased Premises hereunder and pay all expenses which the owner
of the Leased Premises may be required to pay in accordance with any reciprocal
easement agreement or any other agreement or document of record now affecting the
Leased Premises, herein referred to collectively as the "REA", and that Tenant shall
comply with all of the terms and conditions of the REA during the Term of this Lease.
Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord
against any claim, loss or damage suffered by Landlord  by reason of Tenant's failure to
perform any obligations or pay any expenses as required under any REA or comply with
the terms and conditions of any REA as hereinabove provided during the Term of this
Lease.

4.     Use of Leased Premises: Quiet Enjoyment.

(a)     Tenant may use the Leased Premises as a retail store or for any
other lawful purpose so long as such other lawful purpose would not (i) have a material
adverse effect on the value of the Leased Premises, (ii) materially increase (when
compared to use as a retail store) the likelihood that Tenant or Landlord would incur
liability under any provisions of the Act referred to in Paragraph 26 of this Lease, or (iii)
result in or give rise to any environmental deterioration or degradation of the Leased
Premises.  In no event shall the Leased Premises be used for any purpose which shall
violate any of the provisions of any Permitted Encumbrance or any covenants,
restrictions or agreements hereafter created by or consented to by Tenant applicable to
the Leased Premises, or any Legal Requirements.  Tenant agrees that with respect to
the Permitted Encumbrances and any covenants, restrictions or agreements hereafter
created by or consented to by Tenant, Tenant shall observe, perform and comply with
and carry out the provisions thereof required therein to be observed and performed by
Landlord.

(b)     Subject to Tenant's rights under Paragraph 18 hereof, Tenant shall
not permit any unlawful occupation, business or trade to be conducted on the Leased
Premises or any use to be made thereof contrary to applicable Legal Requirements or

7

CO_DOCS_A #63782 v3 WORD97

Insurance Requirements.  Subject to Tenant's rights under Paragraph 18, Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (ii) affect the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, or (iii) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 12 hereof.

(c)    Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants to do no act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

5.    Term.

(a)    Subject to the provisions hereof Tenant shall have and hold the Leased Premises for an initial term commencing on August ____,2000  (the "Commencement Date") and ending on August ____, 2020  (the "Expiration Date") (such initial term, together with any Renewal Term, hereinafter defined, which comes into effect as hereinafter provided, is herein called the "Term").  Notwithstanding the foregoing, until such time as the Sublease shall have expired or is earlier terminated, Tenant's rights in the Leased Premises shall be as a sublessee pursuant to the Sublease (subject to Tenant's obligation nonetheless to pay the Basic Rent to Landlord pursuant to Paragraph 6(a) hereof and to be bound by Paragraph 35 hereof during the Sublease Term Portion) and thereafter but not later than December 31, 2002, Tenant's rights in and to the Leased Premises shall be as a direct tenant with Landlord pursuant to the terms and conditions of this Lease.

(b)    Provided this Lease shall not have been terminated pursuant to the provisions of Paragraphs 13(b) or 19, this Lease and the Term shall be automatically extended for that number of consecutive renewal terms set forth in Exhibit "B" attached hereto and made a part hereof (each, "Renewal Term") each for the duration set forth in Exhibit "B" upon condition that Tenant may cancel any Renewal Term by giving notice ("Renewal Term Cancellation Notice") to Landlord in writing at least six (6)  months prior to the expiration of the then current Term.  If Tenant does not timely give to Landlord a Renewal Term Cancellation Notice, the date by which Tenant may give such Renewal Term Cancellation Notice to Landlord shall be extended to the date occurring ten (10) days after the date on which Landlord shall have given to Tenant a written notice reciting the provisions of this Paragraph 5(b).  Upon the giving of a Renewal Term Cancellation Notice this Lease and the Term shall terminate and come to an end as of the later of (i) the ninetieth (90th) day following the giving of the Renewal Term Cancellation Notice, or (ii) the last day of the then current Term (and if the effect of this sentence is to extend the Term it shall be so extended on the terms and conditions and for the Rent in effect for the Term then expiring).  Any Renewal Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and

8

effect, except that the Basic Rent for each Renewal Term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof. If Tenant shall timely give a Renewal Term Cancellation Notice, then all options with regard to subsequent Renewal Terms shall expire and be null and void.

6.    Rent.

(a)    Tenant shall pay to Landlord (or to Lender, if directed by Landlord), as minimum annual rent for the Leased Premises during the Term, the amounts set forth in Exhibit "B" attached hereto ("Basic Rent") and for the specified time periods, commencing on the Commencement Date for the balance of such month and continuing on the first day of each month thereafter during the Term, (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Lender by wire transfer in immediately available federal funds to such account in such bank as Lender shall designate, from time to time.

(b)    Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

(c)    Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement. Each party shall reflect the transactions represented by this Lease in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

7.    Net Lease; Non-Terminability.

(a)    This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid, except as otherwise expressly set forth in this Lease, without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

(b)    Except as otherwise expressly provided in this Lease, this Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term. Except as may otherwise expressly provided in this Lease, Tenant shall not

9

CO_DOCS_A #63762 v3 WORD97

be entitled to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease; and except as otherwise expressly provided in this Lease, the obligations of Tenant under this Lease shall not be affected by any interference with Tenant's use of any of the Leased Premises for any reason, including but not limited to the following: (i) any damage to or destruction of any of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of any of the Leased Premises, (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of any of the Leased Premises other than pursuant to an express provision of this Lease, (vi) any default on the part of Landlord under this Lease or under any other agreement, (vii) any latent or other defect in, or any theft or loss of any of the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Equipment, (ix) any violation of Paragraph 4 (c) by Landlord, or (x) any other cause, whether similar or dissimilar to the foregoing, any present or future Law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events (or, in lieu thereof, Tenant shall pay amounts equal thereto), and that the obligations of Tenant under this Lease shall continue unaffected, unless this Lease shall have been terminated pursuant to an express provision of this Lease.

(c)     Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise.

(d)     This Lease is the absolute and unconditional obligation of Tenant. Tenant waives all rights which are not expressly stated in this Lease but which may now or hereafter otherwise be conferred by Law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, (ii) to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided in this Lease, and (iii) for any statutory lien or offset right against Landlord or its property.

10

8.   Payment of Impositions; Compliance with Legal Requirements and Insurance
Requirements

(a)    (i)    Subject to the provisions of Paragraph 18 hereof relating to
contests, Tenant shall, before interest or penalties are due thereon, pay and discharge
(all of the following being herein collectively called the "Impositions"):  all taxes of every
kind and nature (including real, *ad valorem*, personal property, gross income, franchise,
withholding, profits and gross receipts taxes) on or with respect to the Leased
Premises; all charges and/or taxes for any easement or agreement maintained for the
benefit of the Leased Premises; all general and special assessments, levies, permits,
inspection and license fees on or with respect to the Leased Premises; all water and
sewer rents and other utility charges on or with respect to the Leased Premises; all
ground rents on or with respect to the Leased Premises; and all other public charges
and/or taxes whether of a like or different nature, even if unforeseen or extraordinary,
imposed or assessed upon or with respect to the Leased Premises, prior to or during
the Term, against Landlord, Tenant or any of the Leased Premises as a result of or
arising in respect of the occupancy, leasing, use, maintenance, operation,
management, repair or possession thereof, or any activity conducted on the Leased
Premises, or the Basic Rent or Additional Rent, including without limitation, any gross
income tax, sales tax, occupancy tax or excise tax levied by any governmental body on
or with respect to such Basic Rent or Additional Rent.  If received by Landlord, Landlord
shall promptly deliver to Tenant any bill or invoice with respect to any Imposition.

(ii)    Nothing herein shall obligate Tenant to pay, and the term
"Impositions" shall exclude, federal, state or local (A) transfer taxes as the result of a
conveyance by (or suffered by) Landlord, (B) franchise, capital stock or similar taxes if
any, of Landlord, (C) income, excess profits or other taxes, if any, of Landlord,
determined on the basis of or measured by its net income, or (D) any estate,
inheritance, succession, gift, capital levy or similar taxes, unless the taxes referred to in
clauses (B) and (C) above are in lieu of or a substitute for any other tax or assessment
upon or with respect to any of the Leased Premises which, if such other tax or
assessment were in effect at the commencement of the Term, would be payable by
Tenant.  In the event that any assessment against any of the Leased Premises may be
paid in installments, Tenant shall have the option to pay such assessment in
installments; and in such event, Tenant shall be liable only for those installments which
become due and payable during the Term.  Tenant shall prepare and file all tax reports
required by governmental authorities which relate to the Impositions.  Tenant shall
deliver to Landlord and to Lender, within twenty (20) days after Landlord's written
request therefor, copies of all settlements and notices pertaining to the Impositions
which may be issued by any governmental authority and receipts for payments of all
Impositions made during each calendar year of the Term, within thirty (30) days after
payment.

11

CO_DOCS_A #63782 v3 WORD97

(b)      Subject to the provisions of Paragraph 18 hereof, Tenant shall promptly comply with and conform to all of the Legal Requirements and Insurance Requirements.

9.     Liens; Recording and Title.

(a)      Subject to the provisions of Paragraph 18 hereof, Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on the Leased Premises, on the Basic Rent, Additional Rent or on any other sums payable by Tenant under this Lease, (other than the Mortgage), the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord or those claiming by, through or under Landlord (except Tenant). Notice is hereby given that Landlord shall not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding any of the Leased Premises through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to any of the Leased Premises.

(b)      Upon written request from one to the other,  Landlord and Tenant shall execute, acknowledge and deliver to the other a written Memorandum of this Lease to be recorded, at Tenant's sole cost, in the appropriate land records of the jurisdiction in which the Leased Premises is located, in order to give public notice and protect the validity of this Lease. In the event of any discrepancy between the provisions of said recorded Memorandum of this Lease and the provisions of this Lease, the provisions of this Lease shall prevail.

(c)      Nothing in this Lease and no action or inaction by Landlord shall be deemed or construed to mean that Landlord has granted to Tenant any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest or lien in or upon the estate of Landlord in any of the Leased Premises.

10.     Indemnification.

(a)      Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from the Leased Premises or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of the Leased Premises,  and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon, whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said injury, death, loss, damage or other claim; except to the extent that any such liability, loss, damage,

12

penalty, cost, expense, cause of action, suit, claim, demand or judgment is the result of the gross negligence of Landlord or the intentional wrongful act of Landlord. In case any action or proceeding is brought against Landlord by reason of any such claim against which Tenant has agreed to defend, pay, protect, indemnify, save and hold harmless pursuant to the preceding sentence, Tenant covenants upon notice from Landlord to resist or defend Landlord in such action, with the expenses of such defense paid by Tenant, and Landlord will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.

(b)     The obligations of Tenant under this Paragraph 10 shall survive any termination of this Lease.

11.     Maintenance and Repair.

(a)     Except for any Alterations that Tenant is permitted to make pursuant to this Lease, Tenant shall at all times, including any Requisition period, put, keep and maintain the Leased Premises (including, without limitation, the roof, landscaping, walls, footings, foundations and structural components of the Leased Premises) and the Equipment in the good condition and order of repair, except for ordinary wear and tear, and shall promptly make all repairs and replacements of every kind and nature, whether foreseen or unforseen, which may be required to be made upon or in connection with the Leased Premises in order to keep and maintain the Leased Premises in the order and condition required by this Paragraph 11(a). Tenant shall do or cause others to do all shoring of the Leased Premises or of foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the Leased Premises, whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may be provided for in any Law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to insurance proceeds or condemnation awards for Restoration pursuant to Paragraphs 13(c) and 14(g) of this Lease. Tenant shall, in all events, make all repairs for which it is responsible hereunder promptly upon receipt of insurance proceeds, thereafter and all repairs shall be in a good, proper and workmanlike manner.

(b)     In the event that any Improvement shall violate any Legal Requirements or Insurance Requirements and as a result of such violation enforcement action is threatened or commenced against Tenant or with respect to the Leased Premises, then Tenant, at the request of Landlord, shall either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such violation, whether the same shall affect Landlord, Tenant or both, or (ii) take

13

CO_DOCS_A #63782 v3 WORD97

such action as shall be necessary to remove such violation, including, if necessary, any Alteration. Any such repair or Alteration shall be made in conformity with the provisions of Paragraph 12.

(c)    If Tenant shall be in default under any of the provisions of this Paragraph 11, Landlord may after thirty (30) business days written notice given to Tenant and failure of Tenant to cure during said period, but without notice in the event of an emergency, do whatever is necessary to cure such default as may be appropriate under the circumstances for the account of and at the expense of Tenant. In the event of an emergency Landlord shall notify Tenant of the situation by phone or other available communication. All reasonable sums so paid by Landlord and all reasonable costs and expenses (including, without limitation, attorneys' fees and expenses and costs incurred by Landlord under the Mortgage as a result of such default by Tenant) so incurred, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

(d)    Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of the Equipment (the "Replaced Equipment") which shall have become worn out or unusable for the purpose for which it is intended, been taken by a Condemnation as provided in Paragraph 13, or been lost, stolen, damaged or destroyed as provided in Paragraph 14. Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of Equipment or Replaced Equipment or other personal property of Tenant or the installation of Replacement Equipment. All Replacement Equipment shall become the property of Landlord, shall be free and clear of all liens and rights of others and shall become a part of the Equipment as if originally demised herein.

12.    Alterations.

(a)    Tenant shall not make any Alterations which would (after the completion thereof) impair the structural integrity of the Leased Premises, without Landlord's written consent, which consent Landlord agrees not unreasonably to withhold or delay, or without Lender's consent if required under the Mortgage. Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following subparagraph (b). Anything herein to the contrary notwithstanding, Tenant agrees that Tenant shall, within eighteen (18) months following the Commencement Date, remodel the Leased Premises, the costs of which (including reasonable soft costs, fixtures, signage and related third-party costs and expenses) shall be not less than Five Hundred ($500,000.00) Thousand Dollars.

(b)    In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration:  (i) the fair market value of the Leased Premises shall not be lessened in

14

any material respect after the completion of any such Alteration, or its structural integrity impaired; (ii) the Alteration and any Alteration theretofore made or thereafter to be made shall not in the aggregate reduce the gross floor area of the Improvements by more than ten percent (10%); (iii) all such Alterations shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements; (iv) all work done in connection with any such Alteration shall comply with all Insurance Requirements; (v) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall (subject to the provisions of Paragraph 18 hereof) discharge all liens filed against any of the Leased Premises arising out of the same; (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration; (vii) all such Alterations shall be the property of Landlord and shall be subject to this Lease; and (viii) all Alterations shall be made in the case of any Alteration the estimated cost of which in any one instance exceeds Two Hundred Thousand Dollars ($200,000) under the supervision of an architect or engineer and, in accordance with plans and specifications which shall be submitted to Landlord (for informational purposes only) prior to the commencement of the Alterations.

13.    Condemnation.

(a)    Tenant, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding.  Landlord, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings. Subject to the provisions of this Paragraph 13 and Paragraph 15, Tenant hereby irrevocably assigns to Landlord or Lender, in that order, any award or payment in respect of any Condemnation of Landlord's interest in the Leased Premises, except that (except as hereinafter provided) nothing in this Lease shall be deemed to assign to Landlord or Lender any award relating to the Tenant's  leasehold interest created by this Lease or any award or payment on account of the Trade Fixtures, moving expenses and out-of-pocket expenses incidental to the move, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, it being agreed, however, that Tenant shall in no event be entitled to any payment that reduces the award to which Landlord is or would be entitled for the condemnation of Landlord's interest in the Leased Premises. Notwithstanding the foregoing, Tenant shall be entitled to any award or payment on account of Tenant's leasehold interest under this Lease only in the event of a Condemnation described in Paragraph 13(b)(i)(A) and then only to the extent that when such award, added to all other awards to which Tenant is entitled hereunder, is subtracted from the entire award in respect to all interests in the Leased Premises, the remainder exceeds the amount set forth on Exhibit "D" attached hereto and made a part hereof.

15

(b)     (i)     (A)     If (I) the entire Leased Premises or (II) at least ten percent (10%) of the applicable Land or the building constructed on the Land or any means of ingress, egress or access to the Leased Premises, the loss of which even after Restoration would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant at the Leased Premises, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than ninety (90) days after a Taking has occurred, serve notice ("Tenant's Termination Notice") upon Landlord of Tenant's intention to terminate this Lease on any Basic Rent Payment Date specified in such Tenant's Termination Notice, which date (the "Termination Date") shall be no sooner than the first Basic Rent Payment Date occurring at least thirty (30) days after the date of such Tenant's Termination Notice.

(B)     In the event that during the Term, Tenant shall serve a Tenant's Termination Notice upon Landlord, Tenant shall, as part of such Tenant's Termination Notice offer (which offer may be rejected by Landlord as set forth below) to purchase the Leased Premises and the award (or if no part of the Leased Premises shall remain, the entire award) for the applicable price (the "Purchase Price") computed in accordance with the schedule annexed hereto and marked Exhibit "C" plus all other amounts which may be due and owing to Lender or Landlord by reason of any default by Tenant in complying with its obligations under this Lease (the "Additions to Purchase Price").

(C)     If Landlord and Lender shall not elect to accept Tenant's offer to purchase, Landlord shall give notice thereof to Tenant within thirty (30) days after the giving of Tenant's Termination Notice.

(D)     Should an offer to purchase not be accepted by Landlord this Lease shall be terminated as above provided and the entire award made in the Condemnation proceeding with respect to the Leased Premises shall be paid to Landlord.

(ii)     In the event that Landlord shall accept or be deemed to have accepted Tenant's offer to purchase title shall close and Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and in such event Tenant shall be entitled to and shall receive any and all awards with respect to the Leased Premises then or thereafter made in the Condemnation proceeding and Landlord shall assign (or in case of any award previously made, deliver to Tenant on the Closing Date) such award as may be made with respect to the Leased Premises. In the event Landlord shall accept Tenant's offer to purchase with respect to the Leased Premises, or be deemed to have accepted such Tenant's offer, title shall close thirty (30) days after the Termination Date hereinbefore defined (the "Closing Date"), at noon at the local office of Landlord's counsel, or at such other time and place as the parties hereto may agree upon, this Lease shall be automatically extended to and including the Closing Date (or, if applicable the extended Closing Date hereinafter described) and

16

Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediate funds to such account or accounts and in such bank or banks as Landlord shall designate, upon delivery of a special warranty deed (or local equivalent) conveying the Leased Premises and all other required documents including an assignment of any award in connection with the taking of the Leased Premises. The special warranty deed (or local equivalent) shall convey title, free from encumbrances other than (A) Permitted Encumbrances, (B) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (C) any installments of Impositions then affecting the Leased Premises, and (D) this Lease. The Purchase Price and Additions to Purchase Price payable as hereinabove provided shall be charged or credited, as the case may be, on the Closing Date, to reflect adjustments of Basic Rent paid or payable to and including the Closing Date, apportioned as of the Closing Date. Tenant shall pay all conveyance, transfer, sales and like taxes required in connection with the purchase, regardless of who is required to pay such taxes under State or local law or custom (and Tenant shall also pay to Landlord any amount necessary to yield to Landlord the entire Purchase Price and Additions to Purchase Price if as a matter of the Law of the State or locality such tax cannot be paid directly by Tenant). If there be any liens or encumbrances against the Leased Premises which Landlord is obligated to remove, upon request made a reasonable time at or before the Closing Date, Landlord shall provide at the Closing funds for the foregoing, payable to the holder of such lien or encumbrances, which funds may be paid from its proceeds at such Closing.

(iii)     In the event that during any Renewal Term, Tenant shall serve a Tenant's Termination Notice upon Landlord, this Lease and the Term hereof shall terminate on the Termination Date specified in the Termination Notice; and in such event the entire award to be made in the Condemnation proceeding shall be paid to Landlord.

(c)     (i)     In the event of a Condemnation of any part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be retained by Landlord; and promptly after such Condemnation, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to its value, condition and character immediately prior to such Condemnation, in accordance with the provisions of this Lease, including but not limited to the provisions of Paragraphs 11(a), 12 and 15 (such restoration following a Condemnation and restoration following a casualty is, as the context shall require, herein called a "Restoration").

(ii)     Upon the payment to Landlord of the Net Award of a Taking which falls within the provisions of this Paragraph 13(c), Landlord shall, to the extent received, make that portion of the Net Award equal to the cost of Restoration (the "Restoration Award") available to Tenant for Restoration, in accordance with the provisions of Paragraph 15, and promptly after completion of the Restoration, the

17

balance of the Net Award shall be paid to Tenant and all Basic Rent, Additional Rent and other sums payable hereunder shall continue unabated and unreduced.

(iii)     In the event of a Requisition of the Leased Premises, Landlord shall apply the Net Award of such Requisition, to the extent available, to the installments of Basic Rent, Additional Rent or other sums payable by Tenant hereunder thereafter payable and Tenant shall pay any balance remaining thereafter. Upon the expiration of the Term, any portion of such Net Award which shall not have been previously credited to Tenant on account of the Basic Rent and Additional Rent shall be retained by Landlord.

(d)     Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Paragraph 13 (a), 13 (b) and 13 (c), no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, which consent shall not be unreasonably withheld or delayed.

14.     Insurance.

(a)     Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i)     Insurance against loss or damage to the Improvements and Equipment under a fire and broad form of all risk extended coverage insurance policy (which shall include flood insurance if the Leased Premises is located within a flood hazard area and which shall include earthquake insurance if the Leased Premises is located in an area where earthquake insurance is customarily maintained for similar commercial properties).⌐ Such insurance shall be in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable) as determined from time to time at Lender's request but not more frequently than once in any 12-month period, by agreement of Landlord, Lender and Tenant, or if not so agreed, at Tenant's expense, by the insurer or insurers or by an appraiser approved by Landlord. Such insurance policies may contain reasonable exclusions and deductible amounts reasonably acceptable to Landlord and acceptable to Lender.

(ii)     Contractual and commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Leased Premises, which insurance shall be written on a so-called "Occurrence Basis," and shall provide minimum protection with a combined single limit in an amount not less than the greater of (x) Five Million ($5,000,000) Dollars (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord or Lender may reasonably request) or (y) the aggregate amount of

18

CO_DOCS_A #63782 v3 WORD97

such insurance carried by Tenant, for bodily injury, death and property damage in any one occurrence.

      (iii)    Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises.

      (iv)    During periods of war or national emergency, war risk insurance in an amount not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable), when and to the extent obtainable from the United States Government or an agency thereof at reasonable cost.

      (v)    Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus located in or about the Improvements in an amount not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable).

      (vi)    Such additional and/or other insurance with respect to the Improvements located on the Leased Premises and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements similar in character, location and use and occupancy to the Improvements located on the Leased Premises, and as required by Lender in the Mortgage.

      (b)    During such time as (i) no Event of Default is outstanding hereunder, (ii) the tangible net worth of Tenant (or of the guarantor of Tenant's obligations under this Lease) shall be not less than One Hundred Million ($100,000,000.00) Dollars as determined in accordance with generally accepted accounting principles consistently applied, and (iii) Tenant (or the guarantor of Tenant's obligations under this Lease) has a Standard & Poors rating of BBB or better, Tenant may self-insure all or any portion of the coverage referred to in Paragraph 14 (a) (i), (ii), (iii) (v) and (vi), provided that the self insurance program of this section (b) does not violate any Legal Requirements of any state which regulates a Lender domiciled in said state, or does not violate any provision in Landlord's Mortgage.

      (c)    Except as otherwise provided in Paragraph 14(b), the insurance required by Paragraph 14(a) shall be written by companies having a claims paying ability rating by Standard & Poors of not less than A-, and all such companies shall be authorized to do an insurance business in the State, or otherwise agreed to by Landlord and Lender.  Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease.  The insurance policies (i) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (ii) shall (except for the worker's

19

CO_DOCS_A #63782 v3 WORD97

compensation insurance referred to in Paragraph 14 (a) (iii) hereof) name Landlord, Tenant and any Lender as additional insured parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d)    Each insurance policy referred to in clauses (i), (iv), (v) (and (vi) if requested by Lender) of Paragraph 14 (a), shall contain standard non-contributory mortgagee clauses in favor of any Lender which holds a Mortgage on the Leased Premises. Each policy shall provide that it may not be canceled except after thirty (30) days prior notice to Landlord and any Lender. Each policy shall also provide that any losses otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, or (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy.

(e)    Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 14, shall renew or replace each policy, and shall deliver to Landlord and Lender a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy at least thirty (30) days prior to the Policy Expiration Date (as hereinafter defined) of each policy. Each such policy shall provide that it shall not expire until the Landlord and Lender shall receive a notice from the insurer to the effect that a policy will expire on a date (the "Policy Expiration Date") which shall be thirty (30) days following the date of the receipt by Landlord and Lender of such notice. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 14 within five (5) business days of the giving of written notice by Landlord to Tenant, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f)    Anything in this Paragraph 14 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 14(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 14, and the Leased Premises is identified in such blanket policy with assigned coverage in an amount equal to or greater than the amounts specified herein. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender evidence of the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 14.

20

CO_DOCS_A #63782 v3 WORD97

(g)     In the event of any casualty loss exceeding $350,000, Tenant shall give Landlord immediate notice thereof.  Tenant shall adjust, collect and compromise any and all claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed, and Landlord and Lender shall have the right to join with Tenant therein.  If the estimated cost of Restoration or repair shall be Three Hundred Fifty Thousand ($350,000.00) Dollars or less, all proceeds of any insurance required under clauses (i), (iv), (v) (and (vi) if requested by Lender) of Paragraph 14(a) shall be payable to a Trustee, which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee").  If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee.  Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant and Landlord each hereby appoints such Trustee as its attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender.  In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder.  The Net Proceeds of such insurance payment shall be retained by the Trustee and, promptly after such casualty, Tenant, as required in Paragraphs 11(a) and 12, shall commence and diligently continue to perform the Restoration to the Leased Premises.  Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for Restoration, in accordance with the provisions of Paragraph 15.  Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements and Equipment in accordance with the provisions of Paragraph 11(a) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.  In the event that any damage or destruction shall occur at such time as Tenant shall not have maintained third-party insurance in accordance with Paragraph 14(a)(i),(iv),(v) or (vi), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such insurance program been in effect (the "Tenant Insurance Payment").

15.     Restoration.  The Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund"") shall be disbursed by the Trustee in accordance with the following conditions:

(a)     If the cost of Restoration will exceed $350,000, prior to commencement of the Restoration the architects, general contractor(s), and plans and specifications for the Restoration shall be approved by Landlord, which approval shall not be unreasonably withheld or delayed and by Lender if required under the Mortgage; and which approval shall be granted to the extent that the plans and specifications depict a Restoration which is substantially similar to the Improvements and Equipment which existed prior to the occurrence of the Casualty or Taking, whichever is applicable.

21

(b)    At the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged or unbonded.

(c)    Disbursements shall be made from time to time in an amount not exceeding the hard and soft cost of the work and costs incurred since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) partial or full releases of liens or lien waivers, and (3) other reasonable evidence of cost and payment required by Landlord or Lender in order to verify that the amounts disbursed from time to time are represented by work that is completed in place or delivered to the site and free and clear of mechanics' lien claims.

(d)    Each request for disbursement shall be accompanied by a certificate of Tenant describing the work, materials or other costs or expenses, for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work or expense and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been substantially completed and complies with the applicable requirements of this Lease. Tenant shall also deliver a certificate from the architect of record that the work has been substantially completed in conformance with the plans and all applicable Laws.

(e)    The Trustee may retain ten percent (10%) of the Restoration Fund until the Restoration is at least fifty percent (50%) complete, and thereafter five percent (5%) until the Restoration is complete.

(f)    The Restoration Fund shall be kept in a separate interest-bearing federally insured account by the Trustee or by Lender.

(g)    At all times the undisbursed balance of the Restoration Fund held by Trustee plus any funds contributed thereto by Tenant, at its option, shall be not less than the cost of completing the Restoration, free and clear of all liens.

(h)    In addition, prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord, exceeds the amount of the Net Proceeds, the Restoration Award and Tenant Insurance Payment available for such Restoration, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of

22

Restoration shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.   Subordination to Financing.

(a)   (i)   Subject to the provisions of Paragraph 16 (a)(ii), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination.

(ii)   Except as expressly provided in this Lease by reason of the occurrence of an Event of Default, Tenant's tenancy and Tenant's rights under this Lease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Lease be affected, by any default under any Mortgage, and in the event of a foreclosure or other enforcement of any Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any Renewal Term, the rights of Tenant under this Lease shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default has occurred and is continuing. Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force insurance proceeds and Restoration Award shall be permitted to be used for Restoration in accordance with the provisions of this Lease. Notwithstanding an Event of Default, but provided no event of default has occurred under the Qualified Sublease, the provisions of this Paragraph 16 (a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17 herein.

(b)   At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of a Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16 (a) above, to attorn, from time to time, to any such owner or Lender, upon the terms and conditions of this Lease, for the remainder of the Term. The provisions of this Paragraph 16(c) shall inure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

(c)   Each of Tenant, any owner and Lender, however, upon demand of the other, hereby agrees to execute, from time to time, instruments in confirmation of the foregoing provisions of Paragraphs 16(a) and 16(b), reasonably satisfactory to the requesting party acknowledging such subordination, non-disturbance

23

CO_DOCS_A #63782 v3 WORD97

and attornment as are provided in such subsections and setting forth the terms and conditions of its tenancy.

(d)     Each of Tenant, Landlord and Lender agrees that, if requested by any of the others, each shall, without charge, enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a) and Tenant hereby agrees for the benefit of Lender that Tenant will not, (i) without in each case the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, amend or modify the Lease (provided, however, Lender, in Lender's sole discretion may withhold or condition its consent to any amendment or modification which would or could (A) alter in any way the amount or time for payment of any Basic Rent, Additional Rent or other sum payable hereunder, (B) alter in any way the absolute and unconditional nature of Tenant's obligations hereunder or materially diminish any such obligations, (C) result in any termination hereof prior to the end of the initial term, or (D) otherwise, in Lender's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (ii) without the prior written consent of Lender which may be withheld in Lender's sole discretion, cancel or surrender or seek to cancel or surrender the Term hereof, or enter into any agreement with Landlord to do so (the parties agreeing that the foregoing shall not be construed to affect the rights or obligations of Tenant, Landlord or Lender with respect to any termination permitted under the express terms hereof in connection with an offer to purchase the Property following certain events of condemnation as provided in Section 13 hereof), or (c) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.     Assignment, Subleasing.

(a)     Tenant may assign, mortgage or pledge its interest in this Lease and may sublet the Leased Premises in whole or in part, from time to time, without the consent of Landlord provided, however, Tenant and Tenant's Guarantor shall remain primarily liable hereunder. Landlord acknowledges that the Leased Premises are currently subject to the Sublease and hereby ratifies its consent to such Sublease.

(b)     Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease. No assignment or sublease shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. Notwithstanding any assignment or subletting Tenant shall continue to remain liable and responsible for the payment of the Basic Rent and Additional Rent and the performance of all its other obligations under this Lease. No assignment or sublease shall impose any obligations on Landlord under this Lease except as otherwise

24

provided in this Lease. (Tenant agrees that in the case of an assignment of the Lease, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment. In the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.)

(c)     (i)      Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the Leased Premises shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease. Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord or to the Lender to (A) return or apply any security deposit under such sublease, unless such security deposit shall be transferred and turned over to the Landlord or Lender or their or either of their Successors, (B) expend any sums to make any installations or alterations provided to be made by the Landlord under said sublease or reimburse the Tenant under said sublease for any installations or alterations made by it, (C) be liable for any act or omission of Tenant as sublandlord (or any successor to Tenant as sublandlord) or be subject to any offsets or defense which such subtenant might have against Tenant as sublandlord (or any successor to Tenant as sublandlord), (D) be bound by any rent or additional rent which such subtenant might have paid for more than the current month to any prior landlord, or (E) be bound by any amendment or modification of the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease. In the event of any Qualified Sublease which shall yield to Tenant any rent in excess of all rent and additional rent payable hereunder (factoring in the first cost of any broker commission, free rent or other like transactional costs borne by Tenant in connection therewith) one-half of such excess shall be payable to Landlord as additional rent.

(ii)     Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant." A "Qualified Sublease" shall be any sublease of all of the Leased Premises, pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of BBB-, or higher or a Moody's investment grade rating of Baa3, or higher (or equivalent rating of any other nationally recognized statistical rating organization) and was not on

25

credit watch, such sublease to be on the terms and conditions of this Lease (except the Basic Rent or Additional Rent (or both) may be higher), and for a term not to exceed the Term of this Lease, (and if any such Qualified Sublease shall include all or part of any Renewal Term or Renewal Terms, then Tenant shall be conclusively deemed to have irrevocably waived the right to issue a Renewal Term Cancellation Notice as to such Renewal Term or Renewal Terms, which waiver Tenant will confirm in writing to Landlord if requested to do so, except that if thereafter such Qualified Sublease shall terminate prior to its original term and on or before the last day as of which Tenant would otherwise be entitled to issue a Renewal Term Cancellation Notice as to any Renewal Term originally included within the term of such Qualified Sublease, then Tenant's right to issue a Renewal Term Cancellation notice as to such Renewal Term and all subsequent Renewal Terms originally falling within the term of such Qualified Sublease shall be reinstated in accordance with the terms of this Lease) . Such qualified Subleases shall be otherwise subject to Landlord's consent, not to be unreasonably withheld, conditioned or delay.

(iii)    A "Qualified Assignee" shall be any assignee of the Tenant's rights, title and interest under this Lease which, at the time of the assignment to it, had a Standard & Poor's investment grade rating of BBB-, or higher, or a Moody's investment grade rating of Baa3, or higher, (or equivalent rating of any other nationally recognized statistical rating organization) and was not on credit watch and otherwise approved by Landlord, such consent not to be unreasonably withheld conditioned, or delay.

18.    Permitted Contests.

(a)    After prior written notice to Landlord, Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any lien referred to in Paragraphs 9 or 12, or (iv) take any action with respect to any violation referred to in Paragraph 11(b) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the collection of, or other realization upon, the Imposition or lien so contested, (B) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such violation, (C) any interference with the use or occupancy of any of the Leased Premises, (D) any interference with the payment of any Basic Rent or any Additional Rent, and (E) the cancellation of any fire or other insurance policy.

(b)    In no event shall Tenant pursue any contest with respect to any Imposition, Legal Requirement, lien, or violation, referred to above in such manner that exposes Landlord or Lender to (i) criminal liability, penalty or sanction, (ii) any civil liability, penalty or sanction  for which Tenant has not made provisions reasonably

26

acceptable to Landlord and Lender or (iii) defeasance of its interest the Leased Premises.

(c)     Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Lender and Landlord harmless against any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

19.    Conditional Limitations: Default Provisions.

(a)     The occurrence of any one or more of the following events (any such event being specified herein as a "failure" or "default") shall constitute an "Event of Default" under this Lease: (i) a failure by Tenant to make (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity or before any administrative tribunal which had or might have the effect of preventing Tenant from complying with the provisions of this Lease): (x) any payment of Basic Rent which continues unremedied for a period of three (3) business days after written notice ("Nonpayment Notice") thereof given to Tenant by Landlord or Lender or Lender's designee, or (y) any payment of Additional Rent or other sum herein required to be paid by Tenant which continues unremedied for a period of ten (10) business days after a Nonpayment Notice is given to Tenant by Landlord or Lender or Lender's designee; (ii) failure by Tenant to perform and observe, or a violation or breach of, any other provision in this Lease and such default shall continue for a period of thirty (30) business days after written notice thereof is given by Landlord or Lender or Lender's designee to Tenant or if such default is of such a nature that it cannot reasonably be cured within such period of thirty (30) business days, such period shall be extended for such longer time as is reasonably necessary provided that Tenant has commenced to cure such default within said period of thirty (30) business days and is actively, diligently and in good faith proceeding with continuity to remedy such default; (iii) Tenant or any guarantor of Tenant's obligations hereunder shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) or voluntarily consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (C) voluntarily file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (D) voluntarily file a general assignment for the benefit of creditors; (iv) a court shall enter an order, judgment or decree appointing, with the voluntary consent of Tenant or any guarantor of Tenant's obligations hereunder, a receiver or trustee for Tenant or any guarantor of Tenant's obligations hereunder or for the Leased Premises or approving a petition filed against Tenant or any guarantor of Tenant's obligations hereunder which seeks relief under the

27

bankruptcy or other similar laws of the United States or any State, and such order, judgment or decree shall remain in force, undischarged or unstayed, 180 business days after it is entered; (v) Tenant or any guarantor of Tenant's obligations hereunder shall in any insolvency proceedings be liquidated or dissolved or shall voluntarily commence proceedings towards its liquidation or dissolution; or (vi) the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within 180 business days after such levy or attachment.

(b)     If any Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter, to do any one or more of the following without demand upon or notice to Tenant:

(i)     Landlord may give Tenant notice (following the occurrence of an Event of Default) of Landlord's intention to terminate this Lease on a date specified in such notice (which date shall be no sooner than thirty (30) days after the date of the notice). Upon the date therein specified, unless the Event of Default for which the termination is effected has been cured by Tenant, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date hereinabove fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder through the date hereinabove fixed for the expiration of the Term, including its liability for Basic Rent and Additional Rent as hereinafter provided.

(ii)     Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (i) above give Tenant notice (following the occurrence of an Event of Default) to surrender the Leased Premises to Landlord on a date specified in such notice (which date shall be no sooner than thirty (30) days after the date of the notice), at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord unless the Event of Default for which the termination is effected has been cured by Tenant. Upon or at any time after taking possession of the Leased Premises, Landlord may remove any persons or property therefrom.  Landlord shall be under no liability for or by reason of any such entry, repossession or removal.  No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (i) above.

(iii)     After repossession of any of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord may relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its reasonable discretion, may determine; and Landlord shall collect and receive any rents payable by reason of such reletting.  The rents received

28

on such reletting shall be applied (A) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (B) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth above. Landlord may make such Alterations as Landlord in its reasonable discretion may deem advisable. Tenant agrees to pay Landlord, as Additional Rent, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting any of the Leased, Premises, including fees and commissions of attorneys, architects, agents and brokers.

(iv)    Landlord may exercise any other right or remedy now or hereafter existing by law or in equity (other than acceleration of rent, except as expressly set forth in subparagraph (d) below). Landlord shall be entitled to obtain from Tenant interest on any amounts of Basic Rent or Additional Rent not paid when due, at the default interest rate of six percent (6%) per annum above the commercial lending rate of Lender or such other commercial lending rate designated by Landlord, but not exceeding any interest rate specified by State Law for such unpaid amounts (the "Default Rate").

(c)    In the event of any expiration or termination of this Lease or repossession of any of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord Basic Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages:  (i) Basic Rent, Additional Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to paragraph 19 (b) (iii), after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alteration and expenses of preparation for reletting). Tenant hereby agrees to be and remain liable for all sums aforesaid and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such

29

CO_DOCS_A #63782 v3 WORD97

damages. Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(d)    At any time after such expiration or sooner termination of this Lease pursuant to Paragraph 19 or pursuant to law or if Landlord shall have reentered the Leased Premises, as the case may be, whether or not Landlord shall have recovered any amounts under Paragraph 19(b)(iii) or 19(c), Landlord shall be entitled to recover from Tenant and Tenant shall pay to Landlord, on demand, as and for liquidated and agreed final damages for Tenant's default, the amount by which the Basic Rent, and all Additional Rent reserved hereunder for the unexpired portion of the Term demised herein as if the Lease had not expired or been terminated exceeds the then fair and reasonable rental value of the Leased Premises for the same period, discounted to present worth at the annual rate of seven percent (7%), minus any such monthly deficiencies previously recovered from Tenant under Paragraph 19(b)(iii) if applicable to such period.

(e)    If any statute or rule of law governing a proceeding in which such liquidated final damages provided for in Paragraph 19(d) are to be proved shall validly limit the amount thereof to an amount less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

20.    Additional Rights of Landlord and Tenant.

(a)    No right or remedy conferred upon or reserved to Landlord in this Lease is intended to be exclusive of any other right or remedy; and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease. No delay or failure by Landlord or Tenant to enforce its rights under this Lease shall be construed as a waiver, modification or relinquishment thereof. In addition to the other remedies provided in this Lease, Landlord and Tenant shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)    Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, any right and privilege which it or any of them may have under any present or future law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof.

(c)    Landlord hereby waives any right to distrain or levy upon Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is

30

CO_DOCS_A #63782 v3 WORD97

created or otherwise. Landlord agrees at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant.

(d)      Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that the Trade Fixtures are Tenant's property and not part of the Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

(e)      Each of Tenant and Landlord (herein called "Paying Party") agrees to pay to the other party (herein called "Demanding Party") any and all reasonable costs and expenses incurred by the Demanding Party in connection with any litigation or other action instituted by the Demanding Party to enforce the obligations of the Paying Party under this Lease, to the extent that the Demanding Party has prevailed in any such litigation or other action. Any amount payable by Tenant to Landlord pursuant to this Paragraph 20(e) shall be due and payable by Tenant to Landlord as Additional Rent. No sum payable by Landlord to Tenant under this subparagraph will be payable or recoverable from any sums pledged or assigned (or intended to have been pledged or assigned) by Landlord to Lender, Tenant's right to recover such sums from Landlord being subordinate to the rights of Lender, such sums only being recoverable after payment to Lender in full of the Loan as constituted on the date hereof. As used in this Paragraph, "costs and expenses" shall include, without limitation, reasonable attorneys' fees at trial, on appeal and on any petition for review, and in any proceeding in bankruptcy, in addition to all other sums provided by law.

21.      Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after having been sent by Federal Express, United Parcel or other nationally recognized air courier service.

To the Addresses stated below:

If to Landlord:
c/o Flatirons Development Corporation
1444 Wazee Suite 120
Denver, CO 80202

31

With a copy to:
Ms. Rebecca Dow, Esquire
Ballard Spahr Andrews & Ingersoll
1225 17th St., Suite 2300
Denver, CO 80202

If to Tenant:
c/o Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011
Attn: Secretary

With a copy to:
Mark A. Drogalis, Esq.
Law Offices of Eric A. Heinz, P.C.
1835 Market Street, Suite 1215
Philadelphia, PA 19103

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and states in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall send a copy of such Notice to Lender in the manner aforesaid. For the purposes of this Paragraph 21, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above. Any Notice may be given on behalf of any party by its counsel.

22.    Estoppel Certificates.  Landlord and Tenant shall at any time and from time to time, upon not less than twenty (20) days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent, payable hereunder has been paid, (iii) that to the knowledge of the signer of such certificate no default by either Landlord or Tenant exists hereunder or specifying each such default of which the signer may have knowledge, (iv) the remaining Term hereof, (v) with respect to a certificate signed on behalf of Tenant, that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said signer's knowledge, specifying and describing the same , and (vi) such other matters as may reasonably be requested by the party requesting the certificate.  It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective purchaser, assignee or subtenant of the Leased Premises.

32

23.    Surrender and Holding Over.

(a)    Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord. Tenant shall remove from the Leased Premises on or prior to such expiration or earlier termination the Trade Fixtures and personal property which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier Termination, repair any damage caused by such removal. Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property and repairing any damage to any of the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

(b)    Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the Term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy from month to month only, at one hundred ten percent (110%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred ten percent (110%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 19 (b).

24.    No Merger of Title.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (b) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership.   No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease and (ii) the fee estate in or ownership of the Leased Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.    Definition of Landlord.

(a)    Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be

33

enforced only against the Landlord's interest in the Leased Premises or the proceeds therefrom and shall not be enforced against the Landlord individually or personally.

(b)    The term "Landlord" as used in this Lease so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

26.    Hazardous Substances.

(a)    Tenant agrees that it will not on, about, or under the Leased Premises, make, release, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 et seq. (the "Act"); but the foregoing shall not prevent the use of any hazardous substances in accordance with applicable laws and regulations. Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local laws, rules or regulations governing "Hazardous Materials". "Hazardous Materials" as used herein shall mean all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 et seq.; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, et seq., any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, et seq., any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et Seq., any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical or other substance regulated by federal, state or local statutes similar to the federal statutes listed above and regulations promulgated under such federal, state or local statutes.

(b)    To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased

34

Premises during the Term. In addition to, and without limiting Paragraph 10 of this Lease Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners, beneficial owners, trustees, members and employees, harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, reasonable attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental law with respect to the Leased Premises or Tenant's or any other person's or entity's prior ownership of the Leased Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) at or from the Leased Premises or any portion or portions thereof, including any past or current release and any release or threatened release during the initial term and any extension or Renewal Term whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the initial term or any extension or Renewal Term.

(c)     The Tenant agrees that it will not install any underground storage tank at the Leased Premises without specific, prior written approval from the Landlord. The Tenant agrees that it will not store combustible or flammable materials on the Leased Premises in violation of the Act or any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27.     Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than two (2) business days except in the case of emergency) to enter the Leased Premises at all reasonable business hours (and at all other times in the event of an emergency): (a) for the purpose of inspecting the same or for the purpose of doing any work under Paragraph 11(c), and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), and (b) for the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within six (6) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.     Intentionally Omitted

29.     No Usury. The intention of the parties being to conform strictly to the applicable usury laws, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

35

CO_DOCS_A #63782 v3 WORD97

30.    Separability.  Each and every covenant and agreement contained in this Lease is, and shall be construed to be, a separate and independent covenant and agreement, and the breach of any such covenant or agreement by Landlord shall not discharge or relieve Tenant from its obligation to perform the same.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

31.    Miscellaneous.

(a)    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

(b)    As used in this Lease the singular shall include the plural as the context requires and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (iii) "lien" shall mean "lien, charge, encumbrance; title retention agreement, pledge, security interest, mortgage and/or deed of trust"; and (iv) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition".

(c)    Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord.  Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense.

(d)    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

(e)    The covenants of this Lease shall run with the Land and bind Tenant, the successors and assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns.

(f)    This Lease will be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes.

(g)    This Lease shall be governed by and construed according to the laws of the State in which the Leased Premises is located.

36

(h)     Wherever the consent or approval of Landlord is required hereunder, Landlord agrees that it will not unreasonably withhold or delay such consent or approval.

32.    Additional Rent. The term "Additional Rent" as used herein includes all amounts, costs, expenses, liabilities and obligations (including but not limited to Tenant's obligation to pay any Net Awards or Purchase Price hereunder) which Tenant is required to pay pursuant to the terms of this Lease other than Basic Rent.

33.    Intentionally Omitted

34.    Leasehold Mortgages. Tenant and every successor and assign of Tenant is hereby given the right (exercisable at any time and from time to time) by Landlord, without Landlord's prior consent, to mortgage their interests in this Lease, under one or more leasehold mortgage(s), and to assign this Lease, and all sublease(s) (provided, however, that any assignment of any sublease by Tenant pursuant to this Paragraph 34 is subject and subordinate to the assignment of such sublease set forth in Paragraph 17(c) hereof), as collateral security for such leasehold mortgage(s), upon the condition that all rights acquired under such leasehold mortgage(s) shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease Agreement, and to all rights and interests of Landlord in this Lease Agreement, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the right given to Tenant to mortgage Tenant's interest in this Lease Agreement, except as expressly provided in this Paragraph 34. If Tenant and/or Tenant's successors and assigns shall mortgage this leasehold and if the holder of any such leasehold mortgage shall send to Landlord notice specifying the name and address of such holder and the pertinent recording data with respect to its leasehold mortgage, then Landlord agrees that the following provisions shall apply to each leasehold mortgage with respect to which such conditions are met (each being herein called a "Leasehold Mortgage"), so long as such Leasehold Mortgage shall remain  unsatisfied of record or until  notice of satisfaction of such Leasehold Mortgage is given by the holder to Landlord:

(a)     There shall be no cancellation, surrender or modification of this Lease Agreement by joint action of Landlord and Tenant without the prior consent in writing of the holder of the Leasehold Mortgage, and no merger shall result from the acquisition by, or devolution upon, any one entity of the fee and leasehold estates in the Leased Premises.

(b)     Landlord shall, upon serving Tenant with any notice of default or other notice provided for in this Lease Agreement, simultaneously serve a copy of such notice upon the holder of the Leasehold Mortgage; and no such notice to Tenant shall be effective unless a copy of such notice is also served on the holder of the Leasehold Mortgage. The holder of the Leasehold Mortgage shall thereupon have the same period, after service of such notice upon it, to remedy or cause to be

37

CO_DOCS_A #63782 v3 WORD97

remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of the holder of the Leasehold Mortgage as if the same had been done by Tenant.

(c)    If any default by Tenant shall occur which, pursuant to any provision of this Lease Agreement or Law, entitles Landlord to terminate this Lease Agreement, and if, before the expiration of ninety (90) days from the date of service of notice of termination upon the holder of the Leasehold Mortgage, such holder shall have notified Landlord of its desire to nullify such notice and shall have paid to Landlord all Basic Rent and other payments provided for in this Lease which are then in default, and shall have complied (or shall have commenced the work of complying) with all of the other obligations of Tenant under this Lease which are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Lease and any notice of termination theretofore given shall be void and of no effect; and in the event that the holder of more than one Leasehold Mortgage shall desire so to act, the holder of the Leasehold Mortgage which is prior in lien shall have the prior right so to act.

(d)    If any default by Tenant shall occur which, pursuant to any provision of this Lease Agreement or Law, entitles Landlord to terminate this Lease Agreement, and Landlord elects to terminate this Lease Agreement, the holder of the Leasehold Mortgage shall not only have the right to nullify any notice of termination by curing such default, as aforesaid, but shall also have the right to postpone and extend the specified date for the termination of this Lease Agreement as fixed by Landlord in Landlord's notice of termination, for a period of not more than four (4) months, provided that such holder shall cure or cause to be cured any then existing monetary defaults and meanwhile pay the Basic Rent, Additional Rent and comply with and perform all of the other terms, conditions and provisions of this Lease on Tenant's part to be complied with and performed, and provided further that the holder of the Leasehold Mortgage shall forthwith take steps to acquire or sell Tenant's interest in this Lease Agreement by foreclosure of the Leasehold Mortgage or otherwise and shall prosecute the same to completion with due diligence. If at the end of said four (4)-month period the holder of the Leasehold Mortgage shall be actively engaged in steps to acquire or sell Tenant's interest in this Lease Agreement and shall have given notice thereof to Landlord, the time for the holder to comply with the provisions of this subparagraph (d) shall be extended for such period as shall be reasonably necessary to complete such steps with reasonable diligence and continuity, provided that the holder of the Leasehold Mortgage continues to pay or cause to be paid all sums owing by Tenant hereunder and provided further that there is not outstanding and uncured any Event of Default hereunder the continuation of which during such additional period may: (i) threaten Landlord's interest in the Leased Premises (ii) have a material adverse effect on the value of the Leased Premises, (iii) materially increase the likelihood that Tenant, Landlord or Lender would incur liability under any provisions of the Act referred to in Paragraph 26 of this Lease, or (iv) result in or give rise to any material environmental deterioration or degradation of the Leased Premises; such as, for example and without

38

limitation, any failure to insure or any failure to repair or care for the Leased Premises the effect of which is to place the Leased Premises at risk or to increase the ultimate cost of such repair.

(e)     Landlord agrees that in the event of any termination of this Lease Agreement or of any New Lease made pursuant to this Paragraph 34(e) prior to its stated expiration date for any reason whatsoever (including, without limitation, by operation of law or the rejection of this Lease Agreement or any New Lease by Tenant as debtor in possession or any trustee of Tenant in any bankruptcy, reorganization, arrangement or similar proceeding), Landlord shall enter into a new lease ("New Lease") of the Leased Premises with the holder of the Leasehold Mortgage (or its nominee) or, if there be more than one Leasehold Mortgage, then with the holder entitled under Paragraph(e)(iv) (or its nominee), for the remainder of the Term of this Lease, effective as of the date of such termination, at the rent and upon the same terms, provisions, covenants and agreements as contained in this Lease Agreement (including without limitation all renewal options, and rights of first refusal), and subject only to the same conditions of title as this Lease Agreement is subject to on the date of the execution hereof, to liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein to be observed or performed by Tenant and the lien of any Impositions then affecting the Leased Premises, and to other liens or encumbrances created pursuant to this Lease, and to the rights, if any, of any parties then in possession of any part of the Leased Premises, provided:

(i)     The holder (or its nominee) shall make request upon Landlord for such New Lease within sixty (60) days after the date on which the holder has received written notice of the occurrence of such termination.

(ii)    The holder (or its nominee) shall pay to Landlord at the time of the execution and delivery of the New Lease all sums which would at the time of the execution and delivery of the New Lease be due pursuant to this Lease Agreement but for such termination, less the net income collected by Landlord subsequent to the date of termination of this Lease Agreement and prior to the execution and delivery of the New Lease, any excess of such net income over the aforesaid sums to be applied  in payment of the rental thereafter becoming due under the New Lease.

(iii)   If more than one holder makes request upon Landlord in accordance with the provisions of this Paragraph 34 (e), the New Lease shall be delivered to the holder requesting such New Lease whose Leasehold Mortgage is prior in lien and prior in estate, and the request of the holder of any  Leasehold Mortgage which is subordinate in lien shall be void and of no force and effect.

(iv)    Upon the execution and delivery of the New Lease, all subleases which theretofore may have been assigned and transferred to Landlord shall

39

thereupon be assigned and transferred (without recourse) by Landlord to the Tenant under the New Lease; and the Tenant under the New Lease shall have the benefit of all of the right, title, interest, powers and privileges of Tenant under this Lease Agreement in and to the Leased Premises, including specifically assignment of Landlord's interest in and to any then existing sublease where the sublessee may have attorned to Landlord and which, at the time of cancellation or termination of this Lease Agreement, was prior in right to the lien of the holder of the Leasehold Mortgage or which by separate agreement or by its terms had been granted non-disturbance privileges pursuant to the provisions of this Lease Agreement; and Landlord hereby agrees that, with respect to any such sublease so assigned, Landlord will not modify or amend any of the terms or provisions thereof, during the period between the expiration or termination of this Lease Agreement and the execution and delivery of the New Lease.

(v)   Following the termination of this Lease Agreement or any New Lease and until the right of the holders of all Leasehold Mortgages to enter into a New Lease shall have expired without any New Lease having been executed:

(A)   Landlord shall not alter or in any way demolish the buildings or other improvements situate on the Leased Premises; and, during said period, Landlord shall not remove, replace or change any furniture, furnishing, fixtures or equipment located on the Leased Premises.

(B)   Landlord shall not terminate any sublease or the rights of any subtenant under such sublease unless such subtenant shall be in default under such sublease.

(f)   Landlord shall, upon request, execute, acknowledge and deliver to the holder of the Leasehold Mortgage an agreement prepared at the sole cost and expense of Tenant, in form reasonably satisfactory to such holder, between Landlord, Tenant and the holder, agreeing to all of the provisions of this Paragraph 34.

(g)   The term "mortgage", whenever used in this Lease Agreement, shall include whatever security instruments are used in the locality of the Leased Premises, such as, without limitation, mortgages, deeds of trust, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code or successor or similar legislation.

35.   "Bond" Lease during Subtenancy Term Portion.   Tenant hereby acknowledges and agrees that it shall be bound by all terms and conditions of this Lease during the Subtenancy Term Portion; and in addition, shall fully perform and comply with all obligations as Sublessee under the Sublease, and shall indemnify, defend and hold Landlord harmless from any such obligations under the Sublease, including, but not limited to, the payment of rent and percentage rent thereunder to SunWest N.O.P., Inc. during such Subtenancy Term Portion.

40

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

STATE STREET PARTNERS, LLC

By:_____
      Name: Jeff W. Oberg
      Title: Manager

TENANT:

1515 WEST STATE STREET BOISE IDAHO,LLC

By:_____
      Robert B. Sari
      Vice President - Law

41

CO_DOCS_A #63782 v3 WORD97

EXHIBIT "A"

All of Block 122 of Boise City Original Townsite, according to the official plat thereof, filed in Book 1 of Plats at Page 1, records of Ada County, Idaho.

TOGETHER WITH the vacated alley through said Block 122.

42

EXHIBIT 'B'

| Term | Annual Basic Rent |
|------|-------------------|
| Initial 20 year Term | $ 311,350 * |
| 1st 5-year Renewal Term | $ 336,752 |
| 2nd 5-Year Renewal Term | $ 361,154 |
| 3rd 5-year Renewal Term | $ 387,556 |
| 4th 5-year Renewal Term | $ 412,958 |
| 5th 5-year Renewal Term | $ 438,360 |
| 6th 5-year Renewal Term | $ 463,762 |

Number of Consecutive Renewal Terms:  Six (6)
Duration of each Renewal Term:  Five (5) Years

   * Notwithstanding the foregoing, prior to the Master Lease Termination (during the Sublease Term Portion), the Annual Basic Rent payable by Tenant to Landlord shall be $295,180.00 under this Lease, and Tenant shall continue to pay , as "Sublessee" under the Sublease, all rents, including percentage rent, directly to SunWest N.O.P. required under the Sublease.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has caused this Guaranty to be executed by its duly authorized officer and its corporate seal to be hereunto duly affixed, on this _____16th_____ day of August, 2000.

RITE AID CORPORATION

By: _____
Robert B. Sari
Vice President - Law

STATE OF PENNSYLVANIA        )
                                              :ss
COUNTY OF _Cumberland_   )

On this _16th_ day of _August_ ─, 2000, before me, the undersigned, a Notary Public in and for the said county and state, personally appeared Robert B. Sari, who acknowledged himself to be the Vice President of 1515 WEST STATE STREET BOISE IDAHO, LLC, a Delaware limited liability company, and that he, as such Vice President, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the company by himself as Vice President and acknowledged to me that such company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
Residence Address: _30 Hunter Lane_

_Camp Hill, PA   17011_
My Commission Expires: _____

(S E A L)

Notarial Seal
Martha K. Hynd, Notary Public
East Pennsboro Twp., Cumberland County
My Commission Expires Apr. 8, 2003

Member, Pennsylvania Association of Notaries

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
dbruck@greenbaumlaw.com
Attorneys for creditor, State Street Partners LLC

| | |
|---|---|
| In re:<br><br>**NEW RITE AID, et al.,**<br><br>Debtors. | Chapter 11<br><br>**Case No.: 25-14861 (MBK)**<br><br>**(Jointly Administered)** |

## OBJECTION OF STATE STREET PARTNERS LLC TO DEBTORS' NOTICE OF POTENTIALLY ASSUMED UNEXPIRED LEASES

State Street Partners LLC (State Street or Landlord) by and through its undersigned counsel, Greenbaum Rowe Smith & Davis LLP (Greenbaum) submits this objection (the Objection) to the Debtors' proposed assumption and assignment of Landlord's lease for premises at 1515 West State Street, Boise Idaho (the Lease). In support of its Objection, Landlord states as follows:

### PRELIMINARY STATEMENT

1.  State Street is the landlord and owner of premises at 1515 West State Street, Boise Idaho. State Street has leased the premises to 1515 West State Street Boise Idaho LLC which is a Rite Aid affiliate and a debtor in these proceedings. The Lease between Landlord and Tenant is dated August 2020. See Exhibit A.

2.  Rite Aid executed a Guaranty of the Lease in August 2020. See Exhibit B.

3.  State Street received a Notice of Potentially Assumed Unexpired Leases (May 19, 2025) on or about May 27, 2025 advising State Street that the Debtors "may assume and assign to

the Successful Bidder the unexpired lease listed on Exhibit A to which you are a counterparty." The lease on Exhibit A attached to the Notice is the Lease. The Notice is attached as Exhibit C.

4.      While not clearly expressed in the Notice it appears that the "successful bidder may be CVS Pharmacy Inc.(CVS). Upon information provided by the Debtors CVS acquired the pharmacy assets at the premises in Boise Idaho through the Auction processed by the Debtors. Landlord has not received any information concerning CVS's financial abilities or other information which would provide it with adequate assurance of future performance as required by Bankruptcy Code section 365.

5.      In connection with a potential assumption and assignment of a Lease the Debtors must be required to pay the full cure amounts associated with the Lease plus any additional pecuniary losses suffered or to be suffered by the Landlord including reasonable attorneys' fees. The Debtor must also cure or provide adequate assurance that they or any proposed assignee will cure all non-monetary defaults under the Lease.

6.      Debtors or a proposed assignee must under Bankruptcy Code section 365  be required to comply with all contractual obligations and indemnifications of Landlord with regard to events which have occurred before assumption and assignment, and continue to timely pay all rent, additional rent and other charges and costs due under the Lease until it is assumed , assumed and assigned or rejected pursuant to Bankruptcy Code section 365(d)(3).

7.      The Lease is in default and the cure amount proposed by the Debtors in the Notice is inadequate.

## **BACKGROUND**

8.      On May 5, 2025 (the Petition Date),,  New Rite Aid LLC filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code with this Court.

9.      Subsequently on May 6, 2025 the Debtors filed Motions for entry of orders approving the auction and bidding procedures, scheduling certain dates and deadlines with respect

9809825.1

thereto, approving the form and manner of Notice thereof, establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and other relief. (The Sales Procedures Order).

10. The Court entered the Sales Procedures Order on May 7, 2025. The date for the sale of the pharmacy assets was set for May 14, 2025. CVS has been announced as the successful bidder of the pharmacy assets at the premises.

11. The Lease has been in default for failure to comply with the insurance provisions of the Lease since at least June 7, 2023. The Debtor has failed and refused to cure the defaults despite multiple efforts by Landlord to resolve the matter. The Lease remains in default and the cure amount set forth in Exhibit A to the Notice of Potentially Assumed Unexpired Leases is wrong and does not address the monetary losses that the Landlord has suffered to date and for which the Landlord must be compensated to allow an assumption and assignment of the Lease.

12. During the prior bankruptcy case for Rite Aid (Case # 23-18993 (MBK), after repeated efforts to resolve the defaults under the Lease by the Landlord, Landlord filed a Motion to Compel Debtors to (1) Comply With the Terms of the Lease, or (2) For an Order Vacating the Stay so as to Permit Movant to Commence Eviction Proceedings in the State Court (ECF # 5342-2), The matter was carried from time to time and a settlement conference was scheduled. Upon the filing of the pending New Rite Aid bankruptcy case, the scheduled dates for the settlement conference and scheduled hearing date were discontinued. Landlord finds itself back where it was in June 2023 and having spent in excess of $100,000 for replacement insurance and attorneys' fees because of the Rite Aid's and now New Rite Aid's refusal to comply with the Lease.

13. The existing defaults in the insurance coverage continue to exist; and because the coverage was not in compliance with the Lease, and because Landlord and Landlord's Lender required compliance Landlord after having spent nearly a year in discussions with Rite Aid, on notice to Rite Aid on or before June 2024 purchased compliant coverage at Landlord's expense.

3

9809825.1

the defauls in the Lease.

14.    Landlord incurred attorneys' fees in connection with the defaults created by Rite Aid under the Lease for which it demanded reimbursement from Rite Aid. Rite Aid refused to reimburse Landlord for attorney's fees uncured by Landlord because of Rite Aid's defaults. As of this date the legal fees incurred by Landlord exceed $40,000.

15.    The cost of compliant insurance coverage incurred by Landlord was approximately $75,000. A copy of the invoice has been provided to Rite Aid. The Lease provides that Rite Aid shall be responsible for interest at the default rate on all expenses so incurred by Landlord from the date of acquisition of the compliant policy (June 25, 2024). Interest is accruing at the default rate as set forth in the Lease, and is part of any cure cost.

16.    To be specific, the defaults in the Lease are as follows:

a.    Paragraph 14 (a)(i) of the Lease requires the Tenant to provide insurance "against loss or damage to the Improvements and Equipment under a fire and broad form of all risk extended coverage insurance policy. Such insurance shall be in amounts sufficient to prevent Landlord or Tenant from becoming a co- insurer under the applicable policies and in any event in amounts not less than the **actual replacement cost** of the Improvements and Equipment....as determined from time to time at Lender's request but not more frequently than once in any 12 month period, by agreement of Landlord, Lender and Tenant, **or if not agreed at Tenant's expense........".**

b.    Rite Aid provided a certificate of insurance for the period June 1, 2023 through June 1, 2024 reflecting that the coverage applicable to the "Building or Business Personal Property is limited to $5,000,000." See Exhibit D.

c.    Landlord believing that the actual replacement cost of the Building and Equipment was far in excess of $5,000,000 requested that Rite Aid obtain a valuation of the Building and Equipment to support the $5,000,000 limit in coverage. Rite Aid refused and failed to do so.

d.    Landlord, confronted with Rite Aid's refusal to comply with the terms of the Lease ordered an appraisal of the Building and Equipment. The appraisal of the Building alone reflected that the replacement value of the Building was $7,465,000. Landlord believes that the value of the Equipment at the premises is in excess of $3,000,000. A copy of the appraisal is attached as Exhibit E.

4

e.  Landlord provided Rite Aid with a copy of the appraisal and again notified Rite Aid that it was in default under the Lease. Rite Aid ignored the Landlord's notice of default.

f.  The Lease also states at Paragraph 14 (a)(ii) that the Tenant must provide Landlord with "Contractual and commercial liability insurance against claims for bodily injury, death or property damage occurring on or about the Leased Premises which insurance shall be written on a so called "Occurrence Basis and shall provide minimum protection with a combined single limit in an amount not less than the greater of (x) Five Million ($5,000,000) Dollars ( or in such increased limits from time to time reflect declines in the purchasing power of the dollar as Landlord or Lender may reasonably request."

g.  Rite Aid's certificate of insurance (Exhibit F) reflects $10,000,000 for coverage for claims but includes a self-insurance provision of $7,000,000 (SIR) which leaves only $3,000,000 in available insurance coverage which is less than the required coverage under the policy of $5,000,000.

h.  Neither Rite Aid nor New Rite Aid is or was credit worthy enough to self-insure under the provisions of the Lease. Paragraph 14(b) states that **Tenant may self-insure only "during such time as (i) no Event of Default shall be outstanding, and (ii) the tangible net worth of tenant (or of a guarantor of Tenant's obligations under the Lease) shall be not less than $100,000,000 as determined in accordance with generally accepted accounting principles consistently applied, and (iii) Tenant or the guarantor of Tenant's obligations under the Lease has a Standard & Poor's rating of BBB or better.** Absent compliance with the credit worthy tests under the Lease Rite Aid and now New Rite Aid may not self-insure and accordingly is in default under the provisions of Paragraph 14(b) of the Lease. Rite Aid did not qualify to self-insure. New Rite Aid cannot qualify to self-insure.

i.  Paragraph 14(e) of the Lease states clearly the requirements for the certificate of insurance to be provided by Tenant and the obligation to pay the premium for the insurance required to be compliant with the Lease. **"In the event of tenant's failure to comply with any of the foregoing requirements of this Paragraph 14 within five (5) business days of the giving of written notice by Landlord to Tenant, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional rent and shall be repaid by Tenant together with interest thereon at the Default Rate from the time of payment by Landlord until fully paid by Tenant immediately upon written demand by Landlord."**

j.  Pursuant to Paragraph 19(b)(vi) of the Lease the default rate is six percent (6%) above the commercial lending rate. Such interest from June 2023 must be included in the cure cost.

k.  In connection with Tenant's multiple defaults Landlord spent the following:

      a.  Property Policy for $7,500,000 of coverage for the building alone- premium of $68,641.00

      b.  Liability policy in compliance with the terms of the Lease- $4,055.

      c.  Credit card processing fee - $2,362.62

      d.  Attorney fees at $40,000

e.    Interest at 12% x ($68,641.00+ $4055 =$72,696) =$ 8723.52.

f.    Total Cure Cost = $123,782.14

17.    Landlord reserves all rights with respect to the proposed assumption and
assignment and states that the cure amount set forth in Exhibit A to the Notice is incorrect. The
correct cure amount is no less than $123,782.14 together with such additional costs and charges as
Landlord may incur through the date of assumption and assignment should that occur.

**RELIEF REQUESTED**

Landlord requests that the Court not permit the assumption and assignment of the Lease absent complete compliance
with Bankruptcy Code Section 365 including but not limited to conditioning any assumption of the Lease upon
curing the existing defaults in the Lease and that any assignment of the Lease be conditioned upon the assignee
satisfying the requirements regarding financial feasibility, fulfilling contractual obligations including
indemnification obligations, posting of adequate security and assurance of future performance as set forth in
Bankruptcy Code section 365.

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Counsel for creditor, State Street Partners, LLC

By:/s/ David L. Bruck_____

Date: May 6, 2025                    David L. Bruck, Esq.

# EXHIBIT A

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 1565    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 58 of 123
Document    Page 8 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 7 of 80

## LEASE

THIS LEASE AGREEMENT made as of the __ day of August, 2000, by and between STATE STREET PARTNERS, LLC, a Colorado limited liability company, having an office at 1444 Wazee Street, Suite 120, Denver, CO 80202 ("Landlord"), and 1515 WEST STATE STREET BOISE IDAHO, LLC, a Delaware limited liability company, having its principal office at 30 Hunter Lane, Camp Hill, PA 17011 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant, intending to be legally bound, hereby covenant and agree as follows:

WHEREAS, Landlord is the current landlord under that certain lease (the "Master Lease") dated November 30, 1962, with SunWest N.O.P., Inc., of the leased premises defined hereinafter as the "Leased Premises" the term of which (taking into account all exercised option periods) expires on December 31, 2002 (the "Master Lease Expiration").

WHEREAS, SunWest N.O.P., Inc., is the current sublessor under that certain Sublease Agreement (the "Sublease") dated June 18, 1979, as amended, with Thrifty Payless, Inc., as tenant regarding the Leased Premises demised by the Master Lease the term of which (taking into account all option periods) expires on November 30, 2002.

WHEREAS, Thrifty Payless, Inc. has or is about to assign its interest as Sublessee under the Sublease to Tenant pursuant to that certain Assignment of Sublease of even date herewith (the "Sublease Assignment") and Tenant shall simultaneously assign its rights as Sublessee under the Sublease to Landlord, and Landlord shall simultaneously enter into this Lease with Tenant.

WHEREAS, Landlord and Tenant desire to enter into this Lease in order to set forth the terms and conditions of Tenant's occupancy of the Leased Premises effective as of the date hereof.

WHEREAS, this Lease shall be deemed to be a sub-sublease under the Sublease, with Landlord as sub-sublessor and Tenant as sub-sublessee, until the expiration or earlier termination of the Sublease, which shall automatically, upon the occurrence of the earlier of (i) the date of the Master Lease Expiration or (ii) the earlier termination of the Sublease by mutual written agreement of SunWest N.O.P., Inc. and Tenant and the contemporaneous automatic termination of the Master Lease pursuant to the Amendment to Master Lease (the "Master Lease Termination"), become a direct

1

CO_DOCS_A #63782 v3 WORD97

Lease between the Landlord and Tenant. Prior to expiration or earlier termination of the Sublease, Tenant shall continue to be solely responsible for all obligations as Sublessee under the Sublease, including, but not limited to, the payment of rent and percentage rent to SunWest N.O.P. Inc. as provided in Paragraph 35 below.

WHEREAS it is the parties' desire that Tenant shall from and after the date hereof lease the Leased Premises for a period of twenty (20) years effective as of the date hereof (the "Term") (which may be extended pursuant to the renewal option periods set forth herein), acknowledging that (i) until such time as the Sublease shall have expired or is earlier terminated as set forth herein, Tenant's rights in and to the Leased Premises shall be as a sub-sublessee pursuant to and in accordance with the Sublease, except that Tenant shall also be obligated under all of the terms and conditions of this Lease (the "Subtenancy Term Portion") and (ii) after termination or expiration of the Sublease, Tenant's rights in and to the Leased Premises shall be held as a direct tenant with Landlord pursuant to the terms and conditions hereof.

1.      Demise of Premises. Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term and upon the provisions hereinafter specified the following described property ("Leased Premises"): (i) the lot or parcel of land described in Exhibit "A" attached hereto and made a part hereof, together with the easements, rights and appurtenances thereunto belonging or appertaining ("Land"); (ii) the buildings, structures and other improvements on the Land (collectively, the "Improvements"); and (iii) the machinery and equipment which is attached to the Improvements in such a manner as to become fixtures under applicable law, together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease (collectively, the "Equipment"), excepting therefrom the Trade Fixtures, as provided below.

2.      Certain Definitions.

"Additional Rent" shall mean Additional Rent as defined in Paragraph 32.

"Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining the Leased Premises.

"Alteration" or "Alterations" shall mean any or all changes, additions (whether or not adjacent to or abutting any then existing buildings), expansions (whether or not adjacent to or abutting any then existing buildings), improvements, reconstructions, removals or replacements of any of the Improvements or Equipment, both interior or exterior, and ordinary and extraordinary.

"Basic Rent" shall mean Basic Rent as defined in Paragraph 6.

"Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 6.

2

CO_DOCS_A #63782 v3 WORD97

"Commencement Date" shall mean the Commencement Date as defined in Paragraph 5.

"Condemnation" shall mean a Taking and/or a Requisition, as defined below.

"Default Rate"  shall mean the Default Rate as defined in Paragraph 19(b)(iv).

"Equipment" shall mean the Equipment as defined in Paragraph 1.

"Event of Default" shall mean an Event of Default as defined in Paragraph 19(a).

"Impositions" shall mean the impositions as defined in Paragraph 8.

"Improvements" shall mean the Improvements as defined in Paragraph 1.

"Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when (i) the estimated cost of the Work in any one instance exceeds the sum of Two Hundred Thousand ($200,000.00) Dollars or (ii) reasonably required by Landlord's Lender, and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord or Landlord's Lender.

"Land" shall mean the Land as defined in Paragraph 1.

"Law" shall mean any constitution, statute or rule of law.

"Leased Premises" shall mean the Leased Premises as defined in Paragraph 1.

"Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency

3

(but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions now of record which may be applicable to Tenant, Landlord (with respect to the Leased Premises) or to all or any part of or interest in Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the Americans with Disabilities Act of 1999, as amended, and similar state laws) or results in interference with the use or enjoyment of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

"Lender" shall mean an entity identified as such in writing to Tenant which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of the Mortgage and Note as a result of an assignment thereof.

"Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

"Mortgage" shall mean a first priority mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender of which Tenant has prior written notice.

"Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any reasonable expenses incurred by Landlord in collecting such award.

"Net Proceeds" shall mean the entire proceeds of any insurance required under clauses (i), (iv), (v) or (vi) of Paragraph 14 (a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

"Note" or "Notes" shall mean a promissory note or Notes hereafter executed from Landlord to Lender, which Note or Notes will be secured by a Mortgage and an assignment of leases and rents.

"Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of the date of Landlord's acquisition thereof, excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord), but including any Mortgage or Loan or security documents thereunder between Landlord and Lender.

"Replaced Equipment" or "Replacement Equipment" shall mean the Replaced Equipment and Replacement Equipment, respectively, as defined in Paragraph 11(d).

4

CO_DOCS_A #63782 v3 WORD97

"Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"Restoration" shall mean the Restoration as defined in Paragraph 13(c)(i).

"State" shall mean the State or Commonwealth in which the Leased Premises is situated.

"Taking" shall mean any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

"Term" shall mean the Term as defined in Paragraph 5.

"Termination Date" shall mean the Termination Date as defined in Paragraph 13(b)(i)(A).

"Trade Fixtures" shall mean all fixtures, equipment and other items of personal property (whether or not attached to the Improvements) which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

3.    Title and Condition.

(a)    The Leased Premises are demised and let subject to (i) the Permitted Encumbrances, (ii) all Legal Requirements and Insurance Requirements, including any existing violation of any thereof, and (iii) the condition of the Leased Premises as of the commencement of the Term; without any representation or warranty by Landlord; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b)    LANDLORD HAS NOT MADE AND WILL NOT MAKE ANY INSPECTION OF ANY OF THE LEASED PREMISES, AND LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES "AS IS", AND TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO ITS FITNESS FOR USE OR PURPOSE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, AS TO THE QUALITY OF

5

CO_DOCS_A #63782 v3 WORD97

THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, AS TO
LANDLORD'S TITLE THERETO, OR AS TO VALUE, COMPLIANCE WITH
SPECIFICATIONS, LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY,
DESCRIPTION, DURABILITY OR OPERATION, IT BEING AGREED THAT ALL RISKS
INCIDENT THERETO ARE TO BE BORNE BY TENANT. Tenant acknowledges that
the Leased Premises are of its selection and to its specifications, and that the Leased
Premises have been previously occupied by and inspected by Tenant and are
satisfactory to it. In the event of any defect or deficiency in any of the Leased Premises
of any nature, whether patent or latent, Landlord shall not have any responsibility or
liability with respect thereto or for any incidental or consequential damages (including
strict liability in tort). The provisions of this Paragraph 3 (b) have been negotiated, and
the foregoing provisions are intended to be a complete exclusion and negation of any
warranties by Landlord, express or implied, with respect to any of the Leased Premises,
arising pursuant to the uniform commercial code or any other Law now or hereafter in
effect or otherwise.

(c)    Tenant acknowledges and agrees that Tenant has examined the
title to the Leased Premises prior to the execution and delivery of this Lease and has
found such title to be satisfactory for the purposes contemplated by this Lease.

(d)    Landlord hereby assigns, without recourse or warranty whatsoever,
to Tenant, all warranties, guaranties and indemnities, express or implied, and similar
rights which Landlord may have against any manufacturer, seller, engineer, contractor
or builder in respect of any of the Leased Premises, including, but not limited to, any
rights and remedies existing under contract or pursuant to the Uniform Commercial
Code (collectively, the "guaranties"). Such assignment shall remain in effect until the
termination of this Lease. Landlord shall also retain the right to enforce any guaranties
assigned in the name of Tenant upon the occurrence of an Event of Default. Landlord
hereby agrees to execute and deliver at Tenant's expense such further documents,
including powers of attorney, as Tenant may reasonably request in order that Tenant
may have the full benefit of the assignment effected or intended to be effected by this
Paragraph 3 (d). Upon the termination of this Lease, the guaranties shall automatically
revert to Landlord. The foregoing provision of reversion shall be self-operative and no
further instrument of reassignment shall be required. In confirmation of such
reassignment Tenant shall execute and deliver promptly any certificate or other
instrument which Landlord may request. Any monies collected by Tenant under any of
the guaranties after the occurrence of and during the continuation of an Event of
Default shall be held in trust by Tenant and promptly paid over to Landlord.

(e)    Landlord agrees to enter into, at Tenant's expense, such
easements, covenants, waivers, approvals or restrictions for utilities, parking or other
matters as desirable for operation of the Leased Premises or properties adjacent
thereto (collectively, "Easements") as reasonably requested by Tenant, subject to
Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld
or delayed; provided, however, that no such Easement shall result in any diminution in

6

the value or utility of the Leased Premises for use as a retail site and further provided that no such Easement shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property, each of which Tenant shall certify to Landlord and Lender in writing delivered with Tenant's request with respect to such Easement. Tenant's request shall also include Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as principal and not merely as a surety or guarantor notwithstanding the establishment of any Easement. Tenant shall be obligated to pay any costs incurred by Landlord or Lender to review such Easements. If Landlord or Lender shall fail to approve or disapprove the form of any such Easements, within a period of thirty (30) days from their respective receipt of same, then Landlord or Lender, shall be deemed to have approved the form of any such Easement.

(f)     Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises hereunder and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises, herein referred to collectively as the "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the Term of this Lease. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord against any claim, loss or damage suffered by Landlord by reason of Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as hereinabove provided during the Term of this Lease.

4.     Use of Leased Premises; Quiet Enjoyment.

(a)     Tenant may use the Leased Premises as a retail store or for any other lawful purpose so long as such other lawful purpose would not (i) have a material adverse effect on the value of the Leased Premises, (ii) materially increase (when compared to use as a retail store) the likelihood that Tenant or Landlord would incur liability under any provisions of the Act referred to in Paragraph 26 of this Lease, or (iii) result in or give rise to any environmental deterioration or degradation of the Leased Premises. In no event shall the Leased Premises be used for any purpose which shall violate any of the provisions of any Permitted Encumbrance or any covenants, restrictions or agreements hereafter created by or consented to by Tenant applicable to the Leased Premises, or any Legal Requirements. Tenant agrees that with respect to the Permitted Encumbrances and any covenants, restrictions or agreements hereafter created by or consented to by Tenant, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by Landlord.

(b)     Subject to Tenant's rights under Paragraph 18 hereof, Tenant shall not permit any unlawful occupation, business or trade to be conducted on the Leased Premises or any use to be made thereof contrary to applicable Legal Requirements or

7

Insurance Requirements. Subject to Tenant's rights under Paragraph 18, Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (ii) affect the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, or (iii) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 12 hereof.

(c)     Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants to do no act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

5.     Term.

(a)     Subject to the provisions hereof Tenant shall have and hold the Leased Premises for an initial term commencing on August ____,2000 (the "Commencement Date") and ending on August ____, 2020 (the "Expiration Date") (such initial term, together with any Renewal Term, hereinafter defined, which comes into effect as hereinafter provided, is herein called the "Term"). Notwithstanding the foregoing, until such time as the Sublease shall have expired or is earlier terminated, Tenant's rights in the Leased Premises shall be as a sublessee pursuant to the Sublease (subject to Tenant's obligation nonetheless to pay the Basic Rent to Landlord pursuant to Paragraph 6(a) hereof and to be bound by Paragraph 35 hereof during the Sublease Term Portion) and thereafter but not later than December 31, 2002, Tenant's rights in and to the Leased Premises shall be as a direct tenant with Landlord pursuant to the terms and conditions of this Lease.

(b)     Provided this Lease shall not have been terminated pursuant to the provisions of Paragraphs 13(b) or 19, this Lease and the Term shall be automatically extended for that number of consecutive renewal terms set forth in Exhibit "B" attached hereto and made a part hereof (each, "Renewal Term") each for the duration set forth in Exhibit "B" upon condition that Tenant may cancel any Renewal Term by giving notice ("Renewal Term Cancellation Notice") to Landlord in writing at least six (6) months prior to the expiration of the then current Term. If Tenant does not timely give to Landlord a Renewal Term Cancellation Notice, the date by which Tenant may give such Renewal Term Cancellation Notice to Landlord shall be extended to the date occurring ten (10) days after the date on which Landlord shall have given to Tenant a written notice reciting the provisions of this Paragraph 5(b). Upon the giving of a Renewal Term Cancellation Notice this Lease and the Term shall terminate and come to an end as of the later of (i) the ninetieth (90th) day following the giving of the Renewal Term Cancellation Notice, or (ii) the last day of the then current Term (and if the effect of this sentence is to extend the Term it shall be so extended on the terms and conditions and for the Rent in effect for the Term then expiring). Any Renewal Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and

8

CO_DOCS_A #63782 v3 WORD97

effect, except that the Basic Rent for each Renewal Term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof. If Tenant shall timely give a Renewal Term Cancellation Notice, then all options with regard to subsequent Renewal Terms shall expire and be null and void.

6.   Rent.

(a)   Tenant shall pay to Landlord (or to Lender, if directed by Landlord), as minimum annual rent for the Leased Premises during the Term, the amounts set forth in Exhibit "B" attached hereto ("Basic Rent") and for the specified time periods, commencing on the Commencement Date for the balance of such month and continuing on the first day of each month thereafter during the Term, (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Lender by wire transfer in immediately available federal funds to such account in such bank as Lender shall designate, from time to time.

(b)   Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

(c)   Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement. Each party shall reflect the transactions represented by this Lease in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

7.   Net Lease; Non-Terminability.

(a)   This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid, except as otherwise expressly set forth in this Lease, without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

(b)   Except as otherwise expressly provided in this Lease, this Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term. Except as may otherwise expressly provided in this Lease, Tenant shall not

9

CO_DOCS_A #63782 v3 WORD97

be entitled to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease; and except as otherwise expressly provided in this Lease, the obligations of Tenant under this Lease shall not be affected by any interference with Tenant's use of any of the Leased Premises for any reason, including but not limited to the following: (i) any damage to or destruction of any of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of any of the Leased Premises, (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of any of the Leased Premises other than pursuant to an express provision of this Lease, (vi) any default on the part of Landlord under this Lease or under any other agreement, (vii) any latent or other defect in, or any theft or loss of any of the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Equipment, (ix) any violation of Paragraph 4 (c) by Landlord, or (x) any other cause, whether similar or dissimilar to the foregoing, any present or future Law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events (or, in lieu thereof, Tenant shall pay amounts equal thereto), and that the obligations of Tenant under this Lease shall continue unaffected, unless this Lease shall have been terminated pursuant to an express provision of this Lease.

(c)     Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise.

(d)     This Lease is the absolute and unconditional obligation of Tenant. Tenant waives all rights which are not expressly stated in this Lease but which may now or hereafter otherwise be conferred by Law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, (ii) to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided in this Lease, and (iii) for any statutory lien or offset right against Landlord or its property.

CO_DOCS_A #63782 v3 WORD97

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
                                        Document    Page 68 of 123
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
                        Document    Page 18 of 73
                        Certification of Jeff Oberg    Page 17 of 80

8.    Payment of Impositions; Compliance with Legal Requirements and Insurance
      Requirements

(a)    (i)    Subject to the provisions of Paragraph 18 hereof relating to contests, Tenant shall, before interest or penalties are due thereon, pay and discharge (all of the following being herein collectively called the "Impositions"):  all taxes of every kind and nature (including real, *ad valorem*, personal property, gross income, franchise, withholding, profits and gross receipts taxes) on or with respect to the Leased Premises; all charges and/or taxes for any easement or agreement maintained for the benefit of the Leased Premises; all general and special assessments, levies, permits, inspection and license fees on or with respect to the Leased Premises; all water and sewer rents and other utility charges on or with respect to the Leased Premises; all ground rents on or with respect to the Leased Premises; and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed or assessed upon or with respect to the Leased Premises, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.  If received by Landlord, Landlord shall promptly deliver to Tenant any bill or invoice with respect to any Imposition.

(ii)    Nothing herein shall obligate Tenant to pay, and the term "Impositions" shall exclude, federal, state or local (A) transfer taxes as the result of a conveyance by (or suffered by) Landlord, (B) franchise, capital stock or similar taxes if any, of Landlord, (C) income, excess profits or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (D) any estate, inheritance, succession, gift, capital levy or similar taxes, unless the taxes referred to in clauses (B) and (C) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant.  In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments which become due and payable during the Term.  Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions.  Tenant shall deliver to Landlord and to Lender, within twenty (20) days after Landlord's written request therefor, copies of all settlements and notices pertaining to the Impositions which may be issued by any governmental authority and receipts for payments of all Impositions made during each calendar year of the Term, within thirty (30) days after payment.

11

(b)     Subject to the provisions of Paragraph 18 hereof, Tenant shall promptly comply with and conform to all of the Legal Requirements and Insurance Requirements.

9.     Liens; Recording and Title.

(a)     Subject to the provisions of Paragraph 18 hereof, Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on the Leased Premises, on the Basic Rent, Additional Rent or on any other sums payable by Tenant under this Lease, (other than the Mortgage), the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord or those claiming by, through or under Landlord (except Tenant). Notice is hereby given that Landlord shall not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding any of the Leased Premises through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to any of the Leased Premises.

(b)     Upon written request from one to the other, Landlord and Tenant shall execute, acknowledge and deliver to the other a written Memorandum of this Lease to be recorded, at Tenant's sole cost, in the appropriate land records of the jurisdiction in which the Leased Premises is located, in order to give public notice and protect the validity of this Lease. In the event of any discrepancy between the provisions of said recorded Memorandum of this Lease and the provisions of this Lease, the provisions of this Lease shall prevail.

(c)     Nothing in this Lease and no action or inaction by Landlord shall be deemed or construed to mean that Landlord has granted to Tenant any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest or lien in or upon the estate of Landlord in any of the Leased Premises.

10.     Indemnification.

(a)     Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from the Leased Premises or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of the Leased Premises, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon, whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said injury, death, loss, damage or other claim; except to the extent that any such liability, loss, damage,

12

CO_DOCS_A #63782 v3 WORD97

penalty, cost, expense, cause of action, suit, claim, demand or judgment is the result of the gross negligence of Landlord or the intentional wrongful act of Landlord. In case any action or proceeding is brought against Landlord by reason of any such claim against which Tenant has agreed to defend, pay, protect, indemnify, save and hold harmless pursuant to the preceding sentence, Tenant covenants upon notice from Landlord to resist or defend Landlord in such action, with the expenses of such defense paid by Tenant, and Landlord will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.

(b)     The obligations of Tenant under this Paragraph 10 shall survive any termination of this Lease.

11.     <u>Maintenance and Repair</u>.

(a)     Except for any Alterations that Tenant is permitted to make pursuant to this Lease, Tenant shall at all times, including any Requisition period, put, keep and maintain the Leased Premises (including, without limitation, the roof, landscaping, walls, footings, foundations and structural components of the Leased Premises) and the Equipment in the good condition and order of repair, except for ordinary wear and tear, and shall promptly make all repairs and replacements of every kind and nature, whether foreseen or unforseen, which may be required to be made upon or in connection with the Leased Premises in order to keep and maintain the Leased Premises in the order and condition required by this Paragraph 11(a). Tenant shall do or cause others to do all shoring of the Leased Premises or of foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the Leased Premises, whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may be provided for in any Law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to insurance proceeds or condemnation awards for Restoration pursuant to Paragraphs 13(c) and 14(g) of this Lease. Tenant shall, in all events, make all repairs for which it is responsible hereunder promptly upon receipt of insurance proceeds, thereafter and all repairs shall be in a good, proper and workmanlike manner.

(b)     In the event that any Improvement shall violate any Legal Requirements or Insurance Requirements and as a result of such violation enforcement action is threatened or commenced against Tenant or with respect to the Leased Premises, then Tenant, at the request of Landlord, shall either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such violation, whether the same shall affect Landlord, Tenant or both, or (ii) take

13

such action as shall be necessary to remove such violation, including, if necessary, any Alteration. Any such repair or Alteration shall be made in conformity with the provisions of Paragraph 12.

(c)     If Tenant shall be in default under any of the provisions of this Paragraph 11, Landlord may after thirty (30) business days written notice given to Tenant and failure of Tenant to cure during said period, but without notice in the event of an emergency, do whatever is necessary to cure such default as may be appropriate under the circumstances for the account of and at the expense of Tenant. In the event of an emergency Landlord shall notify Tenant of the situation by phone or other available communication. All reasonable sums so paid by Landlord and all reasonable costs and expenses (including, without limitation, attorneys' fees and expenses and costs incurred by Landlord under the Mortgage as a result of such default by Tenant) so incurred, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

(d)     Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of the Equipment (the "Replaced Equipment") which shall have become worn out or unusable for the purpose for which it is intended, been taken by a Condemnation as provided in Paragraph 13, or been lost, stolen, damaged or destroyed as provided in Paragraph 14. Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of Equipment or Replaced Equipment or other personal property of Tenant or the installation of Replacement Equipment. All Replacement Equipment shall become the property of Landlord, shall be free and clear of all liens and rights of others and shall become a part of the Equipment as if originally demised herein.

12.    Alterations.

(a)     Tenant shall not make any Alterations which would (after the completion thereof) impair the structural integrity of the Leased Premises, without Landlord's written consent, which consent Landlord agrees not unreasonably to withhold or delay, or without Lender's consent if required under the Mortgage. Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following subparagraph (b). Anything herein to the contrary notwithstanding, Tenant agrees that Tenant shall, within eighteen (18) months following the Commencement Date, remodel the Leased Premises, the costs of which (including reasonable soft costs, fixtures, signage and related third-party costs and expenses) shall be not less than Five Hundred ($500,000.00) Thousand Dollars.

(b)     In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration:  (i) the fair market value of the Leased Premises shall not be lessened in

14

CO_DOCS_A #63782 v3 WORD97

any material respect after the completion of any such Alteration, or its structural integrity impaired; (ii) the Alteration and any Alteration theretofore made or thereafter to be made shall not in the aggregate reduce the gross floor area of the Improvements by more than ten percent (10%); (iii) all such Alterations shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements; (iv) all work done in connection with any such Alteration shall comply with all Insurance Requirements; (v) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall (subject to the provisions of Paragraph 18 hereof) discharge all liens filed against any of the Leased Premises arising out of the same; (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration; (vii) all such Alterations shall be the property of Landlord and shall be subject to this Lease; and (viii) all Alterations shall be made in the case of any Alteration the estimated cost of which in any one instance exceeds Two Hundred Thousand Dollars ($200,000) under the supervision of an architect or engineer and, in accordance with plans and specifications which shall be submitted to Landlord (for informational purposes only) prior to the commencement of the Alterations.

13.    Condemnation.

         (a)    Tenant, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding. Landlord, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings. Subject to the provisions of this Paragraph 13 and Paragraph 15, Tenant hereby irrevocably assigns to Landlord or Lender, in that order, any award or payment in respect of any Condemnation of Landlord's interest in the Leased Premises, except that (except as hereinafter provided) nothing in this Lease shall be deemed to assign to Landlord or Lender any award relating to the Tenant's  leasehold interest created by this Lease or any award or payment on account of the Trade Fixtures, moving expenses and out-of-pocket expenses incidental to the move, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, it being agreed, however, that Tenant shall in no event be entitled to any payment that reduces the award to which Landlord is or would be entitled for the condemnation of Landlord's interest in the Leased Premises. Notwithstanding the foregoing, Tenant shall be entitled to any award or payment on account of Tenant's leasehold interest under this Lease only in the event of a Condemnation described in Paragraph 13(b)(i)(A) and then only to the extent that when such award, added to all other awards to which Tenant is entitled hereunder, is subtracted from the entire award in respect to all interests in the Leased Premises, the remainder exceeds the amount set forth on Exhibit "D" attached hereto and made a part hereof.

15

CO_DOCS_A #53782 v3 WORD97

(b)   (i)   (A)   If (I) the entire Leased Premises or (II) at least ten percent (10%) of the applicable Land or the building constructed on the Land or any means of ingress, egress or access to the Leased Premises, the loss of which even after Restoration would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant at the Leased Premises, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than ninety (90) days after a Taking has occurred, serve notice ("Tenant's Termination Notice") upon Landlord of Tenant's intention to terminate this Lease on any Basic Rent Payment Date specified in such Tenant's Termination Notice, which date (the "Termination Date") shall be no sooner than the first Basic Rent Payment Date occurring at least thirty (30) days after the date of such Tenant's Termination Notice.

(B)   In the event that during the Term, Tenant shall serve a Tenant's Termination Notice upon Landlord, Tenant shall, as part of such Tenant's Termination Notice offer (which offer may be rejected by Landlord as set forth below) to purchase the Leased Premises and the award (or if no part of the Leased Premises shall remain, the entire award) for the applicable price (the "Purchase Price") computed in accordance with the schedule annexed hereto and marked Exhibit "C" plus all other amounts which may be due and owing to Lender or Landlord by reason of any default by Tenant in complying with its obligations under this Lease (the "Additions to Purchase Price").

(C)   If Landlord and Lender shall not elect to accept Tenant's offer to purchase, Landlord shall give notice thereof to Tenant within thirty (30) days after the giving of Tenant's Termination Notice.

(D)   Should an offer to purchase not be accepted by Landlord this Lease shall be terminated as above provided and the entire award made in the Condemnation proceeding with respect to the Leased Premises shall be paid to Landlord.

(ii)   In the event that Landlord shall accept or be deemed to have accepted Tenant's offer to purchase title shall close and Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and in such event Tenant shall be entitled to and shall receive any and all awards with respect to the Leased Premises then or thereafter made in the Condemnation proceeding and Landlord shall assign (or in case of any award previously made, deliver to Tenant on the Closing Date) such award as may be made with respect to the Leased Premises. In the event Landlord shall accept Tenant's offer to purchase with respect to the Leased Premises, or be deemed to have accepted such Tenant's offer, title shall close thirty (30) days after the Termination Date hereinbefore defined (the "Closing Date"), at noon at the local office of Landlord's counsel, or at such other time and place as the parties hereto may agree upon, this Lease shall be automatically extended to and including the Closing Date (or, if applicable the extended Closing Date hereinafter described) and

16

CO_DOCS_A #63782 v3 WORD97

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 74 of 123
Document    Page 24 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 23 of 80

Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediate funds to such account or accounts and in such bank or banks as Landlord shall designate, upon delivery of a special warranty deed (or local equivalent) conveying the Leased Premises and all other required documents including an assignment of any award in connection with the taking of the Leased Premises. The special warranty deed (or local equivalent) shall convey title, free from encumbrances other than (A) Permitted Encumbrances, (B) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (C) any installments of Impositions then affecting the Leased Premises, and (D) this Lease. The Purchase Price and Additions to Purchase Price payable as hereinabove provided shall be charged or credited, as the case may be, on the Closing Date, to reflect adjustments of Basic Rent paid or payable to and including the Closing Date, apportioned as of the Closing Date. Tenant shall pay all conveyance, transfer, sales and like taxes required in connection with the purchase, regardless of who is required to pay such taxes under State or local law or custom (and Tenant shall also pay to Landlord any amount necessary to yield to Landlord the entire Purchase Price and Additions to Purchase Price if as a matter of the Law of the State or locality such tax cannot be paid directly by Tenant). If there be any liens or encumbrances against the Leased Premises which Landlord is obligated to remove, upon request made a reasonable time at or before the Closing Date, Landlord shall provide at the Closing funds for the foregoing, payable to the holder of such lien or encumbrances, which funds may be paid from its proceeds at such Closing.

(iii)    In the event that during any Renewal Term, Tenant shall serve a Tenant's Termination Notice upon Landlord, this Lease and the Term hereof shall terminate on the Termination Date specified in the Termination Notice; and in such event the entire award to be made in the Condemnation proceeding shall be paid to Landlord.

(c)    (i)    In the event of a Condemnation of any part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be retained by Landlord; and promptly after such Condemnation, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to its value, condition and character immediately prior to such Condemnation, in accordance with the provisions of this Lease, including but not limited to the provisions of Paragraphs 11(a), 12 and 15 (such restoration following a Condemnation and restoration following a casualty is, as the context shall require, herein called a "Restoration").

(ii)    Upon the payment to Landlord of the Net Award of a Taking which falls within the provisions of this Paragraph 13(c), Landlord shall, to the extent received, make that portion of the Net Award equal to the cost of Restoration (the "Restoration Award") available to Tenant for Restoration, in accordance with the provisions of Paragraph 15, and promptly after completion of the Restoration, the

17

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 75 of 123
Document    Page 25 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 24 of 80

balance of the Net Award shall be paid to Tenant and all Basic Rent, Additional Rent and other sums payable hereunder shall continue unabated and unreduced.

        (iii)    In the event of a Requisition of the Leased Premises, Landlord shall apply the Net Award of such Requisition, to the extent available, to the installments of Basic Rent, Additional Rent or other sums payable by Tenant hereunder thereafter payable and Tenant shall pay any balance remaining thereafter. Upon the expiration of the Term, any portion of such Net Award which shall not have been previously credited to Tenant on account of the Basic Rent and Additional Rent shall be retained by Landlord.

        (d)    Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Paragraph 13 (a), 13 (b) and 13 (c), no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, which consent shall not be unreasonably withheld or delayed.

14.    <u>Insurance</u>.

        (a)    Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

        (i)    Insurance against loss or damage to the Improvements and Equipment under a fire and broad form of all risk extended coverage insurance policy (which shall include flood insurance if the Leased Premises is located within a flood hazard area and which shall include earthquake insurance if the Leased Premises is located in an area where earthquake insurance is customarily maintained for similar commercial properties).| Such insurance shall be in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable) as determined from time to time at Lender's request but not more frequently than once in any 12-month period, by agreement of Landlord, Lender and Tenant, or if not so agreed, at Tenant's expense, by the insurer or insurers or by an appraiser approved by Landlord. Such insurance policies may contain reasonable exclusions and deductible amounts reasonably acceptable to Landlord and acceptable to Lender.

        (ii)    Contractual and commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Leased Premises, which insurance shall be written on a so-called "<u>Occurrence Basis</u>," and shall provide minimum protection with a combined single limit in an amount not less than the greater of (x) Five Million ($5,000,000) Dollars (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord or Lender may reasonably request) or (y) the aggregate amount of

18

such insurance carried by Tenant, for bodily injury, death and property damage in any one occurrence.

(iii)    Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises.

(iv)    During periods of war or national emergency, war risk insurance in an amount not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable), when and to the extent obtainable from the United States Government or an agency thereof at reasonable cost.

(v)    Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus located in or about the Improvements in an amount not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable).

(vi)    Such additional and/or other insurance with respect to the Improvements located on the Leased Premises and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements similar in character, location and use and occupancy to the Improvements located on the Leased Premises, and as required by Lender in the Mortgage.

(b)    During such time as (i) no Event of Default is outstanding hereunder, (ii) the tangible net worth of Tenant (or of the guarantor of Tenant's obligations under this Lease) shall be not less than One Hundred Million ($100,000,000.00) Dollars as determined in accordance with generally accepted accounting principles consistently applied, and (iii) Tenant (or the guarantor of Tenant's obligations under this Lease) has a Standard & Poors rating of BBB or better, Tenant may self-insure all or any portion of the coverage referred to in Paragraph 14 (a) (i), (ii), (iii) (v) and (vi), provided that the self insurance program of this section (b) does not violate any Legal Requirements of any state which regulates a Lender domiciled in said state, or does not violate any provision in Landlord's Mortgage.

(c)    Except as otherwise provided in Paragraph 14(b), the insurance required by Paragraph 14(a) shall be written by companies having a claims paying ability rating by Standard & Poors of not less than A-, and all such companies shall be authorized to do an insurance business in the State, or otherwise agreed to by Landlord and Lender. Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease. The insurance policies (i) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (ii) shall (except for the worker's

19

compensation insurance referred to in Paragraph 14 (a) (iii) hereof) name Landlord, Tenant and any Lender as additional insured parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d)    Each insurance policy referred to in clauses (i), (iv), (v) (and (vi) if requested by Lender) of Paragraph 14 (a), shall contain standard non-contributory mortgagee clauses in favor of any Lender which holds a Mortgage on the Leased Premises. Each policy shall provide that it may not be canceled except after thirty (30) days prior notice to Landlord and any Lender. Each policy shall also provide that any losses otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, or (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy.

(e)    Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 14, shall renew or replace each policy, and shall deliver to Landlord and Lender a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy at least thirty (30) days prior to the Policy Expiration Date (as hereinafter defined) of each policy. Each such policy shall provide that it shall not expire until the Landlord and Lender shall receive a notice from the insurer to the effect that a policy will expire on a date (the "Policy Expiration Date") which shall be thirty (30) days following the date of the receipt by Landlord and Lender of such notice. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 14 within five (5) business days of the giving of written notice by Landlord to Tenant, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f)    Anything in this Paragraph 14 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 14(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 14, and the Leased Premises is identified in such blanket policy with assigned coverage in an amount equal to or greater than the amounts specified herein. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender evidence of the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 14.

20

(g)    In the event of any casualty loss exceeding $350,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed, and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Three Hundred Fifty Thousand ($350,000.00) Dollars or less, all proceeds of any insurance required under clauses (i), (iv), (v) (and (vi) if requested by Lender) of Paragraph 14(a) shall be payable to a Trustee, which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant and Landlord each hereby appoints such Trustee as its attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender. In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder. The Net Proceeds of such insurance payment shall be retained by the Trustee and, promptly after such casualty, Tenant, as required in Paragraphs 11(a) and 12, shall commence and diligently continue to perform the Restoration to the Leased Premises. Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for Restoration, in accordance with the provisions of Paragraph 15. Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements and Equipment in accordance with the provisions of Paragraph 11(a) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof. In the event that any damage or destruction shall occur at such time as Tenant shall not have maintained third-party insurance in accordance with Paragraph 14(a)(i),(iv),(v) or (vi), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such insurance program been in effect (the "Tenant Insurance Payment").

15.    Restoration. The Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund"") shall be disbursed by the Trustee in accordance with the following conditions:

(a)    If the cost of Restoration will exceed $350,000, prior to commencement of the Restoration the architects, general contractor(s), and plans and specifications for the Restoration shall be approved by Landlord, which approval shall not be unreasonably withheld or delayed and by Lender if required under the Mortgage; and which approval shall be granted to the extent that the plans and specifications depict a Restoration which is substantially similar to the Improvements and Equipment which existed prior to the occurrence of the Casualty or Taking, whichever is applicable.

21

(b)      At the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged or unbonded.

(c)      Disbursements shall be made from time to time in an amount not exceeding the hard and soft cost of the work and costs incurred since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) partial or full releases of liens or lien waivers, and (3) other reasonable evidence of cost and payment required by Landlord or Lender in order to verify that the amounts disbursed from time to time are represented by work that is completed in place or delivered to the site and free and clear of mechanics' lien claims.

(d)      Each request for disbursement shall be accompanied by a certificate of Tenant describing the work, materials or other costs or expenses, for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work or expense and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been substantially completed and complies with the applicable requirements of this Lease.  Tenant shall also deliver a certificate from the architect of record that the work has been substantially completed in conformance with the plans and all applicable Laws.

(e)      The Trustee may retain ten percent (10%) of the Restoration Fund until the Restoration is at least fifty percent (50%) complete, and thereafter five percent (5%) until the Restoration is complete.

(f)      The Restoration Fund shall be kept in a separate interest-bearing federally insured account by the Trustee or by Lender.

(g)      At all times the undisbursed balance of the Restoration Fund held by Trustee plus any funds contributed thereto by Tenant, at its option, shall be not less than the cost of completing the Restoration, free and clear of all liens.

(h)      In addition, prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord, exceeds the amount of the Net Proceeds, the Restoration Award and Tenant Insurance Payment available for such Restoration, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of

22

Restoration shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.    <u>Subordination to Financing</u>.

    (a)    (i)    Subject to the provisions of Paragraph 16 (a)(ii), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination.

    (ii)    Except as expressly provided in this Lease by reason of the occurrence of an Event of Default, Tenant's tenancy and Tenant's rights under this Lease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Lease be affected, by any default under any Mortgage, and in the event of a foreclosure or other enforcement of any Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any Renewal Term, the rights of Tenant under this Lease shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default has occurred and is continuing. Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force insurance proceeds and Restoration Award shall be permitted to be used for Restoration in accordance with the provisions of this Lease. Notwithstanding an Event of Default, but provided no event of default has occurred under the Qualified Sublease, the provisions of this Paragraph 16 (a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17 herein.

    (b)    At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of a Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16 (a) above, to attorn, from time to time, to any such owner or Lender, upon the terms and conditions of this Lease, for the remainder of the Term. The provisions of this Paragraph 16(c) shall inure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

    (c)    Each of Tenant, any owner and Lender, however, upon demand of the other, hereby agrees to execute, from time to time, instruments in confirmation of the foregoing provisions of Paragraphs 16(a) and 16(b), reasonably satisfactory to the requesting party acknowledging such subordination, non-disturbance

CO_DOCS_A #63782 v3 WORD97

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 53 Filed 05/29/25 Entered 05/29/25 14:57:31    Desc Main
                     Document    Page 81 of 123
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
                     Document    Page 31 of 73
                     Certification of Jeff Oberg    Page 30 of 80

and attornment as are provided in such subsections and setting forth the terms and conditions of its tenancy.

(d)    Each of Tenant, Landlord and Lender agrees that, if requested by any of the others, each shall, without charge, enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a) and Tenant hereby agrees for the benefit of Lender that Tenant will not, (i) without in each case the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, amend or modify the Lease (provided, however, Lender, in Lender's sole discretion may withhold or condition its consent to any amendment or modification which would or could (A) alter in any way the amount or time for payment of any Basic Rent, Additional Rent or other sum payable hereunder, (B) alter in any way the absolute and unconditional nature of Tenant's obligations hereunder or materially diminish any such obligations, (C) result in any termination hereof prior to the end of the initial term, or (D) otherwise, in Lender's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (ii) without the prior written consent of Lender which may be withheld in Lender's sole discretion, cancel or surrender or seek to cancel or surrender the Term hereof, or enter into any agreement with Landlord to do so (the parties agreeing that the foregoing shall not be construed to affect the rights or obligations of Tenant, Landlord or Lender with respect to any termination permitted under the express terms hereof in connection with an offer to purchase the Property following certain events of condemnation as provided in Section 13 hereof), or (c) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.    Assignment, Subleasing.

(a)    Tenant may assign, mortgage or pledge its interest in this Lease and may sublet the Leased Premises in whole or in part, from time to time, without the consent of Landlord provided, however, Tenant and Tenant's Guarantor shall remain primarily liable hereunder. Landlord acknowledges that the Leased Premises are currently subject to the Sublease and hereby ratifies its consent to such Sublease.

(b)    Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease.  No assignment or sublease shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. Notwithstanding any assignment or subletting Tenant shall continue to remain liable and responsible for the payment of the Basic Rent and Additional Rent and the performance of all its other obligations under this Lease.  No assignment or sublease shall impose any obligations on Landlord under this Lease except as otherwise

24

CO_DOCS_A #63782 v3 WORD97

provided in this Lease. (Tenant agrees that in the case of an assignment of the Lease, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such  assignment.  In the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.)

   (c) (i) Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the Leased Premises shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease.  Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord or to the Lender to (A) return or apply any security deposit under such sublease, unless such security deposit shall be transferred and turned over to the Landlord or Lender or their or either of their Successors, (B) expend any sums to make any installations or alterations provided to be made by the Landlord under said sublease or reimburse the Tenant under said sublease for any installations or alterations made by it, (C) be liable for any act or omission of Tenant as sublandlord (or any successor to Tenant as sublandlord) or be subject to any offsets or defense which such subtenant might have against Tenant as sublandlord (or any successor to Tenant as sublandlord), (D) be bound by any rent or additional rent which such subtenant might have paid for more than the current month to any prior landlord, or (E) be bound by any amendment or modification of  the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease. In the event of any Qualified Sublease which shall yield to Tenant any rent in excess of all rent and additional rent payable hereunder (factoring in the first cost of any broker commission, free rent or other like transactional costs borne by Tenant in connection therewith) one-half of such excess shall be payable to Landlord as additional rent.

    (ii) Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant." A "Qualified Sublease" shall be any sublease of all of the  Leased Premises, pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of BBB-, or higher or a Moody's investment grade rating of Baa3, or higher (or equivalent rating of any other nationally recognized statistical rating organization) and was not on

25

credit watch, such sublease to be on the terms and conditions of this Lease (except the Basic Rent or Additional Rent (or both) may be higher), and for a term not to exceed the Term of this Lease, (and if any such Qualified Sublease shall include all or part of any Renewal Term or Renewal Terms, then Tenant shall be conclusively deemed to have irrevocably waived the right to issue a Renewal Term Cancellation Notice as to such Renewal Term or Renewal Terms, which waiver Tenant will confirm in writing to Landlord if requested to do so, except that if thereafter such Qualified Sublease shall terminate prior to its original term and on or before the last day as of which Tenant would otherwise be entitled to issue a Renewal Term Cancellation Notice as to any Renewal Term originally included within the term of such Qualified Sublease, then Tenant's right to issue a Renewal Term Cancellation notice as to such Renewal Term and all subsequent Renewal Terms originally falling within the term of such Qualified Sublease shall be reinstated in accordance with the terms of this Lease) . Such qualified Subleases shall be otherwise subject to Landlord's consent, not to be unreasonably withheld, conditioned or delay.

(iii)   A "Qualified Assignee" shall be any assignee of the Tenant's rights, title and interest under this Lease which, at the time of the assignment to it, had a Standard & Poor's investment grade rating of BBB-, or higher, or a Moody's investment grade rating of Baa3, or higher, (or equivalent rating of any other nationally recognized statistical rating organization) and was not on credit watch and otherwise approved by Landlord, such consent not to be unreasonably withheld conditioned, or delay.

18.   Permitted Contests.

(a)   After prior written notice to Landlord, Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any lien referred to in Paragraphs 9 or 12, or (iv) take any action with respect to any violation referred to in Paragraph 11(b) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the collection of, or other realization upon, the Imposition or lien so contested, (B) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such violation, (C) any interference with the use or occupancy of any of the Leased Premises, (D) any interference with the payment of any Basic Rent or any Additional Rent, and (E) the cancellation of any fire or other insurance policy.

(b)   In no event shall Tenant pursue any contest with respect to any Imposition, Legal Requirement, lien, or violation, referred to above in such manner that exposes Landlord or Lender to (i) criminal liability, penalty or sanction, (ii) any civil liability, penalty or sanction  for which Tenant has not made provisions reasonably

26

acceptable to Landlord and Lender or (iii) defeasance of its interest the Leased Premises.

(c)     Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Lender and Landlord harmless against any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

19.    Conditional Limitations; Default Provisions.

(a)     The occurrence of any one or more of the following events (any such event being specified herein as a "failure" or "default") shall constitute an "Event of Default" under this Lease: (i) a failure by Tenant to make (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity or before any administrative tribunal which had or might have the effect of preventing Tenant from complying with the provisions of this Lease): (x) any payment of Basic Rent which continues unremedied for a period of three (3) business days after written notice ("Nonpayment Notice") thereof given to Tenant by Landlord or Lender or Lender's designee, or (y) any payment of Additional Rent or other sum herein required to be paid by Tenant which continues unremedied for a period of ten (10) business days after a Nonpayment Notice is given to Tenant by Landlord or Lender or Lender's designee; (ii) failure by Tenant to perform and observe, or a violation or breach of, any other provision in this Lease and such default shall continue for a period of thirty (30) business days after written notice thereof is given by Landlord or Lender or Lender's designee to Tenant or if such default is of such a nature that it cannot reasonably be cured within such period of thirty (30) business days, such period shall be extended for such longer time as is reasonably necessary provided that Tenant has commenced to cure such default within said period of thirty (30) business days and is actively, diligently and in good faith proceeding with continuity to remedy such default; (iii) Tenant or any guarantor of Tenant's obligations hereunder shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) or voluntarily consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (C) voluntarily file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (D) voluntarily file a general assignment for the benefit of creditors; (iv) a court shall enter an order, judgment or decree appointing, with the voluntary consent of Tenant or any guarantor of Tenant's obligations hereunder, a receiver or trustee for Tenant or any guarantor of Tenant's obligations hereunder or for the Leased Premises or approving a petition filed against Tenant or any guarantor of Tenant's obligations hereunder which seeks relief under the

27

CO_DOCS_A #63782 v3 WORD97

bankruptcy or other similar laws of the United States or any State, and such order, judgment or decree shall remain in force, undischarged or unstayed, 180 business days after it is entered; (v) Tenant or any guarantor of Tenant's obligations hereunder shall in any insolvency proceedings be liquidated or dissolved or shall voluntarily commence proceedings towards its liquidation or dissolution; or (vi) the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within 180 business days after such levy or attachment.

        (b)    If any Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter, to do any one or more of the following without demand upon or notice to Tenant:

        (i)    Landlord may give Tenant notice (following the occurrence of an Event of Default) of Landlord's intention to terminate this Lease on a date specified in such notice (which date shall be no sooner than thirty (30) days after the date of the notice). Upon the date therein specified, unless the Event of Default for which the termination is effected has been cured by Tenant, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date hereinabove fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder through the date hereinabove fixed for the expiration of the Term, including its liability for Basic Rent and Additional Rent as hereinafter provided.

        (ii)    Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (i) above give Tenant notice (following the occurrence of an Event of Default) to surrender the Leased Premises to Landlord on a date specified in such notice (which date shall be no sooner than thirty (30) days after the date of the notice), at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord unless the Event of Default for which the termination is effected has been cured by Tenant. Upon or at any time after taking possession of the Leased Premises, Landlord may remove any persons or property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal. No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (i) above.

        (iii)    After repossession of any of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord may relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its reasonable discretion, may determine; and Landlord shall collect and receive any rents payable by reason of such reletting. The rents received

28

CO_DOCS_A #63782 v3 WORD97

on such reletting shall be applied (A) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (B) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth above. Landlord may make such Alterations as Landlord in its reasonable discretion may deem advisable. Tenant agrees to pay Landlord, as Additional Rent, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting any of the Leased, Premises, including fees and commissions of attorneys, architects, agents and brokers.

(iv)    Landlord may exercise any other right or remedy now or hereafter existing by law or in equity (other than acceleration of rent, except as expressly set forth in subparagraph (d) below). Landlord shall be entitled to obtain from Tenant interest on any amounts of Basic Rent or Additional Rent not paid when due, at the default interest rate of six percent (6%) per annum above the commercial lending rate of Lender or such other commercial lending rate designated by Landlord, but not exceeding any interest rate specified by State Law for such unpaid amounts (the "Default Rate").

(c)    In the event of any expiration or termination of this Lease or repossession of any of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord Basic Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages: (i) Basic Rent, Additional Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to paragraph 19 (b) (iii), after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alteration and expenses of preparation for reletting). Tenant hereby agrees to be and remain liable for all sums aforesaid and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such

29

damages. Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(d)    At any time after such expiration or sooner termination of this Lease pursuant to Paragraph 19 or pursuant to law or if Landlord shall have reentered the Leased Premises, as the case may be, whether or not Landlord shall have recovered any amounts under Paragraph 19(b)(iii) or 19(c), Landlord shall be entitled to recover from Tenant and Tenant shall pay to Landlord, on demand, as and for liquidated and agreed final damages for Tenant's default, the amount by which the Basic Rent, and all Additional Rent reserved hereunder for the unexpired portion of the Term demised herein as if the Lease had not expired or been terminated exceeds the then fair and reasonable rental value of the Leased Premises for the same period, discounted to present worth at the annual rate of seven percent (7%), minus any such monthly deficiencies previously recovered from Tenant under Paragraph 19(b)(iii) if applicable to such period.

(e)    If any statute or rule of law governing a proceeding in which such liquidated final damages provided for in Paragraph 19(d) are to be proved shall validly limit the amount thereof to an amount less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

20.    Additional Rights of Landlord and Tenant.

(a)    No right or remedy conferred upon or reserved to Landlord in this Lease is intended to be exclusive of any other right or remedy; and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease. No delay or failure by Landlord or Tenant to enforce its rights under this Lease shall be construed as a waiver, modification or relinquishment thereof. In addition to the other remedies provided in this Lease, Landlord and Tenant shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)    Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, any right and privilege which it or any of them may have under any present or future law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof.

(c)    Landlord hereby waives any right to distrain or levy upon Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is

30

CO_DOCS_A #63782 v3 WORD97

created or otherwise. Landlord agrees at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant.

(d)    Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that the Trade Fixtures are Tenant's property and not part of the Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

(e)    Each of Tenant and Landlord (herein called "Paying Party") agrees to pay to the other party (herein called "Demanding Party") any and all reasonable costs and expenses incurred by the Demanding Party in connection with any litigation or other action instituted by the Demanding Party to enforce the obligations of the Paying Party under this Lease, to the extent that the Demanding Party has prevailed in any such litigation or other action. Any amount payable by Tenant to Landlord pursuant to this Paragraph 20(e) shall be due and payable by Tenant to Landlord as Additional Rent. No sum payable by Landlord to Tenant under this subparagraph will be payable or recoverable from any sums pledged or assigned (or intended to have been pledged or assigned) by Landlord to Lender, Tenant's right to recover such sums from Landlord being subordinate to the rights of Lender, such sums only being recoverable after payment to Lender in full of the Loan as constituted on the date hereof. As used in this Paragraph, "costs and expenses" shall include, without limitation, reasonable attorneys' fees at trial, on appeal and on any petition for review, and in any proceeding in bankruptcy, in addition to all other sums provided by law.

21.    Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after having been sent by Federal Express, United Parcel or other nationally recognized air courier service.

To the Addresses stated below:

If to Landlord:
c/o Flatirons Development Corporation
1444 Wazee Suite 120
Denver, CO 80202

31

CO_DOCS_A #63782 v3 WORD97

With a copy to:
Ms. Rebecca Dow, Esquire
Ballard Spahr Andrews & Ingersoll
1225 17th St., Suite 2300
Denver, CO 80202

If to Tenant:
c/o Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011
Attn: Secretary

With a copy to:
Mark A. Drogalis, Esq.
Law Offices of Eric A. Heinz, P.C.
1835 Market Street, Suite 1215
Philadelphia, PA 19103

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and states in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall send a copy of such Notice to Lender in the manner aforesaid. For the purposes of this Paragraph 21, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above. Any Notice may be given on behalf of any party by its counsel.

22.  Estoppel Certificates.  Landlord and Tenant shall at any time and from time to time, upon not less than twenty (20) days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent, payable hereunder has been paid, (iii) that to the knowledge of the signer of such certificate no default by either Landlord or Tenant exists hereunder or specifying each such default of which the signer may have knowledge, (iv) the remaining Term hereof, (v) with respect to a certificate signed on behalf of Tenant, that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said signer's knowledge, specifying and describing the same , and (vi) such other matters as may reasonably be requested by the party requesting the certificate.  It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective purchaser, assignee or subtenant of the Leased Premises.

32

CO_DOCS_A #63782 v3 WORD97

23.    Surrender and Holding Over.

(a)    Upon the expiration or earlier termination of this Lease,
Tenant shall peaceably leave and surrender the Leased Premises (except as to any
portion thereof with respect to which this Lease has previously terminated) to Landlord.
Tenant shall remove from the Leased Premises on or prior to such expiration or earlier
termination the Trade Fixtures and personal property which is owned by Tenant or third
parties other than Landlord, and Tenant at its expense shall, on or prior to such
expiration or earlier Termination, repair any damage caused by such removal. Trade
Fixtures and personal property not so removed at the end of the Term or within thirty
days after the earlier termination of the Term for any reason whatsoever shall become
the property of Landlord, and Landlord may thereafter cause such property to be
removed from the Leased Premises. The cost of removing and disposing of such
property and repairing any damage to any of the Leased Premises caused by such
removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be
obligated to reimburse Tenant for any property which becomes the property of Landlord
as a result of such expiration or earlier termination.

(b)    Any holding over by Tenant of the Leased Premises after
the expiration or earlier termination of the Term of this Lease or any extensions thereof,
with the consent of Landlord, shall operate and be construed as tenancy from month to
month only, at one hundred ten percent (110%) of the Basic Rent reserved herein and
upon the same terms and conditions as contained in this Lease. Notwithstanding the
foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition
to collecting Basic Rent at a rate of one hundred ten percent (110%) thereof, to
exercise all rights and remedies provided by law or in equity, including the remedies of
Paragraph 19 (b).

24.    No Merger of Title. There shall be no merger of this Lease nor of the leasehold
estate created by this Lease with the fee estate in or ownership of any of the Leased
Premises by reason of the fact that the same person, corporation, firm or other entity
may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate
created by this Lease or any interest in this Lease or in such leasehold estate and (b)
the fee estate or ownership of any of the Leased Premises or any interest in such fee
estate or ownership.    No such merger shall occur unless and until all persons,
corporations, firms and other entities having any interest in (i) this Lease or the
leasehold estate created by this Lease and (ii) the fee estate in or ownership of the
Leased Premises or any part thereof sought to be merged shall join in a written
instrument effecting such merger and shall duly record the same.

25.    Definition of Landlord.

(a)    Anything contained herein to the contrary notwithstanding,
any claim based on or in respect of any liability of Landlord under this Lease shall be

33

CO_DOCS_A #63782 v3 WORD97

enforced only against the Landlord's interest in the Leased Premises or the proceeds therefrom and shall not be enforced against the Landlord individually or personally.

(b)    The term "Landlord" as used in this Lease so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

26.    Hazardous Substances.

(a)    Tenant agrees that it will not on, about, or under the Leased Premises, make, release, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 et seq. (the "Act"); but the foregoing shall not prevent the use of any hazardous substances in accordance with applicable laws and regulations. Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local laws, rules or regulations governing "Hazardous Materials". "Hazardous Materials" as used herein shall mean all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 et seq.; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, et seq., any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, et seq., any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et Seq., any substance listed in the United States Department of Transportation Table at 45 CFR l72.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical or other substance regulated by federal, state or local statutes similar to the federal statutes listed above and regulations promulgated under such federal, state or local statutes.

(b)    To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased

34

Premises during the Term. In addition to, and without limiting Paragraph 10 of this Lease Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners, beneficial owners, trustees, members and employees, harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, reasonable attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental law with respect to the Leased Premises or Tenant's or any other person's or entity's prior ownership of the Leased Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) at or from the Leased Premises or any portion or portions thereof, including any past or current release and any release or threatened release during the initial term and any extension or Renewal Term whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the initial term or any extension or Renewal Term.

(c)    The Tenant agrees that it will not install any underground storage tank at the Leased Premises without specific, prior written approval from the Landlord. The Tenant agrees that it will not store combustible or flammable materials on the Leased Premises in violation of the Act or any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27.    Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than two (2) business days except in the case of emergency) to enter the Leased Premises at all reasonable business hours (and at all other times in the event of an emergency): (a) for the purpose of inspecting the same or for the purpose of doing any work under Paragraph 11(c), and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), and (b) for the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within six (6) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.    Intentionally Omitted

29.    No Usury. The intention of the parties being to conform strictly to the applicable usury laws, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

35

CO_DOCS_A #63782 v3 WORD97

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 5 Document 05/29/25 93 of 123 ered 05/29/25 14:57:31    Desc Main
Case 23-18993-MBK    Doc 534-2    Document 11/04/24 Page 43 of 73 ered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 42 of 80

30.    <u>Separability.</u>  Each and every covenant and agreement contained in this Lease is, and shall be construed to be, a separate and independent covenant and agreement, and the breach of any such covenant or agreement by Landlord shall not discharge or relieve Tenant from its obligation to perform the same.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

31.    <u>Miscellaneous.</u>

(a)    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

(b)    As used in this Lease the singular shall include the plural as the context requires and the following words and phrases shall have the following meanings: (i) "<u>including</u>" shall mean "including but not limited to"; (ii) "<u>provisions</u>" shall mean "provisions, terms, agreements, covenants and/or conditions"; (iii) "<u>lien</u>" shall mean "lien, charge, encumbrance; title retention agreement, pledge, security interest, mortgage and/or deed of trust"; and (iv) "<u>obligation</u>" shall mean "obligation, duty, agreement, liability, covenant or condition".

(c)    Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord.  Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense.

(d)    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

(e)    The covenants of this Lease shall run with the Land and bind Tenant, the successors and assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns.

(f)    This Lease will be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes.

(g)    This Lease shall be governed by and construed according to the laws of the State in which the Leased Premises is located.

36

(h)    Wherever the consent or approval of Landlord is required hereunder, Landlord agrees that it will not unreasonably withhold or delay such consent or approval.

32.    Additional Rent.  The term "Additional Rent" as used herein includes all amounts, costs, expenses, liabilities and obligations (including but not limited to Tenant's obligation to pay any Net Awards or Purchase Price hereunder) which Tenant is required to pay pursuant to the terms of this Lease other than Basic Rent.

33.    Intentionally Omitted

34.    Leasehold Mortgages.  Tenant and every successor and assign of Tenant is hereby given the right (exercisable at any time and from time to time) by Landlord, without Landlord's prior consent, to mortgage their interests in this Lease, under one or more leasehold mortgage(s), and to assign this Lease, and all sublease(s) (provided, however, that any assignment of any sublease by Tenant pursuant to this Paragraph 34 is subject and subordinate to the assignment of such sublease set forth in Paragraph 17(c) hereof), as collateral security for such leasehold mortgage(s), upon the condition that all rights acquired under such leasehold mortgage(s) shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease Agreement, and to all rights and interests of Landlord in this Lease Agreement, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the right given to Tenant to mortgage Tenant's interest in this Lease Agreement, except as expressly provided in this Paragraph 34.  If Tenant and/or Tenant's successors and assigns shall mortgage this leasehold and if the holder of any such leasehold mortgage shall send to Landlord notice specifying the name and address of such holder and the pertinent recording data with respect to its leasehold mortgage, then Landlord agrees that the following provisions shall apply to each leasehold mortgage with respect to which such conditions are met (each being herein called a "Leasehold Mortgage"), so long as such Leasehold Mortgage shall remain  unsatisfied of record or until  notice of satisfaction of such Leasehold Mortgage is given by the holder to Landlord:

(a)    There shall be no cancellation, surrender or modification of this Lease Agreement by joint action of Landlord and Tenant without the prior consent in writing of the holder of the Leasehold Mortgage, and no merger shall result from the acquisition by, or devolution upon, any one entity of the fee and leasehold estates in the Leased Premises.

(b)    Landlord shall, upon serving Tenant with any notice of default or other notice provided for in this Lease Agreement, simultaneously serve a copy of such notice upon the holder of the Leasehold Mortgage; and no such notice to Tenant shall be effective unless a copy of such notice is also served on the holder of the Leasehold Mortgage.  The holder of the Leasehold Mortgage shall thereupon have the same period, after service of such notice upon it, to remedy or cause to be

37

Case 25-14861-MBK   Doc 1565   Filed 07/25/25   Entered 07/25/25 10:31:56   Desc Main
Case 25-14861-MBK   Doc 575   Filed 05/29/25   Entered 05/29/25 14:57:31   Desc Main
Document   Page 95 of 123
Document   Page 45 of 73
Case 23-18993-MBK   Doc 5342-2   Filed 11/04/24   Entered 11/04/24 16:00:21   Desc
Certification of Jeff Oberg   Page 44 of 80

remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of the holder of the Leasehold Mortgage as if the same had been done by Tenant.

(c)     If any default by Tenant shall occur which, pursuant to any provision of this Lease Agreement or Law, entitles Landlord to terminate this Lease Agreement, and if, before the expiration of ninety (90) days from the date of service of notice of termination upon the holder of the Leasehold Mortgage, such holder shall have notified Landlord of its desire to nullify such notice and shall have paid to Landlord all Basic Rent and other payments provided for in this Lease which are then in default, and shall have complied (or shall have commenced the work of complying) with all of the other obligations of Tenant under this Lease which are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Lease and any notice of termination theretofore given shall be void and of no effect; and in the event that the holder of more than one Leasehold Mortgage shall desire so to act, the holder of the Leasehold Mortgage which is prior in lien shall have the prior right so to act.

(d)     If any default by Tenant shall occur which, pursuant to any provision of this Lease Agreement or Law, entitles Landlord to terminate this Lease Agreement, and Landlord elects to terminate this Lease Agreement, the holder of the Leasehold Mortgage shall not only have the right to nullify any notice of termination by curing such default, as aforesaid, but shall also have the right to postpone and extend the specified date for the termination of this Lease Agreement as fixed by Landlord in Landlord's notice of termination, for a period of not more than four (4) months, provided that such holder shall cure or cause to be cured any then existing monetary defaults and meanwhile pay the Basic Rent, Additional Rent and comply with and perform all of the other terms, conditions and provisions of this Lease on Tenant's part to be complied with and performed, and provided further that the holder of the Leasehold Mortgage shall forthwith take steps to acquire or sell Tenant's interest in this Lease Agreement by foreclosure of the Leasehold Mortgage or otherwise and shall prosecute the same to completion with due diligence. If at the end of said four (4)-month period the holder of the Leasehold Mortgage shall be actively engaged in steps to acquire or sell Tenant's interest in this Lease Agreement and shall have given notice thereof to Landlord, the time for the holder to comply with the provisions of this subparagraph (d) shall be extended for such period as shall be reasonably necessary to complete such steps with reasonable diligence and continuity, provided that the holder of the Leasehold Mortgage continues to pay or cause to be paid all sums owing by Tenant hereunder and provided further that there is not outstanding and uncured any Event of Default hereunder the continuation of which during such additional period may: (i) threaten Landlord's interest in the Leased Premises (ii) have a material adverse effect on the value of the Leased Premises, (iii) materially increase the likelihood that Tenant, Landlord or Lender would incur liability under any provisions of the Act referred to in Paragraph 26 of this Lease, or (iv) result in or give rise to any material environmental deterioration or degradation of the Leased Premises; such as, for example and without

38

limitation, any failure to insure or any failure to repair or care for the Leased Premises the effect of which is to place the Leased Premises at risk or to increase the ultimate cost of such repair.

(e)     Landlord agrees that in the event of any termination of this Lease Agreement or of any New Lease made pursuant to this Paragraph 34(e) prior to its stated expiration date for any reason whatsoever (including, without limitation, by operation of law or the rejection of this Lease Agreement or any New Lease by Tenant as debtor in possession or any trustee of Tenant in any bankruptcy, reorganization, arrangement or similar proceeding), Landlord shall enter into a new lease ("New Lease") of the Leased Premises with the holder of the Leasehold Mortgage (or its nominee) or, if there be more than one Leasehold Mortgage, then with the holder entitled under Paragraph(e)(iv) (or its nominee), for the remainder of the Term of this Lease, effective as of the date of such termination, at the rent and upon the same terms, provisions, covenants and agreements as contained in this Lease Agreement (including without limitation all renewal options, and rights of first refusal), and subject only to the same conditions of title as this Lease Agreement is subject to on the date of the execution hereof, to liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein to be observed or performed by Tenant and the lien of any Impositions then affecting the Leased Premises, and to other liens or encumbrances created pursuant to this Lease, and to the rights, if any, of any parties then in possession of any part of the Leased Premises, provided:

(i)     The holder (or its nominee) shall make request upon Landlord for such New Lease within sixty (60) days after the date on which the holder has received written notice of the occurrence of such termination.

(ii)     The holder (or its nominee) shall pay to Landlord at the time of the execution and delivery of the New Lease all sums which would at the time of the execution and delivery of the New Lease be due pursuant to this Lease Agreement but for such termination, less the net income collected by Landlord subsequent to the date of termination of this Lease Agreement and prior to the execution and delivery of the New Lease, any excess of such net income over the aforesaid sums to be applied  in payment of the rental thereafter becoming due under the New Lease.

(iii)     If more than one holder makes request upon Landlord in accordance with the provisions of this Paragraph 34 (e), the New Lease shall be delivered to the holder requesting such New Lease whose Leasehold Mortgage is prior in lien and prior in estate, and the request of the holder of any  Leasehold Mortgage which is subordinate in lien shall be void and of no force and effect.

(iv)     Upon the execution and delivery of the New Lease, all subleases which theretofore may have been assigned and transferred to Landlord shall

39

CO_DOCS_A #63782 v3 WORD97

thereupon be assigned and transferred (without recourse) by Landlord to the Tenant under the New Lease; and the Tenant under the New Lease shall have the benefit of all of the right, title, interest, powers and privileges of Tenant under this Lease Agreement in and to the Leased Premises, including specifically assignment of Landlord's interest in and to any then existing sublease where the sublessee may have attorned to Landlord and which, at the time of cancellation or termination of this Lease Agreement, was prior in right to the lien of the holder of the Leasehold Mortgage or which by separate agreement or by its terms had been granted non-disturbance privileges pursuant to the provisions of this Lease Agreement; and Landlord hereby agrees that, with respect to any such sublease so assigned, Landlord will not modify or amend any of the terms or provisions thereof, during the period between the expiration or termination of this Lease Agreement and the execution and delivery of the New Lease.

(v)    Following the termination of this Lease Agreement or any New Lease and until the right of the holders of all Leasehold Mortgages to enter into a New Lease shall have expired without any New Lease having been executed:

(A)    Landlord shall not alter or in any way demolish the buildings or other improvements situate on the Leased Premises; and, during said period, Landlord shall not remove, replace or change any furniture, furnishing, fixtures or equipment located on the Leased Premises.

(B)    Landlord shall not terminate any sublease or the rights of any subtenant under such sublease unless such subtenant shall be in default under such sublease.

(f)    Landlord shall, upon request, execute, acknowledge and deliver to the holder of the Leasehold Mortgage an agreement prepared at the sole cost and expense of Tenant, in form reasonably satisfactory to such holder, between Landlord, Tenant and the holder, agreeing to all of the provisions of this Paragraph 34.

(g)    The term "mortgage", whenever used in this Lease Agreement, shall include whatever security instruments are used in the locality of the Leased Premises, such as, without limitation, mortgages, deeds of trust, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code or successor or similar legislation.

35.    "Bond" Lease during Subtenancy Term Portion.    Tenant hereby acknowledges and agrees that it shall be bound by all terms and conditions of this Lease during the Subtenancy Term Portion; and in addition, shall fully perform and comply with all obligations as Sublessee under the Sublease, and shall indemnify, defend and hold Landlord harmless from any such obligations under the Sublease, including, but not limited to, the payment of rent and percentage rent thereunder to SunWest N.O.P., Inc. during such Subtenancy Term Portion.

40

CO_DOCS_A #63782 v3 WORD97

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
                     Document    Page 98 of 123
                     Document    Page 48 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
                     Certification of Jeff Oberg    Page 47 of 80

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

STATE STREET PARTNERS, LLC

By:_____

      Name: Jeff W. Oberg
      Title: Manager

TENANT:

1515 WEST STATE STREET BOISE IDAHO, LLC

By:_____

      Robert B. Sari
      Vice President - Law

41

CO_DOCS_A #63782 v3 WORD97

EXHIBIT "A"

All of Block 122 of Boise City Original Townsite, according to the official plat thereof, filed in Book 1 of Plats at Page 1, records of Ada County, Idaho.

TOGETHER WITH the vacated alley through said Block 122.

CO_DOCS_A #63782 v3 WORD97

EXHIBIT 'B'

| Term | Annual Basic Rent |
|---|---|
| Initial 20 year Term | $ 311,350 * |
| 1st 5-year Renewal Term | $ 336,752 |
| 2nd 5-Year Renewal Term | $ 361,154 |
| 3rd 5-year Renewal Term | $ 387,556 |
| 4th 5-year Renewal Term | $ 412,958 |
| 5th 5-year Renewal Term | $ 438,360 |
| 6th 5-year Renewal Term | $ 463,762 |

Number of Consecutive Renewal Terms:  Six (6)
Duration of each Renewal Term: Five (5) Years

   * Notwithstanding the foregoing, prior to the Master Lease Termination (during the Sublease Term Portion), the Annual Basic Rent payable by Tenant to Landlord shall be $295,180.00 under this Lease, and Tenant shall continue to pay , as "Sublessee" under the Sublease, all rents, including percentage rent, directly to SunWest N.O.P. required under the Sublease.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has caused this Guaranty to be executed by its duly authorized officer and its corporate seal to be hereunto duly affixed, on this _____16th_____ day of August, 2000.

RITE AID CORPORATION

By: _____
Robert B. Sari
Vice President - Law

STATE OF PENNSYLVANIA    )
                                             :ss
COUNTY OF _Cumberland_    )

On this __16th__ day of __August__ —, 2000, before me, the undersigned, a Notary Public in and for the said county and state, personally appeared Robert B. Sari, who acknowledged himself to be the Vice President of 1515 WEST STATE STREET BOISE IDAHO, LLC, a Delaware limited liability company, and that he, as such Vice President, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the company by himself as Vice President and acknowledged to me that such company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
Residence Address: _30 Hunter Lane_

_Camp Hill, PA    17011_

(S E A L)                                                My Commission Expires: _____

Notarial Seal
Martha K. Hynd, Notary Public
East Pennsboro Twp., Cumberland County
My Commission Expires Apr. 8, 2003
Member, Pennsylvania Association of Notaries

# EXHIBIT B

## CORPORATE GUARANTY

In consideration of and as an inducement for the granting, execution and delivery of that certain Lease, dated August _____, 2000 (hereinafter called "Lease"), by **STATE STREET PARTNERS,LLC**, a Colorado limited liability company, the Landlord therein named (hereinafter called "Landlord"), to **1515 WEST STATE STREET BOISE IDAHO, LLC**, a Delaware limited liability company, the Tenant therein named (hereinafter called "Tenant") with respect to Rite Aid (store number 5413) located in Boise, Idaho and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Landlord to the undersigned, RITE AID CORPORATION, a Delaware corporation (hereinafter called "Guarantor"), Guarantor, intending to be legally bound, hereby guarantees to Landlord the full and prompt payment when due of all Basic Rent and Additional Rent and any and all other sums and charges payable by Tenant under the Lease, and the full, faithful and prompt performance and observance of all the covenants, terms, conditions, and agreements therein provided to be performed and observed by Tenant (the "Obligations"); and Guarantor does hereby become surety to Landlord for and with respect to all of the Obligations.

Guarantor hereby covenants and agrees to and with Landlord that if default shall at any time be made by Tenant in the payment of any such rent or other sums or charges payable by Tenant under the Lease or in the performance of any of the covenants, terms, conditions or agreements contained in the Lease, Guarantor will forthwith pay such rent or other sums or charges to Landlord, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such covenants, terms, conditions and agreements, and will forthwith pay to Landlord all damages and all costs and expenses that may arise in consequence of any default by Tenant under the Lease (including, without limitation, all reasonable attorneys' fees incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty).

This Guaranty is an absolute and unconditional guaranty of payment (and not of collection) and of performance and is a surety agreement. Guarantor's liability hereunder is direct and may be enforced without Landlord being required to resort to any other right, remedy or security and this Guaranty shall be enforceable against Guarantor, without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, and without the necessity of any notice of non-payment, non-performance or non-observance or the continuance of any such default or of any notice of acceptance of this Guaranty or of Landlord's intention to act in reliance hereon or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in nowise be terminated, affected or impaired by reason of the

--

CO_DOCS_A #63782 v3 WORD97                    1

assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

This Guaranty shall be a continuing Guaranty, and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way impaired by (a) any amendment or modification of, or supplement to, or extension or renewal of, the Lease or any assignment or transfer thereof; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or any indulgences, forbearances or extensions of time for performance or observance allowed to Tenant from time to time and for any length of time; (c) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceeding relating to Tenant, or its properties; (d) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal bankruptcy law or any other statute or from the decision of any court; (e) any sublease or transfer by Tenant or any assignment, mortgage or pledge of its interest under the Lease, (f) any termination of the Lease prior to the expiration of its Term; or (g) any agreement entered into between the Landlord and a Qualified Assignee or a Qualified Subtenant or any New Lease or other agreement entered into between Landlord and the holder of any Leasehold Mortgage (or between Landlord and the nominee of any such holder of a Leasehold Mortgage).

All of Landlord's rights and remedies under the Lease and under this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others. No termination of the Lease or taking or recovering of the premises demised thereby shall deprive Landlord of any of its rights and remedies against Guarantor under this Guaranty. This Guaranty shall apply to the Obligations pursuant to any extension, renewal, amendment, modification and supplement of or to the Lease as well as to the Obligations thereunder during the original Term thereof in accordance with the original provisions thereof.

The Guarantor hereby waives any requirement that the Landlord protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right to take any action against any person or any collateral (including any rights relating to marshaling of assets).

The Obligations will be paid strictly in accordance with the terms of the Lease, regardless of the value, genuineness, validity, regularity or enforceability of the Obligations, and of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Landlord with respect thereto.

--

CO_DOCS_A #63782 v3 WORD97                    2

The liability of the Guarantor to the extent herein set forth shall be absolute and unconditional, not subject to any reduction, limitation, impairment, termination, defense, offset, counterclaim or recoupment whatsoever (all of which are hereby expressly

Guarantor further agrees that, to the extent that the Tenant or the Guarantor makes a payment or payments to the Landlord, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to the Tenant or the Guarantor or their respective estate, trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, this Guaranty and the advances or part thereof which have been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the date of such initial payment, reduction or satisfaction occurred.

Guarantor shall have no rights (direct or indirect) of subrogation, contribution, reimbursement, indemnification or other rights of payment or recovery from any person or entity (including, without limitation, the Tenant) for any payments made by the Guarantor hereunder, and Guarantor hereby waives and releases absolutely and unconditionally, any such rights of subrogation, contribution, reimbursement, indemnification and other rights of recovery which it may now or hereafter acquire.

Guarantor represents and warrants to Landlord that (a) the execution and delivery of this Guaranty has been duly authorized by the Board of Directors of Guarantor, (b) the making of this Guaranty does not require any vote or consent of shareholders of Guarantor and (c) Tenant is a wholly owned subsidiary of Guarantor.

This Guaranty shall be legally binding upon Guarantor and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns. Reference herein to Tenant shall be deemed to include Tenant and its successors and assigns. The terms and provisions of this Guaranty shall be governed by the laws of the Commonwealth of Pennsylvania.

Guarantor will not enter into any amendment to this Guaranty, and no such amendment will be effective in any event, without the prior written consent thereto by the Lender (as defined in the Lease), promptly following request of Landlord or Lender, confirm in wiring to Landlord and to Lender that this Guaranty remains in full force and in effect in accordance with its terms.

Guarantor and Landlord (by its acceptance of this guaranty) hereby mutually waive trial by jury in connection with any dispute arising hereunder.

# EXHIBIT C

SRF 88496

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 25-14861 (MBK) |
| NEW RITE AID, LLC, *et al.*, | (Jointly Administered) |
| Debtors.[1] | **Re: Docket No. 17, 142, 329, 338 & 352** |

## NOTICE OF POTENTIALLY ASSUMED UNEXPIRED LEASES

YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY
TO AN UNEXPIRED LEASE WITH ONE OR MORE OF THE
DEBTORS AS SET FORTH ON **EXHIBIT A** ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on May 7, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief,* [Docket No. 142] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that on May 16, 2025, in accordance with the Bidding Procedures Order, the Debtors filed the *Amended Notice of (I) Successful Bidders and (II) Adjournment of Auction* [Docket No. 338], declaring, among others, CVS Pharmacy, Inc. as the successful bidder (the "Successful Bidder") for certain of the Pharmacy Assets (the "Successful Bid").

**PLEASE TAKE FURTHER NOTICE** that on May 16, 2025, the Debtors filed the proposed *Order (I) Approving and Authorizing the Sale of Certain Pharmacy Assets Free and Clear of all Liens, Claims, Rights, Interests, and Encumbrances, (II) Approving Certain Asset*

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

*Purchase Agreements and Related Agreements Among the Debtors and Purchaser, (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 329] (the "Proposed Order").

**PLEASE TAKE FURTHER NOTICE** that on May 17, 2025, the Debtors filed the *Notice of Filing of Asset Purchase Agreements with Respect to the Sale of Certain of the Pharmacy Assets* [Docket No. 352], which included copies of the asset purchase agreements among the Debtors and the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that, subject to your right to object described two paragraphs below, pursuant to the Bidding Procedures and the terms of the Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the unexpired lease(s) listed on **Exhibit A** to which you are a counterparty (each, a "Lease"). The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Lease(s) are as set forth on **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, the hearing to consider approval of the Sale of certain Pharmacy Assets to the Successful Bidder and entry of the Proposed Order is currently scheduled to take place on **May 21, 2025, at 11:30 a.m. (prevailing Eastern Time)** (the "Sale Hearing"), before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608 or by videoconference or such other form of remote communication established by the Court.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Lease, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Lease (collectively, an "Assignment Objection"), your Assignment Objection must: (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served and *actually received* **no later than June 2, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Assignment Objection Deadline") by (i) the Bid Notice Parties, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) counsel to any official committees of unsecured creditors appointed in these chapter 11 cases, (iv) the applicable Successful Bidder(s), if known, and (v) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that if an Assignment Objection is not filed by the Assignment Objection Deadline, then (a) you will be deemed to have stipulated that the Cure Payments, if any, as determined by the Debtors are correct and that there are no other defaults entitled to be cured in connection with the proposed assumption and assignment of your Lease, (b) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Lease, and (c) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful

2

Bidder has not provided adequate assurance of future performance as of the closing date of the applicable Sale Transactions.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Lease or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures shall be heard at a later date as may be fixed by the Court, unless otherwise agreed by the Debtors and the non-Debtor Lease counterparty.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Lease on this Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Leases are reserved. Moreover, the Debtors explicitly reserve the right to seek to reject or assume each Lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (a) alters in any way the prepetition nature of the Leases or the validity, priority, or amount of any claims of a counterparty to any Lease against the Debtors that may arise under such Lease, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of a counterparty to any Lease against the Debtors that may arise under such Lease.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, the Proposed Order, and all documents filed in these chapter 11 cases are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retainer in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930- 4577; (b) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

Dated: May 19, 2025

/s/ Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
            svanaalten@coleschotz.com

3

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com
        aeaton@paulweiss.com
        chopkins@paulweiss.com
        smitchell@paulweiss.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

4

### Exhibit A

Proposed Assumed and Assigned Unexpired Leases and Proposed Cure Payments

| Store Number | Address | Landlord | Debtor Counterparty | Proposed Cure |
|---|---|---|---|---|
| 5413 | 1515 WEST STATE STREET, BOISE, ID, 83702 | STATE STREET PARTNERS LLC | THRIFTY PAYLESS, INC. | $52,465.88 |

# EXHIBIT D

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 114 of 123
Document    Page 64 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 61 of 80

## ACORD EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

**DATE (MM/DD/YYYY)** 06/07/2023

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): (866) 283-7122 | COMPANY NAME AND ADDRESS | NAIC NO: 16535 |
|---|---|---|---|
| Aon Risk Services Northeast, Inc. New York NY Office One Liberty Plaza 165 Broadway, Suite 3201 New York NY 10006 USA | | Zurich American Ins Co One Liberty Plaza 30th Floor New York NY 10006 USA | |

| FAX - (A/C, No): (800) 363-0105 | E-MAIL ADDRESS: | The named company shares risk for the coverage(s) indicated below. |
|---|---|---|
| CODE: | SUB CODE: | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
| AGENCY CUSTOMER ID #: 570000022249 | | POLICY TYPE Commercial Property |

| NAMED INSURED AND ADDRESS | LOAN NUMBER | POLICY NUMBER See Attached |
|---|---|---|
| Rite Aid and Affiliates P. O. Box 3165 Harrisburg PA 17105 USA | | |

| | EFFECTIVE DATE 6/1/2023 | EXPIRATION DATE 6/1/2024 | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|---|

ADDITIONAL NAMED INSURED(S)    THIS REPLACES PRIOR EVIDENCE DATED:

**PROPERTY INFORMATION** (ACORD 101 may be attached if more space is required) : ☒ **BUILDING OR** ☒ **BUSINESS PERSONAL PROPERTY**

LOCATION/DESCRIPTION
RE: Store No. 5413, Store Location: 1515 West State Street, Boise, ID.

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGE INFORMATION | PERILS INSURED | BASIC | | BROAD | | SPECIAL | X | All Risk - Subject to Exclusions |
|---|---|---|---|---|---|---|---|---|

COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: $5,000,000    Loss Limit    DED: $25,000

| | YES | NO | N/A | | |
|---|---|---|---|---|---|
| ☒ BUSINESS INCOME  ☒ RENTAL VALUE | X | | | If YES, LIMIT: $5,000,000 ☒ Actual Loss Sustained; # of months: 12 | |
| BLANKET COVERAGE | X | | | If YES, indicate value(s) reported on property identified above $5,000,000 | |
| TERRORISM COVERAGE | X | | | Attach signed Disclosure Notice / DEC | |
| IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | X | | | |
| IS DOMESTIC TERRORISM EXCLUDED? | | X | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| FUNGUS EXCLUSION ( If "YES", specify organization's form used) | | X | | | |
| REPLACEMENT COST | X | | | | |
| AGREED AMOUNT | | X | | | |
| COINSURANCE | | X | | If YES, % | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: $5,000,000 DED: | |
| ORDINANCE OR LAW - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| - Demolition Costs  Incr Cost of Construction | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| - Incr. Cost of Construction | X | | | If YES, LIMIT: Included DED: See Attached | |
| EARTH MOVEMENT (If Applicable) | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| WIND / HAIL INCL ☐ YES ☐ NO  Subject to Different Provisions: | X | | | If YES, LIMIT: Included DED: See Attached | |
| NAMED STORM INCL ☐ YES ☐ NO  Subject to Different Provisions: | X | | | If YES, LIMIT: $5,000,000 DED: See Attached | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | X | | | SIR applies per policy terms & conditions | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☐ CONTRACT OF SALE ☒ LENDER'S LOSS PAYABLE ☐ LOSS PAYEE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|
| ☐ MORTGAGEE | |
| NAME AND ADDRESS State Street Partners, LLC 1720 Wazee, Ste. 1A Denver CO 80202 USA | |
| | AUTHORIZED REPRESENTATIVE  *Aon Risk Services Northeast, Inc.* |

© 2003-2015 ACORD CORPORATION. All rights reserved.

ACORD 28 (2016/03)    The ACORD Name and Logo are registered marks of ACORD

*Holder Identifier: 5413    Certificate No : 570099894657*

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 115 of 123
Document    Page 65 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 62 of 80

AGENCY CUSTOMER ID: _____

LOC #: _____

570000022249

ACORD®

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| | |
|---|---|
| AGENCY    Aon Risk Services Northeast, Inc. | NAMED INSURED    Rite Aid and Affiliates |
| POLICY NUMBER    See Certificate Number:    570099894657 | |
| CARRIER    See Certificate Number:    570099894657    NAIC CODE | EFFECTIVE DATE: |

ADDITIONAL REMARKS

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER:  ACORD 28    FORM TITLE:  Evidence of Commercial Property Insurance

PROPERTY INFORMATION

REMARKS (Including Special Conditions)

State Street Partners, LLC (landlord) is included as Lender's Loss Payee in accordance with the policy provisions of the Property policy with respect to property located at the above referenced location.

ACORD 101 (2008/01)                    © 2006 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT E

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 10/13/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| MARSH USA, LLC.<br>501 MERRITT 7<br>NORWALK, CT 06856<br>Attn: Norwalk.certrequest@marsh.com / Fax: 212-948-0929 | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| CN102271894-DRUG-GAWU-23-24    5413    GLEX | INSURER A : National Union Fire Ins Co. of Pittsburgh PA | | 19445 |
| INSURED<br>RITE AID AND AFFILIATES<br>PO BOX 3165<br>HARRISBURG, PA 17105 | INSURER B : AIU Insurance Co | | 19399 |
| | INSURER C : N/A | | N/A |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER: NYC-009933164-78    REVISION NUMBER: 24

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>CLAIMS-MADE [X] OCCUR | | | SIR - $7,000,000<br><br>***** SEE EXCESS LIABILITY ***** | 10/15/2023 | 10/15/2024 | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY [ ] PRO-JECT [ ] LOC [ ]<br>OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>OWNED AUTOS ONLY  SCHEDULED AUTOS<br>HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | [X] UMBRELLA LIAB [X] OCCUR<br>EXCESS LIAB  CLAIMS-MADE<br>DED [ ] RETENTION $ | | | BE 831 78 854<br>GL/Druggist Liability coverage<br>is subject to $7,000,000 SIR | 10/15/2023 | 10/15/2024 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y/N [N] N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | 49154468 (AOS) | 10/15/2023 | 10/15/2024 | [X] PER STATUTE  OTHER | |
| B | | | | 49154467 (CA) | 10/15/2023 | 10/15/2024 | E.L. EACH ACCIDENT | $ 2,000,000 |
| B | | | | 49154469 (WI) | 10/15/2023 | 10/15/2024 | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: STORE #5413    LOC: 1515 WEST STATE STREET, BOISE, ID 83702-4096.    LOAN #991090060
STATE STREET PARTNERS, LLC (LANDLORD) AND BERKADIA COMMERCIAL MORTGAGE, LLC (MORTGAGEE), MASTER SERVICER FOR US BANK TRUST, AS TRUSTEE FOR JP MORGAN CHASE COMM'L MORTGAGE SEC CORP COMMERCIAL MORTGAGE PASS-THRU CERT SERIES 2001-CIBC1 ARE INCLUDED AS ADDITIONAL INSURED (EXCEPT WORKERS COMPENSATION) WITH RESPECT TO THE ABOVE LOCATION. COVERAGE AFFORDED BY THE PROVISIONS OF THIS CERTIFICATE IS NO MORE THAN REQUIRED BY LEASE OR CONTRACT.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| STATE STREET PARTNERS, L.L.C.<br>1720 WAZEE STREET, SUITE 1A<br>DENVER, CO 80202 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION.  All rights reserved.

**ACORD 25 (2016/03)**    The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: CN102271894

LOC #: Norwalk

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page __2__ of __2__

| AGENCY | | NAMED INSURED |
|---|---|---|
| MARSH USA, LLC. | | RITE AID AND AFFILIATES<br>PO BOX 3165<br>HARRISBURG, PA  17105 |
| **POLICY NUMBER** | | |
| **CARRIER** | NAIC CODE | |
| | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: __25__   FORM TITLE: Certificate of Liability Insurance

THE REFERENCED UMBRELLA LIABILITY POLICY INCLUDES STANDARD COMMERCIAL GENERAL LIABILITY COVERAGE COMPONENTS.

COVERAGE AFFORDED BY THE PROVISIONS OF THIS CERTIFICATE ARE NO MORE THAN REQUIRED BY LEASE OR CONTRACT.

*********************IMPORTANT NOTICE TO TENANT/LANDLORD/LESSOR*****************************

A COPY OF THIS CERTIFICATE/EVIDENCE OF INSURANCE FOR THE 10/15/2023 TO 10/15/2024 POLICY PERIOD SHOULD BE FORWARDED TO THE APPROPRIATE PARTIES (MORTGAGE COMPANIES, FINANCIAL INSTITUTIONS, ETC.) UPON REQUEST.  WHEN THE REQUESTING PARTY IS IN QUESTION, PLEASE CONTACT RITE AID @ 717-761-2633

IF EVIDENCE OF COVERAGE IS NO LONGER REQUIRED, KINDLY RETURN THE CERTIFICATE MARKED "NO LONGER REQUIRED", AND WE WILL ADJUST OUR FILES ACCORDINGLY.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT F



## Valuation Detailed Report
State Auto Insurance Companies

12/21/2023

My Report Title 2

| VALUATION | | | |
|---|---|---|---|
| Valuation Number: | ESTIMATE-0123130 | Effective Date: | 11/21/2023 |
| Value Basis: | Reconstruction | Expiration Date: | 11/20/2024 |
| | | Estimate Expiration Date: | 02/19/2024 |
| | | Cost as of: | 11/2023 |

### BUSINESS

STATE STREET PARTNERS LLC

1515 W STATE ST

BOISE, ID 83702-4039 USA

### LOCATION 1 - STATE STREET PARTNERS LLC

STATE STREET PARTNERS LLC

1515 W STATE ST

BOISE, ID 83702-4039 USA

#### Location Adjustments

| Climatic Region: | 2 - Moderate |
|---|---|
| High Wind Region: | 1 - Minor Damage |
| Seismic Zone: | 3 - Moderate Damage |

### BUILDING 1 - Rite Aid

#### Section 1

**SUPERSTRUCTURE**

| Occupancy: | 100% Department Store | Story Height: | 20 ft. |
|---|---|---|---|
| Construction Type: | 100% Masonry (ISO 2) | Number of Stories: | 1 |
| Gross Floor Area: | 24,390 sq.ft. | Irregular Adjustment: | None |
| Construction Quality: | 4.5 - Premium + | | |
| Year Built: | 1962 | | |

**Adjustments**

| Hillside Construction: | Degree of Slope: Level | Site Accessibility: | Excellent |
|---|---|---|---|
| | Site Position: Unknown | Soil Condition: | Excellent |

**Fees**

| Architect Fees: | 7% is included |
|---|---|
| Overhead and Profit: | 20% is included |



## Valuation Detailed Report

State Auto Insurance Companies

My Report Title 2

Policy Number: ESTIMATE-0123130                                                12/21/2023

| SUMMARY OF COSTS | User Provided | System Provided | Reconstruction | Exclusion |
|---|---|---|---|---|
| **SUPERSTRUCTURE** | | | | |
| Site Preparation | | | $26,301 | |
| Foundations | | | $669,971 | |
| Foundation Wall | | | | |
| Interior Foundations | | | | |
| Slab On Ground | | | | |
| Exterior | | | $1,411,348 | |
| Framing | | | | |
| Exterior Wall | | 5% Wall Openings | | |
| Exterior Wall | | 50% Brick on Masonry | | |
| | | 25% Concrete Block | | |
| | | 25% EIFS on Frame | | |
| Structural Floor | | | | |
| Roof | | | $750,599 | |
| Material | | 100% Built-Up/Tar and Gravel | | |
| Pitch | | | | |
| Interior | | | $1,757,184 | |
| Floor Finish | 20% Epoxy | | | |
| | 80% Tile, Ceramic | | | |
| Ceiling Finish | | 92% Suspended Acoustical | | |
| Partitions | | | | |
| Length | | 609 ft. | | |
| Structure | | 100% Studs, Girts, etc. | | |
| Finish | 100% Drywall | | | |
| | 100% Paint | | | |
| Mechanicals | | | $2,310,253 | |
| Heating | | 100% Rooftop Unit | | |
| Cooling | | 100% Rooftop Unit | | |
| Fire Protection | | 100% Sprinkler System | | |
| | | 100% Manual Fire Alarm System | | |

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Case 25-14861-MBK    Doc 775    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 122 of 123
Document    Page 72 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 74 of 80



## Valuation Detailed Report

State Auto Insurance Companies

My Report Title 2

Policy Number: ESTIMATE-0123130                                              12/21/2023

| SUMMARY OF COSTS | User Provided | System Provided | Reconstruction | Exclusion |
|---|---|---|---|---|
| | | 100% Automatic Fire Alarm System | | |
| Plumbing | | 33 Total Fixtures | | |
| Electrical | | 100% Average Quality | | |
| Elevators | | 0 Passenger | | |
| | | 0 Freight | | |
| Built-ins | | | $539,790 | |
| **TOTAL RC Section 1** | | | $7,465,446 | |
| **TOTAL RC BUILDING 1  Rite Aid** | | | $7,465,446 | |

| | Reconstruction | Sq.Ft. | $/Sq.Ft. |
|---|---|---|---|
| **LOCATION TOTAL, Location 1** | $7,465,446 | 24,390 | $306 |

| | Reconstruction | Sq.Ft. | $/Sq.Ft. |
|---|---|---|---|
| **VALUATION GRAND TOTAL** | $7,465,446 | 24,390 | $306 |

Case 25-14861-MBK    Doc 1565    Filed 07/25/25    Entered 07/25/25 10:31:56    Desc Main
Document    Page 123 of 123
Case 25-14861-MBK    Doc 575    Filed 05/29/25    Entered 05/29/25 14:57:31    Desc Main
Document    Page 73 of 73
Case 23-18993-MBK    Doc 5342-2    Filed 11/04/24    Entered 11/04/24 16:00:21    Desc
Certification of Jeff Oberg    Page 75 of 80



**Valuation Detailed Report**
State Auto Insurance Companies
My Report Title 2
SUMMARY REPORT

Policy Number: ESTIMATE-0123130                                                          12/21/2023

| VALUATION | |
|---|---|

| Valuation Number: | ESTIMATE-0123130 | Effective Date: | 11/21/2023 |
|---|---|---|---|
| Value Basis: | Reconstruction | Expiration Date: | 11/20/2024 |
| | | Estimate Expiration Date: | 02/19/2024 |
| | | Cost as of: | 11/2023 |

| BUSINESS |
|---|

STATE STREET PARTNERS LLC

1515 W STATE ST

BOISE, ID 83702-4039 USA

| LOCATION 1 - STATE STREET PARTNERS LLC |
|---|

STATE STREET PARTNERS LLC

1515 W STATE ST

BOISE, ID 83702-4039 USA

| BUILDING 1: SUPERSTRUCTURE | Reconstruction | Sq.Ft. | $/Sq.Ft. | |
|---|---|---|---|---|
| Section 1    100%    Department Store | $7,465,446 | 24,390 | $306 | |
| **Section Totals** | **Reconstruction** | **Sq.Ft.** | **$/Sq.Ft.** | |
| Section 1    100%    Department Store | $7,465,446 | 24,390 | $306 | |
| **BUILDING TOTAL, Building 1** | **$7,465,446** | **24,390** | **$306** | |

**BUILDING INSURANCE SUMMARY**

| Total Insured Amount | $1 | |
|---|---|---|
| Percent of Insurance to Value | 0% | |
| 100% Co-insurance Requirement | $7,465,446 | $7,465,446 |
| -100% Variance | ($7,465,445) | |
| | Reconstruction | Sq.Ft. | $/Sq.Ft. |
| **LOCATION TOTAL, Location 1** | **$7,465,446** | **24,390** | **$306** |
| | Reconstruction | Sq.Ft. | $/Sq.Ft. |
| **VALUATION GRAND TOTAL** | **$7,465,446** | **24,390** | **$306** |

End of Report