

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW**
**U.S. COURTHOUSE**
**402 E. STATE STREET**
**TRENTON, NEW JERSEY 08608**

**Hon. Michael B. Kaplan,**                                                                 609-858-9360
**United States Bankruptcy Judge**

July 28, 2025

*All Counsel of Record*

                **Re:**    New Rite Aid, LLC, *et al.*, Debtors
                          <u>Case No.: 25-14861</u>

Dear Counsel:

Presently before the Court is New Rite Aid, LLC's ("Debtors" or "Rite Aid" or "Movants") *Emergency Motion to Enforce the Sale Order and Compel Performance by CVS Pharmacy, Inc. Under the CVS Asset Purchase Agreement,* ECF No. 1322 (the "Motion"). CVS Pharmacy, Inc. ("CVS"), has opposed Debtors' Motion. This Court heard initial arguments at a hearing held on July 8, 2025, and scheduled the matter for an evidentiary hearing on July 25, 2025 ("Evidentiary Hearing").[1] For the reasons set forth below, Movants' Motion will be **GRANTED IN PART,** with the balance of unresolved issues to be addressed at a scheduled hearing on August 14, 2025.

---

[1] At the initial hearing on July 8, 2025, the Court provided a preliminary ruling based upon the oral arguments and written submissions, subject to modification after consideration of arguments and evidence at the scheduled evidentiary hearing. This preliminary ruling was withdrawn, in full, for the reasons expressed during an informal zoom conference call, scheduled at the request of the Court, with all parties in interest on July 9, 2025.

1

I. **Jurisdiction**

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended on September 18, 2012, and June 6, 2025, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M) & (O). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code and rules 2002, 6004, and 9013 of the Federal Rules of Bankruptcy Procedure.[2] The Court issues the following findings of fact and conclusions of law as required by FED. R. BANK. P. 7052.[3]

II. **Background**

The factual background and procedural history of this matter are well known to the parties. As such, they will not be repeated in detail here. On May 15, 2025, CVS entered into an asset purchase agreement to acquire certain assets associated with Rite Aid's retail locations in the Pacific Northwest region (the "PNW APA"), as well as separate asset purchase agreements to acquire certain assets associated with Rite Aid's retail locations in Pennsylvania, New York, California and other states (the "National File Buy APAs," and together with the PNW APA, the "APAs").

---

[2] At the initial hearing held on July 8, 2025, the Court overruled CVS's objection to the Motion absent Debtors' initiation of an adversary proceeding, consistent with FED. R. BANKR. P. 7001. As noted by this Court in prior decisions, where there is no prejudice to the nonmoving party, courts will "not elevate form over substance" and require an adversary proceeding when a motion will suffice. *In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 276 (E.D. Pa. 1994); *see, also*, *In re Guterl Special Steel Corp.*, 316 B.R. 843, 852 (Bankr. W.D. Pa. 2004) ("A matter that was incorrectly brought as a contested matter when it should have been brought as an adversary action nonetheless may proceed as originally filed if the party against whom it was brought has suffered no prejudice as a consequence."). In the present matter, there has been no prejudice, as all parties have had ample opportunity to investigate, take discovery, present argument, and introduce evidence at a plenary hearing.

[3] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

(Zhushma Decl. ¶ 4 and Exs. A-B.) On May 21, 2025, the Bankruptcy Court approved the APAs via a Sale Order. (ECF No. 470). The PNW APA includes a "Lookback Period" where the price paid by CVS for the various assets—including the RX Assets[4]—can be adjusted. In particular, Section 2.3(b)(i) of the PNW APA states that Rite Aid must

> certify to [the] Purchaser . . . as to the average prescriptions filled per week from each of the Stores for the four (4) calendar weeks (ending on Saturday and excluding nationally recognized holiday weeks) immediately prior to such certification (the 'Lookback Period')…with the final Rx certification occurring within three (3) Business Days prior to the… closing date for the applicable Store.

Based on this certification, Section 2.3(b)(iii) states:

> To the extent the Rx Certification for a Store, prior to its applicable Closing Date, is less than the Prescription Average for such Store (as set forth [in the APA]) by five percent (5%) or more, then Purchaser shall have the right to reduce the RX Assets Purchase Price to such Store proportionately based on the percent decline (excluding the initial (5%) decline) in prescription volume for such Store.

(Zhushma Decl. ¶ 5 and Ex. A). Each APA includes an exhibit that sets forth the baseline number of prescriptions filled for each store, which is the number to be used in determining whether the corresponding number of prescriptions filled during the Lookback Period is low enough to merit a purchase price adjustment. (Zhushma Decl. ¶ 7 and Exs. A-B).

The thrust of the disputes between the parties center upon the interpretation and methodological application of two provisions/phrases appearing in Section 2.3(b)(i) of the PNW APA and comparable language in the other referenced APAs[5] :

---

[4] The RX Assets consist of prescription files, records, and data utilized and maintained by Rite Aid in the course of operating the licensed pharmacies in its stores.

[5] The parties seem to agree that there are no material differences among the APAs as to the language at issue and the Court will focus its discussion on this referenced section throughout the opinion, unless indicated otherwise.

3

(1) "for the four (4) calendar weeks (ending on Saturday and excluding nationally recognized holiday weeks) immediately prior to such certification" (hereinafter referred by the Court as the "Holiday Exclusion Provision"), and

(2) "prescription filled" (hereinafter referred by the Court as the "Prescription Filled Phrase").

These phrases come into play as part of the purchase price adjustment process under the APAs. CVS is entitled to a purchase price adjustment if attrition at any store with respect to filled prescriptions is greater than 5%. Section 3.10(f) in Exhibit B to the PNW APA creates a baseline average for prescriptions filled at each store over a 13-week period ("Prescription Average"). The Prescription Average is then compared to the average filled prescription during the four-week Lookback Period, as certified by Rite Aid prior to closing ("Rx Certification").

Pertinently, with respect to the Holiday Exclusion Provision, Debtors have taken the position that the language is clear and that both parties have long understood and agreed that if the Lookback Period includes a week containing a national holiday, that week's data is excluded from the Lookback Period, and replaced with data from the first preceding non-holiday week. (Zhushma Decl. ¶ 9). Thus, for example, if the agreement provides for a four-week lookback period ending on Saturday, November 30, 2025, then the week of Thanksgiving (beginning November 24, 2025) is excluded from the calculation, and the next immediately preceding week without a holiday (week beginning October 27, 2025) would be included so as to ensure that the Lookback Period includes the requisite four weeks of data. In contrast, CVS likewise contends that the language of the provision is clear in that weeks containing national holidays are to be excluded from the Lookback Period, but there should be no additional weekly data added to the Lookback Period calculation. In this regard, CVS notes that there is no language in the APA which calls for replacement or substitution of weekly prescription filled data.

4

As to the Prescription Filled Phrase, the parties again are divided upon the proper construction. Debtors submit that the plain words of the contract—as well as the parties' course of performance over many years—make clear that the words "prescriptions filled" mean the completed process of actually filling a prescription, the final step of which is actually dispensing the prescribed medication to the patient at point of sale. Again, in marked contrast, CVS contends that "prescriptions filled" refers to a point in time prior to the actual dispensing of the prescribed medication to the patient, and that the plaint text of the APA confirms that calculations arising under the APAs should be based on the number of prescriptions physically filled and placed on the shelves by Rite Aid pharmacists, not prescriptions sold at Rite Aid stores. Needless to say, as we all know from our experiences, not all ordered prescriptions that are prepared and shelved at a pharmacy are retrieved by customers. Often, the prescriptions are re-stocked after the passage of a reasonable period of time. The issue becomes relevant in that the actual preparation and shelving of the prescriptions may occur outside the Lookback Period, while the retrieval and payment due may occur within the "Lookback Period", having an obvious impact on the filled prescription data under the APA.

There is little contest about the parties' respective intent and underlying objectives behind the APAs and the disputed contract language at issue. The parties' intent, as reflected in the APAs, was that the Debtors would sell, and CVS would purchase, prescription files and record data relative to the Debtors' customers, based on an average prescription count as contractually calculated, and that the purchase price for those assets would correlate to the assets Rite Aid was contracted to deliver at closing (within an allowed variable attrition rate of 5%). *See* PNW APA, §§ 1.1(a)-(b), 2.3(b). Because the number of prescriptions can fluctuate over time, the parties agreed to a purchase price adjustment based on the number of prescriptions filled immediately prior to closing

at each subject store. *See id.* at § 2.3(b)(i). The purpose of the purchase price adjustment was to ensure the closing purchase price reflected the actual number of files that Debtors sold to CVS at closing, based on the baseline average for each store. The purpose of the Holiday Exclusion Provision was to eliminate "statistical noise"[6] associated with holiday weeks, with the goal of accurately reflecting the assets being transmitted and sold, in a manner which maximized the consideration being paid. Complicating the transaction has been the undeniable reality facing the parties—that every day between the contract date and closing, there would be some measure of attrition with respect to the average number of prescriptions filled by each of the Rite Aid stores.

In sum, CVS's intent under the APAs was to ensure that it received at closing what it purchased under the APA and for which it was obligated to pay. Conversely, Rite Aid's aim under the APAs was to maximize the return on the sale of its assets for all of the Debtors' stakeholders and to ensure that CVS performed under the APAs in a manner consistent with the terms of the APA and the parties' custom and practice. Unsurprisingly, given the tremendous volume of prescription files being sold, the competing views by the parties as to their obligations under the disputed provisions produces substantial differences, in the tens of millions of dollars, in the amounts owing under the APAs. At the initial hearing on the Motion, the Court offered a preliminary ruling which proposed what the Court considered to be a practicable pathway towards a sensible methodology to resolve the conflicting approaches to the disputed APA language. In doing so, the Court undertook what it deemed subsequently to be a misguided effort to reform the parties' agreement to better reflect the

---

[6] By "statistical noise", as that phrase was used by the parties in their briefing and during testimony and argument at the Evidentiary Hearing, the Court understands the phrase to reflect the changes in customer prescription-filling behavior during weeks with holidays (*i.e.,* taking into account extended travel and household obligations both before and after certain holidays which may interfere with prescription pick-ups by customers). Of course, all holidays are not the same. This Court took judicial notice of the relevant days for the 2025 national holidays, and it is evident that some holidays offer greater opportunity for significant extended travel and time away from school or work, both before and after the holiday (*e.g.*, holidays that occur on Mondays, Thursdays or Fridays). At issue in the current dispute are two national holidays: Juneteenth and Independence Day. The Court remains unconvinced that consumers behavior on these two holidays is the same.

parties' intent and meet their reasonable expectations in pursuing the transactions. There is no question that this APAs' language could be improved and structured in a way that better and more fairly addresses the parties' expectations and intent. But this Court's task is not to make a better contract for the parties. Nor is it appropriate, notwithstanding this Court's inclination, for the Court to find and impose a "middle ground".[7] Rather, this Court is obligated to apply Delaware law[8] with respect to contract interpretation, to first determine whether the APAs' language is plain on its face, or ambiguous, and if the latter, to consider available and appropriate extrinsic evidence to construe the disputed language in a fashion that best comports with the parties' intent and expectations. In fulfilling its obligations, the Court has considered the testimony of the parties' respective witnesses at the Evidentiary Hearing[9], the exhibits admitted into evidence, the oral argument of counsel, and supplemental pre-hearing briefs filed with the Court.

### III.  Discussion

Delaware law with respect to contract interpretation is well-established and comprehensive. It provides that the Court's task in interpreting the APAs and the language at issue is "to effectuate the parties' intent." *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 988 (Ct. Ch. Del.

---

[7] The Court appreciates CVS and its counsel's efforts to "take the Court's cue" and offer several alternative approaches towards a possible resolution of the disputes; however, reformation of a contract after public bidding and court approval may serve to undercut efficiencies and confidence in bankruptcy §363(b) sales and should be limited to situations where courts are permitted under state law to do so when the parties came to a specific prior understanding, and the document failed to reflect that understanding because of (1) fraud, (2) mutual mistake, or (3) unilateral mistake coupled with knowing silence. *See, e.g., Matter of Jeremy Paradise Dynasty Tr.*, 2023 WL 1241903, at *9 (Del. Ch. Jan. 31, 2023), aff'd, 315 A.3d 445 (Del. 2024)*In re Ethel F. Peirls Charitable Lead Unitrust*, 59 A.3d 464, 470 (Del. Ch. 2012).

[8] The parties agree that Delaware law governs interpretation and enforcement of the APAs.

[9] At the evidentiary hearing, the Court heard testimony from the following witnesses, through initial declarations and cross/redirect examination: for Debtors—George Zhushma (VP of Central Operations & Pharmacy Acquisitions); for CVS—Gui Serrano (AVP, Corporate Development), Stephen Frumento (VP, Patient Growth), and Robin White (Manager of Corporate Acquisitions & Patient Growth). While the Court was somewhat surprised at the lack of dispositive information possessed by some of the witnesses, the Court found all of the witnesses to be truthful and completely candid with the Court.

2023); *see also In re S.A Holding Co., LLC*, 357 B.R. 51, 58 (Bankr. D.N.J. 2006) (observing that "in interpreting the words of a contract, the courts seek the meaning and intention of the parties"). The first step in divining the parties' intent is to begin with the terms of the parties' contract. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (when effectuating the parties' intent, a court is "constrained by a combination of the parties' words and the plain meaning of those words"); *In re S.A. Holding Co.*, 357 B.R. at 58 ("[I]t is not the real intent but the intent expressed or apparent in the writing that controls."). When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement. *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) (citing *Motorola, Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008)) "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (1985). The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan. *Id.*

The Court will interpret clear and unambiguous terms according to their ordinary meaning. *Paul*, 974 A.2d at 145 (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997)). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone–Poulenc Basic Chemicals Co.* 616 A.2d at 1195; *see also Exit Strategy, LLC*

8

*v. Festival Retail Fund BH, L.P.*, 326 A.3d 356 (Del. 2024). Rather, an ambiguity exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Eagle Indus.*, 702 A.2d at 1232. Where a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Id.*

Contrary to the parties' subjective beliefs and arguments to the Court, it is palpably clear that the language employed with respect to both disputed provisions of the APAs—the Holiday Exclusion Provision and the Prescription Filled Phrase—are ambiguous and require the Court to look beyond the language to ascertain and give effect to the parties' intentions. The provisions are readily susceptible to different interpretation or may have two or more different meanings. Looking at the four corners of the APAs does not assist this Court in either identifying the meaning Simply and intent of the parties or upholding the parties' expectations.

Indeed, the interpretations offered by both Rite and CVS are objectively logical and reasonable yet produce dramatically different results. For instance, with respect to the Holiday Exclusion Provision, one can read the language, as CVS does, to require the parties to simply exclude data from weeks with a national holiday, period. There is no mention of substitution or replacement of additional data. Yet, it is no stretch, by any means, to accept Rite Aid's view that this provision is not about the quantity of data—which the parties contractually fixed at four weeks—but rather simply directing the parties to use the data from the weeks closest in time to the Rx Certification date (as opposed to using data from prior periods further back in time). This too is a logical and straightforward reading of the language.

Similarly, with regard to the Prescription Filled Phrase, the terms contained within do not have a common meaning and the language, by itself, easily could give rise to inconsistent expectations

9

by reasonable parties. For the Court, it is no different than being asked "what date did you get the car repaired?" Was it the date I brought it into the garage? The date the mechanic ordered the parts? The date the car was actually serviced? Or the date that I actually picked up the car and paid for the services? There can be many answers and difference of opinion among reasonable persons. This Court must now look to and consider other sources to determine what any objectively reasonable third party would understand to be the parties' intent with these APA provisions. *See United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834-35 (Del. Ch. 2007). "If ambiguity appears 'in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision.'" *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 548 (Del. Ch.) aff'd sub nom. *Horizon Kinetics LLC v. Texas Pac. Land Corp.*, 314 A.3d 685 (Del. 2024) (quoting *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998)). When looking to extrinsic evidence, a court may consider "any admissible extrinsic evidence that may shed light on the expectations of the parties at the time they entered into the [a]greement." *Eagle Indus., Inc.*, 702 A.2d at 1233. Possible sources include "correspondence between the parties, drafts of the [a]greement[,] and drafting session notes." *Id.* Other possible sources include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Salamone v. Gorman,* 106 A.3d 354, 374 (Del. 2014) (cleaned up)*.* In addition, "[w]hen construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016). Some sources of extrinsic evidence, however, are not admissible. For example, "the private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning." *United Rentals*, 937 A.2d at 835. "After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one

10

meaning is objectively reasonable." *Salamone*, 106 A.3d at 374 (citation omitted). In a heavily negotiated agreement, that interpretation generally will be what the court regards as "'the most reasonable meaning of the words used, when interpreted in the particular setting, including the course of negotiation and relevant commercial practices.'" *Harrah's Ent., Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 313 (Del. Ch. 2002) (citation omitted).

In applying these principles to the instant matter, the Court has considered the course of dealing between the parties leading up to the formation of the APAs, as well as the course of performance, including actions and statements of the parties, from the execution of the agreements through the filing of the Motion.[10] Such evidence has been placed before the Court through the testimony of the witnesses and the exhibits introduced into evidence at the Evidentiary Hearing.

The Court turns first to the dispute surrounding the Holiday Exclusion Provision, language which was first inserted into APAs between the parties at Rite Aid's request in October of 2023, and has appeared in every APA since, although with an important difference—earlier APAs contained a much longer Lookback Period of either eight or thirteen weeks. The reason for this change to a shortened Lookback Period is obvious—unlike with APAs negotiated during the first Rite Aid chapter 11 filing, where Rite Aid was committed to a restructuring and maintaining continued operations, the current case involves an admitted and publicized liquidation process. The risks facing CVS of meaningful attrition with respect to purchased prescriptions has increased dramatically (and has been borne out as evidenced by statistics put before the Court). In this regard, the testimony of CVS's witness, Gui Serrano (the CVS individual responsible for negotiating the

---

[10] The Court understands but casts aside CVS's objection to use of such extrinsic evidence given that the present Debtors, New Rite Aid LLC, *et al.,* are technically different entities from the Rite Aid entities that entered chapter 11 in the first case. The evidence confirms, however, consistent with the responses to the Court's own inquiries at the Evidentiary Hearing, that the individuals engaged in the negotiations and implementation of the APAs for all parties remained constant throughout the period, notwithstanding corporate restructurings. The Court finds the continuity in parties with responsibility warrants use of such extrinsic evidence here.

May 2025 APAs), makes it clear that the risk of attrition was one of his foremost concerns. So much so, that he had hoped to reduce the Lookback Period to one week, but the best he could accomplish was to negotiate for a four-week Lookback Period. However, to further protect CVS's interests, Mr. Serrano negotiated several other terms and conditions to protect against the risks of attrition. Pertinently, the very section highlighted below of the provision at issues includes negotiated terms to further protect CVS from attrition risks:

> (b) Rx Certification; Rx Conversion Rights; Rx Purchase Price Adjustment.
>
> **(i)**  Rx Certifications. The applicable Seller shall certify to Purchaser, in writing, as to the average prescriptions filled per week from each of the Stores for the four (4) calendar weeks (ending on Saturday and excluding nationally recognized holiday weeks) immediately prior to such certification (the "Lookback Period"), which average prescriptions filled per week shall consist only of the unadjusted prescriptions filled with all prescriptions filled regardless of days' supply counted as one (1) fill (each, an "Rx Certification"), on a biweekly cadence from and after the date hereof through the applicable Closing Date, with the final Rx Certification occurring within three (3) Business Days prior to the applicable Closing Date for the applicable Store. For the avoidance of doubt, any prescriptions transferred from any Store to Purchaser during the period commencing on the date hereof and ending on the date on which a Rx Certification is delivered, shall be counted towards the aforementioned calculation for the applicable Store from which such prescriptions were transferred. **The foregoing notwithstanding, for any Store where any Rx Certification average weekly script count is fifty percent (50%) or less than the Prescription Average for such Store the Lookback Period and any go-forward Rx Certification for such Store shall be two (2) calendar weeks.**
>
> **(ii)**  **(ii) Rx Conversion Rights. To the extent that, at any time from and after the date hereof until the applicable Closing Date, any Rx Certification for a Store Buy Location shows that the average weekly script count for such Store Buy Location is more than fifty percent (50%) less than the average weekly script count set forth on Exhibit B (the "Prescription Average") attached hereto for the applicable Store Buy Location, then Purchaser shall have the right, but not the obligation, at its sole election, to either (A) for any Store Buy Location set forth on Schedule 2.3(b) (each, a "Target Store Buy Location"), exclude such Target Store Buy Location and any Acquired Assets used exclusively in connection with such Target Store Buy Location from the Transactions and reduce the Closing Date Payment by the Closing Date Payment allocable to such Target Store Buy Location as set forth on Exhibit B ("Terminated Target Store Buy Location"), or (B) convert the sale of any Target Store Buy Location or any other Store Buy Location to a File Buy Location (a "Converted Store") (with the Closing Date 16 Doc#: US1:27086528v18 Payment for such Store**

12

> **being treated in accordance with the terms of this Agreement for a File Buy Location) and reduce the Closing Date Payment to the Conversion Payment notwithstanding any provision to the contrary in Section 2.2(b)(iii) below. Notwithstanding any other provision of this Agreement to the contrary, upon Purchaser's exercise of its rights hereunder with respect to any Terminated Target Store Buy Location(s), this Agreement shall be of no force and effect with respect to such Terminated Target Store Buy Location(s) and its (their) respective Acquired Assets. A "Conversion Payment" is the amount that would have been payable if the Converted Store were originally scheduled on Exhibit B to be a File Buy Location, with the Rx Data Purchase Price adjusted by the proportionate percentage reduction in the Prescription Average for such Converted Store.**

PNW APA § 2.3(b) (i) & (ii) (DX 39).

Mr. Serrano made it clear in his testimony that while he would have preferred a one-week Lookback Period, however, he could not attain agreement to such. Instead, he made sure to provide for other protections, such as the highlighted language above, as well as additional protective terms such as found in §2.4 relative to Front of Store inventory certifications and related purchase price adjustments, and §6.1 which mandates the continuation of certain business conduct by the sellers in advance of closing. All of these additional negotiated terms confirm that CVS was well-aware of the attrition risks and were capable of negotiating protective language to address their concerns. If the parties intended the Lookback Period to be less than four weeks in the event of a national holiday week, they could have easily said so. Indeed, CVS's interpretation would require adding words to the contract that do not exist. This also suggests to the Court that the four weeks of data for the Lookback Period was a "line in the sand" for Rite Aid, and that any interpretation of the Holiday Exclusion Provision which involves using less than four weeks of data contravenes the parties' intent and expectations in pursuing the transaction.

Beyond the negotiation history discussed above, the evidence presented to the Court reflects a course of performance under the APAs having the Holiday Exclusion Provision in which CVS

13

acknowledges and concurs with the approach taken by Rite Aid in including the most immediately preceding weeks that do not have a holiday. While Mr. Serrano admittedly was uninvolved with the negotiation of the APAs which pre-dated the May 2025 APAs, the Court heard testimony and considered exhibits which likewise confirm that there were other responsible CVS representatives who were cognizant of (or at a bare minimum, failed to address or contest) the transparent manner in which Rite Aid was calculating the number of prescription to be included in the Lookback Period. To this point, as late as May 4, 2025, Mr. Serrano and other CVS representatives and professionals were advised by email that the form and substance of the APA agreements would remain the same as such APAs for file buys were undertaken in the past (DX 25). Likewise, CVS confirmed on May 10, 2025, by email that the Rx Certification process would be undertaken in the "usual/customary manner" (DX 32). Given his admitted lack of involvement and familiarity with prior APA transactions between CVS and Rite Aid, Mr. Serrano can be forgiven for not speaking up. The Court is unsure if the same holds true for others.

The parties' course of performance is clear and uncontradicted. CVS does not dispute and has not offered contrary evidence that when the parties excluded holiday weeks in the Lookback Period for all APAs since October of 2023, those excluded weeks were replaced with the closest preceding week(s). To be sure, CVS has introduced persuasive evidence that Rite Aid was sloppy and haphazard in its Rx Certifications with regard to which national holiday weeks to exclude or include (there is no question that Rite Aid on occasion included Easter, which is not a national holiday, and failed to exclude weeks having Martin Luther King, Jr.'s birthday or Veteran's Day); however, in all such situations Rite Aid included prescriptions-filled data for the contractually mandated number of weeks (eight or thirteen). CVS has not identified a single contrary example from any store closing pursuant to any APA.

14

Document    Page 15 of 19

As discussed, CVS's introduction into evidence of extrinsic evidence was limited to Mr. Serrano's expectations and goals in negotiating the terms of the APAs, and the evidence confirming Rite Aid's inconsistent approaching in identifying appropriate national holidays to consider in preparing the Rx Certifications. No evidence has been placed before the Court that the parties previously interpreted the Lookback Period the way that CVS is urging the Court to do now or even raised the issue. Indeed, for the Court, the latter is most fatal to CVS's position.

Going back to November of 2023, Deborah Shifflett of Rite Aid emailed her counterparts at CVS with spreadsheets and information as part of the relevant Rx Certification and expressly noted the exclusion of a holiday week and inclusion of a preceding week. (DX-5). The same holds true for an email from Arun Patel on January 29, 2024 (DX 11), and Ms. Shifflett again on February 20, 2024 (DX15). There is no evidence of any inquires or contest by anyone from CVS. No one took issue or raised a concern. To be sure, Ms. Robin White, the CVS representative charged with verifying the calculations relative to the Lookback Period, and indisputably acting in the course of her employment, also confirmed in her testimony that neither she nor anyone at CVS challenged the accuracy of the approach taken by Rite Aid and reflected in the Rx Certifications and emails. Apparently, Ms. White's role was limited to verifying the math; yet, even with this, the Court remains perplexed as to how in doing the math, she would not be in a position to verify or question the number and timing of the weeks included in the denominator of the calculation.

Even more inexplicable is that no issue was raised by one of Ms. White's supervisors, John Garcia (the Executive Director for Corporate Acquisitions and Patient Growth at CVS, who was also copied on the emails), or anyone else at CVS at any point in time prior to CVS having to write a check for the most current APAs. In point of fact, Ms. White was unable to identify anyone on the emails or outside of the emails who would have the responsibility to verify the Rx

15

Certification's compliance with the express terms of the APA. Likewise, the Court listened to the testimony of Stephen Frumento, who serves as the Executive Vice President for Growth at CVS and was the signatory for each and every amendment reflecting the final purchase price and any adjustment required by Ms. White's validation of the Rx Certifications. There is no evidence in his testimony or otherwise that reflects that he raised any issues, made any inquiries, or contested Rite Aid's approach in preparing the Rx Certifications and assembling the prescription filled data for the Lookback Periods. In sum, the Court finds that with respect to the Holiday Exclusion Provisions, the interpretation and application espoused by Rite Aid best reflects the intent and expectations of the parties.

Moving on to the dispute concerning the interpretation of the Prescription Filled Phrase, much of the Court's above analysis equally applies. The interpretation of the term "prescription filled" as meaning such prescriptions dispensed to patients at point of sale makes abundant sense to the Court, given that CVS has argued and testified that it sought to ensure the most recent and timely prescription data to ensure that it receives what it is purchasing. The process of filling a prescription is not complete until that prescription is picked up (and paid for) by the customer. If the medication is actually never picked up and sits on the shelves for weeks until returned to inventory, the filled prescription is of no value to anyone. The customer is never charged, and any charge to the insurance carrier is reversed. However, under CVS's calculation, even medication that is never picked up and never paid for—and instead is put back on the shelf—would still be included as a "prescription filled." That is plainly not what the parties intended, and the Court does not see how that furthers CVS's expectation and objectives in acquiring active patients, apart from simply reducing its payment obligations.

The extrinsic evidence introduced at the Evidentiary Hearing likewise confirms that in the prior agreements between Rite Aid and CVS, Rite Aid has calculated "prescriptions filled" based on the number of prescriptions actually retrieved by [or dispensed to] patients. That holds true for both the thirteen-week baseline period data, as well as the Lookback Period data. Both sets of data have always represented prescriptions retrieved and paid for by patients. Again, testimony and other evidence confirm that CVS has never until most recently disputed this methodology. In point of fact, the evidence show that CVS employees repeatedly accepted and agreed with Rite Aid's calculations of "prescriptions filled" based on prescriptions dispensed. For example, the November 1, 2023, APA between the parties includes a substantially similar purchase price adjustment mechanism in which Rite Aid provides a baseline number of "prescriptions filled" for each store, which is to be compared to "prescriptions filled" during the lookback period. Rite Aid used the number of prescriptions actually dispensed to patients and CVS accepted and did not dispute Rite Aid's calculation of "prescriptions filled" for either the baseline period or the lookback period (DX 3); Zhushma Decl. ¶ 10.

This Court further finds that the acceptance by all parties with respect to Rite Aid's interpretation and application of the phrase "prescription filled" is reflected in several email exchanges between the parties in June 2025, during these chapter 11 cases and after the APAs at issue here were signed. (DX 49) For instance, on June 10, 2025, Guggenheim contacted Robin White and others at CVS to provide a purchase price adjustment calculation and requested "any feedback on the template so we can make the appropriate adjustments for next week." (DX 48). The template, which calculated purchase price adjustments based on prescriptions filled, was clearly based on "Total [Prescriptions] Sold," with the day-by-day data described as "Sold Rx." *Id*. Ms. White later that day responded "[w]e are in agreement with the audit template and the

17

calculated price adjustments." (DX 47.) On June 13, 2025, Ms. White at CVS asked Rite Aid to provide Lookback Period certifications for certain stores that were closing the week of June 21 *Id*. On June 16, 2025, in response to Ms. White's request, Rite Aid sent her a spreadsheet containing the lookback period certifications for each of the requested stores in the same manner as done the earlier that week. (DX 49). That spreadsheet again explicitly notes that the calculations are based on "Total [Prescriptions] Sold" and "Sold Rx." *Id*. Ms. White again confirmed. (DX 50). Neither Ms. White nor anyone else at CVS ever questioned the use of prescriptions actually sold to patients for purposes of calculating the number of "prescriptions filled."

Similarly, in early July 2025, when CVS sought to reconcile the numbers it received from a third-party (Two Point) and the numbers it received from Rite Aid, CVS asked Rite Aid to "add real fill date" to its spreadsheet, in response to which Rite Aid noted that the spreadsheet "shows the date of completion of fill (sale to a customer) which completes the dispensing process," and that this is "the same data that was provided in diligence, bidder matrix, bi-weekly updates on script counts, and what is being aggregated by Guggenheim (and what we've provided historically) each Monday for script validations." (DX 60). Again, no issue was raised or inquiry made.

Indeed, even Mr. Frumento confirmed in internal emails that CVS is "fine counting sold scripts." (DX 68). Astonishingly, but to Mr. Frumento's credit and candor, this internal email acknowledgement came about after the Motion was filed and dispute articulated. In all, the Court finds that the unrebutted extrinsic evidence placed before the Court confirms that the parties negotiated and ultimately entered into the APAs at issue here, with a clear understanding that they would continue to treat and calculate "prescriptions filled" in a manner that is consistent with their prior courses of dealing and performance. The interpretation advocated by Rite Aid with respect to the Prescription Filled Phrase is correct and should govern the transaction.

Finally, as indicated by the Court at the Evidentiary hearing, the parties' remaining dispute as to the proper treatment of prescriptions transferred from Rite Aid to was not ready for review and consideration; the Court directed that the parties file further supplemental submissions and that the Court would take up the matter for resolution on August 14, 2025.

### IV.    Conclusion

For the reasons discussed, the Court **GRANTS** Movant's Motion, in part. Movant is to submit a proposed form of order, on notice to all parties in interest, consistent with this Opinion.

Dated: July 28, 2025

*[signature]*
Honorable Michael B. Kaplan
United States Bankruptcy Judge