**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Gregory Laufer (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted
*pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW RITE AID, LLC, *et al.*,[1] | ) | Case No. 25-14861 (MBK) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON CORPORATION'S MOTION FOR AN ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM AND RELATED RELIEF

New Rite Aid, LLC, together with its affiliated debtors and debtors in possession

(collectively, the "<u>Debtors</u>," or the "<u>Company</u>"), respectfully submit this memorandum of law in

---

[1] The last four digits of New Rite Aid, LLC's tax identification number are 1483. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at [https://restructuring.ra.kroll.com/RiteAid2025]. The location of Debtor New Rite Aid LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

opposition to *McKesson Corporation's Motion for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief*, Docket No. 655 (the "<u>Motion</u>" or "<u>Mot.</u>").

### Introduction

1.      The disputed issue at the heart of McKesson Corporation's ("<u>McKesson's</u>") Motion is how to treat a $49,674,910 payment that the Debtors made to McKesson on the Petition Date (the "<u>May 5 Payment</u>").

2.      McKesson argues that the May 5 Payment was an ordinary course, pre-petition transfer that satisfied antecedent pre-petition obligations the Debtors owed to McKesson under their Supply Agreement.  Because the May 5 Payment, in its view, was just an "ordinary" "pre-petition" payment of outstanding amounts, McKesson argues it should *keep* the May 5 Payment *and* immediately be paid *an additional* $49,674,910 for goods it shipped post-petition, on May 6, 2025 and May 7, 2025.

3.      McKesson is wrong.  The May 5 Payment was neither a pre-petition nor ordinary course payment.  Rather, it was an extraordinary payment made to McKesson under extreme duress, solely to ensure McKesson's post-petition deliveries of drugs—the same deliveries for which McKesson now seeks payment as an administrative expense.  *See* Liebman Decl. ¶ 10. More specifically:

4.      *First*, properly viewed, the May 5 Payment was not a pre-petition payment.  The parties to the Supply Agreement are McKesson and Rite Aid Corporation ("<u>Rite Aid</u>").  Rite Aid is the principal party to, and the party obligated to pay McKesson under, the Supply Agreement. As McKesson acknowledges, Rite Aid filed its chapter 11 petition at 2:50 p.m. ET on May 5, which was *before* the May 5 Payment was wired to McKesson, at about 3:11 p.m. ET.  Although

the payment was made by Rite Aid Hdqtrs. Corp. ("HQ"), which filed its chapter 11 petition several hours later, HQ was paying on Rite Aid's behalf. *See* Liebman Decl. ¶¶ 4–6, 10.

5.     This Court's Cash Management Order confirms that HQ acts in such a capacity, making payments on behalf of the other Debtors as the head of the Debtors' cash management system.[2]

6.     McKesson's Motion also confirms that "the payment of McKesson's invoices"—always addressed to *Rite Aid*—via a wire from HQ "was consistent with all or virtually all prior payments received by McKesson under the Supply Agreement," Mot. ¶ 28, and "consistent with the parties' course of dealing under the Supply Agreement." *Id.* ¶ 39.

7.     The fact that the Debtors use a cash management system in which HQ pays suppliers on behalf of Rite Aid and the other Debtors does not render the May 5 Payment a pre-petition payment when Rite Aid itself—McKesson's principal counterparty under the Supply Agreement—had already filed a chapter 11 petition.  Thus, the May 5 Payment constitutes a post-petition payment that, as explained below and in a complaint that Rite Aid is filing to avoid and recover payments that it made to McKesson (the "Complaint"), should be avoided under Section 549 of the Bankruptcy Code.

8.     *Second*, the May 5 Payment was not made in the ordinary course.  Rather, the Debtors made the May 5 Payment only *after* McKesson unilaterally changed the payment terms under the Supply Agreement and threatened to stop shipping prescription drugs to the Debtors—an extraordinary occurrence that would have crippled the Debtors' operations rather than, as the

---

[2] *See Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief,* entered on June 9, 2025, Docket No. 765  (the "Cash Management Order") ¶ 20.

Supply Agreement obviously contemplates, facilitated the Debtors' operations.  Liebman Decl.

¶ 7; Benedon Decl., Ex. A.  Further, the payment was made only *after* McKesson confirmed it

would continue to ship prescription drugs to the Debtors only upon payment.  *Compare* Benedon

Decl., Ex. B, *with* Benedon Decl., Ex. A.  McKesson knew that its cessation of deliveries to the

Debtors would force an immediate shutdown of Rite Aid's operations, and also knew that the May

5 Payment was made to ensure deliveries on the Petition Date and thereafter.  *See* Benedon Decl.,

Ex. A.  Thus, HQ hurriedly made the payment, solely because McKesson was threatening to

immediately cease supplying prescription drugs to the Debtors.  *See id.*; *see also* Liebman Decl.

¶ 9.

9.      Not only are the predicates of McKesson's entire position wrong, but the Motion

should also be denied for at least two other independently sufficient reasons:

10.     *First*, even if the Court finds the May 5 Payment to be a pre-petition, rather than a

post-petition, transfer, it should still be avoided.  If it was pre-petition, it was a preferential

payment.  And, as set forth above, it was far from "ordinary course," but rather the result of extreme

and unique pressure, stringent new payment terms that McKesson was foisting on Rite Aid, and

ramped-up collection activities.  Liebman Decl. ¶ 10.  As set forth in the Complaint that Rite Aid

is filing to avoid and recover payments that it made to McKesson, the May 5 Payment was, if pre-

petition, a textbook preference, and McKesson's liability to the Debtors should offset any asserted

administrative expense claim.

11.     *Second*, McKesson is improperly withholding **more than one hundred million**

**dollars** in rebates and credits from the Debtors that, if not for the Debtors' chapter 11 cases,

McKesson would normally credit against future orders.  *Id.* ¶¶ 14–17.

12.     In the ordinary course, when Rite Aid's purchases from McKesson generate volume discounts for McKesson from its suppliers, McKesson shares those discounts with Rite Aid in the form of rebates that are applied as credits for additional purchases ("Rebates").  In addition, McKesson provides credits to Rite Aid for unsold product that Rite Aid either returns directly to McKesson or that is returned through third parties, in which McKesson then gets refunded by the original manufacturer (the "Credits").  *Id.* ¶ 14.

13.     As soon as Rite Aid filed for bankruptcy, however, McKesson stopped providing Rebates and Credits to Rite Aid—for products delivered both pre-petition and post-petition—even though McKesson has, in the case of Rebates, continued to receive tens of millions of dollars of discounts from its suppliers based on the volume of prescription drugs that Rite Aid purchased and is continuing to purchase from McKesson, and, in the case of Credits, recovered tens of millions of dollars either from reselling returned products or recovering directly from the original manufacturer.  Liebman Decl. ¶¶ 14–16.  McKesson also cut off Rite Aid's access to critical information that McKesson had previously routinely provided, including information about Rebates and Credits.  *Id.* ¶ 15; Benedon Decl., Ex. C.

14.     In other words, by withholding more than one hundred million dollars in Rebates and Credits for itself, McKesson is charging the Debtors significantly more for products than it did prior to the Debtors' bankruptcy and imposing a "bankruptcy penalty."  *See* Liebman Decl. ¶¶ 15, 16.  As the Debtors' Complaint demonstrates, McKesson is liable to Rite Aid for the Rebates and Credits it is improperly withholding—the amount of which far exceeds the amount for which McKesson is seeking to compel payment as an administrative expense.  *See id.*  The amounts that McKesson has improperly withheld should therefore, at the very least, be offset against its asserted administrative expense claim.

15.     In these circumstances, McKesson's Motion should be denied, and the Debtors

should not be compelled to pay McKesson $49,674,910 for goods shipped post-petition on May 6,

2025 and May 7, 2025.

## BACKGROUND

### A.  The August 2024 Settlement Agreement and the New Supply Agreement

16.     On August 16, 2024, this Court entered an *Order Approving the Disclosure

*Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite*

*Aid Corporation and its Debtor Affiliates (With Further Modifications)*, *In re Rite Aid Corp.*, No.

23-18992 (Bankr. D.N.J.), Docket No. 4532.  The Rite Aid I Debtors then emerged from their

previous chapter 11 proceedings on August 30, 2024.  As part of those proceedings, McKesson

also took a $700 million write-off on Rite Aid exposure.  Notwithstanding the Debtors' efforts to

wipe the slate clean upon emergence, the present Motion illustrates McKesson's continuing efforts

to penalize Rite Aid.

17.     The Plan of Reorganization incorporated a settlement agreement between the

Debtors and McKesson (the "Settlement Agreement") and provided that Rite Aid and McKesson

would enter into a new supply agreement (as amended, supplemented, or modified from time to

time, the "Supply Agreement"), Benedon Decl., Ex. D.

18.     The Supply Agreement was entered into between McKesson and Rite Aid.  The

agreement allows Rite Aid to assign its right to place orders with McKesson to certain of Rite

Aid's "Assignment Affiliates."  *Id.* § 18.  Rite Aid is nevertheless contractually "responsible for

payment for all purchases hereunder by Rite Aid and shall unconditionally guarantee the prompt

payment of all purchases by its Affiliates, including its Assignment Affiliates."  *Id.* § 7.9.

McKesson deals exclusively with Rite Aid under the Supply Agreement, as the agreement

explicitly provides:  "McKesson shall be entitled to rely exclusively upon any communications it

receives with respect to this Agreement from Rite Aid as binding with respect to Rite Aid and each Rite Aid Affiliate." *Id.* § 18.3.

19.     The Supply Agreement replaced the parties' prior agreement and included new, more restrictive payment and credit terms designed to protect McKesson.

20.     Specifically, the Supply Agreement required Rite Aid to pay for the prescription drugs that McKesson supplied to Rite Aid pharmacies within ten days of invoicing. *Id.* § 7.1(a). It also placed a $270 million cap on the amount of Rite Aid's outstanding accounts payable to McKesson, to limit McKesson's credit exposure. *Id.* This "10-Day Accounts Receivable Cap" was based on the "amount owed to McKesson for Products delivered," *id.*, and therefore was calculated on the basis of "Products" *actually delivered* to Rite Aid.

**B. Payments Under the Supply Agreement**

21.     Payments owed under the Supply Agreement have historically and consistently been paid by HQ. HQ, however, does not own or operate any stores; conduct pharmacy operations; or place orders for, or receive deliveries of, prescription drugs under the Supply Agreement. Rather, under Rite Aid's cash management system, HQ makes most payments that Rite Aid and other Debtors owe to third parties, including to McKesson. Cash receipts that other Debtor entities generate are swept into HQ's accounts, and HQ makes payments on their behalf. Rite Aid and HQ account for these intercompany transfers in their respective books and records. *See* Liebman Decl. ¶¶ 4, 5.

22.     As set forth in the Cash Management Order:

[A]ny payments made by Rite Aid Hdqtrs. Corp. or any other Debtor, on behalf of any other Debtor, including payments made with the property of any Originating Debtor, including with the proceeds of any sale, transfer or disposition of such Originating Debtor's property or assets, *shall be deemed made by the applicable Originating Debtor*.

Cash Management Order ¶ 20 (emphasis added).

23.     As also set forth in the Cash Management Order, nearly every account used by the

Debtors in their cash management system is held by HQ, including all store-level bank accounts.

*Id.*, Ex. 2; *see also* Liebman Decl. ¶¶ 4, 5.

24.     In addition, Rite Aid is the "Borrower" under the Debtors' prepetition asset based

loan facility, and the only party authorized to make draws thereunder.  Rite Aid submits draw

requests to the lenders to fund the Debtors' operations, and the proceeds of those borrowings are

then deposited into an account owned by HQ.   At all times relevant to this dispute, Rite Aid was

in cash dominion under the loan facility, meaning that all cash that was pooled at HQ was swept

daily to the lenders, and then Rite Aid was required to draw amounts necessary to fund

operations.  As a result, the funds in HQ's accounts constituted proceeds of the borrowings that

Rite Aid made on a daily basis under the loan facility.  *Id.* ¶ 6.

25.     As McKesson concedes in its Motion, "HQ making the wire payments to McKesson

for outstanding invoices was consistent with the parties' course of dealing under the Supply

Agreement," Mot. ¶ 39, and, in fact, "all or virtually all prior payments received by McKesson

under the Supply Agreement" were paid by a wire from HQ.  *Id.* ¶ 28.

## C.     McKesson Imposes New More Restrictive Payment Terms

26.     Fearing that Rite Aid's financial condition was deteriorating, in the weeks leading

up to Rite Aid's second bankruptcy filing, McKesson demanded even more restrictive payment

and credit terms than the Supply Agreement provided.

27.     In particular, in a letter dated April 23, 2025, McKesson told Rite Aid that, effective

May 1, 2025:  (i) Rite Aid would have to pay for deliveries within six days (reduced from ten days

as agreed to in the Supply Agreement), and (ii) the 10-Day Accounts Receivable Cap, which Rite

Aid was already struggling to comply with, would be reduced from $270 million to $175 million.

Benedon Decl., Ex. E.   At the time such letter was received, Rite Aid's outstanding accounts

receivable totaled approximately $250 million.  Liebman Decl. ¶ 7.  Thus, less than two weeks before Rite Aid would file for bankruptcy, McKesson was demanding that Rite Aid work down its outstanding balance by nearly $75 million, which had the effect of further accelerating Rite Aid's payment terms.  *See id.*

28.    McKesson also made it more difficult to comply with the substantially reduced 10-Day Accounts Receivable Cap by changing how it calculated Rite Aid's outstanding accounts receivable.  Contrary to past practice, McKesson began calculating its accounts receivable from Rite Aid as including all Rite Aid orders as soon as they were placed with McKesson—rather than, as previously, including orders only after McKesson delivered them to Rite Aid.  *Id.* ¶ 9.

29.    This new calculation method was not only a change from past practice, but also a change from the terms of the Supply Agreement, which states that the 10-Day Accounts Receivable Cap applies solely to "amount[s] owed to McKesson *for Products delivered*," Supply Agreement § 7.1(a) (emphasis added).  This change further tightened the 10-Day Accounts Receivable Cap by forcing Rite Aid to either even further limit future orders or accelerate its payment of outstanding invoices to stay within the cap.  *See* Liebman Decl. ¶ 9.

30.    After receiving the April 23, 2025 letter, Rite Aid executives pleaded with McKesson to relax the restrictive new terms.  Bowers Decl. Ex. 7 at 63.

31.    On April 30, 2025, after negotiations between top executives of both companies, McKesson agreed to relax the restrictive new terms, but only marginally.  McKesson agreed that it would require payment within seven days of invoicing (instead of six days as the April 23 letter required), and instead of dropping to $175 million immediately, the 10-Day Accounts Receivable Cap would be reduced to $200 million starting May 1—an initial $75 million reduction—with additional incremental $5 million reductions in the cap on each day thereafter.  *Id.* at 62.

32.     Even with this slight relaxation of the new payment and credit terms, these terms were far tighter than they had been before, and Rite Aid struggled to comply with them, especially given the new, extracontractual manner in which McKesson was calculating the 10-Day Accounts Receivable Cap.

33.     On May 1, 2025, Rite Aid was already on course to exceed the newly reduced 10-Day Accounts Receivable Cap by $11 million. ███████████████████████████

██████████████████████████████████████████████████

████████████    ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

34.     Rite Aid had no choice but to comply, and agreed to make an additional $11 million payment to McKesson—on top of the amounts then due on ordinary course invoices—to keep Rite Aid's payables to McKesson within McKesson's newly tightened cap that was going into effect that day. ██████████████████████████████████████████

██████████████████████████████████████

35.     Thus, as a result of McKesson's newly imposed trade terms, it received an accelerated $11 million preferential payment from Rite Aid.

**D.     Rite Aid's May 5, 2025 Payment**

36.     Rite Aid's struggle to comply with McKesson's new terms continued as Rite Aid tried to balance its need for new supplies from McKesson with McKesson's new requirements.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

37.     On Sunday May 4, 2025, at 7:54 p.m., McKesson's Bowers wrote an alarming email to Rite Aid's Bixler and McMahon, stating that McKesson had ordered a halt to its processing of new orders from Rite Aid until Rite Aid made an additional payment to McKesson:

> I wanted to inform you that as of this evening, McKesson is holding all new incoming orders because Rite Aid has exceeded today's cap of $185M. So far, Rite Aid's orders have amounted to a little over $21M, and we are anticipating more orders from the West Coast.
>
> *We will not be able to process any further orders until Rite Aid makes the necessary payment.*

Bowers Decl. Ex. 5 at 57 (emphasis added).

38.     As Rite Aid's sole longtime supplier of prescription drugs, McKesson obviously knew that its cessation of deliveries to Rite Aid would have imperiled Rite Aid's operations at a time when Rite Aid was in extreme financial distress and on the brink of commencing these chapter 11 cases.

39.     In an effort to appease McKesson and to ensure that McKesson would continue fulfilling orders that Rite Aid had already placed—and that its customers were reliant on—Bixler wrote back the next morning:

> The pause in order processing is likely to cause operational and patient disruption and we want to try to minimize that impact going forward. We anticipate making a wire payment in the amount of $49.7M today, which I believe will put our outstanding balance at approximately $138M. Are you able to confirm that you will fulfill and ship orders up to the cap amount of $180M based upon receipt of that wire payment?

*Id.*

40.     ████████████████████████████████████████████
████████████████████████████████

41.     At 2:50 p.m. ET on May 5, 2025, Rite Aid—the principal party to the Supply Agreement with McKesson—filed its chapter 11 petition.

42.    Approximately 20 minutes later, at 3:11 p.m. ET, in direct reliance on McKesson's confirmation communicated only shortly earlier that it would continue to fulfill and ship orders, *see id.*, HQ wired $49,674,910 to McKesson on Rite Aid's behalf. █████████████████████ ████████████████████████████████████████████████ ███████████████████████████ HQ itself filed a chapter 11 petition hours later, after that payment had been made.  Liebman Decl. ¶ 9.

E.    **Rite Aid's Post-Petition Orders**

43.    Rite Aid's May 5 Payment to McKesson warded off the immediate threat by McKesson to shut off deliveries to the Debtors.

44.    Between May 6 and May 7, 2025, McKesson delivered just over $50 million worth of product.  Liebman Decl. ¶ 11.  It is these orders for which McKesson is seeking to compel payment as an administrative expense.

45.    Beginning on May 7, 2025, the Debtors have paid McKesson cash in advance based on estimated amounts for the following day's deliveries.  Those payments have totaled hundreds of millions of dollars in the aggregate.  *See id.* ¶ 12.

F.    **McKesson Withholds Rebates and Credits from Rite Aid and Increases Its Profits Post-Petition**

46.    █████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████

47.    Generally speaking, in the ordinary course of business, McKesson receives various credits, incentives, rebates, and other adjustments from prescription drug manufacturers when it purchases certain volumes of prescription drugs.  Liebman Decl. ¶ 14.  Under the Supply

Agreement, McKesson shares some of those savings with Rite Aid.  *See id.*  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

48.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

49.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Liebman Decl. ¶ 13.  McKesson,

in return, either resells products that are returned to it directly by Rite Aid or, for products

processed through third-parties, will receive refunds or credits from the original manufacturer.  *Id.*

50.    In other words, McKesson realizes the benefits of volume purchases and returned

products in real time, and shares them in arrears as rebates and credits to Rite Aid to lower Rite

Aid's ultimate cost of products under the Supply Agreement.

51.    Immediately after the Debtors filed for bankruptcy in these proceedings, however,

McKesson stopped supplying all Rebates and Credits to Rite Aid, and stopped its regular practice

of meeting with Rite Aid to reconcile their calculations of such Rebates and Credits.  Liebman

Decl. ¶¶ 14–16.  Notwithstanding such actions by McKesson, it has continued to receive such

Rebates or Credits from the original manufacturers or third party processors.  *Id.* ¶ 15.

52.    ████████████████████████████████████████████████

████████████████████████████████████████████████ no default existed

before the Petition Date, nor did McKesson ever notify Rite Aid that it was invoking any purported

right to withhold Rebates or Credits at any time before the Petition Date.  And, as set forth above,

since May 7, 2025, Rite Aid has paid for all post-petition orders in advance in cash. Thus, solely as a consequence of the Debtors' commencing these chapter 11 cases, McKesson immediately began to withhold Rebates or Credits that it otherwise would have applied to reduce the cost of the Debtors' post-petition orders.

53.    To date, McKesson has withheld more than $100 million of Rebates and Credits, well in excess of the amount for which McKesson is seeking to compel payment as an administrative expense. Through June 30, 2025, Rite Aid has earned an estimated $60 million of Rebates, and through July 31, 2025, Rite Aid has accrued in excess of $50 million in Credits, both of which McKesson is now withholding—and the amounts continue to grow. Liebman Decl. ¶ 16.

## <u>ARGUMENT</u>

## I.    The May 5 Payment Was Not A Pre-Petition Transfer Because It Was Made on Behalf of Rite Aid, Which Had Already Filed Its Chapter 11 Petition

54.    McKesson's Motion is premised on the false notion that the May 5 Payment was a pre-petition transfer, because HQ wired the money to McKesson before HQ filed its chapter 11 petition. This argument improperly elevates form over substance. *See Pepper* v. *Litton*, 308 U.S. 295, 304–05 (1939) (stating that bankruptcy courts are courts of equity where "substance will not give way to form").

55.    McKesson's Supply Agreement is with Rite Aid—*not* with HQ. The Supply Agreement squarely states that Rite Aid shall serve as the agent of itself and its Assignment Affiliates for all purposes of administration of the agreement and all communications with McKesson pertaining to the agreement, and that McKesson shall be entitled to rely exclusively on any communications from Rite Aid as binding with respect to Rite Aid and each Rite Aid Affiliate. Supply Agreement § 18.3. Thus, while HQ is the entity that pays McKesson because of the Debtors' cash management system, its payments are made on behalf of Rite Aid.

56.     Rite Aid filed its chapter 11 petition at 2:50 p.m. ET on May 5, 2025, *before* McKesson received the May 5 Payment.  Liebman Decl. ¶ 10.  At such time, a bankruptcy estate was automatically created that included "all legal or equitable interests of [Rite Aid] in property as of the commencement of the case," "wherever located *and by whomever held*."  11 U.S.C. 541(a)(1) (emphasis added).

57.     A debtor, such as Rite Aid, can therefore have an interest in funds even if transferred by another entity.  In the context of avoidance actions, for example, a transfer "need not be made directly by the debtor; indirect transfers made by third parties to a creditor on behalf of the debtor may also be avoidable under the Code."  *Warsco* v. *Preferred Technical Grp.*, 258 F.3d 557, 564 (7th Cir. 2001) (citing *Dean* v. *Davis*, 242 U.S. 438, 442 (1917) ("Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such.")).

58.     The fact that HQ made the payment to McKesson is simply an artifact of the Debtors' cash management system.  While HQ holds bare legal title to the Debtors' disbursement accounts, including all store level accounts, it does so on behalf of other Debtors.  HQ does not operate any stores or pharmacies; rather, Rite Aid operating units operate them, and the revenue they earn is swept into HQ accounts to coordinate payment to suppliers like McKesson.  Thus, HQ's accounts are funded almost exclusively from collections on behalf of Rite Aid and other Debtors.  In contrast, Rite Aid, even though it is the principal obligor under the Supply Agreement, does not directly own any bank accounts.  *See* Cash Management Order, Ex. 2.

59.     This Court has already recognized and confirmed the relationship between HQ and Rite Aid in the Cash Management Order.  Specifically, the Court ordered that "*any payments made by Rite Aid Hdqtrs. Corp. or any other Debtor, on behalf of any other Debtor*, including payments made with the property of any Originating Debtor, including the proceeds of any sale, transfer or

disposition of such Originating Debtor's property or assets, *shall be deemed made by the applicable Originating Debtor*." *Id.* ¶ 20 (emphasis added).

60.    McKesson's position is incompatible with these circumstances.    Under McKesson's worldview, Rite Aid—the principal party under the Supply Agreement— would have *no* legal or equitable interest in *any* of the Debtors' cash.  That makes no sense, and has no support in either law or fact (and certainly nothing cited by McKesson in its Motion identifies any such support).

61.    To the contrary, McKesson acknowledges in its Motion that "all or virtually all prior payments received by McKesson under the Supply Agreement since the Debtors' emergence from the Prior Cases" were paid "*via a wire from HQ*."  Mot. ¶ 28 (emphasis added); *see also id.* ¶ 39 ("HQ making the wire payments to McKesson for outstanding invoices was consistent with the parties' course of dealing under the Supply Agreement.").

62.    McKesson's argument that HQ had an independent obligation to pay McKesson as a guarantor of Rite Aid's obligations misses the point.  Mot. ¶¶ 39–40.  Whether HQ itself had a separate obligation as a guarantor does not change the fact that, on May 5 and in the ordinary course, HQ is the entity that pays suppliers like McKesson directly on behalf of Rite Aid.

63.    McKesson's acknowledgment that HQ—which was one of more than a hundred guarantors under the Supply Agreement, and one, no less, that has no pharmacy operations or use for prescription drugs—made "all or virtually all prior payments received by McKesson under the Supply Agreement since the Debtors' emergence from the Prior Cases," Mot. ¶ 28, and that HQ making payments to McKesson "was consistent with the parties' course of dealing under the Supply Agreement," *id.* ¶ 39, further confirms that HQ was paying McKesson on behalf or Rite Aid, for Rite Aid's direct obligation, and not as a guarantor.

64.     McKesson's reliance on *Bauer* v. *General Electric Capital Corp.* (*In re Oncology Assocs. of Ocean County LLC*), 510 B.R. 463 (Bankr. D.N.J. 2014), to support its position is misplaced.  There, a trustee sought to avoid as unauthorized post-petition transfers certain transfers made by one debtor (Modern) after the bankruptcy filing of an affiliate (OACG) but before Modern entered bankruptcy *a year later* when it was substantively consolidated with OACG's bankruptcy case.  *Id.* at 465–66.  The court ruled that the substantive consolidation was not retroactive, and that, at the time Modern's transfers occurred, "Modern was not in bankruptcy and its assets were not property of the bankruptcy estate."  *Id.* at 468.

65.     The circumstances are entirely different here.  The Debtors are not relying on substantive consolidation, but rather on the realities of the Debtors' cash management system and HQ's role within that system.  And, unlike in *Bauer*, HQ did not enter bankruptcy a year after Rite Aid, but only hours later, on the same day.

66.     In sum, HQ made the May 5 Payment to McKesson on behalf of Rite Aid, as HQ always does under the Debtors' cash management system, and Rite Aid had already filed for chapter 11 protection when HQ made the payment.  *See* Liebman Decl. ¶¶ 4, 5, 10.  The transfer was therefore a post-petition payment, notwithstanding HQ's seven-hour delay in filing its own petition.  McKesson's argument elevates form over substance in a manner directly at odds with the Cash Management Order and common sense, and should be rejected.

67.     Additionally, and as set forth more fully in the Debtors' Complaint, the May 5 Payment should be avoided as an unauthorized post-petition payment pursuant to Section 549 of the Bankruptcy Code.  The Court should not award McKesson an allowed administrative expense claim and compel the Debtors to immediately pay McKesson $49.7 million until that issue is resolved.

## II.    The May 5 Payment Was Not An Ordinary Course Transfer To Repay A Prepetition Obligation

68.    McKesson's Motion is also premised on the mistaken proposition that the May 5 Payment was an "ordinary course" payment intended to satisfy the Debtors' prepetition obligations under the Supply Agreement.

69.    While McKesson's Motion is not the correct procedural posture in which to adjudicate this issue, which should be done in the context of an adversary proceeding, suffice it to say that there was nothing remotely "ordinary" about that payment.  In reality, the May 5 Payment was made under extreme duress—a circumstance engendered directly by McKesson itself—for the sole purpose of appeasing McKesson and thereby ensuring that McKesson would continue to deliver prescription drugs to Rite Aid stores on the Petition Date and immediately thereafter. Liebman Decl. ¶ 10

70.    Rite Aid made the May 5 Payment only after McKesson imposed new payment terms the week before and reduced the 10-Day Accounts Receivable Cap by more than $100 million, which forced Rite Aid to reduce orders from, and accelerate payments to, McKesson.  *Id.* ¶ 8. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Moreover, contrary to what the Supply Agreement provides, McKesson began calculating the 10-Day Accounts Receivable Cap to include orders that it had not even delivered, which made it even more difficult for the Debtors to comply with McKesson's terms while also paying other creditors.  Liebman Decl. ¶ 9.

71.    Then, on May 4, 2025, McKesson stated that it was stopping fulfilling orders and ceasing all future deliveries of prescription drugs until Rite Aid made a substantial payment. Benedon Decl., Ex. B (McKesson email to Rite Aid stating that "as of this evening, McKesson is

holding all new incoming orders because Rite Aid has exceeded today's cap of $185M. . . .   We will not be able to process any further orders until Rite Aid makes the necessary payment.")  This termination would have been devastating to the Debtors' operations (and to the Debtors' customers), and was avoided solely because the Debtors gave in to McKesson's pressure and made a significant payment to McKesson.  *See id.*; Benedon Decl., Ex. A.  And, most importantly, Rite Aid made the May 5 Payment only after McKesson confirmed it would only deliver products on the Petition Date and immediately thereafter if the Debtors made the May 5 Payment.  *See* Benedon Decl., Ex. B (McKesson email prior to payment stating, "We will not be able to process any further orders until Rite Aid makes the necessary payment."). ██████████████████

████████████████████

72.    Thus, the May 5 Payment was not an "ordinary course" payment under prevailing law.  *See, e.g.*, *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568 (3d Cir. 2007) (the fact that "[the debtor] was pressured to make accelerated payments during the preference period because of [the creditor's] vigorous enforcement of its credit limit . . . weighed in favor of a finding that the disputed transfers were not 'ordinary' under §547(c)(2)(B)"); *In re J. Allan Steel Co.*, 336 B.R. 226, 229 (W.D. Pa. 2005) ("an unusual action . . . to collect on or pay debts" and "gain an advantage in light of the debtor's deteriorating financial condition" is not ordinary course); *Forklift Liquidating Tr.* v. *Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 738–39 (D. Del. 2006) ("Extraordinary collection efforts can bring payment efforts outside the ordinary course of business even when a differing payment interval alone is not enough to do so."); *Plan Admin. Agent* v. *Coastal Indus. (In re Kevco)*, 2005 WL 6443621, at *20 (Bankr. N.D. Tex. June 30, 2005) (rejecting ordinary course defense where creditor "increased its collection activity during the

Preference Period and . . . its collection activity was unusual, in that it was occurring at a time when [the debtor] was paying [the creditor's] invoices on time").[3]

73. Additionally, and as set forth more fully in the Debtors' Complaint, even if the May 5 Payment were ruled to be pre-petition, it should be avoided as a classic preference under Section 547 of the Bankruptcy Code.

74. The Court should not award McKesson an allowed administrative expense claim and compel the Debtors to immediately pay McKesson $49.7 million until these issues are resolved in the proper procedural context.

## III. McKesson Is Illegally and Inequitably Withholding Rebates and Credits from the Debtors

75. McKesson's Motion should be denied for an additional reason: McKesson should not be entitled to payment in full of its alleged administrative expense claim while simultaneously withholding over one hundred million dollars in Rebates and Credits from Rite Aid, thus reaping benefits from the volume of Rite Aid's purchases and from product returns but without sharing those benefits with Rite Aid as provided in the Supply Agreement. As a result of McKesson's impermissible withholding of Rebates and Credits, it has charged—and continues charging—Rite Aid more than $100 million for post-petition orders than it would have charged had Rite Aid not filed for bankruptcy. Liebman Decl. ¶ 15, 17.

---

[3] *See also, e.g., J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 96 B.R. 474, 478 (D.N.J. 1988) (effort to exercise control over debtor's financial activities by imposing credit limit, following threat to stop shipping supplies, was outside ordinary course), *aff'd*, 891 F.2d 66 (3d Cir. 1989); *Menotte* v. *Oxyde Chems., Inc.* (*In re JSL Chem. Corp.*), 424 B.R. 573, 582 (Bankr. S.D. Fla. 2010) (payments made after creditor imposed credit hold and refused to deliver new merchandise until credit balance was reduced were outside ordinary course); *Off. Comm. of Unsecured Creditors of Gregg Appliances, Inc.* v. *D&H Distrib. Co.* (*In re HHGREGG, Inc.*), 2022 WL 370279, at *9 (Bankr. S.D. Ind. Jan. 13, 2022) (payments made after creditor reduced credit limit and threatened to withhold shipments were outside ordinary course).

76.     McKesson began withholding the Rebates or Credits only *after* the Debtors commenced these chapter 11 cases. *Id.* ¶¶ 14, 15.  As the Debtors' Complaint shows, McKesson's withholding of Rebates or Credits violates 11 U.S.C. § 365(e), which permits a bankruptcy court to invalidate *ipso facto* clauses "to prevent forfeiture of a debtor's rights." *In re Seven Hills, Inc.*, 403 B.R. 327, 335 (Bankr. D.N.J. 2009).

77.     McKesson's actions are also inequitable, particularly with respect to the Debtors' post-petition orders, for which McKesson takes no risk because the Debtors pay cash in advance. There is no basis under the Supply Agreement, or in equity, for McKesson to withhold post-petition Rebates or Credits while continuing to benefit from the volume discounts it receives from manufacturers based on Rite Aid's purchases.  Notably, McKesson has also cut off Rite Aid's access to information concerning Rebates and Credits. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

78.     It would be inequitable to compel payment from the Debtors to McKesson, while McKesson is pocketing for itself the benefits of its high-volume sales to Rite Aid—in effect, punishing Rite Aid for having filed for bankruptcy.  As set forth in the Debtors' Complaint, McKesson's claims should be equitably subordinated to other administrative expense claimants.

## CONCLUSION

79.     For the foregoing reasons, McKesson's motion to compel payment should be denied.

Dated:  July 31, 2025

*/s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Gregory Laufer (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:   arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*