**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Gregory Laufer (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel for Plaintiffs Rite Aid*
*Corporation and Rite Aid Hdqtrs. Corp.*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for Plaintiffs Rite Aid*
*Corporation and Rite Aid Hdqtrs. Corp.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW RITE AID, LLC, *et al.*,[1] | ) | Case No. 25-14861 (MBK) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| RITE AID CORPORATION and RITE AID HDQTRS. CORP., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Proc. No. _____ (MBK) |
| | ) | |
| v. | ) | (Jointly Administered) |
| | ) | |
| MCKESSON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT TO AVOID AND RECOVER AVOIDABLE TRANSFERS, FOR A DECLARATORY JUDGMENT, AND FOR EQUITABLE SUBORDINATION

---

[1] The last four digits of New Rite Aid, LLC's tax identification number are 1483. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be

Plaintiffs Rite Aid Corporation ("Rite Aid") and Rite Aid Hdqtrs. Corp. ("HQ," and together with Rite Aid, "Plaintiffs"), through their undersigned counsel, for their Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination, allege as follows:

## Nature of the Action

1.     This is an action to avoid and recover three transfers that Plaintiffs made to McKesson Corporation ("McKesson") that are avoidable under 11 U.S.C. § 547 and 11 U.S.C. § 549 and recoverable under 11 U.S.C. § 550.

2.     Plaintiffs also seek a declaration that McKesson is wrongfully withholding more than one hundred million dollars of contractual rebates and credits from Rite Aid in violation of Section 365(e)(1) of the Bankruptcy Code; an order directing McKesson to cease withholding— and to promptly credit Rite Aid with—those rebates and credits; and an order equitably subordinating McKesson's claims pursuant to Section 510(c) of the Bankruptcy Code for its inequitable conduct in withholding such rebates and credits.

**The Avoidable Transfers**

3.     McKesson is Rite Aid's longtime partner and largest supplier of prescription drugs.

4.     The companies' relationship, however, has been strained during the Debtors' recent financial struggles, resulting in three avoidable payments that the Debtors made to McKesson— first, in the wake of the Debtors' prior chapter 11 proceeding (Rite Aid I), and then only under extreme pressure from McKesson in the runup to the current proceedings.

---

obtained on the website of the Debtors' proposed claims and noticing agent at [https://restructuring.ra.kroll.com/RiteAid2025]. The location of Debtor New Rite Aid LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

5.      The first avoidable transfer is a $29 million payment that the Debtors made to McKesson on February 28, 2025, well within the 90-day preference period under Section 547 of the Bankruptcy Code.  Rite Aid made that preferential payment to McKesson in connection with a settlement incorporated into its prior chapter 11 plan of reorganization, which required semi-annual payments to McKesson on account of its claims against the Rite Aid I Debtors.

6.      The second avoidable transfer—also a preferential payment—is an $11 million payment that the Debtors made to McKesson on May 1, 2025, to comply with a substantial reduction of the Debtors' available purchasing credit under the Supply Agreement, which McKesson imposed for the first time to protect itself in light of the Debtors' deteriorating financial condition.  This reduction, as well as other changes demanded by McKesson, resulted in a significant departure from the parties' then-existing trade terms, forcing the Debtors to accelerate payments to McKesson.

7.      The third avoidable transfer is a $49,674,910 payment that McKesson demanded on May 5, 2025, as a condition to accepting any new orders from the Debtors.  Faced with the choice of acceding to McKesson's demand or the immediate cessation of all orders under the Supply Agreement, which would have been disastrous to the Debtors' ongoing operations—and its customers' health and safety—HQ, on behalf of Rite Aid, made the $49.7 million payment to McKesson to ensure the continued shipment of prescription drugs that are essential to the Debtors' business.  Significantly, HQ made the payment *after* Rite Aid—the principal party to the Supply Agreement—had already filed its bankruptcy petition, and only hours before HQ would file its own chapter 11 petition.

8.      Each of these transfers was an unusual, non-ordinary course payment that the Debtors were forced to make to maintain their critical relationship with McKesson so that

McKesson would continue to supply the prescription drugs their customers need and that they need to continue operating, and, in regard to the last two payments, as a result of new and substantially more restrictive payment terms that McKesson imposed on the Debtors for the express purpose of accelerating payments to McKesson and reducing its financial exposure to the Debtors.

**Withholding of Rebates and Credits**

9.    ████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████ In the ordinary course, these rebates and credits total tens of millions of dollars every month that McKesson credits to Rite Aid against charges for new orders.

10.    After the Debtors commenced these chapter 11 cases, however, McKesson immediately began withholding all rebates and credits to Rite Aid in connection with purchases and returns that Rite Aid made both before and after filing for bankruptcy.

11.    Rite Aid seeks a declaration that McKesson's withholding of these rebates and credits is a violation of Section 365(e)(1) of the Bankruptcy Code—which prohibits a party to an executory contract from terminating or modifying any right under such contract because of a provision that is conditioned on the commencement of a case under chapter 11 or the financial condition of a debtor—and an order directing McKesson to cease withholding such rebates and credits.

12.    In addition, because McKesson's withholding of these rebates and credits is inequitable and harms other creditors, Rite Aid seeks equitable subordination of McKesson's claims under 11 U.S.C. § 510(c).

**Jurisdiction and Venue**

13.     The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C §§ 157 and 1334, the *Standing Order of*

*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6,

2025 (Bumb, C.J.).

14.     This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (C),

(E), (F), (K), (M), and (O).  The Debtors confirm their consent to the Court entering a final order

in connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.

15.     Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

16.     The statutory basis for the relief requested herein is sections 365(e)(1), 510(c), 547,

549, and 550 of title 11 of the United States Code.

**Parties**

17.     Plaintiff Rite Aid Corporation ("Rite Aid"), is a Delaware corporation that, through

its subsidiaries, operates pharmacies and provides other healthcare services.

18.     Plaintiff Rite Aid Hdqtrs. Corp. ("HQ"), also a Delaware corporation, is a

subsidiary of Rite Aid that consolidates revenues from Rite Aid's operating companies and uses

them to pay suppliers and others on behalf of Rite Aid and its operating companies.

19.     Defendant McKesson is a Delaware corporation with its principal executive offices

in Irving, Texas.  Defendant may be served with process under Rule 7004(b)(3) of the Federal

Rules of Bankruptcy Procedure either by mailing a copy of the summons and complaint to an

officer, managing or general agent, or an agent authorized by appointment or by law to receive service.

## Background

### A.    Rite Aid and McKesson

20.    Rite Aid and McKesson have had a long and (at least until recently) mutually beneficial business relationship, with McKesson serving as Rite Aid's almost sole supplier of prescription drugs.

21.    Rite Aid's recent financial struggles, however, have imposed enormous strain on that relationship.

### B.  The August 2024 Settlement Agreement and the New Supply Agreement

22.    The financial distress that led to Rite Aid's previous chapter 11 proceeding was the source of initial distress for the Company's relationship with McKesson.

23.    On August 16, 2024, this Court entered an *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Modifications)*.  The Rite Aid I Debtors then emerged from their previous chapter 11 proceedings on August 30, 2024.  *In re Rite Aid Corp.*, No. 23-18992 (Bankr. D.N.J.), D.I. 4532.

24.    The Plan of Reorganization incorporated a settlement agreement between the Debtors and McKesson (the "Settlement Agreement") and provided that Rite Aid and McKesson would enter into a new supply agreement (as amended, supplemented, or modified from time to time, the "Supply Agreement," attached hereto as Ex. A).

25.    Among other things, the Settlement Agreement required the Rite Aid I Debtors to pay McKesson up to $175 million in "Guaranteed Deferred Cash Payments," payable semi-annually over a period of three years.  *Disclosure Statement Relating to the Second Amended Joint*

6

*Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates*, No. 23-18992

(Bankr. D.N.J.), D.I. 4532, at 71–72. The first such payment was due six months after the Effective

Date, on February 28, 2025. The "Guaranteed Deferred Cash Payments" were payments on

account of McKesson's claims under section 503(b)(9) of the Bankruptcy Code against the Rite

Aid I Debtors in their 2024 bankruptcy proceeding.

26.    The Supply Agreement was entered into by and between McKesson and Rite Aid.

The agreement allows Rite Aid to assign its right to place orders with McKesson to certain of Rite

Aid's "Assignment Affiliates." Supply Agreement § 18.1  Rite Aid is nevertheless contractually

"responsible for all purchases hereunder by Rite Aid and shall unconditionally guarantee the

prompt payment of all purchases by its Affiliates, including its Assignment Affiliates." *Id.* § 7.9.

The agreement also explicitly provides:  "McKesson shall be entitled to rely exclusively upon any

communications it receives with respect to this Agreement from Rite Aid as binding with respect

to Rite Aid and each Rite Aid Affiliate." *Id.* § 18.3.

27.    The Supply Agreement replaced the parties' prior agreement and includes new,

more restrictive payment and credit terms designed to protect McKesson.

28.    Specifically, the Supply Agreement required Rite Aid to pay for the prescription

drugs that McKesson supplies within ten days of invoicing. *Id*. § 7.1(a). The Agreement also

placed a $270 million cap on the amount of Rite Aid's outstanding accounts payable to McKesson,

to limit McKesson's credit exposure to Rite Aid. *Id.* This "10-Day Accounts Receivable Cap"

was based on the "amount owed to McKesson for Products delivered," *id.*, and therefore was

calculated on the basis of "Products" *actually delivered* to Rite Aid.

**C. Payments Under the Supply Agreement**

29.    As a result of the Debtors' cash management system, payments owed by Rite Aid

and its Assignment Affiliates under the Supply Agreement have historically and consistently been

7

paid by HQ on behalf of Rite Aid and its Assignment Affiliates.  HQ itself does not own or operate

any stores, conduct pharmacy operations, or place orders for, or receive delivery of, prescription

drugs under the Supply Agreement.  Rather, cash receipts that other Debtor entities generate are

swept to HQ's accounts, and HQ makes payments to suppliers and other third parties on their

behalf.  Rite Aid and HQ account for these intercompany transfers in their books and records as

part of the Debtors' cash management system.

30.     This Court confirmed HQ's role within the Debtors' cash management system in

its *Final Order (I) Authorizing the Debtors to (A) Continue To Operate Their Cash Management*

*System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing*

*Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief*

[ECF No. 765] (the "Final Cash Management Order").  That Order provides:

> [A]ny payments made by Rite Aid Hdqtrs. Corp or any other Debtor,
> on behalf of any other Debtor, including payments made with the
> property of any Originating Debtor, including with the proceeds of
> any sale, transfer or disposition of such Originating Debtor's
> property or assets, shall be deemed made by the applicable
> Originating Debtor.

31.     As also set forth in the Final Cash Management Order, nearly every account used

by the Debtors in their cash management system is held by HQ, including all store-level bank

accounts, although HQ itself does not own or operate any stores.

32.     As McKesson itself has acknowledged, all or virtually all payments received by

McKesson under the supplier agreement have been paid by wire from HQ.

**D.  The First Avoidable Transfer:  February 28, 2025**

33.     HQ, on behalf of Rite Aid, paid McKesson $29 million on February 28, 2025, as a

Guaranteed Deferred Cash Payment under the Settlement Agreement (the "February 28, 2025

Payment").

34.     The February 28, 2025 payment, which was made well within the 90-day preference period under 11 U.S.C. § 547, was a non-ordinary course, preferential transfer that Rite Aid made pursuant to the unusual conditions of the Settlement Agreement and in satisfaction of prior claims under Section 503(b)(9) of the Bankruptcy Code.

35.     Had HQ not made the February 28, 2025 payment, McKesson would have had a general unsecured claim against the Debtors for breach of the Settlement Agreement.

**E.  The Second Avoidable Transfer:  May 1, 2025**

36.     HQ, again on behalf of Rite Aid, made another non-ordinary course, preferential transfer to McKesson of $11 million on May 1, 2025 (the "May 1, 2025 Payment").

37.     This unusual, non-ordinary course payment resulted from McKesson's pressure on Rite Aid to comply with new payment and credit restrictions that McKesson imposed on Rite Aid that were even more stringent than under the Supply Agreement, which the parties had agreed to just several months earlier.

38.     As discussed above, the Supply Agreement required Rite Aid to pay McKesson for its prescription drug deliveries within ten days from the date of invoicing.  In addition, the Supply Agreement also limited McKesson's exposure to Rite Aid by imposing a 10-Day Accounts Receivable Cap of $270 million, based on the amount of prescription drugs *delivered* by McKesson but for which invoices remained unpaid.

39.     Less than two weeks before the commencement of these chapter 11 cases, fearing that Rite Aid's financial condition was deteriorating, McKesson demanded even more restrictive payment and credit terms than the Supply Agreement imposed.

40.     In a letter dated April 23, 2025, McKesson told Rite Aid that, as of May 1, 2025, (i) Rite Aid would have to pay for deliveries within six days (reduced from ten days as agreed to in the Supply Agreement), and (ii) that the 10-Day Accounts Receivable Cap, which Rite Aid was

already struggling to comply with,  would be reduced from $270 million to $175 million.  At the

time Rite Aid received the letter, its outstanding accounts receivable totaled approximately $250

million.  Thus, less than two weeks before Rite Aid would file for bankruptcy, McKesson was

demanding that Rite Aid work down its outstanding balance by nearly $75 million, which had the

effect of further accelerating Rite Aid's payment terms.

41.    McKesson also made it more difficult to comply with the substantially reduced 10-

Day Accounts Receivable Cap by changing how it calculated Rite Aid's outstanding accounts

receivable.  Contrary to past practice, McKesson began calculating its accounts receivable from

Rite Aid as including all Rite Aid orders as soon as they were placed with McKesson—rather than,

as previously, including orders only after McKesson delivered them to Rite Aid.

42.    This new calculation method was not only a change from past practice, but also a

change from the terms of the Supply Agreement, which states that the 10-Day Accounts

Receivable Cap applies solely to "amount[s] owed to McKesson *for Products delivered*," Supply

Agreement § 7.1(a) (emphasis added).  This change further tightened the 10-Day Accounts

Receivable Cap by forcing Rite Aid to either even further limit future orders or accelerate its

payment of outstanding invoices to stay within the cap.

43.    After receiving the April 23, 2025 letter, Rite Aid executives pleaded with

McKesson to relax the restrictive new terms.

44.    On April 30, 2025, after negotiations between top executives of both companies,

McKesson agreed to relax the restrictive new terms, but only marginally.  McKesson agreed that

it would require payment within seven days of invoicing (instead of six days as the April 23 letter

required), and instead of dropping to $175 million immediately, the 10-Day Accounts Receivable

10

Cap would be reduced to $200 million starting May 1—an initial $75 million reduction—with additional incremental $5 million reductions in the cap on each day thereafter.

45.     Even with this slight relaxation of the new payment and credit terms, these terms were far tighter than they had been before, and Rite Aid struggled to comply with them, especially given the new, extracontractual manner in which McKesson was calculating the 10-Day Accounts Receivable Cap.

46.     On May 1, 2025, Rite Aid was already on course to exceed the newly reduced 10-Day Accounts Receivable Cap by $11 million. ████████████████████████████

████████████████████████████████████████████████████████████

███████████████    ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

47.     Rite Aid had no choice but to comply, and agreed to make an additional $11 million payment to McKesson—on top of the amounts then due on ordinary course invoices—to keep Rite Aid's payables to McKesson within McKesson's newly tightened cap that was going into effect that day. ████████████████████████████████████████████████

████████████████████████████████████████████

48.     Thus, as a result of McKesson's newly imposed trade terms, it received an accelerated $11 million preferential payment from Rite Aid.

**F.    The Third Avoidable Transfer:  May 5, 2025**

49.     The third avoidable transfer that Rite Aid made to McKesson was a $49.7-million payment that HQ, on behalf of Rite Aid, made on May 5, 2025, several hours before HQ filed its chapter 11 petition but after Rite Aid had filed its chapter 11 petition (the "May 5, 2025 Payment").

Like the May 1, 2025 Payment, the May 5, 2025 Payment was made as a result of McKesson's strong-arm tactics and newly imposed trade terms.

50.     On Sunday May 4, 2025, at 7:54 p.m., McKesson's Bowers wrote an alarming email to Rite Aid's Bixler and McMahon, stating that McKesson had ordered a halt to its processing of new orders from Rite Aid until Rite Aid made an additional payment to McKesson:

> I wanted to inform you that as of this evening, McKesson is holding all new incoming orders because Rite Aid has exceeded today's cap of $185M.  So far, Rite Aid's orders have amounted to a little over $21M, and we are anticipating more orders from the West Coast.
>
> *We will not be able to process any further orders until Rite Aid makes the necessary payment.*

*Declaration of James Justin Bowers in Support of McKesson Corporation's Motion for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief*, Docket No. 655-2 ("Bowers Decl."), Ex. 5 at 57 (emphasis added).

51.     As Rite Aid's sole longtime supplier of prescription drugs, McKesson obviously knew that its cessation of deliveries to Rite Aid would have imperiled Rite Aid's operations at a time when Rite Aid was in extreme financial distress and on the brink of commencing these chapter 11 cases. ████████████████████████████████████

████████████████████████████████████████

52.     In an effort to appease McKesson and to ensure that McKesson would continue fulfilling orders that Rite Aid had already placed—and that its customers were reliant on—Bixler wrote back the next morning:

> The pause in order processing is likely to cause operational and patient disruption and we want to try to minimize that impact going forward.  We anticipate making a wire in the amount of $49.7M today, which I believe will put our outstanding balance at approximately $138M.  Are you able to

confirm that you will fulfill and ship orders up to the cap amount of $180M based upon receipt of that wire payment?

Bowers Decl. Ex. 5 at 57.

53.     In response to that plea, Bowers tersely replied: ███████████████

████████████████████

54.     At 2:50 p.m. ET on May 5, 2025, Rite Aid—the principal party to the Supply Agreement with McKesson—filed its chapter 11 petition.

55.     Approximately 20 minutes later, at 3:11 p.m. ET, in direct reliance on McKesson's confirmation communicated only shortly earlier that it would continue to fulfill and ship orders, HQ wired $49,674,910 to McKesson on Rite Aid's behalf.  HQ itself filed a chapter 11 petition hours later, after that payment had been made.

## G.     McKesson's Withholding of Rebates and Credits

56.     ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████

57.     Generally speaking, in the ordinary course of business, McKesson receives various credits, incentives, rebates, and other adjustments from prescription drug manufacturers when it purchases certain volumes of prescription drugs.  Under the Supply Agreement, McKesson shares some of those savings with Rite Aid.  ███████████████████████

███████████████████████████████████

████████████████████

58.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

59.    Similarly, when Rite Aid returns products to McKesson—either directly or through third parties that specialize in making such returns—Rite Aid receives a credit for such returns, which is applied against charges for subsequent orders.  McKesson, in return, either resells products that are returned to it directly by Rite Aid or, for products processed through third-parties, will receive refunds or credits from the original manufacturer.

60.    In other words, McKesson realizes the benefits of volume purchases and returned products in real time, and shares them in arrears as rebates and credits to Rite Aid to lower Rite Aid's ultimate cost of products under the Supply Agreement.

61.    Immediately after the Debtors filed for bankruptcy in these proceedings, however, McKesson started withholding all Rebates and Credits to Rite Aid, and stopped its regular practice of meeting with Rite Aid to reconcile their calculations of such Rebates and Credits. Notwithstanding such actions by McKesson, it has continued to receive the benefits of Rite Aid's volume purchases and returns from the original manufacturers or third party processors.

62.    ███████████████████████████████████████████

███████████████████████████████████████ no default existed before the Petition Date, nor did McKesson ever notify Rite Aid that it was invoking any purported right to withhold Rebates or Credits at any time before the Petition Date.  And, since May 7, 2025, Rite Aid has paid for all post-petition orders in advance in cash.  Thus, solely as a consequence of the Debtors' commencing these chapter 11 cases, McKesson immediately began to withhold Rebates

or Credits that it otherwise would have applied to reduce the cost of the Debtors' post-petition orders.

63.     To date, McKesson has withheld more than $100 million of Rebates and Credits. Through June 30, 2025, Rite Aid has earned an estimated $60 million of Rebates, and through July 31, 2025, Rite Aid has accrued in excess of $50 million in Credits, both of which McKesson is now withholding—and the amounts continue to grow.

## CAUSES OF ACTION

### COUNT ONE
### (AVOIDANCE OF FEBRUARY 28, 2025 PAYMENT AS A PREFERENCE)

64.     Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

65.     Section 547 (b) of the Bankruptcy Code provides:

> Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property--
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made--
>
>     (A) on or within 90 days before the date of the filing of the petition; or
>
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

66.     The February 28, 2025 Payment:  (i) was transferred to McKesson, one of Rite Aid's creditors; (ii) was for an antecedent debt owed by Rite Aid before the transfer was made (*i.e.*, the first semi-annual payment due under the Settlement Agreement with McKesson); (iii) was made while Rite Aid was presumed to be insolvent as defined by 11 U.S.C. § 101(32); (iv) was made within 90 days before the Petition Date; and (v) enabled McKesson to receive more than it would have received if the Debtors were in a chapter 7 proceeding and the transfer had not been made.

67.     Accordingly, the February 28, 2025 Payment was a preferential transfer avoidable under 11 U.S.C. § 547.

## COUNT TWO
### (AVOIDANCE OF MAY 1, 2025 PAYMENT AS A PREFERENCE)

68.     Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

69.     The May 1, 2025 Payment:  (i) was transferred to McKesson, one of Rite Aid's creditors; (ii) was for an antecedent debt owed by Rite Aid before the transfer was made; (iii) was made while Rite Aid was presumed to be insolvent; (iv) was made within 90 days before May 5, 2025, the Petition Date; and (v) enabled McKesson to receive more than it would have received if the Debtors were in a chapter 7 proceeding and the transfer had not been made.

70.     Accordingly, the May 1 Payment was a preferential transfer avoidable under 11 U.S.C. § 547.

16

## COUNT THREE
### (AVOIDANCE OF MAY 5, 2025 PAYMENT
### AS UNAUTHORIZED POST-PETITION TRANSFER)

71.    Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

72.    Section 549(a) of the Bankruptcy Code provides:

Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

73.    The May 5, 2025 Payment (i) was made by HQ on behalf of Rite Aid; (ii) transferred property that Rite Aid had a legal or beneficial interest in and that was property of Rite Aid's bankruptcy estate; (iii) was made after Rite Aid had commenced a chapter 11 bankruptcy case; and (iv) was not authorized by the Court or by any provision of the Bankruptcy Code.

74.    Accordingly, the May 5 Payment was an unauthorized post-petition transfer avoidable under 11 U.S.C. § 549.

## COUNT FOUR
### (AVOIDANCE OF MAY 5, 2025 PAYMENT AS PREFERENCE)

75.    Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

76.    In the alternative, solely to the extent the May 5, 2025 Payment is determined not to be a post-petition transfer avoidable under 11 U.S.C. § 549, the May 5, 2025 Payment:  (i) was transferred to McKesson, one of Rite Aid's creditors; (ii) was for an antecedent debt owed by Rite

Aid before the transfer was made; (iii) was made while Rite Aid was presumed to be insolvent; (iv) was made within 90 days before May 5, 2025, the Petition Date; and (v) enabled McKesson to receive more than it would have received if the Debtors were in a chapter 7 proceeding and the transfer had not been made.

77.     Accordingly, the May 5 Payment was a preferential transfer avoidable under 11 U.S.C. § 547.

## COUNT FIVE
## (RECOVERY OF AVOIDABLE TRANSFERS PURSUANT TO 11 U.S.C. § 550)

78.     Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

79.     Section 550 of the Bankruptcy Code provides that, if a transfer is avoided under section 547 or section 549 of the Bankruptcy Code, Plaintiffs may recover, for the benefit of the estate, the property or the value of the property transferred from the initial transferee of such transfer.

80.     McKesson is the initial transferee of the February 28, 2025 Payment, the May 1, 2025 Payment, and the May 5, 2025 Payment, each of which is an avoidable transfer, and the value of each of those transfers is recoverable for the estate under section 550 of the Bankruptcy Code.

## COUNT SIX
## (DISALLOWANCE OF MCKESSON'S CLAIMS PURSUANT TO 11 U.S.C. § 502(d))

81.     Plaintiffs  repeat and reallege and incorporate by reference the allegations set forth above.

82.     Under section 502(d) of the Bankruptcy Code:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h),

544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

83.    McKesson is an entity from which property is recoverable under section 550 of the Bankruptcy Code.

84.    McKesson has not paid the amount or turned over any property transferred for which McKesson is liable under section 550 of the Bankruptcy Code.

85.    Under 11 U.S.C. § 502(d), any filed or scheduled claims held by McKesson are disallowed until McKesson pays in full the amounts for which is it liable under section 550 of the Bankruptcy Code.

## <u>COUNT SEVEN</u>

**(DECLATORY JUDGMENT UNDER 28 U.S.C. §§ 2201-02 THAT MCKESSON'S WITHHOLDING OF REBATES AND CREDITS SOLELY DUE TO RITE AID'S BANKRUPTCY IS IN VIOLATION OF 11 U.S.C. § 365(e), AND ORDER DIRECTING MCKESSON TO CEASE WITHHOLDING SUCH REBATES AND CREDITS)**

86.    Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

87.    Section 365(e)(1) of the Bankruptcy Code provides, in pertinent part:

[A]n executory contract . . . may not be terminated or modified, and any right or obligation under such contract . . . may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract ... that is conditioned on

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

88.     The Bankruptcy Code invalidates such *ipso facto* clauses because they lead to the forfeiture of valuable assets and hamper a debtor's rehabilitation or liquidation.

89.      The Supply Agreement is an executory contract between McKesson and Rite Aid, a Debtor.

90.     As used by McKesson against Rite Aid, Section 3.7 of the Supply Agreement is an *ipso facto* clause that is in violation of—and invalid and unenforceable under—section 365(e) of the Bankruptcy Code, as McKesson has invoked it to withhold rebates and credits from Rite Aid solely because Rite Aid filed for bankruptcy.

91.     This is a live controversy that is costing Rite Aid tens of millions of dollars in rebates and credits that it should be receiving each month.

92.     Rite Aid is entitled to a declaration that McKesson's withholding of Rebates or Credits from Rite Aid is an improper and illegal enforcement of an *ipso facto* provision that is invalid under section 365(e)(1) of the Bankruptcy Code, and an order directing McKesson to cease withholding—and to promptly credit Rite Aid with—all such Rebates or Credits earned under the Supply Agreement.

## COUNT EIGHT
### (EQUITABLE SUBORDINATION UNDER 11 U.S.C. § 510(c))

93.     Plaintiffs repeat and reallege and incorporate by reference the allegations set forth above.

94.     Section 510(c) of the Bankruptcy Code provides that "the court may[,] under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

95.     McKesson's illegal and inequitable conduct in withholding Rebates or Credits from Rite Aid is harming the Debtors' estates and Rite Aid's ability to pay other creditors, and warrants the subordination of its claims to the claims of other creditors under section 510(c).

96.     Subordination of McKesson's claims are necessary to remedy the harm caused by McKesson's conduct and to ensure the equitable distribution of the Debtors' estates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against McKesson as follows:

(A)     Avoiding the May 5, 2025 Payment pursuant to 11 U.S.C. § 549, or if such relief is not granted, pursuant to 11 U.S.C. § 547;

(B)     Avoiding the February 28, 2025 Payment and the May 1, 2025 Payment pursuant to 11 U.S.C. § 547;

(C)     Directing McKesson to return the value of the avoided transfers to the bankruptcy estate pursuant to 11 U.S.C. § 550;

(D)     Disallowing any claim asserted by McKesson pursuant to 11 U.S.C. § 502(d);

(E)     Declaring that McKesson's withholding of Rebates or Credits from Rite Aid is in violation of 11 U.S.C. § 365(e)(1) and directing McKesson to cease withholding—and to promptly credit Rite Aid with—all such Rebates and Credits it is due under the Supply Agreement;

(F)     Equitably subordinating all of McKesson's claims against the Debtors' estates, including any administrative expense claims;

(G)     Awarding pre- and post-judgment interest as allowed by law; and

(H)     Awarding costs and such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  July 31, 2025

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
              wusatine@coleschotz.com
              fyudkin@coleschotz.com
              svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Gregory Laufer (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:    arosenberg@paulweiss.com
              aeaton@paulweiss.com
              chopkins@paulweiss.com
              smitchell@paulweiss.com
              glaufer@paulweiss.com
              abenedon@paulweiss.com

*Counsel for Plaintiffs Rite Aid Corporation
and Rite Aid Hdqtrs. Corp.*