| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>Turner N. Falk, Esq.<br>John D. Demmy, Esq.<br>Saul Ewing LLP<br>Centre Square West<br>1500 Market Street, 38th Floor<br>Philadelphia, PA 19102-2186<br>Tel: (215) 972-8415<br>E-mail:turner.falk@saul.com<br>         john.demmy@saul.com<br><br>Jeffrey A. Krieger (CA SBN 156535)<br>Greenberg Glusker Fields Claman & Machtinger LLP<br>2049 Century Park East, Ste. 2600<br>Los Angeles, CA 90067<br>Tel: (310) 553-3610<br>Fax: (310) 553-0687<br>E-mail:jkrieger@greenbergglusker.com<br><br>*Attorneys for PFK Partners LP* | |
| In re:<br><br>NEW RITE AID, LLC, et al.,<br><br>            Debtors[1] | Case No. 25-14861 (MBK)<br><br>Chapter 11<br><br>(Jointly Administered)<br>**Re: Docket Nos. 1320, 1524, 1525**<br><br>**Objection Deadline: August 5, 2025, 5:00 p.m. ET**<br>**Hearing Date: August 14, 2025 at 11:30 a.m. ET**<br><br>The Honorable Michael B. Kaplan |

**OBJECTION OF PFK PARTNERS LP TO DEBTOR'S
PROPOSED ASSUMPTION AND ASSIGNMENT OF LEASE**

PFK Partners LP ('PFK"), one of the entities comprising the lessor under the lease (the

"Lease") for the premises located at 531 N. Glendale Ave, Glendale CA identified as Store No.

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

5537 (the "Premises"), by its attorneys, objects to the proposed assumption and assignment of the Lease as set forth in the Notice of Assumption and Assignment of Certain of the Debtors' Leases filed by New Rite Aid, LLC (the "Debtor") on July 22, 2025 [Docket No. 1525] (the "Assumption Notice"). In support, PFK respectfully represents as follows:

**I.      INTRODUCTION**

1.      The Premises represent approximately 12,000 square feet of retail space within a multi-tenant 102,595 square foot shopping center known as Glendale Plaza (the "Center"). There are nine (9) tenants at the Center including the Debtor. The Premises are the third largest space within the Center. The families which comprise the owner of the Center (the "Landlord") have owned and operated the Center for over 67 years.

2.      Among the existing tenants at the Center, and the largest of the tenants, is a Vons grocery store. It is one of the largest grocery store chains in Southern California and has been the anchor tenant at the Center since 1975. In 2000, at a cost to the Landlord of approximately $1.7 million, the Landlord worked with Vons to demolish and renovate spaces previously held by six (6) other smaller tenants as well as the 32,000 square foot Vons space, converting it into a 52,800,000 square foot space occupied by Vons. Accordingly, Vons currently occupies over 50% of the Center and is the most financially significant tenant. The Vons lease has three years remaining on the term and Vons has options to extend the term through 2048.

3.      The Lease with the Debtor was originally entered into in 1958. At that time, the tenant Thrifty Drug Stores Co. Inc. was already a large well-established pharmacy with over 100 locations.[2] The Lease has been amended nine times over the years, and has been extended twice.

---

[2] Rite Aid acquired Thrifty Drug Stores in 1996.

4. In October, 2023, Rite Aid filed Chapter 11 (the "2023 Bankruptcy Case"). In the 2023 Bankruptcy Case, the Debtor leveraged its position and the threat of imminent lease rejection into a very tenant favorable Lease amendment. The Court approved the assumption of the Lease, as so amended.

5. The Debtor's Plan of Reorganization in the 2023 Bankruptcy Case was confirmed in August 2024 and went effective two weeks later. The Debtor paid rent through March 2025 but failed to pay the rent due in April.

6. On May 5, 2025, the Debtor filed this second bankruptcy case.

7. Under the Lease, monthly rent expressly becomes due and payable on the tenth day of each month. The Debtor failed to pay post-petition rent due on May 10, 2025, but has paid rent for June and July.[3]

8. The July 22, 2025 Assumption Notice provides that the "winning bidder" with respect to the Lease is an entity called Brothers Fresh Marketplace, Inc. (the "Proposed Assignee"). The Assumption Notice further provides that any objection to the proposed assumption and assignment is due by August 5, 2025.

9. PFK objects to the assumption and assignment of the Lease because (1) the cure amount proposed by the Debtors is slightly off (the correct cure amount is $77,204.54, not $76,493.80 per the Debtors), and (2) Proposed Assignee has failed to, and cannot, demonstrate the required adequate assurance of future performance. With respect to adequate assurance, first, the Proposed Assignee has not demonstrated that it can perform under the Lease; nor that its financial condition and operating performance are similar to the Debtor's at the time of the original entry

---

[3] Under the Lease, rent is not due until the 10th day of each calendar month. Accordingly, the rent due on May 10, 2025 is a post-petition obligation. PFK advised the Debtor, through counsel, of its failure to make this post-petition payment. The Debtor responded by saying that because the Debtor historically pays the rent before the 10th, the Debtors view the obligation as being "due" prior to the petition date. The Debtor further responded that in August, it would pay "stub rent" for the month of May. As of the date of this Objection, no rent has been received for the month of May.

into the Lease. Second, inasmuch as the Proposed Assignee is a grocery store when the shopping center already has one, the proposed assignment will disrupt the tenant mix at the Center. In regard to adequate assurance, the Debtor forwarded to PFK only the following self-serving written statement authored by the Proposed Assignee:

> *Our family has been in the specialty grocery store business since 2001 and are currently operating in many locations separately in the Los Angeles area.[4] We cater mostly to the Armenian community and there is a large Armenian population in Glendale that is in high demand for our services. We are a profitable business, and we are confident in our ability to deliver a successful specialty grocery store in the Glendale area.*
>
> *Brothers Fresh Marketplace is the brand that we want to expand. We have one location currently in Granada Hills that we opened in 2023. We subleased a shell surplus CVS space and built it out from scratch. We have been operating a profitable business from the first day we opened the doors.*

10. Upon receiving the above narrative, PFK promptly sought all information on which the Proposed Assignee intends to rely to demonstrate adequate assurance of future performance, including requesting financial statements and operating history for the past five (5) years. On July 31, PFK received an unaudited balance sheet and profit and loss statement for the Proposed Assignee's single location, and 2023 and 2024 tax returns, along with a message indicating that the Proposed Assignee has only been in operation since 2023 and thus does not have five (5) years of operating history.

## II. THE DEBTOR AND ASSIGNEE HAVE FAILED TO DEMONSTRATE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE

11. The term "adequate assurance of future performance" is not defined in the Bankruptcy Code but is included in both §§ 365(b)(1)(C) and 365(f)(2)(B).[5] However, section

---

[4] PFK notes that the reference to the "family" being in business "since 2001…in many locations" is vague, misleading, and irrelevant because the Proposed Assignee has only been operating since 2023, and only at one location.

[5] Courts in the Third Circuit have noted that under either section, the definition of the term "should be generally the same." *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citing Don Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, Minn. L. Rev. 341, 362 (1980)).

365(b)(3) establishes special adequate-assurance criteria related to "shopping center[s],". In that context, adequate assurance includes, among other things, assurances that (1) the proposed assignee has a "similar . . . financial condition and operating performance" as the debtor "as of the time the debtor became the lessee under the lease," and (2) the assignment will not "disrupt any tenant mix or balance in [the] shopping center." *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 293 (2023) (quoting §§365(b)(3)(A), (D)).

### A.    *Adequate Assurance of Future Performance in the Third Circuit*

12.    Although the Bankruptcy Code does not define the term "adequate assurance of future performance," courts in the Third Circuit have referred to the Fifth Circuit's more developed interpretation of the phrase, which in turn draws from the Uniform Commercial Code's definition of "adequate assurance." *Cinicola*, 248 F.3d, at 120.

13.    In *Richmond Leasing Co. v. Capital Bank, N.A*., the Court of Appeals for the Fifth Circuit fleshed out the definition of "adequate assurance" and concluded that "[t]he phrase 'adequate assurance'" is adopted from section 2-609(1) of the Uniform Commercial Code, and should be given "a practical, pragmatic construction… determined by consideration of the facts of the proposed assumption." *Richmond Leasing Co. v. Capital Bank, N.A*., 762 F.2d 1303, 1309 (5th Cir. 1985) (quoting *In re Sapolin Paints, Inc*., 5 B.R. 412, 420-21 (Bankr. E.D.N.Y. 1980); *see also In re Carlisle Homes, Inc*., 103 B.R. 524, 538 (Bankr. D.N.J. 1988)) . In short, by adopting the Fifth Circuit's reasoning, Third Circuit courts likewise apply a fact-intensive, case-by-case inquiry guided by the UCC's commercial standards.

14.    Consistent therewith, courts in the Third Circuit have identified a non-exclusive list of factors that should be considered in determining whether a landlord has received adequate assurance. Quoting *Androse Assocs. of Allaire, LLC v. Great Atlantic & Pacific Tea Co., Inc. (In*

5

*re Great Atlantic & Pacific Tea Co., Inc.)*, 472 B.R. 666, 675 (S.D.N.Y. 2012), the Delaware Bankruptcy Court stated that relevant considerations may include:

> "[T]he debtor's payment history, the extent and history of defaults, presence of a guarantee and/or a security deposit, evidence of profitability, a plan with earmarked funds exclusively for the landlord, the general outlook in the debtor's industry, and whether the lease is at or below the prevailing market rate."

*In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 Bankr. LEXIS 2000, at *33-34 (Bankr. D. Del. Apr. 29, 2014).

15. The facts here closely parallel those of another case within the Third Circuit, *In re RS Legacy Corp*, which arose out of RadioShack's Chapter 11 proceedings. In that case, the landlord of a pedestrian-only shopping district in Miami objected to the proposed assumption and assignment of its lease to the auction's winning bidder. *In re RS Legacy Corp.*, No. 15-10197, 2015 Bankr. LEXIS 2206, at *1-3 (Bankr. D. Del. June 25, 2015). The court sustained the objection and denied the assignment, finding that the potential assignee had failed to provide adequate assurance of future performance under the lease. *Id.*, at *5-6.

16. In that case, in support of its request for assignment and to prove adequate assurance, the potential assignee offered a security deposit equal to one month's rent, plus a personal guarantee from its principal for one year's rent. Its principal also testified that alternatively, the potential assignee would offer three months' prepaid rent and a six-month personal guarantee. In further support, the potential assignee introduced into evidence certain unaudited financial statements relating to its principal's various businesses and an unaudited single-page statement regarding its principal's assets and personal net worth. *Id.,* at 3-4.

17. The landlord in turn testified that, in a non-bankruptcy setting, it would not seriously consider or rely upon the type of financial evidence offered by potential assignee, and that the landlord would require the potential assignee and its principal to post a deposit equal to

six months' rent and a personal guaranty (or letter of credit) covering the full twelve-year term of the Lease. *Id.,* at 4.

18. Further underscoring the parallels between *RS Legacy Corp* and the proposed assignment here, the landlord testified that the leased premises were previously occupied by RadioShack, a "90-year-old publicly traded company with annual revenues in the billions." *Id.* The landlord emphasized that the proposed new tenant, Sportive, Inc., was a privately held limited liability company whose current operations were limited to just two retail stores. *Id.,* at *5.

19. Similarly, PFK is facing a proposed assignment that would replace its tenant, Rite Aid, a national retail chain with hundreds of locations that was already a well-established and successful large retail operator at the time the lease was executed, with the Proposed Assignee, a small family-owned business that operates only one other location and has a performance history of barely two years.

20. In *RS Legacy Corp.*, the landlord's objection challenged the projections for the performance of the assigned location. The landlord argued that although the assignee's principal testified he was prepared to support the store with personal funds if necessary, he was under no legal obligation to do so. *Id.,* at 5.

21. As stated by the *RS Legacy* court, "[c]ase law teaches that the concept of 'adequate assurance' is a flexible one, mainly requiring evidence satisfactory to the Court that the proposed assignee possesses the financial wherewithal to perform all of the obligations under the agreement at issue." *Id.,* at 2. The court ultimately concluded that, "[i]n the face of a robust objection by the Landlord, the Court concludes that based on the facts and circumstances of this case, unaudited financials and projections are insufficient to satisfy the statutory requirement to provide adequate assurance of future performance under the Lease." *Id.,* at 6.

22. *In re RS Legacy Corp.* illustrates that where a proposed assignee cannot demonstrate financial reliability through meaningful and verifiable evidence, especially where the prior tenant was a well-capitalized, national chain, the assignment fails to meet the "adequate assurance" requirement. *Id.*, at 5. This is especially true where, as here, the Proposed Assignee is a private, limited retail operator with limited financial operating history, unaudited financials, and no credit enhancement such as a letter of credit or viable personal guaranty for the length of the lease term.

23. After having been through the 2023 Bankruptcy Case, and now having a new unwanted tenant foisted upon it in the current bankruptcy, the Landlord is poised to end up with its lease being tied up in a third bankruptcy – this time of the Proposed Assignee. Sections 365(b)(1)(C) and 365(f)(2)(B) exist so the Court has the tools to make sure that does not happen.

### B. *The Proposed Assignee Cannot Provide the Extraordinary Protection Afforded to Shopping Center Landlords*

24. Section 365(b)(3) establishes special adequate-assurance criteria related to "shopping center[s]". 11 U.S.C. § 365(b)(3). In that context, adequate assurance includes assurances that (1) the proposed assignee has a "similar . . . financial condition and operating performance" as the debtor "as of the time the debtor became the lessee under the lease," and (2) the assignment will not "disrupt any tenant mix or balance in [the] shopping center." *MOAC Mall Holdings*, 598 U.S., at 293 (quoting §§365(b)(3)(A), (D)).

25. The Third Circuit Court of Appeals has provided guidance on what factors to consider in determining whether a lease falls within the confines of section 365(b)(3). "While it is true that the mall is the archetypal 'shopping center,' all shopping centers do not necessarily take the form of shopping malls." *In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 360-70 (Bankr. D. Del. 1999) (quoting *In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1087-88 (3d Cir. 1990).

26. The *Joshua Slocum* court noted the following criteria:

    (a)    A combination of leases;

    (b)    All leases held by a single landlord;

    (c)    All tenants engaged in the commercial retail distribution of goods;

    (d)    The presence of a common parking area;

    (e)    The purposeful development of the premises as a shopping center;

    (f)    The existence of a master lease;

    (g)    The existence of fixed hours during which all stores are open;

    (h)    The existence of joint advertising;

    (j)    [sic] Contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases;

    (k)    The existence of percentage rent provisions in the leases;

    (l)    The right of the tenants to terminate their leases if the anchor tenant terminates its lease;

    (m)    Joint participation by tenants in trash removal and other maintenance;

    (n)    The existence of a tenant mix; and

    (o)    The contiguity of the stores.

*Joshua Slocum*, 922 F.2d at 1087-88.

27. Given these factors, the Center clearly falls within the meaning of a "shopping center" under section 365(b)(3).

28. The Third Circuit has held that "[s]hopping center landlords, even more than other non-debtor parties to executory contracts and unexpired leases, receive "extraordinary protection" under the Code. *L.R.S.C. Co. v. Rickel Home Centers (In re Rickel Home Centers, Inc.)*, 209 F.3d

291, 298 (3d Cir. 2000) (citing 3 Collier on Bankruptcy P 365.02, at 365-17 (Lawrence P. King ed., 15th ed. 1999); *In re Goldblatt Bros. Inc.*, 766 F.2d 1136, 1140 (7th Cir. 1985) (referring to "special protections available to shopping center landlords")). The right to assume a defaulted lease of real property in a shopping center, as with any executory contract or unexpired lease, is conditioned upon the trustee's provision of adequate assurance of future performance. *Id.*

29. Where the leased premises are in a shopping center, the assignee must meet the heightened definition of adequate assurance of future performance in section 365(b)(3) to ensure that "the essential terms of a debtor's lease in a shopping center [are] not . . . changed in order to facilitate assignment." *L.R.S.C. Co.*, 209 F.3d, at 299 (citing 2 Norton Bankruptcy Law & Practice 2d § 39:46, at 39-133 (William L. Norton, Jr. ed., 1997)).

30. The Court in *Sun TV & Appliances* held that sections 365(b)(3) and (f)(2)(B) evidence Congress' belief that use restrictions and tenant mix in shopping center leases are material [in the adequate assurance analysis]. *Sun TV & Appliances*, 234 B.R., at 370.

31. The Proposed Assignee must not only demonstrate financial viability but also prove that the assignment will not disturb the center's established tenant mix or undermine the overall operating structure of the center. Here, the proposed assignment from a national pharmacy retailer to a small grocery store operator, which proposes to operate a business similar to that of the Center's anchor tenant, Vons grocery store, directly implicates the tenant mix and operational balance protections of section 365(b)(3).

32. Moreover, the Landlord, as a family-owned business itself that relies on the income from the Center, would suffer tremendous financial hardship if its anchor tenant were to choose not to extend its term as a result of the assignment to the Proposed Assignee. Not only would the Center be more than 50% vacant unless and until the Landlord could replace the anchor tenant, but there would be a ripple effect because several of the existing tenants have lease clauses which

allow them to require reductions in their rental obligation or to leave in the event the Center were to become more than 50% vacant. The provisions of section 365(b)(3) of the Bankruptcy Code are designed specifically to protect shopping center landlords from this outcome.

### III. CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Court should deny the proposed assumption and assignment of the Lease to the Proposed Assignee.

Dated: August 5, 2025

**SAUL EWING LLP**

*/s/ Turner N. Falk*
Turner N. Falk, Esq.
John D. Demmy, Esq.
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Tel: (215) 972-8415
E-mail: turner.falk@saul.com
         John.demmy@saul.com

-and-

Jeffrey A. Krieger (CA SBN 156535)
**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
2049 Century Park East, Ste. 2600
Los Angeles, CA 90067
Tel: 310 553-3610
Fax: 310 553-0687
E-mail: JKrieger@GreenbergGlusker.com

*Attorneys for PFK Partners LP*