**EXHIBIT B**

# LEASE

## LEASE

### PARTIES

**THIS LEASE** is made and entered into this 19th day of <u>August,</u> 2003, by and between **ALEX – FORBES AND MURRAY, LP**, a Pennsylvania limited partnership, ("<u>Landlord</u>") and **RITE AID OF PENNSYLVANIA, INC.**, a Pennsylvania corporation ("<u>Tenant</u>").

    1.    **LEASED PROPERTY.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, a portion of the mixed use building to be constructed by Landlord (the "Building") upon Landlord's Property situate at the corner of Forbes Avenue and Murray Avenue, 14th Ward, City of Pittsburgh, Allegheny County, Pennsylvania, known as 5740 Forbes Avenue ("Landlord's Property"). The portion of the Building to be leased by the Tenant (the "Leased Building Area" ) is more specifically described on the floor plan dated March 3, 2003 attached hereto as "Exhibit "1" and incorporated herein by reference. The Landlord also hereby leases to Tenant, and Tenant hereby leases from Landlord the right to the exclusive use of such driveways (the "Driveway"), parking areas (the "Parking Area"), landscaping, footways and other facilities required or made available by Landlord from time to time (or as may be hereinafter provided) all as depicted in the site plan dated January 30, 2003 and as revised on June 17, 2003 attached hereto as Exhibit "2" and  incorporated herein by reference. The Landlord hereby grants the Tenant the exclusive right to use one dumpster contained in the Dumpster Area as described in the site plan attached as Exhibit "2". Collectively, the Leased Building Area and the improvements described on the site plan shall be hereinafter referred to as the "Leased Property". The Leased Property shall also include all such cross easements, rights of ingress, egress and regress across Landlord's property, and any such liberties, privileges, hereditaments and appurtenances in any way appertaining, and shall also include all improvements and fixtures as identified herein. The Landlord's Property and the improvements erected thereon shall be hereinafter collectively referred to as the "Center". Notwithstanding the foregoing, the Tenant grants the Landlord and the Landlord's tenants the right to enter and cross any of that portion of the Leased Property located on the exterior of the Building, including the Driveway and the Parking Area, to access the Landlord's Dumpster, to maintain the Landlord's Property, or for deliveries, provided that such entry on the Leased Premises is scheduled for a time that will not disrupt the Tenant's use and quiet enjoyment of the Leased Property. The Tenant also agrees that the Landlord may erect a bus stop on the sidewalk on Forbes Avenue and as indicated on Exhibit "2" and agrees execute any agreements necessary to facilitate the installation of such bus stop.

    2.    **TERM; RENEWALS.** The initial term of this Lease shall be for a period of 20 years (the "<u>Initial Term</u>") commencing as of the Commencement Date unless extended or sooner terminated as hereinafter provided (the Initial Term as may be extended is referred to as the "<u>Term</u>"). The Commencement Date as used in this Lease shall be the date upon which Tenant conveys fee title of the Property to Landlord in accordance with that certain Agreement of Sale of even date herewith (The "Purchase Agreement").

        A.    <u>Lease Year</u> under this Lease shall be any period of 12 consecutive calendar months beginning on the Commencement Date or anniversary thereof during the Term and terminating on the day immediately preceding the next following anniversary of the Commencement Date; provided however, in the event the first day of the calendar month which is twenty (20) years after the Commencement Date occurs in October, November, December or January, the Lease shall end on January 31 following such date.

        B.    Provided Tenant is not in material default of this Lease, Landlord grants to Tenant the right, privilege and option to extend this Lease for six (6) successive periods of five (5) years each upon the same terms and conditions contained in this Lease, and at the Rents set forth in Article 6, upon Tenant's notice in writing to Landlord exercising each such option, given at least six (6) months prior to the expiration of the term or preceding extension of the term. In order to prevent the inadvertent

failure of Tenant to exercise any of the aforesaid options within the time specified above, it is agreed that Landlord may not terminate this Lease until and unless Landlord notifies Tenant in writing and points out that the option to extend or to further extend, as the case may be, has not been exercised. Tenant's option to extend, in each instance, shall continue for a period of thirty (30) business days after receipt of such notice from Landlord, but if Tenant does not send written notice of the exercise of such option to Landlord within said thirty (30) business day period, Tenant's option to extend shall thereafter terminate. If Landlord fails to give Tenant such notice prior to the expiration of the original term or of any option term, as the case may be, and if Tenant shall remain in possession of the Demised Premises after the expiration of the then current term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month. If Landlord then gives Tenant such notice and Tenant exercises its option to extend, then the effective date of such exercise shall be retroactive to the expiration date of the original term or of the extension term, whichever is appropriate.

3.    **CONSTRUCTION OF LEASED PROPERTY; ACCEPTANCE.**    Subject to the terms hereof (and in accordance herewith), Landlord shall construct the Leased Property on Landlord's Property. Tenant and Landlord shall enter into the form of construction contract attached hereto as Exhibit 3.

Construction shall be commenced on or before September 2, 2003 and completed in accordance with the construction documents entitled "Mixed Use Development" prepared by McCormick Architects and Designers, Inc., issued for bid on March 3, 2003 and issued for construction on June 9, 2003 (the "Plans"). No deviation from the Plans shall be made by Landlord or Tenant without the other's prior written consent, such consent not to be unreasonably withheld. Approval of the Plans by Tenant shall not constitute the assumption of any responsibility of Landlord for their accuracy or sufficiency or their compliance with all applicable statutes, ordinances, rules, regulations, laws or codes which shall be the parties' mutual obligations. Landlord shall cause Landlord's contractor to see that all construction shall be in accordance with applicable laws, ordinances, regulations, codes and other governmental requirements including, without limitation, the Americans with Disabilities Act and in accordance with the requirements of fire underwriters. In addition, said improvements shall designate, be constructed, be made and be completed to meet all physical requirements of the site and to overcome all conditions relative to soil and water and to comply with all laws, ordinances, rules, regulations and orders of any duly constituted authority applicable thereto.

The parties have had the architect prepare the final architectural, structural, mechanical and electrical drawings. Said drawings and specifications shall be deemed incorporated by reference in this Lease as fully as if completely set forth herein. Landlord shall, diligently prosecute to completion the construction of said Building and appurtenances, as well as those improvements including, but not limited to, the Parking Areas, Driveways and sidewalks so that the same will be ready for use by Tenant (the "Delivery Date") not later than two hundred forty (240) days after the Commencement Date (the "Anticipated Delivery Date"), as such Anticipated Delivery Date may be adjusted pursuant to Paragraph 3 of the Construction Contract. Tenant's approval of the final drawings and specifications shall not relieve Landlord of the responsibility of constructing the Building and appurtenances in accordance with all other requirements of this paragraph, including applicable building codes and regulations. Notwithstanding anything contained above, Tenant must approve the contractor used to build Tenant's Building. Tenant shall supply Landlord with a list of acceptable contractors. Tenant shall be entitled to withhold Rent if the Landlord fails to commence or complete construction as described herein.

In the event Landlord fails to construct the Leased Property in accordance with the provisions hereof, Tenant shall have the right to complete construction of its Leased Property including, without limitation, the Building and Parking Area, Driveways and sidewalks and to offset the cost of construction against Rent, Additional Rent or other charges due to Landlord hereunder until Tenant has recouped all of its construction costs

Tenant shall have the right to occupy the Leased Premises even before the same are substantially complete for the purpose of fixturing and such other work as it may desire to do, provided the same shall not interfere with the work being performed by Landlord in completing the Leased Premises.

Landlord shall at all time indemnify, protect, defend and hold Tenant harmless from all actions, claims, demands, losses, costs, damages and all reasonable expenses incurred in investigating or resisting the same for injury or damage to person or property resulting from or arising out of any work on the Leased Property and Parking Areas, which may be performed by Landlord pursuant to this paragraph. For the purposes of protecting Tenant against any claim for damages, Landlord shall maintain, or cause to be maintained by the contractor performing such work, in full force and effect a comprehensive general liability insurance policy with limits of at least Two Million Dollars ($2,000,000) applicable to personal injury and/or death, and against property damage with a limit of Five Hundred Thousand Dollars ($500,000), which insurance shall be in effect at all times which such work is being done by Landlord. Before commencing such work, Landlord shall furnish Tenant with certificates of insurance evidencing compliance with the foregoing requirement.

Any increase in costs incurred by Landlord to fulfill its obligations set forth in this Article 3 (e.g., unknown conditions, errors in architectural plans, or government-required conditions) shall not result in an increase in Rent unless the increased costs are incurred as a result of a written change order or orders by Tenant or any increase in costs due to the act or omission of Tenant or Tenant's agents.

4.    **COMMENCEMENT OF LEASE.**  Landlord warrants that it has obtained all necessary governmental approvals and permits for land development of Landlord's Property and the Leased Property, including without limitation, all permits required for construction, and that it will obtain the required occupancy permits including, but not limited to the Tenant's Occupancy Permit (temporary and permanent) for Tenant's Intended Use. Landlord shall not be liable for any inability to deliver possession of the Leased Property to Tenant by the Anticipated Delivery Date, except that any such inability shall cause rent to abate for the period between the Anticipated Delivery Date and the actual Delivery Date, provided, however, that if delivery of possession does not occur within 180 days of the Anticipated Delivery Date, Tenant may, by written notice to Landlord, terminate the Lease upon 30 days notice, provided, however, that this termination right shall not be vested prior to one hundred eighty (180) days following the Anticipated Delivery Date and shall be voided if Landlord delivers possession in accordance with this Lease within said 30 days.

5.    **RENT.**  Tenant covenants and agrees to pay to Landlord, commencing on the Commencement Date at such address as specified by Landlord during the Term of this Lease, as rent (the "Minimum Rent") for the Leased Property, the following:

A.    From the Commencement Date until the last day of the month which is 240 months (20 years) from the Commencement Date Tenant shall pay $14,850.00 per month. If the Commencement Date is other than the first day of the month, the first rental payment and the last rental payment shall be adjusted for the proportionate fraction of the whole month. All rental payments shall be made on the 5th of every month for the then-current month.

B.    If Tenant exercises the Options to Extend provided for in this Lease, Tenant promises to pay to Landlord Rent according to the following schedule:

1.    During the first five-year option, Tenant shall pay monthly Rent of $16,335.00.
2.    During the second five-year option, Tenant shall pay monthly Rent of $17,968.50.
3.    During the third five-year option, Tenant shall pay monthly Rent of $19,765.35.
4.    During the fourth five-year option, Tenant shall pay monthly Rent of $21,741.88.
5.    During the fifth five-year option, Tenant shall pay monthly Rent of $23,916.07.
6.    During the sixth five-year option, Tenant shall pay monthly Rent of $26,307.58.

Tenant covenants and agrees to pay the Minimum Rent hereby reserved as and when due, without setoff or deduction whatsoever (except as otherwise set forth in this Lease); and in addition to the Minimum Rent, to pay as and when due all sums of money, charges or other amounts required to be paid by Tenant to Landlord or to another person under this Lease, all of which shall be deemed "Additional Rent" (collectively with Minimum Rent, "Rent"). Non-payment of Additional Rent when due shall, at Landlord's option, constitute a default under this Lease to the same extent, and shall entitle the Landlord to the same remedies, as non-payment of Minimum Rent. If Tenant fails to pay any installment of Rent within ten (10) days after written notice that such Rent has become due and payable, Tenant shall pay a late payment penalty of 5%.

6.1    **TAXES; INSURANCE AND UTILITIES.**  Tenant shall pay, as Additional Rent, all real estate taxes and assessments levied or imposed upon the Leased Property. The term "real estate taxes" shall include any tax imposed upon or levied against real estate or upon owners of real estate as such, rather than on persons generally, rents of occupancy, in lieu of, or in addition to any present real estate taxes or assessments, including taxes imposed on household improvements which are assessed against Landlord, together with the reasonable cost of any negotiation, contest or appeal pursued by Landlord in an effort to reduce any such tax, assessment or charge. In such event Landlord shall make all reasonable efforts to have the real estate tax bills, if any, for the Leased Property put in Tenant's name, and Tenant shall pay said bills promptly upon receipt. If Landlord is unable to have the bills for the Leased Property put in Tenant's name, ~~Landlord shall mail the real estate tax bills to Tenant and Tenant shall pay said bills within thirty (30) days of receipt.~~ Tenant shall send receipts to Landlord evidencing payment of each year's bills within ten (10) days of payment. In the event the Leased Property is not separately assessed from Landlord's Property, Tenant shall pay Landlord Tenant's "Proportionate Share," as hereinafter defined, of real estate taxes imposed on both the Land and Building allocable to the Leased Property for the term of this Lease if Landlord provides Tenant with a receipted tax bill indicating Landlord's payment. To calculate the Tenant's Proportionate Share, the Landlord and the Tenant shall first establish the percentage of all real estate taxes attributable to the Land and the percentage attributable to the Building. This percentage shall be established based on the relative fair market value of the Land and the Building, each in relationship to the total fair market value of the Property. If the Landlord and the Tenant cannot agree with regard to the allocation of the total fair market value to the Land and to the Building, they shall retain the services of an independent appraiser, acceptable to both the Landlord and the Seller, who shall establish the portion of the total fair market value attributable to the Land and to the Building. The Landlord and the Tenant shall bear equally any and all costs associated with the services of such appraisal. Tenant's "Proportionate Share" of that portion of the real estate taxes agreed to be associated with the Land on which the Center is located shall be the result of the following computation:

$$A + (B \times .5)$$

Where A is equal to a fraction, the numerator of which is the gross area of the Parking Lot and the denominator of which is the gross area of the Landlord's Property; and

Where B is equal to a fraction, the numerator of which is the Leased Building Area and the denominator of which is the total area of the Land that is covered by the Building.

Tenant's "Proportionate Share" of the real estate taxes associated with the Building shall be a fraction, the numerator of which shall be the Leased Building Area and the denominator of which shall be the gross leasable area of the Building. If, however, any tenant of the Center (a) pays Taxes pursuant to a separate tax assessment from the assessment of the Leased Property or (b) is exempt, in accordance with applicable law and government authorities, from paying such taxes, the amount of such taxes, paid by such tenant shall be excluded from the calculation of Tenant's Proportionate Share of Taxes, or such tenant's Leased Property shall be deducted in computing the square feet of gross leasable area in the Building for purposes of computing Tenant's Proportionate Share of such item.

6.2    For the purposes of this Lease, the word "Taxes" shall include all taxes attributable to improvements now or hereafter made to the Building or any part thereof or attributable to the present or future installation in the Building or any part thereof of fixtures, machinery or equipment, all real estate taxes, assessments, license and permit fees, water and sewer and other governmental impositions and charges of every kind and nature whatsoever, nonrecurring as well as recurring, special or extraordinary as well as ordinary, foreseen, and unforeseen, and each and every installment thereof, which shall or may during the term of this Lease be levied, assessed or imposed, or become due and payable or become liens upon, or arise in connection with the ownership, use, occupancy or possession of, or any interest in, the Building or any part thereof, or any land, buildings or other improvements therein, for any tax year or portion thereof (taxes to be calculated as if there was no such abatement or reduction). The word "Taxes" shall not include any charge, such as water meter charge and sewer rent based thereon, which is measured by the consumption by the actual user of the item or service for which the charge is made.

Landlord agrees to provide Tenant any notices of real estate tax assessment on the Leased Property and/or Building and Parking Areas in advance of any applicable appeal date so that Tenant will have sufficient time to process an appeal of such assessment. Tenant, at its expense, shall have the right to contest the amount or validity of all or part of the taxes for which it is required to reimburse Landlord pursuant to any provision of this Lease, and for that purpose, Tenant shall have the right to file in the name of Landlord all such protests or other instruments, and institute and prosecute proceedings it may deem necessary for the purpose of such contest. Any refund of any tax for which Tenant has reimbursed Landlord shall belong to Tenant, and Landlord agrees to pay the same to Tenant promptly in the event payment thereof is initially made to Landlord. Tenant shall have the right to pay any real estate taxes that are delinquent due to Landlord's failure to pay such taxes and be entitled to an offset of rent as set forth in 5(B) above provided Landlord fails to reimburse Tenant following thirty (30) days notice from Tenant.

Nothing contained in this Lease shall require Tenant to pay (i) any franchise, corporate, estate, inheritance, succession, capital levy, transfer tax of Landlord (except with respect to a transfer tax imposed exclusively with respect to this lease), (ii) any income, profits or revenue tax, or gross receipts taxes (except if in substitution for taxes existing as of the date of this Lease, in which event Tenant shall pay such tax) imposed on Landlord (iii) any other tax, assessment, charge or levy upon the Leased Premises, Leased Property or Center (including but not limited to the initial costs of development of the Building site, which Landlord elects to be placed in the Center in the form of an assessment or tax payable over a term of years; i.e., sewers initially installed, connection of utilities or fees for connecting to utilities, installation of required traffic control devices, off-site street work, etc).or any tax or assessment on Rent or other charge payable by Tenants under this Lease imposed by state, federal, local

or any other regulatory agency except to the extent that it may be imposed in lieu of or in substitution for and not in addition to any Taxes existing as of the date of this Lease.

      **6.3**     Landlord shall have the right to bill Tenant for its annual real estate tax charge at any time after each receipt by Landlord of a bill, assessment, levy, notice of imposition or other evidence of Taxes due or payable all of which are hereinafter collectively referred to as a "tax bill" (whether such bill is a final bill, an estimate of annual Taxes or represents a tax bill based upon a final or partial assessment or determination). Tenant shall pay the balance of its annual real estate tax charge within thirty (30) days of receipt from Landlord of a written statement setting forth the Taxes for which Landlord has received a tax bill, Tenant's Proportionate Share of Taxes, and Tenant's payments theretofore made on account of such annual real estate tax charge.

      **6.4**     Tenant shall not institute any proceedings with respect to the assessed valuation of the Center or any part thereof for the purpose of securing any tax adjustment. In the event the Landlord shall retain any consultant to negotiate the amount of Taxes, tax rate, assessed value and/or other factors influencing the amount of Taxes and/or institute any administrative and/or legal proceedings challenging the tax rate, assessed value or other factors influencing the amount of Taxes, whether or not such action results in a reduction in the amount of Taxes, Taxes shall include the portion of the aggregate of all such reasonable fees, reasonable attorneys' and appraisers' fees and all disbursements, court costs and other similar items paid or incurred by Landlord during the applicable lease year with respect to such proceedings. If Landlord shall receive a refund of any portion of the Taxes for which Tenant has previously paid its proportionate share, Landlord shall credit against future payments due pursuant to this Article 7 in an amount equal to Tenant's Proportionate Share of the net refund received by after deducting all costs and expenses (including, but not limited to, reasonable attorneys' and appraisers' fees) expended or incurred in obtaining such refund.

      **6.5**     If at any time during the term of this Lease, a tax, is imposed against rents payable hereunder (as distinguished from net income or profits generally) such tax, imposition, charge, assessment, levy, excise or license fee, shall be deemed to constitute "Taxes" for the purposes of this Article 6 and shall be paid by Tenant.

      **6.6**     Tenant shall be responsible for and shall pay before delinquency all rent, taxes and taxes assessed against any leasehold interest or personal property of any kind owned or placed in, upon or about the Leased Property by the Tenant as well as any use and occupancy taxes imposed in connection with Tenant's business operations at the Leased Property.

      **6.7**     For each year of the term hereof, Tenant shall pay to Landlord, as Additional Rent, Tenant's proportionate share of all premium costs for fire and broad form all risks extended coverage or special form insurance and respecting all buildings and improvements upon the Center ("Insurance Costs") in equal monthly installments at the same times as fixed Minimum Rent is payable hereunder, without demand and without any deduction or setoff whatsoever. Within 120 days after each insurance year, Landlord will deliver to Tenant a statement showing in reasonable detail Tenant's proportionate share of such actual Insurance Costs. If Tenant's proportionate share of the actual Insurance Costs for any insurance year of Landlord exceeds said annual insurance charge actually paid by Tenant for such period, then within twenty (20) days after delivery of such statement, Tenant will pay such excess shown to be due by said statement. Any overpayment by Tenant shall be credited to sums thereafter due or refunded within thirty (30) days after the end of the term of this Lease. Tenant's proportionate share shall be determined by a fraction, the numerator of which shall be the gross rentable area contained in the Leased Property and the denominator of which shall be the gross number of rentable square feet of space contained within all leased property in the Center which are covered by the particular insurance policy(ies) covering the Leased Property. Landlord may exclude from the fraction leasable area not covered by the particular insurance policy. The first insurance year shall be the period covered by annual

6

insurance premiums. At anytime or times that Landlord determines that Tenant's proportionate share of actual Insurance Costs will exceed the monthly installments then due from Tenant hereunder, Landlord may adjust the amount of the monthly installments thereafter due from Tenant on account of Tenant's proportionate share of the Insurance Costs by increasing such installments by an amount equal to one-twelfth (1/12th) of the excess, if any, of Tenant's estimated proportionate share of such Insurance Costs over the annual insurance charge then due hereunder. Tenant shall not be responsible for any increase in insurance costs resulting from the operations of any other tenants in the Center which shall not be consistent with the mixed retail, restaurant, and office use presently planned for the Center. Any insurance required to be maintained by Tenant may be included as part of Tenant's blanket insurance policies adding the Leased Property to the covered properties.

6.8    Landlord shall bring utility lines to the Leased Property to the locations and in the configuration set forth in the Plans and shall establish all connections and services required by Tenant prior to the Delivery Date. Except to the extent provided for in the Plan, Landlord shall not be responsible for providing any utility service to the Leased Property, nor for providing meters or other services for the measurement of utilities supplied to the Leased Property, and Tenant shall arrange for the finishing to the Leased Property of such utility services as it may require. Thereafter, Tenant shall, during the Term, be responsible for charges for utilities and services of any nature whatsoever used by Tenant in, on or for the account of the Leased Property or any part thereof including without limitation water, sewer, gas, electricity, steam and heat, and for paying all costs and charges for such utilities and services prior to the same becoming delinquent. Landlord shall in no way be responsible for paying for such utilities and services and Tenant shall hold Landlord harmless from any liability therefor except to the extent of Landlord's use of such utilities or services (other than any use associated with performing Tenant's obligations under this Lease). Tenant shall pay all taxes that may be assessed against its own real or personal property.

7.    **USE OF LEASED PROPERTY; COMPLIANCE WITH LAWS.** Tenant shall have the right to use and occupy the Leased Property for a retail drug store and related uses ("Intended Use") or any other lawful use. Provided, however, the Leased Property may not be used for the following reasons without the prior written consent of Landlord:

a. The use is prohibited by exclusives given to any other cotenants in the Leased Property, provided Landlord has given prior written notice upon granting the exclusive; and

b any noxious or offensive activity which Landlord deems objectionable and adverse to the preservation of property values of the Leased Premises, Building or Center.

Tenant shall retain all revenues from Tenant's use of the Leased Property. Tenant shall, at its expense, comply with all laws, orders, ordinances, regulations and rules of all governmental authorities having jurisdiction, the local Board of Fire Underwriters, Landlords casualty insureds, and other applicable insurance rating organization or other bodies exercising similar functions which apply to the Leased Property (collectively "Applicable Laws") (i) regarding the physical condition of the Leased Property, including, without limitation, the making of capital improvements required to conform the Leased Property to such standard as required by Applicable Laws for the Intended Use, or (ii) relating to the lawful use of the Leased Property, including, without limitation, Applicable Laws with which only the occupant can comply, such as laws governing maximum occupancy. Tenant shall give Landlord prompt notice of any violation or recommendation of change of which it shall have received notice. Any changes required by such authorities which are not caused by the act or neglect or specific use by Tenant as a drugstore and which are the responsibility of Landlord shall be remedied by Landlord. Tenant shall not do or permit to be done any act or thing which will invalidate or be in conflict with the Certificate of Occupancy. Tenant shall, at its own cost and expense, promptly procure each and every permit, license, certificate or other authorization and any renewals, extensions or continuances of the same required in connection with the lawful and proper use of the Leased Property. Neither a failure on the part of Tenant

7

to procure such permit, license, certificate or other authorization nor the revocation of the same, shall in any way affect the liability of Tenant for the payment of the Rent herein reserved or the performance or observance of any of the covenants or conditions herein contained on Tenant's part to be performed and observed.

8. **MAINTENANCE AND REPAIRS.** Tenant shall, at its sole cost and expense, maintain and keep the Leased Property in good condition and repair and in a safe, secure, clean, orderly and sanitary condition including, but not limited to, any maintenance or repairs related to any mechanical elements of the Leased Property. If Tenant refuses or neglects to make repairs for which it is responsible, or fails to commence or use reasonable efforts to effectuate the completion of such repairs, after thirty (30) days written notice from Landlord of the need therefor, 24 hours notice in the event of emergency, in which case no notice and cure period shall be required, Landlord may (but shall have no obligation to) make such repairs. Any such repairs made by Landlord shall be at the sole cost and expense of Tenant and such expense shall be collectible as Additional Rent. Landlord shall not be liable by reason of any injury to, or interference with, Tenant's business arising from the making of any such repairs, unless such injury is due to the negligence of Landlord, its agents, servants or employees and there shall be no abatement of Rent because of such repairs.

Tenant will, at Tenant's sole cost and expense, operate and maintain or cause to be operated and maintained the Parking Areas, Driveways, pathways and landscaped areas, including, but not limited to, gardening and landscaping; repairs, repaving, replacements, preventive maintenance, repainting; rental of signs and equipment; lighting; sanitary control; cleaning; removal of snow, trash, rubbish, garbage and other refuse, maintenance, repair and/or replacement of equipment serving the Leased Property, curbs, walkways, landscaping, drainage and lighting facilities..

Landlord agrees to maintain, repair and replace or cause to be maintained, the roof all structural parts of the Leased Property and the Center including the Common Area, if any. Landlord agrees to keep and maintain the roof, foundation, columns, load bearing walls, exterior utility lines (water, sewer, gas and electric) unless due to the act or negligence of Tenant, and any exterior portion of the Leased Property and the Center, and structural portions, thereof except for any damage thereto caused by any wrongful act or omission or negligence of Tenant, its employees, agents, licensees, assignees, contractors or persons making deliveries to the Leased Property, in which event such damage shall be promptly repaired by, and at the sole expense of Tenant.

Notwithstanding the foregoing, Landlord shall make all necessary repairs to the Leased Property, including all fixtures and systems (except for fixtures and systems installed by Tenant) located therein, for a period of one (1) year following the delivery of the Leased Property to Tenant; provided, however, Landlord shall not be required to make any repairs necessitated by the negligence or willful misconduct of Tenant, its agents, contractors, licensees, invitees or employees. Following said one (1) year period, Landlord agrees to provide to Tenant a warranty manual letter and to assign to Tenant all warranties to the extent assignable for any labor and materials used on or in the Leased Property.

9. <u>SIGNS.</u> Tenant shall have the right, at Tenant's sole cost and expense, to erect or post exterior signs on or about the Leased Property referring to Tenant and its business, but in each case only in compliance with all Applicable Laws and in accordance with the sign exhibit attached hereto as Exhibit 4. <u>Tenant's right to place signage on the Building shall be exclusive as to Tenant's façade</u>. Any other signage placed on the Building shall, in no way, block, reduce or obstruct the visibility of Tenant's signage.

10.    **ALTERATIONS AND ADDITIONS.**    No exterior structural alteration, addition, improvement or installation to the Leased Property shall be made or permitted to be made by the Tenant without the prior written approval of the Landlord, which approval will not be unreasonably withheld, conditioned or delayed.  As a condition of giving any approval under this Section 10, Landlord may require that Tenant (a) obtain Landlord's approval of final plans and specifications; (b) obtain all permits, approvals, and certificates required by any governmental or quasi-governmental bodies and, upon completion, certificates of final approval and shall deliver promptly duplicates of all such permits, approvals and certificates to Landlord; and (c) carry, and cause all contractors and subcontractors to carry, worker's compensation, general liability, personal and property damage insurance in amounts subject to Landlord's reasonable approval; and (e) cause the Leased Property to be kept free from mechanics' or materialmen's liens and any such liens filed will be discharged or bonded over within thirty (30) days.

With respect to exterior alterations, additions, improvements or installations requiring Landlord's approval, at least fourteen (14) business days before the commencement of any work under this Section 10 or delivery of materials for such work to the Leased Property, Tenant shall furnish to Landlord all plans and specifications for such work, and all such alterations, additions, improvements and installations to the Leased Property shall be completed in accordance with the submitted plans.  With respect to any other work under this Section 10, Tenant shall notify Landlord of the scope and commencement of such work at least fourteen (14) business days before commencement, and within sixty (60) days after completion of such work, shall provide Landlord with plans and drawings pursuant to which such work was completed. All alterations, additions, improvements and installations made by Tenant to the Leased Property shall comply with all insurance requirements and with all applicable laws, ordinances, rules and regulations of all governmental authorities, shall be constructed in good and workmanlike manner, shall use new materials and installations at least equal in quality to the original materials and installations, and shall not void or adversely effect any warranty in which Landlord has an interest for work performed, or materials and equipment incorporated in such work, at or on the Leased Property.  Tenant shall permit Landlord to inspect construction operations in connection with such work. Unless otherwise agreed in writing by Landlord, all exterior alterations, additions, improvements and installations which may be made to the Leased Property shall become the property of Landlord and remain upon and be surrendered with the Leased Property.  Notwithstanding the provisions of this Section 10, personal property, business and trade fixtures and machinery, other than that which is affixed to the Leased Property so that it cannot be removed without affecting the structural integrity of the Leased Property, shall remain the property of Tenant and may be removed by Tenant at any time during the Term. Tenant agrees to repair any damage to the Leased Property caused by, or in connection with, the removal of any articles of personal property, business or trade fixtures, alterations, improvements and installations.  Tenant shall not permit any mechanics' or materialmen's liens to be filed against the fee of the Leased Property or against Landlord's interest in the Leased Property by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Leased Property through or under Tenant, whether prior or subsequent to the commencement of the Term.  If any such mechanics' or materialmen's lien shall at any time be filed against the Leased Property as a result of any alterations, additions, improvements, repairs or installations performed by or on behalf of Tenant, and Tenant shall fail to remove same or bond against said claim within thirty (30) days thereafter (but if such lien is not susceptible of being removed with due diligence within such thirty (30) day period, the removal period shall be extended for such period as may be necessary to remove the same with all due diligence), it shall constitute a default under this Lease.

9

11.    **ASSIGNMENT AND SUBLETTING.**  Tenant may, without the consent of Landlord, sublease the Leased Property or assign this Lease or its rights under this Lease.  In such event, Tenant shall remain liable for the payment of all rent required to be paid under this Lease and for the performance of all terms, covenants, and conditions undertaken by Tenant.  Tenant agrees not to sublet or assign for a use not complying with Section 8.  Without limitation, it is agreed that Tenant shall have the right to mortgage or otherwise encumber its leasehold interest.

12.1    **ENVIRONMENTAL MATTERS.**  Tenant will operate Tenant's business in compliance with all Environmental Laws, as hereinafter defined.  Tenant will not permit any release (as such term is defined in the Environmental Laws), generation, treatment or disposal of any Hazardous Material on or from the Leased Property.  Landlord covenants for itself, its successors, assigns and others holding rights thorough Landlord, it will not permit any release generation, treatment or disposal of any Hazardous Material on or from the Center.

12.2    Tenant is a party to an indemnification agreement with Cumberland Farms, Inc. that Tenant has assigned to the Landlord.  Collectively, the indemnification agreement and the assignment shall be hereinafter referred to as the "Indemnification Agreement".  A copy of the Indemnification Agreement is attached hereto as Exhibit 5.

12.3    Tenant shall provide to Landlord copies of the following, forthwith after each shall have been submitted, prepared or received by Tenant or any occupant of the Leased Property:  (i) all applications and associated materials submitted to any governmental agency relating to any Environmental Laws; (ii) all notifications, registrations, reports and other documents, and supporting information, prepared, submitted or maintained in connection with any Environmental Laws; (iii) all permits, licenses, approvals, and amendments or modifications thereof, obtained under any Environmental Laws; and (iv) any correspondence, notice of violation, summons, order, complaint, or other document received by Tenant or any occupant of the Leased Property pertaining to compliance with any Environmental Laws.

12.4    Tenant, without the prior written consent of Landlord, shall not install or cause, suffer or permit the installation of, any above or underground storage tank, at the Leased Property.  Tenant shall not cause or suffer or permit to occur at, in, on or under the Leased Property any generation, use, manufacturing, refining, transportation, emission, release, treatment, storage, disposal, presence or handling of hazardous substances, hazardous wastes or hazardous materials (as such terms are now or hereafter defined under any Environmental Laws) (herein called "Hazardous Material") or any other material, substance, liquid, effluent or product now or hereafter regulated by any Environmental Statute (also called "Hazardous Material"), except that construction materials (other than asbestos or polychlorinated biphenyls), office equipment, fuel and similar products (if contained in vehicles) and cleaning solutions, and other maintenance materials that are or contain Hazardous Material may be used, generated, handled or stored on the Leased Property, provided such is incident to and reasonably necessary for the operation and maintenance of the Leased Property for its permitted use hereunder and is in strict compliance with all Environmental Laws and all other applicable governmental requirements.  Should any release of any Hazardous Material occur at the Leased Property, Tenant shall immediately contain, remove and dispose of off the Leased Property, such Hazardous Material, and any material that was contaminated by the release and remedy and mitigate all threats to human health or the environment relating to such release in accordance with a remediation plan approved by Landlord and otherwise compliance with Environmental Laws or Landlord, at its election, shall have the right to perform the removal and disposal thereof itself, in which event Tenant shall reimburse Landlord, on demand, for the cost incurred by Landlord in doing so and complying with all Environmental Laws.  Tenant shall be responsible for the cost of repair or replacement of any part of the Leased Property or the Building, and the improvements, fixtures, equipment, personalty, and installations thereon and therein, necessitated by reason of the remediation required under this Article 13.

12.5    If removal and remediation required hereunder is not complete and the certifications required under Environmental Laws are not obtained prior to the expiration or earlier termination of this Lease, then until the work is completed and such certifications are obtained, Tenant shall be responsible for and shall pay for such completion notwithstanding such expiration or early termination.

12.6    As used herein, "Environmental Laws" shall mean any and all past, present and future laws (including without limitation statutes, regulations, and common law) of the United States, any State, or political subdivision, for the protection of the environment or human health and safety, including without limitation, judgments, awards, decrees, regulations, rules, standards, requirements, orders and permits issued by any court, administrative agency or commission or other <u>governmental authority</u> under such laws, and shall include without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq., the Solid Waste Disposal Act, as amended, 42 U.S.C. 6901 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act of 1976, 15 U.S.C. §2601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. 11001 et seq., the Clean Air Act of 1966, as amended, 42 U.S.C. §7401 et seq., the National Environmental Policy Act of 1969, 42 U.S.C. §4321, the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. 651 et seq.,the Hazardous Materials Transportation Act, 42 U.S.C. 1801, et seq. and the Safe Drinking Water Act of 1974, as amended, 42 U.S.C. §300f et seq., Pennsylvania's environmental laws, including but not limited to, the Pennsylvania Clean Streams Law, 35 P.S. §691.1 et seq, the Pennsylvania Solid Waste Law, 35 P.S. §6018.101 et seq., the Pennsylvania Air Pollution Control Act, 35 P.S. §4001 et seq., the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. §6020.101 set seq., the Pennsylvania Storage Tank and Spill Prevention Act, 35 P.S. §6021.101 et seq., the Land Recycling and Remediation Standards Act, 35 P.S. § 6026.101 et seq., and the regulations and guidelines promulgated or published thereunder as any of the foregoing may be amended, and any other applicable present or future federal, state or local laws, statutes, codes, ordinances, rules, regulations, decrees, orders and other such requirements.

As used herein, "Hazardous Material" shall mean any hazardous or toxic substances, materials or wastes, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 C.F.R. § 172.101 and amendments thereto) or by the Environmental Protection Agency as hazardous substances (40 C.F.R. Part 302 and amendments thereto), or such substances, materials, and wastes which are or become regulated under any applicable federal, state or local law including, without limitation, any material, waste or substance which is: (i) asbestos; (ii) polychlorinated biphenyls; (iii) petroleum or petroleum product, or (iv) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "hazardous material," "regulated substance," or other similar term under the Environmental Laws.

13.    <u>**SURRENDER OF LEASED PROPERTY; HOLDING OVER.**</u>    At the end of the Term, Tenant shall surrender the Leased Property to Landlord, together with all alterations, additions and improvements thereto in good order and repair except for ordinary wear and tear and damage for which Tenant is not obligated to make repairs under this Lease.  Tenant shall have the right at the end of the Term to remove any equipment, furniture, trade fixtures or other personal property placed in the Leased Property by Tenant, provided that Tenant promptly repairs any damage to the Leased Property caused by such removal.  Tenant shall surrender the Leased Property to Landlord at the end of the Term or any renewal hereof without notice of any kind, and Tenant waives all right to any such notice as may be in effect in Pennsylvania, including, without limitation, the Landlord and Tenant Act of 1951, as amended. The provisions of this Section shall survive the expiration or sooner termination of this Lease. If Tenant continues to occupy the Leased Property after the last day of the Term, or after the last day of any extension of the Term, and Landlord elects to accept Rent thereafter, Landlord shall be deemed to have

11

consented to the creation of a tenancy from month-to-month only, at the then most recent monthly Rent, and not for any longer period. If Tenant holds over without consent, Rent for the period of the holdover shall be due at a rate equal to 125% of the Rent in effect immediately before the holdover and, Landlord shall be entitled to recover any remedies it may be entitled to under law or equity.

14.    **INDEMNIFICATION; INSURANCE.**

**14.1**    Except if caused intentionally or by the negligence of Landlord, its agents servants or employees Tenant will indemnify, defend and hold Landlord, Landlord's members, directors, shareholders, officers, partners, agents and affiliates against all liabilities, claims actions, costs and judgments (collectively, "Losses") arising out of the following: (a) the operation of Tenant's business; (b) the violation of any applicable law by Tenant, its agents, employees, licensees, subtenants and assignees; or (c) any breach, violation or non-performance of any term, representation, condition, covenant or other obligation of Tenant under this Lease. Except if caused intentionally or by the negligence of Tenant, to the fullest extent permitted by law, Landlord will Indemnify and Defend Tenant against all Losses arising out of any material breach, violation or non-performance of any term, condition, covenant or other obligation of Landlord under this Lease.

**14.2**    Except if solely caused intentionally or by the gross negligence of Landlord, to the fullest extent permitted by law, Tenant waives all liabilities against Landlord Parties arising from the following any injury, damage or Loss sustained by a Tenant and caused by a party other than a Landlord.

**14.3**    Tenant will, at Tenant's sole expense, procure and maintain throughout the Lease term the following insurance coverages with limits of not less than the amounts set forth below:

Personal Property Insurance. Tenant shall keep all personal property and trade fixtures in the Leased Property insured with "special form" insurance in an amount to cover 100% of the replacement cost of the property and fixtures.

(Liability Insurance. Tenant shall maintain contractual and comprehensive general liability insurance, including public liability, personal injury and property damage, with a combined single limit of $3,000,000, an aggregate of $5,000,000.00 with an additional $5,000,000.00 umbrella for personal injuries or deaths of persons occurring in or about the Leased Property.

Additional Insured. Insurance policies of Tenant required for this Lease shall name the Landlord, and every mortgagee of the Leased Property as identified by Landlord, as loss payee and an additional insured as its interest may appear.

Evidence of Insurance. By the Delivery Date and upon each renewal of its insurance policies, Tenant shall give certificates of insurance to Landlord. The certificate shall specify amounts, types of coverage, the waiver of subrogation, and the loss payee and additional insured. If Tenant fails to give the required certificate within thirty (30) days after notice of demand for it, Landlord may (but shall not be obligated to) obtain and pay for that insurance and receive reimbursement from Tenant.

Landlord hereby releases Tenant from any and all liability and waives Landlord's right of recovery against Tenant, its agents and employees, for any loss or damage to Landlord's property resulting from any hazard insurable under a Landlord's extended coverage policy of insurance including,

but not limited to, fire, smoke, explosion or water damage, and Landlord hereby waives the subrogation rights of its insurance carriers under Landlord's policies of insurance providing coverage against loss or damage by any such hazard. Landlord shall take such steps as are necessary to inform its insurance carriers of this provision and to have endorsements, if necessary, placed on said insurance policies to carry into effect the provisions of this paragraph.

Tenant hereby releases Landlord from any and all liability and waives Tenant's right of recovery against Landlord, its agents and employees, for any loss or damage to Tenant's property resulting from any hazard insurable under a standard fire insurance policy with extended coverage, and Tenant hereby waives the subrogation rights of its insurance carriers under Tenant's policies of insurance providing coverage against loss or damage by any such hazard. Tenant shall take such steps as are necessary to inform its insurance carriers of this provision and to have endorsements, if necessary, placed on said insurance policies to carry into effect the provisions of this paragraph.

## 15.    FIRE OR OTHER CASUALTY

**15.1**    If the Leased Property shall be damaged by fire or other insured casualty, but are not thereby rendered untenantable in whole or in part, Landlord shall promptly at its own expense cause such damage to be repaired, and the minimum annual rent shall not be abated. If by reason of any such occurrence, the Leased Property shall be rendered untenantable only in part, Landlord shall promptly at its own expense cause the damage to be repaired, and the minimum annual rent meanwhile shall be abated proportionately as to the portion of the Leased Property rendered untenantable. If the Leased Property shall be rendered wholly untenantable by reason of such occurrence, the Landlord shall promptly at its own expense cause such damage to be repaired, and the minimum annual rent meanwhile shall be abated in whole, provided, however, that Landlord shall have the right, to be exercised by notice in writing delivered to Tenant within one hundred twenty (120) days from and after said occurrence, to elect not to reconstruct the destroyed Leased Property, and in such event this Lease and the tenancy hereby created shall cease as of the date of said occurrence, the rent to be adjusted as of such date, and Landlord shall reimburse Tenant for the depreciated (straight line) amount of Tenant's Contribution. Landlord's obligations hereunder shall be limited to the Building shell and work originally done by Landlord at Landlord's cost.

**15.2**    Should the Building or the Leased Property (or any part thereof), be damaged or destroyed by fire or other casualty, Landlord shall, except as otherwise provided herein, repair and/or rebuild the same as set forth below with reasonable diligence.

Notwithstanding anything to the contrary contained in this Lease, (1) Landlord or Tenant, at the option of either of them, may terminate this Lease on thirty (30) days notice to the other, given within thirty (30) days after the occurrence of the damage or destruction if (rent abating on an equitable basis for loss of use):

(a)  the Leased Property, shall be damaged and the cost to repair the same shall be more than thirty percent (30%) of the cost of replacement of the Leased Property, and

(b)  such damage shall occur during the last three (3) years of the Term.

Provided, however, in the event Landlord elects to terminate the Lease, Tenant shall have thirty (30) days after receipt of such notice of termination to give its written notice to Landlord of its agreement to reimburse Landlord for the cost of such repair in excess of fifty percent (50%) of the replacement cost of the Leased Property in which case Landlord's election of termination shall be void and of no force and effect and Landlord shall forthwith repair and restore such damage as aforesaid. In such event Tenant shall have the right to recapture the costs incurred by it in connection with such repair and restoration together with interest thereon at the rate of ten percent (10%) per annum against the Rent during the Lease and any extension.

Landlord's obligation to rebuild and repair under this Article 15 shall, in any event, be limited to restoring the Leased Property to the condition in which the same existed prior to the casualty and Tenant agrees that, promptly after completion of such work by Landlord, Tenant shall promptly commence to rebuild, repair, restore and replace its leasehold improvements, fixtures, furnishings and merchandise.

Tenant agrees during any period of reconstruction, restoration or repair of the Leased Premises and/or of the Building to continue the operation of its business in the Premises to the extent reasonably practicable from the standpoint of good business.

Landlord covenants to maintain, with responsible insurance carriers satisfactory to Tenant, insurance reasonably satisfactory to Tenant covering the Center as follows:

(i) Fire Insurance with a Broad Form Extended Coverage endorsement including sprinkler leakage, if applicable, in an amount sufficient to prevent Tenant from being or becoming a coinsurer within the terms of the policy or policies providing such insurance and in any event for not less than the full replacement value of the Center and;

(ii) Comprehensive General Liability Insurance, including blanket contractual liability, and personal injury coverage with a combined single limit for any one occurrence of not less than $20,000,000.

**16**    **EMINENT DOMAIN.** If all of the Leased Property (or all rights of use or occupancy of the Leased Property) shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose, or purchased by such authority under threat of such taking (collectively, a "Taking"), this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority.

(a)     If any such Taking substantially impairs the use of the Leased Property for the use contemplated herein, then, and in any such event, Tenant may cancel this Lease, on not less than thirty (30) nor more than ninety (90) days notice to Landlord, at any time during the period commencing on the date that Tenant receives notice of such Taking and ending on the date which is six (6) months after physical possession by the Taking authority.

(b)     If any Taking does not result in the termination of this Lease, rent and any other payments provided for herein shall be reduced proportionately to the reduction in the square footage of Tenant's Property.

(c)     In the event of any such Taking, Landlord and Tenant shall together make one claim for an award for their combined interests in the Leased Property, and the proceeds shall be paid as follows and in the following order:

(i)     Landlord shall be entitled to receive such portion of said award or proceeds as shall represent compensation for the value of the Center, or the part thereof so taken, as if vacant, unimproved and unencumbered by this Lease or otherwise; and

(ii)    Tenant shall be entitled to receive the depreciated (straight-line) value of the improvements or portion thereof taken and any amount for removal or relocation costs, damages to Tenant's business, or personal property of Tenant; and

(iii)   The remainder of any such award or proceeds, if any, shall be paid to Landlord.

Tenant and Landlord shall each have the right, at its own expense, to appear in any condemnation proceedings and to participate in any and all hearings, trials and appeals therein.  In the event the Landlord or the Tenant shall receive notice of any proposed or pending condemnation affecting the Leased Property, the party receiving such notice shall promptly notify the other party of the receipt and contents thereof.

17.     **DEFAULT.**  The occurrence of any of the following (each an "Event of Default") shall, at Landlord's option, constitute a material default and breach of this Lease by Tenant:

(a)     A failure by Tenant to pay the Rent (either Minimum Rent or Additional Rent) when due, or to make any other payment required to be made by Tenant hereunder when such is due and such failure continues for ten (10) days after written notice thereof from Landlord to Tenant

(b)     The abandonment of the Leased Property by Tenant;

(c)     A failure by Tenant to observe and perform any other provisions or covenants of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such thirty (30) day period, Tenant shall not be deemed to be in default if Tenant shall within thirty (30) days

after written notice commence such cure and thereafter diligently prosecute the same to completion.

(d)    The making by Tenant of any assignment for the benefit of creditors; the adjudication that Tenant is bankrupt or insolvent; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy [unless, in the case of a petition filed against Tenant, the same is dismissed or discharged within sixty (60) days after the filing thereof]; the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Leased Property or of Tenant's interest in this Lease [unless possession is restored to Tenant within thirty (30) days after such appointment]; or the attachment, execution or levy against, or other judicial seizure of, substantially all of Tenant's interest in this Lease [unless the same is discharged within thirty (30) days after issuance thereof].

## 18.    **REMEDIES.**

**18.1**    Upon the occurrence of an Event of Default, Landlord, at its option, may terminate this Lease upon and by giving written notice of termination to Tenant, or Landlord, without terminating this Lease, may at any time after such Event of Default, without notice or demand additional to that provided in Section 19 hereof, and without limiting Landlord in the exercise of any other right or remedy which Landlord may have by reason of such Event of Default (other than the aforesaid right of termination) exercise any one or more of the remedies hereinafter provided in this Section or as otherwise provided by law, all of such remedies (whether provided herein or by law) being cumulative and not exclusive:

**18.2**    Landlord may perform for the account of Tenant any defaulted term or covenant on Tenant's part to be observed or performed, and recover as rent any expenditures made and the amount of any obligations incurred in connection therewith.

**18.3**    Landlord may enter the Leased Property (with or without process of law and without thereby incurring any liability to Tenant and without such entry being constituted an eviction of Tenant or termination of this Lease) and take possession of the Leased Property and all personal property of every kind on the Leased Property.  Landlord may (i) apply against the rent and the expenses, including attorneys' fees, which Landlord may have incurred in connection with such repossession, either the value of such personal property or the proceeds, after selling expenses, from the sale of such personal property, whichever Landlord chooses to do, and (ii) at any time and from time to time relet the Leased Property or any part thereof for the account of Tenant, for such terms, upon such conditions and at such rental as Landlord may deem proper.  In the event of such reletting, (i) Landlord shall receive and collect the rent therefrom and shall first apply such rent against such expenses as Landlord may have incurred in recovering possession of the Leased Property, placing the same in good order and condition, altering or repairing the same for reletting, and such other expenses, commissions and charges, including attorney's fees, which Landlord may have paid or incurred in connection with such repossession and reletting, and then shall apply such rent against the accelerated rent, and (ii) Landlord may execute any lease in connection with such reletting in Landlord's name or in Tenant's name, as Landlord may see fit, and the tenant of such reletting shall be under no obligation to see to the application by Landlord of any rent collected by Landlord.

**18.4**    The exercise of any remedy provided by law or the provisions of this Lease shall not exclude any other remedies unless they are expressly excluded by this Lease.  Any notice of default given

or required to be given by Landlord to Tenant hereunder may be combined with, serve as or include any statutory notice required in connection with the exercise by Landlord of any of its remedies. Tenant hereby waives any right of redemption or relief from forfeiture following termination of, or exercise of any remedy by Landlord with respect to, this Lease.

(a)    Anything to the contrary notwithstanding, if Tenant shall fail to pay to Landlord any installment of Rent or other charges as and when the same are required to be paid hereunder, and such default shall continue for a period of fifteen (15) days after written notice, or if Tenant shall default in the performance of any of the other terms, covenants or conditions of this Lease and such default shall continue for a period of thirty (30) days after written notice (except if Tenant shall, within said period of time, commence to remedy such default), or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereby the Leased Property shall be taken or occupied by someone other than Tenant, Landlord shall have the right at Landlord's option to terminate this Lease and the term hereof, as well as all the right, title and interest of Tenant hereunder, by giving Tenant thirty (30) days' notice in writing of such intention, and upon the expiration of the time fixed in such latter notice, if Tenant has neither cured such default nor is diligently proceeding to cure such default, this Lease and the term hereof, as well as all the right, title and interest of Tenant hereunder, shall wholly cease and expire in the same manner and with the same force and effect (except as to Tenant's liability) as if the date fixed by such latter notice were the expiration of the term herein originally granted; and Tenant shall immediately quit and surrender to Landlord the Leased Property and each and every part thereof and Landlord may enter into or repossess the Leased Property, either by force, summary proceedings or otherwise. The right granted to Landlord in this paragraph or any other paragraph of this Lease to terminate his Lease shall apply to any extension or renewal of the term hereby granted and the exercise of any such right by Landlord during the term hereby granted shall terminate any extension or renewal of the term hereby granted and any right on the part of Tenant thereto.

(b)    In the event of a cancellation or termination hereof, by the service of a notice of termination based on a default of Tenant as above provided, Tenant shall, nevertheless, remain and continue liable to Landlord in a sum equal to all regular monthly rent herein reserved for the balance of the term herein originally granted, subject, however, to the obligation of Landlord to exercise reasonable effort to re-rent the premises at the highest available rental; and Landlord may re-enter the Leased Property using such force for that purpose as may be necessary without being liable to any prosecution for said re-entry or the use of such force and Landlord may repair or alter the Leased Property in such manner as Landlord may deem necessary or advisable, and/or let or relet the Leased Property or any or all parts thereof or the whole or any part of the remainder of the original term hereof or for a longer period, in Landlord's name, or as the agent of Tenant, and out of any rent so collected or received, Landlord shall first pay to itself the expense or cost of taking, repossessing, repairing and/or altering the Leased Property and the expense of removing all persons and property therefrom, and second, pay to itself any cost or expense sustained in securing or attempting to secure any new leases or tenant, and third, pay to itself any balance remaining on account of the liability of Tenant to Landlord for the sum equal to the rents reserved herein and then unpaid by Tenant for the remainder of the term originally herein demised; provided, however, and notwithstanding any provision in this Lease to the contrary, Landlord shall exercise the powers granted it under the provisions of this paragraph 18, including the right to repair, alter and let or relet the Leased Property, only in a fair and reasonable manner. Any entry or reentry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from liability hereunder.

(c)    Should any rent so collected by Landlord after the payments aforesaid be insufficient to fully pay to Landlord a sum equal to all regular monthly rent herein reserved, provided that

17

Landlord shall have exercised reasonable effort to re-rent the Leased Property at the highest available rental, the balance or deficiency shall be paid by Tenant on the rent days above specified, and Tenant shall be and remain liable for any such deficiency, and the right of Landlord to recover from Tenant the amount thereof, or a sum equal to the amount thereof, or a sum equal to the amount of all rent herein reserved, if there shall be no reletting, shall survive the issuance of any dispossess warrant or other termination hereof based upon a default by Tenant.

(d)    Should Landlord default on the performance of any covenant or agreement herein, and such default continue for thirty (30) days after receipt by Landlord of written notice thereof from Tenant (except if Landlord shall, within said period of time, commence and diligently proceeds to cure said default), Tenant may (in addition to all other rights and remedies provided at law or equity and the terms of this Lease), (i) pay any sums necessary to perform any obligation of Landlord hereunder and deduct the cost thereof, with interest at the highest rate allowed by law, from rents due and to become due hereunder, and (ii) terminate this Lease by giving Landlord written notice thereof.  Such deduction from rent by Tenant shall not constitute a default by Tenant unless Tenant shall fail to pay the amount of such deduction within thirty (30) days final adjudication that such amount is owing to Landlord.  Such adjudication shall not be final until all appeals have been decided and entered of record.

19.    **SUBORDINATION AND ATTORNMENT.**  Landlord and Tenant shall execute and deliver Tenant's standard form of Nondisturbance, Subordination and Attornment Agreement attached hereto as Exhibit 6.

20.    **ESTOPPEL CERTIFICATES.**  Tenant shall, at any time and from time to time, within fifteen (15) days following written request from Landlord, execute, acknowledge and deliver to Landlord an estoppel certificate certifying that this Lease is in full force and effect and unmodified (or, if modified, stating the nature of such modification), certifying the date to which the rent reserved hereunder has been paid, and certifying that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed.  Any such statement may be relied upon by any prospective purchaser or mortgagee of all or any part of the Leased Property.

Upon written request of Landlord, Tenant agrees to subordinate its rights under this Lease to any mortgage, trust deed or similar indenture ("Lien"), or ground lease covering the Center, or any part thereof, upon conditions set forth below, and Landlord upon written request of Tenant agrees, as a condition of this Lease, to obtain an agreement upon the conditions set forth below from any mortgage holder, trust deed holder or similar indenture holder ("Lienholder") or ground lessor covering the Center or any part thereof.

That such lienholder or ground lessor agree in writing, in recordable form, that so long as Tenant shall not be in default under this Lease, or if Tenant is in such default, as long as Tenant's time to cure such default shall not have expired, (i) the term of this Lease shall not e terminated or modified in any respect whatsoever, nor the rights of Tenant hereunder or its occupancy of the Leased Premises be affected n any way; (ii) that Tenant shall not be named as a defendant in any legal action or other proceeding whatever which may be instituted by such lienholder and/or ground lessor; (iii) that in the event of default under any lien or ground lease and upon enforcement by the lienholder and/or ground lessor if its remedies, said lienholder and/or ground lessor and/or any subsequent purchaser agrees to perform all of the duties and responsibilities of Landlord under this Lease as a direct Lease so long as Tenant is not in default beyond any applicable cure period under the terms, covenants and conditions of this Lease; and (iv) that such lienholder or ground lessor agrees that (a) all insurance proceeds payable as

a result of damage or destruction shall be applied to the repair and restoration of such damage or destruction pursuant to the terms of the Lease and that (b) all proceeds as a result of the exercise of eminent domain shall be applied pursuant to the terms of this Lease.

The parties agree, from time to time but no more often than twice per lease year, upon (i) not less than fifteen (15) days prior written request, to execute and deliver to the requesting a written estoppel certificate, stating (a) whether this Lease has been modified or amended and, if so, identifying any such modification or amendment; (b) whether Rent and other charges have been paid more than thirty (30) days in advance of the date when due and, if so, the date to which they have been paid in advance; and (c) whether to the best of such party's knowledge, any uncured default exists and, if so, specifying the nature of such default; and (d) such other information as the parties reasonably request.

21.    **WAIVER.**  The failure or delay on the part of either party to enforce or exercise at any time any of the provisions, rights or remedies in this Lease shall in no way be construed to be a waiver thereof, nor in any way to affect the validity of this Lease or any part hereof, or the right of the party to thereafter enforce each and every such provision, right or remedy.  No waiver of any breach of this Lease shall be held to be a waiver of any other or subsequent breach.

22.    **QUIET ENJOYMENT.**  Provided Tenant is not in material default, Tenant shall and may peaceably and quietly have, hold and enjoy the Leased Property for the entire term hereof, subject nevertheless to all of the provisions of this Lease.  Landlord further agrees not to interfere in any manner with vehicular or pedestrian access to the parking facility.

23.    **SUCCESSORS.**  The respective rights and obligations provided in this Lease shall bind and shall inure to the benefit of the parties hereto, their legal representatives, heirs, successors and permitted assigns; provided, however, that no rights shall inure to the benefit of any successor of Tenant unless Landlord's written consent for the transfer to such successor has first been obtained as provided in Paragraph 11 hereof or unless the transfer to the subject successor is permitted without Landlord's consent as provided in Paragraph 11 hereof.

24    **GOVERNING LAW.**  This Lease shall be construed, governed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

25.    **SEPARABILITY.**  If any provision of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions hereof shall in no way be affected or impaired and such remaining provisions shall remain in full force and effect.

26.    **CAPTIONS.**  Marginal captions, titles of exhibits and riders to this Lease, are for convenience and reference only and are in no way to be construed as defining, limiting or modifying the scope or intent of the various provisions of this Lease.

27.    **GENDER.**  As used in this Lease, the word "person" shall mean and include, where appropriate, an individual, corporation, partnership or other entity; the plural shall be substituted for the singular, and the singular for the plural, where appropriate; and words of any gender shall mean to include any other gender.

19

**28.    NOTICES.**  Any notices or other communications, which may be permitted or required under this Lease shall be in writing and shall for all purposes of this Lease be deemed dated, effective and received on the date of receipt or refusal of acceptance by the addressee.  All notices shall be hand delivered, delivered by overnight courier service or mailed through the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to Landlord as follows:

>   Alex Forbes and Murray, LP
>   219 D Grandview Ave
>   Pittsburgh, PA 15211
>   Attn: Secretary
>   Fax: (412) 381-7672

and to Tenant as follows:

>   Rite Aid of Pennsylvania, Inc.
>   30 Hunter Lane
>   Camp Hill, PA 17011
>   Attn: Secretary

or at such other addresses as either party hereto shall from time to time designate to the other party by notice in writing as provided in this paragraph.

**29.    NO BROKERS.**  Each of Tenant and Landlord represents and warrants to the other that in this transaction it has dealt with no real estate broker and that no broker or agent has or will represent it in this transaction.

**30.    EXHIBITS.**  Attached to this Lease and made part hereof, and initialed on behalf of both parties simultaneously with the execution of this Lease are Exhibits 1 to 6, inclusive.

**31.    MEMORANDUM OF LEASE.**  Landlord and Tenant shall execute simultaneously herewith, in recordable form, a memorandum of Lease pursuant to the provisions of Act of Pennsylvania General Assembly, P.L. 454 (June 2, 1959).

**32.    MODIFICATIONS.**  This Lease, including the Exhibits, contains all the agreements, conditions, understandings, representations and warranties made between the parties hereto with respect to the subject matter hereof and may not be modified orally or in any manner other than by an agreement in writing signed by both parties hereto or their respective successors in interest.

**33    MISCELLANEOUS.**

**33.1    Approval of Lenders.**  After execution and delivery of this Lease, Landlord shall submit this Lease to the construction and permanent mortgage lenders (if any) which have provided, or are providing, the financing for the Building and if the lenders or any of them reject or fail to approve the same, Landlord may terminate this Lease if Tenant is unwilling within twenty (20) days after request to modify the Lease in writing to the extent necessary in order to obtain the lenders' approval, provided that Tenant shall not be required to make any modification s that would diminish Landlord's work or obligations under the Lease nor increase Tenant's obligations under the Lease or limit Tenant's use of the premises or its assignability by delivering written notice to that effect to Tenant, and when Landlord shall

have refunded any deposit or deposits which may have been made by Tenant, neither party shall have any further right, duties or obligations under this Lease.

**33.2    No Representation by Landlord.**    Landlord and Landlord's agents have made no representation, agreements, conditions, warranties, understandings, or promises, either oral or written, other than as herein set forth, with respect to the Lease, Building, the Center, other tenants, the Leased Property, or otherwise.

**33.3    Force Majeure.**    Except for the payment of rent and additional rent, if either party is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles, or any cause whatsoever beyond such party's control, the period of such delay or prevention shall be deemed added to the time herein provided for the performance of any such obligation by such party.

**33.4    Time.**    Time is of the essence of this Lease and all of its provisions.

**33.5    Entire Agreement; Interpretation.**    This Lease represents the entire agreement between the parties hereto and there are no collateral or oral agreements or understandings. This Lease shall not be modified in any manner except by an instrument in writing executed by the party against which such modification is sought to be enforced. The word "person" means "person or entity." Except as otherwise expressly provided herein, wherever pursuant to this Lease, any matter is subject to or requires Landlord's approval, consent, or permission, or any item is to be satisfactory to Landlord or determined by Landlord, the decision of Landlord to approve or disapprove or consent or permit or withhold its consent or permission or to decide that an item is satisfactory or not satisfactory, or such determination, shall be determined by the sole discretion of Landlord and shall be final and conclusive and shall be binding on Tenant.

**33.6    Landlord's Warranties and Covenants.**    Landlord covenants, represents and warrants as follows:

**33.7    Zoning.**    Landlord shall obtain the approval of all public and governmental authorities as to all matters relating to zoning, subdivision, lot splits, lot ties, replats or similar requirements for use of the Leased Property as a Rite Aid store in accordance with Tenant's plans and specifications as will permit Tenant to obtain all necessary permits, licenses and approvals. Tenant has entered into this Lease in the expectation of, and based upon, Landlord assisting Tenant in obtaining, after expiration of all applicable appeal periods, all permits, authorizations, approvals, variances, special use permits, site plan approvals, licenses, permissions or other authorizations including, but not limited to, water and sewer permits (collectively called "Permits") necessary for the construction and operation of a complete Rite Aid pharmacy and retail store, including Tenant's signs and special service windows, built according to Tenant's plans and specifications (including without limitation curb cuts in connection with the facility deemed necessary or desirable by Tenant.) To the extent required, for any curb cuts as reflected on the Site Plan, Landlord will be responsible for obtaining any Pennsylvania Department of Transportation approvals.

Landlord or Tenant, as appropriate, agrees to apply for Permits without unreasonable delay after last execution of this Lease and the appropriate party agrees to execute such documents, make

21

such appearances and do such other things as either may reasonably request. Tenant or Landlord may (but shall not be obligated to) terminate this Lease if, after first application, Permits are denied or are not obtained within one hundred ninety (90) days after the last execution of this Lease except that if Tenant has proceeded with diligence and reasonably expects to be able to obtain the Permits, upon Tenant's request, Landlord shall grant a sixty (60) day extension (and, on the same conditions, a second sixty (60) day extension) of such ninety (90) day period. If Landlord elects to terminate this Lease as provided in this Section, Tenant shall have ten (10) days after receiving Landlord's written notice of termination to waive, in writing, the Permit contingency. If Tenant does not waive the Permit contingency, this Lease will terminate and be of no further force and effect, ten (10) days after Tenant's receipt of the notice.

    **33.8**    <u>Utilities.</u>  Landlord agrees to extend utilities to the Leased Property. Landlord hereby grants Tenant the right to enter into utility easement agreements and highway alignment easements in the event the same are necessary to accommodate Tenant's utility needs and curb cuts.

    **33. 9**    <u>Possession.</u>  The Leased Property is free and clear of all tenancies, whether oral or written, and that Tenant shall have sole and actual possession thereof from the date of last execution of this Lease.

    **33.10**    <u>Covenant Not To Compete.</u>  Landlord covenants and agrees that no property now or hereafter owned, leased or controlled, directly or indirectly, by Landlord or any subsidiary of Landlord, located within one (1) mile of the Center (whether or not such other property is subsequently voluntarily conveyed by Landlord) shall, during the term of this Lease and any extensions, be leased, used or occupied as a convenience store, pharmacy or other retail facility competitive with a Rite Aid.

    **33.11**    <u>Setback Restriction</u>: Landlord further covenants and agrees that, if during the term of this Lease or any extensions, Landlord shall own or control any land adjacent or contiguous to the Leased Property, or which constitutes a parcel of the Building, any building(s) or other improvements constructed upon such other land shall be in line with any set back of Tenant's Building and comply with any set back requirement of the City of Pittsburgh Zoning Code (the "Code").

    **33.12**    <u>Access / Visibility.</u>  Tenant acknowledges that the Leased Premises are part of a larger parcel upon which Landlord intends to construct and/or lease to others, additional retail, office or restaurant facilities. Some of such additional structures will be constructed adjacent to, on top of or below the Leased Property. Landlord covenants that after the Delivery Date no such structures will materially impair, in any manner, Tenant's quiet enjoyment of the Leased Premises, its ability to operate the Rite Aid retail store and/or Tenant's exclusive right to the surface parking spaces dedicated to Tenant as reflected on the Site Plan. Neither Landlord, nor any subtenant or other party holding any rights through Landlord, shall at any time during the construction phase of any structure or improvement or at any other time during the term of this Lease materially impair, in any manner, Tenant's access to, visibility of, or parking servicing the Leased Property.

    **33.13**    <u>Waiver of Landlord's Lien.</u>  Landlord expressly waives all rights to any so-called "Landlord's Lien" or any similar statutory lien, granting Landlord a lien for the performance of any obligations of Tenant, on any equipment, fixtures, machinery, goods, wares, merchandise or other personal property and, at the request of Tenant, Landlord shall promptly confirm such waiver by a writing in form satisfactory to Tenant.

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed and sealed this Lease as of the day and year first above written.

LANDLORD:

WITNESS:

ALEX-FORBES AND MURRAY, LP

By: ALEX ENTERPRISES, LLC, General Partner
By:
Title: Managing Member

TENANT:

ATTEST:
WITNESS :

RITE AID OF PENNSYLVANIA, INC.

By:
Name:
Title:





MURRAY AVENUE (60.07 R/W)

FORBES AVENUE (60' R/W)

Landlord's Dumpster

Tenant's Dumpster

PROPOSED
RITE AID,
RETAIL &
OFFICES

FF = 103.30

28 PARKING SPACES

Parking Area

Driveway

SITE PLAN

RETAIL/RITE AID BUILDING

FORBES AVENUE & MURRAY AVENUE

CITY OF PITTSBURGH, ALLEGHENY CO., PA

PHILLIPS & ASSOCIATES
INCORPORATED
CIVIL ENGINEERS

# EXHIBIT 4

Sign Exhibit
(Pending)

# EXHIBIT 3

Construction Contract
(Pending)

S:\AREA14.LEG\SNDA\Blank.snda
REV:mlb:

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made as of the _____ day of _____, 2002, between RITE AID OF , INC., P.O. Box 3165, Harrisburg, PA 17105 ("Tenant") and  having an address at ("Lender").

WHEREAS, Tenant and  ("Landlord") have entered into a Lease dated (the "Lease") covering all of certain premises situated at  as set forth in the Lease (the "Premises"); and

WHEREAS, Lender has made or is about to make a loan to Landlord secured by a mortgage covering the Premises demised under the Lease (the "Mortgage") and intended to be recorded in the public records; and

WHEREAS, Tenant has agreed that its rights in and pursuant to the Lease are and shall be subordinate to the Mortgage, provided Lender executes and delivers to Tenant a Non-Disturbance Agreement, which Lender is willing to provide on condition that Tenant agrees to attorn to Lender;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed:

1.      Subordination.  The Lease is and shall be subject and subordinate to the Mortgage insofar as it affects the Demised Premises, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all future advances made thereunder.

2.      Non-Disturbance Agreement.  As long as Tenant is not in default beyond any applicable grace period in the payment of rent, additional rent or other charges or in the performance of any of the other terms or conditions of the Lease, Tenant's rights under the Lease and its possession of the Premises will not be interfered with or disturbed by Lender during the term of the Lease (including any renewal or extension term) following acquisition of title to the Property (a) by Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, or (b) by Lender pursuant to acceptance of a deed in lieu of foreclosure (in either case, a "Transfer of Ownership").

3.      Attornment Agreement.  If a Transfer of Ownership occurs, Lender and Tenant will be bound to each other, as landlord and tenant, respectively, under all of the terms and conditions of the Lease for the balance of the term thereof (including any renewal or extension term), and Tenant hereby attorns to Lender as its landlord, such attornment to be effective and self-operative, without the execution of any other instruments on the part of either party hereto, immediately upon a Transfer of Ownership.  As used in this Article and in the subsequent provisions hereof, whenever the context allows, the term "Lender" will also include a purchaser of the Property at a foreclosure sale.

4.      Lender's Liability.  Notwithstanding any other provision of this Agreement, Lender will not be:  (a) liable for acts or omissions of any prior landlord (including Landlord) unless such acts or omissions are continuing after attornment or unless otherwise provided by law; (b) subject to offsets or defenses that Tenant might have had against any prior landlord (including Landlord) unless such offsets

1

required by Paragraph 12 of the Purchase and Sale Agreement except that Seller's remediation and investigation efforts shall not unreasonably interfere with the business proposed to be conducted on the site and such remediation and any monitoring wells will not interfere with the site plan provided to Seller by Buyer.  The Buyer shall have the right to comment on any action proposed by Seller and, in addition, shall have the right to undertake additional investigations and feasibility studies, at its own expense, in connection with the activities of the Seller hereunder.  The Buyer shall have the right to review the Seller's investigations, studies, actions and activities in performance of the Seller's obligations under this Agreement.  In the absence of bad faith or manifest error, a determination by Buyer's attorney of legal compliance requirements shall be deemed conclusively correct.

8.    Buyer shall fully cooperate with Seller in order for Seller to participate in any environmental reimbursement program relating to the Property by taking any and all actions requested by Seller, including, without limitation, providing to Seller any and all information or certificates requested by Seller.  Buyer recognizes and acknowledges that the Seller may be eligible for reimbursement for remediation and reimbursement for owner's and operators of petroleum contaminated sites ("Program").  The Seller reserves the right to assign such rights of reimbursement or other benefits associated with the Program subject to its receipt of the reimbursement and/or benefits associated with the Seller's cost and expenses.

9.    In the event Seller is unable or refuses to cleanup and/or remove the Hazardous Materials for which it is responsible, Seller shall fully cooperate with Buyer in order for Buyer to participate in any environmental remediation program relating to the Property by taking any and all actions requested by Buyer, including without limitation, providing to Buyer any and all information or certificates requested by Buyer, assign all rights of reimbursement and/or benefits associated with the Program to Buyer.

10.    The indemnification obligation contained in Paragraph 2 of this Indemnity Agreement shall terminate upon Buyer's receipt of a release of liability under Pennsylvania's Land Recycling and Environmental Remedial Standard Act 35 P.S. 6026.101 et. seq. ("Act 2") from PADEP as a result of Seller's demonstrating attainment of the Act 2 residential statewide health standards.

11.    Except for any notice required by law to be given in another manner, all notices, waivers, demands, or other communications required or permitted by this Agreement (collectively referred to as "Notices") shall be in writing, properly address and shall be given by:

    (a)    personal delivery,

    (b)    established, overnight, commercial courier delivery with charges pre-paid or duly charged by the sender; or

    (c)    registered or certified mail, return receipt requested, first class, postage pre-paid as follows:

IAV1556
8/13/98

### INDEMNITY AGREEMENT

#### THIS INDEMNITY AGREEMENT ("Agreement")

by and between CUMBERLAND FARMS, INC., ("Seller") and RITE AID OF

PENNSYLVANIA, INC. ("Buyer")

RECITALS:

WHEREAS, Seller and Buyer have entered into that certain
Agreement for Purchase and Sale of Real Estate dated May 6, 1998
(hereinafter referred to as the "Purchase and Sale Agreement")
providing for the sale of certain real property owned by Seller located
at 5740 Forbes Street at Murray Avenue, Pittsburgh, PA, (hereinafter
referred to as the "Property"); and

WHEREAS, Seller and Buyer intend to consummate the transactions
contemplated by the Purchase and Sale Agreement on or about August 18,
1998, (the "Settlement Date"); and

WHEREAS, Cumberland Farms agrees to arrange and pay for the
complete underground storage tank system closure within sixty (60) days
from the Settlement Date or the Lease Termination Date (as defined in
Paragraph 11(c) of the Purchase and Sale Agreement), whichever occurs
last.  Seller agrees to arrange and pay for the underground storage tank
("UST") system removal and closure in compliance with the applicable
Federal, state and local laws and regulations including environmental
laws and regulations and to backfill the excavated areas; and

WHEREAS, within sixty (60) days after the Settlement Date or the
Lease Termination Date, whichever occurs last, Seller further agrees to
remove all hydraulic lifts and associated operating, collecting and
containment systems or equipment in accordance with the applicable
Federal, state and local laws and regulations, including environmental
laws and regulations.

NOW THEREFORE, and in consideration of the mutual covenants and
conditions contained herein and other good and valuable consideration,
and intending to be legally bound, the parties hereto agree as follows:

1.   Seller shall be responsible for any and all costs, or
expenses in connection with the clean-up/removal and/or investigation of
Hazardous Materials (as defined in Paragraph 5 of the Indemnity
Agreement) that existed on, in or under or were released at or from the
Property on or prior to the Lease Termination Date (the date the Dealer
Tenant vacates the Property) or the Settlement Date, whichever occurs
last.  Such cleanup/removal and/or investigation of Hazardous Materials
shall be performed in compliance with the applicable Federal, state or
local regulations, rules or ordinances, including meeting the statewide
health standards under the Pennsylvania Land Recycling and Environmental

Remediation Standards Act 35 P.S. Section 6026.101 et. seq. ("Act 2"). Seller's obligation shall include obtaining a release of liability for Seller and Buyer under Act 2 from the Pennsylvania Department of Environmental Protection ("PADEP"). Buyer shall be responsible for any and all costs or expenses in connection with the clean-up/removal and/or investigation of Hazardous Materials that occur or are released and caused by Buyer after the Lease Termination Date or the Settlement Date, whichever occurs last.

2.   Subject to the provisions of Section 4 and 7 hereof, Seller shall indemnify, release, defend and hold harmless Buyer, its directors, officers, shareholders and employees from and against any and all claims, losses, demands, actions, liabilities, expenses, penalties, fines, injuries or damages, (including attorney's fees and expert witness fees) arising out of any Hazardous Materials that existed on, in or under or were released from the Property on or prior to the Lease Termination Date or Settlement Date, whichever occurs last whether known or unknown to Seller.

3.   Buyer shall indemnify and hold harmless Seller, its directors, officers, shareholders and employees from any and all expenses, claims, actions, liabilities, damages, penalties and fines, directly arising from existence or removal of any Hazardous Materials which is caused by Buyer, its employees, agents or vendors after the Lease Termination Date or Settlement Date, whichever occurs last.

4.   The party seeking indemnification hereunder shall not be entitled to recover from the other party to the extent such losses are covered by third party insurance, not including any "self insurance", however administered, if such self insurance is funded by the indemnified party.

5.   For purposes hereof "Hazardous Materials" shall include without limitation, polychlorinated biphynals, petroleum products, any flammable explosives, radioactive materials, hazardous materials, hazardous waste, hazardous or toxic substances or related materials defined in the following:  Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, (42 U.S.C. Section 9601, et seq.), the Hazardous Materials Transportation Act, as amended ("HMTA")(49 U.S.C. Section 1801, et seq.), the Resource Conservation and Recovery Act, as amended ("RCRA") (42 USC Section 6901 et seq.), the Toxic Substances Control Act as amended (15 USC Section 2601 et seq.), and in the regulations adopted and publications promulgated pursuant thereto, or any other federal, state or local governmental law, ordinance, rule or regulation relating to materials of environmental concern excluding any asbestos located in the building on the Property (hereinafter referred to as "Environmental Law").

6.   The terms of this Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania.

7.   Notwithstanding anything herein to the contrary, each party hereto shall cooperate with the other in connection with the performance of its obligations hereunder.  It is specifically understood, acknowledged and agreed that Seller shall have complete control to fully effectuate whatever clean-up or removal of Hazardous Material is

If to Seller:        Cumberland Farms, Inc.
                     777 Dedham Street
                     Canton, MA 02021
                     Attn:  Law Department

with a copy to:      Cumberland Farms, Inc.
                     777 Dedham Street
                     Canton, MA 02021
                     Attn:  V.P. Real Estate

                     and V.P. Environmental Affairs
                     at the same address

If to Buyer:         Rite Aid Corporation
                     P. O. Box 3165
                     Harrisburgh, PA 17105
                     Attn:  Lawrence I. Gelman

or to any other address or addressee which any party entitled to receive
Notice under this Agreement shall designate from time to time, in the
manner provided in the Section for Service of Notice.

12.  The Buyer shall provide Seller with prompt written notice of
any performance or failure to perform which could give rise to the right
of indemnification under this Agreement.  The notice ("Notice") shall
set forth the facts then known by it which give rise to the alleged
performance or failure to perform.  In the event that the Buyer fails to
give Notice as required hereunder, then Seller shall have no obligation
to indemnify the Buyer under this Agreement.  Seller shall control the
performance of any investigation or remediation to be performed under
this Agreement.

13.  Except as otherwise provided, the provisions of this
Agreement shall be continuing, irrevocable and binding upon and shall
inure to the benefit of, the Parties hereto, their heirs, successors and
interests, executors, administrators and assigns; provided, however,
Sellers' obligations under this Agreement shall be discharged unless
within thirty (30) days of any change in ownership of the Property, all
subsequent owners of the Property give Notice to Seller of such change
in ownership and of their agreement to be bound by the terms of this
Agreement.

14.  Buyer and its successors shall cooperate with any
investigation and/or remediation of the Property and shall provide
Seller, its agents and contractors reasonable access to permit Seller to
perform its responsibilities under this Agreement.  Buyer agrees not to
interfere with Sellers' site investigation and remediation activities at
the Property so as to prevent performance or increase the costs of said
site investigation or remediation.

15.  Nothing contained in this Agreement shall be construed as an
admission regarding any responsibility, wrong doing, liability, or
damages by Seller.  Accordingly, Seller reserves its right to pursue any
claims for damages, injunctive relief, declaratory relief, indemnity,
and contribution that it has against third parties, and nothing
contained in this Agreement shall alter or in any way affect any right

Seller may have against any third-parties or any defenses Seller may have to any claims by any third-parties.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as an instrument under seal this _____ day of August_____, 1998.

Witnesses:

_____

_____

Seller:
CUMBERLAND FARMS, INC.

By: _____
Francis G. Locklin,
Sr. Vice President

Buyer:
RITE AID OF PENNSYLVANIA, INC.

By: _____

or defenses are continuing after attornment or unless otherwise provided by law; (c) bound by rent, additional rent or other charges that Tenant might have paid for more than 30 days in advance to any prior landlord (including Landlord) except as provided in the Lease; (d) bound by any amendment or modification of the Lease hereafter made without Lender's prior written consent, which consent will not be unreasonably withheld (except to the extent that the Lease may specifically contemplate any amendment or modification thereof); or (e) responsible for money or other security delivered to Landlord pursuant to the Lease but not subsequently received by Lender.

     5.    <u>Lender's Right to Cure Default</u>. No notice by Tenant to Landlord of any breach or default by Landlord under the Lease will be effective unless and until (a) a copy of the notice is received by Lender, and (b) a reasonable period of time, if no time period is specified in the Lease, has elapsed following Lender's receipt of such copy, during which period Lender will have the right, but will not be obligated, to cure the breach or default.

     6.    <u>Notices</u>. To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postpaid by United States registered or certified mail with return receipt requested. Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.

     The agreements contained herein shall bind and inure to the benefit of the successors and assigns in interest of the parties hereto, and, without limitation of the foregoing generality, the agreements of Lender herein shall specifically be binding upon any purchaser or successor of said property at a sale foreclosing said Mortgage or in lieu of such foreclosure.

     IN WITNESS WHEREOF, the parties hereof have caused the execution hereof as of the date first above written.

WITNESS OR ATTEST:

                                     TENANT:
                                     RITE AID OF , INC.

_____

_____           By:_____
                                       Eve K. Exar
                                     Authorized Representative

                                   LENDER:

_____

_____           By:_____

2

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF CUMBERLAND

On the _____ day of , A.D. 2002, before me, the undersigned authorized representative, personally appeared Eve K. Exar, who acknowledged herself to be the Authorized Representative of Rite Aid of , Inc., a corporation, and that she as such Authorized Representative, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by herself as Authorized Representative.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

_____

My Commission Expires:

STATE OF _____

COUNTY OF _____

On the _____ day of _____, A.D. 2002, before me, the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of _____, a corporation, and that (s)he as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as _____.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

_____

My Commission Expires:

3