**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>                   Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 17, 473, & 1178** |

**NOTICE OF SUCCESSFUL BIDDER WITH RESPECT TO CERTAIN
OF THE DEBTORS' PHARMACY ASSETS**

      **PLEASE TAKE NOTICE** that on May 21, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* [Docket No. 473] (the "Bidding

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

Procedures Order") by which the Court approved procedures (such procedures, the "Bidding Procedures") for the sale or sales of all, substantially all, or any portion of the Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that on July 1, 2025, the Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief.* [Docket No. 1178] (the "Sale Order") authorizing the Debtors, in consultation with the Consultation Parties, to file one or more additional notices of successful bidder (each, an "Additional Notice of Successful Bidder").

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 52 of the Sale Order, the Debtors, in consultation with the Consultation Parties, are filing this Additional Notice of Successful Bidder indicating that the Debtors have selected Med One Pharmacy Inc. as the successful bidder with respect to certain of the Debtors' Pharmacy Assets (the "Successful Bidder" and such bid, a "Successful Bid"). The final form of the purchase agreement (the "APA") is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the proposed Sale of the Assets pursuant to the APA is consistent with the Debtors' existing privacy policies regarding the transfer of personally identifiable information ("PII") and protected health information ("PHI"). The sale, conveyance, assignment, and transfer of PII and PHI will be consistent with the Debtors' policies regarding the transfer of such PII and PHI as of the Petition Date.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to consummation or approval of the Sale must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before August 13, 2025** (the "Sale Objection Deadline") by (i) the Bid Notice Parties, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) counsel to the Official Committee of Unsecured Creditors, Willkie Farr & Gallagher LLP, (iv) the Successful Bidders, and (v) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Sale Order, if no timely objections are received by the Sale Objection Deadline, (i) the Debtors are authorized to consummate the Sale to the Successful Bidder in accordance with the terms set forth in the APA and (ii) the Successful Bidder shall be deemed a Purchaser as defined in and under the Sale Order, and all protections of the Sale Order shall apply to the Sale to the Successful Bidder and the Assets acquired thereby to the same extent as if such Sale had been approved by the Sale Order.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed assumption and assignment of any executory contract or unexpired lease to the Successful Bidder and/or the related proposed cure amount will be subject to a separate objection deadline as set forth

---

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

in the Cure Notice served on each applicable contract or lease counterparty and do not need to be filed on or before the Sale Objection Deadline.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND SALE ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE ASSET PURCHASE AGREEMENT OR SALE ORDER, AS APPLICABLE.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Orders, and the Sale Order, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retainer in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930- 4577; (b) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

*[Remainder of page intentionally left blank]*

Dated:  August 6, 2025

/s/  *Michael D. Sirota,*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:   arosenberg@paulweiss.com
            aeaton@paulweiss.com
            chopkins@paulweiss.com
            smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**Med One APA**

**Asset Purchase Agreement**

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into effective as of August ___, 2025, by and between **Med One Pharmacy Inc.** ("**Buyer**"), and **Rite Aid of Maryland, Inc.** ("**Seller**"). Buyer and Seller may be collectively referred to herein as the "**Parties**," and individually as a "**Party**," as the circumstances require.

1.   <u>Sale of Assets.</u> Seller agrees to sell and Buyer agrees to purchase the "**Purchased Assets**" (defined below) owned by Seller in connection with Seller's retail drug store and pharmacy business located at the address set forth on **Schedule 1** (each, a "**Pharmacy**"), pursuant to the terms hereof. "**Purchased Assets**" shall collectively refer to all of the following:

   A.   All files, prescription records, customer records, lists and profiles, pharmacy records, patient profiles, physician files, documents, instruments, papers, books, computer files and records of prescriptions filled by the applicable Pharmacy, and all other records of Seller for the three (3) years (or such time period mandated by State and Federal laws) immediately preceding the Closing (defined below) in any media relating to the patients, doctors, pharmaceuticals, controlled substances or prescriptions therefor administered or filled by the applicable Pharmacy, which shall include a list of the top five (5) prescribers for each Highly Diverted Controlled Substances ("**HDCS**") and top ten (10) prescribers for all HDCS, number of prescriptions and dosages, number of pills per prescription, prescriber name, DEA number, and address, and prescriber specialty (collectively, the "**Records**"), which will allow Buyer to derive Protected Health Information ("**PHI**"), as that term is defined in the Health Insurance Portability and Accountability Act of 1996, P. L. 104-191, and its implementing rules and regulations (collectively, "**HIPAA**"); for purposes of this Agreement "**Highly Diverted Controlled Substances**" shall mean: (i) oxycodone, (ii) hydrocodone, (iii) hydromorphone, (iv) tramadol, (v) oxymorphone, (vi) morphine, (vii) methadone, (viii) carisoprodol, (ix) alprazolam, and (x) fentanyl. Seller warrants that the Records shall contain, at a minimum, all of the information included in **Exhibit "A"** attached hereto and incorporated herein by reference, and Seller further warrants that the information contained in the Records is complete, accurate and current. The Records shall be transferred to Buyer exclusively, shall not be shared with any third parties (other than as contemplated by this Agreement), and shall not be diminished or removed from the applicable Pharmacy between the date of execution of this Agreement and the Transfer Date (as defined below).

   B.   (i) All items in stock of prescription pharmaceutical inventory of the applicable Pharmacy pursuant to the terms hereof (the "**Purchased Pharmacy Inventory**"), and (ii) all accompanying transaction history, transaction information, and transaction statements (the "**3T Documentation**") as required pursuant to the Drug Supply Chain Security Act (the "**DSCS Act**").

   C.   To the extent in hard copy format, originals of any and all controlled substance invoices, used DEA 222 forms (blue copies for orders placed or executed originals for received single-page forms, as applicable, with each statement attached), and, to the extent dated within the two (2) years prior to the applicable Closing Date, annual controlled substance inventory logs (collectively, the "**DEA Documentation**"); provided, for the avoidance of doubt, that, to the extent such materials (i) are in electronic format, (ii) consist of unused DEA 222 forms or blue copies for unaccepted or defective forms, or (iii) are records of controlled substances disposed of, such materials shall be deemed as Excluded Assets and the applicable Seller shall retain such materials.

**D.**     All leases governing the real property listed on **Schedule 1** (the "**Leases**") pursuant to which the applicable Seller holds leased real property for the applicable Pharmacy (such Leases, the "**Assigned Leases**", and such real property, the "**Purchased Leased Real Property**").

**E.**     All telephone and facsimile numbers used in connection with the applicable Pharmacy as listed on **Schedule 1** (the "**Telephone and Fax Numbers**") pursuant to the provisions in Section 18.

**2.**     <u>**Excluded Assets.**</u> Notwithstanding the foregoing, the following assets of Seller (the "**Excluded Assets**") will be retained by Seller and are specifically excluded from the Purchased Assets: (a) inventory and supplies that are (i) not Purchased Pharmacy Inventory (including, for the avoidance of doubt, front-end store inventory and over-the-counter inventory), (ii) expired, outdated or otherwise untransferable under applicable laws, or (iii) otherwise excluded pursuant to the terms of Section 8, (b) cash and cash equivalents in bank accounts and cash registers, (c) accounts receivable in any form, (d) any and all licenses, franchises, permits, certificates and governmental approvals and authorizations, (e) contracts and understandings, other than the Assigned Leases, (f) leased or other real property, other than the Assigned Leases, and (g) intangible rights. Buyer does not assume any of Seller's liabilities or debts whatsoever. Without limiting the generality of the foregoing, in no event shall Buyer assume (i) any type of successor liability with respect to any law relating to the licensure or regulation of health care providers, suppliers, professionals, facilities, pharmacies, or payors, including state pharmacy laws and any other requirements of federal and state law relating to the provision of, and litigation or any other claim or dispute arising from, opioid treatment services and pharmacy or physician services, including the Federal Controlled Substance Act, 21 U.S.C. § 801 et seq., (ii) any obligations of Seller under HIPAA or other applicable laws or regulations, including the HIPAA privacy standard requiring accounting of certain disclosures of PHI made by Seller prior to the Transfer Date, (iii) any type of successor liability as to trade creditors, unemployment, income, property, sales or other taxes, or otherwise, or (iv) any of Seller's third party provider numbers or licenses, including, without limitation, any and all obligations and/or liabilities of Seller, the applicable Pharmacy or the Purchased Assets with respect to all such third party provider numbers and licenses, it being understood that all such liabilities are "**Excluded Liabilities**". The phrase "liabilities" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured. Furthermore, Buyer shall have no liability for the continued employment or any compensation of employees of Seller or the applicable Pharmacy.

**3.**     <u>**Assignment of Assigned Leases; Cure Costs.**</u>

**A.**     **Schedule 2** sets forth, with respect to each Assigned Lease, the estimated amounts payable, or obligations that must be satisfied, in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of each Assigned Lease (collectively, the "**Cure Costs**") as of the date hereof. In accordance with the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice with Respect Thereto, and (VII) Granting Related Relief* [Docket No. 473], as it may be amended or modified (the "**Bidding Procedures Order**"), (i) Seller shall notify non-Seller counterparties to such Assigned Leases as of the date

2

hereof of the deadline to object to the Cure Costs, if any, and (ii) unless otherwise agreed by the non-Seller counterparty and Seller or as provided by the Bidding Procedures Order, the Bankruptcy Court shall determine the Cure Costs with respect to any Assigned Lease entered into prior to the Petition Date (as defined below).

**B.** To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 3B, Seller agrees to promptly following the date hereof satisfy all Cure Costs in accordance with the Bidding Procedures Order in respect of Assigned Leases for which Bankruptcy Court approval to assign has been obtained; provided, however, that on each applicable Closing Date, Seller shall have paid or otherwise satisfied the Cure Costs for which Bankruptcy Court approval to assign the applicable Assigned Leases has been obtained on or prior to each such Closing Date, except as otherwise provided for by the Bidding Procedures Order. In accordance with the Bidding Procedures Order, Seller shall assign to Buyer the Assigned Leases pursuant to section 365 of the Bankruptcy Code and the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 1178] (the "**Sale Order**"), subject to the provision of adequate assurance by Buyer in respect of the Assigned Leases as may be required under section 365 of the Bankruptcy Code as determined by the Bankruptcy Court.

**C.** To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 3C, at each Closing, Seller shall, pursuant to the terms of the Bidding Procedures Order and the Sale Order assume and assign to Buyer all Assigned Leases corresponding to such Closing that may be assigned by Seller to Buyer pursuant to sections 363 and 365 of the Bankruptcy Code.

**4.** **Inspection/Transfer Date.** Seller shall, prior to the Transfer Date (at such date and time as Buyer elects, provided it is during normal Pharmacy business hours and following reasonable prior notice), give Buyer reasonable access to the Records and allow Buyer to examine the Purchased Assets and the Pharmacies subject to the Assigned Lease. The transfer of the Purchased Assets shall occur on such date as mutually agreed between Seller and Buyer following the date of this Agreement (the "**Transfer Date**").

**5.** **Notice to Seller's Customers.** As of the date of this Agreement, Buyer may utilize Seller's list of the applicable Pharmacy's customers (including names and addresses) from the prior one hundred eighty (180) days for customer outreach purposes, which form shall be mutually agreed upon by the Parties in advance via email. As of the date of this Agreement, Seller shall permit Buyer, at Buyer's discretion, to place signs in the applicable Pharmacy and on the windows of the applicable Pharmacy advising Seller's customers that Buyer has arranged to purchase Seller's Pharmacies. Buyer shall have the right to advertise that Buyer is purchasing or has purchased Seller's Pharmacies.

**6.** **Transfer of Purchased Assets.**

**A.** The Parties agree that Seller will engage InfoWerks Data Services, LLC (the "**Data Converter**") to convert Seller's prescription file and Record data (the "**Record Data**") to a format specified by Buyer. Buyer will be responsible for all of the Data Converter's fees, costs and expenses incurred in connection with the Record Data conversion services. Seller

agrees to provide such access, information and cooperation to the Data Converter as may be required to enable the Data Converter to deliver the Record Data to Buyer's Information Services representative at least ten (10) business days prior to the Transfer Date, or such other period as mutually agreed upon between the Parties, for the purpose of testing the data's conversion to Buyer's format. In the event that the Record Data is not or cannot be delivered to Buyer as of such date or is not successfully converted, Buyer, at Buyer's sole discretion, may either (i) delay the Transfer Date until the Record Data is delivered to Buyer, or the conversion is successful or (ii) following commercially reasonable efforts to effect the conversion, terminate this Agreement upon written notice to Seller.

B.    **Transfer of Possession.** Seller shall deliver possession of the electronic Records and the other Purchased Assets to Buyer at a time mutually agreed upon by the Parties on the Transfer Date. Seller shall deliver possession of the hard copy Records and the other Purchased Assets to Buyer on the Transfer Date. Risk of loss shall transfer to Buyer at the time Buyer takes possession of the Purchased Assets. Concurrently with the transfer of the Purchased Assets to Buyer, Seller shall deliver to Buyer (i) a duly executed and acknowledged Bill of Sale in respect of the applicable Purchased Assets in substantially the same form attached hereto as **Exhibit "B"** and incorporated herein by reference ("**Bill of Sale**"), (ii) with respect to the applicable Purchased Leased Real Property, an Assignment and Assumption of Lease Agreement in substantially the same form attached hereto as **Exhibit "C"** ("**Lease Assignment**"), (iii) with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (as defined below) (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price (as defined below)), signed by a representative of Seller, and (iv) complete copies of Seller's 3T Documentation and DEA Documentation, as applicable, as required for the applicable Purchased Pharmacy Inventory. Seller shall, upon request of Buyer, perform such further acts, assignments, transfers, and assurances as may be reasonably required to convey and transfer all of Seller's right and title in the Purchased Assets to Buyer. Concurrently with the transfer of the Purchased Assets to Buyer, Buyer shall deliver to Seller (i) the applicable Lease Assignment, duly executed by Buyer, and (ii) with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price), signed by a representative of Buyer. Each Party shall also deliver to the other such additional documents as are reasonably required by law or the terms of this Agreement to complete the sale of the Purchased Assets to Buyer. **Subject to the representations in Section 7 below and the other provisions of this Agreement, Buyer further agrees and acknowledges that Buyer shall accept the Purchased Assets "as is, where is."**

C.    **Fire or Other Casualty.** If there is a fire or other casualty which results in damage to or destruction of any portion of the Purchased Assets prior to the Transfer Date, then Buyer may, in its sole election, (i) terminate this Agreement or a portion of the Agreement in respect of the impacted Purchased Assets by written notice to Seller, or (ii) proceed to acquire the remaining portion of the Purchased Assets, in which event the Purchase Price shall be proportionately reduced to reflect the fair market value of the remaining Purchased Assets after the fire or other casualty.

D.    **Request by Pharmacy Customers.** Buyer agrees in the event that, prior to the Transfer Date, Seller receives from any Pharmacy customer any objection to the transfer of the Pharmacy customer's prescription records to Buyer and/or any instruction from the Pharmacy customer to transfer said Pharmacy customer's prescription records to a

4

pharmacy other than the location to which Buyer intends to transfer the Records, Seller shall be relieved of its obligation to transfer the applicable Pharmacy's customer's prescription records to Buyer except to the extent that such a transfer is required by law. Buyer further agrees that in the event a Pharmacy customer objects, after the Transfer Date, to the transfer of the applicable Pharmacy's customer's prescription records to Buyer, Buyer shall immediately transfer the applicable Pharmacy's customer's prescription records to the location designated by the applicable Pharmacy's customer and shall further purge said applicable Pharmacy's customer's prescription records from Buyer's files except to the extent Buyer is required by law to retain such Records. The provisions of this Section 6D shall survive the Transfer Date.

E.     **W-9s**. Seller shall, on or before the Transfer Date, deliver to Buyer a completed form W-9 Request for Taxpayer Identification Number.

F.     **DSCS Act**. Seller agrees to provide Buyer with all readily available product tracing information and other information required by the DSCS Act for the Purchased Pharmacy Inventory, including the 3T Documentation. Seller shall reasonably cooperate and assist Buyer, in such Buyer's efforts to effect a transfer of such 3T Documentation on the applicable Closing Date. Such cooperation may include Seller taking such acts as may be reasonably necessary, including executing a release or authorization for the benefit of any third parties that are maintaining any such 3T Documentation on behalf of Seller, as may be reasonably necessary to facilitate the transfer of all such 3T Documentation to Buyer.

G.     **Power of Attorney**.  In the event that Buyer has not obtained any license related to any DEA registration as of the Closing Date, but Buyer's relocation application is approved effective as of the Transfer Date, Seller shall allow Buyer the right to use any such licenses as Buyer may require pursuant to a Power of Attorney in substantially the form attached hereto as Exhibit "F". Such Power of Attorney shall be delivered by Seller on or before the applicable Closing Date and shall be effective beginning on the Transfer Date subject to the foregoing and continuing until Buyer obtains new licenses; provided, that the term of such Power of Attorney shall end no later than ninety (90) days following the issuance of such Power of Attorney.  Seller shall not surrender, cancel or terminate any licenses that are the subject of the Power of Attorney while the Power of Attorney is in effect.

H.     **Relocation Application Non-Approval**. Notwithstanding anything to the contrary in this Agreement, in the event that Buyer's relocation application (as described in Section 12.B.) is not approved effective as of the Transfer Date, the Purchased Assets shall be deemed to only include the Records and the Telephone and Fax Numbers and the Purchase Price shall be deemed to only be comprised of the Records Purchase Price, and the delivery of such Records shall be to the Buyer's receiving pharmacy specified on **Schedule "1"**.  For the sake of clarity, in such event, Buyer will not acquire or assume the Purchased Pharmacy Inventory, 3T Documentation, DEA Documentation, any Leases, or any other asset or any liabilities.  Furthermore, in such event, the Parties shall only be required to comply with any agreements, covenants, obligations, and terms and conditions under this Agreement to the extent that they are applicable to an acquisition of the Records and the Telephone and Fax Numbers and the payment of the Records Purchase Price.

5

7. **Purchase Price.**

A. The Purchase Price shall consist of:

(i) the amount listed on **Schedule 1** for the Records (the "**Records Purchase Price**");

(ii) the Inventory Purchase Price (as defined below), subject to **Exhibit "D"** (including Annex I thereto) (the "**Inventory Instructions**"); and

(iii) the purchase price listed in **Schedule 1** with respect to the Purchased Leased Real Property (the "**Purchased Leased Real Property Purchase Price**"), which shall be allocated in the manner provided therein.

The Purchased Leased Real Property Purchase Price, the Inventory Purchase Price and the Records Purchase Price, collectively, the "**Purchase Price**".

B. Notwithstanding above, with respect to the Records, in the event that Seller's averaged weekly prescription count for the thirteen (13) week period immediately preceding the Transfer Date (the "**Prescription Count**"), which weeks do not include a nationally recognized holiday (in such case the week prior to the week excluded shall be used in the calculation) (the "**Transfer Date Volume**"), falls below the current volume shown on **Schedule 1** ("**Current Volume**") by more than ten percent (10%) (the "**Prescription Rate Threshold**"), Buyer shall have the right to decrease the Records Purchase Price proportionately per prescription by which the Transfer Date Volume is less than the Prescription Rate Threshold, except the first five percent (5%) shall not be included in such reduction calculation. For purposes of illustration, if the "Current Volume" of a Pharmacy location fell by fifteen percent (15%) then Buyer shall have the right to decrease the applicable Records Purchase Price for such Pharmacy location by ten percent (10%); if the "Current Volume" of a Pharmacy location fell by nine (9%) then Buyer shall have no right to decrease the applicable Records Purchase Price for such Pharmacy location. Further, if the Prescription Count falls below the Current Volume by fifty percent (50%) or more for such thirteen (13) week period, Buyer may choose not to purchase such Purchased Assets from Seller in respect of such Pharmacy and shall provide Seller with notice of its intent not to acquire such Purchased Assets. For the purposes of determining the Transfer Date Volume, Seller shall deliver to Buyer a written statement evidencing the Prescription Count at least five (5) days prior to the Transfer Date.

8. **Inventory Matters and Valuation.** The Parties agree that Buyer will purchase, and the Purchased Assets will include, only those items of inventory that are determined to be Purchased Pharmacy Inventory according to the Inventory Instructions and that Buyer will not purchase any Excluded Inventory. The Parties shall commission WIS International or another mutually acceptable inventory valuation firm (the "**Inventory Service**") to conduct a full review and valuation of the Purchased Pharmacy Inventory at the Pharmacies on the day immediately prior to the respective Closing Date using the Inventory Instructions (such review at an individual Pharmacy, the "**Inventory Review**" and the amount determined pursuant to the Inventory Review at an individual Pharmacy, which shall automatically be reflected on **Schedule 1** thereafter, the "**Inventory Purchase Price**"). The cost and expense of the Inventory Service for all purposes hereunder shall be borne solely by Buyer.

9. **Closing.** Unless otherwise agreed in writing by the Parties, the closing of the sale of Purchased Assets to Buyer (each a "**Closing**" and the date of each Closing, a "**Closing Date**") shall occur on

6

each applicable Transfer Date at a time mutually acceptable to the Parties. On the first business day immediately following such Transfer Date, Buyer shall wire the applicable Purchase Price to Seller by a wire transfer of immediately available funds. Seller's wiring instructions are attached hereto as **Exhibit "E"**.

**10.**     Intentionally omitted.

**11.**     <u>**Representations and Warranties.**</u>

     **A.**     **Liens**. Seller represents and warrants that it has good and marketable title to and is the sole owner of all of the Purchased Assets and that the Purchased Assets shall, as of the Transfer Date, be free and clear of all "**Liens**" as herein defined. Seller further represents and warrants that all suppliers and creditors of the Purchased Assets shall be paid in the normal course of business. The term "**Liens**" shall collectively refer to all liens, charges, restrictions, claims, judgments, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, taxes (presently due or due at any time in the future related to the Purchased Assets and/or this transaction), assessments or other encumbrances (whether secured or unsecured) with respect to any item of the Purchased Assets or the applicable Pharmacy and includes, without limitation, any claim or charge of any creditor or supplier of the Purchased Assets.

     **B.**     **Title to Purchased Leased Real Property.** Seller has a good and valid leasehold interest to the applicable Purchased Leased Real Property free and clear of any lien, mortgage, or encumbrance except for those that will be removed by operation of the Sale Order. **Schedule 2** sets forth the Lease for each Purchased Leased Real Property along with the address, name of landlord entity and the lease expiration date. Seller has made available to Buyer or to Buyer's advisors copies of each such Lease.

     **C.**     **Authority.** Seller and Buyer represent and warrant that each Party has taken all necessary corporate action and, subject to the procedures, notice, and objection rights set forth in the Sale Order, has the full and sole right, power and authority to enter into this Agreement to sell and buy the Purchased Assets, respectively, and that the individual signing below for Seller and Buyer is duly authorized to sign on behalf of Seller's and Buyer's entity. The sale of the Purchased Assets and all of the other obligations of Seller agreed to hereunder do not conflict with or result in a breach of the terms of any agreement or instrument to which Seller is a party or by which it is, or may be, bound or which would constitute a default thereunder, or result in a claim against Buyer, or result in the creation or imposition of any lien, charge or encumbrance on, or give to others any interest in or right to the Purchased Assets.

     **D.**     **Parties Are in Good Standing.** Seller represents and warrants that it is a duly organized corporation in good standing with the state in which the applicable Pharmacy is located and will continue to be so as of the Transfer Date. Buyer represents and warrants that it is a duly organized corporation in good standing with state in which the applicable Pharmacy is located. Seller and Buyer have full power and authority to enter into and perform this Agreement.

     **E.**     **No Brokers.** Except for Guggenheim Securities, LLC, the fees and expenses of which will be paid by Seller, Buyer and Seller each represent and warrant to the other that all negotiations relative to this Agreement and the transactions contemplated herein have been carried on in such manner so as not to give rise to any valid claim against either Buyer or

Seller for any brokerage, commission or finder's fees. In the event any action or inaction by either Buyer or Seller with respect to this transaction has given or shall hereafter give rise to any brokerage, commission or finder's fee, all such fees shall be paid solely and exclusively by the responsible Party and the other Party shall have no obligation or liability therefor.

F.    **HIPAA Compliance.** To the best of its knowledge and belief, Seller is currently in full compliance with the requirements of HIPAA. Without limiting the generality of the foregoing, Seller has implemented a HIPAA compliance program, including but not limited to employee training, provision of Privacy Notices to pharmacy customers, and adoption of privacy policies and security features. After the Transfer Date, Buyer shall make Seller's prescription data transferred hereunder as part of the Records available for access to all eligible parties in accordance with HIPAA Privacy Standards and applicable state law. However, in no event shall Buyer assume any legal obligations of Seller under HIPAA including, but not limited to, the HIPAA Privacy Standard requiring accounting of certain disclosures of Patient's PHI made prior to the Transfer Date. All inquiries for accountings or other patient rights under HIPAA relating to disclosures made prior to the Transfer Date shall be forwarded to Seller or its appointed agent.

G.    **Controlled Substance Act.** Buyer shall comply with all applicable laws and regulations that may relate to the maintenance and confidentiality of Records transferred hereunder and with respect to the applicable Pharmacy's operations in general. Seller shall notify the appropriate governmental agencies, including the State Board of Pharmacy and the regional DEA office, of the transaction described herein.

H.    That, to Seller's reasonable knowledge, the Records are accurate in all material respects and were created or obtained in the ordinary course of Seller's operation of the applicable Pharmacy.

I.    There are no (i) claims, actions, suits, labor disputes, arbitration, legal or administrative proceedings or investigations, including, without limitation, by the DEA, OIG, CMS, FDA, applicable Board of Pharmacy or other governmental body, pending against Seller or, to the knowledge of Seller, threatened against Seller, or otherwise pending or, to the knowledge of Seller, threatened with respect to the Purchased Assets and to Seller's knowledge no such actions, disputes, proceedings or investigations are contemplated, except to the extent any such claim, action, dispute, arbitration, proceeding or investigation would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder or (ii) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or governmental body to which Seller is a party or is subject with respect to the applicable Pharmacy or to which any of the Purchased Assets is subject, except to the extent any such judgment, decree, order, writ, injunction, ruling, decision or reward would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller, any parent, subsidiary or other affiliate of Seller, nor any director, manager, officer or pharmacy employee of Seller has not been disciplined or sanctioned, or to Seller's knowledge has had a discipline or sanction proposed, by any governmental body, except to the extent any such discipline or action would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller is not excluded

8

from participation in any government healthcare payment program, including Medicare or Medicaid, nor does Seller have knowledge of any pending or threatened discipline, sanction, inquiry, investigation or government action that would be reasonably expected to lead to such exclusion.

**J.**     The prescriptions filled at the applicable Pharmacy have arisen from bona fide, legal transactions. Seller's Records have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with local, state and federal laws, statutes, ordinances, regulations, rules, codes, decisions, decrees, and orders, and are consistent with industry standards and clinical guidelines applicable to pharmacists and licensed prescribers. All information regarding the Records provided to Buyer to date is true and correct in all material respects

**K.**     Except as set forth on **Schedule 3**, none of the prescriptions filled at the applicable Pharmacy result from any Non-standard Business. As used in this Agreement, "**Non-standard Business**" means (1) delivering prescriptions by mail, courier, automobile or other delivery system (in each case, including prescriptions filled via the Internet), (2) compounding, including both sterile and non-sterile compounding, (3) filling prescriptions that involve any unique, customized or non-standard packaging, including prescriptions filled for patients in assisted or independent living facilities, nursing homes, long-term care facilities or hospice facilities, (4) any business conducted pursuant to Section 340B of the Public Health Service Act, (5) any non-prescription business (including durable medical equipment) done through the pharmacy computer and included in the prescription count, (6) any prescriptions filled pursuant to any contract, agreement or understanding (other than a standard contract agreement or understanding with any third party payor or government payor providing health care coverage to individuals), or (7) any other business outside the scope of a customary pharmacy or retail drug-store business.

**L.**     The transactions contemplated hereunder (a) are the result of a sale process led by Seller, its affiliates, and its advisors, pursuant to which Buyer submitted an offer for the Purchased Assets, such offer has been accepted and Buyer has been awarded the right to acquire the Purchased Assets, no other person or entity or group of persons or entities has submitted a higher or better offer to purchase the Purchased Assets, and (b) may not be avoided under Section 363(n) or any other section of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"). The Purchase Price for the Purchased Assets (i) was negotiated and is undertaken at arm's length without collusion or fraud and in good faith within the meaning of and otherwise consistent with Sections 363, 365, and 548 of the Bankruptcy Code and (ii) constitutes reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

**M.**     This Agreement has not been entered into for the purposes of hindering, delaying or defrauding creditors of Seller under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable law and none of the Parties hereto have entered into this Agreement or are consummating the sale of the Purchased Assets with any fraudulent or otherwise improper purpose.

**N.**     Seller has timely and properly filed all federal, state and local tax returns and reports and forms which it is or has been required to file, either on its own behalf or on behalf of its employees or other persons or entities including but not limited to all sales and use and

9

employment tax returns, all such returns and reports being true, correct and complete in all respects and has paid all taxes which have become due.

**O.**     The provisions of this Section 11 shall survive the Closing.

**12.**   **Regulatory Notices and Clearances.**

**A.**     Buyer and Seller (where applicable) will, and will cause their respective affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by Buyer under any applicable laws for the consummation of the transactions contemplated herein, if any.

**B.**     Buyer will, and will cause its Affiliates and Advisors to, submit to the Maryland Board of Pharmacy as promptly as possible and no later than three (3) Business Day following the date the Seller is authorized to consummate this Agreement pursuant to the Sale Order, a fully completed and executed Maryland Pharmacy Permit Application with all required supporting forms and materials with respect to relocating Buyer's receiving pharmacy specified on **Schedule "1"** to the location of Store #319 with such relocation to be effective as of the Transfer Date.

**13.**   **Conditions to Closing.** The Closing of the sale transactions set forth herein is subject to all of the following conditions in favor of Buyer and, if any of the following conditions are not satisfied or waived in writing by Buyer as of the Transfer Date, Buyer may terminate this Agreement in respect of such sale transaction without any liability to Seller.

**A.**     **Representations Are True.** Seller's representations are true and correct in all respects on and as of the date of this Agreement and through each Transfer Date with the same force and effect as though made on and as of such date, and Seller shall have performed all of its obligations under this Agreement through the Transfer Date.

**B.**     **Records Successfully Converted.** The Records contained within Seller's computer system have been successfully converted to a reasonably acceptable format through the Data Converter in a form that is acceptable to and usable by Buyer in conducting Buyer's business in its normal course.

**C.**     **Rx Customer Data Deactivated in Seller's System.** The Records contained within Seller's computer system will be deactivated and placed in "transfer mode" within Seller's mainframe. After the Transfer Date, such data will remain in Seller's possession but will be limited to those purposes set forth herein. Seller will provide written verification of the deactivation of the files and records within five (5) business days after the Transfer Date.

**D.**     **Bankruptcy Order.** Rite Aid Corporation and certain of its affiliates, including Seller (collectively, the "**Debtors**"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") on May 5, 2025 (the "**Petition Date**"), at Case No. 25-14861 (the "**Bankruptcy Cases**"). The parties will adhere to the procedures, notice, and objection rights set forth in the Sale Order which (a) authorizes and approves the sale of the Purchased Assets, such that Seller will have the authority and approval from the Bankruptcy Court to consummate the sale of the Purchased Assets to Buyer free and clear of all liens, claims, security interests and encumbrances whatsoever, (b) authorizes Seller to enter into and consummate such sales of such

10

Purchased Assets on the terms and condition, including non-monetary terms and conditions, set forth in this Agreement, which terms and conditions shall be approved, and (c) deems the Buyer a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, Buyer shall be entitled to all of the protections afforded by such provision.

**E.**    **No Licenses.** No Party (i) has been debarred or excluded from federal health care programs or (ii) has had the licenses necessary to carry out its business operations contemplated or required by this Agreement revoked or has been disciplined in such a manner that performance cannot occur or would be substantially impaired.

**F.**    **Evidence of Lien Termination.** On or prior to the Transfer Date, Seller shall deliver to Buyer evidence of the release of any and all Liens encumbering any of the Purchased Assets (including any required UCC termination statements, bank release letters or similar documents).

**G.**    **Liens and Other Encumbrances.**

(a)    Seller represents and warrants that the Purchased Assets, as of each applicable Transfer Date, shall not be subject to any lien, mortgage, or encumbrance, and said Records shall be conveyed free and clear of any right, title or interest of any entity or person.

(b)    Buyer may conduct Uniform Commercial Code searches of state and county records. Any liens or encumbrances disclosed by any such search shall be released in full by Seller, and Buyer may hold all payments due hereunder pending Buyer's receipt of evidence that releases have been filed.

(c)    Seller hereby indemnifies and saves and holds Buyer harmless (including reasonable attorneys' fees and costs) from and against any (i) breach by Seller of any of its representations, warranties, covenants, agreements or obligations in this Agreement or any agreement or document required to be delivered by Seller hereunder, (ii) liability of Seller with respect to the Purchased Assets arising prior to the applicable Closing Date, and (iii) any claim by any creditor of Seller or any third party related to the Purchased Assets arising prior to the applicable Closing Date.

**14.**    **Exclusive Dealing.** From the date hereof until the date of the Closing hereunder or the earlier termination of this Agreement, Seller shall deal exclusively and in good faith with Buyer with regard to the transactions contemplated by this Agreement and shall not, and shall cause its affiliates, representatives, advisors and agents not to (a) solicit submission of any acquisition proposal of the Purchased Assets at the applicable Pharmacy, (b) participate in any discussions or negotiations regarding, or furnish any non-public information to any other person regarding the Purchased Assets other than Buyer and its representatives or otherwise cooperate in any way or assist, facilitate, or encourage the acquisition proposal of the Purchased Assets at the applicable Pharmacy by any person other than Buyer, or (c) enter into any agreement or understanding, whether in writing or oral, that relates to an acquisition proposal of the Purchased Assets at the applicable Pharmacy or would have the effect of preventing the consummation of the transactions contemplated by this Agreement. Seller shall, and Seller shall cause its affiliates, representatives, advisors and agents to (i) immediately cease any discussions or negotiations of the nature described in this Section 14 that were conducted prior to the date hereof, (ii) promptly notify any party which

11

such discussions or negotiations were being held of such termination, and (iii) promptly request in writing that all persons to whom nonpublic information concerning the Purchased Assets has been distributed on or prior to the date of this Agreement return or destroy such information to Seller as soon as possible. If, notwithstanding the foregoing, Seller or its affiliates, representatives or agents should receive any acquisition proposal of the Purchased Assets at the Pharmacies or any inquiry regarding any such proposal from any person, such persons shall promptly inform Buyer and its counsel in writing of the facts and terms thereof.

15.    **Confidentiality.** From and after the date of this Agreement, Seller and Buyer shall keep the transaction contemplated hereby strictly confidential except as may be required by law (and if so required by law, the party with the obligation to so disclose shall provide the other party with advance notice of the required disclosure). Seller shall keep all information about the Purchased Assets and the transactions contemplated by this Agreement confidential both before and after the transfer thereof (except that Seller may release to an individual customer any records belonging to said customer upon the customer's request). Seller shall have absolutely no right to use any of the Records or information included in the Purchased Assets after the transfer thereof to Buyer, except as may be required by law or in connection with pending litigation, third party claims or resolving outstanding accounts receivable, or other reasonable purpose provided that (i) such information is used only for the limited purposes specified herein, and (ii) access to such information is at Buyer's store at such times and under such supervision as Buyer deems appropriate. In addition to, and without limiting the foregoing, Buyer agrees to coordinate with Seller, as applicable, (and vice versa), in gathering audit information required and providing responses to desk audits within audit response timeframes for any Claims (as defined in Section 19). The provisions of this Section 15 shall survive Closing and shall be binding on each Party's legal representatives, successors and assigns. The Purchased Assets are being transferred to Buyer for Buyer's sole and exclusive use. Seller acknowledges that any information obtained by Buyer relating to the applicable Pharmacy's customers is owned solely by Buyer and may not be sold or transferred to any other person or company by Seller. Buyer will submit any advertising copy regarding its purchase of the Purchased Assets to Seller for prior approval, which approval shall not be unreasonably withheld. If Seller does not contact Buyer within three (3) business days of receipt of said copy, Seller shall be deemed to have approved it. Other than as set forth in this Section 15 neither Buyer nor Seller shall issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets by Seller to Buyer without the prior written consent of the other Party.

16.    **Normal Business Operations.** Seller shall, at all times prior to the Transfer Date, operate the applicable Pharmacy's business in the ordinary course, consistent with prior practice (including, without limitation, like pricing, hours, customer service, advertising, and business standards) as Seller maintained prior to this Agreement and Seller shall not take any action that results in a reduction to Seller's volume of prescriptions. Seller shall not conduct any closing, going out of business, last chance or other sales outside of the ordinary course, consistent with past practice at the Pharmacies. Prior to the Transfer Date, Seller shall not sell, transfer, assign, lease, encumber or otherwise dispose of any of the Purchased Assets. Seller shall not subject any of the Purchased Assets to lien, security interest or any other encumbrance, which lien, security interest or other encumbrance must be discharged of record prior to Buyer's payment to Seller. Prior to the Transfer Date, Seller shall not sell, remove or dispose of any of the Purchased Assets (other than in the ordinary and normal course of business) and will not purchase for the Pharmacies any further merchandise or supplies other than in the ordinary course of business. Notwithstanding anything herein to the contrary, Buyer acknowledges that Seller may be winding down the business at the Pharmacies and as such, the operating hours, inventory and staffing levels may change accordingly and any such changes shall not be deemed a breach of this Section 16.

17.    **Taxes.** Seller agrees to be responsible and pay for any tax or similar charge or assessments on the sale or transfer of the Purchased Assets at Closing; provided, however, that Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws. Seller shall forever indemnify and hold harmless Buyer against any and all expense, loss, damage or liability, including reasonable attorneys' fees and court costs, which Buyer may suffer as a result of claims asserted by third parties against Buyer due to any noncompliance by Seller and Buyer with applicable bulk transfer laws. Personal property taxes on the Purchased Assets shall be prorated between Buyer and Seller as of the Transfer Date. Seller shall pay any other taxes on the Purchased Assets prior to the Transfer Date.

18.    **Signs; Telephone and Facsimile Numbers.** Seller shall transfer to Buyer the exclusive right to use the Telephone and Fax Numbers on the Transfer Date. If Seller is unable to complete the transfer of the Telephone Fax Numbers on the Transfer Date, Seller shall remote call forward the Telephone and Fax Numbers for ████████████ until the transfer of the Telephone and Fax Numbers is complete. Seller shall pay all charges relating to the Telephone and Fax Numbers prior to the Transfer Date. Seller shall pay all yellow pages advertising for the applicable Pharmacy prior to the Transfer Date and cancel the same at its sole expense, if applicable. In the event that Buyer's relocation application is not approved by the Transfer Date, Buyer and Seller agree to cooperate to cause appropriate signs to be posted in the Pharmacy and/or the front of the applicable store notifying customers of the temporary Pharmacy closure and that the Purchased Assets will be temporarily relocating to Buyer's store and referring customers to such store, subject to landlord consent (if such landlord consent is required) and provided that the party proposing to post such signage provides such signage to the other.

19.    **Indemnity.** Seller shall indemnify, defend and hold Buyer, its directors, officers, shareholders, employees and agents harmless from and against all liabilities, losses, deficiencies, claims, damages, expenses (including, without limitation, reasonable costs and attorneys' fees, reasonable costs and attorneys' fees on appeal), judgments, proceedings, and causes of action of any kind (collectively, "**Claims**") arising out of, resulting from, relating to or in any way connected with (i) Seller's possession, ownership, sale, disposal and/or use of the Purchased Assets, (ii) Seller's breach of any representation or warranty, (iii) Seller's material breach, default, misrepresentation or omission with respect the performance of any of its covenants and obligations under this Agreement, (iv) related to any Liens on the Purchased Assets prior to the time at which such Purchased Assets, or any of them, are transferred to Buyer, (v) related to any matter that is an Excluded Liability and (vi) any losses that are suffered, sustained, incurred or required to be paid by Buyer relating to Seller's use of the applicable Purchased Assets and/or the operation of the applicable Pharmacy prior to and including the Transfer Date. Buyer shall indemnify, defend and hold Seller, its directors, officers, shareholders, employees and agents harmless from and against all Claims arising out of, resulting from or relating to Buyer's possession, ownership, sale, disposal, use of the Purchased Assets on or after the time at which such Purchased Assets, or any of them, are transferred to Buyer and/or Buyer's breach, misrepresentation or omission under this Agreement. The provisions of this Section 19 shall survive Closing.

20.    **Miscellaneous.**

    A.    **Notices.** All notices given hereunder shall be in writing and shall be given by personal delivery, U.S. Mail (return receipt requested), United States Express Mail (postage or delivery charge prepaid), or other established express delivery service (such as Federal Express or DHL), addressed to the appropriate Party as follows:

<table>
<tr><td>Seller:</td><td>c/o Rite Aid Corporation<br>200 Newberry Commons, Etters, PA 17319 (street address)<br>P.O. Box 3165, Harrisburg, PA 17105 (mailing address)<br>Attn: Secretary</td></tr>
</table>

Seller: c/o Rite Aid Corporation
   200 Newberry Commons, Etters, PA 17319 (street address)
   P.O. Box 3165, Harrisburg, PA 17105 (mailing address)
   Attn: Secretary

Buyer: Med One Pharmacy Inc.
   c/o AZEND Pharma
   2325 Plainfield Ave., Second Floor, Suite 2H
   Plainfield, NJ 07080
   Attn: Humam Farrukh, Senior Operations Manager

Copy to: Saul Ewing LLP
   1201 N. Market Street, Suite 2300
   Wilmington, DE 19801
   Attn:  Mark Minuti, Esq.

All notices shall be deemed given upon receipt or refusal.

**B.** **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties and supersedes all other prior agreements, oral or written, with respect to this transaction. This Agreement may not be modified or otherwise amended, unless in writing and duly authorized by Buyer and Seller.

**C.** **Successors and Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their successors and assigns.

**D.** **Attorneys' Fees.** If either Party takes legal action to enforce the terms of this Agreement, the prevailing Party in such action shall recover its reasonable costs and attorneys' fees, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing Party will be the Party that is awarded judgment as a result of trial or arbitration, or the Party that receives a payment of money from the other Party in settlement of claims asserted.

**E.** **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**F.** **Severability.** If any of the terms of this Agreement are held by any court of competent jurisdiction to be unenforceable, such provisions shall be severed from the Agreement and the remainder of the Agreement shall be given effect by the Parties as if such provision(s) never had been part of the Agreement.

**G.** **Further Assurances**. Each Party will, and will cause it's respective affiliates to, cooperate in good faith with the other Party and from time to time do and perform such additional acts and execute and deliver such additional documents, instruments, conveyances and assurances as may be required by applicable governmental rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement. Without limiting the generality of the foregoing, each Party agrees to endorse, if necessary, and deliver to the other, promptly after its receipt

14

thereof, any Purchased Asset, payment, or document which it receives after Closing and which is the property of the other.

**H.     Survival of Terms.** All of the provisions of this Agreement which impose continuing or new obligations or liabilities on Seller and/or Buyer after the Transfer Date shall survive the date and the delivery of the Bill of Sale and the Purchased Assets to Buyer. Without limiting the foregoing, all representations, warranties, and indemnities shall all survive the Transfer Date and the delivery of the Bill of Sale and the Purchased Assets to Buyer.

**I.     Default.** In the event of any default by any Party to this Agreement, the non-defaulting Party may:

  i.     if such default occurs prior to the Transfer Date, terminate this Agreement upon written notice to the defaulting Party, and recover from the defaulting Party all damages incurred by the non-defaulting Party; provided, however, that if Seller is the defaulting Party and such default relates to one or more, but not all, Pharmacies, Buyer shall not be obligated to terminate the Agreement but instead may choose not to purchase the Purchased Assets from Seller in respect of any such Pharmacy subject to default;

  ii.    Seek specific performance of this Agreement and/or injunctive relief and, in addition, recover all damages incurred by the non-defaulting Party. The Parties intend that this Agreement may be specifically enforced;

  iii.   Perform or pay any obligation or encumbrance necessary to cure the default and offset the cost thereof from monies otherwise due the defaulting Party or recover said monies from the defaulting Party; and

  iv.    Pursue all other remedies available at law, the Parties intending that remedies be cumulative and liberally enforced so as to adequately and completely compensate the non-defaulting Party. The allocation of the Purchase Price is not intended to serve as a measure of damages, and the Parties agree that the breach of any provision of this Agreement may result in damages to the other Party in an amount in excess of any consideration paid for any particular asset.



**J.     Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state in which the applicable Pharmacy is located.

**K.     Counterparts.** This Agreement may be executed by facsimile or pdf copies in two or more counterparts and once so executed by the Parties hereto, each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute one agreement. Facsimile and e-mail signatures shall be deemed originals for purposes of enforcement.

15

**L.**    **No Third Party Beneficiaries.** It is the intention of the Parties that no individual or entity be construed or considered to be an intended or implied third-party beneficiary under this Agreement.

**M.**    **Time of the Essence.** All times provided for in this Agreement for the performance of any act will be strictly construed, time being of the essence.

**N.**    **Incorporation of Exhibits.** All exhibits are incorporated into this Agreement as if set forth in full herein.

**O.**    **Waiver.** No covenant, term or condition, or breach thereof, shall be deemed waived except by written consent of the Party against whom the waiver is claimed. Any claim of the breach of any covenant, term or condition of this Agreement shall not be deemed a waiver of any other covenant, term or condition herein.

**P.**    **No Damages.** In no event shall either Party be responsible for punitive, exemplary, incidental or consequential damages, and each Party agrees, regardless of cause, not to assert any claim whatsoever against the other Party for such damages.

**Q.**    **Bankruptcy.** Seller shall use commercially reasonable efforts to respond to any questions Buyer may have related to the Bankruptcy Cases.

21.    **Marketing to Pharmacy's Customers.** For a period of five (5) years from and after the date of this Agreement, Seller shall not (directly or indirectly):

**A.**    Advertise, encourage or solicit the transfer by customers of the applicable Pharmacy of their records and/or prescriptions to any stores/pharmacies operated by Seller or its subsidiaries. Notwithstanding the foregoing, general mass advertising that does not mention the applicable Pharmacy by name or location is permitted and may be used by Seller.

**B.**    Send letters or other communications in any form to the customers of the applicable Pharmacy, other than general mass advertising not directed to customers of the applicable Pharmacy. In no event shall Seller send letters, any form of incentives or other communications to the applicable Pharmacy's customers to solicit or encourage the relocation of such customers' prescription information or files to another store or pharmacy operated by Seller or its subsidiaries.

**C.**    Advertise or communicate publicly the fact that a pharmacist previously working in the applicable Pharmacy has transferred to another pharmacy operated by Seller or its subsidiaries in the same trade area as the applicable Pharmacy.

From the date of this Agreement until the date of Closing, Seller will encourage the transfer of the prescriptions and records of the applicable Pharmacy's customer to the Buyer's store except as otherwise provided in Section 6D of this Agreement. The Parties hereby recognize, acknowledge and agree that the limitations contained in this Agreement are reasonable and properly required for the adequate protection of the business of the applicable Pharmacy, as it will be conducted by Buyer after the Transfer Date.