Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
201.489.3000   201.489.1536  fax
—
New York
—
Delaware
—
Maryland
—
Texas
—
Florida
—
Washington, DC

**COLE SCHOTZ** P.C.

Felice R. Yudkin
Member
Admitted in NJ and NY

Reply to New Jersey Office
Writer's Direct Line: 201.525.6261
Writer's Direct Fax: 201.678.6261
Writer's E-Mail: FYudkin@coleschotz.com

August 12, 2025

<u>**Via CM/ECF Filing**</u>

The Honorable Michael B. Kaplan
U.S. Bankruptcy Court for the District of New Jersey
402 East State Street
Trenton, NJ 08608

     Re:    *In re New Rite Aid, LLC, et al*., Case No. 25-14861 (MBK)

Dear Judge Kaplan:

    As previewed during the chambers conference on August 7, 2025, we are writing to request that the hearing on McKesson Corporation's ("McKesson") *Motion for Entry of an Order (a) Allowing Administrative Expense Claim, (b) Compelling Immediate Payment Thereof, and (c) Granting Related Relief*, Docket No. 655 (the "Motion"), currently scheduled for August 19 (the "Hearing"), be adjourned until such time that it may be heard alongside the Debtors' adversary proceeding against McKesson, Adv. Proc. No. 25-01316 (the "Adversary Proceeding").

    Both the Motion and several claims in the Adversary Proceeding concern a $49.7 million wire payment that Rite Aid made to McKesson on the day the Debtors filed for bankruptcy.  This payment was made outside the parties' ordinary course of dealing, after McKesson tightened credit terms and terminated shipments to Rite Aid pharmacies.  Rite Aid's objection to the Motion and the Adversary Proceeding also raise the fact that McKesson has been wrongfully withholding more than $100 million in rebates and credits since the Debtors' bankruptcy filing.  However, in the course of discovery on the Motion, McKesson refused to allow the Debtors to obtain discovery regarding rebates and credits—a subject which will undoubtedly be a central issue in adjudicating the parties' overarching dispute.  Further, the parties previously agreed that McKesson is not entitled to any monetary relief even if successful on the Motion, unless and until the Court determines issues raised in the Adversary Proceeding—namely, whether the May 5 wire payment to McKesson was a pre-petition payment and not recoverable as a preferential transfer.  Put another way, the issues raised in both proceedings are inextricably intertwined, and the Court could not award McKesson its requested relief even if the Hearing moved forward as scheduled.

    Further, McKesson has been unable to articulate any credible basis why, in its view, the Hearing must go forward as scheduled.  McKesson is seeking only monetary relief, and the parties (including the DIP Agent) have agreed that any order approving post-petition financing will ensure that this amount is paid if McKesson is ultimately successful, *Stipulation and Agreed Order (i)*

coleschotz.com


COLE SCHOTZ P.C.

Honorable Michael B. Kaplan
August 12, 2025
Page 2

*Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (a) Allowing Administrative Expense Claim, (b) Compelling Immediate Payment Thereof, and (c) Granting Related Relief, (ii) Establishing Certain Protocols, and (iii) Granting Related Relief*, Docket No. 672 ¶ 6 (the "Stipulation"), and the Final DIP Order provides for a "McKesson Reserve" to pay McKesson's claim if McKesson prevails. Docket No. 1396 ¶ 44. In other words, there is no exigency whatsoever.

In light of these circumstances, proceeding at this time would be a waste of judicial resources and would impose unnecessary burdens on the Debtors. We set out the details of those circumstances below:

**The Motion and Adversary Proceeding.** On June 2, McKesson filed the Motion seeking clarity as to a $49.7 million wire payment Rite Aid made to McKesson on May 5 (the "May 5 Wire"). That same day, the Debtors, McKesson, Bank of America, N.A. (in its capacity as DIP Agent), and the Official Committee of Unsecured Creditors entered the Stipulation governing the dispute. At that time, the parties to the Stipulation recognized that the Debtors might subsequently identify causes of action against McKesson that would impact McKesson's claim. The parties thus agreed that, even if McKesson were to succeed on its Motion, payment would be due **only** if "the Court determines that the May 5 Wire was a pre-petition payment **and** is not recoverable as a preferential transfer." *Id.* ¶ 2 (emphasis added). To that end, although the parties agreed preliminarily on a schedule for the Motion, they made clear that "[n]o Participating Party waives any rights, defenses, or arguments in relation to the Motion to Compel by agreeing to this Schedule." *Id.* (Despite that unambiguous reservation, McKesson appears to have now adopted the position that the Stipulation somehow bars the Debtors from prioritizing judicial and party efficiency, which it does not).

Since entering the Stipulation, the Debtors have in fact identified causes of action against McKesson—including a cause of action for preferential transfer that would preclude the relief sought by the Motion. Accordingly, on August 1, the Debtors filed their *Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination*, Docket No. 1760 (the "Complaint"). Among other things, the Complaint seeks avoidance of the May 5 Wire as an unauthorized post-petition transfer or, in the alternative, as a preferential transfer, as well as the equitable subordination of McKesson's claim. *Id.* ¶¶ 75-85. It also seeks a declaratory judgment that McKesson is unlawfully withholding rebates and credits owed to Rite Aid and an order directing McKesson to cease withholding such rebates and credits. *Id.* ¶¶ 86-92. The Adversary Proceeding is in its initial stages. McKesson has only recently been served with the Complaint, and its time to answer or move in response has not yet run.

The Debtors also filed their opposition to the Motion on August 1. Docket Nos. 1739, 1758 (the "Opposition"). Like the Complaint, the Opposition argues, among other things, that, even if the May 5 Wire were as McKesson describes, it should be avoided and—in addition—that McKesson is inequitably withholding over $100 million in rebates and credits owed to the Debtors' under the parties' Supply Agreement. Docket No. 1758 at 20-21.


COLE SCHOTZ P.C.

Honorable Michael B. Kaplan
August 12, 2025
Page 3

Given the substantial overlap between the Motion and the claims in the Adversary
Proceeding, the Debtors submit that it would be a waste of the Court's and the parties' time and
resources to proceed with the Hearing. More specifically, the avoidance claims in the Complaint
would prevent the Court from awarding any relief to McKesson at the Hearing, and it would be
unduly prejudicial for the Debtors to have to litigate the issues concerning rebates and credits on
the abridged record now before the Court—abridged as a direct result of McKesson's own
litigation misconduct, as described below—particularly when those questions will also have to be
resolved following discovery in the Adversary Proceeding.

**_McKesson's Discovery Conduct._** McKesson's own conduct in the course of discovery in
connection with the Motion shows that (i) it believes that issues implicated by the Objection are
not ripe for decision and (ii) the Debtors have been denied the discovery necessary to fully present
their arguments at the Hearing. By way of background, the Debtors served a _Notice of Deposition
of McKesson Corporation Pursuant to Federal Rule of Civil Procedure 30(b)(6)_ (the "Notice") on
McKesson on July 28. Topic No. 8 in the Notice was "McKesson's application of rebates and
credits due to Rite Aid under the Supply Agreement[.]" Ex. A at 5.

On July 29, McKesson informally raised objections to Topic Nos. 2 and 4 of the Notice by
email, asserting that it would not allow its designee to respond to questions on those topics.
Significantly, McKesson at no point raised _any_ objection concerning Topic No. 8, regarding the
rebates and credits issue. Ex. B at 1-2. Nor did McKesson move for a protective order, as it was
required to do if it did not believe Topic No. 8 (or any other topic) was the proper subject of
corporate testimony. _See, e.g._, _Crawford_ v. _George & Lynch, Inc._, 19 F. Supp. 3d 546, 556 (D.
Del. 2013) (the party receiving a Rule 30(b)(6) notice "bears the responsibility of preparing its
Rule 30(b)(6) witness on the noticed deposition topics, absent the entry of a protective order or an
order granting a motion to quash"). In fact, in response to McKesson's "email" objections to Topic
Nos. 2 and 4, the Debtors wrote McKesson and specifically pointed out that instructing a witness
not to answer questions on relevance or scope grounds is improper. Ex. B at 1. McKesson did not
respond to that communication or otherwise oppose it.

The Debtors took McKesson's deposition on August 4. At the deposition, when counsel
for the Debtors turned to the topic of rebates and credits, counsel for McKesson falsely claimed
that McKesson had objected to Topic No. 8, Tr. at 268:15-16 (attached hereto as Ex. C), and then
directed the witness "not to answer any questions on this topic 8 because it has no relation
whatsoever to do with the $49.7 million payment," _id._ at 268:17-21. Heeding counsel's
instruction, McKesson's corporate representative refused to answer any questions about
McKesson's withholding of rebates and credits, notwithstanding the fact that the witness was, as
he admitted, "knowledgeable about that subject," _id._ at 285:18-24, and was "familiar with the
current state of play with respect to the incentives and credits and rebates between the parties" _id._
at 286:18-21.

As the Debtors explained on the record, _id._ at 268:10-271:14, there was no lawful basis for
McKesson to refuse to answer questions on this subject, even if McKesson truly believed—
however implausibly given the issues directly raised by the parties' briefs—that credits and rebates
were irrelevant to the dispute. _See_ Fed. R. Civ. P. 30(c)(2); _see also, e.g._, _Wabote_ v. _Ude_, 2022



Honorable Michael B. Kaplan
August 12, 2025
Page 4

WL 684844, at *6 (E.D. Pa. 2022) ("The fact that a question is repetitive or irrelevant is not an appropriate ground for instructing a witness not to answer a question."). Further, when counsel for the Debtors asked McKesson's counsel to identify any legal authority for McKesson's position, McKesson was unable or unwilling to point to any such authority.

In any event, McKesson's assertion that Topic No. 8 "is not within the scope of the dispute," Tr. at 268:25-269:2, is wrong. The Debtors' Opposition to McKesson's Motion raises McKesson's conduct with respect to rebates and credits as a defense to the Motion and, as a result, McKesson's improper refusal to provide any discovery on this issue has denied the Debtors access to critical information concerning, and necessary to resolution of, the Motion. Document discovery in this dispute was conducted on a highly expedited basis and, as noted in the Opposition, "McKesson has also cut off Rite Aid's access to information concerning Rebates and Credits." Opposition ¶ 77.

Further, even if McKesson were right that credits and rebates were somehow beyond the scope of the Motion, that would only reinforce the Debtors' view that proceeding with the Hearing on August 19 would result in piecemeal adjudication of the Debtors' dispute with McKesson, since the topic of rebates and credits is without a doubt critically relevant to the resolution of the Adversary Proceeding.

\*   \*   \*

For the foregoing reasons, the Debtors respectfully request that the Court adjourn the Hearing pending a scheduling order for the Adversary Proceeding, so that McKesson's Motion and the Debtors' claims in the Adversary Proceeding may be heard together.

Respectfully submitted,

*/s/ Felice R. Yudkin*

Felice R. Yudkin

FRY:cdc
Attachments
Cc:     All counsel of record (via CM/ECF)

# Exhibit A

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Gregory F. Laufer (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
glaufer@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW RITE AID, LLC, *et al.*,[1] | ) | Case No. 25-14861 (MBK) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' NOTICE OF DEPOSITION OF MCKESSON CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rules 7026, 7030, and 9014 of the Federal

Rules of Bankruptcy Procedure, and Rules 26 and 30 of the Federal Rules of Civil Procedure

---

[1] The last four digits of New Rite Aid, LLC's tax identification number are 1483. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at [https://restructuring.ra.kroll.com/RiteAid2025]. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

(collectively the "Rules"), Debtor New Rite Aid, LLC and its affiliated Debtors (collectively, the

"Debtors" or "Rite Aid") by and through their undersigned counsel, will take the oral deposition

under oath of the person designated by McKesson Corporation ("McKesson") as the most

knowledgeable to testify on McKesson's behalf with respect to the topics listed in Exhibit A hereto.

The deposition will take place on August 4, 2025 at 9:00am EDT, by remote

videoconference, and will continue until completed.  The deposition will take place before an

officer authorized by law to administer oaths, and will be recorded stenographically, by videotape

(audio and visual), and through instant virtual display via "real time" software, which provides

instantaneous electronic transcripts on a laptop computer.

Dated:  July 28, 2025

/s/ Alison R. Benedon
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com
                svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Gregory F. Laufer (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019

2

Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990
Email:    arosenberg@paulweiss.com
          aeaton@paulweiss.com
          glaufer@paulweiss.com
          chopkins@paulweiss.com
          smitchell@paulweiss.com
          abenedon@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

3

### Exhibit A – Topics of Examination

1.      The payment of $49,674,910 from Rite Aid to McKesson on May 5, 2025 (the "May 5 Payment"), including, without limitation, McKesson's understanding of the timing of that payment, the source of the funds for that payment, the consideration for that payment, and the reason why that payment was made.

2.      The payment of $11,000,000 from Rite Aid to McKesson on May 1, 2025, including, without limitation, McKesson's understanding of the timing of that payment, the source of the funds for that payment, the consideration for that payment, and the reason why that payment was made.

3.      Any actual or contemplated changes to the terms set forth in section 7.1 of the Supply Agreement between McKesson and Rite Aid dated as of August 30, 2024 (as amended, supplemented, and modified from time to time) (the "Supply Agreement") and any other trade terms between McKesson and Rite Aid, including, without limitation, credit balance caps, account receivable caps, timelines for payment, credit amounts, credit terms, and any remedies for alleged breach of trade terms (collectively, "trade terms").

4.      The April 23, 2025 letter from McKesson to Rite Aid entitled McKesson Corporation Supply Agreement – Notice of Change in Payment Terms and Credit Availability under Section 7.12(a) (the "April 23 Letter"), including, without limitation, the changes in trade terms discussed in the April 23 Letter, McKesson's reasons for sending the April 23 Letter, McKesson's basis for effectuating or purporting to effectuate the changes in trade terms set forth in the April 23 Letter, McKesson's understanding of Rite Aid's financial condition as of the April 23 Letter, any contemplated changes to the April 23 Letter, McKesson's understanding of

4

Rite Aid's ability to perform under the trade terms, and McKesson's understanding of Rite Aid's likely reaction to, and of the likely effect of, the April 23 Letter.

5.      The difference between the trade terms set forth in the April 23 Letter and the trade terms agreed to by McKesson and Rite Aid on April 30, 2025 (the "April 30 Terms"), including the likely effect of the change in trade terms and Rite Aid's ability to perform under the April 30 Terms.

6.      McKesson and Rite Aid's performance under the Supply Agreement, including, without limitation, the payor(s) of any invoices under the Supply Agreement, the guarantor(s) of any payments under the Supply Agreement, the recipient(s) of any goods delivered pursuant to the Supply Agreement, McKesson's accounting for any goods sold and/or delivered pursuant to the Supply Agreement, and the trade terms under the Supply Agreement.

7.      Any actual or contemplated cessation of shipments of prescription drugs from McKesson to Rite Aid under the Supply Agreement and the likely effect of any such cessation.

8.      McKesson's application of rebates and credits due to Rite Aid under the Supply Agreement (including, without limitation, section 3 and its subsections), including, without limitation, any actual or contemplated application of those rebates and credits to reduce Rite Aid's balance under the Supply Agreement.

9.      Any communications between McKesson and Rite Aid from April 23, 2025 to May 5, 2025.

# Exhibit B

**From:** Laufer, Gregory <glaufer@paulweiss.com>
**Sent:** Tuesday, July 29, 2025 6:24 PM
**To:** Jacobs, Gregory <gjacobs@sidley.com>; Siegel, Max <msiegel@paulweiss.com>; Twomey, Dennis M. <dtwomey@sidley.com>; Hasbrouck, Alyssa M. <ahasbrouck@sidley.com>; Crowell, Nicholas P. <ncrowell@sidley.com>; Kuster, John J. <jkuster@sidley.com>; agumport@sidley.com; Jeff Garfinkle <jgarfinkle@buchalter.com>; Michele M. Dudas <mdudas@msbnj.com>; Anthony Sodono <asodono@msbnj.com>
**Cc:** Eaton, Alice <aeaton@paulweiss.com>; Mitchell, Sean A <smitchell@paulweiss.com>; Benedon, Alison R. <abenedon@paulweiss.com>; Clareman, William <wclareman@paulweiss.com>; Luskey, Randy <rluskey@paulweiss.com>
**Subject:** RE: In re New Rite Aid, et al., Case No. 25-14861 (Bankr. D.N.J.)

Thanks, Greg. You are of course free to raise any objections at the deposition, just as we are, but you are not entitled to instruct the witness not to answer questions just because you believe the questions go beyond the scope of legitimate 30b6 inquiry. The witness will still have to answer questions, and you can make your record.

Greg

**Gregory Laufer** | Partner (Bio)
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3441 (Direct Phone) | +1 212 492 0441 (Direct Fax)
glaufer@paulweiss.com | www.paulweiss.com

**From:** Jacobs, Gregory <gjacobs@sidley.com>
**Sent:** Tuesday, July 29, 2025 5:00 PM
**To:** Siegel, Max <msiegel@paulweiss.com>; Twomey, Dennis M. <dtwomey@sidley.com>; Hasbrouck, Alyssa M. <ahasbrouck@sidley.com>; Crowell, Nicholas P. <ncrowell@sidley.com>; Kuster, John J. <jkuster@sidley.com>; agumport@sidley.com; Jeff Garfinkle <jgarfinkle@buchalter.com>; Michele M. Dudas <mdudas@msbnj.com>; Anthony Sodono <asodono@msbnj.com>
**Cc:** Eaton, Alice <aeaton@paulweiss.com>; Mitchell, Sean A <smitchell@paulweiss.com>; Laufer, Gregory <glaufer@paulweiss.com>; Benedon, Alison R. <abenedon@paulweiss.com>; Clareman, William <wclareman@paulweiss.com>; Luskey, Randy <rluskey@paulweiss.com>
**Subject:** RE: In re New Rite Aid, et al., Case No. 25-14861 (Bankr. D.N.J.)

Counsel –

We are writing to confirm the below order for the depositions next week:
- Monday, August 4: Debtors' 30(b)(6) deposition of McKesson's designee
- Tuesday, August 5: McKesson's 30(b)(6) deposition of Debtors' designee

Concerning your deposition notice served yesterday, we object to any topics of examination included in your notice that are outside the scope of the party's stipulation concerning the May 5 Wire, specifically Topic 2 concerning the $11 million payment. This topic was not included in the parties' stipulation and as such is irrelevant to the present dispute. Accordingly, our designee will not answer questions

pertaining to the topic. In addition, Topic 4 seeks testimony regarding MCK's understanding of Rite Aid's financial condition; we requested documents pertaining to such financial information in our RFP 3, to which you have steadfastly refused to produce and have asserted is irrelevant to the present dispute. Given your position that it is irrelevant and absent the production of documents related to this information, we do not believe this is an appropriate topic of examination, and therefore also object to any questions pertaining to such topics.

Regards,

Greg Jacobs

**GREGORY JACOBS**
Managing Associate

**SIDLEY AUSTIN LLP**
+1 212 839 5416
gjacobs@sidley.com

***********************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.
***********************************************************************************************

**From:** Siegel, Max <msiegel@paulweiss.com>
**Sent:** Monday, July 28, 2025 10:54 AM
**To:** Twomey, Dennis M. <dtwomey@sidley.com>; Hasbrouck, Alyssa M. <ahasbrouck@sidley.com>; Jacobs, Gregory <gjacobs@sidley.com>; Crowell, Nicholas P. <ncrowell@sidley.com>; Kuster, John J. <jkuster@sidley.com>; Gumport, Anna <agumport@sidley.com>; Jeff Garfinkle <jgarfinkle@buchalter.com>; Michele M. Dudas <mdudas@msbnj.com>; Anthony Sodono <asodono@msbnj.com>
**Cc:** Eaton, Alice <aeaton@paulweiss.com>; Mitchell, Sean A <smitchell@paulweiss.com>; Laufer, Gregory <glaufer@paulweiss.com>; Benedon, Alison R. <abenedon@paulweiss.com>; Clareman, William (EXTERNAL @PAULWEISS.COM) <wclareman@paulweiss.com>; Luskey, Randy <rluskey@paulweiss.com>
**Subject:** In re New Rite Aid, et al., Case No. 25-14861 (Bankr. D.N.J.)

Counsel:
Attached, please find the Debtors' Notice of Deposition of McKesson Corporation Pursuant to Federal Rule of Civil Procedure 30(b)(6) in the above-captioned matter.
Thank you,
Max

**Max H. Siegel** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 2633 (Direct Phone) | +1 914 874 3511 (Cell)

+1 347 984 8023 (Direct Fax)
msiegel@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# Exhibit C

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF NEW JERSEY

4   Chapter 11

5   Case No. 25-14861 (MKB)

6   -----------------------------------x

7   In re:

8   NEW RITE AID, LLC, et al.,

9                    Debtors.

10  -----------------------------------x

11

12        REMOTE VIDEOTAPED DEPOSITION OF
              JAMES JUSTIN BOWERS

13              Irving, Texas
              August 4, 2025

14

15

16  Reported By:

17  ERIC J. FINZ

18

19

20

21

22

23

24

25

Page 2

1

2                          August 4, 2025

                          10:03 a.m.

3

4          Remote Videotaped Deposition of

5     JAMES JUSTIN BOWERS, taken by Debtors,

6     pursuant to Notice, before ERIC J. FINZ,

7     a Shorthand Reporter and Notary Public

8     within and for the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1
2   A P P E A R A N C E S: (All Via Remote)
3   PAUL WEISS RIFKIND WHARTON &
    GARRISON LLP
4   Attorneys for Debtors and Debtors in
    Possession
5        1285 Avenue of the Americas
         New York, New York 10019
6
    BY:  GREGORY LAUFER, ESQ.
7        glaufer@paulweiss.com
         ALICE EATON, ESQ.
8        aeaton@paulweiss.com
         MAX SIEGEL, ESQ.
9        msiegel@paulweiss.com
         CHRISTOPHER BILICIC, ESQ.
10       cbilicic@paulweiss.com
         KYLE KIMPLER, ESQ.
11       kkimpler@paulweiss.com
         ISABELLE LEIPZIGER, ESQ.
12       ileipziger@paulweiss.com
13
14  CHOATE HALL & STEWART LLP
    Attorneys for Bank of America, N.A.
15       Two International Place
         Boston, Massachusetts 02110
16
    BY:  G. MARK EDGARTON, ESQ.
17       medgarton@choate.com
         DEREK FARQUHAR, ESQ.
18       dfarquhar@choate.com
19
20
21
22
23
24
25

Page 4

1
2   A P P E A R A N C E S: (Continued)
3   SIDLEY AUSTIN LLP
    Attorneys for McKesson Corporation
4        787 Seventh Avenue
         New York, New York 10019
5
    BY:   NICHOLAS CROWELL, ESQ.
6         ncrowell@sidley.com
          ALYSSA HASBROUCK, ESQ.
7         ahasbrouck@sidley.com
          GREGORY JACOBS, ESQ.
8         gjacobs@sidley.com
9             -AND-
10  BUCHALTER LLP
         18400 Von Karman Avenue
11       Irvine, California 92612-0514
12  BY:   JEFFREY K. GARFINKLE, ESQ.
          jgarfinkle@buchalter.com
13        DANIEL SLATE, ESQ.
          dslate@buchalter.com
14
15
16  ALSO PRESENT:
17       BEN CARLSEN
18       MJ ZIMDAHL, Videographer
19
20
21
22
23
24
25

Page 266

1

2          Q.    McKesson had not in fact

3     applied the $49.7 million payment to any

4     particular invoices or amounts due.

5     Correct?

6          A.    It's against the account

7     because it was in dispute.

8          Q.    So the answer to my question

9     is I'm correct, right?

10         A.    Has it been applied to

11     individual invoices?

12         Q.    Yes.

13         A.    No, it has not.

14         Q.    All right.

15              Ordinarily, under the terms of

16     the parties' relationship, and I think

17     you referred to this earlier, McKesson

18     gets credits and incentives and rebates

19     and other adjustments from drug

20     manufacturers when it buys, in particular

21     volumes.  Right?

22         A.    That is correct.

23         Q.    And is it fair to say that

24     Rite-Aid's purchases from McKesson, given

25     their volume, helped generate some of

Page 267

1
2      these volume discounts?
3          A.     That is correct.
4          Q.     And when Rite-Aid's orders
5      make McKesson eligible for those
6      discounts, is it fair to say that
7      McKesson will typically share those
8      discounts to Rite-Aid, or with Rite-Aid?
9          A.     If earned.
10         Q.     Okay.  And McKesson does so by
11     calculating rebates that it, McKesson,
12     has earned in the prior period?
13         A.     Yes.  As long as Rite-Aid's in
14     compliance to their agreement.
15         Q.     Okay.  And so then McKesson
16     applies the rebates as credits that
17     reduce Rite-Aid's future obligations to
18     McKesson.  Fair?
19         A.     Fair.
20         Q.     And is it also true that
21     Rite-Aid can be awarded credits when it
22     returns unsold products?
23         A.     As long as they are in
24     compliance, yes.
25         Q.     Okay.  And the conditions that

Page 268

1

2      govern these rebates and credits are

3      actually set out in the supply agreement.

4      Right?

5              A.      Correct.

6              Q.      Okay.

7                      MR. LAUFER:  And let's go to

8              what I'll mark as Exhibit 15, tab

9              22.

10                     (McKesson Exhibit 16 for

11             identification, email dated June

12             18, 2025, production numbers

13             RAD-MCK 8654.)

14                     MR. CROWELL:  Before you go

15             on, I'm going to direct.  This goes

16             to Topic 8, which I've objected to.

17             And I'm going to direct Mr. Bowers

18             not to answer any questions on this

19             Topic 8 because it was no relation

20             whatsoever to do with the $49.7

21             million payment.

22                     And as you put it earlier,

23             you're permitted to ask questions

24             within the scope of the dispute,

25             and this is not within the scope of

Page 269

1

2          the dispute.  So he's not going to

3          answer these questions.

4               MR. LAUFER:  Well, I disagree.

5          What rule of anything allows you to

6          instruct a witness not to answer

7          questions?

8               MR. CROWELL:  Well, because as

9          you've correctly pointed out

10         earlier, I'm just using your words,

11         you're permitted to ask questions

12         that are within the scope of this

13         dispute.  And this is not.  So he's

14         not going to answer these

15         questions.  If you have a problem

16         you can take it up with the court.

17              MR. LAUFER:  Of course it's

18         within the scope of the dispute.

19         Actually we served a valid

20         deposition notice and you guys were

21         required to move for a protective

22         order.

23              MR. CROWELL:  Well, we

24         objected to it.  And I'm telling

25         you now --

Page 270

1

2          MR. LAUFER:  No, you sent us

3      an email.  You did not go to court.

4      And he is obligated as a deposition

5      recipient, and you guys have

6      designated him, he is absolutely

7      required to answer these questions.

8          If you want to object that

9      it's beyond the scope, you're free

10     to do so.  There is not a rule --

11         MR. CROWELL:  I don't know

12     what you want to do.  He's not

13     going to answer the questions.  So

14     if you want to go to court, go to

15     court.  This has nothing to do with

16     the dispute.

17         MR. LAUFER:  Well, we

18     obviously totally disagree with

19     that.

20         MR. CROWELL:  Understood.  I

21     understand you disagree.

22         MR. LAUFER:  It's part and

23     parcel.  And I also think that it

24     is, I may not have been practicing

25     as long as you have, I cannot

1

2          recall an instance in which

3          somebody has instructed a witness

4          not to answer on the basis that

5          they don't think it's relevant.

6          I'm quite sure that that's actually

7          quite in contravention of all the

8          rules I'm familiar with.

9                MR. CROWELL:  Well, I

10         appreciate that.

11               MR. LAUFER:  I take it then

12         you did not come armed with any

13         citation to a single case from any

14         jurisdiction in this country that

15         enables you to do that?

16               MR. CROWELL:  I told you at

17         the beginning of deposition he is

18         not prepared to answer questions.

19               MR. LAUFER:  I am not

20         disputing that.  What I'm saying

21         is, you can't cite any authority

22         that authorizes you to do that.

23               MR. CROWELL:  I'm not going to

24         get into an argument right now.

25         I'm just telling you what's going

Page 272

1
2          to happen.
3               MR. LAUFER:  Well, we will
4          obviously reserve all rights.  I
5          think it's improper.  And if you
6          have any authority, I take it you
7          have none now, you're free to send
8          it to us afterwards.
9               MR. CROWELL:  Thank you.
10  BY MR. LAUFER:
11       Q.    Section -- by the way,
12  Mr. Bowers, I take it you're going to
13  abide by the instruction that your
14  counsel has given you not to answer any
15  questions whatsoever on this topic?
16       A.    I am.
17       Q.    Okay.
18               MR. LAUFER:  As I said, we
19          disagree with that.
20       Q.    Are you familiar with Section
21  7.11 of the supply agreement, which is
22  about financial information?
23       A.    Can you show it to me?
24       Q.    Sure.
25               Do you see this provision,

Page 273

1

2      sir?

3            A.     I can.

4            Q.     Very good.

5                   Are you familiar with it?

6            A.     Yes, it's part of the supply

7      agreement.  The larger supply agreement.

8            Q.     You say, "So long as this

9      agreement shall be in effect, Rite-Aid

10     shall provide the following financial

11     statements, reports, notices or

12     certificates to McKesson," and then it

13     goes on to list a bunch of things and

14     time periods by which Rite-Aid has to

15     make certain information available to

16     McKesson.  Right?

17           A.     Correct.

18           Q.     And you may have alluded to

19     this or testified about this earlier, but

20     just so we're clear, since this iteration

21     of the agreement was executed, are you

22     aware of any instances in which Rite-Aid,

23     in McKesson's view, didn't timely report

24     certain financial information to McKesson

25     consistent with this provision?

Page 274

```
 1
 2          A.     Yes.
 3          Q.     And when was that?
 4          A.     So they would not provide any
 5    updated information outside of the
 6    January financials.
 7          Q.     Okay.  So what specific
 8    information does McKesson believe it was
 9    entitled to under this provision that it
10    has not timely received?
11          A.     The traction to the
12    projections.
13          Q.     Sorry, the what?
14          A.     The performance to their
15    projections.  And liquidity, their cash
16    flow.
17          Q.     Anything else?
18          A.     Those were the major aspects.
19          Q.     Anything -- well, I'm not just
20    asking about major, I want to hear the
21    full list.
22          A.     I don't have those details
23    with me.
24          Q.     Does anybody have those
25    details?
```

Page 275

1

2          A.     I'm sure collectively.

3          Q.     Who?

4          A.     I mean, I don't know.  So I

5     don't know all of the aspects of what --

6     but particularly it was the financial

7     projections, performance, liquidity.

8          Q.     Is there a document anywhere

9     in McKesson's files that you're aware of

10    that lists out the information that

11    McKesson contends it was contractually

12    entitled to but did not timely receive?

13         A.     Not that I'm aware of.

14         Q.     And so you mentioned two

15    things, you said cash flow, slash,

16    liquidity, and performance to the

17    projections.  Right?

18         A.     Yes.

19         Q.     What does "performance to the

20    projections" mean?

21         A.     So when Rite-Aid, in the new

22    supply agreement, they gave us a plan, a

23    multiyear plan, with target projections

24    that we discussed earlier, the EBITDA.

25    And they're supposed to provide us

Page 276

1

2      performance against those targets,

3      projections.

4           Q.    Okay.  So your testimony is

5      that Rite-Aid breached Section 7.11 by

6      not giving McKesson post-January

7      projections of EBITDA?

8           A.    That's correct.

9           Q.    Okay.  And your testimony is

10     also that Rite-Aid breached Section 7.11

11     of the supply agreement by not giving

12     McKesson cash flow, slash, liquidity

13     information?

14          A.    Yes.

15          Q.    Okay.  On the second issue,

16     what specifically was McKesson

17     contractually entitled to but did not

18     get?

19          A.    Sorry?

20          Q.    What specifically, when you

21     say -- I'm not an accountant, I'm not a

22     finance guy.  So when you say cash flow,

23     slash, liquidity, what were you looking

24     for?

25          A.    Rite-Aid's financials.

Page 277

1

2          Q.     So in other words, you were

3     looking for the income statement and

4     balance sheet and cash flow statement

5     that ordinarily go in either audited or

6     unaudited financial statements?

7          A.     That would be those, yes.

8          Q.     That's what you were looking

9     for?

10         A.     Yes.

11         Q.     Okay.  Do you know what

12    Rite-Aid's fiscal year is?

13         A.     I should, but I can't call it

14    off the top of my head.

15         Q.     If I told that you it was

16    February 28th this year, would you have

17    any reason to dispute that?

18         A.     No.

19         Q.     Okay.  Are you aware that the

20    supply agreement allows Rite-Aid to take

21    up to 90 days after the end of its fiscal

22    year to provide certain financial

23    information?

24         A.     Okay.

25         Q.     Do you dispute that?

Page 278

1

2          A.      No.

3          Q.      And why don't we just take a

4    look at it.  If you look at Section

5    7.11-G of the supply agreement.  It's

6    rather long.

7              But just to quote a portion of

8    it, you're free to read as much as you

9    like, it says that Rite-Aid has to

10   provide certain financial information,

11   quote, no later than 60 days following

12   the end of each fiscal year of Rite-Aid

13   or in the reasonable discretion of

14   McKesson, no later than 30 days after the

15   end of such 60-day period.

16             Do you see that?

17         A.      Okay, I do see that.

18         Q.      Were you aware of this

19   provision before just now?

20         A.      I don't think I had that

21   understanding.

22         Q.      Okay.  Sorry.  Forget the

23   understanding.  Had you seen this

24   provision before just now?

25         A.      I mean, it's in the supply

Page 279

```
 1
 2      agreement.  So I just wasn't as familiar
 3      with it.
 4           Q.    All right.
 5                 Seeing it now, do you dispute
 6      that it says what it says?
 7           A.    No.
 8           Q.    Okay.  If I told you that
 9      February 28th, which was the end of
10      Rite-Aid's fiscal year this year, was a
11      Friday, would you have any reason to
12      dispute that?
13           A.    No.
14           Q.    All right, so that means that
15      Rite-Aid's fiscal year actually ended on
16      March 1st.  Any reason to dispute that?
17           A.    Well, the fiscal ends at the
18      end of the day.  So it would end on
19      Friday.  Not on Monday.
20           Q.    All right.  Let's assume that
21      that's correct.  I'm not sure that that's
22      the case.
23           A.    Okay.
24           Q.    Either way.
25           A.    Okay.
```

Page 280

1

2          Q.    Section -- sorry, 60 days

3     after February 28th would take you to the

4     end of April.  Right?

5          A.    March 31st, 31 of March, then

6     you have 30 days.  Yeah.

7          Q.    Correct?

8          A.    You would be a day short, but

9     yeah.

10         Q.    Okay.  So as of April 23rd

11    when you sent that letter to Rite-Aid,

12    under this provision, Rite-Aid was not in

13    fact in breach of Section 7.11.  Correct?

14         A.    I believe so.

15         Q.    You believe they were in

16    breach or not in breach?

17         A.    They were not in breach.  This

18    is the original supply agreement, right?

19         Q.    This is the --

20         A.    Original.

21         Q.    -- iteration now in effect.

22         A.    Okay.  Because there was

23    agreement that Rite-Aid would provide

24    financial updates on their performance.

25    I don't have -- I mean, this is what the

Page 281

```
 1
 2      agreement says, it's what the agreement
 3      says.
 4          Q.    Okay.  But just to confirm as
 5      of April 23rd, Rite-Aid was not in breach
 6      of Section 7.11.  Correct?
 7              MR. CROWELL:  Object to the
 8          form.
 9          A.    The fiscal year reporting, no.
10          Q.    Well, the record has to be
11      clear.  Is it your view that Rite-Aid was
12      or was not in breach of 7.11 as of the
13      date of the April 23rd letter from you?
14      Yes or no.
15              MR. CROWELL:  Object to the
16          form.
17          A.    To the supply agreement
18      written here, that language, no.
19          Q.    Okay.  And in fact, under this
20      provision that we've just looked at,
21      McKesson had the discretion to extend the
22      60 days another 30 days, which would take
23      us into the end of May.  Correct?
24          A.    That is correct.
25          Q.    Okay.  And again, I'm not
```

Page 282

1
2      asking you for any confidences, did you
3      discuss this provision with anybody at
4      McKesson at any time before you sent your
5      April 23rd letter?
6           A.    I did not.
7           Q.    Do you know if anybody gave
8      any consideration to this provision
9      before McKesson sent the April 23rd
10     letter?
11          A.    I'm not aware.
12               MR. LAUFER:  Let's go to what
13          I'm going to mark as Exhibit, help
14          me out, Max, 15?
15               MR. SIEGEL:  17.
16               MR. LAUFER:  I'm glad I asked.
17          We're going to go to tab 27,
18          please.
19   BY MR. LAUFER:
20          Q.    While Mr. Siegel is pulling
21     that up, Mr. Bowers, are you aware that
22     Rite-Aid has submitted a brief in
23     opposition to McKesson's motion?
24          A.    Meaning that they object to
25     the $49 million payment?

Page 283

1

2          Q.     Yes, in effect.

3          A.     Yeah.

4          Q.     So McKesson has filed a

5     motion, which we looked at earlier, and

6     Rite-Aid has now responded to that

7     motion.  Are you familiar with that

8     sequence of events?

9          A.     That is, yes.

10         Q.     And have you reviewed the

11    brief or the piece of paper that Rite-Aid

12    filed with the court responding to

13    McKesson's motion?

14         A.     No, not that I'm aware of.

15         Q.     All right.

16               I take it you therefore have

17    also not reviewed a declaration or

18    affidavit that Rite-Aid submitted along

19    with its papers in opposition to

20    McKesson's motion.  Correct?

21         A.     I don't believe so.  I've just

22    reviewed the six or nine, whatever, that

23    you -- for this event.

24         Q.     Fair enough.  I realize there

25    is a lot of legalese.  No problem.  I'm

Page 284

```
 1
 2      nevertheless going to show you a
 3      declaration that was submitted along with
 4      Rite-Aid's opposition to McKesson's
 5      motion.  It was signed by somebody named
 6      Marc Liebman.
 7              (McKesson Exhibit 17 for
 8              identification, Declaration of Marc
 9              Liebman.)
10  BY MR. LAUFER:
11      Q.    Do you know who that is?
12      A.    I don't know who that is.
13      Q.    I'm sorry?
14      A.    I don't know.  I don't know
15      that name.  Just not familiar.
16      Q.    Okay.  I will represent to you
17      that it doesn't really matter, but he's
18      effectively a representative of the
19      debtors for purposes of the bankruptcy
20      proceedings.
21              And I'd like to point you to a
22      couple of paragraphs.  Let's start at
23      paragraph 5.
24              THE WITNESS:  Greg, are we
25      about to go down a rabbit trail, so
```

Page 285

1

2          can I grab another break real fast?

3                  MR. LAUFER:  I was going to

4          say a fun adventure, but you can

5          call it whatever you like.  Yes,

6          let's take a quick break.

7                  THE WITNESS:  Thank you.

8                  THE VIDEOGRAPHER:  All right.

9          The time is 2:35 p.m. Central Time,

10         and we are off the record.

11                 (A recess was taken.)

12                 THE VIDEOGRAPHER:  The time is

13         2:43 p.m. Central Time, and we are

14         back on the record.

15   BY MR. LAUFER:

16         Q.    Before I go to Mr. Liebman's

17    declaration, Mr. Bowers.  Just one quick

18    question, I won't pester you with the

19    questions about rebates and credits given

20    the instruction that you were given and

21    will abide by, you are nevertheless

22    knowledgeable about that subject, I take

23    it?

24         A.    Yes.

25         Q.    Yes?

Page 286

1

2          A.     Yes.

3          Q.     Okay.  And if called to

4     testify or if asked questions, you could

5     in fact answer those questions?

6               MR. CROWELL:  Well, object.

7          Because we don't know what the

8          questions are.  But I understand

9          your point.

10         Q.     Let's put it this way:  You

11    are knowledgeable about that subject and

12    could testify about it?

13         A.     I am knowledgeable.  I don't

14    know what the questions are going to be

15    to ask.  So I don't know if I'm the right

16    person to answer for those.

17         Q.     Let me put it this way:

18    You're familiar with the current state of

19    play with respect to the incentives and

20    credits and rebates between the parties?

21         A.     That would be correct.

22         Q.     And you are also knowledgeable

23    about McKesson's decision-making around

24    that issue.  Correct?

25         A.     It depends on what

Page 287

1

2      decision-making.  I don't know what's

3      being referred to.

4            Q.    Is there anybody else at

5      McKesson who is more knowledgeable about

6      the rebates and credits than you?

7            A.    It depends on what you want to

8      talk about.

9            Q.    Who is more knowledgeable than

10     you, generally speaking?

11                 (Direction not to answer.)

12           A.    It depends on what -- how

13     the --

14                 MR. CROWELL:  I'm just going

15           to stop this, Justin.  This is just

16           going to the issues.  Like I said,

17           we're not going to talk about this

18           topic, we're not going to testify

19           about it today.  So we can move on.

20                 MR. LAUFER:  We will continue

21           to reserve all our rights with

22           respect to that.

23           Q.    Let's call up the Liebman

24     declaration.  I know you haven't seen

25     this before, but I'm going to point you