# <u>EXHIBIT 2</u>

THIS LEASE, made and entered into this ......20th......... day of ........February......, ..1987 by and between

LYNWOOD ASSOCIATES, a California general partnership

hereinafter called "Lessor", owner of the hereinafter Demised Premises, and THRIFTY CORPORATION, a California corporation, hereinafter called "Lessee".

## Table of Contents

| | | Page | | | Page |
|---|---|---|---|---|---|
| Art. 1 | Term | 1 | Art. 15 | Extension of Term | 11 |
| Art. 2 | Rental | 2 | Art. 16 | Subordination | 12 |
| Art. 3 | Possession and Title | 4 | Art. 17 | Lessee's Defaults | 12 |
| Art. 4 | Holding Over | 4 | Art. 18 | Lessor's Defaults | 13 |
| Art 5 | Use of Premises and Lessor's Property | 4 | Art. 19 | Notices | 13 |
| | | | Art. 20 | Miscellaneous Provisions | 14 |
| Art. 6 | Common Area Maintenance | 5 | Sch. A | Description of Property and Plot Plan | A-1 |
| Art. 7 | Taxes and Liens | 6 | | | |
| Art. 8 | Repairs, Alterations and Signs | 6 | Sch. B | Construction | B-1 |
| Art. 9 | Damage or Destruction | 8 | Sch. C | Mortgages and Other Encumbrances | C-1 |
| Art. 10 | Insurance | 9 | | Amendments | |
| Art. 11 | Assignment and Subletting | 10 | Sch. D | Additions and Modifications | D-1 |
| Art. 12 | Eminent Domain | 10 | Sch. E | Non-Disturbance, Attornment and Subordination Agreement | E-1 |
| Art. 13 | Attorneys' Fees | 11 | | Exterior | |
| Art. 14 | Permits and Licenses | 11 | Sch. F | Lessee's Signs | F-1 |

## WITNESSETH:

That for and in consideration of the rental hereinafter reserved, and of the mutual covenants, agreements, and conditions hereinafter contained, Lessor does hereby lease to Lessee, and Lessee does hereby rent from Lessor, those certain premises (hereinafter referred to as the "Demised Premises" or the "Premises") which Premises are a portion of certain property owned or controlled by Lessor (hereinafter referred to as "Lessor's Property") situated in the City of .. Lynwood , ........ County of ....Los Angeles........ State of .California............... located at

west side of Long Beach Blvd., at Imperial Highway

, which Demised Premises and Lessor's Property are more particularly described in Schedule A attached hereto and made a part hereof and shown on a plot plan attached to and made a part of said Schedule A (hereinafter referred to as the "Plot Plan"), together with all easements, rights, and appurtenances in connection therewith.

This Lease is made for the term and upon the covenants and conditions hereinafter expressed, to-wit:

## ARTICLE 1: TERM.

1.1. The term of this Lease shall commence (a) 60 days after Lessor delivers possession of the Demised Premises, Ready for Occupancy, as hereinafter defined, to Lessee, or (b) upon such earlier date as Lessee actually commences to do business in the Demised Premises. Lessor shall give Lessee 30 days advance notice of the date possession of the Demised Premises shall be delivered to Lessee. Said delivery of possession of the Demised Premises shall be made pursuant to Paragraph 3.1. hereof. If Lessee's commencement of business in the Demised Premises shall be delayed by reason of governmental regulations, unless due to the fault of Lessor, unavailability of material or (except financial) labor, acts of God, strikes, lockouts, or other matters beyond Lessee's reasonable control which preclude Lessee from commencing to do business in said 60 day period, the date of the commencement of the term of this Lease shall be postponed for a period equal to the duration of such delay, day to day not to exceed an additional period of 30 days.

1.2. The Demised Premises shall be deemed "Ready for Occupancy" when the construction or remodeling of the Demised Premises and the construction of the Common Areas of Lessor's Property to be made by Lessor are substantially completed in accordance with the provisions of Schedule B attached hereto and made a part hereof.

1.3. If Lessor fails to deliver possession of the Demised Premises, Ready for Occupancy, to Lessee within 18 but before substantial completion full calendar months from the date of this Lease, Lessee may at any time thereafter declare this Lease null and void, or may, and from time to time, extend the deadline specified above to a later date. Notwithstanding anything in this Paragraph to the contrary, if delivery of possession of the Demised Premises shall be delayed by reason of governmental regulations, or unavailability of material or labor, acts of God, strikes, lockouts or

1

other matters beyond Lessor's reasonable control, said 6 month period specified above shall be extended for a day to day period equal to the duration of such delay but not to exceed an additional period of 12 full calendar months 1-1/2

1.4.  If for any reason the term of this Lease shall not have commenced within 10 years from the date of this Lease, this Lease shall automatically and ipso facto terminate and no longer be of any force or effect. Nothing in this or the preceding Paragraph shall impair or affect the right of either party hereto to any remedy for breach by the other of any obligation under this Lease occurring prior to such termination.

1.5.  The term of this Lease shall, except as otherwise provided herein, expire at midnight on the 31st day of May, ....2008..... . If this Lease is terminated or cancelled pursuant to the provisions hereunder or by reason of court order, the date of said termination or cancellation shall also be the expiration date of this Lease.

1.6.  Lessor agrees that if the Demised Premises are vacant, Lessee, at any time prior to the beginning of the term of this Lease, upon five (5) days written notice to Lessor may install therein its own fixtures and equipment and receive and store therein its merchandise and other property at its own risk, free from rent, provided the same does not interfere unreasonably with the work being done in or to the Demised Premises by Lessor. Such use of the Demised Premises shall not be construed as a waiver by Lessee of any of Lessor's obligations under Schedule B of this Lease nor as a waiver of any other provisions of this Lease. Lessor further agrees that Lessee may move in and start to do business even though the construction or remodeling of the Demised Premises and the construction of the Common Areas of Lessor's Property are not substantially complete, and such acts by Lessee shall not constitute a waiver of Lessee's rights to have all such work fully completed in accordance with Schedule B hereto.

ARTICLE 2: RENTAL.   ~~ten days after receipt by Lessee of a bill therefor~~ ~~one-half (1/2) of the percentage rent~~ ~~due after deducting Items 2.2(a) and 2.2(b), Lessee~~

2.1.  Effective 30 days after the commencement of the term of this Lease, Lessee shall, except as otherwise provided herein, pay to Lessor as minimum rent for each full calendar year during the term of this Lease the sum(s) set forth in Schedule D, Paragraph 1 of this Lease. Said annual minimum rent shall be paid in equal monthly installments in the amount(s) set forth in Schedule D, Paragraph 1 of this Lease. without setoff (or deduction (except as set forth in this Lease). Said monthly rental payment shall be paid on the 10th day of each full calendar month for each such month. For periods of less than a full calendar month, said monthly rental payment shall be prorated based on the relationship of the number of days of the term of this Lease in such month to the total number of days in such month. The proportionately reduced minimum rental for a part of a calendar month for which rental may be due shall be paid at the same time and together with the rental payment for the first full calendar month for which rent may be due as provided herein.

2.2.  Effective 30 days after the commencement of the term of this Lease, in addition to the minimum rent set forth in Paragraph 2.1 hereof, Lessee shall, except as otherwise provided herein, pay to Lessor, as percentage rent, a sum equal to the amount of three percent (3%) of all Receipts from Gross Sales. as hereinafter defined ~~up to and including Seven Million Dollars ($7,000,000) plus one percent (1%) of Receipts from Gross Sales in excess of Seven Million Dollars ($7,000,000), plus one percent (1%) of all receipts from the sale, if any, of beers, wines and distilled spirits~~ made during any full or partial calendar year of the term of this Lease but less the following amounts paid or payable by Lessee for such period: (a) minimum rent payable pursuant to Paragraph 2.1 of this Lease; (b) percentage rent, if any, payable pursuant to Paragraph 2.3 of this Lease; (c) common area maintenance expenses payable pursuant to Paragraph 6.2 of this Lease; (d) taxes and assessments payable pursuant to Paragraph 7.2 of this Lease; ~~(e) insurance expense payable pursuant to Paragraphs 10.4 and 10.5 of this Lease; and (f) the amount of rental income taxes, if any, imposed on Lessee~~ and (e) the amount of rental income taxes, if any, imposed on Lessee ~~pursuant to the laws of the state in which the Demised Premises are located.~~ the aforesaid deductions from Said percentage rent shall be paid by Lessee to Lessor on or before March 20th following the close of each calendar year. Unless due to Lessee's intentional acts or omissions, materially

2.3.  Whenever Lessee's business is interfered with by virtue of Lessee being prevented ~~in whole or in part~~ from the free, uninterrupted and unimpeded enjoyment of the use of the Demised Premises, or of the fixtures therein, or of the Common Areas of Lessor's Property, by reason of default of Lessor, or by any labor difficulty,*** or by reason of Lessor's making any repairs or alterations to the Demised Premises, ~~or by reason of any~~ unless otherwise set forth herein. casualty or eminent domain proceedings, or by any other cause beyond the control of Lessee, then and in each and all such cases, Lessee may elect, at any time after the commencement of such interference, to abate after written notice to Lessor. (maximum of one (1) month in any calendar year for abatement of other charges minimum rent and other charges payable hereunder for the duration and to the extent of such interrupted enjoyment. During such period of abatement, in lieu of such minimum rent and other charges, Lessee shall pay to Lessor a monthly rental payment equal to the percentage rent specified in Paragraph 2.2. hereof earned during each partial or full calendar month, unless such percentage rent is greater than the minimum monthly and other charges, rental payment otherwise due to Lessor under Paragraph 2.1 hereof, in which case Lessee shall pay to Lessor such minimum monthly rental payment. During any such period of abatement, Lessee shall pay to Lessor such and other charges, monthly rental payment in arrears on the 10th day of each month for the preceding calendar month.

2.4.  If by reason of the minimum rent paid by Lessee during any calendar year as provided in this Lease, the aggregate amount of rent paid by Lessee during any calendar year shall be in excess of the aggregate amount of minimum and percentage rent due hereunder, Lessor shall forthwith refund the excess in question to Lessee. If such excess is not refunded to Lessee, Lessee shall have the right (a) to deduct such excess from any

***(maximum of six (6) months in any calendar year ~~except for casualty or eminent domain pursuant to~~ for labor difficulty). ~~Article 9 and 12 hereof~~

**percentage rent are not cumulative and are deductible only from percentage rent in the applicable calendar year incurred.

2

and all rental payments thereafter becoming due to Lessor hereunder in order to reimburse Lessee for such overpayment, or (b) to take such other action as it deems appropriate to obtain immediate reimbursement for such overpayment. ~~Such deduction shall not be a basis of forfeiture of this Lease nor constitute a default in the payment of rent unless Lessee fails to pay the amount of such deduction to Lessor within 30 days after a final adjudication that such amount is owing to Lessor.~~

2.5. The term "Receipts from Gross Sales" as used herein, is defined as the amount of gross sales made upon credit or for cash upon the Demised Premises, but less the following: (a) all credits and cash refunds (so long as Lessee makes the ice cream) made to customers for merchandise returned or exchanged; (b) all receipts from the sale of ice cream and ~~other frozen dessert products~~, cigarettes, and other tobacco products (the amount of said receipts may be estimated based on the retail value of Lessee's purchases for the Demised Premises); (c) the amount of tax payable by reason of any state sales tax law or of any other tax law based upon sales, gross volume or gross receipts, now in effect or which may be adopted or amended hereafter by duly constituted governmental authority: (d) amounts uncollected due to bad checks or insufficient credit (not to exceed in the aggregate two percent (2%) of Lessee's Gross Sales from the Premises per each calendar year); (e) sums and credits based on the transfer of merchandise from the Demised Premises to another location owned or controlled by Lessee, including but not limited to a warehouse or retail store; (f) receipts from all coin operated devices, including but not limited to, pin-ball games, weighing scales, telephones, vending machines, amusement rides, photo machines, slot machines and similar devices; except that the portion of the receipts to be paid over to Lessee from coin operated devices under any rental concession or percentage arrangement shall be included in Receipts from Gross Sales; and provided further that if Lessee shall be the owner of such coin operated devices, Receipts from Gross Sales shall include that portion of the excess of the money taken in over the money paid out; (g) receipts from the sale of money orders, travelers checks, lottery tickets, tickets for athletic and entertainment events, hunting and fishing licenses and other similar items; provided, however, that any commissions or fees earned by Lessee based on the sale of said items shall be included in Receipts from Gross Sales; (h) receipts from the collection of utility bills or other amounts collected on account of governmental agencies; provided, however, that any commissions or fees earned by Lessee from the collection of said amounts shall be included in Receipts from Gross Sales; (i) the cost of trading stamps offered to customers as a sales inducement; (j) sums and credits received in settlement of claims for loss or damage to merchandise and for the return of merchandise to the supplier (not to exceed in the aggregate two percent (2%) of Lessee's Gross Sales from the Premises per each calendar year); (k) all sales at a discount to employees of Lessee; (l) all service charges paid to banks or other financial institutions based on credit card or other similar credit purchases made by customers; (m) receipts from a bulk transfer made by Lessee, its sublessees or concessionaires, as defined by the law of the state in which the Demised Premises are located; (n) receipts from the sale of fixtures, equipment or property that are not stock in trade, or from any sale not in the ordinary course of business; (o) the amount of credit extended to customers on lay away purchases and which is not collected by Lessee from the customer; (p) promotional and advertising allowances granted to Lessee from Lessee's vendors; (q) amounts uncollected by Lessee from the sale of prescriptions under third party prescription contracts; ~~and (r) sales of beer, wines and distilled spirits.~~

2.6. Lessee agrees to keep true and accurate records of account showing all Receipts from Gross Sales on the Demised Premises and to accompany each monthly rental payment with a statement covering such receipts during the preceding calendar month. ~~Lessee shall also include in said statement the amount of receipts from the sale of beer, wines and distilled spirits which may be estimated based on the retail value of Lessee's purchases for the Demised Premises.~~ No inadvertent mistake by Lessee in the preparation of such statements shall be deemed to be a breach of any covenant of this Lease. Lessee shall use its reasonable best efforts to insure that any such statements prepared by an assignee or sublessee are accurate. Upon receipt of said statement, Lessor may inspect personally, or by its authorized agent or representative, those books of account of Lessee relating to records of sales made upon the Demised Premises only (but not those of general accounting or other records of Lessee covering sales from locations other than the Demised Premises) at any reasonable time during the usual business hours of Lessee at Lessee's corporate headquarters for the purpose of determining the amounts of rental due and payable hereunder. Lessee shall be required to preserve its records on which any statement is based for a period of ~~one year~~ two (2) years after such statement is rendered and no more. If Lessor fails to object in writing to any statement within ~~six months~~ two (2) years after the statement was rendered, such statement shall be conclusively presumed to be correct. Lessor agrees to keep all information relating to Lessee's gross sales confidential, except that Lessor may disclose, to the extent and in the manner that is the custom, such information to prospective purchasers or lenders of Lessor's Property.

2.7. Any audit made by Lessor pursuant to Paragraph 2.6. above shall be at Lessor's sole expense, except that if Lessor makes any such audit for any calendar year and if the gross sales shown by Lessee's statements for such year are found to be understated by more than 3%, Lessee shall pay to Lessor the reasonable expenses of such audit, along with the percentage rent owing.

Minimum annual rental, percentage rental and all other charges due under this Lease are "Additional Rent", *

2.8. Payments of rental hereunder are to be made pursuant to Paragraph 20.15 hereof.

*or referred to herein as rent.

3

TC. LEASE 001          R9/30/86

and all provisions of the "Disposition and Development Agreement"
by and between Lynwood Redevelopment Agency and ~~Simpkins~~ Lynwood
Associates including, but not limited to, all "Nondiscrimination"
provisions thereof.

ARTICLE 3: POSSESSION AND TITLE.

3.1. Lessor shall deliver to Lessee possession of the Demised Premises free and clear of all tenants and
occupants (other than Lessee) and the rights of either, and ~~except as set forth on the Preliminary Title Report, dated~~ *attached hereto on Schedule C,* also free of liens, encumbrances, restrictions and
violations of laws, ordinances, and regulations relating to the use, occupation and construction of the building
on the Demised Premises except as may be specified in Schedule C attached hereto and made a part hereof.
Lessee's taking possession of the Demised Premises shall not constitute a waiver of any patent or latent defect
in the Demised Premises or of any breach by Lessor of Lessor's covenant to make the Demised Premises Ready
for Occupancy pursuant to Schedule B to this Lease. Lessee shall notify Lessor of any such defects within a
~~thirty (30) days~~ ~~reasonable time~~ after Lessee's discovery of any such defects and Lessor shall repair such defects pursuant to
Paragraph 8.3. hereof.
*plus additional rent.*

3.2. Lessor covenants that Lessee, upon paying the rent pursuant to the terms of this Lease, may quietly
have, hold and enjoy the Demised Premises during the term hereof.

3.3. Lessor warrants that as of the date hereof it has good and marketable title to the Demised Premises in
fee simple or a leasehold interest therein for a term exceeding the term of this Lease (any such leasehold
interest shall be set forth in Schedule C hereto), and that the same ~~is~~ *are* subject to ~~leases, subleases, tenancies,~~
~~agreements, liens, encumbrances, restrictions, and violations of laws, ordinances and regulations relating to the~~
~~use, occupation and construction of the building of the Demised Premises other than those specifically set forth~~
*Section C hereto.* in Schedule C hereto. Lessor further warrants and covenants that, as of the date hereof and as of the date the
term of the Lease commences, there are and will be no environmental controls, zoning or other ordinances, laws
or regulations which will prevent Lessee from conducting its ~~usual~~ *drug store* business in the Demised Premises.

3.4. Lessor shall furnish to Lessee, without cost to Lessee, proof by current title policy or report that
Lessor's title to the Demised Premises is in accordance with the warranty made by Lessor in Paragraph 3.3.
*if available to Lessor* hereof. If requested by Lessee, Lessor shall furnish to Lessee without cost to Lessee a recent licensed surveyor's
survey of Lessor's Property.

3.5. If Lessor's interest in the Demised Premises is the leasehold interest referred to in Paragraph 3.3.
hereof, Lessor shall cause the fee simple owner of the Demised Premises to execute concurrently with the
execution of this Lease a Non-Disturbance and Attornment Agreement in the form *reasonably* required by Lessee.

3.6. Lessor agrees to indemnify and hold Lessee harmless from any and all losses and liability arising out
of any breach by Lessor of any covenant or any warranty referred to in Paragraphs 3.1., 3.2., 3.3., and 3.5.

ARTICLE 4: HOLDING OVER.
*not*
4.1. Lessee shall have the option to hold over beyond the expiration date of this Lease ~~unless Lessor shall~~
~~at least 30 days before said expiration date, have given Lessee notice of its intention to terminate this Lease on~~
~~said expiration date.~~

4.2. ~~If such notice is not given and~~ Lessee holds over, Lessee shall become a tenant from month to month
*except minimum annual rent shall increase by one hundred fifty percent (150%)* upon the same terms as herein provided until the tenancy shall be terminated ~~at the end of any month by the~~
~~giving of at least 30 days written notice by either party hereto to the other.~~

ARTICLE 5: USE OF PREMISES AND LESSOR'S PROPERTY.

5.1. Lessee covenants to pay during the term hereof all separately metered electric, water, gas and other
*during construction of the Premises* public utility charges in connection with its occupancy and use of the Demised Premises. Lessor shall install at
its sole cost and expense, the necessary meters to measure Lessee's consumption of said services.

5.2. Lessee shall at all times conduct its business on the Demised Premises in a lawful manner and in
substantial compliance with all governmental laws, rules, regulations, and orders, such compliance to be at its
own cost and expense; provided, however, that this provision shall apply only to the manner in which Lessee
*other* conducts its business and that any alterations, improvements, or additions, structural or otherwise, to or of the
Demised Premises which may be made necessary or required by reason of any law, rule, regulation or order
promulgated by competent governmental authority, shall be made by and at the sole cost and expense of
Lessor.* Wherever there is a conflict between the provisions of this Paragraph and the provisions of Article 8
hereof, the provisions of this Paragraph shall prevail.
*SEE SCHEDULE "D", Paragraph 2.*
5.3/~~Lessee covenants that upon the construction of the building on the Demised Premises continuing~~
store building or buildings upon Lessor's Property and shall have entered into leases with the Co-tenants, in the
sizes and for the uses specified in Paragraph 20.14. hereof. Commencing 180 days after the commencement of
the term hereof, and continuing until the Co-tenants specified in Paragraph 20.14. hereof have first opened
their facilities for business on Lessor's Property, any provision of this Lease to the contrary notwithstanding, it
is agreed that during such period as Lessee conducts its business while any of said Co-tenants above specified is
not operating its store for the use specified herein, Lessee may elect to abate minimum rent and other charges,
~~_____~~ in the manner provided in Paragraph 2.3. hereof. Commencing on that date on which the
*of*
~~_____~~
**except due to Lessee's particular use or occupancy/** the Premises.

TC LEASE 001    R9/30/86 , #42

5.4. Lessee may make use of the sidewalk and parking areas adjacent to the Demised Premises provided and provided that Lessee does not unreasonably interfere with pedestrian or vehicular traffic in the Shopping Center that Lessee give Lessor notice of its intent to so use said areas 15 days prior to the commencement of said use. Said notice shall include a description of the exact areas to be used by Lessee. Lessee shall give Lessor 15 days notice of its intent to cease such use. During the periods of such use by Lessee, Lessor's obligations under Paragraph 10.3 hereof, relating to said described areas only, shall be abated and Lessee's obligations under Paragraph 10.1 hereof shall be extended to include said described areas.

5.5. Nothing in this Article or in any other provision of this Lease shall be construed to require a business to be continuously operated in the Demised Premises or to require Demised Premieses to be continuously occupied.

5.6. Schedule A hereto sets forth other matters relating to the use of Lessor's Property.

5.7 See page 5(a).

ARTICLE 6: COMMON AREA MAINTENANCE. ~~see Schedule A Paragraph 6~~
at its own cost and expense, but subject to reimbursement under Para. 6.2., repair, and replace

6.1. Lessor shall, ~~at its own cost and expense,~~ throughout the term of this Lease, maintain the Common Areas, as hereinafter defined in Schedule A hereto, ~~in good condition and repair and~~ in a clean, safe, presentable and sanitary condition with adequate drainage, and at all times free and clear of snow, ice or other obstructions which would interfere with the operation of Lessee's business or the convenience of Lessee's customers, and shall maintain the parking areas, properly striped at all times, ~~and shall maintain and repair. The~~ sign pylon structure(s). Lessor agrees to keep the parking areas and other Common Areas well lighted ~~during~~ unnecessarily until 11:00 p.m., ~~except for security lighting, which shall be kept on as needed.~~ ~~All hours in which Lessee, in its discretion, determines to remain open for business.~~ Lessor shall also provide, ~~at its own expense,~~ reasonable safeguards, ~~including towing if necessary,~~ to protect the Common Areas and to insure that they are utilized only for those uses specified in Paragraph 5 of Schedule A hereto. In the event that Lessor or any tenant (including Lessee) of Lessor's Property requires all or any part of the parking lot lighting to remain in use (i.e., lighted) beyond 11:00 p.m., Lessor or such tenant (including Lessee) shall itself bear the expense of such extended use and such expense shall not be included as part of common area maintenance under Paragraph 6.2. hereof. Lessor's obligations under this Paragraph shall be fulfilled in accordance with Shopping Center industry standards, and shall be undertaken in such a manner as to cause the least possible inconvenience to Lessee in the conduct of its business.

*and maintenance of said pylon sign structure.

6.2. Lessee shall reimburse Lessor for Lessee's pro rata share of the following common area maintenance expenses on an actual basis for the first (1st) year (unless Lessee approves a budget) and, thereafter, on a monthly ** ~~on an out-of-pocket, net expense basis,~~ which expenses shall cover the Common Areas only: (a) real property taxes and real property assessments (excepting assessments for any on-site or off-site improvements, site acquisition, sewer or street improvements, assessed in connection with the development or acquisition of Lessor's Property) ~~and excepting any increases in real property taxes resulting from a change of ownership of~~ ~~Lessor's Property);~~ (b) public liability insurance premium costs, provided, however, that Lessee shall only be required to pay its pro rata share of insurance premiums for the minimum amount of insurance required by Paragraph 10.3. hereof; (c) costs relating to the upkeep, repair, and maintenance of the parking area, non-enclosed malls, landscaped areas and other Common Areas (excepting costs related to the original construction and installation of said Common Areas and excepting costs exceeding the ordinary and necessary expenses for similar properties in the same geographical area); and (d) management fee not to exceed 5% of the total cost of those items set forth in item (c) above. ~~Expenses related to security guards or to maintenance of lateral utility lines serving the tenants of Lessor's Property shall not be included in common area maintenance expenses.~~ Said common area maintenance expenses shall not include any expenditures made by Lessor which are in the nature of capital improvements or replacements which are not properly chargeable as an expense against income under the Internal Revenue Code, or are not in accordance with generally accepted accounting as in any one (1) calendar year **-* principles. Notwithstanding anything in this Lease to the contrary, Lessee's duty to reimburse Lessor for unless Lessee's share for any such single non-recurring expense is less than $5,000.00. Any single non-recurring common area maintenance expenses shall be conditioned upon Lessor's prior completion of common area construction pursuant to Schedule B hereto.

**estimated basis,

6.3. Lessee shall reimburse Lessor for Lessee's pro rata share of such common area maintenance expenses monthly on a ~~monthly~~ basis promptly after receipt of an itemized statement (together with copies of any invoices requested by Lessee as set forth below) from Lessor setting forth the total expenses paid by Lessor and Lessee's or upon an estimated basis after the first (1st) year of operation. pro rata share thereof. Said pro rata share shall be proportionately reduced for periods of the term of this Lease of less than a full calendar year. Lessee's pro rata share shall be the ratio of the gross number of square feet of ground floor area of the Demised Premises to the gross number of square feet of ground floor building area shown on (excluding building limit lines). Lessor's Property as ~~permitted~~ by the Plot Plan whether built or not. ~~Lessee shall have~~ In addition, the square footage of Building Area for which any portion of the common or parking areas is separately maintained shall be included in the total Building Area in computing Lessee's pro rata share. ~~No~~ in any one (1) calendar year

***expenditures where Lessee's share is in excess of $5,000.00 shall require Lessee's prior written consent.

5

5.7  Lessee herein covenants by and for itself, its heirs,
executors, administrators and assigns, and all persons claiming under
or through it, and this Lease is made and accepted upon and subject to
the following conditions:  There shall be no discrimination against or
segregation of any person or group of persons on account of race,
color, creed, religion, sex, marital status, handicap, age, ancestry
or national origin in the leasing, subleasing, transferring, use,
occupancy, tenure or enjoyment of the Demised Premises herein leased,
nor shall Lessee itself, herself, or any person claiming under or
through it, establish or permit any such practice or practices of
discrimination or segregation with reference to the selection,
location, number, use or occupancy of tenants, lessees, sublessees,
subtenants or vendees in the Demised Premises herein leased.

TC LEASE 001        R9/30/86 , R 1/22/87

~~The Shopping Center is restricted in height to one (1) story plus mezzanines.~~ (Lessee shall have the right to
deduct any overpayment made by Lessee in any calendar year from common area maintenance expenses billed
to Lessee during the succeeding calendar year or years) ~~no more than one (1) time per year~~ Lessee shall have the right to conduct a reasonable
audit of said common area maintenance expenses including but not limited to inspection of the work
undertaken and all invoices and other records for said expenses, and Lessor shall cooperate fully with Lessee in
any such investigation. Lessor shall provide to Lessee, upon request, copies of said invoices to support said
common area maintenance expenses.

6.4. If Lessee conducts an audit of the common area maintenance expenses pursuant to Paragraph 6.3.
above and if such expenses for any calendar year are overstated by more than 3% for such year, Lessor shall
pay to Lessee the reasonable expenses of such audit.

6.5 Lessor may provide reasonable rules and regulations for the Common Area subject to Lessee's reasonable approval.

ARTICLE 7: TAXES AND LIENS.

7.1. All taxes and assessments of every kind and character whatsoever against the Demised Premises or
the property of which the Demised Premises are a part shall be paid by Lessor prior to delinquency; provided,
however, that any tax imposed on Lessee as a condition of doing business, or any franchise tax or license fee
levied against Lessee by the state in which the Demised Premises are located shall be paid by Lessee.

7.2. Lessee shall, for the term of this Lease, reimburse Lessor for the amount of any real property taxes
and real property assessments assessed on the Demised Premises for each fiscal tax year or portion thereof,
excepting assessments for any on-site or off-site improvements, site acquisition, sewer or street improvements,
assessed in connection with the development or acquisition of Lessor's Property and excepting any increase in
taxes resulting from a change of ownership in the Demised Premises. Lessor agrees to furnish Lessee a
~~caused by sale of Lessor's Property after the second sale thereof.~~ Lessor agrees to furnish Lessee a
photostatic copy of a separate tax bill, if obtainable, solely for the Demised Premises. If such separate tax bill
cannot be obtained, Lessor shall furnish Lessee a photostatic copy of the tax bill for Lessor's Property, together
with the tax assessor's estimate of the separate assessed value of the Demised Premises as reflected on the tax
assessor's records. If the assessor's records do not reflect a separately assessed value of the Demised Premises,
the tax bill shall be equitably prorated and shall concern only the building of which the Demised Premises are
physically a part or physically attached to and shall not include any detached or freestanding buildings. In the
event that Lessor furnishes Lessee with a proper segregated tax bill covering the Demised Premises alone,
Lessee shall make payment to Lessor within 30 days after receipt by Lessee of such bill or 30 days prior to
delinquency, whichever is later. ~~In the event, however, that Lessor furnishes Lessee with a proper tax bill which
is not segregated, Lessee shall make payment to Lessor within a reasonable time after receipt of such bill.~~ If the
taxing authority permits payment to be made in installments, Lessee's obligation to reimburse Lessor for taxes
under this Paragraph shall be limited to its proper share of such installment payments. The taxes to be
reimbursed by Lessee hereunder shall include taxes imposed on Lessor against or measured by rents or rental
income payable pursuant to this Lease assessed in lieu of or as a direct substitute for real property taxes, except
~~in addition to~~
any net income tax, inheritance tax, or estate tax of Lessor. Any real property taxes or assessments shall be
proportionately reduced for periods of the term of this Lease of less than a full year. If Lessee desires to contest
the validity of any such tax or assessment, it may do so on Lessor's behalf, at Lessee's sole cost and expense,
provided that it shall indemnify Lessor against any loss, liability or damage on account thereof. If Lessee is
successful in said contest, any refund received which pertains to Lessee's pro rata share of said taxes and
assessments. Lessee shall retain that part of

7.3. Lessee covenants that it will not, during the term hereof, suffer or permit any lien to be attached to or
upon the Demised Premises by reason of any act or omission on the part of Lessee, and hereby agrees to
indemnify and hold Lessor harmless from or against any such lien or claim of lien. In the event any such lien is
recorded against the Demised Premises and shall not be released within 30 days after notice from Lessor to
Lessee to do so, Lessor in its sole discretion, except as provided below, may pay and discharge the same and
remove any such lien from the Demised Premises. Lessee agrees to repay Lessor, upon demand, for any amount
which may have been paid by Lessor in discharging such lien, together with interest at an annual interest rate
of 12% from the date of the expenditure by Lessor to the date of repayment by Lessee. However, if Lessee
desires to contest the validity of any such lien it may do so on Lessor's behalf, and Lessor shall not pay and
discharge such lien, provided that Lessee shall indemnify Lessor against any loss, liability or damage on
account thereof.

7.4. Lessor covenants that it will not, during the term hereof, fail to pay when due any installment of
and assessments
taxes, ~~assessments or charges upon any mortgage, deed of trust or other lien or encumbrance~~ affecting the
Demised Premises and to which this Lease may be subordinate. If Lessor fails to make any such payments
when due, Lessee may cure Lessor's default pursuant to the provisions of Paragraph 18.1. hereof.

ARTICLE 8: REPAIRS, ALTERATIONS AND SIGNS.

8.1. Lessee shall keep the interior of the Demised Premises including the heating, ventilating and air
conditioning systems, in good condition and repair, except for ~~obsolescence, ordinary physical depreciation,~~
ordinary wear and tear, and such repairs as Lessor is required to make under this Lease. Lessee shall also

6

* or at Lessee's option, Lessor shall promptly refund Lessee the amount by which estimated pro rata
charges paid by Lessee for the preceding calendar year exceed Lessee's pro rata share of actual
charges. After reasonable notice to Lessor,

TC LEASE 001

and the storefront

repair all plate glass in the Demised Premises. Lessee shall make all such repairs at its own cost and expense. Upon request by Lessee, Lessor shall assign to Lessee its rights to any warranties it may have covering those portions of the Demised Premises which Lessee is responsible to maintain and repair. If the Demised Premises are part of an entire building containing general systems of electricity and plumbing, Lessee shall have no responsibility for the same beyond the Demised Premises, nor for any portions thereof running through, in, or across the Demised Premises but not serving the same. Lessor agrees to keep said general systems in repair so that the portions thereof which are a part of and serve the Demised Premises will function properly if such portions be kept in good condition and repair by Lessee.

8.2. Lessor shall maintain in good condition and repair the roof (including the skylights and trap doors), gutters, down-spouts, doors, storefront (excluding plate glass) floor slab, exterior walls, foundation, footings and all structural portions (both interior and exterior) of the Demised Premises and the sidewalks and alleys adjacent thereto. Lessor shall also repair any interior or exterior damage to the Demised Premises caused by the willful misconduct or negligence except caused by Lessee's act, omission, or negligence or of its employees, agents or contractors. water or subsidence. Lessor shall also maintain and repair the main lines for the water, gas, sewer, wiring, and utility connections. Lessor shall also maintain the painting of the exterior walls of the Demised Premises and the building of which the same are a part. Lessor shall also repair any and all damage to the Demised Premises, including fixtures and equipment, which may result from its failure to make any such repairs within a reasonable time after being notified by Lessee verbally or in writing that repairs are needed. If any repair or maintenance matter for which Lessor is responsible is of an emergency nature which if not attended to might reasonable       after attempting verbal notice result in bodily injury or property damage, Lessee may make such repair without prior notice to Lessor and unless caused by the negligence of Lessees     its employees or contractors. Lessor shall reimburse Lessee promptly for such repair. The obligations of Lessor under this Article shall not be modified or diminished due to the fact or the manner in which Lessee shall undertake to make such emergency repairs pursuant to this Paragraph.

8.3. Lessor shall make any and all repairs to the interior and exterior of the Demised Premises which may at any time be necessary by reason of any patent or latent defect, whether structural or otherwise, or by reason of dry rot or termites, and shall repair such defects and any and all damage to said Demised Premises (both interior and exterior) which may result from any such defects. Notwithstanding any other provision of this Lease, any addition, alteration or improvement, structural or otherwise, to or of the Demised Premises, or any part thereof, which may be necessary or required by reason of any law, rule, regulation or order promulgated by competent governmental authority shall be made by and at the cost and expense of Lessor, unless due to Lessee's particular use or occupancy of the Premises.
8.4. In addition to Lessor's obligations under this Article 8 to maintain and repair the Demised Premises, use its best efforts to Lessor shall properly maintain and repair, or cause to be properly maintained and repaired, all other buildings located on Lessor's Property. Lessee shall have no direct or indirect obligation for any expenses incurred in the repair and maintenance of said other buildings.

8.5. Lessor shall make all repairs required to be made by it pursuant to this Article 8 at its sole cost and expense, and such expenses shall not be included as part of common area maintenance under Paragraph 6.2. hereof. Lessor shall make all repairs required to be made by it under this Lease within a reasonable time, defined as 3 business days from receipt of verbal or written notice from Lessee, or such reasonable longer period if the repair cannot be completed within 3 business days. Lessor shall also make all such repairs at such times and in such a manner as to cause the least possible inconvenience to Lessee in the conduct of its business. Lessor shall not enter the Demised Premises for the purpose of making such repairs if the same can be made without entry of the Demised Premises. If said repairs can be made outside of Lessee's business hours without substantial additional cost to Lessor, Lessor shall do so, unless Lessee requests that they be made during business hours. Subject to the provisions of this Paragraph, Lessor reserves the right for itself or its duly or lender authorized agents and representatives at all reasonable times during Lessee's business hours to enter the Demised Premises for the purpose of inspecting the same or to show the same to any prospective purchaser and for the purpose of making any necessary repairs to the Demised Premises.

8.6. At all reasonable times Lessor shall have the right to post and keep posted on the Demised Premises any notices permitted by any law of the state in which the Demised Premises are located relating to Lessor's nonresponsibility for mechanics liens or liens of a similar nature.

non-structural*
8.7. Lessee shall have the right at any time to make such additions, repairs, alterations, changes or improvements, in or to the Demised Premises, as Lessee may deem necessary or proper (including, but not provided the Premises has at least 12,000 square feet of single use occupancy of a major tenant, and limited to the installation of trade fixtures, equipment, and partitions required or used from time to time in connection with Lessee's business in the Demised Premises) provided, however, that no work done by Lessee shall lessen the market value of the Demised Premises; and provided further, that Lessee shall pay promptly for After Lessor's reasonable consent, all such work done by it or upon its order. Lessee may install or permit the installation of automatic teller machines, newspaper racks, telephones and similar equipment, in, on or through the exterior walls of the at Lessee's expense. Demised Premises and on the sidewalk areas adjacent to the Demised Premises. Any such installation shall not reduce or alter in any way Lessor's obligations under Paragraph 10.3. hereof. Nothing contained herein shall be construed to require Lessee to make or pay for any repair, alteration, improvement, or addition, or to do any other act or thing which Lessor is required to make or do under any provision of this Lease, or which is
*Structural additions, repairs, alterations, changes or improvements may be made by Lessee only with the consent of Lessor, which shall not be unreasonably withheld.

7

TC LEASE 001

required or becomes necessary at any time because of any failure of Lessor to perform any of its obligations hereunder.

8.8. ~~Lessee, at its own expense and while fulfilling its obligations hereunder, shall, in a good and workmanlike manner~~ proceed with the obtaining of all necessary governmental approvals and with the construction of a building on any part or all of that area identified as "Possible Future Thrifty Expansion Area" on Schedule A hereto and the incorporation of said building into the building originally constructed upon the Demised Premises. All improvements made pursuant to this Paragraph 8.8. shall be and remain the property of Lessor throughout the term of this Lease but ~~subject to the terms hereof~~. Lessee shall bear the entire cost of said construction and incorporation and, upon completion, shall furnish to Lessor an itemized statement of costs and expenses ~~thereof together with the original building plans and specifications of said premises~~.

8.9. ~~Provided that Lessee fully and completely fulfills its obligations of all the terms described in Paragraph~~ 8.8. hereof, Lessee shall have the right to deduct from percentage rent payable hereunder an amount equal to fifty percent (50%) of any and all rentals becoming due hereunder to Lessor for any full calendar year in excess of that rental (hereinafter called "expansion recovery base") actually paid to Lessor for the twelve (12) full calendar months immediately preceding the start of the said construction and incorporation. For periods of less than a full calendar year the "expansion recovery base" shall be proportionately reduced. The right to deduct from percentage rent provided for herein shall be cumulative from year to year until such time as Lessee shall have deducted a sum equal to Lessee's contribution for said construction and incorporation described in Paragraph 8.8. above. Said right shall be exercised in any one year only after the amounts for those rental payments and other charges referred to in Paragraph 2.2. hereof have been deducted from percentage rent. In the event that Lessee does expand the Demised Premises into part or all of said "Possible Future Thrifty Expansion Area" in accordance with the foregoing provisions of Paragraph 8.8. above, then in such event Lessee is hereby granted a sufficient number of additional five year options to provide Lessee with a minimum of 25 years of term (including primary and option terms) from the date of completion of the construction of said building so that Lessee will have a sufficient number of years to amortize the cost of said construction. ~~Conditions for exercise of said options shall be subject to the same terms and conditions of Paragraph 1.2. hereof.~~

Provided said signs are professionally prepared,
8.10. Lessee shall have the exclusive right to affix to, paint and inscribe signs upon the windows and doors of the Demised Premises. ~~Lessee shall have the exclusive~~ subject to government approval. privilege of erecting signs on the roof, canopy and upon the exterior walls of the Demised Premises. All permanent exterior signs shall be subject to Lessor's approval. Such signs shall conform with all applicable local ordinances. Lessor hereby approves Lessee's as attached hereto as Exhibit "A" standard oval trade name signs (in size and design). Lessee shall also have the right of sign representation on any sign pylons or monuments in the Common Area of Lessor's Property pursuant to Schedule B hereto. Lessor shall use its best efforts to obtain any required governmental approvals take no action for Lessee's building and sign pylons or monuments and shall, throughout the term of this Lease ~~take no action~~ ~~that might result in a change in said signs without the written consent of Lessee.~~

8.11. Lessee shall, at the expiration of the term hereof, surrender the Demised Premises together with any ordinary wear and tear excepted. personal property therein belonging to Lessor, and any alterations made thereto ~~in its then existing condition~~. To the extent that the provisions of this Paragraph are in conflict with the provisions of Paragraph 8.1. hereof, the provisions of this Paragraph shall prevail.

8.12. Lessee shall have the ~~right, but no~~ obligation, at any time within 10 business days after the expiration of this Lease to remove from the Demised Premises all merchandise, signs, fixtures, furniture, furnishings, partitions, and equipment installed therein and owned or leased by Lessee; provided, however, that Lessee repair any damage to the Demised Premises caused by any such removal.

8.13. This Article 8 is subject and subordinate to Article 9 and to Schedule B of this Lease.

ARTICLE 9: DAMAGE OR DESTRUCTION.

9.1. If the Demised Premises ~~or any other part of Lessor's Property~~ shall be destroyed or damaged from to the extent of insurance proceeds, any cause other than ordinary wear and tear, ordinary physical depreciation or obsolescence, Lessor shall forthwith repair and restore the same to substantially the same condition existing immediately prior to said damage or destruction with all reasonable dispatch and diligence. Said restoration and repair shall include all leasehold improvements ~~fixtures and equipment~~ in the Demised Premises owned by Lessor and so damaged or destroyed. All such repair and restoration of the Demised Premises shall be made in accordance with plans and specifications approved by Lessee. Lessor shall comply, and shall require all its contractors to comply, with all federal, state and local laws relating to conditions of employment in making any said repairs and restoration. ~~If Lessor shall breach this covenant and Lessee shall be damaged as a result thereof, Lessor shall pay to Lessee the amount of such damage within 30 days of written demand therefor by Lessee.~~ After repair and restoration, Lessor shall give possession to Lessee of the same space in the Demised Premises without diminution or change of location.

9.2. Except as provided in this Article 9, such destruction or damage to the Demised Premises shall not terminate this Lease notwithstanding any laws of the state in which the Demised Premises are located to the contrary.

8

TC LEASE 001    R9/30/86 , R 1/22/87

9.3. If any governmental authority shall condemn the Demised Premises or any part thereof as unsafe or as not in conformity with the laws and regulations relating to the use, occupation and construction thereof, or has ordered or required or shall hereafter order or require any rebuilding, alteration, or repair thereof, Lessor shall immediately at Lessor's sole cost and expense rebuild or make such alterations and repairs as may be necessary to comply with such laws, orders or requirements. All such rebuilding, alterations and repairs shall be made in accordance with plans and specifications ~~mutually~~ approved by Lessee. ~~and Lessor.~~

9.4. Anything in this Article 9 to the contrary notwithstanding, if the Demised Premises shall be destroyed or damaged during the last 12 months of the term hereof ~~by reason of any cause other than ordinary wear and tear, ordinary physical depreciation or obsolescence~~, and the Demised Premises cannot be completely restored within a period of ~~90~~ working days from the date of commencement of such repairs, this Lease may be terminated upon written notice ~~unless terminated pursuant to Schedule D, Paragraph 3.~~ by either party to the other. Provided, however, that if at the time of said destruction or damage, Lessee has a right of extension pursuant to Article 15 hereof, Lessor may not terminate this Lease until it has given Lessee notice of its intent to terminate and Lessee fails to exercise said right of extension within 30 days of receipt of said notice. If Lessee fails to exercise said right of extension, this Lease shall terminate effective 30 days after Lessee's receipt of said notice from Lessor. Upon such termination Lessee shall be relieved from all liabilities hereunder except the liability to pay rent up to the date of such damage or destruction and any accrued charges, costs, and expenses required to be paid by Lessee hereunder up to said date. ~~Any dispute under this Paragraph shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in Los Angeles County, California and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.~~

9.5. Anything in this Article 9 to the contrary notwithstanding, if the repair and restoration provided for in Paragraph 9.1. hereof is not commenced within 12 months from the date of the damage or destruction referred to in said Paragraph, or once commenced, if said repair or restoration is not completed within 12 months of date of commencement, Lessee may terminate this Lease upon written notice to Lessor. Upon such termination, Lessee shall be relieved from all liabilities hereunder except the liability to pay rent up to the date of such damage or destruction and any accrued charges, costs and expenses required to be paid by Lessee hereunder up to said date. Lessee's right to terminate this Lease as provided herein shall be in addition to any other right or remedy Lessee may have arising out of Lessor's breach of any covenant of this Lease.

9.6. Wherever the provisions of this Article 9 are in conflict with the provisions of Article 8 hereof, the provisions of this Article 9 shall prevail.
9.7 See Schedule D,   Paragraph 3.
ARTICLE 10: INSURANCE.

10.1. At all times during the term of this Lease, Lessee shall maintain in force a public liability insurance policy or policies for liability for bodily injury to persons and damage to property occurring within the exterior walls of the Demised Premises, excluding any such liability arising out of Lessor's acts or omissions. Said insurance policy or policies shall name Lessor as an additional insured and shall be in an amount of not less than a combined single limit liability of $2,000,000. Lessee agrees to indemnify and hold Lessor harmless from any and all losses and liability for bodily injury to persons and damage to property occurring within the Demised Premises. ~~[redacted]~~

~~[redacted]~~ Lessee harmless from any and all losses and liability for bodily injury to ~~[redacted]~~ age to property occurring within the Demised Premises arising out of Lessor's ~~[redacted]~~ missions. Lessor further agrees to maintain in force an insurance policy or policies ~~[redacted]~~ such losses and liability naming Lessee as additional named insured. Said insur~~[redacted]~~ or policies shall be primary and noncontributing with any insurance maintained ~~[redacted]~~, shall include a blanket contractual liability endorsement and shall be in an amount of ~~[redacted]~~

10.3. From the date Lessee commences installation of fixtures pursuant to Paragraph 1.6. hereof and throughout the term of this Lease, Lessor shall maintain in force a public liability insurance policy or policies for liability for bodily injury to persons and damage to property, from every cause or source, occurring in or about the Common Areas of Lessor's Property. Said insurance policy or policies shall name Lessee as additional named insured and shall be in the amount of not less than a combined single limit liability of $2,000,000.** Said insurance policy or policies shall be primary and noncontributing with any insurance maintained by Lessee and shall include a blanket contractual liability endorsement. Lessor agrees to indemnify and hold Lessee harmless from any and all losses and liability for bodily injury to persons and damage to property occurring in or about the Common Areas of Lessor's Property.

10.4. At all times during the term of this Lease, Lessee shall maintain in force fire insurance with an extended coverage endorsement in the amount of not less than 100% of the full replacement cost of the Demised Premises and Lessor's improvements, fixtures and equipment on the Demised Premises exclusive of the value of excavations, underground utilities, foundations and footings, ~~but including vandalism coverage.~~ ^A^ and all proceeds of such insurance shall be made payable to Lessor and Lessee and shall be deposited with the first mortgagee or holder. *Lessee shall furnish Lessor with copies of certificates of insurance on all policies of insurance Lessee is required to carry pursuant to this Lease.

**said liability limit shall be increased or decreased from time to time as may be then reasonable, at the request of Lessee and with the consent of Lessor

TC LEASE 001            R 9/30/86, R 1/22/87

of a first deed of trust if either be an institutional lender, or if none, in any bank or trust company agreed to by Lessor and Lessee, as trustee, for the repair and restoration of the Demised Premises as provided by Paragraph 9.1. hereof. If by reason of the provisions of any such mortgage or deed of trust executed by Lessor on the Premises, fire insurance is required to be made payable to the lien holder and/or the policies of insurance placed in its custody, Lessee hereby consents thereto, provided that the lien holder in question shall first agree in writing with Lessor to make the proceeds of said insurance available for the repair and restoration of the Demised Premises pursuant to Paragraph 9.1. hereof. Any disputes under this Paragraph shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in Los Angeles County, California, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

10.5. At all times during the term of this Lease, Lessor shall *use its best efforts to* maintain in force, or cause to be maintained in force, fire insurance with an extended coverage endorsement covering all buildings and improvements on Lessor's Property, other than the Demised Premises, in the amount of not less than 100% of the full replacement cost thereof, excluding the value of excavations, underground utilities, foundations and footings.

10.6. Lessor and Lessee shall each procure from each of the insurers under all policies of insurance obtained pursuant to the provisions of this Article 10, including but not limited to public liability and fire insurance, a waiver of all rights of subrogation which said insurer might otherwise have, as against the other party hereto, said waiver to be in writing and for the express benefit of the other. Lessor and Lessee hereby release each other and waive any claim against the other relating to losses or liabilities for which the releasing party is obligated to obtain insurance under the provisions of this Article 10. For purposes of the preceding sentence Lessor and Lessee shall include the directors, officers and employees of each.

10.7. Except as provided in Paragraph 10.8. hereof, any and all insurance policies obtained by either Lessor or Lessee pursuant to the provisions of this Article 10 shall be issued only by a responsible insurer, properly licensed in the state in which the Demised Premises are located, which insurer has sufficient financial reserves adequate for the risks of the amount of insurance required by the terms of this Article 10. Each such insurance policy shall include an endorsement obligating the insurer to give the party hereto not obtaining said insurance policy 30 days' prior written notice of any cancellation or change in scope or amount of coverage of such insurance policy. Each party hereto shall cause to be issued to the other party, upon request, appropriate certificates of insurance evidencing compliance with the terms of the provisions of this Article 10 relating to insurance. *See Schedule D, Paragraph 4.*
*and which insurer is rated 'X + 12" or better in Best's Insurance Reports.*

10.8. Notwithstanding anything in this Article 10 to the contrary, Lessee may insure for the amount of any insurance required to be carried by it under this Article 10, (a) under any plan of self-insurance which it may from time to time have in force and effect so long as Lessee's net worth exceeds $40,000,000.00, or (b) under a blanket policy or policies covering other liabilities of Lessee and its subsidiaries, controlling or affiliated corporations, or (c) partly under such a plan of self-insurance and partly under such blanket policies. Any portion of any risk for which Lessee is self-insured shall be deemed to be an insured risk under this Lease, and an appropriate premium therefor shall be established for the purposes of recovery under Paragraph 2.2. hereof, such premium not to exceed the cost of such insurance if it were purchased from a responsible licensed insurer.
*or Lessee's parent's $75,000,000.00*
*See Schedule D, Paragraph 4.*

10.9

ARTICLE 11: ASSIGNMENT AND SUBLETTING.
*If Lessee's or Lessee's parent's net worth exceeds $75,000,000.00*

11.1. Lessee shall have the right to assign or sublet the Demised Premises or any part thereof for any lawful retail purpose so long as Lessee shall continue to remain liable to Lessor under all the terms, conditions and covenants of this Lease.

11.2. *See Schedule D, Paragraph 5.*

ARTICLE 12: EMINENT DOMAIN.

12.1. In the event of a "Total Taking", defined as when the entire Demised Premises are taken or appropriated under the power of eminent domain, this Lease shall terminate as of the date of the taking of physical possession of the Premises, and *Lessor and* Lessee shall be released from any liability accruing thereafter under this Lease.

12.2. In the event that through such eminent domain proceedings there is a "Partial Taking," defined as when the floor area of the Demised Premises is reduced by any amount or when either the street frontage or the Common Areas of Lessor's Property are reduced by 10% or more, but less than 100% of said areas, Lessee shall have the option (exercisable by written notice to Lessor at any time within 30 days after the taking of possession under any such proceeding) to terminate this lease forthwith, and all of Lessee's obligations hereunder shall thereupon cease to exist. If the Lessor's Property fronts on a corner, the foregoing shall apply to the frontage of each street on which Lessor's Property fronts. Except as provided in this Article 12, such Partial Taking shall not be a basis to terminate this Lease, notwithstanding any laws of the state in which the Demised Premises are located to the contrary.

12.3. Lessor shall be entitled to all damages and compensation awarded in any eminent domain proceeding relating to its fee simple interest in the Demised Premises. Lessee shall be entitled to all damages and
*In the event Lessee elects to self-insure pursuant to this Section, if Lessee's net worth fall below $75,000,000.00, Lessee shall immediately obtain the coverage required herein from an insurer meeting the criteria of Section 10.7.*

10

*and Lessee's parent's*

TO LEASE 001   R 9/30/86

compensation awarded for its leasehold interest (except to the extent that such compensation diminishes said compensation awarded to Lessor), loss and removal of Lessee's fixtures, furniture, equipment and leasehold improvements made by Lessee or Lessor at Lessee's expense.

12.4. In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, Lessor shall, to the extent of condemnation proceeds its own expense, repair and restore the Demised Premises, including the fixtures and equipment owned by Lessor, and the Common Areas of Lessor's Property to as close to their original condition as possible.

12.5. All repair and restoration of the Demised Premises or the Common Areas of Lessor's Property to be made by Lessor pursuant to Paragraph 12.4. hereof shall be made in accordance with plans and specifications mutually and Lessor. approved by Lessee. Lessor shall comply, and shall require all its contractors to comply, with all federal, state and local laws relating to conditions of employment in making such repairs and restoration. In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, any and all proceeds owing to Lessor resulting from any eminent domain proceedings based on such taking shall be made payable to Lessor and Lessee and shall be deposited with the first mortgagee or holder of a first deed of trust if either be an institutional lender, or if none, in any bank or trust company agreed to by Lessor and Lessee, as trustee, for said repair and restoration. If by reason of the provisions of any such mortgage or deed of trust executed by Lessor on the Premises, eminent domain proceeds are required to be made payable to the lien holder, Lessee hereby consents thereto, provided that the lien holder in question shall first agree in writing with Lessor to make said proceeds available for the repair and restoration of the Demised Premises and Common Areas of Lessor's Property pursuant to this Article 12.

12.6. In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, in addition to any right Lessee may have to abate minimum rent pursuant to Paragraph 2.3. hereof, a reduction of the annual minimum rent payable under Paragraph 2.1. hereof shall be made as follows. If a portion of the Demised Premises is taken, the annual minimum rent shall be reduced by the ratio of the total square feet taken to the total square footage of the Demised Premises. If a portion of the Common Areas of Lessor's Property is taken, an equitable reduction shall be made, based on the amount taken and proximity of the portion taken to the Demised Premises.

12.7. A taking or appropriation, as used in this Article 12, shall be deemed to include one or more takings or appropriations, and the cumulative effect of more than one such taking or appropriation shall be construed as one taking or appropriation. Appropriation or taking by eminent domain as used herein shall also include a conveyance made as a settlement to an existing or threatened eminent domain proceeding.

12.8. Where the provisions of this Article 12 are in conflict with the laws of the state in which the Demised Premises are located, or with the provisions of Article 8 hereof, the provisions of this Article 12 shall apply. Any disputes between Lessor and Lessee under this Article shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in Los Angeles County, California, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

## ARTICLE 13: ATTORNEYS' FEES.

13.1. In the event either party hereto commences legal proceedings to enforce any of the terms of this Lease, or for damages resulting from a breach of this Lease, the successful party in such action shall receive from the other party, in each such action, including any appeal taken thereof, its actual attorneys' fees and costs incurred. Whenever one party is obligated to indemnify the other party under the terms of this Lease, said duty to indemnify shall include the duty to defend the other party and to pay for all attorneys' fees, costs and disbursements related to said defense. The term attorneys' fees as used in this Paragraph shall include the fair market value of Lessor's and Lessee's in-house counsel's services.

## ARTICLE 14: PERMITS AND LICENSES.

14.1 Lessor hereby irrevocably appoints Lessee its attorney-in-fact with full power of substitution to apply for and secure any building permit or permission of any duly constituted authority for the purpose of doing any of the things which Lessee is required or permitted to do under the provisions of this Lease.

14.2. Without limiting the foregoing authorization and appointment, Lessor agrees that, whenever and as often as requested to do so by Lessee, Lessor will in its own name apply for and secure any such permit or license.

14.3. Lessee agrees to indemnify and hold Lessor harmless from loss or damage by reason of any appointment or authority granted in this Article 14.

## ARTICLE 15: EXTENSION OF TERM.

15.1. Lessee shall have the right to extend the term of this Lease upon the same terms, covenants, and set forth in Schedule D, Paragraph 1 conditions as herein contained, and at the same rental/ for four (4) additional consecutive periods of five (5) years each from and after the expiration date hereof, by giving Lessor notice at least 6 *Lessor shall cooperate with Lessee to a reasonable extent to enable Lessee to obtain any permits or licenses Lessee is required by law to obtain to carry on the particular business described herein.

months prior to such expiration date, and prior to each such extended expiration date, notifying Lessor of Lessee's election to so extend said term, provided, however, that in the event that Lessee fails to give such ~~written~~ notice of extension, Lessee shall ~~not~~ be deemed to have waived the right to that extension or any extension. ~~thereafter until Lessor gives Lessee written notice of Lessee's failure to exercise such right of extension and affords Lessee a period of 30 days after receipt of such notice to exercise that right of extension by giving Lessor notice thereof.~~

15.2. Whenever Lessee shall be prevented in whole or in part from the free, uninterrupted, and unimpeded enjoyment of the use of the Demised Premises and the fixtures therein by reason of default of Lessor, or by reason of Lessor's making any repairs, alterations, extensions or additions to the Premises, or the fixtures therein, or by reason of any casualty or eminent domain proceedings or by any labor difficulty or by any other reason beyond the control of Lessee, then, and in each and all of such cases, Lessee shall have the right of extension, as hereinafter defined, which right shall be cumulative and additional to any other rights given in such cases by this Lease or the law. Said right of extension shall give Lessee the option (to be exercised at least 90 days before the conclusion of the term) to add any such period or periods of loss of such enjoyment, or the aggregate of all such periods, to the term of this Lease and to extend the same to May 31st next following the termination of such period or periods or aggregate thereof. If any of the matters and things enumerated in the first sentence of this Paragraph occur during the last year of the term, and materially interfere with Lessee's enjoyment of the Demised Premises, Lessee may terminate this Lease at any time thereafter upon 30 days prior notice to Lessor.

15.3. Wherever there is a reference in this Lease to the term of this Lease, or to the expiration of this Lease, such references shall be construed to include any extension of the term of this Lease.

## ARTICLE 16: SUBORDINATION.

16.1. In the event the Demised Premises are subject to one or more mortgages or deeds of trust Lessor agrees to furnish to Lessee photostatic or certified copies thereof, together with a Non-Disturbance, Attornment and Subordination agreement as provided in Schedule C hereto.

16.2. Lessee covenants that it will execute an agreement subordinating this Lease to any mortgage or deed of trust subsequently placed upon the Demised Premises, provided that Lessor procures execution by each and every such mortgagee or holder of a deed of trust of ~~the said~~ subordination agreement which agreement shall incorporate, among other things, provisions to the following effect: (a) that the mortgagee or holder involved will at all times and under all conditions including but not limited to any foreclosure or other repossession proceedings, recognize, permit and continue the tenancy of Lessee, or its successors and assigns, on the Demised Premises and assume the obligations of Lessor under the provisions of and for the then remaining term of this Lease; and (b) that the mortgagee or holder involved will require that any purchaser acquiring the property covered by this Lease shall take said property subject to this Lease and that any such purchaser assume the obligations of Lessor hereunder so that the rights of Lessee or those holding under Lessee shall not be interfered with or affected in any manner whatsoever.

## ARTICLE 17: LESSEE'S DEFAULTS.

17.1. Should Lessee default in the payment of rent ^(or any other charges) (to be paid hereunder, then Lessor may, at its option, in addition to any other right provided for by law)^(terminate and cancel this Lease, and re-enter and take) possession of the Demised Premises, remove Lessee's property therefrom, and dispose of the same in the manner provided by applicable law. Notwithstanding ^(by 01) the foregoing sentence, no right or remedy of Lessor shall be exercised unless Lessee fails to cure such default within 15 days of receipt of notice from Lessor, specifying in detail such default. Said 15 day notice from Lessor to Lessee shall be in addition to, and not in lieu of, any statutory notice for eviction or foreclosure proceedings required under the laws of the state in which the Demised Premises are located. Upon such termination, Lessor may recover ^(from Lessee: (a) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (b) the worth at the time of award of the amount by which the unpaid rent which could have been earned after termination until the time of award exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided; (c) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided; and (d) any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom

17.2. The "worth at the time of award" of the amounts referred to in subparagraphs (a) and (b) of Paragraph 17.1. above is computed by allowing interest at ^(the highest rate allowed by law.) ~~an annual interest rate of 12~~. The "worth at the time of award" of the amount referred to in subparagraph (c) of Paragraph 17.1. above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1 percent

+or equity, including but not limited to, those remedies outlined in California Civil Code Sections 1951.2 and 1951.4,

++in addition to all other rights and remedies available at law or equity,

17.3. If Lessee shall be in default in the performance of any obligation under this Lease other than in the payment of rent /and if Lessee shall fail to cure such default within 30 days of receipt of notice from Lessor, *on other charges* *materials* specifying in detail the nature of such default, or in case the default is of such a character as to reasonably require more than 30 days to cure, then if Lessee shall fail to use reasonable diligence in curing or attempting to cure such default, then Lessor may cure such default for the account of and at the cost and expense of Lessee. The sum so expended by Lessor shall be deemed to be additional rent if Lessee fails to pay to Lessor the sum so expended within 30 days after Lessee's receipt of notice of a final adjudication that such amount is owing to Lessor. In no event shall any such default, other than the failure to pay such additional rent, be the basis of a forfeiture of this Lease or otherwise result in the eviction of Lessee or the termination of this Lease.

17.4. In the event of the commencement of voluntary or involuntary proceedings by or against Lessee under the United States Bankruptcy Code, the rights and duties of the parties hereto shall be subject to the provisions of the United States Bankruptcy Code, as amended, including any subsequent amendments thereto.

ARTICLE 18: LESSOR'S DEFAULTS. *delinquent, unless Lessor elects to contest the same,*

18.1. If Lessor fails to pay any installment of taxes or assessments or any interest, principal, costs or other charges upon any mortgage or deed of trust or other lien or encumbrance affecting the Demised Premises and to which this Lease may be subordinate when any of the same become due or if Lessor fails to make any repairs or do any work required of Lessor by the provisions of this Lease, or in any other respect fails to perform any *material* obligation under this Lease to be performed by Lessor then and in any such event Lessee, after the continuance of any such failure or default beyond a reasonable period of time, not to exceed 90 days after receipt of notice from Lessor specifying in detail the nature of such default, may (but this shall not be deemed to impose an obligation upon Lessee to do so) pay such taxes, assessments, interest, principal, costs and other charges and cure such defaults on behalf of and at the expense of Lessor, and do all necessary work and make all necessary payments in connection therewith including but not limited to the payment of any fees, costs and charges of or in connection with any legal action which may have been brought. Lessor shall pay to Lessee forthwith the *reasonable* amount so paid by Lessee, together with interest thereon from the date of such expenditure at an annual interest rate of 12%. However, if Lessor desires to contest the validity or correctness of any lien or encumbrance, it may do so, provided that it shall furnish Lessee with a good and sufficient bond indemnifying Lessee against any loss, liability or damage on account thereof. Nothing herein contained shall preclude Lessee from proceeding to collect the amount so paid by it as aforesaid without waiting for rental effects to accrue.

18.2. If Lessor shall fail to pay to Lessee the amount of such expenditures and interest within 30 days of written demand from Lessee to do so, in addition to any other right provided for by law, Lessee may deduct the *reasonable* amount of such expenditures and interest from any and all rental payments and other payments thereafter becoming due to Lessor hereunder. In no event shall such deduction be the basis of forfeiture of this Lease nor constitute a default in the payment of rent unless Lessee shall fail to pay the amount of such deduction within 30 days after Lessee's receipt of notice of a final adjudication that such amount is owing to Lessor. *If at the* expiration of this Lease, there shall be any sums owing by Lessor to Lessee, this Lease may at the election of Lessee be extended and continue in full force and effect until the next May 31st following the date when the indebtedness of Lessor to Lessee shall have been fully paid. Lessee may exercise said right of extension by giving Lessor notice at least 90 days prior to the expiration of this Lease of its intent to so extend the term.

18.3. Any right or remedy Lessee may have under this Lease arising out of Lessor's breach of any covenant of this Lease shall be in addition to any other right or remedy for such breach provided for by law.

ARTICLE 19: NOTICES.

19.1. Any notices, demands, and the like, which are required to be given hereunder or which either party hereto may desire to give to the other shall be given in writing by mailing the same by certified United States mail, return receipt requested, postage prepaid, addressed to Lessor at the address shown in Paragraph 20.15. hereof, or to Lessee, at 3424 Wilshire Boulevard, Los Angeles, California 90010, attention of the President or Secretary of Lessee, or to such other addresses as the respective parties may from time to time designate by notice given as provided in this Lease.

19.2. Any notice served on Lessee pursuant to any statutory procedure related to forfeiture or eviction proceedings under the laws of the state in which the Demised Premises are located shall be served on the Secretary of Lessee at the address specified in Paragraph 19.1. hereof. Wherever there is a conflict between the provisions of this Paragraph 19.2. and any such statutory procedure, the provisions of this Paragraph 19.2. shall prevail.

19.3. If Lessor be more than one person, notice by Lessee or payment by Lessee to any one of them is notice or payment to all. If Lessor be more than one person, Lessee may act on notice from any Lessor, and in the case of conflicting notices may recognize any one of them as valid and disregard the others, but Lessee may ***  treat any notice in any case as of no effect unless signed by all Lessors. If Lessor be a partnership or

*If at the expiration of this Lease, there shall be any sums owing by Lessor to Lessee, this Lease may at the election of Lessee be extended and continue in full force and effect until the next May 31st following the date when the indebtedness of Lessor to Lessee shall have been fully paid. Lessee may exercise said right of extension by giving Lessor notice at least 90 days prior to the expiration of this Lease of its intent to so extend the term.*

13

TC LEASE 001

corporation, Lessee may act on any notice given by any officer or agent of such corporation or of such partnership, or of any partner in such partnership, but may treat any notice in such case as of no effect unless signed by the President or a Vice-President of the corporation or all of the general partners in the partnership.

ARTICLE 20: MISCELLANEOUS PROVISIONS.

20.1. Whenever in this Lease any words of obligation or duty regarding either of the parties are used, such words shall have the same force and effect as though in the express form of covenants. Whenever appropriate from the context, the use of any gender shall include any other or all genders, and the singular number shall include the plural, and the plural shall include the singular.

20.2. Concurrently herewith the parties have executed a Memorandum of Lease for recording. This Lease and said Memorandum of Lease shall be construed together as one instrument. Lessor shall not record this Lease or permit the same to be recorded without the written consent of Lessee:

20.3. No waiver of any breach of any of the covenants, agreements or provisions contained herein shall be construed as a waiver of any subsequent breach of the same or any other covenant, agreement or provision. No payment of rent or other charges payable hereunder by Lessee shall be construed as a waiver by Lessee of any breach by Lessor under this Lease.

20.4. This Lease binds, applies to and inures to the benefit of, as the case may require, the heirs, executors, administrators, successors and assigns of Lessor and the successors and assigns of Lessee.

20.5. Lessee may make any payment or give any notice to Lessor, despite any succession or assignments, and be protected in so doing, until it has written notice to do otherwise from Lessor or in case of Lessor's death and if Lessor be a natural person, from the executor or administrator, together with a certified copy of letters testamentary or letters of administration. If there be conflicting claims to money payable by Lessee under this Lease, or reasonable doubt as to whom the money is payable, Lessee may discharge its obligation to pay by depositing such money in any bank or trust company in Los Angeles County, California, to be distributed pursuant to court order, but Lessee need not recognize any such adverse claims, and may pay the money to Lessor. All sums payable hereunder by either party to the other are payable in lawful money of the United States of America.

20.6. The captions heading the various articles of this Lease are for convenience and identification only, and shall not be deemed to expand, limit or define the contents of their respective paragraphs.

20.7. Lessor ~~agrees to pay all fees, commissions and transfer taxes~~ due for bringing about the execution, delivery and recording of this Lease and Memorandum of Lease and any amendments thereto, ^and agrees to^ ~~Lessor and Lessee~~ ^the other^ ^the other^ indemnify ~~Lessee~~ and hold ~~Lessee~~ harmless from any and all liability therefor, ~~except as set forth above~~. ^therein.^

20.8. Whenever the approval of Lessor or Lessee is required hereunder, such approval shall be in writing and be given pursuant to Article 19 hereof. Such approval shall not be unreasonably withheld or delayed. This Paragraph shall not apply to any provisions of this Lease in which an amendment to this Lease is contemplated.

20.9. This Lease and the Memorandum of Lease referred to in Paragraph 20.2. hereof, taken together, comprise the entire agreement between the parties hereto. There shall be no amendments to this Lease except by written agreement between the parties.

20.10. In the event that any provision of this Lease shall be held invalid or unenforceable, such provision shall be severable from, and such invalidity or unenforceability shall not be construed to have any effect on, the remaining provisions of this Lease.

20.11. This Lease was freely and voluntarily negotiated between the parties and shall not be construed against one or the other party.

20.12. Time is of the essence hereof.

20.13. Definitions for the following terms are set forth in the Paragraphs specified: (a) Ready for Occupancy — Paragraph 1.2.; (b) Receipts from Gross Sales — Paragraph 2.5.; (c) Common Areas — Schedule A, Paragraph 5; (d) Total Taking — Paragraph 12.1.; (e) Partial Taking — Paragraph 12.2.; (f) Lessor's Property — Schedule A, Paragraph 1; (g) Demised Premises — Schedule A, Paragraph 2; (h) ~~Inventory value of improvements at the end of term~~ and (i) Plot Plan — Schedule A, Paragraph 1.

*and Lessee agree that they have not dealt with any Broker or Salesman regarding this Lease and that there are no broker fees or commissions due or payable. Lessor agrees to pay any transfer taxes

20.15. Payments of rent are to be made to:    LYNWOOD ASSOCIATES
c/o Hopkins Development Co.
#13 Corporate Plaza, Suite 200
Newport Beach, CA 92660

Tax I.D. # ................................................................................or to such other person or entity and at
such other place as shall be designated in writing by notice as provided in Article 19 of this Lease at least 30
days prior to the next ensuing rental payment due date.

20.16. The following schedules are attached hereto and by this reference made a part hereof:

Schedule A, Description of Property

Schedule B, Construction

Schedule C, Mortgages and Other Encumbrances

Schedule D, Additions and Modifications

Schedule E, Non-Disturbance, Attornment and Subordination Agreement
(if provided for in Schedule C) , and Schedule F, Lessee's Exterior Signs
20.17  See Schedule D, Paragraph 6.
IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above
written.

LESSOR:                                                    LESSEE:

LYNWOOD ASSOCIATES, a                      THRIFTY CORPORATION, a California
California general partnership                  corporation

By :  Hopkins Development Company, L.P.,     By _____
a Delaware Limited Partnership,
general partner                                                         Chairman

By :  Stephen Hopkins Development Company   By _____
of Newport Beach, a California                     Assistant Vice President
corporation, general partner                       and  Asst. Secretary

By: _____
Stephen C. Hopkins, President

By: _____
Dennis A. Sperry, Sec./Treasurer

15

# SCHEDULE A
### DESCRIPTION OF PROPERTY AND PLOT PLAN

Attached to and forming a part of that certain Lease and Memorandum of Lease executed under date of........
.2/20/87........ by and between

LYNWOOD ASSOCIATES

as Lessor, and THRIFTY CORPORATION, as Lessee.

1. **Lessor's Property.** The Demised Premises are a portion of Lessor's entire property, situated in the City of .........Lynwood........................................ County of ...Los Angeles.......................................... State of ........California........................... , and now commonly known as ..West side of Long Beach......... Blvd., at Imperial Highway .........................................................................................................
........

Such property, herein referred to as "Lessor's Property", means the entire property within the outer property limits shown on the Plot Plan initialed by the parties hereto, dated ...2/20/87......., attached hereto, and made a part hereof ("Plot Plan"). The legal description of Lessor's Property is set forth in Paragraph 10 of this Schedule A.

2. **Demised Premises.** Lessor's Property provides a site for a store building in the location designated "Thrifty" on the Plot Plan. Such building ...... is now thereon, or .X. is to be erected pursuant to Schedule B hereof by Lessor for Lessee, having an approximate width of one hundred fifty-six feet (156') with an approximate depth of one hundred twenty feet (120'), plus a rear appendage having a width of approximately thirty-two feet (32') and a depth of approximately twelve feet six inches (12'6"), all located as shown on the Plot Plan.

Said building site, building, improvements, and appurtenances, and fixtures and equipment owned by the Lessor, now or hereafter located thereon, are collectively referred to in this Lease as the "Premises" or "Demised Premises".

3. ~~Expansion Area. The Demised Premises may be expanded to include an expansion area adjacent~~ thereto and to the rear and ................. thereof having a width of ............... and running a depth of ....... ............ identified as "Possible Future Thrifty Expansion Area" on the Plot Plan together with any building improvements hereafter erected by Lessee on said Possible Future Thrifty Expansion Area. Said expansion of the Demised Premises shall take place automatically upon Lessee's construction of building improvements expanding its building on to all or part of said Possible Future Thrifty Expansion Area. Said Possible Future ~~Thrifty Expansion Area is hereby reserved exclusively for Lessee's expansion of its building.~~

4. **Use of Lessor's Property.** Lessor covenants that Lessor's Property shall be used during the term hereof for the general purpose of a retail shopping center. Lessor covenants that it will not permit the operation or occupancy of any of the following businesses or facilities on Lessor's Property: (a) entertainment, athletic or recreational facility, including but not limited to, a bowling alley, skating rink, health club, theater, video or pinball game operation; (b) educational, vocational or religious facility, including but not limited to, a church, beauty school or other institution for vocational training; (c) professional and business offices of an aggregate total in excess of ../.**....... square feet including but not limited to, any governmental office or operation; (d) industrial facility, including but not limited to, manufacturing and warehousing facility. Lessor covenants that it will, at its own cost and expense, enforce the foregoing restrictions.

5. **Common Area Easements.** Lessee, its agents, employees, patrons and invitees, in common with Lessor and all other tenants of portions of Lessor's Property and their respective agents, employees, patrons, and invitees shall have and are hereby granted, during the entire term of this Lease, the ~~free, uninterrupted and~~ non-exclusive use of the Common Areas of Lessor's Property ("Common Areas"), as hereinafter defined, which use by all users shall be for the purposes of ingress, egress, service utilities, and parking, and which parking area shall consist of a 5 to 1,000 square feet of Building Area parking ratio, ~~sufficient to provide~~ as shown on the Plot Plan. The Common Areas shall be defined as the sidewalks, driveways, roadways, parking areas, non-enclosed mall areas, landscaped areas and all other areas of Lessor's Property except those areas designated as "Building Area" on the Plot Plan. Lessor may not use, nor permit any other person to use, the Common Areas for the benefit of any property, adjoining or otherwise, other than Lessor's Property as defined herein. Except as provided in Paragraph 6.2. of this Lease, Lessee shall have no obligation or liability whatsoever in connection with the ownership, maintenance, or management of the Common Areas and Lessor shall manage, according to the terms of this lease, operate and maintain all such Common Areas, or cause the same to be done on its behalf, pursuant to the terms of this Lease.

\* within one hundred (100) feet from the front door of the Demised Premises, or
\*\* five thousand (5,000) square feet of the Building Area

LG LEASE 601

6  Ingress and Egress. Lessor shall not vary or permit to be varied the designated means of ingress and egress from that shown on the Plot Plan. Lessor will not alter or permit to be altered existing street signs, median cuts, traffic signals or the parking layout except by written amendment to this Lease, duly executed by the parties hereto.

7. Plot Plan. Lessor covenants that no changes shall be made to the building area and/or to the parking and other Common Areas from that shown on the Plot Plan and that no buildings, kiosks or building-type structures may be built except within the building areas or areas for building designated thereon, except by written amendment to this Lease, duly executed by the parties hereto.

8. Covenants Running with the Land. All of the covenants of Lessor contained in this Lease shall be covenants running with the land pursuant to applicable law. It is expressly agreed that each covenant to do or refrain from doing some act on Lessor's Property or any part thereof (a) is for the benefit of the Demised Premises and each person having any leasehold interest therein derived through Lessee, and (b) shall be binding upon each successive owner, during his ownership, of any portion of Lessor's Property and upon each person having any interest therein derived through any owner of Lessor's Property.

9. Use of Demised Premises. The Demised Premises may be used by Lessee for the purpose of conducting any lawful business. Lessee is hereby given the exclusive right and privilege on Lessor's Property of operating a drug store and/or of handling and selling any and all items of merchandise which, by law, must be sold by, or in the presence of, a licensed pharmacist. Lessee is also given the exclusive right and privilege of handling and selling beers, wines and distilled spirits for off-premises consumption. Lessor covenants with respect to said exclusive rights and privileges not to permit any storeroom or other portion of Lessor's Property to be used or occupied for the purpose of selling or handling any of the items above mentioned. Provided, however, that in no event shall Lessee's exclusive provision to operate a drug store be construed to prohibit the super food market or grocery store in the said Shopping Center from handling and selling any of the items it customarily handles and sells.

10.  Legal Description of Lessor's Property.

LAND SITUATED IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

That portion of Tract No. 2551, in the City of Lynwood, County of Los Angeles, State of California, according to a map thereof recorded in Book 24 pages 78 to 80 inclusive of Maps, records of said County, together with those portions of Sanborn Avenue, Peach Street, Court Street, Chester Street, Plaza Street, Long Beach Boulevard, and the unnamed alley lying within said tract, all more particularly described as follows:

BEGINNING at the centerline intersection of Long Beach Boulevard originally 80 feet wide, with Beechwood Avenue 50 feet wide, as shown on said map; thence South 14° 36' 19" East along said centerline of Long Beach Boulevard 715.17 feet; thence South 75° 23' 41" West, at right angles to said centerline 65.00 feet to a point of intersection in the Northerly line of Lot 312 in said Tract, with the Northwesterly line of that particular parcel of land acquired by the State of California for the proposed "Century Freeway" and shown on a State of California Division of Highways right-of-way map No. F1150-6; thence South 02° 00' 07" West along said Northwesterly line 26.09 feet to a point in the Northerly line of Lot 311 in said Tract; thence South 75° 23' 53" West along said last mentioned Northerly line, the Northerly line of Lot 338 in said tract and the Westerly prolongation thereof, 203.56 feet to a point in the centerline of Plaza Street, 40 feet wide as shown on said tract; thence North 14° 35' 48" West along said centerline 130.00 feet; thence South 75° 23' 41" West, at right angles to said centerline of Long Beach Boulevard, 20.00 feet to a point in the Easterly line of Lot 413 in said tract; thence North 14° 35' 48" West along said Easterly line, 21.81 feet to the most Northerly corner of said Lot 413; thence South

A-2

28° 51' 11" West along the Westerly line of said Lot 413 a
distance of 30.04 feet; thence leaving said Westerly line South
75° 23' 41" West, at right angles to said centerline of Long
Beach Boulevard, 34.44 feet to a point in the centerline of Court
Street 50 feet wide as shown on said tract; thence South 28° 51'
11" West, along said centerline 94.03 feet to the beginning of a
tangent curve concave Northwesterly and having a radius of 519.71
feet; thence Southwesterly along said curve through a central
angle of 08° 41' 10" an arc length of 78.79 feet; thence North
52° 27' 02" West along a radial Line to said curve, 25.00 feet to
the Southeast corner of Lot 424 of said tract; thence North 52°
24' 33" West along the Easterly line of said lot, 100.03 feet to
the Northeast corner thereof, said Northeast corner also being in
the Southeasterly line of Lot B, 18.5 feet wide, as shown on said
tract; thence North 53° 12' 47" West 43.48 feet to a point in the
curved centerline of Chester Street, 50 feet wide as shown on
said tract, said curve having a radius of 351.21 feet, with a
radial line to said point being South 52° 22' 05" East; thence
Northeasterly along said curve through a central angle of 08° 46'
07" an arc length of 53.75 feet to a point of tangency in said
centerline, said point also being the intersection with the
Southeasterly prolongation of the Northeasterly line of Lot 439
in said tract; thence North 61° 08' 12" West along said
Northeasterly line and said prolongation thereof, 168.09 feet to
an angle point therein; thence North 84° 10'24" West along the
most Northerly line thereof 67.21 feet to the most Westerly
corner thereof also being the Southeast corner of Lot 447 in said
tract; thence North 05° 49' 36" East along the Easterly line of
said Lot 447 and the Northerly prolongation thereof, 170.00 feet
to a point in the centerline of Sanborn Avenue, 40 feet wide as
shown of said map; thence North 84° 10' 24" West along said
centerline, 166.15 feet to the intersection with the centerline
of Peach Street, 40 feet wide as shown on said map; thence North
17° 59' 42" East along said last mentioned centerline, 353.12
feet to the intersection with said centerline of Beechwood
Avenue; thence South 84° 12' 40" East along said last mentioned
centerline, 261.79 feet to an angle point therein; thence North
75° 25' 12" East along said centerline, 193.75 feet to a point of
intersection with the Southeasterly prolongation of the Easterly
line of Lot 130 in said tract; thence North 14° 36' 19" West
parallel with said centerline of Long Beach Boulevard, 175.00
feet to the Northeasterly corner of said Lot 130 also being the
Southwesterly corner of Lot 134 in said tract; thence North 75°
25' 12" East along the Southeasterly line of said Lot 134 and the
Northeasterly prolongation thereof, 190.00 feet to a point in
said centerline of Long Beach Boulevard; thence South 14° 36' 19"
East along said centerline 175.00 feet to the POINT OF BEGINNING.



A-4

TC LEASE 001

# SCHEDULE B

### CONSTRUCTION

Attached to and forming a part of that certain Lease executed under date of Feb. 20, 1987 by and between

LYNWOOD ASSOCIATES, a California general partnership

as Lessor, and THRIFTY CORPORATION as Lessee.

### Building Construction or Remodeling

1. Lessor covenants that immediately upon the execution of this Lease it will proceed with all reasonable diligence and dispatch to construct upon the real property demised hereunder a building of the dimensions set forth in Schedule A, Paragraph 2 and the Plot Plan attached thereto in accordance with the provisions of this Schedule B. Lessor further covenants that it will diligently prosecute the construction of said building until completed in all details and deliver possession of the Demised Premises, Ready for Occupancy, to Lessee. Said building shall be of Class C construction as defined by the Pacific Fire Rating Bureau, and of Type III construction as defined by the Uniform Building Code of the Pacific Coast Building Officials Conference.

(or)

~~1. Lessor covenants that immediately upon the execution of this Lease it will proceed with all reasonable~~ diligence and dispatch to alter, remodel and reconstruct the building now situate upon the real property demised hereunder in accordance with the provisions of this Schedule B. Lessor covenants that it will diligently prosecute the remodeling of said building until completed in all details and deliver possession of the Demised Premises, Ready for Occupancy, to Lessee. Prior to delivery of possession to Lessee, Lessor shall obtain and deliver to Lessee certification by a registered structural engineer that said building is structurally ~~sound and without structural defects and is in compliance with all applicable building codes and ordinances.~~

2. The plans and specifications for said building shall include but not be limited to the following items all of which items shall be more particularly specified by Lessee to Lessor in writing:

(1) one-eighth inch (⅛") vinyl asbestos tile floor materials & installation warranted for 10 yrs.;

(2) complete electrical wiring system required to utilize the single meter system where same is available, and necessary lighting fixtures and lamps, all of which shall be properly connected;

(3) complete plumbing system, including sprinklers and all necessary fixtures and trim, all of which shall be properly connected;

(4) multi-unit roof mounted package heating, ventilating and mechanical year-round air conditioning system with economizers for entire Premises;

(5) stock area mezzanine of 1900 square feet, with power incline reversible belt conveyor and conveyor roller sections or, at Lessee's option, double decked stockroom shelving and platforms;
(6) painting;

(7) conduits and wiring for running of burglar alarm, intercom, telephone, computer, cash register and other systems;

(8) burglar alarm system;

(9) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(10) complete telephone public address system with background music equipment;

(11) outlets for illuminated signs;

(12) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(13) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(14) hook-up and connection with the proper electric, water, and gas utilities including all fees, taxes, licenses, etc. required to obtain said utilities of all fixtures and equipment whether such fixtures and equipment are owned by Lessor or by Lessee;

(15) Louver-type sun screens;

(16) automatic-opening public entrance doors;

(17) complete refrigeration system for equipment, including equipment and hookup;

(18) 20 year bondable roof with an inspection report by a roofing expert specified by Lessee;

(19) complete energy management system;

(20) exterior storm enclosure if required by Lessee.

3. Prior to commencement of construction or to Lessor's seeking approval for said construction from any governmental entity, Lessor shall first submit to Lessee and obtain Lessee's approval thereof Lessor's proposed overall design theme or concept for the development or remodelling of Lessor's Property. Said design theme or concept shall include elevations for all buildings and building signing to be constructed or remodeled within Lessor's Property and shall be sufficient to meet Lessee's needs, including but not limited to, appropriate signing identity as~~determined by~~ Lessee and comparable architectural prominence for Lessee's signing and building relative to that of all other major tenants within Lessor's Property.

4. Lessor shall cause plans and specifications for Lessee's Demised Premises including its exterior elevations to be prepared promptly by an architect mutually agreeable to Lessor and Lessee, which plans and specifications are to be submitted by Lessor to Lessee for Lessee's approval, and approved by both Lessee and Lessor prior to any construction thereof. Lessor shall submit said plans and specifications to Lessee and obtain Lessee's approval prior to Lessor's submission of said plans and specifications to the appropriate governmental entity or entities for approval. All such work (including preparation of plans and specifications) shall be at Lessor's expense. ~~Lessor covenants that~~ Said plans and specifications will be adequate and complete for a building to house a Thrifty Drug and Discount Store indicated by the size and location of the Demised Premises in accordance with the general plan of operation of Lessee and that in the construction ~~or remodeling~~ of said building said plans and specifications will be strictly followed.

5. While work is in progress, the contractor's wooden barricade around said building shall be painted and copy identifying Lessee shall be placed thereon in such manner as may be directed by Lessee, or if no barricade is erected an appropriate sign as approved by Lessee shall be provided by Lessor at the site. If Lessor fails to provide said Lessee identification, Lessee may, at Lessor's expense, erect its own sign for its identification purposes. Lessor shall, at its own expense, maintain the barricade and sign identifying Lessee.

### Common Area Construction

6. Lessor shall provide all common area on-site and off-site improvements in first class condition pursuant to plans and specifications approved by Lessee. Lessor shall submit said plans and specifications to Lessee and obtain Lessee's approval prior to Lessor's submission of said plans and specifications to the appropriate city or other governmental entity for approval. All expenses incurred for the development of all on-site and off-site improvements, including assessments and fees in connection therewith, shall be at Lessor's sole cost and expense and shall not be charged to Lessee in any form or manner, except as provided in Paragraph 7.

7. Such site improvements shall include two height limit Shopping Center sign pylons identified as Pylons A to be located as shown on the Plot Plan attached to Schedule A hereto. The design and height of said sign pylon shall be subject to the approval of Lessee. Each sign pylon is to carry only two double-faced pylon signs which shall be shared with equal prominence by Lessee and the market co-tenant, the cost of which signs shall be paid by Lessee and the market co-tenant. No other sign pylons or sign monuments shall be erected on Lessor's Property without Lessee's prior approval ~~and, if any such pylon or monument is on a frontage on which Lessee does not have sign representation, without Lessee's being permitted to share equally with one other tenant in Lessor's Property the most prominent position thereon.~~

*one-third (1/3) by the major market, one-third (1/3) by Lessee and one-third (1/3) by Lessor as to the installation cost and maintenance expenses,

# SCHEDULE C

## OR ENCUMBRANCES

Attached to and forming a part of that certain Lease executed under date of ..Feb. 20, 1987.. by and between

### LYNWOOD ASSOCIATES,

as Lessor, and THRIFTY CORPORATION, as Lessee.

The following constitutes all of the liens, encumbrances, restrictions and violations of laws, ordinances, and regulations relating to the use, occupation, and construction of the Demised Premises. If any of the items set forth below refer to a mortgage or deed of trust, Lessor shall cause each mortgagee or holder of said deed of trust to execute a Non-Disturbance, Attornment and Subordination Agreement in the form attached hereto as Schedule E and made a part hereof promptly after the execution of this Lease. If Lessor fails to deliver said Agreement to Lessee prior to the date Lessee may install fixtures in the Demised Premises pursuant to Paragraph 1.6. hereof, Lessee may, at its option, until said Agreement is delivered, postpone the commencement of, and/or terminate this Lease, at any time thereafter by written notice to Lessor. If there are no mortgages or deeds of trust referred to in this Schedule C, Schedule E shall be omitted from this Lease.

See Title Insurance Policy dated 10/21/87, attached hereto as a part hereof.

C-1

# FATCOLA

## *First American Title Company of Los Angeles*
### 520 North Central Avenue
### Glendale, California  91203
### (818) 242-5800

All policies of Title Insurance issued by
First American Title Insurance Company

October 23, 1987

UNION BANK
9460 Wilshire Boulevard, 2nd Floor
Beverly Hills, California

Attn:  Bruce Nelson

Your No.  LYNWOOD
Our Order No.  8732499-8
Form of Policy Coverage Requested:   PRELIMINARY TITLE REPORT

In response to the above referenced application for a policy of title insurance,  this  Company hereby reports that it is prepared to issue, or  cause to be issued, as of the date hereof, a Policy or Policies of Title  Insurance  in the form specified above, describing the land and the estate or  interest therein hereinafter set forth, insuring against loss  which  may  be  sustained  by  reason  of  any  defect,  lien or encumbrance  not  shown  or  referred  to as an Exception below or not excluded  from  coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy form.

The printed exceptions and exclusions from the coverage of said policy or policies are set forth in Exhibit A attached.   Copies of the policy forms should be read.   They are available from the office which issued this report.

This  report  (and  any  supplements  or  amendments hereto) is issued solely  for  the  purpose  of  facilitating the issuance of a policy of title  insurance and no liability is assumed hereby.  If it is desired that  liability  be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of October 21, 1987  at 7:30 A.M.

MIKE NORMAN, Title Officer

Title to said estate or interest at the date hereof is vested in:

LYNWOOD ASSOCIATES, a California general partnership

The  estate  or  interest in the land hereinafter described or referred to covered by this Report is:




-1-

**FATCOLA**

### First American Title Company of Los Angeles

A fee.

THE LAND REFERRED TO IN THIS REPORT IS SITUATED IN THE COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

That portion of Tract No. 2551, in the city of Lynwood, according to a
map thereof recorded in Book 24 Pages 78 to 80 inclusive of Maps,
records of said county, together with those portions of Sanborn,
Avenue, Peach Street, Court Street, Chester Street, Plaza Street, Long
Beach Boulevard, and the unnamed alley lying within said tract, all
more particularly described as follows:

Beginning at the centerline intersection of Long Beach Boulevard
originally 80 feet wide, with the centerline of Beechwood Avenue 50
feet wide, as shown on said map; thence south 14° 36' 19" East along
said centerline of Long Beach Boulevard 715.17 feet; thence South 75°
23' 41" West, at right angles to said centerline 65.00 feet to a point
of intersection in the Northerly line of Lot 312 in said Tract, with
the Northwesterly line of that particular parcel of land acquired by
the State of California per deed recorded June 20, 1986 as Instrument
No. 86-771435, for the proposed "Century Freeway" and shown on a State
of California Division of Highways right-of-way map No. F1150-6;
thence South 02° 00' 07" West along said Northwesterly line 26.09 feet
to a point in the Northerly line of Lot 311 in said tract; thence
South 75° 23' 53" West along said last mentioned Northerly line, the
Northerly line of Lot 338 in said tract and the Westerly prolongation
thereof, 203.56 feet to a point in the centerline of Plaza Street, 40
feet wide as shown on said tract; thence North 14° 35' 48" West along
said centerline 130.00 feet; thence South 75° 23' 41" West, at right
angles to said centerline of Long Beach Boulevard, 20.00 feet to a
point in the Easterly line of Lot 413 in said tract; thence North 14°
35' 48" West along said Easterly line, 21.81 feet to the most
Northerly corner of said Lot 413; thence South 28° 51' 11" West along
the Westerly line of said Lot 413 a distance of 30.04 feet; thence
leaving said Westerly line South 75° 23' 41" West, at right angles to
said centerline of Long Beach Boulevard, 34.44 feet to a point in the
centerline of Court Street 50 feet wide as shown on said tract; thence
South 28° 51' 11" West, along said centerline 94.03 feet to the
beginning of a tangent curve concave Northwesterly and having a radius
of 519.71 feet; thence Southwesterly along said curve through a
central angle of 08° 41' 10" an arc length of 78.79 feet; thence North
52° 27' 02" West along a radial line to said curve, 25.00 feet to the
most Easterly corner of Lot 424 of said tract; thence North 52° 24'
33" West along the Northeasterly line of said lot, 100.03 feet to the
Northerly corner thereof, said Northerly corner also being in the
Southeasterly line of Lot 3, 18.5 feet wide, as shown on said tract;
thence North 53° 12' 47" West 43.48 feet to a point in the curved
centerline of Chester Street, 50 feet wide as shown on said tract,
said curve having a radius of 351.21 feet, with a radial line to said
point being South 52° 22' 05" East; thence Northeasterly along said





**FATCOLA**   *First American Title Company of Los Angeles*

curve through a central angle of 08° 46' 07" an arc length of 53.75 feet to a point of tangency in said centerline, said point also being the intersection - with the Southeasterly prolongation of the Northeasterly line of Lot 439 in said tract; thence North 61° 08' 12" West along said Northeasterly line and said prolongation thereof, 168.09 feet to an angle point therein; thence North 84° 10' 24" West along the most Northerly line thereof 67.21 feet to the most Westerly corner thereof also being the Southeast corner of Lot 447 in said tract; thence North 05° 49' 36" East along the Easterly line of said Lot 447 and the Northerly prolongation thereof, 170.00 feet to a point in the centerline of Sanborn Avenue, 40 feet wide as shown on said map; thence North 84° 10' 24" West along said centerline, 166.15 feet to the intersection with the centerline of Peach Street, 40 feet wide as shown on said map; thence North 17° 59' 42" East along said last mentioned centerline, 353.12 feet to the intersection with said centerline of Beechwood Avenue; thence South 84° 12' 40" East along said last mentioned centerline, 261.79 feet to an angle point therein; thence North 75° 25' 12" East along said centerline, 383.75 feet to the point of beginning.

EXCEPT therefrom, those portions of Court Street and Plaza Street that would pass with the conveyance of Lot 413 of said Tract 2551.

ALSO EXCEPT from portions of Lots 226 to 228, all oil, gas and other mineral rights in and under said property, together with the exclusive right to use such portion of said property lying more than 500 feet below the surface thereof for the extraction of oil, gas and minerals from said property or property in the vicinity thereof; however, with no right of surface entry whatsoever, as reserved and excepted in deed recorded November 21, 1962 in Book D1830 Page 16, Official Records, as Instrument No. 2511.

ALSO EXCEPT from portions of Lots 229 to 233, all oil, gas, hydrocarbon substances and minerals in and under said land or produced and saved therefrom, without any rights in the grantor to the use of the surface and the subsurface areas of said land to a depth of 500 feet for any purpose to produce, prospect for and develop any of such substances;

And also specifically reserving unto the grantor therein, rights of way and easements in and through the subsurface strata of said land lying more than 500 feet below the surface of said land for the purpose of drilling, prospecting for and developing oil, gas and other hydrocarbon substances and minerals lying in and under, and the producing intervals of which are in lands other than the land above described and from the surface of lands other than the land above described, as reserved by Jackson O. Law, Jr., in deed recorded December 11, 1972 as Instrument No. 63.

ALSO EXCEPT from portions of Lots 234 and 235, all oil, gas, hydrocarbon substances and minerals in and under said land or produced



-3-



# FATCOLA

## First American Title Company of Los Angeles

and saved therefrom, without any rights in the (defendant or grantor) to the use of the surface and the subsurface areas of said land to a depth of 500 feet for any purpose to produce, prospect for and develop any of such substances;

And also specifically reserving unto the (defendant or grantor) therein, rights of way and easements in and through the subsurface strata of said land lying below a plane 500 feet below the surface of said land for the purpose of drilling, prospecting for and developing, oil, gas and other hydrocarbon substances and minerals lying in and under, and the producing intervals of which are in lands other than above described and from the surface of lands other than the land above described, excepted by B. Dean Clanton, as his separate property, in deed recorded November 15, 1972 as Instrument No. 73.

ALSO EXCEPT from Lot 246, all oil, gas, hydrocarbon substances and minerals of every kind and character lying below 500 feet below the surface of said land, together with the right to drill into, through, and to use and occupy all parts of said land lying more than 500 feet below the surface thereof for any and all purposes incidental to the exploration for and production of oil, gas, hydrocarbon substances or minerals from said or other lands, but without, however, any right to use either the surface of said land or any portion of said land within 500 feet of the surface for any purpose or purposes whatsoever, in deed recorded January 5, 1978 as Instrument No. 78-11639.

ALSO EXCEPT from Lot 249, all oil, gas, and other hydrocarbon substances in, upon or underlying said land without the right of entry above the depth of 500 feet below the surface of said land, as reserved by Alice M. Wills, a married woman, who acquired title as Alice M. Matyshak, a widow, and Harold L. Wills, her husband, recorded May 5, 1959 as Instrument No. 1535, in Book D455 Page 928 of Official Records.

ALSO EXCEPT from Lot 253, all oil, gas, and other hydrocarbon substances lying below a vertical depth of 500 feet from the surface of said land without the right of surface of surface entry thereto, in deed recorded December 22, 1977 as Instrument No. 77-1411432.

ALSO EXCEPT from said Lot 321 therefrom, all oil, gas, hydrocarbon substances and minerals in and under said land or produced and saved therefrom, without any rights in and to the use of the surface and the subsurface areas of said land to a depth of 500 feet for any purpose to produce, prospect for and develop any of such substances; and also specifically reserving the herein rights of way and easements in and through the subsurface strata of said land lying below a plane 500 feet below the surface of said land for the purpose of drilling, prospecting for and developing oil, gas and other hydrocarbon substances and minerals lying in and under, and the producing intervals of which are in lands other than the land above described





-4-

# FATCOLA

## First American Title Company of Los Angeles

and from the surface of lands other than the land above described, as provided in the deed recorded March 10, 1974 as Instrument No. 11.

ALSO EXCEPT from Lot 133, all ~~oil, gas,~~ hydrocarbon substances and minerals in and under said land or produced and saved therefrom without any rights in the grantor to the use of the surface and the subsurface areas of said land to a depth of 500 feet for any purpose to produce, prospect for and develop any of such substances;

And also specifically reserving unto the grantor therein, rights of way and easements in and through the subsurface strata of said land lying ~~more than a plane~~ 500 feet below the surface of said land for the purpose of drilling, prospecting for and developing oil, gas and other hydrocarbon substances and minerals lying in and under, and the producing intervals of which are in lands other than the land above described and from the surface of lands other than the land above described, as reserved by Jackson O. Law, Jr., recorded December 11, 1972 as Instrument No. 63.

ALSO EXCEPT that portion thereof lying ~~below a depth of 500~~ feet, measured vertically, from the contour of the surface of said property; however, Grantor, or its successors and assigns, shall not have the right for any purpose whatsoever to enter upon, into or through the surface of said property or any part thereof lying between said surface and 500 feet below the surface, as reserved in deed recorded December 15, 1986 as Instrument No. 86-1733235.

ALSO EXCEPT from Lot 312, all ~~oil, gas, hydrocarbons,~~ minerals, mineral rights, natural gas, natural gas rights, and other hydrocarbons by whatsoever name known that may be within or under the parcel of land hereinabove described, together with the perpetual right of drilling, mining, exploring and operating therefor and removing the same from said land or any other land, including the right to whipstock or directionally drill and mine from lands other than those hereinabove described, oil or gas wells, tunnels and shafts into, through or across the subsurface of the land hereinabove described, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines, without, however, the right to drill, mine, explore and operate through the surface or the ~~upper 100~~ feet of the subsurface of the land hereinabove described or otherwise in such manner as to endanger the safety of any highway that may be constructed on said lands, as reserved by Martha L. Fuhrman, a widow, in deed recorded August 17, 1973 as Instrument No. 1068.

AT THE DATE HEREOF EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS CONTAINED IN SAID POLICY FORM WOULD BE AS FOLLOWS:




-5-

**FATCOLA**          *First American Title Company of Los Angeles*

1.      General and special taxes, a lien not yet payable, for the
        fiscal year 1987-1988.

1a.     Supplemental Taxes for the Fiscal Year 1986-1987
        Original 1st Installment:               $ 475.72, plus penalty of
                                                $47.57.
        Original 2nd Installment:               $ 237.47, plus penalty and
                                                cost of $33.74.

        Parcel No.:                             8900-630-61.

        NOTE: This is an escaped assessment after May 1, 1987.

1b.     Affects a portion of said land.

        A sale to the State of California for delinquent taxes for the
        Fiscal Year:                            1986-1987.
        And subsequent delinquencies.
        Amount to redeem:                       $ 852.29.
        Prior to:                               October 31, 1987.

1c.     The lien of Supplemental Taxes, if any, assessed pursuant to
        Chapter 3.5 commencing with Section 75 of the California Revenue
        and Tax Code.

2.      AFFECTS LOTS 257 AND 258.

        An oil and gas lease affecting said land lying below a depth of
        500 feet from the surface thereof, for the term and upon the
        terms, conditions and covenants therein provided,
        Lessor:         Mary C. Spratley Reynolds, also known as Mary C.
                        Reynolds.
        Lessee:         Western Gulf Oil Company, a corporation.
        Recorded:       November 21, 1958 as Instrument No. 2833, in Book
                        M161 Page 161, Official Records.

        Matters affecting the present interest of the lessor or lessee
        are not shown herein.

3.      Rights of way and easements in and through the subsurface strata
        of Lots 133, 229, 230, 231, 232 and 233, lying below a plane 500
        feet below the surface of said land for the purpose of drilling,
        prospecting for and developing oil, gas and other hydrocarbon
        substances and minerals lying in and under, and the producing
        intervals of which are in lands other than the land above
        described and from the surface of lands other than the land
        above described, as reserved by Jackson O. Law, Jr., in deed
        recorded December 11, 1972 as Instrument No. 63.

4.      The fact that said land is within the boundaries of the City of
        Lynwood Redevelopment Plan Project Area "A" redevelopment area,
        as disclosed by a document,

   

-6-

*First American Title Company of Los Angeles*

|  |  |
|---|---|
| Recorded: | As Ordinance No. 945 on July 13, 1973 as Instrument No. 3249, in Book M4418 Page 963, Official Records; and as amended by Ordinance No. 960, recorded December 31, 1973 as Instrument No. 3933, in Book M4560 Page 301, Official Records, and further amended by Ordinance No. 1010, recorded December 16, 1976 as Instrument No. 4714. |

Said matter affects said land, except therefrom Lots 131 and 132; Lots 226, 227 and 228; Lots 309 to 324 inclusive; and Lots 428 to 433 inclusive, of Tract 2551.

5. Covenants, conditions and restrictions, (deleting therefrom any restrictions based on race, color, or creed), as provided in a document,

Recorded:     April 15, 1987 as Instrument No. 87-584539.

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat nor render invalid the lien of any mortgage or deed of trust made in good faith and for value.

6. Covenants, conditions and restrictions, (deleting therefrom any restrictions based on race, color, or creed), as provided in a document,

Recorded:     April 15, 1987 as Instrument No. 87-584540.

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat nor render invalid the lien of any mortgage or deed of trust made in good faith and for value.

7. A deed of trust to secure an indebtedness.

|  |  |
|---|---|
| Face Amount: | $ 1,320,000.00. |
| Trustor: | Lynwood Associates, a California general partnership. |
| Trustee: | Union Bank, a California corporation. |
| Beneficiary: | Union Bank, a California corporation. |
| Dated: | April 6, 1987. |
| Recorded: | April 15, 1987 as Instrument No. 87-584541. |

A document which modified said deed of trust as therein provided was

Recorded:     September 23, 1987 as Instrument No. 87-1523950.

8. An easement for purposes herein stated, and rights incidental thereto as provided in a document

|  |  |
|---|---|
| For: | public utilities. |
| Affects: | That portion of Sanborn Street (40 feet wide), as shown on Tract Map No. 2551 as recorded in Map |




# First American Title Company of Los Angeles

**FATCOLA**

Book 24 Pages 78 through 80, in the office of the recorder of Los Angeles County, bounded on the East by a line beginning at a point on the Northerly line of Lot 323 said Tract, located 25 feet Westerly, measured along said Northerly line, of the Northeast corner of said Lot 323; thence Northerly along a line parallel with and 25 feet Westerly, measured at right angles, of the Easterly line of Lots 324 and 226, and, prolongation thereof, of said tract, to the Northerly line of said Lot 226, said line being the Westerly right of way line of Long Beach Boulevard; and bound Westerly by a line beginning at the Northwest corner of Lot 446 of said tract; thence Northerly along the Northerly prolongation of the Westerly line of said Lot 446 to a point on the centerline of said Sanborn Avenue; thence Westerly along said centerline to a point of intersection with the Southerly prolongation of the Westerly line of Lot 250 of said tract; thence Northerly along Southerly prolongation to the Southwest corner of said Lot 250, said corner being on the Northerly right-of-way line of Sanborn Street and the Easterly right-of-way line of Peach Street (40 feet wide) as shown on said Tract No. 2551.

**Recorded:** April 20, 1987 as Instrument No. 87-604157.

9. An easement for purposes herein stated, and rights incidental thereto as provided in a document

**For:** public utilities.

**Affects:** That portion of Chester Street (50 feet wide) as shown on Tract No. 2551 as recorded in Map Book 24 Pages 78 through 80, in the office of the recorder of Los Angeles County, bounded on the North by the Easterly prolongation of the Northerly line of Lot 443 of said tract, of said line being the Southerly right-of-way line of Sanborn Avenue (40 feet wide); and bounded on the South by a line beginning at the Southwest corner of Lot 423 of said corner, said corner being on the Easterly right-of-way line of Chester Street; thence Westerly along the Westerly prolongation of the Southerly line of said Lot 423 to its point of intersection with the centerline of Chester Street; thence Northerly along said centerline to the point of intersection with the Easterly prolongation of the Southerly line of Lot 440 of said tract; thence Westerly along said Easterly prolongation to the Southeast corner of said Lot 440, said corner being on the Westerly





-8-

# First American Title Company of Los Angeles

right-of-way line of Chester Street.

Recorded:        April 20, 1987 as Instrument No. 87-604157.

10.   An easement for purposes herein stated, and rights incidental
thereto as provided in a document
For:             public utilities.
Affects:         That portion of Court Street (50 feet wide),
formerly known as Lynwood Place, as shown on
Tract No. 2551, as recorded in Map Book 24 Pages
78 through 80, in the office of the recorder of
Los Angeles County, bounded on the North by a
line being the Northerly prolongation of the
Easterly line of Lot 413 of said tract, said line
being the Westerly right-of-way line of Plaza
Street (40 feet wide), and bounded Southerly by a
line beginning at the Southeast corner of Lot 423
of said tract; thence Easterly along the Easterly
prolongation of the Southerly line of said Lot
423 to a point on the centerline of Court Street;
thence Northerly along said centerline to a point
of intersection with a line parallel to and 4.00
feet Southerly, measured at right angles, of the
Westerly prolongation of the Southerly line of
Lot 331 of said tract; thence Easterly along said
parallel line to the Westerly line of Lot 413 of
said tract, said line being the Easterly
right-of-way line of Court Street.
Recorded:        April 20, 1987 as Instrument No. 87-604157.

11.   An easement for purposes herein stated, and rights incidental
thereto as provided in a document
For:             public utilities.
Affects:         That portion of Plaza Street (40 feet wide), as
shown on Tract Map No. 2551, as recorded in Map
Book 24 Pages 78 through 80, in the office of the
recorder of Los Angeles County, bounded on the
North by the Westerly prolongation of the
Northerly line of Lot 325 of said tract, said
line being the Southerly right-of-way line of
Sanborn Avenue (40 feet wide) as shown on said
tract, and bounded on the South by a line
beginning at the Southwest corner of Lot 337 of
said tract, said corner being on the Easterly
right-of-way line of Plaza Street; thence
Westerly along the Westerly prolongation of the
Southerly line of said Lot 337 to its point of
intersection with the centerline of Plaza Street;
thence Northerly along said centerline 146 feet,
more or less, to a point on a line parallel with
and 4.00 feet Southerly, measured at right
angles, of the Westerly prolongation of the





-9-

## FATCOLA    *First American Title Company of Los Angeles*

Southerly line of Lot 331 of said tract; thence
Westerly along said line 20 feet, more or less,
to the Easterly line of Lot 413 of said tract,
said line being the Westerly right-of-way line of
Plaza Street.

Recorded:        April 20, 1987 as Instrument No. 87-604157.

12.  An easement for purposes herein stated, and rights incidental
     thereto as provided in a document
     For:          public utilities.
     Affects:      That portion of the first alley (16 feet wide)
                   West of Long Beach Boulevard as shown on Tract
                   No. 2551 as recorded in Map Book 24 Pages 78
                   through 80, in the office of the recorder of Los
                   Angeles County, bounded on the North by the
                   Southerly right-of-way line of Beechwood Avenue
                   (50 feet wide) as shown on said tract and bounded
                   on the South by the Westerly prolongation of the
                   Southerly line of Lot 312 of said tract.
     Recorded:      April 20, 1987 as Instrument No. 87-604157.

13.  An easement for purposes herein stated, and rights incidental
     thereto as provided in a document
     For:          utilities.
     Affects:      That portion of Sanborn Street (40 feet wide), as
                   shown on Tract Map No. 2551 as recorded in Map
                   Book 24 Pages 78 through 80, in the office of the
                   recorder of Los Angeles County, bounded on the
                   East by a line beginning at a point on the
                   Northerly line of Lot 323 said tract, located 25
                   feet Westerly, measured along said Northerly
                   line, of the Northeast corner of said Lot 323;
                   thence Northerly along a line parallel with and
                   25 feet Westerly, measured at right angles, of
                   the Easterly line of Lots 324 and 226, and
                   prolongation thereof, of said tract, to the
                   Northerly line of said Lot 226, said line being
                   the Westerly right-of-way line of Long Beach
                   Boulevard; and bound Westerly by the Southerly
                   prolongation of the Easterly line of Lot 261 of
                   said tract.

                   Also including that alley (16 feet wide) as shown
                   on said tract bounded on the North by the
                   Southerly line of Beechwood Avenue (50 feet wide)
                   as shown on said tract; bounded on the South by
                   the Northerly line Sanborn Street (40 feet wide)
                   as shown on said tract; bounded on the East by
                   the Westerly lines of Lot 226 through Lot 239;
                   and on the West by the Easterly line of Lots 240
                   and 261.





-10-

**FATCOLA**                    *First American Title Company of Los Angeles*

_____

Recorded:        April 20, 1987 as Instrument No. 87-604157.

14.   Matters which may be disclosed by inspection and/or survey of
said land or by inquiry of parties in possession thereof.

We will inform you as to whether CLTA Indorsement 100 can be
included in the policy when our inspection of the land or other
investigation has been completed.

15.   The  ALTA  Loan Policy to be issued after completion of
improvements  will include CLTA Indorsement 100, insofar as such
indorsement  relates to  matters shown in this report, provided
there exists at the time the ALTA Policy is issued,
(1) NO VIOLATION OF COVENANTS, CONDITIONS AND RESTRICTIONS,
(2) NO ENCROACHMENT OF ANY IMPROVEMENTS UPON EASEMENTS OR
ADJOINING LANDS.

MN/bh:mj
rr:rr





-11-





*First American Title Company of Los Angeles*

THIS MAP MAY OR MAY NOT BE A SURVEY OF THE LAND
DEPICTED HEREON. YOU SHOULD NOT RELY UPON IT FOR ANY
PURPOSE OTHER THAN ORIENTATION TO THE GENERAL LOCA-
TION OF THE PARCEL OR PARCELS DEPICTED. FIRST AMERICAN
EXPRESSLY DISCLAIMS ANY LIABILITY FOR ALLEGED LOSS OR
DAMAGE WHICH MAY RESULT FROM RELIANCE UPON THIS MAP



R 2/20/87
R 1/22/87

(1290-4[2]-09/30/86)

## SCHEDULE "D"

Attached to and forming a part of that certain Indenture of Lease
executed under date of __February 20_____, 1987 , by and between
LYNWOOD ASSOCIATES, a California general partnership, as Lessor, and
THRIFTY CORPORATION, as Lessee.

## A M E N D M E N T S

### 1.  ARTICLE 2, RENTAL:

(a)  Commencing on the date referred to in Paragraph 2.1 hereof and
for the next full one hundred twenty (120) calendar months of the term of this
Lease, ("First Period"), Lessee shall pay the sum of One Hundred Thirty-Three
Thousand Eight Hundred Forty-Eight Dollars ($133,848.00) for a full calendar
year during this period, payable in monthly installments of Eleven Thousand
One Hundred Fifty-Four Dollars ($11,154.00) in advance on or before the 1st
day of each month, as set forth in Article I.

(b)  Commencing on the first day following the last day of the
First Period, and continuing through the balance of the term of this Lease
including option periods (hereinafter referred to as the "Second Period"),
Lessee shall pay the sum of One Hundred Forty-Seven Thousand Two Hundred
Forty Dollars ($147,240.00) for each full calendar year during said period
and payable in monthly installments of Twelve Thousand Two Hundred Seventy
Dollars ($12,270.00) in advance on or before the 1st day of each full calendar
month during the Second Period.

(c)  In the event that the percentage rental computed as
provided in ARTICLE 2 of this Lease exceeds the sum of One Hundred
Thirty-Three Thousand Eight Hundred Forty-Eight Dollars ($133,848.00)
for any one full calendar year during the First Period, or exceeds the
sum of One Hundred Forty-Seven Thousand Two Hundred Forty Dollars
($147,240.00) for any one full calendar year during the Second Period,
such excess sum shall be paid annually by Lessee to Lessor before
March 20 of each year.  For periods of less than a full calendar year
or a full calendar month, each of said sums of One Hundred
Thirty-Three Thousand Eight Hundred Forty-Eight Dollars ($133,848.00),
One Hundred Forty-Seven Thousand Two Hundred Forty Dollars
($147,240.00), Eleven Thousand One Hundred Fifty-Four Dollars
($11,154.00), Twelve Thousand Two Hundred Seventy Dollars
($12,270.00), whichever may apply, shall be proportionately reduced
and the prorata rental to be paid computed by applying the fraction
constituting the number of months or portion thereof for which rental
is due and payable to the said appropriate sum.

### 2.  ARTICLE 5, USE OF PREMISES AND LESSOR'S PROPERTY, PARAGRAPH 5.3.:

(a)  It is understood and agreed that prior to the
commencement of the term hereof, Lessor shall, coincidentally with the
construction of the building on the herein Demised Premises construct
or cause to be constructed, a store building in this Shopping Center
and shall have entered into a lease with a supermarket of at least
0,000 ~~50,000~~ square feet in size for the opening of a retail or wholesale
supermarket business.

(b)  Commencing on that date on which the supermarket has
first opened its facility for business in this Shopping Center and

continuing during the term of this Lease, any provisions of this Lease to the contrary notwithstanding, it is agreed that commencing six (6) months after the said supermarket co-tenant shall cease to operate its store during the term of the Lease, provided Lessee is conducting its business while said co-tenant is not operating its store, Lessee's minimum annual rental obligation shall be modified to be three percent (3%) of the receipt from Gross Sales as defined in ARTICLE 2 of this Lease until Lessor obtains a substitute retail major tenant-user of at least 40,000 square feet, whereupon Lessee shall commence Minimum Annual Rent and Percentage Rent pursuant to this Lease.

(c)  If at any time during the term hereof, Lessee or its permitted assignees and sublessees do not continuously and uninterruptedly do business within the premises for a period of thirty (30) days, except when the premises are not open for business due to fires, earthquakes, floods, strikes, lockouts, labor disputes and governmental restrictions and except for periods when the premises are not open for business due to either improvements to or repair or reconstruction of the demised premises or preparation of the premises for a sub-let or assignment, Lessor may, by written notice inform Lessee that this Lease shall terminate effective thirty (30) days after Lessor gives such notice of its intent to terminate said Lease. Notwithstanding the above, within thirty (30) days after Lessee receives Lessor's notice to terminate this Lease, Lessee shall have the right to continue its business and this Lease shall continue.

3.  ARTICLE 9, DAMAGE OR DESTRUCTION.

9.7  In the event of an uninsured casualty in excess of twenty percent (20%) of the Premises, Lessor may elect to terminate this Lease, provided, however, if the cost of restoration exceeds the amount of proceeds received or to be received from the insurance required under Paragraph 10.4 by more than twenty percent (20%) of the full replacement cost of the Demised Premises, or if the Demised Premises are partially or totally destroyed from a risk not covered by the insurance described in Paragraph 10.4, and the cost of restoration exceeds twenty percent (20%) of the full replacement cost of the Demised Premises, Lessor shall give Lessee notice thereof within fifteen (15) days after determining such restoration cost, said notice to be accompanied by two bids showing in detail the costs of the required restoration and said full replacement cost.  Lessee shall have thirty (30) days thereafter within which to notify Lessor of its election to reimburse Lessor in the amount of such excess, and Lessor shall restore the Demised Premises.  After full reimbursement by Lessee to Lessor hereunder, Lessee shall have the right to withhold for its own use and account to the extent of such reimbursement any and all percentage rent becoming due to Lessor pursuant to Article 2.2 hereof.  In the event that Lessee does not elect to give such notice to Lessor, the Lease shall terminate.

In the event Lessor is required to restore the Demised Premises, the reconstruction shall be commenced by Lessor not later than sixty (60) days after the date of damage and pursued diligently to completion which is to be no later than one hundred eighty (180) days after commencement.  If restoration is not completed within one hundred eighty (180) days, Lessee may terminate this Lease.  If reconstruction is delayed due to Lessor's inability to secure building permits, labor or materials, or proceeds of the insurance required under Paragraph 10.4, and Lessor has made every reasonable effort to secure same, Lessor shall be granted such additional time as Lessor has been delayed by such cause, provided, however, Lessor shall persist in its efforts to start and complete the reconstruction and Lessor shall accomplish same as rapidly may be reasonably possible.

In the event of the termination of this Lease pursuant to the provisions of this Article, any advance rental or other advance payments made by Lessee to Lessor shall be prorated as of the termination date, with the unearned portion to be returned to Lessee

-2-

in cash; the insurance proceeds applicable to the building on the Demised Premises and other improvements constructed and paid for by Lessor shall be paid to Lessor; the insurance proceeds applicable to the trade fixtures and other personal property of Lessee shall be paid to Lessee.

4. ARTICLE 10, INSURANCE:

10.8  On written request of Lessor, the usual form of mortgage clause shall be attached to any fire or casualty insurance policy carried by the Lessee on the Demised Premises.

10.9  In the event Lessor or Lessor's first mortgagee or beneficiary deem it reasonably necessary to increase the amounts or limits of insurance required to be carried by Lessee hereunder, Lessor may reasonably increase said amounts or limits, and Lessee shall increase the amounts or limits of the insurance required to be carried by Lessee hereunder and shall provide Lessor with policies or certificates indicating the increased amounts or limits as provided herein.

5. ARTICLE 11, ASSIGNMENT AND SUBLETTING:

11.2  Provided, however, upon notice to Lessee from Lessor of Lessee's intent to assign or sublease, Lessor shall within thirty (30) days after its receipt of such notice of a proposed transfer from Lessee, (a) consent to such transfer; (b) sublease the Premises from Lessee on the same terms and conditions set forth herein; or (c) terminate this Lease, such termination to be effective thirty (30) days after receipt of such notice by Lessee.  No transfer of this Lease or agreement entered into with respect thereto, whether with or without Lessor's consent, shall relieve Lessee from liability under this Lease, except if Lessor terminates in its sole discretion this Lease and recaptures the Premises.  Lessor's election to recapture the Premises is not subject to a reasonable standard and is in Lessor's sole and absolute discretion.  Notwithstanding anything to the contrary set forth in this Section 11.2, if Lessor elects to recapture the Premises and thereby terminate the Lease, Lessee shall have ten (10) days after written notice thereof from Lessor to Lessee to withdraw Lessee's notice of intent to assign or sublease, whereupon Tenant's request shall be withdrawn and the Lease shall remain in full force and effect.

6. ARTICLE 20, MISCELLANEOUS PROVISIONS,

20.17  In the event of any sale, exchange or other conveyance of the Center or any portion or portions thereof by Lessor and an assignment by Lessor of this Lease, Lessor shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale, exchange or conveyance and assignment, so long as the transferee assumes all of the obligations and liabilities of the Lessor under the Lease by a valid writing, an executed copy of which will be furnished to Lessee. 20.18  Lessor may, at its election, from time to time, perform construction work on the Center or on the Building of which the Premises are a part.  Lessee acknowledges that such construction, if and when it may occur, may involve barricading, materials storage, noise, the presence of workmen and equipment, rearrangement of parking areas, roadways and lighting facilities, and other inconveniences typically associated with construction.  Lessee waives any claim or defense it may have against Lessor and any right of offset against or deductions from rent or any other sum payable under its Lease based upon interruption of or interference with Lessee's conduct of business or inconvenience to its customers caused by such construction, modification or expansion  for the first thirty calendar days of any such construction, modification or expansion.

-3-

20.19 ~~required to be paid pursuant to this Lease as rent or as additional~~
rent.  If such amounts or charges are not paid at the same provided in
this Lease, they shall nevertheless be collectible with the next
installment of Minimum Rent thereafter falling due, but nothing herein
contained shall be deemed to suspend or delay the payment of any
amount of money or charge at the time the same becomes due and payable
~~or to limit any other remedy of Lessor.~~  If Lessee shall fail
to pay, when the same is due and payable, any rent or other charge,
such unpaid amounts shall bear interest at the maximum lawful rate
from the date due to the date of payment.

20.20  The obligations of Lessor under this Lease do not
constitute personal obligations of the individual partners of the
partnership which is Lessor, and Lessee shall look solely to the real
estate that is the subject of this Lease and to no other assets of
Lessor for satisfaction of any liability in respect of this Lease and
will not seek recourse against the individual partners of the
partnerships which is Lessor herein, nor against any of their personal
assets for such satisfaction.

Recorded at the request o.
Thrifty Corporation and
to be mailed after recording to:

THRIFTY CORPORATION
Attn: Real Estate Department
P.O. Box 92333
Los Angeles, California 90009

# SCHEDULE E

### NON-DISTURBANCE, ATTORNMENT
### AND SUBORDINATION AGREEMENT

THRIFTY /CORPORATION, a California corporation, ("Lessee") has entered into a lease (the "Lease") dated ...
February 20, 1987.... with

LYNWOOD ASSOCIATES, a California general partnership

("Lessor") of the premises commonly known as ...West side of Long Beach Blvd., at Imperial Highway, ..., and California, more particularly described in Schedule A attached hereto (the "Demised Premises").

("Beneficiary") is the holder of the beneficial interest under a Deed of Trust dated ....................................... recorded in the Official Records in the County of ...Los Angeles........... State of ...California........... as Instrument No. .................... in Book No. .................... Page .................... on .................................... on said Demised Premises (the "Deed of Trust"). Lessee and Beneficiary desire hereby to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of the following non-disturbance, attornment and subordination agreements.

NOW, THEREFORE, the parties hereto covenant and agree as follows:

1. Provided the Lease is in full force and effect and there are no defaults by Lessee in the payment of rent thereunder, then:

(a) The right of possession of Lessee to the Demised Premises and Lessee's rights arising out of the Lease shall not be affected or disturbed by Beneficiary in the exercise of any of its rights under the Deed of Trust or the Note secured thereby.

(b) Lessee shall not be named in any foreclosure action related to the Deed of Trust.

(c) In the event that Beneficiary or any other person acquires title to the Demised Premises pursuant to the exercise of any remedy provided for in the Deed of Trust or under the laws of the state in which the Demised Premises are located, the Lease shall not be terminated or affected by said foreclosure or sale resulting from any such proceeding; and Beneficiary hereby covenants that any sale by it of the Demised Premises pursuant to the exercise of any rights and remedies under the Deed of Trust or otherwise, shall be made subject to the Lease and the rights of Lessee thereunder; and Lessee covenants and agrees to attorn to Beneficiary or such other person as its new lessor; and the Lease shall continue in full force and effect as a direct lease between Lessee and Beneficiary or such other person, as Lessor, upon all the terms, covenants, conditions and agreements set forth in the Lease between Lessee and Lessor. However, in no event shall Beneficiary or such person be:

(i) liable for any act or omission of Lessor, except for those acts or omissions for which Lessee has given Beneficiary notice thereof prior to said foreclosure or sale;

(ii) bound by any payment of rent made by Lessee for periods extending beyond the date of said foreclosure or sale except for those rental payments provided for under the Lease;

(iii) bound by any amendment to the Lease made subsequent to the date of this Agreement without the written consent of Beneficiary, which consent shall not be unreasonably withheld or withheld for the purpose of effectuating a change in terms to the Deed of Trust. Beneficiary hereby consents to any such subsequent amendment if the primary purpose of such amendment is to provide for the expansion or remodeling of the Demised Premises or an extension of the primary term or option periods, so long as there is no decrease in the minimum rent payable under the Lease.

Notwithstanding the foregoing, the rights and obligations of Lessee and Beneficiary, respectively, upon such attornment shall, to the extent of the then remaining balance of the term of the Lease, including any renewals

E-1

or extensions thereof, be the same as now set forth in the Lease and by this reference the Lease is incorporated herein as part of this Agreement.

2. The Lease shall be subject and subordinate to the lien of the Deed of Trust and to all the terms, conditions and provisions thereof, to all advances made or to be made thereunder, and to any renewals, extensions, modifications or replacements thereof, not inconsistent with Paragraph 1 of this Agreement.

3. Any notices or other communication required or desired to be given by one party to the other party hereto shall be given in writing by mailing the same by certified United States Mail, return receipt requested, postage prepaid, addressed as follows:

> To Lessee: Thrifty Corporation
> 3424 Wilshire Boulevard
> Los Angeles, California 90010
> Attention: President or Secretary

> To Beneficiary:

or to such other addresses as the respective parties may from time to time designate by notice given as provided in this Agreement.

4. This Agreement may not be modified other than by an agreement in writing signed by the parties hereto or by their respective successors in interest.

5. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

6. The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of either party hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of this ................. day of .................., 19........ .

By: _____
(Title)

By: _____
(Title)

BENEFICIARY

THRIFTY CORPORATION, a
California corporation

By: _____
Chairman

By: _____
Sr. Vice President

LESSEE

1-2

Legal Description

SCHEDULE F

LESSEE'S EXTERIOR SIGNS



# SCHEDULE A

### DESCRIPTION OF PROPERTY AND PLOT PLAN

Attached to and forming a part of that certain Lease and Memorandum of Lease executed under date of ........
2/20/87........ by and between

LYNWOOD ASSOCIATES

as Lessor, and THRIFTY CORPORATION, as Lessee.

1. **Lessor's Property.** The Demised Premises are a portion of Lessor's entire property, situated in the City of .........Lynwood........................................... County of ...Los Angeles.......................................
State of .....California............................ , and now commonly known as ..West..side..of..Long..Beach.........
Blvd., at Imperial Highway...................................................................................................................
........:

Such property, herein referred to as "Lessor's Property", means the entire property within the outer property limits shown on the Plot Plan initialed by the parties hereto, dated ...2/20/87............., attached hereto, and made a part hereof ("Plot Plan"). The legal description of Lessor's Property is set forth in Paragraph 10 of this Schedule A.

2. **Demised Premises.** Lessor's Property provides a site for a store building in the location designated "Thrifty" on the Plot Plan. Such building ...... is now thereon, or .x. is to be erected pursuant to Schedule B hereof by Lessor for Lessee, having an approximate width of one hundred fifty-six feet (156') with an approximate depth of one hundred twenty feet (120'), plus a rear appendage having a width of approximately thirty-two feet (32') and a depth of approximately twelve feet six inches (12'6"), all located as shown on the Plot Plan.

Said building site, building, improvements, and appurtenances, and fixtures and equipment owned by the Lessor, now or hereafter located thereon, are collectively referred to in this Lease as the "Premises" or "Demised Premises".

~~3. Expansion Area. The Demised Premises may be expanded to include an expansion area adjacent~~ thereto and to the rear and ................. thereof having a width of ................ and running ~~to a depth of .......~~ ............ identified as "Possible Future Thrifty Expansion Area" ~~on the Plot Plan~~ together with any building improvements hereafter erected by Lessee on said ~~Possible Future Thrifty Expansion Area. Said expansion of~~ the Demised Premises shall ~~take place automatically~~ upon Lessee's construction of building improvements expanding its building on to all or part of said Possible Future Thrifty Expansion Area. Said Possible Future ~~Thrifty Expansion Area is hereby reserved exclusively for Lessee's expansion of such building.~~

4. **Use of Lessor's Property.** Lessor covenants that Lessor's Property shall be used during the term hereof for the general purpose of a retail shopping center. Lessor covenants that it will not permit the operation or occupancy of any of the following businesses or facilities on Lessor's Property: (a) entertainment, athletic or recreational facility, including but not limited to, a bowling alley, skating rink, health club, theater, video or pinball game operation; (b) educational, vocational or religious facility, including but not limited to, a church, beauty school or other institution for vocational training; (c) professional and business offices, if an aggregate total in excess of ../** ....... square feet including but not limited to, any governmental office or operation; (d) industrial facility, including but not limited to, manufacturing and warehousing facility. Lessor covenants that it will, at its own cost and expense, enforce the foregoing restrictions.

5. **Common Area Easements.** Lessee, its agents, employees, patrons and invitees, in common with Lessor and all other tenants of portions of Lessor's Property and their respective agents, employees, patrons, and invitees shall have and are hereby granted, during the entire term of this Lease, the ~~free, uninterrupted and~~ non-exclusive use of the Common Areas of Lessor's Property ("Common Areas"), as hereinafter defined, which use by all users shall be for the purposes of ingress, egress, service utilities, and parking, and which parking area shall consist of ~~5 to 1,000 square feet of Building Area parking ratio~~ as shown on the Plot Plan. The Common Areas shall be defined as the sidewalks, driveways, roadways, parking areas, non-enclosed mall areas, landscaped areas and all other areas of Lessor's Property except those areas designated as "Building Area" on the Plot Plan. Lessor may nor use, nor permit any other person to use, the Common Areas for the benefit of any property, adjoining or otherwise, other than Lessor's Property as defined herein. Except as provided in Paragraph 6.2. of this Lease, Lessee shall have no obligation or liability whatsoever in connection with the ownership, maintenance, or management of the Common Areas, and Lessor shall manage, operate and maintain all such Common Areas, or cause the same to be done on its behalf, pursuant to the terms of this Lease.

\* within one hundred (100) feet from the front door of the Demised Premises, or
\*\* five thousand (5,000) square feet of the Building Area

A-1

THE LEASE. 601

6. Ingress and Egress. Lessor shall not vary or permit to be varied the designated means of ingress and egress from that shown on the Plot Plan. Lessor will not alter or permit to be altered existing street signs, median cuts, traffic signals or the parking layout except by written amendment to this Lease, duly executed by the parties hereto.

7. Plot Plan. Lessor covenants that no changes shall be made to the building area and/or to the parking and other Common Areas from that shown on the Plot Plan and that no buildings, kiosks or building-type structures may be built except within the building areas or areas for building designated thereon, except by written amendment to this Lease, duly executed by the parties hereto.

8. Covenants Running with the Land. All of the covenants of Lessor contained in this Lease shall be covenants running with the land pursuant to applicable law. It is expressly agreed that each covenant to do or refrain from doing some act on Lessor's Property or any part thereof (a) is for the benefit of the Demised Premises and each person having any leasehold interest therein derived through Lessee, and (b) shall be binding upon each successive owner, during his ownership, of any portion of Lessor's Property and upon each person having any interest therein derived through any owner of Lessor's Property.

9. Use of Demised Premises. The Demised Premises may be used by Lessee for the purpose of conducting any lawful business. Lessee is hereby given the exclusive right and privilege on Lessor's Property of operating a drug store and/or of handling and selling any and all items of merchandise which, by law, must be sold by, or in the presence of, a licensed pharmacist. Lessee is also given the exclusive right and privilege of handling and selling beers, wines and distilled spirits for off-premises consumption. Lessor covenants with respect to said exclusive rights and privileges not to permit any storeroom or other portion of Lessor's Property to be used or occupied for the purpose of selling or handling any of the items above mentioned. Provided, however, that in no event shall Lessee's exclusive provision to operate a drug store be construed to prohibit the super food market or grocery store in the said Shopping Center from handling and selling any of the items it customarily handles and sells.

10. Legal Description of Lessor's Property.

LAND SITUATED IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

That portion of Tract No. 2551, in the City of Lynwood, County of Los Angeles, State of California, according to a map thereof recorded in Book 24 pages 78 to 80 inclusive of Maps, records of said County, together with those portions of Sanborn Avenue, Peach Street, Court Street, Chester Street, Plaza Street, Long Beach Boulevard, and the unnamed alley lying within said tract, all more particularly described as follows:

BEGINNING at the centerline intersection of Long Beach Boulevard originally 80 feet wide, with Beechwood Avenue 50 feet wide, as shown on said map; thence South 14° 36' 19" East along said centerline of Long Beach Boulevard 715.17 feet; thence South 75° 23' 41" West, at right angles to said centerline 65.00 feet to a point of intersection in the Northerly line of Lot 312 in said Tract, with the Northwesterly line of that particular parcel of land acquired by the State of California for the proposed "Century Freeway" and shown on a State of California Division of Highways right-of-way map No. F1150-6; thence South 02° 00' 07" West along said Northwesterly line 26.09 feet to a point in the Northerly line of Lot 311 in said Tract; thence South 75° 23' 53" West along said last mentioned Northerly line, the Northerly line of Lot 338 in said tract and the Westerly prolongation thereof, 203.56 feet to a point in the centerline of Plaza Street, 40 feet wide as shown on said tract; thence North 14° 35' 48" West along said centerline 130.00 feet; thence South 75° 23' 41" West, at right angles to said centerline of Long Beach Boulevard, 20.00 feet to a point in the Easterly line of Lot 413 in said tract; thence North 14° 35' 48" West along said Easterly line, 21.81 feet to the most Northerly corner of said Lot 413; thence South

A-2

28° 51' 11" West along the Westerly line of said Lot 413 a
distance of 30.04 feet; thence leaving said Westerly line South
75° 23' 41" West, at right angles to said centerline of Long
Beach Boulevard, 34.44 feet to a point in the centerline of Court
Street 50 feet wide as shown on said tract; thence South 28° 51'
11" West, along said centerline 94.03 feet to the beginning of a
tangent curve concave Northwesterly and having a radius of 519.71
feet; thence Southwesterly along said curve through a central
angle of 08° 41' 10" an arc length of 78.79 feet; thence North
52° 27' 02" West along a radial Line to said curve, 25.00 feet to
the Southeast corner of Lot 424 of said tract; thence North 52°
24' 33" West along the Easterly line of said lot, 100.03 feet to
the Northeast corner thereof, said Northeast corner also being in
the Southeasterly line of Lot B, 18.5 feet wide, as shown on said
tract; thence North 53° 12' 47" West 43.48 feet to a point in the
curved centerline of Chester Street, 50 feet wide as shown on
said tract, said curve having a radius of 351.21 feet, with a
radial line to said point being South 52° 22' 05" East; thence
Northeasterly along said curve through a central angle of 08° 46'
07" an arc length of 53.75 feet to a point of tangency in said
centerline, said point also being the intersection with the
Southeasterly prolongation of the Northeasterly line of Lot 439
in said tract; thence North 61° 08' 12" West along said
Northeasterly line and said prolongation thereof, 168.09 feet to
an angle point therein; thence North 84° 10'24" West along the
most Northerly line thereof 67.21 feet to the most Westerly
corner thereof also being the Southeast corner of Lot 447 in said
tract; thence North 05° 49' 36" East along the Easterly line of
said Lot 447 and the Northerly prolongation thereof, 170.00 feet
to a point in the centerline of Sanborn Avenue, 40 feet wide as
shown of said map; thence North 84° 10' 24" West along said
centerline, 166.15 feet to the intersection with the centerline
of Peach Street, 40 feet wide as shown on said map; thence North
17° 59' 42" East along said last mentioned centerline, 353.12
feet to the intersection with said centerline of Beechwood
Avenue; thence South 84° 12' 40" East along said last mentioned
centerline, 261.79 feet to an angle point therein; thence North
75° 25' 12" East along said centerline, 193.75 feet to a point of
intersection with the Southeasterly prolongation of the Easterly
line of Lot 130 in said tract; thence North 14° 36' 19" West
parallel with said centerline of Long Beach Boulevard, 175.00
feet to the Northeasterly corner of said Lot 130 also being the
Southwesterly corner of Lot 134 in said tract; thence North 75°
25' 12" East along the Southeasterly line of said Lot 134 and the
Northeasterly prolongation thereof, 190.00 feet to a point in
said centerline of Long Beach Boulevard; thence South 14° 36' 19"
East along said centerline 175.00 feet to the POINT OF BEGINNING.

A-3



A-4

STATE OF CALIFORNIA )
COUNTY OF _____ ) SS.

On this _____ day of_____, 19____, before me, _____
_____, a Notary Public in and for said county and state, personally appeared
_____ and _____ known to me to be
the persons whose names are subscribed to the within instrument and acknowledged to me that they executed
the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

_____
Notary Public in and for said
County and State

STATE OF CALIFORNIA )
COUNTY OF _____ ) SS.

On this _____ day of_____, 19____, before me, _____
_____, a Notary Public in and for said county and state, personally appeared
_____
_____
known to me to be _____ of the partners of the partnership that executed the within instrument, and
acknowledged to me that such partnership executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

_____
Notary Public in and for said
County and State

STATE OF CALIFORNIA )
COUNTY OF Los Angeles ) SS.

On this 27th day of April, 1988, before me, Cathy
Hampson, a Notary Public in and for said county and state, personally appeared
Leonard H. Straus known to me to be the Chairman-President
and Linda Breen known to me to be the AVP and Asst. Secretary
of THRIFTY CORPORATION, the corporation that executed the within instrument, known to me to be
the persons who executed the within instrument, on behalf of the corporation herein named, and acknowledged to
me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

OFFICIAL SEAL
CATHY HAMPSON
NOTARY PUBLIC — CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires Feb. 28, 1992

Cathy Hampson
_____
Notary Public in and for said
County and State

STATE OF CALIFORNIA )
COUNTY OF _____ ) SS.

On this _____ day of_____, 19____, before me, _____
_____, a Notary Public in and for said county and state, personally appeared
_____ known to me to be the _____ President
and _____ known to me to be the _____ Secretary
of _____ the corporation that executed the within instrument,
known to me to be the persons who executed the within instruments, on behalf of the corporation
herein named, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

_____
Notary Public in and for said
County and State