

SIDLEY AUSTIN LLP                +1 312 853 7438
ONE SOUTH DEARBORN STREET        DTWOMEY@SIDLEY.COM
CHICAGO, ILLINOIS  60603
+1 312 853-7000
+1 312 853 7036 FAX

August 13, 2025

**Via CM/ECF Filing**

The Honorable Michael B. Kaplan
United States Bankruptcy Court Judge
United States Bankruptcy Court for the District of New Jersey
402 East State Street
Trenton, NJ 08608

  Re: *In re New Rite Aid, LLC, et al.*, Case No. 25-14861 (MBK)

Judge Kaplan:

   We write in response to the letter, dated August 12, 2025 [Docket No. 1860] (the "Letter"), filed by the debtors in the above-referenced chapter 11 cases (collectively, the "Debtors"), regarding the *Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Docket No. 655] (the "Motion to Compel") filed by McKesson Corporation ("McKesson") on June 2, 2025.[1]

   McKesson respectfully submits that the Court should deny the Debtors' improper effort to adjourn the upcoming Hearing on the Motion to Compel. To justify their extraordinary request, the Debtors rely upon blatant mischaracterizations of the Stipulation so-ordered by this Court over two months ago. The Participating Parties were well aware of other potential claims and causes of action at the time they entered into the Stipulation, including the claims set forth in the Debtors' recently-filed Complaint. Yet they nevertheless agreed to limit the questions to be determined in accordance with the Schedule set forth in the Stipulation to two issues: (i) whether the May 5 Wire was a pre-petition payment; and (ii) if so, whether such payment was a preferential payment that could be recovered by the Debtors. The Debtors' request to consolidate these questions with their newly-filed Complaint would completely eviscerate the Stipulation. Their request should be denied, and the Hearing should go forward next week as scheduled.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Letter, the Motion to Compel, or the *Stipulation and Agreed Order Between Debtors, DIP Agent, the Official Committee of Unsecured Creditors and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection With the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 672] (the "Stipulation"), as applicable. For the Court's convenience, the Stipulation is attached hereto as **Exhibit A**.



The Honorable Michael B. Kaplan
August 13, 2025
Page 2

**The Motion to Compel and the Adversary Proceeding**

The Stipulation reflects a carefully negotiated agreement among the Debtors, the DIP Agent (on behalf of itself and the other DIP Secured Parties), the Committee, and McKesson, in which the Participating Parties specified exactly which issues regarding the May 5 Wire would be addressed and the timing for resolution of those issues. Despite the Debtors' arguments otherwise, McKesson is confident the Court will readily conclude that the payment of $49.7 million made by Rite Aid Hdqtrs. Corp. prior to its filing of its bankruptcy petition was one made in the ordinary course in a manner consistent with tens of millions of dollars of similar routine payments made throughout the entirety of the Supply Agreement. *See, e.g.*, Liebman Dep. Tr. 33:5–35:8 (detailing the 10-day payment terms), 82:15–20 (confirming the Debtors' lenders understood the May 5 Wire to have been "part of the normal 10-day payment cycle"), 93:5–94:5 (detailing the 10-day payment terms), 94:13–25 (confirming that prior to the bankruptcy, there were no instances where an invoice was not paid on 10-day terms), 123:6–21 (admitting the Debtors and lenders understood the May 5 Wire to be part of the normal 10-day payment cycle).[2]

The Letter disingenuously states that the Debtors identified a potential preference cause of action for the $49.7 million after entry into the Stipulation. *See* Letter at 2. But the Participating Parties were fully aware of the potential preference claim at the time of entry into the Stipulation and provided for determination of that claim pursuant to the Stipulation:

> The Debtors, the DIP Agent and the Committee agree that the Debtors shall promptly pay, and the DIP Agent, the DIP Lenders and the Committee shall permit such prompt payment of, the May 5 Wire Amount in full in cash if the Court determines that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer (both of which shall be addressed pursuant to the briefing schedule set forth in paragraph 1 of this Stipulation).

Stipulation ¶ 6.

Indeed, the Stipulation repeatedly specified that McKesson would receive prompt payment of the May 5 Wire Amount if the Court determined that the May 5 Wire was a pre-petition payment

---

[2] Contrary to the Debtors' assertions, the May 5 Wire is an ordinary course payment. The May 5 Wire—like every payment before it for goods delivered under the Supply Agreement—was paid on 10-day terms, and any change in the accounts receivable cap had no impact on the Debtors' pre-petition obligation to make that payment. *See* Liebman Dep. Tr. 50:4–23 (agreeing whether Rite Aid was under or above the cap did not affect when payments were due and that the witness did not state in his declaration that the change to the cap had any impact on the May 5 Wire). The Debtors' notion that the May 5 Wire was a prepayment is without merit, as discovery has shown, including that the Debtors ***never*** told McKesson about their plans to file for bankruptcy or to treat the May 5 Wire as anything but on ordinary course payment. *See* Liebman Dep. Tr. 124:10–15. Excerpts of the Lieman Dep. Tr. (the Debtors' representative) are attached hereto as **Exhibit B**.

# SIDLEY

The Honorable Michael B. Kaplan
August 13, 2025
Page 3

and not recoverable as a preferential transfer. *See, e.g.*, Stipulation Recitals, ¶¶ 2, 6. Accordingly, the Stipulation is a compromise and conscious decision by the Participating Parties to limit the scope of potential claims covered therein and ***not include*** other potential claims. McKesson would not have agreed to the Stipulation without this provision.

The Debtors also were aware of the other claims set forth in their Complaint at the time of entry into the Stipulation. These were not recently-discovered potential claims as alleged in the Letter; rather, in advance of and during a meet-and-confer on June 12, 2025—the week following entry of the Stipulation—the Debtors presented McKesson and other parties a detailed analysis of several alleged causes of action, including those now the subject of the Adversary Proceeding showing all too well they were aware of those claims at the time the Stipulation was finalized. The Debtors made a conscious and tactical decision to enter into the Stipulation rather than, for example, refusing to do so and filing their Complaint months ago. They should not now be permitted to walk away from that agreement months later.

The Debtors' suggestion that the Participating Parties reserved all rights with respect to the Schedule laid out in the Stipulation also is inaccurate and misleading. *See* Letter at 2. The Stipulation is unambiguous that the Participating Parties may not unilaterally seek to change the dates and deadlines in the Stipulation: "[n]othing in this Stipulation shall preclude (i) any party in interest ***other than*** (except as mutually agreed between the Participating Parties) ***the Participating Parties from raising a formal objection to the dates and deadlines set forth in the Schedule or to the Motion to Compel*** . . . ." Stipulation ¶ 8 (emphasis added). Moreover, the Stipulation's reservation of rights does not extend to rights compromised as part of the Stipulation itself (such as the dates and deadlines): "***[e]xcept as provided herein***, all rights of each of the Participating Parties are hereby reserved." Stipulation ¶ 9 (emphasis added). And finally, the Stipulation is clear that the preference issue in respect of the May 5 Wire is to be adjudicated pursuant to the Schedule set forth in the Stipulation: "the Debtors shall promptly pay . . . if the Court determines that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer ***(both of which shall be addressed pursuant to the briefing schedule set forth in paragraph 1 of this Stipulation)***." Stipulation ¶ 6 (emphasis added). The Debtors cannot override this provision by attempting to include this same preference issue in their Complaint and arguing that it is no longer subject to the Stipulation.

McKesson has relied upon the Stipulation and will be severely prejudiced if the Stipulation is not enforced. McKesson would have been well within its rights to file the Motion to Compel in the early days of the Debtors' chapter 11 cases without any agreement relating to process or timing and proceed with its efforts to collect on amounts owed and entitled to administrative priority. Instead, McKesson engaged with other key stakeholders and reached agreement with respect to the scope and timeline for resolution relating to the dispute. In fact, McKesson provided an initial draft of the Stipulation for the Debtors' review on Friday, May 9, 2025—over three months ago and only four days after the Petition Date. After weeks of negotiation, the Participating Parties

# SIDLEY

The Honorable Michael B. Kaplan
August 13, 2025
Page 4

filed the Stipulation with the Court on June 2, 2025, and the Court entered the Stipulation on June 3, 2025. Since then, the Participating Parties have operated under the terms of the Stipulation, including multiple extensions mutually agreed upon by the Participating Parties. Allowing the Debtors to draw out the Motion to be litigated alongside their Complaint will cause material and substantial delays and undermine the very purpose of the Stipulation to resolve the May 5 Wire issues promptly. Doing so will frustrate McKesson's ability to compel payment of its administrative claim, punish McKesson's good-faith compliance with the Schedule, and contravene the agreed-upon and Court-approved Stipulation. By contrast, the Debtors will not be prejudiced by enforcement of the Stipulation. As the Debtors themselves note, the Participating Parties recognized at the time of the Stipulation that the Debtors may pursue other claims against McKesson. *See* Letter at 2. Therefore, separate pursuit of the claims in their Complaint (and McKesson's potential counterclaims) will not prejudice the parties.[3]

### Discovery

McKesson complied with the Debtors' lawful discovery requests in accordance with the Stipulation. McKesson served the Debtors with the *Notice of Deposition of Debtors* (the "McKesson 30(b)(6) Notice") on July 25, 2025. The Debtors served McKesson with the *Notice of Deposition of McKesson Corporation Pursuant to Federal Rule of Civil Procedure 30(b)(6)* (the "Debtors' 30(b)(6) Notice")[4] on July 28, 2025. As the Debtors note in their Letter, McKesson raised a number of objections to Debtors' 30(b)(6) Notice, but not to Topic 8, which relates to "McKesson's application of rebates and credits due to Rite Aid under the Supply Agreement (including, without limitation, section 3 and its subsections), including, without limitation, any actual or contemplated application of those rebates and credits to reduce Rite Aid's balance under the Supply Agreement." Ex. C Topic No. 8. McKesson did not object at the time because questions about rebates and credits **that were limited to the May 5 Wire** at issue would have been within the scope of the Stipulation and were fair game.

McKesson did timely object to Topic No. 8 when it became clear Debtors sought to exceed the scope of the Stipulation. *Cf.* Letter at 3. The Debtors' intention to do so only surfaced when Debtors filed their Opposition to the Motion to Compel on Friday, August 1, 2025 [Docket Nos. 1739, 1758], **after** McKesson's initial objections and on the eve of the deposition scheduled for Monday, August 4, 2025. Accordingly, at the outset of the Bowers Deposition (McKesson's representative), counsel for McKesson objected on the record to any questions about "post-petition rebates and credits, which I think form the basis of a large percentage of your opposition brief."

---

[3] In addition, prompt adjudication of the May 5 Wire questions as contemplated by the Stipulation may reduce costs to the Debtors' estates. If McKesson is successful with respect to the Motion to Compel, the Debtors' prompt payment will stop the ongoing accrual of contractual interest at 1% per month on $49.7 million for goods delivered on May 6–7, 2025.

[4] A copy of the Debtors' 30(b)(6) Notice is attached hereto as **Exhibit C**.

# SIDLEY

The Honorable Michael B. Kaplan
August 13, 2025
Page 5

Bowers Dep. Tr. 10:12–24.[5] In fact, McKesson's representative ***did*** testify to issues relating to rebates and credits generally that were in-bounds. *See* Bowers Dep. Tr. 266:15–268:5. However, as indicated at the outset, when the Debtors attempted to ask about ***post-petition rebates and credits***, counsel for McKesson reiterated the objection to Topic No. 8 and refused to allow questions so clearly beyond the well-defined scope of the Stipulation. Bowers Dep. Tr. 268:14–269:3.

Debtors are also wrong that McKesson should have sought a protective order to preclude inquiry on the topic of post-petition rebate and credits. The Stipulation—so ordered by the Court—already defined the scope of the matters to be considered in connection with the litigation. As such, if the Debtors wanted to ***expand*** the scope of the so-ordered Stipulation, it was incumbent upon them to do so. Under these circumstances, McKesson was well within its rights to enforce the scope of the so-ordered Stipulation at the Bowers Deposition. *See, e.g.*, Fed. R. Civ. P. 30(c)(2) (party may instruct a deponent not to answer "to enforce a limitation ordered by the court"); *In re 28 U.S.C. § 1782*, 249 F.R.D. 96, 103–04 (S.D.N.Y. 2008) (the deponent "cannot be compelled to answer" questions that were "not within the permissible scope of the deposition as set forth in the Agreed Order"); *Oy v. Tegus*, Civil Action No. 23-1030-MN, 2024 WL 2106560, at *1 (D. Del. Apr. 9, 2024) (court denied motion to compel testimony to the extent deposition topics asked for information beyond the parties' stipulation); *Equal Employment Opportunity Comm'n v. Smokin' Joe's Tobacco Shop, Inc.*, Civil Action No. 06-01758, 2007 WL 2728926, at *1 (E.D. Pa. Sept. 18, 2007) (finding witness's refusal to answer questions, at the direction of counsel, to be proper where questions exceeded the stipulated scope of Fed. R. Civ. P. 30(b)(6) topics). The Debtors' reliance on cases without any comparable agreed-upon limitation on the scope of a dispute (and therefore discovery about it), *see* Letter at 3, does nothing to refute this position.

For the foregoing reasons, McKesson respectfully requests that the Court enforce the terms of the Stipulation and adjudicate the dispute regarding the May 5 Wire separately from the new claims raised by the Debtors in their Complaint.

Respectfully submitted,

Sidley Austin LLP

*/s/ Dennis M. Twomey*
Dennis M. Twomey

cc:      All counsel of record (via CM/ECF)

---

[5] Excerpts of the Bowers Dep. Tr. (McKesson's representative) are attached hereto as **Exhibit D**.

## Exhibit A

**Stipulation**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>                             Debtors. [1] |

Order Filed on June 3, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey

Chapter 11

Case No. 25-14861 (MBK)

(Jointly Administered)


## STIPULATION AND AGREED ORDER
## BETWEEN DEBTORS, DIP AGENT, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND MCKESSON CORPORATION (I) SCHEDULING CERTAIN DATES AND DEADLINES IN CONNECTION WITH THE MOTION OF MCKESSON CORPORATION FOR ENTRY OF AN ORDER (A) ALLOWING ADMINISTRATIVE EXPENSE CLAIM, (B) COMPELLING IMMEDIATE PAYMENT THEREOF, AND (C) GRANTING RELATED RELIEF, (II) ESTABLISHING CERTAIN PROTOCOLS, AND (III) GRANTING RELATED RELIEF


The relief set forth on the following pages, numbered three (3) through eight (8) is

**ORDERED**.


**DATED: June 3, 2025**

*Michael B. Kaplan*

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**PAUL, WEISS, RIFKIND, WHARTON**
**& GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

| Debtors: | NEW RITE AID, LLC, *et al.* |
|---|---|
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

This Stipulation and Agreed Order (the "Stipulation") is entered into by and among (a) the above-captioned debtors and debtors in possession (collectively, the "Debtors"), (b) Bank of America, N.A., in its capacity as DIP Agent,[2] on behalf of itself and the other DIP Secured Parties, (c) the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Committee"), and (d) McKesson Corporation ("McKesson") (each a "Participating Party" and collectively, the "Participating Parties").  The Participating Parties hereby stipulate and agree as follows:

WHEREAS, on May 5, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court") commencing these chapter 11 cases .

WHEREAS, McKesson and Debtor Rite Aid Corporation ("Rite Aid") are parties to that certain *Supply Agreement*, dated as of August 30, 2024 (as amended, supplemented, restated, amended and restated, supplemented, and otherwise modified from time to time, the "Supply Agreement").

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 143] (the "Interim DIP Order").

(Page | 4)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

WHEREAS, a wire payment was made by Rite Aid Hdqtrs. Corp., an Affiliate Guarantor of Rite Aid under and as defined in the Supply Agreement, to McKesson, in the amount of $49,674,910.00 (the "May 5 Wire Amount") on May 5, 2025 (the "May 5 Wire") prior to Rite Aid Hdqtrs. Corp.'s filing its voluntary bankruptcy petition in these chapter 11 cases.

WHEREAS, the Participating Parties dispute whether the May 5 Wire was a pre-petition payment or whether the May 5 Wire constituted an advance payment for initial post-petition deliveries made by McKesson (the "Initial Post-Petition Deliveries"), as well as whether the May 5 Wire is avoidable and recoverable as a preferential transfer.

WHEREAS, the Participating Parties have agreed that post-petition, McKesson shall be paid by cash, in advance, for all future deliveries.

WHEREAS, McKesson asserts that it currently has the right to suspend shipping of products to the Debtors and/or pursue termination of the Supply Agreement based on (without limitation) the Debtors' failure to timely pay for the Initial Post-Petition Deliveries, but is willing to pursue an orderly resolution of the Participating Parties' dispute regarding the May 5 Wire and the Initial Post-Petition Deliveries so long as such dispute can be timely adjudicated without undue risk to McKesson's ability to recover payment of the May 5 Wire Amount if McKesson prevails.

WHEREAS, the Participating Parties have agreed that if the Court determines that (i) the May 5 Wire was a pre-petition payment and (ii) it is not recoverable as a preferential transfer,

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

payment for the Initial Post-Petition Deliveries in the amount of May 5 Wire Amount remains due and owing to McKesson.

WHEREAS, the Debtors, the DIP Agent and the Committee agree that the Debtors shall promptly pay, and the DIP Agent, DIP Lenders and Committee shall permit such prompt payment of, the May 5 Wire Amount in full in cash if the Court determines that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer.

WHEREAS, the Participating Parties desire that the Court determine their rights and obligations with respect to the May 5 Wire and the Initial Post-Petition Deliveries.

WHEREAS, the Participating Parties have agreed, subject to approval of the Court, to the litigation schedule as set forth in paragraph 1 below to resolve their dispute regarding the May 5 Wire and the Initial Post-Petition Deliveries.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, AND UPON APPROVAL BY THE COURT OF THIS STIPULATION, IT IS SO ORDERED THAT:**

1.    The following dates and deadlines shall govern the forthcoming *Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* (the "Motion to Compel") (such dates and deadlines, the "Schedule"):

(Page | 6)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

| Event | Date |
|---|---|
| McKesson files Motion to Compel | June 2, 2025 |
| Participating Parties to meet and confer/commence negotiations regarding Motion to Compel | Week of June 9, 2025 |
| Commencement of documentary discovery (to proceed on a rolling basis) | No sooner than June 12, 2025 |
| Rule 30(b)(6) depositions of the Debtors and McKesson | June 26/27, 2025 |
| Opposition to Motion to Compel | July 3, 2025 |
| McKesson files reply in support of Motion to Compel | July 11, 2025 |
| Hearing on Motion to Compel | July 14, 2025 |

2.      No Participating Party waives any rights, defenses, or arguments in relation to the Motion to Compel by agreeing to this Schedule, except that the Debtors and the DIP Agent hereby agree that the Debtors shall promptly pay McKesson the May 5 Wire Amount if the Court determines that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer.

3.      The foregoing recitals are hereby incorporated by reference into this Stipulation with the same force and effect as if fully set forth hereinafter.

4.      The Schedule is hereby approved and the Participating Parties shall comply with the dates and deadlines set forth therein.

5.      The Schedule may be modified, amended, extended, or supplemented by written agreement of the Participating Parties without further order of the Court, *provided* that upon any such modification, amendment, extension, or supplement, the Participating Parties shall provide notice to the Court of the modified dates and deadlines.

(Page | 7)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

6.      The Debtors, the DIP Agent and the Committee agree that the Debtors shall promptly pay, and the DIP Agent, DIP Lenders and Committee shall permit such prompt payment of, the May 5 Wire Amount in full in cash if the Court determines that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer (both of which shall be addressed pursuant to the briefing schedule set forth in paragraph 1 of this Stipulation).  In furtherance of the foregoing, the Participating Parties acknowledge and agree that the schedule proposed herein is conditioned upon the order approving the Debtors' post-petition financing on a final basis and/or any order approving such financing on an interim basis entered after the date of this Stipulation (collectively, the "Subsequent DIP Orders" and each a "Subsequent DIP Order") including a provision substantially similar in structure and protections to paragraph 42 of the Interim DIP Order to ensure availability of an amount sufficient to pay McKesson the May 5 Wire Amount if McKesson prevails in establishing that the May 5 Wire was a pre-petition payment and is not recoverable as a preferential transfer, with the specific language to be mutually agreed between the Participating Parties no later than June 3, 2025.

7.      Nothing in this Stipulation shall prevent McKesson from seeking expedited adjudication of the Motion to Compel, adequate assurance of the Debtors' ability to satisfy any judgment in favor of McKesson on the Motion to Compel or any other relief in connection with the Motion to Compel if a Subsequent DIP Order containing the language described in paragraph 6 of this Stipulation is not entered by the date of entry of the Subsequent DIP Order; provided,

| Debtors: | NEW RITE AID, LLC, *et al.* |
|---|---|
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief |

however, that, absent consent of the Participating Parties, the date of entry of the Subsequent DIP Order shall be no later than June 23, 2025.

8.     Nothing in this Stipulation shall preclude (i) any party in interest other than (except as mutually agreed between the Participating Parties) the Participating Parties from raising a formal objection to the dates and deadlines set forth in the Schedule or to the Motion to Compel, or (ii) any party in interest (other than, solely with respect to the inclusion of the language described in paragraph 6 and solely as and to the extent set forth therein, the Participating Parties) from objecting to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 41] in accordance with the Interim DIP Order and/or any applicable Subsequent DIP Order.

9.     Except as provided herein, all rights of each of the Participating Parties are hereby reserved.

10.     The terms and conditions of this Stipulation will be immediately effective and enforceable upon its entry.

11.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation.

Stipulated and agreed by:

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com


**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:    arosenberg@paulweiss.com
          aeaton@paulweiss.com
          chopkins@paulweiss.com
          smitchell@paulweiss.com


*Proposed Co-Counsel to the Debtors and Debtors in Possession*

/s/ *Michele M. Dudas*

**MCMANIMON, SCOTLAND & BAUMANN, LLC**
Michele M. Dudas
75 Livingston Avenue, Suite 201
Roseland, NJ 07068
Telephone: 973.721.5021
Email: mdudas@msbnj.com

**SIDLEY AUSTIN LLP**
Dennis M. Twomey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone: 312.853.7438
Email:  dtwomey@sidley.com

John J. Kuster (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  21.839.7336
Email:  jkuster@sidley.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Buchalter, A Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone: 949.224.6252
Email:  jgarfinkle@buchalter.com

*Co-Counsel to McKesson Corporation and certain corporate affiliates*

*/s/ Alan J. Brody*

**GREENBERG TRAURIG, LLP**

Alan J. Brody, Esq.
500 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 443-3543
Email:  brodya@gtlaw.com


**CHOATE, HALL & STEWART LLP**

John F. Ventola, Esq. (admitted *pro hac vice*)
Mark Edgarton, Esq.  (admitted *pro hac vice*)
J.P. Jaillet, Esq. (admitted *pro hac vice*)
Jonathan D. Marshall, Esq. (admitted *pro hac vice*)
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-5000
Email:   jventola@choate.com
          gedgarton@choate.com
          jjaillet@choate.com
          jmarshall@choate.com

*Co-Counsel to Bank of America, N.A., as DIP Agent*

*/s/ Andrew H. Sherman*

**SILLS CUMMIS & GROSS P.C.**

Andrew H. Sherman, Esq.
Boris Mankovetskiy, Esq.
Gregory Kopacz, Esq.
One Riverfront Plaza Newark, New Jersey 07102
Telephone: (973) 643-7000
 E-mail: asherman@sillscummis.com
          bmankovetskiy@sillscummis.com
          gkopacz@sillscummis.com


**WILLKIE FARR & GALLAGHER LLP**

Brett H. Miller, Esq. (admitted *pro hac vice*)
Todd M. Goren, Esq. (admitted *pro hac vice*)
James H. Burbage, Esq. (admitted *pro hac vice*)
D. Graber, Esq. (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
E-mail: bmiller@willkie.com
          tgoren@willkie.com
          jburbage@willkie.com
          jgraber@willkie.com

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors*

**<u>Exhibit B</u>**

**Excerpts of the Liebman Dep. Tr.**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

------------------------------------------------

In re:  New Rite Aid, LLC, et al,


                Debtors,


                    Case No. 25-14861 (MBK)

                    (Jointly Administered)


------------------------------------------------


        The Videotape Deposition of 30(b)(6)
witness Marc Liebman, taken pursuant to
Notice of Taking Deposition, taken before Deb
Beauvais, RPR, CRR, and a Notary Public in
and for the County of Ramsey, State of
Minnesota, taken remotely on August 5, 2025,
commencing at approximately 10:00 a.m.
Central Standard Time.



Page 2

```
 1  APPEARANCES:
 2    ON BEHALF OF MCKESSON:
 3      NICHOLAS CROWELL, ESQ.
        ALYSSA HASBROUCK, ESQ.
 4      GREGORY JACOBS, ESQ.
        ROCHELLE BALLANTYNE, ESQ.
 5      SIDLEY AUSTIN, LLP
        787 Seventh Avenue
 6      New York, New York 10019
        ncrowell@sidley.com
 7      ahasbrouck@sidley.com
        gjacobs@sidley.com
 8      rballantyne@sidley.com
 9      DANIEL SLATE, ESQ.
        BUCHALTER
10      1000 Wilshire Boulevard
        Suite 1500
11      Los Angeles, California 90017
        dslate@buchalter.com
12
        MICHELE DUDAS, ESQ.
13      MCMANIMON, SCOTLAND & BAUMANN
        75 Livingston Avenue
14      Roseland, New Jersey 07068
        mdudas@msbnj.com
15
      ON BEHALF OF RITE AID, LLC:
16
        ALISON BENEDON, ESQ.
17      ALICE BELISLE EATON, ESQ.
        CHRISTOPHER BILICIC, ESQ.
18      KYLE KIMPLER, ESQ.
        GREGORY LAUFER, ESQ.
19      MAX SIEGEL, ESQ.
        PAUL, WEISS, RIFKIND, WHARTON &
20        GARRISON, LLP
        1285 Avenue of the Americas
21      New York, New York 10019
        abenedon@paulweiss.com
22      aeaton@paulweiss.com
        cbilicic@paulweiss.com
23      kkimpler@paulweiss.com
        glaufer@paulweiss.com
24      msiegel@paulweiss.com
25
```

Page 3

```
 1  APPEARANCES (CONT.)
 2    ON BEHALF OF BANK OF AMERICA, N.A.:
 3      J.P. JAILLET, ESQ.
        DEREK FARQUHAR, ESQ.
 4      CHOATE, HALL & STEWART, LLP
        Two International Place
 5      Boston, Massachusetts 02110
        jjaillet@choate.com
 6      dfarquhar@choate.com
 7    ALSO PRESENT:
        Ben Carlsen, McKesson Managing
 8      Chief Counsel
        James Taylor, Videographer
 9
                  I N D E X
10                            PAGE
    Marc Liebman
11    Examination by Mr. Crowell        7
12  DEPOSITION EXHIBITS
      Exhibit 1 - Confidential - Rite Aid
13      DIP Budget Update 4/2025      18
      Exhibit 2 - Confidential - Email String
14      Re:  Letter from McKesson       22
      Exhibit 3 - Notice of Deposition of
15      Debtors                         27
      Exhibit 4 - Highly Confidential -
16      Supply Agreement               29
      Exhibit 5 - Liebman Declaration   48
17    Exhibit 6 - Confidential - Bowers
        Correspondence dated 4/23/25    59
18    Exhibit 7 - Highly Confidential -
        Security Agreement             61
19    Exhibit 8 - Highly Confidential -
        Subsidiary Guarantee Agreement 63
20    Exhibit 9 - Opposition to Motion to
        Compel                         66
21    Exhibit 10 - Cash Management Order 67
      Exhibit 11 - Highly Confidential -
22      Exit Credit Agreement          72
      Exhibit 12 - Spreadsheet - Extended
23      Daily Cash Flow                75
      Exhibit 13 - Bowers Declaration  80
24    Exhibit 14 - Email String re:  Rite
        Aid payment:  5/2/25           83
25    Exhibit 15 - Confidential - Bank of
```

Page 4

```
 1  DEPOSITION EXHIBITS (CONT.)
      Exhibit 16 - Confidential - Email
 2      String re:  Update             86
      Exhibit 17 - Cash Management Motion 97
 3    Exhibit 18 - Confidential -
        Wagner-Parrish Email re:  RAD
 4      Borrowing Breakdown 3/6/25    111
      Exhibit 19 - 6/16/25 HQ Schedules  115
 5    Exhibit 20 - Global Notes & Statements
        of Limitations, Methodology &
 6      Disclaimers Regarding the Debtors'
        Schedules of Assets & Liabilities &
 7      Statements of Financial Affairs 120
      Exhibit 21 - Confidential - Email
 8      String re:  McKesson Shipping
        Update                        126
 9    Exhibit 22 - Confidential - Email
        String re:  Rx Payments This Week 127
10    Exhibit 23 - Confidential - Email
        String re:  Rite Aid 05/08/2025 129
11    Exhibit 24 - Confidential - Email
        String re:  Rite Aid Reporting 134
12    Exhibit 25 - Confidential - Bixler
        Email dated 3/2/25 with Financials 135
13    Exhibit 26 - Professionals' Eyes Only -
        Rite Aid Corp. Weekly ABL Revolver
14      Borrowing Base Certificate   136
      Exhibit 27 - Confidential -
15      Wagner-Parrish Email re:  RAD
        Deliverables                 140
16    Exhibit 28 - Confidential - Email
        Attachment, Borrowing Base
17      Certificate 2/22/25          141
18
19
20
21
22
23
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We are now on
 3    the record.  This begins media number one in
 4    the deposition of Marc Liebman, 30(b)(6), in
 5    the matter of In Re:  New Rite Aid, LLC, et
 6    al in the United States Bankruptcy Court,
 7    District of New Jersey, Case No. 25-14861
 8    (MBK), Reference Docket No. 1322.
 9        Today is August 5th, 2025 and the
10    time is 8:02 a.m.  This deposition is being
11    taken remotely at the request of counsel for
12    CVS Pharmacy [sic].
13        The videographer is James Taylor,
14    and the court reporter is Deb Beauvais of
15    Magna Legal Services.
16        Will counsel and all parties
17    present state their appearances and whom they
18    represent.
19        MR. CROWELL:  Go ahead, Alison,
20    please.
21        MS. BENEDON:  I was just going to
22    say that part of that read-on was not
23    correct.  This is not the dispute with CVS.
24    It's a dispute between McKesson and Rite Aid.
25        THE VIDEOGRAPHER:  Okay.  So thank
```

MAGNA ▶
LEGAL SERVICES

Page 30

```
1    shall be computed in accordance with Section
2    3 of this Agreement.  No amounts shall be due
3    and payable by Rite Aid (or any other obligor
4    pursuant to Section 18) with respect to any
5    Product unless such amount is properly
6    reflected on an EDI Invoice.  The 'Invoice
7    Date' is the date of delivery of such
8    invoice."  Do you see that?
9    A.  I do.
10   Q.  Okay.  So pursuant to the terms of the Supply
11       Agreement, Rite Aid was obligated to pay
12       invoices within ten days of the invoice date,
13       correct?
14   A.  Yes.
15   Q.  Okay.  Section 7.1 says -- and this is
16       7.1(a).
17           MR. CROWELL:  Just blow it up a
18       little more, please, Greg, so my -- my old
19       man eyes are having a hard time seeing it.
20       Thanks.
21       BY MR. CROWELL:
22   Q.  Section 7.1(a) reads in part, "EDI Invoices
23       for deliveries of Products directly to
24       Pharmacies shall be due and payable ten days
25       after the Invoice Date."  Do you see that?
```

Page 31

```
1    A.  I do.
2    Q.  And you agree with me, don't you, that
3        through the end of April 2025 this provision
4        was never changed?  It was always 10-day
5        terms, right?
6    A.  Yeah, during -- during April this was the
7        term in effect.  And then there were,
8        obviously, amendments and discussions around
9        amendments to that -- those terms between the
10       company and McKesson.
11   Q.  Right.  And we're going to get to those, but
12       those didn't go into effect until May, right?
13   A.  I don't recall a specific date that they were
14       put into effect.
15   Q.  Okay.  We'll get to it.
16           But you agree with me that all
17       invoices issued in April 2025 were always due
18       ten days after delivery of the invoice,
19       right?
20   A.  Unless they were -- unless they were subject
21       of another discussion or agreement between
22       McKesson and the company during April, that's
23       correct.
24   Q.  And are you aware of any specific invoices
25       that were issued in April that were subject
```

Page 32

```
1    of another discussion or agreement between
2    McKesson and the company that you just
3    mentioned?
4    A.  I recall there was a discussion about
5        reducing payment terms from ten days to seven
6        days and implementing a different cap.  I
7        just don't recall specifically the date that
8        those discussions occurred.
9    Q.  And so you don't recall what specifically --
10       actually, strike that.  We'll come back to
11       that.
12           You do agree that the payment date
13       of the invoice was always keyed off the date
14       of -- the invoices were delivered, though,
15       right, regardless of whether it was ten days
16       or seven days?
17           MS. BENEDON:  Object to the form.
18           THE WITNESS:  When you say
19       "delivered," do you mean the product was
20       delivered?
21       BY MR. CROWELL:
22   Q.  No, I mean the invoice.  If you go back -- we
23       can go back to 6.1.
24   A.  Uh-huh.
25   Q.  6.1 again says, "The 'Invoice Date' is the
```

Page 33

```
1    date of delivery of such invoice."  And then
2    7.1 says, "EDI Invoices for deliveries of
3    Products directly to Pharmacies shall be due
4    and payable ten days after the Invoice
5    Date...."  So I'm just asking you, to just
6    make clear for the record, you agree that the
7    payment date of invoices was always keyed off
8    the date the invoices were delivered?
9    A.  That's correct.
10   Q.  Okay.  And if you look at Section 7.2 --
11           MR. CROWELL:  Greg, on page 13.
12       BY MR. CROWELL:
13   Q.  -- section entitled, Non-Business Days, it
14       says, "Notwithstanding anything to the
15       contrary in this Section 7, if a payment is
16       due pursuant to Section 7.1 on a day
17       specified as a Saturday, that payment shall
18       instead be due on the preceding Business Day.
19       If a payment is due pursuant to Section 7.1
20       on a day specified as a Sunday or Holiday,
21       that payment shall instead be due on the
22       following Business Day."  Do you see that?
23   A.  I do.
24   Q.  So if the tenth day after the date that an
25       invoice was delivered fell on a weekend or
```

MAGNA
LEGAL SERVICES

Page 34

```
 1      any other non-business day, this provision
 2      allows for an adjustment of the payment date
 3      slightly, correct?
 4   A.  That's correct.
 5   Q.  Okay.  So if the tenth day was a Sunday,
 6      payment would be due the next day on Monday,
 7      right?
 8   A.  Yes.
 9   Q.  Okay.  So based on the terms that we just
10      reviewed, you would agree, wouldn't you, that
11      if an invoice was delivered on Thursday,
12      April 24th, that payment would be due on
13      Monday, May 5th, right?  The following Monday
14      after the ten days ran on Sunday, May 4th,
15      right?
16          MS. BENEDON:  Objection.  You want
17      to show him a calendar?
18          MR. CROWELL:  I'll represent to him
19      that Thursday is April 24th and that May 5th
20      is Monday.
21          THE WITNESS:  Yes.
22          BY MR. CROWELL:
23   Q.  So just so the record is clear, based on the
24      Supply Agreement's terms, you would agree
25      that if an invoice was delivered on Thursday,
```

Page 35

```
 1      April 24th, payment would be due on Monday,
 2      May 5th, right?
 3   A.  I do.
 4   Q.  Okay.  And similarly you would agree that if
 5      an invoice was delivered on Friday, April
 6      25th, payment would be due on May 5th as
 7      well, ten days later, right?
 8   A.  Correct.
 9   Q.  And Rite Aid does not dispute that McKesson
10      invoiced Rite Aid 28,092,801.85 on April
11      24th, 2025, right?
12   A.  That sounds correct.
13   Q.  And Rite Aid does not dispute that McKesson
14      invoiced Rite Aid 21,595,586.57 for April
15      25th, 2025, right?
16   A.  I believe that's correct.
17   Q.  Okay.  So adding those two amounts together,
18      you agree that pursuant to the terms of the
19      Supply Agreement, Rite Aid was required to
20      make a payment to McKesson of approximately
21      49.7 million on May 5th, 2025, right?
22   A.  That is correct.
23   Q.  In fact, Rite Aid made that payment, right?
24          MS. BENEDON:  Object to the form.
25          THE WITNESS:  No.
```

Page 36

```
 1          BY MR. CROWELL:
 2   Q.  Okay.  So is it your testimony, sir, that
 3      Rite Aid did not make a $49.7 million payment
 4      to McKesson on May 5th?
 5   A.  No.  My testimony is that Rite Aid made that
 6      payment, but it was not on account of the
 7      4-23 and 4-24 invoices that you just
 8      referenced.
 9   Q.  So it was just sheer coincidence that it was
10      the exact amount of those invoices?
11          MS. BENEDON:  Object to the form.
12          THE WITNESS:  Could you restate
13      your question?
14          BY MR. CROWELL:
15   Q.  Sure.  We just established that the invoices
16      for April 24th and 25th added up to 49.7
17      million.  You agreed with that.  You also
18      agreed --
19          MS. BENEDON:  Object.  Sorry, Nick.
20      I think you got the dates wrong there.  I
21      didn't mean to speak over you, though.
22          MR. CROWELL:  That's okay.
23          BY MR. CROWELL:
24   Q.  I think the dates are April 24th and April
25      25th.  Am I wrong about that?
```

Page 37

```
 1          MS. BENEDON:  I'm sorry, I must
 2      have misheard you.
 3          MR. CROWELL:  That's okay.  No
 4      problems.  No worries.
 5          BY MR. CROWELL:
 6   Q.  So we just established that the invoices for
 7      April 24th and April 25th added up to $49.7
 8      million, right?
 9   A.  Correct.
10   Q.  And we also established that on May 5th, ten
11      days after when those invoices were due, Rite
12      Aid paid McKesson $49.7 million, right?
13   A.  That is correct.
14   Q.  But your testimony is that that $49.7 million
15      was not paid to pay down those outstanding
16      invoices that were due that day?  That's your
17      testimony, sir?
18   A.  That is correct.
19   Q.  And explain what it was actually paid for
20      then.
21   A.  The $49.7 million was paid as a prepayment
22      for drugs that we had expected to be
23      delivered for the two-day period post-filing.
24   Q.  So is it just in sheer coincidence that the
25      $49.7 million payment matched exactly the
```

Page 50

```
 1    Q.  And do you remember who these emails are to
 2        and from?
 3    A.  I believe it's Justin to Bixler.
 4    Q.  Okay.  Do you agree with me, sir, as Rite
 5        Aid's corporate representative, that whether
 6        Rite Aid was under or above the cap at any
 7        given time has absolutely no effect
 8        whatsoever on whether payments were due under
 9        the Supply Agreement ten days after they're
10        invoiced?  Right?
11    A.  That -- that is correct.
12    Q.  And you don't say anywhere in your
13        declaration the change to the cap had any
14        impact on the $49.7 million payment, right?
15            MS. BENEDON:  Object to the form.
16            THE WITNESS:  Can you repeat the
17        question?
18    BY MR. CROWELL:
19    Q.  Sure.  You don't say anywhere in your
20        declaration that the change to the cap that
21        you allege occurred had any impact on the
22        $49.7 million payment, correct?
23    A.  That's correct.
24            MR. CROWELL:  Let's go back to the
25        Supply Agreement, Greg.
```

Page 51

```
 1        BY MR. CROWELL:
 2    Q.  Look at 7.1(d), as in dog, please.  So this
 3        section is entitled, Suspension of Shipments
 4        After Payment Default.  And it says, "If Rite
 5        Aid fails to make a payment timely, then, in
 6        addition to its other rights herein,
 7        including in Sections 3.7, 7.1(d), 7.7, 7.12
 8        and 12, McKesson has the immediate right to
 9        suspend any shipment of Products to Rite
10        Aid."  Do you see that?
11    A.  I do.
12    Q.  And you agree that if Rite Aid failed to make
13        a payment when due, then McKesson could
14        suspend shipment of products, right?
15    A.  That is what the plain language that you just
16        read indicates.
17    Q.  And you agree that Rite Aid was ordering tens
18        of millions of dollars of products from
19        McKesson every day, right?
20    A.  Most days that is correct.
21    Q.  And Rite Aid never missed a 10-day payment
22        due for products delivered by McKesson
23        because this provision meant that McKesson
24        would have the right to suspend shipments if
25        it did so, right?
```

Page 52

```
 1            MS. BENEDON:  Object to form.
 2            THE WITNESS:  Never missed a
 3        payment due during the -- up until the point
 4        of the -- you know, the 5th, that's correct.
 5    BY MR. CROWELL:
 6    Q.  And what payment did they miss that was due
 7        on the 5th?
 8    A.  We did not pay the 24th and 25th payments on
 9        the 5th.  The 5th payment was for -- was a
10        prepayment for post-petition orders.
11    Q.  Right.  It just happened to match dollar for
12        dollar exactly what was invoiced, right?
13    A.  That -- that is correct.  And, again, as I
14        said earlier, that was for administrative
15        simplicity.
16            MR. CROWELL:  Let's look at 7.12 of
17        the Supply Agreement.
18    BY MR. CROWELL:
19    Q.  So 7.12 says -- 7.12(a) in part says,
20        "McKesson reserves the right to change a
21        payment term in any material respect
22        (including imposing the requirement of
23        pre-payment, same day or next day electronic
24        payment) or limit total credit immediately
25        upon an occurrence of a payment default under
```

Page 53

```
 1        section 12.1(a), following two days written
 2        notice, if McKesson concludes there has been
 3        a material adverse change in Rite Aid's
 4        financial condition, or following seven days
 5        written notice, if Rite Aid ceases to meet
 6        McKesson's credit requirements...."  Do you
 7        see that?
 8    A.  I do.
 9    Q.  And Rite Aid does not dispute that, pursuant
10        to this section, McKesson had the right to
11        change payment terms following seven days'
12        notice to Rite Aid if it ceased to meet
13        McKesson's credit requirements, right?
14    A.  I don't dispute that at all.
15    Q.  Okay.  And you don't dispute that McKesson
16        notified Rite Aid on April 23rd that it was
17        not in compliance with McKesson's credit
18        requirements, right?
19    A.  They definitely notified us.  I don't
20        recall -- the 23rd sounds correct, yes.
21    Q.  Okay.  I'll represent to you there was a
22        letter dated the 23rd, but I don't expect you
23        to have a perfect memory.
24            And you don't dispute with my
25        representation the letter was the 23rd that
```

MAGNA
LEGAL SERVICES

Page 82

1    payments, the 49.7, right, because of the
2    weekend issue we discussed earlier.
3    Q.  Uh-huh.
4    A.  Can you repeat your question, though, just
5       with that clarification?
6    Q.  Yeah.  So you agree with me that this email
7       shows that Rite Aid was expecting to have to
8       pay 49.7 million to McKesson on May 5th for
9       orders they were invoiced, to your point, on
10      April 24th and 25th, right?
11   A.  That is exactly what this email says, yes.
12   Q.  Okay.  Did Rite Aid ever tell its lenders
13      that this payment was not made in the
14      ordinary course of business?
15   A.  I don't know what -- what conversations that
16      other members at Rite Aid may have had with
17      the lenders, but certainly in my discussions
18      with the lenders they understood that this
19      payment was part of the normal 10-day payment
20      cycle.
21   Q.  So it's your testimony that this payment was
22      made in the ordinary course of business,
23      right?
24   A.  Well, this payment was never made the way
25      we're -- this email describes it.  Was made

Page 83

1    the way I described it earlier.
2    Q.  Well, you don't dispute that a 49 -- that the
3       payment amount for this exact amount -- a
4       payment for this exact amount was made on May
5       5th, right?
6    A.  I do not dispute that at all.
7    Q.  Okay.  You just dispute that it was to pay
8       the April 24th and 25th orders, right?
9    A.  That is correct.  The payment was made as a
10      prepayment for post-petition orders.
11   Q.  And, again, your testimony is you got
12      permission for that payment from Polly
13      Hackett and/or Jenn Cann, right?
14   A.  Yeah.  Obviously, there were other people on
15      the phone, including counsel.  She had
16      counsel on as did we as part of that
17      conversation, that is correct.  Payment was
18      authorized as a prepayment.
19   Q.  Let's look at tab 21.
20          MR. CROWELL:  And we can mark that
21      as Exhibit 14.
22   (Deposition Exhibit 14 was marked for identification.)
23          MR. CROWELL:  Blow that up a little
24      bit, Greg.  Thanks.
25      BY MR. CROWELL:

Page 84

1    Q.  So this is an email chain between Steve
2       Bixler and Justin Bowers and Owen McMahon
3       dated May 5th, 2025.  Are you familiar with
4       this?
5    A.  Yes.
6    Q.  And, I'm sorry, you may have said this
7       already, but, I apologize, who is Steve
8       Bixler?  What's his position?
9    A.  Steve is the chief financial officer of Rite
10      Aid.
11   Q.  Okay.  And he writes, third sentence, "We
12      anticipate making a wire payment in the
13      amount of 49.7 million today, which I believe
14      will put our outstanding balance at
15      approximately 138 million."  Do you see that?
16   A.  I do.
17   Q.  Okay.  And the "outstanding balance" refers
18      to the invoices that are outstanding, right?
19          MS. BENEDON:  Object to the form.
20          THE WITNESS:  That -- that is
21      correct.
22      BY MR. CROWELL:
23   Q.  So ones that have already been issued for
24      orders that have already been placed, right?
25   A.  For orders that have been delivered.

Page 85

1    Q.  Okay.  So from this email from Mr. Bixler to
2       Mr. McKesson saying that Rite Aid anticipates
3       making a wire payment of $49.7 million today,
4       right?  That's what it says, correct?
5    A.  You are reading exactly what Steve wrote
6       here, and when Steve wrote this he -- that
7       was his anticipation.
8    Q.  Are you saying something changed between the
9       time he wrote this and the payment was made?
10   A.  Yes.
11   Q.  What was that, sir?
12   A.  That the payment was authorized expressly as
13      a prepayment by Bank of America, and then it
14      was executed pursuant to that authorization.
15   Q.  And, again, there's no documentation
16      whatsoever showing that, though, right?
17          MS. BENEDON:  Object to the form.
18          THE WITNESS:  I'm not aware of any
19      documentation.
20          MR. CROWELL:  Let's just take a
21      look quickly at tab 22 and mark that as 15.
22   (Deposition Exhibit 15 was marked for identification.)
23          MR. CROWELL:  Just flip to the
24      second page.
25      BY MR. CROWELL:

MAGNA
LEGAL SERVICES

Page 90

1    the privileged and redacted portion of the
2    email. That's not the appropriate subject of
3    testimony.
4        So if you're able to answer it,
5    Marc, without disclosing anything that's
6    privileged, you can go for it.
7        MR. CROWELL: I didn't ask anything
8    about what I don't -- I can't see. I only
9    asked about what this email says, which is
10   not redacted, which is, "Sorry, didn't
11   realize you hadn't talked to BRG." And I
12   think my question was -- let's just see what
13   it was -- do you know why he said, "Sorry,
14   didn't realize you hadn't talked to BRG"?
15       THE WITNESS: Yeah, I'm -- I
16   believe, again, going back in time here quite
17   a bit, that Matt forwarded the email from
18   Britt to B of A, and typically when we're
19   having communications with Bank of America
20   we're also talking to BRG. And so to let
21   them -- make them aware of what has
22   transpired.
23       You know, I'm kind of remembering
24   or inferring to an extent here that I must
25   not have had a chance to talk to BRG prior to

Page 91

1    Matt sending the email directly to B of A to
2    give them a heads up that we had received the
3    email from Britt. That is likely what that
4    statement is related to.
5    BY MR. CROWELL:
6    Q. Okay. And then he says, "In any event, we've
7    been warning the lenders for a while about
8    this." Do you see that?
9    A. I do.
10   Q. What had he been warning the lenders about,
11   if you know?
12       MS. BENEDON: Object to form.
13       THE WITNESS: Look, these are
14   Matt's words, right? So what Matt meant by
15   his words is sort of -- it's really Matt's
16   words, right, for him to answer to.
17       But what I believe he is implying
18   here and meant here is that we had been
19   concerned about the relationship with
20   McKesson, and it was important to us that we
21   let the lenders know that there were risks
22   with respect to that relationship given
23   their -- given the company's Supply Agreement
24   with McKesson.
25   BY MR. CROWELL:

Page 92

1    Q. So is it fair to say that as of 4-20-25 --
2    sorry, April 20th, 2025, the lenders were
3    well aware about McKesson's concerns? Is
4    that -- is that true?
5    A. They were aware to the extent that this email
6    makes them aware that it was forwarded to
7    them. That is correct.
8    Q. Okay. So shifting gears a little bit.
9        MR. CROWELL: You can take that
10   down, Greg.
11   BY MR. CROWELL:
12   Q. HQ always paid amounts due pursuant to a
13   McKesson EDI invoice throughout the life of
14   the Supply Agreement, correct?
15   A. I believe that is correct, yes.
16   Q. So Rite Aid Corporation never paid any
17   invoices directly itself to McKesson, right?
18   A. That is correct.
19   Q. And you don't dispute that the subsidiaries
20   of Rite Aid placed orders for McKesson, and
21   upon deliveries McKesson would then issue the
22   EDI invoices, which were generated by
23   McKesson and sent electronically to Rite Aid,
24   right?
25   A. I do not dispute that.

Page 93

1    Q. Okay. And those invoices reflected the
2    aggregate amounts due for deliveries made on
3    a particular day, right?
4    A. That is correct.
5    Q. And every day, or most days I think you said,
6    there were tens of millions of dollars of
7    product delivered by McKesson to Rite Aid
8    subsidiaries, right?
9    A. That's correct. I don't think there were
10   much in the way of deliveries on the
11   weekends, but during the week certainly, tens
12   of millions, yes.
13   Q. In addition to everyday deliveries, there
14   were also invoices issued every day to
15   reflect amounts owed to McKesson for the
16   deliveries, correct?
17       MS. BENEDON: Object to the form.
18       THE WITNESS: That's correct
19   generally, yes.
20   BY MR. CROWELL:
21   Q. And then HQ remitted the amounts due on
22   10-day terms so that the products delivered
23   on the first day of the month, for example,
24   would get paid on the 10th day of the month,
25   except if that payment was due on a Saturday,

Page 94

1    it would be paid on a Friday; if it was due
2    on a Sunday or a holiday, it would be paid on
3    a Monday?  We've already gone over that,
4    right?
5    A.  That is correct.
6    Q.  Okay.  And, again, Rite Aid understood that
7    if it didn't pay the invoices on 10-day
8    terms, McKesson had the right to suspend
9    shipment of deliveries, right?
10   A.  I believe subject to some notice period
11   that's generally correct.
12   Q.  And I think you said this, but I just want to
13   make sure I got it right.  There were no
14   instances that you were aware of before Rite
15   Aid filed for bankruptcy on May 5th where an
16   EDI invoice issued by Rite Aid was not paid
17   on 10-day terms, right?
18   A.  Where an EDI invoice issued by McKesson
19   wasn't paid on 10-day terms, correct.
20   Q.  Sorry.  My bad.  I misspoke.  That's correct.
21   A.  Uh-huh.
22   Q.  And this was done day in and day out pursuant
23   to the terms of the Supply Agreement,
24   correct?
25   A.  That is correct.

Page 95

1    Q.  Was there a formal internal process at Rite
2    Aid to monitor the cap?
3    A.  Yes.
4    Q.  And what was it, if you can describe it for
5    me?
6    A.  Well, I mean, we -- there was a tracking of
7    where we were with respect to outstanding AP
8    relative to the cap.
9    Q.  And who was in charge of that?
10   A.  I'm not sure who within the finance
11   organization is responsible for it.
12   Q.  Again, we established earlier that HQ is a
13   guarantor of Rite Aid, right?
14   A.  That is correct.
15   Q.  Okay.  So if Rite Aid defaulted on a payment,
16   HQ would be obligated under the Supply
17   Agreement and Subsidiary Agreement to step in
18   and make that payment, right?
19        MS. BENEDON:  Object to the form.
20        THE WITNESS:  That is my
21   understanding legally.
22        MR. CROWELL:  Let's go to -- back
23   to your declaration, which I think we
24   previously marked as Exhibit 5, Greg.
25        MR. JACOBS:  Yeah.  Is there any

Page 96

1    chance we could take a bio break?
2         MR. CROWELL:  A guy who's not
3    taking or defending is calling for a break.
4    But I'll make it happen.  That's fine.
5         Is that okay with you, Alison?
6         MS. BENEDON:  Certainly.
7         MR. CROWELL:  Okay.  We'll take
8    ten.  Thanks, guys.
9         THE VIDEOGRAPHER:  Okay.  This
10   marks the end of media number two.  We're
11   going to go off the record.  It's 10:08.
12        (A recess was taken.)
13        THE VIDEOGRAPHER:  This will mark
14   the beginning of media number three in our
15   deposition of Marc Liebman, 30(b)(6).  We're
16   going back on the record at 10:18 a.m.
17   BY MR. CROWELL:
18   Q.  So before we took a break, Mr. Liebman, we
19   were going to go to Exhibit 5, which is your
20   declaration.
21        MR. CROWELL:  Let's pull that up.
22        MR. JACOBS:  One moment.
23   BY MR. CROWELL:
24   Q.  Okay.  So let's look at paragraph 4.  You
25   state here that:  "Rite Aid operates numerous

Page 97

1    pharmacies nationwide, each of which collects
2    funds from customers," right?
3    A.  That is correct.
4    Q.  And "These affiliates and pharmacies operate
5    under a central cash management system, under
6    which all receipts are collected by HQ,"
7    right?
8    A.  That is correct.
9    Q.  And I'm correct, am I not, that the cash
10   management system generated approximately
11   $1.2 billion per month as of the petition
12   date on May 5th, including store cash
13   receipts, credit and debit card receipts and
14   e-commerce sales?
15        MS. BENEDON:  Object to form and
16   foundation.
17        MR. CROWELL:  Okay.  Let's look at
18   the cash management motion.  Tab 29.  So I
19   can give you some foundation.
20        MR. JACOBS:  This is 17.
21   (Deposition Exhibit 17 was marked for identification.)
22        MR. CROWELL:  Exhibit 17?
23   BY MR. CROWELL:
24   Q.  Let's go to paragraph 9.  I'll represent to
25   you that this is the cash management motion,

Page 122

1    Q.  Yeah.  And it says that "The Borrower will
2    not, nor will it permit any Subsidiary to,"
3    make or -- sorry, "to, pay or make or agree
4    to pay or make, directly or indirectly, any
5    payment of the McKesson Obligations, except:
6    payments...in the ordinary course of
7    business."
8          MR. CROWELL:  Can you highlight
9    that, Greg?  Go down.  Further.  Keep going.
10   There you go.
11   BY MR. CROWELL:
12   Q.  The McKesson -- sorry, 6.08(c), my fault.
13        "The Borrower will not, nor will it
14   permit any Subsidiary to, pay or make or
15   agree or pay to make, directly or indirectly,
16   any payment of the McKesson Obligation,
17   except, (i) payments of the McKesson Trade
18   Obligations in the ordinary course of
19   business," right?
20   A.  I see that.  That's correct.
21   Q.  What did Rite Aid consider to be an ordinary
22   course of business payment of a McKesson
23   trade obligations?
24        MS. BENEDON:  Object to the form
25   and to the extent you're calling for a legal

Page 123

1    conclusion.  You can answer if you know.
2          THE WITNESS:  I, um -- I think that
3    requires a legal conclusion, so I cannot
4    answer.
5    BY MR. CROWELL:
6    Q.  And I think we have this clear on the record,
7    but I just want to make sure that it's there.
8    Rite Aid never provided written notice to the
9    lenders prior to making a request for funding
10   the May 5th wire, that the May 5th wire was a
11   payment that was not a payment in the
12   ordinary course of business, correct?
13   A.  Sorry to make you do this.  Can you -- can
14   you repeat that?
15   Q.  Sure.  Rite Aid never provided written notice
16   to the lenders prior to making a request for
17   funding the May 5th wire that indicated that
18   the May 5th wire was a payment that was not a
19   payment in the ordinary course of business,
20   right?
21   A.  I'm not aware of any communication like that.
22   Q.  Okay.  And there's no written approval of the
23   $49.7 million payment either, right?
24   A.  I -- I don't believe so.
25   Q.  There were never any plans, were there, for

Page 124

1    Rite Aid to forego paying McKesson on any
2    invoices that were due on 10-day terms prior
3    to Rite Aid filing for bankruptcy, right?
4    A.  Can you restate the question, please?
5    Q.  Sure.  There were never outstanding invoices
6    that were not paid on the 10-day terms during
7    the term of the Supply Agreement, right?
8    A.  But for the payment due the 5th, that is
9    true.
10   Q.  Did anyone from Rite Aid ever tell McKesson
11   that this payment was not to pay down the
12   April 24th and 25th invoices at the time it
13   was made?
14   A.  I'm not aware of anyone telling McKesson
15   that.
16   Q.  So that was just an internal Rite Aid
17   decision made at some point, correct?
18   A.  That was the express authorization of the
19   lenders and the express direction of me in
20   making the payment.
21   Q.  And, again, that was all via telephone calls
22   is your testimony, right?
23   A.  And discussions, that's right, with the team.
24        MR. CROWELL:  Let's go to Section
25   5.14, which I think is page 166.  Could be

Page 125

1    wrong.  Yep, there it is.
2    BY MR. CROWELL:
3    Q.  This says that "The Borrower shall maintain
4    accounting systems capable of tracing
5    intercompany transfer of funds and other
6    assets," right?
7    A.  It does.
8    Q.  So intercompany transfers between and among
9    the borrower and its various subsidiary loan
10   parties were permitted by the credit
11   agreement so long as those transfers were
12   traceable, right?
13   A.  That -- yes, that is correct.
14   Q.  And there's nothing in this agreement, to
15   your knowledge, that mandated whether the
16   borrower or any particular subsidiary had to
17   make payments to any of the vendors of any
18   other subsidiary, right?
19   A.  I'm not sure.  This is a very long agreement.
20   Q.  You agree, sir, that --
21        MR. CROWELL:  You can take that
22   down, Greg.
23   BY MR. CROWELL:
24   Q.  You agree, sir, that McKesson continued to
25   make deliveries to Rite Aid after Rite Aid's

MAGNA
LEGAL SERVICES

Page 146

1          MS. BENEDON:  Yes.
2          (Deposition concluded at 1:34 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 147

1     STATE OF MINNESOTA )
2
      COUNTY OF RAMSEY  )
3
           Be it known that I took the
4     deposition of 30(b)(6) witness Marc Liebman
      on August 5, 2025;
5
           That I was then and there a
6     notary public in and for the County of
      Ramsey, State of Minnesota, and that by
7     virtue thereof I was duly authorized to
      administer an oath;
8
           That the witness before
9     testifying was by me first duly sworn to
      testify the whole truth and nothing but the
10    truth relative to said cause;
11         That the testimony of said
      witness was recorded in stenotype by myself
12    and transcribed into typewriting under my
      direction, and that the deposition is a true
13    record of the testimony given by the witness
      to the best of my ability;
14
           That I am not related to any of
15    the parties hereto nor interested in the
      outcome of the action;
16
           Witness my hand and seal this
17    6th day of August, 2025.
18
19
20         DEBRA BEAUVAIS
           COURT REPORTER
21
22
23
24
25

MAGNA
LEGAL SERVICES

## Exhibit C

**Debtors' 30(b)(6) Notice**

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Gregory F. Laufer (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
glaufer@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW RITE AID, LLC, *et al.*,[1] | ) | Case No. 25-14861 (MBK) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' NOTICE OF DEPOSITION OF MCKESSON CORPORATION
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rules 7026, 7030, and 9014 of the Federal

Rules of Bankruptcy Procedure, and Rules 26 and 30 of the Federal Rules of Civil Procedure

---

[1] The last four digits of New Rite Aid, LLC's tax identification number are 1483. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at [https://restructuring.ra.kroll.com/RiteAid2025]. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

(collectively the "<u>Rules</u>"), Debtor New Rite Aid, LLC and its affiliated Debtors (collectively, the "<u>Debtors</u>" or "<u>Rite Aid</u>") by and through their undersigned counsel, will take the oral deposition under oath of the person designated by McKesson Corporation ("<u>McKesson</u>") as the most knowledgeable to testify on McKesson's behalf with respect to the topics listed in Exhibit A hereto.

The deposition will take place on August 4, 2025 at 9:00am EDT, by remote videoconference, and will continue until completed.  The deposition will take place before an officer authorized by law to administer oaths, and will be recorded stenographically, by videotape (audio and visual), and through instant virtual display via "real time" software, which provides instantaneous electronic transcripts on a laptop computer.

Dated:  July 28, 2025

/s/ Alison R. Benedon

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com
          svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Gregory F. Laufer (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison R. Benedon
1285 Avenue of the Americas
New York, New York 10019

2

Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990
Email:    arosenberg@paulweiss.com
            aeaton@paulweiss.com
            glaufer@paulweiss.com
            chopkins@paulweiss.com
            smitchell@paulweiss.com
            abenedon@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

3

## **Exhibit A – Topics of Examination**

1.    The payment of $49,674,910 from Rite Aid to McKesson on May 5, 2025 (the "May 5 Payment"), including, without limitation, McKesson's understanding of the timing of that payment, the source of the funds for that payment, the consideration for that payment, and the reason why that payment was made.

2.    The payment of $11,000,000 from Rite Aid to McKesson on May 1, 2025, including, without limitation, McKesson's understanding of the timing of that payment, the source of the funds for that payment, the consideration for that payment, and the reason why that payment was made.

3.    Any actual or contemplated changes to the terms set forth in section 7.1 of the Supply Agreement between McKesson and Rite Aid dated as of August 30, 2024 (as amended, supplemented, and modified from time to time) (the "Supply Agreement") and any other trade terms between McKesson and Rite Aid, including, without limitation, credit balance caps, account receivable caps, timelines for payment, credit amounts, credit terms, and any remedies for alleged breach of trade terms (collectively, "trade terms").

4.    The April 23, 2025 letter from McKesson to Rite Aid entitled McKesson Corporation Supply Agreement – Notice of Change in Payment Terms and Credit Availability under Section 7.12(a) (the "April 23 Letter"), including, without limitation, the changes in trade terms discussed in the April 23 Letter, McKesson's reasons for sending the April 23 Letter, McKesson's basis for effectuating or purporting to effectuate the changes in trade terms set forth in the April 23 Letter, McKesson's understanding of Rite Aid's financial condition as of the April 23 Letter, any contemplated changes to the April 23 Letter, McKesson's understanding of

4

Rite Aid's ability to perform under the trade terms, and McKesson's understanding of Rite Aid's likely reaction to, and of the likely effect of, the April 23 Letter.

5.      The difference between the trade terms set forth in the April 23 Letter and the trade terms agreed to by McKesson and Rite Aid on April 30, 2025 (the "<u>April 30 Terms</u>"), including the likely effect of the change in trade terms and Rite Aid's ability to perform under the April 30 Terms.

6.      McKesson and Rite Aid's performance under the Supply Agreement, including, without limitation, the payor(s) of any invoices under the Supply Agreement, the guarantor(s) of any payments under the Supply Agreement, the recipient(s) of any goods delivered pursuant to the Supply Agreement, McKesson's accounting for any goods sold and/or delivered pursuant to the Supply Agreement, and the trade terms under the Supply Agreement.

7.      Any actual or contemplated cessation of shipments of prescription drugs from McKesson to Rite Aid under the Supply Agreement and the likely effect of any such cessation.

8.      McKesson's application of rebates and credits due to Rite Aid under the Supply Agreement (including, without limitation, section 3 and its subsections), including, without limitation, any actual or contemplated application of those rebates and credits to reduce Rite Aid's balance under the Supply Agreement.

9.      Any communications between McKesson and Rite Aid from April 23, 2025 to May 5, 2025.

## Exhibit D

**Excerpts of the Bowers Dep. Tr.**

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF NEW JERSEY

4  Chapter 11

5  Case No. 25-14861 (MKB)

6  -----------------------------------x

7  In re:

8  NEW RITE AID, LLC, et al.,

9                    Debtors.

10  -----------------------------------x

11

12      REMOTE VIDEOTAPED DEPOSITION OF
            JAMES JUSTIN BOWERS

13              Irving, Texas
              August 4, 2025

14

15

16  Reported By:

17  ERIC J. FINZ

18

19

20

21

22

23

24

25

Page 2

```
 1
 2              August 4, 2025
                10:03 a.m.
 3
 4      Remote Videotaped Deposition of
 5   JAMES JUSTIN BOWERS, taken by Debtors,
 6   pursuant to Notice, before ERIC J. FINZ,
 7   a Shorthand Reporter and Notary Public
 8   within and for the State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S : (All Via Remote)
 3   PAUL WEISS RIFKIND WHARTON &
     GARRISON LLP
 4   Attorneys for Debtors and Debtors in
     Possession
 5      1285 Avenue of the Americas
        New York, New York 10019
 6
     BY:  GREGORY LAUFER, ESQ.
 7      glaufer@paulweiss.com
        ALICE EATON, ESQ.
 8      aeaton@paulweiss.com
        MAX SIEGEL, ESQ.
 9      msiegel@paulweiss.com
        CHRISTOPHER BILICIC, ESQ.
10      cbilicic@paulweiss.com
        KYLE KIMPLER, ESQ.
11      kkimpler@paulweiss.com
        ISABELLE LEIPZIGER, ESQ.
12      ileipziger@paulweiss.com
13
14   CHOATE HALL & STEWART LLP
        Attorneys for Bank of America, N.A.
15      Two International Place
        Boston, Massachusetts 02110
16
     BY:  G. MARK EDGARTON, ESQ.
17      medgarton@choate.com
        DEREK FARQUHAR, ESQ.
18      dfarquhar@choate.com
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S : (Continued)
 3   SIDLEY AUSTIN LLP
        Attorneys for McKesson Corporation
 4      787 Seventh Avenue
        New York, New York 10019
 5
     BY:  NICHOLAS CROWELL, ESQ.
 6      ncrowell@sidley.com
        ALYSSA HASBROUCK, ESQ.
 7      ahasbrouck@sidley.com
        GREGORY JACOBS, ESQ.
 8      gjacobs@sidley.com
 9      -AND-
10   BUCHALTER LLP
        18400 Von Karman Avenue
11      Irvine, California 92612-0514
12   BY:  JEFFREY K. GARFINKLE, ESQ.
        jgarfinkle@buchalter.com
13      DANIEL SLATE, ESQ.
        dslate@buchalter.com
14
15
16   ALSO PRESENT:
17      BEN CARLSEN
18      MJ ZIMDAHL, Videographer
19
20
21
22
23
24
25
```

Page 5

```
 1
 2           THE VIDEOGRAPHER:  Good
 3      morning.  We are going on the
 4      record today at 10:03 a.m. Central
 5      Time on August 4, 2025.
 6           Please note that this
 7      deposition is being conducted
 8      virtually.  Quality of the
 9      recording depends on the quality of
10      the camera and the internet
11      connection of participants.  What
12      is seen from the witness and heard
13      on the screen is what will be
14      recorded.  Audio and video
15      recording will continue to take
16      place unless always parties agree
17      to go off the record.
18           This is the video-recorded
19      deposition of Justin Bowers, taken
20      in the matter of In re:  New
21      Rite-Aid LLC, et al., filed in the
22      United States Bankruptcy Court,
23      District of New Jersey.
24           This deposition is being
25      conducted remotely using virtual
```

2 (Pages 2 - 5)

Page 10

1
2    of this.  An objection to Request
3    No. 2, the payment of $11 million
4    from Rite-Aid to McKesson.  This
5    proceeding is about the $49.7
6    million payment, and not that
7    payment.  That being said, I do
8    think that Mr. Bowers is prepared
9    to testify about the $11 million
10   payment, to the extent he
11   understands and knows about it.
12       I also have an objection to
13   Request No. 8, which is the
14   application of rebates and credits
15   due to Rite-Aid under the supply
16   agreement.
17       To the extent there are any
18   questions about post-petition
19   rebates and credits, which I think
20   form the basis of a large
21   percentage of your opposition
22   brief, Mr. Bowers is not prepared
23   to testify about that and will not
24   testify about that.
25       MR. LAUFER:  Okay.  I'm going

Page 11

1
2    to be asking questions about that,
3    so you're free to make a record and
4    object to the questions.  But he's
5    obviously obligated to answer any
6    questions and you can object either
7    on scope or other grounds.
8        MR. CROWELL:  No, he won't be
9    answering those questions.  But
10   we'll see when we get to them.
11   I'll just mention it now to give
12   you a heads-up.
13       MR. LAUFER:  I don't agree
14   that there is any basis to instruct
15   a witness not to testify in
16   response to questions unless there
17   is a privilege or some other basis.
18       MR. CROWELL:  I understand
19   your points.  But I'll make my
20   record and you'll make yours.
21   BY MR. LAUFER:
22       Q.   What did you do to prepare for
23   the deposition?  Actually, sorry, let me
24   just go back.
25       With the exception of the two

Page 12

1
2    objections that your counsel just raised,
3    are you otherwise to testify as a
4    corporate representative on the balance
5    of the topics identified in the 30(b)(6)
6    notice?
7        A.   I am.
8        Q.   Okay.  What did you do,
9    generally speaking, to prepare to testify
10   as a corporate representative at this
11   deposition?
12       A.   So I, as you already
13   referenced, I reviewed the deposition,
14   the topics.  I refreshed myself with the
15   supply agreement.  And had a prep session
16   with my legal team.
17       Q.   How many meetings did you have
18   in order to prepare for this deposition?
19       A.   Two.
20       Q.   When was each of those
21   meetings?
22       A.   First was Friday.  And second
23   one was Sunday.
24       Q.   How long was the Friday
25   meeting to prepare for the deposition?

Page 13

1
2        A.   Couple of hours.
3        Q.   And who attended the Friday
4    meeting?
5        A.   Representatives of McKesson's
6    legal team, Sidley legal team
7    and Garfinkle's legal team --
8        Q.   And who?  You're cutting out a
9    little bit, Mr. Bowers, if you could
10   either move the microphone closer to you
11   or make some other adjustment.
12       A.   I can try to move the fan
13   over.  Is that better?
14       Q.   I think so.  Thank you.
15       If you could just give the
16   answer again.  You said there were
17   members of McKesson's legal team, members
18   of the Sidley Austin firm, then you said
19   a third thing that we didn't quite catch.
20       A.   Garfinkle.  Garfinkle.
21       Q.   So were there only lawyers in
22   the Friday meeting?
23       A.   Yes.
24       Q.   How many lawyers were in the
25   Friday meeting?

4 (Pages 10 - 13)

Page 266

1
2     Q.   McKesson had not in fact
3  applied the $49.7 million payment to any
4  particular invoices or amounts due.
5  Correct?
6     A.   It's against the account
7  because it was in dispute.
8     Q.   So the answer to my question
9  is I'm correct, right?
10    A.   Has it been applied to
11 individual invoices?
12    Q.   Yes.
13    A.   No, it has not.
14    Q.   All right.
15       Ordinarily, under the terms of
16 the parties' relationship, and I think
17 you referred to this earlier, McKesson
18 gets credits and incentives and rebates
19 and other adjustments from drug
20 manufacturers when it buys, in particular
21 volumes.  Right?
22    A.   That is correct.
23    Q.   And is it fair to say that
24 Rite-Aid's purchases from McKesson, given
25 their volume, helped generate some of

Page 267

1
2  these volume discounts?
3     A.   That is correct.
4     Q.   And when Rite-Aid's orders
5  make McKesson eligible for those
6  discounts, is it fair to say that
7  McKesson will typically share those
8  discounts to Rite-Aid, or with Rite-Aid?
9     A.   If earned.
10    Q.   Okay.  And McKesson does so by
11 calculating rebates that it, McKesson,
12 has earned in the prior period?
13    A.   Yes.  As long as Rite-Aid's in
14 compliance to their agreement.
15    Q.   Okay.  And so then McKesson
16 applies the rebates as credits that
17 reduce Rite-Aid's future obligations to
18 McKesson.  Fair?
19    A.   Fair.
20    Q.   And is it also true that
21 Rite-Aid can be awarded credits when it
22 returns unsold products?
23    A.   As long as they are in
24 compliance, yes.
25    Q.   Okay.  And the conditions that

Page 268

1
2  govern these rebates and credits are
3  actually set out in the supply agreement.
4  Right?
5     A.   Correct.
6     Q.   Okay.
7        MR. LAUFER:  And let's go to
8  what I'll mark as Exhibit 15, tab
9  22.
10       (McKesson Exhibit 16 for
11 identification, email dated June
12 18, 2025, production numbers
13 RAD-MCK 8654.)
14       MR. CROWELL:  Before you go
15 on, I'm going to direct.  This goes
16 to Topic 8, which I've objected to.
17 And I'm going to direct Mr. Bowers
18 not to answer any questions on this
19 Topic 8 because it was no relation
20 whatsoever to do with the $49.7
21 million payment.
22       And as you put it earlier,
23 you're permitted to ask questions
24 within the scope of the dispute,
25 and this is not within the scope of

Page 269

1
2  the dispute.  So he's not going to
3  answer these questions.
4        MR. LAUFER:  Well, I disagree.
5  What rule of anything allows you to
6  instruct a witness not to answer
7  questions?
8        MR. CROWELL:  Well, because as
9  you've correctly pointed out
10 earlier, I'm just using your words,
11 you're permitted to ask questions
12 that are within the scope of this
13 dispute.  And this is not.  So he's
14 not going to answer these
15 questions.  If you have a problem
16 you can take it up with the court.
17       MR. LAUFER:  Of course it's
18 within the scope of the dispute.
19 Actually we served a valid
20 deposition notice and you guys were
21 required to move for a protective
22 order.
23       MR. CROWELL:  Well, we
24 objected to it.  And I'm telling
25 you now --

68 (Pages 266 - 269)

Page 298

```
1
2        C E R T I F I C A T E
3  STATE OF NEW YORK   )
                        : ss.
4  COUNTY OF NEW YORK  )
5
6      I, ERIC J. FINZ, a Shorthand
7  Reporter and Notary Public within and for
8  the State of New York, do hereby certify:
9      That JAMES JUSTIN BOWERS, the
10 witness whose deposition is hereinbefore
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by the witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I
17 am in no way interested in the outcome of
18 this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 5 day of August, 2025.
21
22
23
24       ERIC J. FINZ
25
```

Page 299

```
1
2        E X H I B I T S
3  DESCRIPTION                    PAGE
4  (McKesson Exhibit 1 for      82
5  identification, Supply
6  Agreement, production numbers
7  RAD-MCK 1085 through RAD-MCK
8  1358.)
9  (McKesson Exhibit 2 for      82
10 identification, Motion of
11 McKesson Corporation.)
12 (McKesson Exhibit 3 for      90
13 identification, Final Order.)
14 (McKesson Exhibit 4 for      99
15 identification, letter dated
16 April 23, 2025, production
17 numbers RAD-MCK 5913 through
18 RAD-MCK 5914.)
19 (McKesson Exhibit 5 for      159
20 identification, email dated
21 April 29, 2025, production
22 numbers MCK 788 through MCK
23 789.)
24
25
```

Page 300

```
1
2        E X H I B I T S (Continued)
3  DESCRIPTION                    PAGE
4  (McKesson Exhibit 6 for      168
5  identification, email dated May
6  2, 2025, with attachment,
7  production numbers MCK 849
8  through MCK 852.)
9  (McKesson Exhibit 7 for      179
10 identification, email dated May
11 1, 2025, production numbers MCK
12 799 through MCK 800.)
13 (McKesson Exhibit 8 for      182
14 identification, email dated May
15 2, 2025, production numbers MCK
16 819 through MCK 820.)
17 (McKesson Exhibit 9 for      218
18 identification, email dated May
19 3, 2025, production numbers MCK
20 13107 through MCK 13108.)
21 (McKesson Exhibit 10 for     224
22 identification, email dated May
23 5, 2025, production numbers MCK
24 898.)
25
```

Page 301

```
1
2        E X H I B I T S (Continued)
3  DESCRIPTION                    PAGE
4  (McKesson Exhibit 11 for     235
5  identification, email dated May
6  5, 2025, production numbers MCK
7  903.)
8  (McKesson Exhibit 12 for     251
9  identification, email dated
10 October 28, 2024, production
11 numbers MCK 4092.)
12 (McKesson Exhibit 13 for     255
13 identification, email dated May
14 23, 2025, production numbers MCK
15 14248.)
16 (McKesson Exhibit 14 for     256
17 identification, email dated May
18 5, 2025, production numbers MCK
19 904 through MCK 905.)
20 (McKesson Exhibit 15 for     259
21 identification, email dated May
22 29, 2025, production numbers MCK
23 14495.)
24
25
```

76 (Pages 298 - 301)