**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **McMANIMON, SCOTLAND & BAUMANN, LLC** <br> 75 Livingston Avenue, Suite 201 <br> Roseland, New Jersey 07068 <br> (973) 622-1800 <br> Anthony Sodono, III <br> Email: asodono@msbnj.com <br> Michele M. Dudas <br> Email: mdudas@msbnj.com <br> *(Local Counsel to McKesson Corporation and certain corporate affiliates)* | **BUCHALTER, a PROFESSIONAL CORPORATION** <br> 18400 Von Karman Avenue, Suite 800 <br> Irvine, California 92612-0514 <br> (949) 760-1121 <br> Jeffrey K. Garfinkle (admitted *pro hac vice*) <br> Email: jgarfinkle@buchalter.com <br> Daniel H. Slate (admitted *pro hac vice*) <br> Email: dslate@buchalter.com <br> Brian T. Harvey (admitted *pro hac vice*) <br> Email: bharvey@buchalter.com <br> *(Co-Counsel to McKesson Corporation and certain corporate affiliates)* |
| **SIDLEY AUSTIN LLP** <br> One South Dearborn Street <br> Chicago, Illinois 60603 <br> Telephone: (312) 853-7000 <br> Dennis M. Twomey (admitted *pro hac vice*) <br> Email: dtwomey@sidley.com <br> -and- <br> 787 Seventh Avenue <br> New York, New York 10019 <br> Telephone: (212) 839-5300 <br> John J. Kuster (admitted *pro hac vice*) <br> Email: jkuster@sidley.com <br> *(Co-Counsel to McKesson Corporation and certain corporate affiliates)* | Case No. 25-14861 (MBK) <br><br> Chapter 11 (Jointly Administered) <br><br> Honorable Michael B. Kaplan, U.S.B.J. |
| In re: <br><br> NEW RITE AID, LLC, *et al.*,[1] <br><br>                    Debtors. | |

**REPLY BRIEF IN SUPPORT OF MOTION OF MCKESSON CORPORATION FOR ENTRY OF AN ORDER (A) ALLOWING ADMINISTRATIVE EXPENSE CLAIM, (B) COMPELLING IMMEDIATE PAYMENT THEREOF, AND (C) GRANTING RELATED RELIEF**

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

McKesson Corporation and certain corporate affiliates (collectively, "McKesson") hereby file this reply brief (the "Reply") in support of the *Motion of McKesson Corporation for an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Dkt. No. 655][2] (including all attachments thereto, the "Motion")[3] in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") filed by Rite Aid Corporation ("Rite Aid") and its affiliated debtors and debtors in possession (collectively, the "Debtors").  In support of the Motion, McKesson submits the accompanying *Declaration of John J. Kuster in Support of Motion of McKesson Corporation for an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* ("Kuster Declaration") with exhibits, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.        On May 5, 2025, McKesson received a wire from Rite Aid Hdqtrs Corp. ("HQ")—as it had every business day since Debtors' emergence from their First Bankruptcy over eight months earlier.  The payment from HQ was in the amount of the outstanding invoices then due and owing to McKesson under the 10-day payment terms of the parties' governing agreement (as amended, supplemented, restated, and otherwise modified from time to time, the "Supply Agreement")—the same 10-day payment terms that had been in effect since Debtors' emergence. In every material respect, the May 5 Wire was made in the same manner and with the same timing as it had been since the Supply Agreement first went into effect.  And non-payment would have permitted McKesson to immediately suspend shipments to Debtors—this was equally true for every other payment made by HQ since emergence.

---

[2] All references to "[Dkt. No. _]" herein refer to the docket in the above-captioned Chapter 11 Cases except where otherwise expressly indicated.
[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

2.      Debtors raise several internally-contradictory theories in an effort to characterize this May 5 Wire as something it was not.  It was not an unauthorized post-petition payment by HQ, supposedly intended as a prepayment for goods to be shipped later by McKesson on May 6 and May 7.  HQ was an obligor under the Supply Agreement and was not in bankruptcy at the time of the payment, and the payment was made from HQ's bank account—this is undisputed and should end the inquiry.  But beyond that, the amount of the May 5 Wire matched the amount owed to McKesson from invoices issued 10 days earlier.  And there is no evidence whatsoever that the May 5 Wire was intended to be a prepayment—in fact, Debtors admit they never told McKesson that the May 5 Wire was intended to be a prepayment.  Finally, Debtors have not even attempted to explain why they purposefully would have made an admittedly *unauthorized* post-petition payment.

3.      Debtors' argument that the May 5 Wire was a preferential transfer is equally unavailing.[4]  The May 5 Wire could not have been more automatic.  As explained above, the May 5 Wire was made in the same amount (10 days outstanding), manner and timing as every other payment made for goods delivered under the Supply Agreement.  Moreover, the McKesson/Rite Aid supply/payment relationship was well-established by the time of the May 5 Wire—McKesson had delivered pharmaceutical products to Debtors every single business day and HQ had paid McKesson every single business day since entry into the Supply Agreement.  This amounted to several billion dollars of products delivered by McKesson and paid for by HQ at a rate of tens of millions of dollars per day.  No case cited by Debtors even comes close to the frequency and consistency of deliveries and payments as existed between McKesson and Rite Aid.

---

[4] Whether the May 5 Wire is recoverable as a preferential transfer will be addressed in a separate, related hearing after the August 19, 2025 hearing.  McKesson reserves all rights, claims and defenses with respect to that litigation, but has included an initial statement of its position on the alleged preference issues for the May 5 Wire herein to respond to the arguments on those issues raised in Debtors' Opposition and the BofA Joinder (defined below).

4.       The fact that Debtors felt pressure to pay McKesson because of the importance of

the products that McKesson supplies and because of the original agreed terms of the Supply

Agreement does not make the May 5 Wire non-ordinary.  Nor does the fact that Debtors were

planning to file for bankruptcy on May 5—indeed McKesson had no knowledge of Debtors'

behind-the-scenes planning and strategy.  The critical facts are that HQ paid McKesson the amount

owed on the same 10-day terms and in the same manner as it had done throughout the term of the

Supply Agreement.

5.       Finally, even if the May 5 Wire were deemed a preferential transfer, it is not

recoverable by Debtors.  Under the cases cited below, McKesson would be entitled to set off the

$49.7 million preference judgment against its over $130 million (potentially $180 million) section

503(b)(9) administrative claim.  The net result would be a reduction of McKesson's outstanding

administrative claim by the preference amount, while the amounts owed by Debtors for goods

delivered by McKesson on May 6 and May 7 would remain outstanding and required to be paid.

## **BACKGROUND**

### I.      **The Constant 10-Day Terms and 10-Day Payments Under the Supply Agreement Following the First Bankruptcy**

6.       McKesson has been a supplier to Debtors' pharmacies for over 20 years.  *See*

Bowers Decl. ¶ 4.[5]  For most of that time, Debtors' relationship with McKesson was governed by

a December 2003 supply agreement, which was amended, restated, supplemented and/or otherwise

modified from time to time and ultimately superseded and replaced in its entirety by a new supply

agreement as of August 30, 2024—the Supply Agreement.  The Supply Agreement arose following

Debtors' emergence (as reorganized debtors) from their prior chapter 11 cases (the "First

---

[5] References to the "Bowers Decl." refer to the *Declaration of James Justin Bowers in Support of Motion of McKesson Corporation for an Order (A) Allowing Administrative Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* attached as part of the Motion.  [Dkt. No. 655-2.]

Bankruptcy"), *see id.* ¶¶ 3–4, and was one of several agreements bearing on the McKesson-Rite Aid relationship approved by this Court in the First Bankruptcy.

7.    From the time the Supply Agreement became effective on August 30, 2024, until the time Debtors filed the instant Chapter 11 Cases on May 5, 2024, Debtors' relationship with McKesson was governed by constant, unchanging 10-day payment terms, which were created and agreed to against the backdrop of the First Bankruptcy—and approved by this Court, *see* [First Bankr. Dkt. No. 4815],[6] [First Bankr. Dkt. No. 4532]—to ensure Debtors would be able to continue to purchase and pay for products supplied by McKesson.

8.    As McKesson explained in the Motion (¶¶ 5–7), since Debtors' emergence from the First Bankruptcy, Debtors were at all times subject to, *inter alia*, the following relevant payment terms:

- **Section 6.1**: Provides that McKesson will invoice all amounts actually due and payable by Rite Aid (or any other obligor pursuant to Section 18 of the Supply Agreement) on EDI Invoices[7] to be computed in accordance with Section 3 of the Supply Agreement.  The "Invoice Date" was defined as the date of delivery of such invoice.  *See* Bowers Decl. Ex. 1, at § 6.1.

- **Section 7.1**: Provides for a fixed cap on the amount of trade credit that can be outstanding at any given time, subject to certain fixed seasonal adjustments (the "Accounts Receivable Cap").  *See id.* at § 7.1.  Additionally provides for 10-day payment terms—in other words, that McKesson would invoice Rite Aid for orders, and payment to McKesson would always be due 10 days after the invoice date.  *Id.*

- **Section 7.12(a)**: Permitted McKesson to change the Payment Terms in any material respect if Rite Aid ceased to meet McKesson's credit requirements, upon giving certain notice.  *See id.* § 7.12(a).

---

[6] All references to "[First Bankr. Dkt. No. _]" herein refer to the docket in the Prior Debtors' jointly-administered cases in the First Bankruptcy, captioned *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J.).

[7] "EDI Invoice" means any invoice for payment by Rite Aid transmitted by EDI stating the EDI Invoice price for Products purchased by Rite Aid and the due date for such EDI Invoice price. *See* Supply Agreement, Sched. 1 § 1.45. "EDI" means electronic data interchange, in the formats adopted by Rite Aid and approved by McKesson. *Id.* § 1.44.

9.       Indeed, at all relevant times, Debtors were on 10-day payment terms with McKesson.  *See* Kuster Decl. Ex. 1 ("Liebman Tr.") 31:2-7.

10.      When Debtors paid McKesson during the relevant time period, payments were always made by wire transfer from Rite Aid's subsidiary, HQ.  Liebman Tr. 92:12-18.  HQ made such payments from an account ending in "2257."  *E.g.*, Bowers Decl. Ex. 6 at 1 (showing payment of May 5 Wire by HQ from an account ending in 2257); *see also* Liebman Tr. 115:3-5.  Contrary to Debtors' representations, HQ owned the 2257 account.  Liebman Ex.[8] 19 ([Dkt. No. 1003]) at PDF[9] 32 (listing the account ending in "2257" as an asset of HQ); Liebman Tr. 110:9-10.  In fact, McKesson and Rite Aid continued to operate under the normal course of McKesson's EDI Invoices being paid on 10-day terms like clockwork, transacting tens of millions of dollars' worth of product sales and payments every business day throughout the pre-petition term of the Supply Agreement.  *See* Liebman Tr. 92:12-94:25.

## II.    McKesson Exercises Its Rights Under the Court-Approved Supply Agreement to Tighten Debtors' Credit Terms

11.      In January 2025, Debtors furnished limited financial reporting to McKesson pursuant to the Supply Agreement that demonstrated that Debtors' financial performance failed to meet McKesson's credit requirements.  *See* Kuster Decl. Ex. 3 ("Bowers Tr.") at 108:6-18; Bowers Ex.[10] 4 at 1.  Specifically, Debtors' actual performance fell far short of the financial projections, including with respect to projected EBITDA and liquidity, provided to McKesson at the time Debtors emerged from the First Bankruptcy.  Bowers Ex. 4 at 1.

---

[8] Citations to "Liebman Ex. _" refer to the selected exhibits from the deposition of Marc Liebman on August 5, 2025, as numbered in that deposition, attached to the Kuster Declaration as Exhibit 2.

[9] Citations to "PDF" refer to the page numbering at the top of the page generated by the Court's electronic filing system, not to a document's internal pagination.

[10] Citations to "Bowers Ex. _" refer to the selected exhibits from the deposition of James Justin Bowers on August 4, 2025, as numbered in that deposition, attached to the Kuster Declaration as Exhibit 4.

12.     Debtors' limited provision of financial information to McKesson also constituted a breach of Debtors' obligations under the Supply Agreement.  Specifically (but without limitation), Section 7.11(f) obligates Debtors to provide various information including financial information, "at the earlier of (i) 20 days after the end of each calendar month and (ii) concurrently with its delivery to its senior lenders pursuant to its senior debt documents or any other holders of Material Indebtedness," and Section 7.11(k) requires Debtors to furnish information about their financial condition "promptly following any request therefor."  Supply Agreement §§ 7.11(f), (k).  Despite these express contractual obligations and McKesson's requests for financial information, Debtors persistently failed to provide it.  Bowers Tr. 103:14-22, 109:5-7, 110:4-12, 136:121-25; Liebman Tr. 139:19-144:20.

13.     Notably, Debtors were considering filing for bankruptcy protection a second time since at least March 2025, but at no point shared this possibility with McKesson.  Liebman Tr. 20:10-21:25 (discussing March-April DIP Budget forecasting).  In planning for their bankruptcy filing, Debtors were preparing to close or sell up to 1/3 of their existing retail stores.  *Id.* 24:22-25:1.  This, of course, would have the obvious consequence of reducing the volume of Products Debtors would need to order from McKesson.  *Id.* 25:2-8.

14.     On April 23, 2025, McKesson exercised its rights under Section 7.12 of the Supply Agreement to change payment terms and limit total credit following seven days' written notice if Rite Aid failed to maintain compliance with McKesson's credit requirements.[11]  Bowers Ex. 4 at 1.  McKesson thus informed Rite Aid that as of May 1, 2025, the Accounts Receivable Cap may not exceed $175 million, and that payment would now be made on 6-day payment terms, though the parties ultimately agreed to terms, including: (i) 7-day terms (effective as of May 12, 2025);

---

[11] McKesson also referenced Section 16 of the Supply Agreement, which is its notice provision.  Supply Agreement § 16.

and (ii) setting the Accounts Receivable Cap at $200,000,000, with an additional $5,000,000

decrease each day until the Accounts Receivable Cap reached $175,000,000.  *Id.* at 2.

### III.    McKesson Assists Debtors in Managing Their Orders to the Accounts Receivable Cap So as to Avoid Debtors' Breach of the Supply Agreement and Continue the Parties' Business Relationship in Good Faith

15.    After the April 23, 2025 letter, Debtors continued placing orders with McKesson—

all still subject to the original 10-day payment terms.  On May 1, 2025, Debtors placed a total

volume of orders that, if fulfilled and invoiced consistent with the Supply Agreement, would place

their outstanding balance with McKesson over the amount permitted under the Accounts

Receivable Cap.  Bowers Tr. 205:12-13.  McKesson processed all orders up to the Accounts

Receivable Cap, and paused orders that would put Debtors over the cap.  *Id.* 225:10-226:4.

16.    Further, to "help Rite-Aid manage to their cap," McKesson informed Debtors that

McKesson's "forecast indicate[d] that Rite Aid is set to exceed the established credit limit of

$200M by the end of the business day."  Bowers Tr. 187:20-23, 189:9-10; Bowers Ex. 8 at

MCK_0000820.  Debtors subsequently made a payment of $11 million on May 1, 2025, bringing

the outstanding balance owed to McKesson below the Accounts Receivable Cap.  Bowers Tr.

207:19-25.  That $11 million was, as proposed by Debtors, applied to pay invoices due May 2,

2025 (for *past* deliveries), and even then, Debtors expressly and contemporaneously identified it

to McKesson as a "prepayment" because it paid such invoices early.  *See id.* 214:19-215:20;

Bowers Ex 4.  Contrary to Debtors' allegations otherwise, at no time did McKesson ever change

the calculation of the Accounts Receivable Cap; rather, McKesson sought to give guidance to

Debtors so that they would be able to better manage to the cap going forward.  *See* Bowers Tr.

189:2-10.  McKesson also kept Debtors apprised of its calculations regarding their outstanding

obligations.  *Id.* 189:2-3, 200:6-11, 208:19-209:2, 211:8-212:4.

**IV.    Debtors Place Orders Totaling $49.7 Million on April 24, 2025 and April 25, 2025, and Pay McKesson $49.7 Million for Those Orders 10 Days Later Consistent With the Supply Agreement**

17.    On April 24, 2025, and April 25, 2025, Debtors placed orders from McKesson totaling approximately $49.7 million.  Liebman Tr. 37:6-9.  Pursuant to the Supply Agreement, payment was due ten days later, on Sunday, May 4, 2025, and Monday, May 5, 2025.  Bowers Decl. ¶ 13; Liebman Tr. 34:9-35:22.  However, because the due date for the April 24, 2025 orders fell on a Sunday (May 4), the adjusted due date for the April 24, 2025 invoice pursuant to Section 7.2 of the Supply Agreement was Monday, May 5, 2025.  Liebman Tr. 34:9-35:22.  Thus, both orders were due to be paid on May 5, 2025.  *Id.*

18.    Specifically, on April 24, 2025, Debtors placed orders from McKesson totaling $28,092,801.85.  Bowers Decl. ¶ 13.  On April 25, 2025, Debtors placed orders from McKesson totaling $21,595,586.57.  *Id.* ¶ 14.  Thus, combined, Debtors owed McKesson $49,688,388.42 on May 5, 2025 for orders placed on April 24, 2025 and April 25, 2025.  *Id.* ¶ 15; Liebman Tr. 34:12-35:22.  Debtors also readily conceded that the Accounts Receivable Cap had "absolutely no effect whatsoever on whether payments were due under the Supply Agreement ten days after they're invoiced."  Liebman Tr. 50:4-11.

19.    At 3:11 P.M. ET on May 5, 2025, McKesson received a wire in the amount of the May 5 Wire Amount from HQ, a subsidiary guarantor of Rite Aid.  Bowers Decl. ¶ 23; Bowers Decl. Ex. 6 at 1.  The wire confirmation showed that the payment came from an account that Debtors' own pleadings reflect was owned by HQ.  *See* [Dkt. No. 23] at PDF 53 (listing bank account ending in "2257" as owned by HQ); Liebman Ex. 19 ([Dkt. No. 1003]) at PDF 32.  The payment of McKesson's invoices via a wire from HQ was consistent with all or virtually all prior payments received by McKesson under the Supply Agreement since Debtors' emergence from the First Bankruptcy.  Bowers Decl. ¶ 23.

20.     Although Rite Aid filed its bankruptcy petition approximately 21 minutes prior to McKesson's receipt of the May 5 Wire Amount from HQ, at the time that McKesson received the May 5 Wire Amount, HQ had not yet filed for bankruptcy.  *Id.* ¶ 24.  HQ filed its chapter 11 petition and entered bankruptcy over seven hours later, at 10:35 P.M. ET.  *Id.*

**V.     Debtors Retroactively Claim the $49.7 Million May 5 Wire Was a Prepayment for Post-Petition Orders**

21.     Following McKesson's receipt of the May 5 Wire Amount from HQ, Debtors disputed that the May 5 Wire Amount satisfies the April 24, 2025 and April 25, 2025 invoices. *See generally* Opp'n.  Notwithstanding that the May 5 Wire Amount matched the amount owed for the April 24, 2025 and April 25, 2025 invoices and that the May 5 Wire Amount was paid to McKesson ten days after those invoices consistent with the Supply Agreement's 10-day terms, Debtors claim that the May 5 Wire constituted an advance payment for certain initial post-petition deliveries made by McKesson on May 6 and May 7, 2025.  *See* [Dkt. No. 672] at 1; Opp'n at 12.

22.     Debtors freely admit that there is no contemporaneous document supporting that the May 5 Wire was authorized as a "prepayment" to McKesson.  Liebman Tr. 38:20-24, 44:25-45:2.  Instead, Debtors claim that their lenders verbally agreed to authorize the payment as a prepayment—in a telephone call with Debtors' counsel, the very day the payment was made— and, crucially, <u>*never communicated to McKesson*</u> that the May 5 Wire was intended to be a prepayment.  Liebman Tr. 123:15-124:20.  At no time prior to May 5, 2025 did any of the Debtors communicate to McKesson that the May 5 Wire was intended to be (much less appropriately applied as) some kind of down payment for future, post-petition deliveries to or orders placed by Debtors to McKesson under the Supply Agreement.  Bowers Decl. ¶ 22; Liebman Tr. 38:20-24.

23.     Debtors' lack of contemporaneous documentation of the May 5 Wire as a purported "prepayment" is in stark contrast to their prior practice throughout their relationship with

McKesson.  Liebman Tr. 43:5-10 (acknowledging that, in contrast to the purported process for the

May 5 Wire, past lender authorizations for Debtors' payments to McKesson had been in writing).

24.      Further, Debtors' assertions that the May 5 Wire of $49,674,910 was a

"prepayment" are entirely inconsistent with Debtors' prepayment practice under the parties' post-

petition arrangement, which has involved wiring flat sums to McKesson to apply to Debtors'

balance.  *See, e.g.*, *id.* 129:21-130:21; Liebman Ex. 23 at MCK_0013299; Kuster Decl. Ex. 5 at

MCK_0013367; Kuster Decl. Ex. 6 at MCK_0013495.

## VI.   McKesson and the Non-McKesson Participating Parties Enter Into the Stipulation and Litigate Their Dispute Over the May 5 Wire Pursuant Thereto

25.      After Debtors abruptly changed course and sought to recharacterize the May 5 Wire

as a post-petition prepayment after filing for bankruptcy, McKesson and the Non-McKesson

Participating Parties entered into a carefully-negotiated stipulation [Dkt. No. 672]

(the "Stipulation") governing the terms on which the dispute regarding the May 5 Wire would be

litigated, including the scope, timing, and operative trigger for McKesson's right to payment of

the May 5 Wire Amount.  *See* Mot. ¶¶ 32-35; Stipulation.

26.      On June 2, 2025, McKesson filed the Motion.  On June 3, 2025, the Non-McKesson

Participating Parties, which include Debtors and their key stakeholders, agreed in the Court-

approved Stipulation that if the Court determines that the May 5 Wire Amount was a pre-petition

payment and is not recoverable as a preferential transfer, then Debtors shall promptly pay

McKesson the May 5 Wire Amount in full in cash, and further agreed for Debtors to take additional

steps to ensure funds are available to make that payment.  *See* Stipulation ¶ 6.  To that end, the

Court approved language in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition

Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and

Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V)*

*Modifying the Automatic Stay, and (VI) Granting Related Relief* [Dkt. No. 1396] (the "<u>Final DIP Order</u>") providing certain mechanisms to protect McKesson's ability to recover in the instant litigation regardless of whether the Chapter 11 Cases are converted or the DIP Termination Date occurs. *See* Final DIP Order ¶ 44.

27.    On August 1, 2025: (i) Debtors filed (after filing under seal on July 31, 2025) (a) the *Debtors' Memorandum of Law in Opposition to McKesson Corporation's Motion for an Order Allowing Administrative Expense Claim and Related Relief* [Dkt. No. 1758] (the "<u>Opposition</u>"), (b) the *Declaration of Marc Liebman in Opposition to McKesson Corporation's Motion for an Order Allowing Administrative Expense Claim and Related Relief* [Dkt. No. 1759] (the "<u>Liebman Declaration</u>"), and (c) the *Declaration of Alison Benedon in Opposition to McKesson Corporation's Motion for an Order Allowing Administrative Expense Claim and Related Relief* (the "<u>Benedon Declaration</u>"); (ii) Debtors filed the *Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination* [Dkt. No. 1760] (the "<u>Adversary Complaint</u>");[12] and (iii) Bank of America, N.A. ("<u>BofA</u>") filed the *Bank of America, N.A's Joinder to the Debtors' Opposition to McKesson's Motion for Payment and Bank of America, N.A.'s Reservation of Rights under the Intercreditor Agreement* [Dkt. No. 1748] (the "<u>BofA Joinder</u>").

28.    On August 14, 2025, the Court rejected Debtors' efforts to delay the hearing based on the various alleged claims against McKesson raised in Debtors' briefing in light of the Stipulation previously agreed to by McKesson and the Non-McKesson Participating Parties and approved by the Court.  On August 15, 2025, the Court determined, after disputes arose between McKesson and the Non-McKesson Participating Parties regarding the timing and scope of the

---

[12] The Adversary Complaint was filed concurrently with the Opposition.

hearing on the Motion, that the hearing would proceed on August 19, 2025, but any preference issues for the May 5 Wire, if applicable, would be adjudicated on a separate, expedited timeframe.

## **ARGUMENT**

**I.     The May 5 Wire Amount Was Unquestionably a Pre-Petition Payment Made to Satisfy the April 24, 2025 and April 25, 2025 Invoices**

29.     Debtors assert that the May 5 Wire was an unauthorized post-petition transfer subject to avoidance under section 549 of the Bankruptcy Code.  After having repeatedly fought tooth and nail to shirk their obligations to McKesson in both the First Bankruptcy and the Chapter 11 Cases, Debtors now ask the Court to believe that—while in "cash dominion" with their senior secured lenders, *see* Opp'n ¶ 24—Debtors voluntarily paid McKesson roughly $49.7 million on a post-petition basis without authorization from the Court or under the Bankruptcy Code.  This position strains credulity and should be rejected.

30.     Debtors bear the burden of proving that a post-petition transfer of estate property has occurred.[13]  *See, e.g.*, *Shubert v. Stranahan (In re Pa. Gear Corp.)*, Bankr. No. 02-36436, Adv. Nos. 03-0940, 03-0942, 2008 WL 2370169, at *6 (Bankr. E.D. Pa. Apr. 22, 2008); *Bolus v. SMS Fin. CH, LLC (In re Bolus)*, No. 5:20-02899-MJC, Adv. Pro. No. 5:22-00049-MJC, 2023 WL 6396094, at *5 (Bankr. M.D. Pa. Sept. 29, 2023); *Plunkett Cooney, P.C. v. Comerica Bank (In re M.T.G., Inc.)*, 2:22-CV-12661-TBG-DRG, 2024 WL 5695966, at *8 n.8 (E.D. Mich. Sept. 30, 2024); *Gonzalez v. Sztx Invs., LLC (In re Fresh Acquisitions, LLC)*, Bankr. No. 21-3072-sgj, Adv. Pro. No. 23-03000-sgj, 2023 WL 4921234, at *6 (Bankr. N.D. Tex. Aug. 1, 2023).  Because

---

[13] The elements of a section 549 claim are (1) a transfer of property of the bankruptcy estate (sometimes articulated as two elements – i.e., transfer of and estate property); (2) that occurs after the commencement of the bankruptcy case; and (3) that was not authorized by any provision of the Bankruptcy Code or by order of the bankruptcy court.  *See* 11 U.S.C. § 549(a); *In re Bamboo Abbott, Inc.*, Adv. No. 11-02139, 2012 WL 2803743, at *3 (Bankr. D.N.J. Jul. 5, 2012); *see also, e.g.*, *Bauer v. Gen. Elec. Cap. Corp. (In re Oncology Assocs. of Ocean Cnty., LLC)*, 510 B.R. 463, 468 (Bankr. D.N.J. 2014) ("It is clear to this Court that Congress intended 11 U.S.C. § 549 to apply only to those transfers of estate property that occur ***after*** the commencement of a debtor's bankruptcy case.").

Debtors cannot meet their burden of proving that a post-petition transfer of estate property has occurred, their arguments under section 549 must fail.

**A.     HQ Made the May 5 Wire Before It Filed Its Bankruptcy Petition**

31.     Foremost, Debtors do not and cannot dispute that HQ paid the May 5 Wire to McKesson _before_ HQ filed for bankruptcy, by definition rendering the May 5 Wire a pre-petition payment.  Instead, Debtors contend—without any meaningful support—that despite being paid by HQ, from an HQ-owned account, the May 5 Wire was made "on behalf of" Rite Aid, which had already filed its petition.

32.     Simply put, Rite Aid's earlier bankruptcy filing is irrelevant.  The May 5 Wire was a transfer made by HQ before _its_ bankruptcy filing, and Rite Aid's prior filing does not render the May 5 Wire a post-petition transfer where the transferor-debtor was not itself in bankruptcy.  _See In re Oncology Assocs. of Ocean Cnty., LLC_, 510 B.R. at 468 (finding transfers were not post-petition where they occurred before transferor-debtor filed its petition).

33.     Debtors' arguments to the contrary entirely miss the point.  Although Debtors attempt to distinguish _Oncology Associates_ on the grounds that it involved debtors that were later substantively consolidated and a one-year gap between the relevant bankruptcy filings, _see_ Opp'n ¶ 65, the fact of the debtors' subsequent substantive consolidation in _Oncology Associates_ would have presented a stronger argument for collapsing the debtors' petition dates because it suggests the debtors' affairs really were intertwined, whereas here there are no allegations, much less rulings, that Rite Aid and HQ are not valid legally separate entities.  Further, Debtors' suggestion that the difference in petition times may be disregarded where that difference is seven hours rather than one year would open the door to precisely the unworkable framework this Court rejected in _Oncology Associates_.  _See In re Oncology Assocs. of Ocean Cnty., LLC_, 510 B.R. at 468 ("One

wonders how an attorney could have counseled the transferees as to risks associated with post-petition transfers where the transferor was ***not*** in bankruptcy.").

### B. The May 5 Wire Was Made by HQ From Its Own Assets According to HQ's Own Obligations to McKesson

34.     It is axiomatic that funds held in a bank account in a given entity's name are presumptively property of that entity.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011) (pointing to "well-settled case law" providing that funds in debtors' deposit accounts constituted property of those debtors' estates); *Rocin Liquidation Est. v. Alta AH & L (In re Rocor Int'l, Inc.)*, 352 B.R. 319, 328 (Bankr. W.D. Okla. 2006) ("[T]he presumption is that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established.") (internal citations omitted); *McHale v. Boulder Cap., LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 70 (Bankr. S.D.N.Y. 2010) ("[M]oney in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate.") (internal citations omitted); *Millard Refrigerated Servs., Inc. v. Landamerica 1031 Exch. Servs., Inc. (In re LandAmerica Fin. Grp., Inc.)*, 412 B.R. 800, 809 (Bankr. E.D. Va. 2009) ("In line with the broad definition of 'property of the estate,' money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate.").  And as noted in the Motion, a parent's ownership of equity in its subsidiary does not render the subsidiary's assets property of the parent's estate.  *See* Mot. ¶ 41.

35.     Crucially, Debtors' own sworn schedules and statements of financial affairs identify the account from which the May 5 Wire was paid and the funds therein as assets of HQ, not Rite Aid.  *See* [Dkt. No. 23] at PDF 53; Liebman Ex. 19 ([Dkt. No. 1003]) at PDF 32; Liebman Tr. 116:6-8; *see also* Opp'n ¶ 58 (noting that Rite Aid "does not directly own any bank accounts").  Likewise, HQ's statement of financial affairs lists the May 5 Wire as a transfer made by <u>HQ</u>, whereas Rite Aid's own statement of financial affairs states that Rite Aid made no transfers within

the 90 days preceding the Petition Date. *See* Liebman Ex. 19 ([Dkt. No. 1003-1]) at PDF 24 (Pt.

2 § 3); Liebman Ex. 20 [Dkt. No. 942-1] at PDF 24 (Pt. 2 § 3); Liebman Tr. 117:14-119:7. Rite

Aid also specifically disclaimed any equitable or trust interest in property in its schedules. *See*

Liebman Ex. 20 [Dkt. No. 942-1] at PDF 31 (Pt. 11 § 21). These filings belie Debtors' baseless

claims that Rite Aid had some form of indirect, latent property interest in the funds used to pay the

May 5 Wire. Moreover, HQ was no stranger to the Supply Agreement, and was instead a primary

obligor thereunder pursuant to the Subsidiary Guarantee Agreement and the Security Agreement,

as contemplated in Section 7.15 of the Supply Agreement.

36.     Tellingly, Debtors refused to produce any relevant documentation regarding the

relationship between Rite Aid Corp. and HQ which would show their cash management system or

the alleged lack of dominion and control by HQ thereunder that they claim, in vague and

conclusory fashion, somehow renders all cash Rite Aid's property notwithstanding the obvious

indicia to the contrary.[14] Kuster Decl. ¶ 8. Instead, Debtors rely on a hodgepodge of miscellaneous

allegations that are, at best, unpersuasive, and in some instances, demonstrably false and/or

contradicted by Debtors' own pleadings.

37.     Debtors' only legal support for their argument is two cases, one of which is from

1917 and predates both the Bankruptcy Code and its predecessor statute, and neither of which

involved centralized cash management systems or other analogous facts, and Debtors make no

attempt to identify any. *See* Opp'n ¶ 57. Debtors briefly note that these cases stand for the

unremarkable general proposition that entities may, in some instances, make potentially voidable

transfers on behalf of one another but fail to establish that any such indirect transfer occurred here.

---

[14] Their failure to provide relevant evidence despite such information being requested and highly relevant to their
position on this issue should result in an adverse inference against Debtors that such evidence would have been harmful
to their position. *See, e.g.*, *Riley v. Taylor*, 277 F.3d 261, 283 (3d Cir. 2001).

38.     That is because they cannot do so.  Instead of presenting meaningful evidence to undermine the incontrovertible fact that HQ's May 5 Wire to McKesson was from HQ's own bank account and assets, Debtors point to a provision in the Cash Management Order (as defined in the Opposition) stating that payments made by HQ "or any other Debtor" on behalf of "any other Debtor" will be deemed made by the "Originating Debtor."  Opp'n ¶ 59 (emphases omitted).  This is irrelevant for multiple reasons.  First, the Cash Management Order is not retroactively effective, so whatever it may say about future transfers (which essentially consists of stipulations for convenience regarding intercompany transactions), it has no bearing on payments made prior to its entry.[15]  *See* Cash Management Order ¶ 24 ("Nothing contained in the Motion or this Final Order, and no action taken pursuant to the relief requested or granted . . . shall be construed or deemed to be . . . a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or applicable law.").  Second, even if the Cash Management Order were applicable, "Originating Debtor" is defined as any Debtor whose property is received by any other Debtor, *see id.* ¶ 20, so this does not establish that Rite Aid, rather than HQ, was the Originating Debtor.

39.     Similarly, Debtors point to the fact that they were allegedly in "cash dominion" (which they have failed to provide documentation of) under their prepetition loan facility and assert that "[a]s a result, the funds in HQ's accounts constituted proceeds of the borrowings that Rite Aid made on a daily basis under the loan facility" Opp'n ¶ 24, but: (i) they elsewhere state that "[c]ash receipts that other Debtor entities generate are swept into HQ's accounts" and that "HQ's accounts are funded almost exclusively from collections on behalf of Rite Aid and other Debtors" (which may or may not include HQ itself), Opp'n ¶¶ 21, 58, suggesting cash in HQ's accounts may come

---

[15] The corresponding interim order did not contain the cited language and was likewise not retroactively effective. *See* [Dkt. No. 127].

from a variety of sources; and (ii) they do not explain how this unproven concept, even if true, would inevitably render cash under the dominion and control of HQ to be property of Rite Aid. To the contrary, Debtors' own statements that any cash arguably attributable to Rite Aid is commingled in HQ's accounts cuts against their argument. *See, e.g.*, *Off. Comm. of Unsecured Creditors of Pack Liquidating, LLC v. Kepler Grp., LLC (In re Pack Liquidating, LLC)*, Case No. 22-0797, Adv. Proc. No. 23-50536, 2024 WL 4427676, at *3-4 (Bankr. D. Del. Oct. 4, 2024) (rejecting "mere conduit" arguments where funds transferred by debtor may have been commingled with funds from other sources in operating account of alleged conduit before alleged conduit paid creditor). [16]

40.    Debtors lean heavily on the fact that HQ was one of many affiliates jointly and severally obligated under the Supply Agreement with Rite Aid, *see* Opp'n ¶¶ 18, 55, 62-63, but again fail to tie this observation to any concrete legal theory.  For example, Debtors point to language authorizing Rite Aid to act as agent for its affiliates but then puzzlingly appear to argue that this somehow renders HQ an agent of Rite Aid.  *See* Opp'n ¶¶ 18, 55.  Debtors similarly do not explain how the fact of there being affiliated guarantors for Rite Aid supports the notion that all such guarantors' property is in fact the property of Rite Aid, the primary obligor. [17]  As Debtors themselves acknowledge, Rite Aid is part of a complex corporate structure featuring numerous

---

[16] Nor is Debtors' obscure reference to the "Remitter Name," Opp'n ¶ 42, persuasive in the face of the clear evidence above that the May 5 Wire was paid by then-*non-Debtor* HQ (as indicated by the fact Debtors themselves ignore it after a single off-hand mention without context, much less support for how or why that form entry alters the outcome).

[17] To the contrary, the fact of affiliated guarantors supports the treatment of such entities as separate and distinct.  *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 208 (3d Cir. 2005), *cert. denied sub nom. McMonagle v. Credit Suisse (USA), Inc.*, 547 U.S. 1123 (2006) (finding that affiliate guarantees were "fundamentally premised on an assumption of separateness"); *R2 Invs., LDC v. World Access, Inc. (In re World Access, Inc.)*, 301 B.R. 217, 287-88 (Bankr. N.D. Ill. 2003) (finding that investor's decision to purchase notes issued by multiple debtors did not evidence investor's treatment of debtors as single consolidated entity, but rather her "awareness" of their "separate corporate" nature, which she used to "hedge" against risk that assets at one debtor may prove less valuable than assets at another debtor); *In re Donut Queen Ltd.*, 41 B.R. 706, 711 (Bankr. E.D.N.Y. 1984) (rejecting argument that lender's insistence on intercompany guarantees reflected failure to treat entities as separate, and reasoning, in denying substantive consolidation, that "in light of [borrower's] limited creditworthiness, [lender] required the additional assurances of two distinct economic entities and required formal guarantees in recognition that they were indeed distinct").

entities with their own assets and liabilities, and operations occur below the Rite Aid level within

that corporate structure.  *See* Opp'n ¶ 58; Liebman Ex. 19 ([Dkt. No. 1003]) at PDF 7-8; [First

Bankr. Dkt. No. 24] Ex. A.  Thus, even if Rite Aid were able to establish that funds paid by HQ

from HQ's account may have originally come from elsewhere within that corporate structure—

which Rite Aid has not done—it would not inevitably follow that the funds came from *Rite Aid*.

Only a *single* Debtor other than Rite Aid (Rite Aid of New Jersey, Inc.) filed for bankruptcy before

the May 5 Wire.  The rest of Debtors' chapter 11 filings, including HQ's, occurred decidedly after

the May 5 Wire.  Rite Aid has not established that the funds could not have come from or through

any of these other Debtors or that all such Debtors lacked dominion and control over any funds (if

any) that flowed to HQ.

41.    These half-baked theories do nothing to counter the presumption that the funds

wired from HQ's account were property of HQ, particularly given Debtors' own sworn statements

supporting McKesson's arguments on that point and Debtors' refusal to produce evidence to

support their contradictory ownership claims.

42.    If the paltry showing by Debtors were deemed sufficient to render any transferee

of a corporate parent's subsidiary vulnerable to claw-back under Section 549 of the Bankruptcy

Code, it would render commonplace cash management systems unworkable and cause chaos for

many businesses.  Any payee would be unable to accept payment without identifying every entity

within the payor's corporate family and either verifying that no such entities had filed for

bankruptcy or obtaining express acknowledgement from all such (and their respective lenders) that

payments received were owned by the entity that made the payments.  If Rite Aid itself cannot or

will not prove its property interest in payments admittedly made by HQ from HQ's account after

repeated discovery requests on that specific issue, it defies logic (and the applicable burden under

Section 549, which requires Debtors to prove the elements of their claim) to require good-faith

transferees like McKesson to prove a negative on that front.

### C. Debtors' Claim That the May 5 Wire Was a Prepayment of Post-Petition Invoices is a Contrived Story with No Meaningful Evidence

43.     In an attempt to evade the clear facts showing that HQ's payment of the May 5

Wire Amount to McKesson was a prepetition payment, Debtors have asserted that the May 5 Wire

was a payment for "initial post-petition deliveries" made by McKesson on May 6 and May 7, 2025.

Opposition ¶¶ 3, 44.   Astoundingly, Debtors freely admit that there is no contemporaneous

documentation indicating that the May 5 Wire was a prepayment, and further admit that the May

5 Wire's alleged status as a "prepayment" was _never communicated to McKesson_ prior to the

instant dispute.   _See_ Liebman Tr. 38:20-39:5, 85:1-19, 123:15-124:14.   Instead, the only

"evidence" supporting the May 5 Wire's status as a prepayment is Debtors' self-serving testimony

of their corporate representative, who admitted that the May 5 Wire was only designated a

"prepayment" the day it was made in an undocumented conversation with lenders.  _Id_. 124:21-23.

Debtors' Opposition also walks back from Debtors' initial position that the May 5 Wire constitutes

a prepayment and, curiously, attributes that argument _to McKesson_.  _See, e.g._, Opp'n ¶ 69.  This is

all preposterous and should be rejected out of hand.

44.     Despite having previously asserted that the May 5 Wire was a prepayment for post-

petition invoices, _see_ Stipulation at 4, Debtors are curiously evasive on this point in their

Opposition.[18]  Debtors state that (i) the May 5 Wire was "solely to ensure post-petition deliveries

---

[18] If the May 5 Wire was a prepayment, Debtors' preference claim for that transfer should fail.  _See, e.g._, _Hechinger Inv. Co. of Del., Inc. v. Universal Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.)_, 489 F.3d 568, 572 (3d Cir. 2007) (payments made prior to the shipment of goods or provision of services "were advance payments and therefore, by definition, not recoverable under § 547 as payments for or on account of an antecedent debt"); _Dots, LLC v. Capstone Media (In re Dots, LLC)_, 533 B.R. 432, 438-40 (Bankr. D.N.J. 2015) (finding that prepayments were not "for or on account of an antecedent debt" as required under § 547(b) notwithstanding existence of master services agreement governing parties' transactions; reasoning that "[t]he debt arises when the debtor receives the goods or

– the same deliveries for which McKesson now seeks payment as an administrative expense";
(ii) the May 5 Wire "warded off the immediate threat by McKesson to shut off deliveries"; and
(iii) "[b]etween May 6 and May 7, 2025, McKesson delivered just over $50 million worth of
product." Opp'n ¶¶ 3, 43-44; *see also* Liebman Decl. ¶ 10 (May 5 Wire was made "in order to
ensure deliveries on and after the Petition Date).[19]  These vague statements do not clearly allege,
much less plausibly establish, that the May 5 Wire was a prepayment for future deliveries.

45.     Again, Debtors' own filings contradict their assertions.  Rite Aid identifies prepaid
wages as the only prepayments it made, and HQ does not identify any prepayment to McKesson
among the various prepayments listed in its schedules.  *See* [Dkt. No. 942] at PDF 24-25 (Pt. 2
§§ 6, 8); Liebman Ex. 19 ([Dkt. No. 1003]) at PDF 24 (Pt. 2 §§ 6, 8), 38-40 (rider to Pt. 2 § 8).

46.     Debtors also failed to produce any documentation supporting the notion that the
May 5 Wire was a prepayment, and their own past practice cuts against their position.  Debtors
have consistently made post-petition prepayments by wiring flat amounts after expressly agreeing
to pay by prepayment.  *See supra* ¶ 24.  In the sole instance in which Debtors sought to make a
payment other than on precise 10-day terms (with respect to the $11 million paid on May 1, 2025),
they expressly identified the payment as a prepayment and paid a flat amount.  *See supra* ¶ 16.
One would expect that in a situation where Debtors were paying for future deliveries in advance
for the first time ever under the Supply Agreement, as they assert—after hundreds of payments on
exactly 10-day terms—they would have made that clear to McKesson (and would have needed to
make that clear in order for any such advance payment to be legally treated as such).  In contrast,
there is no evidence of anyone's intent to treat the May 5 Wire as a prepayment, and it was paid

---

services and is then legally bound to pay" (quoting *Vanguard Airlines, Inc. v. Airline Automation, Inc. (In re Vanguard
Airlines, Inc.)*, 295 B.R. 329, 334 (Bankr. W.D. Mo. 2003))).

[19] Liebman did state in his deposition that the May 5 Wire was a prepayment, *see, e.g.*, Liebman Tr. 52:9-10, 128:16-
20, but these statements are amply contradicted by the record as discussed herein.

not in a flat amount, but in an amount that exactly corresponded to the amount owed for the April 24, 2025 and April 25, 2025 invoices due on May 5, 2025.

47.    Indeed, the entire point of the Supply Agreement's 10-day terms would be subverted if Rite Aid could retroactively and unilaterally redesignate payments as prepayments after McKesson had shipped goods in reliance on those payments being applied to satisfy invoices then-due and thereby prevent the otherwise-automatic payment default that would have entitled McKesson to immediately suspend shipping under Section 7.1(d) of the Supply Agreement.

48.    Debtors admit the May 5 Wire was paid in the aggregate amount of the April 24, 2025 and April 25, 2025 invoices and on the date such invoices were due under the normal 10-day terms. Liebman Tr. 35:9-22, 37:6-13. Further, Debtors' internal forecasts reflect the intent to pay those same specific invoices on May 5, 2025. Liebman Ex. 12 (tab labeled "McK"); Liebman Tr. 79:12-24. Debtors offer no explanation for why a prepayment for future invoices totaling a different amount would be made in the exact amount of the April 24, 2025 and April 25, 2025 invoices on the date those invoices were projected by Debtors to be paid aside from the *post-hoc* assertion that the amount was used "for administrative simplicity." Liebman Tr. 52:8-15.

49.    Given the clear evidence presented by McKesson tying the May 5 Wire to the April 24, 2025 and April 25, 2025 invoices and the absence of any credible showing by Rite Aid to the contrary, Debtors have undeniably failed to pay McKesson for the "just over $50 million worth of product" that Debtors acknowledge was delivered on May 6, 2025 and May 7, 2025.

## II.    Debtors' Arguments That the May 5 Wire Should Still Be Avoided Fail

50.    The May 5 Wire was a routine payment that was consistent with the parties' ordinary course of dealing and is protected from avoidance as a preferential transfer under

section 547(c)(2) of the Bankruptcy Code.[20]

A.    **The May 5 Wire Was Made in the Ordinary Course of Business**

51.    Under section 547(c)(2) of the Bankruptcy Code, a transfer is not avoidable under section 547(b) of the Bankruptcy Code to the extent such transfer was (i) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee and (ii) (A) made in the ordinary course of business of the debtor and transferee or (B) made according to ordinary business terms.  11 U.S.C. § 547(c)(2)(A)-(B).  The language of the statute is disjunctive.  A party may establish an ordinary course of business defense by meeting *either* the "subjective" test under section 547(c)(2)(A) (ordinary course of business of the debtor and transferee) or the "objective" test under section 547(c)(2)(B) (ordinary business terms).  *See, e.g.*, *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 112 (Bankr. D. Del. 2010); *Forman v. P&M Brick LLC (In re AES Thames, L.L.C.)*, Adv. Case No. 13-50406 (KJC), 2016 WL 11595116, at *5 (Bankr. D. Del. Oct. 28, 2016).

52.    The ordinary course of business defense is intended to "induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy."  *In re Elrod Holdings Corp.*, 426 B.R. at 111 (quotation omitted).  "The ordinary course of business exception benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor, provided that the steps taken are consistent with customary practice among

---

[20] McKesson disputes the assertions in the BofA Joinder that McKesson has any turnover obligations to the Senior ABL Secured Parties (as defined in the BofA Joinder) in respect of the May 5 Wire.  BofA's arguments with respect to the Intercreditor Agreement (as defined in the BofA Joinder) are meritless because the May 5 Wire was a Permitted Payment and otherwise permitted under that agreement, but regardless, those issues are beyond the agreed scope of the instant litigation as dictated by the parties' Stipulation, and need not be addressed at this time.  BofA does not argue otherwise, and simply reserves its rights on that issue (as does McKesson).

industry participants." *Howard v. Bangor Hydro Elec. Co. (In re Bangor & Aroostook R.R. Co.)*, 324 B.R. 164, 168 (Bankr. D. Me. 2005) (internal quotations omitted). "The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test involving the consistency of transactions between the creditor and the debtor before and during the preference period." *In re AES Thames, LLC*, 547 B.R. at 103 (quotations omitted).

53.     When reviewing transactions for consistency with prior dealings, courts consider a number of factors, including: (i) the length of time the parties engaged in the type of dealing at issue; (ii) whether the subject transfers were in an amount more than usually paid; (iii) whether the payments at issue were tendered in a manner different from previous payments; (iv) whether there appears to be an unusual action by the creditor or debtor to collect on or pay the debt; and (v) whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition. *Id.* "No one factor is determinative. Rather, the court should consider the parties' relationship in its entirety." *Id.* (quotations omitted).

54.     Here, the May 5 Wire was an ordinary course of business transaction and satisfies the requirements for protection under section 547(c)(2) based on a preponderance of the evidence.

## 1.    The May 5 Wire Was Ordinary in All Relevant Respects

55.     The applicable debt was incurred by Debtors in the ordinary course of business or financial affairs of Debtors and McKesson because Debtors are sellers of pharmaceutical products and McKesson is a supplier of such products to entities such as Debtors. *See, e.g.*, *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 241 (Bankr. D. Del. 2010) (finding requirement satisfied where "[creditor] is in the business of producing plastic trays for use in the food industry and the Debtors purchased the plastic trays for use in their business"), *aff'd*, 511 B.R. 726 (D. Del. 2013); *Simon v. Gerdau MacSteel, Inc. (In re Am. Camshaft Specialties, Inc.)*, 444 B.R. 347, 353 (Bankr. E.D. Mich. 2011) (finding debt incurred in the ordinary course of the

24

parties' business where debt was for purchase of steel supplied by defendant for use in debtor's ordinary business operations); *see also* Liebman Tr. 25:15-18, 26:2-27:3 (confirming that McKesson and Debtors have had a business relationship for over 20 years and that Debtors entered into the Supply Agreement because "McKesson offered the best package of terms, pricing, et cetera"). Debtors have not contended otherwise.

56.     The May 5 Wire also satisfies the "subjective" test for ordinariness under section 547(c)(2)(A) of the Bankruptcy Code.

57.     First, Debtors do not dispute that the length of time the parties engaged in the dealings at issue are sufficient to establish that there was a meaningful volume of transactions between the parties. *See, e.g., Goldstein v. Starnet Cap. Grp., LLC (In re Universal Mktg., Inc.)*, 481 B.R. 318, 327-28 (Bankr. E.D. Pa. 2012) (noting that although parties' "relatively short-lived" history consisted of seven transfers made over an eight-month period, it was still "sufficient to demonstrate a general pattern of behavior"); *Stanziale v. Industrial Specialists, LLC (In re Conex Holdings LLC)*, 522 B.R. 480, 488 (Bankr. D. Del. 2014) (finding parties' 16-month business relationship "of sufficient duration for the Court to determine the ordinary course of business between them"); *In re Archway Cookies*, 435 B.R. at 243 (holding, where "the parties' relationship was established over a two-year period and during their relationship there were 117 transactions between the parties," that "[b]ased on the length of their business relationship and the numerous transactions between the parties, this relationship was of sufficient length to establish an ordinary course of dealing between the parties"). Given the tens of millions of dollars' worth of product being ordered, invoiced and paid for between Debtors and McKesson every day, there is more than ample evidence to establish a baseline for the parties' ordinary course of business.

58.     Second, the amount and manner of tender for the May 5 Wire was uniformly consistent with prior payments under the Supply Agreement, consistent with an ordinary-course transaction: like all other payments, it was paying invoices on 10-day terms.  *See* Liebman Tr. 33:9-35:8, 93:21-94:5, 94:13-25.  This factor firmly supports McKesson's ordinary course of business defense.  *Compare, e.g.*, *In re Am. Camshaft Specialties, Inc.*, 444 B.R. at 359 (finding payments to be made in the ordinary course of business where payment amounts generally matched specific invoice amounts); *Weinman v. Dragul (In re Cornerstone Wine & Liquor, LLC)*, 650 B.R. 583, 590 (Bankr. D. Colo. 2023) (finding transfers protected under ordinary course of business defense where payments "were made for the same amount, for the same purpose (to enable the Debtor to purchase inventory), and were each made at the same time – at the end of the month in which the Debtor borrowed funds"), *with, e.g.*, *Off. Comm. of Unsecured Creditors of Estate of CCG 1355, Inc. (In re CCG 1355, Inc.)*, 276 B.R. 377, 384 (Bankr. D.N.J. 2002) (finding that payment was not ordinary where amount paid was "grossly higher in total amount" than usual payments and thus indicated favoring of transferee).

59.     Indeed, it is difficult to envision a more consistent baseline payment pattern.  HQ paid McKesson like clockwork by wire transfer for the agreed invoice amounts when due on the 10-day terms that applied for the entirety of the parties' prepetition business dealings under the Supply Agreement, and the May 5 Wire was no exception.  *See* Liebman Tr. 33:9-35:8, 93:21-94:5, 94:13-25.  "Courts place particular importance on the timing of payment in determining the ordinary course of business between parties."  *In re Conex Holdings LLC*, 522 B.R. at 488; *see also, e.g.*, *In re Universal Mktg., Inc.*, 481 B.R. at 327 ("In comparing the conduct of the debtor and creditor during the preference period with that of the prepreference period, litigants and courts

frequently focus on what may be characterized as "timing" issues: comparing the timing of the transfers in the pre-preference period to those in the preference period.").

60.    Finally, the May 5 Wire was not made in response to unusual collection activity or efforts to gain a strategic advantage.  Again, this payment was made on the same 10-day terms that had applied throughout the term of the Supply Agreement, and was made for the same reason all of the numerous similar payments had previously been made under the Supply Agreement: to pay for goods supplied by McKesson to Debtors in the ordinary course of business.  Debtors' own Chief Financial Officer referred to a similar payment made a few days earlier (and also after the start of the alleged unusual collection action that Debtors complain of) as a "normal course payment"  *See* Opp'n ¶ 34.  Debtors also admitted that their lenders "understood that this payment was part of the normal 10-day payment cycle."  Liebman Tr. 82:12-20; *see also id.* 123:15-21. Debtors' and BofA's arguments against protection of the May 5 Wire under section 547(c)(2) of the Bankruptcy Code amount to little more than claims that Debtors felt pressured because they knew McKesson expected to be paid in accordance with the original Supply Agreement terms—if that were the standard, it would render virtually every contractual payment preferential.

61.    Unlike the payments at issue in the cases cited in the Opposition, *see* Opp'n ¶¶ 72, 72 n.3, the May 5 Wire was not, for example, an accelerated payment, a catch-up payment on late invoices, or a payment that would not have been required under the parties' payment terms but for a newly-reduced credit limit.  *Cf. In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d at 578 (rejecting ordinary course of business defense where creditor had, shortly before the preference period, "tightened its credit terms, imposed a credit limit, required [debtor] to make payments by wire transfer in large, lump-sum amounts, and required [debtor] to send remittance advices after making payment on its invoices," and where timing of payments during preference period differed

27

dramatically from historical pace).[21]  Debtors' assertion that the May 5 Wire was uniquely made

"under extreme duress" and "for the sole purpose of appeasing McKesson," Opp'n ¶ 69, rings

hollow where, in the course of roughly eight months' of business involving millions of dollars of

transactions per day, Debtors [had never been] late on a payment throughout the history of the

Supply Agreement.[22]  *See* Liebman Tr. 51:17-52:4.  This was due not to any unusual collection

activity by McKesson, but rather to the practical reality that McKesson has always had the right

under the Supply Agreement to suspend shipping if Debtors do not timely pay their invoices.  *Id.*

51:4-16.

---

[21] Two of the other cases cited by Debtors did not actually involve allegedly unusual collection action.  *See Off. Comm of Unsecured Creditors v. Nucor-Yamato Steel Co. (In re J. Allan Steel Co.)*, 336 B.R. 226, 229-30 (W.D. Pa. 2005) (noting that lower court's decision contained "no discussion of" this factor); *Forklift Liquidating Tr. v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (D. Del. 2006) (noting potential relevance of "[e]xtraordinary collection efforts" generally but not addressing this factor in factual analysis).  The rest of Debtors' cited cases are distinguishable as having involved payments made pursuant to new payment terms and/or in cases with a less uniform payment history.  *See J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp. (In re J.P. Fyfe, Inc. of Fla.)*, 96 B.R. 474, 478 (D.N.J. 1988) (finding that isolated payment was not made in the ordinary course of business where it was made on changed payment terms as "part and parcel of an extraordinary and unusual 'master plan' by which [the supplier] exercised a hitherto-unknown degree of control over [the debtor's] business activities"), *aff'd*, 891 F.2d 66 (3d Cir. 1989); *Menotte v. Oxyde Chems., Inc. (In re JSL Chem. Corp.)*, 424 B.R. 573, 576-77 (Bankr. S.D. Fla. 2010) (inferring that surrounding circumstances may have affected debtor's decision to make challenged payments where debtor had rarely paid its invoices on time); *In re Kevco, Inc.*, Adv. No. 04-04-04239-BJH, 2005 WL 6443621, at *1-2, *16, *19-21 (Bankr. N.D. Tex. June 30, 2005) (prior to preference period, "[t]here was a broad spectrum of intervals" between shipment dates and invoice payments, and payment patterns with respect to challenged payments changed after creditor imposed new credit limit).

[22] This is a significant distinction from the facts of *Official Committee of Unsecured Creditors of Gregg Appliances, Inc. (In re hhgregg, Inc.)*, Adv. Pro. No. 17-50282, 2022 WL 370279 (Bankr. S.D. Ind. Jan. 13, 2022), an additional case cited in Debtors' Opposition.  *See* Opp. ¶ 72 n.3.  In that case, the court emphasized that its decision was "not an easy call" given that neither side had made a compelling record, but ultimately rejected the defendant's ordinary course of business defense despite the fact that it was "not clear that the Transfers were made in direct response to" the allegedly unusual collection action.  *Id.* at *8.  However, in *hhgregg*, the parties were operating under both recently-changed payment terms and a newly-reduced credit limit, and because payment timing had historically been made within a range (some payments had been late), there was a legitimate question about whether some payments may have been accelerated in response to the defendant's collection efforts.  *See id.* at *3, *7-8.  Here, in contrast, there is no such question about potential acceleration because HQ paid on the latest day of the payment terms, which was also the same day it had consistently paid invoices on previously.

Rather, the instant facts are more akin to another decision from the *hhgregg* bankruptcy proceedings in which the court ruled for the defendant after finding that the debtors "largely self-serving testimony" about alleged perceived pressure from the defendant was insufficient to defeat the defendant's defense under section 547(c)(2)(A) of the Bankruptcy Code with respect to otherwise-ordinary transfers.  *See Off. Comm. of Unsecured Creditors of Gregg Appliances, Inc. (In re hhgregg, Inc.)*, 636 B.R. 545, 551 (Bankr. S.D. Ind. 2022).

62.    Unable to point to anything legitimately extraordinary about the May 5 Wire itself, Debtors resort to mischaracterizing the relationship between the longstanding 10-day payment terms and the more-recent adjustments to the Accounts Receivable Cap, as well as the parties' correspondence regarding those items.  This approach is unpersuasive as discussed below.

### 2.    The Accounts Receivable Cap Is a Red Herring

63.    Debtors' and BofA's arguments regarding the Accounts Receivable Cap are nothing more than red herrings raised to distract from the ordinary nature of the relevant payment.

64.    To be clear, the May 5 Wire was *not* made for the purpose of staying under the Accounts Receivable Cap.  Debtors' own witness, Marc Liebman, expressly acknowledged as much.  *See* Liebman Tr. 50:4-23 (agreeing with the statements that "whether Rite Aid was under or above the cap at any given time has absolutely no effect whatsoever on whether payments were due under the Supply Agreement ten days after they're invoiced" and that Liebman "[did not] say anywhere in [his] declaration that the change to the cap that [he] allege[d] occurred had any impact on the $49.7 million payment").  The Accounts Receivable Cap governed the amount of unpaid invoices that could be outstanding *before such invoices became due*.  The 10-day terms governed *when such invoices became due*.  Thus, under the Supply Agreement, invoice payments were always due ten days after invoicing, regardless of whether Debtors had additional availability under the Accounts Receivable Cap.  The April 24, 2025 and April 25, 2025 invoices paid by the May 5 Wire were paid at the applicable outside date for such invoices under the ordinary payment terms—payment of those invoices was not accelerated in any way by virtue of the operative Accounts Receivable Cap.  Liebman agreed that the April 24, 2025 and April 25, 2025 invoices were due at the time of and in the amount of the May 5 Wire under the Supply Agreement's original terms.  *See id.* 33:11-35-25; *see also* Bowers Tr. 233:12-21, 234:10-11, 248:19-21, 248:22-25.

65.    Even if the Accounts Receivable Cap had been millions of dollars higher, the April 24, 2025 and April 25, 2025 invoices paid by the May 5 Wire would still have been required to be paid on May 5, 2025 to avoid a default under Section 7.1(d) of the Supply Agreement, and Debtors would therefore inevitably still have paid such invoices in accordance with the 10-day terms just as they had consistently done throughout the period when the Accounts Receivable Cap was in fact higher due to regular seasonal adjustments under the original Supply Agreement terms.

66.    Debtors are also incorrect in asserting that McKesson changed the Accounts Receivable Cap to count invoices for future shipments.[23]  *See* Bowers Tr. 293:4-21.  Rather, McKesson, in trying to ensure an uninterrupted flow of supply to Debtors, was simply forecasting when Debtors would hit the cap based on orders received so Debtors could avoid hitting the cap at a point when they could not make the required payments in time to receive their desired goods. *Id.* 189:2-3, 200:6-11, 208:19-209:2, 211:8-212:4.  Similarly, the emails Debtors paint as demands for payment were in fact simply McKesson trying to help Debtors track their orders and providing information about how Debtors' outstanding obligations and the Accounts Receivable Cap were being calculated.  *See id.* 208:19-22, 211:8-20, 212:2-4.

67.    Setting aside McKesson's disagreement with Debtors' histrionics about the Accounts Receivable Cap and related negotiations, these complaints are simply beside the point. Even if the adjustments to the Accounts Receivable Cap were viewed as unusual collection action, that would not prevent the May 5 Wire from qualifying as an ordinary course transaction because Debtors' obligation to pay the May 5 Wire was independent of, and Debtors' payment of the May

---

[23] Contrary to Debtors' assertion, McKesson never suspended any shipment of Product to Debtors that remained at or below the Accounts Receivable Cap.  On May 4, 2025, all orders placed were shipped for delivery except for shipments to West Coast locations, as such shipments were in excess of the aggregate gross amount owed to McKesson pursuant to the Accounts Receivable Cap.  *See* Bowers Tr. 225:10-16.  Issues concerning deliveries made on May 4, however, are not relevant to whether the April 24 and April 25 invoices were due on 10-day payment terms; they were.

5 Wire was not the result of, any such collection action.  *See Burtch v. Texstars, Inc. (In re AE*

*Liquidation, Inc.)*, Adv. No. 10-55502 (MFW), 2013 WL 5488476, at *6 (Bankr. D. Del. Oct. 2,

2013) ("Even if the August 18 letter were unusual collection activity, the Court must still determine

whether the Transfers were sent in response to [the creditor's] collection effort."); *In re Bangor &*

*Aroostook R.R. Co.*, 324 B.R. at 171 ("If [the trustee] intends to say that, as a matter of law, once

a creditor initiates any collection activity, subsequent payments cannot be within the ordinary

course of the parties' business, I reject that proposition."); *Miller v. Direct Results Radio, Inc. (In*

*re Diversified Mercury Commc'ns, LLC)*, 646 B.R. 403, 417 (Bankr. D. Del. 2022) (rejecting

trustee's effort to rely on allegedly unusual collection action that related to a payment "separate

from" the challenged transfer in opposing § 547(c)(2) defense).

### 3.    Any Preference Determination Is Irrelevant Due to Setoff

68.    Debtors, as a defense to their obligation to pay McKesson's administrative expense

claim for $49.7 million of unpaid post-petition deliveries, assert the May 5 Wire is a preferential

transfer.  In making this argument, Debtors fail to recognize the following undisputed and

outcome-determinative facts:

- McKesson currently holds a roughly $135 million administrative claim under section 503(b)(9) of the Bankruptcy Code for goods delivered during the 20 days preceding the Petition Date (April 16, 2025 through May 5, 2025).

- The $49.7 million May 5 Wire was for goods delivered to Debtors on April 24, 2025 and April 25, 2025, which days fall within the 20-day window of section 503(b)(9) of the Bankruptcy Code.

- To the extent Debtors succeed in avoiding the $49.7 million payment, McKesson's administrative claim would increase by roughly $50 million—to $185 million.[24]

---

[24] As of the filing of this Reply, the Court has not established any procedures or fixed a deadline for the holders of section 503(b)(9) administrative claims to file claims.

69.     In this situation, courts have ruled that unpaid administrative creditors may offset their administrative claims against any preference liability.  *See Off. Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc.* (*In re Quantum Foods, LLC*), 554 B.R. 729, 733 (Bankr. D. Del. 2016); *Off. Comm. of Unsecured Creditors of Great Atl. & Pac. Tea Co. v. McKesson Corp.* (*In re Great Atl. & Pac. Tea Co.*), 657 B.R. 572, 583 (Bankr. S.D.N.Y. 2023).

70.     Here, to the extent the May 5 Wire is deemed preferential, it merely reduces McKesson's section 503(b)(9) administrative claim (be it either $135 million or $185 million).  As result, Debtors cannot use any supposed preference liability for the May 5 Wire as a defense to payment for the post-petition goods delivered by McKesson on May 6, 2025 and May 7, 2025.

## III.   The Court Should Reject Debtors' Irrelevant Arguments Regarding Rebates and Credits, Which Are Outside the Stipulated Scope of This Dispute

71.     As an initial matter, under Section 3.7 of the Supply Agreement, McKesson has no obligation to pay or issue *any* Rebates or Credits to Debtors in light of their payment default, and even absent such default, under Section 3.9 of the Supply Agreement, McKesson has the right to apply such Rebates and Credits to outstanding obligations owed to McKesson "in its sole discretion."  Supply Agreement § 3.7, 3.9.  However, the Court need not reach this issue because Debtors' arguments regarding Rebates and Credits are not only meritless,[25] but also premature. The Court recognized as much in rejecting Debtors' efforts to delay the hearing on the Motion based on these arguments.

72.     To the extent Rebates and Credits may be implicated in the calculation of any setoff in the event of a judgment against McKesson, that issue can be addressed in due course.  However, there should be no such judgment because Debtors have not established a viable cause of action

---

[25] McKesson disputes Debtors' allegations and arguments regarding the Rebates and Credits, including their assertion that section 365(e)'s restrictions on enforceability of *ipso facto* clauses are implicated by the relevant Supply Agreement provisions, *see* Opp'n ¶ 76, but again, these issues are not properly before the Court at this time.

against McKesson.  Absent such a judgment, the issue of Rebates and Credits is beyond the stipulated scope of this dispute, and Debtors should not be permitted to use it as yet another costly stalling tactic in the meantime.

## **CONCLUSION**

For the reasons stated above, McKesson respectfully requests that the Court enter an order (i) (1) finding that the May 5 Wire was a pre-petition payment in satisfaction of the April 24, 2025 and April 25, 2025 invoices, (2) allowing McKesson's administrative expense claim in the amount of $49,674,910.00[26] for its post-petition shipments of goods on May 6, 2025, and May 7, 2025, and (3) authorizing and directing Debtors to immediately pay that full amount in cash to McKesson no more than two business days after entry of an order determining that the May 5 Wire is not recoverable as a preferential transfer; and (ii) granting McKesson such other and further relief to which it may be justly entitled.

Dated: August 15, 2025

*Michele M. Dudas*
Michele M. Dudas
McManimon, Scotland & Baumann, LLC
75 Livingston Avenue, 2nd Floor
Roseland, NJ 07068
Telephone: 973.721.5021
Email: mdudas@msbnj.com

Dennis Twomey (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  312.853.7438
Email:  dtwomey@sidley.com

John J. Kuster (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  212.839.7336

---

[26] As noted in footnote 9 of the Motion, McKesson reserves its rights to seek interest on the amount owed to the extent it is overdue.

Email:  jkuster@sidley.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Buchalter, A Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone: 949.224.6252
Email:  jgarfinkle@buchalter.com

*Co-Counsel to McKesson Corporation*
*and certain corporate affiliates*