**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Gregory F. Laufer (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Alison Benedon
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
glaufer@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com
abenedon@paulweiss.com

*Co-Counsel to the Debtors*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Joint Administration) |

**TRIAL DECLARATION OF MARC LIEBMAN IN OPPOSITION TO MCKESSON CORPORATION'S MOTION FOR ENTRY OF AN ORDER (A) ALLOWING ADMINISTRATIVE EXPENSE CLAIM, (B) COMPELLING IMMEDIATE PAYMENT THEREOF, AND (C) GRANTING RELATED RELIEF**

I, Marc Liebman, declare as follows under penalty of perjury:

1. I am Managing Director at Alvarez & Marsal North America, LLC ("A&M"), financial advisor to the above-captioned debtors and debtors in possession (collectively, "Rite

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

Aid", the "Company", or the "Debtors"). On March 12, 2025, I was appointed Chief Transformation Officer of New Rite Aid, LLC. On May 5, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of New Jersey (the "Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases.

2. I am over the age of 18. In my capacity as Chief Transformation Officer, and based on my work with the Debtors since May 2023, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts. I am authorized to submit this declaration in opposition to *McKesson Corporation's Motion for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief*, Docket No. 655 (the "Motion").

3. The facts set forth in this declaration are based on my personal knowledge, my review of relevant documents; information provided to me by Rite Aid's employees and personnel; my experience, knowledge, and information concerning Rite Aid's operations and financial condition; and/or my discussions with Rite Aid's officers and advisors. If called upon to testify, I would testify competently to the facts set forth in this declaration.

**Rite Aid's Corporate Structure & the Role of HQ**

4. The Debtors in this case constitute a large number of affiliates. As shown in the simplified corporate structure chart attached as **Exhibit A**, New Rite Aid, LLC is the ultimate parent of all of the Debtors.

5. Rite Aid Corporation is a wholly owned subsidiary of New Rite Aid, LLC and, like New Rite Aid, LLC, sits above all of the other Debtors in the corporate structure. Although not

an operating company itself, Rite Aid Corporation enters into corporate-wide contracts on behalf of the many operating company subsidiaries, including the Supply Agreement with McKesson Corporation ("McKesson").

6. Rite Aid Hdqtrs. Corp. ("HQ") is a wholly owned subsidiary of Rite Aid Corporation that plays a key role in the Debtors' cash management system. HQ is not an operating company, but the revenue collected by the Debtors' numerous pharmacies and affiliates nationwide from their respective operations are in the ordinary course swept to HQ. HQ then disburses payments on behalf of all Rite Aid entities—including Rite Aid Corporation—in connection with their respective transactions. To that end, HQ maintains a "concentration account" at Bank of America, ending in -2257, from which HQ makes payments on behalf of Rite Aid entities, but all funds in that account come from, and are paid out on behalf of, other Rite Aid entities, such as HQ's 100% owner, Rite Aid Corporation.

7. Rite Aid Corporation, which sits above HQ in the corporate structure, generally does not earn revenues of its own and has no bank accounts of its own. Instead, it relies on HQ to both pool revenues from the various operating companies and pharmacies and make required disbursements.

8. In addition, Rite Aid Corporation is the "Borrower" under (and as defined in) the Debtors' prepetition asset-based loan facility, and the only party authorized to make draws under that facility. Rite Aid Corporation submits draw requests to the lenders to fund the Debtors' operations, and the proceeds of those borrowings are then deposited into an account owned by HQ, although HQ is not a "Borrower." At all times relevant to this dispute, Rite Aid was in cash dominion under the loan facility, meaning that all cash pooled at HQ was swept daily to the lenders, and then Rite Aid Corporation was required to, and did in fact, draw amounts necessary to fund

operations. As a result, the funds in HQ's accounts constituted proceeds of the borrowings that Rite Aid Corporation made on a daily basis under the loan facility. *See, e.g.*, *Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions*, Docket No. 24 ¶ 39 ("The Prepetition Credit Agreement requires all cash received by the Company to be pooled into a concentration account that is swept on a daily basis to repay outstanding loans under the ABL Facility. Accordingly, the Company's only source of day-to-day liquidity is through continued borrowings under the ABL Facility.").

9. As relevant here, HQ has historically made the payments owed by Rite Aid Corporation under the Supply Agreement with McKesson. HQ does not own or operate any stores; conduct pharmacy operations; place orders for, or receive delivery of, prescription drugs under the Supply Agreement; or generate its own revenue or profits. Rather, cash receipts that Rite Aid stores and pharmacies generate are moved into accounts owned by HQ (as was required under the Prepetition Credit Agreement, *see id.*), and HQ makes payments to McKesson on their behalf. Pursuant to Rite Aid's cash management system, HQ accounts for these intercompany transfers in its books and records, and also accounts for payments to McKesson on a pharmacy-by-pharmacy basis. Nearly every account used by the Debtors in their cash management system is held by HQ, including all store-level bank accounts. *See* DX-40, Ex. 2.

**Rite Aid's May 5 Payment to McKesson & the Events Leading Up to It**

10. McKesson has long been Rite Aid's largest supplier of prescription drugs, responsible for 99% of Rite Aid's inventory. As part of Rite Aid's previous bankruptcy case, Rite Aid Corporation and McKesson entered a new Supply Agreement. DX-03 (the "Supply Agreement"). Under that agreement, Rite Aid Corporation may assign its right to place orders to certain "Assignment Affiliates," *id.* § 18, but Rite Aid Corporation itself remains contractually

"responsible for payment for all purchases hereunder by Rite Aid and shall unconditionally guarantee the prompt payment of all purchases by its Affiliates, including its Assignment Affiliates," *id.* § 7.9. McKesson deals solely with Rite Aid Corporation under the Supply Agreement, which provides that "McKesson shall be entitled to rely exclusively upon any communications it receives with respect to this Agreement from Rite Aid as binding with respect to Rite Aid and each Rite Aid Affiliate." *Id*. § 18.3. Although many Rite Aid entities have become Assignment Affiliates under the Supply Agreement, HQ is not among them.

11. Until recently, the Supply Agreement mandated that Rite Aid pay for drugs that McKesson supplied to Rite Aid pharmacies within ten days of invoicing. *Id*. § 7.1(a). It also placed a $270 million cap on the amount of Rite Aid's outstanding accounts payable to McKesson. *Id.* This "10-Day Accounts Receivable Cap" was based on the "amount owed to McKesson for Products delivered," *id.*, and therefore was calculated on the basis of "Products" *actually delivered* to Rite Aid.

12. On April 23, 2025, McKesson sent a letter to Rite Aid Corporation stating that, effective May 1, 2025: (i) Rite Aid would have to pay for deliveries within six days (reduced from ten days in the Supply Agreement), and (ii) the 10-Day Accounts Receivable Cap would be reduced from $270 million to $175 million. DX-14. Because Rite Aid's receivable balance then totaled approximately $250 million, this change forced Rite Aid to reduce orders from, and accelerate payments to, McKesson to stay within the reduced cap.

13. After further negotiations, on April 30, 2025, McKesson stated that (i) it would require payment within seven days of invoicing, and (ii) the 10-Day Accounts Receivable Cap would be reduced to $200 million starting May 1—an initial $70 million reduction—with a further $5 million step-down each day. *See* DX-23.

14. Without notice to Rite Aid, McKesson also altered how it calculated Rite Aid's outstanding accounts receivable balance, which made it more difficult for Rite Aid to comply with the already reduced 10-Day Accounts Receivable Cap. Previously, McKesson had only included orders in the accounts receivable balance once they were delivered to Rite Aid. After the change, however, McKesson began including all Rite Aid orders in the accounts receivable balance as soon as they were placed, even if not yet delivered. *See* DX-21.

15. Following the change to these trade terms, McKesson began to place increased financial pressure on Rite Aid to make payments that, because of its financial distress, Rite Aid otherwise did not plan to make. On May 1, 2025, for example, Justin Bowers of McKesson stated that "[t]o ensure everything stays on track, it's crucial that McKesson receives the necessary payments" and stated that an $11 million "payment to meet the $200M Cap requirement" was necessary. DX-19. Rite Aid made this payment, which, as Steve Bixler of Rite Aid made clear to McKesson, was "[i]n addition to today's normal course payment." DX-20.

16. But despite Rite Aid's efforts to meet McKesson's tightened terms and demands for payment, on May 4, 2025, Justin Bowers told Steve Bixler that "McKesson is holding all new incoming orders because Rite Aid has exceeded today's cap" and that McKesson "will not be able to process any further orders until Rite Aid makes the necessary payment." DX-26. I understand McKesson is taking the position that it has always calculated the cap based on delivered products, but this email is directly to the contrary. The "orders" that McKesson was holding had not yet translated into "Products delivered," so there was no basis under the Supply Agreement—even as amended on April 30—to refuse to process additional orders.

17. Due to its financial distress, Rite Aid did not anticipate making a payment to McKesson on May 5, 2025, even though certain invoices were due for payment that day. After

McKesson's May 4 termination of shipments, however, the Company had no choice but to pay McKesson so it could continue supplying customers with lifesaving medications. Before doing so, the Company confirmed with McKesson that McKesson would continue to ship product if Rite Aid made a further payment. Steve Bixler explained to Justin Bowers that "[w]e anticipate making a wire payment in the amount of $49.7M today, which I believe will put our outstanding balance at approximately $138M" and asked whether McKesson was "able to confirm that you will fulfill and ship orders up to the cap amount of $180M based upon receipt of that wire payment." DX-27. Bowers replied that "[t]oday's payment will just barely keep you under the cap." *Id.*

18. At 2:50 p.m. ET on May 5, 2025, before the payment to McKesson was made, Rite Aid Corporation filed its chapter 11 petition.

19. The day of filing was, of course, a day of frenzy. Other Rite Aid officers and I spent the day in an all-day meeting, during which each of us took constant phone calls from a large and varied group of stakeholders. Of particular note, the Company kept in near-constant telephone contact with Rite Aid's pre-petition ABL lender, Bank of America. Counsel for Rite Aid and counsel for Rite Aid's pre-petition lenders were included in many conversations throughout the day. As noted above, Rite Aid was in cash dominion under the pre-petition ABL facility at the time of filing and thus needed Bank of America's approval for all payments, as payments were funded by borrowings by Rite Aid Corporation from Bank of America. Given the May 4 termination of McKesson's shipments and the asserted need to pay McKesson in order to resume shipments, I spoke with Bank of America to get its approval to make a payment. Bank of America demanded conditions on that payment—most importantly that it be treated as a prepayment for post-petition deliveries on the two days after the filing, rather than a retroactive payment for pre-petition invoices, even though certain invoices were due for payment on May 5.

20. Shortly after the 2:50 p.m. ET filing, at 3:11 p.m. ET, HQ wired $49,674,910 to McKesson on behalf of Rite Aid pharmacies that depend on McKesson for 99% of their pharmaceutical inventory. HQ itself filed a chapter 11 petition mere hours after it made that payment. Rite Aid made the payment under extreme financial pressure from McKesson and in order to ensure deliveries on and after the Petition Date.

21. The amount of the May 5 payment was a matter of administrative expediency on a day of constant activity. Rite Aid's payments through HQ must be loaded into a payment disbursement system before any funds can be sent from the concentration account to counterparties. Because invoices of $49,674,910 were due to McKesson on May 5, that amount was already loaded into the system. That amount was originally anticipated as a payment for the invoices due on May 5 when loaded into the invoice system. Subsequently, Rite Aid was informed that its lenders would not authorize payment of such invoices, but the classification of the prospective payment in the invoice system was not changed. The classification of the payment changed on the day of filing, in response to the terms of the lenders' authorization. Thus, in a hurry to have McKesson resume its critical shipments of prescription drugs to Rite Aid pharmacies, HQ disbursed the $49,674,910 amount that was in the system and thus ready for prompt processing, even though the payment was now intended as a prepayment for post-petition deliveries. The "Remitter Name" on the wire was recorded as "Rite Aid Corporation," as Rite Aid reported to McKesson. DX-29.

22. McKesson has suggested that Rite Aid's characterization of the payment as a prepayment for future deliveries was made up after the bankruptcy filing. That is false. I was the one at Rite Aid who was ultimately responsible for authorizing the payment (once I secured lender approval), and I understood that the lenders had authorized the payment *only* if it was a pre-

payment for post-petition deliveries. I also understood the $49.7 million that was teed up in the payment system was roughly the same as amounts that would be delivered the following two days, before we could secure Court approval for future payments to McKesson as part of the First Day Hearing. Given the terms on which the lenders would authorize payment and the need to ensure deliveries on May 6 and May 7, I authorized the payment on that basis. I was not responsible for liaising with McKesson and am not personally aware of whether the basis for the payment was communicated to McKesson amidst the frenzy of activity on the petition date.

23. Between May 6 and May 7, 2025, McKesson delivered just over $50 million worth of product.

24. Beginning on May 7, 2025, the Debtors have continued to pay McKesson cash in advance based on estimated amounts for the following day's deliveries. Those payments have totaled hundreds of millions of dollars in the aggregate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August 19, 2025

*/s/ Marc Liebman*
Marc Liebman
Chief Transformation Officer
New Rite Aid, LLC

# Exhibit A

New Rite Aid LLC (DE)
Rite Aid Corporation (DE)
Rite Aid of Michigan, Inc. (MI)
1740 Associates, LLC (MI)
Perry Drug Stores, Inc. (MI)
Richfield Road – Flint, Michigan, LLC (MI)
Apex Drug Stores, Inc. (MI)
PDS-1 Michigan, Inc. (MI)
RDS Detroit, Inc. (MI)
The Lane Drug Company (OH)
Rite Aid Online Store, Inc. (DE)
Rite Aid Payroll Management, Inc. (DE)
Harco, Inc. (AL)
Rite Aid Drug Palace, Inc. (DE)
K & B, Incorporated (DE)
K & B Alabama Corporation (AL)
K & B Louisiana Corporation (LA)
K & B Mississippi Corporation (MS)
K & B Tennessee Corporation (TN)
K & B Texas Corporation (TX)
K & B Services, Incorporated (LA)
Thrifty PayLess, Inc. (CA)
The Bartell Drug Company (WA)
Thrifty Corporation (CA)
Thrifty Ice Cream, LLC (DE)
Name Rite, LLC (DE)
LMW – 90B Avenue Lake Oswego, Inc. (DE)
LG – 90B Avenue Lake Oswego, LLC (DE)
Rite Aid Lease Management Company (CA)
Rite Aid Realty Corp. (DE)
Hunter Lane, LLC (DE)
Ex Holdco, LLC (DE)
Elixir Insurance Company (OH)
Ex Tech, LLC (DE)
Ex Design Holdings, LLC (DE)
Ex Savings, LLC (FL)
Ex Solutions of NV, LLC (NV)
Ex Solutions of OH, LLC (OH)
Ex Procurement, LLC (OH)
First Florida Insurers of Tampa, LLC (FL)
Ex Software, LLC (MN)
Ex Solutions of MO, LLC (MO)
Ex Pharmacy, LLC (OH)
Ex Options, LLC (OH)
Ex Design, LLC (WY)
Ex Rxclusives, LLC (WY)
Ex Initiatives L.L.C. (UT)
Ex Benefits, LLC (FL)
Rite Aid Hdqtrs. Corp. (DE)
Rite Aid of Pennsylvania, LLC (PA)
Rite Aid Specialty Pharmacy, LLC (DE)
RediClinic LLC (DE)
Hackensack Meridian RediClinic, LLC (DE)
Ownership: RediClinic, LLC (55%); Meridian (45%)
RediClinic Associates, Inc. (DE)
RCMH, LLC (TX)
RediClinic Austin, LLC (TX)
Ownership: RediClinic, LLC (51%); Seton (49%)
RediClinic of Dallas-Fort Worth, LLC (DE)
RediClinic of DC, LLC (DE)
RediClinic of MD, LLC (DE)
RediClinic of PA, LLC (DE)
RediClinic of VA, LLC (DE)
RediClinic of WA, LLC (DE)
Ownership: RediClinic, LLC (49%); Multicare (51%)
RediClinic US, LLC (DE)
RediClinic of DE, LLC (DE)
Broadview and Wallings-Broadview Heights Ohio, Inc. (OH)
Drug Palace, Inc. (ME)
GDF, Inc. (MD)
Grand River & Fenkell, LLC (DE)
Lakehurst and Broadway Corporation (NJ)
Rite Aid Hdqtrs. Funding, Inc. (DE)
Rite Investments Corp. (DE)
Rite Investments Corp., LLC (DE)
Rite Aid Transport, Inc. (DE)
Rx Choice, Inc. (DE)
Rx USA, Inc. (DE)
4042 Warrensville Center Road - Warrensville Ohio, Inc. (OH)
5277 Associates, Inc. (WA)
5600 Superior Properties, Inc. (OH)
JCG (PJC) USA, LLC (DE)
The Jean Coutu Group (PJC) USA, Inc. (DE)
P.J.C. Distribution, Inc. (DE)
PJC of Vermont, Inc. (VT)
PJC of Rhode Island, Inc. (RI)
PJC Lease Holdings, Inc. (DE)
PJC of Massachusetts, Inc. (MA)
P.J.C. Realty Co., Inc. (DE)
PJC Realty MA, Inc. (MA)
PJC Special Realty Holdings, Inc. (DE)
PJC Manchester Realty LLC (DE)
PJC Peterborough Realty LLC (DE)
PJC Revere Realty LLC (DE)
JCG Holdings (USA), Inc. (DE)
Eckerd Corporation (DE)
Genovese Drug Stores, Inc. (DE)
84.17340%
.00005%
15.82655%
Thrift Drug, Inc. (DE)
EDC Drug Stores, Inc. (NC)
Maxi Drug, Inc. (DE)
Maxi Green, Inc. (VT)
Maxi Drug North, Inc. (DE)
1%
99%
Maxi Drug South, L.P. (DE)
Rite Aid of Connecticut, Inc. (CT)
Rite Aid of Delaware, Inc. (DE)
Rite Aid of Georgia, Inc. (GA)
Rite Aid of Indiana, Inc. (IN)
Rite Aid of Kentucky, Inc. (KY)
Rite Aid of Maine, Inc. (ME)
Rite Aid of New Hampshire, Inc. (NH)
Rite Aid of Maryland, Inc. (MD)
READ's Inc. (MD)
Rite Aid of New Jersey, Inc. (NJ)
Rite Aid of New York, Inc. (NY)
Rite Aid Rome Distribution Center, Inc. (NY)
Rite Aid of North Carolina, Inc. (NC)
Rite Aid of Ohio, Inc. (OH)
Munson & Andrews, LLC (DE)
Rite Aid of South Carolina, Inc. (SC)
Rite Aid of Tennessee, Inc. (TN)
Gettysburg and Hoover – Dayton, Ohio, LLC (OH)
Rite Aid of Vermont, Inc. (VT)
Rite Aid of Virginia, Inc. (VA)
Rite Aid of Washington, D.C., Inc. (DC)
Rite Aid of West Virginia, Inc. (WV)
LEGEND
Debtor Entities
Ownership is 100% unless otherwise noted

