| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-2(c) | |
| **LUNDY, BELDECOS & MILBY, P.C.**<br>Jessica M. Gulash, Esquire [N.J. Bar No. 019442008]<br>450 N. Narberth Avenue, Suite 200<br>Narberth, PA 19072<br>(610) 668-0772<br>jgulash@lbmlaw.com | |
| *Counsel for Bloch Ironwood, LLC* | |
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>                                        Debtors.[1] | Chapter 11<br>Case No. 25-14861 (MBK)<br>Judge: Hon. Michael B. Kaplan<br><br>(Jointly Administered) |

## DECLARATION OF DARREN BLOCH

I, Darren Bloch, declare as follows:

1.      I am the Manager of Bloch Ironwood WA, LLC, the sole member of Bloch Ironwood, LLC, a Delaware limited liability company ("**Landlord**").

2.      I have personal knowledge of the facts set forth herein.

3.      This Declaration is being submitted in support of Landlord's *Motion to Allow Administrative Expense Claim and Compel Immediate Payment Thereof* (the "**Motion**").

### The Lease

4.      Landlord manages the real property known as and located at 208 West Ironwood Drive, Coeur D'Alene, Idaho (the "**Leased Premises**").

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

5.    Landlord has an ownership interest in the Leased Premises.

6.    The Leased Premises is the location of Rite Aid Store No. 05420 (the "**Store**").

7.    On or about February 20, 1991, First Western Development of Washington V Associates ("**First Western**") and Pay'n Save Drug Stores, Inc. ("**Pay'n Save**") entered into a Lease (the "**Original Lease**") whereby Pay'n Save leased the Leased Premises from First Western. A true and correct copy of the Original Lease is attached hereto as "Exhibit "1.""

8.    On or about July 26, 1992, Pay'n Save assigned the Original Lease to ADC Distribution Corp. ("**ADC**"), at which time ADC succeeded to all of Pay'n Save's right, title, and interest in the Original Lease. A true and correct copy of the notice of the lease assignment is attached hereto as Exhibit "2."

9.    Thereafter, the Original Lease was assigned to Thrifty Payless, Inc. ("**Debtor**").

10.    On or about September 14, 2016, Debtor provided notice to Ironwood Square West, LLC ("**Ironwood Square**") that it had elected to exercise its option to extend the term of the Lease for five (5) years. A true and correct copy of the renewal notice is attached hereto as Exhibit "3."

11.    On or about February 1, 2019, the Leased Premises was transferred to Ironwood Partners, LLC ("**Ironwood Partners**"). A true and correct copy of the Deed conveying the Leased Premises to Ironwood Partners is attached hereto as Exhibit "4."

12.    On or about October 13, 2021, Ironwood Partners and Debtor entered into a First Amendment to Lease (the "**First Amendment**") which extended the term of the Original Lease to May 31, 2032. A true and correct copy of the First Amendment is attached hereto as Exhibit "5."

13.    On January 12, 2023, Ironwood Partners assigned all of its right, title, and interest in the Original Lease, as amended by the First Amendment (the "**Lease**") to Landlord and several other entities. A true and correct copy of a redacted Assignment and Assumption of Leases is

attached hereto as Exhibit "6."

14.     Since the aforementioned assignment, Landlord has been managing the Leased Premises.

### The Bankruptcy

15.     On May 5, 2025, Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, which later became jointly administered with the other Rite Aid bankruptcy cases.

16.     On July 25, 2025, Debtor provided notice that it was rejecting the Lease effective as of July 31, 2025. [Doc. 1572].

### Amounts Owed

#### Minimum Monthly Rent

17.     The minimum monthly rent due and owing to Landlord by Debtor is currently $17,927.29 per month. *See* Exh. "5" at p. 2.

18.     Debtor failed to pay rent due on April 1, 2025, and May 1, 2025.

19.     As Debtor failed to pay rent due and owing on May 1, 2025, Debtor must pay prorated stub rent to Landlord.

20.     Prorated stub rent for 26 days (from May 5, 2025 through May 31, 2025) is $15,536.82.

#### Common Area Maintenance

21.     The Lease also obligates Debtor to pay common area maintenance ("**CAM**") charges. *See* Exh. "1" at pp. 11-13.

22.     Debtor failed to pay 2nd quarter 2025 CAM charges in the sum of $13,130.01.

23.     The 2nd quarter CAM charges prorated from May 5, 2025, through June 30, 2025, are $4,923.49.

24.     Debtor also failed to pay post-petition CAM charges for July 2025 in the sum of $5,813.92.

### Post-Petition Legal Fees

25.     The Lease further obligates Debtor to pay Landlord's attorney's fees incurred in connection with collecting amounts due. *See* Exh. "1" at p. 25.

26.     To date, Landlord has incurred post-petition attorney's fees in the sum of $13,677.38. True and correct copies of the statements supporting same are collectively attached hereto as Exhibit "7."

27.     Attached hereto as "Exhibit "8" is a *Request for Payment of Administrative Expense* in the form required by the local rules.

28.     Accordingly, Landlord respectfully submits that it is entitled to an administrative expense claim in the amount of $39,951.61 and that same should be immediately paid to Landlord.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: 8/27/2025

DocuSigned by:

*Darren Bloch*

**DARREN BLOCH**

# Exhibit "1"

COPY

IWS

# L E A S E

Date:        February 20, 1991

Lessor:      **FIRST WESTERN DEVELOPMENT OF WASHINGTON V
             ASSOCIATES, a Washington limited partnership**

Lessee:      **PAY'n SAVE DRUG STORES, INCORPORATED,
             a California corporation**

Location:    **Ironwood Drive and Lincoln Way, Coeur d'Alene, Idaho**


## INDEX OF PAGE NUMBERS

| | | |
|---|---|---|
| ARTICLE 1: | TERM . . . . . . . . . . . . . . . . . | 03 |
| ARTICLE 2: | RENTAL . . . . . . . . . . . . . . . . | 05 |
| ARTICLE 3: | POSSESSION AND TITLE . . . . . . . . . | 09 |
| ARTICLE 4: | HOLDING OVER . . . . . . . . . . . . . | 10 |
| ARTICLE 5: | USE OF PREMISES AND THE SHOPPING CENTER . . . | 10 |
| ARTICLE 6: | COMMON AREA MAINTENANCE . . . . . . . . . | 11 |
| ARTICLE 7: | TAXES AND LIENS . . . . . . . . . . . | 13 |
| ARTICLE 8: | REPAIRS, ALTERATIONS AND SIGNS . . . . . . . | 15 |
| ARTICLE 9: | DAMAGE OR DESTRUCTION . . . . . . . . . . | 18 |
| ARTICLE 10: | INSURANCE . . . . . . . . . . . . . . . . | 19 |
| ARTICLE 11: | ASSIGNMENT AND SUBLETTING . . . . . . . . . | 22 |
| ARTICLE 12: | EMINENT DOMAIN . . . . . . . . . . . . . | 23 |
| ARTICLE 13: | ATTORNEYS' FEES . . . . . . . . . . . . . | 25 |
| ARTICLE 14: | PERMITS AND LICENSES . . . . . . . . . . . | 25 |
| ARTICLE 15: | EXTENSION OF TERM . . . . . . . . . . . . | 26 |
| ARTICLE 16: | SUBORDINATION . . . . . . . . . . . . . | 27 |

ARTICLE 17:   LESSEE'S DEFAULTS . . . . . . . . . . . . .   27

ARTICLE 18:   LESSOR'S DEFAULTS . . . . . . . . . . . . .   28

ARTICLE 19:   NOTICES . . . . . . . . . . . . . . . . . .   29

ARTICLE 20:   MISCELLANEOUS PROVISIONS . . . . . . . . . .   30


SCHEDULE A:   DESCRIPTION OF PROPERTY - A-1

SCHEDULE B:   CONSTRUCTION - B-1

SCHEDULE C:   MORTGAGES AND OTHER ENCUMBRANCES - C-1

SCHEDULE D:   NON-DISTURBANCE,   ATTORNMENT   AND   SUBORDINATION
              AGREEMENT - D-1

# L E A S E

THIS LEASE, made and entered into this 20th day of February, 1991 by and between FIRST WESTERN DEVELOPMENT OF WASHINGTON V ASSOCIATES, a Washington limited partnership, hereinafter called "Lessor," owner of the hereinafter Demised Premises, and PAY'n SAVE DRUG STORES, INCORPORATED, a California corporation, hereinafter called "Lessee."

### WITNESSETH:

That for and in consideration of the rental hereinafter reserved, and of the mutual covenants, agreements, and conditions hereinafter contained, Lessor does hereby lease to Lessee, and Lessee does hereby rent from Lessor, those certain premises (hereinafter referred to as the "Demised Premises" or the "Premises") which Premises are a portion of certain property owned or controlled by Lessor (hereinafter referred to as "the Shopping Center") situated in the City of Coeur d'Alene, County of Kootenai, State of Idaho, located at Ironwood Drive and Lincoln Way, which Demised Premises and the Shopping Center are more particularly described in Schedule A attached hereto and made a part hereof and shown on a plot plan attached to and made a part of said Schedule A (hereinafter referred to as the "Plot Plan"), together with all easements, rights, and appurtenances in connection therewith.

This Lease is made for the term and upon the covenants and conditions hereinafter expressed, to-wit:

ARTICLE 1:   TERM.

1.1.      The term of this Lease shall commence (a) 60 days after Lessor delivers possession of the Demised Premises, Ready for Occupancy, as hereinafter defined, to Lessee, or (b) upon such earlier date as Lessee actually commences to do business in the Demised Premises. Lessor shall give Lessee 30 days advance notice of the date possession of the Demised Premises shall be delivered to Lessee. In the event Lessor delivers possession of the Demised Premises to Lessee after October 15, 1991 or between October 15 and November 30 of any calendar year, said 60 day period shall be extended to the first day of February of the succeeding year. Said delivery of possession of the Demised Premises shall be made pursuant to Paragraph 3.1 hereof. If Lessee's commencement of business in the Demised Premises shall be delayed by reason of governmental regulations, environmental controls, zoning restrictions, laws, regulations, ordinances, unavailability of material or labor, acts of God, strikes, lockouts, or other matters beyond Lessee's reasonable control which preclude Lessee from commencing to do business within said 60 day period, the date of

COEUR.LSE                          -3-                          021991

the commencement of the term of this Lease shall be postponed for
a period equal to the duration of such delay.  In the event any of
such factors delay Lessee's commencement of business for a period
in excess of 12 full calendar months, Lessee may declare this Lease
null and void.

1.2.      The Demised Premises shall be deemed "Ready for
Occupancy" when the construction of the Demised Premises and the
construction of the Common Areas of the Shopping Center to be made
by Lessor are fully completed in accordance with the provisions of
Schedule B attached hereto and made a part hereof.

1.3.      If Lessor fails to deliver possession of the Demised
Premises, Ready for Occupancy, to Lessee by September 30, 1992,
Lessee may at any time thereafter declare this Lease null and void,
or may, and from time to time, extend the deadline specified above
to a later date.  Notwithstanding anything in this Paragraph to the
contrary, if delivery of possession of the Demised Premises shall
be delayed by reason of governmental regulations, or unavailability
of material or labor, acts of God, strikes, lockouts or other
matters beyond Lessor's reasonable control, said 12 month period
specified above shall be extended for a period equal to the
duration of such delay but not to exceed an additional period of
12 full calendar months.

1.4.      If for any reason the term of this Lease shall not
have commenced within 10 years from the date of this Lease, this
Lease shall automatically and ipso facto terminate and no longer
be of any force or effect.  Nothing in this or the preceding
Paragraph shall impair or affect the right of either party hereto
to any remedy for breach by the other of any obligation under this
Lease occurring prior to such termination.

1.5.      The term of this Lease shall, except as otherwise
provided herein, expire at midnight on the May 31 immediately
following the 25th anniversary of the date the term of this Lease
commenced.  If this Lease is terminated or cancelled pursuant to
the provisions hereunder or by reason of court order, the date of
said termination or cancellation shall also be the expiration date
of this Lease.

1.6.      Provided the Lessee shall hold Lessor harmless for
all claims from such entry, Lessor agrees that if the Demised
Premises are vacant, Lessee, after notice of vacancy by Lessor,
may at any time prior to the beginning of the term of this Lease,
install therein its own fixtures and equipment and receive and
store therein its merchandise and other property at its own risk,
free from rent, provided the same does not interfere, in Lessor's
sole opinion, unreasonably with the work being done in or to the
Demised Premises  by Lessor.  Such use of the Demised Premises
shall not be construed as a waiver by Lessee of any of Lessor's

COEUR.LSE                          -4-                          021991

obligations under Schedule B of this Lease nor as a waiver of any other provisions of this Lease. Lessor further agrees that Lessee may move in and start to do business even though the construction of the Demised Premises and the construction of the Common Areas of the Shopping Center are not fully complete, and such acts by Lessee shall not constitute a waiver of Lessee's rights to have all such work fully completed in accordance with Schedule B hereto.

## ARTICLE 2:   RENTAL.   *Oct/91. commencement*

2.1.      Effective upon the commencement of the term of this Lease, Lessee shall, except as otherwise provided herein, pay to Lessor as minimum rent for each full Lease year during the term of this Lease the sum(s) set forth below in subparagraph(s) 2.1.1 et. seq.   Said annual minimum rent shall be paid in equal monthly installments in the amount(s) set forth in said subparagraph(s). Said monthly rental payment shall be paid in advance without demand no later than the 5th day of each full calendar month for each such month.   For periods of less than a full calendar month, said monthly rental payment shall be prorated based on the relationship of the number of days of the term of this Lease in such month to the total number of days in such month.   The proportionately reduced minimum rental for a part of a calendar month for which rental may be due shall be paid at the same time and together with the rental payment for the first full calendar month for which rent may be due as provided herein.   "Lease year" means the twelve (12) consecutive month period beginning the first day of the first month immediately following the date the Lease term commences, and each subsequent twelve (12) consecutive month period thereafter.

2.1.1.      During the first eight (8) years of the term *Oct 11/99.* of this Lease the annual minimum rent shall be One Hundred Seventy Five Thousand Four Hundred Ninety Nine Dollars ($175,499.00), which sum represents rental at the rate of Seven and 75/100 Dollars ($7.75) per square foot of floor space per year. *1991-1998*

2.1.2.      During years nine (9) to fifteen (15) of the *2 mths/99.* term of this Lease the annual minimum rent shall be One Hundred *12 - 1 2000* Eighty Six Thousand Eight Hundred Twenty One Dollars ($186,821.00), *2001* which sum represents rental at the rate of Eight and 25/100 Dollars ($8.25) per square foot of floor space per year. *1999-2006*

2.1.3.      During years sixteen (16) to twenty-five (25) of the term of this Lease the annual minimum rent shall be Two Hundred Nine Thousand Four Hundred Sixty Six Dollars ($209,466.00), which sum represents rental at the rate of Nine and 25/100 Dollars ($9.25) per square foot of floor space per year.   *$17455.50*
*2006-2025*

2.1.4.      During the four (4) 5-year extension terms of this Lease the annual minimum rent shall be as follows:

| Extension Term | Annual Minimum Rent |
|---|---|
| First Term | $219,883.00 |
| Second Term | $230,979.00 |
| Third Term | $242,528.00 |
| Fourth Term | $254,756.00 |

For purposes of this Paragraph 2.1 the square footage of the building on the Demised Premises on which annual minimum rent is payable is estimated to be 22,645 square feet, which excludes mezzanine and second floor square footage. If the square footage of the building on the Demised Premises upon which annual minimum rent is payable, after completion of construction, differs from that estimate, an appropriate adjustment shall be made in the annual minimum rent provided for in this Paragraph 2.1.

2.2.   Effective on the commencement of the term of this Lease, in addition to the minimum rent set forth in Paragraph 2.1 hereof, Lessee shall, except as otherwise provided herein, pay to Lessor as percentage rent during each calendar year of the Lease term a sum equal to three percent (3%) of all Receipts from Gross Sales (as hereinafter defined) from $6,600,000 to $9,000,000, plus two percent (2%) of Receipts from Gross Sales from $9,000,001 to $12,000,000, plus one and one-half percent (1.5%) of Receipts from Gross Sales over $12,000,000, but less the following amounts paid or payable by Lessee for such period pursuant to this Lease: (a) common area maintenance expenses payable pursuant to Paragraph 6.2 of this Lease; (b) taxes and assessments payable pursuant to Paragraph 7.2 of this Lease; (c) insurance expenses payable pursuant to Paragraph 10.4 and 10.8 of this Lease; and (d) the amount of rental income taxes, if any, imposed on Lessee pursuant to the laws of the State in which the Demised Premises are located. Said offsets to percentage rental described in subparagraphs (a), (b), (c) and (d) above shall be allowed as follows: (1) up to 100% of offset items may be recovered from 33% of the percentage rentals paid at the 3% rate, up to 100% of the offsets may be recovered from 66% of the percentage rentals paid at the 2% rate, and up to 100% of the offset may be recovered from 75% of the percentage rentals paid at the 1.5% rate. In no event will Lessee recover a greater amount of offsets against percentage rentals than one hundred percent (100%) of the percentage rent payable hereunder. Percentage rent shall be due and payable within forty five days after the end of the calendar year. Percentage rent payments shall be prorated on a daily basis for partial calendar years at the beginning and end of the Lease term.

2.3.   Whenever Lessee's business is materially interfered with by virtue of Lessee being prevented in whole or in part from

the free, uninterrupted and unimpeded enjoyment of the use of the Demised Premises, or of the fixtures therein, or of the Common Areas of the Shopping Center, by reason of default of Lessor, or by any labor difficulty, or by reason of Lessor's making any repairs or alterations to the Demised Premises, or by reason of any casualty or eminent domain proceedings, or by any other cause beyond the control of Lessee, then and in each and all such cases, Lessee may elect, at any time after the commencement of such material interference, to abate minimum rent and other charges payable hereunder for the duration of such interrupted enjoyment. During such period of abatement, in lieu of such minimum rent and other charges, Lessee shall pay to Lessor a monthly rental payment equal to three percent (3%) of Receipts from Gross Sales earned during each partial or full calendar month, unless such percentage rent is greater than the minimum monthly rental payment otherwise due to Lessor under Paragraph 2.1 hereof, in which case Lessee shall pay to Lessor such minimum monthly rental payment and other charges.  During any such period of abatement, Lessee shall pay to Lessor such monthly rental payment in arrears on the 10th day of each month for the preceding calendar month.  The provisions of this Paragraph 2.3 shall not diminish or modify in any manner Lessee's obligation to pay percentage rent pursuant to Paragraph 2.2 above.

2.4.    If by reason of the minimum rent paid by Lessee during any calendar year as provided in this Lease, the aggregate amount of rent paid by Lessee during any calendar year shall be in excess of the aggregate amount of minimum and percentage rent due hereunder, Lessor shall forthwith refund the excess in question to Lessee.  If such excess is not refunded to Lessee, Lessee shall have the right (a) to deduct such excess from any and all rental payments thereafter becoming due to Lessor hereunder in order to reimburse Lessee for such overpayment, or (b) to take such other action as it deems appropriate to obtain immediate reimbursement for such overpayment.  Such deduction shall not be a basis of forfeiture of this Lease nor constitute a default in the payment of rent unless Lessee fails to pay the amount of such deduction to Lessor within 30 days after a final adjudication that such amount is owing to Lessor.

2.5.    The term "Receipts from Gross Sales," as used herein, is defined as the amount of gross sales made upon credit or for cash upon the Demised Premises, but less the following:  (a) all credits and cash refunds made to customers for merchandise returned or exchanged;  (b) all receipts from the sale of cigarettes, and other tobacco products (the amount of said receipts may be estimated based on the retail value of Lessee's purchases for the Demised Premises);  (c) the amount of tax payable by reason of any state sales tax law or of any other tax law based upon sales, gross volume or gross receipts, now in effect or which may be adopted or amended hereafter by duly constituted governmental

authority; (d) amounts uncollected due to bad checks or insufficient credit; (e) sums and credits based on the transfer of merchandise from the Demised Premises to another location owned or controlled by Lessee, including but not limited to a warehouse or retail store; (f) receipts from weighing scales, telephones, vending machines, photo machines, and similar devices; except that the portion of the receipts to be paid over to Lessee from coin operated devices under any rental concession or percentage arrangement shall be included in Receipts from Gross Sales; and provided further that if Lessee shall be the owner of such coin operated devices, Receipts from Gross Sales shall include that portion of the excess of the money taken in over the money paid out; (g) receipts from the sale of money orders, travelers checks, lottery tickets, tickets for athletic and entertainment events, hunting and fishing licenses and other similar items; provided, however, that any commissions or fees earned by Lessee based on the sale of said items shall be included in Receipts from Gross Sales; (h) receipts from the collection of utility bills or other amounts collected on account of governmental agencies; provided, however, that any commissions or fees earned by Lessee from the collection of said amounts shall be included in Receipts from Gross Sales; (i) the cost of trading stamps offered to customers as a sales inducement; (j) sums and credits received in settlement of claims for loss or damage to merchandise and for the return of merchandise to the supplier; (k) all sales at a discount to employees of Lessee; (l) all service charges paid to banks or other financial institutions based on credit card or other similar credit purchases made by customers; (m) receipts from a bulk transfer made by Lessee, its sublessees or concessionaires, as defined by the law of the state in which the Demised Premises are located; (n) receipts from the sale of fixtures, equipment or property that are not stock in trade, or from any sale not in the ordinary course of business; (o) the amount of credit extended to customers on lay away purchases and which is not collected by Lessee from the customer; (p) promotional and advertising allowances granted to Lessee from Lessee's vendors; (q) amounts uncollected by Lessee from the sale of prescriptions under third party prescription contracts; and (r) sales of beers, wines and distilled spirits.

2.6.    Lessee agrees to keep true and accurate records of account showing all Receipts from Gross Sales on the Demised Premises and to accompany each monthly rental payment with a statement covering such receipts during the preceding calendar month. Lessee shall also include in said statement the amount of receipts from the sale of beers, wines and distilled spirits which may be estimated based on the retail value of Lessee's purchases for the Demised Premises. No inadvertent mistake by Lessee in the preparation of such statements shall be deemed to be a breach of any covenant of this Lease. Lessee shall use its reasonable best efforts to insure that any such statements prepared by an assignee or sublessee are accurate. Upon receipt of said statement, Lessor

may inspect personally, or by its authorized agent or representative, those books of account of Lessee relating to records of sales made upon the Demised Premises only (but not those of general accounting or other records of Lessee covering sales from locations other than the Demised Premises) at any reasonable time during the usual business hours of Lessee at Lessee's corporate headquarters for the purpose of determining the amounts of rental due and payable hereunder. Lessee shall be required to preserve its records on which any statement is based for a period of two years after such statement is rendered and no more. If Lessor fails to object in writing to any statement within one year after the statement was rendered, such statement shall be conclusively presumed to be correct. Lessor agrees to keep all information relating to Lessee's gross sales confidential, except that Lessor may disclose, to the extent and in the manner that is the custom, such information to prospective purchasers of the Shopping Center.

2.7.      Any audit made by Lessor pursuant to Paragraph 2.6 above shall be at Lessor's sole expense, except that if Lessor makes any such audit for any calendar year and if the gross sales shown by Lessee's statements for such year are found to be understated by more than 3%, Lessee shall pay to Lessor the reasonable expenses of such audit.

2.8.      Payments of rental hereunder are to be made pursuant to Paragraph 20.14 hereof.

ARTICLE 3:  POSSESSION AND TITLE.

3.1.      Lessor shall deliver to Lessee possession of the Demised Premises free and clear of all tenants and occupants (other than Lessee) and the rights of either, and also free of liens, except for financing liens, encumbrances, restrictions and violations of laws, ordinances, and regulations relating to the use, occupation and construction of the building on the Demised Premises except as may be specified in Schedule C attached hereto and made a part hereof. Lessee's taking possession of the Demised Premises shall not constitute a waiver of any patent or latent defect in the Demised Premises or of any breach by Lessor of Lessor's covenant to make the Demised Premises Ready for Occupancy pursuant to Schedule B to this Lease.

3.2.      Lessor covenants that Lessee, upon paying the rent and other monetary obligations as contained in this Lease, may quietly have, hold and enjoy the Demised Premises during the term hereof.

3.3.      Lessor warrants that as of the date of delivery of this Lease it has good and marketable title to the Demised Premises in fee simple and that the same is subject to no leases,

subleases, tenancies, agreements, liens (except for financing),
encumbrances, restrictions, and violations of laws, ordinances and
regulations existing upon the execution of this Lease relating to
the use, occupation and construction of the building on the Demised
Premises other than those specifically set forth in Schedule C
hereto.  Lessor further warrants and covenants that, as of the date
hereof there are no environmental controls, zoning or other
ordinances, laws or regulations which will prevent Lessee from
conducting its usual business in the Demised Premises.

3.4.      Lessor shall furnish to Lessee, without cost to
Lessee, proof by current title policy or report that Lessor's title
to the Demised Premises is in accordance with the warranty made by
Lessor in Paragraph 3.3 hereof.   Lessor shall furnish to Lessee
without cost to Lessee a recent licensed surveyor's survey of the
Shopping Center.

3.5.      Lessor agrees to indemnify and hold Lessee harmless
from any and all losses and liability arising out of any breach by
Lessor of any covenant or any warranty referred to in Paragraphs
3.1, 3.2, and 3.3.

## ARTICLE 4:  HOLDING OVER.

4.1.      Lessee shall have the option to hold over beyond
the expiration date of this Lease unless Lessor shall, at least 30
days before said expiration date, have given Lessee notice of its
intention to terminate this Lease on said expiration date.

4.2.      If such notice is not given and Lessee holds over,
Lessee shall become a tenant from month to month upon the same
terms as herein provided until the tenancy shall be terminated at
the end of any month by the giving of at least 30 days written
notice by either party hereto to the other.

## ARTICLE 5:  USE OF PREMISES AND THE SHOPPING CENTER.

5.1.      Lessee covenants to pay during the term hereof all
separately metered electric, water, gas and other public utility
charges in connection with its occupancy and use of the Demised
Premises as well as its prorata share based on usage of any utility
or service provided in common for all tenants of the center.
Lessor shall install, at its sole cost and expense, the necessary
meters to measure Lessee's consumption of said services.

5.2.      Lessee shall at all times conduct its business on
the Demised Premises in a lawful manner and in substantial com-
pliance with all governmental laws, rules, regulations, and orders,
such compliance to be at its own cost and expense; provided,
however, that this provision shall apply only to the manner in
which Lessee conducts its business, and that any alterations,

COEUR.LSE                    -10-                         021991

improvements, or additions, structural or otherwise, to or of the Demised Premises which may be made necessary or required by reason of any law, rule, regulation or order promulgated by competent governmental authority, shall be made by and at the sole cost and expense of Lessor.   Wherever there is a conflict between the provisions of this Paragraph and the provisions of Article 8 hereof, the provisions of this Paragraph shall prevail.

5.3.      Lessor warrants to Lessee that Lessor has entered into the Agreements, as such term is defined in Paragraph 10 of Schedule A, in the forms provided to Lessee prior to execution of this Lease.

5.4.      Consistent with the Agreements, Lessee may make use of the sidewalk adjacent to the Demised Premises.   During the periods of such use by Lessee, Lessor's obligations under Paragraph 10.3 hereof, relating to said described areas only, shall be abated and Lessee's obligations under Paragraph 10.1 hereof shall be extended to include said described areas.

5.5.      Nothing in this Article or in any other provision of this Lease shall be construed to require a business to be continuously operated in the Demised Premises or to require the Demised Premises to be continuously occupied.

5.6.      Schedule A hereto sets forth other matters relating to the use of the Shopping Center.

**ARTICLE 6:   COMMON AREA MAINTENANCE.**

6.1.      Lessor shall, at its own cost and expense, throughout the term of this Lease, maintain the Common Areas, as hereinafter defined in Schedule A hereto, in good condition and repair and in a clean, safe, presentable and sanitary condition with adequate drainage, and at all times free and clear of snow, ice or other obstructions which would interfere with the operation of Lessee's business or the convenience of Lessee's customers, and shall maintain the parking areas, properly striped at all times, and shall maintain and repair the sign pylon structure(s), excluding Lessee's sign facia.   Lessor agrees to keep the parking areas and other Common Areas well lighted during all hours in which Lessee, in its discretion, determines to remain open for business. Lessor shall also provide, at its own expense, reasonable safeguards, including towing if necessary, to protect the Common Areas and to insure that they are utilized only for those uses specified in Paragraph 5 of Schedule A hereto.   In the event that Lessor or any tenant (including Lessee) of the Shopping Center requires all or any part of the parking lot lighting to remain in use (i.e., lighted) beyond 11:00 p.m., except for security lighting, Lessor or such tenant shall itself bear the expense of

such extended use and such expense shall not be included as part of common area maintenance under Paragraph 6.2 hereof. Lessor's obligations under this Paragraph shall be fulfilled in accordance with industry standards for first-class shopping centers in the Pacific Northwest and shall be undertaken in such a manner as to cause the least possible inconvenience to Lessee in the conduct of its business.

6.2.     Lessee shall reimburse Lessor for Lessee's pro rata share of the following expenses for maintenance of the Common Areas (herein "common area maintenance expenses"), excluding any such expenses relating to enclosed mall areas, on an out of pocket, net expense basis, which expenses shall cover (a) real property taxes and real property assessments (excepting assessments for any on-site or off-site improvements, site acquisition, sewer or street improvements, assessed in connection with the development or acquisition of the Shopping Center; (b) public liability insurance premium costs, provided however that Lessee shall only be required to pay its pro rata share of insurance premiums for the minimum amount of insurance required by Paragraph 10.3 hereof; (c) costs relating to the upkeep, repair, and maintenance of the parking area, the utility lines (excluding lateral lines) in the Common Areas servicing all tenants of the Shopping Center (unless necessitated by the acts or omissions of another tenant), landscaped areas and other Common Areas (excepting costs related to the original construction and installation of said Common Areas and excepting costs exceeding the ordinary and necessary expenses for similar properties in the same geographical area); and (d) a management fee not to exceed 5% of the total cost of those items set forth in item (c) above, excluding utilities and any single item the cost of which exceeds $5,000 ("heavy cost item") for any 12 month period. Any such heavy cost item shall require Lessee's prior written approval. Expenses related to security guards servicing the tenants of the Shopping Center shall not be included in common area maintenance expenses, nor shall insurance and maintenance costs exceeding the approved budget by more than five percent (5%) therefor (as set forth in Paragraph 6.1 of the CAM Agreement) and expenses relating to maintenance of lateral utility lines servicing food service providers in the Shopping Center. Except for expenses related to repaving of the parking area, replacement of light standards, addition of signalization or traffic abatement costs, said common area maintenance expenses shall not include any expenditures made by Lessor which are in the nature of capital improvements or replacements which are not properly chargeable as an expense against income under the Internal Revenue Code, or are not in accordance with generally accepted accounting principles. Expenses relating to replacement of light standards, addition of signalization, or traffic abatement costs shall be amortized over no less than ten (10) years if included in common area maintenance expenses.

Notwithstanding anything in this Lease to the contrary, Lessee's duty to reimburse Lessor for common area maintenance expenses shall be conditioned upon Lessor's prior completion of common area construction pursuant to Schedule B hereto.

6.3.     Lessee shall reimburse Lessor for Lessee's pro rata share of such common area maintenance expenses on a quarterly basis promptly after receipt of an itemized statement together with copies of all supporting invoices from Lessor setting forth the total expenses paid by Lessor and Lessee's pro rata share thereof. Said pro rata share shall be proportionately reduced for periods of the term of this Lease of less than a full calendar year. Lessee's pro rata share shall be the ratio of the gross number of square feet of ground floor area of the Demised Premises to the gross number of square feet of total "Building Area," less outside storage areas, of the Shopping Center that is constructed.  Lessee shall have the right to conduct a reasonable audit of said common area maintenance expenses including but not limited to inspection of the work undertaken and all invoices and other records for said expenses, and Lessor shall cooperate fully with Lessee in any such investigation.



6.4.     If Lessee conducts an audit of the common area maintenance expenses pursuant to Paragraph 6.3 above and if such expenses for any calendar year are overstated by more than 5% for such year, Lessor shall pay to Lessee the reasonable expenses of such audit.

ARTICLE 7:   TAXES AND LIENS.

7.1.     All taxes and assessments of every kind and character whatsoever against the Demised Premises or the property of which the Demised Premises are a part shall be paid by Lessor prior to delinquency; provided, however, that any tax imposed on Lessee as a condition of doing business, or any franchise tax or license fee levied against Lessee by the state in which the Demised Premises are located shall be paid by Lessee.

7.2.     Lessee shall, for the term of this Lease, reimburse Lessor for the amount of any real property taxes and real property assessments assessed on the Demised Premises for each fiscal tax year or portion thereof, excepting assessments for any on-site or off-site improvements, site acquisition, and sewer or street improvements, assessed in connection with the development or acquisition of the Shopping Center.  Lessor agrees to use its best efforts to have the Demised Premises and the pads identified in Schedule A separately assessed and to furnish Lessee a photostatic copy of a separate tax bill, if obtainable, solely for the Demised Premises.  If such separate tax bill cannot be obtained, Lessor shall furnish Lessee a photostatic copy of the tax bill for the Shopping Center, together with the tax assessor's estimate of the

separate assessed value of the Demised Premises as reflected on the tax assessor's records and the tax assessor's map. If the assessor's records do not reflect a separately assessed value of the Demised Premises, the tax bill shall be equitably prorated; provided however that in making that proration the percentage attributed to the pads identified above shall be deemed to be no less than 120% of the percentage which their square footage bears to the square footage of the entire Shopping Center. In the event that Lessor furnishes Lessee with a proper segregated tax bill covering the Demised Premises alone, Lessee shall make payment to Lessor within 30 days after receipt by Lessee of such bill or 30 days prior to delinquency, whichever is later. In the event, however, that Lessor furnishes Lessee with a proper tax bill which is not segregated, Lessee shall make payment to Lessor within thirty (30) days after receipt of such bill and supporting documentation mentioned above. If the taxing authority permits payment to be made in installments, Lessee's obligation to reimburse Lessor for taxes under this Paragraph shall be limited to its proper share of such installment payments. The taxes to be reimbursed by Lessee hereunder shall include taxes imposed on Lessor against or measured by rents or rental income payable pursuant to this Lease assessed in lieu of or as a direct substitute for real property taxes, except any net income tax, inheritance tax, or estate tax of Lessor. Any real property taxes or assessments shall be proportionately reduced for periods of the term of this Lease of less than a full year. If Lessee desires to contest the validity of any such tax or assessment, it may do so on Lessor's behalf, at Lessee's sole cost and expense, provided that it shall indemnify Lessor against any loss, liability or damage on account thereof. If Lessee is successful in said contest, any refund received shall belong entirely to Lessee.

7.3.      Lessee covenants that it will not, during the term hereof, suffer or permit any lien to be attached to or upon the Demised Premises by reason of any act or omission on the part of Lessee, and hereby agrees to indemnify and hold Lessor harmless from or against any such lien or claim of lien. In the event any such lien is recorded against the Demised Premises and shall not be released within 30 days after notice from Lessor to Lessee to do so, Lessor in its sole discretion, except as provided below, may pay and discharge the same and remove any such lien from the Demised Premises. Lessee agrees to repay Lessor, upon demand, for any amount which may have been paid by Lessor in discharging such lien, together with interest at an annual interest rate of 12% from the date of the expenditure by Lessor to the date of repayment by Lessee. However, if Lessee desires to contest the validity of any such lien it may do so on Lessor's behalf, and Lessor shall not pay and discharge such lien, provided that Lessee shall indemnify Lessor against any loss, liability or damage on account thereof.

7.4.       Lessor covenants that it will not, during the term hereof, fail to pay when due any installment of taxes, assessments or charges upon any mortgage, deed of trust or other lien or encumbrance affecting the Demised Premises and to which this Lease may be subordinate.  If Lessor fails to make any such payments when due, Lessee may cure Lessor's default pursuant to the provisions of Paragraph 18.1 hereof.

## ARTICLE 8:  REPAIRS, ALTERATIONS AND SIGNS.

8.1.       Lessee shall keep the interior of the Demised Premises including the heating, ventilating and air conditioning systems, in good condition and repair, except for obsolescence, ordinary physical depreciation, ordinary wear and tear, and such repairs as Lessor is required to make under this Lease.  Lessee shall also repair all plate glass in the Demised Premises.  Lessee shall make all such repairs at its own cost and expense.  Upon request by Lessee, Lessor shall assign to Lessee its rights to any warranties it may have covering those portions of the Demised Premises which Lessee is responsible to maintain and repair.  If the Demised Premises are part of an entire building containing general systems of electricity and plumbing, Lessee shall have no responsibility for the same beyond the Demised Premises, nor for any portions thereof running through, in, or across the Demised Premises but not serving the same.  Lessor agrees to keep said general systems in repair so that the portions thereof which are a part of and serve the Demised Premises will function properly if such portions be kept in good condition and repair by Lessee.

8.2.       Lessor shall maintain in good condition and repair the roof structure, floor slab, exterior walls, foundation, footings and all structural portions (both interior and exterior) of the Demised Premises and the sidewalks and alleys adjacent thereto.  Lessor shall also repair any interior or exterior damage to the Demised Premises caused by water or subsidence due to structural defects or caused by sources outside the building on the Demised Premises.  Lessor shall also maintain the painting of the exterior walls of the Demised Premises and the building of which the same are a part.  Lessor shall also repair any and all damage to the Demised Premises, including fixtures and equipment, which may result from its failure to make any such repairs for which it is responsible within a reasonable time after being notified by Lessee verbally or in writing that repairs are needed.  If any repair or maintenance matter for which Lessor is responsible is of an emergency nature which if not attended to might result in bodily injury or property damage, Lessee may make such repair after prior notice to Lessor, and Lessor shall reimburse Lessee promptly for such repair.  The obligations of Lessor under this Article shall not be modified or diminished due to the fact or the manner in which Lessee shall undertake to make such emergency repairs pursuant to this Paragraph.

COEUR.LSE                        -15-                          021991

8.3.        Lessor shall make any and all repairs to the
interior and exterior of the Demised Premises which may at any time
be necessary by reason of any patent or latent defect, whether
structural or otherwise, or by reason of dry rot or termites, and
shall repair such defects and any and all damage to said Demised
Premises (both interior and exterior) which may result from any
such defects.    Notwithstanding any other provision of this Lease,
any addition, alteration or improvement, structural or otherwise,
to or of the Demised Premises, or any part thereof, which may be
necessary or required by reason of any law, rule, regulation or
order promulgated by competent governmental authority shall be made
by and at the cost and expense of Lessor, except for those that may
be solely attributed to Lessee's specific use of the Premises.

8.4.        In addition to Lessor's obligations under this
Article 8 to maintain and repair the Demised Premises, Lessor shall
properly maintain and repair, or cause to be properly maintained
and repaired, all other buildings located on the Shopping Center
to a standard consistent within the industry for first-class, Class
A shopping centers in the Pacific Northwest.    Lessee shall have no
direct or indirect obligation for any expenses incurred in the
repair and maintenance of said other buildings.

8.5.        Lessor shall make all repairs required to be made
by it pursuant to this Article 8 at its sole cost and expense, and
such expenses shall not be included as part of common area
maintenance under Paragraph 6.2 hereof.    Lessor shall make all
repairs required to be made by it under this Lease within a
reasonable time, defined as 3 business days from receipt of verbal
or written notice from Lessee, or such reasonable longer period if
the repair cannot be completed within 3 business days.    Lessor 
shall also make all such repairs at such times and in such a manner
as to cause the least possible inconvenience to Lessee in the
conduct of its business.    Lessor shall not enter the Demised
Premises for the purpose of making such repairs if the same can be
made without entry of the Demised Premises.    If said repairs can
be made outside of Lessee's business hours without substantial
additional cost to Lessor, Lessor shall do so, unless Lessee
requests that they be made during business hours.    Subject to the
provisions of this Paragraph, Lessor reserves the right for itself
or its duly authorized agents and representatives at all reasonable
times during Lessee's business hours to enter the Demised Premises
for the purpose of inspecting the same or to show the same to any
prospective purchaser, and for the purpose of making any necessary
repairs to the Demised Premises.

8.6.        At all reasonable times Lessor shall have the right
to post and keep posted on the Demised Premises any notices
permitted by any law of the state in which the Demised Premises

are located relating to Lessor's nonresponsibility for mechanics liens or liens of a similar nature.

8.7.     Lessee shall have the right at any time to make such additions, repairs, alterations, changes or improvements, which are nonstructural within the Demised Premises, as Lessee may deem necessary or proper (including, but not limited to the installation of trade fixtures, equipment, and partitions required or used from time to time in connection with Lessee's business in the Demised Premises); provided, however, that no work done by Lessee shall lessen the market value of the Demised Premises; and provided further, that Lessee shall pay promptly for all such work done by it or upon its order.  With Lessor approval, Lessee may install or permit the installation of newspaper racks on the sidewalk areas adjacent to the Demised Premises.  Any such installation shall not reduce or alter in any way Lessor's obligations under Paragraph 10.3 hereof.    Nothing contained herein shall be construed to require Lessee to make or pay for any repair, alteration, improvement, or addition, or to do any other act or thing which Lessor is required to make or do under any provision of this Lease, or which is required or becomes necessary at any time because of any failure of Lessor to perform any of its obligations hereunder.

8.8.     Unless prohibited by the documents referred to in Paragraph 5.3., and with Lessor approval, Lessee shall have the right to affix to, paint and inscribe signs upon the windows and doors of the Demised Premises.  All permanent exterior signs shall be subject to Lessor's approval.  Such signs shall conform with all applicable local ordinances.  Lessor hereby approves Lessee's standard trade name signs subject to governing authorities (in size, number and design), and including liquor and prescription signs.  Lessee shall also have the right of sign representation on any sign pylons or monuments in the Common Area of the Shopping Center pursuant to Schedule B hereto.  At no expense to Lessor, Lessor shall use its best efforts to obtain any required governmental approvals, including variances if necessary, for Lessee's building, pylon or monument signs and shall, throughout the term of this Lease, take no action that might result in a change in said signs without the written consent of Lessee.  In the event all required governmental approvals for Lessee's permitted building signs are not obtained prior to the commencement of the term hereof, Lessee may, at its option, defer the payment of any and all rental due hereunder until such approvals are obtained.  During such period of deferral, said rental shall accrue without interest.  Lessee shall pay such accrued rent in full to Lessor within 15 days after Lessee's receipt of evidence of said approvals.

8.9.     Lessee shall, at the expiration of the term hereof, surrender the Demised Premises together with any personal property therein belonging to Lessor, and any alterations made thereto, in

its then existing condition.  To the extent that the provisions of
this Paragraph are in conflict with the provisions of Paragraph 8.1
hereof, the provisions of this Paragraph shall prevail.

8.10.     Lessee shall have the right, but no obligation,  at
any time within 10 business days after the expiration of this
Lease, to remove from the Demised Premises all merchandise, signs,
fixtures,   furniture,   furnishings,   partitions,   and   equipment
installed therein and owned or leased by Lessee; provided, however,
that Lessee repair any damage to the Demised Premises caused by any
such removal.

8.11.     This Article 8 is subject and subordinate to Article
9 and to Schedule B of this Lease.

## ARTICLE 9: DAMAGE OR DESTRUCTION.

9.1.     If the Demised Premises or any other part of the
Shopping Center shall be destroyed or damaged from any cause other
than ordinary wear and tear, ordinary physical depreciation or
obsolescence, Lessor shall forthwith repair and restore the same
to substantially the same condition existing immediately prior to
said damage or destruction with all reasonable dispatch and
diligence.  Said restoration and repair shall include all fixtures
and equipment in the Demised Premises owned by Lessor and so
damaged or destroyed.  All such repair and restoration of the
Demised Premises shall be made in accordance with plans and
specifications approved by Lessee.  Lessor shall comply, and shall
require all its contractors to comply, with all federal, state and
local laws relating to conditions of employment in making any said
repairs and restoration.  Lessor hereby indemnifies and holds
Lessee harmless from any damages, losses or liabilities resulting
from Lessor's failure to comply with said laws.  After repair and
restoration, Lessor shall give possession to Lessee of the same
space in the Demised Premises without material diminution or change
of location.

9.2.     Except as provided in this Article 9, such destruc-
tion or damage to the Demised Premises shall not terminate this
Lease, notwithstanding any laws of the state in which the Demised
Premises are located to the contrary.

9.3.     If any governmental authority shall condemn the
Demised Premises or any part thereof as unsafe or as not in
conformity with the laws and regulations relating to the occupation
and construction thereof, or has ordered or required or shall
hereafter order or require any rebuilding, alteration, or repair
thereof, which is not the result of Lessee's use of the Premises,
Lessor shall immediately at Lessor's sole cost and expense rebuild
or make such alterations and repairs as may be necessary to comply
with such laws, orders or requirements.  All such rebuilding,

COEUR.LSE                    -18-                         021991

alterations and repairs shall be made in accordance with plans and specifications approved by Lessee.

9.4.       Anything in this Article 9 to the contrary notwithstanding, if the Demised Premises shall be destroyed or damaged during the last 12 months of the term hereof by reason of any cause other than ordinary wear and tear, ordinary physical depreciation or obsolescence, and the Demised Premises cannot be completely restored within a period of 120 working days from the date of commencement of such repairs, this Lease may be terminated upon written notice by either party to the other.   Provided, however, that if at the time of said destruction or damage, Lessee has a right of extension pursuant to Article 15 hereof, Lessor may not terminate this Lease until it has given Lessee notice of its intent to terminate and Lessee fails to exercise said right of extension within 30 days of receipt of said notice.   If Lessee fails to exercise said right of extension, this Lease shall terminate effective 30 days after Lessee's receipt of said notice from Lessor.   Upon such termination Lessee shall be relieved from all liabilities hereunder except the liability to pay rent up to the date of such damage or destruction and any accrued charges, costs, and expenses required to be paid by Lessee hereunder up to said date.   Any dispute under this Paragraph shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in King County, Washington and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

9.5.       Anything in this Article 9 to the contrary not-withstanding, if the repair and restoration provided for in Paragraph 9.1 hereof is not commenced within 12 months from the date of the damage or destruction referred to in said Paragraph, or once commenced, if said repair or restoration is not completed within 12 months of date of commencement, Lessee may terminate this Lease upon written notice to Lessor.   Upon such termination, Lessee shall be relieved from all liabilities hereunder except the liability to pay rent up to the date of such damage or destruction and any accrued charges, costs and expenses required to be paid by Lessee hereunder up to said date.   Lessee's right to terminate this Lease as provided herein shall be in addition to any other right or remedy Lessee may have arising out of Lessor's breach of any covenant of this Lease.

9.6.       Wherever the provisions of this Article 9 are in conflict with the provisions of Article 8 hereof, the provisions of this Article 9 shall prevail.

ARTICLE 10: INSURANCE.

10.1.       At all times during the term of this Lease, Lessee shall maintain in force a public liability insurance policy or

COEUR.LSE                          -19-                          021991

policies for liability for bodily injury to persons and damage to property occurring within the exterior walls of the Demised Premises, excluding any such liability arising out of Lessor's acts or omissions.  Said insurance policy or policies shall name Lessor as an additional insured and shall be in an amount of not less than a combined single limit liability of $2,000,000.  Lessee agrees to indemnify and hold Lessor harmless from any and all losses and liability for bodily injury to persons and damage to property occurring within the exterior walls of the Demised Premises except for such losses or liabilities arising out of Lessor's acts or omissions.

10.2.    Notwithstanding anything in this Article 10 to the contrary, Lessor agrees to indemnify and hold Lessee harmless from any and all losses and liability for bodily injury to persons and damage to property occurring within the exterior walls of the Demised Premises arising out of Lessor's acts or omissions.  Lessor further agrees to maintain in force an insurance policy or policies for any such losses and liability naming Lessee as additional insured.  Said insurance policy or policies shall be primary and noncontributing with any insurance maintained by Lessee, shall include a blanket contractual liability endorsement and shall be in an amount of not less than that amount of Lessee's liability insurance policy as set forth in Paragraph 10.1 above.

10.3.    From the date Lessee commences installation of fixtures pursuant to Paragraph 1.6 hereof and throughout the term of this Lease, Lessor shall maintain in force a public liability insurance policy or policies for liability for bodily injury to persons and damage to property, from every cause or source, occurring in or about the Common Areas of the Shopping Center. Said insurance policy or policies shall name Lessee as additional insured and shall be in the amount of not less than a combined single limit liability of $2,000,000.  Said insurance policy or policies shall be primary and noncontributing with any insurance maintained by Lessee and shall include a blanket contractual liability endorsement.  Lessor agrees to indemnify and hold Lessee harmless from any and all losses and liability for bodily injury to persons and damage to property occurring in or about the Common Areas of the Shopping Center.

10.4.    At all times during the term of this Lease, Lessee shall maintain in force fire insurance with an extended coverage endorsement in the amount of not less than 100% of the full replacement cost of the Demised Premises and Lessor's improve-ments, fixtures and equipment on the Demised Premises exclusive of the value of excavations, underground utilities, foundations and footings.  Any and all proceeds of such insurance shall be made payable to Lessor and Lessee and shall be deposited with the first mortgagee or holder of a first deed of trust if either be an institutional lender, or if none, in any bank or trust company

compliance with the terms of the provisions of this Article 10 relating to insurance.

10.8.      Notwithstanding anything in this Article 10 to the contrary, Lessee may insure for the amount of any insurance required to be carried by it under this Article 10, (a) under any plan of self-insurance which it may from time to time have in force and effect so long as Lessee's net worth exceeds $40,000,000, or (b) under a blanket policy or policies covering other liabilities of Lessee and its subsidiaries, controlling or affiliated corporations, or (c) partly under such a plan of self-insurance and partly under such blanket policies.  Any portion of any risk for which Lessee is self-insured shall be deemed to be an insured risk under this Lease, and an appropriate premium therefor shall be established for the purposes of recovery under Paragraph 2.2 hereof, such premium not to exceed the cost of such insurance if it were purchased from a responsible licensed insurer.

## ARTICLE 11:  ASSIGNMENT AND SUBLETTING.

11.1.      So long as Lessee is not in default hereunder, Lessee may at any time assign this Lease or sublet the Demised Premises, subject to Lessor's consent as set forth below, which consent will not be unreasonably withheld or delayed.  Lessee shall give Lessor at least forty-five (45) days' prior written notice of its intention to so assign or sublet.  In its notice Lessee shall specify the nature of the assignee's or sublessee's proposed operations on the Demised Premises.  Lessor may only refuse to approve a proposed assignee or sublessee if the proposed assignee's or sublessee's proposed use of the Demised Premises will conflict with restrictions contained in the Declaration at that time or with exclusive rights of use set forth in leases with tenants operating at that time in the Shopping Center of which Lessor has notified Lessee in writing.  Within forty-five (45) days after receipt of Lessee's notice Lessor shall advise Lessee in writing if Lessor does not consent to Lessee's proposed assignment or sublease. Lessor's failure to provide such notice shall be deemed to constitute Lessor's consent.  If the Lease is assigned or all or a portion of the Demised Premises is sublet, Lessee shall remain liable to Lessor under all the terms, conditions, and covenants of this Lease.

11.2.      Without Lessor's consent, Lessee may:

(a)  Grant concessions and licenses for the use of its store on the Demised Premises;

(b)  Assign this Lease to any entity affiliated with Lessee; or

agreed to by Lessor and Lessee, as trustee for the repair and restoration of the Demised Premises as provided by Paragraph 9.1 hereof. If by reason of the provisions of any such mortgage or deed of trust executed by Lessor on the Premises, fire insurance is required to be made payable to the lien holder and/or the policies of insurance placed in its custody, Lessee hereby consents thereto, provided that the lien holder in question shall first agree in writing with Lessor to make the proceeds of said insurance available for the repair and restoration of the Demised Premises pursuant to Paragraph 9.1 hereof. Any disputes under this Paragraph shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in King County, Washington, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

10.5.    At all times during the term of this Lease, Lessor shall maintain in force fire insurance with an extended coverage endorsement covering all buildings and improvements on the Shopping Center and shall use its best efforts to cause such insurance to be maintained on improvements in the Shopping Center not owned by Lessor, other than the Demised Premises, in the amount of not less than 100% of the full replacement cost thereof, excluding the value of excavations, underground utilities, foundations and footings.

10.6.    Lessor and Lessee shall each procure from each of the insurers under all policies of insurance obtained pursuant to the provisions of this Article 10, including but not limited to public liability and fire insurance, a waiver of all rights of subrogation which said insurer might otherwise have, as against the other party hereto, said waiver to be in writing and for the express benefit of the other. Lessor and Lessee hereby release each other and waive any claim against the other relating to losses or liabilities for which the releasing party is obligated to obtain insurance under the provisions of this Article 10. For purposes of the preceding sentence Lessor and Lessee shall include the directors, officers and employees of each.

10.7.    Except as provided in Paragraph 10.8 hereof, any and all insurance policies obtained by either Lessor or Lessee pursuant to the provisions of this Article 10 shall be issued only by a responsible insurer, properly licensed in the state in which the Demised Premises are located, which insurer has sufficient financial reserves adequate for the risks of the amount of insurance required by the terms of this Article 10. Each such insurance policy shall include an endorsement obligating the insurer to give the party hereto not obtaining said insurance policy 30 days' prior written notice of any cancellation or change in scope or amount of coverage of such insurance policy. Each party hereto shall cause to be issued to the other party, upon request, appropriate certificates of insurance evidencing

(c) Assign this Lease pursuant to any merger, consolidation, or other reorganization of Lessee, or pursuant to a sale of all or substantially all of Lessee's Northwest Region stores;

provided that the third party's proposed use on or of the Demised Premises will not conflict with (i) then-existing use restrictions in the Declaration, or (ii) exclusive rights of use set forth in leases with tenants then operating in the Shopping Center of which Lessor has notified Lessee in writing.

11.3.    If Lessor objects to a proposed assignee or sublessee under the terms of Paragraphs 11.1 or 11.2, and Lessee disagrees with such determination, Lessee shall have the right to have the appropriateness of the objection arbitrated, in its sole discretion, if it makes demand therefor in writing to Lessor not more than ten (10) days after receipt of Lessor's notice of refusal to consent. The appropriateness of the objection shall be determined by reference to the standard set forth in the fourth sentence of Paragraph 11.1 or the proviso of Paragraph 11.2, respectively, and shall be arbitrated by an individual acceptable to both parties with no less than five (5) years experience in the leasing of commercial real estate comparable to the Shopping Center, with the arbitration hearing to be held no less than thirty (30) days after the demand and the ruling to be rendered no less than ten (10) days after the hearing. The arbitration shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association. If the parties cannot agree on an arbitrator, each party shall select one arbitrator meeting the above criteria and the two arbitrators shall select a third arbitrator meeting those criteria, and arbitration shall proceed as outlined above. Each party shall pay one-half (½) of the fees and expenses of the sole or third arbitrator, as the case may be, and its own costs and expenses of its own arbitrator if any and otherwise incurred in connection therewith. If the arbitration proceeding concludes that the Lessor's objection was not justified, then Lessor shall accept the proposed assignee or sublessee.

## ARTICLE 12:  EMINENT DOMAIN.

12.1.    In the event of a "Total Taking," defined as when the entire Demised Premises are taken or appropriated under the power of eminent domain, this Lease shall terminate as of the date of the taking of physical possession of the Premises, and Lessee shall be released from any liability accruing thereafter under this Lease.

12.2.    In the event that through such eminent domain proceedings there is a "Partial Taking," defined as when the floor area of the Demised Premises is reduced by any material amount or when either the street frontage or the Common Areas of the Shopping

Center are reduced by 10% or more, but less than 100% of said areas, Lessee shall have the option (exercisable by written notice to Lessor at any time within 30 days after the taking of possession under any such proceeding) to terminate this lease forthwith, and all of Lessee's obligations hereunder shall thereupon cease to exist.  Except as provided in this Article 12, such Partial Taking shall not be a basis to terminate this Lease, notwithstanding any laws of the state in which the Demised Premises are located to the contrary.

12.3.    Lessor shall be entitled to all damages or compensation awarded in any eminent domain proceeding relating to its fee simple interest in the Demised Premises.  Lessee shall be entitled to all damages and compensation awarded for its leasehold interest (except to the extent that such compensation diminishes said compensation awarded to Lessor), loss and removal of fixtures, furniture, equipment and leasehold improvements made by Lessee or Lessor at Lessee's expense.

12.4.    In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, Lessor shall, at its own expense, repair and restore the Demised Premises, including the fixtures and equipment owned by Lessor, and the Common Areas of the Shopping Center to as close to their original condition as possible.

12.5.    All repair and restoration of the Demised Premises or the Common Areas of the Shopping Center to be made by Lessor pursuant to Paragraph 12.4 hereof shall be made in accordance with plans and specifications approved by Lessee.  Lessor shall comply with all federal, state and local laws relating to conditions of employment in making such repairs and restoration.  In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, any and all proceeds owing to Lessor resulting from any eminent domain proceedings based on such taking shall be made payable to Lessor and Lessee and shall be deposited with the first mortgagee or holder of a first deed of trust if either be an institutional lender, or if none, in any bank or trust company agreed to by Lessor and Lessee, as trustee, for said repair and restoration.  If by reason of the provisions of any such mortgage or deed of trust executed by Lessor on the Premises, eminent domain proceeds are required to be made payable to the lien holder, Lessee hereby consents thereto, provided that the lien holder in question shall first agree in writing with Lessor to make said proceeds available for the repair and restoration of the Demised Premises and Common Areas of the Shopping Center pursuant to this Article 12.

12.6.    In the event that there is a taking and this Lease is not terminated pursuant to this Article 12, in addition to any right Lessee may have to abate minimum rent pursuant to Paragraph

2.3 hereof, a reduction of the annual minimum rent payable under Paragraph 2.1 hereof shall be made as follows. If a portion of the Demised Premises is taken, the annual minimum rent shall be reduced by the ratio of the total square feet taken to the total square footage of the Demised Premises. If a material portion of the Common Areas of the Shopping Center in Parcel 3 is taken, and such taking results in a material reduction of Lessee's parking and/or service requirements, an equitable reduction shall be made, based on the amount taken and proximity of the portion taken to the Demised Premises.

12.7.    A taking or appropriation, as used in this Article 12, shall be deemed to include one or more takings or appropriations, and the cumulative effect of more than one such taking or appropriation shall be construed as one taking or appropriation. Appropriation or taking by eminent domain as used herein shall also include a conveyance made as a settlement to an existing or threatened eminent domain proceeding.

12.8.    Where the provisions of this Article 12 are in conflict with the laws of the state in which the Demised Premises are located, or with the provisions of Article 8 hereof, the provisions of this Article 12 shall apply. Any disputes between Lessor and Lessee under this Article, except for Paragraph 12.3, shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, in King County, Washington, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

## ARTICLE 13:  ATTORNEYS' FEES.

13.1.    In the event either party hereto commences legal proceedings to enforce any of the terms of this Lease, or for damages resulting from a breach of this Lease, the successful party in such action shall receive from the other party, in each such action, including any appeal taken thereof, its reasonable attorneys' fees and costs incurred. Whenever one party is obligated to indemnify the other party under the terms of this Lease, said duty to indemnify shall include the duty to defend the other party and to pay for all reasonable attorneys' fees, costs and disbursements related to said defense. The term attorneys' fees as used in this Paragraph shall include the fair market value of Lessor's and Lessee's in-house counsel's services.

## ARTICLE 14:  PERMITS AND LICENSES.

14.1.    Lessor hereby irrevocably appoints Lessee its attorney-in-fact with full power of substitution to apply for and secure any building permit, signage variances as may be permitted under the documents referred to in Paragraph 5.3, or permission of

any duly constituted authority for the purpose of doing any of the things which Lessee is required or permitted to do under the provisions of this Lease including Lessee's application for a license to sell distilled spirits.

14.2.    Without limiting the foregoing authorization and appointment, Lessor agrees that, whenever requested to do so by Lessee, Lessor will in its own name apply for and secure any such permit or license, the cost of which is the sole responsibility of the Lessee.

14.3.    Lessee agrees to indemnify and hold Lessor harmless from loss or damage by reason of any appointment or authority granted in this Article 14.

**ARTICLE 15:   EXTENSION OF TERM.**

15.1.    Lessee shall have the right to extend the term of this Lease upon the same terms, covenants, and conditions as herein contained, and at the same rental as herein reserved, for four (4) additional consecutive periods of five (5) years each from and after the expiration date hereof, by giving Lessor notice at least 6 months prior to such expiration date, and prior to each such extended expiration date, notifying Lessor of Lessee's election to so extend said term, provided, however, that in the event that Lessee fails to give such notice of extension, Lessee shall not be deemed to have waived the right to that extension or any extension thereafter until Lessor gives Lessee written notice of Lessee's failure to exercise such right of extension and affords Lessee a period of 30 days after receipt of such notice to exercise that right of extension by giving Lessor notice thereof.

15.2.    Whenever Lessee shall be prevented in whole or in part from the free, uninterrupted, and unimpeded enjoyment of the use of the Demised Premises and the fixtures therein by reason of default of Lessor, or by reason of Lessor's making any material repairs, alterations, extensions or additions to the Premises, or the fixtures therein, or by reason of any casualty or eminent domain proceedings or by any labor difficulty or by any other reason beyond the control of Lessee, then, and in each and all of such cases, Lessee shall have the right of extension, as hereinafter defined, which right shall be cumulative and additional to any other rights given in such cases by this Lease or the law. Said right of extension shall give Lessee the option (to be exercised at least 90 days before the conclusion of the term) to add any such period or periods of loss of such enjoyment, or the aggregate of all such periods, to the term of this Lease.  If any of the matters and things enumerated in the first sentence of this Paragraph occur during the last year of the term, and materially interfere with Lessee's enjoyment of the Demised Premises, Lessee

may terminate this Lease at any time thereafter upon 30 days prior notice to Lessor.

15.3.    Wherever there is a reference in this Lease to the term of this Lease, or to the expiration of this Lease, such references shall be construed to include any extension of the term of this Lease.

**ARTICLE 16:  SUBORDINATION.**

16.1.    In the event the Demised Premises are subject to one or more mortgages or deeds of trust, Lessor agrees to deliver to Lessee concurrently with the execution of this Lease a Non-Disturbance, Attornment and Subordination Agreement executed by each such mortgagee or holder of said deed of trust in the form attached hereto as Schedule D.  If Lessor fails to deliver said Agreement to Lessee prior to the commencement of the term hereof, Lessee may, at its option, defer the payment of any and all rental due hereunder until said Agreement is delivered to Lessee.  During such period of deferral, said rental shall accrue without interest. Lessee shall pay such accrued rent in full to Lessor within 5 days after Lessee's receipt of said Agreement in recordable form fully executed by each such Beneficiary.

16.2.    Lessee covenants that it will execute an agreement subordinating this Lease to any mortgage or deed of trust subsequently placed upon the Demised Premises in the form attached hereto as Schedule D.

**ARTICLE 17:  LESSEE'S DEFAULTS.**

17.1.    Should Lessee default in the payment of rent to be paid hereunder, then Lessor may, at its option, in addition to any other right provided for by law, terminate and cancel this Lease, and re-enter and take possession of the Demised Premises, remove Lessee's property therefrom, and dispose of the same in the manner provided by applicable law.  Notwithstanding the foregoing sentence, no right or remedy of Lessor shall be exercised unless Lessee fails to cure such default within 15 days of receipt of notice from Lessor, specifying in detail such default.  Said 15 day notice from Lessor to Lessee shall be in addition to, and not in lieu of, any statutory notice for eviction or foreclosure proceedings required under the laws of the state in which the Demised Premises are located.  Upon such termination, Lessor may recover from Lessee:  (a) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (b) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided; (c) the worth at the time of award of the amount by which the unpaid rent for the balance of the

term after the time of award exceeds the amount of such rental loss
that Lessee proves could be reasonably avoided; and (d) any other
amount necessary to compensate Lessor for all the detriment
proximately caused by Lessee's failure to perform its obligations
under this Lease or which in the ordinary course of events would
be likely to result therefrom.

17.2.    The "worth at the time of award" of the amounts
referred to in subparagraphs (a) and (b) of Paragraph 17.1 above
is computed by allowing interest at an annual interest rate of 12%.
The "worth at the time of award" of the amount referred to in
subparagraph (c) of Paragraph 17.1 above is computed by discounting
such amount at the discount rate of the Federal Reserve Bank of San
Francisco at the time of award plus 1 percent.

17.3.    If Lessee shall be in default in the performance of
any obligation under this Lease other than in the payment of rent,
and if Lessee shall fail to cure such default within 30 days of
receipt of notice from Lessor, specifying in detail the nature of
such default, or in case the default is of such a character as to
reasonably require more than 30 days to cure, then if Lessee shall
fail to use reasonable diligence in curing or attempting to cure
such default, then Lessor may cure such default for the account of
and at the cost and expense of Lessee.    The sum so expended by
Lessor shall be deemed to be additional rent if Lessee fails to pay
to Lessor the sum so expended within 30 days after Lessee's receipt
of notice of a final adjudication that such amount is owing to
Lessor.    Except as provided below in this paragraph 17.3, no such
default, other than the failure to pay such additional rent,    shall
be the basis of a forfeiture of this Lease or otherwise result in
the    eviction    of    Lessee    or    the    termination    of    this    Lease.
Notwithstanding the foregoing, if the cost and expense to be
incurred by Lessor in connection with the default by Lessee would
exceed $25,000, then Lessor shall not be so limited in its remedies
and may pursue any other right or remedy available hereunder or at
law or equity.

17.4.    In the event of the commencement of voluntary or
involuntary proceedings by or against Lessee under the United
States Bankruptcy Code, the rights and duties of the parties hereto
shall be subject to the provisions of the United States Bankruptcy
Code, as amended, including any subsequent amendments thereto.

## ARTICLE 18:  LESSOR'S DEFAULTS.

18.1.    If Lessor fails to pay any installment of taxes or
assessments or any interest, principal, costs or other charges upon
any mortgage or deed of trust or other lien or encumbrance
affecting the Demised Premises and to which this Lease may be
subordinate when any of the same become due or if Lessor fails to
make any repairs or do any work required of Lessor by the

provisions of this Lease, or in any other respect fails to perform
any obligation under this Lease to be performed by Lessor, then and
in any such event Lessee, after the continuance of any such failure
or default beyond a reasonable period of time, not to exceed 15
days after receipt of notice from Lessee specifying in detail the
nature of such default, may (but this shall not be deemed to impose
an obligation upon Lessee to do so) pay such taxes, assessments,
interest, principal, costs and other charges and cure such defaults
on behalf of and at the expense of Lessor, and do all necessary
work and make all necessary payments in connection therewith
including but not limited to the payment of any fees, costs and
charges of or in connection with any legal action which may have
been brought.  Lessor shall pay to Lessee forthwith the amount so
paid by Lessee, together with interest thereon from the date of
such expenditure at an annual interest rate of 12%.  However, if
Lessor desires to contest the validity or correctness of any lien
or encumbrance, it may do so, provided that it shall first furnish
Lessee with a good and sufficient bond indemnifying Lessee against
any loss, liability or damage on account thereof.  Nothing herein
contained shall preclude Lessee from proceeding to collect the
amount so paid by it as aforesaid without waiting for rental
offsets to accrue.

18.2.    If Lessor shall fail to pay to Lessee the amount of
such expenditures and interest within 30 days of written demand
from Lessee to do so, in addition to any other right provided for
by law, Lessee may deduct the amount of such expenditures and
interest from any and all rental payments and other payments
thereafter becoming due to Lessor hereunder.  If at the expiration
of this Lease, there shall be any sums owing by Lessor to Lessee,
this Lease may at the election of Lessee be extended and continue
in full force and effect until the date when the indebtedness of
Lessor to Lessee shall have been fully paid.  Lessee may exercise
said right of extension by giving Lessor notice at least 90 days
prior to the expiration of this Lease of its intent to so extend
the term.

18.3.    Any right or remedy Lessee may have under this Lease
arising out of Lessor's breach of any covenant of this Lease shall
be in addition to any other right or remedy for such breach
provided for by law.

<u>ARTICLE 19:  NOTICES</u>.

19.1.    Any notices, demands, and the like, which are
required to be given hereunder or which either party hereto may
desire to give to the other shall be given in writing by mailing
the same by certified United States mail, return receipt requested,
postage prepaid, addressed to Lessor at 19009 33rd Avenue West,
Suite 250, Lynnwood, Washington  98036, Attention:  Mark Zenger,
or to Lessee, at 4045 Delridge Way S.W., Seattle, Washington 98106,

attention Real Estate Department, or to such other addresses as the respective parties may from time to time designate by notice given as provided in this Lease.

19.2.    Any notice served on Lessee pursuant to any statutory procedure related to forfeiture or eviction proceedings under the laws of the state in which the Demised Premises are located shall be served on the Secretary of Lessee at the address specified in Paragraph 19.1 hereof. Wherever there is a conflict between the provisions of this Paragraph 19.2 and any such statutory procedure, the provisions of this Paragraph 19.2 shall prevail.

19.3.    If Lessor be more than one person, notice by Lessee or payment by Lessee to any one of them is notice or payment to all. If Lessor be more than one person, Lessee may act on notice from any Lessor, and in the case of conflicting notices may recognize any one of them as valid and disregard the others, but Lessee may treat any notice in any case as of no effect unless signed by all Lessors. If Lessor be a partnership or corporation, Lessee may act on any notice given by any officer or agent of such corporation or of such partnership, or of any partner in such partnership, but may treat any notice in such case as of no effect unless signed by the President or a Vice-President of the corporation or the managing general partner in the partnership.

## ARTICLE 20: MISCELLANEOUS PROVISIONS.

20.1.    Whenever in this Lease any words of obligation or duty regarding either of the parties are used, such words shall have the same force and effect as though in the express form of covenants. Whenever appropriate from the context, the use of any gender shall include any other or all genders, and the singular number shall include the plural, and the plural shall include the singular.

20.2.    Concurrently herewith the parties have executed a Memorandum of Lease for recording. This Lease and said Memorandum of Lease shall be construed together as one instrument. Lessor shall not record this Lease or permit the same to be recorded without the written consent of Lessee.

20.3.    No waiver of any breach of any of the covenants, agreements or provisions contained herein shall be construed as a waiver of any subsequent breach of the same or any other covenant, agreement or provision. No payment of rent or other charges payable hereunder by Lessee shall be construed as a waiver by Lessee of any breach by Lessor under this Lease.

20.4.    This Lease binds, applies to and inures to the benefit of, as the case may require, the heirs, executors,

administrators, successors and assigns of Lessor and the successors
and assigns of Lessee.

20.5.        Lessee may make any payment or give any notice to
Lessor, despite any succession or assignments, and be protected in
so doing, until it has written notice to do otherwise from Lessor
or in case of Lessor's death and if Lessor be a natural person,
from the executor or administrator, together with a certified copy
of letters testamentary or letters of administration.  If there be
conflicting claims to money payable by Lessee under this Lease, or
reasonable doubt as to whom the money is payable, Lessee may
discharge its obligation to pay by depositing such money in any
bank or trust company in King County, Washington, to be distributed
pursuant to court order, but Lessee need not recognize any such
adverse claims, and may pay the money to Lessor.  All sums payable
hereunder by either party to the other are payable in lawful money
of the United States of America.

20.6.        The table of contents is a part of this Lease;
however, the captions heading the various articles of this Lease
are for convenience and identification only, and shall not be
deemed to expand, limit or define the contents of their respective
paragraphs.  The brackets and bold language in the text of this
Lease are for Lessee's administrative purposes and the parties
agree and acknowledge that said brackets and bold language have no
meaning or significance as to the intent of the parties or as to
any other interpretation or construction of this Lease.

20.7.        Lessor agrees to pay all fees and transfer taxes
due for bringing about the execution, delivery and recording of
this Lease and Memorandum of Lease and any amendments thereto, and
agrees to indemnify Lessee and hold Lessee harmless from any and
all liability therefor.

20.8.        Whenever the approval of Lessor or Lessee is
required hereunder, such approval shall be in writing and be given
pursuant to Article 19 hereof.  Such approval shall not be
unreasonably withheld or delayed.  This Paragraph shall not apply
to any provisions of this Lease in which an amendment to this Lease
is contemplated.

20.9.        This Lease and the Memorandum of Lease referred to
in Paragraph 20.2 hereof, taken together, comprise the entire
agreement between the parties hereto.  There shall be no amend-
ments to this Lease except by written agreement between the
parties.

20.10.        In the event that any provision of this Lease shall
be held invalid or unenforceable, such provision shall be severable
from, and such invalidity or unenforceability shall not be

construed to have any effect on, the remaining provisions of this Lease.

20.11.    This Lease was freely and voluntarily negotiated between the parties and shall not be construed against one or the other party.

20.12.    Time is of the essence hereof.

20.13.    Definitions for the following terms are set forth in the Paragraphs specified: (a) Ready for Occupancy - Paragraph 1.2; (b) Receipts from Gross Sales - Paragraph 2.5; (c) Common Areas - Schedule A, Paragraph 5; (d) Total Taking - Paragraph 12.1; (e) Partial Taking - Paragraph 12.2; (f) the Shopping Center - Schedule A, Paragraph 1; (g) Demised Premises - Schedule A, Paragraph 2; (h) Plot Plan - Schedule A, Paragraph 1.

20.14.    Payments of rent are to be made to: FIRST WESTERN DEVELOPMENT OF WASHINGTON V, Tax I.D. # 91-1454248 at the address set forth in Paragraph 19.1 above, or to such other person or entity and at such other place as shall be designated in writing by notice as provided in Article 19 of this Lease at least 30 days prior to the next ensuing rental payment due date.

20.15.    The following schedules are attached hereto and they and the attachments thereto are by this reference made a part hereof:

Schedule A, Description of Property
Schedule B, Construction
Schedule C, Mortgages and Other Encumbrances
Schedule D, Non-Disturbance, Attornment and Subordination
            Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

**LESSOR:**

FIRST WESTERN DEVELOPMENT OF WASHINGTON V ASSOCIATES, a Washington limited partnership

By: _____
   Its: MANAGING GENERAL PARTNER

By: _____
   Its: GENERAL PARTNER


**LESSEE:**

PAY'n SAVE DRUG STORES, INCORPORATED, a California corporation

By: _____
   Richard A. Dortch
   Its:  President

By: _____
   Kinne F. Hawes
   Its:  Senior Vice President

STATE OF WASHINGTON )
                    _Snohomish_  )   ss.
COUNTY OF ~~KING~~   )

    I certify that I know or have satisfactory evidence that
_____ and _____
signed this instrument, on oath stated that they were authorized to
execute the instrument and acknowledged it as the _____
_____ and _____,
respectively, of FIRST WESTERN DEVELOPMENT OF WASHINGTON V
ASSOCIATES, a Washington limited partnership, to be the free and
voluntary act of such party for the uses and purposes mentioned in
the instrument.

    Dated: _January 22_, 1991.

               _____
               NOTARY PUBLIC in and for the State of
               Washington, residing at _Bellevue_.

               My appointment expires: _4/30/94_.


STATE OF WASHINGTON )
                    )   ss.
COUNTY OF KING      )


    I certify that I know or have satisfactory evidence that Richard
A. Dortch and Kinne F. Hawes signed this instrument, on oath stated
that they were authorized to execute the instrument and acknowledged
it as the President and Senior Vice President, respectively, of
Pay'n Save Drug Stores, Incorporated, a California corporation, to
be the free and voluntary act of such party for the uses and
purposes mentioned in the instrument.

    Dated:  February 20, 1991.

               _Katherine Skigen_
               NOTARY PUBLIC in and for the State of
               Washington, residing at Seattle.

               My appointment expires:  11-28-92.

OFFICIAL SEAL
KATHERINE SKIGEN
NOTARY PUBLIC-STATE OF WASHINGTON
MY COMMISSION EXPIRES:  11-28-92

CONUR.ICE               -34-              021991

S C H E D U L E   A

DESCRIPTION OF PROPERTY AND PLOT PLAN

Attached to and forming a part of that certain Lease and Memoran-
dum of Lease executed under the date of February 20, 1991 by and
between FIRST WESTERN DEVELOPMENT V ASSOCIATES, a Washington Limited
Partnership, as Lessor and PAY'n SAVE DRUG STORES, INCORPORATED, a
California corporation, as Lessee.

1.   **The Shopping Center.**  The Demised Premises are a portion of
Lessor's entire property, situated in the City of Coeur d'Alene,
County of Kootenai, State of Idaho, located at Ironwood Drive and
Lincoln Way.

Such property, herein referred to as "the Shopping Center," means
the entire property within the outer property limits shown on the
Plot Plan initialed by the parties, and attached hereto and made a
part hereof ("Plot Plan").  The legal description of the Shopping
Center is set forth in Paragraph 9 of this Schedule A.

2.   **Demised Premises.**  The Shopping Center provides a site for
a store building in the location designated "Pay'n Save" on the Plot
Plan.  Such building is to be erected pursuant to Schedule B hereof
by Lessor for Lessee, having a frontage of 150 feet and running a
depth of 145 feet for a total approximate square footage including
entry area of approximately 22,645 square feet.

Said building site, building, improvements, and appurtenances, and
fixtures and equipment owned by the Lessor, now or hereafter located
thereon, are collectively referred to in this Lease as the
"Premises" or "Demised Premises."

3.   **Use of the Shopping Center.**  Lessor covenants that the
Shopping Center shall be used during the term hereof for the general
purpose of a retail shopping center.  Lessor covenants that it will
not permit the operation or occupancy of any of the following
businesses or facilities on the Shopping Center:  (a) entertainment,
athletic or recreational facility, including but not limited to, a
bowling alley, skating rink, health club (exceeding 1,500 square
feet), theater, video or pinball game operation; (b) educational,
vocational or religious facility, including but not limited to, a
church, beauty school or other institutions for vocational train-
ing; (c) professional and business offices, including but not
limited to, any governmental office or operation; (d) industrial
facility, including but not limited to, manufacturing and warehous-
ing facility.  Lessor covenants that it will, at its own cost and
expense, enforce the foregoing restrictions.

4.    **Common Area Easements.**    Lessee, its agents, employees, patrons and invitees, in common with Lessor and all other tenants of portions of the Shopping Center and their respective agents, employees, patrons, and invitees shall have and are hereby granted, during the entire term of this Lease, the free, uninterrupted, and non-exclusive use of the Common Areas of the Shopping Center ("Common Areas"), as hereinafter defined, which use by all users shall be for the purpose of ingress, egress, service utilities, and parking, and which parking area shall consist of not less than 546 parking spaces, located as shown on the Plot Plan; provided that when the area of the "Phase III Development" identified on the Plot Plan is developed, Lessor shall ensure that sufficient parking spaces are provided in the Phase III Development area to comply with all applicable building codes and serve the buildings and business thereon, without using or reducing the 546 parking spaces available to the tenants of the remainder of the Shopping Center.  The Common Areas shall be defined as the sidewalks, driveways, roadways, parking areas, mall areas, landscaped areas and all other areas of the Shopping Center except those areas designated as building or pad areas on the Plot Plan.  Lessor may not use, nor permit any other person to use, the Common Areas for the benefit of any property, adjoining or otherwise, other than the Shopping Center as defined herein.  Except as provided in Paragraph 6.2. of this Lease, Lessee shall have no obligation or liability whatsoever in connection with the ownership, maintenance, or management of the Common Areas and Lessor shall manage, operate and maintain all such Common Areas, or cause the same to be done on its behalf.

5.    **Ingress and Egress.**    Lessor shall not vary or permit to be varied the designated means of ingress and egress from that shown on the Plot Plan.  Lessor will not alter or permit to be altered existing street signs, median cuts, traffic signals or the parking layout except by written amendment to this Lease, duly executed by the parties hereto.  In the event governmental authorities require changes to the street signs, median cuts or traffic signals, Lessor and Lessee shall cooperate with each other to obtain a result advantageous to Lessee.

6.    **Plot Plan.**    Lessor covenants that no changes shall be made to the building area and/or to the parking and other Common Areas from that shown on the Plot Plan and that no buildings, kiosks or building-type structures may be built except within the building areas or areas for building designated thereon, except by written amendment to this Lease, duly executed by the parties hereto.

7.    **Covenants Running with the Land.**    All of the covenants of Lessor contained in this Lease shall be covenants running with the land pursuant to applicable law.  It is expressly agreed that each covenant to do or refrain from doing some act on the Shopping Center or any part thereof (a) is for the benefit of the Demised Premises

and each person having any leasehold interest therein derived through Lessee, and (b) shall be binding upon each successive owner, during his ownership, of any portion of the Shopping Center and upon each person having any interest therein derived through any owner of the Shopping Center.

8.   **Use of Demised Premises.**   Except for uses prohibited by the Declaration, the Demised Premises may be used by Lessee for the purpose of conducting any lawful business.   Lessor will secure the consent of Albertson's, Inc. to amend the Declaration to allow Lessee to sell alcoholic beverages for off-premises consumption from the Demised Premises, which right shall be exclusive in the Shopping Center with Albertson's, Inc.   Lessee shall not be obligated to pay any rent hereunder until the Declaration has been so amended. Lessee is hereby given the exclusive right and privilege in the Shopping Center of operating a drug store and/or of handling and selling any and all items of merchandise which, by law, must be sold by, or in the presence of, a licensed pharmacist or dispensed by a physician.   Lessor covenants with respect to said exclusive rights and privileges not to permit any storeroom or other portion of the Shopping Center to be used or occupied for the purpose of selling or handling any of the items mentioned in the preceding sentence. Lessor warrants to Lessee that Albertson's, Inc. has entered into an agreement with Lessor pursuant to Paragraph 10.3 of the Development Agreement, which agreement provides that Albertson's, Inc. will not use or allow the use of that portion of the Shopping Center identified on the Plot Plan as "Albertson's" for the sale of drugs requiring the presence of a registered pharmacist for so long as a major drug store is operated and in business on the Demised Premises.

9.   **Legal Description of the Shopping Center.**   The legal description of the Shopping Center is set forth on Schedule A-1, attached hereto and incorporated herein by this reference.

10.   **Rights Relating to Restrictive Agreements.**   Lessor covenants, warrants, and agrees as follows:

(a)   Lessor warrants that none of the provisions of this Lease are prohibited by, inconsistent with, or would be frustrated by, the provisions of the Declaration of Restrictions and Grant of Easements dated February 15, 1989 ("Declaration"), the Common Area Maintenance Agreement dated November 15, 1989 ("CAM Agreement"), or the Development Agreement dated November 15, 1989 between First Western Development of Washington, Inc. ("First Western") and Albertson's, Inc. (collectively the "Agreements"), that Lessor is First Western's assignee thereof, and that Lessor will not amend, consent to or vote in favor of the termination, rescission, or substantial modification of the Agreements,  in a manner which materially affects Lessee's rights under this Lease or is inconsistent with this warranty, without the prior written consent of Lessee.   Lessor agrees that in



the event of inconsistency between this Lease and the Agreements this Lease shall control, and that Lessor shall indemnify and hold Lessee harmless against, and reimburse Lessee for, any claim against or loss incurred by Lessee arising out of any alleged inconsistency between this Lease and the Agreements.

(b)   Lessor agrees to carry out its obligations under the Agreements and to indemnify and hold Lessee harmless against any loss suffered by Lessee as a result of Lessor's failure to do so.



P L O T   P L A N

## SCHEDULE A-1

### LEGAL DESCRIPTION

Lot 3, Ironwood Square, according to the plat recorded
in the office of the County Recorder in Book F of Plats
at Page 248, records of Kootenai County, Idaho.

## S C H E D U L E   B

### CONSTRUCTION

Attached to and forming a part of that certain Lease executed under date of February 20, 1991, by and between First Western Development of Washington V Associates, a Washington limited partnership, as Lessor, and Pay'n Save Drug Stores, Incorporated, a California corporation, as Lessee.

### Building Construction

1.   Lessor covenants that immediately after the plans and specifications for the Premises have been approved by Lessor and Lessee, it will proceed with all reasonable diligence and dispatch (weather permitting) to construct upon the real property demised hereunder a building of the dimensions set forth in Schedule A, Paragraph 2 and the Plot Plan attached thereto in accordance with the provisions of this Schedule B.   Lessor further covenants that it will diligently prosecute the construction of said building until completed in all details and deliver possession of the Demised Premises, Ready for Occupancy, to Lessee.   Said building shall be of Class C construction as defined by the Insurance Service Office Rating Bureau, and of Type VN (fully sprinklered) construction as defined by the Uniform Building Code of the Pacific Coast Building Officials Conference.

2.   The parties understand and agree that plans and specifications for the development of other retail areas directly adjacent to the Demised Premises shall be prepared contemporaneously with the plans and specifications for the Demised Premises itself. Prior to commencement of construction or to Lessor's seeking design approval or approval for said construction from any governmental entity, Lessor shall first submit to Lessee and obtain Lessee's approval of Lessor's proposed overall design theme or concept for the development of the Shopping Center.   Said design theme or concept shall include elevations for all buildings and building signing to be constructed within the Shopping Center and shall be sufficient to meet Lessee's needs, including but not limited to, appropriate signing identity as determined by Lessee and comparable architectural prominence for Lessee's signing and building relative to that of all other major tenants within the Shopping Center. Lessor hereby agrees to submit the plans and specifications for such other retail areas to Lessee prior to the commencement of construction of the Demised Premises for Lessee's comment only. Lessor shall not be required to obtain Lessee's approval of the plans and specifications for such other retail areas prior to the commencement of construction thereof.

COEUR.LSE                              B-1                              021991

After such plans and specifications have been duly submitted to Lessee for comment, Lessor agrees not to materially change such plans and specifications without prior approval from Lessee, which approval shall not be unreasonably withheld.

3.   Lessor shall construct Lessee's building on the Demised Premises in accordance with the following:

3.1  Lessee's Assignment Exhibit General Requirements and Outline Specifications dated December 11, 1989, provided to Lessor and incorporated herein by this reference.

3.2  Plans as developed by CDA Architects and approved by Lessee.

3.3  The dimensions to the exterior walls of the building are to be:

| | |
|---|---|
| Basic store layout | 150' wide by 145' deep |
| Loading dock | 12' wide by 20' deep |
| Entry area | 11' deep by 80' wide |

Lessor shall cause plans and specifications for Lessee's Demised Premises including its exterior elevations, referred to in Paragraph 3, subparagraph 3.2 above, to be prepared promptly by CDA Architects, which plans and specifications are to be submitted by Lessor to Lessee for Lessee's approval, and approved by both Lessee and Lessor prior to any construction thereof, which approval will not be unreasonably withheld.  Lessor shall submit said plans and specifications to Lessee and obtain Lessee's approval prior to Lessor's submission of said plans and specifications to the appropriate governmental entity or entities (including but not limited to Building and Health Departments) for approval.  All such work (including preparation of plans and specifications) shall be at Lessor's expense (which expense is included in the cost of construction set forth in paragraph 5 below).  Lessor covenants that in the construction or remodeling of said building said plans and specifications will be adequate and complete for a building to house a Pay'n Save drugstore indicated by the size and location of the Demised Premises in accordance with the general plan of operation of Lessee and that in the construction or remodeling of said building said plans and specifications will be strictly followed. It is agreed that Lessee may install a satellite antenna on the roof and/or exterior walls of the Demised Premises at its sole cost and expense.

4.   While work is in progress, an appropriate sign as approved by Lessee shall be provided by Lessor at the site (or if agreed provided by Lessee at Lessor's cost).  If Lessor fails to provide said Lessee identification, Lessee may, at Lessor's reasonable

COEUR.LSE                        B-2                              021991

expense, erect its own sign for its identification purposes. Lessor shall, at its own expense, maintain the sign identifying Lessee.

5. Lessor shall construct Lessee's building in accordance with the approved plans and specifications referred to above. Construction costs exclusive of on and off site work, architectural and engineering, engineering inspection, COC insurance, fees and permits, legal fees, and lender fees shall not exceed Six Hundred Eighty-Five Thousand Dollars ($685,000). In the event that Lessee's construction costs, as defined above, exceed the stipulated amount, Lessee shall have the option of (i) payment of the excess construction costs in cash to Landlord within sixty days of turnover for fixturing or (ii) repayment to Landlord of the excess construction costs at the prime interest rate charged its customers by Seattle First National Bank plus 100 basis points, amortized over 10 years or (iii) increasing the annual minimum rental by a factor of 10.5% times the excess construction costs.

6. All change orders pertaining to the construction of Lessee's building initiated by Lessor shall be approved in writing by Lessee prior to commencing the work thereon, and all costs thereof shall be Lessor's sole responsibility. All such change orders initiated by Lessee shall require Lessor's prior consent and all costs thereof shall be Lessee's sole responsibility.

## Common Area Construction

7. Lessor shall provide all common area on-site and off-site improvements to the Shopping Center, which shall be in first class condition pursuant to plans and specifications which shall be approved by Lessee. Lessor shall submit said plans and specifications to Lessee and obtain Lessee's comment prior to Lessor's submission of said plans and specifications to the appropriate city or other governmental entity for approval. All landscaping shall be as low profile in nature and as deciduous and unobstructive as governmental authorities will permit so as not to obscure visibility of the Demised Premises and Lessee's building and pylon signs. All expenses incurred for the initial development of all on-site and off-site improvements, including assessments and fees in connection therewith, shall be at Lessor's sole cost and expense and shall not be charged to Lessee in any form or manner. building and pylon signs.

8. To the extent permitted under the Development Agreement, such site improvements shall include one height limit Shopping Center sign pylon identified as Pylon A, to be located approximately as shown on the Plot Plan attached to Schedule A hereto and further described on the sign criteria attached hereto as Schedule B-1. The design and height of said sign pylon shall be subject to the approval of Lessee and shall meet the specifications set forth in Schedule B-1. Such sign pylon is to be shared by the major co-

tenants.  The Albertson's portion of the sign shall be the only sign placed above Lessee's sign.   No other sign pylons shall be erected on Lessor's Property without Lessee's prior approval and, if any such pylon is on a frontage on which Lessee does not have sign representation, without Lessee's being permitted to share equally with other major tenants in Lessor's Property the most prominent position thereon.

# S C H E D U L E   B - 1

## SIGN CRITERIA

The design of each sign pylon referred to in Paragraph 8 of Schedule B shall be such as to accommodate a Pay'n Save sign with all the following specifications:

(a)  a single double faced interior illuminated rectangular sign can whose width is equal to the widest sign to be installed on the sign pylon and whose square footage is equal to or greater than the square footage of any other sign installed on the sign pylon;

(b)  a sign pylon which is at the maximum height permitted by code and governmental authority (and Lessor shall not do anything to compromise this request) and the placement of the Pay'n Save sign can shall be positioned as high on the sign pylon as legally permissible, subject to Paragraph 8 above;

(c)  no landscaping shall be installed so as to block (now or hereafter) any portion of the Pay'n Save sign; and

(d)  the sign on this sign pylon shall be interior lit and shall be tied into the parking lot lights and the panels for control of same shall be installed on an outside wall in a secured fashion accessible by Lessee.

COEUR.LSE

021991

# S C H E D U L E   C

## MORTGAGES AND OTHER ENCUMBRANCES

Attached to and forming a part of that certain Lease executed under date of February 20, 1991 by and between FIRST WESTERN DEVELOPMENT V ASSOCIATES, a Washington Limited Partnership, as Lessor, and PAY'n SAVE DRUG STORES, INCORPORATED, a California corporation, as Lessee.

The following constitutes all of the liens, encumbrances, restrictions and violations of the laws, ordinances, and regulations relating to the use, occupation, and construction of the Demised Premises:

None.

In the event the Demised Premises are subject to one or more mortgages or deeds of trust, Lessor agrees to deliver to Lessee concurrently with the execution of this Lease a Non-Disturbance, Attornment and Subordination Agreement executed by each such mortgagee or holder of said deed of trust in the form attached hereto as Schedule D.  If Lessor fails to deliver said Agreement to Lessee prior to the commencement of the term hereof, Lessee may, at its option, defer the payment of any and all rental due hereunder until said Agreement is delivered to Lessee.  During such period of deferral, said rental shall accrue without interest.  Lessee shall pay such accrued rent in full to Lessor within 15 days after Lessee's receipt of said Agreement in recordable form fully executed by each such Beneficiary.

COEUR.LSE                          C-1                                    021991

S C H E D U L E    D

Recorded at the request of
**PAY'n SAVE DRUG STORES, INCORPORATED**, and
to be mailed after recording to:

PAY'n SAVE DRUG STORES, INCORPORATED
Attention:  Real Estate Department
P.O. Box 47255
Seattle, Washington  98146-7255

## NON-DISTURBANCE, ATTORNMENT
## AND SUBORDINATION AGREEMENT

Pay'n Save Drug Stores, Incorporated, a California corporation
("Lessee"), has entered into a lease (the "Lease") dated February
20, 1991, with First Western Development of Washington V Associates,
a Washington limited partnership ("Lessor") of the premises commonly
known as _____, and more particularly described in
Exhibit    A    attached    hereto    (the    "Demised    Premises").
_____ ("Beneficiary") is the holder of the beneficial
interest under a Deed of Trust dated _____, recorded in the
Official    Records    in    the    County    of    _____,    State    of
_____ as Instrument No. _____ in Book
No. _____,    Page    _____,    on
_____ on said Demised Premises (the "Deed of Trust").
Lessee and Beneficiary desire hereby to establish certain rights,
safeguards, obligations and priorities with respect to their
respective interests by means of the following non-disturbance,
attornment and subordination agreements.

NOW, THEREFORE, the parties hereto covenant and agree as follows:

1. Provided the Lease is in full force and effect and there are no
   defaults by Lessee in the payment of rent thereunder, then:

   1.1. The right of possession of Lessee to the Demised Premises
        and Lessee's rights arising out of the Lease shall not be
        affected or disturbed by Beneficiary in the exercise of any
        of its rights under the Deed of Trust or the Note secured
        thereby.

   1.2. Lessee shall not be named in any foreclosure action related
        to the Deed of Trust.

1.3.  In the event that Beneficiary or any other person acquires title to the Demised Premises pursuant to the exercise of any remedy provided for in the Deed of Trust or under the laws of the state in which the Demised Premises are located, the Lease shall not be terminated or affected by said foreclosure or sale resulting from any such proceeding; and Beneficiary hereby covenants that any sale by it of the Demised Premises pursuant to the exercise of any rights and remedies under the Deed of Trust or otherwise, shall be made subject to the Lease and the rights of Lessee thereunder; and Lessee covenants and agrees to attorn to Beneficiary or such other person as its new lessor; and the Lease shall continue in full force and effect as a direct lease between Lessee and Beneficiary or such other person, as Lessor, upon all the terms, covenants, conditions and agreements set forth in the Lease between Lessee and Lessor.  However, in no event shall Beneficiary or such person be:

1.3.1.  liable for any act or omission of Lessor, except for those acts or omissions for which Lessee has given Beneficiary notice thereof prior to said foreclosure or sale;

1.3.2.  bound by any payment of rent made by Lessee for periods extending beyond the date of said foreclosure or sale except for those rental payments provided for under the Lease;

1.3.3.  bound by any amendment to the Lease made subsequent to the date of this Agreement without the written consent of Beneficiary, which consent shall not be unreasonably withheld or delayed or withheld or delayed for the purpose of effectuating a change in terms to the Deed of Trust.  Beneficiary hereby consents to any such subsequent amendment if the primary purpose of such amendment is to provide for the expansion or remodeling of the Demised Premises or an extension of the primary term or option periods, so long as there is no decrease in the minimum rent payable under the Lease.

Notwithstanding the foregoing, the rights and obligations of Lessee and Beneficiary, respectively, upon such attornment shall, to the extent of the then remaining balance of the term of the Lease, including any renewals or extensions thereof, be the same as now set forth in the Lease and by this reference the Lease is incorporated herein as part of this Agreement.

COEUR.LSE                        D-2                        021991

2. The Lease shall be subject and subordinate to the lien of the Deed of Trust and to all the terms, conditions and provisions thereof, to all advances made or to be made thereunder, and to any renewals, extensions, modifications or replacements there, not inconsistent with Paragraph 1 of this Agreement.

3. Any notices or other communication required or desired to be given by one party to the other party hereto shall be given in writing by mailing the same by certified United States Mail, return receipt requested, postage prepaid, addressed as follows:

To Lessee:                 Pay'n Save Drug Stores, Incorporated
                           4045 Delridge Way S.W.
                           Seattle, Washington  98106
                           Attention:   Real Estate Department

To Beneficiary:            _____
                           _____
                           _____
                           _____

or to such other addresses as the respective parties may from time to time designate by notice given as provided in this Agreement.

4. This Agreement may not be modified other than by an agreement in writing signed by the parties hereto or by their respective successors in interest.

5. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

6. The foregoing provisions shall be self operative and effective without the execution of any further instruments on the part of either party hereto.

7. Should Beneficiary cease to have a beneficial interest under the Deed of Trust, Beneficiary shall give prompt written notice to Lessee of the reconveyance, assignment or other form of termination of said beneficial interest.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed this _____ day of _____, 19___.

BENEFICIARY:

By:_____
    Its:_____

By:_____
    Its:_____

PAY'n SAVE DRUG STORES,
INCORPORATED,
a California corporation

By:_____
    Its:_____

By:_____
    Its:_____

COEUR.LSE

D-4

021991

STATE OF _____ )
                     )  ss.
COUNTY OF _____ )


     I certify that I know or have satisfactory evidence that
_____ and _____
signed this instrument, on oath stated that they were authorized to
execute the instrument and acknowledged it as the _____
_____ and _____, _____,
respectively, of _____, a _____
_____ to be the free and voluntary act of such party for the
uses and purposes mentioned in the instrument.

     Dated:  _____, 19___.



                         _____
                         NOTARY PUBLIC in and for the State of
                         _____, residing at _____.

                         My appointment expires:_____.


STATE OF WASHINGTON )
                    )  ss.
COUNTY OF KING      )


     I certify that I know or have satisfactory evidence that
_____ and _____
signed this instrument, on oath stated that they were authorized to
execute the instrument and acknowledged it as the _____
_____ and _____, _____,
respectively, of Pay'n Save Drug Stores, Incorporated, a California
corporation, to be the free and voluntary act of such party for the
uses and purposes mentioned in the instrument.

     Dated:  _____, 19___.



                         _____
                         NOTARY PUBLIC in and for the State of
                         Washington, residing at _____.

                         My appointment expires:_____.


COEUR.LSE                    D-5                            021991

# Exhibit "2"

# DAVIS WRIGHT TREMAINE

LAW OFFICES

2300 FIRST INTERSTATE TOWER · 1300 SW FIFTH AVENUE · PORTLAND, OR 97201-5682
(503) 241-2300
FAX: (503) 778-5299 · TELEX 185224

DAVID C. BACA

July 28, 1992

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

First Western Development of
 Washington V Associates
19009 33rd West, Suite 250
Lynnwood, WA  98036

      Re:  Assignment of Lease
           Pay'n Save Store No. P-170
           Our File No. 773070\557

Dear Sir or Madam:

      Please be advised that the tenant under the Lease referred to above has assigned all of its rights to ADC Distribution Corp., and that ADC Distribution Corp. has assumed the obligations of the tenant under that Lease, effective 7:00 a.m. PDT, July 26, 1992.  The obligations of ADC Distribution Corp. are guaranteed by Pay Less Drug Stores Northwest, Inc.  A copy of the executed Assignment and Guaranty is enclosed for your file.

      Any and all notices required or permitted to be given under the Lease shall be given by registered or certified mail and shall be addressed to the new tenant:

           PS Acquisition Corporation
           c/o Pay Less Drug Stores Northwest, Inc.
           9275 SW Peyton Lane
           Wilsonville, Oregon 97070
           Attention:  Vice President, Real Estate
           Pay Less Store #3045

      Please change your records to reflect that all common area maintenance billings and invoices are to be sent to:

           Pay Less Drug Stores Northwest, Inc.
           9275 SW Peyton Lane
           Wilsonville, Oregon 97070
           Attention:  Property Accounting
           Pay Less Store #3045

July 28, 1992
Page 2

    Please change your records to reflect that all invoices
for rent are to be sent to:

        Pay Less Drug Stores Northwest, Inc.
        9275 SW Peyton Lane
        Wilsonville, Oregon 97070
        Attention:  General Ledger
        Pay Less Store #3045

    Please change your records to reflect that all invoices
for real property taxes are to be sent to:

        Pay Less Drug Stores Northwest, Inc.
        9275 SW Peyton Lane
        Wilsonville, Oregon 97070
        Attention:  Property Tax
        Pay Less Store #3045

    Please feel free to contact Robert Sari, the Property
Administrator at Pay Less, at (503) 685-6129 if you have any
questions.

        Very truly yours,

        DAVIS WRIGHT TREMAINE

        David C. Baca

DCB:mg
Enclosure
cc:  Mr. Robert B. Sari (w/enc.)
    Mr. Lyn Psyk (w/enc.)
f:\77\773070\557\notice.ltr

**After recording, return to:**
David C. Baca
1300 SW 5th Avenue, Suite 2300
Portland, Oregon 97201

ASSIGNMENT OF LEASE

AND

GUARANTY OF TENANT'S OBLIGATIONS

PAY'n SAVE DRUG STORES, INCORPORATED ("Assignor"), ADC DISTRIBUTION CORP. ("Assignee") and PAY LESS DRUG STORES NORTHWEST, INC. ("Pay Less") agree as follows:

1. **Recital.** Assignor is the Tenant in possession and is the current owner of all the Tenant's right, title and interest in the Lease described in Exhibit A attached hereto (the "Lease"), which Lease is of the real property located in the State of Idaho and legally described in Exhibit B hereto.

2. **Effective Date.** This Assignment and the Guaranty set forth herein shall be effective at 7:00 a.m. Pacific Daylight Time on the date that a wholly owned subsidiary of Pay Less becomes the owner of all the stock of Assignee (the "Effective Date"), and Assignor shall give possession of the leased premises to Assignee at said hour and date.

3. **Assignment and Assumption.** Assignor assigns and transfers to Assignee all of its right, title and interest in the Lease and Assignee accepts such assignment and assumes and agrees to perform, from the Effective Date as a direct obligation to the Landlord under the Lease, all the duties and obligations of the Tenant under the Lease.

4. **Continuing Liability of Assignor.** Unless otherwise agreed by the Landlord, Assignor shall remain liable to the Landlord for the performance of all of the duties and obligations of the Tenant under the Lease, if and to the extent such duties and obligations are not performed by Assignee.

5. **Guaranty by Pay Less.** Pay Less hereby guarantees the full and faithful performance by Assignee from and after the Effective Date of all of the duties and obligations of the Tenant under the Lease. This guarantee is made expressly for the benefit of the Landlord and the persons or entities who may from time to time succeed to the Landlord's interest under the Lease, and may be enforced against Pay Less to the same extent as if Pay Less were the named Assignee herein and to the same extent as if the Landlord were a party to this agreement.

WITNESS due execution by the respective parties.

Assignor:                    PAY'n SAVE DRUG STORES, INCORPORATED

                             By: _____

                                      SENIOR VICE PRESIDENT
Assignee:                    ADC DISTRIBUTION CORP.

                             By: _____

Pay Less (Guarantor):        PAY LESS DRUG STORES NORTHWEST, INC.

                             By: _____

STATE OF WASHINGTON        )
                           )  ss.
County of *King*           )

        On this *17ᵗ* day of *July* _____, 1992, personally
appeared before me *Kane L. Hawe* _____, to me known to the
*Senior Vice President* of the corporation that executed the within and
foregoing instrument, and acknowledged the said instrument to be
the free and voluntary act and deed of said corporation, for the
uses and purposes therein mentioned, and on oath stated that he was
authorized to execute said instrument and that the seal affixed is
the corporate seal of said corporation.

        In witness whereof, I have hereunto set my hand and
affixed my official seal the day and year first above written.

*OFFICIAL SEAL*
*JANET LUCILLE SAAR*
*Notary Public State of Washington*
*My Commission Expires 3-15-94*

                              *Janet Lucille Saar*
                              NOTARY PUBLIC FOR WASHINGTON
                              residing at *Seattle*
                              My commission expires: *3-15-94*

STATE OF OREGON            )
                           )  ss.
County of Clackamas        )

        On this 10th day of July, 1992, before me, the
undersigned Notary Public in and for said State, personally
appeared James W. Gaube, known to me to be the Vice President of
ADC DISTRIBUTION CORP., a Maryland corporation, and acknowledged to
me that the said instrument is the free and voluntary act and deed
of said corporation, for the uses and purposes therein mentioned,
and on oath stated that he is authorized to execute the said
instrument.

*OFFICIAL SEAL*
*TAMMY L. ANDO*
*NOTARY PUBLIC-OREGON*
*COMMISSION NO. 002961*
*MY COMMISSION EXPIRES JAN. 13, 1995*

                              *Tammy L Ando*
                              NOTARY PUBLIC FOR OREGON
                              My Commission Expires:  1-13-95

Page 3 - ASSIGNMENT OF LEASE AND GUARANTY OF TENANT'S OBLIGATIONS
         f:\77\773070\557\ID-lse.frm
                                                    7-15-92  9:35 am

STATE OF OREGON            )
                          ) ss.
County of Clackamas       )


On this 10th day of July, 1992, before me, the undersigned Notary Public in and for said State, personally appeared James W. Gaube, known to me to be the Vice President of PAY LESS DRUG STORES NORTHWEST, INC., a Maryland corporation, and acknowledged to me that the said instrument is the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute the said instrument.


_Tammy L Ando_
NOTARY PUBLIC FOR OREGON
My Commission Expires:  1-13-95



OFFICIAL SEAL
TAMMY L. ANDO
NOTARY PUBLIC-OREGON
COMMISSION NO. 003961
MY COMMISSION EXPIRES JAN. 13, 1995

**EXHIBIT A**

**Store No. P170**
**208 Ironwood Drive**
**Coeur D'Alene, ID 83814**
**(208) 667-4687**

A.    Lease - Expiration Date: 5\31\17

B.    Master/Ground Lease - Expiration Date:  N\A

C.    Amendments/Supplements/Letter Agreements, etc.

     2\20\91    Memorandum of Lease.
     3\07\91    Non-Disturbance and Attornment Agreement.

D.    Renewal Options - Number remaining as of date hereof : (4)
     5 - year options

     Notice Required to Exercise: 180 days prior to expiration of
     previous term.

E.    Rent:    $7.75/sf for 22,645 sf.

## EXHIBIT A

### Store No. P170
### 208 Ironwood Drive
### Coeur D'Alene, ID 83814
### (208) 667-4687

A.    Lease - Expiration Date: 5\31\17

B.    Master/Ground Lease - Expiration Date:  N\A

C.    Amendments/Supplements/Letter Agreements, etc.

     2\20\91    Memorandum of Lease.
     3\07\91    Non-Disturbance and Attornment Agreement.

D.    Renewal Options - Number remaining as of date hereof : (4)
    5 - year options

    Notice Required to Exercise: 180 days prior to expiration of
    previous term.

E.    Rent:    $7.75/sf for 22,645 sf.

**EXHIBIT B**                                      **Store No.** 170

**PROPERTY DESCRIPTION:**

The land referred to in this Commitment is described as follows:

Lot 3, IRONWOOD SQUARE, according to the plat thereof recorded in the office of the County Recorder at Book "F" of Plats at page 248, records of Kootenai County, Idaho.

# Exhibit "3"



**LEGAL DEPARTMENT**

**MAILING ADDRESS**
P.O. Box 3165
Harrisburg, PA 17105

**GENERAL OFFICE**
30 Hunter Lane
Camp Hill, PA 17011

September 14, 2016

**Telephone 717.761.2633**
**Fax 717.975.5952**

*Via Certified Mail. Return Receipt Requested*

Ironwood Square West, LLC
c/o Tourmaline Capital
2442 Fifth Avenue
Suite 210
San Diego, California 92101

Re:    **LEASE RENEWAL OPTION FOR RITE AID #05420**
**208 WEST IRONWOOD DRIVE**
**COEUR D'ALENE, IDAHO**

Gentlemen:

Please be advised that **THRIFTY PAYLESS, INC.** hereby elects to exercise its option to extend the term of the Lease for the referenced premises for an additional five (5) years. Our new term will commence on June 1, 2017 and will expire on May 31, 2022.

While your acknowledgment of receipt of this notice is not required for its validity, we request that you do so by signing and returning the copy of this letter in the postage-paid envelope enclosed.

Very truly yours,

**THRIFTY PAYLESS, INC.**

Joseph J. Notarianni
Vice President

JJN:llb

*Acknowledged:*

*By:* _____

# Exhibit "4"

KOOTENAI COUNTY RECORDER
JAJ                    2/1/2019 1:15 PM
REQ OF FIRST AMERICAN TITLE NCS -
SEATTLE
RECORDING FEE: $15.00          DD
Electronically Recorded

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL
THIS GRANT DEED TO:

Prince, Yeates & Geldzahler, P.C.
15 West South Temple, Suite 1700
Salt Lake City, Utah 84101
Attn:  T. Richard Davis

AND MAIL ALL
TAX STATEMENTS TO:

Goodale & Barbieri
818 W. Riverside Avenue, Suite 300
Spokane, Washington 99201
Attn:  Bill Duffy

---

**1ST AM** ⑤
*NCS- 922646-Wa1*

**GRANT DEED**

(Space above this line for Recorder's use only)

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **IRONWOOD SQUARE WEST LLC**, a Delaware limited liability company ("**Ironwood S. West**"), and **IRONWOOD SQUARE EAST LLC**, a Delaware limited liability company ("**Ironwood S. East**"; and together with Ironwood S. West, collectively, "**Grantor**"), does hereby GRANT, BARGAIN, SELL AND CONVEY to **IRONWOOD PARTNERS, LLC**, an Idaho limited liability company, its entire interest in that certain real property in the City of Coeur d'Alene, County of Kootenai, State of Idaho, as more particularly described in **Exhibit "A"** attached hereto (the "**Property**"), together with all rights, interests, privileges, easements and appurtenances thereto and all right, title and interest of Grantor in, to and under adjoining streets, rights of way and easements.

SUBJECT TO:    (A) all covenants, conditions, restrictions, servitudes, liens, reservations, easements, declarations and other matters of record or to which reference is made in the public records (whether created by Grantor or otherwise); (B) all matters which an accurate survey and physical inspection of the Property would reveal; (C) interests of parties in possession under existing leases at the Property as tenants thereunder; and (D) a lien for non-delinquent taxes for real property and personal property, and any non-delinquent general or special assessments against the Property.

Date of Execution:

_____2/1_____, 2019

**GRANTOR:**

Date of Execution:

_____2/1_____, 2019

**GRANTOR:**

**IRONWOOD SQUARE WEST LLC,**
a Delaware limited liability company

By:    Tourmaline Capital Fund I LLC,
       a Delaware limited liability company,
       its Manager

       By:    Tourmaline Management LLC,
              a Delaware limited liability company,
              its Manager


              By:    _____
              Name: Jonathan Cheng
              Its:    Manager


**IRONWOOD SQUARE EAST LLC,**
a Delaware limited liability company

By:    Tourmaline Capital Fund I LLC,
       a Delaware limited liability company,
       its Manager

       By:    Tourmaline Management LLC,
              a Delaware limited liability company,
              its Manager


              By:    _____
              Name: Jonathan Cheng
              Its:    Manager


*[Signature Page to Grant Deed – Ironwood]*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                    )
County of _San Diego_                              )

On _January 18, 2019_ before me, _____Ly Vang_____, a Notary Public, personally appeared _Jonathan Cheney_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

LY VANG
Notary Public - California
San Diego County
Commission # 2233919
My Comm. Expires Mar 11, 2022

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                    )
County of _San Diego_                              )

On _January 18, 2019_, before me, _____Ly Vang_____, a Notary Public, personally appeared _Jonathan Cheney_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

LY VANG
Notary Public - California
San Diego County
Commission # 2233919
My Comm. Expires Mar 11, 2022

*[Acknowledgment Page to Grant Deed – Ironwood]*

## EXHIBIT A

### Legal Description

The land referred to herein is situated in the City of Coeur D'Alene, Kootenai County, State of Idaho, and is described as follows:

PARCEL 1:

LOT 1, OF IRONWOOD SQUARE, ACCORDING TO THE PLAT RECORDED IN BOOK "F" OF PLATS, PAGE 248, RECORDS OF KOOTENAI COUNTY, STATE OF IDAHO.

PARCEL 2:

LOT 3A, OF SUBDIVISION OF LOT 3 IRONWOOD SQUARE, ACCORDING TO THE PLAT RECORDED IN BOOK "G" OF PLATS, PAGE 56, RECORDS OF KOOTENAI COUNTY, STATE OF IDAHO.

PARCEL 3:

LOT 3C, BLOCK 1, SUBDIVISION OF LOT 3, IRONWOOD SQUARE, ACCORDING TO THE OFFICIAL PLAT THEREOF FILED AND RECORDED IN BOOK G OF PLATS AT PAGE 56 AND 56A, RECORDS OF KOOTENAI COUNTY, IDAHO.

PARCEL 4:

A PORTION OF TAX NO. 15063 (DESCRIBED IN INSTRUMENT NO. 1244578 RECORDS OF KOOTENAI COUNTY, IDAHO) AND LOT 4 OF IRONWOOD SQUARE (A RECORDED SUBDIVISION ON FILE IN BOOK "F" OF PLATS, PAGE 248 RECORDS OF KOOTENAI COUNTY, IDAHO) SITUATED IN THE EAST HALF OF SECTION 11, TOWNSHIP 50 NORTH, RANGE 4 WEST, BOISE MERIDIAN, KOOTENAI COUNTY, IDAHO, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT AT THE SOUTHEAST CORNER OF SAID LOT 4 (FROM WHICH A STEEL PIN MONUMENTING THE EAST QUARTER CORNER OF SAID SECTION 11 BEARS NORTH 01°08'44" EAST, 100.00 FEET), SAID POINT BEING THE REAL POINT OF BEGINNING; THENCE

ALONG THE WESTERLY LINE OF SAID LOT 4 THE FOLLOWING COURSES AND DISTANCES:

NORTH 88°59'44" WEST, 406.30 FEET; THENCE

NORTH 01°00'16" EAST, 237.00 FEET; THENCE

SOUTH 88°59'44" EAST, 42.74 FEET; THENCE

NORTH 01°00'16" EAST, 185.00 FEET; THENCE

SOUTH 88°59'44" EAST, 60.00 FEET; THENCE

NORTH 01°00'16" EAST, 11.55 FEET: THENCE

LEAVING THE BOUNDARY OF SAID LOT 4, SOUTH 88°59'44" EAST, 263.11 FEET TO THE WESTERLY LINE OF THE CITY STREET (GOVERNMENT WAY); THENCE

ALONG SAID WESTERLY LINE THE FOLLOWING COURSES AND DISTANCES:

SOUTH 01°03'10" WEST, 16.67 FEET; THENCE

NORTHWESTERLY 0.73 FEET ALONG THE ARC OF A NON-TANGENT CIRCULAR CURVE CONCAVE TO THE SOUTHWEST, SAID CURVE HAVING A RADIUS OF 522.96 FEET, A CENTRAL ANGLE OF 0°04'47" AND A LONG CHORD THAT BEARS NORTH 44°29'08" WEST, 0.73 FEET; THENCE

SOUTH 01°03'10" WEST, 41.09 FEET; THENCE

SOUTHERLY 85.55 FEET ALONG THE ARC OF A CIRCULAR CURVE CONCAVE TO THE NORTHEAST, SAID CURVE HAVING A RADIUS OF 687.95 FEET, A CENTRAL ANGLE OF 7°07'28" AND A LONG CHORD THAT BEARS SOUTH 02°30'34" EAST, 253.64 FEET; THENCE

SOUTHERLY 36.86 FEET ALONG THE ARC OF A CIRCULAR CURVE CONCAVE TO THE SOUTHWEST, SAID CURVE HAVING A RADIUS 900.00 FEET, A CENTRAL ANGLE OF 2°20'48" AND A LONG CHORD THAT BEARS SOUTH 06°04'18" EAST, 36.86 FEET; THENCE

SOUTH 01°08'44" WEST, 2.66 FEET TO THE REAL POINT OF BEGINNING.

# Exhibit "5"

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** (this "Amendment") is made as of _Oct. 13_, 2021 ("Effective Date"), by and between **IRONWOOD PARTNERS, LLC,** an Idaho limited liability company, having an address of 155 West 2nd South, Rexburg, Idaho 83440 ("Lessor"), and **THRIFTY PAYLESS, INC.,** a California corporation, having an address at P.O. Box 3165, Harrisburg, PA 17105, Attn: Secretary ("Lessee").

### R E C I T A L S

**WHEREAS,** Lessor, as successor-in-interest to the original lessor, and Lessee, as successor-in-interest to original lessee, entered into a Lease dated February 20, 1991 (the "Lease"), for the premises located at 208 West Ironwood Drive, Coeur D'Alene, Idaho (the "Premises"), which Premises contain approximately 22,645 square feet of retail space located in the shopping center known as Ironwood Square (the "Shopping Center"), as more particularly described in the Lease;

**WHEREAS,** the current term of the Lease expires on May 31, 2022;

**WHEREAS,** Lessor and Lessee now desire to extend the term of the Lease and amend the Lease as set forth herein; and

**WHEREAS,** capitalized terms used but not defined in this Amendment shall have the meanings ascribed to them in the Lease.

### T E R M S

**NOW, THEREFORE,** in consideration of the mutual agreements contained in this Amendment, Lessor and Lessee agree as follows:

1.      Incorporation of Recitals.  The Recitals set forth above are incorporated herein by reference.

2.      Extension Term.  The current term of the Lease is hereby extended for a period of ten (10) years, commencing on June 1, 2022 and expiring on May 31, 2032 (the "Extension Term").  All applicable terms and conditions of the Lease in effect immediately prior to the Extension Term will apply during the Extension Term, except as otherwise set forth in this Amendment.

3.      Options to Extend.  Lessee shall have three (3) options to extend the term of the Lease for a period of five (5) years each (each, an "Option Term") upon the same terms and conditions as set forth in the Lease.

1

4.  <u>Rent</u>.  Notwithstanding anything to the contrary set forth in the Lease, during the Extension Term and each Option Term, Lessee shall pay as rent the following amounts during the periods set forth below:

| Period | Monthly Minimum Rent | Annual Minimum Rent |
|---|---|---|
| Current Term: Effective Date – May 31, 2022 | $18,323.58 | $219,883.00 |
| Extension Term: June 1, 2022 – May 31, 2032 | $17,927.29 | $215,127.48 |
| First Option Term: June 1, 2032 – May 31, 2037 | $19,248.25 | $230,979.00 |
| Second Option Term June 1, 2037 – May 31, 2042 | $20,210.67 | $242,528.00 |
| Third Option Term: June 1, 2042 - May 31, 2047 | $21,229.67 | $254,756.00 |

5.  <u>ACH Payment</u>.  Lessor agrees that Lessee shall make payments of monthly minimum rent, additional rent, and any other charges payable by Lessee in accordance with the Lease by electronic payment using the Automated Clearing House (ACH) system or other similar system.  If required in order to effectuate the foregoing, Lessor shall provide to Lessee a completed ACH Authorization Form upon request from Lessee, substantially in the form attached hereto as Exhibit A, with such modifications as may be required by future banking requirements applicable to electronic payments.

6.  <u>Signs</u>.  In connection with modifications Lessee may make from time to time to its trade dress and signage in connection with Lessee's branding strategy, Lessee may elect, without additional Lessor consent, to design, fabricate and install, at Lessee's expense, replacements of Lessee's existing building and pylon signage with Lessee's then-current prototypical building and pylon sign package (the "Updated Signage"), provided that the Updated Signage complies with applicable governmental requirements.  Lessor agrees to reasonably cooperate with Lessee's ability to install the Updated Signage, including joining in any permit or approval applications, provided that Lessor shall not be required to incur any third-party expense in connection with such cooperation.

7.  <u>No Default</u>.  Lessor represents and warrants to Lessee that as of the Effective Date, to Lessor's actual knowledge, Lessee is not in default under any of the terms, covenants, conditions or provisions of the Lease, and Lessor, to its actual knowledge, as of the Effective Date has no offsets, claims or defenses against Lessee with respect to any obligation or duty of Lessee arising

2

DocuSign Envelope ID: 3D9F0E62-87CE-468C-A88A-704704704DB

pursuant to the Lease.

8.    Brokers.  Each party represents to the other that it has not dealt with any broker in such a manner as to incur any liability for any commission, fee or compensation whatsoever in connection with this transaction, except for ARES ("Broker"), whose commission is to be paid per a separate agreement between Broker and Lessee, and each party shall indemnify the other against any loss, cost or expense resulting from any such claim and shall hold the other harmless from any liability in connection with such claim as may result from their dealing with any brokers.

9.    Ratification of Lease.  Except as herein modified and amended, each and every term, covenant, condition, warranty and agreement of the Lease is hereby ratified and affirmed in its entirety and shall apply with full force and effect during the full term of the Lease.

10.    Conflicting Terms.    In the event of a conflict between the terms of the Lease and this Amendment, the language of this Amendment shall control.

11.    Counterparts.  This Amendment may be executed in one or more counterparts and shall be effective when each party hereto shall have executed at least one counterpart hereof and delivered same with their signature affixed hereto to the other party.  It is the intent and agreement of each party hereto that if any signature hereon is not an original, but is a digital, mechanical, or electronic reproduction (such as, without limitation, a photocopy, fax, email, PDF, Adobe image, jpeg, telegram, telex, or telecopy), then such signature shall be as enforceable, valid and binding as, and the legal equivalent to, an authentic and traditional ink-on-paper original wet signature penned manually by its signatory and each party may rely upon such instrument as an original for all purposes.  The parties agree that such signatures may be exchanged between themselves and/or their legal counsel and assembled into multiple fully executed copies of this Amendment, each of which being deemed one and the same original for all purposes.

12.    Captions.  All captions and headings herein are for convenience and ease of reference only, and shall not be used or referred to in any way in connection with the interpretation or enforcement of this Amendment.

13.    Successors and Assigns.  Except as specifically modified hereby, all of the terms, covenants and conditions of the Lease shall remain in full force and effect and shall be binding on the parties hereto, their successors and assigns.

14.    Representations and Warranties of Lessor.  Lessor hereby makes the following representations and warranties, each of which is material and being relied upon by Lessee:

(a)    The persons executing this Amendment on behalf of Lessor are authorized to do so and, upon execution by such parties, this Lease shall be a valid and binding obligation of Lessor, enforceable against Lessor in accordance with its terms.

(b)    Lessor has not sold, transferred, conveyed, assigned and/or subrogated any of its interest as Lessor in the Lease or the Premises.

3

DocuSign Envelope ID: 3D9F0E62-87CE-4686-8804-BFCDC4879702

       (c)     The consent to this Amendment of any ground lessor, mortgagee, other lending institution or any other entity or individual having an interest in the Leased Premises that are required to be obtained by Lessor prior to Lessor's execution of this Amendment has been obtained and such consent is attached as Exhibit B to this Amendment.  Lessor further agrees to indemnify, defend and hold Lessee harmless from and against any losses or claims arising from Lessor's failure to obtain consent to this Amendment from any such ground lessor, mortgagee, lending institution or other entity or individual.

[Signatures on following page]

IN WITNESS WHEREOF, this Amendment is made as of the day and year first above written.

WITNESS:

*Vicki O'Meehes*

WITNESS:

DocuSigned by:

*Linda Brown*

B150E167A7A34F6...

**LESSOR:**

IRONWOOD SQUARE WEST LLC,
a Delaware limited liability company

By: _Richie W_____

Name: _Richie Will_____

Title: _Manager_____

**LESSEE:**

THRIFTY PAYLESS, INC.,
a California corporation

By _Lisa M Winnick_

Lisa M. Winnick, Vice President

Rite Aid #05420 Coeur D'Alene, ID – First Amendment to Lease v2

**EXHIBIT A**

**ACH AUTHORIZATION FORM**

Rite Aid #05420 Coeur D'Alene, ID – First Amendment to Lease v2

DocuSign Envelope ID: 3D9F0E62-87CE-4686-BF74-B2DB78173BFB

**Rite Aid Corp**
**ACH Authorization Form**

Store Number _____

Store Address _208 West Ironwood Drive_
_Coeur D' Alene ID  83814_

Bank Name _PNC Bank_

9-Digit Routing # _043000096_

Account # _1069941081_



Rite Aid Corp is hereby authorized to directly deposit payments due per
the lease to the account listed above. This authorization will remain in
effect until I modify or cancel it in writing.

Signature _Richie We___

Date _10|11|2021_

Phone # _(208)360 - 2619_

Rite Aid #05420 Coeur D'Alene, ID – First Amendment to Lease v2

## EXHIBIT B

## LENDER'S CONSENT

## [ATTACHED]

**From:** Richie Webb
**To:** Aimee Wong
**Subject:** Fwd: Lease Review: Ironwood Square; ####02095 - Rite Aid 1st Amendment
**Date:** Tuesday, September 28, 2021 5:43:49 PM

The above email is intended to be lender consent.  I can ask for something more official but this is all that was sent.



**Richie Webb**
President
(o) 208.356.6142
(c) 208.360.2619

---------- Forwarded message ---------
From: **Coleman,**

**Jonathan** <jonathan.coleman@pnc.com>
Date: Mon, Sep 20, 2021 at 3:52 PM
Subject: Lease Review: Ironwood Square; ####02095 - Rite Aid 1st Amendment
To: rwebb@hemmingcorp.com <rwebb@hemmingcorp.com>

Good afternoon,

Please let this e-mail serve as Midland as Master Servicer's approval of the First Amendment to Lease with Thrifty Payless Inc. d/b/a Rite Aid, subject to the following conditions:

- Fully executed copy of the First Amendment with no material changes.
- No reimbursements from Lender held reserves for any Tenant Improvements or Leasing Commissions.
- Receipt of $1,500 processing fee (received).
- This approval is valid for 30 days from the date hereof.

This approval is subject to the loan being current, and the information supplied to and relied upon by Midland being as represented in connection with this request. Should Midland become aware of information contradictory to the underwritten information or discovered during the closing process, Midland reserves the right to withdraw this approval.

Please let me know if you have any questions.

Thank you

**Jonathan Coleman**
Asset Manager
Asset Management, Real Estate Solutions

**Midland Loan Services, a PNC Real Estate Business**
10851 Mastin, Suite 300
Overland Park, KS  66210
(p) 913-253-9035

Jonathan.coleman@pnc.com

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com

Exhibit "6"

**ASSIGNMENT AND ASSUMPTION OF LEASES**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES ("**Assignment**") is executed as of January 12, 2023, by and among IRONWOOD PARTNERS, LLC, an Idaho limited liability company ("**Assignor**"), and (i) EMES IRONWOOD LLC, a Delaware limited liability company, as to an undivided 10.00% interest, (ii) BUYS IRONWOOD LLC, a Delaware limited liability company, as to an undivided 20.00% interest, (iii) BARRYB LLC, a Delaware limited liability company, as to an undivided 58.00% interest, and (iv) BLOCH IRONWOOD LLC, a Delaware limited liability company, as to an undivided 12.00% interest, and/or assigns (collectively the "**Assignee**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Definitions.**

"**Property**" means that certain real estate located at 198, 202, 204, 206, 208, 212, 224, 226 and 230 W. Ironwood Drive, Coeur d'Alene, Idaho 83814 in Kootenai County, Idaho and legal described in Exhibit A of the Purchase Agreement (defined below), together with the building, structures and other improvements located thereon.

"**Leases**" means the leases affecting the Property, more particularly described in Schedule 1 attached hereto.

"**Deposits**" means the security deposits and prepaid rents held by or for Assignor on account of the tenants under the Leases as set forth in Schedule 1 attached hereto.

2.      **Assignment.** Assignor hereby bargains, sells, transfers and assigns to Assignee the entire right, title and interest of Assignor in and to the Leases and Deposits. The foregoing assignment is made without representation or warranty except as expressly set forth in the Purchase and Sale Agreement between Assignor and Assignee (as successor-in-interest to First Hill Plaza, L.L.C.) dated as of September 15, 2022, as amended by a First Amendment dated as of November 7, 2022 ("**Purchase Agreement**").

3.      **Assumption.** Effective as of the date hereof, Assignee accepts the foregoing assignment and assumes and agrees to be bound by and to perform, pay, discharge, observe and comply with the covenants, liabilities, duties, debts, obligations and responsibilities of Assignor first accruing on or after the date of hereof under the Leases, including all liability for the credit, refund or return of the Deposits if, when and as required by the Leases.

4.      **Indemnity.** Assignee shall indemnify, defend, and hold harmless Assignor from and against any and all claims, liens, damages, demands, causes of action, liabilities, lawsuits, judgments, losses, costs and expenses (including without limitation, reasonable attorneys' fees and expenses) ("**Liability**") asserted against or incurred by Assignor arising out of the failure of Assignee to perform, pay, discharge, observe or comply with the covenants, liabilities, duties, debts, obligations and responsibilities assumed by Assignee hereunder. Assignor shall indemnify, defend, and hold harmless Assignee from and against any and all Liability asserted against or incurred by Assignee arising out of the failure of Assignor to perform, pay, discharge, observe or comply with the covenants, liabilities, duties, debts, obligations and responsibilities of Assignor under the Leases to the extent required to be performed prior to the effective date of this Assignment.

5.      **Counterparts.** This Assignment may be executed in multiple counterparts, each of which, when assembled will constitute a complete and fully executed original. All such fully executed original counterparts will collectively constitute a single agreement.

DATED as of the date first above written.

**ASSIGNOR:**                                IRONWOOD PARTNERS, LLC,
                                             an Idaho limited liability company

                                             By: _____
                                             Name: Justin C. Reber
                                             Title: Authorized Representative

                                             *[Continued on following page]*

**ASSIGNEE:**                              EMES IRONWOOD LLC,
                                          a Delaware limited liability company

                                          By:    First Hill Plaza, L.L.C.,
                                                 a Washington limited liability company,
                                                 Sole Member

                                                 By:    _Allan Friedman_ (signature)
                                                        Allan Friedman, Manager

                                          BUYS IRONWOOD LLC,
                                          a Delaware limited liability company

                                          By:    Buys Family Trust, as Amended and
                                                 Restated in 2004, dated May 21, 2004,
                                                 Sole Member

                                                 By:    _____
                                                        Maureen L. Buys, Trustee

                                          BARRYB LLC,
                                          a Delaware limited liability company

                                          By:    _____
                                                 Barry Bloch, Sole Member

                                          BLOCH IRONWOOD LLC,
                                          a Delaware limited liability company

                                          By:    Bloch Ironwood WA LLC,
                                                 a Washington limited liability company,
                                                 Sole Member

                                                 By:    _____
                                                        Darren Bloch, Manager

*[Signature Page to Assignment and Assumption of Leases]*

**ASSIGNEE:**

EMES IRONWOOD LLC,
a Delaware limited liability company

By:   First Hill Plaza, L.L.C.,
       a Washington limited liability company,
       Sole Member

       By:   _____
           Allan Friedman, Manager

BUYS IRONWOOD LLC,
a Delaware limited liability company

By:   Buys Family Trust, as Amended and
       Restated in 2004, dated May 21, 2004,
       Sole Member

       By:   *Maureen L. Buys, Trustee*
           Maureen L. Buys, Trustee

BARRYB LLC,
a Delaware limited liability company

By:   _____
       Barry Bloch, Sole Member

BLOCH IRONWOOD LLC,
a Delaware limited liability company

By:   Bloch Ironwood WA LLC,
       a Washington limited liability company,
       Sole Member

       By:   _____
           Darren Bloch, Manager

*[Signature Page to Assignment and Assumption of Leases]*

**ASSIGNEE:**

EMES IRONWOOD LLC,
a Delaware limited liability company

By:   First Hill Plaza, L.L.C.,
a Washington limited liability company,
Sole Member

By:   _____
Allan Friedman, Manager

BUYS IRONWOOD LLC,
a Delaware limited liability company

By:   Buys Family Trust, as Amended and
Restated in 2004, dated May 21, 2004,
Sole Member

By:   _____
Maureen L. Buys, Trustee

BARRYB LLC,
a Delaware limited liability company

By:   _____
Barry Bloch, Sole Member

BLOCH IRONWOOD LLC,
a Delaware limited liability company

By:   Bloch Ironwood WA LLC,
a Washington limited liability company,
Sole Member

By:   _____
Darren Bloch, Manager

*[Signature Page to Assignment and Assumption of Leases]*

**ASSIGNEE:**

EMES IRONWOOD LLC,
a Delaware limited liability company

By:     First Hill Plaza, L.L.C.,
        a Washington limited liability company,
        Sole Member

        By:     _____
                Allan Friedman, Manager

BUYS IRONWOOD LLC,
a Delaware limited liability company

By:     Buys Family Trust, as Amended and
        Restated in 2004, dated May 21, 2004,
        Sole Member

        By:     _____
                Maureen L. Buys, Trustee

BARRYB LLC,
a Delaware limited liability company

By:     _____
        Barry Bloch, Sole Member

BLOCH IRONWOOD LLC,
a Delaware limited liability company

By:     Bloch Ironwood WA LLC,
        a Washington limited liability company,
        Sole Member

        By:     _____
                Darren Bloch, Manager

*[Signature Page to Assignment and Assumption of Leases]*

**SCHEDULE 1 TO LEASE ASSIGNMENT**

**ASSIGNMENT AND ASSUMPTION OF LEASES**



| Tenant | Lease Documents | Security Deposit |
| --- | --- | --- |

REDACTED

Schedule 1-1



| Tenant | Lease Documents | Security Deposit |
|---|---|---|

Schedule 1-2

| Tenant | Lease Documents | Security Deposit |
| --- | --- | --- |



Schedule 1-3

| Tenant | Lease Documents | Security Deposit |
| --- | --- | --- |



Schedule 1-4

| Tenant | Lease Documents | Security Deposit |
|---|---|---|
| REDACTED | | |
| Pay Less Drug Stores Northwest, Inc. | • First Amendment to Lease dated October 13, 2021 | $0.00 |
| | • Lease Renewal Option dated September 14, 2016 | |
| | • Assignment of Lease and Guaranty of Tenant's Obligations by Pay'n Save Drug Stores, Inc. as Assignor and Pay Less Drug Stores Northwest, Inc. as Assignee dated July 28, 1992 | |
| | • Lease Memo dated February 20, 1991 | |
| | • Lease dated February 20, 1991 | |
| REDACTED | | |



# Exhibit "7"

# BUSH KORNFELD LLP
### 601 UNION ST., SUITE 5000
### SEATTLE, WA 98101

**STATEMENT OF FEES AS TO NEW RITE AID**

**CLIENT**: BLOCH IRONWOOD LLC

- June 4, 2025          Invoice # 25374          $6,319.88

- August 7, 2025          Invoice # 25467          $5,437.50

---

601 Union Street • Suite 5000 • Seattle, Washington 98101-2373
(206) 292-2110 • Facsimile (206) 292-2104

ih18vc01y2

Time Entries

## Time Entries

Client: All; Matter: Bloch Ironwood, LLC - Thrifty Payless, Inc. / New Rite Aid, LLC; Responsible Attorney: All; Professional: All; Time-Entry Date: 8/1/2025 - 8/31/2025

| Date | Status | Billable Type | Task | Timekeeper | Actual Hours | Billable Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 8/18/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 0.40 | 0.40 | 400.00 | 160.00 |
| 8/19/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 1.60 | 1.60 | 400.00 | 640.00 |
| 8/19/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 0.20 | 0.20 | 400.00 | 80.00 |
| 8/20/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 1.10 | 1.10 | 400.00 | 440.00 |
| 8/25/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 0.10 | 0.10 | 400.00 | 40.00 |
| 8/26/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 0.40 | 0.40 | 400.00 | 160.00 |
| 8/27/2025 | REDACTED | Billable | BW - Billable Work | Jessica M. Gulash (Jessica Gulash) | 1.00 | 1.00 | 400.00 | 400.00 |
| | | | | **Grand Total** | **4.80** | **4.80** | | **$1,920.00** |

# Exhibit "8"

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | | **REQUEST FOR PAYMENT OF<br>ADMINISTRATIVE EXPENSE** |
|---|---|---|
| In re: | Chapter 11<br><br>Case Number: | |

**NOTE:** This form should not be used for an unsecured claim arising prior to the commencement of the case. In such instances, a proof of claim should be filed.

| Name of Creditor:<br>(The person or other entity to whom the debtor owed money or property.)<br>_____<br><br>Name and Addresses Where Notices Should Be Sent: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | |
| | | THIS SPACE IS FOR COURT USE ONLY |

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this request:<br>☐ replaces a previously filed request, dated:<br>☐ amends a previously filed request, dated: |
|---|---|

**1. BASIS FOR CLAIM**

☐   Goods Sold
☐   Services performed
☐   Money loaned
☐   Personal injury/wrongful death
☐   Taxes
☐   Other (Describe briefly) (Commercial Lease)

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensations (Fill out below)

Provide last four digits of your social security number _____

**2. DATE DEBT WAS INCURRED:**

**3.   TOTAL AMOUNT OF REQUEST AS OF ABOVE DATE:** _____

☐ Check this box if the request includes interest or other charges in addition to the principal amount of the request. Attach itemized statement of all interest or additional charges.

**4.   Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:

☐ Real Estate          ☐ Motor Vehicle
☐ Other (Describe briefly) _____

Value of Collateral: $_____

☐ Check this box if there is no collateral or lien securing your claim.

| **5. Credits:** The amount of all payments have been credited and deducted for the purposes of making this request for payment of administrative expenses.<br><br>**6. Supporting Documents:** *Attach copies of supporting documents*, such as purchase orders, invoices, itemized statements of running accounts, contracts as well as any evidence of perfection of a lien.<br><br>    DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain.<br>    If  the documents are voluminous, attach a summary.<br><br>**7. Date-Stamped Copy:** To receive an acknowledgment of the filing of your request, enclose a self-addressed envelope and copy of this request. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date: | Sign and print below the name and title, if any, of the creditor or other person authorized to file this request (attach copy of power of attorney, if any).<br><br>_____ |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**NOTE:** The filing of this request will not result in the scheduling of a hearing to consider payment of your administrative claim but will result in the registry of your administrative claim with the Bankruptcy Court. If you wish to have a hearing scheduled on your claim, you must file a motion in accordance with D.N.J. LBR 3001-1(b).                                              *rev.8/1/15*