Law Office of Shmuel Klein PA
113 Cedarhill Ave
Mahwah, NJ 07430
845-425-2510
Attorney ID 00851987
Email: shmuel.klein@verizon.net

-and-

NATALI A. RON (SBN 302927)
Law Offices of Hastings & Ron
1330 W. Fremont Street, Suite 1
Stockton, CA 95203
(209) 476-1010
email: nron@hastingslawoffice.com
*Attorneys for Stonebrier Commercial, L.P.*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
_____

In re:
NEW RITE AID LLC, *et al.*,
Debtors

Chapter 11
Case No. 25-14861 (MBK)

_____

TO: HONORABLE MICHAEL B. KAPLAN
United States Bankruptcy Judge


**CERTIFICATION IN SUPPORT OF STONEBRIER COMMERCIAL L.P. MOTION
FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11
U.S.C. § 503(B)(7) AND § 503(B)(9) AND FOR PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM**


I, Corinna Jones, certify I have personal knowledge of the foregoing statements and that they

are true to the best of my knowledge.  I am an adult and competent to testify to these matters, and if

called upon, could truthfully testify hereto, under penalty of perjury under the laws of the United

States:

1.      I am the co-president of Patmon Company, Inc., limited partner of STONEBRIER

COMMERCIAL, L.P.

2.      This    Certification    is    filed    by    STONEBRIER    COMMERCIAL    L.P.

("STONEBRIER") in Support of its motion for allowance of administrative expense claim in the

total aggregate amount of $157,048.62, pursuant to a certain lease made between STONEBRIER

and Debtors, which has since been rejected as of June 30, 2025. (See Dkt. No. 1406).

3.      On May 5, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for

bankruptcy under Chapter 11 of Title 11 of the United States Code. Since the Petition Date, the

Debtors continued to occupy and do business on the Premises.

4.      At issue in this motion is the Debtors continued use and occupancy of lease for

commercial property located at 4774 West Lane Stockton, CA 95210 (the "Premises").

STONEBRIER and Debtors, entered into a certain Lease Agreement beginning June 25, 2008 (the

"Lease Agreement", attached herein as Exhibit A), and most recently amended on June 20, 2024.

(attached herein as Exhibit B).

5.      We received notice of the rejection of the lease of said Premises effective June 30,

2025 (the "Rejection Effective Date"). From the Petition Date through the Rejection Effective

date, the Debtor's continued use and occupancy of the Premises for retail space and conduct their

business.

6.      In total, STONEBRIER claims pursuant to § 503(b)(7) of the Bankruptcy Code the

total aggregate amount of $116,031.92; and pursuant to § 503(b)(9) of the Bankruptcy Code the

total aggregate amount of $41,016.70. (see accounting attached herein as Exhibit C).

7.      As of the Rejection Effective Date, Debtors were tenants under the Lease

Agreement for nearly seventeen (17) years. Pursuant to the Lease Agreement paragraph 5 RENT,

monthly installments for years 11-20 amounted to $47,208.33 per month. Further, a "Late Charge"

of five percent (5%) of the amount overdue shall be paid by Debtors should the outstanding

balance not be paid within 10 days of the Landlord's (STONEBRIER) notice. Debtors have not

paid rent for May 2025 and July 2025. Additionally, Debtors have incurred a Late Charge for April, May, and July installments, which totals $2,360.42 for each Late Charge. In total under paragraph 5 of the Lease Agreement, Debtors outstanding balance owed to STONEBRIER is $101,497.59.

8.      Pursuant to the Lease Agreement paragraph 6 REAL ESTATE TAXES, Debtors agreed to pay all real estate taxes which may be levied or charged against the Premises. Debtors have an outstanding balance for the 2nd Installment Property Tax totaling $27,486.86 and a Delinquent Fee Property Tax totaling $2,803.18. (attached herein as Exhibit D). The total outstanding balance under paragraph 6 of the Lease Agreement is $30,290.04.

9.      Pursuant to the Lease Agreement, paragraph 16 UTILITIES, Debtors agreed to pay all water, light, power, and/or other utility service used by Debtor. Under paragraph 17 MAINTENANCE AND REPAIRS Debtors agreed to pay for the maintenance, repair, and replacement of the entire building and improvements on the site. Debtors have an outstanding balance for March 2025 totaling $3,095.52, April 2025 totaling $3,361.22, May 2025 totaling $3,626.73, June 2025 totaling $3,339.35, and July 2025 totaling $3,148.67, with a total aggregate amount of $16,571.49. (herein attached as Exhibit E).

10.     Pursuant to the Lease Agreement, paragraph 25 DEFAULT part (iv), Debtors agreed to pay Landlord (STONEBRIER) "[a]ny other reasonable amount necessary to compensate Landlord for all the damages proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would likely to result therefore (including, without limitation, … reasonable attorneys' fees…" (see Lease Agreement). Debtors have caused STONEBRIER to incur a total balance of $8,689.50 in attorneys' fees pursuant to the Lease Agreement. (herein attached as Exhibit F).

11.    To date, STONEBRIER has not received payment for the past-due amounts Debtors are obligated to pay pursuant to the Lease Agreement.  Accordingly, STONEBRIER is requesting an allowed administrative expense claim against Debtors in the aggregate amount of $157,048.62.

WHEREFORE  STONEBRIER respectfully requests the motion be granted.


Dated: August 27, 2025

By: /s/ Corinna Jones
        Corinna Jones, Co-President
        Stonebrier Commercial L.P.

# EXHIBIT A



**LEGAL DEPARTMENT**

**I. LAWRENCE GELMAN**
Vice President
Real Estate Law

Lisa M. Winnick
Associate Counsel
Direct Dial: (717) 760-7817
Fax: (717) 975-5952
E-mail: lwinnick@riteaid.com

- **MAILING ADDRESS**
  P.O. Box 3165
  Harrisburg, PA 17105

- **GENERAL OFFICE**
  30 Hunter Lane
  Camp Hill, PA 17011

- **(717) 761-2633**
- **(717) 975-5952** Fax

June 25, 2008

*Via Federal Express*

Charles G. Patmon, III
2013 Cove Court
Stockton CA 95204

> Re:    **Rite Aid #6510**
>        **Stockton CA**

Dear Pat:

Enclosed are the following original documents related to the above-referenced location:

(1) One (1) fully-executed Lease Agreement;
(2) One (1) executed Guaranty;
(3) Two (2) fully-executed Reciprocal Use and Maintenance Agreements; and
(4) One (1) fully-executed Memorandum of Lease.

Please record one (1) original Reciprocal Use and Maintenance Agreement and provide me with a copy of the recorded document when you have it. I will record one (1) original Memorandum of Lease and provide you with a copy when I have it.

If you have any questions regarding the enclosed, please advise.

Very truly yours,
THRIFTY PAYLESS, INC.

Lisa M. Winnick
Associate Counsel

Enclosures



LEGAL DEPARTMENT

**I. LAWRENCE GELMAN**
Vice President
Real Estate Law

Lisa M. Winnick
Associate Counsel
Direct Dial: (717) 760-7817
Fax: (717) 975-5952
E-mail: lwinnick@riteaid.com

* **MAILING ADDRESS**
P.O. Box 3165
Harrisburg, PA 17105

* **GENERAL OFFICE**
30 Hunter Lane
Camp Hill, PA 17011

* **(717) 761-2633**
* **(717) 975-5952** Fax

June 25, 2008

*Via Federal Express*

Charles G. Patmon, III
2013 Cove Court
Stockton CA 95204

Re:    **Rite Aid #6510**
       **Stockton CA**

Dear Pat:

    Enclosed are the following original documents related to the above-referenced location:

        (1) One (1) fully-executed Lease Agreement;
        (2) One (1) executed Guaranty;
        (3) Two (2) fully-executed Reciprocal Use and Maintenance Agreements; and
        (4) One (1) fully-executed Memorandum of Lease.

Please record one (1) original Reciprocal Use and Maintenance Agreement and provide me with a copy of the recorded document when you have it. I will record one (1) original Memorandum of Lease and provide you with a copy when I have it.

    If you have any questions regarding the enclosed, please advise.

                Very truly yours,
                THRIFTY PAYLESS, INC.

                Lisa M. Winnick
                Associate Counsel

Enclosures

# LEASE

DATE OF LEASE:                 June 25, 2008

IDENTITY OF LANDLORD:       STONEBRIER COMMERCIAL LIMITED
PARTNERSHIP
1919 Grand Canal Blvd.
Stockton, California 95207
Federal Identification No. _____

IDENTITY OF TENANT:          THRIFTY PAYLESS, INC.
Post Office Box 3165
Harrisburg, Pennsylvania 17105
Attention: Secretary

## WITNESSETH:

THIS LEASE AGREEMENT (the "Lease"), is dated as of June 25, 2008, by and between **STONEBRIER COMMERCIAL LIMITED PARTNERSHIP** ("Landlord") and **THRIFTY PAYLESS, INC.**, a California corporation ("Tenant").

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows

1.      <u>LEASE EXHIBITS.</u>

Attached to this Lease and hereby made a part hereof are the following:

EXHIBIT A - being a site plan of the Leased Premises showing the location of the Building and improvements to be constructed thereon.

EXHIBIT B - being a legal description of the Property.

EXHIBIT C-1 – being the Plans and Specifications.

EXHIBIT C-2 – being the approved changes to the Plans and Specifications.

EXHIBIT D - being a list of all contracts, leases, tenancies, agreements, restrictions, mortgages, Reciprocal Use and Maintenance Agreement, and other liens and encumbrances of every nature whatsoever which will affect the Leased Premises as of the commencement date of this Lease.

EXHIBIT E – being a form of Subordination, Nondisturbance and Attornment Agreement.

EXHIBIT F - being a form of Memorandum of Lease.

EXHIBIT G – being a form of Recognition Agreement.

EXHIBIT H – being a form of Reciprocal Use and Maintenance Agreement.

EXHIBIT I – being a form of Architect's Certificate

EXHIBIT J – being a form of Punchlist

EXHIBIT K – being a form of Guaranty

2.      LEASED PREMISES.

    Landlord hereby leases unto Tenant, and Tenant hereby rents from Landlord, for the consideration and upon the terms and conditions herein set forth, the following premises:  That parcel of land shown on **Exhibit "A"**, and described in **Exhibit "B",** containing approximately 1.7 acres (the "Property"), together with the store, double drive-thru and improvements constructed or to be constructed thereon containing or to contain approximately 17,340 square feet of space (107' x 163'), located at the Southeast Corner of West Lane and Bianchi, Stockton, California (Leased Premises).

3.      LEASE TERM.

    **TO HAVE AND TO HOLD** the Leased Premises, together with all and singular the improvements, appurtenances, rights, privileges and easements thereunto belonging or in anywise appertaining, unto Tenant, for a term commencing on the date hereof and ending twenty-five (25) years from the end of the calendar month in which the Rent Commencement Date falls.  If the first day of the calendar month which is twenty-five (25) years after the Rent Commencement Date occurs in October, November, December or January, the Lease shall end on January 31, following such date.

    (a)      The date on which Tenant shall become obligated to commence the payment of rent (the "Rent Commencement Date") shall be (i) sixty (60) days after the Delivery Date, as hereinafter defined (such sixty day period being referred to as the "Fixturing Period"), or (ii) upon the opening by Tenant of its business on the premises, whichever first occurs.

    (b) When the Rent Commencement Date and expiration dates have been determined as herein set forth, the Parties shall execute a written memorandum expressly confirming said dates,

and such memorandum shall thereupon be deemed attached hereto, incorporated herein, and by this reference made a part of this Lease.

(c)  The term "Delivery Date" shall mean the date that (i) exclusive actual possession of the entire Leased Premises is delivered to Tenant with all of "Landlord's Work" (as defined in Section 8) substantially completed in accordance with the requirements of the Plans and Specifications (as defined in Section 8) and the Final Plans (as defined in Section 8), and accepted, in writing, by Tenant; (ii) a certificate from Lee-Jagoe or other Licensed Architect or Engineer hired to be responsible for the project(the "Project Architect") (in the form attached hereto as Exhibit "I") shall be delivered to Tenant certifying that all of Landlord's Work has been performed in accordance with the Plans and Specifications and the Final Plans; (iii) all access roads and easements needed for ingress and egress to and from the Leased Premises(as shown on the Site Plan) shall be completed and of record (if applicable) (iv) Landlord has obtained and delivered to Tenant a duly executed subordination, non-disturbance agreement from all master lessors and all lenders having a lien (security interest) on the Leased Premises in the form attached as **Exhibit "E"** hereof; (v) Landlord has obtained and delivered to Tenant the Title Report (as defined in Section 8(i)); (vi) all conditions and obligations have been completed and satisfied; and (vii) Landlord has provided Tenant with at least thirty (30) days' prior written notice of the Delivery Date (the "Delivery Notice").  In no event shall the Delivery Date occur prior to the Estimated Delivery Date (as defined in Section 8(e)). Notwithstanding anything contained herein if the Delivery Date would occur between November 1 and January 1 (a "Dark Period"), Tenant may, by written notice to Landlord delivered within seven (7) business days after the date the Delivery Date would otherwise occur, delay accepting delivery of the Leased Premises until the first day after expiration of such Dark Period, in which event the Delivery Date shall occur on the earlier of the date Tenant accepts possession of the Leased Premises or the first day after expiration of such Dark Period.

4.     OPTION TO EXTEND.

Provided Tenant is not in default, Tenant is hereby granted the right to renew this Lease for six (6) five (5) year renewal periods.  To exercise such options, Tenant shall be required to give to Landlord written notice at least six (6) months prior to the expiration of the original term or the then-current renewal term, as applicable, provided however if Tenant fails to exercise any option right, Tenant's right to exercise said options shall not expire until thirty (30) days after written notice by Landlord of Tenant's failure to exercise same.

5.     RENT.

Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord as fixed annual rental for the Leased Premises, the following amounts, determined and payable in the manner, at the time, and upon the conditions set forth below:

| Years | Annual Rent | Monthly Installments |
|---|---|---|
| Original Term | | |
| Years 1-10 | $515,000.00 | $42,916.67 |

| | | |
|---|---|---|
| Years 11-20 | $566,500.00 | $47,208.33 |
| Years 21-25 | $623,150.00 | $51,929.17 |

Renewal Terms

| | | |
|---|---|---|
| First Renewal Term | $654,307.50 | $54,525.63 |
| Second Renewal Term | $687,022.87 | $57,251.91 |
| Third Renewal Term | $721,374.01 | $60,114.50 |
| Fourth Renewal Term | $757,442.71 | $63,120.23 |
| Fifth Renewal Term | $795,314.84 | $66,276.24 |
| Sixth Renewal Term | $835,080.58 | $69,590.05 |

on or before the tenth day of each and every calendar month of the lease term ("Fixed Rent"). If the Rent Commencement Date shall be on a day other than the first day of the month, the Fixed Rent for the first month shall be prorated on the basis of 1/30th of the monthly rental for each day of such fractional month. The Fixed Rent specified in this Section 5 is agreed to be a fair rental value of the Leased Premises. Tenant shall not be obligated to recognize any agent for the collection of rent or otherwise authorized to act with respect to the Leased Premises until written notice of the appointment and the extent of the authority of such agent shall be given to Tenant by Landlord, or Landlord's mortgagee holding its first lien. In the event any installment of annual rent shall not be paid when due and such failure to pay shall continue for ten (10) days following written notice from Landlord, a "Late Charge" of 5% of the amount so overdue shall be paid by Tenant to Landlord upon demand, as additional rent, for the purpose of defraying Landlord's administrative expenses incident to the handling of such overdue payments. Landlord shall only be required to give two (2) such notices during the term of this Lease, after which the Late Charge shall automatically apply.

6.    REAL ESTATE TAXES.

(a) Commencing on the Rent Commencement Date, Tenant shall pay directly to the taxing authority, provided Landlord has accurately submitted Tenant's billing information to the appropriate taxing authority(ies), all real estate taxes which may be levied or charged against the Leased Premises. Taxes for fractional calendar years, being the first and last years, shall be prorated between Landlord and Tenant.

(b) Landlord shall provide Tenant any notices of real estate tax assessment on the Leased Premises in advance of any applicable appeal date so that Tenant will have sufficient time to process an appeal of such assessment. Tenant at its expense shall have the right to contest the amount or validity of all or part of the taxes, and for that purpose, Tenant shall have the right to file all such protests or other instruments, and institute and prosecute proceedings it may deem necessary for the purpose of such contest. Any refund of any tax shall belong to Tenant, and Landlord agrees to pay the same to Tenant promptly in the event payment thereof is initially made to Landlord.

(c) Nothing contained in this Lease shall require Tenant to pay (i) any franchise, corporate, estate, inheritance, succession, capital levy, or transfer tax of Landlord, (ii) any income, profits or revenue tax, or (iii) any other tax, assessment, charge, or levy upon the Leased Premises (including but not limited to the initial costs of development of the Leased Premises, which Landlord elects to

be placed against the Leased Premises in the form of an assessment or tax payable over a term of years; i.e., sewers initially installed, connection of utilities or fees for connecting to utilities, installation of required traffic control devices, off-site street work, etc.).

7.     Intentionally Omitted.

8.     CONSTRUCTION OF IMPROVEMENTS

(a) Landlord agrees to diligently perform all of the following (all such work being referred to herein as "Landlord's Work"): The Leased Premises shall be substantially completed in accordance with the Prototypical Drawings and Specifications referred to in **Exhibit "C-1"** ("Plans and Specifications"), as the same have been revised and approved by Landlord and Tenant as set forth on Exhibit C-2, with all utility services, equipment and systems therein fully operational. Landlord and Tenant agree that any changes (except as contemplated in Exhibit C-2) to the Plans and Specifications shall require the prior written approval of Tenant.

(i)     The Leased Premises shall be delivered to Tenant by Landlord in a structurally sound condition, with a watertight roof, in neat and clean condition and free of all tenants and occupants, free of debris and personal property.

(ii)     All improvements within the Leased Premises including, without limitation, the paving and striping of parking areas and installation of lighting shall be substantially completed; in addition, such street, storm drainage, traffic signalization, and other offsite improvements required for the Leased Premises to open for business and Tenant to receive a Certificate of Occupancy shall be substantially completed.

(iii)     The Leased Premises shall be in full compliance with all laws, codes, regulations and other governmental requirements including, without limitation, "The Americans with Disabilities Act," and Tenant shall be in a position to receive the Certificate of Occupancy from the appropriate municipal authority for the use and occupancy of the Leased Premises ("Certificate of Occupancy"), subject only to completion of Tenant's fixturing.

(iv)     The Leased Premises shall be free from asbestos containing material and other Hazardous Substances in accordance with Article 15 herein.

The term "substantially complete" or "substantially completed" or words of similar import used herein to describe a work of improvement shall mean that the particular work of improvement has been completed in accordance with the Final Plans, excepting only "Punchlist Items," defined as items, the completion, repair or correction of which do not have a material effect on the use and/or occupancy of the Leased Premises and, will also not materially hinder or delay Tenant's fixturization and stocking of the Leased Premises. Tenant shall provide notice of the Punchlist Items to Landlord (the "Punchlist Notice"), in the form attached hereto as Exhibit "J", within ten (10) days after the date on which Landlord delivers the Leased Premises to Tenant

(b)     Landlord shall complete the Punchlist Items within fifteen (15) days following Landlord's receipt of the Punchlist Notice from Tenant, and upon such completion, Landlord shall send Tenant written notice thereof to 300 Goddard Way, Suite 100, Irvine, California 92618, ATTENTION: Regional Construction Manager (the "RCM Contact"). Tenant shall re-

inspect the Leased Premises within fifteen (15) days after receipt of Landlord's notice (a "Tenant Re-Inspection") and if Tenant determines as a result of a Tenant Re-Inspection that Landlord has failed to complete the Punchlist Items to Tenant's reasonable satisfaction, Tenant shall notify Landlord of such failure within ten (10) days following the Tenant Re-Inspection (a "Re-Inspection Notice"), identifying in such notice the then outstanding Punchlist Items which Landlord must complete. If a Tenant Re-inspection reveals that Landlord has failed to complete the Punchlist Items to Tenant's reasonable satisfaction, then Landlord shall additionally reimburse Tenant for any costs incurred by Tenant in connection with such Tenant Re-Inspection, including, without limitation, the cost of any independent testing or inspection performed by or on behalf of Tenant and any re-inspection of the Leased Premises as a result thereof. If Landlord fails to complete the Punchlist Items within fifteen (15) days after receipt of the Punchlist Notice, or within fifteen (15) days after receipt of a Re-Inspection Notice, as the case may be, then Tenant, at Tenant's option, may correct and complete the Punchlist Items on behalf of Landlord in such manner as Tenant sees fit, and the full cost and expense incurred by Tenant in doing so shall be immediately due by Landlord to Tenant and Tenant shall be and is hereby authorized and directed to deduct the expense incurred, from all Fixed Rent and other sums due by Tenant under this Lease

(c)     Landlord shall, not later than thirty (30) days following the date that Landlord receives all necessary permits to construct the building, commence the construction of the building and appurtenances, as well as those improvements including, but not limited to, the parking areas, driveways, sidewalks and landscaped areas and diligently prosecute to completion the construction thereof so that the same will be ready for use by Tenant not later than Estimated Delivery Date, as hereinafter defined.

(d)     If a Certificate of Occupancy cannot be issued after Tenant's Work is complete due to incompleteness of or defects in Landlord's Work, then the Rent Commencement Date will not be deemed to occur until Landlord's Work is completed or corrected and a Certificate of Occupancy is issued permitting use of the Leased Premises for Tenant's intended use.

(e)     Landlord estimates that the Delivery Date will occur on or before eight (8) months after commencement of construction ("Estimated Delivery Date"). Landlord agrees to use diligent efforts to deliver possession of the Premises to Tenant, with Landlord's Work substantially completed, by the Estimated Delivery Date; and Landlord agrees to provide written notice to Tenant of any delays respecting the Estimated Delivery Date.

(f)     If the Delivery Date does not occur on or before one (1) year after commencement of construction the "Rent Abatement Start Date") for reasons other than Tenant-caused delays, Tenant shall be entitled to, and shall receive, in addition to any other right or remedy provided in this Lease, two (2) days of abated Rent for each day of delay beyond the Rent Abatement Start Date, but excluding any delay in delivery arising solely as a result of the Leased Premises being completed during the Dark Period.

(g)     If Landlord has not commenced Landlord's Work by September 30, 2008 (the "Outside Construction Start Date") for any reason whatsoever other than, failure of the City to issue building permits, Force Majeure or Tenant-caused delays, Tenant shall have the right and option to terminate this Lease within ten (10) business days thereafter upon written notice thereof (the "Termination Notice") given to Landlord prior to Landlord's Work actually starting. If Tenant terminates this Lease under this section, Landlord shall reimburse Tenant for its third party costs

incurred in connection with this Lease up to $20,000 within 10 days after written demand and delivery of reasonable supporting documentation.

(h)   Tenant shall have the right to come onto the Leased Premises in order to observe the performance of Landlord's Work, take measurements and commence Tenant's Work, including fixturing, prior to the Delivery Date and even while Landlord is completing Landlord's Work, but such entry by Tenant shall be at Tenant's sole risk and shall not be deemed a waiver of Landlord's obligation fully to complete Landlord's Work or an agreement by Tenant that the Delivery Date has occurred. The Delivery Date shall occur only upon the satisfaction of all conditions thereto as set forth herein. Any work performed by Tenant prior to the Delivery Date shall be performed in a manner which does not materially interfere with the completion of Landlord's Work. Tenant shall at all times indemnify, defend and hold Landlord harmless from all actions, claims, demands, losses, costs, damages and all reasonable expenses incurred in investigating or defending the same (including reasonable attorney's and expert witness fees) for injury or damage to person or property resulting from or arising out of Tenant's access to or entry upon the Leased Premises pursuant to this Paragraph 8, except to the extent caused by the gross negligence or willful misconduct of the Landlord, its agents or employees.

(i)   Title Report. On or before, and as a condition of, the Delivery Date, Landlord shall furnish to Tenant a copy of its title insurance policy or title commitment for the Property (the "Title Report"). Tenant may, at its option, obtain an updated Title Report (the "Updated Title Report") upon recordation of the Memorandum of Lease (as defined in Article 26). The Updated Title Report, if obtained, shall show that Tenant's leasehold title is subject only to the Permitted Exceptions. If the Updated Title Report shall show any title defects or encumbrances which are not Permitted Exceptions and which, , have or are likely to have a materially adverse effect on Tenant's use and occupancy of the building, Tenant may terminate this Lease, by written notice given to Landlord, which termination shall be effective within thirty (30) days of the date of Tenant's notice of termination, unless Landlord causes the title exception to be permanently remedied and discharged of record within such thirty (30) day period, provided that if the defect or encumbrance is of such a nature that it cannot be permanently remedied and discharged within said thirty (30) day period, so long as Landlord is diligently proceeding to permanently remedy and discharge such defect or encumbrance during said thirty (30) day period, then Landlord shall have an additional sixty (60) days within which to permanently remedy and discharge the defect or encumbrance. Tenant shall have the right to terminate the Lease as set forth herein at the expiration of said additional sixty (60) days if the defect or encumbrance is not permanently remedied and discharged of record. It is understood that if the title defects or encumbrances which are not Permitted Exceptions do not have a materially adverse effect on Tenant's use and occupancy of the building such that Tenant is able to continue its operation of its store, then Tenant shall have no right to terminate this Lease, and Landlord shall diligently proceed to permanently remedy and discharge the defect or encumbrance as set forth herein but with such additional time as may be necessary beyond the additional sixty (60) days.

(j) Landlord shall at all times indemnify, protect, defend and hold Tenant harmless from all actions, claims, demands, losses, costs, damages and all reasonable expenses incurred in investigating or resisting the same for injury or damage to person or property resulting from or arising out of any work on the Leased Premises, which may be performed by Landlord pursuant to this paragraph. For the purposes of protecting Tenant against any claim for damages, Landlord shall maintain, or cause to be maintained by the contractor performing such work, in full force and effect a

comprehensive general liability insurance policy with limits of at least TWO MILLION DOLLARS ($2,000,000.00) per occurrence, which insurance shall be in effect at all times while such work is being done by Landlord. Before commencing any such work, Landlord shall furnish Tenant with certificates of insurance evidencing compliance with the foregoing requirements.

(k)     Upon notice to Landlord, Tenant may, from time to time, and at any time prior to the date of substantial completion, enter upon the Leased Premises for the purpose of inspecting any of the work required to be completed by Landlord hereunder. The foregoing notwithstanding, Tenant shall have the right to make the following inspections (the "Required Inspections"):

(i) Foundation Inspection: The Foundation Inspection shall occur (a) after Landlord has completed the digging of the foundation and all of the underground plumbing and electrical rough work required by the Plans and Specifications including all wastes, drains, drain tile and water and sewer work, if any required thereby and (b) prior to the completion of any soil compaction or backfill work and pouring of the concrete slab.

(ii) Roof Inspections: The Roof Inspections shall occur prior to the initial application of the roofing materials

(iii) Landlord shall send written notice to Tenant's Regional Construction Manager at least seven (7) days and not more than fourteen (14) days prior to the date that the work that is the subject of the Required Inspections is ready for inspection. Tenant shall have the right to inspect such work on such date as the parties hereto shall agree. In the event that Tenant shall fail to inspect such work within seven (7) business days of receipt of Landlord's notice(or on such other date as the parties hereto had otherwise agreed) and provided further that any extension of such date would result in a delay in the construction of the Leased Premises, then the right of Tenant to perform such Required Inspection hereunder shall be waived and Landlord shall have the right to continue construction of the Leased Premises as if such Required Inspection had been performed. Any waiver of a Required Inspection shall not be construed so as to waive (a) Tenant's right to any other Required Inspection hereunder; or (b) any of Landlord's obligations under this Lease (including but not limited to Landlord's obligation to correct defects or nonconforming aspects of the work).

(iv) In the event that a Required Inspection reveals any defective work or work which is not in conformance with the Plans and Specifications or the Final Plans or Exhibit C-2 , then Landlord shall, at Landlord's sole cost and expense, correct all such work to the reasonable satisfaction of Tenant. Any entry upon the Leased Premises by Tenant or Tenant's failure to identify a defect in construction during any Required Inspection, shall not waive any of Landlord's obligations under this Lease (including but not limited to Landlord's obligation to correct defects or nonconforming aspects of the work). Each Required Inspection is for the sole benefit of Tenant and shall not be relied upon by any other party. Nothing herein contained shall be construed as a waiver of or limitation on any additional rights of Tenant hereunder.

(v) Landlord warrants that (a) as of the date of substantial completion, the Leased Premises as constructed shall be structurally sound, well built and fit for Tenant's intended use; and (b) shall be constructed in accordance with applicable law and the Final Plans.

9.    SIGNS

(a)Any and all signage will comply with the Reciprocal Use and Maintenance Agreement, which shall be recorded in the county records and which will be in the form attached hereto as Exhibit H.  Tenant shall have the right to such exterior signage as reviewed and approved pursuant to Exhibit C-2, provided however that Landlord will attempt to gain approvals for a monument sign at the corner of West Lane and Bianchi Road that is visible from three (3) angles, which sign will require the prior written approval from Tenant.

(b)     Tenant shall at all times have the right to remove all fixtures, machinery, equipment, appurtenances and other property furnished or installed by Tenant or by Landlord at Tenant's expense, it being expressly understood and agreed that said property shall not become part of the building or Leased Premises but shall at all times be and remain the personal property of Tenant and shall not be subject to any Landlord's lien. Notwithstanding anything to the contrary herein, in no event shall Tenant be required to remove any electric conveyor installed therein from the Leased Premises at the expiration or earlier termination of this Lease.

10.   <u>ALTERATIONS, REMOVAL OF FIXTURES & EQUIPMENT</u>

Tenant shall have the right to remodel or make alterations to the Leased Premises, including structural changes in connection with such remodeling or alterations, so long as said remodeling or alterations do not materially reduce the value of the Leased Premises or decrease the size of the building.  All alterations or additions which cannot be removed from the Leased Premises without irreparable damage thereto shall constitute a part of the premises and shall remain thereon.  Such other alterations, additions, or improvements as are made and paid for by Tenant, and which are removable without irreparable damage to the Leased Premises, may be removed by Tenant at any time and Tenant shall repair any damage so incurred at the time of such removal.  All signs, trade fixtures, and other fixtures not referred to above, and all machinery, equipment and/or other items or personal property placed in or upon the Leased Premises by Tenant and paid for by it, may be removed by it at any time.  Notwithstanding anything in this paragraph, Tennant acknowledges that there are strict signage and architectural controls contained in the Reciprocal Use and Maintenance Agreement and Tenant at all times will comply with the Reciprocal Use and Maintenance Agreement.

11.   <u>SURRENDER</u>

Tenant covenants and agrees at the end of the lease term or any extension thereof, or upon any sooner termination of this Lease, to quit and deliver up the Leased Premises to Landlord peaceably and quietly and in good order and condition, reasonable use and wear thereof excepted.

12.   <u>USE</u>

Tenant shall be permitted to use the Leased Premises for any lawful purpose consistent with the current or future operations of a Rite Aid drug store or for any of the following uses, provided such following use does not conflict with the primary use of a then existing tenant (or prospective tenant then in good faith negotiations with Landlord) in the adjacent retail development, so long as

Landlord provides Tenant with a written list of the then-existing primary uses and negotiations within fifteen (15) days following Tenant's written request for said information:

    (i)      Financial institutions such as a bank, savings and loan, credit union or other lender.

    (ii)     Offices such as medical, dental or optometrist.

    (iii)    First class retail stores operated by national or regional companies, including their franchisees.

In the event Landlord provides Tenant with a list that includes a prospective tenant or tenants then in good faith negotiations with Landlord and said negotiations do not result in a lease or other form of occupancy agreement within ninety (90) days following Landlord's notice to Tenant, then Tenant shall have the right to use the Leased Premises for said prospective tenant's use without being in violation of this provision.

13.  QUIET ENJOYMENT

Provided Tenant is not in default, Tenant shall have peaceable and quiet enjoyment and possession of the Premises during the term hereof and any renewals without any hindrance or molestation from Landlord, its agents, servants or employees, subject, however, to the other terms and conditions of this Lease.

14.  CONFORMITY TO LAW

(a)    Except as provided in Paragraph 14(b), Tenant shall, at Tenant's sole cost, promptly comply with all laws, statutes, ordinances, regulations, guidelines or requirements now in force or hereafter enacted of any governmental authority having jurisdiction over the Leased Premises, boards of fire underwriters, utility companies serving the Leased Premises, or other similar bodies now or hereafter constituted, relating to or affecting Tenant's business at the Leased Premises and/or the condition, use or occupancy of the Leased Premises, including, without limitation, the obligation to make all repairs, alterations and improvements to the Leased Premises, except for repairs, alterations and improvements to those parts of the Leased Premises which are the responsibility of Landlord under the terms of this Lease. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord is a party thereto or not, that Tenant has violated any of the foregoing shall be conclusive of that fact between Landlord and Tenant.

(b)    Landlord covenants that for a period of one (1) year from the Delivery Date the Leased Premises, fixtures and appurtenances except fixtures installed by Tenant and alterations, additions and improvement made by Tenant, shall conform or that it will promptly cause them to conform, to every applicable requirement of law of duly constituted authority. Landlord shall, for a period of one (1) year from the delivery date, at its expense, make such improvements, repairs or installations necessary as a result of any maintenance, repair, replacement or other work of Landlord pursuant to Paragraph 15(d) and/or Paragraph 17(a) below, such improvements, repairs and/or installations to satisfy this covenant and to cause the Leased Premises to comply with all laws, codes, rules and regulations which may become applicable during the term of this Lease.

15.  LANDLORD'S COVENANTS AND WARRANTIES

(a)  Landlord covenants and warrants that it has full right and power to execute and perform this Lease and to grant the estate leased herein, and covenants that Tenant, on performing its obligations hereunder, shall peaceably and quietly hold and enjoy the Leased Premises, together with the right of ingress and egress throughout the term of this Lease or any extension thereof.  Landlord further covenants and warrants that as of the commencement date, no one other than Landlord and Tenant will have any interest in, or lien, claim or encumbrance against the Leased Premises, except as shown on **Exhibit "D"**, and that no restrictions exist with respect to such property, or its use, except as shown on **Exhibit "D"**.  Landlord represents and warrants (i) that there are no provisions in the leases of other tenants of Landlord imposing any restriction on the use of the Leased Premises, and (ii) that no zoning or building ordinance or any other law or regulation applicable to the Leased Premises prohibits the Leased Premises for retail uses.

(b)  Intentionally Omitted.

(c)  Landlord agrees to pay when due and perform all other obligations required by all charges, encumbrances, mortgages and/or other liens and easements, covenants and restrictions (ECR), on the land or improvements, including the Reciprocal Use and Maintenance Agreement in the form attached hereto as Exhibit H, which Landlord agrees to record in the San Joaquin County.  Tenant may, but need not, perform, acquire, or satisfy any said lien, encumbrance, covenant, restriction and/or obligation of Landlord, including liens for taxes and assessments, which may in Tenant's judgment threaten its enjoyment of the Leased Premises.  If Tenant does so, it shall be subrogated to all rights of the obligee against Landlord and the Premises.  No merger shall be construed or implied which would defeat such subrogation.  Landlord shall reimburse Tenant for resulting disbursements and expenses, including attorney's fees, together with interest at the highest rate allowed by law.  Landlord agrees that it will not (i) modify or terminate any recorded ECR, (ii) grant any consents required from it under the terms of any said ECR, or (iii) enter into any new ECR affecting the Leased Premises without first in all instances obtaining the written consent of Tenant, which consent shall not be unreasonably, withheld, conditioned or delayed.

(d)  Landlord covenants, warrants and represents:

(i)      there are no Hazardous Substances, To Landlords actual knowledge, (including without limitation, asbestos containing material) on, under, above or about the Leased Premises.

(ii)     Landlord has not received any notice with respect to, and has no knowledge of, any facts which would constitute violations of any Environmental Laws relating to the use, ownership or occupancy of the Leased Premises.

(iii)    Landlord has not (and to Landlord's actual knowledge, no third party has) engaged in the generation, storage, treatment, recycling, transportation or disposal of any Hazardous Substances on, under, above or about the Leased Premises (any such activity is referred

to herein as a "Regulated Activity") and to Landlord's actual knowledge, no Regulated Activity has occurred on, under, above or about the Leased Premises.

(e)     If during the term hereof, the presence of any Hazardous Materials or underground storage tanks are found on the Leased Premises (unless caused by Tenant), Landlord, within ninety (90) days after written notice from Tenant or within ninety (90) days after Landlord receives knowledge thereof from any source, at Landlord's sole cost and expense, shall commence the removal and/or abatement or cause to have commenced the removal and/or abatement of the same, and shall restore or cause to have restored the Leased Premises to a condition which complies with all applicable laws, rules and regulations, as soon as reasonably practical.  If within ninety (90) days after receipt of such notice, Landlord has not commenced such removal or abatement or caused to have commenced such removal or abatement and has not proceeded or caused to have proceeded continuously and diligently to complete the same as soon as reasonably practical, Tenant may at any time thereafter (i) make all changes and alterations and hire any contractors and experts Tenant deems necessary to effect and supervise such removal and/or abatement and restoration of the Leased Premises, (ii) institute appropriate legal proceedings to specially enforce all obligations, and (iii) seek any remedy provided by law and this Lease.  Removal, abatement, remediation and restoration shall be performed in compliance with all applicable federal, state and local laws, rules, regulations and ordinances governing such activity.  Tenant shall cooperate with Landlord in Landlord's efforts to remove or abate the Hazardous Materials and shall provide Landlord with any relevant documentation in Tenant's possession relating to said Hazardous Materials.

(f)     The term "Hazardous Substance" shall mean any substance or material defined or designated as hazardous or toxic waste, hazardous or toxic material, a hazardous or toxic substance, or other similar term, including, without limitation, mold, asbestos containing materials and petroleum products, by any federal, state or local environmental health, safety or similar laws, statutes, rules, regulations or ordinances presently in effect or which may be promulgated in the future, as such laws, statutes, rules, regulations and/or ordinances may be supplemented or amended from time to time (collectively, "Environmental Laws").

(g)     If Tenant effects such removal and/or abatement, remediation and restoration, Tenant shall be entitled to set-off against rent due or to become due hereunder, including all Rent, together with interest thereon, all costs and expenses associated therewith, including, but not limited to (i) restoration, (ii) removal and/or abatement and/or disposal of Hazardous Materials or underground storage tanks, (iii) air quality and materials' testing, (iv) related consultants and experts fees, and (v) fines, fees or costs of any nature whatsoever charged or assessed by any governmental authority or agency pursuant to regulating and/or supervising such removal and/or abatement and/or disposal of Hazardous Materials or underground storage tanks.

(h)     Until such time as the removal, restoration, abatement or disposal is completed and the Leased Premises are in compliance with all applicable laws, rules and regulations, Tenant shall be entitled to extend the term of the Lease by a period equal to the time elapsed from the date of Tenant's initial notice to Landlord to the date that the removal and/or abatement and restoration are completed upon written notice to be given by Tenant not later than thirty (30) days after the date of said completion.  If Tenant is unable to utilize the Leased Premises during the time when the removal, restoration, abatement or disposal is occurring and if Tenant's loss of rents insurance does

not apply, then the Rent shall be abated in the amount of fifty percent (50%) of the monthly Rent then due until such time as Tenant is able to utilize the Leased Premises.

(i)    Landlord shall defend, indemnify and hold harmless Tenant, its officers, directors, employees, and agents, and any successors to this Lease, their officers, directors, employees, and agents against any and all claims, demands, losses, liabilities, costs, and expenses (including attorney's fees, at trial and on any appeal or petition for review) incurred by Tenant in connection with investigatory or remedial action required by all applicable laws, rules and regulations and arising out of, or in connection with, the breach of any of the representations or warranties contained in this Lease.

### 16.  UTILITIES

Tenant covenants and agrees to promptly pay for any and all water, light, power and/or other utility service used by Tenant in or about the Leased Premises during the term of this Lease or any extension thereof.

### 17.  MAINTENANCE AND REPAIRS

(a)    Except as otherwise set forth in the Reciprocal Use and Maintenance Agreement, during the Lease Term and any extension thereof, Tenant shall be responsible, at its sole cost and expense, for the maintenance, repair, and replacement of the entire building and improvements on the site, including: (a) roof (including the roof membranes); (b) sidewalks; (c) masonry walls; (d) foundations; (e) plumbing; (f) pipes, tubes, and other conduits and utility lines leading to or from [the utility company connection to the Leased Premises or embedded into the structure of the Leased Premises; (g) floor slabs; (h) exterior surfaces of the building; (i) structural members; (j) glass windows, doors, window frames, and door frames; (k) all mechanical and electrical equipment (including HVAC) and all plumbing including drains and drain lines within the Leased Premises; and (l) the maintenance of floor coverings. Tenant understands that Landlord is responsible to the owner of the master subdivision for the upkeep and maintenance of the exterior of this leased building and certain common areas. Tenant shall reimburse Landlord for all sums payable by Landlord as to the Leased Premises under the terms of the Reciprocal Use and Maintenance Agreement (Exhibit H). If, within the first year from the Delivery Date, Tenant discovers defects in the workmanship or materials used in the exterior or structure of the building, Landlord shall repair such defective exterior or structural area of the building. Notwithstanding the foregoing, Landlord shall make all necessary repairs to the Leased Premises, including all fixtures and systems (except for fixtures and systems installed by Tenant) located therein, for a period of one (1) year following delivery of possession of the Leased Premises; provided, however, Landlord shall not be required to make any repairs necessitated by the negligence or willful misconduct of Tenant, its agents, contractors, licensees, invitees or employees. Following said one (1) year period, Landlord agrees to provide to Tenant a warranty manual binder and to assign to Tenant all warranties to the extent assignable for any labor and materials used on or in the Leased Premises.

(b)    Tenant shall keep the Leased Premises outside of the building area in accordance with the Reciprocal Use and Maintenance Agreement (including without limitation, sidewalks, entrances and exits, driveways, service areas and drives, curbs, drive-thru lane, lighting, lighting standards, landscaped areas, trash enclosures and parking areas) in good order and repair, free of snow, ice and debris and lighted during the normal business hours of Tenant (and lighted during all

dark and twilight hours as required for public safety); provided however, for the first lease year only (except for and afforded by any manufacturers' warranties extending beyond the first lease year), Landlord shall make repairs to the aforesaid areas when such repairs are made necessary because of faulty construction by Landlord.

18.   INSURANCE

(a)   Tenant agrees during the term of this Lease, and any extension thereof, to maintain in force and effect a commercial general liability insurance policy, with limits of at least Four Million Dollars ($4,000,000.00) per occurrence, or such other higher amounts as may be required by Landlord's lender, in a financially responsible insurance company and a company qualified to do business in the state in which the Leased Premises are located and shall name Tenant, Landlord and Landlord's lender as additional named insureds as their interests may appear. Said insurance shall be primary and noncontributory; provide for severability of interest; provide that an act or omission of one of the insureds that would void or otherwise reduce coverage will not reduce or avoid the coverage as to other insureds. Such policy or policies shall, if possible, be written on an occurrence basis. Such policy or policies shall contain a provision that they cannot be canceled without thirty (30) days prior written notice. Such policy or policies shall be adjusted in accordance with standard and commercially reasonable practices to reflect inflationary increases from time to time. Such policy of Tenant may contain a self-insured retention, exclusion or deductible of $2,000,000.00

(b)   Tenant shall keep the Leased Premises improvements insured against damage or destruction by fire, and such other perils as are, from time to time, included in a commercial property insurance special form causes of loss policy with extended coverage endorsements, for the full insurable value thereof, which for the purposes hereof shall mean the actual replacement cost without deduction for depreciation, but shall not include "uninsurables" (i.e., footings, parking lot, underground piping, etc.), as determined from time to time at Lender's request but not more frequently than once in any 12-month period, by agreement of Landlord, Lender and Tenant, or if not so agreed, then by the insurer or insurers or by an appraiser approved by Landlord. Such insurance shall be in amounts sufficient to prevent Landlord or Tenant from becoming co-insurer under the applicable policies. All of said insurance shall be maintained for the protection of Landlord, Landlord's lender and Tenant, and each shall be named as additional named insureds as their interests may appear in all policies of insurance. The proceeds of such insurance in case of loss or damage shall be applied on account of the obligation of Tenant to repair and/or rebuild the Leased Premises pursuant to paragraph 19 to the extent that such proceeds are required for such purpose. Such policy may contain a self-insured retention, exclusion or deductible of $500,000.00.

(c)   Tenant shall carry loss of rents insurance sufficient to cover Rent for a period of two (2) years.

(d)   Certificates of insurance or certified copies of all insurance policies shall be deposited with the Landlord. If Tenant fails to comply with any of the provisions of this paragraph, Landlord, at any time thirty (30) or more days after mailing notice, may without prejudice to any other rights it may have, purchase the insurance required to be carried and the cost thereof shall be billed to the Tenant and shall be additional rent.

19.   DAMAGE OR DESTRUCTION

(a)  If the Leased Premises shall, during the term of this Lease or any extension hereof, be damaged or destroyed by fire or other casualty or cause, Tenant shall forthwith repair and restore the Leased Premises in accordance with plans pursuant to which the improvements were constructed and in compliance with all applicable building codes, laws and regulations.  Tenant shall commence the repair and restoration work promptly and as soon as is reasonably possible, and shall thereafter proceed diligently to complete said work in accordance with all then current applicable laws.

(b)  Notwithstanding the foregoing, if the Building is destroyed or damaged in excess of fifty percent (50%) of its replacement value during the last year of the original term or any renewal term of this Lease, then Tenant may terminate this Lease and shall pay over to Landlord all insurance proceeds payable on account of such damage or destruction, together with Tenant's self-insured portion of such damage or destruction.

20      EMINENT DOMAIN

If the Leased Premises be damaged by the exercise of the right of Eminent Domain or by the change of grade of an adjacent street or other activity by a public body irrespective of whether such damage involves a physical taking of any portion of the property, this shall be considered a taking.

(a) In the case of a Total Taking, Tenant may terminate this Lease as of the date the property is rendered unsuitable for the purpose of the tenancy by written notice to Landlord given within sixty (60) days after the taking.

(b) It is agreed that, without limitation, any of the following takings may, in Tenant's sole judgment, constitute a Total Taking: (i) any portion of the floor area of the building is taken; or (ii) the number of full-sized automobile parking spaces is reduced within the Property to a number which produces a parking ratio less than the minimum parking ratio required by municipal code as a result of a taking; or (iii) the truck well or loading dock area or the access thereto which services the Leased Premises is in any way altered as a result of a taking, and no reasonably acceptable substitute therefor is provided; or (iv) any curb cut, means of ingress or egress is closed and no reasonably acceptable substitute therefor is provided.

(c) In case of a partial taking or if this Lease is not terminated by Tenant, Landlord shall repair and/or restore to the extent reasonably possible the Leased Premises at its own expense in accordance with plans and specifications approved by Tenant, but Landlord shall not be obligated to expend for such repairs an amount greater than the compensation received by Landlord from the condemning authority.  Commencing with the date on which Tenant is deprived of the use of any portion of the Leased Premises or of any rights under this Lease, the Fixed Rent shall be abated or proportionately reduced according to the extent to which Tenant is deprived of such use or rights.

(d) Except as otherwise provided in this Lease, all damages awarded or other forms of awards paid  on account of any condemnation or taking under the power of eminent domain of the Leased Premises or any portion or portions thereof, shall belong to and shall be the sole property of Landlord, whether such damages or other sums are awarded as compensation for loss or diminution in value of the leasehold, severance damages or for the fee of the Leased Premises, or otherwise, and

Tenant assigns to Landlord any interest which Tenant might otherwise have in any such award.

(e    Tenant shall only be entitled to receive as a separate award from any award to Landlord an award, to the extent such award does not reduce Landlord's award or the funds available to pay Landlord's award and which is attributable to: (i) the unamortized cost of improvements or alterations made to the Leased Premises and paid for by Tenant (net of reimbursements or contributions or payments by Landlord) in accordance with this Lease; (ii) Tenant's trade fixtures but not in excess of an amount of the original cost; (iii) Tenant's moving or relocation expenses as allowed by the governmental authority having jurisdiction over the Leased Premises; and (iv) Tenant's loss of good will to extent proven by Tenant. Tenant shall be responsible for applying for any such awards, provided, however, Landlord, at no additional cost to Landlord, shall cooperate with such application.

(f)    In no event shall Tenant have any claim whatsoever against Landlord or any entity exercising the power of eminent domain, for loss or diminution in value of the leasehold, or for the value of any unexpired term of this Lease, or for any lease "bonus value", Tenant expressly waiving all such rights.

21.    INDEMNITY

Tenant agrees to indemnify, protect, defend and hold Landlord harmless from all actions, claims, demands, losses, costs, damages, and all reasonable expenses (including attorney and expert witness fees) incurred in investigating or resisting the same, for injury to person, loss of life or damage to property:

(a) Occurring on the Leased Premises and arising out of its use and occupancy, including by contractors, agent and employees, except if caused by the act or neglect of Landlord, its contractors, agents or employees; or

(b) Caused by the negligence, negligent performance of or failure to perform any of its obligations under this Lease.

Landlord agrees to indemnify, protect, defend and hold Tenant harmless from all actions, claims, demands, losses, costs, damages and all reasonable expenses incurred in investigating or resisting the same, for injury to person, loss of life or damage to property:

(a) Occurring on the Leased Premises if caused by the act or neglect of Landlord, its contractors, agents or employees; or

(b) Caused by the negligence, negligent performance of or failure to perform any of its obligations under this Lease.

22.    WAIVER OF SUBROGATION RIGHTS

(a) Landlord hereby releases Tenant from any and all liability and waives Landlord's right of recovery against Tenant, its agents and employees, for any loss or damage to Landlord's property resulting from any hazard insured under a Landlord's extended coverage policy of insurance

including, but not limited to, fire, smoke, explosion or water damage, and Landlord hereby waives the subrogation rights of its insurance carriers under Landlord's policies of insurance providing coverage against loss or damage by any such hazard. Landlord shall take such steps as are necessary to inform its insurance carriers of this provision and to have endorsements, if necessary, placed on said insurance policies to carry into effect the provisions of this paragraph.

(b) Tenant hereby releases Landlord from any and all liability and waives Tenant's right of recovery against Landlord, its agents and employees, for any loss or damage to Tenant's property resulting from any hazard insured under a standard fire insurance policy with extended coverage, and Tenant hereby waives the subrogation rights of its insurance carriers under Tenant's policies of insurance providing coverage against loss or damage by any such hazard. Tenant shall take such steps as are necessary to inform its insurance carriers of this provision and to have endorsements, if necessary, placed on said insurance policies to carry into effect the provisions of this paragraph.

23.    ASSIGNMENT AND SUBLETTING; SUBTENANT NONDISTURBANCE

(a) Tenant may assign this Lease or sublet the whole or any part of the Leased Premises for any use consistent with Article 12 herein. If Tenant does so sublet, it shall remain liable to Landlord for the full performance of Tenant's obligation. If Tenant does so assign, it shall remain liable to Landlord, as surety, for the full performance of Tenant's obligations provided that no modification or amendment of the Lease shall be binding upon Tenant without Tenant's prior written consent. Termination or cancellation of this Lease shall constitute a termination or cancellation of every such assignment or sublease.

(b) Landlord agrees that Landlord shall enter into an agreement substantially similar to the form attached hereto as **Exhibit G** ("Nondisturbance Agreement") with a subtenant under an Approved Sublease (an "Approved Subtenant") pursuant to which Landlord shall agree that if this Lease is terminated due to a default by Tenant, Landlord shall not disturb the Approved Subtenant's possession under the Approved Sublease and shall otherwise be bound as sublandlord under the Approved Sublease (and the Approved Subtenant shall attorn to Landlord); however the validity of such Nondisturbance Agreement shall be conditioned on the Approved Subtenant being a Qualified Subtenant (as hereinafter defined) under a Qualified Sublease (as hereinafter defined) at the time of the Lease termination. Therefore, in the event that the Approved Subtenant is not a Qualified Subtenant and/or the Approved Sublease is not a Qualified Sublease at the time of the Lease termination, the Nondisturbance Agreement shall be null and void.

(c) For purposes hereof, the following definitions shall be:

(i) "Qualified Subtenant" shall mean and be defined as a subtenant that, on the date of the Lease termination:
(A) is not affiliated with Tenant;

(B) has a tangible net worth (excluding goodwill) of not less than $10,000,000.00;

(C) has at least ten (10) years of retail experience; and

(D) is not in default under the Qualified Sublease, after the expiration of any applicable cure period1.

(ii) "Qualified Sublease" shall mean and be defined as a sublease with a Qualified Subtenant for all of the Leased Premises.

(d) Anything to the contrary notwithstanding, the Nondisturbance Agreement shall contain the following conditions:

(i) Notwithstanding anything to the contrary in the Qualified Sublease, the Qualified Subtenant shall pay to Landlord the greater of the Rent otherwise payable by Tenant under this Lease at the time of the Lease termination or the Rent otherwise payable by Qualified Subtenant under the Qualified Sublease at the time of the subletting;

(ii) Notwithstanding anything to the contrary in the Qualified Sublease, the Qualified Subtenant shall perform and abide by the same obligations as Tenant under this Lease with respect to the premises subleased under the Qualified Sublease;

(iii) Notwithstanding anything to the contrary in the Qualified Sublease, Landlord's obligations as sublandlord under the Qualified Sublease shall be no greater than Landlord's obligations under this Lease; and

(iv) Notwithstanding anything to the contrary in the Qualified Sublease, Landlord shall have the right, at its option, to require that any Qualified Subtenant under a Qualified Sublease shall enter into a new lease directly with Landlord for the Subleased Premises for the remaining term of the Qualified Sublease and otherwise on the terms provided herein and in the Nondisturbance Agreement; in which event this Lease, the Qualified Sublease, and the Nondisturbance Agreement will each, respectively, be null and void.

(e) This clause shall survive the expiration or sooner termination of the Lease.

24. <u>SUBORDINATION; ESTOPPEL</u>

(a) Upon written request of Landlord, Tenant agrees to subordinate its rights under this Lease to any mortgage, trust deed or similar indenture ("lien"), or ground lease covering the Leased Premises, or any part thereof, upon conditions set forth below, and Landlord agrees, as a condition of this Lease, to obtain a subordination, non-disturbance and attornment agreement ("SNDA") in the form attached hereto as **Exhibit "E"** from any mortgage holder, trust deed holder or similar indenture holder ("lienholder") or ground lessor covering the Leased Premises or any part thereof. Landlord acknowledges that there is not and shall not be any mortgage, trust deed or similar indenture covering the Leased Premises, or any part thereof, as of the date of the signing of this Lease, however if there is such a mortgage, trust deed or similar indenture covering the Leased Premises, or any part thereof, as of the date of the signing of this Lease, then Landlord shall provide an SNDA as set forth herein within thirty (30) days following the date of this Lease.

(b) The parties agree, from time to time but no more often than twice per lease year, upon (i) not less than fifteen (15) days' prior written request, to execute and deliver to the requesting party a written estoppel certificate stating (a) whether this Lease has been modified or amended and, if so, identifying any such modification or amendment; (b) whether Rent and other charges have been paid more than thirty (30) days in advance of the date when due and, if so, the date to which they have been paid in advance; and (c) whether to the best of such party's knowledge, any uncured default exists and, if so, specifying the nature of such default.

25.    DEFAULT

(a) Anything to the contrary notwithstanding, if Tenant shall fail to pay to Landlord any installment of Fixed Rent or other charges as and when the same are required to be paid hereunder, and such default shall continue for a period of ten (10) days after written notice, or if Tenant shall default in the performance of any of the other terms, covenants or conditions of this Lease and such default shall continue for a period of thirty (30) days after written notice (except if Tenant shall, within said period of time, commence and diligently proceed to remedy such default), or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereby the Leased Premises shall be taken or occupied by someone other than Tenant, Landlord shall have the right at Landlord's option to terminate this Lease or to exercise the rights described in California Civil Code Section 1951.2. and the term hereof, as well as all the right, title and interest of Tenant hereunder, by giving Tenant notice in writing of such intention, and upon the expiration of the time fixed in such latter notice, if Tenant has neither cured such default nor is diligently proceeding to cure such default, this Lease and the term hereof, as well as all the right, title and interest of Tenant hereunder, shall wholly cease and expire in the same manner and with the same force and effect (except as to Tenant's liability) as if the date fixed by such latter notice were the expiration of the term herein originally granted; and Tenant shall immediately quit and surrender to Landlord the Leased Premises and each and every part thereof and Landlord may enter into or repossess the Leased Premises, either by force, summary proceedings, or otherwise. The right granted to Landlord in this paragraph or any other paragraph of this Lease to terminate this Lease shall apply to any extension or renewal of the term hereby granted and the exercise of any such right by Landlord during the term hereby granted shall terminate any extension or renewal of the term hereby granted and any right on the part of Tenant thereto.

(b) Upon termination of this Lease as provided in California Civil Code Section 1951.2, (i) Tenant shall immediately surrender possession of the Leased Premises to Landlord, and (ii) Landlord shall be entitled to recover the following from Tenant:

(i)    The worth at the time of the award of any unpaid Rent which had been earned at the time of such termination; plus

(ii)    The worth at the time of the award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss which Tenant proves could have been reasonably avoided, plus

(iii)    The worth at the time of the award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such Rent loss which Tenant proves could be reasonably avoided, plus

(iv)    Any other reasonable amount necessary to compensate Landlord for all the damages proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom (including, without limitation, the cost of recovering possession of the Leased Premises, expenses of reletting including necessary renovation and alteration of the Leased Premises, reasonable attorneys' fees, and real estate commissions actually paid and that portion of the leasing commission paid by Landlord and applicable to the unexpired portion of the Term of this Lease, and any liabilities which Landlord may incur in favor of Landlord's lender), plus

(5)    Such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable California law.

As used in Subparagraphs (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest at the rate of ten percent (10%) per annum or such higher rate as may be allowed by law at the time for a loan of money by a lender who is subject to the prohibition against usury. As used in Subparagraph (iii) above, the "worth at the time of the award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%).

(c) Any notice required to be given by Landlord shall be in lieu of, and not in addition to, any notice required under the laws of the State of California. In any case in which Landlord shall re-enter and occupy the whole or any part of the Leased Premises, by unlawful detainer proceedings or otherwise, Landlord, at its option, may repair, alter, subdivide or change the character of the Leased Premises from time to time in such manner as Landlord deems best, may relet the Leased Premises or any part thereof and receive the rents therefore, and none of such actions shall constitute a termination of this Lease or release of Tenant from any liability hereunder. Landlord shall not be deemed to have terminated this Lease or the liability of Tenant to pay any Rents later accruing by any re-entry of the Leased Premises, or by any action in unlawful detainer or otherwise to obtain possession of the Leased Premises. The following shall not constitute termination of Tenant's right to possession: (i) acts of maintenance or preservation or efforts to relet the Leased Premises, or (ii) the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease. After Tenant's default and for as long as Landlord does not terminate Tenant's right to possession of the Leased Premises, Tenant may effectuate an assignment or sublease provided Tenant complies with the provisions relating thereto in this Lease and cures any default prior to the effective date of the assignment or sublease. Any such assignment or sublease, however, shall not release Tenant from liability hereunder.

(d) Should Landlord default on the performance of any covenant or agreement herein, and such default continue for thirty (30) days after receipt by Landlord and Landlord's mortgagee, if any, of written notice thereof from Tenant (except if Landlord shall, within said period of time, commence, and diligently proceed to cure said default), Tenant may (in addition to all other rights and remedies provided at law or equity and the terms of this Lease), (i) pay any sums necessary to

20

perform any obligation of Landlord hereunder and deduct the cost thereof from rents due and to become due hereunder, and (ii) terminate this Lease by giving Landlord thirty days written notice thereof. Provided, however, Landlord's mortgagee shall have an additional thirty (30) days beyond the thirty (30) days provided to Landlord within which Landlord's mortgagee shall have the opportunity to cure said default on the same terms provided to Landlord. Such deduction from rent by Tenant shall not constitute a default by Tenant unless Tenant shall fail to pay the amount of such deduction within thirty (30) days after final adjudication that such amount is owing to Landlord. Such adjudication shall not be final until all appeals have been decided and entered of record and (ii) terminate this Lease by giving Landlord written notice thereof. Tenant's obligation to pay Rent shall resume at such time as such default shall have been remedied.

26.    SHORT LEASE FORM

A Memorandum of this Lease in the form attached hereto as **Exhibit "F"** designating the parties in interest, the term and describing the Leased Premises shall be executed in duplicate and may be placed of record in the county in which the Leased Premises are located; however, this Lease itself shall not be recorded. The party requesting such Memorandum of Lease be recorded shall pay all transfer taxes, charges and fees incurred in connection therewith.

27.    EXAMINATION OF PREMISES

Landlord, or its agents or representatives, may at reasonable times upon reasonable notice (except in case of emergency) enter into or upon said premises or any part thereof for the purpose of examining the condition thereof, and for the purpose of making any repairs which Landlord is either required to or may desire to make to said premises.

28.    LIENS

Tenant will not permit any liens to stand against the Leased Premises for any labor or material furnished in connection with any work performed by or at the direction of Tenant, and Landlord will not permit any liens to stand against the Leased Premises for any labor or material furnished in connection with any work performed by or at the direction of Landlord. The party at whose direction labor and material are furnished may contest the validity or amount of any such lien, but upon final determination of the validity and amount thereof said party will immediately pay any judgment rendered with all proper costs and charges and shall have the lien released at said party's expense.

29.    SUCCESSORS AND ASSIGNS

All rights, remedies, liability and obligations herein given to or imposed upon either of the parties hereto shall inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors in interest and assigns of the respective parties. Wherever the word "Landlord" is used herein, it relates also to all of the respective Landlords jointly and severally.

30.    HOLDING OVER

Any holding over by Tenant after the expiration of the term of this Lease, or any extension thereof, shall be as Tenant from month to month only, and not otherwise, and rent shall be increased 125%.

31.    WAIVER

Any waiver by either of the parties hereto of a breach of any of the terms, covenants, agreements or conditions hereof shall not be deemed a continuing waiver by such party.

32.    ATTORNEYS' FEES

In the event that any suit or action is instituted by either of the parties hereto against the other to enforce compliance with any of the terms, covenants or conditions of this Lease or for damages for breach of this agreement, the unsuccessful party shall, in addition to costs and disbursements provided by statute, pay to the successful party such sums of money as any court of competent jurisdiction may adjudge reasonable as attorneys' fees in such suit or action, including appeal from any judgment rendered therein.

33.    RESTRICTION ON THE SALE OF PHARMACEUTICALS

Landlord and its affiliates or subsidiaries (to which Landlord has a controlling interest (represent that they have not and shall not, either directly or indirectly, during the term of this Lease, lease to or otherwise authorize or permit the operation of: (1) any other pharmacy or any business which employs or is required to employ a registered or licensed pharmacist, nor for the conduct of any store, business, trade or profession which is called, labeled, named or is commonly known or referred to as a "drug store", "pharmacy" or "apothecary" within two (2) miles of the Premises (the "Pharmacy Exclusive Area"); or (2) any other health and/or beauty aids store, vitamins or dietary supplement store greeting card store, one (1) hour photo processing or a store selling beer, wine and/or liquor for off-premises consumption within one (1) mile of the Premises (the "HBA Exclusive Area" and, collectively with the Pharmacy Exclusive Area, the "Exclusive Area"). Landlord represents that it has not previously granted any of such rights with respect to any portion of the Exclusive Area (other than as set forth in the previous sentence); provided, however the

foregoing shall not prohibit the sale of health and/or beauty aids, vitamins or dietary supplements and greeting cards so long as such is incidental (i.e. comprises less than twenty (20%) percent of the store's sales area, not volume) to such other tenant's business enterprise.

If Landlord shall violate any of the provisions of this Article 33 and shall not cure such violation within sixty (60) days after receipt of Tenant's notice thereof, Tenant, at any time thereafter, upon ten (10) days prior written notice to Landlord may: (i) terminate this Lease; (ii) pay to Landlord rent reduced to a level equal to fifty percent (50%) of the rent due immediately prior to such violation; and/or (iii) seek injunctive or other equitable relief. The remedies stated herein shall not be mutually exclusive.

In addition, Landlord shall not permit or suffer any other occupant of property owned by Landlord within 500 feet of the Leased Premises to use any premises or any portion thereof for purposes of a, bowling alley, pool hall, billiard parlor, skating rink, roller rink, , a theater of any kind, , adult book store, adult theatre, adult amusement facility, any facility selling or displaying pornographic materials or having such displays, second hand store, odd lot, closeout or liquidation store, auction house, flea market, blood bank, massage or tattoo parlor, funeral home, , the outdoor housing or raising of animals, , any industrial use (including, without limitation, any manufacturing, smelting, rendering, brewing, refining, chemical manufacturing or processing, or other manufacturing uses), any mining or mineral exploration or development, a carnival, amusement park or circus, , off track betting establishment, bingo hall, any use involving the use, storage, disposal or handling of hazardous materials or underground storage tanks, any use which may materially or adversely affect the water and sewer services supplied to the Leased Premises, a church, temple, synagogue, mosque, or the like, any facility for the sale of paraphernalia for use with illicit drugs,

34.    USE OF THE NAME "RITE AID"

To the extent within Landlord's control, Landlord covenants and warrants that so long as Tenant uses the name "Rite Aid" in connection with the conduct of its business in the Leased Premises, no other tenant or occupant of lands controlled by Landlord within one (1) mile of the Leased Premises any portion thereof shall be permitted to use the name "Rite Aid" in any form in connection with the operation of said tenant or occupant's business or activities.

23

35.    *FORCE MAJEURE.*

Except as otherwise specifically provided, the time periods described in this Lease shall be extended by any time delays (hereinafter unavoidable delays) occurring due to causes beyond the reasonable control of the performing party including, but not limited to, acts of God, Governmental action or inaction: Fire and/or Vandalism; strikes; lockouts; weather in which work cannot proceed; riots; insurrection; war; unavailability of materials from normal sources. Unavoidable delays shall not include delays due to inability or failure to obtain financing or inadequate financial resources. The provisions of this Article shall not operate or excuse Tenant from the prompt payment of Fixed Rent or any other payments required by the terms of this Lease, except as same may be excused during delay in delivery or Landlord's completion of the Leased Premises.

36.    NOTICES.

All notices required or permitted to be given under this Lease shall be in writing and shall be given by United States mail or by United States express mail or other established express delivery service (such as Federal Express), postage or delivery charge prepaid, return receipt requested, and addressed to the person and addresses designated below.

        Landlord:               Stonebrier Commercial Limited Partnership
                                 1919 Grand Canal Blvd.
                                 Stockton, California 95207
                                 Attn: Charles G. Patmon III

        Tenant:                (if by mail)
                                 Thrifty Payless, Inc.
                                 Attn: Secretary
                                 P.O. Box 3165
                                 Harrisburg, Pennsylvania 17105

                                 (if by overnight delivery service)
                                 Thrifty Payless, Inc.
                                 30 Hunter Lane
                                 Camp Hill, Pennsylvania 17011
                                 Attn: Secretary

The person and address to which notices are to be given may be changed at any time by Landlord or Tenant by written notice to the other. All notices given pursuant to the Lease shall be deemed given upon receipt. Receipt shall mean the earlier of any of the following: (i) the date of delivery of the notice or other document to the address shown above and as shown on the return receipt, (ii) the date of actual receipt of the notice or other document by the person or entity shown above, or (iii)

24

in the case of refusal to accept delivery or inability to deliver the notice or other document, the earlier of (A) the date of attempted delivery or refusal to accept delivery, (B) the date of the postmark on the return receipt, or (C) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

37.    LANDLORD'S EXECUTION OF DOCUMENTS

Landlord agrees to execute any document and consents reasonably requested by Tenant required by governmental agencies necessary to the conduct of Tenant's business from the Leased Premises.

38.    BROKERS' COMMISSION.

Landlord and Tenant recognize Mr. Jack Messina of Colliers Tingey International Inc. as the only and exclusive broker representing both parties to this transaction.  Landlord agrees to be responsible for a finders fee to Mr. Messina of $100,052, payable one half ($50,026) at the execution of the lease and one half ($50,026) on the date Tenant opens for business and rent commences.

39.    NON-DISCLOSURE.

Landlord and Tenant agree that the terms of this Lease are confidential and constitute proprietary information of the parties hereto.  Each party agrees that it and its respective partners, officers, directors, attorneys and employees shall not disclose the terms and conditions of this Lease to any other person or entity without the prior written consent of the other except pursuant to an order of a court of competent jurisdiction, to its lenders, to its accountants or to any transferee of said party's interest under this Lease (including a prospective assignee or sublessee of Tenant), to any governmental entity where such disclosure is required by applicable law, regulation or order and in connection with any action brought to enforce the terms of this Lease.

40.    ENTIRE AGREEMENT

This Lease contains all of the terms, covenants, conditions and agreements of the parties hereto relating in any manner hereto and the occupancy of the Leased Premises, and no prior agreement or understanding pertaining to the same shall be valid or of any force or effect, and the terms, covenants, conditions and agreements of this Lease cannot be altered, changed or modified or added to except in writing and signed by the Landlord and the President or a Vice President of Tenant.

41.    CONSTRUCTION OF LEASE.

Landlord and Tenant have negotiated this Lease, have had an opportunity to be advised respecting the provisions contained herein and have had the right to approve each and every provisions hereof; therefore, this Lease shall not be construed against either Landlord or Tenant as a result of the preparation of this Lease by or on behalf of either party.  This Lease shall be governed by and construed in accordance with the laws of the state in which the Leased Premises are located.

[SIGNATURES BEGIN ON NEXT PAGE]

26

**IN WITNESS WHEREOF** this Lease has been signed by the parties on the day and year first above written.

LANDLORD:
STONEBRIER COMMERCIAL
LIMITED PARTNERSHIP

By:_____(seal)
Stonebrier LLC, General Partner
Charles G Patmon III, President


TENANT:
THRIFTY PAYLESS, INC.

By:_____(seal)
    I. Lawrence Gelman
Title: Vice President and Secretary

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** is given as of this 25th day of
_____June_____ 2008, by RITE AID CORPORATION, a Delaware corporation (Guarantor),
to **STONEBRIER COMMERCIAL LIMITED PARTNERSHIP** ("Landlord") with respect to
a Lease ("the Lease") between Landlord and THRIFTY PAYLESS, INC. ("Tenant") for premises
described in the Lease.

**WITNESSETH:** As an inducement to Landlord to execute the Lease, and in consideration
thereof, Guarantor agrees with Landlord as follows:

1.    Guarantor represents that it owns all of the issued and outstanding capital stock of
Tenant, that Tenant is a dully organized corporation, and that all corporate action requisite for
Tenant's execution of the Lease has been dully taken.

2.    Guarantor unconditionally guarantees to Landlord the full and prompt payment of all
rent and additional rent required to be paid by Tenant under the lease, the prompt and full
performance and observance of all obligations required to be performed and observed by Tenant
under the Lease, and the prompt payment of all other obligations and damages for which Tenant
may be legally liable to Landlord.

3.    Guarantor's liability hereunder shall be primary and not secondary, and shall be joint and
several with that of Tenant.  Landlord may proceed against Guarantor under this Guaranty
Agreement without initiating or exhausting its remedy or remedies against Tenant, and may proceed
against Tenant and/or Guarantor separately or concurrently.  If Landlord releases any rights it may
have against any party primarily or secondarily liable on the Lease, such release shall not affect
Guarantor's liability under this Guaranty Agreement.

4.    In any action brought by Landlord under paragraph 2 of this Guaranty, Guarantor shall
not interpose or be entitled to the benefit of any defenses that are not or would not be available to
Tenant if the same action were brought by Landlord against Tenant, including, but not limited to,
defenses based upon modifications of the Lease, upon extensions, indulgences, or forebearances
granted to Tenant, upon delay by Landlord in enforcing Tenant's obligations under the Lease, or
upon failure of Landlord to notify Guarantor of any Lease modifications or any extensions,
indulgences, or forebearances granted to Tenant; and Guarantor expressly waives all defenses
negated by this paragraph 4.

5.    Any notices given to Tenant under or with respect to the Lease shall be conclusively
deemed to have been simultaneously given to Guarantor.

6.    Guarantor's liability under this Guaranty Agreement shall not in any way be affected by
any assignment of the Lease or a subletting of the premises demised under the Lease.

7.    No discharge, modification, impairment or limitation of the obligations of Tenant to its
creditors generally, or to Landlord under the Lease, under any law relation to bankruptcy,

insolvency, arrangements with creditors or corporate reorganizations, shall in any way affect or discharge Guarantor's obligation hereunder. If any trustee, receiver, or conservator of Tenant appointed under any Federal or State law relating to bankruptcy, insolvency, arrangements with creditors or corporate reorganization, rejects the Lease pursuant to any right to do so under any such law, Guarantor's obligations hereunder shall not thereby be affected but shall remain in full force and effect the same as if the Lease had not be rejected but continued in force.

8.  If Landlord files any action against Guarantor to collect rent or additional rent payable under the Lease or any other sum for which Tenant is legally liable to Landlord, and a judgment is rendered for Landlord with respect thereto, then Guarantor shall pay all reasonable counsel fees incurred by Landlord in such action.

9.  Within ten (10) days after Landlord's written request to Guarantor, guarantor shall execute and deliver to Landlord a statement in writing setting forth any amendments to this Guaranty and stating whether or not this Guaranty is in full force and effect and setting forth what reasons or defenses, if any, support any claim that this Guaranty is not in full force and effect. Guarantor acknowledges that such statement may be required in order for Landlord to consummate a sale or mortgage loan, and that a purchaser or mortgage will be entitled to rely on such statement.

10.  Guarantor consents to suit in the state and federal Courts of the State of California on or with respect to this Guaranty Agreement. Guarantor waives any objection to the venue of any action filed by Landlord against Guarantor in any state or federal court of the State of California and waives any claim of forum non conveniens or for transfer of any such action to any other court.

11.  Guarantor acknowledges that this Guaranty Agreement has been delivered in the State of California concurrently with the delivery of the Lease and shall be governed by the laws of the State of California.

12.  If this Guaranty is executed by more than one party, the term "Guarantor" shall be deemed to apply to such parties jointly and severally. The use of the neuter gender herein shall be deemed to mean that correct gender applicable to the Guarantor, and the use of the singular shall include the plural as the context may require.

13.  Guarantor shall, upon request of Landlord, promptly join in the execution of all stipulations and agreements referred to in the Lease.

14.  Any notice which Landlord may elect to send to Guarantor shall be binding upon Guarantor if mailed to at P.O. Box 3165, Harrisburg, Pennsylvania, 17105, Attn: Secretary, or its last address known to Landlord, by U.S. Certified Mail, Return Receipt Requested, or U.S. Registered Mail, or via overnight delivery or courier service if addressed to Guarantor at 30 Hunter Lane, Camp Hill, PA, 17011, Attention: Secretary.

15.  Guarantor waives acceptance of this Guaranty.

16.  This Guaranty Agreement shall be binding upon the successors of Guarantor, and the term "Guarantor," shall used herein, includes such successors. This Guaranty Agreement shall inure to the benefit of Landlord's successors and assigns, and the term "Landlord," as used herein,

includes such successors and assigns. The term "Tenant," as used herein, includes the permitted successors and assigns of Tenant.

IN WITNESS WHEREOF, this Guaranty under seal has been duly signed and sealed by the Guarantor, as of the day and year first above written.

WITNESS:

GUARANTOR:
**RITE AID CORPORATION**

By: _____
Name: I. Lawrence Gelman
Title:  Vice President

# EXHIBIT B

DocuSign Envelope ID: 9B1B92F0-5DD1-4BDE-B55D-D785D29A6F05

Rite Aid Store No. 6510

## AMENDMENT TO LEASE

**THIS AMENDMENT TO LEASE** (this "*Amendment*") is made effective June 20, 2024 (the "*Effective Date*") by and between STONEBRIER COMMERCIAL LIMITED PARTNERSHIP, a(n) California partnership ("*Landlord*"), and THRIFTY PAYLESS, INC., a California corporation ("*Tenant*," and together with the Landlord, the "*Parties*" and each, a "*Party*").

## RECITALS

**WHEREAS**, Landlord and Tenant are parties to that certain lease agreement dated June 25, 2008 (the "*Lease*"), with respect to that certain premises located at 4774 West Lane Stockton, California 95210-0000, which premises is defined and more particularly described in the Lease (the "*Premises*");

**WHEREAS**, on October 15, 2023, Tenant and certain of its debtor affiliates (collectively, the "*Debtors*") commenced a case (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "*Bankruptcy Code*") which is now pending in the United States Bankruptcy Court for the District of New Jersey (the "*Bankruptcy Court*"). The Chapter 11 Cases are being jointly administered under Case Number 23-18993; and

**WHEREAS**, Landlord and Tenant desire to modify certain terms and conditions of the Lease, effective as of the Restructuring Effective Date (as hereinafter defined), as amended by this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Landlord and Tenant hereby agree as follows:

## AGREEMENT

1.    Capitalized Terms. Capitalized terms used and not otherwise defined herein shall have the respective meaning assigned to such terms in the Lease.

2.    Effective Date. This Amendment, and each of its amendments, modifications, and waivers with respect to the Lease as set forth herein, shall be effective on the date that the Lease is assumed or assigned in the Chapter 11 Cases, pursuant to entry of an order by the Bankruptcy Court approving the assumption of the Lease and confirming the Debtors' chapter 11 plan of reorganization in the Chapter 11 Cases (the "*Restructuring Effective Date*"). In the event the Restructuring Effective Date does not occur, this Amendment shall be null and void in all respects, and nothing in this Amendment shall give rise to any claim, causes of action, or damages (compensatory or consequential) against either Party. Tenant hereby agrees to assume the Lease pursuant to section 365 of the Bankruptcy Code.

3.    Lease Modification.

(a)    Term. Notwithstanding anything in the Lease to the contrary, Landlord and Tenant acknowledge and agree that Tenant shall have the option to terminate the Lease (the "*Termination Option*") effective on July 31, 2025 (the "*Early Termination Date*"); *provided* that Tenant issues notice to Landlord of Tenant's election to exercise the Termination Option no later than five (5) months prior to the Early Termination Date.

(b)    Attorneys' Fees. Landlord further acknowledges and agrees that, notwithstanding anything to the contrary in the Lease, Landlord shall not be entitled to receive from Tenant or its affiliates (or charge as rent due from Tenant or its affiliates) any attorneys' fees incurred by Landlord in connection with this Amendment.

1

DocuSign Envelope ID: 9B1B92F0-5DD1-4BBE-B59D-B789D29A6F89

Rite Aid Store No. 6510

4.    Authority. Each Party represents and warrants that it has the authority and power to enter into this Amendment and that this Amendment constitutes a legal, valid and binding obligation of that Party.

5.    Notices.

(a)    Notwithstanding anything to the contrary contained in the Lease, any notices required or permitted to be sent to Tenant under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

If by Certified Mail:
THRIFTY PAYLESS, INC.
P.O. Box 3165
Harrisburg PA 17105
Attn: Legal Department

If by Overnight Courier:
THRIFTY PAYLESS, INC.
200 Newberry Commons
Etters PA 17319
Attn: Legal Department

(b)    Notwithstanding anything to the contrary contained in the Lease any notices required or permitted to be sent to Landlord under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

Name:       STONEBRIER COMMERCIAL LIMITED PARTNERSHIP
Address:    1919 Grand Canal Blvd.
            Stockton CA 95207
Email:      _____
Telephone:  (209) 951-4391

6.    Miscellaneous.

(a)    This Amendment may be executed in counterparts, each of which shall constitute an original, and which together shall constitute one and the same agreement. This Amendment may be executed or delivered by electronic or facsimile means, and copies of executed signature pages stored electronically in portable document format (.pdf) shall be binding as originals. Neither Party shall record this Amendment without the express prior written consent of the other Party. Additions, modifications and/or alterations to the language of this Amendment are subject to written approval of the Parties.

(b)    Subject to the other terms of this Amendment, each of Landlord and Tenant agree to execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the modifications, waivers and amendments contemplated by this Amendment.

2

DocuSign Envelope ID: 9B1B92F0-5DD1-4BDE-B55D-D785D29A6F05

Rite Aid Store No. 6510

(c)      This Amendment, and all covenants contained herein, shall be binding and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.

(d)      The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provisions, which shall remain in full force and effect.

(e)      Except as modified as set forth in this Amendment, all of the terms and provisions of the Lease remain unchanged and in full force and effect and Landlord and Tenant hereby ratify and confirm same.   Landlord and Tenant acknowledge and agree that the Lease, as modified by this Amendment, sets forth the entire agreement between Landlord and Tenant and there are no other agreements, understandings, undertakings, representations, or warranties among the Parties with respect to the subject matter hereof except as set forth herein.  In case of any conflict between the terms and provisions of the Lease and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

*[signature pages follow]*

3

DocuSign Envelope ID: 9B1B92F0-5DD1-4BDE-B55D-D785D29A6F05

Rite Aid Store No. 6510

       **IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment effective as of the Effective Date.

<u>**LANDLORD:**</u>

STONEBRIER COMMERCIAL LIMITED PARTNERSHIP
By Stonebrier, LLC, General Partner

By: _____
Name: Charles G. Patmon, III
Title: President

<u>**TENANT:**</u>

THRIFTY PAYLESS, INC.

By: _____*Lisa M. Winnick*_____
Name:  Lisa M. Winnick
Title:  Vice President

4

# EXHIBIT C

## EXHIBIT C: Statement of Accounting

### Claimed under § 503(b)(7)

| § 503(b)(7) | GRAND TOTAL: | $116,031.92 | |
|---|---|---|---|
| | **Rent & Late Fees** | **Maintenance and Repair** | **Attorney Fees** |
| May-25 | $49,568.75 | $3,626.73 | $1,062.50 |
| Jun-25 | | $3,339.35 | $765.00 |
| Jul-25 | $49,568.42 | $3,148.67 | $552.50 |
| Aug-25 | | | $4,400.00 |
| **Totals Due** | $99,137.17 | $10,114.75 | $6,780.00 |

### Claimed under § 503(b)(9)

| § 503(b)(9) | GRAND TOTAL: | $41,016.70 | | |
|---|---|---|---|---|
| | **Rent & Late Fees** | **Maintenance and Repair** | **Property Taxes-2024** | **Attorney Fees** |
| Mar-25 | | $3,095.52 | | |
| Apr-25 | $2,360.42 | $3,361.22 | $30,290.04 | $1,909.50 |
| **Totals Due** | $2,360.42 | $6,456.74 | $30,290.04 | $1,909.50 |