# EXHIBIT "A"

Trevose#705440
COMMONWEALTH OF PENNSYLVANIA

LEASE AGREEMENT

COUNTY OF BUCKS

THIS LEASE AGREEMENT ("Lease") is made and entered into this 6th day of
November, 2012, by and between SCOTTSVILLE ASSOCIATE, a Pennsylvania general
partnership ("Landlord"), and FAMILY DOLLAR STORES OF PENNSYLVANIA, INC., a
Pennsylvania corporation ("Tenant").

## W I T N E S S E T H

In consideration of the covenants set forth in this Lease, to all of which Landlord
and Tenant agree, Landlord demises to Tenant, and Tenant leases from Landlord, that
certain premises situated in the Landlord's Shopping Center known as Trevose Shopping
Center located on the northeastern corner of the intersection of Brownsville Road and
Andrews Road, in the City of Feasterville - Trevose, County of Bucks, Commonwealth of
Pennsylvania, and being that space, excluding the roof and exterior walls, that contains
approximately 8,000 (80' x 100') interior square feet (the "Demised Premises"). The
Demised Premises are located immediately adjacent to Planet Fitness and on the same
front building line with Planet Fitness and other tenants in the Shopping Center. The
Demised Premises are shown cross-hatched on Exhibit A - Site Plan. The Shopping
Center is shown outlined in bold on Exhibit A-Site Plan. Tenant and its employees and
invitees are also granted the non-exclusive right to use the parking, service and access
areas shown on Exhibit A - Site Plan.

Tenant will have and hold the Demised Premises together with all appurtenances,
rights, privileges and easements belonging or appertaining to the Demised Premises for
an initial term commencing as set forth in Paragraph 5 ("Commencement Date") and
ending on the 30th day of June, 2022; provided, however, Landlord will have the right to
extend the ending date of the initial term so that the initial term will be at least 120 months
from the Rent Commencement Date and will end on the last day of whichever of the
following months is closest to the 120th month after the Rent Commencement Date:
January, February, March, April, May, June or September. Landlord must exercise this
right by giving written notice to Tenant setting forth the ending date of the initial term no
later than 90 days after the Rent Commencement Date, time being of the essence. The
definition of lease year will be adjusted accordingly.

1. <u>RENT</u>. Beginning on the Rent Commencement Date as determined in
Paragraph 5, and continuing through June 30, 2017, ███████████████████



Trevose#705440

█████████████████████████████████████████████ Fixed rent will be paid on or before the first
day of each month.  Tenant will not be deemed late in making a fixed rent payment
unless Landlord does not receive the payment on or before the tenth day of the month.
In the event that Tenant fails to make its fixed rent payments by the tenth day of the
month more than two times in any 12 month period, and Tenant promptly received notice
of each late payment from Landlord, then any subsequent late payment of fixed rent, until
Tenant has made its fixed rent payments on a timely basis for a 12 consecutive month
period, will incur a late payment charge equal to three percent of the payment amount.

     1A.  RITE AID LEASE.  Landlord and Tenant understand that Landlord and Rite
Aid intend to terminate the existing Rite Aid lease on the Demised Premises prior to or
upon Rite Aid's opening for business in a new freestanding store in Trevose Shopping
Center.  Landlord will notify Tenant in writing as soon as the existing lease is terminated.
If the existing lease is not terminated within 18 months of the Effective Date ("Outside
Delivery Date"), then Tenant, at its option, may cancel this Lease or may extend Landlord
additional time to terminate the existing lease.  The "Effective Date" is the date this Lease
is signed by both Landlord and Tenant.

     2.  COVENANT OF TITLE AND AUTHORITY.  Landlord covenants and warrants
that Landlord has full right and lawful authority to enter into this Lease for the full initial
term and all extensions; that, although title to the Shopping Center currently is held by
Bucks County Industrial Development Authority pursuant to a satisfied installment sales
agreement, Landlord has the right to transfer fee simple title to the entire Shopping
Center, including the Demised Premises, to Landlord's name at any time and that
Landlord has satisfied all requirements to obtain such legal title (other than the payment
of a required transfer tax); that the Shopping Center, including the Demised Premises, is
free and clear of all encumbrances that could adversely affect Tenant's rights under this
Lease and is free and clear of all mortgages and liens except that Landlord may place a
first mortgage or deed of trust on the Demised Premises so long as Tenant is provided a
nondisturbance agreement that is consistent with Paragraph 21 of this Lease; that to the
best of Landlord's present knowledge the Demised Premises comply with all laws,
ordinances and regulations including building codes except for work that Tenant will
complete prior to opening for business as set forth on Exhibit B – Tenant's Anticipated
Scope of Work; that to the best of Landlord's knowledge there are no laws, ordinances,
government requirements or regulations, or other matters that will restrict Tenant's rights
under this Lease or limit or prevent the Demised Premises from being used for the retail
sale of merchandise typically sold by variety stores, discount stores, dollar stores or
variety discount stores; and that there are no title restrictions, restrictions in other leases
or zoning matters that will restrict Tenant's rights under this Lease or limit or prevent the
Demised Premises from being used for the retail sale of merchandise typically sold by
variety stores, discount stores, dollar stores or variety discount stores, except as set forth
on Exhibit D – Exclusive Use Provisions; that there are no restrictive covenants or
restrictions in other leases that limit the types of products that may be sold from the





Trevose#705440

Demised Premises, except as set forth on Exhibit D – Exclusive Use Provisions.

3. <u>USE OF PREMISES</u>. Landlord agrees that the Demised Premises may be used for the conduct of a variety store, discount store, dollar store or variety discount store, subject to the restrictions set forth on Exhibit D-Exclusive Use Provisions. Tenant will not change its use to a business other than a variety store, discount store, dollar store, variety discount store or discount clothing store if (i) such other use would be substantially the same as another business being operated in the Shopping Center at the time Tenant gives notice of its intent to change its use of the Demised Premises, or (ii) such other use would violate Exhibit D – Exclusive Use Provisions or any exclusive use rights granted to any tenant who has an existing lease with Landlord and is open for business at the time Tenant notifies Landlord that Tenant desires to change its use, provided and only on condition that within 15 days after Tenant notifies Landlord of Tenant's intent to change its use of the Demised Premises Landlord furnishes to Tenant copies of all such exclusive use rights.

Tenant will not be obligated to continuously occupy or operate a business in the Demised Premises. Whether or not Tenant is occupying or conducting business in the Demised Premises, Tenant will be responsible for paying the rent and other sums due Landlord under this Lease and for performing Tenant's other obligations subject to and in accordance with the provisions of this Lease. In the event that no business is conducted in the Demised Premises for three consecutive months or six months within any consecutive twelve month period for reasons other than strikes, lock-outs, labor troubles, failure of power or other utilities, fire or other casualty, restrictive governmental laws or regulations, riots, insurrection, war or other reason not the fault of Tenant or for any cause beyond Tenant's reasonable control or for remodeling or renovations, and other businesses in the Shopping Center continue to operate, then Landlord will have the option, to be exercised if ever within 30 days after the expiration of said applicable period, to terminate this Lease upon 30 days' prior written notice to Tenant, provided that, on a one-time only basis throughout the term of the Lease, including any extensions thereof, if a business is again conducted within the Demised Premises before the expiration of 30 days after Tenant receives such notice, then such termination notice will be void and this Lease will continue.

4. <u>IMPROVEMENTS BY TENANT</u>. Prior to delivering the Demised Premises to Tenant, Landlord will complete the work set forth on Exhibit E- Landlord Improvements. Landlord will deliver the Demised Premises to Tenant in "broom clean" condition, free of fixtures, sign(s) and all other personal property of previous tenant(s), with no broken or cracked glass in windows or doors, with the interior of the Demised Premises in no worse condition than on the date the Demised Premises were last inspected by Tenant's Construction Manager prior to the date of this Lease, with the heating, air conditioning, plumbing and electrical systems in good working order. Prior to delivering the Demised Premises to Tenant, Landlord will (i) obtain an asbestos report identifying any asbestos containing materials in the Demised Premises, (ii) remove all asbestos containing

3




materials, and (iii) if required by law or ordinance, provide a clean air report or certification that the Demised Premises is free of asbestos. Landlord will also cause the Demised Premises to comply with all building and fire codes, including codes pertaining to sprinklers, in effect on the date of this Lease, except that Landlord will not be responsible for any building and fire code work that is expressly set forth on Exhibit B- Tenant's Anticipated Scope of Work. Prior to delivering the Demised Premises to Tenant, Landlord will remove all trash, debris, brush and weeds from the parking areas, driveways and service areas; place all canopies and awnings in good repair; place all exterior lights in good working order; clean all brick and block surfaces; and steam clean or pressure wash all concrete walkways. Prior to delivering the Demises Premises to Tenant, Landlord will ensure that the roof is clear of debris and free of defects, that the flashing and roof membrane are in good condition, and that the roof is watertight with an expected useful life of at least three years. Landlord will also provide space for three dumpsters in the location shown on Exhibit A – Site Plan for Tenant's exclusive use. If governmental authorities require that any work be performed to other parts of the Shopping Center as a requirement of Tenant's initial opening for business and Tenant's work was performed in accordance with Tenant's plans, permits and approvals, as approved by Landlord and the appropriate governmental authorities, then Landlord will promptly cause the work to be done so as not to delay the completion of work to be performed by Tenant or Tenant's opening for business. Landlord further agrees to cooperate with Tenant in Tenant's effort to obtain any governmental permits or approvals required in order for Tenant to perform its desired alterations and improvements. If a company providing electrical, telephone or cable service to the Demised Premises requires the building owner to grant permission to install lines or conduits or to connect to existing lines, then Landlord will grant the required authorization. The provisions of this Paragraph will not relieve Landlord of Landlord's obligations under Paragraphs 12, 12A and 28.

Landlord will allow Tenant and Tenant's general contractor (or potential general contractors) to have access to the Demised Premises for the purposes of measuring and for other information gathering purposes, but such access will not constitute Tenant's accepting possession of the Demised Premises. Tenant understands that any such access shall, however, remain subject to the cooperation and consent of the present tenant until such time as the present tenant's leasehold interest in the Demised Premises has expired. Tenant will have the right to make all alterations and improvements it desires for its retail store operation consistent with Paragraph 7 hereof.




4



5. <u>DELIVERY OF PREMISES AND COMMENCEMENT OF TERM AND RENT.</u>
Landlord will deliver the Demised Premises to Tenant in the condition set forth in
Paragraph 4 not later than the Outside Delivery Date defined in Paragraph 1A. If the
Demised Premises are not delivered to Tenant in such condition by the Outside Delivery
Date and the parties have not agreed to extend the Outside Delivery Date in writing, then
Tenant, at its option, may terminate this Lease by written notice to Landlord. Tenant will
not be required to accept delivery of the Demised Premises prior to the date on which
Tenant has obtained all governmental permits and approvals required for the construction
of its desired alterations and improvements, and Tenant and Landlord's mortgagee, if
any, have entered into a nondisturbance agreement consistent with the terms of the
Paragraph of this Lease entitled <u>SUBORDINATION TO MORTGAGES</u>.  Landlord agrees
to notify Tenant, in writing, of the date the Demised Premises will be ready for delivery to
Tenant at least 15 days prior to such date.

Landlord and Tenant will use good faith efforts to satisfy the conditions to Tenant's
acceptance of delivery of the Demised Premises. If Landlord and Tenant do not obtain
the necessary permits for their initial improvements within 180 days of the Effective Date,
then either Landlord or Tenant may terminate this Lease by written notice to the other
given at any time prior to the conditions being satisfied; provided, however, Landlord's or
Tenant's termination of this Lease will be void and this Lease will continue if Tenant or
Landlord waives such conditions by written notice to the other given within 30 days after
receiving the other's termination notice.

The term of this Lease will begin on the date Tenant accepts delivery of the
Demised Premises, which shall be no later than the date Tenant has Tenant's necessary
permits and approvals for Tenant's initial improvements and Landlord has completed all
of Landlord's obligations under this Lease provided Landlord has given Tenant the fifteen
days prior written notice of delivery set forth above ("Commencement Date").  Fixed rent
will begin to accrue on the earlier of (i) 120 days following the date Tenant accepts
delivery of the Demised Premises with all of Landlord's required work set forth in
Paragraph 4 above completed, or (ii) the date Tenant opens for business in the Demised
Premises ("Rent Commencement Date").  However, if Tenant is unable to obtain any
required governmental approvals due to any lack of compliance with laws or ordinances
by Landlord or other tenants in the Shopping Center, then the Rent Commencement Date
will be delayed one day for each day that Tenant's required governmental approvals are

CRB



Trevose#705440

delayed.

6. <u>TERM EXTENSIONS</u>.  The term of this Lease will be automatically extended one period at a time for three successive periods ("extended terms") of five years each unless Tenant  gives written notice to Landlord canceling the next extended term at least 180 days before the extended term is scheduled to begin.  If Tenant gives such notice, then this Lease will expire the day before the extended term is scheduled to begin.  All of the terms, covenants and conditions of this Lease will apply to each extended term except the amount of rent will be as set forth below:



For all purposes under this Lease, the phrases "the term of this Lease" and "lease term" will mean the initial term and any extended term that comes into effect.

7. <u>ALTERATIONS BY TENANT</u>.  Tenant will have the right at all times after the Commencement Date to make, at its own expense, any changes, improvements, alterations and additions to the Demised Premises that Tenant desires to conform the Demised Premises for use as a Family Dollar store, except that after Tenant opens for business, Tenant will not make any structural or exterior alterations or improvements without Landlord's prior written consent, which consent will not be unreasonably withheld or delayed. Any alterations and improvements made by Tenant will be done in a good and workmanlike manner and in accordance with applicable code requirements.  Tenant will use Landlord's roofing contractor for any roof penetrations if required by an existing warranty on the roof of which Landlord has given Tenant prior notice.

Tenant agrees to pay promptly when due all charges for labor and materials in connection with any work done by Tenant upon the Demised Premises so that the Demised Premises and the Shopping Center will not be subject to liens resulting from such labor and materials.  If any mechanic's or other lien is filed against the Demised Premises or the Shopping Center arising out of any labor or material furnished to Tenant (other than work performed by Landlord), then Tenant will cause the lien to be canceled and discharged of record by payment or bond within 60 days after Tenant receives written notice of the lien from Landlord.  Tenant will defend on Landlord's behalf, at Tenant's sole cost and expense, any action, suit or proceeding for the enforcement of any such lien, and Tenant will pay any damages and satisfy and discharge any judgment entered



CRB

thereon.

8. <u>FIXTURES</u>.  Tenant will have the right to install on the Demised Premises any fixtures and equipment Tenant deems necessary to conform the Demised Premises for use as a Family Dollar store.  Tenant will, on termination of this Lease, and may at any time during the lease term, remove from the Demised Premises all shelving, fixtures and equipment that Tenant installed.  Tenant will repair any damage to the Demised Premises caused by Tenant's removal of its shelving, fixtures and equipment.  Tenant will have the right to place trash dumpsters and recycling dumpsters in the service area adjacent to the Demised Premises in the approximate location shown on Exhibit A-Site Plan (Google map approved 3-19); and to install communications equipment on the exterior of the Demised Premises or in the rear service area.  If Tenant installs communications equipment then Tenant shall be responsible for any damage caused to the Demised Premises in connection with said equipment and shall indemnify and hold Landlord harmless from all direct and indirect costs, expenses and claims resulting therefrom.  If roof penetrations are required in order to install the communications equipment, Tenant will use Landlord's roofing contractor if required by an existing warranty on the roof of which Landlord has given Tenant prior notice of.

9. <u>UTILITIES</u>.  Utilities means water, sanitary sewer service, natural gas (if available) and electrical service ("Utilities"). Landlord will ensure that the Utilities are properly connected to the Demised Premises, supplied directly by the utility providers and separately metered (no submeters).  Landlord makes no representation that any and all Utilities serving the Demised Premises are sufficient for Tenant's permitted use.  Tenant, at its sole cost and expense, shall be responsible for upgrading any and all infrastructure, equipment and/or service to make Utilities sufficient for its use.  Landlord will be responsible for paying any utility charges that accrued prior to the Commencement Date.  Tenant will pay directly to the utility providers all deposits required to initiate service and all charges for all Utilities used by Tenant in the Demised Premises immediately upon the Commencement Date.  Except to the extent specifically stated in this Lease, Tenant will have no obligation to pay to Landlord any charges or fees billed to Landlord by any utility provider.  If there is a sprinkler system that serves both the Demised Premises and other spaces in the Shopping Center, then Landlord will be responsible for all charges relating to the operation, maintenance, inspections and monitoring of the sprinkler system, if such a sprinkler system exists.

10. <u>DAMAGE AND DESTRUCTION</u>.  If the Demised Premises or the Shopping Center are damaged or destroyed by fire or other casualty, then Landlord will promptly, at Landlord's expense, remove all debris and repair, restore or rebuild the Demised Premises and the Shopping Center so that they will be substantially the same as they were immediately prior to the damage or destruction.  Landlord will not be responsible for Tenant's merchandise, fixtures, equipment or furniture.  Landlord's obligation to restore hereunder, if any, shall be in compliance with then currently applicable building and fire codes and will include performing all work necessary to cause the Demised Premises and

7

CRB



the Shopping Center to comply with then currently applicable building and fire codes.  If the Demised Premises are damaged or destroyed, then rents and other charges will cease and abate on the date of the damage or destruction in proportion to the area of the Demised Premises rendered unusable and any rent paid in advance by Tenant will be refunded to Tenant.  If rents and other charges abated, then rents and other charges will begin to re-accrue upon the earlier of (i) the 30th day after Landlord completes the repair, restoration or rebuilding of the Demised Premises and tenders possession to Tenant, or (ii) the date Tenant reopens for business in the Demised Premises.  If Landlord does not begin the physical restoration or rebuilding of the Demised Premises within 180 days of the date the damage occurred or complete such restoration or rebuilding within 365 days thereafter then Tenant may, at its option, terminate this Lease as its sole remedy.

Notwithstanding the foregoing, provided Landlord has kept the Demised Premises and the Shopping Center insured as required by Paragraph 11 and Landlord has complied with the terms and conditions of its insurance policy, Landlord's obligation to restore or rebuild will be subject to the insurer's payment of the insurance proceeds. Landlord will use its best efforts to obtain the insurance proceeds necessary for restoring or rebuilding, working in good faith with its lender and insurance carrier and Tenant, with the intent to restore and/or rebuild the Demised Premises.  If, however, Landlord is unable to obtain such insurance proceeds, then Landlord will not be obligated to restore or rebuild the Demised Premises and either party may then terminate this Lease, in which case this Lease will end effective on the date of the casualty and any rent paid by Tenant applicable to the period after the casualty will be promptly refunded to Tenant.

Notwithstanding any such termination, Tenant will have the right to reinstate this Lease and require Landlord to rebuild the Demised Premises if at any time within one year of the date of the casualty Landlord commences to rebuild a part of the Shopping Center property or use the Shopping Center property for retail purposes, provided the casualty was not caused by the intentional misconduct of Tenant.  If this Lease is reinstated, then the term and payment of rent will recommence 90 days after the Demised Premises are delivered to Tenant and the term will be the amount of time that remained on the lease term as of the date of the casualty.  All other covenants and conditions will be as stated in this Lease.  Tenant will give notice to Landlord of Tenant's decision to reinstate this Lease within 60 days after the earlier of the date Landlord notifies Tenant in writing that Landlord intends to rebuild a part of the Shopping Center or Tenant learns that Landlord commenced construction or began using the Shopping Center property for retail purposes within the above stated one year period.

Notwithstanding the foregoing, if the Demised Premises are so extensively damaged as to require rebuilding and the damage occurs during the last year of the initial term of this Lease or the last year of any extended term, then prior to Landlord's commencement of rebuilding, Landlord may request in writing that Tenant agree to waive its right to cancel this Lease at the end of the then current term so that there will be at least five full calendar years remaining on the lease term.  If Tenant refuses to agree to

8





Trevose#705440

waive its right to cancel this Lease, or if the damage occurs during the last year of the final extended term, then Landlord will not be obligated to rebuild the Demised Premises, and if Landlord elects not to rebuild, then either Landlord or Tenant may terminate this Lease by giving written notice to the other party.

11.  INSURANCE.  (a) Landlord will obtain and keep in force a commercial property insurance policy covering the Demised Premises and all buildings and improvements in the Shopping Center for their full replacement cost against loss or damage by perils covered by "Causes of Loss – Special Form" Insurance (Commercial Property Coverage Form ISO CP 10 30), or its equivalent.  Landlord's policy will contain an ordinance and law endorsement and will provide debris removal coverage.  Landlord may carry loss of rent insurance.

(b) Landlord will obtain and keep in force a commercial general liability insurance policy with limits of not less than $2,000,000 for each occurrence and $4,000,000 general aggregate insuring Landlord against liability for bodily injury, death and property damage occurring on or involving the common areas (including without limitation or exception, parking areas, driveways, sidewalks, ramps, curbs, exterior utilities, drains, canopies, and service areas) of the Shopping Center.  The liability insurance carried by Landlord may be provided by a primary policy or a combination of primary and umbrella policies, as Landlord may determine in its sole discretion.  Tenant will be named as an additional insured under Landlord's liability coverages, but only for claims against Tenant arising out of the acts or omissions of Landlord including acts arranged by Landlord, or arising from Landlord's management, use, maintenance or control of the common areas.

(c) Effective on the Commencement Date and throughout the lease term, as may be extended, Tenant will either obtain and keep in force commercial property insurance covering Tenant's personal property in the Demised Premises for its full replacement cost against loss or damage by perils covered by Causes of Loss – Special Form Insurance (Commercial Property Coverage Form ISO CP 10 30) or its equivalent, or Tenant will elect to assume the risk of loss of its personal property caused by such perils.  Effective on the Commencement Date and throughout the lease term, as may be extended, Tenant will obtain and keep in force a commercial general liability insurance policy with limits of not less than $2,000,000 for each occurrence and $4,000,000 general aggregate insuring Tenant against liability for bodily injury, death and property damage with respect to occurrences in the Demised Premises.  The liability insurance carried by Tenant may be provided by a primary policy or a combination of primary and excess or umbrella policies, and will be subject to such deductibles or self insured retentions as Tenant elects in its sole discretion.  Landlord will be named as an additional insured under Tenant's liability coverages, but only for claims against Landlord arising out of the acts or omissions of Tenant, or arising out of the manner of Tenant's use of the Demised Premises.

9

CRB



Trevose#705440

(d) Landlord's and Tenant's insurance policies and coverages must be issued by financially responsible insurers that are duly authorized to do business in the state where the Demised Premises are located. Upon written request, Landlord and Tenant will each provide to the other a certificate of insurance from each liability insurer. The certificates of insurance will evidence the required coverages, name Landlord or Tenant, as applicable, as a certificate holder and additional insured and provide that the applicable insurer will endeavor to give not less than 30 days' advance written notice to Landlord or Tenant, as the case may be, prior to the effective date of cancellation of the required insurance.

(e)



completed. All premiums will be reasonable and at competitive rates. Tenant will have no responsibility for payment of any increases in the premium occasioned by any addition or improvement to the Shopping Center other than to the Demised Premises, nor due to the use of any other premises in the Shopping Center in a manner that results in an increase in Landlord's premiums.

Tenant's proportionate share will be equal to a fraction, the numerator of which will be the number of square feet of floor area in the Demised Premises, and the denominator of which will be the total number of square feet of floor area in all buildings in the Shopping Center, including the Demised Premises.






Trevose#705440

(f) Subject to Paragraph 20, <u>MUTUAL WAIVER</u> (which pertains to first party real or personal property losses), from and after the Commencement Date, and thereafter during the term of this Lease, Tenant will defend, indemnify and save Landlord harmless from any claim, liability, loss, cost or expense (including reasonable attorneys fees and litigation expenses) on account of any injury or death to any third person, or damage to any third person's property, occurring in the Demised Premises, or arising out of Tenant's failure to perform its obligations under this Lease, provided that the injury, death, or property damage was not caused or contributed to by the negligent or intentional acts or omissions of Landlord or its agents or employees.  The obligations of Tenant set forth in this Paragraph will survive the expiration or termination of this Lease until they are fully satisfied.

Subject to Paragraph 20, <u>MUTUAL WAIVER</u> (which pertains to first party real or personal property losses), from and after the Commencement Date, and thereafter during the term of this Lease, Landlord will defend, indemnify and save Tenant harmless, from any claim, liability, loss, cost or expense (including reasonable attorneys fees and litigation expenses) on account of any injury or death to any third person, or damage to any third person's property, occurring on or in the common areas, or arising out of Landlord's failure to perform its obligations under this Lease, provided that the injury, death, or property damage was not caused or contributed to by the negligent or intentional acts or omissions of Tenant or its agents or employees.  The obligations of Landlord set forth in this Paragraph will survive the expiration or termination of this Lease until they are fully satisfied.

12.  <u>MAINTENANCE AND REPAIRS.</u>  Landlord will maintain the Shopping Center and keep it in good repair, and Landlord will maintain and repair and replace when necessary all exterior portions of the Demised Premises, including the roof, exterior walls, canopy, gutters, downspouts, doors, door closures and glass in windows and doors and also all structural portions of the Demised Premises whether interior or exterior.  Landlord will make all repairs and replacements to any portion of the Demised Premises where the damage or loss is caused by casualties or perils insurable under the insurance that Landlord is required to carry pursuant to Paragraph 11(a).  Landlord will also be responsible for making all repairs made necessary to the Demised Premises by the settling of the Shopping Center building, all repairs to the interior of the Demised Premises made necessary by Landlord's failure to maintain the exterior of the Demised Premises, all repairs to the fire sprinkler system, if any, and all repairs to exterior (including under slab) plumbing and electrical lines.  Landlord will keep the parking, service and access areas (and other exterior areas, if any) maintained, including the removal of snow, ice, trash, weeds and debris, and in a good state of repair and properly lighted.  Tenant will maintain and repair all interior, non-structural portions of the Demised Premises except for repairs Landlord is required to make.  Landlord grants Tenant access



CRB

11

rights to the roof and to the exterior walls so that Tenant can make repairs or any alterations that Tenant is authorized to make or to install communications equipment or anything else Tenant is authorized to do under this Lease.

Neither Landlord nor Tenant, nor representatives thereof, will be responsible for repairs or replacements that are the direct result of the negligence of the other party unless the repairs or replacements are covered by insurance or required by this Lease to be covered by insurance; provided, if the party charged with negligence disputes that it negligently caused the condition needing the repair or replacement, then the party responsible for making the repair or replacement in the absence of the other party's negligence will make the repair or replacement, but will have the right to recover the reasonable costs of the repair or replacement from the negligent party unless the loss is covered or required to be covered by insurance.

12A. HEATING AND AIR CONDITIONING SYSTEMS. Landlord will furnish heating and air conditioning systems serving only the Demised Premises. The air conditioning system will have a minimum capacity of one ton of cooling for each 400 square feet in the Demised Premises. If the heating and air conditioning systems are ten years old or older on the date of this Lease, then Landlord will, at Landlord's expense, replace the systems with new systems prior to the date Landlord delivers possession of the Demised Premises to Tenant, manufactured by Carrier or equivalent approved by Tenant. If Landlord installs new heating and air conditioning systems at the beginning of the term of this Lease, then Landlord will assign the manufacturer's warranties to Tenant, and Tenant will have full responsibility for the maintenance and repair of the systems. If the heating and air conditioning systems are not new equipment, but are less than ten years old on the date of this Lease, then Landlord will be responsible for all maintenance, repairs and replacements for the first year after Tenant opens for business, and Tenant will be responsible for maintenance and repairs thereafter. However, Tenant will have the right, in its sole discretion, to replace one time during the lease term each heating and air conditioning unit that is not new at the beginning of the lease term at any time after a unit becomes ten years old. When Tenant replaces a unit, Landlord will pay Tenant a contribution toward the cost of the unit at the fixed price of $1,000.00 per ton of cooling capacity, subject to the following exceptions: (i) Landlord's reimbursement will occur only one time during the life of this Lease; (ii) Landlord will not be responsible for any cost to replace a heating and air conditioning unit after year 8 of the lease term unless Tenant exercises the next available extended term; (iii) Tenant will be responsible for the cost of replacing any unit as a result of its negligence, other misconduct, and/or failure to maintain preventative maintenance, and (iv) Landlord will have full responsibility for maintenance and repair (except where Tenant is responsible under (iii) above) of heating and air conditioning units after the commencement of year 8 until such time as a unit or units are replaced. Except for damage or losses caused by casualties or perils insurable under the insurance that Landlord is required to carry per Paragraph 11(a), Tenant will assume responsibility to maintain, repair and replace the heating and air conditioning systems after Landlord's responsibility period ends. However, Tenant will not be required

CRB



to replace any major components of the heating and air conditioning systems, including but not limited to, any compressor, condenser, coils, controls, motor or heat exchanger, during the last two years of the any lease term other than the initial lease term. Tenant's election not to replace a major component will impose no obligation on Landlord to do so, it being agreed that except for Landlord's responsibilities as set forth in this paragraph and except for damage and losses caused by casualties or perils insurable under the insurance that Landlord is required to carry per Paragraph 11(a), Landlord will have no obligation to make any repairs to the heating and air conditioning systems.

12B.  COMMON AREA MAINTENANCE.  The term "Common Areas" means the driveways, parking areas, service areas, exterior sidewalks and curbing, exterior walls of buildings including façade but excluding any structural elements, common utilities, pylon sign (exclusive of each tenant's individual sign thereon), knox box, fire/security room and landscaped areas, some of which are shown on Exhibit A - Site Plan.  Landlord will maintain the Common Areas in good order, condition and repair.

All of such costs will be reasonable and at competitive rates.  Tenant will have no responsibility for other charges and costs incurred by Landlord in connection with the maintenance and repair of the Common Areas.

Tenant's proportionate share will be equal to a fraction, the numerator of which will be the number of square feet of floor area in the Demised Premises, and the denominator of which will be the total number of square feet of floor area in all buildings in the Shopping Center, including the Demised Premises ("Tenant's Pro Rata Share").

Snow Removal Costs means plowing, salting and sanding, shoveling and any other reasonable method of snow and ice removal.



13

CRB



The amount of such costs to be reimbursed by Tenant will be reduced on a per diem basis for partial lease years.

13. <u>TAXES</u>. Landlord will timely pay all taxes, assessments and other charges that may be levied, assessed or charged against the Shopping Center, including the Demised Premises, and Landlord will make all payments required to be made under the terms of any mortgage or deed of trust that is now or later becomes a lien on the Shopping Center or the Demised Premises.

Tenant will timely pay all operating license fees for the conduct of its business, and ad valorem taxes levied upon its trade fixtures, inventory and other personal property.





Trevose#705440



If Landlord receives any notification of any planned increase in the assessed value of the Shopping Center, Landlord agrees to notify Tenant in writing at least 30 days before the last day to contest the increase at the lowest level administrative proceeding. Tenant will have the right to contest, by appropriate proceedings in Landlord's or Tenant's name, the validity or amount of the increase. Landlord agrees to cooperate with Tenant in contesting the increase. If Landlord fails to give written notice of the increase to Tenant within the required time period, then Tenant will not be responsible for reimbursing Landlord for the tax increase. If any state or local real estate tax exemption or abatement program exists during the first year of the lease term, then Landlord will notify Tenant. Landlord will cooperate with Tenant to timely apply for any such exemption or abatement, including any exemption or abatement that provides relief from increases in real estate taxes resulting from an increased assessment of the Demised Premises due to any improvements made to the Demised Premises by Landlord or Tenant prior to the rent commencement date. Tenant will receive its proportionate share of the benefit of any exemption or abatement.

14. <u>DEFAULT BY LANDLORD</u>. If Landlord fails to perform any obligation to be performed by Landlord pursuant to this lease, including any payment which Landlord has agreed to make, and (except in an emergency) Landlord does not cure the failure within



CRB

15

30 days after Tenant gives written notice of the failure to Landlord, then Tenant may, in Tenant's sole discretion, perform the obligation or make the payment as Landlord's agent. In particular, if roof leaks occur more than two times in any 12-month period, and Tenant has notified Landlord in writing after each of the first two occurrences, then whether or not Landlord has made repairs after the previously reported leaks, Tenant will have the right to perform any required repairs or replacement. Tenant shall use Landlord's roofer if the roof is still under warranty and Landlord has notified Tenant in writing prior thereto of the existence of the warranty. The full amount of any cost incurred or payment made by Tenant pursuant to this Paragraph will immediately be due and payable by Landlord to Tenant. Tenant will have the right to deduct all amounts reasonably expended by Tenant, without being in default, out of rents then due or thereafter coming due. In the event of an emergency, including (i) any roof leak, (ii) any failure of the heating system or air conditioning system pursuant to Landlord's responsibilities as set forth in this Lease, (iii) any damage to the building constituting part of the Demised Premises which compromises the security of the Demised Premises or (iv) any event, including action by governmental authorities, that would require Tenant to close its business, Tenant will give such notice to Landlord as is reasonable under the circumstances, including notice by e-mail, fax or telephone. The rights granted in this Paragraph will not release Landlord from any obligation to perform any of the covenants to be performed by Landlord under this lease and will be in addition to any other rights Tenant may have by reason of any default by Landlord. Landlord will have the right to dispute any rent deduction made by Tenant, and may bring suit to recover all sums withheld. Landlord will be entitled to interest on all sums wrongfully withheld by Tenant at the interest rate set forth in this Paragraph, but Tenant will not be in default for failure to pay any sums withheld unless Tenant fails to pay the amount of any final judgment in Landlord's favor within 30 days after the judgment is entered.

15. <u>SIGNS</u>. Tenant, at its sole cost and expense, will have the right to erect two of its standard building signs. One building sign will face Andrews Road and one will face Brownsville Road. Tenant's current standard signs are depicted on Exhibit C – Signs. If Tenant's standard signs are not permitted by local sign ordinances, then Tenant may erect signs as similar to Tenant's standard signs as are allowed by the local ordinances, including any variances obtained by Tenant. Tenant may also erect professionally lettered signs and decals on the exterior of the Demised Premises, such as signs designating its hours of operation or signs marking its rear delivery door, on the doors or windows of the Demised Premises or anywhere on the rear exterior. Tenant may erect a temporary "Grand Opening" or similar sign banner. Tenant will, at Tenant's sole expense, obtain all governmental permits required in order to erect its signs. Tenant will repair any damage resulting from the installation or removal of its signs. Tenant, at its sole cost and expense, will have the right to erect a sign bearing Tenant's standard graphics and colors on the Shopping Center pylon ("Pylon"). Tenant's sign will occupy all of the second tenant position on the Pylon, which is currently occupied by Rite Aid. The approximate location of the Pylon is shown on Exhibit A – Site Plan. Landlord will, at no expense to Landlord, cooperate with Tenant to obtain any governmental permits and approvals



CRB

16

Trevose#705440

needed to erect Tenant's signs. Neither Landlord nor any other tenant will have the right to install any signs on the Demised Premises. Under no circumstances will Landlord remove Tenant's signs without first obtaining Tenant's written consent. Landlord will not permit the erection of signs that would interfere with the visibility of Tenant's sign on the Pylon.

16. <u>EMINENT DOMAIN</u>. If all or any part of the Demised Premises, or any part of the Shopping Center parking, service or access areas are taken by public authorities through the power of eminent domain, then Tenant will have the right to terminate this Lease. If this Lease is terminated, then any unearned rent will be refunded to Tenant. If only a part of the Demised Premises or the parking, service or access areas are taken, and if Tenant elects not to terminate this Lease, then the rent will be reduced in the same proportion that the Demised Premises or parking, service or access areas are reduced. Landlord will restore the Demised Premises or parking, service or access areas, as applicable, to as close to their condition as existed prior to the taking as is feasible. Tenant will have the right to participate in any proceeding pertaining to the taking of the Demised Premises, with such claim limited to relocation costs and unreimbursed costs for Tenant's initial improvements as set forth on Exhibit B. Whether or not Tenant elects to terminate this Lease, Landlord and Tenant will each be entitled to their separate claims based on their respective interests even if a single award for all damages is given by the public authority.

17. <u>TENANT'S DEFAULT</u>. The following will constitute events of default:

(a) Tenant fails to pay any installment of fixed rent when due and the failure continues for ten days after Tenant receives written notice of default from Landlord, or Tenant fails to pay any other sums due Landlord under this Lease when due and the failure continues for 30 days after Tenant receives written notice of default from Landlord; or

(b) Tenant fails to perform or observe any other material agreement or condition on its part to be performed or observed, and Tenant fails to commence to cure such default within 30 days after receipt of notice of the default from Landlord or having commenced to cure the default, Tenant fails to diligently pursue the curing of the default thereafter; or

(c) Tenant is adjudicated bankrupt; or Tenant files in any court a petition in bankruptcy, or for any reorganization pursuant to the provisions of any state or federal insolvency or bankruptcy act; or any involuntary petition in bankruptcy is filed against Tenant, and such petition is not vacated or withdrawn within one year after the date of filing thereof; or Tenant makes a general assignment for the benefit of creditors; or a receiver or trustee of all or a portion of Tenant's property is appointed, and such appointment is not vacated within 180 days after it is made; provided that also as a result



CRB

17

of any such event described in this clause (c), Tenant ceases to pay rent and fails to cure such default in its payment of rent prior to the expiration of the cure period described in clause (a) above.

In any such case Landlord may immediately or any time before the default is corrected, if applicable, on ten days' written notice to Tenant terminate this Lease, and Tenant will forthwith quit and surrender the Demised Premises, but Tenant will remain liable as hereinafter provided. Landlord may, with or without terminating this Lease, immediately or at any time before the default is corrected, reenter and resume possession of the Demised Premises and remove all persons and property therefrom by a suitable action or proceeding at law or in equity without being liable for trespass. No re-entry by the Landlord will be deemed an acceptance of a surrender of this Lease.

Following any such re-entry, Landlord will use reasonable efforts to relet the Demised Premises for a commercially reasonable rent taking into consideration the condition of the Demised Premises and general market conditions. Such reletting may be for a period equal to or greater or less than the remainder of the term of this Lease and upon such terms and concessions as the Landlord will deem reasonable to any tenant or tenants and for any use and purpose which Landlord may deem appropriate. If this Lease will be terminated as provided in this Paragraph, after crediting any rents and other charges due upon reletting, then Landlord will be entitled to recover from Tenant and Tenant will pay to Landlord the following: (1) an amount equal to all reasonable expenses incurred by Landlord in recovering possession of the Demised Premises; (2) all reasonable costs and charges for the care of the Demised Premises while vacant; (3) an amount equal to all reasonable expenses incurred by Landlord in connection with reletting the Demised Premises or any part thereof, including brokers commissions, advertising expenses and the cost of making any repairs Tenant was obligated to make (but specifically excluding any costs for renovating or remodeling the Demised Premises for a new tenant and any attorney's fees to negotiate a new lease); and (4) the rent and other charges required to be paid by Tenant under this Lease which amounts will be due and payable by Tenant to Landlord on the several days on which such rent and other charges would have become due and payable had this Lease not been terminated.

Separate actions may be instituted by Landlord against Tenant from time to time to recover any damages which, at the trial of any such action, will then or theretofore have become due and payable to Landlord under any provisions hereof without waiting until the end of the term of this Lease, and neither the institution of suit or suits, proceeding or proceedings or the entering of judgment will bar Landlord from bringing a subsequent suit or proceeding for damages of any kind thereafter suffered. It is expressly agreed that forbearance on the part of Landlord in the institution of any suit or entry of judgment for any part of the rent herein reserved to Landlord will in no way serve as a defense against nor prejudice subsequent action for later rent. Mention in this Lease of any particular remedy will not preclude Landlord from any other remedy at law or in equity and Landlord will have all remedies and rights available to it at law or equity in addition to all remedies



18

CRB

set forth herein except Landlord will not have the right to lock Tenant out of the Demised Premises without a court order and Landlord will not have the right to accelerate any monetary obligations of Tenant.

Tenant shall indemnify, defend and hold Landlord harmless in and from any and all claims and/or damages resulting from Tenant violating the exclusive use rights set forth on Exhibit D. Further, notwithstanding the other provisions of this Paragraph 17, if Tenant violates the exclusive use rights set forth on Exhibit D and does not cure the violation within thirty (30) days after written notice from Landlord, Landlord shall have the following additional rights and remedies: (i) obtain permanent injunctive relief prohibiting Tenant from engaging in such business which violates the exclusive use rights set forth on Exhibit D; and/or (ii) terminate this Lease.

18.  SURRENDER OF POSSESSION.  Upon the termination of this Lease, Tenant will surrender the Demised Premises broom clean and in good repair, ordinary wear and tear, damage by fire or other casualty and Landlord's maintenance and repair obligations excepted. Tenant will, at Tenant's sole cost and expense, remove its signage from the Demised Premises and Shopping Center upon expiration or sooner termination of this Lease, and Tenant shall repair any and all damage caused by its installation and/or removal.

19.  EXCLUSIVE USE.  So long as Tenant is open and operating for a use permitted under Paragraph 3 of this Lease, unless Tenant is closed for renovations or remodeling or reasons set forth in Paragraph 37, FORCE MAJEURE,  and so long as Tenant is not in default  of this Lease beyond applicable notice and cure periods, Landlord agrees that Landlord and any entity controlled by Landlord or any partner or principal of Landlord will not lease (or permit the leasing or subleasing of) or sell any space in the Shopping Center, nor any space on any property contiguous with or connected to the Shopping Center owned by or controlled by Landlord or any entity controlled by Landlord or any partner or principal of Landlord to any discount store occupying less than 25,000 square feet operated by or under the name of Fred's, Marc's, Wal-Mart, K-Mart, Sears Holdings, Meijer's, Duckwall-Alco, A. J. Wright, Big Lots, Shopko, Pamida, Value City, Dolgencorp or Dollar General, Deals, Only Deals, 99 Cents Only, dd's Discounts, Dollar Tree, or any entity controlled by, affiliated with or related to any of them, or any other dollar store or single price point store occupying more than 2,000 square feet, or any store operated by Variety Wholesalers including but not limited to Maxway, Roses, Super 10, Value Mart, Pope's and Bargain Town.

Landlord shall not be in violation of this Paragraph 19 if a tenant, including a successor, assignee or subtenant thereof, without Landlord's written consent, uses the Shopping Center in violation of the exclusive granted to Tenant ("Rogue Tenant"), provided that Landlord, upon written notification from Tenant, promptly takes appropriate legal and/or equitable action to cure such unauthorized use.  If there is a breach of this Paragraph by Landlord (i.e. Landlord consents to another tenant otherwise prohibited

19



CRB

under this Lease or does not commence and prosecute Court Proceedings against a Rogue Tenant as required above), then Tenant will notify Landlord of the breach and Landlord will have 60 days after receipt of Tenant's notice to either (i) cause the tenant or other person whose operation violates this Paragraph to discontinue its operation, or (ii) initiate appropriate legal proceedings against such tenant or other person. If Landlord initiates legal proceedings, then so long as Landlord is diligently pursuing those proceedings, Landlord will have one year after the initiation of the proceedings to cause the business in breach of this Paragraph to discontinue its operation. After the 60 day notice period or after the one year period, if Landlord diligently pursues legal proceedings, then Tenant's rights and remedies will include, but not be limited to, the right at any time after the breach occurs to terminate this Lease. So long as the breach exists and Tenant has not terminated this Lease, Tenant's only obligation with respect to fixed and percentage rent will be the payment of the lesser of (i) the fixed rent set forth in Paragraph 1 or 6, as applicable, or (ii) percentage rent of two percent of Tenant's gross sales (as defined below), with no fixed rent. Percentage rent will be due within 90 days after the end of each lease year. Tenant will also have the right to seek legal and equitable remedies.

The term "lease year" is a 52 week period ending on June 30. "Gross sales" means all sales made by Tenant from the Demised Premises excluding sales tax, excise tax, refunds, void sales, and sales and revenues from vending machines and other mechanical devices including ATMs. If Tenant is paying the percentage rent set forth above then Tenant will report gross sales to Landlord on an annual basis.

Landlord will have the right to review Tenant's records relating to gross sales at the Demised Premises once for any lease year. The review will be conducted at Tenant's corporate offices in Matthews, North Carolina, during regular working hours on reasonable written notice, and within one year after Tenant sends its statement of percentage rent for the lease year that Landlord desires to review. The review will be limited to Tenant's electronically generated profit and loss statements and electronically generated daily sales reports for the business operated on the Demised Premises during the period covered by the review. If percentage rent was underpaid, then Tenant will promptly pay all amounts due. If percentage rent was overpaid, then Landlord will promptly refund to Tenant any overpayment.

20.  <u>MUTUAL WAIVER</u>.  Landlord and Tenant hereby release all claims and waive all rights of recovery against each other and their directors, officers, agents, employees, successors, sublessees or assigns, for any loss or damage to each party's respective property caused by or resulting from fire or other casualty of whatsoever origin even if caused by negligence, to the extent that the loss or damage is covered by insurance or is required by the terms of this Lease to be covered by insurance. However, nothing contained in this Paragraph will affect Landlord's obligation to repair or rebuild the Demised Premises as otherwise stated in this Lease. All policies insuring the property of Landlord or Tenant will contain a provision or endorsement by which the insurer waives

CRB



all rights of subrogation against the other party to this Lease and their directors, officers, agents, employees, successors, sublessees and assigns.

21. <u>SUBORDINATION TO MORTGAGES</u>. Upon Landlord's request, Tenant will sign, acknowledge and deliver to Landlord Tenant's standard form Subordination, Non-Disturbance and Attornment Agreement ("SNDA"). The SNDA will provide that this Lease will be subordinated to the lien of the mortgage or deed of trust ("Mortgage") that Landlord is placing on the Demised Premises, but that Tenant's rights under this Lease will not be impaired or diminished, its tenancy will not be disturbed or affected by any default under the Mortgage and in the event of foreclosure, this Lease will continue in full force and effect, and Tenant's rights, including any rights to extend the lease term will survive. During the term of this Lease, Tenant will provide one SNDA free of charge. Any subsequent SNDA provided by Tenant will be subject to a processing fee payable to Tenant. Landlord's request for any subsequent SNDA will be accompanied by Landlord's check in the amount of $300.00. Landlord agrees to provide to Tenant free of charge within 30 days after the date of this Lease an SNDA from every present Mortgage holder.

22. <u>HOLDING OVER</u>. If Tenant remains in possession of the Demised Premises after the expiration of the term of this Lease, then all the provisions of this Lease that are applicable during the final year of the lease term will continue to apply, except that Tenant will pay, as fixed rent, an amount equal to 115% of the monthly fixed rental payment due for the last month of the lease term immediately preceding the hold over and Landlord and Tenant will each have the right to terminate this Lease by giving written notice of termination. The effective date of termination will be 60 days after the termination notice is received by Landlord or Tenant, as applicable. Tenant will be in default if Tenant fails to vacate and surrender the Demised Premises to Landlord by the end of the 60th day after receiving Landlord's notice of termination. If Landlord desires that Tenant vacate the Demised Premises without holding over, Landlord may notify Tenant during the last year of the lease term (at least 60 days prior to the last day of the lease term) that no holding over will be permitted, and if after receiving that notice, Tenant fails to vacate the Demised Premises on or before the last day of the lease term, then Tenant will be in default. If Tenant is holding over and Tenant fails to vacate the Demised Premises within 60 days after Tenant's receipt of written notice to vacate from Landlord, then Tenant will pay, as liquidated damages, an amount equal to 150% of the monthly fixed rental payment due for the last month of the lease term immediately preceding the holding over, for as long as Tenant remains in possession of the Demised Premises, and Tenant will also begin to pay Tenant's full pro rata share of taxes ,common area maintenance charges and insurance costs, with no cap on such costs, instead of paying increases over the base amount.

23. <u>BROKERAGE</u>. Landlord agrees to pay to Wexler Commercial Real Estate Inc., a commission resulting from this Lease, pursuant to a separate written agreement. Landlord and Tenant each represent to the other that, in connection with the leasing of the Demised Premises, the party so representing has not dealt with any other real estate

CRB



Trevose#705440

broker, agent or finder, and there is no commission, charge or other compensation due on account of this Lease to any other broker, agent or finder. Each party will defend, indemnify and hold the other party harmless against and from any breach of this representation.

24. <u>PARKING AREA</u>. Landlord acknowledges that (i) convenient automobile access and parking for Tenant's customers and (ii) convenient access to the stockroom/receiving room delivery door by 18 wheel tractor-trailer vehicles is critical to the successful operation of Tenant's business. Landlord agrees not to build any buildings in the Shopping Center except as shown on Exhibit A - Site Plan, and that all area shown on Exhibit A as parking will always be devoted to marked, lighted, paved parking area. Landlord agrees that all entrances, exits, driveways and service areas will remain substantially as shown on Exhibit A. Landlord further agrees that the ratio of the number of paved, marked and lighted parking spaces for full size automobiles for each 1,000 square feet of building area in the Shopping Center will not be lower than the ratio that exists on the date of this Lease as shown on Exhibit A – Site Plan.

Provided Tenant is open and continuously operating, reasons of force majeure or if closed for remodeling or renovations excepted, Landlord agrees not to lease any space in the Shopping Center exceeding 5,000 square feet and within 100 feet of the Demised Premises for use as a theater; bowling alley; bingo parlor; game arcade or other entertainment facility; a bar, tavern, lounge or nightclub; any establishment featuring or selling as a substantial part of its business "adults only" or x-rated books, magazines, videotapes, video discs or novelties; a gym or fitness center; a car dealership or used car lot; a school, training facility or meeting hall; an office; or a restaurant except a fast food restaurant ("Parking Protection Restrictions"). This Paragraph will not apply to any tenant who has a valid lease with Landlord for space in the Shopping Center on the date of this Lease and is identified on Exhibit A - Site Plan, so long as the tenant operates a business permitted by its lease. To the extent Landlord has the right to object, Landlord agrees not to allow any tenant located within 100 feet of the Demised Premises to change its use to a use that is prohibited by this Paragraph. Notwithstanding the above, Tenant understands and agrees that the adjacent space to the Demised Premises is currently operated as a Planet Fitness and that such leasehold interest is exempt from the above stated Parking Protection Restrictions. Furthermore, with Tenant's consent, which will not be unreasonably withheld or delayed, the aforementioned Parking Protection Restrictions will not apply if Landlord plans to enter into a lease for a use that is prohibited by the Parking Protection Restrictions and said tenant(s)' primary parking and entrance for its customers will be in the rear of the Shopping Center and will not unreasonably impact the availability for convenient parking by Tenant's customers.

25. <u>NOTICES</u>. (a) All notices from Tenant to Landlord or Landlord to Tenant must be in writing to be effective. Notices sent via fax and e-mail will be effective between Landlord and Tenant, except that notices sent by Tenant pursuant to Paragraph 6, notices of default sent by either party including any notice intending to start a cure period

22

CRB



Trevose#705440

under Paragraph 14 or 17 or any notice sent to change the notice address of Landlord or Tenant must be sent to the address set forth below either by (i) United States mail sent via Certified Mail, Return Receipt Requested, or by (ii) commercial national delivery service capable of providing written proof of delivery. Any notice sent by certified mail or commercial delivery service will be deemed given when mailed even if the party to whom the notice is sent refuses to accept delivery.

As to Landlord:                    SCOTTSVILLE ASSOCIATE
                                   1105 Industrial Highway
                                   Southhampton, Pennsylvania 18966

As to Tenant:
   For U.S. Mail:                  Lease Administration Department
                                   FAMILY DOLLAR STORES OF PENNSYLVANIA, INC.
                                   Post Office Box 1017
                                   Charlotte, North Carolina 28201-1017

-or-

For Commercial                     Lease Administration Department
   Delivery:                       FAMILY DOLLAR STORES OF PENNSYLVANIA, INC.
                                   10301 Monroe Road
                                   Matthews, North Carolina 28105

Either Landlord or Tenant may change its notice address by giving written notice to the other party of the new address as provided in this Paragraph.

    (b) All rent and other payments will be made by Tenant's check payable to Landlord and mailed to Landlord at the address designated above unless Tenant elects to make payments to Landlord by direct deposit into Landlord's bank account. Tenant will not be obligated to pay rent to any person or entity other than Landlord until Tenant receives either: (i) a written statement signed by Landlord and reasonably acceptable to Tenant designating the person or entity to receive rent and, if applicable, providing notice of the transfer of Landlord's interest in the Demised Premises, or (ii) a copy of the deed signed by Landlord transferring ownership of the Demised Premises or a copy of an assignment of this Lease signed by Landlord. In order to be eligible for payment by direct deposit, Landlord must sign a form which Tenant will provide authorizing payment by direct deposit. If Tenant elects to make payments via direct deposit, then Tenant will deposit rent and other payments directly into the bank account specified by Landlord ("Landlord's Account"). Landlord will bear all risks arising out of Landlord's failure to provide correct information pertaining to Landlord's Account. Landlord agrees to provide written notice to Tenant canceling the direct deposit authorization at least 30 days prior to any assignment of rents payable under this Lease to a party other than Landlord, or any assignment of Landlord's interest in the Demised Premises. In the event Tenant deposits funds into Landlord's Account that Landlord is not entitled to whether due to Tenant's

23





Trevose#705440

error or any other cause, Landlord authorizes Tenant to make an adjusting debit entry to Landlord's Account up to the amount of the erroneously deposited funds, and if the account has been closed or lacks the funds to fully refund the erroneous deposit, then Landlord will repay to Tenant all sums paid to Landlord's Account in error.  Tenant may cancel or discontinue making payments by direct deposit at any time after notice to Landlord in which event Tenant will make rent and other payments by mail pursuant to subparagraph (a) of this Paragraph.  If Landlord desires to change Landlord's Account, then Landlord will provide Tenant with a new signed direct deposit authorization. Landlord acknowledges that changing the Landlord's Account may cause a delay in payment.  A payment will not be deemed to be late if it is delayed due to a change in Landlord's account.

26.  RECORDING.  Landlord agrees to execute a memorandum of lease or a short form lease (collectively "Short Form Lease") reasonably acceptable to Landlord and Tenant which Tenant may record, at its expense, in the appropriate office for the recordation of real estate conveyances for the county or other jurisdiction in which the Demised Premises are located.  Landlord will furnish an accurate legal description of the Demised Premises or the Shopping Center to record the Short Form Lease and Landlord will execute and deliver to Tenant any other affidavits, statements or documents needed to record the Short Form Lease.

After the expiration or other termination of this Lease and provided Tenant is no longer open and operating, Tenant will execute in recordable form and deliver to Landlord a statement that this Lease has been terminated, which statement will release Landlord and Tenant from all obligations arising under this Lease.  At Tenant's request, Landlord will also issue such statement to Tenant within thirty days of receipt of written request.

27.  QUIET ENJOYMENT.  Landlord covenants and warrants that Tenant, subject to its fulfillment of its obligations under this Lease, will have and enjoy during the term of this Lease the quiet and undisturbed possession of the Demised Premises together with all applicable appurtenances.  Rents and other charges due under this Lease will abate during any period of time Tenant is deprived of the use of the Demised Premises due to Landlord's negligence or a willful act of Landlord.

28.  COMPLIANCE WITH LAWS.  Landlord will, at Landlord's sole expense, comply with all requirements of all county, municipal, state and federal laws and regulations, now in force, or which may hereafter be in force, which pertain to the physical or environmental condition of the Shopping Center or the Demised Premises, including without limitation laws and regulations pertaining to disabled persons, asbestos, radon, hazardous substances and sprinkler systems, including the installation, maintenance, modification and monitoring of the systems.  Notwithstanding the above, Landlord will not be responsible for any building or fire code work that is expressly set forth on Exhibit B - Tenant's Anticipated Scope of Work.

24

CRB



From and after the Commencement Date, Tenant will, at Tenant's sole expense, comply with all of the requirements of all county, municipal, state and federal laws and regulations now in force, or which may hereafter be in force, which pertain to the manner in which Tenant operates its business in the Demised Premises, including Tenant's handling, storage, transportation, use and disposal of toxic, hazardous or flammable materials.

Tenant will indemnify Landlord against loss or damage resulting from the discharge or release of toxic or hazardous or flammable materials by Tenant in or on the Shopping Center. Landlord will indemnify Tenant against loss or damage resulting from the discharge or release of toxic or hazardous or flammable materials on the Shopping Center property if the discharge or release was caused by Landlord. In the event the Demised Premises or surrounding Shopping Center property is ever deemed to be unsuitable for retail use and the condition was not caused by Tenant or Landlord then Landlord is not under the obligation to defend or indemnify Tenant but, if Landlord is not able to facilitate a cleanup and remediation of the Demised Premises or surrounding Shopping Center, as applicable, within a reasonable period of time thereafter, then Tenant, without any recourse against Landlord, may terminate this Lease on written notice to Landlord.

29. PARAGRAPH HEADINGS; ETC. The numbered sections of this Lease are referred to as Paragraphs, and the phrase "this Paragraph" means the entire numbered Paragraph and not just a grammatical paragraph contained within a numbered Paragraph. The Paragraph headings throughout this Lease are for convenience and reference only, and will in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Lease. If any provision of this Lease is held to be invalid or unenforceable, then the remainder of this Lease will not be affected, and all other provisions will be valid and enforceable to the fullest extent permitted by law. If any words are stricken from this Lease, whether the words are preprinted, typewritten or handwritten, then no inferences will be drawn as to the parties' intent in striking the deleted words, and this Lease and the parties' intent will be interpreted as if the stricken words had never appeared. This Lease is a negotiated agreement in which Landlord and Tenant have had equal power in determining its terms, and Landlord and Tenant agree that any rule of construction that a document is to be construed against the party who prepared it will not be applied. The term "lease year" is a 52 week period ending on June 30. Any paper, writing or drawing that is designated as an exhibit to this Lease, whether or not physically attached, is a part of this Lease.

30. ASSIGNMENT/SUBLETTING. Tenant will have the right to assign this Lease or sublet the entire Demised Premises only with the Landlord's prior written consent, which consent will not be unreasonably withheld or delayed. Within 15 days after Tenant notifies Landlord of the prospective assignee's or subtenant's name and proposed use of the Demised Premises, Landlord will either approve or reject such assignee or subtenant by written notice to Tenant. If Landlord does not respond to Tenant's notice within the 15

25

CRB



day period, then Landlord will be deemed to have consented to the prospective assignee or subtenant.  When determining whether to grant its consent, Landlord may consider matters relating to the proposed use of the Demised Premises such as parking needs of the proposed assignee or subtenant, other tenant's exclusive use rights and tenant mix of the Shopping Center.  If Landlord unreasonably withholds its consent in connection with any requested assignment or subletting, then Landlord will have committed a material breach of this Lease and Tenant will be entitled to terminate this Lease and be released of its obligations hereunder.  Notwithstanding the foregoing, Tenant will not need Landlord's consent if Tenant assigns this Lease or sublets the Demised Premises to any corporation or other entity into or with which Tenant may be merged or consolidated or to any corporation or other entity which will be an affiliate, subsidiary, parent or successor of either Tenant or a corporation or other entity into or with which Tenant may be merged or consolidated, or to any person or entity acquiring ten or more of Tenant's stores.

Fifty percent of any additional monies paid to Tenant as a result of an assignment or sublease will be paid to Landlord as such additional monies are received by Tenant. "Additional monies" means any payment made to Tenant for the value of this Lease as consideration for an assignment or any base rent paid to Tenant under a sublease in excess of the rent due under this Lease, less, in the event of either an assignment or sublease, any brokerage, remodeling or other expenses incurred by Tenant and less any rent paid to Landlord during any period of time after Tenant closed its business in the Demised Premises.

31.  <u>ESTOPPEL LETTERS</u>.  Landlord and Tenant agree, from time to time at reasonable intervals, within 30 days after written request by the other party, to execute and deliver to the other party a statement certifying to any existing or prospective mortgagee, purchaser or assignee, that this Lease is in full force and effect, that this Lease has not been assigned, modified, supplemented or amended, that Tenant is in possession of the Demised Premises, and that to the best knowledge of the certifying party, the other party is not in default, or properly stating the facts if any of such certifications would not be factual, and stating the date through which fixed rent has been paid, the expiration date of the then current term and the number of remaining extensions of the term available to Tenant under this Lease.  Landlord's request for an estoppel letter should be sent to Tenant via e-mail to:  estoppel@familydollar.com.

32.  <u>NON-WAIVER</u>.  No waiver of any agreement, condition or covenant will be valid unless it is set forth in writing signed by the party to be bound by the waiver.  No waiver of a breach of any agreement, condition or covenant will be claimed or pleaded to excuse a subsequent breach of the same agreement, condition or covenant or any other agreement, condition or covenant.

33.  <u>ATTORNEYS' FEES</u>.  In the event of litigation between Landlord and Tenant, the prevailing party will be entitled to recover from the losing party reasonable attorneys' fees and reasonable out-of-pocket litigation expenses and court costs all as awarded by




the Court. A party who is awarded a money judgment will be considered to be the losing party if the amount awarded is less than the last written offer of payment or settlement made by the other party prior to or within 30 days after suit is filed. In addition, the Court may decide that there is no true prevailing party and that neither party is entitled to its attorneys' fees or litigation expenses.

34. JURISDICTION. This Lease will be construed and enforceable in accordance with the laws of the State where the Demised Premises are located. Any lawsuit brought by Landlord or Tenant against the other must be filed in a court of general jurisdiction where the rules of civil procedure for the State where the Demised Premises are located will apply.

35. LIMITATION OF LANDLORD'S LIABILITY. Landlord will have no personal liability with respect to any monetary obligations or liabilities arising under this Lease, and Tenant will look solely to (i) its right to offset against rent and other sums due Landlord and (ii) Landlord's interest in the Shopping Center or any portion thereof and the rents and income therefrom (and any insurance proceeds or condemnation awards) for the satisfaction of any damages of Tenant in the event of a default by Landlord of any of Landlord's obligations under this Lease; provided, however, the provisions of this Paragraph will be applicable only if all mortgagees holding mortgages or deeds of trust prior in lien to this Lease have executed non-disturbance agreements satisfactory to Tenant. Nothing in this Paragraph will be construed as a limitation on Tenant's right to pursue injunctive or other non-monetary relief against Landlord.

36. TAXPAYER IDENTIFICATION INFORMATION. The Internal Revenue Service ("IRS") requires Tenant to provide a name and Taxpayer Identification Number ("TIN") for each person or entity to whom Tenant makes payments. In order for Tenant to comply with this requirement, Landlord agrees that within 30 days after the date of this Lease, Landlord will provide to Tenant a completed W-9 Form with Landlord's TIN and the name that corresponds with the number. Further, if Landlord's TIN and corresponding name change at any time during the term of this Lease, then Landlord will provide an updated W-9 form to Tenant.

The IRS assesses a penalty to Tenant if Tenant fails to provide the required information or provides a TIN that does not match the name in the IRS' records. If Landlord fails to provide the required information to Tenant, or provides inaccurate information to Tenant, and as a result the IRS assesses Tenant with a penalty, then Tenant will have the right to deduct the amount of the penalty (up to $200.00) from the fixed rent due to Landlord. Tenant will show the deduction on the remittance advice provided with Tenant's rent check.

37. FORCE MAJEURE. If either Landlord or Tenant is delayed or hindered in or prevented from performing any act it is required to perform under the terms of this Lease

27





by reason of strikes, lock-outs, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other reason beyond the control of the party delayed, then the performance of the act will be excused for the period of the delay, and any time limit imposed by this Lease for the performance of the act will be extended for a period equivalent to the delay.  Notwithstanding the foregoing, (a) if the other party desires to perform the act required of the delayed party and is able to do so, then that party will have the right to perform the act and recover the reasonable costs from the delayed party; and (b) in no event will the time period for Landlord's delivery of the Demised Premises to Tenant pursuant to Paragraphs 4, 5 or 10 be extended pursuant to this Paragraph by more than 60 days.

38.  <u>FACSIMILE SIGNATURES</u>.  When this Lease is signed by Landlord or Tenant, Landlord or Tenant may deliver this Lease to the other party via electronic facsimile ("fax") or email.  Facsimile or electronic copies of signatures will be as valid and binding upon the parties as are original ink signatures.  If a party (referred to in the remainder of this Paragraph as the "Sender", whether Landlord or Tenant) who receives a signed lease from the other (whether the signed lease is an original document or an electronic facsimile) signs this Lease and returns via fax or other electronic means only the signature page of this Lease to the other party (referred to in the remainder of this Paragraph as the "Receiver"), then the sending of the signature page will constitute a declaration by the Sender that this Lease has been signed in the form and content received by the Sender without modification unless the Sender simultaneously notifies the Receiver that the Sender has made revisions to this Lease and sends the revised pages or a letter describing the revisions along with the signature page.  The facsimile or electronic signature will not be binding upon the parties if the Receiver notifies the Sender that the Receiver rejects any part of or all of the revisions made to this Lease by the Sender.  Without affecting the validity or finality of this Lease, the Receiver of a facsimile lease or signature page may request that the Sender sign and return one or more original counterparts of this Lease with the Sender's signature notarized and witnessed, or attested if applicable, and the Sender will promptly comply with the request.

39.  <u>CONFIDENTIALITY OF LEASE TERMS AND SALES INFORMATION</u>. Landlord agrees that all terms of this Lease as well as any information provided to Landlord pertaining to Tenant's gross sales are confidential and will not be divulged by Landlord without the written consent of Tenant to anyone other than Landlord's mortgagees or prospective mortgagees and to bona fide prospective purchasers of the Shopping Center.

40.  <u>BROKER</u>.  Landlord agrees to pay to Wexler Commercial Real Estate, Inc. a commission resulting from this Lease, pursuant to a separate written agreement. Landlord and Tenant each represents and warrants to the other that, in connection with the leasing of the Demised Premises hereunder, the party so representing and warranting has not dealt with any real estate broker, agent or finder, and there is no commission, charge or other compensation due on account of this Lease other than as stated above.

CRB 

Each party shall defend, indemnify and hold the other party harmless against and from any breach of this warranty or representation.

41. <u>ENTIRE AGREEMENT; BINDING ON SUCCESSORS</u>.  This Lease constitutes the entire agreement between Landlord and Tenant and all understandings and agreements between Landlord and Tenant are merged into this Lease.  This Lease may not be modified, amended or supplemented except by an agreement in writing signed by Landlord and Tenant.  All covenants and agreements of this Lease will extend to and be binding upon the heirs, devisees, executors, administrators, successors in interest and assigns of both Landlord and Tenant.

Landlord and Tenant have caused this Lease to be duly signed and sealed.

Witnesses:

_____

_____

LANDLORD
SCOTTSVILLE ASSOCIATE

By: _____

Title: _____

ATTEST:

_____
Thomas E. Schoenheit
Assistant Secretary

TENANT
FAMILY DOLLAR STORES
OF PENNSYLVANIA, INC.

By: _____
Robert L. Rogers
Vice President
Real Estate Development

STATE OF _____ *Pa.* _____

COUNTY OF _____ *Bucks* _____                    NOTARY

I, _JOYCE TROMBINO_, a Notary Public in and for the aforesaid State and
County, do hereby certify that _C. Ronald Bleznak_, personally appeared before me
this day and that by the authority duly given and on behalf of SCOTTSVILLE
ASSOCIATE, the foregoing instrument was signed and executed by him for the purposes
therein expressed.

WITNESS my hand and notarial seal this the 2th day of _November_, 2012.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JOYCE TROMBINO, Notary Public
Upper Southampton Twp., Bucks County
My Commission Expires July 5, 2016

_Joyce G. Trombino_
Printed Name: _JOYCE TROMBINO_
Notary Public

My Commission Expires: _7-5-16_

STATE OF NORTH CAROLINA
                                                 NOTARY
COUNTY OF MECKLENBURG

I, Georgina Maria Aguilera, a Notary Public in and for the aforesaid State and
County, do hereby certify that ROBERT L. ROGERS and THOMAS E. SCHOENHEIT,
Vice President-Real Estate Development and Assistant Secretary, respectively, of
FAMILY DOLLAR STORES OF PENNSYLVANIA, INC., personally appeared before me
this day and that by the authority duly given and as the act of the corporation, the
foregoing instrument was signed and executed by them for the purposes therein
expressed.

WITNESS my hand and notarial seal this the 6th day of November, 2012.

_Georgina Maria Aguilera_
Georgina Maria Aguilera, Notary Public

My Commission Expires: July 7, 2015



**EXHIBIT A - SITE PLAN**



BROWNSVILLE ROAD

PROPOSED
RITE AID

ANDREWS ROAD

SYCAMORE AVENUE

MAGNOLIA AVENUE

OAK AVENUE

Approximate Location
Of Pylon Sign

PAVED, MARKED AND
LIGHTED PARKING AREA

Bldg Sign "A"

PLANET FITNESS

FAMILY
DOLLAR
8,000 Sq. Ft.

100'

80'

Bldg Sign "A"

ENTRY

Approximate Location
Of Family Dollar
Dumpsters (3)

DELIVERY

PAVED AND LIGHTED SERVICE
AND ACCESS AREA

NORTH

705440
Trevose, PA
Approved OIDO
09/19/12

INITIAL
HERE
RHH

CRB



## EXHIBIT B
## Tenant's Anticipated Scope of Work

**Date:**  _Rev #2 10/15/12_

**1852 Brownsville Road**
**Trevose, PA**

**Project Number:**  _705440_    SDL

### DEFINITIONS

* The 'Demised Premises' means the property or space located at 1852 Brownsville Road, Trevose, PA

* Family Dollar and FDS mean the tenant identified in the lease.

* A.F.F. means above the finished floor.

* LEFT refers to the left side of the Demised Premises when standing at the storefront and looking into the rear of the space. Right refers to the right side of the Demised premises when standing at the storefront and looking in to the rear of the space.

* Family Dollar's ("FDS") Representative during construction will be the Construction Project Manager, Family Dollar Stores, P.O. Box 1017, Charlotte, NC 28201.

* A Division Heading with no entries underneath means that no work is to occur under that Division Heading.

### Attachments:
The Following are collectively referred to as the "Plan"

| | | |
|---|---|---|
| Site Plan - | Dated: | Attached |
| Floor Plan- | Dated: | To be Supplied by FDS |
| Lighting Plan- | Dated: | To be Supplied by FDS |
| Merchandise Plan - | Dated: | To be Supplied by FDS |
| Fixture Plan - | Dated: | To be Supplied by FDS |
| Architectural Plans - | Dated: | To be Supplied by FDS |

*INITIAL HERE* RHU    CRB

**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

## GENERAL NOTES

*   All work will be completed in a good workmanlike manner and in compliance with applicable governmental codes ("Code").

*   Prior to applying for any building permits or other governmental approvals, FDS's Architect will prepare all Plans and Specifications required for the acquisition of said building permits or other governmental approvals.

| DIVISION 1 - GENERAL REQUIREMENTS |
| --- |

YES   * Pressure wash the front exterior of the building, ensuring it is clean and free of debris of any kind.

| DIVISION 2 - SITE CONSTRUCTION |
| --- |

YES   * Provide and install bollards 6" in diameter by 48" tall as required per the Plan. Bollards are to be painted safety red.

YES   * Remove all existing signage including all associated piping, wiring, brackets and mountings from the exterior of the Demised Premises.

YES   * Remove all interior partitions from the Demised Premises to provide a clear space throughout that is ready for new finishes.

YES   * Remove existing mezzanines, stairwells to mezzanines, pharmacy areas (to include partitions, soffits, platforms, dropped ceilings, plumbing, HVAC, sprinkler and electrical installations) and raised platforms (to provide a level floor).

YES   * Remove existing exterior door(s) as noted on the plan and infill with block and paint to match adjacent exterior wall.

YES   * Remove existing column covers.

YES   * Remove existing flooring as indicated. Notify FDS if subfloor is structurally unsound.

YES   * Remove existing ceiling grid.

YES   * Cap off all plumbing lines, which are not to be reused as directed by FDS's Construction Project Manager, flush with adjacent surfaces.

YES   * Cap off electrical and gas service and remove ductwork to the existing York 3-ton HVAC unit Model # ZF036N08PP2DBA1A leaving the unit on the roof.

YES   * Cap off or terminate all electrical distribution lines, which are not to be reused as determined by FDS' Construction Project Manager, flush with adjacent surfaces.

YES   * Remove all lighting fixtures throughout the Demised Premises in preparation for installation of new FDS specified lighting.

*CRB* *RHU* (initial here)

**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

YES   * Remove alarm panel and components not to be reused as determined by FDS's Construction Project Manager.

YES   * Remove excess phone equipment and related wiring not to be reused.

## DIVISION 3 - CONCRETE
YES   * Patch and repair interior concrete floor.

## DIVISION 4 - MASONRY
## DIVISION 5 - METALS
YES   * Provide and install a metal awning over the delivery door.

YES   * Provide and install metal flashing on perimeter walls of demised premises for rodent control.

## DIVISION 6 - WOOD AND PLASTICS
YES   * Supply and install a fire rated 48" x 96" x 3/4" CDX communication board for use by demark connection and outside installer.

YES   * Supply and install two adjustable shelves over each toilet.

## DIVISION 7 - THERMAL AND MOISTURE PROTECTION
## DIVISION 8 - DOORS AND WINDOWS
YES   * Provide and install a new 3/0 x 7/0 outswing door with peepsite, door closer, weatherstripping and door sweep. Door to have no exterior knobs or handles.

YES   * Weld shut and caulk to seal existing exterior door(s) that are not to be used.

YES   * Verify that existing overhead doors and security gates, if any, are in proper operational condition.  Make any repairs necessary to make operational.  Install brush style door sweeps on exterior doors.

YES   * Install Detex - Model #V4001 and Model #EAX500 security alarm and bar on exterior door.

YES   * Install window film on inside of storefront glass to cover all glass except for 30'-0" wide. Install tint on storefront glass up to 7' A.F.F. if the remaining exposed glass is 11" or more. Otherwise, tint the entire height of the glass for that section that receives tint.

YES   * Install window medallions on inside of storefront glass.

YES   * Provide and install 6' wide x 7' high Eliason Hi Impact Double Swing Doors in wall separating the sales area from Sales Support.

YES   * Provide and install 3/0 x 7/0 door with closure, push/pull plates and deadbolt.

YES   * Provide and install 3/0 x 7/0 door with peepsite, deadbolt, storeroom lockset and door closure.

CRB

**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

| | | **DIVISION 9 - FINISHES** |
|---|---|---|

YES   &ast;   Construct a new Sales Support partition wall with 3-5/8" metal stud framing with 5/8" fire rated gypsum board each side, airtight to roof deck.

YES   &ast;   Construct a new partition wall with 3-5/8" metal stud framing with 5/8" fire rated gypsum board each side, airtight to roof deck.

YES   &ast;   Construct complete Toilet Room(s) with walls (3-5/8" metal stud framing with 5/8" fire rated gypsum board on both sides) and ceiling.  All work will be in compliance with Code and conform to ADA standards.

YES   &ast;   Install FRP on all restroom walls.  Install FRP behind mop sink and water cooler areas. All areas of FRP to be installed up to 4' above floor with trim cap on top and sides.

YES   &ast;   Provide blocking in walls for Electric Hand Dryer and shelving in Toilet Rooms.

YES   &ast;   Construct Manager's Office complete with walls (3-5/8" metal stud framing with 5/8" fire rated gypsum board on both sides) and ceiling.

YES   &ast;   Patch and point up existing drywall finish to prepare for paint.

YES   &ast;   Provide and install furring strips around the sales floor perimeter walls. Paint all wood furring strips to match drywall

YES   &ast;   Frame and finish new 6' x 7' cased opening in the Sales Support wall for new double swing door.

YES   &ast;   Frame and finish new 4' x 7' cased opening as located on the plans.

YES   &ast;   Install Security Monitor Bracket.

YES   &ast;   Repair sub-floor surface as necessary (using a Portland Base Product) to provide a smooth, level surface.

YES   &ast;   Provide and install new vinyl composition floor tile throughout the Sales Area (provide transition strip as required to ensure smooth transition at all openings). Ensure that subfloor surface is smooth and level.

YES   &ast;   Provide and install new sheet vinyl with flash coving in Managers Office (provide transition strip as required to ensure smooth transition at all openings).

YES   &ast;   Provide and install new sheet vinyl with flash coving in Toilet Rooms (provide transition strip as required to ensure smooth transition at all openings).

YES   &ast;   Provide and install new sheet vinyl with flash coving in Toilet Room Vestibule (provide transition strip as required to ensure smooth transition at all openings).

YES   &ast;   Provide and install 4" Black cove base on all wall surfaces to receive paint from floor to ceiling, including all interior Sales Floor columns.

YES   &ast;   Seal Sales Support floor with Clear Acrylic Sealer.

CRB

**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

YES   *   Provide and install a complete new suspended grid ceiling throughout the Sales Area.

YES   *   Patch all holes where signage has been removed to match existing adjacent surfaces and paint.

YES   *   Paint corner of Curb 'Safety Yellow' along FDS storefront width of the store.

YES   *   Paint all walls on the Sales Floor from floor to ceiling.

YES   *   Paint structural poles/columns.

YES   *   Paint interior Sales Support walls.

YES   *   Paint interior of Toilet Room(s) walls, including doors and frames inside and out.

YES   *   Paint interior of Vestibule(s) and/or Corridor(s) walls, including doors and frames inside and out.

YES   *   Paint interior of Office walls, including doors and frames inside and out.

YES   *   Paint a 1'-0" wide stripe around the perimeter of the Sales Support floor.

| **DIVISION 10 - SPECIALTIES** |
| --- |

YES   *   Provide and install stainless steel restroom grab bars per ADA requirements.

YES   *   Provide and install mirror and toilet paper holder.

YES   *   Provide and install wall hung soap dispenser.

| **DIVISION 11 - EQUIPMENT** |
| --- |
| **DIVISION 12 - FURNISHINGS** |
| **DIVISION 13 - SPECIAL CONSTRUCTION** |

YES   *   Provide and install any/all necessary fire sprinkler monitoring systems (for monitored and non-monitored systems) including all alarm devices including, but not limited to, strobes, audio and sensors, in accordance with any/all local or state fire detection requirements.

| **DIVISION 14 - CONVEYING SYSTEMS** |
| --- |
| **DIVISION 15 - MECHANICAL SYSTEMS** |

YES   *   Provide and install floor mounted high efficiency water closet in each toilet room.

YES   *   Provide and install wall hung sink with metering centerset faucet in each toilet room.

YES   *   Furnish and install a new mop sink, faucet with vacuum breaker and all related plumbing. Install FRP to 4'-0" A.F.F. behind sink.

CRB

YES   \*   Install Hi/Lo electric water cooler. Install FRP to 4'-0" A.F.F. behind water cooler.

YES   \*   Furnish and install a new 10 gallon (max.) water heater with all related plumbing and electrical work. Include drain, overflow pan and drain lines as required by Code.

YES   \*   Provide and install 3" sewer line. This includes any saw cutting, demolition, removal, disposal and pour back of any associated concrete or asphalt.

YES   \*   Install new Gas Heater in Sales Support at loading door. Unit should face rear door.

YES   \*   Provide and install new ductwork, grilles and vents into the Manager's Office.

YES   \*   Provide and install new ductwork, grilles and vents into the Restrooms.

YES   \*   Provide and install an exhaust fan for each restroom.

YES   \*   Provide and install new ductwork, grilles and vents in Sales Support.

YES   \*   Provide and install new ductwork, grilles and vents in Vestibules(s) and/or Corridor(s).

YES   \*   Provide and install a Duct Smoke Detection System to meet Code.

YES   \*   Rework existing ductwork to balance distribution of air as required.

YES   \*   Provide and install any/all necessary fire sprinkler monitoring systems (for monitored and non-monitored systems) including all alarm devices including, but not limited to, strobes, audio and sensors, in accordance with any/all local or state fire detection requirements.

---

**DIVISION 16 - ELECTRICAL**

YES   \*   Install new 4' T-8 120v fluorescent light fixtures.

YES   \*   Install new 8' T-8 120v fluorescent light fixtures.

YES   \*   Install a new 60 watt LED light fixture at the rear door. Light to be operated by a switch on the interior of the Demised Premises.

YES   \*   Install Emergency Exterior Light(s) at exit door(s).

YES   \*   Install LED combo exit sign emergency wall pack with 2 Adjustable heads.

YES   \*   Install new battery pack(s) for a standard in-line T-8 Fluorescent light fixture.

CRB

YES  ∗  Provide and install  a (1') one foot piece of 3" conduit running through the Sales Support wall at (3) three locations.  All three pieces must be located 12" above the ceiling.  One piece must be centered on the wall and the other two pieces must be located 5' from the left and right demising walls.  Said conduit should be fire caulked and capped, as required by code, for future use by FDS.

YES  ∗  Furnish and install duplex IG electrical receptacle at new Communication Board.

YES  ∗  Provide and install a duplex convenience electrical receptacle for electric water cooler.

YES  ∗  Furnish and install electrical circuit for the Sales Support heater located at the rear door according to the following schedule:  Gas Heater 20 amp, Electrical 3 phase 30 amps, Electrical single Phase 50 amps.

YES  ∗  Furnish and install duplex convenience electrical receptacle for electric water heater.

YES  ∗  Furnish and install Quad 20 amp convenience electrical receptacle for break area in stockroom.

YES  ∗  Provide one (1) blank duplex receptacle box (w/pull string) with 1" conduit run up through wall to above the ceiling.  If the office is located in Sales Support, run conduit up wall and penetrate through Sales Support wall.  Provide proper Fire Sealant as required per code with end cap.  Install next to phone box in Manager's office for future use by FDS.

YES  ∗  Furnish and install one (1) convenience circuit, one (1) dedicated circuit with isolated ground and one (1) phone connection with duplex jack in Manager's Office.

YES  ∗  Furnish and install wiring and hookup for one (1) dedicated circuit with isolated ground at location indicated for security monitor. Circuit shall be terminated at a junction box above Sales Area ceiling with final connection made to duplex receptacle.

YES  ∗  Furnish and install duplex convenience electrical receptacle located per the Plan.

YES  ∗  Furnish and install duplex convenience electrical receptacle located on column(s) per the Plan.

YES  ∗  Furnish and install weatherproof receptacle at storefront.

YES  ∗  Furnish and install wiring and hookup for each cashier's module including convenience circuit and dedicated circuit with isolated ground.  Circuits must be terminated at a junction box above the ceiling with final connection made to special Plug-in 'Green and Brown Pigtail' connectors. Provide and install a 10' whip to plug.

CRB

**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

YES   *   Furnish and install wiring and hookup for Promotional Outlet. Circuit shall be terminated at a junction box above Sales Area ceiling with final connection made to special Plug-in 'Brown Pigtail' connector. Provide and install a 10' whip to plug.

YES   *   Furnish and install wiring and hookup for Refrigerated Drink Box. Circuit must be terminated at a junction box above Sales Area ceiling with final connection made to special Plug-in 'Brown Pigtail' connector. Provide and install a 10' whip to plug.

YES   *   Furnish and install wiring and hookup for one (1) dedicated circuit with isolated ground above ceiling at Storefront Doors for future security system. Circuit must be terminated at a junction box above Sales Area ceiling with final connection made to special Plug-in 'Green Pigtail' connector.

YES   *   Furnish and install wiring and hookup for Unicru at storefront. Circuit must be terminated at a junction box above Sales Area ceiling with final connection made to special Plug-in 'Green Pigtail' connector. Provide and install a 10' whip to plug.

YES   *   Furnish and install wiring and hookup for ATM Machine at storefront. Circuit must be terminated at a junction box above Sales Area ceiling with final connection made to special Plug-in 'Green Pigtail' connector. Provide and install a 10' whip to plug.

YES   *   Furnish and install wiring and hookup for dedicated 115/208v circuits for Cooler and Freezer Compressors.

YES   *   Furnish and install wiring and hookup dedicated 115/208v circuits for Coolers and Freezers.

YES   *   Furnish wiring and make final hookup for Demised Premises building sign(s) complete with photocell.

YES   *   Furnish wiring and make final hookup for Pylon Sign complete with photocell.

YES   *   Furnish wiring and make final hookup for under canopy sign complete with photocell.

YES   *   Provide and install photocell(s) for the control of the lights and signs.

YES   *   Provide and Install a Door Buzzer at the Delivery Door.

YES   *   Install electric hand dryer and make final electrical connections.

YES   *   Install Venstar system. System to control all Lighting and HVAC units and to be located adjacent to Electrical Panels.




**EXHIBIT B – TENANT'S ANTICIPATED SCOPE OF WORK**

10401 MONROE ROAD
MATTHEWS, NC 28105

| | | |
|---|---|---|
| **NEW STORE** | | |
| **REVISIONS** | | |
| **PROJECT #:** 705440 | **LOCATION:** TREVOSE, PA | |
| **STORE #:** 0000 | **DESCRIPTION:** FLOOR PLAN | **FORMAT:** XSMALL |

**FAMILY DOLLAR**

**PIGTAIL LIST**

**QTY & ITEM # OF D & P PLUGS**

MONITOR PLUG, BROWN, WITH DUPLEX (5XXXM5X4F)

**EXHIBIT C - SIGNS**

# PREFERRED SIGNAGE
## REPLACEMENT FACES



**COLORS**
FACE BKGD.: #437 UNIQUE RED (LACRYL)
'FAMILY': #437 UNIQUE RED (LACRYL)
'DOLLAR': #165 (PMS)ORANGE
'@': ORANGE #165 (PMS)

**REPLACEMENT FACES**
with copy equal to or greater than 11"



**Corporate Headquarters**
6434 Burnt Poplar Road, Greensboro, NC 27409
Phone 800-967-2553  Fax 336-668-7875

*Because Image
Is Everything*



CRB



BEFORE

AFTER

Code: NTE 6% of facade area. Calculate facade area by using total length and total height of building.
LL Recommendation: There is potential for a variance when using the following parameters 25F of sign per 1LF of frontage.
Variance Likelihood: Fair
Variance Cost Estimate: $1,500.00
Variance Time Frame: 2 months

455"

190.5"

185"

48"

CAP OVER FACES

.177 POLY RED #2157

.177 POLY ORANGE #2119

.063 WHITE ALUM. TAB
FOR REGISTER MARK

**Everbrite**

DISCLAIMER: Renderings are for graphic purposes only and not intended for actual construction dimensions. For windload requirements, actual dimensions and mounting data, please refer to engineering specifications and shop drawings.
These drawings and designs are the exclusive property of Everbrite, Inc. Use of or duplication in any manner without express written permission of Everbrite, Inc. is prohibited.

Customer: FAMILY DOLLAR

Description: Replace existing sign w/ 48" Channel Letter Set

Customer Approval: NOTE: Unless specified by customer, all depth of embossing will be determined by Everbrite Engineering or existing customer specifications on file. Colors and graphics on file will be used unless otherwise specified by customer.

| | |
|---|---|
| Project No: 282915-3 | Scale: NTS |
| Date: 6/4/12 | Drawn By: DB |
| Location & Site No: Family Dollar 1852 Brownsville Rd Trevose, PA | FDO705343-1 |

Revised:

Revised:

Revised:

Please read carefully, check appropriate box and fax back to Everbrite.

☐ Sketch OK as is
☐ New sketch required

SIGNATURE                              DATE

EXHIBIT C - SIGNS

CRB



BEFORE

AFTER

Code: NTE 6% of facade area. Calculate facade area by using total length and total height of building.
LL Recommendation: There is potential for a variance when using the following parameters 25F of sign per 1LF of frontage.
Variance Likelihood: Fair
Variance Cost Estimate: $1,500.00
Variance Time Frame: 2 months

48"

190.5"

.177 POLY RED #2157

455"

CAP OVER FACES

185"

.177 POLY ORANGE #2119    .063 WHITE ALUM. TAB
FOR REGISTER MARK

DISCLAIMER: Renderings are for graphic purposes only and not intended for actual construction dimensions. For windload requirements, actual dimensions and mounting
detail, please refer to engineering specifications and shop drawings.
These drawings and designs are the exclusive property of Everbrite, Inc. Use of, or duplication in any manner without express written permission of
Everbrite, Inc. is prohibited.

**Everbrite**

| | |
|---|---|
| Customer: FAMILY DOLLAR | |
| Project No: 282915-3 | Scale: NTS |
| Date: 6/4/12 | Drawn By: DB |
| Location & Site No: Family Dollar 1852 Brownsville Rd Trevose, PA | FDO705343-1 |

Description: Replace existing sign w/
48" Channel Letter Set

Revised:

Revised:

Revised:

Customer Approval: NOTE: Unless specified by customer, all depth of embossing will be
determined by Everbrite Engineering or existing customer specifications on file. Colors and graphics
on file will be used unless otherwise specified by customer.

Please read carefully, check appropriate box and fax
back to Everbrite.

☐ Sketch OK as is
☐ New sketch required

SIGNATURE                    DATE

EXHIBIT C - SIGNS

## EXHIBIT D - EXCLUSIVE USE PROVISIONS

### RHINO BENSALEM T/A PLANET FITNESS
#### Use.

(a)   Tenant may use and occupy the Premises for a gym and fitness center and any legal activities reasonably related to or arising in connection with the conduct of such permitted businesses (the "Permitted Use"). Such Permitted Use shall include, but not be limited to, cardiovascular, strength and free weight training, and other legal activities incidental to health club membership, provided that such incidental activity(ies) complies with applicable zoning and does not conflict with rights of tenant under any other lease at Center. Tenant may also, without any right of exclusivity, maintain refrigerated units within the Premises containing pre-bottled soft drinks and juices and a snack counter, containing pre-packaged snack or nutritional bars and offer tanning and massage services for the comfort and convenience of Tenant's members.   No other use is permitted unless hereinafter approved in writing by Landlord, such approval not to be unreasonably withheld, conditioned or delayed.

(b)   Tenant has the right at any time to change its trade name without the Landlord's consent.

### Tenant's Exclusive Right to Operate.
Subject to (a) Tenant (i) being free of default,and (ii) open and operating its business for Permitted Use continuously, and (b) the rights of other tenants under existing leases, Tenant shall have the sole and exclusive right to operate its business for Permitted Use within the Center and Landlord hereby agrees and acknowledges that Landlord shall hereinafter be strictly prohibited from entering into a new lease or sublease, or allowing any other tenant with the Center to enter into a lease or sublease, with any entity or person that operates a business that is similar, in manner, to Tenant's Permitted Use or that engages in activities defined as a Permitted Use.  Any breach of this provision by Landlord shall be deemed a material default of this Lease and Tenant shall be allowed and entitled to pursue any and all remedies available to Tenant at law or in equity, including, but not limited to, injunctive relief. Tenant agrees that Tenant's exclusive rights shall not apply to any business involving (a) martial arts and/or cardio kickboxing training and/or competition, and/or (b) weight loss and/or maintenance provided that such weight loss and/or maintenance operation does not use exercise equipment within space leased from Landlord. Furthermore, Tenant agrees that its sole and exclusive right to operate within Center for Permitted Use, subject to the above limitations,  shall expire if and when Tenant fails to  timely exercise the then next available option to extend Term pursuant to the terms of Paragraph 38 hereof.

### TREVOSE DONUT T/A DUNKIN DONUT
USE OF LEASED PREMISES:     Tenant shall use the Leased Premises, subject to the provisions of the General Lease Provisions attached hereto, primarily as a donut, coffee, and breakfast sandwich shop. Tenant shall principally operate Leased Premises as a Dunkin Donuts containing a minimum of 2,000 sf within Leased Premises.  In addition to a Dunkin Donuts, as a secondary use only, and subject to the provisions of Paragraph 13



CRB

hereof and the reasonable approval of Landlord, Tenant shall also have the right to use the Leased Premises for another Dunkin Brands  establishment,  excluding Togos, provided that said secondary use operates within 1,200 sf or less of Leased Premises. Tenant represents that Tenant is an authorized Franchisee of Dunkin Brands, and has received all applicable approvals from its Franchisor for use of Leased Premises. As long as Tenant (i) is not in default of the terms of the Lease and/or (ii) has not failed to exercise any then available option, Landlord shall not enter into any new lease with anyone not currently a tenant at Shopping Center for any primary use as a coffee, donut and breakfast sandwich shop throughout the Shopping Center ("Landlord Restriction"). Landlord and Tenant specifically agree, however, that said Landlord Restriction shall not apply to, nor prohibit future tenant use within Shopping Center as (a) a family style and/or sit down restaurant, serving coffee, donuts and/or breakfast, (b) a bakery, where less than 25% of its gross sales are attributable to sales of donuts, or (c) a supermarket.

## RITE AID

### Article IX. Exclusive

Landlord agrees not to permit any property owned or otherwise controlled by Landlord (or any entity by which Landlord has a controlling interest) ("Landlord's Controlled Property") within one (1) mile of the Premises (the "Exclusive Area") to be used for the conduct of any store, business, trade or profession which (i) requires or has a license or permit to conduct a pharmacy or which employs or is required to employ a registered or licensed pharmacist, or (ii) for the conduct of any store, business, trade or profession which is called, labeled, named or commonly known or referred to as a drug store, pharmacy or apothecary (collectively, "Drug Store Restriction") or (iii) for the sale of health aids (including without limitation over the counter medications, vitamin supplements, mineral supplements and medical equipment) (the "Health Aid Restriction"), (iv) or for the sale of beauty aids (including, without limitation, hair care products and cosmetics) (the "Beauty Aid Restriction") [Drug Store Restriction, Health Aid Restriction, and Beauty Aid Restriction are collectively referred to as "Rite Aid Exclusive".] Notwithstanding the foregoing, it is expressly acknowledged that the Rite Aid Exclusive set forth herein shall not restrict any "incidental" use for the Health Aid Restriction and Beauty Aid Restriction. "Incidental" sale at retail is defined herein as less than ten percent (10%) of such other user's total area within their premises.

Landlord shall have the right to terminate Tenant's lease if Tenant violates any of the exclusives granted to another tenant in the shopping center, and Tenant does not cease and desist from violating such exclusive use(s) within thirty (30) days of receipt of written notice from Landlord.





**PENNSYLVANIA LIQUOR CONTROL BOARD**
Sale of Wine and Spirits

**EGO HAIR STUDIO**

8. USE OF LEASED PREMISES: Tenant shall use the Leased Premises, subject to the provisions of the General Lease Provisions attached hereto, solely as a hair and nail salon, as permitted by Lower Southampton Township. No other use is permitted. Subject to Tenant not being in default hereunder, Landlord agrees, throughout the term of this Lease, not to enter into any new leases granting a future tenant the right to primarily use space within Shopping Center as a hair or nail salon.







## EXHIBIT E
## Landlord's Scope of Work

Date: _____ *Rev #2 10/15/12* _____

### 1852 Brownsville Road
### Trevose, PA

Project Number: _____ *705440* _____  SDL

## DEFINITIONS

* The 'Demised Premises' means the property or space located at 1852 Brownsville Road, Trevose, PA

* Family Dollar and FDS mean the Tenant identified in the lease.

* A.F.F. means above the finished floor.

* LEFT refers to the left side of the Demised Premises when standing at the storefront and looking into the rear of the space. Right refers to the right side of the Demised premises when standing at the storefront and looking in to the rear of the space.

* A Division Heading with no entries underneath that no work is to occur under that Division Heading.

* Family Dollar's ("FDS") Representative during construction will be the Construction Project Manager, Family Dollar Stores, P.O. Box 1017, Charlotte, NC 28201

### GENERAL NOTES

* All work will be completed in a good workmanlike manner and in compliance with all applicable governmental codes ("Code").

* There will be no changes to or deviations from the requirements of this Exhibit or the attached Plan unless the changes or deviations are approved in writing by FDS prior to the work being done.



CRB

**EXHIBIT E – LANDLORD'S SCOPE OF WORK**

* The Demised Premises must be clear of any existing permitting or licensure issues on file with any Federal, State, or Local governmental authorities that would prevent FDS from obtaining any permits, certificates, or licenses pertaining to the operation of FDS business or improvements to the Demised Premises prior to FDS possession.  Specifically, LL is responsible to close, finalize, and have signed off any and all open permits.   LL is also responsible to address and clear any and all violations on record with any Federal, State, or Local governmental authorities prior to FDS possession. Written documentation must be provided to the FDS Construction Project Manager.

## WARRANTIES

* LL will provide all manufacturer warranties for new equipment or material installed in this project to FDS.

* LL will test all HVAC units for heat and air conditioning prior to FDS possession of space.

* Separate meter is noted as an individual meter to FDS space --NOT SUB-METERED--

* LL will warrant all labor and construction for one year after the date FDS takes possession of Demised Premises.

| **DIVISION 1 - GENERAL REQUIREMENTS** |
| --- |
| **DIVISION 2 - SITE CONSTRUCTION** |

YES    * Provide for one van accessible disability parking space in close proximity to the Accessible Path to the Demised Premises by painting one parking space as Disability Parking (8' wide minimum) and painting one 8' wide access aisle directly adjacent to this space.

YES    * Provide a Reserved Parking sign (Van Accessible, if applicable), on a pole (60" A.F.F. to bottom of sign) for each Disability Parking Space provided.



CRB

**EXHIBIT E – LANDLORD'S SCOPE OF WORK**

YES    *    Remove existing load bearing walls to the extent required to accommodate the exterior storefront modifications to be performed by LL in accordance with the plans prepared by the LL's architects. A structural engineer must be hired (as part of LL's costs) to field visit the site and provide a set of sealed structural engineered plans.  The engineer will be required to make site visits to insure the work is being completed as per the engineer's specifications. This work must: (i) shore up the structure above and provide column and beam support as required to maintain the structural integrity of the Demised Premises; (ii) conform to Code; and (iii) conform to the structural engineer's requirements.  Upon completion of the work, the structural engineer will provide a stamped and sealed letter indicating the work complies with the structural engineer's specifications. This letter will be given to FDS' Construction Project Manager.

**DIVISION 3 - CONCRETE**

**DIVISION 4 - MASONRY**

**DIVISION 5 - METALS**

YES    *    Provide and install structural steel and footings per the structural engineered plans and to meet Code in accordance with the plans prepared by the LL's architect for the proposed exterior storefront modifications by LL.

**DIVISION 6 - WOOD AND PLASTICS**

**DIVISION 7 - THERMAL AND MOISTURE PROTECTION**

YES    *    Per the roof report, make repairs to roof, flashing, gutters and downspouts as required to put in watertight condition.

**DIVISION 8 - DOORS AND WINDOWS**

YES    *    Remove existing storefront wall.  Construct new aluminum and glass storefront to match existing in location indicated on the Plan.  Provide drawings indicating method of support and installation.

YES    *    Furnish and install new outswing entrance and exit doors.  Include exterior keyed lock with interior thumb turn.  Door must include weather-stripping and Sealeze (C380CLA06AL) door sweep.

YES    *    Provide and install aluminum 1-1/4" crash bars on the interior and exterior of each door store front door.  Bars should be attached at 21" A.F.F.

YES    *    Replace storefront door closures (KAWNEER 'Husky II' W. 105 deg. Hold open).  Closure must not exceed ADA code of 10 lb. – 15 lb. opening force.

**DIVISION 9 - FINISHES**

YES    *    Extend storefront canopy to left end of building in order to cover new storefront.

**DIVISION 10 - SPECIALTIES**

**DIVISION 11 - EQUIPMENT**

**EXHIBIT E – LANDLORD'S SCOPE OF WORK**

CRB

| DIVISION 12 - FURNISHINGS |
| --- |
| DIVISION 13 - SPECIAL CONSTRUCTION |
| DIVISION 14 - CONVEYING SYSTEMS |
| DIVISION 15 - MECHANICAL SYSTEMS |

YES    *   Prior to turnover of the space to FDS, the General Contractor with have all of the supply and return grilles cleaned for the entire space.

| DIVISION 16 - ELECTRICAL |
| --- |

YES    *   Provide and install new undercanopy down light(s). Layout per the Plan.



**EXHIBIT E – LANDLORD'S SCOPE OF WORK**

LEGAL DESCRIPTION

TREVOSE SHOPPING CENTER

ANDREWS & BROWNSVILLE ROADS, TREVOSE, PA

All that certain tract of land situate in the Township of Lower Southampton, County of Bucks, Commonwealth of Pennsylvania being known as Lot 1 as shown on the minor subdivision plan of Parcel B, Scottsville Industrial Park prepared by Tri-State Engineers & Land Surveyors, Inc., 530 Street Road, Southampton, Pa , bounded and described as follows:

BEGINNING at a point, a corner on the northwesterly side of Brownsville Road as widened, said point being the northeasterly point of curve of the northerly radius corner at the intersection of Brownsville Road as widened and Andrews Road ( 50.00 foot wide ); thence from the said point of beginning and along the northeasterly side of Andrews Road the six following courses and distances, viz:

(1) By a curve to the right in a southwesterly direction having a radius of 40.00 feet and for the arc distance of 62.60 feet to a point of tangency; thence

(2) N 52 degrees 58 minutes West 332.77 feet to a point of curve; thence

(3) By a curve to the left in a northwesterly direction having a radius of 200.00 feet and for the arc distance of 15.82 feet to a point of tangency; thence

(4) N 57 degrees 30 minutes W 65.84 feet to a point of curve; thence

(5) By a curve to the right in a northwesterly direction having a radius of 1000.00 feet and for the arc distance of 79.38 feet to a point of tangency; thence

(6) N 52 degrees 57 minutes 6 seconds W 234.14 feet to a point a corner on Lot 2 on the above mentioned minor subdivision plan; thence along the said Lot 2 and crossing a 20.00 foot wide easement N 37 degrees 2 minutes 54 seconds E 471.18 feet to a point a corner in line of Section 2 of the Neshaminy Falls Building Lots said point being on the northeasterly side of the aforesaid 20.00 foot wide easement; thence along line of Section 2 of the Neshaminy Falls Building Lots and along the northeasterly side of the said 20.00 foot wide easement S 53 degrees 12 minutes 47 seconds E 479.50 feet to a point a corner; thence continuing along the same  S  53 degrees  6 minutes E 290.50 feet to a point a corner on the northwesterly side of Brownsville Road as widened, aforesaid; thence along the northwesterly side of Brownsville Road as widened and recrossing the said 20.00 foot wide easement S 37 degrees 22 minutes W 425.26 feet to the point and place of beginning.

CONTAINING 8.2445  ACRES

The "Demised Premises" being leased by Family Dollar Stores of Pennsylvania, Inc. consists of an approximate 8,000 square foot building located within the Trevose Shopping Center.

STATE OF NORTH CAROLINA

GUARANTY

COUNTY OF MECKLENBURG

On the date hereof, FAMILY DOLLAR STORES OF PENNSYLVANIA, INC.

("Tenant") has entered into a lease with SCOTTSVILLE ASSOCIATE ("Landlord") for

premises situated in the Landlord's Shopping Center known as Trevose Shopping Center

located on the northeastern corner of the intersection of Brownsville Road and Andrews

Road, in the City of Feasterville - Trevose, County of Bucks, Commonwealth of

Pennsylvania (the "Lease").  The undersigned, Family Dollar Stores, Inc., a Delaware

corporation, does hereby guarantee the payment of rent and the performance of all other

obligations by Tenant as provided in the Lease; provided, however, this Guaranty is

expressly conditioned on Family Dollar Stores, Inc., being given all notices (in writing and

by Certified Mail, Return Receipt Requested, sent to its Corporate Secretary, P. O. Box

1017, Charlotte, North Carolina 28201-1017) required to be given to Tenant under the

terms of the Lease.

This the 6th day of November, 2012.

FAMILY DOLLAR STORES, INC.

By: _____

Keith M. Gehl
Senior Vice President
Real Estate and Facilities

