**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' REPLY TO OBJECTION TO DEBTORS' REPLACEMENT OF UNIVERSAL GROUP COMPANIES AS SUCCESSFUL BIDDER AT AUCTION OF LEASE OF STORE NO. 5736

New Rite Aid, LLC, together with its affiliated debtors and debtors in possession

(collectively, the "Debtors"), file this reply (this "Reply")[2] in further support of the Motion, and in

---

[1]   The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]   Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in (i) the *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Procedures for the Sale of Certain Leases and Fee Owned Properties, and (II) Granting Related Relief* [Docket No. 22] (the "Motion") and (ii) *Final Order (I) Establishing Procedures for the Sale of Certain Leases and Fee Owned Properties, and (II) Granting Related Relief* [Docket No. 804] (the "Auction Procedures Order"), as applicable.

response to *Objection to Debtors' Replacement of Universal Group Companies as Successful Bidder at Auction of Lease of Store No. 5736* [Docket No. 2187] (the "Objection").  In support of this Reply, in further support of the Motion, and in opposition to the Objection, the Debtors respectfully state as follows.

### Preliminary Statement

1.      No duty is more sacred to a chapter 11 debtor than that of its duty as a fiduciary to maximize the value of its estate for the benefit of all of its stakeholders.  In the context of a sale of assets, a debtor maximizes value for the estate as a whole, and not any individual creditor, by selecting, in its own judgment, the "highest and best" offer.  Indeed, it would be contrary to a debtor's fiduciary duties to impose a limitation on a debtor's ability to pivot to any value-maximizing offer to the extent one presented itself.  Moreover, substituting a debtor's business judgment as to what constitutes "highest and best" for that of a third party with no economic stake in the debtor's estate effectively strips a debtor of its duty to maximize value.  And more importantly, it deprives the debtors' creditors of reaping the benefits of higher offers.

2.      Consistent with this fiduciary duty, which is further memorialized in the Debtors' Auction Procedures, the Debtors seek to assign the Debtors' lease (the "Laguna Woods Lease") for Store No. 5736, located at 24330 El Toro Road, Laguna Woods, California, to Laguna Woods RA, LLC (the "New Successful Bidder") for $800,000, plus the New Successful Bidder's agreement to assume and pay the Laguna Woods landlord Cure Costs totaling no less than $91,895.94.  The New Successful Bidder deal provides the Debtors with ***more than $750,000, or 1700% more*** in net cash consideration than the Bid received by Universal Group Companies ("Universal") at the Auction, and just as importantly, certainty to close, given that the Laguna Woods landlord has reached an agreement with the New Successful Bidder on adequate assurance of future performance.

3.      Even assuming the Landlord was willing to accept an assignment to Universal, Universal's conduct in these cases calls into serious question its veracity and whether and if Universal could or would satisfy its obligations to close on the assignment of the Laguna Woods Lease.  As described in more detail below, Universal has already breached a contract to close on the assignment of a lease for Debtors' Store No. 856, leaving the Debtors not only with the loss of the anticipated purchase price but out of pocket for rent for July 2025 (which it paid after carrying the lease for Universal's benefit following its closing of the location in June).  Even when Universal agreed it would reimburse the Debtor for the rent, it never made the payment (and it never paid the good faith deposit for that lease, which it promised to do).

4.      Even more troubling is its recent conduct (and that of its President, Mohammad Kazmi,[3] the person that signed the Objection) in the last two weeks.  As described in detail below, in attempting to have the Debtors turn over possession of another store (Store No. 3871 in Owings Mills, MD), Kazmi falsely claimed, on multiple occasions, that Universal had wired the purchase price to the Debtors and promised to send a federal reference number to confirm.  To date, that wire has not been made.  With his lies, he extracted (albeit for only a few hours) the agreement of the Debtors to allow him to re-key the premises and obtained the alarm codes from the Debtors' representatives based entirely on his false representations.  While the Debtors have since advised Universal it was not permitted to take possession of that store, Universal has failed to acknowledge that it has no right of possession to the Owings Mills premises.

---

[3]    It is not clear to the Debtors whether Mohammed Kazmi, the person executing the Objection, is the same person that executed the Bidder Registration Form (under the name Mahe Kazmi), or that participated in the Auction and identified himself as Kazmi Shamikh.  The email signature for Kazmi also identifies a person by the name of "S Kazmi" who is perhaps the same party identified in pending litigation in the United States District Court for the Eastern District of Pennsylvania pending against Universal Property Services, Inc. and "Shamikh Kazmi" at Case No. 22-cv-02410-RK-RLS.  For purposes of this Reply, the Debtors will refer to him (as he has referred to himself to the Debtors), as "Kazmi."

5.      Even had Universal met all of its obligations and not engaged in fraudulent conduct, and instead was just beset with the unfortunate circumstance (for it) that the Debtors were approached with a significantly higher bid, the Debtors can ill afford to ignore the substantially more consideration that the sale and assignment of the Laguna Woods Lease will bring in through the New Successful Bidder's bid.  At bottom, it would be contrary to the Debtors' fiduciary duties to trade the significant value of the New Successful Bidder's bid simply to honor that what occurred at the Auction, assuming Universal could or would meet its obligations.  And, critically, despite its attempts to mischaracterize the provisions of the Auction Procedures, nothing in those Auction Procedures or otherwise "obligates" it to move forward with the Universal Bid or prevents the Debtors from pivoting to the New Successful Bidder's bid.

6.      Indeed, contrary to the assertions made in the Objection, the Debtors *are* complying with the Auction Procedures, properly availing themselves of the broad "fiduciary out" provided in, and sacred to, the Auction Procedures.[4]

7.      Disappointed with the outcome, Universal now seeks to cast aspersions on the integrity of the process to prevent the Debtors from closing on the higher and better offer.  The fact that the New Successful Bidder seems to have learned of the existence of the Laguna Woods Lease from a potential subtenant with whom Universal had been purportedly engaging (without the Debtors' knowledge or involvement) is irrelevant to the Debtors' duty to maximize the return on the Laguna Woods Lease and its right to rely on its fiduciary out to pivot to the New Successful Bidder.  Whatever discussions occurred between these third parties are not evidence of "collusion," as alleged.  The New Successful Bidder approached the Debtors with a good faith offer to acquire the Laguna Woods Lease and has at all times negotiated with the Debtors in good faith and at

---

[4]      Auction Procedures § S (Fiduciary Out).

arms' length.  While complaints of collusion often follow parties' efforts to control the price of an auctioned asset, here, the process yielded a purchase price ***more than 17 times*** the purchase price of the Laguna Woods Lease yielded by the Auction.  This is not, despite arguments otherwise, a matter of colluding parties' efforts to control and depress the value of an asset at the expense of the estate.  (In any event, as a disappointed bidder, Universal has no standing to pursue a section 363(n) claim).[5]

8.    Overall, the Debtors' Auction Procedures, which all bidding parties, including Universal, assented to through their participation, contain a broad "fiduciary out" permitting the Debtors to take any action consistent with their fiduciary obligations.  Having received an unsolicited, alternative bid that was more than $750,000 higher than the Universal Bid, the Debtors availed themselves of that fiduciary out.

9.    Accordingly, the Court should overrule the Objection and approve the good faith assignment of the Laguna Woods Lease to the New Successful Bidder.

### Background

10.    On May 6, 2025, the Debtors filed the Motion seeking Court authorization to establish procedures to facilitate an expeditious and orderly process for the sale or other disposition of the Debtors' unexpired leases of non-residential real property and certain fee owned properties. This Court entered the Auction Procedures Order approving the Auction Procedures on June 11, 2025 [Docket No. 804].

---

[5]    And even if Universal has standing—it does not—the Objection is misguided as the Debtors were not harmed by whatever communications between the New Successful Bidder and Universal's purported potential subtenant.

**A.**    **The June Lease Auction – Universal Refuses to Close on Court Approved Lease Assignment**

11.    On June 16, 2025, the Debtors filed a *Notice of Bid Deadline, Potential Auction, and Potential Sale Hearing for Certain Lease Assets* [Docket No. 890] (the "June Lease Auction Notice") informing parties in interest of the June lease sale auction (the "June Lease Auction"), set to take place on June 25, 2025.  That June Lease Auction Notice detailed the lease assets to be auctioned at the June Lease Auction, identifying, among other leases, a lease for the Debtors' Store No. 856 located at 762 Chester Pike, Prospect Park, PA, 19076 (the "Prospect Park Lease").

12.    Universal submitted a Bid for the Prospect Park Lease for $100,000.  Although the Auction Procedures required each bidder contemporaneously to tender an earnest money deposit of ten percent (10.0%) of the proposed cash purchase price (defined in the Auction Procedures as a "Qualified Bidder Deposit"), Universal failed to tender the Qualified Bidder Deposit in connection with its Bid for the Prospect Park Lease.

13.    In connection with its Bid, Universal signed a Bidder Registration Form on June 23, 2025, in which it warranted and represented, among other things, that:

    a.    Universal has received, reviewed, understands, and agrees to abide by the terms and conditions of the Auction Procedures, the terms and conditions of which were incorporated in the Bidder Registration Form by reference.

    b.    Universal has received, reviewed, and understands the terms and conditions of the Assumption and Assignment Agreement, the terms and conditions of which were incorporated in the Bidder Registration Form by reference.

    a.    Universal's Bid is and shall be a good faith, *bona fide*, irrevocable offer to purchase the applicable Lease on an as-is, where-is basis, with no contingencies.

    b.    Universal (i) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Lease in making its offer; (ii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Lease or the completeness of any information provided in connection therewith or

the Auction other than as provided in the Assumption and Assignment
Agreement.

14.    The Debtors held the June Lease Auction on June 25, 2025, where 325 leases were
placed up for bidding.  Following the June Lease Auction, the Debtors filed the *Notice of
Successful and Backup Bidders with Respect to the Auction of Certain of the Debtors' Leases*
[Docket No. 1111] (the "June Successful Bidder Notice") and the *Notice of Assumption and
Assignment of Certain of the Debtors Leases* [Docket No. 1112] (the "June Assumption and
Assignment Notice" and together with the Successful Bidder Notice, the "June Notices").
The June Notices identified Universal as the Successful Bidder for the Prospect Park Lease, with
a successful bid in the amount of $100,000.

15.    The landlord for Store 856 was served with the June Notices.  Moreover, following
the Successful Bid, the Debtors sent the landlord for Store 856 the adequate assurance information
that had been provided by Universal.  The June Notices set a deadline to object to the assumption
and assignment of leases of July 10, 2025.  The landlord for Store 856 did not file an objection to
the proposed assumption and assignment of the Prospect Park Lease to Universal or otherwise
indicate to the Debtors that it was challenging the assignment of the Prospect Park Lease to
Universal.

16.    On July 14, 2025, this Court signed an *Order Approving the Assumption and
Assignment of Unexpired Lease to Universal Group Companies* [Docket No. 1440].

17.    When the Debtors attempted to close, Universal refused to do so, advising, on July
29, 2025, that: "The landlord rejected our assignment … On top of that, he is not agreeing to our
use nor our tenancy. . . . and the landlord is not even picking up my calls at this point. He is refusing
to even speak let alone work through the lease" and requested that the parties work through a
resolution.

18.     The Debtors' counsel and A&G advised Universal that the landlord was now bound by the assignment, but Universal still refused to close, indicating "with as much as we have going on, its not lucrative to fight a landlord looking to impose you. We will have to put up a fight and its just not worth it.  But lets discuss a solution."[6]

19.     Universal's bid was irrevocable and on an as-is where-is basis, with no contingencies.  It signed a binding irrevocable Assumption and Assignment Agreement, and the assignment of the Prospect Park Lease was approved by the Court.  It had no legitimate basis to refuse to close.

20.     However, in an effort to resolve it, the Debtors offered to accept Universal's payment in an amount equal to the July rent for Store 856 (in the amount of $23,336), which the Debtors had paid in reliance on Universal's Successful Bid.  Despite Universal's agreement to pay that amount and subsequent follow up requests by A&G therefor (which were simply ignored), Universal has failed and refused to pay anything on account of its breach, once again failing to live up to a commitment it made.

**B.      The July Lease Auction and the Universal Bids in Connection Therewith**

21.     On July 3, 2025, the Debtors filed a *Notice of Bid Deadline, Potential Auction, and Potential Sale Hearing for Certain Lease Assets* [Docket No. 1320] (the "July Lease Auction Notice") informing parties in interest of the July lease sale auction (the "July Lease Auction"), set to take place on July 21, 2025.  That July Lease Auction Notice detailed the lease assets to be auctioned at the July Lease Auction, identifying, among other leases, a lease for the Debtors' Store No. 5736, *i.e.*, the Laguna Woods Lease, and Store No. 3871 located at 9300 Lakeside Boulevard, Owings Mills, MD (the "Owings Mills Lease").

---

[6]     Copies of the parties' email exchanges summarized herein are attached hereto in their entirety as **Exhibit A**.

22.     On July 17, 2025, Universal submitted a Bid for both the Laguna Woods Lease and the Owings Mills Lease.  Just as with its Bid for the Prospect Park Lease, Universal failed to tender Qualified Bidder Deposits contemporaneously with its Bids.  It was not until <u>after</u> the Auction, when the Debtors were attempting to close the Prospect Park Lease (on July 28, 2025) that the Debtors discovered that Universal had not tendered <u>any</u> Qualified Bidder Deposits, did Universal tender funds on account of the required Qualified Bidder Deposits (in an insufficient amount).  On July 29, 2025, Universal tendered funds on account of the Qualified Bidder Deposit requirement, wiring the sum of $8,500.  Immediately thereupon, A&G advised Universal that it was required to increase its Qualified Bidder Deposits to comport with its Bid at the Auction by another $22,285.71, to which Universal responded, "Erik I will have the True up deposit made. Thanks".[7] Once again, Universal failed to live up to a commitment it made, and to date, Universal still has not tendered that required amount to constitute a Qualified Bidder Deposit for either of its Bids, and, as such, Universal does not meet the requirements to be a Qualified Bidder.

23.     In connection with its Bids, Universal signed a Bidder Registration Form on July 17, 2025, in which it warranted and represented, among other things, that:

    a.    Universal has received, reviewed, understands, and agrees to abide by the terms and conditions of the Auction Procedures, the terms and conditions of which were incorporated in the Bidder Registration Form by reference.

    b.    Universal (i) is not entitled to any break-up fee, termination fee, expense reimbursement, or similar type of payment; (ii) and by submitting an Assumption and Assignment Agreement, waives, and shall be deemed to waive, the right to pursue a substantial contribution claim under section 503 of title 11 of the United States Code (the "Bankruptcy Code") related in any way to the submission of its Bid, the Auction Procedures, or any earnest money deposit.

---

[7]     See email exchange on July 29, 2025, attached hereto as **Exhibit B**.

24.     The Debtors held the July Lease Auction on July 21, 2025, where 816 leases were placed up for bidding.  Following the July Lease Auction, the Debtors filed the *Notice of Successful and Backup Bidders with Respect to the Auction of Certain of the Debtors' Leases* [Docket No. 1524] (the "July Successful Bidder Notice") and the *Notice of Assumption and Assignment of Certain of the Debtors Leases* [Docket No. 1525] (the "July Assumption and Assignment Notice" and together with the Successful Bidder Notice, the "July Notices").  The July Notices identified Universal as the Successful Bidder for the Laguna Woods Lease, with a successful bid in the amount of $138,810.62, and as the Successful Bidder for the Owings Mills Lease for $71,046.79.  The Notices identified Cure Costs due for Laguna Woods of $91,895.94.[8]

25.     Although the Assumption and Assignment Agreement signed by Universal provides that Universal is assuming the Cure Costs, the deal is a "gross" Bid, meaning the Debtors are responsible for the Cure Costs.  As a result, Universal's Bid for the Laguna Woods Lease will net the Debtors' estate no more than $41,948.23 to $46,914.68.

**C.    Attempting to Impermissibly Gain Possession of Store 3871 Owings Mills, MD, Universal Misrepresents to the Debtors and their Counsel Multiple Times that It Wired the Purchase Price for the Owings Mills Lease**

26.     On August 27, 2025, the Court entered that certain *Order Approving the Assumption and Assignment of Unexpired Lease to Universal Group Companies* [Docket No. 2176] (the "Owings Mills Approval Order"), pursuant to which the Court approved the assumption

---

[8]     Although the landlord for the Laguna Woods premises never filed an objection to the Cure Costs, the landlord did informally assert it was owed $125,818.39, comprised of (i) April Rent and CAM totaling $29,156, (ii) May Rent and CAM totaling $29,156, (iii) Aug Rent and CAM totaling $29,156, (iv) 2nd Prop Tax Install with penalties totaling $36,967 and (v) Late Fees for rent totaling $1,386.  Given that the Debtors paid August rent, the Cure Costs asserted by the landlord totaled $96,662.39 as of August 5, 2025.

and assignment of the Owings Mills Lease to Universal.  The Assumption and Assignment Agreement requires Universal to pay the Purchase Price of $71,046.79.

27.     On August 27, 2025, after the entry of the Owings Mills Approval Order, the Debtors' counsel, W. John Park, Esq., of Cole Schotz P.C., requested that Universal wire the $71,046.79 Purchase Price.  Universal did not wire the Purchase Price.  Mr. Park made another request for the payment of the Purchase Price on August 29, 2025.  Once again, Universal did not pay the Purchase Price.

28.     On September 2, 2025, the Mr. Park again emailed Universal making another request that Universal wire the $71,046.79 Purchase Price.  Two minutes after that email, Kazmi, Universal's President, responded, "Wire went through, I will have the wire confirmation number shortly."  *See* email exchange attached hereto as **Exhibit C**.

29.     That statement by Kazmi, Universal's President, was knowingly false.

30.     On September 8, 2025, Kazmi emailed Mr. Park, "John can you please confirm how we will get keys this is urgent please?" which was followed by a telephone call between Mr. Park and Kazmi.  Misled into believing the wire for the Purchase Price had already been paid, Mr. Park advised Universal (Kazmi) that he could re-key the premises, and Kazmi, despite knowing Universal had *not* paid the Purchase Price, emailed Mr. Park as follows: "pursuant to our conversation, this is to confirm that I can get my own lock smith for the property to take possession? I am not sure if it has a alarm or not but if you can please confirm here."  A similar request was then made to Mr. Park and the Debtors' Director, Real Estate Administration, Debora DiPrizito, shortly thereafter, which Mr. Park initially confirmed (again believing the Purchase Price had been paid given Kazmi's misrepresentations to that effect) and Ms. DiPrizito provided

Univeral/Kazmi with the alarm codes for the premises.  *See* emails attached hereto collective as **Exhibit D** (with alarm codes redacted).

31.    After that email exchange, Mr. Park realized that Kazmi/Universal had never provided the wire confirmation he promised and because the Debtors did not have proof that the Purchase Price had been paid, that same day (September 8) Mr. Park revoked any authorization to change the locks.  *See* email dated September 8, 2025, at 3:41 PM ET attached as **Exhibit E**.

32.    Following Mr. Park's email, Kazmi once again misrepresented that the "[w]ire was sent I'll send you fed ref number tomorrow."  *See* email dated September 8, 2025, at 3:44 PM ET attached as **Exhibit F**.

33.    No wire was ever sent, and Kazmi never sent any "fed ref number" (which of course never existed).  After Mr. Park advised Kazmi on September 8, 2025, that he "just checked against looking for that amount ($71,046.79) and it has not been received," Kazmi has gone silent since Mr. Park's email noting that the Debtors could not confirm the receipt of any wire.

**D.    The Debtors Receive an Unsolicited Offer for the Laguna Hills Lease**

34.    On August 6, 2025, the Debtors' counsel, David M. Bass, Esq. of Cole Schotz P.C., received an unsolicited call from David Ravanshenas, who identified himself as a representative of an entity known as South Park Group, expressing an interest in the Laguna Woods Lease. During that call, Mr. Ravanshenas indicated South Park Group would be willing to offer significantly more consideration for the Laguna Woods Lease.

35.    Later that day, Mr. Ravanshenas sent an unsolicited offer of an aggregate amount of (a) $800,000 plus (b) all applicable cure costs for the Lease for the Laguna Woods Lease.  *See* email dated August 6, 2025, attached hereto as **Exhibit G**.

36.     Following that offer, the Debtors determined, in their business judgment, to take further steps in connection therewith.  For example, on August 7, 2025, the Debtors' counsel called the landlord's counsel and advised him that the Debtors had received an offer for significantly more consideration and would be exploring moving forward with that bidder.  Moreover, the Debtors' advisors advised the DIP Lenders' advisors, as Consultation Party, of the offer and the Debtors' intent to continue to explore it notwithstanding the Universal Bid.

37.     Communications between the Debtors and South Park Group ensued for the next couple of days.  The Debtors' counsel also kept in regular contact with the landlord's counsel to keep the landlord apprised and worked with South Park Group to obtain adequate assurance information to provide to the landlord.

38.     On August 13, 2025, the Debtors received a good faith deposit in the amount of $200,000 in connection with the South Park Group bid.

39.     On August 17, 2025, the Debtors provided adequate assurance information regarding South Park Group to the landlord's counsel.

40.     On August 20, 2025, South Park Group's affiliate, Laguna Woods RA, LLC, provided the Debtors with an executed Assumption and Assignment Agreement (the "New Successful Bidder Assignment Agreement").  A copy of the New Successful Bidder Assignment Agreement, executed by the New Successful Bidder is attached hereto as **Exhibit H**.

41.     Upon receipt of the executed New Successful Bidder Assignment Agreement, the Debtors' counsel, Mr. Bass, reached out to Universal to advise that unless Universal was prepared to match the offer of the New Successful Bidder, the Debtors intended to move forward with the proposed assumption and assignment of the Laguna Woods Lease to the New Successful Bidder in accordance with the Debtors' business judgment and in the exercise of its fiduciary duties.

42.     Universal declined to match the offer of the New Successful Bidder and instead requested that the Debtors compensate Universal to avoid an objection to the proposed assumption and assignment to New Successful Bidder, which the Debtors declined to do (and which Universal acknowledged in the Bidder Registration Form it was not entitled to).[9]

43.     On August 21, 2025, the Debtors filed the *Notice of Acceptance of New Successful Bidder with Respect to Store 5736* [Docket No. 1987].

<u>Argument</u>

I.      **The Fiduciary Out Provision in the Auction Procedures Mandates that the Debtors Consider Alternative Value-Maximizing Bids, Like the New Successful Bidder Bid.**

44.     The fiduciary out provision in the Auction Procedures permits the Debtors to consider all alternative offers, like the New Successful Bidder bid, provided that they maximize value of the estate.

45.     It well established that, "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the *maximization of the value of the asset sold*," and that the "debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer." *In re Integrated Res.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (citation omitted). Indeed, a debtor has a "fiduciary duty to get the highest value for" its assets. *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016) ("In conducting an auction sale, debtors have a fiduciary duty to maximize the value of their assets.").[10]

---

[9]     The Debtors and Universal exchanged emails the following day, some of which were attached to the Objection as Exhibit "C". Conveniently, Universal failed to include the initial email in that exchange and stripped out the subject line reference of "SETTLEMENT DISCUSSIONS". Although inappropriate to have included those emails, which were in the nature of settlement discussions, the Debtors waive any issue with respect thereto and attach for reference the entire email chain from August 21, 2025, as **Exhibit I**.

[10]    *See also In re Family Christian, LLC*, 533 B.R. 600, 621-22 (Bankr. W.D. Mich. 2015) ("The Debtors, in conducting the sale process, have a fiduciary duty to maximize the value of their estates.") (citing *In re Embrace Sys. Corp.*, 178 B.R. 112, 123-24 (Bankr. W.D. Mich. 1995)). A duty is imposed upon the trustee to maximize

46.     "In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors

owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the

estates in a multi-debtor case." *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y.

2010).  For that reason, it standard to include provisions in sale procedures like a "fiduciary out"

to ensure that the debtor can satisfy its fiduciary duties to maximize recovery to the estate.  *Id.*

(denying approval of an agreement because the "fiduciary out" clause was flawed).  The Auction

Procedures Order here expressly preserved the Debtors' fiduciary duties.  Section S of the Auction

Procedures provides:

> Nothing in these Auction Procedures shall require each Debtor's management or
> board of directors to take any action, or to refrain from taking any action, with
> respect to these Auction Procedures, to the extent each Debtor's management or
> board of directors determines, or based on the advice of counsel, that taking such
> action, or refraining from taking such action, as applicable, is required to comply
> with applicable law or its fiduciary obligations under applicable law.[11]

47.     Moreover, the Auction Procedures make clear that nothing therein "shall abrogate

the fiduciary duties of the Debtors."[12]  This is precisely the type of provision that courts have

endorsed when debtors consider alternative asset bids.  *See*, *e.g.*, *In re Global Crossing Ltd.*, 295

B.R. at 733, 746 (Bankr. S.D.N.Y. 2003) (concluding that fiduciary out provision permitting

termination of the purchase agreement "in order to discharge its fiduciary duties under applicable

Law, based upon consultation with external counsel" allowed "the Debtors to make an appropriate

---

the value obtained from a sale, particularly in liquidation cases."  *In re Bakalis*, 220 B.R. 525, 532 (Bankr.
E.D.N.Y. 1998) (citations omitted).

[11]   *See* Auction Procedures § S (Fiduciary Out).

[12]   *Id.* § P (Reservation of Rights).

response if a superior offer is made that the Debtors should consider by reason of their fiduciary duties").[13]

48.     Notably, there is no temporal element to the exercise of the Debtors' fiduciary duty under the Auction Procedures.  The Debtors are charged with exercising their fiduciary duty *at all times*.  While the Debtors submit applicable law imposes that responsibility on the Debtors, it is undeniable that the Auction Procedures reinforce that obligation.  Universal's bid was, and continues to be, subject to the provisions of the Auction Procedures.  *See*, *e.g.*, Auction Procedures Order at ¶ 3 ("The Auction Procedures shall govern the *submission*, receipt, and analysis of all Bids relating to any proposed sale or Auction of a Real Property Asset.  Any party desiring to submit a Bid shall comply with the Auction Procedures and this Final Order.") (emphasis added).  In submitting its Bidder Registration Form, Universal "represented and warranted" that it has received, reviewed, understands, and agrees to abide by the terms and conditions of the Auction Procedures, the terms and conditions of which were incorporated in the Bidder Registration Form by reference.  Because Universal submitted its Bid with the express understanding that the Debtors could—and would—continually exercise their fiduciary duties (and continually "analyze" the bids with reference thereto), Universal cannot complain with the Debtors doing so (regardless of whether Universal was determined to be the Successful Bidder at the conclusion of the Auction).

---

[13]   *See also id.* at 745–46 ("If this Court were to believe, for half a second, that the Debtors had spurned a better offer to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers. But there is no basis, on this extensive record, for any such finding.  Rather, the record reflects that with the 'fiduciary out' provisions in Sections 4.3 and 7.1(1) of the Purchase Agreement, execution of Amendment # 2 still permits the Debtors to make an appropriate response if a superior offer is made that the Debtors should consider by reason of their fiduciary duties.'"); *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("Finally, and of paramount importance, I believe that the so-called Fiduciary Out, as written, is flawed. It prohibits the Debtors from taking action consistent with their fiduciary obligations. Fiduciaries owe duties of care and loyalty, and courts have held that these duties apply with equal or greater force in the context of a sale of assets." In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case."); *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 346–47 (Bankr. D.N.J. 2023) (applying the reasoning from the *Innkeepers* case to reject the argument that limitations on a debtor's fiduciary out could be effective as a matter of contract).

Universal certainly cannot claim "reliance" that its Bid would be sacrosanct or that it would suffer damages, when the very Auction Procedures under which it submitted its Bid permit the Debtors to pivot at *any* time if their fiduciary obligations so required.

49.     Despite Universal's suggestions otherwise, the Debtors' ability to consider meaningful alternatives to the proposed Universal bid is unfettered, thereby protecting the interests of all constituents of the estates.[14]   Absent enforcement of the fiduciary out, the Debtors would be stripped of their ability to satisfy their fiduciary duties and the estate deprived of the substantial additional value to be generated from alterative asset bids.  *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 937 (Del. 2003) (concluding that absence of a fiduciary out provision prevented the board of directors from considering alternative transactions and therefore from "discharging its fiduciary responsibilities to the minority stockholders").

## II.    The Assignment of the Laguna Woods Lease to The New Successful Bidder Reflects a Sound Exercise of the Debtors' Business Judgment.

50.     The assignment of the Laguna Woods Lease to the New Successful Bidder reflects a sound exercise of the Debtors' business judgment as the New Successful Bidder bid represents the highest and best offer for the Laguna Woods Lease.

51.     The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *see also Summit Land Co. v. Allen* (*In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted

---

[14]    *In re GSC, Inc.*, 453 B.R. 132, 169–70 (Bankr. S.D.N.Y. 2011) ("The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate. A trustee maximizes value for creditors by selecting the 'highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders.' This duty is an obligation to the estate as a whole, not to individual creditors." (internal citations, quotation marks omitted)).

as a matter of course"). Thus, if the debtor's business judgment has been exercised reasonably, a

court should approve the assumption and assignment of an unexpired lease. *See, e.g.*, *Group of*

*Inst'l Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550-51 (1943).

52.     Here, the New Successful Bidder Bid provides the Debtors with ***immediate*** access

to $800,000 in cash proceeds.  Moreover, the landlord already expressed its willingness to consent

to the Debtors' assignment of the Laguna Woods Lease to the New Successful Bidder, thereby

eliminating any go-forward litigation risk with the landlord.  Conversely, accepting the Universal

Bid would provide the Debtors with at least $750,000 less in cash consideration.  It is clearly in

the best interests of the Debtors and their estates to accept the New Successful Bidder bid.

### III.     The Debtors Conducted the Lease Sale Process in Accordance With the Auction Procedures, Free from Any Collusion or Bad Faith Otherwise Harmful to the Debtors' Estates.

53.     Contrary to the allegations set forth in Universal's Objection, the pivot to the New

Successful Bidder is free from any collusive bidding by the New Successful Bidder.  The offer

from the New Successful Bidder is a bona fide offer made in good faith.  There has been no

collusive bidding.

54.     Further, Universal's allegation that, under the facts and circumstances here, the

New Successful Bidder and the so-called subtenant with whom Universal was purportedly

engaging could "collude" is a misconception of the term "collusion" as used in section 363(n) and

its effects in the context of an auction.  *In re New Energy Corp.*, 739 F.3d 1077, 1079 (7th Cir.

2014) (explaining "why collusion among bidders is forbidden.").   "Collusion is a form of

monopsony that ***depresses*** the price realized at auctions."  *Id.* (emphasis added).   Indeed,

"[c]ollusion by two bidders would have made it *easier* for [the losing bidder] to secure the [auction

asset]" by reducing the high bid—which "would have harmed [the debtors'] creditors, not [the

losing bidder]."  *Id.*  Here, the results of the Debtors' process generated more than *17 times* the

value of the sale of the Laguna Woods Lease brought in at the July Auction. Indeed, the collusion

that Universal alleges, which remains unsupported by the record, are not the actions that the

caselaw and the Bankruptcy Code seek to protect. Whatever discussions that the New Successful

Bidder and the entity to which Universal was engaging may have had did not constitute an unfair

advantage in the auction process and certainly does not rise to the level of vacating an assignment

that the Debtors determine to be value-maximizing.

55.    In any event, Universal does not have standing to pursue a section 363(n) claim.

*Id.* ("[U]nder § 363(n), the trustee rather than a bidder is the right party to protest collusive sales.");

*see also In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 156–57 (Bankr. S.D.N.Y. 2019)

(clarifying that a "[losing bidder] lacks standing to assert a claim under section 363(n) as

[proposed] assignee of the Debtors" where "[t]he Debtors did not assign any rights granted under

the Bankruptcy Code, specifically rights under section 363(n)"); *In re Butan Valley, N.V.*, No.

ADV 09-3291, 2009 WL 5205343, at *2 (S.D. Tex. Dec. 23, 2009). Section 363(n) is not available

to Universal due solely to being outbid. *Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI*

*Helicopters (Ir.) Ltd. (In re Waypoint Leasing Holdings Ltd.)*, 607 B.R. 143, 156–58 (Bankr.

S.D.N.Y. 2019) ("Put simply, Lombard outbid Macquarie, the only other bidder.").

## IV.    The Debtors are Not Bound to Any Successful Bidder Unless and Until the Court Approves the Successful Bidder.

56.    Universal makes a number of allegations in the Objection that highlight its

fundamental misunderstanding of the bankruptcy sale process, the Debtors' "obligations" under

the Auction Procedures and the rights of a "Successful Bidder" prior to Court approval.

57.    For example, Universal states in paragraph 5 of the Objection that "[t]he [July

Successful Bidder] Notice explained that if no party filed a timely objection, the Debtors *would*

seek the Court's entry of an Order approving the assumption and assignment of the Lease to

Universal." Objection at ¶ 5 (emphasis added). The July Successful Bidder notice actually provides as follows: "if no Sale Objection is timely filed, the Debtors *may* seek to have the Court enter, under a certificate of no objection, an order, … approving the assumption and assignment … of each Lease set forth in Exhibit A …" *See* July Successful Bidder Notice at p. 2 (emphasis added).

58.     The Debtors were not, as Universal argues, duty bound to seek an Order to approve an assignment under all circumstances. If, as here, the Debtors' in their business judgment determined otherwise, nothing in the Auction Procedures required the Debtors to seek the Order as Universal alleges. Indeed, this Court has already approved of the Debtors' exercise of its business judgment to decline to seek approval of other Successful Bidders on the July Successful Bidder Notice. *See* Hearing Transcript, August 28, 2025, at pp. 28:19-29:25 (approving a new successful bidder for Store No. 10579), a copy of which is attached hereto as **Exhibit J**.

59.     Similarly, the Debtors are under no "obligation to sell the Lease to Universal." *See* Objection at ¶ 8. Indeed, the Auction Procedures provide that the "Selection of Successful of Successful Bid" is expressly "subject to Court approval." *See* Auction Procedures, § I.(v). In that regard, the Debtors did not "disregard their duties under the Bidding Procedures and the Bankruptcy Code." Objection at ¶ 10. For those very same reasons, Universal has no right to argue it has a right to "rely" on its designation as a Successful Bidder. Unless and until the Court approves it as a Successful Bidder, it has nothing it can rely on.

60.     Moreover, Universal's unsupported statement that "[t]he Debtors have no authority to sell any lease except to the successful bidders who complied with the Bidding Procedures Order and participate in the auction" is wrong; contradicted, as set forth in this Objection, and as expressly set forth in the Auction Procedures. *See*, *e.g.*, Auction Procedures Order at ¶ 3 ("The

Debtors are authorized to take any and all actions necessary to implement the Auction Procedures. Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties,[] may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.[3]"  That footnote 3 specifically provides:  "For the avoidance of doubt, the Debtors also anticipate that some of their Leases and Fee Owned Properties may be sold pursuant to either private sales conducted outside of the Auction Procedures process or the Sales Procedures. Nothing in this Final Order limits the Debtors' ability to include any Lease or Fee Owned Property (a) in any private sale or any sale process conducted pursuant to the Sales Procedures, or (b) not sold pursuant to sale processes conducted pursuant to the Sales Procedures in a subsequent Auction process conducted pursuant to the Auction Procedures."

61.    Finally, Universal makes several references to a contractual relationship with the Debtors relating to the Laguna Woods Lease.  No such contractual arrangement exists.  First, the Debtors never countersigned the Assumption and Assignment or any document with Universal relating to the Laguna Woods Lease.  While the Debtors did sign one with Universal relating to the Prospect Park Lease, it was Universal that breached that one.  Moreover, while the Debtors also signed a contract with Universal for the Owings Mills Lease, it is Universal that has failed to perform thus far (and indeed has committed fraud in connection therewith).

62.    There simply is no contract in place relating to the Laguna Woods Lease, and with no contract, there is, and can be, no breach.  Moreover, even if Universal could meet the heavy burden of demonstrating a right to an administrative claim, it specifically waived the right to seek one by participating under the Auction Procedures and through its Bidder Registration Form, which provides, in relevant part, that is "is not entitled to any break-up fee, termination fee, expense reimbursement, or similar type of payment; … and by submitting an Assumption and

Assignment Agreement, waives, and shall be deemed to waive, the right to pursue a substantial

contribution claim under section 503 of title 11 of the United States Code (the "Bankruptcy Code")

related in any way to the submission of its Bid, the Auction Procedures …"

## V.      Conclusion.

63.      Here, the reality—unfortunate as it may be for Universal—is that the New

Successful Bidder bid of $800,000 represented 1700% of Universal's Bid for the Laguna Woods

Lease.  The Debtors are duty bound to pursue it.  Universal has no enforceable right to the

assignment of the Laguna Woods Lease and, even if it had fully complied with the Bidding

Procedures (and it has not), and acted in good faith with the Debtors (which it has not), there is

nothing that prevents the Debtors from exercising their business judgment and proceeding with a

substantially higher bid on a deal with more certainty to close.

64.      For the reasons set forth herein, the Debtors' respectfully request the Court overrule

the Objection and deny any relief requested therein and authorize the Debtors' entry into the New

Successful Bidder Assumption and Assignment Agreement with the New Successful Bidder.

*[Remainder of page intentionally left blank.]*

Dated:  September 12, 2025

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and
Debtors in Possession*

## EXHIBIT A

**Bass, David**

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Tuesday, July 29, 2025 11:14 AM |
| **To:** | Mike Matlat |
| **Cc:** | Bass, David; Erik Potocek |
| **Subject:** | Re: Rite Aid – Store 856 Prospect Park Assignment – Payment today ASAP |

 External email

Mike, Please call me so we can discuss, with as much as we have going on, its not lucrative to fight a landlord looking to impose you. We will have to put up a fight and its just not worth it.  But lets discuss a solution.

The 8500 for the deposit on the 2nd batch of sites was successfully credited to your account.
The wire came from Universal Group Company
The 8500 is associated with federal reference number, since I see a federal reference number, it must be credited into your account. PLease look again and advise.

**Settlement Reference**
20250729C1B76H1C000190

I am available to speak.

THanks brother

On Tue, Jul 29, 2025 at 10:53 AM Mike Matlat <mike@agrep.com> wrote:

> The Court Order "Trumps" the LL.  The space is yours in spite of the LL not wanting it.
>
>
> Show deposits on the 2 and we can discuss a settlement on #856 but we don't even have a deposit on that one.  We can see if the LL will match your offer or else we'll force the assignment on him.
>
>
> Thank you, Mike
>
>
> Mike Matlat
>
> Senior Managing Director
>
> A&G Real Estate Partners

445 Broadhollow Rd, Suite 420

Melville NY 11747

Direct: 631.465.9509

mike@agrep.com

www.agrep.com



Turnaround Atlas Award 2019, 2020, 2021, 2022 & 2023 'Outstanding Restructuring Real Estate Firm of the Year'

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Tuesday, July 29, 2025 9:50 AM
**To:** Bass, David <DBass@coleschotz.com>
**Cc:** Mike Matlat <mike@agrep.com>; Erik Potocek <EPotocek@agrep.com>
**Subject:** Re: Rite Aid - Store 856 Prospect Park Assignment - Payment today ASAP


Correct, See attached email from landlord objecting which I already sent to Mike. instead of forcing a lengthy fight with the landlord its better we work out a solution please. I have a call into Mike as well to see how we can come up with a solution that works


Thanks


as for the deposit on the other 2 stores. I will share that shortly once im in the office

On Tue, Jul 29, 2025 at 10:46 AM Bass, David <DBass@coleschotz.com> wrote:

The landlord did not object and we obtained an order, a copy of which is attached (and I believe already sent to you by Mike). That order can be enforced in the bankruptcy court. The landlord is not permitted to refuse the assignment and your tenancy at this point. As for the others, we are not showing deposits. Please send us the confirmations.

# COLE SCHOTZ p.c.

**DAVID BASS**
MEMBER

OFFICE 646.563.8932

EMAIL dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY  NEW YORK  DELAWARE  MARYLAND  TEXAS  FLORIDA  WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Tuesday, July 29, 2025 10:41 AM
**To:** Mike Matlat <mike@agrep.com>; Bass, David <DBass@coleschotz.com>
**Cc:** Erik Potocek <EPotocek@agrep.com>
**Subject:** Re: Rite Aid - Store 856 Prospect Park Assignment - Payment today ASAP

Mike and David, I apologize as I thought i replied to Davids email from yesterday but I just noticed its in my outbox

As for the Store 856, The landlord rejected our assignment which I sent a copy to your email already. On top of that, he is not agreeing to our use nor our tenancy. I relayed this to Mike and Erik already and the landlord is not even picking up my calls at this point. He is refusing to even speak let alone work through the lease. He sent an email confirming his rejection via email.

So please call me so we can work through a resolution please.

As for the deposits for the 2 stores we won, the landlords seem to be in agreement as they also called you.

The deposit for those were already sent in.

Please call me so we can get this sorted out please.

Thanks

609 672 1594

On Tue, Jul 29, 2025 at 10:31 AM Mike Matlat <[mike@agrep.com](mailto:mike@agrep.com)> wrote:

> Kazmi,
>
> If we don't get money wired in today on #856 and the deposits on the others we are pulling all your assignments. We act in good faith and expected the same in return.
>
> Thank you, Mike
>
> Mike Matlat
>
> Senior Managing Director
>
> A&G Real Estate Partners
>
> 445 Broadhollow Rd, Suite 420
>
> Melville NY 11747
>
> Direct: 631.465.9508
>
> [mike@agrep.com](mailto:mike@agrep.com)
>
> [www.agrep.com](http://www.agrep.com)
>
> 

Turnaround Atlas Award 2019, 2020, 2021, 2022 & 2023 'Outstanding Restructuring Real Estate Firm of the Year'

---

**From:** Bass, David <[DBass@coleschotz.com](mailto:DBass@coleschotz.com)>
**Sent:** Monday, July 28, 2025 11:05 AM
**To:** Kazmi . <[sk@upssites.com](mailto:sk@upssites.com)>
**Cc:** Mike Matlat <[mike@agrep.com](mailto:mike@agrep.com)>; Erik Potocek <[EPotocek@agrep.com](mailto:EPotocek@agrep.com)>
**Subject:** Store 856 Prospect Park Assignment

Kazmi – We are not showing the wires for the $100,000 purchase price (and I don't see any deposit either) and the cure amount ($37,950.00). There will also need to be an apportionment of rent for July as of the date of the order. We will get back to you that apportionment, but please wire the $137,950 ASAP. Thank you.



## COLE SCHOTZ P.C.

**DAVID BASS**
MEMBER

OFFICE   646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | [ABrennan@coleschotz.com](mailto:ABrennan@coleschotz.com)

* * * * * *

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

**<u>EXHIBIT B</u>**

**Bass, David**

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Tuesday, July 29, 2025 11:53 AM |
| **To:** | Erik Potocek |
| **Cc:** | Mike Matlat; Bass, David |
| **Subject:** | Re: Rite Aid - Store 856 Prospect Park Assignment - Payment today ASAP |

 External email >

Erik I will have the True up deposit made. Thanks

On Tue, Jul 29, 2025 at 11:48 AM Erik Potocek <EPotocek@agrep.com> wrote:

Thanks Kazmi.

Looks like the $8,500 came in this morning so thanks for getting over. You may have not been on the auction call when we asked for deposits to be trued up to 10% of the final sale price. Here is a breakdown of what I need wired.

| Store | Sold Price | 10% Deposit |
|---|---|---|
| 5736 | $138,810.62 | $13,881.06 |
| 856 | $100,000.00 | $10,000.00 |
| 3871 | $ 71,046.49 | $ 7,104.65 |
| Total | $309,857.11 | $30,985.71 |
| Less Deposit Received | | $ (8,500.00) |
| **Remaining to be wired** | | **$22,485.71** |

Let me know if you have any questions,

**Erik Potocek**

**Director - A&G Real Estate Partners**

2803 Butterfield Road, Suite 300

Oak Brook, Illinois 60523

Mobile: 630.352.7110

**<u>EXHIBIT C</u>**

## Bass, David

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Tuesday, September 2, 2025 11:40 AM |
| **To:** | Park, John |
| **Subject:** | Re: #3871-Owings Mills MD |



Wire went through, I will have the wire confirmation number shortly.

Can you please also confirm when keys will be provided, and how?

On Tue, Sep 2, 2025 at 11:38 AM Park, John <JPark@coleschotz.com> wrote:

Please wire the price of $71,046.79 ASAP.



**JOHN PARK**
**MEMBER**

OFFICE   201.525.6211
CELL      201.723.9240
EMAIL     jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

---

**From:** Park, John
**Sent:** Friday, August 29, 2025 11:53 AM
**To:** Kazmi . <sk@upssites.com>
**Subject:** RE: #3871-Owings Mills MD

Please wire the price of $71,046.79 ASAP.

1

**From:** Park, John
**Sent:** Wednesday, August 27, 2025 3:55 PM
**To:** Kazmi . <sk@upssites.com>
**Subject:** RE: #3871-Owings Mills MD

Once the data wipe has occurred we can deliver possession.  I am waiting for confirmation of that.

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Wednesday, August 27, 2025 3:46 PM
**To:** Park, John <JPark@coleschotz.com>
**Subject:** Re: #3871-Owings Mills MD

Thanks, how do I get keys to the property?

On Wed, Aug 27, 2025, 1:50 PM Park, John <JPark@coleschotz.com> wrote:

The order has been issued for this one and attached is a copy.

Also attached are wire instructions.

Please wire the price of $71,046.79 ASAP.



**JOHN PARK**
MEMBER

OFFICE   201.525.6211

CELL    201.723.9240
EMAIL   jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

* * * * * *

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

## EXHIBIT D

**Bass, David**

---

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Monday, September 8, 2025 3:44 PM |
| **To:** | Park, John |
| **Subject:** | Re: #3871-Owings Mills MD |

 External email

Wire was sent I'll send you fed ref number tomorrow

On Mon, Sep 8, 2025, 10:41 PM Park, John <JPark@coleschotz.com> wrote:

> Kamzi, You are not authorized to change the locks until the wire is sent.  You said in your email on 9/2 that it was
> sent but we do not see it received.
>
>
> Please send a reference number.



**JOHN PARK**
**MEMBER**

OFFICE   201.525.6211
CELL     201.723.9240
EMAIL    jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Monday, September 8, 2025 1:34 PM
**To:** Debora Diprizito <ddiprizito@riteaid.com>
**Cc:** Park, John <JPark@coleschotz.com>
**Subject:** Re: #3871-Owings Mills MD

Thank you


On Mon, Sep 8, 2025, 8:05 PM Debora Diprizito <ddiprizito@riteaid.com> wrote:

I do not have the store keys.


Alarm codes:


 or

Thanks,

Debbie


**Debora DiPrizito \ Director, Real Estate Administration**

**P** 717-731-6586

ddiprizito@RITEAID.com





**From:** Park, John <JPark@coleschotz.com>
**Sent:** Monday, September 8, 2025 12:32 PM
**To:** Kazmi . <sk@upssites.com>
**Cc:** Debora Diprizito <ddiprizito@riteaid.com>
**Subject:** RE: #3871-Owings Mills MD


Confirmed

**JOHN PARK**
MEMBER

OFFICE   201.525.6211
CELL     201.723.9240
EMAIL    jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Monday, September 8, 2025 12:31 PM
**To:** Park, John <JPark@coleschotz.com>
**Cc:** Debora Diprizito <ddiprizito@riteaid.com>
**Subject:** Re: #3871-Owings Mills MD

Thanks John, if you dont can we call our lock smith and change the locks as we will need to change locks any ways? Please confirm

On Mon, Sep 8, 2025, 7:30 PM Park, John <JPark@coleschotz.com> wrote:

Deb, can you please advise if you have keys for this location.

**JOHN PARK**
MEMBER

OFFICE   201.525.6211
CELL     201.723.9240
EMAIL    jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY  NEW YORK  DELAWARE  MARYLAND  TEXAS  FLORIDA  WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Monday, September 8, 2025 11:45 AM
**To:** Park, John <JPark@coleschotz.com>
**Subject:** #3871-Owings Mills MD

Hi John pursuant to our conversation, this is to confirm that I can get my own lock smith for the property to take possession? I am not sure if it has a alarm or not but if you can please confirm here

Thank you

--

## S Kazmi

CEO, Universal Group

---

855 Kazmi 12   609 672 1594   sk@upssites.com

ugcbrands.com

.

\* \* \* \* \* \*

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

DISCLAIMER
This e-mail, including attachments, may include confidential, proprietary privileged and/or private information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or intended recipient's authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail and all attachments immediately..

**<u>EXHIBIT E</u>**

**Bass, David**

| | |
|---|---|
| **From:** | Park, John |
| **Sent:** | Monday, September 8, 2025 3:41 PM |
| **To:** | 'Kazmi .' |
| **Subject:** | RE: #3871-Owings Mills MD |

Kamzi, You are not authorized to change the locks until the wire is sent.  You said in your email on 9/2 that it was sent but we do not see it received.

Please send a reference number.

**From:** Kazmi . <sk@upssites.com>
**Sent:** Monday, September 8, 2025 1:34 PM
**To:** Debora Diprizito <ddiprizito@riteaid.com>
**Cc:** Park, John <JPark@coleschotz.com>
**Subject:** Re: #3871-Owings Mills MD

 External email ❯

Thank you

On Mon, Sep 8, 2025, 8:05 PM Debora Diprizito <ddiprizito@riteaid.com> wrote:

I do not have the store keys.


Alarm codes:


 or ███

Thanks,

Debbie


**Debora DiPrizito \ Director, Real Estate Administration**

**P** 717-731-6586

ddiprizito@RITEAID.com

1

**EXHIBIT F**

**Bass, David**

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Monday, September 8, 2025 3:44 PM |
| **To:** | Park, John |
| **Subject:** | Re: #3871-Owings Mills MD |

 External email >

Wire was sent I'll send you fed ref number tomorrow

On Mon, Sep 8, 2025, 10:41 PM Park, John <JPark@coleschotz.com> wrote:

Kamzi, You are not authorized to change the locks until the wire is sent. You said in your email on 9/2 that it was sent but we do not see it received.

Please send a reference number.



**JOHN PARK**
MEMBER

OFFICE   201.525.6211
CELL      201.723.9240
EMAIL     jpark@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Susan Daly | 201.489-3000, ext. 5106 | sdaly@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Monday, September 8, 2025 1:34 PM
**To:** Debora Diprizito <ddiprizito@riteaid.com>
**Cc:** Park, John <JPark@coleschotz.com>
**Subject:** Re: #3871-Owings Mills MD

**EXHIBIT G**

**Bass, David**

| | |
|---|---|
| **From:** | David Ravanshenas <david@southparkgroup.com> |
| **Sent:** | Wednesday, August 6, 2025 7:27 PM |
| **To:** | Bass, David |
| **Cc:** | Yudkin, Felice; Van Aalten, Seth; Sirota, Michael; Usatine, Warren |
| **Subject:** | 24330 El Toro Road, Laguna Woods, CA 92637 |

 External email

Hi David,

Thanks for getting back to me today.

Pursuant to our conversation, I am writing to submit a formal bid for the Lease located at 24330 El Toro Road, Laguna Woods, CA 92637 (Store No. 5736) (the "Lease"). I am ready to pay an aggregate amount of (a) $800,000 plus (b) all applicable cure costs for the Lease. I am ready to pay such amount in a single lump sum, in readily available funds, as early as Monday, August 11, 2025 or deposit such amount into an escrow account.

I would be happy to present you with any requested documents to evidence my company's financial capacity to make full payment. Please be quick to let me know of any additional information you need in connection with your consideration of my proposal.

Please confirm receipt of this proposal and please pass our proposal along to all relevant parties for consideration. We look forward to hearing from you.

Thank you,


David Ravanshenas
South Park Group Inc.
8322 Beverly Blvd Ste. 301
Los Angeles, CA 90048
Office: (323) 651-0191
Direct: (323) 782-1205
Fax: (323) 651-0794
David@southparkgroup.com

DRE Lic. No. 01869082

**<u>EXHIBIT H</u>**

## ASSUMPTION AND ASSIGNMENT AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement"), dated as of August 19, 2025, is by and between Thrifty Payless, Inc. ("Assignor") and Laguna Woods RA, LLC ("Assignee").

## RECITALS

WHEREAS, Assignor, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"); and

WHEREAS, Assignor has agreed to assign and Assignee has agreed to assume the real property lease(s) listed on the attached Schedule A (referred to as the "Lease(s)") with respect to the premises set forth on Schedule A (the "Premises") pursuant to the terms and conditions of the Auction Procedures approved by the Bankruptcy Court in the chapter 11 cases of *In re New Rite Aid, LLC, et al.*, Case No. 25-14861 (MBK) (the "Bankruptcy Court Approval").

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties ("Parties") hereto agree as follows:

## AGREEMENT

1.    Assignment and Assumption.  Effective upon the receipt of Bankruptcy Court Approval and payment of the Purchase Price as set forth below:

(a)    Assignor hereby sells, transfers, conveys, assigns and sets over to Assignee, its successors and assigns, all of Assignor's right, title, and interest in and to the Lease(s).

(b)    Assignee hereby assumes and undertakes to pay, perform, and discharge all of Assignor's obligations and duties with respect to the Lease(s).

2.    Payment of Purchase Price.  Assignee shall, on or before August 31, 2025, deliver the purchase price for the Lease(s) in the amount of $800,000 (the "Purchase Price") in immediately available funds wired to the account specified by Assignor. Together with the Purchase Price, Assignee shall also pay to Assignor the sum of $29,155.49 respecting rent and other charges paid by Assignor under the Lease for the months in which the Closing (hereinafter defined) occurs and any subsequent months. If the assumption and assignment of the Lease(s) do(es) not occur by August 31, 2025, Assignee will additionally reimburse Assignor for all amounts that came due, were required to be paid, and were in fact paid in connection with the Lease(s) on and after August 31, 2025. The Parties acknowledge that if the assignment and assumption of the Lease(s) (the "Closing") does not occur before September 30, 2025, the Lease(s) may thereafter be rejected in the Bankruptcy Court proceeding referenced above.

3.    Assumption of Liabilities.   In addition to assuming all remaining obligations that exist with respect to the Lease(s), including, but not limited to, accrued but unbilled

Docusign Envelope ID: B1B1B885-C6B4-4A22-8362-A56958B7C74A

adjustments for CAM, real estate taxes, and insurance, Assignee shall assume and cure all outstanding liabilities with respect to the Lease(s).

4.    <u>No Further Liability of Assignor</u>.  From and after Closing, Assignor shall have no further obligations and duties with respect to the Lease(s).

5.    <u>Further Assurances</u>.  At any time and from time to time after the date hereof, at the request of Assignee, and without further consideration, Assignor shall execute and deliver such other instruments of sale, transfer, conveyance, assignment, and confirmation or consents and take such other action as Assignee may reasonably request as necessary or desirable in order to more effectively transfer, convey, and assign to Assignee Assignor's rights to the Lease(s).

6.    <u>"As Is Where Is" Transaction</u>.  Assignee hereby acknowledges and agrees that Assignor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Lease(s).  Without limiting the foregoing, Assignor hereby disclaims any warranty (express or implied) of merchantability or fitness for any premises subject to the Lease(s).  Assignee further acknowledges that the Assignee has conducted an independent inspection and investigation of the physical condition of premises subject to the Lease(s) and all such other matters relating to or affecting the Lease(s) as Assignee deemed necessary or appropriate and that in proceeding with its acquisition of the Lease(s), Assignee is doing so based upon such independent inspections and investigations.  Accordingly, Assignee will accept the Lease(s) "AS IS" and "WHERE IS."

7.    <u>Compliance With Law</u>.  Assignee hereby agrees to comply with all applicable laws.  Assignee agrees to indemnify and hold Assignor harmless for any violation or alleged violation of this section.

8.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

9.    <u>Jurisdiction.</u>  The Parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of New Jersey with respect to all matters arising under or relating to this Agreement.  The Parties hereby irrevocably waive any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

10.    <u>No Reliance</u>.  Each Party represents and warrants that in entering into this Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

11.    <u>Construction</u>.  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was

prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other. The execution and delivery of this Agreement is the free and voluntary act of the Parties.

    12. <u>Execution in Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the Parties to this Agreement may be transmitted by facsimile or by electronic mail, and such transmission will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

[<i>Signatures appear on following page</i>]

**ASSIGNOR:**

**THRIFTY PAYLESS, INC.**


By: _____

Name: _____

Its: _____


**ASSIGNEE:**

**LAGUNA WOODS RA, LLC**

Signed by:

By: ___DAVID RAVANSHENAS_____

Name: ___DAVID RAVANSHENAS_____

Its: ___Senior Vice President_____

**EXHIBIT  I**

**Bass, David**

| | |
|---|---|
| **From:** | Bass, David |
| **Sent:** | Thursday, August 21, 2025 10:48 AM |
| **To:** | Kazmi . |
| **Subject:** | SETTLEMENT DISCUSSIONS |
| **Attachments:** | Rite Aid - Final Sale Procedures Order.pdf; Rite Aid - Order Approving Assumption and Assignment of Lease (Universal Group Companies_ Store _856_ Prospect Pa(50459419.1).pdf |

Kazmi –

I raised your request for compensation on Laguna Woods in exchange for you agreeing not to oppose the assignment to the other entity.  First, I again reiterate that the debtors are within their rights to proceed with the significantly higher post-auction bid, pursuant to, among other provisions, paragraph 3 of the order ("Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties, may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.") and paragraphs P ("Nothing in these Auction Procedures shall abrogate the fiduciary duties of the Debtors.") and S of the bid procedures (set out below), which you specifically acknowledged you reviewed and were bound by.

That said, as a way to resolve any objection you have, I would propose to the debtors and the consultation parties that the estate release you from any liability on account of your breach of the assumption and assignment agreement relating to store 856 in Prospect Park PA and your contempt of the order approving that assignment, a copy of which is also attached.  Please advise if that is acceptable and I will push to get it done.  Thanks.


**S. Fiduciary Out**
Nothing in these Auction Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Auction Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.



**DAVID BASS**
**MEMBER**

OFFICE  646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY  NEW YORK  DELAWARE  MARYLAND  TEXAS  FLORIDA  WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

**Bass, David**

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Thursday, August 21, 2025 12:29 PM |
| **To:** | Bass, David |
| **Subject:** | Re: SETTLEMENT DISCUSSIONS |

 External email

David,

Regarding the Laguna Woods transaction arising from the Rite Aid bankruptcy auction, where I was the winning bidder pursuant to the Court-supervised process. Your firm, acting as fiduciary to the estate, has an obligation to exercise its duties in strict compliance with bankruptcy law, court orders, and principles of fair dealing.

Pursuant to your explicit instructions, I complied with all conditions imposed by the landlord, including direct engagement with the landlord and their counsel. As a result, the landlord confirmed  satisfaction with my assignment and granted consent to my assumption of the lease.

Despite this, your firm is now attempting to substitute an undisclosed bidder—one who did not participate in the auction, has not been approved as a qualified bidder under the Bankruptcy Court's process, and has not obtained the landlord's consent for lease assignment. Such actions directly conflict with the Bankruptcy Code's requirement of transparency and fairness and raise serious concerns about the fiduciary obligations owed by your firm to creditors, the estate, and the integrity of the auction process itself.

Moreover, the covenants and restrictions imposed by the shopping center against this property are extensive and compliance is material to the landlord's consent. I have adhered to every one of these obligations to the landlord's satisfaction. It is entirely unknown whether this new bidder has even reviewed these restrictions or is even aware of them, let alone complied with them or obtained landlord approval. A party that has not demonstrated compliance or awareness of  these strict covenants presents a major risk of failing to secure landlord consent and therefore lacks the certainty to close the transaction. Without proof of compliance, this new bidder cannot possibly be considered "best and highest," as that standard necessarily includes the ability to close in full compliance with all lease obligations of the CRC

As you are aware, a fiduciary duty requires loyalty, good faith, and adherence to court-approved procedures. Certainty of closing and compliance with landlord covenants were integral conditions of the auction. I have met those conditions in full. By contrast, the undisclosed bidder's lack of landlord consent, lack of participation in the auction, and complete absence of engagement with the landlord create a fundamental uncertainty regarding the ability to close the transaction. In bankruptcy sales, "best and highest" does not mean the highest purchase price alone; it necessarily includes certainty of closing, compliance with all conditions, and assurance that the transaction can be completed without delay or risk to the estate. A party who has never even spoken with the landlord, has not obtained

landlord approval, and has not gone through the qualification process cannot possibly meet the best and highest standard because there is no evidence or assurance that they can actually close the transaction as required. The result is a substantial risk of failure to close, which undermines the entire purpose of the court-supervised process.

In the Prospect Park matter, when a landlord objected before the court-mandated deadline, your firm stated that the objection was not valid because, although it was submitted within the proper time frame, it did not comply with the strict procedural requirements for objections. I forwarded the landlord's objection email to you, and you confirmed that even though the objection was timely, it was not in the proper form and therefore did not count. Now, in Laguna Woods, the objection is both untimely and procedurally defective, yet you appear to be accepting it, which is inconsistent and concerning. Moreover, in the Prospect Park matter, ColeSchotz offered to have me pay $25,000 to resolve the issue, which I accepted, even though the landlord had not approved my assignment, and I agreed to pay that amount to settle the matter.

I have incurred approximately $150,000 in costs to complete this transaction in compliance with all court- and landlord-imposed conditions. To avoid formal objection and litigation, I am willing to stipulate to one of the following resolutions:

Proceed with my winning bid as contemplated, in compliance with the Bankruptcy Court's process and landlord approval; or

Compensate me $150,000 for my damages and expenses incurred.

If neither option is acceptable, I will engage bankruptcy counsel to file formal objections, seek enforcement of my winning bid rights, and pursue all available remedies for breach of fiduciary duty and violations of bankruptcy sale procedures.

Please let me know by EOD to give me time to seek counsel if needed.

Thank you!


On Thu, Aug 21, 2025 at 10:48 AM Bass, David <DBass@coleschotz.com> wrote:


Kazmi –


I raised your request for compensation on Laguna Woods in exchange for you agreeing not to oppose the assignment to the other entity.  First, I again reiterate that the debtors are within their rights to proceed with the significantly higher post-auction bid, pursuant to, among other provisions, paragraph 3 of the order ("Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties, may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.") and paragraphs P ("Nothing in these Auction Procedures shall abrogate the fiduciary duties of the Debtors.") and S of the bid procedures (set out below), which you specifically acknowledged you reviewed and were bound by.

That said, as a way to resolve any objection you have, I would propose to the debtors and the consultation parties that the estate release you from any liability on account of your breach of the assumption and assignment agreement relating to store 856 in Prospect Park PA and your contempt of the order approving that assignment, a copy of which is also attached.  Please advise if that is acceptable and I will push to get it done.  Thanks.

**S. Fiduciary Out**

Nothing in these Auction Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Auction Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.



**DAVID BASS**
MEMBER

OFFICE  646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

* * * * * *

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

**Bass, David**

---

| | |
|---|---|
| **From:** | Bass, David |
| **Sent:** | Thursday, August 21, 2025 12:34 PM |
| **To:** | Kazmi . |
| **Subject:** | RE: SETTLEMENT DISCUSSIONS |

The proposal is rejected.  The order and procedures I sent you, which you agreed to, specifically waive any right to the compensation you are requesting.  You can object, and we will proceed with litigation for store 856 unless you remit the purchase price this week.  Thanks.  David



**DAVID BASS**
MEMBER

OFFICE  646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Thursday, August 21, 2025 12:29 PM
**To:** Bass, David <DBass@coleschotz.com>
**Subject:** Re: SETTLEMENT DISCUSSIONS



David,

Regarding the Laguna Woods transaction arising from the Rite Aid bankruptcy auction, where I was the winning bidder pursuant to the Court-supervised process. Your firm, acting as fiduciary to the estate, has an obligation to exercise its duties in strict compliance with bankruptcy law, court orders, and principles of fair dealing.

Pursuant to your explicit instructions, I complied with all conditions imposed by the landlord, including direct engagement with the landlord and their counsel. As a result, the landlord confirmed  satisfaction with my assignment and granted consent to my assumption of the lease.

Despite this, your firm is now attempting to substitute an undisclosed bidder—one who did not participate in the auction, has not been approved as a qualified bidder under the Bankruptcy Court's

1

process, and has not obtained the landlord's consent for lease assignment. Such actions directly conflict with the Bankruptcy Code's requirement of transparency and fairness and raise serious concerns about the fiduciary obligations owed by your firm to creditors, the estate, and the integrity of the auction process itself.

Moreover, the covenants and restrictions imposed by the shopping center against this property are extensive and compliance is material to the landlord's consent. I have adhered to every one of these obligations to the landlord's satisfaction. It is entirely unknown whether this new bidder has even reviewed these restrictions or is even aware of them, let alone complied with them or obtained landlord approval. A party that has not demonstrated compliance or awareness of these strict covenants presents a major risk of failing to secure landlord consent and therefore lacks the certainty to close the transaction. Without proof of compliance, this new bidder cannot possibly be considered "best and highest," as that standard necessarily includes the ability to close in full compliance with all lease obligations of the CRC

As you are aware, a fiduciary duty requires loyalty, good faith, and adherence to court-approved procedures. Certainty of closing and compliance with landlord covenants were integral conditions of the auction. I have met these conditions in full. By contrast, the undisclosed bidder's lack of landlord consent, lack of participation in the auction, and complete absence of engagement with the landlord create a fundamental uncertainty regarding the ability to close the transaction. In bankruptcy sales, "best and highest" does not mean the highest purchase price alone; it necessarily includes certainty of closing, compliance with all conditions, and assurance that the transaction can be completed without delay or risk to the estate. A party who has never even spoken with the landlord, has not obtained landlord approval, and has not gone through the qualification process cannot possibly meet the best and highest standard because there is no evidence or assurance that they can actually close the transaction as required. The result is a substantial risk of failure to close, which undermines the entire purpose of the court-supervised process.

In the Prospect Park matter, when a landlord objected before the court-mandated deadline, your firm stated that the objection was not valid because, although it was submitted within the proper time frame, it did not comply with the strict procedural requirements for objections. I forwarded the landlord's objection email to you, and you confirmed that even though the objection was timely, it was not in the proper form and therefore did not count. Now, in Laguna Woods, the objection is both untimely and procedurally defective, yet you appear to be accepting it, which is inconsistent and concerning. Moreover, in the Prospect Park matter, ColeSchotz offered to have me pay $25,000 to resolve the issue, which I accepted, even though the landlord had not approved my assignment, and I agreed to pay that amount to settle the matter.

I have incurred approximately $150,000 in costs to complete this transaction in compliance with all court- and landlord-imposed conditions. To avoid formal objection and litigation, I am willing to stipulate to one of the following resolutions:

Proceed with my winning bid as contemplated, in compliance with the Bankruptcy Court's process and landlord approval; or

Compensate me $150,000 for my damages and expenses incurred.

If neither option is acceptable, I will engage bankruptcy counsel to file formal objections, seek enforcement of my winning bid rights, and pursue all available remedies for breach of fiduciary duty and violations of bankruptcy sale procedures.

Please let me know by EOD to give me time to seek counsel if needed.

Thank you!

On Thu, Aug 21, 2025 at 10:48 AM Bass, David <DBass@coleschotz.com> wrote:

Kazmi –

I raised your request for compensation on Laguna Woods in exchange for you agreeing not to oppose the assignment to the other entity.  First, I again reiterate that the debtors are within their rights to proceed with the significantly higher post-auction bid, pursuant to, among other provisions, paragraph 3 of the order ("Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties, may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.") and paragraphs P ("Nothing in these Auction Procedures shall abrogate the fiduciary duties of the Debtors.") and S of the bid procedures (set out below), which you specifically acknowledged you reviewed and were bound by.

That said, as a way to resolve any objection you have, I would propose to the debtors and the consultation parties that the estate release you from any liability on account of your breach of the assumption and assignment agreement relating to store 856 in Prospect Park PA and your contempt of the order approving that assignment, a copy of which is also attached.  Please advise if that is acceptable and I will push to get it done.  Thanks.

**S. Fiduciary Out**

Nothing in these Auction Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Auction Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.



COLE SCHOTZ P.C.

**DAVID BASS**
MEMBER

OFFICE  646.563.8932

EMAIL    dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY  NEW YORK  DELAWARE  MARYLAND  TEXAS  FLORIDA  WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

* * * * * *

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

**Bass, David**

| | |
|---|---|
| **From:** | Kazmi . <sk@upssites.com> |
| **Sent:** | Thursday, August 21, 2025 12:36 PM |
| **To:** | Bass, David |
| **Subject:** | Re: SETTLEMENT DISCUSSIONS |

 External email ›

I will have my attorney reach out thanks

On Thu, Aug 21, 2025 at 12:34 PM Bass, David <DBass@coleschotz.com> wrote:

> The proposal is rejected.  The order and procedures I sent you, which you agreed to, specifically waive any right to the compensation you are requesting.  You can object, and we will proceed with litigation for store 856 unless you remit the purchase price this week.  Thanks.  David

 COLE SCHOTZ P.C.

**DAVID BASS**
MEMBER

OFFICE  646.563.8932

EMAIL    dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

**From:** Kazmi . <sk@upssites.com>
**Sent:** Thursday, August 21, 2025 12:29 PM
**To:** Bass, David <DBass@coleschotz.com>
**Subject:** Re: SETTLEMENT DISCUSSIONS

David,

Regarding the Laguna Woods transaction arising from the Rite Aid bankruptcy auction, where I was the winning bidder pursuant to the Court-supervised process. Your firm, acting as fiduciary to the estate,

has an obligation to exercise its duties in strict compliance with bankruptcy law, court orders, and principles of fair dealing.

Pursuant to your explicit instructions, I complied with all conditions imposed by the landlord, including direct engagement with the landlord and their counsel. As a result, the landlord confirmed satisfaction with my assignment and granted consent to my assumption of the lease.

Despite this, your firm is now attempting to substitute an undisclosed bidder—one who did not participate in the auction, has not been approved as a qualified bidder under the Bankruptcy Court's process, and has not obtained the landlord's consent for lease assignment. Such actions directly conflict with the Bankruptcy Code's requirement of transparency and fairness and raise serious concerns about the fiduciary obligations owed by your firm to creditors, the estate, and the integrity of the auction process itself.

Moreover, the covenants and restrictions imposed by the shopping center against this property are extensive and compliance is material to the landlord's consent. I have adhered to every one of these obligations to the landlord's satisfaction. It is entirely unknown whether this new bidder has even reviewed these restrictions or is even aware of them, let alone complied with them or obtained landlord approval. A party that has not demonstrated compliance or awareness of these strict covenants presents a major risk of failing to secure landlord consent and therefore lacks the certainty to close the transaction. Without proof of compliance, this new bidder cannot possibly be considered "best and highest," as that standard necessarily includes the ability to close in full compliance with all lease obligations of the CRC

As you are aware, a fiduciary duty requires loyalty, good faith, and adherence to court-approved procedures. Certainty of closing and compliance with landlord covenants were integral conditions of the auction. I have met those conditions in full. By contrast, the undisclosed bidder's lack of landlord consent, lack of participation in the auction, and complete absence of engagement with the landlord create a fundamental uncertainty regarding the ability to close the transaction. In bankruptcy sales, "best and highest" does not mean the highest purchase price alone; it necessarily includes certainty of closing, compliance with all conditions, and assurance that the transaction can be completed without delay or risk to the estate. A party who has never even spoken with the landlord, has not obtained landlord approval, and has not gone through the qualification process cannot possibly meet the best and highest standard because there is no evidence or assurance that they can actually close the transaction as required. The result is a substantial risk of failure to close, which undermines the entire purpose of the court-supervised process.

In the Prospect Park matter, when a landlord objected before the court-mandated deadline, your firm stated that the objection was not valid because, although it was submitted within the proper time frame, it did not comply with the strict procedural requirements for objections. I forwarded the landlord's objection email to you, and you confirmed that even though the objection was timely, it was not in the proper form and therefore did not count. Now, in Laguna Woods, the objection is both untimely and procedurally defective, yet you appear to be accepting it, which is inconsistent and concerning. Moreover, in the Prospect Park matter, ColeSchotz offered to have me pay $25,000 to resolve the issue, which I accepted, even though the landlord had not approved my assignment, and I agreed to pay that amount to settle the matter.

I have incurred approximately $150,000 in costs to complete this transaction in compliance with all court- and landlord-imposed conditions. To avoid formal objection and litigation, I am willing to stipulate to one of the following resolutions:

Proceed with my winning bid as contemplated, in compliance with the Bankruptcy Court's process and landlord approval; or

Compensate me $150,000 for my  damages and expenses incurred.

If neither option is acceptable, I will engage bankruptcy counsel to file formal objections, seek enforcement of my winning bid rights, and pursue all available remedies for breach of fiduciary duty and violations of bankruptcy sale procedures.

Please let me know by EOD to give me time to seek counsel if needed.

Thank you!

On Thu, Aug 21, 2025 at 10:48 AM Bass, David <DBass@coleschotz.com> wrote:

Kazmi –

I raised your request for compensation on Laguna Woods in exchange for you agreeing not to oppose the assignment to the other entity.  First, I again reiterate that the debtors are within their rights to proceed with the significantly higher post-auction bid, pursuant to, among other provisions, paragraph 3 of the order ("Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties, may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.") and paragraphs P ("Nothing in these Auction Procedures shall abrogate the fiduciary duties of the Debtors.") and S of the bid procedures (set out below), which you specifically acknowledged you reviewed and were bound by.

That said, as a way to resolve any objection you have, I would propose to the debtors and the consultation parties that the estate release you from any liability on account of your breach of the assumption and assignment agreement relating to store 856 in Prospect Park PA and your contempt of the order approving that assignment, a copy of which is also attached.  Please advise if that is acceptable and I will push to get it done.  Thanks.

**S. Fiduciary Out**

Nothing in these Auction Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Auction Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such

action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.



**DAVID BASS**
**MEMBER**

OFFICE   646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

\* \* \* \* \* \*

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

**Bass, David**

---

| | |
|---|---|
| **From:** | Bass, David |
| **Sent:** | Thursday, August 21, 2025 12:40 PM |
| **To:** | Kazmi . |
| **Subject:** | RE: SETTLEMENT DISCUSSIONS |

ok



**DAVID BASS**
MEMBER

OFFICE   646.563.8932

EMAIL    dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

---

**From:** Kazmi . <sk@upsites.com>
**Sent:** Thursday, August 21, 2025 12:36 PM
**To:** Bass, David <DBass@coleschotz.com>
**Subject:** Re: SETTLEMENT DISCUSSIONS

 External email

I will have my attorney reach out thanks

On Thu, Aug 21, 2025 at 12:34 PM Bass, David <DBass@coleschotz.com> wrote:

> The proposal is rejected.  The order and procedures I sent you, which you agreed to, specifically waive any right to the compensation you are requesting.  You can object, and we will proceed with litigation for store 856 unless you remit the purchase price this week.  Thanks.  David



**DAVID BASS**
MEMBER

1

OFFICE  646.563.8932

EMAIL  dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY  NEW YORK  DELAWARE  MARYLAND  TEXAS  FLORIDA  WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

---

**From:** Kazmi . <sk@upssites.com>
**Sent:** Thursday, August 21, 2025 12:29 PM
**To:** Bass, David <DBass@coleschotz.com>
**Subject:** Re: SETTLEMENT DISCUSSIONS

David,

Regarding the Laguna Woods transaction arising from the Rite Aid bankruptcy auction, where I was the winning bidder pursuant to the Court-supervised process. Your firm, acting as fiduciary to the estate, has an obligation to exercise its duties in strict compliance with bankruptcy law, court orders, and principles of fair dealing.

Pursuant to your explicit instructions, I complied with all conditions imposed by the landlord, including direct engagement with the landlord and their counsel. As a result, the landlord confirmed  satisfaction with my assignment and granted consent to my assumption of the lease.

Despite this, your firm is now attempting to substitute an undisclosed bidder—one who did not participate in the auction, has not been approved as a qualified bidder under the Bankruptcy Court's process, and has not obtained the landlord's consent for lease assignment. Such actions directly conflict with the Bankruptcy Code's requirement of transparency and fairness and raise serious concerns about the fiduciary obligations owed by your firm to creditors, the estate, and the integrity of the auction process itself.

Moreover, the covenants and restrictions imposed by the shopping center against this property are extensive and compliance is material to the landlord's consent. I have adhered to every one of these obligations to the landlord's satisfaction. It is entirely unknown whether this new bidder has even reviewed these restrictions or is even aware of them, let alone complied with them or obtained landlord approval. A party that has not demonstrated compliance or awareness of  these strict covenants presents a major risk of failing to secure landlord consent and therefore lacks the certainty to close the transaction. Without proof of compliance, this new bidder cannot possibly be considered "best and highest," as that standard necessarily includes the ability to close in full compliance with all lease obligations of the CRC

As you are aware, a fiduciary duty requires loyalty, good faith, and adherence to court-approved procedures. Certainty of closing and compliance with landlord covenants were integral conditions of the auction. I have met those conditions in full. By contrast, the undisclosed bidder's lack of landlord consent, lack of participation in the auction, and complete absence of engagement with the landlord create a fundamental uncertainty regarding the ability to close the transaction. In bankruptcy sales, "best and highest" does not mean the highest purchase price alone; it necessarily includes certainty of closing, compliance with all conditions, and assurance that the transaction can be completed without delay or risk to the estate. A party who has never even spoken with the landlord, has not obtained landlord approval, and has not gone through the qualification process cannot possibly meet the best and highest standard because there is no evidence or assurance that they can actually close the transaction as required. The result is a substantial risk of failure to close, which undermines the entire purpose of the court-supervised process.

In the Prospect Park matter, when a landlord objected before the court-mandated deadline, your firm stated that the objection was not valid because, although it was submitted within the proper time frame, it did not comply with the strict procedural requirements for objections. I forwarded the landlord's objection email to you, and you confirmed that even though the objection was timely, it was not in the proper form and therefore did not count. Now, in Laguna Woods, the objection is both untimely and procedurally defective, yet you appear to be accepting it, which is inconsistent and concerning. Moreover, in the Prospect Park matter, ColeSchotz offered to have me pay $25,000 to resolve the issue, which I accepted, even though the landlord had not approved my assignment, and I agreed to pay that amount to settle the matter.

I have incurred approximately $150,000 in costs to complete this transaction in compliance with all court- and landlord-imposed conditions. To avoid formal objection and litigation, I am willing to stipulate to one of the following resolutions:

Proceed with my winning bid as contemplated, in compliance with the Bankruptcy Court's process and landlord approval; or

Compensate me $150,000 for my damages and expenses incurred.

If neither option is acceptable, I will engage bankruptcy counsel to file formal objections, seek enforcement of my winning bid rights, and pursue all available remedies for breach of fiduciary duty and violations of bankruptcy sale procedures.

Please let me know by EOD to give me time to seek counsel if needed.

Thank you!

On Thu, Aug 21, 2025 at 10:48 AM Bass, David <DBass@coleschotz.com> wrote:


Kazmi –

I raised your request for compensation on Laguna Woods in exchange for you agreeing not to oppose the assignment to the other entity.  First, I again reiterate that the debtors are within their rights to proceed with the significantly higher post-auction bid, pursuant to, among other provisions, paragraph 3 of the order ("Subject to the terms of the Auction Procedures, the Debtors, in consultation with the Consultation Parties, may modify the Auction Procedures as necessary or appropriate to maximize value for their estates.") and paragraphs P ("Nothing in these Auction Procedures shall abrogate the fiduciary duties of the Debtors.") and S of the bid procedures (set out below), which you specifically acknowledged you reviewed and were bound by.

That said, as a way to resolve any objection you have, I would propose to the debtors and the consultation parties that the estate release you from any liability on account of your breach of the assumption and assignment agreement relating to store 856 in Prospect Park PA and your contempt of the order approving that assignment, a copy of which is also attached.  Please advise if that is acceptable and I will push to get it done.  Thanks.

**S. Fiduciary Out**

Nothing in these Auction Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Auction Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.


COLE SCHOTZ P.C.

**DAVID BASS**
MEMBER

OFFICE   646.563.8932

EMAIL   dbass@coleschotz.com

Court Plaza North | 25 Main Street | Hackensack, NJ 07601

NEW JERSEY   NEW YORK   DELAWARE   MARYLAND   TEXAS   FLORIDA   WASHINGTON, D.C.

VCARD | BIO | COLESCHOTZ.COM

Legal Practice Assistant: Aishling Brennan | 201.489.3000 x 5008 | ABrennan@coleschotz.com

* * * * * *

This e-mail message from Cole Schotz P.C. is private and may contain privileged information. If you are not the intended recipient, please do not read, copy or use it or disclose it to others. If you have received this message in error, please notify the sender immediately by replying to this message and then delete it from your system.

**<u>EXHIBIT J</u>**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE DISTRICT OF NEW JERSEY

IN RE:                        .    Case No. 25-14861-MBK
                              .
NEW RITE AID, LLC,            .    Clarkson S. Fisher U.S.
et al.,                       .      Courthouse
                              .    402 East State Street
            Debtors.          .    Trenton, NJ 08608
                              .
                              .    August 28, 2025
 . . . . . . . . . . . . .         12:34 p.m.

             TRANSCRIPT OF SALE HEARING REGARDING CERTAIN
                  LEASES AND FEE OWNED PROPERTIES
              BEFORE THE HONORABLE MICHAEL B. KAPLAN
                 UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              Cole Schotz P.C.
                              By:  DAVID BASS, ESQ.
                              Court Plaza North
                              25 Main Street
                              Hackensack, NJ 07601

For Kin Properties:           Tayman Lane Chaverri LLP
                              BY:  JEFFREY RHODES, ESQ.
                              2001 L Street, NW
                              Suite 500
                              Washington, DC 20036

For 5931 Atlantic LLC:        Ballard Spahr LLP
                              BY:  LESLIE HEILMAN, ESQ.
                              919 North Market Street
                              11th Floor
                              Wilmington, DE 19801

Audio Operator:               Linda Brakel


 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**Email:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

APPEARANCES (CONTINUED):

```
For Ross Dress for Less:        Ballard Spahr LLP
                                BY:  MATTHEW SUMMERS, ESQ.
                                919 North Market Street
                                11th Floor
                                Wilmington, Delaware 19801

                                Saul Ewing LLP
                                BY:  LUCIAN MURLEY, ESQ.
                                1201 North Market Street
                                Suite 2300
                                Wilmington, DE 19801

For SN Investment               Mandelbaum Barrett PC
Properties:                     BY: RYAN BUEHLER, ESQ.
                                3 Becker Farm Road, Suite 105
                                Roseland, NJ 07068

                                Stoel Rives LLP
                                BY: BRYAN GLOVER, ESQ.
                                600 University Street, Suite 3600
                                Seattle, WA 98101

For TMT Bear Creek Shopping     Greenbaum, Rowe, Smith & Davis
Center, Inc:                       LLP
                                BY: DAVID L. BRUCK, ESQ.
                                99 Wood Avenue South
                                Iselin, NJ 08830

For Five Below, Inc:            Jones Day
                                BY: DAN REYNOLDS, ESQ.
                                North Point
                                901 Lakeside Avenue
                                Cleveland, OH 44114

For Various Landlords:          Kelley Drye & Warren LLP
                                BY: JENNIFER RAVIELE, ESQ.
                                3 World Trade Center
                                175 Greenwich Street
                                New York, NY 10007

For BM Properties and           Forman Holt
AJC Legacy Trust, LLC:          BY: MICHAEL HOLT, ESQ.
                                365 West Passaic Street
                                Suite 400
                                Rochelle Park, NJ 07662
```

3

APPEARANCES (CONTINUED):

For Mill Avenue Associates,       Halperin Battaglia Benzua, LLP
LLC:                              BY: DONNA LIEBERMAN, ESQ.
                                 40 Wall Street, 37th Floor
                                 New York, NY 10005

For Chen 1998 Family Trust:       Offit Kurman, P.A.
                                 BY: PAUL WINTERHALTER, ESQ.
                                 21 Main Street, Suite 158
                                 Hackensack, NJ 07601

For SVAP III Plaza Mexico:        Barclay Damon, LLP
LLC:                              BY: SCOTT FLEISCHER, ESQ.
                                 1270 Avenue of the Americas,
                                 Suite 501
                                 New York, NY 10020

For AmeriServ Financial           Tucker Arensberg, P.C.
Bank and Martin Perry as          BY: MARIBETH THOMAS, ESQ.
Receiver:                        One PPG Place, Suite 1500
                                 Pittsburgh, PA 15222

For Murray Avenue Market:         Bernstein Burkley, P.C.
                                 BY: MASON SHELTON, ESQ.
                                 601 Grant Street
                                 9th Floor
                                 Pittsburgh, PA 15219

4

**INDEX**

|  | **ID** | **EVD** |
|---|---|---|
| **EXHIBITS** | | |
| FOR THE DEBTORS: | | |
| D-1 | 39 | 40 |
| D-2 | 39 | 40 |
| D-3 | 39 | 40 |
| FOR SVAP III PLAZA MEXICO LLC: | | |
| S-1 | 39 | 40 |
| S-2 | 39 | 40 |
| S-3 | 39 | 40 |
| S-4 | 39 | 40 |
| FOR MURRAY AVENUE MARKET: | | |
| Declaration of Itzhak Glassner | 61 | 61 |

5

1           (Proceedings commence at 12:34 p.m.)

2           THE COURT:  Good afternoon, everyone.  This is Judge

3  Kaplan.  We'll start today's hearings in a moment. Let

4  everybody adjust their screens.  The Court will be addressing

5  the various Rite Aid matters that are under the agenda.

6           As is the norm, please use the "raise hand" function

7  if you wish to be heard and I haven't called on you already.

8  Let me -- bear with me one second.

9           Okay.  All right, let me turn to debtors' counsel

10 then and ask how you intend to proceed.

11          MR. BASS:  Okay, I just wanted to make sure I was off

12 mute.  Thank you, Your Honor.

13          THE COURT:  No problem.

14          MR. BASS:  David Bass, Cole Schotz PC, on behalf of

15 the debtors.

16          We have two matters that are, well, there may be some

17 more that are contested, but certainly two that will go forward

18 as contested matters.  But before we do that, I wanted to sort

19 of run through sort of a presentation where we are in the

20 process, address some of the matters on the agenda, and then

21 get to the two, as I said, contested matters towards the end.

22 So if that works for Your Honor, I'll proceed in that fashion.

23          THE COURT:  That's fine.

24          MR. BASS:  Okay.  We're here this afternoon to

25 continue to move forward with the Court's approval of the

6

disposition of certain of the debtors' leases that were the

subject of marketing and auction process on July 21st, 2025,

and the approval of the sale of fee-owned properties pursuant

to an auction held on August 1, 2025.  The marketing process

and auctions relating to each of those were authorized by this

Court's final order, establishing procedures for sale of

certain leases and fee-owned properties and granting related

relief.  That order is at Docket 804.

First, with respect to the leases, as I previously

reported to the Court at the hearing held on August 14th, the

debtors believe the transactions for which the debtors are

seeking approval have been a very successful -- the culmination

of a very successful marketing process in which the debtors

received successful bids for more than 90 of their leaseholds

and more than 40 of the fee-owned properties.  We believe the

lease sales will bring in nearly $17 million for the estate and

fee-owned properties nearly $59 million.

We filed a number of notices relating to the

successful bids and the proposed assumption and assignment of

the leases, which are reflected on the agenda that was filed

last evening at Docket Number 2188.  Generally, those notices

include Docket Numbers 1524, 1525, 1788, and 1887.  Following

today's hearing and subject in certain respects to rulings that

may follow today, the debtors intend to continue to present

orders approving those transactions.

7

1          In addition to pushing through the disposition of the

2    debtors' assets with the successful bidders, the debtors have

3    also changed course with a few of the leases that were subject

4    to disputes.  I'll go through those shortly as each one has its

5    own unique set of facts, but wanted to point out those notices,

6    too, which are filed at Docket Numbers 1957, 1987, and 1997.

7          We spent considerable time over the last 30-plus days

8    trying to resolve a number of substantive objections to the

9    proposed assumption and assignment of the leases, whether

10   adequate assurance, cure, or otherwise.  We've made

11   considerable headway, but there remain a number of objections

12   that are not, as of today, completely resolved.  I'm happy to

13   report, however, that of the remaining objections on the

14   calendar today, only two are from landlords who are directly

15   challenging the assumption and assignment of the lease to the

16   proposed assignee.

17         Following the presentation, we intend to present

18   argument and limited testimony with respect to those two

19   objections and seek to have them overruled.  Those objections

20   relate to Store 274 in Pittsburgh, PA, which the debtors seek

21   to assign to Murray Avenue Market and Store 5476, which is part

22   of the raw Stress for Less package of 18 leases.

23         The debtors also filed a limited omnibus reply to the

24   various cure objections that remain unresolved as of today.

25   That's at Docket Number 2004.  Those objections are listed on

8

1  the agenda.  In short strokes, the debtors are asking that the

2  Court permit assignments of the various leases that are subject

3  to a cure objection only without prejudice to the rights and

4  claims of the landlords to recover the full amount of their

5  cure.

6       What the debtors are proposing, consistent with

7  Section 365(b)(1) of the Bankruptcy Code, is that the debtors,

8  or the assignee as applicable, will pay the undisputed portion

9  of the cure amount in conjunction with the assignment and that

10 the remaining disputed portion will be escrowed pending an

11 agreement with the applicable landlord or as determined by the

12 Bankruptcy Board.  Because the disputed amounts will be

13 escrowed, the landlords are protected and the debtors are

14 providing adequate assurance that they will promptly cure,

15 consistent with the statutory requirements.

16      So with that, Your Honor, I'll pause to see if the

17 Court wants to entertain comments, if any, from the landlords

18 on that omnibus reply and the relief that is proposed in there

19 or whether I should proceed through the balance of the agenda

20 and we can pick that up after.

21      THE COURT:  Well, I'd rather address the landlord's

22 concerns regarding the omnibus reply and how we're going to

23 address the various remaining open cure issues.

24      I see a hand raised.  Mr. Rhodes?

25      MR. RHODES:  Yes, Your Honor.  Thank you.

1              Good morning.

2              THE COURT:  Good morning or good afternoon.

3              MR. RHODES:  Or good afternoon, I should say.  This

4    is Jeff Rhodes on behalf of Kin Properties.  And we don't have

5    an issue with the omnibus reply.  I just wanted to get out in

6    front on the record, we are currently in discussions.  One of

7    our leases, one of my clients' leases, it's Store 5621 in

8    Carlsbad, California, is part of the Ross lease package.  And

9    the parties have been discussing the documentation, including

10   assignment documents, proposed order.  We're extremely close,

11   and I understand that Ross also shares that view, but we're not

12   at the finish line just yet.

13             So since the hearing is upon us, I just wanted to

14   appear and apprise the Court of that fact and just to reserve

15   rights.  We fully expect a resolution, but, you know, subject

16   to getting to a final agreement, you know, the parties are

17   reserving all rights.

18             THE COURT:  All right.  Thank you.

19             MR. RHODES:  Thank you.

20             MR. BASS:  And, Your Honor, I did intend to address

21   the Ross status a little bit later on, but I think what Mr.

22   Rhodes set out, and I believe Ross counsel is on as well, can

23   confirm.  I was going to make a similar presentation that,

24   while I think we're there or substantially there on some of the

25   Ross objections, other than the one to Linwood and possibly the

10

1  one to Half Moon Bay, we are, of the 18 leases, I do believe

2  we're extremely close on nearly all of them.

3        So we can discuss with Ross whether or not to submit

4  an order that addresses the ones they've resolved.  But we'll

5  communicate with Ross after the hearing to figure out exactly

6  where they want to go.

7        THE COURT:  All right.  Thank you, Mr. Bass.

8        Ms. Heilman?

9        MS. HEILMAN:  Good afternoon, Your Honor.

10       THE COURT:  Good afternoon, Ms. Heilman.

11       MS. HEILMAN:  Leslie Heilman on behalf of -- I raise

12 my hand, Your Honor, just on behalf of 5931 Atlantic LLC.  It

13 is one of the leases that is subject to a lease termination bid

14 that has been deemed a successful bidder.  We continue to work

15 through a reconciliation of the post-petition waiver amount

16 that's part of the consideration under that LTA, as well as we

17 are working through the LTA.

18       We do believe it was inadvertently included in the

19 omnibus reply on cures because we did file a reservation of

20 rights while the parties continue to reconcile and reach an

21 agreement on the consideration piece for that bid.  So I just

22 raise my hand and just raise that it is not subject to an

23 assignment.  It is subject to a termination agreement with the

24 landlord.

25       MR. BASS:  I'm completely in agreement with Ms.

1 Heilman.

2             THE COURT:  Well, good.  We'll stop there.

3             MS. HEILMAN:  Thank you.

4             THE COURT:  All right.

5             MR. BASS:  Not often.

6             THE COURT:  Thank you.  Thank you, Ms. Heilman.

7             Mr. Summers?

8             MR. SUMMERS:  Good afternoon, Your Honor.

9             Matthew Summers on behalf of Ross Dress for Less,

10 Inc., which is a buyer of some of these leases at issue.

11             I just want to confirm that we are resolved on the

12 Sonoma, California location with respect to the cure and other

13 issues.  On Carlsbad, which was Mr. Rhodes' location, Store

14 5621, there's a lease amendment proposed language to the order.

15 I believe that we're there or almost there, and so I think that

16 that will be resolved.  I understand Mr. Rhodes' reservation of

17 rights.

18             And then on the Tigard, Oregon location, I think

19 we're resolved on the Marshalls lease exclusive issue or use

20 issue with some language that's been proposed that we've agreed

21 to.  There's still about a $15,000 discrepancy on the cure that

22 I think we'll probably be able to work through here very, very

23 shortly.  And otherwise confirm what Mr. Bass has said about

24 the status of the Ross transaction.

25             That leaves Linwood, which I am not handling, as

1  unresolved, and Half Moon Bay is also unresolved.

2         THE COURT:  All right.  Thank you.

3         Mr. Glover?

4         MR. BUEHLER:  Your Honor, there are two Mr. Glovers

5  on here.  I'm Ryan Buehler, Your Honor, local on this.  I used

6  Mr. Glover's dial-in for Zoom, but I'm with Mandelbaum Barrett.

7  I'm here on what would typically be Vince Roldan, Your Honor,

8  on the matter.

9         THE COURT:  Okay.

10        MR. BUEHLER:  But I'm here with Mr. Glover, and Mr.

11 Glover can update Your Honor on where we stand.  And, Your

12 Honor, we represent SN Investment Properties, LLC.

13        THE COURT:  All right.  Well, then we'll call counsel

14 for SN Investment Properties.

15        MR. GLOVER:  Yes, good afternoon, Your Honor, and

16 I'll be very brief.  I know there's a lot to get through today,

17 but I would just confirm essentially what Mr. Summers just said

18 with respect to SN Investments is that we had raised an

19 objection that I believe is being resolved with what I heard,

20 that Ross has accepted our proposed language that would go in

21 the proposed order.

22        So long as that's the case, I believe our use

23 objection is resolved.  The cure would remain outstanding, but

24 just for the record, we still do have that objection out there,

25 but so long as Ross has accepted the language that we had

26 proposed, I just want to state on the record that our objection

27 as far as the use is concerned would indeed be resolved.

1          THE COURT:  All right.  Thank you.

2          MR. GLOVER:  Thank you.

3          THE COURT:  I'll leave that for you to work out or

4   hope and resolve.

5          All right.  Anyone else who wishes to respond or

6   comment or provide the Court with information with respect to

7   the debtors' omnibus reply regarding the cure objections?

8                    (No audible response)

9          THE COURT:  All right, Mr. Bass, let's move on then.

10          MR. BASS:  Okay.  So while I do not intend to go

11   through every single lease or sale transaction today, I did

12   want to highlight the status of a few of those matters and

13   address relief, particularly on some of them.

14          First, I'd like to turn to the item set out in the

15   agenda as Matter O, which is the notice of proposed sale order

16   regarding designation rights agreement between the debtors and

17   Five Below, Inc., which could be found at Docket Number 1963.

18   The only relief we're seeking today with respect to Five Below

19   is the approval of that order.  We are not notably seeking to

20   approve the assumption and assignment of any leases to Five

21   Below today.

22          With that said, we do recognize there are objections

23   both to cure and other substantive issues that have been filed

24   by the landlords to the potential assumption and assignment to

25   Five Below.  Those objections will only become relevant, if at

26   all, once Five Below designates a lease for assignment.  But

14

1   that said, the debtors and Five Below have agreed to certain

2   language in the order that, in essence, preserves pending

3   objections of the landlords and have shared that language with

4   the various objecting landlords to make it clear that those

5   objections are preserved.  And I believe the objecting

6   landlords have all signed off on that language.

7          Also, we did receive an informal objection from the

8   debtors insurers who requested certain language be included in

9   the Five Below orders, which the debtors and Five Below have

10  both agreed to include, so that would resolve that informal

11  objection.

12         With those changes to that order, I don't believe

13  there are any objections to the entry of it.  But before I

14  formally ask the Court to enter that order, I welcome any

15  comments from the opposing landlords or Five Below, should they

16  wish to weigh in today.

17         THE COURT:  All right. I see Mr. Bruck's hand.

18  Before I turn to Mr. Bruck, so what the Court is being asked to

19  do is approve the sale of Five Below, but not any specific --

20         MR. BASS:  Correct.  It would be the designated

21  rights -- it would be --

22         THE COURT:   -- lease assignment among those who have

23  objected.

24         MR. BASS:  Correct.  We're not assigning any leases

25  today.

26         THE COURT:  Any of them.

1          MR. BASS:  The only order we're requesting entry of

2   is the approval of the sale of the designation rights.

3          THE COURT:  The sale of the designation rights.  All

4   right.

5          Mr. Bruck, I see your hand raised.

6          MR. BRUCK:  Good afternoon, Your Honor.  So I

7   represent Landlord TMT Bear Creek Shopping Center, which is one

8   of the leases which is the subject of the sale of the

9   designation rights.

10          And Mr. Bass is correct that there has been some

11   language circulated from counsel to Five Below, as well as the

12   debtor, which basically preserves the rights of the landlord's

13   objections as filed.  And the agreement is that they will not

14   be heard until such time as Five Below actually designates the

15   leases to be assumed.

16          THE COURT:  All right.  Thank you for your

17   confirmation.  Mr. Bass, what's the time frame for the

18   designation for Five Below to make the designation under the

19   order?

20          MR. BASS:  I believe we did extend it to November --

21          THE COURT:  Okay.

22          MR. BASS:  -- which would be before the deadline

23   under 365(d)(4).  But I -- and Five Below's counsel is on.

24   They can certainly speak to it.  I expect that most decisions

25   would be made before November and sometime in September or

26   October.  But again, I do believe they have the right to go

1  until November.

2          THE COURT:  All right.  I'm just trying to get a

3  sense, too, of what will be needed of the Court calendar-wise

4  in the event there are disputes.

5          Mr. Reynolds, raised hand?

6          MR. REYNOLDS:  Yes, Your Honor.  Good morning.

7          Dan Reynolds, counsel for Five Below.

8          Just for the benefit of the record, the designation

9  rights deadline is October 31st.

10          THE COURT:  Okay.

11          MR. BASS:  Okay.  Sorry.  We had been negotiating and

12  I didn't realize if we had extended it.  But October 31st.

13          THE COURT:  All right. So I can anticipate activity

14  as we get close.  Then without further objection, the Court

15  will -- at least I'll indicate the Court has no issue with

16  entering the order approving the sale of the designation

17  rights.  We'll wait for a final order to come down to chambers.

18          MR. BASS:  Yes.  We'll submit that later today to

19  make sure everybody is signed off.

20          THE COURT:  All right.

21          MR. BASS:  Okay.  Next, I'd like to address the

22  notices I referred to earlier relating to Store Numbers 10579,

23  5736 and 5891.  I'll take Store 5736 first, which is the

24  debtors' store in Laguna Woods, California, and the notice we

25  filed at Docket Number 1987.  We received an objection to the

26  debtors' notice of new successful bidder last evening from an

17

1  entity that was initially determined to be the successful

2  bidder.  So in light of that objection, we do not intend to

3  proceed on that matter today.

4          But I did want to provide the Court a little bit of

5  context and ask that the Court schedule the matter for

6  September 16th hearing.  This way, the debtors will have an

7  opportunity to adequately review that objection and respond to

8  the allegations, some of which were raised for the first time

9  in that objection.

10          But just by way of brief background, so the Court

11  understands what was occurring there, following the auction,

12  the debtors received an unsolicited bid for $800,000 for the

13  assignment of that lease, plus the proposed assignee was

14  assuming and paying approximately $92,000 in cure.  So the bid

15  does have a net value to the estate of approximately of

16  $800,000.

17          The successful bid that had been previously agreed

18  upon -- I'm sorry, previously been accepted at the auction had

19  a value of $138,810.  But from that, the debtors are obligated

20  to satisfy the cure.  So it essentially has a net value to the

21  estate of approximately $50,000 or less than $50,000.

22          Once the debtors received a signed assumption and

23  assignment agreement from that new bidder and following

24  discussions with the consultation parties, the debtors advised

25  the prior successful bidder, Universal Group Companies, that

26  they were exercising their fiduciary out consistent with the

18

1  bidding procedures order, which is consistent with the debtors'

2  fiduciary duty in any respect, but there is a specific

3  fiduciary out under the procedures.

4         Again, because there was an objection file last night

5  that made allegations that debtors do want to examine, we're

6  not asking the Court to rule on that today.  And we're asking

7  that the Court defer consideration of the matter until the

8  hearing on September 16th.

9         THE COURT:  All right.  It was the Norgaard O'Boyle

10 firm that I saw filed the objection.

11        MR. BASS:  Correct.

12        THE COURT:  Do we have counsel on the line or do you

13 know if they're joining us?

14        MR. BASS:  I did let Mr. Hannon know last night and

15 Mr. O'Boyle this morning that we would not be seeking relief.

16        THE COURT:  That's fine.

17        MR. BASS:  I did tell Mr. O'Boyle that I would

18 provide a little bit of context, but I did advise them we were

19 not proceeding today.  So I don't know if they're attending or

20 not, but.

21        THE COURT:  All right.  Then we will -- I don't want

22 to comment further.  I did have a chance to read their

23 objection.  We will carry the notice of acceptance Docket 1987

24 to September 16th.  We have it at 11:30.

25        MR. BASS:  Thank you, Your Honor.

26        THE COURT:  Thank you.  With that hearing coming up,

19

1  to the extent there's going to be witness testimony or

2  evidentiary issues rather than simply argument, we'll need to

3  have the parties touch base with chambers in advance.

4          MR. BASS:  Absolutely, Your Honor.

5          THE COURT:  All right.

6          MR. BASS:  Okay.  The next matter I want to address

7  is at Docket 1997, which is relating to the lease for the

8  debtors' Store Number 5891 in Pacifica, California.  There, we

9  had a successful bid from an entity known as Ohana Growth

10 Partners, which is a Planet Fitness franchisee.

11         At the auction, Mr. LeHane, on behalf of the

12 landlord, notified the debtors in the proposed assignee that

13 the landlord would be objecting to the proposed assignment

14 based on a restriction in the lease with another tenant in the

15 shopping center that prohibited, among other uses, a gymnasium

16 or a health or aerobics studio.

17         Well, the debtors dispute that they're bound by that

18 restriction.  There are risks attendant to proceeding with the

19 proposed assignment there.  As a result, when the landlord

20 offered the same consideration that the successful bidder was

21 providing following the auction, the debtors gave that offer

22 due consideration.

23         The debtors discussed the matter with the

24 consultation parties.  And ultimately, given the uncertainty of

25 being able to deliver the lease, the prospect of ongoing

26 protracted litigation and the cost thereof, and the potential

20

1  that the debtors would receive nothing if the assignment

2  failed, whether before this Court or on appeal, the debtors

3  determined to take the landlord's offer.

4        I had a conversation with Ohana, and then we filed

5  the successful bidder notice.  While Ohana was disappointed,

6  they appeared to understand the debtors' decision, and they

7  have not expressed any objection to the debtors proceeding with

8  the landlord offer.  I don't think they're on the Zoom today,

9  but again, they did not indicate any objection.

10       I'm not sure if Mr. LeHane or anyone from the Kelley

11 Drye Firm wants to address this matter but, absent that, we do

12 expect to have an order for the Court's consideration on this

13 one very shortly.

14       THE COURT:  And that is Store 5891?  Which store --

15       MR. BASS:  That is 5891 in Pacifica, California.

16 Correct.

17       THE COURT:  All right.   I see Ms. Raviele?

18       MS. RAVIELE:  Yes, Your Honor.  Can you hear me?

19       THE COURT:  Yes, I can.

20       MS. RAVIELE:   Thank you.

21       For the record, Jennifer Raviele of Kelley Drye &

22 Warren on behalf of the landlord for Store 5891.

23       I just wanted to confirm that we agree with Mr.

24 Bass's recitation of what occurred.  We appreciate that we were

25 able to work something out here, and we look forward to

26 finalizing the documents so we can get the order on file.

1           THE COURT:  All right.  I appreciate your

2   confirmation.  Then, Mr. Bass, I can mark Docket Number 1997

3   with respect to that notice as order to be submitted?

4           MR. BASS:  Correct, Your Honor.

5           THE COURT:  Okay.  So we'll take that off the

6   calendar.  All right.

7           MR. BASS:  Okay.

8           THE COURT:  And that brings us to Store 10579?

9           MR. BASS:  Correct, which is the debtors' store on

10  Fort Hamilton Parkway in Brooklyn.  There we had a bid from an

11  entity known as Capital D Acquisitions, LLC.  However, when we

12  received the adequate assurance information from the bidder, it

13  came from a different entity.  And while the principals, as I

14  understand it, while the principals of Capital D Acquisitions

15  and the proposed assignee, which was known as Golden Touch, may

16  have some relationship, it didn't appear that Capital D

17  Acquisitions and Golden Touch are, in fact, affiliated in any

18  way.

19          And frankly, what was provided in the context of

20  adequate assurance was sparse and without concrete financial

21  support.  We then learned through the debtors' objection of a

22  long-running dispute between the principals or affiliates of

23  Capital D Acquisition and the landlord, and ongoing litigation

24  between affiliates of Capital D Acquisition and the landlord.

25          So after further discussions with the landlord's

26  counsel, it became evident to the estate that the prospect of

1   being able to deliver a good-faith finding on this lease was

2   dubious at best.  The landlord, who was represented by Mr.

3   Holt, made it clear that it would oppose not only the

4   assignment on adequate assurance grounds and the peculiar

5   circumstances surrounding the bidding and the proposed

6   assignee, but would challenge any good-faith finding.

7            In connection with those discussions with the

8   landlord, the landlord then offered to match the consideration

9   provided by the successful bid.  So again, rather than face the

10  prospect of protracted litigation, including the possibility

11  that the assignee would not be conferred good-faith status, the

12  debtors determined in their business judgment to minimize the

13  execution risks and the costs of protracted litigation and

14  proceed with the offer for the landlord.

15

16           While the successful bidder, who I believe is on the

17  Zoom today, or at least a representative of that entity, has

18  continued to push the estate to move forward with its bid, the

19  debtors in their business judgment are not inclined to incur

20  the costs to carry that lease and litigate with the landlord

21  and risk receiving nothing, whether in this Court or having the

22  assignment overturned on appeal.  The discussions with the

23  landlord have been completely arm's length and in good faith.

24           And I can let Mr. Holt address the history here if he

25  wants, but suffice it to say, the debtors believe proceeding

26  with the landlord transaction minimizes the cost and risk to

23

1  the estate and provides a substantial recovery on account of

2  the lease without the risk and cost the proposed assignment to

3  the landlord carries.

4        So here, too, we are prepared to present the Court

5  with an order to approve the termination of the lease with the

6  landlord for $500,000, less the agreed-upon cure amount of

7  approximately $90,000.

8        THE COURT:  All right, thank you, Mr. Bass.  Before I

9  turn to Mr. Holt's hand raised, Mr. Benin (phonetic), who do I

10  have as counsel for the successful bidder at the time?

11        MR. BENIN:  Hi, Judge Kaplan.  I'm sorry.  I'm not

12  that familiar with computers so much.  Obviously, I am.  I just

13  sometimes they work and don't work.  I just want to confirm you

14  can hear me, Judge.

15        THE COURT:  Yes, I can.

16        MR. BENIN:  Okay, Judge, forgive me.  Forgive me,

17  Your Honor.  And I know you're sitting on the bench now to

18  ascertain what's best for this bankruptcy in terms of what

19  Counsel Bass has said to you regarding what their position is.

20        THE COURT:  Well, I need to hear first who you are

21  and what your relationship is.

22        MR. BENIN:  Sorry, Judge.  My name is Mark Benin.  I

23  am a member of the entity that was bidding on the lease, which

24  was actually higher than the bid that they are trying to take

25  today.  My name, again, is Mark Benin, Judge.  And I'm on this

26  hearing, which I found out yesterday by ways of Counsel Bass.

24

1  I contacted my attorney at Reed Smith to involve themselves in

2  this matter.

3        Quite frankly, Your Honor, in one sentence, due to

4  the fact that I'm not going to use this podium as a litigious

5  standpoint, I'm not a lawyer.  The situation is, in my opinion,

6  much different than what Counsel Bass is saying.  And I think

7  that once we're able to prove this to you, Judge, I think that

8  we would get a fair answer in what you deem is fair per the

9  lease for the site on 6423 Fort Hamilton Parkway.

10        There is a $9 million lis pendens on the property

11  right now.  And I am ready, willing, and able to proceed with

12  the funds needed to purchase the lease.  We are in contract to

13  purchase the building.  I don't know if Counsel has mentioned

14  to you that the tenant has been operating the building without

15  a certificate of occupancy for over 20 years.  And in closing,

16  Your Honor --

17        THE COURT:  Finish up then.  Thank you.

18        MR. BENIN:  In closing, Your Honor, I'm asking you

19  for a chance for me to engage with Counsel, which I did

20  yesterday, to bring into this matter.

21        THE COURT:  All right.  Thank you.  Let me hear from

22  Mr. Holt.  Thank you, Mr. Benin.

23        MR. BENIN:  Thank you, Judge.

24        THE COURT:  Mr. Holt.

25        MR. HOLT:  Your Honor, I object to Mr. Benin

26  appearing on behalf of any of the bidders.  They're all either

1  LLCs or corporations.  To my knowledge, he's not an attorney

2  admitted to practice law in the District of New Jersey.  And

3  it's longstanding law in both the federal and state courts in

4  New Jersey that a corporate entity, whether it's an LLC or a

5  corporation, is required to appear through counsel.

6       That being said, I think that Mr. Bass gave an

7  excellent and very concise recitation of the issues that are

8  before Your Honor today.  And it really comes down to that the

9  debtor and the exercise -- the debtors in the exercise of their

10 business judgment in consultation with the consultation parties

11 who have the real skin in the game here have made an informed

12 business decision that accepting a burden in hand is better

13 than accepting continued litigation and the attendant risk

14 that's associated with that litigation.

15       There is a history of litigation between my client as

16 the property owner, my clients as the property owners, and

17 whoever this proposed assignee might be.  The notice of

18 assumption and assignment at ECF Number 1525 identifies it as

19 Capital D Acquisitions LLC.  As Mr. Bass said, when we asked

20 for the adequate assurance package, what we got were two

21 letters involving an outfit called Golden Touch Healthcare LLC

22 or something along those lines.  No mention of Capital D

23 Acquisitions LLC.

24       Those letters were wholly inadequate to support a

25 finding of adequate assurance of future performance.  And we

26

1  lodged an objection, a timely objection, which is at ECF Number

2  1795, both as to the cure amount, the identity of the proposed

3  assignee, and the adequate assurance of future performance.

4  Mr. Benin, while he's not an attorney, appeared on the scene at

5  some point after that objection was filed.

6         To our knowledge, the principal of Capital D

7  Acquisitions LLC is a guy by the name of Dweck, Bert Dweck.  As

8  we set forth in our objection, there was a contract for sale at

9  some point between the property owners and Capital D

10 Acquisitions LLC.  That was terminated, and the parties went

11 their separate ways.  The reason it was terminated really isn't

12 relevant for what is in front of Your Honor today.

13        But then at another point, the debtor, or the

14 property owners rather, had a contract with another entity, SPG

15 someone LLC.  And that contract ended up being terminated for

16 non-performance by the contract purchaser.  And that is the

17 litigation that's pending in the Kings County Supreme Court

18 that Mr. Bass referenced.  So then it turns out that this SPG,

19 whatever it is, LLC, is somehow affiliated with Capital D

20 Acquisitions LLC.

21        And none of this was disclosed to the landlord.  None

22 of it was disclosed to the debtor, and none of it's been

23 disclosed to the Court.  No adequate assurance has been --

24 information has been provided for anybody other than two

25 letters involving this Golden Touch LLC outfit, which

27

1  apparently is some kind of a front for these other people.

2          So what we have is that rather than adequate

3  assurance of future performance, we have an actual history of

4  prior defaults, followed by a failure to disclose to the Court.

5  And then Mr. Benin steps in and he's been emailing Mr. Bass

6  with vaguely saying that Mr. Bass is going to be involved in a

7  fraud somehow because he has a contract to purchase this

8  property, which again, there is no contract at all.  But the

9  last contract that there was before it was terminated, it was

10 with an outfit called SPG something LLC that's not the proposed

11 assignee.

12         And then they've had people showing up at my client's

13 offices and at the home of one of the people that's involved in

14 this.  And Mr. Bass started out by saying the business

15 judgment.  And as the Court is well aware, and Mr. Bass is too,

16 and I don't have to make any argument for him, but as long as

17 the debtors make an informed business decision that is made in

18 good faith, then it's not my job certainly to second guess that

19 decision.  It's not the proposed assignee's decision, and it's

20 respectfully not the Court's really decision either.  The Court

21 should defer to that business judgment that certainly has been

22 well articulated by Mr. Bass.

23         And I've been present for other hearings, Your Honor,

24 where the discussion about whether this case is

25 administratively solvent and whether it might be converted,

1   whether it might be dismissed, have all been raised.  And if

2   Mr. Bass were to move forward with these sketchy proposed

3   assignees, we'd want our full discovery rights under the 7000

4   rules.  We'd want an evidentiary hearing.  We would litigate

5   any adverse result and appeal any adverse result.

6            And if in the meantime the case converts or

7   dismisses, then Section 365 is no longer an option for these

8   debtors.  And they're left with nothing at the end of the day.

9   Whereas the offer that's being presented by my client is it's

10  roughly $410,000 in cash and $90,000 waiving of cure costs.  So

11  it brings them up to the $500,000, which was the number that

12  was in the original notice of assumption and assignment.  And

13  it obviates all of that risk.

14           That certainly is a reasonable exercise of a debtors'

15  business judgment.  And it's not something that should be

16  second guessed by me, by Mr. Benin, by any other proposed

17  assignee, and again, respectfully, or by the Court.

18           THE COURT:  All right. Thank you, Mr. Holt.

19           Mr. Benin, I see your hand raised, but I'm not taking

20  any further argument, because the issue before this Court is

21  very simple.  I'm not making factual findings as to pending

22  litigation or with respect to any contracts or rights of

23  parties, apart from deciding whether this bankruptcy estate is

24  going to benefit from the actions taken by the debtor with the

25  support of the consultation parties and whether the decision

1    being made to accept a particular offer is reasonable, reflects

2    a well-informed, reasonable example of the debtors -- act of

3    the debtors' business judgment.

4            The debtor doesn't necessarily have to turn out to be

5    right or wrong.  But at the time they're making this decision,

6    especially with the benefit of the consultation parties, are

7    they doing so in an informed manner and are they doing so based

8    on information made available to the Court and to the parties?

9            In order for there to be an assumption of the lease,

10   there has to be a demonstration of adequate assurance of future

11   performance.  This Court is convinced by the arguments, by the

12   submissions that have been made that the only finding this

13   Court could make is that there's an adequate assurance of

14   future litigation.  That's not what -- that's not going to

15   assist any stakeholder in this case.

16           As a result, this Court is not going to challenge or

17   question the reasonable exercise of the debtors' business

18   judgment in opting against pursuing a transaction that would

19   lead to continued discovery, motion practice, possible appeals,

20   and litigation, both before this Court and other courts.  It

21   makes no sense.  The dollars don't warrant it.  Therefore, the

22   Court is going to respect the debtors' business judgment and

23   those of the consultation parties and approve the acceptance of

24   the proposed transaction with the landlord and will await the

25   submission of a final order, of a proposed order.

30

1          MR. BASS:  Thank you, Your Honor.

2          MR. HOLT:  Thank you, Your Honor.

3          THE COURT:  You're welcome.

4          MR. BASS:  Okay, next, I did want to address one

5   objection that should have been moved to the moot category on

6   the agenda.

7          THE COURT:  Okay.

8          MR. BASS:  And that was an objection at Docket Number

9   1797, filed by Mill Avenue Associates.  We did have a

10  successful bidder there, but the debtors determined, again, in

11  their business judgment, based on the lack of adequate

12  assurance not to proceed with that bid and have since filed a

13  notice of rejection of the lease.

14         I don't believe the proposed bidder there has an

15  objection to that, but it's really irrelevant.  But Docket

16  Number 1797 should go into the moot category as a result.  I

17  don't know if Ms. Lieberman is on the Zoom, but if she is, she

18  can certainly confirm.

19         MS. LIEBERMAN:  There she is.  Ms. Lieberman, good

20  afternoon.

21         MS. LIEBERMAN:  I am and good afternoon.

22         By the way, Your Honor, thank you for granting my pro

23  hac application.

24         Your Honor, as Mr. Bass has, I think, very succinctly

25  explained, we did file an objection.  It was an unfortunate

1  situation in where the cure amount dispute was the least of it.

2  The bidder, as it turned out, was not the proposed tenant.  And

3  I will thank Mr. Bass because he helped us ascertain some of

4  this information.

5       We eventually learned that the proposed tenant was a

6  single-purpose entity that did not plan to occupy the space and

7  provided us with no adequate assurance information whatsoever.

8  So, under the circumstances, Your Honor, I think the debtors

9  very much made the right decision here.

10       THE COURT:  All right.  Thank you, Ms. Lieberman.

11       Is there anyone else who wishes to be heard with

12  respect to this matter in particular?

13                 (No audible response)

14       THE COURT:  Then the Court will mark ECF Docket

15  Number 1797 as moot and not carry it forward any further.

16  We'll wait for the order that encompasses its rejection.

17  Thank you.

18       MR. BASS:  Thank you, Your Honor.

19       MS. LIEBERMAN:  Thank you, Your Honor.

20       THE COURT:  With respect to, I was going to address

21  the Ross Dress For Less at this moment.  But, you know, it

22  seems like we did it already.  I just want to make sure there

23  are no other parties that want to be heard with respect to Ross

24  Dress For Less, because I know it was raised in the context of

25  the omnibus cure.

1          THE COURT:  All right.  I see Mr. Winterhalter.

2    Counsel?

3          MR. WINTERHALTER:  Yes.  Good afternoon, Your Honor.

4          Paul Winterhalter on behalf of the Chen Family Trust.

5          We filed an objection at Docket Number 1786.  I

6    believe that -- well, we do not have an objection to what the

7    debtor is seeking today.  Essentially, the debtor is seeking --

8    and Chen Family Trust is a Half Moon Bay location, Your Honor,

9    that was mentioned by Mr. Bass.  While the parties are having

10   discussions with Ross, I cannot suggest that we're close.  And

11   I believe the issue is that this consideration focused solely

12   on cure presently will be deferred to another day.  And the

13   discussion is allowed to continue.

14         We don't have an issue if the delta between what has

15   been recognized by the debtor as the amount of cure and what

16   the debtor -- or, excuse me, what the landlord sees as the

17   amount of cure is posted to escrow.  The contemplated transfer

18   is, I think, 3.7, 3.8 million dollars.  So there'll certainly

19   be sufficient monies to cover the disputed cure.

20         So as a result, as long as that's confirmed, I think

21   that Mr. Bass may have mentioned that he might revisit it.  I

22   just wanted the Court to be aware that we're okay with if

23   that's what they choose to approve the sale.  But as long as

24   the monies are posted, we're fine.

25         MR. BASS:  And I will confirm, and there will be

33

1  language consistent with the omnibus reply that will

2  specifically confirm that that money will be held in escrow.

3          THE COURT:  All right.  Thank you.

4          Mr. Summers, I see your hand again.

5          MR. SUMMERS:  Yes.  Yes, sir.  May I be heard on Half

6  Moon Bay?  Matt Summers on behalf of Ross Stores, Ross Dress

7  for Less.

8          With respect to the Half Moon Bay location, the cure

9  asserted by Mr. Winterhalter's client, about $181,000.  And it

10 exceeds the maximum cure whereby Ross would be obligated to

11 close on the sale by $134,000, roughly.  So I don't know where

12 the escrow's coming from that Mr. Bass is proposing, but it's

13 Ross' position here with respect to Half Moon Bay that while

14 we're trying to resolve with Mr. Winterhalter, we're not

15 obligated to close on the sale with respect to Half Moon Bay if

16 we're not able to resolve the cure issue within the bounds of

17 the assignment agreement.  And that would leave Mr.

18 Winterhalter's client rejected.

19         And I don't really know whether he understands that

20 or not, but I want to make sure that nothing we do today is

21 prejudicing Ross' ability to say no to Mr. Winterhalter's

22 client and say we're not going to take your lease.

23         THE COURT:  All right.  Well, let me go back to --

24 Mr. Winterhalter, did you want to respond?

25         MR. WINTERHALTER:  Well, Judge, I guess it's the

34

1  debtor to respond.  I mean, as far as I'm concerned, as long as

2  the money is posted to escrow, we're fine with what has been

3  proposed by the debtor.

4          THE COURT:  So let me turn to Mr. Bass.  With respect

5  to the Ross acquisition of the various leases, and including is

6  the objection that was filed, I guess, Plaza Mexico, SVAP.

7          MR. BASS:  Yeah.  SV -- yep.

8          THE COURT:  What is being requested of the Court

9  today?  Is it, again, just approval of a sale subject to

10 resolving cures and overruling objections as to whether there

11 would be a higher bid on that one property, for instance, or

12 the one lease?  I'm a little unclear.

13         MR. BASS:  Yeah.  So, yes, we will get to the SVAP

14 objection.  And, again, Mr. Summers has a conflict there so

15 there is other counsel for Ross --

16         THE COURT:  Okay.

17         MR. BASS:  -- and we'll address it.  But,

18 essentially, we are looking for the approval of the assignments

19 of the various leases that are part of the Ross package.  It's

20 an 18-store package.  If Ross were to tell us it no longer

21 wants to move forward on a particular lease, I guess we would

22 have that conversation.  We haven't had it yet.

23         THE COURT:  I'm simply -- the Court is simply

24 authorizing the debtor to enter into the transaction at this

25 juncture.

35

1           MR. BASS:  Right.

2           THE COURT:  And if a lease is removed from it, then
3   you'll obviously apprise the parties and the Court.

4           MR. BASS:  Correct.  Correct.  So we would ask that
5   it be approved and that we be authorized to enter into that
6   agreement and that the leases, at least to the extent that the
7   debtors and Ross both agree, should be assigned, that they be
8   assigned. And if they're assigned with a disputed cure, that
9   amount would be, as the debtors have said, reserved.

10          So we can certainly have a follow-up discussion with
11  Mr. Summers after the hearing as to whether or not he wants to
12  proceed on Half Moon Bay and under what circumstances.  But at
13  a minimum, we are not going to -- if we do close on that
14  assignment, we're not going to deprive Mr. Winterhalter of the
15  opportunity to at least, you know, have a determination as to
16  whether or not the cure amount that they have included, which
17  includes more than $90,000 in attorney's fees, should be
18  approved.  But, again, that's an issue for a later day.

19          But if we're not going to, you know, deliver that
20  lease because Ross chooses to, then we'll have to figure that
21  out between Ross and the debtors.  But we're certainly asking
22  this Court to approve, you know, the agreement as it is, which
23  does require us to deliver all 18 stores.

24          THE COURT:  So to the extent the Court authorizes, if
25  it does, the sale to Ross of the leases, the identified leases,

36

1 it's subject to Ross and the landlords agreeing on a cure and

2 Ross, in effect, having that lease included in the purchase

3 package?

4         MR. BASS:  I think that's a fair statement, Your

5 Honor.

6         THE COURT:  All right.

7         MR. SUMMERS:  Your Honor, I think that's a fair

8 statement as well, and I think it's subject to the cure not

9 exceeding the maximum cure like it does here on Half Moon Bay.

10 And we're trying to negotiate a resolution with the landlord,

11 but have not really made a lot of progress.

12         MR. WINTERHALTER:  Your Honor, Paul Winterhalter, on

13 behalf of Half Moon Bay, the location.  We're not bound by what

14 Ross and the debtor believe to be some type of cap.  And what I

15 understand is being asked of the Court by the debtor is the

16 delta is $135,688, and that money is going to be posted

17 somewhere out of the $3,790,000 acquisition for the subject

18 leases.

19         So as long as that $135,000 is posted somewhere,

20 we'll be happy to argue before the Court what is the

21 appropriate cure amount under this particular lease.  And I

22 don't know whether it would be Ross arguing that or whether it

23 would be the debtor arguing that, but someone will need to

24 argue that before this Court regarding that issue.

25         THE COURT:  All right.  Well, either there's going to

37

1  be an escrow of those funds or the lease will be excluded from

2  the package.

3         MR. WINTERHALTER:  That's fine, Judge.

4         THE COURT:  I mean, that's what I'm hearing.

5         MR. WINTERHALTER:  Yes, that's fine.

6         THE COURT:  I can certainly, from the bench,

7  authorize, subject, of course, to addressing the other matters,

8  but authorize the debtor to enter into the transaction under

9  those terms.  And we'll leave it for counsel to, I guess,

10 continue discussions.

11        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12        THE COURT:  All right.  Mr. Bass, does it make sense

13 to then proceed with SVAP now?

14        MR. BASS:  I'm okay either way, whatever the Court

15 prefers.  But we do have two that I would, again, what I would

16 consider to be contested matters that may have testimony

17 together with exhibits.  And the first one I was going to go

18 to, but I'm happy to do SVAP first.

19        But I was going to propose to go to Store 274, which

20 is the proposed assignment to Murray Avenue Market.  It's a

21 challenge to the assignee's ability to satisfy the adequate

22 assurance of future performance as required by 365(f)(2) of the

23 Bankruptcy Code.  So whatever Your Honor's preference is.

24        THE COURT:  Well, let's, since my mindset's on Ross,

25 let's finish Ross.

38

1          MR. BASS:  Okay.

2          THE COURT:  If you don't mind.

3          MR. BASS:  Fair enough.

4          Okay.  So as the Court has pointed out, there is an

5 objection by that SVAP landlord that's at 18 -- Docket Number

6 1873.

7          THE COURT:  Correct.

8          MR. BASS:  Both the debtors and Ross filed responses

9 to that objection.  They're at Docket Numbers 2005 and 2007.

10 And essentially, the Ross response is focused on the adequate

11 assurance aspect of that objection.  And the debtors' response

12 is more focused on, I'll call it process and what was the

13 objection by the landlord that it was not permitted to

14 participate in further competitive bidding with respect to its

15 lease.

16          And so before we begin there, we did send to chambers

17 this morning a set of stipulated exhibits. It's a limited

18 number of exhibits, but I want to make sure the Court had

19 those.

20          THE COURT:  I do.

21          MR. BASS:  Okay.  So given that the parties have

22 stipulated to the admission of those exhibits, we would ask

23 that the Court admit each of them at this point.

24          THE COURT: All right.  Are there any objections?

25 And let me just have, for the record, counsel for SVAP3 Plaza,

1   Mexico enter an appearance.

2           MR. FLEISCHER:  Sure.  Thank you, Your Honor.  Can

3   you hear me okay?

4           THE COURT:  Yes, I can.

5           MR. FLEISCHER:  Great.  And good afternoon.

6           Scott Fleischer, Barclay Damon, on behalf of SVAP III

7   Plaza Mexico LLC, landlord of the real property known as the

8   Plaza Mexico Shopping Center located in Linwood, California.

9           THE COURT:  All right.

10          MR. MURLEY:  Your Honor, if I may make my appearance.

11          THE COURT:  Yes.

12          MR. MURLEY:  Luke Murley of Saul Ewing.  We're

13  counsel for Ross Dress for Less in connection with this

14  objection.

15          THE COURT:  Yes, please.  Thank you.  Thank you,

16  counsel.

17          And the exhibits that were forwarded to the Court

18  include four exhibits by SVAP, Exhibits 1, 2, 3, and 4.  So, I

19  will designate them as S-1, S-2, S-3, S-4, and debtors'

20  exhibit, which will be D-1.  And I will admit them into

21  evidence absent objection.

22          MR. BASS:  Correct.  There were three debtor

23  exhibits.  I just wanted to make sure, right, that Your Honor

24  has 1, 2, and 3?  They're all part of the Ross bid package, but

25  we separated them out.  As the letter being 1, the bidder

40

1  registration form being 2, and the assignment agreement being

2  3.

3          THE COURT:  All right.  I see just one exhibit,

4  Debtor Exhibit 1, which is the ballot letter.

5          MR. BASS:  I will get those to the Court.

6          THE COURT:  Why don't you -- the other two, send them

7  down.

8          MR. BASS:  Okay.  I will get them to the Court.

9          THE COURT:  Okay.

10         MR. BASS:  But, again, they are stipulated to being

11 admitted, so I don't think it's a problem.  We'll just

12 generally refer to them anyway in the context of Mr. Matlat's

13 testimony, but certainly the parties are aware, and I'll get

14 them down to the Court, as well.  So, that might be my problem,

15 my omission, but it certainly wasn't intended.

16         THE COURT:  No problem.  I see it referenced.  I just

17 don't see it attached.

18 (SVAP's Exhibit Numbers S-1 through S-4 admitted into evidence)

19     (Debtors' Exhibit Numbers D-1 through D-3 admitted into

20                          evidence)

21         MR. BASS:  Okay.  I apologize.  So, the debtors do

22 intend to proffer Mr. Matlat from A&G, and we have a proffer

23 we'd be prepared to make, and then have Mr. Matlat available to

24 cross.  I just want to make sure he's on the Zoom because I

25 didn't see him.

1            MR. MATLAT:  I am.

2            MR. BASS:  Okay.  Okay, great.

3            But before I do that, Your Honor, I wanted to check

4   whether the Court was prepared to short-circuit any further

5   argument on this and rule that the landlord, as the debtors

6   believe, lacks standing as an aggrieved bidder.  I mean, the

7   landlord does have standing in the bankruptcy case, but as am

8   aggrieved bidder, we did submit the case law that provides

9   that, generally speaking, an aggrieved bidder does lack

10  standing.

11           THE COURT:  I wanted to address that legal argument

12  before we get into the factual history.  So, Mr. Fleischer, I'm

13  happy to -- I've read the debtors' position. I'd like to hear

14  your position on that issue.

15           MR. FLEISCHER:  Sure.  No problem, Your Honor.

16           Again, for the record, Scott Fleischer, Barclay Damon

17  on behalf of the landlord here.

18           So, most of the debtors' cases they cited for

19  standing, which was the focus of their reply, was actually on

20  appellate standing.  So, I would almost just disregard probably

21  75 percent of what was cited in there as really relevant to

22  this situation here where it's nothing to do with an appeal at

23  this point.

24           Then there were other cases that did talk about

25  bidders.  There were a couple of those, several of which

42

1  acknowledged that, while maybe in just a generic circumstance,

2  a bidder or a prospective bidder may not have standing, someone

3  who's questioning the process by which the sale was engaged in

4  does have standing, and that's in that following section of the

5  debtors' reply, as well.  So, I don't think there's much there.

6          There's also just the clear understanding that the

7  Court would still have to rule on the debtors' submissions

8  anyway.  So, regardless of whether the landlord raises

9  objections or not, the Court has the authority under the

10 applicable standards and has to render its decision.  So,

11 that's what I have preliminarily on that point.

12          THE COURT:  All right.  Any response, Mr. Bass?

13          MR. BASS:  Well, certainly there were cases that

14 dealt with the standing to object within the bankruptcy court,

15 but I don't think there's a distinction between appellate

16 standing for a disgruntled bidder and the ability to challenge

17 a sale.  It's the same standing argument.

18          And with respect to the second element, again, those

19 cases that I cited, while they did recognize the ability to

20 object on a process standpoint, those were cases where

21 collusion was involved or there was no notice absolutely to the

22 proposed bidder, and so that they had an opportunity to raise

23 that objection because they never had a chance to bid.

24          Here, the landlord did have notice.  There was no

25 suggestion of collusion.  And frankly, it's an aggrieved

1  bidder.  And there are cases, whether appellate or otherwise,

2  that say aggrieved bidders don't have standing to challenge the

3  sale to another bidder.  Again, the landlord certainly has

4  standing to raise issues as to adequate assurance.  We're not

5  challenging that.

6        It's this process argument that suggests that the

7  Court should reopen the bidding.  Now, we can get into the

8  substance of whether or not their argument is appropriate, but

9  in the end, they are an aggrieved bidder, and that's the only

10 standpoint they come at this objection from.  So we don't think

11 they should have the ability to challenge the process.

12       THE COURT:  Mr. Fleischer, it seems to me that what

13 your client is challenging is the judgment of the debtor with

14 the support of consult parties to opt for a package of leases

15 to be sold to a particular bidder outside the auction process

16 as opposed to offering your client the chance to bid on one

17 such lease.  That doesn't go to the intrinsic structure of the

18 sale.  That just challenges the business judgment of the debtor

19 and how to maximize the estate's recovery.  And that would be

20 the type, in this Court's view, of challenge that would be

21 foreclosed for a competing bidder.

22       I just don't see -- yes, I agree there are exceptions

23 to the rule where bidders are accorded by the Court standing to

24 challenge sales, but not when you're really challenging simply

25 the merits of the business decision on which bid to accept,

44

1  which bid to hold up for auction, or which group of leases to

2  pursue other avenues for recovery, a private sale.

3         And there is no question that the bidding procedures

4  permitted the debtor to pull any grouping or individual lease

5  and pursue other avenues.  So, frankly, I don't see your client

6  overcoming the standing issue.

7         MR. FLEISCHER:  Understood.  May I respond for a

8  moment, Your Honor?

9         THE COURT:  Yes.

10         MR. FLEISCHER:  Thank you.

11         So, again, for the record, Scott Fleischer, Barclay

12  Damon, counsel for the landlord.

13         With respect to that, I think the case law did

14  distinguish between just general frustrated bidders and those

15  who were actual creditors of the estate, which obviously the

16  landlord is as well.  So, I would point out that difference.

17         There's also, as I was alluding to before, the Court

18  still has to have sufficient evidence to make a ruling right

19  under the applicable standard.  And as of this point, despite

20  us asking for various documents or emails or any sort of

21  evidence right beforehand, before we got here, nothing's been

22  provided, nothing's been filed with the Court.  We only

23  received the Ross bid documents for the first time last night

24  at 9 p.m.  And then, you know, okay, here they are, you know,

25  take a look.

1        So, there's been almost no basis by which the Court

2   could even rule on this.  So, understood on maybe our

3   particular position based on the Court's ruling, but wanted to

4   highlight sort of what we think the Court should be looking at

5   generally speaking, as well.

6        THE COURT:  Are you focusing on the adequate

7   assurance aspect of it or on the decision to accept the bid?

8        MR. FLEISCHER:  So, for that particular point that

9   we're on right now was more focused on the process perspective

10  of, for example, whether the Ross bid ever contemplated having

11  the lease not in the package, whether there were other Ross

12  bids that might have been made, things of that nature.

13

14  We can get into separately the adequate assurance point, which

15  is -- you know, does not deal as much with, as I said, the bid

16  documents or the process.

17        MR. BASS:  Well, Your Honor, I do think we've

18  stipulated to the admission of the exhibits and the Ross bid

19  documents will make clear for the Court that the debtors had no

20  leeway to remove a particular lease or to even auction that

21  lease.  And the debtors in their business judgment, you know,

22  viewed a much more robust offer for this package of leases as

23  maximizing value for the leases.  So, we didn't have the luxury

24  or the leeway to remove it.  And certainly --

25        THE COURT:  But I have that, Mr. Bass, I have that as

1  your argument now.

2          MR. BASS:  No, I understand.  And so, like, what we

3  typically do is attach the documents, you know, to the order

4  that the Court is ultimately entering.  But I am happy to put

5  in a declaration that at least, you know, indicates that -- or

6  Mr. Matlat can testify right now that the agreements did not

7  permit to auction off these leases separately, that the Ross

8  bid was a package bid, not a bid for 18 leases individually.

9          So, I don't know if that is Mr., if that's the point

10 that Mr. Fleischer is making.  But certainly, that is, we can

11 put that in the record.  But that is the record.  The debtors

12 were given a package that was significantly higher on a package

13 bid than it would have been had we sent these out to individual

14 bids at auction.  And there's no disputing that.

15         THE COURT:  Here's what I'm going to suggest.  Rather

16 than do this on the fly based on testimony, I'm going to ask,

17 you actually were going where I was leading.  I'm going to ask

18 debtors counsel to submit a declaration, supporting

19 declaration, to support the decision that lays out the

20 rationale for the decision to choose the Ross bid over

21 competing alternatives.

22         I have the stipulated documents and evidence.  Mr.

23 Bass, if you can have a declaration filed within seven days.

24         MR. BASS:  I'm going to endeavor to do it either

25 today or tomorrow because we want to deliver this lease before

47

1  September, Your Honor.  We are concerned about incurring

2  additional rent here for an estate that doesn't have the funds

3  to do that.

4         MR. FLEISCHER:  Well, may I make a comment on that,

5  Judge?

6         THE COURT:  Yes.

7         MR. FLEISCHER:  So my understanding, again, based on

8  getting this documentation, you know, about Ross last night is

9  that it's really like a per-diem rent situation between the

10 parties.  So it's not as if we if we went into September.  I

11 don't understand that the debtors would be entirely responsible

12 for that month.

13        THE COURT:  I'm not going to bind the Court because

14 of the transaction.  I'm going to carry this to September 16th

15 hearing.  That's the end date by which the Court will decide.

16 So it leaves at worst for this date two weeks worth of

17 exposure.  That doesn't mean I won't decide it in advance of

18 that.  I'm going to ask counsel to submit a supporting

19 certification.  I'll entertain any legal argument you wish to

20 make today.  And the Court will decide it on the papers at some

21 point between after receipt of the declaration and September

22 16th.  Does that pose any issues?

23        MR. BASS:  It's fine with me.  You know, Mr. Matlat

24 is here.  I could put in the testimony today.

25        THE COURT:  Well, I'd rather be able to digest the

48

1  information.

2        MR. BASS:  Okay.

3        THE COURT:  Plus, I'd like to look at the exhibits.

4  So I'd like to be able to make an informed decision.  I think

5  any record that we would want would warrant that.

6        MR. BASS:  I appreciate that, Your Honor.

7        THE COURT:  And I'll give Mr. Fleischer an

8  opportunity to review any certification, which would be the

9  testimony.

10        And, Mr. Fleischer, I don't foresee a factual record

11  as far as witnesses on your end.

12        MR. FLEISCHER:  I do not either.  I think, as you

13  said, I would just like the opportunity to be able to review

14  something, and then we can all think about it a bit as opposed

15  to, you know, coming here now and just doing that.  So I'm fine

16  with that on this particular point.  And if Your Honor is okay

17  with it, and once we get to it, I have legal argument on the

18  adequate assurance point, which is sort of a wholly separate

19  issue that I'm prepared to make today if you'd like.

20        THE COURT:  Let me have the legal argument.  I want

21  the record closed subject to receiving a declaration today.  So

22  let me have the legal argument.

23        Mr. Bass, it's your burden as far as adequate

24  assurance, so do you want to go forward with the argument?

25        MR. BASS:  Yeah, and so if it's okay with Mr. Murley.

49

1   I would probably defer to Mr. Murley.  Again, they did put in a

2   reply on adequate assurance, and so I would ask, you know,

3   maybe --

4           THE COURT:  And I read the reply, so I don't need you

5   to revisit those issues.  I think the outstanding issue for the

6   Court is I think the objector is making a distinction between

7   the Ross entity that's going to be on the lease and the Ross

8   parent.  That seems to be well endowed.  So if you could

9   address that issue for me.

10          MR. MURLEY:  Yes, Your Honor.  Thank you.

11          For the record, Luke Murley of Saul Ewing, special

12  counsel for Ross in connection with this.

13          And what we put before Your Honor in connection with

14  our reply is the financial information that the Court could

15  take judicial notice of regarding the publicly-traded entity,

16  which also includes the detail of the specific assignee and

17  their operations.  It's 1,800 stores under an operating entity

18  of Ross Dress for Less.

19          We think that that carries the burden on adequate

20  assurance.  But just for belt and suspenders, what we've

21  offered to do, and we continue to offer to do in the reply, is

22  to offer a parental guarantee of this publicly-traded entity,

23  which has, I checked this morning, the NASDAQ, Your Honor.

24  It's a market cap of $48 million with 21 billion --

25          THE COURT:  Billion dollars, yes

50

1          MR. MURLEY:  -- 48 billion dollars in sales in 2024.

2          So we think that that obviates any adequate

3   assurance.  We don't understand that the landlord is pressing

4   that, but I will give counsel an opportunity to advise the

5   Court.

6          THE COURT:  All right.  Thank you, Mr. Murley.

7          Mr. Fleischer, you're up.

8          MR. FLEISCHER:  All right.  Thanks.

9          Again, for the record, Scott Fleischer, Barclay

10  Damon, counsel to the landlord here.

11         So at the time we filed our objection, the only

12  adequate assurance information we had was an SEC filing by Ross

13  Stores, Inc., the parent.  And at the time, it's since been

14  acknowledged.  We received the additional information on Ross

15  Dress for Less operationally, which really didn't address

16  anything.  But I guess the concept of a parent guarantee then

17  puts the financials of Ross Stores, you know, more into view.

18  So that's okay.  That is what it is.

19         But putting that to the side, what we're looking at

20  here is the language that's in Bankruptcy Code section

21  365(b)(3)(A), right?  And that doesn't require that the

22  assignee be a, you know, favorable assignee, a good assignee,

23  anything like that.  It actually specifically requires a

24  comparison between the proposed assignee and the tenant at the

25  time of initial leasing.

1          And as we sit here right now, there's absolutely

2    nothing in the record indicating what the financial condition

3    and operating performance of the debtor -- now debtor, you

4    know, tenant at the time -- under the initial lease was.  So we

5    don't know what that is.  And I'm not sure how the Court could

6    really make a ruling with no evidence on that point whatsoever.

7          And as I pointed -- Your Honor, if you have a --

8          THE COURT:  Go ahead.

9          MR. FLEISCHER:  Would you like me to continue?

10         THE COURT:  Yes.

11         MR. FLEISCHER:  Okay, sure.  So the main case that

12   we're relying on here is really sort of the only one that does

13   seem to address this directly on point, which was in the, among

14   the tortured history of the Sears Mall of America dispute,

15   right, the Southern District of New York Chief Judge McMahon in

16   2020 found on this issue specifically that the Southern

17   District of New York Bankruptcy Court got it wrong when they

18   essentially did not perform that comparison between the

19   proposed assignee and the tenant upon initial leasing.

20         So for those same reasons here, there's, again, been

21   nothing in the record indicating what that financial condition

22   or operating performance was.  And there's a number of quotes

23   in there.  I'm not going to start, you know, reading all of

24   them.  I've cited to some of them about how this was Congress's

25   choice to select this particular moment in time for the

52

1  comparison.  You know, being highly likely that the, you know,

2  proposed tenant was similar is not sufficient.  There actually

3  needs to be evidence in the record.  There's a number of quotes

4  in there, and that's really, again, the only case that's sort

5  of been squarely on this particular issue.

6          THE COURT:  What is the date that Rite Aid entered

7  into the lease with your clients?

8          MR. BASS:  Yeah, it's February 20, 1987, Your Honor.

9  We have nobody probably that could competently testify as to

10  the operating performance of that entity in 1987.  I will say,

11  and I sent this to Mr. Fleischer a couple of weeks ago, the

12  only frame of reference that I can sort of identify with

13  respect to Thrifty Corporation as of February 20, 1987, is a

14  link to an article that I found in the L.A. Times that

15  described who Thrifty Corporation was at the time, which,

16  again, I find this argument remarkable, regardless of the Sears

17  decision given who Ross Dress for Less is and their ability to

18  operate under this particular lease.

19          But at the time of the transaction that was described

20  in this L.A. Times article, there were 550 Thrifty drugstores.

21  Thrifty Corp. also --

22          MR. FLEISCHER:  Your Honor, none of this is in

23  evidence.

24          MR. BASS:  Because this is an argument, Your Honor,

25  that is frankly remarkable.

1            THE COURT:  Well, you can make the argument. Mr.

2   Bass, I'll let you respond to the argument.  Let me let Mr.

3   Fleischer finish.  I simply wanted to know what date we were

4   using as comparison, and I do see it's almost 40 years ago.

5            To the extent you want to supplement, you are

6   submitting a supplemental declaration as it is, you want to

7   provide the Court with information on Thrifty, the Thrifty

8   world of 1987, you're free to do so.

9            MR. BASS:  Okay.  Again, I'm not sure I have

10  competent, anyone that could competently testify to Thrifty

11  Corporation, who I'm assuming was part of ultimately someone

12  that was acquired by the Rite Aid, you know, under the Rite Aid

13  umbrella.  But it's --

14            THE COURT:  I understand the hurdle.  I'm not sure I

15  necessarily agree.  I read Sears.  I read Judge McMahon's

16  decision.  I've read a number of her decisions.  Every judge

17  has different views or can, so I'll take that.  But it's the

18  debtors' obligation to put forward the record it wishes for the

19  Court to consider.  Put forward your record.

20            Let me have, Mr. Fleischer, do you wish to add

21  anything to the argument?  I understand the argument being

22  made.

23            MR. FLEISCHER:  Yeah, no, thank you, Your Honor.

24  Just a couple other, you know, pieces from that case that I put

25  on the record just to make that crystal clear.  You know, it

54

1   even made a comment, the Court, toward the end when it said,

2   you know, I'm not sure if Congress is right here, but we can't

3   question that.  So that's sort of the position that we're in.

4        You know, I didn't write 365(b)(3)(A).  None of us,

5   you know, did here to my knowledge.  And unfortunately or

6   fortunately, depending on how you're looking at it, it says

7   exactly what it says without caveats.  And there's also been a

8   discussion of how (b)(3)(A) is not dependent even on, you know,

9   the lease in particular.  It's just a general concept.  And,

10  again, there's just been no evidence here to make any sort of

11  comparison.

12       THE COURT:  Of course, what you're suggesting would

13  be that if this was a 50-year lease or a 75-year lease or a

14  land lease that's 100 years old, that to the extent there were

15  no information available or it was impossible to compare apples

16  to apples, then this lease could never be assigned, there could

17  never be value obtained by the estate, and that the very

18  purposes of Section 365 would be undercut in trying to maximize

19  value for a Chapter 11 debtor.

20       It does lend itself to some absurd results.  But I

21  need to think about it.  And I'm not sure if I interrupted your

22  last thought, so I would apologize.

23       MR. FLEISCHER:  No problem, Your Honor.  I would just

24  add that neither the debtors who didn't get into adequate

25  assurance really in their reply, and then in the very brief

1  reply of Ross, there was really nothing to sort of oppose this

2  concept.  And, in fact, the Ross reply even quoted that exact

3  language from Section 365(b)(3)(A) that you have to compare the

4  two.  I certainly didn't force them to put that in there.  So

5  it seems to be a well-acknowledged thing here.

6        And I think maybe going back to 1987 here, maybe it's

7  not ideal, but at least it isn't 100 years.  So I don't know

8  that it would be impossible.  We'll see what the debtors are

9  able to come up with.  But, again, nothing in any of the papers

10  here made the argument that this comparison either can't be

11  done or shouldn't be done under certain circumstances.  That

12  was never raised.

13        THE COURT:  All right.  Thank you.  Here's where I

14  think we're going to go.  And I welcome any further argument

15  Mr. Murley, Mr. Bass, you wish to make.  I'm going to ask that

16  if counsel will make any supplemental submissions, do so

17  within, let's see, I know we're dealing with Labor Day weekend.

18  Today is the 28th.  And I understand every day is costing

19  dollars for the estate.  So no later than seven days.

20        Any response, Mr. Fleischer, would be three days

21  after that, after their submission, once it's docketed.  At the

22  outside, we'll have a hearing on the 16th.  If the Court feels

23  comfortable in making a decision one way or the other, it will

24  do it on the paper submitted, including the exhibits.  If not,

25  the Court will advise parties if it wants further argument on

56

1  the 16th.

2          MR. BASS:  Your Honor, I would also, what I do intend

3  to include with that supplemental admission is a request for

4  attorney's fees under the lease as a prevailing party.  Should

5  the debtors be successful in assigning this lease over the

6  objection of the landlord, we would ask for attorney's fees.

7          With all due respect, Your Honor, I understand what

8  the statute says.  This is an absurd argument that somehow the

9  financial condition of Ross does not, at a minimum, equate to

10 whatever Thrifty Corporation was in 1987.  Your Honor, I can

11 try to provide whatever information it is, but it is a stall

12 and delay tactic.  It is costing the estate money.  It is

13 costing the estate attorney's fees.  And if the lease has a

14 prevailing party provision, we intend to enforce it for all the

15 fees associated with this particular objection.

16         THE COURT:  Fair enough.

17         MR. MURLEY:  Your Honor, we agree that this is a

18 tortured argument.  To Your Honor's point, we're talking about

19 a lease in 1987.  We're talking about, by objective measures,

20 one of, if not the most healthy, financially healthy, clothing

21 retailers in the nation, and the landlord is making an issue

22 with this.  But we appreciate the Court's comments, and we'll

23 supplement our submission along with the debtor.

24         THE COURT:  All right.  Then we'll proceed along

25 those lines.  I'll urge the parties in counsel to take a step

1  back, see if you can just reach an accord that makes sense in

2  light of my comments, in light of the arguments, before we

3  spend more time and money.  All right?  Thank you.

4          MR. FLEISCHER:  Your Honor, may I just make one more

5  final --

6          THE COURT:  Yes.

7          MR. FLEISCHER:  -- comment on this?  Thank you very

8  much.  Again, for the record, Scott Fleischer of Barclay Damon.

9          We've asked a number of times what exactly Ross

10  intends to do with this particular premises, and I wouldn't

11  normally have to ask such a question, but there's less than

12  three years left on this lease term, and it seems that the

13  construction and otherwise would take quite a while to get it

14  set up here.  I don't know what banner they would -- Ross has a

15  couple of different banners they would operate, so I'm not

16  quite certain as to what their proposed use is.

17          And I get the sense, and I didn't want to have to get

18  into this, but if we're going to start talking about sort of

19  the parties here, we have a strong feeling that Ross does not

20  actually want to operate here and that there's other things at

21  play.  So, again, having not gotten any sort of assurance as to

22  that they even intend to operate or how they would and when

23  they would open questions I've asked, that would be good to

24  know in purposes of this.

25          And I did not want to have to come here today to make

58

1  any of these arguments.  It would be great if people could work

2  it out, but there's really been no opportunity to do so as far

3  as I've seen, and I'm happy to engage in any of those sort of

4  discussions going forward.

5          MR. MURLEY:  Your Honor, may I be heard on that

6  issue?

7          THE COURT:  Sure.

8          MR. MURLEY:  So what I'm paranoid about is that we're

9  opening more issues to brief later.  What I think we're

10 briefing is, number one, the process issue and this adequate

11 assurance.  I don't think there's any objection raised on a use

12 restriction or anything like that or what happens after

13 assumption.  So I think we're just dealing with those two

14 issues, and that's why I asked for clarity on that.

15         THE COURT:  Yeah, sure.  By way of clarification,

16 those are the only issues the Court is going to consider.  I

17 suggest that this continue a dialogue.  From what I'm hearing,

18 this should be something that should be resolved without having

19 to go through this added effort.  But that's up for you all.

20 All right?

21         MR. FLEISCHER:  Your Honor, one scheduling question.

22 So you mentioned the debtors have seven days.  That would take

23 us to the 4th, and then my three days would land on a Sunday.

24 So hoping maybe we can --

25         THE COURT:  That Monday.

59

1          MR. FLEISCHER:  -- by a day?

2          THE COURT:  Yes.  Monday.

3          MR. FLEISCHER:  All right.  So I'll look for that.

4   Thank you.

5          THE COURT:  All right.  Thank you, counsel.

6          All right, Mr. Bass, our remaining issue.

7          MR. BASS:  We have one more, and that's for Store

8   274, which is a proposed assignment to Murray Avenue Market.

9   Again, that's a challenge to the assignee's ability to satisfy

10  adequate assurance of future performance under 365(f)(2) of the

11  Bankruptcy Code.

12         This morning, the proposed assignee filed a

13  declaration of Yitzchok Glassner, supporting adequate assurance

14  of future performance.  And I understand that counsel intends

15  to proper that witness, make him available for

16  cross-examination.  Attached to that declaration is a market

17  business plan for the proposed assignee.  And while I'll defer

18  to the assignee's counsel, Mr. Shelton, shortly, I did want to

19  at least point out from my review of it some key highlights.

20         The proposed assignee has a proven track record going

21  back 50 years.  In the current location in which it operates,

22  which lacks dedicated parking and the visibility that the Rite

23  Aid store, I understand, would offer, the assignee generates

24  approximately $5 million in annual sales with over $500,000 in

25  net profit.  Under that scenario, there doesn't seem to be a

60

1   real argument that the assignee won't be able to make the

2   rental obligation, which is currently $16,335 per month.

3        But with that, I'll turn it to Mr. Shelton, who can

4   provide some more context regarding the assignee, and proffer

5   the testimony, and make the witness subject.  And then we can

6   have, I guess, argument, perhaps, after the testimony as to

7   whether or not we've met the obligations for adequate

8   insurance.

9        THE COURT:  All right.  First, let me have an

10  appearance on behalf of, I guess, AmeriServ, the receiver.

11       Ms. Thomas?

12       MS. THOMAS:  Good afternoon, Your Honor.

13       Maribeth Thomas on behalf of AmeriServ Financial Bank

14  and Martin Perry as receiver for the 1700 Murray Avenue

15  property.

16       THE COURT:  All right.

17       MR. THOMAS:  And Mr. Perry is online today, as well.

18       THE COURT:  All right.  Thank you.

19       So now turning to Mr. Shelton, do you want to make a

20  proffer of what your client's testimony would be?

21       MR. SHELTON:  Yes, Your Honor.

22       First of all, Mason Shelton, Bernstein Burkley, on

23  behalf of Murray Avenue Market.  Your Honor, that's correct.

24  The Court so sees at Docket Number 2183, I entered my

25  appearance on a pro hac vice basis, sponsored by Keri Ebeck in

1 my office.

2        This morning at Docket Number 2194, the declaration

3 of Mr. Glassner was filed on the record.  And I would move for

4 such declaration to be admitted to evidence.  That also

5 includes the exhibit mentioned by Attorney Bass.  That includes

6 the business plan and certain financial projections of Murray

7 Avenue Market for the next three years.

8        THE COURT:  Any objection to the declaration coming

9 into evidence?

10                (No audible response)

11        THE COURT:  All right. It will be admitted into

12 evidence.

13    (Declaration of Yitzchok Glassner admitted into evidence)

14        THE COURT:  Mr. Shelton, beyond the declaration, do

15 you want to stand on the declaration at this juncture?

16        MR. SHELTON:  I would only be repeating it, Your

17 Honor, but Mr. Glassner is here to be cross-examined if a party

18 so chooses.

19        THE COURT:  All right.  Let me ask.  Thank you,

20 counsel. Ms. Thomas, do you wish the opportunity to

21 cross-examine Mr. Glassner?

22        MS. THOMAS:  Not at this time.

23        THE COURT:  All right.  Then we will just rest on the

24 declaration.  Is there any other evidence that would be coming

25 in on behalf of the debtor and the assignee?

62

1          MR. BASS:  Nothing from the debtor, Your Honor.

2          MR. SUMMERS:  Nothing from the assignee, Your Honor.

3    Thank you.

4          THE COURT:  Ms. Thomas, on your end, before we get to

5    legal argument, I'd rather see, close our factual record.  Do

6    you have any testimony you would offer?

7          MS. THOMAS:  I do have the receiver, Martin Perry,

8    here with us today that can testify to the additional

9    obligations, financial obligations, in addition to the monthly

10   rent that the assignee would be responsible for under the

11   lease.  We do maintain our objection with respect to the lack

12   of adequate assurance of the assignee's ability to financially

13   perform.

14         I believe that Mr. Perry could kind of explain that

15   to you or I could go ahead with our legal argument.

16         THE COURT:  Is there a contest as to the amounts that

17   would be due under the lease going forward?

18         MS. THOMAS:  I think the issue is, Your Honor, the

19   rent at this time is substantially the same as the landlord, as

20   the current rent that the tenant is paying.  However, it's a

21   triple net lease, as Mr. Perry could explain.  And under that

22   lease, the tenant is also responsible for real estate taxes,

23   improvements to the property.

24         As the anchor tenant of the store, they're

25   responsible for sidewalk maintenance, parking lot maintenance,

63

1  their pro rata share of the CAM charges associated with the

2  lease.  So it well exceeds the $16,335 current rent, which is

3  set to increase over time.

4         The assignee is, as you know, a single purpose entity

5  that was created for the sole purpose of purchasing this lease.

6  In response to our request for adequate assurance, we received

7  only the two-page business plan, as well as a 2023 tax return

8  for Murray Avenue Kosher, which is the current grocery store

9  that's operating down the street.

10        We don't have, and the declaration that was filed

11 this morning explains it a bit better, but we have no

12 information regarding the principals of the new entity, their

13 financial wherewithal to perform, the obligations.  There's no

14 guarantee under this lease, but we haven't seen any actual

15 financial information, any proposed budgets.  And we don't know

16 what assets are there to pay the rent, to make the necessary

17 improvements, to convert the space from a drugstore retail

18 space to a kosher grocery store.

19        So we're simply asking for additional financial

20 information to support their ability to operate as the anchor

21 retailer in this building.  And I will note that Ameriserv, my

22 client, and Mr. Perry became involved when this property was

23 subject to a state court receivership in the Court of Common

24 Pleas of Allegheny County.  At that time, the Murray Avenue

25 market was a bidder on the property.

1      And in conjunction with their bid, which ultimately

2 did not succeed, we asked for the same financial information to

3 purchase the building.  And we didn't receive it then, and we

4 still haven't received it now.  It's our position that we're

5 entitled to this information under Section 365(c) of the

6 Bankruptcy Code, and would ask the Court to direct that that

7 information be provided for us before the assignment is

8 approved.

9      THE COURT:  Let me turn then back to Mr. Shelton.  It

10 seems to me, I mean, the business plan is a step.  I mean, it

11 was put on the docket on the 28th.  Is our time better spent

12 just getting the assignee, getting the objecting party the

13 information they're requesting?

14      I mean, if we're talking about supporting financial

15 documents, the testimony is just going to be a repetition of

16 what's in these papers, but it's not going to cure necessary

17 elemental questions on the capacity of what is a newly formed

18 entity for the purposes of going into this, to be able to pay

19 going forward.  And that information should be available, and

20 we can obviate the need for testimony and an evidentiary

21 hearing.

22      MR. SHELTON:  Yes, Your Honor, I think that's a fair

23 summation of probably where we would want to go.  It's just our

24 position that we've provided the necessary financial

25 information at this time.  That's the most recent tax return

1  for the entity that Murray Avenue Market is acquiring.  It

2  demonstrates financial feasibility, the ability to pay rent.

3          But I agree with the Court's sentiment that greater

4  financial information, if it obviates further proceeding here,

5  can be done among the parties.

6          THE COURT:  Well, what I would do is set a deadline.

7  Give a few days, submit the financial data, and I'll rule on

8  the papers.

9          MR. SHELTON:  Okay.

10         THE COURT:  I think the objection and the

11  declarations, I'll certainly hear any additional legal

12  argument, but even the legal argument is going to be a

13  repetition of all the arguments that are always made on both

14  sides of this 365 issue.  What the Court needs to see is the

15  same that the landlord, in essence, needs to see, the

16  financials.  And then I can rule quickly, within days.

17         So what would be -- Ms. Thomas, does this make sense

18  to you as a way of approaching this?

19         MS. THOMAS:  It does make sense, Your Honor.  We

20  would prefer that to a full-blown evidentiary hearing, although

21  if that doesn't work, we would ask that that be scheduled.

22         The one thing I did want to point out is the tax

23  return is not in the same name as the current grocery store.

24  And I understand that that is because it's a new entity that

25  was formed solely for the purpose of acquiring this lease.

1  However, we don't have the background information to know if

2  the principals are the same.  Is it really the same -- is it a

3  continuation of the current entity that we could rely on those

4  financials, or are we looking at a completely different, you

5  know, set of numbers?

6          But to answer your question, yes, that would be

7  acceptable to be a deadline to get the information and decision

8  on the papers.

9          THE COURT:  The Court is not -- the Court is

10 obviously going to go beyond simply the form of the party, the

11 assignee.  We recognize it's a new entity.  And what the Court

12 wants to see is that information that goes that next step.  And

13 what the landlord would want to see.  And I think it could be

14 available rather quickly.

15         So, why don't we do this?  How long would it take,

16 Mr. Shelton, for you to put together a package for Ms. Thomas

17 and her client to review?

18         MR. SHELTON:  Your Honor, I would ask for just one

19 week, if we can bookend it at September 5th.

20         THE COURT:  All right.  Then one week, September 5th.

21 I'm going to carry this matter to the 16th, but I don't intend

22 to have it go that far.  By Wednesday the 10th, Ms. Thomas,

23 I'll ask for any supplemental objection based on the

24 information that's been provided.

25         MS. THOMAS:  Understood.

67

1          THE COURT:   And the Court will rule on the papers

2    after that.   Does that work for anybody?   Mr. Bass, does that

3    make sense for you all?

4          MR. BASS:   That works for me, Your Honor.

5          THE COURT:   All right.   So, with that time frame, I

6    think that's how we can address this most efficiently and

7    effectively.

8          MS. THOMAS:   Thank you, Your Honor.

9          THE COURT:   Thank you.   Mr. Bass, what else do you

10   have for me today?

11         MR. BASS:   I believe, sorry, I don't want to torture

12   you anymore, but I believe that is the end of our agenda.

13         THE COURT:   Okay.   It's enough.

14         LAW CLERK:   What about dates?

15         THE COURT:   Oh, dates, my law clerk reminds me.   I

16   have a sense we're going to need another date before -- we have

17   a date on the 16th.   We also have an omnibus date on the 21st.

18   But we believe that we probably need a date in between.

19              (Court and Clerk confer briefly)

20         THE COURT:   Oh, I'm sorry. October 21.   So, we have

21   9/16 and we have October 21.   And we're going to need an

22   omnibus date to set aside for all these wonderful challenging

23   issues somewhere in between.   The Court's suggestion is

24   September 30th at 10:00. That puts us before we get into the

25   Jewish holiday, Yom Kippur.

68

1         MR. BASS:  That works for me, Your Honor.

2         THE COURT:  All right.  Anyone else have any issues?

3  I did see some raised hands, but they've been withdrawn.

4                   (No audible response)

5         THE COURT:  All right. We are in recess.  Thank you.

6         MR. BASS:  Thank you, Your Honor.

7              (Proceedings concluded at 2:15 p.m.)

8                      * * * * *

9

10

11

12              **C E R T I F I C A T I O N**

13         I, DIPTI PATEL, court-approved transcriber, certify

14  that the foregoing is a correct transcript from the official

15  electronic sound recording of the proceedings in the

16  above-entitled matter, and to the best of my ability.

17

18  /s/ Dipti Patel

19  DIPTI PATEL, AAERT CET-997

20  J&J COURT TRANSCRIBERS, INC.       DATE:  September 2, 2025

21

22

23

24