S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

## <u>GROUND LEASE</u>

 **THIS GROUND LEASE** (this "Lease") dated as of the 12th day of November, 2008 (the "Effective Date"), by and between **KACHR, LLC** having an address of 2668 Leisczs Bridge Road, Lessport, Pennsylvania  19533 ("Landlord"), Attention:  Scott Landis and **ECKERD CORPORATION** with offices at Post Office Box 3165, Harrisburg, Pennsylvania, 17105, ("Tenant").

## R E C I T A L S

 **WHEREAS**, Landlord is the owner of certain parcels of land located at the south west corner of the intersection of Perkiomen Avenue (State Route 422) and West 47th Street in the Township of Exeter, Berks County, Pennsylvania, more particularly described by metes and bounds on **Exhibit "A"** annexed hereto and made a part hereof, together with any and all appurtenances, rights, privileges and easements benefiting, belonging or pertaining thereto, and any right, title and interest of Landlord in and to any land lying in the bed of any street, road or highway (open or proposed) to the center line thereof, in front of or adjoining said tract, piece or parcel of land and together with any strips and gores relating to said tract, piece or parcel of land (all the foregoing hereinafter referred to as the "Premises"); and

 **WHEREAS**, Tenant desires to lease the foregoing parcel of land as hereinafter set forth.

 **NOW THEREFORE**, for and in consideration of the mutual promises of the parties herein contained, and intending to be legally bound hereby, Landlord and Tenant hereby agree with each other as follows:

 1. <u>Demise of Premises:</u>

  1.1 Landlord hereby leases to Tenant and Tenant hereby takes from Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, the Premises together with all improvements to be constructed thereon.  The Premises are shown on the survey attached hereto as **Exhibit "A-1"** and incorporated herein by this reference ("Survey") and contains approximately 2 acres.

  1.2 Subject to Tenant obtaining Tenant's Approvals (hereafter defined) and satisfying the contingencies set forth in Section 41 below, Tenant, at its own expense, may demolish the building and other improvements existing on the Premises (the "Existing Improvements") and construct parking areas, buildings or any other improvements that it desires on the Premises (collectively, the "Improvements"), which Improvements shall be constructed in accordance with any applicable governmental requirements.

 2. <u>Term:</u>

  2.1 The obligations of the parties under this Lease shall be binding as of the Effective Date; provided, however, that Tenant's obligation to pay rent shall commence on the



1

S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

date (the "Rent Commencement Date") which is the earlier to occur of: (a) two hundred seventy (270) days after the Delivery Date (hereafter defined); or (b) the date that Tenant opens for business in its building at the Premises.  As used herein, the "Delivery Date" shall be the date that all of the following conditions have been satisfied: (1) the Approvals Date has occurred in accordance with Section 10.4 below; (2) Landlord has delivered exclusive possession of the Premises to Tenant in the condition required by this Lease; and (3) the contingencies set forth in Section 41 below have been satisfied or waived by Tenant.  The parties hereto shall execute a written statement setting forth (i) Delivery Date, the Rent Commencement Date and the date of expiration of this Lease promptly after the same shall have been ascertained, (ii) the dates for the increases in Rent (as defined in Section 3 hereof) in accordance with Section 3 hereof and (iii) the renewal periods (as described in Section 2.3 hereof) notice dates in accordance with Section 2.3 hereof, but the enforceability of this Lease shall not be affected should either party fail or refuse to execute such statement.

2.2     The term of this Lease shall expire two hundred forty (240) full calendar months after the Rent Commencement Date, unless sooner terminated as herein provided.

2.3     Provided Tenant is not in default, Tenant is hereby granted the right to renew this Lease for eight (8) successive five (5) year renewal period(s).  To exercise each, Tenant shall be required to give to Landlord written notice at least six (6) months prior to the expiration of the then current term. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the term of this Lease under any of the eight (8) options set forth in this Section 2.3 through inadvertent failure to give notice of exercise thereof within the time limits prescribed. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the term of this Lease for any of the aforesaid renewal periods, then Landlord may notify Tenant in writing thereof ("Landlord's Option Notice").  Tenant's right to extend for any of the renewal periods shall not expire unless (i) Tenant fails to give Landlord notice of the extension within thirty (30) days of receipt of Landlord's Option Notice, or (ii) Tenant advises Landlord in writing that Tenant has elected not to extend the term of this Lease.

3.     Rent

(a)     Tenant shall pay as Minimum rent ("Minimum Rent") the following amounts:

| Years | Annual Rent | Monthly Installments |
|---|---|---|
| Original Term *Commencement 19 - 2011* | | |
| Years  1 - 10 | $175,000.00 | $14,583.33 |
| Years  11-15 | $183,750.00 | $15,312.50 |
| Years  16-20 | $192,937.50 | $16,078.13 |
| First Renewal Term | $202,584.37 | $16,882.03 |
| Second Renewal Term | $212,713.58 | $17,726.13 |
| Third Renewal Term | $223,349.25 | $18,612.44 |
| Fourth Renewal Term | $234,516.71 | $19,543.06 |
| Fifth Renewal Term | $246,242.54 | $20,520.21 |



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

| Sixth Renewal Term | $258,554.66 | $21,546.22 |
| Seventh Renewal Term | $271,482.39 | $22,623.53 |
| Eighth Renewal Term | $285,056.50 | $23,754.71 |

    (b)    If the term shall commence on a day other than the first day of a month, then fixed rent shall be pro-rated for the balance of said month on a per diem basis. Rent shall be payable in advance, in equal monthly installments, on the first day of each and every calendar month from and after the Rent Commencement Date (as defined in Section 2.1) during the term hereof, and shall be proportionately reduced for any partial month during the term.

    4.    <u>Use of Premises; Subdivision:</u>

    4.1    The Premises may be used for any lawful purpose. Landlord represents and warrants that Landlord has granted no exclusives and has not entered into nor is the Premises subject to any restrictive use agreements except for the Permitted Encumbrances listed on **Exhibit "C"** attached hereto. Nothing in this Article or otherwise in this Lease is intended to imply or create a covenant that Tenant will initially open for business or will operate its business in any particular manner, or at all.

    4.2    The Premises is currently comprised of more than one subdivided parcel. Tenant shall have the right (as part of obtaining Tenant's Approvals) to apply to the applicable municipal authorities to have the parcels comprising the Premises consolidated.

    5.    <u>Taxes and Utility Expenses:</u>

    5.1    5.1.1    The Premises is currently separately assessed for the purpose of paying all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Premises or the Landlord in substitution thereof ("Real Estate Taxes") and Landlord shall cause all Real Estate Tax bills and assessments regarding the Premises to be sent directly to Tenant, and commencing on the Rent Commencement Date, Tenant shall pay all Real Estate Taxes on or prior to the date such Real Estate Taxes are due. The Real Estate Taxes for any tax year shall mean such amounts as shall be finally determined to be the real estate taxes payable during such tax year less any abatements, refunds or rebates made thereof.  Tenant shall indemnify Landlord and hold Landlord harmless from and against any and all Real Estate Taxes not paid when due together with all interest, costs and penalties incurred by Landlord in the payment thereof.  Upon written request from Landlord, Tenant shall provide Landlord with evidence of payment for all Real Estate Taxes paid by Tenant.

    5.1.2    Real Estate Taxes shall not include the following:  (i) income, intangible, franchise, capital stock, estate or inheritance taxes or taxes substituted for or in lieu of the foregoing exclusions; (ii) any roll-back taxes relating to conservation easements or similar "clean and green" tax incentive programs; (iii) taxes on rents, gross receipts or revenues of Landlord from the Premises; (iv) impact fees, including, but not limited to, loophole and proffer fees, which were not triggered by Tenant's development of the Premises as contemplated by this Lease.



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

5.2     5.2.1    If the Term of this Lease shall terminate on any date other than the last day of a tax fiscal year, the amount payable by Tenant during the tax fiscal year in which such termination occurs shall be prorated on the basis which the number of days from the commencement of said tax fiscal year to and including said termination date bears to 365.  A similar proration shall be made for the tax fiscal year in which the Rent Commencement Date occurs.

5.2.2   In the event for any reason that any real estate tax bills or assessments are not sent directly to Tenant, then Landlord shall furnish Tenant with copies of all such real estate tax bills and assessments on the Premises promptly upon receipt thereof and in sufficient time to allow Tenant to determine whether or not to contest any increase in Real Estate Taxes.  If Tenant desires to contest such tax increase, Tenant shall promptly notify Landlord and Tenant shall have the right to do so at its expense and Landlord shall fully cooperate with Tenant in any such proceeding.

5.3     In connection with construction by Tenant at the Premises preceding the Rent Commencement Date and from and after the Rent Commencement Date, Tenant shall pay the applicable utility companies or governmental agencies directly for all utilities consumed on the Premises by Tenant.  Landlord shall not take or permit any person claiming under Landlord to take, any action which shall interrupt or interfere with any electric, gas, water, sewage or telephone service to the Premises.

6.      Landlord's Work; Improvements, Repairs, Additions, Replacements:

6.1     On or prior to the date which is ten (10) days after the Approval Date (the "Outside Delivery Date"), Landlord shall deliver the Premises to Tenant free and clear of all tenancies.

6.2     Subject to Tenant obtaining Tenant's Approvals, Tenant shall have the right, at its own cost and expense, to construct on any part or all of the Premises, at any time and from time to time, such building and improvements as Tenant shall from time to time determine, provided that such improvements shall be in compliance with all then applicable building codes and ordinances.  Tenant shall also be entitled to demolish any buildings and other improvements that presently exist on the Premises.

6.3     Tenant shall, at all times during the term of this Lease and during each renewal term, and at its own cost and expense, keep and maintain or cause to be kept and maintained in repair and good condition (ordinary wear and tear excepted) the building and improvements Tenant constructs on the Premises, and shall use all reasonable precaution to prevent waste, damage or injury.

6.4     Tenant may at its option and at its own cost and expense, at any time and from time to time, make such alterations, changes, replacements, improvements, and additions in and to the building and improvements Tenant constructs on the Premises as it may deem desirable, provided Tenant complies with all then applicable building codes and ordinances.



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

6.5    Until the expiration or sooner termination of this Lease, title to the building and improvements, Tenant's personal property and any alteration, change or addition thereto, shall remain solely in Tenant; and Tenant alone shall be entitled to deduct all depreciation on Tenant's income tax returns for all of same.    Upon expiration or sooner termination of the Lease, title to the building and improvements affixed to the Premises shall vest in Landlord.

6.6    On the expiration or sooner termination of the term of this Lease, Tenant shall quit and surrender the Premises, and the building and improvements thereon, broom clean and in good condition and repair (ordinary wear and tear and damage by the elements excepted), except that Tenant may remove its personal property and trade fixtures.

7.    Requirements of Public Authority:  During the term of this Lease, Tenant shall, at its own cost and expense, promptly observe and comply (unless Tenant contests same and protects Landlord, at no cost to Landlord) with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of any governmental body (collectively, "Governmental Requirements") dealing with Tenant's use and occupancy of the Premises.

8.    Covenant Against Liens:    If, because of any act or omission of Tenant, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Landlord or any portion of the Premises, that is not otherwise permitted by this Lease, Tenant shall, at its own cost and sixty (60) days after written notice from Landlord to Tenant of the filing thereof, discharge said lien; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees, resulting therefrom.  In connection therewith, Tenant hereby indemnifies Landlord, and holds Landlord harmless from and against all such mechanic's liens or other lien, charge or order for the payment of money filed against the Landlord or any portion of the Premises.

9.    Covenant of Quiet Enjoyment.  Landlord covenants and warrants that Landlord is the true and lawful owner of the Premises, subject only to those matters set forth in **Exhibit "C"**, attached hereto and by this reference made a part hereof (the "Permitted Encumbrances") and has good right and full power to let and lease the same.  Landlord agrees that Tenant shall quietly and peaceably hold, possess and enjoy the Premises for the full Term of this Lease, or any extension thereof, without any hindrance or molestation by the agents or employees of Landlord, and further, Landlord shall defend the title to the Premises and the use and occupancy of the same by Tenant against the lawful claims of all persons whomsoever, except those claiming by or through the Tenant.  Without limiting the generality of the foregoing, Landlord acknowledges that a material inducement to Tenant in entering into this Lease, is an assurance that Tenant's customers, employees and visitors shall have continuous access to the Premises from an entry or entries to the Premises as shown on the Site Plan and to the extent that such access is interrupted other than by reason of temporary closure, the correction of which must be diligently pursued, such interruption shall constitute a breach of Landlord's covenant and warranty to Tenant of quiet enjoyment and in such event, Tenant, in addition to any other rights and remedies available to it at law or in equity shall have the right to terminate this Lease, effective upon thirty (30) days' written notice to Landlord, in which case thereafter neither party shall be liable to the other except as to rights otherwise specifically set forth in this Lease. Landlord hereby represents and



5

S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

warrants that Landlord, its successors or assigns, shall not enter into, or agree to modify, amend, revise or change any documents, including but not limited to declarations, easements, restrictions, or other similar instruments ("Declarations"), that are or are to be recorded against the Premises, or otherwise affect the Premises, and affect the rights and/or obligations of the Tenant, without first obtaining the prior written consent of Tenant, which consent shall not be unreasonably withheld if agreement does not adversely affect (i) the parking areas serving the Premises; (ii) access to or from the Premises; (iii) the visibility of the Premises from the public streets adjoining the Premises; (iv) free passage of delivery and service vehicles and personnel serving the Premises; or (v) Tenant's operations in or around the Demised Premises in a material manner, including any interference with utilities serving the Premises (conditions (i) through (v) are sometimes collectively referred to herein as "Tenant's Operating Conditions").

10.     Feasibility/Approvals Period:

10.1    Tenant's obligation hereunder to complete the transactions contemplated in this Agreement shall be conditioned on the satisfaction (or Tenant's written waiver) of each of the following Conditions (each of which shall be for the benefit of Tenant alone):

10.1.1  Each of Landlord's representations under this Lease shall be true and accurate.

10.1.2  Landlord shall have performed all of its obligations under this Lease.

10.1.3  Tenant has not terminated this Lease prior to the expiration of the Feasibility Period (hereinafter defined) or the Approval Period (hereinafter defined) in accordance with this Section 10.1.

10.2    For a period of ninety (90) days following the Effective Date (the "Feasibility Period"), Tenant shall have the right to (i) enter upon the Premises to investigate all aspects of the Premises including, without limitation, soil and sub-soil conditions (including core samples, wetland demarcation and other related tests), and to conduct environmental studies, engineering studies, market studies, land use and planning feasibility studies, utilities availability studies, drainage, access, sewer, and such other investigations as Tenant, in its sole discretion, may desire to determine the feasibility of developing the  Premises, (ii) determine by title examination and survey review that title to the Premises is satisfactory to Tenant and (iii) satisfy any and all other conditions precedent to Tenant's obligations hereunder, subject to the terms hereof .  Any entry by Tenant onto the Premises shall be subject to the following conditions:

10.2.1  Such entry shall be at Tenant's sole cost and expense;

10.2.2  Such entry shall not constitute a taking of possession by Tenant;

10.2.3  Tenant shall return each test location to substantially its original condition;



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

10.2.4 Neither Tenant nor any of the Tenant Parties shall suffer or cause any liens or encumbrances against the Premises arising from such activities, and Tenant shall indemnify, defend and save harmless Landlord from any such liens or encumbrances.

10.2.5 Tenant shall indemnify and hold Landlord harmless from and against any claims for injuries to persons or Premises or other liability arising out of or in any way related to Tenant's activities on the Premises including any (1) claims or judgments against Landlord or (2) physical damage to the Premises, in either case caused by any acts or omissions of the Tenant Parties while on the  Premises unless such claims or liability result from the negligence or willful misconduct of Landlord or its agents or contractors.

10.3    If Tenant determines, in Tenant's sole discretion, not to develop the Premises, then Tenant may, at its option, terminate this Lease by written notice to Landlord on or before the expiration of the Feasibility Period.  Upon such termination by Tenant, this Lease shall be null and void and neither party shall have any further rights, duties, liabilities or obligations, at law or in equity, arising out of or relating to this Lease; except for the indemnity provisions set forth in subparagraph's 10.2.4 and 10.2.5 above which shall survive the termination of this Lease.

10.4    Tenant shall, at its sole cost and expense, be solely responsible for obtaining land development, subdivision, site plan and all other permits, approvals, variances, and other requirements of any governmental agency, adjoining landowners or any other person or entity, including without limitation, easements, consent or other agreements necessary or desirable from private parties in connection for the development, construction and operation of the Project (collectively, "Tenant's Approvals").  For purposes of this Lease, the Term "Project" shall refer to that certain building containing approximately 14,673 square feet ("Tenant's Building") together with other related accessory buildings, building signage and pylon signage and other improvements contemplated to be constructed by Tenant on the Premises substantially in accordance with the Site Plan attached hereto as Exhibit "A-2", as may be revised by Tenant in its sole discretion.  Landlord agrees to cooperate with Tenant's applications and pursuit of Tenant's Approvals and to execute all such documents necessary to effectuate the same, including re-subdivision and/or consolidation of the existing parcels comprising the Premises to accommodate the Project.  Tenant's  Approvals shall only contain conditions and requirements that are satisfactory to Tenant in its sole discretion.  Tenant's Approvals shall not be deemed obtained until the same are unappealed and unappealable.  Tenant shall have fifteen (15) months from the Effective Date in order to seek Tenant's Approvals (the "Approval Period").  The date upon which all Tenant's Approvals have been obtained as provided herein is referred to in this Lease as "Approval Date."  In the event Tenant has not obtained the Approvals by the expiration of the Approval Period, then Tenant may: (1) elect to terminate this Lease by a written notice to Landlord; or (2) elect to extend the Approval Period for two (2) additional periods of sixty (60) days each (each, an "Extension") by providing Landlord written notice of its intent to do so prior to the expiration of the Approval Period.   Tenant covenants to act in good faith and use due diligence to satisfy the condition set forth in this Section 10.4.

10.5    Following Tenant's receipt of all Tenant Approvals, including the building permit for Tenant's Building, Tenant shall provide Landlord with its then current construction



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

schedule upon written request by Landlord.  Thereafter, upon Landlord's request, Tenant shall provide Landlord with periodic updates of Tenant's construction progress and the estimated date for Tenant's opening for business at the Premises.

11.   Assignment and Subletting:  Tenant may assign its interest in this Lease or sublet the Premises (in whole or in part or parts) without requiring Landlord's consent; provided, however, in such event Tenant shall remain liable hereunder.  Tenant shall furnish Landlord written notice of the assignment or subletting within thirty (30) days thereafter, together with the name and address of the assignee or subtenant.

12.   Indemnity:

12.1   Tenant shall indemnify and save harmless Landlord, its officers, agents, servants, employees, contractors, successors and assigns (collectively, the "Landlord Parties") from and against any and all liability, damage, penalties or judgments arising from injury to person or property sustained by anyone in and about the Premises resulting from any act or acts or omission of Tenant, or Tenant's agents, servants, employees or contractors, (collectively, the "Tenant Parties").  Tenant shall, at its own cost and expense, defend any and all suits or actions which may be brought against the Landlord Parties or in which the Landlord Parties may be impleaded with others upon any such above-mentioned matter, claim or claims, except as may result from the acts set forth in Section 12.2.  The indemnity obligations of Tenant to Landlord pursuant to this paragraph shall survive the expiration or earlier termination of this Lease for a period not to exceed the applicable statute of limitations with respect to the indemnified claim.

12.2   Except for the acts or negligence of the Landlord Parties, Landlord shall not be responsible or liable for any damage or injury to Tenant's Building, the Improvements, or personal property of Tenant or to any person or persons, at any time on the Premises, including any damage or injury to Tenant or to any of Tenant's agents, servants, employees or contractors.

12.3   The obligation of Tenant to indemnify Landlord, as hereinabove set forth, shall not extend to any matter against which Landlord shall be protected by insurance, provided however, that if any such liability shall exceed the amount of the collectable insurance in question, the liability of Tenant shall apply to such excess further, provided, however, that the provisions of this Section shall be inapplicable in the event that they prevent Landlord from being insured for liabilities to third parties for personal injuries, death and/or property damage.

12.4   Landlord shall reimburse, defend, indemnify and hold harmless Tenant, its officers, agents, servents, employees, contractors and their respective successors, assigns and other parties claiming any interest in the Premises by, through or under Tenant, from and against any and all liabilities, claims, damages, penalties, expenditures, losses or charges (including, but not limited to, all costs of investigation, monitoring, legal fees, remedial response, removal, restoration or permit acquisition) that may in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred as the result of (a) any contamination existing on, above or under the Premises, which was not caused by the Tenant Parties; and (b) any investigation, monitoring, clean up, removal, restoration, remedial response or remedial work undertaken on the Premises by or on behalf of Tenant subsequent to the date hereof with respect to any such contamination.



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

This obligation to indemnify Tenant shall survive the expiration or earlier termination of this Lease.

    13.    <u>Insurance:</u>

    13.1    Tenant shall, at no expense to Landlord, provide and keep in force general liability insurance in a good and solvent insurance company or companies licensed to do business in the state wherein the Premises is located in the amount of at least Three Million Dollars ($3,000,000.00) with respect to injury or death to more than one person in any one accident or other occurrence and Five Hundred Thousand Dollars ($500,000.00) with respect to damage to property.  All of said insurance shall be maintained for the protection of both Landlord, Landlord's Lender and Tenant, and each shall be named an additional named insured as their interests may appear in all policies of insurance.  Tenant agrees to deliver certificates of such insurance to Landlord.  Such insurance shall be non-cancelable (except for the non payment of premium) without at least ten (10) days' written notice to Landlord.

    13.2    Tenant shall keep the Premises insured against damage or destruction by fire, and such other perils as are, from time to time, included in standard fire insurance policy with extended coverage endorsements, for the full insurable value thereof.  For the purposes hereof, full insurable value, shall mean the actual replacement cost without deduction for depreciation, but shall not included "unisurables" (i.e., footings, parking lot, underground piping, etc.).  All of said insurance shall be maintained for the protection of both Landlord and Tenant, and each shall be named as insureds in all policies of insurance.  The proceeds of such insurance in case of loss or damage shall be made available to Tenant to repair and/or rebuild the Premises.

    13.3    Any insurance required to be provided by Tenant pursuant to this Lease may contain a deductible provision, and may be provided by blanket insurance covering the Premises and other locations in which Tenant has an interest. Tenant may carry all or any part of such insurance:  (A) a self-insured retention of up to $500,000 for the property and casualty and $2,000,000 for general liability (subject to customary and reasonable adjustments); (B) under any plan of self-insurance which Tenant may from time to time have in force and effect; or (C) under a blanket policy or policies, covering other liabilities of Tenant and its subsidiaries, controlling or affiliated corporation; or (D) partly under such a plan of self insurance and partly under such blanket policies; provided, that any blanket policy shall specifically provide that the coverage requirements under this Lease are not affected by losses at other locations covered by such blanket policy.

    13.4    Except with respect to the insurance required by Section 13 hereof, neither Landlord nor Tenant shall take out separate insurance concurrent in form or contributing in the event of loss with that required in this Section 13 to be furnished by, or which may reasonably be required to be furnished by Tenant unless Landlord and Tenant are included therein as the insured, with loss payable as in this Lease provided.  Each party shall immediately notify the other of the placing of any such separate insurance and shall cause the same to be delivered as is required.



Case 25-14861-MBK    Doc 2467-1    Filed 09/16/25    Entered 09/16/25 11:59:52    Desc
Exhibit A (part 1 of 2)    Page 10 of 44
S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

14.  Waiver of Subrogation:  All insurance policies carried by either party covering the Premises, including but not limited to contents, fire and casualty insurance, shall expressly waive any right on the part of the insurer against the other party.  The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same shall be obtainable without extra cost, or if extra cost shall be charged therefor, so long as the other party pays such extra cost.  If extra cost shall be chargeable therefor, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its elections, may pay the same, but shall not be obligated to do so. Neither party, nor its agents, employees or guests, shall be liable to the other for loss or damage caused by any risk covered by such insurance, provided such policies shall be obtainable.  This release shall extend to the benefit of any subtenant and the agents, employees and guests of any such subtenant.

15.  Destruction:

15.1  If at any time during the term of this Lease, Tenant's Building or the Improvements shall be destroyed or damaged in whole or in part by fire or other cause within the extended coverage of the fire insurance policies carried by Tenant in accordance with this Lease, then, Tenant shall, at its own cost and expense, cause the same to be repaired, replaced or rebuilt within a period of time which, under all prevailing circumstances, shall be reasonable recognizing that Tenant shall be required to diligently and in good faith pursue restoration of the Leased Premises.

15.2  If (a) Tenant's Building or the Improvements constructed by Tenant on the Premises have been damaged or destroyed so that the cost of repair or replacement thereto shall exceed the sum of the proceeds to be received by Tenant from applicable insurance policies, and the deductible amount maintained by Tenant under such policies or (b) during the last three (3) years of the term hereof or during any renewal term, Tenant's Building or the Improvements are damaged or destroyed to the extent of fifty percent (50%) or more of the value of Tenant's Building or the Premises are rendered substantially untenantable for operation of Tenant's business, then Tenant shall have the right, but not the obligation, to elect not to repair, replace or rebuild and to terminate this Lease by giving written notice of termination to Landlord on or prior to the date ninety (90) days after the occurrence of such damage or destruction, and upon the giving of such notice of termination: (1) the term of this Lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed herein as the expiration date of the term of this Lease; (2) Tenant shall pay over to Landlord such insurance proceeds as Tenant shall have received from the Tenant's insurance carrier; and (3) neither party shall have any further rights or liabilities hereunder.

16.  Eminent Domain:

16.1  If the whole of the Premises shall be taken for any public or quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof (a "Taking"), then this Lease shall automatically terminate as of the date of the vesting of title.  In the event of a partial Taking of the Premises pursuant to which Tenant's business is adversely affected, then Tenant shall have the right to terminate this Lease by giving written notice of such



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

termination to Landlord on or prior to the date ninety (90) days after the date of such Taking and upon the giving of such notice of termination the term of this Lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed herein as the expiration date of the term of this Lease.  If this Lease shall terminate or shall be terminated, the rent shall, if and when necessary, be adjusted to the day of the Taking and neither party shall have any further rights or liabilities hereunder.

16.2    In the event of a Taking resulting in the termination of this Lease pursuant to the provisions of Section 16.1, the parties hereto agree to cooperate in applying for and in prosecuting any claim for compensation for such Taking and further agree, that the aggregate net award, after deducting all expenses and costs, including attorneys' fees, incurred in connection therewith, shall be paid to both Landlord and Tenant as their interests appear, provided however that Tenant shall be solely entitled to any awards for Tenant's leasehold estate and the buildings and improvements constructed by Tenant.

16.3    If, after the execution of this Lease and prior to the expiration of the term of this Lease, any taking under the power of eminent domain by a public or private authority or any conveyance by Landlord in lieu thereof, shall result in:

16.3.1  a reduction of five percent (5%) or more of the square footage of the Premises;

16.3.2  a taking that results in the closing of any entrance or exit to the Premises; or

16.3.3  a taking of any portion of the access roads to the Premises, or any portion of the Premises, which taking in Tenant's sole discretion materially impedes or materially interferes with access to the Premises, or materially affects the conduct of Tenant's business as theretofore conducted at the Premises; then Tenant may, at its election, terminate this Lease by giving Landlord notice of the exercise of Tenant's election within thirty (30) days after Tenant shall receive notice of such taking.  In the event of termination by Tenant under the provisions of this Section, this Lease and the Term hereof shall cease and terminate as of the date of such taking subject to the right of Tenant, at its election, to continue to occupy the Premises, subject to the terms and provisions of this Lease, for all or such part, as Tenant may determine of the period between the date of such taking and the date when possession of the Premises shall be taken by the appropriating authority, and any unearned rent or other charges, if any, paid in advance, shall be refunded to Tenant.

16.4    In the event of a taking in respect of which Tenant shall not have the right to elect to terminate this Lease or, having such right, shall not elect to terminate this Lease, this Lease and the Term thereof shall continue in full force and effect and Tenant, at Tenant's sole cost and expense, but subject to receipt of available condemnation proceeds pursuant to Section 16.5 below, shall promptly and diligently proceed to restore the remaining portions of the Premises, including any and all improvements made theretofore, together with the remaining portions of the parking areas, to an architectural whole in substantially the same condition that



Case 25-14861-MBK    Doc 2467-1    Filed 09/16/25    Entered 09/16/25 11:59:52    Desc
Exhibit A (part 1 of 2)    Page 12 of 44
S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

the same were in prior to such taking.  An equitable proportion of the Rent reserved hereunder and any other charges payable by Tenant hereunder, according to the nature and extent of the injury to the Premises, shall be suspended or abated until the completion of such restoration and thereafter the Rent and any other charges shall be reduced to equitably reflect the effect of such taking on Tenant's business.

16.5    All compensation awarded for any Taking related to Landlord's fee simple interest in the Premises, whether for the whole or a portion of the Premises, shall belong to Landlord, (subject to delivery to Tenant for restoration of the Premises as provided herein), provided that Tenant shall be entitled to any award made, whether to Landlord or to Tenant, for the cost of Tenant's betterments and improvements, moving and relocation expenses, the value of Tenant's trade fixtures, for any other compensation as provided under applicable federal and state laws and for the loss of Tenant's leasehold estate (collectively, "Tenant's Damages").  With respect to any compensation awarded for any taking, Landlord shall immediately pay to Tenant from the amount awarded to it as damages therefor an amount equal to Tenant's Damages, except to the extent that Tenant receives a separate award from the condemning authority to cover such losses.

16.6    In the event of any termination of this Lease as the result of the provisions of this Article 16, the parties, effective as of such termination, shall be released, each to the other, from all liability and obligations thereafter arising under this Lease and this Lease shall become null and void and of no further force or effect, subject to Tenant's right to receive Tenant's damages as provided above.

17.    <u>Utility Easement & Highway Alignment; Cross Easements</u>:  Tenant shall have the right to enter into reasonable agreements with utility companies creating easements in favor of such companies as are required in order to service Tenant, Tenant's Building or the Improvements, and Landlord covenants and agrees to consent thereto and to execute any and all documents, agreements and instruments, and to take all other actions, in order to effectuate the same, all at no cost or expense to Landlord.  Landlord further covenants and agrees, upon request of Tenant, to convey without compensation therefor insubstantial perimeter portions of the Premises for highway or roadway purposes, to any appropriate governmental authorities.

18.    <u>Mortgages</u>:

18.1    Upon written request from Landlord, Tenant agrees to subordinate this Lease to any mortgage now or hereafter placed upon the Premises by Landlord and to all advances made or hereafter to be made upon the security thereto, provided that the holder of any such mortgage shall execute and deliver a Subordination, Non-Disturbance and Attornment Agreement in form and substance reasonably satisfactory to the Tenant.  The word "mortgage" as used herein includes mortgages, deeds of trust or similar instruments both in effect as of the delivery date or thereafter.  Provided, however, that if Tenant is not in default of this Lease, its tenancy will not be disturbed but shall continue in full force and effect.  As a condition to this Lease, Landlord shall obtain within ninety (90) days after the execution of this Lease a subordination, non-disturbance attornment agreement in conformance with **<u>Exhibit "B"</u>**, from the holders of any and all of the above mortgages.



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

18.2    Tenant and every successor and assign of Tenant is hereby given the right (exercisable at any time and from time to time) by Landlord, without Landlord's prior consent, to mortgage their interests in this Lease, under one or more leasehold mortgage(s), and to assign this Lease, and all sublease(s), as collateral security for such leasehold mortgage(s), upon the condition that all rights acquired under such leasehold mortgage(s) shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease, and to all rights and interests of Landlord in this Lease, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the right given to Tenant to mortgage Tenant's interest in this Lease, except as expressly provided in this Article 18.  If Tenant and/or Tenant's successors and assigns shall mortgage this leasehold and if the holder of any such leasehold mortgage shall send to Landlord notice specifying the name and address of such holder and the pertinent recording data with respect to its leasehold mortgage, then Landlord agrees that the following provisions shall apply to each leasehold mortgage with respect to which such conditions are met (each being herein called a "Leasehold Mortgage"), so long as such Leasehold Mortgage shall remain unsatisfied of record or until  notice of satisfaction of such Leasehold Mortgage is given by the holder to Landlord:

(a) There shall be no cancellation, surrender or modification of this Lease by joint action of Landlord and Tenant without the prior consent in writing of the holder of the Leasehold Mortgage, and no merger shall result from the acquisition by, or devolution upon, any one entity of the fee and leasehold estates in the Premises.

(b) Landlord shall, upon serving Tenant with any notice of default or other notice provided for in this Lease, simultaneously serve a copy of such notice upon the holder of the Leasehold Mortgage and for information purposes, upon Landlord's current mortgagee, Vist Bank; and no such notice to Tenant shall be effective unless a copy of such notice is also served on the holder of the Leasehold Mortgage.  The holder of the Leasehold Mortgage shall thereupon have the same period, after service of such notice upon it, to remedy or cause to be remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of the holder of the Leasehold Mortgage as if the same had been done by Tenant.

(c) If any default by Tenant shall occur which, pursuant to any provision of this Lease or law, entitles Landlord to terminate this Lease, and if, before the expiration of ninety (90) days from the date of service of notice of termination upon the holder of the Leasehold Mortgage, such holder shall have notified Landlord of its desire to nullify such notice and shall have paid to Landlord all Minimum Rent and other payments provided for in this Lease which are then in default, and shall have complied (or shall have commenced the work of complying) with all of the other obligations of Tenant under this Lease which are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Lease and any notice of termination theretofore given shall be void and of no effect.

(d) If any default by Tenant shall occur which, pursuant to any provision of this Lease or law, entitles Landlord to terminate this Lease, and Landlord elects to terminate this Lease, the holder of the Leasehold Mortgage shall not only have the right to nullify any notice of



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

termination by curing such default, as aforesaid, but shall also have the right to postpone and extend the specified date for the termination of this Lease as Fixed by Landlord in Landlord's notice of termination, for a period of not more than six (6) months, provided that such holder shall cure or cause to be cured any then existing monetary defaults and meanwhile pay the Minimum Rent, additional rent and comply with and perform all of the other terms, conditions and provisions of this Lease on Tenant's part to be complied with and performed, and provided further that the holder of the Leasehold Mortgage shall forthwith take steps to acquire or sell Tenant's interest in this Lease by foreclosure of the Leasehold Mortgage or otherwise and shall prosecute the same to completion with due diligence.  If at the end of said six (6)-month period the holder of the Leasehold Mortgage shall be actively engaged in steps to acquire or sell Tenant's interest in this Lease and shall have given notice thereof to Landlord, the time for the holder to comply with the provisions of this subparagraph (d) shall be extended for such period as shall be reasonably necessary to complete such steps with reasonable diligence and continuity, provided that the holder of the Leasehold Mortgage continues to pay or cause to be paid all sums owing by Tenant hereunder.

(e) Landlord agrees that in the event of any termination of this Lease or of any New Lease made pursuant to this subparagraph (e) prior to its stated expiration date for any reason whatsoever (including, without limitation, by operation of law or the rejection of this Lease or any New Lease by Tenant as debtor in possession or any trustee of Tenant in any bankruptcy, reorganization, arrangement or similar proceeding), Landlord shall enter into a new lease ("New Lease") of the Premises with the holder of the Leasehold Mortgage (or its nominee), for the remainder of the Term of this Lease, effective as of the date of such termination, at the rent and upon the same terms, provisions, covenants and agreements as contained in this Lease (including without limitation all renewal options, rights of first refusal and/or options to purchase the Premises, if any), and subject only to the same conditions of title as this Lease is subject to on the date of the execution hereof, to liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein to be observed or performed by Tenant and the lien of any impositions then affecting the Premises, and to other liens and encumbrances created pursuant to this Lease, and to the rights, if any, of any parties then in possession of any part of the Premises, provided:

(i) The holder (or its nominee) shall make request upon Landlord for such New Lease within sixty (60) days after the date on which the holder has received written notice of the occurrence of such termination.

(ii) The holder (or its nominee) shall pay to Landlord at the time of the execution and delivery of the New Lease all sums which would at the time of the execution and delivery of the New Lease be due pursuant to this Lease but for such termination, less the net income collected by Landlord subsequent to the date of termination of this Lease and prior to the execution and delivery of the New Lease, any excess of such net income over the aforesaid sums to be applied in payment of the rental thereafter becoming due under the New Lease.

(iii) Upon the execution and delivery of the New Lease, all subleases which theretofore may have been assigned and transferred to Landlord shall thereupon be



assigned and transferred (without recourse) by Landlord to the Tenant under the New Lease; and the Tenant under the New Lease shall have the benefit of all of the right, title, interest, powers and privileges of Tenant under this Lease in and to the Premises, including specifically assignment of Landlord's interest in and to any then existing sublease where the sublessee may have attorned to Landlord and which, at the time of cancellation or termination of this Lease, was prior in right to the lien of the holder of the Leasehold Mortgage or which by separate agreement or by its terms had been granted non-disturbance privileges pursuant to the provisions of this Lease; and Landlord hereby agrees that, with respect to any such sublease so assigned, Landlord shall not modify or amend any of the terms or provisions thereof, during the period between the expiration or termination of this Lease and the execution and delivery of the New Lease.

(iv) Following the termination of this Lease or any New Lease and until the right of the holders of a Leasehold Mortgage to enter into a New Lease shall have expired without any New Lease having been executed:

(A) Landlord shall not alter or in any way demolish the buildings or other improvements situate on the Premises; and, during said period, Landlord shall not remove, replace or change any furniture, furnishing, fixtures or equipment located on the Premises.

(B) Landlord shall not terminate any sublease or the rights of any subtenant under such sublease unless such subtenant shall be in default under such sublease.

(f) The term "mortgage", whenever used in this Lease, shall include whatever security instruments are used in the locality of the Premises, such as, without limitation, mortgages, deeds of trust, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code or successor or similar legislation.

(g) No holder of a Leasehold Mortgage shall have any liability for performance of Tenant's obligations under this Lease unless and until such holder acquires title to Tenant's leasehold estate or assumes possession of the Premises. Notwithstanding anything to the contrary in the Lease, while any party who is a holder of a Leasehold Mortgage, or at any time was the holder of a leasehold mortgage or is a designee or nominee of any existing or former holder of a Leasehold Mortgage, holds title to the Lease or to a New Lease or possession of the Premises through a receiver or otherwise, or is proceeding to foreclosure on a lien held by it against Tenant's leasehold estate created by the Lease or to obtain title to Tenant's leasehold estate created by the Lease by a deed in lieu of foreclosure, no provision in the Lease requiring reconstruction or rehabilitation of any buildings, improvements or other property following a condemnation, fire or other casualty, if any, shall be applicable to or enforceable against such party to an extent in excess of the condemnation award or the net insurance proceeds actually received by reason of such fire or other casualty.

18.3    The provisions of this Article 18 shall survive any termination of this Lease to the extent of any new lease as set forth hereinabove or with respect to any wrongful



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

termination of this Lease by Landlord in violation of Landlord's covenants in this Article 18 or of any other provision of this Lease.

19.    Landlord Representations

19.1    Landlord represents and warrants to Tenant that it has good and marketable fee simple title to the Premises and the power and authority to execute and deliver this Lease and to carry out and perform all covenants to be performed by it hereunder.

19.2    Landlord further represents and warrants to Tenant that:

19.2.1  the Premises are free from all encumbrances, liens, defects in title, violations of law, leases, tenancies, easements, restrictions and agreements, except the Permitted Encumbrances;

19.2.2  prior to the Outside Delivery Date, or such earlier date as may be mutually acceptable to the parties, sole and undisturbed physical possession of the entire Premises will be delivered to Tenant subject only to the Permitted Encumbrances;

19.2.3  at all times Tenant shall have unobstructed and adequate means of ingress and egress to the Premises from all abutting streets, roads and highways, except in the event of a Taking or other events occurring after the Effective Date beyond Landlord's control;

19.3    If Landlord shall be in default under this Section 19, Tenant, in addition to any and all remedies it may have in law and/or equity, may terminate this Lease upon written notice to Landlord in which event the Deposit shall be returned to Tenant.

20.    Defaults:

20.1    In the event Tenant shall at any time be in default in the payment of rent or other charges herein required to be paid by Tenant or in the observance or performance of any of the other covenants and agreements required to be performed and observed by Tenant hereunder and any such default shall continue for a period of fifteen (15) days after written notice to Tenant for monetary obligations and thirty (30) days after written notice to Tenant for all other obligations (or if such default is incapable of being cured in a reasonable manner within thirty (30) days, if Tenant has not commenced to cure the same within said thirty (30) day period and thereafter diligently prosecutes the same to completion) and Tenant shall not thereafter cure such default, then Landlord shall be entitled at its election, to exercise concurrently or successively any one or more of the following rights, in addition to all remedies otherwise provided in this Lease and otherwise available at law or in equity under the laws of the United States or the State in which the Premises is located (provided, however, Landlord shall not be entitled to accelerate rent, nor shall it be entitled to consequential or punitive damages):

20.1.1  to bring suit for the collection of any amounts for which Tenant may be in default, or for the performance of any other covenant or agreement devolving upon Tenant, without terminating this Lease; and/or



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

20.1.2  terminate this Lease upon thirty (30) days' written notice to Tenant without waiving Landlord's rights to damages for Tenant's failure to perform its obligations hereunder.  In the event Landlord shall elect to terminate this Lease, as aforesaid, all rights and obligations of Landlord, and of any permitted successors or assigns, shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all amounts for the payment of which Tenant shall then be in default and all damages to Landlord by reason of any such breach.

20.2    In the event that Landlord shall at any time be in default in the observance or performance of any of the covenants and agreements required to be performed and observed by Landlord hereunder and any such default shall continue for a period of thirty (30) days after written notice to Landlord (or if such default is incapable of being cured in a reasonable manner within thirty (30) days, if Landlord has not commenced to cure the same within said thirty (30) day period and thereafter diligently prosecutes the same to completion) and Landlord shall not thereafter cure such default, Tenant shall be entitled at its election, to exercise concurrently or successively any one or more of the following rights, in addition to all remedies otherwise provided in this Lease and otherwise available at law or in equity under the laws of the United States or the State in which the Premises is located:

20.2.1  to bring suit for the collection of any amounts for which Landlord may be in default, or for the performance of any other covenant or agreement devolving upon Landlord, without terminating this Lease; and/or

20.2.2  terminate this Lease upon thirty (30) days' written notice to Landlord without waiving Tenant's rights to damages for Landlord's failure to perform its obligations hereunder.  In the event Tenant shall elect to terminate this Lease, as aforesaid, all rights and obligations of Tenant, and of any permitted successors or assigns, shall cease and terminate, except that Tenant shall have and retain full right to sue for and collect all amounts for the payment of which Landlord shall then be in default and all damages to Tenant by reason of any such breach.

20.3    In the event that either Landlord or Tenant commences any suit for the collection of any amounts for which the other may be in default or for the performance of any other covenant or agreement hereunder, the non-prevailing party shall, in addition to costs and disbursements provided by statute, pay to the prevailing party such sums of money as any court of competent jurisdiction may adjudge reasonable as attorneys' fees in such suit or action, including appeal from any judgment rendered therein.

20.4    All remedies of Landlord or Tenant herein created or remedies otherwise existing at law or in equity are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other; provided that in no event shall (a) either party have the right to consequential damages for the other party's default; or (b) Landlord have the right to accelerate rental reserved hereunder for Tenant's default hereunder.  Except as limited hereinabove, all rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem necessary.



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

21.    Bankruptcy and Insolvency:

21.1    If, after the commencement of the term of this Lease;

21.1.1   Tenant shall be adjudicated a bankrupt or adjudged to be insolvent;

21.1.2   a receiver or trustee shall be appointed for the aforesaid Tenant's property and affairs;

21.1.3   Tenant shall make an assignment for the benefit of creditors or shall file a petition in bankruptcy or insolvency or for reorganization or shall make application for the appointment of a receiver; or

21.1.4   any execution or attachment shall be issued against the aforesaid Tenant or any of the aforesaid Tenant's property, whereby the Premises or any building and improvements shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, except as may herein be permitted; and such adjudication, appointment, assignment, petition, execution or attachment shall not be set aside, vacated, discharged or bonded within one hundred and twenty (120) days after the issuance of the same, then a default hereunder shall be deemed to have occurred so that the provisions of Section 20 hereof shall have occurred and Landlord shall have the rights and remedies provided for therein.  Notwithstanding anything to the contrary hereinabove contained, upon the occurrence of a default pursuant to this Section 21, if the rent due and payable hereunder shall continue to be paid the covenants, conditions and agreements of this Lease on Tenant's part to be kept and performed shall continue to be kept and performed, no event of default shall have been deemed to have occurred and the provisions of Section 21 hereof shall not become effective.

22.    Waivers:  Failure of Landlord or Tenant to complain of any act or omission on the part of the other party no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder.  No waiver by Landlord or Tenant at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver or a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.  No acceptance by Landlord of any partial payment shall constitute an accord or satisfaction but shall only be deemed a part payment on account.

23.    Force Majeure:  If Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder (excluding the payment of monetary sums owed) by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

24.    Notices:  Every notice, approval, consent or other communication authorized or required by this Lease shall not be effective unless same shall be in writing and sent postage



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

prepaid by United States registered or certified mail, return receipt requested, or by a reputable commercial overnight carrier, directed to the other party at its address set forth below, or such other address as either party may designate by notice given from time to time in accordance with this Section 24.  The rent payable by Tenant hereunder shall be paid to Landlord at the same place where a notice to Landlord is herein required to be directed.

Landlord's Address:

KACHR, LLC
2668 Leisczs Bridge Road
Leesport, PA  19533
ATTENTION:  Mr. Scott Landis

with a copy to:

Karen H. Cook,  Esquire
Masano Bradley
1100 Berkshire Boulevard
Suite 201
Wyomissing, PA 19610

Tenant's Address:

Eckerd Corporation
30 Hunter Lane
Camp Hill, PA 17011
ATTENTION:  Secretary

with a copy to:
Eckerd Corporation
30 Hunter Lane
Camp Hill, PA 17011
ATTENTION:  I. Lawrence Gelman, Vice President

with a copy to:
Alan P. Garubba, Esquire
20 Erford Road, Suite 10
Lemoyne, PA  17043

25.    Governing Law:  This Lease and the performance thereof shall be governed, interpreted, construed and regulated by the laws of the state wherein the Premises is located.

26.    Partial Invalidity:  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

unenforceable, shall not be affected thereby, and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

27.  <u>Short Form Lease:</u>  Landlord shall at the request of Tenant promptly execute duplicate originals of an instrument in the form attached hereto as Exhibit "E", which will constitute a short form of lease, which Tenant may cause to be recorded at its expense among the Land Records of the county where the Premises is located.  Tenant shall be responsible for payment of realty transfer taxes due in connection with the execution and recording of this Lease.

28.  <u>Interpretation:</u>  Wherever herein the singular number issued, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The captions or headings used herein are for reference and convenience only, and shall not enter into the interpretation hereof.  This Lease may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

29.  <u>Entire Agreement:</u>  No oral statement or prior written matter shall have any force or effect.  Tenant agrees that it is not relying on any representations or agreements other than those contained in this Lease.  This agreement shall not be modified or canceled except by writing subscribed by all parties.

30.  <u>Parties:</u>  Except as herein otherwise expressly provided, the covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, successors administrators and assigns.

31.  <u>Broker's Fee:</u>  Landlord and Tenant mutually warrant, one to another, that there are no real estate brokers entitled to a commission as a result of producing this Lease and that neither employed or engaged a real estate broker or agent to effectuate this Lease Agreement. Landlord and Tenant shall hold each other harmless from any claims made by any real estate broker for a commission as a result of allegedly effectuating this Lease.

32.  <u>Right Of First Negotiation:</u>  Landlord shall not at any time during the term of this Lease sell or convey or agree to sell or convey the Premises or all or substantially all of the ownership interests in Landlord without first having complied with the requirements of this section.  If Landlord shall desire to sell or convey all or any portion or portions of the Premises or all or substantially all of the ownership interests in Landlord, Landlord shall first notify Tenant, which notice shall contain Landlord's written offer (the "Offer") to sell to Tenant the Leased Premises or all or substantially all of the ownership interests in Landlord; and Tenant shall have twenty (20) days within which to elect to purchase the portion of the Premises or the ownership interests in Landlord which is the subject of the Offer (herein called the "Subject Premises") on the terms and conditions of the Offer or on such other terms and conditions on which Landlord and Tenant may agree (except that if the Offer shall be in whole or in part for consideration other than cash, Tenant shall have the right to pay in cash the fair market value of such non-cash consideration).  If Tenant elects to so purchase the Premises or such ownership interests, Tenant shall give to Landlord written notice thereof ("Acceptance Notice") and closing shall be held



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

shall be held within sixty (60) days after the date of the Acceptance Notice, whereupon Landlord shall convey the Premises to Tenant. At closing of a purchase of the Premises Landlord shall deliver to Tenant a special warranty deed (or local equivalent), sufficient to convey to Tenant fee simple title to the Premises free and clear of all liens, restrictions and encumbrances, except for the Permitted Encumbrances, liens or encumbrances created, suffered or consented to in writing by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein to be observed or performed by Tenant. At the closing of a purchase of ownership interests in Landlord, Landlord will deliver assignments and such other documents as are called for by the Offer. This right of first negotiation shall continue as to all portions of the Premises and ownership interests in Landlord throughout the Term. If Tenant shall elect not to so purchase the Premises or such ownership interests, Landlord may thereafter sell the Premises or the ownership interests which are the subject of the Offer to a third party and only in accordance with the terms of the Offer, unless a further Offer is submitted to Tenant in accordance with this section. To prevent Landlord from defeating the rights of Tenant under this section, Landlord agrees that Landlord will at no time accept an offer to purchase all or any portion of the Premises or such ownership interests together with any other property (except other property which is leased to Tenant or an affiliate of Tenant). In no event shall the provisions of this section or the rights and privileges of Tenant under this section be construed as limiting in any manner any other rights granted elsewhere in this Lease to Tenant. Notwithstanding anything to the contrary herein, the provisions of this section shall not apply to (i) any sale or conveyance of the Leased Premises in foreclosure (or similar proceeding) of a *bona-fide* mortgage or deed of trust or to any conveyance in lieu of foreclosure of such a mortgage or deed of trust, (ii) any transfer of the Premises to any governmental or quasi-governmental agency with power of condemnation, (iii) any transfer of the Premises to any affiliate of Landlord, or (iv) any transfer of the ownership interest in Landlord for estate planning purposes.

33.    <u>Submission Not An Option:</u>  The submission of this document for examination does not constitute an option or offer to lease the Premises. This document shall have no binding effect on the parties unless executed by Landlord and Tenant and a fully executed copy is delivered to both Landlord and Tenant.

34.    <u>Environmental Provisions:</u>

34.1    Landlord shall deliver the Premises to Tenant, on or before the Delivery Date, in compliance with all Environmental Requirements (as hereinafter defined), so as to allow the construction and operation of the Project without impairment, interruption, interference, liability or additional cost or expense to Tenant with respect to any Hazardous Substances (as hereinafter defined), together with such permits, reports, audits and other documentation that Tenant shall reasonably require, certified for Tenant's reliance thereon, that the Premises are in compliance with all Environmental Requirements. Landlord shall perform any and all investigation, remediation or other response necessary to address any environmental conditions caused by the presence of with respect to any Hazardous Substances (collectively, the "Remedial Activities"). In connection with the foregoing, Landlord agrees to perform and all Remedial Activities necessary to the full satisfaction of applicable Environmental Requirements and in a manner which results in a government "clean closure" or "no further action" determination or



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

other governmental acknowledgement that no further action is necessary in connection with the Remedial Activities.

34.2    "Hazardous Substances" for purposes of this Lease shall be interpreted broadly to include, but not be limited to, any material or substance that is defined or classified under federal, state, or local laws as:  (a) a "Hazardous substance" pursuant to section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601(14), section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1321, as now or hereafter amended; (b) a "hazardous waste" pursuant to section 1004 or section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. §§6903, 6921, as now or hereafter amended; (c) a toxic pollutant under section 307(a)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §1317(a)(1); (d) a "hazardous air pollutant" under section 112 of the Clean Air Act, 42 U.S.C. §7412, as now or hereafter amended; (e) a "hazardous material" under the Hazardous Materials Transportation Uniform Safety Act of 1990, 49 U.S.C. App. §1802(4), as now or hereafter amended; (f) toxic or hazardous pursuant to regulations promulgated now or hereafter under the aforementioned laws; or (g) presenting a risk to human health or the environment under other applicable federal, state or local laws, ordinances, or regulations, as now or as may be passed or promulgated in the future (all of the foregoing laws, ordinances, regulations and other governmental strictures and guidelines pertaining to the environment, health and safety being herein sometimes referred to as the "Environmental Requirements").  "Hazardous Substances" specifically include, but are not limited to, asbestos, polychlorinated biphenyls ("PCBs"), radioactive substances, petroleum and petroleum-based derivatives, hydrocarbons and urea formaldehyde.

34.3    Neither Tenant nor employee, agent, contractor or subcontractor of Tenant (collectively, the "Tenant Parties") shall cause or permit the storage, use, escape, disposal or release of Hazardous Substances in, on or under the Premises in any manner not in compliance with the Environmental Requirements; provided, however, that nothing herein shall prevent Hazardous Substances to be brought onto the Premises in the ordinary course of Tenant's business, as long as such presence is in compliance with the Environmental Requirements. Tenant shall indemnify and hold harmless Landlord against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation Landlord's attorneys' fees) arising out of a breach by Tenant of its covenant in the preceding sentence.  The foregoing covenants and indemnities shall survive the expiration or earlier termination of this Lease; provided, however, that Tenant shall not be required to indemnify Landlord from any matter arising from Hazardous Substances present at the Premises prior to the delivery of exclusive possession to Tenant which were not brought onto the Premises by Tenant or any other Tenant Party, Landlord's gross negligence or willful misconduct or a breach of Landlord's covenant contained in Section 34.4 below.

34.4    Landlord shall not cause or permit the storage, use, escape, disposal or release of Hazardous Substances in, on or with respect to the Premises in any manner not in compliance with the Environmental Requirements.  Landlord shall indemnify and hold Tenant harmless against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation reasonable attorney's fees) arising out of a breach by Landlord of its covenant in the preceding sentence. Further,



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

Further, Landlord shall indemnify and hold Tenant harmless against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation reasonable attorneys' fees) arising out of any Hazardous Substances present at the Premises which are not present as a result of the acts of Tenant or any Tenant Party. The foregoing covenants and indemnities in this Section 34.4 shall survive the expiration or earlier termination of this Lease; provided, however, that Landlord shall not be required to indemnify Tenant from any matter arising from Tenant's gross negligence or willful misconduct or a breach of Tenant's covenant contained in Section 34.3 above.

34.5    If either party defaults in the performance of any obligation imposed on it by this Lease and does not cure such default within thirty (30) days after receipt of written notice from the other party specifying the default (or does not within said period commence and diligently proceed to cure such default), the other party, without waiver of or prejudice to any other right or remedy it may have, shall have the right (provided, in Tenant's case, Tenant shall have given similar prior written notice and time to cure to the holder of any mortgage secured upon the Premises or any part thereof), at any time thereafter, to cure such default for the account of the defaulting party, and the defaulting party shall reimburse the other party upon invoice for any amount paid and any expense or contractual liability so incurred together with interest thereon at the Interest Rate. In the event of emergencies, or where necessary to prevent injury to persons or damage to property, either party may cure a default by the other before the expiration of the waiting period, but after giving such written or oral notice to the other party as is practical under all of the circumstances.

35.    <u>Holding Over:</u>  In the event of Tenant's continued occupancy of the Premises after the expiration of the term of this Lease or any renewal or extension thereof, or any earlier termination provided or permitted by this Lease, with or without the consent of Landlord, such tenancy shall be from month-to-month terminable on thirty (30) days written notice from either party to the other.

36.    <u>Estoppel Certificate:</u>  Either party agrees within fifteen (15) business days after request therefor by the other party to execute and deliver to the requesting party a statement, certifying to its actual knowledge (a) whether or not this Lease is in full force and effect, (b) the date of commencement and termination of the term of this Lease, (c) the date to which rental and all other charges hereunder are paid currently without any offset or defense thereto (or stating any such offset or defense), (d) the amount of rental and all other charges hereunder, if any, paid in advance, (e) whether or not this Lease has been modified and, if so, identifying the modifications, (f) that there are no uncured defaults by the other party or describing the claimed defaults and (g) such other matters as the requesting party shall reasonably request. Nothing in any such estoppel statement shall be deemed to modify or amend this Lease. Tenant shall be required to give no more than two (2) such certificates in any calendar year.

37.    <u>Interest Rate.</u>

"Interest Rate" as used herein means an annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the Commonwealth of Pennsylvania, or (ii) the prime rate from time to time as set forth in the Money Rates Section (or successor section) in the Wall Street



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

Street Journal (or, if the Wall Street Journal is no longer being published, then another similar financial publication) plus two hundred (200) basis points. Interest shall payable to a party owing and shall be calculated on the basis of a 365-day year, actual days elapsed, from the thirtieth date after any cost or expense is due and payable until the amount owing is fully paid.

38.    Waiver of Landlord's Lien:    For so long as Tenant, its parent or any of its subsidiaries or affiliates is the tenant under this Lease, Landlord hereby waives in favor of Tenant its landlord's lien for rent against any and all of the property of Tenant, its parent, subsidiaries or affiliates to the extent provided in the applicable laws, regulations or ordinances where the Premises are located.

39.    Exclusive:    Landlord agrees not to permit any property owned or otherwise controlled by Landlord (or any entity by which Landlord has a controlling interest) within two (2) miles of the Premises (the "Exclusive Area") to be used for the conduct of any store, business, trade or profession which (i) requires or has a license or permit to conduct a pharmacy or which employs or is required to employ a registered or licensed pharmacist, or (ii) for the conduct of any store, business, trade or profession which is called, labeled, named or commonly known or referred to as a drug store, pharmacy or apothecary (collectively, "Drug Store Restriction") or (iii) for the sale of health aids (including without limitation over the counter medications, vitamin supplements, mineral supplements and medical equipment) (the "Health Aid Restriction"), (iv) or for the sale of beauty aids (including, without limitation, hair care products and cosmetics), (collectively, the "Beauty Aid Restriction").  Neither the Health Aid Restriction nor the Beauty Aid Restriction shall be deemed to prohibit the incidental sale of health and/or beauty aids by tenants or occupants of property of Landlord within the Exclusive Area provided that such sales do not exceed five percent (5%) of the gross sales of such tenant or occupant.  If Landlord shall violate any of the provisions of this Article 39 and shall not cure such violation within sixty (60) days after receipt of Tenant's notice thereof, Tenant, at any time thereafter, upon ten (10) days prior written notice to Landlord may (in addition to, and not as a substitute to, any and all other legal or equitable rights or remedies it may have): (i) terminate this Lease; or (ii) pay to Landlord rent reduced to a level equal to 50% of the rent due immediately prior to such violation.  The provisions of this paragraph shall be covenants that run with the land and shall be binding upon the named Landlord herein during its ownership of the Premises.  If the named Landlord herein (or any entity by which the named Landlord has a controlling interest) no longer owns an interest in the Premises, directly or indirectly, the Drug Store Restriction, the Health Aid Restriction and the Beauty Aid Restriction shall no longer apply to other property owned by such party within the Exclusive Area.

40.    If Landlord obtains fee title to one or both of the parcels adjoining the Premises and depicted on Exhibit "A-2" as the "Future Development Parcels", Tenant agrees to reasonably cooperate, at no cost to Tenant, with Landlord's development of the Future Development Parcels by granting its consent to certain easements over the undeveloped portion of the Premises located to the south of Tenant's improved parking areas to the extent necessary to satisfy green space requirements, landscape buffer requirements, utility requirements, parking requirements or storm water drainage requirements; provided the following conditions are satisfied:  (1) the proposed easement over or use of the undeveloped portion of the Premises does not, in Tenant's sole judgment, interfere with Tenant's use of enjoyment of the Premises as contemplated in this Lease



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

contemplated in this Lease or violate any governmental requirements for Tenant's development and operation of the Premises for a full line retail drug store, including without limitation, any development conditions imposed as part of Tenant's Approvals; (2) any work performed by or on behalf of Landlord with respect to the Future Development Parcels shall be performed by Landlord at its sole cost and expense in a manner that complies with all applicable governmental requirements and does not interfere with Tenant's use and enjoyment of the Premises; (3) prior to any entry onto the Premises by Landlord or anyone acting on Landlord's behalf, Landlord shall obtain Commercial General Liability Insurance in the amount of at least $3,000,000 combined single limit naming Tenant as an additional insured and otherwise reasonably acceptable to Tenant; (4) the form of any such easement or consent for the benefit of the Future Development Parcels shall be subject to the prior written approval of Tenant; (5) Landlord shall indemnify, defend and hold Tenant harmless from and against any claims, damages, losses or liabilities of any kind resulting from Landlord's development and operation of the Future Development Parcels; and (6) if any improvements are constructed upon the Premises in connection with Landlord's development of the Future Development Parcels, Landlord shall be responsible for all Real Estate Taxes or other assessments imposed by any governmental authority having jurisdiction over the Premises with respect to such improvements and, thereafter, Tenant and Landlord will share equally the Real Estate Taxes imposed upon the land comprising the portion of the Premises situate south of the "20′ Wide Alley" depicted on **Exhibit A-2** adjoining the Future Development Parcels along their western boundary.

     41.    <u>Lease Contingencies</u>. In addition to the Tenant's Approvals contingency set forth in Section 10.4 above, Tenant's obligations under this Lease are expressly contingent upon the satisfaction of the following conditions prior to the expiration of the Approval Period, as the same may be extended in accordance with Section 10.4 above:

     (a)  Tenant shall have obtained consent of Sunoco Oil Company or other parties holding rights with respect to the pipeline running through the Premises to permit the construction of the Project upon such terms and conditions as are acceptable to Tenant, in its sole discretion.

     (b)    The execution and delivery of easements or access agreements with owners of land adjoining the Premises necessary or desirable to permit the development of the Project, including without limitation, the proposed access drive connecting the Premises to Oak Circle and modifications to the 20′ Wide Alley depicted on **Exhibit A-2**. Landlord agrees to join in any such easements or access agreements as the fee simple owner of the Premises.

     (c)    Tenant shall have direct access onto Route 422 as depicted on the Site Plan and the Premises shall have access to west bound Route 422 by a left turn onto West 47th Street from either the 20′ Wide Alley traversing the Premises or via the Oak Circle access to the Premises onto West 47th Street.

     If the foregoing conditions are not satisfied prior to the expiration of the Approval Period, Tenant shall have the right, in its sole discretion, to elect to: (i) terminate this Lease by written notice to Landlord in which event, neither party shall have any further rights or obligations; (ii) extend the Approval Period to the extent necessary to satisfy one or more of the conditions for two consecutive sixty (60) day periods by written notice to Landlord in accordance with Section



Case 25-14861-MBK    Doc 2467-1    Filed 09/16/25    Entered 09/16/25 11:59:52    Desc
Exhibit A (part 1 of 2)    Page 26 of 44
S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

accordance with Section 10.4 above; or (iii) waive the condition or requirement in which case this Lease shall continue in accordance with its terms.

42.    <u>Interim Licensees</u>.    Until such time as Tenant notifies Landlord that it has obtained all of Tenant's Approvals pursuant to the terms of Section 10.4 of this Lease and that Tenant has satisfied or waived all of the Lease Contingencies set forth in Section 41 of this Lease, Landlord shall be permitted to enter into temporary license agreements for the land which comprises the Premises to itinerant vendors who sell seasonal items on such terms and conditions as Landlord shall deem appropriate; however, in no event shall the term of any such license grant a license term in excess of thirty (30) days and each such license shall be terminable by Landlord upon not more than ten (10) days written notice.  Each such license agreement shall contain an express acknowledgment from the proposed licensee that the license agreement is a personal, revocable privilege to use the Premises during the term of the license and shall not be deemed to confer on or vest in the licensee any title, interest or estate in the Premises or confer the benefits of a tenant upon licensee.  Any license between Landlord and a proposed licensee pursuant to this section shall further provide that the licensee shall not interfere with Tenant's ability to investigate all aspects of the Premises in accordance with Section 10.2 of this Lease during the Feasibility Period or to perform any other work permitted or required by Tenant in order to obtain Tenant's Approvals and shall prohibit the licensee from bringing Hazardous Substances onto the Premises.  Landlord agrees to terminate any license agreement upon written notice by Tenant that Tenant has obtained Tenant's Approvals and satisfied or waived the Lease Contingencies set forth in Section 41 hereof

43.    <u>Guaranty</u> The validity and effectiveness of this Lease is expressly conditioned upon the execution of the Guaranty by Rite Aid Corporation, a Delaware corporation in the form attached to this Lease as Exhibit F.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

WITNESS:                          LANDLORD:
                                  **KACHR, LLC**

_Kan D Cord_____          By:  _Sharon A Landis_
                                  Name:  Sharon A. Landis
                                  Title:  Member


WITNESS:                          TENANT:
                                  **ECKERD CORPORATION**

_Linda D. Brown_____              By:  _____

S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

Name: **I. Lawrence Gelman**
Title:   **Vice President**



I:\HMasano\DOCS\Kachr LLC\Exeter Township\Rite-Aid\Ground Lease 9-17-08-Clean.DOC

COMMONWEALTH OF PENNSYLVANIA          :
                                                              :
COUNTY OF CUMBERLAND                      :


On the 12th day of November          A.D. 2008, before me, the undersigned officer, personally appeared I. LAWRENCE GELMAN, who acknowledged himself to be the Vice President of ECKERD CORPORATION, a corporation, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Vice President.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.


My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LINDA L. BROWN, NOTARY PUBLIC
EAST PENNSBORO TWP., CUMBERLAND CO.
MY COMMISSION EXPIRES JUNE 18, 2012

COMMONWEALTH OF PENNSYLVANIA          :
                                                              :
COUNTY OF BERKS                                 :


On the 24th day of October          A.D. 2008, before me, the undersigned officer, personally appeared Sharon A. Landis, who acknowledged herself to be the Member of KACHR, LLC, a limited liability company, and that she, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by herself as such Member.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.


My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SHERRY BORTZEL - NOTARY PUBLIC
WYOMISSING BORO., BERKS COUNTY
MY COMMISSION EXPIRES MAY 12, 2012

28



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

## LIST OF EXHIBITS:

A -    LEGAL DESCRIPTION
A-1    SURVEY
A-2    SITE PLAN
B -    SNDA
C -    PERMITTED ENCUMBRANCES
D -    INTENTIONALLY OMITTED
E -    MEMORANDUM OF LEASE
F -    GUARANTY



S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

# EXHIBIT "A"
## LEGAL DESCRIPTION



### *First American Title Insurance Company*

Commitment No. NCS-318092-PHIL

## SCHEDULE C

TRACT 1:

ALL THAT CERTAIN lot or piece of ground shown on Harry R. Huyett's plan of lots known as Green Tree Acres, recorded in the public records of Berks County in Plan Book #6A Page #68, as lots #42, 43, and 44, situated in Exeter Township, Berks County, Pennsylvania, bounded and described as follows:

BEGINNING at an iron pipe in the North line of Oak Parkway and in the line between lots #44 and #45; thence along Oak Parkway in a Westerly direction a distance of 79 feet 3 inches to an iron pipe, thence by a line curving to the right with a radius of 20 feet and a central angle of 90 degrees a distance of 31 feet 5 inches to an iron pipe, thence by a reverse curve to the left with a radius of 80 feet and a central angle of 99 degrees and 40 minutes, a distance of 139 feet 1-7/8 inches to an iron pipe, (in the line between lots #41 and #42; thence by the radial line between said lots a distance of 162 feet 5-1/2 inches to an iron pipe in the South line of a twenty foot wide alley, thence along said alley in an Easterly direction making an interior angle of 64 degrees and fifty-two minutes, a distance of228 feet 2-5/8 inches to an iron pipe in the rear line of lot #47; thence along the rear of said lot and by line between lot #44 and #45 in a Southerly direction making an interior angle of 105 degrees and 28 minutes with the line of the alley mentioned aforesaid a distance of l97 feet 10-1/8 inches to the place of BEGINNING.

TRACT 2:

ALL THAT CERTAIN tract or piece of ground lying on the southwestern side of the State Highway leading from Reading to Philadelphia (formerly known as the Reading and Perkiomen Turnpike) and situate in Exeter Township, Berks County, and State of Pennsylvania, bounded on the northeast by said State Highway, on all other sides by other property of the said Harry F. Althouse, described more fully as follows, to wit:

BEGINNING at a corner m the center line of said State Highway (eighty feet wide) said corner being four hundred sixty-eight feet nine and one-eighth inches (468 9- 1/8") southeast of a point formed by the intersection of said center line of said State Highway and a straight line drawn between the termini of the division line between properties of said Harry F Althouse and David Brumbach, thence along other property of said Harry F. Althouse the five (5) following courses and distances, to wit. (1) south forty-one degrees twenty-four minutes west (S 41" 24' W) a distance of two hundred twenty feet (220') to a corner, (2) south forty-eight degrees thirty-six minutes east (S. 46° 36' E) a distance of twenty feet (20') to a corner, (3) North forty-one degrees twenty-four minutes east (N. 416 24' E ) a distance of forty feet (40') to a corner, (4) south forty-eight degrees thirty-six minutes east (S 48° 36'E) a distance of thirty feet (30 ) to a corner and (5) north forty-one degrees twenty-four minutes east (N 41° 24' E.) a distance of one hundred eighty feet (180') to a corner in the aforesaid center line of the State Highway eighty (80) feet wide, leading from Reading to Philadelphia, thence along the same north forty-eight degrees thirty-six minutes west (N 48° 36' W.) a distance of fifty feet (50') to the place of BEGINNING.

CONTAINING 9800 square feet including one half of said State Highway (80 feet wide).

TRACT 3:

ALL THAT CERTAIN lot or piece of ground with frame house and garage thereon erected, situate on the Southwestern side of the State Highway leading from Reading to Philadelphia, (formerly known as the Reading and Perkiomen Turnpike), in the Township of Exeter, County of Berks and State of Pennsylvania; more particularly bounded and described as follows:

BEGINNING at a post m the center line of said State Highway, at a corner of property now or late of Elmer G. Althouse, thence along the same the three following courses and distances:



### *First American Title Insurance Company*

Commitment No.  NCS-318092-PHIL

(1) In a Southwesterly direction at right angles to the said center line of said State Highway, a distance of 180'0" to a point; (2) in a Northwesterly direction, at right angles to last described line, a distance of 30'0" to a point, and (3) in a Southwesterly direction, at right angles to last described line, a distance of 40'0" to a point in the Northeastern side of a proposed 20' wide alley; thence in a Southeasterly direction along the same, at right angles to last described line, a distance of 130' 3-3/4" more or less to a point in the Northwestern side of a proposed 50' wide Street called Forty-Seventh Street; thence in a Northeasterly direction along the same, a distance of 228' 4-5/8" more or less to a point in the center line of the aforesaid State Highway; thence in a Northwesterly direction along the same, at right angles to first described line, a distance of 38' 9-7/8" more or less to the place of BEGINNING.

CONTAINING 16,504.3 square feet.

EXCEPTING thereout, All that certain tract or piece of land conveyed by grantors herein by their deed dated July 23, 1946 unto Donald H Burkey and Jane Burkey, his wife, said Deed being recorded in Deed Book 993, page 552, Berks County records.

TRACT 4:

ALL THAT CERTAIN lot or piece of ground, situate on the Southwestern side of the State Highway leading from Reading to Philadelphia, (formerly known as the Reading and Perkiomen Turnpike); in the Township of Exeter, County of Berks and State of Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point in the center line of said State Highway, at a corner of property now or late of Araminta Hetrich; thence in a Southwesterly direction along the same, at right angles to the said center line of said State Highway, a distance of 220'0" to a point in the Northeastern side of a proposed 20' wide alley, thence in a Southeasterly direction along the same at right angles to last described line, a distance of 100'0" more or less to a corner of property now or late of Elmer G. Althouse, thence m a Northeasterly direction along the same, at right angles to last described line, a distance of 220'0" to a point in the center line of the aforesaid State Highway; thence in a Northwesterly direction along the same, at right angles to last described line, a distance of 100'0" to the place of BEGINNING.

CONTAINING 22,000 square feet.

TRACT 5:

ALL THAT CERTAIN two story brick dwelling house and the lot or piece of ground upon which the same is erected, said lot of ground lying on the Southwestern side of the State Highway leading from Reading to Philadelphia (formerly known as the Reading and Perkiomen Turnpike) and situate in Exeter Township, Berks County, Pennsylvania, bounded on the northeast by said State Highway and on all other sides by property now or late of Henry M Althouse, of which the herein described premises are a part, and more fully described as follows, to wit:

BEGINNING at a corner in the center line of said State Highway (formerly eighty feet wide but later increased m width), said corner being two hundred twenty feet and three and one-eighth inches (220' 3-1/8") southeast of a point formed by the intersection of said center line of said State Highway and a straight line drawn between the termini of the division line between property now or late of David Brumbach, thence along property of said Henry F Althouse, of which the herein described premises are a part, the three following courses and distances, to wit:

South forty-one degrees twenty-four minutes west (S 41° 24' W) a distance of two hundred and twenty feet (220') to a corner, South forty-eight degrees 36 minutes east, a distance of 48'6 " to a corner; North forty-one degrees twenty-four minutes East (N 41° 24' E) a distance of two hundred and twenty feet (220') to a corner in the aforesaid center line of said State Highway, thence along said center line North forty-eight degrees thirty-six minutes West (N 48° 36' W) a distance of forty-eight feet and six inches (48'6").

### *First American Title Insurance Company*

Commitment No. NCS-318092-PHIL

CONTAINING 10,670 SQUARE FEET.

TRACT 6:

ALL THAT CERTAIN lot or piece of ground lying on the southwestern side of the State Highway leading from Reading to Philadelphia (formerly known as the Reading and Perkiomen Turnpike), and situate in Exeter Township, Berks County and State of Pennsylvania, bounded on the northeast by said State Highway, on the Northwest by property now or late of William E. Althouse, on the Southwest by property now or late of Henry A. Althouse, and on the Southeast by property now or late of Araminta Hetrich and described more fully as follows, to wit

BEGINNING at a corner in the center line of said State Highway (formerly eighty feet wide, but later increased m width) said corner being two hundred sixty-eight feet and nine and one-eighth inches (268 8-1/8") southeast of a point formed by the intersection of said center line of said State Highway and a straight line drawn between the termini of the division line between property now or late of said Henry F. Althouse and property now or late of said William E. Althouse and wife, south forty-one degrees twenty-four minutes west (S 41° 24' W) a distance of two hundred twenty feet (220') to a corner, thence along other property now or late of said Henry F. Althouse, south forty-eight degrees thirty-sa minutes east (S 48° 36' E) a distance of fifty feet (50 ) to a corner of property now or late of Araminta Hetrick, thence along the same North forty-one degrees twenty-four minutes East (N 41° 24' E) a distance of two hundred twenty feet (220') to a corner in the aforesaid center line of said State Highway, thence along said center line north forty-eight degrees thirty-six minutes west (N 48° 36' W) fifty feet (50') to the place of BEGINNING.

CONTAINING 11,000 square feet.

TRACT 7:

ALL THAT CERTA1N lot of ground lying on the southwestern side of State Highway leading from Reading to Philadelphia (formerly known as Reading and Perkiomen Turnpike) and situate m Exeter Township, Berks County and State of Pennsylvania, bounded on the Northeast by said State Highway, on all other sides by other property of Henry M. Althouse, of which the herein-described premises was a part and described more fully as follow, to wit:

BEGINNING at a corner m the center line of said State Highway (eighty feet wide, but later increased in width) said corner being three hundred eighteen feet and nine and one-eighth inches (318' 9-l/8") southeast of a point formed by the intersection of said center line of said State Highway and a straight line drawn between the termini of the division line between property of said Henry F Althouse and property of late David Brumbach, thence along property of the said Henry F. Althouse of which the herein described premises was a part, the three following courses and distances to wit: South forty-one degrees twenty-four minutes west (S 41° 24' W) a distance of two hundred twenty feet (220') to a corner, south forty- eight degrees thirty-six minutes east (S 48° 36' E) a distance of fi#y feet to a corner, north forty-one degrees twenty-four minutes east (N 41° 24' E.) a distance of two hundred twenty feet to a corner in the aforesaid center line of said State Highway, thence along said center line North forty-eight degrees thirty-six minutes west (N 48° 36' W) a distance of fifty feet (50') to the place of BEGINNING.

CONTAINING 11,000 square feet.

TRACT 8:

ALL THAT CERTAIN lot or piece of ground with the frame house and garage thereon erected, situate on the Southwestern side of the State Highway leading from Reading to Philadelphia (formerly known as the Reading and Perkiomen Turnpike), m the Township of Exeter, County of Berks and State of Pennsylvania, more particularly bounded and described as follows, to wit:

### *First American Title Insurance Company*

Commitment No.  NCS-318092-PHIL

BEGINNING at a point on the Northwestern side of a proposed fifty (50) feet wide street, called 47 Street, said point being one hundred eighty-six (186) feet ten and five-eighths (10-5/8) inches from the center line of the said State Highway; thence in a Northwesterly direct ron along other properties of Howard S. Fegely and Pearl M Fegely, his wife, South forty-eight (48) degrees thirty-six minutes East one hundred nineteen (119) feet one and five-eighths (1-5/8) inches to a point; thence in a Southwesterly direction at right angles to the last described line, a distance of forty (40) feet to a point in the Northeastern side of a proposed twenty (20) feet wide alley; thence in a southeasterly direction along the same at right angles to the last described line, a distance of one hundred thirty (130) feet three and three- quarters (3-3/4) inches, more or less to a point m the Northwestern side of a proposed fifty (50) feet wide street, called 47th Street; thence in a Northeasterly direction along the same, a distance of forty-one (41) feet six and three-eighths (6- 3/8) inches to the place of BEGINNING.

BEING 4630 Perkiomen Avenue, Reading, Pennsylvania 19606

BEING Tax Parcel 5325-07-69-8843

BEING the same premises which Fegely's Restaurant, Inc., a Pennsylvania corporation, by Deed  dated 10/18/2005  and recorded 10/21/2005 in Berks County at Record Book 4890, Page 1493, granted and conveyed unto Kachr, LLC, a Pennsylvania limited liability company, in fee.

S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

# EXHIBIT "A-1"
## SURVEY



SU-101

**PROPOSED RITE AID PHARMACY**
STORE NO. 11172-03
PERKIOMEN AVENUE (S.R. 422)
AND WEST 47TH STREET
EXETER TOWNSHIP, BERKS COUNTY, PENNSYLVANIA

S:\Legal\RAC\Exeter, PA(11172)vr6 execution version.100908.DOC

## EXHIBIT "A-2"
### SITE PLAN







I:\HMasano\DOCS\Kachr LLC\Exeter Township\Rite-Aid Guaranty Agrmt 10-24-08.doc

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** is given as of this _12th_ day of _November_ _____ 2008, by **RITE AID CORPORATION**, a Delaware corporation (Guarantor), to **KACHR, LLC** ("Landlord") with respect to a Lease ("the Lease") between Landlord and **ECKERD CORPORATION**, ("Tenant") for premises described in the Lease.

**WITNESSETH:**    As an inducement to Landlord to execute the Lease, and in consideration thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees with Landlord as follows:

1.    Guarantor represents that it owns all of the issued and outstanding capital stock of Tenant, that Tenant is a dully organized corporation, and that all corporate action requisite for Tenant's execution of the Lease has been duly taken.

2.    Guarantor unconditionally guarantees to Landlord the full and prompt payment of all rent, additional rent and other charges to accrue thereunder required to be paid by Tenant under the Lease, the prompt and full performance and observance of all obligations, terms covenants and conditions required to be performed and observed by Tenant under the Lease, and the prompt payment of all other obligations and damages for which Tenant may be legally liable to Landlord.

3.    Guarantor's liability hereunder shall be primary and not secondary, and shall be joint and several with that of Tenant.  Landlord may proceed against Guarantor under this Guaranty Agreement without initiating or exhausting its remedy or remedies against Tenant, and may proceed against Tenant and/or Guarantor separately or concurrently.  If Landlord releases any rights it may have against any party primarily or secondarily liable on the Lease, such release shall not affect Guarantor's liability under this Guaranty Agreement.

4.    In any action brought by Landlord under paragraph 2 of this Guaranty, Guarantor shall not interpose or be entitled to the benefit of any defenses that are not or would not be available to Tenant if the same action were brought by Landlord against Tenant, including, but not limited to, defenses based upon modifications of the Lease, upon extensions, indulgences, or forebearances granted to Tenant, upon delay by Landlord in enforcing Tenant's obligations under the Lease, or upon failure of Landlord to notify Guarantor of any Lease modifications or any extensions, indulgences, or forebearances granted to Tenant; and Guarantor expressly waives all defenses negated by this paragraph 4.

5.    Any notices given to Tenant under or with respect to the Lease shall be conclusively deemed to have been simultaneously given to Guarantor.

6.    Guarantor's liability under this Guaranty Agreement shall not in any way be affected by any assignment of the Lease or a subletting of the premises demised under the Lease.

7.    No discharge, modification, impairment or limitation of the obligations of Tenant to its creditors generally, or to Landlord under the Lease, under any law relation to bankruptcy,

insolvency, arrangements with creditors or corporate reorganizations, shall in any way affect or discharge Guarantor's obligation hereunder. If any trustee, receiver, or conservator of Tenant appointed under any Federal or State law relating to bankruptcy, insolvency, arrangements with creditors or corporate reorganization, rejects, disaffirms or abandons the Lease pursuant to any right to do so under any such law, Guarantor's obligations hereunder shall not thereby be affected but shall remain in full force and effect the same as if the Lease had not be rejected but continued in force.

8.     If Landlord files any action against Guarantor to collect rent or additional rent payable under the Lease or any other sum for which Tenant is legally liable to Landlord, and a judgment is rendered for Landlord with respect thereto, then Guarantor shall pay all reasonable counsel fees incurred by Landlord in such action. Guarantor shall also pay Landlord's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection or in any negotiations relative to the obligations hereby guaranteed or enforcing this Guaranty against Guarantor.

9.     Within ten (10) days after Landlord's written request to Guarantor, Guarantor shall execute and deliver to Landlord a statement in writing setting forth any amendments to this Guaranty and stating whether or not this Guaranty is in full force and effect and setting forth what reasons or defenses, if any, support any claim that this Guaranty is not in full force and effect. Guarantor acknowledges that such statement may be required in order for Landlord to consummate a sale or mortgage loan, and that a purchaser or mortgage will be entitled to rely on such statement.

10.    Guarantor consents to suit in the state and federal Courts of the Commonwealth of Pennsylvania on or with respect to this Guaranty Agreement. Guarantor waives any objection to the venue of any action filed by Landlord against Guarantor in any state or federal court of the Commonwealth of Pennsylvania and waives any claim of forum non conveniens or for transfer of any such action to any other court.

11.    Guarantor acknowledges that this Guaranty Agreement has been delivered in the Commonwealth of Pennsylvania concurrently with the delivery of the Lease and shall be governed by the laws of the Commonwealth of Pennsylvania.

12.    If this Guaranty is executed by more than one party, the term "Guarantor" shall be deemed to apply to such parties jointly and severally. The use of the neuter gender herein shall be deemed to mean that correct gender applicable to the Guarantor, and the use of the singular shall include the plural as the context may require.

13.    Guarantor shall, upon request of Landlord, promptly join in the execution of all stipulations and agreements referred to in the Lease.

14.    Any notice which Landlord may elect to send to Guarantor shall be binding upon Guarantor if mailed to at P.O. Box 3165, Harrisburg, Pennsylvania, 17105, Attn: Secretary, by U.S. Certified Mail, Return Receipt Requested, or U.S. Registered Mail, or via overnight delivery or courier service if addressed to Guarantor at 30 Hunter Lane, Camp Hill, PA, 17011,

2

Attention: Secretary.  Guarantor shall provide Landlord with written notice of any change in Guarantor's address.  Any notice to Landlord or change in Guarantor's address shall e effective seven (7) days after receipt by Landlord.

15.   Guarantor hereby unconditionally and irrevocably waives, to the extent permitted under applicable law,  the following:

15.1   acceptance of this Guaranty;

15.2   any and benefits, rights and defenses it may have arising out of an election of remedies by Landlord, even though that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against the principal; and

15.3   any and all notice of any demand by Landlord, as well as any notice of default in the payment of rent or any other amounts payable by Tenant under the provisions of the Lease or notice of any other default by Tenant under the Leases due under the Lease and under law.

16.   Landlord, without notice, may assign this Guaranty in whole or in part and no assignment or transfer of the Lease shall operate to extinguish or diminish the liability or obligations of Guarantor hereunder.

17.   This Guaranty shall continue in favor of the Landlord notwithstanding any extension, modification or alteration of the Lease or any assignment of the Lease, with or without the consent of Landlord.  No extension, modification, alteration or assignment, transfer or sublease of the Lease, including but not limited to any such assignment, transfer or sublease made pursuant to Section 11 of the Lease shall in any manner release or discharge Guarantor.

18.  This Guaranty Agreement shall be binding upon the successors of Guarantor, and the term "Guarantor," shall used herein, includes such successors.  This Guaranty Agreement shall inure to the benefit of Landlord's successors and assigns, and the term "Landlord," as used herein, includes such successors and assigns.  The term "Tenant," as used herein, includes the permitted successors and assigns of Tenant.

IN WITNESS WHEREOF, this Guaranty under seal has been duly signed and sealed by the Guarantor, as of the day and year first above written.

WITNESS:

GUARANTOR:
RITE AID CORPORATION

By:_____
Name: I. Lawrence Gelman
Title:  Vice President

3

I:\HMasano\DOCS\Kachr LLC\Exeter Township\Rite-Aid\SNDA Agrmt 9-16-08 Clean.doc

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement ("Agreement") is made as of the ___5th___ day of ___January___, 2008 between **ECKERD CORPORATION**, 30 Hunter Lane, Camp Hill, PA 17011, Attn: Secretary ("Tenant") and VIST Bank, a Pennsylvania banking corporation having an address at 1240 Broadcasting Road, Wyomissing, PA 19610 ("Lender").

**WHEREAS**, Tenant and Kachr, LLC ("Landlord") have entered into a lease dated November 12, 2008 (the "Lease") covering all of certain premises situate at the intersection of Perkiomen Avenue (State Route 422) and West 47th Street in the Township of Exeter, Berks County, Pennsylvania, as set forth in the Lease (the "Premises"); and

**WHEREAS**, Lender has made or is about to make a loan to Landlord secured by a mortgage covering the Premises demised under the Lease (the "Mortgage") and intended to be recorded in the public records; and

**WHEREAS**, Tenant has agreed that its rights in and pursuant to the Lease are and shall be subordinate to the Mortgage, provided Lender executes and delivers to Tenant a Non-Disturbance Agreement, which Lender is willing to provide on condition that Tenant agrees to attorn to Lender;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed:

1. Subordination. The Lease is and shall be subject and subordinate to the Mortgage insofar as it affects the Demised Premises, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all future advances made thereunder.

2. Non-Disturbance Agreement. As long as Tenant is not in default beyond any applicable grace period in the payment of rent, additional rent or other charges or in the performance of any of the other terms or conditions of the Lease, Tenant's rights under the Lease and its possession of the Premises will not be interfered with or disturbed by Lender during the term of the Lease (including any renewal or extension term) following acquisition of title to the Property (a) by Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, or (b) by Lender pursuant to acceptance of a deed in lieu of foreclosure (in either case, a "Transfer of Ownership").

3. Attornment Agreement. If a Transfer of Ownership occurs, Lender and Tenant will be bound to each other, as landlord and tenant, respectively, under all of the terms and conditions of the Lease for the balance of the term thereof (including any renewal or extension term), and Tenant hereby attorns to Lender as its landlord, such attornment to be effective and self-operative, without the execution of any other instruments on the part of either party hereto, immediately upon a Transfer of Ownership. As used in this Article and in the subsequent provisions hereof, whenever the context allows, the term "Lender" will also include a purchaser of the Property at a foreclosure sale.

4. <u>Lender's Liability</u>. Notwithstanding any other provision of this Agreement, Lender will not be: (a) liable for acts or omissions of any prior landlord (including Landlord) unless otherwise provided by law; (b) subject to offsets or defenses that Tenant might have had against any prior landlord (including Landlord) unless otherwise provided by law; (c) bound by rent, additional rent or other charges that Tenant might have paid for more than 30 days in advance to any prior landlord (including Landlord); (d) bound by any amendment or modification of the Lease hereafter made without Lender's prior written consent, which consent will not be unreasonably withheld (except to the extent that the Lease may specifically contemplate any amendment or modification thereof); or (e) responsible for money or other security delivered to Landlord pursuant to the Lease but not subsequently received by Lender.

5. <u>Lender's Right to Cure Default</u>. Notwithstanding any provision of the Lease, no notice by Tenant to Landlord of any breach or default by Landlord under the Lease will be effective unless and until (a) a copy of the notice is received by Lender at Lender's notice address set forth in Paragraph 6, and (b) a reasonable period of time, if no time period is specified in the Lease, has elapsed following Lender's receipt of such copy, during which period Lender will have the right, but will not be obligated, to cure the breach or default.

6. <u>Notices</u>. To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postpaid by United States certified mail with return receipt requested or by a nationally recognized overnight courier service at the addresses set forth on the first page hereof, or at such other address as the parties may provide in writing. Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.

The agreements contained herein shall bind and inure to the benefit of the successors and assigns in interest of the parties hereto, and, without limitation of the foregoing generality, the agreements of Lender herein shall specifically be binding upon any purchaser or successor of said property at a sale foreclosing said Mortgage or in lieu of such foreclosure.

**IN WITNESS WHEREOF**, the parties hereof have caused the execution hereof as of the date first above written.

WITNESS OR ATTEST:

TENANT:
**ECKERD CORPORATION**

By: _Lisa M. Winnick_
Name: Lisa M. Winnick
Title: Authorized Representative

LENDER:
**VIST BANK**

By: _Clyde E. Lowery_
Name: Clyde E. Lowery
Title: Senior Vice-President

2

COMMONWEALTH OF PENNSYLVANIA    :
    :
COUNTY OF CUMBERLAND    :

On the ___5th___ day of __January__, 200_9_, before me, the undersigned officer, personally appeared _Lisa N. Winnick_ who acknowledged himself/herself to be the _Authorized Rep._ of **ECKERD CORPORATION**, a corporation, and that she as such Authorized Representative, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by herself as Authorized Representative.

    **IN WITNESS WHEREOF**, I have hereunto set my hand and Notarial Seal.

                               _____
                               My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA    :
    :
COUNTY OF BERKS    :

    On the _3rd_ day of _December_, A.D. 2008, before me, the undersigned officer, personally appeared _Clyde E Lowery_, who acknowledged him/herself to be the _Senior Vice President_ of VIST BANK, a Pennsylvania banking corporation, and that (s)he as such _Senior Vice President_, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as _Senior Vice President_.

    **IN WITNESS WHEREOF**, I have hereunto set my hand and Notarial Seal.

NOTARIAL SEAL
AMY VALENTINO
Notary Public
WYOMISSING BOROUGH, BERKS COUNTY
My Commission Expires Mar 30, 2010

                               _____
                            My Commission Expires: