UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

---

**Caption in Compliance with D.N.J. LBR 9004- 1(b)**

**BALLARD SPAHR LLP**
Leslie C. Heilman
Laurel D. Roglen
Margaret A. Vesper
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
         roglenl@ballardspahr.com
         vesperm@ballardspahr.com

*Counsel to Manoa Shopping Center Associates, L.P.*

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*[1] | Case No.  25-14861 (MBK) |
| Debtors. | (Jointly Administered) |

## OBJECTION OF MANOA SHOPPING CENTER ASSOCIATES, L.P. TO NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTORS' LEASES TO DOLLAR TREE STORES, INC.

Manoa Shopping Center Associates, L.P. (the "Landlord"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Notice of Assumption and Assignment of Certain of the Debtors' Leases to Dollar Tree Stores, Inc.* [Docket No. 2260] (the "Assignment Notice"), seeking to assume and assign that certain unexpired nonresidential real property lease between Rite Aid of Pennsylvania, LLC and Landlord to Dollar Tree Stores, Inc. ("Dollar Tree" or "Assignee").[2]  In support of the Objection, Landlord respectfully represents as follows:

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2] Capitalized terms used but not otherwise defined here shall have the meanings ascribed to them in the Assignment Notice and accompanying documents.

## I.    <u>PRELIMINARY STATEMENT</u>

The proposed assumption and assignment of the Lease (defined below) to Dollar Tree—a retailer that sells a wide variety of goods, including groceries and food for off-site consumption, primarily at a fixed price point of $1.25—should not be approved as such use is not only prohibited under the current permitted use clause of the Lease, but it will also result in violation of a grocery exclusive granted to another tenant in the Center (defined below), that, if allowed, will result in significant pecuniary harm and losses to Landlord, and is contrary to the express provisions of Section 365(b)(3) of the Bankruptcy Code.   Specifically, another grocery store tenant (ACME), in the same Center who is a direct competitor of Dollar Tree, has the exclusive right to sell "food for off-premises consumption" in the Center.

Under no circumstances can Landlord consent to the Debtors' proposed assumption and assignment of the Lease to Dollar Tree.  If approved as the assignee of the Lease, not only is Dollar Tree's use prohibited by the restricted use provisions of the Lease, but it is also in conflict with other tenant's exclusives in its lease and will subject the Landlord to pecuniary harm and loss, as well as disrupt the tenant mix and balance of an otherwise balanced and diversified shopping center.  Because the Debtors will be unable to overcome these issues, they cannot meet their burden of showing that adequate assurance of future performance can be provided under 11 U.S.C. § 365(b)(3)(B), (C), and (D).  Accordingly, the Court must deny the Debtors' proposed assumption and assignment of the Lease to Dollar Tree.

To the extent the Court is inclined to grant the assumption and assignment of the Lease to Dollar Tree, as a condition to any assumption and assignment of the Lease, the Debtors and/or the Successful Bidder, as applicable, must cure or provide adequate assurance of prompt cure of all defaults under the Lease, including to compensate the Landlord for any actual pecuniary losses incurred by the Landlord resulting from such defaults, such as their reasonable attorneys' fees, as

well as any losses and damages incurred by the Landlord as a result of the violation of the use and exclusives in the Lease and other tenant's leases arising from the assumption and assignment of the Lease to a direct competitor, and the disruption of the tenant mix and balance.

In addition, any assignment of the Lease must not be free and clear of (a) all applicable reciprocal easement agreements (or similar agreements) and other restrictive covenants applicable to the Center; (b) any liability and responsibility for all obligations to pay all accruing or accrued, but unbilled charges or obligations due under the Lease, including un-billed year-end adjustments and reconciliations, which may come due in the future in accordance with the terms of the Lease, regardless of when they arose, or (c) any contractual indemnification obligations to indemnify and hold the Landlord harmless with regard to claims for personal injuries at the Premises and/or damage to the Premises or Center arising from the Debtors' use and occupancy of the Premises prior to the assumption and assignment, but which may not be known to the Landlord as of the time of the assumption and assignment.  Any proposed form of order approving the assumption and assignment of the Lease (the "Assignment Order") must be modified to ensure that the assumption and assignment of the Lease is pursuant to the terms of the Lease and does not cut-off obligations arising thereunder and the Landlord's rights to enforce those obligations or any related agreements.  Absent sufficient assurances, including modification of the Assignment Order, an assignment of the Lease must be denied.

Landlord is prepared to work with the parties regarding each of the issues raised by this Objection to reach a consensual order for the assignment of the Lease, but if not resolved consensually, the Landlord reserves all rights to argue these and other issues at any hearing set on the Objection.

II.     **BACKGROUND FACTS**

(a) **The Bankruptcy Cases**

1.      On May 5, 2025 (the "Petition Date"), New Rite Aid, LLC and certain of its debtor affiliates (the "Debtors", and each a "Debtor") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey (the "Court").

2.      On May 6, 2025, the Debtors filed *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Procedures for the Sale of Certain Leases and Fee Owned Properties, and (II) Granting Related Relief* [Docket No. 22] (the "Lease Procedures Motion"), seeking to establish procedures to sell or transfer certain unexpired leases of non-residential real property by public auction (the "Auction Procedures").

3.      On June 11, 2025, the Court entered the *Final Order (I) Establishing Procedures for the Sale of Certain Leases and Fee Owned Properties, and (II) Granting Related Relief* [Docket No. 804] (the "Lease Procedures Order"), which granted the Lease Procedures Motion, including the Auction Procedures.

4.      On July 21, 2025, the Debtors conducted an auction with respect to certain leases, including Landlord's Lease (the "Auction").

5.      Following the Auction, the Debtors entered into an Assumption and Assignment Agreement (the "Sale Agreement") with Dollar Tree, and on August 29, 2025, the Debtors' filed the *Second Supplemental Notice of Successful and Backup Bidders with Respect to the Auction of Certain of the Debtors' Leases* [Docket No. 2205] (the "Sale Notice") announcing the proposed sale of the Lease to Dollar Tree.

6.       On September 2, 2025, the Debtors filed the Assignment Notice indicating their intent to assume and assign the Lease to Dollar Tree, as Assignee, under the terms of the Lease Procedures Order.   The Assignment Notice included a proposed form of order (the "Assignment Order") and scheduled a proposed cure amount of $59,778.00 (the "Proposed Cure Amount") in connection with any assumption and assignment of the Lease to the Assignee.

**(b) The Lease**

7.       The Debtor, Rite Aid of Pennsylvania, LLC and Landlord are parties to that certain unexpired lease of nonresidential real property dated June 15, 1984, as amended by that certain First Amendment to Lease dated April 19, 1995, Second Amendment to Lease dated March 11, 2011 and Third Amendment to Lease dated January 22, 2018 (collectively, as amended or modified, the "Lease"), whereby the Debtors lease retail space from Landlord located at 1305 West Chester Pike, Havertown, Pennsylvania (the "Premises"), in that certain shopping center more commonly known as Manoa Shopping Center (the "Center").

8.       The Lease is a lease "of real property in a shopping center" as that term is used in Section 365(b)(3).  See In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

9.       In addition, Landlord is a counterparty to a lease with Acme Markets, Inc. ("ACME"), who also leases space in the Center.  Landlord and ACME's predecessor-in-interest entered into the lease on November 11, 1993 (as amended and assigned, the "ACME Lease")[3].

10.       The ACME Lease contains an exclusive use provision that restricts Landlord from permitting or consenting to the use or occupancy of any part of the Center for the "sale of food for off-premises consumption . . . ." See Fifth Amendment to ACME Lease, ¶ 4.[4]

---

[3] A copy of the leases referenced herein may be made available upon request to the undersigned counsel for the Landlord.

[4] There are certain exceptions within the restrictive covenants in the ACME Lease, including an exception that permits the use of "no more than fifty (50) square feet of any tenant or tenants to be used for incidental sales of food for off-

11.    In the event of a violation of the exclusive use, ACME shall have the right "withhold payment of fixed annual rent and Charges accruing during any period from the date of any breach until same be cured, and the monies so withheld may be retained by Tenant as liquidated damages and not as a penalty."  ACME Lease, ¶ 21 (C).

## III.    ARGUMENT

12.    The Landlord opposes any assumption and assignment of the Lease to Dollar Tree in violation of the restrictive use provisions of the Lease and the exclusives contained in the leases of other Center tenants.  To the extent the Court is inclined to approve the assumption and assignment of the Lease over the Landlord's Objection, Landlord further objects to any assumption and assignment of the Lease absent strict compliance with all of the requirements of Sections 365 of the Bankruptcy Code, including as to cure and adequate assurance of future performance, and the recognition of liability for accruing but not yet due obligations under the Lease, as well as any indemnification obligations, as more fully set forth herein, and the Assignment Order must be modified to address the Landlord's objections raised herein.

### A.    The Debtors must demonstrate adequate assurance of future performance to assume and assign the Lease to Dollar Tree.

13.    The Debtors may not assume and assign the Lease unless they demonstrate adequate assurance of future performance.    11 U.S.C. § 365(b)(1)(C); see also 11 U.S.C. § 365(f)(2).  The provision of adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365. See In re Rachels Indus., Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).  The obligation to comply

---

premises consumption."  Fifth Amendment to ACME Lease, ¶ 4.  However, Landlord does not believe that Dollar Tree's proposed use for the Premises would fall within this exception.

with Section 365(b) and Section 365(f) is unaffected by the assumption and assignment process

taking place through a sale under Section 363. Courts require a specific factual showing through

competent evidence to determine whether adequate assurance of future performance has been

provided. See, e.g., Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even

though experts presented cash flow projections, the court found that insufficient documentary

evidence had been presented).

14.     In this case, the Lease is a shopping center lease and, as such, the

Bankruptcy Code requires more than the basic adequate assurance of future performance of the

Lease under Section 365(b)(1)(C). In re Sun TV and Appliances, Inc., 234 B.R. 356, 359 (Bankr.

D. Del. 1999). In order to assume and assign shopping center leases, the Debtors must satisfy the

heightened requirements set forth in 11 U.S.C. § 365(b)(3)(A) - (D). See Joshua Slocum, 922 F.2d

at 1086; see also L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209

F.3d 291, 299 (3d Cir. 2000). The heightened adequate assurance requirements that Debtors must

satisfy under Section 365(b)(3) include the following:

- the source of rent and that the financial condition and operating performance of the proposed assignee and its guarantors, if any, must be similar to the financial condition and operating performance of the debtor and its guarantor(s), if any, as of the time the debtor became the lessee. See 11 U.S.C. § 365(b)(3)(A);

- that **any percentage rent due under the lease will not decline substantially**. See 11 U.S.C. § 365(b)(3)(B) (emphasis added);

- that assumption and assignment of the lease is subject to all provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision, and will not breach of any such provision in any other lease**, financing agreement, or master agreement relating to such shopping center. See 11 U.S.C. § 365(b)(3)(C) (emphasis added); and

- that assumption and assignment of the lease **will not disrupt the tenant mix or balance in the shopping center**. See 11 U.S.C. § 365(b)(3)(D) (emphasis added).

15.     A heightened adequate assurance of future performance determination must be satisfied in connection with an assumption and assignment under Section 365(f)(2)(B).  Sun TV and Appliances, Inc., 234 B.R. at 370.  In connection with the heightened adequate assurance requirement for shopping center leases, courts also require a specific factual showing through competent evidence to determine whether the Debtors have provided adequate assurance of future performance.  Matter of Haute Cuisine, Inc., 58 B.R. at 394.  The Debtors have not met their burden for the reasons more fully set forth herein.

**B.      Any Assumption and Assignment Must Comply with Terms of the Lease, and Not Breach Another Lease at the Center, Violate the Existing Use, or Disrupt the Tenant Mix or Balance.**

16.     Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amendments, "Section 365(f)(1) was amended to make sure that all of the provisions of Section 365(b) are adhered to and that 365(f) of the Code does not override Section 365(b)."  Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).  In explaining the change to Section 365(f)(1), Senator Hatch stated:

> The bill helps clarify that an owner should be able to retain control over the mix of retail uses in a shopping center.  When an owner enters into a use clause with a retail tenant forbidding assignments of the lease for a use different than that specified in the lease, that clause should be honored.  Congress has so intended already, but bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 2461 (daily ed. Mar. 10, 2005).

17.     The changes embodied in the BAPCPA specifically preserve a landlord's right to enforce use and other lease provisions.   Again, Senator Hatch's remarks in the Congressional Record clarify the intent behind Section 365(b) and 365(f):

> A shopping center operator . . . must be given broad leeway to determine the mix of retail tenants it leases to.  Congress decided that use or similar restrictions in a retail lease, which the retailer cannot evade under nonbankruptcy law, should not be evaded in bankruptcy.  It is my

understanding that some bankruptcy judges have not followed this mandate. Under another provisions of the Code, Section 365(f), a number of bankruptcy judges have misconstrued the Code and allowed the assignment of a lease even though terms of the lease are not being followed. (emphasis added).

151 Cong. Rec. S. 2459, 2461-62 (daily ed. Mar. 10, 2005).

18.     BAPCPA clarified Section 365 to reflect the Congressional intent that a Debtor cannot use Section 365(f)(1) to void lease provisions, and to overrule those prior court decisions that did not strictly enforce lease terms.  The predicate to the limited ability to assign a lease over a landlord's objection under Section 365(f) is that such assignment must be subject to the protections of Section 365(b)(1) and (3).

19.     Section 365(f)(1) does not modify or override Section 365(b).  Trak Auto Corp. v. West Town Ctr. LLC (In re Trak Auto Corp.), 367 F.3d 237, 243-44 (4th Cir. 2004) (bankruptcy courts could not use the general anti-assignment provision of Section 365(f)(1) to trump the specific protections granted to landlords in Section 365(b)(3)(C)); Three A's Holdings, 364 B.R. 550, 559-61 (Bankr. D. Del. 2007) ("Although the Court has broad authority under section 365(f)(1) to authorize the assumption or assignment of leases in violation of their terms, *this discretion is severely constrained if the assumption or assignment involves a lease of real property in a shopping center.*  In 1984, Congress provided for heightened restrictions in section 365(b)(3) to provide a framework for enforcing common provisions found in shopping center leases.") (emphasis added).  Any assignment must remain subject to all provisions of the Lease, including those provisions concerning use, radius, exclusivity, tenant mix and balance and must ensure that percentage rents will not decline substantially.

20.     To the extent that Dollar Tree intends to use the Premises for the purpose of selling a wide variety of goods, including groceries and food for off-site consumption, primarily

at a fixed price point of $1.25, the Debtors are unable to satisfy the requirements under
§ 365(b)(3)(C) as such use does not comply with the current permitted use under the Lease and
will violate certain other tenant's exclusive uses.

21.    As a threshold matter, as a multi-price-point chain of discount variety stores,
Dollar Tree in addition to the sale of other goods, is a retailer of food for off-premises consumption,
which is restricted by the Use provision in the Lease itself, which prohibits any other use other
than to sell "health and beauty aids and the incidental sale of those items normally found in a full-
line drug store." See Indenture of Lease, Use of Premises. Sun TV and Appliances, Inc., 234 B.R.
at 370 (court denied a motion for approval of the assumption and assignment of a lease in a
shopping center which contained a restrictive use condition.).  Furthermore, the First Amendment
to the Lease explicitly prohibits the sale of food for off-premises consumption, "Tenant shall not
sell food in the Additional Premises, except for the minor, incidental sale of candy and snack food
items." See First Amendment to Lease, ¶ 1.

22.    In addition, in order to assume and assign a shopping center lease, the
Debtors must provide adequate assurance that the assignment of the lease "is subject to all the
provisions thereof, including (but not limited to) provisions such as a radius, location, **use, or
exclusivity provision, and will not breach any such provision contained in any other lease**,
financing agreement, or master agreement relating to such shopping center." 11 U.S.C.
§ 365(b)(3)(C).  The first clause of Section 365(b)(3)(C) calls for examining the lease between the
landlord and the debtor tenant, while the second clause calls for evaluating other leases with other
tenants in the same shopping center.  See In re Heilig-Meyers Co., 294 B.R. 660, 662 (Bankr. E.D.
Va. 2001) (concluding that debtor's proposed assignment of lease to Hancock Fabrics could not
satisfy § 365(b)(3)(C) as lease conflicted with another lease executed by the landlord after the

bankruptcy filing that (1) gave another fabric retailer "exclusive rights in the center for a fabric

shop" and (2) prohibited the landlord from "leas[ing] to any other tenant who would be in direct

competition with [such retailer].").

23.     Here, the ACME Lease contains an exclusive use provision that restricts

Landlord from permitting or consenting to the use or occupancy of any part of the Center for the

"sale of food for off-premises consumption . . . ."  See Fifth Amendment to ACME Lease, ¶ 4.

24.     Further, pursuant to Section 365(b)(3)(B) of the Bankruptcy Code, an

assignment must ensure that any percentage rent due under the lease will not decline substantially.

If the Court approves the assignment to Dollar Tree, there will be a direct competitor for the sale

of food for off-site consumption, and therefore Landlord will suffer a substantial decline in the

percentage rent.  See In re Ames Dep't Stores, Inc., 348 B.R. 91, 96 (Bankr. S.D.N.Y. 2006)

(analyzing that percentage rent is "intended to limit internal or external competition or to create

synergies.").

25.     The Debtors must provide adequate assurance that the assignment of the

Lease to Dollar Tree "will not disrupt any tenant mix or balance in [the] shopping center." 11

U.S.C. § 365(b)(3)(D).  The "tenant mix" issue "focus[es] on the inclusion or exclusion of a store

in the array or mix of mall stores," while the "tenant balance" issue "focus[es] on the location and

relationship of tenants in the mix of mall stores."  In re Federated Dep't Stores, Inc., 135 B.R. 941,

943 (Bankr. S.D. Ohio 1991).  On the importance of protecting a shopping center's tenant mix or

balance, Congress has indicated,

> A shopping center is often a carefully planned enterprise, and
> though it consists of numerous individual tenants, the center is
> planned as a single unit, often subject to a master lease or financing
> agreement. Under these agreements, the tenant mix in a shopping
> center may be as important to the lessor as the actual promised rental

> payments, because certain mixes will attract higher patronage of the
> stores in the center.

H.R. Rep. No. 95-595, at 348 (1977), reprinted in 1977 U.S.C.C.A.N. 5963, 6305. Accordingly, §

365(b)(3)(D) "guarantees to the landlord and remaining tenants that the tenant mix will not

be . . . disrupted." Joshua Slocum, 922 F.2d at 1088. And on this issue, "[t]he level of competition

between stores in a shopping center must be considered, especially in connection with the fact that

the success or failure of individual tenants may affect the landlord and the other tenants in the

center." Rockland Ctr. Assocs. v. TSW Stores of Nanuet, Inc. (In re TSW Stores of Nanuet, Inc.),

34 B.R. 299, 307 (Bankr. S.D.N.Y. 1983).

26.     Here, the Debtors are unable to provide adequate assurance that the

assignment of the Lease to Dollar Tree will not disrupt the Center's existing tenant mix or balance,

which includes a Dollar or Two store concept with a similar product mix and pricing model.

Hence, Dollar Tree's presence in the Center poses a direct threat to ACME's success and disrupting

the tenant mix.

27.     The Center's comprehensive presence of use clauses in the leases that

govern the exclusive and prohibited uses of the premises exemplify the need for a balanced and

diversified mix of tenants. Cf. Trak Auto, 367 F.3d at 242 ("To maintain proper tenant mix, that

is, store variety, shopping center landlords have routinely placed use restrictions in leases."); TSW

Stores of Nanuet, 34 B.R. at 307 (rejecting debtor's proposed modification of restrictive-use clause

in lease in connection with proposed assumption and assignment to assignee who directly

competed with another tenant after finding that "the landlord has inserted restrictive use clauses in

the tenants' leases to avoid a head to head confrontation between two stores selling the exact same

categories of merchandise").

**C.    Any Assignment of Leased Real Property Must be Subject to all Applicable Restrictive Covenants.**

28.    The *cum onere* principle and requirements of section 365 (including section 365(b)(3)) of the Bankruptcy Code also mandate that restrictive covenants be respected in connection with any lease assignment. See 11 U.S.C. § 365(b)(3)(C) (requiring that "assumption or assignment of such lease is subject to all the provisions thereof"); Bildisco, 465 U.S. 513, 531-32 (1984); In re MF Glob. Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012). As is typical, shopping center leases are part of an integrated and complex commercial relationship between the shopping center owner and tenants that arise under both leases as well as reciprocal easement agreements (or similar agreements) and other restrictive covenants applicable to the properties. Accordingly, assumption and assignment of the Lease in accordance with section 365 of the Bankruptcy Code and applicable law requires compliance with, and is subject to, any agreements containing restrictive covenants or other obligations related to the properties.

29.    Accordingly, Landlord objects to the assumption and/or assignment of the Lease to the extent such transfer is not subject to all applicable reciprocal easement agreements, other similar agreements, and other restrictive covenants or obligations set forth therein.

**D.    The Debtors' proposed cure amount as set forth in the Assignment Notice fails to provide for the payment of all obligations due and owing under the Lease.**

30.    In order to assume and assign the Lease, to the extent permitted over the Objection of the Landlord, the Debtors must also comply with Section 365(b)(1) of the Bankruptcy Code which provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
> –

13

(A) cures, or provides adequate assurance that the trustee will
promptly cure, such default other than a default that is a breach
of a provision relating to the satisfaction of any provision (other
than a penalty rate or penalty provision) relating to a default
arising from any failure to perform nonmonetary obligations
under an unexpired lease of real property, if it is impossible for
the trustee to cure such default by performing nonmonetary acts
at and after the time of assumption, except that if such default
arises from a failure to operate in accordance with a
nonresidential real property lease, then such default shall be cured
by performance at and after the time of assumption in accordance
with such lease, and pecuniary losses resulting from such default
shall be compensated in accordance with the provisions of this
paragraph; . . . .

11 U.S.C. § 365(b)(1).

31.     The Proposed Cure Amount set forth in the Assignment Notice does not
account for accrued but unbilled charges which may come due in the future.  Should the Lease be
assigned, the Proposed Cure Amount set forth by the Debtors must be modified to reflect the
additional charges due and owing, as well as the proposed form of Order must recognize the
liability for accruing but not yet due charges under the Lease, and account for the Landlord's
pecuniary losses for its reasonable attorneys' fees, and any damages or losses suffered by the
Landlord stemming from any violation of the use as more fully set forth herein.

32.     Landlord agrees with the $59,778.00 base cure for amounts presently
outstanding under the Lease, exclusive of any sums which become due after the filing of this
Objection (which amounts must be paid when due under the Lease) (the "Landlord's Cure").  The
Landlord's Cure is the Landlord's base cure claim amount subject to additional qualifications and
modifications (such as reimbursement amounts for attorney's fees and any indemnification
required under the Lease to compensate and hold the Landlord harmless for any pecuniary losses
and damages suffered as a result of the use and exclusives violations) as more fully set forth below.

33.    In determining what must be paid as cure pursuant to Section 365(b), the charges referenced below must also be taken into consideration and paid, either as cure on the effective date of any assumption or assumption and assignment, or when properly billed under the Lease.

i.    Attorneys' Fees, Costs and Interest

34.    The Debtors (or the Successful Bidder) takes the Lease *cum onere*—subject to existing burdens.  The Debtors cannot assume the favorable portions, and reject the unfavorable provisions, of their leases.  In re Wash. Capital Aviation & Leasing, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993).  If forced to continue in the performance of the Lease, the Landlord is entitled to the full benefit of the bargain under the Lease with the Debtors.  See Matter of Superior Toy and Mfg. Co., Inc., 78 F.3d 1169 (7th Cir. 1996).

35.    Here, the Lease contains a provision for recovery of attorneys' fees, costs, and interest in the event the Landlord is required to take legal action to protect its interests.  The Debtors are obligated to cure all defaults under the Lease, and compensate the Landlord for its actual pecuniary losses as a result of defaults under the Lease.  See 11 U.S.C. § 365(b)(1)(A) and (B).  The principle is well-recognized.  In re LCO Enterprises, 12 F.3d 938, 941 (9th Cir. 1993); Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989) (debtors allowed to assume lease provided it cured all pre-petition defaults).

36.    The "full benefit of the bargain" principle has been held to require payment of interest.  "The cure of a default under an unexpired lease pursuant to 11 U.S.C. § 365 is more akin to a condition precedent to the assumption of a contract obligation than it is to a claim in bankruptcy.  One of the purposes of Section 365 is to permit the debtors to continue in a beneficial contract; provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract."  In re Entm't, Inc., 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998)

(citation omitted; bankruptcy court allowed interest at 18%).  Interest on pre-petition lease charges

continues to run from the filing of the Debtors' petitions and must be paid as a condition of the

assumption of the Lease.  See In re Skylark Travel, Inc., 120 B.R. 352, 355 (Bankr. S.D.N.Y.

1990).  Interest calculations are, therefore, not cut short by the automatic stay, and payment of

such interest is required to fully compensate Landlord for the Debtors' defaults under the Lease,

and thus to properly assume (or assume and assign) the Lease.  Finally, post-petition interest is

allowable where such interest is provided for under the terms of the Lease.  Cukierman v. Uecker

(In re Cukierman), 265 F.3d 846, 853 (9th Cir. 2001).

           37.     Attorneys' fees and costs incurred in enforcement of the covenants,

obligations, and conditions of a lease are also proper components of a cure claim, and the Debtors

(or successor) must satisfy these lease charges as part of the assumption and assignment of the

Lease if permitted.  Entm't, Inc., 223 B.R. at 152 (citation omitted).  There is no logical distinction

for purposes of Section 365 between attorneys' fees incurred in connection with pre-petition

defaults and fees incurred with post-petition defaults.  Id. at 154.  The fact that a landlord uses

bankruptcy procedures to enforce a lease should not preclude recovery of attorneys' fees and costs

for such enforcement activity (particularly where the Bankruptcy Court is the exclusive forum

where the landlord can obtain any relief, being foreclosed from state court relief by the automatic

stay).  Id., see also In re Crown Books Corp., 269 B.R. 12 (Bankr. D. Del. 2001) (Landlord's fees

and costs are recoverable as a component of cure under 11 U.S.C. § 365(b)(1)); Urban Retail Props.

v. Loews Cineplex Entm't Corp., et al., Case No. 01 Civ.8946, 2002 WL 535479 (S.D.N.Y. Apr.

9, 2002) (where lease "provides for recovery of attorneys' fees and interest, their receipt deserves

the same priority under Section 365(d)(3) as any of the debtors' other obligations that arise

postpetition . . . ."); Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Incorporated), 167

F.3d 843, 850 (4th Cir. 1999).  The Supreme Court has upheld the enforceability of such attorneys'

fees clauses, ruling that pre-petition attorneys' fee clauses were enforceable with respect to issues

peculiar to bankruptcy law.  <u>Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric</u>,

127 S. Ct. 1199, 1206 (2007).

38.     Should an assumption and assignment of the Lease be permitted to Dollar

Tree, Landlord will suffer additional pecuniary losses arising from the assumption and assignment

of the Lease in violation of the use and exclusive provisions in the form of the damages and losses

that the Landlord will be subject to, should ACME decide to pursue its remedies as a result of the

violation of its exclusive.

39.     While it is difficult to monetize the complete harm that the Landlord will

suffer at this stage in the proceedings, the Landlord's Cure does not yet factor in any additional

losses that may be incurred if ACME elects to enforce the violation of its exclusives, or any losses

as a result of any decline in percentage rents and/or due to the disruption in tenant mix and balance

at the Center as a result of the assignment of Lease, which damages could be significant.

40.     Accordingly, the Landlord further requests that it be reimbursed for all of

its actual pecuniary losses including, but not limited to, attorneys' fees and costs expended with

regard to Debtors' defaults in these bankruptcy proceedings, including in connection with this

Objection to oppose the assumption and assignment of the Lease in violation of the Lease

provisions for use and other tenant's exclusives.  Through any hearing on this Objection, the

Landlord estimates its attorney's fees and costs incurred to be approximately no less than $25,000,

and reserves the right to supplement this figure with its actual billings at the time any cure is

reconciled and paid.

i.     <u>Year-End Adjustments and Reconciliations and Indemnification</u>

41.     In addition to rent and related monthly charges, attorneys' fees, costs and interest, and other losses, some charges for which the Debtors bear responsibility under the Lease have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods.  By way of example, the Debtors occupy retail space at the Center pursuant to a triple-net lease, where it pays rent and related lease charges in advance for each month.  The Debtors pay fixed minimum rent, along with a pro-rata share of expenses such as real property taxes, insurance, common area maintenance ("CAM") fees, annual percentage rent, and the like.  Certain charges, such as CAM and property taxes are estimated prospectively, billed to and paid by the tenant during the year, and then reconciled after year-end.  The reconciliation compares the amounts estimated and paid against actual charges incurred at the Center.  To the extent the estimated payments exceed actual charges, the result is a credit to the tenant.  To the extent the estimated payments do not cover actual charges incurred under the Lease, the result is an additional amount (or debit) for which the tenant is liable.  In some instances, year-end reconciliations and adjustments for previous years for the Premises may not yet be complete (i.e., year-end reconciliations and adjustments that accrued through 2024 may not yet have been billed, and such charges that are accruing for 2025 will not be billed until 2026).  In other instances, certain charges may be paid in arrears, and cannot be calculated (in some cases) until a year or more after year-end.  Since Section 365(b) only requires debtors to cure defaults under their leases, and since there can be no default for failure to pay an amount that has not as yet been billed, these accrued, but unbilled, charges are not yet due under the Lease, and they do not create a current default that gives rise to a requirement of cure by the Debtors at this time.  The obligation to pay the year-end adjustments is, however, certainly a part of the obligation to provide adequate assurance of future performance.  As a result, the Court should deny any attempt to assign the Lease "free and clear" of these obligations.

42.     Debtors remain responsible for all accrued or accruing charges under the Lease, and must pay such charges when they come due under the Lease.  The Debtors (or any assignee) assumes and assigns the Lease subject to their terms, and must assume and assign all obligations owing under the Lease, including obligations that have accrued but may not yet have been billed under the Lease.  The final Assignment Order should clearly state that the Debtors (or the Successful Bidder) will assume these lease obligations and pay them when due, regardless of whether they relate to the period prior to, or after, the closing of the assignment.  In addition, any provision in the Assignment Order that purports to release the Debtors (or the Successful Bidder) of further liability based upon a payment of cure amounts, must specify that such release does not apply to obligations to pay accrued or accruing, but unbilled, charges that come due under the Lease.

43.     Finally, the Lease requires the Debtors (or the Successful Bidder) to indemnify and hold the Landlord harmless with respect to any existing claims which may not become known until after the assumption and assignment of the Lease, examples of which may include such claims as personal injuries at the Premises and damage to the Premises or Center by the Debtors, the Successful Bidder or their agents.  Any assumption and assignment of the Lease must be subject to the terms of the Lease, including the continuation of all indemnification obligations, regardless of when they arose.[5]  In the alternative, the Debtors must provide (by insurance or otherwise) that they can satisfy the indemnification obligations under the Lease for any claims that relate to the period prior to assumption or assumption and assignment of the Lease. Nothing in the Assignment Order should preclude the Landlord from pursuing the Debtors, their insurance, or any other party that may be liable under the Lease, and the Landlord requests that

---

[5] Any ability to assume and assign the Lease is subject to the protections provided by Section 365(b) and (f). Therefore, any assumption (or assumption and assignment) must be in accordance with all provisions of the Lease.

any order specifically preserves its right to pursue such rights irrespective of any resolution of cure amounts herein.[6]

44.    Landlord, therefore, requests that in the event an assumption and assignment of the Lease is approved by the Court, language must be inserted into the Assignment Order to provide that the Successful Bidder shall be responsible for all unpaid year-end adjustments, whether accruing prior to or after the effective date of assumption of the Lease, when such charges become due in accordance with the terms of the Lease, including with respect to indemnification and insurance obligations.  In default thereof, a suitable escrow for the Lease equal to 150% of the average year-end adjustments for the prior three (3) years must be established to assure that any amounts due will be available to Landlord when the year-end adjustments are actually billed and due pursuant to the terms of the respective Lease.

ii.    The Cure Amount Serves Only As An Estimate

45.    Landlord can only provide the information presently available regarding amounts owing by the Debtors, while reserving the right to amend the Objection as necessary to include any additional or unknown charges that arise, including but not limited to subsequent rent defaults, attorney fees, costs, interest, and year-end adjustments and reconciliations.  There is no basis to impose upon the Landlord the equivalent of an administrative bar date, limiting its recourse to recover charges and other amounts to which it is entitled under the Lease.

iii.    The Debtors Must Pay Undisputed Cure Amounts Immediately

46.    Section 365(b)(1)(A) requires that the Debtors promptly cure outstanding balances due under the Lease upon assumption or assumption and assignment.  To the extent there is a dispute over the total cure obligation for the Lease, all undisputed cure amounts should be paid

---

[6] If Debtors are covered under an "occurrence basis" insurance policy, rather than a "claims made" policy, this objection may be satisfied by proof of such insurance by the Debtors for Landlord's locations.

immediately.   Debtors should escrow disputed amounts, and the Court should set a status

conference within thirty (30) days of the assumption and assignment of the Lease to deal with any

disputes that remain unresolved after such period.

### E.    Assumption and Amendment Agreement

Landlord also requests that, as a condition to any order approving assumption and

assignment of Landlord's Lease, the Successful Bidder shall be required to enter into a short form

Assumption and Amendment Agreement whereby the Successful Bidder shall become directly

obligated to Landlord and the provisions of the Lease regarding notice addresses will be modified.

## IV.    RESERVATION OF RIGHTS TO RAISE FURTHER OBJECTIONS

47.    Landlord reserves all rights to (i) raise further or other objections as may be

necessary, including but not limited to the final form of Assignment Order and/or the final

transaction documents once such documents are filed of record with the Court; (ii) to require

payment of all accrued but unbilled Lease charges and compliance with all Lease terms; and,

(iii) to require any assignment on a form acceptable to Landlord.

## V.    JOINDER IN OBJECTIONS RAISED BY OTHER LANDLORDS

48.    Landlord hereby joins in the objections filed by Debtors' other landlords to

the extent that such objections are not inconsistent with the provisions hereof.

## VI.    CONCLUSION

Landlord respectfully requests that: (a) the assumption and assignment of the Lease be

denied; (b) any Assignment Order approving the assumption and assignment of the Lease

expressly provide that it is subject to, and not free from, all of the restrictions contained in the

Lease as well as any use and exclusive restrictions contained in other tenant's leases; (c) any

Assignment Order approving the assumption and assignment of the Lease be subject to and

conditioned upon the Successful Bidder providing adequate assurance of future performance;

(d) any assumption of the Lease be conditioned upon responsibility of Successful Bidder to pay a cure amount totaling not less than the cure amounts, if any, when due in accordance with the Lease, plus the Landlord's pecuniary losses; and (e) the Court should grant such other relief that the Court finds just and proper.

Respectfully submitted,

Dated: September 16, 2025

*/s/ Leslie C. Heilman*
Leslie C. Heilman, Esquire
Laurel D. Roglen, Esquire*
Margaret A. Vesper, Esquire*
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com
        roglenl@ballardspahr.com
        vesperm@ballardspahr.com

*Counsel to Manoa Shopping Center Associates, L.P.*