# EXHIBIT A

# SHOPPING CENTER LEASE

Laurelwood Rite Aid – San Mateo FINAL

# SHOPPING CENTER LEASE

THIS LEASE (this "Lease") is entered into and made effective as of this 12 TH day of December, 2012 (the "Effective Date"), by and between CARSTENS REALTY, a California corporation ("**Landlord**") and THRIFTY PAYLESS, INC., a California corporation doing business as RITE AID ("**Tenant**"), and is guaranteed by RITE AID CORPORATION, a Delaware corporation, pursuant to that certain Continuing Lease Guaranty dated as of the Effective Date and attached hereto as Exhibit "D".

## A.    BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS.

| | | |
|---|---|---|
| EFFECTIVE DATE: | December 12, 2012 | |
| LANDLORD: | Carstens Realty, a California corporation | |
| ADDRESS OF LANDLORD: | 1206 West Hillsdale Boulevard, Suite A<br>San Mateo, CA  94403 | |
| TENANT: | Thrifty Payless, Inc., a California corporation<br>doing business as Rite Aid | |
| GUARANTOR: | Rite Aid Corporation, a Delaware corporation | |
| ADDRESS OF TENANT: | 1320 West Hillsdale Boulevard<br>San Mateo, CA  94403 | |
| BUSINESS HOME OFFICE<br>ADDRESS: | Thrifty Payless, Inc.<br>30 Hunter Lane<br>Camp Hill, PA 17011 | |
| Check (✓) preferred mailing address: | [  ] Store Address    [✓] Business Home Office | |
| TENANT'S TRADE NAME: | Rite Aid | |
| LEASED PREMISES: | 1320 West Hillsdale Boulevard<br>San Mateo, CA  94403 | (1.01) |
| LEASE TERM: | 15 years | (1.03) |
| COMMENCEMENT DATE: | June 1, 2014 | (1.03) |
| TERMINATION DATE: | May 31, 2029 | (1.03) |
| FIXED MINIMUM RENT: | $17,474 per month for the first 60 months | (2.01) |
| ADJUSTMENT DATE: | June 1, 2019, and June 1, 2024 | (2.01) |
| FIRST ADJUSTMENT DATE: | June 1, 2019 | (2.01) |
| PERMITTED USES: | Pharmacy and retail drug store, as more particularly described in Section 5.01. | (5.01) |
| SECURITY DEPOSIT: | None | (6.01) |
| PERCENTAGE RENT: | Three percent of net sales, less Minimum Rent only. | (2.02) |
| INITIAL MONTHLY<br>IMPOUND FOR COSTS: | None | (13.01) |
| ADVERTISING<br>OBLIGATION: | None | (21.03) |

B.    SIGNIFICANCE OF BASIC LEASE PROVISIONS. Each reference in this Lease to any of the Basic Lease Provisions contained in Section A, above shall be deemed and construed to incorporate all the terms provided under each such Basic Lease Provision; provided, that the Basic Lease Provisions shall be controlled by the specific terms and provisions of this Lease relating to the subject matter of those Basic Lease Provisions.

C.    ENUMERATION OF EXHIBITS. The exhibits enumerated in this Section and attached to this Lease are incorporated herein by reference and are to be construed as a part of this Lease. Each party agrees to perform any obligations on its part stated in any and all such Exhibits:

| | | |
|---|---|---|
| Exhibit A | – | Shopping Center Plot Plan; Protected Area |
| Exhibit B | – | Tenant's Remodel Scope of Work |
| Exhibit C | – | Landlord's Sign Criteria |
| Exhibit D | – | Continuing Lease Guaranty |
| Exhibit E | -- | Memorandum of Lease |
| Exhibit F | -- | Quitclaim of Memorandum of Lease |
| Exhibit R | – | Shopping Center Rules and Regulations |

## ARTICLE I
## GRANT AND TERMS

### SECTION 1.01.  LEASED PREMISES.

Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, those certain premises more particularly depicted in Exhibit "A", attached hereto and made a part hereof, for the sole purpose of showing the approximate location of the Premises in the Shopping Center (the "**Shopping Center**") in San Mateo County, California, which premises consist of a store having approximately 7,625 square feet, reserving and excepting to Landlord the use of the exterior walls (other than store fronts) and the roof (the "**Premises**"). Landlord grants to Tenant, its customers, employees and invitees, the non-exclusive right to use the Common Areas (as defined in Article VII hereof) of the Shopping Center for parking, ingress and egress.

### SECTION 1.02.  ADDITIONAL AREAS.

The use and occupation by Tenant of the Premises shall include the use in common with others entitled thereto of the common areas, parking areas, service roads, and sidewalks, shown on Exhibit "A", and other facilities as may be designated from time to time by the Landlord subject, however, to the terms and conditions of this Lease.

### SECTION 1.03.  TERM.

A.    The initial term of this Lease (the "**Initial Term**") shall be for fifteen (15) years commencing June 1, 2014 (the "**Commencement Date**") and terminating May 31, 2029 (the "**Termination Date**"), unless otherwise extended pursuant to Section 1.03(B), below.

B.    **Options to Extend.** Provided that Tenant is not in default of this Lease following the expiration of all applicable cure periods without cure by Tenant (either at the time Tenant gives its renewal notice of its election to extend the Term for an Extended Term or on the commencement date of any Extended Term), Tenant shall have the right to extend the Term of this Lease, under the same terms, conditions and covenants herein contained (except for Rent, as specified herein) for two (2) additional terms of five (5) years each, each extended term to begin at the expiration of the preceding term (each, an "**Extended Term**"). Tenant's election to extend the Term for an Extended Term shall be irrevocable when made. Should Tenant elect to exercise any of the options, it shall do so by giving written notice ("**Tenant's Renewal Notice**") to Landlord at least nine (9) months prior to the then effective expiration date of the Term of this Lease. Tenant shall have no right to extend the Term of this Lease beyond the second Extended Term.

## SECTION 1.04.  HOLDING OVER.

Any holding over after the expiration of the Term, with or without the consent of Landlord, shall be construed to be a tenancy from month to month, and shall be on the terms and conditions herein specified, so far as applicable; provided, however, during such holding over, Tenant shall pay monthly Minimum Rent at one hundred twenty-five (125%) of the Rent applicable to the period immediately preceding the expiration or termination of the Term or Extended Term.

## ARTICLE II
## RENT

### SECTION 2.01  MINIMUM RENT.

The Minimum Rent during the Term, and any Extended Term, shall be payable by Tenant in monthly installments as noted below on the first day of each calendar month in advance, at the office of Landlord as noted in Section A, above, without any prior notice or demand therefore, and without any deduction or offset whatsoever:

| LEASE YEARS | MONTHLY RENT | ANNUAL RENT |
|---|---|---|
| 1 – 5 | $17,474.00 | $209,688.00 |
| 6 – 10 | $19,571.00 | $234,850.00 |
| 11- 15 | $21,920.00 | $263,040.00 |
| 16 - 20 First Option | $25,925.00 | $311,100.00 |
| 21 – 25 Second Option | $30,118.00 | $361,416.00 |

### SECTION 2.02.  PERCENTAGE RENT.

A.    In addition to the monthly payment of Minimum Rent, Tenant shall pay Landlord at the time and in the manner herein specified, as additional  rent, a sum equal to the amount by which three percent (3%) of the amount of Tenant's Gross Receipts, as hereinafter defined exceeds the amount of Minimum Rent paid by Tenant for such period.  Such computation shall be made with respect to each calendar year to commence on the first day of the Term, and each subsequent calendar year to commence on January 1 of each calendar year; provided however, that with respect to the first or last calendar year the gross receipts received during such fractional year, if any, shall be included in the gross receipts of the first full calendar month of that calendar year.  For any partial calendar year and any full lease year during which Tenant's obligation to pay Minimum Rent has been abated, (in whole or in part for any reason) the amount of annual gross receipts set forth in this Section 2.02 (A) shall be reduced by multiplying such amount by a fraction, the numerator of which is the total actual amount of Minimum Rent Tenant was obligated to pay and the denominator of which is the total Minimum Rent Tenant would have been obligated to pay, on an average basis, had the partial lease year at issue in fact been a full lease year.

B.    Tenant, on or before the tenth (10th) day of each calendar month, commencing with the 10th day of the month after Tenant first opens for business in the Premises and ending with the 10th day of the month following the last month of the Lease Term, shall deliver to Landlord with a statement which sets forth Tenant's gross receipts for the month just concluded (the "**Monthly Sales Statement**"), including any authorized deductions which deductions shall be set forth in detail sufficient for Landlord to recognize the category and nature of such deduction.  The statement must be signed and certified by Tenant to be true and correct, setting forth the Gross Receipts, for the month just concluded.  In the event that Tenant fails to deliver any such reports or statements by said dates and following not less than ten (10) days prior written notice, Landlord may in each instance have an audit conducted of the business conducted in and about the Premises by Tenant, its subtenants and concessionaires, and Tenant shall immediately reimburse Landlord for its costs for making any such audit, as additional rent. Tenant shall maintain at its Business Home Office full and accurate books of account, records, cash receipts and other pertinent data showing its Gross Receipts (as defined in Section 2.03, below) in a commercially reasonable manner, consistent with its national corporate policy, and in accordance with generally accepted accounting principles consistently applied.  Such books, receipts, and records shall be kept for a period of two (2) years after the close of each lease year, and shall be available for inspection and audit by Landlord and its representatives at its Business Home Office upon thirty (30) days prior written notice.  In no event shall Landlord conduct any

4

such audit more than annually. In addition, upon request of Landlord or its representatives, Tenant agrees to furnish copies of Tenant's state and local sales and use tax returns, if required to be filed in the state where the Shopping Center is located.

C.      On or before March 20th of each calendar year, there shall be determined the total Gross Receipts of Tenant during said calendar year (the "**Annual Sales Statement**") and the amount paid to Landlord as Minimum Rent and the amount payable as Percentage Rent if any. If Tenant shall owe to Landlord any Percentage Rent, then Tenant shall forthwith pay such amount to Landlord. Each calendar year shall be considered as an independent period for purposes of computing Percentage Rent. Percentage Rent shall be paid on all Gross Receipts in excess of the specified amount whether made in, upon, or from the Premises prior to or during the Term. Said Percentage Rent shall be payable at the office of the Landlord or such other place as Landlord may designate, without any prior demand therefore, and without any offset or deduction whatsoever.

### SECTION 2.03.  GROSS RECEIPTS.

"**Gross Receipts**" as used herein is defined to mean gross sales and rentals of Tenant and of all subtenants or other persons or entities occupying any part of the Premises with or without the consent of Landlord and/or Tenant, from all sources and businesses conducted upon or from the Premises, whether such business be conducted by Tenant or by any subtenant, assignee, licensee, concessionaire, or person or entity other than Tenant, and whether such sales or rentals be evidenced by check, credit, charge account, exchange or otherwise, and shall include, but not be limited to, the amounts received from the sales or rentals of tools, wares, gift certificates (which amounts shall be included for reporting purposes in the month the certificate was purchased) and merchandise and for services performed on or at the Premises, sales or rentals of Tenant's fixtures, furniture and equipment (wherever such furniture, fixtures and equipment is located at the time of its sale), together with the amount of all orders taken or received at the Premises, whether such orders be filled from the Premises or elsewhere. Specifically included within Gross Receipts shall be any sales or rentals conducted or generated by any internet or website conducted or operated in connection with the business operated by Tenant from the Premises. A credit sale shall be treated as a sale for the full price in the month during which such sale shall be made. Gross receipts shall include all service fees or any and all other consideration paid to Tenant as compensation for Tenant's sale or distribution of lottery tickets, hunting or fishing licenses, or in connection with any other local, state or federal lottery or licensing program similar to the foregoing, including, to the extent permitted by law, Tenant's compensation for winning lottery tickets.

Gross Receipts shall exclude the selling price of merchandise returned by customers and accepted for full credit, or the amount of discounts, refunds, and allowances made on defective or unsatisfactory merchandise, provided the selling price of such merchandise was previously included, and there shall be deducted from Gross Receipts the sales price of merchandise returned by customers for exchange, provided the sales price of merchandise delivered to the customer in exchange shall be included in Gross Receipts. Gross Receipts shall not include the amount of any sales, use, or gross receipts tax imposed by any federal, state, municipal or governmental authority directly on sales and collected from customer, provided that the amount thereof is added to the selling price, separately stated, and paid by the Tenant to such governmental authority. No franchise or capital stock tax and no income or similar tax based upon income or profits as such shall be deducted from Gross Receipts in any event whatever. Gross Receipts shall exclude all sales at a discount to Tenant's employees and all service charges paid to banks or other financial institutions based on credit card or other similar credit purchases made by customers. Furthermore, Gross Receipts shall exclude sums and credits received in settlement of claims for loss or damage to merchandise and for the return of merchandise to Tenant's supplier. Gross Receipts shall also exclude (a) proceeds from the sale of fixtures or equipment or other property that is not stock in trade; (b) exchanges or transfers of merchandise between stores or warehouses of Tenant; (c) receipts from vending machines or ATMs located in the Premises; (d) merchandise ordered over the internet or by catalog to the extent the order is placed at and delivery made from a location other than the Premises; and (f) amounts uncollected by Tenant from the sale of prescriptions under third party prescription contracts.

Notwithstanding anything to the contrary in the Lease, for purposes of determining Percentage Rent as set forth in Section 2.02 above, Tenant may offset its payment of the

Minimum Rent, but may not offset by any portion of Tenant's Common Area Costs, as hereinafter defined, or Tenant's obligations to pay taxes or insurance as required by this Lease.

### SECTION 2.04. DELINQUENCY CHARGES.

A.    For the purpose of this Lease, the term "**Rent**" shall mean and be defined as all Minimum Rent, Percentage Rent and Additional Rent due from Tenant to Landlord hereunder. "**Additional Rent**" means all sums (exclusive of Minimum Rent and Percentage Rent) that Tenant is required to pay Landlord. Tenant acknowledges that late payment by Tenant to Landlord of Minimum Rent or any installment thereof, Percentage Rent or any other additional rents, fees or costs payable under this Lease within five (5) days after such sum has become due, will cause Landlord to incur additional costs and expenses not contemplated by this Lease, the exact amount of such costs being extremely difficult and impracticable to fix. Such costs include, without limitation, processing and accounting charges, extra collection efforts, handling costs, and potential impairment of credit or late charges on loan(s) for which this Lease may be security. Tenant agrees and acknowledges that in such event, Landlord, in addition to its other remedies shall be entitled to recover a late payment charge against Tenant equal to five percent (5%) of the amount not paid within said five (5) day period, which constitutes a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment; provided however, the charge for failing to report Gross Receipts in a timely fashion shall be $100.00 for each day the report is delinquent provided no such penalty shall be assessed for the first such failure to report Gross Sales in any twelve (12) month period. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amount.

B.    Any past due amounts under this Lease shall bear interest from the date due until paid at the rate of the lesser of one and one-half percent (1½%) per month or the maximum rate permitted by law. Tenant further agrees to pay Landlord any cost incurred by Landlord in effecting the collection of such past due rent including but not limited to fees of any attorney or collection agency. Nothing herein contained shall limit any other remedy of Landlord.

If Tenant pays any installment of Minimum Rent, Rent, Percentage Rent or additional rent or any other sum by check and such check is returned for insufficient funds or other reasons not the fault of the Landlord, then Tenant shall pay to Landlord, pursuant to California state statute, the maximum service charge permitted by California Civil Code Section 1719, in addition to treble and other damages also permitted by Section 1719 of the Civil Code, so long as Landlord has complied with such applicable statute. Such payment of the service charge shall be made within seven (7) days after receiving written notice that such check has not been paid to the holder thereof, plus bank fees incurred by the holder. In addition to all other remedies, Landlord shall have the right to require that Tenant pay monies due in the form of a cashier's check or money order if Landlord experiences a return of any of Tenant's checks due to insufficient funds or any other reason.

### SECTION 2.05. CONTINUATION.

If this Lease is terminated by Landlord because of Tenant's default, and if Tenant becomes liable for any deficiency in rent by way of damages or otherwise, then from and after the time of the breach causing such termination, the rent shall be deemed to be the combined total of the Minimum Rent set forth in Section 2.01, above and an amount based upon the average of the payments which have accrued to Landlord as Percentage Rent under this Article II during the twenty four (24) months following the date of commencement of Tenant's obligations to pay Percentage Rent, in which event the previous twelve (12) (or fewer, if applicable) months shall be used as the basis of such average.

### SECTION 2.06. CAUSES OF ACTION.

In any case where Landlord has a cause of action for damages, Landlord shall have the privilege of splitting its causes of action so as to permit the institution of a separate suit for the Minimum Rent provided above, and neither the institution of any such suit, nor the subsequent entry of judgment, shall bar Landlord from bringing another suit for the Percentage Rent provided in this Article II; it being the express purpose of this provision to provide that the forbearance on the part of Landlord in any suit or entry of judgment for any part of the rent reserved under this Lease, to sue for, or to include in any such suit and judgment the Percentage Rent then due, shall not serve as a defense against, nor prejudice a subsequent action for, such

Percentage Rent with any previous suit or judgment entered. The claims for Minimum Rent and those for the Percentage Rent may be regarded by Landlord, if it so elects, as separate claims capable of being assigned separately.

## ARTICLE III
## INTENTIONALLY DELETED

## ARTICLE IV
## CONSTRUCTION

### SECTION 4.01.  PREMISES.

Tenant accepts the Premises in their "AS IS, WHERE IS, WITH ALL FAULTS" condition, and Tenant agrees and acknowledges that Landlord has made no representation or warranty as to the condition of the Premises.  Landlord and Tenant are parties to that certain Lease, dated April 15, 1988, as amended, concerning the Premises.

### SECTION 4.02.  CHANGES AND ADDITIONS TO BUILDING.

Landlord reserves the right to construct other buildings or improvements in the Shopping Center and/or in the common areas from time to time and to make alterations thereof or additions thereto.  Notwithstanding the foregoing, but subject to Section 7.01.B, below and subject to Landlord's compliance with all legal requirements affecting the ownership, operation and management of the Shopping Center, Landlord may not make any permanent changes to the area (the "Protected Area"), which is cross-hatched on the Shopping Center Plot Plan, attached as Exhibit A and incorporated by this reference, that would adversely materially affect the visibility, access or parking for the Premises.  Furthermore, Landlord may not alter the façade or exterior of the building of which the Premises are a part.

### SECTION 4.03.  INTENTIONALLY DELETED.

## ARTICLE V
## CONDUCT OF BUSINESS BY TENANT

### SECTION 5.01.  USE OF PREMISES.

A.      The Premises shall be used only for the Permitted Use set forth in the Basic Lease Provisions above, and for any other lawful use that does not in any way conflict with any existing covenants, conditions or restrictions encumbering or affecting the Shopping Center, or in violation of any exclusivity contained in any lease or agreement existing as of the Effective Date of this Lease.  Furthermore, subject to Tenant's full and complete performance of its obligations hereunder, Landlord shall not lease to or otherwise authorize or permit the operation of any business, trade or profession which requires or has a license to permit it to conduct a pharmacy, or which employs or is required to employ a registered or licensed pharmacist, nor for the conduct of any store whose business, trade or profession is called, labeled, named or commonly known or referred to as a "drug store," "pharmacy" or "apothecary."

B.      Tenant shall not use or permit the use of the Premises for any purpose which is illegal, dangerous to persons or property or which, in Landlord's reasonable opinion, unreasonably disturbs any other tenants of the Shopping Center or interferes with the operation of the Shopping Center.  Tenant at Tenant's sole cost and expense shall comply with all laws, statutes, ordinances, rules, regulations, guidelines or requirements now in force or hereafter enacted of any governmental authority having jurisdiction over the Premises or the Shopping Center, including, without limitation, the Americans with Disabilities Act, regarding or affecting the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises.  Tenant, within 10 days after receipt thereof, shall provide Landlord with copies of any notices it receives regarding a violation or alleged violation of any laws.  Tenant shall comply with the rules and regulations of the Shopping Center attached hereto as Exhibit "R" and incorporated herein by this reference and such other reasonable rules and regulations adopted by Landlord from time to time.  Tenant shall also cause its agents, contractors, subcontractors, employees, customers, and subtenants to comply with all rules and regulations.

C.      Except as to any use, lease or agreement existing as of the Effective Date of this Lease, Landlord and Tenant each covenants and warrants that no part of the Shopping Center or

7

the Premises shall be used for any of the following purposes: (i) an entertainment or recreational facility such as a bowling alley, skating rink, theater, billiard or pool operations; (ii) a religious facility such as a church or a house of worship; or (iii) an industrial facility for manufacturing and warehousing purposes.

D.    Tenant shall not use, store, transport, or dispose of any Hazardous Materials in, on, under or about the Premises except in accordance with all applicable laws, rules and regulations; provided, however, nothing herein shall be deemed to prohibit the transportation to and from, and the use, storage, maintenance and handling within, the Premises of substances sold over the counter at retail and commonly used in connection with the normal business operations connected therein so long as such use, storage and transportation is in compliance all applicable laws, rules and regulations. Tenant shall notify Landlord of any notice or communication from a governmental agency or other party alleging a violation of environmental laws.

E.    Tenant shall provide Landlord with access to the Property during regular business hours to conduct any remediation, inspection, monitoring, removal, or repair related to the presence of Hazardous Materials on the Shopping Center or the Premises.

F.    Tenant shall indemnify, defend, protect and hold Landlord, its officers, directors, employees, agents and any successors to this Lease, their officers, directors, employees, and agents harmless from any and all claims, demands, losses, liabilities, costs and expenses, including attorneys' fees and consultant fees at trial and on any appeal or petition for review, (collectively referred to hereinafter as "**Claims**") arising from the presence of any Hazardous Materials as a result of the actions of Tenant, its agents, employees, contractors and invitees in, on, about, or under the Premises or the Shopping Center occurring after the commencement of the Term, except to the extent caused by Landlord, its agents, employees, contractors and invitees.

G.    Landlord shall indemnify, defend, protect and hold Tenant, its officers, directors, employees, agents and any successors to this Lease, their officers, directors, employees, and agents harmless from any and all claims, demands, losses, liabilities, costs and expenses, including attorneys' fees and consultant fees at trial and on any appeal or petition for review, (collectively referred to hereinafter as "**Claims**") arising from the presence of any Hazardous Materials in, on, about or under the Premises or the Shopping Center, except to the extent caused by Tenant, its agents, employees, contractors and invitees.

H.    Notwithstanding any provision of this Lease to the contrary, Landlord shall not be responsible for paying the cost of remediating any Hazardous Materials in, on, about or under the Premises or the Shopping Center due to the activities, acts or omissions of Tenant, its officers, directors, agents, employees, contractors or invitees.

I.    The provisions of this Section 5.01, shall survive the termination of the Lease.

J.    For purposes of this Lease, the term "**Hazardous Materials**" shall include, but not be limited to, any substance, material or waste containing asbestos or radioactive materials; any petroleum and petroleum products, fractions, distillates or substances now or hereafter defined as "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," or "restricted hazardous waste" under any provision of California law; now or hereafter defined as "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") of 1980, as amended, 42 U.S.C. Section 9601 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801, *et seq.*; the Resource Conversation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*; and those substances defined as hazardous wastes in Section 25117 of the California Health and Safety Code or as hazardous substances in Section 25316 of the California Health and Safety Code; and in the regulations adopted and publications promulgated pursuant to such laws.

K.    **HAZARDOUS SUBSTANCE DISCLOSURE.** Many locations throughout the Shopping Center may from time to time be exposed to tobacco smoke or asbestos containing materials ("**ACM**"). although these areas are generally inaccessible to tenants, such as inside of sealed walls and above suspended ceilings. Tenant agrees not to expose or disturb any ACM unless Landlord has given Tenant prior written consent thereto and Tenant fully complies with all applicable legal requirements and Landlord's written procedures for handling ACM.

8

Tenant's failure to comply with the immediately preceding sentence shall constitute an event of default under this Lease.

### SECTION 5.02.  OPERATION OF BUSINESS.

A.      Tenant shall not use or conduct or permit any person to use or conduct in or about the Premises a secondhand store, auction, distress or fire sale, or bankruptcy or going-out-of-business sale, nor for any illegal or improper use or purpose.  Tenant shall not sell or allow any person to sell any drug related paraphernalia in or about the Premises.

B.      Tenant shall warehouse, store and/or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retain at, in, from or upon the Premises.  Tenant shall use for office, clerical, or other non-selling purposes only such space in the Premises as is reasonably required for Tenant's business in the Premises.

C.      Notwithstanding any other provision of this Lease, if, after the Commencement Date, Tenant fails to operate a business operation permitted by the terms hereof for a period of ninety (90) consecutive days, except for non-operation by reason of (i) Force Majeure, (ii) damage, destruction, casualty or condemnation, or (iii) business purposes such as remodeling the Leased Premises, Landlord, by written notice in its sole discretion (the "Termination Notice") given at any time before Tenant recommences any such permitted business operations shall have the right, but not the obligation, to terminate this Lease and recapture the Leased Premises.  If Landlord gives the Termination Notice, then this Lease shall terminate ninety (90) days from the date of Landlord's Termination Notice.  Notwithstanding the foregoing, Tenant, by written notice (the "Abeyance Notice") given to Landlord no later than forty five (45) days after Landlord's Termination Notice, may elect to recommence any such permitted business operations no later than the day (the "Recommencement Deadline") that is ninety (90) days after Landlord's Termination Notice, in which event the effect of the Termination Notice shall be held in abeyance pending the possible recommencement of permitted business operations by Tenant prior to the Recommencement Deadline.  If, after the Abeyance Notice is given by Tenant, Tenant recommences business operations prior to the Recommencement Deadline, then this Lease shall continue in full force and effect.  If, after the Abeyance Notice is given by Tenant, Tenant does not recommence permitted business operations prior to the Recommencement Deadline, then this Lease shall terminate as of the Recommencement Deadline.  Any termination of this Lease pursuant to this Section 5.02.C shall not constitute a default by Tenant hereunder and shall not entitle Landlord to recover any damages under this Lease.  If this Lease is terminated pursuant to this Section 5.02.C, then the parties shall have no further obligations under this Lease, except for those that accrue and remain undischarged.  The term "Force Majeure" as used in this Section 5.02.C shall mean acts of God, strikes, lockouts, riots, insurrection, war, or acts of governmental authority, including but not limited to delays caused by such authorities.

### SECTION 5.03.  INTENTIONALLY DELETED

### ARTICLE VI
### SECURITY DEPOSIT

### SECTION 6.01.  INTENTIONALLY DELETED

### ARTICLE VII
### COMMON AREAS AND RULES

### SECTION 7.01.  DEFINITION OF COMMON AREAS AND CONTROL BY LANDLORD.

A.      The Common Areas are defined to be all portions of the Shopping Center except for the interior areas of buildings constructed for leasing to tenants.

B.      Common Areas shall at all times be subject to the exclusive control, regulation, and management of Landlord.  Landlord shall have the right to construct, maintain, and operate lighting facilities on all said areas and improvements; to police the same; from time to time to change the area level, location and arrangement of parking areas and other facilities; to use during the construction or reconstruction of buildings or additions; to erect buildings and/or improvements on the Common Areas from time to time; to restrict parking by tenants, their

9

officers, agents and employees to employee parking areas; and to perform such other acts in and to said areas and improvements as, in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their officers, agents, employees, and customers. Landlord will operate and maintain the Common Areas in such manner as Landlord, in its sole discretion, shall determine from time to time. Without limiting the scope of such discretion, Landlord shall have the full right and authority to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the Common Areas and facilities. Subject to the foregoing and subject to Landlord's compliance with all legal requirements affecting the ownership, operation or management of the Shopping Center, Landlord may not make any permanent changes to the area marked "Protected Area" on the Shopping Center Plot Plan that would adversely materially affect the visibility of, or the access or parking for the Premises.

C.    **COMMON AREA COSTS.**

1.    Tenant shall pay Landlord, as further additional rent without deduction or offset, a proportion of the Common Area Costs as provided in Sections 13.01 and 13.02.

2.    "**Common Area Costs**" as used herein, in Sections 13.01 and 13.02 and elsewhere in this Lease means any amount paid or payable by Landlord or others on behalf Landlord, arising out of Landlord's ownership, maintenance, painting, operating, repair, replacement and administration of the Shopping Center and Common Area, and constructing new improvements to the Common Areas after the Common Areas are initially constructed, including, without limitation, gardening and landscaping, repairs, striping, lighting, utilities, sanitary control, paving, signs, storm drains, pest control, walkways, stairways, retaining walls, curbs, gutters, removal of trash, rubbish, garbage and other refuse, reasonable reserves for replacements and repairs, any change for parking imposed by any governmental or quasi-governmental agency or body, any cost of repairing, restoring and maintaining any existing parking areas including, without limitation, blacktopping, resurfacing, repainting, restriping, repaving, asphalting, seal-coating or cleaning; management fees (not to exceed eight percent (8%) of the Common Area Costs), and the cost of personnel to implement such services, to direct parking and to police the Common Areas; replacement of worn out equipment or other improvements; amounts actually paid by Landlord for personal injury and property damage claims, including, but not limited to, reasonable attorneys' fees and deductible on personal injury and property damage insurance policies, costs of creating and maintaining a website for the benefit of the Shopping Center; and any such expenses and costs resulting from substitution of work, labor, material or services in lieu of any of the above itemizations. Landlord, at Landlord's option, may charge Tenant its proportionate share of sewer charges, fees and assessments, based upon Tenant's actual water consumption. It is the intent of Landlord and Tenant that all costs arising out of Landlord's ownership, maintenance, improving, operating, repairing, replacement and administration of the Shopping Center and Common Area shall be reimbursed by Tenant and other tenant's in the Shopping Center in the proportion set forth in Article XIII, below.

3.    Notwithstanding anything to the contrary contained herein, in no event shall Common Area Costs include any of the following: (1) cost for which Landlord is reimbursed, receives a credit or is otherwise compensated (other than tenant reimbursements for Common Area Costs); (2) rent or other amounts payable under any ground lease or master lease, or interest, amortization or other repayment of indebtedness or costs, fees, points or other expenses in connection with any financing or refinancing of all or any part of the Shopping Center; (3) subject to Section 5.01 above, any costs relating to Hazardous Materials, except for customary automobile gasoline and oil spills; (4) costs of repair or restoration required due to casualty damage or condemnation (except for commercially reasonable deductibles); (5) reserves for anticipated or unanticipated future expenses; (6) interest or penalties incurred as a result of Landlord's failure to pay any bill as it shall become due or costs resulting from the negligence or willful misconduct of Landlord, its employees, agents and/or contractors; (7) costs of leasing any item which if purchased, rather than leased, would be excluded from Common Area Expenses pursuant hereto; (8) any amount paid to Landlord, to other entity related to Landlord, or to the managing agent of Landlord which is in excess of the amount which would have been paid in the absence of such relationship; (9) costs related to the operation of Landlord as an entity rather than the operating of the Shopping Center (including, without limitation, costs of formation of the entity, internal accounting, legal matters and/or preparation of tax returns) or costs associated with marketing the Shopping Center for sale, or any interest therein, or converting the Shopping

10

Center to a different form of ownership; (10) leasing commissions, attorneys' fees, costs and disbursements, and other expenses (including, without limitation, advertising and marketing costs) incurred in connection with leasing, renovating, or improving space for tenants or other occupants or prospective tenants or occupants of the Shopping Center or development of other properties, or costs (including, without limitation, permit, license, and inspection fees) incurred in renovating or otherwise improving or decorating, painting or redecorating space for tenants or other occupants vacant space; (11) costs of any services sold to tenants or other occupants for which Landlord is entitled to be reimbursed by such tenants or other occupants as an additional charge or rental over and above the basic rent and escalations payable under the lease with such tenant or other occupant, and costs associating with valet parking (including, without limitation, wages and other expenses); (12) any depreciation of the Shopping Center; and (13) Shopping Center's management fees in excess of the eight percent (8%) management fee referenced above.

## ARTICLE VIII
### IMPROVEMENTS, ALTERATIONS, FIXTURES, AND SIGNS

#### SECTION 8.01.  INSTALLATION BY TENANT.

A.     Not later than twelve (12) months following the Effective Date of this Lease, Tenant shall commence the improvements of the Premises pursuant to the scope of work described in the attached Exhibit "B" and incorporated by this reference ("Tenant's Remodel Scope of Work"). Such work shall be at the Tenant's own cost and expense and at no cost or liability to Landlord, and shall be completed within one hundred eighty (180) days after Tenant commences its Remodel Scope of Work. TIME IS OF THE ESSENCE. All such work shall be performed in a workmanlike manner and in compliance with all applicable laws. No work may commence until Tenant has: (i) obtained all necessary licenses and permits; (ii) required all contractors and subcontractors to carry worker's compensation insurance, public liability insurance, and property damage insurance; (iii) delivered certificates of such coverage to Landlord; and (iv) to the extent applicable, complied with Landlord's Sign Criteria in the attached Exhibit "C" and incorporated by this reference.

B.     Tenant shall not make or permit to be made any changes to the store front or any exterior entry level, or make or permit to be made any structural or material exterior alterations to the Premises, without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Except as described above, Tenant may remodel or make alterations to the interior of the Premises without Landlord's prior written approval so long as such nonstructural or interior remodeling or alterations do not exceed Fifty Thousand Dollars ($50,000.00), and so long as Tenant presents in advance for Landlord's approval plans and specifications for such work. All fixtures installed by Tenant shall be new or completely reconditioned. Landlord shall not be obligated to approve any plans or specifications of Tenant if such plans or specifications: (i) result in unusual expense to re-adapt the Premises to normal use on any termination or expiration of the Lease; (ii) result in an increase in the cost of insurance or taxes on the Premises, and Tenant has not in writing expressed its agreement to assume and pay for such additional expense; or (iii) result in an increase in the Landlord services called for under the Lease, and Tenant has not in writing expressed its agreement to assume and pay for such additional expense.

#### SECTION 8.02.  REMOVAL BY TENANT.

All alterations, decorations, additions and improvements made by the Tenant, or made by Landlord on the Tenant's behalf, shall remain the property of the Tenant for the Term, or extension or renewal thereof. Such alterations, additions, or improvements as are made and paid for by Tenant, and which are removable without damage to the Premises may be removed by Tenant at any time and Tenant shall repair any damage so incurred at the time of such removal. All signs, trade fixtures, machinery, equipment and/or other items or personal property placed in or upon the Premises by Tenant and paid for by it, may be removed by it at any time. At the expiration of the Term or any extensions or renewals thereof, all permanent, non-movable alterations, additions and improvements shall become the property of the Landlord, subject to the provisions of Section 9.03 hereof.

### SECTION 8.03.  LIENS.

A.    Without in any way limiting the terms and conditions of any other indemnification or hold harmless provision in this Lease, Tenant covenants and agrees to promptly pay or cause to be paid all costs of work done by it or caused to be done by it on the Premises and shall keep the Premises free and clear of all mechanic's and other liens.  In addition, Tenant hereby agrees to indemnify, defend, protect and hold Landlord (and its agents and employees) and the Premises harmless from and against any and all claims, liens, demands, losses, damages, expenses, suits and damages, costs, attorneys' fees, and other expenses by reason of the performance of any work by or on behalf of Tenant at any time, including, without limitation, by reason of (i) any disputes between or among any of Tenant, its contractors, subcontractors, material providers and design professionals, and any other person or entity; (ii) any accident or matter occurring in or about the Shopping Center, causing injury or damage to any property or person, except to the extent such accident or other matter resulted from the gross negligence or wrongful act of Landlord;  (iii) the failure of Tenant, or any of its contractors, subcontractors, material provider or design professions to fully and faithfully perform the obligations and observe the conditions of this Lease, or (iv) the negligence or otherwise tortious act of Tenant, or any of its contractors, subcontractors, material provider or design professionals or anyone in or about the Shopping Center on behalf of or at the invitation or right of Tenant.  Landlord may post and record an appropriate notice of non-responsibility with respect to any work and Tenant shall maintain any such notices posted by Landlord in or on the Premises.

B.    Should Tenant desire to contest any claim of lien, it shall furnish the Landlord adequate security in the amount of the claim, plus estimated costs and interest, or a bond from a responsible corporate surety in such amount conditioned on the discharge of the lien.  In the event any such mechanic lien is recorded against the Shopping Center and such lien has not been released within thirty (30) days of recordation thereof, Landlord in its sole discretion may pay said claim and any costs.  The amount so paid, together with reasonable attorneys' fees incurred in connection therewith, shall be immediately due and owing from the Tenant.

### SECTION 8.04.  SIGNS.

Tenant shall not erect or install any signs on the exterior of the Premises (including, without limitation, bars, awnings, canopies, etc.) (collectively "Sign") without Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed, or the approval and consent of all governmental bodies having jurisdiction over the Shopping Center.  Tenant may install any signs within the interior of the Premises without Landlord's prior written consent.  Tenant further agrees to maintain at Tenant's sole cost all such signs in good condition and repair at all times.

### ARTICLE IX
### CONDITION AND MAINTENANCE OF PREMISES

### SECTION 9.01.  CONDITION AND MAINTENANCE BY TENANT.

A.    Tenant shall be deemed to have agreed by accepting occupancy that the Premises are in good order, condition and repair.  Tenant, at Tenant's sole expense, shall at all times keep the Premises (including maintenance of exterior entrances, all glass and show window moldings and all partitions, doors, door jambs, door closers, door hardware, ceilings, walls, floor coverings, concrete slab, fixtures, equipment and appurtenances thereof (including electrical, lighting, heating and plumbing, plumbing fixtures, and any air conditioning system, including leaks around ducts, pipes, vents or other parts of the air conditioning, heating, or plumbing systems which protrude through the roof) in good working order, condition and repair, Tenant agrees to repaint the interior of the Premises at least twice during the Initial Term.

B.    Tenant shall obtain and keep in full force and effect maintenance contracts for the heating and air conditioning system serving the Premises with a maintenance company approved by Landlord in writing.  Tenant agrees to provide Landlord with a copy of the maintenance contract and any renewals thereof and must obtain Landlord's written approval to the terms thereof.

12

**SECTION 9.02.  MAINTENANCE BY LANDLORD.**

A.      Subject to the provisions of Section 13 of this Lease, Landlord shall maintain and repair the exterior structural portions of the Premises, including the exterior structural walls and the roof, and the periodic repainting of the exterior unless such maintenance and repairs are caused in whole or in part by the act, neglect, fault, or omission by Tenant, its agent, servants, employees, invitees, or any damage caused by breaking and entering, in which case Tenant shall make such repairs or undertake such maintenance.

B.      If Tenant refuses or neglects to maintain or repair property as required hereunder to the reasonable satisfaction of Landlord as soon as reasonably possible after written demand, Landlord may undertake such maintenance or make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixture, or other property or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay Landlord's costs for making such repairs, plus twenty percent (20%) for overhead, upon presentation of a bill therefore, as additional rent.

C.      If Landlord refuses or neglects to maintain or repair property as required hereunder to the reasonable satisfaction of Tenant as soon as reasonably possible after written demand, Tenant may undertake such maintenance or make such repairs without liability to Landlord and Landlord shall pay Tenant's costs for making such repairs plus twenty percent (20%) for overhead upon presentation of a full therefore.

D.      At its option, Landlord may provide security patrols or other security systems for the Common Area only.  Tenant at Tenant's sole cost shall be responsible for any security patrols or other security systems for the Premises.  Landlord accepts no responsibility whatsoever for providing security to any customer or invitee of Tenant while such customer or invitee is in or about the Premises or if such customer or invitee is in or about the Shopping Center at any time other than the normal business hours of the Shopping Center.  Any security patrol that Landlord elects to provide will be an independent contractor of Landlord and not an employee of Landlord.  As an independent contractor, Landlord does not represent that such security patrol will be effective or should be relied upon by Tenant or any customer or invitee of Tenant.

**SECTION 9.03.  SURRENDER OF PREMISES.**

At the expiration or earlier termination of this Lease, Tenant shall surrender all keys to Landlord and shall surrender the Premises in good condition and repair, reasonable wear and tear and casualty damage excepted.  Subject to the provisions of Section 8.02 hereof, Tenant shall remove all its trade fixtures within ten (10) business days following the expiration or early termination of the term of this Lease.  Such repairs, to be performed in a manner reasonably satisfactory to the Landlord and in accordance with all applicable laws, shall include, without limitation, to the following: cap all plumbing, cap all electrical wiring, repair all holes in walls, restore damaged floor and/or ceiling tiles, and professionally clean Premises in their entirety.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease.

**ARTICLE X**
**TAXES**

**SECTION 10.01. BUSINESS AND PERSONAL PROPERTY.**

Tenant shall be liable for and shall pay when due all taxes, charges, assessments, and license fees assessed or levied against its business operation, as well as upon personal property, trade fixtures, merchandise, and other property in or on the Premises, whether or not such items are levied against Tenant, Tenant's property, Landlord or Landlord's property.  If Landlord pays any such taxes (which Landlord shall have the right to do regardless of the validity thereof), Tenant, as additional rent, shall reimburse Landlord the full amount thereof, or the proportion caused by any increased assessment due to the inclusion of Tenant's property on the Premises.

**SECTION 10.02. REAL PROPERTY.**

Tenant shall pay Landlord, as provided in Sections 13.01 and 13.02 hereof, as further additional rent without deduction or offset, Tenant's proportionate share of all taxes,

13

assessments, and other governmental charges, general and special, ordinary and extraordinary, levied or assessed on the land, buildings, improvements, equipment or Common Areas comprising the Shopping Center or any part thereof, or on Landlord with respect to the land, buildings, improvements or Common Areas that comprise the Shopping Center. Tenant shall not be responsible for any increase in real property taxes resulting from the third or any subsequent change of ownership of the Shopping Center.

### SECTION 10.03. GROSS RECEIPTS.

Tenant shall be liable for and shall pay all taxes, assessments, or excises on rents or other payments by Tenant to Landlord, or license fees to allow Landlord to collect rents, now or hereafter levied or assessed against Landlord or Tenant on account of the use or occupancy of the Premises, on account of the rent reserved hereunder, or as a substitute in whole or in part for property taxes. If any such tax, assessment, excise or fee is collectible from Landlord, then Tenant shall reimburse Landlord as additional rent for the full amount thereof before the same becomes delinquent. Tenant shall not, however, be required to reimburse Landlord for any governmental income, franchise, estate, or inheritance taxes of Landlord.

### ARTICLE XI
### INSURANCE AND INDEMNITY

### SECTION 11.01. TENANT INSURANCE.

A.      Tenant shall, at its sole expense, maintain in full force during the Term and any Extended Term (and, if Tenant shall occupy or conduct activities in or about the Premises prior to or after the term hereof, then also during such pre-term or post-term period) the following policies of insurance:

1.      Commercial general liability insurance (including property damage and automobile liability insurance, and contractual liability coverage) which will insure Tenant and Landlord (and such persons, firms or corporations as are designated by Landlord) against liabilities for injury to persons and/or property and death of any person or persons occurring in, on, or about the Premises (or otherwise resulting from Tenant's operations in the Shopping Center) from whatever cause; minimum coverage shall be $2,000,000.00 per occurrence, with an annual aggregate of $3,000,000.00.

2.      Property insurance protecting Tenant against loss or damage from fire and other risks as are insurable under then-available standard forms of all-risk insurance policies insuring Tenant's stock in trade, alterations, improvements, additions, property, furniture and fixtures, without deduction for depreciation.

3.      Plate glass insurance sufficient to pay for the replacement of all damaged plate glass on the Premises.

4.      Workers' Compensation Insurance in compliance with California law.

B.      Each such policy of tenant's insurance shall be primary above and beyond any insurance that may be carried by Landlord and shall be approved as to form and insurance company by Landlord. Such insurance shall be written by companies of recognized financial standing that have a credit rating of "A-" or better and "VIII" or better from A.M. Best's Insurance Reports and that are legally qualified in the state where the policy is issued. The commercial general liability insurance shall protect Tenant, as an additional named insured by policy endorsement, and Landlord and any other indemnitee and any other parties designated by Landlord, as additional named insureds; shall insure Landlord's and such other parties contingent liability with regard to acts or omissions of Tenant; and shall specifically include all liability assumed by Tenant under this Lease (provided however, that such contractual liability coverage shall not limit or be deemed to satisfy Tenant's indemnity obligations under this Lease). Landlord reserves the right to increase the foregoing amount of liability coverage from time to time as Landlord determines is required to adequately protect Landlord and the other parties designated by Landlord from the matters insured thereby. Tenant shall deliver to Landlord a copy of the policies or certificates of insurance as required by this Lease on or before the Term or any Extended Term commences. Said policies shall contain a clause that the insurer will not cancel or change the insurance without first giving the Landlord thirty (30) days prior written

14

notice. All renewal policies or certificates shall be delivered to Landlord at least thirty (30) days prior to the expiration dates of expiring policies. All policies obtained by Tenant must contain an endorsement establishing a satisfactory minimum amount of insurance as specified herein. Such policies shall also specify that any co-insurance provision that reduces coverage was eliminated from the applicable policy.

C.     Should Tenant fail to obtain the coverage provided for in this Section 11.01, Landlord shall have the right to obtain said insurance and pay the premiums therefore, and in such event the entire amount of such premiums shall be immediately paid by Tenant to Landlord.

### SECTION 11.02. LANDLORD INSURANCE.

Tenant shall also pay Landlord, as further additional rent without deduction or offset, its share, as provided in Sections 13.01 and 13.02 of the premiums for the insurance coverage carried by Landlord on the building in which the Premises are located and on the Shopping Center Common Areas, which may include Fire Insurance with extended coverage and vandalism and malicious mischief coverage, boiler coverage, rental income insurance with one hundred percent (100%) contribution covering all rental and any other payments due and payable to Landlord, all-risk and/or difference in conditions coverage, including flood and earthquake coverage, general liability coverage, and any other business insurance deemed necessary by Landlord.

Landlord shall maintain in effect throughout the Term a policy or policies of insurance providing protection for the following liabilities and/or risks (collectively, "Shopping Center Insurance"):

(1)     Commercial general liability insurance applying to all bodily injury, property damage, personal injury and other covered loss, however occasioned, in the Common Area arising from or related to Landlord's ownership and/or operation of the Shopping Center and Common Area with coverage limits having a minimum combined single limit of liability of at least Two Million an NO/100 Dollars ($2,000,000.00) and a general aggregate limit of Four Million and NO/100 Dollars ($4,000,000.00).

(2)     All-risk extended coverage insurance covering the Premises and the Common Areas, exclusive of any item insured by Tenant, in an amount which is greater of its full replacement cost (exclusive of excavations, foundations and footings) or such amount as any Mortgagee may require Landlord to maintain. Such coverage may include earthquake, terrorism and rental loss. Landlord's obligation to carry said all-risk insurance may be satisfied by inclusion of the Premises and the Common Area within the coverage of so-called blanket policy or policies of insurance carried and maintained by Landlord.

### SECTION 11.03. INCREASED PREMIUMS.

Tenant shall not keep, use, dispose, sell or offer for sale in or upon the Premises, any article which may be prohibited or limited by any insurance policy affecting the Premises, the Shopping Center, Landlord, or Landlord's interest in the Premises or the Shopping Center. In the event Tenant's occupancy causes any increase of premium on any insurance carried by Landlord above the rate which reflects the least hazardous type of occupancy legally permitted in the Premises, Tenant shall pay, upon demand by Landlord, the additional premium.

### SECTION 11.04. WAIVER OF SUBROGATION.

Each party hereto waives any right such party may have on account of any loss or damage suffered by such party and hereby releases the other party, and each of its shareholders, employees, officers, agents, directors, and authorized representatives, from any claims for or actual losses or damages caused by or resulted from risks insured against under any insurance policies carried or required to be carried by such party. Tenant shall take such steps as are necessary to inform its insurance carriers of this provision and to have endorsements, if necessary, placed on said insurance policies to carry into effect the provisions of this Section.

### SECTION 11.05. INDEMNIFICATION.

Tenant shall indemnify, protect, defend and hold Landlord (and its shareholders, partners, owners, agents, contractors, servants, officers, directors, employees, licensees, successors and

15

assigns) and save it harmless from and against any and all claims, demands, actions, damages, liability and expense (including reasonable attorney's fees and costs of investigation with respect to any claim, demand or action) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, or any breach or Event of Default under this Lease by Tenant, or occasioned in whole or in part by any act or omission of Tenant, its agents, contractors, employees, servants, tenants or concessionaires, or any accident, injury or damage, howsoever and by whomsoever caused, to any person or property, occurring in or about the Premises. This indemnification shall not apply to damages resulting solely from the gross negligence or willful acts or omissions of Landlord or its authorized representatives, unless covered by insurance required to be carried by Tenant. In the event that Landlord without fault on its part be made a party to any litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and reasonable attorneys' fees (by counsel selected by Landlord) incurred or paid by Landlord in connection with such litigation.

Landlord shall indemnify, protect, defend and hold Tenant (and its shareholders, partners, owners, agents, contractors, servants, officers, directors, employees, licensees, successors and assigns) and save it harmless from and against any and all claims, demands, actions, damages, liability and expense (including reasonable attorney's fees and costs of investigation with respect to any claim, demand or action) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence, or any breach or Event of Default under this Lease by Landlord, or occasioned in whole or in part by any act or omission of Landlord, its agents, contractors, employees, servants, landlords or concessionaires, or any accident, injury or damage, howsoever and by whomsoever caused, to any person or property. This indemnification shall not apply to damages resulting solely from the gross negligence or willful acts or omissions of Tenant or its authorized representatives, unless covered by insurance required to be carried by Landlord. In the event that Tenant without fault on its part be made a party to any litigation commenced by or against Landlord, then Landlord shall protect and hold Tenant harmless and shall pay all costs, expenses and reasonable attorneys' fees (by counsel selected by Tenant) incurred or paid by Tenant in connection with such litigation.

### SECTION 11.06. LOSS OR DAMAGE.

Landlord shall not be liable for any damage to property of Tenant or of others located on the Premises, or in the Shopping Center, loss of or damage to any property of Tenant or of others by theft or otherwise. Landlord shall not be liable for any injury or damage to persons or property resulting from fire, earthquake, flood, explosions, falling plaster, steam, gas, electricity, water, rain or snow, or leaks from any part of the Premises or from the pipes, appliances or plumbing works or by any other cause of whatever nature. Landlord shall not be liable for any such damage caused by any other tenants or persons in the Premises, occupants of adjacent property of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-public work. Notwithstanding the above, this Section shall not apply where such damage, loss or injury is caused by the willful misconduct or gross negligence of Landlord. The provisions of Sections 11.05 and 11.06 shall survive the expiration or earlier termination of this Lease, and shall inure to the benefit of any lender holding a lien against the Shopping Center superior to Tenant.

### ARTICLE XII
### UTILITIES

### SECTION 12.01. UTILITY CHARGES.

A.    From the Commencement Date of this Lease, Tenant shall be solely responsible for and promptly pay before delinquency all charges for heat, air conditioning, water, gas, electricity, telephone service, internet, telecommunications, trash removal, sewer service, or any other utility or service used or consumed in the Premises, together with the cost of meter and hook-up fees. Should Landlord elect to supply any such item, or any other utility or service used or consumed in the Premises, Tenant agrees to purchase and pay the reasonably competitive charges for the same as additional rent as apportioned by the Landlord, under the provisions of Sections 13.01 and 13.02. Except to the extent caused by the negligence or intentional misconduct of Landlord, in no event shall Landlord be liable for an interruption or failure in the supply of any such utilities to the Premises. Tenant hereby waives the provisions of California

16

Civil Code Section 1932(1) or any other applicable existing or future law, ordinance, or governmental regulation permitting the termination of this Lease due to such interruption or failure.

B.      In the event any governmental or quasi-governmental agency having jurisdiction over the Premises or the Shopping Center creates or revises any law, regulation, code or ordinance, or creates any mandatory or voluntary controls or guidelines on Landlord, the Premises, or Shopping Center, relating to the conservation of energy or utilities ("Controls"), Landlord may comply with any and all such Controls, without any liability to Tenant, or creating any right for Tenant to terminate the Lease or to recover damages from Landlord.

C.      Tenant shall pay its pro rata share of sewer charges, fees and assessments based upon Tenant's actual water consumption thereof.

### ARTICLE XIII
### PAYMENTS AND ALLOCATIONS OF COSTS

### SECTION 13.01. PAYMENT OF COSTS.

A.      Tenant shall pay to Landlord Tenant's pro rata share of real property taxes and assessments, other taxes, utility costs, Common Area Costs, insurance costs and management fees, from and after the date the Term has commenced, but subject to adjustments as hereinafter provided. Tenant shall pay Landlord on the first day of each calendar month in advance during the Term an amount estimated by Landlord to be Tenant's pro rata share of such costs. (The amount of Tenant's initial pro rata monthly share of such costs at the commencement of this Lease shall be zero ($0.00) to be remitted monthly without further billing. This initial monthly charge may be adjusted at such times as Landlord deems appropriate on the basis of Landlord's experience and reasonably anticipated costs.)

B.      Quarterly, semi-annually or, at Landlord's option, each calendar year, Landlord shall make an accounting of the total of the aforementioned costs incurred and shall determine Tenant's pro rata share of those items under the provisions of Section 13.02. If such costs exceed the total monthly payments made by Tenant, Tenant shall reimburse the amount of such excess within thirty (30) days of a billing from Landlord. If Tenant's share of such costs is less than the total amount of monthly payments made by Tenant, Landlord shall refund the difference to Tenant or, at Landlord's option, shall apply such difference to any amounts otherwise due Landlord.

C.      At the end of each accounting period, the monthly payments to be made by Tenant shall be adjusted to reflect any increase or decrease in the estimated costs described above for the ensuing calendar quarter or year.

D.      Notwithstanding the foregoing provisions to the contrary, at the option of the Landlord, Tenant shall pay its proportionate share of the Common Area Costs to be paid as Additional Rent in the following manner:

1.      Tenant shall pay Landlord Tenant's proportionate share of real property taxes, assessments and other taxes annually within fifteen (15) days of receipt of Landlord's written statement therefore accompanied by a copy of the corresponding tax bills.

2.      Tenant shall pay Landlord Tenant's proportionate share of insurance premiums for insurance carried by Landlord on Shopping Center improvements and on the Common Areas annually within fifteen (15) days of receipt of Landlord's written statement therefore.

3.      Utility costs and Common Area Costs shall be determined by Landlord periodically, but not more often than quarterly, and Tenant shall pay Landlord Tenant's proportionate share of said costs within fifteen (15) days of receipt of Landlord's written statement therefore.

### SECTION 13.02. ALLOCATION OF COSTS.

Tenant's proportionate share of costs to be paid as additional rent shall be determined by applying the following ratio to the total costs:

17

Laurelwood Rite Aid – San Mateo FINAL

| | |
|---|---|
| Numerator: | Number of square feet leased by Tenant as stated in Section 1.01. |
| Denominator: | Number of total constructed gross leasable square feet in the Tenant's building or the entire Shopping Center, as applicable in Landlord's reasonable discretion. Leasable shall mean leased or designated for lease, with the gross leasable area calculated in the same manner as the number of square feet leased by Tenant. |

To the extent that certain costs are specifically allocable to a particular building or area, Landlord, in its sole discretion, may equitably allocate such cost to that specific building or area. From time to time Landlord may adjust its method of allocation of costs so long as such reallocation does not unreasonably impose upon any tenant an unfair share of the costs.

### SECTION 13.03. INTENTION REGARDING COSTS.

It is the intention of Landlord and Tenant that the Monthly Rent paid to Landlord throughout the Term or any Extended Term of this Lease shall be absolutely net of all costs set forth in this Article XIII. Landlord shall not provide any other services other than those specifically set forth in this Lease.

### SECTION 13.04.    AUDIT RIGHTS

Landlord will keep at the Shopping Center, complete, accurate books of account and records with respect to the Common Area Costs and will retain such books and records and reasonable supporting documentation for at least two (2) years from the end of the period to which they are applicable. Tenant's payment of Tenant's Share of Common Area Costs will be without prejudice to Tenant's examination and audit rights. Tenant may at any reasonable time during normal business hours, on thirty (30) days' prior written notice to Landlord, cause a complete audit to be made of those books, records and other materials which Landlord is required to retain for all or any part of the two (2) years immediately preceding the giving of that notice. Tenant may require Landlord to produce such information about the books and records as is necessary for a proper examination and audit thereof and to make the books and records available to Tenant for examination and audit. Any such audit will be conducted in a manner so as to minimize interference with Landlord's business operations. If the audit discloses any overpayment by Tenant of Tenant's Share of Common Area Costs, Landlord will refund to Tenant the amount of the overpayment within thirty (30) days following Landlord's receipt of the audit. If the audit discloses any underpayment by Tenant of Tenant's Share of Common Area Costs, Tenant will pay the amount of that deficiency to Landlord together with delivery to Landlord of the audit within thirty (30) days of the audit. If the audit discloses an overpayment by Tenant of Tenant's Share of Common Area Costs by five percent (5%) or more, Landlord will pay to Tenant thirty (30) days after demand Tenant's reasonable cost in conducting the audit (as evidenced by invoices or other reasonable supporting documents delivered to Landlord).

### ARTICLE XIV
### MORTGAGEE PROVISIONS

### SECTION 14.01. ESTOPPEL CERTIFICATE.

Tenant shall execute, acknowledge and deliver to Landlord at any time within ten (10) days after request, a statement in writing certifying, if such be the case, that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified), the date of commencement and termination of this Lease, the dates to which rent and other charges have been paid, and such other information as Landlord shall reasonably request, including the existence of modifications and defaults, such statement shall be on Tenant's standard form. It is acknowledged by Tenant that any such statement is intended to be delivered by Landlord and relied upon by prospective purchasers and lenders.

### SECTION 14.02. ATTORNMENT.

In the event of any proceedings for the foreclosure or the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant immediately and automatically shall attorn to and recognize such purchaser as the Landlord

Laurelwood Rite Aid – San Mateo FINAL

hereunder, and this Lease shall remain in full force and effect as a direct lease between the purchaser and Tenant.

### SECTION 14.03. SUBORDINATION.

This Lease is expressly made subject to and subordinate to any deed of trust, mortgage, ground lease, underlying lease, or other method of financing or refinancing, now or hereafter in force against the Shopping Center ("Encumbrance") and to all advances made or hereafter to be made thereunder. This section shall be self-operative and no further instrument or subordination shall be necessary unless required by a lender. Notwithstanding the foregoing, any subordination shall expressly provide that Tenant's rights under this Lease shall not be disturbed following any action by such lender to enforce its rights under any Encumbrance. Within thirty (30) days following the execution of this Lease, Landlord shall cause to be delivered a non-disturbance agreement, in recordable form, from the holder of any mortgage or deed of trust encumbering the Shopping Center ensuring Tenant's right of possession.

### ARTICLE XV
### ASSIGNMENT AND SUBLETTING

### SECTION 15.01.    CONSENT REQUIRED.

(A)    Subject to the provisions of Section 15.01(F) below, Tenant shall not (a) assign this Lease, or any interest therein, (b) sublet all or any part of the Premises; or (c) transfer any interest in this Lease, whether voluntary, involuntary or by operation of law, to any person partnership, corporation or other entity without first obtaining the prior written consent of Landlord in each instance. Landlord's consent shall not be unreasonably withheld. The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting.

(B)    Subject to the provisions of Section 15.01(F) below, if this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by anyone other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the rent herein reserved, but such assignment, sublease, occupancy or collection shall not be deemed a waiver of this covenant or the acceptance of the assignee, sublessee or occupant as tenant, or a release of Tenant from the further performance of covenants on the part of Tenant herein contained. Tenant shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants and conditions of this Lease.

(C)    Notwithstanding anything in this Article XV to the contrary, Landlord hereby consents to the assignment, subletting or transfer of this Lease by Tenant to any corporation which owns or controls Tenant, to any corporation owned or controlled by Tenant, to any corporation owned or controlled by or affiliated with any corporation which owns or controls Tenant, or to any corporation resulting from a consolidation, or to the surviving corporation in case of a merger, to which consolidation or merger Tenant shall be a party, or to a corporation to which all or substantially all of the assets of Tenant have been sold. In addition, Landlord's consent shall not be required for any subleasing of departments or concessions within the Premises provided such sublease does not affect more than twenty-five percent (25%) of the square footage of the Premises.

(D)    Tenant shall reimburse Landlord, as additional rent, the sum of Two Thousand Five Hundred Dollars ($2,500.00) for Landlord's reasonable costs incurred in conjunction with the processing and documentation of any such requested transfer, assignment, subletting, or change of ownership relating to this Lease or Tenant's interest in and to the Premises. Landlord, in its reasonable discretion, may determine that the above fee is insufficient to cover Landlord's various costs and fees and may, as a condition to proceeding further with such matter, require Tenant to fully reimburse Landlord for all attorneys' fees and costs incurred by Landlord in connection with such assignment, subletting or change of ownership.

E.    Before entering into any assignment of this Lease or into a sublease of all or part of the Premises, Tenant shall give written notice to Landlord identifying the intended assignee or sublessee by name, address, and phone number, and specifying the terms of the intended assignment or sublease. Tenant covenants that it shall not assign this Lease or sublease any portion of the Premises for any use which is prohibited pursuant to any written exclusive use

19

provision between Landlord and any tenant of the Shopping Center, which is in effect at the time of such proposed assignment or sublease and of which Tenant has receive written notice from Landlord pursuant to Section 22.06, below.

F. Any one or more of the acts prohibited by this Section 15.01, without Landlord prior written consent, shall be void and, at the option of Landlord, shall terminate this Lease. Except with the prior written consent of Landlord, which consent may be withheld or conditioned in Landlord's discretion, no sublease or assignment shall result in the Premises being operated as anything other than (a) a single tenant occupied store; or (b) a drug store, pharmacy or apothecary.

**SECTION 15.02. RIGHT TO TRANSFER.**

The term "**Landlord**," as used in this Lease, shall mean only the owner or owners of the Shopping Center at the time in question. Landlord shall have the right to sell, assign, transfer or otherwise dispose of, in whole or in part, the Shopping Center and/or Premises of which is a part, and be released from all obligations hereunder; provided, however, that such release shall not be applicable to any obligations which have accrued on the part of the selling or assigning Landlord prior to the time of such sale, assignment or other disposition.

**SECTION 15.03. SUCCESSORS AND ASSIGNS.**

Subject to the provisions of Section 15.01, above, all rights, obligations, and liabilities herein given shall inure to the benefit of and shall extend to and bind the respective heirs, executors, administrators, successors, and assigns of the parties. If there shall be more than one tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless such assignment has been approved by Landlord in writing as provided in Section 15.01 hereof.

**ARTICLE XVI**
**TOTAL OR PARTIAL DESTRUCTION.**

**SECTION 16.01.** If the Premises shall be damaged by fire, the elements, or other insured casualty, but are not thereby rendered untenantable in whole or in part, then Landlord shall cause such damage to be repaired, and the rent shall not be abated. If by reason of such occurrence the Premises shall be rendered untenantable only in part, to the extent of requiring repairs of fifty percent (50%) or less of the then replacement value, then Landlord shall cause the damage to be repaired (except those additions, alterations, fixtures and similar items originally installed by Tenant), and the Minimum Rent and Additional Rent meanwhile shall be abated proportionately as to the portion of the Premises rendered untenable until Landlord completes the work required of it. If the Premises shall be rendered wholly untenantable or damaged to the extent of requiring repairs of more than fifty percent (50%) of the then replacement value by reason of such occurrence, then Landlord may cause such damage to be repaired, or Landlord may, at its election, terminate this Lease and the tenancy hereby created by giving to Tenant written notice not later than sixty (60) days following date of such occurrence. If Landlord elects to repair the damage, then the Minimum Rent and any other charges under the Lease hereunder payable by Tenant shall be abated proportionately as to the portion of the Premises rendered untenantable.

**SECTION 16.02.** If the Premises are damaged by any cause not covered by any required insurance and the cost to repair such damage does not exceed thirty percent (30%) of the then replacement value of the premises, then Landlord shall at its own expense cause such damage to be repaired. If the cost to repair such damage exceeds thirty percent (30%) of the then replacement value of the Premises, Landlord shall have the right, at its election, to terminate this Lease and the tenancy hereby created by giving to Tenant written notice not later than sixty (60) days following date of such occurrence. If Landlord elects to repair the damage, the Minimum Rent hereunder payable by Tenant shall be abated proportionately as to the portion of the Premises rendered untenantable.

**SECTION 16.03.** Nothing in this Article XVI shall be construed as a limitation of Tenant's liability for such occurrence, should such liability otherwise exist.

**SECTION 16.04.** Landlord shall not be required to repair any injury or damage by fire or other cause, or to make any repairs or replacements of any fixtures, contents, or any other property

20

contained or installed in the Premises by Tenant. Anything to the contrary contained in this Article XVI notwithstanding, Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises when the damage resulting from any casualty covered under this Article occurs during the last twelve (12) months of the Term or any Extended Term unless Tenant exercises a remaining option to extend the Term in which event Landlord's termination right shall be nullified.

**SECTION 16.05.** Nothing contained herein shall require Landlord to restore alterations made by Tenant, Tenant's improvements, Tenant's trade fixtures, or Tenant's personal property, such excluded items being the sole responsibility of Tenant to restore.

**ARTICLE XVII**
**EMINENT DOMAIN**

**SECTION 17.01. TOTAL OR PARTIAL CONDEMNATION.**

A.    If the whole of the Premises or Common Areas, or if any portion thereof which in Landlord's reasonable judgment shall render the Premises unsuitable for the business of the Tenant, shall be condemned by eminent domain or acquired in lieu thereof for any public or quasi-public use or purpose (a "**taking**"), then the Term or any Extended Term shall cease and terminate as of the date of title vesting in the condemnor, all rentals shall be paid up to that date, and Tenant shall have no claim against Landlord for the value of any unexpired term.

B.    In the event of a partial taking which is not so extensive as to render the Premises unsuitable for the business of Tenant, then Landlord shall within reasonable time restore the Common Areas and/or the Premises to a condition comparable to that at the time of such condemnation less the portion lost in the taking, and this Lease shall continue in full force and effect.

C.    A voluntary sale by Landlord to any public or quasi-public body or agency having the power of eminent domain in lieu of condemnation shall be deemed to be a taking by eminent domain.

**SECTION 17.02. LANDLORD'S AND TENANT'S DAMAGES.**

A.    In no event shall Tenant be entitled to any part of the award, as damages or otherwise, for any such taking and Landlord shall receive the full amount of any such award, Tenant hereby expressly waiving any right or claim to any part thereof. Tenant shall, nevertheless, have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded on account of any cost or loss to which Tenant might be entitled in removing Tenant's merchandise, furniture, fixtures, and equipment, provided that said compensation does not diminish the amount to be received by the Landlord.

B.    In the event this Lease is terminated pursuant to any provision of this Article XVII, or in the event Tenant's business is affected in any manner due to Landlord's repairs or restoration work, Tenant waives all claims against Landlord relating thereto.

C.    Each party waives the provisions of Code of Civil Procedure Section 1265.130 allowing either party to petition the superior court to terminate this lease in the event of a partial taking of the Premises.

**ARTICLE XVIII**
**DEFAULT**

**SECTION 18.01. DEFINITION OF DEFAULT.**

A.    Each of the following events is deemed to be a default hereunder ("**Event of Default**"):

1.    Tenant's interest, or any part of its interest, in this Lease is assigned or transferred in whole or in part, voluntarily or by operation of law, without Landlord's prior written consent.

21

2.    A finding or judgment of insolvency of Tenant is made; or a voluntary or involuntary petition in bankruptcy is filed; or a writ of execution on the business of Tenant or on the assets of Tenant located on the Premises is levied, which is not discharged within five (5) days after the date of said levying; or a petition for reorganization, or for an arrangement, is filed by or against Tenant, or any member of Tenant if Tenant is a partnership or joint venture; or a receiver is appointed of the business or of the assets of Tenant (except a receiver appointed at the instance or request of Landlord); or Tenant makes a general assignment, or any assignment for the benefit of its creditors.

3.    Tenant fails (a) in the payment of any sum due under this Lease for five (5) calendar days; or (b) in keeping of any other term, covenant or condition of this Lease, when such failure continues for fifteen (15) calendar days after notice thereof by Landlord.

## SECTION 18.02. LANDLORD'S REMEDIES.

A.    In the event of Tenant's default as defined in Section 18.01 hereof, in addition to all other rights and remedies which Landlord may have in equity or in law, Landlord shall have all of the following remedies:

1.    Landlord may terminate this Lease, enter into possession of the Premises and recover all Rents and other sums due under this Lease, or Landlord may sue and recover without entering into possession of the Premises, all without prejudice to any other remedies that Landlord may have. In the event of any such termination, Landlord shall have all the rights and remedies of a Landlord provided by law. The amount of damages which Landlord may recover includes: (a) the worth at the time of award of the unpaid rent or other charges which had been earned at the time of termination; (b) the worth at the time of award of the amount by which the unpaid rent or other charges which would have been earned after termination until the time of award exceeds the amount of loss of such rental and other charges that Tenant proves could have been reasonably avoided; (c) the worth at the time of award of the amount by which the unpaid rent and other charges for the balance of the Term after the time of award exceeds the amount of the loss of such rental and other charges for such period that Tenant proves could be reasonably avoided; and (d) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform his obligations under this Lease, or which the ordinary course of things would be likely to result therefrom. The "worth at the time of award" as utilized in sub-paragraphs (a) and (b) hereinabove shall be computed by allowing interest at the maximum rate allowed by law.

2.    Landlord shall have the right to continue this Lease in full force and effect. In such event, Landlord shall have the right to collect rents from Tenant when due, and shall have the right to enter the Premises and relet them, or any part of them, and Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Premises, including, without limitation, brokers' commissions, expenses of remodeling the Premises required by the reletting, and like costs. Reletting can be for a period shorter or longer than the remaining Term. Tenant shall pay to Landlord all Rents due under this Lease on the dates such rents are due, less the rents Landlord receives from any reletting. Any act by Landlord allowed by this paragraph (2) of Section 18.02, or any action in unlawful detainer, shall not terminate this Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate this Lease.

3.    If Landlord elects to relet the Premises as provided in this section, rent that Landlord receives from reletting shall be applied to the payment of: First, any indebtedness from Tenant to Landlord other than rent due from Tenant; Second, all costs, including for maintenance, incurred by Landlord in reletting; Third, rent due and unpaid under this Lease. After deducting the payments referred to in this section, any sum remaining from the rent Landlord receives from reletting shall be held by Landlord and applied in payment of future rent as rent becomes due under this Lease. In no event shall Tenant be entitled to any excess received by Landlord. If, on the date the rent is due under this Lease, the rent received from reletting is less than the rent due on that date, Tenant shall pay to Landlord, in addition to the remaining rent due, all costs including maintenance, Landlord incurred in reletting that remain after applying the rent received from the reletting as provided in this section.

4.    Landlord shall have the right to cause a receiver to be appointed in any action against Tenant to take possession of the Premises and/or to collect the rents or profits derived therefrom. Said receiver may, if it is necessary or convenient in order to collect such

22

rents or profits, take possession of any property belonging to Tenant and used in the conduct of such business and may use the same in conducting such business on the Premises without compensation to Tenant for such use. Neither the application for the appointment of such receiver nor the appointment of such receiver shall constitute an election on the part of Landlord to terminate this Lease unless a written notice of such intention is given to Tenant.

## ARTICLE XIX
## ATTORNEYS' FEES

In the event of any action at law or in equity to interpret or enforce the provisions of this Lease, the successful party shall be entitled to recover from the other reasonable attorneys' fees and costs. If Landlord, without fault on its part, be made a party to any litigation instituted by or against Tenant, then Tenant shall pay to Landlord all costs and expenses incurred by Landlord, including attorneys' fees.

## ARTICLE XX
## ACCESS BY LANDLORD

Landlord or Landlord's agents shall have the right, but not the obligation, to enter the Premises at all reasonable times to examine the same, to post or keep posted thereon notices as permitted or provided by law which Landlord may deem to be proper for the protection of Landlord's interests, to show said premises to prospective purchasers, lenders or lessees, and to make such repairs, alterations, improvements, or additions as Landlord may deem necessary or desirable. Landlord shall be allowed to take all material into and upon the Premises that may be required therefore without the same constituting an eviction of Tenant in whole or in part and the rent reserved shall in nowise abate while said repairs, alterations, improvements or additions are being made, by reason or loss or interruption of business of Tenant, or otherwise. During the six (6) months prior to the expiration of the Term or any Extended Term, Landlord may place upon the Shopping Center (but not the Premises) any signage marketing the availability of the Premises for lease.

## ARTICLE XXI
## INTENTIONALLY DELETED

## ARTICLE XXII
## MISCELLANEOUS

**SECTION 22.01. WAIVER.**

The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord, unless such waiver is in writing by Landlord.

**SECTION 22.02. SATISFACTION AND ACCORD.**

No payment by Tenant or receipt by Landlord of a lesser amount than the rent and additional rent herein provided shall be deemed to be other than on account of the earliest amount due and payable hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such rent or additional rent or to pursue any other remedy provided for in this Lease.

**SECTION 22.03. ENTIRE AGREEMENT.**

This Lease and the Exhibits, and any Riders attached hereto and forming a part hereof set forth all the covenants, agreement and conditions between Landlord and Tenant concerning the Premises, and there are no covenants, agreements or conditions either oral or written between them other than are herein set forth. Except as herein otherwise provided, no subsequent

23

alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by the party to be charged with such performance.

### SECTION 22.04. NO PARTNERSHIP.

Landlord does not, in any way for any purpose, become a partner of Tenant in the conduct of its business or otherwise, or joint venturer or member of a joint enterprise with Tenant. The provisions of this Lease relating to the Percentage Rent payable hereunder are included solely for the purpose of providing a method whereby the rent is to be measured and ascertained.

### SECTION 22.05. DELAYS.

If either party, except as otherwise herein specifically provided, shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be executed for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 22.05 shall not operate to excuse Tenant from the prompt payment of rent, percentage rent, additional rent or any other payments required by the terms of this Lease.

### SECTION 22.06. NOTICES.

All notices or demands under this Lease shall be in writing, and shall be deemed delivered when delivered by facsimile as confirmed by sender's receipt of a facsimile transmission confirmation or deposited in the United Sates mail, certified or registered mail, postage prepaid, addressed to:

| | |
|---|---|
| Tenant: | Thrifty Payless, Inc.<br>Attention: Corporate Secretary<br>30 Hunter Lane<br>Camp Hill, PA 17011 |
| | Phone:   (717) 761-2633<br>Fax:       (717) 975-5952 |
| Landlord: | Carstens Realty, a California corporation<br>Attention: Linda Carstens Hall, Treasurer<br>1206 W. Hillsdale Boulevard, Suite A<br>San Mateo, CA  94402 |
| | Phone:   (650) 349-0431<br>Fax:       (650) 349-0367 |

or to such other address as either party may from time to time by notice designate for this purpose.

### SECTION 22.07. CAPTIONS AND SECTION NUMBERS.

The captions, section numbers, article numbers, and index appearing in this Lease are inserted for convenience only and shall in no way define, limit, construe or describe the scope or intent of such sections or articles of this Lease or in any way affect this Lease.

### SECTION 22.08. TENANT DEFINED AND USE OF PRONOUN.

The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof, and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference,

24

even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations.

## SECTION 22.09. PARTIAL INVALIDITY.

If any term, covenant or condition of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, then the remainder of this Lease, or the other application of such term, covenant, or condition shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## SECTION 22.10. CALIFORNIA LAW.

This Lease shall be governed and interpreted by the laws of the State of California.

## SECTION 22.11. NON-RESPONSIBILITY OF LANDLORD'S PRINCIPALS.

Tenant hereby agrees that it shall look solely to the equity of Landlord in the Shopping Center including rents, issues, profits and insurance proceeds, and not to Landlord's other assets or those of Landlord's shareholders, officers, directors, principals or investors for any satisfaction, assertion, or remedy Tenant may have against Landlord in the event of breach by Landlord of any covenants or conditions in this Lease.

## SECTION 22.12. AUTHORITY.

The undersigned hereby represent and warrant that they are properly empowered and authorized to execute this Lease.

## SECTION 22.13.   INFORMATION. Intentionally deleted.

## SECTION 22.14. BROKERS' COMMISSION.

Landlord and Tenant each represents and warrants that there are no claims for brokerage commissions of finders' fee in connection with the execution of this Lease and each party agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claim, including, without limitation, the cost of attorneys' fees in connection therewith.

## SECTION 22.15. TIME.

TIME IS OF THE ESSENCE of this Lease and of each and every provision thereof.

## SECTION 22.16. SURVIVAL

Each and every agreement by Tenant to indemnify and hold Landlord harmless shall survive the expiration or termination of this Lease, including any extension periods.

## SECTION 22.17.  SHORT FORM OF LEASE

Concurrent with the execution of this Lease, the parties shall execute and acknowledge a Memorandum of Lease in the form attached hereto as Exhibit "E" (the "Memorandum"), which designates the parties in interest, the Term and the Premises. The Memorandum, not this Lease, shall be recorded with the San Mateo County Recorder's Office. Furthermore, the parties shall also execute and acknowledge a Quitclaim of Memorandum of Lease in the form attached hereto as Exhibit "F" (the "Quitclaim"), which Landlord shall hold, unrecorded, until the expiration or earlier termination of the Term of this Lease, at which time Tenant hereby authorizes Landlord to record the Quitclaim with the San Mateo County Recorder's Office.

25

IN WITNESS WHEREOF, the parties have executed this Lease on the day and year first above written.

LANDLORD:                                             TENANT:

Carstens Realty                                       Thrifty Payless, Inc.
a California Corporation                               a California corporation

By: _____                         By: _____
    Linda Carstens Hall                                   Its: Vice President & Asst. Secretary
Its:    Treasurer

By: _____                         By: _____
    Chris Carstens                                        Its: _____
Its:    President

26

# EXHIBIT "A"

## SHOPPING CENTER PLOT PLAN



EXHIBIT "B"

## TENANT'S REMODEL SCOPE OF WORK

### Remodel Scope

1) Exterior:
   a) Refurbish exterior signage. Replace plexi face material that is faded on "Pharmacy" and "Cosmetic" fascia signs. Re-lamp the signs.
   b) Clean "Rite Aid" sign.
   c) Clean up exterior storefront.
   d) Install window décor film on glazing of display windows.
   e) Power wash sidewalk.
   f) Provide entry floor finish and mat system.

2) Interior Ceiling:
   a) Replace all interior ceiling tile on sales floor. Repair any damaged t-bar grid.
   b) Add Customer World ceiling décor features.
   c) Clean and repair HVAC diffusers.
   d) Clean up ceiling light fixtures and replace or repair any inoperative lighting.

3) Interior Floor:
   a) Refurbish entire store flooring and floor base.
   b) Replace damaged VCT flooring, approximately 3,000sf.
   c) Replace damaged carpet at the pharmacy area.
   d) Refurbish flooring in restrooms and office area.
   e) Complete full strip and wax at completion.

4) Interior Paint:
   a) Prep and repaint interior sales floor, pharmacy, restrooms, office, and other areas of store in Customer World colors.

5) Sales Floor:
   a) Refurbish existing wall finishes as need.
   b) Upgrade interior graphics to Customer World remodel design.
   c) Replace perimeter valance material to Customer World finishes.
   d) Install new steel shelving on wall line. Supplement new parts throughout the remainder of the sales floor as needed. e) Install new checkstands.
   f) Install new camera area fixtures.
   g) Upgrade vendor racks and displays.
   h) Reset merchandise throughout store.

6) Pharmacy:
   a) Refurbish existing pharmacy finishes, floor and ceiling.
   b) Install new drop off window.
   c) Install new pickup counters.
   d) Refurbish cabinets, counters, pill bays, and checkstands.

7) Backroom:
   a) Refurbish existing office finishes.
   b) Refurbish existing restrooms as needed.
   c) Clean up existing employee lounge. Include new cabinets, fixtures, and equipment as needed.

**EXHIBIT "C"**

**LANDLORD'S SIGN CRITERIA**







## EXHIBIT "D"

## GUARANTY

THIS GUARANTY AGREEMENT is given this _____ day of _____
_____, 2012, by **RITE AID CORPORATION**, a Delaware corporation
("**Guarantor**"), to **CARSTENS REALTY**, a California corporation ("**Landlord**") with respect
to a Lease (the Lease") between Landlord and **THRIFTY PAYLESS, INC.,** ("**Tenant**") for
premises described in the Lease.

**WITNESSETH:** As an inducement to Landlord to execute the Lease, and in
consideration thereof, Guarantor agrees with Landlord as follows:

1.     Guarantor represents that it owns all of the issued and outstanding capital stock of
Tenant, that Tenant is a dully organized corporation, and that all corporate action requisite for
Tenant's execution of the Lease has been dully taken.

2.     Guarantor unconditionally guarantees to Landlord the full and prompt payment of
all Minimum Rent and additional rent required to be paid by Tenant under the lease, the prompt
and full performance and observance of all obligations required to be performed and observed by
Tenant under the Lease, and the prompt payment of all other obligations and damages for which
Tenant may be legally liable to Landlord.

3.     In any action brought by Landlord under paragraph 2 of this Guaranty, Guarantor
shall not interpose or be entitled to the benefit of any defenses that are not or would not be
available to Tenant if the same action were brought by Landlord against Tenant, including, but
not limited to, defenses based upon modifications of the Lease, upon extensions, indulgences, or
forbearances granted to Tenant, upon delay by Landlord in enforcing Tenant's obligations under
the Lease, or upon failure of Landlord to notify Guarantor of any Lease modifications or any
extensions, indulgences, or forbearances granted to Tenant; and Guarantor expressly waives all
defenses negated by this paragraph 3.

4.     Any notices given to Tenant under or with respect to the Lease shall be
conclusively deemed to have been simultaneously given to Guarantor.

5.     Guarantor's liability under this Guaranty Agreement shall not in any way be
affected by any assignment of the Lease or a subletting of the premises demised under the Lease.

6.     No discharge, modification, impairment or limitation of the obligations of Tenant
to its creditors generally, or to Landlord under the Lease, under any law relation to bankruptcy,
insolvency, arrangements with creditors or corporate reorganizations, shall in any way affect or
discharge Guarantor's obligation hereunder.  If any trustee, receiver, or conservator of Tenant
appointed under any Federal or State law relating to bankruptcy, insolvency, arrangements with
creditors or corporate reorganization, rejects the Lease pursuant to any right to do so under any
such law, Guarantor's obligations hereunder shall not thereby be affected but shall remain in full
force and effect the same as if the Lease had not been rejected but continued in force.

7.     If Landlord files any action against Guarantor to collect Minimum Rent or
Additional Rent payable under the Lease or any other obligations for which Tenant is legally
liable to Landlord, and a judgment is rendered for Landlord with respect thereto, then Guarantor
shall pay all reasonable counsel fees and costs and expenses of litigation (including expert
witness fees and costs) incurred by Landlord in such action.

8.     Within ten (10) days after Landlord's written request to Guarantor, Guarantor
shall execute and deliver to Landlord a statement in writing setting forth any amendments to this
Guaranty and stating whether or not this Guaranty is in full force and effect and setting forth
what reasons or defenses, if any, support any claim that this Guaranty is not in full force and
effect.  Guarantor acknowledges that such statement may be required in order for Landlord to
consummate a sale or mortgage loan, and that a purchaser or lender will be entitled to rely on
such statement.

9.     Guarantor consents to suit in the state and federal Courts of the State of California
on or with respect to this Guaranty Agreement.  Guarantor waives any objection to the venue of

any action filed by Landlord against Guarantor in any state or federal court of the State of California (which court shall apply and interpret California law) and waives any claim of forum non conveniens or for transfer of any such action to any other court.

10. Guarantor shall, upon request of Landlord, promptly join in the execution of all stipulations and agreements referred to in the Lease.

11. Any notice which Landlord may elect to send to Guarantor shall be binding upon Guarantor if mailed by United States Postal Service Express Mail to the Guarantor at P.O. Box 3165, Harrisburg, PA, 17105, Attn: Secretary, or its last address known to Landlord, or by nationally recognized overnight courier service to Guarantor at 30 Hunter Lane, Camp Hill, PA, 17011, Attention: Secretary.

12. Guarantor waives acceptance of this Guaranty. Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement. Without limiting the generality of the foregoing, Guarantor hereby waives any and all benefits of the provisions of Sections 2809, 2810 and 2845 of the California Civil Code and any similar or analogous statutes of California or any other jurisdiction.

13. Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

14. Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor. Without limiting the generality of the foregoing, Guarantor hereby waives any and all benefits of the provisions of Sections 2819, 2849 and 2850 of the California Civil Code and any similar or analogous statutes of California or any other jurisdiction.

15. This Guaranty Agreement shall be binding upon the successors of Guarantor, and the term "Guarantor," as used herein, includes such successors. This Guaranty Agreement shall inure to the benefit of Landlord's successors and assigns, and the term "Landlord," as used herein, includes such successors and assigns. The term "Tenant," as used herein, includes the permitted successors and assigns of Tenant.

IN WITNESS WHEREOF, this Guaranty under seal has been duly signed and sealed by the Guarantor, as of the day and year first above written.

Rite Aid Corporation,
a Delaware corporation

By:_____
Its:

By:_____
Its:

EXHIBIT "E"

## MEMORANDUM OF LEASE

| | |
|---|---|
| RECORDED AT THE REQUEST OF | ) |
| AND WHEN RECORDED RETURN TO: | ) |
| | ) |
| Thrifty Payless, Inc. | ) |
| 30 Hunter Lane | ) |
| Camp Hill, PA 17011 | ) |
| Attn: Corporate Secretary | ) |

---

### MEMORANDUM OF LEASE

This Memorandum of Lease is entered into this _____ day of _____, 2012, by and between CARSTENS REALTY, a California corporation (Landlord), and THRIFTY PAYLESS INC., a California corporation (Tenant).

1.      LEASED PREMISES.  By that certain Lease Agreement of even date herewith ("Lease"), Landlord has leased to Tenant the premises situated on the Land located at 1320 West Hillsdale boulevard, San Mateo, California, legally described on Exhibit A attached hereto (the "Leased Premises") and by this reference incorporated herein.

2.      TERM.  The Lease commences June 1, 2014, and terminates fifteen (15) years thereafter, or through May 31, 2029, unless otherwise extended.

3.      OPTIONS TO EXTEND.  Landlord grants to Tenant under said Lease the right to extend the Lease for two (2) consecutive extended terms of five (5) years each, each extended term to begin on the expiration of the preceding term, pursuant to the terms and conditions of the Lease.

4.      CONTROLLING DOCUMENT.  The Lease described in paragraph 1, above shall control this Memorandum of Lease in the event of any inconsistency between them.

IN WITNESS WHEREOF this Memorandum of Lease has been signed by the parties on the day and year first above written.

| LANDLORD: | TENANT: |
|---|---|
| CARSTENS REALTY, | THRIFTY PAYLESS, INC., |
| a California corporation | a California corporation |
| | |
| By:_____ | By:_____ |
| Its:_____ | Its:_____ |
| | |
| By:_____ | By:_____ |
| Its:_____ | Its:_____ |

STATE OF CALIFORNIA     )
             )
COUNTY OF SAN MATEO    )

   On _____, 2012, before me, _____, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

   I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

   WITNESS my hand and official seal.


Signature _____  (SEAL)


STATE OF CALIFORNIA     )
             )
COUNTY OF SAN MATEO    )

   On _____, 2012, before me, _____, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

   I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

   WITNESS my hand and official seal.


Signature _____  (SEAL)

EXHIBIT "F"

<u>QUITCLAIM OF MEMORANDUM OF LEASE</u>

| | |
|---|---|
| RECORDED REQUESTED BY AND<br>WHEN RECORDED MAIL TO:<br><br>CARSTENS REALTY,<br>a California corporation<br>1206 West Hillsdale Boulevard, Suite A<br>San Mateo, CA  94403 | )<br>)<br>)<br>)<br>)<br>)<br>) |

## QUITCLAIM

The undersigned, THRIFTY PAYLESS, INC., a California corporation, hereby irrevocably quitclaims, releases and relinquishes to CARSTENS REALTY, a California corporation, all of the undersigned's right, title and interest, if any, in, to and under (i) that certain Memorandum of Lease recorded on _____, 2012, as Instrument No. _____ in the Official Records of County of San Mateo, State of California (the "Memorandum"), (ii) the Lease (as defined in the Memorandum) and (iii) the Leased Premises (as defined in the Memorandum).

IN WITNESS WHEREOF, this Quitclaim has been executed as of _____, 20___.

THRIFTY PAYLESS, INC.,
a California corporation

By:_____

Its:_____

By:_____

Its:_____

STATE OF CALIFORNIA )
)
COUNTY OF SAN MATEO )

On _____, 2012, before me, _____, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her/their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____    (SEAL)


STATE OF CALIFORNIA )
)
COUNTY OF SAN MATEO )

On _____, 2012, before me, _____, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____    (SEAL)

## EXHIBIT "R"

## SHOPPING CENTER RULES AND REGULATIONS

The following rules and regulations shall apply, where applicable, to the Premises, the Shopping Center, the parking facility, the Property, and the appurtenances. Capitalized terms have the same meaning as defined in the Lease.

1. Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises. No rubbish, litter, trash, or material shall be placed, emptied, or thrown in those areas. At no time shall Tenant permit Tenant's employees, its agents, representatives or invitees to loiter in the Common Areas or elsewhere about the Shopping Center.

2. All garbage and refuse shall be kept in containers specified by Landlord, which shall be placed outside of the Premises in the manner and at the times and places specified by Landlord.

3. Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed in the fixtures or appliances. Damage resulting to fixtures or appliances by Tenant, its employees, agents, representatives or invitees, shall be paid for by Tenant, and Landlord shall not be responsible for the damage.

4. No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Shopping Center or the Project, except those of such color, size, style and in such places as are first approved in writing by Landlord. All tenant identification and suite numbers at the entrance to the Premises shall be installed by Landlord, at Tenant's cost and expense, using the standard graphics for the Shopping Center and otherwise in compliance with Landlord's Sign Criteria. Except in connection with the hanging of lightweight pictures and wall decorations, no nails, hooks or screws shall be inserted into any part of the Premises or the Shopping Center except by the Shopping Center maintenance personnel.

5. Landlord may provide and maintain in the Common Areas of the Shopping Center as determined by Landlord an alphabetical directory board or other directory device listing tenants, and no other directory shall be permitted without Landlord's prior written consent.

6. Tenant shall not place any locks on any door in the Premises or the Shopping Center without Landlord's prior written consent and Landlord shall have the right to retain at all times and to use keys to all locks within and into the Premises. A reasonable number of keys to the locks on the entry doors in the Premises shall be furnished by Landlord to Tenant at Tenant's cost, and Tenant shall not make any duplicate keys. All keys shall be returned to Landlord at the expiration or early termination of this Lease.

7. All contractors, contractor's representatives and installation technicians performing work in the Shopping Center shall be subject to Landlord's prior approval and shall be required to comply with Landlord's standard rules, regulations, policies and procedures, which may be revised from time to time.

8. Nothing shall be erected on the roof or exterior walls of the Premises or on the Common Areas without, in each instance, Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Any item so installed without such prior written consent may be removed without notice at Tenant's sole cost and expense.

9. No loud speakers, televisions, phonographs, radios, or other devices shall be used so as to be heard or seen outside the Premises. Tenant shall conduct its business

in a quiet and orderly manner so as not to create any unreasonable noises or interferences.

10. Movement in or out of the Shopping Center of furniture, fixtures or equipment, or dispatch or receipt by Tenant of merchandise or materials requiring the uses, stairways, loading dock areas, shall be restricted to hours designated by Landlord. Tenant shall obtain Landlord's prior approval by providing a detailed listing of the activity. If approved by Landlord, then the activity shall be under the supervision of Landlord and performed in the manner as required by Landlord. Tenant shall assume all risks for damage to articles moved and injury to any persons resulting from the activity. If equipment, property, or personnel of Landlord or of any other party is damaged or injured as a result of or in connection with such activity, then Tenant shall be solely liable for any resulting damage or loss.

11. Landlord shall have the right to approve the weight, size or location of heavy equipment or articles in and about the Premises. Damage to the Shopping Center by the installation, maintenance, operation, existence or removal of Tenant's property shall be repaired at Tenant's sole expense and at no cost or liability to Landlord.

12. Corridor doors, when not in use, shall be kept closed.

13. Tenant shall not: (1) make or permit any improper, objectionable or unpleasant noises or odors in the Shopping Center, or otherwise interfere in any way with other tenants or persons having business with them; (2) solicit business or distribute, or cause to be distributed, in any portion of the Shopping Center, handbills, promotional materials or other advertising; or (3) conduct or permit other activities in the Shopping Center that might, in Landlord's sole opinion, constitute nuisance.

14. No animals, except those assisting handicapped persons, shall be brought into the Shopping Center or kept in or about the Premises.

15. No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises or the Shopping Center. Tenant shall not, without Landlord's prior written consent, use, store, install, spill, remove, release or dispose of, within or about the Premises or any other portion of the Shopping Center, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or Hazardous Materials (as defined in section 5.01 (J) hereof) under the provisions of 42 U.S.C. Section 6901 *et seq.*, or any other applicable environmental law which may now or later be in effect. Tenant shall comply with all laws pertaining to and governing the use of the Hazardous Materials by Tenant, and shall remain solely liable for the costs of abatement and removal.

16. Tenant shall not use or occupy the Premises in any manner or for any purpose which might injure the reputation or impair the present or future value of the Premises or the Shopping Center. Tenant shall not use, or permit any part of the Premises to be used, for lodging, sleeping or for any other purpose that is not a Permitted Use (as defined in Section 5.01 hereof).

17. Tenant shall not take any action which would violate Landlord's labor contracts or which would cause a work stoppage, picketing, labor disruption or dispute, or interfere with Landlord's or any other tenant's or occupant's business or with the rights and privileges of any person lawfully in the Shopping Center or the Project (**"Labor Disruption"**). Tenant shall take the actions necessary to resolve the Labor Disruption, and shall have pickets removed and, at the request of Landlord, immediately terminate any work in the Premises that gave rise to the Labor Disruption, until Landlord gives its written consent for the work to resume. Tenant shall have no claim for damages against Landlord or any of the Landlord Related Parties, nor shall the Commencement Date of the Term be extended as a result of the above actions.

18.  Tenant shall not install, operate or maintain in the Premises or in any other area of
the Shopping Center, electrical equipment that would overload the electrical
system beyond its capacity for proper, efficient and safe operation as determined
solely by Landlord.  Tenant shall not furnish cooling or heating to the Premises,
including, without limitation, the use of electric or gas heating devices, without
Landlord's prior written consent.  Tenant shall not use more than its proportionate
share of telephone lines and other telecommunication facilities available to
service the Shopping Center.

19.  Tenant shall not operate or permit to be operated a coin or token operated vending
machine or similar device (including, without limitation, telephones, lockers,
toilets, scales, amusement devices and machines for sale of beverages, foods,
candy, cigarettes and other goods), except for machines for the exclusive use of
Tenant's employees, and then only if the operation does not violate the Permitted
Use hereof.

20.  Bicycles and other vehicles are not permitted inside the Shopping Center or on the
walkways outside the Shopping Center, except in areas expressly designated by
Landlord.

21.  Landlord may from time to time adopt systems and procedures for the security
and safety of the Shopping Center.  Tenant, its agents, employees, contractors,
guests and invitees shall each comply with Landlord's systems and procedures.

22.  Landlord shall have the right to prohibit the use of the name of the Shopping
Center or any other publicity by Tenant that in Landlord's sole discretion may in
any way impair or adversely affect the reputation of Landlord, the Shopping
Center or its desirability.  Promptly upon written notice from Landlord, Tenant
shall cease and desist from such publicity and failure to render timely compliance
constitutes an Event of Default as defined in Section 18.01 hereof.

23.  Tenant shall not canvass, solicit or peddle in or about the Shopping Center.

24.  Neither Tenant nor its agents, employees, contractors, guests or invitees shall
smoke or permit smoking in the Common Areas, unless the Common Areas have
been declared a designated smoking area by Landlord, nor shall the above parties
allow cigarette smoke or any noxious or offensive odor from the Premises to
emanate into the Common Areas or any other part of the Shopping Center.
Landlord shall have the right to designate the Shopping Center (including the
Premises) as a non-smoking property.

25.  Landlord shall have the right to designate and approve standard window
coverings for the Premises and to establish rules to assure that the Shopping
Center presents a uniform exterior appearance.  Tenant shall ensure, to the extent
reasonably practicable, that window coverings are closed on windows in the
Premises while they are exposed to the direct rays of the sun.  Tenant shall
thoroughly clean and maintain the inside of all windows no less than once every
calendar month or more frequently as necessary to maintain a neat and clean
appearance reasonably satisfactory to Landlord.

26.  Deliveries to and from the Premises shall be made only at the times, in the areas
and through the entrances and exits designated by Landlord.  Tenant shall not
make deliveries to or from the Premises in a manner that might interfere with the
use by any other tenant of its premises or of the Common Areas, any pedestrian
use, or any use which is inconsistent with good business practices.

27.  The work of cleaning personnel shall not be hindered by Tenant after 5:30 P.M.
Windows, doors and fixtures may be cleaned at any time.  Tenant shall provide
adequate waste and rubbish receptacles to prevent unreasonable hardship to the
cleaning service.

28.   The outside areas adjoining the Premises shall be kept clean and free from dirt and rubbish by the Tenant on a daily basis or more frequently in order to maintain a neat and clean appearance reasonably satisfactory to Landlord.

29.   Tenant and Tenant's employees shall park their vehicles in areas designated by Landlord. Should there be any violations of this provision after written notice from Landlord, Tenant agrees to pay Landlord $100.00 for each violation. If the violations persist, then the offending vehicle may be towed at Tenant's expense, and Tenant shall indemnify and hold Landlord harmless from any liability incurred in connection with such towing. Any payments due because of any such violation shall be considered Additional Rent as such is defined in the Lease.

30.   The plumbing facilities shall be used solely for the purpose for which they are constructed, and no foreign substance of any kind shall be thrown therein. The expense of any breakage, stoppage or damage or any associated repair costs resulting from a violation of this provision shall be borne by Tenant.

31.   Tenant shall not burn any trash or garbage in or about the Shopping Center.

32.   All public entrances and exists to the Premises shall be kept unobstructed and open to the public at all times during normal business hours.

33.   Tenant shall not cause or permit any obnoxious or foul odors.

34.   Tenant shall not display or sell merchandise, or allow carts, portable signs, devices or other objects to be stored or kept outside the Premises or any portion of the Common Areas.

35.   Tenant, Tenant's employees, agents or representatives shall not solicit business in the Common Areas, nor shall Tenant distribute any handbills or other advertising matter on vehicles in the Shopping Center.

36.   At no cost or liability to Landlord, Tenant shall promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises, excluding structural changes not affected by Tenant's improvements, acts or omissions. The judgment of any court or the Tenant's admission, whether or not Landlord be a party, that Tenant has violated any law, statute, ordinance or governmental rule, regulation or requirement, shall be conclusive of that fact as between Landlord and Tenant.

## QUITCLAIM OF MEMORANDUM OF LEASE

RECORDED REQUESTED BY AND          )
WHEN RECORDED MAIL TO:             )
                                   )
CARSTENS REALTY,                   )
a California corporation           )
1206 West Hillsdale Boulevard, Suite A  )
San Mateo, CA  94403               )

---

The undersigned, THRIFTY PAYLESS, INC., a California corporation, hereby irrevocably quitclaims, releases and relinquishes to CARSTENS REALTY, a California corporation, all of the undersigned's right, title and interest, if any, in, to and under (i) that certain Memorandum of Lease recorded on _____, 2012, as Instrument No. _____ in the Official Records of County of San Mateo, State of California (the "Memorandum"), (ii) the Lease (as defined in the Memorandum) and (iii) the Leased Premises (as defined in the Memorandum).

IN WITNESS WHEREOF, this Quitclaim has been executed as of __June 19_____, 2013 .

                          THRIFTY PAYLESS, INC.,
                          a California corporation

                          By: _____

                          Its: _Vice President_____


                          By: _____

                          Its: _____

STATE OF Pennsylvania                                    )
                                                         )
COUNTY OF Cumberland                                     )


On June 19 , 2012, before me, Linda L. Brown , personally appeared Joseph Notanami, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her/their signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _Linda L. Brown_____          (SEAL)

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LINDA L BROWN, NOTARY PUBLIC
CAMP HILL, CUMBERLAND CO.
MY COMMISSION EXPIRES JUNE 18, 2016

STATE OF                                                 )
                                                         )
COUNTY OF                                                )


On _____, 2012, before me, _____, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____          (SEAL)

## AMENDMENT TO LEASE

**THIS AMENDMENT TO LEASE** (this "*Amendment*") is made effective January 1, 2024 (the "*Effective Date*") by and between CARSTENS REALTY, a California corporation ("*Landlord*"), and THRIFTY PAYLESS, INC., a California corporation ("*Tenant*," and together with the Landlord, the "*Parties*" and each, a "*Party*").

## RECITALS

**WHEREAS**, Landlord and Tenant are parties to that certain Shopping Center Lease, dated December 12, 2012, (as amended from time to time thereafter, the "*Lease*"), with respect to that certain premises located at 1320 West Hillsdale Boulevard San Mateo, California 94403-3125, which premises is defined and more particularly described in the Lease (the "*Premises*"), for a term commencing on June 1, 2014, and expiring on May 31, 2029 (the "*Termination Date*");

**WHEREAS**, on October 15, 2023, Tenant and certain of its debtor affiliates (collectively, the "*Debtors*") commenced a case (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "*Bankruptcy Code*") which is now pending in the United States Bankruptcy Court for the District of New Jersey (the "*Bankruptcy Court*"). The Chapter 11 Cases are being jointly administered under Case Number 23-18993; and

**WHEREAS**, Landlord and Tenant desire to modify certain terms and conditions of the Lease, effective as of the Restructuring Effective Date (as hereinafter defined), as amended by this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Landlord and Tenant hereby agree as follows:

## AGREEMENT

1.    <u>Capitalized Terms</u>.  Capitalized terms used and not otherwise defined herein shall have the respective meaning assigned to such terms in the Lease.

2.    <u>Effective Date</u>.  This Amendment, and each of its amendments, modifications, and waivers with respect to the Lease as set forth herein, shall be effective on the date that the Lease is assumed or assigned in the Chapter 11 Cases, whether pursuant to (a) procedures approved by the Bankruptcy Court or (b) entry of an order by the Bankruptcy Court approving the assumption or assignment of the Lease, including pursuant to or in connection with a sale of Tenant's assets pursuant to Section 363 of the Bankruptcy Code, confirmation of Tenant's chapter 11 plan of reorganization in the Chapter 11 Cases, or a stand-alone motion for assumption or assignment of the Lease (in each case, the "*Restructuring Effective Date*"); *provided, however*, that Tenant shall obtain the benefit of this Amendment, and this Amendment shall be binding on Landlord, beginning on the Effective Date hereof.  In the event the Restructuring Effective Date does not occur, or the Lease is rejected in accordance with the Bankruptcy Code, this Amendment shall be null and void in all respects, and nothing in this Amendment shall give rise to any claim, causes of action, or damages (compensatory or consequential) against either Party.  Nothing contained in this Amendment is intended to be or shall be construed as or deemed an assumption or an assignment of the Lease, as amended hereby, or any contract or document related thereto under section 365 of the Bankruptcy Code. Prior to the Restructuring Effective Date, Tenant expressly reserves its right, in its sole and absolute discretion, to assume, reject, or assign the Lease pursuant to section 365 of the Bankruptcy Code.

1

3.    <u>Lease Modification</u>.

(a)    <u>Rent</u>.    Landlord and Tenant acknowledge and agree that, from and after the Restructuring Effective Date and through the Termination Date, Tenant shall only be obligated to pay Minimum Rent in the amount of $211,367.00 per annum ("***Base Rent***"), payable on the first (1ˢᵗ) day of each month in equal installment of $17,613.92, which payment excludes any percentage rent, common area maintenance charges, taxes, and insurance premiums and all other additional rent due and owing under the Lease (together with Base Rent, collectively referred to as "***Rent***").    In the event that, the Restructuring Effective Date is not on the first day of the month, and Tenant has paid Rent in excess of the amount herein specified for the period specified above, then Tenant shall be entitled to offset such excess amounts with respect to the remainder of the month following the Restructuring Effective Date against the next installment(s) of Rent coming due under the Lease until such time as such excess amounts have been recouped in full by Tenant.    The foregoing notwithstanding, the Parties acknowledge and agree that Rent paid by Tenant on or after the commencement of the Chapter 11 Case through the Restructuring Effective Date are an administrative expense, reimbursing Landlord the actual, necessary costs and expenses and reasonable value for Tenant's use and occupancy of the Premises thereby benefiting the bankruptcy estate, and as such, no excess amounts are due Tenant and Tenant shall not be entitled to recoup any amounts so paid during this period.

(b)    <u>Attorneys' Fees</u>.    Landlord further acknowledges and agrees that, notwithstanding anything to the contrary in the Lease, Landlord shall not be entitled to receive from Tenant or its affiliates (or charge as rent due from Tenant or its affiliates) any attorneys' fees incurred by Landlord in connection with this Amendment.

4.    <u>No Default and Waiver of Charges</u>.    Landlord acknowledges and affirms that as of the Effective Date, Tenant is not in default under any of the terms, conditions, or provisions of the Lease, and that there exist no events or circumstances which, with the passage of time or the giving of notice or both, constitutes a default under the Lease (including, without limitation, any failure of Tenant to meet its obligations to continuously operate in the Premises).    Landlord further acknowledges and agrees that it has no offsets, claims, or defenses against Tenant with respect to any obligation or duty of Tenant arising pursuant to the Lease.    To the extent that any notices of default or non-payment have been delivered to Tenant, all such notices are hereby waived and of no further force or effect.    No default interest, late fees, charges, surcharges, or other fees shall be due, and all such interest, late fees, charges, surcharges, or other fees are waived and shall not apply.

5.    <u>Force Majeure</u>.    Notwithstanding anything to the contrary contained in the Lease, it is understood and agreed by the Parties that in the event Tenant shall be prevented from operating its business in a commercially reasonable manner by a cause or causes beyond Tenant's control which shall include, without limitation, all labor disputes, civil commotion, shelter in place orders from any governmental authority, widespread disease or other public health and safety concerns (including, without limitation, COVID-19 and SARS-CoV-2), acts of war, war—like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, terrorism, governmental regulations or controls, fire or other casualty, inability to obtain any material, services or financing, or through Acts of God (collectively, "***Force Majeure***"), then Tenant shall be excused from, and shall not be responsible for any failure to perform, any of its covenants and obligations under the Lease (other than payment obligations including, without limitation, the obligation to pay Rent, or obligations that may be cured by the payment of money (*e.g.*, maintaining insurance)) for any period that Force Majeure prevents Tenant from operating its business as described herein.

DocuSign Envelope ID: 4167FBD5-C68F-4B5D-9C07-878953DF09C7

Rite Aid Store No. 5903

6.    <u>Confidentiality</u>.  Tenant and Landlord will keep confidential (a) the terms of this Amendment, and (b) all negotiations and communications, including each Party's representatives in connection with this Amendment (collectively, "***Confidential Information***").  Tenant and Landlord will not disclose or make available any Confidential Information to any other person or entity, except (i) accountants, brokers, attorneys, and other agents of Landlord and Tenant for the sole purpose of providing advice to Landlord and Tenant in connection with the Confidential Information and who agree to preserve the confidential nature of same, or (ii) as required by law.

7.    <u>Authority</u>.  Each Party represents and warrants that it has the authority and power to enter into this Amendment and that this Amendment constitutes a legal, valid and binding obligation of that Party.

8.    <u>Notices</u>.

(a)    Notwithstanding anything to the contrary contained in the Lease, any notices required or permitted to be sent to Tenant under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

If by Certified Mail:
THRIFTY PAYLESS, INC.
P.O. Box 3165
Harrisburg PA 17105
Attn: Legal Department

If by Overnight Courier:
THRIFTY PAYLESS, INC.
200 Newberry Commons
Etters PA 17319
Attn: Legal Department

(b)    Notwithstanding anything to the contrary contained in the Lease any notices required or permitted to be sent to Landlord under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

Name:    CARSTENS REALTY
Address:  1206 W. Hillsdale Boulevard, Suite A
           San Mateo, CA 94403

Email:     chris@carstensrealty.com
         ken@carstensrealty.com
         casey@carstensrealty.com

9.    <u>Miscellaneous</u>.

(a)    Landlord and Tenant each hereby represents that it has dealt with no party or broker in connection with this Amendment [except for A&G Real Estate Partners ("***Tenant's Broker***").  Any and all fees that may be due to Tenant's Broker shall be paid by Tenant pursuant to a separate agreement].  Insofar as each Party knows, no other broker negotiated this Amendment or is entitled to any commission in connection therewith.  Landlord and Tenant each agrees to indemnify, defend and hold the other harmless from and against any and all claims, loss, cost and damages (including reasonable attorney fees and court costs) suffered or incurred by the representing Party as a result of a breach of this representation.

3

DocuSign Envelope ID: 4167FB2F5-C68F-4B5D-9C07-878953DF09C7

Rite Aid Store No. 5903

(b)     This Amendment may be executed in counterparts, each of which shall constitute an original, and which together shall constitute one and the same agreement.  This Amendment may be executed or delivered by electronic or facsimile means, and copies of executed signature pages stored electronically in portable document format (.pdf) shall be binding as originals.  Neither Party shall record this Amendment without the express prior written consent of the other Party.

(c)     Subject to the other terms of this Amendment, each of Landlord and Tenant agrees to execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the modifications, waivers and amendments contemplated by this Amendment.

(d)     This Amendment, and all covenants contained herein, shall be binding and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.

(e)     The invalidity or unenforceability of any provision of this Amendment shall not affect or impair any other provisions, which shall remain in full force and effect.

(f)     Except as modified as set forth in this Amendment, all of the terms and provisions of the Lease remain unchanged and in full force and effect and Landlord and Tenant hereby ratify and confirm same.  Landlord and Tenant acknowledge and agree that the Lease, as modified by this Amendment, sets forth the entire agreement between Landlord and Tenant and there are no other agreements, understandings, undertakings, representations, or warranties among the Parties with respect to the subject matter hereof except as set forth herein.  In case of any conflict between the terms and provisions of the Lease and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment effective as of the Effective Date.

**LANDLORD:**

CARSTENS REALTY,
a California corporation

By: _____
Name:   Chris Carstens
Title:    President

**TENANT:**

THRIFTY PAYLESS, INC.,
a California corporation

By: _____
Name:  Lisa M. Winnick
Title:  Vice President

4