**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>                Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 17, 473, & 1178** |

**NOTICE OF SUCCESSFUL BIDDER WITH RESPECT TO CERTAIN
OF THE DEBTORS' PHARMACY ASSETS**

      **PLEASE TAKE NOTICE** that on May 21, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* [Docket No. 473] (the "Bidding

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

Procedures Order") by which the Court approved procedures (such procedures, the "Bidding Procedures") for the sale or sales of all, substantially all, or any portion of the Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that on July 1, 2025, the Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief.* [Docket No. 1178] (the "Sale Order") authorizing the Debtors, in consultation with the Consultation Parties, to file one or more additional notices of successful bidder (each, an "Additional Notice of Successful Bidder").

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 52 of the Sale Order, the Debtors, in consultation with the Consultation Parties, are filing this Additional Notice of Successful Bidder indicating that the Debtors have selected McKesson Corporation as the successful bidder with respect to certain of the Debtors' Pharmacy Assets (the "Successful Bidder" and such bid, a "Successful Bid").  The final form of the purchase agreement (the "APA") is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the proposed Sale of the Assets pursuant to the APA is consistent with the Debtors' existing privacy policies regarding the transfer of personally identifiable information ("PII") and protected health information ("PHI").  The sale, conveyance, assignment, and transfer of PII and PHI will be consistent with the Debtors' policies regarding the transfer of such PII and PHI as of the Petition Date.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to consummation or approval of the Sale must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before September 25, 2025** (the "Sale Objection Deadline") by (i) the Bid Notice Parties, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) counsel to the Official Committee of Unsecured Creditors, Willkie Farr & Gallagher LLP, (iv) the Successful Bidder, and (v) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Sale Order, if no timely objections are received by the Sale Objection Deadline, (i) the Debtors are authorized to consummate the Sale to the Successful Bidder in accordance with the terms set forth in the APA and (ii) the Successful Bidder shall be deemed a Purchaser as defined in and under the Sale Order, and all protections of the Sale Order shall apply to the Sale to the Successful Bidder and the Assets acquired thereby to the same extent as if such Sale had been approved by the Sale Order.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed assumption and assignment of any executory contract or unexpired lease to the Successful Bidder and/or the related proposed cure amount will be subject to a separate objection deadline as set forth

---

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

in the Cure Notice served on each applicable contract or lease counterparty and do not need to be filed on or before the Sale Objection Deadline.

<u>**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND SALE ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE ASSET PURCHASE AGREEMENT OR SALE ORDER, AS APPLICABLE.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, and the Sale Order, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retained in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930- 4577; (b) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

Dated:  September 18, 2025

/s/  Michael D. Sirota,
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
              wusatine@coleschotz.com
              fyudkin@coleschotz.com
              svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019

Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**McKesson Corporation APA**

**CONFIDENTIAL**
**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into effective as of September 18, 2025, by and between McKesson Corporation, a Delaware corporation ("**Buyer**"), and Rite Aid of New Jersey, Inc., a New Jersey corporation ("**Seller**"), and evidences the agreement by which Seller provides product to Buyer, the authorized immediate trading partner from which such product was purchased or received (as more fully detailed herein). Buyer and Seller may be collectively referred to herein as the "**Parties**," and individually as a "**Party**," as the circumstances require.

1.  **Purchased Assets**. Seller agrees to return, sell, assign, transfer, convey and deliver and Buyer agrees to accept such return and acquire (as applicable) all of Seller's rights, title and interest in, under and to the Purchased Assets (as defined below), pursuant to the terms hereof. "**Purchased Assets**" shall collectively refer to all of the following:

    A.  items of Seller's prescription pharmaceutical inventory originally purchased from Buyer or its affiliates that has since been deemed unsaleable and directed for removal from the supply chain or destruction and in possession of Inmar, Inc. ("**Inmar**") as of the Closing Date, including those that are damaged or out-of-date prescription pharmaceutical inventory that has been unboxed and processed (the "**Initial Inmar Inventory**"); provided, however, that the Initial Inmar Inventory shall be limited to only those items specifically listed on **Schedule 2** attached hereto;

    B.  Seller's prescription drugs located at the address set forth on **Schedule 1** (the "**Facility**") pursuant to Section 7 hereof (the "**Facility Inventory**");

    C.  items of Seller's prescription pharmaceutical inventory originally purchased from Buyer or its affiliates that has since been deemed unsaleable and directed for removal from the supply chain or destruction and in possession of Inmar as of the Inmar Closing Date, including those that are: (i) damaged or out-of-date prescription pharmaceutical inventory that has not been unboxed or processed (the "**Unprocessed Inmar Inventory**"), (ii) damaged or out-of-date prescription pharmaceutical inventory that has been unboxed and processed that is not Initial Inmar Inventory (the "**Processed Inmar Inventory**"), or (iii) damaged or out-of-date prescription pharmaceutical inventory that has been unboxed, processed, and determined to be in-date according to the manufacturer's national return policy (the "**Aging Inmar Inventory**" and, together with the Unprocessed Inmar Inventory and the Processed Inmar Inventory, the "**Subsequent Inmar Inventory**" and together with the Initial Inmar Inventory, the "**Inmar Inventory**"); and

    D.  all of Seller's rights under warranties, indemnities, rights to return, and all similar rights against third parties to the extent exclusively related to the Facility Inventory and Inmar Inventory; and all accompanying transaction history, transaction information, and transaction statements (the "**3T Documentation**") as required pursuant to the Drug Supply Chain Security Act (the "**DSCSA**") exclusively related to the Purchased Assets.

2.  **Excluded Assets**. The Parties acknowledge and agree that Seller is not selling, assigning, transferring, conveying or delivering to Buyer the following assets of Seller (the "**Excluded Assets**"), which will be retained by Seller and specifically be excluded from the Purchased Assets:

    A.  Inventory and supplies that are (i) not Facility Inventory (including, for the avoidance of doubt, front-end store inventory and over-the-counter inventory); (ii) not Inmar Inventory; (iii) Inmar Inventory products which are (A) no-credit vendor products or (B) products for

which the applicable manufacturer does not pay a credit; (iv) untransferable under applicable laws; (v) Excluded Inventory; and (vi) otherwise excluded pursuant to the terms of Section 7;

B.    cash and cash equivalents in bank accounts and cash registers;

C.    accounts receivable in any form;

D.    any and all licenses, franchises, third party provider numbers, permits, certificates and governmental approvals and authorizations;

E.    contracts and understandings;

F.    leased or other real property; and

G.    intangible rights.

3.    **Liabilities**. Seller shall deliver the Purchased Assets to Buyer free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(f), including any recall obligations or suspect and illegitimate product investigations.  Except as expressly set forth herein, the Parties acknowledge and agree that Buyer shall not assume or be obligated to pay, perform, or otherwise discharge any liability, tax (except as provided in Section 16) or obligation of Seller whatsoever, regardless of whether any such liabilities or obligations are accrued or fixed, absolute or contingent, determined or determinable, matured or unmatured, due or to become due, asserted or unasserted, known or unknown, liquidated or unliquidated, or otherwise (collectively, the "**Excluded Liabilities**"). Seller shall remain liable for its Excluded Liabilities, including any obligations arising out of the operation of the Facility or the ownership of the Purchased Assets prior to the Closing Date, the Facility Closing Date or Inmar Closing Date, as applicable. Without limiting the generality of the foregoing, in no event shall Buyer assume (a) any obligations of Seller under applicable laws or regulations, (b) any type of successor liability as to trade creditors, unemployment, income, property, sales or other taxes, or otherwise, or (c) any liabilities arising out of or relating to any breach of contract, warranty, or violation of law, it being understood that all such liabilities are Excluded Liabilities and Seller agrees to save and hold Buyer harmless from any claim for the same. Furthermore, Buyer shall have no liability for the continued employment or any compensation of employees of Seller or the Facility. The Parties agree that there are no assumed liabilities by Buyer, except with respect to such liabilities to the extent associated with or related to the Initial Inmar Inventory following the Closing Date, the Facility Inventory following the Facility Closing Date, or the Subsequent Inmar Inventory following the Inmar Closing Date.

4.    **Closing; Closing Deliverables**.

A.    Unless otherwise mutually agreed to by Buyer and Seller in writing, the closing of the sale of the Initial Inmar Inventory to Buyer (the "**Closing**") shall commence no later than three (3) business days following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the applicable conditions set forth in Section 12 (the "**Closing Date**"); provided, however, that the Closing Date shall not be earlier than September 25, 2025 and no later than September 26, 2025.

B.    On the Closing Date, Seller shall deliver to Buyer:

(i)    a duly executed and acknowledged Bill of Sale in respect of the Initial Inmar

Inventory, in substantially the form attached hereto as **Exhibit E** (the "**Initial Inmar Inventory Bill of Sale**"); and

    (ii)    a properly completed IRS Form W-9 Request for Taxpayer Identification Number (TIN) duly executed by Seller.

C.    On the Closing Date, Buyer shall:

    (i)    deliver to Seller, with respect to the Initial Inmar Inventory Bill of Sale, a countersigned signature page thereto; and

    (ii)    become obligated to pay to Seller the Initial Inmar Inventory Purchase Price, which shall be paid in monthly installments during the period commencing on the Closing Date and ending on the earlier of (a) forty-eight (48) months after the Closing Date and (b) the full reconciliation of all Initial Inmar Inventory and payment of the applicable Initial Inmar Inventory Purchase Price therefor (the "**Initial Inmar Credit Payment Period**"); provided, however, that prior to the occurrence of the Inmar Closing Date, the Initial Inmar Inventory Purchase Price shall be capped at $5 million in the aggregate. Each such installment during the Initial Inmar Credit Payment Period shall be payable within thirty (30) days after the end of each calendar month and shall be in an amount, if any, determined in accordance with **Exhibit D** with respect to manufacturer credits issued in the name of Buyer and actually received by Buyer during the immediately preceding calendar month in respect of the Initial Inmar Inventory.

D.    Unless otherwise mutually agreed to by Buyer and Seller in writing, the closing of the sale of the Facility Inventory to Buyer (the "**Facility Closing**") shall commence no later than three (3) business days following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the applicable conditions set forth in Section 12 (the "**Facility Closing Date**"); provided, however, that the Facility Closing Date shall not be earlier than a date to be mutually agreed upon by the Parties.

E.    On the Facility Closing Date, Seller shall deliver to Buyer:

    (i)    a duly executed and acknowledged Bill of Sale in respect of the Facility Inventory in substantially the same form attached hereto as **Exhibit A** and incorporated herein by reference (the "**Facility Inventory Bill of Sale**");

    (ii)    with respect to the Facility Inventory, a report of the Facility Inventory Review (as defined below) (which report shall identify the Facility Inventory and set forth the Facility Inventory Purchase Price (as defined below)) ("**Facility Inventory Review Report**"), signed by a representative of Seller; and

    (iii)    complete copies of Seller's 3T Documentation, as required for the Facility Inventory.

F.    On the Facility Closing Date, Buyer shall deliver to Seller:

    (i)    with respect to the Facility Inventory Purchase Price, a wire transfer to Seller in immediately available funds, in an amount equal to the Facility Inventory Purchase Price, determined in accordance with Section 7 below, pursuant to the wire

instructions as attached hereto as **Exhibit C**;

(ii)   with respect to the Facility Inventory, the Facility Inventory Review Report, signed by a representative of Buyer; and

(iii)  with respect to the Facility Inventory Bill of Sale, a countersigned signature page thereto.

G.     Once the conditions precedent of a chapter 11 plan of reorganization for Seller and its affiliates that are debtors in possession as of the date of this Agreement (i) for which Buyer is the plan sponsor and (ii) that is acceptable to Buyer in its reasonable discretion (a "**Qualifying Chapter 11 Plan**") have been satisfied or waived; provided, however, that the draft chapter 11 plan provided by Buyer to Seller on September 15, 2025 shall be a Qualifying Chapter 11 Plan subject to, for all documents other than the Plan (as defined in the RSA), Buyer's consent rights pursuant to that certain Restructuring Support Agreement (the "**RSA**") dated as of August 31, 2025 by and between Buyer, the Debtors, and certain other parties thereto (the "**Inmar Closing Date**"); provided, however, the Inmar Closing Date shall not occur unless and until the conditions set forth in Section 12.D have been satisfied:

(i)    Buyer shall become obligated to pay to Seller the Subsequent Inmar Inventory Purchase Price, which shall be paid in monthly installments during the period commencing on the Inmar Closing Date and ending on the earlier of (a) forty-eight (48) months after the Inmar Closing Date and (b) the full reconciliation of all Subsequent Inmar Inventory and payment of the applicable Subsequent Inmar Inventory Purchase Price therefor (the "**Subsequent Inmar Credit Payment Period**"). Each such installment during the Subsequent Inmar Credit Payment Period shall be payable within thirty (30) days after the end of each calendar month and shall be in an amount, if any, determined in accordance with **Exhibit D** with respect to manufacturer credits issued in the name of Buyer and actually received by Buyer during the immediately preceding calendar month in respect of the Subsequent Inmar Inventory; and

(ii)   Buyer and Seller shall execute and deliver a Bill of Sale in respect of the Subsequent Inmar Inventory, in substantially the form attached hereto as **Exhibit E** (the "**Subsequent Inmar Inventory Bill of Sale**").

5.   **Inspection**. Seller shall, promptly on or following the date hereof (at such date and time as Buyer elects, provided, however, it is during normal Facility business hours and following reasonable prior notice), allow Buyer to examine the Purchased Assets both physically and from a documentation standpoint.  Prior to this examination, Seller shall have used reasonable best efforts to separate all Excluded Assets and Excluded Inventory, from the Purchased Assets. The transfer of the Purchased Assets shall occur on the Closing Date, the Facility Closing Date, and the Inmar Closing Date, as applicable.

6.   **Transfer of Purchased Assets**.

A.     **Transfer of Purchased Assets**. Seller shall:

(i)    deliver possession of the Purchased Assets, other than the Inmar Inventory, to Buyer at the Facility on the Facility Closing Date. Risk of loss shall transfer to Buyer at the

Facility Closing. Buyer further agrees and acknowledges that Buyer shall accept the Purchased Assets, other than the Inmar Inventory, "as is, where is"; and

(ii)  deliver ownership of (i) the Initial Inmar Inventory to Buyer at the Inmar facility located at 3845 Grand Lakes Way, Suite 100, Grand Prairie, Texas 75050 (the "**Inmar Facility**") on the Closing Date; and (ii) the Subsequent Inmar Inventory to Buyer at the Inmar Facility on the Inmar Closing Date. Risk of loss shall transfer to Buyer on (i) the Closing Date, with respect to the Initial Inmar Inventory and (ii) the Inmar Closing Date, with respect to the Subsequent Inmar Inventory. Buyer further agrees and acknowledges that Buyer shall accept the Inmar Inventory "as is, where is". Notwithstanding the foregoing, Buyer shall not take ownership of any Inmar Inventory unless and until such Inmar Inventory is physically located at the Inmar Facility. Seller covenants and agrees that it shall be solely responsible, at its own cost and expense, for transferring and delivering all Inmar Inventory to the Inmar Facility prior to the Closing Date and the Inmar Closing Date, as applicable.

B.  **Fire or Other Casualty**. If there is a fire or other casualty which results in damage to or destruction of any portion of the Purchased Assets prior to the Closing Date, Facility Closing Date or Inmar Closing Date, as applicable, then Buyer may, in its sole election, (i) terminate this Agreement or a portion of this Agreement in respect of the impacted Purchased Assets by written notice to Seller, or (ii) proceed to acquire the remaining portion of the Purchased Assets, in which event the Purchase Price shall be calculated only on the remaining Purchased Assets after the fire or other casualty determined in accordance with this Agreement, including **Exhibit D** attached hereto.

C.  **DSCSA**. Seller shall use reasonable best efforts to provide Buyer with all product tracing information and other information required by the DSCSA for the Purchased Assets, including the 3T Documentation. Seller shall reasonably cooperate and assist Buyer, in such Buyer's efforts to effect a transfer of such 3T Documentation on the Closing Date, the Facility Closing Date and the Inmar Closing Date, as applicable. Such cooperation may include Seller taking such acts as may be reasonably necessary, including executing a release or authorization for the benefit of any third parties that are maintaining any such 3T Documentation on behalf of Seller, as may be reasonably necessary to facilitate the transfer of all such 3T Documentation to Buyer.

D.  **Controlled Substance Act**. Seller shall, at its sole cost and expense, notify the appropriate governmental agencies, including without limitation the applicable State Board of Pharmacy and the regional office of the U.S. Drug Enforcement Administration ("**DEA**"), of the transaction described herein. Seller shall have the sole and exclusive responsibility for, and shall bear all costs and liabilities associated with, the possession, handling, storage, transfer, and ultimate disposition or destruction of any and all controlled substances located at the Facility. Under no circumstances shall Buyer have any responsibility, obligation, or liability (whether direct or indirect, contingent or otherwise) with respect to any such controlled substances, including, without limitation, any regulatory compliance, reporting, recordkeeping, costs of destruction, or claims arising from or relating thereto, all of which shall remain the sole responsibility of Seller.

7.  **Inventory Matters and Valuation**.

A.  The Parties agree that Buyer will accept the return and acquire, and the Facility Inventory will include, only those items of inventory that are Saleable and Returnable (as defined

below) as determined in accordance with this Agreement and the Facility Inventory Instructions (as defined below) on the Facility Closing Date; provided, however, that Buyer will not purchase any Excluded Inventory. For purposes hereof, "**Saleable and Returnable**" means inventory that is "Saleable" as defined in Exhibit G to that certain Supply Agreement, dated as of August 30, 2024, by and between McKesson Corporation and Rite Aid Corporation (as amended, supplemented, restated, amended and restated, and otherwise modified from time to time, the "**Supply Agreement**") and meets all of the requirements to be eligible for return pursuant to the terms and conditions of the Supply Agreement; and "**Excluded Inventory**" shall mean all items of inventory that fit within one or more of the following categories: (i) front-end store inventory; (ii) over-the-counter or non-prescription inventory; (iii) all inventory untransferable under applicable laws; (iv) inventory for which there are no controls in place as required by applicable law; (v) inventory that is damaged, open, or otherwise not in original, sealed packaging; (vi) inventory purchased from a wholesaler other than Buyer; (vii) inventory classified as controlled substances under applicable law; (viii) inventory requiring refrigerated or below-freezing cold storage; (ix) inventory that is subject to Seller-specific formulary requirements; (x) inventory that is suspect or illegitimate as defined by the DSCSA or subject of a suspect or illegitimate notification; (xi) inventory that is adulterated or misbranded as defined by the Federal Food, Drug, and Cosmetic Act; (xii) inventory that meets the definition of "Unsaleable" in Exhibit G to the Supply Agreement (as defined above); (xiii) inventory that does not satisfy each of the requirements in Section 7.B; and (xiv) any other items that the Parties mutually agree in writing (electronic mail being acceptable) to exclude.

B.      For the avoidance of doubt, all items of inventory that comprise the Purchased Assets, other than the Inmar Inventory, must (i) be accompanied by a return authorization and a valid invoice (without duplication), consistent with current practice; and (ii) reflect the same bottle size and quantity as the inventory being returned. Any items of inventory that do not satisfy each of the foregoing requirements in this Section 7.B, as reasonably determined by Buyer during the Facility Inventory Review, in cooperation with Seller, shall be considered Excluded Inventory.

C.      The Parties shall together conduct a full review and valuation of the Facility Inventory at the Facility to be completed at least one (1) business day immediately prior to the Facility Closing Date using the Facility Inventory Instructions (such review, the "**Facility Inventory Review**" and the amount determined pursuant to the Facility Inventory Review, which shall, subject to the terms of this Agreement, be reflected on **Schedule 1** thereafter, the "**Facility Inventory Purchase Price**"). Each Party shall bear its own costs and expenses incurred in connection with the Facility Inventory Review.

D.      The Parties agree that the purchase price with respect to (i) the Initial Inmar Inventory (the "**Initial Inmar Inventory Purchase Price**"); and (ii) the Subsequent Inmar Inventory (the "**Subsequent Inmar Inventory Purchase Price**") shall be determined by applying the pricing methodology set forth on **Exhibit D** and payable in accordance with Section 4.C and Section 4.G, respectively.

E.      The determination of the Facility Inventory Purchase Price shall be based on the Invoice Price as defined in the Supply Agreement (the "**Invoice Price**"), which in no event shall be greater than the amount Seller was originally invoiced by Buyer to purchase such inventory under the Supply Agreement.

F.      Any items of inventory examined during the Facility Inventory Review or any related inspection that are determined, in accordance with Section 7.A, to constitute Excluded Inventory shall not be included in the Facility Inventory Purchase Price, and shall not be purchased by Buyer. Seller shall retain and be solely responsible for the destruction or other disposition of Excluded Inventory in accordance with applicable law. However, in the event Seller inadvertently delivers any Excluded Inventory to Buyer, Buyer is authorized to conduct the destruction or disposition of such Excluded Inventory, Buyer has no obligation to return such Excluded Inventory back to Seller or to otherwise adjust the Purchase Price as a result of such destruction or disposition, and Seller disclaims any and all rights to such Excluded Inventory. The Parties acknowledge and agree that Seller shall not be entitled to any further rebate, refund or other credit under the Supply Agreement with respect to the Purchased Assets or any Excluded Inventory delivered as contemplated in this Section 7.F.

G.      Prior to the Closing Date, with respect to the Initial Inmar Inventory, and the Inmar Closing Date, with respect to the Subsequent Inmar Inventory, Seller shall have the sole and exclusive responsibility for, and shall bear all costs and liabilities associated with, the possession, handling, storage, transfer, and ultimate disposition or destruction of any and all Inmar Inventory for which Buyer does not receive manufacturer credits in accordance with Section 4.C and Section 4.G, as applicable. Following the Closing Date, with respect to the Initial Inmar Inventory, and the Inmar Closing Date, with respect to the Subsequent Inmar Inventory, to the extent Seller fails to comply with this Section 7.G with respect to any Inmar Inventory, Buyer shall have the right to set off or deduct any such costs and liabilities Buyer incurs from any payments otherwise due to Seller in respect of the Inmar Inventory.

H.      The processing of refunds of Inmar Inventory will be conducted by Buyer in good faith and in a manner consistent with past practice, and Buyer will not compromise manufacturer credits in any material respect without Seller's consent; provided, however, that acceptance of a manufacturer's position on eligibility for credits shall not constitute a "compromise" of such credits. Buyer shall keep a representative designated by Seller reasonably informed and provide updates on such processing upon request.

8.    **Purchase Price**.

A.      The "**Purchase Price**" shall consist of:

(i)      the Facility Inventory Purchase Price, subject to **Exhibit B** (the "**Facility Inventory Instructions**") and **Exhibit D**, and payable in accordance with Section 4.F;

(ii)     the Initial Inmar Inventory Purchase Price, subject to **Exhibit D**, and payable in accordance with Section 4.C; and

(iii)    the Subsequent Inmar Inventory Purchase Price, subject to **Exhibit D**, and payable in accordance with Section 4.G.

9.    **Seller Representations and Warranties**. Seller covenants, represents, and warrants to Buyer, as of the Closing Date, with respect to the Initial Inmar Inventory, the Facility Closing Date, with respect to the Facility Inventory, and the Inmar Closing Date, with respect to the Subsequent Inmar Inventory, as follows:

A. **Liens**. Seller has good and marketable title to and is the sole owner of all of the Purchased Assets and the applicable Purchased Assets are free and clear of all Liens (as defined below). The term "**Liens**" shall collectively refer to all liens, charges, restrictions, claims, judgments, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, taxes (presently due or due at any time in the future related to the Purchased Assets and/or this transaction), assessments or other encumbrances (whether secured or unsecured) with respect to any item of the applicable Purchased Assets and includes, without limitation, any claim or charge of any creditor or supplier of the applicable Purchased Assets.

B. **Authority**. Seller has taken all necessary corporate action and, subject to the occurrence of the Sale Approval Conditions (as defined below), has the full and sole right, power and authority to enter into this Agreement to sell the applicable Purchased Assets. This Agreement has been duly and validly authorized, executed, and delivered by Seller and constitutes the legal, valid, and binding obligations of Seller enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles, and the discretion of courts in granting equitable remedies. The sale of the applicable Purchased Assets and all of the other obligations of Seller agreed to hereunder do not conflict with or result in a breach of the terms of any agreement or instrument to which Seller is a party or by which it is, or may be, bound or which would constitute a default thereunder, or result in a claim against Buyer, or result in the creation or imposition of any lien, charge or encumbrance on, or give to others any interest in or right to the applicable Purchased Assets.

C. **Good Standing**. Seller is a duly organized legal entity, validly existing and in good standing in each state in which Seller conducts its business, and holds all required licenses, registrations, and authorizations necessary to conduct its business.

D. **No Brokers**. Except for Guggenheim Securities, LLC, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with this Agreement or the transactions contemplated hereby**.**

E. **Documentation**. To the knowledge of Seller, the 3T Documentation delivered to Buyer pursuant to this Agreement is true, correct, and complete in all material respects

F. **Inmar Inventory**. Seller has determined all applicable Inmar Inventory to be unsaleable and directed for removal from the supply chain or destruction, and not intended for resale.

G. **Litigation**. There are no (i) claims, actions, suits, arbitration, legal or administrative proceedings or investigations, including, without limitation, by the DEA, U.S. Department of Health and Human Services Office of Inspector General, the U.S. Centers for Medicare & Medicaid Services, U.S. Food and Drug Administration, any applicable Board of Pharmacy or other governmental body, pending against Seller or, to the knowledge of Seller, threatened against Seller, or otherwise pending or, to the knowledge of Seller, threatened with respect to the Purchased Assets and to Seller's knowledge no such actions, disputes, proceedings or investigations are contemplated, except to the extent any such claim, action, dispute, arbitration, proceeding or investigation would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including

8

the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder or (ii) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or governmental body to which Seller is a party or is subject with respect to the Facility or to which any of the applicable Purchased Assets is subject, except to the extent any such judgment, decree, order, writ, injunction, ruling, decision or award would not reasonably be expected to be, individually or in the aggregate, material to such Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Neither Seller, nor any parent, subsidiary or other affiliate of Seller, nor any director, manager, officer or pharmacy employee of Seller has been disciplined or sanctioned, or to Seller's knowledge has had a discipline or sanction proposed, by any governmental body, except to the extent any such discipline or action would not reasonably be expected to be, individually or in the aggregate, material to the applicable Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller is not excluded from participation in any government healthcare payment program, including Medicare or Medicaid, nor does Seller have knowledge of any pending or threatened discipline, sanction, inquiry, investigation or government action that would be reasonably expected to lead to such exclusion.

H.  **Bankruptcy Matters**.

(a)  The transactions contemplated hereunder (i) are the result of a sale process led by Seller, its affiliates, and its advisors, pursuant to which Buyer submitted an offer for the Purchased Assets, such offer has been accepted and Buyer has been awarded the right to acquire the Purchased Assets, no other person or entity or group of persons or entities has submitted a higher or better offer to purchase the Purchased Assets, and (ii) may not be avoided under Section 363(n) or any other section of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"). The Purchase Price for the Purchased Assets (A) was negotiated and is undertaken at arm's length without collusion or fraud and in good faith within the meaning of and otherwise consistent with Sections 363, 365, and 548 of the Bankruptcy Code and (B) constitutes reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

(b)  This Agreement has not been entered into for the purposes of hindering, delaying or defrauding creditors of Seller under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable law and none of the Parties hereto have entered into this Agreement or are consummating the sale of the Purchased Assets with any fraudulent or otherwise improper purpose.

(c)  On the date of this Agreement, the Debtors shall file and serve an Additional Notice of Successful Bidder (as defined in the KPH Healthcare Sale Order (as defined below) pursuant to the terms thereof), to which this Agreement, with appropriate redactions, shall be attached.

I.  **Tax Matters**. Seller has timely and properly filed all federal, state and local income and other material tax returns and reports and forms which it is or has been required to file, either on its own behalf or on behalf of its employees or other persons or entities including but not limited to all material sales and use and employment tax returns, all such returns

and reports being true, correct and complete in all material respects and has paid all income or other material taxes (whether or not shown on any tax return) which have become due. Since August 30, 2024, no written claim has ever been made by a governmental body in a jurisdiction where Seller has not filed an income or other material tax return or paid income or other material taxes, asserting that Seller is subject to such tax by, or required to file such tax return in, that jurisdiction, solely with respect to the Purchased Assets.

J.      **Survival**. The provisions of this Section 9 shall survive the Closing, the Facility Closing Date and the Inmar Closing Date.

10.     **Buyer Representations and Warranties**. Buyer covenants, represents, and warrants to Seller, as of the date of this Agreement and as of the Closing Date, the Facility Closing Date and the Inmar Closing Date, as follows:

A.      **Good Standing**. Buyer is a duly organized legal entity, validly existing and in good standing in each state in which Buyer conducts its business, and holds all required licenses, registrations, and authorizations necessary to conduct its business and to hold the assets acquired from Seller hereunder.

B.      **Authority**. Buyer has taken all necessary corporate action and, has the full and sole right, power and authority to enter into this Agreement to buy the Purchased Assets. This Agreement has been duly and validly authorized, executed, and delivered by Buyer and constitutes the legal, valid, and binding obligations of Buyer enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles, and the discretion of courts in granting equitable remedies. The sale of the Purchased Assets and all of the other obligations of Buyer agreed to hereunder do not conflict with or result in a breach of the terms of any agreement or instrument to which Buyer is a party or by which it is, or may be, bound or which would constitute a default thereunder, or result in a claim against Seller, or result in the creation or imposition of any lien, charge or encumbrance on, or give to others any interest in or right to the Purchased Assets. Buyer has taken all appropriate action to enable it to perform its obligations under this Agreement.

C.      **No Brokers**. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with this Agreement or the transactions contemplated hereby.

D.      **Sufficiency of Funds**. Buyer will have access to sufficient funds as of the Closing, the Facility Closing Date and the Inmar Closing Date, as applicable, to pay the Purchase Price to Seller, on the terms and conditions contained in this Agreement, and will not require external third-party financing in order to pay the Purchase Price.

E.      **Survival**. The provisions of this Section 10 shall survive the Closing, the Facility Closing Date and the Inmar Closing Date.

11.     **Regulatory Notices and Clearances**. Buyer and Seller (where applicable) will, and will cause their respective affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by Buyer under any applicable laws for the consummation of the transactions contemplated herein, if any.

12. **Conditions to Closing**.

    A.     **Parties' Conditions**. It is agreed that the respective obligations of the Parties under this Agreement to consummate the Closing are strictly contingent upon and subject to the satisfaction of each of the following conditions precedent on or before the Closing Date:

        (i)     **Bankruptcy Order**. Rite Aid Corporation and certain of its affiliates, including Seller (collectively, the "**Debtors**"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") on May 5, 2025 (the "**Petition Date**"), at Case No. 25-14861 (the "**Bankruptcy Cases**"). On May 9, 2025, the Bankruptcy Court entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice with Respect Thereto, and (VII) Granting Related Relief*, as it may be amended or modified [Docket No. 473] (the "**Bidding Procedures Order**"). On July 1, 2025 the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Accordance Therewith, and (IV) Granting Related Relief* (the "**KPH Healthcare Sale Order**") [Docket No. 1178]. Prior to the Closing, (i) the Bidding Procedures Order and KPH Healthcare Sale Order shall remain unstayed and in full force and effect, (ii) the Debtors shall have filed and served an Additional Notice of Successful Bidder (as defined in the KPH Healthcare Sale Order pursuant to the terms thereof) with respect to the transactions contemplated by this Agreement, and (iii) either (x) no objections shall have been filed to such Additional Notice of Successful Bidder by the Additional Sale Objection Deadline (as defined in the KPH Healthcare Sale Order) or (y) the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Buyer, which remains in full force and effect which (A) authorizes and approves the sale of the Purchased Assets, such that Seller will have the authority and approval from the Bankruptcy Court to consummate the sale of the Purchased Assets to Buyer free and clear of all liens, claims, security interests and encumbrances whatsoever and (B) authorizes Seller to enter into and consummate such sales of such Purchased Assets on the terms and conditions, including non-monetary terms and conditions, set forth in this Agreement, which terms and conditions shall be approved (the satisfaction of the foregoing (i) – (iii), collectively, the "**Sale Approval Conditions**");

      (ii)     **Licenses**. No Party (A) has been debarred or excluded from federal health care programs or (B) has had the licenses necessary to carry out its business operations contemplated or required by this Agreement revoked or has been disciplined in such a manner that performance cannot occur or would be substantially impaired;

      (iii)     **Facility Inventory Review**. The Facility Inventory Review has been completed and the Facility Inventory Purchase Price has been finally determined in accordance with this Agreement; and

(iv) **No Action**. No governmental body or court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any law or order (including any temporary restraining order or preliminary or permanent injunction) that is in effect and does restrain, enjoin, or otherwise prohibit or make illegal the transactions contemplated hereby with respect to the Closing Date.

B.    **Buyer's Conditions**. It is agreed that the respective obligations of Buyer under this Agreement to consummate the applicable transactions contemplated hereby are strictly contingent upon and subject to the satisfaction of each of the following conditions precedent on or before the Closing Date and the Facility Closing Date, as applicable:

(i) Seller has performed and complied in all material respects with all agreements, covenants and obligations contained in this Agreement that are required to be performed or complied with by Seller at or prior to the Closing Date or the Facility Closing Date, as applicable, and each of the representations and warranties of Seller contained in Section 9 shall be true and correct in all material respects on the Closing Date or the Facility Closing Date, as applicable, as though made on such date; and

(ii) Seller has delivered to Buyer the applicable documents listed in Section 4.B or Section 4.E, as applicable.

C.    **Seller's Conditions**. It is agreed that the respective obligations of Seller under this Agreement to consummate the applicable transactions contemplated hereby are strictly contingent upon and subject to the satisfaction of each of the following conditions precedent on or before the Closing Date and the Facility Closing Date, as applicable:

(i) Buyer has performed and complied in all material respects with all agreements, covenants and obligations contained in this Agreement that are required to be performed or complied with by Buyer at or prior to the Closing Date or the Facility Closing Date, as applicable, and each of the representations and warranties of Buyer contained in Section 10 shall be true and correct in all material respects on the Closing Date as though made on such date; and

(ii) Buyer has delivered to Seller the applicable documents listed in Section 4.C or Section 4.F, as applicable.

D.    **Conditions to Subsequent Inmar Inventory Purchase**. It is agreed that the respective obligations of Buyer under Section 4.G are strictly contingent upon and subject to the satisfaction of each of the following conditions precedent on or before the Inmar Closing Date:

(i) The effective date of a Qualifying Chapter 11 Plan shall have occurred.

(ii) No Party (A) has been debarred or excluded from federal health care programs or (B) has had the licenses necessary to carry out its business operations contemplated or required by this Agreement revoked or has been disciplined in such a manner that performance cannot occur or would be substantially impaired.

(iii) No governmental body or court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any law or order (including any temporary restraining order or preliminary or permanent injunction) that is in effect and does

restrain, enjoin, or otherwise prohibit or make illegal the transactions contemplated hereby with respect to the Inmar Closing Date.

E.   **Frustration of Closing Conditions**. No Party may rely on the failure of any condition set forth in this Section 12 to be satisfied if such failure was caused by such party's breach of this Agreement.

13.   **Fiduciary Obligations**.

A.   Buyer and Seller acknowledge and agree that nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable law. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estates or is otherwise a higher or better offer for the Purchased Assets.

B.   Without limiting the generality of Section 13.A, any portion of this Agreement may be terminated at any time prior to the Closing, the Facility Closing or the Inmar Closing Date, by written notice from Seller to Buyer, if Seller, or the board of directors (or similar governing body) of Seller, determines, based on the advice of counsel, that proceeding with the transactions contemplated hereby, or failing to terminate a portion of this Agreement, would be inconsistent with its or such person's or body's fiduciary duties.  Nothing herein limits Buyer's ability to contest that any such asserted exercise of fiduciary duties was, in fact, a valid exercise of Seller's fiduciary duties.

14.   **Confidentiality**. From and after the date of this Agreement, Seller and Buyer shall keep the transaction contemplated hereby and all proprietary or confidential information relating to the Purchased Assets (including, without limitation, technical, business, financial or customer information, trade secrets, methods, processes, forecasts, or other information of a similar nature that is customarily treated as confidential) strictly confidential and shall not disclose or use such information except as may be required by law or as otherwise filed in connection with the Bankruptcy Cases (and if so required by law, the Party with the obligation to so disclose shall provide the other Party with advance notice of the required disclosure). In addition to, and without limiting the foregoing, Buyer agrees to coordinate with Seller, as applicable (and vice versa), in gathering audit information required and providing responses to desk audits within audit response timeframes for any liabilities, losses, deficiencies, claims, damages, expenses (including, without limitation, reasonable costs and attorneys' fees, reasonable costs and attorneys' fees on appeal), judgments, proceedings, and causes of action of any kind. The provisions of this Section 14 shall survive Closing, the Facility Closing and the Inmar Closing Date, and shall be binding on each Party's legal representatives, successors and assigns. The Purchased Assets are being transferred to Buyer for Buyer's sole and exclusive use.

15.   **Communications**. Neither Party shall (i) produce any press releases or other advertising or (ii) issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets, at any time prior to or after the Closing Date, the Facility Closing Date and the Inmar Closing Date, unless otherwise agreed upon in writing by the other Party or required in connection with the Bankruptcy Cases, in accordance with the occurrence of the Sale Approval Conditions. Notwithstanding anything to the contrary herein, Seller shall have the right to notify the public (including through posting of signage, mailing of letters or placement of newspaper notices, as applicable) that the Purchased Assets will be transferred to Buyer in order

to comply with federal and state law, including applicable state pharmacy board requirements; provided, however, that Seller shall give Buyer reasonable prior notice of any such required notifications identifying Buyer. The foregoing shall not apply to restrict the dissemination of information by Buyer, its direct or indirect shareholders or their respective affiliates to current or prospective limited partners, lenders, insurers, investors or prospective limited partners, lenders, insurers or investors on a "need to know" basis (provided, however, that any such dissemination shall be subject to Section 14 in all respects).

16.     **Taxes**.

A.      Notwithstanding anything in this Agreement to the contrary, Buyer and its respective agents shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable law.  If Buyer identifies any obligation to deduct or withhold any amount payable to Seller under this Agreement (other than a result of Seller's failure to deliver the form described in Section 4.B, Buyer shall notify Seller in writing at least five (5) days prior to the Closing Date, the Facility Closing Date or the Inmar Closing Date, as applicable, of such obligation to deduct and withhold (or as soon as practicable after Buyer becomes aware that it is required to make such deduction or withholding if later), and the Parties shall use their respective commercially reasonable efforts to reduce or eliminate such withholding. If any amount is so withheld and paid over to the applicable governmental body or other appropriate person, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person with respect to which such deduction or withholding was imposed.

B.      Buyer and Seller shall each be responsible for and timely pay to the applicable governmental body 50% of any transfer, documentary, sales, use, excise, stock transfer, stamp, recording, registration and other similar taxes (collectively, "**Transfer Taxes**") on the sale or transfer of the Purchased Assets at Closing, the Facility Closing Date and the Inmar Closing Date, as applicable; provided, however, that Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws. Buyer and Seller shall cooperate in good faith to minimize, to the extent permissible under applicable law, the amount of any Transfer Taxes. Personal property taxes on the Purchased Assets shall be prorated between Buyer and Seller as of the Closing Date, the Facility Closing Date and the Inmar Closing Date, as applicable.

17.     **Miscellaneous**.

A.      **Notices**. All notices given hereunder shall be in writing and shall be given by personal delivery, email, U.S. Mail (return receipt requested), United States Express Mail (postage or delivery charge prepaid), or other established express delivery service (such as Federal Express or DHL), addressed to the appropriate Party as set forth below or to such other address as any Party shall have previously designated by notice in accordance herewith. Any such notice shall be deemed effective (i) on the date of personal delivery, (ii) on the date sent by email if sent between 9:00 A.M. and 6:00 P.M. (Eastern Time) on a business day (and, if sent outside of such hours, at 9:00 A.M. (Eastern Time) on the next business day), or (iii) one day after delivery to a reputable overnight courier service, in each case properly addressed and with all charges prepaid.

> Seller:          c/o Rite Aid Corporation
>                  200 Newberry Commons, Etters, PA 17319 (street address)

P.O. Box 3165, Harrisburg, PA 17105 (mailing address)
Attn: Secretary

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn:   Megan Spelman; Andrew N. Rosenberg; Alice Belisle
Eaton; Christopher Hopkins; Sean Mitchell
Email:  mspelman@paulweiss.com;
arosenberg@paulweiss.com; aeaton@paulweiss.com;
chopkins@paulweiss.com; smitchell@paulweiss.com

Buyer:          McKesson Corporation
6555 North State Hwy 161, Irving, Texas 75039
Attn: Justin Bowers
Senior Vice President, General Manager
Financial Services & Solutions

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attn:  Dennis M. Twomey; Jackson T. Garvey; Alexis A. Cooper
Email:  dtwomey@sidley.com; jgarvey@sidley.com;
acooper@sidley.com

All notices shall be deemed given upon receipt or refusal.

B.     **Entire Agreement; Severability**. This Agreement constitutes the entire agreement of the Parties and supersedes all other prior or contemporaneous agreements, oral or written, with respect to this transaction. This Agreement may not be modified or otherwise amended, unless in writing and duly authorized by Buyer and Seller. If any of the terms of this Agreement are held by any court of competent jurisdiction to be unenforceable, such provisions shall be severed from the Agreement and the remainder of the Agreement shall be given effect by the Parties as if such provision(s) never had been part of the Agreement.

C.     **Assignment**. Neither Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Party; provided, however, that Buyer may assign its rights under this Agreement (i) to one or more of its affiliates (with prior written notice to Seller) or (ii) in connection with any collateral assignment to its lenders, in each case without Seller's consent, provided, further, that in each case of (i) and (ii), Buyer shall remain jointly and severally liable in all respects for Buyer's obligations under this Agreement. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their successors and assigns. All successors and assigns of the Debtors, including any plan administrator, will be entitled to enforce the terms and provisions of this Agreement in all respects.

15

D.    **Headings**. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

E.    **Further Assurances**. Either Party will, and will cause its respective affiliates to, cooperate in good faith with the other Party and from time to time do and perform such additional acts and execute and deliver such additional documents, instruments, conveyances and assurances as may be required by applicable governmental rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement. Without limiting the generality of the foregoing, each Party agrees to endorse, if necessary, and deliver to the other, promptly after its receipt thereof, any Purchased Asset, payment, or document which it receives after Closing, the Facility Closing Date and the Inmar Closing Date, as applicable, and which is the property of the other.

F.    **Survival of Terms**.  All of the provisions of this Agreement which impose continuing or new obligations or liabilities on Seller and/or Buyer after the Closing Date, the Facility Closing Date and the Inmar Closing Date, as applicable, shall survive the date and the delivery of each of the Facility Inventory Bill of Sale, the Initial Inmar Inventory Bill of Sale, the Subsequent Inmar Inventory Bill of Sale and the Purchased Assets to Buyer. Without limiting the foregoing, all representations, warranties, and indemnities shall survive the Closing Date, the Facility Closing Date and the Inmar Closing Date, as applicable, and the delivery of the Facility Inventory Bill of Sale, the Initial Inmar Inventory Bill of Sale, the Subsequent Inmar Inventory Bill of Sale and the Purchased Assets to Buyer.

G.    **Default**. In the event of a breach of covenant or obligation by any Party to this Agreement (a "**Breach**"), the non-breaching Party may:

   i.    if such Breach occurs (a) prior to the Closing Date, terminate this Agreement upon written notice to the breaching Party; (b) following the Closing Date and prior to the  Facility Closing Date and the Inmar Closing Date, terminate this Agreement, with respect to the purchase of the Facility Inventory and the Subsequent Inmar Inventory, upon written notice to the breaching Party; or (c) following the Closing Date and the Facility Closing Date, but prior to the Inmar Closing Date, terminate this Agreement, with respect to the purchase of the Subsequent Inmar Inventory, upon written notice to the breaching Party; or

   ii.    seek specific performance of this Agreement and/or injunctive relief. The Parties intend that this Agreement may be specifically enforced.

Neither Party shall be deemed to be in Breach under this Agreement except upon the expiration of twenty (20) days (ten (10) days in the event of failure to pay money) from receipt of written notice from the other Party specifying the particulars in which such Party has failed to perform its obligations under this Agreement unless such Party, prior to expiration of said twenty (20)-day period (ten (10)-day period in the event of failure to pay money), has remedied the particulars specified in said notice of Breach. From and after the Inmar Closing Date, in no event shall Seller be required to pay any damages in excess of the actual Purchase Price paid by Buyer to Seller hereunder.

H.    **Governing Law; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware for which any dispute may arise,

16

including all matters of construction, validity of performance and enforcement. Each of the Parties irrevocably agrees that any action of any kind that may be based upon, arising out of, or related to this Agreement will be brought and determined only in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) if the Bankruptcy Court is unwilling or unable to hear such action, in the Court of Chancery of the State of Delaware.

I.      **Attorneys' Fees**. If either Party takes legal action to enforce the terms of this Agreement, the prevailing Party in such action shall recover its reasonable costs and attorneys' fees and expenses sustained or incurred in connection with the defense, investigation, adjudication, settlement or other resolution of any controversy or claim, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing Party will be the Party that is awarded judgment as a result of trial or arbitration, or the Party that receives a payment of money from the other Party in settlement of claims asserted.

J.      **Counterparts**. This Agreement may be executed by facsimile or pdf copies in two or more counterparts and once so executed by the Parties hereto, each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute one agreement. Facsimile and email signatures shall be deemed originals for purposes of enforcement.

K.      **No Third Party Beneficiaries**. It is the intention of the Parties that no individual or entity be construed or considered to be an intended or implied third-party beneficiary under this Agreement.

L.      **Time of the Essence**. All times provided for in this Agreement for the performance of any act will be strictly construed, time being of the essence.

M.      **Incorporation of Schedules and Exhibits**. All schedules and exhibits are incorporated into this Agreement as if set forth in full herein.

N.      **No Set-Off for Non-APA Claims**. Buyer, on its own behalf and on behalf of any of its affiliates and each of their respective former, current or future affiliates, officers, directors, employees, partners, members, managers, agents, and advisors, and its and their respective successors and permitted assigns (the "**Buyer Group**"), hereby waives, solely as a defense to payment of the Purchase Price and not for any other purposes, any rights of set-off, netting, offset, recoupment or similar rights that Buyer or any member of the Buyer Group may have, with respect to any existing claims against Seller or its affiliates that arise prior to the date hereof and do not arise under this Agreement, including claims under Section 503(b)(9) of the Bankruptcy Code or any other administrative or priority claims.

O.      **Waiver**. No covenant, term or condition, or breach thereof, shall be deemed waived except by written consent of the Party against whom the waiver is claimed, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature. Any claim of the breach of any covenant, term or condition of this Agreement shall not be deemed a waiver of any other covenant, term or condition herein.

P.      **No Damages**. In no event shall either Party be responsible for punitive damages, and each Party agrees, regardless of cause, not to assert any claim whatsoever against the other Party for such damages, except to the extent such damages are paid to a third party.

Q.      **Construction**. When a reference is made herein to a section, schedule or exhibit, such

reference shall be to a section of, or a schedule or exhibit to, this Agreement unless otherwise indicated. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a person are also to its permitted successors and assigns. For all purposes of this Agreement, unless otherwise specified herein, (i) "or" shall be construed in the inclusive sense of "and/or"; (ii) words (including capitalized terms defined herein) in the singular shall be construed to include the plural and vice versa; (iii) words (including capitalized terms defined herein) of one gender shall be construed to include all other genders as the context requires; (iv) the terms "hereof" and "herein" and words of similar import shall be construed to refer to this Agreement as a whole (including all the schedules and exhibits) and not to any particular provision of this Agreement; (v) the words "include", "includes" and "including" and words of similar import when used in this Agreement shall mean "including, without limitation"; (vi) the words "will" and "will not" are expressions of command, not merely expressions of future intent or expectation; (vii) references to "day" shall mean a calendar day, unless otherwise expressly specified; and (viii) all references herein to "$" or dollars shall refer to United States dollars. Each representation, warranty, covenant and agreement contained herein shall have independent significance.

18. **Termination**. This Agreement may be terminated at any time prior to the Closing (with respect to the Initial Inmar Inventory), the Facility Closing Date (with respect to the Facility Inventory) or the Inmar Closing Date (with respect to the Subsequent Inmar Inventory):

A. By mutual written agreement of Buyer and Seller;

B. By Buyer or Seller if the Closing has not occurred on or before October 10, 2025 (the "**Outside Date**"); provided, however, that the right to terminate this Agreement under this Section 18.B shall not be available to any Party whose breach of this Agreement has been the principal cause of, or resulted in, the failure of the Closing to occur by such date;

C. By Buyer or Seller if the Facility Closing has not occurred on or before November 17, 2025 (the "**Facility Outside Date**"); provided, however, that the right to terminate this Agreement under this Section 18.C shall not be available to any Party whose breach of this Agreement has been the principal cause of, or resulted in, the failure of the Facility Closing to occur by such date;

D. By Buyer or Seller if the Inmar Closing Date has not occurred on or before November 17, 2025 (the "**Inmar Outside Date**"); provided, however, that the right to terminate this Agreement under this Section 18.D shall not be available to any Party whose breach of this Agreement has been the principal cause of, or resulted in, the failure of the Inmar Closing Date to occur by such date;

E. By either Buyer or Seller if the Bankruptcy Court or any other governmental body shall have issued a final, non-appealable order permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby; or

F. By the non-breaching Party pursuant to Section 17.G.i.

In the event of termination of this Agreement pursuant to this Section 18, this Agreement shall forthwith become void and of no effect without liability of any Party; provided, however, that notwithstanding any termination of this Agreement pursuant to this Section 18, the breaching Party shall remain liable for any and all liabilities, damages, losses or obligations arising from or relating to such Breach, and termination shall not be deemed to waive or limit any rights or remedies available to the non-breaching Party at law or in equity with respect to such Breach.

[*Signature Pages Follow.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.


**BUYER:**

McKesson Corporation

Signed by:

By: _____

Name: Justin Bowers

Its: SVP & GM, Finance Shared Service

**SELLER:**

Rite Aid of New Jersey, Inc.

By: _____
Name: Steven Bixler
Its: Vice President and Treasurer

**Schedule 1**

| Closing Date | Address | City | State | Zip | Initial Inmar Inventory Purchase Price | Subsequent Inmar Inventory Purchase Price | Facility Inventory Purchase Price | Purchase Price |
|---|---|---|---|---|---|---|---|---|
| | 701 Delran Parkway | Delran | NJ | 08075 | See Exhibit D | See Exhibit D | See Exhibit B and Exhibit D | |

## **Schedule 2**

**INITIAL INMAR INVENTORY**

[See attached.]

## Exhibit A

**BILL OF SALE**

KNOW ALL PERSONS BY THESE PRESENTS:

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, [●], a [●] ("**Seller**"), does hereby return, sell, assign, transfer, convey, and deliver to [●], a [●] ("**Buyer**"), the following assets referenced in that certain Asset Purchase Agreement (the "**Agreement**") between Seller and Buyer dated as of September 18, 2025 for the Facility located at [●]: all of Seller's right, title and interest in, under and to the Purchased Assets (other than the Inmar Inventory) with the exception of all items specifically excluded by the Agreement. This Bill of Sale evidences the agreement by which Seller provides product to Buyer, the authorized immediate trading partner from which such product was purchased or received.

All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Agreement.

Seller hereby represents and warrants that the Purchased Assets (other than the Inmar Inventory) are free and clear of and from all Liens and encumbrances and that Seller has the right to sell the same, and that Seller, its successors and assigns, will warrant and defend the sale and transfer of the Purchased Assets (other than the Inmar Inventory) to Buyer against the lawful claims and demands of all persons whomsoever.

In addition, Seller hereby assigns and transfers to Buyer any and all warranties relating to the Purchased Assets (other than the Inmar Inventory) which may be lawfully assigned or transferred.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this [●] day of [●] 2025.

*[Signature Page to Follow.]*

**Seller**:

Rite Aid of New Jersey, Inc.


By:_____
Name:
Its:

**Exhibit B**

**FACILITY INVENTORY INSTRUCTIONS**

In connection with the Asset Purchase Agreement (the "**Agreement**") dated as of September 18, 2025 by and between McKesson Corporation, a Delaware corporation ("**Buyer**"), and Rite Aid of New Jersey, Inc., a New Jersey corporation ("**Seller**"), this **Exhibit B** sets forth the agreed upon methods, standards and procedures for counting and determining the value of the Facility Inventory. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

1.   <u>General Instructions</u>.

1.1.   At least one (1) qualified representative of each of Buyer and Seller must be present throughout the Facility Inventory Review.

1.2.   Buyer shall take possession of the Facility Inventory at the Facility, and shall be responsible for any shipping costs incurred after taking possession. For the avoidance of doubt, each Party shall bear its own costs and expenses incurred in connection with the Facility Inventory Review, and Buyer shall not be responsible for, and shall not reimburse Seller for, any costs that Seller may incur in preparing the Facility Inventory for shipping.

1.3.   No pre-counting of inventory will be permitted.

1.4.   Buyer's representative will prepare two (2) copies (or one (1) original and one (1) photocopy) of the "Physical Inventory Review Report" in the form attached as <u>Annex I</u> hereto, which must be approved and signed by representatives of both Buyer and Seller at the conclusion of the inventory. After the Physical Inventory Review Report has been signed by the aforementioned representatives, Seller and Buyer will each retain a copy of the same.

1.5.   Buyer will determine (in cooperation with Seller) whether the inventory satisfies the requirements of being included in Purchased Assets (i.e., whether it is Saleable and Returnable, or should be Excluded Inventory).

1.6.   Buyer will reconcile (in cooperation with Seller) the invoices and 3T Documentation against the Facility Inventory to ensure the return authorization process can be executed and accurate 3T Documentation is being transferred to Buyer.

1.7.   As inventory is determined to satisfy the requirements of being Purchased Assets in accordance with these Facility Inventory Instructions, such inventory shall be loaded into totes (which shall be provided by Seller for such purpose) and sealed by Buyer or its agents. Once sealed, such totes shall not be unsealed by any person until delivery to Buyer on the Closing Date in accordance with the Agreement or valid termination of the Agreement. Buyer shall have no obligation to return any totes used to transport the Facility Inventory, or to make any payment in respect thereof, and Buyer may dispose of such totes in its discretion.

2.   <u>Cut-Off Procedure</u>.

2.1.   All Facility Inventory received up to, but not including, the day of the inventory shall be included in the inventory. Seller shall be responsible for the payment of all invoices for merchandise received up to, but not including, the day of inventory.

2.2.    Seller shall not accept or permit the transfer of merchandise from any other store or from any warehouse of Seller on the Closing Date.

3.    <u>Valuation Of Facility Inventory; Excluded Inventory</u>.

3.1.    <u>Valuation</u>. In calculating the Facility Inventory Purchase Price, the Parties shall value the Facility Inventory in accordance with the methodology set forth on **Exhibit D**.

3.2.    <u>Excluded Inventory</u>. The Parties shall not ascribe any value to Excluded Inventory or any inventory set forth in Section 2.A of the Agreement.

3.3.    <u>Inventory Preparation</u>. Open containers will not be accepted consistent with current returns practice. Product must be a complete manufacturer saleable unit or in larger bulk container and in manufacturer's packaging and labeling. Items to be excluded from the sale will be pulled and accumulated at a pre-designated location for disposition.

<u>**Annex I**</u>
**Form of Physical Inventory Review Report**

DATES AND TIMES OF INVENTORY: _____

_____

_____

STORE LOCATION: _____

SECTION TO BE COMPLETED BY BUYER'S AND SELLER'S REPRESENTATIVES

|  | **Invoice Price** | **X Cost Factor** | **Cost $** |
|---|---|---|---|
| **Brand RX**<br>See Exhibit D | $_____ | x See Exhibit D | $_____ |
| **Generic RX**<br>See Exhibit D | $_____ | x See Exhibit D | $_____ |
| **TOTAL INVENTORY** | $_____ |  | $_____ |

UPON COMPLETION, BOTH SELLER'S AND BUYER'S REPRESENTATIVES MUST SIGN WITH A THIRD-PARTY WITNESS. IMMEDIATELY THEREAFTER, EMAIL COPIES OF BOTH THIS SHEET AND THE INVENTORY SERVICE FINAL COUNT SHEET TO ABUBAKER.DURRANI@RITEAID.COM AND BRANDY.HULSEY@MCKESSON.COM. PLEASE INCLUDE A COVER PAGE SHOWING THE NAME OF EACH PERSON WHO SIGNED THE DOCUMENT AND THEIR TITLE, AS WELL AS THE STORE NUMBER AND ADDRESS OF THE INVENTORIED LOCATION. PLEASE CONTACT ABU BAKER DURRANI (ABUBAKER.DURRANI@RITEAID.COM) WITH ANY QUESTIONS.

The above and foregoing is accepted by Buyer and Seller as the final total dollar value of the pharmaceuticals located at the captioned store, subject to the terms and conditions of the Agreement, including, but not limited to, Section 7 thereto.

**SELLER:**                                              **BUYER:**

By:_____          By:_____
Authorized Representative                              Authorized Representative

**<u>Exhibit C</u>**

**WIRE INSTRUCTIONS**

[See attached.][1]

---

[1]   <u>Note to Draft</u>: Wire instructions to be inserted when signing is close at hand and sent directly among the business side through a password-protected secure method.

## <u>Exhibit D</u>

## PRICING CHART

| Category | Valuation |
|---|---|
| Facility Inventory that is generic inventory (non-controlled) | 40% of the applicable Invoice Price |
| Facility Inventory that is branded inventory (non-controlled) | 65% of the applicable Invoice Price |
| Inmar Inventory | 50% of the credit value received from the applicable manufacturer in Buyer's name |

## <u>Exhibit E</u>

### BILL OF SALE

KNOW ALL PERSONS BY THESE PRESENTS:

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, [●], a [●] ("**Seller**"), does hereby return, sell, assign, transfer, convey, and deliver to [●], a [●] ("**Buyer**"), the following assets referenced in that certain Asset Purchase Agreement (the "**Agreement**") between Seller and Buyer dated as of September 18, 2025 for the Facility located at [●]: all of Seller's right, title and interest in, under and to the [Initial/Subsequent] Inmar Inventory with the exception of all items specifically excluded by the Agreement. This Bill of Sale evidences the agreement by which Seller provides product to Buyer, the authorized immediate trading partner from which such product was purchased or received.

All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Agreement.

Seller hereby represents and warrants that the [Initial/Subsequent] Inmar Inventory is free and clear of and from all Liens and encumbrances and that Seller has the right to sell the same, and that Seller, its successors and assigns, will warrant and defend the sale and transfer of the [Initial/Subsequent] Inmar Inventory to Buyer against the lawful claims and demands of all persons whomsoever.

In addition, Seller hereby assigns and transfers to Buyer any and all warranties relating to the [Initial/Subsequent] Inmar Inventory which may be lawfully assigned or transferred.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this [●] day of [●] 2025.

*[Signature Page to Follow.]*

**Seller**:

Rite Aid of New Jersey, Inc.


By:_____
Name:
Its: