

**Order Filed on September 22, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Jointly Administered) |

### ORDER (I)(A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION PROCEDURES, (C) APPROVING THE FORM OF BALLOT AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF AND (II)(A) SCHEDULING CERTAIN DATES WITH RESPECT TO THE DISMISSAL OF THE CHAPTER 11 CASES, AND (B) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through twenty-two (22), is

**ORDERED**.

**DATED: September 22, 2025**

*Michael B. Kaplan*
Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

1     The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

(Page | 3)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), pursuant to sections 105, 305, 349, 363, 502, 554, 1107(a), 1108, 1112, 1123(a), 1124, 1125, 1126, 1128, and 1129 of the Bankruptcy Code, Bankruptcy Rules 1017, 2002, 3001, 3003, 3016, 3017, 3018, 3020, 6007, 9006, 9013-1, and 9014 and Local Rules 2002(b), 3016-1, 3018-1 and 9013-1: (a) (i) conditionally approving the adequacy of the *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "Disclosure Statement"); (ii) approving the Solicitation Procedures; (iii) approving the Ballot and Opt-Out Form; (iv) approving the Solicitation Packages; (v) approving the Non-Voting Claimants' Package; (vi) approving the Combined Hearing / Dismissal Hearing Notice; (vii) approving the Publication Notice; (viii) approving the Assumption Notice; (ix) approving any other notices in connection therewith; and (x) scheduling certain dates with respect thereto including but not limited to the Voting Record Date, the Plan Supplement Filing Deadline, the Dismissal Orders filing deadline, the Solicitation Mailing Deadline, the Publication Deadline, the deadline to file the Toggle Notice, the Dismissal Orders Objection Deadline, the deadline to file a form Confirmation Order, the Dismissal Hearing, the Voting and Opt-Out Deadline, the Deadline to File Voting Report, the Confirmation and Final Disclosure Statement Objection Deadline, the Confirmation Brief and Confirmation and Final

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

Disclosure Statement Reply Deadline, and the Combined Hearing Date; and (b) in the alternative (i) approving Dismissal of the Debtors' Chapter 11 Cases; (ii) scheduling certain dates and procedures with respect thereto, and (iii) granting related relief; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sufficient cause exists for the relief set forth herein; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as provided herein.

## I.      Approval of the Disclosure Statement on a Conditional Basis.

2.      The Disclosure Statement is hereby approved on a conditional basis as containing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code. This approval is without prejudice to the right of any party in interest to argue at the Combined

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

Hearing that the Disclosure Statement does not contain adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code, and this Order shall be without preclusive effect as to any determination by the Court at the Combined Hearing solely regarding the adequacy of the information contained in the Disclosure Statement within the meaning of section 1125(a)(1) of the Bankruptcy Code.

3.     For the avoidance of doubt, notwithstanding anything to the contrary herein, the burden shall remain on the Debtors to demonstrate at the Combined Hearing that the Disclosure Statement contains adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code.

4.     The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims or Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in <u>Article X</u> of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

(Page | 6)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

**II.     Approval of the Ballot, the Timeline, the Forms of Notices Related to Solicitation, the Combined Hearing, and the Objection Procedures Thereto.**

     **A.     Approval of the Solicitation Procedures.**

     5.     The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures attached hereto as **Exhibit 2**, which are hereby approved in their entirety and comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

     **B.     Scheduling of the Voting Record Date, Solicitation Mailing Deadline, Voting and Opt-Out Deadline, Dismissal Hearing, Combined Hearing, and Related Filing Deadlines.**

     6.     The following Confirmation / Dismissal Dates are hereby established (subject to modification as necessary) with respect to (i) the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan and (ii) entry of the Dismissal Orders:

| Event | Date | Description |
|---|---|---|
| Voting Record Date | September 8, 2025 | The date to determine which Holders of Claims are entitled to vote to accept or reject the Plan (the "Voting Record Date"). |
| Solicitation Mailing Deadline | No later than September 26, 2025 | The deadline by which the Debtors must distribute Notices of Non-Voting Status and Solicitation Packages, including the Ballot, to Holders of Claims entitled to vote to accept or reject the Plan (the "Solicitation Mailing Deadline"). |
| Publication Deadline | No later than September 26, 2025 | The date by which the Debtors will submit the Combined Hearing / Dismissal Hearing Notice in a format modified for publication (such notice, the "Publication Notice," and such date, the "Publication Deadline"). |

(Page | 7)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

| Event | Date | Description |
|---|---|---|
| Deadline to File Toggle Notice | September 26, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file the notice indicating whether a Confirmation of the Plan or the Non-Plan Toggle will be pursued (the "Toggle Notice") |
| Deadline to File Confirmation Order (if applicable) | September 29, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file with the Court a proposed order confirming the Plan (the "Confirmation Order"). |
| Deadline to File Dismissal Orders (if applicable) | September 30, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file a proposed form of Dismissal Orders. |
| Plan Supplement Filing Deadline (if applicable) | September 30, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file the Plan Supplement (the "Plan Supplement Filing Deadline"). |
| Voting and Opt-Out Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which all Ballots and Opt-Out Forms must be properly executed, completed, and submitted (the "Voting and Opt-Out Deadline") so that they are **actually received** by Kroll Restructuring Administration LLC (the "Claims Agent"). |
| Dismissal Orders Objection Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which parties in interest may file objections to the proposed form of Dismissal Orders and corresponding relief requested in the Motion (the "Dismissal Orders Objection Deadline"). |
| Confirmation and Final Disclosure Statement Objection Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which parties in interest may file objections to (i) Confirmation of the Plan and final approval of the Disclosure Statement or (ii) entry of the Confirmation Order, as applicable (the "Confirmation and Final Disclosure Statement Objection Deadline"). |
| Deadline to File Reply in Support of Dismissal Orders (if applicable) | October 17, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which any party in interest may file a reply in support of entry of the Dismissal Orders. |

(Page | 8)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

| Event | Date | Description |
|---|---|---|
| Confirmation Brief and Confirmation and Final Disclosure Statement Reply Deadline (if applicable) | October 17, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which (i) the Debtors shall file their brief in support of Confirmation of the Plan (the "Confirmation Brief") and reply to objections to Confirmation of the Plan and final approval of the Disclosure Statement and (ii) any party in interest may file a reply in support of entry of the Confirmation Order (the "Confirmation and Final Disclosure Statement Reply Deadline"). |
| Deadline to file Voting Report (if applicable) | October 17, 2025 or three (3) days prior to the Combined Hearing Date, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file, if applicable, the report tabulating voting on the Plan (the "Voting Report"). |
| Dismissal/Combined Hearing Date (as applicable) | October 20, 2025, at 9:00 a.m., prevailing Eastern Time | The date of the Combined Hearing at which the Court will consider Confirmation of the Plan, final approval of the Disclosure Statement, and entry of the Confirmation Order (the "Combined Hearing Date"). OR The date of the hearing at which the Court will consider entry of the Dismissal Orders. |

7.     The Solicitation Mailing Deadline provides sufficient time for Holders of Claims entitled to vote on the Plan to make informed decisions with respect to voting on the Plan. The Debtors may adjourn the Combined Hearing / Dismissal Hearing Date and any related dates and deadlines from time to time, without notice to the parties in interest other than announcement of such adjournment in open court and/or filing a notice of adjournment with the Court and serving

(Page | 9)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

such notice on the parties required to be notified under Bankruptcy Rule 2002 and any applicable local bankruptcy rules.

8.    With respect to any transferred Claim, only the Holder of such Claim as of the Voting Record Date shall be entitled to receive a Solicitation Package and, if applicable, cast a Ballot on account of such Claim. Any transferee of such Claim after the Voting Record Date shall be bound by any vote on the Plan made by the Holder of such Claim as of the Voting Record Date.

9.    Notwithstanding anything to the contrary herein, the Debtors are authorized to extend or otherwise modify the dates by which the Toggle Notice and Voting Report shall be filed with the Court; *provided*, *however*, that the Debtors will file notice of any modification to such deadlines. In the event that the Debtors file a Toggle Notice indicating that the Debtors intend to pursue entry of the Dismissal Orders, the Debtors are authorized to proceed with the dismissal path as set forth in the Motion and this Order. If necessary, the Court shall hold a hearing to consider entry of the Dismissal Orders (the "Dismissal Hearing") on October 20, 2025, at 9:00 a.m., prevailing Eastern Time.

**C.    Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

10.    The Solicitation Packages to be transmitted on or before the Solicitation Mailing Deadline to those Holders of Claims entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.    the Disclosure Statement (and exhibits thereto, including the Plan), substantially in the form to be attached to this Order as Exhibit 1;

(Page | 10)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

b.      a copy of the Solicitation Procedures, substantially in the form attached to this Order as <u>Exhibit 2</u>;

c.      the form of Ballot, substantially in the form of Ballot attached to this Order as <u>Exhibit 3</u>, together with detailed voting instructions and instructions on how to submit the Ballot;

d.      the Combined Hearing / Dismissal Hearing Notice, substantially in the form attached to this Order as <u>Exhibit 5</u>;

e.      this Order (without exhibits, except for the Solicitation Procedures); and

f.      any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

11.      The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Mailing Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

12.      Only Holders of Prepetition FILO Claims in Class 3 who are reflected on the Prepetition ABL Agent's books and records as of the Voting Record Date shall be entitled to vote in the amount set forth on the books and records of the Prepetition ABL Agent.  The register of such Holders and voting amounts, as of the Voting Record Date, shall be provided to the Claims Agent in Microsoft excel, or similar, format upon request by the Debtors or Claims Agent, as applicable.

13.      The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b), 9006(c)(1), and 3017(d), the Bankruptcy Code, and the Local Rules.

(Page | 11)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

14.     The Debtors are authorized to cause the Solicitation Packages to be delivered via first-class mail and/or distributed in electronic format via e-mail, hyperlink, and/or flash drive, as applicable, through the Claims Agent to Holders of Claims in the Voting Class.  Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Claims Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense).

15.     The Debtors are authorized to distribute the Plan, Disclosure Statement, and this Order (without exhibits, except for the Solicitation Procedures) to Holders of Claims entitled to vote on the Plan in electronic format (i.e., via e-mail, hyperlink, and/or on a flash drive, as applicable[2]). The Ballot and the Combined Hearing / Dismissal Hearing Notice shall be provided in electronic format to those parties receiving service by e-mail, and paper format for those parties receiving service by first-class mail.  Any party that receives materials in electronic format via e-mail or flash drive but would prefer to receive materials in paper format or on a flash drive may contact the Claims Agent and request paper copies of the materials previously received in electronic format, to be provided at the Debtors' expense.

16.     The Debtors and Claims Agent are authorized to rely on the address information (for voting and non-voting parties alike) maintained by the Debtors and provided to the Claims Agent as of the Voting Record Date unless an alternative address was received by the Debtors

---

[2]     The flash drive shall contain the (i) fully compiled Disclosure Statement, including the Plan and (ii) the Order (without exhibits, except for the Solicitation Procedures).

(Page | 12)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

and/or the Claims Agent before the Voting Record Date.  Any obligation for the Debtors or the Claims Agent to conduct any additional research for updated addresses based on undeliverable solicitation materials (including undeliverable Ballots) is hereby waived.  Furthermore, notwithstanding anything herein to the contrary, neither the Debtors nor the Claims Agent shall be required to mail a Solicitation Package or any other materials related to voting or confirmation of the Plan to any person or entity from which the notice of the Motion or other mailed notice in this case was returned as undeliverable unless the Claims Agent is provided with accurate addresses for such persons or entities before the Voting Record Date.  The Debtors and the Claims Agent are not required to conduct any additional research or investigation to determine updated addresses for any party to whom Solicitation Packages or Non-Voting Claimants' Packages are returned as undeliverable, unless the Claims Agent is provided with accurate addresses for such Persons or Entities before the Voting Record Date.

17.     With respect to Holders of Claims or Interests who are not entitled to vote on the Plan who are currently incarcerated in a local jail, state or federal prison (or private facility under contract to federal, state, or local authorities), to the extent the Holder's proof of Claim reflects the mailing address for such facility, the Claims Agent shall mail to such address paper copies of all items included with the Non-Voting Claimants' Package.

18.     The Ballot, substantially in the form attached hereto as **Exhibit 3**, is hereby approved and complies with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(Page | 13)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

19.     The Debtors are authorized to cause the Non-Voting Claimants' Package to be delivered via first-class mail and/or e-mail, as applicable, through the Claims Agent to (i) Holders of Claims or Interests in the Non-Voting Classes, (ii) Holders of non-classified Claims and Interests, (iii) non-Debtor counterparties holding unexpired lease interests, and (iv) Holders of Disputed Claims.

20.     On or before the Solicitation Mailing Deadline, the Debtors (through the Claims Agent) shall provide complete Solicitation Packages (other than the Ballot) via electronic mail, first-class mail, overnight courier, or next day business service, in the Debtors' discretion, to the U.S. Trustee and all parties on the Master Service List, including parties required to be notified under Bankruptcy Rule 2002 and any applicable local bankruptcy rules.

21.     The Claims Agent is authorized to assist the Debtors in:  (a) distributing the Solicitation Packages and Non-Voting Claimants' Package; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors; (c) responding to inquiries from Holders of Claims or Interests and other parties in interest relating to the conditionally approved Disclosure Statement, the Plan, the Ballot, the Opt-Out Form, the Solicitation Packages, the Non-Voting Claimants' Package, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to confirmation of the Plan; (d) soliciting votes on the Plan; (e) if necessary, contacting creditors or interest Holders regarding the Plan and/or the Disclosure Statement; and (f) if necessary, contacting parties that submit an incomplete or

(Page | 14)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

otherwise deficient Ballot to make a reasonable effort to cure such deficiencies, as the Debtors and/or the Claims Agent deem necessary and applicable; *provided* that neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

22.     All votes to accept or reject the Plan must be cast by using the Ballot.  All Ballots must be properly executed, completed, and delivered according to its voting instructions online via the Debtors' restructuring website maintained by the Claims and Noticing Agent at https://restructuring.ra.kroll.com/RiteAid2025 (the "E-Ballot Portal"), so that the Ballots are **actually received** by the Claims Agent by no later than the Voting and Opt-Out Deadline.  The E-Ballot Portal is the sole manner in which Ballots shall be accepted.  Ballots submitted in hard copy format via regular mail, overnight courier, or hand delivery or by electronic mail or facsimile or any other electronic means (other than through the E-Ballot Portal) shall not be counted as a vote on the Plan except in the sole discretion of the Debtors.  The encrypted Ballot data and audit trail created by submission via the E-Ballot Portal will become part of the record of Ballots submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective.

23.     The Debtors and/or the Claims Agent are authorized to determine, in good faith, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation

(Page | 15)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

or withdrawal of Ballots, and such determinations shall be final and binding absent a contrary ruling by the Court.

24.     The Opt-Out Form, substantially in the form attached hereto as **<u>Exhibit 4A</u>** (the "Opt-Out Form"), is hereby approved in all respects.  The Opt-Out Form shall be distributed to (i) Holders of Claims or Interests in the Non-Voting Classes, (ii) Holders of non-classified Claims and Interests, (iii) non-Debtor counterparties holding unexpired lease interests, and (iv) Holders of Disputed Claims as part of the Non-Voting Claimants' Package, and such Holders shall be permitted to elect to "opt-out" of the Third-Party Release set forth in the Plan by properly completing and submitting the Opt-Out Form in accordance with the instructions therein.  The deadline to submit the Opt-Out Form shall be the same as the voting deadline for Ballots, as set forth in this Order, the Voting and Opt-Out Deadline.  For the avoidance of doubt, all Opt-Out Forms and Ballots must be properly executed, completed, and actually received by the Claims Agent by no later than October 13, 2025, at 4:00 p.m., prevailing Eastern Time.  Any Opt-Out Form received after the Voting and Opt-Out Deadline shall not be counted, except as otherwise determined by the Debtors in their discretion.

25.     The Claims Agent shall retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon, the Claims Agent is authorized to destroy and/or otherwise dispose of: (a) all paper copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-

(Page | 16)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the clerk of the Court in writing within such one (1) year period.

### D.     Approval of the Form of Notice to Non-Voting Classes.

26.     On or before the Solicitation Mailing Deadline, the Claims Agent shall mail the Non-Voting Claimants' Package, including the Combined Hearing / Dismissal Hearing Notice and the Notice of Non-Voting Status, the form of which, attached hereto as **Exhibit 4**, is hereby approved and complies with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, to those parties outlined below, who are not entitled to vote on the Plan:

| Class | Status | Treatment |
|---|---|---|
| Class 1 and Class 2 | Unimpaired—Deemed to Accept | Holders of Claims that are deemed to accept the Plan are not entitled to vote.  As such, Holders of such Claims, will receive a Notice of Non-Voting Status, substantially in the form attached to the Order as **Exhibit 4**, in lieu of a Solicitation Package. |
| Class 4, Class 7, and Class 8 | Impaired—Deemed to Reject | Holders of Claims or Interests that are deemed to reject the Plan are not entitled to vote.  As such, Holders of such Claims or Interests will receive a Notice of Non-Voting Status, substantially in the form attached to the Order as **Exhibit 4**, in lieu of a Solicitation Package. |

27.     Opt-Out Forms may be submitted either (a) via the E-Ballot Portal, or (b) by first-class mail, overnight courier, or hand delivery.  Electronic Opt-Out Forms shall not be accepted by facsimile, e-mail or any other electronic means (other than via the E-Ballot Portal or Public Securities Opt-Out Portal (as defined below)).  The encrypted Opt-Out Form data and audit trail created by submission via the E-Ballot Portal or Public Securities Opt-Out Portal will become

(Page | 17)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

part of the record of Opt-Out Forms submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective. To be effective, Opt-Out Forms must be actually received by the Claims Agent on or before the Voting and Opt-Out Deadline of October 13, 2025 at 4:00 p.m. (prevailing Eastern Time).

28.     Beneficial owners (the "Beneficial Holders") of the Debtors' Senior Secured Notes, whose positions in the Senior Secured Notes are held in 'street name' through a bank, broker, or other intermediary (each a "Nominee" and collectively, the "Nominees") shall receive their Non-Voting Claimants' Packages through their Nominees. The Claims Agent shall provide sufficient quantities of the Non-Voting Claimants' Package to each Nominee with instructions that they immediately forward the Non-Voting Claimants' Packages to their Beneficial Holder clients. Nominees are authorized to deliver the Non-Voting Claimants' Packages, and/or disseminate information pertaining thereto, to their Beneficial Holder clients according to their customary practices for doing so, including email, telephone and/or via an electronic link to an online platform. To be effective, Beneficial Holders who elect to opt-out of the grant of the Plan's Third-Party Release must submit their Opt-Out Form to the Claims Agent via the online portal on the Debtors' restructuring website maintained by the Claims Agent at https://restructuring.ra.kroll.com/RiteAid2025 (the "Public Securities Opt-Out Portal"), according to instructions contained therein, so as to be actually received on or before the Voting and Opt-Out Deadline.

(Page | 18)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

29.     The Debtors are not required to distribute Solicitation Packages, other solicitation materials, or Non-Voting Claimants' Packages to: (a) Holders of Claims that have already been paid in full during the Chapter 11 Cases or that are otherwise paid in full in the ordinary course of business pursuant to an order previously entered by this Court; (b) any party to whom the notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; (c) the holders of Class 5 Claims (Intercompany Claims) and Class 6 Interests (Intercompany Interests); or (d) parties that received a Non-Voting Claimants' Package, as applicable.

30.     Notwithstanding anything to the contrary contained herein, the Claims Agent shall not be required to serve Solicitation Packages or Non-Voting Claimants' Packages, or any other solicitation materials or notices, on account of Claims or Interests filed after the Voting Record Date but before the Voting and Opt-Out Deadline.

31.     The Non-Voting Claimants' Package shall include, among other things: (a) instructions as to how to view or obtain copies of the Disclosure Statement (including the Plan and the other exhibits attached thereto), the Order, and all other materials in the Solicitation Package (excluding the Ballot) from the Claims Agent and/or the Court's website via PACER; (b) notice to recipients of their status as Holders or potential Holders of Claims or Interests in non-voting classes; and (c) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article X of the Plan.

(Page | 19)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al*. |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

32.     For the avoidance of doubt, and notwithstanding anything to the contrary in this Disclosure Statement Order, Plan or Disclosure Statement, the Debtors shall cause the Non-Voting Claimants' package to be served upon all known Holders of Claims and Interests (other than those classified in class 3, 5, or 6), including, without limitation, Holders of non-classified Claims and Interests (*i.e.*, Holders of DIP Claims, Priority Tax Claims, etc.) and non-Debtor counterparties holding unexpired lease interests—including those that were previously rejected in the course of the Chapter 11 Cases—and such persons/entities shall remain eligible to elect to submit an Opt-Out Form through the Voting and Opt-Out Deadline.

### E.     Approval of the Combined Hearing / Dismissal Hearing Notice.

33.     The Combined Hearing / Dismissal Hearing Notice, substantially in the form attached hereto as **Exhibit 5**, which shall be filed by the Debtors and served upon parties in interest in these Chapter 11 Cases by no later than the Solicitation Mailing Deadline and published in a format modified for publication one time no later than the Publication Deadline, in the *New York Times* (national edition) or other national newspaper, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan and Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(Page | 20)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

**F.      Approval of Notices to Contract and Lease Counterparties.**

34.      The Debtors are authorized to mail a notice of assumption of any Executory Contracts or Unexpired Leases, in the form attached hereto as **Exhibit 6**, to the applicable counterparties to Executory Contracts and Unexpired Leases that may be assumed or assumed and assigned pursuant to the Plan, within the time periods specified in the Plan.  The deadlines to object to the Debtors' proposed assumption or assumption and assignment of and/or cure amount related to any such Executory Contract or Unexpired Lease, as set forth in the form attached hereto as **Exhibit 6**, are hereby approved.

**G.      Non-Substantive Modifications.**

35.      The Debtors are authorized to make non-substantive changes to the Plan, Disclosure Statement, Solicitation Procedures, Ballot, Solicitation Packages, Non-Voting Claimants' Package, Combined Hearing / Dismissal Hearing Notice, Publication Notice, Assumption Notice, and any notice attached hereto, and any related documents without further order of the Bankruptcy Court, including formatting changes, changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials (including any appendices thereto) in the Solicitation Packages before distribution; *provided*, *however*, that the Debtors shall provide the U.S. Trustee with notice of such non-substantive changes.  Subject to the foregoing, the Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with this Order, without further order of the Court.

(Page | 21)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

**H.    Approval of the Procedures for Filing Objections to (i) the Confirmation of the Plan and Final Approval of the Disclosure Statement and (ii) to Entry of the Dismissal Orders.**

36.    Objections to the confirmation of the Plan and final approval of the Disclosure Statement will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order.  Specifically, all objections to (i) the final approval of the Disclosure Statement, the confirmation of the Plan, or requests for modifications to the Plan, or (ii) entry of the Dismissal Orders, if any, **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of this Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served so as to be **actually received** on or before the Confirmation and Final Disclosure Statement Objection Deadline and Dismissal Orders Objection Deadline, as applicable, by each of the notice parties identified in the Combined Hearing / Dismissal Hearing Notice.

**III.    Miscellaneous.**

37.    The Debtors' rights are reserved to modify the Plan in accordance with Article XII of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

38.    Nothing in this Order shall be construed as a waiver of any rights, claims, defenses, or objections of the Debtors or any other party in interest, including, without limitation, the right

(Page | 22)

| | |
|---|---|
| Debtors: | NEW RITE AID, LLC, *et al.* |
| Case No. | 25-14861 (MBK) |
| Caption of Order: | Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief |

to object to any proof of Claim or Motion for payment of Administrative Claim. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39. Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rules and the Local Rules are satisfied by such notice.

40. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

41. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

42. The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 1**

## **Disclosure Statement**

SOLICITATION VERSION

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT**
**RELATING TO THE JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES**

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>[2]**

---

**THIRD-PARTY RELEASE**

**PLEASE BE ADVISED THAT <u>ARTICLE X</u> OF THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, WHICH ARE ALSO SET FORTH IN <u>ARTICLE VI.J</u> OF THIS DISCLOSURE STATEMENT.   <u>ARTICLE X.D</u> OF THE PLAN CONTAINS A THIRD-PARTY RELEASE.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SET FORTH IN <u>ARTICLE X</u> OF THE PLAN AS YOUR RIGHTS MAY BE AFFECTED.**

---

**<u>DISCLOSURE STATEMENT, DATED SEPTEMBER 19, 2025</u>**

**SOLICITATION OF VOTES ON THE JOINT CHAPTER 11 PLAN OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **PREPETITION FILO CLAIMS** |

    **IF YOU ARE IN CLASS 3 (THE "<u>VOTING CLASS</u>"), YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

---

[2]   Capitalized terms used in the sections entitled "Important Information About this Disclosure Statement" and "Special Notice Regarding Federal and State Securities Laws and Forward-Looking Statements" but not otherwise defined therein (as applicable) shall have the meanings given to them later in this Disclosure Statement (as defined below).

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE ACTUALLY RECEIVED BY THE CLAIMS AGENT BY THE VOTING AND OPT-OUT DEADLINE, WHICH IS 4:00 P.M. (PREVAILING EASTERN TIME) ON OCTOBER 13, 2025.  BALLOTS MAY ONLY BE SUBMITTED ONLINE VIA THE E-BALLOT PORTAL ON THE DEBTORS' RESTRUCTURING WEBSITE MAINTAINED BY THE CLAIMS AGENT AT:**

**HTTPS://RESTRUCTURING.RA.KROLL.COM/RITEAID2025.**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CALL THE CLAIMS AGENT AT (888) 575-9318 (USA OR CANADA, TOLL FREE) OR +1 (646) 930-4577 (INTERNATIONAL) OR EMAIL THE CLAIMS AGENT AT RITEAID2025INFO@RA.KROLL.COM WITH "IN RE NEW RITE AID, LLC – SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THIS "DISCLOSURE STATEMENT") PROVIDES INFORMATION REGARDING THE *FIRST AMENDED JOINT CHAPTER 11 PLAN OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES* (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "<u>PLAN</u>"),[3] WHICH THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN FROM CLASS 3, COMPRISED OF HOLDERS OF OUTSTANDING PREPETITION FILO CLAIMS.  ONLY HOLDERS OF CLAIMS IN CLASS 3 ARE ENTITLED TO VOTE ON THE PLAN UNDER THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS AND INTERESTS THAT (A) DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE X.D</u> OF THE PLAN OR (B) DO NOT FILE AN OBJECTION WITH THE COURT THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE X.D</u> OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  ANY HOLDER OF CLAIMS OR INTERESTS THAT OBJECTS TO OR ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE SET FORTH IN <u>ARTICLE X.D</u> OF THE PLAN

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between (i) this Disclosure Statement and the Plan, the Plan will govern, and (ii) this Disclosure Statement and any other materials contained in the Soliciation Package (other than the Plan), such other materials shall govern.

WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN **ARTICLE X.D** OF THE PLAN.

NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN **ARTICLE VIII** HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES AND IN ALL RESPECTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY SEEK TO OBJECT TO CLAIMS AFTER THE

CONFIRMATION OR EFFECTIVE DATE OF THE PLAN, IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS SPECIFICALLY NOTED OTHERWISE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, AMENDMENT, OR OTHER CHANGES.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE XI.A OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK-FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH FEDERAL OR STATE

SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS

No securities to be issued pursuant to the Plan have been approved or disapproved by the U.S. Securities and Exchange Commission (the "SEC") or by any state securities commission or similar public, governmental, or regulatory authority whether in the United States or elsewhere. This Disclosure Statement and the Plan have not been filed for approval with the SEC or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense in the United States. Neither the solicitation of votes on the Plan nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Upon confirmation of the Plan, the securities described in this Disclosure Statement will be issued without registration under the U.S. Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar U.S. federal, state, or local laws to persons resident or otherwise located in the United States in reliance on the exemption set forth in Section 1145 of the Bankruptcy Code. To the extent exemption from registration under Section 1145 of the Bankruptcy Code does not apply, the securities may not be offered or issued to persons resident or otherwise located in the United States except pursuant to (i) an effective registration statement or (ii) an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act, including section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or another available exemption under the securities laws of the United States. To the extent exemption from registration under Section 1145 of the Bankruptcy Code does not apply, the securities may be issued to persons outside the United States pursuant to Regulation S under the Securities Act ("Regulation S") and exemptions under the laws of foreign jurisdictions, as applicable. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor of the debtor under the plan is not liable, on account of such participation, for violation of any applicable law, rule, or regulation concerning the offer, issuance, sale, or purchase of securities.

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements." However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms. Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates. There can be no assurance that such statements will be reflective of actual outcomes. Forward-looking statements are provided in this Disclosure Statement pursuant to the safe-harbor established under the Private Securities Litigation Reform Act of 1995 and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein.

The reader is cautioned that all forward-looking statements are subject to significant risks, uncertainties, and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements. Important assumptions and other important factors that could cause actual results to differ materially from those expected include, but are not limited to, those factors, risks, and uncertainties described in more detail under the heading "Risk Factors" and elsewhere in the financial information

and projected recoveries included elsewhere herein.  Due to these uncertainties, readers cannot be assured that any forward-looking statements will prove to be correct.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.  The Debtors undertake no obligation to update or revise the forward-looking statements included in the Plan and Disclosure Statement, whether as a result of new information, future events or otherwise.

The statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified.  The terms of the Plan govern in the event of any inconsistency with the summaries in this Disclosure Statement.

No independent auditor or accountant has reviewed or approved the projected recoveries herein.  The Debtors urge each Holder of a Claim or Interest to consult with their own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Class 3 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Court's approval of the Plan at the combined hearing to approve the adequacy of the Disclosure Statement and Confirmation of the Plan (the "<u>Combined Hearing</u>").

# Table of Contents

Page

| | | |
|---|---|---|
| I. | INTRODUCTION. | 1 |
| II. | PRELIMINARY STATEMENT. | 1 |
| | A. Background. | 1 |
| | B. Overview of the Plan. | 8 |
| III. | OVERVIEW OF DEBTORS' OPERATIONS AND CORPORATE AND CAPITAL STRUCTURE. | 12 |
| | A. Rite Aid's History & Operations. | 12 |
| | B. Rite Aid's Prepetition Corporate and Capital Structure. | 15 |
| IV. | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 18 |
| | A. Challenges Following the 2023 Cases. | 18 |
| | B. Strategic Initiatives Explored Following the 2023 Cases. | 21 |
| | C. Footprint Rationalization and Rite Aid 2.0 Business Plan. | 21 |
| | D. Efforts to Obtain Incremental Liquidity. | 22 |
| | E. Advisor Engagement. | 23 |
| | F. Prepetition Sales and Marketing Process. | 23 |
| | G. Corporate Governance Efforts. | 24 |
| V. | MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE CHAPTER 11 CASES. | 24 |
| | A. First Day Motions. | 24 |
| | B. Other Motions & Pleadings. | 28 |
| | C. Section 341 Meeting and Appointment of Official Committee of Unsecured Creditors. | 29 |
| | D. Reporting Requirements. | 30 |
| | E. Stakeholder Engagement. | 30 |
| | F. The Debtors' Multi-Track Parallel Sales Processes. | 31 |
| | G. Approval of the DIP Facility. | 34 |
| | H. The Administrative Claims Procedures. | 36 |
| | I. Employee Matters. | 36 |
| | J. Adversary Proceedings & Other Bankruptcy Litigation. | 38 |
| | K. The Restructuring Support Agreement. | 43 |
| | L. Remaining Operations. | 43 |
| | M. Proposed Confirmation and Dismissal Schedule. | 43 |
| VI. | THE PLAN. | 45 |
| | A. Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims. | 45 |
| | B. Classification and Treatment of Claims and Interests. | 50 |
| | C. Treatment of Claims and Interests. | 50 |
| | D. Special Provision Governing Unimpaired Claims. | 54 |
| | E. Elimination of Vacant Classes. | 54 |
| | F. Voting Classes, Presumed Acceptance by Non-Voting Classes. | 54 |
| | G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. | 54 |
| | H. Controversy Concerning Impairment. | 54 |
| | I. Subordinated Claims. | 54 |
| | J. Releases, Injunctions, Discharge, and Related Provisions. | 55 |

**VII.**  **OTHER KEY ASPECTS OF THE PLAN.** .................................................................................63

   **A.**    Conditions Precedent to Consummation of the Plan.................................................63

**VIII.**  **RISK FACTORS.** ...............................................................................................................**64**

   **A.**    Bankruptcy Law Considerations. ...........................................................................65
   **B.**    Risks Related to Recoveries under the Plan. ............................................................68
   **C.**    Risks Related to the Offer and Issuance of Securities Under the Plan.......................70
   **D.**    Additional Factors...................................................................................................70

**IX.**  **SOLICITATION AND VOTING PROCEDURES.** .............................................................**71**

   **A.**    Votes Required for Acceptance by a Class. ..............................................................72
   **B.**    Certain Factors to Be Considered Prior to Voting. ..................................................72
   **C.**    Voting Procedures...................................................................................................73
   **D.**    Solicitation and Related Materials. .........................................................................78

**X.**  **CONFIRMATION OF THE PLAN.** ..................................................................................**81**

   **A.**    The Combined Hearing.............................................................................................81
   **B.**    Objections to Confirmation. ....................................................................................81
   **C.**    Requirements for Confirmation of the Plan. ............................................................82
   **D.**    Best Interests of Creditors/Liquidation Analysis. ...................................................82
   **E.**    Feasibility................................................................................................................83
   **F.**    Acceptance by Impaired Classes..............................................................................83
   **G.**    Confirmation Without Acceptance of Impaired Classes. ..........................................84

**XI.**  **CERTAIN SECURITIES LAW MATTERS.** .....................................................................**85**

   **A.**    Section 1145 Exemption. .........................................................................................85
   **B.**    Section 4(a)(2) of the Securities Act and Regulation S Under the Securities Act.......85
   **C.**    Trust Interests. ........................................................................................................85
   **D.**    Subsequent Transfers ..............................................................................................86

**XII.**  **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** ................................**88**

   **A.**    Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors. ..........91
   **B.**    Certain U.S. Federal Income Tax Consequences to the Non-U.S. Holders of Allowed Prepetition FILO Claims. ..................................................................................96
   **C.**    Information Reporting and Backup Withholding.......................................................97

**XIII.**  **RECOMMENDATION OF THE DEBTORS** .....................................................................**98**

**EXHIBITS**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Restructuring Support Agreement

EXHIBIT C     Organizational Structure Chart

EXHIBIT D     Liquidation Analysis

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## I.        INTRODUCTION.

On May 5, 2025 (the "Petition Date"), New Rite Aid, LLC and each of the debtors and debtors in possession in the above-captioned chapter 11 case (collectively, the "Debtors," "Rite Aid," or the "Company") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Court for the District of New Jersey (the "Court").    The Debtors' chapter 11 cases (the "Chapter 11 Cases") are jointly administered under the lead Case No. 25-14861.

The Debtors jointly submit this *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (as may be amended, supplemented, or modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors (collectively, the "Holders") in connection with the solicitation of votes for acceptance of the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (as may be amended, supplemented, or modified from time to time, the "Plan"),[1] filed contemporaneously herewith.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

Although referred to as a "joint" plan, the Plan comprises 118 separate plans (one for each Debtor's Chapter 11 Case).  For purposes of this Disclosure Statement, the Debtors distinguish between the Plan as it relates to the Reorganized Debtors, on the one hand, and the Plan as it relates to the Wind-Down Debtors, on the other.

The purpose of the Disclosure Statement is to provide Holders entitled to vote on the Plan with sufficiently detailed information to make an informed decision on whether to vote to accept or reject the Plan.  The Disclosure Statement contains, among other things, a summary of:  (i) the Debtors' business and certain historical events; (ii) key events during the Chapter 11 Cases; (iii) the treatment of Claims against and Interests in the Debtors under the Plan; (iv) risk factors affecting the Debtors; and (v) the standard for seeking Confirmation of the Plan.

## II.       PRELIMINARY STATEMENT.

### A.        Background.

#### 1.        Events Preceding the Commencement of the Debtors' Chapter 11 Cases.

Rite Aid, a leading full-service pharmacy and drug store chain, has served millions of Americans since its inception in 1962, when it began as a single location discount drug store in Scranton, Pennsylvania. Rite Aid's success turned on its ability to operate two separate lines of business—Rite Aid's prescription drug pharmacy business, through which its committed pharmacists delivered needed medications and accompanying care to millions of pharmacy-care customers across the country, and, its "front-end" retail business, through which Rite Aid sold a variety of non-prescription products, such as health, beauty, and convenience items.  The Company's pharmacy business complimented its retail business by driving a large volume of foot traffic into a given store location and thereby facilitating the sale of high-margin front-end merchandise.  The symbiotic nature of these business lines helped Rite Aid develop its reputation as a trusted and iconic brand.  However, despite its storied history of growth and success, Rite Aid has faced consistent and overwhelming setbacks.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

Like many companies in the retail and pharmacy space, adverse macroeconomic factors and business challenges since the COVID-19 pandemic—including elevated labor costs, declining reimbursement rates from third-party payors,[2] reduced demand for front-end merchandise, increased shrinkage, and the consumer shift away from shopping at brick-and-mortar stores—coupled with the Company's large lease portfolio and limited working capital, strained the Company's finances and operations.

On the heels of a pandemic that permanently changed consumer behavior, Rite Aid experienced falling sales and a tightening liquidity position.  The Company's constrained liquidity position triggered a vicious tailspin:  As Rite Aid's front-end merchandise vendors grew concerned about the Company's liquidity, they began imposing restrictive payment terms and lower credit limits on the Company.  These strained vendor credit relationships, coupled with limited capital, kneecapped the Company's ability to adequately stock its front-end business, which caused the Company's front-end merchandise sales to fall further.  As merchandise sales continued to fall, the Company's liquidity position was further strained, and in turn, caused vendors to further tighten trade terms.  Ultimately, these financial and operational challenges proved too much to bear and on October 15, 2023, Rite Aid Corporation and certain of its subsidiaries filed for chapter 11 protection in the Court (the "2023 Cases").

Through the restructuring effectuated in the 2023 Cases, the Company was able to deleverage its balance sheet and implement growth initiatives designed to strengthen its business and improve its competitive positioning in the retail pharmacy market.  In addition, the Company sold or wound down approximately 800 underperforming stores across the country, including substantially all of its stores in Michigan and Ohio.  In August 2024, the Company emerged from the 2023 Cases and immediately began implementing its post-emergence business plan, which, as discussed further below, was derailed by significant challenges.

As the Company attempted to implement its post-emergence business plan and stabilize its operations, it experienced unforeseen challenges.  Many vendors continued to impose restrictive trade terms on the Company.  In addition, the Company's ability to access incremental funding was both delayed and limited.  This significantly impaired Rite Aid's front-end business and triggered the same vicious cycle that prompted the commencement of the 2023 Cases, where tightening liquidity led to empty store shelves, which led to decreased sales, which caused the Company to have insufficient liquidity to operate its business and service its debts, which led to further constrained trade terms and, in turn, an even more precarious liquidity position.

        **2.**        **The Debtors' Prepetition Strategic Initiatives.**

In January 2025, the Company, faced with a number of operational and financial challenges and significant constraints on its ability to raise new capital, engaged in extensive arms' length and good faith negotiations regarding its financing needs with its Prepetition ABL Lenders (as defined below).  The results of these negotiations were memorialized in an amendment to the Prepetition Credit Agreement (as defined below) that provided the Company with incremental liquidity, which the Company intended to use to stabilize its operations.

---

[2]    A substantial portion of the Debtors' pharmacy revenue is currently generated from a limited number of third-party payors.  Many of these payors, including Medicare Part D plans and commercial payors, began adopting preferred pharmacy networks, in which participating pharmacies had to accept lower reimbursement in exchange for access to the payors' patient population.  The Debtors incurred negative financial impacts due to the declining reimbursement rates associated with these preferred networks.  Further, the Debtors were unable to offset lower reimbursement with additional prescription volume, other business, or improved efficiencies.

Although the amendment to the Prepetition Credit Agreement provided the Company with additional liquidity, this capital boost did not fully make up for the Company's continued decline in front-end sales and operational costs associated with running the business.  Accordingly, the Company continued to engage the Prepetition ABL Lenders in thorough and deliberate negotiations designed to provide a longer-term solution to its difficulties.  Ultimately, in exchange for the requisite consent to amend the Prepetition Credit Agreement, the Company and the Prepetition ABL Lenders agreed to a broader restructuring focused on the (i) development of a business rationalization plan, and (ii) implementation of a comprehensive marketing process for the sale of the Company's business and assets.

The Company engaged certain restructuring advisors, including Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), Guggenheim Securities, LLC ("Guggenheim Securities"), and Alvarez & Marsal North America, LLC ("Alvarez & Marsal") to assist in developing a business rationalization plan to decrease the Company's operational cash burn and preserve liquidity and commencing an external marketing process to generate and evaluate potential third-party interest in a sale transaction.

The Company and its advisors commenced a fulsome marketing process to solicit transaction proposals for substantially all of the Company's assets.  By late April 2025, the Company had received seven total indications of interest for certain of its assets.  Based on the proposals and indications of interest received, it became apparent to the Debtors that the marketing process was unlikely to yield a third-party purchaser that could facilitate an out-of-court sale transaction, and further, that an orderly, court-supervised sales process was required not only to maximize the value of the Debtors' most significant assets, its prescription files and related records (the "Pharmacy Assets"), but also to maintain the integrity of regional pharmacy systems across the country.  In light of this, the Company pivoted to pursuing an in-court process to effectuate the best transaction(s) possible under the circumstances.

### 3.    Overview of the Chapter 11 Cases.

Notwithstanding significant and painstaking efforts to explore any and all potentially value-maximizing alternatives, Rite Aid was ultimately unable to service its funded debt obligations while simultaneously supplying sufficient inventory to its store locations, which necessitated the commencement of the Debtors' Chapter 11 Cases.  The Debtors commenced their Chapter 11 Cases to maximize estate value for the benefit of all stakeholders through the implementation of several prompt and orderly parallel-track sales processes, while maintaining the delivery of outstanding pharmacy-care to customers and minimizing disruption to critical healthcare systems, retail customers, and employees.  The Debtors obtained debtor in possession ("DIP") financing to support their working capital and other funding needs in these Chapter 11 Cases, including to:  (i) complete the prepetition sales and marketing process for substantially all of the Debtors' assets; (ii) conduct going-out-of-business liquidation sales of their front-end inventory at brick-and-mortar store locations; and (iii) market, auction, and otherwise dispose of assets comprising their real property portfolio.

On the Petition Date, and in furtherance of the marketing and sale process commenced prepetition, the Debtors filed a bidding procedures motion that established formal bidding procedures to govern a two-stage process for the sale of substantially all of the Debtors' assets (the "Bidding Procedures Motion"), which the Court approved.  The first stage of this sales process saw the Debtors solicit bids, and conduct an auction, for the sale of their Pharmacy Assets on an expedited timeline.  After the auction for Pharmacy Assets concluded, the Debtors implemented the second stage of the sales process, where they solicited bids for the sale of those Pharmacy Assets that were not previously sold and all of the Debtors' other assets (collectively, the "Remaining Assets").  Following a robust marketing process that began prepetition and continued postpetition, as well as several auctions, each with multiple interested buyers, the Debtors entered into, and the Court approved, binding purchase agreements memorializing the sales of substantially all of

the Debtors' assets, including the Pharmacy Assets of over 800 Rite Aid pharmacy locations, and the Debtors' "Thrifty Ice Cream" business and related assets (the "Thrifty Assets").

In addition to approving procedures for the sale of substantially all of the Debtors' assets, the Court approved procedures for the Debtors to market, auction, and sell their leasehold interests in non-residential real property and fee-owned real properties [Docket No. 804] (the "Real Property Sale Procedures Order"). In accordance with the Real Property Sale Procedures Order, the Debtors marketed for sale: (i) 1,180 lease assets,[3] of which 143 were successfully auctioned;[4] and (ii) 49 fee-owned properties,[5] all of which were successfully auctioned.[6]  As of August 29, 2025, the Debtors have obtained orders approving the sale, assumption and assignment, or termination, as applicable, of 59 lease assets[7] and 11 fee-owned properties.[8]

Additionally, the Debtors have monetized, and continue to monetize, the value of their front-end inventory through various "going-out-of-business" and other sales conducted in accordance with the relief granted in the *Final Order (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Authorizing and Approving the Sale of Closing Location Assets, With Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 1397] (the "Store Closing Order").

The Debtors' progress in advancing these sales processes has been substantial and no small feat. However, the purchase commitments resulting from them, as well as the options available to monetize the Debtors' Remaining Assets, the forecasted timeline for the Debtors' operational wind-down, and the value of the secured, administrative, and priority claims asserted against the Debtors' estates, make clear that the distributable proceeds of the Debtors' estates are likely to be insufficient to repay in full their DIP financing lenders (the "DIP Lenders"), who were granted priming liens on substantially all of the Debtors' assets. Accordingly, the Debtors began evaluating options that would allow them to implement a chapter 11 plan that could—notwithstanding the lack of unencumbered value in their estates—facilitate the wind-down of their remaining operations, liquidation of their Remaining Assets, and distribution of value to their stakeholders, including the payment of some administrative expense claims that are otherwise likely to go unpaid in a chapter 7 liquidation or dismissal of the Chapter 11 Cases.[9]

Following extensive negotiations, the Debtors and Bank of America, N.A. ("BoA"), in its capacity as administrative agent of the DIP Facilities (the "DIP Agent") and as the administrative and collateral agent of the Prepetition ABL Facility (the "Prepetition ABL Agent") (each such facility, as defined below), agreed to allow up to $5 million of cash collateral encumbered by the DIP Lenders' liens (the "Administrative Claims Distribution Pool") to be used to fund cash distributions to consenting holders of certain administrative expense claims (such claims, the "Eligible Administrative Claims" and the

---

[3]    *See* Docket Nos. 890 (as amended by Docket No. 1034), and 1320 (as amended by Docket No. 1370).

[4]    *See* Docket Nos. 1111 (as amended by Docket No. 1344), and 1524.

[5]    *See* Docket No. 1321.

[6]    *See* Docket No. 1788.

[7]    *See* Docket Nos. 1312, 1408, 1409, 1437-1441, 1445-1453, 1496, 1549, 1568, 1569, 1719, 1730, 1751, 1884, 1893-1903, 1925-1934, 1959, 1960, 1992, 2026, 2028, 2029, 2172, 2176, 2177, 2198, 2199, 2203, and 2208.

[8]    *See* Docket Nos. 1954, 1983-1986, 1989, 1990, 2030, 2171, 2174, and 2175.

[9]    Absent a negotiated outcome with the DIP Lenders, the Debtors would not be able to make *any* distributions to any stakeholders other than the DIP Lenders.

holders of such claims, the "Eligible Administrative Claimants") in full and final satisfaction of their Eligible Administrative Claims (such accelerated payment procedures and settlement terms, collectively, the "Administrative Claim Procedures").

Under the Administrative Claims Procedures, Eligible Administrative Claimants had the right to timely and properly indicate their election to opt in to the Administrative Claims Procedures (an "Opt-In Election") would receive a distribution (the "First Distribution") equal to such Eligible Administrative Claimant's Pro Rata Share[10] of the Administrative Claims Distribution Pool, which distribution would not exceed 5.00% of the amount recorded on such Eligible Administrative Claimant's election form (the "Recorded Amount") (or such other amount as agreed upon by the Debtors and the applicable Eligible Administrative Claimant), within ten days of the Debtors' filing of a notice indicating that the applicable participation condition (the "Participation Condition") had been met or waived.

Under the Administrative Claims Procedures, Eligible Administrative Claimants that:  (i) fail to timely, properly, and affirmatively opt-out of the Administrative Claims Procedures would be deemed to consent to receiving a distribution equal to such Eligible Administrative Claimant's Pro Rata Share of amounts remaining in the Administrative Claims Distribution Pool following disbursement of the First Distribution; *provided, that,* each such distribution would (a) not exceed 5.00% of such Eligible Administrative Claimant's Recorded Amount (or such other amount as agreed upon by the Debtors and the applicable Eligible Administrative Claimant or, in certain instances, the amount in which the applicable Eligible Administrative Claim was allowed pursuant to the Plan or order of the Court) and (b) be implemented pursuant to the terms of the Plan (or any other subsequent chapter 11 plan confirmed in these Chapter 11 Cases), in satisfaction of section 1129 of the Bankruptcy Code; and (ii) timely and properly indicate an election to opt-out of the Administrative Claims Procedures (an "Opt-Out Election") will (a) receive no recovery under such procedures and (b) retain their right to assert their Eligible Administrative Claim against the Debtors.

After obtaining Court approval of the Administrative Claims Procedures, the Debtors began soliciting Eligible Administrative Claimants' consent to settle their Eligible Administrative Claims in accordance with the terms of the Administrative Claim Procedures.  The current deadline to elect the Opt-In Election or Opt-Out Election is 5:00 p.m. (prevailing Eastern Time) on September 16, 2025, after which time, the Debtors will file a notice indicating whether the Participation Condition has been met or waived.

Upon obtaining Court approval of the Administrative Claims Procedures, the Debtors continued to engage their stakeholders in extensive discussions regarding the best path available to conclude the Chapter 11 Cases.  These negotiations were ultimately successful as the Debtors, McKesson Corporation ("McKesson"), and BoA, Wells Fargo Bank, National Association ("Wells Fargo") and Capital One, National Association ("Capital One") (each in its capacity as a DIP Lender and a lender under the Prepetition FILO Facility (as defined below) (a "Prepetition FILO Lender"), and collectively,

---

[10]    "Pro Rata Share" means, for purposes of these Administrative Claims Procedures, (i) with respect to each Eligible Administrative Claimant making an Opt-In Election, the Recorded Amount (or such other amount as agreed between the Debtors and such Eligible Administrative Claimant) of such Eligible Administrative Claimant's Eligible Administrative Claim relative to the aggregate Recorded Amounts (or such other amounts as agreed between the Debtors and such Eligible Administrative Claimants) of all other Eligible Administrative Claimants that timely and properly make Opt-In Elections, and (ii) with respect to each Eligible Administrative Claimant that fails to make an Opt-In Election or makes an Opt-Out Election, the Recorded Amount (or such other amount as agreed between the Debtors and such Eligible Administrative Claimant) of such Eligible Administrative Claimant's Eligible Administrative Claim relative to the aggregate Recorded Amounts (or such other amounts as agreed between the Debtors and such Eligible Administrative Claimants) of all other Eligible Administrative Claimants that fail to make an Opt-In Election or Opt-Out Election.

the "<u>Consenting Banks</u>"), executed a restructuring support agreement, a copy of which is attached hereto as **Exhibit B** (the "<u>Restructuring Support Agreement</u>").

Pursuant to the Restructuring Support Agreement and subject to the conditions specified therein, the Consenting Banks agreed, among other things, to use commercially reasonable efforts to cause (i) Prepetition FILO Lenders holding at least 50% of the principal amount of debt incurred under the Prepetition FILO Facility (such lenders, the "<u>Consenting FILO Lenders</u>") and (ii) DIP Lenders who collectively meet the definition of "Required Lenders" under the DIP Credit Agreement (as defined below) (the "<u>Consenting DIP Lenders</u>," and together with the Consenting FILO Lenders, the "<u>Consenting Creditors</u>") to execute a joinder to the Restructuring Support Agreement and become parties thereto, in each case, by no later than the date on which the Court enters the proposed conditional disclosure statement order (the "<u>Disclosure Statement Order</u>").

The Restructuring Support Agreement memorializes the RSA Parties'[11] agreements with respect to a plan of reorganization and related transactions (the "<u>Global Settlement</u>"). These transactions and settlements are described in more detail herein and include: (i) the transfer of the Reorganized Debtors' equity to McKesson in exchange for full satisfaction of any claims held by McKesson arising under section 503(b)(9) of the Bankruptcy Code (such claims, the "<u>McKesson 503(b)(9) Claims</u>"); (ii) McKesson's payment of $15 million of cash consideration; (iii) McKesson's agreement to the mutual releases described in the Restructuring Support Agreement; (iv) the settlement of certain litigation claims by and among McKesson and the Debtors, as described herein; (v) McKesson's agreement to purchase certain pharmaceutical inventory; and (vi) the RSA Parties' agreement to the mutual releases set forth in the Plan (clauses (i) through (vi), collectively, the "<u>Plan Transaction</u>"). The RSA Parties also agreed to negotiate a good-faith compromise and settlement of various issues and disputes related to the Debtors' Chapter 11 Cases and events and actions preceding the Debtors' Chapter 11 Cases, pursue the Restructuring Transactions (as defined below), and support confirmation of the Plan. The Restructuring Support Agreement also includes a toggle feature, that, to the extent the Debtors reasonably determine that pursuing the Plan Transaction is impossible or impractical, would see the Debtors immediately cease their efforts to pursue implementation of the Plan and pivot to a structured dismissal of the Chapter 11 Cases, among other things (the "<u>Non-Plan Toggle</u>").

(a)    **Transactions Contemplated Under the Restructuring Support Agreement if Confirmation of A Plan Is Pursued.**

If a Plan Transaction is pursued, the Restructuring Support Agreement contemplates that, among other things:

- McKesson will purchase certain of the Debtors' saleable branded pharmaceutical assets (the "<u>Branded Inventory</u>") for a purchase price of 65% of the applicable Invoice Price[12] for

---

[11] "<u>RSA Parties</u>" means all of the parties that have executed the Restructuring Support Agreement as of the date hereof (*i.e.*, the Debtors, McKesson, and the Consenting Banks) together with any Consenting Creditors that execute a joinder to the Restructuring Support Agreement (including, for the avoidance of doubt BoA, Wells Fargo, and Capital One, each in its capacity as co-collateral agents under the DIP Credit Agreement) between the execution of this Disclosure Statement and entry of the Disclosure Statement Order.

[12] "<u>Invoice Price</u>" shall have the meaning ascribed to it in the New McKesson Supply Agreement (as defined herein).

such Branded Inventory; and otherwise in accordance with the terms and conditions to be agreed by the Debtors and McKesson (the "Branded Inventory Transaction");[13]

- McKesson will purchase certain of the Debtors' saleable generic pharmaceutical assets (the "Generic Inventory," such acquisition, the "Generic Inventory Transaction," and together with the Branded Inventory Transaction, the "McKesson Inventory Sales")[14] for a purchase price of 40% of the applicable Invoice Price for such Generic Inventory in accordance with the terms and conditions to be agreed by the Debtors and McKesson;

- McKesson and the Debtors would hold all litigation as between them, including the *Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Docket No. 655](the "McKesson Motion to Compel") and the *Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination* filed in *Rite Aid Corp.* v. *McKesson Corp. (In re New Rite Aid, LLC)*, Adv. Proc. No. 25-01316-MBK (Bankr. D.N.J. Jul. 31, 2025) [Docket No. 1] (the "McKesson Complaint ") in abeyance (such abeyance, the "Litigation Stay"), with all rights reserved, until the earlier of (i) the termination of the Restructuring Support Agreement with respect to McKesson or (ii) the release of the claims and Causes of Action subject to the Litigation Stay pursuant to the Plan or any Plan-related documents;

- The Reorganized Debtors would own and operate, among other things, the central fill facility located in Delran, New Jersey, and own the NexGen dispensing system, the Rite Care platform, and Rite Aid intellectual property, excluding the Plan Excluded Assets;[15] and

- The Plan will incorporate (i) the RSA Parties' mutual and full release of all potential claims and causes of action, including those arising under the New McKesson Supply Agreement,[16] the Intercreditor Agreement,[17] and any potential avoidance actions, preference claims, and similar claims against McKesson and its affiliates, (ii) customary

---

[13]   For the avoidance of doubt, the purchase of Branded Inventory by McKesson is a condition precedent to consummation of the Plan Transaction.

[14]   For each of the McKesson Inventory Sales, the applicable aggregate Invoice Price must be no less than a minimum threshold amount to be mutually agreed between the Debtors and McKesson, which amount shall be set forth in the applicable inventory purchase agreement.

[15]   The "Plan Excluded Assets" include (i) the Debtors' https://www.riteaid.com/ website and (ii) any rights with respect to the use of the Rite Aid brand name.  Further, the McKesson Inventory Sales will exclude pharmaceuticals that are classified as controlled substances.

[16]   The "New McKesson Supply Agreement" means that certain Supply Agreement, dated as of August 30, 2024 (as amended, supplemented, restated, amended and restated, or otherwise modified from time to time)

[17]   The "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of August 30, 2024 (as amended, supplemented, restated, amended and restated, or otherwise modified from time to time).

consensual third-party releases by Holders of Claims and Interests,[18] and (iii) a discharge of the Debtors.

Upon consummation of the Plan Transaction:

- The McKesson 503(b)(9) Claims will be deemed satisfied in full on account of the distribution of the Reorganized Debtors' equity and the releases described herein; and

- McKesson would withdraw the McKesson Motion to Compel and release the underlying claim against the Debtors and the Debtors would dismiss, with prejudice, the McKesson Complaint and release the underlying claims against McKesson.

**(b)      Non-Plan Toggle.**

In the event that the Non-Plan Toggle is exercised, the Restructuring Support Agreement provides that:

- The Debtors may elect to sell the Branded Inventory to (a) McKesson in accordance with the terms of the Branded Inventory Transaction, or (b) a third-party, subject to certain conditions, including, among others, that McKesson be provided the opportunity to outbid such third-party for the Branded Inventory and determines to do so;

- McKesson and the Debtors will consummate the Generic Inventory Transaction;

- Neither McKesson nor the Debtors shall be obligated to grant releases or take any other actions with respect to the McKesson Motion to Compel or the McKesson Complaint, the abeyance of which shall end on the date the Debtors determine to effect the Non-Plan Toggle;

- McKesson and the Debtors shall agree upon a schedule for the resumption of proceedings related to the Motion to Compel and the McKesson Complaint; and

- McKesson's rights with respect to the McKesson 503(b)(9) Claims will be reserved, including any right to recovery on account of the McKesson 503(b)(9) Claims with respect to distributions made to administrative claimants pursuant to any structured dismissal or other non-Plan arrangement.

**B.      Overview of the Plan.**

The Plan rests on the settlement of all disputes among the RSA Parties.  The Global Settlement outlined in the Restructuring Support Agreement and incorporated into the Plan (to the extent applicable) contemplates that the applicable RSA Parties will, among other things:  (i) consummate the McKesson Inventory Sales, (ii) implement the Litigation Stay; (iii) consent to accepting certain treatment in respect of their claims; (iv) agree to the mutual releases described in the Plan; (v) pay $15 million in cash consideration; and (vi) support and vote in favor of the Plan.

---

[18]    Prior to consummation of the Plan and unless and until the Debtors determine to effect the Non-Plan Toggle, the RSA Parties have agreed to hold all litigation as between them in abeyance, with all rights reserved.

The Plan's primary objective is to maximize value for all stakeholders and to distribute property of the Debtors' estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Debtors' estates. Generally, the Plan:

- Effectuates the transfer of equity in the Reorganized Debtors to McKesson;

- Designates a Plan Administrator to liquidate and wind down the Wind-Down Debtors' affairs, pay and reconcile certain Claims, and administer the Plan in an efficient manner;

- Resolves those disputes underlying the Global Settlement;

- Contemplates recoveries to certain Holders of Eligible Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code and in accordance with the Administrative Claims Procedures, where applicable; and

- Provides for the releases, injunctions, and exculpation as set forth in Article X of the Plan.

The Debtors believe that the Plan, Restructuring Transactions, and Global Settlement will enable these Chapter 11 Cases to conclude in an orderly and value-maximizing manner and that Confirmation of the Plan will avoid the lengthy delay and significant cost of a liquidation process under chapter 7 of the Bankruptcy Code.

### 1.    Who is Entitled to Vote on the Plan?

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes that are entitled to receive or retain property on account of such Claims or Interests under the plan, are entitled to vote on the plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of bankruptcy events) and reinstates the maturity of such Claim or Interest as it existed before the default.

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of September 8, 2025 (the "Voting Record Date"). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not entitled to vote (deemed to accept) |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote (deemed to accept) |

| 3 | Prepetition FILO Claims | Impaired | Entitled to vote |
|---|---|---|---|
| 4 | General Unsecured Claims | Impaired | Not entitled to vote (deemed to reject) |
| 5 | Intercompany Claims | Unimpaired/ Impaired | Not entitled to vote (deemed to accept or reject) |
| 6 | Intercompany Interests | Unimpaired/ Impaired | Not entitled to vote (deemed to accept or reject) |
| 7 | Existing Equity Interests | Impaired | Not entitled to vote (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | Not entitled to vote (deemed to reject) |

**THE PLAN PROVIDES THAT ANY HOLDER OF A CLAIM OR INTEREST THAT (A) (I) VOTES TO ACCEPT THE PLAN, (II) IS DEEMED TO ACCEPT THE PLAN, (III) ABSTAINS FROM VOTING ON THE PLAN, (IV) VOTES TO REJECT THE PLAN OR IS DEEMED TO REJECT THE PLAN, AND (B)(I)DOES NOT (I) AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN OR (II) FILE AN OBJECTION WITH THE COURT THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN <u>ARTICLE X</u> OF THE PLAN AND THAT IS NOT CONSENSUALLY RESOLVED PRIOR TO CONFIRMATION OR SUPPORT ANY SUCH OBJECTION OR OBJECTOR (IN EACH CASE ONLY SO LONG AS SUCH HOLDER IS PERMITTED TO OPT OUT) IS DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

<div align="center">

**2.**      **Summary of Proposed Treatment Under the Plan.**

</div>

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are Impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for Holders of Claims and Interests. The following table is qualified in its entirety by reference to the full text of the Plan. A more detailed summary of the terms and provisions of the Plan is provided in the summary of the Plan set forth in <u>Article VI</u> of this Disclosure Statement.

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote |
|---|---|---|---|---|
| 1 | Other Secured Claims | Each Holder receives, at the Debtors' option: (i) payment in full in cash; (ii) the collateral securing the Claim; (iii) reinstatement of the Claim; or (iv) such other treatment as to render such Holder's Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | Not entitled to vote (deemed to accept) |
| 2 | Other Priority Claims | Each Holder receives, at the Debtors' option: (i) payment in full in cash; or (ii) other treatment consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | Not entitled to vote (deemed to accept) |
| 3 | Prepetition FILO Claims | Each Holder receives its Pro Rata share of the FILO cash distribution. | Impaired | Entitled to vote |
| 4 | General Unsecured Claims | Claims are discharged, cancelled, released, and extinguished without any distribution. | Impaired | Not entitled to vote (deemed to reject) |
| 5 | Intercompany Claims | Each Claim may be reinstated, set off, settled, distributed, contributed, cancelled, or released, or receive other treatment as determined by the Debtors. | Unimpaired/ Impaired | Not entitled to vote (deemed to accept or reject) |
| 6 | Intercompany Interests | Each Interest may be reinstated, set off, settled, distributed, contributed, cancelled, or released, or receive other treatment as determined by the Debtors. | Unimpaired/ Impaired | Not entitled to vote (deemed to accept or reject) |
| 7 | Existing Equity Interests | All existing Equity Interests are cancelled and extinguished; Holders receive no recovery. | Impaired | Not entitled to vote (deemed to reject) |
| 8 | Section 510(b) Claims | Claims are discharged, cancelled, released, and extinguished without any distribution. | Impaired | Not entitled to vote (deemed to reject) |

**The Debtors do not anticipate, nor do they intend to file, pleadings to establish a bar date for General Unsecured Claims as the Debtors' projections reflect no recovery for Holders of General Unsecured Claims in both a Plan and in a chapter 7 liquidation scenario.** *See* **the Liquidation Analysis attached hereto as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>").** **Notwithstanding the foregoing, the Debtors expressly reserve the right to file a motion establishing a bar date for General Unsecured Claims.**

3.      Debtors' Plan Voting Recommendation.

The Debtors believe that the Plan and the compromises and transactions contemplated therein are fair, equitable, value-maximizing, and represent the best available option for completing the Debtors'

Chapter 11 Cases at this time.  The Debtors urge all Holders entitled to vote to accept the Plan by returning their ballot(s), substantially in the form attached as **Exhibit 3** to the Disclosure Statement Order (each a "Ballot"), so that Kroll Restructuring Administration LLC ("Kroll"), the Debtors' claims, noticing, and solicitation agent (the "Claims Agent"), actually receives such Ballots by 4:00 p.m. (prevailing Eastern Time) on October 13, 2025 (the "Voting and Opt-Out Deadline").  Assuming the Plan receives the requisite accepting votes, the Debtors intend to seek the Court's approval of the Plan at the Combined Hearing scheduled for 9:00 a.m. (prevailing Eastern Time) on October 20, 2025.

III.    **OVERVIEW OF DEBTORS' OPERATIONS AND CORPORATE AND CAPITAL STRUCTURE.**[19]

A.    **Rite Aid's History & Operations.**

1.    **Formation & History.**

Rite Aid, a pharmacy retail chain, operated two parallel, complimentary business segments.  Its primary business line was its pharmacy segment, through which it offered a wide range of health care services to millions of pharmacy-care customers in the United States, including dispensing medications, performing immunizations and other clinical care, assisting pharmacy-care customers with high blood pressure and diabetes care, and educating pharmacy-care customers on managing their medications and potential side effects.  Rite Aid also sold a variety of front-end merchandise, including health and beauty aids, personal care products, seasonal merchandise, and a large private brand portfolio of food and consumer products, through both its physical locations and e-commerce business.  Over the course of six decades, Rite Aid's position as a staple retailer for American families in hundreds of communities was cemented.

Rite Aid's corporate history dates back to 1962, when it began as a single discount drug store in Scranton, Pennsylvania with the name of Thrif D Discount Center.  Within four years, the Company operated 36 stores in five Northeast and Mid-Atlantic states, including its first in-store pharmacy in New Rochelle, New York.  In 1968, the Company changed its name to Rite Aid Corporation and made its initial public offering on the American Stock Exchange.  Over the course of the next several decades, Rite Aid continued to grow its footprint, and by 1981, it was the third-largest retail drug chain in the country.  At the time it commenced the 2023 Cases, Rite Aid operated more than 2,100 stores in 17 states and employed more than 6,100 pharmacists and 45,000 total employees.

As discussed more fully herein, the Debtors' corporate structure and business operations relate back to the 2023 Cases commenced by Debtor Rite Aid Corporation and certain of its then-subsidiaries.  Following the 2023 Cases, the Company continued as a strengthened going concern after obtaining access to exit financing, right-sizing its operational footprint, and shedding significant litigation overhang.[20]

---

[19]    A detailed description of the Company's history and events leading to the Debtors' Chapter 11 Cases can be found in the *Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 24] (the "First Day Declaration").

[20]    The Company had a large and varied litigation claims portfolio, including more than 1,600 opioid-related suits.  Rite Aid was also required to defend significant contract disputes, government investigations, and securities matters.  The Company's extensive litigation portfolio was expensive to manage, drained liquidity, required substantial time and attention from key executives, and complicated the ability to explore out-of-court alternatives, particularly when combined with other operational headwinds.

2.      **The 2023 Cases.**

On October 15, 2023, Rite Aid Corporation and certain of its affiliates (the "2023 Debtors") filed for chapter 11 protection, with the goal of pursuing a dual-track sales and plan confirmation process.  On the sales front, Rite Aid continued the marketing process for its non-core pharmacy benefit management ("PBM") business that had commenced prepetition.  The Company also launched a global marketing process for both whole-company, going-concern bids and bids for discrete portions of the Debtors' asset portfolio across its business.  Simultaneously, in the absence of a whole-company or all-asset sale, Rite Aid pursued a holistic restructuring designed to deleverage its balance sheet, rationalize its sub-optimal lease portfolio, and obtain access to new capital to enable it to focus on its long-term growth initiatives.

The 2023 Cases were the result of the cumulative effect of several financial and operational factors that limited Rite Aid's liquidity and constrained its ability to execute on its turnaround initiatives and in-store investments.  Ahead of the 2023 Cases, Rite Aid had approximately $4 billion in funded debt obligations and paid approximately $200 million annually in interest.  Rite Aid's financial performance in the period prior to the commencement of the 2023 Cases was adversely affected by elevated labor costs, declining reimbursement rates from third-party payors, reduced demand for front-end merchandise and COVID-19 vaccines, and the loss of key accounts for Elixir, the Company's PBM business.  Rite Aid was also burdened by unprofitable stores that were difficult to exit outside of the tools offered in bankruptcy.  Even where the Company was able to close stores, it was burdened by millions of dollars of annual "dead rent" costs due to its inability to exit their underlying leases.  Other factors contributing to the 2023 Cases were (i) liquidity and trade challenges the Company experienced as restructuring-related rumors broke, (ii) litigation overhang resulting from significant contract disputes, government investigations, securities matters, and over 1,600 opioid-related suits, and (iii) increased competition from larger traditional competitors and online retailers and pharmacies.

Within the first few months of the 2023 Cases, Rite Aid completed the $575 million sale of its PBM assets to MedImpact Healthcare Systems, Inc. ("MedImpact").  Despite this early success, the 2023 Cases proved to be extremely complex and contentious, and involved numerous counterparties with competing interests that each vigorously negotiated for the best possible treatment during a protracted mediation process.  At several points in time, it appeared that a global consensual path forward did not exist.  The administrative costs associated with the prolonged 2023 Cases, coupled with continued financial and operational challenges faced by the business, complicated negotiations and required parties to revisit the overall deal on multiple occasions.  Ultimately, negotiations were successful and resulted in an interconnected series of settlements embodied in the chapter 11 plan pursued in the 2023 Cases (the "2023 Cases' Plan").

The 2023 Cases' Plan embodied a complex series of restructuring transactions by which assets, including certain estate causes of action, insurance rights, and cash, were transferred to a series of trusts established for the benefit of Rite Aid's creditors.  Through the 2023 Cases' Plan, approximately 90% of new equity interests in New Rite Aid, LLC were issued to the 2023 Debtors' prepetition noteholders and approximately 10% of new equity interests were issued to a trust for the benefit of the 2023 Debtors' general unsecured creditors.  Claims under the 2023 Debtors' junior DIP financing facility, provided by certain prepetition secured second lien noteholders in the 2023 Cases, were rolled into exit 1.5L Notes (as defined below) and prepetition secured second lien noteholders received 3L Notes (as defined below) on account of their prepetition notes claims.  The 2023 Cases' Plan included a waterfall by which proceeds of a significant receivable due from the Centers for Medicare & Medicaid Services for the 2023 year would be distributed to certain creditor constituencies, including the Department of Justice, Holders of junior DIP claims, and lenders under the 2023 Debtors' prepetition loan facility.  The 2023 Cases' Plan also provided for the global resolution of tort liability through a channeling injunction, with the sole source of recovery for tort claimants coming out of the litigation trust established pursuant to the 2023 Cases' Plan.

The 2023 Cases' Plan also reflected a global settlement with McKesson on the terms of the New McKesson Supply Agreement and the treatment of McKesson's prepetition 503(b)(9) claim (the "McKesson Settlement"). Under the McKesson Settlement, McKesson was granted a second-priority lien on substantially all of the property and assets of the Debtors as collateral for the payment of the Debtors' obligations under the New McKesson Supply Agreement (the "McKesson Obligations"). In addition, the Debtors agreed to make a series of guaranteed and contingent cash payments to McKesson consisting of certain amounts due upon emergence from the 2023 Cases, certain contingent deferred payments, and certain guaranteed deferred payments due in regular installments beginning six months after emergence.

The confirmed 2023 Cases' Plan had near unanimous support from its stakeholders. The 2023 Cases' Plan was substantially consummated, and the 2023 Cases' debtors emerged from chapter 11 on August 30, 2024.

Further details regarding the 2023 Cases can be found in the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (as Further Modified)* (Case No. 23–18993, [Docket No. 2697]) and the *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (Solicitation Version)* (Case No. 23–18993, [Docket No. 2512]). Rite Aid also maintains a website, https://restructuring.ra.kroll.com/RiteAid/, at which general information regarding the 2023 Cases can be obtained free of charge.

### 3.    Key Assets.

The Company has relied primarily on its partnership with McKesson to fulfill its prescription drug requirements. Over the past twenty years, no partnership has been more crucial to the Company's success than its relationship with McKesson. Pursuant to the New McKesson Supply Agreement, the Company purchased almost all of its branded pharmaceutical products and generic pharmaceutical products from McKesson, accounting for 99% of the dollar volume of its prescription drugs.

Prior to February 1, 2024, Rite Aid owned and operated a PBM business, Elixir. Through Elixir, the Company provided a comprehensive suite of PBM offerings to various clients, including regional health plans, commercial employees, and labor groups. The Company also offered drug benefits to eligible beneficiaries under the Medicare Part D Program, which was administered through a non-Debtor subsidiary, Elixir Insurance Company. During the 2023 Cases, Rite Aid completed the sale of its PBM business to MedImpact and divested a majority of its Health Dialog assets to Carenet Healthcare Services. Rite Aid's PBM operations, which were carried out through the "Elixir" group of entities, were historically a critical component of the Company's business. The entities formerly comprising the Elixir group did not, as of the Petition Date, have any operations or assets other than non-Debtor Elixir Insurance Company, which is undergoing a wind-down process.

### 4.    Employee Base.

As of the Petition Date, the Company operated 1,277 stores and three distribution centers in 15 states and employed approximately 24,500 people, 1,400 of whom were unionized under one of the Debtors' seven collective bargaining agreements ("CBAs"). As of August 11, 2025, the Company employed over 6,000 people, most on a full-time basis. As described in greater detail herein, the Company provided compensation and benefits to its employees including a number of insurance and benefits programs, including health benefits, prescription drug benefits, life insurance, disability benefits, and retirement plans.

14

5.    **Regulatory Framework.**

The Company was subject to extensive and overlapping regulatory oversight. There were various federal, state, and local laws, regulations, and administrative practices concerning the provision of and payment for healthcare services, including:

- Federal, state, and local licensure and registration requirements concerning the operation of pharmacies, pharmacy benefit managers, and health discount programs;

- Various insurance-related regulators;

- Medicare, Medicaid, and other publicly financed health benefit plan regulations regarding the submission of claims;

- The Affordable Care Act; and

- Regulations of the Food and Drug Administration, Consumer Product Safety Commission, Federal Trade Commission, and Drug Enforcement Administration.

The Company was also subject to laws and regulations governing the purchase, sale, storage, and dispensing of controlled substances, listed chemicals, and other products, including nicotine products, medical devices, and alcoholic beverages. In addition, various laws governed the Company's relationship with its employees, including health and safety standards, minimum wage requirements, equal opportunity matters, and unionizing efforts.

B.    **Rite Aid's Prepetition Corporate and Capital Structure.**

1.    **Corporate Structure.**

New Rite Aid, LLC is the ultimate parent of each Debtor. It conducts business through its 121 subsidiaries, 117 of which are wholly owned (directly or indirectly) Debtors. A simplified corporate structure chart is attached hereto as **Exhibit C**. The Company maintains its corporate headquarters in Etters, Pennsylvania.

(a)    **Corporate Governance and Management.**

Upon the Company's emergence from the 2023 Cases, a new slate of directors was appointed to New Rite Aid, LLC's board of directors (the "Board"). As of the Petition Date, the Board was comprised of four members: Matthew Schroeder, who is also the Chief Executive Officer of New Rite Aid, LLC and Rite Aid Corporation, and Tim Pohl, Michael Wartell, and Scott Vogel, each of whom is an independent director.

2.    **Capital Structure.**

(a)    **Funded Debt Obligations.**

As of the Petition Date, the Debtors had approximately $2.161 billion in aggregate principal amount of funded debt obligations outstanding. The following table summarizes the Debtors' funded indebtedness outstanding as of the Petition Date.

| Instrument | Maturity | Principal |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | August 2028 | $1,460,693,742.20 |
| FILO Term Loan Facility | August 2028 | $240,000,000.00 |
| 1.5L Secured Notes | August 2031 | $83,000,000.00 |
| 3L Secured Notes | August 2031 | $377,000,000.00 |
| **Total Funded Debt** | | **$2,160,693,742.20** |

(i)    *The Prepetition ABL Facility and Prepetition FILO Facility.*

Rite Aid Corporation, as borrower, BoA, as the Prepetition ABL Agent, and certain lenders (the "Prepetition ABL Lenders" and the "Prepetition FILO Lenders") are party to that certain Credit Agreement, dated as of August 30, 2024 (as amended by that certain First Amendment to Credit Agreement, dated as of January 14, 2025, the "First Amendment," and as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Credit Agreement"). The Prepetition Credit Agreement provided for a (i) senior secured asset based revolving credit facility (the "Prepetition ABL Facility") and (ii) "first in, last out" term loan facility (the "Prepetition FILO Facility," and together with the Prepetition ABL Facility, the "Prepetition Credit Facilities"). The Prepetition Credit Facilities were guaranteed by substantially all of Rite Aid Corporation's subsidiaries, including each subsidiary that is a Debtor (such guarantors, together with Rite Aid Corporation, the "Prepetition Obligors"), and were secured by first priority liens on substantially all personal and real property of the Prepetition Obligors (the "Prepetition Collateral"). The Prepetition Credit Facilities mature on August 30, 2028.

The Prepetition ABL Facility (i) had $2.25 billion in commitments upon the Debtors' emergence from the 2023 Cases, which were reduced to $1.9 billion pursuant to the First Amendment, and (ii) was subject to a customary "borrowing base" formula, where availability is the lesser of the commitments and the net orderly liquidation value of certain of the Prepetition Obligors' assets. Under the terms of the Prepetition Credit Agreement, Rite Aid Corporation was required to maintain a certain minimum amount of availability under the Prepetition ABL Facility (the "Minimum ABL Availability Covenant"), which amount was $225 million as of the Debtors' emergence from the 2023 Cases.

The Prepetition Credit Agreement required all cash received by the Company to be pooled into a concentration account that was swept on a daily basis to repay outstanding loans under the Prepetition ABL Facility. Accordingly, prepetition, the Company's only source of day-to-day liquidity was through continued borrowings under the Prepetition ABL Facility. Given the Company's declining financial performance and the resulting impact on its borrowing base, availability under the Prepetition ABL Facility had been significantly reduced from the Company's emergence from the 2023 Cases through the Petition Date.

As of the Petition Date, approximately (i) $1.461 billion in borrowings remained outstanding under the Prepetition ABL Facility and (ii) $240 million in borrowings remained outstanding under the Prepetition FILO Facility.

16

*(ii)      The Prepetition Secured Notes.*

On August 30, 2024, Rite Aid Corporation issued three tranches of senior secured notes pursuant to Indentures among Rite Aid Corporation, the Prepetition Obligors, and U.S. Bank Trust Company, National Association, as trustee and securities collateral agent (the "<u>Senior Secured Notes Trustee</u>"): (i) $78,263,042 in aggregate principal amount of Floating Rate Senior Secured PIK Notes due 2031 (the "<u>1.5L Notes</u>"); (ii) $125 million of 15.000% Third-Priority Series A Senior Secured PIK Notes due 2031 (the "<u>3L Series A Notes</u>"); and (iii) $225 million of 15.000% Third-Priority Series B Senior Secured PIK Notes due 2031 (the "<u>3L Series B Notes</u>," together with the 3L Series A Notes, the "<u>3L Notes</u>," and collectively with the 1.5L Notes, the "<u>Senior Secured Notes</u>"). As of the Petition Date, $83 million of 1.5L Notes, $242 million of 3L Series A Notes, and $135 million of 3L Series B Notes remained outstanding.

The maturity date of the Senior Secured Notes is August 30, 2031. Each of the Prepetition Obligors guaranteed the Senior Secured Notes. The 1.5L Notes were secured by liens on the Prepetition Collateral, which liens were junior to the first-priority security interests securing the Prepetition Credit Facilities. The 3L Notes were secured by third-priority liens on the Prepetition Collateral, which were junior to the liens securing the Prepetition Credit Facilities, the 1.5L Notes, and the McKesson Obligations. The 3L Series B Notes were payment subordinated to the 3L Series A Notes.

**(b)      McKesson Obligations.**

The McKesson Obligations were secured by the Prepetition Collateral on a junior priority basis to the Prepetition Credit Facilities and the 1.5L Notes and a senior priority basis to the 3L Notes and were guaranteed by the Prepetition Obligors.

**(c)      The Intercreditor Agreements.**

The respective rights and interests of the lenders under the Prepetition Credit Agreement, holders of Senior Secured Notes, and McKesson are governed by various intercreditor agreements, each dated August 30, 2024 (collectively, the "<u>Intercreditor Agreements</u>"). Among other things, the Intercreditor Agreements set forth the parties' respective rights and interests relating to their rights to the Prepetition Collateral, their ability to exercise remedies in connection with an event of default, and their relative rights and obligations in the event of a chapter 11 filing by the Prepetition Obligors. Pursuant to the Intercreditor Agreements, (i) the liens securing the 3L Notes are subordinate to liens securing the McKesson Obligations, the 1.5L Notes, and the Prepetition Credit Facilities, (ii) the liens securing the McKesson Obligations are subordinate to the liens securing the 1.5L Notes and the Prepetition Credit Facilities, and (iii) the liens securing the 1.5L Notes are subordinate to the liens securing the Prepetition Credit Facilities.

**(d)      The 1970 Group Letter of Credit Facility.**

1970 Group, Inc. ("<u>1970 Group</u>") and Rite Aid Corporation are party to that certain Substitute Insurance Collateral Facility Agreement, dated as of November 1, 2024 (the "<u>1970 LC Facility</u>"). Under the 1970 LC Facility, 1970 Group arranged for the issuance of approximately $66,750,000 of letters of credit from third-party financial institutions to enable the Company to provide credit support under certain of its workers' compensation, commercial automotive, and general liability insurance policies. Upon certain events, including any draw due for nonpayment of any obligation under the subject insurance policies or 1970 Group making any payments under a subject policy on the Company's behalf, the Company is obligated to reimburse 1970 Group in the amount of such draw or payment less any amount of the approximately $4,487,085 currently held in escrow by 1970 Group as credit support for the Company's obligations under the facility. The 1970 LC Facility was guaranteed by the Prepetition Obligors. On

April 30, 2025, 1970 Group issued a notice of default to the Company under the 1970 LC Facility, directing the Company to remit to 1970 Group as cash collateral $66,750,000 no later than May 1, 2025.

### (e)    Finance Leases.

The Company leased most of its retail stores and certain distribution facilities under non-callable operating and finance leases, most of which have initial lease terms of one to five years.  The Company also leased certain of its equipment and other assets under non-callable operating leases with initial terms of three to 10 years.  As of the Petition Date, approximately $2.6 million remained outstanding under such equipment and other asset operating leases.

### (f)    Equity Interests.

Rite Aid transitioned from a publicly traded to a privately-held company upon its emergence from the 2023 Cases.  Pursuant to the 2023 Cases' Plan, New Rite Aid, LLC issued new common equity to the holders of its prepetition secured notes (approximately 90%) and to a trust for the benefit of holders of general unsecured claims (approximately 10%).  Each of the other Debtors is a direct or indirect wholly-owned subsidiary of New Rite Aid, LLC, except as otherwise specified in the organizational chart attached hereto as **Exhibit C**.

## IV.    EVENTS LEADING TO THE CHAPTER 11 FILINGS.[21]

As summarized in the Preliminary Statement, a confluence of headwinds stressed the Company's financial performance leading up to the Petition Date.  This Article IV summarizes how—since the 2023 Cases—the Company reacted to those headwinds.

### A.    Challenges Following the 2023 Cases.

Following the 2023 Cases, the Company set forth on a plan to reposition its business for long-term success.  The Company's efforts were stunted, however, by significant challenges to its front-end business, including elevated out-of-stock rates, primarily resulting from counterparties dragging their feet or otherwise backtracking on commitments made during the 2023 Cases.

The Company faced front-end inventory challenges that prevented it from realizing the revenue projections needed to implement its post-emergence business plan.  At the time of emergence from the 2023 Cases, the Debtors' in-stock rates were at an all-time low and replenishing front-end inventory was a critical component of the Company's turnaround efforts.  Low in-stock rates were detrimental to the high-margin front-end business, which relied heavily on consumers purchasing front-end merchandise while visiting the store to procure prescriptions.  While the front-end business is historically lower volume, it is highly margin accretive.  Accordingly, replenishing inventory—which required increased liquidity—was critical to the Company's post-emergence business plan.  However, the Company was unable to access the promised liquidity—and therefore unable to replenish inventory—primarily because of two unanticipated challenges.

*First*, the Company's front-end vendors were unwilling to return to normalized trade terms following emergence, despite assurances that they would do so.  During the 2023 Cases, the Company's

---

[21]    The foregoing background on the events leading to the filing of the Debtors' Chapter 11 Cases is a recitation from the Debtors' perspective.  The Debtors understand that McKesson disputes their views and reserves all rights with respect thereto.

vendors were supplying to the Company only on restrictive payment and trade terms, and many of these vendors required cash deposits in order to supply to the Company. This vendor contraction cumulatively resulted in an approximately $130 million impact to the Company's liquidity, compared to its liquidity position prior to filing the 2023 Cases. The Company understood that significant liquidity benefits would result from these vendors supplying to the Company on pre-filing trade terms post-emergence, as is customary upon a company's exit from chapter 11. Accordingly, during the 2023 Cases, and thereafter, the Company embarked on a months-long process to expand trade terms with vendors and realize the resulting liquidity benefits. By mid-July 2024, the Company and its advisors had contacted over 50 of its top front-end vendors for individualized discussions, educating these vendors through a comprehensive presentation on the enhanced liquidity position of the Company at emergence in an effort to persuade these vendors to commit to improved supply terms with the Company given its improved financial position at emergence.

These discussions were successful. By late June 2024, the Company had realized or received commitments in the amount of $44.2 million of incremental liquidity at emergence and was on pace to meet its goal of a total of $60 million committed working capital expansion prior to emergence. Based on this success, the Company's extensive discussions with its suppliers, and long history of negotiating supply terms with its vendors, the Company's post-emergence business plan was premised on the expectation that these vendors and others would return to pre-filing terms and return deposits provided in connection with the 2023 Cases, therefore resulting in $126 million in overall incremental liquidity from trade-term expansion by February 2025.

Despite these projections, many front-end vendors declined to provide ordinary trade credit on a post-emergence basis and held onto deposits, which has significantly hampered the Company's liquidity. In sum, by February 2024, the Company only realized approximately $46 million in total working capital expansion, falling far short of its well-tested assumptions and contrary to many assurances and historical data points. As discussed further below, the harm of restricted access to trade credit was compounded by changes in consumer behavior affecting the brick-and-mortar retail industry.

***Second***, the Company's liquidity position at emergence—and therefore its ability to build inventory quickly following emergence—was also impacted by a significant delay and reductions in amount of replacement letter of credit facilities. The Company began negotiating the terms of replacement letter of credit facilities with counterparties in March 2024, during the 2023 Cases, expecting that such facilities—and the associated liquidity benefits—would be in place at emergence. These negotiations were initially successful: the Company received three separate term sheets, across three financing providers or partners, contemplating an aggregate of $280 million in incremental liquidity from these replacement letter of credit transactions, each with assurances that these providers could close these facilities on expedited timelines. Importantly, these transactions provided the Company with multiple options to close the transactions and access the full amount of liquidity contemplated by these term sheets.

Despite the assurances provided to the Company, negotiations with applicable counterparties were delayed and protracted, and in some cases, lenders who had executed term sheets walked away months after signing. The Company was thus unable to enter into any replacement letter of credit facilities except for the 1970 LC Facility, which was less than half the amount contemplated at emergence and did not close until November 2024, after the Company had already lost months of valuable time to right-size its inventory levels. Other counterparties that had committed to providing additional replacement letter of credit facilities declined to do so altogether.

The delayed timing and lost opportunity to reinvigorate the front-end business resulted in a permanent loss to front-end sales and gross margin. These negative effects were exacerbated by the time at which this delay and lost opportunity occurred—immediately ahead of the critical seasonal period when

pharmacies typically have their highest sales volume. The Company experienced increased foot traffic in its stores from September through December each year due to customers visiting the pharmacy as a result of vaccine season (flu and COVID-19). The Company's business plan and historical performance included front-end purchases from these customers while visiting the store for their vaccines. In addition, this time period contains several key holidays and events (including Halloween, Thanksgiving, and Christmas) that typically drive foot traffic and, therefore, business in the front-end of the Company's stores. As a result, the Company's low front-end in-stock rates heading into September (*i.e.*, immediately after emergence on August 30, 2024), had a greater impact on sales volume than it would have at a different time of the year.

Compounding these challenges, the Company faced a structural shift in its market, primarily resulting from changed customer behavior. Rite Aid's customer demographic includes low- and fixed-income consumers. Historically, these customers visited Rite Aid to obtain prescription drugs and frequently used the opportunity to purchase high-margin household goods and other items from Rite Aid's front-end business. Upon emergence, however, customer purchases of these products from brick-and-mortar convenience stores waned significantly, as Rite Aid was viewed as a higher-cost provider of these items. Accordingly, Rite Aid was not able to sell the limited front-end inventory it did have consistent with historical sales volumes or margins, accentuating the Company's liquidity problems.

These setbacks created a perfect storm for Rite Aid. The liquidity generated by returning to favorable terms and receiving vendor deposits, as well as anticipated letter of credit replacement facilities, would have allowed the Company to better replenish its front-end inventory and improve in-stock rates. Without it, however, the Company's front-end business deteriorated, which in turn exacerbated the inability to restock shelves to normal levels and reinvigorate performance. The inability to increase high-margin front-end purchasing volumes and sales further impacted the Company's vendor relations, as the Company began to move backwards on vendor terms and was unable to take advantage of promotions and cash discounts that would have been earned if it was able to achieve a normalized volume of purchasing, putting further pressure on the Company's liquidity and financial performance relative to its business plan. As the Company's liquidity continued to deteriorate over time, vendors began to reimpose or further tighten trade terms in a vicious cycle, with many demanding cash on delivery or refusing to continue shipments to the Company altogether.

In addition to decreasing the Company's saleable products needed to generate revenue, low inventory rates reduced the Company's ability to borrow under the Prepetition ABL Facility. The borrowing base under the Prepetition ABL Facility is calculated based on specified "advance rates" against the liquidation value of, among other things, certain eligible inventory and accounts receivable. Thus, low inventory leads to decreased revenue and a decreased borrowing base, which in turn, leads to less ability to borrow the amounts necessary to replenish inventory and right-size the front-end business. The substantial negative impact of these inventory challenges on the Company's liquidity are reflected in the Company's declining borrowing base since emergence (as shown above). Prior to the 2023 Cases, the Company maintained average in-stock rates across its front-end business of 89%, which had dropped to 57% at the time of emergence. As of February 2025, the Company's in-stock rates had fallen to 55%. When combined with the other challenges and competitive pressures described herein, these inventory challenges set the Company on a negative trajectory that could not be turned around.

Rite Aid's deteriorating financial condition has also caused McKesson to tighten its credit terms. Just days before the Petition Date, McKesson notified Rite Aid that, because of Rite Aid's weakened financial condition, McKesson was requiring that Rite Aid pay for its pharmaceutical products within six days (rather than 10 days, as the parties previously agreed), and that the aggregate gross amount that Rite Aid could owe to McKesson for such products would be capped at $175 million (rather than $270 million, as previously agreed). After discussions with Rite Aid, McKesson agreed to slightly less restrictive terms—payment in seven days, and an accounts receivable cap of $200 million, with a $5 million step-down each

day until the cap reached $175 million.  But, while less restrictive than what McKesson initially demanded, the revised payment terms remain significantly tighter than the terms Rite Aid has been operating under post-emergence.

## B.    Strategic Initiatives Explored Following the 2023 Cases.

The Company sought to address these challenges through a variety of strategic initiatives. Following emergence and prior to the Petition Date, the Company, with the help of its advisors, implemented comprehensive cost-saving measures to further streamline operations and alleviate liquidity-related pressures.  These measures included, among other things:  (i) implementing reductions in workforce across discretionary departments, affecting approximately 2,119 employees in the aggregate; (ii) implementing cost-saving policies across major spend areas such as fixed repair and maintenance, capital expenditures, and marketing expenses; (iii) consolidating its distribution centers; (iv) managing its supply chain to reduce freight, shipping, and distribution center handling costs; (v) actively managing labor hours; (vi) closely managing working capital, cash flow, and liquidity to minimize impact on vendor and landlord relations; (vii) implementing lease modifications and applying rent credits and abatements negotiated throughout the 2023 Cases; and (viii) pursuing various organizational measures designed to reduce costs with respect to employee compensation.  These initiatives were intended to alleviate the Company's ongoing liquidity constraints as it attempted to stabilize its operations and implement its turnaround business plan.

## C.    Footprint Rationalization and Rite Aid 2.0 Business Plan.

In the 2023 Cases, Rite Aid undertook a bottoms-up footprint rationalization effort and developed the Company's business plan, referred to as "Rite Aid 2.0."  The Company also undertook an intensive, store-level evaluation, testing stores' financial performance, rent relative to market, and supply chain and other operational and geographic considerations impacting its competitive landscape and overall strategies with its network, an analysis that remained ongoing prior to the commencement of the Debtors' current Chapter 11 Cases.  Based on this analysis, the Company identified, on a regular basis, collections of underperforming stores.  These underperforming stores hampered the Company's growth, turnaround initiatives, and free cash flow.  Accordingly, they were, once identified, slated for closure.  This allowed the Company to focus its efforts and liquidity on the stores remaining in its portfolio.

The Company continued to work to rationalize its store footprint post-emergence from the 2023 Cases.  Since emergence, the Company and its advisors undertook an intensive, store-level evaluation that tested the stores' financial performance, rent relative to market, remaining lease term, supply chain, and other operational and geographic considerations influencing the competitive landscape.  In March 2025, the Company engaged consultants to provide advisory services in furtherance of the Company's comprehensive footprint evaluation.  Once a store is selected for closure, the applicable assets (primarily prescription files) are marketed to the Company's major competitors pursuant to a store closing auction process.  As a result of these efforts, the Debtors sold and/or closed an additional 29 retail locations between emerging from the 2023 Cases and the Petition Date.[22]

---

[22]    The Debtors also entered into definitive purchase agreements for the prescription files of 63 additional stores, which sales were consummated, and the applicable stores wound down, in the early stages of the Debtors' Chapter 11 Cases.

### D.    Efforts to Obtain Incremental Liquidity.

In early 2025, the Company determined that it was at risk of breaching the "Minimum ABL Availability Covenant" under its Prepetition Credit Agreement.  The Company promptly engaged with the Prepetition ABL Lenders, to amend the Prepetition Credit Agreement on January 14, 2025 (the "Prepetition Credit Agreement Amendment"), to provide for (i) incremental liquidity in the form of (a) step-down reductions in the Minimum ABL Availability Covenant from $225 million to $160 million from February 13, 2025, through July 22, 2025 (with such threshold increasing back to $225 million by December 23, 2025), and (b) with the support of the majority of holders of Senior Secured Notes and equity holders, the release of up to $35 million from the CMSR Escrow Account (as defined in the 2023 Cases' Plan) established under the 2023 Cases' Plan, with approximately $27,466,543 released on the effective date of the First Amendment and approximately $3.6 million released on February 27, 2025, (ii) a reduction of the commitments under the Prepetition ABL Facility to $1.9 billion, and (iii) certain additional reporting obligations.

The financial reprieve granted by the Prepetition Credit Agreement Amendment was short lived— the extension of incremental liquidity was insufficient to restock front-end inventory and convince trade creditors to normalize trade terms.  On February 24, 2025, the Company breached the modified Minimum ABL Availability Covenant, which gave rise to an event of default, triggering the Prepetition ABL Lenders' right to exercise remedies.  The Company promptly re-engaged in discussions with the Prepetition ABL Lenders regarding the terms of a consent and waiver under the Prepetition Credit Agreement to provide stability for the Company as it explored its next steps.  On February 28, 2025, the Company and the Prepetition ABL Lenders executed a Consent Under Credit Agreement (the "Original Consent"), pursuant to which the Prepetition ABL Lenders agreed to modify the Minimum ABL Availability Covenant through March 15, 2025.  The Prepetition ABL Lenders conditioned their consent on the Company's agreement to, among other things, (i) comply with certain limitations on disbursements, (ii) provide the Prepetition ABL Lenders with additional reporting, (iii) develop and deliver a comprehensive business rationalization plan, and (iv) retain an investment banker and store closing sales professionals to prepare for a potential sales process.

After executing the Original Consent, the Company and Prepetition ABL Lenders continued discussions regarding the Company's path forward.  As the Company's liquidity situation continued to deteriorate, the Company and the Prepetition ABL Lenders began negotiating the terms of an amendment to the Original Consent that contemplated a potential sale and orderly monetization of its assets in the event that the business was not sold as a going concern (or that there were unsold assets following a pre-filing sale process).

On March 11, 2025, the Company and the Prepetition ABL Agent entered into the Amended and Restated Consent Under Credit Agreement (the "First Amended Consent") to further modify the Minimum ABL Availability Covenant through March 14, 2025.  The First Amended Consent imposed additional obligations on the Company, including to, among other things, (i) develop and deliver a strategic alternatives plan for the Company's business operations, including an orderly monetization of the Company's assets not sold pursuant to auctions, (ii) continue to engage an investment banker, location closing sales professionals, and real estate advisors, (iii) retain a chief transformation officer, and (iv) implement certain governance changes in anticipation of a chapter 11 process.

To further ensure that the Company continued to receive ongoing funding to extend the Company's runway to conduct a value-maximizing sales process, the Company and the Prepetition ABL Agent executed a Second Amended and Restated Consent Under Credit Agreement (the "Second Amended Consent") on March 17, 2025, which provided relief from the Minimum ABL Availability Covenant through April 5, 2025, and thereafter, a Third Amended and Restated Consent Under

the Credit Agreement (the "Third Amended Consent") on April 3, 2025, which provided relief from the Minimum ABL Availability Covenant through May 4, 2025. In addition to the covenants contained in the First Amended Consent, the Second Amended Consent and the Third Amended Consent imposed milestones with respect to a comprehensive sale and marketing process for the Company's businesses and assets.

### E. Advisor Engagement.

Rite Aid engaged Paul, Weiss and Cole Schotz P.C. ("Cole Schotz"), in March 2025, to begin contingency planning. Around the same time, the Company also engaged Guggenheim Securities and expanded the scope of Alvarez & Marsal's prior engagement to facilitate potential sales and/or store closing processes and otherwise to support contingency preparations.

### F. Prepetition Sales and Marketing Process.

In March 2025, the Company, with the assistance of Guggenheim Securities, began a comprehensive marketing process for the sale of some or substantially all of its assets (other than certain specified inventory, prescription records, real property and/or leasehold interests which are contemplated to be sold pursuant to certain standalone transactions effectuated directly by the Debtors and certain of its other advisors, without the assistance of Guggenheim Securities). By early April 2025, the Company, with the assistance of Guggenheim Securities, had contacted 38 potentially interested parties regarding a potential sale transaction. The universe of bidders contacted included large and regional U.S. parties as well as a range of international parties, including national pharmacy companies, national supermarkets, and regional supermarkets with stores in Rite Aid states, as well as other national retailers. Each of these parties was informed of the opportunity to submit a bid for substantially all or any portion of the Debtors' assets (*e.g.*, the entirety of the Company's businesses, assets, prescriptions, and/or stores, or any combination thereof). Ultimately, 21 of the contacted potential purchasers executed confidentiality agreements with the Debtors and 20 of those parties were provided access to a virtual data room that included extensive information on the relevant assets. The Debtors requested that by April 18, 2025, potential bidders submit initial indications of interest for the prepetition marketing process, and granted extensions to parties who expressed a need for more time in order to conduct additional diligence, prepare their documentation, and/or improve the terms and conditions of previously submitted indications of interest. Prior to the Petition Date, the Debtors received six indications of interest for various parts of the Debtors' businesses, along with one indication of interest for the combined purchase of substantially all of the Debtors' prescription files and certain parts of their inventory. The parties that had submitted such indications of interest consisted of a combination of national and regional retail pharmacies, grocery stores, and general retail chains. Following the submission of such indications of interest, the Debtors, assisted by Guggenheim Securities, engaged in discussions on certain economic and financial terms of the proposals with certain of these parties. The Debtors commenced the Chapter 11 Cases to continue their prepetition marketing and sales process and, as of the Petition Date.

Rite Aid also retained A&G Realty Partners, LLC ("A&G"), which had served as an advisor to the Company in connection with its 2023 Cases, to market and sell certain of the Company's non-residential real property leasehold interests and their fee-owned real property assets (together, the "Real Property Assets").

On April 3, 2025, Rite Aid entered into a consulting agreement with a contractual joint venture (the "Consultants") formed by SB360 Capital Partners, LLC and Hilco Merchant Resources, LLC, pursuant to which the Consultants agreed to provide certain asset divestment and monetization advisory services. Rite Aid previously engaged the Consultants during the 2023 Cases to provide liquidation advisory services and to facilitate store closing and similarly themed sales for Rite Aid's closing stores.

### G.       Corporate Governance Efforts.

The Company's Board and senior management proactively managed the Company's circumstances and maintained a strong governance process.  Once it became clear that a near-term chapter 11 process was a distinct possibility, the Company proactively evaluated its corporate governance structure and reconstituted the Board with three new independent directors that possessed expertise in restructurings.  In March of 2025, the Board determined that it was appropriate and in the Company's best interest to establish a special committee of the Board (the "Special Committee"), which was comprised of the three independent directors.  The Board delegated to the Special Committee its power and authority to plan for, negotiate, and evaluate potential strategic alternatives.  Additionally, the Board determined that it was in the best interests of the Company and its stakeholders to appoint Marc Liebman, the co-head of Alvarez & Marsal's turnaround and restructuring efforts in the western region of the United States, as Chief Transformation Officer of New Rite Aid, LLC.  The Board did so to leverage Mr. Liebman's extensive restructuring and operational experience to aid the Company in its contingency planning efforts and, if necessary, guide the Company through these Chapter 11 Cases.

## V.       MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE CHAPTER 11 CASES.

### A.       First Day Motions.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases, ensure a seamless transition between the Debtors' pre- and postpetition operations, and minimize disruption to the Debtors' business.  At a hearing on May 7, 2025, (the "First Day Hearing") the Court granted the relief requested in the First Day Motions on an interim and final basis, as applicable, with orders entered contemporaneously with or shortly following the First Day Hearing.  As of the date hereof, the Court has granted, on a final basis, the relief sought in all of the First Day Motions.

The First Day Motions and such orders, along with all other pleadings filed in the Chapter 11 Cases can be viewed free of charge at https://restructuring.ra.kroll.com/RiteAid2025/.  The following is a brief overview of the relief granted in respect of the First Day Motions.[23]

### 1.       Certain Procedural Motions.

The Debtors filed, and the Court granted, various procedural motions that are common to chapter 11 proceedings of similar size and complexity as these Chapter 11 Cases.[24]

---

[23]   This Disclosure Statement's summary of the First Day Motions and related orders is qualified in its entirety by reference to the First Day Motions and related orders themselves.  In the case of any inconsistency between this Disclosure Statement and the First Day Motions and related orders, the First Day Motions and related orders shall govern.

[24]   *See, e.g.*, the *Order Regarding Debtors' Application for Expedited Consideration of First Day Matters* [Docket No. 30]; *Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 122]; *Order Granting Chapter 11 Complex Case Designation* [Docket No. 123]; the *Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 140]; and the *Final Order (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor,*

2.        **Utilities Motion.**

In the ordinary course of business, the Debtors incurred certain expenses related to essential utility services including, among others, electricity, natural gas, and other similar services from several utility providers, either directly or through applicable lease agreements. The Debtors sought entry of interim and final orders: (i) prohibiting the Debtors' utility service providers from altering, refusing, or discontinuing utility services; (ii) approving the Debtors' proposed adequate assurance of payment for future utilities services; (iii) approving the Debtors' procedures for resolving requests for additional adequate assurance of future payment; (iv) authorizing the Debtors to provide adequate assurance of future payment to the Debtors' utility service providers; and (v) granting related relief. On May 7, 2025, the Court entered an order approving the Debtors' utilities motion on an interim basis [Docket No. 137]. The Court entered a final order approving the Debtors' utilities motion on a final basis on June 9, 2025 [Docket No. 773].

3.        **Taxes Motion.**

In the ordinary course of business, the Debtors paid and remitted, as applicable, taxes and fees on a periodic basis, typically remitting them monthly, quarterly, annually, or on other terms to the relevant authorities, depending on the nature and incurrence of a particular tax or fee and as required by applicable laws and regulations. The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations. Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if the Debtors fail to timely pay their outstanding taxes and fees. Similarly, tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay or even seek to hold the Debtors' directors and officers personally liable for any unpaid amounts. Accordingly, the Debtors sought, and the Court granted on interim [Docket No. 136] and final [Docket No. 774] basis, authority to remit or pay (or use tax credits or other attributes to offset or otherwise satisfy) all taxes and fees expected to become due and owing to various federal, state, local, and other applicable authorities that arose prior to the Petition Date and that the Debtors expected to become due and payable following the Petition Date.

4.        **Insurance & Surety Programs Motion.**

In the ordinary course of business, the Debtors maintained a comprehensive insurance program. The Debtors' existing insurance programs are essential to preserve the value of the Debtors' business, properties, and assets. In many cases, the insurance coverage provided by the existing insurance policies was required by diverse regulations, laws, and contracts that governed the Debtors' commercial activities. Failure to make the payments required to maintain the Debtors' insurance policies could have had a significant negative impact on the Debtors' operations. Absent sufficient and continuing insurance coverage, the Debtors also risked exposure to substantial liability and may not have been able to operate in certain key jurisdictions. As a result, the Debtors sought, and the Court granted, authority for the Debtors to continue their prepetition insurance programs and maintain their surety bond program, renew, amend, supplement, extend, or purchase additional insurance policies, and pay premiums and other amounts arising thereunder in the ordinary course of business [Docket Nos. 133 and 777].

5.        **Critical Vendors Motion.**

The Debtors requested authorization through their critical vendors motion to pay the prepetition claims of certain essential vendors and service providers, including lien claimants, 503(b)(9) claimants, and foreign vendors, in light of the importance of the products and services provided by such vendors. The

---

*(C) Redact Certain Personally Identifiable Information of Natural Persons, and (II) Granting Related Relief* [Docket No. 769].

Debtors believed that vendors could make credible and actionable threats to cease supplying the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' business while in chapter 11, unless they were paid on account of their prepetition debt. Further, the Debtors believed that any disruption in the provision of the critical supplies, materials, and services the Debtors sourced from their vendors would have had far-reaching and adverse economic and operational consequences on the Debtors' business. As a result, the Debtors sought, and the Court granted, authority for the Debtors to pay certain of these creditors on an interim [Docket No. 130] and final [Docket No. 779] basis.

### 6. Customer Programs Motion.

In the ordinary course of business, the Debtors provided certain incentives, discounts, promotions, and accommodations, and administered related programs, to attract customers and maintain positive customer relationships. These customer programs included a loyalty program, charitable donation program, gift card program, coupon and sale promotional offers, rebate program, credit card processing program, and a refund and exchange program. These programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Continuing the administration of these programs until their wind-down during the pendency of these Chapter 11 Cases was critical to preserving the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable pharmacy business, and the customer relationships and goodwill it relied upon. Accordingly, the Debtors sought, and the Court granted, relief confirming the Debtors' authority to maintain and administer their customer-related programs, policies, and practices and honor certain prepetition obligations related thereto, on an interim [Docket No. 131] and final [Docket No. 776] basis.

### 7. Wages Motion.

As of the Petition Date, the Debtors employed, in the aggregate, thousands of full-time and part-time employees, temporary workers, and independent contractors. This workforce relied on the compensation and benefits provided or funded by the Debtors to continue to pay their daily living expenses. It was essential to the smooth operation of the Debtors' business that their workforce continued to perform in the ordinary course, and so a stable workforce was critical to the uninterrupted continuation of the Debtors' business and the preservation and maximization of the value of the Debtors' estates during these Chapter 11 Cases. Accordingly, the Debtors sought, and the Court granted, on an interim [Docket No. 138] and final basis [Docket No. 772], the authority to, among other things, (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses to their employees and (ii) continue employee benefits programs in the ordinary course of business.

### 8. Equity and Claims Trading Motion.

The Debtors possess net operating loss ("NOL") carryforwards and other tax attributes. Under the U.S. Internal Revenue Code, the Debtors' ability to use these NOL carryforwards and other tax attributes could be limited if, among other things, the Debtors experienced a change of control. In order to protect the Debtors' ability to use their tax attributes, the Debtors sought, and the Court granted, interim [Docket No. 128] and final [Docket No. 768] orders approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to New Rite Aid, LLC's common stock or any beneficial ownership therein.

### 9. Cash Management Motion.

As described in detail in the Debtors' cash management motion [Docket No. 23], the Debtors maintained an integrated cash management system in the ordinary course of their operations. To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11

Cases, it was vital that the Debtors be permitted to maintain their cash management system and be authorized to, *inter alia*, pay any outstanding bank, processing, and security fees owed in relation to their cash management system, continue utilizing their corporate credit cards, maintain their existing business forms, and continue engaging in ordinary course intercompany transactions. The Court entered orders granting the relief sought in the cash management motion on an interim [Docket No. 127] and final [Docket No. 765] basis.

### 10.     De Minimis Assets Sale Procedures Motion.

The Debtors filed a motion seeking to establish procedures for the sale or abandonment of de minimis assets free and clear of liens, claims, interests and encumbrances, and on an expedited basis without incurring the delay and costs of preparing, filing, serving and having hearings on motions for approval of each such disposition (the "De Minimis Sales Procedures"). The De Minimis Sales Procedures only apply to the sale, transfer, or other disposition of assets with a sale price equal to or less than $5 million. The Court authorized and approved the De Minimis Sale Procedures on an interim [Docket No. 132] and final [Docket No. 778] basis.

### 11.     Store Closing Procedures Motion.

In furtherance of their thoroughly considered, value-focused lease rejection and comprehensive sales and marketing process, the Debtors filed a motion seeking the Court's authority to (i) engage certain store-closing services consultants, (ii) conduct liquidation sales at their stores and distribution centers, and (iii) continue sales and internal transfers of their Pharmacy Assets, among other requested relief, which relief was granted on an interim basis on May 9, 2025 [Docket No. 184] and a final basis on July 10, 2025 [Docket No. 1397].

### 12.     Procedures for Rejection of Executory Contract and Unexpired Leases and First Day Executory Contract and Lease Rejection Motions.

In the period leading up to the Petition Date, the Debtors determined that it was appropriate to close and wind down any remaining brick-and-mortar stores and reject certain executory contracts, and, accordingly, began to analyze their executory contracts and unexpired leases to determine how best to maximize value from such contracts and leases. On May 7, 2025, the Court entered an order authorizing the rejection of hundreds of executory contracts and approximately 11 unexpired leases [Docket No. 139]. On that same day, the Court entered an order approving, on an interim basis, certain procedures solely for the rejection of executory contracts and unexpired leases [Docket No. 134] (the "Rejection Procedures"). The Debtors proposed the Rejection Procedures in an effort to streamline the contract and lease rejection process, consistent with applicable law, minimize costs to the Debtors' estates, reduce the burden on the Court, and provide counterparties with adequate notice and an opportunity to object to any proposed rejections. The Court authorized and approved of the Rejection Procedures on a final basis on June 9, 2025 [Docket No. 776].

13.     **Real Property Sale Procedures Motion.**

On May 9, 2023, the Court entered an interim order establishing procedures (the "Real Property Sale Procedures") whereby the Debtors could sell the Real Property Assets not otherwise sold pursuant to the bidding procedures or store closing sale procedures, or which are not otherwise rejected [Docket No. 183]. The Court approved the Real Property Sale Procedures on a final basis on June 11, 2025 [Docket No. 804].

14.     **Bidding Procedures Motion.**

Foundational to the Debtors' asset monetization strategy was the Debtors' commitment to implement a sale process designed to (i) gauge market interest in the sale of the Debtors' Pharmacy Assets and (ii) dispose of the Remaining Assets in an effort to realize maximum value for stakeholders. To effectuate these sale processes, the Debtors filed the Bidding Procedures Motion, pursuant to which the Debtors sought the authority to proceed with a multi-staged bidding and sale processes on an expeditious, yet flexible, timeline. The Court granted the relief set forth in the Bidding Procedures Motion on an interim basis on May 7, 2025 [Docket No. 142] (the "Interim Bidding Procedures Order") and on a final basis on May 21, 2025 [Docket No. 473] (the "Final Bidding Procedures Order," and together with the Interim Bidding Procedures Order, the "Bidding Procedures Orders").

15.     **DIP Financing Motion.**

To ensure the Debtors' ability to conduct an efficient and expeditious sale process and continue operations in the ordinary course, prior to the Petition Date, the Debtors secured a commitment from their Prepetition ABL Lenders to provide a DIP financing facility, which, as reflected in the Final Financing Order (as defined below), is comprised of a (i) $1.7 billion DIP asset-based revolving credit facility (the "DIP ABL Facility") and (ii) $180 million DIP "first-in, last-out" term loan facility (the "DIP FILO Facility," and together with the DIP ABL Facility, the "DIP Facilities").

On May 7, 2025, the Court entered the interim DIP financing order [Docket No. 143] authorizing the Debtors to obtain financing under the DIP Facility, use the Prepetition ABL Lenders' cash collateral, and, in connection therewith, to provide adequate protection to such lenders, and approving the Debtors' entry into that certain Debtor-In-Possession Credit Agreement by and among the Debtors, the DIP Lenders, and the DIP Agent (the "DIP Credit Agreement") [Docket No. 143]. On July 10, 2025, following extensive negotiations with various constituencies, the Court entered the final DIP financing order on a consensual basis [Docket No. 1396] (as amended by the *Amended Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. [●]], and as may be further amended, the "Final Financing Order").

B.     **Other Motions & Pleadings.**

In addition to the aforementioned First Day Motions, the Debtors filed several motions and other pleadings to facilitate the Debtors' restructuring efforts and ease administrative burdens. The following is a brief overview of the relief granted in respect of such pleadings.

1.     **Retention of Debtors' Professionals.**

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Court

authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable: (i) Paul, Weiss, as co-counsel to the Debtors; (ii) Cole Schotz, as co-counsel to the Debtors; (iii) Guggenheim Securities, as investment banker to the Debtors; (iv) Alvarez & Marsal, as financial advisor to the Debtors; (v) A&G, as real estate consultant and advisor to the Debtors; (vi) Kroll, as the Debtors' Claims Agent; and (vii) Jackson Lewis P.C., as labor and employment litigation counsel (collectively, the "Debtors' Professionals"). Concurrently with the application requesting authorization to retain Alvarez & Marsal, the Debtors sought entry of an order designating Marc Liebman, Managing Director of Alvarez and Marsal, as Chief Transformation Officer to the Debtors. The Court subsequently entered orders approving the retention of the Debtors' Professionals and appointment of Mr. Liebman as Chief Transformation Officer [Docket Nos. 681, 771, 783, 784, 1045, 1079, and 1493].

## 2.     Retention of Ordinary Course Professionals.

In the ordinary course of business, the Debtors employed professionals to render a wide variety of services, such as law firms, attorneys, auditors, accountants, and consultants that had a direct and significant impact on the Debtors' day-to-day operations. To maintain the uninterrupted functioning of the Debtors in the Chapter 11 Cases, it is essential that the Debtors continue the employment of these ordinary course professionals. Accordingly, the Debtors filed a motion approving procedures for the retention and compensation of these ordinary course professionals and authorizing the Debtors to compensate such professionals without the need to file fee applications. The Court entered an order granting the relief sought in this motion on June 9, 2025 [Docket No. 770].

## C.     Section 341 Meeting and Appointment of Official Committee of Unsecured Creditors.

On May 15, 2025, the United States Trustee for the District of New Jersey (the "U.S. Trustee") filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 316], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors in the Chapter 11 Cases (the "Committee"). On May 19, 2025, the U.S. Trustee amended and reconstituted the Committee [Docket No. 440]. The Committee currently consists of nine members:

- RAD Sub-Trust A;

- RAD Sub-Trust B;

- AmerisourceBergen Drug Corporation;

- Pension Benefit Guaranty Corporation;

- Realty Income Corporation;

- United Food and Commercial Workers International Union;

- Iron Mountain Information Management, LLC;

- Computershare Trust Company, NA; and

- Evergreen-Partners, LLC d/b/a Evergreen Trading.

The Committee selected Willkie Farr & Gallagher LLP ("Willkie") and Sills Cummis & Gross P.C. ("Sills"), to serve as its legal co-counsel, and AlixPartners, LLP, to serve as its financial advisor

(collectively with Willkie and Sills, the "Committee Professionals"). The Court entered orders approving the retention of the Committee Professionals [Docket Nos. 1457, 1458, and 1491].

The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on June 4, 2025.

### D.    Reporting Requirements.

On May 6, 2025, the Debtors filed a motion seeking entry of an order extending the deadline by which the Debtors were required to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional 28 days, for a total of 42 days after the Petition Date [Docket No. 7]. On May 7, 2025, the Court entered the order thereby extending the deadline for the Debtors to file their Schedules and Statements by 28 days (i.e., through and including June 16, 2025) [Docket No. 141]. On June 16, 2025, the Debtors filed their Schedules and Statements [Docket Nos. 892–966; 968–1010]. The Schedules and Statements contain, among other things, information regarding the Debtors' books and records, claims, and executory contracts and unexpired leases.

Since commencing the Chapter 11 Cases, the Debtors have been filing monthly operating reports Docket Nos. 1182–1225, 1227-1231, 1233-1302, 1595-1623, 1625-1641, 1643-1700, 1702-1715, 2037-2131, 2134-2156.

### E.    Stakeholder Engagement.

The Debtors' corporate and capital structures, their operations, the events giving rise to these Chapter 11 Cases, the relief requested by the Debtors over the course of these Chapter 11 Cases, and the formulation of their chapter 11 plan are each complex subjects. To bring their stakeholders up to speed, maintain a full and fair flow of information, and drive these cases to a value-maximizing conclusion as efficiently as possible, the Debtors and the Debtors' Professionals have worked continuously to share information with the Debtors' substantial stakeholders.

Among other things, the Debtors have (i) maintained open lines of communication with the Committee Professionals, beginning immediately following the Committee's appointment on May 15, and have engaged in good faith to respond to diligence requests submitted by the Committee, (ii) continued to negotiate with their DIP Lenders regarding the use of cash collateral and DIP financing, (iii) negotiated with the U.S. Trustee regarding any concerns raised by the U.S. Trustee with respect to the relief sought by the Debtors in these Chapter 11 Cases, including concerns resolved consensually regarding the Debtors' first day and final operational relief, and (iv) created and maintained a data room that has been made available to prospective purchasers in the sales and marketing processes and responded to and engaged with these potential purchasers, as described in further detail below.

In addition, the Debtors and the Debtors' Professionals have addressed numerous informal questions, concerns, and issues raised on an almost daily basis by current and former employees, vendors, customers, individual creditors, and other parties in interest to ensure that they have access to resources necessary to understand the bankruptcy process and to protect their interests in connection therewith. Among other things, the Debtors have established and rolled out communications plans for various constituencies, and established a general information center hotline with domestic and international numbers available on the Debtors' bankruptcy website maintained by their Claims Agent.

F.        **The Debtors' Multi-Track Parallel Sales Processes.**

As previewed in the First Day Declaration, the Debtors have worked tirelessly to identify a value-maximizing path to wind-down the Company's operations.  A key component to maximizing estate value is identifying the closure date for a given store location.  Prior to the Petition Date, the Debtors, with the assistance of the Debtors' Professionals, conducted a comprehensive analysis of the Debtors' store portfolio, financial performance, and market geography to determine how best to monetize any given store's assets while simultaneously minimizing the costs associated with maintaining such store's operations for a longer period during the Debtors' Chapter 11 Cases.

The Company's meticulous, thoroughly considered store closure plan was developed based on the asset disposition strategy to be deployed at each store location, which strategy was informed by the costs associated with operating such store location and the value realizable through the sale of such store location's Pharmacy Assets, other assets and inventory, and/or lease.  With respect to Pharmacy Assets, the Debtors' strategy for maximizing store proceeds consists of either (i) transferring (or "pouring") Pharmacy Assets to nearby Rite Aid store locations that would remain open for a longer duration, or (ii) selling the Pharmacy Assets to another (non-Rite Aid) pharmacy (pursuant to the Bidding Procedures Orders).  With respect to other assets or inventory, the Debtors' strategy for maximizing store proceeds consisted of either (i) transferring such assets and/or inventory to another store location that would remain open for a longer duration, or (ii) conducting a self-managed strategic mark-down plan followed by a clearance sale at the store location (pursuant to the Store Closing Order).  With respect to the Debtors' leasehold interest in the premises underlying a store location, the Debtors' strategy for maximizing value consisted of either (i) concluding operations at the store and rejecting the lease as quickly as practicable, or (ii) selling the leasehold interest to a third-party purchaser (pursuant to the Real Property Sale Procedures).

Subsequent to the closure of stores and conclusion of the comprehensive marketing and sales process, each as described further herein, the Debtors considered whether to reject or market their store leases for sale pursuant to the Real Property Sale Procedures.  Since the Petition Date, the Debtors have (i) effectuated the rejection of 1,066 leases, resulting in approximately $48 million in base rent savings and (ii) entered into agreements to sell their interests in 143 leases for cash proceeds of approximately $19 million, including pre- and postpetition cure waivers.

1.        **Contract and Lease Rejections.**

On May 7, 2025, to streamline the contract and lease rejection process, consistent with applicable law, minimize costs to the Debtors' estates, and provide counterparties with adequate notice and opportunity to object to any proposed rejections, the Debtors sought and obtained Court approval (i) to reject hundreds of executory contracts and approximately 11 unexpired lease, effective as of the Petition Date, and (ii) of the Rejection Procedures.  The Court subsequently entered 25 orders approving the rejection of certain contracts and leases proposed to be rejected by the Debtors pursuant to the Rejection Procedures.[25]

2.        **Store Closings and Liquidation Sales.**

In the ordinary course of the Debtors' business, both prior to and following the 2023 Cases, the Debtors actively analyzed and evaluated their retail store portfolio to optimize their operational footprint.

---

[25]    *See* Docket Nos. 848-852, 1125, 1126, 1404-1406, 1508, 1776, 1941-1943, 1964-1968, 2209-2213.

The Company's store portfolio rationalization process accelerated in the months leading up to the Petition Date and, in connection with the Debtors' operational wind down, has continued since.

Prior to the Petition Date, the Company negotiated the terms of a consulting agreement among New Rite Aid, LLC, on the one hand, and SB360 Capital Partners, LLC, and Hilco Merchant Resources, LLC, on the other.  As contemplated in the Store Closing Order, pursuant to this consulting agreement, the Consultants agreed to provide the Debtors with a suite of services in connection with store closings, including in respect of data analysis, planning and logical coordination, sale oversight and support, and the monetization of a closing store's retail inventory and furniture, fixtures, and equipment.

In the leadup to the Petition Date, the Company, with the assistance of its advisors and the Consultants (as defined below), identified 47 store locations to be closed on or around the Petition Date on the basis that they would yield, after factoring in continued operating costs, limited to no value in a competitive chapter 11 sales process given:  (i) their historic financial underperformance; (ii) their lack of proximity to major competitors (who would be likely purchasers of the store's assets in a competitive sales process); and (iii) the lack of interest expressed by potential purchasers during the comprehensive prepetition sales and marketing process.

With the assistance of their advisors and the Consultants, as of August 26, 2025, the Debtors: (i) have noticed an additional 919 store locations for closure;[26] and (ii) have generated cash proceeds of $96 million in connection with the store closing sales conducted by the Consultants.

### 3.    Sales of Real Property Assets.

The Real Property Sale Procedures authorized the Debtors to market and sell their Real Property Assets via public auction or private sale.  The Debtors, with the assistance of A&G, marketed hundreds of Real Property Assets, that were otherwise not sold pursuant to the Bidding Procedures Orders, for sale.

In accordance with the Real Property Sale Procedures, the Debtors provided parties in interest with notice of the deadlines and procedures applicable to the marketing and sale of 327 of the Debtors' leases on June 16, 2025 [Docket No. 890] (as amended by Docket No. 1034).  Following expiration of the applicable bid deadline, the Debtors filed a notice identifying the 29 leases that had received one or more qualified bids and would therefore be auctioned on June 25, 2025 [Docket No. 1069].  On June 26, 2025, the Debtors filed a notice (i) designating the successful bidders with respect to each auctioned lease [Docket No. 1111] and (ii) regarding the assumption and assignment of the 29 leases [Docket No. 1112]. As no objections to this notice were timely filed, the Debtors sought Court approval of these sales and lease assignments pursuant to a certificate of no objection filed on July 11, 2025 [Docket No. 1416].  The Court approved the sales to the various successful bidders and the orders approving such sales were entered over the next several weeks.[27]

On July 3, 2025, the Debtors provided parties in interest with notice of the deadlines and procedures applicable to the marketing and sale of 816 of the Debtors' leases [Docket No. 1320] (as amended by Docket No. 1370).  As a result of their marketing process, the Debtors timely received qualified bids for 109 of these lease assets.  The Debtors held an auction for the sale of these 109 leases on July 21, 2025 [Docket No. 1498].  On July 22, 2025, the Debtors filed a notice (i) designating the successful bidders with respect to each auctioned lease [Docket No. 1524] and (ii) regarding the assumption and assignment of the

---

[26]    *See* Docket Nos. 185, 333, 505, 595, 697, 743, 862, 1046, 1133, 1319, 1417, 1497, 1514, 1576, 1752, 1845, 1889, and 1996.

[27]    *See* Docket Nos. 1312, 1408, 1409, 1437-1441, 1445-1453, 1496, 1549, 1568, 1569, 1719, 1730, 1751, and 1884.

109 leases [Docket No. 1525].  The hearing on approval of the sale and assignment of these leases took place on August 14, 2025, and the orders approving these sales and lease assignments were entered thereafter.[28]

The Debtors noticed parties in interest of their intent to sell 49 of their fee-owned properties pursuant to an auction process [Docket No. 1321].  The Debtors conducted an auction with respect to 45 of these fee-owned properties on August 1, 2025 and provided notice of its results on August 4,2025 [Docket Nos. 1788].  The hearing on approval of the sale of these fee-owned properties took place on August 14, 2025, and the orders approving the purchase agreements memorializing such sales were entered thereafter.[29]  The Debtors continued the auction of the remaining four fee-owned properties on August 13, 2025 [Docket No. 1887].  The hearing to approve the sale of these four fee-owned properties took place on August 28, 2025.  The Debtors anticipate that orders approving the purchase agreements memorializing these four sales will be entered in due course.

As of August 29, 2025, the Real Property Assets sold pursuant to the Real Property Sale Procedures Order generated cash proceeds of approximately $70 million.

## 4.    Sales and Marketing Process.

Prior to the commencement of these Chapter 11 Cases, the Debtors commenced a comprehensive sales and marketing process for substantially all of their assets, with the assistance of their investment banker, Guggenheim Securities.  In connection with that process, the Debtors, with the assistance of Guggenheim Securities, contacted 38 potentially interested parties identified as likely bidders and offered these parties the opportunity to submit a bid for substantially all or any portion of the Debtors' assets.

The Debtors and their advisors moved expeditiously to progress their out-of-court marketing process, with Guggenheim Securities establishing and populating a customized virtual data room for the 21 parties that executed non-disclosure agreements.  The Debtors, with the assistance of Guggenheim Securities, instructed these parties to submit preliminary indications of interest for all or any portion of the Debtors' assets by April 18, 2025.  Of the potentially interested parties with whom the Debtors and their advisors interfaced at the outset of the Debtors' out-of-court marketing process, seven submitted indications of interest to the Company.  Upon evaluating these sale proposals, the Debtors recognized that an out-of-court sales process would risk disorderly conduct that could cause significant value erosion for the Debtors' assets and/or compromise the integrity of pharmacy healthcare systems across the country.  Accordingly, the Debtors made the decision to commence the Chapter 11 Cases to maximize the value of their assets for the benefit of their estates through one or more sales of substantially all of their assets to one or more purchasers at public auctions.

To allow the Debtors to continue their sales and marketing process on a postpetition basis, the Debtors sought, at the outset of these Chapter 11 Cases, the Court's authority to continue their prepetition sales and marketing process postpetition via the Bidding Procedures Motion.  The Bidding Procedures Motion established (i) requirements with respect to the contents of any bid submitted by a potential investor, (ii) a dual-track schedule with respect to conducting auctions to determine, and obtaining Court approval of, the highest and best offers with respect to the Debtors' Pharmacy Assets and Remaining Assets, and (iii) procedures which would allow the Debtors to proactively resolve disputes related to the assumption

---

[28]    *See* Docket Nos. 1893-1903, 1925-1934, 1959, 1960, 1992, 2026, 2028, 2029, 2172, 2176, 2177, 2198, 2199, 2203, 2208, 2217, 2026, 2251-2255, and 2257.

[29]    *See* Docket Nos. 1954, 1983, 1984, 1985, 1986, 1989, 1990, 2030, 2240-2247.

and assignment of executory contracts and unexpired leases in connection with these transactions, to minimize any delays and uncertainties which might arise from that process.

The Debtors conducted the first-stage of the comprehensive sales and marketing process in accordance with the "Pharmacy Asset Sale Schedule" set forth in the Interim Bidding Procedures Order. Upon expiration of the Pharmacy Asset auction's bid deadline, the Debtors filed a notice confirming receipt of qualified bids for the Pharmacy Assets and that the Pharmacy Asset auction would proceed on May 14, 2025, as initially intended [Docket No. 241]. Thereafter, the Debtors conducted a two-day auction for certain Pharmacy Assets at the offices of Paul, Weiss. Following the Pharmacy Asset auction, the Debtors provided notice of the results of the Pharmacy Assets auction: the sale of the Pharmacy Assets of over 800 Rite Aid pharmacy locations to various national and regional pharmacy retailers [Docket No. 338]. The hearing to approve these Pharmacy Asset sales was held on May 21, 2025 (the "Pharmacy Asset Sale Hearing"). Thereafter, the Court entered orders approving the sale of certain Pharmacy Assets to: (i) CVS Pharmacy, Inc. [Docket No. 470];[30] (ii) Walgreen Co. [Docket No. 469]; and (iii) each of Albertson's LLC, Brahmaji Valiveti &Praveen Challa., Fred Meyer Stores, Inc., Giant of Maryland LLC, Gopal Sojitra, Jio Pharma Inc., The Golub Corporation, True Script Corp., Weis Markets, Inc., 33 Rx Inc., and Giant Eagle, Inc. [Docket No. 472].

Following entry of the Final Bidding Procedures Order, the Debtors continued marketing for sale certain Remaining Assets, including the Thrifty Assets, unsold Pharmacy Assets, intellectual property, and Rite Aid loyalty data [Docket No. 342]. The Debtors held an auction for the Thrifty Assets on June 24, 2025, after which Hilrod Holdings L.P. was determined to be the successful bidder for the Thrifty Assets, and KPH Healthcare Services, Inc. was declared the successful bidder for certain unsold Pharmacy Assets. The Court entered orders approving these sales on July 1, 2025 [Docket Nos. 1178 and 1179]. The sale of the Thrifty Assets to Hilrod Holdings L.P. closed on July 31, 2025 [Docket No. 1750]. Additionally, the Debtors sold certain Pharmacy Assets (i) to Giant Eagle, Inc. on July 2, 2025 [Docket No. 1306], (ii) jointly to Unity Rx 103 LLC and Aspire Rx LLC on July 18, 2025 [Docket No. 1492], and (iii) to Med One Pharmacy Inc. on August 6, 2025 [Docket No. 1819]. The Debtors consummated each of the foregoing Pharmacy Asset sales in accordance with the terms of the applicable purchase agreement.

On September 18, 2025, the Debtors filed a notice of successful bidder declaring McKesson as the successful bidder for certain Pharmacy Assets [Docket No. 2500].

All or substantially all of the sales of the majority of the Debtors' Pharmacy Assets are projected to close on or in advance of Confirmation of the Plan.

The auctions for all Remaining Assets has been adjourned *sine die* [Docket No. 1515].

### G. Approval of the DIP Facility.

The Debtors' business was abnormally cash-intensive, with significant daily and monthly cash needs to meet obligations to vendors, employees, and landlords, among others. In light of their cash needs, the Debtors explored potential sources of DIP financing prepetition. Ultimately, the Debtors determined that the realities of their business and capital structure would render efforts to obtain incremental capital from parties other than the Prepetition ABL Lenders at best futile, and at worst, value-destructive.[31]

---

[30] In addition to purchasing the Pharmacy Assets of 625 Rite Aid pharmacies across fifteen states, CVS also purchased 64 Rite Aid stores, located in Idaho, Oregon and Washington, on a going concern basis.

[31] As described in greater detail in the First Day Declaration, the Debtors ability to source postpetition funding from third-parties or junior secured lenders was constrained due to, among other things: (i) provisions in the Intercreditor Agreements by and among the Debtors' prepetition secured lenders which prohibited non-

Accordingly, the Debtors undertook extensive, arm's-length negotiations with the Prepetition ABL Lenders to obtain sufficient liquidity to fund the Debtors' day-to-day operations during the Chapter 11 Cases and the Debtors' operational wind-down. The DIP Facilities and the consensual cash collateral arrangements described in the Interim Financing Order[32] are the product of these negotiations.

Through the Interim Financing Order, the Debtors were granted interim access to an aggregate $1.94 billion in commitments under the DIP Facilities to support working capital needs and administrative costs during the Chapter 11 Cases. The funding under the DIP Facilities was secured by first priority priming liens on and senior security interests in favor of the DIP Agent, for the benefit of the DIP Lenders, on substantially all of the Debtors' assets.

Following entry of the Interim Financing Order, the DIP Facilities were used to administer the Chapter 11 Cases, operate the Debtors' business in the ordinary course, and facilitate the sales and marketing processes contemplated in the Bidding Procedures Orders, Store Closing Order, and Real Property Sale Procedures Order. In addition to the funds made available through the DIP Facilities, the Interim Financing Order permitted the Debtors to use prepetition cash collateral to meet the Debtors' postpetition liquidity needs.

After the Court entered the Interim Financing Order on May 7, 2025, various parties informally expressed concerns with or requested modifications to the terms of, or formally filed an objection to, the proposed Final Financing Order, which had been modeled off of the Interim Financing Order. Generally, this informal and formal feedback reflected the concerns of two constituencies: the Committee and the Debtors' landlords.

The Debtors' Professionals, the Committee Professionals, the DIP Lenders and their professionals, and counsel to several landlords engaged in extensive negotiations in the period leading up to the final hearing on the DIP financing motion. Ultimately, the Debtors resolved the Committee's objection to the proposed Final Financing Order through, among other things, the DIP Lenders' agreement to remove DIP liens from certain avoidance action proceeds, commitment to work in good faith to reach an agreement on the resolution of the Debtors' Chapter 11 Cases, and concessions in respect of the Committee's budget and lien challenge period. The Debtors also resolved several landlord objections by establishing an escrow account to pay claims on account of "stub" rent (which is rent owed for the period between the Petition Date and the first rental payment due date following the commencement of these Chapter 11 Cases), funding this stub rent escrow account with approximately $23 million, and incorporating into the Final Financing Order procedures to disburse payments on account of a landlord's stub rent claim. Accordingly, following a consensual hearing on July 10, 2025, the Court entered the Final Financing Order.

The Final Financing Order also provides for a roll up of the full principal amount of obligations under the Prepetition ABL Facility and $180 million in the aggregate principal amount of obligations under the Prepetition FILO Facility into the DIP ABL Facility and the DIP FILO Facility, respectively, the

---

consensual collateral priming; (ii) the Prepetition ABL Lenders' refusal to consent to having its collateral primed; (iii) the Debtors' lack of material unencumbered assets; and (iv) the risk that news of the Debtors' impending bankruptcy filing would cause customer and employee attrition.

[32] The "Interim Financing Order" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 143].

completion of the Debtors' Chapter 11 Cases within certain milestones, and the grant of certain adequate protection to, among others, the Prepetition ABL Lenders and Prepetition ABL Agent.

**H.     The Administrative Claims Procedures.**

On August 6, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Administrative Claims Procedures and (II) Granting Related Relief* [Docket No. 1820], pursuant to which the Debtors sought the Court's approval of procedures that would allow for the accelerated payment of Eligible Administrative Claims under section 503(b)(9) of the Bankruptcy Code.  The Court heard the motion on August 14, 2025 and shortly thereafter entered an order authorizing and approving the Administrative Claims Procedures [Docket No. 1883], as described above in <u>Article I.A.3</u> of this Disclosure Statement.

**I.     Employee Matters.**

**1.     CBAs.**

As of the Petition Date, approximately 7,500 of the Company's employees were unionized under one of seven CBAs.  The Company generally made monthly contributions to provide health, welfare, and retirement benefits to certain union employees, and the unions administered the retirement benefits.  The Company also contributed to (i) six multiemployer defined benefit pension plans under the terms of certain CBAs on behalf of union members it currently employs and (ii) multiemployer health and welfare plans on behalf of certain of its union-represented employees.

During the Chapter 11 Cases, the Company bargained with its unions about certain obligations under the CBAs.  During these discussions, the Company negotiated reductions from previously agreed upon severance amounts for certain represented employees and reduced costs associated with certain administrative burdens.  The terms of these negotiations are contained in "Effects Agreements" with the unions.  Aside from the changes agreed to via the Effects Agreements, the CBAs otherwise remain in effect as written, including the Company's obligations to pay into union health & welfare and union pension/401(k) funds, among other obligations.  However, as part of the Effects Agreements, the Company and the unions agreed that their obligations to each other under the National Labor Relations Act and the CBA will terminate as of the last day of employment of the last union member employee.  All Rite Aid retail stores' operations and union employees are expected to be terminated by no later than September 27, 2025, and the corresponding CBAs will terminate at such time in accordance with their terms and the applicable Effects Agreement.

Moreover, during the Chapter 11 Cases, the Company closed various operations, including its distribution center in Lancaster, CA, and a store in Ohio.  These closures resulted in the separation of all employees at these locations, which under the applicable Effects Agreement, terminated the CBAs associated with these locations and ended the Company's obligations under these CBAs.  Additionally, the Company sold its Thrifty Ice Cream business, which had two CBAs covering the employees at this facility.  As of the date hereof, seven CBAs remain in effect.

**2.     Rite Aid Corporation's Pension Plan.**

As of the Petition Date, Debtor Rite Aid Corporation sponsored the Rite Aid Pension Plan (the "<u>Pension Plan</u>"), which is covered by Title IV of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>").

36

The Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned United States government corporation and agency created under Title IV of ERISA, administers the federal pension insurance program and guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.  Pursuant to section 1342(a) of ERISA, in certain circumstances the PBGC may involuntarily terminate a pension plan covered by Title IV of ERISA.  Following an involuntary termination, the PBGC becomes the trustee and is granted authority to administer the plan.

Effective as of August 4, 2025, the PBGC effectuated an involuntary termination of the Pension Plan, with a plan termination date of July 31, 2025, and became the trustee of the Pension Plan.  Due to the termination, the plan administrator and its service providers will transfer the Pension Plan's records and assets to the PBGC.  After the records and assets have been transferred, the PBGC will be responsible for administration of the Pension Plan.  In this role the PBGC will recalculate benefits, inform Pension Plan participants of their new benefit amount, accept applications from retirees not currently in payee status, and pay benefits up to a guaranteed limit.  Once the assets for the Pension Plan have been transferred to the PBGC, administrative expenses for the Pension Plan will be submitted to the PBGC for payment.

PBGC has requested that the following provision be incorporated into this Disclosure Statement and the Plan:

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document Filed in the Chapter 11 Cases.  For the avoidance of doubt, neither the Reorganized Debtors nor the Elixir Insurance Company shall be released from any liability or obligation under ERISA, the Internal Revenue Code of 1986, as amended (the "IRC"), and any other applicable law relating to the Pension Plan.

The Debtors are continuing to evaluate PBGC's requested language and will continue to work with the PBGC to address their concerns in advance of the Confirmation Hearing.  All parties' rights are reserved.

### 3.        Multiemployer, 401(k), and Health and Welfare Plans.

As of the Petition Date, certain of the Debtor-entities contributed to 10 multiemployer defined benefit pension plans under the terms of certain CBAs and to multiemployer health and welfare plans on behalf of certain of its union-represented employees.  Rite Aid anticipates that in the next four weeks, all of its employees covered by CBAs will be terminated and that it will make no further multiemployer plan contributions.  As a result of its withdrawal from the 10 multiemployer defined benefit pension plans, Rite Aid anticipates that certain withdrawal premiums will become due.

Rite Aid Corporation maintains three 401(k) plans, under which it made employer-matching contributions to eligible participants.  Rite Aid Corporation continues to maintain one of these 401(k) plans (the "401(k) Plan").  Under the terms of the 401(k) Plan, Rite Aid Corporation was obligated to make employer-matching contributions to eligible participants.  Rite Aid Corporation froze all matching contributions to the 401(k) Plan, effective as of July 13, 2025.  In accordance with the requirements of applicable law, Rite Aid Corporation provided participants with a notice describing the freeze on all

matching contributions.  Effective as of August 8, 2025, Rite Aid Corporation froze employee deferrals to the 401(k) Plan.  As of the date of filing of this Disclosure Statement, no further participant contributions will be made to the 401(k) Plan, but Rite Aid Corporation is required to fund 2025 matching contributions that accrued during the 2025 plan year prior to July 13, 2025.  The 2025 employer-matching contribution is expected to be funded in September 2025.  Rite Aid anticipates that it will take approximately a year to terminate and wind up the 401(k) Plan.  It is possible that as of the date of filing of the Disclosure Statement, the Company may still have employees making deferral contributions into the two smaller 401(k) plans, but those contributions will cease as of the last paycheck for those associates.

Rite Aid continues to sponsor health and welfare benefit plans in which its non-union employees, and certain union employees, may be eligible to participate.  The benefit plans sponsored by Rite Aid included medical, dental, and vision plans, life insurance, tuition assistance programs, and paid time off, among other things.  The Rite Aid health and welfare plans provide retiree health and welfare benefits for certain former employees.  The Debtors intend to continue all health and welfare benefit plans until all Rite Aid employees terminate employment.  Upon termination of the health and welfare benefit plans, Rite Aid anticipates that it will take approximately twelve to eighteen months to wind up the plans.

### J.    Adversary Proceedings & Other Bankruptcy Litigation.

#### 1.    McKesson Litigation & Adversary Proceeding.[33]

McKesson is the Debtors' largest supplier of pharmaceutical drugs, accounting for approximately 99% of the Debtors' inventory.  In the 2023 Cases, the Debtors entered into the McKesson Settlement, as part of which the Debtors and McKesson also entered into the New McKesson Supply Agreement.  On February 28, 2025, the Debtors made a $29 million payment to McKesson, pursuant to the McKesson Settlement Agreement (the "February 28 Payment").

In the lead-up to the Chapter 11 Cases, pursuant to the New McKesson Supply Agreement, McKesson changed its trade terms with the Debtors.  Under the New McKesson Supply Agreement, the Debtors were previously subject to a $270 million cap on the outstanding accounts receivable balance due to McKesson for products that had been delivered, but not yet paid for, at any given time (the "Cap").  Additionally, the New McKesson Supply Agreement required that the Debtors pay for any products within 10 days after delivery.  On April 23, 2025, McKesson sent a letter to the Debtors stating that, due to Rite Aid's failure to meet McKesson's credit requirements, as of May 1, 2025, the Debtors (i) would have to pay for deliveries within six days and (ii) the Cap would be reduced from $270 million to $175 million.  At that time, Rite Aid had an outstanding receivable balance of approximately $250 million.  Following further negotiations, McKesson agreed that, instead of their previously proposed terms, as of May 1, 2025, the Debtors (i) would have to pay for deliveries within seven days and (ii) the Cap would immediately be reduced from $270 million to $200 million and would subsequently decrease by an additional $5 million each day thereafter.  The Debtors contend, although McKesson disputes, that McKesson also began calculating the Cap based on the total volume of orders the Debtors had placed, regardless of whether they had been delivered, as opposed to prior practice and the terms of the Supply Agreement, under which only products that had been delivered were counted toward Rite Aid's balance.

On May 1, 2025, Rite Aid was on course to exceed the newly reduced Cap by $11 million.  Thus, in response to demands from McKesson, Rite Aid made an $11 million accelerated payment to McKesson

---

[33]   The foregoing summary of the McKesson litigation & adversary proceeding is a recitation from the Debtors' perspective.  The Debtors understand that McKesson disputes their views and reserves all rights with respect thereto.

prior to its due date (the "May 1 Payment") in order to ensure a continued flow of drugs. Then, on May 4, 2025, McKesson notified Rite Aid that McKesson would not process any further orders because Rite Aid had exceeded the reduced Cap. Accordingly, on May 5, 2025, the Petition Date, Rite Aid made a $49,674,910 payment to McKesson (the "May 5 Payment") to ensure a continued postpetition flow of drugs. This payment was disbursed from Rite Aid Hdqtrs. Corp., which acts as the paying agent for all Rite Aid entities and has initiated the wire transfer for payment of every invoice under the New McKesson Supply Agreement. The Debtors contend, and McKesson disputes, that the payment was made on behalf of Rite Aid Corporation (the signatory to the Supply Agreement) and the Rite Aid pharmacies that actually receive and dispense drugs supplied by McKesson. After filing the Chapter 11 Cases, the Debtors agreed to pay McKesson cash in advance for deliveries on a go-forward basis, with an exception for invoices in respect of deliveries made on May 6, 2025 and May 7, 2025, which McKesson asserts remain unpaid and the Debtors assert were paid by the May 5 Payment.

Additionally, under the New McKesson Supply Agreement, McKesson is required to provide various rebates, volume incentives, credits, and other adjustments in favor of Rite Aid to reduce or offset the purchase price for Rite Aid's future orders. Rebates comprise certain credits, incentives, rebates, and other adjustments from prescription drug manufacturers that McKesson earns due to the volume of Rite Aid's orders. Credits comprise amounts due to Rite Aid for returns or reclamations of pharmaceutical inventory. McKesson may suspend these rebates and credits only if Rite Aid defaults on a payment, which it never did. Nonetheless, on the Petition Date, McKesson suspended the rebates and credits owed to Rite Aid and cut off Rite Aid's access to information concerning those rebates and credits. The Debtors contend, although McKesson disputes, that as of June 30, 2025, McKesson was withholding approximately $60 million in rebates, and as of July 31, 2025, McKesson was withholding approximately $50 million in credits.

On June 2, 2025, McKesson filed the McKesson Motion to Compel, seeking to retain the May 5 Payment and seeking an additional $49,674,910 Administrative Claim for postpetition deliveries. On June 2, 2025, Rite Aid, McKesson, the Committee, and the DIP Agent stipulated that Rite Aid would promptly pay this amount in full if the Court determined that the May 5 Payment was a prepetition payment and not recoverable as a preferential transfer. *Stipulation and Agreed Order by and Between the Debtors, DIP Agent, the Official Committee of Unsecured Creditors, and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection with the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 672] (the "McKesson Stipulation"). The McKesson Stipulation also provided that any postpetition financing order would ensure that a reserve in the amount of the May 5 Payment would be available to promptly pay McKesson's Administrative Claim if the McKesson Motion was granted.

On July 31, 2025, the Debtors filed their *Memorandum of Law in Opposition to McKesson Corporation's Motion for an Order Allowing Administrative Expense Claim and Related Relief* [Docket No. 1758]. The Debtors argued that the May 5 Payment was a postpetition payment on behalf of Rite Aid Corporation to ensure a continued flow of drugs after the Petition Date. They also argued that the May 5 Payment was not an ordinary course transfer to repay a prepetition obligation. The Debtors also filed the McKesson Complaint. In the McKesson Complaint, the Debtors sought (i) avoidance of the February 28 Payment as a preference, (ii) avoidance of the May 1 Payment as a preference, (iii) avoidance of the May 5 Payment as an unauthorized postpetition transfer, (iv) in the alternative, avoidance of the May 5 Payment as a preference, (v) recovery of avoidable transfers pursuant to 11 U.S.C. § 550, (vi) disallowance of McKesson's claims pursuant to 11 U.S.C. § 502(d), (vii) a declaratory judgment that McKesson's withholding of rebates and credits solely due to Rite Aid's bankruptcy is in violation of 11 U.S.C. § 365(e) and an order directing McKesson to cease withholding such rebates and credits, and

(viii) equitable subordination under 11 U.S.C. § 510(c).  McKesson disputes the allegations in the McKesson Complaint.

On August 15, 2025, McKesson filed the *Reply Brief in Support of Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Docket No. 1907].

Pursuant to the Restructuring Support Agreement, McKesson and the Debtors agreed to implement the Litigation Stay, which will cause proceedings related to the McKesson Motion to Compel and McKesson Complaint (and any briefing or other litigation deadlines with respect there to) to be stayed, until the earlier of (i) the termination of the Restructuring Support Agreement with respect to McKesson, (ii) the release of the claims and Causes of Action subject to the Litigation Stay pursuant to the Plan or any Plan-related documents or (iii) in the event the Non-Plan Toggle is exercised, the date the Debtors determine to effect the Non-Plan Toggle.  For the avoidance of doubt, if the Non-Plan Toggle is exercised and a Plan Transaction is not implemented, neither McKesson nor the Debtors shall be obligated to grant releases or take any other actions with respect to the McKesson Motion to Compel or the McKesson Complaint.  If the Plan is consummated, however, McKesson will withdraw the McKesson Motion to Compel and the Debtors will dismiss the McKesson Complaint with prejudice.

### 2.    CVS Litigation.

#### (a)    The Asset Purchase Agreement Disputes.

On May 15, 2025, CVS entered into an asset purchase agreement to acquire certain assets associated with Rite Aid's retail locations in the Pacific Northwest region (the "PNW APA"), as well as separate asset purchase agreements to acquire certain assets associated with Rite Aid's retail locations in Pennsylvania, California, and other states (the "National File Buy APAs," and together with the PNW APA, the "APAs").  Subsequently, several disputes arose between CVS and the Debtors concerning the interpretation of a purchase price adjustment mechanism in the APAs, which provided for a reduction in purchase price at closing if the number of prescriptions filled at a given pharmacy fell below a specified baseline number.  On July 3, 2025, the Debtors filed their *Emergency Motion to Enforce the Sale Order and Compel Performance by CVS Pharmacy, Inc. Under the CVS Asset Purchase Agreements* [Docket No. 1322], which raised three issues.

*First*, the parties disputed the relevant "lookback period" for the purchase price adjustment mechanism.  The APAs attached an exhibit with a baseline number of prescriptions filled at each store for which prescriptions were being sold and provided for a purchase price adjustment if the average number of prescriptions filled in the four weeks prior to closing fell more than a specified amount below the baseline.  The provision excluded weeks containing national holidays from the calculation.  Rite Aid contended that the provision unambiguously requires four weeks of data, and thus weeks containing national holidays must be replaced with earlier weeks immediately preceding the default lookback period to determine the applicable sample.  CVS, by contrast, contended that holiday weeks are excluded and not replaced.  After an evidentiary hearing, the Court issued the *Letter Opinion Granting in Part Debtors' Emergency Motion to Enforce the Sale Order and Compel Performance by CVS Pharmacy* [Docket No. 1591] (the "Enforcement Opinion"), holding that Rite Aid's interpretation was correct, based on evidence including the parties' uniform course of dealing under other materially identical agreements.  The Court's *Order Granting, in Part, Debtors' Emergency Motion to Enforce the Sale Order and Compel Performance by CVS Pharmacy, Inc. Under the CVS Asset Purchase Agreement* [Docket No. 1800] (the "Enforcement Order"), followed.

*Second*, the parties disputed the meaning of "prescriptions filled" under the purchase price adjustment mechanism. Rite Aid contended that a prescription counts as filled only once it is dispensed to a customer, whereas CVS contended that a prescription is filled once it is bottled and ready for pickup. In the Enforcement Opinion and Enforcement Order, the Court adopted Rite Aid's interpretation. It held that prescriptions are of no economic value until picked up and paid for by customers and that other extrinsic evidence supported Rite Aid's interpretation.

*Third*, the parties disputed how transferred prescriptions were to be treated. Specifically, the purchase price adjustment mechanism provided that Rite Aid would receive credit for prescriptions transferred from Rite Aid to CVS in the time leading up to the closing of a sale, as customers may move their prescriptions to CVS stores prior to a formal sale of a pharmacy or its prescriptions to CVS. The credit is calculated based on the average transfers per week, and the parties disputed whether the weeks to be included comprised every week following the signing of the APAs or solely the four weeks included in the lookback period described above. The Enforcement Opinion and Enforcement Order reserved decision on this dispute, and the Court directed that the parties submit supplemental briefing. After Rite Aid filed its supplemental brief, the parties reached agreement on a settlement. Under the settlement, the calculation of prescriptions transferred under the PNW APA comprises all weeks from the signing of the APA to the closing of a transaction thereunder, but the calculation of prescriptions transferred under the National File Buy APAs includes only the weeks within the lookback period. The parties submitted a stipulation and agreed order resolving this dispute.

On August 19, 2025, CVS filed a notice of appeal from the Enforcement Order [Docket No. 1947].

### 3.   MedImpact Recoupment Dispute.

The confirmation order in the 2023 Cases provided for the reorganized 2023 Debtors and MedImpact to resolve disputes concerning the Debtors' potential assumption and assignment of the (i) Participating Pharmacy Agreement between RxOptions, Inc. and Rite Aid Hdqtrs. Corp. dated May 1, 2013 (Commercial), including all amendments, addenda, exhibits, and other attachments thereto (the "Elixir Commercial Agreement"), and (ii) Participating Pharmacy Agreement between RxOptions, Inc. and Rite Aid Hdqtrs. Corp. dated August 15, 2013 (Medicare), including all amendments, addenda, exhibits, and other attachments thereto (the "Elixir Cash Card Agreement" and, together with the Elixir Commercial Agreement, the "Legacy Elixir Network Agreements"). Additionally, the Debtors and MedImpact are party to the MedCare Pharmacy Network Agreement, dated as of April 17, 2006 (the "MedImpact Pharmacy Network Agreement" and, together with the Legacy Elixir Network Agreements, the "MedImpact Agreements").

Shortly after the Debtors filed these Chapter 11 Cases, MedImpact initiated administrative freezes over payments due and owing to the Debtors under each of the Agreements pending clarification as to whether MedImpact's netting out of amounts due and owing to and from MedImpact and the Debtors constitutes recoupment or setoff. On July 14, 2025, MedImpact filed its *Motion for (i) a Declaration That MedImpact May Exercise Its Recoupment Rights or, in the Alternative (ii) Relief from the Automatic Stay to Setoff Amounts Due and Owing* [Docket No. 1434] (the "MedImpact Motion").

To resolve the MedImpact Motion, the Debtors and MedImpact entered into the *Stipulation and Consent Order Regarding the Debtors' Assumption of Certain Legacy Agreements and MedImpact's Exercise of Recoupment Rights Under Certain Agreements* [Docket No. 1592] (the "MedImpact Stipulation"). Under the MedImpact Stipulation, the Legacy Elixir Network Agreements were deemed assumed by the Debtors and assigned to the Debtors as of the August 30, 2024 effective date of the plan of reorganization in the 2023 Cases. Additionally, the Debtors and MedImpact agreed that MedImpact's withholding of fees and other amounts due and owing to MedImpact from the Debtors under

41

each of the MedImpact Agreements from payments due and owing to the Debtors from MedImpact under the MedImpact Agreements, in the ordinary course of business, constitutes recoupment; provided that such recoupment is (i) of fees and other amounts due and owing under the MedImpact Agreements for services performed under the MedImpact Agreements, (ii) withheld from payments for transactions in connection with which those services were performed, and (iii) consistent with the Debtors' and MedImpact's prepetition practices. Further, they agreed that MedImpact could exercise its recoupment rights under the terms of each of the MedImpact Agreements and applicable law, and could otherwise operate in the ordinary course under the MedImpact Agreements—and consistent with applicable law, orders of any court of competent jurisdiction, and the parties' prepetition practices—without the need to seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code in these Chapter 11 Cases or with respect to any other stay or injunction. Upon the effective date of the MedImpact Stipulation, MedImpact remitted to the Debtors' all amounts due and owing to the Debtors under each of the MedImpact Agreements previously withheld pursuant to MedImpact's administrative fees.

### 4.    Gordon WARN Act Adversary Proceeding.

On or around the Petition Date, Martin Gordon was terminated from his position as a regional construction manager at Rite Aid's corporate headquarters. On May 16, 2025, Mr. Gordon filed a complaint and thereby commenced a class action adversary proceeding against certain of the Debtors. *Martin C. Gordon II, on behalf of himself and all others similarly situated* v. *New Rite Aid, LLC and Rite Aid Hdqtrs. Corp.*, Adv. Proc. No. 25-01204 (MBK) (Bankr. D.N.J. May 16, 2025) [Docket No. 1] (the "WARN Adversary Complaint"). In the WARN Adversary Complaint, Mr. Gordon alleged that New Rite Aid, LLC and Rite Aid Hdqtrs. Corp.'s (together, the "WARN Defendants") termination of his employment violated the federal Workers Adjustment and Retraining Notification Act, 29 U.S.C. §2101 *et seq.* (the "WARN Act"). The WARN Adversary Complaint purports to identify as members of the putative plaintiff class (together with Mr. Gordon, the "WARN Plaintiffs") those similarly situated corporate employees who (i) worked at, were based out of, reported to, or received assignments from the WARN Defendants' corporate offices located in either Etters or Philadelphia, Pennsylvania, and (ii) allegedly were terminated without receiving 60 days' advance written as required under the WARN Act. The WARN Plaintiffs seek (x) damages on account of lost wages and benefits for the period during which the alleged WARN Act violation continued (*i.e.*, up to a maximum of 60 days' wages and benefits), and (y) attorney's fees, costs, and disbursements.

On August 12, 2025, counsel for the WARN Plaintiffs served and filed the *Motion for Class Certification and Related Relief*, Adv. Proc. No. 25-01204 (MBK) (Bankr. D.N.J. Aug. 12, 2025) [Docket No. 6] (the "Class Certification Motion"). To allow the WARN Defendants' additional time to respond to the WARN Adversary Complaint and Class Certification Motion, both parties entered into the *Stipulation and Consent Order Extending the Deadlines for Responding to the Adversary Complaint and Class Action Certification Motion and Providing Related Relief*, Adv. Proc. No. 25-01204 (MBK) (Bankr. D.N.J. Aug. 29, 2025) [Docket No. 12] (the "WARN Stipulation"). Pursuant to the WARN Stipulation, the WARN Defendants' deadline to respond to the WARN Adversary Complaint and Class Certification Motion was extended to October 13, 2025 and October 27, 2025, respectively. In addition, the WARN Stipulation continued the pretrial conference in respect of the adversary proceeding, which was initially scheduled for October 6, 2025, to a date after October 27, 2025. The parties to the WARN Adversary Complaint later agreed to an additional extension to these deadlines and to continue the pretrial conference to an even later date and expect that a second stipulation and consent order granting this relief will be entered shortly following the filing of this Disclosure Statement.

K.      **The Restructuring Support Agreement.**

As a result of the Debtors' ongoing engagement with its stakeholders, on August 31, 2025, the Debtors, McKesson, the DIP Agent, the Prepetition ABL Agent, and the Consenting Banks executed the extensively negotiated Restructuring Support Agreement, which is described in detail in Article II.A.3 of this Disclosure Statement.

L.      **Remaining Operations.**

As of the date hereof, the Debtors have entered into agreements to sell, or have consummated the sales of, substantially all of their assets. At this stage, Rite Aid intends to carry out four primary directives: (i) consummating sales agreed to in the course of the Chapter 11 Cases, including the McKesson Inventory Sales; (ii) overseeing and executing monetization efforts in respect of those Remaining Assets that remain in the Debtors' estates; (iii) managing and winding down the Wind-Down Debtors; and (iv) implementing the Plan Transaction.

The Debtors' remaining employees are primarily tasked with pursuing consummation of asset sales, overseeing asset monetization efforts, managing the wind-down of the Wind-Down Debtors' estates, and performing various tasks related to the foregoing, including ensuring the Debtors continue to comply with applicable laws and regulations.

The Debtors' Remaining Assets include a limited number of properties and interests in leases, interests in joint ventures, inventory, intellectual property, and other miscellaneous assets that the Debtors are actively working to monetize through engagement and negotiations with potential buyers.

M.      **Proposed Confirmation and Dismissal Schedule.**

In accordance with the Restructuring Support Agreement and the Disclosure Statement Order, the Debtors have proposed the following case timeline for Confirmation of the Plan or dismissal of the Chapter 11 Cases, if the Non-Plan Toggle is exercised, subject to Court approval and availability:

| Event | Date | Description |
|---|---|---|
| Voting Record Date | September 8, 2025 | The date to determine which Holders of Claims are entitled to vote to accept or reject the Plan (the "Voting Record Date"). |
| Solicitation Mailing Deadline | No later than September 26, 2025 | The deadline by which the Debtors must distribute Notices of Non-Voting Status and Solicitation Packages, including the Ballot, to Holders of Claims entitled to vote to accept or reject the Plan (the "Solicitation Mailing Deadline"). |
| Publication Deadline | No later than September 26, 2025 | The date by which the Debtors will submit the Combined Hearing / Dismissal Hearing Notice in a format modified for publication (such notice, the "Publication Notice," and such date, the "Publication Deadline"). |

| Event | Date | Description |
|-------|------|-------------|
| Deadline to File Toggle Notice | September 26, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file the notice indicating whether a Confirmation of the Plan or the Non-Plan Toggle will be pursued (the "Toggle Notice"). |
| Deadline to File Confirmation Order (if applicable) | September 29, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file with the Court a proposed order confirming the Plan (the "Confirmation Order"). |
| Deadline to File Dismissal Orders (if applicable) | September 30, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file a proposed form of Dismissal Orders. |
| Plan Supplement Filing Deadline (if applicable) | September 30, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file the Plan Supplement (the "Plan Supplement Filing Deadline"). |
| Voting and Opt-Out Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which all Ballots and Opt-Out Forms must be properly executed, completed, and submitted (the "Voting and Opt-Out Deadline") so that they are **actually received** by Kroll Restructuring Administration LLC (the "Claims Agent"). |
| Dismissal Orders Objection Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which parties in interest may file objections to the proposed form of Dismissal Orders and corresponding relief requested in the Motion (the "Dismissal Orders Objection Deadline"). |
| Confirmation and Final Disclosure Statement Objection Deadline (if applicable) | October 13, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which parties in interest may file objections to (i) Confirmation of the Plan and final approval of the Disclosure Statement or (ii) entry of the Confirmation Order, as applicable (the "Confirmation and Final Disclosure Statement Objection Deadline"). |
| Deadline to File Reply in Support of Dismissal Orders (if applicable) | October 17, 2025, at 4:00 p.m., prevailing Eastern Time | The date by which any party in interest may file a reply in support of entry of the Dismissal Orders. |
| Confirmation Brief and Confirmation and Final Disclosure Statement Reply Deadline (if applicable) | October 17, 2025, at 4:00 p.m., prevailing Eastern Time | The deadline by which (i) the Debtors shall file their brief in support of Confirmation of the Plan (the "Confirmation Brief") and reply to objections to Confirmation of the Plan and final approval of the Disclosure Statement and (ii) any party in interest may file a reply in support of entry of the Confirmation Order (the "Confirmation and Final Disclosure Statement Reply Deadline"). |

| Event | Date | Description |
|---|---|---|
| Deadline to file Voting Report (if applicable) | October 17, 2025 or three (3) days prior to the Combined Hearing Date, at 4:00 p.m., prevailing Eastern Time | The date by which the Debtors shall file, if applicable, the report tabulating voting on the Plan (the "Voting Report"). |
| Dismissal/Combined Hearing Date (as applicable) | October 20, 2025, at 9:00 a.m., prevailing Eastern Time | The date of the Combined Hearing at which the Court will consider Confirmation of the Plan, final approval of the Disclosure Statement, and entry of the Confirmation Order (the "Combined Hearing Date").<br><br>OR<br><br>The date of the hearing at which the Court will consider entry of the Dismissal Orders. |

## VI.    THE PLAN.

The treatment of Claims and Interests, contained in Article II and Article III of the Plan, as well as the Plan's Release, Exculpation, and Injunction provisions found in Article X of the Plan, are described below.  The complete Plan is attached hereto as **Exhibit A**, and the Debtors recommend you read the Plan in its entirety, as the summary of certain Plan provisions below and as otherwise described in the Disclosure Statement are not intended to be in lieu of reviewing the Plan.

> THE FOLLOWING SUMMARIZES SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### A.    Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Settled Priority Claims, and McKesson 503(b)(9) Claims) will receive, in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which

an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter), without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Court; *provided*, *however*, that the distributions to Holders of Administrative Claims occurring after the Effective Date in accordance with the foregoing provisos (b) through (e) shall be made exclusively from the Administrative / Priority Claims Reserve, and the Reorganized Debtors shall have no obligation to pay any Administrative Claims.

Except for Professional Fee Claims, Claims for the fees addressed in the Article II.B of the Plan, DIP Claims, McKesson 503(b)(9) Claims, Settled Priority Claims (to the extent set forth in Article II.E of the Plan), and Administrative Claims previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors or the Wind-Down Debtors, as applicable, no later than the Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Debtors or the Wind-Down Debtors and the requesting party on or before the Claims Objection Deadline.  The Reorganized Debtors shall have no role in the adjudication of the Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and prior Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Court that becomes a Final Order.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, the Reorganized Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, the Reorganized Debtors, or any notice to or action, order, or approval of the Court or any other Entity.

## 2.    Payment of Fees and Expenses Under Financing Orders.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Wind-Down Debtors, as applicable, shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents and the DIP Lenders, and the Prepetition ABL Agent, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the Financing Orders and in accordance with the Approved Budget.  Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims.  Nothing herein shall require the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, or their respective professionals, to File applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims.

3.        **Professional Fee Claims.**

(a)        **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Court orders. The Wind-Down Debtors or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator, as applicable, shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Court. Notwithstanding anything herein to the contrary, the Allowance and payment of Professional Fee Claims (including any Professional Fee Claims for Indenture Trustee Fees) shall be consistent with, and limited to the amounts set forth in, the Approved Budget. For the avoidance of doubt, any Professional Fee Claims in excess of the Approved Budget shall be treated solely as General Unsecured Claims and shall not be entitled to priority under sections 503 or 507 of the Bankruptcy Code, or otherwise.

Professional Fee Claims for Indenture Trustee Fees shall be paid in cash on the Effective Date or as soon as reasonably practicable thereafter in the amount allocated to the payment of such fees in the Approved Budget, without any requirement that the 1.5L Indenture Trustee or 3L Indenture Trustee file any application with the Court for payment or Allowance of such Claims.

(b)        **Professional Fee Escrow Account.**

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, in accordance with the terms of the Final Financing Order. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the applicable escrow agent at the direction of the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve, Distributable Assets, and Administrative / Priority Claim Reserve if not paid in full from the Professional Fee Escrow Account; *provided*, *further*, that no payment of Professional Fee Claims from the Administrative / Priority Claim Reserve shall reduce or otherwise impair the Administrative Claims Procedures Distributions to be made to Holders of Settled Priority Claims. Notwithstanding the foregoing, however, no Reorganized Debtor shall have any liability for any Professional Fee Claims. When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court (or, with respect to Claims for Indenture Trustee Fees which are Professional Fee Claims and permitted to be paid pursuant to the Approved Budget, pursuant to the Plan) and in accordance with the Final Financing Order, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-

Down Debtors without any further notice to or action, order, or approval of the Court or any other Entity, and constitute Distributable Assets.

### (c)  Professional Fee Amount.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors or the Committee, or under the 1.5L Indenture or 3L Indenture, as applicable, before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days prior to the anticipated Effective Date; *provided* that such estimate shall be consistent with the Approved Budget and shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

### (d)  Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals, if any, from the Wind-Down Reserve in accordance with the Wind-Down Budget.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

### 4.  Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and paid (a) on the Effective Date or (b) from the Administrative / Priority Claims Reserve thereafter in accordance with <u>Article VIII</u> of the Plan; *provided* that the Reorganized Debtors shall have no obligation to pay any Priority Tax Claims.

### 5.  Settled Priority Claims.

Each Holder of a Settled Priority Claim shall receive and has, pursuant to the Administrative Claims Procedures consented to or been deemed to consent to receive in satisfaction of section 1129 of the Bankruptcy Code, in full and final satisfaction, compromise, settlement, release, and discharge of such Claims, to the extent not received prior to the Effective Date, its Administrative Claims Procedures Distribution.  For the avoidance of doubt, any Holder of a Settled Priority Claim that received an Election Form indicating a Recorded Amount (each as defined in the Administrative Claims Procedures) shall not be required to file a Proof of Claim or request for payment of such Claim, as applicable, and such Settled Priority Claims shall be deemed Allowed in such Recorded Amounts except as otherwise agreed between the Debtors and any such Holder or provided pursuant to a Final Order of the Court with respect to such Claim; *provided* that the Reorganized Debtors shall have no obligation to pay any Settled Priority Claims.

Distributions on account of Settled Priority Claims shall be made (a) if such Settled Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Settled Priority Claim is not Allowed as of the Effective Date, no later than 10 Business Days after the date on which (i) an order Allowing such Settled Priority Claim becomes a Final Order, or (ii) the Debtors or the Wind-Down Debtors, as applicable, determine that such Settled Priority Claim is allowed pursuant to Article IX.A of the Plan, or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by the Holder of such Settled Priority Claim and the Debtors or the Wind-Down Debtors, as applicable; or (d) at such time and upon such terms as set forth in a Final Order of the Court; *provided*, *however*, that the distributions on account of Settled Priority Claims occurring after the Effective Date in accordance with the foregoing provisos (b) through (d) shall be made exclusively from the Administrative / Priority Claims Reserve.

### 6. McKesson 503(b)(9) Claims.

In accordance with the Restructuring Support Agreement, McKesson has agreed to receive, on account of and in full and final satisfaction, compromise, settlement, release and discharge of the McKesson 503(b)(9) Claims, the McKesson Equity Distribution. The McKesson Equity Distribution shall be issued and delivered in accordance with the Restructuring Steps Memorandum.

### 7. DIP Claims.

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement including principal, interest, fees, costs, other charges, and expenses (but excluding, for the avoidance of doubt, professional fees to be paid in accordance with Article II.B of the Plan). In full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed DIP Claim shall receive (a) its Pro Rata share of any Distributable Assets distributed by the Debtors on the Effective Date or the Plan Administrator thereafter, and (b) in the event that the Liquidating Trust is established in accordance with Article IV.D of the Plan, an interest in the Liquidating Trust entitling it to its Pro Rata share of any distributions of the Liquidating Trust Assets. Distributions of the Distributable Assets (or Liquidating Trust Assets, as applicable) will be made from the Effective Date through the Dissolution Date, in accordance with Article VIII.E of the Plan; *provided* that the Reorganized Debtors shall have no obligation to pay any DIP Claims.

Upon the later of (a) the Dissolution Date and (b) distribution, abandonment, or other disposition of all Distributable Assets (or Liquidating Trust Assets, as applicable), the DIP Claims shall be deemed satisfied, and in accordance with the terms of Article II.G of the Plan, the Final Financing Order, and the DIP Documents, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Court or any other Entity.

Pursuant to the DIP Credit Agreement, all distributions made under the Plan on account of DIP Claims shall be made to the applicable DIP Agent for distributions to the applicable DIP Lender in accordance with the DIP Credit Agreement unless otherwise agreed upon in writing by the DIP Agent and the Debtors, as applicable. The DIP Agent shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims. The DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders. The DIP Agent shall not have any liability to any person with respect to such distributions made or directed to be made.

B.      **Classification and Treatment of Claims and Interests.**

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition FILO Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.      **Treatment of Claims and Interests.**

Subject to Article IV of the Plan, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of (a) the Effective Date and (b) if such Claim is not Allowed as of the Effective Date, the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter, with distributions on account of the foregoing proviso (b) to Claims in Class 1 and Class 2 being made exclusively from the Administrative / Priority Claims Reserve.

1.      **Class 1 – Other Secured Claims**

    **(a)**    *Classification*:  Class 1 consists of all Other Secured Claims.

    **(b)**    *Treatment*:  Each Holder of an Allowed Other Secured Claim, unless such Holder agrees to less favorable treatment, shall receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

        (i)    payment in full in Cash;

        (ii)    the collateral securing its Other Secured Claim;

        (iii)    Reinstatement of its Other Secured Claim; or

        (iv)    Such other treatment as to render such Holder's Allowed Other Secured Claim unimpaired pursuant to the Bankruptcy Code.

    **(c)**    *Voting*:  Class 1 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      **Class 2 – Other Priority Claims**

    **(a)**    *Classification*:  Class 2 consists of all Other Priority Claims.

    **(b)**    *Treatment*:  Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

        (i)    payment in full in Cash; or

        (ii)    such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

    **(c)**    *Voting*:  Class 2 is Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    **Class 3 – Prepetition FILO Claims**

(a)    *Classification:* Class 3 consists of all Prepetition FILO Claims.

(b)    *Allowance of Prepetition FILO Claims*: The Prepetition FILO Claims shall be Allowed in the aggregate amount of $60 million.

(c)    *Treatment*: Each Holder of an Allowed Prepetition FILO Claim shall receive, except to the extent that a Holder of an Allowed Prepetition FILO Claim and the Debtors or Wind-Down Debtors, as applicable, agree to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the FILO Cash Distribution.

(d)    *Voting:* Class 3 is Impaired. Therefore, Holders of Prepetition FILO Claims are entitled to vote to accept or reject the Plan.

4.    **Class 4 – General Unsecured Claims**

(a)    *Classification:* Class 4 consists of all General Unsecured Claims, including Deficiency Claims. Pursuant to section 506(a) of the Bankruptcy Code, all 1.5L Notes Claims, 3L Notes Claims, and McKesson Secured Claims are Deficiency Claims, and shall be treated in accordance with Article III.B.4 of the Plan (excluding, for the avoidance of doubt, any Deficiency Claim held by McKesson which is a McKesson 503(b)(9) Claim).

(b)    *Treatment:* General Unsecured Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

(c)    *Voting:* Class 4 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively deemed to have rejected the Plan. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.    **Class 5 – Intercompany Claims**

(a)    *Classification*: Class 5 consists of all Intercompany Claims.

(b)    *Treatment*: Each Intercompany Claim shall be, at the option of the Debtors or Wind-Down Debtors, as applicable, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is determined by the Debtors; *provided* that any Intercompany Claims held by or assertable against any Reorganized Debtor shall be released without any distribution on account of such Intercompany Claims.

**(c)**    *Voting*:  Holders of Claims in Class 5 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.    Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    **Class 6 – Intercompany Interests**

**(a)**    *Classification*:  Class 6 consists of all Intercompany Interests.

**(b)**    *Treatment*:  Each Intercompany Interest shall be, at the option of the Debtors, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors but in all respects in accordance with the Restructuring Steps Memorandum.

**(c)**    *Voting*:  Holders of Interests in Class 6 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.    Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    **Class 7 – Existing Equity Interests**

**(a)**    *Classification*:  Class 7 consists of all Existing Equity Interests in New Rite Aid, LLC.

**(b)**    *Treatment*:  All Existing Equity Interests in New Rite Aid, LLC will be cancelled and extinguished, and Holders of Existing Equity Interests shall receive no recovery on account of such Interests.

**(c)**    *Voting*:  Class 7 is Impaired.  Holders of Existing Equity Interests in New Rite Aid, LLC are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests in New Rite Aid, LLC are not entitled to vote to accept or reject the Plan.

8.    **Class 8 – Section 510(b)**

**(a)**    *Classification:*  Class 8 consists of all Section 510(b) Claims.

**(b)**    *Treatment:*    Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

**(c)**    *Voting:*  Class 8 is Impaired.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan.  Therefore,

Holders (if any) of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**D.     Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

**E.     Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Court in an amount greater than $0.00 as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.     Voting Classes, Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting or deemed to reject Class of Claims or Interests.  The Debtors, subject to the terms of the Restructuring Support Agreement, including the consent rights set forth therein, reserve the right to modify the Plan prior to Confirmation and in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**H.     Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.     Subordinated Claims.**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify

any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

J.      **Releases, Injunctions, Discharge, and Related Provisions.**

1.      **Settlement, Compromise, and Release of Claims and Interests.**

**The assets of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose. Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as of the Effective Date, of Claims, Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.**

2.      **Release of Liens; Transfer Free and Clear.**

**On the Effective Date, concurrently with the Consummation of the Restructuring Transactions and as set forth in the Restructuring Steps Memorandum, any assets transferred to McKesson or any Reorganized Debtor pursuant to the Restructuring Steps Memorandum shall vest in McKesson or the applicable Reorganized Debtor, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Restructuring Steps Memorandum, each as applicable. Without limiting the foregoing, except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement**

55

or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of any such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

3.      **Released, Releasing, and Related Parties.**

Under the Plan, "Released Party" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties; (e) each current and former Affiliate of each Entity in clauses (a) through (d); (f) each Related Party of each Entity in clauses (a), (b), (c), and (e); (g) each current and former Affiliate of each Entity in clauses (d) through (f) and the following clause (h); and (h) each Related Party of each Entity in clauses (d) through (g) and this clause (h); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

Under the Plan, "Releasing Party" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Agents; (e) the DIP Secured Parties; (f) McKesson; (g) the Committee (and each of its members, solely in its capacity as such); (h) the Liquidating Trustee on behalf of the Liquidating Trust in the event that the Liquidating Trust is established pursuant to Article IV.D of the Plan; (i) the Plan Administrator; (j) the 1.5L Indenture Trustee; (k) the 3L Indenture Trustee; (l) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided for in the Plan; (m) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (n) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (o) all Holders of Claims who vote or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (p) each current and former Affiliate of each Entity in clauses (a) through (o); and (q) each Related Party of each Entity in clauses (a) through clause (p).

Under the Plan, "Related Party" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager

**of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.**

4.    **Debtor Release.**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Reorganized Debtors, and Wind-Down Debtors, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions[34] and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, the Wind-Down Debtors, or the Reorganized Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, the Reorganized Debtors, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the pursuit of the Restructuring Transaction, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any (a) Retained Causes of Action or (b) claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is**

---

[34]   Notwithstanding anything to the contrary contained in the Plan, on the Effective Date and in accordance with paragraph 7(a) of the Final Financing Order, all Avoidance Actions for payments made by the Debtors under $500,000 (other than payments below $500,000 made to a party that also received at least one payment equal or exceeding $500,000) (a) shall not be Retained Causes of Action, (b) shall be deemed settled, waived, discharged, and/or released by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and any successor in interest to any such Party as of the Effective Date, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary, and (c) shall not and cannot be offered, sold, resold, pledged, delivered, allotted or otherwise transferred to or vested in any party or Entity pursuant to the Plan or otherwise.

determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article X.C of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Court's finding that each release described in Article X.C of the Plan is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

5.        Third-Party Release.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that nothing in the Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or (b) Claims or

Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article X.D of the Plan, which include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Court's finding that each release described in Article X.D of the Plan is: (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in Article X.D of the Plan may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in Article X.D of the Plan, been released pursuant hereto, without first obtaining a Final Order from the Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or derivative claim released pursuant to Article X.C of the Plan, and (b) is colorable.  Solely to the extent legally permissible and as provided for in Article XIII of the Plan, the Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

6.     Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Debtors' estates during the course of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

59

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan pursuant to section 1125(e) of the Bankruptcy Code.

The exculpation provided for in <u>Article X.E</u> of the Plan will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the Plan, the 1125(e) Covered Parties shall not incur liability for any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof. No Entity or Person may commence or pursue a claim or Cause of Action against any of the 1125(e) Covered Parties that is subject to the terms of this paragraph, without the Court (a) first determining, after notice and a hearing, that (i) such claim or Cause of Action represents a colorable claim or Cause of Action for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Covered Party which is not within the scope of the limitation of liability set forth in section 1125(e) of the Bankruptcy Code, and (ii) such party is not otherwise exculpated pursuant to <u>Article X.E</u> of the Plan; and (b) specifically authorizing such Entity or Person to bring such claim or Cause of Action against such 1125(e) Covered Party. The Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or Cause of Action.

    7.        **Injunction.**

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Causes of Action, or Interests that have been released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to <u>Article X.B</u> of the Plan), or are subject to exculpation pursuant to <u>Article X.E</u> of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes

of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E of the Plan, without the Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, (b) determining that such Person or Entity is not barred from commencing or pursuing such Claim or Cause of Action pursuant to Article X.F of the Plan, and (c) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such party.  For the avoidance of doubt, any party that obtains such determination and authorization and then subsequently wishes to amend the authorized complaint or petition must obtain authorization from the Court before filing any such amendment in the court where such complaint or petition is pending.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article X.F of the Plan.

As of the Effective Date, except as specifically provided in the Plan or Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Reorganized Debtors (or their Affiliates), or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Plan from the Effective Date.  Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Debtors, subject to the final paragraph of Article X.D of the Plan.

8.      Preservation of Setoff Rights.

Notwithstanding anything in Article X of the Plan to the contrary, any right of setoff or recoupment is preserved against the Debtors, the Wind-Down Debtors, the Reorganized Debtors, and any of their affiliates and successors solely to the extent such right(s) exist under applicable law and subject to the Debtors' and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided*, *however*, that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (a) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (b) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process, or (c) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

**9.      Protections Against Discriminatory Treatment.**

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.      Document Retention.**

On and after the Effective Date, the Debtors and the Wind-Down Debtors, as applicable, may maintain, transfer, and destroy documents in accordance with the Data Retention Plan and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors or the Wind-Down Debtors, as applicable. The costs and expenses of such retention which are allocated to the Debtors pursuant to the Data Retention Plan shall be paid exclusively from the Wind-Down Reserve in accordance with Article VIII.C of the Plan. The Reorganized Debtors shall have the right, but not the obligation, to maintain, transfer, and destroy documents of the Debtors or the Wind-Down Debtors in the possession of the Reorganized Debtors on or after the Effective Date, subject to the terms of the Data Retention Plan.

**11.      Reimbursement or Contribution.**

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**12.      Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

13.     **Subordination Rights.**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510 of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

## VII.    OTHER KEY ASPECTS OF THE PLAN.

### A.    Conditions Precedent to Consummation of the Plan.

#### 1.    Conditions Precedent to the Effective Date.

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied (or will be satisfied contemporaneously with the occurrence of the Effective Date) or waived pursuant to the provisions of Article XI.B of the Plan:

I.      The DIP Facilities and the Financing Orders each remain in full force and effect;

II.     The final version of each of the Definitive Documents to become effective on or prior to the Effective Date is in form and substance consistent in all respects with the consent rights set forth in the Restructuring Support Agreement;

III.    The Restructuring Transactions shall have been implemented in accordance with the Restructuring Steps Memorandum in all material respects;

IV.     The McKesson Inventory Sales shall have closed;

V.      The Debtors shall have removed all inventory not purchased by McKesson from the Central Fill Facility, and the Central Fill Facility shall be in "broom clean" condition;

VI.     The McKesson Motion to Compel shall have been withdrawn with prejudice;

VII.    The McKesson Complaint shall have been dismissed with prejudice;

VIII.   The Confirmation Order shall have been entered and not stayed, reversed, amended, supplemented, or otherwise modified except in a manner consistent with the consent rights set forth in the Restructuring Support Agreement;

IX.     All documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith and in accordance with any applicable consent rights set forth in the Plan;

X.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, and documents that are necessary to implement and effectuate the Plan;

XI.    The Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded in accordance with the Wind-Down Budget;

XII.   The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount, and, solely to the extent set forth in the Approved Budget, Professional Fee Claims for the Indenture Trustee Fees shall have been paid in Cash in accordance with Article II.C of the Plan;

XIII.  All accrued and unpaid reasonable and documented fees and expenses required to be paid pursuant to Article II.B of the Plan and any Financing Order shall have been paid, to the extent invoiced three (3) Business Days prior to the Effective Date;

XIV.   The Liquidating Trust Agreement shall have been executed;

XV.    The Transition Services Agreement, if any, shall have been executed;

XVI.   Any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained, as and to the extent necessary for the Debtors' emergence from chapter 11; and

XVII.  The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan and the Plan Supplement.

### 2.    Waiver of Conditions.

Subject to and without limiting the rights of each party under the Final Financing Order, the conditions to Consummation set forth in Article XI.A of the Plan may be waived by the Debtors, and with the consent of (a) the Required DIP Co-Collateral Agents and (b) McKesson; *provided that*, the condition in Article XI.A.9 of the Plan (Article VII.A.1.IX of this Disclosure Statement) may not be waived without the consent of the affected Professionals.

### 3.    Effect of Failure of Conditions.

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### 4.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## VIII.   RISK FACTORS.

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS IN CLASS 3 SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS**

DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.

A.      **Bankruptcy Law Considerations.**

1.      **General.**

While the Debtors believe that the remainder of the Chapter 11 Cases will be efficient and will not be materially harmful to the value of their assets, the Debtors cannot be certain that this will be the case. It is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Court, would add substantial expense and uncertainty to the process. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the value of the Debtors' assets or on the amount of distributable value available to Holders of Claims.

2.      **Risk of Termination of the Restructuring Support Agreement.**

The Restructuring Support Agreement contains provisions that give the RSA Parties the ability to terminate the Restructuring Support Agreement upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve certain milestones. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the value of the Debtors' estates or the amount of distributable value available to Holders of Claims.

3.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article XI.A of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place, no distributions will be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

If the transactions contemplated in the Plan are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, or pursuing a structured dismissal of these Chapter 11 Cases. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

4.      **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than

those provided for in a chapter 11 plan. *See* the Liquidation Analysis, attached hereto as **Exhibit D,** for a discussion of the effects that a chapter 7 liquidation would have on the recoveries to Holders of Claims.

<div align="center">

**5.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.**
</div>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

<div align="center">

**6.      The Debtors May Fail to Satisfy Vote Requirements.**
</div>

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction or may pursue a structured dismissal of the Chapter 11 Cases. There can be no assurance that the terms of any such alternative course of action would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the estates than the Plan.

<div align="center">

**7.      The Debtors May Not Be Able to Secure Confirmation of the Plan.**
</div>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; (iii) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code; and (iv) as applicable here, such plan provides for the payment of Allowed Claims entitled to priority pursuant to section 1129(a)(9) of the Bankruptcy Code in full on the effective date of such plan, provided that a plan may provide for payment of a lesser, agreed upon amount in full satisfaction of such administrative or priority claims if the holders of such claims consent to such treatment.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear whether the Debtors will be able to reorganize and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests. Less favorable treatment could

<div align="center">

66
</div>

include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

8.      **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

The Court may confirm a chapter plan at the Debtors' request if at least one impaired Class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each impaired Class that is deemed not to accept a chapter 11 plan, the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if Class 3, the only Class entitled to vote on the Plan, votes in favor of the Plan and the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Court may decline to confirm the Plan, if it finds that any of the requirements for confirmation are not met. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent chapter 11 plan.

9.      **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.     **Contingencies Could Affect Votes of Voting Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Holders of Class 3 Claims that are entitled to vote to accept or reject the Plan or require any sort of revote by such Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.

11.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for

the Plan.  The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to release certain claims and causes of action held by the Released Parties, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

12.    **The Debtors May Lose Continuing Access to the DIP Facilities And Their Cash Collateral.**

The Debtors' ability to fund administrative and operating expenses during the Chapter 11 Cases is predicated upon, among other things, their ability to continue using their cash collateral.  The Debtors' ability to access their cash collateral depends on, among other things, whether the Debtors can continue receiving approval of future budgets from the applicable creditors under the Final Financing Order and whether the Debtors are able to comply with the variance tests and minimum liquidity requirement under the Final Financing Order or any subsequent order authorizing the Debtors to use cash collateral, as applicable.  There can be no assurance that the Debtors will be able to continue using their cash collateral prior to the Effective Date.

13.    **The Debtors May Seek to Amend, Waive, or Modify the Plan at Any Time Prior to Confirmation.**

Subject to and in accordance with the terms of the RSA, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (ii) the Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests, or is otherwise permitted by the Bankruptcy Code.

B.    **Risks Related to Recoveries under the Plan.**

1.    **The Sale Documents Providing for the Sale of the Debtors' Assets Are Subject to Conditions to Closing that may be Beyond the Debtors' Control and May Be Difficult for Them to Satisfy.**

Although the Debtors intend to pursue and consummate the sale of substantially all of their assets on the terms set forth in the applicable sale documents, there can be no assurance that the Debtors will be successful in completing all of the sale transactions on the terms and timeframes set forth in the applicable sale documents, on different terms, or at all.  Generally, the sale documents contain customary representations, warranties and covenants, or conditions precedent.  The closing of each of the asset sales is subject to customary closing conditions, including approval by the Court.  If these conditions are not met,

the affected sale documents may be terminated.  If any of the Sale Documents are terminated, the Debtors' ability to confirm and consummate the Plan could be materially and adversely affected.

### 2. Cure Amounts and Other Contract Payment Obligations Could be More than Projected.

There can be no assurance that the estimated cure amounts or other payment obligations of the Debtors arising or otherwise resulting from the assumption of certain executory contracts or unexpired leases will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Such cure amounts or payment obligations could be significant and material and, if the Debtors are unsuccessful in challenging such amounts, confirmation or the effectiveness of the Plan may be jeopardized.

### 3. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (i) the ability to develop, confirm, and consummate transactions specified in the Plan; (ii) the ability to obtain Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) the ability of third parties to seek and obtain Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (iv) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' remaining operations and financial condition.  Also, the Debtors will need the prior approval of the Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 4. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a chapter 11 plan.  A long period of operations under Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

### 5. The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of

the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**C.      Risks Related to the Offer and Issuance of Securities Under the Plan.**

**1.      Holders of the New Equity Interests May Be Restricted in Their Ability to Transfer or Sell Their New Equity Interests.**

Pursuant to section 1145(a)(1) of the Bankruptcy Code, securities issued under the Plan may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims or Interests (as applicable) who receive new equity securities pursuant to the Plan (the "New Equity Interests") that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Equity Interests are not expected to be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Equity Interests to freely resell the New Equity Interests. *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 85.

**D.      Additional Factors.**

**1.      The Debtors are Operating Under Liquidity Restraints.**

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. The Debtors have limited operations while they have incurred and expect to continue to incur significant professional fees and other costs in connection with these Chapter 11 Cases. The Debtors cannot guarantee that cash on hand will be sufficient to satisfy ongoing obligations related to these Chapter 11 Cases.

**2.      The Debtors Could Withdraw the Plan.**

The Debtors could revoke or withdraw the Plan (with respect to any Debtor or all Debtors) prior to the Confirmation Date.

**3.      The Debtors Have No Duty to Update This Disclosure Statement.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered by the Court.

**4.      No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than

those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 5. No Representations Made

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Article XII of this Disclosure Statement.

### 7. No Legal or Tax Advice Is Provided by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim and/or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 8. The Global Settlement May Not Be Approved and/or is Subject to Termination.

Some or all of the settlement agreements contemplated in the Restructuring Support Agreement and incorporated into the Plan may not be approved on a final basis by the Court and/or other foreign courts. Further, these settlements are subject to termination based upon the occurrence of certain events. If the settlements are not approved on a final basis and/or terminate in accordance with their terms, actual distributions to Holders of Allowed Claims and Interests and the Debtors' ability to confirm a Plan may be affected.

## IX. SOLICITATION AND VOTING PROCEDURES.

The Debtors are providing copies of this Disclosure Statement, accompanied with a Ballot to be used for voting on the Plan or a notice of non-voting status (as applicable), to each Holder of a Claim or Interest, as of the Voting Record Date (each, a "Record Holder"). Each Record Holder should carefully review the Plan, attached hereto as **Exhibit A**.

The Debtors have engaged Kroll as their Claims Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE CLAIMS AGENT ON OR BEFORE THE VOTING AND OPT-OUT DEADLINE OF 4:00 P.M. (PREVAILING EASTERN TIME), ON OCTOBER 13, 2025, IF YOU ARE A MEMBER OF THE VOTING CLASS, UNLESS EXTENDED BY THE DEBTORS. PLEASE RETURN YOUR BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS RECEIVED WITH YOUR BALLOT.**

**PLEASE RETURN A PROPERLY EXECUTED BALLOT VIA THE E-BALLOT PORTAL WITH YOUR VOTE.**

IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE CLAIMS AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT

RECEIVED AFTER THE VOTING AND OPT-OUT DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTOR.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE CLAIMS AGENT AT THE TELEPHONE NUMBER INDICATED ON YOUR BALLOT, OR AT ONE OF THE BELOW NUMBERS: U.S./Canada (toll-free): (888) 575-9318 International (toll): +1 (646) 930-4577.   Questions (but not documents) may also be directed to riteaid2025info@ra.kroll.com (please reference "In re New Rite Aid, LLC Solicitation" in the subject line). Additional copies of this Disclosure Statement are available for review and download, free of charge, at <u>https://restructuring.ra.kroll.com/riteaid2025</u>, or upon request made to the Claims Agent at the telephone numbers or e-mail address set forth immediately above.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

A.      **Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

B.      **Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- Unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- Although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Court will confirm the Plan;

- The Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- Any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Class (as defined below) or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to the "Risk Factors" section in Article VIII of this Disclosure Statement.

### C.    Voting Procedures.

#### 1.    Voting Record Date.

The Court has approved **September 8, 2025** as the Voting Record Date.  The Voting Record Date is the record date for purposes of determining which Holders of Prepetition FILO Claims in Class 3, the Voting Class, are entitled to vote on the Plan.  The Voting Record Date shall also be the record date for purposes of determining which Holders of Claims or Interests in Classes 1, 2, 4, 7, or 8  shall be entitled to elect to not grant the releases in Article X of the Plan.

Notwithstanding anything to the contrary contained herein, the Claims Agent will not be required to serve any solicitation materials or notices, on account of Claims or Interests filed after the Voting Record Date but before the Voting and Opt-Out Deadline.

#### 2.    Voting and Opt-Out Deadline.

The Court has approved **October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)** as the Voting and Opt-Out Deadline.  The Debtors may extend the Voting and Opt-Out Deadline, in their discretion, without further order of the Court.  To be counted as votes to accept or reject the Plan, all Ballots must be executed, completed, and delivered pursuant to the instructions set forth on the Ballots so that they are **actually received** by the Claims Agent by no later than the Voting and Opt-Out Deadline.

#### 3.    Holders of Claims or Interests Entitled to Vote on the Plan.

Only Holders of Prepetition FILO Claims in Class 3 (the "Voting Class") who are reflected on the Prepetition ABL Agent's books and records as of the Voting Record Date shall be entitled to vote in the amount set forth on the books and records of the Prepetition ABL Agent.  The register of such Holders and voting amounts, as of the Voting Record Date, shall be provided to the Claims Agent in Microsoft excel, or similar, format upon request by the Debtors or Claims Agent, as applicable.

#### 4.    Holders of Claims or Interests Not Entitled to Vote on the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, 6, 7, or 8 (collectively, the "Non-Voting Classes") as Holders in these Non-Voting Classes hold Claims and/or Interests that are either (i) not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, or (ii) are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

Accordingly, Record Holders in the Non-Voting Classes (other than Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests))[35] will not receive a Solicitation Package, but instead each will receive (i) a form of notice of the Combined Hearing (the "Combined Hearing / Dismissal Hearing Notice"), (ii) a notice of non-voting status, substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order (each, a "Notice of Non-Voting Status"), (iii) a disclosure regarding the (a) settlement, release, exculpation, and injunction language set forth in Article X of the Plan and (b) opportunity to make elections with respect to the Opt-Out Form (clauses (i) through (iii), collectively, the "Non-Voting Claimants' Package"). For the avoidance of doubt, and notwithstanding anything to the contrary in the Disclosure Statement Order, Plan or this Disclosure Statement, the Debtors shall cause the Non-Voting Claimants' package to be served upon all known Holders of Claims and Interests (other than those classified in class 3, 5, or 6), including, without limitation, Holders of non-classified Claims and Interests (*i.e.*, Holders of DIP Claims, Priority Tax Claims, etc.) and non-Debtor counterparties holding unexpired lease interests— including those that were previously rejected in the course of the Chapter 11 Cases—and such persons/entities shall remain eligible to elect to submit an Opt-Out Form through the Voting and Opt-Out Deadline.

The Non-Voting Claimants' Package will include an optional opt-out form (each, an "Opt-Out Form") that such Record Holders may complete if they elect to not grant the releases in Article X of the Plan. The Opt-Out Forms will provide instructions for electing to opt-out of the grant of the Plan's Third-Party Release and for online submission of the Opt-Out Form via the online portal on the Debtors' restructuring website maintained by the Claims Agent at https://restructuring.ra.kroll.com/RiteAid2025 (the "E-Ballot Portal" or "Public Securities Opt-Out Portal," as applicable). Opt-Out Forms may be submitted either (a) via the E-Ballot Portal or Public Securities Opt-Out Portal, or (b) by first-class mail, overnight courier, or hand delivery. The encrypted Opt-Out Form data and audit trail created by submission via the E-Ballot Portal or Public Securities Opt-Out Portal, as applicable will become part of the record of Opt-Out Forms submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective. The deadline for submission of Opt-Out Forms is the Voting and Opt-Out Deadline. To be counted as an election to not grant the releases in Article X of the Plan, Opt-Out Forms must be executed, completed, and delivered pursuant to the instructions set forth on the Notice of Non-Voting Status and Opt-Out Form so that they are **actually received** by the Claims Agent by no later than the Voting and Opt-Out Deadline.

Beneficial owners of the Debtors' Senior Secured Notes (the "Beneficial Holders"), whose positions in the Senior Secured Notes are held in 'street name' through a bank, broker, or other intermediary (each a "Nominee" and collectively, the "Nominees") shall receive their Non-Voting Claimants' Packages through their Nominees. The Claims Agent shall provide sufficient quantities of the Non-Voting Claimants' Package to each Nominee with instructions that they immediately forward the Non-Voting Claimants' Packages to their Beneficial Holder clients. Nominees are authorized to deliver the Non-Voting Claimants' Packages, and/or disseminate information pertaining thereto, to their Beneficial Holder clients according to their customary practices for doing so, including email, telephone and/or via an electronic link to an online platform. To be effective, Beneficial Holders who elect to opt-out of the grant of the releases set forth in Article X.D of the Plan must submit their Opt-Out Form to the Claims Agent, according to instructions contained therein, so as to be actually received on or before the Voting and Opt-Out Deadline. To be effective, Beneficial Holders who elect to opt-out of the grant of the Plan's Third-Party Release must submit their completed Opt-Out Forms via the Public Securities Opt-Out Portal, which is accessible through the left-hand navigation panel of the Debtors' restructuring website

---

[35] Holders of Claims in Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) will not receive the Non-Voting Claimants' Package, or any other type of notice in connection with solicitation of the Plan, as discussed below.

at https://restructuring.ra.kroll.com/RiteAid2025  so that such Opt-Out Forms are **actually received** by the Claims Agent on or before the Voting and Opt-Out Deadline.  To submit an Opt-Out Form via the Public Securities Opt-Out Portal, Beneficial Holders should upload to such portal a PDF of their completed Opt-Out Form.  Opt-Out Forms will not be accepted by facsimile, e-mail, or any other electronic means (other than via the E-Ballot Portal or Public Securities Opt-Out Portal).

### 5.      Voting and Ballot Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"):

- Except as otherwise provided in the solicitation procedures described in and attached to the Disclosure Statement Order (the "Solicitation Procedures"), unless the Ballot being furnished is timely submitted and actually received by the Claims Agent on or prior to the Voting and Opt-Out Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

- The Claims Agent will date-stamp all Ballots when received;

- The Debtors will file the Voting Report by no later than three (3) days prior to the Combined Hearing Date.  The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged;

- The only acceptable means of submission of a Ballot is online via the E-Ballot Portal on the Debtors' restructuring website maintained by the Claims Agent at https://restructuring.ra.kroll.com/RiteAid2025.  Ballots submitted in hard copy format via regular mail, overnight courier, or hand delivery or by electronic mail or facsimile or any other electronic means (other than through the E-Ballot Portal) will not be counted as a vote on the Plan except in the sole discretion of the Debtors.  The encrypted Ballot data and audit trail created by submission via the E-Ballot Portal will become part of the record of Ballots submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective;

- A Ballot will be deemed delivered only when the Claims Agent actually receives the executed Ballot via the E-Ballot Portal;

- An executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Claims Agent by any means other than as expressly provided in the applicable Ballot will not be valid, except in the sole discretion of the Debtors;

- Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth in the Disclosure Statement Order and attachments thereto), and (ii) required to vote every portion of such Claim collectively to

accept or reject the Plan. In the event that (x) a Ballot, (y) a group of Ballots within a Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion;

- For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim may be treated as a single vote to accept or reject the Plan in each case, in the Debtors' discretion; *provided*, *however*, that if separate affiliated entities, including any funds or accounts that are advised or managed by the same entity or by affiliated entities, hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity or managed fund or account will be counted separately as a vote to accept or reject the Plan;

- No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

- If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting and Opt-Out Deadline, the last properly submitted, valid Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

- Holders must vote all of their Claims either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the Voting Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

- A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

- The Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

- Neither the Debtors nor any other Entity, including the Claims Agent will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

- Unless waived or as ordered by the Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting and Opt-Out Deadline or such Ballots will not be counted;

- In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

- Subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

- If a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

- If an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

- The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) except as otherwise provided in the Disclosure Statement Order, any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**;

- After the Voting and Opt-Out Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Court; and

- To assist in the solicitation process, the Claims Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; *provided* that the Claims Agent is not obligated to do so and neither the Debtors nor the Claims Agent will suffer any liability for failure to notify parties of such deficiencies.

**UNLESS A BALLOT IS RECEIVED BY THE CLAIMS AGENT ON OR PRIOR TO THE VOTING AND OPT-OUT DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN.**

   6.  **Non-Plan Toggle; Effect on Solicitation and Confirmation.**

  As set forth in the Disclosure Statement Order, progression to a hearing on confirmation of the Plan is expressly conditioned upon the Debtors' filing of the Toggle Notice and such notice providing that the Debtors have determined to seek confirmation of the Plan. The Debtors will file the Toggle Notice on or before September 26, 2025 at 4:00 p.m. (prevailing Eastern Time) (as such date may be extended by the Debtors, with the consent of the DIP Agent and in consultation with the Committee), regardless of whether the Debtors elect to pursue confirmation of the Plan or the Non-Plan Toggle.

  If the Toggle Notice indicates that the Debtors will elect the Non-Plan Toggle and not pursue confirmation of the Plan: (a) the Debtors shall not proceed with confirmation of the Plan, and all Ballots

received shall be deemed null and void, shall not be counted or tabulated for any purpose, and the Claims Agent shall have no obligation to prepare or file a Voting Report; and (b) the Debtors will proceed to seek dismissal of these Chapter 11 Cases pursuant to the procedures and timetable set forth in the Disclosure Statement Order, and the Dismissal Hearing shall proceed on October 20, 2025. The Dismissal Hearing may be continued from time to time by the Court or the Debtors, with the consent of the DIP Agent and in consultation with the Committee, without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on all parties entitled to notice in accordance with the Disclosure Statement Order.

The Debtors reserve the right, in accordance with the Disclosure Statement Order, and with the consent of the DIP Agent and in consultation with the Committee, to (i) extend the deadline to file the Toggle Notice, and (ii) modify any other dates or procedures contained herein to the extent necessary to accommodate the determination reflected in the Toggle Notice.

## 7.    Agreements Upon Furnishing Ballots.

The delivery to the Claims Agent of an accepting Ballot pursuant to one of the procedures set forth herein will constitutes the agreement of the voting creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation of votes on the Plan and (ii) the terms of the Plan, including the injunction, releases, and exculpations set forth in Article X therein. All parties in interest retain their right to object to Confirmation of the Plan, subject to any applicable terms of the RSA.

## 8.    Amendments to the Plan and Solicitation Procedures.

The Debtors reserve the right to make non-substantive changes to the Disclosure Statement, Plan, Combined Hearing / Dismissal Hearing Notice, Solicitation Packages, Toggle Notice, Notice of Non-Voting Status, Ballot, Opt-Out Form, Publication Notice, Solicitation Procedures, Assumption Notice, and any related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to any materials in the Solicitation Packages before distribution; *provided*, that the Debtors shall provide the U.S. Trustee with notice of such non-substantive changes.

## D.    Solicitation and Related Materials.

## 1.    Solicitation Package Contents.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

- The Solicitation Procedures, substantially in the form attached to the Disclosure Statement Order as **Exhibit 2**;

- The Ballot, substantially in the form of Ballot attached to the Disclosure Statement Order as **Exhibit 3**, together with detailed voting instructions and instructions on how to submit the Ballot;

- This Disclosure Statement (and exhibits thereto, including the Plan);

- The Disclosure Statement Order (without exhibits, except for the Solicitation Procedures);

- The Combined Hearing / Dismissal Hearing Notice, substantially in the form attached to the Disclosure Statement Order as **Exhibit 5**; and

- Any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

**2.      Distribution of the Solicitation Package.**

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Class.  The Debtors shall distribute the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures) to Holders of Claims entitled to vote on the Plan in electronic format (i.e., via e-mail, hyperlink and/or on a flash drive, as applicable).[36]  The Ballot, and the Combined Hearing / Dismissal Hearing Notice shall be provided in electronic format to those parties receiving service by e-mail, and paper format for those parties receiving service by first class mail.  In addition, these Solicitation Procedures, the Disclosure Statement, the Plan, the Disclosure Statement Order, and all pleadings filed with the Court shall be made available on the Debtors' case website https://restructuring.ra.kroll.com/RiteAid2025; *provided* that any party that would prefer paper format may contact the Claims Agent by: (a) calling the Claims Agent at (888) 575-9318 (USA or Canada, toll free) or +1 (646) 930-4577 (International); (b) emailing the Claims Agent at RiteAid2025Info@ra.kroll.com (with "In re New Rite Aid, LLC – Solicitation Inquiry" in the subject line); or (c) writing to the Claims Agent at Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

The Debtors will serve, or cause to be served, all of the materials in the Solicitation Package (excluding Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Class who are entitled to vote on the Plan no later than September 26, 2025.  Any party that receives solicitation materials in electronic format via email or flash drive but would prefer paper format or a flash drive, as applicable, may contact the Claims Agent and request paper copies or a flash drive of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).  The Debtors will not distribute Solicitation Packages or other solicitation materials to:  (i) any party to whom notice of the *Debtors' Motion for Entry of an Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Approving, in the Alternative, Dismissal of the Debtors' Chapter 11 Cases, (B) Scheduling Certain Dates With Respect Thereto, and (C) Granting Related Relief,* [Docket No. 2289], was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; (ii) the Holders in Class 5 (Intercompany Claims) or Class 6 (Intercompany Interests); or (iii) parties that received a Notice of Non-Voting Status, as applicable.

**3.      Notices in Respect of Executory Contracts and Unexpired Leases.**

Counterparties to Executory Contracts and Unexpired Leases that receive a *Notice of Assumption of Executory Contracts and Unexpired Leases* substantially in the form annexed as Exhibit 6 to the Disclosure Statement Order may file an objection to the Debtors' proposed assumption of and/or cure amount related to such Executory Contract or Unexpired Lease, as applicable.  Such objections must:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Court electronically by attorneys who regularly practice before the Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002

---

[36]   The flash drive will contain the (i) fully compiled Disclosure Statement, including the Plan and (ii) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures).

(the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Court) and, by all other parties in interest, if not otherwise filed with the Clerk of the Court electronically, via hard copy, and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before **21 days following service of the applicable notice, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure/Assumption Objection Deadline"):[37]

| Debtors |
|---|
| **New Rite Aid, LLC**<br>200 Newberry Commons, Etters, Pennsylvania 17319 |

| Counsel to the Debtors | Counsel to the Debtors |
|---|---|
| **PAUL, WEISS, RIFKIND,<br>WHARTON & GARRISON LLP**<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn:  Andrew N. Rosenberg; Alice Belisle Eaton;<br>Christopher Hopkins; and Sean A. Mitchell | **Cole Schotz, P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn:  Michael D. Sirota; Warren A. Usatine; Felice R.<br>Yudkin; and Seth Van Aalten |

| Counsel to the Committee |
|---|
| **WILLKIE FARR & GALLAGHER LLP**<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Brett H. Miller; Todd M. Goren; James H. Burbage; and Jessica D. Graber<br><br>**SILLS CUMMIS & GROSS P.C.**<br>One Riverfront Plaza<br>Newark, New Jersey 07102<br>Attn: Andrew H. Sherman; Boris Mankovetskiy; and Gregory Kopacz |

| Counsel to the DIP Agents |
|---|
| **Choate, Hall & Stewart LLP**<br>Two International Place<br>Boston, Massachusetts 02110<br>Attn: John F. Ventola; Jonathan D. Marshall; and Mark D. Silva<br><br>**Greenberg Traurig LLP**<br>500 Campus Drive, Suite 400<br>Florham Park, New Jersey 07932<br>Attn: Alan J. Brody |

---

[37]  *Provided* that if any executory contract or unexpired lease is added to the Schedule of Assumed Executory Contracts of Unexpired Leases after the initial filing of such schedule, or an executory contract or unexpired lease proposed to be assumed by the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, is proposed to be assigned to a third party after the initial filing of such schedule, then the Cure/Assumption Objection Deadline with respect to such executory contract or unexpired lease shall be fourteen (14) days after service of such amended schedule with such modification (or such other time period as the Debtors set (subject to Court approval)).

| *Counsel to McKesson Corporation (as Plan Sponsor)* |
|---|
| **SIDLEY AUSTIN LLP**<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Dennis M. Twomey; Jackson T. Garvey; and Ian C. Ferrell<br><br>**McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Suite 201<br>Roseland, New Jersey 07068<br>Attn: Anthony Sodono, III; and Michele M. Dudas |
| *United States Trustee* |
| **Office of the United States Trustee**<br>**United States Trustee, Region 3**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Jeffrey M. Sponder; and Lauren Bielskie |

## X.    CONFIRMATION OF THE PLAN.

### A.    The Combined Hearing.

Under section 1128(a) of the Bankruptcy Code, the Court, after notice, may hold a hearing to confirm a plan of reorganization.  Notice of the Combined Hearing to confirm the Plan and approve the adequacy of this Disclosure Statement will be provided to parties in accordance with the Disclosure Statement Order.  The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be filed with the Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.    Objections to Confirmation.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to Confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Court may order:

- The Debtors, 200 Newberry Commons, Etters, Pennsylvania 17319 (Attn: Matthew Schroeder, Chief Executive Officer);

- Counsel to the Debtors, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Andrew N. Rosenberg, Alice Belisle Eaton, Christopher Hopkins, and Sean A. Mitchell), and (ii) Cole Schotz P.C., Court Plaza North, 25 Main

Street, Hackensack, New Jersey 07601 (Attn: Michael D. Sirota, Warren A. Usatine, Felice R. Yudkin, and Seth Van Aalten);

- Counsel to the Committee, (i) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099 (Attn:  Brett H. Miller, Todd M. Goren, James H. Burbage, and Jessica D. Graber), and (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102 (Attn:  Andrew H. Sherman, Boris Mankovetskiy, and Gregory Kopacz);

- Counsel to the DIP Agent and the Prepetition ABL Agent, (i) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn:  John F. Ventola, Jonathan D. Marshall, and Mark D. Silva), and (ii) Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, NJ 07932, (Attn:  Alan J. Brody and Julia Frost-Davies);

- Counsel to McKesson, (i) McManimon, Scotland & Baumann, LLC, 75 Livingston Avenue, 2nd Floor, Roseland, New Jersey 07068 (Attn: Anthony Sodono and Michele Dudas), (ii) Sidley Austin LLP, (a) One South Dearborn, Chicago, Illinois 60603 (Attn: Dennis M. Twomey, Jackson T. Garvey, and Ian C. Ferrell), and (iii) Buchalter LLP, 18400 Von Karman Avenue, Suite 800, Irvine, CA 92612-0514 (Attn: Jeffrey K. Garfinkle); and

- The U.S. Trustee, One Newark Center, Suite 2100, Newark, NJ 07102 (Attn:  Jeffrey M. Sponder and Lauren Bielskie).

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE COURT.**

---

### C.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

### D.      Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a Court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7 on such date.

A Liquidation Analysis has been prepared by the Debtors' financial and restructuring advisors, Alvarez & Marsal, and Paul, Weiss, and is attached hereto as **Exhibit D**.  Based upon the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy

Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### E.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for, among other things, the distribution of the Debtors' Distributable Assets after the completion of the transactions described therein. For purposes of determining whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Plan contemplates and requires appropriate reserves for payment of certain administrative and priority Claims, and mechanisms for consummation of distributions to all Holders of Claims entitled to them. The Debtors, with the assistance of their advisors, will file the Wind-Down Budget with the Plan Supplement, which will providefor the activities and expenses to be incurred by the Wind-Down Debtors pursuant to the Plan, including, for the avoidance of doubt, all Statutory Fees relating to any of the Debtors or their Chapter 11 Cases, and other amounts necessary to fund the Administrative / Priority Claims Reserve, the Professional Fee Escrow Amount, and the Wind-Down Reserve.

The Plan also provides that equity interests in the Reorganized Debtors will be transferred to McKesson, a corporation that is sufficiently capitalized and carries on strong, healthy business operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements for both the Wind-Down Debtors and the Reorganized Debtors.

### F.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[38]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting

---

[38]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### G.      Confirmation Without Acceptance of Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a Court to confirm a plan even if all impaired classes have not accepted it; *provided,* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Although certain Impaired Classes are conclusively deemed to reject the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination.

The "no unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### 2.      Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive

more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN SECURITIES LAW MATTERS.

No registration statement has been or will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan. Pursuant to the Plan, New Rite Aid, LLC will be authorized to issue or cause to be issued and must, as provided for in the Restructuring Steps Memorandum, issue, on the Effective Date, the New Equity Interests to McKesson.

### A.    Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code, any New Equity Interests offered, issued, or distributed pursuant to the Plan (the "Section 1145 Securities"): (i) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration for the offer or sale of a security pursuant to section 1145 of the Bankruptcy Code; (ii)(a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (w) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (x) has not been such an "affiliate" within 90 calendar days of such transfer, (y) has not acquired New Equity Interests from an "affiliate" of the Debtors within one year of such transfer, and (z) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code; and (iii) will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (b) compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such New Equity Interests, and (c) the restrictions in the applicable organizational documents.

### B.    Section 4(a)(2) of the Securities Act and Regulation S Under the Securities Act.

To the extent that section 1145 of the Bankruptcy Code is inapplicable to the issuance of the New Equity Interests or any other securities pursuant to the Plan (including with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), the offering, issuance, exchange, or distribution of any New Equity Interests or any other securities pursuant to the Plan is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S, and/or another available exemption from registration under Section 5 of the Securities Act. To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

### C.    Trust Interests.

Interests in the Liquidating Trust are not expected to be to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such Interest in the Liquidating Trust is expected to be exempt from the registration under Section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the

Securities Act, Regulation D promulgated thereunder, Regulation S, and/or other available exemptions from registration.

Interest in the Liquidating Trust will not be transferrable by holders thereof except as permitted in the Liquidating Trust Agreement.

The Company need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of Interest in the Liquidating Trust under applicable securities laws.

### D.     Subsequent Transfers

The Section 1145 Securities may be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities, as defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters", excluding, in each case, with respect to ordinary trading transactions of an entity that is not an issuer:

- a person (as defined in section 101(41) of the Bankruptcy Code, a "<u>Person</u>") who purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

- a Person who offers to sell securities offered or sold under a plan for the holders of such securities;

- a Person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities, and under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

- a Person who is an "issuer", which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer (as used in Section 2(a)(11) of the Securities Act) with respect to the securities.

Under Section 2(a)(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive Section 1145 Securities pursuant to the Plan and the Confirmation Order are deemed to be underwriters under section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted from registration under the Securities Act or other applicable Law by section 1145 of the Bankruptcy Code.  Persons deemed to be underwriters under section 1145(b) of the Bankruptcy Code may, however, be permitted to resell such Section 1145 Securities without registration pursuant to and in accordance with the provisions of Rule 144 under the Securities Act, which is described below, or another available exemption under the Securities Act.

Holders of Section 1145 Securities who are deemed underwriters may be able to resell Section 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act. Generally, Rule 144 would permit the public sale of securities received by such Person if, at the time of the sale, certain current public information regarding the issuer is available, and only if such Person also complies with the volume, manner of sale, and notice requirements of Rule 144.  If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, adequate current public

information as specified under Rule 144 is available if certain company information is made publicly available, as specified in Section (c)(2) of Rule 144. The Debtors expect that, after the Effective Date, the issuer of the Equity Distribution Trust Interests will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Whether or not any particular Person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan and the Confirmation Order would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving Section 1145 Securities or other securities under the Plan and the Confirmation Order would be an underwriter with respect to such Section 1145 Securities or other securities, whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

Notwithstanding the foregoing, the Section 1145 Securities will be subject to any applicable transfer restrictions in the applicable organizational documents, if any.

Any 4(a)(2) Securities (if any) will be deemed "restricted securities" (as defined in Rule 144(a)(3) of the Securities Act), will bear customary legends and transfer restrictions and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available. If in the future a Holder of 4(a)(2) Securities decides to offer, resell, pledge, or otherwise transfer any 4(a)(2) Securities, such 4(a)(2) Securities may be offered, resold, pledged, or otherwise transferred only (i) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer (as defined in Rule 144A promulgated under the Securities Act ("Rule 144A")) in a transaction meeting the requirements of Rule 144A, (ii) outside the United States in a transaction complying with the provisions of Rule 904 of Regulation S, (iii) pursuant to an exemption from registration under the Securities Act (including the exemption provided by Rule 144) (to the extent the exemption is available), or (iv) pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, in each of cases (i)-(iv) in accordance with any applicable securities laws of any state of the United States. Such Holder will, and each subsequent Holder is required to, notify any subsequent acquiror of the 4(a)(2) Securities from it of the resale restrictions referred to above.

Rule 144 provides a limited safe harbor for the resale of restricted securities (such that the seller is not deemed an "underwriter") if certain conditions are met. These conditions vary depending on whether the seller of the restricted securities is an "affiliate" of the issuer. The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. The Debtors expect that the issuer of the New Equity Interests will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE
ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT

BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "UNDERLINE ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (i) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (ii) the 4(a)(2) Securities will be subject to the other restrictions described above.

In addition to the foregoing restrictions, the 4(a)(2) Securities will also be subject to any applicable transfer restrictions in the applicable organizational documents, if any.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER.

**THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## XII.   CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

The following is a summary description of certain material U.S. federal income tax consequences of the Plan to the Debtors, Reorganized Debtors and to certain Holders of Allowed Prepetition FILO Claims.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder  (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of the Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Only the principal consequences of the Plan for the Debtors and those Holders of Claims that are entitled to vote to accept or reject the Plan are described below.  This summary assumes that all Allowed Prepetition FILO Claims are held as capital assets within the meaning of Section 1221 of the IRC.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the IRS or any other tax authorities have been

sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding on the IRS or such other authorities. As a result, there can be no assurance that the IRS will not disagree with or challenge any of the conclusions described herein. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors, Reorganized Debtors or any Holder of Allowed Prepetition FILO Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, Reorganized Debtors, or to certain holders of Allowed Prepetition FILO Claims in light of their individual circumstances. This summary does not address any estate or gift tax consequences of the Plan or tax consequences of the Plan under any state, local or non-U.S. laws, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income).

The tax consequences of the Plan are complex, and the tax treatment of certain aspects of the Plan may be subject to considerable uncertainty. You should consult your own tax advisors as to the particular U.S. federal income tax consequences to you of the Plan, as well as the consequences to you arising under other U.S. federal tax laws and the laws of any other taxing jurisdiction. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- A dealer in securities or currencies;

- A financial institution;

- A regulated investment company;

- A real estate investment trust;

- An insurance company;

- A tax-exempt organization;

- A person holding Claims as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;

- A trader in securities that has elected the mark-to-market method of accounting for its securities;

- A person required to accelerate the recognition of any item of gross income with respect to Claims as a result of such income being recognized on an applicable financial statement;

- A person liable for the alternative minimum tax;

- A partnership, an S corporation or other pass-through entity for U.S. federal income tax purposes (or an investor in a partnership, S corporation or other passthrough entity);

- A controlled foreign corporation;

- A passive foreign investment company;

- A corporation that accumulates earnings to avoid U.S. federal income tax;

- A United States expatriate;

- Holders that actually or constructively owns five percent or more of the total fair market value of all classes of Debtor's stock; or

- A U.S. Holder (as defined below) whose "functional currency" is not the U.S. dollar.

As used herein, the term "U.S. Holder" means a beneficial owner of Allowed Prepetition FILO Claims that is for U.S. federal income tax purposes:

- An individual citizen or resident of the United States;

- A corporation created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- An estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

The term "Non-U.S. Holder" means a beneficial owner of Allowed Prepetition FILO Claims (other than a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is not a U.S. Holder.

If a partnership or other pass-through entity holds Allowed Prepetition FILO Claims, the tax treatment of a partner or other owner will generally depend upon the status of the partner (or other owner) and the activities of the entity.  If you are a partner (or other owner) of a pass-through entity holding a Claim, you should consult your tax advisors regarding the tax consequences of the Plan to your particular situation.

This summary assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  This summary does not discuss tax consequences to Holders of Allowed Prepetition FILO Claims that act or receive consideration in a capacity other than as a Holder of Claims, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (ii) that are deemed to reject the Plan, or (iii) that are otherwise not entitled to vote to accept or reject the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL

CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE UNDER THE PLAN, INCLUDING THE IMPACT OF TAX LEGISLATION.

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.**

1.    **In General.**

The Debtors expect that the Restructuring Transactions will be structured as a recapitalization of certain existing Debtors under their current corporate structure, where the Holder of the McKesson 503(b)(9) Claims will receive, pursuant to the Plan, 100% of the New Equity Interests as of the Effective Date in exchange for their Claims.  As a result of the Restructuring Transactions, the Debtors will be subject to the application of section 382 of the IRC, and will recognize a material amount of cancellation of indebtedness income ("COD Income") and be subject to rules with respect to COD Income as described below.

2.    **Effects of the Restructuring Transactions on Tax Attributes of Debtors.**

(a)    **Existing Tax Attributes.**

The Debtors estimate that, as of February 2, 2024, the Debtors had consolidated net operating loss carryforwards for U.S. federal income tax purposes of approximately $2.03 billion of federal net operating losses ("NOLs"), approximately $817 million of interest deductions deferred and permitted to be carried forward to subsequent tax years under Section 163(j) of the IRC ("163(j) Carryforwards"), and certain other tax attributes.  The Debtors expect to generate substantial additional tax attributes for the period through the Effective Date.  The amount of any such NOLs and other tax attributes ("Tax Attributes") remains subject to audit and potential adjustment by the IRS, and such Tax Attributes may be materially reduced as a result of the Restructuring Transactions as described below in "Cancellation of Indebtedness and Preservation of Tax Attributes."

(b)    **Cancellation of Indebtedness Income and Preservation of Tax Attributes.**

The Debtors expect to recognize COD Income resulting from the Restructuring Transactions, and, assuming COD Income does arise, the Debtors expect that it could be substantial.  In general, absent an exception, a debtor will realize and recognize COD Income upon actual or deemed satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (X) the amount of Cash paid (or deemed paid), (Y) the issue price of any new indebtedness of the Debtors issued, and (Z) the fair market value of any other consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction.  For this purpose, various rules under section 108(e) of the IRC are expected to apply in determining the amount of COD Income recognized by the Debtors.  Unless an exception or exclusion applies, COD Income constitutes taxable income like any other item of taxable income.

Pursuant to section 108(a)(1)(A) of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if such debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD

91

Income that it excluded from gross income pursuant to section 108(a)(1)(A) of the IRC.  In general, the Tax Attributes of a debtor will be reduced in the following order:  (i) NOLs and NOL carryforwards; (ii) general business credit carryovers; (iii) minimum tax credit carryovers; (iv) capital loss carryovers; (v) tax basis in assets, which includes the stock of subsidiaries (subject to the Asset Tax Basis Floor, as described below); (vi) passive activity loss and credit carryovers; and (vii) foreign tax credits.  Alternatively, a debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC prior to effecting any other reductions in tax attributes set forth above, though it has not been determined whether the Debtors will make this election.  Any 163(j) Carryforward are not reduced pursuant to these rules.  The reduction in Tax Attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined.  Any excess COD Income over the amount of available Tax Attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness that the Debtors will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations (including intercompany debt) that are treated as debt under general U.S. federal income tax principles are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors, and any resulting reduction in the tax attributes of the Debtors and their affiliates, will not be determinable until after the consummation of the Plan.

**(c)      Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC.**

After giving effect to the reduction in Tax Attributes resulting from excluded COD Income, the Debtors' ability to use any remaining Tax Attributes post-emergence will be subject to certain limitations under Sections 382 and 383 of the IRC.

(i)      *Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC.*

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," (as determined for purposes of those sections) the amount of its NOLs and NOL carryforwards, 163(j) Carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if the Debtors have a net unrealized built-in gain at time of an "ownership change," any built-in gains recognized (or, according to a currently effective IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the Reorganized Debtors would be permitted to use their Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Alternatively, if the Debtors have a net unrealized built-in loss at the time of an "ownership change" (taking into account most assets and items of "built-in" income and deductions), then built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a debtor's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000, or (ii) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Equity Interests pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes. The Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation under sections 382 and 383 of the IRC (in addition to any limitations in effect pursuant to such sections prior to the Restructuring) unless an exception to the general rules of sections 382 and 383 of the IRC applies.

<div align="center">(ii)    <i>General Section 382 Annual Limitation.</i></div>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 3.71% for September 2025). As discussed above, the 382 Limitation may be increased by the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65 (as modified by IRS Notice 2018-30). Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an "ownership change," a debtor corporation and its subsidiaries do not continue such debtor corporation's historic business, or do not use a significant portion of their historic business assets in a new business, for the two years after the ownership change, the annual limitation resulting from the ownership change is zero, which precludes any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

<div align="center">(iii)    <i>Special Bankruptcy Exceptions.</i></div>

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when creditors of a debtor corporation in chapter 11 holding certain "qualified indebtedness" (generally, indebtedness that (i) was held by the creditor at least 18 months before the date of filing of the chapter 11 case or (ii) arose in the ordinary course of the trade or business of the debtor corporation and is held by the person who at all times held the beneficial interest in such indebtedness) receive, in respect of such qualified indebtedness, at least fifty percent (50%) of the vote and value of the stock of the Reorganized Debtors (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If a debtor qualifies for the 382(l)(5) Exception, such debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Reorganized Debtors were to undergo

<div align="center">93</div>

another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because a debtor does not qualify for the 382(l)(5) Exception or a debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of a debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOLs, NOL carryforwards and 163(j) Carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the effective elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors believe that the 382(l)(5) Exception may be available based on currently available information. Should such exception provide significant cash tax savings by allowing increased usage of their NOLs, the Debtors may choose to utilize the 382(l)(5) Exception and not elect out of its application. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Prepetition FILO Claims.

### 3. In General.

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Allowed Prepetition FILO Claim will receive its Pro Rata share of the FILO Cash Distribution.

### 4. Recognition of Gain or Loss.

A U.S. Holder of an Allowed Prepetition FILO Claim should be treated as exchanging such Claim for cash in a fully taxable exchange under Section 1001 of the IRC and should recognize gain or loss equal to the difference between (i) the cash received in exchange for its Claim (subject to the discussion of "Accrued Interest" below) and (ii) the U.S. Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations, as discussed below. To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. *See* the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

### 5. Accrued Interest.

A portion of the consideration received by U.S. Holders of Allowed Prepetition FILO Claims may be attributable to accrued but untaxed interest (or original issue discount ("OID")) on such Claims. If any amount is attributable to such accrued interest (or OID), then such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Prepetition FILO Claims should be able to recognize a deductible loss to the extent any accrued interest on the Claims was

previously included in the U.S. Holder's gross income for U.S. federal income tax purposes but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Prepetition FILO Claims in each Class will be allocated first to the principal amount of such Allowed Prepetition FILO Claims (as determined for United States federal income tax purposes), with any excess allocated to the remaining portion of such Claims, if any.  There is no assurance that the IRS will respect such allocation.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received in satisfaction of their Allowed Prepetition FILO Claims and the U.S. federal income tax treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### 6.      Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Prepetition FILO Claim constituting a debt instrument who exchanges such Claim for a recovery pursuant to the Plan may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instrument constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

U.S. Holders of Allowed Claims who acquired the debt instrument underlying their Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

### 7.      Limitation on Use of Capital Losses.

A U.S. Holder of an Allowed Prepetition FILO Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

95

**B.** **Certain U.S. Federal Income Tax Consequences to the Non-U.S. Holders of Allowed Prepetition FILO Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  Each non-U.S.  Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan.

**1.**      **Gain Recognition.**

A Non-U.S. Holder of an Allowed Prepetition FILO Claim should recognize gain or loss equal to the difference between (a) the cash received in exchange for its Claim (subject to the discussion of "Accrued Interest" below) and (b) the Non-U.S. Holder's adjusted tax basis in its Claim.  However, any gain realized by a non-U.S. Holder on the exchange of its Claim under the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2.**      **Accrued Interest.**

Subject to the discussion of FATCA and backup withholding below, payments to a non-U.S. Holder that are attributable to amounts received pursuant to the Plan in respect of accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

> The non-U.S. Holder actually or constructively owns, directly or indirectly through entities that are treated as partnership for U.S. federal income tax purposes, 10% or more of the equity of Rite Aid;

> The non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the IRC) with respect to Rite Aid;

> The non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

> Such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States.

96

A non-U.S. Holder described in the first three bullets above generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on amounts received pursuant to the Plan in respect of accrued but untaxed interest.

A non-U.S. Holder described in the fourth bullet above generally will not be subject to withholding tax if it provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims—Accrued Interest," the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

The allocation of payments between principal and interest on a Non-U.S. Holder's Claim would be as described in the Section titled "Certain U.S. Federal Income Tax Consequences to the U.S. Holders – Accrued Interest" above.

### 3.      FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must generally report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income.  Pursuant to proposed Treasury Regulations on which taxpayers are permitted to rely pending their finalization, this withholding obligation would not apply to gross proceeds from the sale or disposition of property.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

EACH NON-U.S. HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POSSIBLE IMPACT OF THESE RULES.

### C.      Information Reporting and Backup Withholding.

All distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including (as applicable) employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder fails to furnish its social security number or other taxpayer identification number (a "TIN"), furnishes an incorrect TIN, fails properly to report interest or dividends, or under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.  Certain

persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF TAX LEGISLATION AND ANY OTHER CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 19, 2025

New Rite Aid, LLC
on behalf of itself and all other Debtors

*/s/ Marc Liebman*

Marc Liebman
Chief Transformation Officer
New Rite Aid, LLC

## Exhibit A

**Plan of Reorganization**

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES

> **NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ..................................................................................................1
    A.     Defined Terms. ............................................................................................................1
    B.     Rules of Interpretation. .............................................................................................14
    C.     Computation of Time. ...............................................................................................15
    D.     Governing Law. ........................................................................................................15
    E.     Reference to Monetary Figures. ...............................................................................15
    F.     Controlling Document. ..............................................................................................15
    G.    Nonconsolidated Plan. ..............................................................................................15
    H.    Consultation, Notice, and Consent Rights. ..............................................................15

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX
      CLAIMS, AND DIP CLAIMS ...............................................................................15
    A.     Administrative Claims. .............................................................................................16
    B.     Payment of Fees and Expenses under Financing Orders............................................16
    C.     Professional Fee Claims. ...........................................................................................17
    D.     Priority Tax Claims....................................................................................................18
    E.     Settled Priority Claims. .............................................................................................18
    F.     McKesson 503(b)(9) Claims. ....................................................................................19
    G.    DIP Claims. ...............................................................................................................19

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................19
    A.     Classification of Claims and Interests. ......................................................................19
    B.     Treatment of Claims and Interests. ...........................................................................20
    C.     Special Provision Governing Unimpaired Claims. ....................................................23
    D.     Elimination of Vacant Classes. .................................................................................23
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ...............................23
    F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..................23
    G.    Controversy Concerning Impairment..........................................................................23
    H.    Subordinated Claims. ................................................................................................23

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................................24
    A.     General Settlement of Claims and Interests. .............................................................24
    B.     McKesson Equity Distribution & Reorganized Debtors. ...........................................24
    C.     Plan Administrator & Wind-Down. ...........................................................................26
    D.     Liquidating Trust.......................................................................................................27
    E.     Release of Liens. .......................................................................................................29
    F.     Cancellation of Existing Securities and Agreements. ................................................29
    G.    Corporate Action; Restructuring Transactions. .........................................................30
    H.    McKesson Sale Transactions. ...................................................................................31
    I.     New Governance Documents. ....................................................................................31
    J.     Effectuating Documents; Further Transactions..........................................................31
    K.    Section 1146 Exemption. ..........................................................................................31
    L.     Exemption from Securities Act Registration..............................................................32
    M.   Preservation of Causes of Action. .............................................................................32
    N.    Private Company.........................................................................................................33

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................33
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...............33
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................35
    C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases................35
    D.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........36

E.      Insurance Policies. ............................................................................................37
F.      Indemnification Provisions. ...............................................................................37
G.      Employee and Retiree Benefits. .........................................................................38
H.      Collective Bargaining Agreements ....................................................................38
I.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. .........38
J.      Reservation of Rights. ........................................................................................38
K.      Nonoccurrence of Effective Date. ......................................................................38

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .................................................38
A.      Timing and Calculation of Amounts to Be Distributed. ....................................38
B.      Distributions on Account of Obligations of Multiple Debtors. ..........................39
C.      Distributions Generally. .....................................................................................39
D.      Post-Effective Distributions by the Wind-Down Debtors or Liquidating Trust. ......40
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. .......40
F.      Manner of Payment. ............................................................................................41
G.      Compliance with Tax Requirements. ..................................................................41
H.      Allocations. .........................................................................................................41
I.      Foreign Currency Exchange Rate. ......................................................................41
J.      Setoffs and Recoupment. ....................................................................................41
K.      Claims Paid or Payable by Third Parties. ...........................................................41

ARTICLE VII THE PLAN ADMINISTRATOR & LIQUIDATING TRUSTEE .........................42
A.      The Plan Administrator & Liquidating Trustee. .................................................42
B.      Wind-Down. ........................................................................................................44
C.      Exculpation, Indemnification, Insurance & Liability Limitation. ......................44
D.      Tax Returns. ........................................................................................................44

ARTICLE VIII POST-EFFECTIVE DATE DISTRIBUTIONS BY THE PLAN ADMINISTRATOR
AND LIQUIDATING TRUST ..............................................................................45
A.      Establishment of Reserve Accounts. ..................................................................45
B.      Undeliverable Distribution Reserve. ..................................................................45
C.      Wind-Down Reserve. ..........................................................................................46
D.      Administrative / Priority Claims Reserve. ..........................................................46
E.      Distributions of Distributable Assets. .................................................................46
F.      Professional Fee Escrow Account ......................................................................47

ARTICLE IX  PROCEDURES  FOR  RESOLVING  CONTINGENT,  UNLIQUIDATED,  AND
DISPUTED CLAIMS ............................................................................................47
A.      Disputed Claims Process .....................................................................................47
B.      Allowance of Claims. ..........................................................................................47
C.      Estimation of Claims. ..........................................................................................47
D.      Adjustment to Claims or Interests Without Objection. .......................................48
E.      Time to File Objections to Claims. .....................................................................48
F.      Disallowance of Claims or Interests. ..................................................................48
G.      No Distributions Pending Allowance. .................................................................48
H.      Distributions After Allowance. ...........................................................................48
I.      Tax Treatment of Reserves for Disputed Claims. ..............................................49
J.      No Interest. ..........................................................................................................49
K.      Amendments to Claims. ......................................................................................49

ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........49
A.      Settlement, Compromise, and Release of Claims and Interests. ........................49
B.      Release of Liens; Transfer Free and Clear. ........................................................50
C.      Debtor Release. ...................................................................................................50
D.      Third-Party Release. ...........................................................................................51
E.      Exculpation. ........................................................................................................52

F.    Injunction. ..............................................................................................................................53
G.    Preservation of Setoff Rights. ...............................................................................................54
H.    Protections Against Discriminatory Treatment. ....................................................................54
I.    Document Retention. ..............................................................................................................54
J.    Reimbursement or Contribution. ...........................................................................................55
K.    Term of Injunctions or Stays. ................................................................................................55
L.    Subordination Rights. .............................................................................................................55

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .........................................55
A.    Conditions Precedent to the Effective Date. .........................................................................55
B.    Waiver of Conditions. ............................................................................................................56
C.    Effect of Failure of Conditions. .............................................................................................56
D.    Substantial Consummation. ....................................................................................................56

ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .......................................57
A.    Modification and Amendments. .............................................................................................57
B.    Effect of Confirmation on Modifications. .............................................................................57
C.    Revocation or Withdrawal of Plan. .......................................................................................57

ARTICLE XIII RETENTION OF JURISDICTION ...............................................................................57

ARTICLE XIV MISCELLANEOUS PROVISIONS .................................................................................59
A.    Immediate Binding Effect. .....................................................................................................59
B.    Additional Documents. ...........................................................................................................59
C.    Payment of Statutory Fees. ....................................................................................................59
D.    Dissolution of the Committee and Cessation of Fee and Expense Payment. ........................60
E.    Reservation of Rights. .............................................................................................................60
F.    Successors and Assigns. ..........................................................................................................60
G.    Notices. ...................................................................................................................................60
H.    Entire Agreement. ...................................................................................................................61
I.    Exhibits. ..................................................................................................................................61
J.    Nonseverability of Plan Provisions. .......................................................................................62
K.    Votes Solicited in Good Faith. ...............................................................................................62
L.    Closing of Chapter 11 Cases. .................................................................................................62
M.    Waiver or Estoppel. ................................................................................................................62

## INTRODUCTION

New Rite Aid, LLC ("Rite Aid") and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*1.5L Indenture Trustee*" means U.S. Bank Trust Company, National Association and CSC Delaware Trust Company, as successor trustee under the 1.5L Notes.

2.     "*1.5L Notes*" means those certain Floating Rate Senior Secured PIK Notes due 2031.

3.     "*1.5L Notes Claims*" means all Claims arising under or related to the 1.5L Notes, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the 1.5L Notes Indenture.

4.     "*1.5L Notes Indenture*" means that certain Indenture dated as of August 30, 2024 pursuant to which the 1.5L Notes were issued.

5.     "*1125(e) Covered Parties*" means, each of, and, in each case, in its capacity as such, (a) the Exculpated Parties, (b) the directors and officers of any of the Debtors or their affiliates, and (c) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' Related Parties, in each case solely in their capacity as such.

6.     "*3L Indenture Trustee*" means U.S. Bank Trust Company, National Association and Computershare Trust Company, National Association, as successor trustee under the 3L Notes.

7.     "*3L Notes*" means, collectively, those certain Third-Priority Series A Senior Secured PIK Notes due 2031 and Third-Priority Series B Senior Secured PIK Notes due 2031.

8.     "*3L Notes Claims*" means all Claims arising under or related to the 3L Notes, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the 3L Notes Indenture.

9.     "*3L Notes Indenture*" means that certain Indenture dated as of August 30, 2024 pursuant to which the 3L Notes were issued.

10.     "*Administrative / Priority Claims Reserve*" means a segregated account owned by the Wind-Down Debtors and established in accordance with Article VIII.D.

11.     "*Administrative / Priority Claims Reserve Amount*" means the amount of Cash necessary (as determined by the Debtors and the DIP Agent in accordance with the Wind-Down Budget) to satisfy all Allowed Administrative Claims, Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and any unpaid Settled Priority Claims entitled to distributions after the Effective Date in accordance with this Plan and the Administrative Claims Procedures, which aggregate amount shall be funded into the Administrative / Priority Claims Reserve on or prior to the Effective Date.

12.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

13.     "*Administrative Claims Procedures*" means the procedures approved pursuant to the *Order (I) Authorizing the Administrative Claims Procedures and (II) Granting Related Relief* [Docket No. 1883].

14.     "*Administrative Claims Procedures Distribution*" means the distribution that each Holder of a Settled Priority Claim has consented to or been deemed to consent to receive on account of such Claim pursuant to the Administrative Claims Procedures.

15.     "*Affiliate*" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.

16.     "*Agents*" means, collectively, the Prepetition ABL Agent, the DIP Agents, and in each case, any successors thereto.

17.     "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim or request for payment of an Administrative Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or agreement in writing by the Debtors and the Holder of such late-Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

18.     "*Approved Budget*" shall have the meaning ascribed to such term in the Final Financing Order.

19.     "*Assumption/Rejection Procedures Order*" means the *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 702].

20.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or analogous non-bankruptcy law, including fraudulent transfer laws.

21.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

22.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the District of New Jersey.

23.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

24.     "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks are authorized to close under the laws of, or in fact are closed in, the state of New York.

25.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

26.     "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

27.     "*Cash Distributable Assets*" means any Distributable Assets which are Cash.

28.     "*Cash Liquidating Trust Assets*" means any Liquidating Trust Assets which are Cash.

29.     "*Cause of Action*" or "*Causes of Action*" means any claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, including Indemnification Rights, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at law, in equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

30.      "*Central Fill Facility*"  means the Debtors' central fill facility located in Delran, New Jersey.

31.     "*Chapter 11 Cases*" means the procedurally consolidated cases Filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

32.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

33.     "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims and noticing agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 140].

34.     "*Claims Bar Date*" means the deadline, which shall be thirty (30) days after the Effective Date, by which Proofs of Claim or requests for payment, as applicable, must be Filed with respect to Administrative Claims, Other Priority Claims, Priority Tax Claims, Other Secured Claims, and Settled Priority Claims unless this Plan expressly provides that the applicable claimant is not required to file a Proof of Claim or request for payment, as applicable.  For the avoidance of doubt, (a) Professional Fee Claims shall not be subject to the Claims Bar Date and shall be filed and treated in accordance with <u>Article II.C</u> hereof, and (b) the Claims Bar Date shall not apply to Claims for Cure Costs, if any, which shall be administered in accordance with <u>Article V</u> hereof.

35.     "*Claims Objection Deadline*" means the deadline for objecting to any Claim or request for payment of any Administrative Claim (other than Professional Fee Claims), which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

36.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

37.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

38.     "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

39.     "*Combined Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, and approval of the Disclosure Statement on a final basis, as such hearing may be continued from time to time.

40.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases [Docket No. 316].

41.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

42.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

43.     "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

44.     "*Consummation*" means the occurrence of the Effective Date.

45.     "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults and other non-monetary defaults to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors or assumed and assigned by the Debtors pursuant to a Sale Order or the Confirmation Order pursuant to sections 365 and/or 1123 of the Bankruptcy Code.

46.     "*D&O Liability Insurance Policies*" means all directors and officers/liability Insurance Policies (including any "tail policy") issued or providing coverage at any time to any of the Debtors, any of their predecessors, and/or any of their current or former subsidiaries for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

47.    "*Data Retention Plan*" means the Debtors' go-forward plan with respect to the retention of their books, records, and data, which shall be included in the Plan Supplement.

48.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article X.C of the Plan.

49.     "*Debtors*" has the meaning ascribed to such term in the preamble.

50.    "*Deficiency Claims*" means any portion of any 1.5L Claim, 3L Claim, and McKesson Secured Claim which is not Secured by operation of section 506(a) of the Bankruptcy Code.

51.    "*Definitive Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement.

52.    "*DIP Agent*" means Bank of America, N.A., in its capacities as administrative, collateral agent, and senior collateral agent, as applicable, under the DIP Credit Agreements, together with its respective successors, assigns, or any replacement agent(s) appointed pursuant to the terms of the DIP Credit Agreement.

53.    "*DIP Agents*" means the DIP Agent and the DIP Co-Collateral Agents.

54.    "*DIP Claims*" means, collectively, the DIP FILO Claims and the DIP Revolving Claims.

55.    "*DIP Co-Collateral Agents*" means each of Wells Fargo Bank, National Association and Capital One, National Association, each in its capacity as co-collateral agent under the DIP Credit Agreement.

56.    "*DIP Credit Agreement*" means the debtor-in-possession financing credit agreement by and between the certain Debtors and the DIP Secured Parties setting forth the terms and conditions of the DIP Facilities dated as of May 8, 2025.

57.    "*DIP Documents*" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into therewith, including, without limitation, any guarantee amendments, pledge and collateral agreements, intercreditor agreements, and other security documents.

58.    "*DIP Facilities*" means the DIP ABL Facility and the DIP FILO Facility, each as defined and described in the Final Financing Order.

59.    "*DIP FILO Claim*" means any Claim arising under or relating to the DIP FILO Facility under the DIP Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

60.    "*DIP FILO Facility*" means the new superpriority secured first-in, last-out term loan made in accordance with the DIP Credit Agreement and the Financing Orders in the initial principal amount of $180 million.

61.    "*DIP Lenders*" means the lenders from time to time under the DIP Credit Agreement.

62.     "*DIP Revolving Claim*" means any Claim arising under or relating to the DIP Revolving Facility under the DIP Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

63.    "*DIP Revolving Facility*" means the new superpriority secured revolving asset-based loan made in accordance with the DIP Credit Agreement and the Financing Orders in the principal amount of $1.7 billion.

64.    "*DIP Secured Parties*" means, the DIP Agent, the DIP Co-Collateral Agents, the DIP Lenders, and the other agents and arrangers party to the DIP Credit Agreement.

65.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is scheduled as $0.00 or as contingent, Disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Code pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

66.     "*Disbursing Agent*" means, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administrator, the Liquidating Trustee, or any other Entity or Entities selected by the Debtors, or the Wind-Down Debtors, or the Plan Administrator to make or facilitate distributions contemplated under the Plan (including the DIP Agent and Prepetition ABL Agent to the extent set forth in Article VI.C hereof).

67.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time.

68.     "*Disputed*" means, with respect to any Claim or Interest (or portion thereof), any Claim or Interest (or portion thereof) that is not yet Allowed.

69.     "*Dissolution Date*" has the meaning set forth in Article IV.C.4.

70.     "*Dissolved Debtor*" has the meaning set forth in Article IV.C.2.

71.     "*Distributable Assets*" means all (a) Cash on hand of the Debtors (other than the Reorganized Debtors following the Effective Date) or the Wind-Down Debtors, as applicable, on or after the Effective Date, after giving effect to the funding of (i) all Cash distributions to be made to Holders of Claims on the Effective Date in accordance with this Plan, other than the payment of Cash Distributable Assets to Holders of DIP Claims; (ii) the Professional Fee Escrow Account, (iii) the Wind-Down Reserve, (iv) the Administrative / Priority Claims Reserve, and (v) the FILO Cash Distribution; (b) the Wind-Down Debtors' reversionary interest in amounts remaining in the Professional Fee Escrow Account, the Wind-Down Reserve, and the Administrative / Priority Claim Reserve; and (c) any Cash proceeds or other value received on account of the liquidation of the assets which vest in the Wind-Down Debtors in accordance with this Plan and the Confirmation Order by the Plan Administrator.

72.     "*Distributable Assets Account*" means a segregated bank account controlled by the DIP Agent and owned by the Wind-Down Debtors and administered by the Plan Administrator, in which Cash Distributable Assets shall be held prior to disbursement in accordance with the terms of this Plan.

73.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court.

74.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XI.A of the Plan have been satisfied or waived in accordance with Article XI.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

75.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

76.     "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

77.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

78.    "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

79.    "*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Wind-Down Debtors; (d) the Committee and each of its members; (e) with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's current and former control persons (including any officers), directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

80.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

81.    "*Existing Equity Interests*" means, collectively, the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or exercisable for the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, or other equity, ownership, or profit interests of any Debtors (in each case, whether or not arising under or in connection with any employment agreement).

82.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

83.    "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized Designee in the Chapter 11 Cases.

84.    "*FILO Cash Distribution*" means Cash in the amount of $600,000.00 to be distributed to Holders of Allowed Prepetition FILO Claims.

85.    "*Final Financing Order*" means the *Amended Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. [_]].[2]

86.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

87.    "*Financing Orders*" means, collectively, the Interim Financing Order and Final Financing Order.

---

[2]    The Final Financing Order amended the order previously entered by the Bankruptcy Court at Docket No. 1396.

88.    "*General Unsecured Claim*" means any Claim (including any Deficiency Claim which is not otherwise entitled to priority under section 507 of the Bankruptcy Code) other than a Secured Claim, that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) an Other Secured Claim, (d) an Other Priority Claim, (e) a Settled Priority Claim, (f) a DIP Claim, (g) a Prepetition FILO Claim, (h) an Intercompany Claim, or (i) a Section 510(b) Claim.

89.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

90.    "*Holder*" means any holder of an Allowed Claim or Interest.

91.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

92.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, indemnification agreements, employment contracts, or trust agreements, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, other Professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

93.    "*Indemnification Right*" means the Debtors' indemnification rights against any manufacturer, distributor, supplier, or other party, with respect to any of the Debtors' products, including by way of contract, statute, common law, or otherwise.

94.    "*Indenture Trustee Fees*" means all reasonable and documented compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses, and disbursements, incurred by the 1.5L Indenture Trustee or 3L Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the Effective Date, to the extent the Debtors are obligated to pay such compensation, fees, expenses, and disbursements under the 1.5L Notes and 3L Notes, respectively; *provided* that the Indenture Trustee Fees payable or required to be paid hereunder shall be limited to amounts allocated to the payment of such fees in the Approved Budget.

95.    "*Insurance Policies*" means, collectively, insurance policies, including commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' insurance policies.

96.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor.

97.    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

98.    "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

99.    "*Interim Financing Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 143].

100.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

101.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

102.    "*Liquidating Trust*" means the trust, if any, established pursuant to this Plan, the Liquidating Trust Agreement, and the Confirmation Order, to be established and administered in accordance with the terms set forth in Article IV.D hereof.

103.    "*Liquidating Trust Agreement*" means the agreement, to be included in the Plan Supplement, as it may be amended, executed on the Effective Date and effective upon the date of the first transfer to the Liquidating Trust made in accordance with Article IV.D, if any, establishing and setting forth the terms and conditions which shall, in conjunction with this Plan and the Confirmation Order, govern the administration of the Liquidating Trust, if any, which agreement shall be in a form acceptable to the Debtors and the DIP Agent.

104.    "*Liquidating Trust Assets*" means the Distributable Assets transferred to the Liquidating Trust in accordance with Article IV.D hereof, if any.

105.    "*Liquidating Trustee*" means the trustee of the Liquidating Trust, if any, to be appointed in accordance with this Plan and the Liquidating Trust Agreement in the event that the Liquidating Trust is established in accordance with Article IV.D hereof, which shall, unless otherwise designated by the Plan Administrator with the consent of the Required DIP Co-Collateral Agents (as defined in the Final Financing Order) in accordance with this Plan, be the Plan Administrator.

106.    "*McKesson*" means, collectively, the McKesson Corporation and certain corporate Affiliates, as creditors and contract counterparties in the Chapter 11 Cases.

107.    "*McKesson 503(b)(9) Claim*" means any Claim held by McKesson against any Debtor entitled to priority under section 503(b)(9) of the Bankruptcy Code.

108.    "*McKesson Complaint*" means that certain Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination filed in *Rite Aid Corp.* v. *McKesson Corp. (In re New Rite Aid, LLC)*, Adv. Proc. No. 25-01316-MBK (Bankr. D.N.J. Jul. 31, 2025) [Docket No. 1] (together with any amendments thereto).

109.    "*McKesson Equity Distribution*" means the distribution to McKesson of 100% of the New Equity Interests pursuant to this Plan and the Confirmation Order, in accordance with the Restructuring Steps Memorandum.

110.    "*McKesson Inventory Sales*" means the sales of certain branded and generic inventory of the Debtors to McKesson in accordance with the Restructuring Support Agreement.

111.    "*McKesson Inventory Sale Agreement*" means that certain Asset Purchase Agreement by and between McKesson Corporation and Debtor Rite Aid of New Jersey, Inc., dated as of [September 18, 2025].

112.    "*McKesson Motion to Compel*" means the *Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Docket No. 655].

113.    "*McKesson Sale Order*" means the Sale Order, if any, authorizing the Debtors' entry into an asset purchase agreement with respect to the McKesson Inventory Sales.

114.    "*McKesson Secured Claim*" means any Claim held by McKesson that is Secured.

115.    "*McKesson Supply Documents*" means that certain Supply Agreement dated as of August 30, 2024 (as amended restated, supplemented, or otherwise modified from time to time and in effect on the Petition Date) together with the Supply Documents (as defined therein) by and among McKesson and Rite Aid Corporation.

116.    "*New Board*" means the board of directors of [Reorganized New Rite Aid].

117.    "*New Equity Interests*" means the common stock, limited liability company membership units, or functional equivalent thereof of the Reorganized Debtors having the terms set forth in the New Governance Documents to be issued on the Effective Date subject to the terms and conditions set forth in this Plan.

118.    "*New Governance Documents*" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of the Reorganized Debtors, each of which shall be included in the Plan Supplement and consistent with the Restructuring Support Agreement in all respects, including the consent rights set forth therein.

119.    "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; (b) a Priority Tax Claim; or (c) a Settled Priority Claim.

120.    "*Other Secured Claim*" means any Secured Claim (including Secured Tax Claims), other than (a) a Prepetition FILO Claim or (b) a DIP Claim.

121.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code and shall include, without limitation, the Liquidating Trust and the Liquidating Trustee.

122.    "*Petition Date*" means May 5, 2025, the date on which the Debtors commenced the Chapter 11 Cases.

123.    "*Plan*" has the meaning set forth in the Introduction.

124.    "*Plan Administrator*" means, the person or persons identified in the Plan Supplement (as determined by the Debtors and the Required DIP Co-Collateral Agents) to be appointed on the Effective Date and who will serve as the initial trustee for the Liquidating Trust, if any, and administrator for the Wind-Down Debtors as set forth in <u>Article IV.C</u> of the Plan.

125.    "*Plan Administrator Agreement*" means that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan and the consent rights set forth in the Restructuring Support Agreement.

126.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time prior to the Effective Date in accordance with the terms hereof and of the Restructuring Support Agreement, and in accordance with the Bankruptcy Code and Bankruptcy Rules), drafts of which shall be Filed by the Debtors no later than the Plan Supplement Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the New Governance Documents; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases;  (c) the Schedule of Retained Causes of Action, (d) the Restructuring Steps Memorandum; (e) a document listing the members of the New Board to the extent known; (f) the identity of the Plan Administrator and the terms of compensation of the Plan Administrator; (g) the Liquidating Trust Agreement; (h) the Data Retention Plan; (i) the Transition Services Agreement; and (j) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement (including each document included therein) shall be in form and substance consistent with the Restructuring Support Agreement, including with respect to the consent rights set forth therein.

127.    "*Plan Supplement Deadline*" means the deadline set by the Bankruptcy Court for the filing of the Plan Supplement.

128.    "*Prepetition ABL Agent*" means Bank of America, N.A., in its capacity as administrative and collateral agent under the Prepetition ABL Credit Agreement.

129.    "*Prepetition ABL Credit Agreement*" means that certain credit agreement, dated as of August 30, 2024 (as amended, restated, supplemented, or otherwise modified from time to time and as in effect as of the Petition Date).

130.    "*Prepetition FILO Claim*" any Claim derived from, based upon, or arising under the Prepetition FILO Facility.

131.    "*Prepetition FILO Facility*" means that certain last-out term loan facility provided under the Prepetition ABL Credit Agreement.

132.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code, other than any such Claim which is a Settled Priority Claim.

133.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or, with respect to DIP Claims, the proportion that an Allowed DIP Claim bears to the aggregate amount of Allowed DIP Claims.

134.    "*Professional*" means (a) any Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, and (b) the 1L Indenture Trustee and 3L Indenture Trustee, subject to the limitations on payment of Indenture Trustee Fees set forth in this Plan.

135.    "*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees, and including Indenture Trustee Fees which are permitted to be paid under the Approved Budget) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order, and which are payable only in accordance with the Approved Budget.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

136.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to be funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount in accordance with the Approved Budget and Wind-Down Budget.

137.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors or the Committee or under the 1.5L Indenture or 3L Indenture, as applicable, prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II of the Plan and shall only be payable in accordance with the Approved Budget.

138.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

139.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

140.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers,

consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

141.    "*Released Party*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties; (e) each current and former Affiliate of each Entity in clauses (a) through (d); (f) each Related Party of each Entity in clauses (a), (b), (c), and (e); (g) each current and former Affiliate of each Entity in clauses (d) through (f) and the following clause (h); and (h) each Related Party of each Entity in clauses (d) through (g) and this clause (h); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

142.    "*Releasing Party*" means, collectively, in each case solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Agents; (e) the DIP Secured Parties; (f) McKesson; (g) the Committee (and each of its members, solely in its capacity as such); (h) the Liquidating Trustee on behalf of the Liquidating Trust in the event that the Liquidating Trust is established pursuant to <u>Article IV.D</u> hereof; (i) the Plan Administrator; (j) the 1.5L Indenture Trustee; (k) the 3L Indenture Trustee; (l) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided for in the Plan; (m) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (n) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (o) all Holders of Claims who vote or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (p) each current and former Affiliate of each Entity in clauses (a) through (o); and (q) each Related Party of each Entity in clauses (a) through clause (p).

143.    "*Reorganized Debtors*" means the Debtors in which the New Equity Interests are to be issued to McKesson via the McKesson Equity Distribution in accordance with the Restructuring Steps Memorandum.

144.    "*Reorganized Debtor Insurance Policy*" means any Insurance Policy which the Debtors indicate will vest in the Reorganized Debtors in the Schedule of Assumed Executory Contracts and Unexpired Leases.

145.    "[*Reorganized New Rite Aid*]" means the successor in interest of New Rite Aid, LLC as determined in accordance with the Restructuring Steps Memorandum.

146.    "*Restructuring Steps Memorandum*" means a document to be included in the Plan Supplement that will set forth a summary of the transaction steps to complete the Restructuring Transactions, which shall be included in the Plan Supplement and subject to the consent rights applicable thereto under the Restructuring Support Agreement.

147.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement by and among the Debtors and the non-Debtor parties thereto, dated as of August 31, 2025, attached as Exhibit B to the Disclosure Statement.

148.    "*Restructuring Transactions*" means the transactions to be consummated pursuant to the Plan.

149.    "*Retained Causes of Action*" means any Causes of Action retained pursuant to this Plan in accordance with <u>Article IV.M</u> and the Plan Supplement.  For the avoidance of doubt, no claim or Cause of Action against any Released Party shall be a Retained Cause of Action unless such claim or Cause of Action is listed in the Schedule of Retained Causes of Action.

150.    "*Rules*" means Rule 501(a)(1), (2), (3) and (7) of the Securities Act.

151.    "*Sale Order*" means any Bankruptcy Court order approving the Debtors' entry into one or more purchase agreements and the sale of assets pursuant to section 363 of the Bankruptcy Code.

152.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule of certain Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors pursuant to the Plan and associated Cure Costs proposed by the Debtors, as such schedule may be amended, modified, or

supplemented from time to time by the Debtors in accordance with Article V of the Plan, including any modifications thereto, which shall be included in the Plan Supplement.

153.    "*Schedule of Retained Causes of Action*" means a schedule of certain Causes of Action to be retained under the Plan, which shall be included in the Plan Supplement.

154.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

155.    "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

156.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

157.    "*Secured Tax Claim*" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

158.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

159.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

160.    "*Settled Priority Claim*" means any Claim with respect to which the Holder thereof has, pursuant to the Administrative Claims Procedures, consented or been deemed to consent to receiving an Administrative Claims Procedures Distribution on account thereof.

161.    "*Solicitation Materials*" means all solicitation materials in respect of the Plan.

162.    "*Statutory Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

163.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article X.D of the Plan.

164.    "*Transition Services Agreement*" means an agreement between the Reorganized Debtors and Wind-Down Debtors to be executed on the Effective Date, with respect to the provision of transition services by the Wind-Down Debtors to the Reorganized Debtors.

165.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

166.    "*Undeliverable Distribution Reserve*" has the meaning set forth in Article VIII.B hereof.

167.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

168.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

169.    "*Voting Deadline*" means the deadline for voting on the Plan as established pursuant to the Final Order conditionally approving the Disclosure Statement.

170.    "*Wind-Down*" means the wind-down, dissolution, and liquidation of the Estates of the Wind-Down Debtors on and after the Effective Date.

171.    "*Wind-Down Budget*" means a budget, which shall be included in the Plan Supplement and subject to the consent rights applicable thereto under the Restructuring Support Agreement, for the activities and expenses to be incurred in connection with the Wind-Down including, for the avoidance of doubt, all Statutory Fees relating to any of the Debtors or their Chapter 11 Cases, which shall include amounts necessary to fund the Administrative / Priority Claims Reserve, the Professional Fee Escrow Amount and the Wind-Down Reserve.

172.    "*Wind-Down Debtors*" means any Debtor which is not a Reorganized Debtor.

173.    "*Wind-Down Reserve*" means a segregated account established by the Wind-Down Debtors established in accordance with <u>Article VIII.C</u> and funded in accordance with the Wind-Down Budget.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (f) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (g) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (h) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (i) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (j) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (k) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (n) any effectuating provisions may be interpreted by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (o) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (p) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (q) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (r) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors or the Wind-Down Debtors shall mean the Debtors and the Reorganized Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

C. *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D. *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

E. *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F. *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the relevant document in the Plan Supplement shall control (except as expressly provided in such Plan Supplement document). In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control, except as expressly provided therein.

G. *Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for substantive consolidation of any of the Debtors.

H. *Consultation, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement shall be incorporated herein by this reference and fully enforceable as if stated in full herein. In the case of conflict with respect to consultation, information, notice, and consent rights between the Restructuring Support Agreement, on the one hand, and the Plan, on the other hand, the Restructuring Support Agreement as in effect on the applicable date shall control and govern.

### ARTICLE II
### ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE
### CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Settled Priority Claims, and McKesson 503(b)(9) Claims) will receive, in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter), without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided*, *however*, that the distributions to Holders of Administrative Claims occurring after the Effective Date in accordance with the foregoing provisos (b) through (e) shall be made exclusively from the Administrative / Priority Claims Reserve, and the Reorganized Debtors shall have no obligation to pay any Administrative Claims.

Except for Professional Fee Claims, Claims for the fees addressed in the following Article II.B, DIP Claims, McKesson 503(b)(9) Claims, Settled Priority Claims (to the extent set forth in Article II.E), and Administrative Claims previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors or the Wind-Down Debtors, as applicable, no later than the Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Debtors or the Wind-Down Debtors and the requesting party on or before the Claims Objection Deadline. The Reorganized Debtors shall have no role in the adjudication of the Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, the Reorganized Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, the Reorganized Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.      *Payment of Fees and Expenses under Financing Orders.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Wind-Down Debtors, as applicable, shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents and the DIP Lenders, and the Prepetition ABL Agent, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the Financing Orders and in accordance with the Approved Budget. Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing herein shall require the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, or their respective professionals, to File applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims.

C.      *Professional Fee Claims.*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Wind-Down Debtors or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator, as applicable, shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Allowance and payment of Professional Fee Claims (including any Professional Fee Claims for Indenture Trustee Fees) shall be consistent with, and limited to the amounts set forth in, the Approved Budget. For the avoidance of doubt, any Professional Fee Claims in excess of the Approved Budget shall be treated solely as General Unsecured Claims and shall not be entitled to priority under sections 503 or 507 of the Bankruptcy Code, or otherwise.

Professional Fee Claims for Indenture Trustee Fees shall be paid in cash on the Effective Date or as soon as reasonably practicable thereafter in the amount allocated to the payment of such fees in the Approved Budget, without any requirement that the 1.5L Indenture Trustee or 3L Indenture Trustee file any application with the Bankruptcy Court for payment or Allowance of such Claims.

2.      <u>Professional Fee Escrow Account</u>.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, in accordance with the terms of the Final Financing Order. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the applicable escrow agent at the direction of the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve, Distributable Assets, and Administrative / Priority Claim Reserve if not paid in full from the Professional Fee Escrow Account; *provided*, *further*, that no payment of Professional Fee Claims from the Administrative / Priority Claim Reserve shall reduce or otherwise impair the Administrative Claims Procedures Distributions to be made to Holders of Settled Priority Claims. Notwithstanding the foregoing, however, no Reorganized Debtor shall have any liability for any Professional Fee Claims. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court (or, with respect to Claims for Indenture Trustee Fees which are Professional Fee Claims and permitted to be paid pursuant to the Approved Budget, pursuant to this Plan) and in accordance with the Final Financing Order, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and constitute Distributable Assets.

3.      <u>Professional Fee Amount</u>.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors or the Committee, or under the 1.5L Indenture or 3L Indenture, as applicable, before

and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days prior to the anticipated Effective Date; *provided* that such estimate shall be consistent with the Approved Budget and shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.      Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals, if any, from the Wind-Down Reserve in accordance with the Wind-Down Budget.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and paid (a) on the Effective Date or (b) from the Administrative / Priority Claims Reserve thereafter in accordance with Article VIII; *provided* that the Reorganized Debtors shall have no obligation to pay any Priority Tax Claims.

E.      *Settled Priority Claims.*

Each Holder of a Settled Priority Claim shall receive and has, pursuant to the Administrative Claims Procedures, consented to or been deemed to consent to receive in satisfaction of section 1129 of the Bankruptcy Code, in full and final satisfaction, compromise, settlement, release, and discharge of such Claims, to the extent not received prior to the Effective Date, its Administrative Claims Procedures Distribution.  For the avoidance of doubt, any Holder of a Settled Priority Claim that received an Election Form indicating a Recorded Amount (each as defined in the Administrative Claims Procedures) shall not be required to file a Proof of Claim or request for payment of such Claim, as applicable, and such Settled Priority Claims shall be deemed Allowed in such Recorded Amounts except as otherwise agreed between the Debtors and any such Holder or provided pursuant to a Final Order of the Bankruptcy Court with respect to such Claim; *provided* that the Reorganized Debtors shall have no obligation to pay any Settled Priority Claims.

Distributions on account of Settled Priority Claims shall be made (a) if such Settled Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Settled Priority Claim is not Allowed as of the Effective Date, no later than 10 Business Days after the date on which (i) an order Allowing such Settled Priority Claim becomes a Final Order or (ii) the Debtors or the Wind-Down Debtors, as applicable, determine that such Settled Priority Claim is Allowed pursuant to Article IX.A hereof, or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by the Holder of such Settled Priority Claim and the Debtors or the Wind-Down Debtors, as applicable; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided*, *however*, that the distributions on account of Settled Priority Claims occurring after the Effective Date in accordance with the foregoing provisos (b) through (d) shall be made exclusively from the Administrative / Priority Claims Reserve.

F.      *McKesson 503(b)(9) Claims.*

In accordance with the Restructuring Support Agreement, McKesson has agreed to receive, on account of and in full and final satisfaction, compromise, settlement, release and discharge of the McKesson 503(b)(9) Claims, the McKesson Equity Distribution.  The McKesson Equity Distribution shall be issued and delivered in accordance with the Restructuring Steps Memorandum.

G.      *DIP Claims.*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement including principal, interest, fees, costs, other charges, and expenses (but excluding, for the avoidance of doubt, professional fees to be paid in accordance with Article II.B).  In full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed DIP Claim shall receive (a) its Pro Rata share of any Distributable Assets distributed by the Debtors on the Effective Date or the Plan Administrator thereafter, and (b) in the event that the Liquidating Trust is established in accordance with Article IV.D hereof, an interest in the Liquidating Trust entitling it to its Pro Rata share of any distributions of the Liquidating Trust Assets.  Distributions of the Distributable Assets (or Liquidating Trust Assets, as applicable) will be made from the Effective Date through the Dissolution Date, in accordance with Article VIII.E; *provided* that the Reorganized Debtors shall have no obligation to pay any DIP Claims.

Upon the later of (a) the Dissolution Date and (b) distribution, abandonment, or other disposition of all Distributable Assets (or Liquidating Trust Assets, as applicable), the DIP Claims shall be deemed satisfied, and in accordance with the terms of this Article II.G, the Final Financing Order, and the DIP Documents, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Pursuant to the DIP Credit Agreement, all distributions made under this Plan on account of DIP Claims shall be made to the applicable DIP Agent for distributions to the applicable DIP Lender in accordance with the DIP Credit Agreement unless otherwise agreed upon in writing by the DIP Agent and the Debtors, as applicable.  The DIP Agent shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims.  The DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agent shall not have any liability to any person with respect to such distributions made or directed to be made.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition FILO Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Subject to <u>Article IV</u> hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of (a) the Effective Date and (b) if such Claim is not Allowed as of the Effective Date, the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter, with distributions on account of the foregoing proviso (b) to Claims in Class 1 and Class 2 being made exclusively from the Administrative / Priority Claims Reserve.

1.      <u>Class 1 – Other Secured Claims</u>

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  Each Holder of an Allowed Other Secured Claim, unless such Holder agrees to less favorable treatment, shall receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)      payment in full in Cash;

(ii)      the collateral securing its Other Secured Claim;

(iii)      Reinstatement of its Other Secured Claim; or

(iv)      Such other treatment as to render such Holder's Allowed Other Secured Claim unimpaired pursuant to the Bankruptcy Code.

(c)      *Voting*: Class 1 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)      payment in full in Cash; or

(ii)      such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – Prepetition FILO Claims

(a)      *Classification:*  Class 3 consists of all Prepetition FILO Claims.

(b)      *Allowance of Prepetition FILO Claims*:  The Prepetition FILO Claims shall be Allowed in the aggregate amount of $60 million.

(c)      *Treatment*:  Each Holder of an Allowed Prepetition FILO Claim shall receive, except to the extent that a Holder of an Allowed Prepetition FILO Claim and the Debtors or Wind-Down Debtors, as applicable, agree to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the FILO Cash Distribution.

(d)      *Voting:*  Class 3 is Impaired.  Therefore, Holders of Prepetition FILO Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – General Unsecured Claims

(a)      *Classification:*  Class 4 consists of all General Unsecured Claims, including Deficiency Claims.  Pursuant to section 506(a) of the Bankruptcy Code, all 1.5L Notes Claims, 3L Notes Claims, and McKesson Secured Claims are Deficiency Claims, and shall be treated in accordance with this Article III.B.4 (excluding, for the avoidance of doubt, any Deficiency Claim held by McKesson which is a McKesson 503(b)(9) Claim).

(b)      *Treatment:*  General Unsecured Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

(c)      *Voting:*  Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are conclusively deemed to have rejected the Plan.  Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.      Class 5 – Intercompany Claims

      (a)    *Classification*:  Class 5 consists of all Intercompany Claims.

      (b)    *Treatment*:  Each Intercompany Claim shall be, at the option of the Debtors or Wind-Down Debtors, as applicable, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is determined by the Debtors; *provided* that any Intercompany Claims held by or assertable against any Reorganized Debtor shall be released without any distribution on account of such Intercompany Claims.

      (c)    *Voting*:  Holders of Claims in Class 5 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.      Class 6 – Intercompany Interests

      (a)    *Classification*:  Class 6 consists of all Intercompany Interests.

      (b)    *Treatment*:  Each Intercompany Interest shall be, at the option of the Debtors, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors but in all respects in accordance with the Restructuring Steps Memorandum.

      (c)    *Voting*:  Holders of Interests in Class 6 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Existing Equity Interests

      (a)    *Classification*:  Class 7 consists of all Existing Equity Interests in New Rite Aid, LLC.

      (b)    *Treatment*:  All Existing Equity Interests in New Rite Aid, LLC will be cancelled and extinguished, and Holders of Existing Equity Interests shall receive no recovery on account of such Interests.

      (c)    *Voting*:  Class 7 is Impaired.  Holders of Existing Equity Interests in New Rite Aid, LLC are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests in New Rite Aid, LLC are not entitled to vote to accept or reject the Plan.

8.      Class 8 – Section 510(b)

      (a)    *Classification:*  Class 8 consists of all Section 510(b) Claims.

      (b)    *Treatment:*  Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

      (c)     *Voting:* Class 8 is Impaired. Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan. Therefore, Holders (if any) of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

      C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

      D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than $0.00 as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

      E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

      F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to <u>Article III.B</u> of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting or deemed to reject Class of Claims or Interests. The Debtors, subject to the terms of the Restructuring Support Agreement, including the consent rights set forth therein, reserve the right to modify the Plan prior to Confirmation and in accordance with <u>Article XII</u> hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

      G.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

      H.     *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, to the maximum extent permitted by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Articles VI and XIV hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final, shall be in full satisfaction of such Claims, and shall be free and clear of the Liens of any Entity.

B.      *McKesson Equity Distribution & Reorganized Debtors.*

On the Effective Date (or before the Effective Date, as specified in the Restructuring Steps Memorandum), the Debtors or the Reorganized Debtors (as applicable) shall take all actions set forth in the Restructuring Steps Memorandum, and enter into any transaction and take any actions as may be necessary or appropriate to effect the Restructuring Transactions described herein (as determined by the Debtors and McKesson in their reasonable discretion), subject in all respects to the terms set forth herein, including, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) the issuance of New Equity Interests constituting the McKesson Equity Distribution and any other securities necessary to implement the Restructuring Transactions, all of which shall be authorized and approved in all respects; (e) the execution and delivery of the Definitive Documents, and (f) all other actions that the Debtors and McKesson determine to be necessary or appropriate in connection with the Consummation of the Plan, in their reasonable discretion.

The Confirmation Order shall, and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, approved by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

1.      Reorganized Debtors.

On the Effective Date, in accordance with the terms of the New Governance Documents, the New Board shall be appointed by McKesson, and [Reorganized New Rite Aid] shall adopt the New Governance Documents.

2.      Corporate Existence of the Reorganized Debtors.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Reorganized Debtor shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Governance Documents, in each case consistent with the Plan. To

the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, and any Reorganized Debtor may be disposed of, dissolved, wound down, or liquidated without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

       3.      <u>Vesting of Assets in Reorganized Debtors.</u>

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate of each Debtor which is to become a Reorganized Debtor pursuant to the Restructuring Steps Memorandum shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided* that Retained Causes of Action, if any, shall vest in the Reorganized Debtors or Wind-Down Debtors as specified in the Schedule of Retained Causes of Action.  On and after the Effective Date, except as otherwise provided in the Plan, including <u>Article X</u> hereof, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

       4.      <u>Vesting of Distributable Assets and Reserve Accounts in Wind-Down Debtors.</u>

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in the Estate of each Wind-Down Debtor shall vest in each respective Wind-Down Debtor for the purpose of liquidating such assets, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided* that Retained Causes of Action, if any, shall vest in the Reorganized Debtors or Wind-Down Debtors as specified in the Schedule of Retained Causes of Action.  On and after the Effective Date, the Wind-Down Debtors may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, but subject in all respects to the provisions of this Plan governing the use and disposition of amounts to be funded into the Wind-Down Reserve, Administrative / Priority Claim Reserve, and Distributable Assets Account.

       5.      <u>The New Equity Interests.</u>

On the Effective Date, New Rite Aid, LLC is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Steps Memorandum, issue the New Equity Interests on account of the McKesson Equity Distribution without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the New Equity Interests issued pursuant to the Plan, as contemplated by the Restructuring Steps Memorandum, shall be duly authorized and validly issued and shall be full paid and non-assessable.

       6.      <u>Cash on Hand.</u>

Except as otherwise provided herein, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan.

7.      Creation of the Administrative / Priority Claims Reserve and the Wind-Down Reserve.

On or before the Effective Date, the Debtors shall, with Cash on hand, fund each of the Administrative / Priority Claims Reserve and Wind-Down Reserve in accordance with the Wind-Down Budget and Articles VIII.C and D hereof.

C.      *Plan Administrator & Wind-Down.*

1.      Plan Administrator.

As of the Effective Date, the existing board of directors or managers, as applicable, of each of Wind-Down Debtor shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity Holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  The Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of each Wind-Down Debtor, succeed to the powers of, and act for each Wind-Down Debtor in the same fiduciary capacity as, each of the Wind-Down Debtors' managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  The Plan Administrator shall have the authority to, as set forth in Article VII hereof, (a) sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets (including, for the avoidance of doubt, through the dissolution of any non-Debtor direct or indirect subsidiary of any Wind-Down Debtor) without any additional notice to or approval from the Bankruptcy Court; (b) effect the dissolution of any Wind-Down Debtor including as set forth in Article IV.C.4; (c) complete and file all final or otherwise required federal, state, and local tax returns required to be filed in a manner consistent with the Restructuring Steps Memorandum and pay taxes required to be paid for any of the Wind-Down Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any of the Wind-Down Debtors or their Estates for any tax incurred during the administration of such Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws; (d) represent the interests of the Wind-Down Debtors before any taxing authority in all tax matters in a manner consistent with the Restructuring Steps Memorandum, including any action, suit, proceeding, or audit; and (e) pursue Retained Causes of Action which vest in the Wind-Down Debtors in accordance with this Plan and the Schedule of Retained Causes of Action, if any.  The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Wind-Down Debtors.

2.      Dissolved Debtors.

To the extent that the Restructuring Steps Memorandum provides for the dissolution of any Debtor (any such Debtor, a "*Dissolved Debtor*"), on and after Confirmation and prior to the Effective Date, such Dissolved Debtors shall be deemed to be dissolved in accordance with the Restructuring Steps Memorandum without any further action by Debtors, including the filing of any documents with the secretary of state for the state in which any Dissolved Debtor is formed or any other jurisdiction.  On and after Confirmation but prior to the Effective Date, the filing by the Debtors of any of the Dissolved Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

3.      Wind-Down Debtors.

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and the Wind-Down Reserve in accordance with the Wind-Down Budget, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes

of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) liquidating all assets of the Wind-Down Debtors, and (g) otherwise administering the Plan in accordance with its terms and at the direction of the Plan Administrator.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors to File motions or substitutions of parties or counsel in each such matter.

      4.      <u>Dissolution of the Wind-Down Debtors.</u>

Upon the Filing with the Bankruptcy Court by the Plan Administrator a certification that all Distributable Assets of any Wind-Down Debtor have been transferred, abandoned, otherwise liquidated, or distributed in accordance with this Plan, such Wind-Down Debtor shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.

Upon (a) the Filing with the Bankruptcy Court by the Plan Administrator, with the consent of the DIP Agent, of a certification that all distributions have been made and that it has completed all its duties under the Plan and (b) entry of a final decree closing the last of the Chapter 11 Cases (the date on which the foregoing (a) and (b) have occurred, the "*Dissolution Date*"), any Wind-Down Debtors not dissolved as of such time shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.

Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve any Wind-Down Debtor in, and withdraw any Wind-Down Debtor from, applicable states and provinces to the extent required by applicable law.  On and after the Effective Date, the filing by the Plan Administrator of any of the Wind-Down Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

      *D.*      *Liquidating Trust.*

Notwithstanding anything to the contrary herein, the Plan Administrator, on behalf of the Wind-Down Debtors, may, with the consent of the DIP Agent, transfer all or any portion of the Distributable Assets to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations; *provided*, *however*, that the Plan Administrator shall not transfer any assets to the Liquidating Trust which are required for the Plan Administrator to perform its obligations under the Transition Services Agreement. The Liquidating Trust shall be established, and the Liquidating Trust Agreement shall be deemed to be effective upon, the date on which the first such transfer, if any, occurs, in which case the Liquidating Trust shall be established for the primary purposes of (a) liquidating any Liquidating Trust Assets transferred to the Liquidating Trust in accordance with this <u>Article IV.D</u>, (b) reconciling Claims asserted against the Debtors and the Wind-Down Debtors, and (c) distributing the proceeds of the Liquidating Trust Assets in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust.  Upon the transfer of the Wind-Down Debtors' assets to the Liquidating Trust, the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust.  To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. The Plan Administrator may, with the consent of the DIP Agent, designate a Liquidating Trustee for the purposes of administering the Liquidating Trust and, if no trustees are so designated, the Plan Administrator shall serve as Liquidating Trustee and administer the Liquidating Trust in accordance with this Plan and the Liquidating Trust Agreement.  The reasonable costs and expenses of administering the Liquidating Trust shall be paid from the Wind-Down Reserve in accordance with the Wind-Down Budget.

The beneficiaries of the Liquidating Trust, if any, shall be the Holders of DIP Claims. No amounts held in the Wind-Down Reserve, Administrative / Priority Claim Reserve, or Professional Fee Escrow Account shall be transferred to the Liquidating Trust prior to the date, if any, on which such amounts become Distributable Assets pursuant to this Plan.

1.   <u>Liquidating Trust Treatment.</u>

The following discussion shall apply in the event the Liquidating Trust is established pursuant to this <u>Article IV.D</u> and any Distributable Assets are transferred to the Liquidating Trust, which is intended to be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary (and except to the extent the Debtors determine otherwise in their discretion to treat all or any portion of the Liquidating Trust as a "qualified settlement fund," a "disputed ownership fund" and/or otherwise), the Debtors expect to treat the Liquidating Trust, if established, as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, any transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Liquidating Trustee, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their book value and distributed the proceeds to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy

of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

   2.  <u>Disputed Ownership Fund Treatment.</u>

   To the extent the Debtors determine to treat the Liquidating Trust or a portion thereof as a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations or a disputed ownership fund under section 1.468B-9 of the Treasury Regulations, any appropriate elections with respect thereto shall be made and such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return may be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

   E.  *Release of Liens.*

   Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the Holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable.  Notwithstanding anything to the contrary in the Plan, solely with respect to the Wind-Down Debtors, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the later of (a) the Dissolution Date and (b) the distribution, abandonment, or other disposition of all Distributable Assets (or Liquidating Trust Assets, as applicable).

   F.  *Cancellation of Existing Securities and Agreements.*

   On the Effective Date, except as otherwise specifically provided for in the Plan (including, for the avoidance of doubt, the foregoing <u>Article IV.E</u>:  (a) the obligations under the DIP Documents, the Prepetition ABL Credit Agreement, the 1.5L Indenture, the 3L Indenture, and the McKesson Supply Documents, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled except as set forth herein, and the Reorganized Debtors and Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

   On or after the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture(s) or credit agreement that governs the rights of such Holder of such Claim upon such Holder's (or its nominee's or designee's) receipt of the distributions to which it is entitled pursuant to the Plan.  Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, this <u>Article IV.F</u>; *provided* that such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights.  If (a) the record Holder of a 1.5L Notes Claim or 3L Notes Claim is DTC or its

nominee, the applicable trustee, or another securities depository or custodian thereof, and (b) the Holders of such 1.5L Notes Claims or 3L Notes Claims are represented by a global security held by or on behalf of DTC, the applicable trustee, or such other securities depository or custodian, then each such Holder of such 1.5L Notes Claim or 3L Notes Claim shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC, the applicable trustee, or such other securities depository or custodian thereof.

Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, and (b) the DIP Credit Agreement and Prepetition ABL Credit Agreement shall continue in effect solely for the purpose of (i) allowing Holders of the DIP Claims and Prepetition FILO Claims to receive the distributions provided for under the Plan, (ii) allowing the DIP Agent and Prepetition ABL Agent to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (iii) preserving all rights, including rights of enforcement, of the DIP Agent and Prepetition ABL Agent to indemnification or contribution pursuant and subject to the terms of the Prepetition ABL Credit Agreement in respect of any claim or Cause of Action asserted against the DIP Agent or Prepetition ABL Agent, respectively, (iv) permitting the DIP Agent and Prepetition ABL Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, (v) preserving the Liens on Avoidance Actions securing the DIP Claims, and (vi) preserving any rights of the DIP Agent and the Prepetition ABL Agents to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the Prepetition ABL Credit Agreement or DIP Credit Agreement, as applicable.

The Prepetition ABL Agent shall be released from its duties and obligations arising under the Prepetition ABL Credit Agreement and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Prepetition ABL Agent and their respective representatives and Professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Prepetition ABL Agent shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in this Plan or the Confirmation Order, on the Effective Date, the DIP Agent and its respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the applicable DIP Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents shall fully terminate and be of no further force or effect on the Effective Date.

G.    *Corporate Action; Restructuring Transactions.*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including, as applicable: (a) selection of the Plan Administrator; (b) implementation of the Restructuring Transactions; (c) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date), including the Restructuring Steps Memorandum. The abandonment of any Intercompany Interests which are to be abandoned pursuant to the Restructuring Steps Memorandum are accordingly deemed authorized and approved pursuant to this Plan and section 554 of the Bankruptcy Code, and, upon any such abandonment, the abandoning entit(ies) shall automatically be deemed to have surrendered and relinquished all rights, title, and interest in such equity interests.

All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be deemed to have occurred and effective as of the Effective Date (or, to the extent such actions take place prior to the Effective Date, the date on which such actions occur in accordance with the Restructuring Steps Memorandum), without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be

authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.    *McKesson Sale Transactions.*

As contemplated in the McKesson Sale Order, to the extent that the Restructuring Steps Memorandum provides for the transfer of any assets to McKesson (or to the extent such transfer is indirectly effected through the McKesson Equity Distribution), the Restructuring Steps Memorandum shall control.  Pursuant to sections 1123(a)(5)(D), 1141(c), and 1146 of the Bankruptcy Code, any such transfers are approved and shall be consummated in accordance with the Restructuring Steps Memorandum, and shall be consummated free and clear of any Liens or encumbrances, including those securing the DIP Facility.

I.    *New Governance Documents.*

On the Effective Date, each Reorganized Debtor shall enter into and deliver the New Governance Documents to McKesson, and the New Governance Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each party, including McKesson, shall be bound thereby, in each case, and as applicable, without the need for execution by any party thereto other than the applicable Reorganized Debtor.

The New Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the New Governance Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

J.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the instruments issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to any Reorganized Debtor, a Debtor to the Wind-Down Debtor, or from the Wind-Down Debtor to the Liquidating Trust or to any other Person) of property under the Plan or pursuant to (a) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (d) the making, assignment, or recording of any lease or sublease, or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any Restructuring Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and

by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

        L.      *Exemption from Securities Act Registration.*

        No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of securities under the Plan. The issuance of the New Equity Interests under the Plan is expected to be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code. Thus, the New Equity Interests to be issued under the Plan (a) would not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) would be freely tradable and transferable by any initial recipient thereof that (i) is not an "Affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "Affiliate" within 90 days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. The rights of holders of New Equity Interests, including the right to transfer such interests, will also be subject to any restrictions in the New Governance Documents, to the extent applicable.

        To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of the New Equity Interests pursuant to the Plan, is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S under the Securities Act and/or another available exemption from registration under section 5 of the Securities Act. To the extent the New Equity Interests is issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation S under the Securities Act, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

        The interests in the Liquidating Trust, if any, shall be non-transferrable and are not expected to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such interests is expected to be exempt from the registration under section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

        The Wind-Down Debtors and Reorganized Debtors, as applicable, need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests or interests in the Liquidating Trust, if any, under applicable securities laws.

        M.      *Preservation of Causes of Action.*

        In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article X</u> hereof, the Debtors and, on and after the Effective Date, the Reorganized Debtors and Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action allocated to them in the Schedule of Retained Causes of Action, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Causes of Action exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in this Plan, including, without limitation, <u>Article X</u> hereof; *provided* that no claim or Cause of Action against any Released Party shall be a Retained Cause of Action unless any such claim or Cause of Action is included in the Schedule of Retained Causes of Action, and any such claims or Causes of Action against any Released Party not included in the Schedule of Retained Causes of Action shall be deemed released and waived by the Debtors, the Reorganized Debtors, and the Wind-Down Debtors as of the Effective Date.

Retained Causes of Action shall vest in either the Wind-Down Debtors or Reorganized Debtors as specified in the Schedule of Retained Causes of Action.  Any Retained Causes of Action that vest in the Wind-Down Debtors in accordance with this Plan shall be Distributable Assets.

Notwithstanding anything to the contrary contained in this Plan, on the Effective Date and in accordance with paragraph 7(a) of the Final Financing Order, all Avoidance Actions for payments made by the Debtors under $500,000 (other than payments below $500,000 made to a party that also received at least one payment equal or exceeding $500,000) (a) shall not be Retained Causes of Action, (b) shall be deemed settled, waived, discharged, and/or released by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and any successor in interest to any such Party as of the Effective Date, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary, and (c) shall not and cannot be offered, sold, resold, pledged, delivered, allotted or otherwise transferred to or vested in any party or Entity pursuant to this Plan or otherwise.

N.      *Private Company.*

The Reorganized Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected (including any Executory Contract or Unexpired Lease entered into after the Petition Date) shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (a) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed or rejected by the Debtors pursuant to any Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (d) are to be assumed and assigned by the Debtors, as applicable, including through a Sale Order in connection with any sale transaction; (e) are a contract, release, or other agreement or document entered into in connection with the Plan; or (f) are an Insurance Policy. Notwithstanding the foregoing, by consent of McKesson and the Debtors, the deadline for assumption or rejection of the McKesson Supply Documents shall be extended through fifteen (15) Business Days after the earliest of (1) termination of the McKesson Inventory Sale Agreement in accordance with its terms, (2) if the Inmar Outside Date occurs prior to occurrence of the Inmar Closing, the expiration of the Initial Inmar Credit Payment Period (as defined in the McKesson Inventory Sale Agreement), and (3) if the Inmar Closing occurs, expiration of the Subsequent Inmar Credit Payment Period (as defined in the McKesson Inventory Sale Agreement).

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, (a) the assumptions and assumptions and assignments of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases and (b) the rejections of any such agreements not assumed or assumed and assigned pursuant to this Plan, in each case pursuant to sections 365 and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein or in the Confirmation Order or any Sale Order, assumptions or rejections of Executory Contracts and

Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to this Article V.A, the effective date of rejection of such Unexpired Leases shall be the later of: (a) the Effective Date, and (b) the date upon which the Debtors or the Wind-Down Debtors, as applicable, notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors or the Wind-Down Debtors surrender the premises as set forth in the foregoing proviso (b), all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. The Debtors shall provide each counterparty to an Unexpired Lease which is not assumed pursuant to this Plan with a notice (which notice may, for the avoidance of doubt, be included in the notice such party receives with respect to the filing of the Plan Supplement).

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct "going-out-of-business" sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the applicable Reorganized Debtor or Wind-Down Debtor (as indicated on the Schedule of Assumed Executory Contracts and Unexpired Leases) in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto. Notwithstanding anything to the contrary to the Plan or the Confirmation Order, the Debtors may amend or otherwise modify the Schedule of Assumed Executory Contracts and Unexpired Leases prior to the Effective Date to (a) designate an Executory Contract previously included on the Schedule of Assumed Executory Contracts and Unexpired Leases for assumption and assignment or (b) remove any Executory Contract or Unexpired Lease. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

To the maximum extent permitted by law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease. To the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases as of the Confirmation Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor has (x) consented to such rejection, (y) objected to the assumption of such Unexpired Lease and such objection remains outstanding, or (z) consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code, as extended pursuant to any Bankruptcy Court order (and as further extended with the applicable lessor's consent, the "*Deferred Deadline*"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume or reject such Unexpired Lease, subject to the applicable lessor's right to object to such assumption or rejection. For any Unexpired Lease assumed pursuant to this paragraph, all Cure Costs shall be paid on the Effective Date or as soon as reasonably

practicable thereafter, unless subject to a dispute with respect to Cure Cost, such dispute shall be addressed in accordance with Article V.C.

>B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases for any Claims which would be subject to the Claims Bar Date pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the earliest of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Effective Date.  **Any such Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such Claims against the Debtors and/or receiving distributions on account of such Claims in these Chapter 11 Cases.  The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed;** ***provided*** **that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed**.  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Pursuant to Article III.B General Unsecured Claims shall not receive any recovery pursuant to the Plan, are not subject to the Claims Bar Date, and no Proofs of Claim with respect to such Claims must be Filed.

For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (a) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or any third party, and (b) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Claim in accordance with this Article V.B, which Claims, if any, shall be treated as General Unsecured Claims.

>C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Wind-Down Debtors, or, solely with respect to any Executory Contracts or Unexpired Leases to be assumed by, or assumed and assigned to, any Reorganized Debtor, the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan, if any, on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved.  Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

Unless (a) otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease or (b) an earlier deadline has been set with respect to such objection by a Final Order (including, without limitation, the Bidding Procedures Order or any Sale Order, in which case the deadlines set forth in such orders with respect to the applicable Executory Contract or Unexpired Lease shall control), any objection by a counterparty to an Executory Contract or Unexpired Lease to be assumed pursuant to this Plan to the applicable proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors by no later than 14 days after the service of notice of assumption on affected counterparties (which notice may, for the avoidance of doubt, be included in the notice such party receives with respect to the filing of the Plan Supplement).  **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized**

**Debtors or the Wind-Down Debtors, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court**.

Except as otherwise set forth in any applicable Sale Order, if there is any dispute regarding any Cure Costs, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, at the earliest convenience of the Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors may, at any time prior to the resolution of any such objection regarding Cure Costs or the ability of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors to provide "adequate assurance," remove the applicable Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, and the effective date of the rejection of any such Executory Contract or Unexpired Lease and deadline for Filing any Proof of Claim arising therefrom, if any, shall be determined in accordance with Article V.A upon the Debtors' service of notice to the counterparty as required thereunder.

If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases (such greater amount, the "Court-Ordered Cure Cost"), the Debtors shall have the right to (a) satisfy the Court-Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms herein or, (b) within 14 days of such determination, remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of (i) the date of entry of the Court-Ordered Cure Cost and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of rejection of an Unexpired Lease pursuant to the preceding clause (ii), the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor or ordered by the Court, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as extended pursuant to any Bankruptcy Court order, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (a) the applicable counterparty consents to such rejection, (b) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (c) the court orders a Court-Ordered Cure Cost. Notwithstanding anything to the contrary herein, the Debtors, Reorganized Debtors, the Wind-Down Debtors, and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Cost dispute.

D.       *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.       *Insurance Policies.*

Notwithstanding anything to the contrary in the Plan, the Plan Supplement or the Confirmation Order:

The Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan and, unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims under such Insurance Policies, and (b) such Insurance Policies and any agreements, documents, or instruments relating thereto, shall vest, unaltered in their entirety, in the Wind-Down Debtors, except in the case of any Reorganized Debtor Insurance Policy, in which case such Insurance Policy shall vest in the Reorganized Debtors.  Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, insureds, Debtors, Wind-Down Debtors, Plan Administrator, or, solely with respect to the Reorganized Debtor Insurance Policies, the Reorganized Debtors, under the Insurance Policies in any manner, and such insurance carriers, insureds, Debtors, Wind-Down Debtors, Plan Administrator, or, solely with respect to the Reorganized Debtor Insurance Policies, the Reorganized Debtors, in each case as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insurance carriers, insureds, Debtors, Wind-Down Debtors, Plan Administrator, or, solely with respect to the Reorganized Debtor Insurance Policies, the Reorganized Debtors, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors as existed prior to the Effective Date.

Nothing in the Plan, the Plan Supplement or the Confirmation Order shall terminate or otherwise reduce the coverage available to any beneficiary or "insured" under any D&O Liability Insurance Policies.  After the Effective Date all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

On or after the Confirmation Date, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors shall not take any action to terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policies (including any "tail policy") for the full term of such policy regardless of whether such directors and/or officers remain in such positions before or after the Effective Date.  Each of the Debtors' D&O Liability Insurance Policies will be assumed and retained in accordance with the first paragraph of this Article V.E. Each of the Debtors' D&O Liability Insurance Policies (including any "tail policy") shall remain in full force and effect for their entire term and shall not be cancelled, impaired, or otherwise modified (notwithstanding, for the avoidance of doubt, the dissolution of any Debtor, Wind-Down Debtor, or the Liquidating Trust, if any).

F.       *Indemnification Provisions.*

Other than as explicitly assumed in connection with the assumption of executory contracts and unexpired leases by the Reorganized Debtors under this Plan, the Reorganized Debtors shall not assume any indemnification obligations of the Debtors, including pursuant to the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, or employment contracts of the Debtors for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable.  The organizational documents of the Reorganized Debtors may be amended on and after the Effective Date to provide indemnification, exculpation, and other similar protections only to the Reorganized Debtors' officers and directors for acts on or after the Effective Date.

G.        *Employee and Retiree Benefits.*

Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue in accordance with their terms; *provided*, *however*, that the Wind-Down Debtors or Reorganized Debtors, as applicable, may modify or terminate such programs in accordance with the terms thereof as of the Effective Date.

H.        *Collective Bargaining Agreements*

Each of the collective bargaining agreements between any Debtor and a labor union (a) has terminated or will terminate pursuant to its terms or by agreement between the applicable Debtor(s) and labor union, (b) will be assumed as of the Effective Date to the extent listed on the Schedule of Assumed Executory Contract and Unexpired Leases in accordance with Article V hereof, or (c) shall be rejected pursuant to this Plan and the Confirmation Order upon a showing that the Debtors have complied with the requirements of section 1113 of the Bankruptcy Code with respect to any such collective bargaining agreement.

I.        *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan or a Sale Order, each assumed or assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

J.        *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or a Sale Order.

K.        *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.        *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan (including this Article VI), on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Distributions to Holders of Claims

which are not Allowed as of the Effective Date which are subsequently Allowed, as well as distributions of Distributable Assets or Liquidating Trust Assets to Holders of Allowed DIP Claims, shall be made at such times as provided for under this Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims which would, if Allowed, be entitled to distributions under this Plan, distributions on account of any such Disputed Claims, if any, shall be made pursuant to the provisions set forth in Article IX hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be released pursuant to Article X of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of Judicial Code until such time as its Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.    *Distributions Generally.*

Except as otherwise provided herein, distributions under the Plan shall be made by the applicable Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of DIP Claims shall be made to or at the direction of the applicable DIP Agent and distributions to Holders of Prepetition FILO Claims shall be made to or at the direction of the Prepetition ABL Agent, as applicable, each of which shall act as a Disbursing Agent for distributions to the respective Holders of DIP Claims and Holders of Prepetition FILO Claims, as applicable, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable.  The Prepetition ABL Agent shall arrange to deliver such distributions to or on behalf of such Holders of Prepetition FILO Claims.  Neither the DIP Agent nor the Prepetition ABL Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

In no event shall the Reorganized Debtors be required to make or fund any distributions provided for under this Plan, which shall be made (a) to the extent this Plan provides for the making of any distribution or payment on the Effective Date, by the Debtors or Wind-Down Debtors, or (b) to the extent this Plan provides for the making of any distribution after the Effective Date, by the Wind-Down Debtors in accordance with Article VIII.

1.    Powers of the Disbursing Agent.

Any Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by a Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including reasonable attorney fees and expenses) made by a Disbursing Agent shall be paid in Cash from the Wind-Down Reserve and in accordance with the Wind-Down Budget.

D.      *Post-Effective Distributions by the Wind-Down Debtors or Liquidating Trust.*

Distributions made by the Plan Administrator or Liquidating Trust (if any) after the Effective Date in accordance with the terms of this Plan shall be made solely by the Wind-Down Debtors or Liquidating Trust, as applicable, pursuant to <u>Article VIII</u> hereof.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      <u>Delivery of Distributions.</u>

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agent or the Prepetition ABL Agent as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided further* that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Interest Filed by such Holder, or, if no Proof of Claim or Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

2.      <u>Minimum Distributions.</u>

No Cash payment of less than $100.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.  Furthermore, whenever payment of a fractional amount under the Plan would otherwise be required, such fractional distribution shall be rounded down to the nearest penny.

3.      <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of twelve months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary) and constitute Distributable Assets and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

A distribution shall be deemed unclaimed if a Holder has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Wind-Down Debtors' requests, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

Any such unclaimed distributions returned to the Plan Administrator after the Effective Date shall be treated in accordance with <u>Article VII.B</u> hereof.

F.    *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

G.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

J.    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, the Wind-Down Debtors may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Debtor(s) and Holder of Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.

K.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties.</u>

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor or Wind-Down Debtor, such Holder shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization Filed in these Chapter 11 Cases and/or receiving distributions from the Debtors, Wind-Down Debtors, or Liquidating Trust on account of such Claims in these Chapter 11 Cases. The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims Filed with respect to an Executory Contract or Unexpired Lease that received payment in full on account of such Claim whether from a Debtor, Wind-Down Debtor, the Liquidating Trust, or any party that is not a Debtor or a Wind-Down Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Wind-Down Debtor, or

the Liquidating Trust on account of such Claim thereafter, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Wind-Down Debtor, or Liquidating Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor, Wind-Down Debtor, or Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove the applicable portion of such Claim.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Notwithstanding anything herein to the contrary (including, without limitation, Article X, but except as provided in Article IV.B), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII
# THE PLAN ADMINISTRATOR & LIQUIDATING TRUSTEE

*A.    The Plan Administrator & Liquidating Trustee.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distributable Assets and the amounts set forth in the Administrative / Priority Claims Reserve and the Wind-Down Reserve in accordance with the Plan and Wind-Down Budget, and wind-down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):  (a) liquidating, receiving, holding, investing, supervising, and protecting the Distributable Assets, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve in accordance with the Wind-Down Budget; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan of Distributable Assets and from the Administrative / Priority Claims Reserve and the Wind-Down Reserve; (c) making distributions of Distributable Assets and from the Administrative / Priority Claims Reserve and the Wind-Down Reserve as contemplated under the Plan in accordance with the Wind-Down Budget; (d) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees (including Statutory Fees related to any Chapter 11 Case), expenses, debts, charges, and liabilities of the Wind-Down Debtors in accordance with the Wind-Down Budget; (g) administering and paying taxes of the Wind-Down Debtors in a manner consistent with the Restructuring Steps Memorandum, including filing tax returns; (h) representing the interests of the Wind-Down Debtors before any taxing authority in all matters in a manner consistent with the Restructuring Steps Memorandum, including any action, suit, proceeding, or audit; (i) complying with the Debtors' continuing obligations under any Sale Order; (j) pursuing Retained Causes of Action, if any, at the Plan Administrator's discretion; and (k) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.  Any provision of this Plan which authorizes the Wind-Down Debtors to take any action, including, without limitation, the provisions set forth in Article IX hereof with respect to the Allowance, Disallowance,

estimation, objection, or other reconciliation of Claims shall be deemed to authorize the Plan Administrator to take such actions on behalf of the Wind-Down Debtors.

To the extent the Liquidating Trust is established pursuant to Article IV.D hereof, the Liquidating Trustee shall succeed the Plan Administrator with respect to such rights as they relate to liquidating and distributing such assets and be authorized to act in the same capacity.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Wind-Down Debtors, the DIP Agent, and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the DIP Agent.  Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the DIP Agent.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

The Liquidating Trustee, if any, may resign pursuant to the terms of the Liquidating Trust Agreement, and a permanent or interim successor Liquidating Trustee shall be appointed in accordance with the terms of this Plan and the Liquidating Trust Agreement.

    1.    Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code; *provided*, *however*, that, if the Liquidating Trust is established pursuant to Article IV.D, the trustee of the Liquidating Trust shall be the trustee of any Liquidating Trust Assets and the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to such Liquidating Trust Assets.

    2.    Retention of Professionals.

The Plan Administrator and Liquidating Trustee, if any, shall have the right to retain the services of attorneys, accountants, and other Professionals that, in the discretion of the Plan Administrator or Liquidating Trustee, as applicable, are necessary to assist the Plan Administrator or Liquidating Trustee in the performance of his or her duties.  The reasonable fees and expenses of such Professionals shall be paid by the Wind-Down Debtors exclusively from the Wind-Down Reserve and in accordance with the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's and/or Liquidating Trustee's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

    3.    Compensation of the Plan Administrator.

The Plan Administrator's and/or Liquidating Trustee's compensation shall be as described in the Plan Supplement and, with respect to the Liquidating Trustee, the Liquidating Trust Agreement, and paid from the Wind-Down Reserve and in accordance with the Wind-Down Budget.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator and/or the Liquidating Trustee on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator and/or the Liquidating Trustee in connection with such Plan Administrator's or Liquidating Trustee's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court.

    4.    Plan Administrator Expenses.

All costs, expenses and obligations incurred by the Plan Administrator or Liquidating Trustee in administering this Plan, the Wind-Down Debtors, or the Liquidating Trust, as applicable, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors or the Liquidating Trust

thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

None of Debtors, Wind-Down Debtors, Reorganized Debtors, Plan Administrator, or Liquidating Trustee, as applicable, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the any such party is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid from the Wind-Down Reserve and in accordance with the Wind-Down Budget.

B.      *Wind-Down.*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Wind-Down Debtors' and their Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (a) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan, Confirmation Order, any Sale Order, and any other documents contemplated thereby; (b) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable), and/or File any document required to be Filed with the Bankruptcy Court to effect the automatic dissolutions contemplated in Article IV.C hereof; and (c) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan, subject to the terms hereof (including Article X).  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except as set forth herein, the Wind-Down Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to this Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Wind-Down Debtors' dissolution, the Wind-Down Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, resolution of applications for, and payment of Professional Fee Claims in accordance with this Plan.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.      *Exculpation, Indemnification, Insurance & Liability Limitation.*

The Plan Administrator and/or Liquidating Trustee and all professionals retained by the Plan Administrator or Liquidating Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator and/or Liquidating Trustee may obtain, solely using funds from the Wind-Down Reserve and in accordance with the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator and/or Liquidating Trustee may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator and/or Liquidating Trustee, each in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.      *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Wind-Down Debtors in a manner consistent with the Restructuring Steps

Memorandum, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE VIII
## POST-EFFECTIVE DATE DISTRIBUTIONS BY THE PLAN ADMINISTRATOR AND LIQUIDATING TRUST

A.      *Establishment of Reserve Accounts.*

The Plan Administrator shall establish each of the Administrative / Priority Claims Reserve and the Wind-Down Reserve (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).  The Wind-Down Reserve shall be funded in the amount set forth in the Wind-Down Budget.

B.      *Undeliverable Distribution Reserve.*

1.      Deposits.

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated account (the "*Undeliverable Distribution Reserve*") for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B..2 of this Plan.

2.      Forfeiture.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within twelve months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets.  In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Wind-Down Debtors and constitute Distributable Assets, notwithstanding any federal or state escheat laws to the contrary.

3.      Disclaimer.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Holder of any Claim; *provided* that in its sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve.

Within 15 Business Days after the Holder of an Allowed Claim which previously received a distribution on account of such Claim which was undeliverable or unclaimed satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B of this Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

C.       *Wind-Down Reserve.*

On the Effective Date, the Wind-Down Debtors shall establish the Wind-Down Reserve by depositing Cash in the amount set forth in the Wind-Down Budget into the Wind-Down Reserve.  The Wind-Down Reserve shall be used by the Wind-Down Debtors solely to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator (or the Liquidating Trustee, as applicable) as set forth in the Plan and Wind-Down Budget, including all costs and expenses associated with the winding up of the Wind-Down Debtors (including the storage, transfer, and destruction of records and documents of the Wind-Down Debtors in accordance with the Data Retention Plan), the payment of Statutory Fees, any other costs which this Plan expressly designates shall be funded from the Wind-Down Reserve and, to the extent permitted pursuant to this Plan, Professional Fee Claims not paid in full from the Professional Fee Escrow Account.  Any amount remaining in the Wind-Down Reserve as of the Dissolution Date shall constitute Distributable Assets to be distributed in accordance with this Plan.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

The Wind-Down Reserve shall be administered, and distributions from the Wind-Down Reserve shall be made by, the Plan Administrator, and except in accordance with this Article VIII.C, amounts held in the Wind-Down Reserve shall not constitute Distributable Assets or be transferred to the Liquidating Trust.

The Plan Administrator may, with the consent of the Required DIP Co-Collateral Agents, replenish the Wind-Down Reserve from the Distributable Assets Account from time to time in such amounts as consented to by the DIP Agent.

D.       *Administrative / Priority Claims Reserve.*

On the Effective Date, the Wind-Down Debtors shall establish the Administrative / Priority Claims Reserve by depositing Cash in the amount of the Administrative / Priority Claims Reserve Amount into the Administrative / Priority Claims Reserve.  The Administrative / Priority Claims Reserve Amount shall be used solely to pay Holders of all Allowed Other Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Settled Priority Claims which are not paid in full on the Effective Date of the Plan in accordance with its terms and, to the extent permitted pursuant to this Plan, Professional Fee Claims not paid in full from the Professional Fee Escrow Account.

Upon the payment, settlement, or Disallowance of all Other Priority Claims, Administrative Claims, Priority Tax Claims, Other Secured Claims, or Settled Priority Claims timely asserted as of the Claims Bar Date, amounts remaining in the Administrative / Priority Claims Reserve shall revert to the Wind-Down Debtors and constitute Distributable Assets.

The Administrative / Priority Claims Reserve shall be administered, and distributions from the Administrative / Priority Claims Reserve shall be made by, the Plan Administrator, and except in accordance with this Article VIII.D, amounts held in the Administrative / Priority Claims Reserve shall not constitute Distributable Assets or be transferred to the Liquidating Trust.

E.       *Distributions of Distributable Assets.*

On the Effective Date or as soon as reasonably practicable thereafter, the Plan Administrator (or, to the extent the Plan Administrator has transferred Distributable Assets to the Liquidating Trust in accordance with Article IV.D hereof, the Liquidating Trustee) shall distribute, to the Holders of Allowed DIP Claims (which distribution shall be made by the Plan Administrator to the DIP Agent as Disbursing Agent pursuant to Article VI.C hereof), all Cash Distributable Assets (or Cash Liquidating Trust Assets, as applicable) existing on the Plan Effective Date, subject to the terms of Article VI hereof, including any withholdings required thereby.

Following the Effective Date through the Dissolution Date, the Plan Administrator (or Liquidating Trustee, as applicable) shall (a) promptly place any Cash Distributable Assets received into the Distributable Assets Account and (b) make distributions of Cash Distributable Assets (or Cash Liquidating Trust Assets, as applicable) to Holders of DIP Claims (which distributions shall be made by the Plan Administrator to the DIP Agent as Disbursing Agent

pursuant to Article VI.C hereof) on the dates which it determines, with the consent of the DIP Agent, such distributions are most efficiently made.

      *F.*     *Professional Fee Escrow Account.*

      The Plan Administrator shall be authorized to, and shall, take any and all actions necessary to cause the Professional Fee Escrow Account to be administered in accordance with Article II.C hereof.  Until such time as all Allowed Professional Fee Claims are irrevocably paid in full pursuant to Article II.C and the applicable orders of the Bankruptcy Court, amounts in the Professional Fee Escrow Account shall not constitute Distributable Assets or be the property of the Debtors or Wind-Down Debtors, or be transferred to the Liquidating Trust.

# ARTICLE IX
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

      *A.*     *Disputed Claims Process*

      The Debtors or the Wind-Down Debtors (as applicable) shall have the exclusive authority and responsibility to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (a) the Effective Date or (b) the Claims Bar Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, Reorganized Debtor, Wind-Down Debtor, or the Liquidating Trust, as applicable, without the need for any objection or further action by the Debtor, Reorganized Debtor, Wind-Down Debtor, or the Liquidating Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.

      *B.*     *Allowance of Claims.*

      After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

      Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or pursuant to a Final Order is considered Disallowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

      *C.*     *Estimation of Claims.*

      Before or after the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at $0.00, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or Wind-Down Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures

are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

        D.      *Adjustment to Claims or Interests Without Objection.*

        Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Debtors or the Wind-Down Debtors, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Debtors or the Wind-Down Debtors, as applicable, without the Debtors or Wind-Down Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

        E.      *Time to File Objections to Claims.*

        Any objections to Claims shall be Filed by the Debtors or the Wind-Down Debtors, as applicable, on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

        F.      *Disallowance of Claims or Interests.*

        Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Wind-Down Debtors, as applicable.

        **If a Proof of Claim or request for payment, as applicable, is not received by the Claims and Noticing Agent on or before the Claims Bar Date, if applicable to such Claim, the Holder of the underlying Claim shall be barred from asserting such Claim against the Debtors, the Wind-Down Debtors, the Reorganized Debtors, or the Liquidating Trust, and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any such claims not received by the Claims and Noticing Agent before the Claims Bar Date; *provided* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.**

        G.      *No Distributions Pending Allowance.*

        Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Disputed Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Interest; *provided* that if the Allowed amount of a Claim or Interest is Disputed, but not the existence or nature of such Claim, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

        H.      *Distributions After Allowance.*

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) at such times and in such amounts as provided for under this Plan.

I.        *Tax Treatment of Reserves for Disputed Claims.*

After the Effective Date, Cash may be distributed to Holders of Claims which are Disputed as of the Effective Date but ultimately determined to be Allowed after the Effective Date (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article II or Article III hereof.  Pending the resolution of such Claims, a portion of the Cash to be received by Holders of such Claims if such Claims become Allowed may be held back and deposited into the Administrative / Priority Claims Reserve, and to the extent that any property is deposited into such a reserve, the reserve is expected to be subject to "disputed ownership fund" treatment under section 1.468B-9 of the United States Treasury Regulations.

J.        *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided* that interest on any Disputed Priority Tax Claim that (i) becomes an Allowed Priority Tax Claim and (ii) is treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code shall accrue and be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

K.        *Amendments to Claims.*

Except as otherwise expressly provided for in the Plan or the Confirmation Order, on or after the Claims Bar Date, any Claim subject to the Claims Bar Date may not be Filed or amended (nor may a request for payment of an Administrative Claim be made) without the authorization of the Bankruptcy Court or the Debtors or the Wind-Down Debtors, as applicable.  Absent such authorization, any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

## ARTICLE X
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.        *Settlement, Compromise, and Release of Claims and Interests.*

The assets of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as of the Effective Date, of Claims, Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets and properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default

or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

B.      Release of Liens; Transfer Free and Clear.

**On the Effective Date, concurrently with the Consummation of the Restructuring Transactions and as set forth in the Restructuring Steps Memorandum, any assets transferred to McKesson or any Reorganized Debtor pursuant to the Restructuring Steps Memorandum shall vest in McKesson or the applicable Reorganized Debtor, as applicable, free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Restructuring Steps Memorandum, each as applicable. Without limiting the foregoing, except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III</u> hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of any such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.      Debtor Release.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Reorganized Debtors, and Wind-Down Debtors, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, the Wind-Down Debtors, or the Reorganized Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, the Reorganized Debtors, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the

purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the pursuit of the Restructuring Transaction, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any (a) Retained Causes of Action or (b) claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this <u>Article X .C</u> by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this <u>Article X.C</u> is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

D.     *Third-Party Release.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that nothing in this Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or

(b) Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is:  (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in this Article X.D may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this Article X.D, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to Article X.C, and (b) is colorable.  Solely to the extent legally permissible and as provided for in Article XIII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

E.    *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Debtors' estates during the course of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan pursuant to section 1125(e) of the Bankruptcy Code.

The exculpation provided for in this Article X.E will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect,

limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the Plan, the 1125(e) Covered Parties shall not incur liability for any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof.  No Entity or Person may commence or pursue a claim or Cause of Action against any of the 1125(e) Covered Parties that is subject to the terms of this paragraph, without the Bankruptcy Court (a) first determining, after notice and a hearing, that (i) such claim or Cause of Action represents a colorable claim or Cause of Action for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Covered Party which is not within the scope of the limitation of liability set forth in section 1125(e) of the Bankruptcy Code, and (ii) such party is not otherwise exculpated pursuant to this Article X.E; and (b) specifically authorizing such Entity or Person to bring such claim or Cause of Action against such 1125(e) Covered Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or Cause of Action.

    F.      Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Causes of Action, or Interests that have been released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E hereof, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, (b) determining that such Person or Entity is not barred from commencing or pursuing such Claim or Cause of Action pursuant to this Article X.F, and (c) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such party.  For the avoidance of doubt, any party that obtains such determination and authorization and then subsequently wishes to amend the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth

in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

As of the Effective Date, except as specifically provided in the Plan or Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Reorganized Debtors (or their Affiliates), or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors.  Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Debtors, subject to the final paragraph of Article X.D.

G.       Preservation of Setoff Rights.

Notwithstanding anything in Article X to the contrary, any right of setoff or recoupment is preserved against the Debtors, the Wind-Down Debtors, the Reorganized Debtors, and any of their affiliates and successors solely to the extent such right(s) exist under applicable law and subject to the Debtors' and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided*, *however*, that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (a) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (b) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process, or (c) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

H.       Protections Against Discriminatory Treatment.

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.       Document Retention.

On and after the Effective Date, the Debtors and the Wind-Down Debtors, as applicable, may maintain, transfer, and destroy documents in accordance with the Data Retention Plan and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors or the Wind-Down Debtors, as applicable.  The costs and expenses of such retention which are allocated to the Debtors pursuant to the Data Retention Plan shall be paid exclusively from the Wind-Down Reserve in accordance with Article VIII.C hereof.  The Reorganized Debtors shall have the right, but not the obligation, to maintain, transfer, and destroy documents of the Debtors or the Wind-Down Debtors in the possession of the Reorganized Debtors on or after the Effective Date, subject to the terms of the Data Retention Plan.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

L.      *Subordination Rights.*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510 of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied (or will be satisfied contemporaneously with the occurrence of the Effective Date) or waived pursuant to the provisions of <u>Article XI.B</u> hereof:

1.      the DIP Facilities and the Financing Orders each remain in full force and effect;

2.      the final version of each of the Definitive Documents to become effective on or prior to the Effective Date is in form and substance consistent in all respects with the consent rights set forth in the Restructuring Support Agreement;

3.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Steps Memorandum in all material respects;

4.      the McKesson Inventory Sales shall have closed;

5.      the Debtors shall have removed all inventory not purchased by McKesson from the Central Fill Facility, and the Central Fill Facility shall be in "broom clean" condition;

6.      the McKesson Motion to Compel shall have been withdrawn with prejudice;

7.      the McKesson Complaint shall have been dismissed with prejudice;

8.      the Confirmation Order shall have been entered and not stayed, reversed, amended, supplemented, or otherwise modified except in a manner consistent with the consent rights set forth in the Restructuring Support Agreement;

9.      all documents necessary to consummate this Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith and in accordance with any applicable consent rights set forth in this Plan;

10.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, and documents that are necessary to implement and effectuate the Plan;

11.      the Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded in accordance with the Wind-Down Budget;

12.      the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount, and, solely to the extent set forth in the Approved Budget, Professional Fee Claims for the Indenture Trustee Fees shall have been paid in Cash in accordance with Article II.C of the Plan;

13.      all accrued and unpaid reasonable and documented fees and expenses required to be paid pursuant to Article II.B of this Plan and any Financing Order shall have been paid, to the extent invoiced three (3) Business Days prior to the Effective Date;

14.      the Liquidating Trust Agreement shall have been executed;

15.      the Transition Services Agreement, if any, shall have been executed;

16.      any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained, as and to the extent necessary for the Debtors' emergence from chapter 11; and

17.      the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan and the Plan Supplement.

B.      *Waiver of Conditions.*

Subject to and without limiting the rights of each party under the Final Financing Order, the conditions to Consummation set forth in Article XI.A may be waived by the Debtors, and with the consent of (a) the Required DIP Co-Collateral Agents and (b) McKesson; *provided that*, the condition in Article XI.A.12 may not be waived without the consent of the affected Professionals.

C.      *Effect of Failure of Conditions.*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

D.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in each case subject to the consent rights set forth in the Restructuring Support Agreement.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, subject to the consent rights set forth in the Restructuring Support Agreement, to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan and the conditional approval of the Disclosure Statement, including the approval of the procedures by which acceptances and rejections of the Plan were solicited, shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests, or the fixing or limiting of the recovery to which the Holders of such Claims were entitled under the Plan), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Causes of Action, or Interests; (ii) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity.

# ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, except as otherwise set forth in this Plan, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      subject to <u>Article IXA</u> of this Plan, allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Reorganized Debtors or the Wind-Down Debtors, as applicable, amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.        grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.        ensure that distributions to Holders of Allowed Claims entitled to distributions hereunder are accomplished pursuant to the provisions of the Plan;

6.        adjudicate, decide, or resolve any motions, adversary proceedings, contested, litigated matters, or any other matters pending in the Bankruptcy Court as of the Effective Date, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.        enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article X hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

14.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.        enter an order concluding or closing the Chapter 11 Cases;

17.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, including any Plan Supplement documents Filed after the Confirmation Date, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article X hereof;

23.     enforce all orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

24.     hear any other matter related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, subject to the terms of this Plan, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Following the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Wind-Down Debtors shall pay any and all Statutory Fees when due and payable, and such fees shall be paid solely by the Wind-Down Debtors from the Wind-Down Reserve (and, to the extent amounts in the Wind-Down Reserve are insufficient to pay any such Statutory Fees, the Distributable Assets).  The Wind-Down Debtors shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee with respect to each Chapter 11 Case until such Chapter 11 Case has been closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code, and the U.S. Trustee shall not be required to file any request for payment of an Administrative Claim or be treated as a Releasing Party pursuant to the Plan.

D.      *Dissolution of the Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee shall dissolve automatically and the members thereof and each Professional retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Committee will remain in place after the Effective Date solely for the purpose of addressing (a) all final fee applications for all Professionals for the Committee and any matters concerning Professional Fee Claims held or asserted by any Professional retained by the Committee, and (b) the resolution of any appeals of the Confirmation Order or other appeals to which the Committee is a party.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur, except as expressly set forth therein.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All pleadings, notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors, to:

Rite Aid Corporation
200 Newberry Commons
Etters, Pennsylvania 17319
Attn:  Steven K. Bixler; Marc Liebman
Email address:  sbixler@riteaid.com; Marc.Liebman@alvarezandmarsal.com

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:  Andrew N. Rosenberg; Alice B. Eaton; Christopher J. Hopkins; Sean A. Mitchell
Email Addresses:  aeaton@paulweiss.com; smitchell@paulweiss.com

2.  if to the DIP Agents or DIP Lenders:

    Choate, Hall, & Stewart LLP
    Two International Place
    Boston, Massachusetts 02110
    Attn:  John F. Ventola; Mark D. Silva; J.P. Jaillet; Jonathan D. Marshall
    Email Addresses:  jventola@choate.com; msilva@choate.com;
    jjaillet@choate.com; jmarshall@choate.com

3.  if to McKesson, to:

    Sidley Austin LLP
    One South Dearborn Street
    Chicago, Illinois 60603
    Attn:  Dennis M. Twomey; Jackson T. Garvey; Ian C. Ferrell
    Email Addresses:  dtwomey@sidley.com; jgarvey@sidley.com;
    iferrell@sidley.com

4.  if to the Committee, to:

    Willkie Farr & Gallagher LLP
    787 Seventh Avenue
    New York, New York 10019-6099
    Attn:  Brett H. Miller; Todd M. Goren; James H. Burbage; Jessica D. Graber
    Email Addresses:  bmiller@willkie,com; tgoren@willkie.com;
    jburbage@willkie.com; jgraber@willkie.com

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

    H.  *Entire Agreement.*

Except as otherwise indicated herein, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

    I.  *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits

and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025 or the Bankruptcy Court's website at www.njb.uscourts.gov.

    J.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent and subject to the consent rights set forth in the Restructuring Support Agreement; and (c) nonseverable and mutually dependent.

    K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the 1125(e) Covered Parties will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

    L.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors or the Wind-Down Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases. Furthermore, the Claims and Noticing Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

    M.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of page intentionally left blank]*

Dated:  September 19, 2025

NEW RITE AID, LLC
on behalf of itself and all other Debtors


*/s/ Marc Liebman*

Marc Liebman
Chief Transformation Officer
New Rite Aid, LLC

## **Exhibit B**

**Restructuring Support Agreement**

*Execution (Amended)*

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE SUBJECT TO THE TERMS HEREOF.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with <u>Section 14.02</u> hereof, in each case, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into as of August 31, 2025 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, together with any Additional Consenting Creditors, collectively, the "**Parties**"):[1]

    i.    New Rite Aid, LLC, a Delaware limited liability company, on behalf of itself and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to each other Party (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    Bank of America, N.A. ("**Bank of America**"), Wells Fargo Bank, N.A. ("**Wells Fargo**"), and Capital One, N.A. ("**CONA**"), each in their capacities as DIP Lenders and/or Prepetition FILO Lenders, in each case as applicable, that have executed and

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in <u>Section 1</u>.

delivered counterpart signature pages to this Agreement to each other Party (collectively, the "**Consenting Banks**"); and

iii.    McKesson Corporation, a Delaware corporation (the "**Plan Sponsor**" and, together with the Consenting FILO Lenders, Consenting Banks, and Consenting DIP Lenders, the "**Consenting Creditors**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Creditors have in good faith and at arm's length negotiated certain restructuring transactions on the terms set forth in this Agreement and as specified in the term sheet attached hereto as **Exhibit B** (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, on May 5, 2025 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"), jointly administered under the case styled *In re New Rite Aid LLC*, *et al.*, Case No. 25-14861 (MBK); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Administrative Claims Procedures Order**" means the *Order (I) Authorizing the Administrative Claims Procedures and (II) Granting Related Relief* [Docket No. 1883].

"**Additional Consenting Creditor**" means any DIP Lender or Prepetition FILO Lender that becomes a Party to this Agreement by executing and delivering a Transfer Agreement or Joinder Agreement, as applicable, in accordance with <u>Section 9</u>.

"**Agents**" means, collectively, the DIP Agent, DIP Co-Collateral Agents, and Prepetition ABL Agent, including, in each case, any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which each of the conditions set forth in Section 2.01 have been satisfied.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any written or oral inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, tender offer, recapitalization, plan of reorganization, share exchange, business combination, liquidation, asset sale, share issuance, joint venture, partnership, debt incurrence (including, without limitation any debtor-in-possession financing, use of Cash Collateral, or exit financing), or similar transaction or series of transactions involving any one or more Company Parties or a material portion of their assets, in each case, in whole or in part, or the debt, equity, or other interests in any one or more Company Parties other than in accordance with or in furtherance of one or more of the Restructuring Transactions and as contemplated in the Restructuring Term Sheet.

"**Approved Budget**" has the meaning ascribed to such term in the Financing Order.

"**Bank of America**" has the meaning set forth in the preamble to this Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

"**Business Day**" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means, without limitation, any action, Claim, Equity Interest, damage, remedy, judgment, cause of action, controversy, demand, right, action, suit, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, contribution, reimbursement, suit, class action, third-party claim, obligation, liability, debt, account, defense, offset, power, privilege, license, lien, indemnity, guaranty or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured,

disputed or undisputed, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Equity Interests; (d) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Combined Hearing**" means the hearing before the Bankruptcy Court on confirmation of the Plan and final approval of the Disclosure Statement.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including, but not limited to, the DIP Facility Claims, the Prepetition FILO Claims, and the Plan Sponsor 503(b)(9) Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Party Termination Events**" has the meaning set forth in Section 12.03 of this Agreement.

"**Complaint**" means that certain *Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination* filed in *Rite Aid Corp.* v. *McKesson Corp.* (In re New Rite Aid, LLC), Adv. Proc. No. 25-01316-MBK (Bankr. D.N.J. Jul. 31, 2025) [Docket No. 1] (together with any amendments thereto).

"**CONA**" has the meaning set forth in the preamble to this Agreement.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

"**Consent Parties**" means, collectively, the Plan Sponsor and the Consenting Banks.

"**Consenting Banks**" has the meaning set forth in the preamble to this Agreement; *provided* that any consent required to be given by, or notice required to be given to, the Consenting Banks, may be given by or to, as applicable, such parties in their capacities as Consenting Agents following satisfaction of the Condition Subsequent.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting DIP Lenders**" means the DIP Lenders that have consented to the Restructuring Transactions and become party to this Agreement.

"**Consenting FILO Lenders**" means the Prepetition FILO Lenders that have consented to the Restructuring Transactions and become party to this Agreement.

"**Debtors**" means the Company Parties that commenced the Chapter 11 Cases.

"**Definitive Documents**" has the meaning set forth in <u>Section 3</u> of this Agreement, including all exhibits, annexes, schedules, amendments, and supplements relating to such documents.

"**DIP Agent**" means Bank of America, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Co-Collateral Agents**" has the meaning ascribed to such term in the Financing Order.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement by and between the certain Company Parties and the DIP Secured Parties setting forth the terms and conditions of the DIP Facilities.

"**DIP Documents**" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP Facilities, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Facilities**" has the meaning ascribed to such term in the Financing Order.

"**DIP Facility Claims**" means any Claim against a Debtor arising under, derived from, based on, or related to the DIP Documents.

"**DIP Lenders**" means the lenders providing the DIP Facilities.

"**DIP Secured Parties**" means the DIP Agent, DIP Lenders, and other agents and arrangers party to the DIP Credit Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits and schedules thereto and references therein, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disclosure Statement Motion**" means the motion of the Debtors seeking entry of the Disclosure Statement Order.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court (a) approving the Solicitation Materials, (b) conditionally approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, (c) scheduling the Combined Hearing, and (d) scheduling the Structured Dismissal Hearing and authorizing the Debtors to file, pursuant to the

deadlines set forth therein, a proposed Structured Dismissal Order to be considered at the Structured Dismissal Hearing in the event of a Non-Plan Toggle.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Fiduciary Out Notice**" has the meaning set forth in Section 8.01 of this Agreement.

"**Financing Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 1396], as may be further amended and approved by the Bankruptcy Court in accordance with this Agreement, including the consent rights set forth in Section 3.02.

"**Inventory Purchase Agreements**" means any purchase or sale agreement documenting the Inventory Transactions.

"**Inventory Sale Hearing**" means the hearing at which the Debtors will seek entry of the Inventory Sale Order, if required.

"**Inventory Sale Order**" means the Bankruptcy Court order(s) approving the Debtors' entry into and performance under the Inventory Purchase Agreements pursuant to section 363 of the Bankruptcy Code, to be noticed, filed, and approved pursuant to paragraph 52 of the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interest, (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 1178].

"**Inventory Transaction Documents**" means all agreements, instruments, pleadings, orders, or other related documents utilized to consummate the Inventory Transactions, which shall be consistent in all respects with the economic terms set forth in the Restructuring Term Sheet, including, without limitation, the Inventory Purchase Agreements, Inventory Sale Order, and any related notices or pleadings required to be filed with respect to the notice and hearing thereof.

"**Inventory Transactions**" has the meaning set forth in the Restructuring Term Sheet.

"**Joinder**" means the form of joinder attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Litigation Schedule**" means an agreed schedule for the resumption of proceedings related to the Motion to Compel and the Complaint in the event of the termination of this Agreement or a Non-Plan Toggle.

"**Litigation Stay**" means the abeyance of proceedings related to the Motion to Compel and the Complaint, including all related or underlying claims.

"**Litigation Stay Documents**" means any agreements, stipulations, orders, or related documents providing for the Litigation Stay.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**Motion to Compel**" means the *Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief* [Docket No. 655].

"**New Governance Documents**" means the organizational and governance documents for the Reorganized Debtors and any subsidiaries thereof, including, as applicable, the certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, or certificates of conversion, limited liability company agreements, operating agreements, limited partnership agreements, stockholder or shareholder agreements, bylaws, indemnification agreements, and any registration rights agreements (or equivalent governing documents of any of the foregoing).

"**Non-Plan Toggle**" has the meaning set forth in the Restructuring Term Sheet.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" has the meaning set forth in Section 9.01.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan**" means any joint plan that may be filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, and is consistent with and attaches this Agreement, as may be amended supplemented, or otherwise modified from time to time pursuant to this Agreement, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Schedule of Retained Causes of Action**" means the schedule to be included in the Plan Supplement listing Causes of Action to be retained by the Debtors pursuant to the Plan in the

event of a Plan Transaction, and indicating whether each such Cause of Action is to be retained by the Reorganized Debtors or the Wind-Down Debtors.

"**Plan Sponsor**" has the meaning set forth in the Preamble to this Agreement.

"**Plan Sponsor 503(b)(9) Claims**" means any allowed claims of the Plan Sponsor as of the Execution Date arising under 11 U.S.C. § 503(b)(9).

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that may be filed by the Debtors with the Bankruptcy Court, which plan supplement, including all documents, forms of documents, schedules and exhibits included therein, including the New Governance Documents and the Restructuring Steps Memorandum.

"**Plan Transaction**" means the consummation of the Restructuring Transactions pursuant to the Plan, in the event that a Non-Plan Toggle does not occur.

"**Prepetition ABL Agent**" means Bank of America, N.A. in its capacity as administrative and collateral agent under the Prepetition ABL Credit Agreement.

"**Prepetition ABL Credit Agreement**" has the meaning ascribed to such term in the Financing Order.

"**Prepetition FILO Claims**" means Claims arising under the Prepetition FILO Facility (as defined in the Financing Order) pursuant to the Prepetition ABL Credit Agreement,

"**Prepetition FILO Lenders**" means the holders of any Prepetition FILO Claims.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests or enter with customers into long and short positions in Company Claims/Interests, in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities, other debt, or interests).

"**Remedial Action**" means any action to enforce, request the enforcement of (including any request upon a trustee or agent), or direct the enforcement of any of the rights and remedies available under any credit agreement, indenture, note, loan agreement, guaranty, security agreement, deed of trust, or other collateral agreement, or any agreements or instruments entered into in connection with any of the foregoing or any amendments or supplements to any of the foregoing (each, a "**Debt Document**"), including, without limitation, any action to accelerate or collect any amounts with respect to the obligations under a Debt Document, the sending of any written notice to the Company Party that a default or event of default has occurred under a Debt Document and is continuing, the sending of any written request to any trustee or agent under a Debt Document to initiate an action, suit, or proceeding such Debt Document, or any action to exercise any rights or remedies under such Debt Document, which is actually known to the Company Parties.

"**Reorganized Debtors**" means the Company Parties which are reorganized under the Plan in accordance with the Restructuring Steps Memorandum.

"**Required Consenting FILO Lenders**" means Consenting FILO Lenders holding more than 50% by principal amount of the Prepetition FILO Claims.

"**Required DIP Lenders**" means the Consenting DIP Lenders constituting the Required Lenders.

"**Required Lenders**" has the meaning ascribed to such term in the DIP Credit Agreement.

"**Restructuring Steps Memorandum**" means the memorandum setting forth the corporate reorganizational and other steps to be taken to effect the Restructuring Transactions.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Schedules of Retained Causes of Action**" means the Plan Schedule of Retained Causes of Action and the Structured Dismissal Schedule of Retained Causes of Action.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, without limitation, the Disclosure Statement, forms of ballots with respect to votes on the Plan, forms with respect to the releases contained in the Plan, as applicable.

"**Structured Dismissal**" means the dismissal of the Debtors' Chapter 11 Cases in the event of a Non-Plan Toggle in accordance with the terms set forth in the Restructuring Term Sheet.

"**Structured Dismissal Effective Date**" means the date on which the Structured Dismissal occurs in accordance with the terms of the Structured Dismissal Order; *provided*, *however*, that if the Structured Dismissal Order provides for the serial or iterative dismissal of the Debtors' Chapter 11 Cases, the Structured Dismissal Effective Date shall be the date on which the (i) first such dismissal has occurred and (ii) distributions are authorized to be made per the terms of the Structured Dismissal Order.

"**Structured Dismissal Hearing**" means the hearing at which the Bankruptcy Court considers the Structured Dismissal Order in the event that a Non-Plan Toggle occurs.

"**Structured Dismissal Order**" means the order of the Bankruptcy Court authorizing the Structured Dismissal.

"**Structured Dismissal Schedule of Retained Causes of Action**" means the schedule to be attached to the Structured Dismissal Order listing Causes of Action to be retained by the Debtors in the event of a Structured Dismissal.

"**Termination Date**" means, with respect to a Party, the date on which termination of this Agreement as to such Party is effective in accordance with Sections 12.01, 12.02, 12.04, 12.04, 12.05, or 12.06 as applicable.

"**Termination Events**" has the meaning set forth in Section 12.03 of this Agreement.

"**Toggle Notice**" means the notice to be filed by the Debtors with the Bankruptcy Court indicating whether a Plan Transaction or Non-Plan Toggle will be pursued, which may be the Participation Notice (as defined in the Administrative Claims Procedures Order).

"**Toggle Notice Deadline**" means the date on which the Milestone for filing the Toggle Notice falls, as may be extended in accordance with this Agreement.

"**Transaction Effective Date**" means the Plan Effective Date or, in the event of a Non-Plan Toggle, the Structured Dismissal Effective Date.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Wells Fargo**" has the meaning described in the preamble to this Agreement.

"**Wind-Down Debtors**" means, in the event of a Plan Transaction, any Debtor which is not a Reorganized Debtor.

1.02.   Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of

such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)      unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto in accordance with Section 14.02, rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; and

(j)      the use of "include" or "including" is without limitation, whether stated or not.

2.01.    This Agreement shall become effective and binding upon each of the Parties (i) in the case of the initial Parties listed in subparagraphs (a) through (c) of this Section 2.01, at 12:01 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions stated in this Section 2.01 have been satisfied or waived in accordance with this Agreement and (ii) in the case of any Additional Consenting Creditor, on the date such party becomes an Additional Consenting Creditor, as applicable:each of the Company Parties shall have executed and delivered counterpart signature pages to this Agreement to counsel to each of the Parties;

(b)      the Plan Sponsor shall have executed and delivered a counterpart signature page to this Agreement to counsel to each of the Parties; and

(c)      Each Consenting Bank, in its capacity as a Prepetition FILO Lender and/or DIP Lender with respect to its Company Claims, as applicable, shall have executed and delivered counterpart signature pages to this Agreement to counsel to each of the Parties.

2.02.    Following the Execution Date, (a) the Required DIP Lenders, (b) Prepetition FILO Lenders holding (i) more than 50% in number, (ii) two-thirds in amount of the Prepetition FILO

11

Claims shall deliver executed Joinders, and (c) (i) Bank of America, in its capacity as DIP Agent, and (ii) Wells Fargo and CONA, each in its capacity as DIP Co-Collateral Agent (Bank of America, Wells Fargo, and CONA in such capacities, the "Consenting Agents"), shall deliver executed Joinders in such capacities, in each case, by no later than Wednesday, September 24, 2025 (the "Condition Subsequent").  Following the Execution Date, each Consenting Bank shall each use commercially reasonable efforts to cause the Condition Subsequent to occur.

**Section 3.** *Definitive Documents.* The Definitive Documents governing the Restructuring Transactions (collectively, the "**Definitive Documents**"), which shall, in each case, be in form and substance consistent with this Agreement, including Section 3.02, shall include the following:

(a)     the Restructuring Term Sheet;

(b)     the Plan (including, for the avoidance of doubt, all exhibits, annexes, schedules, and supplements related thereto, including the Plan Supplement);

(c)     any amendment to the Financing Order;

(d)     the Confirmation Order and any motion or other pleadings related to the Plan or confirmation of the Plan;

(e)     the Disclosure Statement, the Disclosure Statement Motion, the Disclosure Statement Order, and the Solicitation Materials, including any motion seeking approval of the Solicitation Materials;

(f)     the Inventory Transaction Documents;

(g)     the Litigation Schedule, and any related stipulation Filed with respect thereto;

(h)     the Litigation Stay Documents;

(i)     the New Governance Documents;

(j)     the Structured Dismissal Order including any motion approving the Structured Dismissal Order; and

(k)     all other material documents, motions, pleadings, briefs, applications, orders, agreements, supplements, and other filings, including any summaries or term sheets in respect thereof, that are directly related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring Transactions.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation, completion, and ongoing due diligence.  Upon completion, the Definitive Documents, and every other material document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall be reasonably acceptable in form and substance to the Company Parties and the Consent Parties, and contain terms, conditions, representations, warranties, and covenants

consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13; *provided*, *however*, that notwithstanding the foregoing: (a) the Toggle Notice need only be in form and substance acceptable to the Company Parties and the Consenting Banks, subject to Section 12.02, and otherwise consistent with this Agreement; (b) the New Governance Documents need only be in form and substance acceptable to the Plan Sponsor, in consultation with the Company Parties, and otherwise consistent with this Agreement; (c) the Parties agree that the Structured Dismissal Order shall provide that (i) it is a condition precedent to the dismissal of the Chapter 11 Cases of both Debtor Rite Aid Corporation (No. 25-14731) and Debtor Rite Aid Hdqtrs. Corp. (No. 25-14589) that the Motion to Compel and the Complaint have been resolved by final order of this Court or as mutually agreed by the Plan Sponsor, the DIP Agent and such Debtors, and that all payment and other obligations owed to the Plan Sponsor under such final order or agreement, if any, have been fully satisfied, (ii) the Financing Order remains in full force and effect and any dismissal of the Chapter 11 Cases of either Debtor listed in the following clause (c)(iii) of this Section 3.02 shall constitute an Accelerated Funding Trigger Event triggering the Accelerated Funding Deadline to the extent the Non-Accelerated Funding Deadline has not previously occurred, and (iii) the McKesson Reserve Account (as defined in the Financing Order) shall be owned by either Debtor Rite Aid Corporation (No. 25-14731) or Debtor Rite Aid Hdqtrs. Corp. (No. 25-14589); (d) the Schedules of Retained Causes of Action shall be acceptable to the Company Parties and the Consenting Banks; *provided* that the Plan Schedule of Retained Causes of Action shall be acceptable to the Plan Sponsor solely with respect to the treatment of (i) Causes of Action arising out of or related to the operations of the Reorganized Debtors or tax attributes of the Reorganized Debtors and (ii) Causes of Action against the Plan Sponsor; (e) the Plan and Structured Dismissal Order shall include customary exculpation provisions; and (f) any amendments to the Financing Order shall be acceptable solely to the Debtors and Consenting Banks; *provided* that any amendments to the Financing Order which would reasonably be expected to materially and adversely impact the Plan Sponsor and/or any amendments to paragraph 44 of the Financing Order (including any defined terms used therein) shall also be acceptable to the Plan Sponsor.

**Section 4.** *Milestones.* The following milestones shall apply to the Restructuring Transactions unless extended or waived in writing by the Company Parties and the Consent Parties:

(a)   By no later than Wednesday, September 3, 2025, the Plan, Disclosure Statement, and Disclosure Statement Motion shall have been filed with the Bankruptcy Court;

(b)   By no later than Friday, September 5, 2025, the Debtors shall have delivered a proposed Structured Dismissal Order to the Consenting Banks and the Plan Sponsor.

(c)   By no later than Friday, September 19, 2025, the Debtors shall have filed the Inventory Transaction Documents required to be filed in accordance with the applicable Bankruptcy Court order(s) to seek approval of the Inventory Transactions;

(d)   By no later than Monday, September 22, 2025,  the Bankruptcy Court shall have entered the Disclosure Statement Order;

(e)   By no later than Tuesday, September 30, 2025, (i) the Debtors shall have filed (1) a proposed Structured Dismissal Order in accordance with the terms of the Disclosure Statement

Order and (2) a stipulation with respect to the Litigation Schedule, and (ii) the Parties shall have agreed to the contents of the Schedules of Retained Causes of Action.

(f)      The Bankruptcy Court shall have entered the Inventory Sale Order by (i) if no objections are timely filed with respect to the Inventory Transactions, no later than Friday, September 26, 2025, or (ii) if any objections are timely filed and not resolved prior to the Inventory Sale Hearing, no later than Wednesday, October 1, 2025;

(g)      By no later than Friday, September 26, 2025, the Debtors shall have filed the Toggle Notice indicating whether a Non-Plan Toggle has occurred;

(h)      In the event that a Non-Plan Toggle has occurred, by no later than (i) Monday, October 20, 2025, the Structured Dismissal Hearing shall have occurred, and (ii) Wednesday, October 22, 2025, the Bankruptcy Court shall have entered the Structured Dismissal Order; and

(i)      In the event that a Non-Plan Toggle has not occurred, by no later than (i) Monday, October 20, 2025, the Combined Hearing shall have occurred, (ii) Wednesday, October 22, 2025, the Bankruptcy Court shall have entered the Confirmation Order, and (iii) Tuesday, November 17, 2025, the Plan Effective Date shall have occurred.

4.02.    A Milestone may only be extended by agreement (email being sufficient) of the Company Parties, Plan Sponsor, and Consenting Banks; *provided*, *however*, that, after satisfaction of the Condition Subsequent, any Milestone extension that provides for an extension of more than ten (10) Business Days in the aggregate for any particular Milestone shall also require the consent of the Required DIP Lenders and Required Consenting FILO Lenders, which consent may be provided to and communicated to the Parties by the Consenting Agents, as applicable.

**Section 5.**      ***Commitments of the Consenting Creditors.***

5.01.    <u>General Commitments, Forbearances, and Waivers.</u>

(a)      During the Agreement Effective Period, each Consenting Creditor agrees, in respect of all of its Company Claims/Interests presently owned and hereafter acquired (for so long as it remains the beneficial or record owner thereof, or the nominee, investment manager, or advisor for beneficial holders thereof), to:

(i)      use commercially reasonable efforts to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)      negotiate in good faith and use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)      use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in <u>Section 5.01(b)</u>; *provided* that the foregoing shall not require

14

any Consenting Creditor to file any pleadings with respect thereto if, in consultation with the Debtors, it determines a pleading is not reasonably necessary to comply with this provision;

(iv)    give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(v)    negotiate in good faith and execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party (including the negotiation of and entry into the Inventory Transaction Documents); and

(vi)    to consent to, and not oppose in any manner, the Litigation Stay, including through execution, consent to, or stipulation with respect to any Litigation Stay Document which is consistent with this Agreement, until the earlier of (i) in the event of a Non-Plan Toggle, such time as provided in the Litigation Schedule, (ii) the termination of this Agreement with respect to the Plan Sponsor in accordance with its terms, or (iii) the release of the Claims and Causes of Action subject to the Litigation Stay pursuant to any Definitive Document.

(b)    During the Agreement Effective Period, each Consenting Creditor agrees, in respect of all of its Company Claims/Interests presently owned and hereafter acquired (for so long as it remains the beneficial or record owner thereof, or the nominee, investment manager, or advisor for beneficial holders thereof), that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Plan or the Restructuring Transactions;

(ii)    propose, file, support, or vote (or allow any proxy appointed by it to vote) for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Restructuring Transactions, or any Definitive Document;

(iv)    initiate, have initiated on its behalf, or directly or indirectly direct any other person or Entity to initiate or file any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against any other Party other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests in a manner that is materially inconsistent with this Agreement;

(vi)    seek to modify the Definitive Documents, in whole or in part, in a manner inconsistent with this Agreement and the Restructuring Term Sheet, over the objection of any of the other Consenting Creditors or the Company Parties;

15

(vii)    announce publicly its intention not to support the Restructuring Transactions;

(viii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(ix)    encourage or facilitate any person or Entity to do any of the actions described in the foregoing Section 5.01(b).

5.02.    Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, each Consenting Creditor agrees that it shall:

(i)    to the extent it is entitled to do so pursuant to the terms of the Plan, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials;

(ii)    to the extent it is not entitled to vote on the Plan, consent to the recovery proposed to be distributed to it thereunder on account of its Company Claims/Interests;

(iii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iv)    to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to opt in to the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(v)    support the mutual release, exculpation, and injunction provisions to be agreed upon by the Debtors and Consenting Creditors (subject to Section 3.02(iii)) and provided in the Plan or the Structured Dismissal Order; and

(vi)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote, election, or consent referred to in clauses (i) through (vi) above.

(b)    During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent in all respects with this Agreement and the Restructuring Transactions.

16

**Section 6.**      ***Additional Provisions Regarding the Consenting Creditors' Commitments.***
<u>Generally</u>.   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)      be construed to prohibit any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering, or impeding, directly or indirectly, the Restructuring Transactions;

(b)      affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(c)      impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)      prevent any Consenting Creditor from negotiating the Definitive Documents in good faith;

(e)      prevent any Consenting Creditor from enforcing this Agreement or any Definitive Document, including any right, remedy, condition, consent, or approval requirement, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, as permitted by the Restructuring Term Sheet;

(f)      be construed to prohibit any Consenting Creditor, either itself or through any representatives or agents, from soliciting, initiating, negotiating, facilitating, proposing, continuing, or responding to any proposal to purchase or sell Company Claims/Interests, so long as such Consenting Creditor complies with <u>Section 9</u> of this Agreement;

(g)      prohibit any Consenting Creditor from withdrawing its vote to support, or other consent with respect to, the Plan after a Termination Event has occurred as to such Consenting Creditor;

(h)      require any Consenting Creditor to incur any material financial or other material liability other than as expressly described in this Agreement;

(i)      require any Consenting Creditor to take any action which is prohibited by applicable Law or prevent any Consenting Creditor from taking any action which is required by applicable Law;

(j)      prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity or existence of its Claims against the Company Parties (including the filing of proofs of claim); or

(k)      prohibit any Consenting Creditor from taking any other action that is not materially inconsistent with this Agreement, the Restructuring Transactions, or any Definitive Document.

**Section 7.**     *Commitments of the Company Parties.*  Affirmative Commitments.  Except as expressly permitted in Section 8, during the Agreement Effective Period, each of the Company Parties agrees to, and agrees to cause each of its direct and indirect subsidiaries to, subject in each case to availability under the Approved Budget applicable at the time of such action:

(a)     support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with this Agreement and the Milestones and take all commercially reasonable and appropriate actions in furtherance of the Plan and the Restructuring Transactions as contemplated by this Agreement;

(b)     to the extent any legal, financial, or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment, and negotiate in good faith any appropriate additional or alternative provisions or agreements with the Consenting Creditors to address any such impediment, or that are necessary to effectuate the consummation of the Restructuring Transactions or that would improve the tax efficiency of the Restructuring Transactions;

(c)     use commercially reasonable efforts to obtain, and reasonably consult with counsel to the Consenting Creditors regarding, any and all required governmental, regulatory, and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith with the Consenting Creditors and use commercially reasonable efforts to prepare, execute, and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions in accordance with this Agreement and the Milestones;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)     timely file a formal objection to any motion filed with the Bankruptcy Court seeking the entry of an order for relief that: (i) is inconsistent with this Agreement or any Definitive Document; or (ii) would, or would be reasonably expected to, frustrate the purposes of this Agreement or any Definitive Document, including by preventing the consummation of the Restructuring Transactions;

(g)     oppose and object to any motion, application, adversary proceeding, or cause of action filed with the Bankruptcy Court by any party (excluding, for the avoidance of doubt, any such pleading filed by a Party in furtherance of the Restructuring Transactions) seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; or (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(h)     oppose any objections filed with the Bankruptcy Court to the Plan, any other Definitive Document, or the Restructuring Transactions;

18

(i)      inform counsel to each Consenting Creditor in writing (email being sufficient) as soon as reasonably practicable, and in any event within two (2) Business Days, after becoming aware of: (i) a breach of this Agreement (including a breach by any Debtor); (ii) the occurrence, or failure to occur, of any event or circumstance of which the Company Parties have actual knowledge and which would be likely to cause any condition precedent contained in this Agreement or the Restructuring Term Sheet not to occur or become impossible to satisfy (or impossible to satisfy on or before any applicable Milestone) and/or permit any Party to terminate, or that would result in the termination of, this Agreement; (iii) receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Company Parties, threatened against the Company Parties relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring Transactions; and (iv) any representation or statement made or deemed to be made by any Debtor under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made as of the Execution Date;

(j)      inform counsel to the Consenting Creditors as soon as reasonably practicable following the receipt of notice of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(k)      upon reasonable request of any Consenting Creditor (or any Consenting Creditor's counsel), reasonably and promptly inform counsel to the Consenting Creditors of, and promptly provide relevant documentation related to the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents;

(l)      other than in furtherance of the Restructuring Transactions, use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(m)      notify counsel to the Consenting Creditors in writing (email being sufficient) of any Remedial Action taken by any creditor within two (2) Business Days of the Company Parties receiving notice or obtaining actual knowledge of such Remedial Action;

(n)      notify counsel to the Consenting Creditors in writing (email being sufficient) of the commencement of any material governmental or third-party complaints, litigations, investigations, or hearings as soon as reasonably practicable, but no later than two (2) Business Days of the Company Parties receiving notice of any of the foregoing;

(o)      provide draft copies of any pleading or document material to the Restructuring Transactions (including any Definitive Document) that any Company Party intends to file with or submit to the Bankruptcy Court or any governmental authority to counsel with any consent rights with respect to such pleading or document at least two (2) Business Days prior to the date when such Debtor intends to file, submit or issue such document, and consult in good faith with each such Consenting Creditor regarding the form and substance of such proposed filing with or submission, subject to the consent rights set forth herein; and

(p)     commencing on the applicable Transaction Effective Date, pay the Allowed Professional Fees (as defined in the Financing Order) of the Debtors' professionals only after accounting for the application by each professional of all retainers received but not previously applied to such professional's Allowed Professional Fees.

7.02.   <u>Negative Commitments</u>.   Except as expressly permitted in <u>Section 8</u>, during the Agreement Effective Period, each of the Company Parties shall not, and shall cause each of its direct and indirect subsidiaries to not, directly or indirectly:

(a)     object to, delay, impede, or take any other action or inaction that could interfere, delay, or impede the acceptance, implementation, or consummation of the Plan or the Restructuring Transactions;

(b)     take any action or inaction that is inconsistent in any material respect with, or is intended, or could be reasonably expected, to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions, this Agreement, the Restructuring Term Sheet or the Definitive Documents;

(c)     solicit, initiate, endorse, propose, file, support, approve, or otherwise promote or advance any Alternative Restructuring Proposal, subject to <u>Section 8.02</u>; *provided*, *however*, that this <u>Section 7.02(c)</u> shall not restrict, prohibit, or be construed as a covenant by the Company Parties not to engage in or continue any discussions regarding Alternative Restructuring Proposals which are ongoing as of the Agreement Effective Date, subject to <u>Section 8.02</u>.

(d)     seek payment of, or make payment on, professional fees for any period in excess of the budgeted amounts for such period;

(e)     execute or file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Restructuring Term Sheet, the Plan, or the Restructuring Transactions;

(f)     sell, or file any motion or application seeking to sell, any material assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363), other than in the ordinary course of business, in each case without the prior written consent of the Consent Parties (which may be by email);

(g)     without the prior written consent of the Consent Parties (which may be by email): (i) other than in the ordinary course of business, enter into any material settlement regarding any Claims or Interests (other than as allowed by the Financing Order, this Agreement or the Restructuring Transactions), (ii) enter into any material agreement that is materially inconsistent with this Agreement, (ii) amend, supplement, or otherwise modify, or terminate, any material agreement in a way that is materially inconsistent with this Agreement, (iii) knowingly allow any material agreement to expire if such expiration would frustrate or impede consummation of the Restructuring Transactions, or (iv) knowingly allow any material permit, license, or regulatory approval to lapse, expire, terminate, or be revoked, suspended, or modified; in each case solely to the extent that any such action or failure to act would reasonably be expected to adversely impact the Restructuring Transactions;

(h)      other than in the ordinary course of business or as contemplated by this Agreement or the Restructuring Transactions transfer any material asset or right of the Company Parties (or their Affiliates) to any person or entity, solely to the extent that any such transfer would have an adverse impact on the tax efficiency of the Restructuring Transactions or the value of Reorganized Debtors;

(i)      take any other action or inaction in contravention of this Agreement or any Definitive Document, or to the material detriment of the Restructuring Transactions; or

(j)      without the consent of the Consenting Banks, terminate any Inventory Purchase Agreement.

**Section 8.**      *Additional Provisions Regarding Company Parties' Commitments.*

8.01.      Notwithstanding anything to the contrary in this Agreement (but subject to compliance with the notice requirements for any Fiduciary Out Notice pursuant to this Section 8.01), nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body or special committee of any governing body of a Company Party, based on advice of counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided*, that the Company Parties shall give written notice (a "**Fiduciary Out Notice**") to counsel to the Consenting Creditors of any determination made in accordance with this Section 8, including a determination to pursue an Alternative Restructuring Proposal made in accordance with the following Section 8.02 or to otherwise abandon pursuit of the Restructuring Transactions promptly in the event of any such determination (and in any event no later than twenty-four (24) hours following such determination).  This Section 8 shall not impede any Consenting Creditor's rights to terminate this Agreement pursuant to its terms, or to assert that any action taken by the Company in reliance on this Section 8.01 was not a valid or proper exercise of the applicable Company Party or governing body's fiduciary duties.  Upon receipt of such Fiduciary Out Notice, this Agreement shall automatically terminate pursuant to Section 12.05 of this Agreement.

8.02.      Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right, consistent with their fiduciary duties, to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into any confidentiality or nondisclosure agreements with any Entity in connection with any Alternative Restructuring Proposal; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Creditor), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals or other transactions (in each case, consistent with the terms hereof).  If any Company Party receives a written proposal regarding any Alternative Restructuring Proposal

21

or any update to an Alternative Restructuring Proposal, (A) the Company Party shall notify (with email being sufficient) counsel to the Consenting Creditors within two (2) Business Days of any such written proposal, with such notice to include the identity of the Entity or group of Entities involved, as well as the key terms of such Alternative Restructuring Proposal, and a copy of such proposal; (B) provide the advisors to the Consenting Creditors with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) respond promptly to reasonable information requests and questions from the advisors to Consenting Creditors relating to such Alternative Restructuring Proposal or any of the actions contemplated by this Section 8.02, to the extent permitted pursuant to the Company Parties' obligations pursuant to any applicable confidentiality agreement; *provided* that, to the extent any Company Party is prohibited from doing so due to a confidentiality restriction or condition upon which such proposal was submitted, such Company Party shall (x) notify counsel to the Consenting Creditors of the existence of any such confidential proposal received, (y) use commercially reasonable efforts to obtain relief from such restriction or condition in order to comply with its obligations under this Section 8.02, and (z) subject to compliance with the preceding clauses (x) and (y), not be in breach of this Section 8.02.

8.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is materially inconsistent with, this Agreement.

**Section 9.**   *Transfer of Equity Interests and Securities; Joinder.*

9.01.   During the Agreement Effective Period, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless, except as otherwise provided in this Section 9, the transferee (a) executes and delivers to counsel to the Company Parties and counsel to the Consenting Creditors in accordance with Section 14.07, at or before the time of the proposed Transfer, a fully executed Transfer Agreement or (b) is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest transferred) to counsel to the Company Parties and counsel to the Consenting Creditors in accordance with Section 14.07 at or before the time of the proposed Transfer (any such transfer, a "**Permitted Transfer**"); *provided*, *however*, that no transfer of Plan Sponsor 503(b)(9) Claims shall be a Permitted Transfer, and any such transfer shall be void *ab initio*. Notwithstanding anything to the contrary in this Section 9, no Transfer shall be permitted which would violate the *Final Order (I) Approving Notification and Hearing Procedures for Certain Transfers Of, and Declarations of Worthlessness with Respect to, Common Stock, and (II) Granting Related Relief* [Docket No. 775].

9.02.   Upon compliance with the requirements of Section 9.01, (a) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests and (b) the transferee shall be deemed to be a Consenting Creditor hereunder in the same capacity as the transferor. Any Transfer in violation of Section 9.01 shall be void *ab initio*. Any Consenting Creditor that effectuates a Transfer in accordance with this Section 9 shall have no liability under

this Agreement arising from or related to the failure of the transferee to comply with the terms of this Agreement.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Company Claims/Interests; *provided*, *however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Creditors); (b) such Consenting Creditor must provide notice of such acquisition (including the amount and type of Company Claims/Interests acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition; and (c) the Plan Sponsor acknowledges and agrees that the McKesson Equity Distribution (as defined in the Plan) shall be made solely on the basis of the Plan Sponsor 503(b)(9) Claims, and not any claims acquired after the Execution Date.

9.04.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests from a Consenting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not (x) be required to be or become a Consenting Creditor to effect any Transfer of any Company Claims/Interests by a Consenting Creditor to such Qualified Marketmaker or (y) be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if: (a) such Qualified Marketmaker acquired such Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker; (b) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) to a transferee that an Entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; and (c) such subsequent Transfer otherwise is a Permitted Transfer under Section 9.01.  For the avoidance of doubt, to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Creditor without the requirement that the Transfer to such ultimate transferee is a Permitted Transfer under Section 9.01.

9.05.    Notwithstanding anything to the contrary in this Section 9, to the extent that a Consenting Creditor's Company Claims/Interests may be loaned by such Consenting Creditor (and consequently pledged, hypothecated, encumbered, or rehypothecated) as part of customary securities lending arrangements (each such arrangement, a "**Customary Securities Lending Arrangement**"), and such Customary Securities Lending Arrangement does not adversely affect such Consenting Creditor's ability to timely satisfy any of its obligations under this Agreement, such Customary Securities Lending Arrangement shall not be deemed a Transfer hereunder.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

9.07.    Upon the delivery by a DIP Lender or Prepetition FILO Lender of an executed Joinder to this agreement to the Parties at the time of delivery, such DIP Lender or Consenting FILO Lender shall be bound by the terms of this Agreement and deemed to be a Consenting DIP Lender or Consenting FILO Lender, as applicable.

**Section 10.    *Representations and Warranties of Consenting Creditors.*** Each Consenting Creditor severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement:it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Creditor's signature page to this Agreement or Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 9</u>); *provided*, *however*, that without limiting the applicability of this Agreement to any and all Company Claims of the Plan Sponsor, the Plan Sponsor does not make the representation and warranty provided for in this <u>Section 10(a)</u>;

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, its Company Claims/Interests;

(c)    the Company Claims/Interests held by it are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law.

**Section 11.    *Mutual Representations, Warranties, and Covenants.*** <u>Mutual Representations, Warranties and Covenants</u>. Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the applicable Transaction Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

24

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)     it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereby.

## Section 12.     *Termination Events.*

12.01.   <u>Consenting Creditor Termination Events</u>.  Each of (a) any Consenting Bank and (b) the Plan Sponsor may terminate this Agreement as to itself or themselves, as applicable, by delivering prior written notice to counsel to the Company Parties in accordance with <u>Section 14.10</u> hereof upon the occurrence of any of the following events (the "**Consenting Creditor Termination Events**" and any Consenting Creditor or group of Consenting Creditors terminating on account thereof, a "**Terminating Creditor**"); *provided*, *however*, that any termination pursuant to the following <u>Section 12.01(b)</u> shall only be permitted with respect to the applicable breaching Consenting Creditor):

(a)     the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) calendar days after the Terminating Creditor transmits a written notice in accordance with <u>Section 14.10</u> hereof detailing any such breach;

(b)     the breach in any material respect by another Consenting Creditor of any of the representations, warranties, commitments, or covenants of such Consenting Creditor set forth in this Agreement that (i) is adverse to the Terminating Creditor seeking termination pursuant to this provision and (ii) to the extent capable of being cured, remains uncured for five (5) calendar days after such Terminating Creditor transmits a written notice in accordance with <u>Section 14.10</u> detailing any such breach;

(c)     any of the Company Parties sends a Fiduciary Out Notice to any of the Consenting Creditors;

(d)     the issuance by any governmental authority, any regulatory authority, or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions or (ii) (A) would prevent consummation of a material portion of the Restructuring Transactions and (B) remains in effect for ten (10) Business Days after the Terminating Creditor transmits a written notice in accordance with <u>Section 14.10</u> hereof detailing any such issuance; *provided* that this

termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)        any Company Party files, amends, modifies, executes, or enters into, or files a pleading seeking authority to execute, enter into, amend, or modify, any Definitive Document in contravention of the consent rights set forth in this Agreement, or publicly announces its intention to take any such action;

(f)        other than in the furtherance of the Restructuring Transactions, the entry of an order by the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion, joinder, application, or other court filing by any Company Party seeking or consenting to such an order (without the prior written consent of the Consent Parties):

(i)        (A) directing the appointment of a trustee in any of the Chapter 11 Cases; (B) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (C) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code; or (D) modifying or terminating any of the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(ii)        approving the rejection of this Agreement or declaring this Agreement to be unenforceable; or

(iii)        (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is inconsistent with this Agreement, and such order remains in effect for fourteen (14) calendar days after entry thereof; (B) reversing or vacating the Disclosure Statement Order, the Confirmation Order or the Financing Order; (C) approving any plan, disclosure statement or Definitive Document, in any such case, that is not in all respects in form or substance consistent with this Agreement; or (D) in the event of a Non-Plan Toggle, declining to grant the Structured Dismissal Order;

(g)        the Debtors lose the exclusive right to file and/or solicit acceptances of a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(h)        the occurrence of the DIP Termination Date and subsequent expiration of the DIP Remedies Notice Period (each as defined in the Financing Order);

(i)        any of the Milestones set forth in Section 4 (as may be extended or waived in accordance with this Agreement) has not been achieved by the date specified for such Milestone, unless such failure is the result of any act, omission, or delay on the part of a holder included in the applicable Terminating Creditor in violation of its obligations under this Agreement;

(j)        any of the Company Parties terminate this Agreement pursuant to a Company Party Termination Event; or

(k)        any of the other Consenting Creditors terminate this Agreement pursuant to a Consenting Creditor Termination Event.

26

12.02.  Due Diligence Period.   The Company Parties, Consenting FILO Lenders, Consenting Banks, and Consenting DIP Lenders acknowledge and agree that the Plan Sponsor intends to undertake a due diligence review of the Company Parties with respect to the Plan Transaction in the period of time between the Agreement Effective Date and the Toggle Notice Deadline (the "**Due Diligence Period**"); *provided, however*, that the Due Diligence Period shall not extend past Friday, September 26, 2025 without the prior written consent of the Company Parties and the Consenting Banks.  At any time during the Due Diligence Period, upon twenty-four (24) hours' notice (which may be via electronic mail or any other means specified in Section 14.10) to counsel to the Company Parties and the Consenting Banks at the addresses specified in Section 14.10, the Plan Sponsor shall have the right to require that the Toggle Notice indicate a Non-Plan Toggle if (i) the Plan Sponsor is unable to complete a satisfactory due diligence review (as determined by the Plan Sponsor in its reasonable discretion) due to the failure of the Company Parties to promptly provide any information reasonably determined to be necessary by the Plan Sponsor, or (ii) as a result of the Plan Sponsor's due diligence review, the Plan Sponsor determines, in its reasonable discretion, that any facts, information or issues identified in such due diligence review would adversely impact the Company Parties, the Reorganized Debtors or the respective assets, liabilities, or operations of the Company Parties or the Reorganized Debtors, in each case in a manner that would adversely impact the Plan Sponsor's recovery in a Plan Transaction.  This Section 12.02 shall not apply to, limit, or otherwise modify or give rise to any termination right with respect to the obligations of the Parties hereunder with respect to the Inventory Transactions.

12.03.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties (or, in the event of the Company Party Termination Event set forth in the following Section 12.03(a), the applicable breaching Consenting Creditor) by delivering written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events (the "**Company Party Termination Events**", and together with the Consenting Creditor Termination Events, the "**Termination Events**"):

(a)    the breach in any material respect by any Consenting Creditor of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by counsel to the applicable Consenting Creditor(s) of notice and a description of such breach;

(b)    the board of directors, board of managers, or such similar governing body, or any special committee thereof, of any Company Party, or of any special committee of any board of any such Company Party, determines in good faith, based on advice of counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in each case in accordance with Section 8.01;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fourteen (14) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)      the Condition Subsequent is not satisfied; or

(e)      the Bankruptcy Court enters an order denying confirmation of the Plan or, in the event of the Non-Plan Toggle, enters an order declining to grant the Structured Dismissal Order.

12.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Consent Parties; and (b) each Company Party.

12.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the applicable Transaction Effective Date.

12.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action, except, in the event of any termination pursuant to <u>Section 12.05</u> hereof, as such Party's rights with respect to such Claims or Causes of Action are limited or modified by the Definitive Documents providing for the occurrence of the applicable Transaction Effective Date.  Upon the occurrence of a Termination Date (other than pursuant to <u>Section 12.05</u>), (x) any and all consents or ballots tendered prior to such Termination Date by the Parties subject to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, the Restructuring Transactions and this Agreement or otherwise and (y) such ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company Parties allowing such change or resubmission); *provided*, *however*, any Consenting FILO Lender withdrawing or changing its vote pursuant to this <u>Section 12.06</u> shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any Consenting Creditor from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Creditors, and (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its rights under the Financing Order and any claims against any Company Party or other Consenting Creditor, except as expressly provided for herein or in any Definitive Document which is consistent with this Agreement.  No purported termination of this Agreement shall be effective under this <u>Section 12.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, with such material breach causing, or resulting in, the occurrence of one or more Termination Events.  Following the occurrence of a Termination Date, the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such

Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) Sections 1.02, 12.06, and 14 hereof. The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action or delivering any notice necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**Section 13.**   *Amendments and Waivers.* This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)   This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party and (b) the Consent Parties; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Creditor or its rights or obligations hereunder, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, waiver, or supplement; *provided*, *further*, that any amendments to (i) the definition of "Consent Parties," "Required Consenting FILO Lenders," or "Required DIP Lenders" shall require the consent of (A) each Company Party and (B) each (x) Consent Party, (y) Consenting FILO Lender, or (z) Consenting DIP Lender, respectively, and (ii) this Section 13 shall in each case require the written consent of each Company Party and each Consenting Creditor.

(c)   Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(e)   Any consent or waiver contemplated in this Section 13 may be provided by electronic mail from counsel to the relevant Party.

**Section 14.**   *Miscellaneous*

14.01.   Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements with respect to the Restructuring Transactions, oral or written, among the Parties with respect thereto.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (*e.g.*, via electronic mail in .pdf form) shall be effective as delivery of a manually executed counterpart of this Agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.  No Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting Creditor without such Consenting Creditor's prior written consent.  Any public filing of this Agreement, with the Bankruptcy Court, the SEC or otherwise, which includes executed signature pages to this

Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and, except as set forth in <u>Section 9</u>, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Rite Aid Corporation
200 Newberry Commons
Etters, PA 17319
Attn: Steven K. Bixler, Chief Financial Officer; Marc Liebman,
Chief Transformation Officer

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:  Alice B. Eaton; Sean A. Mitchell
E-mail address:  aeaton@paulweiss.com; smitchell@paulweiss.com

(b)     if to a Consenting Creditor:

The address set forth on its signature page hereto or such Consenting Creditor's Transfer Agreement or Joinder, as applicable, with copies to its counsel as indicated on such signature page.

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Creditor hereby confirms that its decision to execute this Agreement has been based upon its independent

investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Reservation of Rights; Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason pursuant to <u>Section 12</u> (other than pursuant <u>Section 12.05</u>, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to <u>Section 13</u> in the case of any claim for breach of this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.  Further, nothing herein shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Agreement Effective Period, such appearance and the positions advocated in connection therewith are consistent with this Agreement and any Definitive Document and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the consummation of the Restructuring Transactions.

14.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Consenting Creditors under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.   Capacities of Consenting Creditors.  Each Consenting Creditor has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.   Survival.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 14 shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 14 shall survive such termination.

14.20.   Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or any Consenting Creditor, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21.   Relationship Among Consenting Creditors.   None of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, any Company Party, or any of the Company Parties' respective creditors or other stakeholders.   The Company Parties acknowledge that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Consenting Creditors and the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditors that principally manage and/or supervise such Consenting Creditor's investment in the Company Parties, and shall not apply to any other trading desk or business group of such Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**[COMPANY PARTIES]**

By: _____

Name:

Authorized Signatory

**Plan Sponsor Signature Page to
the Restructuring Support Agreement**

**[PLAN SPONSOR]**

_____

Name:

Title:


Address:


E-mail address(es):


Counsel Contact Information:

**[Consenting Creditor] Signature Page to
the Restructuring Support Agreement**

**[CONSENTING CREDITOR]**

_____
Name:
Title:


Address:


E-mail address(es):


Counsel Contact Information:


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| | |
| | |

**<u>Exhibit A</u>**

**Company Parties**

## Exhibit A.1

1.    EX Solutions of OH, LLC
2.    Ex Tech, LLC
3.    Ex Design, LLC
4.    Ex Design Holdings, LLC
5.    Ex Rxclusives, LLC
6.    Ex Savings, LLC
7.    Ex Holdco, LLC
8.    Ex Options, LLC
9.    Ex Solutions of MO, LLC
10.    Ex Solutions of NV, LLC
11.    Ex PR, Inc.
12.    FIRST FLORIDA INSURERS OF TAMPA, LLC
13.    Hunter Lane, LLC
14.    Ex Software, LLC
15.    Ex Pharmacy, LLC
16.    Ex Initiatives, LLC
17.    Ex Procurement, LLC

## <u>Exhibit A.2</u>

| | |
|---|---|
| 18. | Thrifty Ice Cream, LLC |
| 19. | 1740 Associates, L.L.C. |
| 20. | 4042 Warrensville Center Road – Warrensville Ohio, Inc. |
| 21. | 5277 ASSOCIATES, INC. |
| 22. | 5600 Superior Properties, Inc. |
| 23. | Apex Drug Stores, Inc. |
| 24. | Broadview and Wallings–Broadview Heights Ohio, Inc. |
| 25. | Eckerd Corporation |
| 26. | EDC Drug Stores, Inc. |
| 27. | GDF, INC. |
| 28. | Genovese Drug Stores, Inc. |
| 29. | Gettysburg and Hoover-Dayton, Ohio, LLC |
| 30. | Harco, Inc. |
| 31. | Health Dialog Services Corporation |
| 32. | K & B ALABAMA CORPORATION |
| 33. | K & B Louisiana Corporation |
| 34. | K & B MISSISSIPPI CORPORATION |
| 35. | K & B SERVICES, INCORPORATED |
| 36. | K & B TENNESSEE CORPORATION |
| 37. | K&B TEXAS CORPORATION |
| 38. | K & B, Incorporated |
| 39. | LAKEHURST AND BROADWAY CORPORATION |
| 40. | Maxi Drug North, Inc. |
| 41. | Maxi Drug South, L.P. |
| 42. | Maxi Drug, Inc. |
| 43. | Maxi Green Inc. |
| 44. | Munson & Andrews, LLC |
| 45. | NAME RITE, L.L.C. |
| 46. | P.J.C. Distribution, Inc. |
| 47. | P.J.C. Realty Co., Inc. |
| 48. | PDS-1 Michigan, Inc. |
| 49. | Perry Drug Stores, Inc. |
| 50. | PJC Lease Holdings, Inc. |
| 51. | PJC Manchester Realty LLC |
| 52. | PJC of Massachusetts, Inc. |
| 53. | PJC of Rhode Island, Inc. |
| 54. | PJC of Vermont Inc. |
| 55. | PJC Peterborough Realty LLC |
| 56. | PJC Realty MA, Inc. |
| 57. | PJC Revere Realty LLC |
| 58. | PJC Special Realty Holdings, Inc. |
| 59. | RDS Detroit, Inc. |

60.    Read's, Inc.
61.    RITE AID DRUG PALACE, INC.
62.    Rite Aid Hdqtrs. Corp.
63.    RITE AID LEASE MANAGEMENT COMPANY
64.    Rite Aid of Connecticut, Inc.
65.    Rite Aid of Delaware, Inc.
66.    RITE AID OF GEORGIA, INC.
67.    RITE AID OF INDIANA, INC.
68.    RITE AID OF KENTUCKY, INC.
69.    Rite Aid of Maine, Inc.
70.    RITE AID OF MARYLAND, INC.
71.    RITE AID OF MICHIGAN, INC.
72.    RITE AID OF NEW HAMPSHIRE, INC.
73.    Rite Aid of New Jersey, Inc.
74.    RITE AID OF NEW YORK, INC.
75.    Rite Aid of North Carolina, Inc.
76.    Rite Aid of Ohio, Inc.
77.    Rite Aid of Pennsylvania, LLC
78.    RITE AID OF SOUTH CAROLINA, INC.
79.    RITE AID OF TENNESSEE, INC.
80.    RITE AID OF VERMONT, INC.
81.    Rite Aid of Virginia, Inc.
82.    Rite Aid of Washington, D.C., Inc.
83.    RITE AID OF WEST VIRGINIA, INC.
84.    Rite Aid Online Store, Inc.
85.    Rite Aid Payroll Management, Inc.
86.    RITE AID REALTY CORP.
87.    RITE AID ROME DISTRIBUTION CENTER, INC.
88.    RITE AID SPECIALTY PHARMACY LLC
89.    Rite Aid Transport, Inc.
90.    RX CHOICE, INC.
91.    The Lane Drug Company
92.    Thrift Drug, Inc.
93.    THRIFTY CORPORATION
94.    Thrifty PayLess, Inc.
95.    THE BARTELL DRUG COMPANY
96.    Drug Palace, Inc.
97.    Grand River & Fenkell, LLC
98.    ILG - 90 B Avenue Lake Oswego, LLC
99.    LMW - 90B AVENUE LAKE OSWEGO, INC.
100.   Richfield Road-Flint, Michigan, LLC
101.   Rx USA, Inc.
102.   JCG Holdings (USA), Inc.
103.   JCG (PJC) USA, LLC
104.   Rite Aid Hdqtrs. Funding, Inc.
105.   Rite Investments Corp.

106.    Rite Investments Corp., LLC
107.    THE JEAN COUTU GROUP (PJC) USA, INC.
108.    RediClinic LLC
109.    RCMH LLC
110.    RediClinic Associates, Inc.
111.    RediClinic of PA, LLC
112.    Ex Benefits, LLC
113.    Rediclinic of Dallas-Fort Worth, LLC
114.    Rediclinic of DC, LLC
115.    Rediclinic of DE, LLC
116.    Rediclinic of MD, LLC
117.    Rediclinic US, LLC
118.    Rediclinic of VA, LLC

## Exhibit B

## Restructuring Term Sheet

*Execution*

---

**IN RE NEW RITE AID, LLC, ET AL., CASE NO. 25-14861 (BANKR. D.N.J.)**

**TRANSACTION & SETTLEMENT TERM SHEET**

**August 31, 2025**

---

**NOTHING IN THIS "TERM SHEET" SHALL BE AN ADMISSION OF FACT OR LIABILITY BY ANY PARTY. THIS TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS.**

**THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PROPOSED TRANSACTIONS, WHICH SUCH TRANSACTIONS WOULD BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND TO THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH IT IS ATTACHED (THE "RESTRUCTURING SUPPORT AGREEMENT"). THE PROPOSALS CONTAINED IN THIS TERM SHEET REMAIN SUBJECT TO MODIFICATIONS, AS WELL AS THE COMPLETION OF CUSTOMARY DUE DILIGENCE AND OBTAINING ALL INTERNAL APPROVALS, IN EACH CASE, IN ACCORDANCE WITH THE RESTRUCTURING SUPPORT AGREEMENT.**

| 1. | **Parties** | The "Parties" means, collectively: (a) the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Debtors"); (b) Bank of America, N.A., in both its capacity as DIP Agent,[1] on behalf of itself and the other DIP Secured Parties, and in its capacity as Prepetition ABL Agent,[2] on behalf of itself and the other Prepetition ABL Secured Parties;[3] and (c) McKesson Corporation ("McKesson"). |
|----|----|----|
| 2. | **Overview of Settlement** | The Parties would enter into a settlement and support a transaction pursuant to which: (a) the Parties would agree to a good-faith compromise and settlement of various issues and disputes related to the Debtors' chapter 11 cases and events and actions preceding the Debtors' chapter 11 cases; (b) the Debtors would propose a global settlement of administrative claims and a chapter 11 plan of |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Stipulation and Agreed Order Between Debtors, DIP Agent, the Official Committee of Unsecured Creditors and McKesson Corporation (I) Scheduling Certain Dates and Deadlines in Connection With the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief, (II) Establishing Certain Protocols, and (III) Granting Related Relief [Docket No. 672] (the "Stipulation").  Except as otherwise specified herein, docket numbers referenced herein refer to the filings in the above-captioned chapter 11 cases.

[2]   "Prepetition ABL Agent" is defined in the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief [Docket No. 1396] (the "Final DIP Order").

[3]   "Prepetition ABL Secured Parties" is defined in the Final DIP Order.

| | | reorganization consistent with the terms herein (the "Plan") and seek confirmation of such Plan pursuant to sections 1123 and 1129 of the Bankruptcy Code; (c) the Parties would support confirmation of the Plan consistent with the terms herein; (d) the Debtors and McKesson would pursue the Plan Transaction (as defined herein); and (e) the Parties would support entry of an order approving the Plan Transactions as necessary. |
|---|---|---|
| | | This Term Sheet does not include a description of all of the terms, conditions, representations, warranties and other provisions that would be contained in the Plan and documents necessary to give effect to the terms of the Plan (including any plan supplement) or definitive documents relating to the Plan Transaction (the "Definitive Documents"). The settlement described herein would be set forth in and governed by the Definitive Documents and any order confirming the Plan. |
| 3. | **Plan Transaction** | Pursuant to and upon the effective date of the Plan, McKesson would acquire one hundred percent (100%) of the equity of the reorganized Rite Aid Corporation and certain other entities to be determined (the "Reorganized Equity" and, such transaction, the "Plan Transaction"). |
| 4. | **Administrative Claims Procedures** | In furtherance of the Plan Transaction, the Debtors shall seek approval of procedures (the "Administrative Claims Procedures") soliciting consents from administrative claimants to reduced recoveries pursuant to the Administrative Claims Procedures Order (as defined in the Restructuring Support Agreement).  Upon the distribution of funds to opt-in claimants identified in the preceding clause (a), the Debtors shall waive any and all claims and causes of action arising against such opt-in claimants arising under section 547 of the Bankruptcy Code. |
| | | McKesson agrees to opt-out under the Administrative Claims Procedures with respect to the 503(b)(9) Claim (as defined below), which shall either (a) be satisfied in full on account of the Reorganized Equity distribution as set forth below in the event that a Plan Transaction is consummated or (b) in the event of the Non-Plan Toggle (as defined below), remain outstanding with all rights reserved by McKesson with respect to the 503(b)(9) Claim.[4] |
| | | In the event of a Plan Transaction, notwithstanding McKesson's agreement to opt-out under the Administrative Claims Procedures, the Debtors shall, in consideration for the settlement of McKesson's 503(b)(9) Claim, give McKesson and its affiliates full releases of all |

---

[4]    The Administrative Claims Procedures will not apply in a Non-Plan Toggle scenario.  The election to opt-out must be made prior to the decision as to whether a Plan is pursued, but in any event, the opt-out shall not result in McKesson's rights with respect to the 503(b)(9) Claim being impaired or altered on account of the Administrative Claims Procedures.

| | | potential claims and causes of action, as detailed in Section 10 of this Term Sheet. |
|---|---|---|
| 5. | **Inventory Transaction(s)** | Irrespective of whether the Plan Transaction is consummated, McKesson shall acquire the Debtors' salable generic pharmaceuticals (the "Generic Inventory," and such acquisition, the "Generic Inventory Transaction") that meet certain criteria to be agreed upon by and between the Debtors and McKesson, including criteria related to salability and returnability.[5] |
| | | In the event a Plan Transaction is consummated, McKesson shall also purchase the Debtors' salable branded pharmaceuticals (the "Branded Inventory," and any such acquisition, the "Branded Inventory Transaction," and, together with the Generic Inventory Transaction, the "Inventory Transactions") that meet certain criteria to be agreed upon by and between the Debtors and McKesson, including criteria related to salability and returnability; provided, that in the event a Plan Transaction is not consummated, the Debtors may elect to sell the Branded Inventory to another party so long as McKesson is provided the opportunity to outbid such other party for the Branded Inventory and determines not to do so; provided, further, that in the event that the Debtors pursue a sale of the Branded Inventory to another party consistent with the terms of the foregoing clause, then the Parties agree to not pursue the Branded Inventory Transaction. |
| | | The Generic Inventory Transaction shall be consummated through a sale pursuant to section 363 of the Bankruptcy Code, irrespective of whether a Plan Transaction or Non-Plan Toggle occurs. The Branded Inventory Transaction shall be consummated either pursuant to the Plan Transaction or through a sale pursuant to section 363 of the Bankruptcy Code. |
| 6. | **Purchase Price – Inventory Transactions** | McKesson shall purchase the Generic Inventory for a purchase price of forty percent (40%) of the applicable Invoice Price[6] of all Generic Inventory; provided, however, the aggregate Invoice Price of all Generic Inventory available for purchase (and meeting the criteria to be agreed upon by and between the Debtors and McKesson) shall be no less than a minimum threshold amount mutually acceptable to the Debtors and McKesson to be set forth in the applicable inventory purchase agreement. |
| | | In the event a Plan Transaction is consummated, McKesson shall purchase the Branded Inventory for a purchase price of sixty-five percent (65%) of the applicable Invoice Price; provided, however, the aggregate Invoice Price of all Branded Inventory available for purchase |

---

[5]    Parties agree that criteria related to Salability and Returnability will be consistent with the Supply Agreement (Exhibit G).

[6]    "Invoice Price" has the meaning set forth in the Supply Agreement (as defined herein).

| | | |
|---|---|---|
| | | (and meeting the criteria to be agreed upon by and between the Debtors and McKesson) shall be no less than a minimum threshold amount mutually acceptable to the Debtors and McKesson to be set forth in the applicable inventory purchase agreement. In the event a Plan Transaction is not consummated, McKesson shall purchase the Branded Inventory on the terms set forth in the foregoing sentence, unless the Debtors elect to sell the Branded Inventory to another party (which sale shall be permissible so long as McKesson is provided the opportunity to outbid such other party for the Branded Inventory and determines not to do so).[7] For the avoidance of doubt, the purchase of Branded Inventory by McKesson shall be a condition precedent to consummation of the Plan Transaction. |
| 7. | **Excluded Assets** | The assets transferred to McKesson pursuant to the Plan Transaction shall not include: (a) the Debtors' https://www.riteaid.com/ website; or (b) any rights with respect to the use of the Rite Aid brand name (together, the "Plan Excluded Assets"). The Inventory Transactions shall exclude pharmaceuticals that are classified as controlled substances. |
| 8. | **Consideration – Reorganized Equity** | McKesson shall receive the Reorganized Equity in exchange for: (a) full satisfaction of McKesson's claim under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claim"); (b) payment of $15 million in cash to the Debtors; and (c) McKesson's agreement to the mutual releases described below. |
| 9. | **Continued Operation of Business** | At the effective date of the Plan, the entities in which McKesson is acquiring the Reorganized Equity (collectively, the "Reorganized RAD") would own and operate, among other things, the central fill facility located in Delran, New Jersey, and own the NexGen dispensing system, the Rite Care platform, and Rite Aid intellectual property, excluding the Plan Excluded Assets. At the time of acquisition by McKesson, Reorganized RAD would be discharged of all liabilities under the Plan and be free of all liabilities, obligations, claims, and encumbrances of any kind arising prior to the effective date of the Plan. The Plan Transaction would be structured in a manner to optimize tax attributes of Reorganized RAD, and the Plan may incorporate steps that optimize the legal entity structure of Reorganized RAD in a manner acceptable to the Debtors and McKesson. |
| 10. | **Releases by the Debtors and Releases by** | The Plan would include the Parties' mutual full releases of all potential claims and causes of action, including those arising under the Supply |

---

[7]   For the avoidance of doubt, in the event that the Debtors pursue a sale of the Branded Inventory to another party consistent with the terms herein, then the Parties agree to not pursue the Branded Inventory Transaction.

| | Holders of Claims and Interests | Agreement,[8] the Intercreditor Agreement,[9] and any potential avoidance actions, preference claims, and similar claims against McKesson and its affiliates, as well as customary consensual third-party releases by holders of claims and interests.  For the avoidance of doubt, McKesson would withdraw its Motion to Compel[10] and release the underlying claim against the Debtors, and the Debtors would dismiss their Complaint[11] with prejudice and release the underlying claims against McKesson.<br><br>Prior to consummation of the Plan and until the Debtors determine to effect the Non-Plan Toggle, the Parties would agree to hold all litigation as between them in abeyance, with all rights reserved. |
|---|---|---|
| 11. | **Support for the Plan** | The Parties would agree to take commercially reasonable steps to consummate the transactions and undertakings contained herein and support and not object to the Plan; _provided_, that the Definitive Documents are consistent with the terms set forth herein and otherwise satisfactory to the Parties. |
| 12. | **Non-Plan Toggle** | If the Debtors reasonably determine that pursuing the Plan Transaction is impossible or impracticable (the "Non-Plan Toggle"), the Parties agree that:<br><br>(a) They will consummate the Generic Inventory Transaction (and, if applicable, the Branded Inventory Transaction) notwithstanding the non-consummation of the Plan Transaction;<br>(b) Neither Party shall be obligated to grant the releases or take any other actions with respect to ongoing litigation, the abeyance of which shall end on the date on which the Debtors determine to effect the Non-Plan Toggle;<br>(c) The Debtors may, in their discretion, transfer any assets not sold pursuant to an Inventory Transaction to any third party at terms acceptable to the Debtors in their sole discretion; and<br>(d) McKesson reserves all of its rights with respect to the 503(b)(9) Claim, including any recovery on account of the 503(b)(9) Claim with respect to distributions made to administrative |

---

[8]    The "Supply Agreement," as defined in the Stipulation, means that certain _Supply Agreement_, dated as of August 30, 2024 (as amended, supplemented, restated, amended and restated, supplemented, and otherwise modified from time to time).

[9]    The "Intercreditor Agreement" means the "ABL/1.5L/McKesson Intercreditor Agreement" as defined in the Final DIP Order.

[10]   The "Motion to Compel" means the Motion of McKesson Corporation for Entry of an Order (A) Allowing Administrative Expense Claim, (B) Compelling Immediate Payment Thereof, and (C) Granting Related Relief [Docket No. 655].

[11]   The "Complaint" means that certain Complaint to Avoid and Recover Avoidable Transfers, for a Declaratory Judgment, and for Equitable Subordination filed in Rite Aid Corp. v. McKesson Corp. (In re New Rite Aid, LLC), Adv. Proc. No. 25-01316-MBK (Bankr. D.N.J. Jul. 31, 2025) [Docket No. 1] (together with any amendments thereto).

|  |  | claimants pursuant to any structured dismissal or other non-Plan arrangement.[12] |
|--|--|--|

---

[12] The Debtors currently contemplate a distribution to administrative claimants in the event of a structured dismissal in which each such claimant receives its pro rata portion of approximately $2 million.

## Exhibit C

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of August 31, 2025[1] by and among the Company Parties and the Consenting Creditors (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a Consenting Creditor under the terms of the Agreement in the same capacity as the Consenting Creditor from which it is purchasing the Company Claims/Interests indicated below.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer and any further date specified in the Agreement, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| | |
| | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## Exhibit D

### Provision for Joinder Agreement

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of August 31, 2025[1] by and among the Company Parties and the Consenting Creditors (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), and agrees to be bound by the terms and conditions thereof, and shall be deemed a Consenting Creditor under the terms of the Agreement.

The Joining Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

Counsel Contact Information:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| | |
| | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Corporate Organization Chart**



## **Exhibit D**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### I. INTRODUCTION

Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," requires that a bankruptcy court find, as a condition of confirmation, that the chapter 11 plan provides, with respect to each class, that each holder of an allowed claim either (i) has accepted the plan of reorganization, or (ii) will receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such non-accepting holders would receive or retain if the debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

The Debtors, with assistance from their restructuring advisors, have prepared the following hypothetical liquidation analysis ("Liquidation Analysis"), in connection with the Plan and the Disclosure Statement.[1] The Liquidation Analysis shows the estimated recoveries that may be obtained by classes of Claims or Interests assuming a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis. Accordingly, the values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan, which does not contemplate a liquidation.

### II. STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, a hypothetical liquidation of the Debtors' assets in a chapter 7 is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from certain of their advisors, are subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were hypothetically liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. NOTHING CONTAINED IN THIS LIQUIDATION

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *the Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and its Debtor Affiliates* (the "Disclosure Statement") or in the *Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and its Debtor Affiliates* (the "Plan"), as applicable.

ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE DEBTORS' CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## III. OVERVIEW AND GENERAL ASSUMPTIONS

Hypothetical chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below.  The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of **November 1st, 2025** (the "Conversion Date") and the net costs to execute the administration of the wind-down of the Estates.  The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a single court appointed chapter 7 trustee.  The selection of a separate chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the chapter 7 cases from a large duplication of effort by each trustee and his or her professionals.

Summary Notes to Liquidation Analysis

1. **Dependence on Assumptions**.  The Liquidation Analysis depends on a number of assumptions. Although developed and considered reasonable by the management and the restructuring advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management.  The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the hypothetical liquidation process would be resolved.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. **Dependence on a Forecast Balance Sheet**.  This Liquidation Analysis contains numerous estimates and remains subject to further legal and accounting analysis. This Liquidation Analysis utilizes the assumed recovery value of the Debtors' assets as of July 31, 2025 as a starting point, or more recent values where available and applies pro forma adjustments to arrive at the remaining assumed value as of the Conversion Date. The Debtors have also projected cash balances, receivables, inventory, real estate, debt claims and certain administrative and unsecured claim balances forward to the Conversion Date.

3. **DIP ABL and DIP FILO ("DIP Facilities") Assumptions**.  The Liquidation Analysis assumes that, upon conversion of the Debtors' chapter 11 cases to chapter 7 cases, the DIP Secured Parties will seek relief from the automatic stay to foreclose on the Debtors' assets under the jurisdiction of the Bankruptcy Court to recover on their outstanding Claims.  For the purpose of this analysis, it is assumed that the conversion from chapter 11 to chapter 7 would take place on the Conversion Date and that the DIP Secured Parties would have the ability to recover on their respective secured

positions from the DIP Collateral, which represents substantially all of the Debtors' assets.

4. **Chapter 7 Liquidation Process**.  The liquidation of the Debtors' assets and wind-down of the Estates are assumed to be completed over a four-month period inside of chapter 7 cases managed by the chapter 7 trustee.  The chapter 7 trustee would manage the Estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals (*e.g.*, attorneys, investment bankers, financial advisors, accountants, consultants, appraisers, experts) to assist in the liquidation and wind-down of the Estates.

5. **Consolidated Liquidation**.  The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding in Chapter 7.  The Liquidation Analysis presents the liquidation of the Debtors on a consolidated basis considering the assertion of the DIP Claims at each of the Debtor entities.

6. **Claims Estimates**.  In preparing this Liquidation Analysis, the Debtors and their advisors developed preliminary estimates of Allowed Claims for each Class based upon a review of the Debtors' estimated balance sheet.  Administrative Claims were estimated based on the Debtors' financial projections as of the Conversion Date.  Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date.  The estimate of all Allowed Claims in this Liquidation Analysis is based on the estimated book value of those Claims, where applicable. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in this Liquidation Analysis.  The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

## IV. CONCLUSION

**AS SUMMARIZED IN THE FOLLOWING ANALYSIS, CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR OF THE DEBTORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## V. LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors.[2]

| $ in millions | Claim ($) | Ch. 11 Plan | HLA (MID) |
|---|---|---|---|
| DIP ABL[1,2] | $1,712 | 56.3% | 51.6% |
| DIP FILO[3] | $202 | 0.0% | 0.0% |
| Pre-Petition FILO[4] | $67 | 1.0% | 0.0% |
| 1.5L Exit Notes | $84 | 0.0% | 0.0% |
| 3L Takeback Debt | $391 | 0.0% | 0.0% |
| Administrative Claims[5] | $5 | 100.0% | 0.0% |
| General Unsecured Claims[6] | [TBD] | 0.0% | 0.0% |

*(1) Includes pre-petition ABL and LC balance, closing fees, and PIK interest. Under the hypothetical liquidation analysis, the ABL balances also include post-conversion accrued interest*
*(2) 56.3% Recovery percentage represents approximately $964M of estimated recoveries under the Plan distributable to the $1,712M ABL claim*
*(3) Includes $180 million of roll-up principal and pro-rata share of closing fees and PIK interest. Under the hypothetical liquidation analysis, also includes pro-rata share of post-conversion accrued interest*
*(4) Includes $60 million of pre-petition principal and pro-rata share of closing fees and PIK interest. Under the hypothetical liquidation analysis, also includes pro-rata share of post-conversion accrued interest*
*(5) Claims listed are net of agreed settlements according to the administrative claim procedures and claims that would be asserted by McKesson if a Plan is not confirmed*
*(6) The Liquidation Analysis does not estimate General Unsecured Claims, and assumes no recovery on General Unsecured Claims*

*(continued on next page)*

---

[2]    The estimated claims on the following pages may differ from the estimated claims included in the Disclosure Statement because of differing assumptions between a chapter 11 reorganization and a hypothetical chapter 7 liquidation.

| USD $ in Millions | Notes | Assets | | | Estimated Recovery - % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 7/31/2025 | PF Adj. | Conv. Date | Low | Mid | High | Low | Mid | High |
| **LIQUIDATION PROCEEDS** | | | | | | | | | | |
| Cash | [1] | $ 15 | $ - | $ 15 | 100.0% | 100.0% | 100.0% | $ 15 | $ 15 | $ 15 |
| Outstanding A/R | [2] | 207 | (143) | 64 | 46.1% | 52.8% | 61.2% | 29 | 34 | 39 |
| Rx Inventory | [3] | 137 | (116) | 21 | 60.0% | 70.0% | 80.0% | 12 | 14 | 16 |
| FE Inventory | | 75 | (75) | - | - | - | - | - | - | - |
| Real Estate | [4] | 75 | (53) | 23 | 80.0% | 90.0% | 100.0% | 18 | 20 | 23 |
| IP | [5] | 29 | (5) | 23 | 34.8% | 45.4% | 56.0% | 8 | 11 | 13 |
| FF&E | | 4 | (4) | - | - | - | - | - | - | - |
| Lease Assets | [6] | 18 | (8) | 10 | 30.0% | 50.0% | 70.0% | 3 | 5 | 7 |
| Ice Cream Plant | | 19 | (19) | - | - | - | - | - | - | - |
| Transaction Escrow | | 11 | - | 11 | 100.0% | 100.0% | 100.0% | 11 | 11 | 11 |
| Utility Deposits | [7] | 10 | (6) | 4 | - | 25.0% | 50.0% | - | 1 | 2 |
| Other Assets | [8] | 8 | (6) | 2 | - | 25.0% | 50.0% | - | 1 | 1 |
| **Gross Liquidation Assets** | | $ 610 | $ (437) | $ 173 | 56.5% | 64.9% | 74.0% | $ 98 | $ 112 | $ 128 |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | | | |
| Chapter 7 Trustee Fees | [9] | | | | | | | (2) | (3) | (3) |
| Realization Costs | [10] | | | | | | | (1) | (2) | (2) |
| Litigation Contingency | [11] | | | | | | | (50) | (25) | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | | | $ (54) | $ (30) | $ (6) |
| **Net Liquidation Assets (Post-Conversion)** | | | | | | | | $ 44 | $ 82 | $ 122 |
| (+) Pre-Conversion Net Recoveries | | | | | | | | 810 | 810 | 810 |
| **Net Total Recoveries (Post-Petition)** | | | | | | | | $ 854 | $ 893 | $ 933 |

(continued on next page)

6

## CLAIMS & RECOVERIES

| | | Total Estimated Claim | | | Total Recovery - % | | | Total Recovery - $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Petition Date | Adj. | Claim | Low | Mid | High | Low | Mid | High |
| **Secured Claims** | | | | | | | | | | |
| DIP ABL | [12] | $ 1,507 | $ 223 | $ 1,730 | 49.4% | 51.6% | 53.9% | $ 854 | $ 893 | $ 933 |
| DIP FILO | [13] | 180 | 28 | 208 | - | - | - | - | - | - |
| Pre-Petition FILO | [14] | 60 | 9 | 69 | - | - | - | - | - | - |
| 1.5L Exit Notes | [15] | 84 | - | 84 | - | - | - | - | - | - |
| 3L Takeback Debt | [16] | 391 | - | 391 | - | - | - | - | - | - |
| **Total Secured Claims** | | $ 2,222 | $ 261 | $ 2,482 | 34.4% | 36.0% | 37.6% | $ 854 | $ 893 | $ 933 |
| Remaining Distributable Value after Secured Claims | | | | | | | | $ - | $ - | $ - |
| **Administrative Claims** | | | | | | | | | | |
| Administrative Claims | [17] | 237 | - | 237 | - | - | - | | | |
| **Total Administrative Claims** | | $ 237 | $ - | $ 237 | - | - | - | | | |
| Remaining Distributable Value after Administrative Claims | | | | | | | | $ - | $ - | $ - |
| **Unsecured Claims** | | | | | | | | | | |
| General Unsecured Claims | [18] | TBD | - | TBD | - | - | - | - | - | - |
| **Total Unsecured Claims** | | $ - | $ - | $ - | - | - | - | $ - | $ - | $ - |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | $ - | $ - | $ - |
| **Total Claims / Total Recovery** | | $ 2,459 | $ 261 | $ 2,719 | 31.4% | 32.8% | 34.3% | $ 854 | $ 893 | $ 933 |

## VI. NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### Note 1 – Cash and Cash Equivalents

The Liquidation Analysis assumes 100% recovery on the projected cash balance at the Conversion Date.

### Note 2 – Accounts Receivable

Accounts receivable at the Conversion Date consists primarily of long-tail receivable balances for prescription sales and disputed A/R balances. Given the nature of these disputes (demand letters, class actions, long collection timing, etc.), the Liquidation Analysis discounts the outstanding receivable amount due to collection uncertainty.

### Note 3 – Pharmacy Inventory

The Liquidation Analysis includes estimated pharmacy inventory as of the Conversion Date, which includes all drug inventory, including branded and generic drugs, and vaccine inventory ("Pharmacy Inventory"). Pharmacy Inventory is assumed to be sold "as is, where is" through orderly liquidations resulting in a discount to value compared to an orderly sale.

### Note 4 – Real Estate

Real estate assets consist of the Debtor's fee owned property.  The Liquidation Analysis assumes that the sale of the majority of these assets occurs before the Conversion Date, however the chapter 7 trustee would be responsible for collection of sales proceeds and attempt to sell or otherwise monetize any remaining real estate.  The assumed recovery range on real estate is based on third-party valuations, adjusted to account for closing/collection risk and the forced sale in a compressed timeframe that would likely occur during a chapter 7 liquidation for any remaining real estate.

### Note 5 – Intellectual Property

Intellectual property assets consist of liquor licenses, trade names and proprietary in-house software.

### Note 6 – Lease Assets

Consists of marketable leases for store locations. The Liquidation Analysis assumes a heavier discount on these lease assets than fee owned property given the compressed timeframe and uncertainty of on-going auctions under a liquidation.

### Note 7 – Utility Deposits

Consists of deposits made to utility providers. The Liquidation Analysis assumes some of these will be returned, but many are unlikely to be recovered due to the long collection tail.

### Note 8 – Other Assets

Primarily consists of P-Card collateral. The Liquidation Analysis assumes a low likelihood of these amounts being return given the condensed collection timeframe.

## VII. WIND-DOWN COSTS

### Note 9 – Chapter 7 Trustee Fees

Per statutory guidelines, the chapter 7 trustee is eligible to receive compensation based on the gross proceeds available for distribution to interested parties, excluding cash. The Liquidation Analysis assumes a chapter 7 trustee fee of 3% of gross proceeds available for distribution, excluding cash. In addition to payment of the Trustee, these amounts will be used to pay for Trustee counsel, accountants and data warehousing expenses in order to effectuate the wind down.

### Note 10 – Asset Realization Fees

Asset realization fees include transaction fees and broker / agent fees in connection with monetizing Real Estate and IP.

### Note 11 – Litigation Contingency

Contingent liability for ongoing litigation with McKesson, which is proposed to be settled pursuant to the Plan. The Liquidation Analysis assumes a 50% likelihood of success in the Mid case.

## VIII. SECURED CLAIMS

### Note 12 – DIP ABL Claims

The Liquidation Analysis assumes that amounts outstanding under the DIP ABL Facility total $1,730 million at the end of the wind down period (which aggregate amount includes all outstanding letters of credit, closing fees, accrued interest estimated as of the Conversion Date, and accrued interest post-conversion for the wind down period). The DIP ABL Facility is secured by first-priority liens on the Debtors' working capital assets (*e.g.*, cash on hand, eligible accounts receivable, and inventory). The DIP ABL Facility has payment priority over the DIP FILO Facility with respect to such assets.

### Note 13 – DIP FILO Claims

The Liquidation Analysis assumes that amounts outstanding under the DIP FILO Facility total $208 million at the end of the wind down period, inclusive of closing fees, accrued interest estimated as of the Conversion Date and accrued interest post-conversion for the wind down period.

### Note 14 – Pre-Petition FILO Claims

The Liquidation Analysis assumes that amounts outstanding under the Prepetition FILO Facility total $69 million, inclusive of closing fees, accrued interest estimated as of the Conversion Date and accrued interest post-conversion for the wind down period.

### Note 15 – 1.5L Exit Notes

The Liquidation Analysis assumes that amounts outstanding under the 1.5L Exit Notes total $84 million, inclusive of pre-petition accrued interest.

**Note 16 – 3L Takeback Debt**

The Liquidation Analysis assumes that amounts outstanding under the 3L Takeback Debt total $391 million, inclusive of pre-petition accrued interest.

## IX. ADMINISTRATIVE AND PRIORITY CLAIMS

### Note 17 – Administrative Claims

Administrative and Priority Claims include amounts such as claims pursuant to section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims"), other post-petition accounts payable, and other Administrative Claims and Priority Claims estimates at the Conversion Date.  Administrative and Priority Claims are estimated at approximately $237 million as of the Conversion Date.  The Liquidation Analysis reflects no recovery on estimated Administrative and Priority Claims.

## X. UNSECURED CLAIMS

### Note 18 – Unsecured Claims

General Unsecured Claims include trade claims, rent and contract rejection claims, litigation claims, and other unsecured claims existing as of the Conversion Date. The Liquidation Analysis does not estimate General Unsecured Claims, and assumes no recovery on General Unsecured Claims.

NO ORDER OR FINDING HAS BEEN ENTERED OR MADE BY THE BANKRUPTCY COURT ESTIMATING OR OTHERWISE FIXING THE AMOUNT OF CLAIMS AT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS.  THE ESTIMATES OF THE AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN.  THE ACTUAL AMOUNTS OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT FROM THE AMOUNTS OF CLAIMS ESTIMATED IN THIS LIQUIDATION ANALYSIS.

**Exhibit 2**

**Solicitation Procedures**

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice K. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**SOLICITATION PROCEDURES**

    **PLEASE TAKE NOTICE THAT** on [●], 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (i)(a) authorizing New Rite Aid, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan")[2]; (b) conditionally approving the *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (ii) in the event the Debtors determine to seek entry of

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

the Dismissal Orders (the "Non-Plan Toggle"), scheduling certain dates with respect to the dismissal of these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors will file a notice (the "Toggle Notice"), indicating their intention to continue to seek Confirmation of a Plan or entry of the Dismissal Orders, by **September 26, 2025, at 4:00 p.m. (prevailing Eastern Time)**, as such date may be extended in accordance with the Disclosure Statement Order.

A.    **The Voting Record Date.**

The Court has approved **September 8, 2025** as the record date for purposes of determining which Holders of Class 3 Prepetition FILO Claims (the "Voting Class") are entitled to vote on the Plan (the "Voting Record Date").

B.    **The Voting and Opt-Out Deadline.**

The Court has approved **October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)** as the voting deadline for the Plan and the deadline for submission of Opt-Out Forms (the "Voting and Opt-Out Deadline"). The Debtors may extend the Voting and Opt-Out Deadline, in their discretion, without further order of the Court. To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") and Opt-Out Forms must be executed, completed, and delivered pursuant to the instructions set forth on the applicable Ballot or Opt-Out Form so that they are **actually received** by Kroll Restructuring Administration LLC ("Kroll" or the "Claims Agent") no later than the Voting and Opt-Out Deadline.

C.    **Form, Content, and Manner of Notices.**

1.    The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.    the Disclosure Statement (and exhibits thereto, including the Plan), substantially in the form to be attached to the Disclosure Statement Order as Exhibit 1;

b.    these Solicitation Procedures, substantially in the form attached to the Disclosure Statement Order as Exhibit 2;

c.    the form of Ballot, substantially in the form of Ballot attached to this Disclosure Statement Order as Exhibit 3, together with detailed voting instructions and instructions on how to submit the Ballot;

d.    the Combined Hearing / Dismissal Hearing Notice, substantially in the form attached to the Disclosure Statement Order as Exhibit 5;

e.    the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); and

f.    any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

2.        Distribution of the Solicitation Package.

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Class.  The Debtors shall distribute the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures) to Holders of Claims entitled to vote on the Plan in electronic format (i.e., via e-mail, hyperlink and/or on a flash drive, as applicable[3]).  The Ballot, and the Combined Hearing / Dismissal Hearing Notice shall be provided in electronic format to those parties receiving service by e-mail, and paper format for those parties receiving service by first class mail.  In addition, these Solicitation Procedures, the Disclosure Statement, the Plan, the Disclosure Statement Order, and all pleadings filed with the Court shall be made available on the Debtors' case website https://restructuring.ra.kroll.com/RiteAid2025; *provided* that any party that would prefer paper format may contact the Claims Agent by: (a) calling the Claims Agent at (888) 575-9318 (USA or Canada, toll free) or +1 (646) 930-4577 (International); (b) emailing the Claims Agent at RiteAid2025Info@ra.kroll.com (with "In re New Rite Aid, LLC – Solicitation Inquiry" in the subject line); or (c) writing to the Claims Agent at Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002.  In addition, the Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Class within three (3) Business Days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) who are entitled to vote, as described in Section D.**Error! Reference source not found.** below.  Any party that receives solicitation materials in electronic format via email or flash drive but would prefer paper format or a flash drive, as applicable, may contact the Claims Agent and request paper copies or a flash drive of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense). The Debtors will not distribute Solicitation Packages or other solicitation materials to:  (i) any party to whom notice of the *Debtors' Motion for Entry of an Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Approving, in the Alternative, Dismissal of the Debtors' Chapter 11 Cases, (B) Scheduling Certain Dates With Respect Thereto, and (C) Granting Related Relief* [Docket No. 2289] was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; (ii) the Holders in Class 5 (Intercompany Claims) or Class 6 (Intercompany Interests); or (iii) parties that received a Notice of Non-Voting Status, as applicable.

3.        Notice of Non-Voting Status for Unimpaired, Impaired and Disputed Claims.

Certain (i) Holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, and (ii) Holders of Claims or Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the Notice of Non-Voting Status, substantially in the form annexed as Exhibit 4 to the Disclosure Statement Order.  Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** the Ballot). The Non-Voting Claimants' Packages, including the Combined Hearing / Dismissal Hearing Notice and the Notice of Non-Voting Status will be accompanied by the optional Third-Party Release Opt-Out Form

---

[3]    The flash drive shall contain the (i) fully compiled Disclosure Statement, including the Plan and (ii) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures).

(the "Opt-Out Form"), which will provide instructions for electing to opt-out of the grant of the Plan's Third-Party Release and for online submission of the Opt-Out Form via the E-Ballot Portal (as defined below).  Electronic Opt-Out Forms will not be accepted by facsimile, e-mail or any other electronic means (other than via the E-Ballot Portal or Public Securities Opt-Out Portal).  The encrypted Opt-Out Form data and audit trail created by submission via the E-Ballot Portal will become part of the record of Opt-Out Forms submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective.  The deadline for submission of Opt-Out Forms is the Voting and Opt-Out Deadline.

Notwithstanding anything to the contrary contained herein, the Claims Agent shall not be required to serve Solicitation Packages or Non-Voting Claimants' Packages, or any other solicitation materials or notices, on account of Claims or Interests filed after the Voting Record Date but before the Voting and Opt-Out Deadline.

Beneficial owners (the "Beneficial Holders") of the Debtors' Senior Secured Notes, whose positions in the Senior Secured Notes are held in 'street name' through a bank, broker, or other intermediary (each a "Nominee" and collectively, the "Nominees") shall receive their Non-Voting Claimants' Packages through their Nominees.  The Claims Agent shall provide sufficient quantities of the Non-Voting Claimants' Package to each Nominee with instructions that they immediately forward the Non-Voting Claimants' Packages to their Beneficial Holder clients.  Nominees are authorized to deliver the Non-Voting Claimants' Packages, and/or disseminate information pertaining thereto, to their Beneficial Holder clients according to their customary practices for doing so, including email, telephone and/or via an electronic link to an online platform.  To be effective, Beneficial Holders who elect to opt-out of the grant of the Plan's Third-Party Release must submit their completed Opt-Out Forms via the Public Securities Opt-Out Portal, which is accessible through the left-hand navigation panel of the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025  so that such Opt-Out Forms are  actually received by the Claims Agent on or before the Voting and Opt-Out Deadline. To submit an Opt-Out Form via the Public Securities Opt-Out Portal, Beneficial Holders should upload to such portal a PDF of their completed Opt-Out Form.

For the avoidance of doubt, and notwithstanding anything to the contrary in the Disclosure Statement Order, Plan or the Disclosure Statement, the Debtors shall cause the Non-Voting Claimants' package to be served upon all known Holders of Claims and Interests (other than those classified in class 3, 5, or 6), including, without limitation, Holders of non-classified Claims and Interests (*i.e.*, Holders of DIP Claims, Priority Tax Claims, etc.) and non-Debtor counterparties holding unexpired lease interests— including those that were previously rejected in the course of the Chapter 11 Cases—and such persons/entities shall remain eligible to elect to submit an Opt-Out Form through the Voting and Opt-Out Deadline.

4.      Notices in Respect of Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts and Unexpired Leases that receive a *Notice of Assumption of Executory Contracts and Unexpired Leases* substantially in the form annexed as Exhibit 6 to the Disclosure Statement Order may file an objection to the Debtors' proposed assumption of and/or cure amount related to such Executory Contract or Unexpired Lease, as applicable.  Such objections must:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Court electronically by attorneys who regularly practice before the Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Court) and, by all other parties in interest, if not otherwise filed with the Clerk of the  Court

electronically, via hard copy, and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before **21 days following service of the applicable notice, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure/Assumption Objection Deadline"):[4]

| Debtors | |
|---|---|
| **New Rite Aid, LLC** 200 Newberry Commons, Etters, Pennsylvania 17319 | |
| *Counsel to the Debtors* | *Counsel to the Debtors* |
| **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** 1285 Avenue of the Americas New York, New York 10019 Attn: Andrew N. Rosenberg; Alice Belisle Eaton; Christopher Hopkins; Sean A. Mitchell | **Cole Schotz, P.C.** Court Plaza North, 25 Main Street Hackensack, New Jersey 07601 Attn: Michael D. Sirota; Warren A. Usatine; Felice R. Yudkin; Seth Van Aalten |
| *Counsel to the Committee* | |
| **WILLKIE FARR & GALLAGHER LLP** 787 Seventh Avenue New York, New York 10019 Attn: Brett H. Miller; Todd M. Goren; James H. Burbage; Jessica D. Graber **SILLS CUMMIS & GROSS P.C.** One Riverfront Plaza Newark, New Jersey 07102 Attn: Andrew H. Sherman; Boris Mankovetskiy; Gregory Kopacz | |
| *Counsel to the DIP Agents* | |
| **Choate, Hall & Stewart LLP** Two International Place Boston, Massachusetts 02110 Attn: John F. Ventola; Jonathan D. Marshall; Mark D. Silva **Greenberg Traurig LLP** 500 Campus Drive, Suite 400 Florham Park, New Jersey 07932 Attn: Alan J. Brody | |

---

[4]    *Provided* that if any executory contract or unexpired lease is added to the Schedule of Assumed Executory Contracts of Unexpired Leases after the initial filing of such schedule, or an executory contract or unexpired lease proposed to be assumed by the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, is proposed to be assigned to a third party after the initial filing of such schedule, then the Cure/Assumption Objection Deadline with respect to such executory contract or unexpired lease shall be fourteen (14) days after service of such amended schedule with such modification (or such other time period as the Debtors set (subject to Court approval)).

| *Counsel to McKesson Corporation (as Plan Sponsor)* |
|---|
| **SIDLEY AUSTIN LLP**<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Dennis M. Twomey; Jackson T. Garvey; Ian C. Ferrell<br><br>**McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Suite 201<br>Roseland, New Jersey 07068<br>Attn: Anthony Sodono, III; Michele M. Dudas |
| *United States Trustee* |
| **Office of the United States Trustee**<br>**United States Trustee, Region 3**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Jeffrey M. Sponder and Lauren Bielskie |

D.     **Voting and Tabulation Procedures.**

1.     Holders of Claims Entitled to Vote.

Only Holders of Prepetition FILO Claims in Class 3 who are reflected on the Prepetition ABL Agent's books and records as of the Voting Record Date shall be entitled to vote in the amount set forth on the books and records of the Prepetition ABL Agent. The register of such Holders and voting amounts, as of the Voting Record Date, was provided to the Claims agent promptly following the Voting Record Date.

2.     Voting and Ballot Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.     except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted and actually received by the Claims Agent on or prior to the Voting and Opt-Out Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

b.     the Claims Agent will date-stamp all Ballots when received;

c.     the Debtors will file the Voting Report by no later than three (3) days prior to the Combined Hearing Date. The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged;

d.     the only acceptable means of submission of a Ballot is online via the Debtors' restructuring website maintained by the Claims Agent at https://restructuring.ra.kroll.com/RiteAid2025 (the "E-Ballot Portal"). Ballots

6

submitted in hard copy format via regular mail, overnight courier, or hand delivery or by electronic mail or facsimile or any other electronic means (other than through the E-Ballot Portal) will not be counted as a vote on the Plan except in the sole discretion of the Debtors.  The encrypted Ballot data and audit trail created by submission via the E-Ballot Portal will become part of the record of Ballots submitted in this manner and the signatures contained therein shall be deemed immediately legally valid and effective;

e.      a Ballot will be deemed delivered only when the Claims Agent actually receives the executed Ballot via the E-Ballot Portal;

f.      an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Claims Agent by any means other than as expressly provided in the applicable Ballot will not be valid, except in the sole discretion of the Debtors;

g.      where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (x) a Ballot, (y) a group of Ballots within a Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion;

h.      for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim may be treated as a single vote to accept or reject the Plan in each case, in the Debtors' discretion; *provided, however*, that if separate affiliated entities, including any funds or accounts that are advised or managed by the same entity or by affiliated entities, hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity or managed fund or account will be counted separately as a vote to accept or reject the Plan;

i.      no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

j.      if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting and Opt-Out Deadline, the last properly submitted, valid Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

k.      Holders must vote all of their Claims either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the Voting Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

l.      a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

m.      the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

n.      neither the Debtors nor any other Entity, including the Claims Agent, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

o.      unless waived or as ordered by the Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting and Opt-Out Deadline or such Ballots will not be counted;

p.      in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

q.      subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

r.      if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

s.      if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

t.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) except as otherwise provided in the Disclosure Statement Order, any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other

than the Claims Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

u.      after the Voting and Opt-Out Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Court; and

v.      to assist in the solicitation process, the Claims Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; *provided* that the Claims Agent is not obligated to do so and neither the Debtors nor the Claims Agent will suffer any liability for failure to notify parties of such deficiencies.

### E.      Non-Plan Toggle; Effect on Solicitation and Confirmation

As set forth in the Disclosure Statement Order, progression to a hearing on confirmation of the Plan is expressly conditioned upon the Debtors' filing of the Toggle Notice and such notice providing that the Debtors have determined to seek confirmation of the Plan. The Debtors will file the Toggle Notice on or before September 26, 2025, at 4:00 p.m. (prevailing Eastern Time) (as such date may be extended by the Debtors, with consent of the DIP Agent and in consultation with the Committee), regardless of whether the Debtors elect to pursue confirmation of the Plan or the Non-Plan Toggle.

If the Toggle Notice indicates that the Debtors will elect the Non-Plan Toggle and not pursue confirmation of the Plan: (a) the Debtors shall not proceed with confirmation of the Plan, and all Ballots received shall be deemed null and void, shall not be counted or tabulated for any purpose, and the Claims Agent shall have no obligation to prepare or file a Voting Report; and (b) the Debtors will proceed to seek dismissal of these Chapter 11 Cases pursuant to the procedures and timetable set forth in the Disclosure Statement Order, and a hearing to dismiss these Chapter 11 Cases (the "Dismissal Hearing") shall proceed on October 20, 2025. The Dismissal Hearing may be continued from time to time by the Court or the Debtors, with consent of the DIP Agent and in consultation with the Committee, without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on all parties entitled to notice in accordance with the Disclosure Statement Order.

The Debtors reserve the right, in accordance with the Disclosure Statement Order, with consent of the DIP Agent and in consultation with the Committee, to (i) extend the deadline to file the Toggle Notice, and (ii) modify any other dates or procedures contained herein to the extent necessary to accommodate the determination reflected in the Toggle Notice.

### F.      Amendments to the Plan and Solicitation Procedures.

The Debtors reserve the right to make non-substantive changes to the Disclosure Statement, Plan, Combined Hearing / Dismissal Hearing Notice, Solicitation Packages, Toggle Notice, Notice of Non-Voting Status, Ballot, Opt-Out Form, Publication Notice, Solicitation Procedures, Assumption Notice, and any related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to any materials in the Solicitation Packages before distribution; *provided*, *however*, that the Debtors shall provide the U.S. Trustee with notice of such non-substantive changes.

Dated:  September [●], 2025

/s/ Draft
_____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and
Debtors in Possession*

## **Exhibit 3**

**Ballot for Holders of Class 3 Prepetition FILO Claims**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al*., | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**BALLOT FOR VOTING ON THE FIRST AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES**

**CLASS 3 – PREPETITION FILO CLAIMS**

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AGENT AT (888) 575-9318 (U.S./CANADA, TOLL FREE) OR +1 (646) 930-4577 (INTERNATIONAL) OR EMAIL RITEAID2025INFO@RA.KROLL.COM AND REFERENCE "IN RE NEW RITE AID. – SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT. THIS BALLOT IS BEING SENT TO YOU TO SOLICIT YOUR (I) VOTE ON THE DEBTORS' PLAN OF REORGANIZATION AND (II) ELECTION WITH RESPECT TO CERTAIN RELEASES CONTAINED IN ARTICLE X OF THE DEBTORS' PLAN OF REORGANIZATION.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "CLAIMS AGENT") BY OCTOBER 13, 2025, AT 4:00 P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE").**

**IF THE DEBTORS' PLAN OF REORGANIZATION IS CONFIRMED BY THE COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU HAVE VOTED TO ACCEPT OR REJECT, OR ABSTAINED FROM VOTING ON, THE DEBTORS' PLAN OF REORGANIZATION. IF YOU DO NOT OPT OUT OF THE RELEASES CONTAINED IN ARTICLE X OF THE DEBTORS' PLAN OF REORGANIZATION, THE RELEASES WILL BE BINDING ON YOU.**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS ENCLOSED WITH THIS BALLOT.**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND SUBMIT *PROMPTLY* BY THE METHOD BELOW.**

By electronic, online submission:

To submit your Ballot via the online E-Ballot Portal (as defined below), please visit https://restructuring.ra.kroll.com/RiteAid2025, click on the "Submit E- Ballot" section of the website, and follow the instructions to submit your electronic Ballot.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID# _____**

The E-Ballot Portal is the sole manner in which Ballots will be accepted. Ballots submitted in hard copy format, or in electronic format by facsimile or email will not be counted.

Each Unique E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your E-Ballot.  Please complete and submit an E- Ballot for each Unique E-Ballot ID# you receive, as applicable.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *First Amened Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]]

(collectively, with all exhibits related thereto, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (collectively, with all exhibits related thereto, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 3 (the "Voting Class").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. The Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in the Voting Class votes to accept the Plan. The Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in the Plan. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You are receiving this ballot (the "Ballot") because you are the Holder (as defined in the Disclosure Statement) of a Class 3 Prepetition FILO Claim as of September 8, 2025 (the "Voting Record Date"). **For additional discussion of the treatment of your Claims under the Plan and the rights of Holders of Class 3 Prepetition FILO Claims under the Plan, please read the Disclosure Statement and the Plan.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Ballot. If you desire paper copies of the Solicitation Package, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) the Claims Agent, at no charge by: (i) accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; (ii) writing to the Claims Agent at New Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) calling (888) 575-9318 (U.S./Canada Toll-Free) or +1 (646) 930-4577 (International); or (iv) emailing RiteAid2025Info@ra.kroll.com and referencing "In re New Rite Aid. - Solicitation Inquiry" in the subject line; or (b) by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, please contact the Claims Agent *immediately* at the address, telephone number, or email address set forth above.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Claims Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON OCTOBER 13, 2025, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

<u>Item 1</u>. **Amount of Class 3 Prepetition FILO Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Class 3 Prepetition FILO Claims in the following aggregate unpaid amount:

Amount of Class 3 Prepetition FILO Claims: $_____

<u>Item 2</u>.  **Class 3 Prepetition FILO Claim Recovery.**

Pursuant to Article III of the Plan, Except to the extent that a Holder of a Prepetition FILO Claim and the Debtor against which such Allowed Prepetition FILO Claim is asserted agree to less favorable treatment, each Holder of an

Allowed Prepetition FILO Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

      (i)      its Pro Rata share of the FILO Cash Distribution.

**Item 3.** **Vote on Plan.**

The Holder of the Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

<div style="border:1px solid black; padding:10px;">

**<u>ACCEPT</u>** (vote FOR) the Plan            **<u>REJECT</u>** (vote AGAINST) the Plan

</div>

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1, above, and this Item 3.</u>**

<u>Item 4</u>. **Important information regarding the Third-Party Release.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE X.D OF THE PLAN SET FORTH BELOW, UNLESS YOU ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE BY CHECKING THE BOX BELOW AND SUBMITTING THIS BALLOT BY THE VOTING DEADLINE.**

<u>Article X.D of the Plan provides for the following ("**Third-Party Release**"):</u>

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; provided that nothing in this Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or (b) Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is**

determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this <u>Article X.D</u>, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this <u>Article X.D</u> is:  (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in this <u>Article X.D</u> may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this <u>Article X.D</u>, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in <u>Article X.C</u> of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to <u>Article X.C</u>, and (b) is colorable.  Solely to the extent legally permissible and as provided for in <u>Article XIII</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

<u>Definitions related to the Third-Party Release</u>:

UNDER THE PLAN, "RELATED PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, COMMITTEE MEMBERS, MEMBERS OF ANY GOVERNING BODY, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE RELEASING PARTIES; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (D); (F) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A), (B), (C), AND (E); (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (D) THROUGH (F) AND THE FOLLOWING CLAUSE (H); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (D) THROUGH (G) AND THIS CLAUSE (H); PROVIDED THAT, IN EACH CASE, ANY HOLDER OF A CLAIM OR INTEREST THAT IS NOT A RELEASING PARTY SHALL NOT BE A RELEASED PARTY.

UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE AGENTS; (E) THE DIP SECURED PARTIES; (F) MCKESSON; (G) THE COMMITTEE (AND EACH OF ITS MEMBERS, SOLELY IN ITS CAPACITY AS SUCH); (H) THE LIQUIDATING TRUSTEE ON BEHALF OF THE LIQUIDATING TRUST IN THE EVENT THAT THE LIQUIDATING TRUST IS ESTABLISHED PURSUANT TO ARTICLE IV.D HEREOF; (I) THE PLAN ADMINISTRATOR; (J) THE 1.5L INDENTURE TRUSTEE; (K) THE 3L INDENTURE TRUSTEE; (L) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (M) ALL HOLDERS OF CLAIMS THAT ARE PRESUMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (N) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (O) ALL HOLDERS OF CLAIMS WHO VOTE OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH CLAUSE (P).

\*      \*      \*

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE X.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE X.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE X.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

| |
|---|
| **By checking this box, you elect to opt <u>OUT</u> of the Third-Party Release** |

**Item 5.**   **Certifications.**

By signing this Ballot the undersigned certifies that:

1.      they are (a) the Holder of a Class 3 Prepetition FILO Claim being voted, or (b) the authorized signatory for an entity that is a Holder of such Claim;

2.      the undersigned has received a copy of the solicitation materials, including the Plan and the Disclosure Statement, and acknowledges that the undersigned's vote as set forth on this Ballot is subject to the terms and conditions set forth therein and herein;

3.      the undersigned has cast the same vote with respect to all of its Class 3 Prepetition FILO Claims, as applicable, in connection with the Plan; and

4.      (a) no other Ballot with respect to the same Class 3 Prepetition FILO Claims identified in Item 1 has been cast or (b) if any other Ballot has been cast with respect to such Class 3 Prepetition FILO Claims, then any such earlier Ballots are hereby revoked and deemed to be null and void.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| Title: | (If other than the holder) |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**THE VOTING DEADLINE IS OCTOBER 13, 2025, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**THE CLAIMS AGENT MUST ACTUALLY RECEIVE
THIS BALLOT ON OR BEFORE THE VOTING DEADLINE.**

*Remainder of page intentionally left blank; continued to next page.*

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of certain Holders of Class 3 Prepetition FILO Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of impaired creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. This Ballot contains voting options with respect to the Plan.

4. To vote, you <u>MUST</u>: (a) fully complete this Ballot; (b) clearly indicate your decision to accept or reject the Plan in Item 3 of this Ballot; and (c) sign, date, and return this Ballot via the Claims Agent's online E-Ballot Portal as described more fully below.

5. **<u>Use of Online Ballot Portal</u>**. To ensure that your customized electronic Ballot is counted, please visit the Claims Agent's online voting portal at https://restructuring.ra.kroll.com/RiteAid2025 (the "<u>E-Ballot Portal</u>"), <u>click</u> <u>on the</u> "Submit E- Ballot" section of the website, and follow the instructions to submit your Ballot. You will need to enter your Unique E-Ballot ID# indicated above. The E-Ballot Portal is the sole manner in which Ballots will be accepted. **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or electronic means (other than the online portal)**. Each Unique E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each Unique E- Ballot ID# you receive, as applicable.

6. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan, or is improperly signed and returned will <u>NOT</u> be counted unless the Debtors otherwise determine.

7. To vote, you <u>MUST</u> deliver your completed Ballot so that it is **ACTUALLY RECEIVED** by the Claims Agent on or before the Voting Deadline via the E-Ballot Portal as described above. The Voting Deadline is **OCTOBER 13, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

8. Any Ballot received by the Claims Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Debtors otherwise determine. No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior written consent.

9. Delivery of a Ballot reflecting your vote to the Solicitation will be deemed to have occurred only when the Claims Agent actually receives the Ballot (for the avoidance of doubt, a Ballot submitted via the E-Ballot Portal shall be deemed to contain a signature). In all cases, you should allow sufficient time to assure timely submission.

10. If you submit multiple Ballots with respect to the same Claim to the Claims Agent, <u>ONLY</u> the last properly submitted Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior received Ballot(s).

11. You must vote all of your Class 3 Prepetition FILO Claims either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims within Class 3, the Debtors may direct the Claims Agent to aggregate the Claims of any particular Holder within Class 3 for the purpose of counting votes.

12. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or an Interest, in the Debtors' chapter 11 cases.

13.     You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

14.     <u>SIGN AND DATE</u> your Ballot.[2] Please provide your name and mailing address in the space provided on this Ballot if it is different from that set forth on the Ballot or if no address is presented on the Ballot.

**PLEASE RETURN YOUR BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AGENT AT (888) 575-9318 (U.S./CANADA, TOLL FREE) OR +1 (646) 930-4577 (INTERNATIONAL) OR EMAIL RITEAID2025INFO@RA.KROLL.COM AND REFERENCE "IN RE NEW RITE AID - SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS OCTOBER 13, 2025 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**THE CLAIMS AGENT MUST ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[2]     If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims Agent, the Debtors, the Debtors' counsel, or the Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder. For the avoidance of doubt, an attorney representing one or more clients who are Holders of Class 3 Prepetition FILO Claims may execute and submit a Ballot on behalf of each such client so long as the attorney has the authority under applicable law to vote to accept or reject the Plan (and make the election with respect to the Third-Party Release) on behalf of each such client.

**Exhibit 4**

**Notice of Non-Voting Status**

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OR POTENTIAL HOLDERS OF
(I) UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO
ACCEPT THE PLAN, (II) IMPAIRED CLAIMS OR INTERESTS CONCLUSIVELY
PRESUMED TO REJECT THE PLAN, (III) NON-CLASSIFIED CLAIMS,
(IV) UNEXPIRED LEASE INTERESTS, AND (V) DISPUTED CLAIMS**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AGENT.**

**PLEASE TAKE NOTICE THAT** on [●], 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (i)(a) authorizing New Rite Aid, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan")[2]; (b) conditionally approving the

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

*First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (ii) in the event the Debtors determine to seek entry of the Dismissal Order (the "Non-Plan Toggle"), scheduling certain dates with respect to the dismissal of these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims Agent"), by: (a) calling the Claims Agent at (888) 575-9318 (U.S./ Canada, toll free) or +1 (646) 930-4577 (international); (b) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/RiteAid2025 (c) writing to the Claims Agent at New Rite Aid, LLC's Election Form Processing Center c/o Kroll Restructuring Administration LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232; or (d) emailing RiteAid2025Info@ra.kroll.com.(with "In re New Rite Aid Solicitation Inquiry" in the subject line). You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid2025, or the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE THAT** you are a Holder or potential Holder of a Claim against or Interest in the Debtors that, due to the nature and treatment of such Claim or Interest under the Plan, *is **not** entitled to vote on the Plan*. Specifically, under the terms of the Plan, (i) a Holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) a Holder of a Claim or Interest in a Class that is Impaired under the Plan and, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, (iii) a Holder of a non-classified Claim, (iv) a non-Debtor counterparty holding an unexpired lease interest, or (v) a Holder of a Claim that is subject to a pending objection by the Debtors, is *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** Holders of General Unsecured Claims in Class 4 are Impaired and ***conclusively presumed to reject the Plan***. The Debtors currently do not anticipate that Holders of General Unsecured Claims will receive any recovery under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the following provisions are included in the Plan:

**ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE X.D OF THE PLAN PROVIDES FOR THE FOLLOWING THIRD-PARTY RELEASE (THE "THIRD-PARTY RELEASE"):**

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions**

3

or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; provided that nothing in this Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or (b) Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this <u>Article X.D</u>, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this <u>Article X.D</u> is:  (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in this <u>Article X.D</u> may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this <u>Article X.D</u>, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in <u>Article X.C</u> of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to <u>Article X.C</u>, and (b) is colorable.  Solely to the extent legally permissible and as provided for in <u>Article XIII</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

<u>Definitions related to the Third-Party Release</u>:

UNDER THE PLAN, "RELATED PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, COMMITTEE MEMBERS, MEMBERS OF ANY GOVERNING BODY, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE RELEASING PARTIES; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (D); (F) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A), (B), (C), AND (E); (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (D) THROUGH (F) AND THE FOLLOWING CLAUSE (H); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (D) THROUGH (G) AND THIS CLAUSE (H); PROVIDED THAT, IN EACH CASE, ANY HOLDER OF A CLAIM OR INTEREST THAT IS NOT A RELEASING PARTY SHALL NOT BE A RELEASED PARTY.


UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE AGENTS; (E) THE DIP SECURED PARTIES; (F) MCKESSON; (G) THE COMMITTEE (AND EACH OF ITS MEMBERS, SOLELY IN ITS CAPACITY AS SUCH); (H) THE LIQUIDATING TRUSTEE ON BEHALF OF THE LIQUIDATING TRUST IN THE EVENT THAT THE LIQUIDATING TRUST IS ESTABLISHED PURSUANT TO ARTICLE IV.D HEREOF; (I) THE PLAN ADMINISTRATOR; (J) THE 1.5L INDENTURE TRUSTEE; (K) THE 3L INDENTURE TRUSTEE; (L) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (M) ALL HOLDERS OF CLAIMS THAT ARE PRESUMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (N) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (O) ALL HOLDERS OF CLAIMS WHO VOTE OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH CLAUSE (P).

\*    \*    \*

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT OUT FORM WITH RESPECT TO THE EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASE PROVIDED IN THE PLAN. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AGENT.**

Dated:  September [●], 2025

/s/  *Draft*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com
          svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:    arosenberg@paulweiss.com
          aeaton@paulweiss.com
          chopkins@paulweiss.com
          smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**<u>Exhibit 4A</u>**

**Opt-Out Form**

**THIRD-PARTY RELEASE OPT-OUT FORM**

***IF YOU ARE A HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS AND IF YOU WOULD LIKE TO MAKE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND SUBMIT IT PROMPTLY BY ONLY ONE OF THE FOLLOWING APPROVED SUBMISSION METHODS BELOW.***

| First-Class Mail (or in the enclosed reply envelope provided), Overnight Courier or Hand-Delivery To:<br><br>New Rite Aid, LLC Ballot Processing Center c/o Kroll Restructuring Administration LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232<br><br>If you would like to coordinate hand delivery of your Opt-Out Form, please send an email to RiteAid2025Ballots@ra.kroll.com (with "New Rite Aid Opt-Out Delivery" in the subject line) at least 24 hours prior to your arrival at the Claims Agent's address above, providing the anticipated date and time of your delivery. | By electronic, online submission:<br><br>To retrieve and submit your electronic Opt-Out Form (as defined below) via the online Ballot portal (the "E-Ballot Portal"), please visit https://restructuring.ra.kroll.com/RiteAid2025, click on the "Submit E-Ballot" section of the website and, after entering your Unique E-Opt-Out ID # as provided below, follow the instructions to submit your customized electronic Opt-Out Form.<br><br>**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**<br><br>**Unique E-Opt-Out ID#:_____**<br><br>Electronic Opt-Out Forms will be accepted only via the E-Ballot Portal. Opt-Out Forms will not be accepted by facsimile, e-mail, or any other electronic means. |

For all persons or entities who hold one or more positions in the Debtors' publicly-traded debt securities (the 1.5L Notes and 3L Notes, collectively, the "Senior Secured Notes") (as identified by the CUSIPs and ISINs set forth below) in "street name" at a bank, broker, or other intermediary, through DTC or another similar depository (such Holders being "Beneficial Holders" of the Debtors' Senior Secured Notes):

| Security Description | CUSIP | ISIN |
|---|---|---|
| Floating Rate Senior Secured PIK Notes due 9/1/31 | 767754CR3 | US767754CR33 |
| 15.000% Third-Priority Series A Senior Secured PIK Notes due 9/1/31 | 767754CS1 | US767754CS16 |
| 15.000% Third-Priority Series B Senior Secured PIK Notes due 9/1/31 | 767754CT9 | US767754CT98 |

**By electronic, online submission:**

As a Beneficial Holder of the Debtors' Senior Secured Notes, you will not be issued a Unique E-Opt-Out ID# to retrieve and submit the customized electronic version of your Opt-Out Form. Instead, click on the Public Securities Opt-Out Portal link located on the left-hand navigation panel of the Debtors' restructuring website at: https://restructuring.ra.kroll.com/RiteAid2025 to upload a PDF of your completed Opt-Out Form. For the avoidance of doubt, only Holders of Senior Secured Notes, whose ownership thereof is registered in the Holder's own name directly on the books and records of the Debtors and/or the applicable trustee for the Senior Secured Notes, will receive a Unique E-Opt-Out ID#, which will enable them to retrieve and submit a customized electronic version of their Opt-Out Form.

> **THE OPT-OUT DEADLINE IS OCTOBER 13, 2025, AT 4:00 P.M. (PREVAILING EASTERN TIME).**
>
> **THE CLAIMS AGENT MUST ACTUALLY RECEIVE**
> **THIS OPT-OUT FORM ON OR BEFORE THE OPT-OUT DEADLINE.**

You are receiving this Opt-Out form (the "Opt-Out Form") because you are or may be a holder of a Claim or Interest that is not entitled to vote on the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"). **You are deemed to grant the Third-Party Release set forth below unless you affirmatively opt out by completing and returning this Opt-Out Form in accordance with the directions herein or file an objection to the Third-Party Release with the Court <u>on or before</u> October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

Notwithstanding anything to the contrary in the Disclosure Statement Order, Plan or the Disclosure Statement, the Debtors shall cause the Non-Voting Claimants' package to be served upon all known Holders of Claims and Interests (other than those classified in class 3, 5, or 6), including, without limitation, Holders of non-classified Claims and Interests (*i.e.*, Holders of DIP Claims, Priority Tax Claims, etc.) and non-Debtor counterparties holding unexpired lease interests—including those that were previously rejected in the course of the Chapter 11 Cases—and such persons/entities shall remain eligible to elect to submit an Opt-Out Form through the Voting and Opt-Out Deadline.

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY <u>BEFORE</u> COMPLETING THIS OPT-OUT FORM.

**If you choose to opt out of the Third-Party Release set forth in Article X.D of the Plan, please promptly complete, sign, and date this Opt-Out Form and return it** to the Claims Agent by **ONLY ONE** of the following methods: (a) First Class Mail (or in the enclosed reply envelope provided), overnight courier, or hand-delivery to New Rite Aid, LLC Ballot Processing Center c/o Kroll Restructuring Administration LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232; or (b) Online submission via the E-Ballot Portal (or, for Beneficial Holders of Senior Secured Notes, via the Public Securities Opt-Out Portal) at https://restructuring.ra.kroll.com/RiteAid2025. If you would like to coordinate hand delivery of your Opt-Out Form, please send an email to RiteAid2025Ballots@ra.kroll.com (with "New Rite Aid Opt-Out Delivery" in the subject line) at least 24 hours prior to your arrival at the Claims Agent's address above, providing the anticipated date and time of your delivery. **Opt-Out Forms will not be accepted by facsimile, e-mail, or any other electronic means (other than via the E-Ballot Portal or Public Securities Opt-Out Portal)**.

**THIS OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE CLAIMS AGENT BY THE OPT-OUT DEADLINE OF OCTOBER 13, 2025, AT 4:00 P.M. (PREVAILING EASTERN TIME). IF THE OPT-OUT FORM IS RECEIVED AFTER THE OPT-OUT DEADLINE, IT WILL NOT BE COUNTED.**

If you believe you have received this Opt-Out Form in error, or if you believe that you have received the wrong Opt-Out Form, please contact the Claims Agent immediately by: (a) calling the Claims Agent at (888) 575-9318 (U.S./Canada, toll free) or +1 (646) 930-4577 (international), (b) emailing the Claims Agent at RiteAid2025Info@ra.kroll.com with a reference to "In re New Rite Aid – Solicitation Inquiry" in the subject line, or (c) writing to the Claims Agent at New Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

<u>Article X.D of the Plan provides for the following ("Third-Party Release"):</u>

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy**

law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; provided that nothing in this Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or (b) Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this **Article X.D**, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this **Article X.D** is:  (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in this **Article X.D** may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this **Article X.D**, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in **Article X.C** of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to **Article X.C**, and (b) is colorable.  Solely to the extent legally permissible and as provided for in **Article XIII** of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

**Definitions related to the Third-Party Release:**

UNDER THE PLAN, "RELATED PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, COMMITTEE MEMBERS, MEMBERS OF ANY GOVERNING BODY, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE RELEASING PARTIES; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (D); (F) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A), (B), (C), AND (E); (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (D) THROUGH (F) AND THE FOLLOWING CLAUSE (H); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (D) THROUGH (G) AND THIS CLAUSE (H); PROVIDED THAT, IN EACH CASE, ANY HOLDER OF A CLAIM OR INTEREST THAT IS NOT A RELEASING PARTY SHALL NOT BE A RELEASED PARTY.

UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE AGENTS; (E) THE DIP SECURED PARTIES; (F) MCKESSON; (G) THE COMMITTEE (AND EACH OF ITS MEMBERS, SOLELY IN ITS CAPACITY AS SUCH); (H) THE LIQUIDATING TRUSTEE ON BEHALF OF THE LIQUIDATING TRUST IN THE EVENT THAT THE LIQUIDATING TRUST IS ESTABLISHED PURSUANT TO ARTICLE IV.D HEREOF; (I) THE PLAN ADMINISTRATOR; (J) THE 1.5L INDENTURE TRUSTEE; (K) THE 3L INDENTURE TRUSTEE; (L) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (M) ALL HOLDERS OF CLAIMS THAT ARE PRESUMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (N) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (O) ALL HOLDERS OF CLAIMS WHO VOTE OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH CLAUSE (P).

### Important information regarding the Third-Party Release:

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE X.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE X.D OF THE PLAN ONLY IF YOU (A) TIMELY SUBMIT THE FORM BELOW OR (B) TIMELY FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE X OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE X.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE DEBTOR RELEASE SET FORTH IN ARTICLE X.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

IF YOU DO <u>NOT</u> OPT OUT OF THE THIRD-PARTY RELEASE, YOU WILL BE RELEASED FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION THE DEBTORS MAY HAVE AGAINST YOU.

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE X.D OF THE PLAN IF YOU CHECK THE BOX BELOW:**

☐ By checking this box, you elect to opt <u>OUT</u> of the Third-Party Release

**Certifications.**

By signing this Opt-Out Form, the undersigned certifies:

(a)    that, as of the Voting Record Date of September 8, 2025, the undersigned is, or is an authorized signatory of, a Holder of a Claim against or Existing Equity Interests in the Debtors;

(b)    that the Holder has received a copy of the *Notice of Non-Voting Status to Holders or Potential Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan, Holders or Potential Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, and Holders or Potential Holders of Disputed Claims* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

(c)    that the undersigned has submitted the Opt-Out Form with respect to all of its Claims against or Existing Equity Interests in the Debtors; and

(d)    that no other Opt-Out Form with respect to these Claims against or Existing Equity Interests in the Debtors has been submitted or, if any other Opt-Out Forms have been submitted with respect to such Claims against or Existing Equity Interests in the Debtors, then any such earlier Opt-Out Forms are hereby revoked.

Name of Holder:    _____
                                      (Print or Type)

Signature:    _____

Name of Signatory:    _____
                                          (If other than the Holder)

Title:    _____

Address:    _____
                   _____
                   _____

Telephone Number:    _____

Email:    _____

Date Completed:    _____

If your address or contact information has changed, please note the new information here.

## <u>INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM</u>

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "<u>Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. To ensure that your election is counted, you <u>must</u> complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt-out" of the Third-Party Release set forth in the Plan in <u>Item 1</u> above; (b) make sure that the information required by <u>Item 2</u> above has been correctly inserted; <u>and</u> (c) sign, date and submit your Opt-Out Form in accordance with instructions set forth above.

**3.** **<u>Return of Opt-Out Form</u>**: Your Opt-Out Form MUST be returned to the Claims Agent so as to be **<u>actually received</u>** by the Claims Agent on or before the Opt-Out Deadline, which is **<u>4:00 p.m. (prevailing Eastern Time) on October 13, 2025</u>**.

4. If an Opt-Out Form is received by the Claims Agent <u>after</u> the Opt-Out Deadline, it will not be effective. Additionally**,** the following Opt-Out Forms will <u>NOT</u> be counted:

   - ANY OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR INTEREST;

   - ANY OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT-OUT OF THE RELEASE;

   - ANY OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE CLAIMS AGENT), OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   - ANY OPT-OUT FORM TRANSMITTED BY FACSIMILE OR E-MAIL;

   - ANY UNSIGNED OPT-OUT FORM**;** OR

   - ANY OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE SOLICITATION ORDER.

5. Delivery of your Opt-Out Form will be deemed made to the Claims Agent only when the Claims Agent **<u>actually receives</u>** the completed Opt-Out Form. Holders should allow sufficient time to assure timely delivery.

6. If multiple Opt-Out Forms are received from the same Holder with respect to the same Claim or Interest prior to the Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7. The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to Opt-Out of the Third-Party Release. Accordingly, at this time, Holders of Interests should not surrender certificates or instruments representing or evidencing their Interests,

and neither the Debtors nor the Claims Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8.  The Opt-Out Form does <u>not</u> constitute, and shall not be deemed to be, (a) a proof of claim, (b) proof of interest, or (c) an assertion or admission of a Claim or Interest.

9.  <u>Please be sure to sign and date your Opt-Out Form</u>. If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

**<u>IF YOU DESIRE TO OPT-OUT, PLEASE RETURN YOUR OPT-OUT FORM
PROMPTLY</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM
OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT**

**THE CLAIMS AGENT AT:**

**(888) 575-9318 (U.S./CANADA, TOLL FREE) OR +1 (646) 930-4577
(INTERNATIONAL) OR EMAIL <u>RITEAID2025INFO@RA.KROLL.COM</u> (WITH
"IN RE NEW RITE AID, LLC - SOLICITATION INQUIRY" IN THE SUBJECT LINE)**

---

**IF THE CLAIMS AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THE OPT-OUT FORM FROM YOU BEFORE THE OPT-OUT DEADLINE, WHICH IS 4:00 P.M. PREVAILING EASTERN TIME ON OCTOBER 13, 2025, THEN YOUR OPT-OUT ELECTION TRANSMITTED THEREBY WILL NOT BE EFFECTIVE.**

## Exhibit 5

**Combined Hearing / Dismissal Hearing Notice**

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF (A) HEARING TO CONSIDER CONFIRMATION OF
THE CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED
VOTING AND OBJECTION DEADLINES, AND (B) IN THE ALTERNATIVE,
HEARING TO CONSIDER DISMISSAL OF THE DEBTORS' CHAPTER 11 CASES**

**PLEASE TAKE NOTICE THAT** on [●], 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (i)(a) authorizing New Rite Aid, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan")[2]; (b) conditionally approving the *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c)

---

[1]    The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (ii) in the event the Debtors determine to seek entry of the Dismissal Orders (the "Non-Plan Toggle"), scheduling certain dates with respect to the dismissal of these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors will file a notice  (the "Toggle Notice"), indicating their intention to continue to seek Confirmation of a Plan or entry of the Dismissal Orders, by **September 26, 2025, at 4:00 p.m. (prevailing Eastern Time)**, as such date may be extended in accordance with the Disclosure Statement Order.

**PLEASE TAKE FURTHER NOTICE THAT**, in the event that the Debtors seek Dismissal, the Dismissal Hearing will commence on **October 20, 2025, at 9:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE THAT**, in the event that the Debtors confirm they intend to seek confirmation of the Plan, the hearing at which the Court will consider confirmation of the Plan and approval of the Disclosure Statement on a final basis, will commence on **October 20, 2025, at 9:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Combined Hearing") before the Honorable Chief Judge Michael B. Kaplan, United States Bankruptcy Judge, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

---

**PLEASE BE ADVISED**:  THE COMBINED HEARING OR DISMISSAL HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

---

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **September 8, 2025** (the "Voting Record Date"), which is the date for determining which certain Holders of Claims are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is **October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**:  (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing and solicitation agent, Kroll Restructuring Administration LLC, (the "Claims Agent") on or before the Voting Deadline.  **A failure to follow such instructions may disqualify your vote**.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN AND/OR OBJECTING TO ENTRY OF THE DISMISSAL ORDERS

**Objection Deadlines**.  The deadline for filing objections to the Plan is **October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline").  The deadline for filing objections to the Dismissal is **October 13, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Dismissal Objection Deadline").  Any objection to the relief sought at the Confirmation Hearing or the Dismissal Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Court electronically by attorneys who regularly practice before the Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of

March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Court) and, by all other parties-in-interest, if not otherwise filed with the Clerk of the Court electronically via hard copy, and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| *Debtors* |
|---|
| **New Rite Aid, LLC**<br>200 Newberry Commons, Etters, Pennsylvania 17319 |

| *Counsel to the Debtors* | *Counsel to the Debtors* |
|---|---|
| **PAUL, WEISS, RIFKIND,**<br>**WHARTON & GARRISON LLP**<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn:  Andrew N. Rosenberg; Alice Belisle Eaton;<br>Christopher Hopkins; Sean A. Mitchell | **Cole Schotz, P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn:  Michael D. Sirota; Warren A. Usatine; Felice R.<br>Yudkin; Seth Van Aalten |

| *Counsel to the Committee* |
|---|
| **WILLKIE FARR & GALLAGHER LLP**<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Brett H. Miller; Todd M. Goren; James H. Burbage; Jessica D. Graber<br><br>**SILLS CUMMIS & GROSS P.C.**<br>One Riverfront Plaza<br>Newark, New Jersey 07102<br>Attn: Andrew H. Sherman; Boris Mankovetskiy; Gregory Kopacz |

| *Counsel to the DIP Agents* |
|---|
| **Choate, Hall & Stewart LLP**<br>Two International Place<br>Boston, Massachusetts 02110<br>Attn: John F. Ventola; Jonathan D. Marshall; Mark D. Silva<br><br>**Greenberg Traurig LLP**<br>500 Campus Drive, Suite 400<br>Florham Park, New Jersey 07932<br>Attn: Alan J. Brody |

| *Counsel to McKesson Corporation (as Plan Sponsor)* |
|---|
| **SIDLEY AUSTIN LLP**<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Dennis M. Twomey; Jackson T. Garvey; Ian C. Ferrell<br><br>**McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Suite 201<br>Roseland, New Jersey 07068<br>Attn: Anthony Sodono, III; Michele M. Dudas |

| *United States Trustee* |
|---|
| **Office of the United States Trustee**<br>**United States Trustee, Region 3**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Jeffrey M. Sponder and Lauren Bielskie |

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.   The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format), please feel free to contact the Debtors' Claims Agent, by:  (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/RiteAid2025; (b) writing to the Claims Agent at New Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232; (c) calling the Claims Agent at (888) 575-9318 (USA or Canada, toll free) or +1 (646) 930-4577 (international).; or (d) email RiteAid2025Info@ra.kroll.com  (with "In re New Rite Aid - Solicitation Inquiry" in the subject line).  You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid2025, or the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.  Please be advised that the Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) **no later than September 30, 2025, at 4:00 p.m. (prevailing Eastern Time)** and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Dated:  September [●], 2025

/s/ Draft

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and
Debtors in Possession*

**Exhibit 6**

**Notice of Assumption of Executory Contracts and Unexpired Leases**

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**NOTICE TO CONTRACT PARTIES
TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS**

</div>

**PLEASE TAKE NOTICE THAT** on [●], 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (i)(a) authorizing New Rite Aid, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan")[2]; (b) conditionally approving the *First Amended Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (ii) in the event the Debtors determine to seek entry of the Dismissal Orders (the "Non-Plan Toggle"), scheduling certain dates with respect to the dismissal of these chapter 11 cases.

---

[1]     The last four digits of Debtor New Rite Aid, LLC̓s tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor̓s tax identification number may be obtained on the website of the Debtors̓ claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC̓s principal place of business and the Debtors̓ service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2]     Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT,** on [●], 2025, the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* [Docket No. [●]] (the "Assumed Contract Schedule") with the Court as part of the *Plan Supplement for the Joint Chapter 11 Plan of New Rite Aid, LLC and Its Debtor Affiliates*, as contemplated under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and final approval of the Disclosure Statement (the "Combined Hearing") is scheduled to commence on **October 20, 2025, at 9:00 a.m. (prevailing Eastern Time)** or as soon thereafter as counsel may be heard before the Honorable Chief Judge Michael B. Kaplan, United States Bankruptcy Judge, United States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice (this "Notice") because the Debtorsx records reflect that you are a party to a contract or une/pired lease that is listed on the Assumed Contract Schedule. Therefore, you are advised to carefully review the information contained in this Notice and the related provisions of the Plan, including the Assumed Contract Schedule.

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, the e/ecutory contracts and une/pired leases listed on the Assumed Contract Schedule may be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Plan. The Assumed Contract Schedule can also be viewed on the Debtorsx restructuring website, https:jjrestructuring.ra.kroll.comjRiteAid2025. The Debtorsx determination to assume or assume and assign the une/pired leases and e/ecutory contracts listed on **Schedule A** hereto is sub'ect to revision.

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under e/ecutory contracts and une/pired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the e/ecutory contracts and une/pired leases, which amounts are listed on **Schedule A** attached hereto. Please note that if no amount is stated for a particular e/ecutory contract or une/pired lease, the Debtors believe that there is no cure amount outstanding for such e/ecutory contract or une/pired lease.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed cure amounts or ob'ect to the assumption or assumption and assignment of an e/ecutory contract or une/pired lease, including for lack of adequate assurance, your ob'ection (a "CurejAssumption Ob'ection") **must**: (a) be in writing; (b) state with particularity the basis of the ob'ection; and (c) be filed with the Clerk of the Court electronically by attorneys who regularly practice before the Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the Usersx Manual for the Electronic Case Filing System can be found at www.n'b.uscourts.gov, the official website for the Court) and, by all other parties in interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before 21 days following service of this Notice (the "CurejAssumption Ob'ection Deadline")[3]:

---

[3]    *Provided* that if any e/ecutory contract or une/pired lease is added to the Assumed Contract Schedule after the filing of the initial Assumed Contract Schedule, or an e/ecutory contract or une/pired lease proposed to be assumed by the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, is proposed to be assigned to a third party after the filing of the initial Assumed Contract Schedule, then the CurejAssumption Ob'ection Deadline with respect to such e/ecutory contract or une/pired lease shall be fourteen (14) days after service of the amended Assumed Contract Schedule with such modification (or such other time period as the Debtors set (sub'ect to Bankruptcy Court approval)).

| Debtors |
|---|
| **New Rite Aid, LLC**<br>200 Newberry Commons, Etters, Pennsylvania 17319 |

| Counsel to the Debtors | Counsel to the Debtors |
|---|---|
| **PAUL, WEISS, RIFKIND,<br>WHARTON & GARRISON LLP**<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn:  Andrew N. Rosenberg; Alice Belisle Eaton;<br>Christopher Hopkins; Sean A. Mitchell | **Cole Schotz, P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn:  Michael D. Sirota; Warren A. Usatine; Felice R.<br>Yudkin; Seth Van Aalten |

| Counsel to the Committee |
|---|
| **WILLKIE FARR & GALLAGHER LLP**<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Brett H. Miller; Todd M. Goren; James H. Burbage; Jessica D. Graber<br><br>**SILLS CUMMIS & GROSS P.C.**<br>One Riverfront Plaza<br>Newark, New Jersey 07102<br>Attn: Andrew H. Sherman; Boris Mankovetskiy; Gregory Kopacz |

| Counsel to the DIP Agents |
|---|
| **Choate, Hall & Stewart LLP**<br>Two International Place<br>Boston, Massachusetts 02110<br>Attn: John F. Ventola; Jonathan D. Marshall; Mark D. Silva<br><br>**Greenberg Traurig LLP**<br>500 Campus Drive, Suite 400<br>Florham Park, New Jersey 07932<br>Attn: Alan J. Brody |

| Counsel to McKesson Corporation (as Plan Sponsor) |
|---|
| **SIDLEY AUSTIN LLP**<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Dennis M. Twomey; Jackson T. Garvey,;Ian C. Ferrell<br><br>**McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Suite 201<br>Roseland, New Jersey 07068<br>Attn: Anthony Sodono, III; Michele M. Dudas |

| United States Trustee |
|---|
| **Office of the United States Trustee**<br>**United States Trustee, Region 3**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Jeffrey M. Sponder and Lauren Bielskie |

PLEASE TAKE FURTHER NOTICE that if no ob'ection is filed by the CurejAssumption Ob'ection Deadline, then: **(i) you will be deemed to have stipulated that the Cure amounts as determined by the Debtors are correct; (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assumed Contract; and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assumption or assumption and assignment.**

PLEASE TAKE FURTHER NOTICE that any CurejAssumption Ob'ection that otherwise complies with these procedures yet remains unresolved as of the CurejAssumption Ob'ection Deadline may be heard at a later date to be fi/ ed by the Court.

PLEASE TAKE FURTHER NOTICE that notwithstanding anything herein, the mere listing of any e/ ecutory contract or une/ pired lease on the Assumed Contract Schedule does not require or guarantee that such e/ ecutory contract or une/ pired lease will be assumed at any time or assumed and assigned, and all rights of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, with respect to such e/ ecutory contract or une/ pired lease are reserved.  Moreover, the Debtors e/ plicitly reserve their rights, in their reasonable discretion to seek to re'ect or assume each e/ ecutory contract or une/ pired lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures set forth in Article V of the Plan.

PLEASE TAKE FURTHER NOTICE that nothing herein:  (i) alters in any way the prepetition nature of the e/ ecutory contracts or une/ pired leases or the validity, priority, or amount of any claims of a counterparty to any e/ ecutory contracts or une/ pired leases against the Debtors that may arise under such e/ ecutory contracts or une/ pired leases; (ii) creates a postpetition contract or agreement; or (iii) elevates to administrative e/ pense priority any claims of a counterparty to any e/ ecutory contract or une/ pired lease against the Debtors that may arise under such e/ ecutory contract or une/ pired lease.

PLEASE TAKE FURTHER NOTICE THAT if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact Kroll Restructuring Administration LLC, the Debtorsxclaims, noticing, and solicitation agent in the chapter 11 cases (the "Claims Agent"), by: (a) visiting the Debtorsx restructuring website at:  https:jjrestructuring.ra.kroll.comjRiteAid2025; (b) writing to New Rite Aid Ballot Processing Center, cjo Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Claims Agent at RiteAid2025Info@ra.kroll.com (with "In re New Rite Aid Solicitation Inquiry" in the sub'ect line); or (d) calling the Claims Agent at (888) 575-9318 (USA or Canada, toll-free) or +1 (646) 930-4577 (international).  You may also obtain copies of any pleadings filed with the Court free of charge by visiting the Debtorsx restructuring website, https:jjrestructuring.ra.kroll.comjRiteAid2025, or the Courtxs website at https:jjwww.n'b.uscourts.gov in accordance with the procedures and fees set forth therein.

---

**ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE X.D CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AGENT.**

---

*[Remainder of page intentionally left blank]*

Dated:  [●], 2025

*/s/ Draft*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and
Debtors in Possession*