**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Jointly Administered) |

**DEBTORS' OBJECTION TO STONEBRIER COMMERCIAL L.P.'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)(7) AND § 503(b)(9) AND FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

New Rite Aid, LLC, together with its affiliated debtors and debtors in possession (collectively, the "Debtors"), file this objection to *Stonebrier Commercial L.P.'s Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(7) and § 503(b)(9) and for Payment of Administrative Expense Claim* [Docket No. 2218] (the "Motion") and in response thereto, the Debtors respectfully state as follows:

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

1.	Stonebrier Commercial, L.P. ("Stonebrier"), a landlord to one of the Debtors' rejected leases, requests immediate payment of a purported administrative expense priority claim in the amount of $157,048.92 pursuant to sections 503(b)(7) and (b)(9) of title 11 of the United States Code (the "Bankruptcy Code"). However, as set forth below, those sections of the Bankruptcy Code are wholly inapplicable and Stonebrier has failed to present this Court with any authority (or evidence) to meet its heavy burden for the allowance of an administrative expense priority claim. Accordingly, Stonebrier's request for the allowance and payment (immediate or otherwise) of an administrative expense priority claim should be denied.

## BACKGROUND

2.	On May 5, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. As set forth in the Motion, the Debtors had not, as of the Petition Date, paid the rent obligations due under the Lease (as defined below) for the May 2025 period.

3.	Prior to the Petition Date, and as set forth in the Motion, on or about June 25, 2008, Debtor Thrifty Payless, Inc., as tenant, was party to a lease with Stonebrier, as landlord, for the premises located at 4774 West Lane, Stockton, CA, 95210 (Store No. 6510) (the "Lease"). *See* Certification in Support of Motion, Ex. A. On or about June 20, 2024, the Lease was amended. *Id.,* Ex. B. On or about February 27, 2025, in accordance with that amendment, the Debtors provided notice of their intent to terminate the Lease as of July 31, 2025 (the "Termination Letter"). Annexed hereto as **Exhibit A** is a copy of the Termination Letter.[2]

---

[2] Although Stonebrier submits, without support (or frankly any explanation), that the termination of the Lease effective July 31, 2025, entitles Stonebrier to July 2025 rent (despite the Lease being effectively rejected on June 30, 2025), the termination of the Lease is only relevant to the extent Stonebrier asserts a rejection damages claim. Moreover, Stonebrier curiously contends that "Debtor failed to notify movant in advance of its intent to exercise the Termination Option and was thus obligated on the lease through and including July 31, 2025." *See* Memorandum of Law at p. 2. In addition to being wrong about the effect of such a failure if true (and it is not

2

4.     On June 25, 2025, pursuant to the *Final Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 776] (the "Rejection Procedures Order"), the Debtors filed the *Tenth Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 1093] (the "Rejection Notice") providing notice of their intent to reject the Stonebrier Lease effective as of June 30, 2025 (the "Rejection Date").  *See* Rejection Notice, pg. 21 of 27, line 59.  The Rejection Procedures Order provides that the Debtors may reject any lease effective as of the later of:

> (a) the proposed effective date set forth on the Rejection Notice, and (b) the date the Debtors relinquish control of the premises by (1) notifying the affected landlord in writing, with email being sufficient, of the Debtors' surrender of the premises and turning over keys, key codes, and security codes, if any, to the affected landlord, or (2) notifying the affected landlord in writing, with email being sufficient, that the keys, key codes, and security codes, if any, are not available, but that the landlord may rekey the leased premises, or (c) such other date to which the Debtors and the applicable Rejection Counterparty have agreed or as the Court may order.

*See* Rejection Procedures Order, ¶ 2(a); *see also* Rejection Order (defined below), ¶ 1 (approving rejection of the Lease on the same terms).

5.     On June 26, 2025, in compliance with the Rejection Procedures Order, the Debtors sent a surrender letter (the "Surrender Letter") to Stonebrier via overnight mail advising that the Debtors were surrendering the premises as of 11:59 p.m. (prevailing local time) on June 30, 2025, and advising Stonebrier that it could rekey the premises.  Annexed hereto as **Exhibit B** is a copy of the Surrender Letter.  Indeed, in the Motion, Stonebrier acknowledges receipt of the notice of

---

true), Stonebrier is wrong about the timing. Having "issue[d] notice to Landlord of Tenant's election to exercise the Termination Option" on or about February 27, 2025, of the July 31, 2025 "Early Termination Date," *i.e.*, which is a date that is "no later than five (5) months prior to the [July 31, 2025] Early Termination Date," the Debtors provided the requisite notice required by the June 20, 2024 amendment to the Lease.

3

rejection and does not contest the efficacy of such notice. *See* Certification in Support of Motion, ¶ 5.

6. On July 11, 2025, having received no objection to the Rejection Notice from Stonebrier, the Court entered the *Tenth Order Approving the Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No 1406] (the "Rejection Order") approving the rejection of the Lease as of June 30, 2025. *See* Rejection Order, pg. 14 of 19, line 57.

7. On August 29, 2025, Stonebrier filed the Motion seeking (immediate) payment of a purported administrative expense claim pursuant to sections 503(b)(7) and 503(b)(9) of the Bankruptcy Code.

## I. Stonebrier Does Not Assert a Valid Basis for an Administrative Claim Pursuant to § 503(b)(7) for Pre-Rejection Date Amounts and Any Such Claim Should be Denied

8. Section 503(b)(7) provides for an allowed administrative claim:

> with respect to a nonresidential real property lease ***previously assumed under section 365, and subsequently rejected***, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6).

*See* 11 U.S.C. 503(b)(7) (emphasis added). Section 503(b)(7) is wholly inapplicable here as the Debtors never assumed the Lease in the pending proceeding, and the Motion does not allege any facts suggesting otherwise. Section 503(b)(7) "applies only to prepetition leases that are assumed and then rejected under section 365. If a lease has not been assumed ***in the case***, or a lease has been assumed but not rejected, section 503(b)(7) is not applicable." 4 Collier on Bankruptcy ¶ 503.14 (16th ed. 2025) (emphasis added). While Stonebrier refers to an assumption of the Lease

during the Debtors' prior cases commenced in 2023, it ***does not*** cite any support for the assertion that such assumption makes section 503(b)(7) applicable here.

9. Stonebrier incorrectly argues that it is entitled to rent, late charges, maintenance and repair charges, and attorneys' fees pursuant to section 503(b)(7). Notwithstanding the improper reliance on section 503(b)(7), none of the asserted amounts are actually due and owing under the Lease.

10. *First*, Stonebrier asserts that May rent is due; however, May rent was incurred on May 1, 2025, and is a prepetition claim.[3]

11. *Second,* Stonebrier asserts late fees for May 2025 rent. Even to the extent the asserted late charges would be due and payable under the Lease (and, as set forth below, they are not), late charges for May 2025 rent, which was due prior to the Petition Date, is a pre-Petition Date claim and should be denied administrative expense priority on that basis alone.

12. Regardless, no late fees are due and payable under the terms of the Lease. Specifically, the Lease provides:

> [i]n the event any installment of annual rent shall not be paid when due and such failure to pay shall continue for ten (10) days following written notice from [Stonebrier], a "Late Charge" of 5% of the amount so overdue shall be paid by [Debtors] to [Stonebrier] upon demand, as additional rent, for the purpose of defraying [Stonebrier's] administrative expenses incident to the handling of such overdue payments. [Stonebrier] shall only be required to give two (2) such notices during the term of the Lease, after which the Late Charge shall automatically apply.

*See* Lease, § 5. Stonebrier has not produced any evidence that the required notice was provided and, accordingly, no late charges are due under the terms of the Lease. And again, even if the required notice was provided (and such notice, to the extent it demanded May 2025 rent would

---

[3] On September 8, 2025, the Debtors paid Stonebrier, on an accelerated basis, *i.e.*, prior to the effective date of a plan, the sum of $39,594.08 on account of the "stub period."

5

have violated the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code),[4] such a claim is a pre-Petition Date claim which is not due and payable as an administrative expense priority claim, and Stonebrier's request therefor should be denied.

13.     *Third*, Stonebrier asserts that maintenance and repair costs for May and June 2025 are due and owing under the Lease.  Stonebrier, however, does not produce any evidence, *e.g.*, invoices that were billed to the Debtors, supporting such a claim, and the Debtors have no record of having received any invoice or demand for payment during the post-Petition Date, pre-Rejection Date period.  Thus, no maintenance and repair costs are due and payable (or allowable as an administrative expense priority claim).

14.     *Fourth*, Stonebrier asserts an administrative expense claim for its attorneys' fees, relying on "paragraph 25 DEFAULT part (iv)".  Notably, however, Stonebrier only selectively quotes from the provision of the Lease (paragraph 25(b)(iv)) purporting to entitle it to attorneys' fees, omitting reference to the lead in to "part (iv)," *i.e.*, paragraph 25, ***section (b)***.  Section (b) of paragraph 25 renders that section inapplicable, as such fees are only applicable "[u]pon termination of [the] Lease as provided in California Civil Code Section 1951.2" . . . *See* paragraph 25(b) of the Lease.  The Lease, though rejected, was not terminated as provided in California Civil Code Section 1951.2, at least not prior to the Rejection Date (and any fees for periods after the Rejection Date are not entitled to administrative expense priority claims and would constitute rejection damage claims as described below).

---

[4]     Section 362(a)(6) provides as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . ., operates as a stay, applicable to all entities, of . . . *any act* to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(6) (emphasis added).

15. Here, the Lease was rejected, which is considered a breach as of the Petition Date. *See* 11 U.S.C. 365(g) ("the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . . immediately before the date of the filing of the petition."). Based on the rejection of the Lease, the cited attorneys' fee provision does not apply. Accordingly, no attorneys' fees are due under this provision.

16. Although not cited by Stonebrier, the Lease also includes a "prevailing party" provision with respect to attorneys' fees, providing:

> In the event that any suit or action is instituted by either of the parties hereto against the other to enforce compliance with any of the terms, covenants or conditions of this Lease or for damages for breach of this agreement, the unsuccessful party shall, in addition to costs and disbursements provided by statute, pay to the successful party such sums of money as any court of competent jurisdiction may adjudge reasonable as attorneys' fees in such suit or action, including appeal from any judgment rendered therein.

*See* Lease § 32. Here, no action has been brought to enforce the Lease. Rather, Stonebrier has only brought this Motion, in which it incorrectly asserts a right to administrative expense priority claims under completely inapplicable provisions of the Bankruptcy Code and for amounts that are not due and payable as administrative expense priority claims. Further, it has not (at least to date) been a "successful party" in any such suit or action. If Stonebrier intends to rely on this provision and the Court is inclined to consider an award of attorneys' fees, such award should be granted to the Debtors in the event the Motion is denied.

17. Based on the foregoing, Stonebrier is not entitled to any claim for pre-Rejection Date amounts pursuant to section 503(b)(7) of the Bankruptcy Code.

**II.    Any Administrative Claim for Amounts Due After the Rejection Date Pursuant to Section 503(b)(7) of the Bankruptcy Code Should be Denied**

18. In addition to its claims for amounts due prior to the Rejection Date, Stonebrier asserts that, pursuant to section 503(b)(7), it is entitled to an administrative expense priority claim

7

for rent, maintenance and repair charges, and attorneys' fees arising *after* the Rejection Date for the periods covering July and August 2025 (for which period it seeks attorneys' fees). For the same reasons set forth above, neither section 503(b)(7) nor the terms of the Lease provide Stonebrier a right to an administrative expense priority claim for these amounts.

19. Further, section 365(d)(3) of the Bankruptcy Code provides no right to payment. That section provides that, notwithstanding section 503(b)(1), a debtor "shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, ***until such lease is assumed or rejected***. . ." 11 U.S.C. § 365(d)(3) (emphasis added). Section 502(g)(1) provides that "[a] claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same ***as if such claim had arisen before the date of the filing of the petition***." 11 U.S.C. § 502(g)(1) (emphasis added). Therefore, with respect to the amounts claimed for the periods after the Rejection Date, Stonebrier is limited to an unsecured nonpriority claim for rejection damages, subject to the limitations set forth in section 502(b)(6) of the Bankruptcy Code.

20. Here, there is simply no legal basis for an administrative expense priority claim for any amounts purportedly arising after the Rejection Date. Such claims, to the extent warranted under the Lease, may only be brought through an appropriate rejection damages claim.[5]

---

[5] Without explaining the basis therefor, Stonebrier seeks amounts, including Rent & Late Fees and charges for Maintenance & Repair, for July 2025, despite the fact that the Lease was rejected effective June 30, 2025. Stonebrier seems to be relying on the July 31, 2025 "Early Termination Date" in the Termination Letter as the basis therefor. However, Stonebrier never explains how that would entitle it to administrative rent following the rejection of the Lease. Since there is no legal basis therefor, the Court should deny any right to an administrative expense priority claim for the periods following the Rejection Date.

8

**III. Stonebrier is Not Entitled to an Administrative Claim for Prepetition Amounts Due Under the Lease Pursuant to Section 503(b)(9) of the Bankruptcy Code**

21. Section 503(b)(9) provides that there shall be an allowed administrative expense claim for "the value of any *goods* received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." *See* 11 U.S.C. 503(b)(9) (emphasis added).

22. Courts in the Third Circuit have found that "goods" conforms with the meaning set forth in Article 2 of the Uniform Commercial Code. *In re Goody's Family Clothing, Inc.*, 401 B.R. 131, 134 (Bankr. D. Del.) ("Given the near unanimous nationwide adoption of Article 2 of the UCC, the Court concludes that the term 'goods' in section 503(b)(9) conforms with the meaning given in U.C.C. § 2-105(1); 'goods' are something that is 'moveable.'").

23. Under this analysis, Stonebrier avers that it is entitled to rent, late fees, maintenance and repair charges, property taxes, and attorneys' fees incurred in the 20 days prior to Petition Date. None of these asserted costs are or relate to "goods" subject to section 503(b)(9) of the Bankruptcy Code. Stonebrier relies on case law which supports the argument that electricity and natural gas charges may be "goods"; however, Stonebrier does not allege that it provides the Debtors with electricity and natural gas, and none of the costs for which it seeks allowance under section 503(b)(9) of the Bankruptcy Code, relate to the provision of electricity and natural gas. That is not surprising, as the Lease requires that the Debtors pay utilities directly for these services. *See* Lease, § 16.

24. Accordingly, the Court should reject any purported administrative expense priority claim under section 503(b)(9).

**IV.   Stonebrier's Claim is Not a "DIP Obligation" Within the Meaning of the DIP Order**

25.   Next, Stonebrier wrongly relies on a defined term within the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 1396, as amended Docket No. 2536] (the "DIP Order"), as a basis to argue its claims are a "Superpriority Claim" or a "DIP Obligation" under the DIP Order.

26.   Stonebrier's reliance on the DIP Order and the provisions/definitions therein is completely misplaced.

27.   While Stonebrier may have been entitled to payments from a "DIP," *i.e.*, the applicable Debtor tenant, a debtor in possession, prior to the rejection of the Lease (and such amounts were, in fact, paid by the Debtor as a "DIP"), Stonebrier does *not* hold a "DIP Obligation" entitled to a "DIP Superpriority Claim" under and within the meaning of the DIP Order, second only to the Carve Out (as defined in the DIP Order). DIP Superpriority Claims include "all of the DIP Obligations [which] shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates." *See* DIP Order, ¶ 6(a). "DIP Obligations" refer to the facilities and loans provided under the debtor-in-possession financing facility and *do not* include administrative claims. *See* DIP Order, pg. 3, Preamble (i). Thus, despite its unsupportable and uninformed insistence otherwise, Stonebrier does not hold a "DIP Obligation."

**V.   Stonebrier Has Failed to Meet Its Heavy Burden for Allowance of an Administrative Expense Priority Claim**

28.   A party moving for administrative expense priority treatment of its claims bears a heavy burden to establish entitlement to priority treatment. *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) ("To give priority to a claimant not clearly entitled thereto

10

is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer.") (internal citation omitted); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) ("A party seeking payment of costs and fees as an administrative expense must . . . carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets.") (internal citation omitted); *In re Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) ("In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.") (citing *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988)); *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 4-5 (1st Cir. 1992) ("The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses.") (citing *S. Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985)). To meet its burden, a party moving for payment of an administrative priority claim generally must demonstrate that the claim (i) arises from a post-petition transaction between such party and the debtor, and (ii) conferred a benefit upon such debtor's bankruptcy estate. *See In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021) (citing *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005)).

29.  Stonebrier has not and cannot establish that the amounts sought in the Motion result from a post-Petition Date, pre-Rejection Date transaction with the Debtors or that they conferred a benefit upon the Debtors' bankruptcy estates (other than with respect to the obligations for the stub period, which have been paid). *See In re Energy Future Holdings Corp.*, 990 F.3d at 741. Stonebrier's failure to adequately support its alleged administrative expense priority claims merits

disallowance of such claims and, to the extent any such claims are allowable, the Debtors certainly should not be compelled to pay those claims now.

[*Remainder of page intentionally left blank*]

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court deny the Motion and grant the Debtors such other relief as is just and proper.

Dated:  September 23, 2025

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and Debtors in Possession*

**EXHIBIT A**



**CORPORATE OFFICE**
200 Newberry Commons, Etters, PA 17319

Legal Department

February 27, 2025

**VIA FEDERAL EXPRESS**
STONEBRIER COMMERCIAL LIMITED PARTNERSHIP
1919 Grand Canal Blvd.
Stockton, CA 95207

      Re:    **NOTICE OF EXERCISE OF TERMINATION OPTION**
              **4774 West Lane**
              **Stockton, California**
              **Rite Aid #6510**

Sir/Madam:

    Please be advised that THRIFTY PAYLESS, INC. will be exercising its Termination Option to terminate the Lease for the referenced premises pursuant to the Amendment to Lease dated June 20, 2024. Therefore, the Lease will expire July 31, 2025.

    Please be aware that information relating to our lease expiration and store closures is confidential, and we expect that Landlord will not post marketing signs or alert our customers or store associates, directly or indirectly, to such information.

    While your acknowledgment of receipt of this notice is not required for its validity, we request that you do so by signing and scanning via email a copy of this letter to Legal.Realestate@riteaid.com.

                        Very truly yours,
                        THRIFTY PAYLESS, INC.

                        *Tracy Verastegui*
                        Tracy L. Verastegui
                        Vice President, Real Estate

Acknowledged:

By:_____

**EXHIBIT B**



**Corporate Office**  Pack ID:  51
200 Newberry Commons,
Etters, PA 17319
June 26, 2025

**Via Overnight Mail or Email**
STONEBRIER COMMERCIAL LP
1919 GRAND CANAL BOULEVARD
STOCKTON CA 95207-0000

    **Re:**    **Vacant Possession - Store # 6510**
               Lease between STONEBRIER COMMERCIAL LP (*"Landlord"*) and THRIFTY PAYLESS, INC. *("Tenant")* for premises located at 4774 WEST LANE, STOCKTON, CA, 95210 *("Premises")*

Dear Landlord:

    As you may know, on May 5, 2025 (the "Petition Date"), New Rite Aid, LLC and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  The Debtors' chapter 11 cases are pending before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, and are being jointly administered under the caption *In re New Rite Aid, LLC, et al.,* Case No. 25-14861 (Bankr. D.N.J.).  More information, including all documents filed in the case, can be found on the Debtors' restructuring website, which can be located by going to https://restructuring.ra.kroll.com/RiteAid2025.

    In accordance with the Rejection Notice [*See* Docket No. 1093], this shall confirm that as of June 30, 2025, (the "Surrender Date") the above-referenced lease will be rejected through the Bankruptcy Court.  This letter shall confirm that Tenant hereby relinquishes actual control of the Premises and surrenders to Landlord possession and control of the Premises as of **11:59 p.m. (prevailing local time) on the Surrender Date**, in accordance with the *Final Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 776] (the "Lease Rejection Order").

    Pursuant to the Lease Rejection Order, upon surrender the Landlord is permitted to rekey the Premises and Tenant will have relinquished control of the Premises to the Landlord.

    The Debtors have arranged for the burglar alarm company to disable the burglar alarm system.  The burglar alarm will be disabled as of midnight on the Surrender Date but will

continue to ring locally (police will not be notified) until it is silenced with the codes or disconnected as provided on the instructions attached to this letter as **Schedule 1**. To the extent the Landlord is not already in possession of the alarm code, the alarm code is unavailable and the Landlord is free to reset the alarm system.

Kroll Restructuring Administration LLC ("Kroll"), the Debtors' claims and noticing agent, can provide relevant utility information. **Notification of the rejection will be provided by Rite Aid to the utility providers for cancelation of services. Landlord shall make all contact after that date.** You can reach out to Kroll toll-free at (888) 575-9318, or +1 (646) 930-4577 for calls originating outside of the U.S. or Canada, or by emailing Kroll at RiteAid2025Info@ra.kroll.com. Any claims for amounts you believe you are owed by the Debtors should be handled through the chapter 11 claims process.

We cannot provide you with legal advice. You should consult your own counsel with respect to the above.

Sincerely,
New Rite Aid, LLC


*/s/ Tracy Verastegui*
Tracy Verastegui
Vice President, Real Estate Operations

2

**Schedule 1**

**Alarm Code Instructions**

**General Panel Instructions:**
- To DISARM:
    - **Code** and **off** (usually on the #1 button) OR
    - **Code** and **enter** (usually bottom right button)
- To ARM (make sure ALL doors are completely closed or you won't be able to set the alarm):
    - **Code** and **away** (usually on the #2 button) OR
    - **Code** and **enter** (usually bottom right button)

**BOSCH Panel Instructions:**
- To DISARM:
    - **Code** and **enter** (bottom right button – will say ENT or be blank)
- To ARM (make sure ALL doors are completely closed or you won't be able to set the alarm):
    - **Code** and **enter** (bottom right button – will say ENT or be blank)

**EPS Panel Instructions:**
- To DISARM:
    - **Code** and **enter**
- To ARM (make sure ALL doors are completely closed or you won't be able to set the alarm):
    - **CMD1** and **Code** – or - **Code** and **enter**

**DMP Panel Instructions (Option 1):**
- To DISARM:
    - Press **Command (CMD)** until you see ARM DISARM
    - Select **DISARM**
    - Enter **Code** and you will see ALL? NO YES
    - Select **YES**
- To ARM (make sure ALL doors are completely closed or you won't be able to set the alarm):
    - Press **Command (CMD)** until you see ARM DISARM
    - Select **ARM**
    - Enter **Code** and you will see ALL? NO YES
    - Select **YES**

**DMP Panel Instructions (Option 2):**
- To DISARM:
    - **Code** (you will see ALL or AWAY on the screen)

3

- o **ALL**
- To ARM (make sure ALL doors are completely closed or you won't be able to set the alarm):
    - o **Code** (you will see ALL or AWAY on the screen)
    - o **AWAY**

**This alarm will no longer notify the police, but it will auto arm every night at 9pm. To prevent the alarm from sounding in the future when someone enters the building, it needs to be disabled. To disable the alarm:**
- Locate the main control panel. It may have a Protection 1 or ADT sticker on it.
- Open the control panel. It may have the key in the lock of the door, or on top of the box.
- Remove one of the leads (red or black) from the battery in the bottom of the box. It will be a black or gray rectangle inside on the bottom.
- Unplug the panel's power plug from your wall outlet, usually located near the control panel, or flip the breaker for the circuit the panel is connected to.

4