**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket Nos. 17, 473, & 1178** |

## NOTICE OF SUCCESSFUL BIDDER WITH RESPECT TO CERTAIN OF THE DEBTORS' PHARMACY ASSETS

**PLEASE TAKE NOTICE** that on May 21, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice With Respect Thereto, and (VII) Granting Related Relief* [Docket No. 473] (the "Bidding

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

<u>Procedures Order</u>") by which the Court approved procedures (such procedures, the "<u>Bidding Procedures</u>") for the sale or sales of all, substantially all, or any portion of the Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that on July 1, 2025, the Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the KPH Healthcare Services Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief.* [Docket No. 1178] (the "<u>Sale Order</u>") authorizing the Debtors, in consultation with the Consultation Parties, to file one or more additional notices of successful bidder (each, an "<u>Additional Notice of Successful Bidder</u>").

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 52 of the Sale Order, the Debtors, in consultation with the Consultation Parties, are filing this Additional Notice of Successful Bidder indicating that the Debtors have selected WesClare Corporation as the successful bidder with respect to certain of the Debtors' Pharmacy Assets (the "<u>Successful Bidder</u>" and such bid, a "<u>Successful Bid</u>").  The final form of the purchase agreement (the "<u>APA</u>") is attached hereto as **<u>Exhibit A</u>**.

**PLEASE TAKE FURTHER NOTICE** that the proposed Sale of the Assets pursuant to the APA is consistent with the Debtors' existing privacy policies regarding the transfer of personally identifiable information ("<u>PII</u>") and protected health information ("<u>PHI</u>").  The sale, conveyance, assignment, and transfer of PII and PHI will be consistent with the Debtors' policies regarding the transfer of such PII and PHI as of the Petition Date.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to consummation or approval of the Sale must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** **on or before October 17, 2025** (the "<u>Sale Objection Deadline</u>") by (i) the Bid Notice Parties, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) counsel to the Official Committee of Unsecured Creditors, Willkie Farr & Gallagher LLP, (iv) the Successful Bidder, and (v) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Sale Order, if no timely objections are received by the Sale Objection Deadline, (i) the Debtors are authorized to consummate the Sale to the Successful Bidder in accordance with the terms set forth in the APA and (ii) the Successful Bidder shall be deemed a Purchaser as defined in and under the Sale Order, and all protections of the Sale Order shall apply to the Sale to the Successful Bidder and the Assets acquired thereby to the same extent as if such Sale had been approved by the Sale Order.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed assumption and assignment of any executory contract or unexpired lease to the Successful Bidder and/or the related proposed cure amount will be subject to a separate objection deadline as set forth

---

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

in the Cure Notice served on each applicable contract or lease counterparty and do not need to be filed on or before the Sale Objection Deadline.

## <u>CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND SALE ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE ASSET PURCHASE AGREEMENT OR SALE ORDER, AS APPLICABLE.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, and the Sale Order, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retained in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930- 4577; (b) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid2025; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

*[Remainder of page intentionally left blank]*

Dated:  October 10, 2025

/s/  Michael D. Sirota,

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:    arosenberg@paulweiss.com
          aeaton@paulweiss.com
          chopkins@paulweiss.com
          smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## **Exhibit A**

**WesClare Corporation APA**

**Execution Version**

**First Amended and Restated Asset Purchase Agreement**

THIS FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (which further amends and restates that certain Asset Purchase Agreement, dated as of July 21, 2025, as amended by that certain Amendment No. 1, dated as of August 7, 2025, the "**Agreement**") is entered into effective as of August 21, 2025, by and between **WesClare Corporation** ("**Buyer**" and collectively with the "**Buyer Entities**" designated on **Schedule 1** attached hereto, "**Buyers**"), and **Rite Aid of Pennsylvania, LLC** ("**Seller**"). The applicable Buyer and Seller may be collectively referred to herein as the "**Parties,**" and individually as a "**Party,**" as the circumstances require. This Agreement amends, restates and supersedes in its entirety that certain Asset Purchase Agreement, dated as of July 21, 2025, as amended by that certain Amendment No. 1, dated as of August 7, 2025.

1.  **Sale of Certain Assets.** Seller agrees to sell and the applicable Buyer agrees to purchase the "**Purchased Assets**" (defined below) owned by Seller in connection with Seller's retail drug store and pharmacy business located at the address set forth on **Schedule 1** (each, a "**Pharmacy**"), pursuant to the terms hereof. "**Purchased Assets**" shall collectively refer to all of the following:

    A.  All files, prescription records, customer records, lists and profiles, pharmacy records, patient profiles, physician files, documents, instruments, papers, books, computer files and records of prescriptions filled by the applicable Pharmacy, and all other records of Seller for the three (3) years (or such time period mandated by State and Federal laws) immediately preceding the Closing (defined below) in any media relating to the patients, doctors, pharmaceuticals, controlled substances or prescriptions therefor administered or filled by the applicable Pharmacy, which shall include a list of the top five (5) prescribers for each Highly Diverted Controlled Substances ("**HDCS**") and top ten (10) prescribers for all HDCS, number of prescriptions and dosages, number of pills per prescription, prescriber name, DEA number, and address, and prescriber specialty (collectively, the "**Records**"), which will allow the applicable Buyer to derive Protected Health Information ("**PHI**"), as that term is defined in the Health Insurance Portability and Accountability Act of 1996, P. L. 104-191, and its implementing rules and regulations (collectively, "**HIPAA**"); for purposes of this Agreement "**Highly Diverted Controlled Substances**" shall mean: (i) oxycodone, (ii) hydrocodone, (iii) hydromorphone, (iv) tramadol, (v) oxymorphone, (vi) morphine, (vii) methadone, (viii) carisoprodol, (ix) alprazolam, and (x) fentanyl. Seller warrants that the Records shall contain, at a minimum, all of the information included in **Exhibit "A"** attached hereto and incorporated herein by reference, and Seller further warrants that the information contained in the Records is complete, accurate and current. The Records shall be transferred to the applicable Buyer exclusively, shall not be shared with any third parties (other than as contemplated by this Agreement), and shall not be diminished or removed from the applicable Pharmacy between the date of execution of this Agreement and the Transfer Date (as defined below).

    B.  (i) All items in stock of prescription pharmaceutical inventory of the applicable Pharmacy pursuant to the terms hereof (the "**Purchased Pharmacy Inventory**"), and (ii) all accompanying transaction history, transaction information, and transaction statements (the "**3T Documentation**") as required pursuant to the Drug Supply Chain Security Act (the "**DSCS Act**").

    C.  To the extent in hard copy format, originals of any and all controlled substance invoices, used DEA 222 forms (blue copies for orders placed or executed originals for received single-page forms, as applicable, with each statement attached), and, to the extent dated

within the two (2) years prior to the applicable Closing Date, annual controlled substance inventory logs (collectively, the "**DEA Documentation**"); provided, for the avoidance of doubt, that, to the extent such materials (i) are in electronic format, (ii) consist of unused DEA 222 forms or blue copies for unaccepted or defective forms, or (iii) are records of controlled substances disposed of, such materials shall be deemed as Excluded Assets and the applicable Seller shall retain such materials.

**D.**     All tangible personal property, including trade fixtures, shelving, displays, counters, checkouts, coolers and freezers, located at or used in connection with the business at each Pharmacy (the "**Acquired Personal Property**").

**E.**     Solely to the extent assignable or transferable under applicable law, all of the rights, interests and benefits (if any) accruing under those licenses, franchises, permits, certificates and governmental approvals and authorizations listed or described on **Schedule 2** for the operation of the applicable Pharmacy and all pending applications therefor as well as the rights to all data and records held by governmental bodies in connection therewith (collectively, the "**Purchased Permits**").

**F.**     All telephone and facsimile numbers used in connection with the applicable Pharmacy as listed on **Schedule 1** (the "**Telephone and Fax Numbers**") pursuant to the provisions in Section 19.

**2.**     **Excluded Assets.** Notwithstanding the foregoing, the following assets of Seller (the "**Excluded Assets**") will be retained by Seller and are specifically excluded from the Purchased Assets: (a) inventory and supplies that are (i) not Purchased Pharmacy Inventory (including, for the avoidance of doubt, front-end store inventory and over-the-counter inventory), (ii) expired, outdated or otherwise untransferable under applicable laws, or (iii) otherwise excluded pursuant to the terms of Section 8, (b) cash and cash equivalents in bank accounts and cash registers, (c) accounts receivable in any form, (d) any and all licenses, franchises, permits, certificates and governmental approvals and authorizations, other than the Purchased Permits, (e) contracts and understandings, (f) all land, together with all buildings, structures, improvements, and fixtures located thereon, and all easements and other rights and interests appurtenant thereto owned by the Seller, other than the Acquired Real Property (as defined below) and the Acquired Personal Property, and (g) intangible rights. The applicable Buyer does not assume any of Seller's liabilities or debts whatsoever. Without limiting the generality of the foregoing, in no event shall the applicable Buyer assume (i) any type of successor liability with respect to any law relating to the licensure or regulation of health care providers, suppliers, professionals, facilities, pharmacies, or payors, including state pharmacy laws and any other requirements of federal and state law relating to the provision of, and litigation or any other claim or dispute arising from, opioid treatment services and pharmacy or physician services, including the Federal Controlled Substance Act, 21 U.S.C. § 801 et seq., (ii) any obligations of Seller under HIPAA or other applicable laws or regulations, including the HIPAA privacy standard requiring accounting of certain disclosures of PHI made by Seller prior to the Transfer Date, (iii) any type of successor liability as to trade creditors, unemployment, income, property, sales or other taxes, or otherwise, or (iv) any of Seller's third party provider numbers or licenses, including, without limitation, any and all obligations and/or liabilities of Seller, the applicable Pharmacy or the Purchased Assets with respect to all such third party provider numbers and licenses, other than the Purchased Permits, it being understood that all such liabilities are "**Excluded Liabilities**". The phrase "liabilities" shall include, without limitation, any direct or indirect indebtedness, guaranty, bankruptcy claim or requirement, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted,

2

liquidated or unliquidated, secured or unsecured. Furthermore, the applicable Buyer shall have no liability for the continued employment or any compensation, benefits, vacation pay, claims, or liability of or relating to employees of Seller or the applicable Pharmacy.

**3.    Real Property Matters.**

    **A.**    Seller agrees to sell and the applicable Buyer agrees to purchase, on the applicable Real Property Transfer Date, all land, together with all buildings and improvements located thereon, and all easements and other rights and interests appurtenant thereto, owned by the Seller at the locations as set forth on **Schedule 1** (the "**Acquired Real Property**").

    **B.**    The Parties agree to enter into a Lease Agreement with respect to each of Rite Aid Store #1514 and Rite Aid Store #3443, in substantially the same form attached hereto as **Exhibit "C"** (each, a "**Lease**", and together, the "**Leases**"), on the Transfer Date.

**4.    Inspection/Transfer Date.** Seller shall, prior to the Transfer Date (at such date and time as the applicable Buyer elects, provided it is during normal Pharmacy business hours and following reasonable prior notice), give the applicable Buyer reasonable access to the Records and allow the applicable Buyer to examine the Purchased Assets. The transfer of the Purchased Assets shall occur on such date as mutually agreed between Seller and the applicable Buyer following the date of this Agreement (the "**Transfer Date**") and the transfer of the Acquired Real Property shall occur on September 22, 2025 (or such other date as mutually agreed between Seller and the applicable Buyer) (the "**Real Property Transfer Date**").

**5.    Notice to Seller's Customers.** As of the date of this Agreement, the applicable Buyer may utilize Seller's list of the applicable Pharmacy's customers (including names and addresses) from the prior one hundred eighty (180) days for customer outreach purposes, which form shall be mutually agreed upon by the Parties in advance via email. As of the date of this Agreement, Seller shall permit the applicable Buyer, at the applicable Buyer's discretion, to place signs in the applicable Pharmacy and on the windows of the applicable Pharmacy advising Seller's customers that the applicable Buyer has arranged to purchase Seller's Pharmacies. The applicable Buyer shall have the right to advertise that the applicable Buyer is purchasing or has purchased Seller's Pharmacies.

**6.    Transfer of Assets.**

    **A.**    The Parties agree that Seller will engage InfoWerks Data Services, LLC (the "**Data Converter**") to convert Seller's prescription file and Record data (the "**Record Data**") to a format specified by the applicable Buyer. The applicable Buyer will be responsible for all of the Data Converter's fees, costs and expenses incurred in connection with the Record Data conversion services. Seller agrees to provide such access, information and cooperation to the Data Converter as may be required to enable the Data Converter to deliver the Record Data to the applicable Buyer's Information Services representative at least ten (10) business days  prior to the Transfer Date, or such other period as mutually agreed upon between the Parties, for the purpose of testing the data's conversion to the applicable Buyer's format. In the event that the Record Data is not or cannot be delivered to the applicable Buyer as of such date or is not successfully converted, the applicable Buyer, at the applicable Buyer's sole discretion, may either (i) delay the Transfer Date until the Record Data is delivered to the applicable Buyer, or the conversion is successful or (ii) following commercially reasonable efforts to effect the conversion, terminate this Agreement upon written notice to Seller.

**B.**     **Transfer of Possession.** Seller shall deliver possession of (i) the electronic Records and the other Purchased Assets to the applicable Buyer at a time mutually agreed upon by the Parties on the Transfer Date and (ii) the Acquired Real Property on the Real Property Transfer Date. Seller shall deliver possession of the hard copy Records and the other Purchased Assets to the applicable Buyer on the Transfer Date. Risk of loss shall transfer to the applicable Buyer at the time the applicable Buyer takes possession of the Purchased Assets and Acquired Real Property. Concurrently with the transfer of the Purchased Assets to the applicable Buyer, Seller shall deliver to the applicable Buyer (i) a duly executed and acknowledged Bill of Sale in respect of the applicable Purchased Assets in substantially the same form attached hereto as **Exhibit "B"** and incorporated herein by reference ("**Bill of Sale**"), (ii) duly executed Leases, (iii) with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (as defined below) (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price (as defined below)), signed by a representative of Seller, and (iv) complete copies of Seller's 3T Documentation and DEA Documentation, as applicable, as required for the applicable Purchased Pharmacy Inventory.  On the Real Property Transfer Date, Seller shall deliver to the applicable Buyer a special warranty deed conveying to the applicable Buyer fee simple title to such Acquired Real Property free and clear of all liens, rights of redemption, and any and all other claims, in substantially the same form attached hereto as **Exhibit "D"** and incorporated herein by reference ("**Special Warranty Deed**"). Seller shall, upon request of the applicable Buyer, perform such further acts, assignments, transfers, and assurances as may be reasonably required to convey and transfer all of Seller's right and title in the Purchased Assets and Acquired Real Property to the applicable Buyer. Concurrently with the transfer of the Purchased Assets to the applicable Buyer, the applicable Buyer shall deliver to Seller (i) duly executed Leases, and (ii), with respect to the applicable Purchased Pharmacy Inventory, a report of the Inventory Review (which report shall identify the Purchased Pharmacy Inventory and set forth the Inventory Purchase Price), signed by a representative of the applicable Buyer. Each Party shall also deliver to the other such additional documents as are reasonably required by law or the terms of this Agreement to complete the sale of the Purchased Assets and Acquired Real Property to the applicable Buyer. **Subject to the representations in Section 11 below and the other provisions of this Agreement, the applicable Buyer further agrees and acknowledges that the applicable Buyer shall accept the Purchased Assets and Acquired Real Property "as is, where is."**

**C.**     **Fire or Other Casualty.** If there is a fire or other casualty which results in damage to or destruction of any portion of the Purchased Assets prior to the Transfer Date, then the applicable Buyer may, in its sole election, (i) terminate this Agreement or a portion of the Agreement in respect of the impacted Purchased Assets by written notice to Seller, or (ii) proceed to acquire the remaining portion of the Purchased Assets, in which event the Purchase Price shall be proportionately reduced to reflect the fair market value of the remaining Purchased Assets after the fire or other casualty.

**D.**     **Request by Pharmacy Customers.** The applicable Buyer agrees in the event that, prior to the Transfer Date, Seller receives from any Pharmacy customer any objection to the transfer of the Pharmacy customer's prescription records to the applicable Buyer and/or any instruction from the Pharmacy customer to transfer said Pharmacy customer's prescription records to a pharmacy other than the location to which the applicable Buyer intends to transfer the Records, Seller shall be relieved of its obligation to transfer the applicable Pharmacy's customer's prescription records to the applicable Buyer except to

the extent that such a transfer is required by law. The applicable Buyer further agrees that in the event a Pharmacy customer objects, after the Transfer Date, to the transfer of the applicable Pharmacy's customer's prescription records to the applicable Buyer, the applicable Buyer shall immediately transfer the applicable Pharmacy's customer's prescription records to the location designated by the applicable Pharmacy's customer and shall further purge said applicable Pharmacy's customer's prescription records from the applicable Buyer's files except to the extent the applicable Buyer is required by law to retain such Records. The provisions of this Section 6D shall survive the Transfer Date.

**E.**     **W-9s**. Seller shall, on or before the Transfer Date, deliver to the applicable Buyer a completed form W-9 Request for Taxpayer Identification Number.

**F.**     **DSCS Act**. Seller agrees to provide the applicable Buyer with all readily available product tracing information and other information required by the DSCS Act for the Purchased Pharmacy Inventory, including the 3T Documentation. Seller shall reasonably cooperate and assist the applicable Buyer, in such the applicable Buyer's efforts to effect a transfer of such 3T Documentation on the applicable Closing Date. Such cooperation may include Seller taking such acts as may be reasonably necessary, including executing a release or authorization for the benefit of any third parties that are maintaining any such 3T Documentation on behalf of Seller, as may be reasonably necessary to facilitate the transfer of all such 3T Documentation to the applicable Buyer.

**G.**     **Powers of Attorney**. Seller shall, on or before the Transfer Date, deliver to the applicable Buyer duly executed Powers of Attorney in substantially the same forms attached hereto as **Exhibit "E"** (**"Powers of Attorney"**).

**7.**     **Purchase Price.**

**A.**     The Purchase Price shall consist of:

(i)     the amount listed on **Schedule 1** for the Records (the "**Records Purchase Price**");

(ii)     the Inventory Purchase Price (as defined below), subject to **Exhibit "E"** (including Annex I thereto) (the "**Inventory Instructions**");

(iii)     the purchase price listed in **Schedule 1** with respect to the Acquired Personal Property (the "**Acquired Personal Property Purchase Price**"), which shall be allocated in the manner provided therein; and

(iv)     the purchase price listed in **Schedule 1** with respect to the Acquired Real Property (the "**Acquired Real Property Purchase Price**"), which shall be allocated in the manner provided therein.

The Acquired Personal Property Purchase Price, the Acquired Real Property Purchase Price, the Inventory Purchase Price, and the Records Purchase Price, collectively, the "**Purchase Price**".

**B.**     Notwithstanding above, with respect to the Records, in the event that Seller's averaged weekly prescription count for the thirteen (13) week period immediately preceding the Transfer Date (the "**Prescription Count**"), which weeks do not include a nationally recognized holiday (in such case the week prior to the week excluded shall be used in the

calculation) (the "**Transfer Date Volume**"), falls below the current volume shown on **Schedule 1** ("**Current Volume**") by more than seven percent (7%) (the "**Prescription Rate Threshold**"), the applicable Buyer shall have the right to decrease the Records Purchase Price proportionately per prescription by which the Transfer Date Volume is less than the Prescription Rate Threshold, except the first seven percent (7%) shall not be included in such reduction calculation. For purposes of illustration, if the "Current Volume" of a Pharmacy location fell by fifteen percent (15%) then the applicable Buyer shall have the right to decrease the applicable Records Purchase Price for such Pharmacy location by eight percent (8%); if the "Current Volume" of a Pharmacy location fell by six (6%) then the applicable Buyer shall have no right to decrease the applicable Records Purchase Price for such Pharmacy location. For the purposes of determining the Transfer Date Volume, Seller shall deliver to the applicable Buyer a written statement evidencing the Prescription Count at least five (5) days prior to the Transfer Date.

8.    **Inventory Matters and Valuation.**  The Parties agree that the applicable Buyer will purchase, and the Purchased Assets will include, only those items of inventory that are determined to be Purchased Pharmacy Inventory according to the Inventory Instructions and that the applicable Buyer will not purchase any Excluded Inventory. The Parties shall commission WIS International or another mutually acceptable inventory valuation firm (the "**Inventory Service**") to conduct a full review and valuation of the Purchased Pharmacy Inventory at the Pharmacies, on the day immediately prior to the respective Closing Date using the Inventory Instructions (such review at an individual Pharmacy, the "**Inventory Review**" and the amount determined pursuant to the Inventory Review at an individual Pharmacy, which shall automatically be reflected on **Schedule 1** thereafter, the "**Inventory Purchase Price**"). The cost and expense of the Inventory Service for all purposes hereunder shall be borne solely by the applicable Buyer.

9.    **Closing.** Unless otherwise agreed in writing by the Parties, the closing of the sale of Purchased Assets and the Acquired Real Property to the applicable Buyer (each a "**Closing**" and the date of each Closing, a "**Closing Date**") shall occur on each applicable Transfer Date or Real Property Transfer Date, as applicable, at a time mutually acceptable to the Parties (provided that the Closing and Closing Date with respect to the Acquired Real Property shall occur on September 22, 2025 (or such other date as mutually agreed between Seller and the applicable Buyer). On the first business day immediately following such Transfer Date, or Real Property Transfer Date, as applicable, the applicable Buyer shall wire the applicable Purchase Price to Seller by a wire transfer of immediately available funds. Seller's wiring instructions are attached hereto as **Exhibit "G"**.

10.    Intentionally omitted.

11.    **Representations and Warranties.**

A.    **Liens**. Seller represents and warrants that it has good and marketable title to and is the sole owner of all of the Purchased Assets and Acquired Real Property and that the Purchased Assets shall, as of the Transfer Date, and the Acquired Real Property, as of the Real Property Transfer Date, be free and clear of all "**Liens**" as herein defined. Seller further represents and warrants that all suppliers and creditors of the Purchased Assets and Acquired Real Property shall be paid in the normal course of business. The term "**Liens**" shall collectively refer to all liens, charges, restrictions, claims, judgments, bankruptcy claims or requirements, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, taxes (presently due or due at any time in the future related to the Purchased Assets, Acquired Real Property and/or this

6

transaction), assessments or other encumbrances (whether secured or unsecured) with respect to any item of the Purchased Assets, the Acquired Real Property or the applicable Pharmacy and includes, without limitation, any claim or charge of any creditor or supplier of the Purchased Assets and Acquired Real Property.

B.   **Title to Acquired Real Property.** Seller has a good and marketable fee simple title to such Acquired Real Property, free and clear of all Liens.

C.   **Authority.** Seller and the applicable Buyer represent and warrant that each Party has taken all necessary corporate action and, subject to the procedures, notice, and objection rights set forth in the *Final Order (I) Authorizing and Establishing Procedures for the De Minimis Asset Transactions, (II) Authorizing and Establishing Procedures for De Minimis Asset Abandonment, and (III) Approving the Form and Manner of the Notice of De Minimis Asset Transactions and Abandonment* [Docket No. 778] (the "**Sale Order**"), has the full and sole right, power and authority to enter into this Agreement to sell and buy the Purchased Assets and Acquired Real Property, respectively, and that the individual signing below for Seller and the applicable Buyer is duly authorized to sign on behalf of Seller's and the applicable Buyer's entity. The sale of the Purchased Assets, Acquired Real Property and all of the other obligations of Seller agreed to hereunder do not conflict with or result in a breach of the terms of any agreement or instrument to which Seller is a party or by which it is, or may be, bound or which would constitute a default thereunder, or result in a claim against the applicable Buyer, or result in the creation or imposition of any lien, charge or encumbrance on, or give to others any interest in or right to the Purchased Assets or Acquired Real Property, and if such an event would occur or result in such a claim against Buyer, Seller hereby agrees to hold Buyer harmless from the same.

D.   **Parties Are in Good Standing.** Seller represents and warrants that it is a duly organized corporation in good standing with the state in which the applicable Pharmacy is located and will continue to be so as of the Transfer Date. The applicable Buyer represents and warrants that it is a duly organized corporation in good standing with state in which the applicable Pharmacy is located. Seller and the applicable Buyer have full power and authority to enter into and perform this Agreement.

E.   **No Brokers.** Except for Guggenheim Securities, LLC, the fees and expenses of which will be paid by Seller, the applicable Buyer and Seller each represent and warrant to the other that all negotiations relative to this Agreement and the transactions contemplated herein have been carried on in such manner so as not to give rise to any valid claim against either the applicable Buyer or Seller for any brokerage, commission or finder's fees. In the event any action or inaction by either the applicable Buyer or Seller with respect to this transaction has given or shall hereafter give rise to any brokerage, commission or finder's fee, all such fees shall be paid solely and exclusively by the responsible Party and the other Party shall have no obligation or liability therefor.

F.   **HIPAA Compliance.** To the best of its knowledge and belief, Seller is currently in full compliance with the requirements of HIPAA. Without limiting the generality of the foregoing, Seller has implemented a HIPAA compliance program, including but not limited to employee training, provision of Privacy Notices to pharmacy customers, and adoption of privacy policies and security features. After the Transfer Date, the applicable Buyer shall make Seller's prescription data transferred hereunder as part of the Records available for access to all eligible parties in accordance with HIPAA Privacy Standards

7

and applicable state law. However, in no event shall the applicable Buyer assume any legal obligations of Seller under HIPAA including, but not limited to, the HIPAA Privacy Standard requiring accounting of certain disclosures of Patient's PHI made prior to the Transfer Date. All inquiries for accountings or other patient rights under HIPAA relating to disclosures made prior to the Transfer Date shall be forwarded to Seller or its appointed agent.

G. **Controlled Substance Act.** The applicable Buyer shall comply with all applicable laws and regulations that may relate to the maintenance and confidentiality of Records transferred hereunder and with respect to the applicable Pharmacy's operations in general. Seller shall notify the appropriate governmental agencies, including the State Board of Pharmacy and the regional DEA office, of the transaction described herein.

H. That, to Seller's reasonable knowledge, the Records are accurate in all material respects and were created or obtained in the ordinary course of Seller's operation of the applicable Pharmacy.

I. There are no (i) claims, actions, suits, labor disputes, arbitration, legal or administrative proceedings or investigations, including, without limitation, by the DEA, OIG, CMS, FDA, applicable Board of Pharmacy or other governmental body, pending against Seller or, to the knowledge of Seller, threatened against Seller, or otherwise pending or, to the knowledge of Seller, threatened with respect to the Purchased Assets, and to Seller's knowledge, no such actions, disputes, proceedings or investigations are contemplated, except to the extent any such claim, action, dispute, arbitration, proceeding or investigation would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder or (ii) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or governmental body to which Seller is a party or is subject with respect to the applicable Pharmacy or to which any of the Purchased Assets is subject, except to the extent any such judgment, decree, order, writ, injunction, ruling, decision or reward would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller, any parent, subsidiary or other affiliate of Seller, nor any director, manager, officer or pharmacy employee of Seller has not been disciplined or sanctioned, or to Seller's knowledge has had a discipline or sanction proposed, by any governmental body, except to the extent any such discipline or action would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets (including the value thereof) or have a material adverse effect on Seller's ability to perform its obligations hereunder. Seller is not excluded from participation in any government healthcare payment program, including Medicare or Medicaid, nor does Seller have knowledge of any pending or threatened discipline, sanction, inquiry, investigation or government action that would be reasonably expected to lead to such exclusion.

J. The prescriptions filled at the applicable Pharmacy have arisen from bona fide, legal transactions. Seller's Records have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with local, state and federal laws, statutes, ordinances, regulations, rules, codes, decisions, decrees, and orders, and are consistent with industry standards and clinical guidelines applicable to pharmacists and licensed

8

prescribers. All information regarding the Records provided to the applicable Buyer to date is true and correct in all material respects

K.    Except as set forth on **Schedule 3**, none of the prescriptions filled at the applicable Pharmacy result from any Non-standard Business. As used in this Agreement, "**Non-standard Business**" means (1) delivering prescriptions by mail, courier, automobile or other delivery system (in each case, including prescriptions filled via the Internet), (2) compounding, including both sterile and non-sterile compounding, (3) filling prescriptions that involve any unique, customized or non-standard packaging, including prescriptions filled for patients in assisted or independent living facilities, nursing homes, long-term care facilities or hospice facilities, (4) any business conducted pursuant to Section 340B of the Public Health Service Act, (5) any non-prescription business (including durable medical equipment) done through the pharmacy computer and included in the prescription count, (6) any prescriptions filled pursuant to any contract, agreement or understanding (other than a standard contract agreement or understanding with any third party payor or government payor providing health care coverage to individuals), or (7) any other business outside the scope of a customary pharmacy or retail drug-store business.

L.    The transactions contemplated hereunder (a) are the result of a sale process led by Seller, its affiliates, and its advisors, pursuant to which the applicable Buyer submitted an offer for the Purchased Assets and Acquired Real Property, such offer has been accepted and the applicable Buyer has been awarded the right to acquire the Purchased Assets and Acquired Real Property, no other person or entity or group of persons or entities has submitted a higher or better offer to purchase the Purchased Assets and Acquired Real Property, and (b) may not be avoided under Section 363(n) or any other section of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"). The Purchase Price (i) was negotiated and is undertaken at arm's length without collusion or fraud and in good faith within the meaning of and otherwise consistent with Sections 363, 365, and 548 of the Bankruptcy Code and (ii) constitutes reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

M.    This Agreement has not been entered into for the purposes of hindering, delaying or defrauding creditors of Seller under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable law and none of the Parties hereto have entered into this Agreement or are consummating the sale of the Purchased Assets and Acquired Real Property with any fraudulent or otherwise improper purpose.

N.    Seller has timely and properly filed all federal, state and local tax returns and reports and forms which it is or has been required to file, either on its own behalf or on behalf of its employees or other persons or entities including but not limited to all sales and use and employment tax returns, all such returns and reports being true, correct and complete in all respects and has paid all taxes which have become due.

O.    The provisions of this Section 11 shall survive the Closing.

12.    **Regulatory Notices and Clearances.**

A. The applicable Buyer and Seller (where applicable) will, and will cause their respective affiliates and advisors to, timely make or cause to be made all filings and submissions required to be made by the applicable Buyer under any applicable laws for the consummation of the transactions contemplated herein, if any.

B. In the event that any Purchased Permits shall not have been effectuated to the benefit of the applicable Buyer as of the applicable Transfer Date, Seller shall allow the applicable Buyer the right to use such Purchased Permits pursuant to a Power of Attorney to allow the applicable Buyer to utilize the Purchased Permits, to the extent permitted under applicable law, in the applicable Buyer's ownership or operation of the Pharmacies. Such Power of Attorney shall be delivered by Seller on or before the applicable Transfer Date and shall be effective until the aforementioned is effectuated by the appropriate governmental body or the applicable Buyer obtains new authority directly from such governmental body in the name of the applicable Buyer; provided, that the term of such Power of Attorney shall end no later than ninety (90) days following the issuance of such Power of Attorney.

13. **Conditions to Closing.** The Closing of the sale transactions set forth herein is subject to all of the following conditions in favor of the applicable Buyer and, if any of the following conditions are not satisfied or waived in writing by the applicable Buyer as of the Transfer Date, the applicable Buyer may terminate this Agreement in respect of such sale transaction without any liability to Seller.

A. **Representations Are True.** Seller's representations are true and correct in all respects on and as of the date of this Agreement and through each Transfer Date with the same force and effect as though made on and as of such date, and Seller shall have performed all of its obligations under this Agreement through the Transfer Date.

B. **Records Successfully Converted.** The Records contained within Seller's computer system have been successfully converted to a reasonably acceptable format through the Data Converter in a form that is acceptable to and usable by the applicable Buyer in conducting the applicable Buyer's business in its normal course.

C. **Rx Customer Data Deactivated in Seller's System.** The Records contained within Seller's computer system will be deactivated and placed in "transfer mode" within Seller's mainframe. After the Transfer Date, such data will remain in Seller's possession but will be limited to those purposes set forth herein. Seller will provide written verification of the deactivation of the files and records within five (5) business days after the Transfer Date.

D. **Bankruptcy Order.** Rite Aid Corporation and certain of its affiliates, including Seller (collectively, the "**Debtors**"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") on May 5, 2025 (the "**Petition Date**"), at Case No. 25-14861 (the "**Bankruptcy Cases**"). The Parties will adhere to the procedures, notice, and objection rights set forth in the Sale Order, which (a) authorizes and approves the sale of the Purchased Assets and Acquired Real Property, such that Seller will have the authority and approval from the Bankruptcy Court to consummate the sale of the Purchased Assets and Acquired Real Property to the applicable Buyer free and clear of all liens, claims, security interests and encumbrances whatsoever, (b) authorizes Seller to enter into and consummate such sales of such

10

Purchased Assets and Acquired Real Property on the terms and condition, including non-monetary terms and conditions, set forth in this Agreement, which terms and conditions shall be approved, and (c) deems the applicable Buyer a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, Buyer shall be entitled to all of the protections afforded by such provision.

**E.**    **No Licenses.** No Party (i) has been debarred or excluded from federal health care programs or (ii) has had the licenses necessary to carry out its business operations contemplated or required by this Agreement revoked or has been disciplined in such a manner that performance cannot occur or would be substantially impaired.

**F.**    **Evidence of Lien Termination.** Except in the case of entry of the Sale Order (in each case which has not been stayed and remains in full force and effect), on or prior to the Transfer Date, Seller shall deliver to the applicable Buyer evidence of the release of any and all Liens encumbering any of the Purchased Assets or Acquired Real Property (including any required UCC termination statements, bank release letters or similar documents).

**G.**    **Liens and Other Encumbrances.**

(a)    Seller represents and warrants that the Purchased Assets and Acquired Real Property, as of each applicable Transfer Date or Real Property Transfer Date, shall not be subject to any lien, mortgage, or encumbrance, and said Records shall be conveyed free and clear of any right, title or interest of any entity or person.

(b)    The applicable Buyer may conduct Uniform Commercial Code searches of state and county records. Any liens or encumbrances disclosed by any such search shall be released in full by Seller, and the applicable Buyer may hold all payments due hereunder pending the applicable Buyer's receipt of evidence that releases have been filed.

(c)    Seller hereby indemnifies and saves and holds the applicable Buyer harmless (including reasonable attorneys' fees and costs) from and against any (i) breach by Seller of any of its representations, warranties, covenants, agreements or obligations in this Agreement or any agreement or document required to be delivered by Seller hereunder, (ii) liability of Seller with respect to the Purchased Assets and Acquired Real Property arising prior to the applicable Closing Date, and (iii) any claim by any creditor of Seller or any third party related to the Purchased Assets and Acquired Real Property arising prior to the applicable Closing Date.

**14.**    **Exclusive Dealing.** From the date hereof until the date of the Closing hereunder or the earlier termination of this Agreement, Seller shall deal exclusively and in good faith with the applicable Buyer with regard to the transactions contemplated by this Agreement and shall not, and shall cause its affiliates, representatives, advisors and agents not to (a) solicit submission of any acquisition proposal of the Purchased Assets at the applicable Pharmacy, (b) participate in any discussions or negotiations regarding, or furnish any non-public information to any other person regarding the Purchased Assets other than the applicable Buyer and its representatives or otherwise cooperate in any way or assist, facilitate, or encourage the acquisition proposal of the Purchased Assets at the applicable Pharmacy by any person other than the applicable Buyer, or

11

(c) enter into any agreement or understanding, whether in writing or oral, that relates to an acquisition proposal of the Purchased Assets at the applicable Pharmacy or would have the effect of preventing the consummation of the transactions contemplated by this Agreement. Seller shall, and Seller shall cause its affiliates, representatives, advisors and agents to (i) immediately cease any discussions or negotiations of the nature described in this Section 14 that were conducted prior to the date hereof, (ii) promptly notify any party which such discussions or negotiations were being held of such termination, and (iii) promptly request in writing that all persons to whom nonpublic information concerning the Purchased Assets has been distributed on or prior to the date of this Agreement return or destroy such information to Seller as soon as possible. If, notwithstanding the foregoing, Seller or its affiliates, representatives or agents should receive any acquisition proposal of the Purchased Assets at the Pharmacies or any inquiry regarding any such proposal from any person, such persons shall promptly inform the applicable Buyer and its counsel in writing of the facts and terms thereof.

15. **Confidentiality.** From and after the date of this Agreement, Seller and the applicable Buyer shall keep the transaction terms contemplated hereby strictly confidential except as may be required by law (and if so required by law, the party with the obligation to so disclose shall provide the other party with advance notice of the required disclosure). Seller shall keep all information about the Purchased Assets and the transactions contemplated by this Agreement confidential both before and after the transfer thereof (except that Seller may release to an individual customer any records belonging to said customer upon the customer's request and may engage in communications and announcements as contemplated in Section 5 above). Seller shall have absolutely no right to use any of the Records or information included in the Purchased Assets after the transfer thereof to the applicable Buyer, except as may be required by law or in connection with pending litigation, third party claims or resolving outstanding accounts receivable, or other reasonable purpose provided that (i) such information is used only for the limited purposes specified herein, and (ii) access to such information is at the applicable Buyer's store at such times and under such supervision as the applicable Buyer deems appropriate. In addition to, and without limiting the foregoing, the applicable Buyer agrees to coordinate with Seller, as applicable, (and vice versa), in gathering audit information required and providing responses to desk audits within audit response timeframes for any Claims (as defined in Section 20). The provisions of this Section 15 shall survive Closing and shall be binding on each Party's legal representatives, successors and assigns. The Purchased Assets are being transferred to the applicable Buyer for the applicable Buyer's sole and exclusive use. Seller acknowledges that any information obtained by the applicable Buyer relating to the applicable Pharmacy's customers is owned solely by the applicable Buyer and may not be sold or transferred to any other person or company by Seller. the applicable Buyer will submit any advertising copy regarding its purchase of the Purchased Assets to Seller for prior approval, which approval shall not be unreasonably withheld. If Seller does not contact the applicable Buyer within three (3) business days of receipt of said copy, Seller shall be deemed to have approved it. Other than as set forth in this Section 15 neither the applicable Buyer nor Seller shall issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Purchased Assets by Seller to the applicable Buyer without the prior written consent of the other Party.

16. **Normal Business Operations.** Seller shall, at all times prior to the Transfer Date, operate the applicable Pharmacy's business in the ordinary course, consistent with prior practice (including, without limitation, like pricing, hours, customer service, advertising, and business standards) as Seller maintained prior to this Agreement and Seller shall not take any action that results in a reduction to Seller's volume of prescriptions. Seller shall not conduct any closing, going out of business, last chance or other sales outside of the ordinary course, consistent with past practice at the Pharmacies. Prior to the Transfer Date, Seller shall not sell, transfer, assign, lease, encumber

or otherwise dispose of any of the Purchased Assets or Acquired Real Property. Seller shall not subject any of the Purchased Assets or Acquired Real Property to lien, security interest or any other encumbrance, which lien, security interest or other encumbrance must be discharged of record prior to the applicable Buyer's payment to Seller. Prior to the Transfer Date, Seller shall not sell, remove or dispose of any of the Purchased Assets or Acquired Real Property (other than in the ordinary and normal course of business) and will not purchase for the Pharmacies any further merchandise or supplies other than in the ordinary course of business. Notwithstanding anything herein to the contrary, the applicable Buyer acknowledges that Seller may be winding down the business at the Pharmacies and as such, the operating hours, inventory and staffing levels may change accordingly and any such changes shall not be deemed a breach of this Section 16.

17. **Employment of Pharmacy Employees.** Seller acknowledges that the applicable Buyer shall have the right to interview and, following the Closing Date, hire Seller's current employees at its respective Pharmacies, in such Buyer's sole discretion. Such interviews shall be conducted outside such employees' work shifts with Seller and in a manner that would not reasonably be expected to materially disrupt the ordinary course of business at such Pharmacies, in each case as advised by such employees. For the avoidance of doubt, the applicable Buyer may not hire any of Seller's employees with a start date prior to the Closing Date for the Pharmacy where such employee works.

18. **Taxes.** Seller agrees to be responsible and pay for any tax or similar charge or assessments on the sale or transfer of the Purchased Assets and Acquired Real Property at Closing; provided, however, that the applicable Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws. Seller shall forever indemnify and hold harmless the applicable Buyer against any and all taxes, expense, loss, damage or liability, including reasonable attorneys' fees and court costs, which the applicable Buyer may suffer as a result of claims asserted by third parties against the applicable Buyer due to any noncompliance by Seller and the applicable Buyer with applicable bulk transfer laws. Personal property taxes on the Purchased Assets and Acquired Real Property shall be prorated between the applicable Buyer and Seller as of the Transfer Date. Seller shall pay any other taxes on the Purchased Assets and Acquired Real Property prior to the applicable Transfer Date or Real Property Transfer Date.

19. **Signs; Telephone and Facsimile Numbers.** Following the applicable Closing Date, Seller shall use commercially reasonable efforts to transfer to the applicable Buyer the exclusive right to use the Telephone and Fax Numbers on the Transfer Date. If Seller is unable to complete the transfer of the Telephone Fax Numbers on the Transfer Date, Seller shall remote call forward the Telephone and Fax Numbers for six (6) months until the transfer of the Telephone and Fax Numbers is complete. Seller shall pay all charges relating to the Telephone and Fax Numbers prior to the Transfer Date. Seller shall pay all yellow pages advertising for the applicable Pharmacy prior to the Transfer Date and cancel the same at its sole expense, if applicable.

20. **Indemnity.** Seller shall indemnify, defend and hold the applicable Buyer, its directors, officers, shareholders, members, employees and agents harmless from and against all liabilities, losses, deficiencies, claims, damages, expenses (including, without limitation, reasonable costs and attorneys' fees, reasonable costs and attorneys' fees on appeal), judgments, proceedings, and causes of action of any kind (collectively, "**Claims**") arising out of, resulting from, relating to or in any way connected with (i) Seller's possession, ownership, sale, disposal and/or use of the Purchased Assets or Acquired Real Property, (ii) Seller's breach of any representation or warranty, (iii) Seller's material breach, default, misrepresentation or omission with respect the performance of any of its covenants and obligations under this Agreement, (iv) related to any

13

Liens on the Purchased Assets or Acquired Real Property prior to the time at which such Purchased Assets or Acquired Real Property, or any of them, are transferred to the applicable Buyer, (v) related to any matter that is an Excluded Liability and (vi) any losses that are suffered, sustained, incurred or required to be paid by the applicable Buyer relating to Seller's use of the applicable Purchased Assets, Acquired Real Property and/or the operation of the applicable Pharmacy prior to and including the Transfer Date. The applicable Buyer shall indemnify, defend and hold Seller, its directors, officers, shareholders, employees and agents harmless from and against all Claims arising out of, resulting from or relating to the applicable Buyer's possession, ownership, sale, disposal, use of the Purchased Assets or Acquired Real Property on or after the time at which such Purchased Assets or Acquired Real Property, or any of them, are transferred to the applicable Buyer and/or the applicable Buyer's breach, misrepresentation or omission under this Agreement. The provisions of this Section 20 shall survive Closing.

21.  **Miscellaneous.**

    A.    **Notices.** All notices given hereunder shall be in writing and shall be given by personal delivery, U.S. Mail (return receipt requested), United States Express Mail (postage or delivery charge prepaid), or other established express delivery service (such as Federal Express or DHL), addressed to the appropriate Party as follows:

| | |
|---|---|
| Seller: | c/o Rite Aid Corporation |
| | 200 Newberry Commons, Etters, PA 17319 (street address) |
| | P.O. Box 3165, Harrisburg, PA 17105 (mailing address) |
| | Attn: Secretary |
| | |
| Buyers: | WesClare Corporation |
| | 3 Nickman Plaza |
| | Lemont Furnace, PA 15456 |
| | Attn: James W. Nickman Jr. |

All notices shall be deemed given upon receipt or refusal.

    B.    **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties and supersedes all other prior agreements, oral or written, with respect to this transaction. This Agreement may not be modified or otherwise amended, unless in writing and duly authorized by the applicable Buyer and Seller.

    C.    **Successors; Assignment.** This Agreement will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by either Party without the other Party's prior written consent; provided, however, Buyer may assign this Agreement (in whole or part) to a wholly owned subsidiary (or controlled affiliate) of Buyer (provided, further, in no event shall such assignment release Buyer from any liability or obligation hereunder).

    D.    **Attorneys' Fees.** If either Party takes legal action to enforce the terms of this Agreement, the prevailing Party in such action shall recover its reasonable costs and attorneys' fees, whether or not such controversy or claim is litigated or prosecuted to judgment. The prevailing Party will be the Party that is awarded judgment as a result of trial or arbitration, or the Party that receives a payment of money from the other Party in settlement of claims asserted.

E.    **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

F.    **Severability.** If any of the terms of this Agreement are held by any court of competent jurisdiction to be unenforceable, such provisions shall be severed from the Agreement and the remainder of the Agreement shall be given effect by the Parties as if such provision(s) never had been part of the Agreement.

G.    **Further Assurances.** Each Party will, and will cause it's respective affiliates to, cooperate in good faith with the other Party and from time to time do and perform such additional acts and execute and deliver such additional documents, instruments, conveyances and assurances as may be required by applicable governmental rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement. Without limiting the generality of the foregoing, each Party agrees to endorse, if necessary, and deliver to the other, promptly after its receipt thereof, any Purchased Asset, Acquired Real Property, payment, or document which it receives after Closing and which is the property of the other.

H.    **Survival of Terms.** All of the provisions of this Agreement which impose continuing or new obligations or liabilities on Seller and/or the applicable Buyer after the Transfer Date shall survive the date and the delivery of the Bill of Sale and the Purchased Assets and Acquired Real Property to the applicable Buyer. Without limiting the foregoing, all representations, warranties, and indemnities shall all survive the Transfer Date and the delivery of the Bill of Sale and the Purchased Assets and Acquired Real Property to the applicable Buyer.

I.    **Default.** In the event of any default by any Party to this Agreement, the non-defaulting Party may:

    i.    if such default occurs prior to the Transfer Date, terminate this Agreement upon written notice to the defaulting Party, and recover from the defaulting Party all damages incurred by the non-defaulting Party; provided, however, that if Seller is the defaulting Party and such default relates to one or more, but not all, Pharmacies, the applicable Buyer shall not be obligated to terminate the Agreement but instead may choose not to purchase the Purchased Assets or Acquired Real Property from Seller in respect of any such Pharmacy subject to default;

    ii.    Seek specific performance of this Agreement and/or injunctive relief and, in addition, recover all damages incurred by the non-defaulting Party. The Parties intend that this Agreement may be specifically enforced;

    iii.    Perform or pay any obligation or encumbrance necessary to cure the default and offset the cost thereof from monies otherwise due the defaulting Party or recover said monies from the defaulting Party; and

    iv.    Pursue all other remedies available at law, the Parties intending that remedies be cumulative and liberally enforced so as to adequately and completely compensate the non-defaulting Party. The allocation of the Purchase Price is not intended to serve as a measure of damages, and the Parties agree that the breach of any

provision of this Agreement may result in damages to the other Party in an amount in excess of any consideration paid for any particular asset.

Neither Party shall be deemed to be in default under this Agreement except upon the expiration of twenty (20) days (ten (10) days in the event of failure to pay money) from receipt of written notice from the other Party specifying the particulars in which such Party has failed to perform its obligations (or breached any of its representations or warranties) under this Agreement unless such Party, prior to expiration of said twenty (20) days period (ten (10) in the event of failure to pay money), has remedied the particulars specified in said notice of default.

J.      **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state in which the applicable Pharmacy is located.  For purposes of this Agreement, the Parties hereby stipulate that each Pharmacy is located in the Commonwealth of Pennsylvania.

K.      **Counterparts.** This Agreement may be executed by facsimile or pdf copies in two or more counterparts and once so executed by the Parties hereto, each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute one agreement. Facsimile and e-mail signatures shall be deemed originals for purposes of enforcement.

L.      **No Third Party Beneficiaries.** It is the intention of the Parties that no individual or entity be construed or considered to be an intended or implied third-party beneficiary under this Agreement.

M.      **Time of the Essence.** All times provided for in this Agreement for the performance of any act will be strictly construed, time being of the essence.

N.      **Incorporation of Exhibits.** All exhibits are incorporated into this Agreement as if set forth in full herein.

O.      **Waiver.** No covenant, term or condition, or breach thereof, shall be deemed waived except by written consent of the Party against whom the waiver is claimed. Any claim of the breach of any covenant, term or condition of this Agreement shall not be deemed a waiver of any other covenant, term or condition herein.

P.      **No Damages.** In no event shall either Party be responsible for punitive, exemplary, incidental or consequential damages, and each Party agrees, regardless of cause, not to assert any claim whatsoever against the other Party for such damages.

Q.      **Bankruptcy.** Seller shall use commercially reasonable efforts to respond to any questions the applicable Buyer may have related to the Bankruptcy Cases.

22.     <u>**Marketing to Pharmacy's Customers.**</u> For a period of five (5) years from and after the date of this Agreement, Seller shall not (directly or indirectly):

A.      Advertise, encourage or solicit the transfer by customers of the applicable Pharmacy of their records and/or prescriptions to any stores/pharmacies operated by Seller or its subsidiaries. Notwithstanding the foregoing, general mass advertising that does not

mention the applicable Pharmacy by name or location is permitted and may be used by Seller.

**B.** Send letters or other communications in any form to the customers of the applicable Pharmacy, other than general mass advertising not directed to customers of the applicable Pharmacy. In no event shall Seller send letters, any form of incentives or other communications to the applicable Pharmacy's customers to solicit or encourage the relocation of such customers' prescription information or files to another store or pharmacy operated by Seller or its subsidiaries.

**C.** Advertise or communicate publicly the fact that a pharmacist previously working in the applicable Pharmacy has transferred to another pharmacy operated by Seller or its subsidiaries in the same trade area as the applicable Pharmacy.

From the date of this Agreement until the date of Closing, Seller will encourage the transfer of the prescriptions and records of the applicable Pharmacy's customer to the applicable Buyer's store except as otherwise provided in Section 6D of this Agreement. The Parties hereby recognize, acknowledge and agree that the limitations contained in this Agreement are reasonable and properly required for the adequate protection of the business of the applicable Pharmacy, as it will be conducted by the applicable Buyer after the Transfer Date.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**THE APPLICABLE BUYER:**

**WesClare Corporation**

By: _____

Name:  James W. Nickman Jr.

Its: President

**SELLER:**

**Rite Aid of Pennsylvania, LLC**

By: _George Zhushma_

Name:  George Zhushma

Its:  Group Vice President

Schedule 1

| Description | Seller Entity | Buyer Entity | Last Day of Business | Transfer Date | Address | City | State | Zip | Telephone and Fax Numbers | Current Volume | Transfer Date Volume | Records Purchase Price | Inventory Purchase Price | Acquired Personal Property Purchase Price | Acquired Real Property Purchase Price | Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rite Aid Store #1514 080-005-00-01-0011-00 | Rite Aid of Pennsylvania, LLC | WesClare Corporation | August 21, 2025 | August 22, 2025 | 404 Third Street | California | PA | 15419-1105 | | 1,256 | | $250,000.00 | | $6,500.00 | $300,000.00 | |
| Rite Aid Store #3443 3004006202 | Rite Aid of Pennsylvania, LLC | WesClare Corporation | August 22, 2025 | August 23, 2025 | 6039 National Pike | Grindstone | PA | 15442-1107 | | 2,142 | | $450,000.00 | | $6,500.00 | $350,000.00 | |
| Parcel of land adjacent to Rite Aid Store #3443 3004006204 | Rite Aid of Pennsylvania, LLC | WesClare Corporation | N/A | N/A | 6039 National Pike | Grindstone | PA | 15442-1107 | N/A | N/A | N/A | N/A | N/A | N/A | $30,000.00 | |

Schedule 2

**PURCHASED PERMITS**

1.     US Department of Justice, Drug Enforcement Administration, Division of Diversion Control Combat Methamphetamine Epidemic Act Self-Certification for a Retail Vendor, Certification 60036267 for Store # 1514.

2.     US Department of Justice, Drug Enforcement Administration, Division of Diversion Control DEA Registration for a Retail Pharmacy, Registration AR2841864 for Store # 1514.

3.     Pennsylvania Pharmacy License # PP412757L for Store # 1514.

4.     US Department of Justice, Drug Enforcement Administration, Division of Diversion Control Combat Methamphetamine Epidemic Act Self-Certification for a Retail Vendor, Certification 60037015 for Store # 3443.

5.     US Department of Justice, Drug Enforcement Administration, Division of Diversion Control DEA Registration for a Retail Pharmacy, Registration BR3773365 for Store # 3443.

6.     Pennsylvania Pharmacy License # PP414786L for Store # 3443.

Schedule 3

## NON-STANDARD BUSINESS

None.

Exhibit A

- Prescription Number
- Transfer Number
- Quantity
- Patient First Name
- Patient Last Name
- Patient Address
- Dr. Name
- Dr. DEA
- Dr. Phone Number
- Dr. Address
- Drug Description
- Mfg. NDC Number
- SIG Description
- Price Code
- Price
- Copay
- Cost
- RA RPH
- RR
- RF#
- O-date Int
- R-Date Sub

Exhibit B

**BILL OF SALE**

KNOW ALL PERSONS BY THESE PRESENTS:

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, **Rite Aid of Pennsylvania, LLC** ("**Seller**"), does hereby sell, assign, grant, bargain, transfer and deliver to **WesClare Corporation** ("**Buyer**"), the following assets referenced in that certain First Amended and Restated Asset Purchase Agreement (as may be amended, modified or restated from time to time, the "**Agreement**") between Seller and Buyer dated August 22, 2025 for the Pharmacy located at [●]:

All of Seller's right, title and interest in and to the Purchased Assets with the exception of all items specifically excluded by the Agreement.

All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Agreement.

Seller hereby represents and warrants that said personal property is free and clear of and from all Liens and encumbrances and that Seller has the right to sell the same, and that Seller, its successors and assigns, will warrant and defend the sale and transfer of said personal property to the Buyer against the lawful claims and demands of all persons whomsoever.

In addition, Seller hereby assigns and transfers to Buyer any and all warranties relating to said personal property which may be lawfully assigned or transferred.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this [_____] day of [_____] 2025.

[Signature Page to Follow]

**Seller:**

**Rite Aid of Pennsylvania, LLC**


By:_____
Name: George Zhushma
Its: Group Vice President

Exhibit C

## LEASE

This **LEASE** is made and entered into as of **August __, 2025** by and between **Rite Aid of Pennsylvania, LLC,** having an address at 200 Newberry Commons, Etters, PA 17319 ("**Landlord**"), and **WesClare Corporation**, having an address at 3 Nickman Plaza, Lemont Furnace, PA 15456 ("**Tenant**").

## RECITALS

**WHEREAS**, Landlord is the owner of the Property (as defined below); and

**WHEREAS**, pursuant to that certain First Amended and Restated Asset Purchase Agreement, dated as of August __, 2025, which further amends and restates that certain Asset Purchase Agreement, dated as of July 21, 2025, as amended by that certain Amendment No. 1, dated as of August 7, 2025, by and between Landlord and Tenant (collectively, the "**Agreement**"), Tenant desires to lease from Landlord, and Landlord desires to lease to Tenant, the Property, on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, Landlord agrees to enter into this Lease and to demise the Property described herein to Tenant, and Tenant agrees to enter into this Lease and to lease the Property from Landlord in accordance with the terms and conditions set forth herein.

1.  **Definitions**.  Capitalized terms used but not defined in this Lease have the respective meanings for such terms that are set forth in the Agreement.  The following terms when used in this Lease shall have the following meanings:

(a)     Commencement Date:  August __, 2025.

(b)     Insurance Costs:  The cost of all insurance required on the Property.

(c)     Land:  That certain real property more particularly set forth in Exhibit A attached hereto.

(d)     Operating Costs:   All costs, actual and accrued, incurred in the operation, management, cleaning, maintenance, repair, preservation and protection of the Property, including, without limiting the generality of the foregoing, the following: materials and supplies; replacement parts and components for equipment and systems, including installation and any other related third party costs; consumable materials used therein; Insurance Costs; the costs (including fuel and electric energy) of providing heat, ventilation and air conditioning to the Property; water and sewer charges; the costs of providing electric energy to the

26

Property and appurtenant areas; and equipment, services and personnel for protection and security.

(e)     <u>Address of Landlord</u>:  P.O. Box 3165, Harrisburg, PA 17105, Attn: Secretary, or such other address as Landlord shall notify Tenant of in writing.

(f)     <u>Address of Tenant</u>:  3 Nickman Plaza, Lemont Furnace, PA 15456, Attn: James W. Nickman Jr., or such other address as Tenant shall notify Landlord of in writing.

(g)     <u>Permitted Use</u>:  All uses permitted by applicable law, including without limitation a pharmacy.

(h)     <u>Property</u>:  The Land and improvements thereon, with the address commonly known as _____.

(i)     <u>Real Property Taxes</u>:  All real estate taxes, including general or special assessments, if any, which may be levied or assessed by any lawful authority against the Property.

(j)     <u>Rent</u>:  The amounts set forth in Paragraph 4 of this Lease.

(k)     <u>Term</u>:  The period beginning on the Commencement Date and ending upon the earlier of September __, 2025 or the execution of the Special Warranty Deed for the Property.

**2.     Lease of Property.** In consideration of the rent to be paid and the covenants to be performed by Tenant, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Property.

**3.     Expiration Date**.  This Lease and the tenancy hereby created shall cease on the expiration date of the Term without the necessity of any notice from either Landlord or Tenant.

**4.     Rent**.  Tenant covenants and agrees to pay Landlord for the entirety of the Term base rent in the aggregate amount of Five Thousand and No/100 Dollars ($5,000.00) (the "**Rent**") without demand.  Payment shall be made at the Address of Landlord or to such other person or at such other place as may be designated by the Landlord from time to time.

**5.     Real Property Taxes**.  During the entire Term, Tenant shall pay or cause to be paid all Real Property Taxes relating to the Property directly to the appropriate governmental authorities, on or before the date due and payable.  Landlord shall promptly forward any notices received by Landlord regarding Real Property Taxes to Tenant at the Address of Tenant.  Any amounts shall be prorated on a day-for-day basis.

**6.     Insurance**.  During the entire Term, Tenant shall, at its own expense, obtain and maintain (or cause to be obtained and maintained) in full force and effect customary and reasonable insurance, including, without limitation, general liability insurance written on a so-called "Comprehensive General Liability Form" with regard to the Property, in commercially

27

reasonable amounts as reasonably agreed by Landlord and Tenant, protecting Landlord and Tenant as named insureds, additional insureds or loss payees (as the case may be) against any and all claims for personal injury, death, or property damage occurring in, upon, adjacent to or connected with the Property or any part thereof.  Upon request of Landlord, Tenant shall provide applicable insurance certificates.

7.     **Operating Costs**.  During the entire Term, Tenant covenants that it will promptly pay or cause to be paid all of the Operating Costs directly to the supplier of the relevant service.

8.     **Care and Use of Property**.

(a)     The Property shall be used by Tenant solely for the Permitted Use.

(b)     Tenant will maintain or cause to be maintained the Property at its own expense in a clean, orderly and sanitary condition and will not permit undue accumulations of garbage, trash, rubbish and other refuse, but will remove the same at its own expense; and will comply with all laws and ordinances and all valid rules and regulations of governmental authorities with respect to the use and occupancy of the Property.

9.     **Default**.  If (i) Tenant shall default in the payment of Rent or shall fail to make when due any other payment required by this Lease, and such default shall continue for five (5) days after written notice thereof from Landlord, or (ii) Tenant shall default in the performance of any of the other provisions of this Lease and any such default of the Tenant shall continue uncorrected for ten (10) days after notice thereof from the Landlord, then the Landlord, by giving notice to the Tenant at any time thereafter during the continuance of such default, may (a) continue this Lease in full force and effect without terminating Tenant's right to possession of the Property, in which event Landlord shall have the right to collect Rent and all other charges when due, (b) peaceably re-enter the Property, but without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof, or (c) terminate this Lease by written notice to Tenant specifying a date therefore, which shall be no sooner than 30 days following notice to Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant the worth at the time of the award of any obligation which has accrued prior to the date of termination, plus the amount of unpaid rent for the balance of the Term.

10.     **Sublease or Assignment**.  Tenant shall not, at any time, (a) assign, convey, mortgage, hypothecate or otherwise transfer or encumber this Lease or any interest under it, (b) allow any transfer thereof or any lien upon Tenant's interest by operation of law, (c) sublet the Property or any part thereof or (d) permit the use or occupancy of the Property or any part thereof by a third party, except with Landlord's consent (in Landlord's sole discretion) in each instance.

11.     **Alterations**.  Tenant may not make alterations to the Property, at the sole cost and expense of Tenant, without the consent of Landlord.

12.     **Liens and Encumbrances**.

(a)     Without the prior written consent of Landlord (which may not be unreasonably withheld, delayed or conditioned), Tenant shall not do any act which shall in any way encumber the title of Landlord in and to the Property, nor shall the interest or estate of Landlord in the Property be in any way subject to any claim by way of lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Tenant.  Any claim to, or lien upon, the Property arising from any act or omission of Tenant shall accrue only against the leasehold estate of Tenant and shall be subject and subordinate to the paramount title and rights of Landlord in and to the Property.

(b)     Landlord shall not do any act which shall in any way encumber the title of Tenant in and to the Property, nor shall the interest or estate of Tenant in the Property be in any way subject to any claim by way of lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Landlord.  Any claim to, or lien upon, the Property arising from any act or omission of Landlord shall be subject and subordinate to this Lease and the rights of Tenant in and to the Property.

13.     **Quiet Enjoyment**.  So long as Tenant is not in default under the covenants and agreements of this Lease, Tenant's quiet and peaceable enjoyment of the Property shall not be disturbed or interfered with by Landlord or by any person claiming by, through or under Landlord.

14.     **Indemnification**.  Landlord and Landlord's Agents (as hereinafter defined) (collectively, "**Indemnified Parties**"), shall not be liable to Tenant or its Tenant's Agents for, and Tenant shall indemnify, defend and hold harmless the Indemnified Parties from and against, any and all claims, liabilities, costs and expenses of every kind and nature for which the Indemnified Parties are not reimbursed by insurance, including, without limiting the generality of the foregoing, reasonable attorneys' fees and expenses, court costs, penalties and fines incurred in connection with or arising out of any of the following (to the extent not caused by the negligence or improper act or omission of the Indemnified Parties or matters occurring outside the Property without the fault of Tenant or its Agents):

(a)     the use or manner of use of the Property by Tenant or by its Agents;

(b)     any event or circumstance occurring at the Property, including any injury or damage (x) to Landlord, Tenant, their respective Agents or any other person or entity in or about the Property, (y) to the Property or (z) to any property of Landlord, Tenant, their respective Agents or any other person or entity located at the Property;

(c)     any default by Tenant in the observance or performance of, or compliance with any of, the terms, provisions or conditions of this Lease including, without limitation, such matters relating to obtaining possession of the Property following any such default;

(d)     any holdover beyond the Term of this Lease; and

(e)     any acts, omissions or negligence of Tenant or any person claiming through or under Tenant, or the Agents of Tenant or any such person, in or about the Property.

29

As used herein, "**Agents**" of a party shall mean such party's employees, agents, contractors, licensees and invitees. The provisions of this Article shall survive the expiration or earlier termination of this Lease.

## 15.   Remedies Cumulative/Waiver.

(a)     No mention in this Lease of any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled either at law or in equity; and the failure of Landlord to insist in any one or more instances upon a strict performance of any covenant of this Lease or to exercise any option or right herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, right, or option, but the same shall remain in full force and effect unless the contrary is expressed in writing by Landlord.

(b)     No act or forbearance or failure to insist on the prompt performance of any provision of this Lease, either express or implied, shall be construed as a waiver of any of the terms, conditions, or covenants of this Lease.

## 16.   Counterparts.  This Lease may be executed by facsimile, pdf or DocuSign in any number of counterparts, each of which shall be deemed to be an original and all of which together shall comprise but a single instrument.

## 17.   Successors and Assigns.  This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective successors and assigns.  Any liability or obligation of either party existing under this Lease as of the expiration or earlier termination of the Term shall survive such expiration or earlier termination.

## 18.   Notices.  All notices from Tenant to Landlord required or permitted by any provision of this Lease shall be directed to the Address of Landlord.  All notices from Landlord to Tenant so required or permitted shall be directed to the Address of Tenant.  Either party may, at any time or from time to time, designate in writing a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address.  All notices hereunder must be in writing and shall be deemed to have been given if addressed to the aforesaid addresses and deposited in the United States Mail, postage prepaid, registered or certified, return receipt requested, or delivered in person, or sent by nationally recognized overnight courier service.

## 19.   Captions/Applicable Law.

(a)     The captions and headings throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify, or add to the interpretation, construction, or meaning of any provision of or the scope or intent of this Lease.

(b)     This Lease shall be construed under the laws of the state where the Property is situated.  This Lease constitutes the entire agreement between Landlord and Tenant.  It may only be amended by a written instrument executed by both parties.

**20.**     **Net Lease**.  Except as may be otherwise expressly set forth in this Lease,

(a)     this Lease shall be deemed and construed to be a fully "net lease" and Tenant shall pay to Landlord, absolutely net throughout the Term, all amounts arising hereunder, free of any charges, assessments, impositions or deductions of any kind and without abatement, deduction or setoff whatsoever, in the manner set out above for the payment thereof, as the case may be, and under no circumstances or conditions, whether now existing or hereafter arising, shall Landlord be expected or required to make any payment of any kind whatsoever relating to the Property or be under any obligation or liability hereunder or otherwise, and

(b)     Tenant shall pay all costs, expenses and charges of every kind and nature relating to the Property which may arise or become due or payable during or after (but attributable to a period falling within) the Term (but excluding any costs, expenses or charges if and to the extent caused by Landlord, other than in connection with Owner's enforcing its rights or remedies under this Lease).

[REMAINDER OF PAGE INTENTIONALLY BLANK]

31

**IN WITNESS WHEREOF**, this Lease is hereby executed effective as of the date first above written.

**LANDLORD:**

**Rite Aid of Pennsylvania, LLC**

By: _____
Name: George Zhushma
Its: Group Vice President

**TENANT:**

**WesClare Corporation,**

By: _____
Name: James W. Nickman Jr.
Its: President

**EXHIBIT A**

(Description of Land)

Exhibit D

## SPECIAL WARRANTY DEED

Upon recording, please return to:

_____

_____

_____

Tax Parcel #: [INSERT TAX PARCEL #]

### THIS SPECIAL WARRANTY DEED

IS MADE on this _____ day of _____, 2025,
and made effective as of this _____ day of _____, 2025,

**BETWEEN**

[GRANTOR], a [STATE/ENTITY]

(hereinafter called "**Grantor**")

**AND**

[GRANTEE], a [STATE/ENTITY]

(hereinafter called "**Grantee**"):

**WITNESSETH**, that the said Grantor, in consideration of the sum of _____
($_____), in hand paid to the Grantor by the Grantee, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey to the Grantee, its successors and assigns:

**ALL THAT CERTAIN** real property situated in the Township of _____, County of _____, and Commonwealth of Pennsylvania, and as further described on Exhibit A, attached hereto and made a part hereof (the "**Property**").

**BEING** the same Property conveyed to [INSERT PRIOR RECORDED DEED INFORMATION].

**UNDER AND SUBJECT** to those matters listed on Exhibit B, attached hereto (collectively, the "**Permitted Exceptions**").

**TOGETHER WITH** all rights and appurtenances thereto.

34

**TO HAVE AND TO HOLD** the same to and for the use of the Grantee and its successors and assigns forever, and the Grantor for itself and its successors and assigns, hereby covenants and agrees that it will **WARRANT SPECIALLY** the Property hereby convened, **UNDER AND SUBJECT** as aforesaid.

**NOTICE: THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT. [This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984, as amended, and is not intended as notice of any unrecorded instruments.]**

[signatures on following pages]

**IN WITNESS WHEREOF**, the Grantor has executed this Deed as of the day and year written above.

**[GRANTOR]**,
a [STATE/ENTITY]

By:_____
Name: _____
Title: _____

**<u>ACKNOWLEDGMENT</u>**

STATE/COMMONWEALTH OF _____)
                                             ) ss:
COUNTY OF _____)

On this the \_\_\_\_ day of _____, 2025, before me, a Notary Public in and for the _____, the undersigned officer, personally appeared _____, who acknowledged herself/himself to be the _____ of [GRANTOR], a [STATE/ENTITY], and that she/he, as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of such limited liability company by herself/himself as such officer.

In Witness Whereof, I hereunto set my hand and official seal.

                                       _____
                                       Notary Public

My Commission Expires:

NOTICE: THE UNDERSIGNED, AS EVIDENCED BY THE SIGNATURE(S) TO THIS NOTICE AND THE ACCEPTANCE AND RECORDING OF THIS DEED, (IS, ARE) FULLY COGNIZANT OF THE FACT THAT THE UNDERSIGNED MAY NOT BE OBTAINING THE RIGHT OF PROTECTION AGAINST SUBSIDENCE, AS TO THE PROPERTY HEREIN CONVEYED, RESULTING FROM COAL MINING OPERATIONS AND THAT THE PURCHASED PROPERTY, HEREIN CONVEYED, MAY BE PROTECTED FROM DAMAGE DUE TO MINE SUBSIDENCE BY A PRIVATE CONTRACT WITH THE OWNERS OF THE ECONOMIC INTEREST IN THE COAL. [This notice is inserted herein to comply with the Bituminous Mine Subsidence and Land Conservation Act of 1966.]

**[GRANTEE]**,
a [STATE/ENTITY]

By:_____

Name: _____

Title: _____

## CERTIFICATE OF RESIDENCE

I do hereby certify that the address of the within named Grantee is:

_____

_____

_____


_____
Grantee/ Agent for Grantee

37

EXHIBIT A
LEGAL DESCRIPTION OF PROPERTY


[INSERT LEGAL DESCRIPTION]

EXHIBIT B
PERMITTED EXCEPTIONS

[INSERT PERMITTED ENCUMBRANCES, IF ANY]

Exhibit E

**POWERS OF ATTORNEY**

[See attached.]

## AUTHORIZATION AND LIMITED POWER OF ATTORNEY (DEA)

THIS AUTHORIZATION AND LIMITED POWER OF ATTORNEY (this "Limited Power of Attorney") is made and entered into as of [DATE], effective as of the Closing Date, by and between [SELLER LICENSEE ENTITY], a [STATE] [ENTITY TYPE] ("Grantor"), and [THE APPLICABLE BUYER LICENSE HOLDER], a [STATE ENTITY TYPE] ("Attorney").

Through this Limited Power of Attorney, Grantor, to the full extent of its power legally to do so, hereby makes, constitutes, and appoints Attorney and its respective designated Pharmacists-In-Charge as Grantor's true and lawful attorney, in its name, place, and stead to do the following at the pharmacies set forth on Schedule A (each a "Pharmacy", collectively, the "Pharmacies"), the assets of which Attorney is acquiring from Grantor's Affiliates pursuant to that certain First Amended and Restated Asset Purchase Agreement (as may be amended, modified or restated from time to time, the "**Agreement**") dated August 22, 2025, by and between Grantor and Attorney (the "Agreement"):

(a)  operate the Pharmacies listed on the attached Schedule A under each Pharmacy's current (i) DEA registration number, and (ii) any and all other DEA registrations, certificates, certifications, and/or authorizations set forth on Schedule A, in order to carry out the ordering, storing, distributing, dispensing, prescribing and handling controlled substances and related business activities of the Pharmacy (the "Controlled Substance Activities");

(b)  without limitation, the Controlled Substance Activities shall include, and Grantor hereby makes, constitutes and appoints Attorney its true and lawful attorney-in-fact in Grantor's name, place and stead, to execute applications for books of official order forms and to sign such order forms in requisition for Schedules I, II, III, IV and V controlled substances, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. Section 828) and part 1305 of Title 21 of the Code of Federal Regulations, as is necessary for the treatment of patients at the Pharmacies from and after the Closing Date, and the Grantor ratifies and confirms all that Attorney must lawfully do or cause to be done by virtue of these terms and covenants;

(c)  represent to third parties its authority hereunder, including by providing a copy hereof;

(d)  execute all necessary forms and other instruments that require the use of said registration number and certificate; and

(e)  perform any act that is required by or incidental to the full use and enjoyment of said registration number and/or other registrations, certificates, certifications, and/or authorizations.

It is recognized that so long as this Limited Power of Attorney shall be in effect, Attorney and its respective designated Pharmacists-In-Charge are hereby irrevocably vested with the powers granted herein and that Grantor does hereby renounce the right to revoke this Power of Attorney or any of the powers hereby confirmed upon Attorney and its respective designated Pharmacists- In-Charge. Where permitted by applicable law, Grantor also renounces all rights in its part to exercise the powers which Attorney and its respective designated Pharmacists-In-Charge are authorized to perform pursuant to this Limited Power of Attorney.

Attorney's power under this Limited Power of Attorney with respect to each Pharmacy shall automatically terminate upon the issuance of a new registration number for such Pharmacy in its own name.

The following terms and conditions shall apply to the grant of authority hereunder:

(a)   Grantor agrees to allow Attorney, as an agent of Grantor, to continue the Controlled Substance Activities of the registrant to be carried out under the Grantor's DEA registration;

(b)   Grantor acknowledges that, as the registrant, Grantor will be held accountable for any violations of controlled substance laws which may occur; and

(c)   Attorney agrees that the Controlled Substance Activities of the registrant may be carried out under Grantor's registration and shall remain in effect for no more than ninety (90) days after the purchase date, which is _____, 2025.

Attorney covenants and agrees that it shall follow and abide by and comply with all controlled substance laws at all times while utilizing this Limited Power of Attorney. Attorney hereby covenants and agrees that Attorney shall indemnify and hold Grantor harmless for any and all liability, loss, damages, costs or expense which Grantor may incur or be required to pay by reason of the exercise of the powers granted to Attorney and its respective designated Pharmacists-In-Charge herein.

Each Pharmacy's current DEA registration number and other DEA registrations, certificates, certifications, and/or authorizations are set forth on the attached Schedule A.

Capitalized terms used but not defined in this Limited Power of Attorney have the respective meanings for such terms that are set forth in the Agreement.

[Signatures on Following Pages]

<u>GRANTOR</u>:


[GRANTOR]




By:   _____
Name: _____
Title:  _____

Date: _____






STATE OF_____ )
                              ) SS:
COUNTY OF _____ )




Subscribed and sworn to before me this _____day of _____,    2025, by

_____, as the _____of _____.




_____

Notary Public

My commission expires:


43

<u>ATTORNEY</u>:

[ENTITY]

By:    _____

Name: _____

Title:  _____

Date: _____

Witnesses:

1. _____

2. _____

Signed and dated on the _____day of _____, (year), at _.

STATE OF_____  )
                                                       ) SS:
COUNTY OF _____  )

Subscribed and sworn to before me this _____day of _____,    2025, by

_____, as the _____of _____.

_____

Notary Public

My commission expires:

44

**SCHEDULE A**

| Store Number | Entity Name/Address | DEA Number | DEA Expiration Date | Other DEA registration, number |
|---|---|---|---|---|
|  |  |  |  |  |

## AUTHORIZATION AND LIMITED POWER OF ATTORNEY (NON-DEA)

THIS AUTHORIZATION AND LIMITED POWER OF ATTORNEY (this "Limited Power of Attorney") is made and entered into as of [DATE], effective as of the Closing Date, by and between [SELLER LICENSEE ENTITY], a [STATE] [ENTITY TYPE] ("Grantor"), and [THE APPLICABLE BUYER LICENSE HOLDER], a [STATE ENTITY TYPE] ("Attorney").

Through this Limited Power of Attorney, Grantor, to the full extent of its power legally to do so, hereby makes, constitutes, and appoints Attorney and its respective designated Pharmacists-In-Charge as Grantor's true and lawful attorney, in its name, place, and stead to do the following at the pharmacies set forth on Schedule A (each a "Pharmacy", collectively, the "Pharmacies"), the assets of which Attorney is acquiring from Grantor's Affiliates pursuant to that certain First Amended and Restated Asset Purchase Agreement (as may be amended, modified or restated from time to time, the "**Agreement**") dated August 22, 2025, by and between Grantor and Attorney (the "Agreement"):

(a)  operate the Pharmacies listed on the attached Schedule A under each Pharmacy's current (i) State Board of Pharmacy license or registration number, and (ii) State Board of Pharmacy Controlled Substances registration number (if applicable);

(b)  represent to third parties its authority hereunder, including by providing a copy hereof;

(c)  execute all necessary forms and other instruments that require the use of said registrations and licenses; and

(d)  perform any act that is required by or incidental to the full use and enjoyment of said registrations and licenses.

It is recognized that so long as this Limited Power of Attorney shall be in effect, Attorney and its respective designated Pharmacists-In-Charge are hereby irrevocably vested with the powers granted herein and that Grantor does hereby renounce the right to revoke this Power of Attorney or any of the powers hereby conferred upon Attorney and its respective designated Pharmacists- In-Charge. Where permitted by applicable law, Grantor also renounces all rights in its part to exercise the powers which Attorney and its respective designated Pharmacists-In-Charge are authorized to perform pursuant to this Limited Power of Attorney.

Attorney's power under this Limited Power of Attorney with respect to each Pharmacy shall automatically terminate with respect to the applicable registration or license upon the earlier of: (i) the date Buyer obtains such new registration or license for such Pharmacy or (ii) ninety days (90) after the purchase date, which is _____, 2025.

Attorney hereby covenants and agrees that Attorney shall indemnify and hold Grantor harmless for any and all liability, loss, damages, costs or expense which Grantor may incur or be required to pay by reason of the exercise of the powers granted to Attorney and its respective designated Pharmacists-In-Charge herein.

47

Capitalized terms used but not defined in this Limited Power of Attorney have the respective meanings for such terms that are set forth in the Agreement.

[Signatures on Following Pages]

<u>GRANTOR</u>:

[GRANTOR]

By: _____
Name: _____
Title: _____

Date: _____

STATE OF_____ )
                              ) SS:
COUNTY OF _____ )

Subscribed and sworn to before me this _____day of _____,    2025, by

_____, as the _____of _____.

_____

Notary Public

My commission expires:

49

ATTORNEY:

By: _____

Name: _____

Title: _____

Date: _____

Witnesses:

1. _____

2. _____

Signed and dated on the _____day of _____, (year), at _.

STATE OF_____ )
                                                    ) SS:
COUNTY OF _____ )

Subscribed and sworn to before me this _____day of _____,      2025,
by

_____, as the _____of _____.

_____

Notary Public

My commission expires:

50

**SCHEDULE A**

| Store Number | Entity Name/Address | State Board of Pharmacy License Number / Expiration Date | Controlled Substance Registration Number and Expiration Date |
|---|---|---|---|
|  |  |  |  |

Exhibit F

## INVENTORY INSTRUCTIONS

In connection with the that certain First Amended and Restated Asset Purchase Agreement (as may be amended, modified or restated from time to time, the "**Agreement**") between Seller and Buyer dated August 22, 2025, this Exhibit F sets forth the agreed upon methods, standards and procedures for counting and determining the value of the Purchased Pharmacy Inventory. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

1.    General Instructions.

1.1.    At least 1 qualified representative of each of Buyer and Seller must be present throughout the Inventory Review.

1.2.    The cost of taking inventory will be borne solely by Buyer.

1.3.    No pre-counting of inventory will be permitted.

1.4.    Buyer's representative will prepare 2 copies (or 1 original and 1 photocopy) of the "Physical Inventory Review Report" in the form attached as Annex I hereto, and must be signed by representatives of both Buyer and Seller at the conclusion of the inventory. After the Physical Inventory Review Report has been signed by the aforementioned representatives, Seller and Buyer will retain a copy of the same.

1.5.    Buyer will reconcile the 3T Documentation against the Purchased Pharmacy Inventory to ensure accurate 3T Documentation is being transferred to Buyer.

2.    Cut-Off Procedure.

2.1.    All Purchased Pharmacy Inventory received up to, but not including, the day of the inventory shall be included in the inventory. Seller shall be responsible for the payment of all invoices for merchandise received up to, but not including, the day of inventory.

2.2.    Seller shall not accept or permit the transfer of merchandise from any other store or from any warehouse of Seller on the applicable Closing Date.

3.    Valuation Of Purchased Pharmacy Inventory; Excluded Inventory.

3.1.    Valuation. In calculating the aggregate value of the Purchased Pharmacy Inventory and determining the Inventory Purchase Price, the Inventory Service shall value the Purchased Pharmacy Inventory based on Medi-Span's Average Wholesale Price ("**AWP**") that is within 30 days prior to the applicable Closing Date, AWP minus 30% for brand name Purchased Pharmacy Inventory, and AWP minus 98% for generic Purchased Pharmacy Inventory.

3.2.    Excluded Inventory. The Inventory Service shall not ascribe any value to Excluded Inventory. As used herein, "**Excluded Inventory**" means all items of inventory that fit

within one or more of the following categories: (i) all inventory out of date on the Inventory Date, as shown by manufacturer's labeled expiration date; (ii) all inventory untransferable under applicable laws; and (iii) any other items that the Parties mutually agree in writing (electronic mail shall be acceptable) to exclude. Seller agrees to remove all items of Excluded Inventory from the Stores prior to the applicable Closing Date, and no later than the start of the Inventory Review.

3.3.    <u>Inventory Preparation</u>. Open containers will be counted in tenths. Seller must mark the open container with an "X" mark, and "faced in the front" of the similar type drugs. Items to be excluded from the sale will be pulled and accumulated at a pre-designated location for disposition.

3.4.    <u>Matters Related to Prescriptions</u>. Prior to the applicable Closing Date, Seller shall use reasonable efforts to fill and deliver to pharmacy customers any partial-fill prescriptions with a remaining quantity balance ("**IOU Prescriptions**"). For any IOU Prescriptions remaining on the applicable Closing Date, Seller shall credit the prescription to the customer or to the third-party payor, as appropriate, on the applicable Closing Date. In addition, prior to the applicable Closing Date, Seller shall reverse and return to stock any filled prescriptions that have not been picked up, providing all necessary notice to any third-party payors, and shall use reasonable best efforts to provide Buyer with a list of such prescriptions so that Buyer may fill such prescriptions on or after the Closing Date.

## Annex I

### Form of Physical Inventory Review Report

DATE OF INVENTORY _____

TIME STARTED _____

TIME COMPLETED _____

STORE LOCATION _____

SECTION TO BE COMPLETED BY THE APPLICABLE BUYER'S AND SELLER'S REPRESENTATIVES

|  | | **AWP/Ret $** | **X Cost Factor** | **Cost $** |
|---|---|---|---|---|
| **Brand**_____ | **RX** | $_____ | x 70% | $_____ |
| [Brand = AWP minus 30%] | | | | |
| **Generic**_____ | **RX** | $_____ | x 2% | $_____ |
| [Generic = AWP minus 98%] | | | | |
| **TOTAL INVENTORY** | | $_____ | | $_____ |

**<span style="color:red">IF THE TOTAL EXCEEDS $_____ – DO NOT SIGN – EMAIL ABU BAKER DURRANI (ABUBAKER.DURRANI@RITEAID.COM) FOR DIRECTION ON HOW TO PROCEED.</span>**

UPON COMPLETION, BOTH SELLER'S AND THE APPLICABLE BUYER'S REPRESENTATIVES MUST SIGN WITH A THIRD-PARTY WITNESS. IMMEDIATELY THEREAFTER, EMAIL COPIES OF BOTH THIS SHEET AND THE INVENTORY SERVICE FINAL COUNT SHEET TO ABUBAKER.DURRANI@RITEAID.COM. PLEASE INCLUDE A COVERPAGE SHOWING THE NAME OF EACH PERSON WHO SIGNED THE DOCUMENT AND THEIR TITLE, AS WELL AS THE STORE NUMBER AND ADDRESS OF THE LOCATION INVENTORIED. PLEASE CONTACT ABU BAKER DURRANI (ABUBAKER.DURRANI@RITEAID.COM) WITH ANY QUESTIONS.

The above and foregoing is accepted by Buyer and Seller as the final total dollar value of the pharmaceutical and allowed non-pharmaceutical merchandise located at the captioned store, subject to the terms and conditions of the Agreement, including, but not limited to, Section 8 thereto.

**SELLER:**                                          **THE APPLICABLE BUYER:**

By:_____        By:_____
Authorized Representative                         Authorized Representative

Exhibit G

**WIRE INSTRUCTIONS**

[See attached.]