## **Exhibit 3**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

Robert L. LeHane
Jennifer D. Raviele (admitted *pro hac vice*)
Connie Y. Choe
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
           jraviele@kelleydrye.com
           cchoe@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for Equity One (Copps Hills) LLC*

| | |
|---|---|
| In re:<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case Number: 25-14861 (MBK)<br><br>(Jointly Administered)<br><br>**Re:  Docket No. 2260**<br>**Objection Deadline:  09/18/2025**[2] |

**OBJECTION OF EQUITY ONE (COPPS HILLS) LLC TO**
**NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**OF THE DEBTORS' LEASES TO DOLLAR TREE STORES, INC.**

Equity One (Copps Hills) LLC ("Landlord"), by and through its undersigned

---

[1]  The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

[2]  Extended by agreement of counsel to Debtors.

counsel, Kelley Drye & Warren LLP, submits this objection (the "Objection") to the *Notice of Assumption and Assignment of Certain of the Debtors' Leases to Dollar Tree Stores, Inc.* (the "Notice of Assignment").[3]  In support of this Objection, Landlord respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Landlord opposes the proposed assignment of the Rite Aid Lease to Dollar Tree Stores, Inc. ("Proposed Assignee") because it would violate sections 365(b)(3)(C) and 365(b)(3)(D) of the Bankruptcy Code. Specifically, and as explained in detail below, the Michaels Prohibited Use Provision prevents Dollar Tree from operating in the Shopping Center, and, if the Proposed Assignee sells food products for off-premises consumption, its use could also violate the Stop & Shop Prohibited Use Provision. Assigning the Rite Aid Lease to Proposed Assignee would also violate section 365(b)(3)(D) because it would disrupt the carefully crafted tenant mix and balance in the Shopping Center.

2.      Landlord must receive adequate assurance from Debtors and Proposed Assignee that assignment of the Rite Aid Lease to Proposed Assignee would comply with the prohibited use clauses in the leases of all other tenants operating in the Shopping Center and would not disrupt any tenant mix or balance in the Shopping Center, as required by section 365(b)(3)(C) and (D) of the Bankruptcy Code.  Absent sufficient assurances, assignment to Proposed Assignee should not be approved.

3.      If the Court authorizes assumption and assignment of the Rite Aid Lease to the Proposed Assignee, then (i) Debtors must be required to pay the Landlord Cure Amount, plus any additional pecuniary losses suffered by Landlord, including reasonable attorneys' fees; (ii) Debtors must cure or provide adequate assurance that they or Proposed Assignee will cure all

---

[3]      Docket No. 2260.  Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Notice of Assignment.

non-monetary defaults under the Rite Aid Lease; (iii) Debtors or Proposed Assignee must (a) satisfy any Adjustment Amounts which have not yet been billed or have not yet become due under the terms of the Rite Aid Lease, and (b) be required to comply with all contractual obligations to indemnify and hold Landlord harmless with regard to events which occurred before assumption and assignment, but which were not known to Landlord as of the date of the assumption and assignment; (iv) Debtors must continue to timely pay all rent, additional rent, and percentage rent due under the Rite Aid Lease until it is assumed, assumed and assigned, or rejected pursuant to section 365(d)(3) of the Bankruptcy Code; (v) Proposed Assignee must provide security in connection with section 365(l) of the Bankruptcy Code; and (vi) Proposed Assignee must agree to enter into a short-form assumption and assignment agreement with Landlord to put the parties in privity.

## BACKGROUND

### I.    The Rite Aid Lease

4.    Landlord is the owner or affiliate of or managing agent for the owner of the shopping center located at 125 Danbury Road, Ridgefield, Connecticut, which is commonly referred to as Copps Hills Plaza (the "Shopping Center").

5.    On or about August 30, 2001, Landlord, through its predecessor in interest, Ridgefield Properties LLC, and Genovese Drug Stores, Inc. ("Tenant"), entered into a lease agreement (as amended, modified, and/or supplemented, the "Rite Aid Lease") for approximately 10,908 square feet of retail space in the Shopping Center (the "Leased Premises").[4]  The Leased Premises have been designated by Debtors as Store No. 10389 and are

---

[4]    A copy of the Rite Aid Lease is available to parties in interest upon written request and subject to execution of a confidentiality agreement.

located in a shopping center, as that term is used in section 365(b)(3) of the Bankruptcy Code.
*See In re Joshua Slocum, Ltd.*, 922 F.2d 1081 (3d Cir. 1990).

6.      Under the terms of the Rite Aid Lease, the Debtors are required to pay,
among other things, minimum monthly rent and additional rent, consisting of taxes and common
area maintenance obligations.

## II.      The Stop & Shop Lease

7.      On or about August 28, 1970, Landlord and The Stop & Shop Companies,
Inc. ("Stop & Shop") entered into a lease agreement (as amended, modified, and/or
supplemented, the "Stop & Shop Lease") for certain retail space in the Shopping Center.[5]

8.      Pursuant to section 9.2(b) of the Amended and Restated Stop & Shop
Lease, the Landlord shall not permit the use or operation of any portion of the Shopping Center
for certain prohibited uses (the "Stop & Shop Prohibited Use Provision").[6]

9.      One of the prohibited uses is "the sale of any food products for off-
premises consumption, other than the incidental sale of such food products in not more than 500
sq. ft. of any retail store business."[7]  The Amended and Restated Stop & Shop Lease contains an
exception to that prohibition which would permit "a variety store… [to] sell food items for off-
premises consumption, provided, however, that not more than a total of 2,500 square feet of
selling space, or (if less) a total of 10% of the total floor area of the premises used for such
business, shall be used for the sale (including display) and storage of food items."[8]

---

[5]      A copy of the Stop & Shop Lease, as amended and restated on October 26, 2001 (the "Amended and Restated Shop & Shop Lease"), is available to parties in interest upon written request and subject to execution of a confidentiality agreement.

[6]      Amended and Restated Stop & Shop Lease at § 9.2(b)

[7]      *Id.*

[8]      *Id.* at § 9.2(b)(v).

10.     If the Rite Aid Lease is assigned to Proposed Assignee and Proposed Assignee sells food items for off-premises consumption in violation of the Stop & Shop Prohibited Use Provision, then Landlord would be in default under the Stop & Shop Lease and Stop & Shop would be entitled to enforce its remedies at law and in equity against Landlord.

### III.     The Michaels Lease

11.     On or about November 20, 2023, Landlord and Michaels Stores, Inc. ("Michaels") entered into a lease agreement (as amended, modified, and/or supplemented, the "Michaels Lease") for certain retail space in the Shopping Center.[9]

12.     Pursuant to section 16.5 of the Michaels Lease, the Landlord may not permit the use or operation of any portion of the Shopping Center for the prohibited uses outlined in Exhibit J to the Michaels Lease (the "Michaels Prohibited Use Provision" and, together with the Stop & Shop Prohibited Use Provision, the "Prohibited Use Provisions").[10]

13.     One of the prohibited uses in the Michaels Prohibited Use Provision is a "dollar store, including price point retailers (for example, but without limitation, Dollar Tree…)."[11]

14.     The Michaels Lease carves out Rite Aid from the Shopping Center tenants subject to the Michaels Prohibited Use Provision, with one important exception – if "Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission."[12]  The Rite Aid Lease requires written consent of Landlord, not to

---

[9]     A copy of the Michaels Lease is available to parties in interest upon written request and subject to execution of a confidentiality agreement.

[10]     Michaels Lease at § 16.5.

[11]     *Id.* at Exhibit J.

[12]     *Id.* at § 16.5.

be unreasonably withheld, for Rite Aid to assign the Rite Aid Lease to any tenant that is not a drug store or affiliate.[13]

15.     If the Michaels Prohibited Use Provision is violated, then Michaels would be permitted to pursue any available remedy at law or in equity against Landlord and would have the right to (i) pay 25% reduced rent after sixty (60) days of the violation, (ii) pay 50% reduced rent after one-hundred and twenty (120) days of the violation, and (iii) terminate the lease after one-hundred and eighty (180) days of the violation.[14]

16.     Negotiation of the Michaels Prohibited Use Provision was material to Landlord and Michaels because it relates to the economic viability of the Shopping Center.[15]

### IV.     The Bankruptcy Cases

17.     On May 5, 2025 (the "Petition Date"), Debtors, including Tenant, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court.  Since the Petition Date, Debtors have continued to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

18.     On May 6, 2025, Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Auction and Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing (A) the Sale of Assets and (B) Shortened Notice with Respect Thereto, and (VII) Granting Related Relief*

---

[13]     Rite Aid Lease at § 15(A).

[14]     *Id.* at § 16.5.

[15]     *Id.*

(the "Sale Procedures Motion").[16]  The Sale Procedures Motion sought to establish, among other things, the process by which Debtors would market and sell leased assets and a timeline for the bidding and sale process.

19.    On May 7, 2025, the Court entered an order[17] granting certain relief requested in the Sale Procedures Motion and, on June 11, 2025, the Court entered the *Final Order (I) Establishing Procedures for the Sale of Certain Leases and Fee Owned Properties, and (II) Granting Related Relief.*[18]

20.    On August 29, 2025, Debtors docketed the results of the sale of certain leases to the Proposed Assignee with the *Second Supplemental Notice of Successful and Backup Bidders with Respect to the Auction of Certain of the Debtors' Leases* (the "Notice of Successful Bidder").[19]  The Notice of Successful Bidder advised that Proposed Assignee was the successful bidder to purchase the Rite Aid Lease.

21.    On September 2, 2025, the Debtors filed the Notice of Assignment, which included Debtors' proposed cure amount for the Rite Aid Lease, as set forth on **Exhibit A**, attached hereto, in the column titled "Debtor Cure Amount" (the "Debtor Cure Amount").

## OBJECTION

I.    **Assignment of the Rite Aid Lease to Proposed Assignee Must be Denied Because Debtors Have Not Provided Landlord with Evidence of Adequate Assurance of Future Performance Under the Rite Aid Lease**

22.    Adequate assurance of future performance is a key element of the assumption process and must be satisfied pursuant to the Bankruptcy Code. 11 U.S.C. § 365(b)(1)(C).  Section 365(f)(2)(B) provides that a trustee or debtor-in-possession may assign an

---

[16]    Docket No. 17.

[17]    Docket No. 142.

[18]    Docket No. 804.

[19]    Docket No. 2205.

unexpired nonresidential lease only if "adequate assurance of future performance by the assignee

of such contract or lease is provided, whether or not there has been a default in such contract or

lease." *See In re Sun TV and Appliances, Inc.*, 234 B.R. 356, 370 (Bankr. D. Del. 1999).

23.     While adequate assurance of future performance is not defined in the

Bankruptcy Code, several courts have looked to the legislative history for guidance and have

concluded that "the term was intended to be given a practical, pragmatic construction" in light of

the facts of each case. *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009). The emphasis

is on protection of the lessor, and the intention "is to afford landlord with a measure of protection

from having to be saddled with a debtor that may continue to default and return to bankruptcy."

*In re Natco Industries, Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985). By implication,

Bankruptcy Code section 365 operates to remove doubts entertained by a lessor concerning the

status of his lease with the bankruptcy estate. *See In re Standard Furniture Co.*, 3 B.R. 527, 530

(Bankr. S.D. Cal. 1980).

24.     The Rite Aid Lease is for "real property in a shopping center" as that term

is used in Section 365(b)(3). *See In re Joshua Slocum, Ltd.,* 922 F.2d 1081, 1086-1087 (3d Cir.

1990); *In re Sun TV and Appliances, Inc.,* 234 B.R. 356, 360 (Bankr. D. Del. 1999). As a result,

Landlord is entitled to the protections afforded shopping center landlords under Bankruptcy

Code section 365(b)(3). "Shopping center landlords, even more than non-debtor parties to

executory contracts and executory leases, receive 'extraordinary protection' under the Code." *In*

*re Rickel Home Centers, Inc.,* 209 F.3d 291, 298 (3d Cir. 2000).

25.     When a shopping center lease is assumed and assigned, the landlord is

afforded special statutory protections under the Bankruptcy Code in the form of adequate

assurance of future performance. *In re Joshua Slocum*, 922 F.2d at 1086; *In re Trak Auto Corp.*, 277 B.R. 655 (Bankr. E.D. Va. 2002). Section 365(f)(2) provides:

> The trustee may assign an executory contract or unexpired lease of the debtor only if–
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

26.    Section 365(b)(1) of the Bankruptcy Code provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–
>
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default…;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease for any actual pecuniary loss to such party resulting from such default; and
>
> (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

27.    It is well-established that "[t]he Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases of shopping centers." *In re Serv. Merch. Co., Inc.*, 297 B.R. 675, 681 (Bankr. M.D. Tenn. 2002), aff'd sub nom. *Ramco-Gershenson Properties, L.P. v. Serv. Merch. Co.*, 293 B.R. 169 (M.D. Tenn. 2003).  Bankruptcy Code section 365(b)(3), added as part of the so-called 1984 "Shopping Center Amendments" to the Bankruptcy Code, provides that adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance

(A)     of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B)     that any percentage rent due under such lease will not decline substantially;

(C)     that *assumption or assignment of such lease is subject to all the provisions thereof, including* (but not limited to) provisions such as a radius, location, *use, or exclusivity provision*, and *will not breach any such provision contained in any other lease*, financing agreement, or master agreement *relating to such shopping center*; and

(D)     that assumption or assignment of such lease will *not disrupt any tenant mix or balance* in such shopping center.

11 U.S.C. § 365(b)(3) (emphasis added).

28.     Before 1984, sections 365(b)(3)(C) and (D) of the Bankruptcy Code provided that an assignment of a shopping center lease must not "substantially" breach any use or exclusivity provision or "substantially" disrupt any tenant mix or balance in a shopping center. In 1984, however, the legislature approved amendments to section 365 of the Bankruptcy Code to afford further protection for landlords and tenants in shopping centers.  *See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353*.  Among these protections was the deletion of the word "substantially" from section 365(b)(3) of the Bankruptcy Code

29.     Consistent with the legislative purpose, the Debtors bear the burden of proof to demonstrate the proposed assignee's ability to provide the landlord with adequate assurance of future performance.  *See In re TSW Stores of Nanuet, Inc., 34 B.R. 299, 308 (Bankr. S.D.N.Y, 1983)*; *see also In re Federated Dept. Stores, Inc., 135 B.R. 941, 944 (Bankr. S.D. Ohio 1991)*.

30.     Here, the Debtors have not satisfied their burden with respect to the elements of adequate assurance of future performance set forth in Bankruptcy Code section 365(b)(3), as the proposed assignment would violate the Prohibited Use Provisions in the Michaels Lease and Stop & Shop Lease and disrupt the tenant mix and balance in the Shopping Center.

### A.      Debtors Have Failed to Establish that Proposed Assignee will Comply With All Use Provisions, Including the Prohibited Use Provisions

31.     The potential assignment of the Rite Aid Lease to Proposed Assignee is premised on Proposed Assignee's demonstration of adequate assurance of future performance. Proposed Assignee's use and occupancy of the Leased Premises is "subject to **all the provisions thereof**, including (but not limited to) provisions such as a radius, location, **use, or exclusivity provision**… contained in **any other lease**… **relating to the shopping center**."  11 U.S.C. § 365(b)(3)(C) (emphasis added).

32.     An assignment of the Rite Aid Lease to Proposed Assignee would violate the Michaels Prohibited Use Provision and, therefore, must be denied under section 365(b)(3)(C) of the Bankruptcy Code.  During Rite Aid's tenancy, the Michaels Prohibited Use Provision was not applicable; however, in the event of an assignment of the Rite Aid Lease, the Michaels Prohibited Use Provision becomes applicable to any assignee of the Rite Aid Lease.  This is not an anti-assignment provision; it represents the product of arms' length negotiations between the parties regarding the situations in which Michaels was willing to waive the Michaels Prohibited Use Provision.  And in the current situation, proposed assignment of the Rite Aid Lease, the Michaels Prohibited Use Provision is not waived and is in full force and effect.  The filing of the Debtors' bankruptcy cases cannot impact, modify, or rewrite the provisions of the Michaels

Lease and section 365(b)(3)(C) requires that the Court honor the terms of the Michaels Lease by denying a lease assignment that would violate it.

33.     In addition, Landlord is aware that Proposed Assignee, in the ordinary course of its business, often sells food items for off-premises consumption in its stores. Debtors and Proposed Assignee have failed to provide adequate assurance that Proposed Assignee will comply with the limitations on the sale of food items in the Stop & Shop Prohibited Use Provision. Unless and until such adequate assurance is provided, the Court must deny assignment of the Rite Aid Lease to Proposed Assignee because assignment would violate section 365(b)(3)(C) of the Bankruptcy Code.

**B.     Assignment of the Rite Aid Lease to Proposed Assignee Would Disrupt Tenant Mix and Balance**

34.     Section 365(b)(3)(D) of the Bankruptcy Code states that a shopping center lease cannot be assigned if such assignment would "disrupt any tenant mix or balance in such shopping center."[20] 11 U.S.C. § 365(b)(3)(D); s*ee also In re TSW Stores of Nanuet, Inc*., 34 B.R. 299, 307 (Bankr. S.D.N.Y, 1983) (applying section 365(b)(3)(D) to reject the proposed assignment because it would cause substantial disruption to tenant mix and balance); *see also In re Federated Dept. Stores, Inc*., 135 B.R. 941, 943 (rejecting assignment of the lease because of disruption of tenant mix and balance). Thus, by enacting section 365(b)(3)(D) of the Bankruptcy Code, Congress intended for the courts to be especially solicitous in the shopping center context in ensuring that tenant mix and balance are not disrupted by any potential lease assignments, and to protect landlords and other shopping mall tenants from the damage caused by bankrupt

---

[20]     Tenant mix, as used in section 365(b)(3)(D) of the Bankruptcy Code, relates to "the inclusion or exclusion of a store in the array or mix of mall stores," whereas tenant balance relates to "the location and relationship of tenants in the mix of mall stores." *See Federated Dept. Stores*, 135 B.R. at 943.

tenants.  *Id.* at 945; *see also Rockland Center Assocs. v. TSW Stores of Nanuet, Inc.* (*In re TSW Stores of Nanuet, Inc.*)*,* 34 B.R. 299, 303 (Bankr. S.D.N.Y. 1983) ("[A] good tenant mix in a shopping center benefits the landlord and the tenants as well.").

35.    Section 365(b)(3)(D) of the Bankruptcy Code favors minimizing disruption to carefully planned tenant mixes in shopping centers.  *See Rockland*, 34 B.R. at 299. The Third Circuit, in *Joshua Slocum*, noted that a bankruptcy court must be sensitive to the non-debtor party and the underlying tenant so that the non-debtor receives the full benefit of its bargain.  922 F.2d at 1089–90.

36.    The Debtors cannot prove that the proposed assignment of the Rite Aid Lease to Proposed Assignee will not disrupt the tenant mix or balance at the Shopping Center. Proposed Assignee's proposed use of the Leased Premises would not only violate the Prohibited Use Provisions, but it would also disrupt the tenant mix and balance at the Shopping Center, which are critical to preserving and maximizing value for all of the Shopping Center's tenants. *See Federated Dep't Stores*, 135 B.R. at 945–46.  The Shopping Center offers a balanced mix of retail and restaurant options for customers with the goal of drawing customers to the Shopping Center and its tenants rely on this deliberate mix and balance of businesses.  In connection with the development and leasing at the Shopping Center, Landlord has worked to ensure that there is not significant overlap between retail operations or operations that are incompatible with each other.

37.    Here, the carefully planned tenant mix and balance currently in place at the Shopping Center would be disrupted by: (i) the operation of a store selling food products for off-premises consumption at the Shopping Center, rather than other stores that do not conflict with the Stop & Shop Prohibited Use Provision; and/or (ii) the operation of a Dollar Tree, rather

than other stores that do not conflict with the Michaels Prohibited Use Provision.  Therefore, the

Court should not permit Debtors to assign the Rite Aid Lease to Proposed Assignee because it

would violate section 365(b)(3)(D) of the Bankruptcy Code.

**C.      The Rite Aid Lease Must Be Assumed and Assigned *Cum Onere***

38.      Section 365(b)(3)(C) of the Bankruptcy Code provides that the assumption

of a shopping center lease "is subject to all the provisions thereof…".  11 U.S.C. § 365(b)(3)(C).

Bankruptcy courts have described the assumption of an unexpired lease as "an all-or-nothing

proposition – either the whole contract [or lease] is assumed or the entire contract [or lease] is

rejected."  *See, e.g.*, *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 249 (3d Cir. 2003).

39.      As the court noted in *In re Washington Capital Aviation & Leasing*:

> Adequate assurance of future performance by the assignee is important
> because 11 U.S.C. § 365(k) "relieves the ... estate from any liability for
> any breach of such ... lease occurring after such assignment."  A party
> subject to a contractually created obligation ordinarily cannot divest itself
> of liability by substituting another in its place without the consent of the
> party owed the duty.   *See* Douglas G. Baird and Thomas H. Jackson,
> Bankruptcy 285 (2d ed. 1990) (citing Restatement (Second) of Contracts
> § 318(3) (1981) ("delegation of performance . . . does not discharge any
> duty or liability of the delegating obligor")).  While the assignee may be
> entitled to perform for the original obligor, the original obligor remains
> ultimately liable until discharged by performance or otherwise.
> Section 365(k) changes this common law rule and relieves the estate from
> all liability under the lease following assignment.

156 B.R. at 167, 175 n. 3 (Bankr. E.D. Va. 1993); *see also In re Rickel Home Ctrs., Inc.*, 209

F.3d 291, 299 (3d Cir. 2000) (adequate assurance is "necessary to protect the rights of the non-

debtor party to the contract or lease, because assignment relieves the trustee and the estate from

liability arising from a post-assignment breach"); *Matter of Lauderdale Motorcar Corp.*, 35 B.R.

544, 548–49 (Bankr. S.D. Fla. 1983) ("[T]his [c]ourt cannot enlarge or increase the [d]ebtor's

property or rewrite the terms of a contract.").   Debtors are not entitled to the benefits and

protections of section 365(k) if they do not assume and assign a lease *cum onere* — with all

benefits and burdens. *See, e.g.*, *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir. 1999).

## II.     **The Proposed Cure Amount Is Incorrect**

40.     Landlord disputes the cure amount proposed by Debtors in the Notice of Assignment.   The correct cure amount for the Rite Aid Lease is set forth on the attached **Exhibit A** in the column titled "Landlord Cure Amount" (the "Landlord Cure Amount"), which includes an estimate of attorneys' fees incurred to date.  Landlord reserves the right to amend the Landlord Cure Amount to include additional amounts that continue to accrue and any obligations that arise and/or become known to Landlord prior to assumption and assignment of the Rite Aid Lease.

41.     Pursuant to the Rite Aid Lease, Debtors are obligated to pay regular installments of fixed monthly rent, percentage rent, and/or gross rent, as well as a share of common area maintenance costs, real estate taxes, and assessments.   In addition, prior to assumption and assignment of the Rite Aid Lease, Debtors are required by section 365(b)(1) of the Bankruptcy Code to cure all outstanding defaults under the Rite Aid Lease and compensate Landlord for any actual pecuniary loss, including the payment of related attorneys' fees. *See* 11 U.S.C. §365(b)(1)(B).  Attorney's fees due under the Rite Aid Lease are compensable. *See LJC Corp. v. Boyle*, 768 F.2d 1489, 1494–96 (D.C. Cir. 1985); *In re Bullock*, 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982); *In re Crown Books Corp.*, 269 B.R. 12, 14-15 (Bankr. D. Del. 2001); *In re BAB Enters., Inc.*, 100 B.R. 982, 984 (Bankr. W.D. Tenn. 1989); *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 757 (Bankr. S.D.N.Y. 1986); *In re Ribs of Greenwich Vill., Inc.*, 57 B.R. 319, 322 (Bankr. S.D.N.Y. 1986).  Accordingly, as part of its pecuniary losses, Landlord is entitled to attorney's fees in connection with Debtors' obligation to cure all monetary defaults under the Rite Aid Lease.

### III.     Debtors or Proposed Assignee Must Be Responsible for (A) Payment of Adjustment Amounts When They Come Due in the Ordinary Course of Business, and (B) Satisfaction of Indemnification Obligations

42.     To the extent that rent, attorneys' fees, interest, and/or other charges continue to accrue, and/or Landlord suffers other pecuniary losses with respect to the Rite Aid Lease, Landlord hereby reserves the right to amend the Landlord Cure Amount to reflect such additional amounts or to account for year-end adjustments, including, without limitation, adjustments for 2024 and 2025, which have not yet been billed or have not yet become due under the terms of the Rite Aid Lease (the "Adjustment Amounts").  Debtors or Proposed Assignee must be responsible to satisfy all accrued but unbilled obligations under the Rite Aid Lease, including the Adjustment Amounts, if any, when due in accordance with the terms of the Rite Aid Lease, regardless of when such Adjustment Amounts were incurred.

43.     Furthermore, Debtors or Proposed Assignee must be required to comply with all contractual obligations to indemnify and hold Landlord harmless for events which occurred before assumption and assignment, but which were not known to Landlord as of the date of the assumption and assignment.  This includes, but is not limited to, (i) claims for personal injury that occurred at the Leased Premises, (ii) damage and destruction to the Leased Premises or property by Debtors or their agents, and (iii) environmental damage or clean-up.  To cure possible pre-assignment, non-monetary defaults and provide adequate assurance of future performance with respect to the indemnification obligations under the Rite Aid Lease, either (a) Debtors or Proposed Assignee must be required to satisfy any and all such claims, notwithstanding anything to the contrary contained in a plan or any court order, or (b) Debtors must be required to demonstrate or obtain adequate insurance (by purchase of "tail" coverage or otherwise) in order to satisfy potential indemnification obligations based on events or occurrences that occurred prior to the effective date of an assignment.  Such claims for indemnity

could include claims for personal injury occurring at the Leased Premises where Landlord is

joined as a party to a lawsuit or for damage and destruction of property by Debtors or their

agents or employees.

## IV. Debtors Must Be Responsible for Timely Payment of All Post-Petition Rent And Additional Rent Due Under the Rite Aid Lease Until It Is Assumed, Assumed and Assigned, or Rejected

44.     Section 365(d)(3) of the Bankruptcy provides, in pertinent part:

> The [debtor] shall timely perform all the obligations of the debtor…arising
> from and after the order for relief under any unexpired lease of
> nonresidential real property, until such lease is assumed or rejected,
> notwithstanding section 503(b)(1) of [the Bankruptcy Code].

11 U.S.C. § 365(d)(3).

45.     Landlord requests that any assumption and assignment of the Rite Aid

Lease be conditioned upon Debtors' timely performance of all obligations arising under the Rite

Aid Lease until it is assumed, assumed and assigned, or rejected pursuant to section 365(d)(3) of

the Bankruptcy Code.  This includes, without limitation, the payment in full of rent and related

charges on the first day of each month.

## V. Demand for Security

46.     Section 365(l) of the Bankruptcy Code provides, in pertinent part:

> If an unexpired lease under which the debtor is lessee is assigned pursuant
> to this section, the lessor of the property may require a deposit or other
> security for the performance of the debtor's obligations under the lease
> substantially the same as would have been required by the landlord upon
> the initial leasing to a similar tenant.

11 U.S.C. § 365(l).

47.     In the ordinary course of business, Landlord requires security deposits,

letters of credit, and/or guaranties when leasing (or assessing an assignment of a lease) to certain

companies based on their financial information and history.  In connection with the proposed

assumption and assignment of the Rite Aid Lease, Landlord hereby demands such security in one of those forms as required by section 365(l) of the Bankruptcy Code. Until the complete financials of Proposed Assignee are known to Landlord, Landlord reserves its right to specify the exact form and amount of such security; however, Landlord would typically require a parent or personal guaranty in connection with leasing to a new tenant and a security deposit equal to six months of rent and related charges.

48. Moreover, Landlord asserts that, if the Court is inclined to authorize assignment of the Rite Aid Lease to Proposed Assignee over this Objection, then Proposed Assignee should be required to execute a short-form assumption and assignment agreement with Landlord in connection with the proposed assignment of the Rite Aid Lease so that Landlord will be in privity with its new tenant.

## RESERVATION OF RIGHTS

49. Landlord reserves the right to amend and/or supplement this Objection on any basis, including, without limitation, by adding or supplementing objections to Debtors' proposed cure amount and by adding or supplementing objections to the adequate assurance of future performance provided by Debtors or Proposed Assignee.

## CONCLUSION

**WHEREFORE,** Landlord requests that the Court enter an order: (a) denying the proposed assignment of the Rite Aid Lease to Proposed Assignee; or (b) in the alternative, conditioning assumption and assignment of the Rite Aid Lease on (i) Debtors or Proposed Assignee providing adequate assurance of future performance in accordance with section 365(b) of the Bankruptcy Code; (ii) Proposed Assignee indemnifying Landlord for all damages resulting from any breach of the Prohibited Use Provisions; (iii) Debtors or Proposed Assignee promptly paying the Landlord Cure Amount plus any additional pecuniary losses suffered by Landlord,

including reasonable attorney's fees; (iv) requiring Debtors or Proposed Assignee to continue to comply with all obligations under the Rite Aid Lease, including payment of the Adjustment Amounts and satisfaction of any indemnification obligations in the regular course of business; (v) entry of an assignment order barring any other tenant in the Shopping Center from asserting that assignment of the Rite Aid Lease to Proposed Assignee is a basis to declare a default, reduce rent, enforce any remedies, or otherwise modify the terms of or terminate any other lease in the Shopping Center; (vi) requiring Proposed Assignee to enter into short-form assumption and assignment agreements with Landlord; (vii) requiring Proposed Assignee to provide security to Landlord pursuant to section 365(l) of the Bankruptcy Code; and (viii) granting such other and further relief as the Court deems just and proper.

Dated: September 18, 2025

**KELLEY DRYE & WARREN LLP**

By: */s/ Robert L. LeHane*
Robert L. LeHane
Jennifer D. Raviele (admitted *pro hac vice*)
Connie Y. Choe
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Email: rlehane@kelleydrye.com
　　　jraviele@kelleydrye.com
　　　cchoe@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: (973) 503-5900

*Attorneys for Equity One (Copps Hill) LLC.*

**Exhibit A**

| Store No. | Landlord | Location | Debtor Cure Amount | Landlord Cure Amount |
|---|---|---|---|---|
| 10389 | Equity One (Copps Hill) LLC | 125 Danbury Road, Ridgefield, CT | $29,990.00 | $39,990.00 |