## Exhibit 4

Store: 5692R

THIS LEASE, made this ___3o<sup>th</sup>___ day of _____August_____, 2001, by and between RIDGEFIELD PROPERTIES LLC, a Delaware limited liability company, hereinafter referred to as "Landlord," and GENOVESE DRUG STORES, INC., a Delaware corporation, hereinafter referred to as "Tenant":

## WITNESSETH:

**Premises**

**SECTION 1.** A. Landlord, for and in consideration of the covenants, conditions, agreements and stipulations herein contained, does hereby lease to Tenant, and Tenant does hereby take and hire from Landlord, those certain premises consisting of a store room with area inside walls of approximately 10,908 square feet plus Mezzanine, as shown on the site plan marked Exhibit "A" attached hereto and made a part hereof, in a building in existence or to be constructed upon property located at the southwestern corner of Danbury Road and Copps Hill Road, situated in the City of Ridgefield, County of Fairfield, State of Connecticut.

B. The premises being leased hereunder are hereinafter referred to as the "Leased Premises" and are a portion of a shopping center in existence or to be erected by the Landlord on the lands described above, hereinafter referred to as the "Shopping Center," which Shopping Center shall be as shown on Exhibit "A" and designated as Copps Hill Plaza. The Shopping Center shall be deemed to include the outparcels, if any, shown on Exhibit "A", and legally described in Exhibit "B" attached hereto.

C. Tenant shall be permitted to use the Leased Premises for the operation of a typical drug store and/or evolution thereof, and/or for any other lawful purpose or purposes, including, but not limited to, an Express Photo and/or photo processing center, a postal substation or package mailing center, and an optical center for the practice of opticianry and optometry. Notwithstanding the foregoing, Tenant shall not violate any use restriction as shown on Exhibit "C", provided such use restrictions result from exclusives given to other tenants of the Shopping Center and such exclusives are in effect at the time Tenant wishes to change its use of the Leased Premises or such proposed use, or uses constitute a noxious use or are unsuitable for a first-class shopping center. Provided Tenant obtains all requisite permitting, Tenant may also sell alcoholic beverages for off-premises consumption. Landlord warrants that the Leased Premises are properly zoned (or the relevant variances or site approvals have been obtained) which allow each of the specific uses described above and that there are no recorded restrictions which would prohibit or restrict the Tenant from using the Leased Premises for a typical drug store and photo processing center. Tenant has the right to discontinue all or any part of its business operations (including, but not limited to, its pharmacy operations) at the Leased Premises at any time, at Tenant's sole discretion and without Landlord's approval or consent. Notwithstanding the foregoing, Tenant covenants that it shall initially open for business at the Leased Premises for the operation of a typical Genovese drug store.

**Term**

**SECTION 2.** A. The term of this Lease shall commence concurrently with rent commencement as provided in Section 4.A., hereinafter referred to as the "Commencement Date," and shall end at midnight twenty (20) years later, hereinafter referred to as the "Termination Date."

B. Because of the admittedly seasonal aspect of Tenant's business operations, it is mutually agreed that Tenant shall not be obligated to initially open for business between December 1 and January 31. Minimum Rent (as defined in Section 4.B.) shall not begin to accrue until February 1 if possession of the Leased Premises is made available to Tenant for initial store opening at any time between December 1 and January 1. The foregoing provisions shall have no effect upon continued payment of rental following Tenant's initial store opening.

C. Landlord and Tenant agree to execute, acknowledge and deliver instruments to each other in recordable form certifying the Commencement Date and Termination Date of this Lease.

## Option Periods and Surrender

**SECTION 3.** A. Tenant, if not in default beyond any applicable cure period, has the option to renew this Lease for four (4) successive five (5) year periods on the same terms and conditions herein contained, provided Tenant gives Landlord six (6) months notice of its election to exercise an option prior to the end of the term hereof or extended term.

B. Tenant will deliver up and surrender to Landlord possession of the Leased Premises upon the expiration or termination of this Lease in good condition and repair (loss by casualty, subject to Section 13 hereof, and ordinary wear and decay excepted and except for any conditions which, under the provisions of this Lease, Landlord is required to remedy).

## Rent

**SECTION 4.**  A. Rent shall accrue hereunder ninety (90) days after the Leased Premises are completed by Landlord in accordance with the provisions of this Lease and possession thereof has been tendered to Tenant, or the date Tenant opens for business, whichever occurs earlier. The existing lease between Landlord and Tenant for space in the Shopping Center shall expire and Tenant shall return possession sixty (60) days following the date the Leased Premises opens for business, subject to Section 2.B. hereof.  Notwithstanding the foregoing, rent and all other monetary obligations shall cease on the date the dent commences on the Leased Premises.  The parties agree Tenant shall, at all times, be paying rent on either the Leased Premises by the terms of this Lease or on its current space in the Shopping Center by the terms of the existing lease.

    B. Tenant shall pay to Landlord at the address hereinafter set forth Minimum Rent as follows:



All monthly payments of Minimum Rent shall be paid in advance on the first day of each and every calendar month during the term of this Lease without deduction setoff or counterclaim unless expressly provided for in this Lease. If the term shall commence on a day other than the first day of a month, then Minimum Rent shall be prorated for the balance of the said month on a per diem basis.

C. Minimum Rent as provided in Section 4.B. shall be considered sufficient consideration for the term of this leasehold. Notwithstanding the foregoing, in addition to the payment of Minimum Rent, Tenant covenants and agrees to pay to Landlord as additional rent for each ▮▮Lease Year▮▮ of the term hereof, on the Gross ·Receipts (as defined in Section 5) made in such Lease Year from Tenant's business or businesses conducted on the Leased Premises, ██████████████t ██████████████████████████████████████████ , hereinafter referred to as "Percentage Rent." ████████████████████████████████████████████ ████████████ Throughout this Lease "Rent" shall mean both Minimum Rent and Percentage Rent.

D. For purposes of calculating the Percentage Rent due hereunder, the Tenant's Lease Year shall run concurrently with each year of the term of the Lease per Section 2.A. hereof. Percentage Rent for first and last Lease Years shall be apportioned.

# Gross Receipts

**SECTION 5.** A. "Gross Receipts" is hereby defined as the total receipts from all business conducted by Tenant on the Leased Premises for cash or credit except as follows:

B. Gross Receipts shall not include: Sales of merchandise for which cash has been refunded or allowance made; the sales price of merchandise returned by customers for exchange; the amount of any luxury, excise, sales, use or gross receipts tax imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers; services provided to customers for which Tenant derives no profit, including the operation of a drivers license bureau (if any) or utilities payment center (if any); the operation of a blood laboratory station (if any); merchandise transferred between stores owned or controlled by  Tenant; discount sales to employees of Tenant and its affiliates; financing or carrying charges on balances due on repossessed items and trade-in allowances; gift wrapping charges; telephone commissions; sales of public transportation tickets; any funds derived from a state-supported lottery system; postage and delivery charges to customers; amounts received as coupons; layaway items not paid for and not delivered; the amount of any credit sales deemed uncollectible by Tenant; sales of merchandise ordered through the use of mail order catalogs or filled through catalog order channels operated by Tenant or by a parent, subsidiary or affiliated corporation of Tenant, regardless of the place of the order, payment or delivery; receipts from snack bars and cafeterias operated solely for the use of Tenant's employees, weighing machines, vending and other coin machines maintained for the convenience of Tenant's employees and the incidental convenience of customers, amusement devices and public telephones; premiums, commissions, payments and other amounts received from or in connection with (i) the sale of policies of insurance, mutual funds, stocks, bonds and other securities, travelers' checks, money orders, and similar items, (ii) the making of personal loans, (iii) the operation of savings plans, (iv) the cashing or issuing of checks; (v) the sale or rendition of any and all other financial services, and (vi) the sale of postage stamps, fishing and hunting licenses, and tickets (including but not limited to, those customarily sold by travel and theater agencies); sales of any items (not among those listed above) which are owned by others than Tenant, its departmental lessees, concessionaires, or licensees and for which Tenant receives a commission or brokerage fee, provided, however, that there shall be included in net retail sales the amounts received as commission or brokerage fees on such sales; and sales of prescription items pursuant to third party prescription plans.  For the purposes of this Section,

third party prescription plans shall be deemed to be those health benefit plans under which all or any portion of the cost of prescription items and pharmaceuticals is paid or reimbursed by a governmental agency, insurance carrier, health maintenance organization, union, trust or benefit organization, employer or employer group, or any similar organization pursuant to an agreement between Tenant and such organization.

C. Tenant shall submit to Landlord on or before the ninetieth (90th) day following the end of each Lease Year a statement showing the amount of Gross Receipts for the preceding Lease Year. Upon delivery of such statement, Tenant shall pay to Landlord any Percentage Rent required by Section 4.C.

D. Tenant shall make available to Landlord at Tenant's Florida headquarters Tenant's business records of its Gross Receipts for the preceding Lease Year. Not more than once each year, Landlord may, at its own expense, examine and audit Tenant's records for the sole purpose of ascertaining the amount of such Gross Receipts from the Leased Premises during the preceding Lease Year. Landlord shall notify Tenant and proceed with such audit within one hundred eighty (180) days after receipt of Tenant's statement. Should Landlord fail to examine and audit said records within the above one hundred eighty (180) day period, Landlord shall have no further right of access to the records of Tenant, and Tenant's statement shall be deemed final.

E. Landlord agrees that all information concerning Tenant's affairs shall remain confidential, and shall not be divulged or published by Landlord, except to the mortgagee or potential mortgagee of the Leased Premises or in connection with the sale of the Shopping Center or the Leased Premises or in a tax abatement proceeding.

## Construction

**SECTION 6.** A. Landlord will, at its own expense, prepare and deliver to Tenant five (5) sets of detailed plans and specifications for construction of the Leased Premises in accordance with guide plans (Edition: Phase II-A; latest issue date October 16, 1997, as revised through May 8, 2000 - includes Bulletins Nos. 1 - 6) furnished by Tenant. Landlord acknowledges receipt of Tenant's guide plans heretofore delivered by Tenant. Such construction plans shall be subject to approval by Tenant, initialed by the parties hereto and considered a part hereof such approval not to be unreasonably withheld or delayed. Tenant shall have sixty (60) days to make such approval. If Tenant fails to respond in such 60-day period, the construction plans shall be deemed approved. If Landlord elects to proceed with construction prior to obtaining Tenant's approval of plans and prior to the end of the 60-day period, any changes required by Tenant shall be at Landlord's sole cost and expense.

B. Immediately upon execution of this Lease, Landlord shall proceed with due diligence to obtain all requisite permitting for development of the Leased Premises, including any pylon sign variance required pursuant to the terms of Section 9.E. hereof. Landlord shall commence construction no later than April 1, 2002 and shall complete the Leased Premises in accordance with the approved plans and specifications no later than December 1, 2002 (hereinafter referred to as the "Completion Date"). Upon one hundred twenty (120) days written notice, Landlord shall have the right to extend the construction commencement date and the Completion Date up to eight (8) months. In no event shall the Completion Date be extended beyond July 1, 2003. At least thirty (30) days prior to completion, written notice shall be given by Landlord to Tenant that the Leased Premises will be completed and ready for Tenant's occupancy. Any general contractor, project architect or civil engineer retained by Landlord to perform Landlord's construction

obligations hereunder shall be approved in advance by Tenant not to be unreasonably withheld or delayed. Tenant shall have fifteen (15) days to make such approvals. If Tenant fails to respond in such 15-day period such general contractor, project architect or civil engineer shall be deemed approved. Landlord shall obtain from the authority having jurisdiction the street address to be assigned to the Leased Premises and provide Tenant with such information in writing as promptly as possible after commencement of construction. If construction is delayed for a period of six (6) months or longer, plans shall be resubmitted by Landlord for approval by Tenant prior to construction or recommencement of construction.

C. The Leased Premises shall be deemed to have been fully completed and ready and available for occupancy by Tenant when all of the following have been accomplished: (a) a certificate of occupancy, or a temporary certificate of occupancy which allows Tenant to operate, or an equivalent use permit is issued by and obtained from the governmental authority having jurisdiction; (b) the architect who prepared the plans and specifications has certified in writing to Tenant that the Leased Premises have been substantially completed in accordance with the plans and specifications approved by Landlord and Tenant as set forth in this Section 6; (c) Landlord has tendered possession of the Leased Premises to Tenant with the store absolutely cleaned, including the cleaning and waxing of floors; (d) all mechanical systems servicing the Leased Premises have been completed and are in good working condition; and, (e) the Shopping Center as shown on Exhibit "A" has been sufficiently completed (the Shopping Center shall be considered sufficiently complete with the following: unobstructed access from the curb cuts on Copps Hill Road and Danbury Road to the Leased Premises as shown on Exhibit "A"; completed exterior construction of the proposed retail space adjacent to the Leased Premises as shown on Exhibit "A"; and completion of the approximately sixty (60) parking aisles located closest to the Leased Premises as shown outlined in red on Exhibit "A"). Landlord agrees to provide Tenant with two (2) copies of an as-built survey of the Shopping Center within ninety (90) days after the completion of the Shopping Center including the Stop & Shop expansion (the "As-Built Survey"). The As-Built Survey shall include, without limitation, a metes and bounds legal description, all easements, utilities, and public and private right-of-ways. In the event Landlord fails to provide Tenant with the copies of the As-Built Survey as provided herein, Tenant may have an As-Built Survey prepared and offset the cost of such survey and the two (2) copies thereof against Rent due or becoming due under this Lease. Landlord warrants that the Leased Premises shall be free from defects in materials or workmanship for a period of one (1) year following the Completion Date. Upon completion of the Leased Premises as provided herein, Landlord will not thereafter paint, decorate or change the architectural treatment of any part of the exterior of the Leased Premises, nor make any structural alterations, additions or changes to the Leased Premises without Tenant's prior written approval not to be unreasonably withheld or delayed.

D. Acceptance by Tenant of delivery of the Leased Premises prior to the Completion Date shall be at the option of Tenant, such acceptance not to be unreasonably withheld.

E. At Tenant's sole risk, Landlord will afford Tenant reasonable access to the Leased Premises prior to the Commencement Date for the purpose of inspecting, measuring, installing or arranging for the installation of fixtures, but only to the extent that such activity proceeds without interfering with Landlord's contractors, subcontractors, and their respective employees. By giving Tenant access to the Leased Premises prior to the Commencement Date, Landlord assumes no responsibility whatsoever for injury to persons entering the Leased Premises, or damage to property brought in, or upon, the Leased Premises, nor shall Landlord be

05/17/01 :7878-3                    5

obligations hereunder shall be approved in advance by Tenant not to be unreasonably withheld or delayed. Tenant shall have fifteen (15) days to make such approvals. If Tenant fails to respond in such 15-day period such general contractor, project architect or civil engineer shall be deemed approved. Landlord shall obtain from the authority having jurisdiction the street address to be assigned to the Leased Premises and provide Tenant with such information in writing as promptly as possible after commencement of construction. If construction is delayed for a period of six (6) months or longer, plans shall be resubmitted by Landlord for approval by Tenant prior to construction or recommencement of construction.

C. The Leased Premises shall be deemed to have been fully completed and ready and available for occupancy by Tenant when all of the following have been accomplished: (a) a certificate of occupancy, or a temporary certificate of occupancy which allows Tenant to operate, or an equivalent use permit is issued by and obtained from the governmental authority having jurisdiction; (b) the architect who prepared the plans and specifications has certified in writing to Tenant that the Leased Premises have been substantially completed in accordance with the plans and specifications approved by Landlord and Tenant as set forth in this Section 6; (c) Landlord has tendered possession of the Leased Premises to Tenant with the store absolutely cleaned, including the cleaning and waxing of floors; (d) all mechanical systems servicing the Leased Premises have been completed and are in good working condition; and, (e) the Shopping Center as shown on Exhibit "A" has been sufficiently completed (the Shopping Center shall be considered sufficiently complete when the buildings, parking aisles, access drives and curb cuts outlined in blue on Exhibit "A" are completed). Landlord warrants that unobstructed access from a completed curb cut on Copps Hill Road will be completed by the sixtieth (60th) day following Tenant opening for business at the Leased Premises. Landlord agrees to provide Tenant with two (2) copies of an as-built survey of the Shopping Center within ninety (90) days after the completion of the Shopping Center including the Stop & Shop expansion (the "As-Built Survey"). The As-Built Survey shall include, without limitation, a metes and bounds legal description, all easements, utilities, and public and private right-of-ways. In the event Landlord fails to provide Tenant with the copies of the As-Built Survey as provided herein, Tenant may have an As-Built Survey prepared and offset the cost of such survey and the two (2) copies thereof against Rent due or becoming due under this Lease. Landlord warrants that the Leased Premises shall be free from defects in materials or workmanship for a period of one (1) year following the Completion Date. Upon completion of the Leased Premises as provided herein, Landlord will not thereafter paint, decorate or change the architectural treatment of any part of the exterior of the Leased Premises, nor make any structural alterations, additions or changes to the Leased Premises without Tenant's prior written approval not to be unreasonably withheld or delayed.

D. Acceptance by Tenant of delivery of the Leased Premises prior to the Completion Date shall be at the option of Tenant, such acceptance not to be unreasonably withheld.

E. At Tenant's sole risk, Landlord will afford Tenant reasonable access to the Leased Premises prior to the Commencement Date for the purpose of inspecting, measuring, installing or arranging for the installation of fixtures, but only to the extent that such activity proceeds without interfering with Landlord's contractors, subcontractors, and their respective employees. By giving Tenant access to the Leased Premises prior to the Commencement Date, Landlord assumes no responsibility whatsoever for injury to persons entering the Leased Premises, or damage to property brought in, or upon, the Leased Premises, nor shall Landlord be

entitled to any Rent by reason of such access. Tenant agrees to indemnify and hold Landlord harmless from and against any and all claims and demands arising out of such access, unless such claims or demands are due to negligence of Landlord, its agents, employees or contractors.

## Common Facilities

**SECTION 7.** A. Landlord shall construct the sidewalks, service drives, parking aisles, driveways, streets and parking area and provide adequate water drainage (hereinafter referred to as the "Common Facilities") as shown on Exhibit "A". Prior to the Commencement Date, the Common Facilities shown outlined in blue on Exhibit "A" shall be completed. The area provided for the parking of automobiles shall be built in accordance with Exhibit "A" and, at all times shall meet all applicable ordinances, rules and regulations. All sidewalks shall be concrete and all service drives, parking aisles, driveways, streets and parking areas shall be graded, leveled and paved with concrete or asphalt, clearly marked with painted lines, and repainted as required. Landlord agrees there shall be unobstructed use of sidewalks, driveways and roadways for automotive and pedestrian traffic to and from the Leased Premises and adjacent public streets and highways. Landlord shall make no charge of any kind to Tenant's customers for use of the Common Facilities or any additions thereto. All of the Common Facilities, and any signs owned or permitted by Landlord, shall be constructed in a good and workmanlike manner by Landlord and shall be maintained by Tenant, at its sole cost and expense.

B. Landlord shall construct paved driveways at the rear of the Leased Premises as shown on Exhibit "A" in order to provide convenient public access to the delivery or service entrances. Such driveways shall be of sufficient width so as to permit the passage and unloading of trailer trucks and other commercial vehicles.

C. Landlord agrees that the parking lot will be ground level only and that the Shopping Center will remain as shown on Exhibit "A" unless written permission is obtained from Tenant for any change or alteration, such permission not to be unreasonably withheld or delayed. Landlord shall prohibit the placing of any buildings or the conduct of any business on the parking lot. Notwithstanding the foregoing, Tenant agrees that the grocer store tenant and the department store tenant, and their respective successors and assigns, shall be allowed to conduct business directly in front of its premises so long as such business does not interfere with access to or from the Leased Premises or the approximately sixty (60) parking aisles located closest to the Leased Premises as shown outlined in red on Exhibit "A". The outparcels, if any, shown on Exhibit "A" shall be further restricted to the extent that no building constructed thereon shall exceed one-story or twenty-three (23) feet in height, including parapet, except for the proposed retail buildings shown on Exhibit "A" adjacent and to the west of the Leased Premises which shall not exceed twenty-six and one-half (26.5) feet including parapet. If Landlord violates the above covenants, Tenant shall be granted, any remedy Tenant may have under this Lease or in law or equity.

## Ingress and Egress To Shopping Center

**SECTION 8.** Landlord warrants as a consideration for this Lease that it will initially provide and maintain for the term of this Lease and any extension thereof, ingress and egress facilities to public highways in the number and the locations depicted on Exhibit "A", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

06/11/01 :7878-4

7

## Signs and Antenna

**SECTION 9.** A. Landlord agrees that Tenant shall have the right at its own cost and expense to erect and maintain signs advertising its business and the services it provides on the exterior of the Leased Premises. Any signs erected by Tenant shall conform to the requirements of local ordinances and shall be signs generally used by Tenant to advertise its business from time to time, including, but not limited to, its standard capsule sign.

B. Landlord shall apply for and, if permitted, erect a Shopping Center identification pylon sign to include capsules for Stop & Shop, Kohl's and Tenant. If such a sign is erected or replaced, and if any other tenant in the Shopping Center is permitted to erect its sign upon the sign structure, Tenant shall also be entitled to erect its standard capsule sign no less prominently displayed than a sign of any other tenant other than Stop & Shop or Kohl's or their respective successors. Notwithstanding the foregoing, this Lease is not contingent upon Tenant being allowed to place a capsule on any Shopping Center pylon sign, Tenant reserves the right to apply for and erect its standard capsule pylon sign(s) at its sole cost and expense along the street frontage in front of the Leased Premises in the location shown on Exhibit "A" provided it doesn't interfere with or preclude any other Landlord signs for the Shopping Center.

C. If Tenant erects its own standard capsule pylon sign(s) as provided herein, Tenant shall be permitted, as soon as possible after the date hereof, to install sign foundations with conduits as shown in the Plans and at the locations shown on Exhibit "A" upon which Tenant may install its readerboards and sign panels. Landlord shall extend electrical service to such pylon signs as soon as practical thereafter.

D. Landlord shall not, without Tenant's written consent, utilize or permit others to utilize the exterior of the Leased Premises, or the space above it, for sign display purposes.

E. Tenant may install satellite receiving/transmitting equipment on the roof of the Leased Premises provided such installation does not penetrate the roof or otherwise adversely affect the integrity of the roof structure or the roof bond or violate any applicable laws. Tenant agrees to indemnify and hold Landlord harmless from and against any and all claims and demands arising from the installation, removal or repair of such equipment, unless such claims or demands are due to the negligence of Landlord, its agents, employees or contractors.

F. If Tenant erects its own standard capsule pylon sign(s), as provided in Section 9.C. above, and if any variances from governmental sign codes or zoning ordinances are required in order for Tenant to install its signs as depicted on the Plans or at the locations shown on Exhibit "A," Landlord shall use its best efforts to obtain such variances.

## Maintenance and Repairs

**SECTION 10.** A. Tenant will keep the interior and exterior of the Leased Premises and exterior facilities in good order and repair (excepting, however, all repairs made necessary by reason of fire, casualty, the elements or Landlord's default under the terms of this Lease) at its own cost and expense, including the repair, maintenance and replacement of all heating, ventilation and air-conditioning systems. Notwithstanding the foregoing, Landlord shall make all necessary repairs to the Leased Premises, including all fixtures and systems (except for fixtures and systems installed by Tenant) located therein, for a period of one (1) year following the

Completion Date; provided, however, Landlord shall not be required to make any repairs necessitated by the negligence of Tenant, its agents or employees. Following said one (1) year period, Landlord agrees to assign to Tenant all warranties for any labor and materials used on or in the Leased Premises.

B. The Landlord shall, at its own cost and expense, maintain in good operating condition (including making all necessary repairs and replacements to accomplish the same) the roof and structural members of the building on the Leased Premises, any water, plumbing, gas or electrical lines or conduits permanently embedded in the walls, floor or ceiling, and any repairs necessary to make the Leased Premises watertight. Landlord shall also make all repairs due to fire, casualty, the elements or Landlord's failure to comply with the terms of this Lease and be responsible for pest control in all areas outside the interior of the Leased Premises. Notwithstanding the foregoing, if any of the aforementioned repairs are made necessary by reason of Tenant's use or occupancy of the Leased Premises in any manner inconsistent with the reasonable use and occupancy thereof, as a result of Tenant's negligence, or by reason of alterations made by Tenant, such repairs shall be made by Tenant at its own cost and expense.

C. In the event the need for emergency repairs arises, and such repairs are the obligation of Landlord, Tenant, in its sole discretion, may proceed to have such repairs promptly made and if Landlord fails to reimburse Tenant for such repair costs within thirty (30) days after receipt of request for reimbursement from Tenant, Tenant may deduct the cost of such repairs from Rent due or to become due. Tenant shall use its best efforts to give Landlord telephonic or such other notice as may be practical under the circumstances prior to making such emergency repairs. By undertaking the performance of Landlord's repair obligations pursuant to this paragraph, Tenant assumes no responsibility for the performance of future repairs, which are the obligation of Landlord.

## Utilities

**SECTION 11.** Tenant shall pay for all trash disposal services, water, gas, heat, electric current and other utilities consumed by it, in or upon the Leased Premises, and Landlord shall pay for all sewerage disposal and drainage services in connection with the Common Facilities, at rates set by local public utility as approved by public authority having jurisdiction. Landlord agrees to furnish the Leased Premises with separate meters for measuring consumption of water and electricity.

## Tenant's Right To Make Changes

**SECTION 12.** A. Tenant, at its own expense during the term of the Lease, may make any alterations or additions to the Leased Premises which it may deem necessary, except changes which would enlarge the size of the Leased Premises or impair the structural integrity of the Leased Premises, including the roof, unless approved by Landlord, but it shall make them in accordance with all applicable governmental regulations. All salvage from such work shall belong to Tenant. All permanent improvements shall belong to Landlord.

B. All trade fixtures and equipment and other personal property owned by Tenant and installed or placed by it in the Leased Premises may be removed by Tenant at any time during the term. Tenant agrees to repair any damage to the Leased Premises occasioned by such removal.

## Damages To Premises

**SECTION 13.** A. Tenant shall at all times during the term of this Lease and any renewals thereof maintain "all risk" insurance on the Leased Premises insuring

against all risks of physical loss or damage in the amount of one hundred percent (100%) of the full replacement cost of the improvements located on the Leased Premises. Landlord and any mortgagee named by Landlord from time to time shall be named as additional loss payee and mortgagee, respectively. Upon request, Tenant shall supply to Landlord a copy of the certificate of insurance evidencing such coverages.

B. Except as otherwise provided in Section 13.C. below, in the event the Leased Premises shall be partially damaged or totally destroyed by fire or other disaster, Tenant shall promptly cause same to be restored, subject to such changes as Tenant may reasonably require and Landlord reasonably approves prior to commencement of reconstruction. Due allowance shall be made for (1) reasonable time necessary (not to exceed one hundred eighty (180) days) for Tenant to adjust the loss with insurance companies, and (2) delay occasioned by strikes, lockouts, and conditions beyond the reasonable control of Tenant, provided such delay does not exceed six (6) months without Landlord's consent.

C. Should the Leased Premises, or a portion thereof, be rendered untenantable by fire or other disaster, the Rent shall be reduced proportionately from the date of the damage to the date of restoration of the Leased Premises. No Rent shall accrue for any portion of the Leased Premises unless Tenant is able to conduct its usual business on that portion of the Leased Premises which remains tenantable. Notwithstanding anything to the contrary contained herein, if such damage occurs during the last two (2) years of the term of this Lease and the cost of restoration of the Leased Premises would be more than one-third (1/3) of the replacement value of the Leased Premises, as certified by a registered architect, Landlord and Tenant shall each have the right to terminate this Lease by written notice to the other given within thirty (30) days after such occurrence. If this Lease is terminated then all insurance proceeds attributable to the Leased Premises shall be paid to Landlord and Landlord alone shall have the right to settle any claim with the insurance carrier with respect thereto. If Landlord elects to terminate this Lease, such termination shall not be effective if Tenant elects (within ten (10) days after receipt of Landlord's notice of termination) to renew this Lease by exercising any remaining options which are described in Section 3. If, at the date of the fire or other disaster, Tenant shall have paid any rent in advance, Tenant shall be entitled to a proportionate refund. Notwithstanding this Section 13.C., no rent shall abate or be reduced so long as Tenant's insurance includes rental loss or business disruption insurance covering all Rent and other payments due hereunder, or loss of income therefrom. All Rents and other charges shall abate during the period in which such rental loss or business disruption insurance payments fully reimburses Landlord for such sums and shall resume immediately upon the cessation of payment of such insurance proceeds. It is the intent hereof that Landlord shall continue to receive all Rent and other payments during such period from either Tenant or Tenant's insurance carrier.

D. Provided this Lease is not terminated as set forth in this Section 13, the term of this Lease shall be automatically extended for a period of time equal to the period of time the Leased Premises are totally untenantable due to fire or other disaster.

E. Landlord agrees to insure or cause to be insured the remainder of the Shopping Center against all risks of physical loss for one hundred percent (100%) of the full replacement cost thereof. A copy of such policy or certificate thereof shall be furnished to Tenant upon request. The proceeds from any such insurance shall be utilized to repair and rebuild the Shopping Center as provided in this Section 13. In the event the Shopping Center shall be partially damaged or totally destroyed by fire or other disaster prior to the last two (2) years of the end of the term or extended term of this Lease, Landlord shall promptly cause the same to be restored, subject to

receiving all necessary approvals. Due allowance shall be made for (1) reasonable time necessary (not to exceed one hundred eighty (180) days) for Landlord to adjust the loss with insurance companies, and (2) delay occasioned by strikes, lockouts, and conditions beyond the reasonable control of Landlord, provided such delay does not exceed six (6) months without Tenant's consent. If the premises of both Inducement Tenants shall be so damaged or destroyed, so that both have closed for business to the public, Minimum Rent shall abate and Tenant shall pay rent equal to two percent (2%) of Gross Receipts until one of the premises shall have been restored and the Inducement Tenant shall have reopened for business, at which time rent shall be paid as set forth in Sections 4.B. and 4.C.

## Landlord Representations and Warranties

**SECTION 14.** A. Landlord warrants that it is, or before the Commencement Date, will be, the owner in fee of the Shopping Center; that the Shopping Center is not presently subject to any liens or mortgages except a mortgage to Key Bank National Association dated December 28, 1999, and that Landlord has full right and title to execute and perform this Lease. So long as this Lease is in force and effect, Landlord agrees that it will not permit the disturbance of, or interference with, Tenant's quiet enjoyment of the Leased Premises and its non-exclusive rights in and to the Common Facilities in accordance with the terms of this Lease.

B. Prior to the Commencement Date, Landlord shall furnish Tenant with satisfactory evidence of Landlord's title in the form of Landlord's title insurance commitment. If such evidence shows that the Shopping Center or any part thereof is subject to any mortgage, deed of trust, or other encumbrance in the nature of a mortgage, which is prior and superior to this Lease, Landlord will deliver to Tenant, in form and substance reasonably satisfactory to Tenant, an agreement duly executed by such mortgagee or trustee, obligating such mortgagee or trustee or any successor thereto to be bound by this Lease and by all of Tenant's rights hereunder provided Tenant is not in default beyond any applicable cure period under the terms of this Lease.

C. Landlord represents and warrants that with respect to any exceptions to the title to the Shopping Center that (i) nothing contained in any of said exceptions prohibits or restricts Landlord from performing any or all of its obligations under this Lease during the full term hereof, (ii) none of said exceptions adversely affects or interferes with Tenant's enjoyment of the Leased Premises, and (iii) there are no easements under, above or through the building to be constructed on the Leased Premises.

D. Landlord warrants that physical possession of the Leased Premises shall be delivered to Tenant by Landlord free of asbestos, radon, PCB and other toxins and/or hazardous materials as defined by CERCLA (42 U.S.C. Section 9601, et seq.). Landlord hereby agrees to defend, indemnify and save harmless Tenant from and against any and all claims and demands arising out of a breach of the foregoing warranty.

## Assignment and Subletting

**SECTION 15. A.** Tenant shall have the absolute right to assign this Lease or sublet the Leased Premises at any time to any drug store or affiliate of Tenant. Tenant shall not, without the written consent of Landlord, such consent not to be unreasonably withheld or delayed, sublease the Leased Premises or assign this Lease for a non-drug store use, except to an affiliate of Tenant. Tenant shall give notice of any and all assignments and subleases to Landlord, together with a copy of the applicable instrument.

B. No assignment of this Lease or subletting of the Leased Premises shall relieve Tenant of its obligations under this Lease.

C. If Tenant provides written notice to Landlord of Tenant's intent to sublease the Leased Premises or assign its Lease to a non-affiliate of Tenant for a non-drug store use, Landlord shall have the option to recapture the Leased Premises and terminate this Lease by providing written notice to Tenant of its intent to recapture and reimbursing Tenant for its unamortized costs as carried on Tenant's books utilizing generally accepted accounting principles at the time of such recapture. Landlord's rights as provided for herein shall apply to all subsequent assignees and sublessees. Landlord must exercise its right to recapture within thirty (30) days of receipt of written notice of Tenant's intent to sublease or assign. Landlord waives its right to recapture as to any one proposed sublessee or assignee only if it does not express its intent in such 30-day period. If Landlord elects to recapture the Leased Premises, Tenant shall have up to sixty (60) days to vacate the Leased Premises and Tenant shall remain liable for Rent and all other obligations under this Lease until Tenant has vacated and surrendered possession of the Leased Premises to Landlord.

## Mechanics Liens

**SECTION 16.** When completed, Landlord will ensure that the Leased Premises are free and clear of all claims of lien by mechanics and materialmen for and on account of labor and materials furnished in and about the construction by Landlord. Thereafter, if any mechanic's or other liens, or order for the payment of money arising through the fault of either party, shall be filed against the Leased Premises or additions, alterations or extensions thereto, such party shall cause the same to be canceled and discharged of record, by bond or otherwise, and shall also defend and pay damages and attorney fees, if any, on behalf of the other, for any action, suit or proceeding which may be brought thereupon for the enforcement of such lien, liens or orders. Upon failure of the defaulting party to comply with the provisions of this Section, the other party may, after thirty (30) days notice, do so on the defaulting party's behalf, and all sums thereby expended by the other party shall on demand be paid to it by the party in default. In the event Landlord is the defaulting party, Tenant may offset against Rent due or to become due all sums expended by Tenant as a result of Landlord's failure to comply with this Section. Notwithstanding the foregoing, Tenant may not pay off any liens on behalf of Landlord unless its tenancy or quite enjoyment of the Leased Premises is imperiled.

## Law, Regulations

**SECTION 17.** Subject to the provision that this Section shall not be applicable to a) the roof or structural parts of the Leased Premises, b) water, sprinkler, gas or electrical lines or conduits permanently embedded in the walls, ceiling or floor of the Leased Premises, c) the exterior of the Leased Premises, or d) any condition which existed prior to the Commencement Date, Tenant agrees to comply with all orders, rules, regulations and requirements of any governmental body relating to the manner of Tenant's use and occupancy of the Leased Premises, or alterations made by the Tenant, and Tenant will pay all costs and expenses incidental to such compliance and will indemnify and save harmless Landlord therefrom. In the event compliance with any governmental orders, rules, regulations or requirements is not the responsibility of Tenant as provided in this Section, Landlord shall comply with such orders, rules, regulations and requirements at its sole cost and expense and will indemnify and save Tenant harmless therefrom.

## Insurance

**SECTION 18.** A. Tenant, in its name and at its own expense, shall procure and continue in force, general liability insurance against damages occurring in the

Leased Premises during the term of this Lease and any extension thereof. Such insurance shall be in an amount  Such insurance shall be written in a company or companies authorized to engage in the business of general liability insurance in the state in which the Leased Premises are located.

B. Landlord, in its name and at its own expense, subject to reimbursement pursuant to Section 35 below, shall procure and continue in force, general liability insurance against damages occurring in the Shopping Center during the term of this Lease and any extensions thereof. Such insurance shall be in an amount  Such insurance shall be written in a company or companies authorized to engage in the business of general liability insurance in the state in which the Shopping Center is located.

C. Tenant covenants to keep in good order and repair the plate glass in the Leased Premises, and to replace all broken glass with same quality as that broken; provided, however, should damage or breakage occur due to structural fault, or the fault or neglect of Landlord, then Landlord shall be responsible for replacing the damaged or broken glass.

D. The policies of insurance described herein shall be written for a period of not less than one (1) year. As soon as practical after the expiration of any policy of insurance, the insured party will provide evidence of the renewal or replacement policy to the other party upon request.

E. Should Tenant desire to carry coverage described in Section 18.A. under a "blanket" policy or policies covering other properties of Tenant, its parent corporation, its subsidiaries, or controlling or affiliated corporations, or of any assignee of this Lease, or to self-insure in whole or in part, such shall be deemed compliance with Tenant's obligations under this Section, as to both original coverage and renewals.

F. Landlord agrees to defend, indemnify and save harmless Tenant from and against any and all claims and demands whether from injury to person, loss of life, or damage to property, occurring within the Shopping Center (excluding the Leased Premises), excepting, however, such claims or demands as may result from any injury or damage caused by acts or omissions of Tenant.

G. Tenant agrees to defend, indemnify and save harmless Landlord from and against any and all claims and demands whether from injury to person, loss of life, or damage to property, occurring within the Leased Premises, excepting, however, such claims or demands as may result from any injury or damage caused by acts or omissions of Landlord.

## Waiver of Subrogation

**SECTION 19.** A. Tenant hereby agrees not to assign to any insurance company any right or cause of action for damage to the property of Tenant located in the Leased Premises which Tenant now has or may subsequently acquire against Landlord during the term of this Lease, and expressly waives all rights of recovery for such damage.

B. Landlord hereby agrees not to assign to any insurance company any right or cause of action for damages to the property of Landlord located in the Shopping Center which Landlord now has or may subsequently acquire against Tenant during

the term of this Lease, and expressly waives all rights of recovery from such damage.

C. It is specifically understood this Section shall only apply (1) where such insurance as described herein allows the insured to enter into an agreement waiving recovery rights, and (2) to the extent insurance proceeds are recovered.

## Default

**SECTION 20.** A. Each of the following shall be deemed a default by Tenant and a breach of this Lease:

1.   Any of the following which shall result in final adjudication against Tenant:

 a)   The filing of a bankruptcy petition by or against Tenant for adjudication, reorganization or arrangement;

 b)   Any proceedings for dissolution or liquidation of Tenant; or

 c)   Any assignment for the benefit of Tenant's creditors.

2.   Failure to:

 a)   pay Rent for a period of ten (10) days after receipt of notice (provided Landlord shall not be required to give Tenant notice of its failure to pay rent more than twice in any calendar year); or

 b)   perform any other covenant or condition of this Lease.

B. In the event of any default of Tenant, Landlord shall serve written notice upon Tenant that Landlord elects to terminate this Lease upon a specified date not less than thirty (30) days after the date of serving of such notice. This Lease shall then expire on the date so specified as if that date had been originally fixed as the expiration date of the term herein granted unless steps have, in good faith, been commenced promptly by Tenant to rectify the same, and are prosecuted to completion with diligence and continuity. If the matter in question shall involve building construction, or if Tenant shall be subject to unavoidable delay by conditions beyond the control of Tenant, Tenant's time to perform shall be extended for a period commensurate with such delay, provided such delay does not exceed six (6) months without Landlord's consent.

C. Upon termination of this Lease for Tenant's default, Landlord or its agents may immediately or at any time thereafter, re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by a suitable action or proceeding at law without being liable for any damages therefor, subject, however, to Tenant's right to remove trade fixtures and personal property, after notice to Landlord, within fifteen (15) days after termination of the Lease. No re-entry by Landlord shall be deemed an acceptance of a surrender of this Lease. Thereafter, Landlord may in its own behalf, relet any portion of the Leased Premises for any period of the remaining term for any reasonable sum to any reasonable tenant for any reasonable use or purpose. In connection with any such reletting, Landlord may make such changes to the Leased Premises and may grant such concessions of free rent as may be reasonably appropriate or helpful in effecting such lease.

## Rent Under Default

**SECTION 21.**  In the event this Lease shall be terminated for Tenant's default, Landlord shall be entitled to recover from Tenant, the following:

An amount equal to the amount of all Minimum Rent reserved under this Lease, less the net rent, if any, collected by Landlord on reletting the Leased Premises, which shall be due and payable, by Tenant to Landlord, on the several days on which the Minimum Rent reserved in this Lease would have become due and payable. Net rent collected on reletting by Landlord shall be computed by deducting from the gross rents collected all expenses incurred by Landlord in obtaining possession of the Leased Premises and in connection with the reletting of the Leased Premises, including broker's commission and the cost of repairing, renovating or remodeling the Leased Premises, but not including the cost of performing any covenant required to be performed by Landlord; and

## Entry of Landlord

**SECTION 22.**  Subject to Tenant's reasonable security requirements, Landlord may at reasonable times inspect, alter or repair the Leased Premises when necessary for its safety or preservation. Landlord may show the Leased Premises to others at any reasonable time within six (6) months immediately preceding the expiration of this Lease and may affix a notice for letting or selling the Leased Premises to any suitable part thereof, except show windows or entrances.

## Compliance

**SECTION 23.** Should either Landlord or Tenant fail to comply with any of the terms of this Lease, each may, after thirty (30) days notice to the other, comply therewith, but each shall not be obligated to do so. The cost of such compliance shall be payable upon demand by the non-complying party to the performing party. This Section shall not apply to the payment of rent by Tenant.

## Tenant's Right To Cure Landlord's Default

**SECTION 24.**  In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to the Leased Premises and to which this Lease shall be subordinate, or shall fail to perform any obligation specified in this Lease, then Tenant may, after the continuance of any such default for ten (10) days after notice thereof to Landlord, pay said taxes, assessments, principal, interest or other charges and cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant, and Tenant may withhold any and all Rent payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness. Notwithstanding the foregoing, Tenant may not cure the defaults of Landlord unless its tenancy or quiet enjoyment of the Leased Premises is imperiled.

## Notices

**SECTION 25.** All notices and rental checks shall be forwarded to Landlord, as follows:

To Landlord at:    333 Newbury Street
                   Boston, MA 02115
                   Attention: Property Management Department

until Tenant is notified otherwise in writing. ████████████████████
████████████████████ All notices given to Tenant hereunder shall be forwarded, as
follows:

| | |
|---|---|
| To Tenant in care of: | Eckerd Corporation |
| | Store #5692R |
| | 8333 Bryan Dairy Road |
| | Largo, Florida 33777 |
| | Attention: Vice President, Real Estate |

with copies to:

| | | |
|---|---|---|
| Eckerd Corporation | and | Eckerd Corporation |
| Store #5692R | | Store #5692R |
| 80 Marcus Drive | | 8333 Bryan Dairy Road |
| Mellville, New York 11747 | | Largo, Florida 33777 |
| Attn: Regional Real Estate Director | | Attn: Legal Department. (CW3W) |

until Landlord is notified otherwise in writing. Notices delivered to the Leased
Premises shall not constitute notice to Tenant under the terms of this Lease. Notices
to each shall be by certified mail, return receipt requested, or by bonded overnight
courier, and shall be effective upon receipt or refusal to accept delivery.

## Lease Subordination and Notices to Mortgagee

**SECTION 26.** A. Tenant agrees to subordinate this Lease to any first mortgage or
blanket mortgage placed on the Shopping Center, provided only that so long as this
Lease is in full force and effect (1) Tenant's tenancy will not be disturbed, nor will this
Lease be affected by any default under such mortgage; (2) the rights of Tenant
hereunder shall expressly survive and shall not be cut off; and (3) this Lease shall, in
all respects, continue in full force and effect.

B. If Landlord is in full compliance with the provisions of this Lease, Tenant will, upon
demand and without cost, execute an instrument necessary to effectuate such
subordination.

C. Any notices required or permitted to be given to Landlord under this Lease shall
also be given to any mortgagee whose name and address Landlord has provided to
Tenant in writing. Such mortgagee shall have the right, but not the obligation, to cure
any default by Landlord within the same time period as may be granted Landlord
under any provision in this Lease.

## Inducement Clause

**SECTION 27.** A. Landlord covenants and agrees that it has induced Tenant to
execute and deliver this Lease by Landlord's representation that each of the
following tenants (hereinafter referred to as "Inducement Tenants") will be in
occupancy of their respected premises in the Shopping Center in the location and of
the general size and area as shown on Exhibit "A": Stop & Shop and Kohl's

B. At the time Landlord delivers possession of the Leased Premises, the Inducement
Tenants shall have taken possession of the storerooms as shown on Exhibit "A".
Nothing contained herein shall preclude any later increase in the sizes of such
premises provided the general locations and the front lines of the stores are not
changed, and such changes do not violate any other requirements of this Lease.
Should both Inducement Tenants cease to operate (for reasons other than casualty,
remodeling or reasons beyond their reasonable control) for a consecutive period of
one (1) year, Tenant may cancel this Lease upon thirty (30) days written notice to

Landlord. No delay by Tenant in exercising its right to cancel pursuant to this Section 27.C. shall be construed as a waiver of such right, nor shall the replacement by Landlord of any Inducement Tenant with any other tenant operate to extinguish the continuing right of Tenant to cancel this Lease.

**Exclusive**

**SECTION 28.** A. Tenant shall have the exclusive right during the term of this Lease or any extension or renewal hereof to sell or dispense prescription drugs in the Shopping Center, except for Kohl's and Stop & Shop, and their respective successors and assigns, without the prior written permission of Tenant. In the event Landlord shall default in the performance of this covenant, and such default shall continue for thirty (30) days after receipt by Landlord of written notice thereof, then no Rent shall be paid or become payable under this Lease for such time as such default shall continue after the expiration of said thirty (30) day period, and Tenant, at its option, may declare the term ended and vacate the Leased Premises and be relieved from all further obligations under this Lease. Nothing in this section shall preclude or in any way be construed as limiting any other legal or equitable right or remedy Tenant may have. If a court of competent jurisdiction finds this exclusive covenant unenforceable, Tenant shall have the option to terminate this Lease. This exclusive covenant shall run with the land and shall be binding on Landlord, its transferees, successors and assigns.

B. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as an army-navy store, surplus store, or non-categorized discount store or with any store or business devoting more than one thousand (1,000) square feet of its retail floor area to the sale of cosmetics, health and beauty aids and related items (except for Kohl's and Stop & Shop), without the express written consent of Tenant. This paragraph shall not apply to Stop & Shop, Kohl's, and their respective successors and assigns or future occupants of the premises occupied by Stop & Shop and Kohl's so long as such premises are used as a grocery store or department store, respectively.

C. Landlord further agrees that it will not directly or indirectly lease, rent, sell or otherwise permit any property in which it has any interest (direct or indirect) located within the Shopping Center, or within one thousand (1,000) feet of any exterior boundary of the Leased Premises, to be used as a drug store, or a business which sells or dispenses prescription drugs or for any collateral use in direct support of an adjacent drug store or a business which sells or dispenses prescription drugs (such as, parking, drainage, or service drives), any of the businesses described in Section 28.B. (except for Kohl's and Stop & Shop, and their respective successors and assigns) without the written permission of Tenant. This Section 28.C. shall not apply to a mortgagee of the Leased Premises or the Shopping Center or to a purchaser, unrelated to Landlord, of the Leased Premises or the Shopping Center who had an interest which would violate this section at the time it purchased the Leased Premises or Shopping Center.

D. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as a photo processing store or photo development store or with any store or business devoting more than one thousand (1,000) square feet of its retail floor area to the sale of film, and related items (except for Kohl's and Stop & Shop), without the express written consent of Tenant.

E. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as a greeting card store or with any store or business devoting more than one thousand (1,000) square feet of

its retail floor area to the sale of greeting cards (except for Kohl's and Stop & Shop), without the express written consent of Tenant. Notwithstanding the foregoing, Tenant acknowledges that a Hallmark store currently exists in the Shopping Center and Landlord shall have the right to extend the lease for the Hallmark store for a space not to exceed 2,500 square feet.

## Exculpation

**SECTION 29**. Tenant agrees that except for damages arising out of any fraudulent misrepresentation on the part of Landlord, Landlord shall have no personal liability with respect to any of the provisions of this Lease, and Tenant shall look solely to the estate and property of Landlord in the Leased Premises, including any condemnation award, sales proceeds or casualty proceeds payable but not yet paid to Landlord for the satisfaction of Tenant's remedies, including, withou5 limitation, the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms and provisions of this Lease to be observed and/or performed by Landlord, subject, however, to the prior rights of any holder of any mortgage covering all or any part of the Leased Premises, and no other assets of Landlord or any principal of Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claims. This Section shall inure to the benefit of Landlord, its successors and assigns and their respective principals.

## Short Form Lease

**SECTION 30.** The parties hereto do mutually agree that a short form of this Lease will be executed for the purpose of recording. Such short form shall be recorded ahead of any mortgage hereafter placed on the Shopping Center or any part thereof

## Eminent Domain

**SECTION 31.** A. If the entire building on the Leased Premises shall be taken by reason of condemnation or under eminent domain proceedings, Landlord or Tenant may terminate this Lease as of the date when possession of the building is taken. If a portion of the building shall be taken under eminent domain or by reason of condemnation and if in the opinion of Tenant, reasonably exercised, the remainder of the building is no longer suitable for Tenant's business, this Lease, at Tenant's option, to be exercised by notice to Landlord within sixty (60) days of such taking, shall terminate; any unearned rents paid or credited in advance shall be refunded to Tenant. If this Lease is not so terminated, Landlord forthwith and with due diligence, shall restore the building. Until so restored, Minimum Rent shall abate to the extent that Tenant shall not be able to conduct business in a reasonable manner, and thereafter Minimum Rent for the remaining portion of the term of this Lease shall be proportionately reduced (based on the reduced square foot floor area of the building).

B. In the event any part of the parking areas of the Shopping Center shall be taken by reason of condemnation or under eminent domain or if as a result of such taking any driveway or curb cut access to the Leased Premises will be closed, and if in the opinion of Tenant, reasonably exercised, the Leased Premises are no longer suitable for Tenant's business, this Lease, at Tenant's option by notice to Landlord within sixty (60) days of such taking shall terminate. If this Lease is not terminated, Landlord, at Landlord's expense, shall restore the remaining Leased Premises and parking areas to a proper and usable condition. However, Tenant shall no have such right to terminate this Lease if Landlord provides alternate parking areas, which are reasonably acceptable to Tenant. Until so restored, Minimum Rent shall abate to the extent that Tenant shall not be able to conduct business at the Leased Premises in a reasonable manner, and thereafter Minimum Rent for the remaining portion of the

term of this Lease shall be proportionally reduced (based on the effect such taking has on Tenant's business at the Leased Premises).

C.  For purposes of this Section 28, the term "condemnation or under eminent domain proceedings" shall include conveyances and grants made in anticipation of or in lieu of such proceedings.

## Force Majeure

**SECTION 32.** Anything in this Lease to the contrary notwithstanding, neither Landlord nor Tenant shall be in default of the performance of any provisions of this Lease to the extent such performance shall be delayed or prevented by strike, war, act of God, or other cause beyond the control of party seeking to excuse such performance; provided, however, no such excusable delay shall exceed six (6) months.

## Severability

**SECTION 33.** If any term or provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

## Obligation of Successors

**SECTION 34.**  All of the provisions hereof shall bind and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns, and all covenants, conditions and agreements contained herein shall be construed as covenants running with the land.

## Common Facilities Maintenance

**SECTION 35.**  Commencing upon the Commencement Date, Tenant shall pay to Landlord, upon demand, but not more than once a month, Tenant's proportionate share of maintaining the Common Facilities, based upon Landlord's estimates, subject to readjustment as hereinafter provided.

Within one hundred fifty (150) days following the end of each calendar year Landlord shall furnish Tenant with a statement, certified as correct by Landlord, showing the total costs of maintaining the Common Facilities for the calendar year just expired along with invoices authenticating Landlord's costs, the amount of Tenant's share of such costs, and payments made by Tenant during such calendar year under this Lease.  If Tenant's proportionate share of such costs for such calendar year shall exceed Tenant's payments, as shown on the statement, then, without thirty (30) days after Tenant's receipt of the statement, Tenant shall pay t he difference to Landlord. If the statement indicates an overpayment by Tenant, then Tenant shall receive a refund from Landlord for such amount.

Landlord's costs of maintaining the Common Facilities (for the purposes of this section) shall be amounts actually paid by Landlord for lawn and landscaping maintenance, repair and replacement; sweeping and cleaning of all Common Facilities; all electric, water and sewer charges for the Common Facilities; maintenance of the parking lot and sidewalks, including resurfacing, restriping, and resealing; maintenance and repair of parking lot lights and fixtures; security for the fire sprinkler alarm; administrative costs (not to exceed five percent  of the total Common Facilities Maintenance charges); general liability insurance for the

remainder of the Shopping Center; and shall not include amounts paid for management (other than administrative costs as noted above), overhead, depreciation of equipment, taxes, property insurance, costs incurred by Landlord in connection with compliance with law, improvements and additions (as opposed to repairs), debt service and ground rents, leasing expenses (such as brokerage fees, costs for tenant improvements, etc.), costs incurred by Landlord to repair or replace defective construction, costs incurred by Landlord in connection with casualty or condemnation repairs or restorations, or costs which would have been reimbursed by insurance had Landlord maintained customary insurance coverages.

Tenant's proportionate share shall be in the ratio which the total number of square feet comprising the Leased Premises bears to the total number of square feet comprising all leasable area within the Shopping Center.

In the event the Common Facilities are not maintained properly by Landlord, then Tenant has the right, after giving Landlord thirty (30) days notice in writing to correct same, to order and pay for the necessary maintenance in front .of the Leased Premises and bill the cost thereof to Landlord.   If Landlord does not reimburse Tenant for such cost within thirty (30) days of receipt of the charges, then Tenant may deduct the sum from Rent due or to become due.    By undertaking the performance of Landlord's maintenance obligations pursuant to this paragraph, Tenant assumes no responsibility for future maintenance, which is the obligation of Landlord.

Upon request by Tenant, Landlord shall make available to Tenant at Landlord's business headquarters Landlord's business records of the costs and expenses described in this Section and Tenant may, at its own expense, examine and audit such records for the sole purpose of ascertaining the amount due from Tenant under this Section.

## Taxes

**SECTION 36.** Tenant shall reimburse Landlord within thirty (30) days after proof of payment has been tendered to Tenant by Landlord for Tenant's proportionate share of general real estate taxes for the Shopping Center (excluding special assessments) paid by Landlord. The amount of each year's tax bill to be used in such computation shall be the net amount of taxes payable in the first tax payment month. Tenant's proportionate share shall be in the ratio which the total number of square feet comprising the Leased Premises bears to the total number of square feet comprising the Shopping Center.

If the Leased Premises are assessed separately from the Shopping Center, Landlord shall promptly deliver to Tenant, upon receipt, all ad valorem real estate tax bills for the Leased Premises.  Tenant shall pay such tax bills directly to the taxing authority. Provided the tax bills are delivered to Tenant by Landlord in a timely manner, Tenant agrees to pay all ad valorem real estate taxes before delinquency, and Landlord shall not be obligated to pay any penalty for delinquent payment.

In any expansion of the Leased Premises, the tax base for the expansion area will be established by the same formula as that used in the first instance.

Landlord agrees to pay all taxes before delinquency and Tenant shall not be obligated to pay any portion of any penalty for delinquent payment. Any payment due hereunder shall be prorated as of the termination or expiration date of this Lease.

Any payment made by Tenant to Landlord under this section shall be a non-cumulative credit against any Percentage Rent due under Section 4.C. of this Lease during its term or any renewals thereof.

**SECTION 37.** Intentionally deleted.

## Miscellaneous

**SECTION 38.**   A.  The captions in this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

B.  This Lease shall be construed in accordance with applicable law of the state in which the Leased Premises are located.

C.  Tenant agrees, from time to time, upon (i) not less than thirty (30) days' prior written request by Landlord, and (ii) payment by Landlord of  to cover legal and administrative costs incurred by Tenant in processing such request (said fee shall not apply to the first two (2) in any calendar year), to execute and deliver to Landlord a written certificate stating (a) whether this Lease has been modified or amended and, if so, identifying any such modification or amendment; (b) whether Rent and other charges have been paid more than thirty (30) days in advance of the date when due and, if so, the date to which they have been paid in advance; and (c) whether to the best of Tenant's knowledge, any uncured default exists on the part of Landlord and, if so, specifying the nature of such default.

D.  One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same or any other covenant, term or condition; nor shall any delay or omission by either party to seek a remedy for any breach of this Lease or to exercise a right accruing to such party by reason of such breach be deemed a waiver by such party of its remedies or rights with respect to such breach.  The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any similar act.

## Environmental Compliance

**SECTION 39.**   (1)Tenant shall not use, generate, manufacture, produce, store, release, discharge or dispose of, on, under or about the Leased Premises, or transport to or from the Leased Premises, any Hazardous Substance (as defined below), or allow any other person or entity to do so.  Tenant shall keep and maintain the Leased Premises in compliance with, and shall not cause or permit the Leased Premises to be in violation of any Environmental Laws (as defined below).  Notwithstanding the foregoing, Tenant may use and store in reasonable amounts and in accordance with applicable laws such cleaning products, automotive products and other products as are normally used, sold or stored in Eckerd Drug Stores from time to time, including, without limitation, chemicals and materials used in connection with photoprocessing.

(2) Landlord and Tenant shall each give the other party prompt notice of any of the following of which the party in question has actual knowledge: (i) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Leased Premises or the migration thereof from or to other property; (ii) all claims made or threatened by any third party against Tenant, Landlord or the Leased Premises relating to any loss or injury resulting from any Hazardous Substance; and (iii) discovery of any occurrence or condition on any real

property adjoining or in the vicinity of the Leased Premises that could cause the Leased Premises or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Leased Premises under any Environmental Law or any regulation adopted in accordance therewith.

(3) Tenant shall protect, defend, indemnify and hold harmless Landlord, its directors, officers, partners, employees, agents, successors and assigns from and against any and all loss, damage, cost, expense or liability (including attorneys' fees and costs) arising out of Tenant's failure to comply with the terms of this Section 39.

(4)   Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, other than as disclosed in the following: that certain Environmental Site Assessment dated December, 1999, prepared for Landlord, by Sanborn, Head & Associates, Inc. ("SHA") (SHA File 1356.1) (the presence of Hazardous Substances, if any, described in said reports, if any, is referred to as the "Condition") no Hazardous Substance is present, or as installed, exposed, released or discharged in or under the Leased Premises at any time during or prior to Landlord's ownership thereof; that no prior owner or occupant of the Leased Premises has used Hazardous Substances on the Leased Premises; and that the Leased Premises have been used and operated upon compliance with all applicable local, state and federal laws, ordinances, rules regulations and orders.   Landlord shall protect, indemnify, defend and hold harmless Tenant, its officers, employees, agent, successors, and assigns from and against any and all loss, penalties, fines, judgments, forfeitures, damage, cost, expense or liability (including attorneys' fees and costs) arising from or caused in whole or in part, directly or indirectly (i) from the Condition; (ii) any remediation of the Condition performed by Landlord or a third party or any of its or their officers, employees, agents, successors and assigns, and (iii) from Landlord's breach of its representations contained in this paragraph.   This indemnification shall survive the expiration or earlier termination of this Lease. Tenant acknowledges the Condition, if any. Tenant shall have no right to compel Landlord to remediate the Condition; provided, however, that Landlord shall comply with any governmental requirement to remediate the Condition.  In the event that Landlord sells the Leased Premises to a bona fide third-party purchaser which is not an affiliate or controlled or under common control with Landlord, such subsequent landlord shall not be liable for a breach of the warranty contained in the first section of this Section 39(4).  In the event Landlord is required by any governmental agency to perform remedial activities on the Leased Premises as a result of the Condition, Tenant agrees to enter into an appropriate access and remediation agreement which is reasonably acceptable to Tenant. If, as a result of the Condition, Tenant, in its reasonable judgment, is unable to use all or a portion of the Leased Premises for its business purposes, Minimum Rent as provided for herein shall abate in proportion to the loss of use.  If such loss of use continues for longer than one year, Tenant may terminate this Lease upon sixty (60) days notice to Landlord.

(5) "Environmental Law" shall mean any federal, state, or local law, statute, ordinance or regulation pertaining to health, industrial hygiene, or the environmental conditions on, under or about the Leased Premises, including without limitation the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended from time to time ("CERCLA"), 42 U.S.C. Sections 9601 et seq., and the Resource Conservation and Recovery Act of 1976, as amended from time to time ("RCRA"), 42 U.S.C. Sections 6901 et seq.  The term "Hazardous Substance" shall include, without limitation: (i) those substances included within the definition of "hazardous substances", "hazardous materials", "toxic substances", or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801 et seq., and in the regulations promulgated pursuant to said laws; (ii) those substances defined as "hazardous wastes" in any Connecticut Statute

and in the regulations promulgated pursuant to any Connecticut Statute; (iii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (iv) such other substances, materials and wastes which are or become regulated under applicable local, state, or federal law, or which are classified as hazardous or toxic under federal, state or local laws or regulations; and (v) any material, waste or substance which is (1) petroleum (2) asbestos (3) polychlorinated biphenyls (4) designated as a "hazardous substance" pursuant to Section 311 of the Clean Air Act, 33 U.S.C. Section 1251 et seq., or listed pursuant to Section 307 of the Clean Air Act, (5) flammable explosive, or (6) radioactive materials.

(6) Landlord shall have the right to inspect the Leased Premises and audit Tenant's operations thereon to ascertain Tenant's compliance with the provisions of this Lease at any reasonable time and Tenant shall provide periodic certifications to Landlord, upon request, that Tenant is in compliance with the environmental restrictions contained herein. Landlord shall have the right, but not the obligation, to enter into the Leased Premises and perform any obligation of Tenant hereunder of which Tenant is in default, including without limitation, any remediation necessary due to environmental impact of Tenant's operations on the Leased Premises, without waiving or reducing Tenant's liability for Tenant's default hereunder.

(7) All of the terms and provisions of this Section 39 shall survive expiration or termination of this Lease for any reason whatsoever.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed under seal by their respective duly authorized representatives as of the day and year first above written.

WITNESSES:                                              "LANDLORD"

As to Landlord:                                          RIDGEFIELD PROPERTIES LLC, a Delaware
                                                         limited liability company

                                                         By:  Samuels & Associates Holdings LLC,
                                                              its sole member

Printed Name: ALINE PLASOFSKY
                                                              By: _____
                                                              Name: _____
Printed Name: Joseph T Harmon                                 Title: _____

                                                         "TENANT"

As To Tenant:                                            GENOVESE DRUG STORES, a Delaware corporation
Printed Name: Anne Fitzgerald
                                                         By: _____
Printed Name: Barbara Eliason                                 Steven A. Messing
                                                              Vice President

EXHIBITS ATTACHED:
Exhibit "A"    Site Plan
Exhibit "B"    Legal Description
Exhibit "C"    List of Use Restrictions

05/17/01 :7878-3                         22



**COPPS HILL PLAZA**
**.ANBURY ROAD / COPPS HILL ROAD**
**RIDGEFIELD, CONNECTICUT**

| DATE: | AUGUST 18, 2000 |
|---|---|
| SCALE: | AS SHOWN |
| DESIGNED BY: | SES |
| DRAWN BY: | JFO |
| APPROVED BY: | LJW |
| PROJECT NO.: | 1383 |
| FILE NO.: | 1383BASE.DWG |

| No. | Description | App'd | Date |
|---|---|---|---|
| 3 | REVISED PER PLANNING BOARD COMMENTS | LW | 2/8/01 |
| 2 | REVISED PER PLANNING BOARD COMMENTS | LW | 1/24/01 |
| 1 | REVISED RETAIL LAYOUT & PER TOWN COMMENTS | LW | 12/1/00 |

**REVISIONS**



Exhibit B

ALL THAT CERTAIN piece or parcel of land together with all buildings
and improvements thereon situated in the Town of Ridgefield, County of
Fairfield, and State of Connecticut and bounded and described as follows,
to wit:

BEGINNING at a point on the westerly side of the highway
known as Route #35 at the dividing line between lands herein
described and lands of Mario Marcheggiani, et al, which point
is 1.08' southerly of a Connecticut Dept. of Transportation
monument; thence in a westerly direction along lands of said
Mario Marcheggiani; et al and land of Anshirdon Properties,AS,
each in part,N 68° 06'   00" W  375.00' to a corner; thence
along land of said Anshirdon Properties, AS, S 16° 17' 50" W
200.00' to a corner; thence still along land of said
Anshirdon Properties, AS,  S 68° 06' 00" B  15.00' to a
corner; thence along land of Stephen J. Zemo, S 22° 17' 50" W
188.45' to a corner; thence still along lands of said Zemo,
S 67° 51' 10" E  46.50'  to a corner; thence along lands of
said Zemo, and C.R.B. Realty Co.,each in part; S 27° 37' 50" W
195.05' to a corner: thence along land of L.C.G. Associates,
N 49° 38' 40" W  248.88' to a point; thence along lands of
Thomas and Barbara McCarthy and Louise M. Bowman, each in part,
N 10° 15' 20" W  132.07' to a corner; thence still along land
of said McCarthy, N 66° 05' 20" W  60.98' and N 68° 57' 20" W
75.10' to a corner; thence along lands of Robert B. Wosshla
and Stephen A. Walton, each in part, N 6° 54' 20" W  170.65' to
a point; Thence still along lands of said Walton and John F. &
Sharon Blute, each in part, N 10° 40' 20" W  79.32' to a point;
thence still along lands of said Blute and Chun Tung,et al, each
in part, N 4° 55' 20" W  160.37' to a point; thence along lands
of Francis J. Simoneau,et ux and Gloria S. Martin, each in part,
N 8° 09' 20" W  127.83' to a point; thence along land of Philip
R. Carpenter,et ux, N 11° 10'.20" W  20.23' to a point; thence
still along land of said Carpenter and John C. Anderson, et ux,
and Richard W. Adams,et ux, each in part, N 24° 14'  20" W  175.05'
to a corner on the southerly side of highway known as Copp's Hill
Road; thence along said southerly side of Copp's Hill Road,
the following courses and distances; N 84° 45' 50" B  80.06',
N 86° 37'.30" E  370.00',  S 86° 19' 10" B  190.75',
S 70° 00' 00"  B  147.93', S 64° 54' 00" B  305.19',
S 60° 09' 30".E  87.52',  to the corner of Copp's Hill Road and
Route #35; thence around the corner along a curve to the right
having a radius of 30.00' and a length of 39.92' to a point,
thence along the westerly side of said Route #35, S 16° 04' 50" W
410.26' to a point; thence still along said Route #35,
S 16° 17' 50" W  1.08' to the point or place of BEGINNING.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT described in Cross Easement
Agreement between Joseph Klein and Edward Zandri dated May 2, 1980 and
recorded in Volume 269 at Page 792 of the Ridgefield Land Records.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT described in Cross Easement
Agreement between Joseph Klein and Steven J. Zemo dated March 30, 1981,
and recorded in Volume 276 at Page 365 of the Ridgefield Land Records.

Being the same premises on map entitled, "Copps Hill Plaza,
Ridgefield, Connecticut scale 1" =40', 15.5073 acres" dated
June 24, 1986 revised October 6, 1986 "certified substantially
correct" by William E. Riordan, surveyor as being a Class A
Survey.

Said premises may also be described as follows:

A CERTAIN PARCEL OF LAND SITUATED IN THE TOWN OF RIDGEFIELD, COUNTY OF FAIRFIELD, STATE OF CONNECTICUT AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY STREETLINE OF COPPS HILL ROAD (VARIABLE WIDTH), SAID POINT BEING ON A STONE WALL AND MARKING THE NORTHWEST CORNER OF THE LAND HEREIN DESCRIBED;

THENCE RUNNING ALONG SAID SOUTHERLY STREETLINE OF COPPS HILL ROAD,
N 84'-45'-50" E  80.06 FEET TO A POINT;
N 86'-37'-30" E  370.00 FEET TO A POINT;
S 88'-15'-10" E  150.75 FEET TO A POINT;
S 70'-00'-00" E  147.93 FEET TO A POINT;
S 64'-54'-00" E  305.19 FEET TO A POINT;
S 60'-09'-30" E  87.52 FEET TO A POINT;
ALONG A CURVE TO THE RIGHT, DELTA=76'-14'-20", R=30.00 FEET, L=39.92 FEET. TO A POINT ON THE WESTERLY STREETLINE OF DANBURY ROAD, ROUTE 35 (VARIABLE WIDTH);

THENCE RUNNING ALONG SAID WESTERLY STREETLINE OF DANBURY ROAD, ROUTE 35 (VARIABLE WIDTH);
S 16'-04'-50" W 410.26 FEET TO A CHD MONUMENT W/DISK;
S 16'-17'-50" W 1.08 FEET TO A POINT BEING THE NORTHEASTERLY CORNER OF LANDS N/F OF MARIO MARCHEGGIANI;

THENCE RUNNING ALONG LANDS N/F MARIO MARCHEGGIANI AND ANSHIRDON PROPERTIES, EACH IN PART:
N 68'-08'-00" W  375.00 FEET THROUGH AN IRON PIPE TO A POINT;

THENCE RUNNING ALONG LAND N/F ANSHIRDON PROPERTIES:
S 16'-17'-50" W  200.00 FEET TO A POINT;
S 68'-08'-00" E  15.00 FEET TO A POINT;

THENCE RUNNING ALONG LANDS N/F STEPHEN J. ZEMO AND C.R.B. REALTY CO., EACH IN PART:
S 22'-17'-50" W  188.43 FEET TO A POINT;
S 67'-51'-10" E  46.50 FEET TO A POINT;
S 27'-37'-50" W  195.05 FEET TO A POINT;

THENCE RUNNING ALONG LAND N/F CARL LECHTER AND ADAM BRODERICK CORRAL;
N 49'-38'-40" W  248.88 FEET TO A DRILL HOLE;

THENCE RUNNING ALONG LANDS N/F THOMAS J. McCARTHY AND LOUISE M. BOWMAN, EACH IN PART:
N 10'-13'-20" W  132.07 FEET TO A POINT;
N 66'-05'-20" W  60.98 FEET TO A POINT;
N 68'-37'-20" W  75.16 FEET TO A POINT IN A STONE WALL;

THENCE RUNNING ALONG LANDS N/F KAREN PACH, GIRI VAIDYANANTHAN, WILLIAM R. & LISA K. SCALA, LEUNG CHUNG-TUNG, FRANCES J., EDWARD J. & THERESA M. SIMONEAU & PATRICIA M. DONNELLY, EDWARD J. & GLORIA SCALA MARTIN, JOANNA NICHOLS, VICTOR A. & KATHLEEN B. VESCERA, RICHARD W. & MARY ELLEN ADAMS, EACH IN PART ALONG A STONE WALL:
N 06'-54'-20" W  170.59 FEET TO A POINT;
N 10'-40'-20" W  79.32 FEET TO A POINT;
N 04'-55'-20" W  180.37 FEET TO A POINT;
N 08'-09'-20" W  127.83 FEET TO A POINT;
N 11'-10'-20" W  20.23 FEET TO A POINT;
N 24'-14'-20" W  175.05 FEET TO THE POINT AND PLACE OF BEGINNING.

SAID PARCEL CONTAINS 675.487 SQUARE FEET OR 15.507 ACRES.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT DESCRIBED IN CROSS EASEMENT AGREEMENT BETWEEN JOSEPH KLEIN AND EDWARD ZANDRI DATED MAY 2, 1980 AND RECORDED IN VOLUME 269 AT PAGE 792 OF THE RIDGEFIELD LAND RECORDS.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT DESCRIBED IN CROSS EASEMENT AGREEMENT BETWEEN JOSEPH KLEIN AND STEVEN J. ZEMO DATED MARCH 30, 1981 AND RECORDED IN VOLUME 276 AT PAGE 365 OF THE RIDGEFIELD LAND RECORDS.

# EXHIBIT C

# EXHIBIT C-1

## New England Video of Ridgefield, Inc.

## Lease dated July 24, 1991*

**Exclusive Uses:**

Section 8.06. For so long as this Lease is in full force and effect, Landlord agrees not to enter into any new leases with any future tenants whose primary business is the sale or rental of video tapes, CDs and similar products. Landlord agrees to use reasonable efforts to enforce this exclusive against other future tenants in the Shopping Center. This limitation shall not apply to any existing tenants or their replacements, successors and assigns including but not limited to Stop N Shop, Genovese and Caldors. This limitation shall become null and void if Tenant ceases operating at the Premises.

**Prohibited Uses:**

ARTICLE 43. Prohibition Against Pornographic Uses

Section 43.01. Tenant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any subtenant or assignee of the premises. This Article shall directly bind any successors in interest to Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct. Pornographic material is defined for purposes of this Section as any written, videotaped, videodisc, filmed, or pictorial matter with prurient appeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity. If Tenant is a franchise of "Blockbuster Video" then the

limitations and restrictions of the Franchisor with respect to pornography shall be followed by Tenant for purposes of this Lease but in no event shall Tenant sell or rent "X" or similar rated movies or materials.

Section 43.02. Notwithstanding the foregoing, pornographic video tapes may be sold subject to the following restrictions, the careful observance of which by Tenant are material inducements to Landlord to enter into the within Lease:

(a) They shall not be displayed in the store or in the store windows.

(b) They shall not be shown on any playback devices in the store or store windows.

(c) They shall not be mentioned in any way, directly or indirectly, on any signs within or without the Demised Premises, except as permitted under subsection (f) below.

(d) The name of the store shall not in any way allude to such materials nor shall such name contain the word "adult" or the letter "X".

(e) Such sale must be permitted under the law by all authorities having jurisdiction.

(f) Video tapes of an adult nature shall be kept discreetly in a separate room in the rear of the store and not in an area for the general public, nor visible through any store windows or from the main (front) portion of the store.

* This lease shall terminate upon mutual agreement of the Landlord and New England Video of Ridgefield, Inc. if the Landlord relocates New England Video of Ridgefield, Inc. to new premises in the Shopping Plaza at which time the lease dated July 24, 1991 shall terminate and the Exclusive Uses and Prohibited Uses in Exhibit C-2 attached hereto shall be binding on Tenant.

## EXHIBIT C-2

### New England Video of Ridgefield, Inc.

Lease to become effective if Landlord relocates New England Video of Ridgefield, Inc. to new premises in the Shopping Plaza and upon termination of the existing lease dated July 24, 1991.

### Exclusive Uses:

Landlord covenants and agrees that during the Term, so long as Tenant is not in default under any term of this Lease, beyond any applicable notice or grace periods, Tenant shall have the exclusive right (hereinafter, "Tenant's Exclusive Right") in the Shopping Center, to sell, rent and/or distribute prerecorded video cassettes, video tapes, video discs, laser discs, video games (including without limitation CD-1), digital video discs or other video software (including CD-ROM) and/or any substitutes for, or items which are a technological evolution of, the foregoing items (hereinafter, collectively "Tenant's Exclusive Items"). This covenant and Tenant's Exclusive Right shall run with the land on which the Shopping Center is located during the Term of this Lease. Notwithstanding the foregoing, Tenant's Exclusive Right shall not apply to those premises currently, or in the future to be, occupied by Stop & Shop Supermarkets, Kohl's and Eckerd/Genovese Drugstore, Inc. and their successors and/or assigns, as well as to existing tenants in the Shopping Center, no matter where located, as of the date of this Lease or future tenants of the Shopping Center so long as their sale of Tenant's Exclusive Items does not constitute more than 20% of their business. Except as aforesaid, Landlord agrees not to enter into future leases at the Shopping Center which violate Tenants Exclusive Right. In the event of a breach by Landlord under this Article 1.D., Tenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity.

### Prohibited Uses:

Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is, and will remain, retail in character and, further, that no part of the Shopping Center shall be used for (i) a theater, (ii) an auditorium, meeting hall, or other place of public assembly, (iii) a school, (iv) any type of karate facility, a gymnasium, health club, physical fitness facility, or an exercise or dance studio, (v) a dance hall, (vi) a bar not associated with a restaurant, (vii) an off-track betting business, (viii) a billiard or pool hall, (ix) for bingo or similar games of chance, (x) a massage parlor, (xi) a game arcade, (xii) a bowling alley, (xiii) a skating rink, (xiv) automobile sales or a car wash, car repair or car rental agency, (xv) a night club, (xvi) an adult book or adult video tape store (which are defined as stores in which any portion of the inventory is not available for sale or rental to children under 18 years old because such inventory explicitly deals with or depicts human sexuality), (xvii) hotel or other lodging facilities, or (xviii) flea market. Tenant acknowledges that a current tenant in the Shopping Center is a restaurant that contains a bar.

## EXHIBIT C-3

### The Stop & Shop Companies, Inc.

### Lease dated August 28, 1970*

Exclusive and Prohibited Uses:

ESTRIC-    **Section 10.2**  Except as specifically provided to the con⁻ra⁻⁻
IONS    below, the other premises in the Shopping Center may be used for
ON LAND—any lawful purpose.  Tenant agrees, however, that this lease is subject
LOND·    to the restrictive covenants set forth in Exhibit D hereto attached,
but to no others.

ood    **Section 10.2(a)**  During such time as any part of the demised
es    premises shall be used for the conduct of a food supermarket business
or for the sale of food products for off-premises consumption, Land-
lord shall not lease, use or permit to be used any other portion of
or premises in the Shopping Center for the conduct of a food super-
market business or for the sale of any food products for off-premises
consumption (whether by humans or animals); except that Landlord may
permit the sale of the following items and the conduct of the following
types of businesses (i) ice cream stores, doughnut stores, lunch rooms,
luncheonettes, restaurants and snack bars in variety stores (and in
junior department stores and department stores) may sell take-out
orders, ready for immediate consumption, of soups, sandwiches, hot
and cold beverages and individual servings of items which are also
being sold (on the same premises) for on-premises consumption; and
(ii) an ice cream store business of the kind now operated under
the name "Friendly" may be operated in the Shopping Center and
may sell ice cream and other frozen dairy products for off-premises
consumption; and (iii) a candy store business may be operated in
the Shopping Center and may sell bulk and packaged candies and
salted nuts for off-premises consumption; and (iv) a package liquor
store business may be operated in the Shopping Center and may sell
alcoholic beverages for off-premises consumption, and, as an ancillary
part of its business, may sell cocktail ingredients, such as syrups
and carbonated beverages, and cocktail snacks, such as pretzels,
potato chips and salted nuts, for off-premises consumption (provided,
however, that a package liquor store business shall not be operated
in the Shopping Center if such operation precludes Tenant from obtaining
a license to sell beer or beer and wine in the demised premises); and
(v) a bakery business may be operated in the Shopping Center, provided,
however, that such business shall be operated in premises containing
no more than 3,000 square feet of floor area (as defined for the
purposes of this Article in Section 10.2(c) below), and that only
products baked on the premises shall be sold for off-premises consump-
tion; except that such a bakery may devote 100 lineal feet of shelf
space to products baked off the premises; and (vi) a drug store
leased to the Genovese Drug Store chain ("Genovese") may be used
for maintaining its drug store business as presently operated by
it in the Metropolitan Area of Greater New York; provided, however,
that if the present lease to Genovese shall expire or be terminated
or cancelled, then any succeeding drug store business in the Shopping
Center shall be limited to the use of 300 square feet of selling space
for the sale of baby foods, food substitutes (such as Metrecal), candy,
salted nuts, and ice cream for off premises consumption, and no such
succeeding business may sell alcoholic beverages if such sale would
preclude Tenant from obtaining (or retaining) a license to sell beer
or beer and wine in the demised premises.

– 11 –

*This lease shall terminate upon mutual agreement of the Landlord and The Stop & Shop
Companies, Inc. if the Landlord relocates the Tenant to new premises in the Shopping Plaza at
which time the lease dated August 28, 1970 shall terminate and the Exclusive Uses and Prohibited
Uses in Exhibit C-4 attached hereto shall become binding on the Tenant.

and (vii) a doughnut store business of the kind now conducted under the name "Mister Donut" may be operated in the Shopping Center and may sell doughnuts and other fried dough products for off-premises consumption; (viii) a variety store, a junior department store, or department store business leased to W. T. Grant Company may sell food items for off-premises consumption; provided, however, that said premises demised to W.T. Grant Company, or any part thereof, shall never be used as a food supermarket, and provided further that in the event of the termination, cancellation or expiration of the present lease to W. T. Grant Company, any succeeding operator or lessee of a variety or department or junior department store in the Shopping Center shall be limited to the use of 2500 square feet of floor space for the sale, display and storage of food items to be consumed off of the premises; (ix) a Kosher butcher shop containing not more than 2,500 square feet of floor area, (x) a gourmet food shop, so-called, containing not more than 2,500 square feet of floor area, and (xi) the sale by a restaurant, luncheonette or gourmet shop of delicatessen items, but only if such sale is incidental to the principal business of such restaurant, luncheonette or gourmet shop.

Section 10.2(b)    During such time as more than fifty (50) per cent of the floor area of the demised premises is used for the conduct of a "retail business", so-called, no other part of or other premises in the Shopping Center shall be used (i) for the redemption of trading stamps; or (ii) for the conduct of a discount operation of the type which regularly or with significant frequency sells merchandise of the types or qualities now commonly known as "odd lot", "close out", "clearance", "discontinued", "cancellation", "second", "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "overstock", "distressed", "bankruptcy", "fire sale" or "damaged"; or (iii) for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors; or (iv) for any purpose other than the conduct of a "retail business", so-called, (which term shall mean and include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, dance studios, health salons, real estate brokerage, stock brokerage and insurance brokerage businesses, as well as ordinary retail businesses selling merchandise); or (v) for the operation of a motel or tourist court; or (vi) for a car-hop or carry-out restaurant business; or (vii) for any "amusement operation", so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities whether or not as a business or as a part or aspect of a business, except that Landlord may have one theatre of not more than 600 seats provided that such theatre shall be at least 200 feet distant from the nearest part of the demised premises; and except also that Landlord may have a cocktail lounge in which dancing is permitted; or (viii) for any automobile or truck sales, storage, service, fueling, washing, or repair operation, except that the premises leased to W. T. Grant Company may contain a t/b/a area, so called; or (ix) for any business using a substantial amount of outdoor space in its regular operations, such as lumber yards, boat sales yards and the like; or (x) for any office or storage operations except (A) office and storage operations which are a part of the conduct of a retail business in the Shopping Center; and (B) the use of a total of not more than 5,000 square feet (in the aggregate) of floor area on the ground floor level for business offices which are not included in the above definition of "retail business" and for professional offices.

Section 10.2(c)    For the purposes of this Article the "floor area" of any premises shall be measured from the exterior faces of exterior walls and to the center lines of party or partition walls, and shall include the ground coverage of any "garden shop" or "outdoor selling area" (whether or not enclosed or covered) which is or may be used in the conduct of business by the occupant of such premises.

- 12 -

outside       Section 10.3(a)   While any part of the demised premises is used
shopping for the conduct of a food supermarket business no other premises which
center   .are, now or hereafter, directly or indirectly, owned or controlled by
Landlord and which are located within three (3) miles of the perimeter
of the Shopping Center shall be used for the conduct of a food super-
market business or for any other business the principal activity of
which is the sale of food items for off-premises consumption. Tenant
agrees that if it opens another supermarket within 1 mile of the
perimeter of the shopping center, it will during the period it operates
such supermarket, pay to Landlord annual mimimum rent at the rate pro-
vided in Section 4.2, regardless of the volume of gross sales on the
demised premises.

        Section 10.3(b)   The provisions of Section 10.3(a) shall not be
applicable to premises which are now, directly or indirectly, owned
or controlled by Landlord and which are being used for a prohibited
purpose at the time this lease is executed; or, in the case of premises
which are not now but which are hereafter, directly or indirectly,
owned or controlled by Landlord, said prohibitions shall not be
applicable to premises being used for a prohibited purpose at the time
Landlord acquires such direct or indirect ownership or control; but
Landlord shall not agree to the enlargement of any of the premises
to which this Section 10.3(b) applies or to the extension of the period
during which such use may be made, in any case in which Landlord's
agreement thereto is necessary.

## EXHIBIT C-4

### The Stop & Shop Companies, Inc.

Lease to become effective if Landlord relocates The Stop & Shop Companies, Inc. to new premises in the Shopping Plaza and upon termination of the existing lease dated August 28, 1970.

### Exclusive and Prohibited Uses:

Section 9.2(a). Restrictions on other Premises. Except as specifically provided to the contrary below, the other premises in the Shopping Center shall only be used for lawful retail purposes.

Section 9.2(b). During such time as any part of the demised premises shall be used or occupied for the conduct of a food supermarket business, or for a combination food/drug store/general merchandise business, or for a so-called "Super Store", or for the sale of food products for off-premises consumption, Landlord shall not lease, use or permit to be used any other portion of or premises in the Shopping Center or Landlord's Adjacent Land for the conduct of a food supermarket business or for the sale of any food products for off-premises consumption (whether by humans or animal), except that Landlord may permit the sale of food items and the conduct of businesses principally engaged in food sales, as follows:

Section 9.2(b)(i)   snack bars in variety stores, junior department stores and department stores may sell take-out orders, ready for immediate consumption, of soups, sandwiches, hot and cold beverages and individual servings of items which are also being sold (on the same premises) for on-premises consumption, but not frozen foods; and

Section 9.2(b)(ii)   an ice cream store business of the kind now operated under the name "Friendly" or "Baskin Robbins", may be operated in the Shopping Center and may sell ice cream and ice cream products for off-premises consumption; and

Section 9.2(b)(iii)   a candy store business may be operated in the Shopping Center and may sell bulk and packaged candies and nuts for off-premises consumption; and

Section 9.2(b)(iv)   a package liquor store business may be operated in the Shopping Center and may sell alcoholic beverages for off-premises consumption only, and, as an ancillary part of its business, may sell cocktail ingredients, such as syrups and carbonated beverages, and cocktail snacks, such as pretzels, potato chips and nuts, for off-premises consumption only (provided, however, that a package liquor store business shall not be operated in the Shopping Center if such operation precludes Tenant from obtaining a license to sell beer or beer and wine in the demised premises); and

{A2CC0139.DOC /}

Section 9.2(b)(v) a variety store, a junior department store, or department store business may sell food items for off-premises consumption, provided, however, that not more than a total of 2,500 square feet of selling space, or (if less) a total of 5% of the total floor area of the premises used for such business, shall be used for the sale (including display) and storage of food items; and

Section 9.2(b)(vi) a pet shop may devote not more than 200 square feet of selling space for the sale and display of pet foods.

Section 9.2(c). During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a drug store, or for a pharmacy, or for the sale of health and beauty aids, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center or Landlord's Adjacent Land for:

Section 9.2(c)(i) the conduct of a drug store, or for a pharmacy, or for health and beauty aid business; or

Section 9.2(c)(ii) the sale, display or advertising of drugs, medicines, rubber goods or hospital or "sickroom" supplies or equipment (except that "patent" and "proprietary" medicines which may, by law, be sold in stores which do not contain a prescription department and which do not employ a registered pharmacist on the premises may be sold in premises in the Shopping Center or Landlord's Adjacent Land which contain not less than 20,000 square feet of floor area and which are used for the business of a department store, junior department store or variety store (if otherwise permitted), but the total amount of floor area devoted to the sale, storage and display of such "patent" and "proprietary" medicines by any one such business conducted in the Shopping Center or Landlord's Adjacent Land shall not exceed 2,500 square feet; or

Section 9.2(c)(iii) the conduct of the business consisting principally of the sale of perfumes, cosmetics, vitamins, "patent" or "proprietary" medicines (described above) or "sundries" of the types commonly sold in drug stores, or of any combination of the foregoing, whether operated on a discount or limited price or regular price basis, and whether on a self-service or service basis; or

Section 9.2(c)(iv) the conduct of a business consisting principally of the sale of greeting cards, gift wrapping and "party goods", so-called.

Section 9.2(d). During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for the sale or rental of prerecorded video tapes, cassettes, disks, or other forms of so-called "video software", Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center or Landlord's Adjacent Land for the sale or rental of prerecorded video tape, cassettes, disks, or other forms of so-called "video software" and related technology and products.

Section 9.2(e). During such time as Tenant or anyone

{AZC0139.DOC /}

29

claiming under Tenant shall use or occupy any portion of the
demised premises for the sale of flowers, plants or other
horticultural products, Landlord shall not lease, use, or permit
to be used any other portion of or other premises in the
Shopping Center or Landlord's Adjacent Land for the sale of
flowers, plants or other horticultural products.

Section 9.2(f). During such time as Tenant or anyone
claiming under Tenant shall use or occupy any portion of the
demised premises for a business which provides film or photo
processing or developing services (including so-called "one-
hour" film developing services), Landlord shall not lease, use,
or permit to be used any portion of, or other premises in, the
Shopping Center or premises on Landlord's Adjacent Land for the
operation of a business which provides film or photo processing
or developing services of any type.

Section 9.2(g). During such time as Tenant or anyone
claiming under Tenant shall use or occupy any portion of the
demised premises for the operation of a bank, Landlord shall not
lease, use, or permit to be used any portion of, or other
premises in, the Shopping Center or premises on Landlord's
Adjacent Land for use as a bank and/or for banking services.

Section 9.2(h). In order to insure that the parking areas
of the Shopping Center shall not be overburdened and to preserve
the character of the Shopping Center as an active center of
retail trade offering a variety of goods and services capable of
attracting the widest possible spectrum of shoppers, Landlord
agrees that during such time as more than fifty percent (50%) of
the floor area of the demised premises is used or occupied for
the conduct of a "retail business", so-called, no other part of
or other premises in the Shopping Center shall be used for any
one or more of the following:

Section 9.2(h)(i) for the conduct of a business operation
which regularly or with significant frequency sells merchandise
of the types or qualities now commonly known as "odd lot",
"close out", "clearance", "discontinued", "cancellation",
"second", "factory reject", "sample", "floor model",
"demonstrator", "obsolescent", "over-stock", "distressed",
"bankruptcy", "fire sale" or "damaged"; or

Section 9.2(h)(ii) for any purpose or business which is
noxious or unreasonably offensive because of the emission of
noise, smoke, dust or odors, or

Section 9.2(h)(iii) for any purpose other than the conduct
of a "retail business", so-called, which term shall mean and
include mail-order catalog store operations of the Sears Roebuck
and Montgomery Ward type, banks, finance company businesses,
service and self-service dry cleaning and laundry businesses,
shoe repair shops, barber shops, beauty shops, dance studios,
health salons, and real estate brokerage, stock brokerage and
insurance brokerage businesses, as well as ordinary retail
businesses selling merchandise; or

Section 9.2(h)(iv) for the operation of a motel or tourist
court; or

{AZC0139.DOC /}

30

Section 9.2(h)(v)   for a restaurant business or alcoholic
beverage business ("bar") of any kind, including, without
limitation (A) a "car-hop" or "carry-out" restaurant business
whose customers consume food items sold for off-premises
consumption while such customers are occupying vehicles parked
on the Common Facilities of the Shopping Center, and (B) a
banquet hall business which serves its guests on a special,
catered basis as distinguished from a restaurant business open
to the public at large on a random basis, and (C) a restaurant-
bar business which serves alcoholic beverages for on-premises
consumption to customers who do not consume the beverages in
question as a part of their meals; or

Section 9.2(h)(vi)   for any "amusement operation,"
so-called, which term shall mean and include any activity
consisting wholly or in substantial part of the furnishing of
entertainment or amusement facilities, whether or not as a
business or as a part or aspect of a business (including,
without limitation, off-track betting parlors, movie theaters,
"penny arcades," so-called; amusement games or devices
(electronic or otherwise), "discos", so-called; so-called "strip
shows", and live entertainment of any kind); or for a massage
parlor, so-called or the business of the sale of so-called
"adult" material such as, without limitation, magazines, books,
movies and photographs; Notwithstanding the foregoing, if
Exhibit A shows any area(s) marked "Permitted Theater", one (and
only one) indoor theater business may be conducted in the
Shopping Center in a building located in (one of) the Permitted
Theater area(s) and containing not more than the number of seats
specified on Exhibit A, or

Section 9.2(h)(vii)   for any automobile or truck sales,
storage, service, fueling, washing, or repair operation; or

Section 9.2(h)(viii)   for any business using outdoor space
in its regular operations, such as lumber yards, boat sales
yards and the like; or

Section 9.2(h)(ix)   for any office or storage operations
except office and storage operations which are a part of the
conduct of a retail business in the Shopping Center.

Section 9.2(i).   For the purposes of this Article (i) the
"floor area" of any premises (including the demised premises)
shall include the ground coverage of any "garden shop" or
"outdoor selling area" (whether or not enclosed or covered)
which is or may be used in the conduct of business by the
occupant of such premises, and (ii) "selling space" shall be
measured to the interior faces of adjoining walls and to the
exterior lines of adjoining aisles.

31

# EXHIBIT C-5

## Tandy Corporation
## (Radio Shack)

### Lease dated February 18, 1998

<u>Exclusive Uses:</u>

There are no exclusive uses specific to Tandy Corporation

<u>Prohibited Uses:</u>

### ARTICLE 44. Prohibition Against Pornographic Uses

Tenant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment.  Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor."  Tenant agrees further that Tenant will not permit any of these uses by any subtenant or assignee of the premises. This Article shall directly bind any successors in interest to Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic material is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient appeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in New York Penal Law Section 235.00.

# EXHIBIT C-6

## Joseph Karpinski
## (Ridgefield Liquors)

### Lease dated January 16, 1995

__Exclusive Uses:__

There are no exclusive uses specific to Joseph Karpinski

__Prohibited Uses:__

### ARTICLE 42.  Prohibition Against Pornographic Uses

Section 42.01.  Tenant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment.  Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor."  Tenant agrees further that Tenant will not permit any of these uses by any subtenant or assignee of the premises.  This Article shall directly bind any successors in interest to Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic material is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient appeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity.  Obscene material is defined here as it is in New York Penal Law Section 235.00.

## EXHIBIT C-7

### Jenni's Inc.
### (Hallmark Store)

### Lease dated May 1, 1981

### <u>Exclusive Uses:</u>

Landlord shall not lease any other premises in the shopping center for a greeting card store.

# EXHIBIT C-8

## The Chase Manhattan Bank of Connecticut, N.A.

## Lease dated December 3, 1992

### Exclusive Uses:

There are no exclusive uses specific to The Chase Manhattan Bank of Connecticut, N.A.

### Prohibited Uses:

**ARTICLE 44. Prohibition Against Pornographic Uses**

Tenant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any subtenant or assignee of the premises. This Article shall directly bind any successors in interest to Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct. Pornographic material is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient appeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity.

# EXHIBIT C-9

## Walrus, Walrus, Walrus, Inc.

### Lease dated October 14, 1992

### Exclusive Uses:

Section 8.04.  Tenant further agrees that no representations have been made to Tenant that any other tenants have leased or will continue to lease space within the Shopping Center, or that Tenant has any exclusive right to sell merchandise or render any services of any type (it being agreed and understood that Landlord shall have the right to lease other space in the Shopping Center to tenants selling the same type of merchandise or services as that sold by Tenant, and that there may be existing tenants who already have such a right), except that, so long as Tenant is open for business in the Demised Premises and not otherwise in default under this Lease, Landlord shall not have the right to enter into any future leases which would permit the tenants thereunder to operate a dry cleaning establishment as a primary business in the Shopping Center during the term hereof. The foregoing, however, shall not apply to any existing tenants who now have such a right, nor to any assignees, subtenants, or replacements thereof; nor to Blockbuster, Caldor, Genovese, and Stop & Shop nor the spaces occupied by any of them; nor to any other stores containing at lease 5,000 square feet of floor area.

### Prohibited Uses:

#### ARTICLE 44.  Prohibition Against Pornographic Uses

enant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are sed for any obscene or pornographic purposes or any sort of commercial sex establishment.  Tenant agrees that Tenant will not bring r permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and hall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude odeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor."  Tenant agrees urther that Tenant will not permit any of these uses by any subtenant or assignee of the premises.  This Article shall directly bind ny successors in interest to Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such iolation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic aterial is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient ppeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity.  Obscene material is defined ere as it is in New York Penal Law Section 235.00.

# EXHIBIT C-10

## Dress Barn, Inc.

### Lease dated

<u>Exclusive Uses:</u>

There are no exclusive uses specific to Dress Barn, Inc.

<u>Prohibited Uses:</u>

## ARTICLE 43.  Prohibition Against Pornographic Uses

Section 43.01.  Tenant agrees that the value of the Demised Premises and the reputation of the Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor."  Tenant agrees further that Tenant will not permit any of these uses by any subtenant or assignee of the premises.  This Article shall directly bind any successors in interest to Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic material is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient appeal or any objects or instrument that are primarily concerned with lewd or prurient sexual activity.  Obscene material is defined here as it is in New York Penal Law Section 235.00.

## EXHIBIT D

Lease from PLAZA INVESTORS HOLMDELL CORP. to THE STOP & SHOP
COMPANIES, INC. dated          , 1970.

The land constituting the Shopping Center referred to in this
lease is free and clear of all restrictions and encumbrances except
the following:*

1. Extract from lease to Genovese Drug Stores, Inc.

    "39.  Tenant may use demised premises for maintaining
    its drug store business as presently operated by the
    Genovese Drug Store drug chain in the Metropolitan Area
    of Greater New York and/or cosmetics or health and beauty
    aids business, and for the conduct of any other lawful
    business except a department or junior department store
    or supermarket business or the main business of any other
    retail store in the Shopping Center."

    "40.  In order to induce Tenant to enter into this
    Lease, Landlord agrees for itself, its successors and
    assigns, its officers, directors and shareholders (holding
    more than ten (10%) percent of its stock), its parent,
    affiliated and subsidiary corporations and any party
    affiliated with it, that none of the foregoing shall use,
    suffer, permit or consent to the use or occupancy of
    (a) any part of the Entire Premises, or (b) any other
    premises owned or controlled by Landlord or any of the
    above-described parties adjacent to Entire Premises or
    within a radius of three (3) miles of the Entire
    Premises, as a drug store with prescription drugs
    requiring a licensed pharmacist, cosmetic or health
    and beauty aid stores.  A beauty parlor, however, may
    sell these products as an incident of its business. A
    department store or supermarket may sell drug items
    not requiring presence of registered pharmacists on
    their respective premises."

2. Extract from lease to W. T. Grant Company.

    "12. (a) The Tenant may use the premises for any
    lawful purpose except that the Tenant may not use the
    premises for the sale of any item requiring by law the
    presence of a registered pharmacist during the term of
    the drug store lease mentioned in sub-section (b) of
    this Section 12., nor shall the Tenant use all or any
    part of the premises as a food supermarket during the
    term of the food supermarket lease mentioned in sub-
    section (b) of this Section 12.  It is further agreed,
    that the foregoing shall in no way restrict the use of
    the demised premises by the Tenant for the sale of food,
    articles and/or merchandise carried by a food super-
    market so long as the Tenant does not use all or any
    part of the premises as a food supermarket.  Subject
    to the provisions of Section 4. hereof and sub-sections
    (b) and (c) of this Section 12, Tenant may vacate or
    sublet all or any part of the demised premises or assign
    this Lease, but the Tenant shall not thereby be relieved
    of any liability hereunder.

---

*Note:  Give complete references to all pertinent recording data.

## EXHIBIT D CONTINUED

12. (b)  The Tenant hereby covenants and agrees that notwithstanding the provisions of Section 12. (a) hereof, it will not sublet all or any part of the demised premises or assign this Lease for use as a food supermarket or drug store during the terms of the existing leases now held by the Landlord, which leases contain exclusive rights to the use of store premises in RIDGEFIELD PLAZA for the above specified purposes (but those limitations on Tenant's right to sublet and/or assign shall in no event be wider in scope than the restrictions contained in the respective leases referred to above).

26 (a).  The Landlord agrees that it will not occupy or use or permit to be occupied or used any store premises in the Shopping Center for any department store, junior department store, 5 and 10 cent store, 5 cent to $1.00 store, 25 cent to $1.00 store, variety store (whether limited priced or not) or discount store without the Tenant's written consent in each instance except (i) the store premises herein demised.

26 (b).  The store frontage and the total square foot area of all the floor area in the store premises occupied by the Tenant in the Shopping Center shall not be exceeded by the premises of any other tenant or occupant in said Shopping Center.  Landlord agrees that it will not occupy or use or permit to be occupied or used at any time during the term or any extension of the term of this lease any store premises in the Shopping Center or any enlargement or extension thereof which do not conform to the requirements of this sub-section."

3.  Said premises are subject to a mortgage now held by Avon Investment Company, Inc., the present principal balance of which is $375,000.00.  Landlord agrees with Tenant to cause said mortgage to be discharged of record, or to be subordinated of record to this lease, on or before the date on which Landlord shall notify Tenant that the demised premises are substantially completed.