## Exhibit 5

# LEASE

## RIDGEFIELD PROPERTIES LLC

as Landlord

and

## THE STOP & SHOP SUPERMARKET COMPANY

as Tenant

Copps Hill Plaza

Ridgefield, Connecticut

{AZC0372.DOC / 9}

EMB\RIDGEFIELD\LEASE(ML0373)

## TABLE OF CONTENTS

Page

ARTICLE I
DEMISED PREMISES; SHOPPING CENTER ...................................................................2

ARTICLE II
TERM AND INDUCEMENTS ...................................................................3

ARTICLE III
EXTENSIONS AND ENLARGEMENTS ...................................................................5

ARTICLE IV
RENT ...................................................................6

ARTICLE V
REAL ESTATE TAXES ...................................................................10

ARTICLE VI
COMMON FACILITIES CHARGES ...................................................................17

ARTICLE VII
CONSTRUCTION ...................................................................21

ARTICLE VIII
PARKING AREAS AND OTHER COMMON FACILITIES ...................................................................27

ARTICLE IX
USE AND RESTRICTIONS ...................................................................30

ARTICLE X
REPAIRS AND ALTERATIONS ...................................................................42

ARTICLE XI
TENANT'S MISCELLANEOUS OBLIGATIONS ...................................................................43

ARTICLE XII
INDEMNIFICATION; LIABILITY INSURANCE ...................................................................44

ARTICLE XIII
TENANT'S FIXTURES AND EQUIPMENT ...................................................................46

ARTICLE XIV
SIGNS ...................................................................46

ARTICLE XV
FIRE AND CASUALTY; INSURANCE; EMINENT DOMAIN ...................................................................47

ARTICLE XVI
LANDLORD'S REMEDIES ...................................................................54

ARTICLE XVII
TITLE AND ZONING ...................................................................55

ARTICLE XVIII
[INTENTIONALLY OMITTED] ...................................................................57

{AZC0372.DOC / 9}

ARTICLE XIX
MISCELLANEOUS PROVISIONS...................................................................................58

ARTICLE XX
SALE OF SHOPPING CENTER .....................................................................................65

ARTICLE XXI
ASBESTOS AND TOXIC WASTE..................................................................................67

## EXHIBITS AND ATTACHMENTS

EXHIBIT A              SITE PLAN FOR REDEVELOPED SHOPPING CENTER

EXHIBIT A-1            LEGAL DESCRIPTION OF SHOPPING CENTER

EXHIBIT AA             SITE PLAN FOR EXISTING SHOPPING CENTER

EXHIBIT AAA            PHASING PLAN

EXHIBIT AAA-1          PHASING PLAN NARRATIVE

EXHIBIT AAA-2          PRELIMINARY PROJECT BUDGET

EXHIBIT B              PERMITTED ENCUMBRANCES

EXHIBIT C              COST TO BUYOUT EXISTING LEASES

EXHIBIT D              KOHL'S DEPARTMENT STORES PERMITTED USES

EXHIBIT E              ENVIRONMENTAL REPORTS

## AMENDMENT AND RESTATEMENT OF LEASE

THIS AMENDMENT AND RESTATEMENT OF LEASE is dated as of October **26**, 2001 between RIDGEFIELD PROPERTIES LLC, a Delaware limited liability company with a place of business in Boston, Massachusetts ("Landlord"), and THE STOP & SHOP SUPERMARKET COMPANY, a Delaware corporation with offices in Quincy, Massachusetts ("Tenant").

### W I T N E S S E T H:

WHEREAS, by lease dated August 28, 1970, Plaza Investors Holmdel Corp. leased and demised to The Stop & Shop Companies, Inc., certain premises containing approximately 30,080 square feet of ground floor area, located in the shopping center known as Copps Hill Plaza in Ridgefield, Fairfield County, Connecticut (the "Shopping Center"), which premises are more particularly identified and described in the lease, a Short Form and Notice of Lease of which has been recorded with the Ridgefield Land Records in Volume 150, Page 461 (the "lease"); and

WHEREAS, The Stop & Shop Companies, Inc. assigned all of its right, title and interest as lessee under the lease to Tenant (formerly known as Stop & Shop Grocery Co., Inc.) by Assignment of Lease dated June 7, 1988, and Tenant is the present holder of the lessee's interest in the lease; and

WHEREAS, Landlord has succeeded to the lessor's interest in the lease as of April 30, 1999; and

WHEREAS, Landlord and Tenant amended the lease by an amendment dated as of May 1, 1999 and recorded an Amended Notice of Lease with the Ridgefield Land Records in Book 618, Page 1023; and

WHEREAS, Landlord and Tenant desire to further amend the lease to provide, among other things, for an extension of the current term of the lease and for the construction of a new and expanded supermarket building, and such other terms and conditions as agreed upon by Landlord and Tenant.

NOW, THEREFORE, in consideration of the execution of this Amendment and Restatement of Lease, and in further consideration of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree as follows:

1.    This Amendment and Restatement of Lease is not, and shall not be deemed to be, a new lease, but shall be and shall be deemed to be a restatement and consolidation of the lease, as hereby further amended.

2.    The provisions of this Amendment and Restatement of Lease shall take effect on the execution date hereof (the "Effective Date") and shall be deemed to supersede all terms and provisions of the lease as it presently exists.  Except for the references in Sections 4.1(i), (ii) and (iii), after the Effective Date hereof, in determining the relationship between Landlord and Tenant, no further reference shall be necessary to any prior instrument, or document comprising the lease other

{AZC0372.DOC / 9}

than the within instrument, which shall entirely and fully
govern said relationship and any and all rights and obligations
flowing therefrom.

3.    Subject to the preceding provisions of paragraphs 1
and 2 above, the parties hereto hereby consolidate, restate and
further amend the lease as follows:

ARTICLE I

DEMISED PREMISES; SHOPPING CENTER

Section 1.1(a).  ==Demised Premises==.  Landlord hereby leases
to Tenant, and Tenant hereby leases from Landlord, subject to
the provisions of this lease, including specifically the
delivery provisions of Section 2.2(a) hereof, the following
premises (the "demised premises") in the Shopping Center, owned
by Landlord, and located on Copps Hill Road and Danbury Road
(Route 35) in Ridgefield, Fairfield County, Connecticut:

> The premises containing approximately 59,015
> square feet of ground floor area, together
> with certain interior mezzanine space, in a
> building to be constructed by Tenant at the
> location shown as the area marked "Proposed
> Supermarket", on the site plan prepared by
> Appledore Engineering, Inc. entitled "Copps
> Hill Plaza (Danbury Road/Copps Hill Road)
> Ridgefield, Connecticut" dated July 20,
> 2001, hereto attached as Exhibit A.

Section 1.1(b).  Appurtenances.  The demised premises are
demised subject to and with the benefit of the easements,
rights, restrictions, agreements and encumbrances set forth on
Exhibit B hereto and with the benefit of all the rights
contained in this lease and all the rights appurtenant to this
lease and to the demised premises by operation of law.

Section 1.1(c).  "Floor Area" Defined.  "Floor area" shall
be measured from exterior faces of exterior walls and from the
center lines of party or partition walls, except as otherwise
specified.

Section 1.1(d).  Loading Docks and Sidewalks.  All loading
docks, trash compactors, and outdoor freezer chests located
adjacent to and serving the Tenant's store premises and all
sidewalks (if any) located immediately adjacent thereto shall be
deemed included in the demised premises hereunder.
Notwithstanding such inclusion, however, it is understood and
agreed that said trash compactors, outdoor freezer chests and
sidewalks (if any) shall be disregarded in computing Fixed Rent
and in all other calculations made to determine charges payable
by Tenant under this lease.

Section 1.2.  ==Shopping Center==.  The term "Shopping Center"
shall mean the land described in Exhibit A-1 hereto attached,
together with the buildings, Common Facilities and other
improvements from time to time situated thereon.  The Shopping
Center is also shown on Exhibit A as the area included within
the property line identified thereon.  The configuration of the

{AZC0372.DOC / 9}

Shopping Center as it now exists is shown on the site plan
attached hereto as Exhibit AA.

Section 1.3.   Revised Site Plans.   At Tenant's request sent
after the substantial completion of the demised premises,
Landlord shall deliver to Tenant a revised copy of Exhibit A
(the "as-built plan") which shall be certified by Landlord's
architect or engineer as substantially correct and which shall
show the status of the Shopping Center's development on the date
of the substantial completion of the demised premises.   In
addition, within sixty (60) days after the completion of any
additional building (and after the completion of the demolition
of any previously existing building) subsequent to the
Commencement Date (as defined in Section 2.2 hereof), Landlord
shall, following Tenant's request, deliver to Tenant a revised
copy of Exhibit A (the "current site plan") which shall be
certified by Landlord's architect or engineer as substantially
correct and which shall show the status of the Shopping Center's
development after the completion of the construction of the
additional building or the demolition of the previously existing
building.   The as-built plan and each current site plan shall
reflect (a) all construction which has taken place since the
date of Exhibit A, or of the next-prior revision of Exhibit A,
as shall be appropriate; and (b) the demolition of any
previously existing building which was shown on Exhibit A or on
a prior revision of Exhibit A; and (c) any proposed improvements
(such as proposed additional stores or the possible expansion of
the demised premises) which were shown on Exhibit A (or a prior
revision of Exhibit A, or which have been specifically approved
by Tenant in writing), the construction of which has not yet
begun; and (d) any changes in the land area comprising the
Shopping Center since the date of Exhibit A or of the next-prior
revision of Exhibit A, as shall be appropriate.   Each revised
site plan shall also show the dimensions and floor areas of all
buildings in the Shopping Center in sufficient detail to
facilitate the administration of the provisions of Articles V,
VI and IX.


ARTICLE II

TERM AND INDUCEMENTS

Section 2.1.   Term.   The original term of this lease shall
begin on the Commencement Date (as defined in Section 2.2) and
shall terminate (unless extended pursuant to Article III hereof)
upon the expiration of the twentieth (20th) Lease Year (as Lease
Year is defined in Section 2.7) of the term hereof.   For
purposes of this lease, the word "term" shall mean the original
term prior to the exercise of an extension right, but shall mean
the original term as it may have been extended, if extension
rights are exercised.

Section 2.2.   Commencement Date Pre-Conditions.   The
"Commencement Date" shall be the date on which all of the
following shall have occurred and be subsisting:

Section 2.2(a).   Construction Period.   Eighteen (18) months
shall have elapsed following the delivery by Landlord to Tenant
of possession, free and clear of all tenants and occupants, of
the existing Genovese Drugstore (a/k/a Eckerd Drugstore) and

{AZC0372.DOC / 9}

3

Venice Pizza spaces adjacent to Tenant's existing supermarket premises.

Section 2.2(b).   Construction Completed.   Unless due to delays attributable to Tenant's directions regarding the phasing of Landlord's reconstruction of the Common Facilities, Landlord shall have substantially completed the construction and the landscaping of the Common Facilities provided for in Article VIII and all off-site improvements required by the permits and approvals of the appropriate governmental authorities for the reconstruction of the buildings in the Shopping Center, except for so-called "punch list" items that do not materially interfere with Tenant's use and occupancy of the demised premises and the Common Facilities, provided the cost to complete such "punch list" items does not exceed ▮▮▮▮▮▮▮ provided the completion of landscaping shall be ▮▮▮▮▮▮ delays necessitated by seasonal considerations and adverse weather conditions, so long as Landlord commences the landscaping in a timely manner and proceeds with due diligence to completion.

Section 2.2(c).   Access.   The following streets and highways (having been fully paved, accepted and opened to traffic as public streets) shall be fully open to traffic to and from the Shopping Center in both directions (meaning, without limitation, that both left and right turns are permitted both to and from the Shopping Center):   Copps Hill Road and Danbury Road.

Section 2.2(d).   Traffic Controls.   All traffic control facilities shown on Exhibit A shall have been provided and shall be in use or available for use, as shall be appropriate.

Section 2.2(e).   Satellite Stores.   Landlord shall have completed construction of the buildings shown on Exhibit A as "Proposed Relocation Space 9,545 SF" and "Proposed Relocated Restaurant 1,609 SF" (hereinafter collectively "Building A"), "Proposed Pharmacy" (hereinafter the "Pharmacy Building") and "Building C" (hereinafter "Building C").

Section 2.3   Early Opening.   Tenant shall endeavor to continue to conduct business and to stay open to the public in its existing supermarket during the construction of its new and expanded supermarket building.   If however, Tenant opens for business with respect to all of the new and enlarged supermarket constituting the entire demised premises prior to the occurrence of all of the events described in Section 2.2, the date of such opening shall be the Commencement Date.

Section 2.4.   Construction Self-Help.   If, on the thirtieth (30th) day following the Commencement Date, the construction required by Sections 2.2(b) and 2.2(e) remains incomplete, Tenant shall notify Landlord in writing of that fact, and if Landlord fails to complete such construction within thirty (30) days following receipt of Tenant's notice (unless such failure to complete is attributable to Tenant's directions regarding Landlord's phasing of the reconstruction of the Common

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

{AZC0372.DOC / 9}



Section 2.5.   [Intentionally Omitted]

Section 2.6.   Notice of Lease; Commencement Date Agreement.
If a recordable notice (or "memorandum" or "short form" ) of
this lease is not executed at the time this lease is executed,
Landlord shall do so at a later time, upon Tenant's request.
The notice shall contain such information as either party may
request, except the rent and other charges payable by Tenant.
If, after the Commencement Date, Tenant shall execute and
deliver to Landlord counterpart copies of a recordable
instrument setting forth the Commencement Date, then Landlord,
not more than sixty (60) days following receipt of those copies
from Tenant, shall execute, deliver and redeliver to Tenant all
such counterpart copies except one to be retained by Landlord.

Section 2.7.   "Lease Year" Defined.   The term "Lease Year"
shall mean each of the successive periods of twelve (12)
calendar months which fall in the term, beginning with the first
day of the first month following the Commencement Date (or
beginning with the Commencement Date, if that is the first day
of a month), but if this lease ends on a day other than the last
day of a Lease Year (as defined above), the last Lease Year
shall end on the termination date.

ARTICLE III

EXTENSIONS AND ENLARGEMENTS

Section 3.1(a).   Extensions.   The original term of this
lease shall be automatically extended, without the requirement
of any further act, lease or agreement by either party, for a
total of        en        .ve _   ds     /e     _        1
("Extension Periods"), unless Tenant, at least        /e    )
     1s _ or        _   tion        _ .nal   m        st
   x          ,   _ or        _    ion        nt
      ion      od (the "Last Notice Date"), shall give Landlord
notice in writing to the contrary, in which event the term of
this lease shall terminate on such expiration date.

{AZC0372.DOC / 9}

Section 3.1(b). Tenant's Grace Period. If Tenant fails to give Landlord the termination notice provided for in Section 3.1(a) by the Last Notice Date, Landlord shall give Tenant a written reminder notice of that fact, not less than thirty (30) days after the Last Notice Date. Notwithstanding the provisions of Section 3.1(a), Tenant shall have the right to terminate this lease by giving written notice to Landlord not later than the thirtieth (30) day following (i) Tenant's actual receipt of Landlord's reminder notice under this Section, or (ii) the end of the twelve (12) month or six (6) month period (as the case may be) beginning with the most recent deadline for Tenant's termination notice under Section 3.1(a), whichever of the two events (i.e., Tenant's receipt or the end of the twelve (12) month or the six (6) month period, as the case may be) shall be the first to occur. Tenant's cancellation notice under this Section 3.1(b) shall take effect at the end of the twelve (12) month or the six (6) month period (as the case may be) beginning with the first day of the first calendar month following the month in which Tenant gives such notice. If Tenant does not send a cancellation notice under the provisions of this Section 3.1(b), the lease shall continue in effect in accordance with its terms.

Section 3.2. Continued Occupancy. Upon the expiration of the term of this lease, Tenant shall have the right to continue to occupy the demised premises under the lease provisions applicable on the expiration date for the period between the expiration date and the last day of the following February. Tenant shall exercise its right under this Section 3.2 in Tenant's notice of its intention to terminate the lease under Section 3.1; or, if the term of the lease has been extended so as to expire at the end of the last Extension Period provided for in Section 3.1, Tenant's right under this Section 3.2 shall be exercised by written notice to Landlord not less than six (6) months prior to the originally specified expiration of that last Extension Period; but in any event, Tenant's rights under this Section 3.2 shall be exercised only once. If Tenant's holdover right under this Section or Section 3.1(b) extends in whole or in part into a period with respect to which Tenant would have paid increased rent under Section 4.2 if it had exercised an extension right, then the portion of the applicable period shall be at such higher rate.

ARTICLE IV

RENT

{AZC0372.DOC / 9}



(iv) Phases I and II (including IIA through IIF) of the Project consist of the site work and construction of the Pharmacy Building, Building A and Building C, which Phases I and II of the Project are also identified on <u>Exhibit AAA</u> attached hereto. Phases I and II of the Project shall be deemed completed at such time as the tenant of the Genovese Drugstore space adjacent to Tenant's existing supermarket premises vacates its existing space and such space becomes available to Tenant.

(v) The Costs for Phases I and II of the Project are all of Landlord's Project Costs (as hereinafter defined) for the development of Phases I and II of the Project excluding all of Landlord's Construction Costs (as defined in Section 7.6 hereof) attributable to the construction of the Pharmacy Building (but the costs of all site work necessary to complete and deliver a certified, buildable pad per Eckerd plans and specifications on which to construct the Pharmacy Building shall not be excluded). The portion of the Project Costs included within Phases I and II of the Project shall be as defined in <u>Exhibit AAA</u> (Phasing Plan) and <u>Exhibit AAA-1</u>(Phasing Narrative), and shall include, without limitation, the work described in the budget line items shown on the preliminary project budget attached hereto as <u>Exhibit AAA-2</u> (the "Preliminary Project Budget"). Landlord and Tenant agree that the Preliminary Project Budget does not create a fixed price or cap on the Project Costs, the final amount of which Project Costs shall be the actual amounts spent by Landlord to complete the relevant portions of the reconstruction and reconfiguration of the Shopping Center. The Preliminary Project Budget sets forth the currently projected line item categories which shall be included within the Project Costs, but shall not exclude other potential line items that fall within Project Costs but are not currently known. Notwithstanding anything to the contrary set forth in <u>Exhibits AAA-1</u> and <u>AAA-2</u>, no portion of Landlord's costs for remediating or removing any asbestos, asbestos containing material and/or any contaminated ground

water and soil from the Shopping Center shall be included in
Project Costs ("Landlord's Environmental Remediation Costs").



(vii)  The term "institutional lender" shall mean one
or more of the following:  (i) a real estate investment trust,
bank, saving and loan association, investment bank, insurance
company, trust company, commercial credit corporation, pension
plan, pension fund or pension advisory firm, mutual fund,
government entity or plan, (ii) a trustee in connection with the
securitization of a loan secured, in whole or in part, by the
borrowers' interest in the mortgaged property, so long as such
trustee  or the servicer therefore is an entity that otherwise
would be an institutional lender pursuant to clause (i) above,
(iii) a depositor in any such securitization which is an
affiliate of the institutional lender, (iv) an institution
substantially similar to any of the foregoing which is regularly
engaged in the business of making commercial mortgage loans, or
(v) any entity controlled (as defined below) by any of the
entities described in clause (i) above.  For purposes of this
definition only, "control" means the ownership, directly or
indirectly, in the aggregate of more than fifty percent (50%) of
the beneficial ownership interest of an entity and the
possession, directly or indirectly, of the power to direct or
cause the direction of the management or policies of an entity,
whether through the ability to exercise voting power, by
contract or otherwise.

Section 4.2.  Fixed Rent.  For the term of this lease,
Tenant shall pay to Landlord without offset or deduction, except
as otherwise specifically provided in this lease, at Landlord's
addresses for notices (or to such other person or at such other
address as Landlord may direct from time to time by written
notice) Fixed Rent in accordance with the Fixed Rent Schedule
below.  Fixed Rent shall be paid in equal monthly installments
in advance, on the first day of each month, and pro rata for the
fraction of any month.

Fixed Rent Schedule



{AZC0372.DOC / 9}



ARTICLE V

**REAL ESTATE TAXES**

Section 5.1(a).  Tenant's Tax Obligations.  Subject to the
provisions of this Article, Tenant shall pay Landlord the real
estate taxes attributable to the demised premises for any tax
year.  Tenant shall also pay Landlord the amount of any real
estate tax assessed for any tax year against Tenant's exterior
sign(s) or against any improvement which Tenant may make after
the date hereof.  Tenant shall pay directly to the applicable
governmental authority all personal property taxes imposed upon
Tenant's personal property at the demised premises.

{AZC0372.DOC / 9}

### Section 5.1(b)(i).   Tenant's Tax Share - Demised Premises.



### Section 5.1(b)(ii).   Tenant's Tax Share - Other.   If Tenant [1]

Section 5.1(c).   Tenant's Payments.   Tenant shall pay the amount due under this Article for any tax year not later than (i) the thirtieth (30th) day after Tenant receives Landlord's bill therefor, or (ii) the thirtieth (30th) day prior to the last day on which the real estate taxes may be paid without being delinquent, whichever is later. Landlord agrees that all sums paid to it by Tenant for then unpaid real estate taxes shall be received by it in trust.

Section 5.2(a).   Definitions.   The definitions set forth in this Section shall be applied in interpreting the provisions of this Article.

Section 5.2(a)(i).   Real Estate Taxes.   Subject to the exclusions provided for below, the term "real estate taxes" as used in this lease shall mean the regularly imposed taxes currently commonly levied by municipal, county, and district governmental authorities (as distinguished from State and Federal governmental authorities) against the owners of real property, which taxes are measured by the value of each unit of

{AZC0372.DOC / 9}

subject property on a "flat-rate" basis, separately from any other property of the owner of the subject property.  The term "real estate taxes", shall not in any case include any income, estate, inheritance or succession taxes.  If the present system of taxation is changed, with the result that the whole or a determinable part of the "original real estate taxes" (i.e., those taxes defined above as "real estate taxes") is substituted for by a tax (an "alternate tax") imposed on owners of real property with respect to that property in a form other than that of the original real estate taxes or in a form not included in the foregoing definition, or by other impositions or charges, then each tax imposed in substitution for the whole or for a determinable part of the original real estate taxes and which has a materially different applicability to the owners of real property, or to real property, or to income from real property than it does to owners of other kinds of property, or to other kinds of property, or to other kinds of income shall be considered part of "real estate taxes" for the purposes of this lease.  Nevertheless, the amount of any such alternate tax which may be taken into consideration for the purposes of determining the real estate taxes attributable to the demised premises (or for determining Tenant's liability with respect to the alternate tax) shall be no greater than would be the case if the Shopping Center were the only property of Landlord subject to the alternate tax, and provided further that the amount of any such alternate tax taken into consideration in determining Tenant's liability under this Article shall also be subject to the limitations provided for in this Article.

     Section 5.2(a)(ii).  Tax Year.  The term "tax year" shall mean, in general, the fiscal year for real estate tax purposes established, from time to time, by a taxing authority having jurisdiction over any part of the Shopping Center.  In any particular reference in this Article, however, "tax year" shall mean that portion (or the whole) of the taxing authority's fiscal year falling within the term of this lease, and shall never be deemed to refer to any portion of any such fiscal year falling outside the term of this lease.  At the present time, the tax year for the municipality in which the demised premises are located is the twelve (12) month period beginning on July 1 of each year.





Section 5.2(a)(v).  Land Tax.  The "Land Tax" for a tax
year shall be the total of all real estate taxes assessed
against the land constituting the Shopping Center, against those
improvements to the land which are a part of the Common
Facilities of the Shopping Center (but not any improvement which
is a part of any enclosed mall included as one of the Common
Facilities), and against Landlord's Shopping Center sign, but
the Land Tax shall not include any tax assessed against any
other exterior sign or against any building or any other
improvement in the Shopping Center.

Section 5.2(a)(vi).  Building Tax.  The "Building Tax" for
a tax year shall be the total of all real estate taxes assessed
against the building(s)as may exist from time to time in the
Shopping Center, except that real estate taxes attributable to
any space or floor area in the Shopping Center (including floor
area which is a part of any improvement to the demised premises
made by Tenant after the date hereof) which is excluded from
consideration in determining Tenant's Building Fraction shall be
excluded from the total.

Section 5.2(a)(vii).  Fully Assessed Premises.  The term
"fully assessed" premises (or floor area of other improvements)
for a tax year are those which have been assessed for real
estate tax purposes as fully completed, and not as incomplete or
in the process of construction, either on the assessment date
for that tax year or on any "reassessment date" provided by law

{AZC0372.DOC / 9}

13

to permit an increase in the assessment for that tax year for premises (or floor area of improvements) which were in the process of construction on the regularly designated assessment date for that tax year, but which were subsequently completed.

Section 5.2(a)(viii).  Tax Review.  The term "tax review" shall mean and include all proceedings permitted by law, including appellate proceedings, to obtain any form of reduction of real estate taxes assessed against the Shopping Center (or against any part of the Shopping Center) or of the assessment therefor.

Section 5.2(a)(ix).  Tax Default Year.  The term "tax default year" is a tax year with respect to which (A) Landlord failed to furnish to Tenant in a timely manner the information required under Section 5.3(a) of this Article, or (B) Landlord failed to pay the Shopping Center real estate taxes in a timely manner, as required under Section 5.3(a), or (C) Landlord failed to furnish the required information and also failed to pay the taxes, with the result (in any of those three situations) that (D) Tenant is barred from initiating or prosecuting a tax review for that year, or is prohibited from doing so without paying an amount in excess of Tenant's tax amount for the prior tax year.

Section 5.2(b).  The Operating Rules stated in the subdivisions of this Section shall govern the application of this Article.

Section 5.2(b)(i).  Multiple Taxing Authorities.  If more than one real estate taxing authority has jurisdiction over the Shopping Center, the provisions of this Article shall be applied separately to the real estate taxes levied by each such authority to determine the amount of Tenant's liability under this Article.

Section 5.2(b)(ii).  Installment Payments.  If any real estate tax imposed on the Shopping Center may be paid in installments (as is presently the case in Connecticut, where real estate taxes, as defined herein, are payable in equal, semi-annual or quarterly installments), Tenant's liability to pay any share of such tax under this Article shall be determined on the assumption that Landlord has elected to pay that tax in equal installments over the longest time permitted by law (whether or not Landlord has in fact made such an election), and only those installments (or partial installments) attributable to installment periods (or partial periods) falling within the term of this lease shall be taken into account in determining Tenant's liability under this Article.

Section 5.2(b)(iii).  Floor Area.  The floor area for a tax year shall be determined as of the assessment date for real estate taxes for that tax year [or on the reassessment date, in the circumstances provided for in Section 5.2(a)(vii)] and shall be measured from the exterior faces of exterior walls and from the center lines of party or partition walls.

Section 5.2(b)(iv).  Liability Pro Rated.  Tenant's liability under this Article shall in all cases be pro rated on the basis of a three hundred sixty-five (365) day year for any

{AZC0372.DOC / 9}

tax year which is not included in its entirety in the term of this lease.

Section 5.2(b)(v). **Tax Share - Other Premises.** If, for any tax year, any premises, exterior sign or other improvement shall be assessed separately from the remainder of the Shopping Center, then the real estate taxes attributable to such separately assessed premises, sign or improvement for that tax year shall be the total of (i) the separately assessed real estate taxes for that tax year and (ii) the result of multiplying the entire amount of the Land Tax for that tax year by a fraction whose numerator is the number of square feet of floor area (if any) contained in such premises (or improvement) and whose denominator is the number of square feet of floor area contained in all of the buildings in the Shopping Center. In the absence of a separate assessment, the real estate taxes for a tax year attributable to any premises in the Shopping Center or to parts of premises (such as a store addition) or to other improvements (such as exterior signs or additional or improved Common Facilities) shall be as stated in writing by the taxing authority, or (if a written statement is not available) as determined by the agreement of the parties, or (failing such agreement) by a mutually acceptable appraiser. The parties agree that(to the extent the provisions of this Section differ from Section 5.1(b) hereof) this Section 5.2(b)(v) shall have no application to Tenant, to the demised premises, to any improvements made by Tenant or to Tenant's exterior signs, all of which are dealt with in Section 5.1(b).

Section 5.3(a)(i). **Tax Information to be Supplied.** Not less than thirty (30) days prior to the last day provided by law for the initiation of any tax review for the assessment for any tax year, Landlord shall furnish Tenant with a copy of each notice of real estate tax assessment for any part of the Shopping Center for that tax year and a copy of Landlord's computation establishing the approximate amounts payable by Tenant under this Article based on the new assessment but using the mill rate for the prior tax year. Within ten (10) days after receipt of Tenant's written request therefor, Landlord shall furnish Tenant with such substantiating evidence in support of that computation as Tenant may reasonably require.

Section 5.3(a)(ii). **Landlord's Tax Payments.** Landlord shall pay the real estate taxes assessed against the Shopping Center and the demised premises (or the several installments thereof, when permitted by law) promptly when the same are due prior to the imposition of interest or penalties.

Section 5.3(a)(iii). **Proof of Payment.** Landlord shall furnish Tenant with reasonably satisfactory evidence of payment of all Shopping Center real estate taxes within thirty (30) days after the last due date for the tax payment(s) prior to the imposition of interest or penalties.

Section 5.3(b). **Tenant's Remedy.** At Tenant's election, Tenant shall have no obligation to make the payment(s) to Landlord provided for in Section 5.1 for any tax default year but shall pay Landlord the real estate taxes attributable to the demised premises for such tax default year based upon the mill rate for the tax default year and the assessed values for the

{AZC0372.DOC / 9}

15

land and buildings of the Shopping Center for the most recent tax year which is not a tax default year.

Section 5.4. Abatements. Except as expressly provided in the immediately succeeding paragraph, Landlord shall have the sole right to initiate a tax review for any tax year.

If the Landlord notifies Tenant at least fourteen (14) days before the last day on which an appeal or abatement can be filed that Landlord has determined not to initiate a tax review, or fails to notify Tenant of such determination prior to said fourteen (14) day period, then Tenant shall have the right to initiate and prosecute a tax review for the demised premises, either in Tenant's name or Landlord's, as permitted or required by law. Landlord shall transmit a copy of Landlord's tax bill to Tenant within seven (7) days of Landlord's receipt of same.

In any case where a tax review is initiated by Landlord or by Tenant, the following shall apply: (i) the non-initiating party without charge to the other shall cooperate reasonably in the prosecution of any tax review undertaken; (ii) if, as the result of any tax review (or for any other reason), the real estate taxes assessed against the Shopping Center (or against any part of it which is taken into account in determining Tenant's liability under this Article) shall be reduced or refunded for any tax year, Tenant's liability for that tax year under this Article (together with all related charges for which Tenant was liable and all related credits to which Tenant was entitled) shall be recomputed so as to reflect the net amount of the reduction remaining after the initiating party has deducted the costs of obtaining the same (Landlord agreeing to first pay Tenant's costs out of refunds or abatements if Tenant is the initiating party); (iii) costs of the tax review deductible by the initiating party (which shall be payable only against refunds or abatements) shall include reasonable amounts for attorneys fees and for fees of other specialists required in the prosecution of a tax review, as well as filing fees and other necessary out-of-pocket expenses, but shall not include any amounts paid or payable to the party prosecuting the review or to any person or legal entity having an interest in the Shopping Center, or to any employee of any of them, except that the cost and expense of Tenant's in-house counsel (if in lieu of outside counsel) shall be a deductible cost; and (iv) the initiating party shall prosecute the same to final determination with due diligence and shall not, without the written consent of the non-initiating party, discontinue prosecution of such tax review except, however, the initiating party may discontinue prosecution at any time after giving the non-initiating party notice and an opportunity to take over the prosecution of the tax review (and each, without charge to the other, shall furnish any pertinent information reasonably requested).  The recomputation of Tenant's liability provided for above shall be made within ten (10) days after the completion of the tax review (by Tenant, if Tenant prosecuted the review; otherwise by Landlord), and within thirty (30) days after the end of the ten (10) day period (Tenant having first been given a copy of Landlord's computation), Tenant shall pay Landlord any deficiency in Tenant's prior payments, or Landlord (Landlord having first been given a copy of Tenant's computation) shall refund to Tenant any excess in Tenant's prior payments.

{AZC0372.DOC / 9}

16

Section 5.5.  Base Tax Year.  Notwithstanding anything to

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

## ARTICLE VI

## COMMON FACILITIES CHARGES

Section 6.1.  Common Facilities. As consideration for
Landlord's performance of its obligations with respect to the
Common Facilities, Tenant shall pay to Landlord Tenant's pro
rata share of the following actual costs (less credits and
reimbursements, other than payments made by other lessees or
occupants of the Shopping Center on the basis of requirements
similar to this Article VI) with respect to the Common
███████████████████████████████████████████
███████████████████████████████████████████
insurance and (if applicable) personal property taxes:

(a) The care and replacement of all stone walls and
retaining walls and all shrubbery, plantings, and other
landscaping;

(b) Maintenance, repair and replacement of the Common
Facilities, including without limitation catch basins and
drainage systems and concrete and asphalt paving and other
surface materials used on drives, parking areas and walkways
using, to the extent reasonably possible, the same type and
quality of material originally installed, to the end that
drives, parking areas and walkways are at all times kept in a
level, smooth and substantially uniform condition;

(c) Adequate marking, striping and directional signing of
all parking area driveways and service areas;

(d) Maintenance, repair and replacement of all common
electrical and other common utility equipment and facilities so
that the same are at all times in good operating condition,
including lighting in the Common Facilities, and electric light
bulb replacements;

(e) Payment of all electrical, water and other utility
usage charges or fees (which shall not include any fees or
charges relating to the connection of such utilities or any
costs of relocating any utilities) for utility services
furnished to the Common Facilities;

(f) Provision of adequate security service and security
measures including, but not limited to, additional lighting for
security reasons, monitoring and surveillance equipment and
personnel, all of which shall be subject to the prior written
approval of Tenant, which shall not be unreasonably withheld or

{AZC0372.DOC / 9}

delayed; provided, however, that Tenant's approval rights shall not apply until Tenant is obligated to pay its pro rata share of Landlord's costs for operating and maintaining the Common Facilities pursuant to Section 6.6 hereof, but Tenant at that time can challenge any security services and security measures that Landlord has previously implemented without Tenant's approval.

(g)  Snow removal, when and if necessary, and sweeping and removal of rubbish and debris at least three (3) times per week, but more frequently if necessary;

(h)  Casualty and liability insurance with respect to the Common Facilities; and

(i)  Maintenance, repair and replacement of the Shopping Center pylon, monument signs, and off-site Shopping Center identification signs (provided that with respect to the construction, erection, or replacement of such off-site Shopping Center identification signs, Landlord has obtained Tenant's prior written approval, which shall not be unreasonably withheld or delayed), if any, including lighting Shopping Center identification signs erected thereon (which shall not include the tenant identification signs, if any, erected thereon, which shall be maintained by such tenants at their sole cost and expense).

Tenant's pro rata share of the foregoing costs shall be computed by multiplying the whole of said costs for the applicable calendar year during the lease term by Tenant's Land Fraction (as defined in Section 5.2(a)(iii) hereof). Within ninety (90) days after the end of each calendar year during the term hereof, Landlord shall furnish to Tenant a statement in reasonable detail setting forth the computation of Landlord's costs and expenses pursuant to this Section 6.1. Upon Tenant's written request, Landlord shall furnish to Tenant photocopies of bills and other relevant material confirming Landlord's statement of costs and expenses. Within twenty-one (21) days after receipt by Tenant of Landlord's statement (or if Tenant has requested such confirmatory material, within twenty-one (21) days after receipt by Tenant of such confirmatory material), there shall be an adjustment between Landlord and Tenant, with payment by Tenant to Landlord or repayment by Landlord to Tenant, as the case may require, to the end that Landlord shall receive Tenant's pro rata share of such costs (Tenant shall pay when due those expenses as to which Tenant has not requested confirmatory material). Payments under this Section shall be made monthly in advance on the first day of each month on the basis of Tenant's actual pro rata share for the preceding calendar year, when such amount becomes known, or based upon Landlord's good faith budget for such current calendar year, with an adjustment after costs for the current calendar year are known, as hereinabove provided.

Section 6.2.  Replacements.  Notwithstanding the foregoing, with respect to Replacements (defined below) only the annual amortization (determined below) shall be included in determining Tenant's share of costs under this Article.  As herein used, the term "Replacements" means replacements or repairs to a particular category of the Common Facilities, which are

{AZC0372.DOC / 9}

18



Section 6.3. **Books and Records**. Landlord shall keep, in an office at the Shopping Center, or within the continental United States, for at least the period required by the Internal Revenue Service, complete and accurate books and records with respect to all of the Common Facilities costs for such period and Tenant shall have the right at any time during such period to have such books and records audited and/or inspected. Tenant shall have the right, upon thirty (30) days prior notice in writing to Landlord, to audit such records for any calendar year, but only if such audit is commenced within the three (3) year period following the end of such calendar year and thereafter concluded with reasonable diligence. Such audit shall be performed during Landlord's usual business hours and without unreasonable interference with the conduct of business at the place where the audit is made.

In the event that such audit or inspection discloses that Tenant paid an amount in excess of its proper contribution, Landlord shall refund to Tenant the excess promptly upon demand. Tenant shall not be deemed in default of non-payment of Common Facilities charges during such time as it contests the same in good faith, but Landlord reserves the right to bring legal proceedings to collect the same.

Any statements or payments made by Landlord and not the subject of Tenant's audit hereunder within the aforesaid period shall be deemed final and conclusive, and Landlord shall have no further obligations to keep such records or make them available

Section 6.4. **Written Estimate**. If Tenant can cause Landlord's maintenance under this Article to be performed at a cost of ¡s ,n ;ty _ ¡nt ¡s thereof for the prior calendar year, which written notice given by Tenant to Landlord shall include therewith (and be based upon) a copy of a bona fide arms-length estimate from an independent, commercially reputable and experienced maintenance contractor or contractors (with substantial existing maintenance contracts for comparable first-class community shopping centers in Connecticut) of the cost to perform such maintenance (the "Written Estimate") (and Landlord shall have the right to match the Written Estimate), then Tenant's pro rata share of costs hereunder shall be on the basis of the Written Estimate, but regardless of whether Landlord retains such contractor or contractors, Tenant's pro rata share for the period covered by the Written Estimate shall not exceed what would have been Tenant's pro rata share had the Written Estimate been the basis of calculation of Tenant's costs; provided however that such Written Estimate shall not be

{AZC0372.DOC / 9}

the basis of calculation of Tenant's costs if Landlord in good faith disputes the Written Estimate.

Section 6.5. Unsatisfactory Maintenance. (A) The parties acknowledge that other provisions of this lease contain certain rights in Tenant, on a so-called self-help basis, to perform maintenance work with respect to the Common Facilities in the event that Landlord fails to do so. The parties agree that the exercise of such self-help shall be the initial remedy of Tenant to the extent applicable, but acknowledge the possibility that despite such self-help Landlord's maintenance of the Common Facilities shall be so unsatisfactory, on a continuing basis, as to be a default in Landlord's requirement for first-class maintenance as provided in this lease ("Unsatisfactory Maintenance"). Accordingly, in the event that Landlord's maintenance is Unsatisfactory Maintenance, Tenant shall have the right to give Landlord written notice specifying such default in reasonable detail and, unless during the sixty (60) day period thereafter, Landlord, on a good faith basis, performs regularly its maintenance obligations so that the same does not constitute Unsatisfactory Maintenance, Tenant shall have the right, upon not less than thirty (30) days prior written notice to Landlord, to assume all then existing maintenance obligations of Landlord with respect to the Common Facilities of the Shopping Center, and (provided Landlord has within a reasonable time prior thereto furnished Tenant with copies of relevant leases) in accordance with the requirements of other leases in the Shopping Center. In the event of such assumption by Tenant (which assumption, at Tenant's election, may exclude Replacements), Tenant shall have no obligations under Section 6.1 (except for the pro-rata share of utilities and insurance) and Landlord shall pay to Tenant the pro-rata share of all other tenants and occupants in the Shopping Center, provided however that Landlord's obligation to pay the pro-rata share of other tenants and occupants in the Shopping Center shall apply only to sums actually received by Landlord with respect thereto from such other tenants and occupants, Landlord agreeing in good faith and with due diligence to take all proceedings necessary to collect any delinquent payments and to pay such sums to Tenant when received by Landlord. Such payments by Landlord shall be made monthly, on the first day of each month, on the basis of the preceding calendar year's amounts. Within a reasonable time after the end of each calendar year, Tenant shall furnish to Landlord the statement referred to in Section 6.1, and thereafter there shall be an adjustment between the parties similar to that set forth in said Section within thirty (30) days thereafter. In the event Landlord shall fail to make payments hereunder, Tenant shall have the right to deduct the same from rent. Tenant shall have the right, upon not less than sixty (60) days prior written notice to Landlord, to require Landlord to assume again its obligations under Section 6.1, and thereafter the provisions of Section 6.1 shall again be in effect. If Landlord reassumes the maintenance obligations under 6.1, the provisions of this Section 6.5 shall remain in effect. In the event of assumption by Tenant of its obligations under this Section 6.5, Tenant shall indemnify and hold Landlord harmless from any and all loss, cost, claim or liability (including without limitation reasonable attorney fees) arising out of or relating to Tenant's failure to perform such maintenance obligations hereunder.

{AZC0372.DOC / 9}

(B)   Notwithstanding the foregoing, in the event that Tenant, having exercised its right to perform the maintenance work under this Section 6.5, performs such maintenance work in a manner that is Unsatisfactory Maintenance, then Landlord shall have the right to give Tenant written notice specifying such default in reasonable detail and, unless during the sixty (60) day period thereafter, Tenant, on a good faith basis, performs regularly its maintenance obligations so that same do not constitute Unsatisfactory Maintenance, Landlord shall have the right, upon not less than thirty (30) days prior written notice to Tenant, to assume all then existing maintenance obligations previously assumed by Tenant, in which event the remaining provisions of this Article shall again apply.

Section 6.6.   Abatement of Common Facilities Charges.

██████████████████████████████████████████

ARTICLE VII

CONSTRUCTION

Section 7.1.   ==Tenant's Work==.  Tenant shall prepare complete working drawings and specifications (the "Building Plans") which shall govern the performance of "Tenant's Work", which shall mean and include the demolition of the existing retail spaces of Genovese Drugstore and Venice Pizza and the construction of the demised premises.  The Building Plans shall in any case conform to applicable governmental requirements and shall be in compliance with all federal, state, and local building codes and/or requirements of building officials administering such codes (including, without limitation, all applicable federal, state and local laws relating to "architectural barriers" affecting the physically handicapped and to all environmental protection laws), and to sound and generally accepted engineering practices as applied to the site conditions.  Tenant shall provide Landlord for informational purposes only with a copy of the Building Plans at least thirty (30) days prior to the commencement of Tenant's Work.

Section 7.2.   Tenant's Construction.  Tenant shall commence Tenant's Work as soon as possible after Landlord delivers the existing Genovese Drugstore and Venice Pizza spaces to Tenant free and clear of all tenants and occupants and shall diligently prosecute the same to completion on all business days without interruption, in a good and workmanlike manner in accordance with the Building Plans and applicable governmental requirements.  Tenant shall be responsible for and shall bear the additional construction costs arising from the existence of any asbestos or asbestos containing materials in the Genovese Drugstore and Venice Pizza spaces, as well as in Tenant's existing supermarket premises.  During the performance of any construction, Tenant shall maintain or cause to be maintained builder's "all risk" fire and commercial general liability

insurance with respect to such construction in such amounts and on such terms as are customary for like construction and shall otherwise comply with its obligations under Article XII hereof. Tenant's Work will also be undertaken in accordance with and subject to the provisions of Sections 7.3, 7.10 and 11.4 hereof. After the substantial completion of the demised premises, Tenant shall deliver to Landlord as-built plans for the demised premises certified by Tenant's architect or engineer as an accurate reflection of the dimensions and floor areas of the building constituting the demised premises and the location of its HVAC, electrical and plumbing systems.

Section 7.3.    Tenant's Indemnification.    Tenant agrees to pay promptly when due for the entire cost of any work done upon the demised premises by Tenant or by its employees, agents or contractors, so that the demised premises and the Shopping Center shall at all times be free of liens for labor and materials.    Tenant further agrees to indemnify and save Landlord harmless from and against any and all injury, loss, claims or damage to Landlord or to any person or property occasioned by, or arising out of Tenant's Work.    In connection with Tenant's indemnification pursuant to this Section 7.3, Tenant agrees to defend any claim or demand brought, or any action, petition or order filed, against Landlord, its subsidiaries or affiliates, or against any and all of the agents, servants, employees, officers, or directors of any of the same, or in which any of the same may be impleaded, at Tenant's sole cost and expense, whether any such claim or action is rightfully or wrongfully brought or filed.

Section 7.4.    Ownership of Building.    As of the Commencement Date, all buildings, structures, improvements and other property on the demised premises, constructed or placed thereon by Tenant, shall be owned by Tenant until the expiration or sooner termination of this lease, at which time they shall, if remaining at the end of the term, ipso facto, and without the need for any deed or other instrument, become the property of Landlord.    Tenant will, however, if requested by Landord, execute any documents reasonably requested by Landlord to confirm that said buildings, structures and improvements shall become the property of Landlord at the end of the term.    As of the Commencement Date and during the term of this lease, Tenant alone shall be entitled to deduct all depreciation on Tenant's federal and state income tax returns with respect to all such buildings, improvements, structures and other property.

Section 7.5.    ==Landlord's Work==.    Landlord, upon the Effective Date of this Amendment and Restatement of Lease, shall reconfigure the Shopping Center from its existing condition as shown on Exhibit AA attached hereto to the configuration shown on Exhibit A attached hereto ("Landlord's Work").    The demolition of existing stores, the construction of new buildings and the reconfiguration of the Common Facilities shall be undertaken in accordance with the phases shown on Exhibit AAA attached hereto and the phasing narrative set forth on Exhibit AAA-1 attached hereto.    Notwithstanding the foregoing, Landlord reserves the right to alter the phasing order if the same must be altered in Landlord's commercially reasonable judgment because of matters beyond Landlord's control, but no such alteration shall occur without prior consultation with and

{AZC0372.DOC / 9}

22

approval by Tenant, whose approval will not be unreasonably withheld or delayed.  In addition, Tenant shall have the right to request that Landlord alter the phasing schedule (i) so long as Landlord's Work can continue generally in a reasonably expeditious fashion and such altered schedule does not cause Landlord to violate its obligations to other tenants of the Shopping Center and (ii) provided Tenant shall be responsible for any increased costs which Landlord can reasonably substantiate it has incurred by reason of such altered schedule.

If Tenant requests that Landlord alter the phasing schedule, Landlord will consult with its construction manager and will then provide Tenant with an estimated cost change order reflecting any increased costs due to the alteration in the phasing schedule.  If Tenant approves the estimated change order, then Landlord will alter the phasing schedule in accordance with Tenant's request.  If Tenant rejects the estimated change order, then the phasing schedule will remain unaltered unless Landlord and Tenant can otherwise agree to a different altered phasing schedule or to a method for reducing the amount of the estimated change order.

Section 7.6.   Construction Costs; Landlord Construction Bids.  Except for Phase I, which Landlord shall commence



As used herein, "Construction Costs" shall mean only the costs of labor and materials for construction of Landlord's Work, including a contractor's so-called "soft costs" for insurance, payment, performance and completion bonds, overhead general conditions and all other items typically included in a contractor's bid for similar construction projects.

Each invitation to bid shall contain the following:

(i) each bid shall specifically list each item comprising a portion of the Construction Costs, and the costs associated with each such item, and shall specifically segregate the costs for the site work associated with the Kohl's Department Stores lease (being portions of Phases IID and IIF set forth on Exhibit AAA) (and specifically defined in the Phasing Narrative set forth on Exhibit AAA-1) (which segregated item is hereinafter called the "Excluded Portion");

(ii) notification that any and all bids or bidders, may be rejected;

(iii) instructions that all bids be sealed and submitted to Landlord and Tenant not later than a date set forth in such invitation;

(iv) the requirement that all bids provide for commencement and completion of Landlord's Work consistent with the requirements of the construction schedule agreed to by Landlord and Tenant; and

When all of the respective bids shall be received, then Landlord shall prepare a tabulation sheet for Tenant containing the qualified bid for each general contractor relating to the Construction Costs.  Tenant shall proceed to evaluate the bids to determine which bids, if any, conform to the requirements of this Section 7.6, and which appear to be bona fide, responsible, and free of apparent error.  Any bid which, in Landlord's or Tenant's reasonable judgment, fails to meet any of those standards, shall be rejected, unless in the opinion of Landlord and Tenant it is appropriate to waive the particular requirement or to seek a revision(s) or modification(s) of a bid rather than to reject it.  The low bidder shall be selected by Landlord unless Tenant requests Landlord to choose one of the other bidders who is also reasonably acceptable to Landlord.  Upon completion of the bid procedure set forth in this Section 7.6 and after Landlord and Tenant accept a bid, Landlord shall enter into a contract (in form and substance reasonably acceptable to Landlord) for Landlord's Work promptly thereafter with the successful bidder, who shall be the low bidder or such other bidder as is reasonably acceptable to the parties.

Any bid which is approved by Tenant hereunder shall be referred to hereinafter as an "Approved Contract".  Except for required change orders due to matters beyond the reasonable control of Landlord or its contractors with respect to unforeseen conditions or unforeseen changes in the phasing schedule of Landlord's Work (hereinafter "Required Change Orders"), Landlord shall not modify or amend the economic terms of any Approved Contract, nor shall Landlord authorize any additional or extra work or services under any such Approved Contract without first obtaining Tenant's written approval thereof, which approval may be granted or withheld by Tenant in its reasonable discretion; if there is a dispute between the parties with respect to a modification or amendment of any Approved Contract, the dispute shall be resolved by Appledore Engineering, Inc., whose decision shall be final and conclusive with respect to said dispute.  Any such modification or authorization for extra work which is approved in writing by Tenant or which is a Required Change Order shall be referred to

{AZC0372.DOC / 9}

hereinafter as an "Approved Modification". In no event shall
the "Construction Costs" include (1) any hard or soft costs paid
or payable under any contract or agreement which is not an
Approved Contract or (2) any hard or soft costs in excess of the
contract price, or cost or amount specified in each such
Approved Contract unless such excess cost has been authorized
pursuant to an Approved Modification. If Tenant requires
Landlord to enter an Approved Contract with a general contractor
whose bid cost for the Excluded Portion of the Site Work is in
excess of KCC's bid cost for such Excluded Portion of the Site
Work, then Tenant shall, within thirty (30) days following the
Commencement Date, pay Landlord a sum equal to the amount by
which the costs under the Approved Contract for the Excluded
Portion exceeds KCC's costs for the Excluded Portion.

Section 7.7.    Landlord's Book and Records. Landlord
agrees to keep accurate books and records in accordance with
good accounting practice of all items of Project Costs (as
defined in Section 4.3 hereof) and agrees to make such books and
records and all invoices, receipts, contracts, and subcontracts
and other information pertaining to the computation of Project
Costs available to Tenant and its representatives from time to
time and upon reasonable notice. Tenant shall have the right at
any time within thirty (30) days subsequent to receipt of the
cost breakdown of Project Costs, to have such books, records and
such other items herein required to be kept audited. In the
event that such audit discloses that some amount paid by Tenant
to Landlord on account of any Project Costs involves an item or
items that were not properly included in Project Costs either as
a budget line item on the Preliminary Project Budget attached
hereto as Exhibit AAA-2 or as an item otherwise falling within
the definition of Project Costs, as defined in Section 4.3,
whether or not the same is listed as a budget line item on
Exhibit AAA-2, such amount and the Interim Rents under Section
4.1 and/or the Initial Rent under Section 4.2 shall be
recalculated and Landlord shall refund to Tenant any excess
amount previously paid by Tenant to Landlord and any excess
rents previously paid promptly upon demand, together with
interest thereon at the Interest Rate (as defined in Section 2.4
hereof). If Landlord disagrees with any aspect of Tenant's
audit, the parties will submit the disputed matter promptly to a
mutually agreeable third party, whose decision will be final and
conclusive with respect to the dispute. If the parties are
unable to agree on a third party to resolve the disputed matter,
then the matter shall be submitted to arbitration, as
hereinafter provided, in accordance with the provisions of
applicable Connecticut law, as from time to time amended.

Arbitration proceedings, including the selection of an
arbitrator, shall be conducted pursuant to the rules,
regulations and procedures from time to time in effect as
promulgated by the American Arbitration Association. Prior
written notice of application by either party for arbitration
shall be given to the other at least ten (10) days before
submission of the application to the said Association's office
in the City of New Haven (or the nearest other city having an
Association office). The arbitrator shall hear the parties and
their evidence. The decision of the arbitrator shall be binding
and conclusive and judgment upon the award or decision of the
arbitrator may be entered in the appropriate court of law; and

{AZC0372.DOC / 9}

the parties consent to the jurisdiction of such court and
further agree that any process or notice of motion or other
application to the court or a judge thereof may be served
outside of the State of Connecticut by registered mail or
personal service, provided a reasonable time for appearance is
allowed. Each party shall pay for its own costs and expenses of
the arbitration and shall share equally in the costs and
expenses of the arbitration.

Section 7.8.   Landlord's Construction.  Landlord shall
commence Landlord's Work as soon as possible after the Effective
Date of this Amendment and Restatement of Lease and shall
diligently prosecute the same substantially on all business days
without material interruption (except as otherwise noted on
Exhibit AAA-1), in a good and workmanlike manner in accordance
with all applicable governmental requirements.  During the
performance of any construction, Landlord shall maintain or
cause to be maintained commercial general liability insurance
with respect to such construction in such amounts and on such
terms as are customary for like construction and shall otherwise
comply with its obligations under Article XII hereof.
Landlord's Work will also be undertaken in accordance with and
subject to the provisions of Sections 7.9 and 7.10 hereof.

Section 7.9.   Landlord's Indemnification.  Landlord agrees
to pay promptly when due for the entire cost of any work done
upon the Shopping Center by Landlord or by its employees, agents
or contractors, so that the demised premises and the Shopping
Center shall at all times be free of liens for labor and
materials.  Landlord further agrees to indemnify and save Tenant
harmless from and against any and all injury, loss, claims or
damage to Tenant or to any person or property occasioned by, or
arising out of Landlord's Work.  In connection with Landlord's
indemnification pursuant to this Section 7.9, Landlord agrees to
defend any claim or demand brought, or any action, petition or
order filed, against Tenant, its subsidiaries or affiliates, or
against any and all of the agents, servants, employees,
officers, or directors of any of the same, or in which any of
the same may be impleaded, at Landlord's sole cost and expense,
whether any such claim or action is rightfully or wrongfully
brought or filed.

Section 7.10.  General Construction Provisions.  The
following construction provisions shall apply to construction by
Tenant, Landlord or any other party in the Shopping Center:

(a)  No staging areas shall be located in the parking areas
adjacent to the demised premises without Tenant's consent.

(b)  At the request of either Landlord or Tenant, Landlord,
Tenant or such party, as the case may be, shall designate
construction areas.  At the request of either Landlord or
Tenant, Landlord, Tenant or such party, as the case may be,
shall install reasonable screens and barriers around any
construction areas.

(c)  Taking into account the extent and character of the
required construction work, particularly as identified on
Exhibit AAA (the Phasing Plan), all construction work shall be
undertaken in a manner which shall not unreasonably interfere

with or obstruct access to, and customer travel from, the
demised premises and throughout the Shopping Center and the
various premises in the Shopping Center.  In furtherance
thereof, the parties agree that:  (i) except for the limited
right of trucks and vehicles to pass and repass, if the Tenant
is open for business to the public, the party constructing will
not allow any trucks or other construction related vehicles,
machines or equipment to park or stand on that portion of the
paved parking areas located adjacent to the demised premises;
(ii) the party constructing shall not allow any trucks or other
construction related vehicles, machines or equipment to park or
stand on any of the Shopping Center driveways, entrances or
exits as shown on <u>Exhibit A</u> (except as reasonably necessary to
reconstruct the same); (iii) the party constructing will cause
all materialmen, tradesmen and other construction related
personnel to store all construction materials and equipment and
to park their vehicles solely within any designated construction
area; and (iv) the party constructing will keep the Shopping
Center driveways, entrances and exits and access ways and the
parking areas adjacent to the demised premises reasonably free
of mud and debris caused by construction.


## ARTICLE VIII

## PARKING AREAS AND OTHER COMMON FACILITIES

        Section 8.1.  <u>Common Facilities</u>.  The Common Facilities of
the Shopping Center shall consist of all those portions of the
Shopping Center which are not from time to time occupied by
buildings permitted by this lease.  The general term "Common
Facilities" includes, without limitation, all parking areas,
aisles, driveways, entrances, exits, corridors, enclosed
walkways, public restrooms, public lobbies, sidewalks, access
ramps of all kinds (whether for regular pedestrian use, for use
by handicapped persons or for use in delivery of merchandise),
roadways, loading areas, service roads, lighting facilities (of
all types and wherever located, if used to illuminate any of the
Common Facilities), surface drainage facilities, pavement
striping, traffic control signs (including directional signs at
the entrances and exits), and fences which exist in the Shopping
Center from time to time, and any plantings and landscaped areas
which Landlord elects or is required to construct.  The demised
premises shall at all times have reasonable, adequate and direct
access to the Common Facilities and through them to the streets
adjacent to the Shopping Center, subject to temporary closures
and relocations due to the phasing of construction related to
the redevelopment of the Shopping Center.

        Section 8.2(a).  <u>Use of Common Facilities</u>.  Subject to
takings by eminent domain, repairs and casualty, and except as
specifically provided otherwise in this Section 8.2, during the
term of this lease, including any Extension Periods, Landlord
shall continuously and without interruption make available, and
hereby grants and demises to Tenant a nonexclusive easement and
the right for Tenant and its subtenants, customers, guests,
licensees, invitees, employees and agents, in common with
Landlord and all persons, firms, and corporations conducting
business within the Shopping Center and their respective
customers, guests, licensees, invitees, subtenants, employees

and agents, to use those portions of the Shopping Center shown
on Exhibit A hereto as automobile parking areas, pedestrian and
vehicular accessways, sidewalks and passageways, and ingress and
egress areas for pedestrian and vehicular ingress and egress,
parking and all purposes for which such areas would customarily
be utilized.  In addition, throughout the term of this lease,
including any Extension Periods, Tenant (and its subtenants,
customers, guests, licensees, invitees, employees and agents)
shall have, and is hereby granted, an irrevocable right to use
all other Common Facilities now or hereafter located in the
Shopping Center in common with the other occupants of the
Shopping Center and those having business with them, together
with an irrevocable right to use all service and loading
facilities, except that the loading facilities and areas
adjacent to any service door of the demised premises shall not
be subject to such use in common but shall be used exclusively
by Tenant (including in such use the parking of tractor trailers
subject to applicable laws), subject to reasonable rights of
passage in others over such loading areas and except that the
loading facilities adjacent to any service doors of the other
tenants and occupants of the Shopping Center shall not be
subject to use in common but shall be used exclusively by the
tenant or occupant thereof for loading and unloading and for
parking of tractor trailers immediately adjacent thereto,
subject to reasonable rights of passage in others over such
loading areas.  No charge shall be made for the use of the
Common Facilities, except charges such as those provided in
Article VI.

     Section 8.2(b).  Tenant may use the sidewalks adjacent to
the demised premises for sales purposes and for one or more
parcel pick-up stations, and any tenants may use the sidewalks
adjacent to their respective premises for such purposes, but any
such use shall not unreasonably impede pedestrian traffic among
the stores in the Shopping Center.  Except as aforesaid, the
Common Facilities shall not be used for sales or advertising
purposes or for the operation of amusement devices.

     Section 8.2(c).  Landlord, upon request of Tenant, shall
use reasonable efforts to designate portions of the parking
areas (subject to Tenant's prior written reasonable approval)
for use by employees of occupant(s) of the Shopping Center.
Tenant (with respect to its own employees) and Landlord (with
respect to employees of other occupants) shall use reasonable
diligence to cause all of such employees to park their vehicles
in the designated areas.  Tenant shall comply with such
reasonable, uniform, and uniformly enforced rules for the use of
the Common Facilities as Landlord may make from time to time,
but Tenant need not comply with any such rule prior to the
delivery of a copy thereof to Tenant.

     Section 8.2(d).  Landlord shall not permit the use of the
Common Facilities by any person or legal entity other than those
occupying space in the Shopping Center and those having business
with them therein and those with existing rights pursuant to the
matters set forth on Exhibit B hereto.  If any such prohibited
use of the Common Facilities shall be made, Landlord shall, upon
request of Tenant, initiate and prosecute legal proceedings and
take such other action as may be reasonably necessary and
customary to prevent such use.

{AZC0372.DOC / 9}

Section 8.3(a). Layout. The layout of the Common Facilities shall be that shown on Exhibit A. No material change in the initial layout shall be made without Tenant's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed. . If a detailed parking layout (including a specification of the number of parking spaces) is shown on Exhibit A, Tenant shall be deemed to have approved the size of the parking areas (and the number of spaces so specified), and the parking areas (and number of spaces) shall not, except by takings by eminent domain, be materially reduced below the size (and number of spaces) shown on Exhibit A.

Section 8.3(b). Landlord shall not add to the Shopping Center, or integrate with it, any additional land, without the consent of Tenant, which consent shall not be unreasonably withheld or delayed. In addition, Landlord shall not place or erect any structures or improvements in the Shopping Center except (i) the present and proposed buildings (substantially in the locations herefore) shown on Exhibit A, containing at most, the amounts of ground floor area designated on Exhibit A; (ii) additions to stores if and to the extent shown on Exhibit A; (iii) underground sewer, water and utility lines; (iv) bumpers and similar parking area appurtenances; (v) signs and fences permitted or required by this lease; and (vi) the Common Facilities. No building or structure in the Shopping Center shall contain a basement or floor space above the ground floor level, except for mezzanines in the demised premises and those mezzanines shown on Exhibit A. Except as permitted under Section 8.2, or described in Section 1.1(a), no covered or uncovered outdoor area shall be placed in the Shopping Center unless shown on Exhibit A or located within an area where building is permitted.

Section 8.4. Maintenance. Landlord shall maintain all of the Common Facilities in good order, repair and condition, free of snow, ice and refuse, and free of obstructions, but Landlord shall not be required to remove snow and ice from landscaped areas or to remove snow, ice or refuse from the sidewalks adjacent to the demised premises. Such maintenance shall be of the type and extent considered to be acceptable maintenance of a first class shopping center, provided, however, that if maintenance of a first class shopping center would entail an item of expense with respect to which Tenant is not obligated to reimburse Landlord under Article VI hereof, nothing in this lease shall be deemed to require Landlord to perform such maintenance. No rubbish, trash or garbage shall be burned in the Shopping Center by Landlord or any tenant. Landlord shall keep all of the Common Facilities well lit during Tenant's evening and nighttime business hours and for at least one-half





kiosks, shall be placed in the Shopping Center except parking corrals as shown on Exhibit A, which parking corrals shall not be moved without Tenant's prior written approval, not to be unreasonably withheld or delayed. Visibility of Tenant's entrance to the demised premises shall not be hindered by Landlord nor flow of traffic thereto hindered. Landlord shall, at Tenant's request, provide personnel in such numbers as may be reasonably necessary to maintain the safe and free flow of traffic into, out of and within the Shopping Center, and Tenant shall pay its equitable share of the cost of providing such personnel.

ARTICLE IX

USE AND RESTRICTIONS

Section 9.0. <mark>Initial Opening</mark>. Subject to all applicable laws and ordinances, and further subject to the provisions of this Section 9.0, Tenant agrees to fully fixture and equip the demised premises for a Food Supermarket Business (as hereinafter defined) and, within ninety (90) days following the occurrence of the Commencement Date, to operate and use the demised premises for a period of one (1) day as a Food Supermarket Business under the name "Super Stop & Shop" or "Stop & Shop" or such other name as is used by a majority of stores operated by Tenant (or its successors and assigns) in Connecticut, it being understood and agreed that nothing contained herein or elsewhere in this lease shall require Tenant to keep the demised premises (or any portion thereof) open for the conduct of a Food Supermarket Business or any business after the expiration of said one (1) day operating period, and the demised premises may be closed at any time after the expiration of said one (1) day operating period.

The provisions of Section 19.5 of this lease are specifically made applicable to Tenant's obligation to open and operate said Food Supermarket Business in the demised premises, and in no event shall the demised premises be required to be open for the conduct of business during such time as the same may be contrary to any governmental order, directive or law from time to time in effect.

{AZC0372.DOC / 9}

the State of Connecticut, because the use of the premises

As used herein, the term "Food Supermarket Business" shall mean a food supermarket business or a combination food/general merchandise business or a combination food/drug store/general merchandise business of the kind from time to time operated by the initial Tenant, but the predominant use is to be the sale of food, food items and food products and the kind of general merchandise customarily sold in food supermarkets or superstores from time to time.  Except for the one-day operating period set forth above, neither the provisions of the preceding sentence nor any other provisions of this Article or this lease are intended, nor do they require, that a Food Supermarket Business be operated in the name "Stop & Shop" or any other name.

Section 9.1(a).  Notwithstanding anything in this lease to the contrary, Tenant shall always have the right (subject to the provisions of Section 9.1(f) hereof) to operate and to assign and/or sublet (and grant occupancy and license agreements) for the conduct of a Food Supermarket Business containing not less than 30,000 feet of floor area in the demised premises, without the necessity of Landlord's consent and without the right in Landlord to exercise any cancellation or termination right with respect thereto.  No part of the demised premises shall be used for a "car-hop" restaurant business, as defined below, or for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors or for any purpose or business prohibited by the provisions of Sections 9.2(h)(i), (ii), (iv), (vi), (vii), (viii), or (ix).  In addition, Tenant shall not use the demised premises in violation of the exclusive under the lease dated August 30, 2001 of Genovese Drugstore a/k/a Eckerd Drugstore (or its permitted successor or assign under such lease) to the extent Tenant's rights under this lease are subject to such exclusive.  Except as hereinafter provided, if the demised premises are open for the conduct of business, a Food Supermarket Business containing not less than 30,000 square feet of floor area shall be operated in the demised premises.

Section 9.1(b).  Tenant shall have the right, by written notice ("Trigger Notice") to Landlord given at any time to advise Landlord that Tenant desires to be released from the requirement that a Food Supermarket Business of not less than 30,000 square feet of floor area be operated if the demised premises are open for business; provided however that if a majority of stores operated by the Tenant named herein within the State of Connecticut change the use of their operations to other than a Food Supermarket Business ("Non-supermarket Use"), then, notwithstanding anything to the contrary herein contained, the use of the demised premises by the named Tenant may be changed to such Non-supermarket Use without consent of Landlord and without being required to give Landlord a Trigger Notice, and in no event shall Landlord have any right to recapture or terminate this lease on account thereof.

Section 9.1(c).  In the event that Tenant shall give a Trigger Notice, Landlord shall have the right, by written notice to Tenant ("Termination Notice") given at any time during the six (6) month period ("the Six Month Period") following the

{AZC0372.DOC / 9}

Trigger Notice, to terminate this lease ("Termination Right"), effective ("Effective Date of Termination") on the 180th day following the giving of such Termination Notice.

Section 9.1(d). If Landlord validly exercises its Termination Right, then this lease shall terminate and expire as if the Effective Date of Termination were originally fixed for the termination and expiration date of this lease, and, except as set forth below, neither party shall have any further rights or obligations hereunder after the Effective Date of Termination. Such Termination Notice from Landlord, in order to be effective, shall be accompanied by: (i) a certification by Landlord's attorney (which certification is confirmed in writing by Tenant's leasehold title insurer) that the consent of no other party (whether assignee, mortgagee or otherwise) is required in order to release Tenant from its obligations under this lease, or, in the alternative, specifying the identity of those parties whose consent is required, and (ii) the consent to such termination of each such party so certified by Landlord's attorney and confirmed as aforesaid. Such consent shall be in recordable form and in form reasonably satisfactory to Tenant and Tenant's insurer.

In the event this lease is terminated by Landlord pursuant to this Section 9.1, Landlord shall, on or prior to the Effective Date of Termination (and, at Tenant's election, as a condition precedent thereto): (i) refund to Tenant any Fixed Rent and additional charges paid for any period after the Effective Date of Termination, and (ii) pay to Tenant (by Federal Reserve wire transfer or by certified or bank check) the net book value (as set forth in Tenant's financial records) of both the building and all leasehold improvements on the demised premises and Tenant's furniture, fixtures and equipment installed within the demised premises. Landlord's obligations hereunder shall survive any termination of this lease. Tenant shall, upon Landlord's written request (which shall be at reasonable times and a reasonable number of times), advise Landlord of the amount of the then current net book value of the assets referred to in this Section, and Tenant's Trigger Notice shall specify the current net book value.

In addition and as a condition to the termination of this lease, Landlord agrees that, if Tenant or its successor is operating a Food Supermarket Business in any one of the following listed municipalities (the "Benefitted Stores") as of the Effective Date of Termination, then Landlord for a period of ten (10) years following the Effective Date of Termination shall not lease, use or permit to be used any portion of or premises in the Shopping Center for the conduct of a Food Supermarket Business. The Benefitted Stores are any stores operated in the Connecticut municipalities of Ridgefield, Danbury, Wilton, Redding and Bethel and the New York municipalities of Pound Ridge and South Salem. The foregoing restriction (and the following two paragraphs) shall be set forth in the document terminating this lease, shall be in recordable form and in form reasonably satisfactory to Tenant and shall be binding upon Landlord's successors and assigns of the Shopping Center. The foregoing restriction shall hereinafter be referred to as the "Recapture Termination Restriction."

{AZC0372.DOC / 9}

If any provision or clause of the Recapture Termination Restriction, or any portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provisions shall not thereby by affected and shall be given full effect, without regard to the invalid portion.  It is the intention of the parties that if any court construes any provision or clause of the Recapture Termination Restriction, or any portion thereof to be illegal, void, or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce the duration, area, or matter of such provision, and in its reduced form, such provision shall be enforceable, and shall be enforced.  In particular, the parties agree that the scope and duration of restrictions contained in the Recapture Termination Restriction are fair, but the parties recognize that it is not possible to predict with certainty that the restrictions contained therein will be enforced.  Accordingly, the parties agree that, with respect to duration, the 10 year restriction on Landlord is not only fair and reasonable, but necessary to protect Tenant's investment in the Benefitted Stores; and given the nature of Tenant's business, and given the market area for supermarkets, the geographical restriction consisting of an area less than seven listed municipalities is not sufficient to protect Tenant's interest.

Accordingly, if it should appear that any of the terms of the Recapture Termination Restriction, including the scope and duration thereof, are in conflict with any rule of law in the State of Connecticut, which conflict would render any portion thereof inoperative or void, then the parties request the court to modify such term so that the intention is carried out to as great an extent as is permissible.  With respect to the duration of the Recapture Termination Restriction, the parties agree that the court may reduce the duration in one (1) year increments to the maximum permissible under the law.  With respect to the geographical scope of the Recapture Termination Restriction, the parties agree that the court may limit this to one or more of the municipalities listed.

Section 9.1(e).  If Landlord does not validly exercise its Termination Right under this Section 9.1, such Termination Right under this Article IX shall expire and be null and void, and Tenant shall have the right, from time to time, to use, assign and/or sublet the demised premises and/or grant occupancy rights and licenses of any kind with respect thereto for any lawful retail use without Landlord's consent but subject to the second and third sentences of Section 9.1(a) hereof.

Section 9.1(f)(i).  Subject to the preceding provisions of this Section 9.1, Tenant shall have the right to assign this lease and to sublet (and to grant occupancy rights and licenses of any kind with respect to) the whole or any part of the demised premises or of the term for any purpose permitted pursuant to this Article IX.  If Tenant assigns this lease, and if after the effective date of such assignment, (i) this lease is terminated or cancelled for any reason, including without limitation the default of such assignee or any future assignee, or (ii) this lease shall be rejected by such assignee or any future assignee under any applicable federal or state bankruptcy

or reorganization statute, Landlord shall promptly give written notice thereof to The Stop & Shop Supermarket Company (The Stop & Shop Supermarket Company or its successor being hereinafter referred to as the "Original Tenant"), together with a statement of any and all sums which at the time of such notice would be due under this lease but for such termination or rejection, and of all other defaults, if any, under this lease then known to Landlord.  The Original Tenant shall have the option, to be exercised by written notice to Landlord within sixty (60) days after receipt of such notice, to require Landlord to enter into a new lease (the "New Lease") of the demised premises with the Original Tenant or its designee (which shall be an affiliate of the Original Tenant).  If the Original Tenant notifies Landlord of the exercise of its option to enter into a New Lease hereunder, and if this lease has not yet been terminated as a result of such default or rejection, Landlord agrees to terminate this lease.

Section 9.1(f)(ii).  If the Original Tenant notifies Landlord of the exercise of its option to enter into a New Lease hereunder, Landlord shall, as promptly as possible after receipt of the Original Tenant's notice exercising such option, enter into such New Lease with Tenant or its designee.  Such New Lease shall be effective on the date of termination of this lease and shall be for the remainder of the term of this lease, at the rent and upon all agreements, terms, covenants and conditions thereof, including any applicable rights of renewal.  Upon the effective date of such New Lease, the Original Tenant or its designee shall undertake to cure all unfulfilled monetary defaults of the tenant under this lease and all non-monetary defaults relating to the condition of the demised premises or the tenant's repair or maintenance obligations hereunder which are susceptible of being performed by the Original Tenant or such designee.

Section 9.1(f)(iii).  Notwithstanding the foregoing, if Landlord delivers to the Original Tenant, together with Landlord's notice under Section 9.1(f)(i) above, a release of the Original Tenant and all subsequent holders of the lessee's interest in this lease as to all liability under this lease, as theretofore amended (consented to by all necessary parties), the Original Tenant shall not have the foregoing option.

Section 9.2(a).  ==Restrictions on other Premises==.  Except as specifically provided to the contrary below, the other premises in the Shopping Center shall only be used for lawful retail businesses, subject to the restrictions hereinafter set forth.  Notwithstanding the foregoing, (i) Tenant acknowledges that the lease dated August 30, 2001 of Eckerd Drugstore permits the tenant thereunder to use its premises for any lawful purpose, and thus is not limited to retail purposes, although such uses are otherwise subject to the restrictions hereinafter set forth and (ii) Kohl's Department Stores (or its permitted successor or assign under the Kohl's lease) may sell, display or store food items to be consumed off-premises in no more than 3,000 square feet of floor space as described on Exhibit D attached hereto, but is otherwise subject to the restrictions hereinafter set forth (except that, with respect to Sections 9.2 (e) and (f), only to the extent the Kohl's lease is subject to the same).

Section 9.2(b).  During such time as at least 30,000 square feet of the floor area of the demised premises shall be used or occupied for the conduct of a Food Supermarket Business,

Landlord shall not lease, use or permit to be used any other portion of or premises in the Shopping Center for the conduct of a Food Supermarket Business or for the sale of any food products for off-premises consumption, other than the incidental sale of such food products in not more than 500 sq. ft. of any retail store business, except that Landlord may permit the sale of food items and the conduct of businesses principally engaged in food sales, as follows:

Section 9.2(b)(i)   snack bars in variety stores, junior department stores and department stores may sell take-out orders, ready for immediate consumption, of soups, sandwiches, hot and cold beverages and individual servings of items which are also being sold (on the same premises) for on-premises consumption, but not frozen foods; and

Section 9.2(b)(ii)   one ice cream store business similar but not limited to the kind now operated under the name "Friendly" or "Baskin Robbins", may be operated in the Shopping Center and may sell ice cream and ice cream products for off-premises consumption; and

Section 9.2(b)(iii)   one candy store business may be operated in the Shopping Center and may sell bulk and packaged candies and nuts for off-premises consumption; and

Section 9.2(b)(iv)   a package liquor store business may be operated in the Shopping Center and may sell alcoholic beverages for off-premises consumption only, and, as an ancillary part of its business, may sell cocktail ingredients, such as syrups and carbonated beverages, and cocktail snacks, such as pretzels, potato chips and nuts, for off-premises consumption only (provided, however, that a package liquor store business shall not be operated in the Shopping Center, other than the existing Ridgefield Liquor store business, if such operation precludes Tenant from obtaining a license to sell beer or beer and wine in the demised premises); and

Section 9.2(b)(v)   a variety store, a junior department store, or department store business may sell food items for off-premises consumption, provided, however, that not more than a total of 2,500 square feet of selling space, or (if less) a total of 10% of the total floor area of the premises used for such business, shall be used for the sale (including display) and storage of food items; and

Section 9.2(b)(vi)   A full service sit-down or take-out restaurant as provided in Section 9.2(h)(v);

Section 9.2(c).   During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a drug store, or for a pharmacy, or for the sale of health and beauty care products, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center for:

Section 9.2(c)(i)   the conduct of a drug store, or for a pharmacy, or for health and beauty care products other than the relocated Eckerd Drugstore which will be located in the building shown on Exhibit A as "Proposed Pharmacy"; or

{AZC0372.DOC / 9}

Section 9.2(c)(ii)   except with respect to the relocated Eckerd Drugstore, the sale, display or advertising of drugs, medicines, rubber goods or hospital or "sickroom" supplies or equipment (except that "patent" and "proprietary" medicines which may, by law, be sold in stores which do not contain a prescription department and which do not employ a registered pharmacist on the premises may be sold in premises in the Shopping Center which contain not less than 20,000 square feet of floor area and which are used for the business of a department store, junior department store or variety store (if otherwise permitted), but the total amount of floor area devoted to the sale and display of such "patent" and "proprietary" medicines by any one such business conducted in the Shopping Center shall not exceed 2,500 square feet; or

Section 9.2(c)(iii)   the conduct of the business consisting principally of the sale of perfumes, cosmetics, vitamins, "patent" or "proprietary" medicines (described above) or "sundries" of the types commonly sold in drug stores, or of any combination of the foregoing, whether operated on a discount or limited price or regular price basis, and whether on a self-service or service basis; or

Section 9.2(c)(iv)   the conduct of a business consisting principally of the sale of greeting cards, gift wrapping and "party goods", so-called, except for the existing lease to Jenny's Hallmark store.

Section 9.2(d).   [Intentionally Omitted]

Section 9.2(e).   During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for the sale of flowers, plants or other horticultural products, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center for the sale of flowers, plants or other horticultural products.

Section 9.2(f).   During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a business which provides film or photo processing or developing services (including so-called "one-hour" film developing services), Landlord shall not lease, use, or permit to be used any portion of, or other premises in, the Shopping Center (other than the relocated Eckerd Drugstore) for the operation of a business which provides film or photo processing or developing services of any type.

Section 9.2(g).   [Intentionally Omitted]

Section 9.2(h).   In order to insure that the parking areas of the Shopping Center shall not be overburdened and to preserve the character of the Shopping Center as an active center of retail trade offering a variety of goods and services capable of attracting the widest possible spectrum of shoppers, Landlord agrees that during such time as more than fifty percent (50%) of the floor area of the demised premises is used or occupied for the conduct of a "retail business", so-called, no other part of

or other premises in the Shopping Center shall be used for any one or more of the following:

Section 9.2(h)(i)   for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types or qualities now commonly known as "odd lot", "distressed", "bankruptcy", "fire sale" or "damaged" or of the type known in the trade as "schlock," provided, however, that, in any event, an operation of the kind currently conducted by Marshalls, TJ Maxx or other comparable "off-price" retail operations shall be permitted; or

Section 9.2(h)(ii)   for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors, or

Section 9.2(h)(iii)   for any purpose other than the conduct of a "retail business", so-called, which term shall mean and include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, as well as ordinary retail businesses selling merchandise or other businesses typically found in comparable shopping centers in Connecticut; or

Section 9.2(h)(iv)   for the operation of a motel or tourist court; or

Section 9.2(h)(v)   for a restaurant business or alcoholic beverage business ("bar") of any kind, including, without limitation (A) a "car-hop" or "carry-out" restaurant business whose customers consume food items sold for off-premises consumption while such customers are occupying vehicles parked on the Common Facilities of the Shopping Center, and (B) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis, and (C) a restaurant-bar business which serves alcoholic beverages for on-premises consumption to customers who do not consume the beverages in question as a part of their meals; except that one full service sit down or take-out restaurant of not more than 2,000 square feet may be located either on the eastern end of Building A or on the eastern end of the Pharmacy Building; or

Section 9.2(h)(vi)   for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, movie theaters, "penny arcades," so-called; amusement games or devices (electronic or otherwise), "discos", so-called; so-called "strip shows", and live entertainment of any kind); or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books, movies and photographs; or

Section 9.2(h)(vii) for any automobile or truck sales, storage, service, fueling, washing, or repair operation; or

Section 9.2(h)(viii) for any business using outdoor space in its regular operations, such as lumber yards, boat sales yards and the like except for tenant sidewalk sales and outdoor sales on the south side of the building currently occupied by Kohl's Department Stores; or

Section 9.2(h)(ix) for any office or storage operations except office and storage operations which are a part of the conduct of a retail business in the Shopping Center.

Section 9.2(i). For the purposes of this Article (i) the "floor area" of any premises (including the demised premises) shall include the ground coverage of any "garden shop" or "outdoor selling area" (whether or not enclosed or covered) which is used in the conduct of business by the occupant of such premises, and (ii) "selling space" shall be measured to the interior faces of adjoining walls and to the exterior lines of adjoining aisles.

Section 9.2(j). If any of the restrictions or prohibitions set forth in Section 9.2 shall be violated, Tenant shall not be entitled to terminate this lease or to any abatement of the rent or other charges payable by Tenant under this lease, but Tenant shall be entitled to seek all other remedies available to it, at law and in equity, because of such violation. If Tenant shall obtain any judgment for damages because of any such violation, Tenant's right to withhold sums from rent installments on account of such damages under Section 19.2 shall be exercised only with respect to the "excess" portion of any rent installment, i.e., the portion of the rent installment which exceeds that part of Landlord's next required payment of principal and interest of the first mortgage of the Shopping Center, which (part) is fairly allocable to the demised premises on a basis which shall reflect total area contained in the premises in the Shopping Center, without regard to vacancies.

Section 9.3(a)(i). While at least 30,000 square feet of the floor area of the demised premises is used: (1) principally for the conduct of a Food Supermarket Business, no premises outside of the Shopping Center which are directly or indirectly owned or controlled by Landlord and which are located within the Town of Ridgefield (the "controlled premises") shall be used for a "competing purpose" (i.e., shall be used: for the conduct of a Food Supermarket Business or for the sale (other than as an incidental part of a tenant's business) of food items for off-premises consumption; and if the foregoing restriction is violated, the annual rent payable under Section 4.2 shall be reduced by fifteen percent (15%) for the period during which the controlled premises are used for a competing purpose. The foregoing restriction shall not prohibit Landlord from leasing within the Town of Ridgefield up to 3,500 square feet of space outside of the Shopping Center for the sale of food items for off-premises consumption, including without limitation, for a convenience food store.

Section 9.3(a)(ii). The rent reduction provided for in Section 9.3(a)(i) shall not be limited to a single reduction of

{AZC0372.DOC / 9}

38

fifteen percent (15%), but shall be applied separately, at that rate, for each controlled premises used for a competitive purpose. Each reduction provided for in Section 9.3(a)(i) shall take effect on the date on which the controlled premises in question was first used for a competing purpose, subject to the provisions of Section 9.3(b) and Section 9.3(c). Landlord shall refund to Tenant any amount by which the rent reserved under Section 4.2 is overpaid by Tenant, as the result of Tenant's belated discovery of the conduct of a competing business in a controlled premises. If Landlord fails to reimburse Tenant within ten (10) days after receipt of Tenant's bill for such reimbursement, Tenant shall have the right to deduct the amount of the required reimbursement from any installment(s) of rent or from any other payment thereafter coming due from Tenant to Landlord, until Tenant has been fully reimbursed. Any rent reduction provided for in Section 9.3(a)(i) shall continue until the controlled premises, whose use for a competing purpose was the occasion for the rent reduction, shall cease to be used for a competing purpose, regardless of any change in ownership or control of the controlled premises and whether or not the person or legal entity owning or controlling the controlled premises in question has ceased to hold the lessor interest (or an interest therein) under this lease prior to the cessation of such use. Tenant's sole rights with respect to the use of any controlled premises for a competing purpose shall be as set forth in this Section 9.3, and Tenant shall not have the right to terminate this lease, to equitable relief, or to damages other than the rent reduction provided for in this Section 9.3.

Section 9.3(b). The provisions of Section 9.3(a) shall not be applicable to controlled premises which are being used for a competing purpose at the time this lease is executed; or, in the case of premises which are not now but which hereafter become controlled premises, those provisions shall not be applicable to premises being used for a competing purpose at the time they become controlled premises; but Landlord shall not agree to the enlargement of any of the premises to which this Section 9.3(b) applies or to the extension of the period during which such premises may be used for a competing purpose, in any case in which Landlord's agreement thereto is necessary.

Section 9.3(c). The provisions of Section 9.3(a) shall not apply to premises outside the Shopping Center which are "controlled premises" in relation to any institutional holder of a first mortgage of the Shopping Center or of the demised premises, at any time when such holder may be considered the "Landlord" under this lease, whether for the reason that such holder is in possession of the Shopping Center, or has the benefit of a collateral or contingent or other assignment of the lessor interest in this lease, or otherwise; but any such holder which has taken possession of the Shopping Center or the demised premises (whether by foreclosure, by transfer in lieu thereof, or otherwise) shall be bound by all of the provisions of this Article other than the provisions of Section 9.3(a). Any person or legal entity claiming under any such holder (except another institutional holder entitled to the benefit of the foregoing exceptions) shall be bound by all of the provisions of this Article without exception.

{AZC0372.DOC / 9}

Section 9.3(d). For the purposes of Section 9.3, "indirect" ownership or control by Landlord shall mean direct or indirect ownership or control by a person or legal entity holding a 35% equity interest (or more) in Landlord or in the Shopping Center.

Section 9.4. (a) The obligations and liabilities under this Article of each person and legal entity who or which holds all or part of the lessor interest under this lease at any time shall continue in effect while this lease remains in effect, notwithstanding any transfer of such interest by such holder, but after such transfer the transferring holder shall be responsible only for his or its own prior violations of the provisions of this Article, if the transferring holder complies with the requirements of Section 19.12(b). Wherever in this Article IX certain restrictions apply or relate to Landlord during such time as the demised premises are open or occupied or used (or words of similar import), such as, without limitation, Section 9.2 and Section 9.3 hereof, such restriction or application shall always be deemed in effect and applicable not only during "such time" but also (i) during such time as the demised premises are closed for  herefore , repairs, renovations, and the like, (ii) in connection with assignments and subletting, (iii) for a period of one year (which period shall include any closures pursuant to subsections (i) and (ii) above) if the demised premises are no longer in operation and (iv) in any event, the provisions of Section 19.5 shall always apply.

(b) Landlord shall, within fourteen (14) days after receipt of Tenant's written request  herefore (which request shall include a copy of the sublease), execute and deliver to any subtenant of not less than 15,000 square feet a written agreement (a "Nondisturbance Agreement") in form suitable for recording to the effect that, so long as any such subtenant shall not be in default under its sublease beyond any applicable notice and cure period set forth therein, and provided such subtenant agrees to be bound to Landlord under all the terms, covenants and conditions contained in any such sublease, and agrees to attorn to Landlord and recognize Landlord under such sublease, then, if this lease is terminated for any reason whatsoever, Landlord covenants and agrees that such termination of this lease shall not result in a termination of such sublease, and that such sublease shall continue automatically for the duration of its term and any extensions thereof as a direct lease between Landlord hereunder and such subtenant, with the same force and effect as if Landlord hereunder had originally entered into such sublease as Landlord thereunder.

Section 9.5. Recapture. If, at any time after the occurrence of the Commencement Date, less than 30,000 square feet of floor space in the demised premises shall be open for business for more than one (1) year (it being understood and agreed that the foregoing shall not include cessation of business as a result of acts of God, war or other military activity, fire, casualty, eminent domain, strikes, shortages of labor, materials or equipment, or other causes beyond Tenant's reasonable control, nor shall the foregoing include any cessation of business in connection with alterations, remodeling, refixturing or any assignment of this lease or any

{AZC0372.DOC / 9}

subletting of the demised premises but shall recommence when such cause no longer exists), Landlord shall have the right to terminate this lease ("Termination Right"), said right to be exercised by written notice delivered to Tenant within thirty (30) days following the expiration of the aforesaid one (1) year period, but prior to Tenant's (or an assignee's or subtenant's) reopening for business in the demised premises or Landlord's receipt of notice from Tenant of Tenant's (or an assignee's or subtenant's) agreement to reopen for business in the demised premises in at least 30,000 square feet of space provided such reopening in fact occurs within six (6) months following the date of Landlord's receipt of said notice of agreement. If Landlord exercises the Termination Right, such termination shall be effective ("Effective Date of Termination") on the forty-fifth (45th) day following the termination notice. Notwithstanding the foregoing, if Tenant has given Landlord a Trigger Notice and if Landlord does not exercise its recapture right, then the one year period referred to above shall be deemed to be a two year period from and after the giving of the Trigger Notice.

If Landlord validly exercise its Termination Right, then this lease shall terminate and expire as if the Effective Date of Termination were originally fixed for the termination and expiration date of this lease, and, except as set forth below, neither party shall have any further rights or obligations hereunder after the Effective Date of Termination. Such termination notice from Landlord, in order to be effective, shall be accompanied by:  (i) a certification by Landlord's attorney (which certification is confirmed in writing by Tenant's leasehold title insurer) that the consent of no other party (whether assignee, mortgagee or otherwise) is required in order to release Tenant from its obligations under this lease, and that no other entity has the benefit of a conditional, collateral or other assignment of the lessor interest in this lease, or, in the alternative, specifying the identify of those parties whose consent is required, and (ii) the consent to such termination of each such party so certified by Landlord's attorney and confirmed as aforesaid.  Such consent shall be in recordable form and in form reasonably satisfactory to Tenant and Tenant's insurer.

In the event this lease is terminated by Landlord pursuant to this Section, Landlord shall, on or prior to the Effective Date of Termination (and, at Tenant's election, as a condition precedent thereto):  (i) refund to Tenant any Fixed Rent and additional charges paid for any period after the Effective Date of Termination, and (ii) pay to Tenant (by Federal Reserve wire transfer or by certified or bank check) the net book value ( as set forth in Tenant's financial records) of both the building and all leasehold improvements on the demised premises and Tenant's furniture, fixtures and equipment installed in the demised premises.  Landlord's obligations hereunder shall survive any termination of this lease. Tenant shall, upon Landlord's written request (which shall be at reasonable times and a reasonable number of times), advise Landlord of the amount of the then current net book value of the assets referred to in this Section.  In addition, and as a condition to the

{AZC0372.DOC / 9}

termination of this lease, if Tenant or its successor is operating a Food Supermarket Business in any Benefitted Store (as described in the third paragraph of Section 9.1(d) hereof) as of the Effective Date of Termination, then Landlord agrees to set forth the Recapture Termination Restriction (and the last two paragraphs of Section 9.1(d) hereof) in the document terminating this lease.

## ARTICLE X

### REPAIRS AND ALTERATIONS

Section 10.1.  Tenant's Repairs.  Tenant agrees to make all repairs (including replacements and alterations where necessary) necessary to keep the interior, exterior and structure of the demised premises in good order, repair and condition, including without limitation, the roof, the foundation and all HVAC, electrical and plumbing systems, except for those necessitated by reasonable use and wear.

Section 10.2.  Governmental Requirements.  Tenant shall make all repairs and alterations to the demised premises necessary to comply with all applicable laws, orders and regulations of governmental authorities.

Section 10.3.  Alterations.  Tenant shall have the right, at its election, at any time and from time to time, during the term hereof, including any Extension Periods, to make such alterations, changes, replacements, improvements and additions in and to the demised premises, and any part thereof from time to time, as it may deem desirable, in Tenant's sole discretion, so long as any such alterations, changes, replacement, improvements and additions (i) shall be undertaken in a good and workmanlike manner and in compliance with all applicable laws, orders and regulations of governmental authorities, and (ii) shall not materially adversely affect the fair market value of the demised premises.

Section 10.4.  Satellite Dish.  Tenant shall have the right, subject to all applicable governmental regulations, to place, maintain, repair and replace on the roof of the demised premises a satellite dish antenna and related equipment. ("Dish").  Tenant shall be responsible for repair and maintenance of the Dish during the term hereof, at Tenant's sole cost and expense, and upon termination or expiration of this lease Tenant shall remove the Dish and repair damage to said roof caused solely as a result of such removal. The parties agree that the Dish is, and shall remain, the property of Tenant and that the Dish is not, and the installation of the Dish shall not cause the Dish to become, a fixture pursuant to this lease or by operation of law.  Tenant shall have no obligation to make payment of any rent, license fee or other consideration because of the rights granted to Tenant pursuant to this paragraph. Landlord shall not permit any other entity to install, anywhere in the Shopping Center, any telecommunication or other equipment which interferes with the proper function of Tenant's Dish.

Section 10.5. **Landlord's Repairs.** Landlord agrees to make all repairs (including replacements where necessary) (i) to the Common Facilities of the Shopping Center pursuant to Sections 6.1 and 8.4; (ii) to all wiring, plumbing, pipes, conduits and other water, sewerage, utility and sprinkler fixtures and equipment including, without limitation, all connections with and components of any private sewerage system) serving the demised premises which are located outside of the demised premises or elsewhere in the Shopping Center, and (iii) to the demised premises, to the extent the same are necessitated by any act, negligence or default under this lease by Landlord or any of its agents, employees, contractors or licensees.

## ARTICLE XI

### TENANT'S MISCELLANEOUS OBLIGATIONS

Section 11.1. **Payment Obligations.** Tenant agrees that it will pay the rent and other charges reserved hereunder promptly when due and that it will remain liable for the same notwithstanding any assignment of the lessee interest or any subletting of the term or the premises, Landlord agreeing that any sums paid by any such assignee or sublessee shall be credited against Tenant's liability herefore. Tenant agrees to pay for its own utilities, water, heat and air conditioning; and to pay sewer "taxes" or sewer use charges (but not sewer entrance fees, so-called) measured by the consumption of water in the demised premises or measured by the area thereof, or by some other means reasonably related to Tenant's use of the sewer system.

Section 11.2. **Licenses and Permits.** Tenant covenants that it will procure any license or permit required by law for any use made of the demised premises and that it will pay Landlord any increases in Landlord's fire insurance premiums which are attributable to any use of the demised premises for a purpose other than the conduct of a retail business. Landlord shall be liable for or shall reimburse Tenant for any increases in Tenant's fire insurance premiums which are attributable to any business operation conducted by other tenants of the Shopping Center.

Section 11.3. **Snow and Refuse Removal.** Tenant agrees that it will keep and maintain the sidewalks adjacent to the demised premises reasonably free of snow, ice and refuse; and that it will store all refuse within the demised premises (or, at Tenant's election, in closed containers outside and at the rear thereof) and arrange for regular refuse disposal. Tenant shall also have the right to install and use rubbish compactors outside the demised premises in the locations shown on <u>Exhibit A</u>. Landlord shall require all other lessees and occupants of the Shopping Center to comply with the provisions of this Section with respect to their premises.

Section 11.4. **Tenant's Work.** Tenant agrees at any time, and from time to time, to pay promptly when due the entire cost of any work undertaken by Tenant in, on or to any part of the demised premises (Tenant reserving the right, however, in good faith to contest its liability for such costs); to promptly secure the discharge of record of any lien imposed with respect

{AZC0372.DOC / 9)

to such work; to procure and pay for all necessary insurance (including builder's risk, so-called) and permits before undertaking such work (Landlord agreeing to execute promptly and without charge to Tenant any instrument of approval which may be required in connection with any such permit); and to do all of such work in a good and workmanlike manner, employing materials of good quality and complying with all applicable governmental requirements.

Section 11.5.   Landlord's Right of Entry.   Tenant agrees that it will permit Landlord to enter the demised premises at reasonable times to show the same to prospective purchasers and lenders and to exercise Landlord's rights and discharge Landlord's obligations under this lease.   Landlord agrees that no entry by it shall result in unreasonable interference with the conduct of business in the demised premises and that if any such entry shall require or result in the suspension of Tenant's business, the rent and other charges payable by Tenant hereunder shall be abated in the same manner and to the same extent as provided in the case of damage by fire.   Landlord further agrees that no forcible entry will be made except to prevent injury to persons or substantial damage to property and that no entry will be made outside of Tenant's business hours except after written, oral or telegraphic notice (as may be appropriate in the circumstances) to Tenant's store manager or other agent designated by Tenant to receive such notice.

Section 11.6.   Yield-Up.   At the end of the term, Tenant shall peaceably yield up the demised premises to Landlord, in good order, repair and condition, except for those matters set forth in Article X as limitations on Tenant's repair obligations.   Tenant shall not be required to remove or undo any installation, erection, alteration or addition made in, on or to the demised premises except as provided in Article XIII.

ARTICLE XII

INDEMNIFICATION; LIABILITY INSURANCE

Section 12.1.   Indemnification by Tenant.   Beginning with the Effective Date of this Amendment and Restatement of Lease, Tenant shall defend and save Landlord harmless and indemnified from and against all bodily and personal injury, loss, claims or damage to any person or property while in the demised premises (unless occasioned by the act or negligence of Landlord, its employees, agents, licensees or contractors or by a default in the proper performance of Landlord's obligations under this lease); and, from and after the execution of this lease, Tenant shall defend and save Landlord harmless and indemnified from and against all bodily and personal injury, loss, claims or damage to any person or property anywhere in the Shopping Center, including the Common Facilities, which is occasioned by any act or negligence of Tenant, its employees, agents, licensees (other than customers) or contractors, or by a default in the proper performance of Tenant's obligations under this lease.

Section 12.2.   Indemnification by Landlord.   Beginning with the Effective Date of this Amendment and Restatement of Lease, Landlord shall defend and save Tenant harmless and indemnified from and against all bodily and personal injury, loss, claims or

damage to any person or property while on or about the Common
Facilities, unless occasioned by the act or negligence of
Tenant, its employees, agents, licensees (other than customers)
or contractors, or by a default in the proper performance of
Tenant's obligations under this lease; and, beginning with the
execution of this lease, Landlord shall defend and save Tenant
harmless and indemnified from and against all bodily and
personal injury, loss, claims or damage to any person or
property anywhere in the Shopping Center, including the demised
premises, which is occasioned by any act or negligence of
Landlord, its employees, agents, licensees or contractors, or by
a default in the proper performance of Landlord's obligations
under this lease.

   Section 12.3.   Tenant's Liability Insurance   Tenant shall

   Section 12.4.   Landlord's Liability Insurance.   Landlord

   Section 12.5.   Certificates.   Each party shall deposit with
the other certificates of the insurance which such party is
required to maintain under this Article at or prior to the
execution date of this Amendment and Restatement of Lease, and
thereafter within ten (10) days prior to expiration of each such
policy.  The insurance required hereunder may be maintained
under a "blanket policy" but no insurance policy required to be
maintained by any party shall be canceled or changed without at
least ten (10) days' prior written notice to the other party.
All insurance under this Article shall be maintained with
responsible insurance companies qualified to do business in the
state in which the demised premises are located.

{AZC0372.DOC / 9}

ARTICLE XIII

TENANT'S FIXTURES AND EQUIPMENT

All furniture, furnishings, fixtures and equipment, and all other erections, installations, alterations and improvements placed in or on or made in, on or to the demised premises by or at the expense of Tenant (or by or at the expense of anyone occupying space in the demised premises) and which are susceptible of being removed without substantial physical injury to the demised premises shall remain the property of Tenant or such occupant, and Tenant (or such occupant) may remove the same or any part thereof at any time or times during the term hereof. Tenant shall, however, repair any damage to the demised premises occasioned by such removal, if such damage shall have been caused by the failure of Tenant to use reasonable care in the course of the removal. Tenant shall remove such property from the demised premises within twenty (20) days after the end of the term.

ARTICLE XIV

SIGNS

Section 14.1. Tenant's Signs. Tenant shall have the right at its expense and in conformity with applicable law to erect signs on the exterior and interior of the demised premises. Such signs shall not be flashing or moving but may be of such other type and of such size and degree of illumination as Tenant may elect. Tenant shall not paint signs on or affix paper signs to any part of the exterior of the demised premises except the windows thereof. Tenant also shall have the right to erect, maintain and, from time to time, replace in the Common Facilities of the Shopping Center signs of reasonable size designating Tenant's parcel pick-up station(s). Following the execution of this lease, Tenant shall have the right, at its expense and in conformity with applicable law, to erect a sign on the land constituting the Shopping Center, announcing that Tenant will occupy expanded premises in the Shopping Center. Tenant may continue to maintain such sign on the site until the completion of the construction of the demised premises, but Tenant shall relocate or remove such sign if its continued maintenance will interfere unreasonably with the progress of Landlord's Work.

Section 14.2. Shopping Center Sign. There is currently a pylon sign (the "Pylon Sign") at the Danbury Road entrance (as shown on Exhibit A) advertising the Shopping Center with the name "Copps Hill Plaza" at the top thereof and a tenant identification panel for Kohl's Department Stores ("Kohls"). Subject to applicable law and the obtaining of the necessary permits from the Town of Ridgefield, Landlord shall attempt to replace the existing Pylon Sign with a new Pylon Sign, with the name "Copps Hill Plaza" thereon, in approximately the same location as the existing Pylon Sign. If the Town allows additional tenant identification panels on the new Pylon Sign, Tenant's panel shall be the highest panel other than any panel for Kohl's, and Tenant's identification panel shall consist of 40% of the square footage allocated to the tenant identification

panels for Kohl's and Tenant if the Town allows different sizes
for the tenant identification panels. The Pylon Sign shall not
be removed, relocated or altered (other than for the change of
panels, from time to time, to provide for the loss of tenants or
to advertise other tenants) without the prior written approval
of Tenant. Neither Landlord, Tenant nor any other occupant of
the Shopping Center shall cause, permit or suffer to be erected
any other sign on the perimeter of the Shopping Center or a free
standing sign anywhere in the Shopping Center.

Section 14.3. Sign Standards. No exterior signs shall be
erected or placed on any other premises in the Shopping Center
except non-flashing and non-moving signs which, in size and
number, shall have a reasonable relationship to the premises to
which they relate, as compared with the relationship between the
demised premises and the size and number of the exterior signs
thereon. Neither Landlord nor any tenant or occupant of the
Shopping Center shall paint signs on or affix paper signs to any
part of the exterior of the buildings in the Shopping Center, or
on any windows. All exterior signs shall be placed upon the
marquee or against the parapet of each store, and the highest
point on any such sign shall be no higher above the ground than
the highest point on Tenant's highest sign. Notwithstanding any
of the foregoing provisions of this Article, any national or
regional "chain store" tenant may have a reasonable number of
signs designating its parcel pick-up station(s) (if any) and
non-moving, non-flashing signs on the exterior of its store of
the same number, size, design and degree of illumination as are
customarily utilized by it for a majority of its other stores of
substantially the same size.

Section 14.4. Signs on Exterior of Demised Premises.
Landlord shall not cause or permit any signs other than Tenant's
signs to be placed on the exterior or roof of the demised
premises.

ARTICLE XV

FIRE AND CASUALTY; INSURANCE; EMINENT DOMAIN

Section 15.1(a). Fire Insurance. From and after the
Commencement Date, Tenant shall maintain with respect to the
demised premises fire insurance (with "special coverage" or "all
risk" endorsements including "differences in condition,
including flood and earthquake" and "change in building code
requirements" endorsements) in an amount not less than the full
replacement cost thereof. For the purposes of this Section the
demised premises shall be deemed to include, without limitation,
improvements to the realty which may, from time to time, be made
(whether by Tenant or others), such as painting, light fixtures,
floor coverings, partitions, and signs, to the extent the same
are customarily insurable as a part of the realty and may be

restoration of the demised premises, together with any
additional funds required, but any surplus proceeds shall belong
to Tenant. Notwithstanding the foregoing, so long as Tenant
and/or any guarantor of this lease maintains an aggregate net

{AZC0372.DOC / 9}

required evidence of Tenant's and/or of said guarantor's aggregate net worth a certificate signed by a financial officer of Tenant stating the then aggregate net worth of Tenant and/or of said guarantor.

Section 15.1(b)(i).  **Waiver of Subrogation.**  Each policy of insurance maintained by Tenant (whether or not required under the provisions of this lease) with respect to the demised premises or with respect to any property or improvements therein shall include provisions by which the insurance carrier(s) (A) waive(s) all rights of subrogation against Landlord (and against all those for whom Landlord may be legally responsible) on account of any loss payable under the policy and (B) agree(s) that the policy will not be invalidated because the insured (in writing and prior to the occurrence of any loss under the policy) has waived part or all of its right(s) of recovery against any party on account of any loss or damage covered by the policy.  If Tenant is unable to procure the inclusion of either of the clauses described in the next-preceding sentence, Tenant shall name Landlord as an additional insured in the policy.

Section 15.1(b)(ii).  If Landlord is named as an insured in any policy maintained by Tenant [as required under Section 15.1(b)(i)], Landlord shall have no right to participate in the adjustment of any loss thereunder or to receive any of the proceeds of such insurance, and Landlord shall promptly endorse to Tenant's order (without recourse) any check or other form of payment made on account of any loss under such policy.  Landlord hereby irrevocably waives any and all rights in and to any such payment, except rights deriving from the provisions of Section 15.1(a).

Section 15.1(b)(iii).  Landlord hereby waives any and all rights of recovery which it might otherwise have against Tenant, its agents, employees and other persons for whom Tenant may be responsible, for any loss or damage to Landlord's property, or any other part of the Shopping Center, if the casualty is covered by any policy of insurance maintained, or required to be maintained by Landlord (or, if no insurance is maintained or required to be maintained, then such waiver shall apply to casualties covered by fire insurance and broad form extended coverage, including vandalism and malicious mischief), even though that loss or damage results from the negligence, willful act or default under the terms of this lease by Tenant, its agents, employees, contractors or other persons for whom Tenant may be responsible.

Section 15.1(b)(iv).  Tenant hereby waives any and all rights of recovery which it might otherwise have against Landlord, its agents, employees and other persons for whom Landlord may be responsible, for any loss or damage to the demised premises or to Tenant's property or improvements in the demised premises, if the casualty is covered by any policy of insurance maintained, or required to be maintained by Tenant (or, if no insurance is maintained or required to be maintained, then such waiver shall apply to casualties covered by fire

{AZC0372.DOC / 9}

insurance and broad form extended coverage, including vandalism and malicious mischief), even though the loss or damage results from the negligence, willful act or default under the terms of this lease by Landlord, its agents, employees, contractors, or other persons for whom Landlord may be responsible.

Section 15.1(b)(v). Landlord agrees that the insurance policies maintained by Landlord with respect to other portions of the Shopping Center shall contain provisions or endorsements substantially similar to those described in Section 15.1(b)(i), so that Tenant's liabilities shall be limited in the same manner as Landlord's liabilities are to be limited pursuant to the provisions of Section 15.1(b)(i) and its subdivisions. Tenant agrees that if Landlord names Tenant as an additional insured in any policy maintained by Landlord [under circumstances like those requiring Tenant to name Landlord as an additional insured in Tenant's fire insurance policy, as provided in Section 15.1(b)(i)], Tenant shall have no right to participate in the adjustment of any loss under any such policy or to receive any of the proceeds of such insurance. Tenant shall promptly endorse to Landlord's order (without recourse) any check or other form of payment made on account of any loss under any policy maintained by Landlord and naming Tenant as an additional insured, as provided herein, Tenant hereby irrevocably waiving any and all rights in and to any such payment.

Section 15.1(c)(i). Certificates. Not less than ten (10) days prior to the Commencement Date (and thereafter not less than ten (10) days prior to the expiration of each such policy), each party shall deliver to the other a certificate of each policy (and of each endorsement thereon) which is required by this Article to be carried by such party. No such policy shall be canceled or changed without at least ten (10) days' prior written notice to the other party.

Section 15.1(c)(ii). Tenant shall give Landlord written notice, from time to time, as Landlord may reasonably request, setting forth in reasonable detail a description of all insurance policies maintained by Tenant which are affected by the provisions of Section 15.1(b) and its subdivisions, and, promptly after any such change occurs, Tenant shall give Landlord written notice of any cancellation (or change in the terms of) any such policy or endorsement thereof which would affect Landlord's rights or liabilities under Section 15.1(b) or any of its subdivisions.

Section 15.2. Restoration Obligations. If at any time during the term hereof, the demised premises shall be damaged or destroyed by fire or other casualty, and if this lease is not terminated by Tenant pursuant to Section 15.3 hereof by or because of such damage or destruction, Tenant, with due diligence after settlement of the loss, shall commence to repair the demised premises, and shall restore with reasonable due diligence the same to their condition prior to such fire or casualty with any changes desirable to Tenant in connection with its use of the same, so long as any exterior changes are architecturally compatible with the other buildings existing at that time in the Shopping Center and do not adversely affect the Shopping Center's utility systems. There will be no abatement

of rent under this lease by reason of any fire or other casualty
to the demised premises.

Section 15.2(a).  Abatements.  If at any time during the
term, (i) the whole or any part of the demised premises shall be
appropriated by a taking by eminent domain (whether or not by
public authority) or by act of or pursuant to public authority
(with or without a formal taking) or (ii) the whole or any part
of the Common Facilities are destroyed or damaged by fire or
other casualty or the whole or any part of the Common Facilities
or right appurtenant thereto shall be destroyed or damaged or
appropriated by a taking by eminent domain (whether or not by
public authority) or by act of or pursuant to public authority
(with or without a formal taking), then in each such case the
rent and the other charges payable by Tenant shall be fairly and
equitably abated in an amount proportional to the extent of
interference to the business conducted in the demised premises
at the time of the destruction, damage, or appropriation, as the
case may be, and the extent to which said Common Facilities have
been thereby rendered unfit for their intended purposes, as well
as the extent to which the demised premises have thereby been
rendered unfit for the conduct of such business.  Such abatement
shall come into effect on the date on which the destruction,
damage or appropriation occurred, as the case may be, and shall
continue in effect until Tenant has restored the demised
premises and Landlord has restored said Common Facilities to
their prior condition (taking into account any takings by
eminent domain) and for any further period (not in excess of
ninety (90) days) which Tenant, in the exercise of reasonable
diligence, may require to open the restored portion of the
demised premises for business in the normal manner; or, if this
lease is terminated because of the destruction, damage or
appropriation, as the case may be, until the termination date;
except that any abatement of rent and other charges which
results from a taking of the demised premises by eminent domain
or an act of or pursuant to public authority shall continue in
effect for the balance of the term, appropriately reduced in
amount to reflect the effect of both Landlord's and Tenant's
restoration work, as the case may be.

Section 15.2(b).  If any part or all of the term is
appropriated, the rent and other charges payable by Tenant under
this lease and all other obligations of Tenant under this lease
shall be wholly abated.  Such abatement shall come into effect
on the date on which the appropriation is made and shall
continue in effect for the period described in Section 15.2(a),
but the provision (set forth in the last sentence of that
Section) for a continuation of the abatement for the balance of
the term shall not be applicable to an abatement under this
Section.

Section 15.3.  Termination Rights; Fire.  Tenant shall have
the right to terminate this lease, if, after the execution of
this lease, the demised premises are destroyed or damaged by
fire or other casualty to the extent of at least 35%, 25% or 15%
of the total cost of replacing them, during the third-last,
second-last or last year, respectively, of the original term or
of an extension period.  Tenant's termination rights under this
Section shall be exercised by written notice to Landlord sent
within thirty (30) days after the occurrence of the destruction

{AZC0372.DOC / 9}

50

or damage. Any termination notice sent by Tenant shall take effect thirty (30) days after mailing thereof. Upon termination as aforesaid by Tenant, this lease and the term hereof and all obligations hereunder not then accrued shall cease and come to an end. However, Tenant's rights to terminate this lease as set forth above may only be exercised if Tenant has maintained the insurance required by Section 15.1(a) hereof and assigns to Landlord all rights to receive insurance proceeds resulting from such destruction or damage.

  Section 15.4(a). Termination Rights; Eminent Domain. If, after the execution of this lease, the whole of the demised premises, or the whole (or an undetermined portion) of the remainder of the original term or of the then current extension period, is taken by eminent domain by any public, quasi public or private authority, or is otherwise appropriated (without a formal taking) pursuant to public authority, this lease shall terminate on the date Landlord is divested of its title to the demised premises, or the date Tenant is divested of the lessee interest herein.

  Section 15.4(b). If, as the direct result of any such taking by eminent domain or any act of or pursuant to public authority, any one or more of the conditions described below shall come into existence after the execution of this lease, Tenant shall have the right to terminate this lease by written notice to Landlord, as provided below. Such termination shall take effect as of the date on which the event giving rise to the termination right occurred. Said conditions are as follows:

  (i) The aggregate of all reductions in the ground floor area of the demised premises resulting from all such takings and acts equals or exceeds fifteen percent (15%) of the original ground floor area of the demised premises; or

  (ii) The aggregate of all reductions in the land area of the Shopping Center resulting from all such takings and acts equals or exceeds fifteen percent (15%) of the land area at the time this lease was executed; or

  (iii) The aggregate of all reductions in the paved parking areas of the Common Facilities resulting from all such takings and acts equals or exceeds fifteen percent (15%) of the original area or original capacity of either, measured either by the number of parking stalls or by land area; or

  (iv) Reasonable, direct passage on foot between the demised premises and the paved parking areas of the Common Facilities shall be permanently prevented or substantially impeded; or

  (v) The demised premises or the Shopping Center shall be permanently deprived of reasonable, direct access on foot or by vehicle, to or from any public way adjoining the Shopping Center; or

  (vi) A specific part, twelve (12) months or more (but less than the whole), of the original term, or of the then current extension period, shall be taken or appropriated as aforesaid.

{AZC0372.DOC / 9}

Section 15.4(c). Landlord shall give Tenant written notice in reasonable detail of each taking and each act of or pursuant to public authority described in Section 15.4(a) and 15.4(b). Tenant's termination rights under Section 15.4(b) shall be exercised by written notice to Landlord sent within thirty (30) days after receipt of Landlord's notice of the relevant facts, or, if Landlord fails to give Tenant the required notice, within ninety (90) days after Tenant's first receipt of notice of the relevant facts from a responsible source.

Section 15.4(d). Notwithstanding the termination of this lease under this Section 15.4, Tenant, at its election, may nevertheless (to the extent permitted by law) continue to occupy the demised premises, use the Common Facilities and enjoy and exercise all of its rights and privileges under this lease for all (or for such part as Tenant elects) of the period between the taking or act and the date on which the authority which made the taking or performed the act shall evict Tenant, or the date on which Tenant or those having business with it in the Shopping Center shall be prohibited from using the taken access or the taken passageway. No prior notice of the duration or the termination of such period of occupancy shall be required of either Landlord or Tenant. During such period of occupancy, to the extent permitted by law, so long as Landlord shall have the right to collect rent or use and occupancy charges for the demised premises, the obligations of Landlord and Tenant under this lease shall continue in effect, as if the lease had not been terminated, except that (i) the term of this lease shall be the period described above in this Section 15.4(d); and (ii) the rent and other charges payable by Tenant shall be abated in accordance with the provisions of Section 15.2; and (iii) rent and parking area charge payments under Articles IV and VI shall be made on the last day of the month, in arrears; and (iv) Tenant shall receive full credit against any payments due to Landlord hereunder for all sums paid or payable by Tenant to the taking authority. If after any such termination, any such taking or appropriation shall become ineffective for any reason, then at Tenant's election to be exercised by written notice to Landlord within thirty (30) days thereafter, this lease shall continue in full force and effect, unless Tenant shall theretofore have vacated and surrendered the demised premises to Landlord.

Section 15.4(e). Landlord reserves to itself, and Tenant assigns to Landlord, all rights to damages accruing as the result of any such taking or act (including without limitation any taking of Tenant's leasehold), excepting, however, rights to damages payable solely for the demised premises or any leasehold improvements or trade fixtures installed by or on behalf of Tenant (or anyone claiming under Tenant) and excepting rights to damages (other than damages accruing because of the loss of or injury to the lessee interest herein) which are considered "special damages" to Tenant, such as an award for moving expenses. Tenant agrees to execute and deliver to Landlord such instruments confirming the foregoing assignment as Landlord may reasonably require. If this lease is terminated under this Article because of any such taking or act, Landlord shall pay Tenant, to reflect Tenant's reservation of rights to damages set forth in the first sentence of this Section, out of the damages awarded to Landlord by reason of such taking or act, an amount

equal to the Tenant's net book value for the demised premises
and any other improvements made to the demised premises by or on
behalf of Tenant (or anyone claiming under Tenant).  If this
lease is not terminated by reason of such taking or act, Tenant
shall apply all proceeds of such award received by Tenant from
Landlord, together with additional funds required, to the
restoration of the demised premises, and to effectuate the
foregoing, Landlord shall pay Tenant, out of Landlord's award,
an amount equal to Tenant's net book value for the portion of
the demised premises and any improvements thereto so taken.
Tenant's net book value for the foregoing items shall be
determined from Tenant's federal income tax returns.  Tenant
shall repair and restore and rebuild what may remain of the
demised premises to a complete architectural unit for use by
Tenant, with any changes desirable to Tenant, so long as any
exterior changes are architecturally compatible with the other
buildings existing at that time in the Shopping Center and do
not adversely affect the Shopping Center's utility systems.

Section 15.5.  **Refund of Unearned Rent**.  If this lease is
terminated under this Article, Landlord shall promptly refund to
Tenant all unearned rent and other charges paid in advance by
Tenant.  Landlord shall also refund to Tenant any overpayment
made by Tenant under Section 15.4(d) promptly after receipt of
Tenant's bill herefore, which shall be accompanied by
reasonably satisfactory substantiating evidence.

Section 15.6.  **Landlord's Restoration Obligations**.  If the
Common Facilities shall be damaged or destroyed by fire or other
casualty or damaged, destroyed or appropriated by any such
taking or act, and if this lease is not terminated by or because
of such damage, destruction or appropriation, Landlord, within

[black redaction bar]

shall commence to repair and restore the Common Facilities to
their condition prior to such damage, destruction or appro-
priation.  Landlord shall diligently proceed with the work of
repair and restoration, in a good and workmanlike manner, using
good materials, so that such work shall be completed within
twelve (12) months after it was commenced.  Landlord's
obligations hereunder shall be limited, in the case of an
appropriation, so as to reflect the unavailability of any of the
land previously occupied by the Common Facilities after the
appropriation.  If Landlord's Work of repair and restoration is
not begun (or completed) by the times herein provided, Tenant
may terminate this lease by written notice to Landlord sent at
any time after the end of said ninety (90) day or six (6) month
period, as applicable (but before Landlord has begun the work),
or at any time after the end of said twelve (12) month period,
but before Landlord has completed the work.  Any such
termination notice shall be effective on the thirtieth (30th) day
after it is sent.  If any other store premises in the Shopping
Center shall be damaged, destroyed or appropriated, as
aforesaid, Landlord shall either, within the periods provided
above, repair and restore the same to their prior condition, or,
at Landlord's sole election, demolish such other premises
(within ninety (90) days after the occurrence of such damage,
destruction or appropriation), in which case Landlord shall lay
out and construct additional paved parking areas or landscaped

areas on the land previously occupied by the demolished buildings. The time for Landlord's commencement and completion of any work of restoration, repair or demolition under this Section shall be extended for delays therein resulting from any cause specified in Section 19.5, if Landlord gives Tenant prompt written notice of such delay at the time of its occurrence. For the purposes of this Section, delays by a taking authority in assuming physical possession of any part of the Shopping Center appropriated by such authority shall be deemed a delay resulting from a cause specified in Section 19.5.

## ARTICLE XVI

### LANDLORD'S REMEDIES

Section 16.1. Termination for Tenant's Default. Each of the following shall be an event of default: (a) Tenant shall fail to pay rent for a period of fifteen (15) days after Tenant's receipt of written notice from Landlord specifying the amount of such rent due and unpaid, and (b) Tenant shall fail to perform or observe any other term or condition contained in this lease and on the part of Tenant to be performed or observed for a period of thirty (30) days after Tenant's receipt of written notice from Landlord of such failure; provided, however, Tenant shall not be deemed in default with respect to any matter which, by its nature, may not be cured within thirty days, if Tenant shall promptly within such thirty-day period commence to cure such default and thereafter diligently prosecute the cure to completion. Upon the occurrence of an event of default, defined as aforesaid, then in any such case, notwithstanding any waiver or other indulgence of any prior default, Landlord may terminate this lease by written notice to Tenant sent at any time thereafter, but before Tenant has cured or removed the cause for such termination. Such termination shall take effect on the last day of the month in which Tenant receives it and shall be without prejudice to any remedy Landlord might otherwise have for any prior breach of covenant.

Section 16.2. Tenant's Damage Payments. If this lease is

Section 16.3. Limitations of Damages. Tenant's obligations to Landlord for any default under this lease shall be limited to payment of the sums provided for herein, payment of the reasonable cost of procuring substitute performance (as, for example, in the case of Tenant's failure to perform one of its repair obligations), and such prohibiting injunctive relief as a court of competent jurisdiction may determine, but Tenant shall never have any liability or responsibility whatever for any consequential or indirect damages, whether proximately or

remotely related to a default by Tenant.  Landlord hereby waives all rights of distraint and distress and all other rights, title and interest in and restrictions and encumbrances on all Tenant's alterations, fixtures, improvements, signs and all other property of Tenant, but this waiver is not intended to limit Landlord's right of recovery against Tenant for any loss or damages.

ARTICLE XVII

TITLE AND ZONING

Section 17.1.  Landlord's Title Warranties.  Landlord hereby covenants with Tenant and warrants and represents to Tenant that Landlord is the record owner of the Shopping Center in fee simple absolute.  Landlord further covenants with Tenant and also warrants and represents to Tenant as follows:

(a)  that the Shopping Center, the demised premises, and all rights of Tenant hereunder are free and clear of all encumbrances and restrictions (whether contained in deeds, leases or other instruments or agreements), except those described in Exhibit B; and

(b)  that this lease is and shall remain a first lien on the demised premises and the Common Facilities, subject only to any mortgage to which this lease may be subordinated in accordance with the terms of this lease, to real estate taxes not yet due, to the rights of others (as set forth in this lease) to use the Common Facilities, and to the matters described in Exhibit B; and

(c)  that Landlord and each person executing this lease on behalf of Landlord (or in any representative capacity) have full right and lawful authority to execute this lease; and

(d)  that there is no legal prohibition or materially adverse interference (whether arising out of any matter described in Exhibit B, or out of any building, zoning, fire, health or safety law, or otherwise) to the construction and use of the demised premises, the Common Facilities and the Shopping Center for retail use purposes and in accordance with the provisions of this lease, or to the exercise and enjoyment by Tenant of its rights and privileges under this lease; and

(e)  that, as of the Commencement Date, Landlord shall have complied with all federal, state and local environmental laws, ordinances and regulations applicable to the demised premises (as a building rather than for any particular use) and applicable to the Shopping Center, so that the Shopping Center and the business to be conducted by Tenant from the demised premises may be operated in a normal manner and without hindrance or molestation from any person or entity on account of any failure to comply with any of the same; and

(f)  that Landlord will not make or enter into any agreement or lease which is inconsistent with any of Tenant's rights or privileges under this lease; and

{AZC0372.DOC / 9}

(g) neither the Shopping Center, nor the demised premises, nor the construction thereof, shall be financed by or be subject to (nor is presently financed by or subject to) any private activity bonds or similar debt instruments as described in Section 141(a) of the Internal Revenue Code of 1986, as amended (the "Code") (or any successor provision thereto), nor any security interest given in connection therewith, which may, pursuant to any governmental law, ordinances or regulations, require or impose (i) any restriction, condition, or limitation whatsoever upon or with respect to any capital expenditures which may be made by Tenant and/or any parent, subsidiary, affiliate or related person (as defined in the Code) of Tenant, or (ii) any obligation to file any reports or returns with respect thereto, or (iii) could result in the allocation of any so-called tax exempt financing to Tenant as a result of which Tenant could be considered a "test period beneficiary" with respect to the demised premises or the Shopping Center pursuant to Section 144(a)(10)(D) of the Code (or any successor provision thereto); and

Landlord acknowledges that Tenant has relied on each of the foregoing covenants, warranties and representations in executing this lease, and that each of the same is material.

Section 17.2. Tenant's Remedies. If (i) any warranty or representation contained in Section 17.1 shall prove to be false, or if (ii) a combination of "Landlord Failure" (defined below) and any change in applicable law shall have a material, adverse effect on Tenant's right to conduct in the demised premises a food supermarket business, a so-called "Super Store", a food/drug store/general merchandise business, or the sale of food products for off-premises consumption, or if (iii) Landlord's failure to perform any of its obligations under this lease shall prevent or materially adversely affect Tenant's use and enjoyment of the demised premises or the Common Facilities, then, in any such case, Tenant shall have the right to terminate this lease by written notice to Landlord sent at any time thereafter. ("Landlord Failure" means, for purposes of this Section 17.2, the neglect or failure of Landlord to take commercially reasonable action if necessary and if practicable in order that such change in law not have the effect set forth herein. By way of example only, if a change in law results in a "grandfathering" of the demised premises and if the change in law requires restoration in the case of an eminent domain taking within a specified time in order to preserve the "grandfathering" aspects, there would be a Landlord Failure if Landlord did not comply with such requirement). Tenant's termination notice shall take effect on the sixtieth (60th) day after Tenant sends the notice, unless the default or other condition justifying Tenant's termination has been cured or removed prior to that day; provided, however, that if such cure or removal cannot reasonably be completed within such sixty (60) day period, Landlord shall, within such sixty (60) day period, have commenced and thereafter be diligently prosecuting such cure or removal to completion; provided further, however, that if such cure and/or removal has not been effected within one year following such notice from Tenant, this lease shall terminate as of the expiration of such one year period. The rent and other payments required of Tenant under this lease for the sixty (60) day period (or the portion thereof ending with

(AZC0372.DOC / 9)

the date on which the default or condition shall be cured or removed) shall be abated in proportion to the extent of the injury to the business conducted in the demised premises at the beginning of the period, and Landlord shall refund all unearned rent and other charges paid in advance by Tenant. Notwithstanding the first sentence of this Section 17.2, Tenant shall not have a cancellation right under this Section 17.2 with respect to any direct obligation of Landlord to Tenant hereunder if, under applicable provisions hereof, Tenant has the right of self-help and rent offset.

Section 17.3.   Suspension of Business by Government Order. If Tenant is prohibited from conducting business in the demised premises by any governmental authority having jurisdiction because of any event or any condition of or in the Shopping Center or any part thereof which is not the result of Tenant's act, negligence or default under this lease, and if such prohibition shall continue in effect for more than six (6) months, then the rent and other charges reserved hereunder shall be wholly abated from and after the end of such six-month period.  If such prohibition continues in effect for more than twelve (12) months, Tenant shall have the right to terminate this lease by written notice sent to Landlord at any time after the expiration of such twelve (12) month period, but before the prohibition is ended, and Landlord shall forthwith refund to Tenant all unearned rent and other charges paid in advance by Tenant.  Landlord shall promptly initiate and diligently prosecute to completion any action which may be necessary to abate the condition(s) which gave rise to the prohibition.

Section 17.4.   Title Certificate.  Within fifteen (15) days after receipt of Tenant's request  herefore, Landlord shall deliver to Tenant a current opinion, running to Tenant, of an attorney or title insurance company (each reasonably acceptable to Tenant) setting forth the state of Landlord's title to the Shopping Center, which shall include, without limitation, all encumbrances and restrictions upon the demised premises and Tenant's rights hereunder.

Section 17.5.   Title Insurance.  In addition to and without limiting any of Landlord's covenants, warranties and representations or any of Tenant's remedies under this Article XVII, notwithstanding the present state of Landlord's title to the demised premises and to the Shopping Center, Landlord shall deliver to Tenant, prior to the execution of this lease, at no cost to Tenant, a commitment for a leasehold title insurance policy, issued by a title insurance company reasonably

█████████████████████████████████████████████████

only to matters described in Exhibit B hereto attached.   It shall be a condition precedent of the occurrence of the Commencement Date that, upon payment of the premium, which shall be Tenant's responsibility, the policy described above shall be in full force and effect.

ARTICLE XVIII

[Intentionally Omitted]

{AZC0372.DOC / 9}

## ARTICLE XIX

## MISCELLANEOUS PROVISIONS

Section 19.1. Subordination to Certain Mortgages. Upon the written request of Landlord, Tenant shall enter into a recordable agreement with an institutional lender (as defined in Section 4.1 (vii) hereof) that is the holder of any future first mortgage of the Shopping Center, which shall provide that (a) the lien of this lease shall be subordinated to the lien of such mortgage, (b) in the event of foreclosure of said mortgage (or any other action thereunder by the mortgagee), the mortgagee (and its successors in interest) and Tenant shall be directly bound to each other to perform the respective undischarged obligations of Landlord and Tenant hereunder (accruing after such foreclosure or other action, provided, however, that any and all of Tenant's abatement, offset and similar rights which have accrued before such foreclosure shall continue in full force and effect), (c) this lease shall continue in full force and effect, (d) Tenant's rights hereunder shall not be disturbed, except as in this lease provided, and (e) such mortgagee specifically recognizes the obligation of Landlord to apply fire insurance and taking proceeds for restoration purposes as provided in this lease. If this lease is subordinate to any mortgage of all or part of the Shopping Center, Landlord shall, as a condition precedent to the occurrence of the Commencement Date, either cause the holder of such mortgage to enter into an agreement with Tenant which meets the requirements of this Section 19.1, or Landlord shall cause such mortgage to be paid and discharged of record. The word "mortgage" as used herein includes mortgages, deeds of trust and all similar instruments, all modifications, extensions, renewals and replacements thereof, and any and all assignments of the Landlord's interest in this lease given as collateral security for any obligation of Landlord, and provided further that, with respect to any undischarged obligation of Landlord which is on-going after such foreclosure, such as, by way of example, a Common Facilities repair, the mortgagee and its successors in interest shall be liable for damages or injuries arising after such foreclosure.

Section 19.2(a). Self Help Rights. If either Landlord or Tenant defaults in making any payment to or for the benefit of the other (whether required by this lease or otherwise) or in the performance of any other obligation imposed on it by this lease, and shall not cure such default within thirty (30) days after written notice thereof (or, if the default requires more than thirty (30) days to be cured, if the defaulting party does not begin to cure the default within that period and then diligently prosecute the cure to completion), then the aggrieved party (without waiving any claim of breach or for damages) at any time thereafter may make such payment or cure such other default for the account of the defaulting party. If necessary to protect the interest of either party in the Shopping Center or the demised premises, or to prevent the interruption of business in the demised premises (including, without limitation, interruption which may result if snow is not removed promptly from the paved parking

{AZC0372.DOC / 9}

58

areas), or to prevent injury to persons or damage to property, either party may cure a default by the other prior to the expiration of the waiting period but after oral or written notice to the other party.

Section 19.2(b). Any amount paid or contractual liability



Section 19.3. Covenant of Quiet Enjoyment. Landlord covenants with Tenant that, if Tenant shall pay the rent and perform all of the other obligations imposed on it herein, Tenant shall and may peaceably and quietly have, hold, occupy and enjoy the demised premises and all of Tenant's rights and privileges hereunder without hindrance or molestation of any kind.

Section 19.4. Application to Extension Periods. All of the provisions of this lease shall apply during any extension of the original term, except as specifically provided to the contrary elsewhere in this lease.

Section 19.5. Force Majeure. The time for the performance of any act required to be done by either party shall be extended by a period equal to any delay caused by or resulting from act of God, war, civil commotion, fire, casualty, labor difficulties, shortages of labor or materials or equipment, governmental regulation, act or default of the other party, or other causes beyond such party's reasonable control (which shall not, however, include the availability of funds), whether such time be designated by a fixed date, a fixed time or otherwise.

Section 19.6. Holdover. If Tenant continues in occupancy of the demised premises after the end of the term, as the same may be extended pursuant to Section 3.2 hereof, such occupancy shall not be deemed to extend or renew the term of this lease. Such occupancy shall be deemed a tenancy at will, from month to

end of the term, prorated and payable in arrears at the end of each month for the period of such occupancy. Landlord agrees, however, that Tenant shall not be required to give any prior notice of the termination of such tenancy at will or of Tenant's occupancy under this Section.

{AZC0372.DOC / 9}

Section 19.7.  Waiver.  Neither the failure of a party to complain of any act or omission on the part of the other party (however long the same may continue), nor the payment or acceptance of rent, nor the performance of any obligation, shall be deemed to be a waiver of any rights hereunder or of the right to recover the amount of any payment or the cost of any performance made or done under protest, whether or not such protest was made in writing.  No waiver by either party shall be effective unless in writing and signed by the party asserted to have made such waiver.  No waiver of any breach of any provision of this lease shall be deemed a waiver of a breach of any other provision of this lease or a consent to any subsequent breach of the same or any other provision.  If any action by either party shall require the consent or approval of the other party, the grant of such consent or approval on any one occasion shall not be deemed a consent to or approval of that action on any subsequent occasion or of any other action on the same or any subsequent occasion.  Each right and remedy which either party may have under this lease or by operation of law shall be distinct and separate from every other such right and remedy; all such rights and remedies shall be cumulative, and none of them shall be deemed inconsistent with or exclusive of any other, whether or not exercised; and any two or more or all of such rights and remedies may be exercised at the same time or successively.

Section 19.8.  Tenant's Business Activities.  Nothing contained in this lease shall be deemed or construed to impose any affirmative obligation on Tenant to make any particular use of the demised premises, or any use thereof at all; and nothing in this lease contained shall be deemed or construed to require Tenant to keep the demised premises open for the conduct of any business during any particular hours, or on any particular days, or at all, or to restrict Tenant's business activities outside the Shopping Center.

Section 19.9.  Costs of Performance.  Wherever this lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 19.10.  Notices.  Except as provided elsewhere in this lease, all notices required hereunder shall be in writing and shall be sent by certified or registered mail, return receipt requested or by national, overnight express courier service (to the extent such service can make delivery to a Post Office Box).  Any written notice shall be deemed to have been given when mailed and shall be effective when given, except as specifically otherwise provided in this lease.  Any notice hereunder shall be deemed to have been received on the delivery date endorsed by the Postal Service on the return receipt, except that any notice which is (according to the terms of this Section 19.10) correctly addressed but which is returned by the Postal Service as undeliverable shall be deemed to have been received on the earliest date on which the Postal Service attempted delivery as indicated by Postal Service endorsement on the return receipt form.  Notices intended for Landlord shall be mailed to Landlord c/o Samuels & Associates, 333 Newbury Street, Second Floor, Boston, Massachusetts 02115, Attention: Property Management Department, with a copy mailed in the same manner to

{AZC0372.DOC / 9}

James H. Shulman, Esquire, Murtha, Cullina, Roche, Carens &
DeGiacomo LLP, 99 High Street, Boston, Massachusetts 02110.
Notices intended for Tenant shall be mailed to Tenant,
Attention:  Vice President of Real Estate Law, Post Office Box
1942, Boston, Massachusetts 02105 with a copy, mailed in the
same manner to Tenant, Attention: Senior Vice President, Real
Estate, Post Office Box 1942, Boston, Massachusetts 02105.
Either party, by written notice to the other, may designate
other (and additional) addresses to which notices for the
designating party shall be sent.  Notwithstanding any assignment
or subletting, copies of any notice to the holder of Tenant's
interest hereunder alleging default shall always be sent to the
Tenant named herein, and Landlord shall always accept payment or
performance from the Tenant named herein.  Each party agrees
that notices to such party ("Receiving Party") may be given to
the Receiving Party by the attorney for the other party
("Sending Party") acting on behalf of the Sending Party.

     Section 19.11.  Partial Invalidity.  If any provision of
this lease or the application thereof to any person or
circumstance shall, to any extent, be adjudged invalid by a
court of competent jurisdiction, the remainder of this lease
(and the application of such provision to other persons or
circumstances) shall not be affected thereby.

     Section 19.12(a).  Obligations of Parties.  If the named
Landlord or any successor to the named Landlord is a group or
combination (such as, for example, a group of tenants in
common), rather than a single person or a single corporation,
the covenants and liabilities of Landlord shall be the joint and
several obligations of all the persons and legal entities
comprising such group or combination and may be enforced in a
proceeding brought against one or more of the members of the
group or combination with the same effect as if each member had
been made a party thereto and duly served with process.  Any
pronoun referring to Landlord, Tenant or a third party shall be
read in such number and gender as the context may require.

     Section 19.12(b).  The word "Landlord" shall be deemed to
include each successive holder of the lessor interest in this
lease, and the word "Tenant" shall be deemed to include each
successive holder of the lessee interest in this lease, and the
provisions of this lease shall be binding on and enforceable by
the parties and their respective heirs, devisees, personal
representatives, successors and assigns, as appropriate; but if
the transferee (or prospective transferee) of the lessor
interest herein (other than a mortgagee holding or about to
acquire a contingent or collateral assignment of the lessor
interest) shall execute, acknowledge and deliver to Tenant
(Tenant agreeing to execute, acknowledge and deliver the same
promptly after receiving it) a recordable agreement providing
that the parties thereto, after such transfer, shall be directly
bound to each other to perform the respective undischarged
obligations of Landlord and Tenant hereunder (whether accruing
before or after the transfer), then after the effective date of
such agreement the transferring owner of the lessor interest
shall have no liability to Tenant or any claimant under Tenant
for any act or omission of Landlord occurring after such
effective date.  If the transferring owner of the lessor
interest fails to obtain and deliver such an agreement to

{AZC0372.DOC / 9}

Tenant, the transferee's acceptance of rent shall constitute the transferee's agreement to be bound directly to Tenant to perform the undischarged obligations of Landlord, Tenant hereby agreeing (in consideration thereof) to be bound to the transferee to perform the undischarged obligations of Tenant.  If the original Landlord herein is a fee owner, nothing herein contained shall be deemed to change the relationship of this lease to other than as a direct lease from the fee owner to Tenant, and if the original Landlord named herein is a ground lessee, nothing herein contained shall be deemed to change the status of this lease to other than as a direct lease from the holder of such groundlease interest to Tenant.

Section 19.12(c).  If at any time the lessor interest (or the lessee interest) in this lease shall be held by anyone acting in a fiduciary capacity, then, notwithstanding any other provision of this lease, the Landlord's obligations (or the Tenant's obligations, as the case may be) shall not be binding upon such fiduciary individually or upon any beneficiary or shareholder for whom such fiduciary acts, but only upon such fiduciary in that capacity and upon the estate held by such fiduciary.

Section 19.12(d).  (i) Notwithstanding anything to the contrary contained in this lease, it is specifically understood and agreed that there shall be absolutely no corporate or personal liability incurred by the Landlord, whether the same be a corporation, a limited liability company or an individual, trust, joint venture, tenancy in common, firm, or partnership, general or limited, or on the part of the officers, directors and stockholders of the Landlord, or on the part of the members of any firm, company, partnership or joint venture, or the trustees or beneficiaries or any shareholder, director, officer, joint venturer, partner or member of any trust, or beneficiary or trustee of any trust, with respect to any of the terms, covenants and conditions of this lease, and Tenant shall look solely to the equity of Landlord, to the estate of Landlord in the demised premises, and to Landlord's interest in the Shopping Center and the rents, issues and profits therefrom, for the satisfaction of Tenant's remedies, or for the collection of a judgment (or other judicial process) requiring the payment of money by such Landlord, or in any claims arising out of or related to this lease or any of the terms, covenants and conditions hereof to be observed and/or performed by such Landlord, and no other property or assets of the Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies, and neither the Landlord nor any of its members, trustees, beneficiaries, partnerships, officers, agents or employees shall be personally liable hereunder.  No provision of this Section shall be deemed to excuse any default or other breach on Landlord's part under the lease nor shall any right or remedy of Tenant be thereby otherwise limited or derogated, including without limitation the right of Tenant to specific performance and injunctive relief. Each holder of the Landlord's interest hereunder shall be liable for acts or defaults only during the period of its ownership; provided however that the foregoing shall in no event modify or affect Tenant's rights of offset, deduction, self-help and the like with respect to any default of the holder of the Landlord's

{AZC0372.DOC / 9}

interest in this lease, whether or not occurring during the ownership of the current or of a prior Landlord.

(ii) No provision of this Section 19.12(d) shall operate to limit or derogate from Tenant's rights or remedies as to funds accruing from any eminent domain proceeding or the insurance in the manner described in Article XV of this lease, or as to Landlord's obligations pursuant to Article XXI hereof, or as to clauses insured against, such as, without limitation, claims covered by Landlord's insurance, all of which Landlord shall remain personally liable for (to the extent of such proceeds or award actually received and not applied in accordance with the provisions of this lease), nor shall they render Tenant liable for the obligations or other liabilities of Landlord to others.

(iii) Landlord shall never have any liability or responsibility whatever for any consequential or indirect damages, whether proximately or remotely related to a default by Landlord.

Section 19.13. "No Partnership" Clause. No provision of this lease shall be deemed to render Landlord and Tenant partners or participants in any other type of joint enterprise.

Section 19.14. Brokerage Claims. Landlord shall defend Tenant and hold Tenant harmless and indemnified against all claims for compensation of any kind which are based in any way on the execution of this lease or the negotiations herefore, except claims asserted by Tenant's officers, employees or legal counsel. Tenant warrants and represents (acknowledging Landlord's reliance thereon) that only its officers, employees and legal counsel have acted on Tenant's behalf in connection with such negotiations and execution.

Section 19.15. Estoppel. Upon the reasonable request of either party, at any time or from time to time, Landlord and Tenant agree to execute, acknowledge and deliver to the other, within thirty (30) days after request, a written instrument, duly executed and acknowledged, (a) certifying that this lease has not been modified and is in full force and effect or, if there has been a modification of this lease, that this lease is in full force and effect as modified, stating such modifications, (b) specifying the dates to which the Fixed Rent and additional rent have been paid, (c) stating whether or not, to the knowledge of the party executing such instrument, the other party hereto is in default, and, if such party is in default, stating the nature of such default, (d) whether or not there are then existing any set-offs or defenses against the enforcement of any of the obligations hereunder upon the part of Landlord or Tenant, as the case may be, to be performed or complied with (and, if so, specifying the same).

Section 19.16. Index and Cross References. Any index or table of contents attached to the lease or heading references or title of Articles is used only as a matter of convenience for reference and is not to be deemed part of the lease or used to determine the intent of the parties. Any reference made in this lease to an Article, Section, subsection or other type of subdivision of this lease shall be construed as a reference to

{AZC0372.DOC / 9}

the entire Article (including all of its Sections, subsections and other subdivisions), to the entire section (including all of its subsections and other subdivisions), to the entire subsection (including all its subdivisions) or to the entire subdivision (including all of its further subdivisions), as the case may be, and shall also be construed as a reference to any appendix provision which complements, supplements or modifies the provision referred to.

Section 19.17.  Prior Representations; Prior and Preliminary Agreements.  The parties acknowledge that in the course of negotiating this lease their respective representatives have gradually reached preliminary agreement on the several terms set forth in this instrument.  The parties acknowledge and agree that at all times they have intended that none of such preliminary agreements (either singly or in combination) shall be binding on either party, and that they shall be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the parties, in final form, which has been executed by a duly authorized officer of Tenant (with a corporate vote of Tenant attached) and by Landlord or a duly authorized representative of Landlord.  The parties acknowledge that none of the prior oral and written agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this lease shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this lease.

Section 19.18.  Exhibits and Appendix Incorporated.  The Exhibits and any Appendix attached to this lease shall be deemed a part of this instrument.

Section 19.19.  Guaranty.  All of Tenant's financial obligations under this lease are guaranteed by Tenant's parent corporation, Koninklijke Ahold, n.v., a Netherlands corporation.

Section 19.20.  C.P.I. Adjustments.  If any liability or limit of liability of a party to this lease is to be established by a calculation involving a component which is to be adjusted to reflect changes, increases or decreases, in the general price level, the adjustment will utilize the United States Bureau of Labor Statistics Revised Consumer Price Index, Food at Home, All Urban Consumers, Boston-Salem-Lawrence, Massachusetts (base period 1982-1984  = 100) [the "Index"].  The adjustment shall be effected by multiplying the item to be adjusted by a fraction whose numerator is the Index as of the most recent date prior to the beginning of the period for which the adjustment is to be made (the "Current Index" ) and whose denominator is the Index as of the most recent date prior to the date of this lease ("Original Index"); provided, however, that if the Current Index is less than the Original Index, the adjustment shall not be made in any case where the adjustment is to reflect only increases in the general price level, but shall be made in the case of an adjustment to reflect changes or decreases in the general price level. If the base year used in expressing the Index shall be changed after the execution of this lease, appropriate adjustments in the Current Index shall be made by

the parties so that it will be expressed with reference to the same base year as the Original Index.

## ARTICLE XX

### SALE OF SHOPPING CENTER

Section 20.1.  Right of First Opportunity.  Landlord agrees that it will not sell or otherwise transfer Landlord's fee simple interest in all or any portion of the Shopping Center unless and until Landlord shall have first complied with all of the provisions of this Article XX.

Section 20.2.  Landlord's Offer.  If during the term of this lease Landlord proposes or desires to sell all or any part of the fee simple interest in the Shopping Center, Landlord shall give Tenant written notice of such intention, which notice ("Landlord's Offer") shall set forth all terms and conditions of such proposed sale (including, without limitation, the gross cash price and any payment terms which Landlord is willing to accept) and shall constitute an offer to sell the Shopping Center to Tenant at the gross cash price and upon the terms stated therein.  Landlord's Offer shall be accompanied by a detailed notice regarding all outstanding leases, mortgages, security interests, attachments, tax claims and other pecuniary liens affecting the title to the Shopping Center.

Section 20.3.  Tenant's Acceptance of Landlord's Offer.  Tenant's acceptance of Landlord's Offer shall be by written notice given within forty-five (45) days following Tenant's receipt thereof together with delivery of a check representing ten percent (10%) of the gross cash price contained in Landlord's Offer (the "Deposit").  If Tenant fails, within forty-five (45) days of receipt of Landlord's Offer, to accept Landlord's Offer, or if prior to forty-five (45) days Tenant rejects Landlord's Offer, Landlord shall be free to sell (or enter into a contract to sell) the Shopping Center to anyone for a gross cash price not less than 95% of the gross cash price set forth in Landlord's Offer and upon terms and conditions not more favorable than those set forth in Landlord's Offer for a period of eighteen (18) months following the date of Landlord's receipt of Tenant's rejection of Landlord's Offer or eighteen (18) months following the expiration of the forty-five (45) day period within which Tenant was permitted to accept Landlord's Offer, whichever is earlier.  In the event that Landlord fails to sell (or enter into a contract to sell) the Shopping Center or the part offered for sale within such eighteen-month period, then any sale or transfer occurring thereafter shall be deemed a new proposal to sell, and Tenant shall be entitled to receive a new written offer from Landlord as provided in Section 20.2.  In addition, the provisions of this Article XX shall continue in force and effect notwithstanding any rejection by Tenant of any offer by Landlord on any one occasion and notwithstanding any waiver by Tenant of its rights under this Article XX on any one occasion.

Section 20.4.  Limited Right of First Opportunity.  At such time as Ridgefield Properties, LLC (the "Original Landlord") or any party directly or indirectly owning an interest in the Original Landlord, including specifically Steven B. Samuels or

{AZC0372.DOC / 9}

any spouse, child or parent of his or any affiliate (as hereinafter defined) of the Original Landlord or of any party directly or indirectly owning an interest in the Original Landlord, no longer is the Landlord under this lease, then Tenant's rights under Section 20.3, if its fails to accept Landlord's Offer, shall no longer apply and shall be limited to the following:  If within forty-five (45) days following receipt of Landlord's Offer, Tenant fails to accept Landlord's Offer or Landlord and Tenant fail within said 45-day period to agree on the terms and conditions for Tenant's purchase of the fee simple interest in the Shopping Center, then Landlord shall be free to sell the Shopping Center to anyone thereafter at any time and on such terms and conditions as Landlord shall desire, free and clear of Tenant's rights under this Article XX, provided, however, that any successor Landlord shall be subject to Tenant's rights under Article XX, as limited by this Section 20.4.

The term "affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such first person or entity.  The term "control" means the possession, directly or indirectly, of the power, whether or not exercised, to direct or cause the direction of the management or policies of a person or an entity, whether through the ownership of stock or other equity ownership interest, by contract or otherwise, and the terms "controlled" or "common control" have correlative meanings.

Section 20.5.  Closing Procedures.  The date of closing pursuant to this Article XX shall be the later of (a) the date of closing provided in Landlord's Offer, or (b) the date which is sixty (60) days after Tenant's acceptance of Landlord's Offer.  On the date specified for closing, Landlord shall deliver both the deed conveying the Shopping Center or such part thereof as was offered for sale, and possession of the Shopping Center in the same condition it was in at the time of Tenant's acceptance of Landlord's Offer, reasonable wear and tear excepted, and Tenant shall pay Landlord the price specified in Landlord's Offer, minus the Deposit, making payment in cash or on the terms set forth in Landlord's Offer.  Conveyance shall be made to Tenant or to a nominee designated by Tenant by written notice to Landlord sent not less than seven (7) days prior to the date specified for the delivery of the deed.  The deed shall be a Connecticut special warranty deed (unless otherwise specified in Landlord's Offer), and shall convey a good and clear record and marketable title to the Shopping Center, free from all encumbrances and restrictions except (a) this lease; (b) any other existing leases in the Shopping Center; (c) provisions of local zoning laws; (d) such real estate taxes for the current year as are not yet due and payable on the date of the delivery of the deed; (e) liens for municipal betterments assessed after the mailing of Tenant's acceptance of Landlord's Offer; and (f) any encumbrance either set forth on Exhibit B or set forth (with specificity) in Landlord's Offer.

{AZC0372.DOC / 9}

Section 20.6.  Default Remedies.  In the event that the closing does not occur solely as a result of Tenant's failure to perform its obligation to pay Landlord the amounts required under Section 20.5, unless such failure is because Landlord cannot deliver title or possession of the Shopping Center in accordance with the provisions of Section 20.5, then Landlord shall retain the Deposit as liquidated damages (and not as a penalty) as Landlord's sole right or remedy at law or in equity by reason of Tenant's failure to perform.  In the event that the closing does not occur solely as a result of Landlord's failure to perform its obligations pursuant to Section 20.5, then Tenant shall be entitled to the return of the Deposit or, in the event of a willful failure of Landlord to so perform, Tenant may pursue any and all remedies available to it at law or in equity including but not limited to an action for specific performance.

Section 20.7.  Excluded Transactions.  The provisions of this Article XX shall not apply to (i) any transfers to any affiliates of or parties directly or indirectly owning an interest in Landlord; (ii) to any sale by Landlord and/or its affiliates or parties directly or indirectly owning an interest in Landlord involving at least two properties, one of which is the Shopping Center, or (iii) any mortgage foreclosure sales or deed in lieu of foreclosure given to the holder (or its nominee) of an existing mortgage covering the Shopping Center.

ARTICLE XXI

ASBESTOS AND TOXIC WASTE

Section 21.1.  Asbestos: Toxic Waste.  Landlord represents, warrants, covenants and agrees that none of the buildings and improvements to be constructed by Landlord in the Shopping Center (including the Common Facilities of the Shopping Center) shall contain any asbestos or any building materials containing asbestos nor shall Landlord permit any such materials containing asbestos to be installed within any buildings and improvements constituting the Shopping Center at any time during the term of this lease.  Landlord further represents, warrants, covenants and agrees that, except as otherwise noted in the environmental reports listed on Exhibit E attached hereto, to the best of its knowledge, but without any independent inquiry other than the site assessments listed on Exhibit E that were undertaken at Landlord's request, no portion of the land constituting the Shopping Center (including the surface and subsurface thereof) contains any hazardous materials or oil, as those terms are defined in Connecticut General Statutes Chapter 22(a)-114, et seq., as from time to time amended, and 42 U.S.C.A. 9601, et seq. (hereinafter "Toxic Materials"), nor shall Landlord permit any dumping or storage of Toxic Materials during the term of this lease in violation of applicable law.

Section 21.2.  Indemnification.  Landlord shall indemnify and hold Tenant, its subsidiaries and affiliates, as well as any and all of the agents, servants, employees, officers, directors and trustees of any of them, harmless from and against any and all actions, petitions, orders, claims or demands made, brought or instituted by any and all private parties and/or any and all public agencies or authorities, together with any and all

{AZC0372.DOC / 9}

67

expenses, including attorneys' fees, costs, losses, demands, liabilities or penalties assessed against or incurred by any of them, arising out of or in any way connected with any breach or violation of the foregoing representations, warranties, covenants and agreements by Landlord or any of its agents, servants, employees, invitees or contractors. This agreement shall extend to and be enforceable by Tenant's public liability, health, disability, and worker's compensation insurer(s). In connection with the Landlord's indemnifications hereunder: (i) Landlord agrees to defend any claim or demand brought, or any action, petition, or order filed, against Tenant, its subsidiaries or affiliates, or against any or all of the agents, servants, employees, officers, directors or trustees of any of them, or in which any of the same may be impleaded, at its sole cost and expense, whether any such claim or action is rightfully or wrongfully brought or filed; and (ii) Landlord shall pay, satisfy and discharge any judgments, liens, orders or decrees which may be recovered or filed against Tenant, its subsidiaries or affiliates, or any or all of the agents, servants, employees, officers, directors or trustees of any of them, arising out of any such claim, demand, action, petition or order.

Section 21.3.    Removal and Repair.    In addition to the foregoing, Landlord agrees that in the event any Toxic Materials shall be found within, under or upon the Shopping Center, Landlord shall, forthwith upon receipt of written notice from Tenant, initiate and thereafter diligently prosecute to completion all actions necessary to comply with applicable law for and with respect to all such Toxic Materials.    All such work hereunder shall be performed at Landlord's sole cost and expense in a first class workmanlike manner and in accordance with all requirements of any federal, state or municipal governmental authorities having jurisdiction.    In addition, prior to commencing any work of removal, repair, restoration or any other construction work in connection therewith, Landlord shall submit to Tenant for informational purposes only detailed working drawings showing all such work (and including a schedule indicating the dates on which the various phases of all such work will be commenced and completed).    Notwithstanding the foregoing provisions of this Section, there are specifically excluded from Landlord's obligations under this Section any Toxic Materials present as a result of Tenant's action or the action of those claiming by, through or under Tenant.

Section 21.4.    Abatement.    In the event: (i) Tenant shall be unable to conduct its normal business operations within the demised premises as a result of the presence of any Toxic Materials in, on or under the Shopping Center; or (ii) Tenant shall be prohibited from conducting its normal business operations within the demised premises or any portion thereof by any governmental authority as a result of the presence of any Toxic Materials within the Shopping Center or any improvements constituting the Shopping Center (including the Common Facilities of Shopping Center); or (iii) normal business operations within the demised premises or normal pedestrian and vehicular access to the demised premises and/or the Shopping Center shall be interfered with as a result of any work of removal, repair, restoration or other construction work performed in connection with the removal of any such Toxic Materials then and in any such event, the rent and other charges

{AZC0372.DOC / 9}

68

payable under this lease shall be abated in an amount which
shall be fairly and equitably proportional to the extent of
interference with the business conducted in the demised premises
at the time thereof, and Landlord shall forthwith refund to
Tenant all unearned rent and other charges paid in advance by
Tenant.  If such interference or prohibition shall materially
interfere with the conduct of Tenant's business and shall
continue in effect for a period of twelve (12) months, Tenant
shall have the right to terminate this lease by written notice
sent to Landlord at any time after the expiration of such twelve
(12) month period, but before the interference or prohibition is
ended.  Landlord shall promptly initiate and diligently
prosecute to completion any action which may be necessary to
abate the condition(s) which gave rise to the interference or
prohibition.

    Section 21.5   Tenant's Indemnification.  Tenant hereby
agrees to indemnify and hold Landlord harmless from and against
any and all demands, claims, actions, losses, damages and
liabilities (the "Claims"), together with reasonable attorney's
fees and litigation costs and expenses which may be imposed on,
asserted against or incurred by Landlord arising from or out of
the conduct by Tenant or those claiming under Tenant of business
on the demised premises during the period of Tenant's occupancy
(including the period of any "holdover") relating to the
presence of any Toxic Materials, including, without limitation,
any and all liabilities pertaining to any present or future use
during the period of Tenant's occupancy (including the period of
any "holdover") in violation of any federal, state, local or
other laws relating thereto, and shall take such remediation
action necessary to comply with the applicable law for and with
respect to the same ("Tenant's Fault").  If any action or
proceeding is brought against Landlord by reason of any Claim,
Tenant, upon notice from Landlord, shall defend such action or
proceeding by counsel reasonably satisfactory to Landlord and
Tenant shall pay all reasonable expenses incurred in connection
with defending against such action or proceeding.

    In addition to the foregoing, Tenant agrees that, in the
event any asbestos or any materials containing asbestos or Toxic
Materials shall be found within the demised premises or the
Shopping Center and shall be due to "Tenant Fault", Tenant
shall, forthwith upon receipt of written notice from Landlord,
initiate and thereafter diligently prosecute to completion all
actions necessary to comply with applicable laws for and with
respect to such asbestos or materials containing asbestos and/or
all such Toxic Materials.  All such work hereunder shall be
performed at Tenant's sole cost and expense in a first class
workmanlike manner and in accordance with all requirements of
any federal, state or municipal governmental authorities having
jurisdiction.  In addition, prior to commencing any work of
removal, repair, restoration or any other construction work in
connection therewith, Tenant shall submit to Landlord for
informational purposes only detailed working drawings showing
all such work (and including the schedule indicating the dates
on which the various phases of all work shall be commenced and
completed).  Notwithstanding the foregoing provisions of this
Section, there are specifically excluded from Tenant's
obligations under this Section any asbestos or asbestos

containing materials or Toxic Materials that are present, but
not as a result of Tenant Fault.

IN WITNESS WHEREOF, the parties hereto have executed this
lease under seal as of the day and year first above written.

Witness:                           LANDLORD:

                                   RIDGEFIELD PROPERTIES LLC

                                   By: Samuel & Associates Holdings
                                       LLC, its sole member

                                   By: _____
                                       Steven B. Samuels, its sole
                                       member

Witness:                           TENANT:

                                   THE STOP & SHOP SUPERMARKET
                                   COMPANY

                                   By _____
                                      Richard J. Picariello
                                      Executive Vice President

EXHIBIT A-1

LEGAL DESCRIPTION OF SHOPPING CENTER

BEGINNING AT A POINT ON THE SOUTHERLY STREETLINE OF COPPS HILL ROAD (VARIABLE WIDTH), SAID POINT BEING ON A STONE WALL AND MARKING THE NORTHWEST CORNER OF THE LAND HEREIN DESCRIBED;

THENCE RUNNING ALONG SAID SOUTHERLY STREETLINE OF COPPS HILL ROAD,
N 64°-45'-50" E   80.06 FEET TO A POINT;
N 86°-37'-30" E   370.00 FEET TO A POINT;
S 86°-15'-10" E   150.75 FEET TO A POINT;
S 70°-00'-00" E   147.93 FEET TO A POINT;
S 64°-54'-00" E   305.19 FEET TO A POINT;
S 60°-09'-30" E   87.52 FEET TO A POINT;
ALONG A CURVE TO THE RIGHT, DELTA=76°-14'-20", R=30.00 FEET, L=39.92 FEET, TO A POINT ON THE WESTERLY STREETLINE OF DANBURY ROAD, ROUTE 35 (VARIABLE WIDTH);

THENCE RUNNING ALONG SAID WESTERLY STREETLINE OF DANBURY ROAD, ROUTE 35 (VARIABLE WIDTH);
S 16°-04'-50" W   410.26 FEET TO A CHD MONUMENT W/DISK;
S 16°-17'-50" W   1.08 FEET TO A POINT BEING THE NORTHEASTERLY CORNER OF LANDS N/F OF MARIO MARCHEGGIANI;

THENCE RUNNING ALONG LANDS N/F MARIO MARCHEGGIANI AND ANSHIRDON PROPERTIES, EACH IN PART;
N 68°-06'-00" W   375.00 FEET THROUGH AN IRON PIPE TO A POINT;

THENCE RUNNING ALONG LAND N/F ANSHIRDON PROPERTIES;
S 16°-17'-50" W   200.00 FEET TO A POINT;
S 68°-06'-00" E   15.00 FEET TO A POINT;

THENCE RUNNING ALONG LANDS N/F STEPHEN J. ZEMO AND C.R.B. REALTY CO., EACH IN PART;
S 22°-17'-50" W   188.45 FEET TO A POINT;
S 67°-51'-10" E   46.50 FEET TO A POINT;
S 27°-37'-50" W   195.05 FEET TO A POINT;

THENCE RUNNING ALONG LAND N/F CARL LECHTER AND ADAM BRODERICK CORRAL;
N 49°-38'-40" W   248.88 FEET TO A DRILL HOLE;

THENCE RUNNING ALONG LANDS N/F THOMAS J. McCARTHY AND LOUISE M. BOWMAN, EACH IN PART;
N 10°-13'-20" W   132.07 FEET TO A POINT;
N 66°-05'-20" W   60.98 FEET TO A POINT;
N 68°-37'-20" W   75.18 FEET TO A POINT IN A STONE WALL;

THENCE RUNNING ALONG LANDS N/F KAREN PACH, GIRI VAIDYANANTHAN, WILLIAM R. & LISA K. SCALA, LEUNG CHUNG-TUNG, FRANCES J., EDWARD J., & THERESA M. SIMONEAU & PATRICIA M. DONNELLY, EDWARD J. & GLORIA SCALA MARTIN, JOANNA NICHOLS, VICTOR A. & KATHLEEN B. VESCERA, RICHARD W. & MARY ELLEN ADAMS, EACH IN PART ALONG A STONE WALL;
N 06°-54'-20" W   170.59 FEET TO A POINT;
N 10°-40'-20" W   79.32 FEET TO A POINT;
N 04°-55'-20" W   160.37 FEET TO A POINT;
N 08°-09'-20" W   127.83 FEET TO A POINT;
N 11°-10'-20" W   20.23 FEET TO A POINT;
N 24°-14'-20" W   175.05 FEET TO THE POINT AND PLACE OF BEGINNING.

SAID PARCEL CONTAINS 675,487 SQUARE FEET OR 15.507 ACRES.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT DESCRIBED IN CROSS EASEMENT AGREEMENT BETWEEN JOSEPH KLEIN AND EDWARD ZANDRI DATED MAY 2, 1980 AND RECORDED IN VOLUME 269 AT PAGE 792 OF THE RIDGEFIELD LAND RECORDS.

TOGETHER WITH THAT CERTAIN CROSS EASEMENT DESCRIBED IN CROSS EASEMENT AGREEMENT BETWEEN JOSEPH KLEIN AND STEVEN J. ZEMO DATED MARCH 30, 1981 AND RECORDED IN VOLUME 276 AT PAGE 365 OF THE RIDGEFIELD LAND RECORDS.

## COPPS HILL PLAZA REHABILITATION PROJECT – PELIMINARY PHASING SUMMARY*

1.      **Phase I – September 2001 through March 2002**

    **A. Sitework & Utilities for Sub-Phase I***
- Install utilities for new Building A, including any temporary connections.
- Overhaul existing storm water drainage system,
- Overhaul parking facilities, including new curbs and paving
- Install landscape, hardscape, site lighting and site accessories.
- Overhaul main entrance drive into plaza from Danbury Road.

    **B. Building A (11,154 sf)**
- Construct new steel frame, masonry exterior, four (4) tenant, retail building,
- Complete interior fit-up for turnkey delivery of *Radio Shack* (2,668 sf) and *Blockbuster Video* (4,662 sf),
- Complete vanilla box fit up for *Ridgefield Liquors* (2,215 sf),
- Leave remaining space as shell space for future tenant to be determined (1,609 sf).

    **C. Tenant Relocation**
- Relocate three tenants *(Radio Shack, Blockbuster Video and Ridgefield Liquors)* from the existing Copps Hill Road strip building to the new Building A.

---

\* - Reference Appledore Engineering, Phasing Plan, Sheet C-19 dated 7/20/01.
\*\* - Demolition of the second half of the existing strip building, completion of environmental remediation and opening of the relocated Copps Hill front driveway may be delayed until spring of 2003 unless the current tenants (33 1 3, Jenni's Hallmark and Walrus Cleaners) are removed from the existing strip building prior to lease expiration.
\*\*\* - Demolition of the existing bank building and construction of new pharmacy building may be delayed until spring of 2003 unless the current tenant (Chase Bank) is removed from the building prior to lease expiration.

2.    **Phase II – April 2002 through December 2002**

**A. Onsite Work & Utilities for Sub-Phase IIA***
- Perform complete or partial demolition existing strip building** and existing bank building.***
- Close existing driveway to plaza from Copps Hill Road.
- Install underground utilities for new Buildings B and C.
- Install any remaining permanent utility lines for Building A.
- Overhaul of existing storm water drainage system.
- Overhaul parking facilities, including new curbs and paving.
- Install landscape, hardscape, site lighting and site accessories.

**B. Buildings B & C (11,437 sf and 2,450 sf)*****
- Construct two new steel frame, masonry exterior, stand alone retail buildings.
- Complete interior fit-up for turnkey delivery of *Eckerd Drug* (11,437 sf).

**C. Tenant Relocation**
- Relocate *Eckerd Drug*

**D. Offsite Work for Sub-Phase IIA***
- Upgrade two (2) existing traffic signals on Danbury Road.
- Install new curb cut and vehicle entrance from Copps Hill Road**.
- Repair existing storm water outfall structure across Copps Hill Road.
- Complete various traffic improvements on City streets.

**E. Environmental Remediation, Sitework and Utilities for Sub-Phase IIB****
- Perform environmental inspection of soil conditions under existing strip building.
- If necessary, install and operate Soil Vapor Extraction system in sub-phase II-B area.
- If necessary, excavate and remove of contaminated soils.
- Install utilities.
- Overhaul existing storm water drainage system.
- Overhaul parking facilities, including new curbs and paving
- Install landscape, hardscape, site lighting and site accessories.
- Open new entrance from Copps Hill Road.
- Continue ground well monitoring program.

* - Reference Appledore Engineering, Phasing Plan, Sheet C-19 dated 7/20/01.
** - Demolition of the second half of the existing strip building, completion of environmental remediation and opening of the relocated Copps Hill front driveway may be delayed until spring of 2003 unless the current tenants (33 1/3, Jenni's Hallmark and Walrus Cleaners) are removed from the existing strip building prior to lease expiration.
*** - Demolition of the existing bank building and construction of new pharmacy building may be delayed until spring of 2003 unless the current tenant (Chase Bank) is removed from the building prior to lease expiration.

### F. Sitework & Utilities for Sub-Phases IIC Thru IIF*

- If necessary, install temporary electric service to Stop & Shop and Kohl's.
- Sitework will likely proceed in the alpha numeric order as shown on Appledore Phase Plan*, including:
  - o Install utilities.
  - o Overhaul existing storm water drainage system.
  - o Overhaul parking facilities, including new curbs and paving.
  - o Install landscape, hardscape, site lighting and site accessories.

## 3.      Phase III – January 2003 through Completion

### A. Stop & Shop Expansion

- Perform expansion and renovation of existing store from 30,108 sf to 65,125 sf.

### B. Remaining Sitework

- Overhaul storm water drainage system for any remaining of portions of the site.
- Overhaul parking facilities including, new curbs and paving for any remaining portions of the site,
- Install landscape, hardscape, site lighting and site accessories at any remaining portions of site,
- Adjust elevation of catch basin castings and install finish-paving course throughout the entire site.

### C. Sitework & Utilities in Phase III*

- Install utilities.
- Overhaul existing storm water drainage system.
- Overhaul parking facilities, including new curbs and paving.
- Install landscape, hardscape, site lighting and site accessories.

* - Reference Appledore Engineering, Phasing Plan, Sheet C-19 dated 7/20/01.
** - Demolition of the second half of the existing strip building, completion of environmental remediation and opening of the relocated Copps Hill front driveway may be delayed until spring of 2003 unless the current tenants (33 1/3, Jenni's Hallmark and Walrus Cleaners) are removed from the existing strip building prior to lease expiration.
*** - Demolition of the existing bank building and construction of new pharmacy building may be delayed until spring of 2003 unless the current tenant (Chase Bank) is removed from the building prior to lease expiration.

## Copps Hill Plaza - Pharmacy Construction – Cost Responsibility Breaking Point

**Phase II Sitework Contractor will supply "Pad Ready" site for pharmacy building. "Pad Ready" site entails:**
- demolish existing building,
- environmental remediation complete,
- sub-grade and rough grade completed to specifications,
- utilities brought to within 10 (10') feet of new pharmacy foundation,
- Prepare electrical service for delivery to pharmacy including transformer,

**Pharmacy Building Contractor will be responsible for:**
- Excavation and installation off footings and foundation walls.
- Complete installation of utilities from within ten (10') feet of building.
- Installation of concrete sidewalks directly abutting building,
- Installation of concrete dumpster pad and screen fencing adjacent to pharmacy building.
- Construction of core and shell for pharmacy,
- Construction of tenant fit out for pharmacy,
- Construction of drive-through canopy.

## Copps Hill Plaza – Kohl's Parking Field Reconstruction – Cost Responsibility Breaking Point

**Phase II Sitework Costs at Kohl's Parking Field to be broken out for sub-phases IID and IIF\* (These costs are excluded from Construction Costs.)**
- Sub-grade preparation and reclamation of existing asphalt,
- Required demolition of existing traffic improvement,
- Rough and finish grade preparation,
- Installation of new curbs, sidewalks, site lighting, irrigation and landscape,
- Binder and finish paving,
- Temporary and permanent striping and signage,
- Overhead, profit, general conditions and fees associated with this work.

**Phase II Sitework Costs not broken out for sub-phases IID and IIF\* (These costs are included within Construction Costs.)**
- Any primary utility installations required through area including: gas, water, fire protection and electric,
- Installation of drainage structures and sewer manholes,
- Installation of any drain and sewer lines,
- Overhead, profit, general conditions and fees associated with this work.

\* - Reference Appledore Engineering, Phasing Plan, Sheet C-19 dated 7/20/01.
\*\* - Demolition of the second half of the existing strip building, completion of environmental remediation and opening of the relocated Copps Hill front driveway may be delayed until spring of 2003 unless the current tenants (33 1/3, Jenni's Hallmark and Walrus Cleaners) are removed from the existing strip building prior to lease expiration.
\*\*\* - Demolition of the existing bank building and construction of new pharmacy building may be delayed until spring of 2003 unless the current tenant (Chase Bank) is removed from the building prior to lease expiration.

EXHIBIT B

PERMITTED ENCUMBRANCES

1.  Pole line easement to the State of Connecticut, recorded
    July 19, 1972, in Volume 160 at Page 895 of the Ridgefield
    Land Records.

2.  Agreement with the State of Connecticut Department of
    Transportation, recorded on October 31, 1972 in Volume 162
    at Page 491 of the Ridgefield Land Records.

3.  Sewer easement to the Town of Ridgefield, recorded in
    Volume 251 at Page 93, Page 96, Page 99, Page 141, Page 147,
    and Page 165 of the Ridgefield Land Records.

4.  Terms, conditions and easements contained in a cross
    easement agreement between Joseph Klein and Edward Zandri
    dated May 2, 1980, and recorded in Volume 269 at Page 792
    of the Ridgefield Land Records.  Said agreement was
    modified by Stipulation and Modification Agreement by and
    among Ridgefield Properties LLC and Angelo Rossi et al
    dated March 23, 2000, and recorded in Volume 608 at Page 79
    of the Ridgefield Land Records.

5.  Zoning variance dated July 19, 1980, and recorded in Volume
    271 at page 1083 of the Ridgefield Land Records.

6.  Zoning variance dated February 10, 1981, and recorded in
    Volume 275 at Page 724 of the Ridgefield Land Records.

7.  Terms, conditions and easements contained in a cross
    easement agreement between Joseph Klein and Steven J. Zemo,
    dated March 30, 1981, and recorded in Volume 276 at Page
    365 of the Ridgefield Land Records.

8.  Agreement between Joseph Klein and Steven J. Zemo dated
    October 18, 1984, and recorded in Volume 315 at Page 701 of
    the Ridgefield Land Records.

9.  Covenant by Copps Hill Plaza Associates dated September 25,
    1991, and recorded in Volume 437 at Page 650 of the
    Ridgefield Land Records.

10. Easement from Copps Hill Plaza L.L.C. to the State of
    Connecticut recorded December 1, 1997, in Volume 555 at
    Page 1013 of the Ridgefield Land Records.

11. Distribution Easement from Ridgefield Properties LLC to
    Yankee Gas Services Company dated January 1, 2000, and
    recorded in Volume 604 at Page 118 of the Ridgefield Land
    Records.

12. Zoning Variance dated February 8, 2000, recorded in Volume
    604 at Page 752 of the Ridgefield Land Records.

*13. Mortgage in the amount of $9,000,000.00 from Ridgefield
     Properties LLC to KeyBank, National Association dated
     December 22, 1999 and recorded in Volume 602 at Page 360 of
     the Ridgefield Land Records.

*14. Assignment of Leases and Rents from Ridgefield Properties
     LLC to KeyBank, National Association dated December 22,

1999, and recorded in Volume 602 at Page 398 of the Ridgefield Land Records.

*15.   UCC-1 Financing Statement from Ridgefield Properties LLC to KeyBank, National Association recorded in Volume 602 at Page 408 of the Ridgefield Land Records.

16.   Declaration of Notice of Lease by Caldor, Inc. dated May 24, 1990 and recorded in Volume 418 at Page 574 of the Ridgefield Land Records and assigned to The Caldor Corporation by Assignment and Assumption of Lease Agreement dated as of April 2, 1990 and recorded in Volume 418 at Page 633 of the Ridgefield Land Records, and further assigned to Kohl's Department Stores, Inc. by Assignment and Assumption Agreement dated as of March 1, 1999 and recorded in Volume 585 at Page 412 of the Ridgefield Land Records.

*      Items 13, 14 and 15 are affected by a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") dated December 21, 1999 between Tenant and KeyBank, National Association and recorded in Volume 602 at Page 414 of the Ridgefield Land Records. If Items 13, 14 and 15 are not discharged of record prior to the completion of Phases I and II of the Project (as defined in Section 4.1(iv) of the lease), then the SNDA will need to be amended prior to said completion date to apply to this Amendment and Restatement of Lease.

## EXHIBIT C

<u>COST TO BUYOUT EXISTING LEASES</u>

3.   If necessary, termination and/or buyout amounts for the tenants referenced below to be mutually agreed upon between the Landlord and Tenant:

## EXHIBIT C-5

### GENOVESE RIDGEFIELD DRUGS, INC.
### (ECKERD DRUG)

**Lease dated June 3, 1970**

**Exclusive Uses:**

**Prohibited Uses:**

**EXHIBIT C-9**

**GENOVESE DRUG STORES, INC.**
**(ECKERD DRUG)**

Lease to become effective if Landlord relocates Genovese Ridgefield Drug, Inc. to new premises in the Shopping Plaza and upon termination of the existing lease dated June 3, 1970.

**Exclusive Uses and Prohibited Uses:**

# EXHIBIT C

### Joseph Karpinski
### (Ridgefield Liquors)

### Lease dated January 16, 1995

**Exclusive Uses:**

**Prohibited Uses:**

## EXHIBIT C-8

**Jenni's Inc.**
**(Hallmark Store)**

**Lease dated May 1, 1981**

**Exclusive Uses:**

# EXHIBIT C-9

## The Chase Manhattan Bank of Connecticut, N.A.

### Lease dated December 3, 1992

**Exclusive Uses:**

**Prohibited Uses:**

---

# EXHIBIT C-90

## Walrus, Walrus, Walrus, Inc.

### Lease dated October 14, 1992

**Exclusive Uses:**

**Prohibited Uses:**

# EXHIBIT C-1

## Dress Barn, Inc.

### Lease dated

**Exclusive Uses:**

**Prohibited Uses:**

EXHIBIT D

KOHL'S DEPARTMENT STORES PERMITTED USES

Extract from lease to W.T. Grant Company.

EXHIBIT D

KOHL'S DEPARTMENT STORES PERMITTED USES

Extract from Kohl's Department Stores lease (Article Four,
Section 1):

EXHIBIT E

ENVIRONMENTAL REPORTS

1.  **Results of Third Round of Monitoring Well Installation
    and Testing** Copps Hill Plaza, Ridgefield, CT - From:
    Duncan Wood & Mike Regan at SHA; To:  Larry Guilmette
    at Samuels and Associates; Dated: August 12, 1998.

2.  **Environmental Site Assessment, Copps Hill Plaza, 125
    Danbury** Road, Ridgefield, CT - Prepared for:
    Ridgefield Properties, LLC; Prepared by:  Sanborn,
    Head & Associates, Inc.; Dated:  December 1999.

3.  **Investigative  Survey Report for Asbestos - Containing
    Materials**, Copps Hill Plaza, Ridgefield, CT  -
    Prepared for:  Samuels & Associates, 333 Newbury
    Street, Boston, MA  02001; Prepared by:  Axiom
    Partners, Inc., 10 Diamond Drive, Derry, New Hampshire
    03038; Dated:  December 20, 1999.

4.  **Fall 2000 Groundwater Sampling Round Results Copps
    Hill** Plaza, Ridgefield, CT  - From:  Duncan Wood at
    SHA; To:  Larry Guilmette at Samuels & Associates,
    Inc.; Dated:  April 3, 2001.

5.  **June 2001 Groundwater Sampling Round Results, Copps
    Hill** Plaza, Ridgefield, CT - From:  Duncan Wood at
    SHA; To:  Larry Guilmette at Samuels & Associates,
    Inc.; Dated:  July 2, 2001.