## Exhibit 6

DocuSign Envelope ID: 829B8021-325D-4918-A603-448B2859152B

11/16/2023

### SHOPPING CENTER LEASE

In consideration of the mutual covenants and upon the terms and conditions set forth in "Basic Lease Provisions" below, Exhibit C "General Lease Provisions" and other attachments and exhibits to this Shopping Center Lease (this "**Lease**"), MICHAELS STORES, INC., a Delaware corporation ("**Tenant**"), hereby leases from the Landlord named below and Landlord hereby leases to Tenant, the Premises described below.

### BASIC LEASE PROVISIONS

1. Landlord: EQUITY ONE (COPPS HILL) LLC, a Florida limited liability company, whose Federal Taxpayer Identification Number is ▆▆▆—▆▆▆▆▆▆

2. Shopping Center (Exhibit A, Exhibit C, Section 1.1, 1.2):

   Name: "Copps Hill Plaza"
   Location: City: Ridgefield    County: Fairfield    State: Connecticut
   Total Leasable Square Feet: Approximately 172,657

3. Premises (Exhibit B, Exhibit C, Section 1.1, 1.2):

   Space Designation: "Premises"    Leasable Square Feet: 15,936
   (dimensions: as shown on Tenant's Site Specific
   Floorplan Layout attached as Exhibit D-2 to this Lease)

4. Initial Term (Exhibit C, Section 2.1): Commencing on the Completion Date and ending on the last day of the one hundred twentieth (120th) full calendar month after the Rental Commencement Date (the "**Expiration Date**"); provided, however, if the Expiration Date is scheduled to occur during the period from September 1 of any calendar year through January 31 of the succeeding calendar year, and Tenant does not extend the Lease Term for the next Extension, or if there are no further Extensions available to Tenant hereunder, then the Expiration Date shall automatically be extended until the last day of February of said succeeding calendar year unless Tenant notifies Landlord in writing two hundred seventy (270) days prior to the last day of the Lease Term that Tenant elects not to have the Lease Term automatically extended as provided herein above.

5. Options to Extend Term (Exhibit C, Section 2.2):    (each such extension period being an "**Extension**").

6. Minimum Rent (Exhibit C, Section 3.2):



| Applicable Time Period | Total Annual Minimum Rent | Total Monthly Minimum Rent | Annual Minimum Rent Per Leasable Square Foot of Premises |
|---|---|---|---|
| ▆▆▆▆▆▆▆▆ | ▆▆▆▆ | ▆▆▆▆ | ▆▆▆▆ |
| ▆▆▆▆▆▆▆▆ | ▆▆▆▆ | ▆▆▆▆ | ▆▆▆▆ |
| ▆▆▆▆▆h | ▆▆▆▆0 | ▆▆▆▆0 | ▆▆▆▆ |
| ▆▆▆▆▆h | ▆▆▆▆2 | ▆▆▆▆6 | ▆▆▆▆ |
| ▆▆▆▆▆h | ▆▆▆▆8 | ▆▆▆▆4 | ▆▆▆▆ |

(*) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Upon proper certification of the Leasable Square Feet of the Premises by Landlord's architect in accordance with this Lease, the Minimum Rent set forth above shall be adjusted in accordance therewith, which such



adjustment shall apply from the Completion Date.  Landlord warrants and represents that the actual Leasable Square Feet of the Premises will not be less than ninety seven percent (97%) of the Leasable Square Feet stated in Paragraph 3 of the Basic Lease Provisions (the "**Stated Premises Size**").  Further, unless otherwise agreed to between the parties, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of one hundred three percent (103%) of the Stated Premises Size, the Premises, for purposes of calculating Minimum Rent, Common Area Charges, Real Estate Taxes and any other charges and for all other purposes shall be deemed to be one hundred three percent (103%) of the Stated Premises Size.  Irrespective of the variance in the Leasable Square Feet of the Premises, in no event shall the frontage of the Premises be less than the frontage shown on Tenant's Site Specific Floorplan Layout attached as <u>Exhibit D-2</u> to this Lease.

7.    <u>Tenant's Share of Certain Charges</u> (Exhibit C, Sections 3.3, 3.4, 3.5, 3.6):

    a.    Common Area Charges: ████████████████████████

    b.    Real Estate Taxes: ████████████████████████

    c.    Utilities: ████████████

    d.    Insurance: ████████████

8.    <u>Other Required Lessees</u> (Exhibit C, Sections 2.1.2, 16):

| Name of Lessee | Leasable Square Feet of Space | Type of Operation |
|---|---|---|
| a. | | |
| b. s | ) | s |
| c. | | |

9.    <u>Construction</u> (Exhibit D): Construction of leasehold improvements will be accomplished pursuant to <u>Exhibit D</u>, <u>Exhibit D-1</u> and <u>Exhibit D-2</u>.

10.    <u>Addresses for Notices and Payment of Rent</u> (Exhibit C, Section 17.13):

TO TENANT:

3939 West John Carpenter Freeway
Irving, Texas  75063
Attn:    Director of Real Estate Administration

With a copy of notices to:

3939 West John Carpenter Freeway
Irving, Texas  75063
Attn: Associate General Counsel – Real Estate

TO LANDLORD:

c/o Regency Centers Corporation
One Independent Drive, Suite 114
Jacksonville, Florida 32202-5019
Attention: Legal Department

With a copy of notices to:
Regency Centers Corporation
28 Church Lane
Westport CT 06880
Attn: Property Management

11.    <u>Exhibits</u>: The following Exhibits are attached to this Lease and made a part of this Lease for all purposes.

Exhibit A:    Legal Description of Shopping Center
Exhibit B:    Site Plan
Exhibit C:    General Lease Provisions
Exhibit D:    Tenant's Work
Exhibit D-1:    Landlord's Work
Exhibit D-2:    Site Specific Layout
Exhibit E:    Notice of Lease
Exhibit F:    Building Sign Rendering
Exhibit F-1:    Pylon Sign Rendering
Exhibit G:    Non-Disturbance Agreement Form
Exhibit H:    Underlying Documents
Exhibit I:    Existing Leases Not Subject to Tenant's Exclusive or Prohibited Uses/Other Exclusives



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

Exhibit J:        Prohibited Uses
Exhibit K:        Memorandum of Lease

12.    <u>Incorporation of Other Provisions</u>:

Cross-references contained in the Basic Lease Provisions are not intended to be exhaustive.  All of the provisions, covenants and conditions set forth in <u>Exhibit C</u> to this Lease and all other exhibits and attachments described in Paragraph 11 of the Basic Lease Provisions are by this reference incorporated into the Basic Lease Provisions as fully as if the same were set forth at length in the Basic Lease Provisions.  Each reference in the exhibits and other attachments to any provision in the Basic Lease Provisions will be construed to incorporate all of the terms provided under the referenced provision in the Basic Lease Provisions.  In the event of any conflict between a provision in the Basic Lease Provisions, on the one hand and a provision in the exhibits or other attachments, on the other hand, the latter will control.

13.    <u>Effective Date of Lease</u> (Exhibit C, Section 17.14):  _____ .

14.    <u>Broker</u> (Exhibit C, Section 17.16):

15.    <u>Allowance</u> (Exhibit C, Section 17.25):        ████████00



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

<u>TENANT</u>

MICHAELS STORES, INC.,
a Delaware corporation

By:
Name:   Tim Cheatham
Title:    EVP – General Counsel and Secretary

Date of Execution by Tenant:

11/20/2023

STATE OF TEXAS             §
                                         §
COUNTY OF DALLAS      §

BEFORE ME, the undersigned authority, on this day personally appeared Tim Cheatham, EVP General Counsel & Secretary of MICHAELS STORES, INC., a Delaware corporation, who acknowledged that she was duly authorized to execute this agreement on behalf of said corporation.

GIVEN under my hand and seal of office this 20th day of November, 2023.

REVA BARBER
Notary Public, State of Texas
Comm. Expires 03-10-2024
Notary ID 132396708

Notary Public in and for the
State of Texas    Reva Barber

Notary's Printed Name
My Commission Expires: 3-10-2024

-iv-

LANDLORD

EQUITY ONE (COPPS HILL) LLC,
a Florida limited liability company

By:    Regency Centers, L.P.,
       a Delaware limited partnership
Its:   Managing Member


       By:    Regency Centers Corporation,
              a Florida corporation
       Its:   General Partner


              By:    _____
              Name:  _____
              Title: _____


Date of Execution by Landlord:

11/29/2023


STATE OF _Connecticut_          §
                                §   Greenwich
COUNTY OF _Fairfield_           §

On _November 29, 2023_ before me, _Joanne Phillips, Notary Public_
       DATE                     NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared _Jack deVilliers_
                    NAME(S) OF SIGNER(S)


☒ personally known to me - or - ☐    proved to me on the basis of satisfactory evidence to be the
                                     person(s) whose name(s) is/are subscribed to the within
                                     instrument and acknowledged to me that he/she/they executed
                                     the same in his/her/their authorized capacity(ies), and that by
                                     his/her/their signature(s) on the instrument the person(s), or the
                                     entity upon behalf of which the person(s) acted, executed the
                                     instrument.


              WITNESS my hand and official seal.


              _____
              SIGNATURE OF NOTARY

              **JOANNE PHILLIPS**
              **NOTARY PUBLIC**
              **STATE OF CONNECTICUT**
              **MY COMMISSION EXPIRES 11/30/2025**


[THIS LEASE MUST BE EXECUTED FOR LANDLORD, IF A CORPORATION, BY THE PRESIDENT OR
VICE-PRESIDENT AND ATTESTED BY THE SECRETARY OR ASSISTANT SECRETARY, UNLESS THE
BY-LAWS OR A RESOLUTION OF THE BOARD OF DIRECTORS OTHERWISE PROVIDE, IN WHICH
EVENT A CERTIFIED COPY OF THE BY-LAWS OR RESOLUTION, AS THE CASE MAY BE, MUST BE
FURNISHED.]

1         EXHIBIT A
2           TO
3       SHOPPING CENTER LEASE
4         BETWEEN
5      EQUITY ONE (COPPS HILL) LLC
6         AND
7       MICHAELS STORES, INC.

8    LEGAL DESCRIPTION OF SHOPPING CENTER

## EXHIBIT A

All that certain piece or parcel of land situate in the Town of Ridgefield, County of Fairfield and State of Connecticut and being more particularly bounded, and described as follows:

Beginning at a point on the southerly streetline of Copps Hill Road (variable width), said point being on a stonewall and marking the northwest corner of the land herein described;

Thence running along said southerly streetline of Copps Hill Road, North 84°-45'-50" East a distance of 80.06 feet to a point; North 86°-37'-30" East a distance of 370.00 feet to a point; South 86°-15'-10" East a distance of 150.75 feet to a point; South 70°-00'-00" East a distance of 147.93 feet to a point, South 64°-54'-00" East a distance of 305.19 feet to a point; South 60°-09'-30" East a distance of 87.52 feet to a point; Along a curve to the right having a radius of 30.00 feet, central angle of 76°-14'-20", length of 39.92 and a chord bearing of South 22°-02'-20" East a distance of 37.04 feet to a point on the westerly streetline of Danbury Road, Route 35 (variable width);

Thence running along. said westerly streetline of Danbury Road, Route 35 (variable width); South 16°-04'-50" West a distance of 410.26 feet to a CHD monument with disk, South 16°-17'-50" West a distance of 1.08 feet to a point being the northeasterly corner of lands now or formerly of Mario Marcheggiani;

Thence running along lands now or formerly Mario Marcheggiani and Anshirdon Properties, each in part; North 68°-06'-00' West a distance of 375.00 feet through an iron pipe to a drill hole;

Thence running along lands now or formerly Anshirdon Properties, South 16°-17'-50" West a distance of 200.00 feet to a drill hole; South 68°-06'-00" East a distance of 15.00 feet to a point;

Thence running along lands now or formerly Stephen J. Zemo and C.R.B. Realty Co., each in part; South 22° -17'-50" West  a distance of 188.45 feet to an iron pin; South 67°-51'-10" East a distance of 46.50 feet to a mag nail; South 27°-37'-50" West a distance of 195.05 feet to a mag nail;

Thence running along lands now or formerly Carl Lechter and Adam Broderick Corral; North 49°-38'-40" West a distance of 248.88 feet to a drill hole;

Thence running along lands now or formerly Thomas J. McCarthy and Louise M. Bowman, each in part; North 10°-13'-20" West a distance of 132.07 feet to a point; North 66°-05'-20" West a distance of 60.98 feet to a point; North 68°-37'-20" West a distance of 75.18 feet to a point in a stone wall;

NY01/FULTK/1404754.4

9



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

Thence running along lands, now or formerly Karen Pach, Giri Vaidyananthan, William R. and Lisa K. Scala, Leung Chung-Tung, Frances J., Edward J. and Theresa M. Simoneau and Patricia A. Donnelly, Edward J. and Gloria Scala Martin, Joanna Nichols, Victor A. and Kathleen B. Vescera and Richard W. and Mary Ellen Adams, each in part along a stone wall; North 06°-54'-20" West a distance of 170.59 feet to a point; North 10°-40'-20" West a distance of 79.32 feet to a point; North 04°-55'-20" west a distance of 160.37 feet to a point; North 08°-09'-20" West a distance of 127.83 feet to a point, North 11°-10'-20" West a distance of 20.23 feet to a point North 24° -14'- 20" West a distance of 175.05 feet to the point and place of beginning.

Together with that certain cross easement described in Cross Easement Agreement between Joseph Klein and Edward Zandri dated May 2, 1980 and recorded in Volume 269 at Page 792 of the Ridgefield Land Records, as modified by Stipulation and Modification Agreement by and among Ridgefield Properties LLC and Angelo Rossi et al dated March 23, 2000 and recorded in Volume 608 at Page 79 of the Ridgefield Land Records.

Together with that certain cross easement described in an Agreement between Joseph Klein and Stephen J. Zemo dated March 30, 1981 and recorded in Volume 276 at Page 365 of the Ridgefield Land Records; as amended by Agreement between Joseph Klein and Stephen J. Zemo dated October 18, 1984 and recorded in Volume 315 at Page 701 of the Ridgefield Land Records; as further amended by Amendment of Easement Agreements by and between Ridgefield Properties LLC and Stephen J. Zemo dated October 28, 2002 and recorded in Volume 690 at Page 103 of the Ridgefield Land Records.

---

NY01/FULTK/1404754.4

Received for Record at Ridgefield, CT
On 04/01/2010 At 11:08:39 am
_____ *Barbara Serfilippi* _____
Town Clerk

1



B-2

1                                            EXHIBIT B
2                                               TO
3                           SHOPPING CENTER LEASE
4                                      BETWEEN
5                     EQUITY ONE (COPPS HILL) LLC
6                                      AND
7                       MICHAELS STORES, INC.

8                                  SITE PLAN



**Legend:**
- ▧ — Premises
- ▭ — Pylon (1)
- Temporary Storage for trailer/container
- ▭ — Outparcel Area (4.6)
- — Critical Common Areas (4.5)
- ▭ — Proposed area for Trash Dumpster

Not a part of Shopping Center

9
10
11



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

EXHIBIT C
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.

GENERAL LEASE PROVISIONS

1.    PREMISES

    1.1.    Location.  The term "**Shopping Center**" means the land described in Exhibit A to this Lease, together with all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements, and appurtenances pertaining thereto.  Landlord represents and warrants to Tenant that the land described in Exhibit A depicts the entirety of the Shopping Center as shown on Exhibit B of this Lease.  The term "**Premises**" means that portion of the Shopping Center cross-hatched and labeled "Premises" on Exhibit B of this Lease.  There are appurtenant to the Premises rights, privileges, easements, and appurtenances as described herein.

    1.2.    Leasable Square Feet Defined.  The term "**Leasable Square Feet**" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall shall be deemed to exceed 12" in width); provided, however, that the following areas shall not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks (if any) and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area).  The Leasable Square Feet of any building constructed on any out parcel or pad site shall also be deemed to include ground balconies and separately demised outdoor or other outdoor areas exclusively utilized by a tenant or occupant of the Shopping Center for retail sales or food or beverage service (exclusive of drive through or walk up take out food or beverage service and exclusive of outdoor areas utilized by food or beverage services for tables or seating that are not separately demised, such as seating and tables for a gourmet coffee purveyor or juice bar).  The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in Paragraphs 2 and 3 respectively of the Basic Lease Provisions.  Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Completion Date in accordance with the provisions of this Section 1.2.  The certification, if factually correct or if not objected to by Tenant within fifteen (15) days after the later to occur of (i) Tenant's receipt of the certification, or (ii) the Completion Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes.  If Tenant in good faith objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant shall specify the number of Leasable Square Feet it believes the Premises contain.  The parties shall give reasonable efforts to resolve their differences.  If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each shall name an architect within ten (10) days thereafter.  Within ten (10) days after being named, such architects shall name a third architect, who shall, within twenty (20) days, measure the Premises.  The measurement of the third architect shall be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount shall be deemed the correct number of Leasable Square Feet in the Premises.  The party whose measurement was not averaged with that of the third architect shall pay the fees and expenses of the third architect, and each party shall pay the fees and expenses of its own architect.

2.    TERM

    2.1.    Initial Term.  The "**Initial Term**" (herein so called) of this Lease will begin on the Completion Date (defined below) and continue through the Expiration Date set forth in Paragraph 4 of the Basic Lease Provisions.

        2.1.1    Completion Date Defined.  The "**Completion Date**" will be the date upon which all of the following conditions precedent have been fulfilled by Landlord: (i) the "Landlord's Work", as such term is defined in Exhibit D-1 to this Lease, is substantially complete and a certificate of occupancy for same has been issued by the appropriate governmental authority, provided that if a certificate of occupancy is not available until Tenant has completed its construction and/or fixturing and merchandising, then the requirement of providing a certificate shall be satisfied so long as Tenant can obtain said certificate upon completion of its construction, fixturing and merchandising in accordance with Laws (defined below), (ii) Landlord has delivered actual and exclusive possession of the Premises to Tenant free of existing leases, tenancies, and parties in possession and free of any prior occupants' furniture, fixtures and equipment, (iii) the construction of all buildings in the Shopping Center as shown on Exhibit B is complete, (iv) the Common Areas and all roads shown on Exhibit B (whether public or private) are paved (including top or final coat of



C-1

paving) and striped and are open for public use, including all driveways and parking areas (including, without limitation, paved driveways shown on Exhibit B to this Lease from adjoining public streets around the front and rear of the Premises, (v) all improvements adjacent to the Shopping Center (such as, without limitation, traffic lights, turn lanes) required for the development of the Shopping Center and/or for the issuance of a certificate of occupancy are complete, (vi) Landlord has completed all landscaping, (vii) all security lights on the building within which the Premises is located and all light standards in the parking areas are installed and operating, (viii) Landlord has provided Tenant with the recorded agreements of non-disturbance described in Section 8.3 of this Exhibit C (the "**SNDA**") or has provided Tenant with a sworn certificate from an authorized signatory for Landlord that there are no underlying landlords or lienholders of the Premises, and (ix) Landlord's representations and warranties contained in this Lease are true and correct.

Tenant acknowledges that the conditions relating to the Common Areas and buildings, as described in (iii), (iv), (v), (vi) and (vii) above, shall be deemed satisfied so long as the Common Areas and buildings remain in the same condition as existed as of April 23, 2023 and are in good order, repair and condition on the Contemplated Completion Date.

2.1.1.1    Notice of the Completion Date. Landlord warrants and represents, and hereby gives notice, that the Completion Date will be on or before March 1, 2024 (the "**Contemplated Completion Date**"). Landlord will give fifteen (15) days' prior written notice of a Completion Date which Landlord intends to be earlier than the original Contemplated Completion Date (said new date, upon giving of said notice by Landlord, being hereinafter for all purposes the "Contemplated Completion Date"); provided, however, in order to be effective, said notice shall include (a) the actual opening date or scheduled opening date for each of the Other Required Lessees, and (b) a statement from Landlord affirming that Landlord's representations and warranties contained in this Lease are true and correct as of the date of said notice and will be true and correct as of the Completion Date.   If Landlord fails to complete or satisfy the conditions provided under Section 2.1.1 on or before the Contemplated Completion Date or such earlier date of which it notifies Tenant, Tenant may, at Tenant's sole option: (i) extend the Contemplated Completion Date by written agreement by any number of days as elected by Tenant in its sole discretion and/or (ii) occupy the Premises without accepting the Premises under the terms of Section 2.1.1.2 until such time as Section 2.1.1 is satisfied and/or (iii) terminate this Lease by written notice to Landlord, and Tenant shall be relieved of all further obligations under this Lease.  If Landlord fails to use its commercially reasonable efforts to complete or satisfy the conditions provided under Section 2.1.1 on or before the Contemplated Completion Date, Tenant may, at its option and in addition to the foregoing remedies, pursue any and all other remedies available to Tenant at law or in equity.  Notwithstanding the foregoing to the contrary, in no event shall Tenant be obligated to accept possession of the Premises during the period from and including the first day of June of any calendar year through and including the last day of November of such calendar year (the "**Possession Deferral Period**"), subject to Tenant Caused Delays.  As used in this Lease, the term "Tenant Caused Delays" means any delay in Landlord's construction of Landlord's Work which is caused by (i) Tenant's failure to respond to any plan submission within the time frames required by this Lease, (ii) Tenant's failure to perform any obligation of Tenant within the time frames required by this Lease, or (iii) any unreasonable interference  with Landlord's Work by Tenant or its employees, contractors or agents, provided Landlord shall notify Tenant within ten (10) days after an event of Tenant Caused Delay that a Tenant Caused Delay has occurred.  Landlord's notice ("**Delay Notice**") shall include Landlord's good faith estimate of the number of days of Tenant Caused Delay and in no event shall the number of days of Tenant Caused Delay exceed the number of days estimated in the Delay Notice.

2.1.1.2    Access before the Completion Date. For the period from thirty (30) days prior to the Contemplated Completion Date through the Completion Date, Tenant will have the right to use the Common Areas and occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction and pre-construction activities (including without limitation, interviewing prospective employees) provided such entry or installation does not unreasonably interfere with or delay the orderly construction and completion of the Premises by Landlord, and such entry shall not constitute acceptance of possession of the Premises by Tenant. Tenant shall not perform any such entry or installation if, in Landlord's reasonable judgment, the performance of such work would result in a delay in the performance of Landlord's Work. Tenant must coordinate any work or the installation of any fixtures or equipment with Landlord's general contractor. Tenant's contractor(s), agents or employees must perform their work under their own permits and not under the permits of any contractor employed by Landlord. Also, Tenant must follow the reasonable rules and directions of Landlord's general contractor.). Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant.

2.1.2    Rental Commencement Date Defined. The "**Rental Commencement Date**" means the later of (i) the date which is one hundred eighty (180) days after the later to occur of (aa)  the Completion Date, or (bb) the date Tenant obtains all Permits (defined below), subject to Section 2.1.2.2 below, or (ii) the date on which the following conditions precedent are met: (A) the "Initial Co-Tenancy Requirement" (below defined) is satisfied, and (B) each of the conditions precedent in Section 2.1.1 of this Exhibit C are met, and (C) all punch list items have been completed in accordance with Exhibit D-1



(provided, however, the nonsatisfaction of the requirement stated in this subpart (C) shall not delay the Rental Commencement Date if, on the date all other conditions precedent to the Rental Commencement Date are satisfied, Landlord has previously commenced the correction of all punch list items and is pursuing completion of same with commercially reasonable diligence). Notwithstanding anything contained in this Lease to the contrary, subject to a Tenant Caused Delay, Tenant will not be required to pay                          : from Tenant under this Lease, in the event the Rental Commencement Date falls during the period from the first day of October of any calendar year through the last day of December of such calendar year (said period being the "**Rent Deferral Period**"), and in such event, the Rental Commencement Date shall be extended for all purposes under this Lease to the first day of January of the succeeding calendar year, provided, however, if Tenant opens for business during the Rent Deferral Period and all other conditions to the Rental Commencement Date are met, the Rental Commencement Date shall be deemed to be the date Tenant opens for business. The "**Initial Co-Tenancy Requirement**" shall mean that at least two (2) of the "Other Required Lessees" of the Shopping Center enumerated in Paragraph 8 of the Basic Lease Provisions have opened their stores in the premises marked for their occupancy on Exhibit B and are operating for the uses listed in said Paragraph 8 of the Basic Lease Provisions.

2.1.2.1    Failure of the Initial Co-Tenancy Requirement. If the Initial Co-Tenancy Requirement is not satisfied on the date on which the Rental Commencement Date would otherwise have occurred but for the failure to satisfy the Initial Co-Tenancy Requirement, and Tenant elects to open for business with the public, then Tenant shall pay, from the date Tenant opens for business in the Premises until such time as the Initial Co-Tenancy Requirement is met:



2.1.2.2    Permits.    Within ten (10) business days after the later to occur of (a) Tenant's receipt of the SNDA, (b) the completion of Tenant's plans for Tenant's Work ("**Tenant's Plans**") or (c) the date Landlord approves Tenant's Plans to the extent such approval is required under this Lease ("**Permit Filing Date**"), Tenant shall, at Tenant's own expense, apply for any and all governmental permits, licenses and approvals (collectively, "**Permits**") required to permit Tenant to perform Tenant's Work (defined below), and thereafter Tenant shall diligently pursue obtaining the Permits. Tenant shall give Landlord written notice of (i) the actual Permit filing date, together with a dated stamped copy of the first page of Tenant's application from the applicable governmental agencies showing the actual Permit filing date, (ii) the date Permits are issued, and (iii) the actual date Tenant obtains its Permits, which notice shall be accompanied by a copy of such Permit. Upon Tenant's written request, Landlord agrees to reasonably cooperate with Tenant, at no cost or expense to Landlord, as may be necessary for Tenant to obtain such Permits, provided Landlord shall not be required to make any changes to the Shopping Center or any entitlements thereto in connection with the issuance of the Permits. To the extent Landlord approval is required, if Tenant fails to submit Tenant's Plans for Landlord's approval within the timeframe set forth in this Lease, or to resubmit the same within ten (10) business days after receiving any comments from Landlord, or if Tenant fails to submit its application for Permits on or before the Permit Filing Date, or if Tenant otherwise fails to diligently pursue its Permits, the one hundred eighty (180) day rent accrual timeframe set forth above shall be reduced by one (1) day for each day of delay in Tenant complying with Tenant's obligations set forth in this Section 2.1.2.2 and Tenant shall be deemed to have waived its right to terminate provided for in this Section 2.1.2.2. If Tenant has failed to obtain the Permits within ninety (90) days after Tenant's timely submission of its application for such Permits, Landlord shall have the right, but not the obligation, to pursue the Permits on Tenant's behalf and at Landlord's expense. If Tenant fails to obtain all Permits within one hundred eighty (180) days after the Permit Filing Date, Landlord shall have the right at any time thereafter prior to Permits being obtained by Tenant to terminate this Lease by giving notice of such election to terminate; provided, however, Landlord's notice to terminate shall be null and void and this Lease shall continue in full force and effect if Tenant advises Landlord within ten (10) business days after receiving Landlord's termination notice that Tenant has either obtained such Permits or waives its right to terminate this Lease on account of failure to obtain the Permits. If Tenant waives its right to terminate on account of failure to obtain such Permits, the one hundred eighty (180) day period set forth in Section 2.1.2 of this Exhibit C shall commence on the later of the date Landlord's termination notice was given or the date all conditions precedent to the Rental Commencement Date are satisfied, other than Permits. Provided that (i) Tenant has timely submitted and resubmitted Tenant's Plans to Landlord for approval to the extent required under this Lease and its application for Permits as provided for above, and



Tenant has used good faith diligent efforts to obtain the same, if the Permits have not been issued within one hundred eighty (180) days after the Permit Filing Date, Tenant shall have the right to terminate this Lease by giving notice of such election to terminate to Landlord at any time prior to issuance of Permits; provided, however, Tenant's notice to terminate shall be null and void and this Lease shall continue in full force and effect if Landlord advises Tenant within ten (10) days of receiving Tenant's termination notice that Landlord obtained such Permits for Tenant.  For purposes of this Section 2.1.2.2, the term "diligently pursue" shall include payment of all fees and charges, providing all requested information and data to the governmental agencies in a timely manner, and otherwise cooperating with the governmental agencies in a timely manner.

2.2.    <u>Options to Extend Term</u>.  Tenant will have options for the number of Extensions of the Lease Term set forth in Paragraph 5 of the Basic Lease Provisions.  Each option will be exercisable by written notice (the "**Option Notice**") given to Landlord at least ⁃ to the last day of the Initial Term or then effective Extension, as the case may be.  Upon receipt of each such notice, this Lease will be extended for the period specified in Paragraph 5 of the Basic Lease Provisions without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, ████████████████████████████████.  Notwithstanding the foregoing, any Option Notice given by Tenant at a time when Tenant is in material default of its monetary obligations hereunder (after receipt of written notice and expiration of any applicable cure period), shall be ineffective.  For purposes of this Section 2.2 only, Tenant shall not be deemed in default of its monetary obligations due to good faith disputes by Tenant of any amount alleged to be due by Tenant under this Lease with the exception of Minimum Rent.

2.3.    <u>Lease Term Defined</u>.  As used in this Lease, the phrase the "**Lease Term**" means the Initial Term and any Extension.  Landlord and Tenant agree to sign on or before the sixtieth (60th) day following the Rental Commencement Date, a "Notice of Lease" in the form set forth in <u>Exhibit E</u> to this Lease, setting forth the commencement date of the Initial Term, the Rental Commencement Date, the certified number of Leasable Square Feet in the Premises, the revised Minimum Rent amounts based upon the certified number of Leasable Square Feet in the Premises, and the Expiration Date, said Notice of Lease thereafter to be conclusive of said information.

2.4.    <u>Holdover Tenancy</u>.  If Tenant or any party claiming under Tenant remains in possession of the Premises, or any part thereof, after any termination or after the expiration of the Lease Term without execution of a new lease or of an agreement extending the Lease Term, Tenant will be deemed to be occupying the Premises as a tenant from month to month, subject to all of the terms of this Lease as may be applicable to a month to month tenancy and

, except that thereafter either Landlord or Tenant may terminate the Lease upon written notice to the other.  Landlord or Tenant may by written notice terminate the month-to-month tenancy effective on the last day of the calendar month next following the date of the notice, and if Tenant, after notice from Landlord, thereafter fails or refuses to vacate the Premises on or before the termination date for said tenancy, then Landlord shall have all rights and remedies available to Landlord at law or in equity, and in addition, ████████████████████████████████ ██████████████  In the event Landlord notifies Tenant in writing that Landlord has executed a lease with another party for all or a portion of the Premises for a period of time commencing after the last day of the Lease Term, and if Tenant holds over in the Premises beyond the later to occur of the last day of the Lease Term, or thirty (30) days after receipt of such notice from Landlord, and Tenant's holdover directly results in Landlord's incurring damages in connection with the delivery of the Premises to such party, Tenant shall indemnify, defend, protect and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liability and expenses (including attorneys' fees and court costs) resulting from Tenant's holdover.

2.5.    <u>Intentionally Deleted</u>.

2.6.    <u>Intentionally Deleted</u>.

3.    <u>RENT AND OTHER TENANT CHARGES</u>

3.1.    <u>Commencement of Rent</u>.  Notwithstanding anything to the contrary contained in this Lease, subject to the Free Rent Period, the Minimum Rent, Common Area Charges, Real Estate Taxes and any other charges due from Tenant under this Lease will not begin to accrue until the Rental Commencement Date.  Tenant covenants and agrees to pay Landlord, or such other persons or entities and at such place as Landlord may designate, the rents and other charges set forth below in this Section 3.

3.2.    <u>Minimum Rent</u>.  Subject to the Free Rent Period, Tenant will pay Landlord for each month within the Lease Term after the Rental Commencement Date, the Minimum Rent set forth in Paragraph 6



of the Basic Lease Provisions. Minimum Rent shall be payable in advance on the first day of each month in equal installments which shall not be decreased, increased or abated except as set forth in this Lease. If the Rental Commencement Date does not occur on the first day of a calendar month, the Minimum Rent for the first partial calendar month that the Minimum Rent is due will be prorated based on the actual number of days within said calendar month after the Rental Commencement Date. If the term of this Lease expires or is terminated on a day which is not the last day of the calendar month, the Minimum Rent for the final partial calendar month that the Minimum Rent is due will be prorated based on the actual number of days within said calendar month prior to the end of the Lease Term.

3.2.1    <u>Late Fee</u>. 

3.2.2    <u>Additional Rent</u>. Any payments to be made by Tenant to Landlord under this Lease in addition to the Minimum Rent, whether or not denominated as Minimum Rent, will be deemed to be additional rent under this Lease for the purpose of securing their collection. Landlord will have the same rights and remedies upon Tenant's failure to make such payments as for the nonpayment of Minimum Rent.

3.3.    <u>Common Area Charges</u>

3.3.1    <u>Common Area Charges Defined</u>. Tenant shall reimburse to Landlord, in the manner set forth below in Section 3.3.4 of this <u>Exhibit C</u> as additional rent, Tenant's pro rata share of Landlord's cost of operation, repair, replacement (if expressly permitted hereunder) and maintenance of the "Common Areas" during the Lease Term, determined in accordance with generally accepted accounting principles (the "**Common Area Charges**"). Common Area Charges will also include the cost of the repair and maintenance of the sanitation, sewer, storm drainage systems, plumbing, electrical and other utility systems which serve the Common Areas exclusively, repainting (as set forth below) and repaving (as set forth below). The insurance premiums for the insurance required to be maintained by Landlord pursuant to Sections 5.2.1, 5.2.2 and 5.2.4 of this <u>Exhibit C</u> shall not be included in Common Areas Charges and instead, shall be reimbursable by Tenant pursuant to Section 3.6 of this <u>Exhibit C</u>. Landlord shall deduct from Common Area Charges any income received by Landlord with regard to the Common Area. There shall be no duplication of charges within Common Area Charges. Common Area Charges will not include any of the following: (i) Real Estate Taxes, (ii) cost of capital improvements or capital repairs, including, without limitation, repainting of buildings and total repaving of the parking areas (or partial repaving of parking areas if in the aggregate such partial repairs will result in a substantially total repair), provided, however, that Landlord may include the cost of repainting of buildings once in any _ _ . . _ _ _ _ l after the Rental Commencement Date and the cost of repaving of parking areas once in any _ _ _ _ _ _ _ after the Rental Commencement Date provided said repainting and repaving is amortized over such _ _  -- _ _ _ _ _ _ ' period, as the case may be, for purposes of Common Area Charges, except that, for purposes of this Section 3.3.1, normal patching and resurfacing of parking areas consisting of asphalt overlays, slurry, chip or seal coating or restriping, or touch-up painting or graffiti removal shall not be considered capital improvements or capital repairs, and provided further, however, Landlord may include the reasonable cost and expense of a capital improvement which results in an actual reduction in Landlord's overall cost of operation and maintenance of the Common Areas (but in no event shall the cost of such capital improvement exceed the savings actually received as a result of such capital improvement) which such cost and expense shall be amortized over the useful life of such capital improvement, and only the amortized portion of the cost shall be included in each calendar year, (iii) cost of roof repairs, (iv) cost associated with construction or renovation of the Shopping Center or cost of repairing design or construction defects or costs of repairs or modification to the Shopping Center, Premises, or leasehold improvements thereto that are necessary due to Landlord's failure to construct the Shopping Center, Premises or leasehold improvements in full compliance with Laws in effect at the time of construction, (v) cost of improvements, repairs, or replacements covered by insurance or reimbursed by third parties, (vi) repairs or other work (including rebuilding) occasioned by casualty or condemnation, (vii) cost of constructing leasehold improvements for any lessee of the Shopping Center, (viii) legal or brokerage fees and other costs of procuring tenants associated with any lease for space in the Shopping Center, (ix) cost of advertising, (x) management fees, whether payable to Landlord or third parties, (xi) so-called "administrative charges" or other add-ons to the total of Common Area Charges, except Landlord may include in Common Area Charges an administrative fee equal to ten percent (10%) of Common Area Charges, (xii) principal or interest on debt or amortization payments on any mortgages or deeds of trust or any other debt for borrowed money and amortization of improvements, (xiii) depreciation of Landlord's original investment in the Shopping Center, (xiv) amounts paid by Landlord to affiliates of Landlord for services in connection with the Common Areas, to the extent such fees are in excess of the ordinary and reasonable fees paid in arms' length transactions, (xv) rents and other charges payable to underlying landlords including any charges arising due to violations of said leases, (xvi) costs and expenses of



C-5

enforcing leases against other tenants, (xvii) except as may be expressly provided in Section 6.1 of this <u>Exhibit C</u>, maintenance by Landlord of the items required by Landlord to be maintained under Section 6.1 of this <u>Exhibit C</u> of this Lease, (xviii) expenses related to vacant space, including utility costs, security and renovation, (xix) the costs and expenses related to investigation of, testing for, removal and/or clean-up of Hazardous Materials (below defined), which shall be governed by Section 9.3 of this Exhibit C, or (xx) the purchase of art work, sculptures, seasonal decorations or other similar purchases.

3.3.2    <u>Computation of Tenant's Pro Rata Share</u>.  Tenant's pro rata share of Common Area Charges will be an amount equal to the product of (i) total Common Area Charges for such calendar year, multiplied by 

3.3.3    <u>Maximum Payable by Tenant</u>.  Tenant's pro rata share of Common Area Charges (on an annualized basis) (i) will not, prior to the end of the first full calendar year of the Lease Term after the Rental Commencement Date, exceed the amount set forth in Paragraph 7(a) of the Basic Lease Provisions, and (ii) will not increase, on a calendar year to calendar year basis thereafter, by more than ▉▉▉ ▉▉▉▉▉▉▉ of Tenant's actual or maximum payable share (whichever is less) of Common Area Charges for the previous full calendar year, which ▉▉▉▉▉▉▉▉▉▉▉▉▉ cap may accumulate from year to year, but in no event shall Tenant's pro rata share of Common Area Charges ever increase by more than ▉▉▉▉▉▉▉▉t ▉▉▉▉ over Tenant's maximum payable share of Common Area Charges for the previous calendar year. Notwithstanding the foregoing, utility costs, and snow removal costs shall be excluded from the cap described in (ii) above on Common Area Charges for purposes of calculating Tenant's maximum share of Common Area Charges.  Tenant's pro rata share of insurance shall be payable pursuant to Section 3.6 below and shall not be subject to the limitations of this Section 3.3.3.

3.3.4    <u>Payment of Common Area Charges</u>.  The Common Area Charges shall be paid in the manner set forth in this Section 3.3.4:

3.3.4.1    <u>Annual Estimates</u>.  Landlord may reasonably estimate the amounts Tenant will owe for the Common Area Charges for the current full or partial calendar year of the Lease Term.  In such event, Tenant will pay, subject to the provisions of Section 3.3.3 of this <u>Exhibit C</u> with respect to the Common Area Charges, one-twelfth (1/12) of the estimated annual amounts, on a monthly basis, on the first day of each calendar month, together with Tenant's payment of Minimum Rent.

3.3.4.2    <u>Annual Statement</u>.  On or before the fifteenth day of April of each calendar year (the "**Statement Deadline**"), Landlord will deliver a statement (the "**CAM Statement**") to Tenant certified by Landlord's authorized representative showing: (i) the amount of the actual Common Area Charges for the preceding calendar year, with a breakdown of amounts by major categories of the Common Area Charges, (ii) the amounts paid by Tenant toward the estimated Common Area Charges during the preceding calendar year, (iii) any applicable limitation under Section 3.3.3 of this <u>Exhibit C</u>, (iv) Tenant's pro rata share and the detail for determining same, and (v) subject to the provisions of Section 3.3.3 of this <u>Exhibit C</u>, any revised estimate of Tenant's obligations for the estimated Common Area Charges for the current calendar year.  In the event Landlord fails to deliver the CAM Statement to Tenant on or before the Statement Deadline, and after thirty (30) days after written request therefor from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend the monthly payment of Tenant's estimated Common Area Charges, and for only so long as Landlord has not delivered the CAM Statement to Tenant, Tenant shall only be required to reimburse Landlord for Tenant's pro rata share of the Common Area Charges quarter-annually, in arrears, payable to Landlord within thirty (30) days after receipt by Tenant of information similar to that to be provided in the CAM Statement and proof reasonably satisfactory to Tenant of the amount of Tenant's proportionate share of the Common Area Charges for the preceding three (3) month period.

3.3.4.3    <u>Differentials</u>.  If the CAM Statement shows that Tenant's estimated payments were less than Tenant's actual obligations for the Common Area Charges for the preceding calendar year, Tenant will pay the difference within thirty (30) days after Tenant receives the CAM Statement.  If the CAM Statement shows an increase in Tenant's estimated payments for the current calendar year subject to the limitation in Section 3.3.3 of this <u>Exhibit C</u>, Tenant shall also pay the difference between the new and former estimates for the period from January 1 of the current calendar year through the month in which the CAM Statement is sent.  If the CAM Statement shows that Tenant's estimated payments exceeded Tenant's actual obligations for the Common Area Charges, Tenant will receive a refund of such excess within thirty (30) days after Tenant's receipt of the CAM Statement.



**3.3.4.4    Partial Calendar Years.** If the Rental Commencement Date commences other than on January 1, or the Lease Term ends other than on December 31, Tenant's obligations to pay estimated and actual amounts toward the Common Area Charges for such partial calendar years will be prorated on the basis of the portion of such calendar years included in the Lease Term following the Rental Commencement Date.  Such proration shall be made by multiplying the total estimated or actual (as the case may be) Common Area Charges for the calendar year in question, by a fraction having as its numerator the number of days of the Lease Term following the Rental Commencement Date within the partial calendar year, and as its denominator "365".

**3.3.5    Right to Inspect Books.** Landlord shall maintain an accurate set of books and records of all Common Area Charges.  All such records shall be retained and preserved for at least thirty-six (36) months after the end of the calendar year to which such books and records relate.  Tenant will have the right, from time to time (but not more frequently than once each calendar year) upon ten (10) days' prior written notice delivered to Landlord on or before thirty-six (36) months after receipt of any CAM Statement (or the end of the applicable calendar year if a CAM Statement has not been provided in a timely fashion), to audit, copy and inspect, at reasonable times and in a reasonable manner, such books and records.  Any such audit shall be at the sole expense of Tenant.  Such records shall be made available by Landlord for examination at the office where the same are regularly maintained by Landlord.  Tenant shall furnish to Landlord a copy of the audit results within thirty (30) days following the completion of any such audit.   If any CAM Statement shall be revealed by Tenant's audit to reflect an overstatement of Common Area Charges ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ If any such audit discloses the actual amount of Common Area Charges is less than the amount paid by Tenant, Landlord will pay to Tenant, within thirty (30) days after conclusion of the audit, any refund due to Tenant.  If any such audit discloses the actual amount of Common Area Charges is more than the amount paid by Tenant, Tenant will pay to Landlord, within thirty (30) days after conclusion of the audit, any additional amount payable to Landlord, subject to Section 3.3.3 of this Exhibit C.  Failure of Tenant within ninety (90) days following such audit to request payment for any overpayment of Common Area Charges revealed from said audit shall result in Tenant being forever barred from claiming for same. Any audit so conducted must be performed by an officer or employee of Tenant or a Certified Public Accountant and cannot be conducted on a contingency basis.  If Tenant fails to notify Landlord in writing of an audit of Common Area Charges within thirty-six (36) months after receipt of the applicable CAM Statement by Tenant (or within thirty-six (36) months after the end of the applicable calendar year if Landlord has not provided a CAM Statement), any such CAM Statement or Common Area Charges shall be conclusively deemed true and correct; provided, however, this sentence shall not be deemed to obligate Tenant to continue to pay for any erroneous or incorrect charges contained in the applicable CAM Statement to the extent such erroneous or incorrect charges are included on future CAM Statements, but shall only prohibit Tenant from recovering the erroneous or incorrect charges which were billed to Tenant but not audited within thirty-six (36)  months after such billing.

**3.4.    Real Estate Taxes**

**3.4.1    Real Estate Taxes Defined.** The term "**Real Estate Taxes**" means all real property taxes first due and payable during the Lease Term following Rental Commencement Date which are assessed by any lawful authority against the Shopping Center, less any rebates, credits or abatements from said authorities which are granted or agreed upon with respect to the Shopping Center; provided, however, that as regards any assessment which under the laws then in force may be paid in installments, there will be included within the meaning of the term "Real Estate Taxes" with respect to any tax fiscal year only the current annual installment.  Real Estate Taxes will not include any of the following: (i) any assessments for highway, street or traffic control improvements, sanitary or storm sewers, utilities, or for other off-site improvements of any nature whatsoever made in connection with the development of the Shopping Center, (ii) any franchise, gift, estate, inheritance, conveyance, transfer, capital investment or other tax assessed against Landlord or Landlord's heirs, successors or assigns, (iii) any income, excess profits or other tax, assessment, charge, or levy on the rent payable by Tenant under this Lease, (iv) any property tax applicable to a so-called "pad site" or "out parcel" or any other parcel which is separately assessed, or land and/or improvements not within the boundaries of the Shopping Center, as shown on Exhibit B of this Lease, or (v) any interest, fine, or penalty for late payment or nonpayment by Landlord of any Real Estate Taxes.

**3.4.2    Computation of Tenant's Pro Rata Share.** Tenant will pay to Landlord, as additional rent, Tenant's pro rata share of Real Estate Taxes.  Tenant's pro rata share of Real Estate Taxes will be an amount equal to the product of: (i) all Real Estate Taxes, as defined in Section 3.4.1 of this Exhibit C, multiplied by ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



██████████████████████████████████████████████ . Tenant's payment of its pro rata share of Real Estate Taxes shall be due to Landlord thirty (30) days following the later of the following: (a) Tenant's receipt of a copy of proof of payment by Landlord of all Real Estate Taxes if the then current tax bill shows Real Estate Taxes for the previous tax period as past due or delinquent and (b) Tenant's receipt of an itemized detailed current Real Estate Tax statement showing (I) the amount of Real Estate Taxes for the preceding calendar year and (II) a statement of Tenant's pro rata share of Real Estate Taxes due and the detail necessary and calculations made for determination of the same, including at Tenant's request, any tax parcel map(s) reasonably necessary to determine the propriety of the Real Estate Taxes. Notwithstanding the foregoing, Tenant shall not be obligated to pay its pro rata share of Real Estate Taxes to Landlord more than thirty (30) days prior to the last date such Real Estate Taxes may be paid by Landlord without incurring penalties or interest.

3.4.3    Partial Tax Fiscal Years. All Real Estate Taxes for the partial tax fiscal years falling within the Lease Term following the Rental Commencement Date will be prorated by multiplying the amount of Real Estate Taxes for the tax fiscal year falling within the Lease Term following the Rental Commencement Date by a fraction having as its numerator the number of days in such tax fiscal year falling within the Lease Term following the Rental Commencement Date and having as its denominator the number "365".

3.4.4    Right to Contest.  Landlord shall, within thirty (30) days of receiving notification thereof, send to Tenant notice of any increases in assessments for Real Estate Taxes.  Provided (i) Tenant at least thirty (30) days prior has requested Landlord to make such a contest and Landlord or other tenants have not then previously filed or do not thereafter within said thirty (30) days file a contest of the amount or validity of specific Real Estate Taxes which are payable by Tenant, (or in the alternative, if Landlord has not given Tenant written notice of Landlord's intention to file such a contest prior to the applicable deadline), and (ii) occupants of at least fifty percent (50%)of the then occupied premises in the Shopping Center (including Tenant) have consented to such contest, Tenant will have the right, at Tenant's expense, to contest the amount or validity of Real Estate Taxes by appropriate administrative and legal proceedings brought either in Tenant's name, Landlord's name or jointly with Landlord, as Tenant may deem appropriate, by counsel selected and engaged by Tenant.  Landlord will execute and deliver to Tenant whatever documents Landlord and Tenant jointly determine may be necessary or proper to permit Tenant to contest Real Estate Taxes or which may be necessary to secure payment of any refund which may result from any such proceedings.  Any refund resulting from a proceeding brought either by Tenant or Landlord or by them jointly will be applied first to reimburse the party or parties who brought the proceeding for the costs incurred with the proceeding, and then to reimburse Tenant for the difference between the amount Tenant paid for Real Estate Taxes for each fiscal tax year involved in the proceeding and the amount Tenant would have been required to pay if the Real Estate Taxes had been assessed in accordance with the decision rendered in the proceeding, together with interest on the amount of such difference at the annual rate allowed by the court on the overpayment of Real Estate Taxes.  Any remaining balance will be paid to Landlord.  Tenant's election to contest Real Estate Taxes shall not relieve Tenant of its obligation to pay Landlord for Tenant's pro rata share of such contested Real Estate Taxes as provided in this Section 3.4.2.

3.4.5    Payment by Landlord.  Landlord shall pay to the appropriate governmental authorities, on or before same are due, all taxes, assessments, levies or related charges due and payable to said authorities.

3.4.6    Personal Property Taxes.       Tenant will pay, prior to delinquency, any and all taxes and assessments that may be assessed or levied on or against any of Tenant's business or operation or personal property, fixtures or equipment placed on or in the Premises.

3.5.    Utilities

3.5.1    Separate Metering.  Landlord shall furnish, install and maintain throughout the Lease Term without expense to Tenant, all electric, water, gas, telephone, sanitary and storm sewer lines to the Premises and equipment required to provide service. All hook-up, tap and similar fees payable in relation to the installation or furnishing of said utilities shall be the responsibility of Landlord (provided, however, Tenant shall be responsible for telephone hook up fees).  In addition, Landlord will, at Landlord's sole cost and expense, provide separate meters to measure Tenant's individual consumption of utilities. If any utility services to the Premises are interrupted due to the negligent acts or omissions of Landlord, its employees, agents or contractors or the failure of Landlord to maintain or repair any utility lines or equipment which are Landlord's obligation to maintain under this Lease and Tenant is forced to close the Premises solely as a result thereof, Tenant's Minimum Rent and all other charges payable under this Lease shall be abated until such services are restored.

3.5.2    Payment of Utility Bills.  Tenant will promptly pay all charges (based on consumption) for electricity, water, gas, telephone service, sewer service, and other utilities furnished to the Premises directly to the utility providing such service.  Tenant shall be entitled to any credits, rebates



or other monies payable with respect to the Premises by governmental or quasi-governmental authorities or utility providers for the use of particular equipment or fixtures, including, but not limited to, those rebates given for use of energy efficient lighting or air conditioning systems.

        3.5.3   <u>Fire Alarm Monitoring</u>. If the fire alarm system serving the Premises is a shared system, then Landlord shall, as a condition precedent to the Completion Date and throughout the Lease Term, arrange for monitoring of the fire alarm system, and shall be responsible for maintaining the fire alarm system in good working order throughout the Lease Term. From and after the Rental Commencement Date, Tenant shall reimburse Landlord for Tenant's pro rata share of the costs of such maintenance and monitoring as a part of Common Area Charges.

        3.6.   <u>Payment of Tenant's Share of Insurance Costs</u>. Tenant agrees to pay, as additional rent, Tenant's pro rata share of all premiums for the portion of the premium attributable to the calendar year paid by Landlord for Landlord's insurance under Sections 5.2.1, 5.2.2 and 5.2.4 of this <u>Exhibit C</u>, at the same times and in the same manner as provided in Section 3.3.4 of this <u>Exhibit C</u>, for the payment of Common Area Charges. If the cost of the insurance increases as a result of any use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from the amounts payable by Tenant. Tenant's pro rata share will be an amount equal to the product of (i) the insurance premiums, multiplied by ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Landlord shall provide a copy of the invoice and declaration page of the insurance policy along with Landlord's demand for reimbursement, and if the insurance policy covers multiple properties, then Landlord shall also provide a schedule showing how the premiums are allocated among the properties.

        3.7.   <u>Waiver of Recovery of Tenant's Share of Certain Charges</u>. If Landlord fails to seek reimbursement of Common Area Charges, Real Estate Taxes or insurance expenses from Tenant within ██████ after the last day of the calendar year during which such expense was incurred, Landlord's right to recover such charge or expense shall be deemed to have been waived.

        3.8.   <u>Rent</u>. Minimum Rent, Tenant's share of Common Area Charges, Real Estate Taxes and insurance, and all other amounts to be paid by Tenant to or on behalf of Landlord shall constitute "rent" for purposes of this Lease and applicable law.

4.     COMMON AREAS

        4.1.   <u>Common Areas Defined</u>. The term the "**Common Areas**" as used in this Lease means those parts of the Shopping Center for the common use of all tenants, including, among other facilities, parking areas, driveways within the Shopping Center and to public roads adjoining the Shopping Center, sidewalks, landscaping, loading areas (if any), private streets and alleys, lighting facilities, drinking fountains, and public toilets, exclusive of (i) buildings and associated truck ramps, wells and trash compactors exclusively for the use of one tenant, (ii) any outside sales area contained within an individual building area, and (iii) any future buildings, when and if same are actually constructed.

        4.2.   <u>Right to Use Common Areas</u>. Landlord hereby grants to Tenant and Tenant's customers, invitees and employees for the entire Lease Term, an irrevocable and unrestricted easement to use, in common with Landlord, Landlord's customers, invitees and employees and with the other lessees and occupants of the Shopping Center and their respective customers, invitees and employees, the Common Areas for their intended purposes. Subject to applicable laws and necessary repairs performed in accordance with this Lease, the Common Areas will remain open at all times during the Lease Term, and Landlord shall not allow the use of the Common Areas for carnival type shows, rides, entertainment, outdoor shows, displays (except as similar to that allowable under Section 4.2.1 of this <u>Exhibit C</u>), automobile and other product shows, or the leasing of kiosks; provided, however, Landlord shall have the right to permit temporary displays and sales for seasonal items, such as fireworks, flowers, pumpkins and Christmas trees within any area outside of the Critical Common Area.

        4.2.1   <u>Sidewalk Sales</u>. Tenant will have the right in accordance with applicable Laws (below defined) and the rights of the existing occupants of the Shopping Center as of the Effective Date ("**Existing Occupants**") to display merchandise and to hold "sidewalk sales" on the sidewalk immediately in front of the Premises. Tenant's conduct of such sidewalk sales and displays shall be carried out in such a manner so as to not prevent or unreasonably impair pedestrian access to and across the portion of the sidewalk utilized for any such sale or display, and in all instances in accordance with applicable laws, including ADA. During the course of any such sale or display, Tenant shall be responsible, at its sole cost and expense, to maintain in a clean, neat and orderly condition the portion of the sidewalk utilized for any



C-9

such sales or displays, and to repair any damage caused to the sidewalk or other portions of the Common Areas resulting from any such sales or displays. In the event leases of the Existing Occupants prohibit "sidewalk sales", (i) Tenant has the right to obtain necessary consents from the Existing Occupants, and (ii) Landlord will not enforce the provisions of the leases prohibiting "sidewalk sales" unless an Existing Occupant requests in writing that Landlord enforce such provision.

       **4.2.2**   <u>Storage Trailers and Containers</u>. Tenant will have the right in accordance with applicable Laws to park temporary storage trailers and/or containers (including, but not limited to, those associated with Tenant's grand opening activities) in the designated area noted for such on <u>Exhibit B</u> ("**Storage Parking**"), provided said trailers do not unreasonably block the vehicular or pedestrian access, ingress and egress to and from the Shopping Center. Landlord shall have the right to relocate the Storage Parking, provided said Storage Parking remains in the side parking area and Landlord notifies Tenant prior to the delivery of any storage trailer and/or container.

       **4.2.3**   <u>Trash Dumpster</u>. Tenant will have the exclusive right and easement, without payment of additional rent under this Lease, to install in compliance with applicable Laws at a location shown on <u>Exhibit B</u> a trash dumpster. If required by Laws, and to the extent such Laws are enforced, Landlord shall, at Landlord's cost and expense, provide an enclosure for the trash dumpster. Any trash bailer shall be located within the Premises. If Tenant installs said bailer, thereafter Tenant will pay for collection of its own trash and Landlord will include only the cost of trash collection for the Common Areas in Tenant's pro rata share of Common Area Charges. Costs incurred by Landlord in connection with trash collection for other tenants or occupants of the Shopping Center will not be included in Tenant's pro rata share of Common Area Charges.

    **4.3.**   <u>Parking Areas</u>. At Landlord's sole cost and expense, Landlord shall provide parking areas for the use of the customers, invitees and employees of Tenant, consisting of paved areas immediately adjacent to the stores in the Shopping Center as shown on <u>Exhibit B</u>. The number of parking spaces will never be less than the greater of (a) the number of parking spaces required by applicable Law, or (b) the ratio of                        , with reserved handicap parking spaces so as to comply with applicable Laws, and a handicap access ramp immediately in front of the Premises so as to comply with applicable Laws. Unless required by any Laws, no charge will ever be made (or permitted) by Landlord to any person for the privilege of parking vehicles in the parking areas. The parking areas will have adequate unobstructed entrances and exits to all thoroughfares adjacent to the Shopping Center. Pick-up and delivery areas and access to such areas, will be clearly delineated. Landlord shall provide an illumination at all points within open parking and walking areas equal to that of comparable shopping centers in Ridgefield, Connecticut. If and to the extent Landlord grants similar rights to any other occupant of the                        premises shown on <u>Exhibit B</u> occupying                        , then subject to the rights of existing tenants and applicable laws, Landlord hereby grants Tenant the right to designate            s within close proximity to the Premises as "reserved" for the parking of customers picking up orders placed on-line. The cost of manufacturing, installing and maintaining the signage designating such reserved spaces shall be the responsibility of Tenant. Landlord will use Landlord's commercially reasonable efforts to prevent unauthorized use of the Common Areas by parties other than lessees of the Shopping Center and their customers, invitees and employees.

    **4.4.**   <u>Maintenance of Common Areas</u>. At all times during the Lease Term, Landlord will maintain the Common Areas and all mechanical and lighting equipment, the pylon and/or monument signs and drainage facilities thereon in good order, condition and repair and will keep the Common Areas reasonably clean and free from rubbish, ice and snow and cause the Common Areas and the pylon and/or monument signs to be well lit during at least such hours as the Shopping Center is open for business, and Landlord shall also cause the Common Areas to be lit during such times as employees are normally at the Premises if it is dark, for example, in the early morning hours during winter. Landlord will maintain and repaint any directional signs, markers and parking space lines as often as necessary as reasonably determined by Landlord. Landlord will maintain surfaces of sidewalks and parking areas, in a level and smooth condition with the type of surfacing material originally installed thereon subject to repairs and maintenance of same. Landlord will also maintain in accordance with local ordinances the landscaping on and about the Shopping Center in a manner which will not materially obstruct the visibility of Tenant's storefront and the storefront, pylon and monument signs, including in said maintenance the trimming and thinning of trees as and to the extent the same are controlled by Landlord. Landlord will also maintain or cause to be maintained all parts of the Shopping Center outside the Premises other than the Common Areas in good order, condition and repair. Landlord shall notify Tenant in writing at least ten (10) days prior to the commencement of any reconstruction, repairing or repaving of the Common Areas and/or any restriction or closure of any access roads or entrances to the Shopping Center. Landlord shall schedule its reconstruction, repairs and repaving so as to minimize the length and scope of disruptions in the operation of the Common Areas.

    **4.5.**   <u>Configuration of Common Areas</u>. Landlord will not change the size, location or configuration of the sidewalks, driveways, parking areas, and parking aisles in the "**Critical Common Area**", as shown on <u>Exhibit B</u> of this Lease, without Tenant's prior written consent, which consent shall not



be unreasonably withheld, delayed or conditioned (except for immaterial changes such as re-landscaping, hardscaping, cross-walks and reasonable restriping of parking areas therein, provided such immaterial changes do not (i) reduce the number of parking spaces in the Critical Common Area by more than 10 spaces, or (ii) materially or adversely alter the flow of automobile or pedestrian traffic into the Critical Common Area). It shall not be unreasonable for Tenant to withhold its consent for any change which would materially or adversely affect Tenant's usage of the Critical Common Area, access to the Shopping Center, traffic flow to the Premises or visibility of the Premises from the Critical Common Area. Landlord will neither change, nor permit the change of, the size, location or configuration of the sidewalks, driveways, parking areas, and parking aisles outside the Critical Common Areas to any extent which would (a) reduce the parking ratio below the ratio required by Section 4.3 above, or (b) materially adversely affect the flow of vehicular and/or pedestrian traffic to and from the Shopping Center and/or the Premises or (c) visibility of Tenant's storefront from the Critical Common Area. Notwithstanding the foregoing, Landlord will neither change, nor permit the change of the Critical Common Area in any way that would materially adversely interfere with access to the Premises for or maneuverability of Tenant's trucks and service vehicles, except as otherwise required by applicable Law. If Landlord or any other tenant or occupant of the Shopping Center performs any elective remodeling which result in any governmental authority requiring changes to the Critical Common Area and such changes would (a) reduce the number of parking spaces within the Critical Area below the number shown on <u>Exhibit B</u> or (b) materially and adversely affect access to the Premises for either customer access or delivery access by larger tractor trailer delivery vehicles, then such changes shall not be deemed "required by applicable Law" and shall not be permitted.

    4.6.   <u>Restrictions on Construction</u>. Landlord will not create out parcels or pad sites, in addition to the out parcels or pad sites shown on <u>Exhibit B</u> of this Lease. Except as may be existing as of the Effective Date, any buildings, pylon or monument signs constructed on the out parcels or pad sites within the "<b>Outparcel Area</b>" shown on <u>Exhibit B</u> and owned by or acquired by Landlord or any affiliate of Landlord shall be subject to the following restrictions: (i) no building or improvements constructed on any out parcel or pad site shown on <u>Exhibit B</u> shall exceed           t (including architectural features, provided such architectural features do not interfere (other than in an immaterial nature) with the visibility of the Premises), (ii) each building shall comply with Laws; and (iii) any pylon signs erected or constructed on the out parcels or pad sites shall not obstruct the visibility of the pylon signs identifying the Shopping Center or Tenant. Landlord shall endeavor to not perform (nor permit to be performed subject to the rights of existing tenants, emergencies and applicable laws) any exterior construction in the Shopping Center during the months of November or December after Tenant has opened for business in the Premises.

    4.7.   <u>Employee Parking</u>. Landlord may designate, and may from time to time change the designation of, the particular parking areas in the Shopping Center to be used by the employees of the various occupants of the Shopping Center (the "<b>Employee Parking Areas</b>"); provided that the rules for parking shall be uniformly imposed upon all tenants of the Shopping Center. Landlord shall exercise commercially reasonable efforts to ensure that any designated Employee Parking Areas shall impose no unreasonable burden upon the employees of Tenant and shall impose no greater safety or security risk upon Tenant's employees than any other parking areas of the Shopping Center.

    4.8.   <u>Intentionally Deleted</u>.

    4.9   <u>Telecommunications</u>. Tenant and Tenant's agents will have the right of access to areas in the Shopping Center, such as central located telecom closet , community telecom closet, any adjacent telecom closet, conduits , raceways, etc. and the right to review, survey, maintain and upgrade Tenant's telecommunication systems. Tenant will have the right to install the wiring, components, and other equipment within the Shopping Center that the Tenant deems necessary for the operation of Tenant's Telecommunication Cable System (defined below). In connection with the foregoing, Tenant and Tenant's agent(s) shall have the right to place, lay, bury, underground bore, construct, install, operate, repair, maintain (including aerial patrol), renew, rebuild, replace, upgrade, expand, penetrate building and relocate fiber optic cables, copper cables, coaxial cables or other cables through which voice, data, video or other signals are transmitted, conduits, inner ducts, hand holes, splice vaults, poles, optical or electronic equipment, marker posts or signs, and other related facilities appropriate for installation, use, or maintenance of such cables (collectively, the "<b>Telecommunications Cable System</b>"), in, on, over, under, through and/or across the Shopping Center. Landlord shall reasonably cooperate with Tenant in accomplishing the foregoing. Tenant will repair any damage caused by Tenant to the before condition as necessary.

5.   <u>INSURANCE</u>

    5.1.   <u>Tenant's Insurance.</u> ██████████████████████████████████



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

███████████████████████████████. All such insurance may be carried in a single policy or a combination of primary and excess liability policies or under a blanket policy covering the Premises and any of Tenant's other stores and be written by a company authorized to do business in the state of the location of the Premises, with a Best rating of not less than A-VIII.  The liability policy will provide contractual coverage of Tenant's liability to Landlord assumed under the indemnification provisions of Section 5.3 of this <u>Exhibit C</u>.  Tenant will provide to Landlord a certificate from Tenant's insurer evidencing the coverage required hereunder, which certificate will include the waiver of subrogation required by Section 5.4 of this <u>Exhibit C</u>.  Each policy of liability insurance required to be maintained by Tenant hereunder shall name Landlord, Landlord's lender and other appropriate parties (provided Landlord has provided Tenant this information), subject to the limits for indemnification as set forth below in Section 5.4 below, as an additional insured as its interests may appear.

5.2.    <u>Landlord's Insurance</u>.

5.2.1    <u>Property Insurance</u>.  Landlord will keep the buildings and other structures (including all improvements, alterations, additions, and changes thereto) which are located within the Shopping Center, including, without limitation, the building in which the Premises is located, insured under an all risks property insurance policy (not excluding from coverage perils normally included within the definitions of extended coverage, vandalism and malicious mischief, earthquake and flood), in the amount of ████████████████████████, with endorsements for contingent liability from operation of building laws, increased cost of construction, and demolition costs which may be necessary to comply with building laws provided, however, that Tenant acknowledges that other tenants or occupants of the Shopping Center may separately maintain insurance (or may separately assume the responsibility for the risk normally covered by such insurance) with respect to the buildings occupied by such tenants or occupants, and in such event Landlord shall not be obligated to maintain such insurance hereunder.  Tenant shall not be obligated to reimburse Landlord for any terrorism, pollution or environmental insurance carried by Landlord.  The insurance required hereby shall be written by a company authorized to do business in the state of the location of the Premises.  Landlord will be responsible for determining the amount of property insurance to be maintained, but such coverage will be on an agreed value basis to eliminate the effects of co-insurance.  Landlord will provide to Tenant a certificate from Landlord's insurer evidencing the coverage required under this Lease and which is carried by Landlord (as opposed to third parties), which certificate will include the waiver of subrogation required by Section 5.4 of this <u>Exhibit C</u>.

5.2.2    <u>Liability Insurance</u>. .  Landlord will also maintain, or cause to be maintained, from and after the date of this Lease and throughout the Lease Term, commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred upon any part of the Shopping Center.  Such insurance policy will name Tenant as an additional insured, have combined single limits of not less ██████████████████████████ and provide contractual coverage of Landlord's liability to Tenant assumed under the indemnification provisions of Section 5.3 of this <u>Exhibit C</u> and elsewhere under this Lease.  The insurance required hereby shall be written by a company authorized to do business in the state of the location of the Premises.  Landlord will provide to Tenant a certificate from Landlord's insurer evidencing the coverage required under this Lease.

5.2.3    <u>Proceeds from Property Insurance</u>.  Subject to Section 12.7 of <u>Exhibit C</u>, the proceeds of Landlord's property insurance in case of loss or damage will be applied on account of the obligation of Landlord to repair and/or rebuild the damaged or destroyed buildings and improvements in accordance with Section 12 of this <u>Exhibit C</u>.

5.2.4    <u>Additional Insurance</u>. Landlord shall also have the right, at its sole discretion, subject to reimbursement by Tenant, to maintain such additional insurance coverages and endorsements commonly maintained by the owners of similar shopping centers in the area in which the Shopping Center is located, provided such insurance is available at commercially reasonable rates, including, without limitation, ██████████████████████

5.3.    <u>Indemnity</u>.

5.3.1    <u>Tenant's Indemnity</u>.  Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, partners and employees harmless from and against any and all claims, actions, damages, liabilities, and expenses allegedly or actually: (i) arising from or out of the occupancy or use by Tenant of the Premises or any part thereof (or Tenant's trash compactor area, loading and service areas or that portion of the Common Areas used by Tenant for sidewalk sales as provided herein) or (ii) occasioned by any act or omission of Tenant or Tenant's employees, agents, contractors, sublessees, or concessionaires, excepting, however, in each case, any claims arising out of the gross negligence (but not the ordinary negligence) or willful misconduct of Landlord or Landlord's employees, agents or contractors.  Tenant's indemnity obligation shall include the costs and expenses (including reasonable attorneys' fees) incurred by Landlord in seeking to enforce Tenant's indemnity obligation. In case any action or proceeding is brought against Landlord and/or its partners, joint venturers, directors, officers, agents and/or employees



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

by reason of any such claim. Tenant, upon notice from Landlord, shall resist and defend such action or proceeding by counsel reasonably satisfactory to Landlord.

5.3.2    Landlord's Indemnity. Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, partners, employees, sublessees, and concessionaires harmless from and against any and all claims, actions, damages, liabilities, and expenses allegedly or actually (i) arising from or out of the use of the Shopping Center outside of the Premises or any part thereof or (ii) occasioned by any act or omission of Landlord or Landlord's employees, agents or contractors, excepting, however, in each case, any claims arising out of the gross negligence (but not the ordinary negligence) or willful misconduct of Tenant or Tenant's employees, agents, contractors, sublessees, or concessionaires. Landlord's indemnity obligation shall include the costs and expenses (including reasonable attorneys' fees) incurred by Tenant in seeking to enforce Landlord's indemnity obligation. In case any action or proceeding is brought against Tenant and/or its partners, joint venturers, directors, officers, agents and/or employees by reason of any such claim. Landlord, upon notice from Tenant, shall resist and defend such action or proceeding by counsel reasonably satisfactory to Tenant.

5.4.    Waiver of Subrogation.

5.4.1    Express Waiver. Landlord and Tenant each hereby waive on behalf of any insurer providing insurance to such party, any right of subrogation which such insurer might otherwise acquire against the other party or the shareholders, partners, officers, directors, or employees of either party by virtue of losses to Landlord or Tenant. Each party hereto also expressly waives any and every claim which arises or may arise in such party's favor against the other party and such party's shareholders, partners, officers, and employees during the Lease Term for any and all loss of or damage to any of such party's property, located within or upon or constituting a part of, the Premises or Shopping Center, which loss or damage is caused by a peril required by this Lease to be covered by the insurance of the party incurring the loss or, if greater, to the extent of the recovery under any insurance policy covering the party incurring the loss.

5.4.2    Notice to Insurance Carriers. Inasmuch as the mutual waivers in Section 5.4.1 of this Exhibit C, will preclude the assignment of any claim by way of subrogation (or otherwise) to an insurance company (or any other party), each party immediately shall give to each insurance company which has issued to such party policies of property insurance, written notice of the terms of the mutual waivers of subrogation and to have such insurance policies properly endorsed, if necessary, to prevent the invalidation of the insurance coverages by reason of such waivers.

6.    MAINTENANCE

6.1.    Landlord's Obligations. At Landlord's sole cost and expense (except as may otherwise be set forth in this Lease), Landlord shall make all structural repairs to the Premises, including but not limited to, the roof (including, without limitation, gutters, downspouts, and canopies), foundation and bearing walls. In addition, with respect to the Premises, and at Landlord's sole cost and expense, Landlord shall maintain the exterior walls, all plumbing and wiring inside the walls and/or within or under the floor slab of the Premises, plumbing and electrical wiring and facilities outside the Premises, and structural parts and supporting members of the Premises, and such portions of the Premises required to be maintained by Landlord under Section 6.2 of this Exhibit C, in good order, condition and repair, ordinary wear and tear and damage by casualty excepted and otherwise keep the roof free of leaks.  Landlord hereby agrees to install a new heating, ventilating and air conditioning system in accordance with the requirements of Exhibit D-1 (the "HVAC System"). Landlord shall transfer all warranties for the HVAC System to Tenant to the extent assignable so that Tenant may have the benefit of all rights and remedies under such warranties and Tenant shall be responsible for the repair and maintenance of the HVAC System in accordance with Section 6.2 of this Exhibit C. If Landlord fails to provide the maintenance or make the repairs described in Section 4.4 or Section 6.1 of this Exhibit C, within thirty (30) days after requested to do so by Tenant (except Tenant may cure any such breach or failure as aforesaid prior to the expiration of said waiting period if an emergency situation exists and the immediate curing of such breach or failure is necessary to protect the Premises, property located therein, or persons from imminent injury or damage (however, in such event, Tenant shall use reasonable efforts to give Landlord oral, facsimile, or E-Mail notice)), Tenant will have the right, at Tenant's sole option, in addition to any other remedy available to Tenant under this Lease to provide such maintenance or make such repairs and Landlord will, within thirty (30) days after receipt of written demand and invoice therefor, reimburse Tenant for Tenant's expenses incurred thereby.



. No deduction from the Minimum Rent or reimbursement by Tenant in accordance with this



1 Section 6.1 will constitute a default or breach by Tenant under this Lease. Notwithstanding anything to the
2 contrary in the foregoing, Tenant's right to cure Landlord's breaches or failures shall be limited to the
3 performance of Landlord's maintenance and repair obligations under this Lease which directly relate to the
4 interior portions of the Premises and the Critical Common Area. In no event shall Tenant have the right to
5 exercise its right to cure in regard to the other portion of the Common Area, or other tenant premises in the
6 Shopping Center. Tenant, and not Landlord, will make repairs otherwise required to be performed by
7 Landlord by this Section 6.1 if such repair is caused by or is necessitated by (a) the negligence or willful
8 misconduct of Tenant or Tenant's employees, agents or contractors, unless the waiver of subrogation
9 provisions of Section 5.4 of this Exhibit C apply, or (b) a failure by Tenant to perform maintenance or make
10 repairs required under Section 6.2 of this Exhibit C.
11
12          6.2.    Tenant's Obligations. Tenant will maintain the interior of the Premises, including, but not
13 limited to, the interior walls and glass, floor coverings, storefront, plate glass, mechanical, plumbing,
14 sewage, electrical, and utility lines which serve the Premises exclusively and which are located within the
15 Premises, interior walls, ceilings and the HVAC System servicing the Premises (except that Tenant will not
16 be required to replace any components or parts of the HVAC System except as set forth in Section 6.3 of
17 this Exhibit C), in good order, condition and repair, ordinary wear and tear and damage by casualty
18 excepted. Notwithstanding the foregoing, Landlord, and not Tenant, will make repairs otherwise required
19 to be performed by Tenant by this Section 6.2 if such repair is covered by any construction or product
20 warranty of Landlord or if caused by or is necessitated by (i) the negligence of Landlord or Landlord's
21 employees, agents or contractors, unless the waiver of subrogation provisions of Section 5.4 of this Exhibit
22 C apply, (ii) a design defect in the building containing the Premises, (iii) a failure by Landlord to perform
23 maintenance or make repairs required under Section 6.1 of this Exhibit C, or (iv) any structural problems
24 which may arise in the Shopping Center which affect the Premises.
25
26          6.3.    Heating, Ventilating and Air Conditioning. In addition to ordinary seasonal preventative
27 maintenance required of Tenant in Section 6.2 of this Exhibit C, during any Extension of this Lease, Tenant
28 shall repair and replace the HVAC System, as necessary to keep same in good working order, condition
29 and repair. ███████████████████████████████████████████████████████
30 █████████████████████████████████████████████████████████████████████████
31 █████████████████████████████████████████████████████████████████████████
32 █████████████████████████████████████████████████████████████████████████
33 █████████████████████████████████████████████████████████████████████████
34 █████████████████████████████████████████████████████████████████████████
35 █████████████████████████████████████████████████████████████████████████
36 █████████████████████████████████████████████████████████████████████████
37 ██████████████████████████ If Tenant later exercises any Extension of the Lease Term, then Tenant
38 shall reimburse Landlord for those costs (or portion thereof as appropriate) paid by Landlord to Tenant for
39 Landlord's pro rata share of reimbursement of the HVAC System costs and expenses. Landlord and Tenant
40 shall work together in good faith to determine if repair or replacement is necessary for the HVAC System,
41 and if Landlord and Tenant do not agree, in good faith, whether repair or replacement is necessary, the
42 parties shall choose a third (3rd) party, acceptable to both parties, to determine whether repair or
43 replacement is necessary. Notwithstanding the foregoing, during the last twenty-four (24) months of the
44 Lease Term (either the Initial Term or any Extension), if Tenant notifies Landlord that Tenant, in good faith,
45 believes that the HVAC System requires replacement, and Tenant also notifies Landlord that, in good faith,
46 it does not intend to extend the Lease Term for the next available Extension, if any (although such notice
47 shall not constitute the notice required to exercise any Extension under Section 2.2 of this Exhibit C and
48 shall not bind Tenant to exercise or not exercise any such Extension), then replacement of the HVAC
49 System shall not be required so long as the HVAC System is capable of being repaired so as to be fully
50 functional and capable of heating and cooling the Premises in accordance with the typical requirements of
51 comparable tenants in comparable shopping centers in the proximate metropolitan area in which the
52 Shopping Center is located. In the event Tenant subsequently elects to extend the Lease Term for the next
53 available Extension, then Landlord and Tenant shall work together in good faith to determine if repair or
54 replacement is necessary for the HVAC System as stated above.
55
56          6.4.    Surrender of Premises. Upon the expiration or earlier termination of this Lease, Tenant
57 shall remove all of its personal property and trade fixtures, and shall surrender the Premises to Landlord,
58 broom clean and in good order and condition, ordinary wear and tear and damage by casualty excepted.
59
60 7.       SIGNS
61
62          7.1.    Exterior Signs. Tenant will have the exclusive right to install on the outside walls of the
63 Premises (including front and rear walls) signs of such color, size, type, or design as may be deemed
64 desirable by Tenant, provided that any such signs are in compliance with all applicable laws, ordinances,
65 rules, rulings, regulations, orders and interpretations (collectively "Laws"). Subject to the foregoing, Exhibit
66 F attached hereto and incorporated herein by reference are hereby expressly approved by Landlord for use
67 by Tenant on the Premises. Should Laws change and/or should larger signage be available to tenants of
68 the Shopping Center, Landlord agrees that Tenant is permitted to install the largest sign permitted on the



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

Premises, subject to applicable Laws. The Shopping Center contains one (1) pylon sign in the approximate location labeled "Pylon" on Exhibit B (the "**Pylon Sign**"). Tenant shall have the right to install a double-sided sign panel on the Pylon Sign in the location depicted on Exhibit F-1 attached hereto and incorporated herein by reference, and the size of Tenant's sign panel shall be as depicted on Exhibit F-1. Should Tenant desire to seek a variance from applicable building codes and ordinances to expand or modify the signage permitted by said codes, ordinances or regulatory officials, then Landlord will cooperate with Tenant in seeking same; provided same does not diminish the signage rights of any other occupant of the Shopping Center. If Landlord erects or allows to be erected any additional multi-tenant pylon or monument signs identifying any other occupants of the Shopping Center, Tenant will have the right to mount a sign panel thereon and the size and position of Tenant's panels shall be determined based on the number of Leasable Square Feet in the Premises, in comparison to the Leasable Square Feet contained in the premises occupied by the other lessees or occupants also maintaining sign panels on said pylon or monument sign. Tenant shall be responsible for the fabrication, installation and maintenance of said sign panel faces. During the Lease Term, Tenant shall not be required to remove its signs unless required to do so by Laws enacted subsequent to the date hereof. Tenant may at any time remodel or replace the sign facia to conform with Tenant's then standard signage, so long as such signage does not violate any Laws.

7.2.    Other Signs. Subject to Laws, Tenant or Tenant's agent shall have the right (i) to erect a temporary "Coming Soon" and/or "Now Open" and/or "Grand Opening" and/or "Future Home of Michaels" and/or "Opening  <date>  " sign, or signs, on or near the Premises prior to the opening of Tenant's business and (ii) to affix window appliques and other treatments commonly used at Tenant's store locations. Tenant shall remove all signs and appliques at the termination of this Lease, and shall repair any damage caused by such removal.

7.3    Tenant's Trademarks. Landlord expressly recognizes that the service marks and trademarks "Michaels", "Michaels, The Arts and Crafts Store" and Where Creativity Happens" are the valid and exclusive property of Tenant and Landlord agrees that Landlord shall not either during the Lease Term or thereafter directly or indirectly adopt or use any of said marks except, with Tenant's reasonable approval, and without Tenant's prior consent, in connection with Landlord's marketing of the Shopping Center, including brochures and site plans. Landlord further agrees that Landlord will not at any time permit any other tenant or occupant of the Shopping Center to use any of the foregoing marks, nor will Landlord do or cause to be done any act or thing, directly or indirectly which contests or in any way impairs any part of Tenant's right, title and interest in any of Tenants marks, Landlord specifically acknowledges that any use thereof pursuant to this Lease shall not create in Landlord any right, title or interest in any of the aforesaid marks.

8.    TITLE TO PREMISES

8.1.    Ownership of Premises. Landlord represents and warrants to Tenant that Landlord is the owner of the Premises and the Shopping Center, and that there are no other individuals or entities having an ownership interest in the Premises and/or the Shopping Center whatsoever except as expressly stated in this Lease, and that Landlord has full right, power and authority, corporate and otherwise, to execute this Lease, to lease the Premises and to perform the obligations of Landlord under this Lease. Landlord shall provide Tenant with  its most recent commitment of title insurance or other proof adequate to Tenant, to insure that Landlord has title to the Shopping Center, unencumbered by claims which may disturb Tenant's enjoyment of the Premises and that no tax liens exist against the Shopping Center.

8.2.    Covenant of Quiet Enjoyment. Subject to all Laws and the terms and conditions of this Lease, Landlord warrants to Tenant that, by paying the rent provided for in this Lease and performing Tenant's obligations under this Lease, Tenant will be entitled to peaceably and quietly enjoy the Premises and all rights and appurtenances thereto during the Lease Term, without molestation or hindrance of any person whomsoever making a claim by, under or through Landlord.

8.3.    Nondisturbance Agreement. As a condition precedent to the Completion Date, Landlord will deliver to Tenant agreements of nondisturbance from all lienholders or underlying landlords of the Premises in the form and substance of Exhibit G of this Lease. Such agreements will provide that such lienholders or underlying landlords will recognize the terms of this Lease in the event of foreclosure or the exercise of the power of sale under any mortgage or deed of trust, or in the event any proceedings are brought for default under any ground lease. The agreement executed by such lienholder must also contain an agreement to cause any purchaser at foreclosure sale to assume and agree to perform all of the duties of Landlord under this Lease. If Landlord fails to deliver such agreements of nondisturbance to Tenant within sixty (60) days from the Effective Date of this Lease, Tenant will have the right at any time thereafter, until same is received and in addition to other remedies available to Tenant, to terminate this Lease by written notice to Landlord. Tenant will also execute the agreement set forth on Exhibit G to assure said lienholder or underlying landlord of Tenant's attornment to said lienholder or underlying landlord in accordance with the terms hereof.



8.4.    <u>Restrictions</u>.  Landlord warrants and represents to Tenant that (i) to Landlord's actual knowledge, there exist no zoning, laws, or statutes which prohibit the use of the Premises as a retail store, (ii) all use restrictions applicable to the Premises are set forth on Exhibit I attached hereto, (iii) Landlord's title to the Premises is subject to certain liens, easements, restrictions and encumbrances as described in <u>Exhibit H</u> (the "**Underlying Documents**"), but none of the Underlying Documents prohibit the use of the Premises as a typical Michaels store, (iv) Landlord has delivered to Tenant true and complete copies of the Underlying Documents (v) no joinder or approval of another person is required with respect to Landlord's right and authority to enter into this Lease, (vi) the terms and conditions of this Lease, including the exhibits attached hereto, are in compliance with and do not violate the provisions of the Underlying Documents, (vi) any approvals required pursuant to the Underlying Documents have been obtained, and (viii) all approvals from underlying landlords have been obtained.  Landlord shall not encumber the Shopping Center with any other restrictions or encumbrances that would increase Tenant's costs hereunder or would have an adverse effect on Tenant's business or operations at the Premises.

9.    COMPLIANCE

9.1.    <u>As to Premises</u>.  Tenant will, at Tenant's sole cost and expense, comply with all Laws, of any local, regional, state or federal governmental entity, agency, court, judicial or quasi-judicial body, or legislative or quasi-legislative body, present or future (collectively, "**Governmental Authorities**"), which affect the carrying on of the business being conducted in the Premises, as distinguished from the physical facilities in which such business is being conducted.  Notwithstanding the foregoing, Tenant shall have the right to contest the legality of any such Laws, at Tenant's sole cost and expense, and during the pendency of any such contest, Tenant shall not be deeming in default under this Lease. Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to cause the Premises at the commencement of the Lease Term to comply with all Laws of all Governmental Authorities having jurisdiction over the Shopping Center and Landlord will bear the expense of any alterations or improvements or repairs to the Premises ordered by any Governmental Authority  (including, but not limited to, any requirements imposed under Title III of The Americans with Disabilities Act of 1990 or "ADA"), unless such alterations or improvements or repairs (i) relate solely to (a) the type of business conducted in the Premises by Tenant, (b) the manner in which Tenant is conducting Tenant's business in the Premises, (c) alterations or improvements made to the Premises by Tenant, or (d) the type of fixtures installed or utilized by Tenant, or (ii) are otherwise Tenant's responsibility pursuant to the first sentence of this Section 9.1.

9.2.    <u>As to Common Areas</u>.  Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to cause the Premises at the commencement of the Lease Term, and the Common Areas to comply with all Laws of all Governmental Authorities having jurisdiction over the Shopping Center (including, but not limited to, any requirements imposed under Title III of The Americans with Disabilities Act of 1990 or "ADA"), including such acts as may be necessary in order to ensure Tenant's enjoyment of the rights and privileges granted to Tenant under this Lease.

9.3.    <u>As to Hazardous Materials</u>.

9.3.1    <u>Landlord's Obligations</u>.  Landlord represents and warrants that, except as set forth in Phase I Environmental Site Assessment Report dated October 2008, prepared by Sanborn, Head & Associates, Inc., Landlord has no actual knowledge of the existence of any Hazardous Materials upon, within or under the land comprising the Shopping Center.  Landlord represents and warrants that upon completion of Landlord's construction obligations under <u>Exhibit D-1</u> (i) the Premises will be in compliance with all Environmental Laws (hereinafter defined), and (ii) there will be no Hazardous Materials (hereinafter defined) in, on or about the Premises or Shopping Center which require special handling or remediation in accordance with applicable Environmental Laws.  During the Lease Term, Landlord will not use, generate, place, store, release, or otherwise dispose of, nor permit the use, generation, placing, storage, release, or disposal of Hazardous Materials in the Shopping Center, except in strict accordance with all Environmental Laws.  If during the Lease Term Hazardous Materials are discovered in any portion of the Shopping Center or the Premises, subject to Section 9.3.2 below, Landlord will promptly undertake or cause to be undertaken remediation or removal of the Hazardous Materials in accordance with all Environmental Laws and, to the extent Tenant's business is interrupted during the remediation or removal, Tenant's rent will be abated as is fair and reasonable under the circumstances.  Landlord will indemnify, defend and hold Tenant and Tenant's partners, shareholders, officers, employees, agents, contractors, sublessees, assignees, concessionaires, customers, and invitees (collectively, "**Affiliated Parties**") harmless against and reimburse Tenant and Tenant's Affiliated Parties for all Hazardous Materials Liabilities asserted against or incurred by Tenant or Tenant's Affiliated Parties arising out of a breach of the representations, warranties or covenants set forth in this Section 9.3.1.

9.3.2    <u>Tenant's Obligations</u>.  During the Lease Term, Tenant will not use, generate, place, store, release or otherwise dispose of Hazardous Materials, nor permit the use, generation, placing, storage, release, or disposal of Hazardous Materials, in the Premises or Shopping Center, except in strict accordance with all Environmental Laws.  In the event of a breach of the foregoing, Tenant will promptly undertake remediation or removal in accordance with all Environmental Laws.  In addition, Tenant will



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

indemnify, defend and hold Landlord and Landlord's Affiliated Parties harmless against and reimburse Landlord and Landlord's Affiliated Parties for all Hazardous Materials Liabilities asserted against or incurred by Landlord or Landlord's Affiliated Parties as a result of a breach of Tenant's obligations under this Section 9.3.2.

9.3.3    Hazardous Materials Defined.  The term "**Hazardous Materials**" as used herein means any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any Environmental Law, (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous, (iii) which is or becomes regulated by any Governmental Authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises.

9.3.4    Environmental Laws Defined.  The term "**Environmental Laws**" refers to all Laws relating to (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials onto land or into ambient air, surface water, groundwater, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, or septic systems, (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation, or shipment of Hazardous Materials, or (iii) the protection of human health or the environment.

9.3.5    Hazardous Materials Liabilities Defined.    The term "**Hazardous Materials Liabilities**" as used herein means all claims, damages, losses, forfeitures, expenses, or liabilities arising from or caused in whole or in part, directly or indirectly, by a breach by the other party of its representations, warranties, or covenants under Section 9.3.1 or 9.3.2 of this Exhibit C, including, without limitation, all costs of defense (including reasonable attorneys' fees and other costs of litigation), all consultants' fees, and all costs of investigation, repair, remediation, restoration, cleanup, detoxification or decontamination, and/or preparation and implementation of any closure, remedial action or other required plan.

9.3.6    Survival.  The provisions of this Section 9.3 will survive the expiration or earlier termination of this Lease.

10.    ALTERATIONS AND FIXTURES

10.1.    Alterations and Additions.  After completion of initial leasehold improvements, if any, Tenant will not make any exterior (except for a change in building signage in accordance with Section 7.1 above) or structural alterations or additions to any part of the Premises or any changes to any utility or life safety systems also servicing adjacent premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld (except in the case of storefront or exterior alterations, which such consent may be withheld by Landlord in Landlord's sole discretion).  Tenant shall have the right in its sole discretion to make any interior alterations or additions or perform any remodeling of a nonstructural nature. Tenant shall minimize any interference with the business of other tenants of the Shopping Center during any construction by Tenant.  All alterations and additions to the Premises by Tenant shall be made in accordance with all applicable Laws and, except, as specified in Section 10.2 of this Exhibit C, will remain at the end of the Lease Term for the benefit of Landlord.  Tenant will obtain any necessary permits required for any such alterations or additions.  If Tenant proposes to make any alterations or additions to the interior of the Premises and the cost of such alterations or additions                          , Tenant shall give Landlord prior written notice describing such alterations or additions in sufficient detail and if construction drawings are necessary for the performance of such alterations or additions, Tenant shall provide Landlord with a copy of such construction drawings.  In the event, after receipt of Tenant's notice, Landlord reasonably determines that Tenant's alteration or addition will not be useful for a subsequent occupant of the Premises, Landlord may elect to require that such alteration or addition be removed at the end of the Lease Term, which such election must be exercised by written notice given to Tenant within fifteen (15) days after Landlord's receipt of Tenant's written notice specifying any such alterations or additions.

10.2.    Fixtures.  Any trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs, and other personal property of Tenant will remain the property of Tenant and Landlord agrees that Tenant will have the right, at any time and from time to time during the Lease Term, to remove any of Tenant's trade fixtures, machinery, equipment, signs, and other personal property which Tenant may have stored or installed in the Premises.  All such personal property shall be removed by Tenant upon the expiration or earlier termination of this Lease, and if Tenant fails to do so, Landlord may do so on its behalf and reasonable expense, in accordance with applicable Laws. Tenant, at Tenant's sole cost and expense, will immediately repair any damage occasioned to the Premises, by reason of the removal of any such trade fixtures, machinery, equipment, signs, and other personal property.  All other improvements made by Tenant to the Premises, including, but not limited to, floor coverings, carpeting and partitions, will become the property of Landlord upon expiration or earlier termination of this Lease except as otherwise set forth in Section 10.1.



10.3.    <u>Liens Arising Through Tenant</u>.  Tenant shall promptly pay for all materials supplied and work done in respect of the Premises so as to ensure that no lien is registered against any portion of the Shopping Center or in Landlord or Tenant's interest therein.  If a lien is registered or filed, Tenant shall pay, discharge or otherwise secure said lien at its expense within thirty (30) days of the notice thereof failing which Landlord may at its option discharge the lien by paying the amount claimed to be due in court or directly to the lien claimant in the amount so paid and all reasonable expenses of Landlord, including legal fees (on an attorney and client basis) shall be paid by Tenant to Landlord as additional rent.

10.4.    <u>Liens Arising through Landlord</u>.  Landlord shall promptly pay for all materials supplied and work done in respect of the Premises so as to ensure that no lien is registered against any portion of the Shopping Center or in Landlord or Tenant's interest therein.  If a lien is registered or filed, Landlord shall pay, discharge or otherwise secure said lien at its expense within thirty (30) days of the notice thereof failing which Landlord shall indemnify, defend and save Tenant harmless from any and all claims, demands, losses, costs or liabilities arising therefrom, and all reasonable expenses of Tenant, including legal fees (on an attorney and client basis) shall be paid by Landlord to Tenant upon demand.  Tenant shall only be entitled to the rights and remedies provided for in Section 14.2 of this <u>Exhibit C</u> for a default under this Section 10.4 in the event Tenant is named as a party to any lien filed and Landlord has not secured said lien within thirty (30) days of notice as provided above.

11.    ASSIGNMENT AND SUBLETTING

11.1.    <u>General Rights</u>.  Tenant will have the right at any time during the Lease Term, without the consent of Landlord, to sublet the Premises or any portion thereof or to transfer or assign Tenant's interest in this Lease to any person or entity with a net worth that is equal to or greater than $100,000,000.00 (the "**Minimum Net Worth**"), provided that the use made of the Premises by any such sublessee or assignee (i) does not conflict with any Prohibited Use set forth in <u>Exhibit J</u> of this Lease, (ii) does not violate any exclusive uses set forth in Exhibit I of this Lease for so long as such exclusive uses remain in effect to restrict the Premises, (iii) does not violate any exclusive use restriction hereafter granted to any other lessee or occupant of the Shopping Center, and (iv) does not violate or change the parking requirements for the Premises or Shopping Center or otherwise cause Landlord to be required to obtain a parking variance or special exception ("**Future Exclusives**") so long as (a) Landlord has given Tenant written notice of such Future Exclusive, (b) such Future Exclusive contains a reasonable exception allowing for the incidental sale or rendering of the products or services protected by such exclusive, and (c) such Future Exclusive does not restrict the sale of any product or services sold from the Premises prior to Tenant's receipt of written notice of the Future Exclusive. Notwithstanding any such assignment or subletting, Tenant shall remain primarily liable for all obligations under this Lease unless the net worth of the proposed assignee or sublessee is equal to or more than the Minimum Net Worth in which event Tenant shall be released of all further obligations of "tenant" arising after the date of the assignment or subletting.  In no event shall Tenant be permitted to divide the Premises into more than two (2) separate premises.  Subject to Section 11.2 below, in the event Tenant sublets the Premises, Landlord shall enter into a commercially reasonable non-disturbance agreement with the subtenant, providing that, so long as the subtenant is not in default beyond applicable notice and cure periods under the sublease, and the subtenant is occupying the Premises (subject to temporary closures due to remodeling, condemnation or casualty), the sublease will be recognized by Landlord and that the possession of the subtenant pursuant to the terms of the sublease will not be disturbed provided that (A) the rent reserved under such sublease is no less than the rent reserved under this Lease, (B) the sublease applies to at least one-half (½) of the Leasable Square Feet of the Premises, (C) the use of the Premises by such subtenant is permitted under this Lease, and (D) Tenant will reimburse Landlord within thirty (30) days after receipt of an invoice with reasonably sufficient supporting documentation for the reasonable costs incurred by Landlord in connection with the review of each such nondisturbance agreement, not to exceed Five Hundred Dollars ($500.00).

11.2.    <u>Recapture of Premises by Landlord</u>.  In the event Tenant desires to assign its interest in this Lease or sublet all or any portion of the Premises to any individual or entity other than to an Affiliate (below defined) or to a person or entity acquiring similar rights to four (4) or more locations of Tenant in the State of Connecticut, including the Premises (which such transaction shall be deemed a "**Group Transfer**"), Tenant shall give Landlord notice of said desire (the "**Recapture Offer Notice**"), and Landlord shall have the right to recapture the Premises (or the portion thereof to be sublet) by notice to Tenant (the "**Recapture Acceptance Notice**") at any time within thirty (30) days following Landlord's receipt of the Recapture Offer Notice.  If Landlord fails timely to deliver the Recapture Acceptance Notice, then Tenant may assign this Lease or sublet the Premises to the entity named in the Recapture Offer Notice.  In the event Landlord timely elects to recapture the Premises (or the portion to be sublet), then this Lease (or the relevant portion of this Lease relating to the portion of the Premises to be sublet) shall terminate on the thirtieth (30th) day following the Recapture Acceptance Notice and Landlord and Tenant shall be released from any and all obligation arising under this Lease from and after said date, provided that Landlord and Tenant shall remain liable for all sums due and payable prior to the thirtieth (30th) day following the Recapture Acceptance Notice and for all adjustment to prior charges and Tenant shall be responsible for the timely vacating of the Premises in the condition required by this Lease.  In the event that Landlord exercises its right to recapture the Premises, Tenant shall have the right to nullify such recapture by withdrawing its Recapture Offer Notice



by notice given to Landlord within thirty (30) days after Tenant's receipt of the Recapture Acceptance Notice. In the event Tenant withdraws the Recapture Offer Notice, this Lease shall not terminate and Tenant shall not be entitled to sublet the Premises or assign this Lease to the person or entity named in the Recapture Offer Notice. The term "**Affiliate**" shall mean an entity (or individual) that is either (i) a surviving corporation in the event of a merger, consolidation or acquisition of Tenant, (ii) Tenant's parent corporation, (iii) a subsidiary of Tenant or entity controlled by or under common control with Tenant, (iv) an entity which may acquire fifty percent (50%) or more of the outstanding voting stock or assets of Tenant (it being agreed such transfer is permitted) or (v) an entity which may acquire a majority of the assets of Tenant in the State of Connecticut, but in no event fewer than twenty-five (25) locations.

12.    DESTRUCTION OF PREMISES

12.1.    Partial Destruction.  If the Premises and/or the Shopping Center is partially destroyed by fire or other casualty (collectively, "**Casualty**"), the same will, at the expense of Landlord, be repaired and/or rebuilt.

12.2.    Total Destruction.  If the Premises and/or the Shopping Center (whether or not the Premises is included in the portion destroyed or damaged) is destroyed or so damaged by Casualty in the opinion of a reputable third party construction contractor experienced in retail construction retained by Landlord (which such contractor shall be retained by Landlord within thirty (30) days after the date of the Casualty), the damage to the Premises and/or Shopping Center cannot be reasonably restored within two hundred seventy (270) days after the date of the Casualty, Tenant may, by notice given to Landlord not more than sixty (60) days after the date of the Casualty, terminate this Lease.  Landlord shall notify Tenant in writing of such contractor's opinion within forty-five (45) days after the date of the Casualty.  If Landlord fails to provide such opinion to Tenant within said forty-five (45) day period, the deadline for Tenant to exercise its right to terminate this Lease as provided herein above shall be extended one (1) day for each day Landlord delays in providing Tenant with such opinion. In addition, in the event more than fifty percent (50%) of Shopping Center is destroyed, either Landlord or Tenant may, by written notice given to the other party within thirty (30) days after the occurrence of the Casualty, terminate this Lease; provided, however, that Landlord may only exercise said termination rights if Landlord also terminates the leases and/or occupancy agreements of all other similarly situated lessees and occupants of the Shopping Center provided Landlord has the ability to terminate such leases.  If neither party terminates this Lease pursuant to this Section 12.2, Landlord will, as promptly as may be reasonable, repair, rebuild or restore the damage suffered in the Premises and/or the Shopping Center.

Notwithstanding anything in this Section 12.2 to the contrary, in the event as a result of a Casualty, Landlord is required to rebuild the Premises, Landlord shall be relieved of its obligation to rebuild if prior to the commencement of the rebuilding Landlord (i) gives Tenant written notice of the schedule for the completion of the rebuilding, (ii) requests in the notice that Tenant agree to reopen as soon as practicable following the completion of the rebuilding as a condition precedent to the commencement of the rebuilding, and (iii) Tenant thereafter refuses or fails to notify Landlord in writing that it will reopen as soon as practicable following the completion of the rebuilding.  In the event Tenant does not, within thirty (30) days after its receipt of such notice, confirm its intention to reopen in the Premises following the completion of the rebuilding, and such failure continues for a period of thirty (30) days following Tenant's receipt of a second notice from Landlord containing the information described in (i) and (ii) above, this Lease shall automatically terminate on the thirtieth (30th) day following the date of Landlord's second notice.

12.3.    Landlord's Repair Obligation.  Landlord's obligation will be to restore the Premises and/or Shopping Center to substantially the same condition as of the date of the Casualty (exclusive of Tenant's furniture, fixture and equipment) and will not be limited to the extent allowed by available insurance proceeds except as provided below.  If Landlord for any reason whatsoever fails (i) to commence the repair and/or restoration work required by Sections 12.1 or 12.2 of this Exhibit C within one hundred eighty (180) days from the date of the Casualty, (ii) to proceed diligently to complete such repair work and/or rebuilding, or (iii) fails to complete same within two hundred seventy (270) days from the date when such Casualty occurred, then Tenant, as its sole remedy, will have the option to terminate this Lease by giving Landlord notice of Tenant's election to do so at any time prior to the completion of such repairs or rebuilding.  Upon giving of notice to terminate, this Lease will automatically terminate and Tenant will be released from all further obligations under this Lease.

12.4.    Abatement of Rent.  Until the earlier of (i) sixty (60) days after the date on which the Premises and/or the Shopping Center is repaired, rebuilt and delivered to Tenant and the conditions precedent of Section 2.1.2 of this Exhibit C are satisfied, or (ii) the date Tenant reopens for business in the damaged portion of the Premises, the Minimum Rent, Common Area Charges, Real Estate Taxes, or any other charges due from Tenant under this Lease, or a fair and just proportion thereof according to the nature and extent of the damage sustained, will be abated.  If Tenant has paid any rents or other charges in advance, Landlord will immediately repay to Tenant an amount equal to that portion of any rents or other charges paid in advance for which payment is abated.



C-19

12.5.    Destruction at End of Lease Term.    Notwithstanding the provisions of Sections 12.1, 12.2 and 12.3 of this Lease, if at the time the Premises is totally or partially destroyed the remainder of the Lease Term is less than twenty-four (24) months and the cost to rebuild or restore the Premises would exceed twenty-five percent (25%) of the replacement cost thereof, either Landlord or Tenant shall have the right to terminate this Lease by written notice given to the other party within thirty (30) days after the date of the Casualty; provided, however, Tenant shall have the right to nullify any such termination by Landlord by (i) giving Landlord written notice of Tenant's election to exercise its next available option for an Extension, or (ii) giving Landlord written notice of Tenant's election to extend the then current term of the Lease so that there remains within the Lease Term a period of five (5) years from the date of the Casualty if such Casualty occurs during the last twenty-four (24) months of the final Extension period and there shall be no further right of renewal thereafter.  If Tenant exercises its right to terminate this Lease, or if Landlord terminates this Lease and Tenant fails to extend the Lease Term as provided above (or if there is no further right to renew under this Section 12.5), this Lease shall terminate thirty (30) days after the non-terminating party's receipt of the terminating party's notice.

12.6.    Insufficiency of Proceeds Due to Lender's Application.    In the event any holder of a mortgage lien against the Shopping Center exercises a valid right pursuant to the instruments creating or securing such mortgage, to apply the proceeds of any property insurance payable to Landlord as the result of a Casualty, to the balance of the mortgage or for some purpose other than the rebuilding of the Premises and Shopping Center, then Landlord shall use good faith and diligent efforts to obtain alternative financing to fund the rebuilding of the Premises and Shopping Center necessary for the conduct of Tenant's business to the extent required by Sections 12.1, 12.2 and 12.3 above.  In the event Landlord is unable, despite using good faith and diligent efforts, to secure commercially reasonable financing that is acceptable to Landlord in its sole but reasonable discretion (Landlord and Tenant agree that if the financing is not non-recourse, it will not be satisfactory to Landlord), within sixty (60) days after the date of the Casualty, and the cost to restore the Premises and the Shopping Center, exceeds ███████████████████; ███████████, Landlord shall have the right to terminate this Lease by written notice given to Tenant within seventy-five (75) days after the date of the Casualty, which such notice shall substantiate that Landlord has used good faith and diligent efforts to obtain commercially reasonable alternative financing that is acceptable to Landlord in its sole but reasonable discretion, and that such financing is unavailable (the "**Notice of Lender's Application of Proceeds**").  In the event Landlord fails to give the Notice of Lender's Application of Proceeds within seventy-five (75) days after the date of the Casualty and such failure continues for a period of ten (10) days after Landlord's receipt of Tenant's written request which such written request shall have been given by Tenant subsequent to the expiration of the seventy-five (75) day period, then it shall be deemed that Landlord intends to rebuild the Premises and Shopping Center to the extent required by Sections 12.1, 12.2 and 12.3 hereinabove, irrespective of such application of the insurance proceeds for a purpose other than the rebuilding of the Premises and Shopping Center, and Landlord shall be obligated to commence and complete such restoration within the timeframes prescribed in Section 12.3 above, but such timeframes shall be extended for seventy-five (75) days for purposes of this Section 12.6 only, and Tenant shall have all rights and remedies as described in Section 12.3 for the failure to commence and/or complete within such timeframes.  Notwithstanding the foregoing, Landlord's right to terminate this Lease pursuant to this Section 12.6 shall be contingent upon Landlord also terminating the leases and/or occupancy agreements of all other similarly situated lessees and occupants of the Shopping Center which are affected by the Casualty provided Landlord has the ability to terminate such leases.  This Section 12.6 shall not apply to any Casualty for which the cost to restore the Premises and the Shopping Center does not exceed ███████████████████████ and Landlord's obligation to restore any such Casualty shall be as prescribed by Sections 12.1, 12.2 and 12.3 hereinabove.

12.7.    Uninsured Casualty.    In the event of damage to the Premises as the result of any peril not covered by Landlord's property insurance because such coverage is either unavailable or not required by the provisions of this Lease (and not because of a breach by Landlord of Landlord's obligations to insure under this Lease or the terms of said policy or a decision by Landlord to carry certain deductible amounts or to self-insure), Landlord's obligation to restore the Premises shall be limited to the amount recoverable from Landlord's insurance plus a contribution from Landlord of ███████0 ("**Landlord's Maximum Expenditure**").  If Landlord's Maximum Expenditure will be insufficient to fully restore the Premises and Critical Common Area and Landlord does not elect to pay such deficiency, either party shall have the right to terminate this Lease by written notice given to the other party within thirty (30) days after Tenant's receipt of notice advising of the extent of the restoration which will be allowed by Landlord's Maximum Expenditure, Landlord hereby agreeing to so notify Tenant promptly upon Landlord's determination of the extent of the restoration; provided, however, if Landlord elects to terminate the Lease as stated above, Tenant will have the right to nullify Landlord's termination by electing to either (i) pay the excess of the cost to repair or restore the Premises and Critical Common Areas beyond the extent allowed by the available insurance proceeds plus Landlord's Maximum Expenditure and to reimburse itself for such amounts as may be expended by Tenant for such repair or restoration plus interest thereon at the Interest Rate out of any damages collected from third parties, or (ii) continue this Lease with the restoration limited to the extent allowed by Landlord's Maximum Expenditure.  Notwithstanding the foregoing, Landlord's right to terminate this Lease pursuant to this Section 12.7 shall be contingent upon Landlord also terminating the leases



and/or occupancy agreements of all other similarly situated lessees and occupants of the Shopping Center which are affected by the Casualty provided Landlord has the ability to terminate such leases.

13.    EMINENT DOMAIN

13.1.    Total Taking of Premises. If the whole of the Premises, or a portion of the Premises and/or the Shopping Center which is extensive enough, in Tenant's commercially reasonable judgment to render the Premises and/or Shopping Center unsuitable for the business of Tenant, is acquired or condemned by eminent domain for any public or quasi-public purpose, the Lease Term will terminate as of the date title vests in the condemning authority. All rent will be paid up to the date of termination of this Lease.

13.2.    Partial Taking of Premises. In the event less than all of the Premises and/or Shopping Center is taken and the part of the Premises and/or Shopping Center taken is not extensive enough, in Tenant's commercially reasonable judgment, to render the Premises and/or Shopping Center unsuitable for the business of Tenant, Landlord will promptly restore, at Landlord's sole cost and expense, the Premises and/or Shopping Center to a condition comparable to its condition at the time of taking, less the portion lost in the taking. In such event, this Lease will continue in full force and effect, except that if a portion of the Premises is taken, the Minimum Rent and other sums due hereunder will be reduced in a fair and equitable manner with respect to the nature, value and extent of the portion of the Premises which is taken.

13.3.    Award. In the event of any condemnation or taking of the Premises or the Shopping Center, whether partial or total, Landlord shall be entitled to the entire condemnation award, except that Tenant may apply for a separate award for Tenant's fixtures and other tangible personal property, moving expenses, lost business, and leasehold improvements made or paid for by Tenant.

14.    DEFAULT

14.1.    Tenant's Default. Each of the following events will be deemed to be an event of default by Tenant under this Lease ("**Event of Default**"): (i) failure by Tenant to pay any sum payable by Tenant under this Lease if such failure continues for ten (10) days after receipt by Tenant of written notice from Landlord specifying such default or (ii) failure by Tenant to perform or observe any of Tenant's nonmonetary covenants contained in this Lease within thirty (30) days after receipt by Tenant of written notice from Landlord specifying the failure (or within such additional period, if any, as may be reasonably required to cure the failure if the failure cannot reasonably be cured within a thirty (30) day period). On the occurrence of any Event of Default, Landlord will have the option to terminate this Lease, terminate Tenant's right to possession without terminating this Lease, or cure the Event of Default on behalf of Tenant. If Landlord terminates either the Lease or Tenant's right to possession of the Premises, Tenant will immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof. Any termination only of Tenant's right to possession of the Premises will not relieve Tenant of Tenant's obligation to pay the Minimum Rent and other charges under this Lease on the days originally set forth in this Lease for payment, without acceleration except as provided below. If Landlord regains possession of the Premises, Landlord will use reasonable efforts to mitigate any damages incurred by Landlord and to relet the Premises (but in no event will Landlord be required to employ greater efforts to relet the Premises under such circumstances than Landlord would employ to relet other vacant space in the Shopping Center in the ordinary course of Landlord's business). For purposes of this Section, the phrase "reasonable efforts" means that Landlord shall be required to do all of the following in an effort to relet the Premises: (a) place a "For Rent" or "For Lease" sign in a conspicuous location at one of the front show windows of the Premises (showing on such sign the telephone number of a proper party to contact to commence arrangements for occupancy of the Premises) and permit such sign to remain until the rerenting or reletting of the Premises; (b) advertise the availability of the Premises for at least two (2) days per week in a daily (or once per week in a weekly) newspaper in the city in which the Shopping Center is located; (c) list the Premises as being for rent or for lease with at least one real estate broker (substantially involved in selling and leasing commercial real estate in the city in which the Shopping Center is located), the listing with such real estate broker to continue until the Premises have been re-rented or relet; and (d) negotiate in good faith with each reasonably prospective tenant for the Premises until the Premises have been relet. Failure to use such reasonable efforts shall not subject Landlord to liability but shall reduce any award to Landlord by the amount Landlord could have mitigated by use of such reasonable efforts. In determining the amount of loss which Landlord suffers by reason of termination of this Lease, allowance will be made for the expense of repossession (including reasonable brokerage and attorney's fees) and any necessary repairs, but not for any remodeling undertaken by Landlord following repossession.

Without limiting the generality of the foregoing, Landlord shall have the remedy such that Landlord may continue this Lease in effect following Tenant's breach and abandonment and recover from Tenant rent as it becomes due, provided that Tenant has the right to sublet the Premises or assign Tenant's interest in this Lease subject only to reasonable limitations.



14.2.    Landlord's Default.  In the event Landlord fails to perform on or before the required date for performance any obligation set forth in this Lease to be performed by Landlord, and such failure continues for thirty (30) days after receipt by Landlord of written notice from Tenant (or such additional period, if any, as may be reasonably required to cure the failure if the failure cannot be cured within a thirty (30) day period, provided Landlord commences to cure within thirty (30) days after receipt of written notice and thereafter diligently pursues such cure to completion), Tenant may commence legal and/or equitable action against Landlord and/or perform such obligations on behalf of Landlord and/or, if such default by Landlord is a material default which adversely affects Tenant's ability to operate its business in the Premises, terminate this Lease.  In the event Tenant performs any of such obligations of Landlord, Landlord shall reimburse Tenant within thirty (30) days after receipt of Tenant's demand therefor, failing in which Tenant may commence legal and/or equitable action against Landlord and/or deduct such payments plus interest, at the Interest Rate, from the next installment or installments of the Minimum Rent due under this Lease; provided, however, Tenant may not deduct from any monthly installment of Minimum Rent an amount which exceeds twenty-five percent (25%) of that particular installment, which such deduction may be taken by Tenant until Tenant has fully recovered its expenses plus interest.  No deduction from the Minimum Rent or reimbursement by Tenant in accordance with this Section 14.2 or any other section of this Exhibit C, will constitute a default or breach by Tenant under this Lease.

14.3.    Estoppel and Waiver.  No breach under this Lease will be deemed to have been waived, nor will either party be guilty of laches, because of the failure of either party to take action pertaining to such breach.

14.4.    Remedies Cumulative.  The rights and remedies given to Landlord and/or Tenant in this Lease are distinct, separate and cumulative remedies, and the exercise of any one or more of them shall not be deemed to exclude Landlord's and/or Tenant's rights to exercise any or all of the others which are given in this Lease, or at law or in equity, unless said remedies are expressly excluded.

14.5.    Litigation, Court Costs and Attorneys' Fees.  In the event that at any time either Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the prevailing party in such action or proceeding will be entitled to recover from the other party reasonable and necessary costs and attorneys' fees.

14.6.    Defaults by Assignees or Sublessees.  In the event this Lease is assigned or sublet by Tenant and Tenant remains liable for the performance of the obligations of "Tenant" under this Lease, and should any default occur requiring notice as provided in this Section 14, Landlord shall furnish Tenant with a copy of the notice at the same time said notice is sent to the assignee or sublessee.  In the event that the default is not corrected by the assignee or sublessee during the specified time periods, Tenant shall have an additional period of ten (10) days to correct the default, and, upon correction of the default, Tenant shall have the right and option to resume actual possession of the Premises as Tenant for the unexpired term of this Lease.

15.    SUBORDINATION

15.1.    Landlord's Mortgagees.  Upon Landlord's written request, Tenant will execute and deliver to Landlord an agreement in recordable form subordinating Tenant's rights to the lien of any first mortgage now or hereafter encumbering the Premises.  Tenant, however, will not be required to subordinate Tenant's rights hereunder to any mortgage unless and until the holder of such mortgage executes and delivers to Tenant a written agreement providing in substance (i) that so long as Tenant faithfully discharges Tenant's obligations under this Lease, Tenant's right of possession to the Premises and other rights under this Lease will not be affected by any default by Landlord under any instrument creating or secured by such mortgage, (ii) that in the event of foreclosure or any other enforcement of such mortgage, the rights of Tenant hereunder will expressly survive and this Lease will continue in full force and effect and (iii) that any purchaser at foreclosure will assume in writing the obligations of Landlord under this Lease.  If Landlord requests more than one (1) subordination agreement in any twelve (12) month period during the Lease Term, Landlord will reimburse Tenant within thirty (30) days after receipt of an invoice therefor for the reasonable costs incurred by Tenant in connection with the review of each such additional subordination agreement,                           .

15.2.    Landlord's Liens.  Landlord hereby waives and releases any liens which Landlord may have against Tenant's personal property, trade fixtures, equipment, merchandise, cash, or accounts receivable therein, whether such lien is statutory, constitutional, or contractual, or arises out of operation of law or otherwise.

16.    OTHER TENANCIES AND USE.



16.1.   <u>Required Leases</u>.  Landlord represents that Landlord has entered into leases or occupancy agreements for the spaces shown on <u>Exhibit B</u> of this Lease with the Other Required Lessees identified in Paragraph 8 of the Basic Lease Provisions as required to satisfy the Initial Co-Tenancy Requirement.

16.2.   <u>Intentionally Deleted</u>.

16.3.   <u>Failure of Other Required Lessees to Operate</u>.  As used in this Section 16.3, the term "<u>**On-Going Co-Tenancy Requirement**</u>" shall mean that at least                    ) of the premises occupied by              ' of the Other Required Lessees shall each be open and continuously operated by a single Anchor Tenant (as defined below).  "<u>**Anchor Tenant**</u>" shall mean a retailer that (a) operates at least         ' other retail stores in the  United States, all under the same trade name as the retail store to be operated in the Shopping Center, (b) otherwise complies with all applicable provisions of this Lease, (c) is not a single price point retailer such as those operated under the trade names Dollar Wave, Dollar Tree or Dollar General on the date hereof, and (d) is not a closeout retailer such as those operated under the trade names Big Lots or Odd Lots on the date hereof.  If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied for a period of one hundred eighty (180) consecutive days, Tenant shall pay to Landlord on a monthly basis, "Alternative Rent".  "Alternative Rent" shall be defined as an amount equal to                          : which would have been payable for such period in the absence of this provision.  In addition to the rights of Tenant to pay Alternative Rent, if the non-satisfaction of the On-Going Co-Tenancy Requirement shall continue for a period of twenty-four (24) months beyond the initial failure to meet the On-Going Co-Tenancy Requirement, Tenant shall have the right to terminate this Lease by sixty (60) days written notice given to Landlord at any time thereafter (subject to the remainder of this paragraph) until such time as that specific failure of the On-Going Co-Tenancy Requirement is satisfied.  During any period of time in which Tenant has the right to terminate this Lease as provided in this Section 16.3, Landlord shall have the right by written notice to Tenant, to demand that Tenant either terminate this Lease or discontinue the payment of Alternative Rent and commence the payment of the full amount of Minimum Rent due under this Lease (the "<u>**On-Going Co-Tenancy Demand Notice**</u>").  Upon said termination, the parties shall have no liability under this Lease for obligations arising after that date.  If Tenant fails to terminate this Lease within thirty (30) days after receipt of the On-Going Co-Tenancy Demand Notice, Tenant shall resume paying Minimum Rent in accordance with this Lease on the first day of the calendar month after Tenant's receipt of the On-Going Co-Tenancy Demand Notice.  In no event shall the foregoing sentence prevent Tenant from later claiming a breach of the On-Going Co-Tenancy Requirement from another closure when, if ever, the On-Going Co-Tenancy Requirement is again satisfied but is later not satisfied by a different closure at which time this Section 16.3 shall apply.

Notwithstanding anything to the contrary contained in this Section 16.3, a tenant shall not be deemed to fail to continuously operate if it closes for a reasonable duration due to (y) remodeling, casualty or condemnation of its premises which is being diligently repaired, restored or pursued, or (z) any Uncontrollable Event, as defined in Section 17.17 of this <u>Exhibit  C</u>.

16.4.   <u>Exclusive Use</u>.

16.4.1   <u>Limitation on Use</u>.  No portion of the Shopping Center (other than the Premises) shall be occupied or used, directly or indirectly, for the purpose of conducting a "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday themed décor, decorations and costumes, wedding goods (except apparel), party goods, scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories.  This Section 16.4.1 shall not apply to (A) any lessee whose lease was fully executed on the Effective Date hereof and is identified on <u>Exhibit I</u> as an "<u>**Existing Lease Not Subject to Tenant's Exclusive**</u>;" provided, however, that this exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive if Landlord may avoid the granting of such permission, or (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns if Landlord may avoid the granting of such permission, or (iii) Landlord permits or agrees to  an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (B) any lessee for which the sale of a product or service covered by the exclusive granted to Tenant hereunder is merely incidental to such lessee's primary use, unless the total space which such lessee devotes to the products or services which violate the exclusive contained in this Section 16.4.1 exceeds the lesser of ten percent (10%) of the Leasable Square Footage within such lessee's premises or one thousand (1,000) Leasable Square Feet (inclusive of allocable aisle space and linear shelf space); and further provided, in no event shall this exception for incidental use apply to custom framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer custom framing services.



Tenant hereby acknowledges that:

(a) a typical "card shop", such as a Hallmark, shall not be deemed in violation of this Section 16.4.1 provided that such typical "card shop" operates in the same manner as a typical "card shop", such as a Hallmark, operates as of the Effective Date of this Lease;

(b) a typical "furniture rental" store, such as Aarons, shall not be a violation of this Section 16.4.1 provided such typical "furniture rental" store operates in the same manner as a typical "furniture rental" store operates as of the Effective Date of this Lease;

(c) a typical "membership wholesale club" store, such as "Costco" or "Sam's Club", shall not be deemed in violation of this Section 16.4.1 provided that such "membership wholesale club" store operates in the same manner as a typical "membership wholesale club" store operates as of the Effective Date of this Lease;

(d) a typical "home furnishings" store, such as "HomeGoods", "HomeSense", "Cost Plus" or "Kirkland's", shall not be a violation of this Section 16.4.1; provided, however, in no event shall such home furnishings store provide picture framing services or devote more than the lesser of (I) 1,500 Leasable Square Feet, or (II) ten percent (10%) of its Leasable Square Feet in the Shopping Center, in the aggregate, to the sale of arts and crafts, frames, artificial flowers, artificial floral arrangements, wedding or party goods;

(e) a typical "office supply" store, such as "Staples", shall not be deemed in violation of this Section 16.4.1 provided that such office supply store operates in the same manner as a typical "office supply" store operates as of the Effective Date of this Lease; and

(f)    a typical "furniture" store such as a "Ashley Furniture" shall not be deemed in violation of this Section 16.4.1 provided that such "furniture" store operates in the same manner as a typical "furniture" store operates as of the Effective Date of this Lease.

The exclusive granted to Tenant under this Section 16.4.1 shall not apply to (A) a typical supermarket/grocery store primarily selling food products which is at least 10,000 Leasable Square Feet as such stores typically operate as of the Effective Date of this Lease (i.e. primarily selling food products), (B) a typical department store (i.e. Kohl's) which is at least 40,000 Leasable Square Feet as such stores typically operate as of the Effective Date of this Lease, (C) a typical discount department store (i.e. Wal-mart) which is at least 75,000 Leasable Square Feet as such stores typically operate as of the Effective Date of this Lease, or (D) a typical Nordstrom Rack store which is at least 25,000 Leasable Square Feet as such stores typically operate as of the Effective Date of this Lease. In addition, the exclusive shall not apply to any presently existing leases, or to successors or assigns of tenants under such existing leases or to any lease renewals, expansions, extensions, relocations or replacements of such tenants, to the extent such existing leases either permit such tenants to use their respective premises for a conflicting use or do not preclude such tenants from using their respective premises for a conflicting use (the "**Existing Leases**"); provided, however, that upon any assignment or subletting under such Existing Leases, Landlord shall enforce Tenant's rights set forth above unless (a) such assignment or subletting is for a purpose presently permitted or not precluded by such Existing Leases; or (b) Landlord is not permitted, pursuant to the terms of such Existing Lease, to enforce Tenant's rights hereunder in connection with such assignment or sublease; or (c) Landlord would be required to terminate such Existing Lease.

If, for a period of twelve (12) consecutive months, Tenant fails to operate Tenant's business (other than for non-economic reasons beyond Tenant's reasonable control) or changes its use such that it is no longer selling items covered by the exclusive granted in this Section 16.4.1, Tenant shall no longer have an exclusive right as to the specific item(s) not sold but described in this Section 16.4.1; provided, however, in the event Tenant recommences its business in the Premises or again sells or offers the items or services covered by this Section 16.4.1, then, upon Landlord's receipt of notice of such recommencement, the exclusive granted to Tenant hereunder shall again be effective, and any leases executed during the interim period during which this exclusive was not effective, shall be treated as an Existing Lease Not Subject to Tenant's Exclusive.

16.4.2  Remedy of Tenant.  If any person or entity shall violate the exclusive granted to Tenant hereinabove, Landlord shall, at its sole cost and expense, use commercially reasonable efforts to promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit such violation, including the commencement of legal action at Landlord's election. In the event of any violation of the exclusive granted to Tenant hereinabove, Tenant may, at its option, pursue any available remedy, at law or in equity. In the event Tenant commences any legal proceedings with respect to any such violation, Landlord shall reasonably cooperate with Tenant with respect to such proceeding (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such proceeding and by appearing at any hearing or trial with respect to such proceeding). In addition, Tenant shall have the following remedies at any time during the existence of said violation, said remedies being separate, distinct and cumulative remedies, and the exercise of any one or



C-24

more of which shall not be deemed to preclude Tenant's rights to exercise any other legal or equitable remedy available, including but not limited to, an action for injunctive relief:

    (i)    reducing the Minimum Rent by twenty-five percent (25%) so long as such violation exists (or until the remedy as stated in (b) below takes effect), commencing sixty (60) days after Tenant has notified Landlord in writing of such violation; and

    (ii)    reducing the Minimum Rent by fifty percent (50%) so long as such violation exists, commencing one hundred twenty (120) days after Tenant has notified Landlord in writing of such violation; and

    (iii)    terminating this Lease upon ninety (90) days written notice by Tenant if the violation has continued to exist for a period of at least one hundred eighty (180) days without any further liability by either party for obligations arising after the date of termination except as specified in this Lease for delivery of the Premises, return of deposits and equalization of estimated payments; provided, however, if Tenant has not exercised its right to terminate this Lease within two (2) years after the commencement of the violation, Landlord shall have the right to demand by written notice (the "**Demand Notice**") that Tenant either (a) exercise its right to terminate this Lease within thirty (30) days after Tenant's receipt of the Demand Notice, or (b) waive its rights under clauses (i), (ii) and (iii) above with respect to that particular violation.  If Tenant fails to exercise its right to terminate this Lease within thirty (30) days after Tenant's receipt of the Demand Notice, then it shall be deemed that Tenant has waived its rights under clauses (i), (ii) and (iii) above with respect to that particular violation, and the abatement described in clause (i) and (ii) shall cease as of the thirtieth (30th) day after Tenant's receipt of the Demand Notice.

    Notwithstanding the foregoing, if any other tenant or occupant of any part of the Shopping Center breaches or violates the exclusive granted to Tenant as herein above set forth without Landlord's grant of a right to do so under any lease or other agreement, and otherwise without Landlord's consent or approval, and within thirty (30) days of Landlord learning of such violation Landlord gives Tenant reasonable supporting evidence that such breach or violation is being conducted without Landlord's consent or approval (such tenant or occupant bring referred to herein as a "**Rogue Tenant**"), then in such event Tenant shall not have any of the remedies against Landlord set forth in this Section 16.4.2 provided Landlord shall at its sole cost and expense promptly commence all appropriate legal proceedings and rigorously prosecute such Rogue Tenant to enjoin and prohibit such violation.

    Landlord acknowledges that the granting of the exclusive contained hereinabove is a material inducement to Tenant's agreement to enter into this Lease and the enforcement of this exclusive is integral to the economic viability of the Shopping Center to Tenant.  The statement of the remedies specified hereinabove shall not be deemed to excuse Landlord from enforcing the exclusive granted to Tenant hereunder.

    16.5.    <u>Prohibited Uses</u>.  No portion of the Shopping Center shall be occupied or used, directly or indirectly, for any of the prohibited uses set forth on <u>Exhibit J</u> to this Lease (the "**Prohibited Uses**").  This Section 16.5 shall not apply to any lessee whose lease was fully executed on the Effective Date hereof and is identified on <u>Exhibit I</u> as an "**Existing Lease Not Subject to Tenant's Exclusive or Prohibited Uses**;" provided, however, that this exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any Prohibited Uses, or (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (iii) Landlord permits or agrees to  an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the Prohibited Uses by giving said existing lessee notice of the Prohibited Uses or otherwise.  The restrictions set forth above shall be deemed to be covenants running with the land and shall bind and burden the Shopping Center and shall inure to the benefit of the Premises and Tenant.  If any person or entity shall violate the Prohibited Uses, or if any person or entity indicates to Landlord that it will violate the Prohibited Uses, or if Tenant notifies Landlord that it believes, in good faith, that any other entity is violating or will in the future violate the Prohibited Uses, Landlord shall, at its sole cost and expense, promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit such violation.  In the event of any violation of the Prohibited Uses, Tenant may, at its option, pursue any available remedy, at law or in equity.  In the event Tenant commences any legal proceedings with respect to any such violation, Landlord shall cooperate with Tenant with respect to such proceeding (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such proceeding and by appearing at any hearing or trial with respect to such proceeding).  In addition, Tenant shall have the following remedies at any time during the existence of said violation, said remedies being separate, distinct and cumulative remedies, and the exercise of any one or more of which shall not be deemed to preclude Tenant's rights to exercise any other legal or equitable remedy available, including but not limited to, an action for injunctive relief:



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

  (i)  reducing the Minimum Rent by twenty-five percent (25%) so long as such violation exists (or until the remedy as stated in (b) below takes effect), commencing sixty (60) days after Tenant has notified Landlord in writing of such violation; and

  (ii)  reducing the Minimum Rent by fifty percent (50%) so long as such violation exists, commencing one hundred twenty (120) days after Tenant has notified Landlord in writing of such violation; and

  (iii)  terminating this Lease upon ninety (90) days written notice by Tenant if the violation has continued to exist for a period of at least one hundred eighty (180) days without any further liability by either party for obligations arising after the date of termination except as specified in this Lease for delivery of the Premises, return of deposits and equalization of estimated payments; provided, however, if Tenant has not exercised its right to terminate this Lease within two (2) years after the commencement of the violation, Landlord shall have the right to demand by written notice (the "**Prohibited Use Demand Notice**") that Tenant either (a) exercise its right to terminate this Lease within thirty (30) days after Tenant's receipt of the Prohibited Use Demand Notice, or (b) waive its rights under clauses (i), (ii) and (iii) above with respect to that particular violation. If Tenant fails to exercise its right to terminate this Lease within thirty (30) days after Tenant's receipt of the Prohibited Use Demand Notice, then it shall be deemed that Tenant has waived its rights under clauses (i), (ii) and (iii) above with respect to that particular violation, and the abatement described in clause (i) and (ii) shall cease as of the thirtieth (30th) day after Tenant's receipt of the Prohibited Use Demand Notice.

  Notwithstanding the foregoing, if any other tenant or occupant of any part of the Shopping Center breaches or violates the Prohibited Uses without Landlord's grant of a right to do so under any lease or other agreement, and otherwise without Landlord's consent or approval, and within thirty (30) days of Landlord learning of such violation Landlord gives Tenant reasonable supporting evidence that such breach or violation is being conducted without Landlord's consent or approval (such tenant or occupant bring referred to herein as a "**Prohibited Use Rogue Tenant**"), then in such event Tenant shall not have any of the remedies set forth in (i), (ii) and (iii) above provided Landlord shall at its sole cost and expense promptly commence all appropriate legal proceedings and rigorously prosecute such Prohibited Use Rogue Tenant to enjoin and prohibit such violation.

  Landlord acknowledges that the restriction against the Prohibited Uses is a material inducement to Tenant's agreement to enter into this Lease and the enforcement of the Prohibited Uses is integral to the economic viability of the Shopping Center to Tenant. The statement of the remedies specified hereinabove shall not be deemed to excuse Landlord from enforcing the Prohibited Uses.

  16.6. <u>Other Exclusives</u>. Tenant shall be subject to the exclusive use restrictions listed in <u>Exhibit I</u> for so long as such exclusive use restrictions remain effective to restrict the use of the Premises.

  16.7. <u>Use of the Premises</u>. The Premises will be used initially by Tenant as a typical "Michaels" store (as of the date of Tenant's opening), and for such office and storage purposes ancillary thereto. Thereafter, Tenant may use the Premises for any lawful retail use which (i) does not conflict with any Prohibited Uses set forth in <u>Exhibit J</u> of this Lease, (ii) does not violate any Exclusive Uses set forth in <u>Exhibit I</u> of this Lease for so long as such exclusive uses remain in effect to restrict the Premises, and (iii) does not violate or change the parking requirements for the Premises or Shopping Center or otherwise cause Landlord to be required to obtain a parking variance or special exception.

## 17. MISCELLANEOUS

  17.1. <u>Relationship of Parties</u>. The amount of money provided to be paid Landlord will in no event be deemed to make Landlord a partner or an associate of Tenant in the conduct of Tenant's business, nor will either party be liable for any debts incurred by the other party in the conduct of the other party's business. The relationship between the parties is for the entire Lease Term that of Landlord and Tenant.

  17.2. <u>Heirs, Successors and Assigns</u>. This Lease and the covenants and agreements herein contained will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

  17.3. <u>GOVERNING LAW</u>. THIS LEASE WILL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH AND ENFORCED UNDER THE LAWS OF THE STATE IN WHICH THE SHOPPING CENTER IS LOCATED.

  17.4. <u>Rules of Construction</u>. This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties.



17.5.    Materiality of Covenants. Every covenant contained in this Lease will be construed to be material, whether or not the covenant expressly so provides.

17.6.    Implications as to Operation. Except as set forth in Section 17.23 below, nothing in this Lease shall be interpreted to obligate Tenant to open or operate a business in the Premises. No implication will be made concerning the use or operation of the Premises from the manner in which rent is paid or from the amounts of rent paid.

17.7.    Severability. If any term or provision of this Lease is found to be invalid, illegal or unenforceable, the remaining terms and provisions hereof will not be affected thereby; and each term and provision hereof will be valid and enforceable to the fullest extent permitted by law.

17.8.    Entire Agreement; Amendment. THIS LEASE CONTAINS THE ENTIRE AGREEMENT BETWEEN LANDLORD AND TENANT WITH RESPECT TO THE SUBJECT MATTER OF THE LEASE AND MAY BE AMENDED OR MODIFIED ONLY BY SUBSEQUENT WRITTEN AGREEMENT DULY SIGNED BY BOTH PARTIES HERETO.    EXCEPT FOR THOSE PROMISES, WARRANTIES, REPRESENTATIONS, CONTINGENCIES, CONDITIONS AND/OR AGREEMENTS SET FORTH IN THIS LEASE, NO PROMISES, WARRANTIES, REPRESENTATIONS, CONTINGENCIES, CONDITIONS, AND/OR AGREEMENTS HAVE BEEN MADE BY LANDLORD OR TENANT, ONE TO THE OTHER OR BETWEEN THEM, WITH RESPECT TO THE SUBJECT MATTER OF THIS LEASE, AND NEITHER PARTY HAS RELIED ON ANY PROMISES, WARRANTIES, REPRESENTATIONS, CONTINGENCIES, CONDITIONS, OR AGREEMENTS THAT ARE NOT SET FORTH IN THIS LEASE. LANDLORD AND TENANT ACKNOWLEDGE THAT THE PROVISIONS OF THIS LEASE HAVE BEEN NEGOTIATED AND AGREED TO BETWEEN LANDLORD AND TENANT AND THAT THIS LEASE REFLECTS THE AGREEMENT AND UNDERSTANDING OF EACH PARTY. EACH PARTY HAS READ THIS LEASE AND WAS GIVEN THE OPPORTUNITY TO HAVE THIS LEASE REVIEWED BY COUNSEL OF SUCH PARTY'S CHOOSING.  NO ACTION, VERBAL STATEMENT OR WRITTEN STATEMENT BY ANY EMPLOYEE, AGENT OR REPRESENTATIVE OF EITHER PARTY TO THIS LEASE (OTHER THAN AN AMENDMENT SIGNED BY BOTH PARTIES) SHALL BE CONSTRUED TO AMEND OR MODIFY THIS LEASE NOR TO DIMINISH OR DISCHARGE ANY OF THE RIGHTS AND OBLIGATIONS OF EITHER PARTY HEREUNDER.

17.9.    Gender, Number. Pronouns in this Lease importing any specific gender, will be interpreted to refer to corporations, partnerships, men and women, as the identity of the parties referred to, may require. Pronouns, verbs and/or other words in this Lease importing the singular number will be interpreted as plural words, as the identity of the parties or objects referred to, may require.

17.10.    Headings. The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, amplify, limit, construe, or describe the scope or interest of any section of this Lease.

17.11.    Section Numbers.  All references to section numbers contained in the Basic Lease Provisions, this Exhibit C or Exhibit D to this Lease are to the sections of this Exhibit C, unless expressly provided to the contrary.

17.12.    Memorandum of Lease. Landlord and Tenant will (i) execute contemporaneously with the execution of this Lease, a Memorandum of Lease in the form attached hereto as Exhibit K for recording purposes, and (ii) cooperate with one another to provide such other information and/or execute such other required instruments as is/are necessary in order to record the Memorandum of Lease. The party desiring to record the Memorandum of Lease, if at all, shall do so at its own cost and expense.

17.13.    Notices. All notices or requests given, sent or required to be given with respect to any matter pertaining to this Lease must be in writing and must be sent by nationally recognized overnight courier service, such as, but not limited to, Federal Express, by certified mail with return receipt requested, or by express mail, in each case with charges billed to sender proper postage prepaid as applicable and will be deemed given on the date received (or refused) when addressed to the parties at the addresses set forth in Paragraph 10 of the Basic Lease Provisions or to such other addresses as Landlord or Tenant may designate in writing.

17.14.    Effective Date. The "**Effective Date**" of this Lease will be the date of execution by the later to sign of Landlord or Tenant, provided an executed copy of this Lease is thereafter delivered to the other party.

17.15.    Confidentiality of Lease Terms. Landlord and Tenant will treat the monetary and operating terms and conditions of this Lease as confidential and will not divulge same to any person other than any existing or prospective mortgagee of the Shopping Center or any prospective purchaser of Landlord's or



C-27

Tenant's (as applicable) interest in this Lease. Neither Landlord nor Tenant not furnish copies of all or any part of this Lease to a person other than to a party described in the preceding sentence.

17.16.  Brokers.  Tenant agrees that Tenant will not present any broker or agent to Landlord for payment of any brokers', agents' or finders' fees or commissions due as a result of the execution of this Lease or the performance of the terms and provisions contained herein, except for fee(s) or commission(s) due to any broker(s) named in Paragraph 14 of the Basic Lease Provisions. Landlord will be solely responsible for the payment of any fees or commissions due with respect to this Lease.

17.17.  Force Majeure.  In the event that Landlord or Tenant, cannot commence and/or complete the work or perform any other obligation of such party hereunder by the date specified therefor because of strikes, lockouts, labor disputes, acts of God, war, civil commotion, fire or other casualty, or other cause beyond the reasonable control of such party, financial inability excepted (collectively, "Uncontrollable Events"), the time for the commencement and/or the completion of the work or the performance of such obligation shall be extended for the period of delay due to the Uncontrollable Event, but in no event shall such extension be for a period of more than sixty (60) days.  Notwithstanding anything to the contrary contained in this Lease, in no event shall this Section 17.17 be construed to: (i) excuse or delay the performance of a monetary obligation by either party, (ii) require Tenant to accept delivery of the Premises or to commence fixturing during the Possession Deferral Period, or (iii) act to delay the commencement of liquidated damages as outlined in Section G.4 of Exhibit D-1 of this Lease if the Completion Notice has already been delivered.  In order for either Landlord or Tenant to avail itself of the rights granted in this Section 17.17, that party must notify the other party within ten (10) days of the beginning and the end of the occurrence of an Uncontrollable Event.

17.18.  Right to Recapture.  In the event Tenant ceases operation of its business in the Premises for a period in excess of one hundred eighty (180) consecutive days (the initial one hundred eighty (180) day period being the "**Shutdown Period**"), Landlord will have the option to terminate this Lease by delivering to Tenant prior written notice of such decision at any time following the Shutdown Period ("**Notice Period**").  If Landlord exercises Landlord's option to terminate, this Lease will automatically terminate on the thirtieth (30th) day following the giving of said notice (the "**Recapture Termination Date**").  Thereafter, both parties will be relieved of all rights, duties or obligations hereunder except for duties and obligations accruing prior to the Recapture Termination Date, and such accrued duties and obligations will survive the termination of this Lease.  Notwithstanding anything contained above to the contrary, this Lease will not terminate if at any time prior to the Recapture Termination Date: (i) Tenant recommences business in the Premises for a period of at least thirty (30) consecutive days and Tenant notifies Landlord that Tenant has reopened for business, or (ii) Tenant shows proof (such as a letter of intent) to Landlord that Tenant has entered into bonafide, good faith negotiations to assign or sublet the Premises and such subtenant or assignee opens for business in the Premises within one hundred twenty (120) days after the Recapture Termination Date; provided, however, Tenant shall only be entitled to nullify Landlord's recapture of the Premises as set forth above one (1) time during the Lease Term.  Notwithstanding anything to the contrary contained in this Section 17.18, Landlord will not have a right of termination with respect to any Shutdown Period resulting from (a) remodeling, casualty or condemnation of the Premises which is being diligently repaired, restored or pursued, or (b) any Uncontrollable Event, as defined in Section 17.17 of this Exhibit C.

17.19.  Access.  Subject to the conditions of the following sentences, Landlord shall have the right after reasonable written notice to Tenant (except in cases of emergency in which no prior written notice shall be necessary) to enter upon the Premises at any reasonable time for the purpose of inspecting same, or making repairs to the Premises or adjacent premises.  With respect to those repairs or alterations to be made by Landlord which may disrupt Tenant's business operations, Landlord shall coordinate with Tenant's on-site management team to attempt to schedule such work before or after Tenant's business hours.  During any entry by Landlord, Landlord shall use reasonable effort to minimize interruption of Tenant's operations.

17.20.  Display of Premises.  Within one hundred eighty (180) days prior to the end of the term of this Lease, Landlord may enter the Premises during Tenant's normal business hours to show the Premises to prospective lessees; provided, however, Landlord shall use good faith efforts during any such entry to not alert Tenant's customers and employees of the pending expiration of this Lease. Tenant will permit Landlord to place and maintain "For Rent" or "For Lease" signs on the Premises during the last one hundred eighty (180) days of the Lease Term if Tenant has not timely exercised any option for an Extension; or if there are no further Extensions available, at a location reasonably acceptable to Tenant, it being understood that such signs shall in no way affect Tenant's obligations under any provision of this Lease.

17.21.  Counterparts; Execution.  This Lease may be executed in any number of counterparts, each of which will be an original, and such counterparts together will constitute one and the same instrument.  Execution may be effected by electronic means, including digital signature, or facsimiles of signature pages.



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

17.22.  Limitation of Liability.  It is understood and agreed that Landlord, its partners, shareholders, officers, directors, employees, agents and representatives, shall have no personal liability for any default on the part of Landlord accruing hereunder, it being understood and agreed that any money judgment obtained by Tenant by reason of Landlord's default shall be enforced against and satisfied only out of (i) the proceeds of sale produced upon execution of such judgment and levy thereon against Landlord's interest in the Shopping Center, and (ii) the consideration received by Landlord from the sale or mortgage refinancing all or any portion of Landlord's interest in the Shopping Center made subsequent to the entry of the money judgment, and Tenant shall look solely to the Shopping Center and improvements thereon (and to said property specified in clauses (i) and (ii) above) for the payment and satisfaction of any such claim or action in any judgment thereon.  Notwithstanding anything contained in this Lease to the contrary, in no event shall Landlord or any of its partners, shareholders, officers, directors, employees, agents and representatives ever be liable pursuant to this Lease for lost profits or consequential, speculative or punitive damages.  The foregoing provisions of this Section 17.22 are not intended to relieve Landlord from the performance of any of its covenants and obligations hereunder, but rather to limit Landlord's liability as aforesaid; provided, however, that nothing contained in this Section 17.22 shall be deemed to limit or impair in any manner any rights or remedies of Tenant which do not involve the personal liability of Landlord.  Notwithstanding the foregoing, if Landlord fails or refuses to maintain in effect any insurance policy required by Section 5.2.1 or 5.2.2 of this Exhibit C, and Tenant suffers a loss which would have been covered by any such policy, Landlord shall pay to, and remain liable for, an amount equal to the portion of Tenant's loss which would have been covered by such insurance and the execution of any money judgment obtained by Tenant against Landlord for such amount shall not be subject to the restrictions of this Section 17.22 of this Exhibit C.

17.23.  Recapture for Failure to Open in the Premises.  If Tenant fails to open to the public for business in the Premises within one hundred eighty (180) days following the Rental Commencement Date, Landlord will have the option to terminate this Lease by delivering to Tenant written notice of such decision at any time after the end of the one hundred eighty (180) day period until such time as Tenant has opened for business in the Premises in accordance with this Lease; provided, however if Tenant opens for business fully stocked, staffed and fixtured in the Premises within 30 days after receipt of Landlord's notice to terminate, Landlord's termination shall be nullified.  If Landlord exercises Landlord's option to terminate, this Lease will automatically terminate on the thirtieth (30th) day following the giving of said notice (the "**Opening Recapture Termination Date**").  Thereafter, both parties will be relieved of all rights, duties or obligations hereunder except for the provisions of this Lease as expressly survive the termination and except for duties and obligations accruing prior to such termination date; and all of the provisions, duties and obligations will survive the termination of this Lease.  Notwithstanding anything contained above to the contrary, this Lease will not terminate if at any time prior to the Opening Recapture Termination Date Tenant opens for business to the public in the Premises for at least one day fully fixtured and stocked with inventory.  Notwithstanding anything to the contrary contained in this Section 17.23, Landlord will not have a right of termination with respect to any failure to open resulting from (i) casualty or condemnation of the Premises which is being diligently repaired, restored or pursued, or (ii) an Uncontrollable Event (as defined in Section 17.17 of this Exhibit C).  Anything in this Lease to the contrary notwithstanding, the option of Landlord to terminate this Lease is the sole and exclusive legal and/or equitable remedy of Landlord for the failure of Tenant to open for business as provided in this Section 17.23.

17.24.



17.25.  Allowance.    Landlord shall pay to Tenant the sum of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉) (the "**Allowance**") as an inducement to Tenant to construct its own improvements in the Premises, together with related interest costs (i.e., interest carry costs calculated at the Interest Rate to accrue from the date of payment of any sum in connection with Tenant's Work to the date of reimbursement of the Allowance to Tenant) and all applicable taxes.  So long as Tenant is not in monetary default of this Lease beyond any applicable notice and cure period, the Allowance shall be due and payable within thirty (30) days after the latest to occur of (i) the completion by Tenant of Tenant's Work, (ii) Landlord's receipt of a sworn statement, final and unconditional lien waiver from Tenant's general contractor and any subcontractor or supplier performing work or furnishing materials ▉▉▉▉▉▉▉, and (iii) Tenant is open for business to the public in the entire Premises.  If Landlord fails to pay the Allowance when due, Tenant may, upon thirty (30) days notice to Landlord, deduct and offset the Allowance, together with interest at the Interest Rate, from all rent and/or other charges due from Tenant to Landlord.  The foregoing shall not be construed to allow Landlord a right to withhold payment of the Allowance.

[the remainder of this page intentionally left blank]



EXHIBIT D
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.

"TENANT'S WORK"

Tenant, at its sole cost and expense, may make whatever improvements to the Premises it deems appropriate to prepare the Premises for operation of its business in the Premises.  Exhibit D-2 references the initial layout of the Premises for purposes of enabling Landlord to complete Landlord's Work.  From and after the Completion Date,  Tenant and Tenant's agents will the right of access to areas in the Shopping Center that are necessary for Tenant to review the telecommunication systems existing or proposed for the Shopping Center and Tenant will have the right to install the wiring, components and other equipment within the Shopping Center Tenant deems necessary for the operation of Tenant's Telecommunication Cable System (defined below)  In connection with the foregoing, Tenant and Tenant's agents shall have the right to place, lay, bury, underground bore, construct, install, operate, repair, maintain (including aerial patrol), renew, rebuild, replace, upgrade, expand, penetrate building and relocate fiber optic cables, copper cables, coaxial cables or other cables through which voice, data, video or other signals are transmitted, conduits, inner ducts, hand holes, splice vaults, poles, optical or electronic equipment, marker posts or signs, and other related facilities appropriate for installation, use, or maintenance of such cables (collectively, the "**Telecommunications Cable System**"), in, on, over, under, through and/or across the Shopping Center. Landlord shall reasonably cooperate with Tenant in accomplishing the foregoing.



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

EXHIBIT D-1
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.
"LANDLORD'S WORK"

1.  GENERAL.  Except as expressly stated on this Exhibit D-1, Landlord shall deliver the Premises to Tenant in substantially the same condition as existed on April 23, 2023.

2.  REMOVAL OF SIGNAGE.  None

3.  HAZARDOUS MATERIALS.  Landlord shall remove any and all asbestos and other hazardous materials and supply approved manifest showing proper disposal and monitoring data in accordance with all applicable governmental regulatory requirements.

4.  FIRE PROTECTION.  Landlord shall provide a fire water line sized for distribution adequate and required per code, including NFPA 13, to handle Tenant's intended use as a typical Michaels' store.

5.  STRUCTURAL.  Landlord hereby represents and warrants to Tenant that the Premises is structurally sound.

6.  COMPLIANCE.  The Premises and the Shopping Center shall be in compliance with all laws, ordinances and codes and shall be certifiable for a certificate of occupancy subject to the completion of any improvements contemplated and to be performed by Tenant.

7.  WARRANTY.  After any warranty periods provided in this Lease, Landlord will promptly upon request by Tenant, assign to Tenant any guarantees or warranties of workmanship and/or materials which Landlord has or may receive in connection with the Premises for items which Tenant is required by this Lease to maintain.

8.  REMOVAL OF FIXTURES, ETC.  As is (i.e. none within the Premises).

9.  ROOF.  Landlord shall ensure that the roof over the Premises is water-tight.

10. Landlord to stub in all utilities per the below. Landlord to provide all required tap fees and meters.

11. Landlord to provide 400A, 277/480 v 4W 3PH electrical service stubbed into the rear of the Premises with 480v 42-circuit breaker panel.

12. Landlord to provide 1 ½" domestic water line stubbed into the rear of the Premises.

13. Landlord to provide a 4" sanitary line stubbed into the rear of the Premises.

14. Landlord to provide existing gas manifold to accept future gas piping for Tenant's use. Tenant shall install gas piping as part of Tenant's RTU work and new gas service.

In the event the Completion Date (as defined in Section 2.1.1 of <u>Exhibit C</u>) occurs after the Contemplated Completion Date (as defined in Section 2.1.1.1 of <u>Exhibit C</u>), Landlord will pay to Tenant, as liquidated damages,



The foregoing right shall not be Tenant's exclusive remedy for failure of Landlord to pay same nor shall said right be deemed an agreement for Landlord to withhold payment of damages.



D-1-1

1
2
3 EXHIBIT D-2
4 TO
5 SHOPPING CENTER LEASE
6 BETWEEN
7 EQUITY ONE (COPPS HILL) LLC
8 AND
9 MICHAELS STORES, INC.
10
11
12 SITE SPECIFIC LAYOUT
13



14



EXHIBIT E
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.
NOTICE OF LEASE

As provided by the terms of the Shopping Center Lease (the "**Lease**") dated _____ , 20__ , between the undersigned parties leasing premises described as follows:

_____
_____
_____

the undersigned hereby establish and agree (i) the Initial Term of the Lease commenced on the Completion Date which was _____ , 20__ ; (ii) the **[certified]** Leasable Square Feet of the Premises is _____ ; (iii) the Rental Commencement Date is _____ ; and (iv) the Expiration Date of the Lease is _____ , although the Lease Term may be extended as provided in the Lease for the exercise of certain Extension options.  Accordingly, pursuant to Paragraph 6 of the Basic Lease Provisions of the Lease, the Minimum Rent shall be adjusted.  Therefore, the Minimum Rent amounts in Paragraph 6 of the Basic Lease Provisions of the Lease are hereby substituted by the following: [insert revised rent amounts]

LANDLORD:

_____ ,
a _____

DATE: _____        By:_____
                                      Name:_____
                                      Title:_____

TENANT:

MICHAELS STORES, INC.,
a Delaware corporation

DATE: _____        By:_____
                                      Name:_____
                                      Title:_____



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

1   EXHIBIT F
2   TO
3   SHOPPING CENTER LEASE
4   BETWEEN
5   EQUITY ONE (COPPS HILL) LLC
6   AND
7   MICHAELS STORES, INC.

8   BUILDING SIGN RENDERING
9





10
11

F-1

1               EXHIBIT F-1
2                    TO
3        SHOPPING CENTER LEASE
4                  BETWEEN
5         EQUITY ONE (COPPS HILL) LLC
6                   AND
7          MICHAELS STORES, INC.

8          PYLON SIGN RENDERING
9



(2) Flat Polycarbonate Face Replacements for (1) Existing D/F Multi-Tenant Sign

**SCOPE**
• Remove (2) existing tenant faces from existing D/F sign
• Manufacture & install (2) new flat polycarbonate faces with 1st surface application of reverse-cut film

**GENERAL DESCRIPTION**
• Faces of white (7328) polycarbonate with 1st surface application w/vinyl
• Faces installed into existing D/F multi-tenant sign with existing metal retainers/divider bars

**COLOR SCHEDULE**
FACES: 7328 White polycarbonate w/ 1st surface vinyl application - to match Avon 2500C:33 Red

**"CLINGS"**
(4) Temporary low-tack vinyl messages (two with "OPENING SOON" and two with "NOW OPEN") applied to poly faces

For purposes of signage only. No elevation approval contained herein

10
11

F-2

C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

EXHIBIT G
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.


SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT


STATE OF _____    §
                                §
COUNTY OF _____     §

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") is made and entered into this _____ day of _____, 20__, by and between _____ , a _____ ("**Landlord**"); _____ , a _____ ("**Lender**"); and MICHAELS STORES, INC., a Delaware corporation ("**Tenant**").

W I T N E S S E T H :

WHEREAS, Tenant entered into that certain Shopping Center Lease dated _____, 20__ with Landlord for retail premises ("**Premises**") in _____ Shopping Center (the "**Shopping Center**"), constructed on that certain tract or parcel of land in the City of _____ , County of _____ and State of _____ , more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Shopping Center Lease and all amendments and modifications thereto are hereinafter referred to as the "**Lease**"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____, made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "**Mortgage**"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.    Subject to the terms of this Agreement, Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage. Lender agrees that so long as the Lease shall be in full force and effect, and so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, (a) Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby; (b) the possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected, impaired by or interfered with, by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and (c) all condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

2.    In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "**Purchaser**") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument.  Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease.  The



G-1

respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3. In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4. If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5. All notices or requests given, sent or required to be given with respect to any matter pertaining to this Agreement must be in writing and must be sent by nationally recognized overnight courier service, such as, but not limited to, Federal Express or UPS, by certified mail with return receipt requested, or by express mail, in each case with charges billed to sender proper postage prepaid as applicable and will be deemed given on the date received (or refused) when addressed to the parties at the addresses set forth below or to such other addresses as Landlord or Tenant may designate in writing.

| | |
|---|---|
| LANDLORD: | *[please provide]* |
| LENDER | *[please provide]* |
| TENANT: | MICHAELS STORES, INC.<br>3939 West John Carpenter Freeway<br>Irving, Texas 75063<br>ATTN: Director – Real Estate Administration |
| | With a copy of notices to: |
| | MICHAELS STORES, INC.<br>3939 West John Carpenter Freeway<br>Irving, Texas 75063<br>ATTN: Associate General Counsel- Real Estate |

6. This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

7. This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

8. The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANDLORD

_____ ,
a _____

By: _____
Name: _____
Title: _____



G-2

<u>LENDER</u>

_____,

a _____

By: _____
Name: _____
Title: _____

<u>TENANT</u>

MICHAELS STORES, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

ACKNOWLEDGMENTS

<u>LANDLORD</u>

STATE OF _____        §
                                §
COUNTY OF _____       §

On _____ before me, _____
           DATE                    NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared _____
                              NAME(S) OF SIGNER(S)

☐ personally known to me - or - ☐    proved to me on the basis of satisfactory evidence to be the
                                     person(s) whose name(s) is/are subscribed to the within
                                     instrument and acknowledged to me that he/she/they executed
                                     the same in his/her/their authorized capacity(ies), and that by
                                     his/her/their signature(s) on the instrument the person(s), or the
                                     entity upon behalf of which the person(s) acted, executed the
                                     instrument.

WITNESS my hand and official seal.

_____
           SIGNATURE OF NOTARY



**LENDER**

STATE OF _____                §

COUNTY OF _____                §
                                                                         §

On _____ before me, _____

        DATE                          NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared _____

                                             NAME(S) OF SIGNER(S)

☐  personally known to me - or - ☐    proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

SIGNATURE OF NOTARY

**TENANT**

STATE OF TEXAS                §

COUNTY OF DALLAS                §
                                                §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of MICHAELS STORES, INC., a Delaware corporation, who acknowledged that she was duly authorized to execute this agreement on behalf of said corporation.

GIVEN under my hand and seal of office this _____ day of _____, 20__.

_____

Notary Public in and for the
State of Texas

_____

Notary's Printed Name
My Commission Expires:_____



G-4

DocuSign Envelope ID: 829B8021-236D-491B-A603-448B28EB1F2B

EXHIBIT H

TO

SHOPPING CENTER LEASE

BETWEEN

EQUITY ONE (COPPS HILL) LLC

AND

MICHAELS STORES, INC.


UNDERLYING DOCUMENTS


To be provided by Landlord



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

EXHIBIT I
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.

I.    EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE OR PROHIBITED USES:

HomeGoods
Stop & Shop
Supercuts
Jersey Mike's Subs
Rite Aid
Choice Pet Supply
Ridgefield Liquors
Myeyedr.
Venice Restaurant
Sun Cleaners
Chloe Nail Salon
Gyro On Pita

II.    OTHER EXCLUSIVES:

**Kohl's**
Exclusive Uses:

**Stop & Shop**
Exclusive:
Landlord shall not lease, use or permit to be used any other portion of or premises in the Shopping Center for the conduct of a Food Supermarket Business or for the sale of any food products for off-premises consumption, other than the incidental sale of such food products in not more than 500 sq. ft. of any retail store business, except that Landlord may permit the sale of food items and the conduct of businesses principally engaged in food sales, as follows:

(i) snack bars in variety stores, junior department stores and department stores may sell take-out orders, ready for immediate consumption, of soups, sandwiches, hot and cold beverages and individual servings of items which are also being sold (on the same premises) for on-premises consumption, but not frozen foods; and



I-1

(ii) one ice cream store business similar but not limited to the kind now operated under the name "Friendly" or "Baskin Robbins", may be operated in the Shopping Center and may sell ice cream and ice cream products for off-premises consumption; and

(iii) one candy store business may be operated in the Shopping Center and may sell bulk and packaged candies and nuts for off-premises consumption; and

(iv) a package liquor store business may be operated in the Shopping Center and may sell alcoholic beverages for off-premises consumption only, and, as an ancillary part of its business, may sell cocktail ingredients, such as syrups and carbonated beverages, and cocktail snacks, such as pretzels, potato chips and nuts, for off-premises consumption only (provided, however, that a package liquor store business shall not be operated in the Shopping Center, other than the existing Ridgefield Liquor store business, if such operation precludes Tenant from obtaining a license to sell beer or beer and wine in the demised premises); and

(v) a variety store, a junior department store, or department store business may sell food items for off-premises consumption, provided, however, that not more than a total of 2,500 square feet of selling space, or (if less) a total of 10% of the total floor area of the premises used for such business, shall be used for the sale (including display) and storage of food items; and

(vi) A full-service sit-down or take-out restaurant as provided in Section 9.2(h) (v);

During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a drug store, or for a pharmacy, or for the sale of health and beauty care products, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center for:

(i) the conduct of a drug store, or for a pharmacy, or for health and beauty care products other than the relocated Eckerd Drugstore which will be located in the building shown on Exhibit A as "Proposed Pharmacy"; or

(ii) except with respect to the relocated Eckerd Drugstore, the sale, display or advertising of drugs, medicines, rubber goods or hospital or "sickroom" supplies or equipment (except that "patent" and "proprietary" medicines which may, by law, be sold in stores which do not contain a prescription department and which do not employ a registered pharmacist on the premises may be sold in premises in the Shopping Center which contain not less than 20,000 square feet of floor area and which are used for the business of a department ~tore, junior department store or variety store (if otherwise permitted) , but the total amount of floor area devoted to the sale and display of such "patent" and "proprietary" medicines by any one such business conducted in the Shopping Center shall not exceed 2,500 square feet; or

(iii) the conduct of the business consisting principally of the sale of perfumes, cosmetics, vitamins, "patent" or "proprietary" medicines (described above) or "sundries" of the types commonly sold in drug stores, or of any combination of the foregoing, whether operated on a discount or limited price or regular price basis, and whether on a self-service or service basis; or

(iv) the conduct of a business consisting principally of the sale of greeting cards, gift wrapping and "party goods", so-called, except for the existing lease to Jenny's Hallmark store.

During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for the sale of flowers, plants or other horticultural products, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center for the sale of flowers, plants or other horticultural products.

During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a business which provides film or photo processing or developing services (including so-called "one-hour" film developing services), Landlord shall not lease, use, or permit to be used any portion of, or other premises in, the Shopping Center (other than the relocated Eckerd Drugstore) for the operation of a business which provides film or photo processing or developing services of any type.

Landlord Restriction:

Landlord agrees that during such time as more than fifty percent (50%) of the floor area of the demised premises is used or occupied for the conduct of a "retail business", so-called, no other part of or other premises in the Shopping Center shall be used for any one or more of the following:

(i) for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types or qualities now commonly known as "odd lot", "distressed", "bankruptcy", "fire sale" or "damaged" or of the type known in the trade as "schlock," provided, however, that, in any evert, an operation of the kind currently conducted by Marshalls, TJ Maxx or other comparable "off-price" retail operations shall be permitted; or

(ii) for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors, or



I-2

(iii) for any purpose other than the conduct of a "retail business", so-called, which term shall mean and include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses,
shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, as well as ordinary retail businesses selling merchandise or other businesses typically found in comparable shopping centers in Connecticut; or

(iv) for the operation of a motel or tourist court; or

(v) for a restaurant business or alcoholic beverage business ("bar") of any kind, including, without limitation (A) a "car-hop" or "carry-out" restaurant business whose customers consume food items sold for off-premises consumption while such customers are occupying vehicles parked on the Common Facilities of the Shopping Center, and (B) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis, and (C) a restaurant-bar business which serves alcoholic beverages for on-premises consumption to customers who do not consume the beverages in question as a part of their meals; except that one full service sit down or take-out restaurant of not more than 2,000 square feet may be located either on the eastern end of Building A or on the eastern end of the Pharmacy Building; or

(vi) for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, movie theaters, "penny arcades," so-called; amusement games or devices (electronic or otherwise), "discos", so-called; so-called "strip shows", and live entertainment of any kind); or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books, movies and photographs; or

(vii) for any automobile or truck sales, storage, service, fueling, washing, or repair operation; or

(viii) for any business using outdoor space in its regular operations, such as lumber yards, boat sales yards and the like except for tenant sidewalk sales and outdoor sales on the south side of the building currently occupied by Kohl's Department Stores; or

(ix) for any office or storage operations except office and storage operations which are a part of the conduct of a retail business in the Shopping Center.

**Supercuts**
<u>Exclusive:</u>

<u>Landlord Restriction:</u>

**Jersey Mike's**
<u>Exclusive:</u>

<u>Landlord Restriction:</u>



I-3

**Rite Aid**

Exclusive:

A. Tenant shall have the exclusive right during the term of this Lease or any extension or renewal hereof to sell or dispense prescription drugs in the Shopping Center, except for Kohl's and Stop & Shop, and their respective successors and assigns, without the prior written permission of Tenant.

B. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as an army-navy store, surplus store, or non-categorized discount store or with any store or business devoting more than one thousand (1,000) square feet of its retail floor area to the sale of cosmetics, health and beauty aids and related items (except for Kohl's and Stop & Shop), without the express written consent of Tenant. This paragraph shall not apply to Stop & Shop, Kohl's, and their respective successors and assigns or future occupants of the premises occupied by Stop & Shop and Kohl's so long as such premises are used as a grocery store or department store, respectively.

C. Landlord further agrees that it will not directly or indirectly lease, rent, sell or otherwise permit any property in which it has any interest (direct or indirect) located within the Shopping Center, or within one thousand (1,000) feet of any exterior boundary of the Leased Premises, to be used as a drug store, or a business which sells or dispenses prescription drugs or for any collateral use in direct support of an adjacent drug store or a business which sells or dispenses prescription drugs (such as, parking, drainage, or service drives), any of the businesses described in Section 28.B. (except for Kohl's and Stop & Shop, and their respective successors and assigns) without the written permission of Tenant. This Section 28.C. shall not apply to a mortgagee of the Leased Premises or the Shopping Center or to a purchaser, unrelated to Landlord, of the Leased Premises or the Shopping Center who had an interest which would violate this section at the time it purchased the Leased Premises or Shopping Center.

D. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as a photo processing store or photo development store or with any store or business devoting more than one thousand (1,000) square feet of its retail floor area to the sale of film, and related items (except for Kohl's and Stop & Shop), without the express written consent of Tenant.

E. Landlord agrees that no lease will be entered into in the Shopping Center or any extensions thereof with any type store commonly known as a greeting card store or with any store or business devoting more than one thousand (1,000) square feet of its retail floor area to the sale of greeting cards (except for Kohl's and Stop & Shop), without the express written consent of Tenant. Notwithstanding the foregoing, Tenant acknowledges that a Hallmark store currently exists in the Shopping Center and Landlord shall have the right to extend the lease for the Hallmark store for a space not to exceed 2,500 square feet.

Landlord Restriction:
None.

**MyEyeDr.**

Exclusive:

Landlord Restriction:

**HomeGoods**

Exclusive:

I-4

Landlord Restrictions:

**Choice Pet**

Exclusive:

**Marshalls**

Exclusive:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Landlord Restrictions:
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52



C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$e4b77ce1847e$7F3CF59F474F4F7E95988BD93B8BCB16.docx

EXHIBIT J
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.


PROHIBITED USES

1.   funeral establishment;

2.   automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities and quick-lube and tire and battery facilities;

3.   auction or bankruptcy sale;

4.   pawn shop;

5.   circus, carnival or amusement park, or other entertainment facility, except as otherwise expressly permitted in this Lease and an entertainment facility shall be permitted in space located to the rear and/or the side of the Premises so long as the entrance is also located to the rear of the Premises;

6.   outdoor meetings;

7.   bowling alley within 200 feet of the Premises;

8.   primarily pool or billiard establishment;

9.   shooting gallery;

10.  off-track betting (provided that state sponsored lottery tickets shall not be prohibited);

11.  refinery;

12.  adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality);

13.  massage parlor, except that one (1) nationally or regionally recognized facility offering therapeutic massages, such as Massage Envy, shall be permitted so long as such facility does not occupy more than three thousand five hundred (3,500) Leasable Square Feet, and the foregoing shall not prohibit massage services that are provided by a nail or hair salon providing spa services (it being understood that there shall be no limitation on GLA or number of occupants in the shopping center on any nail salon or hair salon);

14.  any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms;

15.  theater within 200 feet of the Premises;

16.  auditorium, meeting hall, ballroom, day care facility, school or other place of public assembly, except that learning or education centers occupying 5,000 square feet or less commonly found in comparable shopping centers, such as Goddard, Kumon, Swim school, Sylvan shall be permitted on the out parcels, and Goddard may be located in the building behind the Premises;

17.  agency, department or bureau of any governmental authority or unemployment agency, service or commission;

18.  gymnasium, health club, exercise or dance studio, except that (a) one (1) of the foregoing shall be permitted in the building behind the Premises and parking for such shall be located to the rear and/or the side of the Premises, and (b) up to three (3) boutique fitness centers (e.g., Orangetheory) shall be permitted on the out parcels, not to exceed 3,000 square feet each;



J-1

19.    dance hall;

20.    cocktail lounge, bar, disco or night club (primarily serving alcohol, it being understood that the foregoing shall not apply to restaurants serving alcohol);

21.    bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business;

22.    video game or amusement arcade, except as an incidental part of another primary business;

23.    skating or roller rink;

24.    car wash, car repair or car rental agency;

25.    temporary or seasonal stores which sell holiday and seasonal (including without limitation, Christmas and/or Halloween) themed décor, decorations, costumes, artificial Christmas trees, Christmas lights, Christmas ornaments, and/or holiday themed party goods similar to Tenant including without limitation, the following stores:  Spirit Halloween stores, Always Christmas stores, and similar operations, however the foregoing shall not restrict the sale of live pumpkins or Christmas trees;

26.    second hand store (provided, however, that, one (1) national or regional high-end resale store shall be permitted), close-out store (except that one [1] consignment store occupying 4,500 square feet or less shall be permitted), dollar store, including price point retailers (for example, but without limitation, Dollar Tree, Family Dollar, pOpshelf, Dollar General, Bill's Dollar Store, etc., but Five Below shall not be prohibited), auction house, or flea market;

27.    any establishment which sells or dispenses marijuana or drug related paraphernalia;  or

28.    non-retail use, (which shall not prohibit in the Shopping Center such uses commonly referred to as "quasi-retail" or "service retail" such as a travel agency, real estate office, insurance agency, accounting service, dental, optical services, physical therapy/chiropractor, urgent care, learning center, etc., so long as same do not exceed twenty percent (20%) of the Leasable Square Feet of the Shopping Center).



J-2

EXHIBIT K
TO
SHOPPING CENTER LEASE
BETWEEN
EQUITY ONE (COPPS HILL) LLC
AND
MICHAELS STORES, INC.

MEMORANDUM OF SHOPPING CENTER LEASE

1.    Effective Date of Lease. _____, 2023.

2.    Name and Address of Landlord.  EQUITY ONE (COPPS HILL) LLC, a Florida limited liability company, having an office at c/o Regency Centers Corporation, One Independent Drive, Suite 114, Jacksonville, Florida 32202-5019, Attention: Legal Department.

3.    Name and Address of Tenant.  MICHAELS STORES, INC., a Delaware corporation, having an office at 3939 West John Carpenter Freeway, Irving, Texas 75063, Attention: Director of Real Estate Administration.

4.    Description of Premises.  Approximately 15,936 (Dimensions as shown on Tenant's Site Specific Floorplan Layout attached as Exhibit D-2 to the Lease) Leasable Square Feet and being a part of Copps Hill Plaza (the "**Shopping Center**") located in the City of Ridgefield, County of Fairfield, State of Florida, and constructed on land described in Exhibit A attached hereto and as depicted on Exhibit B attached hereto.

5.    Term of Lease.  Commencing on the "Completion Date" of the Lease (as such term is defined in the Lease) and ending on the last day of the one hundred twentieth (120th) full calendar month after the Rental Commencement Date (the "Expiration Date"); provided, however, if the Expiration Date is scheduled to occur during the period from September 1 of any calendar year through January 31 of the succeeding calendar year, and Tenant does not extend the Lease Term for the next Extension, or if there are no further Extensions available to Tenant hereunder, then the Expiration Date shall automatically be extended until the last day of February of said succeeding calendar year unless Tenant notifies Landlord in writing two hundred seventy (270) days prior to the last day of the Lease Term that Tenant elects not to have the Lease Term automatically extended as provided herein above.

6.    Options to Extend.  The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for          s of



K-1

1     each.

2

3        7.      Restrictions on Construction.  Landlord will not create out parcels or pad sites, in addition

4     to the out parcels or pad sites shown on Exhibit B of the Lease.  Except as may be existing as of the

5     Effective Date, any buildings, pylon or monument signs constructed on the out parcels or pad sites within

6     the "Outparcel Area" shown on Exhibit B and owned by or acquired by Landlord or any affiliate of Landlord

7     shall be subject to the following restrictions: (i) no building or improvements constructed on any out parcel

8     or pad site shown on Exhibit B shall exceed one (1) story in height, or twenty-eight feet (28') in height

9     (including architectural features, provided such architectural features do not interfere (other than in an

10    immaterial nature) with the visibility of the Premises),  (ii) each building shall comply with Laws; and (iii) any

11    pylon signs erected or constructed on the out parcels or pad sites shall not obstruct the visibility of the pylon

12    signs identifying the Shopping Center or Tenant.  Landlord shall endeavor to not perform (nor permit to be

13    performed subject to the rights of existing tenants, emergencies and applicable laws) any exterior

14    construction in the Shopping Center during the months of November or December after Tenant has opened

15    for business in the Premises.

16

17       8.      Prohibited Uses.  There exists in the Lease various restrictions upon other uses at the

18    Shopping Center, including, without limitation, those set forth on Exhibit C attached hereto.  The restrictions

19    set forth above shall be deemed to be covenants running with the land and shall bind and burden the

20    Shopping Center and shall inure to the benefit of the Premises and Tenant.

21

22       9.      Employee Parking.  Landlord may designate, and may from time to time change the

23    designation of, the particular parking areas in the Shopping Center to be used by the employees of the

24    various occupants of the Shopping Center (the "**Employee Parking Areas**"); provided that the rules for

25    parking shall be uniformly imposed upon all tenants of the Shopping Center.  Landlord shall exercise

26    commercially reasonable efforts to ensure that any designated Employee Parking Areas shall impose no

27    unreasonable burden upon the employees of Tenant and shall impose no greater safety or security risk

28    upon Tenant's employees than any other parking areas of the Shopping Center.

29

30       10.     Exclusive. Section 16.4.1 of Exhibit C to the Lease provides as follows: "No portion of the

31    Shopping Center (other than the Premises) shall be occupied or used, directly or indirectly, for the purpose

32    of conducting a "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or

33    picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant



K-2

1    arrangements, holiday themed décor, decorations and costumes, wedding goods (except apparel), party

2    goods, scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies,

3    accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and

4    other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or

5    providing classes on any of the foregoing or any combination of the foregoing categories.  This Section

6    16.4.1 shall not apply to (A) any lessee whose lease was fully executed on the Effective Date hereof and is

7    identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this

8    exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any such

9    permitted use which violates Tenant's exclusive if Landlord may avoid the granting of such permission, or

10    (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or

11    assigns if Landlord may avoid the granting of such permission, or (iii) Landlord permits or agrees to  an

12    assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or

13    (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor

14    the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (B)

15    any lessee for which the sale of a product or service covered by the exclusive granted to Tenant hereunder

16    is merely incidental to such lessee's primary use, unless the total space which such lessee devotes to the

17    products or services which violate the exclusive contained in this Section 16.4.1 exceeds the lesser of ten

18    percent (10%) of the Leasable Square Footage within such lessee's premises or one thousand (1,000)

19    Leasable Square Feet (inclusive of allocable aisle space and linear shelf space); and further provided, in

20    no event shall this exception for incidental use apply to custom framing services, it being the intention that

21    no other lessee or occupant of the Shopping Center shall be permitted to offer custom framing services.

22

23    Tenant hereby acknowledges that:

24

25    (a) a typical "card shop", such as a Hallmark, shall not be deemed in violation of this Section 16.4.1

26    provided that such typical "card shop" operates in the same manner as a typical "card shop", such

27    as a Hallmark, operates as of the Effective Date of this Lease;

28

29    (b) a typical "furniture rental" store, such as Aarons, shall not be a violation of this Section 16.4.1

30    provided such typical "furniture rental" store operates in the same manner as a typical "furniture

31    rental" store operates as of the Effective Date of this Lease;

32

33    (c) a typical "membership wholesale club" store, such as "Costco" or "Sam's Club", shall not be



1    deemed in violation of this Section 16.4.1 provided that such "membership wholesale club" store

2    operates in the same manner as a typical "membership wholesale club" store operates as of the

3    Effective Date of this Lease;

4

5    (d) a typical "home furnishings" store, such as "HomeGoods", "HomeSense", "Cost Plus" or

6    "Kirkland's", shall not be a violation of this Section 16.4.1; provided, however, in no event shall such

7    home furnishings store provide picture framing services or devote more than the lesser of (I) 1,500

8    Leasable Square Feet, or (II) ten percent (10%) of its Leasable Square Feet in the Shopping Center,

9    in the aggregate, to the sale of arts and crafts, frames, artificial flowers, artificial floral

10    arrangements, wedding or party goods;

11

12    (e) a typical "office supply" store, such as "Staples", shall not be deemed in violation of this Section

13    16.4.1 provided that such office supply store operates in the same manner as a typical "office

14    supply" store operates as of the Effective Date of this Lease; and

15

16    (f)    a typical "furniture" store such as a "Ashley Furniture" shall not be deemed in violation of

17    this Section 16.4.1 provided that such "furniture" store operates in the same manner as a typical

18    "furniture" store operates as of the Effective Date of this Lease.

19

20    The exclusive granted to Tenant under this Section 16.4.1 shall not apply to (A) a typical

21    supermarket/grocery store primarily selling food products which is at least 10,000 Leasable Square Feet

22    as such stores typically operate as of the Effective Date of this Lease (i.e. primarily selling food products),

23    (B) a typical department store (i.e. Kohl's) which is at least 40,000 Leasable Square Feet as such stores

24    typically operate as of the Effective Date of this Lease, (C) a typical discount department store (i.e. Wal-

25    mart) which is at least 75,000 Leasable Square Feet as such stores typically operate as of the Effective

26    Date of this Lease, or (D) a typical Nordstrom Rack store which is at least 25,000 Leasable Square Feet as

27    such stores typically operate as of the Effective Date of this Lease.  In addition, the exclusive shall not apply

28    to any presently existing leases, or to successors or assigns of tenants under such existing leases or to

29    any lease renewals, expansions, extensions, relocations or replacements of such tenants, to the extent

30    such existing leases either permit such tenants to use their respective premises for a conflicting use or do

31    not preclude such tenants from using their respective premises for a conflicting use (the "Existing Leases");

32    provided, however, that upon any assignment or subletting under such Existing Leases, Landlord shall

33    enforce Tenant's rights set forth above unless (a) such assignment or subletting is for a purpose presently



1  permitted or not precluded by such Existing Leases; or (b) Landlord is not permitted, pursuant to the terms

2  of such Existing Lease, to enforce Tenant's rights hereunder in connection with such assignment or

3  sublease; or (c) Landlord would be required to terminate such Existing Lease.

4

5      If, for a period of twelve (12) consecutive months, Tenant fails to operate Tenant's business (other

6  than for non-economic reasons beyond Tenant's reasonable control) or changes its use such that it is no

7  longer selling items covered by the exclusive granted in this Section 16.4.1, Tenant shall no longer have

8  an exclusive right as to the specific item(s) not sold but described in this Section 16.4.1; provided, however,

9  in the event Tenant recommences its business in the Premises or again sells or offers the items or services

10  covered by this Section 16.4.1, then, upon Landlord's receipt of notice of such recommencement, the

11  exclusive granted to Tenant hereunder shall again be effective, and any leases executed during the interim

12  period during which this exclusive was not effective, shall be treated as an Existing Lease Not Subject to

13  Tenant's Exclusive."

14

15      This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which

16  Lease reference is made for the full agreement between the parties.  This Memorandum is not intended to

17  modify any term, provision or condition of the Lease and to the extent of any conflict between this

18  Memorandum and the Lease, the Lease will control.

19      EXECUTED this _____ day of _____, 2023.

20  <u>TENANT</u>

22  MICHAELS STORES, INC.,
23  a Delaware corporation

27  By:      _____
28  Name:  _____
29  Title:    _____

33  _____, 2023

39  <u>LANDLORD</u>
40  EQUITY ONE (COPPS HILL) LLC,
41  a Florida limited liability company

43  By:      Regency Centers, L.P.,
44            a Delaware limited partnership
45  Its:      Managing Member



K-5

By:    Regency Centers Corporation,
a Florida corporation

Its:    General Partner


By: _____

Name: _____

Title: _____


Date of Execution By Landlord:

_____, 2023



K-6

## ACKNOWLEDGEMENTS

### TENANT

STATE OF TEXAS                    §

                                 §

COUNTY OF DALLAS                  §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of MICHAELS STORES, INC., a Delaware corporation, who acknowledged that he was duly authorized to execute this agreement on behalf of said corporation.

GIVEN under my hand and seal of office this _____ day of _____, 20__.

_____

Notary Public in and for the

State of Texas

_____

Notary's Printed Name

My Commission Expires:_____

### LANDLORD

STATE OF _____        §

                                 §

COUNTY OF _____         §

On _____ before me, _____
    DATE           NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared _____
                NAME(S) OF SIGNER(S)

☐ personally known to me - or - ☐    proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

SIGNATURE OF NOTARY



K-7