**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher J. Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweisss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW RITE AID, LLC, *et al.*, | ) | Case No. 25-14861 (MBK) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 2260, 2497** |

**DEBTORS' AND DOLLAR TREE STORES, INC.'S**
**JOINT REPLY IN SUPPORT OF ASSIGNMENT**
**OF LEASE FOR STORE #10389 IN RIDGEFIELD, CONNECTICUT**

1.      The Debtors and Dollar Tree Stores, Inc. ("Dollar Tree") submit this joint reply in

support of the *Notice of Assumption and Assignment of Certain of the Debtors' Leases to Dollar*

*Tree Stores, Inc.* [Docket No. 2260], with respect to the lease associated with Store #10389 (125

---

[1]      The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the
Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website
of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025.   The location of
Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases
is 200 Newberry Commons, Etters, Pennsylvania 17319.

Danbury Road, Ridgefield, CT) (the "Rite Aid Lease") and in response to the objection thereto filed by Equity One (Copps Hills) LLC (the "Landlord") [Docket No. 2497] (the "Objection").[2]

2.      The Landlord seeks to prohibit Dollar Tree's valid assumption of the Rite Aid Lease on contrived pretextual bases and notwithstanding (1) Dollar Tree's express agreement to comply with the Prohibited Use Provision in the lease between the Landlord and The Stop & Shop Companies, Inc. ("Stop & Shop") that pre-dated the Rite Aid Lease; (2) the fact that Dollar Tree's presence does not disrupt the tenant mix of the Shopping Center; and (3) Dollar Tree's willingness to constructively work with the Landlord to submit a proposed order that resolves the issues not otherwise addressed herein.

3.      The Debtors' assignment of the Rite Aid Lease is permissible pursuant to section 365 of the Bankruptcy Code and maximizes value for the Debtors' estates and creditors. The Objection should be overruled, particularly in light of the fact that (a) Dollar Tree has rendered certain aspects of it moot by agreeing to comply with the Prohibited Use Provision of the Landlord's lease with Stop & Shop and (b) the only other lease restrictions raised by the Landlord are set forth in a lease between the Landlord and Michaels Stores, Inc. ("Michaels"), an unrelated third-party tenant also located within the Shopping Center, that was entered into decades after the execution of the Rite Aid Lease (the "Michaels Lease") and to which neither Rite Aid nor its potential assignee, Dollar Tree, could be bound.  Further, a blanket and unsupported statement that Dollar Tree would disrupt the tenant mix of the Shopping Center is insufficient to impede upon the Debtors' exercise of a fundamental right afforded under the Bankruptcy Code.

**Preliminary Statement**

---

[2]   Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Objection.

4.      After nearly 25 years as a tenant in the Ridgefield, Connecticut shopping center, and after a Court-approved sale process where the Debtors solicited interest from parties (including the Landlord) in buying the Rite Aid Lease, the Debtors seek to assign the Rite Aid Lease to the winning bidder Dollar Tree pursuant to the Bankruptcy Code, to maximize the value of their estates for the benefit of their stakeholders.

5.      The Landlord, however, attempts to bind the Debtors to use restrictions in leases it previously entered into with third parties. As noted above, Dollar Tree is aware of the restrictive language set forth in the lease between the Landlord and Stop & Shop and is able and willing to comply with the terms therein.  The Landlord is also seeking to bind the Debtors and, resultingly bar Dollar Tree's assignment of the Rite Aid Lease, by asserting the assignment may potentially violate a "dollar store" prohibited use restriction set forth in the Michaels Lease—notwithstanding that Michaels is a third party that became a tenant at the Shopping Center (in 2023) *more than two decades after* the Debtors (in 2001).  Notwithstanding the Landlord's separate and subsequent contractual arrangement with Michaels, the Debtors negotiated for a broad permitted use in the Rite Aid Lease, which allows the Debtors to use the premises for "a drug store and/or evolution thereof" or "any other lawful purpose or purposes," (Rite Aid Lease, § 1.C) subject only to certain restrictions that are set forth in the Rite Aid Lease—and which do *not* include the specific "dollar store" restriction from Michaels.  Yet, despite the clear and unambiguous language in the Rite Aid Lease, the Landlord seeks to use the Bankruptcy Code as a sword to broaden its rights for the apparent protection of Michaels—even though courts have consistently held that (i) assignment of a debtor's lease (like the Rite Aid Lease) need *not* comply with leases entered into *after* the debtor's lease (like the Michaels Lease), (ii) the Debtors and Dollar Tree are not in privity with

Michaels, and (iii) the Objection is noticeably void of any assertions with respect to Michaels' actual position.

6.      Importantly, and also contrary to the Objection, a court-approved assignment of the Rite Aid Lease to Dollar Tree will *not* result in the Landlord being in default under the Michaels Lease, as the law excuses the Landlord from performance that has been rendered legally impossible—i.e., by an order from this Court approving the assignment of the Rite Aid Lease to Dollar Tree, over the Landlord's objection.

7.      Thus, the Objection should be overruled.  The relevant facts and circumstances more than sufficiently demonstrate that the Objection is without merit and, if sustained, will deprive the Debtors' estates of much needed and duly obtained value.  The Debtors have certainly met their burden to assign the Rite Aid Lease to Dollar Tree—a $20+ billion public company with the financial wherewithal[3] and means to comply with the terms of such lease—and there is nothing in the record of these chapter 11 cases to suggest otherwise.

### Michaels' "Dollar Store" Provision Is Not Applicable

8.      Section 365(b)(3)(C) requires, in relevant part, "adequate assurance … that assumption or assignment of such lease … will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center." 11 U.S.C. § 365(b)(3)(C).

9.      As several courts have recently explained (including in this District), the phrase "any other lease" in section 365(b)(3)(C) means those leases that existed *at the time* of the debtor's

---

[3]   Dollar Tree Stores, Inc. and its affiliates operate more than 9,000 retail discount stores across the 48 contiguous states and five Canadian provinces and is a wholly-owned subsidiary of Dollar Tree, Inc. (which is a publicly-traded company with a market capitalization of approximately $20 billion and for which additional information, including the annual report and other financial data, is available at https://corporate.dollartree.com).

lease and were incorporated therein—*not* leases that were entered into *after* the debtor's lease.

*See, e.g.*:

- *In re Toys "R" Us*, Inc., 587 B.R. 304, 310 (Bankr. E.D. Va. 2018) (permitting assignment of debtor's lease notwithstanding restriction in other shopping center lease because the debtor's lease was executed "long before the [other] lease came into existence, and it contains no provision that requires compliance with the [other] lease use restrictions");

- *In re Bed Bath & Beyond, Inc.*, Case No. 23-13359 (Bankr. D.N.J.), August 30, 2023 Transcript (Exhibit A hereto) (the "BBB Transcript"), 120:1-6 (phrase 'any other lease' "must be understood to mean breach of agreements with other tenants that were in existence at the time the debtor entered into the lease and would either be incorporated into the lease or part of an agreement or part of a master agreement, not subsequently entered into leases that the debtor had no knowledge of or agreed to");

- *In re Big Lots, Inc.*, Case No. 24-11967 (Bankr. D. Del.), January 21, 2025 Transcript (Exhibit B hereto) (the "Big Lots Transcript"), 61:6-13 ("This Court agrees with the reasoning of the District Court for the Southern District of New York in *Sears* and the New Jersey Bankruptcy Court in *Bed Bath & Beyond* that the provisions of Section 365(b) must be read in harmony with 365(f)(2)(B) and that the phrase "any other lease" could not have been intended to mean a subsequent lease between a landlord and a third party to which the debtor was not a party."); and

- *In re JOANN Inc.*, Case No. 25-10068 (Bankr. D. Del.), June 11, 2025 Transcript (Exhibit C hereto) (the "JOANN Transcript"), 9:20-10:4 (agreeing with *Big Lots* and *Bed Bath & Beyond* to overrule an objection based on a restriction "in a lease that came after the [debtor's] lease in question").

10.    This is so for several reasons.  First, the "provisions of 365(b) must be read in harmony with 365(f)(2)(B)" and the "focus" of section 365(b) is "on the lease with the debtor and the landlord. … [T]here's where it all derives from."  BBB Transcript, 116:18, 122:1-3; *see* 11 U.S.C. § 365(b) ("assignment of such lease"); *see also* Big Lots Transcript, 61:6-13; *In re Toys "R" Us, Inc.*, 587 B.R. 304, 309 (Bankr. E.D. Va. 2018) ("The Fourth Circuit Court of Appeals has acknowledged that the purpose of § 365(b)(3)(C) 'is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are *spelled out in the lease with the*

*debtor-tenant.*'") (quoting *Trak Auto Corp. v. West Town Center LLC (In re Trak Auto Corp.)*, 367 F.3d 237, 244 (4th Cir. 2004) (emphasis added)).

11.    Second, "any other interpretation would expand the rights of a shopping center landlord outside of bankruptcy, [a] result which has been virtually, as far as this Court knows, universally rejected in the case law."  BBB Transcript, 120:7-10.  The Rite Aid Lease includes a broad permitted use provision that permitted "any [] lawful purpose or purposes" subject to only those restrictions set forth in the lease.  *See* Rite Aid Lease, "Premises," Section § 1.C.  The permissible use provision in the Rite Aid Lease trumps the later Michaels Lease; the Landlord would have no ability to block the tenant under the Rite Aid Lease from operating a dollar store. The Landlord cannot now expand its rights under the Bankruptcy Code to prevent an assignment to Dollar Tree for the same use.  *See* BBB Transcript, 120:7-10.  Notably, the *Bed Bath and Beyond* court ruled against the landlord even though its lease with the debtor permitted the landlord to terminate the lease upon an assignment that it does not approve of, because such a provision is not enforceable in bankruptcy.  *Id.* at 122:23-123:8.

12.    And third, a debtor does not have any privity with leases that post-date its lease, absent an agreement to comply with them.  BBB Transcript, 121:5-8 ("before a contractual provision can be enforced, there must be privity of contract between the parties … there was no privity of contract").  Neither the Debtors nor Dollar Tree can be in breach of the Michaels Lease because neither of them is party to it, have any privity with it, nor have they agreed to comply with the Michaels Lease.

13.    Here, there is no dispute that the Rite Aid Lease pre-dates the Michaels Lease. There is nothing in the Rite Aid Lease that requires compliance with the Michaels Lease.  And there is no master lease agreement that requires compliance with the Michaels Lease.  Thus, the

Michaels Lease cannot block the proposed assignment.  Holding otherwise would mean that "the ability of debtors to maximize the proceeds from their leases would or could be severely curtailed by landlord's subsequent agreement with other tenants to limit the use for which the debtor's premises were expressly allowed to be used without debtor agreeing to those terms."  Big Lots Transcript, 61:20-25.

14.     To the extent the Court has any concerns that the Landlord may have liability exposure to Michaels, the Landlord cannot be liable to Michaels if the law (such as the Bankruptcy Code and an order by this Court) prohibits it from complying with the Michaels Lease.  *See In re Toys "R" Us, Inc.*, 587 B.R. 304, 310 (Bankr. E.D. Va. 2018) ("a court order approving the assumption and assignment of a lease is a judicial action that may render the landlord unable to comply with a restriction contained in another lease"); BBB Transcript, 125:20-25 (same).

## Assignment Will Not Disrupt the Current Tenant Mix and Balance

15.     The Landlord summarily claims the Debtors' assignment to Dollar Tree will disrupt the tenant mix and balance in the Shopping Center.  *See* Objection ¶ 12.  "The burden is on the landlord to establish the existence of an intended tenant mix, and that requires more than simply demonstrating that it has provided each of its tenants with exclusivity provisions."  BBB Transcript, 129:19-24.  The Landlord has not met that burden.  The Landlord's only argument on this issue is that the tenant mix will be disrupted by Dollar Tree violating the Stop & Shop restriction (which is moot, given Dollar Tree's willingness to comply with such restriction) and the Michaels restriction (which is not binding on Dollar Tree).  That rehashing is not sufficient to clear Landlord's burden and should not prevent assignment of the Rite Aid Lease for the reasons above.

* * *

16.     For the reasons herein, the Debtors and Dollar Tree request that the Court hold that the "dollar store" prohibited use restriction in the Michaels Lease is unenforceable with respect to the proposed assignment of the Rite Aid Lease to Dollar Tree.

Dated: October 23, 2025

/s/ Adam S. Ravin

**LATHAM & WATKINS LLP**
Adam S. Ravin (NJ Bar No. 047591995)
Candace M. Arthur (*pro hac vice* pending)
Jonathan C. Gordon (*pro hac vice* pending)
1271 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 906-1200
Facsimile:      (212) 751-4864
Email:    adam.ravin@lw.com
              candace.arthur@lw.com
              jonathan.gordon@lw.com

*Counsel to Dollar Tree Stores, Inc.*

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and
Debtors in Possession*

## Exhibit A

**BBB Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 23-13359-VFP
                            .
BED BATH & BEYOND, INC., .       M.L.K. Federal Building
et al.,                     .    50 Walnut Street, 3rd Floor
                            .    Newark, NJ 07102
            Debtors.        .
                            .    August 30, 2023
. . . . . . . . . . . . .         10:09 a.m.

   TRANSCRIPT OF SALE HEARING WITH RESPECT TO PHASE I LEASES
            BEFORE HONORABLE VINCENT F. PAPALIA
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:         Kirkland & Ellis LLP
                         By:  ROSS J. FIEDLER, ESQ.
                              EMILY E. GEIER, P.C.
                         601 Lexington Avenue
                         New York, NY 10022

                         Kirkland & Ellis LLP
                         By:  CASEY McGUSHIN, ESQ.
                         300 North LaSalle
                         Chicago, IL  60654

                         Kirkland & Ellis LLP
                         By:  CHRISTINE SHANG, ESQ.
                         609 Main Street
                         Houston, TX  77002

                         Cole Schotz, P.C.
                         By:  WARREN A. USATINE, ESQ.
                         Court Plaza North, 25 Main Street
                         Hackensack, New Jersey 07601

Audio Operator:          Juan Filgueiras

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For Pinnacle Hills, LLC:   Kelley Drye & Warren LLP
                          By:  ROBERT L. LeHANE, ESQ.
                               CHRISTINE ISAACS, ESQ.
                          3 World Trade Center
                          175 Greenwich Street
                          New York, NY 10007

                          Kelley Drye & Warren LLP
                          By:  WILLIAM S. GYVES, ESQ.
                               PHILIP A. WEINTRAUB, ESQ.
                          3 World Trade Center
                          175 Greenwich Street
                          New York, NY 10007

For Michaels Stores,      Lowenstein Sandler, LLP
Inc.:                     By:  PHILIP J. GROSS, ESQ.
                          One Lowenstein Drive
                          Roseland, New Jersey 07068

                          Lowenstein Sandler, LLP
                          By:  KENNETH A. ROSEN, ESQ.
                          1251 Avenue of the Americas
                          New York, NY  10020

For DPEG Fountains, LP:   Porzio, Bromberg & Newman, P.C.
                          By:  JOHN S. MAIRO, ESQ.
                          100 Southgate Parkway
                          P.O. Box 1997
                          Morristown, NJ 07962

                          Porzio, Bromberg & Newman, P.C.
                          BY:  DEAN M. OSWALD, ESQ.
                          1675 Broadway, Suite 1810
                          New York, NY 10019

For Michaels Stores,      White & Case, LLP
Inc.:                     By:  SAMUEL P. HERSHEY, ESQ.
                          1221 Avenue of the Americas
                          New York, New York 10020

                          White & Case, LLP
                          By:  LAURA E. BACCASH, ESQ.
                          111 South Wacker Drive, Suite 5100
                          Chicago, IL  60606-4302

APPEARANCES (Cont'd):

For Michaels Stores,        White & Case, LLP
Inc.                        By:  DEVIN RIVERO, ESQ.
                            Southeast Financial Center
                            200 South Biscayne Blvd., Suite 4900
                            Miami, FL  33131-2352


For Burlington Coat         Womble Bond Dickinson (US) LLP
Factory Warehouse           By:  WOJCIECH F. JUNG, ESQ.
Corporation:                950 Third Avenue, Suite 2400
                            New York, NY  10022


- - -

1    (Proceedings commenced at 10:29 a.m.)

2         THE COURT:  Okay.  Good morning.

3         MR. FIEDLER:  Good morning, Your Honor.

4         THE COURT:  It is Wednesday, August 30th --

5         ELECTRONIC INTERRUPTION:  Recording in progress.

6         THE COURT:  Good morning, everyone.  It is Wednesday,

7    August 30, 2023.  This is the United States Bankruptcy Court

8    for the District of New Jersey, and we are here in the case of

9    Bed Bath & Beyond, Inc., et al., 23-13359, and it's an

10   evidentiary hearing with regard to the debtors' motion to

11   assume and assign three leases, one at the Pinnacle Hill

12   Shopping Center, Serramonte, and Fountains.

13        I know you filed an amended agenda last night, so why

14   don't we get started and I have a couple of preliminary

15   comments and then we can proceed.

16        MR. FIEDLER:  Okay.  Great, Your Honor.  Good

17   morning.  Ross Fiedler of Kirkland and Ellis on behalf of the

18   debtors.  I'm joined by my partners, Emily Geier and Casey

19   McGushin, along with my colleague, Christine Shang, and co-

20   counsel, Warren Usatine, from Cole Schotz.

21        THE COURT:  Okay.  Good morning.

22        MR. FIEDLER:  Your Honor, as you noted, we filed an

23   amended agenda yesterday at Docket Number 2085.  As you'll

24   note, there was a rejection motion at Docket 1613, which we've

25   resolved one of the objections, and we'll file an order for

1  Your Honor's consideration.  We have adjourned that rejection

2  motion solely as it relates to the remaining lease in Addison,

3  Texas, to September 12th.

4        But with that, as Your Honor mentioned, we're here

5  today on one key matter, that's the assignment of these three

6  leases.  I'm happy to proceed or if Your Honor wanted to make

7  those preliminary comments.  However Your Honor would like to

8  proceed.

9        THE COURT:  Well, I do have some preliminary comments

10  and questions and they mostly relate to how we're going to

11  proceed today.  The first one is opening statements.  I've read

12  the papers.  I have a good feel for what the facts and

13  arguments are up to this point, certainly.  And I'm fine with a

14  very brief opening statement, and I'm also fine with dispensing

15  with opening statements and also proceeding directly with, and

16  this is going to fall into my second and third questions, the

17  evidentiary presentation.

18        So do the parties wish to make opening statements?

19  And that goes to the --

20        MR. FIEDLER:  Yeah.

21        THE COURT:  -- debtors and the landlords and whomever

22  else is here to be heard.

23        MR. FIEDLER:  Your Honor, I'd like to just make a few

24  comments at the outset to set the stage for the key issues and

25  facts.  I think we can dispense with opening statements.

1        On the evidentiary point, which I was planning to

2   make, why don't I just turn to that now.  We do have basically

3   a fully stipulated evidentiary record that consists of the

4   leases, which, as Your Honor noted, is the Pinnacle Hills

5   lease, the Serramonte lease, and the Fountains lease.  Those

6   are the debtors leases.

7        THE COURT:  Right.

8        MR. FIEDLER:  The other leases are the landlord

9   leases with other third-party shopping center tenants.  That's

10  the Hobby Lobby lease, the Dollar Tree lease, and the two Ross

11  Store leases.  We also have testimony, which consists of the

12  declarations and the deposition transcripts.  As to the

13  depositions of Mr. Amendola and Mr. Aronoff, the parties have

14  agreed to certain excerpts to the deposition transcripts which

15  were submitted to chambers last night via email by Mr. Usatine

16  and Ms. Isaacs of Kelley Drye.

17       As to the declarations, those include the Amendola

18  declaration from the debtors at Docket Number 2062; the Aronoff

19  declaration and the Elliott declaration from Pinnacle Hills,

20  filed at Docket Number 1927 and 28, respectively; the Bell

21  declaration from Serramonte filed at Docket Number 1930; and

22  finally, the Dhanani declaration from Fountains at Docket

23  Number 1573.

24       With respect to Serramonte, we have filed the

25  stipulation of facts at Docket Number 2087.

1          THE COURT:  Oh, I didn't --

2          MR. FIEDLER:  I don't know if Your Honor saw that.

3          THE COURT:  That's what I was going to ask, because I

4  thought there was going to be a stipulation of facts, and I

5  didn't see it, so --

6          MR. FIEDLER:  I have a copy if you'd like me to --

7          THE COURT:  Yeah.  I mean, obviously, since I didn't

8  see it, I didn't read it, so I would need a moment to read

9  that.  Are you saying this applies only to the Serramonte

10  lease, or?

11          MR. FIEDLER:  That's right, only Serramonte.

12  Although we do have another stipulation of facts, which I

13  understand was just filed, and that's for the Fountains lease.

14  So, apologies for getting that to Your Honor after the hearing

15  started, but it took a little while to tie the bow on that.

16          THE COURT:  And not as to the Pinnacle --

17          MR. FIEDLER:  Pinnacle Hills, we've agreed to rely on

18  the leases and the testimony, which includes the deposition

19  transcript excerpts that were submitted to Your Honor, as well

20  as the declarations.  Well, certain of the declarations.

21          THE COURT:  All right.  So then, I guess that does --

22          MR. FIEDLER:  So, unless Your Honor has any questions

23  on the evidence, I would, given the agreement on the parties,

24  ask that we submit those documents into evidence.

25          THE COURT:  Yeah.  Well, I'll ask if there are any

1 objections.  But I do have that question first, is that it was

2 my understanding that there was going to be some type of

3 evidentiary hearing today with testimony.  But as I understand

4 what you're saying and Mr. Gyves' letter, although I wanted to

5 just confirm it, is that it seems like you're saying there's no

6 more testimony that's going to be needed and we're going to

7 proceed on the record as you just outlined it.

8          MR. FIEDLER:  That's correct, Your Honor.

9          THE COURT:  So are we headed right to the closing

10 argument?  Is that where this is?

11          MR. FIEDLER:  I can give Your Honor just a brief

12 overview to set the stage.  We do have three objections, but

13 they're all very similar and they share a lot of commonalities,

14 and I think we can address each lease objection individually,

15 starting with Pinnacle Hills.  Or if Your Honor would just like

16 to go straight forward with all of them, we can proceed that

17 way as well.

18          THE COURT:  I'm not going to tell you how you present

19 your case.  You can present it in whichever way you believe is

20 most appropriate.  And also, same goes for the landlords.  And

21 to the extent there's any -- I don't think anyone else filed

22 papers as far as I can tell, so I think that's really the scope

23 of it.

24          And then, I just wanted to clarify one other thing.

25 I did have one final question.  The way this was presented to

1 me, at least initially, and I think almost all throughout

2 except maybe towards the very end of the submissions, was that

3 I was being asked to rule on whether the adequate assurance

4 requirements of 365(b)(3)(C) and (D) were satisfied.  And

5 that's what this is all about.

6         There was some discussion of adequate assurance as to

7 financial condition, but that seemed to have been addressed in

8 the sense that the debtor said they'll provide whatever they

9 need, whatever is requested reasonably.  And I thought

10 percentage rent might have slipped in there at the end, too,

11 but it wasn't a focus of anything and I'm not sure there's

12 really much evidence or kind of any evidence on that at at this

13 point.  So that was what I think is my last question.

14         MR. FIEDLER:  Okay.  Yeah.  That's right, Your Honor.

15 It's just 365(b)(3)(C) and (D), and I'll get to that in a

16 moment.  I think before we proceed, if it's all right with Your

17 Honor, if we could just proceed with getting the evidence

18 submitted and then we can go to a statement and argument after

19 that.

20         THE COURT:  Okay.  So the landlord's heard

21 Mr. Fiedler's presentation as to what the evidence is.  And if

22 there's any clarification or addition or whatever that needs to

23 be made, then why don't we do that?

24         MR. FIEDLER:  Your Honor, we also submitted three

25 additional documents relating to the Pinnacle Hills Shopping

1 Center directory and stores that were emailed to your chambers.

2 I have them here and we would like to add that to the

3 evidentiary record as well.  The landlord and Michaels are both

4 aware of that as well.

5         THE COURT:  This is different than the PowerPoint

6 that was provided?

7         MR. FIEDLER:  That's right.  This is just an overview

8 of the directory and map of the shopping center at Pinnacle

9 Hills --

10         THE COURT:  Okay.

11         MR. FIEDLER:  -- and the stores therein.

12         THE COURT:  And then, I thought -- I wasn't correct.

13 I said it was my last question, but it wasn't really my last

14 question because there also seems to have been, I want to use

15 the right word, but I thought we were initially talking about

16 the Pinnacle Hills Shopping Center, and then subsequently, the

17 focus was with the whatever hundred-plus stores and

18 subsequently, there was a lot of discussion of the power

19 center, which is, as I understood it, is kind of a subset of

20 the Pinnacle Hills Shopping Center.  But the shopping center we

21 were talking about and I thought that was agreed to was the

22 Pinnacle Hills Shopping Center.

23         MR. FIEDLER:  That is our understanding, Your Honor,

24 and that is part of our argument, that we should be looking at

25 the shopping center broadly and not the power center, which is

1 a subset of collection of stores within the broader shopping

2 center.  But, yes, we will certainly touch on that.

3           THE COURT:  All right.

4           MR. FIEDLER:  Okay, so --

5           THE COURT:  Mr. LeHane.  Yeah.

6           He wanted to comment.  I invited other comments on

7 your presentation.  It sounded like you were done.

8           MR. LEHANE:  Good morning, Your Honor.  Robert

9 Lehane, Kelley Drye and Warren, on behalf of Pinnacle Hills,

10 the landlord at Rogers, Arkansas, and Daly City Serramonte

11 Center, LLC, the landlord at the Serramonte Center in Daly

12 City, California.

13           With me today are my partner, Bill Gyves, associate

14 Philip Weintraub, and from Brookfield Properties, the owner of

15 Pinnacle Hills, Jeffrey Aronoff is here in Court today, Your

16 Honor.

17           THE COURT:  Okay.  Well, good morning and welcome.

18           MR. LEHANE:  Thank you very much, Your Honor.

19           We know we've got a lot to get through this morning.

20 We appreciate and I agree with Mr. Fiedler's recitation of what

21 the agreements that we've reached with respect to the evidence

22 that should be in the record.  We do have an amendment or a

23 supplement as well with respect to some of the deposition

24 transcripts.  We just want to add and supplement, there are

25 some additional pages of Mr. Amendola's deposition excerpts,

1   which Mr. Gyves will point out.  But other than that, we agree,

2   but we would also, for the record, disagree about any agreement

3   on what the relevant shopping center is.  There's no agreement

4   on that and that's subject of today's discussion, Your Honor.

5            Thank you.

6            THE COURT:  All right.

7            So, you were going to tell me those read-ins from

8   Amendola's deposition?

9            MR. GYVES:  Good morning, Your Honor.  Am I okay here

10  or shall I get up there?

11           THE COURT:  Well, I understand that it's better at

12  the podium for recording purposes.

13           MR. GYVES:  Easy enough.

14           Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. GYVES:  Bill Gyves, Kelley Drye.

17           The only addition that we would propose and we've

18  conferred with counsel for debtors and Michaels is, in our rush

19  to get you deposition excerpts yesterday, I dropped one page

20  and 14 lines from the Amendola deposition.  So we would like to

21  supplement our Exhibit 6 with Page 42 of the Amendola

22  deposition, Lines 2 through 16.

23           THE COURT:  Page 42, let me get there.

24           MR. GYVES:  4-2, Lines 2 through 16.

25           THE COURT:  Did you say 42?

1          MR. GYVES:  Page 42.

2          THE COURT:  I don't have it.

3          MR. GYVES:  That's what I have.

4          THE COURT:  Okay.  I was looking for it and I didn't

5  see it.

6          MR. GYVES:  That's what I should have gotten to you

7  yesterday.

8          THE COURT:  All right.  Thank you.

9          MR. GYVES:  And that's all we have on that, Your

10 Honor.  Thank you.

11         THE COURT:  9 through?

12         MR. GYVES:  2 through 1-6.

13         THE COURT:  Okay.

14         MR. GYVES:  All right.  Thank you.

15         THE COURT:  Got it.  Thank you.

16         MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

17 from White and Case for Michaels Stores.  I'm joined by my

18 colleagues Laura Baccash and Devin Rivero.

19         I just want to note for the avoidance of doubt that

20 Michaels also was part of the conversations between the debtors

21 and the landlord regarding how we will proceed today, and

22 Michaels agrees with the agreement that was reached.

23         THE COURT:  Of course.

24         MR. HERSHEY:  Thank you.

25         MR. FIEDLER:  Okay.  Your Honor, with that, why don't

1    I proceed.

2           As I mentioned, we have three separate objections

3    filed by three distinct landlords.  These are leases that the

4    debtors are seeking to assign.  They're valuable leases.  It's

5    not disputed that they're under market, which is to say that

6    Bed Bath currently rents these properties for less than the

7    landlord could otherwise rent the property if the debtors were

8    to reject the leases and return the property to the landlords.

9           And so, that's part of the reason why we have

10   substantial bids from Michaels and Burlington to take these

11   leases on.  And I think it's easy to see why the objecting

12   landlords do not want to see their properties assigned to the

13   new tenants on the current lease terms.

14          Despite having had the opportunity to participate in

15   the auction for these leases by putting forth competitive bids

16   just like everyone else, the landlords opted not to.  They're

17   now looking to claw back their leases by other means.

18   Specifically, as Your Honor noted, there are two really

19   distinct, I'll say, novel legal arguments at play.

20          First is that the landlord --

21          THE COURT:  Can I stop you, though, for one second?

22   I don't want to interrupt your flow, but you said they did not

23   bid at the auction of landlords.  What significance do you want

24   me to attach to that?

25          MR. FIEDLER:  The significance, Your Honor, is they

1  had the opportunity to bid for an under market lease and get

2  their lease back by the auction process that was established by

3  the debtors.  But in their decision, they opted not to, and now

4  are trying to stand in the way of the lease assignments by

5  mischaracterizing the law and not participating in the debtors'

6  auction process.  Also at --

7          THE COURT:  But are you saying that they had some

8  obligation to do that or --

9          MR. FIEDLER:  Not necessarily, Your Honor, that they

10  had an obligation, but we have Michaels and Burlington paying

11  significant amounts for these leases, nearly $1.5 million, and

12  we don't have a backup bidder.  And so there's a lot of money

13  at stake for the debtors' estate and its stakeholders in a case

14  where, as you've seen, every dollar really matters.

15          But as I was mentioning, two distinct legal

16  arguments.  First, the landlords are arguing that the Bed Bath

17  lease would violate, the lease assignment would violate

18  365(b)(3)(C) because it would breach an exclusive provision set

19  forth in the landlord's lease, not with the debtors but with

20  some other unaffiliated third party in the shopping center.

21          The second main argument the landlords make is that

22  the proposed assignments to Michaels and to Burlington would

23  disrupt the tenant mix and balance in the underlying shopping

24  centers, purportedly in violation of 365(b)(3)(D) of the

25  Bankruptcy Code.  Your Honor, as you'll hear today from the

1  debtors, from Burlington, from Michaels, none of these

2  objections can survive legal scrutiny, much less the evidence

3  in the record before you.

4        So, overall, Your Honor, throughout these cases, the

5  debtors have been really successful in monetizing the value of

6  their leases and if the proposed assignments are approved, as I

7  mentioned, there's nearly $1.5 million set to inure to the

8  estate for the benefit of key stakeholders.

9        Let me just also say this, Your Honor, there have

10 been hundreds of leased properties up for auction in these

11 cases and issues have been raised by landlords with a number of

12 the proposed lease sales.  And that's evidenced by the jam-

13 packed docket that Your Honor has seen.  But valid objections

14 have been filed and the debtors have exercised their discretion

15 appropriately to address those objections.  And so there's been

16 a number of valid use restrictions in the debtors' leases where

17 the debtors chose not to proceed with valuable lease sales.

18       But here is a little different, Your Honor.  The

19 debtors can't sit back and abide by any land grabs by the

20 landlords to recapture their under market leases, not only as a

21 result of not participating in the auction, but in

22 characterizing the law it fundamentally at odds with the

23 existing authority.  So, that's just a flavor of the issues,

24 Your Honor.  I'm happy to just turn to argument now on the

25 Pinnacle Hills lease, if that's acceptable to you.

1          THE COURT:  So I guess that's where we are.  So we're

2     really going straight to oral argument.

3          MR. FIEDLER:  That's right, Your Honor.

4          THE COURT:  Okay.  That wasn't exactly the way I

5     thought it was going to proceed but that's fine, so why don't

6     we get started?

7          MR. FIEDLER:  Okay.  Great.  Thank you, Your Honor.

8          THE COURT:  Does anyone have any issue with that?

9               (No audible response)

10          THE COURT:  Okay.

11          MR. FIEDLER:  So, Your Honor, Pinnacle Hills first,

12     where I'd like to start is the plain terms of the Pinnacle

13     Hills lease, which clearly permit the debtors to assign the

14     lease to Michaels, and the landlord hasn't proposed anything

15     that would suggest otherwise.

16          So, first, under the Pinnacle Hills lease, the

17     debtors are authorized to use the premises for any permitted

18     use, and that term is broadly defined as any lawful use not

19     specifically prohibited by Section 13.11 of the lease.  And

20     when we turn to that section of the lease, the language

21     provides that the tenant cannot use the premises, one, for any

22     prohibited use, or two, in violation of any of the existing

23     exclusives.

24          Now, on the first point, prohibited uses, those are

25     identified in Exhibit L of the lease, and they include things

1  like laundromats, medical centers, tattoo parlors, and other

2  non-retail uses.  They do not, however, include things like the

3  operation of a Michaels store.  And the debtors believe the

4  landlord is largely in agreement with that.

5       I'd just point Your Honor to Page 69 of Mr. Aronoff's

6  deposition transcript.

7       THE COURT:  All right.  Let me just grab that.

8  This is Amendola.

9       MR. FIEDLER:  I know, there's a lot.

10       THE COURT:  Okay.  Page 69?

11       MR. FIEDLER:  Page 69.

12       Essentially, Mr. Aronoff was asked whether after his

13  review of Exhibit L whether any of the prohibited uses on that

14  exhibit raised an issue as to Michaels store and the operation

15  of a Michaels store and whether that would violate any of the

16  enumerated uses in that exhibit.  And Mr. Aronoff clearly

17  confirmed that they didn't.  And I think that's not only

18  evidence that this operation of a Michaels store is permitted

19  as it doesn't violate any of the enumerated uses in that

20  exhibit, but the landlord hasn't proposed anything to suggest

21  otherwise.

22       The second point I'd make is on the existing

23  exclusives.  Section 13.3.1 of the lease obligates the debtors

24  to honor the existing exclusives that are identified in

25  Exhibit K1 of the lease.  The existing exclusives include eight

1  tenants, none of them are Hobby Lobby or Dollar Tree.  And I

2  think Mr. Aronoff acknowledges that fact in Page 72 of his

3  deposition transcript.

4        But more importantly, Your Honor, the Pinnacle Hills

5  lease and the discussion of existing exclusives expressly

6  disclaims any obligation by the debtors to honor any exclusives

7  besides the existing exclusives.  And what that's getting at is

8  really any future exclusives.  And on this point, I think

9  there's a few points to note from Mr. Aronoff's testimony,

10 which is first, on Pages 76 and 77, Mr. Aronoff acknowledges

11 that the Bed Bath lease makes clear that if an exclusive is not

12 expressly mentioned in that Exhibit K1 of the Bed Bath lease,

13 then it is not binding on Bed Bath which is, I think, an

14 important point, Your Honor, that there are no exclusives

15 within the lease that would prohibit the assignment to

16 Michaels.

17        Second, Your Honor, on Pages 74 and 75 of his

18 deposition transcript, Mr. Aronoff acknowledges that there was

19 never an amendment to the Bed Bath lease with the landlord that

20 would have bound Bed Bath to the Hobby Lobby or the Dollar Tree

21 exclusives.  And in fact, the landlord never asked for such an

22 amendment, even though it had the option to.

23        And what's interesting here, Your Honor, is that the

24 landlord has had an opportunity previously to offer that to Bed

25 Bath.  Years ago, when the landlord was agreeing to bring Hobby

1  Lobby into the shopping center, it had to look to Bed Bath to

2  get express approval for entering into the Hobby Lobby lease.

3  And as Mr. Aronoff makes clear in his testimony, that prior

4  amendment to the Bed Bath lease, which included allowing Hobby

5  Lobby to come into the shopping center, did not include any

6  exclusive for Hobby Lobby or any other tenants in the shopping

7  center.

8          And so while the landlord had the option to ask for

9  that, for some reason it chose not to.

10          THE COURT:  What did you refer to pages of the --

11          MR. FIEDLER:  Yeah.  That was Page 74 and 75 and 76

12  and 77 of the deposition transcript.

13          THE COURT:  Okay.

14          MR. FIEDLER:  And, Your Honor, as the debtor's

15  witness, Mr.  Amendola, makes clear in his declaration, leases

16  often include these sorts of future exclusives and landlords

17  expressly require tenants to comply with the future exclusive,

18  and that was noticeably missing from the Pinnacle Hills lease.

19  And so, I think it's clear, Your Honor, that just based on the

20  plain language of the lease, an assignment to Michaels does not

21  violate the prohibited use or the exclusive use provision or

22  any other provision in the lease.

23          And, Your Honor, since the landlord is unable to show

24  that the plain terms of the Pinnacle Hills lease prohibit the

25  assignment to Michaels, the landlord instead turns to a gross

1  mischaracterization of the language of Section 365(b)(3)(c) to

2  stand in the way of the assignment.

3        As Your Honor is aware, there's two key elements to

4  365(b)(3).  When a debtor looks to assume and assign a lease,

5  first, assumption and assignment of such lease is subject to

6  all provisions thereof.  And second, it will not breach any

7  such provision contained in any lease, financing arrangement,

8  or master agreement relating to such shopping center.

9        And I think what's important to note here, Your

10 Honor --

11       THE COURT:  What is the gross mischaracterization

12 there?  I mean, I understand the various arguments as to why

13 your side is saying that really refers to leases to which the

14 debtor was subject, but doesn't it say any other lease in the

15 shopping center?

16       MR. FIEDLER:  Your Honor, I think the case law on

17 this is very clear, both in the Toys case, the Trak Auto case,

18 the cases from SDNY and Martin Paint Stores and Ames Department

19 Stores, which is that that language is referring to any lease

20 that the debtors have entered into or master agreement relating

21 to the shopping center that the debtor has entered into.  And

22 it cannot be the case, and Congress did not intend it to be the

23 case, that the debtor would be bound by potentially several

24 hundred provisions in hundreds of leases to which it could not

25 possibly know about because it never negotiated those leases,

1  it never signed off on the provisions in those leases,

2  primarily because here, the lease that the debtor entered into

3  came well over 10 years before the other leases that the

4  landlords are referring to.

5          THE COURT:  Am I allowed to, I think you just kind of

6  implicitly said that that is what it says, but they can't have

7  meant that.  So, it says it, but you're asking me to say that's

8  what it says, but it can't be what they meant.

9          MR. FIEDLER:  Well, I think --

10         THE COURT:  Isn't that what the argument is?

11         MR. FIEDLER:  I think there's two points on that,

12 Your Honor.

13         The language says it will not breach any such

14 provision contained in any other lease, right?  And it is a

15 tenant of contract law that a party can't breach a contract to

16 which it was never a party.  And so that language is referring

17 to leases that the debtor had actually entered into or master

18 agreements that document the terms of the shopping center,

19 which we noticeably don't have here in the Pinnacle Hills

20 lease.

21         THE COURT:  But isn't the landlord saying, and I

22 don't want to steal anyone's thunder, but isn't the landlord

23 saying that in response to that argument that the lease between

24 Hobby Lobby and the landlord is being breached?  And that's a

25 lease in the shopping center.

23

1         MR. FIEDLER:  That's right, Your Honor, but the lease

2    is being breached by the landlord not the debtor, and I think

3    what's important to note here is the legislative history which

4    really supports the reading that the debtors and Michaels have

5    proposed, which is that Congress intended this language to

6    preserve the landlord's rights in respect of its lease with the

7    debtor and any other applicable agreements, and that includes

8    master agreements to which the debtors had entered into.

9         Specifically, when enacting 365(b)(3), the House

10   Judiciary Committee discussed the import of looking at the

11   debtor lease.  And I'm quoting from a report which says, "A

12   shopping center is often carefully planned and apprised, and

13   though it consists of numerous individual tenants, the center

14   is planned as a single unit, often subject to a master lease or

15   financing agreement.  Under those agreements, the tenant mix in

16   a shopping center may be as important to the lessor as the

17   promised rental payments."

18        And I know we're delving a bit into tenant mix, but I

19   think it's abundant and clear that the House Judiciary Report

20   and the other legislative history bits that are cited in our

21   papers make clear that the master lease or the financing

22   agreement that Congress speaks of is one in which the debtor,

23   as the shopping center tenant, had entered into and made itself

24   bound by.

25        And I think, Your Honor, the Toys case rightly

1  recognized this, and you'll hear a lot about the Toys case

2  because the facts there are nearly identical to the facts here.

3  And there, the Court said that the assignment could go through

4  because the assignment did not violate the terms in the

5  debtor's lease, which the debtor had bargained for with the

6  landlord.

7         And I think what that court was getting at is what

8  is, not only did Congress not intend for a debtor to be bound

9  by several hundred leases, but recognized the practical

10  importance of not making a party bound by a contract to which

11  it has no clue about what's in it.  And so I think any other

12  reading, including the reading that the landlords propose,

13  would lead to the absurd result that the debtors must be

14  knowledgeable about the terms, provisions of potentially

15  hundreds of other contracts to which they never entered into.

16         THE COURT:  So the argument really is that the plain

17  language says what it says, and the general rule is that if the

18  language is plain, the analysis really ends there unless it

19  leads to an absurd result and that's what's being argued here.

20         MR. FIEDLER:  Well, that's right, Your Honor.  I

21  think the plain language was intended to refer to leases and

22  other agreements to which the debtors were actually party to.

23  And the legislative history supports that and the fact that it

24  would lead to these absurd results and unjust results that a

25  debtor would be bound by a contract it has no clue about

1  clearly weighs in favor of not only the debtors' reading of the

2  statute, but the several other courts that have read the

3  statute the same way, both in <u>Toys</u>, in <u>Trak Auto</u>, and a number

4  of the SDNY cases.

5          THE COURT:  So then it's even a little further than

6  that.  It's kind of the flip of the landlord plain language

7  argument.  You're saying the plain language of (b)(3) and (C)

8  refers to only the lease with the debtor.

9          MR. FIEDLER:  That's right, Your Honor.  Or any

10  master agreement that the debtor had entered into as part of

11  the shopping center arrangement.

12          THE COURT:  But don't I have to go to legislative

13  history or other sources to get to that?

14          MR. FIEDLER:  Well, I think, Your Honor, yes, the

15  case law is pretty clear.  I did not see one case cited in the

16  landlord's, not only Pinnacle Hills' landlord, but the

17  Serramonte and Fountains landlord briefs, which said a court

18  was looking to something other than a debtor's lease in

19  analyzing the assignability of a contract under 365(b)(3).  So

20  I think that's important to note that accepting the landlord's

21  reading would really be breaking ground here and at odds with

22  all of the existing case law as well as the legislative

23  history.

24          THE COURT:  Okay.

25          MR. FIEDLER:  With that, Your Honor, I'd like to turn

1  to the landlord's reading of 365(b)(3) as it relates to

2  365(f)(1), which really turns a blind eye to the fundamental

3  protection that the bankruptcy accords debtors, which is, as

4  Your Honor's aware, the Code greatly favors the debtors' free

5  assignability of its contracts.  And in that spirit, courts,

6  both in this circuit and others, acknowledge that

7  Section 365(b)(3) of the Bankruptcy Code is not meant to be

8  read in isolation, but rather is meant to be read in

9  conjunction with 365(f), which it explicitly cross references.

10         And this is exactly what the Court held in the

11  Delaware case in Rickel Home Centers.  And so when interpreting

12  365(f), courts have construed the terms of leases to not only

13  render unenforceable lease provisions would prohibit assignment

14  outright, but also those lease provisions that are so

15  restrictive that they constitute de facto anti-assignment

16  provisions.

17         And here, Your Honor, I can't think of a more clear

18  de facto anti-assignment provision than the imposition of the

19  exclusivity provisions in the Hobby Lobby lease and the Dollar

20  Tree lease, which --

21         THE COURT:  But doesn't it say (f)(1) says except as

22  provided in (B) and (C) of 365?  And wasn't it amended to make

23  that clear.

24         MR. FIEDLER:  That's right, Your Honor.  But as the

25  Toys court pointed out, and as the Fourth Circuit held in Trak

1 <u>Auto</u>, that did not mean that 365(f)(1) can never be used to

2 invalidate a clause prohibiting or restricting assignment in a

3 shopping center lease.  And I think that is largely exactly in

4 line with Congress's intent, which is that what Congress meant

5 in focusing on restrictive provisions was to focus on those

6 provisions that are in a debtor tenant lease that it had agreed

7 to.

8        And to the extent the bankruptcy court at the time

9 was seeking to disregard those covenants in a proving

10 assignment, that is what Congress intended to avoid.  And so, I

11 think the provisions that are in the Hobby Lobby lease and the

12 Dollar Tree lease are not binding on the debtors simply because

13 they constitute *de facto* anti-assignment clauses under

14 365(f)(1).

15        THE COURT:  But all they're saying is that -- in

16 other words, let's just say, for example, that the Hobby Lobby

17 lease was entered into before the Bed Bath & Beyond lease, and

18 there was restriction on that.  That would prohibit the

19 assignment, right?

20        MR. FIEDLER:  Well, I think, Your Honor, to engage in

21 your hypothetical, there have been a number of objections in

22 these cases filed because there were prior in time exclusives,

23 and the debtors didn't go forward with those assignments in

24 part because they were prior in time.  Here, we're talking

25 about leases that came at least 10, in some cases, 15 years

1 after the debtors entered into their lease. And so --

2       THE COURT: Right. So it's not -- so but I guess

3 that -- my point was that it's not that C is an anti-assignment

4 clause or prohibits the assignment. It just says a valid

5 restrictive use has to be honored in a shopping center lease,

6 right?

7       MR. FIEDLER: Well, I think, Your Honor, Congress was

8 clear that those restrictive provisions are those to which the

9 debtor tenant had agreed. As explained by Senator Hatch in the

10 Congressional House Report, he's made clear that it is my

11 understanding sorry, I'll start over.

12       Congress decided that use or similar restrictions in

13 a retail lease, which the retailer can't evade under non-

14 bankruptcy law, should not be evaded in bankruptcy. It's my

15 understanding from Mr. Hatch that some bankruptcy judges have

16 not followed this mandate. Under another provision of the

17 Code, Section 365(f), a number of bankruptcy judges have

18 misconstrued the Code and allowed the assignment of a lease

19 even though the terms of the lease are not being followed.

20       And clearly in that language, Mr. Hatch is referring

21 to the lease that the debtors had entered into. And so I think

22 that's important to note that 365(f)(1) can be used or should

23 be viewed in conjunction with 365(b)(3)(C) to prevent the

24 assignment, or to allow the assignment of a lease despite a

25 restrictive covenant in a lease in which the debtors were not

1  party to.

2        So, unless Your Honor has any other questions on

3  that, I'd like to turn now to tenant mix, which as Your Honor

4  is aware, the landlords assert that the proposed assignment to

5  Michaels will disrupt tenant mix and balance in violation of

6  (b)(3)(D) of the Bankruptcy Code.  All of the evidence in the

7  record and the controlling legal precedent on this tells a very

8  different story, Your Honor.

9        As Your Honor may know, as with 365(b)(3)(C),

10  365(b)(3)(D) must be interpreted to refer to the contractual

11  protections in the debtors' lease or a master lease in which

12  the debtor had been party to.  That is directly from the Ames

13  Department Stores case the Toys R Us opinion as well.  And,

14  Your Honor, as I've mentioned, there's no master lease or

15  similar arrangement in the Pinnacle Hill Shopping Center, which

16  you would ordinarily suspect at a shopping center.  And the

17  landlord really hasn't pointed to any provision within the

18  debtors' lease that would speak to the intent to maintain some

19  sort of tenant mix and balance in the shopping center that

20  would otherwise prohibit the assignment to Michaels.  But --

21        THE COURT:  Well, what about the one that allows them

22  to terminate?  I understand that's not enforceable in

23  bankruptcy, but what about the one that allows them to

24  terminate if they don't agree with the proposed use?

25        MR. FIEDLER:  That's right, Your Honor.  The landlord

1  does assert that Section 15 of the lease it has a right to

2  terminate the lease outside of bankruptcy.  But they do

3  acknowledge that that provision would be an anti-assignment

4  clause unenforceable in Chapter 11.  But what the landlord

5  conveniently omits is that the landlord would be required to

6  pay the tenant substantial damages in the case it were to

7  terminate the lease based on a proposed unacceptable

8  assignment.

9        So by blocking the assignment in Chapter 11 and not

10 paying the tenant substantial damages that it otherwise would

11 outside of Chapter 11, the landlord is asking the Court to

12 enlarge the bargain for protections that it had agreed to back

13 when it signed the lease.  And, Your Honor, the debtors don't

14 think that is appropriate, nor does the case law support that.

15        THE COURT:  But my question to you was, I thought

16 your argument was that they didn't deal with the use in the

17 lease.  And I think the argument that's being made is that they

18 dealt with it by saying it's a termination if they don't like

19 it and they have to pay substantial damages or whatever the

20 damages are.  I don't really know what they are.  But they have

21 to pay damages if they don't agree with the use.  That feels

22 like they were concerned about the use to me.

23        MR. FIEDLER:  Well, I think, Your Honor, this goes

24 back to the point I made a little while ago, which is, if the

25 landlord really thought that the coexistence of Michaels and

1  Hobby Lobby and Dollar Tree and Michaels would be detrimental

2  to the tenant mix, they would have negotiated that in the

3  debtors' lease.  And they had the opportunity to do so when

4  they asked Bed Bath & Beyond to waive the otherwise prohibition

5  on Hobby Lobby coming into the center.

6         And so Mr. Aronoff made clear in his deposition

7  testimony that they had the opportunity to do so and they opted

8  not to.  And I think that speaks to the fact that the landlord

9  is not seeking to -- there hasn't been an intent within the

10  lease to maintain tenant mix and balance.

11         But I do want to hit on one rather interesting and I

12  think flawed point, which Your Honor mentioned at the outset of

13  the hearing, which is that despite the clear language in the

14  statute referring to shopping center, when looking at tenant

15  mix, the landlord is saying we must look at a few stores within

16  the shopping center and not the whole shopping center itself.

17  And I think that's a very dangerous argument to make, Your

18  Honor, because the shopping center is clearly defined in the

19  lease as encompassing the entire Pinnacle Hills property, not

20  just the power center, which is only consisting of 12 stores

21  and a fraction of the square footage of the over million square

22  feet shopping center.

23         And I think --

24         THE COURT:  I was going to ask Mr. Lehane that

25  because that's what I thought it said as well.

1          MR. FIEDLER:  Yeah.

2          THE COURT:  I guess we'll save that for when he's up

3    here.

4          MR. FIEDLER:  I think, Your Honor, I'd like to point

5    the Court to page 65 of Mr. Aronoff's declaration.  And more --

6    sorry, not his declaration, his deposition transcript.

7          When Mr. Aronoff was asked whether referring to in

8    analyzing tenant mix of the large complex, which is called the

9    Pinnacle Hills Shopping Center, as defined in the lease,

10   whether he was looking at that in analyzing tenant mix, or

11   whether he was looking at analyzing tenant mix just in respect

12   to the power center, he confirmed, and I quote, "that the

13   Pinnacle Hills Shopping Center was not in our discussion.  It

14   was only the power center."

15         And like I mentioned, the definition of shopping

16   center in the lease clearly refers to Pinnacle Hills Shopping

17   Center as a whole, and it's not in any way limited to any

18   subdivision within the shopping center like the power center.

19   And I believe Mr. Aronoff acknowledged that in Pages 40 and 41

20   of his deposition transcript.

21         So, it's therefore really unclear, Your Honor, what

22   evidence the landlord has put forward as to the lease agreement

23   itself and the shopping center to support the notion that

24   tenant mix is somehow disrupted at the shopping center as a

25   whole.  And so, I don't think it's appropriate, Your Honor, to

1  look to a few stores within a shopping center that has over a

2  hundred stores and over about a million square feet and limit

3  the tenant mix analysis to just about 250,000 square feet.

4         But, again, if we were to analyze tenant mix outside

5  of the intention of the contractual terms that the debtors

6  agreed to, like I said, there's over 100 stores in the Pinnacle

7  Hills Shopping Center.  There's at least 28 women's clothing

8  stores, five children's stores, five department stores, six

9  electronic stores, seven jewelry stores, and more and more.

10 And of those a hundred, many of them sell the exact same items.

11 But what is more telling is that over a hundred of those

12 stores, there's only two stores that the landlord has

13 identified that sell craft items.  And not even both of those,

14 the landlord admits, are not craft focused retailers.

15        And I'd like to point the Court to Page 46 and

16 Page 48 of Mr. Aronoff's deposition transcript.  Here, after

17 scrolling through the entire tenant roster of the Pinnacle

18 Hills Shopping Center with Mr. Aronoff, Mr. Aronoff admitted

19 that Hobby Lobby was the only craft focused retailer in the

20 shopping center and that he didn't know whether Dollar Tree was

21 even a craft focused retailer, though he acknowledged they do

22 engage in the selling of certain craft items.

23        And so, adding another retailer like Michaels that is

24 engaged in the selling of craft products certainly does not

25 disrupt the tenant mix of a shopping center with over a hundred

1  stores and perhaps two that are engaged in the sale of craft

2  products.  But, I think more telling, Your Honor, is as

3  explained in Mr. Amendola's declaration, Michaels and Hobby

4  Lobby coexist in at least 30 shopping centers across the

5  country.  And the landlord generally agrees with that.  Indeed,

6  Ms. Elliott's declaration acknowledges that at at least 19 of

7  those locations, those two tenants coexist and likely more.

8         And the same is true of Dollar Tree and Michaels.

9  And I think for that reason, Your Honor, there is a reason for

10  that, Your Honor, and Mr. Amendola makes that clear in his

11  declaration, which is that companies, particularly retailers,

12  actually like to be located in close proximity to their

13  competition because of the additional foot traffic it would

14  bring, not only their store, but to the shopping center as a

15  whole.

16         And assuming Michaels was a direct competitor of

17  Hobby Lobby and Dollar Tree, which I'm not sure they are, those

18  tenants may gain the additional foot traffic from bringing

19  Michaels in there.

20         THE COURT:  You're not sure if Hobby Lobby and

21  Michaels are direct competitors?  Or Hobby Lobby and Dollar

22  Tree?  Or both?

23         MR. FIEDLER:  Michaels and Hobby Lobby and Michaels

24  and Dollar Tree.

25         THE COURT:  You're saying Michaels and Hobby Lobby

1 are not competitors?

2        MR. FIEDLER:  I think, Your Honor, Mr. Aronoff's

3 testimony focuses on Hobby Lobby being a craft focused

4 retailer, and so it's possible that they are competitors.  They

5 likely are.  But certainly not with respect to Dollar Tree.

6        But I think, Your Honor, the more important point is

7 Congress's intent when enacting 365(b)(3), which I've hit on a

8 bunch, which was to preserve the bargain for exchange between

9 the parties and that's the debtor tenant and the landlord.  And

10 so, as I've mentioned, if there was any issue that the landlord

11 foresaw with tenant mix and balance in bringing a store like

12 Michaels into the shopping center, they would have negotiated

13 that in the Bed Bath lease.  And I really don't think it's

14 appropriate for the bankruptcy court to entertain the

15 landlord's request to enlarge the rights in its lease in

16 Chapter 11 that it otherwise wouldn't have outside.

17        Lastly, Your Honor, I'd like to just turn to the rent

18 abatement and damages point that was raised by the landlord

19 where the landlord argues that the proposed assignment should

20 be denied because if the lease is assigned, the landlord may be

21 subject to certain rent abatements by Hobby Lobby under the

22 terms of the Hobby Lobby lease.  I think this argument fails on

23 many grounds, Your Honor, and is frankly irrelevant to the

24 discussion of the assignability of the contract under

25 365(b)(3).

1          First, Your Honor, there's nothing in the case law,

2    and the landlord hasn't pointed to a case, that suggests a

3    bankruptcy court must consider a landlord's supposed expected

4    losses from its other contractual arrangements with other

5    parties that the debtors don't know about as a result of the

6    assignment of the lease.  As the bankruptcy court in the Ames

7    Department Stores case explained, Congress has determined that

8    subject to certain statutory safeguards, the value of the

9    debtors' leases should go to the debtors' creditors and that

10   leases may be sold to achieve that end with or without the

11   landlord's consent.

12         There is one point I'd like to make about the Hobby

13   Lobby lease, which is there is an express provision in that

14   lease related to rent abatement, which says in the event the

15   tenant violates the Hobby Lobby exclusive without the

16   landlord's consent, then rent abatement would be triggered.

17   And I think, Your Honor, by overruling the objection and

18   maintaining the status quo with respect to the language of

19   365(b)(3), the landlord would have met that requirement and

20   would not be subject to the damages that it claims it might be.

21         That's the same view that the Martin Paint Stores

22   case took in the Southern District of New York, as well as the

23   view that the Toys court took in the Eastern District of

24   Virginia that essentially a court order is a judicial action

25   that may render the landlord incapable of complying with a

1  restriction on another lease, and therefore would excuse the

2  landlord's performance under that provision.

3      THE COURT:  What Martin Paint Store case are you

4  referring to because there's a few of them, and I thought, or

5  at least two, and one of them wasn't even really a shopping

6  center case as I understood it.

7      MR. FIEDLER:  I was referring, Your Honor, to cite

8  199 B.R. 258 (1996).

9      THE COURT:  I don't have at my fingertips whether

10 that's the one I'm referring to.  I know what Toys R Us says,

11 but I don't know Martin Paints.  At least one of them did not

12 have to address the issue because of well, didn't have to

13 address the issue because it wasn't a shopping center and then

14 there was another one where there was no standing found.  So

15 I'm not sure what Martin Paints adds to the discussion at this

16 moment.

17     MR. FIEDLER:  Your Honor, I think it's really the

18 point that the law excuses performance if there's a legal

19 impossibility of actually performing.  And that's the quote

20 from the Martin Paint case, I believe, which gets to the point

21 here that if the landlord can't possibly consent, it doesn't

22 need to be bound by the abatement provision in the Hobby Lobby

23 lease.

24     So, with that, Your Honor, I think that really

25 concludes my argument.  I will say there is a lot of money at

1  stake here.  We do not have any backup bidders.  The landlord's

2  reading of this statute would call into question any debtor's

3  ability to maximize value of its estate for the benefit of all

4  of its stakeholders, not just the landlord.

5          And I think accepting the landlord's reading of this

6  statute would really jeopardize not only retail debtors but any

7  debtor's ability to restructure in Chapter 11.

8          THE COURT:  Okay.  Thank you.

9          MR. FIEDLER:  Thank you, Your Honor.

10          THE COURT:  I mean, in terms of order, I think we're

11  dealing with the Pinnacle Hills Shopping Center, at least, and

12  Michaels certainly was supportive of that.  It seems to me it

13  makes sense to hear from Michaels and then hear from the

14  landlord.  Otherwise, there might be --

15          MR. FIEDLER:  I think that makes sense, Your Honor.

16          THE COURT:  All right.

17          MR. FIEDLER:  Thank you.

18          THE COURT:  Mr. Hershey.

19          MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

20  from White and Case on behalf of Michaels Stores.

21          Just a few preliminary notes.  I know that Mr. LeHane

22  transmitted some slides last night and I have some thoughts on

23  those but I think those thoughts are best saved for rebuttal

24  after Mr. LeHane goes through them.  So, I just wanted to up

25  front reserve some time for rebuttal with the Court's

1  permission.

2       I do not have a slide deck for Your Honor.

3  Everything that Michaels wanted Your Honor to consider was in

4  our briefs, and on that note, I do just want to say, at the

5  start of the hearing, Your Honor referenced the debtors' briefs

6  and the landlord's briefs.  Michaels did, of course, also file

7  briefs, specifically a reply at Docket Number 1383, and a sur-

8  surreply on Docket Number 2059.  I just wanted that on the

9  record.

10       THE COURT:  Of course, Michaels has been here

11  throughout.  I apologize for that omission.

12       MR. HERSHEY:  I just wanted to avoid --

13       THE COURT:  I did not forget.  I just omitted that.

14       MR. HERSHEY:  That's all I wanted to confirm.  Thank

15  you, Your Honor.  I appreciate that.

16       Anyway, despite not having slides, I do want to give

17  Your Honor a brief roadmap of where I'm going to go today.

18  There are really, as everyone's observed, two sections of the

19  Code at issue, 365(b)(3)(C) and 365(b)(3)(D).  I'm going to

20  discuss each of them in turn.  I think I will be able to avoid

21  overlapping too much with Mr. Fiedler's argument.  But what I

22  want to do is talk about each, and in respect of each, what the

23  law is and what the law should be.  Because I think what Your

24  Honor will find is that the law overwhelmingly, in some cases

25  totally, supports the debtors' and Michaels' position, but also

1  that's the way it should be, because under the landlord's

2  proposed view of the world, restructurings by retail debtors

3  would be completely impossible.

4          And I'll get there, but before I do, let's start with

5  the actual plain language of Subsection C.  And I will just

6  read it to make things simple.  This is 365(b)(3)(C) starting

7  with (3).

8          "For the purposes of Paragraph (1) of this subsection

9          and Paragraph (2)(b) of Subsection (f), adequate

10         assurance of future performance of a lease of real

11         property in a shopping center includes adequate

12         assurance,"

13 and cutting down to (C):

14         "[T]hat assumption or assignment of such lease is

15         subject to all the provisions thereof, including, but

16         not limited to, provisions such as radius, location,

17         use, or exclusivity provisions, and will not breach

18         any such provision contained in any other lease,

19         financing agreement, or master agreement relating to

20         such shopping center."

21         So, the first thing that becomes really clear,

22 looking at this, is Congress is focused on the lease at issue

23 to be assigned.  We see that in "such lease" and "thereof," the

24 reference is clearly to the lease.  But then of course there is

25 a second part of that talks about other leases, financing

1 agreements, master agreements.  And look, like items are

2 grouped together.  I forget the Latin expression for that, but

3 we're talking about a master agreement that is by definition an

4 agreement that the debtor will be a party to because it applies

5 to all tenants, a financing agreement, again, an agreement that

6 would apply to all tenants that a debtor would be party to, and

7 then I guess where the rubber meets the road is with other

8 leases.

9         And it's perfectly possible to imagine a situation

10 where a debtor has multiple leases in a shopping center.

11 Particularly, say, a franchise, where a franchisor might have

12 multiple franchise locations in the same shopping center.  And

13 what the Code is guaranteeing to a landlord is that a debtor

14 will not be able to use the terms of one of its leases to

15 breach the terms of other leases to which it is a party with

16 the landlord.

17         In other words, the Code is guaranteeing the benefit

18 of the bargain that the landlord has with the debtor, right,

19 not giving the debtor greater rights than what are in the

20 leases that the debtor has actually agreed to.  And on that

21 note, I think we have confirmation of that point in the use of

22 the term "breach."

23         As Mr. Fiedler observed, and as the landlord has

24 agreed in its briefing, a party can only breach an agreement if

25 it is a party to that agreement.  What that means is that the

42

debtors' assignment to Michaels of their lease cannot be a
breach by the debtors of the Hobby Lobby lease.  The debtors
are not party to that lease.  It cannot be a breach by Michaels
of the Hobby Lobby lease.  Michaels is not party to that lease.
And I'll take it one step further, I actually disagree with
Mr. Fiedler on this point.  It's not a breach by the landlord
of that lease with Hobby Lobby.  The landlord standing
helplessly by and watching by operation of the Bankruptcy Code
its lease be assigned over its objection is not taking any
steps to breach that lease.

There's no breach of contract claim that Hobby Lobby
can now bring against the landlord saying, "You did this, and
by doing this, you breached our agreement."  To the contrary,
the landlord has been working very hard, as we know full well,
to prevent the assignment to Michaels, and therefore, is not in
any kind of breach.

There is, however, a breach happening here, and I
think it needs to be noted.  The breach that's happening here
is a breach by the landlord of the debtors' lease.  The
landlord is seeking to import into that lease terms that the
debtors never agreed to.  And it's worth noting that it's a
black letter rule under the Bankruptcy Code that a bankruptcy
does not modify a contract.  But that is exactly what the
landlord is trying to do by taking terms that were agreed to
after the debtors entered into their lease with the landlord

1  and seeking to apply them.

2        THE COURT:  But doesn't the Bankruptcy Code modify

3  contracts all the time, including particularly 365?

4        MR. HERSHEY:  Well, fair enough, Your Honor.  I think

5  there are examples where the Bankruptcy Code carves out

6  exceptions to that rule.  For example, anti-assignment

7  provisions and rules those out.  But it is generally a tenant

8  that, except for those exceptions, there is not a modification

9  to a contract simply by the fact of a bankruptcy which is what

10  the landlord is trying to do.

11        And I'll just note, Your Honor, there was an easy

12  solution to this.  There are multiple easy solutions to this

13  that the landlord could have pursued before bankruptcy, right.

14  The landlord could have written different restrictions into the

15  debtors' lease.  It could have said, this lease is only to be

16  used for bedding, or whatever other purposes Bed Bath & Beyond

17  would use it for.  Or it could have said, this lease is subject

18  to all future exclusives that this landlord may enter into.

19  There are leases that say that.  This is not one of them.

20        The landlord could have had a master agreement

21  between all the tenants in the shopping center that says the

22  leases in the shopping center should be used only for the

23  purposes agreed to in that lease.  That happens as well.  It

24  didn't happen here.  And the Code actually specifically

25  references master agreements for that reason.  And the landlord

44

1  could have bid.  Came to the auction, knew about it, chose not

2  to bid, right.  That would be a way to avoid the damages that

3  it claims it's facing.  I agree with Your Honor, there is no

4  obligation for the landlord to do that, but it was an option.

5  And it could have avoided being here today if it had bid.  It

6  chose not to.  Michaels was the sole bidder at auction with no

7  backup bidder, and that's why we're here today.

8        So moving on from the plain language of the statute,

9  I do want to focus a bit on the cases, and Mr. Fiedler said it

10 perfectly.  Every case that we are aware of that was cited by

11 any party favors the debtors' and Michaels' position.  That's

12 from the Ames case in 1991 from the Southern District of New

13 York to the Trak Auto case, which is by the way the only

14 Circuit level case on this issue from 2004, the Fourth Circuit,

15 all the way up to the Toys R Us case in 2018.

16        And I want to pause there and just note, there's no

17 disagreement among the parties that the Toys R Us case is

18 directly on point.  The facts are squarely on four with what

19 Your Honor is confronting today.  So not only is the landlord

20 asking Your Honor to be the first court to rule differently and

21 break from precedent on these issues, but also to rule against

22 a case that considered these issues directly and decided in

23 favor of the debtors and Michaels.  And we think that's

24 important.

25        THE COURT:  Well, if they're saying that Toys R Us

1  got it wrong.  That's basically it, right.

2       MR. HERSHEY:  Yeah.  Look, Your Honor, I agree.  I

3  will note that Toys R Us is in line with a substantial body of

4  precedent.  There is not a single case that's been cited that

5  rules differently.  So I understand the landlord disagrees with

6  the case.  But all the body of the law that's been cited is in

7  line with Toys R Us.

8       I'll note, and Mr. Fiedler touched on this, it's not

9  just the case law that supports the debtors' and Michaels'

10 position, the Congressional record is crystal clear that what

11 Congress was seeking to protect was the landlord's bargain for

12 protections in its lease with the debtors.  That's why so many

13 of the cases that come out our way quote the Congressional

14 record, and I'm going to do the same.  Here's a quote.

15            "When an owner enters into a use clause with a retail

16            tenant forbidding assignments of the lease for a use

17            different than that specified in the lease, that

18            clause should be honored."

19       All right.  That was Senator Orrin Hatch in 2005

20 talking about the Bankruptcy Abuse Prevention and Consumer

21 Protection Act.  Here's another one.

22            "Congress decided that use or similar restrictions in

23            a retail lease, which the retailer cannot evade under

24            non-bankruptcy law, should not be evaded in

25            bankruptcy."

1  Again, Senator Hatch focusing on the terms of the lease.

2          And last, this is from the House report on the Act

3  that I just mentioned.

4          "Section 404(b) amends Section 365(f)(1) to assure

5          that Section 365(f) does not override any part of

6          Section 365(b).  Therefore, for example, assumption

7          or assignment of a lease of real property in a

8          shopping center must be subject to the provisions of

9          the lease, such as use clauses."

10  Again, Congressional focus on the lease itself.  There is not a

11  single example I'm aware of of Congress focusing on anything

12  other than the provisions of the lease and the landlord's

13  bargain for benefits under that lease.

14          Now, there is one case that the landlord tries to

15  rely on in support of its argument under Subsection C, excuse

16  me.  That's the Sears case.  And I'll just pause here and say

17  it must have been a very difficult decision by the landlord to

18  cite that case because Sears completely supports the debtors'

19  and Michaels' position on Subsection D.  And for that reason,

20  I'll be coming back to Sears momentarily when I get to

21  Subsection D.

22          But in the meantime, I want to note two things.

23  First, the landlord's reliance on Sears isn't really based on

24  Sears' discussion of Subsection C.  It's based on Sears'

25  discussion of Subsection A and the sort of application of that

1 Subsection C, or that discussion, rather, to C.  There's no

2 basis for that in the _Sears_ decision.  The _Sears_ decision never

3 says and this analysis should be applied to Subsection C.  In

4 fact, the _Sears_ analysis completely disclaims such an

5 application.  And I'll just read from that case where the _Sears_

6 court, and this is I can give Your Honor the pincite.  It's

7 613 B.R. 51, 78.

8       The _Sears_ court refers to 365(b)(3)(A) as having more

9 stringent requirements and saying that it differs substantially

10 from how a use clause or restriction on assignment addresses

11 the landlord's ability to control the look and feel of its

12 property.  The _Sears_ court also says, "The Bankruptcy Code,"

13 this is, sorry pincite 70, same case, "The Bankruptcy Code

14 cannot be read to place the landlord in a better position than

15 it would have occupied absent the bankruptcy."

16       And that's actually a good segue to the point I want

17 to make about what the law should be, right.  The landlord's

18 position in bankruptcy and outside of bankruptcy.

19       Let's look at how things would work if the landlord

20 had its way, okay.  There's no dispute that outside of

21 bankruptcy, this lease could be assigned to Michaels.  There's

22 no provision limiting the assignment right of Bed Bath & Beyond

23 to assign to Michaels.

24       THE COURT:  Other than the termination.

25       MR. HERSHEY:  Other than the termination provision,

1  which is --

2        THE COURT:  But that's a pretty big other, isn't it?

3        MR. HERSHEY:  Well, fair enough, Your Honor, except

4  to note that focusing specifically on the use provisions, which

5  I think are what's relevant here because the termination right

6  doesn't apply in bankruptcy, I think that's what we have to

7  look at, is what Congress intended for the exclusive

8  provisions.  That's what C focuses on, so let's look at that.

9        There's no use provision, no exclusive use provision

10 that would limit the assignment to Michaels.  Now, under the

11 landlord's perspective, if the landlord had its way, the

12 debtors would be limited in their ability to assign their lease

13 not just by the terms that they negotiated and agreed to, but

14 by the terms of every other lease in the shopping center that

15 they had no part in negotiating and never agreed to.  And in

16 fact, in this case, were negotiated and agreed over a decade

17 after the debtors negotiated their lease.

18       Not only that, these are terms that the debtors do

19 not know and cannot know.  They are confidential, commercially

20 sensitive terms in lease agreements that are not public and are

21 not made public.  And we know this firsthand because when this

22 dispute started, we asked the landlord for a copy of the Hobby

23 Lobby lease, and they refused.  And when we pressed, they gave

24 us this, which is on the docket.  This is the redacted copy of

25 the Hobby Lobby lease.  Pages and pages of redactions of terms

1  that we still don't know and we can't know, right, but that the

2  landlord might come forward and say, actually, there's this

3  term that you had no way of knowing about, that's secret and

4  confidential, but that bars you from making this assignment.

5       THE COURT:  But I mean, if there was something in

6  there that supported their position.  If there was, for

7  example, if there was a use restriction in there or some other

8  term that indicated that, for example, Bed Bath & Beyond had

9  agreed to it, or they had to go get their consent or something

10  like that, I would --

11       MR. HERSHEY:  Well, presumably, Your Honor, if we

12  agreed to the term, we would know about it or we'd be subject

13  to it.  We would say, if we, for example, had in our lease a

14  clause that said, "This lease is subject to all future

15  exclusives," right, we would be saying, we may not know what

16  those exclusives are, but we're subject to them.  There's

17  nothing like that here.  We have no ability -- we've never

18  agreed to those terms.  We have no ability to know them.

19       And I get it.  I mean, the last thing a landlord

20  wants is for one tenant to know what's in another tenant's

21  lease.  It makes perfect sense why these would be secret and

22  confidential.  But what the landlord is arguing is that debtors

23  effectively go into bankruptcy blind giving up their rights

24  under their lease and making themselves subject to all other

25  leases not knowing what those leases say.  That cannot be what

1  the law is.

2         And to be clear, we're not talking about a small

3  number of terms that the debtor makes itself subject to.  I

4  want to turn back, actually, to the language of the statute,

5  which I read, which says that the assignment must comply with

6  certain terms and, here I'm going to quote, "including but not

7  limited to, provisions such as radius, location, use, or

8  exclusivity."

9         So that's four specific terms, "radius, location,

10  use, and exclusivity," that the landlord claims it can rely on

11  to block an assignment, but it's not limited, right.  It's

12  "including, but not limited to."  There's a potential infinite

13  number of terms that the landlord can come into court and say,

14  because this term is in another lease that the debtor never

15  agreed to, never negotiated, didn't know about, we are able to

16  block the assignment.

17         And here's where things get a little interesting.

18  The landlord argues in its surreply, and Mr. Fiedler touched on

19  this, that only the leases in the power center, which is a 12-

20  store subset of the 100-store promenade, can be used to block

21  the assignment.  And we all know why the landlord made this

22  argument.  Because the landlord doesn't want to make the

23  extreme argument.  There are hundreds of leases with hundreds

24  and hundreds of terms that it could rely on.  It wants to try

25  to limit its position to focus just on 12 because the Court may

be more likely to agree if the position is less extreme.  I

have three responses to that.

        And the first is that even if we were just talking

about 12 other leases, based on the four non-exclusive terms in

the statute that I just read, that's about 50 terms still that

the landlord could come into Court and argue, any one of which

blocks the assignment.  But second, the landlord is simply

wrong.  As Mr. Aronoff acknowledged in his deposition, and as

clear in the terms of the lease, and I'll read the lease,

Section 1134 says the following, creates the defined term

shopping center.

        And it says, "The shopping center, known as Pinnacle

Hills Promenade, located in Rogers, Arkansas, consists of two

retail shopping centers, which shall be operated as a single

integrated shopping center.  One, the so called big box center,

in which the premises shall be located, containing

approximately, whatever, square feet.  That's called the power

center.  And, two, the regional outdoor mall anchored by

certain stores designated the promenade."  Okay.

        The lease makes crystal clear that as far as the

plain terms of the debtors' and the landlord's agreement are

concerned, there is just one shopping center, and all of these

terms apply to that shopping center with 100 plus stores.  And

the last thing I'll say on this point is that, regardless of

the legal distinction under the lease between the 12-store

52

1  power center, the 100-store promenade, it's really irrelevant,

2  because whatever this Court rules doesn't just apply to this

3  case.  It applies to every case.  As we note in our brief, the

4  result of the Court ruling in the landlord's favor is that

5  debtors will have fewer rights in bankruptcy than they would

6  have out of bankruptcy.

7          Out of bankruptcy, as I said, and subject to I

8  understand the termination provision, but just focusing on the

9  use provisions, there's no dispute that a tenant's ability to

10 assign its lease is based solely on the terms of its lease, and

11 the terms of other leases to which it is not party are

12 irrelevant.  But in bankruptcy, according to the landlord, all

13 that changes.  In bankruptcy, even if the debtors' lease had no

14 provision that would preclude a proposed assignment, as is the

15 case here, the landlord can step forward and say, "Sorry.

16 Lease Number 67 has this term that prevents the assignment."

17 Or, "Sorry.  Lease Number 114 has this term, and you can't make

18 the assignment."  That's not what the law is.  It's not what

19 the law should be.

20          I'm going to turn quickly to Subsection D.  I think I

21 can be brief here.  I'm going to touch on the evidence,

22 although I think Mr. Fiedler did an excellent job with it, and

23 I'm going to largely rest on his discussion of the evidence.  I

24 also think the parties have sort of moved on from the evidence.

25 As Your Honor observed, we were supposed to have a big

1  evidentiary hearing.  That's not what happened today.  And I

2  think the reason for that is really this is about the law, and

3  that's always been Michaels' position, and I think the cases

4  bear that out.

5          And in terms of the law, the best place to start is

6  the <u>Sears</u> case because the landlord relies on that case, and I

7  don't think the landlord can credibly argue that the <u>Sears</u>

8  court got it exactly right on one subsection of 365(b)(3), but

9  exactly wrong on another section of 365(b)(3).  And on

10 Section 365(b)(3)(D), <u>Sears</u> completely supports the debtors'

11 and Michaels' position.  And I'll just read from that case.

12 This is at pincite 74.

13          "Put more generally, where there are few or no use

14          restrictions on a demised premises,"

15 I want to pause and just focus on use restrictions, because

16 that's what the Court considered, not other terms, not related

17 to use restrictions, but use restrictions.

18          "[A]nd the assignee agrees to be bound by whatever

19          restrictions do exist,"

20 as the (indiscernible) has here,

21          "[A] court may deem the adequate assurances under

22          365(b)(3)(D) to have been given."

23 That's it.  Right.  The focus is on the lease, the use

24 restrictions in the lease, and whether those are satisfied.

25          And there is no dispute that with respect to the use

54

1 provisions here, those are satisfied, and therefore so is

2 365(b)(3)(D).

3        Now, Sears also does a very good job, and I want to

4 note this, distinguishing the one case the landlord identifies

5 in support of its position on Subsection D, and that's the

6 Federated Stores case, which is out of Ohio from 1991.  And

7 what Sears observes is that the landlord's ability in that case

8 to block the assignment under Subsection D was based not on

9 protections the landlord received or bargained for under the

10 debtors' lease, but rather under the debtors' plan that of

11 course was entered into subsequent to the lease, and obviously

12 that's not the case here.

13        Now, with regard to the evidence, I want to make just

14 one point.  I think I have to address the Powers declaration.

15 We're not putting it into evidence today and I just didn't want

16 to not say anything about it.  But what I do want to note is

17 that I don't think we even need it in evidence because the

18 Elliott declaration submitted by the landlord basically puts

19 everything in the Powers declaration into evidence for us.  And

20 in particular, what the Elliott declaration shows is that

21 Michaels and Hobby Lobby coexist in dozens of shopping centers,

22 in some cases, right next door to each other.

23        The last thing I want to touch on is I want to

24 address the landlord's alleged damages that it claims it will

25 incur from the assignment to Michaels, which, by the way, are

55

1   damages that it bargained for and it agreed to under the Hobby

2   Lobby lease.  But look, in the first instance, I would note

3   that those damages are illusory.

4        Under the Hobby Lobby lease, as long as the landlord

5   makes good faith efforts to object to the assignment, damages

6   cannot be enforced.  Moreover, Mr. Fiedler, and I know Your

7   Honor discussed this, the <u>Toys</u> case expressly addressed this

8   issue and held that if the Court enters an order approving the

9   assignment, then the landlord is not in breach.

10       Second, the landlord's alleged damages, even if real,

11  are simply irrelevant.  There is no provision of the Code that

12  instructs the Court to consider those damages.  And I don't

13  mean to be glib here, but as Judge Glenn of the Southern

14  District once said to me, sometimes in restructurings, people

15  get restructured.

16       There are hundreds, thousands of unsecured creditors

17  in this case who are recovering pennies on the dollar.  There

18  are lots and lots of people who could stand up before Your

19  Honor and complain about what's happening to them in this

20  bankruptcy case.  And it happens every day of every week of

21  every month of every year in this building.  That's bankruptcy

22  court.  It's just how it is.

23       Now, the Bankruptcy Code does provide certain special

24  protections to landlords, and those provisions should be

25  enforced.  But what the Court should not do is create new

56

1  protections that have no basis under the law and that impede

2  the ability of debtors to restructure, as the landlord seeks to

3  do here.

4          Thank you.

5          THE COURT:  But isn't the argument that, the whole

6  argument is it's not a new protection, it's what it says.

7  That's the whole argument.

8          MR. HERSHEY:  Well, that no court has ever found to

9  exist.  I mean, that's why it's new.  Yeah.  Yes, Your Honor.

10 No court has ever found this.  The Congressional record doesn't

11 indicate it.  That is the basis for my saying it would be a new

12 protection for this Court to break new ground and break from

13 precedent, frankly.

14         THE COURT:  Okay.  Thank you.

15         MR. HERSHEY:  Thank you, Your Honor.

16         THE COURT:  Mr. LeHane.

17         MR. LEHANE:  Good afternoon, Your Honor.  Robert

18 LeHane, Kelley Drye and Warren, on behalf of Pinnacle

19 Hills LLC, the landlord at Rogers, Arkansas, and also Daly City

20 Serramonte Center, the landlord at the Serramonte Center.

21         Your Honor, it's been briefed extensively.  Just

22 heard a lot from Mr. Fiedler and Mr. Hershey.  The essential

23 summary of our argument, I think they've stated it well, and

24 you, I think, understand it as well.  Our view is the proposed

25 assignment to Michaels will breach use restrictions in two

1 other tenant leases in the shopping center, Hobby Lobby and

2 Dollar Tree.

3     And, Your Honor, those are protected leases.  The

4 fundamental disagreement here is, A, that the statute, we

5 believe, is absolutely clear.  We don't think you need to go

6 beyond the plain meaning of the statute.  We think the Third

7 Circuit is very clear on that in the case law.  We also think

8 it's important to note, the Third Circuit in <u>Joshua Slocum</u>

9 pointed out, this is a very heightened burden.  But since the

10 debtors and Michaels have spent a tremendous amount of time on

11 legislative history, we think it's important then for us to

12 visit the legislative history.  So I want to talk about the

13 plain meaning, the legislative history, and common sense, Your

14 Honor.

15     So, with respect to tenant mix and balance, common

16 sense just tells you when you put the number one competitor one

17 door down from its competitor in a specific arts and crafts

18 retail chain, that you're going to disrupt the tenant mix and

19 balance in that power center.  I'm happy to talk about the

20 shopping center and whether we're defining one larger shopping

21 center that the lease clearly says is two shopping centers

22 later.

23     THE COURT:  But when you say that, it's clear that --

24 but there is evidence that not only that sometimes it's better

25 to have competitors next to each other, but also that, in fact,

1  there's at least two that I recall from Ms. Elliott's

2  declaration that say they're adjacent to each other, Hobby

3  Lobby and --

4          MR. LEHANE:  Right.

5          THE COURT:  -- Michaels.

6          MR. LEHANE:  Right.  Well, I'd like to discuss that

7  when we discuss tenant mix, but I would also submit that tenant

8  mix is about this shopping center, not any other shopping

9  centers.  For that reason, Powers declaration was irrelevant.

10  We went through it because it would have been put in evidence,

11  but it's not relevant to the analysis of this shopping center

12  and tenant mix in this shopping center.

13          But, Your Honor, I think it's helpful to actually

14  look at what we're talking about here and take a look at it.

15  So, what we have here is the Pinnacle Plaza is a 12-store power

16  center that's circled in blue, and it's in the upper right hand

17  corner.  And the promenade is below that, you have the

18  promenade, and it's a much larger number of stores.  If it

19  would help Your Honor, I have this also in paper, so you could

20  look at it on paper.

21          But, the power center is made up of those stores.

22  Bed Bath & Beyond is highlighted in yellow.  There's T.J. Maxx

23  in the middle, and there is the Hobby Lobby store right next to

24  it.  And there are nine other stores in that separate power

25  center, a shopping center, and as the only evidence we have on

59

1  that is from Jeffrey Aronoff, from Senior Vice President, who

2  was involved in this whole project.  He's been there.  He has

3  personal knowledge.  And he specializes in optimizing the

4  tenant mix and balance in shopping centers.

5         This is treated as a shopping center.  Promenade is a

6  shopping center, and, yes, Mr. Hershey read into the record

7  exactly what the lease says.  There's two shopping centers that

8  they operate as one integrated shopping center.

9         THE COURT:  So I'm supposed to effect the plain

10  language on 365(b)(3)(C), but not in the lease?

11         MR. LEHANE:  And the lease as well because the lease

12  says there's two shopping centers that we're going to treat as

13  one integrated shopping center.

14         THE COURT:  As one integrated.

15         MR. LEHANE:  Yeah.

16         THE COURT:  And the parties agreed to it.  That's not

17  even a -- that one I have a hard time with because there's an

18  agreement that it's one integrated center.  So why would they

19  agree that is one integrated center when that's an issue in

20  every shopping center case?  It's used to be an issue, but then

21  landlords dealt with it by saying, this is a shopping center

22  and you got to agree to that, right.  So I'm having a hard time

23  with that.

24         MR. LEHANE:  Okay.  Do you want me to address tenant

25  mix right now?  Or can I go through --

1          THE COURT:  I mean, I think you are addressing it

2    because you're telling me that I've got to consider just the

3    power center, even though that's not what the lease defines as

4    an integrated shopping center.

5          MR. LEHANE:  Well, let me try to encapsulate the

6    argument on that and then I want to walk through this as well.

7          It's the debtors' burden to show that there will not

8    be any disruption in tenant mix and balance in the center and

9    the evidence doesn't show that.  In fact, the evidence shows

10   the opposite.  Both Mr. Aronoff and even Mr. Amendola admitted

11   there will be an impact and there will be a disruption in

12   tenant mix and balance.  It's in both declarations.  So not

13   only do the debtors not have any evidence showing that there

14   will not be any disruption, but the evidence to the contrary

15   shows that there will be a disruption in the tenant mix and

16   balance in the shopping center.

17         So I think the debtors have not met their burden with

18   regard to tenant mix and balance.  It is the debtor's burden

19   and they simply haven't met it.  And common sense says that if

20   you put the number one retailer in arts and crafts one door

21   down from its number one competitor, there's going to be a

22   disruption.  The other evidence, I believe, that this will

23   disrupt the tenant mix and balance is the fact that the two

24   other tenants in that portion of the shopping center have

25   specific provisions in their leases saying that this is a

1  protected use or a prohibited use would be to allow either an

2  arts and crafts retailer specialized in that within this part

3  of the shopping center, the power center, or expressly,

4  Michaels is expressly a prohibited use under the Dollar Tree

5  lease.

6        THE COURT:  What did Bed Bath & Beyond know about

7  that?

8        MR. LEHANE:  Bed Bath & Beyond didn't know anything

9  about it, Your Honor.  That's a great question.  It was

10  executed 15 years before these two other leases were entered.

11  And that gets to the question of the balance between what the

12  shopping center protections did when the Code was enacted in

13  1978, and how the 1978 Bankruptcy Code drastically changed the

14  rights of landlords after the bankruptcy had been filed.

15        So I think it's important, since we're talking about

16  legislative history, to keep in mind, prior to 1978, Your

17  Honor, the lease provisions that said if the debtor files for

18  bankruptcy, I can terminate my lease, that was enforceable.

19  And all the anti-assignment provisions in the leases were

20  enforceable.  So, the Bankruptcy Code does a wonderful thing

21  for debtors and the debtors have done a good job of that here.

22        They have managed to dispose of over 200 leases.

23  They've brought in $65 million.  They've closed on 135 lease

24  assignments.  I think that utterly contradicts their worries

25  that if you read the statute as it's written, as we believe

62

1  it's interpreted, you'll have absurd results.  It's belied by

2  the results that have already been achieved in this case.

3         But let's also talk about what Congress did when it

4  passed the Bankruptcy Code in 1978 and it put 365 in place and

5  it took out the *ipso facto* provisions in leases and it took out

6  the anti-assignment provisions in leases.  It also very

7  specifically and very intentionally protected shopping centers.

8  Not just the landlords, Your Honor, but all of the participants

9  in the shopping center system.

10         It expressly protected the other tenants, the solvent

11  tenants.  And it also protected the lenders.  Other parties

12  than the debtor and the landlord are protected.  Let's look at

13  a couple snippets from the actual Congressional record from the

14  Shopping Center's Protections Improvements Act of 1982.  The

15  title of the Act was designed to protect all of the

16  participants in the shopping center.  Why?  Because shopping

17  centers were an incredibly important part of the American

18  economy and they remain so.

19         In 1978, there was approximately tens of thousands of

20  shopping centers.  Now, there are more than 100,000 shopping

21  centers in the country.  Congress said, shopping centers are an

22  important sector of U.S. retail trade.  The linchpin of the

23  entire operation is the freely accepted and openly negotiated

24  contractual agreements among the parties.  While the operation

25  of the bankruptcy law necessarily alters contractual

relationships, these alterations have direct and potentially

crippling impacts on other shopping center businesses and

consequently must be strictly limited and minimized.

They also said that Congress recognized and sought to

deal with the potential harm to shopping centers and their

solvent tenants, which arise when one tenant becomes bankrupt.

They weren't talking about what happened when the lease was

initially entered into, they were talking about protecting the

tenants in the shopping center when one tenant files for

bankruptcy and goes to assign the leases.

THE COURT:  But which way does this cut, Mr. -- this

is the first time I'm seeing this, I think.  I don't know if

this was in the papers.  Was this in the papers?

MR. LEHANE:  We cited to the Congressional record and

we cited to the legislative history in the paper, Your Honor --

in our papers, and we'll go back to that.  But --

THE COURT:  But which way does this cut?  It says,

"The linchpin of this entire operation is freely accepted and

openly negotiated contractual agreements among the parties."  I

mean --

MR. LEHANE:  And then, what it goes on to say,

though, is that to the extent the Bankruptcy Code is going to

alter the contractual relationships, which it does to the

landlord by removing, as you've noted, its right to terminate

these leases, right, it must do so in a way that minimizes the

1  harm and is strictly limited.  And there's another quote that

2  says, when the trustee is unable to find a lease that can be

3  assumed and assigned without violating use provisions, then the

4  lease should revert to the landlord.

5       So I think we'd like to also walk through adequate

6  assurance of future performance.  And this is part of the

7  Bankruptcy Code since inception.  And 365(b)(1) starts with

8  that it's the debtor's burden to provide adequate assurance of

9  future performance at the time of the assumption of the lease,

10 right.  So this adequate assurance is now.

11      And then 365(b)(3), we've talked about them a lot, A

12 through D, those are the specific, that's the heart of the

13 shopping center protections.  And A and B, Your Honor, really

14 go to the relationship between the landlord and its debtor,

15 right.  A is that the source of rent must be assured and there

16 will be similar financial condition and operating performance

17 between the assignee and the debtor at the time the lease was

18 entered into.  And B says there'll be no reduction in

19 percentage rent.  C and D, Your Honor, go to protection of the

20 other tenants and they have since the inception of the Code.

21      Let's look at what 365(b)(3)(C) looked like when the

22 Code was first passed in 1978.  It was only one clause.  And

23 what it said was that "Assumption or assignment of the lease

24 will not breach substantially any provision, such as radius,

25 location, exclusivity, in any other financing agreement or

1   master agreement or lease relating to such shopping center."

2          It was only one clause, and it only protected the

3   other tenants in the shopping center.  That was the 1978

4   version of the Code.  There was a problem.  Some debtors were

5   arguing that this assignment, even though it will reach the

6   terms of my lease with the debtor, a use, a radius or

7   exclusivity provision, since it won't breach any other leases

8   in the shopping center, then I can go forward and have this

9   assignment and the Court can ignore the provisions in the

10  debtors' lease with the tenant as anti-assignment provisions.

11         So in 1984, the Code was amended to deal specifically

12  with that problem.  And when it did so, it specifically said in

13  the legislative history, the debtors are ignoring the terms of

14  their own leases and arguing that they're only required to

15  comply with the other non-debtor leases.  So the solution was

16  to break this provision into two clauses and make sure that in

17  connection with an assignment that the assignment can't breach

18  the terms of the lease between the landlord and the debtor and

19  similarly, will not breach any such provision with any other

20  lease financing arrangement or agreement relating to such

21  shopping center.

22         THE COURT:  I didn't see any case that -- and maybe

23  you can tell me otherwise.  I didn't see any case pre-'84 or

24  after '84 that cited to a provision in a lease to which the

25  debtor was not party, or a master agreement to which the debtor

1  was not party, or a financing agreement to which the debtor was

2  not subject, that said, this is how it works.

3       MR. LEHANE:  Well, we would submit, Your Honor, that

4  the plain language of this statute is so clear that it's never

5  before been litigated to final decision until Toys R Us in

6  2018.  That's really the only decision.  And as we've pointed

7  out at length in our briefs, the Toys R Us decision is deeply

8  flawed.

9       First, it relies on Trak Auto.  Your Honor, Trak Auto

10 didn't deal with other leases.  It dealt with the lease that

11 the debtor had with the tenant and it went in favor of the

12 landlord because the debtor tried to assign a lease to someone

13 that was not an auto supplier.  Trak Auto was an auto supplier

14 and that lease said you have to be an auto supplier in order to

15 use this.  And so Trak Auto, in favor of the landlord.  It does

16 not support the logic of the Toys R Us decision.

17       In dicta in that, Trak Auto talks about Ames.  And

18 unfortunately, the Ames decision that they refer to was also

19 not about 365(b)(3)(C).  So, Toys R Us also ignores the whole

20 second clause.  We really believe it's a deeply flawed decision

21 and it's not binding on this Court.

22       THE COURT:  Okay.  So you're saying it's just because

23 it's so clear, it's not litigated.

24       MR. LEHANE:  It hasn't been litigated.

25       THE COURT:  Okay.

1          MR. LEHANE:  So there's also the common sense portion

2   of it and what Congress was clearly trying to do in the

3   legislative history was protect all of the participants in a

4   shopping center, not just the landlord.  And we've heard

5   argument that it's only protecting agreements with the

6   landlord.  Financing agreements, Your Honor, are oftentimes the

7   agreements between the landlord and its lender.  And they

8   may --

9          THE COURT:  Right, and they're recorded.

10         MR. LEHANE:  Right.

11         The debtor wouldn't be -- no tenant would be a party

12  to a financing agreement between the landlord and its lenders.

13  But those are also protected agreements.  There also may be

14  reciprocal easement agreements.  The Three A's Holdings case is

15  a good example, and there's others, where the agreement that's

16  being referred to that can't be breached is some zoning

17  agreement, agreement with adjacent property owners, or a

18  municipality stating -- the debtors have nothing to do with

19  those.  The tenants don't enter into those agreements, the

20  landlord does.

21         THE COURT:  But in Three A's, it was a restriction to

22  which the debtor was subject.  And the financing agreement

23  either would be recorded or would be disclosed in the lease as

24  saying this is a restriction in the use, so therefore, you

25  can't do it.  So, that's different than any other lease

1  being -- any lease that is entered into 14 years later, or a

2  lease that the debtor doesn't know anything about, and it's

3  troubling to me.

4        I'll be completely forthright.  The plain language

5  argument, I get it.  It's a good argument.  And this argument

6  is a good argument, too.  The debtors' argument and Michaels'

7  argument is a good argument also.  I think they're good

8  arguments both ways.  I guess I'm having a little bit of

9  trouble with a fundamental fairness kind of issues to how you

10  make somebody subject to the terms of a contract with somebody

11  else that you have no knowledge of.  It's hard to -- there was

12  discussion of common sense on the mix.  This gets into common

13  sense as well.

14        MR. LEHANE:  Yeah.  And I think, Your Honor, the

15  answer to that is, though, that outside of bankruptcy, the

16  landlord still had the right to terminate these.  And maybe

17  there would have been some economic consequences or damages,

18  and outside of bankruptcy, they can weigh that.  They could

19  have said, hey, Michaels wants to move into the vacant Bed

20  Bath & Beyond space.  We're not in bankruptcy.  We will suffer

21  damages, our other tenants, Dollar Tree, and Hobby Lobby.  The

22  provisions in their leases allow them to assert damages us, and

23  they could weigh that.  But the Bankruptcy Code removes that

24  right, right.

25        THE COURT:  Let me ask you this, Mr. LeHane.  You're

1  a well regarded, experienced, knowledgeable landlord lawyer,

2  right.  And doesn't this look like, and I like looking at words

3  of documents and things like that.  When you look at the lease,

4  Pinnacle Hill Lease with Bed Bath & Beyond, it looks like the

5  landlord, with its really capable lawyers, negotiating and

6  using its bargaining power with respect to Bed Bath & Beyond,

7  which I think at the time was a very, very powerful and

8  desirable tenant, going back and forth on lease terms, and they

9  came up with a recognition that, you know what, we might put

10 these use restrictions in here and have these issues in here,

11 or these limitations in here, but if there's a problem and, for

12 example, in this case, some crazy bankruptcy court says you can

13 assign this anyway, as long as you fight it, I'm not faulting

14 anyone for using violation in the objection.

15        But to say violation in the lease, right, as opposed

16 to breach, it shall be a breach of the lease to assign to

17 someone outside the use restriction.  If it's to say a

18 violation is different than a breach and doesn't give right, it

19 wouldn't even give rise to any enforcement right because they

20 dealt with it and that was a function of the bargaining power

21 between the parties that Bed Bath & Beyond negotiated for a

22 freely assignable lease.

23        And the landlord said, yeah, I want to get you in

24 here and I got you in here and I had to give up the veto right,

25 I guess, over the use restriction.  But, A, I'm dealing with it

 1  in this challenge provision and, B, then I can just go ahead

 2  and enter into a contract or lease with Hobby Lobby and say,

 3  you can't have one of the stores that was expressly permitted

 4  by the assignment in the BBB Pinnacle Hills lease.

 5          That's a lot.  Okay.  That's like --

 6          MR. LEHANE:  I want to answer your question if I

 7  can --

 8          THE COURT:  Usually, to be subject to something,

 9  you've got to agree to it.

10          MR. LEHANE:  Well, excuse me?

11          THE COURT:  To be subject to something, you have to

12  agree to it usually, right?  I mean --

13          MR. LEHANE:  True.  But I think it's important to

14  keep the background context.  The landlord had rights and only

15  the bankruptcy filing of Bed Bath & Beyond took those rights

16  away.  The Bankruptcy Code takes a bunch of rights away, but at

17  the same time it then protects the participants in that

18  complicated economic unit.

19          THE COURT:  And isn't the landlord protected?  So if

20  the Hobby Lobby lease was entered into before the Bed Bath &

21  Beyond lease and there was a use restriction that said you

22  can't have a Michaels in here in the Hobby Lobby lease, we

23  wouldn't be talking about this.  It would be over.  Right?

24          MR. LEHANE:  That's correct.

25          THE COURT:  We would be done.  The landlord

71

1  couldn't --

2          MR. LEHANE:  Wait, excuse me, in the Hobby Lobby

3  lease?

4          THE COURT:  I'm sorry?

5          MR. LEHANE:  In the Hobby Lobby lease, there is.  It

6  says you can't allow Michaels.

7          THE COURT:  I'm sorry.  In the Hobby Lobby lease

8  before the Bed Bath & Beyond.  If the timing was reversed,

9  right.  The timing was reversed.  Hobby Lobby is before --

10         MR. LEHANE:  Bed, Bath --

11         THE COURT:  -- Bed Bath & Beyond --

12         MR. LEHANE:  Certainly --

13         THE COURT:  And then, the Bed Bath & Beyond lease

14 says you can't, you can assign, but you can't assign to another

15 arts and crafts store.

16         MR. LEHANE:  Right.

17         THE COURT:  Then the landlord is fully protected with

18 respect to the benefit of its bargain, right?

19         MR. LEHANE:  Right.  But the landlord can only

20 protect the benefits of bargain to the extent it knows what its

21 shopping center looks like now.  And shopping centers are

22 dynamic places, right.  The leases don't all terminate at the

23 same time.  Things change over time, as evidenced by the Dollar

24 Tree lease and the Hobby Lobby lease, which have come in within

25 the last five years.  The situation now is drastically

different than it was 15 years ago when the Bed Bath & Beyond
lease was put in place.  And Congress specifically protected
the shopping centers now, at the time of the assumption, by
giving protections to those other tenants for the situation
now.  And I think that's the plain meaning of the argument.

You can drive down really deeply on breach versus
violation, but the plain reading and the way the statute was
originally written was this is going to protect the other
tenants against the failure of one tenant now, and the harms
aren't that tremendous and terrific.  I will say the original
bid that Michaels put in for this was $100,000, Your Honor, and
there has been exponentially greater amount of time spent on
that because the absurd results that have been suggested by
counsel for Michaels and the debtor, we would say are
contradicted by the tremendous results achieved to date.

Whereas, the Toys R Us decision we believe is wrong
and we believe following it would do extreme harm and undermine
the specific protections that Congress intended the other
participants in the shopping center industry to have.  And it's
a very careful balance.

And also, I'll say this.  There's a lot of, or not a
lot, but some mention by both Mr. Fiedler and Mr. Hershey that
there's nothing in the Bankruptcy Code that could otherwise
protect these landlords against these harms.  And that's just
absolutely incorrect as well.  There's a very broad provision

1   that says -- it's 363(e) -- anytime the debtor sells, uses, or

2   leases anything that another party has an interest in, the

3   bankruptcy court shall provide adequate protection to the other

4   parties with an interest in that property being used, sold, or

5   leased.

6          That's a very broad provision.  It's used in a lot of

7   other contexts, right, and the Bankruptcy Code weighs and

8   balances the harm when it's considering lifting the automatic

9   stay or considering the appointment of examiners.  It

10  oftentimes demands that the courts look to the potential harms

11  by what's going to happen.

12         Here we have a very specific provision of the

13  Bankruptcy Code.  Congress said you must protect the shopping

14  centers not just the landlords, but the other parties as well.

15  The financing agreements, the master agreements, and the other

16  leases in the shopping center.  And we think a very plain

17  language, common sense read is why there's very little

18  litigation on this.

19         I think if you read the decisions underlying Toys R

20  Us, they're deeply flawed.  And with respect to Sears, the

21  important point of Sears, that the district court said this is

22  a heightened standard, and the bankruptcy courts can't just

23  rewrite the standards that Congress put in place because they

24  don't like them.  And why it's relevant here is because, in

25  that case, it went to, A, it was the financial condition and

1  the judge found that transform is perfectly fine.  It's got a

2  net worth of $50 million, but he also found it is not of

3  similar financial condition to the debtor when the tenant

4  entered into this lease because when Sears entered into the

5  initial lease, it was one of the most powerful financial

6  companies in the world.  They just were not similar.

7  And the district court judge said you may be correct

8  that it is significant financial wherewithal, but that's not

9  what the Bankruptcy Code says.  And what the Bankruptcy Code

10  says is very specific and clear and you can't just rewrite that

11  to suit your purposes.  So we think that here it would be

12  suiting the purposes to let one narrow set of transactions go

13  through that really is a very small subset, even of the total

14  leases the debtors has tried to assign.  They've assigned 135

15  leases successfully.  We're hung up on three of them because

16  they fall within protections that Congress provided to the

17  Bankruptcy Code.

18  That's less than 5 percent of their total lease

19  assignments.  It's far less than the total amount of leases

20  that they had, Your Honor.  So, look, we understand that it's

21  very important for the debtor to maximize its value.  Both of

22  these clients are also creditors of the estate, right.  But it

23  is a liquidating company, right, and they are difficult

24  decisions.  We don't think that the need to maximize value

25  trumps the protections that Congress granted to the shopping

1  centers.

2          And in short, you --

3          THE COURT:  How about in the <u>Sears</u> case that I

4  thought -- I think that was Judge McMahon.

5          MR. LEHANE:  It was.  Colleen McMahon.  Correct.

6          THE COURT:  She went into a very, very detailed and

7  thoughtful discussion about D, and how -- which D runs --

8          MR. LEHANE:  The D argument --

9          THE COURT:  -- in all candor, completely contrary to

10 your C argument in a lot of ways, and your D arguments, because

11 you said you just got to look at it in the context of the

12 bargain between the debtor and the landlord.

13         MR. LEHANE:  But you need to have evidence that there

14 will be no disruption and she found there was no evidence of a

15 disruption.

16         Here, to the contrary, the only evidence that we have

17 is that there will be a disruption.  Not only from the

18 declaration of Jeff Aronoff, who specializes in tenant mix and

19 balance, right.  He worked on these properties specifically.

20 He's been there.  This is what Jeff Aronoff does, right.  And

21 he said there will absolutely be an impact, and a negative

22 impact, on the tenant mix and balance in the shopping center.

23         THE COURT:  But if you look at it in the context of

24 the Hobby Lobby Pinnacle, I mean, I'm sorry, Bed Bath & Beyond

25 Pinnacle lease, is it fair for Pinnacle Hills to get Hobby

1  Lobby as a tenant in part on the basis of the free

2  assignability clause, and then, 14 years later, enter into a

3  lease with a third party that they know nothing about, that Bed

4  Bath & Beyond knows nothing about, and then restrict that very

5  broad assignment provision?  Isn't that kind of having it both

6  ways?

7          MR. LEHANE:  They had the right to terminate outside

8  of bankruptcy, Your Honor, and --

9          THE COURT:  Yeah, but you know that that's one that's

10  not the 365(f) --

11          MR. LEHANE:  Right.

12          THE COURT:  -- and all that.  That's different.  But

13  you know, that the other, as far as the B and C and all that.

14  But I'm just having a bit of a more difficult time with that.

15  It just seems like an unintended benefit to parties that

16  were -- to the landlord who got the benefit of the tenant in

17  the first place, and then just eviscerates it by entering into

18  another agreement 14 years later that restricts the use in a

19  manner that wasn't contemplated by that lease.

20          MR. LEHANE:  Well, look, we think it's, in my mind,

21  it's commercially reasonable for them to say Bed Bath & Beyond

22  can use that for whatever they want to now, right.  But, and if

23  Bed Bath & Beyond changed its use, there was nothing that

24  Pinnacle Hills could have done or the Pinnacle power center.

25          THE COURT:  Arts and crafts.

1          MR. LEHANE:  Right.  Bed Bath & Beyond had an

2     unlimited lawful use, right.  But the point is, once you file

3     for bankruptcy, you stop paying rent, you can reject the lease,

4     completely breach it, right.  And our claims under that are

5     capped and we'll get paid whatever it is.  In this case, there

6     will probably be no return.  And we no longer have that right

7     to terminate.  That was really the protection they had, was to

8     say, if we're in a situation where the assignment is going to

9     breach these other two leases, we have the ability to say, hey,

10     Bed Bath & Beyond, you can't do that assignment.

11          And obviously, at that point, Bed Bath & Beyond has

12     decided they want out if they're going to assign it outside of

13     bankruptcy.  And the landlord and Bed Bath & Beyond, by that

14     15.1.2, are able to have that negotiation, essentially.

15          THE COURT:  So, if Bed Bath & Beyond just was doing a

16     reorganization and part of the reorganization was that they

17     were going to shift their focus from bed and bath to arts and

18     crafts, and Hobby Lobby was already there, right, Hobby Lobby

19     was already in there as an arts and crafts store.

20          MR. LEHANE:  We would have a very different

21     conversation going on, Your Honor, because if there's no

22     assumption in an assignment of the lease, right, and then I

23     believe that --

24          THE COURT:  No, I said assumption.  I said there is

25     assumption.

1          MR. LEHANE:  Right, but there's no assignment.

2          THE COURT:  Right.

3          MR. LEHANE:  Right, there's just assumption for

4  purposes of changing their use.  I think it's a very different

5  conversation.

6          Bed Bath & Beyond had almost unfettered use of the

7  premises, and that is different.

8          THE COURT:  Why?

9          MR. LEHANE:  Because there's no assignment and the

10  Bankruptcy Code is very clear about this.

11          THE COURT:  So what?

12          MR. LEHANE:  So you don't get your shopping center --

13          THE COURT:  If I do the plain language, right --

14          MR. LEHANE:  Yeah.

15          THE COURT:  If I do the plain language, wouldn't them

16  changing to the -- it says the assumption or assignment, it

17  doesn't say the assumption and assignment.  It says assumption

18  or assignment is subject to the provision of any other lease.

19  And the Hobby Lobby lease says you can't have another arts and

20  crafts store.  Why is that different?

21          MR. LEHANE:  Perhaps we would be -- I haven't

22  considered this one before, Your Honor.  I guess it is.

23  It's --

24          THE COURT:  It's not a bad argument.

25          MR. LeHANE:  It's not a bad one.  It's a good one.

1                       (Laughter)

2             THE COURT:  All right.

3             MR. LeHANE:  And, look, going to 365(d)(3) to tenant

4   mix to (d), it used to say substantial disruption.  It doesn't

5   anymore.  They amended it, right.  It's now any disruption, and

6   it's their burden to show that there will not be any

7   disruption.  And I think the evidence that we have shows that

8   there will be a disruption.  So as a result, I think the

9   assignment also fails on the tenant mix arguments.

10            THE COURT:  Okay.  All right.

11            MR. LeHANE:  You know, Your --

12            THE COURT:  I appreciate that.  I thank you.  Well, I

13  guess parties wanted some rebuttal, and we'll get to 12:20.  So

14  I don't know what the plan is with regard to the other leases.

15  Can you help me on that?  Is that --

16            MR. LeHANE:  So I think I probably can from my

17  perspective, Serramonte Center.  We also represent Daly City

18  Serramonte Center.  And many of the arguments are almost

19  exactly the same.  There may be some nuance to them, and

20  counsel for Burlington or the debtors may want to make some.

21            But those are -- you have competitors, Burlington,

22  Ross.  And the Ross leases, it's undisputed that they have

23  provisions in them which say you can't operate a certain

24  percentage of the square footage in this center as a discount

25  retailer, and that's what Burlington would be operated as.  So

80

1  the argument is you'll be breaching these.

2          Now there's some nuance to those, but I think the

3  larger arguments are the same, that Congress was protecting the

4  landlord and the shopping center and the other tenants.

5          THE COURT:  Even if they didn't have an agreement?

6          MR. LeHANE:  Right.  Yeah.

7          THE COURT:  Debtor.

8          MR. LeHANE:  Yeah, I think --

9          THE COURT:  Or warrants subject to something that's

10  --

11          MR. LeHANE:  That's right.

12          THE COURT:  -- runs with the land --

13          MR. LeHANE:  Right.

14          THE COURT:  -- like a master -- like the reciprocal

15  --

16          MR. LeHANE:  Yeah.

17          THE COURT:  -- easement agreement and/or restrictive

18  covenants or a master agreement or -- well, that might not run

19  with the land.

20          MR. LeHANE:  Yeah.

21          THE COURT:  But a financing agreement, that kind of

22  thing.

23          MR. LeHANE:  Can you put the one other slide up,

24  Phil?

25          There is one quote from the congressional legislation

81

1  that we think is, it's actually exactly the same hypothetical

2  that we have here where the legislative history says if you had

3  a women's wear store assigned to a men's wear store, that could

4  have a negative impact on the other men's wear stores in the

5  shopping center and we're protecting against that, that with

6  both (c) and (d).

7         So certainly appreciate it, but the similarities

8  between the arguments, Serramonte lease also has the right to

9  terminate.  The 15.2.1, it's almost exactly identical, right.

10  And it would clearly breach the Ross exclusive protective use

11  provision.  Happy to answer any other questions on that.

12         THE COURT:  I asked you enough questions.

13         MR. LeHANE:  All right.  Thank you, Your Honor.

14         THE COURT:  Thank you.

15         MR. MAIRO:  Your Honor, for the record, John Mairo of

16  Porzio Bromberg & Newman on behalf of the Landlord DPEG

17  Fountains, LP.  Are we going to conclude with the Pinnacle

18  arguments and then turn to Serramonte and DPEG?  That's how I

19  understood it.  Or are we trying to do it all in one enchilada?

20         THE COURT:  Well, I think that's exactly the question

21  I had.  And I think what Mr. LeHane said is that it's really

22  the same arguments with Serramonte, just perhaps some nuances.

23  So I think the rebuttal, unless you're going to just tell me

24  that you agree with what Mr. LeHane said and then that would be

25  for rebuttal for them, I guess.  Unless you want to make new

82

1 and different arguments.

2          MR. MAIRO:  I certainly want to argue for DPEG

3 Fountains some different arguments.  I don't know if it makes

4 sense to do it now or let them rebut to the Pinnacle and

5 Serramonte.

6          THE COURT:  I think we might as well just finish

7 Pinnacle right now, so yeah.

8          MR. FIEDLER:  Okay, Your Honor.  I'll be fairly quick

9 here.  Just --

10          THE COURT:  Everybody says that.

11          MR. FIEDLER:  Yeah.  Just a few points on rebuttal.

12          Mr. LeHane talked about common sense at the outset.

13 Not common sense to put the number one competitor next to each

14 other.  I don't know if they're the number one competitor, but

15 the landlord acknowledges in Ms. Elliott's declaration that it

16 happens all the time.  At least 19 times and perhaps 30 times

17 are they next to each other.

18          And so I think the common-sense argument in that

19 respect is a little far-fetched.  I will also say there was

20 nothing prohibiting Hobby Lobby from entering into an amendment

21 with the landlord right when Bed Bath filed to add every

22 exclusive under the sun under its lease just knowing that Bed

23 Bath might assign its lease out to another party.

24          And so it would be unfathomable to think that the

25 debtors would be bound by an amendment to that lease that adds

1  say 100 exclusives including every other store that Bed Bath or

2  Bed Bath was seeking to assign to a new tenant.  And so common

3  sensically, I don't think we should be binding the debtor to a

4  lease that is subsequent in time and which the debtor had no

5  clue was entered into.  That's the first point on common sense.

6        The second point is on tenant mix.  The landlord

7  asked the Court to look to the Power Center and not the

8  shopping center.  And I think the inquiry ends right there.

9  The shopping center is clearly defined in the lease as one

10 integrated shopping center that includes the Power Center and

11 the Promenade.  And it would be one thing if the landlord said

12 the tenant mix and the Power Center will certainly be upset but

13 the tenant mix and the whole shopping center will be upset, as

14 well.  They didn't do that.

15       As Mr. Aronoff made clear in his testimony in his

16 declaration, it wasn't even part of the discussion to address

17 the shopping center.  They only addressed the Power Center, and

18 there's a reason for that, because there was no intent behind

19 tenant mix and use for the entire shopping center.  And even if

20 there was, the landlord can't prove that it's disrupted by

21 adding Michaels.

22       I will also say, Your Honor --

23       THE COURT:  What about I think he said that you don't

24 have any evidence that the tenant mix won't be disrupted?

25       MR. FIEDLER:  Well, I think there's a wealth of

1    evidence, Your Honor.  First, the idea that there are over a

2    hundred stores in the shopping center and the landlord admits

3    that there's only one that is engaged in a craft item-oriented

4    business and that's Hobby Lobby.  The other potentially being

5    Dollar Tree, the landlord couldn't even confirm if that was a

6    craft-oriented business.  And granted, they do sell craft

7    items, but there are several other stores in the shopping

8    center that sell the same exact items.

9           Further, there's nothing in the lease or in a master

10   agreement relating to the shopping center that specifies some

11   intent to get to tenant mix and balance.

12          THE COURT:  There is a master agreement?

13          MR. FIEDLER:  There is not.

14          THE COURT:  No.

15          MR. FIEDLER:  And that's my point, Your Honor.

16          THE COURT:  I thought you said there's nothing in the

17   lease or the master agreement.

18          MR. FIEDLER:  Or a master agreement.  There --

19          THE COURT:  There's no --

20          MR. FIEDLER:  There is no --

21          THE COURT:  There's nothing in the lease and there is

22   no master agreement.

23          MR. FIEDLER:  That's right.

24          So tenant mix requires an intended tenant mix.  And

25   there's a great example for why context matters and why that

1 interpretation should be applied to 365(b)(3)(C).  Tenant mix

2 does not exist in a vacuum, and a court can't decide what

3 selection of stores is an ideal tenant mix.  And I think the

4 evidence shows that the landlord can't prove there's an ideal

5 tenant mix, it can't prove there's a tenant mix that was

6 intended.  And I think the evidence shows that there is no

7 tenant mix that is being upset here.

8        THE COURT:  But that's not their burden.  The burden

9 is on the debtor to show that there's no disruption to the

10 tenant mix.

11        MR. FIEDLER:  That's right, Your Honor.  I think the

12 Amendola declaration proves that.  I think the directory that

13 we submitted to Your Honor shows that.  And there's nothing in

14 the landlord's deposition or testimony that would show any

15 disruption to the tenant mix in the shopping center.  They're

16 only talking about a subcollection of stores in the Power

17 Center.  And that's just tenant mix.

18        I will say and want to address the point which is

19 what we were discussion not too long ago about it being black

20 letter law that you can't modify a lease subject to certain

21 exceptions.  What the landlord is asking you to do, Your Honor,

22 is place additional restrictions in the Bed Bath lease that it

23 didn't negotiate or ask to negotiate in the lease it executed

24 or any subsequent amendment.  So rewriting the lease to put an

25 additional restriction on the debtors' ability to assign it is

1    not appropriate.

2           While the Bankruptcy Code does allow the modification

3    of certain contracts, it doesn't do so in favor of non-debtor

4    parties, as the Court ruled in Bon Ton Restaurant & Pastry Shop

5    in the Northern District of Illinois, "It is not intended that

6    a non-debtor party should acquire greater rights in a case

7    under the Code than he has outside of the Code.  A lessor

8    cannot insist that bankruptcy law give him what the lease

9    itself does not."

10           And I think that --

11           THE COURT:  I don't remember that case.  Was that

12   case cited to me?

13           MR. FIEDLER:  It's 53 B.R. 789, Your Honor, 1985 out

14   of Northern District of Illinois.

15           THE COURT:  What was the name of it?

16           MR. FIEDLER:  Bon Ton Restaurant & Pastry Shop.

17           THE COURT:  Okay.

18           MR. FIEDLER:  And so that's what's really key, Your

19   Honor, that the landlord is asking the Court to rewrite the

20   lease.

21           And the last point I'll make about the rent abatement

22   is it's really irrelevant -- or I'll stay on tenant mix for a

23   second.  It's really irrelevant what might happen to one tenant

24   in the shopping mall, shopping center.  The landlord makes the

25   argument that Hobby Lobby would be significantly disadvantaged

1  by putting Michaels a store away from it even though that

2  exists in numerous shopping centers throughout the country.

3       But what tenant mix really gets at is the proposed

4  assignment creating an upset of the balance of the entire

5  shopping center, not just what happens to Hobby Lobby.

6       And so I think, Your Honor, I can conclude there

7  unless you have any questions.  I do want to make actually one

8  more point, and I'm going a little longer than I said I would.

9  But I think you're right, Your Honor.  If there is a covenant

10  or zoning or master agreement that's recorded on the property

11  that makes it enforceable against the debtor, there is notice

12  in the record that the circumstance is that the debtor be bound

13  by whatever is in that agreement.  And if there was a

14  restriction on the property, we would be bound by that and we

15  would be put on notice of that.

16       But it begs the question why there's not a master

17  agreement here or some sort of covenant prescribing certain use

18  restrictions, particularly if this was supposed to be a

19  shopping center that we're talking about.  And so I think the

20  fact that there's no master agreement is important in kind of

21  relaying the fact that the landlord did not intend a tenant mix

22  that the tenants be bound by.

23       So with that, Your Honor, I'll conclude unless you

24  have any questions.

25       THE COURT:  No, I don't have any more questions.

1 Thank you.

2          MR. FIEDLER:  Thank you, Your Honor.

3          MR. HERSHEY:  Good afternoon.  I guess now it's

4 afternoon, Your Honor.  Sam Hershey from White & Case for

5 Michaels.  I will be extremely brief.

6          Two points, the first is Mr. LeHane makes the

7 argument that Section 365(b)(3)(C) so obviously applies to the

8 leases of other tenants in the shopping center that it's never

9 been litigated.  If it's so obvious, why has court after court

10 said the opposite?  I mean even if it is dicta, as he observes,

11 court after court that we have cited to you have said that you

12 look solely to the debtors' lease.  Those courts have not found

13 it so obvious that that provision means you look to other

14 leases.

15          THE COURT:  Well, other than <u>Toys 'R Us</u>, there's not

16 that many courts that --

17          MR. HERSHEY:  Well, no, that's not true, Your Honor.

18 The <u>Trak Auto</u> case, the <u>Ames</u> case, I mean those cases -- I mean

19 his response is that it's dicta, but those cases do say you

20 look to the debtors' lease to determine the application of use

21 provisions under 365(b)(3)(C).

22          The same could be said for the congressional record.

23 Mr. LeHane went through a presentation with a lot of slides.  I

24 did not see a single slide showing a quote from the

25 congressional record saying we have to look to other leases

89

1  beyond the leases that the debtor has agreed to, whether that's

2  a master lease or the lease that the debtor has in the shopping

3  center.

4        The last point I'll make, Your Honor, is on tenant

5  mix and balance.  We have an unambiguous lease agreement here.

6  I'm not sure we need to look to the extrinsic evidence.  I

7  think we look to that lease agreement.  But even if we were to

8  do so, tenant mix is about the nature of the shopping center.

9  I think Mr. LeHane actually made this point when talking about

10  the men's wear versus women's wear.  It attracts a different

11  clientele.  That's what it's about, about letting in a tattoo

12  parlor or a burlesque club, something like that, not letting in

13  a competitor to one of the existing tenants.

14        When Your Honor reads Mr. Aronoff's declaration or,

15  sorry, his deposition transcript, rather, you'll see again and

16  again examples that he just walked through of competitors

17  existing within the Promenade shopping center.  It's very

18  common for competitors to exist in the same shopping center.

19  That's not what tenant mix is about.  It's about the nature of

20  the center, the nature of the clientele.

21        Thank you very much.

22        THE COURT:  Thank you.

23        Mr. LeHane.

24

25        MR. LeHANE:  Thank you very much, Your Honor.  I'll

1  try to be very brief.

2       First of all, co-existence does not mean successful

3  co-existence.  I think whatever may be happening elsewhere with

4  Michaels and Hobby Lobby is irrelevant, right.  And even the

5  debtors' witness, Mr. Amendola, who by the way and I'd suggest

6  that you look at it, he has no expertise in tenant mix and

7  balance, limited familiarity with the concepts.  But he admits

8  that Michaels will have a negative impact on the Hobby Lobby

9  lease sales and will have a negative impact on tenant mix and

10  balance in the shopping center, right, so --

11       THE COURT:  Well, didn't you say it might be

12  initially negative and then it will be positive?

13       MR. LeHANE:  Exactly.  There will be a negative

14  impact.  And the statute doesn't say substantial.  It says any

15  impact.  And even their witness admits that, and Jeff Aronoff

16  who specializes in this absolutely states in his declaration

17  that putting Hobby Lobby -- Michaels right next to Hobby Lobby

18  in that portion of the shopping center will disrupt the tenant

19  mix and balance in the shopping center.  It's the debtors'

20  burden to show there will be no disruption.

21       Mr. Fiedler and Mr. Hershey, with all due respect,

22  are not experts in tenant mix and balance.  The only witness we

23  have heard that has any experience in tenant witness -- tenant

24  mix and balance is Jeff Aronoff, Senior Vice-President of

25  Brookfield Properties.  And his declaration makes it absolutely

1  clear that there will be a disruption of tenant mix and balance

2  in the shopping center.  Thank you very much, Your Honor.

3          THE COURT:  Thank you.  I appreciate it.

4          All right.  I think we're concluded with the

5  Pinnacle's and Serramonte, and now we move on to Fountains.  Is

6  there a -- I mean I think probably it makes sense for Mr. Mairo

7  to give his presentation and then we would go to your response.

8  Does that make sense or do you want to go first?  It's your

9  motion.

10          MR. FIEDLER:  It's fine if Mr. Mairo goes first.

11          THE COURT:  Okay.

12          MR. MAIRO:  Thank you, Your Honor.

13          For the record, John Mairo of Porzio Bromberg &

14  Newman on behalf of the Landlord DPEG Fountains LP.

15          Your Honor, DPEG is pursuing its objection based on

16  365(b)(3)(C) grounds, the use exclusivity provisions of another

17  lease in the Fountains shopping center would be breached.

18  We're no longer pursuing a tenant mix/balance argument under

19  365(b)(3)(D).  We have stipulated to certain facts and that

20  will be getting sent to Your Honor within the next I think half

21  hour.

22          And the Fountains lease is attached to the stipulated

23  facts.  And part of the stipulated facts is that the parties

24  have agreed that the Fountains Center is a shopping center for

25  purposes of 365.  And we have stipulated, as well, that a true

1  and correct copy of the DPEG and Ross lease are attached to the

2  objection that we filed that was at ECF 1344.

3      There has been a reference to Mr. Amendola's

4  declaration being admitted into evidence.  I do want to point

5  out that his declaration does not state that he reviewed the

6  DPEG-Ross lease, nor did Mr. Amendola speak to whether the use

7  exclusivity provisions of the DPEG-Ross lease would be violated

8  or breached.

9      DPEG contends that the debtors have not met their

10 burden of showing adequate assurance.  Your Honor, I view this

11 as fairly straightforward.  365(b)(3)(C) is clear on its face.

12 And the proposed assignment to Burlington must be shown to not

13 breach any use or exclusivity provision in the DPEG-Ross lease

14 which is another lease in the shopping center.

15     And the DPEG-Ross lease says, and this is at Section

16 15.3(a) that, "No tenant or occupant of the shopping center

17 other than tenant may use" -- and then I'm skipping over some

18 unnecessary language -- "use its premises for the off-price

19 sale as hereinafter defined of merchandise or, B, use more than

20 10,000 square feet of leaseable floor area of its premises for

21 the sale of apparel except for discount department store in

22 excess of 85,000 square feet of leaseable floor area."

23     Then further on in that Section 15.3(a), Burlington

24 is identified as an off-price retailer.  And the Bed Bath lease

25 that we're in question here to be assigned is for over 25,000

1  square feet.  Obviously, much more than 10,000.

2          So on its face, the use exclusivity provision is

3  getting breached violated.  Then you go to subpart (b) in the

4  Ross lease, Section 15(b), the exceptions.  And, first of all,

5  it says that the section is limited to tenants and occupants

6  operating as of the effective date under the existing leases.

7  But importantly, this section, 15.3(b), is different than the

8  Serramonte-Ross lease which appears to extend exceptions to

9  "any assignments or subleases of tenants on the effective

10 date."

11         However, under the DPEG lease, the Ross-DPEG lease,

12 even though Bed Bath was excepted as a current tenant, there is

13 no language relating to assignments.  So if Burlington violates

14 or breaches the use exclusivity provisions, 15.3(b) does not

15 except out Burlington.  Accordingly, under Section

16 365(b)(3)(C), the assignment Burlington would breach the DPEG-

17 Ross lease's use exclusivity provisions so the proposed

18 assumption to Burlington must be denied.

19         Now a couple of other points, Your Honor, there was

20 reference made at the outset about the Dhanani declaration,

21 which is DPEG's declaration in support of its objection, being

22 admitted into evidence, and that's at Document 1573 on the

23 docket.  Paragraphs 11 and 12 of that declaration, in Paragraph

24 11, it certified that it's his understanding, the declarant's,

25 that the proposed assignment of the Bed Bath lease to

1  Burlington if approved would result in a violation of Section

2  15.3 of the Ross lease, which would expose DPEG to potential

3  damages in the form of, A, termination of the Ross lease which

4  has approximately 66 months remaining and approximate rent owed

5  for that time period of over one and a half million dollars or,

6  B, Ross would have the option of paying substituted rent of

7  either its minimum rent or two percent of gross sales during

8  the preceding month.

9          The point there, Your Honor, as has been talked about

10 with respect to the Pinnacle lease, the landlord here could be

11 exposed to significant claims from Ross.  And the language of

12 365(b)(3)(C) talks about a breach.  It doesn't talk about

13 debtors' breach, landlord's breach, tenant's breach.  It's just

14 a breach of another lease.  And I know there was a little

15 disagreement on this side as to whether use exclusivity

16 provision that is violated, would it be considered a breach.

17         Mr. Fiedler said the landlord would be breaching, not

18 the debtor.  Mr. Hershey said I'm not sure the landlord would.

19 But neither of these folks are going to be the Court and be

20 determining whether or not my client is going to be facing

21 claims from Ross.  And that ties in with something Mr. LeHane

22 mentioned in terms of 363(e), adequate protection.

23         If this is going to be sold in some way, the

24 leasehold interest, we need to be adequately protected.  And

25 that would be setting aside significant sums for the benefit of

1  my client to be able to protect itself against any type of

2  claims that may be brought.

3        And the other paragraph I wanted to raise in the

4  certification is Paragraph 12.  Just that Ross has objected to

5  the assignment of this lease to my client, has directed them to

6  consider and to pursue an objection because of Section 15.3 of

7  the lease.

8        I also want to just hit upon something that has been

9  raised and Mr. LeHane covered this, as well.  But there's been

10 a fair amount of discussion in the papers as well as in oral

11 argument about how on a certain level, like the sky is falling

12 if Your Honor were to uphold these objections.  Retail cases

13 would end.  It would turn the Bankruptcy Code on its head.

14 It's just not true.

15       And as Mr. LeHane detailed, the Bed Bath case proves

16 it.  The enforcement of 365(b)(3) as argued by the landlords

17 before you today will only impact three proposed assumptions,

18 and the debtors have successfully assigned over I think I heard

19 125 shopping center leases.  So applying 365(b)(3)(C) according

20 to its terms which are clear, plain meaning, would not lead to

21 absurd results.

22       Another point that was made is, oh, you're taking

23 value potentially away from the estate if the objections are

24 upheld.  Well, look, maybe a little bit less would be paid by

25 Burlington but, Your Honor, as Mr. LeHane said, that's all part

1  of the balance of the Bankruptcy Code.  There are provisions

2  that protect nondebtors.

3         And Burlington acknowledges in its pleading that

4  price adjustments have already occurred to its bid.  In

5  Paragraph 2 of Burlington's reply which is at ECF 2058,

6  Burlington admitted, "The debtors withdrew one lease from their

7  bid package resulting in an adjustment to the purchase price."

8  Presumably, a similar price adjustment would occur if the

9  Fountain's lease was removed.  Thus, the debtors' estate would

10 still get the benefit of Burlington's bid for all the other

11 leases.

12        And I guess I'll just close, Your Honor, with a point

13 that I think I heard towards the end from Mr. Fiedler saying to

14 the Court that it's not appropriate to rewrite leases.  I would

15 say my argument in sum is that it's not appropriate for this

16 Court to rewrite the Bankruptcy Code, specifically Section

17 365(b)(3)(C).

18        THE COURT:  Well, I guess I'm being asked to

19 interpret what that other lease provision means, and that's

20 where I'm having the issue.  But also, on the adequate

21 protection argument, if the lease is assigned subject to all

22 its terms, the Bed Bath-Fountain's lease, then what else --

23 what other adequate protection would debtor be required to

24 provide if the lease is being assigned subject to all its

25 terms?

1          MR. MAIRO:  I think the request would be to set aside

2     money from that for some type of reserve to protect the

3     landlords in the event they're faced with lawsuits from Ross.

4          THE COURT:  To protect the landlord from the breach

5     of its agreement with the third party that came after the

6     debtors' Bed Bath and the landlord's lease was Bed Bath &

7     Beyond.

8          MR. MAIRO:  That would be right, Your Honor.  But on

9     a certain level, I also don't want to lose sight of the primary

10    argument that in my view we don't even go there because a

11    strict application of the Bankruptcy Code requires denial of

12    the assignment.

13         THE COURT:  Right.  That argument I get.  I totally

14    get that.

15         MR. MAIRO:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17         MR. FIEDLER:  All right.  Back again, Your Honor.

18         THE COURT:  All right.

19         MR. FIEDLER:  Just real quick, Your Honor, I did not

20    hear anything in Mr. Mairo's recitation that would be different

21    than the Pinnacle Hills' assignment or the Serramonte

22    assignment.  And so all the arguments previously made in

23    support of the Michaels assignment I think apply equally to

24    this assignment.  I just want to correct --

25         THE COURT:  Well, to be fair, I think what he's

1  saying is it doesn't have like the Pinnacle Hills-Bed Bath &

2  Beyond lease, it doesn't have that out if you're contesting the

3  assignment in good faith.  Is that right or am I wrong on that,

4  Mr. Mairo or no?

5       MR. MAIRO:  I'm not aware of that provision, Your

6  Honor.

7       THE COURT:  Okay.

8       MR. FIEDLER:  Okay.  So just a few points, Your

9  Honor.  Mr. Mairo said I think that if the objection was

10 sustained, Burlington would just pull it out and we'd still get

11 the other leases.  The estate's still going to lose money if

12 that happens.  There is almost $1.5 million at stake here.  And

13 so my question to Mr. Mairo and his client is at what point is

14 the money to be gained by the estate not enough, right?

15      And so, yes, Burlington had 44 leases.  One of those

16 was pulled out because the lease was actually terminated, and

17 Your Honor was made aware of that.  But there is significant

18 money at stake.

19      The second point refers to the first thing Mr. Mairo

20 said I think was that Mr. Amendola didn't review the Fountains

21 lease in his declaration, but in Paragraph 17 of his

22 declaration, it makes clear that he did.  And that says, "In

23 reviewing the Fountain lease, I understand" and it continues

24 on.  But I'll turn just to the provisions of the Fountain lease

25 itself.

1          Under 25(b) of the Fountains lease, the debtors are

2   authorized to assign the lease for certain permitted uses.  The

3   Fountain leases further provides tenants, assignees, and

4   sublessees shall be permitted to use the premises or applicable

5   portion thereof for the uses permitted by Section 25.  The

6   prohibited uses in turn fail to prohibit the operation of the

7   Fountains lease premises by Burlington.  There's nothing in the

8   Fountain lease that would prohibit Burlington from using that

9   premises for its apparel operations.

10          And similar to the Pinnacle Hills violation, the

11  landlord here is violating the warranties and representations

12  that it made in the use of the premises by objecting to the

13  assignment here.

14          Notwithstanding the fact that the Fountains lease

15  expressly permits the assignment of the lease to Burlington,

16  Fountains also alleges that the lease will violate exclusives

17  and a non-debtor tenant lease in the non-debtor lease of Ross

18  Stores.  I think we made ourselves clear in the prior

19  discussion with Pinnacle Hills that Bed Bath should not be

20  bound by an exclusive in a lease to which it did not enter into

21  and could not have possibly known about.

22          And so I think the lease expressly permits the use by

23  Burlington.  There's no exclusive within the lease that would

24  prohibit the assignment to Burlington.  And there is a

25  provision in Section 23(d)(3) that talks about the future

1  exclusives and says that the lease provides that any future

2  exclusive should not relate to the sale, rental or distribution

3  of apparel or apparel accessories.  And I think Burlington fits

4  squarely within that definition of 23(d)(3) of the lease.

5  And so I think the lease expressly provides or

6  permits for the assignment to Burlington.  There's nothing in

7  the lease that the landlord has pointed to that would say

8  otherwise.  And unless Your Honor has any questions, I think

9  we'd rest on the argument we made in connection with the

10 Pinnacle Hills assignment.

11 THE COURT:  I think they're basically the same

12 arguments except for these nuances, those details.

13 Mr. Mairo?  Oh, I'm sorry, Burlington is -- I think

14 Burlington didn't --

15 MR. JUNG:  Good afternoon, Your Honor.

16 Wojciech Jung, Womble Bond Dickinson, on behalf of

17 Burlington.  Your Honor, the way we view the issues before Your

18 Honor is that they are squarely legal issues and not so much

19 factual issues.  As Mr. Mairo said, we did enter into a

20 stipulation that's probably being filed as I speak.  But the

21 issue, Your Honor, as I said is legal.  Plenty of argument has

22 been made by the debtors, by Michaels that are fully applicable

23 to the leases that Burlington seeks to take over.

24 Your Honor, I would specifically address briefly

25 issues raised by Mr. Mairo that Your Honor's ruling in the

1  landlord's favor would not disrupt the assignment and

2  assumptions of leases in retail cases.  And he specifically

3  points to the fact that the debtor was successful in assuming

4  and assigning many leases to prospective buyers, potential

5  buyers, including Burlington.

6          But as Your Honor noted in other context, the meaning

7  of that, if any, could be turned around.  One could say that

8  the other landlords subject to those leases did not take the

9  absurd position that the two landlords are taking here, right.

10 One could say they were rational.  They did not fight the

11 debtors' proposed assumptions because the law and the statute

12 is quite clear.

13         The statute refers to the lease in question which is

14 a debtor cannot be bound by a lease that it is not a party to.

15 Any by analogy, Your Honor, there is plenty of case law in the

16 context of claim objections related to rejection damages, for

17 example, when a debtor rejects a lease.  And when someone else

18 files a rejection damage claim saying, hey, I was somehow

19 impacted by the debtors' rejection of a third-party claim,

20 courts clearly say that that party has no right to complain

21 because it did not -- it is not, excuse me, a party to that

22 lease.

23         And, Your Honor, that analogy I would suggest is

24 squarely applicable here.  So, Your Honor, for those reasons

25 and incorporating arguments raised by Michaels and the debtors,

1 we would rest on the papers and request tat Your Honor --

2          THE COURT:  I'm not sure I understood the last

3 argument.  Could you say --

4          MR. JUNG:  I apologize?

5          THE COURT:  The last argument, what was that?  The

6 one that you just made about --

7          MR. JUNG:  With respect to --

8          THE COURT:  The rejection.

9          MR. JUNG:  Correct, Your Honor.  There are instances

10 where a debtor rejects a contract and a third party, another

11 party to the contract files a claim before a bankruptcy court

12 that's saying I was somehow impacted by the rejection of that

13 contract and seeks whatever damages they would seek from the

14 debtor.

15          And there are cases, there are plenty of cases that

16 say that, sure, maybe you're somehow impacted by the debtors'

17 rejection of a contract, but you have no reason to complain

18 because you are not a party to that contract.  The debtor has

19 never contracted to protect you.

20          Your Honor, similarly, here I would say that the

21 landlord assumes the risk when it enters into a contract that

22 that contract may be assigned to someone else.  And the only

23 meaningful way to protect itself in that situation is to

24 expressly contract or enter into provisions and agreements in a

25 contract that prevents or prohibits the tenant from assuming a

1  contract to a party the landlord may not find acceptable.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Mairo, do you have any rebuttal?

5          MR. MAIRO:  Thank you, Your Honor.

6          John Mairo for the record.

7          If I heard Mr. Jung correctly, I think he's on some

8  level characterized our arguments as absurd and irrational.  I

9  completely disagree.  I don't understand --

10         THE COURT:  No, I'm not finding any arguments are

11 absurd or irrational.  For example, I don't know out of the

12 other landlords' leases that were assumed and assigned whether

13 parties had potential objections or didn't have them.  So I

14 don't know how I can as to the use.  So I don't know how I can

15 give that any weight one way or the other.  It just doesn't

16 seem to -- it's just not something that is a fact in this case.

17 It's just not here.  So I'm not going to --

18         MR. MAIRO:  Fair enough, Your Honor.

19         THE COURT:  I'm not going to consider that either

20 way.

21         MR. MAIRO:  Thank you, Your Honor.  Again, and

22 certainly we view it as just a strict application of the

23 Bankruptcy Code.

24         And I wanted to just hit upon something that Mr.

25 Fiedler mentioned in terms of Mr. Amendola's declaration.  He

1  does not reference the DPEG-Ross lease.  In Paragraph 5, he

2  describes reviewing the leases of Bed Bath & Beyond's leases

3  with the leases that are considered to be assumed and assigned.

4  And then Paragraph 17 that Mr. Fiedler referenced is not the

5  DPEG-Ross lease.  That's again the Bed Bath-Fountains lease.

6          So I just wanted to be clear that Mr. Amendola's

7  declaration he does not say he reviewed the Ross-DPEG lease, he

8  does not reference it in Paragraph 17.  And it is the debtors'

9  burden to establish adequate assurance.  And I don't believe

10  they have, Your Honor.

11          THE COURT:  Well, there's no dispute that the

12  Fountains lease with Ross prohibits the Burlington use, right?

13          MR. MAIRO:  I agree.

14          THE COURT:  So, in contrast, that is something that's

15  in the record.

16          MR. MAIRO:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          All right.  That's it for the presentations I guess.

19  And it's 1:00, so that's a good time to break.  I need to

20  digest all this, and I know there's time pressures involved in

21  the sense that there's -- well, this is -- I think the

22  landlords were gracious in saying no rent during this period

23  from July 31st to August 31st while this gets decided.  I don't

24  know if it goes beyond that, but I would like to decide this

25  today but I may need some time.

1          And I was wondering whether -- I mean there's a lot

2    of parties here that are very -- that are charging the estate

3    or charging their clients.  And it's going to be a couple of

4    hours at least or sometime later this afternoon.  So if the

5    parties want to go back to their offices and work on other

6    things or limit the time for now and I'll go bank on the record

7    and I anticipate being able to read my decision into the record

8    later on, although with today's technology, maybe you can work

9    from here and it doesn't really matter.  But I give you that

10   option.

11          MR. FIEDLER:  I just want to make one note, Your

12   Honor.  While Mr. LeHane's clients have agreed to waive

13   obligations for September, the same is not true for the

14   Fountains landlord.  And I think it's our position that any

15   obligation for rent in September would not be required from the

16   debtors.  And to the extent Your Honor were to rule in their

17   favor, there will just be a lease termination or rejection as

18   of the end of this month.

19          THE COURT:  In other words, another reason for me to

20   decide today.

21          MR. FIEDLER:  I don't want to put pressure on you.

22          THE COURT:  No.  That's all right.  I can handle it.

23          MR. FIELDER:  All right.  Thank you, Your Honor.

24          MR. HERSHEY:  Sam Hershey from White & Case, Your

25   Honor, for Michaels.  If Your Honor wants counsel to stay,

1  we're certainly happy to.  Otherwise, I think at least the

2  White & Case team are based in New York and we would return to

3  the office and join virtually when Your Honor reads your

4  ruling.  Whatever Your Honor prefers, of course.

5          THE COURT:  I have no preference.  I'm just going to

6  --

7          MR. HERSHEY:  I think that's what we'll do, Your

8  Honor.

9          THE COURT:  I was just offering it to you as a way to

10  hopefully limit the expense to -- because, like I say, it could

11  be --a few hours, you know.

12          MR. HERSHEY:  And that's our goal too is to limit the

13  expense.  That's what we'll do.  We'll join virtually later

14  whenever Your Honor is ready to read the ruling.

15          THE COURT:  All right.

16          MR. HERSHEY:  Thank you very much.

17          THE COURT:  And otherwise, we'll make -- you know

18  what, and then I was just thinking of another alternative,

19  Juan, is that we could also make conference rooms available to

20  the parties.  They can go there.

21          MR. FIEDLER:  Your Honor, does it make sense to maybe

22  set a time later for today to put forth a conference call

23  available for folks that aren't going to be joining in the

24  courtroom or does it make sense for everyone to join via Zoom

25  at that time?

1          THE COURT:  I think since everybody's been doing it

2   by Zoom all along, I think we should continue the Zoom.

3          MR. FIEDLER:  Okay.

4          THE COURT:  Those kinds of issues are not my forte.

5          MR. FIEDLER:  Yeah, yeah, yeah.  I understand.

6   That's on us.

7          THE COURT:  I'm fine with people appearing by Zoom,

8   appearing in person.  What I do know is that Court Solutions

9   and Zoom doesn't usually work, so it's going to be Zoom or in

10  person.

11         MR. FIEDLER:  Okay.  Yeah, I've experienced that

12  before, by the way.

13         THE COURT:  All right.

14         MR. FIEDLER:  All right.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         All right.  Thank you for all the professionalism,

17  and really exceptional presentations.  You make my decision a

18  difficult one, but that's what I have to do and I'm going to --

19  I have every intent of deciding today, okay.

20         Thank you very much.

21         MULTIPLE COUNSEL:  Thank you, Your Honor.

22         THE COURT:  Thank you.  Bye bye.

23         (Recess at 1:02 p.m./Reconvened at 5:25 p.m.)

24         THE COURT:  Okay.  We're back on the record in the

25  Bed Bath & Beyond case, 23-13359.  We had a hearing this

1  morning at which certain evidence was admitted into the record.

2  I'll describe it in more detail in a few moments.  But

3  basically, there were stipulations, there were deposition

4  transcripts that were admitted in excerpts.  And there were

5  also declarations that were admitted.  However, there was no

6  testimony.  And there was extensive argument.

7           So before the Court today are the objections filed by

8  three landlords to the motion of the debtors here, Bed Bath &

9  Beyond, Inc., and its affiliated entities, we'll collectively

10 call them the debtors, to the assignment of certain leases by

11 the debtors.  Two of the leases are intended to be assigned to

12 Burlington Stores, and those assignments are opposed by the

13 Daly City Serramonte Center, which I'll call Serramonte, and

14 Landlord DPEG Fountains, LP.  We'll call them Fountains.

15          The third is intended to be assigned to Michaels

16 Stores, and that assignment is opposed by the Landlord Pinnacle

17 Hills, LLC, Pinnacle we'll call them, and collectively the

18 objecting landlords.  The objections are based primarily on or

19 really exclusively on 11 U.S.C. 365(b)(3)(C) and (D) which

20 apply to shopping centers and are referred to as the use,

21 restrictive use and tenant mix and balance provisions.

22          There has been extensive briefing on the issues

23 before the Court including the following papers.  As to the

24 Pinnacle proposed assignment with Michaels as the proposed

25 assignee, is Document 1323, an objection to the assignment

1    filed by Pinnacle on 7/12; Document 1383, a response by

2    Michaels filed on 7/17; Document 1926, a surreply by Pinnacle

3    filed on August 18th and supported by the declarations of

4    Jeffrey Aronoff at 1927 and Kristin S. Elliott at 1928.

5         Document 2059 was a further reply by Michaels filed

6    on August 25th.  Document 2062 was an omnibus response by the

7    debtor filed on 8/25 and supported by the declaration of Emilio

8    Amendola, Document 2062-1.

9         As to the Serramonte lease, which is the proposed

10   assignee as Burlington, there was Document 1388, a limited

11   objection filed by the Landlord Serramonte on 7/12.  And on

12   August 18th, a supplemental objection was filed by Daly City

13   Serramonte at 1929 and supported by the declaration of Ernst

14   Bell.  And then there was a Burlington omnibus reply filed on

15   8/25, Document 2058, and the omnibus response by the debtor on

16   8/25, as I noted at 2062 and 2062-1.  There also was a

17   stipulation of undisputed facts at Docket 2087.

18        And then, finally, as to the Fountains lease, and the

19   assignee again proposed is Burlington, Document 1933; a

20   supplemental objection by Fountains and a joinder in Pinnacle's

21   opposition to the Michaels arguments; Document 1573, a

22   certification of Nikhil Dhanani, filed by Fountains.  The

23   Burlington omnibus reply at 2058, and the debtors' omnibus

24   reply at 2062 and 2062-1.

25        As I noted briefly earlier, the Court scheduled an

1  evidentiary hearing on these motions for today, but the need

2  for live testimony was obviated by the parties' agreement to

3  admit into evidence the direct testimony contained in each of

4  the declarations described above.  In addition, the parties

5  agreed to admit into evidence in lieu of cross-examination

6  certain excerpted portions of the depositions of Mr. Aronoff

7  and Mr. Amendola.  And then, finally, as noted, the debtor and

8  the Serramonte landlord and the debtor and the Fountain

9  landlord submitted stipulations today.

10       The Court admits each of these documents into

11  evidence.  As a result, today's hearing consisted entirely of

12  the arguments of counsel as well as the admission of those

13  documents.

14       By way of background, the debtors filed these cases

15  under Chapter 11 for reorganization on April 23rd, 2023.  The

16  debtors have indicated a primary focus in this case has been to

17  maximize the value of its assets for all stakeholders including

18  through the sale of its below-market leases which is also

19  referred to as lease optimization efforts.  These efforts

20  included conducting Phase I and Phase II Lease auctions.

21     Numerous objections were filed to those proposed

22  assumptions and assignments.  The objections were based on cure

23  costs and adequate assurance, also, the debtors' financial

24  ability to perform.  And those objections were largely or

25  completely resolved.  There were also other objections based on

1   those issues, as well as tenant mix and exclusivity provisions.

2          Most of those as far as this Court knows have also

3   been resolved, although I'm not 100 percent sure which way

4   they've all been resolved.  I assume some resulted in

5   withdrawal of the leases from the motion and some were in

6   connection with withdrawal of the objections.  That said, the

7   objections that are the focus of today's hearing relate

8   exclusively to the tenant mix and exclusive use provisions in

9   the leases and only those grounds, 365(b)(3)(C) and (D), as

10  acknowledged by the parties.

11         This Court has jurisdiction over this matter under 28

12  U.S.C. 1334(b), and the standing orders of reference entered by

13  the District Court for New Jersey on July 10th, 1984, as

14  amended on September 18th, 2012.  This is a core proceeding

15  under 28 U.S.C. 157(b)(2)(A) and (O).  Venue is proper in this

16  Court under 28 U.S.C. 1408.

17         The Court issues the following findings of fact and

18  conclusions of law pursuant to Federal Rule of Bankruptcy

19  Procedure 7052.  To the extent any of the findings of fact

20  might constitute conclusions of law, they're adopted as such,

21  and the reverse is also true.

22         The applicable law under 365(f)(2)(B), a trustee or

23  debtor in possession that seeks to assign an unexpired lease to

24  provide adequate assurance of future performance by the

25  assignee.  Section 365(b)(3) then defines what adequate

112

1  assurance of future performance means in the context of a lease

2  in a shopping center.

3       Section 365(b)(3) of the Bankruptcy Code has four

4  subsections applicable to shopping centers including (C) and

5  (D) which as noted are at issue today.  Subsection (C) requires

6  adequate assurance that "assumption or assignment of such a

7  lease is subject to all the provisions thereof, including but

8  not limited to provisions such as a radius, location, use, or

9  exclusivity provision and will not breach any provision

10  contained in any other lease, financing agreement, or master

11  agreement relating to such shopping center."

12       That's (C), and the focus there is in any other lease

13  relating to such shopping center.  And subsection (D) requires

14  adequate assurance that assumption or assignment of such lease

15  will not disrupt any tenant mix or balance in such shopping

16  center.  That's 11 U.S.C. 365(3)(D).

17       Shopping centers are not defined by the Bankruptcy

18  Code, but here they are defined by the lease between Bed Bath &

19  Beyond and Pinnacle, the landlord.  And Section 1134 of the

20  lease provides that the shopping center known as Pinnacle Hills

21  Promenade located in Rogers, Arkansas, the shopping center

22  consists of two retail shopping centers which shall be operated

23  as a single operating -- single integrated shopping center.

24       So there was some dispute today that frankly caught

25  the Court a bit by surprise as to whether the shopping center

consisted of the integrated shopping center known as the

Promenade, Pinnacle Hills Promenade, which consists of over 100

stores, or what was so-called Power Center which includes just

12 stores but may be defined as big box retailers that include

the lease with Bed Bath & Beyond that is sought to be assigned

to Michaels as well as the leases with Dollar Tree and Hobby

Lobby.  They're all in the Power Center.

I'm going to go by the lease and find that the

shopping center consists of the two shopping centers that are

operated as a single integrated shopping center.  So that is

the Court's holding on that point, which is based on the

agreement of the parties and is pretty clear to me.

Based on the pre-hearing briefing and evidence and

argument presented today, the Court is convinced that the

objections under 365(b)(3)(C) and (D) could be resolved as a

matter of law as was suggested by certain of the parties.  But

the Court will first address the legal issues which largely

overlap and also Fountains and Serramonte both expressly joined

in the Pinnacle surreply.  And then the Court will address the

certain factual issues under 365(b)(3)(D) in the alternative.

The landlord's primary argument under 365(b)(3)(C) is

that the assignments to Michaels and Burlington as proposed

should be prohibited because the addition of those stores to

the shopping malls would violate the exclusive use provisions

the objecting landlords have granted in leases entered into

1  subsequent to the leases with the debtors and in some cases, in

2  most cases, more than ten years after the lease with Bed Bath &

3  Beyond.

4          But as to the plain language, the Supreme Court has

5  instructed that when the meaning of the statute is plain, the

6  Court's inquiry and there, that's Bostock v Clayton County,

7  Georgia, 141 S.Ct. 1731, 1749.  The Third Circuit feels the

8  same way.  Burton v. Schamp, for example, 25 F.4th 198, 207 (3d

9  Cir. 2022), quoting, "As always statutory interpretation begins

10 with an examination of the statute's plain language."

11         Accordingly, this Court turns first to the disputed

12 phrase provision in 365(b)(3)(C) that states that the

13 assignment proposed will not breach any radius, location, use,

14 or exclusivity provision in "any other lease, financing

15 agreement, or master agreement in such shopping center relating

16 to such shopping center."

17         There are no temporal or other restrictions on this

18 phrase, thus, the objecting landlords argue that that should be

19 the end of the analysis.  In other words, a proposed assignment

20 must not breach any other lease, with emphasis on the word

21 "any," a landlord may have entered into with respect to the

22 subject shopping center including those such as the ones

23 Pinnacle has with Hobby Lobby and Dollar Tree and the other

24 leases relating to the Serramonte and Fountains shopping

25 center, all of which were entered into years after the Bed Bath

1  & Beyond lease.

2          In the case of the Hobby Lobby and Dollar Tree lease,

3  they were more than a decade after the debtors' lease, 14 years

4  as to Hobby Lobby and 12 as to the debtor -- as to Dollar

5  Store.  The same is generally true as to the lease with the

6  Serramonte which was entered into about three years before and

7  with Ross and the one with Ross and Fountains which was also

8  many years, entered into many years after the BBB lease.

9          And the Court acknowledges that there is appeal to

10  the plain language argument, and it is frankly one that I

11  struggled with.  But I don't believe that the plain language

12  canon or principle is the only one that is at play here for

13  various reasons, which I will describe.  The Court will also

14  consider Supreme Court precedent that holds the plain meaning

15  of legislation should be conclusive except in rare cases in

16  which the literal application of the statute would --

17          UNIDENTIFIED SPEAKER:  (Indiscernible).  I don't

18  think so.

19          THE COURT:  I'm sorry.

20          UNIDENTIFIED SPEAKER:  I'm not --

21          THE COURT:  Hello?

22          I'm just going to continue.  The literal application

23  of the statute will produce a result demonstrably at odds with

24  the intentions of its drafters.  Griffin v. Oceanic

25  Contractors, Inc., 458 U.S. 564, 571.  This Court finds that

1 this is one of those rare cases where a strictly literal

2 application of the phrase "any other lease" in 365(b)(3)(C)

3 would be at odds with the intentions of the drafters of 365.

4         The Court also will consider the related principle of

5 statutory interpretation that the provisions of the statute

6 must be read in the context of the statutory scheme as a whole.

7 Gundy v. United States, 139 S.Ct. 2116, 2126 (2019).  Statutory

8 interpretation is a holistic endeavor which determines meaning

9 by looking not to isolates words but to text and context along

10 with purpose and history.

11         When those canons of statutory construction are

12 applied, it becomes clear to the Court that the phrase "any

13 other lease" could not have been intended and was not intended

14 to mean a subsequent lease between a landlord and a third party

15 as to which the debtor was not a party.

16         As the District Court for the Southern District of

17 New York persuasively explained in the Sears case, the

18 provisions of 365(b) must be read in harmony with 365(f)(2)(B),

19 Sears Holding Corp, 613 B.R. 51,68 (S.D.N.Y. 2020).

20         That court relied extensively on the Ames Department

21 Store cases in the Bankruptcy Court for the Southern District

22 of New York where the Ames court noted that subject only to

23 certain statutory safeguards, the value of the debtors' leases

24 should go to the debtors' creditors and that leases can be sold

25 to that end with or without the landlord's consent.  Ames

1  Department Stores, 348 B.R. 91,98 (Bankr. S.D.N.Y. 2006).  The

2  Ames cases were the earlier cases that Judge McMahon relied on.

3         As the Burlington Stores' objection notes, the

4  landlords, the proposed interpretation turns 365(b)(3)(C) and

5  (D) into a sword rather than a shield, a sword that bestows

6  upon the landlords a commercially competitive advantage that

7  actually allows them to improve their position to the detriment

8  of the debtors' estate.

9         And that is because applying the plain language

10  argument here would mean that the debtors are bound by

11  restrictive use and similar provisions in any other leases that

12  were entered into after the Bed Bath & Beyond leases, in these

13  cases, often more than a decade later, and make the broad

14  assignment provisions negotiated for by BBB unenforceable based

15  on the landlords' agreement with a third party that the debtor

16  never knew about or much less agreed to.

17         And it would also violate the provisions in the BBB

18  lease that say that BBB is not required to honor any exclusive

19  subsequently given by the landlord.  Thus, the ability of

20  debtors to maximize the proceeds from their leases would or

21  could be severely curtailed by landlords' agreement with other

22  tenants to limit the uses for which the BBB premises were

23  expressly allowed to be used without BBB, Bed Bath & Beyond

24  agreeing to those terms.

25         The landlords would be permitted to eviscerate the

1  debtors' negotiated bargain, a broad assignment provision, by

2  subsequently entering into an agreement with any third party in

3  the same shopping center that restricts uses that Bed Bath &

4  Beyond was expressly permitted to have under their lease.  That

5  would seriously limit BBB's assignment's rights without its

6  knowledge or consent.  And this frankly makes no sense to the

7  Court, especially in light of the legislative history that I

8  will also discuss.

9       The House Report from when the Modern Bankruptcy Code

10 was enacted in 1978 in discussing the shopping mall protections

11 in 365 states that, "To assure the landlord of his bargains for

12 exchange, the court would have to consider factors such as the

13 nature of the business to be conducted by the trustee or his

14 assignee whether that business complies with the requirements

15 of any master agreement and whether the business proposed to be

16 conducted would result in a breach of other clauses and master

17 agreements relating, for example, to tenant mix and location as

18 per House Report 95-595 at 348-349, 1978 U.S.C.C.A.N.

19 5963,6305."

20      It just demonstrates that from the very beginning,

21 the focus was on a landlord's bargain for his rights with the

22 debtor, not with the third parties, including things like

23 master agreements to which the debtor would be the party.

24 Then, in 1984 when Congress decided to enhance or reduce any

25 confusion or lack of clarity in 365(b)(3), the legislative

1  history makes plain that Congress's purpose was to ensure that

2  "the lessor and the other tenants maintain the benefit of the

3  original bargain with the debtor."

4        Later when -- that's Senate Report No. 65, 98th

5  Cong., 166 1ST Sess. 67-68 (1983).  And I emphasize original

6  bargain with the debtor.  Later, when changes were made to the

7  365 by BAPCPA, Senator Hatch stated, "The bill helped clarify

8  that an owner should be able to attain control over the mix of

9  retail uses in the shopping center.  When an owner enters into

10 a use clause with a retail tenant forbidding assignments of the

11 lease for a use different than that specified in the lease, the

12 clause should be honored."  151 Cong. Rec. S. 2455-2361 (March

13 10, 2005).

14       In this case, it is acknowledged by all that the

15 leases at issue do not contain a use clause that would forbid

16 the proposed assignments to Michaels or Burlington.

17       In response, the objecting landlords point to a

18 portion of the legislative history that states that Section

19 (b)(3) provides that in lease situations common to shopping

20 centers, protections must be provided for the lessor if the

21 trustee assumes the lease, including protecting against a

22 decline in percentage rents, breach of agreements with other

23 tenants, and preservation of tenant mix.

24       In this Court's view, that statement is not

25 consistent with those already cited.  The phrase "breach of

1  agreements with other tenants" must be understood to mean

2  breach of agreements with other tenants that were in existence

3  at the time the debtor entered into the lease and would either

4  be incorporated into the lease or part of an agreement or part

5  of a master agreement, not subsequently entered into leases

6  that the debtor had no knowledge of or agreed to.

7        Any other interpretation would expand the rights of a

8  shopping center landlord outside of bankruptcy result which has

9  been virtually as far as this Court knows universally rejected

10  in the case law.  See, for example, <u>Great Atlantic & Pacific</u>

11  <u>Tea Company, Inc.</u>, 472 B.R. 666-675 (S.D.N.Y. 2012).

12        Section 365 does not give the landlord the right to

13  improve its position on the bankruptcy of the tenant.  <u>In re</u>

14  <u>Sears Holding</u>, 613 B.R. 51,70 (S.D.N.Y. 2020).

15        The Bankruptcy Code cannot be read to place the

16  landlord in a better position than it would have been absent

17  the bankruptcy.  And also, as the Third Circuit noted in the

18  <u>Joshua Slocum</u> case, Congress has suggested that the

19  modification of a contracting party's rights is not to be taken

20  lightly, 922 F.2d. 1081 at 1091 (3d Cir. 1990).  At the same

21  time, the <u>Joshua Slocum</u> court noted that the non-debtor party,

22  here the landlord, that the policy is to require that the

23  non-debtor party receive the full benefit of his bargain.

24        Further, the language that is at issue here as to not

25  breaching any provision contained in any other lease, the

argument is made by the debtor and Michaels and also Burlington

is that a debtor can't breach a contract to which it's a party.

Pinnacle's lease with Hobby Lobby, for example, provides that

is to be governed by the laws of Arkansas, and Arkansas law

provides that before a contractual provision can be enforced,

there must be privity of contract between the parties.

There was no privity of contract between Bed Bath &

Beyond and Hobby Lobby or Dollar Tree.  In each instance, Bed

Bath & Beyond's lease precluded those leases in time, and there

was no provision in the Bed Bath & Beyond lease that made it

subject to future lease restrictions.  In fact, the exact

opposite is true.  Section 13.3.2 of the June 1st, 2007 lease

between Pinnacle and Bed Bath & Beyond states that, "Except as

expressly set forth in this Section 3.3, tenant shall not be

obligated to honor any exclusive granted to landlord in any

shopping center."

The objecting landlord's reading of the statute would

also write that "bargain for" provision our of the BBB lease

and that, as noted, is not what was intended according to the

legislative history, as cited above.  It would also give the

landlord extra unbargained for rights by actually breaching the

lease with the debtor.  And I just can't find that that's what

Congress intended.  It just doesn't make sense to me.

And by reading the statute in this way and in

harmony, what I'm saying is that you start out with 365(b) and

1  its focus is on the lease with the debtor and the landlord.

2  And that's where it all derives from.  And then that's the

3  context.  And then if you read it the way I think it is

4  intended is that it wouldn't read the words out of the statute.

5       It would just say that, for example, it would be

6  enforced where the lease was subject to a master lease

7  agreement that said the lease -- the proposed use was

8  prohibited or a reciprocal easement agreement as in the Three

9  A's case that was in place before the tenant agreed to lease

10 the premises, or a financing agreement that was recorded and

11 which the tenant knew about and agreed to or acknowledged or

12 consented to in advance.

13      None of those things are here, but it would allow for

14 the enforcement of the restrictive use provisions in many many

15 cases, and this Court dares to say in cases where that's what

16 was intended and that was what was bargained for by the party.

17 And so, by this reading and I believe I am harmonizing the

18 legitimate commercial expectations of the debtor, the landlord,

19 and other tenants and Congress in enacting 365(b)(3)(C).

20    Outside of bankruptcy, the tenant such as Hobby Lobby

21 could not have expected that the provisions of his lease would

22 supersede provisions in existing tenant lease that was entered

23 into 14 years before.  And then that gets into the other issue

24 where the landlord candidly acknowledges that you can't enforce

25 -- that there's a provision in the leases that allows the

123

1  landlord to terminate the lease in the event of an assignment

2  that it does not approve of.

3         But as the landlords also candidly and forthrightly

4  acknowledged, that kind of provision would not be enforceable

5  in the bankruptcy court.  So that kind of provision would not

6  be enforceable, and we're left with the provisions that allow

7  for the assignment to virtually any -- for any use that's not

8  prohibited by law, essentially.

9         All that said, and as the landlords point out,

10 there's no binding precedent in this jurisdiction, as neither

11 the Third Circuit nor the Supreme Court has ruled on this

12 precise issue.  In a case from another jurisdiction that has

13 been heavily discussed here and factually nearly identical,

14 it's very rare that there's a virtually identical case, but the

15 Toys "R" Us case is one, 587 B.R. 304.

16         It even involved a Ross lease that was a lease with

17 Toys "R" Us that was proposed to be assigned to a Burlington

18 and that they would have been adjacent to each other.  And the

19 court allowed that assignment that was alleged to violate the

20 exclusive use provisions of another lease that was entered into

21 many years after the subject lease with the debtor and that was

22 sought to be assigned.

23         The Court specifically found that the cases cited by

24 landlord did not support its plain language argument argument,

25 although I'll admit there wasn't a long discussion on that.

1  That's at 310.  Nonetheless, Pinnacle urges the Court not to

2  follow Toys, arguing that it was wrongly decided because it did

3  not examine the plain meaning of the statute and relied on

4  dicta from the Fourth Circuit's Trak Auto opinion.

5       The Court is not persuaded by that argument because

6  this Court's own examination of the plain meaning of the

7  statute led it to the same conclusion.  And I will note that

8  that conclusion that it doesn't violate the plain language of

9  the statute was at least tacitly and preliminarily adopted by

10  the district court in the Toys "R" Us case when it refused to

11  grant the landlord a stay pending appeal of the Toys "R" Us

12  decision because the landlord could not show a likelihood of

13  success on the merits based on, among other things, the plain

14  language argument.  That's Brea Union Plaza I, LLC v. Toys "R"

15  Us, 2018 Lexis 123049*3 (E.D.Va. 2018).

16       Pinnacle would suggest that this Court should follow

17  the guidance in the Sears Holding Corp case, 613 B.R. 5172, a

18  case that was referred to earlier.  That case, though,

19  addressed 365(b)(3)(A) and (D) rather than (C), but the

20  rationale behind that ruling and particularly that 365(b)

21  should be read in harmony with 365(f) actually cuts in favor of

22  this Court's ruling today because it's a holistic analysis and

23  that 365(f) refers to the lease with the debtor and so does the

24  beginning of 365.

25       There's also the argument that there will be harm to

125

1  the landlords because there will be rent abatements with Hobby

2  Lobby and Dollar Tree and also with the other stores in the

3  Fountains and Serramonte malls.  The Court also disagrees with

4  that argument because at least certainly in the case of the

5  Pinnacle lease, Section 7.4 provides that any use which would

6  otherwise violate a tenant's exclusive shall not be allowed to

7  continue for any assignment unless landlord does not have a

8  right to approve such assignment.  Here, it is the bankruptcy

9  court and not the landlord that has a right to approve the

10 assignment.

11       Similarly, Section 7.5 of the Hobby Lobby lease

12 provides that a tenant shall not be entitled to abatement and

13 rent if the landlord promptly initiates and diligently pursues

14 all commercially reasonable remedies including without

15 limitation legal action for final approval.  Here, Pinnacle

16 promptly initiated and is diligently pursuing its objection to

17 the proposed assignment.  It's acting in accordance with the

18 lease by bringing the issue before the Court and allowing the

19 Court to decide if the assignment violates the Bankruptcy Code.

20       And as the Toys "R" Us and Martin Store courts

21 observed, the assumption and assignment of the lease is a

22 judicial action that may render the landlord unable to comply

23 with the restriction contained in another lease and the law

24 would excuse performance that has been rendered legally

25 impossible or -- that's 199 B.R. 265.  Or similarly, that

1  provision 7.5 says that the rent isn't going to be abated as

2  long as the landlord proceeds with the objection.

3      And so, similarly, the <u>Toys "R" Us</u> court

4  alternatively found that the assignment would not breach the

5  exclusivity provision because the Court's order would render

6  the landlord without the capacity to prevent Burlington's

7  intended use which was based on the lease with Ross Stores that

8  only applied if the landlord had the capacity to prevent a

9  tenant from selling off-price apparel.

10      And then I also have to note the use of the word

11  "violation" rather than breach, and I think this lease is a

12  very heavily negotiated document and by extremely sophisticated

13  attorneys that, whether it's 2007 or 2019 or 2021, had the

14  Bankruptcy Code and the related assignment provisions in mind

15  when it was drafted.  And a violation is not necessarily a

16  breach as is particularly true in this case with 7.5 because as

17  I understand the lease and as I read the lease, it couldn't be

18  terminated and there wouldn't be any rent abatement as long as

19  the landlord is diligently prosecuting the objection.

20      So then I also note that the Fountains landlord makes

21  a similar argument that it could be exposed to substantial

22  damages pursuant to its lease with Ross, but that 15.3(a) of

23  the Ross-Fountains lease provides that landlord, if it had the

24  capacity to do so, shall not permit any other tenant or

25  occupant of the shopping center to use its premises for the

1  off-price sale of merchandise.

2         So the damages arguments appear to be possibly

3  illusory or, alternatively, I would say the one thing that's

4  clear is that the landlord had knowledge of the Hobby Lobby

5  broad assignment provisions when it entered into these leases.

6  And whether it was to entice the new tenants to enter into the

7  lease or it was just part of the whole negotiating process,

8  what ended up happening was that the landlord gave the

9  exclusive use provisions to the other tenants without getting

10  BBB's consent, without modifying BBB's lease, without BBB even

11  having knowledge of the use restrictions.

12         And I also adopt the argument of the debtors and the

13  tenants that -- the proposed tenants that the damages, if any,

14  and this is what I was getting at, are the result of the

15  landlord's actions that it undertook knowingly in violation of

16  not only the assignment provisions of the Bed Bath & Beyond

17  lease but also the provision that says that they're not going

18  to be bound by any exclusive, yet the landlords are seeking to

19  enforce exclusives of the other tenants.

20         I'm going to find then that I'm not required to

21  reject the proposed assignments based on the plain language of

22  365(b)(3) for all those reasons.  But even in the alternative,

23  even if I were to give effect, full effect to the landlord's

24  plain language argument, the proposed assignments to Michaels

25  and Burlington that I noted here would not result in a breach

1 at all as the lease will continue and the landlord did what it

2 was supposed to do to make it continue.

3 And I'm also reading 365(b)(3)(C) in a manner that

4 places in context with the rest of 365 and allows the landlord

5 to the full benefit of what it bargained for and allows the

6 tenant, debtor tenant to maximize its recovery when it's

7 legally permissive to do so and doesn't effectively not only

8 provide greater rights to the landlord than are available

9 outside of bankruptcy, but also would allow the landlord to

10 breach the lease and specifically the provision that allows --

11 that says that it's not bound by future exclusives and then

12 benefit from that breach.

13 So it respects the rights, this interpretation

14 respects the rights of both parties but doesn't eviscerate any

15 clause at all. What it does is I believe interpret it in a way

16 that was intended by the legislature and the cases that

17 construe it including the very thorough and persuasive opinion

18 of Judge McMahon in the <u>Sears</u> case.

19 So on all those grounds, whether it's because it

20 would lead to a result that was never intended as in the case

21 before the Court here or whether on the basis that you read the

22 statute in context or also on the basis that even if you read

23 it the way the landlords are asking, there is no breach of the

24 lease because the debtor was not party to it and the debtor was

25 not party to it. And if there was a breach -- well, not party

129

1  to it and also the lease itself provides that there's no rent

2  abatement or other damages recoverable in that instance.

3       So I am going to reject the 365(b)(3)(C) arguments as

4  for the reasons described.

5       Subsection (D), turning to that now, requires

6  adequate assurance that assumption or assignment of such lease

7  will not disrupt any tenant mix or balance in the shopping

8  center.  That's (3)(D).  On this issue, the objecting

9  landlord's arguments is that allowing Michaels and Burlington

10 into the shopping centers is unacceptable because they are

11 direct competitors of other tenants such as Hobby Lobby, Dollar

12 Tree, and Ross/Dress For Less.  In fact, some of the leases

13 specifically name these proposed assignees.

14      Oh, I should note here also that Fountains at this

15 point indicated that it was not pursuing the 365(b)(3)(D)

16 argument, so it just applies to the Pinnacle and Serramonte

17 stores.

18      And while it is undeniably debtors' burden to

19 demonstrate adequate assurance under 365(f), in the case of the

20 tenant mix, that burden arises -- before that burden arises,

21 "The burden is on the landlord to establish the existence of an

22 intended tenant mix, and that requires more than simply

23 demonstrating that it has provided each of its tenants with

24 exclusivity provisions."  In re Toys "R" Us, 598 B.R. 233, 242.

25      As the district court found in the Lasalle-Trak Auto

130

1  case, "As a predicate to a finding that a shopping center is

2  entitled to protection under 365(b)(3)(D), the lessor must

3  demonstrate that there was an intended tenant mix in the first

4  instance.  Intent to create a diverse tenant mix must be

5  established in light of the lease terms.  In order to establish

6  that the proposed assignment" -- omitting a word or two there

7  -- "would disturb the tenant mix of the shopping center -- In

8  order to establish that the proposed assignment would have

9  disturbed a tenant mix of the shopping center, the landlord

10 must establish that the tenant mix was part of its bargained-

11 for exchanged in its lease and leases with the other tenants."

12 Lasalle v. Trak Auto, 288 B.R. 114,125 (E.D.Va. 2003)  Also

13 Toys "R" Us Property Co I, 2019 WL *6 (E.D.Va. February 11,

14 2019).

15         Here, as noted, the debtors had a virtually

16 unrestricted right to use the premises for any lawful purpose

17 which would include arts and crafts stores or discount apparel

18 stores.  Then, the Court further notes that tenant mix or

19 balance is not defined in the Bankruptcy Code, but the Court

20 agrees with the reasoning in Sears where the Court in a very

21 detailed and well-reasoned opinion found that given the lack of

22 any statutory definition for the words "tenant mix" and the

23 several possibilities for what it might mean, it makes perfect

24 sense to interpret the phrase "tenant mix" for the purposes of

25 365(b)(3)(D) in light of the lease whose performance is being

1  assured because the tenancy governed by that lease is part of

2  the tenant mix at the shopping center.  <u>Sears</u> 613 B.R. 68.

3        And here, I'm going to adopt the -- and really, in

4  total, the district court's reasoning at Pages 65 to 71 where

5  the court discussed in great detail the legal basis for that

6  interpretation in light of the case law, in light of

7  legislative history, in light of principles of statutory

8  construction.  And although the case is relied upon by the

9  landlords for the (A) portion and the (A) discussion, I find

10 the (D) discussion to be of particular relevance not only here

11 but also in the case of -- I'm sorry, I need to get the case

12 here -- in the case of the analysis for (3)(C), by analogy,

13 because it does require a focus on the lease at issue.

14       And that court, I'll just note in its conclusion

15 after that lengthy and detailed analysis, concluded as follows:

16 "The bankruptcy court cannot be read to place the landlord in a

17 better position than it would have occupied absent the

18 bankruptcy."  That's the <u>Great Atlantic & Pacific Tea Company</u>

19 case, 472 B.R. 675.

20       And then quoting from that case, "Section 365 does

21 not give a landlord the right to improve its position upon the

22 bankruptcy of the tenant.  The statute affords no relief to a

23 landlord simply because it might seek to escape a bargain it

24 made, quoting <u>Rock 49th Restaurant</u> case.

25       So then the court then concludes in support of the

argument and the words that the tenant mix will not be

disrupted, that must be read to guarantee the preservation of

the very businesses or at least the same type and number of

businesses that were resident in the mall just before Sears

declared bankruptcy.  And then it went on to distinguish the

Federated case which I agree with that is a distinguishing

factor, also.

So I think as a matter of law, I need to look at the

lease again between Bed Bath & Beyond and the respective

landlords.  And in none of those leases was any of these uses

prohibited.  So the landlords didn't care to negotiate that in

or weren't able to negotiate that into the leases when they

entered into the lease with Bed Bath & Beyond.  And maybe that

was because Bed Bath & Beyond wouldn't agree to it without it.

And so then to allow the landlord to just get out of that

provision because the debtor filed bankruptcy just does not

make sense to this Court.

So I think in that context, I don't really need to

look at other -- and especially in the context of the entire

shopping center.  When you look at the lease, the lease, these

uses are permitted, so why would that result in a disruption in

the tenant mix and balance as was contemplated by Congress and

the case law in light of the agreement between the parties, the

landlord and the tenant?

At the hearing on August 30th, the parties stipulated

to asserted facts and also the leases were all stipulated into
evidence.  No one pointed out in those leases where the tenant
mix was subject to a master lease or some particular tenant mix
that the debtor agreed to.  In fact, the opposite is true is
that the landlord granted Bed Bath & Beyond very broad rights
to assign the lease and, in fact, did not require it to honor
any exclusives.

So the tenant mix could have been affected by that
because it wasn't required to honor any exclusives, but that
was the deal.  And to give the landlord more rights than it
would have outside of the bankruptcy again is inconsistent for
the reasons stated.

So, again, I think I can decide that as a matter of
law.  But to the extent that we need to get into facts, the
Court finds that the evidence falls short of establishing that
the existing tenant mix is going to be disrupted in the
shopping center as opposed to the Power Center.  The only
evidence that was submitted in Mr. Aronoff's certification
says, "The contractual use, exclusive use, and assignment
provisions of the leases of the various tenants of the Power
Center including the Hobby Lobby lease, the BBY lease, and the
Dollar Tree lease allow landlord to control the tenant mix and
balance at the Power Center and the Promenade."

He had to limit it to the Power Center to even make
that statement.  But as the Court previously found, the

shopping center includes the 100-plus stores and the two stores
that -- the two arts and crafts stores that will be there are
two out of a hundred.  And they are very close to each other,
but to the extent again I have to consider facts and this goes
to the Elliott certification and the -- I'm not sure where it
stands on the Power certification.

        But the Elliott certification makes clear that there
are plenty of places in the country where Michaels and Hobby
Lobby co-exist and where also the other proof about it that
Ross and Burlington co-exist in various places.  But I think
that gives further support to you have to look at the agreement
between the two key parties' argument because it is a function
of the individual leases.

        In some places, the Michaels and the Hobby Lobby at
least two are right next to each other.  So in those cases,
that did not obviously by definition disrupt the tenant mix and
balance because they're there together.  And there's plenty of
other instances where even taking away the ones as to which
there's some question, there are a few stores away in the same
center.

        So that's why you have to look at the agreement
between the parties, and whether it was for whatever reasons
the parties agreed that Bed Bath & Beyond could assign to
essentially whomever it wanted, that to me means that the
tenant mix was not that important because you could assign to

1 anyone who wasn't operating something illegal or a tattoo

2 parlor or something like that.

3        And, further, there is an indication that there would

4 be some possible diminishment in traffic at the Hobby Lobby

5 store, for example, when the Michaels first opens.  But then

6 that there might be beneficial synergies to that.  I don't

7 know.  I'm not an expert in that, but that also seems to make

8 sense to me.

9        And in any event, I don't find that the landlords met

10 their initial burden as to the mix.  But even considering the

11 facts that were provided in the context of the lease, I can't

12 find that there was a disruption of the tenant mix and balance

13 as contemplated by 365(b)(3)(D).

14        So that's the Court's ruling.  I'm going to allow the

15 assignment subject to all the terms of the leases including

16 whatever restrictions there might be and whatever the terms

17 are, they are.  There's no change in any of the terms.  It's

18 just being assigned exactly as it was or as is.  So that's the

19 Court's ruling.

20        MR. LeHANE:  Your Honor, Robert LeHane for the

21 record, Kelley Drye & Warren, on behalf of the Pinnacle

22 landlord and the Serramonte landlord.  Just a few questions,

23 Your Honor?

24        THE COURT:  Sure.

25        MR. LeHANE:  Is all of the evidence offered by all of

1  the parties now admitted into evidence?  I just want to --

2          THE COURT:  Yeah.  I didn't say that?  I'm sorry.

3  It's all admitted into evidence.

4          MR. LeHANE:  Okay.  That includes the leases, the

5  declarations, the Aronoff, the Elliott, the deposition

6  transcript excerpts, and the declaration exhibits?

7          THE COURT:  I meant to say that when I listed all of

8  them.

9          MR. LeHANE:  Yeah.

10          THE COURT:  But apparently I forgot.

11          MR. LeHANE:  Right.

12          THE COURT:  But they're all admitted into evidence.

13          MR. LeHANE:  The additional slides, the -- okay.

14          THE COURT:  They're all in.

15          MR. LeHANE:  Okay.  Now with respect to an order, we

16  would ask that we have time to work through an order, and we

17  would ask for that there would be the typical time to allow the

18  parties to as for file a notice of appeal and not that the

19  order be enforceable immediately.  We would ask to have some

20  time to work through that with counsel for the debtor.

21          THE COURT:  Okay.  That's no problem.  But I'm going

22  to tell you right now I'm not going to say that you can't have

23  those 14 days at least to try to come to the form of order or

24  do whatever it is that you want to do in connection with any

25  appeal.

1          I kind of said this, but maybe I didn't directly say

2   it.  This was a difficult decision for me.  There was a lot of

3   good arguments on both sides, and it required a lot of thought

4   and a lot of consideration and a lot of reading of cases and

5   hundred-page leases in small print.  And that's the way I came

6   out, but it's a difficult issue.  And I appreciate the

7   arguments on both sides.

8          And as much as I appreciate the arguments on both

9   sides, I more appreciate the absolutely impeccable and really

10  in many ways unprecedented professionalism, courtesy, and

11  respect that the parties have shown for each other throughout

12  these proceedings.  I have to call them one way or another, and

13  that means somebody wins and somebody loses.

14         But I appreciate that all the effort that goes into

15  this and even more the professionalism and good faith that has

16  been shown.  For example, that the landlord said let the lease

17  payment go for 30 days or actually 60 days.  That's good faith,

18  to me.  Okay?

19         MR. LeHANE:  Thank you very much, Your Honor.

20         THE COURT:  Thank you.

21         So we'll just mark this order to be submitted.  And

22  you know our Rules, this is not going to happen, but our Rules

23  provide that if the parties can agree, one party can submit on

24  seven days' notice and the other party has the right to object

25  and submit their own form of order.  I think the form of order

1  should be pretty simple, but I haven't seen that mean simple

2  ones in this case.  I'll be waiting on it and I'll be ready to

3  enter it when it's the appropriate time.  Okay?

4          Thank you very much.

5          MULTIPLE COUNSEL:  Thank you, Your Honor.

6          THE COURT:  Much appreciated again.  Have a good

7  afternoon.

8          UNIDENTIFIED COUNSEL:  Same to you.

9          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

10          THE COURT:  I'm sorry for keeping everybody late, but

11  I'm glad we got it done today.  I think it's helpful to all

12  involved.

13          (Proceedings concluded at 6:29 p.m.)

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T I O N**

2          We, KAREN K. WATSON AND DIPTI PATEL, court approved

3 transcribers, certify that the foregoing is a correct

4 transcript from the official electronic sound recording of the

5 proceedings in the above-entitled matter, and to the best of

6 our ability.

7

8 /s/ Karen K. Watson

9 KAREN WATSON, CET-1039

10

11 /s/ Dipti Patel

12 DIPTI PATEL, CET-997

13 J&J COURT TRANSCRIBERS, INC.       DATE:  September 1, 2023

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit B

**Big Lots Transcript**

1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

                                       .  Chapter 11
3    IN RE:                            .  Case No. 24-11967 (JKS)
                                       .
4    BIG LOTS, INC., *et al.*,         .  (Jointly Administered)
                                       .
5                                      .  Courtroom No. 6
                                       .  824 North Market Street
6              Debtors.               .  Wilmington, Delaware 19801
                                       .
7                                      .  Tuesday, January 21, 2025
                                       .  11:00 a.m.
8    . . . . . . . . . . . . . . . .

9                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE J. KATE STICKLES
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Adam Shpeen, Esquire
                               Stephen Piraino, Esquire
13                             Kevin Winiarski, Esquire
                               Jacob Goldberger, Esquire
14                             DAVIS POLK & WARDWELL LLP
                               450 Lexington Avenue
15                             New York, New York 10017

16   For the Committee:        Justin Alberto, Esquire
                               COLE SCHOTZ P.C.
17                             500 Delaware Avenue, Suite 200
                               Wilmington, Delaware 19801
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Gauri Patel, ECRO

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

```
 1   APPEARANCES (CONTINUED):

 2   For Brixmor Operating
     Partnership:                Laurel Roglen, Esquire
 3                               BALLARD SPAHR LLP
                                 919 North Market Street
 4                               11th Floor
                                 Wilmington, Delaware 19801
 5
     For Expressway
 6   Marketplace, LLC:           Ivan Gold, Esquire
                                 ALLEN MATKINS LECK GAMBLE
 7                                 MALLORY & NATSIS LLP
                                 3 Embarcadero Center
 8                               12th Floor
                                 San Francisco, California 94111
 9
     For Gordon Brothers:        Steven Fox, Esquire
10                               RIEMER & BRAUNSTEIN LLP
                                 Times Square Tower, Suite 2506
11                               Seven Times Square
                                 New York, New York 10036
12
     For 5620 Nolensville
13   Pike, LLC:                  Alan Root, Esquire
                                 CHIPMAN BROWN CICERO & COLE, LLP
14                               1313 North Market Street
                                 Suite 5400
15                               Wilmington, Delaware 19801

16   For Burlington Coat
     Factory Warehouse
17   Corporation:               Hailey Oestreich, Esquire
                                 JACKSON WALKER LLP
18                               2323 Ross Avenue
                                 Suite 600
19                               Dallas, Texas 75201

20   For Edgewater Park
     Urban Renewal, LLC:         Seth Niederman, Esquire
21                               FOX ROTHSCHILD LLP
                                 1201 North Market Street
22                               Suite 1200
                                 Wilmington, Delaware 19801
23

24

25
```

1  APPEARANCES (CONTINUED):

2  For Aldi, Inc.:          Karen Bifferato, Esquire
                            CONNOLLY GALLAGHER LLP
3                           1201 North Market Street
                            20th Floor
4                           Wilmington, Delaware 19801

5                           James Rossow, Esquire
                            RUBIN & LEVIN, PC
6                           135 North Pennsylvania Street
                            Suite 1400
7                           Indianapolis, Indiana 46204

8      For Ogden Plaza,
9      BDPM Group, and
       Hartsville DE, LLC:  Carl Kunz, III, Esquire
10                          MORRIS JAMES LLP
                            500 Delaware Avenue
11                          Suite 1500
                            Wilmington, Delaware 19801
12

13 For Highland and
   Sterling, LLC;
14 Big Holdings 2, LLC:     Leslie Heilman, Esquire
                            BALLARD SPAHR LLP
15                          919 North Market Street
                            11th Floor
16                          Wilmington, Delaware 19801

17 For Ross:                Kevin Mann, Esquire
                            Cross & Simon LLC
18                          1105 North Market Street
                            Suite 901
19                          Wilmington, Delaware 19801

20

21

22

23

24

25

1                                        INDEX

2  <u>MOTIONS</u>:                                                          <u>PAGE</u>

3     Agenda
4     Item 18: Ashley Furniture's Motion for Relief            10
                  from the Automatic Stay (D.I. 1603,
5                 filed 1/7/25)

6     Agenda
      Item 15: Motion of Debtors for Entry of an Order         11
7                 (I) Extending Time to Assume or Reject
                  Unexpired Leases of Nonresidential Real
8                 Property and (II) Granting Related
                  Relief (D.I. 1351, filed 12/13/24)
9
                  Court's Ruling:                              21
10

11    Agenda
      Item 13: Thirty-five Individual Motions Seeking          22
12                to Compel Payment of Asserted
                  Administrative Expenses Under Sections
13                503 and 365 of the Bankruptcy Code. For
                  Movants and D.I. Numbers, See Attached
14                Exhibit A.

15                Court's Ruling:                              32

16    Agenda
      Item 19: Motion of Highland and Sterling, LLC and        33
17                Big Holdings 2, LLC to (A) Compel
                  Immediate Rejection of Lease and
18                Surrender Possession of the Premises
                  Pursuant to 11 U.S.C. § 365 or,
19                Alternatively, (B) Grant Landlord Relief
                  from Stay Pursuant to 11 U.S.C. § 362(d);
20                and (C) for Related Relief (D.I. 1605,
                  filed 1/7/25)
21

22

23

24

25

1                                    <u>INDEX</u>

2    <u>MOTIONS</u>:                                              <u>PAGE</u>

3    Agenda
     Item 14: Fourth Notice of (A) Bid Deadline, (B)              37
4            Sale Hearing, and (C) Potential
5            Assumption and Assignment of Certain
             Unexpired Leases (D.I. 1236, filed
6            11/25/24)

7            Court's Ruling:                                      95

8

9    <u>EXHIBITS</u>:                                             <u>PAGE</u>

10   Debtors Lease Exhibits                                       38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 1:01 p.m.)

2               THE COURT:  Good afternoon, everyone.  Please be

3     seated.

4               This is Judge Stickles.  We're on the record in Big

5     Lots, Case No. 24-11967.

6               Good afternoon.

7               MR. SHPEEN:  Good afternoon, Your Honor.  Quickly,

8     I just wanted to do a mic check to make sure everybody on

9     Zoom can hear us at the podium.

10              So, again, good afternoon, Your Honor.  For the

11     record Adam Shpeen of Davis Polk on behalf of the debtors and

12     debtors-in-possession. I am joined today by my colleagues,

13     Brian Resnick, Stephen Piraino, and others from the Davis

14     Polk law firm as well our co-counsel from Morris Nichols.

15              Your Honor, we filed an agenda last week on January

16     16th for today's hearing at Docket No. 1739.  We filed an

17     amended agenda the following day on January 17th at Docket

18     No. 1776, a further amended agenda last night at Docket No.

19     1784, and a yet further amended agenda filed about 45 minutes

20     ago at Docket No. 1798.

21              The good news is that the reason we've been filing

22     so many amended agendas, as my colleague, Mr. Piraino, will

23     discuss, is that many of the items that were originally

24     scheduled to be heard today have either been consensually

25     resolved or we have agreement to adjourn the matter until our

1   next omnibus hearing which is currently scheduled for

2   February 26th.

3          Your Honor, before we get into the specific agenda

4   items we thought it might be helpful to give Your Honor and

5   other parties in interest a brief status update since the

6   sale concluded about two weeks ago.  So, Your Honor, the good

7   news is that the GRP sale transaction was consummated on

8   schedule.  It closed on Friday, January 3rd, the day after

9   Your Honor entered the sale order.  We filed a notice of sale

10  closing on January 6th at Docket No. 1588.

11         Your Honor may have seen that five notices of

12  appeal were filed last week on January 16th, which was the

13  final day of the 14-day appeal period, with respect to the

14  GRP sale order and the accompanying orders shortening notice.

15  I won't discuss in any detail today except to say that the

16  debtors believe that these appeals are meritless and we'll

17  respond in due course.  Since the sale to GRP closed, we have

18  been -- we, the debtors, have been primarily focused on a few

19  critical work streams.

20         First, with respect to the transfer of assets to

21  GBRP and other designated buyers in the winddown of our

22  operations, the debtors and GBRP have been performing under

23  the terms of the sale agreement. The debtors have been

24  receiving payments according to the budget schedule that was

25  worked out as part of the APA and we have been working with

1   GBRP in transferring designated assets in accordance with the

2   asset purchase agreement.  So, that process is proceeding

3   well and at pace.

4        Second, just to preview for Your Honor as a coming

5   attraction, Your Honor may recall that one of the main

6   excluded assets from the GBRP sale was the debtors corporate

7   headquarters where the debtors will retain any proceeds of

8   the sale of the headquarters in excess of $10 million.  The

9   debtors have been in advance discussions with a buyer and

10  have been trading drafts of the sale agreement.  We may be

11  before Your Honor very soon requesting approval to proceed

12  with the sale of that asset.

13       Third, the debtors filed their exclusivity period

14  extension motion with respect to a plan and disclosure

15  statement on January 6th at Docket No. 1590. The debtors were

16  pleased that no parties objected to the requested relief and

17  that this Court enter the exclusivity extension order prior

18  to this hearing at Docket No. 1755.

19       Zooming out, we, the debtors, are in close dialogue

20  with the committee regarding how best to resolve these cases.

21  That is front of mind and we intend to do so to resolve so

22  these cases in a manner that is most efficient, whether

23  that's through a plan, a conversion, or dismissal.  So, no

24  decision has been made yet.  We are actively considering all

25  options but the extension of our exclusive period to file a

1  plan and disclosure statement is certainly helpful with

2  respect to that process.

3        Fourth and finally, one agenda item that we would

4  like to get out of the way at the outset has to do with -- is

5  the two motions filed by Nexus that was scheduled to be heard

6  today. I am pleased to announce that as reflected on the

7  agenda, Nexus has agreed to adjourn both motions to a later

8  date because the debtors and the committee have reached a

9  settlement in principle to resolve our and the committee's

10 objections with respect to those motions.

11       We, the committee, Nexus, are working to document

12 this settlement as we speak via stipulation, which we're told

13 Nexus aims to file under certification of counsel in very

14 short order following this hearing.  So, we wanted to, you

15 know, cross that off of the agenda for today.  And I don't

16 know whether counsel for Nexus is on the line, if they wanted

17 to say anything, so I will pause, but we can move on from

18 that agenda item.

19       So, with that, Your Honor, unless Your Honor has

20 any questions regarding the update, I will turn the podium

21 over to Mr. Piraino to walk through the specific agenda

22 items.

23            THE COURT:  Okay.

24            MR. PIRAINO:  Good afternoon, Your Honor.

25            THE COURT:  Good afternoon.

1        MR. PIRAINO:  Stephen Piraino, Davis Polk &

2   Wardwell on behalf of the debtors.

3        Your Honor, just before going into the substance I

4   just wanted to give a quick roadmap of how we would like to

5   proceed today.  First, there is a stipulation in progress

6   with Ashley Furniture to resolve their lift stay that my

7   colleague, Mr. Winiarski, will go through very briefly just

8   to give the Court an update on that.  We would then like to

9   go through our 365(d)(4) extension motion, address the

10  various administrative expense claim motions that were filed

11  and then end with the various lease sale matters as set forth

12  in the agenda.

13       THE COURT:  Are the parties in agreement to that?

14       MR. PIRAINO:  Okay, thank you, Your Honor.  With

15  that I will just cede the podium quickly to Mr. Winiarski.

16       MR. WINIARSKI:  Good afternoon, Your Honor.  Kevin

17  Winiarski, Davis Polk, on behalf of the debtors.

18       I rise now just to briefly discuss the Ahsley

19  Furniture lift stay motion, which Ashley filed at Docket No.

20  1603.  As Your Honor may know from Ashley's papers, the

21  motion sought to lift the automatic stay so that Ashley could

22  liquidate certain furniture inventory that had previously

23  been manufactured and designated for sale to the debtors

24  pursuant to the terms of a custom supply and manufacturing

25  agreement between Big Lots and Ashley.

1          Your Honor, I am pleased to report that as we

2    previewed in the amended agenda, the debtors, Ahsley, and

3    GBRP have reached a business deal in principle that would

4    allow for the listing of the stay subject to certain terms

5    and conditions on the resale of the afore mentioned furniture

6    inventory.  The parties are currently working to document

7    these terms and a revised form of order which we will expect

8    will be filed under COC by Ashley shortly after this hearing.

9          So, as we noted in the amended agenda, Ashley's

10   motion is not going forward today and we thank both Ashley

11   and GBRP's counsel for working constructively over the last

12   week to resolve the matter. Unless Your Honor has any

13   questions or Ashley's counsel, Mr. Schwaberg (phonetic), I am

14   not sure if he is on the line, has anything to add I will

15   turn the podium back over to Mr. Piraino.

16          Thank you.

17          THE COURT:  Okay, does anybody want to be heard

18   with respect to Ashley?

19      (No verbal response)

20          THE COURT:  Okay, I hear no one.

21          MR. PIRAINO:  Your Honor, again for the record,

22   Stephen Piraino, Davis Polk & Wardwell.

23          Your Honor, I now would like to turn to Docket No.

24   1351 which is the debtors motion for an extension of the

25   365(d)(4) deadline.  The debtors initial 120 day period to

1  assume or reject their unexpired leases expired on January

2  7th, 2025 and this Court entered a bridge order at docket No.

3  1551 extending the deadline through and including today.  The

4  debtors are seeking an extension of the deadline through and

5  including April 7th, 2025 which would be the full 210-day

6  period permitted by the bankruptcy code.

7       As of today, the debtors have over 850 leases and

8  extension of the 365(d)(4) deadline is a critical component

9  to GBRP getting the benefit of its bargain on the designation

10  rights it purchased as part of the asset purchase agreement

11  approved by this Court.  The GBRP sale order at Docket No.

12  1556 confirms this.  There is a finding in Paragraph (u) that

13  states, and I quote, "The designation rights are an integral

14  part of the APA and the sale."

15       As Your Honor will recall from the sale hearing,

16  GBRP purchased designation rights for all of the debtors

17  leases and under the APA the designation rights period would

18  run through February 28th, 2025 and can be extended by GBRP

19  in its sole discretion until March 31st, 2025. The debtors

20  submit that given the designation rights period in the APA

21  extending the deadline as requested in the motion is

22  appropriate under the circumstances.  GBRP certainly needs

23  the certainty that it could exercise their rights as

24  bargained for under the APA and to the extent GBRP does not

25  designate a lease during that period the debtors will need

1   time to determine what to do with those leases which is why

2   the full 210, instead of just to March 31st, is appropriate

3   here.

4          Your Honor, Section 365(d)(4) provides that the

5   deadline can be extended for cause which is, as we know, not

6   defined in the bankruptcy code.  Rather, the decision to

7   extend is within the sound discretion of the Court.  As set

8   forth in our papers, there are certain non-exclusive factors

9   that courts have used to evaluate whether cause exists.  The

10  so-called Burger Boys factors.  We believe that the record in

11  these cases, particularly after the sale hearing,

12  demonstrates that the factors do weigh in favor of extending

13  the deadline.

14          Again, I won't go through all of the factors but,

15  for example, the leases are certainly an important asset of

16  the estate and, again, I will point back to that Paragraph

17  (u) of the sale order that I just quoted.  And, obviously,

18  the value of the designation rights are derivative of the

19  value of the leases themselves.  These cases are certainly

20  complex given the number of leases across the country,

21  numerous landlords.  While the debtors have been before the

22  Court since September, the sale to GBRP has only closed three

23  weeks ago. Importantly, as set forth in the record of the

24  sale hearing, GBRP is paying the go-forward occupancy

25  expenses as set forth in the APA and the agency agreement.

1          Your Honor, there were eight objections filed.  We

2    are pleased that we resolved all but one at this point.  Just

3    to go through those quickly:

4          Docket 1435 was filed by various landlords, that

5    has been withdrawn.

6          Docket No. 1439 was filed by Core Shoppes, also

7    withdrawn.

8          Shortly before the hearing Steger Towne Crossing

9    withdrew their objection.  Their objection was filed at 1440.

10         We were able to resolve in advance of the hearing

11   the objections filed by Commodore at 1447 and Kin at 1438.

12         Then we have also had constructive dialog with Mr.

13   Gold who filed an objection at Docket No. 1701 and Ms. Roglen

14   who filed at Docket 1703.  With respect to Mr. Gold, I think

15   we are just confirming some amounts but we should, otherwise,

16   be there.  And with respect to Ms. Roglen who has a good

17   number, as you know, of landlords in this case, we are still

18   confirming a few numbers but believe that we have resolution

19   as set forth -- as I will set forth right now.

20         I guess two pieces to that.  One, we are continuing

21   to go through our records to make sure that our records, the

22   landlords records on go forward expenses are clarified, that

23   everything matches up.  Second, realizing that there is a

24   good amount of work to do to go through the 20 or so leases

25   that are remaining, what we would propose solely with respect

1   to the leases at 1703 is to extend the deadline to our next

2   omnibus hearing.  Hopefully by then it will all be resolved

3   and that we could then announce a resolution and have it

4   extended for the full period but certainly understand Ms.

5   Roglen's desire to reserve rights there.

6          So that really leaves just one objection which was

7   the objection filed at 1414 by Edgewater Park and this was

8   filed on December 23rd and I think the date here is

9   particularly relevant.  It was filed after the status

10  conference on December 19th where we announced that the Nexus

11  sale was not going forward but it was before the GBRP sale

12  hearing, before the sale was approved, before the motion was

13  even filed.  We think that the facts have certainly changed

14  since the filing of that objection.

15         For example, the movant there alleges that, and I

16  am quoting from the objection, "There is little reason to

17  suspect that the unexpired leases will play a crucial role in

18  the debtors reorganization."  Obviously, the designation

19  rights and the GBRP APA certainly undercuts that.  And given

20  that the facts and circumstances are very different the

21  debtors, through the GBRP sale order, are paying the go

22  forward freight we believe that the objection should be

23  overruled.

24         So, I will just pause there.

25         THE COURT:  Okay, let me hear from the objector.

1          MR. ALBERTO:  Good afternoon, Your Honor.

2          THE COURT:  Did the committee want to be heard?  I

3    just -- let me hear anybody who is in support of the motion.

4          MR. ALBERTO:  Thank you, Your Honor.  Justin

5    Alberto from Cole Schotz on behalf of the committee.

6          Very briefly, a little less then a month ago we

7    stood before this Court and took the position that allowing

8    the GBRP liquidation, as opposed to immediate conversion was

9    in the best interest of these estates as the most value

10   maximizing alternative that was available at that time but

11   only on the express condition that stub-rent and post-

12   petition rent continued not only to be budgeted but paid.

13         I understand this to be the case.  We thank the

14   debtors and their professionals and the landlords ands their

15   professionals in working through the reconciliations but as

16   long as that is the case the UCC supports this motion which I

17   believe is necessary to give effect to the GBRP APA and allow

18   these liquidations to continue.

19         Thank you.

20         THE COURT:  Thank you.

21         MR. FOX:  Good afternoon, Your Honor.  Steven Fox,

22   Reimer & Braunstein, on behalf of Gordon Brothers Retail

23   Partners LLC in its capacity as buyer under the asset

24   purchase agreement approved by Your Honor in your January

25   2nd, 2025 order.

1    I won't repeat everything that Mr. Piraino said,

2    but suffice it to say that the designation rights, as

3    reflected in this Court's order, were a critical and

4    essential component of the asset purchase agreement and the

5    overall transaction approved by this Court.  To date, my

6    client has committed over $400 million to this transaction

7    between the initial purchase price payment, stub-rent

8    payments and the budgeted expenses in addition to the amounts

9    payable under the agency agreement which is part of the asset

10   purchase agreement.  A critical component of that is the

11   designation rights.

12       As Your Honor will see in the last three items on

13   today's agenda, we have been working diligently with the

14   debtors and third parties to realize value in respect of the

15   designation rights.  We do expect, as has been publicly

16   announced, that Variety Wholesalers, our partner in this

17   transaction, will be designating not fewer then 200 stores as

18   early as this Friday which will be the subject of notices

19   that will be filed with the Court shortly thereafter but this

20   process is moving a pace with diligence and vigilance and

21   with the cooperation of all the parties concerned.  We

22   believe that the 365(d)(4) extension is not only warranted

23   here but also essential in order to give us the full benefit

24   of the transaction that was previously approved by this Court

25   and we would ask that you do so today.

1           Thank you, Your Honor.  Happy to respond to any

2  questions you may have.

3           THE COURT:  No thank you.

4           MR. GOLD:  Good afternoon, Your Honor.  Ivan Gold

5  of Allen Matkins.

6           We had filed an objection, as Mr. Piraino noted, at

7  1701 on behalf of two landlords affiliated with River Oaks

8  Properties.  Just so the record is clear and complete, we

9  have been working with the debtors.  The stub-rent has been

10 paid, other sums have been paid.  There are, I'll call it,

11 some loose ends or short pays with respect to January that in

12 the big scheme of things are de minimis enough that we will

13 figure out a way to solve that problem.  Obviously, with the

14 appropriate reservation of rights if we don't but with that

15 those remedies would be separate from the (d)(4) objection.

16 Our objection at 1701 can be considered resolved and

17 withdrawn for purposes of an extension.

18          THE COURT:  Thank you.

19          MR. GOLD:  Thank you, Your Honor.

20          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

21          THE COURT:  Excuse me, one more.

22          UNIDENTIFIED SPEAKER:  I'll sit back down.

23          THE COURT:  Ms. Roglen.

24          MS. ROGLEN:  Good afternoon, Your Honor.  Laurel

25 Roglen of Ballard Spahr on behalf of various landlords.

1            As. Mr. Piraino noted, we did file an objection to

2    the 365(d)(4) extension motion at Docket No. 1703.  We have

3    approximately 30 remaining leases that have not yet been

4    rejected in these cases and we have been working diligently

5    with our clients, and with the debtors, and their

6    professionals to identify any issues with payment of post-

7    closing lease obligations and stub-rent.  We have identified

8    about a dozen right now that haven't been resolved yet but

9    that is just, frankly, I think largely a function of timing

10   from when the sale closed, when those obligations became due,

11   when Gordon Brothers funded, when those payments were then

12   made to landlords.

13           So, we agree with the resolution, as Mr. Piraino

14   noted, that we will do an extension with respect to our

15   clients, we will agree and will not oppose entry of an order

16   extending the 365(d)(4) deadline through the next omnibus

17   hearing date on February 26th to hopefully allow us to

18   resolve all these issues and if not to bring it back before

19   this Court, of course, without prejudice to rights of the

20   debtors to obtain a further extension at that time.

21           Thank you, Your Honor.

22           THE COURT:  Anyone else?

23           MR. NIEDERMAN:  Thank you, Your Honor.  Seth

24   Niederman from Fox Rothschild on behalf of Edgewater Park

25   Urban Renewal, LLC.

1        Your Honor, we did file an objection.  As we state

2    in our papers, our client has prospective tenants that are

3    interested in the property and are asking for when they can

4    get it, when it will be available, which is an uncertain item

5    at this point.  We feel that the 120 days have passed, more

6    then 120 days, with the bridge order and that it is

7    appropriate, at least as to our lease and we are not saying

8    in total as to the motion, that the deadline not be extended.

9        I understand the argument as to the change in

10   circumstances but from what I hear on that argument is that

11   the extension is critical to GBRP, not to the debtors.  That

12   is an important distinction.  GBRP bought these designation

13   rights subject to a looming deadline to assume or reject.  At

14   this point extending it would be doing so for the benefit of

15   GBRP not for the debtors.

16       So, I will rest there on my papers.  Beyond that,

17   happy to answer any questions but we feel, at least, as to

18   the Edgewater lease the deadline should not be extended.

19       THE COURT:  I'm curious, have there been

20   communications with respect to specifically the Edgewater

21   Park lease?

22       MR. NIEDERMAN:  I know there have been discussions

23   about payments but as to the assumption or rejection not to

24   my knowledge.

25       MR. PIRAINO:  Your Honor, for the record Stephen

1  Piraino, Davis Polk & Wardwell, on behalf of the debtors.

2        Just very briefly, Your Honor, I think the first

3  point sort of who is this important to, of course, its

4  important to GBRP but its equally important to the debtors

5  who are a party to the APA.  This is a core of our

6  reorganization, the core of these cases, and we have

7  obligations under the APA, you know, including to insure that

8  GBRP can exercise its designation rights so incredibly

9  important to us.

10        Then, you know, with respect to ongoing

11  discussions, you know, myself, Mr. Fox, we are always

12  available to discuss with folks.  You know, we are happy to

13  have conversations.  That being said, you know, we do believe

14  that there is sufficient cause to extend the deadline and we

15  appreciate that folks are reserving rights, as Ms. Roglen and

16  Mr. Gold said, but we do believe that is appropriate to

17  extend the deadline at this point.

18        THE COURT:  Do you want to be heard further?

19        MR. NIEDERMAN:  Nothing further, Your Honor.

20        THE COURT:  I am going to overrule the objection of

21  Edgewater Park and grant the extension but I want Edgewater

22  Park continued to the next hearing together with Ms. Roglen.

23  I do find, as a general matter, that cause exists to extend

24  the deadline for 90 days including the importance of

25  preserving optionality with respect to the leases and the

1  time required to give effect to the designation rights.  But

2  as required by 365(d) debtors must continue timely payment on

3  account of post-petition rent obligations arising with

4  respect to these unexpired leases.

5          MR. PIRAINO:  Thank you, Your Honor.  Understood.

6  We will work right after this hearing, or, frankly, folks at

7  our office can do it during this hearing, with counsel to

8  Edgewater and with Ms. Roglen on the form of order which we

9  will submit under COC so we can get that signed up today.

10         THE COURT:  Okay, thank you.

11         MR. NIEDERMAN:  Thank you, Your Honor.  May I be

12 excused?

13         THE COURT:  Yes, you may be excused.

14         MR. PIRAINO:  And if Your Honor will just allow me

15 to grab my notes that I forgot.

16         THE COURT:  Yes, certainly.  And anyone else who

17 wishes to be excused after their matter is presented feel

18 free to leave.

19         MR. PIRAINO:  Okay, Your Honor, the next place that

20 we would like to go is on the administrative claims motions.

21 There are three that are before the Court today and before

22 ceding to counsel who has filed -- the Morris James firm

23 filed those three motions.  I did want to give Your Honor an

24 update on where we stand given the volume that were filed and

25 as Mr. Shpeen mentioned in his opening remarks that we are

1    proposing a process for the reconciliation of administrative

2    expense claims.

3          So, there are two categories of these, the trade

4    vendors and the landlords.  Starting with the trade vendors,

5    six movants had filed motions before the sale hearing and an

6    additional 17 were filed after the sale hearing that were

7    originally noticed for today.  Just, you know, for sake of

8    completeness there are a good number of motions that were

9    originally set for the February hearing.  So, just focusing

10   on what was originally noticed for today.

11         Of those 23 motions, each of the movants has agreed

12   to adjourn until the February omnibus hearing and I do just

13   want to specifically note two of those motions, Giftree

14   Crafts Docket No. 1584, and Hybrid Promotions Docket No.

15   1421.  We have, obviously, been in contact with counsel to

16   all of the movants but with respect to Giftree specifically,

17   you know, we have taken a look at our records, they have

18   taken a look at their records, I think we have a very small

19   difference, about $5,000.

20         So, we are happy to continue working with Miss

21   (indiscernible), counsel to Giftree, to make sure that our

22   numbers align with their numbers.  Similarly, with Hybrid

23   Promotions, we and AlixPartners have been in repeated contact

24   with their counsel, Mr. Carroll, and understand the delta

25   between their asserted claim amount and what our records show

1   is also quite small.  So, you know, we will certainly

2   continue working with Mr. Carroll to reconcile those amounts

3   on our end.

4           Then with respect to the landlord movants, there

5   were 12 motions filed for stub-rent and other amounts

6   purported to be due under Section 365(d)(3). So, of those 12

7   we were able to fully resolve one, Paragon Windermere and

8   Lebanon Windermere (phonetic), that was for stub-rent and

9   that has been paid in accordance with the GBRP sale order.

10  The remaining motions were either adjourned, those eight, or

11  the three motions filed by the Morris James firm, Ogden

12  Plaza, BDPM Group, and Hartsville which are going forward

13  today.

14          Just to say, you know, we strongly believe going

15  forward on those three motions today is not the right -- it's

16  inappropriate given the circumstances of the case right now.

17  We are continuing to reconcile amounts that are due.  We

18  think it's appropriate to, frankly, let the process play out

19  a little bit more.  As Mr. Fox noted, there will be further

20  clarity at the end of the week which stores are being

21  assumed. If the stores are being assumed cure costs are

22  naturally going to take care of these amounts; otherwise, we

23  are continuing to reconcile and it does take time.  I will,

24  you know, let the Morris James folks handle their motion and

25  we can respond at that point.

1          THE COURT:  Can I stop you there a minute.

2          MR. PIRAINO:  Sure.

3          THE COURT:  Is there an actual process in place. I

4   know the motion, you know, asked for the Court to defer until

5   there was a process.  Is there a process?

6          MR. PIRAINO:  So, Your Honor, we are going to be --

7   this leads me, sort of, to the next piece of this which is to

8   give a walkthrough of the --

9          THE COURT:  Yes.

10          MR. PIRAINO:  -- proposed procedures.  So, we are

11   going to be filing a motion with these procedures.  We are

12   continuing to work with Mr. Alberto and the committee on

13   them.  We will be sharing a form of the motion with them.

14   Obviously, welcome their feedback.  But if Your Honor would

15   allow, I just would like to walk through what we are

16   proposing to do.

17          So, thinking of this as, sort of, three pillars.

18   The first pillar of the procedures would be the establishment

19   of a bar date for pre-sale closing administrative claims.

20   So, everything up to January 3rd we would propose, again

21   subject to discussions with the committee, around 21 days for

22   a bar date which we believe would give folks adequate notice.

23   The second pillar of that is, you know, the actual allowance

24   process.  While, you know, we do need to set a bar date we

25   also don't want to make this unduly burdensome on creditors.

1    So, we think that the most transparent and equitable way to

2    reconcile the claims would be to file and serve, essentially,

3    a schedule like we would do with prepetition claims that list

4    out what the debtors believe to be their administrative

5    expense exposure for trade vendors, for landlords.

6          If a claimant agrees with what is scheduled then no

7    further action is required. If they don't agree with what is

8    scheduled, they would file a proof of claim form.  We would

9    provide a form with our motion. The debtors would then have a

10   period of time to reconcile any disputed amounts.  And we are

11   hopeful that we, of course, could continue working

12   constructively with parties to avoid coming back before the

13   Court but if there is an amount that we can't reconcile then

14   we would seek Your Honor's intervention.

15         So, you know, again, the procedures are not in

16   front of you today.  There are a couple of details that need

17   to be ironed out but we do believe rather than the filing of

18   -- I think we are probably at 50 plus motions and expending

19   estate resources, resources of everyone in this room going

20   motion by motion that doing a process like this will both

21   protect claimants rights and promote judicial efficiency and

22   economy.

23         THE COURT:  So, speaking of resources and economy,

24   so for those parties who have already filed motions would

25   they then have to file separate --

1          MR. PIRAINO:  No, Your Honor.  We will, of course -

2   - they will be scheduled and if -- you know, just to use an

3   example, if we schedule it for $1 and in their motion, they

4   ask for $5 they won't have to file a separate claim.  We will

5   know that from the filing of the motion and what they

6   asserted in there that there is a disputed amount.

7          THE COURT:  Okay, and would you anticipate getting

8   this motion on file for a February hearing?

9          MR. PIRAINO:  Yes, Your Honor.  We would like to

10  get it on file in advance.  February 11th would be 14 days'

11  notice but we are working hard to get it on file in advance

12  of that so that it could then be heard on the 26th.

13         THE COURT:  Okay, is the hearing February 26th?

14         MR. PIRAINO:  Yes.  So, I guess the 12th is the 14

15  days.  Math is not my strong suit today.  And, Your Honor,

16  just to say, at this point with the -- again, I will cede the

17  podium in just a minute to the ones that have not been

18  adjourned but we do believe that granting any of the motions

19  at this point would just, sort of, undermine the process.  We

20  realize there is not a motion before you but we were able to

21  get, you know, 30 some odd folks on board with the contours

22  of this process and we believe it would be unfair to the

23  remaining claimants to, sort of, do these on an ad hoc basis.

24         THE COURT:  Okay.

25         MR. ALBERTO:  Good afternoon, again, Your Honor.

1   Justin Alberto, Cole Schotz, on behalf of the committee.

2          The committee is fully supportive of claims being

3   filed, reconciled to whatever extent possible, ultimately

4   paid as quickly as possible.  That process should be orderly

5   and organized both to give claimants a fair opportunity to

6   submit their claims and also to minimize any costs of the

7   estate professionals expended in reconciling them.  What that

8   process shouldn't be, Your Honor, is a race to the

9   courthouse.  That would be inconsistent with this Court's

10  precedent and while it may benefit a few, I would believe it

11  would cause more harm to the many since not every creditor in

12  this case has the benefit of attentive counsel and likely

13  won't understand that they even have to file a claim until

14  they receive notice of an admin claims bar date.

15         So, with that, Your Honor, I think these are better

16  off left for an orderly process and we look forward to

17  continuing to work with the debtors in what that process and

18  the details look like.

19         THE COURT:  Okay, can I ask one question --

20         MR. ALBERTO:  Of course.

21         THE COURT:  -- before the debtors and the committee

22  sit down.  Do I understand that you talked about the pre-sale

23  closing and I think I might have derailed your presentation.

24  Were there more than one bucket?

25         MR. PIRAINO:  So, Your Honor, for the record

1    Stephen Piraino.

2          With respect to the procedures, it would just be

3    for the pre-sale. The post-sale will be paid in accordance

4    with the administration budget as noted at the sale hearing.

5          THE COURT:  Okay.  Mr. Kunz.

6          MR. KUNZ:  Good afternoon, Your Honor.  Carl Kunz

7    on behalf of objections filed by Ogden at 1436, BDPM at 1451,

8    Shops at Hartsville at 1566.

9          Your Honor, I appreciate the debtors wanting a

10   streamlined process but I will start with, you know, we were

11   at a hearing for a long time on New Years Eve where the issue

12   of what exactly go forward expenses were and which ones were

13   going to be paid, we had been asking for a month as to

14   whether that includes the true ups that had been billed and

15   will become due under 365(d)(3) that Your Honor just said is

16   material with respect to, at least, in this particular

17   circumstance BDPM, which is owed $45 plus thousand dollars as

18   of tomorrow, and Shops at Hartsville which will be owed

19   $22,000 plus as of the 27th, next Monday.

20         All we did, Your Honor, we were happy to continue

21   with the other 32 motions that were filed as long as we got

22   assurances that those amounts would be paid as and when due.

23   The debtors would not provide that confirmation and have not

24   provided that confirmation as of today.  And the fact is,

25   Your Honor, there was absolutely no substantive response to

1   our motion.  Despite having the bills for over a month or a

2   month, there has been no question about those bills whether

3   they're due, whether they're appropriately calculated; they

4   have had them and we have had not response as to whether they

5   have a question about them or whether they are going to pay

6   them most importantly.

7          Instead, the response says, well, we shouldn't have

8   to do anything.  We're going to provide a process for dealing

9   with administrative claims that Your Honor just heard.  The

10  fact is there is a process, its called 365(d)(3).  Those

11  amounts become due under the terms of the lease within 30

12  days of being billed.  They have been billed.  The debtors

13  ought to be able to know now whether those amounts are going

14  to be paid or not.  That is all we ask.  If they are not, one

15  of my clients wants to immediately cease GOB sales at their

16  property, that's BDPM, and have that lease returned to them

17  immediately.  If they are going to be paid then BDPM, like

18  others, will have to ride out the process so long as those

19  amounts are being paid in the ordinary course but as of right

20  now, we have no assurances that those amounts are either

21  budgeted or are going to be paid in the ordinary course.  We

22  think we are entitled to that.

23         So, Your Honor, again, BDPM is due $45,000 plus as

24  of tomorrow and Shops at Hartsville is due $22,000 plus as of

25  January 26th but I think its ultimately Monday, if I have my

1  dates correct.  Your Honor, that is all that we are asking

2  for is a confirmation today, no testimony, no anything.  Our

3  go forward expenses under 365(d)(3) that are becoming due are

4  they going to be paid.  I don't need to wait for an

5  administrative process that may be heard at the end of

6  February.  We are not lumped into that administrative

7  process.  Some of my clients are.  Some of my clients had

8  pre-closing administrative claims and they will be in that

9  process but for, at least, BDPM and Hartsville they are not

10  in that process with respect to these payments and I would

11  like to know whether they are not going to be paid or not.

12          Thank you.

13          THE COURT:  Okay, let me hear from the debtors.

14          MR. PIRAINO:  Your Honor, for the record Stephen

15  Piraino, Davis Polk & Wardwell.

16          Your Honor, with respect to the asserted amounts,

17  you know, the debtors are happy to continue to work with Mr.

18  Kunz.  Again, I think we do need to go -- there is, again,

19  over 800 some odd leases here. I do think we need to

20  reconcile our records against his and be given an opportunity

21  to do that.  We are not looking to undo the sale order or

22  what was budgeted. It will be paid pursuant to the sale

23  order.  We just need the opportunity to go through these and,

24  again, we are happy to work with Mr. Kunz on that.

25          THE COURT:  Anyone else want to be heard?

1      (No verbal response)

2          THE CORUT:  I am very sympathetic -- Mr. Kunz, did

3   you want to be heard?

4          MR. KUNZ:  No, Your Honor.

5          THE COURT:  Okay. I am very sympathetic to the

6   objectors in this case but I also agree with the debtors and

7   the committee that under the facts of this case it isn't a

8   prudent use of time or expense engaging in ad hoc litigation

9   of claims.  So, the debtors really do need to implement,

10  timely implement, an orderly process to reconcile and

11  determine the validity of administrative expense claims.

12  It's important that this process be orderly and equitable but

13  its also important that the debtors communicate with

14  creditors.

15         So, at the expense of sounding like your mom, I am

16  going to suggest that the parties here speak because I don't

17  want the end of February to roll around and we're in the same

18  predicament we are here today adjourning because we haven't

19  had an opportunity to look at claims.  And I mean that as no

20  disrespect to anyone.

21         MR. PIRAINO:  Of course, Your Honor. Completely

22  understood.  We definitely will use the time between now and

23  the next hearing to resolve as much of this as we can.  We

24  certainly want to get people on board with the procedures and

25  folks such as Mr. Kunz who believe that it may be a post-

1  closing and covered by the APA, we will certainly work with

2  him and hopefully not have to bring any further disputes

3  before Your Honor.

4          THE COURT:  Thank you.

5          MR. PIRAINO:  Thank you, Your Honor.

6          THE COURT:  I welcome disputes.  What I don't

7  appreciate is when parties indicate that they haven't gotten

8  responses and that is all I am asking is to have

9  communication.

10          MR. PIRAINO:  Understood, Your Honor.

11          THE COURT:  You may disagree ultimately, and that's

12  fine, but communicate.

13          MR. PIRAINO:  Understood, Your Honor.  And at this

14  point I think the next group of items on the agenda relate to

15  certain lease matters, so I will cede the podium to my

16  colleague, Mr. Goldberger.

17          THE COURT:  Okay.

18          MR. GOLDBERGER:  Good afternoon, Your Honor.  Jacob

19  Goldberger, Davis Polk, on behalf of the debtors.

20          There is one item that I think we can dispense with

21  quickly and that is the motion that Ms. Heilman filed to

22  compel rejection.  We have been working constructively with

23  the counterparties there.  You know, the debtors filed this

24  morning a notice of designation rights notice that we

25  believe, and we're in agreement with Ms. Heilman, can push

1  this matter.  I think we are going to reach out to Chambers

2  to see if we can find some time to schedule calendars

3  approving at the end of that designation period, some time in

4  February, but I will cede to Ms. Heilman.

5        THE COURT:  Okay, bring me up to speed.  Sorry, I

6  am not sure what all has been filed. I have been focusing

7  exclusively on the agenda so if there is something else

8  filed, please let me know.

9        MS. HEILMAN:  Good afternoon, Your Honor.  For the

10  record Leslie Heilman of Ballard Spahr on behalf of the

11  landlord, Highland and Sterling, LLC and Big Holdings 2, LLC,

12  for Big Lots store located in National City, California.

13        I am happy to bring you up to speed with respect to

14  the motion that I am presenting today; although, Mr.

15  Goldberger almost stole my thunder.  But we are here today on

16  the landlords motion to compel the immediate rejection of the

17  lease and surrender of the premises or in the alternative we

18  sought relief from stay which was filed as a result of a

19  number of the debtors defaults, among other reasons, with

20  respect to the lease and it was filed at Docket 1605 on

21  January 7th.

22        The debtors in turn filed an objection to the

23  motion on January 15th at Docket No. 1727 which did make an

24  umber of factual assertions that we don't believe were

25  supported by any evidence. So, in response we did serve them

1   with discovery on January 16th with a return date of

2   yesterday at noon.  The debtors have objected to those

3   document requests in their entirety so all those responses

4   are still outstanding but notwithstanding the debtors

5   informally provide the landlord with two schedules to the APA

6   that they believe are responsive to the landlords request and

7   the landlord is still reviewing those documents.

8           In addition, since the filing of the motion, the

9   debtors have communicated to the landlord that the utilities,

10  security system and insurance to the premises have been

11  reinstated and will remain in place, at least, through the

12  end of January.  An open point, Your Honor, with respect to

13  that immediate harm to the landlord is that we will need to

14  work to make sure the February operating expenses are

15  covered.  And about two hours before today's hearing the

16  debtors now have filed a designation notice designating the

17  lease for assumption and assignment to Burlington Coat

18  Factory; nothing like waiting till the last minute.

19          THE COURT:  I enjoyed reading your papers.

20          MS. HEILMAN:  Your Honor, we do believe that many

21  of the issues presented by the motion continue to exist but

22  we also recognize the economy is a scale and we do believe

23  there is some overlap in the issues that will be determined

24  in connection with the assignment notice.  In that regard we

25  do believe that we would like to treat today as a scheduling

1  conference on the motion and we would like to seek some time

2  though from Your Honor before the February 26th omnibus

3  hearing because time is of the essence. This lease is sitting

4  dark and there are reasons its in considerable default. The

5  stub-rent has not been paid.  So, the landlord continues to

6  be harmed here but we do believe there is an overlap and we

7  want to use the time to respond to the assignment notice,

8  raise the issues that are present in our motion in

9  conjunction with there, and reach an agreement on a schedule.

10        Shortly before the hearing, the parties were able

11  to confer and they do believe the week of the 10th is open

12  for the parties.  Mainly the 13th is all parties seem to be

13  available if Your Honor is available.  That is a date that we

14  would like to set a hearing that week.

15        THE COURT:  Okay, I am going to have Chambers look

16  for a date while we're here and we will get back to you.

17        MS. HEILMAN:  In addition to that, Your Honor, I

18  believe the objection deadline on the assignment notice will

19  be February 4th.  The week of -- we were talking about the

20  week of the 10th for a hearing and February 10th as a reply

21  deadline for both parties, both the landlord to reply to its

22  motion and for the debtor to reply to any objection filed by

23  the landlord.

24        In the meantime, I do believe the parties will

25  continue to work consensually to resolve the issues. There

1   are discussions ongoing with respect to the stub-rent, the

2   payment of the stub-rent.  The landlord is in discussions

3   with Burlington. All parties are working towards a resolution

4   and we do hope that we will narrow any issues prior to that

5   hearing.

6          THE COURT:  Okay, I appreciate the parties working

7   together. Thank you.

8          MR. GOLDBERGER:  Your Honor, that brings us to the

9   next lease sale matter which is a lease sale, proposed

10  assumption and assignment to Burlington for the lease in

11  Nashville.  This is something that the debtors and GBRP seek

12  to pursue.  As an initial matter we filed, in connection with

13  our reply to objections from the landlord and from Ross a

14  motion to seal the Ross lease.  We would appreciate if the

15  Court could enter that motion as an initial matter.

16         THE COURT:  Does anyone object to the sealing of

17  the Ross lease?

18     (No verbal response)

19         THE COURT:  Okay, I hear no one.  I will enter that

20  order.

21         MR. GOLDBERGER:  Thank you, Your Honor.

22         There are four pieces of evidence that we would

23  like to enter into evidence that we have listed on our

24  exhibit list for today that we filed this morning.

25         THE COURT:  Do you have a copy of that exhibit list

 1  or can you tell me a docket number?

 2        MR. GOLDBERGER:  The four items are the debtors

 3  lease, the Ross lease, Ross is a co-tenant in the shopping

 4  center, the first leased modification is the debtors lease

 5  modification, and the memorandum of lease of the Ross lease.

 6  So, those are the four items that we understand all parties

 7  are in agreement to enter into evidence.

 8        THE COURT:  Does anyone object to the admission

 9  into evidence of those four documents, which are Docket

10  Numbers 1737-1, 17 -- they're all 1731.  Anyone object?

11      (No verbal response)

12        THE COURT:  Okay, I hear no one.  They're

13  admitted.

14      (Exhibits received in evidence)

15        MR. GOLDBERGER:  Thank you, Your Honor.  With

16  respect to the objections themselves and the question before

17  Your Honor, the question before Your Honor today is very

18  narrow.  Let me start by explaining what the question is not.

19  The question is not whether the debtors' lease allows for

20  this assumption and assignment to Burlington.  The assignment

21  and use provisions of the debtors' lease undeniably provide

22  authority for the debtors to assign this lease to Burlington.

23        With respect to Ross's restrictive use provision

24  referencing Burlington, the applicable state law is clear.

25  The debtors' bargained for the expanse of assignment and

1 usage rights they have under their lease. and Ross and the

2 landlord were in no position to unilaterally restrict those

3 rights at a later point.  The landlord and Ross admit as

4 much.  Neither objection so much as mentions the debtors'

5 lease in connection with this issue.

6 　　　　　The issue before Your Honor today really has

7 nothing to do with the debtors' lease at all.  Rather, the

8 question before Your Honor is the narrow legal question of

9 interpreting Section 365(b)(3).  Those provisions describe

10 the heightened standard for adequate assurance in the

11 shopping center context and require, in part, adequate

12 assurance that the assignment of the lease will not breach

13 any exclusivity provisions in other leases in the shopping

14 center.

15 　　　　　The question is simple:  Are those Code provisions

16 intended to protect the rights landlords bargain for in their

17 leases with debtor tenants, or did Congress gift landlords

18 new rights they don't have under applicable state law simply

19 because a debtor/tenant filed for bankruptcy.  The answer,

20 Your Honor, is clear in the words of the Code, the

21 legislative history, and case law.

22 　　　　　Under the Code, adequate assurance is only

23 assurance of obligations existing under the debtors' lease.

24 What 365(b)(3)(C) means is that, to the extent that the

25 debtors' lease requires them to abide by restrictive

1   provisions in other shopping center leases, compliance with

2   those restrictions must be adequately assured upon lease

3   assumption and assignment.

4        What 365(b)(1) says is that the trustee must

5   provide adequate assurance of future performance under such

6   contract or lease.  The entire concept of adequate assurance

7   is to assure performance of obligations under the relevant

8   lease.  365(b)(3) then adds that for the purposes of

9   paragraph (1) of this subsection, adequate assurance of

10  future performance of a lease of real property in a shopping

11  center includes adequate assurance, et cetera.  By its

12  explicit language, 365(b)(3) is clarifying the words adequate

13  assurance of paragraph 1, it is not impacting the fact that

14  adequate assurance is entirely assurance of performance under

15  such contract or lease.

16       The intent of 365(b)(3) is simple.  In the

17  shopping center world, many landlords enter into carefully

18  structured leases that preserve a certain tenant mix and

19  interact with other leases in intentional ways.  Often, if

20  one stick is pulled out, the whole tower can collapse.

21  Congress made clear in 365(b)(3) that to the extent a

22  debtor's lease was designed to be subject to other leases in

23  a shopping center, the landlord's interest in keeping the

24  shopping center structure intact is valuable enough to

25  enforce against the debtor and their assignee, but Congress

 1  is not simply giving out freebies on the back of a bankrupt

 2  debtor.  The legislative history says the same thing.

 3          As the Third Circuit Court of Appeals in the

 4  Joshua Slocum case said that the intent of Congress in

 5  365(b)(3) is to assure a landlord of his bargained-for

 6  exchange.  The Fourth Circuit in In re Trak Auto also

 7  explained that, "Congress's purpose in 365(b)(3)(C) is to

 8  preserve the landlord's bargained-for protections with

 9  respect to premises use and other matter that are spelled out

10  in the lease between the debtor and the tenant."

11          365(b)(3) is all about protecting existing rights,

12  not creating new ones.  The case law says the same thing.  In

13  the Toys "R" Us bankruptcy, the debtor tenant sought to

14  assign a lease to Burlington in the face of a restrictive use

15  provision in a Ross lease, the same facts that are here

16  today.  The Toys "R" Us court concluded that the preexisting

17  Toys R Us lease was not subject to the Ross exclusive use

18  provision or restrictive use provision under state law and

19  that, therefore, 365(b)(3) was inapplicable.  The Toys "R" Us

20  court got it right and the debtors urge this Court to approve

21  this identical assignment.

22          We will rest on our papers and the Amendola

23  declaration filed at Docket 1375 with respect to our

24  arguments that the Ross lease by its terms doesn't restrict

25  this assignment.

1          And with respect to the 180-day go-dark period

2     that Burlington is seeking, we just note that the go-dark

3     period should be a matter of mutual interest.  Burlington

4     will be paying rent for the property upon assumption and is

5     incentivized to get up and running as quickly as possible.

6          And with respect to the form of order, we believe

7     that the form of order entered in connection with the other

8     December-waived lease sales is appropriate, but we've had

9     constructive dialogue with the counterparties and I think we

10    can get to a place of mutual agreement on a form of order if

11    this Court approves the assignment to Burlington.

12          THE COURT:  Okay, thank you.

13          MS. OESTREICH:  Good afternoon, Your Honor, Hailey

14    Oestreich with Jackson Walker on behalf of Burlington here

15    today.  I know we just heard from debtors, so I agree with

16    their points, and Burlington, as noted in our papers, fully

17    agrees and supports and would like to partake in their

18    argument.  I'm not going to go back over everything for the

19    sake of efficiency, but there are a couple points that I

20    would like to make.

21          As debtors' counsel noted, there have not been any

22    questions about whether Burlington, a Fortune 500 company,

23    has provided or can provide adequate assurance for this

24    lease.  As debtors' counsel has noted, we're really here

25    talking about the Ross lease, who is a third party not only

1 | to this bankruptcy, but actually to the assignment at issue

2 | here.

3 |       As debtors' counsel noted, that this lease,

4 | debtors' lease does not have any restrictions that would

5 | prohibit this assignment if we weren't in the bankruptcy

6 | context.  Instead, what landlord and Ross are asking you to

7 | do today, Your Honor, is make it so that the debtor actually

8 | has less rights and less of a chance to recover for the

9 | benefit of the estate in the bankruptcy context than out of

10 | it.

11 |       For all the reasons that debtors' counsel

12 | discussed about the language of the Code, the harmony of

13 | Section 365(b) and (b)(1) and (b)(3), and just the entire

14 | purpose of bankruptcy as a whole, we believe that Ross and

15 | landlord's interpretation of 365(b)(3)(C) should be rejected,

16 | and a strict reading should be rejected, because of the

17 | bizarre consequence that it could create in this case of

18 | granting a landlord additional rights in a bankruptcy that

19 | they would not have outside of it.

20 |       Your Honor, on the go-dark objection, we agree

21 | with debtors' analysis and that the go-dark provision is in

22 | fact an anti-assignment provision.  As debtor said, my

23 | clients, if they did get this lease, would be paying rent

24 | during the go-dark period and would have every incentive to

25 | make the go-dark period as limited as possible.

1          The final point that I would just like to make is

2    the impact that this might have on third party bidders such

3    as my client.  My clients went through a bidding process,

4    were the successful bidder, and won through that process the

5    right to assign this lease.  By putting third parties in a

6    position where they can spend money to not only go through

7    the process, presumably win by becoming the successful

8    bidder, but then having a fight where they're expending more

9    cost to try to deal with these outside-party leases that

10   don't actually govern the lease at issue, it could really

11   have a chilling effect on who's willing to jump into this

12   sphere if there's always kind of a bogeyman that might be in

13   the closet that they have to keep an eye out.

14          And for those reasons, Your Honor, because the

15   assignment to Burlington would not violate the terms of

16   debtors' lease that we're trying to assign, Ross's and

17   landlord's objection should be overruled here.

18          THE COURT:  Thank you.

19          MR. FOX:  For the record, Your Honor, Steven Fox,

20   Riemer & Braunstein, on behalf of GBRP.

21          As you will hear for the next period of weeks a

22   common theme and that is the value ascribed to the

23   designation rights and the rights under the asset purchase

24   agreement acquired by my client, this is the first in a

25   series that you're going to hear, and we are acutely

1  sensitive to any effort by a landlord to expand its rights

2  and otherwise limit the debtors' rights in respect of

3  assumptions and assignments and to graft onto -- terms into

4  the existing leases that don't presently exist, and otherwise

5  seek to circumscribe the debtors' ability in furtherance of

6  anti-assignment clauses.  We expect that these are types of

7  issues, given the age of some of the debtors' leases that are

8  going to crop up again, and we'd like to, as the saying goes,

9  nip it in the bud as quickly as we can.

10         This is a critical component for my client.  We

11  believe that the facts support approval of the assumption and

12  assignment and grant of the debtors' request here before the

13  Court.  As Counsel noted, there is no actual objection to

14  assumption and assignment relating to adequate assurance or

15  any other dispute with respect to cure amounts or otherwise,

16  and my client is four-square in favor of proceeding today

17  with the assumption and assignment to Burlington.

18         THE COURT:  Thank you.

19         MR. FOX:  Thank you, Your Honor.

20         MR. ROOT:  Good afternoon, Your Honor, for the

21  record, Alan Root of Chipman Brown Cicero & Cole on behalf of

22  5620 Nolensville Pike LLC, which is the landlord for the

23  shopping center at issue in Nashville, Tennessee.

24         I'll give my presentation in a moment, but I just

25  wanted to address the last comment that Burlington made when

 1  they were at the podium that they went through a process.  I

 2  saw Your Honor nodding at that and I understand that

 3  argument, but I want to be clear on two points.  One, the

 4  memorandum of lease, which is in evidence, Your Honor, was

 5  publicly recorded in 2022 in Davidson County, Tennessee,

 6  that's public record.  It has the Ross exclusivity provisions

 7  in there.  So this is not as if they were a bidder that are

 8  finding out about this at the first time while we're here at

 9  the podium, Your Honor, or after our objection was filed.

10       And further, Your Honor, Nolensville participated

11  in that auction and prior to the auction did raise this

12  issue.  Nolensville was actually the backup bidder at

13  $250,000, so there's only a $50,000 difference between the

14  successful bid and the backup bid here, Your Honor.  So these

15  are not issues that came up post-auction, Your Honor, and so

16  I think the parties were aware.  So, to the extent there's an

17  argument that they went through this process, they expended

18  resources, it's not as if they're learning about it for the

19  first time after the auction.

20       THE COURT:  So would your argument be then it's

21  case specific with respect to each lease that the landlord

22  should investigate -- or the party to whom the lease is being

23  assigned should independently go look at the lease and all

24  the other leases in the shopping center to determine whether

25  there are restrictions to subsequently signed leases?

1          MR. ROOT:  Well, Your Honor, I think factually

2    here that certainly could be an important factor, Your Honor.

3    I mean, all the parties were well aware of this.

4          In general, Your Honor, I think Section

5    365(b)(3)(C) is very clear, it has two requirements, the

6    debtors and Burlington have the burden on those.  It's not

7    just to show that there's no violation of the debtors' lease

8    being assigned, but they also have to show that it won't

9    violate other leases in the shopping center, including

10   exclusivity provisions.

11         That's what the Code provides.  The cases are sort

12   of all over the place on this, Your Honor, and we recognize

13   that cases like Toys "R" Us have said otherwise, but,

14   respectfully, those cases are outside the Third Circuit, I

15   think they got them wrong.  They've collapsed the statutory

16   provision into one requirement when there are two.  And I

17   think the Third Circuit in Joshua Slocum recognized that you

18   need to look not just to the debtors' lease, but to the other

19   leases in the shopping center, because that's what

20   365(b)(3)(C) says Your Honor should do.  And it's very clear

21   here, Your Honor, that Section 15.3 of the Ross lease

22   prohibits other off-price competitors in the shopping center

23   and it specifically names Burlington as a competitor.

24         And, unlike the cases like Toys "R" Us that were

25   cited by the debtors, I think there's a factual distinction

1   here as well, Your Honor.  Everybody said you only need to

2   look at the Ross lease, well, I don't think that's true.  I

3   think the Burlington lease -- or, excuse me, the Big Lots

4   lease that's being assigned and which is also in evidence has

5   provisions in it that provide -- specifically at Section 4(a)

6   that provide that you can use it for any other purpose, the

7   leased premises for any other purposes, provided that it does

8   not violate then-existing exclusive use rights in the

9   shopping center.  So there is a provision in the lease that

10  is being assigned that references other exclusivity

11  provisions, Your Honor.

12          And we think, Your Honor, that puts us squarely in

13  other cases that have come out the way we are arguing here,

14  Your Honor, which includes the Eastern District of Virginia

15  decision in Heilig-Meyers, which is at 294 B.R. 660.  There

16  the court looked both at the debtor lease being assigned and

17  at the lease that was -- another shopping center lease that

18  had an exclusivity provision and, on similar facts, denied

19  the assumption and assignment because it violated the

20  exclusivity provisions of the non-debtor lease.

21          Your Honor, I'd also point you to the Three A's

22  Holdings case with Judge Shannon, which is at 364 B.R. 550.

23  There Judge Shannon, in applying 365(b)(3)(C), looked not

24  just at the debtor lease, but also at restrictive covenants

25  and restrictive use provisions that were recorded publicly,

1  and found that the assignment violated those and denied the

2  assumption and assignment.

3           So, Your Honor, I think, as a general statement,

4  the Code -- the plain meaning of the Code says what it says,

5  but I think factually here as well, Your Honor, I think we

6  fall into a camp of cases that would prevent assignment of

7  this particular lease.

8           THE COURT:  Let me ask you -- you cited to (4)(a),

9  what does 4(a) mean by the provision "then-existing"?

10          MR. ROOT:  That's a good question, Your Honor, and

11  I read through that and gave that some thought.  I think what

12  it means here, Your Honor, is it says you can use it for any

13  other retail purpose as long as when you're going to use it

14  for that other purpose, at the time you're going to use it

15  for that other purpose, it doesn't violate any then-existing

16  use rights in the shopping center.  Well, the purpose is

17  going to change upon assignment, it's no longer going to be

18  Big Lots, it's going to be Burlington.  So you need to look

19  at it as then as now, when the use changes, if the assignment

20  was today, the use changes today, and is there an exclusivity

21  provision in play today that would be violated.

22          Your Honor, I just want to make sure I don't have

23  any other arguments here.  I just wanted to point out, again,

24  we are the backup bidder here, I don't think there's any --

25  to the extent the other cases like Toys "R" Us were focused

1    on the idea of maximizing the value of lease portfolios,

2    certainly we understand the desire to maximize the value of

3    lease portfolios in an effort for debtor to maximize the

4    value of its assets, but factually, again, while that may be

5    a policy reason to generally allow for assignment over

6    exclusivity provisions, here there's no value-maximization

7    issue.  We're talking about a $50,000 difference between the

8    successful bid and the backup bid.  It's not as if it's

9    $300,000 or nothing here, Your Honor.  So I don't think

10   there's any windfall to the landlord or any prejudice to the

11   debtors here, Your Honor.

12              Thank you.

13              THE COURT:  Okay.  Thank you.

14              MR. MANN:  Good afternoon, Your Honor, Kevin Mann

15   from Cross & Simon on behalf of Ross.

16              I rise mostly just to join in with Mr. Root's

17   argument, but there's one thing I did want to point out, and

18   I think Your Honor noted this when you looked at the word

19   then-existing in the lease.  It doesn't say now existing, it

20   doesn't just say existing, it says then-existing, which would

21   lead us to believe that it would be at the time that the

22   change is made, which will be here at the time of the

23   assignment.  So I think that puts us a little closer to Toys

24   "R" Us.  Even if we determine that Toys "R" Us was improperly

25   decided, we can still say that this is distinguishable from

1   Toys "R" Us because Toys "R" Us, the lease that was being

2   assigned did not contain any provisions that required

3   compliance with any other lease's use restrictions.

4          The last thing I wanted to point out, Your Honor,

5   is -- I think everybody has talked about the Joshua Slocum

6   case, that case does say that the legislative intent behind

7   the shopping center amendments was to protect the rights of

8   lessors and the center's other tenants.  Congress recognized

9   that, unlike the usual situation where a lease assignment

10  affects only the lessor, an assignment of a shopping center

11  lease to an outside party can have a significant detrimental

12  impact on others, in particular the center's other tenants.

13         So with that, Your Honor, I have nothing further,

14  but would ask that Your Honor deny this assignment.  Thank

15  you.

16         MR. GOLDBERGER:  Your Honor, with respect to 4(a)

17  in the debtors' lease, there's a reason this wasn't mentioned

18  at all in the papers that were filed.  The permitted uses

19  generally permit the right to use and occupy the demised

20  premises for the purpose of the sale of general merchandise

21  and there's no "provided, however" with respect to the sale

22  of general merchandise.  And we believe that it's clear that

23  Burlington is a retailer that, you know, sells general

24  merchandise, and that's why this wasn't raised in any of the

25  papers and there's no proviso that says that any then-

1  existing exclusive use rights apply to that type of sale --

2  or that type of usage.

3         We also do believe that then-existing is a

4  reference to the time of the entry of this lease, but we

5  would argue that the use here is general -- the use is the

6  sale of general merchandise and is not subject to that

7  provision of the lease at all.

8         We'd also say that with respect to the Joshua

9  Slocum case, the case there makes clear that Congress's

10 intent was to protect the bargained-for rights, and that

11 includes the bargained-for rights of the other tenants in the

12 shopping center, that's for sure.  And that's part of the

13 structure of a shopping center, but the debtors were here

14 first and the debtors bargained for the rights that they

15 have, and there's nothing in the Code or in the legislative

16 history that we believe provides a right that wouldn't exist

17 if this would have been -- if the debtors would have tried to

18 do this assumption on September 8th of last year, a day

19 before this -- the day before this bankruptcy case started.

20        THE COURT:  Let me just -- bear with me one

21 second.

22        What is your response with respect to the

23 memorandum of lease having been on file?

24        MR. GOLDBERGER:  So we understand that the

25 memorandum of lease was public and parties were on notice of

1  the fact that there was a subsequent lease that had certain

2  rights vis-a-vis the -- that tenant, Ross, and the landlord,

3  but to the extent that those aren't binding on the debtor

4  under applicable state law -- and, again, it doesn't seem

5  like this case would be in front of a judiciary if it would

6  have been -- if the assumption and -- if the assignment would

7  have been proposed on September 8th.

8          So we don't think it's necessary to look into the

9  -- you know, anything that's publicly filed with respect to

10 leases that aren't binding on the debtors' lease and that the

11 debtor isn't responsible for under applicable state law.

12         THE COURT:  Thank you.

13         MR. GOLDBERGER:  Thank you, Your Honor.

14         MR. FOX:  For the record, Your Honor, Steven Fox,

15 I rise just briefly for two points in response to Counsel's

16 suggestion that there's no prejudice from denying approval of

17 the assignment today and forcing us to turn to a backup bid.

18         Candidly, Your Honor, we believe my client will be

19 prejudiced in two respects.  First, the risk and potential of

20 a negative precedent which could have lasting effect on some

21 800-plus other leases that we are in the process of in the

22 market now looking to assume and assign for value.  To allow

23 a landlord to graft additional rights and restrictions that

24 don't presently exist in the debtors' leases will

25 dramatically negatively impact on our marketing opportunities

1  going forward.

2         THE COURT:  Well, how do you reconcile that with

3  the cases the objectors cite?

4         MR. FOX:  Your Honor, we don't believe those cases

5  support their position.  And, as debtors' counsel has said,

6  the statute supports enforcement of the debtors' lease and

7  any restrictions in the debtors' lease.  The debtors' lease

8  here does not include the type of restriction that the Ross

9  lease suggests exists.  The fact that it was publicly of

10  record here too, in my opinion, Your Honor, in my view is of

11  no moment.  Yes, parties may have been on notice, either

12  constructively or actually, and maybe they assumed some risk

13  in that regard, but at the same time those parties when they

14  appeared and bid on the lease were entitled to rely upon what

15  they believe is an appropriate interpretation of the statute

16  and the applicable case law.  And that suggests, Your Honor,

17  the result that the debtors seek today, and that is approval

18  of assumption and assignment of the debtors' lease, which is

19  not subject to any further restrictions of any other lease in

20  the center.

21         Your Honor, the reality here is, you know, to the

22  extent that these are shopping center leases, the debtors

23  don't necessarily, in the absence of a specific restriction

24  appearing in their lease, have access to the leases of every

25  other tenant in the centers.  And certainly my client doesn't

1  have access to those because those are confidential, private,

2  proprietary information between the landlords and those other

3  lessees.  So --

4        THE COURT:  Does it make a difference, though,

5  that they raised it at the auction?

6        MR. FOX:  No, Your Honor, I don't believe it does

7  because, again, you're entitled -- both the debtors and the

8  counterparties who were bidding on these leases, including my

9  client, who are running a process now pursuant to the asset

10  purchase agreement and the designation rights it acquired,

11  has the right to rely upon what it understands the law is in

12  this Court, as well as the case law that has come before this

13  case.  The collective interpretation of the debtors and my

14  client is that the case law supports assumption and

15  assignment and not enforcement of the restriction that Ross,

16  who in my view is a mere interloper here in this case -- it

17  is not a creditor, it's not a landlord, and therefore it

18  doesn't have any rights in this court whatsoever.  The

19  landlord does, but we think the landlord is wrong on the

20  facts and the law.

21        Also on the question of prejudice, Your Honor,

22  yes, there's an economic component to this certainly.  The

23  landlord suggests that, well, if we get less money, it's not

24  prejudicial to us.  We fundamentally disagree with that

25  notion.  I'm not ashamed to say this is about money, you

1   know.  As I said earlier in my remarks at the outset, my

2   client has committed over $400 million to this transaction

3   and continues to fund essential expenses of this estate in

4   furtherance of its commitments under the asset purchase

5   agreement, and in consideration and exchange for that, Your

6   Honor, we're entitled, we believe, to have our rights

7   enforced by this Court, and that specifically includes the

8   designation rights that were part of the asset purchase

9   agreement and a critical component of the transaction.

10          So we would urge this Court to overrule the

11  landlord's and Ross's debtors and approve the debtors' motion

12  seeking assumption and assignment.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MS. OESTREICH:  Your Honor, Hailey Oestreich of

16  Jackson Walker on behalf of Burlington.  I would just like to

17  make one final point.

18          As you're aware, the debtors' lease is

19  significantly older from the Ross lease -- than the Ross

20  lease, I believe by about 11 years.  Debtors' lease

21  originally did have an exclusivity provision, but you'll see

22  in Exhibit 3, the first lease modification of debtors' lease,

23  the debtors actually made a concession and modified their

24  lease in order to let Ross into the shopping center.  There

25  was a bargain and the parties bargained to change debtors'

1   rights.

2          Ross, at the time, and landlord, at the time,

3   didn't bargain for Big Lots debtors to give up their free

4   assignment provision with no conditions on it.  That's what

5   the parties agreed to when all of these parties were brought

6   together at the same time that debtors would keep their

7   provision, they gave them the free right to assign to anyone

8   without landlord's consent.  If we're talking about the

9   bargained-for rights, enforcing the provision as debtor -- or

10  enforcing the assignment as debtors have requested and

11  overruling Ross and landlord's objections is what the parties

12  have bargained for when they all first came together back in

13  the beginning.

14          MR. ROOT:  Your Honor, again, briefly, Alan Root,

15  for the record, on behalf of the landlord.

16          I would just come back to the plain language of

17  the statute, Your Honor, and Counsel said we got it wrong on

18  the law.  Well, respectfully, the law is all over the place

19  on this issue.  And the Third Circuit, to the extent it's

20  spoken on it, has spoken on it in Joshua Slocum and did --

21  whether it's dicta or whether it's a holding did indicate

22  that you should be looking at not just the debtor lease, but

23  the other leases in the shopping center, and that's what

24  365(b)(3)(C) says on its face.  The plain language has two

25  tests, you look at the debtors' lease, and you make sure that

 1 | it also -- the assignment doesn't violate the leases of the

 2 | other tenants in the shopping center.

 3 |         Now, I understand there's policy arguments here,

 4 | but Congress enacted what it enacted, and that's the plain

 5 | language of the statute.  And, Your Honor, we think you

 6 | should enforce the plain language, especially in the facts

 7 | and circumstances that we've discussed here, Your Honor.

 8 |         THE COURT:  Thank you.

 9 |         MR. GOLDBERGER:  Just one final point, Your Honor.

10 | The case law in this circuit is limited, but I would just

11 | point Your Honor to the language in the <u>Joshua Slocum</u> case

12 | quoting from Congress that the purpose of 365(b)(3) is,

13 | quote, "to assure a landlord of his bargained-for exchange."

14 |         And, as the Counsel for Burlington made clear and

15 | as the leases here indicate, the bargained-for exchange was

16 | that the debtors would have the ability to assign and use the

17 | premises consistent with this proposed assumption and

18 | assignment, and that's the proposed assumption and assignment

19 | we believe the Court should allow.

20 |         THE COURT:  Okay, thank you.

21 |         Anything further?

22 |    (No verbal response)

23 |         THE COURT:  Okay.  We're going to take a brief

24 | recess.  I would say probably I'll be back around 2:30.

25 | Okay?  Thank you.

1          (Recess taken at 2:15 p.m.)

2          (Proceedings resumed at 2:43 p.m.)

3               THE COURT:  Please be seated.  Thank you,

4    everyone, for your patience.  I appreciate you being patient

5    and allowing me the time to look at my notes.

6               The landlord and Ross oppose the proposed

7    assignment of the Nolensville lease to Burlington because it

8    will breach certain exclusivity provisions contained in the

9    Ross lease.  The landlord argues that pursuant to 11 U.S.C.

10   Section 365(b)(3) debtor cannot provide adequate assurance of

11   future performance, and the Court must deny the proposed

12   assignment to the proposed assignee.

13              The Nolensville lease is freely assignable

14   pursuant to its terms.  Section 22 of the lease provides that

15   Big Lots "shall have the right at any time... to assign this

16   lease without landlord's consent, provided that no such...

17   assignment shall relieve tenant of any of its obligations

18   thereunder."

19              In addition, paragraph 4 of the Nolensville lease

20   permits Big Lots to use and occupy the premises for a number

21   of retail purposes, including "for the sale of general

22   merchandise."

23              Under paragraph 4(a), any covenants or

24   restrictions of record affecting Big Lots' use were attached

25   and incorporated in the Nolensville lease in Article 7(b) and

1   in Exhibit F.  The Court disagrees with the objectors and

2   finds the phrase "then-existing" does not apply to a future,

3   unknown assignment.

4          The Ross lease was entered into after the

5   Nolensville lease.  Section 15.3 of the Ross lease prohibits

6   the use of the premises for the "off-price sale of

7   merchandise," or the use of more than 10,000 square feet of

8   any premises at the shopping plaza for the display and/or

9   sale of apparel on an off-price basis.

10          The landlord and Ross contend that the proposed

11  assignee is an off-price retailer that intends to use the

12  premise for the off-price sale of merchandise.  They note

13  that this lease specifically restricts Burlington.  The Ross

14  protection provision at 15.3, however, "shall not apply to

15  the existing tenants listed on Exhibit L."

16          Here, the debtors are existing tenants under the

17  lease.  Big Lots is also listed on Exhibit L of the Ross

18  lease.

19          The Ross lease does not restrict Nolensville lease

20  assignment.  The lease being assigned contains no provision

21  requiring compliance with the Ross exclusive use provision;

22  accordingly, the debtors' proposed assignment to Burlington

23  does not violate the terms of the Nolensville lease.

24          Similar to Toys "R" Us, the lease to be assigned

25  was executed long before the Ross lease was in effect, and

1   the lease here included nothing that requires adherence to

2   the provisions of the Ross lease.  On the other hand, Three

3   A's is distinguishable.  Unlike the issue here, Three A's

4   involved covenants that run with the land and the

5   interpretation of a permitted use under California state law.

6          This Court agrees with the reasoning of the

7   District Court for the Southern District of New York in Sears

8   and the New Jersey Bankruptcy Court in Bed Bath & Beyond that

9   the provisions of Section 365(b) must be read in harmony with

10  365(f)(2)(B) and that the phrase "any other lease" could not

11  have been intended to mean a subsequent lease between a

12  landlord and a third party to which the debtor was not a

13  party.

14         Applying the plain language argument would mean

15  that the debtors are bound by restrictive use provisions in

16  other leases that were entered into after the Big Lots lease,

17  making the broad assignment provisions negotiated for by Big

18  Lots unenforceable based on the landlord's subsequent

19  agreement with a third party that the debtors were not party.

20  As the Court explained in Bed Bath & Beyond, the ability of

21  debtors to maximize the proceeds from their leases would or

22  could be severely curtailed by landlord's subsequent

23  agreement with other tenants to limit the use for which the

24  debtor's premises were expressly allowed to be used without

25  debtor agreeing to those terms.  Landlords would be permitted

1   to eviscerate the debtor's negotiated bargain, a broad

2   assignment provision, by subsequently entering into an

3   agreement with any third party in the same shopping center

4   that restricts uses the debtor was expressly permitted to

5   have under the lease.

6          So the debtors' assignment of the Nolensville

7   lease is permitted, including the going-dark provision, and

8   I'll overrule the objection.

9          I understand that there's a revised form of order

10  that will be submitted.  And I would just ask that you do a

11  clean and blackline under certification of counsel.

12         MR. GOLDBERGER:  Yes, we will, Your Honor.  Thank

13  you.

14         THE COURT:  Okay.  Is there anything further?

15         MR. PIRAINO:  Your Honor, for the record, Stephen

16  Piraino, Davis Polk & Wardwell.  There's one last thing we'd

17  just like to note for you, Your Honor, as filed on our

18  agenda.  As you may recall, there were three lease holdovers

19  from December, one of which was related to the Vero Beach

20  property.

21         THE COURT:  Yes.

22         MR. PIRAINO:  The debtors do not intend to proceed

23  with the assumption and assignment with respect to Aldi's

24  and, in furtherance of GBRP's designation rights, a

25  certificate of counsel has been filed to approve a

1   stipulation to enter into a lease termination agreement.

2            THE COURT:  Okay.

3            MR. PIRAINO:  We understand that Counsel to Aldi's

4   would like to be heard on that, but I would just like to very

5   quickly let Your Honor know the debtors' position on this and

6   sort of how this, you know, sort of unfolded.

7            As Your Honor will recall, we had our November

8   lease waive, some things were carried over and, you know, at

9   the 19th we said we would push things to January.  Obviously,

10  something happened between the 19th and today, the sale to

11  GBRP, including the sale of designation rights with respect

12  to all of our leases.  GBRP recognized that, you know, there

13  were -- that there had been a prior process, they engaged

14  with parties who were part of that prior process and, for

15  example and what you just ruled on, the designation decision

16  was the same as what the debtors would have done.  That's not

17  the case in every instance.  For example, here, GBRP's

18  exercise of their designation rights was with respect to a

19  termination and, as Your Honor will have probably seen in the

20  docket, the landlord here, you know, before any of this all

21  happened --

22            THE COURT:  This is PAM right?

23            COUNSEL:  Yes.

24            THE COURT:  Okay, all right.  I just want -- oh,

25  that's --

1          MR. PIRAINO:  I needed my helpers back there.

2          THE COURT:  I'm sorry, that's an acronym.  Yes.

3          MR. PIRAINO:  That's okay.  Yes.

4          THE COURT:  Okay, I just wanted to make sure we

5     were talking about the right thing.

6          MR. PIRAINO:  Yes.  We think we've called all of

7     these properties by different things.

8          So, you know, they've designated their -- decided

9     to designate this through the termination with the landlord.

10    Before that happened, even before the sale hearing, we

11    understood the landlord was going to take issue with Aldi's.

12    So the decision was made not just out of the blue, but,

13    frankly, to resolve potential litigation, to enter into this

14    termination.  The estate supported that because avoiding

15    litigation at this point for the estate is a prudent use of

16    resources.

17         And just one last -- one last piece.  Your Honor

18    has approved, I think we're up to four or five of these lease

19    sale procedures.  So we know there's an order out there,

20    there was an auction that occurred pursuant to the lease sale

21    procedures, but the lease sale procedures, there's two

22    important points I just want to note for the Court.  The

23    first is the debtors' acceptance of bids only occurs upon

24    approval of the bids, nothing has been approved, and sort of

25    the corollary to that is the debtors at any time can

1  terminate the sale process and pursue an alternative

2  transaction.  I think it's very clear we did pursue an

3  alternative transaction, the GBRP sale.

4          So, with that, our position is we're not going

5  forward.  The certificate of counsel is on file at 1783, and

6  we believe that it's consistent with the sale order and

7  GBRP's designation rights.

8          THE COURT:  Okay.  Good afternoon, Ms. Bifferato.

9          MS. BIFFERATO:  Good afternoon, Your Honor, Karen

10 Bifferato on behalf of Aldi, Inc.

11         I rise briefly to introduce my co-counsel, Mr.

12 James Rossow from Rubin & Levin in Indiana.  He's been

13 previously admitted *pro hac vice*.  We filed those papers

14 actually back in mid-December when we were teed up for a

15 December 19th hearing.  We actually thought everything was

16 going forward at the 19th hearing in December, it was not.  A

17 lot has happened, and it's actually the process that we want

18 to talk to the Court about today.

19         And before I hand the podium over to Mr. Rossow I

20 did just want to mention, because debtors' counsel brought it

21 up, the certification of counsel regarding the lease

22 termination; that was filed under certification of counsel

23 last night, we saw it today, we have a problem with it as of,

24 you know, right now, depending on what happens.  But we would

25 ask that the Court not enter the order and we would submit

 1  that it should not have been under certification of counsel,

 2  but we'll get to that in Mr. Rossow's presentation.

 3           THE COURT:  Okay.

 4           MS. BIFFERATO:  Thank you.

 5           THE COURT:  Well, I haven't seen it and it hasn't

 6  been entered.  So --

 7           MS. BIFFERATO:  Great.  Thank you.

 8           MR. ROSSOW:  Thank you, Your Honor, Jim Rossow,

 9  Rubin Levin, Indianapolis, Indiana, on behalf of Aldi, Inc.

10  If the Court will permit me to walk through the story to

11  provide context and of how we got here and why we're here on

12  a hearing that I think the debtors believe, along with Gordon

13  Brothers, was mooted by a lease termination agreement that

14  was filed last night.

15           Aldi has participated as a bidder in this case for

16  three properties.  The Court has already found and approved

17  transactions with three other properties in which Aldi was

18  found to be a successful bidder.  We have experience bidding

19  in these cases.  Aldi has 2400 stores, they happen to be

20  postured that they are a good buyer for stores of this size.

21  And in other cases, I know the parties mentioned Toys "R" Us,

22  Aldi was involved in Toys "R" Us as a bidder.  Any stores

23  that have that footprint are ones where Aldi is a candidate

24  to be a buyer.  As a result, we have been a bidder in many

25  bankruptcy cases.

1           A&G that has run this, brokering the liquidation

2   of leasehold interests, obviously, is quite well renowned.

3   We have been part of that process for many years.  We know

4   A&G well, we hold them in the highest regard, they run great

5   auctions, and we've participated in many auctions, which

6   brings us to Vero Beach.  Well, if I can, let me back up.

7           There is one location, Taylor, Michigan, and

8   Taylor, Michigan is a location that was in a shopping center.

9   And I want to mention Taylor, Michigan because the lease at

10  issue in Vero Beach is not in a shopping center under the

11  Joshua Slocum factors.  So that lease was under a shopping

12  center, it had an alcohol restriction, and that's what this

13  is about is an alcohol restriction.  The debtors invited us

14  to contact the landlords because they knew that the landlords

15  would be taking issue with Aldi attempting to acquire a lease

16  free and clear of an alcohol restriction.  I believe the

17  landlord in that case is represented by Kirkland & Ellis.  We

18  worked with them, worked out an amendment, and also paid the

19  estate some price to acquire leasehold interest, and then

20  amend the lease to address the landlord's concerns and also

21  allow for operation and the sale of alcohol.

22          THE COURT:  This meaning the Michigan?

23          MR. ROSSOW:  That's the Michigan case and this is

24  different.  And I wanted to sort of explain that because we

25  -- certainly we understand the difference and I think we bid

1  a much lower amount for the Taylor, Michigan case -- store

2  location.  Here, we bid on an auction held December 4th,

3  after competitive bidding.  We were the first opening bid at

4  $150,000.  There was also a cure amount that was at issue.  I

5  think at the auction, Mike Matlat at A&G, who runs the

6  auction, had indicated with I think Mr. Goldberger also

7  clarifying that there was a cure amount, roughly, at the time

8  was determined to be $80,000.

9          So Aldi bid 150, plus cure, give or take, call it

10  a $230,000 bid, but the dollar amount to the estate was

11  $150,000.  Havertys was also a competitive bidder.  Of the

12  locations that went up for auction, Burlington was there,

13  that was a notable event, and there were issues in which the

14  landlord made its objections clear.  But Aldi bid, and it was

15  a spirited round of bidding, and we went from $150,000 at

16  $10,000 increments, with some skips in between, and Aldi

17  wound up the highest bidder at $800,000.  Havertys was a

18  backup bidder at $750,000.

19          On December 5th, the debtor filed its notice of

20  the successful bidders, and the hearing, I believe, was set

21  for December 19th, as Mr. Goldberger had indicated.

22          The landlord filed its objection on December 12th,

23  I believe, and that objection, I would characterize that

24  diplomatically -- and I don't take issue with it, but I think

25  it's true -- it was a placeholder objection.  It was an

1  objection that said this is in a shopping center and, broadly

2  speaking, citing the principle of *cum onere*, that the lease

3  obligations must be borne by the assignee in their full

4  regard.

5          We had discussion -- when I say we, the Aldi team

6  had discussions with landlord's counsel to try to resolve

7  these issues and it -- I should back up.  So we had made a

8  determination that this was not in a shopping center.  I

9  really don't think it's controversial, but we have a document

10  in which the landlord indicates that it's in a shopping

11  center.

12          So there's -- and I'm going to -- we have a brief

13  on file that elucidates this, Your Honor, so I don't think I

14  need to go into great detail, but there is a mall that was

15  developed to the north of this property, that mall had

16  excepted out the parcel that we're calling the Big Lots

17  parcel.  So it really -- it's not part of that REA, I don't

18  think there's a colorable argument.  There is with respect to

19  our parcel, the parcel in question, there's Big Lots and

20  Mattress Firm.  So there are two buildings, they each have

21  parking space.  They're contiguous, there's ingress and

22  egress, there's -- you know, there's the ability to move

23  between parking spaces, but their parking is separate, I

24  mean, one for one store, one for the other, they're facing

25  opposite directions.  There is a declaration, but that

1 | declaration deals with very minimal issues of maintenance.

2 | So, under the Joshua Slocum factors, this property

3 | is not in a shopping center.  And somebody may disagree with

4 | me, but I -- you know, I'd love to have that argument because

5 | I believe we can prevail on that point.

6 | What it does have is an alcohol restriction.  And

7 | so, under our analysis, that alcohol restriction would not be

8 | subject to the heightened 365(b)(3) standards regarding use

9 | that we've been talking about, but would be subject to

10 | scrutiny as to whether or not it is an anti-assignment

11 | provision.  We just heard earlier some discussion, I believe

12 | Burlington may have pointed out that the go-dark provision in

13 | the Burlington lease was *de facto* anti-assignment, right?

14 | Certainly something that comes up all the time.  In fact, in

15 | this case the lease -- in our lease there really isn't a true

16 | go-dark provision.  There is a continuous operation

17 | provision, but it doesn't read the way that we typically see

18 | a go-dark provision.

19 | So, anyway, Your Honor, we're here, we believe we

20 | have a lease that we paid good value for, that it was below

21 | market.  The idea -- and we have presented a declaration from

22 | Jordan Ford, the director of real estate for Aldi, it

23 | indicated what is obviously true, which is that where an Aldi

24 | can sell beer and wine in this market in Florida, that's

25 | where customer sales are better.  So they do better when they

1 can sell beer and wine in Florida.

2          And I should say, just contextually, Florida is a

3 state where beer and wine licenses are relatively plentiful,

4 they're not a scarce commodity.  So when people do their

5 shopping, they want to pick up their beer and wine and that's

6 just sort of a competitive advantage.  So that's why Aldi

7 paid -- offered to pay $800,000.

8          So, fast-forward, we have the objection.  It is a

9 -- maybe a barebones objection.  We had some discussions with

10 landlord's counsel, as the debtors had invited us to do to

11 try to resolve our issues, I think they were happy.  If we

12 had resolved that issue, they would have been happy to stand

13 by our transaction.

14               So we filed our brief and

15 our supporting documentation, keeping in mind that we didn't

16 really know what we were arguing against.  So we had to argue

17 about the shopping center not having really received a cogent

18 argument about that, we argued about the alcohol restriction.

19 We cited the Toys "R" Us cases, Aldi was a party in the Toys

20 "R" Us cases.  There are two decisions that came out of Toys

21 "R" Us, one of them involves Aldi and it involves the

22 shopping center issue -- not the use restriction issue, but a

23 shopping center issue.  And it involves the shopping center

24 issue, not the use-restriction issue, but a shopping center

25 issue, so we're familiar with Toys "R" Us.

1             But that brings us to more recent events.  So,

2    ALDI, from our perspective, we thought we were having a

3    hearing on December 19th.  There was some discussion about

4    moving that hearing off.  We were more than willing to do

5    that.  To be honest, the issue, which makes sense from the

6    debtors' perspective is if they were going to continue the

7    hearing, they wanted to make sure that the backup bidder

8    would stand by and be prepared to close, and the second issue

9    is the rent accrual.

10            It turns out that this lease, the rent was paid

11   quarterly, so we actually had until March before the next

12   rent is paid, so that provided time, which is why we thought

13   we would have a hearing, here in January.  So, we filed our

14   papers.  What we saw is we didn't hear from the debtors.  I'm

15   sorry, we didn't hear from the landlord and we had some

16   discussion with debtors' counsel, Mr. Goldberger about our

17   negotiations.  They asked to see some language that we

18   provided in typical leases.

19            And Mr. Gold is here representing the landlords,

20   so he may speak to this issue and I'd like an opportunity to

21   respond, if I may, but in any case, what we were told last

22   week, we were informed that there was a lease-termination

23   agreement that was worked out and that they, the debtors

24   would not be proceeding with our transaction.

25            I will say, in termination of communication, and I

1  understand this happens, I know that this -- a lot has

2  happened in this case.  I heard Mr. Fox talk about a $400

3  million investment by Gordon Brothers.  I get it.  But we

4  come in here in these cases in good faith.  We play by the

5  rules.

6          Your Honor, when Mike Matlat (phonetic) runs these

7  auctions, the debtors' counsel transcribes those auctions,

8  they require us all to listen to the bid procedures and

9  confirm that we will play by the rules.  We will not collude.

10 We will not engage in anything other than bidding and good

11 faith and that's what we do, and that's why we're here, Your

12 Honor.

13         So, we find out that the deal, the landlord worked

14 out a deal with, ostensibly with Gordon Brothers.  It appears

15 less than clear whether it's Gordon Brothers or the debtors;

16 it's rely both.  I asked for the disclosure of the amount of

17 consideration, because I knew that that might be an issue.  I

18 didn't get an answer.  I asked repeatedly.  I've asked three

19 times in the last eight days since we were told that a lease-

20 termination agreement would be forthcoming.

21         We filed it last night, so what was filed under

22 certification last night, Your Honor, that you didn't look at

23 is a lease termination and the part that I cared about is how

24 much was being paid by the landlord to the debtors.  And this

25 was also proved by Gordon Brothers.  The amount is roughly

1   $660,000, but --

2              THE COURT:  Say that again, $660,000 paid by whom?

3              MR. ROSSOW:  Paid, ostensibly, and I could be

4   corrected, by the landlord to terminate.

5              There is a cure provision, because, obviously, if

6   we're at 800,000 and they're at 660, something doesn't add

7   up.  If you do the math, it works out to, wait for it,

8   $800,000.  Not a penny more than what we bid.  Not even a

9   topper, on top of what we bid.  So, they bid the exact same

10  as what we bid and now we're -- now, I understand that's

11  going out under certification.

12             So, to back up, we thought we were having a

13  hearing today.  I understand the events that happened in

14  December, Your Honor, and I want to carefully talk about that

15  and address -- I think I sort of previewed my argument, which

16  is why counsel talked about this issue about having the right

17  to pursue alternative bids, because I understand that's what

18  the point is.

19             And I would point out that there is a declaration

20  that has not been admitted into evidence today, but it's on

21  the record and it was identified as an exhibit, and that is

22  the declaration from Emilio Amendola, as to the bidding

23  process.  That was filed on December 17th and that includes

24  the sworn statements that ALDI was the highest-and-best bid

25  for the Vero Beach property, all the kind of language that we

1  welcome and we agree with and that apparently was as true --

2  was true on December 17th and theoretically is still true

3  today.

4          So, with respect to the Gordon Brothers

5  transaction, because we weren't -- we now -- now, we get it.

6  Now, I get why we have -- why I'm arguing for whether I even

7  get to have an argument, Your Honor, and that is that the

8  Gordon Brothers transaction ostensibly applies to the leases

9  that, these leases that were subject to the auction that had

10 not yet closed.

11         I will say that, as you know, Your Honor, there

12 was the Nexus transaction and Nexus had worked with ALDI to

13 provide capital for many of those leases on the Nexus side,

14 but we were not pursuing those to the auction process that

15 A&G was handling.  So the four -- the three locations that I

16 referred to earlier were the ones that were running outside

17 of the Nexus process.

18         So, from our perspective, it made sense that we

19 would pursue the transactions that already booked, that were

20 ready to close, but for a few objections by the landlord that

21 when the Nexus transaction fell through, that the debtor

22 pursued an alternative with Gordon Brothers.  I will say

23 that, and I know the timing, but it's simply for the record,

24 that that motion was filed on a Friday, December 27th.  It

25 was filed on shortened notice.  There was a notice, a 2002(c)

1  notice.  I would respectfully submit that that notice did not

2  indicate what assets were being sold.  It certainly did not

3  disclose that the leasing question that we had an interest in

4  was being sold.  We thought that that was set over for a

5  hearing and we thought that that, maybe rightly or wrongly,

6  that that would proceed outside of Gordon Brothers.  After

7  all, the money was already under contract and would, once

8  approved, come into this estate, independent of anything that

9  Gordon Brothers did.

10         And keep in mind, Your Honor, that Burlington is,

11  in fact, a transaction that proceeded at auction that the

12  debtors elected to proceed with, whereas, this transaction,

13  they've elected not to proceed with and take the position

14  that Gordon Brothers has the right to terminate.  So, as Your

15  Honor knows, there was great urgency.  Your Honor had a

16  hearing on Monday, indicated that an order would be entered.

17         I will say that there was an asset purchase

18  agreement filed with that motion.  That asset purchase

19  agreement refers to a schedule of "365 contracts."  Now, that

20  schedule was not filed with the Court, which happens.  I know

21  that happens in these cases, but it wasn't filed with the

22  Court.

23         The Court held a hearing.  The Court entered an

24  order.  When the Court entered an order, I should say there

25  was an amended asset purchase agreement filed shortly before

1  the Court entered its order on January 2nd.  That amended

2  purchase agreement actually did away with the term 365

3  contracts, but it referred to, instead, "disclosure

4  schedules."

5          The disclosure schedules, then, also, referred to

6  365 contracts.  So it wasn't a direct schedule; it was a

7  separate sub schedule of the disclosure schedules.  And as

8  Your Honor probably knows where I'm getting is, there were no

9  contracts filed with that amended asset purchase agreement.

10 Nothing on record with the Court.

11         And when the Court entered the order and the order

12 was attached, that order that's attached also doesn't have

13 any of these contracts.  So there's nothing on record with

14 respect to the Court's entry of an order indicating that this

15 asset would be part of the assets that were being sold to

16 Gordon Brothers.

17         So, with respect to the process, obviously, we

18 weren't given an opportunity to bid competitively.  I will

19 tell everybody a secret, which is that we had more authority

20 to bid at the auction on December 4th, but Havertys stopped

21 bidding, so I didn't volunteer more money from ALDI to pay

22 for the leasehold interest because Havertys didn't want to

23 pay anymore.  So, we were the highest bidder at $800,000.

24         I certainly am offering -- if you want to have the

25 auction right now, we'll increase our bid, but it's notable

1  that the landlord didn't even increase, they didn't even top

2  our bid.

3           And I understand what's going to be said.  The

4  argument is going to be made that there's a litigation risk

5  associated with the cost.  And so I will make the argument

6  that's in our brief that also comes from Toys "R" Us.  And

7  I'm not giving sole deference to Toys "R" Us, Your Honor, but

8  it is instructive and I think this point is relevant, which

9  is, what is the value to the estate, right.

10          I think I heard it made in connection with the

11  argument by the landlord as the backup bidder in Burlington.

12  I think landlord counsel in that case said that we're only

13  $50,000 away and the answer is, of course you weren't.

14  Because if there weren't two bidders bidding competitively,

15  then the initial bid would have been the highest bid.

16          So, in our case, I don't even know what Havertys'

17  initial bid was, but it was something less than $150,000.  So

18  the competitive bidding process increased the bid up to

19  $800,000.

20          Now, why is that?  It's because we believe that

21  the Court has the ability to sell and assign this lease free

22  and clear of the alcohol use restriction.

23          I will say that I have had -- and I'm not asking

24  the Court to determine that today.  You know, Your Honor, I

25  don't want to win in Court.  I want to not lose.  And I'd

1   like to not lose today by at least having an opportunity for

2   the Court to address this issue, perhaps, at a full hearing,

3   both, with respect to the Gordon Brothers' transaction, with

4   respect to the request for termination, and what may underlie

5   that.

6         So, for example, and I want to be very careful,

7   but it occurs to me that I have not heard of Havertys, and I

8   would not suggest they're doing anything wrong, but is it

9   possible that Havertys might want to acquire this site and

10   they may also be in the background of the transaction

11   involving the landlord?  It's possible.  I wouldn't even

12   accuse anybody.  I'm not suggesting that it's improper.

13         But at least it would be something that would be

14   relevant for purposes of competitive bidding for enhancing

15   the bankruptcy estate.  I know there will be a lot of

16   comments from counsel, and if I can, I'll reply, hopefully

17   very briefly, Your Honor, to all those comments.

18         I know Mr. Gold.  I've had discussions with

19   Mr. Gold.  We had a spirited discussion during the break and

20   I know he will make some (indiscernible) remarks, but what I

21   would say, Your Honor, is we're not trying -- you know, I'm

22   not trying -- I just want a fair shake.  And ALDI wants to

23   come back in these bankruptcy cases, and they will, they will

24   be back.  They happen to be in a position where they have --

25   they're the kind of business right now that is in the times

1  we are, they are able to acquire and expand and they're in

2  that trajectory.

3           So, I can respond to specific issues.  I will say

4  if this is turning into a hearing on what I thought it

5  originally was, which was an evidentiary hearing on something

6  where the landlord has a burden, I have evidence, but I'm not

7  sure that's what -- you know, we have our brief.  I will say

8  that we filed exhibits with our brief.  Many of those are

9  certified copies of records, so they're automatically

10  admitted if the Court would consider looking at those.  I

11  believe those are admissible without the foundation, but we

12  also have a declaration from Jordan Ford.

13           I don't think that the issues in the Ford

14  declaration, I think they go to adequate assurance issues,

15  but I'm happy to address those.  So, with that, Your Honor,

16  if I have the opportunity to respond, I'll turn it over to

17  the other parties.

18           THE COURT:  Thank you.

19           MR. FOX:  Good afternoon, again, Your Honor.

20           Steven Fox, Riemer & Braunstein, on behalf of

21  Gordon Brothers Retail Partners.

22           Your Honor, I'll be brief if I can.  First and

23  foremost, I want the record to be clear that from Gordon

24  Brothers' perspective, we have absolutely no criticism of

25  ALDI in this circumstance.  We have every reason to believe

1    that in the process that Mr. Rossow described, that ALDI

2    conducted itself in all instances, in good faith.  And we

3    also completely understand and get the fact that Mr. Rossow

4    and his client are disappointed with where we are today, but

5    the fact remains twofold.

6             First, the debtors have already advised this Court

7    that it does not intend to pursue the transaction with ALDI,

8    pursuant to the results of the auction, conducted back in

9    December, as described.  So, as a fundamental and starting

10   point matter with this Court, there is nothing before the

11   Court today on this matter.  And while I appreciate the

12   background that Mr. Rossow described to the Court, about the

13   Michigan lease and about their view on Vero Beach, the fact

14   remains that on January 2nd, this Court entered an order

15   approving a transaction between the debtors and Gordon

16   Brothers.

17            As has been described in earlier remarks today,

18   that transaction critically included designation rights over

19   the entire universe and population of the debtors' leases and

20   contracts.  My client, having evaluated the facts and

21   circumstances of this particular lease and the positions of

22   the parties, the debtors, the landlord, and ALDI, as the

23   putative successful bidder back in December, made a conscious

24   business decision, as is its exclusive right under the asset

25   purchase agreement and the sale order from January 2nd, to go

1   and pivot in a different direction.

2           And rather than take on the litigation risk, as

3   described, it decided that it would negotiate, in conjunction

4   with the debtors, a lease-termination agreement with the

5   landlord.  In my view, the fact that the dollars and cents

6   may be equivalent is of no moment.  This is a business

7   decision solely in the discretion of Gordon Brothers and,

8   again, we mean no disrespect and no criticism of ALDI in this

9   regard, but it is a business decision we've made.

10          We are not under any contractual or other

11  obligation, statute or otherwise, to conduct any further

12  competitive auction.  In this particular instance, we

13  determined not to do that.

14          Mr. Rossow described much about, you know, the

15  hearing back on December 30 and December 31st, which led to

16  the January 2nd sale approval order.  The fact remains that

17  his colleagues were present at that hearing on Zoom and made

18  no mention whatsoever of their interests, made no attempt to

19  exclude these assets, and as a result, these assets were

20  included or this lease was included in the assets, subject to

21  the asset purchase agreement.

22          There is nothing for this Court to decide today,

23  insofar as Mr. Rossow's client is concerned.  What is going

24  to be before the Court, as Mr. Piraino mentioned, is a

25  certification of counsel, accompanied by a lease-termination

1  agreement that has been approved by the debtors and Gordon

2  Brothers, consented to us, by us, pursuant to which we intend

3  to terminate the lease on consent with the landlord, pursuant

4  to paragraph 42 of the sale order.  We believe that is

5  entirely appropriate by way of procedure, which the sale

6  order explicitly provides that if there's an agreement among

7  the parties, no hearing is required, no further objection

8  period is required between those two principal parties, and

9  we would ask the Court when it has an opportunity to review

10  the certification of counsel, to enter an order approving the

11  lease termination, as negotiated among the parties.

12          I'm happy to respond to any questions you may

13  have, Your Honor.

14          THE COURT:  No, I'll hear from others.

15          MR. FOX:  Thank you, Your Honor.

16          MR. GOLD:  Good afternoon, again, Your Honor.

17          Ivan Gold of Alan Matkins.  I'm co-counsel with

18  Mr. McDaniel for Premium Asset Management, PAM, not the

19  kitchen product.

20          Your Honor, I'm going to start by quoting a

21  longtime practitioner in front of this Court, Ms. Heilman's

22  mentor, David Pollack.  David once built an entire argument

23  around an old ad campaign:  There's Hertz and there's not

24  exactly.  And I channel that, because listening to

25  Mr. Rossow's comments, I heard a lot of "not exactly."  I

1   heard a lot of conflating issues.  I heard a lot of

2   conflating timeline.  And I'd like to respond to the high

3   points.

4          We start with the fact that the debtor made clear

5   on Friday, they filed an agenda, that they weren't moving

6   forward.  That was preceded by phone conversations and emails

7   earlier in the week.  The debtor advised and Mr. Rossow

8   acknowledged he spoke to Mr. Goldberger earlier in the week

9   that Gordon Brothers had decided to go another way.

10          Well, I don't want to have to call Mr. Goldberger

11   to the stand to establish the timeline that the reply brief

12   or whatever you want to call it, filed by ALDI and the

13   witness list, followed that phone call.  They knew Gordon

14   Brothers was going another way.  What you saw is docket

15   grandstanding, that they were going to go forward whether

16   anyone else liked it or not, and we saw a lot of that today.

17          We saw a lot of argument about things that are

18   moot.  I don't know -- I think I just sat through, not one,

19   but two motions for reconsideration.  I think we saw a motion

20   for reconsideration of your original bidding procedures

21   order, Your Honor, back at Docket 612, which, Mr. Piraino

22   referred to as paragraph 8 of the Court-approved bidding

23   procedures says:

24          "Doing a deal with the debtor is not an acceptance

25   of the deal under an order is entered by the Court."

1          That didn't happen.

2          Paragraph 12 of the same bidding procedures

3  contains the traditional fiduciary out and in the language

4  there it says that the debtor, in its discretion, at any

5  time, prior to entry of this Court's order, may pursue an

6  alternative transaction.

7          Exhibit A to the existence of an alternative

8  transaction is my friend, Mr. Fox, who I know is

9  uncomfortable today, because I don't think in the long time

10  we've known each other, we've ever agreed more on a single

11  topic than what's before the Court this afternoon.

12      (Laughter)

13          MR. GOLD:  But the fact is, Your Honor --

14          MR. FOX:  For the record, Your Honor, I am

15  uncomfortable.

16      (Laughter)

17          MR. GOLD:  Your Honor, counsel for ALDI said that

18  he referred to being mooted by the lease-termination

19  agreement.  That's false; they were mooted by the Gordon

20  Brothers' sale order.  This was not an excluded asset.  The

21  debtor chose to go another way.  Gordon Brothers bought it,

22  bag and baggage, bought the deals, and they now have the

23  decision-making ability, which they have exercised, under the

24  designation rights.

25          So, not one order, but two support just simply

1  going forward with the transaction with the landlord.  All

2  the references about the auction and A&G, in the bluntest

3  terms, Your Honor, A&G was ousted by your ruling on the 2nd.

4  That process ended.  We had two days of hearings where

5  everybody involved in this case had an opportunity to be

6  heard, ask for clarifications, objections.

7          Was ALDI here to say, Hey, Your Honor, we have

8  this pending transaction.  Can I get a clarification?  Are we

9  done?  Do I now talk to Gordon Brothers?  Are we still on?

10         They didn't do any of that.

11         So the fact is, Your Honor, that the process that

12 Mr. Rossow complains about is history, like so much of this

13 case.  That was then, and since entry of your order

14 authorizing the Gordon Brothers' sale transaction, this is

15 now.  And under that transaction, as well as paragraphs 8

16 and 12 of the bidding procedures, the debtor sold these, the

17 rights to make decisions regarding the Vero Beach lease and

18 others, and Gordon Brothers, in its business judgment, which

19 it bargained, and as Mr. Fox said earlier, paid handsomely

20 for, they've decided to go another way.

21         Now, Mr. Rossow said that they played by the

22 rules, and that may very well have been true, but the fact is

23 that the rules changed.  That was a consequence of the

24 failure of the Nexus transaction, the debtor being compelled

25 to pursue an alternate transaction, which was contemplated,

1   and this Court approving that alternative transaction.

2          The price the landlord paid is not particularly

3   relevant, or will pay, because of the litigation risks.  Your

4   Honor, I was fully prepared, but for the deal, to litigate

5   with ALDI.  We noticed the deposition.  You can see that

6   reflected in the docket.  That was withdrawn in reliance on

7   the fact that we had the deal.  That was the deposition of

8   the debtors' representatives.

9          We had quite a robust hearing, Your Honor, because

10  I would have told you Toys "R" Us doesn't matter.  This is

11  free and clear of an alcohol restriction.  This was bargained

12  for in a lease in 2023 and I would argue to you that if you

13  have the lease in front of you, and you don't, and this isn't

14  the entirety of my argument, it's just to respond about the

15  litigation risks, that I would argue to you it was a risk

16  management and insurance provision.  I would also tell you

17  that ALDI's form of APA, which is on file with the Court, is

18  greedy.  And, yes, I choose that word very purposefully,

19  because it didn't just wasn't to invalidate it for 365(f)

20  purposes, it wanted you to excise that provision for all

21  time.  It wanted to transfer it free and clear, which I would

22  have argued to you is completely impermissible under the

23  Code, I don't care what case you cite.

24          I would also argue that there were indemnification

25  problems with the ALDI APA, which excluded historical events

1   for which the debtor had insurance.  We solved that problem

2   in the Nexus sale order.  We solved that problem with the

3   Gordon Brothers' sale order.

4        But ALDIs didn't solve that problem; they defied

5   it.  I would argue that even if you went ahead with ALDIs, I

6   would object on the basis of your Gordon Brothers sale order

7   that says that those indemnification issues will be handled,

8   but that's not what the ALDI APA said.

9        So, when Mr. Fox and his client made the

10  determination to go another way, they not only had the right

11  to do it under this Court's order, it was rational, because

12  when Mr. Rossow says, Oh, there was no topping, yes, the

13  litigation risks and the litigation costs, and to prove how

14  invisible that apparently is to ALDI, he stands before you

15  and is suggesting all these really wild procedures that we

16  need to have going forward, just so ALDI can take their next

17  shot at a process that passed them by.  The cost would only

18  go up, Your Honor, and that's the decision Gordon Brothers

19  made and that's the decision they paid for and that's the

20  decision-making ability you approved as part of that

21  transaction.

22        So, as to get back to where Mr. Piraino started, I

23  don't think there's anything before the Court today, and

24  we've been talking for a while, but the debtor is not going

25  forward with that transaction.  As they were entitled to do,

1  the debtor pursued an alternative transaction, as they were

2  entitled to do.

3         Gordon Brothers, who became the decision-maker

4  under your January 2nd order, as they were entitled to do,

5  has made a different decision.  They are following the

6  procedures under paragraph 42 of that order, with the

7  certification of counsel, as they're entitled to do under

8  this Court's order.  So, I don't see any grounds for

9  upsetting where we are and where we have been over the last

10  several weeks.

11         Although, this is not precisely the forum, but the

12  Third Circuit has long held that disgruntled bidders

13  generally don't have standing, so even if you think it's a

14  continuation of the same process, a winning bidder has been

15  declared under procedures and the discretion that you

16  granted.  And just because ALDIs thought they had a deal, and

17  I'm not suggesting at one time that might not have been in

18  good faith, but the fact is that your orders made it clear

19  there isn't a deal until you sign an order.

20         And we can look at the -- I don't know, I think we

21  probably passed 1800 items on the docket by the time the

22  hearing is done today -- you will not find an order approving

23  the assignment of the Vero Beach lease in any of the 1800

24  items on the docket, Your Honor.  So, without that order,

25  they had no right to claim they had a deal and the rules

1  changed from the 30th to 31st, the 2nd, whichever date we

2  want to pick.  I'd like to think I wasn't the only one who

3  could tell what was going on because I sat in your courtroom

4  for those two days, but it was apparent that this was no

5  longer the A&G process; this was now the Gordon Brothers

6  process.

7          Gordon Brothers isn't required to have an auction.

8  They get to do this at their own discretion.  They can

9  privately market it.  They can solicit lease termination bids

10 from landlords, as I'll tell you they're doing with other

11 clients of mine, or they can run a public process.  But they

12 paid, as part of the multimillion-dollar consideration, they

13 paid for that flexibility.  They paid for that optionality

14 and they have exercised it, and there's no reason to

15 reconsider, at this point, that process, which has been

16 approved by this Court and is in the process of being

17 implemented.

18          Thank you, Your Honor.

19          MR. PIRAINO:  Your Honor, for the record, Stephen

20 Piraino, Davis Polk & Wardwell, on behalf of the debtors.

21          Your Honor, very briefly, I fully agree with what

22 Mr. Gold and Mr. Fox said.  I think one point -- I guess,

23 just two points.  You know, one, importantly, from the

24 estate's perspective, we've been here for a good amount of

25 time today already on this issue.  We chose not to -- well,

1    I'm sorry -- Gordon Brothers decided not to go forward with

2    this through their designation rights.  The debtors have an

3    obligation to follow those designation rights, which is why

4    we, also, are not going forward and we think it's in the

5    estate's best interests for the process that was approved by

6    the APA, the sale order to be followed here and to not

7    continue to have to expend resources on that.

8            And, also, I just think it's very important, just

9    to underscore what Mr. Gold said about playing by the rules.

10   The rules were the sale procedures.  Those rules did change.

11   They're the designation rights procedures.  We don't need to

12   get into a complicated evidentiary hearing on that.  I think

13   it's very clear, based on this Court's orders, where we're

14   at, who has the ability to elect what happens with these

15   leases.  It's Gordon Brothers; they paid for it.

16           And I'd also -- just one last thing -- I said only

17   two, I'll do three things -- the certification of counsel,

18   which attaches the termination agreement, there is a waiver

19   for rejection damages.  There is a benefit to the estate from

20   this, so it's sort of an added bonus for the estate.  We

21   avoid litigation.  We're complying with our obligations to

22   ensure that Gordon Brothers has their designation rights.

23   And we're also getting the claims waiver, which, obviously,

24   is beneficial to everyone who has a claim against the

25   debtors.  Thank you.

1                    THE COURT:  Thank you.

2                    MR. ROSSOW:  Thank you, Your Honor.

3                    Jim Rossow, Rubin & Levin, for ALDI.

4                    I do want to make a couple of brief points.  One

5      is that the deposition that was noticed was a deposition of

6      the debtors' representative; it wasn't a deposition of ALDI.

7      We would have been more than happy to press forward.

8                    I think, I'm surmising that the debtor didn't want

9      to have a witness stand for deposition.  I don't think the

10     Court should read anything into that, other than the fact

11     that the debtors' posture was to not engage in any

12     litigation.

13                   With respect to the, with the sale procedures, we

14     get it.  This is bankruptcy.  Courts have flexibility.  But

15     this assumption and assignment agreement is subject to New

16     York law and New York, like many states, has an implied

17     covenant of good faith and fair dealing.

18                   My position is, and this will be relevant in other

19     cases, Your Honor, is that we can't have this in these cases.

20     A&G and the debtor identified ALDI's Vero Beach bid as the

21     highest-and-best offer.  And it's understood that the debtor

22     will protect that transaction.  Yes, we understand there's

23     some litigation involved, but litigation is what drove the

24     price.

25                   I heard arguments that somehow the consideration

1  that's being paid doesn't matter, but it kind of does matter,

2  doesn't it.  It does matter because the math works out to

3  exactly the same as what the ALDI offer is, right.  Because

4  if it didn't matter, Your Honor, I think you'd see a

5  different number.  And, you know, if it were me, it might be

6  more.

7          I will stand by our proposal that we're prepared

8  to pay more.  I have authority.  I mean, if it's okay, I

9  won't say what my maximum authority is, but it's to go higher

10  than the $800,000.  It's to pay higher -- I will tell

11  you 810, we'll go higher than that.  So, we're prepared to

12  pay more if we had a fair opportunity.

13          I think the -- once you're in the transaction,

14  proceed, protect the transaction.  I don't -- and I'm not

15  criticizing the Court, but the identification of assets, it's

16  not part of the notice.  It's not part of the motion.  It's

17  not part of the purchase agreement.  It's not part of the

18  amended purchase agreement.  That is what I'm being told

19  poured my future in concrete and mooted everything, is an

20  identification of assets that were never attached to anything

21  on the docket.

22          So, Your Honor, I understand that this is

23  difficult, but I can say that I'm not happy that we're here,

24  but we bid in good faith and now I see, frankly, the

25  transaction with the landlord to be diplomatic and somewhat

1  complementary is the landlord's counsel, and Mr. Gold became

2  involved after that objection was filed, so he's talking

3  about arguments that -- he's talking about the arguments that

4  he would have been a formidable opponent; arguments that were

5  never made in the objection.  They were never made to the

6  Court and that's the posture that we go into what would be a

7  contested hearing.

8          And he is right, in terms of the timing of the

9  brief.  We actually -- it takes us some time to prepare these

10 briefs, so we had drafted it, but we hadn't actually filed

11 it, in terms of the timing.  I think we needed an affidavit

12 that we filed that we hadn't got a signature on.

13         So it's not that the debtor disclosed to us that

14 there was a lease termination being negotiated and then all

15 of a sudden, you know, in a day, we drafted a brief.  We were

16 drafting our response.  We were fully intending to litigate.

17         Frankly, we were intending to litigate because we

18 kind of didn't think we were going to get much support from

19 the debtor, but that's okay.  We're happy to do our job and

20 ask the Court for relief, but that didn't happen in this

21 case.

22         So, Your Honor, I would just say that with respect

23 to the transaction, please don't approve the certification.

24 I thought certification of counsel was in a situation where

25 the parties didn't -- where there were no disputes as to the

1  relief that was being requested.  And I know, Your Honor, I'm

2  not -- I'm only admitted *pro hac* here, so I defer to the

3  parties, but I can just tell you that without any animosity,

4  and I will tell you, I heard a lot of animosity, a lot of

5  the -- I mean, frankly, *ad hominem*.

6    I don't feel that way towards the lawyers, but I do know

7    that this is a process in which, from the outside, it looks

8    like the landlord who never appeared at the auction, who

9    chose not to bid, chose not to assert an objection, all

10   they did is notice up a deposition and the apparent

11   posturing collapsed and then they did a deal with, they did

12   a deal directly with the assignee of the buyer -- of the

13   debtor, Gordon Brothers -- or the buyer of the debtors'

14   assets.

15        So, I mean, it looks like they saw that they were

16  not going to get relief in an actual contested proceeding,

17  and so they did a separate transaction.  So thank you, Your

18  Honor.

19        THE COURT:  Thank you.

20    Anything further?

21      (No verbal response)

22        THE COURT:  I'm going to overrule the objection.

23  I appreciate counsel's comments here this afternoon and I

24  appreciate ALDI's participation in this process, but the bid

25  procedures provided that the debtors' presentation to the

1   Court of successful bids and alternative bids would not

2   constitute the debtors' acceptance of such bids, which

3   acceptance will only occur upon approval of such bids by the

4   Court.

5          The sale order approved the sale of the

6   designation rights.  Gordon Brothers has a court order

7   approving its designation rights and Gordon Brothers paid for

8   optionality, and it has exercised that optionality and

9   proceeded differently under the circumstances.

10          So, I will review the matter under certification,

11   but let me clarify for counsel, given what's gone on here

12   today, I would ask that counsel have an opportunity to at

13   least review the order under certification of counsel and

14   communicate with the debtors and Gordon Brothers, with

15   respect to the certification and the landlord PAM.  And, of

16   course, hopefully, you'll be able to promptly submit that to

17   the Court.

18          MR. PIRAINO:  Your Honor, for the record, Stephen

19   Piraino of Davis Polk & Wardwell.

20          It's, of course, fine and, you know, we look

21   forward to whatever comments there may be, which we'll

22   discuss with Mr. Fox.

23          Just one last thing on the scheduling.  Just to

24   alert Your Honor on, I believe, the week of March 19th, we

25   have an omnibus hearing scheduled.  There are some conflicts,

1  so we're going to be reaching out to chambers to see if

2  there's an alternative time, but we did just want to let Your

3  Honor know that we will be reaching out to your courtroom

4  deputy to see if there's an alternative time.

5          THE COURT:  Okay.  And you also need a hearing

6  sometime the week of February 10th?

7          MR. PIRAINO:  Yes, and I think both, Ms. Heilman

8  and Mr. Fox have assisted on that, so, perhaps, I'll let

9  Ms. Heilman handle that.

10          MS. HEILMAN:  Good afternoon, Your Honor.

11          Leslie Heilman, Ballard Spahr, for the record, for

12  the landlord of Highland.

13          Your Honor, yes, we wanted to revisit the week of

14  the 10th for a hearing date, with respect to the Store

15  Number 4126 and the assignment to Burlington.  I think

16  Burlington would also like to be heard, as to availability,

17  as well, depending on what your Court's availability is.

18          THE COURT:  We may have to move a couple of things

19  to try to get something, because I have no availability on

20  the 12th or the 13th and the 14th, I have a contested matter

21  in the morning, so I may have to call and see how much time

22  they think.  And then the next week starts with a holiday.

23          MR. FOX:  Your Honor, Steven Fox.

24          We would be fine the holiday week.  We understand

25  Monday the 17th is not an option.  We've already imposed upon

1  Your Honor enough for holidays.  But subject to Ms. Heilman's

2  willingness to move into that week, we'd be, certainly, from

3  Gordon Brothers' perspective, we'd be fine with that.

4           THE COURT:  What are we contemplating, in terms of

5  time?

6           MR. FOX:  Hard to say, Your Honor.

7           Ms. Heilman is unhappy with the result of the

8  transaction that's going -- that is the subject of the second

9  designation notice filed earlier today.  Her client wants

10 control over the lease and we have designated it for

11 assumption and assignment to Burlington.

12          Now, you've heard many issues about Burlington.

13 We don't think there will be an adequate assurance of future

14 performance question there.  They have been approved by this

15 Court as an assignee on multiple occasions, including in this

16 case, but I don't want to speak for Ms. Heilman.  She's very

17 creative.  I'm sure she'll come up with something, so it's

18 hard to predict what we would expect.

19          But the designation notices on file, it does

20 trigger a 14-day objection period.  I think the debtors,

21 Gordon Brothers --

22          THE COURT:  Was this filed today?

23          MS. HEILMAN:  Yes.

24          MR. FOX:  It does, Your Honor, but we can set a

25 hearing within X number of days after that so we have some

1   flexibility among the parties.  Sooner is obviously better.

2           I, personally, will be in Las Vegas for a

3   conference the week of the 10th, so I share Your Honor's

4   difficulty in scheduling that week, but we are available the

5   following week.

6           MS. HEILMAN:  Your Honor, in terms of timing, as I

7   stand here today, I can't really tell you how long it would

8   be.  I mean, we've had -- there have been other matters

9   before you today that talked about whether or not it's a

10  designation rights asset and not a designation rights asset.

11  Your Honor, we're continuing to do discovery on that.

12          Contrary to some of the other matters you've heard

13  today, this particular lease was not subject to any bidding

14  procedures or bidding process, so the paragraphs 8 and 12 do

15  not apply to this particular lease, Your Honor.  And there is

16  considerable harm that is still running to the landlord.  I

17  don't believe we have confirmation today that the insurance,

18  utilities, and security will remain into February.  We only

19  have assurances through January.

20          We have been addressing these issues with the

21  debtor since October.  None of the rents have been paid on

22  this lease at all.  We have a half a million dollars that is

23  outstanding to the debtor.  We have reservations of rights in

24  the designation notice that says that they're going to

25  contest the cure.

1           Your Honor, time is of the essence.  We've asked

2    for a hearing the week after the designation notice was

3    filed.  We're not really sure why it was filed today.  We had

4    a pseudo auction on this lease a week ago Monday and we were

5    told on Wednesday that it was a designated asset, but the

6    debtors waited until today to file their notice of

7    assumption.

8           That now pushes us into February.  This should

9    have all been concluded, actually, by the end of December,

10   which is the position of the landlord.  But we're now into

11   January and now we're at the end of January into February.

12          Your Honor, respectfully, the matter needs to move

13   forward.  And I understand that Gordon Brothers paid for

14   optionality and is exercising that optionality, but we do

15   dispute that it's a designation rights asset.  We raised

16   these concerns prior to the sale hearing and got no response.

17   And, Your Honor, we do dispute that it was a designation

18   rights asset and that any benefit, if any, should be going to

19   the estate, and that the lease-termination agreement that was

20   accepted by the debtors, outside of any process, should be

21   approved by this Court and the landlord should get its space

22   back so no further harm is done.

23          MR. PIRAINO:  Your Honor, for the record, Stephen

24   Peraino, Davis Polk.

25          I'm not going to respond to each of Ms. Heilman's

1  points, but I do just want to, on insurance and utilities.

2  Obviously, the debtor, and Mr. Fox has confirmed on behalf of

3  GBRP, we'll ensure that if the hearing is the week of

4  the 17th, whatever works for the Court, that utilities,

5  insurance, et cetera, will be maintained through the hearing.

6  We certainly wouldn't cut it off prior to any hearing.

7          THE COURT:  Okay.  Well, let me ask you this, does

8  the response deadline have to be 14 days as to this, take it

9  or leave it?

10          MR. PIRAINO:  I mean, pursuant to the sale order,

11  yes, I think that the parties could discuss, because,

12  obviously, we've been in receipt of Ms. Heilman's motion for

13  some time.

14          THE COURT:  Right.

15          MR. PIRAINO:  We could certainly discuss a more

16  expedited briefing schedule if that --

17          THE COURT:  I'm going to have my chambers look at

18  dates and see what can be compressed, but obviously, this

19  doesn't sound like something that's going to take an hour.

20  So, we'll get back to you about a date.

21          MR. PIRAINO:  Understood, Your Honor.

22          THE COURT:  And, hopefully, we'll get back to you

23  this afternoon.

24          MR. PIRAINO:  Okay.  Understood.

25          And we'll, obviously, be in touch with Ms. Heilman

 1  and Mr. Fox and we'll respond promptly.

 2          And then, I guess, with respect to the order that

 3  would need to be entered today, the 365(d)(4) order, with

 4  thanks to Ms. Roglen and some of my colleagues back at the

 5  office, I think we have incorporated sort of the comments to

 6  push both, Ms. Roglen, or, I guess, accelerate the deadline

 7  for Ms. Roglen and the edge order.  Folks will send that

 8  around to Ms. Roglen and to Fox Rothschild and then have that

 9  submitted, hopefully, very shortly, so that it can be entered

10  today if that's okay, Your Honor?

11          THE COURT:  Yep.

12          MR. PIRAINO:  Okay.  So, from the debtors'

13  perspective -- from our perspective, nothing further, but I

14  believe Burlington might have one more thing.

15          MS. PEGUERO:  Good afternoon, Your Honor.

16          Kristhy Peguero, Jackson Walker, on behalf of

17  Burlington Stores, and my 9010 application is on file, and it

18  may have been granted in the time that we've sat here at the

19  hearing.

20          I just wanted to request that if Your Honor sends

21  communication to the debtors and to GB and to the landlord,

22  with respect to the hearing date, that Burlington be

23  included, to the extent that --

24          THE COURT:  Okay.  We don't maintain emails.

25          If there's certain parties that -- and it's not

1   our habit to communicate with counsel.  Our habit is to, or

2   practice is to let debtor, the United States Trustee, and

3   whoever the opponent is, and they should share the date with

4   you.

5           MS. PEGUERO:  Wonderful, okay.

6           THE COURT:  But it will not go beyond scheduling a

7   date.

8           MS. PEGUERO:  Okay.  Wonderful.  Thank you.

9           THE COURT:  If there's an issue with that, then

10  the parties need to let us know, okay.

11          MS. PEGUERO:  Thank you, Your Honor.

12          MR. PIRAINO:  And just to confirm, Your Honor,

13  once we get, you know, emails on the scheduling, we'll, of

14  course, include the Burlington folks, as they're a relevant

15  party here.

16          THE COURT:  Right.  Understood.  Okay.

17          MR. PIRAINO:  So, I think with that, we have

18  nothing further for today.  So, we very much thank Your Honor

19  for your time.

20          THE COURT:  Okay.  Thank you.

21          Everybody have a good afternoon and I'll see you

22  shortly.  We stand adjourned.

23          MR. PIRAINO:  Thank you, Your Honor.

24          COUNSEL:  Thank you, Your Honor.

25        (Proceedings concluded at 3:47 p.m.)

1                                CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 23, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    January 23, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25

## Exhibit C

**JOANN Transcript**

Page 1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE

3    Case No. 25-10068-CTG

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    JOANN INC. et al.,

8

9          Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11                 United States Bankruptcy Court

12                 824 N. Market Suite # 500

13                 Wilmington, DE 19801

14

15                 June 11, 2025

16                 2:00 PM

17

18

19

20

21   B E F O R E :

22   HON. CRAIG T. GOLDBLATT

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ALYCE DOODY

1   HEARING re Order Regarding Second Notice of Assumption and

2   Assignment of Certain Executor Contract and/or Unexpired

3   Leases

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lindsay Peacock

```
 1   A P P E A R A N C E S :

 2

 3   COLE SCHOTZ P.C.

 4        Attorney for The Debtors

 5        500 Delaware Avenue, Suite 600

 6        Wilmington, Delaware 19801

 7

 8   BY:  PATRICK J. REILLEY

 9

10   CLARK HILL

11        Attorneys for QCM Partners

12        824 N Market St # 710

13        Wilmington, DE 19801

14

15   BY:  AUDREY HORNISHER (TELEPHONICALLY)

16        KAREN GRIVNER (TELEPHONICALLY)

17

18   LATHAM & WATKINS

19        Attorney for Dollar Tree

20        1209 Orange St, Wilmington

21        Delaware, 19801

22

23   BY:  CANDACE M. ARTHUR (TELEPHONICALLY)

24

25
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Good afternoon.  We're on the record

3    in re Joann case number 25-10068.  I guess, Mr. Reilley,

4    before I pass the baton, there was communication with

5    Chambers that led me to think, you know what, it is best

6    just to have a hearing and do this the normal way.  So I'm

7    happy to just proceed.

8              So with that, Mr. Reilley, I'm happy to pass the

9    virtual podium to -- the actual podium to you.

10             MR. REILLEY:  Yeah, thanks.  Thank you, Your

11   Honor.  Good afternoon.  Patrick Reilley from Cole Schotz,

12   on behalf of the Debtors.

13             Your Honor, turning to the agenda, the only matter

14   scheduled is the second notice of assumption and assignment.

15   Your Honor, the Court scheduled the special hearing today to

16   go forward on the second notice, and the objection filed by

17   the landlord, QCM.  Thank you to Your Honor and Chambers for

18   making time for us today for this special hearing.  I think

19   this hearing will be pretty brief this afternoon.

20             So Your Honor, the notice, as you may have seen,

21   seeks to assume and assign a lease to Dollar Tree.  The

22   landlord, QCM, objected.  The Debtors and the purchaser,

23   Dollar Tree, filed a joint reply.

24             In terms of proceeding today, the parties

25   discussed how to best proceed, and how to streamline things,

1    and the parties agreed, subject to Your Honor, that if it

2    makes sense, we're going to let Counsel for QCM proceed with

3    their objection or statement.  Ms. Hornisher, from the Clark

4    Hill firm, is on the Zoom, and then thereafter, Counsel for

5    Dollar Tree will respond, and I see Ms. Arthur is on the

6    Zoom as well, from Latham & Watkins.

7              THE COURT:  Okay.  Very well.  So thank you.

8              MR. REILLEY:  Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Reilley.  Happy to hear

10   from -- I'm sorry?

11             MS. GRIVNER:  (indiscernible)

12             THE COURT:  Okay.  Very well.

13             MS. GRIVNER:  Sorry.  Didn't mean to interrupt

14   you.

15             THE COURT:  No, no.  No worries.  Please, please

16   proceed.

17             MS. GRIVNER:  Good afternoon, Your Honor.  For the

18   record, Karen Grivner, from Clark Hill, on behalf of the

19   Landlord, QCM partners.

20             As Mr. Riley pointed out, my colleague, Audrey

21   Hornisher, is joining us via Zoom today.  We'd like to thank

22   the Court for approving her virtual appearance.  It is very

23   much appreciated.

24             Earlier today, we filed her pro has vice motion.

25   It's at Docket 1115.  I have a copy, if Your Honor would

1     like to see it.

2               THE COURT:  Yeah, very well.  We'll get that

3     entered.

4               MS. GRIVNER:  Great.

5               THE COURT:  And in the meantime, we can act as if

6     it's been entered.

7               MS. GRIVNER:  Right.  Thank you.

8               As Mr. Reilley mentioned, before the Court today

9     is the Landlord's objection to the Debtor's proposed

10    assumption as an assignment of its lease to Dollar Tree.

11    The parties have engaged in extensive negotiations with

12    respect to the objection, and have successfully limited the

13    issues that are outstanding before Your Honor today.

14              And with your permission, I will turn the now

15    virtual podium over to Ms. Hornisher.

16              THE COURT:  Very well.  Thank you very much.

17              Ms. Hornisher, you can proceed.

18              MS. HORNISHER:  Good afternoon, Your Honor.  I'm

19    Audrey Hornisher for QCM Partners LLC.

20              As my co-counsel discussed, the parties have

21    (indiscernible) issues before Your Honor today is for a

22    single issue, which is whether the noxious lease provision

23    in the Trader Joe's lease agreement prohibits the assumption

24    and assignment of a lease agreement to Dollar Tree.

25              In regards to the (indiscernible) issues, the

1    parties have stipulated to a short set of facts, which are

2    that the general lease agreement was amended in 2011, before

3    the Trader Joe's lease agreement that was entered into in

4    2020.  Section 6 of the Trader Joe's lease agreement

5    contains a noxious lease provision that prohibits a dollar-

6    type store in the shopping center.  Section 6 is applicable

7    to a replacement tenants' (indiscernible)

8              Your Honor, the Landlord designed (indiscernible)

9    to prevent separate or additional arguments (indiscernible)

10   today.  Rather, we will (indiscernible) To the extent that

11   the Court is inclined to overrule the objection, the parties

12   have negotiated a proposed order that we filed on the docket

13   (indiscernible) parties.  The proposed order is located at

14   Docket number 1113.  If Your Honor has any questions, we

15   would be happy to answer (indiscernible)

16             THE COURT:  I can be honest, I've seen the papers,

17   and I think the streamlining of the issue is helpful and

18   appreciated.  And I guess I'm happy to hear from anyone on

19   the other side of this.

20             MS. ARTHUR:  Good afternoon, Your Honor.  For the

21   record, Candace Arthur of Latham & Watkins, and again,

22   representing Dollar Tree stores in this matter.  We do thank

23   Your Honor for the time, particularly scheduling it because

24   I think it was effective in getting the parties to want to

25   streamline, and also to be able to negotiate the language of

Page 8

1   a proposed order (indiscernible) satisfactory on the issues

2   at hand.

3           Your Honor, in terms of the way we view this,

4   really just kind of providing the Court with, like, a

5   30,000-foot view here, Dollar Tree, of all the three

6   tenants, was the first one in a shopping center in that

7   state.  We view this more as like a relocation, particularly

8   given that our existing lease is expiring shortly.  We had a

9   valid assignment in moving in and stepping into the shoes of

10  a Joann lease.  Just looking at the black letters of the

11  Joann lease provision, there is no restriction for Dollar

12  Tree to operate.  Today, neither Dollar Tree or Joann would

13  have to comply or have to be subject to the noxious use

14  provisions that the Landlord is referring to in the Trader

15  Joe's lease, which came about five years ago.

16          And I think it's important, Your Honor, when

17  thinking about, you know, Section 365, and the importance

18  for landlords, and the type of protections that are

19  specifically given for shopping center landlords, it's just

20  not present in this instance.  So when we look at the lease

21  itself, or look at the purpose for which the Bankruptcy Code

22  was amended in order to protect shopping center landlords,

23  there's not a mixed -- a kind of mixed use issue here.

24  Dollar Tree, again, was here first, so there's not a -- It's

25  not a (indiscernible) issue at stake here.  And then looking

1    at the fact that the Trader Joe's lease that's in question

2    just came after the fact, after Joann, after Dollar Tree, it

3    really is impractical in any way to have either of the

4    parties, the Debtors, the Dollar Tree, be subject to the

5    language of that lease.

6         So (indiscernible) Your Honor, we do believe that

7    in this respect, the facts itself lends to a decision in

8    favor of Dollar Tree.  And also, the language of the

9    proposed order would also reflect that Dollar Tree and the

10   Landlord (indiscernible) agree on how to move forward in

11   terms of, like, the restrictions, in terms of, you know,

12   other aspects of being able to provide the adequate

13   assurance that is necessary for future performance under the

14   Joann lease.  And you know, for those reasons, and subject

15   to any questions that Your Honor may have, we do

16   respectfully request that the objection be overruled today.

17        THE COURT:  Thank you, Ms. Arthur.  Any other

18   parties of interest wish to be heard on this matter?  Okay.

19        So I appreciate the issue.  I'm going to go ahead

20   and overrule the objection, and enter the order.  I'm

21   satisfied by the points Ms. Arthur makes about this simply

22   being a relocation, as well as the point that Judge Stickles

23   made in Big Lots with respect to the timing.  I think that

24   that reasoning controls here, that here, to the extent the

25   provision did apply, it was in a lease that came after the

Page 10

1    lease in question.  And just making sense of 365, I think

2    that what Judge Stickle said, and as well as the decision in

3    Bed Bath & Beyond, I just agree with that analysis of the

4    question.

5            So I've seen the revised form of order.  I am fine

6    -- I appreciate all the party's efforts to narrow the

7    issues, and to simplify things, and that revised form of

8    order seems to me to be appropriate.  So unless someone says

9    otherwise, I'm happy to have that order entered when it's

10   uploaded.

11           MR. REILLEY:  Thank you, Your Honor.  Your Honor,

12   my office didn't upload the order, so that should be

13   (indiscernible)

14           THE COURT:  Oh.  Never mind, then.  We'll go ahead

15   and get that entered as soon as we're back in chambers then.

16           MR. REILLEY:  Great.  Thank you, Your Honor.

17           THE COURT:  Okay.  Is there anything else that I

18   can do to be helpful while we're here this afternoon?

19           MR. REILLEY:  No, there are no other matters for

20   this afternoon, but thank you.

21           THE COURT:  Okay.  So --

22           MR. REILLEY:  And again, we appreciate you taking

23   time.

24           THE COURT:  That is the job for which I signed up.

25   Very happy to do it, and appreciate all of the work of the

1   parties to make this, you know, as straightforward as you

2   have.  So much appreciated.

3           We'll get that order entered, and with that, we're

4   adjourned.  Thank you.

5

6   (Whereupon these proceedings were concluded at 2:08 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3        I, Lindsay Peacock, certify that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8

9   Lindsay Peacock

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 18, 2025

[& - court]

| & | |
|---|---|
| **&** | 3:18 5:6 |
| | 7:21 10:3 |

| 1 | |
|---|---|
| **11** | 1:15 |
| **1113** | 7:14 |
| **1115** | 5:25 |
| **11501** | 12:23 |
| **1209** | 3:20 |
| **18** | 12:25 |
| **19801** | 1:13 3:6 |
| | 3:13,21 |

| 2 | |
|---|---|
| **2011** | 7:2 |
| **2020** | 7:4 |
| **2025** | 1:15 |
| | 12:25 |
| **25-10068** | 1:3 |
| | 4:3 |
| **28661** | 12:6 |
| **2:00** | 1:16 |
| **2:08** | 11:6 |

| 3 | |
|---|---|
| **30,000** | 8:5 |
| **300** | 12:22 |
| **330** | 12:21 |
| **365** | 8:17 10:1 |

| 5 | |
|---|---|
| **500** | 1:12 3:5 |

| 6 | |
|---|---|
| **6** | 7:4,6 |
| **600** | 3:5 |

| 7 | |
|---|---|
| **710** | 3:12 |

| 8 | |
|---|---|
| **824** | 1:12 3:12 |

| a | |
|---|---|
| **able** | 7:25 9:12 |
| **accurate** | 12:4 |
| **act** | 6:5 |
| **actual** | 4:9 |
| **additional** | 7:9 |
| **adequate** | 9:12 |
| **adjourned** | |
| | 11:4 |
| **afternoon** | 4:2 |
| | 4:11,19 5:17 |
| | 6:18 7:20 |
| | 10:18,20 |
| **agenda** | 4:13 |
| **ago** | 8:15 |
| **agree** | 9:10 10:3 |
| **agreed** | 5:1 |
| **agreement** | |
| | 6:23,24 7:2,3,4 |
| **ahead** | 9:19 |
| | 10:14 |
| **al** | 1:7 |
| **alyce** | 1:25 |
| **amended** | 7:2 |
| | 8:22 |
| **analysis** | 10:3 |
| **answer** | 7:15 |
| **appearance** | |
| | 5:22 |
| **applicable** | 7:6 |
| **apply** | 9:25 |

| | |
|---|---|
| **appreciate** | |
| | 9:19 10:6,22 |
| | 10:25 |
| **appreciated** | |
| | 5:23 7:18 11:2 |
| **appropriate** | |
| | 10:8 |
| **approving** | |
| | 5:22 |
| **arguments** | 7:9 |
| **arthur** | 3:23 5:5 |
| | 7:20,21 9:17 |
| | 9:21 |
| **aspects** | 9:12 |
| **assign** | 4:21 |
| **assignment** | 2:2 |
| | 4:14 6:10,24 |
| | 8:9 |
| **assume** | 4:21 |
| **assumption** | |
| | 2:1 4:14 6:10 |
| | 6:23 |
| **assurance** | 9:13 |
| **attorney** | 3:4,19 |
| **attorneys** | 3:11 |
| **audrey** | 3:15 |
| | 5:20 6:19 |
| **avenue** | 3:5 |

| b | |
|---|---|
| **b** | 1:21 |
| **back** | 10:15 |
| **bankruptcy** | |
| | 1:1,11,23 8:21 |
| **bath** | 10:3 |
| **baton** | 4:4 |
| **bed** | 10:3 |

| | |
|---|---|
| **behalf** | 4:12 |
| | 5:18 |
| **believe** | 9:6 |
| **best** | 4:5,25 |
| **beyond** | 10:3 |
| **big** | 9:23 |
| **black** | 8:10 |
| **brief** | 4:19 |

| c | |
|---|---|
| **c** | 3:1 4:1 12:1,1 |
| **candace** | 3:23 |
| | 7:21 |
| **case** | 1:3 4:3 |
| **center** | 7:6 8:6 |
| | 8:19,22 |
| **certain** | 2:2 |
| **certify** | 12:3 |
| **chambers** | 4:5 |
| | 4:17 10:15 |
| **clark** | 3:10 5:3 |
| | 5:18 |
| **code** | 8:21 |
| **cole** | 3:3 4:11 |
| **colleague** | 5:20 |
| **communicati...** | |
| | 4:4 |
| **comply** | 8:13 |
| **concluded** | 11:6 |
| **contains** | 7:5 |
| **contract** | 2:2 |
| **controls** | 9:24 |
| **copy** | 5:25 |
| **counsel** | 5:2,4 |
| | 6:20 |
| **country** | 12:21 |
| **court** | 1:1,11 |
| | 4:2,15 5:7,9,12 |

| | | | |
|---|---|---|---|
| 5:15,22 6:2,5,8 6:16 7:11,16 8:4 9:17 10:14 10:17,21,24 | **efforts** 10:6 | **given** 8:8,19 | **i** |
| **craig** 1:22 | **either** 9:3 | **go** 4:16 9:19 10:14 | **importance** 8:17 |
| **ctg** 1:3 | **engaged** 6:11 | **going** 5:2 9:19 | **important** 8:16 |
| **d** | **enter** 9:20 | **goldblatt** 1:22 | **impractical** 9:3 |
| **d** 4:1 | **entered** 6:3,6 7:3 10:9,15 11:3 | **good** 4:2,11 5:17 6:18 7:20 | **inclined** 7:11 |
| **date** 12:25 | **et** 1:7 | **great** 6:4 10:16 | **indiscernible** 5:11 6:21,25 7:7,8,9,10,13 7:15 8:1,25 9:6 9:10 10:13 |
| **de** 1:13 3:13 | **executor** 2:2 | **grivner** 3:16 5:11,13,17,18 6:4,7 | |
| **debtor's** 6:9 | **existing** 8:8 | **guess** 4:3 7:18 | |
| **debtors** 1:9 3:4 4:12,22 9:4 | **expiring** 8:8 | **h** | **instance** 8:20 |
| **decision** 9:7 10:2 | **extensive** 6:11 | **hand** 8:2 | **interest** 9:18 |
| **delaware** 1:2 3:5,6,21 | **extent** 7:10 9:24 | **happy** 4:7,8 5:9 7:15,18 10:9,25 | **interrupt** 5:13 |
| **designed** 7:8 | **f** | **hear** 5:9 7:18 | **issue** 6:22 7:17 8:23,25 9:19 |
| **discussed** 4:25 6:20 | **f** 1:21 12:1 | **heard** 9:18 | **issues** 6:13,21 6:25 8:1 10:7 |
| **district** 1:2 | **fact** 9:1,2 | **hearing** 2:1 4:6 4:15,18,19 | **j** |
| **docket** 5:25 7:12,14 | **facts** 7:1 9:7 | **helpful** 7:17 10:18 | **j** 3:8 |
| **dollar** 3:19 4:21,23 5:5 6:10,24 7:5,22 8:5,11,12,24 9:2,4,8,9 | **favor** 9:8 | **hill** 3:10 5:4,18 | **joann** 1:7 4:3 8:10,11,12 9:2 9:14 |
| | **filed** 4:16,23 5:24 7:12 | **hon** 1:22 | **job** 10:24 |
| | **fine** 10:5 | **honest** 7:16 | **joe's** 6:23 7:3,4 8:15 9:1 |
| | **firm** 5:4 | **honor** 4:11,13 4:15,17,20 5:1 5:8,17,25 6:13 6:18,21 7:8,14 7:20,23 8:3,16 9:6,15 10:11 10:11,16 | **joining** 5:21 |
| **doody** 1:25 | **first** 8:6,24 | | **joint** 4:23 |
| **e** | **five** 8:15 | | **judge** 1:23 9:22 10:2 |
| **e** 1:21,21 3:1,1 4:1,1 12:1 | **foot** 8:5 | | **june** 1:15 12:25 |
| **earlier** 5:24 | **foregoing** 12:3 | **hornisher** 3:15 5:3,21 6:15,17 6:18,19 | **k** |
| **ecro** 1:25 | **form** 10:5,7 | | **karen** 3:16 5:18 |
| **effective** 7:24 | **forward** 4:16 9:10 | | |
| | **future** 9:13 | | |
| | **g** | | |
| | **g** 4:1 | | |
| | **general** 7:2 | | |
| | **getting** 7:24 | | |

| | | | |
|---|---|---|---|
| **kind** 8:4,23 | **made** 9:23 | **ny** 12:23 | **party's** 10:6 |
| **know** 4:5 8:17 | **make** 11:1 | **o** | **pass** 4:4,8 |
| 9:11,14 11:1 | **makes** 5:2 9:21 | | **patrick** 3:8 |
| **l** | **making** 4:18 | **o** 1:21 4:1 12:1 | 4:11 |
| | 10:1 | **objected** 4:22 | **peacock** 2:25 |
| **landlord** 4:17 | **market** 1:12 | **objection** 4:16 | 12:3,9 |
| 4:22 5:19 7:8 | 3:12 | 5:3 6:9,12 7:11 | **performance** |
| 8:14 9:10 | **matter** 1:5 | 9:16,20 | 9:13 |
| **landlord's** 6:9 | 4:13 7:22 9:18 | **office** 10:12 | **permission** |
| **landlords** 8:18 | **matters** 10:19 | **oh** 10:14 | 6:14 |
| 8:19,22 | **mean** 5:13 | **okay** 5:7,12 | **please** 5:15,15 |
| **language** 7:25 | **mentioned** 6:8 | 9:18 10:17,21 | **pm** 1:16 11:6 |
| 9:5,8 | **mind** 10:14 | **old** 12:21 | **podium** 4:9,9 |
| **latham** 3:18 | **mineola** 12:23 | **operate** 8:12 | 6:15 |
| 5:6 7:21 | **mixed** 8:23,23 | **orange** 3:20 | **point** 9:22 |
| **lease** 4:21 6:10 | **motion** 5:24 | **order** 2:1 7:12 | **pointed** 5:20 |
| 6:22,23,24 7:2 | **move** 9:10 | 7:13 8:1,22 9:9 | **points** 9:21 |
| 7:3,4,5 8:8,10 | **moving** 8:9 | 9:20 10:5,8,9 | **present** 8:20 |
| 8:11,15,20 9:1 | **n** | 10:12 11:3 | **pretty** 4:19 |
| 9:5,14,25 10:1 | | **outstanding** | **prevent** 7:9 |
| **leases** 2:3 | **n** 1:12 3:1,12 | 6:13 | **pro** 5:24 |
| **led** 4:5 | 4:1 12:1 | **overrule** 7:11 | **proceed** 4:7,25 |
| **legal** 12:20 | **narrow** 10:6 | 9:20 | 5:2,16 6:17 |
| **lends** 9:7 | **necessary** 9:13 | **overruled** 9:16 | **proceeding** |
| **letters** 8:10 | **negotiate** 7:25 | **p** | 4:24 |
| **limited** 6:12 | **negotiated** | | **proceedings** |
| **lindsay** 2:25 | 7:12 | **p** 3:1,1 4:1 | 11:6 12:4 |
| 12:3,9 | **negotiations** | **p.c.** 3:3 | **prohibits** 6:23 |
| **llc** 6:19 | 6:11 | **papers** 7:16 | 7:5 |
| **located** 7:13 | **neither** 8:12 | **particularly** | **proposed** 6:9 |
| **look** 8:20,21 | **never** 10:14 | 7:23 8:7 | 7:12,13 8:1 9:9 |
| **looking** 8:10 | **normal** 4:6 | **parties** 4:24 | **protect** 8:22 |
| 8:25 | **notice** 2:1 4:14 | 5:1 6:11,20 7:1 | **protections** |
| **lots** 9:23 | 4:16,20 | 7:11,13,24 9:4 | 8:18 |
| **m** | **noxious** 6:22 | 9:18 11:1 | **provide** 9:12 |
| | 7:5 8:13 | **partners** 3:11 | **providing** 8:4 |
| **m** 3:23 | **number** 4:3 | 5:19 6:19 | |
| | 7:14 | | |

| | | | |
|---|---|---|---|
| **provision** 6:22 7:5 8:11 9:25 **provisions** 8:14 **purchaser** 4:22 **purpose** 8:21 | **reply** 4:23 **representing** 7:22 **request** 9:16 **respect** 6:12 9:7,23 **respectfully** 9:16 **respond** 5:5 **restriction** 8:11 **restrictions** 9:11 **revised** 10:5,7 **right** 6:7 **riley** 5:20 **road** 12:21 | **sense** 5:2 10:1 **separate** 7:9 **set** 7:1 **shoes** 8:9 **shopping** 7:6 8:6,19,22 **short** 7:1 **shortly** 8:8 **side** 7:19 **signature** 12:6 **signed** 10:24 **simplify** 10:7 **simply** 9:21 **single** 6:22 **solutions** 12:20 **soon** 10:15 **sorry** 5:10,13 **special** 4:15,18 **specifically** 8:19 **st** 3:12,20 **stake** 8:25 **state** 8:7 **statement** 5:3 **states** 1:1,11 **stepping** 8:9 **stickle** 10:2 **stickles** 9:22 **stipulated** 7:1 **store** 7:6 **stores** 7:22 **straightforw...** 11:1 **streamline** 4:25 7:25 **streamlining** 7:17 | **subject** 5:1 8:13 9:4,14 **successfully** 6:12 **suite** 1:12 3:5 12:22 |
| **q** | | | **t** |
| **qcm** 3:11 4:17 4:22 5:2,19 6:19 **question** 9:1 10:1,4 **questions** 7:14 9:15 | | | **t** 1:22 12:1,1 **telephonically** 3:15,16,23 **tenants** 7:7 8:6 **terms** 4:24 8:3 9:11,11 **thank** 4:10,17 5:7,8,9,21 6:7 6:16 7:22 9:17 10:11,16,20 11:4 **thanks** 4:10 **things** 4:25 10:7 **think** 4:5,18 7:17,24 8:16 9:23 10:1 **thinking** 8:17 **three** 8:5 **time** 4:18 7:23 10:23 **timing** 9:23 **today** 4:15,18 4:24 5:21,24 6:8,13,21 7:10 8:12 9:16 **trader** 6:23 7:3 7:4 8:14 9:1 **transcribed** 2:25 |
| **r** | **s** | | |
| **r** 1:21 3:1 4:1 12:1 **rather** 7:10 **really** 8:4 9:3 **reasoning** 9:24 **reasons** 9:14 **record** 4:2 5:18 7:21 12:4 **referring** 8:14 **reflect** 9:9 **regarding** 2:1 **regards** 6:25 **reilley** 3:8 4:3 4:8,10,11 5:8,9 6:8 10:11,16 10:19,22 **relocation** 8:7 9:22 **replacement** 7:7 | **s** 3:1 4:1 **satisfactory** 8:1 **satisfied** 9:21 **says** 10:8 **scheduled** 4:14 4:15 **scheduling** 7:23 **schotz** 3:3 4:11 **second** 2:1 4:14,16 **section** 7:4,6 8:17 **see** 5:5 6:1 **seeks** 4:21 **seems** 10:8 **seen** 4:20 7:16 10:5 | | |

**[transcript - zoom]**                                                    Page 5

| | |
|---|---|
| **transcript**  12:4 | **worries**  5:15 |
| **tree**  3:19 4:21 | **x** |
|    4:23 5:5 6:10 | **x**  1:4,10 |
|    6:24 7:22 8:5 | **y** |
|    8:12,12,24 9:2 | **yeah**  4:10 6:2 |
|    9:4,8,9 | **years**  8:15 |
| **true**  12:4 | **z** |
| **turn**  6:14 | **zoom**  5:4,6,21 |
| **turning**  4:13 | |
| **type**  7:6 8:18 | |
| **u** | |
| **u.s.**  1:23 | |
| **under**  9:13 | |
| **unexpired**  2:2 | |
| **united**  1:1,11 | |
| **upload**  10:12 | |
| **uploaded** | |
|    10:10 | |
| **use**  8:13,23 | |
| **v** | |
| **valid**  8:9 | |
| **veritext**  12:20 | |
| **vice**  5:24 | |
| **view**  8:3,5,7 | |
| **virtual**  4:9 | |
|    5:22 6:15 | |
| **w** | |
| **want**  7:24 | |
| **watkins**  3:18 | |
|    5:6 7:21 | |
| **way**  4:6 8:3 9:3 | |
| **wilmington** | |
|    1:13 3:6,13,20 | |
| **wish**  9:18 | |
| **work**  10:25 | |