|  |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**DUANE MORRIS LLP**<br>Wendy M. Simkulak, Esquire<br>30 South 17th Street<br>Philadelphia, PA 19103-4196<br>Telephone: (215) 979-1000<br>Email: wmsimkulak@duanemorris.com<br><br>-and-<br><br>Jessica Kenney Bonteque, Esquire (*pro hac vice forthcoming*)<br>22 Vanderbilt<br>335 Madison Avenue, 23rd Floor<br>New York, NY 10017-4669<br>Telephone: (212) 692-1036<br>Fax: (212) 954-5310<br>Email: JBonteque@duanemorris.com<br><br>*Counsel for the Chubb Companies* |

| In re: | Chapter 11 |
|---|---|
| *NEW RITE AID, LLC, et al.*,[1] | Case No. 25-14861 (MBK) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE CHUBB COMPANIES WITH RESPECT TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES, OPT-OUT OF THIRD-PARTY RELEASE, AND RESERVATION OF RIGHTS**

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

ACE American Insurance Company, Indemnity Insurance Company of North America, ACE Fire Underwriters Insurance Company, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Executive Risk Indemnity Inc., Pacific Indemnity Company, and each of their respective U.S.-based affiliates, predecessors, and successors (collectively, and solely in their capacities as insurers and/or third party administrators of one or more of the above-captioned debtors, the "Chubb Companies"), by and through their undersigned counsel, hereby file this objection (the "Objection") with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3215] (the "Plan")[2] and in support of the Objection, the Chubb Companies respectfully state as follows:

## BACKGROUND

### A.    The 2023 Bankruptcy Case

1.     On October 15, 2023 (the "2023 Petition Date"), Rite Aid Corporation and certain of its affiliates (collectively, the "2023 Debtors") each filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), the 2023 Debtors bankruptcy cases were jointly administered as Case No. 23-18993 (the "2023 Case").

2.     On August 16, 2024, the Bankruptcy Court entered the *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Modifications)* [2023 Case Docket No. 4532] (the "2023 Confirmation Order"), the *Second Amended Joint*

---

[2]    Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Plan.

2

*Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)*, was attached as Exhibit A to the 2023 Confirmation Order (as modified, amended, and including all supplements, the "2023 Plan").

3. Pursuant to paragraph 236 of the 2023 Confirmation Order, the Reorganized Debtors assumed the Insurance Programs (as defined below); however, with regard to certain insurance policies, the rights, titles, privileges, interests, claims, demands or entitlements, as well as obligations, thereunder were assigned to a litigation trust (and various sub-trusts).

4. On August 30, 2024, the 2023 Plan was declared effective [2023 Case Docket No. 4800].

B. **The 2025 Bankruptcy Case**

5. On May 5, 2025 (the "Petition Date"), New Rite Aid, LLC and certain of its affiliates, which includes all the Reorganized Debtors from the 2023 Case (collectively, the "Debtors") each filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court.

6. On September 3, 2025, the Debtors filed with the Bankruptcy Court the *Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2286] and the *Disclosure Statement relating to for the Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2287], along with the *Debtors' Motion for Entry of an Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates with Respect Thereto, and (E) Granting Related Relief and (II)(A) Approving, in the Alternative, Dismissal of the Debtors' Chapter 11 Cases, (B) Scheduling Certain Dates with Respect Thereto, and (C) Granting Related Relief* [Docket No. 2289].

3

7. On September 19, 2025, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2517] and the *First Amended Disclosure Statement Relating to First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Solicitation Version)* [Docket No. 2518].

8. On September 22, 2025, the Bankruptcy Court entered the *Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates with Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates with Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief* [Docket No. 2535].

9. On November 11, 2025, the Debtors filed the Plan, the *Second Amended Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Solicitation Version)* [Docket No. 3216] (as may be amended, supplemented, or revised, the "Disclosure Statement"), and the *Notice of Filing of Plan Supplement* [Docket No. 3218], which included the Restructuring Steps Memorandum.

C. **The Insurance Programs**

10. Prior to the Petition Date, the Chubb Companies issued certain insurance policies (as renewed, amended, modified, endorsed or supplemented from time to time, collectively, the "Policies") to the Debtors as named insureds.

11. Prior to the Petition Date, the Chubb Companies and the Debtors also entered into certain written agreements in connection with the Policies (as renewed, amended, modified, endorsed or supplemented from time to time, and including any exhibit or addenda thereto, collectively, the "Insurance Agreements").

4

12. Pursuant to certain Policies and Insurance Agreements (collectively, the "ACE Insurance Program"),[3] ACE American Insurance Company, Indemnity Insurance Company of North America, ACE Fire Underwriters Insurance Company, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company, provide, *inter alia*, certain workers' compensation, automobile liability, property, environmental, general liability, fire, casualty, directors' and officers' liability, fidelity, managed care errors and omissions, electronic media, marine cargo, umbrella excess, contractual indemnification, and other insurance for specified policy periods subject to certain limits, deductibles, retentions, exclusions, terms and conditions, as more particularly described therein, and the insureds, including one or more of the Debtors, are required to pay to the Chubb Companies certain amounts including, but not limited to, insurance premiums (including audit premiums), deductibles, funded deductibles, expenses, taxes, assessments and surcharges, as more particularly described in the ACE Insurance Program (collectively, the "ACE Program Obligations").

13. Pursuant to certain other Policies and any agreements related thereto (collectively, the "Federal Insurance Program," and together with the ACE Insurance Program, the "Insurance Programs"),[4] Federal Insurance Company, Great Northern Insurance Company, Executive Risk Indemnity Inc., Pacific Indemnity Company, and/or certain of its U.S.-based affiliates provides,

---

[3] The "ACE Insurance Program" includes that certain binder by and between Rite Aid Corporation and Indemnity Insurance Company of North America, dated December 17, 2024 (and any agreements or insurance policies related thereto).

[4] The descriptions of the Insurance Programs set forth herein are not intended to, and shall not be deemed to amend, modify or waive, any of the terms or conditions of the Insurance Programs. Reference is made to the Insurance Programs for a complete description of their terms and conditions. Further, for the avoidance of doubt the Insurance Programs as defined herein do not include the rights, titles, privileges, interests, claims, demands or entitlements, as well as obligations that were assigned to a litigation trust (and further to a subtrust) under the 2023 Plan.

5

*inter alia*, automobile liability, workers' compensation, and other insurance for specified policy periods subject to certain limits, deductibles, retentions, exclusions, terms and conditions, as more particularly described therein, and the insureds, including one or more of the Debtors, are required to pay to the Chubb Companies certain amounts including, but not limited to, insurance premiums (including audit premiums), deductibles, funded deductibles, expenses, taxes, assessments and surcharges, as more particularly described in the Insurance Programs (collectively, the "Federal Program Obligations," and collectively with the ACE Program Obligations, the "Obligations").[5]

14. The Obligations are payable over an extended period of time and are subject to future audits and adjustments.

15. Certain of the Obligations are secured by certain collateral, including letters of credit and proceeds of letters of credit. The Obligations may also be secured by other letters of credit, trusts, escrows, surety bonds, cash collateral, other paid loss deposit funds, or other amounts.

### D. The Plan

16. With regard to the Insurance Policies the Plan provides as follows:

> Notwithstanding anything to the contrary in the Plan, the Plan Supplement or the Confirmation Order:
>
> The Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan and, unless otherwise provided in the Plan, on the Effective Date, (a) the Wind-Down Debtors shall be deemed to have assumed such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims under such Insurance Policies, and (b) such Insurance Policies and any agreements, documents, or instruments relating thereto, shall vest,

---

[5] The Obligations include both monetary and non-monetary obligations that the insureds, including one or more of the Debtors, may have.

unaltered in their entirety, in the Wind-Down Debtors. For the avoidance of doubt, no Insurance Policy (including the D&O Liability Insurance Policies), Indemnification Provisions, or obligations related thereto will be or will be deemed to be assumed by any of the Reorganized Debtors. Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, insureds, Debtors, Wind-Down Debtors, or Liquidating Trustee, under the Insurance Policies in any manner, and such insurance carriers, insureds, Debtors, Wind-Down Debtors, or Liquidating Trustee, in each case as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insurance carriers, insureds, Debtors, Wind-Down Debtors, or Liquidating Trustee, in the same manner and according to the same terms and practices applicable to the Debtors as existed prior to the Effective Date.

Nothing in the Plan, the Plan Supplement or the Confirmation Order shall terminate or otherwise reduce the coverage available to any beneficiary or "insured" under any D&O Liability Insurance Policies. After the Effective Date all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

On or after the Confirmation Date, the Debtors, Wind-Down Debtors, and Reorganized Debtors shall not take any action to terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policies (including any "tail policy") for the full term of such policy regardless of whether such directors and/or officers remain in such positions before or after the Effective Date. Each of the Debtors' D&O Liability Insurance Policies will be assumed and retained in accordance with the first paragraph of this Article V.E. Each of the Debtors' D&O Liability Insurance Policies (including any "tail policy") shall remain in full force and effect for their entire term and shall not be cancelled, impaired, or otherwise modified (notwithstanding, for the avoidance of doubt, the dissolution of any Debtor, Wind-Down Debtor, or the Liquidating Trust, if any).

7

Plan at Art. V.E.

17. The Plan further provides that "'Liquidating Trust Assets' means the assets transferred to and administered by the Liquidating Trust in accordance with this Plan and the Restructuring Steps Memorandum, including … (c) any assets (including Causes of Action) which are retained by or vest in the Wind-Down Debtors and transferred to the Liquidating Trust in accordance with this Plan and the Restructuring Steps Memorandum." Plan at Art. I.103. The Plan and Restructuring Steps Memorandum do not clearly state what, if any, Insurance Policies are being assigned to the Liquidating Trust.

18. The Plan further proposes, with regard to Indemnification Obligations, as follows:

> Other than as provided for in executory contracts expressly assumed in connection with the assumption of executory contracts and unexpired leases under this Plan, no Reorganized Debtor or Wind-Down Debtor shall assume any indemnification obligations of the Debtors, including pursuant to the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, or employment contracts of the Debtors for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable. The organizational documents of the Reorganized Debtors may be amended on and after the Effective Date to provide indemnification, exculpation, and other similar protections only to the Reorganized Debtors' officers and directors for acts on or after the Effective Date.

Plan at Art. V.F.

19. The Plan also contains a broad third-party release at Art.X.D, which can be opted-out of by affirmatively opting out of the release or filing an objection with this Bankruptcy Court that expressly objects to such holder being a Releasing Party. Disclosure Statement, at pg. ii.

20. The Plan also contains a "gatekeeping" provision embedded in the Injunction at Art.X.F.

**OBJECTION**

21. The Chubb Companies object to the Plan[6] on the grounds that: (I) the Plan cannot modify, alter or impair the Insurance Programs; (II) to the extent the Plan seeks to assign the Insurance Programs, or any part thereof, it cannot do so without the Chubb Companies' consent, (III) the Plan must provide that workers' compensation and direct action claims must continue in the ordinary course; and (IV) the Plan contains an improper "gatekeeping" provision.

**I.  The Plan Must Clearly Provide That Nothing Modifies, Alters Or Impairs The Insurance Programs.**

22. Neither the Debtors nor this Court can rewrite the Insurance Programs, but rather, the Insurance Programs must be enforced as written. *See, e.g.*, *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 679 (7th Cir. 2013) ("A court may not rewrite a contract to suit one of the parties but must enforce the terms as written.") (citation omitted); *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091 (9th Cir. 1997) (noting that a debtor's estate has "no greater rights in property than those held by the debtor prior to the bankruptcy"); *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) *aff'd*, 988 F.2d 414 (3d Cir. 1993) ("Courts do not rewrite

---

[6] This Objection focuses on the Chubb Companies' objections to the Plan. As for the Disclosure Statement, section 1125 of the Bankruptcy Code provides that a plan proponent may not solicit acceptance or rejection of a plan unless, before such solicitation, the plan proponent transmits to the parties to be solicited the plan and a disclosure statement containing "adequate information," as defined in section 1125(a) of the Bankruptcy Code, which has been approved by the bankruptcy court after notice and a hearing. *See* 11 U.S.C. § 1125(b). A disclosure statement contains "adequate information" if it provides information concerning the proposed plan of a kind and in sufficient detail that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the plan. *See* 11 U.S.C. § 1125(a). Courts consistently refuse to approve disclosure statements that lack the information that a "reasonable hypothetical investor" would require to make an informed decision about the proposed plan. *See, e.g., Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417-18 (3d Cir. 1988), cert. denied, 488 U.S. 967 (1988); *In re Route 202 Corp.*, 37 B.R. 367, 375 76 (Bankr. E.D. Pa. 1984); *In re Fierman*, 21 B.R. 314 (Bankr. E.D. Pa. 1982); *In re E. Redley Corp.*, 16 B.R. 429 (Bankr. E.D. Pa. 1982); *In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981). In this case, the Chubb Companies cannot determine with complete certainty how the Debtors propose to treat the Insurance Programs and the Chubb Companies' claims thereunder and, therefore, object to the Disclosure Statement and final approval thereof on this basis.

contracts to include terms not assented to by the parties."); *Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 484 F. Supp. 2d 850, 853 (N.D. Ill. 2007) (a "court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included.") (citation omitted); *Ally Financial Inc., v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*, 531 B.R. 25, 45 (Bankr. S.D.N.Y. 2015) (a party cannot convince a court to "rewrite [a] contract to fulfill [its] unspoken expectation"); *In re Best Mfg. Grp. LLC*, 2012 WL 589643, at *6 (Bankr. D. N.J. 2012) ("Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."); *In re Lloyd E. Mitchell, Inc.*, 06-13250-NVA, 2012 Bankr. LEXIS 5531 (Bankr. D. Md. Nov. 29, 2012) (noting that "insurance contracts cannot be re-written by th[e] Court"); *In re Enterprise Lighting Inc.*, 1994 Bankr. LEXIS 1307 at *7 (Bankr. E.D. Va. Jan. 21, 1994) (the generally broad equitable powers of a bankruptcy court "have not been interpreted to go so far as to allow the Court to rewrite contracts or create new contractual rights between the Debtor and a third party").

23. However, the Plan contains provisions that provide for the release of liens, the vesting of assets in the Debtors' successors free and clear of liens, releases of certain third parties, and exculpation and injunctions against certain actions. *See, e.g.*, Plan at Art. X.

24. Further, the Plan does not clearly provide that either the Liquidating Trust or the Wind Down Debtors will remain liable for the Obligations because the definition of Insurance Policies only includes the Debtors' rights and not the obligations thereunder. Moreover, Art. V.E is silent with regard to the payment of go-forward obligations under Insurance Policies.

25. It is well-established that debtors (and their successors and assignees) cannot seek to receive benefits of a contract without being liable for obligations thereunder. *See Tompkins ex. rel. A.T. v. Troy Sch. Dist.*, 199 Fed. Appx. 463, 468 (6th Cir. 2006) (holding that it is a basic principle of contract law that a party to an agreement is constrained to accept the burdens as well as the benefits of the agreement); *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 457 F.3d 766, 773 (8th Cir. 2006) (finding that a party who accepts the benefit of a contract must also assume its burdens); *Bhushan v. Loma Alta Towers Owners Assoc., Inc.*, 148 Fed. Appx. 882, 888 (11th Cir. 2005) (stating "one who has accepted a contract's benefit may not challenge its validity in order to escape its burdens"); *S & O Liquidating P'ship v. C.I.R.*, 291 F.3d 454, 459 (7th Cir. 2002) ("A party who has accepted the benefits of a contract cannot 'have it both ways' by subsequently attempting to avoid its burdens."); *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) ("In short, [plaintiff] cannot have it both ways. [It] cannot rely on the contract when it works to its advantage, and repudiate it when it works to [its] disadvantage." (citations and quotations omitted)); *Ricketts v. First Trust Co. of Lincoln, Neb.*, 73 F.2d 599, 602 (8th Cir. 1934) (finding that "he who seeks equity must do equity, and that one may not accept the benefits and repudiate the burdens of his contract."); *Meierhenry Sargent Ltd. Liab. P'ship v. Williams*, No. 16-4180, 2017 U.S. Dist. LEXIS 65739, at *20 (D.S.D. May 1, 2017) ("Various courts have held that a party may not avail itself of a favorable aspect of the contract and then disavow a non-favorable aspect.") (internal citations omitted); *Power Sys. & Controls, Inc. v. Schneider Elec. USA, Inc.*, No. 10-137, 2010 U.S. Dist. LEXIS 56671 at *3 (E.D. Va. June 9, 2010) ("[A] party may not avail itself of one aspect of a contract and disavow another aspect of the contract in order to avoid its consequences. . .[.]"); *see also In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) ("'The [debtor] . . . may not blow hot and cold. If he accepts the contract he

11

accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.'") (internal citations omitted); *In re Texas Rangers Baseball Partners*, 521 B.R. 134, 180 (Bankr. N.D. Tex. 2014) ("A debtor may not merely accept the benefits of a contract and reject the burdens to the detriment of the other party."); *see also In re American Home Mortgage Holdings, Inc.*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365.").[7]

26. Therefore, to the extent that the Debtors or their successors and/or assignees (including the Liquidating Trust) seek to retain the benefits of any portion of the Insurance Programs, the Insurance Programs must continue. The Debtors or any of their successors or assignees, including the Liquidating Trust must also remain liable for all of the Obligations arising under the Insurance Programs.

27. The Plan must therefore clarify that nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any other document related to the foregoing, including, but not limited to, those provisions identified above, shall modify, alter or impair the

---

[7] The Chubb Companies reserve the right to argue that the Insurance Programs are an integrated insurance program and therefore must be read, interpreted and enforced in its entirety. *See Huron Consulting Servs., LLC v. Physiotherapy Holdings, Inc. (In re Physiotherapy Holdings, Inc.)*, 538 B.R. 225, 233 (D. Del. 2015) (finding that separately drafted agreements dated at different times but relating to the same subject constitute one cohesive agreement); *Dunkin' Donuts Franchising LLC v. CDDC Acquisition Co. LLC (In re FPSDA I, LLC)*, 470 B.R. 257, 269 (E.D.N.Y. 2012) (holding that "two agreements [were] so interrelated, [that] they form[ed] a single overarching executory contract"); *In re Aneco Elec. Constr.*, 326 B.R. 197, 202 (Bankr. M.D. Fla. 2005) (finding "single, non-severable agreement" where contracts were between same parties and obligations of each party are mutually dependent upon the other); *In re Karfakis*, 162 B.R. 719 (Bankr. E.D. Pa. 1993) (stating that "two contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties").

Insurance Programs, including the rights and obligations of the Chubb Companies and the Debtors thereunder, as well as the coverage provided thereunder.

## II. The Insurance Programs Cannot Be Assigned or Otherwise Transferred Without the Prior Written Consent of the Chubb Companies, Which Has Not Been Sought or Given.

28. To the extent that the Debtors seek to assign the Insurance Programs (and/or the rights, benefits, interests and proceeds thereunder and/or any collateral or security provided by or on behalf of any of the Debtors) in connection with the Plan, such assignment cannot occur without the express written consent of the Chubb Companies.

29. Section 365 of the Bankruptcy Code governs a debtor's use of executory contracts and unexpired leases and provides the basis by which a debtor may assume and assign said contracts.

30. Section 365(f)(1), which allows assignment of a contract or lease despite a prohibition, restriction, or condition in the contract to the contrary, is not without limits. Section 365(f) is subject to and controlled in all respects by section 365(c). *See* 11 U.S.C. § 365(f)(1) ("Except as provided in subsection (b) and (c) of this section[.]"); *see also In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 122 (Bankr. D. Del. 2015) ("Section 365(f)(1), though, is expressly subject to any alternative rule provided in Section 365(c).").

31. Pursuant to 11 U.S.C. § 365(c), a debtor may not assume or assign an executory contract if applicable law excuses the counterparty from accepting performance from or rendering performance to an entity other than the debtor and such party does not consent to the assumption or assignment. 11 U.S.C. § 365(c)(1)(A) and (B).

32. Therefore, under section 365(c)(1) "if non-bankruptcy law provides that the [counterparty] would have to consent to an assignment of the [executory] contract to a third party, *i.e.*, someone 'other than the debtor or the debtor in possession,' then [the Debtor] . . . cannot

13

assume that contract" and, by extension, assign it. *In re West Elecs. Inc.*, 852 F.2d 79, 83 (3d Cir. 1988); *see also Trump Ent. Resorts, Inc.*, 526 B.R. at 122 ("The Section 365(c)(1) limitation on the assumption of executory contracts applies whenever the contract is 'subject to a legal prohibition against assignment' to a third party and the non-debtor party to the contract does no consent to assignment.").

33. Applicable non-bankruptcy law does, in fact, prohibit the assignment of insurance policies without the insurer's consent. *See, e.g.*, *Banco Popular v. Kanning*, No. A-13-CV-200 RP, 2015 U.S. Dist. LEXIS 175647, at *25 (W.D. Tex. Mar. 9, 2015) (finding that a purported assignment of an insurance policy that did not comply with the express terms of the insurance policy was not enforceable); *Rotella v. Cutting*, 2011 Tex. App. LEXIS 7116, Tex. App.—Fort Worth 2011, *no pet.*) (where an insurer's express written consent to any transfer of rights under an insurance policy is required by the terms of the policy, failure to evidence the insurer's express written consent renders any purported transfer invalid); *Mercedes-Benz of W. Chester v. Am. Family Ins.*, Nos. CA2009-09-244, CA2009-09-245, CA2009-09-246, 2010 Ohio App. LEXIS 1898 at ¶ 22 (Ohio Ct. App. May 24, 2010) (finding that third party "cannot impute a legally binding obligation to pay against [insurer]" where insureds assigned insurance contract without insurer's consent, because to find otherwise "would place an undue risk and burden on [insurer]"); *Touchet v. Guidry*, 550 So. 2d 308, 313 (La. App. 1989) (holding that an insurance policy is a personal contract between the insurer and the named insured and that "coverage terminates when the contract is assigned or transferred without the consent, permission, and approval of both contracting parties") (citations omitted); *Shadid v. Am. Druggist Fire Ins. Co.*, 386 P.2d 311 (Okla.

14

1963) (noting the importance of an insurer's consent to an assignment of an insurance policy, and holding that the policy does not pass to the purchaser simply by a sale of the insured property).[8]

34. Similarly, insurers cannot be compelled to provide insurance coverage to any entity. *See Atwood v. Progressive Ins. Co.*, No. 950051089S, 1997 Conn. Super. LEXIS 2450, at *18 (Conn. Super. Ct. Sept. 3, 1997) (stating that "[i]nsurers should not, for example, be forced to assume coverage for a risk which at the time a policy was written was not fairly in its and the insured's contemplation"); *King v. Meese*, 43 Cal. 3d 1217, 1222 (Cal. 1987) (noting that "an insurer may refuse to insure based on any permissible classification"); *Cummins v. Nat'l Fire Ins. Co.*, 81 Mo. App. 291, 296 (Mo. Ct. App. 1899) ("An insurance company may well refuse to insure some persons. They, like any other entity, have a right of choice as to who they will contract with and they can no more be forced to a change of the assured than the assured could be forced to accept insurance from some other company (in which he may have no confidence) than the one contracted with."). Therefore, the Insurance Programs (and/or the rights, benefits, interests and proceeds thereunder and/or any collateral or security provided by or on behalf of any of the Debtors) cannot be assigned without the prior written consent of the Chubb Companies.

35. Further, as a condition precedent for any consent that may be given by the Chubb Companies to an assignment, sale, or other transfer of the Insurance Programs (and/or the rights, benefits, interests and proceeds thereunder), the Debtors and the assignee will be required to

---

[8] Some courts have found that insurance policies may be assigned to a trust created under § 524(g) pursuant to a plan under § 1123 without the consent of the insurer. *See, e.g.*, *In re Fed.-Mogul Glob.*, 684 F.3d 355, 382 (3d Cir. 2012) (holding that anti-assignment provisions in insurance policies were "preempted by § 1123(a)(5)(B) [of the Bankruptcy Code] to the extent they prohibit transfer to a § 524(g) trust."); *In re W.R. Grace & Co.*, 475 B.R. 34, 198-99 (D. Del. 2012) (holding that anti-assignment provisions in insurance policies were preempted by § 1123(a)(5)(B) in the context of the establishment of a § 524(g) trust). The present case does not involve an assignment to a trust created pursuant to § 524(g).

execute one or more assumption agreements, in form and substance acceptable to the Chubb Companies. These agreements have not yet been negotiated, let alone executed.

36. Accordingly, because the Chubb Companies have not consented to any proposed assignment of the Insurance Programs (and/or the rights, benefits, interests and proceeds thereunder and/or any collateral or security provided by or on behalf of any of the Debtors), the Chubb Companies reserve their rights with respect to any and all such assignments at this time.

### III. The Plan Must Provide That Workers' Compensation Claims and Direct Action Claims Must Continue In The Ordinary Course.

37. The Plan does not provide for the handling of workers' compensation claims and direct action claims.

38. Both workers' compensation claims and direct action claims are subject to state-law regulations that dictate the resolution of such claims, which cannot be modified by the terms of the Debtors' Plan. *See, e.g., Ohio v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 660 F.2d 1108 (6th Cir. 1981) (finding that the administration of workers' compensation claims was a valid exercise of a state's police powers and exempt from the automatic stay provisions); *see also* La. R.S. 22:1269 (2012) (Louisiana grants injured persons a right of direct action against a tortfeasor's insurer, which, in several instances, may be brought against the insurer alone, or against both the insured and insurer jointly and in solido); Wis. Stat. § 632.24 (2012) (Wisconsin grants injured persons a right of direct action against a tortfeasor's insurer irrespective of whether liability is presently established or is contingent and to become fixed or certain by final judgment against the insured).

39. Accordingly, the Plan must clarify that workers' compensation and direct action claims must continue to be administered, handled, defended, settled, and/or paid in the ordinary course, and relatedly, that the Chubb Companies may continue to so administer, handle, defend,

settle, and/or pay such covered claims in the ordinary course, and pursuant to the terms of the Insurance Programs and applicable non-bankruptcy law.

### IV. The Plan contains an improper "gatekeeping" provision.

40. The Plan provides that certain claims against the Debtors and certain third parties, which may include claims covered by insurance, can only go forward if, among other things, the claimant first obtains from the Bankruptcy Court a determination that its claim is "colorable," which determination the Court will purportedly "have sole and exclusive jurisdiction" to make. *See* Plan at Art. X.F.

41. As an initial matter, it is well-established that the Plan cannot confer the Court with jurisdiction over any dispute or proceeding. *See In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002) ("[T]he source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004) ("[J]urisdiction cannot be conferred … in a plan of reorganization"); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 515 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021) ("Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.") (emphasis in original).

42. It is also well-established that bankruptcy courts lack core jurisdiction over the liquidation or estimation of contingent or unliquidated personal injury tort claims. *See* 28 U.S.C. § 157(b)(2)(B); *see also In re Schepps Food Stores, Inc.*, 169 B.R. 374, 377 (Bankr. S.D. Tex. 1994) ("Congress did *not* want proceedings affecting the liquidation of personal injury or wrongful death claims to be core matters. Thus, bankruptcy courts lack the power to finally adjudicate these causes of action.").

43. Thus, to the extent the Plan purports to confer on the Court any jurisdiction, including any exclusive jurisdiction and/or jurisdiction to estimate or finally adjudicate personal injury claims, this is contrary to applicable law.

## OPT-OUT OF THIRD-PARTY RELEASE

44. The Chubb Companies do not consent to and opt-out of the Third-Party Release.

45. Consistent with the concept of opting out, and the notices provided in these Bankruptcy Cases (*see, e.g.,* Disclosure Statement, at pg. ii), the Debtors have not required that any objection to the Third-Party Release be sustained, or even addressed by the Court, in order for the opt out to be effective. It is the Chubb Companies' position that, by filing this Objection, the Chubb Companies have properly opted out of the Third-Party Release and are not Releasing Parties.

## RESERVATION OF RIGHTS

46. The Chubb Companies specifically reserve all of their rights with respect to the Insurance Programs and their rights to assert additional objections to the Plan, to assert any other objections, including, but not limited to, objections to the Plan Supplement, the Restructuring Steps Memorandum, the Liquidating Trust Agreement, and the Confirmation Order and/or any documents related thereto, and/or to join in or rely on the objections of other insurers or other parties to the Plan or any documents related thereto and/or any other objections.

Dated: November 19, 2025

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Wendy M. Simkulak*
Wendy M. Simkulak, Esquire
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Email: wmsimkulak@duanemorris.com

and

Jessica Kenney Bonteque, Esquire (*pro hac vice* forthcoming)
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669
Telephone: (212) 692-1036
Fax: (212) 954-5310
Email: JBonteque@duanemorris.com

*Counsel for the Chubb Companies*