UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re: | : |  |
|  | : | Case No. 25-14861 (MBK) |
| New Rite Aid, LLC, et als.,[1] | : |  |
|  | : | The Honorable Michael B. Kaplan |
| Debtors. | : |  |
|  | : | Hearing Date: November 24, 2025 at 10:00 a.m. |
|  | : |  |

**UNITED STATES TRUSTEE'S OBJECTION TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects to the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Affiliates* [Dkt. 3215] (the "Plan"),[2] and respectfully states as follows:

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (including exhibits), as applicable.

## PRELIMINARY STATEMENT[3]

1.      In contravention of United States Supreme Court precedent and applicable state law, the Plan extracts non-consensual third-party releases and, to the extent that exculpation is permissible beyond the provisions of Bankruptcy Code section 1125(e), the proposed Plan's exculpation provision violates controlling Third Circuit case law by attempting to shield non-fiduciaries of the Debtors' estates.

2.      In addition, the Plan contains (i) overbroad Debtor releases and injunctions, (ii) a gatekeeping role for the Court, (iii) language that improperly suggests that the Plan itself is a settlement agreement, (iv) language that the releases, Debtor and third-party, are approved pursuant to Fed. R. Bankr. P. 9019, and (v) improperly seeks the waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.      The U.S. Trustee further objects to several miscellaneous provisions of the Plan including (i) Article XIV.C concerning Statutory Fees; (ii) Article III.E concerning votes and deemed acceptances; (iii) Article VII.C concerning indemnification of the Liquidating Trustee and his or her professionals; (iv) Article XIV.D concerning the separate release and discharge of the liabilities of the Committee and its members; and (v) Article XI.D concerning Substantial Consummation of the Plan.

4.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation.

## JURISDICTION AND STANDING

5.      This Court has jurisdiction to hear and determine confirmation of the Plan and this Objection pursuant to: **(i)** 28 U.S.C. § 1334; **(ii)** applicable orders of the United States District

---

[3] The U.S. Trustee recognizes that this Court has overruled similar objections in prior cases.  Notwithstanding, the U.S. Trustee continues to object to these provisions as more fully set forth herein.

Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and **(iii)** 28 U.S.C. § 157(b)(2).

6.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

7.      The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this Objection pursuant to 11 U.S.C. § 307.  *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

### Background

**A.      The Chapter 11 Cases**

8.      On May 5, 2025, New Rite Aid, LLC, and affiliated debtors (the "Debtors") commenced these chapter 11 cases by filing voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"). *See* for example Case No. 25-14861/MBK at Dkt. 1.

9.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.     On May 16, 2025, the U.S. Trustee appointed an official committee of unsecured creditors. *See* Dkt. 316.

11.     As of the date hereof, no trustee or examiner has been requested or appointed.

**B.      The Debtors and their Businesses**

12.     The Debtors operated a full-service pharmacy and drug store chain.  *See* Dkt. 3216

at Section II.A.1, page 12 of 243.  According to the Debtors, their business model operated two

parallel complimentary business segments.  *See id.* at Section III.A.1, page 23 of 243.  The

Debtors' "primary business line was its pharmacy segment, through which it offered a wide range

of health care services to millions of pharmacy-care customers in the United States, including

dispensing medications, performing immunizations and other clinical care, assisting pharmacy-

care customers with high blood pressure and diabetes care, and educating pharmacy-care

customers on managing their medications and potential side effects."  *See id.*  The Debtors "also

sold a variety of front-end merchandise, including health and beauty aids, personal care products,

seasonal merchandise, and a large private brand portfolio of food and consumer products, through

both its physical locations and e-commerce business."  *See id.*

**C.      The Administrative Procedures Order, Conditional Approval of the Disclosure
         Statement and Plan.**

13.     On August 14, 2025, the Court entered an Order (I) Authorizing the Administrative

Claims Procedures and (II) Granting Related Relief (the "Administrative Procedures Order").  *See*

Dkt. 1883.  Pursuant to the Administrative Procedures Order, certain administrative claimants were

provided with the opportunity to elect to opt-out of an agreement to accept a reduced payment in

satisfaction of such claims.  *See id.*  No further information has been provided concerning the

outcome of the opt-out election.  As such, it is unclear whether the Debtors will be able to pay the

opt-out administrative claims in full.

14.     On September 3, 2025, the Debtors filed the *Joint Chapter 11 Plan of

Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "First Plan"), and the related

4

Disclosure Statement.  *See* Dkts. 2286 and 2287.  The Debtors through the First Plan and Disclosure Statement sought either to confirm the First Plan or toggle to a dismissal of the cases.

15.     On September 4, 2025, the Debtors filed *Debtors' Motion for Entry of an Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates with Respect Thereto, and (E) Granting Related Relief and (II)(A) Approving, in the Alternative, Dismissal of the Debtors' Chapter 11 Cases, (B) Scheduling Certain Dates with Respect Thereto, and (C) Granting Related Relief* (the "Disclosure Statement and Solicitation Motion").  *See* Dkt. 2289.

16.     On September 10, 2025, the U.S. Trustee filed an Objection to the Disclosure Statement and Solicitation Motion.  *See* Dkt. 2403.

17.     On September 19, 2025, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "First Amended Plan"), and the related Disclosure Statement.  *See* Dkts. 2517 and 2518.  The Debtors through the First Amended Plan and Disclosure Statement sought either to confirm the First Amended Plan or toggle to a dismissal of the cases.

18.     On September 22, 2025, the Court entered an Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates With Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief (the "Conditional Approval Order").  *See* Dkt. 2535.  The Court originally scheduled a confirmation hearing for October 20, 2025, which was adjourned to November 24, 2025.

19.     On October 27, 2025, the Court entered an Order to Show Cause as to Why Case Should Not be Dismissed or Converted to Chapter 7 (the "OTSC"), and scheduled a hearing for November 10, 2025.  *See* Dkt. 2997.

20.     On November 7, 2025, the U.S. Trustee filed a Response to the Court's Order to Show Cause as to Why Case Should Not be Dismissed or Converted to Chapter 7 (the "U.S. Trustee Response").  *See* Dkt. 3198.  The U.S. Trustee Response provided that the cases should be converted to chapter 7 cases as cause exists including substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.  *See id.*  Such cause remains today.

21.     On November 10, 2025, instead of conducting a hearing concerning the OTSC, the Court filed a text order advising that the confirmation hearing was adjourned to November 24, 2025.

22.     The next day, on November 11, 2025, the Debtors filed the Plan that is the subject of this Objection, and related Disclosure Statement.  *See* Dkts. 3215 and 3216.

23.     Also, on November 11, 2025, the Debtors filed a Notice of Filing of Plan Supplement (the "Plan Supplement") and Notice of Filing of Proposed Confirmation Order (the "Confirmation Order").  *See* Dkts. 3218 and 3219.

**D.     Specific Provisions of the Plan**

24.     The Plan includes the following provisions relevant to this Objection.

i.      **Third-Party Release Provision**

25.     Article X.D of the Plan broadly provides that the Releasing Parties[4] shall release

each Released Party[5] "from any and all claims and Causes of Action, whether liquidated or

unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or

unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in

law, equity, contract, tort, or arising under federal or state statutory or common law, or any other

applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty,

requirement, or otherwise."[6]  *See* Dkt. 3215 at Art. X.D, pages 56 of 68.

---

[4] The Plan defines "Releasing Party" as follows:

> "*Releasing Party*" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Agents; (e) the DIP Secured Parties; (f) McKesson; (g) the Committee (and each of its members, solely in its capacity as such); (h) the Liquidating Trustee on behalf of the Liquidating Trust; (i) the 1.5L Indenture Trustee; (j) the 3L Indenture Trustee; (k) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided for in the Plan; (l) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (m) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (n) all Holders of Claims who vote or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (o) each current and former Affiliate of each Entity in clauses (a) through  (n); and (p) each Related Party of each Entity in clauses (a) through clause (o).

*See* Dkt. 3215 at Art. I.A.140, page 16 of 68.

[5] The Plan defines "Released Party" as follows:

> "*Released Party*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Reorganized  Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties; (e) each current and former Affiliate of each Entity in clauses (a) through (d); (f) each Related Party of each Entity in clauses (a), (b), (c), and (e) (including Holders of Existing Equity Interests in Class 7); (g) each current and former Affiliate of each Entity in clauses (d) through (f) and the following clause (h); and (h) each Related Party of each Entity in clauses (d) through (g) and this clause (h); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

*See* Dkt. 3215 at Art. I.A.139, pages 15 and 16 of 68.

[6] The Plan provides for a Third Party Release as follows:

> Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally,

irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that nothing in this Plan or the Confirmation Order shall operate as a release of any (a) Retained Causes of Action, or (b) Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is: (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

From and after the Effective Date, any Entity that opted out of the releases contained in this Article X.D may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this Article X.D, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to Article X.C, and (b) is colorable. Solely to the extent legally permissible and as provided for in Article XIII of the

26.     Holders of Other Secured Claims in Class 1, Other Priority Claims in Class 2, General Unsecured Claims in Class 4, Intercompany Claims in Class 5, Intercompany Interests in Class 6, Existing Equity Interest in Class 7, and Section 510(b) Claims in Class 8 are either unimpaired or are insiders or Affiliates of the Debtor; as a result, they are either presumed to have accepted the Plan or deemed to have rejected it, and so are not entitled to vote on the Plan. *See id.* at Art. III.A, page 24 of 68.  Instead, pursuant to the Conditional Approval Order, the holders of claims in these classes other than Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) received a Notice of Non-Voting Status, which contained an Opt-Out Form. *See* Dkt. 2535 at Exhibit 4 and Exhibit 4A, pages 16 and 287-301 of 314.

27.     The Notice of Non-Voting Status and Opt-Out Forms that were sent to members of Classes 1, 2, 4, 7, and 8 specifies that a recipient who fails to timely and properly submit an Opt-Out Form to the Balloting Agent by the Opt-Out Deadline with the opt-out box checked will be deemed to have consented to the third-party releases in Article X.D of the Plan.[7] *See id.* at Exhibit 4A, page 295 of 314.

28.     Holders of Claims in Class 3 are entitled to vote under the Plan. *See* Dkt. 3215 at page 24 of 68.  The ballots provided to the voting class included an opt-out election. *See* Dkt. 2535 at Exhibit 3, pages 276-286 of 314.  The opt-out election provides that a claimant will be deemed to provide the releases contained in Article X.D of the Plan unless the box is checked and the ballot submitted to the Balloting Agent prior to the Voting Deadline. *See id.*

---

Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

*See* Dkt. 3215 at Art. X.D, page 56 of 68.

[7] It is unclear whether a member of the non-voting classes could file an objection in lieu of an Opt-Out Form if it does not consent to granting the third-party releases.

### ii.      Debtor Release Provision

29.      Article X.C of the Plan broadly provides that each Released Party is deemed released by all of the Debtors and their Estates, the Reorganized Debtors, and Wind-Down Debtors (and the Liquidating Trust as the successor in interest to the Wind-Down Debtors), as applicable. The Clams being released include "any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, the Wind-Down Debtors, or the Reorganized Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise."[8]  *See* Dkt. 3215 at Art. X.C, page 55 of 68.

---

[8] The Plan provides for Debtor Releases as follows:

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Reorganized Debtors, and Wind-Down Debtors (and the Liquidating Trust as the successor in interest to the Wind-Down Debtors), as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, the Wind-Down Debtors, or the Reorganized Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, the Reorganized Debtors, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or

### iii.    Exculpation Provision

---

contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the pursuit of the Restructuring Transaction, the implementation and making of the McKesson Equity Distribution, the administration and implementation of the Wind-Down, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any (a) Retained Causes of Action or (b) claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article X .C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.C is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

*See* Dkt. 3215 at Art. X.C, pages 55 of 68.

30. Section X.E of the Plan is an overbroad exculpation provision[9] for Exculpated Parties.[10] *See* Dkt. 3215 at Art. X.E, page 57 of 68.

---

[9] The Plan's exculpation provision states as follows:

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Debtors' estates during the course of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan pursuant to section 1125(e) of the Bankruptcy Code.

The exculpation provided for in this Article X.E will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided, however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the Plan, the 1125(e) Covered Parties shall not incur liability for any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof. No Entity or Person may commence or pursue a claim or Cause of Action against any of the 1125(e) Covered Parties that is subject to the terms of this paragraph, without the Bankruptcy Court (a) first determining, after notice and a hearing, that (i) such claim or Cause of Action represents a colorable claim or Cause of Action for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Covered Party which is not within the scope of the limitation of liability set forth in section 1125(e) of the Bankruptcy Code, and (ii) such party is not otherwise exculpated pursuant to this Article X.E; and (b) specifically authorizing such Entity or Person to bring such claim or Cause of Action against such 1125(e) Covered Party. The Bankruptcy Court

12

### iv.     Injunction Provision

31.     The Plan does not provide for substantive consolidation of any of the Debtors. *See* Dkt. 3215 at Art. I.G, page 19 of 68.  Pursuant to the Restructuring Steps Memorandum included in the Plan Supplement, there appears to be only four (4) Debtors that will become the Reorganized Debtors under the Plan.  *See* Dkt. 3218 at page 58 of 112.

32.     Despite the Plan being named a reorganization plan, it appears that only four (4) of the many Debtors are being reorganized and the remaining Debtors will be liquidated.  Article X.F of the Plan broadly provides a permanent injunction against "all Entities who have held, hold, or may hold claims, Causes of Action, or Interests that have been released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan." *See* Dkt. 3215 at Art. X.F, page 58 of 68.  Article X.F also "enjoins all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates" from taking any actions to interfere with the

---

will have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or Cause of Action.

*See* Dkt. 3215 at Art. X.E, page 57 of 68.

[10] The Plan defines "Exculpated Parties" as follows:

"*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Wind-Down Debtors; (d) the Committee and each of its members; (e) with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's current and former control persons (including any officers), directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

*See* Dkt. 3215 at Art. I.A.78, page 11 of 68.

implementation or Consummation of the Plan and to the extent a holder accepted or is eligible to

accept distributions, such holder will be deemed to have consented to the injunction.[11]  *See id.*

---

[11] The Plan's injunction provision states as follows:

> Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Causes of Action, or Interests that have been released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors or Liquidating Trust (or their Affiliates), the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

> No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E hereof, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, (b) determining that such Person or Entity is not barred from commencing or pursuing such Claim or Cause of Action pursuant to this Article X.F, and (c) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such party. For the avoidance of doubt, any party that obtains such determination and authorization and then subsequently wishes to amend the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.

> Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

###### v.       Gatekeeping Provision

33.       The Plan also includes a gatekeeping injunction that forces a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.[12] *See* Dkt. 3215 at Art. X.D, page 56 of 68, and Art. X.F, page 58 of 68.

###### vi.      Rule 3020(e) Waiver

---

As of the Effective Date, except as specifically provided in the Plan or Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Reorganized Debtors (or their Affiliates), or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors. Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Debtors, subject to the final paragraph of Article X.D.

*See* Dkt. 3215 at Art. X.C, pages 57 and 58 of 68.

[12] The Plan's gatekeeping provision states as follows:

From and after the Effective Date, any Entity that opted out of the releases contained in this Article X.D may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this Article X.D, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to Article X.C, and (b) is colorable. Solely to the extent legally permissible and as provided for in Article XIII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

*See* Dkt. 3215 at Art. X.D, page 56 of 68.  In addition, the gatekeeping provision also applies to the injunction:

Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Reorganized Debtors, or the Wind-Down Debtors, subject to the final paragraph of Article X.D.

*See* Dkt. 3215 at Art. X.F, page 58 of 68.

34.    The Debtors seek a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e).[13]

*See* Dkt. 3215 at Article XIV.A, page 64 of 68.

### vii.    Provisions Providing that the Plan is a Settlement and Approval of the Releases Pursuant to Rule 9019

35.    Article IV.A[14] provides that the Plan is a compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan or Confirmation Order.  *See* Dkt. 3215 at Article IV.A, page 28 of 68.

---

[13] Article XIV.A of the Plan states as follows:

> Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the Liquidating Trust, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*See* Dkt. 3215 at Art. XIV.A, page 64 of 68.

[14] Article IV.A of the Plan states as follows:

> Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, to the maximum extent permitted by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan or Confirmation Order. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Articles VI and XIV hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final, shall be in full satisfaction of such Claims, and shall be free and clear of the Liens of any Entity.

*See* Dkt. 3215 at Art. IV.A, page 28 of 68.

36.     Articles X.C[15] and X.D[16] provide that the releases described in Articles X.C and X.D are approved pursuant to Rule 9019.  *See* Dkt. 3215 at Article X.C, page 55 of 68 and Article X.D. at page 56 of 68.

### viii.   Other Provisions

---

[15] The relevant part of Article X.C of the Plan provides as follows:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article X.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.C is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

*See* Dkt. 3215 at Art. X.C, page 55 of 68.

[16] The relevant part of Article X.D of the Plan provides as follows:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is: (a) consensual; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of such claims and Causes of Action; (d) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties or the Debtors, their respective Estates, the Reorganized Debtors, or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

*See* Dkt. 3215 at Art. X.D, page 56 of 68.

37.     Article XIV.C[17] of the Plan contains language concerning the payment of Statutory

Fees[18] pursuant to 11 U.S.C. § 1930(a)(6).  *See* Dkt. 3215 at Article XIV.C, page 64 of 68.

38.     Article III.E of the Plan provides that a class will be deemed to accept the Plan if

no votes are cast and the class contains claims or interests eligible to vote.[19]  *See id.* at Article

III.E, page 27 of 68.

39.     Article VII.C of the Plan includes exculpation and indemnification of the

Liquidating Trustee and his or her professionals.[20]  *See id.* at Article VII.C, page 49 of 68.

---

[17] Article XIV.C of the Plan states as follows:

> All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidating Trust shall pay any and all Statutory Fees when due and payable, and such fees shall be paid solely from the Wind-Down Reserve (and, to the extent amounts in the Wind-Down Reserve are insufficient to pay any such Statutory Fees, the Distributable Assets).  The Wind-Down Debtors shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee with respect to each Chapter 11 Case until such Chapter 11 Case has been closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code, and the U.S. Trustee shall not be required to file any request for payment of an Administrative Claim or be treated as a Releasing Party pursuant to the Plan.

*See* Dkt. 3215 at Art. XIV.C, page 64 of 68.

[18] The Plan defines "Statutory Fees" as follows:

> "*Statutory Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

*See* Dkt. 3215 at Art. IA.163, page 17 of 68.

[19] Article. III.E. of the Plan states as follows:

> If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

*See* Dkt. 3215 at Art. III.E, page 27 of 68.

[20] Article VII.C of the Plan states as follows:

> The Liquidating Trustee and all professionals retained by the Liquidating Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Liquidating Trustee may obtain, solely using funds from the Wind-Down Reserve and in accordance with the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Liquidating Trustee may rely upon written information previously generated by the Debtors.

40.     Article XIV.D of the Plan provides a separate release and discharge of liabilities to the Committee and its members.[21]  *See id.* at Article XIV.D, pages 64 and 65 of 68

41.     Article XI.D[22] of the Plan provides that Substantial Consummation will be deemed to occur on the Effective Date.  *See id.* at Article XI.D, page 61 of 68.

## OBJECTION

### I.     Confirmation Standard

42.     A chapter 11 plan cannot be confirmed unless this Court finds the plan complies with the provisions of 11 U.S.C. § 1129(a).  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000).  A plan proponent bears the burden of proof with respect to each element of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

43.     For the following reasons, the Plan cannot be confirmed in its present form.

---

*See* Dkt. 3215 at Art. VII.C, page 49 of 68.

[21] Article XIV.D of the Plan states as follows:

> On the Effective Date, the Committee shall dissolve automatically and the members thereof and each Professional retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Committee will remain in place after the Effective Date solely for the purpose of addressing (a) all final fee applications for all Professionals for the Committee and any matters concerning Professional Fee Claims held or asserted by any Professional retained by the Committee, and (b) the resolution of any appeals of the Confirmation Order or other appeals to which the Committee is a party.

*See* Dkt. 3215 at Art. XIV.D, pages 64 and 65 of 68.

[22] Article XI.D of the Plan states as follows:

> "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

*See* Dkt. 3215 at Art. XI.D, page 61 of 68.

## II.    The Plan is Not Confirmable Because it Proposes Non-Consensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code

### A.    Introduction

44.    The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them.  *See* 603 U.S. 204, 209, 227 (2024).  The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release."  *See id.* at 226.

45.    A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement.  *See Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

46.    Here, there is no existing release agreement between non-debtors.  Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

47.    State law governs whether non-debtors have agreed to release each other.  *See infra* Part B.  Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans.  Under New York law, which appears to be the law

20

governing the Plan, as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here.  The Debtors thus cannot deem those who fail to opt out to have released claims because those claimants have not agreed to the third-party release under state law.

### B.     State Contract Law Applies

48.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims."  *See Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

49.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.  Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*."  *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual

obligations of third parties, the parties themselves have so agreed." *See Arrowmill*, 211 B.R. at

507.

50.     Because the Bankruptcy Code does not authorize the imposition of an involuntary

release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law.

There is no Bankruptcy Code provision that preempts otherwise applicable state contract law

governing releases between non-debtors.   *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate

Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a

statute provides the rule of decision or authorizes a federal court to supply one, 'state law must

govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72

(1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the

Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the

state.").   Section 105(a), for example, "serves only to carry out authorities expressly conferred

elsewhere in the code."  *See Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the Code

does not confer any authority to impose a release of claims between non-debtors that would not be

valid under state law.  The Bankruptcy Code does not define a "consensual release."  *See* 11 U.S.C.

§ 101.  "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism"

for third-party releases in chapter 11 plans.  *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 78

(Bankr. S.D.N.Y. 2015).  And no Code provision authorizes bankruptcy courts to deem a non-

debtor to have consented to release claims against other non-debtors where such consent would

not exist as a matter of state law.

51.     Some courts have held that federal rather than state law applies to determine

whether a third-party release is consensual.  But because there is no applicable Code provision,

whether a non-debtor has consented to release another non-debtor is not, as one court concluded,

22

a "matter of federal bankruptcy law." *See In re Spirit Airlines, Inc.*, 666 B.R. 689, 716 (Bankr. S.D.N.Y 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *See Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

52.     Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a

23

third-party release "is no different from any other settlement or contract" and thus "the validity of

the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than

upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations

in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . .

any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance

and consent."  *See In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024)

(quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by

state law."  *See id.*

53.     Even if federal law applied, however, it would not lead to a different result.  That

is because "federal contract law is largely indistinguishable from general contract principles under

state common law."  *See Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d

344, 354 (5th Cir 2015) (cleaned up).  *See also Deville v. United States*, 202 F. App'x 761, 763

n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core

principles of the common law of contracts that are in force in most states.' . . . These core principles

can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8

(5th Cir. 2003)).

### C.     Under State Law, Silence is Not Acceptance

54.     The Debtors bear the burden to prove that their Plan is confirmable.  *See In re

American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  The Debtors have not met this

burden because they have failed to establish that the third-party release is consensual under

applicable state law, nor have they even contended that consent exists under state law.

55.     Here, for the most part, the Plan provides that the governing law is the State of New

York.  *See* Dkt. 3215 at Article I.D, page 19 of 68.  Under New York law, like in other states, an

agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[23]  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 658 (2d Cir. 1996) ("A valid contract requires a manifestation of mutual assent to a bargained-for exchange").

56.    Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[24]  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL

---

[23] The Court may apply New York law because no party has suggested that any other state's law applies.  *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").  Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required.  *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014).  Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true.  Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 669 (E.D. Va. 2022).

[24] New York, like many states, follows the Restatement (Second) of Contracts § 69.  *See Friedman v. Schwartz*, 2010 U.S. Dist. Lexis 10588 at * 8 (E.D.N.Y. September 30, 2010) ("This principle is stated in § 69(1) of the Restatement (Second) of Contracts, which reflects the law of New York").

1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

57.    There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *See Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds." *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

58.    But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *See id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

**D.    Failing to Opt Out Does Not Provide the Required Affirmative Consent**

59.    The Plan imposes a third-party release on anyone who is provided a ballot and does not return it with the opt-out box checked and anyone who is provided the Notice of Non-Voting Status, which contains an Opt-Out Form, and does not return the Opt-Out Form.   In other words, the Debtors purport to impose an otherwise non-existent duty to speak on behalf of claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law, silence is not acceptance of the offer to release non-debtors.

26

*See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

60.    A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *See Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *See id*. The customer did not opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

61.    The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *See Norcia*, 845 F.3d at 1284 (quotation marks omitted).  *See also Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440, 84 N.E.2d 625, 626 (1949) ("where the recipient of an offer is under no duty to speak, silence–when not misleading, may not be translated into acceptance merely because the offer purports to attached that effect to it.").  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *See Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action

to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *See id*. at 1286 (quotation marks and citation omitted).

62.    The Ninth Circuit held that none of the exceptions to this rule applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

63.    Here, too, Debtors' creditors have not signed an agreement to release the non-debtors nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### i.    Not voting and not opting out is not consent to release non-debtors

64.    Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to both those creditors who simply abstain from voting and those creditors who are not entitled to vote on the Plan because they are deemed to accept or reject. There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

65.    Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to

respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See* Restatement (Second) Of Contracts § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

66.    Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

67.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *See Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-

20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent.  *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake."  *See id.*

68.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *See In re Washington Mut., Inc.*, 442 at 355; *see also Chassix*, 533 B.R. at 81–82.

### ii.    Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release

69.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* Restatement (Second) of Contracts § 69 cmt. a (1981).  Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors.  The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors.  *See* Restatement (Second) of Contracts § 69 cmt. a.  Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan.  *See* 11 U.S.C. § 1126(a).  Merely exercising that right does not manifest consent to release claims against non-debtors.

70.    Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to

the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" *See* 533 B.R. at 79 (emphasis added).

### iii.    Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect

71.    One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote. *See Smallhold*, 665 B.R. at 723. The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release. *See id.* But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that silence may operate as acceptance" of a third-party release. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," *see* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[25] Thus, consent to release third-party claims (which are governed by

---

[25] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *See In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id.* at *21. " When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

nonbankruptcy law) cannot properly be inferred from a party's failure to check an opt-out box on

a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy

law). *See supra*.

### E.   Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

72.   Applicable state contract law cannot be disregarded on a procedural default theory,

applied by some courts, under which creditors who remain silent are held to have forfeited their

rights against non-debtors if they received notice of the non-debtor release but failed to object, just

as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[26]  *See,*

*e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6

(Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt*

*PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179,

218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24,

2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so

long as the creditors received notice of a proposed non-debtor release and were informed of the

consequences if they did not opt out or object to that release, there is no unfairness or deprivation

of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this

reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party

release to be entered by default").

73.   A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In*

*re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court stated

that "the notion that an individual or entity is in some instances deemed to consent to something

---

[26] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its
holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

by their failure to act is one that is utilized throughout the judicial system." *See id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *See id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *See id*.

74.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *See id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

75.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

76.     And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See Smallhold*, 665 B.R. at 719.

77.   The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *See id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

78.   But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default

34

judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

79.     "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722.  A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *See id.*  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id.*  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See id*. at 719-20.

80.     Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *See id*. at 709.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[27]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *See id*. at 720 (emphasis added).

---

[27] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id*. at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

81.     In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by holders of Claims or Interests to the third-party releases the Plan seeks to provide to the many so-called "Released Parties."  As a result, the Debtors do not meet their state-law burden of establishing that the members of the Classes in the Plan have agreed to release their property rights and have that release memorialized in the Plan.  *See Mizuna, Ltd.* 90 F.3d at 658.  Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law.  It is especially egregious to do so here to parties that are not entitled to vote on the Plan.  The Plan's third-party releases are therefore non-consensual, and so are prohibited by *Purdue*.

## III.    The Debtor Releases in the Plan Are Overbroad

82.     The Plan provides for a release by the Debtors to the Released Parties.  *See* Dkt. 3215 at Article X.C, page 55 of 68.

83.     The Plan does not establish that each of the proposed Released Parties are providing adequate consideration in exchange for receiving such releases. In addition, certain persons included in the definition of Released Parties do not appear to be entitled to such releases under applicable case law.  Many individuals and entities are also included in the definition of Released Parties that are unknown parties.[28]  Further, the definition of Released Parties refers to and includes unknown Related Parties.[29]  Also, estate fiduciaries are not only receiving an exculpation under the Plan but are also receiving a release from the Debtors.

---

[28] Included in the definition of Released Party are "(e) each current and former Affiliate of each Entity in clauses (a) through (d); (f) each Related Party of each Entity in clauses (a), (b), (c), and (e) (including Holders of Existing Equity Interests in Class 7); (g) each current and former Affiliate of each Entity in clauses (d) through (f) and the following clause (h); and (h) each Related Party of each Entity in clauses (d) through (g) and this clause (h)."  *See* Dkt. 3215 at Art. I.A.139, pages 15 and 16 of 68.

[29] The Plan defines "Related Party" as follows:

84.     In *In re Zenith Elecs. Corp.*, the Court identified five factors that are relevant to

determine whether a debtor's release of a non-debtor is appropriate:

(1)     an identity of interest between the debtor and non-debtor such that a suit
against the non-debtor will deplete the estate's resources;

(2)     a substantial contribution to the plan by the non-debtor;

(3)     the necessity of the release to the reorganization;

(3)     the overwhelming acceptance of the plan and release by creditors and
interest holders; and

(4)     the payment of all or substantially all of the claims of the creditors and
interest holders under the plan.

*See Zenith*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing Master Mortgage Inv. Fund, Inc.*, 168

B.R. 930, 937 (Bankr. W.D. Mo. 1994). These factors are neither exclusive nor conjunctive

requirements but provide guidance in the court's determination of fairness.  *See Master Mortgage*,

168 B.R. at 935 (finding there is no "rigid test" to be applied in every circumstance and that the

five factors are neither exclusive, nor conjunctive).

85.     The first *Zenith* factor requires an "identity of interest between the debtor and the

third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will

deplete the assets of the estate."  *See In re Spansion, Inc.*, 426 B.R. 114, n. 47 (Bankr. D. Del.

2010), *citing Zenith*, 241 B.R. at 110.  An identity of interest exists when, among other things, the

---

"*Related Party*" means, each of, and in each case in its capacity as such, current and former directors,
managers, officers, committee members, members of any governing body, equity holders
(regardless of whether such interests are held directly or indirectly), affiliated investment funds or
investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns,
subsidiaries, Affiliates, partners, limited partners, general partners, principals, members,
management companies, fund advisors or managers, employees, agents, trustees, advisory board
members, financial advisors, attorneys (including any other attorneys or professionals retained by
any current or former director or manager in his or her capacity as director or manager of an Entity),
accountants, investment bankers, consultants, representatives, and other professionals and advisors
and any such Person's or Entity's respective heirs, executors, estates, and nominees.

*See* Dkt. 3215 at Art. I.A.138, page 15 of 68.

debtor has a duty to indemnify the non-debtor receiving the release. *See Wash. Mut.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*). Here, it is unclear whether an identity of interest exists between the Debtors and each of the Released Parties.

86.    The second *Zenith* factor involves whether the non-debtor party benefiting from the release made a substantial contribution of assets to the debtor's reorganization. *See In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007). In considering releases, substantial contribution does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring. *See In re Genesis Health*, 266 B.R. at 606-7 ("the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization."). There is scant evidence that each of the Released Parties provided a substantial contribution of assets.

87.    As to the third *Zenith* factor, no information is provided to support the contention that all of the releases are necessary to a reorganization as this Plan is in fact mostly a liquidation.

88.    The fourth *Zenith* factor concerning acceptance of the Plan is premature and cannot be assessed at this time as the Debtors have not filed a certification of ballots.

89.    The fifth *Zenith* factor is not satisfied as it does not appear that unsecured creditors will receive all or substantially all of their claims. Accordingly, these factors do not support the Debtor Releases.

90.    Additionally, estate fiduciaries receive an exculpation for their actions or inactions between the Petition Date and the Effective Date under the Plan. *See* Dkt. 3215 at Article X.E, page 57 of 68. The estate fiduciaries do not satisfy the *Zenith* factors and should only be granted

an exculpation for their actions or inactions between the Petition Date and the Effective Date, not

a release from the Debtors.

**IV.    The Exculpation Provision in the Plan is Overbroad and Exceeds the Limitation of Third Circuit Law**

91.     The Plan is not confirmable for the separate and independent reason that it includes

an impermissible exculpation provision.   To the extent applicable law authorizes exculpation

beyond the provisions of Bankruptcy Code section 1125(e), the Plan's exculpation provision

contravenes Third Circuit precedent because it is not limited to estate fiduciaries.  *See In re PWS*

*Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

92.     The Plan's definition of Exculpated Parties is overbroad as it includes current and

former control persons (including any officers), directors, members of any committees of any

Entity's board of directors or managers, equity Holders (regardless of whether such interests are

held directly or indirectly), principals, members, employees, agents, advisory board members,

financial advisors, attorneys (including any attorneys or other professionals retained by any current

or former director or manager in his or her capacity as director or manager of an Entity),

accountants, investment bankers, consultants, representatives, and other professionals, each in

their capacity as such."  *See* Dkt. 3215 at Article I.A.78, page 11 of 68.

93.      In addition, the Debtor seeks to exculpate the Exculpated Parties "from any claim

or Cause of Action for any act or omission arising prior to the Effective Date," which includes

prepetition conduct.  *See id.* at Article X.E., page 57 of 68.

94.     However, exculpation is only available for services rendered between the Petition

Date and the Effective Date.  *See Mallinckrodt*, 639 B.R. at 883 (holding that exculpation "only

extends to conduct that occurs between the Petition Date and the effective date," and ordering

contrary language "must therefore be stricken").  As the Plan's exculpation provision would allow

exculpation for conduct that occurred before the Petition Date, it exceeds the allowable scope of exculpation, and effectively imposes a non-consensual release of non-debtors by non-debtors in contravention of the Supreme Court's decision in *Purdue,* 144 S. Ct. at 2082-88. As such, the Plan cannot be confirmed unless the exculpation provision is revised to comply with applicable law.

95.     Further, through the Plan's exculpation provision, the "Exculpated Parties" are granted the protection and benefits provided pursuant to section 1125(e) of the Bankruptcy Code. *See* Dkt. 3215 at Article X.E, page 57 of 68. However, section 1125(e) provides protection to a "person that solicits acceptance or rejection of a plan[.]" *See* 11 U.S.C. § 1125(e). Here, it is unclear as to who solicited acceptances and rejections under the Plan other than the Debtors and their professionals. Unless they can show that they participated in the solicitation of acceptances and rejections under the Plan, such protection should not be provided to the "Exculpated Parties" that were not involved in the solicitation of acceptances or rejections under the Plan.[30] In addition, it appears that the 1129(e) Covered Parties that include the Exculpated Parties and Related Parties are also being granted the protection and benefits provided pursuant to section 1125(e) of the Bankruptcy Code. *See* Dkt. 3215 at Article X.E, page 57 of 68.

96.     Additionally, the Exculpation Provision shields the Exculpated Parties in ways inconsistent with Third Circuit precedent, including *PWS,* because it seeks to "deem" the Exculpated Parties as having participated in good faith, which then swallows the exception that limits exculpatory relief for "claims or Causes of Action in each case arising out of or related to

---

[30] Article I.A.5 defines "1125(e) Covered Parties" as follows:

> "*1125(e) Covered Parties*" means, each of, and, in each case, in its capacity as such, (a) the Exculpated Parties, (b) the directors and officers of any of the Debtors or their affiliates, and (c) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' Related Parties, in each case solely in their capacity as such.

*See* Dkt. 3215 at Article X.E, page 57 of 68.

any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence." *See* Dkt. *id.*

97.     In light of the foregoing, the Plan cannot be confirmed unless the exculpation provision is stricken or otherwise amended to be made consistent with applicable law.

## V.     The Injunction Provision in the Plan is Overbroad and Impermissible

98.     This Court also may not approve the injunction enforcing the third-party release by barring claims against non-debtors. *Purdue* held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue*, 603 U.S. at 227.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context:  asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 222 (citing 11 U.S.C. § 524(g)).

99.     Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction.  An injunction is critically different from a consensual non-debtor release.  The legal effect of a consensual release is based on the parties' agreement. *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change.  An injunction, by contrast, relies on the court's power to enter orders binding on parties.  The court must therefore have both constitutional and statutory authority to enter an injunction.  And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted.

100.     In addition, the injunction language in the Plan appears to provide a discharge to the many Debtors that are being liquidated.   The Plan does not provide for substantive

consolidation of any of the Debtors and it appears that only four (4) of the Debtors will be

Reorganized Debtors.  *See* Dkt. 3215 at Art. I.G, page 19 of 68 and Dkt. 3218 at page 58 of 112.

101.    Pursuant to Section 524(a)(3) of the Bankruptcy Code, confirmation of a liquidating

plan does not operate as an injunction.  Only a discharge operates as an injunction, and as this Plan

is mostly a liquidating plan, many of the Debtors are not entitled to a discharge.  Instead, pursuant

to Section 362(c) of the Bankruptcy Code, the automatic stay remains in effect until the earlier of

the time the case is closed or the case is dismissed.  Additionally, pursuant to Section 1141(a), the

provisions of a confirmed plan bind all parties, including debtors and creditors, to the terms of a

plan.

102.    Because the Bankruptcy Code protects the liquidating Debtors by continuing the

automatic stay until the earlier of the time the case is dismissed or the case is closed (11 U.S.C. §

362(c)), and by binding all parties to the terms of the Plan (11 U.S.C. § 1141(a)), the U.S. Trustee

submits that Article X.F is unnecessary for the liquidating Debtors.  In addition, the Plan or

Confirmation Order should provide that "nothing contained in the Plan shall be deemed to

constitute a discharge of the liquidating Debtors under section 1141(d)(3) of the Bankruptcy Code.

## VI.    The Court Should Not Waive the Rule 3020 Stay

103.    The Debtors' request for a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e)

is inappropriate and should be denied.[31]

104.    Federal Rule of Bankruptcy Procedure 3020(e) provides that "[a]n order confirming

a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders

---

[31] The Plan provides for the waiver of the 14-day stay as follows:  "The Debtors and Committee request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g)."  *See* Dkt. 3215 at Art. XIV.A, at page 64 of 68.

otherwise." *See* Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot."  *See id.*

105.    Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").

106.    "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *see In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

107.    Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.  The Court should thus deny their request to waive Rule 3020(e)'s stay.

## VII.    The Plan Cannot Be Confirmed Because It Contains a Gatekeeping Provision

108.    The Plan includes language that creates a "gatekeeper" role for this Court that forces a non-debtor who wishes to pursue a Claim or Cause of Action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.  By specifying that this Court shall determine whether a claimant can

proceed, the Plan's gatekeeping injunction effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors. The gatekeeping injunction would apply even after the Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

109. The procedure proposed by the gatekeeping injunction should not be permitted. The defense of "release" is an affirmative defense that cannot be adjudicated prior to the filing of the action to which it relates. *See*, *e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008. There is no reason why the court in which the relevant action has been filed cannot determine whether the non-debtor claim was released under the Plan.

110. A similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *See Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

111. In light of the foregoing, the Gatekeeping injunction should be stricken from the Plan.

## VIII. The Plan Cannot Be Confirmed Because the Plan is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019

112. The Plan cannot be confirmed because it purports to be a "settlement" with parties that have no formal agreements with the Debtors or the non-debtors that are included in the third-party injunctions. *See* Dkt. 3215 at Art. IV.A, page 28 of 68.

113.   Under 11 U.S.C. § 1123(b)(3)(A), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." But section 1123(b)(3)(A) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that its creditors and equity security holders may have against it.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted).

114.   The resolution of claims against the Debtors is governed by Sections 1129 and 1141 of the Bankruptcy Code.  While a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves.  A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (12th ed. 2024).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *See id.*

115.   Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

116.    The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *See Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) ("Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129."). What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

117.    Here, Article IV.A purports to treat the Plan itself as if it were a Rule 9019 "settlement." Further, it appears Articles X.C and X.D are not limited to settling claims belonging to the Debtors or the bankruptcy estates. Instead, they seek to "settle" claims belonging to holders of Claims and Interests that have not entered into any agreement to "settle" any claims or controversies. Thus, Articles IV.A, X.C and X.D exceed the scope of what can be settled under Section 1123(b)(3)(A).

## IX.    The Statutory Fee Provision Must be Revised in the Plan

118.    Section XIV.C of the Plan provides for the payment of Statutory Fees pursuant to 11 U.S.C. § 1930(a)(6). *See* Dkt. 3215 at Art. XIV.C, page 64 of 68. The language in the Plan provides that Statutory Fees will be included in the Wind-Down Budget, that Statutory Fees will be funded from the Wind-Down Reserve or Distributable Assets, and that the Liquidating Trustee will pay all reasonable fees including Statutory Fees. *See* Dkt. 3215 at Art. I.A 172, at page 18 of 68, Art. VII.A, at page 47 of 68, Art. VIII.C, at page 51 of 68, and Art. XIV.C, at page 64 of 68.

119.    The Plan further provides that the Debtors are responsible for the payment of Statutory Fees through the Effective Date and that the Liquidating Trust will be responsible thereafter until a case has been closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. *See id.* at Art. XIV.C, page 64 of 68.

120.    The U.S. Trustee requests the language contained in Article XIV.C be revised as follows: "All Statutory Fees pursuant to 28 U.S.C. § 1930(a)(6) payable on or before the Effective Date shall be paid by the Debtors in full in cash on the Effective Date.  After the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and any entity making disbursements on behalf of any Debtors, Reorganized Debtors, Wind-Down Debtors, including the Wind-Down Officer, the Liquidating Trust, and Liquidating Trustee, (solely in their capacity as such), or any entity making disbursements on account of an obligation of any Debtors, Reorganized Debtors, or Wind-Down Debtors including the Wind-Down Officer, the Liquidating Trust and Liquidating Trustee (solely in their capacity as such), shall be jointly and severally liable to pay any and all Statutory Fees in full in cash when due and payable in these Chapter 11 Cases for each quarter (including any fraction thereof) until the earliest of that Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, the Wind-Down Officer, and the Liquidating Trustee, shall cause to be filed with the Bankruptcy Court post-confirmation quarterly reports for these Chapter 11 Cases for each quarter (including any fraction thereof) that these Chapter 11 Cases are pending, using UST Form 11-PCR.  The U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Statutory Fees in these Chapter

11 Cases and shall not be treated as providing any release under the Plan.  The provisions of this

paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary."

## X.       The Deemed Acceptance Language Must be Removed From the Plan

121.    Article III.E of the Plan provides that a class will be deemed to accept the Plan if

no votes are cast and the class contains claims or interests eligible to vote.  *See* Dkt. 3215 at Article

III.E, page 27 of 85.

122.    The Debtors do not provide any basis under the Bankruptcy Code, Bankruptcy

Rules or case law that supports this provision.  As such, the provision should be removed from the

Plan.

## XI.      Language Concerning Indemnification and Exculpation of the Liquidating Trustee Must be Removed From the Plan

123.    Article VII.C of the Plan includes indemnification and exculpation of the

Liquidating Trustee and all professionals retained by the Liquidating Trustee.  *See* Dkt. 3215 at

Article VII.C, 49 of 68.

124.     However, there is no reason to include indemnification and exculpation in the Plan

of an entity that does not exist until after the Effective Date.   Here, the Liquidating Trust

Agreement attached to the Plan Supplement provides indemnification and exculpation to the Trust

Indemnified Parties, which includes the Liquidating Trustee and the officers, employees,

consultants, advisors, attorneys, and agents of each of the Trust and the Liquidating Trustee.  *See*

Dkt. 3218 at Exhibit G, page 87 of 122.  As such, Article VII.C. is duplicative and unnecessary.

## XII.     The Separate Release and Discharge to the Committee and Its Members Must be Removed from the Plan

125.    Article XIV.D of the Plan provides a separate release and discharge to the

Committee and its members:  "On the Effective Date, the Committee shall dissolve automatically

and the members thereof and each Professional retained thereby shall be released and discharged

from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from,

or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Committee

will remain in place after the Effective Date solely for the purpose of addressing (a) all final fee

applications for all Professionals for the Committee and any matters concerning Professional Fee

Claims held or asserted by any Professional retained by the Committee, and (b) the resolution of

any appeals of the Confirmation Order or other appeals to which the Committee is a party." *See*

Dkt. 3215 at Article XIV.D, pages 64 and 65 of 68.

126.    The Committee and its members act as fiduciaries for the estate.  As fiduciaries, the

Committee and its members are entitled to an exculpation for actions or inactions occurring from

the Petition Date to the Effective Date of a plan.

127.    Pursuant to the Plan, it appears that the Committee and its members are receiving

an exculpation (Art. X.E), as well as debtor releases (Art. X.C), third-party releases (Art. X.D),

and a release and discharge of liabilities (Art. XIV.D).

128.    As the Committee and its members should only be entitled to an exculpation for

their actions or inactions from the Petition Date to the Effective Date of a Plan, Article XIV.D

should simply dissolve the Committee and allow the Committee standing concerning fee

applications and any appeals.

## XIII.   Substantial Consummation Must be Revised in the Plan

129.    Article XI.D of the Plan provides that Substantial Consummation will be deemed

to occur on the Effective Date.  *See* Dkt. 3215 at Article XI.D, page 61 of 68.

130.    However, "Substantial Consummation" under the Bankruptcy Code "means:  (A)

transfer of all or substantially all of the property proposed by the plan to be transferred; (B)

assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." *See* 11 U.S.C. § 1101(2).  Unless distributions commence on the Effective Date, the Plan cannot be deemed to be substantially consummated on the Effective Date.

131.    As "Substantial Consummation" can only occur if each of the three parts of the statute have been met, the U.S. Trustee requests that the provision in the Plan concerning "Substantial Consummation" be replaced with the statutory definition.

**XIV.   The Liquidating Trustee Has Not Been Disclosed**

132.    Pursuant to Section 1129(a)(5)(i) of the Bankruptcy Code, the Debtors are required to disclose the identity of the individual proposed to serve as the Liquidating Trustee.

133.    Article IV.C.3 of the Plan provides that "the Liquidating Trustee shall be the sole representative of, and shall act for, the Wind-Down Debtors." *See* Dkt. 3215 at Art. IV.C.3, page 30 of 68.

134.    Article I.A.105 provides that Liquidating Trustee means the trustee of the Liquidating Trust to be appointed in accordance with this Plan and the Liquidating Trust Agreement. *See* Dkt. 3215 at Art. I.A.105, page 13 of 68.

135.    The Debtors should be required to disclose the name of the Liquidating Trustee prior to confirmation.

### RESERVATION OF RIGHTS

136.    The U.S. Trustee reserves all of his rights and objections regarding any and all future amendments to the Plan.  The U.S. Trustee reserves the right to comment on and object to the proposed form of confirmation order.  The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that this Court sustain the Objection and either deny confirmation or require revisions to be made to the Plan and grant such other relief it deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By:  */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

Dated: November 19, 2025