| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> **Caption in Compliance with D.N.J. LBR 9004-1(b)** <br><br> **KELLEY DRYE & WARREN LLP** <br> Robert L. LeHane <br> Andres Barajas (admitted *pro hac vice*) <br> Connie Y. Choe <br> 7 Giralda Farms, Suite 340 <br> Madison, NJ 07940 <br> Tel: (973) 503-5900 <br> Email: rlehane@kelleydrye.com <br>           abarajas@kelledrye.com <br>           cchoe@kelleydrye.com <br><br> *Counsel for Thomas A. Pitta, as Trustee of the RAD Sub-Trust A* | |
| **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.** <br> Arthur J. Abramowitz, Esq. <br> Ross J. Switkes, Esq. <br> 308 Harper Drive, Suite 200 <br> Moorestown, NJ 08057 <br> Tel: (856) 662-0700 <br> Email: aabramowitz@shermansilverstein.com <br>           rswitkes@shermansilverstein.com <br><br> *Local Counsel to the RAD Sub-Trust B* | **GRANT & EISENHOFER P.A.** <br> Gordon Z. Novod, Esq. <br> Meagan Farmer, Esq. <br> 485 Lexington Ave. <br> 29th Floor <br> New York, NY 10017 <br> Tel: (646) 722-8500 <br> Email: gnovod@gelaw.com <br>           mfarmer@gelaw.com <br><br> *Co-Counsel to the RAD Sub-Trust B* |
| **GILBERT LLP** <br> Kami E. Quinn, Esq. <br> Daniel I. Wolf, Esq. <br> Beth Koehler, Esq. <br> 700 Pennsylvania Ave., SE <br> Suite 400 <br> Washington, DC  20003 <br> Tel: (202) 772-2336 <br> Email: quinnk@gilbertlegal.com <br>           wolfd@gilbertlegal.com <br>           koehlerb@gilbertlegal.com <br><br> *Co-Counsel to the RAD Sub-Trust B* | **MCKOOL SMITH** <br> Kyle A. Lonergan, Esq. <br> James H. Smith, Esq. <br> 1301 Avenue of the Americas <br> 32nd Floor <br> New York, NY 10019 <br> Tel: (212) 402-9400 <br> Email: klonergan@mckoolsmith.com <br>           jsmith@mckoolsmith.com <br><br> *Co-Counsel to the RAD Sub-Trust B* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re<br><br>NEW RITE AID, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-14861 (MBK)<br><br>(Jointly Administered)<br><br>Docket Nos. 3215, 3218<br><br>Hearing Date: November 24, 2025, at 10:00 a.m. (ET)<br>Objection Deadline: November 19, 2025, at 4:00 p.m. (ET) |

**JOINT LIMITED OBJECTION OF**
**RAD SUB-TRUST A AND RAD SUB-TRUST B**
**TO THE DEBTORS' DATA RETENTION PLAN**

RAD Sub-Trust A and RAD Sub-Trust B (each, a "Trust", and collectively, the "Trusts") formed pursuant to the confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Technical Modifications)* (the "2023 Plan")[2] of Rite Aid Corporation ("Rite Aid") and its debtor affiliates (collectively, and inclusive of the entities that are the debtors in the jointly administered above-captioned cases, the "Debtors" the "Reorganized Debtors" or the "Wind-Down Debtors"), by and through their undersigned counsel, hereby files this limited objection (the "Objection") to the Data Retention Plan, which is included as Exhibit H to the Plan Supplement to the Debtors'

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025/Home-DocketInfo. The location of Debtor New Rite Aid, LLC's principal place of business and Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, PA 17319.

[2] Case No. 23-18993, Docket No. 4532.

2

*Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "Plan").[3] In support of this Objection, the Trusts respectfully state as follows:

## PRELIMINARY STATEMENT[4]

1. The Trusts object to the Debtors' proposed Data Retention Plan as currently drafted because it would replace the 2023 Plan cooperation provisions that require the Debtors to transfer and retain documents relevant to the Trusts' pursuit of claims, and instead allow the Wind-Down Debtors after an unreasonably short time period to withhold and destroy data and documents that are critical to the Trusts' ability to maximize the value of the Assigned Claims and Assigned Insurance Rights, and shift all of the cost regarding continued storage and transfer of disputed documents to the Trusts. Under the 2023 Plan, the Trusts are successors-in-interest to the 2023 Debtors and have, since the 2023 Plan Effective Date, diligently undertaken its obligations, most importantly by prosecuting the Assigned Claims and Assigned Insurance Rights for the benefit of their beneficiaries. Despite these efforts, the Trusts now face a material impediment created by the proposed Data Retention Plan. The carefully negotiated cooperation and data retention terms of the 2023 Plan should not be rewritten without appropriate safeguards ensuring the Trusts' continued, reasonable access to documents required to pursue the Assigned Claims and Assigned Insurance Rights in accordance with the 2023 Plan, as well as the Debtors' reasonable cooperation in facilitating such access.

2. Specifically, the Trusts first propose that the Notice Period be extended from thirty (30) days to ninety (90) days, subject to further modification of time by agreement of parties or by Court order, to allow sufficient time for the Trusts to request additional data, raise

---

[3] Docket Nos. 3215, 3218. All terms referenced but not capitalized herein shall have the meaning ascribed to it under the Plan or 2023 Plan, as applicable.

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms below in the Objection.

3

disputes, or negotiate certain terms with the Debtors before the Data Inventory is permanently destroyed and the Trusts irreparably deprived of access to that information.

3. Second, the costs associated with retaining any Trust Data requested by the Trusts since the Effective Date through the Notice Period that could reasonably be transferred to the Trusts at this stage should be borne entirely by the Wind-Down Debtors. The Trusts have been making requests for data for more than a year, providing the Debtors with ample time to address and produce the requested information. It would be grossly unfair for the Trusts to be forced to shoulder the entirety of the retention costs for this data. Accordingly, the Wind-Down Debtors should continue to bear all associated retention costs relating to Data Inventory that is undisputedly Trust Data that could readily transfer, but the Wind-Down Debtors fail to transfer, until after the Notice Period expires.

4. The Trusts acknowledge that certain categories of Trust Data, such as data subject to ongoing negotiations, including Protected Trust Data, must continue to be retained by the Wind-Down Debtors while those negotiations are concluded among the various parties in interest. For any Disputed Data that cannot be transferred during the Notice Period due to a good faith dispute between the parties, the Trusts request that the Wind-Down Debtors pay their fair share by splitting retention costs evenly with the Trusts.

5. The Trusts continue to work cooperatively with the Debtors and other parties in interest to reach a consensual resolution of the issues presented in this Objection, but reserves all rights to present their arguments at the confirmation hearing.

**BACKGROUND**

**I.     The 2023 Cases and Establishment of the Trusts**

6. On October 15, 2023, Rite Aid and its affiliates (the "2023 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court (the "2023 Cases").[5]

7. On August 16, 2024, the Court entered an order confirming the 2023 Plan (the "2023 Confirmation Order").[6] The 2023 Plan became effective on August 30, 2024 (the "2023 Plan Effective Date").[7]

8. On the 2023 Plan Effective Date, the Litigation Trust (the "Master Trust"), the Trust, and RAD Sub-Trust B were each established pursuant to trust agreements entered into with the Debtors (each a "Trust Agreement," and collectively, the "Trust Agreements").[8] The Master Trust was established for the primary purpose of liquidating the Litigation Trust Assets, reconciling claims, and distributing the proceeds thereof to holders of Allowed General Unsecured Claims asserted against the 2023 Debtors in accordance with the 2023 Plan.[9] To that end, the Debtors transferred all "Litigation Trust Assets" to the Master Trust, which included, among other assets, (i) the Assigned Claims; (ii) the Proceeds of the Assigned Claims; (iii) the Assigned Insurance Rights; and (iv) the Tort Claim Insurance Proceeds.[10] The 2023 Confirmation Order

---

[5]   *In re Rite Aid Corporation, et al.*, Case No. 23-18993 (MBK) (Bankr. D.N.J.), Docket No. 1.

[6]   *Id.*, Docket No. 4532.

[7]   *Id.*, Docket No. 4800.

[8]   The substantially final forms of the Master Trust Agreement, Sub-Trust A Agreement, Sub-Trust B Agreement were filed on August 31, 2024 as part of the Eleventh Amended Plan Supplement. *See* Case No. 23-18993, Docket No. 4793.

[9]   2023 Plan, § IV.E.3. Holders of the New Money DIP Notes Claims are also entitled to some of these proceeds.

[10]  2023 Plan, §§ I.A.74, IV.E.3(b); 2023 Confirmation Order, ¶ 40.

5

and 2023 Plan provide that the Trustees are the "successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims."[11]

9. On the 2023 Plan Effective Date, the Master Trust transferred, among other things, the Assigned Claims and Assigned Insurance Rights to the Trusts for the Trusts to investigate, prosecute, settle, and/or abandon the Assigned Claims and Assigned Insurance Rights.[12] The primary purpose of the Trusts are to monetize the assets of each respective Trust and distribute proceeds thereof to maximize recoveries for their beneficiaries in accordance with the 2023 Plan.[13]

## II. The Debtors' Commitments to Cooperation and Data Retention Under the 2023 Plan and Cooperation Agreement

10. The 2023 Confirmation Order and 2023 Plan require the Reorganized Debtors to provide the Trusts with "reasonable cooperation necessary to maximize the value of the Assigned Claims."[14] Reasonable cooperation includes, among other obligations, Rite Aid's duty to:

> (i) provid[e] the [Trusts] and [their] Professional[s] with full access to the Debtors' books, records, and other documents that are relevant to the Assigned Claims and Assigned Insurance rights (including privileged documents and materials containing PHI or other individually identifiable health information insofar as such documents and materials are relevant to the Assigned Claims and Assigned Insurance Rights assigned, transferred, or otherwise vested to or in the [Trust]); . . .
>
> [and]
>
> (v) tak[e] commercially reasonable measures to retain documents relevant to the Assigned Claims and Assigned Insurance Rights, consistent with the "Document

---

[11] 2023 Plan, § VII.R; 2023 Confirmation Order, ¶ 144.

[12] The Assigned Claims are defined broadly under the Plan to mean "all of the Debtors' claims and Causes of Action, including all of the Debtors' claims against Excluded Parties" that are specifically enumerated under the 2023 Plan. 2023 Plan, § I.A.42.

[13] *See* Sub-Trust A Agreement, § 1.5(a).

[14] 2023 Confirmation Order, ¶¶ 40, 116; 2023 Plan, § IV.E.6.

6

Retention" provision in this Plan and the Litigation Trust Cooperation Agreement and applicable law . . . .[15]

11. The 2023 Plan also contains a "Document Retention" provision that provides the Debtors may maintain documents "in accordance with the Litigation Trust Cooperation Agreement and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors . . . in accordance with the Litigation Trust Cooperation Agreement . . . ."[16] In connection with the Debtors' obligation to cooperate with the Trusts under the 2023 Plan: "(a) the Reorganized Debtors shall bear the costs of document retention incurred in the ordinary course of business, consistent with historical practices and applicable law," with the Trusts responsible for only such document retention costs "that are either not in the ordinary course of business for the Reorganized Debtors or are otherwise not consistent with historical document retention practices."[17]

12. On the 2023 Plan Effective Date, the Debtors, the Master Trust, RAD Sub-Trust A, and RAD Sub-Trust B entered into the Litigation Trust Cooperation Agreement (the "Cooperation Agreement"). The Cooperation Agreement required, among other things, the Debtors to use reasonable efforts to transfer to the Trusts such documents or information requested by the Trusts that are relevant to pursue and/or litigate any Assigned Claims and/or Assigned Insurance Records.[18] The Trusts were afforded one year after the 2023 Plan Effective Date to make requests to the Debtors for relevant documents, but such period has been extended by consent

---

[15] 2023 Plan, § IV.E.6.

[16] *Id.*, § X.L.

[17] *Id.*

[18] Cooperation Agreement, § 1.1(a).

7

of the Debtors.[19] The Debtors were required to "use methods designed to minimize the costs of collection, production, and export of" documents to the Trusts and "to enable productions in response to the Trusts' requests to be made reasonably promptly."[20]

13. The Cooperation Agreement requires the Debtors to preserve all documents required by the Trusts to pursue their respective claims until at least August 30, 2029:

> ***The Debtors shall take reasonable measures to preserve, or cause to be preserved, unless and until they are transferred to the Trust or GUC Sub-Trust, Documents or information (including ESI) known or reasonably believed to be relevant to the Assigned Claims, Assigned Insurance Rights, and/or Tort Claims for a period of five years following the* [2023 Plan] *Effective Date, subject to the Trustees' ability to seek extensions to the preservation period from the Debtors, which shall not be unreasonably refused by the Debtors, or by Bankruptcy Court order***. This shall include Documents or information subject to a litigation hold in prepetition litigation related to (i) any Tort Claim, (ii) any other General Unsecured Claim, or (iii) any Assigned Claim.[21]

14. The Cooperation Agreement made the Debtors responsible for paying the costs (i) associated with the retention of documents and information identified in Exhibits A and B (the "Cooperation Agreement Data Requests") and (ii) associated with documents the Debtors would retain in the ordinary course of business, consistent with historical practices and applicable law, with the Trusts responsible for the costs of preserving documents not covered by the foregoing (i) and (ii).[22] The Cooperation Agreement provides that the Debtors were to conduct a reasonable search for and produce the Cooperation Agreement Data Requests "reasonably promptly."[23]

---

[19] *Id.*, § 1.1(f). The Debtors have consented to extend the Trust and RAD Sub-Trust B's rights to request documents under the Cooperation Agreement several times. The current expiration date under section 1.1(f) is November 24, 2025, subject to further extension.

[20] *Id.*

[21] *Id.*, § 1.2. (emphasis added).

[22] *Id.*, § 3.3(b).

[23] *Id.*, § 1.1(b).

**III.    The Trust' Request for Documents and Commencement of Litigations**

15.    Promptly following the 2023 Plan Effective Date, through counsel, the Trusts began engaging with the Reorganized Debtors regarding the transfer of documents pursuant to the Cooperation Agreement.  For months thereafter, the Trusts and the Reorganized Debtors' professionals met regularly regarding the Trusts' various document requests.  Unfortunately, despite these meetings, the Reorganized Debtors failed to produce documents reasonably promptly.

16.    On May 5, 2025, New Rite Aid, LLC and its affiliates (the "New Rite Aid Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[24]  The bankruptcy filing caused additional delays in the Debtors' document productions.  To date, the Trusts still have not received any documents related to multiple requests that have been pending for many months, including certain of the Cooperation Agreement Data Requests.[25]

17.    Despite the Debtors' failure to produce significant portions of the documents that the Trusts have requested, the Trusts have diligently pursued relevant claims and causes of action for the benefit of their beneficiaries.  In early October 2025, RAD Sub-Trust A commenced several adversary proceedings in connection with the Assigned Claims and hundreds of actions to recover avoidable transfers under section 547 of the Bankruptcy Code.[26]  RAD Sub-Trust B continues to pursue its Assigned Insurance Rights in *Mangus et al v. Rite Aid Corporation*

---

[24]    The New Rite Aid Debtors are, in all material respects, the same entities as the Reorganized Debtors in the 2023 Cases.

[25]    Indeed, the Cooperation Agreement required the Debtors to produce, reasonably promptly, "all documents" responsive to the Cooperation Agreement Data Requests. The Debtors, however, have not performed searches of custodial email accounts to locate and produce documents that are responsive to these requests.

[26]    *See Thomas A. Pitta, Trustee of the RAD Sub-Trust A v. McKinsey & Company, Inc., et al.*, Case No. 25-01387 (MBK), Docket No. 1; *Thomas A. Pitta, Trustee of the RAD Sub-Trust A v. Bodaken et al.*, Case No. 25-01386 (MBK), Docket No. 1; *Thomas A. Pitta, Trustee of the RAD Sub-Trust A v. Anderson, Jr., et al.*, Case No. 25-01388 (MBK), Docket No. 1.  The Trust has also filed 967 preference actions.

*et al.*, Adv. Case No. 24-01211 (Bankr. D.N.J.) [Dkt. 47] and *Rite Aid Corp., et al. v. ACE American Ins. Co., et al.*, C.A. No. N19C-04-150 EMD CCLD, pending in the Superior Court of the State of Delaware.

## IV.    The Data Retention Plan

18.    On November 11, 2025, the Debtors filed the *Notice of Filing Plan Supplement* with the Data Retention Plan.  After the effective date of the Debtors' Plan (the "Effective Date"), the Data Retention Plan will replace the cooperation provisions of the 2023 Plan and the Cooperation Agreement to govern the transfer and retention of relevant documents relating to the claims being pursued by the Trusts.[27]

19.    The Data Retention Plan provides that the Wind-Down Debtors will be authorized to abandon, dispose, and destroy all Data Inventory beginning thirty (30) days following the Effective Date (the "Notice Period"), unless such Data Inventory is subject to a dispute.  During the same thirty-day Notice Period, the Wind-Down Debtors are obligated to transfer to the Trusts the Data Inventory that (i) are relevant to pursue or litigate any Assigned Claims and/or Assigned Insurance Rights or to reconcile and administer Tort Claims; (ii) are requested prior to the expiration of the Notice Period; and (iii) either does not contain PHI or PII ("Non-Protected Trust Data") or does contain PHI or PII ("Protected Trust Data," and together with the Non-Protected Trust Data, the "Trust Data").  Protected Trust Data will be transferred only in accordance with applicable law and the Wind-Down Debtors agree to negotiate in good faith with the Trusts on the terms for transferring Protected Trust Data during the Notice Period or such other deadline ordered by the Court.  Although the Wind-Debtors are obligated to transfer

---

[27]    Plan, § I.A.47 (defining the Data Retention Plan as "the Debtors' go-forward plan with respect to the retention of their books, records, and data."); *see also id.*, § X.I.

10

Trust Data during the Notice Period, the Data Retention Plan does impose any consequences if the Wind-Down Debtors fail to transfer such Trust Data during the Notice Period.

20. Under the Data Retention Plan, the Wind-Down Debtors are required to pay the costs only for retaining Data Inventory during the Notice Period and for abandoning Data Inventory. The Trusts, on the other hand, will be required to pay for the costs incurred on account of (i) any transfer of Data Inventory to the Trusts, (ii) the review and designation of Data Inventory containing PHI or PII,[28] (iii) the retention of all Data Inventory after the end of the Notice Period (even Trust Data that has been requested if the Wind-Down Debtors fail to transfer such data prior to the expiration of the Notice Period), and (iv) the retention of Data Inventory that is subject to a dispute raised by the Trusts ("Disputed Data").

21. If the Debtors and the Trusts are not able to reach a consensual resolution regarding the scope or terms of the transfer of Data Inventory and the Trusts file a notice prior to expiration of the Notice Period, then the Data Dispute Resolution Procedures shall apply. The Data Dispute Resolution Procedures require the Wind-Down Debtors to retain Disputed Data until the disagreement is resolved either by consensual resolution or order of the Bankruptcy Court. The Wind-Down Debtors are not responsible for paying any costs of retention of Trust Data after the Notice Period and the costs are solely borne by the Trusts, regardless of the reason the Trust Data was not timely transferred within the Notice Period.

---

[28] The Trusts are seeking to relief in connection with this issue in their pending *Joint Motion for Entry of an Order (I) Authorizing and Directing the Debtors to Share Data Containing Protected Information Pursuant to the 2023 Plan; and (II) Granting Related Relief* (the "PHI Turnover Motion") [Docket No. 3166].

**OBJECTION**

22. The Trusts object to the Data Retention Plan because it unfairly rewrites carefully negotiated cooperation and data retention terms in connection with the 2023 Plan that the Debtors agreed to, and that this Court ordered the Debtors to follow.

23. The Trusts appreciate that the Wind-Down Debtors are liquidating and it is not seeking to require the Wind-Down Debtors to strictly comply with the 2023 Plan and Cooperation Agreement including their obligation to preserve all documents required by the Trusts to pursue their Assigned Claims and Assigned Insurance Rights until at least August 30, 2029. However, the 2023 Plan and Cooperation Agreement were designed to provide the Trusts with reasonable access to the documents they need to maximize the value of the Assigned Claims and Assigned Insurance Rights for their beneficiaries and to enable the Trusts to fulfill their obligations as successors-in-interest to the 2023 Debtors. Accordingly, the Trusts are asking that the Debtors be required to amend the Data Retention Plan to more closely preserve the Trusts' rights under the 2023 Plan and Cooperation Agreement with respect to the retention of documents and the allocation of associated costs.[29] Specifically, the Data Retention Plan should be amended to (i) increase the Notice Period to ninety (90) days and (ii) require the Wind-Down Debtors to pay for (a) all costs for retaining Trust Data that the Trusts requested before or during the Notice Period and that could reasonably be transferred to the Trusts during the Notice Period and (b) 50% of the costs incurred for retaining Disputed Data.

24. The Notice Period in the Data Retention Plan should be increased from thirty days to ninety days. The Notice Period is critical because it controls (i) the time the Trusts

---

[29] *See In re APP Winddown, LLC, et al.*, No. 16-12551 (Bankr. D. Del. December 16, 2019), Docket No. 2279 (denying post-confirmation debtors' motion to abandon and destroy documents and holding that the debtors' liquidating plan required the debtors to retain and preserve the documents to prevent interfering with the litigation trustee's rights to pursue litigation trust causes of action).

12

Document    Page 13 of 17

have to request relevant Data Inventory (and thereby prevent such documents from being destroyed), (ii) the time the Wind-Down Debtors will negotiate terms for transferring Protected Trust Data, (iii) the time the Trusts have to raise a Data Dispute Resolution Procedure notice, and (iv) the time when the Trusts will begin paying to retain documents.

25. A thirty-day Notice Period is insufficient considering the severity of the risk that Data Inventory necessary to pursue Assigned Claims and Assigned Insurance Rights could be permanently lost or destroyed. The Trusts have been diligently requesting Trust Data from the Debtors since shortly after the 2023 Plan Effective Date and thus has several pending requests for Data Inventory that should not be subject to destruction under the Data Retention Plan. Nonetheless, the Trusts are in the various stages of several important litigations seeking to monetize their respective claims. A longer Notice Period will increase the likelihood that the Trusts can identify Data Inventory that may be required by the Trusts in connection with these litigations and decrease the risk that critical litigation documents will be destroyed.

26. A thirty-day Notice Period also fails to provide the parties with sufficient time to negotiate the terms for transferring Protected Trust Data. The issues and laws related to the transfer of Protected Trust Data are complex, as evidenced by the fact that the Trusts and Debtors have been attempting to negotiate the terms for transferring Protected Trust Data for months now. While the Trusts are hopeful that the PHI Turnover Motion will help facilitate the prompt transfer of Protected Trust Data, it would also be prudent to increase the Notice Period to provide sufficient time for the parties to negotiate and effectuate the transfer.

27. The inadequacy of a thirty-day Notice Period is highlighted when compared to the terms of the Cooperation Agreement. The Cooperation Agreement provided the Trusts with one year, with extensions not to be unreasonably withheld, to request documents relevant to the Assigned Claims. The Data Retention Plan provides the Trusts with just thirty days, subject to

extension only by order of the Court. The Cooperation Agreement required the Reorganized Debtors to retain documents relevant to the Assigned Claims until August 2029.[30] The Data Retention Plan allows the Wind-Down Debtors to destroy all documents after the Notice Period ends, likely in January 2026, effectively eliminating the Trusts' rights to three and half years of data retention. The Trusts respectfully request that the Court require the Wind-Down Debtors to retain Data Inventory during a ninety-day Notice Period, subject to extension or reduction with by agreement between the parties or by further Court order.

28. The Trusts also object to the Data Retention Plan because it requires the Trusts to pay for the retention of all documents following the expiration of the Notice Period. The Trusts do not disagree with paying their fair share for documents that the Wind-Down Debtors will be retaining after the Notice Period only for the Trusts' benefits, but the Data Retention Plan goes further than that. If the Wind-Down Debtors do not transfer Trust Data to the Trusts during the Notice Period, regardless of how long ago the Trusts requested such Trust Data and regardless of the reason, if any, for the Wind-Down Debtors' failure to transfer the applicable Trust Data, the Data Retention Plan unfairly requires that the Trusts pay to retain that data.

29. As stated above, the Trusts began making requests for documents soon after the 2023 Plan Effective Date. To date, the Trusts have still not received significant portions of all the documents they have requested, including several of the documents requested in their pending Cooperation Agreement Data Requests. The Trusts should not have to pay for the retention of Trust Data after the Notice Period if the Trust Data is being retained only because the Wind-Down Debtors fail to timely transfer it before the expiration of the Notice Period. For example, there is

---

[30] Cooperation Agreement, §§ 1.1(f), 1.2.

no reason the Wind-Down Debtors could not immediately transfer all of the requested Non-Protected Trust Data.

30. The 2023 Plan and Cooperation Agreement both provide support for requiring the Debtors to pay to retain the documents that are subject of pending document requests. The Document Retention provision in the 2023 Plan required the Reorganized Debtors to bear the costs of document retention incurred in the ordinary course of business, consistent with historical practices and applicable law until 2029. The Cooperation Agreement required the Reorganized Debtors to pay to retain the Cooperation Agreement Data Requests until they were transferred to the Trusts. The Trusts are not aware that any of the outstanding document requests implicate documents that are not maintained by the Debtors in the ordinary course. Moreover, the outstanding requests are for documents that were either included in the Cooperation Agreement Data Requests or documents which the Debtors have known about for months. The Trusts appreciate that the Debtors had to devote their attention to these chapter 11 cases and that likely has delayed production. However, the Trusts should not be penalized again if the Wind-Down Debtors fail to timely transfer Trust Data during the Notice Period.

31. Finally, the Trusts should not be solely responsible for paying for the retention of Disputed Data. The Trusts have been acting in good faith in requesting documents that are relevant to pursue Assigned Claims for the benefit of General Unsecured Creditors of the 2023 Debtors. The Trusts are hopeful that they will not need to invoke the Data Dispute Resolution Procedures, but in the event that they do, the Wind-Down Debtors should be required to pay their fair share of the costs associated with retaining such Disputed Data.

32. Accordingly, for the reasons provided above, the Trusts request that the Data Retention Plan be amended to expressly require the Wind-Down Debtors to pay (i) any costs associated with retaining documents beyond the Notice Period if such documents can reasonably

15

be transferred to the Trusts before the expiration of the Notice Period, and (ii) 50% of the costs for retaining Disputed Data.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

**WHEREFORE**, the Trusts respectfully request that the Court (i) amending the Data Retention Plan as set forth herein, and (ii) granting such other and further relief as the Court deems just and proper.

Date: November 19, 2025

By: */s/ Robert L. LeHane*_____
**KELLEY DRYE & WARREN LLP**
Robert L. LeHane
Andres Barajas (admitted *pro hac vice*)
Connie Y. Choe
7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel: (973) 503-5900
Email: rlehane@kelleydrye.com
          abarajas@kelledrye.com
          cchoe@kelleydrye.com

*Counsel for Thomas A. Pitta, as Trustee of the RAD Sub-Trust A*

By: */s/ Beth A. Koehler*_____
**GILBERT LLP**
Kami E. Quinn, Esq.
Daniel I. Wolf, Esq.
Beth A. Koehler, Esq.
700 Pennsylvania Ave., SE
Suite 400
Washington, DC 20003
Tel: (202) 772-2336
quinnk@gilbertlegal.com
wolfd@gilbertlegal.com
koehlerb@gilbertlegal.com

*Co-Counsel to the RAD Sub-Trust B*

By: */s/ Arthur J. Abramowitz*_____
**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, New Jersey 08057
Telephone: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
          rswitkes@shermansilverstein.com

By: */s/ Gordon Z. Novod*_____
**GRANT & EISENHOFER P.A.**
Gordon Z. Novod, Esq.
Meagan Farmer, Esq.
485 Lexington Ave.
29th Floor
New York, NY 10017
Tel: (646) 722-8500
gnovod@gelaw.com
mfarmer@gelaw.com

*Co-Counsel to the RAD Sub-Trust B*

By: */s/ Kyle A. Lonergan*_____
**MCKOOL SMITH**
Kyle A. Lonergan, Esq.
James H. Smith, Esq.
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
Tel: (212) 402-9400
klonergan@mckoolsmith.com
jsmith@McKoolSmith.com

*Co-Counsel to the RAD Sub-Trust B*

17