UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**BALLARD SPAHR LLP**
Leslie C. Heilman
Laurel D. Roglen
Nicholas J. Brannick
Margaret A. Vesper
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
   roglenl@ballardspahr.com
   brannickn@ballardspahr.com
   vesperm@ballardspahr.com

**ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP**
Ivan M. Gold (admitted *pro hac vice*)
Three Embarcadero Center, 12th Floor
San Francisco, California 94111-4074
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
E-mail:  igold@allenmatkins.com

*Co-Counsel for Objecting Landlords*

In Re:

New Rite Aid, LLC, *et al.*,[1]

   Debtors.

Case No.:  25-14861 (MBK)

Chapter 11

(Jointly Administered)

### OBJECTION OF MULTIPLE LANDLORDS TO (I) CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES AND (II) FINAL APPROVAL OF SECOND AMENDED DISCLOSURE STATEMENT AND RESERVATION OF RIGHTS

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025.  The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

The parties identified in Exhibit A hereto, all formerly landlords of Debtors (collectively, "Objecting Landlords"), by and through the undersigned counsel, respectfully submit their objection to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3215] (the "Proposed Plan") and final approval of the adequacy of the *Second Amended Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3216] (the "Disclosure Statement"),[2] and state as follows:

## I. PRELIMINARY STATEMENT

1. On or about May 5, 2025 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee or examiner has been appointed and Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. An Official Committee of Unsecured Creditors (the "Committee") was formed

2. The commencement of Debtors' Chapter 11 cases came only eight months after Debtors' emergence from their prior Chapter 11 cases in this Court, *In re Rite Aid Corporation, et al.*, jointly administered under Case No. 23-18993 (MBK) (the "2023 Bankruptcy Case"). On August 16, 2024, this Court entered its *Order Approving the Disclosure Statement for, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Modifications)* [Docket No. 4532 in 2023 Bankruptcy Case]. The effective date of the confirmed Chapter 11 plan in the 2023 Bankruptcy Case occurred on August 30, 2024 [Docket No. 4800 in 2023 Bankruptcy Case].

---

[2] Capitalized terms not otherwise defined shall have the same meaning as set forth in the Proposed Plan and accompanying Disclosure Statement.

2

3. It has been clear from the Petition Date that these are liquidating Chapter 11 cases. *See generally Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 24].

4. Now, Debtors, who appear to be administratively insolvent, are rushing to confirmation of the Proposed Plan and seeking approval of the Disclosure Statement that does not demonstrate administrative solvency, with the critical Wind-Down Budget yet to be disclosed. Further, as discussed below, the Proposed Plan, through multiple provisions, effectively provides for releases of multiple non-debtor parties, including Debtors' insurers, for post-Petition Date events and occurrences in the day-to-day conduct of Debtors' business and the wind-down and liquidation of Debtors' retail operations.

## II. ARGUMENT

### A. The Disclosure Statement Fails To Provide Adequate Information

5. Meaningful and adequate disclosure is at the heart of the reorganization process. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988); *H & L Dev., Inc. v. Arvida/JMB Partners (In re H & L Dev., Inc.)*, 178 B.R. 71, 74 (Bankr. E.D. Pa. 1994). Effective disclosure requires the dissemination of "adequate information," *Knupfer v. Wolfberg (In re Wolfberg)*, 255 B.R. 879, 883 (9th Cir. B.A.P. 2000), defined under the Bankruptcy Code to include:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

6. Section 1125(b) of the Bankruptcy Code provides that acceptance or rejection of a proposed plan of reorganization may not be solicited unless the holder of a claim or interest to

3

whom the solicitation is made is provided with the proposed plan or summary thereof "and a written disclosure statement approved, after notice and hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  Adequate information means that the disclosure statement must clearly and succinctly inform the average creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution. *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991).  "The disclosure statement is primarily a source of information upon which creditors make an informed judgment about the merits of a plan of reorganization." *In re Apex Oil Co.*, 101 B.R. 92, 98 (Bankr. E.D. Mo. 1989).

7. Relevant factors in evaluating the adequacy of a disclosure statement may include:

> (1) the events which led to the filing of the bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of the information contained in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors in a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Metrocraft Publ'g Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *accord*, *In re Avianca Holdings, S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (observing that "no one list of categories will apply in every case").

8. The most fundamental flaw in the Disclosure Statement is Debtors' failure to timely provide the Wind-Down Budget to creditors for review and analysis prior to the objection deadline on the Proposed Plan. Less than a month ago (October 27, 2025), this Court questioned the administrative solvency of these Chapter 11 cases and issued its *Order to Show Cause as to Why Case Should Not Be Dismissed or Converted to Chapter 7* [Docket No. 2997]. Now, only a few weeks later, Debtors' Proposed Plan (at Article II.A) purports to provide for payment of Administrative Claims, as is required by Bankruptcy Code section 1129(a)(9). But there are limitations on the potential payments of Administrative Claims as the Proposed Plan provides for the establishment of an Administrative/Priority Claims Reserve and the satisfaction of Administrative Claims after the Effective Date "shall be made *exclusively* from the Administrative/Priority Claims Reserve, and the Reorganized Debtors shall have no obligation to pay any Administrative Claims." The proposed Administrative/Priority Claims Reserve thus potentially functions as a "cap" on recoveries of a portion of Administrative Claims, making its adequacy a critical feature of the Proposed Plan and a necessary confirmation issue under Bankruptcy Code section 1129(a)(9), which requires payment of the "allowed amount of such claim," not some percentage of a potentially underfunded Administrative/Priority Claims Reserve.[3] The Wind-Down Budget, as defined in the Proposed Plan (at Article I(A)(172)), provides that the Wind-Down Budget "shall include amounts necessary to fund the Administrative/Priority Claims Reserve . . . ."

---

[3] It is well established that, absent express statutory language, the bankruptcy court may not establish priorities among various administrative claimants. *See, e.g., In re Lazar*, 83 F.3d 306, 308-309 (9th Cir. 1996) ("Under the Bankruptcy Code, administrative expense creditors must be treated equally and the court should not set up its own order of priorities."); *In re Digital Impact, Inc.*, 223 B.R. 1, 7 fn. 2 (Bankr. N.D. Okla. 1998) ("The Court has a duty to ensure an equitable distribution among like claims . . . ."); *In re Vale*, 204 B.R. 716, 728 n.15 (Bankr. N.D. Ind. 1996); *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 980 (Bankr. W.D. Wash. 1994). If the Administrative/Priority Claims Reserve is inadequate, the Proposed Plan does just that.

5

9. Without adequate advance disclosure of the Wind-Down Budget and Administrative/Priority Claims Reserve, the Disclosure Statement fails to contain adequate information regarding the Proposed Plan. Indeed, if a "disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization" (*In re Cardinal Congregate I*, 121 B.R. 760, 765–66 (Bankr. S.D. Ohio 1990)),[4] Debtors' failure to disclose the Wind-Down Budget and the Administrative/Priority Claims Reserve, deprives administrative expense creditors of a meaningful opportunity to review their adequacy and completeness,[5] highlighting the risk that Administrative Claims will not be satisfied in full. As result, Debtors' Disclosure Statement is inadequate as a matter of law.

10. In addition to necessary disclosures bearing on the administrative solvency of these Chapter 11 cases, Holders of Administrative Claims and General Unsecured Claims, in evaluating the Proposed Plan and potential objections, are simply entitled to know "what went wrong." In the simplest terms, why did Debtors' liquidation fail to provide any return on account of General Unsecured Claims and may not fully satisfy Administrative Claims? The Disclosure Statement contains a bland, procedural history of these Chapter 11 cases and related litigation (*see* Article V of Disclosure Statement), but avoids any discussion of whether Debtors' failure to produce any return to unsecured creditors was the result of disappointing asset sales,

---

[4] It is important to remember that as far back as early June of this year, in its *Statement of the Official Committee of Unsecured Creditors With Respect to the Debtors' Motion to Extend the Deadline to Assume or Reject Unexpired Leases Pursuant to Section 365(d)(4) of the Bankruptcy Code* [Docket No. 707], the Committee expressed their concern that "the collective effect of [relief sought by the DIP Financing Motion] could leave unsecured creditors facing *a full or partial haircut on their administrative expense claims*, without meaningful legal protections . . . ." It appears that scenario may indeed have occurred.

[5] The Due Process Clause of the United States Constitution applies to proceedings under the Bankruptcy Code. *See, e.g.*, *In re Center Wholesale, Inc*., 759 F.2d 1440, 1448 (9th Cir. 1985). "The fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Turney v. Federal Deposit Ins. Corp*., 18 F.3d 865, 868 (10th Cir. 1994); *see also In re Nextwave Personal Comm'cns, Inc*., 244 B.R. 253, 264 (Bankr. S.D.N.Y. 2000) ("The Bankruptcy Code requires, as an element of fairness and due process, notice, a hearing and court approval before actions impacting vital interests may be taken.").

incorrect or incomplete projections of anticipated revenues and expenses, operational difficulties or something else. In failing to candidly address the circumstances that, from the perspective of unsecured creditors, caused these cases to fail, the purported "settlement" and releases of parties' claims, asserted throughout the Proposed Plan (*see, e.g.*, Article X.A), fails to meet the Third Circuit standards for approval of a settlement under *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). Indeed, the *Martin* factors apply to asserted settlements of claims against a debtor. *See, e.g.*, *In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

> B. **The Proposed Plan's Exculpation and Injunction Provisions Are Overbroad and Jeopardize Potential Recoveries from Debtors' Existing Insurance and Other Parties**

11. The exculpation provision (Article X.E) of the Proposed Plan is overbroad, particularly when read in conjunction with the injunction provision (Article X.F). Under Article X.E, Exculpated Parties are exculpated "from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 cases . . . and the administration of Debtors' estates during the course of these Chapter 11 Cases . . . , except for claims and Causes of Action" found to "have constituted fraud, willful misconduct, or gross negligence . . . ." Exculpated Parties is broadly defined to include not only the Debtors, but their agents, consultants and representatives. Proposed Plan at Article I.A(78).

12. Accordingly, the exculpation provision of the Proposed Plan does not extend to ordinary claims of negligence, for which Debtors maintained commercial general liability and property insurance, in many cases as required by the terms of nonresidential real property leases, including those with Objecting Landlords. By exculpating the Debtors from liability for ordinary negligence in the operation of its business during these Chapter 11 Cases and enjoining any action or proceeding in connection with such claims (Article X.F of Proposed Plan), even where

Debtors had existing and available insurance coverage, the Proposed Plan effectively terminates Debtors' insurable interest for negligence claims and functionally releases its insurers from potential claims. Similarly, by sweeping in Debtors' agents, the exculpation provision effectively exonerates non-Debtor parties, such as Debtors' consultants, from direct claims for their own negligence, even where (as discussed below) they were obligated to indemnify the Debtors.

13. By way of example, in connection with the store closing sale conducted at the Rite Aid location in Sunland, California (Store No. 5532), SB360 Capital Partners, LLC ("SB360"), one of Debtors' liquidators, sold certain store fixtures. In the process of removing those fixtures for sale, SB360 or its contractor, drilled and hammered floor bolts anchoring the fixtures through the concrete slab, causing approximately 150 penetrations through the concrete slab and causing damage to a tenant on the floor below Rite Aid. There were also water intrusions at these premises, causing damage to both the Rite Aid premises and those of the tenant below. Under the exculpation provision (Article X.E) of the Proposed Plan, such occurrences constitute an "act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 cases." Further, SB360 was functioning as Debtors' agent, pursuant to the Consulting Agreement previously approved by this Court [see Docket No. 1397].

14. Under Paragraph 6(a) of the Consulting Agreement, SB360 was required to "indemnify, defend, and hold the Merchant and its directors, officers, members, managers, partners, employees, attorneys, advisors, representatives, lenders, principals, and affiliates (other than such Consultant or its Consultant Indemnified Parties (as defined herein)) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands,

8

damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (i) the willful or negligent acts or omissions of such Consultant or such Consultant Indemnified Parties; (ii) such Consultant's breach of any provision of, or the failure to perform any obligation under, this Agreement; (iii) any liability or other claims made by such Consultant Indemnified Parties or any other person (excluding the Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to such Consultant's conduct of the Sale or provision of Services . . . " SB360, as "Consultant" was further required, in support of its indemnification obligation, to maintain certain "casualty and liability insurance policies covering injuries to persons and property at or in connection with the Designated Closing Locations (including, but not limited to, products liability/completed operations, contractual liability, comprehensive public liability, and auto liability insurance) on an occurrence basis." Paragraph 4(b) of Consulting Agreement.

15.    The functional release of Debtors' insurers for ordinary claims of negligence resulting from Debtors' operations (and the activities of its liquidators) is not limited to the unique facts occurring at the Sunland, California location. Ordinary "slip and fall" events could have occurred at any of Debtors' store locations, with personal injury claims not yet asserted under applicable statutes of limitations. By *exculpating Debtors* from any such liability, as contrasted to *discharging the bankruptcy estate* from liability for such claims, Debtors' real property landlords will lose the benefit of the indemnification rights and insurance coverage bargained for in the Leases. This result goes beyond the ordinary consequences of lease rejection, where indemnification claims to the extent of available insurance generally survive. Indeed, even landlords whose Rite Aid leases were assigned to third parties, but bargained for the continued availability of insurance coverage for pre-assignment events and occurrences to

9

provide adequate assurance of future performance (11 U.S.C. § 365(b)(1) and (b)(3)(A)) of indemnification obligations under the assumed and assigned leases (*see, e.g.*, *Order Approving Assumption and Assignment of Certain Unexpired Leases Designated in Notice of Debtors' Thrifty Payless, Inc., The Bartell Drug Company and Thrift Drug, Inc. Five Below Assumption and Assignment* [Docket No. 3253] at ¶ 3), are impacted and impaired by the exculpation and release provisions.[6]

16.  Now, having bargained for indemnification from SB360 for ordinary claims of negligence in connection with the store closing sales, and required SB360 to obtain and maintain insurance, by exculpating SB360 for the conduct of the sales at the Sunland, California location, the Proposed Plan functionally releases SB360, along with Debtors' and SB360's insurers, from such liability.  Such an outcome is contrary to well-settled principles that non-debtors, including a debtor's insurers, are generally not entitled to a third-party release in a Chapter 11 bankruptcy plan—particularly a nonconsensual one, as presented here.  11 U.S.C. § 524(e); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 144 S. Ct. 2071, 2085 (2024).  There is simply no basis in the Bankruptcy Code, except in the narrow context of asbestos claims under Section 524(g), to extinguish claims against non-debtors without the consent of the affected creditor. The fact that the extinguishment of such potential claims is achieved through release and exculpation provisions is not dispositive in any way.  As the Supreme Court made clear in *Purdue*, "word games cannot obscure the underlying reality." 144 S. Ct. at 2086.

17.  Under these circumstances, the Proposed Plan, as proposed, functionally exculpates and releases non-debtor third parties, including insurers, contrary to Bankruptcy Code

---

[6] Similar provisions for continued reliance on Debtors' insurance coverage for events and occurrences during these Chapter 11 Cases are found in lease termination agreements previously approved by this Court. *See, e.g.*, *Amended Order Pursuant to Sections 365 and 363 Approving Lease Termination Agreement with B10 Mountain B WA LLC* [Docket No. 2370].

section 524(e) and deprives multiple parties of the benefit of existing coverage. Accordingly, the Proposed Plan does not comply with the applicable provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)) and is not "fair and equitable. 11 U.S.C. § 1129

### III. JOINDER

To the extent not inconsistent with the foregoing, Objecting Landlords join in the objections to confirmation of the Proposed Plan and the adequacy of the Disclosure Statement filed by Debtors' other landlords and the Committee.

### IV. RESERVATION OF RIGHTS

Objecting Landlords reserve the right to make such other and further objections to the Proposed Plan and Disclosure Statement as may be appropriate based upon any new information provided by Debtors, particularly the belated disclosure of the Wind-Down Budget and Administrative/Priority Claims Reserve, or on any different relief requested by Debtors, or as may be developed through formal or informal discovery.

### V. CONCLUSION

For the foregoing reasons, the Disclosure Statement is inadequate and the Proposed Plan, as presently proposed, should not be confirmed.

Date: November 19, 2025

Respectfully Submitted,

*/s/ Leslie C. Heilman*
BALLARD SPAHR LLP
Leslie C. Heilman
Laurel D. Roglen
Nicholas J. Brannick
Margaret A. Vesper
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
          roglenl@ballardspahr.com
          brannickn@ballardspahr.com
          vesperm@ballardspahr.com

11

and

**ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP**
Ivan M. Gold
Three Embarcadero Center, 12th Floor
San Francisco, California 94111-4074
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
E-mail:  igold@allenmatkins.com

*Attorneys for Objecting Landlords*