**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

### DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1]  The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

**TABLE OF CONTENTS**

<u>Page</u>

Preliminary Statement.................................................................................................................1

I.  Chapter 11 Plan and Procedural History...............................................................................4

    A.  Marketing Process...............................................................................................4

    B.  The Administrative Claims Procedures ..............................................................5

    C.  RSA and Chapter 11 Plan. .................................................................................7

    D.  Mediation. ...........................................................................................................8

    E.  Plan Solicitation .................................................................................................9

    F.  Plan Modifications. ...........................................................................................11

    G.  The Objections. .................................................................................................13

Argument ...................................................................................................................................15

II.  The Disclosure Statement Contains "Adequate Information" as Required by
Section 1125 of the Bankruptcy Code, and the Debtors Complied with the
Applicable Notice Requirements. .........................................................................................15

    A.  The Disclosure Statement Contains Adequate Information..................................16

    B.  The Debtors Complied with the Applicable Notice and Solicitation
Requirements. ......................................................................................................20

    C.  Solicitation of the Plan Complied with the Bankruptcy Code and Was in
Good Faith. .........................................................................................................20

III.  The Plan Satisfies Each Requirement for Confirmation.....................................................21

    A.  The Plan Complies with the Applicable Provisions of the Bankruptcy
Code (Section 1129(a)(1)). ................................................................................21

        1.  The Plan Satisfies the Classification Requirements of Section 1122
of the Bankruptcy Code. ........................................................................22

        2.  The Plan Satisfies the Mandatory Plan Requirements of Section
1123(a) of the Bankruptcy Code............................................................24

    B.  The Debtors Have Complied with the Applicable Provisions of the
Bankruptcy Code (Section 1129(a)(2)).............................................................27

        1.  The Debtors Have Complied with the Disclosure and Solicitation
Requirements of Section 1125................................................................28

        2.  The Debtors Have Satisfied the Plan Acceptance Requirements of
Section 1126..........................................................................................30

    C.  The Debtors Proposed the Plan in Good Faith and Not by Any Means
Forbidden by Law (Section 1129(a)(3)). ..........................................................31

    D.  The Plan Provides That the Debtors' Payment of Professional Fees and
Expenses Are Subject to Bankruptcy Court Approval (Section 1129(a)(4)).........32

i

**TABLE OF CONTENTS (CONT'D)**

**Page**

E.    The Debtors Will Satisfy Disclosure Obligations Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ......................................................33

F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). .................................................................................................33

G.    The Plan is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). .................................................................................................34

H.    The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code. ......................................................35

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims Except as Otherwise Agreed By the Claimholder (§ 1129(a)(9)) .........................36

J.    At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)). ....................................................................................39

K.    The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)) .........................40

L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). .....................................................................44

M.    The Plan Provides for Post-Effective Date Payment, or Other Satisfaction of, Required Retiree Benefits (Section 1129(a)(13)). .............................45

N.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ....................................................................46

O.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...................46

    1.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)) ...............................47

    2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)). ..............................................................................48

P.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). .............................................49

IV.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. .......................................................................49

A.    The Plan Complies with Section 1123(d) of the Bankruptcy Code. .....................50

B.    The Plan Appropriately Incorporates Settlements of Claims and Interests. ..........50

C.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code. ......................................................52

    1.    The Third-Party Release Is Wholly Consensual and Is Appropriate. ........53

    2.    The Debtor Release Is Appropriate. ....................................................55

    3.    The Exculpation Provision Is Appropriate. .............................................59

    4.    The Injunction Provision is Appropriate. ...............................................62

## TABLE OF CONTENTS (CONT'D)

**Page**

V.  The Remaining Objections to Confirmation of the Plan and Final Approval of the
    Adequacy of the Disclosure Statement Should Be Overruled. ..........................................63

    A.  The U.S. Trustee's Objection Should be Overruled. ...............................................64

        1.  The Third-Party Release is Consensual, Permissible, and
            Appropriate, and the Bankruptcy Court has Jurisdiction to Approve
            the Third-Party Release.............................................................................64

        2.  The Debtor Release Should Be Approved. ................................................66

        3.  The Plan's Exculpation Provisions Are Consistent with Section
            1125(e) of the Bankruptcy Code and Third Circuit Law and Should
            be Approved...............................................................................................69

        4.  The "Gatekeeping Provision" is Integral to the Plan and Should be
            Approved.....................................................................................................71

        5.  The Injunction Provision, As Modified, Is Appropriate and Does
            Not Effect an Improper Discharge of the Wind-Down Debtors...............78

    B.  The Landlord Objections Should be Overruled ....................................................79

    C.  The Sub-Trusts' Objection Should Be Overruled.................................................82

Waiver of Bankruptcy Rule 3020(e)............................................................................................82

Conclusion ...................................................................................................................................83

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993
  WL 316183 (S.D.N.Y. May 21, 1993) ................................................................................23

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
  No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ....................57, 58, 68

*In re A.H. Robins Co. Inc.*,
  88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989).........................12, 13

*In re Aegean Marine Petroleum Network, Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ..............................................................................62

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).......................41, 49

*In re Alex & Ani, LLC*,
  No. 21-10918 (CTG) (Bankr. D. Del. Sept. 22, 2021) ....................................................56, 65

*In re APP Winddown, LLC*,
  et al., No. 16-12551 (Bankr. D. Del. Dec. 16, 2019) .........................................................93

*In re Applied Safety, Inc.*,
  200 B.R. 576 (Bankr. E.D. Pa. 1996) ..............................................................................41, 42

*In re Arsenal Intermediate Holdings, LLC*,
  No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)...........................55

*In re Avaya Inc.*,
  No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) .......................................................73

*Matter of AWECO, Inc.*,
  725 F.2d 293 (5th Cir. 1984) ...........................................................................................52

*Bank of Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)........................................................................................................35, 48

*In re Barneys New York, Inc.*,
  Case No. 19-36300 (Bankr. S.D.N.Y. Feb. 2, 2020) ...........................................................44

*Baron* v. *Sherman (In re Ondova Ltd. Co.,*),
  2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017)....................................................74

i

<u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

*Barton* v. *Barbour*,
104 U.S. 126 (1881).................................................................................................74

*In re Bed Bath & Beyond Inc.*,
No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023)............................................*passim*

*Berkley Fed. Bank & Trust* v. *Sea Garden Motel & Apartments (In re Sea Garden
Motel & Apartments)*,
195 B.R. 294 (D.N.J. 1996) ......................................................................................41

*In re Blackhawk Mining LLC*,
No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019)...........................................................70

*Re BlockFi Inc.*,
2025 WL 1811970 (Bankr. D.N.J. July 1, 2025) .....................................................91

*In re BlockFi Inc.*,
No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023).......................................................*passim*

*In re BlockFi Inc.*,
No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023)................................50, 66, 80

*Boston Reg'l Med. Ctr. Inc.* v. *Reynolds (In re Boston Reg'l Med. Ctr. Inc.)*,
410 F.3d 100 (1st Cir. 2005) ......................................................................................75

*In re Brotby*,
303 B.R. 177 (B.A.P. 9th Cir. 2003) .................................................................41, 42

*In re Careismatic Brands, LLC*,
No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024) .......................................69, 75

*In re Carestream Health, Inc.*,
No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022)...................................56, 65

*Carter* v. *Rodgers*,
220 F.3d 1249 (11th Cir. 2000) ................................................................................74

*In re Casa Loma Assocs.*,
122 B.R. 814 (Bankr. N.D. Ga. 1991) ...................................................................93

*In re Century Glove, Inc.*,
No. Civ. A. 90-400 (SLR), 1993 WL 239489 (D. Del. Feb. 10, 1993) ..................32

*Century Glove, Inc.* v. *First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988)........................................................................................16

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986).......................................................................33

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Checkout Holding Corp.*,
    No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) ................................70

*In re Cineworld Group PLC*,
    No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023).................................56, 65, 73

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007) ................................61

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ................................58

*Crestar Bank* v. *Walker (In re Walker)*,
    165 B.R. 994 (E.D. Va. 1994)................................41

*In re Ctr. For Autism & Related Disorders, LLC*,
    No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) ................................56, 65

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ................................35

*In re Cyxtera Techs.*,
    No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) ................................56, 65, 76, 95

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010
    WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d
    496 (2d Cir. 2010)................................41, 42

*In re Diocese of Camden, New Jersey*,
    653 B.R. 309 (Bankr. D.N.J. Aug. 29, 2023)................................32

*In re Dow Corning Corp.*,
    237 B.R. 374 (Bankr. E.D. Mich. 1999) ................................12

*In re Drexel Burnham Lambert Grp. Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)................................23

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)................................63, 64

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005)................................63

*In re Extraction Oil & Gas, Inc.*,
    No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) ................................56, 65

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Fin. Sec. Assurance Inc.* v. *T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ................................................................32

*Frito-Lay, Inc.* v. *LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993)...................................................................23

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)...................................................33

*In re G–I Holdings Inc.*,
420 B.R. 216 (D.N.J. 2009) ..................................................................41

*In re Gemstone Solutions Group, Inc.*,
Case No. 19-30258 (Bankr. E.D. Va. Jun. 5, 2020)...............................44

*In re Great Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................23

*Hallock* v. *Key Fed. Sav. Bank (In re Silver Oak Homes, Ltd.)*,
167 B.R. 389 (Bankr. D. Md. 1994) (applying Barton Doctrine to president of the debtor) ............................................................................................74

*Harrington* v. *Purdue Pharma L.P*,
603 U.S. 204 ........................................................................................82

*Helmer* v. *Pogue*,
212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to a debtor in possession)...........................................................74

*In re Hercules Offshore, Inc.*,
565 B.R. 732 (Bankr. D. Del. 2016) ......................................................59

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................23

*In re Highland Capital Management, L.P.*,
No.19-34054 (SGJ) (Bankr. N.D. Tex. Nov. 24, 2020)...........................73

*In re Hollister Construction Services, LLC*,
No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021)..............................95

*In re Horsehead Holding Corp.*,
No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) ...............................70

*In re Indianapolis Downs*,
486 B.R. ..............................................................................................55

iv

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Indianapolis Downs*,
486 B.R. 286 (Bankr. D. Del. 2013) .......................................................54, 57, 63, 67

*In re Invitae Corp.*,
No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) ........................................40, 82

*In re Jackson Brewing Co.*,
624 F.2d at 602–03 ...................................................................................................52

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).....................................................................................23

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs. (In re Route 37
Bus. Park Assocs.)*,
987 F.2d 154 (3d Cir. 1993)................................................................................23, 47

*Kirk* v. *Texaco, Inc.*,
82 B.R. 678, 682 (S.D.N.Y. 1988)..............................................................................16

*Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003)........................................................................................16

*In re L'OCCTAINE, Inc.*,
No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021) ..............................................95

*In re Lannett Co., Inc.*,
No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023)...........................56, 65, 67, 75

*Lisanti* v. *Lisanti (In re Lisanti Foods, Inc.)*,
329 B.R. 491 (Bankr. D.N.J. 2005) ......................................................................16, 33

*Lowenbraun* v. *Canary (In re Lowenbraun)*,
453 F.3d 314 (6th Cir. 2006) (applying Barton Doctrine to trustees' counsel) ......................74

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) ....................................................................54, 55

*In re Mallinckrodt PLC*,
No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) ..........................................56, 65

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)......................................................................57

*In re Metrocraft Publ'g Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) .........................................................................17

*In re Midway Gold US, Inc.*,
575 B.R. 475 (Bankr. D. Colo. 2017) .......................................................................59

v

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Modell's Sporting Goods, Inc.*,
No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020)...........................................................75

*In re Monnier Bros.*,
755 F.2d 1336 (8th Cir. 1985) ...........................................................................................16

*Myers* v. *Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996).................................................................................................52

*In re Nat'l Realty Inv. Advisors, LLC*,
No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) ..........................................................73

*In re Nautical Solutions, L.L.C.*,
No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) .....................................................73

*In re Nickels Midway Pier, LLC*,
No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ...........................23

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ..................................................................................32

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................................22

*In re Ocean View Motel, LLC*,
No. 20-21165-ABA, 2022 WL 243213 (Bankr. D.N.J. Jan. 25, 2022) .................................49

*In re One Aviation Corp.*,
No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) ..........................................................70

*Oneida Motor Freight, Inc.* v. *United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988)...............................................................................................16

*In re Phoenix Petrol., Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .............................................................................16, 17

*In re Pier 1 Imports, Inc.*,
Case No. 20-30805 (Bankr. E.D. Va. Jul. 30, 2020) ..........................................................44

*In re Premier Int'l Holdings, Inc.*,
2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010)...................................................21, 59, 62

*In re Princeton Alternative Income Fund, LP*,
No. 18-14603 (MBK) (Bankr. D.N.J. Feb. 19, 2020)..........................................................73

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ................................................................................41

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).................................................................28, 32, 62

*In re PWS Holding Corp.*,
   228 F.3d at 246–47 ........................................................................................63

*In re RCS Cap. Corp.*,
   No. 16-10223 (MFW) (Bankr. D. Del. Mar. 21, 2016) .........................................67

*In re Revel AC, Inc.*,
   No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) ..........................................50

*In re Rite Aid Corp.*,
   No. 23-18993 (MBK) (Bankr. D.N.J. Aug. 16, 2024)..............................70, 71, 73

*In re River Village Assoc.*,
   181 B.R. 795 (E.D. Pa. 1995) .......................................................................16

*In re Riverbed Tech., Inc.*,
   No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) ......................................56, 65

*Rivercity* v. *Herpel (In re Jackson Brewing Co.)*,
   624 F.2d 599 (5th Cir. 1980) ........................................................................52

*In re Roberds, Inc.*,
   270 B.R. 702 (Bankr. S.D. Ohio 2001)..............................................................83

*In re Rochem, Ltd.*,
   58 B.R. 641 (Bankr. D.N.J. 1985) ..................................................................23

*In re S & W Enter.*,
   37 B.R. 153 (Bankr. N.D. Ill. 1984) ...............................................................22

*In re S B Bldg. Assocs. Ltd. P'ship*,
   621 B.R. 330 (Bankr. D.N.J. 2020) ....................................................47, 49, 52, 56

*In re Samson Resources Corp.*,
   No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) ..........................................70

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988)...............................................................17

*In re Sears Holdings Corp.*,
   Case No. 18-23538 (Bankr. D.N.J. Oct. 15, 2019)..............................................44

*In re Sentinel Mgmt. Grp., Inc.*,
   398 B.R. 281 (Bankr. N.D. Ill. 2008) .............................................................12

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re SiO2 Medical Products, Inc.*,
No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) ......................................56, 65

*In re Slack*,
290 B.R. 282 (Bankr. D.N.J. 2003) ...................................................................91

*In re SLT Holdco, Inc.*,
No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) .................................56, 65, 95

*In re Spansion, Inc.*,
No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) ..........................62

*In re Steward Health Care Sys. LLC*,
Case No. 24-90213 (Bankr. S.D. Tex. Jul. 25, 2025) ...........................................44

*Su* v. *Offshore Investment Ltd. (In re Vantage Drilling Int'l)*,
603 B.R. 538 (D. Del. 2019) ...........................................................................59

*In re Swan Transportation Co.*,
596 B.R. 127 (Bankr. D. Del. 2018) ................................................................74

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) .........................................................*passim*

*In re Tehum Care Services, Inc.*,
No. 23-90086 (Bankr. S.D. Tex. Oct. 30, 2025) [Docket No. 2521]......................65

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ........................................................................16

*In re Thrasio Holdings, Inc.*,
No. 24-11840 (CMG) (Bankr. D.N.J. Jun. 13, 2024) .........................................73

*In re TK Holdings Inc.*,
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ..........................................70

*In re Toys "R" Us, Inc.*,
Case No. 17-34665 (Bankr. E.D. Va. Nov. 21, 2018) .........................................44

*In re Transwest Resort Props., Inc.*,
881 F.3d 724 (9th Cir. 2018) ..........................................................................40

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
B.R. 208 (Bankr. D. Del. 2011) ................................................................41, 58

*In re Triumph Christian Ctr.*,
493 B.R. 479 (Bankr. S.D. Tex. 2013) .............................................................93

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Two Sts., Inc.*,
   597 B.R. 309 (Bankr. S.D. Miss. 2019) ................................................................42

*U.S. Bank Nat'l Ass'n* v. *Wilmington Trust Co. (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...................................................54, 55, 57

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) ..............................................................17

*In re Unichem Corp.*,
   72 B.R. 95 (Bankr. N.D. Ill. 1987) ...................................................................16

*In re Union Cnty. Wholesale Tobacco & Candy Co., Inc.*,
   8 B.R. 442 (Bankr. D.N.J. 1981) .......................................................................29

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012), aff'd, 729 F.3d 311 (3d Cir. 2013) ....................32

*In re Wash. Mut.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...................................................54, 57, 61

*In re WebSci Technologies, Inc.*,
   234 Fed. Appx. 26 (3d Cir. 2007) ...........................................................53, 56

*Westland Oil Dev. Corp.* v. *MCorp Mgmt. Sols., Inc.*,
   157 B.R. 100 (S.D. Tex. 1993) ..........................................................................17

*In re WeWork, Inc.*,
   No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) ......................................69, 75

*Will* v. *Nw. Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006) ...............................................................52, 53, 56

*In re Wilton Armetale, Inc.*,
   618 B.R. 424 (Bankr. E.D. Pa. 2020) ................................................................91

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ....................................................54, 58, 59

**STATUTES**

11 U.S.C. § 101-1532 ..................................................................................*passim*

11 U.S.C. § 105 ...................................................................................................73

11 U.S.C. § 105(a) ..............................................................................................90

11 U.S.C. § 105(a) ..............................................................................................90

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 362(c) .................................................................................................80

11 U.S.C. § 365 ...............................................................................................51, 83

11 U.S.C. § 502(a) .................................................................................................78

11 U.S.C. § 503(b) .................................................................................................36

11 U.S.C. § 503(b)(9) ..............................................................................................7

11 U.S.C. § 507(4) .................................................................................................36

11 U.S.C. § 507(5) .................................................................................................36

11 U.S.C. § 507(6) .................................................................................................36

11 U.S.C. § 507(7) .................................................................................................36

11 U.S.C. § 507(a)(1) .............................................................................................36

11 U.S.C. § 507(a)(2) .......................................................................................36, 45

11 U.S.C. § 507(a)(8) .............................................................................................37

11 U.S.C. § 510(b) ...........................................................................11, 24, 30, 47

11 U.S.C. § 554 .............................................................................3, 85, 90, 92

11 U.S.C. §§ 701–784 ....................................................................18, 19, 34, 35

11 U.S.C. §§ 701-784 ....................................................................................passim

11 U.S.C. §§ 1101–1195 ..............................................................................passim

11 U.S.C. § 1114 .....................................................................................................46

11 U.S.C. § 1114(a) ...............................................................................................46

11 U.S.C. § 1122 ...........................................................................................passim

11 U.S.C. § 1122(a) .........................................................................................22, 23

11 U.S.C. § 1123 ...................................................................................12, 22, 64

11 U.S.C. § 1123 .....................................................................................................52

11 U.S.C. § 1123(a) ...............................................................................................24

11 U.S.C. § 1123(a)(1) ..........................................................................................25

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1123(a)(1)–(7) ....................................................................................24

11 U.S.C. § 1123(a) (1)–(8) ....................................................................................24

11 U.S.C. § 1123(a)(2) ............................................................................................25

11 U.S.C. § 1123(a)(3) ............................................................................................25

11 U.S.C. § 1123(a)(4) ............................................................................................25

11 U.S.C. § 1123(a)(5) ......................................................................................26, 27

11 U.S.C. § 1123(a)(6) ............................................................................................27

11 U.S.C. § 1123(a)(7) ......................................................................................27, 28

11 U.S.C. § 1123(a)(8) ............................................................................................24

11 U.S.C. § 1123(b) ....................................................................................50, 53, 64

11 U.S.C. § 1123(b)(3) ............................................................................................52

11 U.S.C. § 1123(b)(3)(A) ................................................................................51, 56

11 U.S.C. § 1123(b)(6) ............................................................................................73

11 U.S.C. § 1123(d) ..........................................................................................50, 51

11 U.S.C. § 1125 ...............................................................................................passim

11 U.S.C. § 1125(a) ..........................................................................................20, 30

11 U.S.C. § 1125(a)(1) ......................................................................................16, 18

11 U.S.C. § 1125(b) ..........................................................................................29, 30

11 U.S.C. § 1125(c) ................................................................................................30

11 U.S.C. § 1125(e) ..........................................................................................passim

11 U.S.C. § 1126 ...............................................................................................passim

11 U.S.C. § 1126(c) ................................................................................................31

11 U.S.C. § 1126(f) ..........................................................................................30, 31

11 U.S.C. § 1126(g) ................................................................................................31

11 U.S.C. § 1127(a) ....................................................................................12, 22, 64

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1129 ......................................................................................................1, 75

11 U.S.C. 1129 .......................................................................................................21, 49

11 U.S.C. § 1129(a) ................................................................................................21, 47

11 U.S.C. § 1129(a)(1) ................................................................................................21

11 U.S.C. § 1129(a)(1) ...........................................................................................22, 64

11 U.S.C. § 1129(a)(2) ..........................................................................................*passim*

11 U.S.C. § 1129(a)(3) ...........................................................................................32, 62

11 U.S.C. § 1129(a)(3) ................................................................................................72

11 U.S.C. § 1129(a)(4) ...........................................................................................32, 33

11 U.S.C. § 1129(a)(5) ................................................................................................21

11 U.S.C. § 1129(a)(5) ...........................................................................................33, 34

11 U.S.C. § 1129(a)(5)(A)(i) .......................................................................................33

11 U.S.C. § 1129(a)(5)(A)(ii) ......................................................................................33

11 U.S.C. § 1129(a)(6) ................................................................................................34

11 U.S.C. § 1129(a)(7) ...........................................................................................34, 35

11 U.S.C. § 1129(a)(8) .......................................................................................36, 40, 47

11 U.S.C. § 1129(a)(9) ................................................................................................21

11 U.S.C. § 1129(a)(9) .......................................................................................36, 37, 39

11 U.S.C. § 1129(a)(9)(A) .....................................................................................36, 37

11 U.S.C. § 1129(a)(9)(B) ..................................................................................36, 37, 38

11 U.S.C. § 1129(a)(9)(C) .....................................................................................37, 39

11 U.S.C. § 1129(a)(10) ..............................................................................................40

11 U.S.C. § 1129(a)(11) ..............................................................................................21

11 U.S.C. § 1129(a)(11) ........................................................................................*passim*

11 U.S.C. § 1129(a)(12) ..............................................................................................45

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1129(a)(13) .................................................................................................46

11 U.S.C. § 1129(a)(14) .............................................................................................46, 47

11 U.S.C. § 1129(a)(15) .................................................................................................46

11 U.S.C. § 1129(a)(15) .................................................................................................47

11 U.S.C. § 1129(a)(16) .................................................................................................46

11 U.S.C. § 1129(a)(16) .................................................................................................47

11 U.S.C. § 1129(b) .................................................................................................passim

11 U.S.C. § 1129(b)(1) .........................................................................................47, 48, 49

11 U.S.C. § 1129(b)(2)(B)(i) ...........................................................................................48

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................................48

11 U.S.C. § 1129(c) .................................................................................................49, 50

11 U.S.C. § 1129(d) .................................................................................................49, 50

11 U.S.C. § 1129(e) .................................................................................................49, 50

11 U.S.C. § 1141(a) .......................................................................................................73

11 U.S.C. § 1141(b) .......................................................................................................73

11 U.S.C. § 1141(c) .......................................................................................................73

11 U.S.C. § 1141(d)(3) .............................................................................................79, 80

11 U.S.C. § 1142(b) .......................................................................................................90

11 U.S.C. § 1142(b) .......................................................................................................90

11 U.S.C. § 3020(e) .......................................................................................................94

15 U.S.C. § 77e .............................................................................................................49

28 U.S.C. § 1930 ...........................................................................................................45

29 U.S.C. § 1306(a)(7) .....................................................................................................9

**RULES**

Fed. R. Bankr. P. 3017 ...................................................................................................28

TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

Fed. R. Bankr. P. 3018 ........................................................................................28

Fed. R. Bankr. P. 3019 ........................................................................................12

Fed. R. Bankr. P. 3020(e) ...............................................................................94, 95

Fed. R. Bankr. P. 6007(a)(2) ...............................................................................85

Fed. R. Bankr. P. 6007(a)(2) ...............................................................................85

Fed. R. Bankr. P. 9019 ..................................................................................52, 56

LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5936 ......................................................................................28

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ........................................22

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978
    U.S.C.C.A.N. 5787 ......................................................................................28

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787........................................16, 22

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file

this memorandum of law (this "<u>Memorandum</u>") (a) in support of (i) final approval of the *Second*

*Amended Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of*

*Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3216] (the "<u>Disclosure</u>

<u>Statement</u>") and (ii) confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization*

*of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3215] (as modified, amended, or

supplemented from time to time, the "<u>Plan</u>") pursuant to sections 1125, 1126, and 1129 of title 11

of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), and (b) in response

to objections, supplemental objections, joinders, and/or reservations of rights that remain

unresolved as of the filing of this Memorandum (the "<u>Objections</u>," and the parties who submitted

Objections, the "<u>Objectors</u>").[2]  In further support of confirmation of the Plan, final approval of the

Disclosure Statement, and in response to the Objections, the Debtors rely on declarations submitted

contemporaneously with the filing of this Memorandum and additional evidence presented at the

hearing to consider approval of the Plan and final approval of the Disclosure Statement (the

"<u>Combined Hearing</u>"), and respectfully state as follows:

<u>Preliminary Statement</u>[3]

1.    The Debtors' Plan is the culmination of months of intense, hard-fought

negotiations.  It reflects meaningful concessions by all key stakeholders, and, ultimately, global

consensus across the Debtors' capital structure.  The Plan itself exemplifies and embodies a value-

maximizing settlement with every major constituency in the case—receiving unanimous support

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Disclosure
Statement, as applicable.

[3]    A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors'
Chapter 11 Cases are set forth in greater detail in the *Declaration of Marc Liebman, Chief Transformation Officer
of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 24] (the "<u>First
Day Declaration</u>").

from the largest creditor constituencies in these cases, including the DIP Lenders, Prepetition FILO

Lenders—the sole voting class of Claims, which voted unanimously to confirm the Plan—and

McKesson Corporation ("McKesson").    The Plan and related proposed Confirmation Order

[Docket No. 3219] also incorporates a settlement with the PBGC, and a proposed settlement with

the DOJ, which, if formally approved by the DOJ on or before December 5, 2025, will allow the

Plan to go effective.  The Plan is consistent with the Bankruptcy Code, maximizes the value of the

Debtors' assets, and provides a meaningful recovery to as many creditors as possible, including

holders of Administrative Claims.  The transactions contemplated by the Plan (the "Restructuring

Transactions") are the product of a series of interrelated and interconnected settlements and

compromises and reflect the Debtors' only path to Confirmation of a chapter 11 plan.    The

alternatives to Confirmation—dismissal or conversion of the chapter 11 cases to chapter 7—would

wipe away the hard fought economic benefits achieved by the Plan and are undoubtedly less

favorable for all of the Debtors' stakeholders, including their creditors.  The Court should confirm

the Plan.

2.    The Plan satisfies all of the requirements for Confirmation under the Bankruptcy

Code.  Of the 14 formal Objections filed to Confirmation of the Plan and/or final approval of the

Disclosure Statement, only a handful remain standing in the way of Confirmation.[4]   The only

Objections which seriously contest confirmation of the Plan relate to feasibility.  Namely, parties

that assert Administrative Expense Claims object that there is insufficient evidence that all such

Allowed Claims will be paid in full as required by the Plan  As evidenced by the Liebman

Declaration and as may be further adduced at the Confirmation Hearing, the Debtors have

---

[4]    A summary of the Objections to the Plan and the Debtors' responses thereto are attached as **Exhibit A**.

reasonably estimated all obligations of the Debtors and Wind-Down Debtors, including projected Administrative Expense Claims. Furthermore, as set forth in the Wind-Down Budget, the Wind-Down Debtors will have more than sufficient assets to satisfy those obligations that are ordered by the Court. Accordingly, these Objections should be overruled.

3.      Other Objections, including from the U.S. Trustee and certain former landlords to the Debtors, challenge the merits and scope of certain of the Plan's release, injunction, and exculpation provisions. These provisions are middle-of-the-fairway for what is customary for bankruptcy courts in this circuit, and should be approved. Further Objections from the litigation trusts created under the prior Rite Aid chapter 11 plan assert that the Debtors may not reject their obligations under the Litigation Trust Cooperation Agreement ("LTCA"), and demand more favorable provisions than are in the Debtors' proposed data retention plan. But the LTCA is a mere executory contract which may be rejected, and the data retention plan is consistent with applicable law, including Bankruptcy Code section 554. Finally, the other Objections seek modifying or clarifying language in the Plan and/or Confirmation Order, including with respect to the preservation of setoff rights, the impact of the Plan on certain of the Debtors' insurance policies and surety bonds agreements, among other miscellaneous matters. Most if not all of those Objections have been, or will be addressed before the Confirmation Hearing.

4.      A reply to all Objections, if not otherwise addressed in the body of this Memorandum, is included in Part V, below, and in the reply chart ("Reply Chart") attached hereto as Exhibit A. The Debtors also received a number of informal objections, the status of which is included in the Reply Chart. The Debtors continue to engage with the Objectors to reach a consensual resolution on outstanding Objections. As explained in detail below, to the extent not resolved prior to the Combined Hearing, the Court should overrule all outstanding Objections, and

3

enter the Confirmation Order confirming the Plan and approving the Disclosure Statement on a final basis.

5.      This Memorandum is divided into five parts. <u>Part I</u> describes the facts and circumstances leading to these chapter 11 cases, the procedural history of the Plan, the Debtors' solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan. <u>Part II</u> requests that the Court approve the Disclosure Statement on a final basis. <u>Part III</u> establishes the Plan's compliance with each of the applicable requirements for Confirmation. <u>Part IV</u> establishes that certain of the discretionary contents of the Plan, such as the Releases, are appropriate and should be approved. <u>Part V</u> establishes that the Objections to the Plan and to final approval of the Disclosure Statement should be overruled. In further support of Confirmation of the Plan and final approval of the Disclosure Statement, the Debtors have filed contemporaneously herewith:[5]

- the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "<u>Voting Report</u>"); and

- the *Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "<u>Liebman Declaration</u>").

## I.      Chapter 11 Plan and Procedural History

### A.      Marketing Process.

---

[5]     The Debtors have submitted the proposed *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* (the "<u>Proposed Confirmation Order</u>"), attached as Exhibit A to the *Notice of Filing of Proposed Confirmation Order* [Docket No. 3219], which contemplates, among other things, confirmation of the Plan and final approval of the Disclosure Statement. The Proposed Confirmation Order remains subject to ongoing review and material revision in all respects.

6.     The Debtors filed these chapter 11 cases with agreed debtor-in-possession financing provided by their DIP Lenders to facilitate a sale of all or substantially all of their assets in bankruptcy.  Through a comprehensive, court-supervised marketing and sale process that began prepetition and continued postpetition, the Debtors solicited interest from a broad universe of strategic and financial parties and conducted multiple auctions and private sales.  These coordinated efforts culminated in court-approved transactions, through which—along with the other monetization efforts undertaken by the Debtors, including numerous "going-out-of-business" sales and a real estate monetization process—the Debtors sold substantially all of their Pharmacy and non-Pharmacy assets, other than those assets which will vest in the Reorganized Debtors or Wind-Down Debtors, respectively, on the Effective Date.

**B.     The Administrative Claims Procedures**

7.     Prior to commencing solicitation on the Plan, the Debtors determined that if every holder of an Allowed Administrative Claim demanded payment in full, the Debtors would have insufficient assets to confirm a Plan.  Accordingly, the Debtors and the DIP Lenders agreed that up to $5,000,000 of cash collateral (the "Administrative Claims Distribution Pool") would be made available to fund consensual cash payments to certain holders of administrative expense claims, in exchange for such holders agreeing to cap their administrative expense claims, pursuant to court-approved administrative claims procedures (the "Administrative Claims Procedures") [Docket No. 1883].

8.     The Administrative Claims Procedures offer a voluntary, global settlement under which eligible holders that opt in receive an accelerated, pro rata cash payment from a dedicated distribution pool, capped at 5.00% of their recorded administrative claim amount (or another agreed amount), in full and final satisfaction of their Allowed Administrative Claim.  The program is voluntary—holders may opt out and preserve their claims, and holders that do not opt out are

deemed to consent to a subsequent pro rata distribution under a confirmed plan, subject to the same cap.  Distributions under these procedures are conditioned on sufficient creditor participation to enable Confirmation of the Plan, and if the participation threshold is met, the Debtors will fund the initial distributions and proceed with Confirmation and consummation of the Plan.

9.      Consistent with the Administrative Claims Procedures, the Debtors solicited elections and set a September 16, 2025, 5:00 p.m. (Eastern Time) election deadline (the "Election Deadline").  Eligible administrative claimants making an Opt-In Election will receive a "First Distribution" within ten business days after the Debtors file a notice indicating the Participation Condition (as defined in the Administrative Claims Procedures) has been met (the "Toggle Notice"), equal to their Pro Rata Share of the Administrative Claims Distribution Pool, capped at 5.00% of their Recorded Amount (or another agreed amount).

10.     Claimants opting out of the Administrative Claims Procedures will receive no distribution under the Administrative Claims Procedures and retain all rights to assert their administrative claims outside the procedures.  Claimants that did not affirmatively opt out are deemed to consent to receive any subsequent pro rata "Second Distribution," if and when made, from remaining Administrative Claims Distribution Pool funds under any confirmed chapter 11 plan on the Effective Date or as soon as reasonably practicable thereafter (if Allowed prior to the Effective Date), likewise capped at 5.00% (or another agreed or allowed amount).  Distributions on Settled Priority Claims that are not yet Allowed as of the Effective Date will be made within 10 business days after the claim is Allowed by Final Order or deemed Allowed under the Plan, or as soon as reasonably practicable thereafter.  Alternatively, such distributions may be made at a different time and on different terms either agreed to by the claimant and the Debtors or

6

Liquidating Trustee, or as ordered in a Final Order of the Bankruptcy Court, but in all events must be paid exclusively from the Administrative / Priority Claims Reserve.

11.     The Debtors implemented the Administrative Claims Procedures as approved, and served administrative claimants with the requisite materials and notices thereunder.  Following the Election Deadline, and consistent with the Administrative Claims Procedures, the Debtors plan to file the Toggle Notice indicating that the Participation Condition has been met prior to the Combined Hearing

**C.    RSA and Chapter 11 Plan.**

12.     Upon obtaining Court approval of the Administrative Claims Procedures, the Debtors continued to engage their stakeholders in extensive discussions regarding the best path available to conclude the Chapter 11 Cases.  These negotiations were ultimately successful as the Debtors, McKesson, and Bank of America, N.A., Wells Fargo Bank, National Association, and Capital One, National Association (each in its capacity as a DIP Lender and a lender under the Prepetition FILO Facility (a "Prepetition FILO Lender"), and collectively, the "Consenting Banks"), executed a restructuring support agreement (as amended, modified, or supplemented in accordance with its terms, the "RSA").

13.     The RSA memorialized the  agreements between the Debtors, the Consenting Banks, and McKesson (collectively, the "RSA Parties") with respect to a plan of reorganization and related transactions.  Those transactions include:  (i) the transfer of the Reorganized Debtors' equity to McKesson in exchange for full satisfaction of any claims held by McKesson arising under section 503(b)(9) of the Bankruptcy Code; (ii) McKesson's payment of $15 million of cash consideration (subsequently increased to $20 million in connection with the Mediation, as explained below); (iii) McKesson's agreement to the mutual releases described in the RSA; (iv) the settlement of certain litigation claims by and among McKesson and the Debtors, as

described herein; (v) McKesson's agreement to purchase certain pharmaceutical inventory; and (vi) the RSA Parties' agreement to the mutual releases set forth in the Plan (clauses (i) through (vi), collectively, the "Plan Transaction"). The RSA Parties also agreed to negotiate a good-faith compromise and settlement of various issues and disputes related to the Debtors' Chapter 11 Cases and events and actions preceding the Debtors' Chapter 11 Cases, pursue the Restructuring Transactions, and support confirmation of the Plan.

**D.     Mediation.**

14.     After the RSA Parties executed the RSA, they entered into mediation ("Mediation") to resolve certain remaining open issues between and among themselves and non-RSA Parties, including the DOJ, PBGC, and certain Holders of Existing Equity Interests in the Debtors. Mediation proved successful, and, as documented in the Plan, Plan Supplement, and Proposed Confirmation Order, provides for the following compromises and settlements:

a.     **McKesson Contribution.**  McKesson increased its cash consideration to $20 million, including a $5 million incremental contribution earmarked to fund Plan expenses under a mutually agreed budget. McKesson also agreed to support and mutual releases and to complete the pharmaceutical inventory purchase arrangements contemplated in the RSA and Plan.

b.     **DIP Lenders' Consents and Waivers.**  The DIP Lenders agreed to DIP and Wind-Down Budget modifications to ensure payment of Plan expenses and the DOJ and PBGC settlement amount. The DIP Lenders also agreed to support the Plan, to consent to Debtor releases of current and former directors, officers, and shareholders, and to waive any right to recover from Elixir Insurance Company ("EIC"), a non-Debtor Affiliate of the Debtors.

c.     **DOJ/EIC Resolution.**  Subject to, and conditioned upon, an amendment to that certain Settlement Agreement, dated July, 3, 2024, by and among the United States of America, acting through the DOJ and on behalf of the Office of Inspector General of the Department of Health and Human Services; EIC and Rite Aid Corporation, Elixir Rx Options, Elixir Rx Solutions, and Relator Glenn Rzeszutko (the "EIC Settlement"), the Debtors propose to pay the United States $2,000,000 in cash (the "DOJ Payment") on the Effective Date in satisfaction of the Debtors' outstanding obligations under the EIC Settlement. Upon the effectiveness of such amendment and receipt of the DOJ Payment, the United States will release

and be enjoined from asserting all such claims against the Debtors, Reorganized Debtors, and Wind-Down Debtors arising under or relating to the EIC Settlement, while expressly preserving all DOJ claims against EIC. In accordance with the EIC Settlement amendment, the Debtors, Reorganized Debtors, Wind Down Debtors, DIP Agent and DIP Lenders, and Holders of Existing Equity Interests will also irrevocably waive and release any rights to recover from EIC as described in the Proposed Confirmation Order. DOJ approval of this proposed settlement by December 5, 2025 is a condition to Plan effectiveness.

d.    **Relator Release**. As set forth in the Proposed Confirmation Order, the Relator will release any claims against the Debtors, Reorganized Debtors, and Wind-Down Debtors arising from or relating to the EIC Settlement, with such claims fully enjoined.

e.    **Shareholder Consents.** Holders of Existing Equity Interests agreed to support the restructuring steps and to waive any right to recover from EIC; in exchange, they will receive customary Debtor releases as reflected in the Plan.

f.    **Centerbridge Resolution.** Centerbridge agreed to withdraw all objections to the Plan and the Final Financing Order and to support Confirmation, with the Debtors reimbursing up to $150,000 of its reasonable, documented professional fees.

g.    **PBGC Termination Premium Settlement.** On the Effective Date, the Debtors or Reorganized Debtors will pay the PBGC $225,000 in cash in full and final satisfaction of PBGC's termination premium claim arising from the involuntary termination of the Rite Aid Pension Plan under 29 U.S.C. § 1306(a)(7). Upon payment, the PBGC's termination premium claim will be released and enjoined as to the Debtors, Reorganized Debtors, and Wind-Down Debtors, while PBGC's and the Pension Plan's claims, if any, against EIC are expressly preserved.[6]

**E.    Plan Solicitation**

15.    On September 22, 2025, the Court entered an order [Docket No. 2535] (the "Disclosure Statement Order"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) conditionally approving the Disclosure Statement; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting,

---

[6]    The PBGC's separate Administrative Expense Claims will be treated in accordance with the Administrative Claims Procedures and the Plan.

noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan, or, in the event the Debtors determine to seek dismissal of the chapter 11 cases, scheduling certain dates with respect thereto, including establishing September 26, 2025 as the deadline by which the Debtors would file and serve the Toggle Notice, and setting the date of the Combined Hearing for October 20, 2025. The Debtors subsequently adjourned the date of the Combined Hearing, and extended the deadline to file the Toggle Notice, pursuant to paragraphs 7 and 9 of the Disclosure Statement Order, respectively [Docket Nos. 2579, 2696].

16.     On November 11, 2025, the Debtors filed the *Revised Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting and Objection Deadlines* [Docket No. 3220] (the "Revised Combined Hearing Notice"). The Revised Combined Hearing Notice: (a) established November 19, 2025 at 4:00 p.m. (prevailing Eastern Time) as the deadline for Holders of Claims in the Voting Class to submit their Ballots; (b) established November 19, 2025 at 4:00 p.m. (prevailing Eastern Time) as the date by which to file objections to Confirmation of the Plan and final approval of the Disclosure Statement (the "Plan Objection Deadline"); and (c) scheduled the commencement of the Combined Hearing for November 24, 2025 at 10:00 a.m. (prevailing Eastern Time).

17.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims in the Impaired Class (Class 3 – Prepetition FILO Claims) are entitled to vote on the Plan.[7]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired (in which case they were presumed to accept the Plan) or if they are not receiving or retaining any property under the Plan (in which case they were conclusively deemed to reject the

---

[7]  *See* 11 U.S.C. § 1126.

Plan).  The following Classes of Claims and Interests were not entitled to vote on the Plan, and the

Debtors did not solicit votes from the Holders of such Claims and Interests:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

18.     The Debtors solicited votes on the Plan from Holders of Claims in Class 3, which

was entitled to vote to accept or reject the Plan (the "Voting Class").  The voting results, as

reflected in the Voting Report, filed by the Debtors contemporaneously herewith, are summarized

as follows:[8]

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 – Prepetition FILO Claims | 100% | 100% | 0% | 0% |

**F.     Plan Modifications.**

---
[8]     *See* Voting Report, Ex. A.

19.    A plan proponent may modify its plan at any time before confirmation if the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[9]  Once filed, "the plan as modified becomes the plan."[10]  Pursuant to Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[11]

20.    Here, the Plan and Disclosure Statement transmitted to Class 3 (the only voting class) were the solicitation versions filed at Docket Nos. 3215 and 3216, respectively, on November 11, 2025, to which no modifications have been subsequently made.

21.    For all other parties and non-voting classes, the Debtors previously served the "First Amended Plan" and "First Amended Disclosure Statement" filed at Docket Nos. 2517 and 2518, respectively.  The Debtors then served the Revised Notice of Combined Hearing on November 11, 2025 [Docket No. 3220] and caused a revised notice to be published in The New York Times on November 14, 2025 [Docket No. 3273] (the "Revised Publication Notice"), which advised stakeholders of the solicitation version of the Plan and how to access it.

22.    Only those modifications that are "material" require resolicitation.  Even assuming that standard applies in the context of plans and disclosure statements distributed to Holders of

---

[9]    11 U.S.C. § 1127(a).

[10]    *Id.*

[11]    *See In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class's distribution was not sufficiently material to require re-solicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co. Inc.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The [Bankruptcy] Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

Claims and Interests in the non-voting class, that standard is met here.  A plan modification is not material unless it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.[12]  Here, to clarify and address certain claimant concerns and to reflect changes resulting from negotiations between the key parties in interest, including in the Mediation, the Debtors filed the amended Plan and Disclosure Statement.[13]  The modifications were filed with the Court before the Plan Objection Deadline, all parties received notice of such modifications through the service of Revised Notice of Combined Hearing and publication of the Revised Publication Notice, and all parties in interest had an opportunity to object to such modifications.

## G.    The Objections.

23.    Formal Objections were filed by (a) the U.S. Trustee (such objection, the "U.S. Trustee Objection"),[14] (b) Element Fleet Corporation (such objection, the "Element Fleet Objection"),[15] (c) Chubb Companies (such objection, the "Chubb Objection"),[16] (d) Santiago Holdings II, LLC; Levin Management Corporation; MAG II Morrell Plaza, LP; Trusts Under the Will of Janice Levin; Robert Marin and Celeste de Schulthess Marin, Trustees of the Robert Marin and Celeste de Schulthess Marin Family Trust (SPW) UDT; Felos Associates, LLC; Joseph Murphy Corporation; Yoko C. Gates Trust; SADG-1 Limited Partnership; SADG-3 Limited Partnership; SADG-4 Limited Partnership; RAP Hamlin LP; RAP Dallas LP; Ald Capital PA; LLC Bethel Park Library, LLC; Red Lion Broadway, LLC; 569 Broadway Associates; Mt.

---

[12]    *See In re A.H. Robins Co. Inc.*, 88 B.R. at 750 ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Court concludes that the modifications do not require resolicitation of acceptances or rejections.").

[13]    *See* Docket No. 3215.

[14]    Docket No. 3266.

[15]    Docket No. 3263.

[16]    Docket No. 3265.

Lebanon Cooke, LP (such objection, the "Stark Landlords Objection"),[17] (e) The Commons at Calabasas, LLC; CLPF Harbour Pointe, LLC; GKGF, LLC; MGP XI Northgate, LLC; MGP XI-A Town Center Lake Forest, LLC; B10 Mountain A LA LP; B10 Mountain B LA LP; B10 Mountain A OC LP; B10 Mountain A OR LLC; B10 Mountain B OR LLC; B10 Mountain B SF LLC; B10 Mountain A WA LLC; B10 Mountain B WA LLC; BCORE Westwood Village LLC; NMP-C4 Fairfield S/C, LLC; ROIC Paramount Plaza, LLC; RI – Grass Valley, LLC; Rich/Cherry, LLC; J.W. Rich Investment Company; Montecito Market Place Associates; Surapaneni Fresno Properties, LLC; Zentmyer Properties II LLC (such objection, the "Allen Matkins Landlords Objection"),[18] (f) RAD Sub-Trust A and RAD Sub-Trust B (such objection, the "Sub-Trusts Objection"),[19] (g) Martin C. Gordon and the putative class of WARN Plaintiffs (such objection, the "WARN Claimants Objection"),[20] (h) 5931 Atlantic, LLC; AAT Del Monte LLC; Balden Towne Plaza Limited Partnership; Brixton Capital; CP/IPERS Woodfield, LLC; EDENS; Fairview Shopping Center, LLC; Gartin Properties LLC; HCP RRF Sand Canyon LLC; Huntingdon Pike Company; Lancaster Development Company, LLC; Manoa Shopping Center Associates, L.P.; Northern Trust Bank of CA, N.A. ; Prime/FRIT Bell Gardens, LLC; QCSI Six LLC; RAR 2 Queen Anne Eden Hill QRS, LLC; Realty Income Corporation; Redondo Prime 1, LLC; S & N II, Ltd.; SOGoodnoes Corner JV LLC; Spirit EK Vineland NJ, LLC; Spirit RA Plains PA, LLC; SVAP III Plaza Mexico, LLC; The Irvine Company LLC; Valley Mall, L.L.C.; and Weis Markets Inc. (such objection, the "Ballard Spahr Landlords Objection"),[21] (i) The Southern

---

[17]    Docket Nos.  3267 and 3269.

[18]    Docket No. 3271.

[19]    Docket No. 3270.

[20]    Docket No. 3275.

[21]    Docket No. 3272.

California UFCW Unions & Drug Employers Pension Fund and the Southern California Drug Benefit Fund (such objection, the "Pension Funds Objection"),[22] (j) Brixmor Property Group; East Park Development, LLC; First Washington Realty, LLC; Lerner Properties; NewMark Merrill Companies; NNN REIT, Inc.; and Regency Centers, L.P. (such objection, the "KDW Landlords Objection"),[23] (k) Gibraltar Management Co., Inc.; Inland Commercial Real Estate Services LLC; and The Widewaters Group, Inc. (such objection, the "BarclayDamon Landlords Objection"),[24] (l) CVS Pharmacy, Inc. (such objection, the "CVS Objection"),[25] Ebony Bates (such objection, the "Ebony Bates Objection"),[26] and NBPIV Delran LLC (such objection, the "Central Fill Landlord Objection").[27]

24.     To the extent the Debtors are unable to consensually resolve such Objections prior to the Combined Hearing, the Debtors request that the Court overrule such Objections. A detailed response to each of the outstanding Objections is set forth in Part V of this Memorandum, the Reply Chart, and, with respect to objections to the adequacy of the Disclosure Statement and the feasibility of the Plan, in Part II and Part III.K, hereof, respectively.

### Argument

25.     For the reasons set forth herein, the Debtors respectfully request that the Court overrule the remaining Objections and (a) approve the adequacy of the Disclosure Statement on a final basis and (b) confirm the Plan.

---

[22]    Docket No. 3268.

[23]    Docket No. 3277.

[24]    Docket No. 3284.

[25]    Docket No. 3289.

[26]    Docket No. 3297.

[27]    Docket No. 3294.

## II. The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with the Applicable Notice Requirements.

### A. The Disclosure Statement Contains Adequate Information.

26.     The purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision as to whether to vote to accept or reject the plan.[28]   "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[29]   Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[30]

---

[28]   S*ee, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (providing that a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan" (internal quotations omitted)); *Century Glove, Inc.* v. *First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petrol., Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan.").

[29]   11 U.S.C. § 1125(a)(1) ("'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *see also Oneida Motor Freight, Inc.* v. *United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("the information required will necessarily be governed by the circumstances of the case").

[30]   *See, e.g.*, *Lisanti* v. *Lisanti (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case."); *Kirk* v. *Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a): 'Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case.'" (quoting H.R. Rep. No. 595, at 408–09 (1977))); *see also In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *In re Phoenix Petroleum Co.*, 278 B.R. at 393 (same).

27.     Courts look for certain information when evaluating the adequacy of the disclosures

in a proposed disclosure statement, including:

    a.    the events which led to the filing of a bankruptcy petition;

    b.    the relationship of a debtor with its affiliates;

    c.    a description of the available assets and their value;

    d.    the anticipated future of the company;

    e.    the source of information stated in the disclosure statement;

    f.    the present condition of a debtor while in chapter 11;

    g.    the claims asserted against a debtor;

    h.    the estimated return to creditors under a chapter 7 liquidation;

    i.    the future management of a debtor;

    j.    the chapter 11 plan or a summary thereof;

    k.    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;

    l.    the information relevant to the risks posed to claimants under the plan;

    m.    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

    n.    the litigation likely to arise in a nonbankruptcy context; and

    o.    the tax attributes of a debtor.[31]

28.     The Disclosure Statement contains adequate information.    The Disclosure

Statement contains descriptions and summaries of, among other things: (a) the Debtors' business

---

[31]     *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp.* v. *MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics "is not necessary in every case." *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phoenix. Petroleum,* 278 B.R. at 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

operations and capital structure;[32] (b) certain events preceding the commencement of these chapter 11 cases;[33] (c) key events in these chapter 11 cases;[34] (d) the Debtors' sale and reorganization efforts;[35] (e) an overview of the Plan;[36] (f) the classification, treatment and projected recoveries of Claims and Interests;[37] (g) a description of the Debtor Release, the Third-Party Release and related opt-out, and exculpation provisions in the Plan;[38] (h) risk factors affecting the Plan;[39] (i) the Liquidation Analysis, which sets forth the estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation;[40] and (j) federal tax law consequences of the Plan.[41]

29.    The Allen Matkins Landlords object that the Disclosure Statement does not provide "adequate information" because it did not include the final Wind-Down Budget and because, in their view, it does not sufficiently explain "what went wrong" in these Chapter 11 Cases and why general unsecured and certain administrative claims receive the treatment provided under the Plan.[42]   Section 1125 of the Bankruptcy Code, however, focuses on whether parties receive information "of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor" to make an informed judgment about the Plan.[43]  Consistent with

---

[32]   *See* Disclosure Statement Art. III.

[33]   *See* Disclosure Statement Art. IV.

[34]   *See* Disclosure Statement Art. V.

[35]   *See* Disclosure Statement Art. V.

[36]   *See* Disclosure Statement Art. VI.

[37]   *See* Disclosure Statement Art. VI.

[38]   *See* Disclosure Statement Art. VI.

[39]   *See* Disclosure Statement Art. VII.

[40]   *See* Disclosure Statement Art. X.

[41]   *See* Disclosure Statement Art. XII.

[42]   Allen Matkins Landlords Objection ¶¶ 5–10; *see also* Barclay Damon Landlords Objection, ¶ 8.

[43]   11 U.S.C. § 1125(a)(1).

that standard, and as reflected in the Court's conditional approval of the Disclosure Statement in the Disclosure Statement Order,[44] as described above, the Disclosure Statement describes the Debtors' prepetition capital structure, the events leading to these Chapter 11 Cases, and the Debtors' postpetition operations and wind-down, including the court-approved marketing and sale processes for substantially all of the retail pharmacy and non-pharmacy assets and related going-out-of-business and real-estate monetization efforts.    It then summarizes the Plan's classification and treatment of each class of Claims and Interests, projected recoveries, and the Administrative Claims Procedures, and attaches and explains a liquidation analysis that compares estimated recoveries under the Plan to those in a hypothetical chapter 7 case and shows that creditors, including Holders of Administrative Claims, are not worse off in chapter 11.[45]

30.    The Disclosure Statement also discloses the funding of the Wind-Down Reserve and the Administrative / Priority Claims Reserve through the Wind-Down Budget as a condition to effectiveness, and explains that post-effective-date payments of Administrative and Priority Claims will be made from those reserves in accordance with the Plan.[46]  While the Allen Matkins Landlords seek additional narrative commentary about why these cases did not yield recoveries for general unsecured creditors, section 1125 does not require an exhaustive, fault-finding account or claim-by-claim analysis for each non-voting creditor.  It requires adequate, case-appropriate information for a reasonable investor in the relevant class to assess the Plan.  In light of the conditional approval already granted, and the detailed description of the Debtors' operations and sales, the Plan's treatment of all classes, and the comparative chapter 7 analysis, that standard is satisfied and the adequacy objection should be overruled.

---

[44]    *See* Docket No. 2535.

[45]    Disclosure Statement Arts.  III–VI, X.

[46]    Disclosure Statement Arts.  V, VIII, X.

31.     As discussed above, section 1125(a) requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  Given the existence of a single voting class, comprised of sophisticated and represented constituencies who have been critically involved in the development of the Plan, and in recognition of the extensive information set forth in the Disclosure Statement, the Disclosure Statement satisfies section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

**B.     The Debtors Complied with the Applicable Notice and Solicitation Requirements.**

32.     In addition to conditionally approving the adequacy of the Disclosure Statement, the Disclosure Statement Order: (a) approved on a final basis the Solicitation and Voting Procedures; (b) approved the forms of the Combined Hearing Notice, the Non-Voting Status Notices, and the Publication Notice and authorized their service and publication; (c) approved the contents and distribution of the Solicitation Packages; and (d) certain dates and deadlines with respect to the Plan and Disclosure Statement. These dates and deadlines were subsequently rescheduled as set forth in the Revised Notice of Combined Hearing.  The Debtors complied with the procedures and timeline approved by the Conditional Disclosure Statement Order and as set forth in the Revised Notice of Combined Hearing and provided adequate notice of the Confirmation Hearing, including by serving the Revised Notice of Combined Hearing on all Holders of Claims and Interests, and publishing the same in the New York Times on November 14, 2025.

**C.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

33.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions

of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[47]

34.     As demonstrated by the Debtors' compliance with the Disclosure Statement Order, the Debtors at all times took appropriate actions in connection with the solicitation of the Plan in good faith and in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

35.     For the foregoing reasons, the Court should enter an order approving the Disclosure Statement on a final basis.

## III.     The Plan Satisfies Each Requirement for Confirmation.

36.     To confirm the Plan, the Court must find that the Debtors have satisfied the requirements of section 1129 of the Bankruptcy Code.[48]  Objections were raised only to the Plan's compliance with sections 1125, 1129(a)(1), 1129(a)(2), 1129(a)(5), 1129(a)(9), and 1129(a)(11) of the Bankruptcy Code.  As described herein, the Plan complies with all requirements of those provisions, as well as all other relevant provisions of the Bankruptcy Code and all other applicable law, and the Objections should be overruled.

### A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

---

[47]    11 U.S.C. § 1125(e).

[48]    *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 'plan has a reasonable probability of success,' and is more than a 'visionary scheme [].'") (citing *Wiersma* v. *Bank of the West (In re Wiersma)*, 227 F. App'x 603, 606 (9th Cir. 2007)).

37.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of the [Bankruptcy Code]."[49]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[50]  As explained below, the Plan, as modified to address certain Objections relating to the Exculpation, Injunction, and discharge provisions,[51] complies with the requirements of sections 1122 and 1123 in all respects, and such remaining Objections, including with respect to the Debtor Release and Third-Party Release, should be overruled.

1.    **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

38.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[52]

39.    Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational

---

[49]    11 U.S.C. § 1129(a)(1).

[50]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must 'compl[y] with the applicable provisions of this title,' requires that a plan comply with 11 U.S.C. §§ 1122 and 1123.").

[51]    *See* generally U.S. Trustee Obj.; Pension Funds Obj. ¶¶ 21–22.

[52]    11 U.S.C. § 1122(a).

basis to do so.[53]  Moreover, the requirement of substantial similarity does not mean that claims or

interests within a particular class must be identical or that all similarly situated claims must receive

the same treatment under a plan.[54]

40.    The Plan's classification of Claims and Interests satisfies the requirements of

section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into eight

separate Classes, with Claims and Interests in each Class differing from the Claims and Interests

in each other Class in a legal or factual way or based on other relevant criteria.[55]  Specifically, the

Plan provides for the separate classification of Claims and Interests into the following Classes:

| | |
|---|---|
| <u>Class 1</u> | Other Secured Claims |
| <u>Class 2</u> | Other Priority Claims |

---

[53]    *See, e.g.*, *In re Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code
requires that claims be substantially similar within a particular class, there is no requirement within Section 1122
or elsewhere in the Code that all substantially similar claims be included within a particular class."). Courts have
identified grounds justifying separate classification, including: (a) where members of a class possess different
legal rights, and (b) where there are good business reasons for separate classification. *See John Hancock Mut.
Life Ins. Co.* v. *Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir.
1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to
merit separate voice in the decision whether the proposed reorganization should proceed," the classification is
proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of
claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also
Frito-Lay, Inc.* v. *LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate
classification appropriate because classification scheme had a rational basis related to the bankruptcy court-
approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that
"the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative
vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993)
(holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable
discretion to classify claims and interests according to the facts and circumstances of the case") (internal
quotations and citation omitted), *aff'd*, No. 93 CIV. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993); *In re
Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the
Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar
classes be grouped together.").

[54]    *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("Separate classification
of similar claims has been found to be permissible where the classification is offered in good faith, does not foster
an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway
Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one
rule regarding classification of separate classification of similar classes under section 1122, which is that "thou
shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[55]    *See* Plan Art. III.

| | |
|---|---|
| <u>Class 3</u> | Prepetition FILO Claims |
| <u>Class 4</u> | General Unsecured Claims |
| <u>Class 5</u> | Intercompany Claims |
| <u>Class 6</u> | Intercompany Interests |
| <u>Class 7</u> | Existing Equity Interests |
| <u>Class 8</u> | Section 510(b) Claims |

41.     Here, each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class.  The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.  Other aspects of the classification scheme are related to the different legal or factual circumstances of the Claims or Interests within each Class.  Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the distinctions among Classes are based on valid business, factual, and legal distinctions.  The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

**2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

42.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[56]  The Plan satisfies each of these requirements.[57]

i.     <u>Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).</u>

---

[56]    11 U.S.C. § 1123(a)(1)–(7).

[57]    *See* 11 U.S.C. § 1123(a) (1)–(8). Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

43.     For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[58]

ii.     Specification of Unimpaired Classes (§ 1123(a)(2)).

44.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[59]

iii.     Treatment of Impaired Classes (§ 1123(a)(3)).

45.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[60]

iv.     Equal Treatment within Classes (§ 1123(a)(4)).

46.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[61] The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[62]

v.     Means for Implementation (§ 1123(a)(5)).

---

[58]     *See* Liebman Decl. ¶¶ 14–15.

[59]     *See* Plan Art. III; Liebman Decl. ¶ 16.

[60]     *See id.*

[61]     11 U.S.C. § 1123(a)(4).

[62]     *See* Liebman Decl. ¶ 17.

47.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[63]   The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.[64]   Among other things, the Plan provides for:

- the global compromise and settlement of Claims and Interests as embodied in the Plan, including the McKesson-related settlements and the coordinated resolution of disputes;[65]

- the McKesson Equity Distribution and related governance of the Reorganized Debtors, including appointment of the New Board and adoption of New Governance Documents on the Effective Date;[66]

- the establishment of the Liquidating Trust and the Wind-Down Debtors and the vesting of Distributable Assets and reserve funding necessary to implement the wind-down, make distributions, and administer the Wind-Down Debtors post-Effective Date;[67]

- the release of liens to implement the Plan distributions;[68]

- the cancellation of existing securities and agreements as set forth in the Plan;[69]

- the authorization of all corporate actions and Restructuring Transactions necessary to implement the Plan and the related Restructuring Steps Memorandum, including the execution and delivery of all Definitive Documents and effectuating instruments;[70]

- the McKesson sale transactions and related operational steps (including inventory sales and transitional actions) required to consummate the Plan;[71]

- the creation of the Rite Aid Plan Sponsor Entity to serve as sponsor of the Rite Aid 401(k) Plan;[72]

---

[63]   11 U.S.C. § 1123(a)(5).

[64]   *See* Liebman Decl. ¶ 18.

[65]   *See* Plan Art. IV.A.

[66]   *See id.* Arts. IV.B, IV.H.

[67]   *See id.* Arts. IV.C.

[68]   *See id.* Arts. IV.D.

[69]   *See id.* Arts. IV.E.

[70]   *See id.* Arts. IV.F, IV.I.

[71]   *See id.* Art. IV.G.

[72]   *See id*. Art. V.G.

- the preservation of the Debtors' Causes of Action to the extent retained;[73] and

- the vesting of property in the Reorganized Debtors and Wind-Down Debtors free and clear of Liens, Claims, and encumbrances, as applicable, consistent with the Plan. [74]

48.     The terms governing the execution of these transactions are set forth in greater detail in the Plan and the Plan Supplement, as applicable.    Thus, the Plan satisfies section 1123(a)(5).

### vi.     Issuance of Non-Voting Securities (§ 1123(a)(6)).

49.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[75]    The New Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.[76]    Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no parties have asserted otherwise.

### vii.     Directors and Officers (§ 1123(a)(7)).

50.     Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[77]    The Plan satisfies this requirement by providing for the appointment of the New Board on the Effective Date in accordance with the terms of the New Governance Documents.[78]    The members and officers of

---

[73]     *See id*. Art. IV.L.

[74]     *See id*. Arts. IV.B, IV.C.

[75]     11 U.S.C. § 1123(a)(6).

[76]     *See* Plan Art. IV.M.

[77]     11 U.S.C. § 1123(a)(7).

[78]     *See* Plan Art. IV.B.1.

the New Board will be selected by McKesson and set forth in the Plan Supplement prior to the Plan Effective Date. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code. No party has asserted otherwise.

**B.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

51.     The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[79]  The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[80]  As discussed in more detail in Part III herein, and as set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.[81]  Further, as explained herein, the Allen Matkins Landlords' objection that the Plan does not comply with section 1129(a)(2) because it contains impermissible exculpation and third-party release provisions should be overruled.[82]

**1.     The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.**

---

[79]     *See In re TCI 2 Holdings, LLC*, 428 B.R. at 170 ("Section 1129(a)(2) requires that '[t]he proponent of the plan compl[y] with the applicable provisions of this title.'") (citing 11 U.S.C. § 1129(a)(2)); *In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir. 2000) ("§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125").

[80]     *See In re TCI 2 Holdings*, 428 B.R at 170; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936; S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (collectively, the legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions").

[81]     *See* Voting Report ¶¶ 4–7.

[82]     Allen Matkins Landlords Obj. ¶ 17.

52.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[83] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[84]

53.     As described in Section II.A herein and below, section 1125 is satisfied here. Before the Debtors solicited votes on the Plan, the Court conditionally approved the Disclosure Statement.[85]  The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting on the Plan and objecting to the Plan and the Disclosure Statement,[86] which were subsequently rescheduled as set forth in the Revised Combined Hearing Notice.    Additionally, following entry of the Disclosure Statement Order and prior to commencement of solicitation, the Debtors filed revised versions of the Plan and Disclosure Statement.   Redlines comparing the revised Plan and Disclosure Statement to the prior versions were filed at Docket No. 3217, so parties could readily review each change.  As detailed above, these updates do not adversely affect the treatment of any holder or class and do not reduce any distribution.

---

[83]   11 U.S.C. § 1125(b).

[84]   *See In re Union Cnty. Wholesale Tobacco & Candy Co., Inc.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (holding that the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

[85]   *See* Disclosure Statement Order.

[86]   *See generally* Disclosure Statement Order.

54.     As stated in the Voting Report, the Debtors, through the Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, satisfying sections 1125(a) and 1125(b) of the Bankruptcy Code.[87]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class, and that different disclosure statements may be provided as between classes.  Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.     The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.

55.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[88]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims), which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[89]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 4 (General Unsecured Claims), Class 7 (Existing Equity Interests), and Class 8 (Section 510(b) Claims), which are Impaired and receiving no recovery under the Plan (collectively, the "Deemed Rejecting Classes").[90]  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.  Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code,

---

[87]   *See* Voting Report ¶¶ 4–7 ; *see also Affidavit of Service* [Docket No. 3164] and *Supplemental Affidavit of Service* [Docket No. 3290] (collectively, the "*Affidavits of Service*").

[88]   *See* 11 U.S.C. § 1126.

[89]   *See* Plan, Art. III.B.

[90]   *See id.*

as applicable, Holders of Claims in Classes 7 and 8 are deemed to have accepted the Plan or rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.

56.    Accordingly, the Debtors solicited votes only from Holders of Allowed Claims in the Voting Class—Class 3—because this Class is Impaired and entitled to receive a distribution under the Plan.[91]  With respect to the Voting Class of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[92]

57.    The Voting Report, summarized above, demonstrates that the Plan has been accepted by the Voting Class in accordance with section 1126 of the Bankruptcy Code.[93]  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2).

### C.    The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

58.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[94]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement

---

[91]    *See id.; see generally* Affidavits of Service.

[92]    11 U.S.C. § 1126(c).

[93]    *See generally* Voting Report, Ex. A.

[94]    11 U.S.C. § 1129(a)(3); *see also In re Diocese of Camden, New Jersey*, 653 B.R. 309, 350 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *In re TCI 2 Holdings*, 428 B.R. at 142.

of section 1129(a)(3) of the Bankruptcy Code is satisfied.[95]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the Plan.[96]

59.     Here, the Debtors have proposed the Plan with the goal of maximizing value, providing recoveries to creditors, and maximizing the value of the Debtors' estates.  The Plan represents the culmination of collaborative efforts between the Debtors, their stakeholders, and their respective advisors.  Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law as required by section 1129(a)(3) of the Bankruptcy Code.

### D.     The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Bankruptcy Court Approval (Section 1129(a)(4)).

60.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[97]  Courts in this district and elsewhere have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[98]

61.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[99]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these

---

[95]     See, e.g., In re PWS Holding Corp., 228 F.3d at 242 (quoting In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986)); In re Century Glove, Inc., No. Civ. A. 90-400 (SLR), 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); In re NII Holdings, Inc., 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[96]     See, e.g., Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997); In re W.R. Grace & Co., 475 B.R. 34, 87 (D. Del. 2012), aff'd, 729 F.3d 311 (3d Cir. 2013); In re Century Glove, 1993 WL 239489, at *4.

[97]     11 U.S.C. § 1129(a)(4).

[98]     In re Lisanti Foods, Inc., 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), aff'd, 241 F. App'x 1 (3d Cir. 2007); In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[99]     See Liebman Decl. ¶¶ 30–31.

chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[100]  Article II.C.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[101]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

> **E.    The Debtors Will Satisfy Disclosure Obligations Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

62.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[102]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[103]

63.    The Debtors will disclose the identities of each individual proposed to serve as a director or officer of the New Board in the Plan Supplement prior to the Effective Date.  In addition, in response to the U.S. Trustee Objection,[104] the Debtors will also disclose the identity of the Liquidating Trustee prior to Confirmation.  Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied.

> **F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

---

[100]   *See* Plan, Art. II.

[101]   *See* Plan, Art. II.C.1.

[102]   11 U.S.C. § 1129(a)(5)(A)(i).

[103]   11 U.S.C. § 1129(a)(5)(A)(ii).

[104]   U.S. Trustee Obj. ¶¶ 132– 35.

64.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation.[105]  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

**G.     The Plan is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

65.     The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than that which such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[106]  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[107]

66.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of Alvarez & Marsal, LLP, the Debtors' financial advisor, prepared a liquidation analysis, attached to the Disclosure Statement as Exhibit D (the "Liquidation Analysis"), which is discussed further in the Liebman Declaration.[108]  The Liquidation Analysis

---

[105]   *See* Liebman Decl. ¶ 34.

[106]   11 U.S.C. § 1129(a)(7).

[107]   *See Bank of Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[108]   *See* Liebman Decl. ¶¶ 36–39.

compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[109]  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.[110]

67.     Based on the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.[111]  Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.      The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

68.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[112]  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[113]

69.     The Voting Class (Class 3) voted to accept the Plan.  With respect to the Classes deemed to reject the Plan, the Debtors satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to the deemed rejecting Classes.

---

[109]   *See id.*

[110]   *See id .*

[111]   *See id.*

[112]   11 U.S.C. § 1129(a)(8).

[113]   11 U.S.C. § 1129(b).

I.    **The Plan Provides for Payment in Full of All Allowed Priority Claims Except as Otherwise Agreed By the Claimholder (§ 1129(a)(9)).**

70.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[114]    In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[115]    Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim in a class comprised of claims of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[116]    Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[117]

71.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

72.    ***First***, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code.  Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim,

---

[114]    11 U.S.C. § 1129(a)(9).

[115]    11 U.S.C. § 1129(a)(9)(A).

[116]    11 U.S.C. § 1129(a)(9)(B)

[117]    11 U.S.C. § 1129(a)(9)(C)

on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed Administrative Claim will receive Cash equal to the Allowed amount of such Claim, in accordance with Article II.A and Article VIII.D of the Plan. Pursuant to the Administrative Claims Procedures, certain holders of Administrative Claims (*i.e.*, holders of Settled Priority Claims) have consented to receiving, in full and final satisfaction of their Administrative Claims, Cash distributions from the Administrative Claims Distribution Pool in less than the full face amount of such claims. Because these holders of Settled Priority Claims consented to this treatment, these reduced payments in full and final satisfaction of Settled Priority Claims satisfy section 1129(a)(9) of the Bankruptcy Code, which contemplates that any holder of a particular claim which may otherwise be entitled to priority treatment may agree to treatment other than as would be required under section 1129(a)(9) as a default. All Administrative Claims which become Allowed after the Effective Date will be paid from the Administrative / Priority Claims Reserve in accordance with the Plan, and the McKesson 503(b)(9) Claims and Professional Fee Claims are addressed separately as set forth in the Plan.

73.    Holders of "Stub Rent Claims" (as defined in paragraph 49(a) of the Final Financing Order), by consenting to entry of the Final Financing Order, have agreed that no Stub Rent Claim shall be an Allowed Claim if payment on account of such claim would, when taken together with all payments made by the Debtors on account of Stub Rent Claims in these Chapter 11 Cases (the "Prior Stub Rent Payments"), cause the sum of any payment on account of such claim and all Prior Stub Rent Payments to exceed the $23,388,878 cap for Stub Rent Claims set forth in paragraph 49(a) of the Final Financing Order (the "Stub Rent Claims Cap"). Thus, any right to demand payment of any Stub Rent Claims which, if paid, would result in payments on account of Stub Rent Claims in excess of the Stub Rent Claims Cap was fully, finally, and forever

waived upon entry of the Final Financing Order, and no Stub Rent Claim shall be Allowed if the

Allowance and payment thereof would result in any such excess payment.   Accordingly, the

Debtors shall make no payment on account of any Stub Rent Claim that is not an Allowed Claim

by application of the Final Financing Order as set forth above.

74.    **Second**, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code.  Except

to the extent that the Holder of an Allowed Other Priority Claim has agreed to a different treatment,

each Holder of an Allowed Other Priority Claim shall be Unimpaired under the Plan and shall

receive, to the extent Allowed on the Effective Date, Cash in an amount equal to such Holder's

Allowed Claim on the Effective Date or as soon as reasonably practicable thereafter, except to the

extent such Claims have been paid or satisfied in the ordinary course prior to the Effective Date.

Payment of any Other Priority Claims which become Allowed after the Effective Date shall be

made from the Administrative / Priority Claims Reserve.  To the extent any holder of an Other

Priority Claim has consented to settlement of its claim pursuant to the Administrative Claims

Procedures, such Holder will receive the agreed Cash distributions from the Administrative Claims

Distribution Pool in full and final satisfaction of such settled Claims.

75.    **Third**, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy

Code because it provides that except to the extent a Holder of an Allowed Priority Tax Claim

agrees to a less favorable treatment, each Holder of such Allowed Priority Tax Claim will be

treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code,

and paid (a) on the Effective Date or (b) from the Administrative / Priority Claims Reserve

thereafter.  To the extent any holder of a Priority Tax Claim has consented to settlement of its

claim pursuant to the Administrative Claims Procedures, such Holder will receive the agreed Cash

38

distributions from the Administrative Claims Distribution Pool in full and final satisfaction of such

settled Claims.

76.     Certain Objectors assert that the Plan violates section 1129(a)(9) of the Bankruptcy

Code by failing to demonstrate that all Administrative Claims will be paid in full.[118]  This conflates

the feasibility inquiry under section 1129(a)(11), described below, with the mechanical question

of whether, by its terms, the Plan treats the Claims described in section 1129(a)(9) as required.  As

explained above, the Plan does so, and therefore complies with each of the requirements of section

1129(a)(9) of the Bankruptcy Code.

**J.      At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)).**

77.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an

impaired class of claims, at least one impaired class of claims must accept the plan, "without

including any acceptance of the plan by any insider," as an alternative to the requirement under

section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept

the plan or be unimpaired under the plan.[119]

78.     As set forth above, Holders of Claims in the Voting Class—which is an impaired

Class under the Plan—overwhelmingly voted to accept the Plan independent of any insiders'

votes.[120]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section

1129(a)(10) of the Bankruptcy Code with respect to all of the Debtors, and no party has asserted

otherwise.[121]

---

[118]  *See, e.g.*, KDW Landlords Obj. ¶¶ 9–13; BarclayDamon Landlords Obj. ¶ 8.

[119]  11 U.S.C. § 1129(a)(10).

[120]  *See* Voting Report, <u>Ex. A</u>.

[121]  *See, e.g.*, *In re Transwest Resort Props., Inc.*, 881 F.3d 724 (9th Cir. 2018) (applying section 1129(a)(10) on a per-plan basis in jointly administered cases); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (same).

### K.   The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).

79.      Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.   The debtor bears the burden of demonstrating the feasibility of the plan by a preponderance of the evidence.[122]   This threshold is not generally viewed as rigorous.[123]   A finding that a plan is feasible does not require a guarantee of success.[124]   Instead, the Court must find that the plan offers a reasonable expectation of success.[125]

80.      With respect to a reorganized business, in determining whether a plan is feasible, courts have identified the following probative factors:

- the adequacy of the reorganized business's capital structure;

- the earning power of the business;

- the economic conditions;

---

[122]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal citations omitted); *Berkley Fed. Bank & Trust* v. *Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[123]   *See In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) ("The Code does not require the debtor to prove that success is inevitable. . . [A] relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility.") (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002); *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998)); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) ("[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous.").

[124]   *Crestar Bank* v. *Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994) (noting that the "plan [must] present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success").

[125]   *See In re G–I Holdings Inc.,* 420 B.R. 216, 267 (D.N.J. 2009) ("[The] key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed.").

- the ability of management;

- the probability of the continuation of the same management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[126]

81.    Here, the Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code with respect to the Reorganized Debtors.  The Reorganized Debtors will be a wholly-owned subsidiary of McKesson, a well-capitalized publicly traded company involved in pharmaceutical distribution, health information technology, and medical supplies.  No one has disputed that, under McKesson's ownership, the Reorganized Debtors are unlikely to be liquidated or require further financial reorganization.

82.    With respect to the Wind-Down Debtors, the Plan is likewise feasible, because the Wind-Down Debtors will be able to make the payments provided for by the Plan and the Wind-Down Budget, including to holders of Administrative Claims, and the Wind-Down Budget has reasonably estimated the cash available to the Liquidating Trust (both as of the Effective Date and account of future receipts received in connection with the liquidation of assets through the Wind-Down) relative to the obligations of the Liquidating Trust, including obligations to make the payments provided for under the Plan.[127]

83.    With respect to the portion of the Debtors' business being wound down under the Plan, the Debtors are required to show only that it is reasonably likely those entities will be able to perform their obligations (most saliently, obligations with respect to the payment of claims)

---

[126]    *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

[127]    *See In re Two Sts., Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (stating that, when considering if a liquidating plan is feasible, "[t]he focus of the analysis is whether the liquidation itself, as proposed in the plan, is feasible").

under the Plan.[128]  Many Objections assert that the Plan is not feasible because the Debtors have

not demonstrated that they will be able to pay all Allowed Administrative Claims in full, including

certain Claims asserted by the objectors.[129]  These Objections should be overruled.

84.    As described in the Liebman Declaration, the Debtors estimate that the

post-Effective Date expenses of the Wind-Down Debtors are as follows:  (a) $10.4 million for the

Administrative / Priority Claims Reserve, to be funded from available funds on or before the

Effective Date, which amount takes into account "cushion" or redundancy on a risk-adjusted basis

to ensure sufficient funding under any reasonably adverse scenario; and (b) for the Wind-Down

Reserve, $4.3 million from available funds on or before the Effective Date.  Additional amounts

to be funded from the remaining cash or, if necessary, the collection of the Specified Receipts after

the Effective Date, in each case, are available to ensure timely payment in full of ongoing expenses

necessary to complete an orderly Wind-Down in accordance with the Plan.[130]  Furthermore,

consistent with the Plan, on the Effective Date the Debtors will also establish and fund a

Professional Fee Escrow Account in the Professional Fee Escrow Amount.[131]

85.    With respect to administrative or other priority claims not subject to the

Administrative Claims Procedures, the Plan provides for the payment of Administrative Claims

and Claims in Classes 1 and 2 which are Allowed as of the Effective Date on the Effective Date

---

[128]    *See In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) ("The Code does not require the debtor to prove that success is inevitable. . . [A] relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility.") (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002); *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998)); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) ("[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous.").

[129]    *See, e.g.*, Stark Landlords Obj. ¶¶ 13–15; WARN Claimants' Obj. ¶¶ 3–10; Ballard Spahr Landlords Obj. ¶¶ 10–13; Pension Funds Obj. ¶¶ 12–20; KDW Landlords Obj. ¶¶ 9–13; BarclayDamon Landlords Obj. ¶ 8.

[130]    Liebman Decl. ¶ 54.

[131]    *Id.*

or as soon as reasonably practicable thereafter, and the Debtors have provided for payment in full

of these Claims under the Approved Budget.  For such Claims which become Allowed after the

Effective Date, the amounts funded into the Administrative / Priority Claims Reserve on the

Effective Date are, per the Liebman Declaration, are expected by the Debtors to be sufficient to

provide for payment of such Claims in full, as required under the Plan.  Further, because the pre-

funded amounts and expected Specified Receipts—which, when taken together with all other

projected receipts, are estimated to be $209.9 million—meaningfully exceed the Wind-Down

Debtors' expected liability from and after the Effective Date, the feasibility requirement has been

met.[132]

86.     Feasibility is measured by reasonable assurance, not perfection.  The Debtors

believe that the receipts on which the Debtors' projections rely are likely to be realized, and the

Debtors have facilitated this collection through (a) the negotiation and finalization of the

Liquidating Trust Agreement and terms of retention of the Liquidating Trustee, (b) the funding of

the Wind-Down Reserve to ensure that the Liquidating Trustee is adequately capitalized to

administer the Wind-Down, and (c) the retention, under the Plan, of valuable causes of action for

the benefit of the beneficiaries of the Liquidating Trust.[133]  Courts routinely confirm chapter 11

plans that incorporate comprehensive settlement structures for administrative and priority claims,

particularly where, as here, the plan proponent provides for funding mechanisms to satisfy

statutory priority requirements.[134]

---

[132]   Liebman Decl. ¶ 57.

[133]   Liebman Decl. ¶ 56.

[134]   *See, e.g.*, *In re Steward Health Care Sys. LLC*, Case No. 24-90213 (Bankr. S.D. Tex. Jul. 25, 2025); *In re Sears Holdings Corp.*, Case No. 18-23538 (Bankr. D.N.J. Oct. 15, 2019); *In re Toys "R" Us, Inc.*, Case No. 17-34665 (Bankr. E.D. Va. Nov. 21, 2018); *In re Pier 1 Imports, Inc.*, Case No. 20-30805 (Bankr. E.D. Va. Jul. 30, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (Bankr. S.D.N.Y. Feb. 2, 2020); *In re Gemstone Solutions Group, Inc.*, Case No. 19-30258 (Bankr. E.D. Va. Jun. 5, 2020).

87.     Based on this record and the Liebman Declaration, no further financial reorganization or liquidation (other than the Wind-Down proposed under the Plan) is likely to follow Confirmation, and the Plan's implementation mechanics provide a reasonable assurance of success.  Thus, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code with respect to the Wind-Down Debtors and the Reorganized Debtors.

**L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

88.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[135]

89.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XIV.C of the Plan provides that all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Liquidating Trust shall pay any and all Statutory Fees when due and payable, and such fees shall be paid solely from the Wind-Down Reserve (and, to the extent amounts in the Wind-Down Reserve are insufficient to pay any such Statutory Fees, the Distributable Assets).  The Wind-Down Debtors shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee with respect to each Chapter 11 Case until such Chapter 11 Case has been closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

---

[135]   11 U.S.C. § 507(a)(2).

90.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.      The Plan Provides for Post-Effective Date Payment, or Other Satisfaction of, Required Retiree Benefits (Section 1129(a)(13)).**

91.     Section 1129(a)(13) requires that all retiree benefits continue post-effective date at any levels established in accordance with section 1114 of the Bankruptcy Code.[136]  Article V.G of the Plan provides that as of the Effective Date, all retiree benefits, if any, shall continue to be paid in accordance with applicable law.

92.     Other than the Retiree Plans, as of the Effective Date, the Debtors do not sponsor and are not obligated to administer or provide any retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).  With respect to the Retiree Plans, as explained further in the Liebman Declaration, the Debtors have, or will have as of the Effective Date, either (i) arranged a consensual buyout of the Debtors obligation under the Retiree Plans, or (ii) made provision for the administration and payment in full of all obligations in connection with the Retiree Plans, in each case to the extent required by section 1129(a)(13) of the Bankruptcy Code, including pursuant to one or more agreements with non-Debtor parties to administer the plans.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.

**N.      Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

---

[136]  11 U.S.C. § 1129(a)(13). Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as: "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a).

93.    Several of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[137]   Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined in the Bankruptcy Code.[138]   Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[139]

**O.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

94.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[140]

95.    As noted above, the Impaired Class of Claims entitled to vote on the Plan voted in favor of the Plan.  Claims and Interests in Class 4 (General Unsecured Claims), Class 7 (Existing Equity Interests), and Class 8 (Section 510(b) Claims) are Impaired under the Plan, and the Holders of such Claims and Interests have been deemed to reject the Plan.  Claims and Interests in

---

[137]   11 U.S.C. § 1129(a)(14).

[138]   11 U.S.C. § 1129(a)(15).

[139]   11 U.S.C. § 1129(a)(16).

[140]   *In re Route 37 Bus. Park Assoc.*, 987 F.2d at 157 n.5; *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (holding that a plan must be "'fair and equitable'" and may not "unfair[ly] discriminat[e] [under the] requirements of section 1129(b)").

Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) may be Impaired under the Plan and deemed to reject the Plan. The Debtors respectfully submit that the Plan may nonetheless be confirmed over the rejection by such Classes pursuant to section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with respect to all non-accepting Impaired Classes.

### 1. The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

96.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[141]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[142]

97.     The Plan satisfies section 1129(b) of the Bankruptcy Code. There are no Claims or Interests in the Debtors that are junior to Class 3 (Prepetition FILO Claims) that are receiving any recovery under the Plan. Accordingly, the Plan satisfies the absolute priority rule with respect to all Classes.

### 2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).

98.     Unlike the concept of "fair and equitable," which is defined under the Bankruptcy Code, the Bankruptcy Code does not provide a standard for determining when "unfair

---

[141]    *Bank of Am. Nat. Trust & Sav. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[142]    11 U.S.C. § 1129(b)(2)(B)(ii).

discrimination" exists.  Courts typically examine the facts and circumstances of the particular case to make the determination.[143]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[144]  A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[145]

99.    Here, the Plan's treatment of the non-accepting Impaired Classes (*i.e.*, the Deemed Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale, and no party has asserted otherwise.  Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and may be confirmed irrespective of any rejection by Impaired Classes.

**P.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

100.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.

***First***, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan.  ***Second***, the purpose of the Plan is not to

---

[143]  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 157 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs.*, 621 B.R. at 375-77 (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied).

[144]  *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment") (internal quotations and citations omitted).

[145]  *See Aleris Int'l*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006)).

avoid taxes or the application of section 5 of the Securities Act of 1933.[146]    Moreover, no

governmental unit or any other party has requested that the Court decline to confirm the Plan on

such grounds.    Accordingly, the Plan satisfies the requirements of section 1129(d) of the

Bankruptcy Code.    *Finally*, section 1129(e) of the Bankruptcy Code is inapplicable because none

of the Debtors' chapter 11 cases is a "small business case."    Accordingly, the Plan satisfies the

requirements of section 1129(c), (d), and (e) of the Bankruptcy Code, and no party has asserted

otherwise.

## IV.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

101.    Finally, as discussed above, the Plan contains provisions implementing certain

releases and exculpations, compromising claims and interests, and enjoining certain causes of

action.  These provisions are substantially consistent with those approved by the Court in precedent

chapter 11 plans.[147]  Each of these provisions is appropriate because, as applicable, they (a) are the

product of arm's-length negotiations, (b) were critical to obtaining the support of the various

constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and

in the best interests of the Debtors, their Estates, and these chapter 11 cases, and (e) are consistent

with the relevant provisions of the Bankruptcy Code and Third Circuit law.[148]  Such provisions are

discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

### A.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

---

[146]    *See* Liebman Decl. ¶ 69.

[147]    *See, e.g.*, *In re BlockFi Inc.*, No-22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming liquidating chapter 11 plan with third party and debtor releases substantially consistent with those in the Plan); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Revel AC, Inc.*, No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) (same).

[148]    *See* Liebman Decl. ¶¶ 69–84.

102.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[149]  The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V.C of the Plan.[150]  In accordance with Article V.C of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.   The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they submit a request for payment that differs from the cure amounts paid or proposed to be paid by the Debtors.

103.    The Debtors are not proceeding on any cure or assumption disputes at the Combined Hearing.  Instead, the Debtors hope to resolve such objections consensually and, if necessary, will address such objections at a later hearing date, after proper notice.

104.    Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

**B.    The Plan Appropriately Incorporates Settlements of Claims and Interests.**

105.    The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[151]  The Plan provides

---

[149]   11 U.S.C. § 1123(d).

[150]   *See* Plan Art. V.

[151]   11 U.S.C. § 1123(b)(3)(A).

for a general settlement of all Claims and Interests to the extent provided for by the Bankruptcy Code.

106.    Settlements are favored in chapter 11 because they minimize litigation and expedite the administration of the bankruptcy case.[152]   Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings" that would otherwise be "lengthy, complicated, and costly."[153]    Ultimately, approval of a compromise is within the "sound discretion" of the Court.[154]

107.    The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.[155]   Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."[156]   The Third Circuit has provided the following four criteria that a Court should consider when approving a settlement pursuant to Bankruptcy Rule 9019: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d)

---

[152]   *See Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy.") (internal quotations omitted).

[153]   *Rivercity* v. *Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).

[154]   *See Matter of AWECO, Inc.*, 725 F.2d 293, 297–98 (5th Cir. 1984) ("The decision of whether to approve a particular compromise lies within the discretion of the trial judge . . . The term 'discretion' denotes the absence of a hard and fast rule. When invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.") (citations omitted); *see also In re Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

[155]   *See In re S B Bldg. Assocs.*, 621 B.R. at 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).").

[156]   *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will* v. *Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

the paramount interest of creditors.[157]  In addition, the court must determine whether the proposed

settlement is fair and equitable, and in the best interests of the estate.[158]

108.    The Debtors believe the settlement embodied in the Plan—including with respect

to the various claims and Causes of Action held by the Debtors, DIP Lenders, McKesson, DOJ,

PBGC, and Holders of Existing Equity Interests—satisfies the above factors.  The settlement

embodied in the Plan and the Proposed Confirmation Order is fair and equitable and consistent

with the Bankruptcy Code.  The claims and Causes of Action resolved by the Plan and Proposed

Confirmation Order were thoroughly analyzed by the Debtors and their advisors.

109.    The Debtors and their advisors have worked diligently to ensure the Debtors'

creditors are receiving the greatest value possible on their Claims through the Plan, in the best

interest of all stakeholders.  If the Debtors were forced to litigate the issues necessary to resolve

such Claims outside of the Plan, the additional costs and attendant delay of such litigation would

eliminate the Debtors' chance to confirm a chapter 11 plan, and the Debtors would either seek

dismissal or conversion of their chapter 11 cases.  As reflected by the overwhelming support of

creditors for the Plan, this settlement is in the best interests of creditors and all parties in interest.

### C.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.

110.    The Plan includes certain Debtor and third-party releases, an exculpation provision,

and an injunction provision.  These discretionary provisions are proper because, among other

things, they are the product of extensive good-faith, arm's-length negotiations, were a material

inducement for parties to enter into the settlements embodied in the Plan, are overwhelmingly

---

[157] *See In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

[158] *See In re Nutraquest, Inc.*, 434 F.3d at 645 ("Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to other parties, *i.e.*, the parties who did not settle.").

supported by the Debtors and their key stakeholders[159] and are consistent with applicable precedent.  Further, the Third-Party Release provisions were fully and conspicuously disclosed to all parties in interest through the Ballots, Notice of Non-Voting Status, Revised Notice of Non-Voting Status, Opt-Out Form, and Supplemental Opt-Out Form, which excerpted the full text of the Third-Party Release provision as set forth in the Plan.  Various parties, including the U.S. Trustee, Allen Matkins Landlords, and the Pension Funds, object to such provisions.  As explained herein and in Section V.B, below, those Objections should be overruled to the extent not resolved by changes to the Plan and/or Confirmation Order.

### 1.    The Third-Party Release Is Wholly Consensual and Is Appropriate.

111.    The Plan provides for the Releasing Parties' release of the Released Parties to the extent set forth in the Plan (the "<u>Third-Party Release</u>").[160]  The U.S. Trustee objects to the Plan's Third-Party Release, arguing that it is not consensual.[161]  The Debtors disagree and believe the Third-Party Release is appropriate and consensual.  Courts in the Third Circuit routinely approve such release provisions if, as here, they are consensual and appropriately tailored.[162]  The determination as to whether a third-party release is consensual depends on the particular circumstances at issue in a particular case.[163]  Affirmative consent to a third-party release is not

---

[159]    Voting Report, <u>Ex. A</u>.

[160]    *See* Plan, Art. X.D.

[161]    U.S. Trustee Objection ¶¶ 44–81.

[162]    *See, e.g.*, *In re Indianapolis Downs*, 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *U.S. Bank Nat'l Ass'n* v. *Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same); *In re Wash. Mut.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); *In re Mallinckrodt PLC*, 639 B.R. 837, 877–879 (Bankr. D. Del. 2022) (approving third-party release that applied to shareholders deemed to reject the plan and unsecured creditors who were unimpaired or who did not return a ballot with the opt out box checked or otherwise submit an opt out form as consensual).

[163]    *See In re Indianapolis Downs*, 486 B.R. at 305.

required for such release to be "consensual."[164]   Rather, a third-party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[165]   Courts recognize that "shareholders and creditors have an obligation to read their mail."[166]

112.    Here, all parties in interest will be given ample opportunity to evaluate and opt out of the Third-Party Release.  For example, stakeholders in the Voting Class and in the Non-Voting Classes will receive notice and opportunity to "opt out" of the Third-Party Release by checking the appropriate box on the Opt-Out Form or Supplemental Opt-Out Form.  All voting stakeholders and non-voting stakeholders were asked to certify that they read and understood the election they were making in the Opt-Out Form or Supplemental Opt-Out Form and received notice and instructions for doing so.  Such stakeholders could have opted out by checking the appropriate box on the Opt-Out Form or Supplemental Opt-Out Form or objecting on or before the Opt-Out Deadline.

113.    Furthermore, the structure of the Plan is reciprocal: to the extent a stakeholder qualifies as a Releasing Party, that stakeholder is also included as a Released Party where applicable, and thus receives the benefit of the same releases it is granting.  This reciprocity provides a material benefit to those stakeholders and further supports the reasonableness and fairness of the Third-Party Release.

---

[164]  *See id.*; *In re Spansion, Inc.*, 426 B.R. at 144.

[165]  *See In re Indianapolis Downs*, 486 B.R. at 305–06; *In re Spansion, Inc.*, 426 B.R. at 144.

[166]  *In re Mallinckrodt*, 639 B.R. at 880 (quoting *In re EV Energy Partners*, No. 18-10814, Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")); *see also In re Arsenal Intermediate Holdings, LLC,* No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.").

114.    For these reasons, and as courts in New Jersey, the Third Circuit, and across the country have held,[167] the Third-Party Release is consensual as to all creditors and interest holders who did not opt out or object, including those deemed to reject the Plan.[168]

### 2.    The Debtor Release Is Appropriate.

115.    Article X.C of the Plan also provides for releases by the Debtors and their Estates, the Reorganized Debtors, and Wind Down Debtors (and the Liquidating Trust as the successor in interest to the Wind-Down Debtors), as applicable, of claims and Causes of Action against each Released Party (the "Debtor Release").  The Debtors submit that the Debtor Release is a vital component of the Plan, a sound exercise of the Debtors' business judgment, and it should be approved.

116.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[169]  A debtor may release claims under section 1123(b)(3)(A) "if the release is a valid

---

[167]    *See, e.g.*, *In re Bed Bath & Beyond Inc.,* No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023); *In re BlockFi, Inc.*, No-2219361 (MBK) (Bankr. D.N.J. Oct. 4, 2023); *In re Cyxtera Techs.,* No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 22, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

[168]    The U.S. Trustee objected to the Third-Party Release.  The Debtors respond to the U.S. Trustee's objection in section V.A.

[169]    *See In re S B Bldg. Assocs.*, 621 B.R. at 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3)."); *In re Nutraquest, Inc.*, 434 F.3d at 644 ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). *See also In re WebSci Technologies, Inc.*, 234 Fed. Appx. at 29 (3d Cir. 2007) (quoting *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)) (holding that to approve a settlement pursuant to Rule 9019, the court must balance "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'"

exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[170]

117.    Courts in this jurisdiction and elsewhere generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[171]  The analysis includes an inquiry into whether there is: (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[172]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[173]  The Debtor Release easily meets the applicable standard and should be approved.

118.    ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan (or to participate in the ultimate implementation of it) without the Debtor Release.[174]  The

---

[170]  *In re Spansion, Inc.*, 426 B.R. at 143; *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[171]  *See In re Indianapolis Downs*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937–938 (Bankr. W.D. Mo. 1994). The *Master Mortgage* factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness." *See In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Wash. Mut.,* 442 B.R. at 346).

[172]  *See In re Wash. Mut.,* 442 B.R. at 346 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *In re Master Mortg.*, 168 B.R. at 937).

[173]  *Id.* (citing *In re Master Mortg.*, 168 B.R. at 935).

[174]  *See In re Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

56

Debtor Release—which was the product of extensive negotiations and has been carefully crafted to reflect the various settlements struck—provides finality to those parties critical to effectuating the Restructuring Transactions, underpins the settlement and compromise of issues achieved by the Plan, maximizes value for creditors, and actually permits the Estates to consummate the Plan; therefore, the inclusion of the Debtor Release inures to the benefit of all the Debtors' stakeholders.

119.    ***Second***, as set forth in the Liebman Declaration, the Released Parties provided integral support to the Debtors throughout these Chapter 11 Cases to facilitate administration of these cases as well as support confirmation of the Plan.   As courts in this jurisdiction have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[175]

120.    The record reflects tangible, quantifiable contributions from key non-debtors that directly enabled plan funding, consensus, and feasibility.  McKesson committed new money—$20 million in Cash, including an incremental amount earmarked to fund Plan expenses—and provided additional consideration through Plan support and related Restructuring Transactions, all of which materially increased value available for distributions and implementation costs.[176]   The DIP Lenders consented to the use of their cash collateral to fund the payment of Administrative Claims, including authorizing a dedicated Administrative Claims Distribution Pool of Cash Collateral for

---

[175]    *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring, (b) plan sponsor funded the plan and agreed to compromise its claim, and (c) a committee negotiated the plan and assisted in the solicitation of its constituents); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to reduce their claim); *In re Long Ridge Road*, 2014 WL 886433, at *15 (finding that the non-debtor party had substantially contributed by providing financial support, without which the plan would not be feasible).

[176]    *See In re Long Ridge Road Operating Company , II, LLC,* No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding that providing funding so as to provide distributions to claimants under the plan was a substantial contribution); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (same).

consensual payments to holders of Administrative Claims, and provided necessary consents under

the Approved Budget to ensure payment of Plan expenses and settlement obligations.[177]  Holders

of Existing Equity Interests agreed to forego any rights to distributions from EIC under the prior

chapter 11 plan, eliminating potential competing claims to that value and facilitating the mediated

resolutions embedded in the Plan.    Additionally, the Debtors' current and former directors,

officers, professionals, and other agents have been instrumental in negotiating, formulating, and

implementing the restructuring transactions contemplated by the Plan.[178]  In the absence of these

parties' contributions, for which the Debtor Release was negotiated as in the Plan, there would

simply be no restructuring to consummate and the transactions contemplated by the Plan would

not be possible.

121.    *Third*, the Debtor Release is essential to the success of the Debtors' Plan.  Absent

the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the

Plan, and highly unlikely that the a successful settlement, or the Plan, would exist at all.[179]  In the

absence of Released Parties' support, the Debtors would not be in a position to confirm the Plan,

---

[177]    *See In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017) (finding that without the contributions of the third parties being granted releases by the debtors, which include the provision of financing for the chapter 11 cases and consent to the use of their cash collateral by the debtors, the chapter 11 cases could not likely have reached confirmation); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) ("[T]he releases are an integral part of the agreement with the [non-debtor parties] to finance the chapter 11 cases and to fund the [p]lan.").

[178]    *See Su* v. *Offshore Investment Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–60 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the Special Committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders").

[179]    *See* Liebman Decl. at ¶¶ 72–77.

implement the Plan, and maximize value for creditors.  The Debtor Release, therefore, is essential to the Debtors' Restructuring Transactions.

122.    **Fourth**, as evidenced by the Voting Report and discussed herein, the Debtors' stakeholders overwhelmingly support the Plan.  The Voting Class unanimously voted to accept the Plan.[180]

123.    **Fifth**, the Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors giving up potential claims, if any that could hypothetically be pursued.  As demonstrated by the Liquidation Analysis,[181] the ranges of recoveries for Holders of Claims are higher under the Plan than they would have been in a chapter 7 liquidation scenario.[182] The Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

124.    For the reasons set forth above, and as supported by the Liebman Declaration and the Voting Report, the *Zenith* factors support approval of the Debtor Release.  The Debtors have easily satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release is fair, reasonable, overwhelmingly supported by creditors, and in the best interests of the Debtors' Estates.  For these reasons, the Debtors' agreement to provide the Debtor Release is in the best interests of creditors and all stakeholders and is an integral part of the Plan.  The Debtor Release should be approved.

### 3.    The Exculpation Provision Is Appropriate.

125.    Article X.E of the Plan provides that each Exculpated Party shall be released and exculpated from any causes of action arising out of acts or omissions in connection with these

---

[180]    *See* Voting Report, Ex. A.

[181]    *See* Liebman Decl. ¶¶ 36–39

[182]    *See id.*

chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation"). The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring. The Exculpation is an integral part of the Plan and otherwise satisfies the governing standards in the Third Circuit. This provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan, and the U.S. Trustee and Allen Matkins Landlords' remaining Objections thereto should be overruled.

126.     Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[183] Exculpation provisions that are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[184] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the

---

[183] *See In re Congoleum Corp.*, 362 B.R. 167, 195–97 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[184] *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming plan where exculpation provision covered the debtors and wind down debtors, the creditors' committee, and related parties, including current and former control persons and professionals); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

Debtors' restructuring.[185]  Exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[186]

127.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[187] Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, their Related Parties.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

128.    Here, the Debtors and their Related Parties and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  The Exculpated Parties played a critical role in negotiation, formulating, and implementing the Disclosure Statement, Plan, and related documents. Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should

---

[185]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[186]  *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[187]  *See* Liebman Decl. ¶¶ 82–83

also extend to the Exculpated Parties.  In short, the Exculpation represents an integral piece of the

overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations,

and significant sacrifice by the Exculpated Parties.

129.    Exculpation for parties participating in the plan process is appropriate where plan

negotiations could not have occurred without protection from liability.[188]  As set forth in the Plan,

the scope of the Exculpation is narrowly tailored to exclude certain acts, relates only to acts or

omissions in connection with or arising out of the Debtors' restructuring, is limited to any act or

omission arising prior to the Effective Date, and ultimately inures to the benefit of only those

parties traditionally considered estate fiduciaries and their agents.

130.    Additionally, the Exculpated Parties and the Debtors' directors and managers are

covered pursuant to section 1125(e) of the Bankruptcy Code.  Pursuant to the Plan, for these

1125(e) Covered Parties to have any liability for Claims and Causes of Action arising out of acts

or omissions in connection with the chapter 11 cases and certain related transactions, the Court

must find that such a claim is colorable before it is permitted to be brought (the "1125(e) Provision"

and, together with the Exculpation Provision, the "Exculpation Provisions").

131.    Under the circumstances, it is appropriate for the Court to approve the Exculpation

Provisions and to find that the Exculpated Parties have acted in good faith and in compliance with

the law.[189]

### 4.      The Injunction Provision is Appropriate

---

[188]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R.
497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the
Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.").

[189]    *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful
misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

132.    The injunction provision set forth in Article X.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Persons and Entities from commencing or pursuing any Cause of Action against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors or Liquidating Trust (or their Affiliates), the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, or arising out of a claim or Cause of Action discharged, released, exculpated, or settled under the Plan. Thus, the Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.[190]    Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose.

133.    The Debtors submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code. In light of the foregoing, because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## V.    The Remaining Objections to Confirmation of the Plan and Final Approval of the Adequacy of the Disclosure Statement Should Be Overruled.

134.    The Debtors received 11 formal objections to Confirmation of the Plan and final approval of the adequacy of the Disclosure Statement, as set forth in the Reply Chart attached hereto. As of the filing of this Memorandum, the Debtors have resolved almost all informal Objections. The Debtors continue to work diligently with the remaining objecting parties to resolve the outstanding Objections before the commencement of the Combined Hearing. As

---

[190]    *See SEC* v. *Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve an injunction provision where such provision "plays an important part in the debtor's reorganization plan").

discussed below, the Court should overrule the remaining Objections for the reasons described below.[191]

### A.    The U.S. Trustee's Objection Should be Overruled.

#### 1.    The Third-Party Release is Consensual, Permissible, and Appropriate, and the Bankruptcy Court has Jurisdiction to Approve the Third-Party Release.

135.    The Third-Party Release is a consensual release.  All parties in interest—including the U.S. Trustee—have had opportunity to evaluate and opt out of the Third-Party Release by returning an opt-out form to the Debtors and checking the opt-out box.  The Third-Party Release complies with Third Circuit law and is supported by the facts and circumstances of these chapter 11 cases.  The Court unambiguously has the authority to approve the Third-Party Release, and courts in this district, other courts in the Third Circuit, and courts across the country routinely exercise that authority by confirming plans containing third-party releases similar to those contained in the Plan.[192]

---

[191]    The Debtors continue to engage with certain parties regarding language to be included in the Confirmation Order to resolve such parties' objections. To the extent not resolved prior to the Combined Hearing, the Debtors are prepared to present oral argument in response to the Objections.

[192]    *See, e.g.*, *In re Blockfi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming a plan stating that all holders of claims or interests entitled to vote on the plan or deemed to accept the plan were deemed to consent to the releases unless and until they affirmatively opted out or objected to the releases); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote) were deemed to consent to the releases unless and until they affirmatively opted out or objected to the releases); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote) were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Tehum Care Services, Inc.*, No. 23-90086 (Bankr. S.D. Tex. Oct. 30, 2025) [Docket No. 2521]; *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same).

136.    The U.S. Trustee's contention that the Third-Party Release is not consensual[193] is belied by the extensive notice of the existence of the Third-Party Release, the plain language of the Plan, and the robust service of the Court-approved opt out forms to Holders of Claims and Interests alerting them to the Third-Party Release and the procedures for exercising their right to opt out.  The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).

137.    Courts in this jurisdiction, including this Court, have overruled similar objections by the U.S. Trustee in several recent cases.  In *In re Bed Bath & Beyond Inc.*, for example, the Court approved a plan that included an opt-out mechanism for holders of claims deemed to accept the plan or those who voted to reject the plan but who did not opt out.[194]  Similarly, in *In re Blockfi*, the Court approved a plan that included an opt-out mechanism.[195]

138.    Further, in these Chapter 11 Cases, the Court has already approved an opt-out structure in connection with the Administrative Claims Procedures Order, pursuant to which (a) eligible administrative claimants were given clear, conspicuous notice of the settlement and their election rights, (b) those claimants could affirmatively opt in to an accelerated cash settlement or affirmatively opt out and preserve their full claims, and (c) claimants that did not return an election form by the court-approved deadline were deemed to consent to a capped pro rata recovery in full and final satisfaction of their administrative claims under a subsequent chapter 11 plan.  In entering the Administrative Claims Procedures Order, the Court necessarily found that this opt-out

---

[193]   U.S. Trustee Obj. ¶ 44–81.

[194]   *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023); Hr'g Tr. at 38–40 (Bankr. D.N.J. Sept. 12, 2023).

[195]   *In re BlockFi Inc.*, Hr'g Tr. at 110-11, No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023).

framework provided adequate notice and an appropriate mechanism for obtaining creditor consent to treatment under a plan.

139.    Here, the Debtors clearly and conspicuously included the Third-Party Release language in the Opt-Out Form and Supplemental Opt-Out Form, and through those documents, will have explicitly alerted parties that, unless they expressly opt out of the Third-Party Release, they will be a Releasing Party under the Plan.  Accordingly, there is no question that all applicable stakeholders had proper notice of their rights and could have chosen to opt out of the Third-Party Release.  Further, because the Third-Party Release applies only to Holders of Claims or Interests that vote affirmatively for the Plan or do not opt out, it is consensual under the weight of authority (in this district and others) of what constitutes consent in the context of a third-party release.[196]

140.    The Third-Party Release is consensual, and the scope of the Third-Party Release here is necessary for the consummation of the Plan, warranted under the circumstances, clearly permitted by the applicable law, and should be approved as contemplated. Accordingly, the U.S. Trustee Objection should be overruled.

### 2.    The Debtor Release Should Be Approved.

141.    The U.S. Trustee argues that certain of the releases contained in the Debtor Release are overly broad because the Plan does not establish that each of the proposed Released Parties

---

[196] *In re Lannett Company, Inc, Inc.,* Hr'g Tr. at 36:2-8, No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent. It is incumbent on effected parties who have been properly served to protect their own rights. Parties that fail to act in response to a judicial process are routinely bound by the result of the process."); *In re RCS Cap. Corp.,* No. 16-10223 (MFW), Hr'g Tr. 59:21–60:2 (Bankr. D. Del. Mar. 21, 2016) ("[T]here's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release. If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote. So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases"); *In re Indianapolis Downs,* 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved.").

provided adequate consideration in exchange for receiving the Debtor Release and that certain of

the Released Parties are not entitled to the Debtor Release under applicable case law.  Support for

the Debtor Release is laid out in detail in Section VI.D.2 herein.  However, the Debtors respond to

the U.S. Trustee's objections with respect to each *Zenith* factor below.

142.    The U.S. Trustee Objection asserts that the first *Zenith* factor is not met because it

is unclear whether an identity of interest exists between the Debtors and each of the Released

Parties.[197]  An identity of interest clearly exists between the Debtors and the Released Parties

because each of the Released Parties, as a stakeholder and critical participant in the Plan process,

shares a common goal with the Debtors in seeing the Plan succeed and would have been highly

unlikely to participate in the negotiations and compromises that led to the ultimate formulation of

the Plan without the Debtor Release.

143.    As for the second *Zenith* factor, the U.S. Trustee argues that contributions related

to operational restructuring or negotiating a financial restructuring do not qualify as "substantial

contributions."[198]  To the contrary, courts in this district have found that a wide variety of acts,

including playing an integral role in the formulation of the Plan and expending significant time

and resources negotiating the Plan, constitute substantial contributions for the purposes of a debtor

release.[199]

144.    The third *Zenith* factor is met despite the U.S. Trustee's assertion that there is "no

information" to support the contention that the Debtor Release is necessary to a reorganization.[200]

---

[197]    U.S. Trustee Obj. ¶ 85.

[198]    U.S. Trustee Obj. ¶ 86.

[199]    *See In re Long Ridge Road Operating Company, II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (finding that the non-debtor party had substantially contributed by providing financial support, without which, the plan would not be feasible).

[200]    U.S. Trustee Obj. ¶ 87.

The Debtor Release was a heavily negotiated term in the Plan, and it is highly unlikely that the Released Parties would have agreed to support the Plan absent the Debtor Release. Indeed, it is unlikely that the Plan would exist at all without the Debtor Release.

145.    The fourth *Zenith* factor is clearly met given that the Voting Class unanimously voted to accept the Plan.[201]

146.    Finally, as to the fifth *Zenith* factor, while the Plan does not provide for payment of all or substantially all of the unsecured creditors' claims, the Plan still provides for meaningful recoveries to administrative creditors, in a greater amount than if the cases were converted or dismissed.

147.    Further, the Debtor Release is supported by the Debtors' true economic stakeholders—the DIP Lenders—whose liens encumber any such released claims and who would, in any event, be entitled to receive the value, if any, attributable to such claims. In economic substance, therefore, the Debtor Release effects a compromise by and among the parties that hold the upside in such causes of action, rather than a giveaway of value belonging to an out-of-the-money constituency. The Debtor Release is a settlement of estate Causes of Action in exchange for substantial contributions and concessions that are integral to the Plan, supported by the holders of the economic interests in those claims, and designed to maximize value and promote finality in a heavily negotiated restructuring.

148.    The Debtor Release is consistent with Third Circuit precedent.[202] Taken together, the foregoing considerations provide ample support for the appropriateness of the Debtor Release under the Bankruptcy Code and applicable case law.

---

[201]   *See* Voting Report Ex. A.

[202]   *See, e.g.*, *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024) (approving a Plan providing for releases of certain former directors and officers); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed*

### 3. The Plan's Exculpation Provisions Are Consistent with Section 1125(e) of the Bankruptcy Code and Third Circuit Law and Should be Approved

149.     The U.S. Trustee objects that the Plan's exculpation provision is "overbroad," is not limited to estate fiduciaries, and improperly extends to prepetition conduct, in contravention of Third Circuit precedent.[203]   As set forth below, the Debtors have agreed to a narrowing modification that fully addresses the only colorable concern raised by the U.S. Trustee, and the remaining aspects of the Plan's exculpation and related good-faith findings are squarely consistent with this precedent from this Court and in the Third Circuit.

150.     *First*, in response to the U.S. Trustee's argument that exculpation "is only available for services rendered between the Petition Date and the Effective Date" and therefore may not extend to prepetition conduct,[204] the Debtors have revised the Exculpation provision in the Plan to make explicit that it applies only to acts or omissions occurring from and after the Petition Date through and including the Effective Date.  As modified, the exculpation period is fully consistent with how this Court construed and approved exculpation in Rite Aid's previous chapter 11 cases.[205]

151.     *Second*, the U.S. Trustee raises questions about the Plan's incorporation of section 1125(e) protections for the "1125(e) Covered Parties," including who, beyond the Debtors and their professionals, may appropriately benefit from section 1125(e).[206]   The Plan's 1125(e)

---

*Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. September 14, 2023) (same); *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

[203]   U.S. Trustee Obj. ¶¶ 91-97.

[204]   U.S. Trustee Obj. ¶ 94.

[205]   *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Aug. 16, 2024).

[206]   U.S. Trustee Obj. ¶ 95.

coverage, however, is narrowly drawn and aligned with both the statutory text and this Court's approach in Rite Aid's prior chapter 11 cases.[207]  The Plan limits the 1125(e) protections to the defined "1125(e) Covered Parties," and the related exculpation is confined to conduct "related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof."[208]  That is the scope Congress codified in section 1125(e) of the Bankruptcy Code, and, as in Rite Aid's previous chapter 11 cases, the protection applies only to those parties who, as a factual matter, engaged in covered solicitation or securities activity.  The Plan's "gatekeeper" construct for 1125(e) Covered Parties, requiring a threshold colorability and scope determination by this Court before a purported 1125(e)-barred claim may proceed, similarly follows the structure this Court approved in Rite Aid's previous chapter 11 cases and gives practical effect to section 1125(e) of the Bankruptcy Code without expanding it.[209]

152.    ***Third***, the U.S. Trustee's broader assertion that the Plan's exculpation improperly extends beyond "estate fiduciaries"[210] does not align with the actual definition of "Exculpated Parties" or with binding Third Circuit law.  As the U.S. Trustee acknowledges, *PWS* approves an exculpation that protects "the fiduciaries who have served during the chapter 11 proceeding."[211]

---

[207]   *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Aug. 16, 2024).

[208]   Plan Art. X.E.

[209]   Plan Art. X.E; *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Aug. 16, 2024).

[210]   U.S. Trustee Obj. ¶¶ 91–92.

[211]   U.S. Trustee Obj. ¶ 91 (citing *PWS*, 228 F.3d at 246).

That is what the Plan provides.  The Exculpated Parties are limited to the Debtors, Reorganized Debtors, and Wind-Down Debtors; the Committee and its members; and, with respect to each of those entities, their current and former control persons, directors, officers, employees, and professionals, in each case solely in such capacities and solely for case-related conduct within the Petition Date–Effective Date window.  The Plan's definition tracks the structure this Court approved in Rite Aid's previous chapter 11 cases for estate fiduciaries and those acting at their direction.

153.    *Lastly*, the U.S. Trustee challenges the Plan's good-faith findings in favor of the Exculpated Parties, asserting that the exculpation "seeks to 'deem' the Exculpated Parties as having participated in good faith" and thereby undermines the carve-out for actual fraud, gross negligence, or willful misconduct.[212]  The Plan's good-faith finding with respect to the Exculpated Parties is, however, expressly limited to conduct covered by section 1125(e)—that is, "the solicitation of votes and the offer, issuance, sale or purchase of securities" under the Plan.[213]  That is the type of finding contemplated by section 1125(e) of the Bankruptcy Code when a court concludes under sections 1129(a)(2) and (a)(3) of the Bankruptcy Code that the Plan was proposed, and solicitation conducted, in good faith and in compliance with the Bankruptcy Code. Accordingly the Exculpation Provisions should be approved.

### 4.    The "Gatekeeping Provision" is Integral to the Plan and Should be Approved.

154.    The U.S. Trustee has also objected to the "gatekeeping provision" in the Plan[214] (the "Gatekeeping Provision"), which provides that:

---

[212]  U.S. Trustee Obj. ¶ 96.

[213]  Plan Art. X.E.

[214]  U.S. Trustee Obj. ¶¶ 108–111.

71

From and after the Effective Date, any Entity that opted out of the releases contained in this Article X.D may not assert any claim or other Cause of Action against any Released Party which would have, if such party had not opted out of the releases contained in this Article X.D, been released pursuant hereto, without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan as a derivative claim or otherwise and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action (a) constitutes a direct claim or a derivative claim released pursuant to Article X.C, and (b) is colorable.  Solely to the extent legally permissible and as provided for in Article XIII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[215]

155.    The Gatekeeping Provision is a legitimate exercise of this Court's power under sections 105, 1123(b)(6), and 1141(a)–(c) of the Bankruptcy Code.  The purpose of the Gatekeeping Provision is to ensure that the Debtors and other Released Parties do not become bogged down in vexatious, meritless litigation.  Gatekeeping provisions have been utilized by many courts to provide a threshold level of review following confirmation of a chapter 11 plan.  Under this construct, which has been approved in numerous jurisdictions (including this district),[216] the Court interprets its own order in the first instance and determines whether a litigant has a colorable claim that remains assertable following confirmation of the Plan.

---

[215]    Plan Art. X.D.

[216]    *See, e.g., In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Aug. 15, 2024) (approving a similar gatekeeping provision); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Jun. 13, 2024); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Nat'l Realty Inv. Advisors, LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alternative Income Fund, LP*, No. 18-14603 (MBK) (Bankr. D.N.J. Feb. 19, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits); *In re Cineworld Group plc*, No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023) (approving a similar gatekeeping provision); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) (same); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) (same); *In re Highland Capital Management, L.P.*, No.19-34054 (SGJ) (Bankr. N.D. Tex. Nov. 24, 2020) (same).

156.    To be clear, it is not contemplated that the Court is ruling on the underlying merits

of the action.  Rather, the Court is making an inquiry into whether or not there is an ability to bring

the action or whether it has been addressed already as part of the Plan or the Confirmation Order.

The Court is being asked to make an initial threshold inquiry and engage in the construction of the

terms of the Plan, and to interpret those terms in conjunction with the Confirmation Order.  The

Court is undoubtably the best forum to accurately construe the language of its own plan and

confirmation order.

157.    The Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine"

established by the Supreme Court in *Barton* v. *Barbour.*[217]  The Barton Doctrine provides that, as

a general rule, before a suit may be brough against a trustee, leave of the appointing court must be

obtained.[218]  While the Barton Doctrine originated as a protection for federal receivers, courts have

applied the concept to various participants in chapter 11 cases, including debtors in possession,[219]

trustees appointed to administer post-confirmation liquidation of the bankruptcy Estate,[220] officers

and directors of a debtor,[221] and professionals retained by the debtors.[222]  By requiring claimants

to seek leave of the Court before pursuing actions against the Debtors and their successors in

---

[217]  104 U.S. 126 (1881).

[218]  *Baron* v. *Sherman (In re Ondova Ltd. Co.,*), 2017 Bankr. LEXIS 325, at *30 (Bankr. N.D. Tex. Feb. 1, 2017).

[219]  *Helmer* v. *Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to a debtor in possession).

[220]  *In re Swan Transportation Co.*, 596 B.R. 127, 137 (Bankr. D. Del. 2018) (citing *Richardson* v. *Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 489-98 (Bankr. D. Del. 2012)).

[221]  *See Carter* v. *Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (holding that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock* v. *Key Fed. Sav. Bank (In re Silver Oak Homes, Ltd.)*, 167 B.R. 389 (Bankr. D. Md. 1994) (applying Barton Doctrine to president of the debtor).

[222]  *Lowenbraun* v. *Canary* (*In re Lowenbraun*), 453 F.3d 314, 321 (6th Cir. 2006) (applying Barton Doctrine to trustees' counsel).

73

interest, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.

158.    The Gatekeeping Provision is also not an attempt to impermissibly extend the Court's jurisdiction past its limits.    Courts in this circuit have confirmed plans on numerous occasions that provide permanent bankruptcy court jurisdiction over matters arising out of the chapter 11 cases, recognizing that bankruptcy courts may continue to exclusively adjudicate issues related to the chapter 11 cases on a post-emergence basis.[223]    Furthermore, courts have acknowledged that bankruptcy court jurisdiction over matters arising out of chapter 11 cases may extend even further where the debtor is liquidating its assets, as is the case here. In *Boston Regional Medical Center, Inc.* v. *Reynolds*, the First Circuit acknowledged that a "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court," and "[a]ny litigation involving such a debtor thus relates much more directly to a proceeding under title 11."[224]

159.    Furthermore, contrary to the assertions of the U.S. Trustee the Gatekeeping Provision does not impose any greater burden or administrative hurdle on claimholders than the Plan would impose without the Gatekeeping Provision.    Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties.    If a claimant seeks to assert a claim following the

---

[223]    *See, e.g.*, *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (approving a plan that provides that parties asserting a claim or Cause of Action against the Debtors, the Reorganized Debtors, or the Released Parties must first obtain a Final Order of the Bankruptcy Court); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023) (providing that the bankruptcy court will have sole and exclusive jurisdiction to determine whether a claim or cause of action constitutes a direct or derivative claim, is colorable and, to adjudicate the underlying claim or cause of action); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020) (providing that the bankruptcy court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

[224]    *Boston Reg'l Med. Ctr. Inc.* v. *Reynolds (In re Boston Reg'l Med. Ctr. Inc.)*, 410 F.3d 100, 107 (1st Cir. 2005).

Effective Date of the Plan but is unsure whether that claim constitutes a colorable claim that has

not been released, the claimant will need a judicial determination that the claim was not released

under the Plan; otherwise, the claim could not be properly asserted. The Gatekeeping Provision

ensures that the Court—the court most familiar with the facts and circumstances of these

chapter 11 cases and the court best-positioned to determine as to whether the claim may be

asserted—is the court making that determination. This inures to the benefit of all parties, including

potential claimants.

160.    As with the Third-Party Release, courts in this jurisdiction, including this Court,

have recently approved gatekeeping provisions consistent with the Gatekeeping Provision.[225]  For

example, the *In re Bed Bath & Beyond Inc.* gatekeeping provision provided that:

> From and after the Effective Date, any Entity (other than the DIP Agent,
> the DIP Lenders, the ABL Agent, the FILO Lenders, or the FILO Agent)
> that opted out of (or otherwise did not participate in) the releases
> contained in this Article X.D may not assert any claim or other Cause
> of Action against any Released Party for which it is asserted or implied
> that such claim or Cause of Action is not subject to the releases
> contained in Article X.C of the Plan without first obtaining a Final Order
> from the Bankruptcy Court (a) determining, after notice and a hearing,
> that such claim or Cause of Action is not subject to the releases
> contained in Article X.C of the Plan and (b) specifically authorizing
> such Person or Entity to bring such claim or Cause of Action against
> any such Released Party. . . . The Bankruptcy Court will have sole and
> exclusive jurisdiction to determine whether a claim or Cause of Action
> constitutes a direct or derivative claim, is colorable and, only to the
> extent legally permissible and as provided for in Article XIII of the Plan,
> the Bankruptcy Court shall have jurisdiction to adjudicate the
> underlying claim or Cause of Action.[226]

---

[225]  *See In re Cyxtera Technologies, Inc.*, No. 23-24853 (JKS) (Bankr. D.N.J. Nov. 17, 2023); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[226]  *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

161.    In overruling the U.S. Trustee's objection to this provision and approving the provision, the *Bed Bath* court recognized that, absent a gatekeeping function, courts across the country are likely to "construe and interpret the language of a plan and a confirmation order in inconsistent fashion."[227]   The *Bed Bath* court also recognized the minimal burden imposed on the court in acting as a gatekeeper because "in all likelihood in all of these situations it's coming back before the bankruptcy court anyway."[228]

162.    Similarly, the *In re BlockFi Inc.* gatekeeping provision stated that:

> From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.B or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[229]

163.    This Court observed that the gatekeeping provision is not an assertion of jurisdiction over which the court does not have and is instead limited to what the Bankruptcy Code

---

[227]   *Id.*, Hr'g Tr. 41:17–42:1 (Bankr. D.N.J. Sept. 12, 2023) ("Absent a gatekeeping function, there is a risk that you're going to have courts across this country construe and interpret the language of a plan and a confirmation order in inconsistent fashion. That's disservice to those plaintiffs. It's a disservice to those who were under the impression they were benefitting by making a contribution to the reorganization and getting certain protections.").

[228]   *Id.* at 42:2–9 ("The ability of a single court to take on a limited burden, and let's be clear -- it's minimal. Let's be clear, in all likelihood in all of these situations it's coming back before the bankruptcy court anyway. It's either the defendant is going to come back before the court to ask for clarity and enforcement of a confirmation order, enforcement of a discharge or one of the other parties to the litigation. And that's the way it should be because the courts will have a familiarity.").

[229]   *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023).

and the judicial code allows the court to decide.[230]  Instead, this Court reasoned that the gatekeeper function preserves both judicial economy and the centrality of the Court as an appropriate forum to decide what the meaning of the plan and confirmation order is and how potential claims fall within such documents.[231]  "It makes no sense to urge parties to make contributions to a Chapter 11 case and in return secure releases or secure certain rights that will be undercut by then having to defend their position all across the country in front of separate courts in separate forums, with inconsistent results."[232]

164.    The Court should approve the Gatekeeping Provision consistent with *Bed Bath* and *BlockFi.*  Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  In the absence of the Gatekeeping Provision, it is entirely possible that parties subject to the Plan's release and exculpation provisions will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, hindering the effectiveness of the Debtors' Plan. Critically, the absence of the Gatekeeper Provision would not hinder creditors from bringing actions related to claim disputes in front of this Court. Bankruptcy Code 502(a) preserves the ability for any party to object to a claim, even post confirmation. As the Court noted in its ruling on the gatekeeping provision *in In re BlockFi*:

> [a]s I said in other hearings, we end up in the same place anywhere.  When these actions are brought, somebody is bringing it back to the bankruptcy court to determine whether or not it's a discharge injunction, it's a plan injunction . . . . It comes back to this court anyway. So we're just putting in place in language what it is the practice. I have no issue with the scope or the provisions of the gatekeeping function.[233]

---

[230]    *In re Blockfi, Inc.,* Hr'g Tr. at 111:23–25 (Bankr. D.N.J. Sept. 26, 2023).

[231]    *Id.* at 111:25–112:6.

[232]    *Id.* at 112:15–20.

[233]    *In re BlockFi, Inc.,* No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023) Hr'g Tr. 113:5–16.

165.    The Gatekeeping Provision represents a permissible exercise of the Court's jurisdiction and will inure to the benefit of the Debtors, their successors in interest, and potential claimants.  Accordingly, the Court should overrule the objection of the U.S. Trustee and approve the Gatekeeping Provision.

**5.    The Injunction Provision, As Modified, Is Appropriate and Does Not Effect an Improper Discharge of the Wind-Down Debtors**

166.    The U.S. Trustee objects that Article X.F of the Plan operates as an impermissibly broad injunction, particularly as applied to the Wind-Down Debtors, and in substance confers a discharge that is unavailable to liquidating debtors under section 1141(d)(3) of the Bankruptcy Code.[234]  The Debtors submit that, with modest clarifying modifications to the duration and effect of the injunction as it relates to the Wind-Down Debtors—and with an express statement in the Confirmation Order that the Wind-Down Debtors do not receive a discharge—the Injunction provision is both appropriate and necessary to implement the Plan.

167.    The Debtors have clarified the temporal scope of the injunction as applied to the Wind-Down Debtors in the proposed Confirmation Order.  Specifically, with respect to the Wind-Down Debtors, the Debtors have proposed to modify the Plan and Confirmation Order to provide that the injunction shall operate from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed in accordance with the terms of the Plan.  This clarification aligns the injunction with the actual, limited period during which the Wind-Down Debtors are tasked with administering and distributing estate property and then effectively ceasing operations.  It also conforms to the approach taken in *Bed Bath*, where the court approved an injunction

---

[234]   U.S. Trustee Obj. ¶¶ 98–102.

provision that remained in place only so long as is necessary to complete the wind-down and distribution process for estate assets.[235]

168.    Further, to dispel any concern that the Injunction provision could be misconstrued as conferring a discharge on the Wind-Down Debtors, the Debtors have adopted the U.S. Trustee's requested clarifying language in the Confirmation Order stating that "nothing contained in the Plan or this Confirmation Order shall be deemed to constitute a discharge of the Wind-Down Debtors under section 1141(d)(3) of the Bankruptcy Code" which comports with the statutory framework under sections 1141(d)(3) and 362(c) of the Bankruptcy Code, under which liquidating debtors do not receive a discharge, but remain protected by the automatic stay and by the binding effect of the confirmed plan while they carry out their post-effective date functions.

169.    Additionally, nothing in the Plan alters the rights of non-consenting parties to pursue any direct, non-derivative claims against non-Debtor parties that are not released under the Plan or Plan injunction.[236]   The injunction enforcing the Plan's Third-Party Release remains in place only as to those parties who have consented to the release and, by extension, to the Court's entry of the related injunction.   In that respect, the injunction is both derivative of and co-extensive with the consensual release itself—enforcing the bargained-for compromise embodied in the Plan, rather than expanding it.   With the clarifications described above, the Injunction provision is appropriately tailored to the needs of these cases, respects the limitations of section 1141(d)(3) of the Bankruptcy Code, and should be approved.

### B.    The Landlord Objections Should be Overruled

---

[235]    *In re Bed Bath & Beyond, Inc., et al.*, No. 23-13359-VFP (Sept. 14, 2023); Hr'g Tr. at 25:22-26:3 (Bankr. D.N.J. Sept. 12, 2023).

[236]    Plan Art. X.D.

Case 25-14861-MBK    Doc 3298    Filed 11/21/25    Entered 11/21/25 21:00:49    Desc Main
Document    Page 98 of 136

170.    Certain Landlords[237] raise various objections to the Plan and Confirmation Order, including that the Exculpation and Injunction provisions are overbroad and impermissible, and that the Debtors must preserve the landlords' rights to pursue insurance and indemnification rights. None of the Objections are meritorious, and, except insofar as the Debtors have agreed to language in the Plan or Confirmation Order to resolve such objections, each should be overruled.

171.    The Allen Matkins Landlords object to the exculpation and injunction provisions under the Plan, claiming they unduly prejudice their rights to pursue claims against non-Debtor third parties, including insurers and agents of the Debtors, such as SB360, the Debtors' liquidation consultant.[238]    However, any such claims, if Allowed, will be Administrative Claims entitled to payment in full by the Debtors or Wind-Down Debtors, and are appropriately reserved for in the Wind-Down Budget, including the claim asserted by the Sunland, California Landlord.    The Debtors intend to add clarifying language to the Plan and/or Confirmation Order to that effect. Further, the Plan's exculpation provision applies only for the period between the Petition Date and the Effective Date,[239] so no prepetition claims are being exculpated.    Accordingly, the Landlords retain all rights against non-Debtors with respect to such prepetition claims in accordance with the Plan, and are not prejudiced by the exculpation and injunction contained in the Plan.

172.    Contrary to the arguments of certain Landlords,[240] the exculpation does not contradict or conflict with prior lease assumption or termination agreements or orders approving the same, which merely preserved whatever rights a landlord had with respect to available

---

[237] The "Landlords" are, collectively, the Stark Landlords, the Allen Matkins Landlords, the Ballard Spahr Landlords, the KDW Landlords, and the BarclayDamon Landlords.

[238] See Allen Matkins Landlords Objection, Docket No. 3271 ¶¶ 11–17.

[239] As described herein, the Debtors have agreed to limit the temporal scope of the Exculpation in response to the objection of the U.S. Trustee.

[240] See, e.g., Allen Matkins Landlords Obj., Docket No. 3271 ¶ 15.

insurance coverage.[241]  Such preservation of rights in the prior lease assumption or termination agreements do not preclude the Debtors from seeking approval of a customary exculpation provision under a subsequently filed chapter 11 plan, as such agreements do not override applicable law.[242]

173.    Finally, even if the exculpation in the Plan were to somehow prejudice the Landlords, it is squarely within precedent in this Court and the Third Circuit, and is justified by the facts and circumstances of these cases, as described above.[243]  *Harrington* v. *Purdue Pharma L.P*,[244] which famously bars non-consensual third-party releases, did not disturb exculpations in bankruptcy plans, which remain common, including in this Court.[245]

174.    Additionally, certain Landlords assert that the Plan must preserve their rights to pursue insurance claims.[246]  It does.  Landlords retain their ability to bring direct claims and Causes of Action against insurers relating to insurance and indemnification obligations, provided such Landlords opt-out of the Third-Party Release (or such insurer is not otherwise a Released Party under the Plan).  Furthermore, the Plan expressly provides for the assumption of, and vesting in, the Wind-Down Debtors with respect to the Debtors' Insurance Policies, unaltered in their

---

[241]    *See* Docket No. 3253 ¶ 3 (Bankruptcy Court lease assumption and assignment order providing: "Nothing in this Order or the Purchase Agreement shall impair or prejudice an applicable landlord's rights to the Debtors' available insurance coverage . . ."); Docket No. 2370, Exh. 1, ¶ 4 (Bankruptcy Court lease termination order providing: "Landlord . . . expressly retains its rights and remedies with regard to . . . any indemnification obligations arising from third party claims . . .").

[242]    *See* Docket No. 3222 ¶ 6 (emphases added) (Bankruptcy court order authorizing assumption and assignment of a lease, which includes a provision that "nothing shall impair or prejudice the rights of the landlord to the Real Property Lease with respect to the Debtors' available insurance coverage for third-party claims asserted in connection with the Debtors' use and occupancy of the premises subject to the Real Property Lease for events that occurred prior to the Lease Assignment Date, **subject in all respects to** the Lease and **applicable law**").

[243]    *See supra* note **Error! Bookmark not defined.**.

[244]    603 U.S. 204, 221–223.

[245]    *See, e.g.*, *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024).

[246]    *See, e.g.*, Stark Landlords Obj., Docket No. 3267, ¶ 10.

entirety.[247]  In any event, the Debtors are under no obligation to facilitate any Landlord's pursuit

of any claims for which insurance would provide a source of recovery, nor are they obligated to

assume or cause the Wind-Down Debtors or Reorganized Debtors to assume any indemnification

obligations.  And while it could be true that "landlords will lose the benefit of the indemnification

rights and insurance coverage bargained for in the Leases,"[248] under the Plan, such consequence,

if realized, is hardly inconsistent with the loss of numerous Landlord rights under leases rejected

pursuant to Bankruptcy Code section 365.[249]

175.    The other objections of the Landlords are described in Reply Chart and should be

overruled.

## C.    The Sub-Trusts Objection Should Be Overruled.

176.    The Sub-Trusts Objection demands that two modifications be made to the Data

Retention Plan:  *first*, that the Notice Period be extended from 30 to 90 days, and *second*, that the

Wind-Down Debtors bear, indefinitely, (a) 100% of the costs associated with the retention of Data

Inventory which is requested by the Sub-Trusts and "can reasonably be transferred" to the

Sub-Trusts prior to the expiration of the Notice Period but is not transferred, and (b) 50% of the

costs associated with retaining Data Inventory which is subject to a "good faith dispute between

the parties" as to its transferability after the expiration of the Notice Period.  Sub-Trusts Obj. at

¶¶ 4, 23.  Neither modification is required under applicable law, nor appropriate given the facts

and circumstances of these Chapter 11 Cases.

---

[247] Plan Art. V.E.

[248] Allen Matkins Landlords Obj., Docket No. 3271, ¶ 15

[249] *See, e.g., In re Roberds, Inc.*, 270 B.R. 702, 705 (Bankr. S.D. Ohio 2001) ("Once the lease is rejected, the
contractual terms of the lease no longer obligate a debtor.")

### 1.    The Notice Period Should Not Be Extended.

177.    Under the Data Retention Plan, the Notice Period is the period of time during which the Debtors are obligated to, *inter alia*, negotiate in good faith with the Sub-Trusts regarding the transfer of Data Inventory to (or for the benefit of) the Sub-Trusts which is relevant to the litigation rights assigned to the Sub-Trusts in the 2023 Cases (as defined in the Sub-Trusts Objection). During this period, no Data Inventory will be destroyed, and the Wind-Down Debtors will bear 100% of the costs of retaining all Data Inventory.  At the end of the Notice Period, the Wind-Down Debtors will be authorized to dispose of their Data Inventory in accordance with applicable law, unless a Sub-Trust (or another party in interest) objects to the Debtors' destruction of any Data Inventory, in which case the Data Inventory subject to such objection shall be retained pending the resolution of the applicable objection by the Bankruptcy Court.  While the Data Retention Plan includes provisions detailing the Debtors' obligations with respect to certain specific third parties (including the Sub-Trusts), it also provides that Data Inventory which is the subject of a subpoena validly served by any third party shall be preserved pending resolution of the applicable document request, subject to the foregoing cost-sharing provisions.

178.    The Notice Period is thus meant to provide parties in interest, including the Sub-Trusts, with an extended period of time during which to negotiate the consensual turnover of documents.  However, given the Debtors' rapidly diminishing workforce and lack of funding to provide for extended retention, the Data Retention Plan is intended to disincentivize overbroad or unreasonable document requests or objections to destruction by shifting retention costs to any party that forces the Debtors to retain Data Inventory after the Notice Period has elapsed.

179.    30 days is an appropriate duration for the Notice Period.  The Data Retention Plan is, at its core, a framework pursuant to which the Debtors are seeking to abandon and destroy their books and records pursuant to section 554 of the Bankruptcy Code.[250]

180.    Bankruptcy Rule 6007(a)(2) provides for the required notice period with respect to a proposed abandonment of property: a 14-day objection period.  Fed. R. Bankr. P. 6007(a)(2). Other than this notice requirement, there is no requirement in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules that the Debtors undertake the obligations provided for in the Data Retention Plan (*e.g.*, to negotiate in good faith for any period of time, file notices of agreed transfer, etc.), and so the Notice Period, far from being insufficient, provides for *more than double* the required notice under the Bankruptcy Rules to parties in interest of the abandonment contemplated in the Data Retention Plan.  The Bankruptcy Rules deem a 14-day objection period sufficient with respect to third-party creditors that had *no* prior notice of the proposed abandonment; where, as admitted in the Sub-Trusts Objection, the Debtors and Sub-Trusts have been negotiating with respect to the terms of the proposed transfer or destruction of the Data Inventory for months, the Sub-Trusts' assertion that they are prejudiced by the duration of the Notice Period falls especially flat.  Sub-Trusts Obj. at ¶ 15, 16.

181.    The Notice Period is thus appropriate under applicable law.  The Sub-Trusts Objection cites no legal authority to the contrary, instead relying on the terms of the Cooperation Agreement (as defined in the Sub-Trusts Objection) which, even if it were enforceable against the Debtors (it is not, as discussed *infra*), would not require the relief sought by the Sub-Trusts.  The Cooperation Agreement required the Debtors to take "commercially reasonable measures" to

---

[250]    The permissibility of the Debtors' proposed abandonment of property under applicable law is discussed *infra*.

preserve potentially relevant Data Inventory.[251]  The Sub-Trusts Objection does not, and could not,

assert that *any* continued retention of the massive quantity of data subject to their document

requests, let alone the at least three months of retention they demand, would be "commercially

reasonable" for the Wind-Down Debtors functioning on a budget calibrated to fund operations

necessary to maximize the recoveries of the Debtors' first-lien creditors and fund distributions to

priority creditors under the Plan.  The Sub-Trusts also offer no legal authority supporting the non-

consensual use of the proceeds of the DIP Lenders' collateral for this purpose.

**2.      Retention Costs Should Not be Foisted on the Wind-Down Debtors**.

182.    In addition to seeking to triple the duration of the Notice Period, the Sub-Trusts

Objection also seeks to impose (a) 100% of the costs associated with the retention of Data

Inventory which is requested by the Sub-Trusts and "can reasonably be transferred" to the

Sub-Trusts prior to the expiration of the Notice Period but is not transferred, and (b) 50% of the

costs associated with retaining Data Inventory which is subject to a "good faith dispute between

the parties" as to its transferability.  Sub-Trusts Obj. at ¶¶ 4, 23.

183.    As an initial matter, the standard proposed by the Sub-Trusts is

unclear: no elaboration is offered which would clarify when the Debtors' refusal to transfer data

is the result of (a) "good faith dispute" or, or (b) some other unspecified motive where the subject

data is, in fact, "reasonably" able to be transferred.  The Debtors do not doubt, for example, the

*technological* feasibility of transferring some categories of Data Inventory requested by the Sub-

Trusts to date; the Debtors' refusal to transfer Data Inventory in response to certain demands by

the Sub-Trusts is instead driven by the Debtors' belief that doing so would contravene applicable

law, would not be sanctioned by the Protective Order or 2023 Plan or 2023 Confirmation Order

---

[251]  *Cooperation Agreement* § 1.1(g).

(each as defined in the Sub-Trusts Objection), respectively, and would potentially expose the Estates to material liability on account of a subsequent data breach. As the Sub-Trusts admit, the Debtors and Sub-Trusts have reached an "impasse" with respect to the massive quantities of Data Inventory subject to open requests from the Sub-Trusts.[252]  Months of repeated discussions on what would constitute a legal, non-cost prohibitive method of transferring the Data Inventory requested by the Sub-Trusts have failed to produce a mutually acceptable outcome, and subjecting the parties to a cost-sharing mechanism that is ambiguous on its face will only serve to add yet another layer of dispute regarding whether failure to transfer some subset of Data Inventory was the result of (a) the Debtors acting "unreasonably" or (b) "a good faith dispute," a question which is determinative under the Sub-Trusts' proposed cost-sharing mechanism.

184.    Further, the Sub-Trusts Objections' assertion that the terms of the Cooperation Agreement would require the Debtors to cover these retention costs is incorrect. As acknowledged in the Sub-Trusts Objection, under the Cooperation Agreement and 2023 Plan, respectively, the Sub-Trusts are responsible for "document retention costs 'that are either not in the ordinary course of business for the Reorganized Debtors or are otherwise not consistent with historical document retention practices.'"  Sub-Trusts Obj. at ¶ 29.  The subsequent statement in the Sub-Trusts Objection that "[t]he Trusts are not aware that any of the outstanding document requests implicate documents that are not maintained by the Debtors in the ordinary course" beggars belief. It is preposterous that any party that has been following these Chapter 11 Cases could assert in good faith that the documents requested by the Sub-Trusts (*e.g.*, historical emails and more than 33 trillion fields of patient data) are necessary for the Debtors' "ordinary course" operations given

---

[252] *Joint Motion of RAD Sub-Trust A and RAD Sub-Trust B for Entry of an Order (I) Authorizing and Directing the Debtors to Share Data Containing Protected Information Pursuant to the 2023 Plan; and (II) Granting Related Relief* [Docket No. 3166] (the "Sub-Trusts' Data Motion") at ¶ 29.

that the Debtors have, among other things, (a) filed Plan documents and made statements on the

record publicly conveying their intentions to liquidate substantial portions of their business and

(b) sold a vast majority of their operating assets months ago.  The Debtors have no meaningful or

ordinary-course operations, and the assertion that the Debtors would retain the Data Inventory

sought by the Sub-Trusts "in the ordinary course" is completely without merit.  Accordingly, the

Cooperation Agreement would not require the Debtors to bear these retention costs.  The Sub-

Trusts' arguments that the 2023 Plan documents and Cooperation Agreement, respectively, would

require the Debtors to shoulder these retention costs is further undercut by the fact that those

obligations, if they existed under the Cooperation Agreement or 2023 Plan documents, would be

unenforceable as against the Debtors, as discussed *infra*.

185.    The Sub-Trusts' arguments thus boil down to an assertion that permitting the

Debtors to destroy the applicable Data Inventory or, alternatively, require the Sub-Trusts to bear

the cost of its retention would be "unfair."  Sub-Trusts Obj. at ¶¶ 3, 4, 22, 28, 31.  To the extent

this is a legally relevant assertion (and no authority is provided which would support the conclusion

that it is), it is incorrect.

186.    *First*, the fact that the Sub-Trusts have been making requests for Data Inventory

over an extended period of time, *see*, e.g., Sub-Trusts Obj. at ¶ 3, is hardly relevant;

notwithstanding that certain of these requests (including requests for patient data) have broadened

over time, the Debtors do not claim that their refusal to meet these requests is on account of their

recency.  The Debtors will not fulfill the Sub-Trusts' requests due to serious concerns that doing

so would violate applicable law, vitiate patient rights, and expose the Estates to liability.

187.    *Second*, like the other arguments in the Sub-Trusts Objection, the perceived

unfairness of requiring the Sub-Trusts to bear the cost of retention is the product of willful

ignorance of the Debtors' dire financial condition and impending wind down.  The Wind-Down

Debtors are liquidating, and so the distribution of their assets will be, ultimately, a zero-sum game

with distributions determined in accordance with the Plan and the priority scheme set forth in the

Bankruptcy Code.  Every dollar of cost that the Sub-Trusts seek to impose on the Wind-Down

Debtors, whether it be directly through the demands in the Sub-Trusts Objection that the

Wind-Down Debtors bear open-ended retention costs or indirectly on account of the substantial

professional and employee time that will undoubtedly need to be dedicated to an additional *three*

*months* of conversations on this issue with the Sub-Trusts and their counsel, will directly reduce

the recovery of the Debtors' senior secured creditors.  Further, given the interdependent and

integrated nature of the Global Settlement, imposing millions of dollars of incremental retention

costs and professional fees would undoubtedly throw the viability of the Debtors' restructuring

into doubt to the detriment of all recovering secured and priority creditors, as well as the other

parties to the Global Settlement.  The parties to the Global Settlement agreed to a carefully

negotiated resolution that involved, among other things, mutual material concessions that were

understood to be final.  No explanation is offered as to how imposing these consequences on other

stakeholders is a more "fair" result for any party other than the Sub-Trusts.

188.    *Third*, as discussed *infra*, millions of patients have entrusted Rite Aid with their

Patient Data.  To the extent that information is turned over to any third party, let alone to the Sub-

Trusts in a manner consistent with their demands (wholesale, without screening by the Debtors or

any third party for relevance or protected information as requested in the Sub-Trusts' Data

Motion), the risk of a data leak which affects those patients increases materially.  Any retention or

transfer, relative to secure destruction of the data, yields that result.  However, where months of

negotiation and the Sub-Trusts' own filing of the Sub-Trusts' Data Motion evidence that the Sub-

Trusts are unwilling or unable to implement sufficient safeguards in receiving an unprecedented quantity of protected data, that risk is severely exacerbated.  It is not "fair" to expose patients to that risk for the Sub-Trusts' benefit.

189.    Accordingly, the Sub-Trusts objection should be overruled with respect to the Sub-Trusts' demands regarding allocation of costs.

> **3.    The Abandonment Contemplated in the Data Retention Plan is Permissible Under Applicable Law**.

190.    As noted *supra*, notwithstanding that the Data Retention Plan provides third parties with additional notice and protection relative to a typical abandonment of property and provisions ensuring the secure destruction of protected information, the Debtors are essentially seeking authorization to abandon the Data Inventory under section 554 of the Bankruptcy Code.

191.    Section 554 of the Bankruptcy Code provides that, "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554.  Additional authority to approve the Data Retention Plan in connection with confirmation of the Plan is also present in section 1142(b) of the Bankruptcy Code, which provides that a bankruptcy court may "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan" and section 105(a) of the Bankruptcy Code, which provides that a bankruptcy court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §§ 105(a), 1142(b).

192.    A debtor's power to abandon property is discretionary, and with respect to decisions to abandon property, "[c]ourts defer to the trustee's judgment and place the burden on the party

opposing abandonment to prove a benefit to the estate and an abuse of the trustee's discretion." *E.g.*, *In re Slack*, 290 B.R. 282, 285 (Bankr. D.N.J. 2003); *see also In re Wilton Armetale, Inc.*, 618 B.R. 424, 433 (Bankr. E.D. Pa. 2020) ("In deciding whether abandonment should be allowed, a court's role is not to second guess the trustee, but to determine if the trustee made a reasonable decision."). Abandonment of the Data Inventory easily passes muster under this deferential standard. The ongoing retention of hundreds of terabytes of Data Inventory imposes meaningful costs on the Estates, and by the end of the Notice Period (and in all likelihood, substantially in advance thereof), the Debtors will have identified and catalogued for retention the minimal subset of Data Inventory necessary to maximize the value of the Wind-Down Debtors' remaining assets.

193.    In addition to the obvious pecuniary costs of ongoing retention, long-term hosting of sensitive data is burdensome in and of itself. As this Court recently held in *Re BlockFi Inc.*, 2025 WL 1811970, at *1 (Bankr. D.N.J. July 1, 2025), "the indefinite retention of personally identifiable information and other sensitive customer data presents unnecessary exposure to potential cybersecurity breaches, which itself burdens the estate, and disposal of the Data Inventory is necessary to mitigate such risk." As in *BlockFi*, the indefinite retention of Patient Data imposes additional risks on both the Debtors and individual patients with no control over the future of their private health information, which evidences that ongoing retention is burdensome. And, as in *BlockFi*, the Debtors have proposed a Notice Period based on their reasonable determination of the maximum amount of time that Data Inventory can be retained before destruction must be commenced to avoid material additional fixed costs. Finally, and again as in *BlockFi*, "the requested relief is both appropriate and necessary to limit the risk of possible future data breaches and conclude these Chapter 11 Cases in an orderly, lawful, and efficient manner," because the imposition of material costs or lingering obligations would prevent the confirmation

of the Plan pursuant to the Global Settlement. In turn, failure to effect the Global Settlement would almost certainly result in the conversion or dismissal of these Chapter 11 Cases.  In the event of conversion or dismissal, the funding, framework, and professionals necessary to effect the secured, lawful destruction of protected information contemplated in the Data Retention Plan will not be readily available.

194.    The Sub-Trusts have offered no evidence or argument that the Debtors have failed to meet their burden under section 554 of the Bankruptcy Code.  This defect alone should be sufficient grounds to overrule the Sub-Trusts Objection.

195.    Instead, the Sub-Trusts Objection relies solely on the terms of the 2023 Plan and Cooperation Agreement, respectively.  With respect to the Cooperation Agreement, that agreement is a prepetition executory contract which the Sub-Trusts are attempting to enforce in violation of the automatic stay, and which will be rejected on the Effective Date.

196.    The filing of a bankruptcy petition results in the automatic imposition of a global stay which prevents, *inter alia*, parties from seeking to "obtain possession of property of the estate or to exercise control over the property of the estate." 11 U.S.C. § 362(a)(3).  Under section 541 of the Bankruptcy Code, the estate is comprised of, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case," a phrase which is construed broadly and has been held by courts in other jurisdictions to include the Debtors' books and records.  *In re Endeavor Highrise, L.P.*, 432 B.R. 583, 636 (Bankr. S.D. Tex. 2010) ("Records related to the operation of a debtor's business are included within this property that becomes part of the estate upon filing."); *In re Integrated Res., Inc.*, 1992 WL 8335 (Bankr. S.D.N.Y. Jan. 14, 1992) (affirming the bankruptcy court's decision to decline to grant a request to lift the stay to compel the return of books and records, which were held to be property of the estate); *In re Blinder,*

*Robinson & Co.*, 140 B.R. 790 (D. Col. 1992) ("Property of the estate includes books and records produces during a corporation's existence.").

197.    As the Sub-Trusts note, however, the Debtors and the Trusts have reached an impasse.[253]  As a consequence of this impasse, the Sub-Trusts now seek to enforce the terms of a prepetition contract which they aver requires ongoing retention of Data Inventory, improperly seeking to compel the Debtors to retain (and transfer) that Data Inventory.  That alone would constitute unlawful interference with the property of the Estates; this is exacerbated by the material costs the Debtors seek to impose through this extended retention period.[254]  These costs inure to the benefit of no stakeholder but the Sub-Trusts.

198.    This piecemeal enforcement by prepetition creditors and contract counterparties which permits one stakeholder to siphon value from a debtor's estate to the detriment of others is exactly what the automatic stay and, as addressed *infra*, the Debtors' ability to reject burdensome contracts are intended to prevent.  *In re Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d. Cir. 1982) ("Under the [Bankruptcy Code], relief from a stay must be authorized by the Bankruptcy Court to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.").  The data sought by the Sub-Trusts is the property of the Debtors' estates, which the Sub-Trusts seek to exercise control over, at substantial cost to the Debtors and in a manner exposing prior patients to considerable risk.  Because the Trusts have not

---

[253]  Sub-Trusts' Data Motion at ¶ 29.

[254]  *E.g.*, if the Debtors are required to continue storing structured data on their "mainframe" hosting system past January 31, 2026, they will incur a $2.3 million annual renewal charge.  Staffing, network, equipment, and other application services related to the mainframe result in significant costs as well, and the Debtors estimate that total Mainframe costs result in over $1.7 million of expenses on a monthly basis (inclusive of disaggregated yearly charges like the $2.3 million referenced).

sought to lift the automatic stay to permit their requested exercise of control over the Debtors' books and records nor attempted to make the required showing of cause, the Sub-Trusts' reliance on the terms of the Cooperation Agreement must fail.

199.    In addition to seeking relief in contravention of the automatic stay without the required showing of cause,[255] the Sub-Trusts Objection would render the Debtors' rejection powers a nullity with respect to the Cooperation Agreement.  Section 365(a) of the Bankruptcy Code provides in pertinent part that "subject to the court's approval, may assume or reject *any* executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a) (emphasis added).  The rejection power "is limited only when additional restrictions or limitations have been established in the Bankruptcy Code" and "has its roots in the principle that the trustee in bankruptcy may renounce title to and abandon burdensome property if such action is deemed to be in the best interests of the estate."  *Matter of Taylor*, 103 B.R. 511 (Bankr. D.N.J. 1989).

200.    The Sub-Trusts, like all parties in interest, have been on notice since the first iteration of the Plan was filed on September 3, 2025, that the Debtors intended to reject all executory contracts save for a subset of agreements specifically identified for assumption under the Plan.   This message has been amplified in the Debtors' regular exchanges with the Sub-Trusts regarding the Data Retention Plan, which has, since it was originally shared with the Sub-Trusts in draft form in September, 2025, stated that it would serve as a replacement for the Cooperation Agreement.  The Debtors' position has long been clear:  the prior information sharing paradigm, even if it would have permitted the Debtors to share information in the manner requested by the Sub-Trusts, would not be sustainable in the face of the Debtors' impending wind down.

---

[255]  11 U.S.C. § 362(d).

201.    The Cooperation Agreement is an archetypically burdensome agreement of the sort which Congress intended for debtors to be able to discard for the benefit of the estate under section 365(a) of the Bankruptcy Code.   The decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See, e.g.*, *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996); *see also N.L.R.B. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test.").   The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See Lubrizol Enters., Inc. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert, denied, 475 U.S. 1057 (1986).   The ability to assume or reject executory contracts and unexpired leases is essential in chapter 11 to relieve a debtor's estate from burdensome obligations that could impede confirmation of a chapter 11 plan. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984).

202.    Accordingly, even if the Cooperation Agreement required the relief sought by the Sub-Trusts, the Debtors are empowered to reject it if doing so comports with their business judgment, so long as it is an executory contract.   The Third Circuit Court of Appeals has adopted the "Countryman" test to determine whether a contract is executory, which provides that "[a]n executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  *In re Weinstein Company Holdings LLC*, 997 F.3d 497, 504 (3d. Cir. 2021) (citing *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623 (3d Cir. 2005)).

94

203.    The Cooperation Agreement is executory under this standard.    The Debtors'

obligations under the Cooperation Agreement include that:

(a)     Section 1.1(a) requires the Debtors to "use reasonable efforts to collect, copy, and transfer to the Trust (and/or applicable GUC Sub-Trust), Documents or information requested by the Trust under the terms of this Agreement that are relevant to pursue and/or litigate any Assigned Claims and/or Assigned Insurance Rights or to reconcile and administer Tort Claims.[256]

(b)     Sections 1.1(b) and 1.1(c) require the Debtors to "conduct a reasonable search for" and, if identified through that search, transfer certain claim records, and to confer with the Sub-Trusts regarding the parameters for this review.[257]

(c)     Section 1.1(d) requires the Debtors to provide access to their books and records to the Trusts.[258]

(d)     Section 1.1(g) requires the Debtors to take "commercially reasonable measures" to preserve potentially relevant documents for a period of five years following the effective date of the 2023 Plan.  Section 1.2 calls for similar retention obligations, for the same duration.[259]

(e)     Section 2.1 requires the Debtors to make their current and former employees and professionals available to the Sub-Trusts for purposes of providing testimony and information to the Sub-Trusts in connection with the litigation and insurance rights assigned to them.[260]

204.    In addition to being obligated to treat protected, confidential, or privileged

information per the requirements of the Cooperation Agreement,[261] the Sub-Trusts are obligated

to reimburse the Debtors for reasonable costs and expenses (including professional fees and

allocation of employee time) "incurred in connection with [the Debtors] cooperation thereunder,"

subject to exclusions for retaining providing certain subsets of data specified on exhibits to the

---

[256]   *Cooperation Agreement § 1.1(a).*

[257]   *Cooperation Agreement § 1.1(b)-(c).*

[258]   *Cooperation Agreement § 1.1(d).*

[259]   *Cooperation Agreement § 1.1(g).*

[260]   *Cooperation Agreement § 2.1.*

[261]   *Cooperation Agreement §§ 1.3, 1.6.*

Cooperation Agreement and for actions the Debtors would take in the ordinary course of business consistent with historical practices.[262]

205.    Bankruptcy courts apply state law to determine whether an obligation is "material" for purposes of applying the Countryman test.  *In re S.A. Holding Co., LLC*, 357 B.R. 51, 57 (Bankr. D.N.J. 2006) ("The materiality of any remaining unperformed obligation is evaluated according to the relevant non-bankruptcy law.")  Under New York State law, which governs the Cooperation Agreement,[263] a provision is material if it "go[es] to the root of the agreement between the parties," and its breach "is so substantial that it defeats the object of the parties in making the contract."  *Wechsler* v. *Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004) (quoting *Felix Frank Assocs., Ltd.* v. *Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d. Cir. 1997); *Genesis Global Holdco, LLC*, 660 B.R. 439, 517 (Bankr. S.D.N.Y. 2024) (same).  Further, the Countryman test as expressly adopted in this Circuit provides its own definition: an obligation is material if its breach would "excus[e] the performance of the other [party]."  *In re Weinstein Company Holdings LLC*, 997 F.3d 497 at 504; *see also In re In re Exide Technologies,* 607 F.3d 957, 962 (3d. Cir. 2010) ("Under New York law, a material breach, which justifies the other party to suspend his own performance, is a breach which is so substantial as to defeat the purpose of the entire transaction.") (internal quotations omitted).

206.    The foregoing obligations of both the Debtors and the Sub-Trusts are plainly material.  As the Cooperation Agreement itself states, its purpose is to lay out the parameters pursuant to which the Debtors provide reasonable cooperation necessary to support the Sub-Trusts' pursuit of the claims and insurance rights assigned to them under the 2023 Plan.[264]  Each of the

---

[262]  *Cooperation Agreement § 3.1.*

[263]  *Cooperation Agreement § 3.12.*

[264]  *Cooperation Agreement § 3.12*

Debtors' obligations listed *supra* is part and parcel of this litigation support which is the *raison d'être* of the Cooperation Agreement, and so "goes to the root of the agreement between the parties." *Weschler* v. *Hunt Health Sys.,*, 330. F. Supp. 2d at 414.

207.     Further, the Cooperation Agreement expressly provides, as contemplated under the Countryman test, that the Sub-Trusts' reimbursement obligation is "material."  Section 3.5 of the Cooperation Agreement states, in pertinent part, that "***a material breach of obligations of the Trust under this Agreement, including a failure by the Trust to promptly reimburse the Reorganized Debtors in accordance with Section 3.3(a)***, may constitute an event of default . . ." permitting cessation of performance by the Debtors after notice and a determination that such a breach has occurred by the Bankruptcy Court.[265]   The Cooperation Agreement, by its plain language, identifies at least one material obligation of the Sub-Trusts, in a provision which uses the word "including" to clarify that it is not an exhaustive list.

208.     The Sub-Trusts aver in the Sub-Trusts Objection that the Debtors have not fully performed their cooperation obligations, and so long as this cooperation remains ongoing, the Sub-Trusts are responsible for the applicable reimbursements of costs incurred in connection with it. Those outstanding obligations of the Debtors and the Sub-Trusts are material, and the Cooperation Agreement is thus an executory contract.

209.     The fact that the Cooperation Agreement was approved by the 2023 Confirmation Order does not transform it into an evergreen package of obligations that the Debtors cannot reject. *In re Columbia Gas Sys.*, 50 F.3d 233, 238 (3d. Cir. 1995) (When evaluating whether a court-approved agreement remains a contract susceptible to rejection, the relevant analysis is whether the arrangement "should be considered a contract under nonbankruptcy law," with this being the

---

[265]   *Cooperation Agreement § 3.5.*

case where agreements "share many characteristics of voluntary contracts and are construed according to traditional precepts of contract construction," finding a court-approved settlement executory where "[t]he parties crafted the agreement and the court approved it" and "the rights and obligations of the parties do not derive solely from the court's judgment, but depend . . . on the performance of the other party").[266]  Nor does the fact that a contract is approved pursuant to a prior plan of reorganization preclude rejection in a subsequent bankruptcy.  *In re Jartran, Inc.*, 71 B.R. 938, 943 n. 8 (Bankr. N.D. Ill. 1987) (holding that counterparty to a contract assumed pursuant to a prior plan of reorganization was not entitled to priority rejection damages claims under 11 U.S.C. § 365(g)(2)(A), because the court had "determined that the instant case is a different case than the prior case.").

210.    Accordingly, the Cooperation Agreement is a prepetition executory contract that the Debtors may reject if doing so is a reasonable exercise of their business judgment.  The Cooperation Agreement is burdensome and its rejection provides a clear and immediate benefit to the Debtors' estates, satisfying that standard.  This is evidenced by an examination of the would-be consequences of the Trusts' recent efforts to enforce it.  The Sub-Trusts do not, and cannot, assert that rejecting the Cooperation Agreement is inconsistent with the Debtors' business judgment.

211.    Finally, as the Sub-Trusts acknowledge, under the Cooperation Agreement they were "afforded one year after the 2023 Plan Effective Date to make requests to the Debtors for relevant documents, but such period has been extended by consent of the Debtors."  Sub-Trusts Obj. at ¶ 12.  The Debtors will, naturally, decline to grant further extensions of the Cooperation Agreement.  So, enforcement of the prepetition, executory Cooperation Agreement's provisions regarding years-long retention (setting aside the arguments regarding allocation of cost discussed

---

[266]    The Sub-Trusts repeatedly describe this framework as "carefully negotiated."  Sub-Trusts Obj. at ¶¶ 1, 22.

*supra*) is an effort to contravene the automatic stay to enforce a prepetition contract subject to near-term reject, and the Sub-Trusts' rights to request Claim Records under it shall have expired prior to entry of any order confirming the Plan.

212.    With respect to the 2023 Plan and 2023 Confirmation Order (as defined in the Sub-Trusts Objection), the Sub-Trusts' assertions boil down to the argument that the terms of the prior Confirmation Order should bind the Debtors in these Chapter 11 Cases, even through Confirmation of the Plan.  This outcome would be inconsistent with the well-developed body of caselaw providing that "the failure of Congress to include in § 109 a prohibition against filing a second Chapter 11 petition ***evidences an intent not to close the courthouse doors to Chapter 11 debtors who, as a result of unanticipated changed circumstances, are unable to fully perform under a prior plan***."   *In re Casa Loma Assocs.*, 122 B.R. 814, 815 (Bankr. N.D. Ga. 1991) (emphasis added); *see also In re Triumph Christian Ctr.*, 493 B.R. 479, 487 (Bankr. S.D. Tex. 2013) ("Where unanticipated changed circumstances exist, Chapter 11 relief may be justified even when obligations created under a previously confirmed, substantially consummated plan will be modified.").  While these cases (and the others comprising this well-established body of caselaw) concern dismissal of repeat filings at their outset, an issue not before this Court, the rule they embody is clear:  in a subsequent chapter 11 case, a debtor may modify the terms of a prior plan, including through confirmation of a subsequent plan.

213.    The one case cited in the Sub-Trusts Objection, *In re APP Winddown, LLC*, et al., No. 16-12551 (Bankr. D. Del. Dec. 16, 2019), Docket No. 2279, is inapposite.  While *APP Winddown* did concern two serially confirmed chapter 11 plans, it addressed a motion to abandon property in contravention of the terms of the *second* and most recently confirmed of the two, not the effect of the first plan on the terms of the second.  Accordingly, the holding in *APP Winddown*

99

does not support the Sub-Trusts' position that a *prior* plan's prohibitions on document destruction are enforceable against a debtor in a subsequent chapter 11 case. Rather, the *APP Winddown* decision underscores the importance of obtaining appropriate and practicable relief in connection with confirmation of the Plan before this court.

214.    The Debtors do not intend to malign the motivations of the Sub-Trusts and credit their intent is to serve their beneficiaries to the best of their ability. However, that good faith does not justify the concerns of the Sub-Trusts and their beneficiaries superseding those of the stakeholders in these Chapter 11 Cases and prior patients, particularly given the absence of any supporting legal authority in the Sub-Trusts Objection. If the Sub-Trusts are able, during the Notice Period, to leverage the conversations that have occurred over the past months to formulate and propose a solution which accounts for the interests of those stakeholders, the Debtors remain committed to transferring them Data Inventory pursuant to that solution. This commitment is substantiated by the record, which reflects that the Debtors have repeatedly consensually extended the Cooperation Agreement, dedicated significant resources to these conversations with the Sub-Trusts, and have not sought to enforce the Cooperation Agreement's reimbursement provisions during this time. However, in the event that a mutually agreeable solution is not reached, it is not "fair," as repeatedly asserted in the Sub-Trusts Objection to impose the cost of further delay, incurred for the benefit of the Sub-Trusts, on other stakeholders.

215.    Accordingly, the Sub-Trusts Objection should be overruled.

### **Waiver of Bankruptcy Rule 3020(e)**

216.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[267]

---

[267]    *See* 11 U.S.C. § 3020(e).

217.    To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).  Courts in this district have waived the stay where the Debtors demonstrate that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020(e)so that the Confirmation Order will be effective immediately upon its entry.[268]

218.    As set forth in the Liebman Declaration, the Debtors currently anticipate emerging from chapter 11 on or around December 8, 2025, and there are a number of critical steps that must be completed in advance of emergence.  These steps include, among other things, effectuating the transfer of the Rite Aid 401(k) Plan to the Plan Sponsor Entity, as well as implementing certain of the tax-related restructuring transactions described in the Restructuring Steps Memorandum.  The timely completion of these actions is necessary to avoid jeopardizing the Debtors' targeted emergence timeline and to ensure an orderly and efficient transition to the Reorganized Debtors' post-emergence structure.  In addition, no party in interest other than the U.S. Trustee has objected to, or otherwise opposed, the Debtors' request for a waiver of the Bankruptcy Rule 3020(e) stay.

219.    Accordingly, good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## **Conclusion**

220.    For the reasons set forth herein, the Debtors respectfully request that the Court overrule any outstanding Objections, confirm the Plan, approve the Disclosure Statement on a final basis, and enter the Confirmation Order.

---

[268]    S*ee, e.g., Cyxtera Technologies, Inc., et al.*, No. 23-14853 (JKS) (Nov. 17, 2023) (waiving the stay); *Bed Bath & Beyond, Inc., et al.*, No. 23-13359-VFP (MBK) (Sept. 14, 2023) (same); *In re L'OCCTAINE, Inc.*, No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021) (same)*; In re Hollister Construction Services, LLC*, No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021) (same); *In re SLT HoldCo, Inc., et al.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (same).

Dated:     November 21, 2025

/s/ Michael D. Sirota
─────────────────────────────────
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
Email:        msirota@coleschotz.com
              wusatine@coleschotz.com
              fyudkin@coleschotz.com
              svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel for Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Reply Chart**

***In re New Rite Aid, LLC*, Case No. 25-14861 (MBK)**

Summary of Formal Confirmation Objections[1]

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| **1.** | Element Fleet Corporation ("Element Fleet") [Dkt. No. 3263] | • Plan should preserve Element Fleet's setoff rights. ¶¶ 17–22.<br><br>• Element Fleet should not be required to file a motion to preserve its setoff rights. ¶ 23. | The Debtors anticipate resolving this objection with agreed language in the Confirmation Order. | Expected to be resolved. |
| **2.** | Chubb Companies [Dkt. No. 3265] | • The Plan cannot modify, alter, or impair the Insurance Programs and they must be enforced as written. ¶¶ 22–27.<br><br>• The Plan cannot assign Insurance Programs, or any part thereof, without the Chubb Companies' consent. ¶¶ 28–36.<br><br>• The Plan must provide that workers' compensation and direct action claims continue in the ordinary course. ¶¶ 37–39.<br><br>• The Plan contains an improper gatekeeping provision. ¶¶ 40–43.<br><br>• The Chubb Companies do not consent to and opt-out of the Third-Party Release. ¶¶ 44–45. | The Debtors anticipate resolving this objection with agreed language in the Confirmation Order. | Expected to be resolved. |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Plan, the Disclosure Statement, or the relevant Objection, as applicable.

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| **3.** | Santiago Holdings II, LLC, Levin Management Corporation; MAG II Morrell Plaza, LP; Trusts Under the Will of Janice Levin; Robert Marin and Celeste de Schulthess Marin, Trustees of the Robert Marin and Celeste de Schulthess Marin Family Trust (SPW) UDT; Felos Associates, LLC; Joseph Murphy Corporation; Yoko C. Gates Trust; SADG-1 Limited Partnership; SADG-3 Limited Partnership; SADG-4 Limited Partnership; RAP Hamlin LP, RAP Dallas LP; Ald Capital PA; LLC | • Plan should preserve the Claimants' rights to pursue insurance claims. ¶¶ 10–12.<br><br>• The Plan does not demonstrate that all administrative expense claims will be paid in full as required by section 1129(a)(9)(A) of the Bankruptcy Code. ¶¶ 13–15.<br><br>• Cross-motion for allowance and payment of filed administrative expense claims for unpaid rents. ¶¶ 16–21. | • The Debtors have proposed language in the Confirmation Order that would confirm that each of the Stark Landlords opted-out of the Third-Party Release, such that they are neither a Releasing Party nor a Released Party under the Plan.<br><br>• The Wind-Down Budget is reasonably calculated to pay all Allowed Administrative Expense Claims in full, unless the Holder has agreed to different treatment, in accordance with the Plan and as required by the Bankruptcy Code. Further, the cash projected to be available to the Wind-Down Debtors will be sufficient to satisfy all payments provided for in the Wind-Down Budget. Accordingly, the Plan is feasible.<br><br>• Any motions for payment of administrative claims may be filed any time prior to the Claims Bar Date, and the Debtors shall be obligated to pay any such Allowed Administrative | Outstanding. |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | Bethel Park Library, LLC; Red Lion Broadway, LLC; 569 Broadway Associates; Mt. Lebanon Cooke, LP<br><br>(the "Stark Landlords") [Dkt. Nos. 3267 and 3269] | | Expense Claims in accordance with the Plan. | |
| 4. | The Commons at Calabasas, LLC; CLPF Harbour Pointe, LLC; GKGF, LLC; MGP XI Northgate, LLC; MGP XI-A Town Center Lake Forest, LLC; B10 Mountain A LA LP; B10 Mountain B LA LP; B10 Mountain A OC LP; B10 Mountain A OR LLC; B10 Mountain B OR LLC; B10 Mountain B SF LLC; B10 Mountain | • The Disclosure Statement fails to provide "adequate information." In particular, the most fundamental flaw is Debtors' failure to timely provide the Wind-Down Budget to creditors for review and analysis prior to the objection deadline on the Proposed Plan. ¶¶ 5–10.<br><br>• The Plan fails to meet the Third Circuit standards for approval of a settlement under *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). ¶ 10.<br><br>• Plan's exculpation and injunction provisions are overbroad and jeopardize potential recoveries from Debtors' existing insurance and other parties, including SB360. ¶¶ 11–17. | • The Disclosure Statement provides adequate information in accordance with section 1125 of the Bankruptcy Code.<br><br>• To the extent applicable, the proposed settlements in the Plan under Bankruptcy Rule 9019 satisfy the standard set forth in *In re Martin*, which recognizes the following four criteria a bankruptcy court should consider when determining whether or not to approve a settlement.<br><br>• (1) the probability of success in litigation; | Outstanding. |

| Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| A WA LLC; B10 Mountain B WA LLC; BCORE Westwood Village LLC; NMP-C4 Fairfield S/C, LLC; ROIC Paramount Plaza, LLC; RI - Grass Valley, LLC; Rich/Cherry, LLC; J.W. Rich Investment Company; Montecito Market Place Associates; Surapaneni Fresno Properties, LLC; Zentmyer Properties II LLC (the "Allen Matkins Landlords") [Dkt. No. 3271] | | <ul><li>(2) the likely difficulties in collection;</li><li>(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and</li><li>(4) the paramount interest of the creditors.</li></ul> *In re Martin*, 91 F.3d at 393.<br><br><ul><li>Here, the Debtors have not identified any valuable claims that are being released pursuant to the Plan, and the releases and other settlements, including with the PBGC and DOJ are supported by the Debtors' creditors, including the DIP Lenders, who have a lien on all of the Debtors' claims and Causes of Action.</li></ul><br><ul><li>The Exculpation and Injunction provisions are consistent with applicable law, are integral components of the Plan, and have been approved in prior chapter 11 cases in the Third Circuit,</li></ul> | |

|  | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
|  |  |  | including in the prior Rite Aid chapter 11 cases. |  |
| 5. | RAD Sub-Trust A and RAD Sub-Trust B (the "Sub-Trusts") [Dkt. No. 3270] | Data Retention Plan should be amended to (i) increase the Notice Period to 90 days and (ii) require the Wind-Down Debtors to pay for (a) all costs for retaining Trust Data requested during the Notice Period that could reasonably be transferred and (b) 50% of the costs for retaining Disputed Data. ¶¶ 22–32. | The Debtors are permitted to reject the Litigation Trust Cooperation Agreement, which is an executory contract, and it is in their business judgement to do so. Further, the Debtors may destroy the Trust Data as contemplated in the Data Retention Plan pursuant to section 554 of the Bankruptcy Code and applicable law. | Outstanding. |
| 6. | Martin C. Gordon and Putative Class of WARN Plaintiffs ("WARN Claimants") [Dkt. No. 3275] | Plan is not feasible because it provides no information that the WARN Act Claims, as priority claims, will be paid in full. ¶¶ 3–10. | As explained above in row 3, the Plan is feasible with respect to payments to be made to Holders of Allowed Administrative Expense Claims. The putative WARN class action covers Federal WARN claimants who worked at or reported to, or received assignments from the Valley Green Facility and the Collaboration Center Facility. The Administrative Claims Procedures did not except Federal WARN claims (only, among others, NY, NJ, and MD WARN claims). Only 48 individuals of the putative class opted out of the Administrative | Outstanding. |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | | | Claims Procedures of for a total asserted amount of claims of approximately $700,000. | |
| 7. | 5931 Atlantic, LLC; AAT Del Monte LLC; Balden Towne Plaza Limited Partnership; Brixton Capital; CP/IPERS Woodfield, LLC; EDENS; Fairview Shopping Center, LLC; Gartin Properties LLC; HCP RRF Sand Canyon LLC; Huntingdon Pike Company; Lancaster Development Company, LLC; Manoa Shopping Center Associates, L.P.; Northern Trust Bank of CA, N.A.; Prime/FRIT Bell Gardens, LLC; | • Plan is not feasible under section 1129(a)(9) of the Bankruptcy Code because the Debtors have provided insufficient disclosure regarding the projected amount of payments to Holders of Administrative Claims and how much funding will be available to make required payment. ¶¶ 10–13.<br><br>• All rights and obligations of the parties to leases must survive Plan confirmation and the effective date, regardless of whether they arose or accrued prior to Plan confirmation. ¶¶ 14–15.<br><br>• Plan cannot provide for automatic disallowance of any claims without notice to the Claimant. ¶ 16. | • As explained above in row 3 above, the Plan is feasible with respect to payments to be made to Holders of Allowed Administrative Expense Claims. The Ballard Spahr Landlords are entitled to opt-out of the Third-Party Release and retain any claims and Causes of Action they may have against non-Debtors, including insurers. Further, as explained in Memorandum, the Plan is feasible, including with respect to payment of any Allowed Administrative Claims owed to landlords, whether arising in connection with the rejection of their lease or otherwise.<br><br>• The Bankruptcy Code does not impose any obligations in connection with confirmation of the Plan to affirmatively preserve or facilitate the pursuit of any | Outstanding. |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | QCSI Six LLC; RAR 2 Queen Anne Eden Hill QRS, LLC; Realty Income Corporation; Redondo Prime 1, LLC; S & N II, Ltd.; SOGoodnoes Corner JV LLC; Spirit EK Vineland NJ, LLC; Spirit RA Plains PA, LLC; SVAP III Plaza Mexico, LLC; The Irvine Company LLC; Valley Mall, L.L.C.; and Weis Markets Inc.Company LLC, Valley Mall, L.L.C. and Weis Markets Inc. (the "Ballard Spahr Landlords") [Dkt. No. 3272] | | claims or Causes of Action any parties may have against insurers. <br><br> • The Debtors have added language to the proposed Confirmation Order that retains Holders' rights to challenge any determination by the Debtors to automatically disallow a proof of claim. The Debtors believe that such language resolves this objection. | |
| 8. | The Southern California UFCW Unions & Drug Employers Pension Fund | • Debtors have failed to demonstrate that the plan is feasible, specifically that they are able to pay administrative claims in full, including the Pension Funds' potential administrative claim for withdrawal liability. ¶¶ 12–20. Pension | • As explained above in row 3, the Plan is feasible with respect to payments to be made to Holders of Allowed Administrative Expense Claims, including with | Outstanding. |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | and the Southern California Drug Benefit Fund [Dkt. No. 3268] (the "Pension Funds") | Funds estimate that the Debtors' total withdrawal liability is $82,714,852. They contend that most of this amount is a general unsecured claim, but that a "portion" is attributable to the postpetition period and therefore constitutes an administrative expense. ¶¶ 6–7.<br><br>• Debtors should not receive a discharge as the Plan provides for the liquidation of all or substantially all of the Debtors' Estates. ¶¶ 21–24.<br><br>• Plan provides for overbroad third-party releases and injunction provisions which are overbroad and not permissible under applicable law. ¶¶ 25–26. | respect to any obligations owed with respect to administrative claims for withdrawal liability.<br><br>• The Debtors have agreed to include language in the Confirmation Order stating that the Wind-Down Debtors are not receiving a discharge. | |
| 9. | Brixmor Property Group, East Park Development, LLC, First Washington Realty, LLC; Lerner Properties; NewMark Merrill Companies; NNN REIT, Inc.; and Regency Centers, L.P. (the "KDW Landlords") [Dkt. No. 3277] | • Confirmation of the Plan should neither impair nor diminish Landlords' setoff rights pursuant to their leases. ¶¶ 5–8.<br><br>• Plan fails to satisfy sections 1129(a)(9) and 1129(a)(11) of the Bankruptcy Code by failing to show whether the Administrative / Priority Claims Reserve will contain sufficient funds to satisfy all Administrative and Priority Claims. ¶¶ 9–13.<br><br>• Neither the Confirmation Order nor the Plan should modify or diminish the Debtors' | • The Debtors have added language to the Confirmation Order that preserves the KDW Landlords' right of setoff. The Debtors believe that such language resolves this objection.<br><br>• As explained above in row 3, the Plan is feasible with respect to payments to be made to Holders of Allowed Administrative Expense Claims. | Outstanding |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | | obligations pursuant to the Final Financing Order to pay Stub Rent and Post-Petition Obligations. ¶¶ 14–17.<br><br>• Neither the Confirmation Order nor the Plan should impact the agreements of the relevant parties to any Lease Assignment Order. ¶¶ 18–21.<br><br>• The bar date for Rejection Claims should not occur earlier than the Plan Effective Date to afford Landlords sufficient time to prepare and file their Rejection claims. ¶¶ 22–23. | • The Debtors have added language to the Confirmation Order that provides that notwithstanding entry of the Confirmation Order, all parties' rights with respect to rejection, assumption, assumption and assignment, and/or cure that remain outstanding are reserved. The Debtors' believe that such language resolves this objection.<br><br>• Stub Rent Claims are capped in the aggregate at $23,388,878, and no individual Stub Rent Claim can be allowed or paid to the extent that, when added to prior Stub Rent payments, it would cause total Stub Rent payments to exceed that cap. Any right to payment above that cap was permanently waived upon entry of the Final Financing Order.<br><br>• The Debtors expect to resolve the objection with respect to the Rejection Bar Date through revised language to the Plan and/or Confirmation Order. | |

|  | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| **10.** | Gibraltar Management Co., Inc.; Inland Commercial Real Estate Services LLC; and The Widewaters Group, Inc. (the "BarclayDamon Landlords") [Dkt. No. 3284] | Plan does not sufficiently disclose the Debtors' ability to satisfy "Excluded Claims" under the Administrative Claims Procedures from the reserves detailed in the Plan which leaves the Landlords without any assurance that their administrative claims will be paid in full as required by section 1129(a)(9) of the Bankruptcy Code. ¶ 8. | As explained above in row 3, the Plan is feasible with respect to payments to be made to Holders of Allowed Administrative Expense Claims. | Outstanding. |
| **11.** | CVS Pharmacy, Inc. ("CVS") [Dkt. No. 3289] | Plan should clarify continuing rights and obligations of Debtors, Wind-Down Debtors, and/or Reorganized Debtors in accordance with the CVS Sale Order and CVS APAs. ¶¶ 3–6. | The Debtors anticipate resolving this objection with agreed language in the Confirmation Order. | Expected to be resolved. |
| **12.** | U.S. Trustee [Dkt. No. 3266] | Plan proposes unauthorized non-consensual third-party releases. ¶¶ 44–81. | The Debtors believe the Plan's third-party releases are consensual and consistent with precedent. | Outstanding. |
|  |  | Plan proposes overbroad Debtor releases. ¶¶ 82–90 | The Debtors believe the Plan's debtor releases are appropriately tailored and consistent with precedent. | Outstanding. |
|  |  | Plan proposes an overbroad exculpation provision which exceeds the limitations of Third Circuit law. ¶¶ 91–97 | • The Debtors believe that the 1125(e) exculpation is consistent with the Bankruptcy Code. | Outstanding. |

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | | | • The Debtors believe that the Plan's exculpation provisions are appropriately tailored and consistent with precedent. | |
| | | Plan proposes an overbroad and impermissible injunction provision. ¶¶ 98–102 | • The Debtors have proposed language to limit the scope of the injunction with respect to the Wind-Down Debtors. The Debtors believe this objection has been resolved.<br><br>• The Debtors believe the Plan's injunction provision is appropriately tailored and consistent with precedent | Partially outstanding. |
| | | Debtors have not presented exigencies that justify a waiver of the 14-day Bankruptcy Rule 3020(e) stay. ¶¶ 103–107. | The Debtors believe cause exists to support a waiver of the 14-day stay under Bankruptcy Rule 3020(e). | Outstanding. |
| | | Plan proposes a gatekeeping provision that should not be permitted. ¶¶ 108–111 | The Debtors believe the Plan's gatekeeping provision is appropriate and consistent with the approval of the third-party release. | Outstanding. |
| | | Plan exceeds the scope of what can be settled under section 1123(b)(3)(A) of the Bankruptcy Code and is not a settlement subject to approval under Bankruptcy Rule 9019. ¶¶ 112–117. | The Debtors anticipate resolving this objection with agreed language in the Plan and/or Confirmation Order. | Expected to be resolved. |

11

| | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
| | | Plan provisions regarding Statutory Fees should be revised to provide joint and several liability for the Wind-Down Debtors and Reorganized Debtors. ¶¶ 118–120. | The Debtors anticipate resolving this objection with agreed language in the Plan and/or Confirmation Order. | Expected to be resolved. |
| | | Plan provisions providing deemed acceptance if no votes are cast and the class contains voting-eligible holders of claims or interests is inconsistent with the Bankruptcy Code. ¶¶ 121–122. | The Debtors have agreed to remove this language from the Plan. | Resolved. |
| | | Plan provisions concerning indemnification and exculpation for Liquidating Trustee should be removed as Liquidating Trust does not exist until after Effective Date. ¶¶ 123-124. | The Debtors will resolve this objection with removal of agreed language in the Plan. | Resolved. |
| | | Plan provisions providing for separate release and discharge to the Committee should be removed. ¶¶ 125-128. | The Debtors anticipate resolving this objection with agreed language in the Plan. | Expected to be resolved. |
| | | Plan provisions providing for Substantial Consummation should be revised to occur only when the requirements of section 1101(2) of the Bankruptcy Code are met. ¶¶ 129-131. | The Debtors will resolve this objection with agreed language in the Plan. | Resolved. |
| | | Plan does not disclose the identity of the Liquidating Trustee as required by section 1129(a)(5)(i) of the Bankruptcy Code. ¶¶ 132-135. | The Debtors have resolved this objection by disclosing identity of Liquidating Trustee prior to Confirmation Hearing. | Resolved. |
| 13 | Ebony Bates [Dkt. No. 3297] | • Plan should not preclude Ms. Bates from seeking recovery against proceeds of Debtors' insurance policies. ¶¶ 11-17. | The Debtors anticipate resolving this objection with agreed language in the Confirmation Order. | Expected to be resolved |

12

|  | Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|---|
|  |  | • To the extent that the Plan's gatekeeping provisions prevent this, Ms. Bates also objects to such provisions. ¶ 18. |  |  |
| 14 | NBPIV Delran LLC (the "Central Fill Landlord") [Dkt. No. 3294] | Reservation of rights with respect to the Central Fill Facility Lease, including the Debtors' request to assume the Central Fill Facility Lease under the Plan and set a cure amount. ¶¶ 6-7. | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Expected to be resolved. |

[*Remainder of Page Intentionally Left Blank*]

***In re New Rite Aid, LLC*, Case No. 25-14861 (MBK)**

Summary of Informal Confirmation Objections[1]

| | **Party** | **Summary of Objection** | **Status** |
|---|---|---|---|
| **1.** | Texas Comptroller of Public Accounts ("<u>Texas Comptroller</u>") | Preservation of setoff rights. | Resolved with language in the Confirmation Order. |
| **2.** | Berkley Insurance Company and The Hanover Insurance Company (the "<u>Berkley/Hanover Sureties</u>") | • Plan should not bind Berkley/Hanover Sureties to Plan release, exculpations, and injunction provisions.<br><br>• Preservation of existing rights and obligations under existing surety bond programs. | Resolved with language in the Confirmation Order. |
| **3.** | L. Perrigo Company and its affiliates' (including without limitation PBM Nutritionals, LLC) (collectively, the "<u>Perrigo Entities</u>," and each, a "<u>Perrigo Entity</u>") | Preservation of setoff rights. | Resolved with language in the Confirmation Order. |
| **4.** | RAD Sub-Trust A and RAD Sub-Trust B (Assigned Insurance Rights) | Preservation of litigation trusts' insurance-related rights. | Resolved with language in the Confirmation Order. |
| **5.** | International Fidelity Insurance Company ("<u>IFIC</u>") | • Preservation of rights under surety bonds, indemnity agreements, and collateral. | Resolved with language in the Confirmation Order. |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Plan, the Disclosure Statement, or the relevant Objection, as applicable.

| | Party | Summary of Objection | Status |
|---|---|---|---|
| | | • Plan should not bind IFIC to Plan release, exculpations, and injunction provisions. | |
| 6. | National Union Fire Insurance Company of Pittsburgh, Pa. and/or each of the affiliates and successors (collectively, "AIG") | • Plan should preserve AIG's insurance policies and related rights/obligations.<br><br>• Plan should permit claims under AIG's insurance policies to continue to be administered post-Confirmation. | Resolved with language in the Confirmation Order. |
| 7. | Co-Defendants Under Prior Chapter 11 Plan ("Co-Defendants") | Preservation of defensive rights arising under Rite Aid's prior chapter 11 plan. | [Resolved with language in Confirmation Order.] |
| 8. | MedChart, Inc. ("MedChart") | Plan should not permit destruction of prescription and patient health records in alleged violation of state and federal law. | [Resolved with language in Confirmation Order.] |

2