**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF MARC LIEBMAN, CHIEF TRANSFORMATION OFFICER OF THE DEBTORS, IN SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NEW RITE AID, LLC AND ITS DEBTOR AFFILIATES

I, Marc Liebman, hereby declare under penalty of perjury:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"),

financial advisor to the above-captioned debtors and debtors in possession (collectively,

---

[1]   The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

the "Debtors").  On March 12, 2025, I was appointed Chief Transformation Officer of Debtor New Rite Aid, LLC.

2.      I have been a financial advisor to stressed and distressed companies for approximately 25 years.  I co-head A&M's turnaround and restructuring efforts in the western region of the United States.  A&M is a restructuring consulting firm with extensive experience providing specialized management and restructuring advisory services to debtors and distressed companies.  I have a bachelor's degree in business administration with a concentration in accounting from the University of Notre Dame and an MBA in finance from the University of Chicago.

3.      I submit this declaration (this "Declaration") in support of (a) Confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3215] (as may be modified, amended, or supplemented from time to time, the "Plan")[2] and (b) final approval of the *Second Amended Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3216] (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement").  I have reviewed and am familiar with both the Plan and Disclosure Statement, respectively, as well as the relief sought therein.

4.      Except where otherwise noted, this Declaration is based on my personal knowledge of the Debtors' operations, business affairs, financial performance, and restructuring efforts, information based on my review of relevant documents, and information received from the Debtors' management and advisors.  If called to testify, I would testify as follows:

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

### Introduction and Background

5.      On May 5, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors filed these chapter 11 cases with agreed debtor-in-possession financing provided by the DIP Lenders (together with the DIP Agent, the "DIP Secured Parties") to, among other objectives, facilitate sales of all or substantially all their assets.  Prior to the Petition Date and for several months thereafter, together with the Debtors' management and other advisors, I helped to facilitate a comprehensive marketing-and-sale process that culminated in transactions approved by the Bankruptcy Court pursuant to which the Debtors consummated the sales of their assets.  As a result, the Debtors have now sold substantially all of their assets, other than those that will vest in the Reorganized Debtors or Wind-Down Debtors, respectively, on the Effective Date.

6.      Together with the Debtors' management and other advisors, I also worked with the Debtors' key stakeholders in these chapter 11 cases to negotiate and document the comprehensive resolution embodied in the Global Settlement (as defined herein) and the Plan, respectively.  The Global Settlement depends upon several important developments that have occurred over a period of months.  These include:  (a) approval by the Bankruptcy Court of the Administrative Claims Procedures,[3] pursuant to which up to $5,000,000 of encumbered cash collateral (the "Administrative Claims Distribution Pool") could be made available to fund consensual cash payments to certain Holders of Administrative Claims that agreed (or were deemed to agree) to waive the remainder of their Administrative Claims; (b) entry by the Debtors, certain DIP Secured Parties, and McKesson into the Restructuring Support Agreement, which committed the parties

---

[3]  *See Order (I) Authorizing the Administrative Claims Procedures and (II) Granting Related Relief* [Docket No. 1883] (the "Administrative Claims Procedures Order").

thereto to a framework for exit from chapter 11; and (c) participation in a mediation (the "Mediation") under the supervision of the Bankruptcy Court, which resulted in the Global Settlement (as defined herein) that is embedded in the proposed *Order Approving the Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* ("Confirmation Order") [Docket No. 3219].

7.       The Mediation brought together key stakeholders that included the Debtors, the various parties to the Restructuring Support Agreement, the United States Department of Justice ("DOJ"), and certain Holders of Existing Equity Interests.  In addition, in connection and contemporaneous with the Mediation, the Debtors engaged in settlement discussions with a number of stakeholders, including the Pension Benefit Guaranty Corporation ("PBGC"). After several weeks of extensive, hard-fought, and good-faith negotiations in which I actively participated, the Mediation (and the negotiations that took place in parallel) proved successful and the parties reached agreement in respect of a series of interrelated settlements, transactions, and compromises (collectively, the "Global Settlement") to facilitate Confirmation of the Plan. The key terms of the Global Settlement include, among other things:

a.       Distributions to Holders of eligible Administrative Claims that consented (or were deemed to consent) to the settlements contemplated in the Administrative Claims Procedures;

b.       Transfer of the Reorganized Debtors' equity to McKesson (the "McKesson Equity Distribution") in full satisfaction of any claims held by McKesson arising under section 503(b)(9) of the Bankruptcy Code (collectively, the "McKesson 503(b)(9) Claims");

c.       Payment by McKesson of $20 million in cash consideration, and McKesson's agreement to purchase certain pharmaceutical inventory;

d.       Resolution of potential disputes with Centerbridge, which has withdrawn all objections to the Plan and the Final Financing Order, respectively, and now supports Confirmation, in exchange for the

Debtors' agreement to reimburse up to $150,000 of Centerbridge's reasonable, documented professional fees;

e.    Settlement of potential claims held by the PBGC in full and final satisfaction of PBGC's termination premium claim arising from the involuntary termination of Debtor Rite Aid Corporation's pension plan under 29 U.S.C. § 1306(a)(7);

f.    Settlement of claims held by the DOJ arising under that certain settlement agreement, dated July 3, 2024, by and among the United States of America, acting through the DOJ and on behalf of the Office of Inspector General of the Department of Health and Human Services, EIC (as defined herein), and Rite Aid Corporation, Elixir Rx Options, Elixir Rx Solutions, and relator Glenn Rzeszutko (the "EIC Settlement"), effectuated by a proposed amendment to the EIC Settlement, which remains subject to approval by the United States of America, acting through the DOJ, and execution by the parties thereto;

g.    Agreement by the DIP Secured Parties to, among other things, consent to certain revisions to the budget required to ensure payment of Plan expenses and the EIC Settlement (including through the funding of the Administrative / Priority Claims Reserve and Wind-Down Reserve), support the Plan, consent to Debtor releases of current and former directors, officers, and shareholders, and waive any right to recovery from non-Debtor Elixir Insurance Company ("EIC");

h.    Establishment of a Liquidating Trust, and transfer of the Liquidating Trust Assets thereto for distribution pursuant to the Plan; and

i.    Distributions to Holders of Claims in Class 3, who unanimously voted to accept the Plan.

8.    Based upon my participation in the Mediation and other negotiations with key stakeholders, I believe that the Global Settlement was a material inducement for the broad stakeholder support that the Plan has received and is integral to the Restructuring Transactions contemplated thereby. As is set forth in greater detail herein, I likewise believe that each element of the Global Settlement is essential to the success of the Plan, and it is my strong belief that any revision or modification to the terms of the Plan could jeopardize support for the Plan from the Debtors' key stakeholders.

9.     This Declaration will set forth the bases for my opinions that (a) the Disclosure Statement contains "adequate information" as I understand that section 1125 of the Bankruptcy Code requires, and (b) the Plan complies with the applicable requirements of section 1129 of the Bankruptcy Code as I understand each requirement.

**The Disclosure Statement Should Be Approved on a Final Basis**

**I.     The Disclosure Statement Should Be Approved on a Final Basis Under Section 1125 of the Bankruptcy Code**

10.     It is my understanding that section 1125 of the Bankruptcy Code requires a disclosure statement to contain "adequate information" so that a hypothetical investor may make an informed judgment about a chapter 11 plan.  It is my opinion that the Disclosure Statement contains information adequate to enable all parties in interest to make an informed judgment about the Plan, including information regarding:

a.     The Debtors' Operations and Corporate and Capital Structure. Article III of the Disclosure Statement describes in detail the Debtors' corporate history, business operations, assets, corporate and capital structure, and organizational structure, an overview of which is provided in Exhibit C to the Disclosure Statement.

b.     Events Leading to These Chapter 11 Cases.  Article IV of the Disclosure Statement provides an overview of the events leading to the commencement of these chapter 11 cases.

c.     Material Developments and Anticipated Developments of the Chapter 11 Cases.  Article V of the Disclosure Statement provides an overview of the material developments in these chapter 11 cases.

d.     Release, Injunction, Exculpation, and Other Provisions of the Plan. Article VI of the Disclosure Statement provides an overview of the Plan's provisions, includes bolded language related to the Debtor Release, Third-Party Release, Exculpation, and Injunction (each as defined herein), and describes the entities and actions (as applicable) subject to each of the foregoing under the Plan.

e.     Key Aspects of the Plan.  Article VII of the Disclosure Statement sets forth the conditions precedent to Consummation of the Plan.

f.      <u>Risk Factors</u>.  Article VIII of the Disclosure Statement outlines certain risks associated with these chapter 11 cases, the Plan, and the distributions and recoveries contemplated thereby, and provides a general disclaimer as to the information provided by and set forth in the Disclosure Statement.

g.      <u>Liquidation Analysis</u>.  The Liquidation Analysis (as defined herein) was attached to the Disclosure Statement as Exhibit D.

h.      <u>Solicitation and Voting Procedures</u>.  Article IX of the Disclosure Statement describes the Solicitation Procedures (as defined herein).

i.      <u>Confirmation of the Plan</u>.  Article X of the Disclosure Statement describes the Confirmation procedures and statutory requirements for Confirmation and Consummation of the Plan.

j.      <u>Certain Securities Laws Matters</u>.  Article XI of the Disclosure Statement describes the applicability of each of section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, and Regulation S under the Securities Act.

k.      <u>Certain United States Federal Income Tax Consequences of the Plan</u>.  Article XII of the Disclosure Statement describes certain U.S. federal income tax law consequences of the Plan.

l.      <u>Recommendation of the Debtors</u>.  Article XIII sets forth the recommendation of the Debtors that Holders of Claims in Class 3 (Prepetition FILO Claims) vote to accept the Plan.

11.      Based on my understanding of the requirements of section 1125 of the Bankruptcy Code, I believe that the Disclosure Statement provides a hypothetical investor with adequate information to make an informed judgment about the Plan.

**<u>The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation</u>**

12.      It is my understanding that the Bankruptcy Code sets forth certain requirements that any chapter 11 plan must comply with in order to be confirmed.  I believe the Plan complies with each applicable requirement.  The following is a recitation of certain features and characteristics of the Plan, organized by the provision or section of the Bankruptcy Code to which I understand they are relevant.

## I.    Section 1129(a)(1)—Compliance with All Applicable Provisions of the Bankruptcy Code

13.    I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code, including the rules governing the classification of claims and interests in section 1122 and the provisions dictating the contents of a chapter 11 plan in section 1123.  For the reasons set forth below, I believe that the Plan complies with these provisions of the Bankruptcy Code.

### A.    Sections 1122 and 1123(a)(1)—Classification of Claims and Interests

14.    I understand that sections 1122 and 1123(a)(1) of the Bankruptcy Code govern the manner in which a debtor may classify claims and interests, and that section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan specify the classifications of claims and interests. Article III of the Plan provides for the following classifications of Claims and Interests, as applicable:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition FILO Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

15.    As such, I believe that the Plan satisfies section 1123(a)(1) of the Bankruptcy Code. Additionally, I believe that the Plan's classification of Claims and Interests complies with section 1122(a) of the Bankruptcy Code because each Class is composed of substantially similar Claims or Interests, respectively.  I understand that the Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.  It is my understanding that each instance of separate classification of similar Claims and Interests is based on such Claims' and Interests' legal nature and factual circumstances. Accordingly, I believe that the Plan's classification of Claims and Interests is reasonable and complies with the Bankruptcy Code, and so the Plan complies with section 1122 of the Bankruptcy Code.

### B.    Sections 1123(a)(2) and 1123(a)(3)—Specification of Impairment and Treatment of Classes

16.    I understand that the second and third requirements of section 1123(a) of the Bankruptcy Code are that a chapter 11 plan specify (a) the status (*i.e.*, impaired or unimpaired) of each class of claims and interests treated under the plan and (b) the precise nature of the treatment of each class of claims or interests that is impaired under such chapter 11 plan. I understand that the identity and treatment of each Unimpaired and Impaired Class under the Plan is identified in Article III thereof.  Accordingly, I believe that the Plan satisfies the requirements of sections 1123(a)(2) and (3) of the Bankruptcy Code.

### C.    Section 1123(a)(4)—Equal Treatment Within Each Class of Claims or Interests

17.    I understand that the fourth requirement of section 1123(a) is that a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class, unless the holder

of a particular claim or interest agrees to a less favorable treatment." Furthermore, I understand that Article III of the Plan provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of such particular Claim or Interest. I understand, moreover, that this requirement applies to Holders within each Class. Accordingly, I believe that the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### D.    Section 1123(a)(5)—Adequate Means for Implementation of the Plan

18.    I understand that the fifth requirement of section 1123(a) is that a chapter 11 plan must provide adequate means for its implementation. I believe that Article IV of the Plan, in conjunction with various other Plan provisions, provides adequate means for implementing the Plan as required by section 1123(a)(5) of the Bankruptcy Code, including through, among other things: (a) the compromise and settlement of Claims and Interests as embodied in the Plan and consistent with the Global Settlement, including the McKesson-related settlements and the coordinated resolution of disputes; (b) the McKesson Equity Distribution and related governance of the Reorganized Debtors, including appointment of the New Board and adoption of the New Governance Documents on the Effective Date; (c) the establishment of the Liquidating Trust and the Wind-Down Debtors and the vesting therein of the Distributable Assets and reserve funding necessary to implement the Wind-Down, make distributions, and administer the estates post-Effective Date; (d) the release of liens to implement the Plan distributions; (e) the cancellation of existing securities and agreements as set forth in the plan; (f) the authorization of all corporate actions and Restructuring Transactions necessary to implement the Plan and the related Restructuring Steps Memorandum, including the execution and delivery of all Definitive Documents and effectuating instruments; (g) the McKesson sale transactions and related

operational steps (including inventory sales and transitional actions) required to consummate the Plan; (h) the preservation of the Debtors' Causes of Action to the extent retained; (i) the vesting of property in the Reorganized Debtors and Wind-Down Debtors free and clear of Liens, Claims, and encumbrances, as applicable, consistent with the Plan; and (j) the transfer of the sponsorship of the Rite Aid 401(k) Plan to a new Entity.  Accordingly, I believe that the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### E.      Section 1123(a)(6)—Issuance of Non-Voting Securities

19.      I understand that section 1123(a)(6) of the Bankruptcy Code requires a corporate debtor's chapter 11 plan to prohibit the issuance of non-voting equity securities in the constating documents for the reorganized debtor.  It is my understanding that the Plan provides that New Governance Documents will be adopted by the Reorganized Debtors, and that Article IV.H of the Plan specifically provides that the New Governance Documents will prohibit the issuance of any non-voting Equity Securities to the extent required by section 1123(a)(6).  Accordingly, I believe that the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### F.      Section 1123(a)(7)—Provisions Regarding Directors and Officers

20.      Additionally, I understand that section 1123(a)(7) requires that a chapter 11 plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."  It is my understanding of Article IV.B of the Plan that, following the Effective Date, the New Board will be appointed in accordance with the Plan, and thereafter, the New Board will be populated in accordance with the terms of the New Governance Documents. Furthermore, I understand that the members and officers of the New Board will, to the extent not set forth in the Plan Supplement prior to Confirmation, be set forth in the Plan Supplement prior

to the Effective Date.  I also believe that the appointment of the New Board is consistent with the interests of creditors and equity security holders and complies with public policy with respect to the manner of selecting the directors for the New Board.  Accordingly, I believe that the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### G.     Section 1123(d)—The Plan's Cure Process

21.     I understand that section 1123(d) of the Bankruptcy Code provides that amounts necessary to cure defaults under a chapter 11 plan "shall be determined in accordance with the underlying agreement and applicable non[-]bankruptcy law."  Furthermore, it is my understanding that Article V of the Plan provides for the satisfaction of the Cure Costs associated with each Executory Contract or Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  Specifically, I understand that the Plan provides that the Debtors or the Reorganized Debtors, as applicable, will pay undisputed Cure Costs, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter, for Executory Contracts and Unexpired Leases assumed as of the Effective Date, (b) in the ordinary course of the Debtors' business in accordance with the terms of such Executory Contract or Unexpired Lease, or (c) the assumption effective date, if different than the Effective Date, and that any disputed Cure Cost will be determined in accordance with the procedures set forth in Article V.C of the Plan and applicable law.  As such, I understand that the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, insofar as I understand such requirements.  Accordingly, I believe that the Plan complies with section 1123(d) of the Bankruptcy Code.  Based upon the foregoing, the Plan complies with

sections 1122 and 1123 of the Bankruptcy Code, and therefore satisfies the requirements of section 1129(a)(1), as well.

## II.      Section 1129(a)—Other Requirements

### A.      Section 1129(a)(2)—Compliance with the Bankruptcy Code

22.      I understand that section 1129(a)(2) of the Bankruptcy Code requires the proponent of a chapter 11 plan to comply with the "applicable provisions" of the Bankruptcy Code, and, in that regard, is specifically intended to ensure compliance with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  Based on my review of information provided by the Debtors and their advisors, along with the Voting Report (as defined below), I believe that the Debtors have complied with the requirements of sections 1125 and 1126 of the Bankruptcy Code and, accordingly, have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

23.      Section 1125: Solicitation and the Disclosure Statement.  I understand that section 1125 of the Bankruptcy Code sets forth the requirements with respect to solicitation of a chapter 11 plan, and prohibits the solicitation of acceptances or rejections of a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."

24.      As set forth above, I understand that the Disclosure Statement contained descriptions and summaries of the material provisions of the Plan.  I also understand that various stakeholders and their advisors had opportunities to review and comment on the Disclosure Statement in advance of solicitation to ensure it contained adequate information for their respective clients.  Furthermore, it is my understanding that the notice of non-voting status (the "Notice of

Non-Voting Status") distributed to Holders of Claims or Interests in Classes 1, 2, 4, 7, and 8 (collectively, the "Non-Voting Classes"), and the voting ballots (each, a "Ballot") distributed to Holders in Class 3 (Prepetition FILO Claims) (the "Voting Class") each prominently disclosed the full text of the Plan's Debtor Release, Third-Party Release, Exculpation, and Injunction provisions, which text clearly described the scope of these provisions, the identity of the Released Parties and Releasing Parties, respectively, the mechanics for consensually opting out of the Third-Party Release (including how to opt out and applicable deadlines), and the consequences of failing to opt out of the Third-Party Release.

25.     It is therefore my belief that, as evidenced by the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "Voting Report") and the Certificate of Service [Docket No. 3164] (the "Solicitation Certificate"), respectively, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order[4] governing notice, disclosure, and solicitation in connection with both the Plan and the Disclosure Statement, as I understand such requirements. Accordingly, I believe that the Disclosure Statement and the Plan (as well as the Debtors' solicitation of votes thereon) complied in all respects with section 1125 of the Bankruptcy Code.

---

[4]     The "Disclosure Statement Order" means the *Order (I)(A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballot and Notices in Connection Therewith, (D) Scheduling Certain Dates with Respect Thereto, and (E) Granting Related Relief and (II)(A) Scheduling Certain Dates with Respect to the Dismissal of the Chapter 11 Cases, and (B) Granting Related Relief* [Docket No. 2535].

26.  <u>Section 1126: Acceptance of the Plan</u>.  It is my understanding that section 1126 of the Bankruptcy Code sets forth the requirements for voting on and determining acceptance of a chapter 11 plan, and provides that only holders of allowed claims or equity interests in impaired classes of claims or equity interests that will receive or retain property under a chapter 11 plan on account of such claims or equity interests may vote to accept or reject such chapter 11 plan. Based upon my review of the Voting Report and the Solicitation Certificate, respectively, I likewise understand that, consistent with the "<u>Solicitation Procedures</u>" (as such term is defined in the Disclosure Statement Order) approved by the Bankruptcy Court, the Debtors (a) solicited acceptances of the Plan only from the Holders of Claims in Class 3, which is the only Class that is Impaired and entitled to vote on the Plan, and (b) did not solicit votes to accept or reject the Plan from the Holders of Claims and Interests in the Non-Voting Classes, each of which is either (i) Unimpaired and, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

27.  I understand that sections 1126(c) and (d) of the Bankruptcy Code specify that, with respect to each class of claims or interests entitled to vote on a chapter 11 plan, holders of claims or interests in such class must vote in favor of such plan by at least two-thirds in amount and more than one-half in number of the allowed claims or interests in such class to accept such chapter 11 plan.  Based on my review of the Voting Report, I understand that all Holders of Claims in Class 3 voted to accept the Plan.

28.  Based on the foregoing, I believe that (a) the requirements of sections 1125 and 1126 of the Bankruptcy Code have been satisfied and (b) the Debtors have accordingly satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

**B.** **Section 1129(a)(3)—The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

29.    I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." I believe that the Plan is the result of extensive negotiations conducted at arm's length among the Debtors and their major stakeholders and reflects and embodies the Global Settlement that was agreed upon pursuant to the Mediation. I believe that the Plan was proposed with the purpose of maximizing value to the Debtors' various stakeholders, and not for any improper purpose. Accordingly, I believe that the Plan was proposed in good faith and the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**C.** **Section 1129(a)(4)—Professional Fees and Expenses Are Subject to Approval by the Bankruptcy Court**

30.    I understand that section 1129(a)(4) of the Bankruptcy Code requires that any payment to be made by a debtor for services rendered or expenses incurred in connection with its chapter 11 case or plan is subject to approval by the court. It is my understanding that section 1129(a)(4) has been construed to require that all payments of fees incurred by estate professionals that are made from estate assets must be subject to review and approval as to their reasonableness by the court.

31.    I likewise understand that Article II.C of the Plan provides that all Professional Fee Claims must be approved by the Bankruptcy Court as reasonable pursuant to final fee applications, and that Article XIII of the Plan provides that the Bankruptcy Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant

to the Bankruptcy Code or the Plan." Accordingly, I believe that the applicable provisions in the Plan comply with section 1129(a)(4) of the Bankruptcy Code.

### D. Section 1129(a)(5)—The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

32.     It is my understanding that section 1129(a)(5) of the Bankruptcy Code requires that (a) the proponent of a chapter 11 plan disclose the identity and affiliations of the proposed directors and officers of the reorganized debtor, (b) the appointment or continuance of such directors and officers be consistent with the interests of creditors and holders of equity securities and with public policy, and (c) disclosure of the identity of, and nature of any compensation provided to, any insiders that will be retained or employed by the debtors, if any.

33.     I understand that the Debtors, in connection with the Plan Supplement, intend to disclose (a) the identities and affiliations of any individuals that are proposed to serve as a director or officer of the New Board, and (b) the identity of the Liquidating Trustee and the responsibilities thereof. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### E. Section 1129(a)(6)—The Plan Does Not Contain Any Rate Changes

34.     I understand that section 1129(a)(6) of the Bankruptcy Code permits confirmation of a chapter 11 plan only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in such chapter 11 plan. I further understand that (a) the Plan does not provide for any rate changes and (b) the Debtors are not subject to any applicable regulation. Accordingly, I believe that section 1129(a)(6) of the Bankruptcy Code is not applicable to the Plan.

**F.      Section 1129(a)(7)—The Plan Satisfies the "Best Interests" Test**

35.      I understand that section 1129(a)(7) of the Bankruptcy Code requires that each

holder of a claim or interest, as applicable, in an impaired class of claims or interests, as applicable,

that rejects or is deemed to reject a chapter 11 plan must receive or retain, on account of its claim

or interest, property of a value that is not less than the amount that such holder would otherwise

receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code, measured

as of the effective date of such chapter 11 plan.  It is my understanding that the so-called "best

interests" test does not apply to Holders of Claims in Class 1 (Other Secured Claims) or Class 2

(Other Priority Claims) as they are, in each case, Unimpaired and therefore presumed to have

accepted the Plan.  I likewise understand that, to the extent Holders of Claims or Interests,

as applicable, in Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are Impaired,

they consent to such treatment.  The only other Impaired Classes are Class 3 (Prepetition FILO

Claims), Class 7 (Existing Equity Interests), and Class 8 (Section 510(b) Claims).

36.      Together with my team at A&M, the Debtors' management, and the Debtors' other

advisors, I assisted the Debtors in preparing, solely for purposes of the Disclosure Statement,

a hypothetical, reasonable, and good-faith estimate of the distributable proceeds that would be

generated if the Debtors were liquidated in accordance with the priorities set forth in chapter 7 of

the Bankruptcy Code (the "Liquidation Analysis"), a true and correct copy of which is attached as

**Exhibit D** to the Disclosure Statement.  The Liquidation Analysis reflects the Debtors' best

estimate of cash proceeds, net of liquidation-related costs, that would likely be available to the

Debtors' estates for distribution to creditors if the Estates were liquidated under chapter 7 of the

Bankruptcy Code.

37.     Because I was directly involved in its preparation, I am familiar with the methods used in the preparation of and the conclusions ultimately reached in the Liquidation Analysis.  The Liquidation Analysis was based on a variety of assumptions, which are detailed therein and in the notes thereto.  The Liquidation Analysis assumed that these chapter 11 cases would be converted to cases under chapter 7 of the Bankruptcy Code on November 1, 2025 (the "Assumed Conversion Date") and a chapter 7 trustee (the "Trustee") would be appointed to convert all assets into cash and distribute, subject to claims that may exist against such entities as a result of applicable law, the proceeds of those assets in accordance with the priorities set forth in the Bankruptcy Code. The Liquidation Analysis likewise assumed that the Trustee would manage the Debtors' estates to maximize recovery to creditors by retaining professionals, liquidating the Debtors' assets, and winding down the estates over a period of approximately four months.

38.     Based on the foregoing assumptions, the Liquidation Analysis (a) estimated the cash proceeds that would be generated from a hypothetical orderly liquidation of the Debtors' assets (the "Liquidation Proceeds"), (b) determined the distribution of those cash proceeds net of liquidation and other Wind-Down costs (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7 of the Bankruptcy Code, and (c) compared each Holder's Liquidation Distribution to the estimated distribution under the Plan that such Holder would receive if the Plan is confirmed and consummated in accordance with its terms.

39.     As set forth in the Liquidation Analysis, subject to the assumptions and limitations contained therein, and incorporated herein by reference, the liquidation of the Debtors' assets would result in Liquidation Proceeds ranging from $98 million to $128 million, which amounts would be reduced by the necessary chapter 7 liquidation and other Wind-Down costs.  After

applying available Liquidation Proceeds in accordance with the priorities set forth in the Bankruptcy Code and applicable law, the Liquidation Analysis establishes that all Holders of Claims and Interests in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount equal to or greater than what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**G.**      **Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class**

40.      I understand that, subject to the exceptions identified in section 1129(b) of the Bankruptcy Code, section 1129(a)(8) requires that each class of claims or interests either accept the chapter 11 plan or be unimpaired by such chapter 11 plan.  As reflected in the Voting Report, the "Impaired Voting Class" (Class 3 (Prepetition FILO Claims)) voted to accept the Plan.  Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired and therefore were not entitled to vote on the Plan.  Class 4 (General Unsecured Claims), Class 7 (Existing Equity Interests), and Class 8 (Section 510(b) Claims) are Impaired and deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.   Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are presumed to accept or deemed to reject the Plan.  I understand that, to the extent Holders of Claims or Interests, as applicable, in Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are Impaired, they consent to such treatment as proponents of the Plan.

41.      However, I believe that the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code and the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 4, 7, and 8 and, to the extent Classes 5 and 6 are treated as Rejecting Classes, notwithstanding their roles as proponents of the Plan, such Classes.

Accordingly, notwithstanding the ostensible requirements of section 1129(a)(8), I understand that the Plan is nevertheless confirmable because, as set forth below, it satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 4, 7, and 8 and, to the extent applicable, Classes 5 and 6.

**H.**      **Section 1129(a)(9)—The Plan Provides for Payment of All Allowed Priority Claims**

42.    I understand that, as set forth in greater detail below, section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to different treatment with respect to such claims.

43.    I likewise understand that Article II of the Plan provides that, except as otherwise agreed by such Holder, Administrative Claims which are Allowed on the Effective Date will be paid in full on or prior to the Effective Date or, to the extent not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter.  It is also my understanding that Holders of certain Administrative Claims have agreed to alternative treatment in respect of such Claims pursuant to the Administrative Claims Procedures, the Final Financing Order, and the Restructuring Support Agreement.  I understand that only a small number of Holders of Administrative Claims opted out of such alternative treatment, and that the potential Administrative Claims attributable to these Holders are modest and otherwise accounted for by the Wind-Down Budget, as is further set forth below.

44.    ***First***, it is my understanding that Article II.E of the Plan provides for payment of Administrative Claims characterized as Settled Priority Claims under the Administrative Claims Procedure Order from the Administrative Claims Distribution Pool.  Specifically, I understand that Holders of Allowed Administrative Claims that elected to participate in the Administrative Claims

Procedures (*i.e.*, holders of Settled Priority Claims) have consented to receiving, in full and final satisfaction of such Administrative Claims, accelerated, *pro rata* cash distributions (capped at 5.00% of the recorded Claim amount or another agreed amount) from the Administrative Claims Distribution Pool.  I also understand that Holders of Claims that were deemed to consent to the Administrative Claims Procedures were likewise deemed to consent to receiving, in full and final satisfaction of such Administrative Claims, any subsequent *pro rata* "Second Distribution" (subject to the same cap) from remaining pool funds under a confirmed Plan and that the funds set aside in the Wind-Down Budget are sufficient to make these payments.  Because I understand these Holders of Settled Priority Claims to have consented to this treatment, and because I understand that the Bankruptcy Code contemplates that any holder of a particular claim which may otherwise be entitled to priority treatment may agree to treatment other than as would be required under section 1129(a)(9) as a default, it is my belief that the reduced payments in full and final satisfaction of the Settled Priority Claims satisfy section 1129(a)(9) of the Bankruptcy Code.

45.    ***Second***, it is my understanding that Holders of "Stub Rent Claims" under and as defined in the Final Financing Order consented, upon entry of the Final Financing Order, to waiver of any Stub Rent Claim to the extent that payment on account of such Claim, when aggregated with all payments the Debtors have made on account of Stub Rent Claims in these chapter 11 cases, would exceed the $23,388,878 cap (the "Stub Rent Claims Cap") set forth in paragraph 49 of the Final Financing Order.  Accordingly, I understand that the Debtors will make no payment on account of any Stub Rent Claim that is not an Allowed Claim by operation of the Stub Rent Claims Cap.

46.    ***Third***, it is my understanding that McKesson has, in accordance with the Restructuring Support Agreement, agreed to receive, on account of and in full and final satisfaction

of the McKesson 503(b)(9) Claims, the McKesson Equity Distribution. ***Finally***, it is my understanding that Administrative Claims not resolved through the Administrative Claims Procedures, Final Financing Order, or Restructuring Support Agreement and Claims in Classes 1 and 2 (which are Allowed on the Effective Date or as soon as reasonably practicable thereafter) will be paid in full on the Effective Date (or as soon as reasonably practicable thereafter) or as otherwise required by section 1129(a)(9) by the Wind-Down Debtors from funding sources that are earmarked in the Plan and incorporated into the Approved Budget, including the Administrative / Priority Claims Reserve. Specifically, I understand that, with respect to Administrative Claims or Claims in Classes 1 and 2 which become Allowed after the Effective Date, the amounts (a) funded into the Administrative / Priority Claims Reserve on the Effective Date and (b) to be funded into the Administrative / Priority Claims Reserve on account of the Specified Receipts are, in the aggregate, expected by the Debtors to be sufficient to provide for payment of such Claims in full as required under the Plan. Because Allowed Administrative Claims are entitled to payment in full under the Plan except to the extent Holders consented to separate treatment under the Administrative Claims Procedures or otherwise, I believe that the Plan satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code.

47.    It is my understanding, moreover, that, except as set forth above, no Holders of the types of Claims specified by section 1129(a)(9)(B) of the Bankruptcy Code are Impaired under the Plan because such Claims have been paid in the ordinary course. For this reason, I believe that the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code. It is also my understanding that the Plan satisfies the requirements of section 1129(a)(9)(C) because Article II.D provides that Holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. However, to the extent any Holder of

an Other Priority Claim or a Priority Tax Claim has consented to the settlement of its Claim pursuant to the Administrative Claims Procedures, such Holder will receive the agreed upon cash distribution from the Administrative Claims Distribution Pool in full and final satisfaction of such settled Claim. Accordingly, I believe that the Plan satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**I.** **Section 1129(a)(10)—At Least One Class of Impaired Claims Has Accepted the Plan**

48.     I understand that section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a chapter 11 plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." As set forth in the Voting Report, I understand that Holders in Class 3 (Prepetition FILO Claims), who are Impaired under the Plan, have accepted the Plan, excluding any acceptances by any insiders in such Class. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**J.** **Section 1129(a)(11)—The Plan Is Feasible**

49.     I understand section 1129(a)(11) of the Bankruptcy Code to require that a chapter 11 plan be "feasible," meaning that confirmation of such chapter 11 plan is not likely to be followed by the liquidation or further reorganization of the debtor or any successor thereto.

50.     It is my belief that the Plan satisfies the requirements of section 1129(a)(11) with respect to the Reorganized Debtors. I understand that McKesson has already committed significant capital and other resources to the success of the Restructuring Transactions and is a generally well-capitalized enterprise. It is also my understanding that the Reorganized Debtors will emerge from these chapter 11 cases with access to sufficient funding, no material near-term maturities imposed by the Plan, and a streamlined operating footprint with very limited go-forward

expenses or other liabilities.  Accordingly, I believe that a further reorganization or liquidation of the Reorganized Debtors is unlikely.

51.     As is set forth in greater detail below, it is also my belief that the Plan satisfies the requirements of section 1129(a)(11) with respect to the Wind-Down Debtors.  To ensure that the Wind-Down Debtors can fulfill their go-forward obligations under the Plan, including, without limitation, payment of all Statutory Fees relating to any of the Debtors or their chapter 11 cases and all amounts necessary to fund each of the Administrative / Priority Claims Reserve, the Wind-Down Reserve, and the Professional Fee Escrow Amount, my team at A&M worked with the Debtors' management to prepare the Wind-Down Budget, a summary of which is attached hereto as **Exhibit A**.  Because I was directly involved in its preparation, I am familiar with the assumptions made, the methods used, and the conclusions reached in preparing the Wind-Down Budget.

52.     The Wind-Down Budget sets forth the sources and uses of cash after the Effective Date and reflects a comprehensive, risk-adjusted accounting of both receipts that are anticipated to fund the Plan and the Wind-Down, respectively, and disbursements that are necessary to administer and consummate same.  With respect to anticipated receipts, the Wind-Down Budget accounts for both operating receipts ("Operating Receipts") and receipts arising from the liquidation of assets ("Liquidating Receipts"), which include, among other sources, (a) rebate recoveries from pharmacy-benefit managers and related parties and other "Specified Receipts" under and as defined in the Plan, which are expected to total approximately $35 million, (b) collections of disputed and underpaid third-party receivables, (c) proceeds from settlements and recoveries related to pre-Effective Date receivables, (d) returns of deposits, collateral, and other escrowed or withheld amounts, and (e) the proceeds from the

monetization of certain remaining assets, including, without limitation, pharmaceutical inventory, owned real property, liquor licenses, and intellectual-property assets. With respect to disbursements, the Wind-Down Budget separately identifies and allocates funds to satisfy: (x) Administrative / Priority Claims, including, without limitation, certain Administrative Claims that the Debtors expect they will be obligated to pay on or shortly after the Effective Date, obligations related to retiree benefits within the meaning of section 1141 of the Bankruptcy Code, unpaid employee benefits, certain unpaid operating expenses, and Cure Costs; and (y) expenditures of the Wind-Down Reserve required to effectuate the Estates' orderly Wind-Down, which include, without limitation, data retention and destruction costs, IT and other operating expenses, Professional Fee Claims, and expenses of the Liquidating Trustee.

53.     The Wind-Down Budget distinguishes between (a) amounts to be funded on or before the Effective Date, including amounts to be funded into the Administrative / Priority Claims Reserve, the Wind-Down Reserve, and the Professional Fee Escrow Amount (collectively, the "Initially Funded Amounts"), which are contemplated to be approximately $14.7 million and include certain amounts "rolled over" from the Approved Budget under and as defined in the Final Financing Order and (b) amounts to be funded from the remaining cash or, if necessary, the collection of the Specified Receipts after the Effective Date (the "Subsequently Funded Amounts"), thereby ensuring that sufficient funds will be available at all times to fund the Restructuring Transactions, Consummation of the Plan, and administration of the Wind-Down. For the avoidance of doubt, I understand that the Wind-Down Budget does not contemplate that collections from Specified Receipts or any other source will be necessary to fund either the Administrative / Priority Claims Reserve or the Wind-Down Reserve, both of which will be fully funded as set forth below on or before the Effective Date.

54.     To develop the Wind-Down Budget, my team at A&M tied cash receipts to forecasted obligations and reserve sizing.  This methodology required my team to, first, identify the discrete sources of cash and the timing of receipts associated with same.  Second, for disbursements, we sized:  (a) the Administrative / Priority Claims Reserve to ensure payment in full of all Allowed Administrative Claims (other than Professional Fee Claims), Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and unpaid Settled Priority Claims, all of which collectively amount to approximately $10.4 million to be funded from available funds on or before the Effective Date and (b) the Wind-Down Reserve, which will be funded (i) in the amount of approximately $4.3 million from available funds on or before the Effective Date and (ii) to the extent necessary thereafter, with the Subsequently Funded Amounts, which will be funded from available cash or, if necessary, the Specified Receipts, in each case, to ensure timely payment in full of ongoing expenses necessary to complete an orderly Wind-Down, including data-retention costs, Professional Fee Claims to the extent not paid from the Professional Fee Escrow Amount, and anticipated expenses of the Liquidating Trustee.

55.     In sizing both the Administrative / Priority Claims Reserve and the Wind-Down Reserve, as applicable, my team relied upon the Debtors' actual books and records, certain agreements and fee letters to be entered into in connection with the Wind-Down, actuarial assessments, vendor quotes, run-rate analyses, and known or foreseeable obligations under the Plan.  Where uncertainty existed, *e.g.*, in respect of certain contingent Claims that may result in additional Allowed Administrative Claims, we applied "cushion" or redundancy on a risk-adjusted basis to ensure sufficient funding under any reasonably adverse scenario.

56.     By way of illustrative example, for purposes of ensuring that the Claims asserted in putative class-action lawsuits involving the Debtors (Adv. Pro. No. 25-01338 and Adv. Pro.

No. 25-01204), which such Claims, if Allowed, would otherwise constitute Administrative Claims (or Priority Claims), are appropriately accounted for in sizing the Wind-Down Budget, I reviewed the election record maintained in connection with the Administrative Claims Procedures, in which members of the putative class participated as Holders of Claims.  That review revealed that only 48 individuals among the pool of *all* eligible Holders of Administrative Claims opted out of the procedures (such Holders, the "Opt-Out Administrative Claimants").  I understand that the Opt-Out Administrative Claimants assert Claims totaling approximately $700,000, which amount—out of an abundance of caution—is specifically reserved in the Wind-Down Budget to satisfy such Claims in the event they are all Allowed.  I understand that the Claims of all Opt-Out Administrative Claimants (including those whose Claims arise in connection with the putative class-action lawsuit) have settled, or will be settled via the Administrative Claims Procedures or will otherwise be addressed through the claims reconciliation process, pursuant to which certain Claims will be paid via disbursements from the Administrative / Priority Claims Reserve.

57.    It is my belief that the receipts upon which the Wind-Down Budget will rely are likely to be realized in the risk-adjusted amounts forecast.  I understand that the Debtors have facilitated this collection through (a) the negotiation and finalization of the Liquidating Trust Agreement and the terms of retention of the Liquidating Trustee, (b) the funding of the Wind-Down Reserve on or before the Effective Date, and (c) the retention, under the Plan, of valuable Causes of Action for the beneficiaries of the Liquidating Trust.  Moreover, I understand that the aggregate amount of anticipated receipts for which collection is assumed to be highly likely would, without any need of risk-adjustment, significantly exceed the disbursements associated with funding the Administrative / Priority Claims Reserve and Wind-Down Reserve, respectively.

58.     Altogether, the Wind-Down Budget projects total receipts of approximately $209.9 million, comprising $92.5 million in Operating Receipts and $117.4 million in Liquidating Receipts, all of which I understand would otherwise comprise collateral of the DIP Secured Parties. As set forth in greater detail in **Exhibit A**, the Wind-Down Budget demonstrates that (a) aggregate cash receipts substantially exceed anticipated disbursements and (b) the Wind-Down Debtors' disbursements and funding as of the Effective Date and collection of anticipated receipts are temporally aligned.  Given my experience in comparable circumstances, it is my belief that the assumptions and contingencies that inform the Wind-Down Budget provide substantial comfort that all payments anticipated to be made from the Administrative / Priority Claims Reserve and the Wind-Down Reserve, respectively, will be made in full as and when necessary.  It is my belief that the Wind-Down is appropriately resourced.

59.     In light of the foregoing, it is my opinion that the Plan provides adequate means for its implementation, establishes the Administrative / Priority Claims Reserve and the Wind-Down Reserve, respectively, and identifies concrete sources of risk-adjusted funding to satisfy risk-adjusted obligations in accordance with the Wind-Down Budget.  I believe that the Debtors' cash on hand, when coupled with the proceeds from the transactions contemplated in Article IV of the Plan, will be sufficient to timely satisfy all obligations required under the Plan, including payment of Allowed Administrative Claims and other Claims entitled to statutory priority in accordance with the terms of the Plan, and to fund the operations of the Liquidating Trust and Wind-Down Debtors, respectively.

60.     In my view, the Plan offers a reasonable expectation of success and will allow the Estates to effect the Wind-Down in an efficient and orderly manner.  Based upon my involvement in the development of the Wind-Down Budget, my experience in comparable circumstances, and

my familiarity with the Plan's implementation mechanics, I believe the Plan is feasible for purposes of section 1129(a)(11) of the Bankruptcy Code and that Confirmation is not likely to be followed by liquidation or further reorganization of the Debtors, other than as provided for in the Plan. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**K.      Section 1129(a)(12)—All Statutory Fees Have or Will Be Paid Under the Plan**

61.     I understand that section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under section 1930 of title 28 of the United States Code. It is my understanding that, in accordance with these requirements, Article XIV.C of the Plan provides that (a) all Statutory Fees due and payable before the Effective Date will be paid by the Debtors, and (b) all Statutory Fees due and payable after the Effective Date will be paid by the Wind-Down Debtors from the Wind-Down Reserve. I likewise understand that the Wind-Down Debtors will remain obligated to pay Statutory Fees to the Office of the U.S. Trustee with respect to each chapter 11 case until such chapter 11 case has been closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**L.      Sections 1129(a)(13)—The Plan Provides for Post-Effective Date Payment of Retiree Benefits**

62.     I understand that section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to provide for the payment of all "retiree benefits," as defined in section 1114 of the Bankruptcy Code, at the level established under subsection (e)(1)(B) or (g) thereof prior to confirmation of a chapter 11 plan. I further understand that Article V.G of the Plan provides that, except as otherwise agreed between the Debtors and an applicable retiree, the Wind-Down Debtors

(or Liquidating Trustee) shall make any such required payments in accordance with the Wind-Down Budget.

63.     In addition, I understand that the Debtors intend to implement post-Effective Date arrangements for three categories of Retiree Plans:  medical, disability, and life insurance. *First*, with respect to retiree medical benefits—which I understand are currently provided to seven former Rite Aid employees and six eligible spouses of former Rite Aid employees—I understand that the Debtors intend to enter into agreements to buy out the obligations owed to each covered party on or before the Effective Date or otherwise provide benefits as required by section 1129(a)(13) of the Bankruptcy Code. *Second*, with respect to retiree disability benefits— which I understand are currently provided to seven long-term disability claimants—it is my understanding that the Debtors intend to enter into an agreement, effective January 1, 2026, pursuant to which a third-party carrier would assume responsibility for paying covered disability benefits in exchange for a single lump-sum payment. *Third*, with respect to retiree life insurance benefits— for which I understand there are 44 covered retirees—I understand that the Debtors intend to enter into an agreement, effective January 1, 2026, pursuant to which a third-party carrier would assume the Debtors' life insurance obligations for these retirees in exchange for a single lump-sum payment.  In each case, it is my understanding that these arrangements will be effectuated in accordance with applicable non-bankruptcy law and the Plan.  These arrangements, together with the Plan provisions described above, are designed to ensure that any retiree benefits within the meaning of section 1114, if any, continue to be provided in accordance with section 1129(a)(13) of the Bankruptcy Code.  Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**M.      Sections 1129(a)(14) Through (16)—No Debtor Is an Individual, Non-Profit Entity, or Trust**

64.      It is my understanding that sections 1129(a)(14) and 1129(a)(15) of the Bankruptcy Code apply only to debtors that are individuals, and that section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are non-profit entities or trusts.  The Debtors are not individuals, non-profit entities, or trusts.  Accordingly, I believe that the requirements of sections 1129(a)(14) through (16) of the Bankruptcy Code are not applicable to the Plan.

**III.    Section 1129(b) of the Bankruptcy Code—The Plan Satisfies the "Cram-Down" Requirements of the Bankruptcy Code**

65.      It is my understanding that, under section 1129(b)(1) of the Bankruptcy Code, if all applicable requirements of section 1129(a) other than section 1129(a)(8) are satisfied, a chapter 11 plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are also satisfied.  I likewise understand that a chapter 11 plan that is not accepted by every impaired class and therefore does not satisfy the requirements of section 1129(a)(8) can nonetheless be confirmed if such chapter 11 plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  I further understand that a chapter 11 plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a chapter 11 plan (or is deemed to reject a chapter 11 plan) if it complies with the "absolute priority" rule, which provides that a junior stakeholder may not receive or retain property under a chapter 11 plan of reorganization "on account of" its junior claims or interests unless all senior classes either (a) are paid in full or (b) vote in favor of such chapter 11 plan.

66.      Here, I understand from the Voting Report that Class 4 (General Unsecured Claims), Class 7 (Existing Equity Interests), and Class 8 (Section 510(b) Claims) (collectively, the "Rejecting Classes") were deemed to reject the Plan.  I also understand that, to the extent

Intercompany Claims in Class 5 and Intercompany Interests in Class 6, respectively, are not reinstated, that Class 5 and Class 6 would likewise comprise Rejecting Classes.  It is my belief that the Plan does not discriminate unfairly because (a) all similarly situated Holders of Claims and Interests, including Claims and Interests in the Rejecting Classes, will receive substantially similar treatment, and (b) the Plan's classification scheme rests on a legally acceptable rationale.

67.    It is likewise my belief that the Plan is fair and equitable with respect to Intercompany Claims in Class 5 and Intercompany Interests in Class 6 because, to the extent such Claims and Interests, respectively, receive any recovery, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests, respectively.  Rather, Reinstatement of such Claims and Interests, as applicable, will facilitate the Restructuring Transactions for the benefit of Holders of Claims that will receive recoveries under the Plan.  Reinstatement of Intercompany Claims or Intercompany Interests, as applicable, otherwise will be of no economic substance.

68.    I understand that there are no stakeholders junior to the Rejecting Classes (Classes 4, 7, and 8) that will receive or retain property under the Plan on account of their junior interests or otherwise fare better under the Plan than the Holders in these Rejecting Classes and there are no Classes of equal priority to these Rejecting Classes that are receiving more favorable treatment thereunder.  As such, I believe that the Plan satisfies the absolute priority rule and is fair and equitable as to these Rejecting Classes.  Accordingly, I believe the Plan is fair and equitable and does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

## IV.    Section 1129(d)—The Purpose of the Plan Is Not the Avoidance of Taxes or the Avoidance of Securities Laws

69.    I understand that section 1129(d) of the Bankruptcy Code prohibits confirmation of a chapter 11 plan if it were designed and proposed to evade taxes or the requirements of section 5 of the Securities Act.  I do not believe the purpose of the Plan is to avoid taxes or the application

of section 5 of the Securities Act.  Rather, I believe the Debtors filed the Plan to accomplish their objectives of maximizing value for the benefit of the Estates by efficiently and responsibly distributing recoveries to their stakeholders in accordance with the priorities set forth in the Bankruptcy Code.    Accordingly, I believe that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## V.    The Discretionary Contents of the Plan Are Appropriate

70.    It is my understanding that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code.  Among other provisions, the Plan classifies and describes the treatment for Claims and Interests, respectively, and identifies which Claims and Interests are, as applicable, Impaired or Unimpaired.  I understand, as well, that the Plan provides for treatment of Executory Contracts and Unexpired Leases.  As discussed in greater detail below, it is also my understanding that the Plan contains various significant provisions that, among other things, implement certain releases and exculpations, discharge Claims and Interests, respectively, and permanently enjoin certain Causes of Action.  I believe that each provision of the Plan, including those discussed in greater detail below, is reasonable, appropriate, and necessary in light of the circumstances of these chapter 11 cases.

71.    I understand that section 1123(b)(3) provides that a chapter 11 plan may provide for the settlement, adjustment, or retention of any claim or interest belonging to the Debtors. I likewise understand that section 1123(b)(6) of the Bankruptcy Code authorizes the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  It is my understanding that Article X of the Plan sets forth certain release, exculpation, and injunction provisions, as permitted by section 1129(b) of the Bankruptcy Code, including (a) a "debtor release" pursuant to Article X.C of the Plan (the "<u>Debtor Release</u>"), (b) a "third-party

34

release" by certain Holders of Claims and Interests pursuant to Article X.D of the Plan (the "Third-Party Release"), (c) an "exculpation" of certain parties from liability pursuant to Article X.E of the Plan (the "Exculpation"), and (d) an "injunction" implementing the provisions of Article X of the Plan pursuant to Article X.F of the Plan (the "Injunction").  Based on my knowledge of the Debtors' restructuring efforts, I believe that the Debtor Release, Third-Party Release, Exculpation, and Injunction in the Plan are the products of good-faith negotiations that were conducted at arm's length, were a material inducement for parties to support the Global Settlement, are supported by the Debtors and their key constituents, are integral to the Global Settlement, are consistent with the scope of releases, exculpations, and injunctions approved by the Bankruptcy Court in other complex chapter 11 cases, are appropriate based on the facts and circumstances of these chapter 11 cases and the Plan, and should be approved without modification.

### A.     The Debtor Release Is Appropriate and Should Be Approved

72.     It is my understanding that Article X.C of the Plan provides for a release of any and all Claims and Causes of Action, including, without limitation, contingent, unliquidated, unknown, and derivative claims, of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and their respective Estates, against the Released Parties in connection with, among other things and in whole or in part, the Debtors, the Reorganized Debtors, the Estates, the chapter 11 cases, the Restructuring Transactions, the Debtors' capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest, as applicable, that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents,

and the pursuit and implementation of the Restructuring Transactions, including, without limitation, the McKesson Equity Distribution and the administration and implementation of the Wind-Down.

73.     I also understand that section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Based upon my participation in these chapter 11 cases, including my direct participation in the negotiation and documentation of the Global Settlement, it is my belief that the Debtor Release is fair, equitable, and in the best interests of the Estates, and that the Debtor Release should be approved without modification for the following reasons.

74.     ***First***, I understand that the Debtors' management, after considering (a) whether any colorable Causes of Action may exist against the Released Parties and (b) the estimated time and expense of pursuing any such Claims and the low likelihood of meaningful recoveries resulting from such Causes of Action, concluded that no viable Causes of Action against the Released Parties exist. I also understand the terms of the Debtor Release were considered and approved by Debtor New Rite Aid, LLC's Special Committee—a body comprised entirely of independent directors. In approving the Debtor Release, I understand that the Debtors' board of managers also considered the fact that the Debtor Release contained certain limitations, including (among other carve-outs) that the Debtor Releases shall not be construed as releasing any Released Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

75.     ***Second***, I believe that the Debtor Release is an integral part of the Restructuring Transactions to be effected through the Plan, and as such, the respective parties would not have agreed to the Global Settlement in the absence of the Debtor Release. Consequently, I believe that

the Global Settlement (as effected through the Plan and the Debtor Release) is in the best interests of the Debtors' stakeholders, accordingly represents a sound exercise of the Debtors' business judgment, and should be approved.

76.     ***Finally***, I understand that the Plan, including, without limitation, the Debtor Release and the Global Settlement, was negotiated in good faith and at arm's length by sophisticated entities that conditioned their support for, and acceptance of, the Plan on, among other things, the inclusion of the Debtor Release in its current form.  It is also my understanding that each of the parties to the Global Settlement was represented by competent advisors.  I believe that the Debtor Release has provided a material benefit to the Estates by securing votes in favor of the Plan cast by Holders of Class 3 Prepetition FILO Claims, who unanimously voted to support the Plan.  It is my belief that the Released Parties have played an integral role in these chapter 11 cases and made substantial concessions that underpin the consensual resolution of these chapter 11 cases via the Global Settlement, and that such Released Parties may be unwilling to support the Plan in the absence the Debtor Release in its current form.

77.     Accordingly, I believe that the Debtor Release should be approved without modification.

**B.     The Third-Party Release Is Appropriate and Should Be Approved**

78.     It is my understanding that Article X.D of the Plan provides for a wholly consensual release of any and all Causes of Action, including derivative claims, by certain non-Debtor Releasing Parties against the Released Parties in connection with, among other things and in whole or in part, the Debtors, the Reorganized Debtors, the Estates, these chapter 11 cases, the Restructuring Transactions, the Debtors' capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or

events giving rise to, any Claim or Interest, as applicable, that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, and the pursuit and implementation of the Restructuring Transactions, including, without limitation, the McKesson Equity Distribution and the administration and implementation of the Wind-Down. I likewise understand that (a) the Third-Party Release applies only to stakeholders party to the Global Settlement or, with respect to Holders of Claims or Interests classified under the Plan, Holders who (i) voted or were presumed to accept the Plan, (ii) abstained from voting on the Plan, or (iii) voted or were deemed to reject the Plan that, in each case, did not opt out after receiving clear and conspicuous notice of the release and the procedure and deadline to opt out, and such Holders' Affiliates and Related Parties, and (b) the Plan structure is reciprocal, such that, to the extent a stakeholder qualifies as a Releasing Party, that stakeholder is also included as a Released Party where applicable.  For the reasons set forth herein, it is my belief that the Third-Party Release is wholly consensual and should be approved without modification.

79.    Based upon my participation in these chapter 11 cases, including my direct participation in the negotiation and documentation of the Global Settlement, I believe that the Third-Party Release is an integral part of the Plan and, like the Debtor Release, a necessary component of the Restructuring Transactions and the Global Settlement.  I believe that the Third-Party Release facilitated participation by the Released Parties in both the Plan and the chapter 11 process and was critical in reaching consensus to support the Plan and Restructuring Transactions for the benefit of all stakeholders.  I believe that the Third-Party Release was a core negotiation point for the parties to the Global Settlement, and I believe that it appropriately offers certain protections to parties that constructively participated in the restructuring.

80.     I also believe that the Third-Party Release is given for substantial consideration. Certain of the Released Parties have played an extensive and integral role in these chapter 11 cases and the negotiation and documentation of the Definitive Documents, including through material concessions made by the Released Parties.  I believe that these substantial contributions include, among other things, (a) compromising Claims and accepting Impaired recoveries, waiving recovery on material Claims entirely, or preserving valuable tax attributes for the Debtors, (b) with respect to the DIP Secured Parties, providing the DIP Facilities and permitting the use of encumbered assets and cash collateral during these chapter 11 cases, and (c) negotiating and supporting the Plan and other Definitive Documents essential to the success of these chapter 11 cases and the Restructuring Transactions.  In my view, the contributions of the Released Parties allow for a value-maximizing restructuring that provides the best possible outcome for the Estates in light of the circumstances of these chapter 11 cases.

81.     Finally, I understand, based upon my review of the Solicitation Certificate, that pursuant to the Solicitation Procedures, Holders of Claims or Interests classified under the Plan (other than Holders of Intercompany Claims and Intercompany Interests in Classes 5 and 6, respectively) received either a Ballot or Notice of Non-Voting Status that:  (a) included the full text of the Third-Party Release; (b) provided an opt-out box and instructions (including electronic submission) and the applicable deadline; and (c) made clear that stakeholders party to the Global Settlement and Holders of Claims or Interests classified under the Plan who (i) voted or were presumed to accept the Plan (ii) abstained from voting on the Plan, or (iii) voted or were deemed to reject the Plan would, in each case, grant the Third-Party Release unless they elected to opt out on the applicable form.  Consequently, I believe that the Solicitation Materials and other noticing materials filed and served in connection with the Disclosure Statement provided recipients with

timely, sufficient, appropriate, and adequate notice of the Third-Party Release.  In my opinion, such notice made clear that, among other things, all Holders of Claims that voted to accept the Plan would grant the Third-Party Release unless they elected on their Ballot to opt out of the Third-Party Release, all Holders of Claims that voted to reject the Plan would grant the Third-Party Release unless they elected on their Ballot to opt out of the Third-Party Release, and Holders of Claims or Interests, as applicable, in the Non-Voting Classes would grant the Third-Party Release unless they elected on the applicable opt-out form to opt out of the Third-Party Release. Accordingly, it is my belief that each Releasing Party under the Plan consented to the Third-Party Release, that such consent to the Third-Party Release was wholly consensual, and that, as a result, the Third-Party Release should be approved without modification.

### C.    The Exculpation Is Appropriate and Should Be Approved

82.    I understand that Article X.E of the Plan contains a customary exculpation for the benefit of the Exculpated Parties for claims arising out of or relating to, among other limited topics, these chapter 11 cases, the negotiation of the Definitive Documents, and the pursuit of Consummation of the Plan.  It is my understanding, moreover, that the term "Exculpated Parties" is defined narrowly to include only the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the Committee, and certain related parties of the foregoing entities' related parties.  It is also my understanding that the scope of the Exculpation is limited to acts or omissions occurring prior to the Effective Date, and that the Exculpation does not protect the Exculpated Parties from liability determined by Final Order of a court of competent jurisdiction to have resulted from actual fraud, willful misconduct, or gross negligence.

83.     I believe that the Exculpation is necessary and appropriate because the Exculpated Parties have made substantial contributions to the Debtors' reorganization efforts and should be protected from future collateral attacks related to actions taken in good faith in connection with these chapter 11 cases and the Restructuring Transactions.  Furthermore, I believe that the Exculpated Parties played a critical role in formulating, negotiating, soliciting, and implementing, as applicable, the Plan and the other Definitive Documents necessary to implement the Restructuring Transactions.  I believe that the Exculpated Parties have participated in good faith throughout these chapter 11 cases, and I understand that the Debtors have made certain revisions to the Exculpation to limit its scope to actions undertaken after the Petition Date and before the Effective Date or as ordered by the Bankruptcy Court pursuant to section 1142(b) of the Bankruptcy Code.  Accordingly, I believe that the Exculpation should be approved without further modification.

### D.      The Injunction Is Appropriate and Should Be Approved

84.     I understand that Article X.F of the Plan provides for an injunction that is necessary to implement the Plan's release, discharge, and exculpation provisions.  It is my understanding that the Injunction generally provides that all entities are permanently enjoined from commencing or maintaining any action against, as applicable, the Debtors (and their Affiliates), the Reorganized Debtors, the Wind-Down Debtors, the Liquidating Trust (or their Affiliates), the Exculpated Parties, and/or the Released Parties on account of, in connection with, or with respect to, among other things, any Claims or Interests, as applicable, released, discharged, or exculpated pursuant to the Plan.  I believe that the Plan's release and exculpation provisions, each of which were material components of the Global Settlement, would be substantially weakened without the Injunction provision.  I also understand that the Debtors have proposed to make certain

modifications to limit the scope of the Injunction with respect to the Wind-Down Debtors, in response to the objection raised by the United States Trustee that the Injunction as originally proposed effectively provided a discharge to the Wind-Down Debtors in violation of the Bankruptcy Code. It is therefore my belief that the Injunction is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan and is thereby necessary for Consummation of the Plan and the implementation of the Restructuring Transactions.

85.    In addition, I understand that the Injunction includes a "gatekeeping" provision to implement the Exculpation (the "<u>Gatekeeping Provision</u>") by requiring parties wishing to pursue certain Claims or Causes of Action, as applicable, to obtain authorization from the Bankruptcy Court to bring such Claims or Causes of Action. It is my belief that the Gatekeeping Provision is essential to give effect to the Exculpation. Accordingly, I believe that the Bankruptcy Court should approve the Injunction, including the Gatekeeping Provision, as set forth in the Plan and without, as applicable, further modification.

<u>**Modifications to the Plan**</u>

86.    I understand that Class 3 was solicited on the Plan filed at Docket No. 3215, and that, following solicitation, the Debtors have not modified the Plan as to Class 3 or any accepting Holder. Any updates to the Plan, as effected by the proposed Confirmation Order or any revised form thereof, involve or are likely to involve, as applicable, technical clarifications, resolve certain informal comments from stakeholders, do not reflect material differences to the recoveries of each Class, and are not material to the treatment of any accepting Holder or Class 3

as a whole.  In my opinion, no Holder within the Voting Class is "likely" to reconsider its acceptance of the Plan.

### **Waiver of Bankruptcy Rule 3020(e)**

87.    It is my understanding that Bankruptcy Rule 3020(e) provides that "[a]n order confirming a chapter 11 plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  I understand that Bankruptcy Rules 6004(h) and 6006(d) provide similar stays in respect of orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  It is my understanding that each of the foregoing Bankruptcy Rules also permits modification of the imposed stay upon further order of a court. Based upon my experience in complex chapter 11 cases, I understand that courts have waived the applicable stay periods to allow orders confirming chapter 11 plans to become effective immediately upon entry.

88.    Here, given the complexity of the Plan and the Restructuring Transactions, respectively, it is my opinion that good cause exists to waive any stay that is otherwise applicable to the Confirmation Order and to permit the Confirmation Order to become effective immediately upon its entry.  It is my opinion that immediate effectiveness will allow the parties to consummate the Restructuring Transactions in a value-maximizing fashion that is consistent with budgetary imperatives, fund the Administrative / Priority Claims Reserve and Wind-Down Reserve, respectively, without undue delay, take all required steps to effectuate the Plan so that the Effective Date can occur promptly, and avoid the unnecessary and burdensome administrative and professional costs attributable to remaining in chapter 11 for any longer than necessary.

89.      It is my understanding that the restructuring steps outlined in the Restructuring Steps Memorandum include time-sensitive corporate, funding, and operational actions, including, without limitation, the administration of initial distributions contemplated to occur on the Effective Date.  I understand these actions are interdependent and require coordination in their execution from the Debtors' remaining employees, many of whom are due to depart imminently. Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the Confirmation Order may become effective immediately upon its entry.

## Conclusion

90.      It is my opinion that the Disclosure Statement contains "adequate information" and the Plan satisfies the requirements of Confirmation.  Confirmation of the Plan would represent an extraordinary result for the Debtors' creditors that is attributable to the hard work of numerous stakeholders to resolve these chapter 11 cases in a fair, equitable, and value-maximizing fashion. The Plan provides for significant value for the Debtors' stakeholders, and it is the only path for the Debtors to emerge from chapter 11.  For these reasons, the Plan is also supported by the Debtors and many of their key stakeholders.  I firmly believe that Confirmation of the Plan is in the best interests of the Estates.  As a result, I believe that the Bankruptcy Court should approve the Disclosure Statement on a final basis and confirm the Plan.

*       *       *       *       *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  November 21, 2025                              _/s/ Marc Liebman_____
                                                       Marc Liebman
                                                       Chief Transformation Officer
                                                       New Rite Aid, LLC

## Exhibit A

**Wind-Down Budget**

| | Pre-Effective Date DIP Period | At Closing / Effective Date | Post Effective Date Period | | | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11/16 - 12/12 | 12/12 | 12/15 - 12/31 | Q1 CY26 | Q2 CY26 | Q3 CY26 | Q4 CY26 | CY27 | Later | Pre-Effective / Closing | Post-Effective | Aggregate |
| **Receipts** | | | | | | | | | | | | |
| Operating Receipts | $ - | $ - | $ 8.3 | $ 63.0 | $ 7.4 | 3.0 | 3.6 | $ 7.2 | | $ | 92.5 | $ 92.5 |
| Liquidating Receipts | 34.8 | 20.0 | 17.6 | 18.9 | 2.9 | 3.4 | 1.4 | 14.7 | 3.6 | 54.8 | 62.5 | 117.4 |
| **Total Receipts** | $ 34.8 | $ 20.0 | $ 25.8 | $ 81.9 | $ 10.3 | $ 6.4 | $ 5.1 | $ 22.0 | $ 3.6 | $ 54.8 | $ 155.1 | $ 209.9 |
| **Disbursements** | | | | | | | | | | | | |
| **DIP Disbursements** | | | | | | | | | | | | |
| Operating Disbursements | $ (20.1) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ (20.1) | $ - | $ (20.1) |
| Non-Operating Disbursements | (9.7) | (5.2) | - | - | - | - | - | - | | (14.9) | - | (14.9) |
| **Total DIP / ED** | $ (29.8) | $ (5.2) | $ - | $ - | $ - | $ - | $ - | $ - | | $ (35.0) | $ - | $ (35.0) |
| **Admin / Priority Claims Reserve** [1] | | | | | | | | | | | | |
| Unpaid DIP Admin Claims | $ - | $ - | $ (1.7) | $ (2.8) | $ - | $ - | $ - | $ - | | $ - | $ (4.5) | $ (4.5) |
| Other A/P Reserves | - | - | (4.7) | (1.2) | | | | | | - | (5.9) | (5.9) |
| **Total Admin / Priority Claims Reserve** | $ - | $ - | $ (6.4) | $ (4.1) | $ - | $ - | $ - | $ - | | $ - | $ (10.4) | $ (10.4) |
| **Wind Down Reserve** [1] | | | | | | | | | | | | |
| Operating Expenses | $ - | $ - | $ (0.3) | $ (0.8) | $ - | $ - | $ - | $ - | | $ - | $ (1.1) | $ (1.1) |
| Trustee and Professional Costs | - | - | (0.5) | | | | | | | - | (0.5) | (0.5) |
| Other | - | - | (0.8) | (1.9) | | | | | | - | (2.7) | (2.7) |
| **Total Wind Down Reserve** | $ - | $ - | $ (1.6) | $ (2.7) | $ - | $ - | $ - | $ - | | $ - | $ (4.3) | $ (4.3) |
| **Total Disbursements** | $ (29.8) | $ (5.2) | $ (7.9) | $ (6.8) | $ - | $ - | $ - | $ - | | $ (35.0) | $ (14.7) | $ (49.7) |
| **Net Cash Flow** | $ 5.0 | $ 14.9 | $ 17.9 | $ 75.1 | $ 10.3 | $ 6.4 | $ 5.1 | $ 22.0 | $ 3.6 | $ 19.9 | $ 140.4 | $ 160.2 |

*Memo: Total Reserve Amounts Funded at Closing / Effective Date*

| | | |
|---|---|---|
| Admin / Priority Claims Reserve | $ | (10.4) |
| Wind Down Reserve | | (4.3) |
| **Total Reserve Funding at Closing** | $ | (14.7) |

*Note: Wind-Down Budget assumes any valid Administrative Claims contemplated in the pre-Effective Date period (i.e. DIP Budget) that remain unpaid upon the occurrence of the Effective Date increase or decrease the Administrative / Priority Claims Reserve accordingly.*

*[1] While actual disbursements from the Administrative / Priority Claims Reserve and Wind-Down Reserve amounts are presented as post-Effective Date, both the Administrative / Priority Claims Reserve and the Wind-Down Reserve will be fully funded no later than the Effective Date as part of the flow of funds at closing.*