**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF FILING OF FIRST AMENDED PLAN SUPPLEMENT

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AGENT.**

**PLEASE TAKE NOTICE THAT** on September 22, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court")[2] entered an order [Docket No. 2535] (the "Disclosure Statement Order"): (a) authorizing New Rite Aid, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2517]; (b) conditionally approving the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2518] as

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

   **PLEASE TAKE FURTHER NOTICE** that, on November 11, 2025, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3215] (as modified, amended, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 3216] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), and the *Notice of Filing of Plan Supplement* [Docket No. 3218] (the "Initial Plan Supplement").

   **PLEASE TAKE FURTHER NOTICE THAT**, as contemplated by the Disclosure Statement Order, the Debtors hereby file this First Amended Plan Supplement (the "First Amended Plan Supplement," and, together with the Initial Plan Supplement, the "Plan Supplement").

   **PLEASE TAKE FURTHER NOTICE THAT** the First Amended Plan Supplement includes the following exhibits:

| Exhibit | Document |
| --- | --- |
| Exhibit B | Schedule of Assumed Executory Contracts and/or Unexpired Leases |
| Exhibit B-1 | Changed Pages Only Redline of the Revised Schedule of Assumed Executory Contracts and/or Unexpired Leases Against the Original Schedule of Assumed Executory Contracts and/or Unexpired Leases Filed at Docket No. 3218 |
| Exhibit D | Restructuring Steps Memorandum |
| Exhibit D-1 | Changed Pages Only Redline of the Revised Restructuring Steps Memorandum Against the Original Restructuring Steps Memorandum Filed at Docket No. 3218 |
| Exhibit E | New Board of Directors Disclosures |
| Exhibit G | Liquidating Trust Agreement |
| Exhibit G-1 | Changed Pages Only Redline of the Revised Liquidating Trust Agreement Against the Original Liquidating Trust Agreement Filed at Docket No. 3218 |
| Exhibit H | Data Retention Plan |

| Exhibit H | Data Retention Plan |
|---|---|
| Exhibit H-1 | Changed Pages Only Redline of the Revised Data Retention Plan Against the Original Data Retention Plan Filed at Docket No. 3218 |
| Exhibit I | Conformed Wind-Down Budget |

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in this Plan Supplement remain subject to continuing negotiations. Subject to the terms and conditions of the Plan, the Disclosure Statement Order, and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan, the Disclosure Statement Order, or any other order of the Court.

**PLEASE TAKE FURTHER NOTICE** that the virtual hearing at which the Court will consider confirmation of the Plan and final approval of the Disclosure Statement will commence on **November 24, 2025, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608 (the "Combined Hearing"). The Combined Hearing may be continued from time to time without further notice other than by an announcement in open court or a notice filed on the Court's docket and served on all parties entitled to the notice.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims Agent"), by: (a) calling the Claims Agent at (888) 575-9318 (U.S./Canada, toll free) or +1 (646) 930-4577 (international); (b) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/RiteAid2025; (c) writing to the Claims Agent at New Rite Aid, LLC's Election Form Processing Center c/o Kroll Restructuring Administration LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232; or (d) emailing RiteAid2025Info@ra.kroll.com.(with "In re New Rite Aid - Solicitation Inquiry" in the subject line). You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid2025, or the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*    *    *

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AGENT.**

*[Remainder of Page Intentionally Left Blank]*

Dated:  November 24, 2025

/s/   Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:      arosenberg@paulweiss.com
            aeaton@paulweiss.com
            chopkins@paulweiss.com
            smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**<u>Exhibit B</u>**

**Schedule of Assumed Executory Contracts and/or Unexpired Leases**

This **Exhibit B**[1] contains the Schedule of Assumed Executory Contracts and Unexpired Leases,[2] which includes those Executory Contracts and Unexpired Leases proposed to be assumed by, or assumed and assigned to, the Reorganized Debtors, Wind-Down Debtors, and Rite Aid Plan Sponsor Entity as set forth on **Exhibit B-1**, **Exhibit B-2**, and **Exhibit B-3** respectively. As set forth in the Plan, unless an Executory Contract or Unexpired Lease is specifically included in this **Exhibit B** (or otherwise within the categories listed in the following provisos (a) through (f) of Article V.A of the Plan), **such Executory Contract or Unexpired Lease shall be rejected as of the Effective Date in accordance with the following provisions of the Plan**.

Article V.A of the Plan provides as follows:

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected (including any Executory Contract or Unexpired Lease entered into after the Petition Date) shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed or rejected by the Debtors pursuant to any Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (d) are to be assumed and assigned by the Debtors, as applicable, including through a Sale Order in connection with any sale transaction; (e) are a contract, release, or other agreement or document entered into in connection with the Plan; or (f) are an Insurance Policy. Notwithstanding the foregoing, by consent of McKesson and the Debtors, the deadline for assumption or rejection of the McKesson Supply Documents shall be extended through fifteen (15) Business Days after the earliest of (1) termination of the McKesson Inventory Sale Agreement in accordance with its terms, (2) if the Inmar Outside Date occurs prior to occurrence of the Inmar Closing, the expiration of the Initial Inmar Credit Payment Period (as defined in the McKesson Inventory Sale Agreement), and (3) if the Inmar Closing occurs, expiration of the Subsequent Inmar Credit Payment Period (as defined in the McKesson Inventory Sale Agreement).

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease

---

[1]    The Debtors propose to assume each of the third party administrative service agreements and supporting agreements listed in this **Exhibit B**, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed agreement (with the exception of The Hartford agreements) and which is necessary to ensure the ability of the Debtors to administer any applicable employee benefit plan in accordance with the Plan.

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the [*First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2517]] (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").

by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, (a) the assumptions and assumptions and assignments of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases and (b) the rejections of any such agreements not assumed or assumed and assigned pursuant to this Plan, in each case pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein or in the Confirmation Order or any Sale Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to this Article V.A, the effective date of rejection of such Unexpired Leases shall be the later of: (a) the Effective Date, and (b) the date upon which the Debtors or the Wind-Down Debtors, as applicable, notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors or the Wind-Down Debtors surrender the premises as set forth in the foregoing proviso (b), all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. The Debtors shall provide each counterparty to an Unexpired Lease which is not assumed pursuant to this Plan with a notice (which notice may, for the avoidance of doubt, be included in the notice such party receives with respect to the filing of the Plan Supplement).

Article V.B of the Plan provides as follows:

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases for any Claims which would be subject to the Claims Bar Date pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the earliest of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Effective Date. **Any such Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such Claims against the Debtors and/or receiving distributions on account of such Claims in these Chapter 11 Cases. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the**

**Claims Register to remove any Claims not timely filed; *provided* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed**. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Pursuant to Article III.B General Unsecured Claims shall not receive any recovery pursuant to the Plan, are not subject to the Claims Bar Date, and no Proofs of Claim with respect to such Claims must be Filed.

Article V.C of the Plan provides as follows:

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Wind-Down Debtors, or, solely with respect to any Executory Contracts or Unexpired Leases to be assumed by, or assumed and assigned to, any Reorganized Debtor, the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan, if any, on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

Unless (a) otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease or (b) an earlier deadline has been set with respect to such objection by a Final Order (including, without limitation, the Bidding Procedures Order or any Sale Order, in which case the deadlines set forth in such orders with respect to the applicable Executory Contract or Unexpired Lease shall control), any objection by a counterparty to an Executory Contract or Unexpired Lease to be assumed pursuant to this Plan to the applicable proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors by no later than 14 days after the service of notice of assumption on affected counterparties (which notice may, for the avoidance of doubt, be included in the notice such party receives with respect to the filing of the Plan Supplement). **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors or the Wind-Down Debtors, as applicable,**

**or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court**.

Inclusion of any document in the Schedule of Assumed Executory Contracts and Unexpired Leases is not an admission by the Debtors that any such document constitutes an Executory Contract or Unexpired Lease.  Subject to the terms of the Plan and the Restructuring Support Agreement, the Debtors reserve the right to assert that any of the documents listed in the Schedule of Assumed Executory Contracts and Unexpired Leases are not Executory Contracts or Unexpired Leases.  As a matter of administrative convenience, in certain cases the Debtors may have listed the original parties to the Executory Contracts and Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases without taking into account any succession of trustees or any other transfers or assignments from one party to another.  The fact that the current parties to any particular Executory Contract or Unexpired Leases may not be named in the Schedule of Assumed Executory Contracts and Unexpired Leases is not intended to change the treatment of such Executory Contracts or Unexpired Leases.  References to any Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan are to the applicable Executory Contract or Unexpired Lease and other operative documents as of the date of the Plan Supplement, as they may have been amended, modified, or supplemented from time to time and as may be further amended, modified, or supplemented by the parties thereto between such date and the Effective Date.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit B**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**Exhibit B-1**

**Assumed Executory Contracts and Unexpired Leases (Reorganized Debtors)**

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| COLLECTIVE BARGAINING AGREEMENT, DATED SEPTEMBER 21, 2023 | UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776KS | RITE AID OF NEW JERSEY, INC. | COLLECTIVE BARGAINING AGREEMENT | $0.00 |
| INDUSTRIAL BUILDING LEASE, DATED DECEMBER 22, 2015 | COLFIN COBALT I-II OWNER, LLC | RITE AID OF NEW JERSEY, INC. | REAL ESTATE LEASE FOR CENTRAL FILL FACILITY | $100,347.76 |
| MASTER SERVICES AGREEMENT | ENSONO, INC. | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $42,222.49 |
| STATEMENT OF WORK – MAINFRAME REMOTE HOSTED SERVICES | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES AGREEMENT |
| AMENDMENT #1 TO THE MASTER SERVICES AGREEMENT | ENSONO, INC. | RITE AID HDQTRS. CORP. | AMENDMENT | INCLUDED IN MASTER SERVICES AGREEMENT |
| STATEMENT OF WORK – RITE AID MAINFRAME PROCESSOR MAINTENANCE | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES AGREEMENT |
| STATEMENT OF WORK – RITE AID ICA CARDS AND CABLES | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES AGREEMENT |

| CHANGE ORDER #1 – BC12 AND Z13S REMOTE HOSTED, SECURITY & TRAINING | ENSONO, INC. | RITE AID HDQTRS. CORP. | CHANGE ORDER | INCLUDED IN MASTER SERVICES AGREEMENT |
|---|---|---|---|---|
| ~~SERVICE AGREEMENT~~ [1] | ~~SCRIPTABILITY~~ | ~~RITE AID HDQTRS. CORP.~~ | ~~SERVICE AGREEMENT~~ | ~~$0.00~~ |

[1]     The Debtors are no longer proposing to assume the Scriptability contract to the Reorganized Debtors at this time.

**Exhibit B-2**

**Assumed Executory Contracts and Unexpired Leases (Wind-Down Debtors)**

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| SERVICES AGREEMENT DATED AS OF JUNE 30, 2021 (AS AMENDED) | MEDCHART US INC. | RITE AID HDQTRS. CORP. | SERVICES AGREEMENT | $0.00 |
| MASTER HEALTH SERVICES AGREEMENT (MHSA), EFFECTIVE JANUARY 1, 2022 | HIGHMARK INC. | RITE AID HDQRTS. CORP. | MASTER HEALTH SERVICES AGREEMENT | $0.00 |
| PRESCRIPTION DRUG PROGRAM AGREEMENT, DATED AS OF JANUARY 1, 2025 | EXPRESS SCRIPTS, INC. | RITE AID HDQRTS. CORP. | PRESCRIPTION DRUG PROGRAM AGREEMENT | $0.00 |
| MASTER SERVICES AGREEMENT | BUSINESSOLVER.COM, INC. | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $0.00 |
| NONDISCLOSURE AGREEMENT (DATED 2/2/2017) | DELTA DENTAL OF PENNSYLVANIA | RITE AID HDQRTS. CORP. | NONDISCLOSURE AGREEMENT | $0.00 |
| DELTA DENTAL ADMINISTRATIVE SERVICES CONTRACT (DATED 7/1/2011) | DELTA DENTAL OF PENNSYLVANIA | RITE AID HDQRTS. CORP. | ADMINISTRATIVE SERVICES CONTRACT | $0.00 |
| REMITTANCE AGREEMENT (SIGNED 11/6/2023) | DELTA DENTAL OF PENNSYLVANIA | RITE AID CORPORATION | REMITTANCE AGREEMENT | $0.00 |
| RENEWAL FOR TERM 7/1/2023 - 6/30/2028 (DATED 1/24/2023) | DELTA DENTAL OF PENNSYLVANIA | RITE AID CORPORATION | RENEWAL | $0.00 |

| | | | | |
|---|---|---|---|---|
| AMENDMENT TO THE MASTER UNIVERSAL SERVICE AGREEMENT | EQUIFAX | RITE AID HDQTRS. CORP. | MASTER UNIVERSAL SERVICE AGREEMENT | |
| SCHEDULE A – EPAYROLL SERVICES SERVICE PROVIDER, TERM AND FEES FOR SERVICES | EQUIFAX | RITE AID HDQTRS. CORP. | PAYROLL SERVICES | $2,734.76 |
| PRESCRIPTION DRUG PROGRAM AGREEMENT (DATED 1/1/2025) | EXPRESS SCRIPTS | RITE AID HDQTRS. CORP. | PRESCRIPTION DRUG PROGRAM | $0.00 |
| LETTER OF AGREEMENT (DATED 12/20/2024) | EXPRESS SCRIPTS | RITE AID HDQTRS. CORP. | AGREEMENT | $0.00 |
| PERFORMANCE AGREEMENT (DATED 1/1/2023) | HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY | RITE AID HDQTRS. CORP. | PERFORMANCE AGREEMENT | $0.00 |
| LONG TERM DISABILITY BENEFIT ADMINISTRATION AGREEMENT (DATED 1/1/2023) | HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY | RITE AID HDQTRS. CORP. | LONG TERM DISABILITY BENEFIT ADMINISTRATION AGREEMENT | $0.00 |
| ADMINISTRATIVE SERVICES AGREEMENT (DATED 1/1/2015) | HEWIT ASSOCIATES LLC ("AON HEWITT") | RITE AID CORPORATION | ADMINISTRATIVE SERVICES AGREEMENT | $0.00 |
| MASTER HEALTH SERVICES AGREEMENT (DATED 1/1/2020) | HIGHMARK | RITE AID HDQTRS. CORP. | MASTER HEALTH SERVICES AGREEMENT | $0.00 |
| GROUP AGREEMENT FOR RITE AID CORPORATION (DATED 5/31/2019 FOR GROUP ID: 100507) | KAISER FOUNDATION HEALTH PLAN | RITE AID CORPORATION | GROUP AGREEMENT | $3,006.09 |

| | | | | |
|---|---|---|---|---|
| GROUP AGREEMENT FOR RITE AID CORPORATION (DATED 5/31/2019 FOR GROUP ID: 606616) | KAISER FOUNDATION HEALTH PLAN | RITE AID CORPORATION | GROUP AGREEMENT | $3,006.09 |
| BUSINESS ASSOCIATE AGREEMENT | LYRA HEALTH | RITE AID HDQTRS. CORP. | BUSINESS ASSOCIATE | $0.00 |
| STATEMENT OF WORK NO. 1 DATED 07/01/2023 | LYRA HEALTH | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |
| MASTER SERVICES AGREEMENT (DATED 7/1/2023) | LYRA HEALTH | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $0.00 |
| MASTER AGREEMENT DATED 10/21/2022 | ONESOURCE VIRTUAL INC. | RITE AID HDQTRS. CORP. | MASTER AGREEMENT | $0.00 |
| ORDER FORM | ONESOURCE VIRTUAL INC. | RITE AID HDQTRS. CORP. | ORDER FORM | $0.00 |
| BUSINESS ASSOCIATE AGREEMENT DATED 07/06/2023 | QUANTUM | RITE AID HDQTRS. CORP. | BUSINESS ASSOCIATE AGREEMENT | $0.00 |
| HEALTHCARE NAVIGATION AND CARE COORDINATION SERVICES AGREEMENT DATED 01/09/2023 | QUANTUM | RITE AID HDQTRS. CORP. | CARE COORDINATION SERVICES AGREEMENT | $0.00 |
| STATEMENT OF WORK — HEALTH AND WELFARE PLAN MANAGEMENT SERVICES DATED 07/28/2014 | TOWERS WATSON DELAWARE INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |
| STATEMENT OF WORK — HEALTH AND WELFARE PLAN MANAGEMENT SERVICES DATED 10/01/2010 | TOWERS WATSON PENNSYLVANIA INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |

| GROUP VISION CARE POLICY (DATED 7/1/2016) | VSP | RITE AID HDQTRS. CORP. | GROUP VISION CARE POLICY | $0.00 |
|---|---|---|---|---|
| RENEWAL AGREEMENT (DATED 1/23/2024) | VSP | RITE AID HDQTRS. CORP. | RENEWAL | $0.00 |

\* The Debtors propose to assume each of the third party administrative service agreements and supporting agreements listed above, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed agreement (with the exception of The Hartford agreements) and which is necessary to ensure the ability of the Debtors to administer the applicable employee benefit plan in accordance with the Plan.

\*\*The Debtors and MedChart US Inc. ("MedChart") continue to discuss the terms pursuant to which this agreement shall be assumed, and the Debtors and MedChart's rights pursuant to Article V.C. of the Plan are fully reserved.

**Exhibit B-3**

**Assumed and Assigned Executory Contracts and Unexpired Leases (Rite Aid Plan Sponsor Entity)**

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| MASTER SERVICES AGREEMENT (DATED 3/13/2013) | CLIFTONLARSONALLEN, LLC | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $2,310.00 |
| ADMINISTRATIVE SERVICES AGREEMENT DATED 09/03/2019 | GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY | RITE AID CORPORATION | ADMINISTRATIVE SERVICES AGREEMENT | $0.00 |
| LETTER OF AGREEMENT DATED 09/20/2021 | NEPC LLC | RITE AID HDQTRS. CORP. | LETTER OF AGREEMENT | $0.00 |
| TRUST AGREEMENT DATED 03/25/2021 | US BANK NATIONAL ASSOCIATION | RITE AID CORPORATION | TRUST AGREEMENT | $0.00 |

*The Plan Sponsor Entity proposes to assume each of the third party administrative service agreements and supporting agreements listed above, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed agreement and which is necessary to ensure the ability of the Plan Sponsor Entity to administer the applicable employee benefit plan in accordance with the Plan.

**Exhibit B-1**

**Changed Pages Only Redline of the Revised Schedule of Assumed Executory Contracts and/or
Unexpired Leases Against the Original Schedule of Assumed Executory Contracts and/or
Unexpired Leases Filed at Docket No. 3218**

**Exhibit ~~C~~B**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

This **Exhibit ~~C~~B**[1] contains the Schedule of Assumed Executory Contracts and Unexpired Leases,[2] which includes those Executory Contracts and Unexpired Leases proposed to be assumed by, or assumed and assigned to, the Reorganized Debtors ~~as set forth on~~ **~~Exhibit C-1 or the~~**, Wind-Down Debtors ~~,~~ **, and** Rite Aid Plan Sponsor Entity as set forth on **Exhibit ~~C~~B-1, Exhibit B-2**~~,~~[2]**, and Exhibit B-3 respectively.** As set forth in the Plan, unless an Executory Contract or Unexpired Lease is specifically included in this **Exhibit ~~C~~B** (or otherwise within the categories listed in the following provisos (a) through (f) of <u>Article V.A</u> of the Plan), **such Executory Contract or Unexpired Lease shall be rejected as of the Effective Date in accordance with the following provisions of the Plan**.

<u>Article V.A</u> of the Plan provides as follows:

> On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected (including any Executory Contract or Unexpired Lease entered into after the Petition Date) shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed or rejected by the Debtors pursuant to any Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (d) are to be assumed and assigned by the Debtors, as applicable, including through a Sale Order in connection with any sale transaction; (e) are a contract, release, or other agreement or document entered into in connection with the Plan; or (f) are an Insurance Policy. Notwithstanding the foregoing, by consent of McKesson and the Debtors, the deadline for assumption or rejection of the McKesson Supply Documents shall be extended through fifteen (15) Business Days after the earliest of (1) termination of the McKesson Inventory Sale Agreement in accordance with its terms, (2) if the Inmar Outside Date occurs prior to occurrence of the Inmar

---

[1] The Debtors propose to assume each of the third party administrative service agreements and supporting agreements listed in this **Exhibit ~~C~~B**, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed agreement (with the exception of The Hartford agreements) and which is necessary to ensure the ability of the Debtors to administer any applicable employee benefit plan in accordance with the Plan.

[2] **Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the [_First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates_ [Docket No. 2517]] (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").**

[2] ~~Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the [_First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates_ [Docket No. 2517]] (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").~~

affected counterparties (which notice may, for the avoidance of doubt, be included in the notice such party receives with respect to the filing of the Plan Supplement). **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors or the Wind-Down Debtors, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court**.

Inclusion of any document in the Schedule of Assumed Executory Contracts and Unexpired Leases is not an admission by the Debtors that any such document constitutes an Executory Contract or Unexpired Lease. Subject to the terms of the Plan and the Restructuring Support Agreement, the Debtors reserve the right to assert that any of the documents listed in the Schedule of Assumed Executory Contracts and Unexpired Leases are not Executory Contracts or Unexpired Leases. As a matter of administrative convenience, in certain cases the Debtors may have listed the original parties to the Executory Contracts and Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases without taking into account any succession of trustees or any other transfers or assignments from one party to another. The fact that the current parties to any particular Executory Contract or Unexpired Leases may not be named in the Schedule of Assumed Executory Contracts and Unexpired Leases is not intended to change the treatment of such Executory Contracts or Unexpired Leases. References to any Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan are to the applicable Executory Contract or Unexpired Lease and other operative documents as of the date of the Plan Supplement, as they may have been amended, modified, or supplemented from time to time and as may be further amended, modified, or supplemented by the parties thereto between such date and the Effective Date.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit ~~C~~B**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**[Exhibit CB-1][3]**

**Assumed Executory Contracts and Unexpired Leases (Reorganized Debtors)**

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| COLLECTIVE BARGAINING AGREEMENT, DATED SEPTEMBER 21, 2023 | UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1176KS1776KS | RITE AID OF NEW JERSEY, INC. | COLLECTIVE BARGAINING AGREEMENT | $0.00 |
| INDUSTRIAL BUILDING LEASE, DATED DECEMBER 22, 2015 | COLFIN COBALT I-II OWNER, LLC | RITE AID OF NEW JERSEY, INC. | REAL ESTATE LEASE FOR CENTRAL FILL FACILITY | $79,180.73100,347.76 |
| MASTER SERVICES AGREEMENT | ENSONO, INC. | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $42,222.49 |
| STATEMENT OF WORK – MAINFRAME REMOTE HOSTED SERVICES | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES AGREEMENT |
| AMENDMENT #1 TO THE MASTER SERVICES AGREEMENT | ENSONO, INC. | RITE AID HDQTRS. CORP. | AMENDMENT | INCLUDED IN MASTER SERVICES AGREEMENT |
| STATEMENT OF WORK – RITE AID MAINFRAME PROCESSOR MAINTENANCE | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES AGREEMENT |
| STATEMENT OF WORK – RITE AID ICA CARDS | ENSONO, INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | INCLUDED IN MASTER SERVICES |

---

[3]  NTD:  Subject to ongoing review.

| AND CABLES | | | | AGREEMENT |
|---|---|---|---|---|
| CHANGE ORDER #1 – BC12 AND Z13S REMOTE HOSTED, SECURITY & TRAINING | ENSONO, INC. | RITE AID HDQTRS. CORP. | CHANGE ORDER | INCLUDED IN MASTER SERVICES AGREEMENT |
| SERVICE AGREEMENT [1] | SCRIPTABILITY | RITE AID HDQTRS. CORP. | SERVICE AGREEMENT | $0.00 |

[1] The Debtors are no longer proposing to assume the Scriptability contract to the Reorganized Debtors at this time.

**[Exhibit C~~B-2~~]**[4]

**Assumed Executory Contracts and Unexpired Leases (Wind-Down Debtors)** ~~/ Assumed and Assigned Executory Contracts and Unexpired Leases (Rite Aid Plan Sponsor Entity)~~

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| **SERVICES AGREEMENT DATED AS OF JUNE 30, 2021 (AS AMENDED)** | **MEDCHART US INC.** | **RITE AID HDQTRS. CORP.** | **SERVICES AGREEMENT** | **$0.00** |
| MASTER HEALTH SERVICES AGREEMENT (MHSA), EFFECTIVE JANUARY 1, 2022 | HIGHMARK INC. | RITE AID ~~HDQRTS~~**HDQT RS**. CORP. | MASTER HEALTH SERVICES AGREEMENT | $0.00 |
| PRESCRIPTION DRUG PROGRAM AGREEMENT, DATED AS OF JANUARY 1, 2025 | EXPRESS SCRIPTS, INC. | RITE AID ~~HDQRTS~~**HDQT RS**. CORP. | PRESCRIPTION DRUG PROGRAM AGREEMENT | $0.00 |
| MASTER SERVICES AGREEMENT | BUSINESSOLVER.COM, INC. | RITE AID ~~HDQRTS~~**HDQT RS**. CORP. | MASTER SERVICES AGREEMENT | $0.00 |
| ~~MASTER SERVICES AGREEMENT (DATED 3/13/2013)~~ | ~~CLIFTONLARSONALLEN, LLC~~ | ~~RITE AID HDQTS. CORP.~~ | ~~MASTER SERVICES AGREEMENT~~ | ~~$2,310.00~~ |
| NONDISCLOSURE AGREEMENT (DATED 2/2/2017) | DELTA DENTAL OF PENNSYLVANIA | RITE AID ~~HDQRTS~~**HDQT RS**. CORP. | NONDISCLOSURE AGREEMENT | $0.00 |
| DELTA DENTAL ADMINISTRATIVE | DELTA DENTAL OF PENNSYLVANIA | RITE AID ~~HDQRTS~~**HDQT** | ADMINISTRATIVE SERVICES | $0.00 |

---

[4] ~~NTD:  Subject to ongoing review.~~

| | | | | |
|---|---|---|---|---|
| SERVICES CONTRACT (DATED 7/1/2011) | | RS. CORP. | CONTRACT | |
| REMITTANCE AGREEMENT (SIGNED 11/6/2023) | DELTA DENTAL OF PENNSYLVANIA | RITE AID CORPORATION | REMITTANCE AGREEMENT | $0.00 |
| RENEWAL FOR TERM 7/1/2023 - 6/30/2028 (DATED 1/24/2023) | DELTA DENTAL OF PENNSYLVANIA | RITE AID CORPORATION | RENEWAL | $0.00 |
| AMENDMENT TO THE MASTER UNIVERSAL SERVICE AGREEMENT | EQUIFAX | RITE AID HDQTRS. CORP. | MASTER UNIVERSAL SERVICE AGREEMENT | $2,734.76 |
| SCHEDULE A – EPAYROLL SERVICES SERVICE PROVIDER, TERM AND FEES FOR SERVICES | EQUIFAX | RITE AID HDQTRS. CORP. | PAYROLL SERVICES | |
| PRESCRIPTION DRUG PROGRAM AGREEMENT (DATED 1/1/2025) | EXPRESS SCRIPTS | RITE AID HDQTRS. CORP. | PRESCRIPTION DRUG PROGRAM | $0.00 |
| LETTER OF AGREEMENT (DATED 12/20/2024) | EXPRESS SCRIPTS | RITE AID HDQTRS. CORP. | AGREEMENT | $0.00 |
| ADMINISTRATIVE SERVICES AGREEMENT DATED 09/03/2019 | GREAT WEST LIFE & ANNUITY INSURANCE COMPANY | RITE AID CORPORATION | ADMINISTRATIVE SERVICES AGREEMENT | $0.00 |
| PERFORMANCE AGREEMENT (DATED 1/1/2023) | HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY | RITE AID HDQTRS. CORP. | PERFORMANCE AGREEMENT | $0.00 |
| LONG TERM DISABILITY BENEFIT ADMINISTRATION AGREEMENT (DATED 1/1/2023) | HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY | RITE AID HDQTRS. CORP. | LONG TERM DISABILITY BENEFIT ADMINISTRATION AGREEMENT | $0.00 |
| ADMINISTRATIVE SERVICES AGREEMENT (DATED 1/1/2015) | HEWIT ASSOCIATES LLC ("AON HEWITT") | RITE AID CORPORATION | ADMINISTRATIVE SERVICES AGREEMENT | $0.00 |
| MASTER HEALTH SERVICES AGREEMENT | HIGHMARK | RITE AID HDQTRS. CORP. | MASTER HEALTH SERVICES AGREEMENT | $0.00 |

| (DATED 1/1/2020) | | | | |
|---|---|---|---|---|
| GROUP AGREEMENT FOR RITE AID CORPORATION (DATED 5/31/2019 FOR GROUP ID: 100507) | KAISER FOUNDATION HEALTH PLAN | RITE AID CORPORATION | GROUP AGREEMENT | $3,006.09 |
| GROUP AGREEMENT FOR RITE AID CORPORATION (DATED 5/31/2019 FOR GROUP ID: 606616) | KAISER FOUNDATION HEALTH PLAN | RITE AID CORPORATION | GROUP AGREEMENT | **$3,006.09** |
| BUSINESS ASSOCIATE AGREEMENT | LYRA HEALTH | RITE AID HDQTRS. CORP. | BUSINESS ASSOCIATE | $0.00 |
| STATEMENT OF WORK NO. 1 DATED 07/01/2023 | LYRA HEALTH | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |
| MASTER SERVICES AGREEMENT (DATED 7/1/2023) | LYRA HEALTH | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $0.00 |
| ~~LETTER OF AGREEMENT DATED 09/20/2021~~ | ~~NEPC LLC~~ | ~~RITE AID HDQTRS. CORP.~~ | ~~LETTER OF AGREEMENT~~ | ~~$0.00~~ |
| MASTER AGREEMENT DATED 10/21/2022 | ONESOURCE VIRTUAL INC. | RITE AID HDQTRS. CORP. | MASTER AGREEMENT | $0.00 |
| ORDER FORM | ONESOURCE VIRTUAL INC. | RITE AID HDQTRS. CORP. | ORDER FORM | $0.00 |
| BUSINESS ASSOCIATE AGREEMENT DATED 07/06/2023 | QUANTUM | RITE AID HDQTRS. CORP. | BUSINESS ASSOCIATE AGREEMENT | $0.00 |
| HEALTHCARE NAVIGATION AND CARE COORDINATION SERVICES AGREEMENT DATED 01/09/2023 | QUANTUM | RITE AID HDQTRS. CORP. | CARE COORDINATION SERVICES AGREEMENT | $0.00 |
| STATEMENT OF WORK — HEALTH AND WELFARE PLAN MANAGEMENT | TOWERS WATSON DELAWARE INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |

| | | | | |
|---|---|---|---|---|
| SERVICES DATED 07/28/2014 | | | | |
| STATEMENT OF WORK — HEALTH AND WELFARE PLAN MANAGEMENT SERVICES DATED 10/01/2010 | TOWERS WATSON PENNSYLVANIA INC. | RITE AID HDQTRS. CORP. | STATEMENT OF WORK | $0.00 |
| GROUP VISION CARE POLICY (DATED 7/1/2016) | VSP | RITE AID HDQTRS. CORP. | GROUP VISION CARE POLICY | $0.00 |
| RENEWAL AGREEMENT (DATED 1/23/2024) | VSP | RITE AID HDQTRS. CORP. | RENEWAL | $0.00 |

**\* The Debtors propose to assume each of the third party administrative service agreements and supporting agreements listed above, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed agreement (with the exception of The Hartford agreements) and which is necessary to ensure the ability of the Debtors to administer the applicable employee benefit plan in accordance with the Plan.**

**\*\*The Debtors and MedChart US Inc. ("MedChart") continue to discuss the terms pursuant to which this agreement shall be assumed, and the Debtors and MedChart's rights pursuant to Article V.C. of the Plan are fully reserved.**

## Exhibit B-3

### Assumed and Assigned Executory Contracts and Unexpired Leases (Rite Aid Plan Sponsor Entity)

| Title of Contract | Counterparty | Debtor Counterparty | Description of Contract | Cure |
|---|---|---|---|---|
| MASTER SERVICES AGREEMENT (DATED 3/13/2013) | CLIFTONLARSONALLEN, LLC | RITE AID HDQTRS. CORP. | MASTER SERVICES AGREEMENT | $2,310.00 |
| ADMINISTRATIVE SERVICES AGREEMENT DATED 09/03/2019 | GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY | RITE AID CORPORATION | ADMINISTRATIVE SERVICES AGREEMENT | $0.00 |
| LETTER OF AGREEMENT DATED 09/20/2021 | NEPC LLC | RITE AID HDQTRS. CORP. | LETTER OF AGREEMENT | $0.00 |
| TRUST AGREEMENT DATED 03/25/2021 | US BANK NATIONAL ASSOCIATION | RITE AID CORPORATION | TRUST AGREEMENT | $0.00 |

*The Plan Sponsor Entity proposes to assume each of the third party administrative service agreements and supporting agreements listed above, as well as all current amendments, renewals, business associate agreements, statements of work, appendices, and other supporting documents and agreements incorporated into or entered under the listed

**agreement and which is necessary to ensure the ability of the Plan Sponsor Entity to administer the applicable employee benefit plan in accordance with the Plan.**

**Exhibit D**

**Restructuring Steps Memorandum**

## Restructuring Steps Memorandum

Pursuant to the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (the "Plan"), the Restructuring Transactions shall, except as otherwise explicitly stated below, be consummated pursuant to the following steps and in the order set forth below.  Any capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Plan.

In accordance with the Plan, the steps set forth in this Restructuring Steps Memorandum remain subject to modification, in accordance with the Plan and with the consent of McKesson and the DIP Agent, until the Effective Date.

**Restructuring Transactions**:

**Step 1.**    Prior to the Effective Date and prior to Step 2, pursuant to Article III.B.5 of the Plan, each of the Debtors under the Plan shall waive any Intercompany Claims arising out of rights to subrogation, contribution, reimbursement, indemnity or similar rights (the "Rights") under: (i)(a) the Debtor in Possession Guarantee Agreement dated as of May 8, 2025, by and among New Rite Aid, LLC, certain of its subsidiaries from time to time party thereto, and Bank of America, N.A., as Collateral Agent and (b) the Debtor-in-Possession Indemnity, Subrogation and Contribution Agreement, dated as of May 8, 2025, by and among Rite Aid Corporation, New Rite Aid, LLC, certain subsidiaries of Rite Aid Corporation from time to time party thereto, and Bank of America, N.A., as Collateral Agent; (ii) the Subsidiary Guarantee Agreement dated as of August 30, 2024, by and among certain subsidiaries of Rite Aid Corporation from time to time party thereto, and Bank of America, N.A., as Collateral Agent; (iii) the Indemnity, Subrogation and Contribution Agreement dated as of August 30, 2024, by and among Rite Aid Corporation, certain subsidiaries of Rite Aid Corporation from time to time party thereto, and Bank of America, N.A., as Collateral Agent; and (iv) the indentures dated August 30, 2024 and entered in connection with the Floating Rate Senior Secured PIK Notes due 2031, Third-Priority Series A Senior Secured PIK Notes due 2031, and Third-Priority Series B Senior Secured PIK Notes due 2031. Any such Rights shall be cancelled and of no further legal effect upon such waiver.

**Step 2.**    Prior to the Effective Date, each of the following Debtors (which shall comprise the "Wind-Down Debtors" under the Plan, as of the Effective Date) shall transfer to Rite Aid of New Jersey, Inc. any Reorganized Debtor Assets (as defined in Exhibit 1 hereto) owned by such Wind-Down Debtor. For the avoidance of doubt, all Specified Excluded Assets (as defined in Exhibit 2 hereto) of the Wind-Down Debtors shall not be assigned and/or transferred to the Reorganized Debtors, and shall be retained by the Wind-Down Debtors to be administered in accordance with the Plan subject to the terms of any purchase agreement executed prior to the Effective Date, including, without limitation, that certain Asset Purchase Agreement by and between McKesson and Rite Aid of New Jersey, Inc., dated September 18, 2025 (the "McKesson APA").  For

the avoidance of doubt, nothing herein shall modify, amend or alter McKesson's obligations under the McKesson APA to acquire the Purchased Assets (as defined in the McKesson APA) subject to the terms and conditions of the McKesson APA, and any such Purchased Assets shall not constitute Reorganized Debtor Assets.

| Debtor | Jurisdiction |
|---|---|
| 1740 Associates, L.L.C. | Michigan |
| 4042 Warrensville Center Road - Warrensville Ohio, Inc. | Ohio |
| 5277 Associates, Inc. | Washington |
| 5600 Superior Properties, Inc. | Ohio |
| Apex Drug Stores, Inc. | Michigan |
| Broadview and Wallings-Broadview Heights Ohio, Inc. | Ohio |
| Drug Palace, Inc. | Maine |
| Eckerd Corporation | Delaware |
| EDC Drug Stores, Inc. | North Carolina |
| Ex Benefits, LLC | Florida |
| Ex Design Holdings, LLC | Delaware |
| Ex Design, LLC | Wyoming |
| Ex Holdco, LLC | Delaware |
| Ex Initiatives, LLC | Utah |
| Ex Options, LLC | Ohio |
| Ex Pharmacy, LLC | Ohio |
| Ex Procurement, LLC | Ohio |
| Ex Rxclusives, LLC | Wyoming |
| Ex Savings, LLC | Florida |
| Ex Software, LLC | Minnesota |
| Ex Solutions of MO, LLC | Missouri |
| Ex Solutions of NV, LLC | Nevada |
| Ex Solutions of OH, LLC | Ohio |
| Ex Tech, LLC | Delaware |
| First Florida Insurers of Tampa, LLC | Florida |
| GDF, Inc. | Maryland |
| Genovese Drug Stores, Inc. | Delaware |
| Gettysburg and Hoover-Dayton, Ohio, LLC | Ohio |
| Grand River & Fenkell, LLC | Delaware |
| Harco, Inc. | Alabama |
| Hunter Lane, LLC | Delaware |
| ILG – 90 B Avenue Lake Oswego, LLC | Delaware |
| JCG (PJC) USA, LLC | Delaware |
| JCG Holdings (USA), Inc. | Delaware |
| K & B Alabama Corporation | Alabama |

| | |
|---|---|
| K & B Louisiana Corporation | Louisiana |
| K & B Mississippi Corporation | Mississippi |
| K & B Services, Incorporated | Louisiana |
| K & B Tennessee Corporation | Tennessee |
| K & B, Incorporated | Delaware |
| K&B Texas Corporation | Texas |
| Lakehurst and Broadway Corporation | New Jersey |
| LMW - 90B Avenue Lake Oswego, Inc | Delaware |
| Maxi Drug North, Inc. | Delaware |
| Maxi Drug South, L.P. | Delaware |
| Maxi Drug, Inc. | Delaware |
| Maxi Green Inc. | Vermont |
| Munson & Andrews, LLC | Delaware |
| Name Rite, LLC | Delaware |
| P.J.C. Distribution, Inc. | Delaware |
| P.J.C. Realty Co., Inc. | Delaware |
| PDS-1 Michigan, Inc. | Michigan |
| Perry Drug Stores, Inc. | Michigan |
| PJC Lease Holdings, Inc. | Delaware |
| PJC Manchester Realty LLC | Delaware |
| PJC of Massachusetts, Inc. | Massachusetts |
| PJC of Rhode Island, Inc. | Rhode Island |
| PJC of Vermont Inc. | Vermont |
| PJC Peterborough Realty LLC | Delaware |
| PJC Realty MA, Inc. | Massachusetts |
| PJC Revere Realty LLC | Delaware |
| PJC Special Realty Holdings, Inc. | Delaware |
| RCMH LLC | Texas |
| RDS Detroit, Inc. | Michigan |
| READ's Inc. | Maryland |
| RediClinic Associates, Inc. | Delaware |
| RediClinic LLC | Delaware |
| RediClinic of Dallas-Fort Worth, LLC | Delaware |
| RediClinic of DC, LLC | Delaware |
| RediClinic of DE, LLC | Delaware |
| RediClinic of MD, LLC | Delaware |
| RediClinic of PA, LLC | Delaware |
| RediClinic of VA, LLC | Delaware |
| RediClinic US, LLC | Delaware |
| Richfield Road - Flint, Michigan, LLC | Michigan |
| Rite Aid Drug Palace, Inc. | Delaware |

| | |
|---|---|
| Rite Aid Hdqtrs. Funding, Inc. | Delaware |
| Rite Aid Lease Management Company | California |
| Rite Aid of Connecticut, Inc. | Connecticut |
| Rite Aid of Delaware, Inc. | Delaware |
| Rite Aid of Georgia, Inc. | Georgia |
| Rite Aid of Indiana, Inc. | Indiana |
| Rite Aid of Kentucky, Inc. | Kentucky |
| Rite Aid of Maine, Inc. | Maine |
| Rite Aid of Maryland, Inc. | Maryland |
| Rite Aid of Michigan, Inc. | Michigan |
| Rite Aid of New Hampshire, Inc. | New Hampshire |
| Rite Aid of New York, Inc. | New York |
| Rite Aid of North Carolina, Inc. | North Carolina |
| Rite Aid of Ohio, Inc. | Ohio |
| Rite Aid of Pennsylvania, LLC | Pennsylvania |
| Rite Aid of South Carolina, Inc. | South Carolina |
| Rite Aid of Tennessee, Inc. | Tennessee |
| Rite Aid of Vermont, Inc. | Vermont |
| Rite Aid of Virginia, Inc. | Virginia |
| Rite Aid of Washington, D.C. Inc. | District of Columbia |
| Rite Aid of West Virginia, Inc. | West Virginia |
| Rite Aid Online Store, Inc. | Delaware |
| Rite Aid Payroll Management, Inc. | Delaware |
| Rite Aid Realty Corp. | Delaware |
| Rite Aid Rome Distribution Center, Inc. | New York |
| Rite Aid Specialty Pharmacy, LLC | Delaware |
| Rite Aid Transport, Inc. | Delaware |
| Rite Investments Corp. | Delaware |
| Rite Investments Corp., LLC | Delaware |
| Rx Choice, Inc. | Delaware |
| Rx USA, Inc. | Delaware |
| The Bartell Drug Company | Washington |
| The Jean Coutu Group (PJC) USA, Inc. | Delaware |
| The Lane Drug Company | Ohio |
| Thrift Drug, Inc. | Delaware |
| Thrifty Corporation | California |
| Thrifty Ice Cream, LLC | Delaware |
| Thrifty PayLess, Inc. | California |

**Step 3**.    Prior to the Effective Date, each of the following Debtors shall convert to a limited liability company that will be classified as a disregarded entity for U.S.

5

federal and applicable state and local income tax purposes, with the effective date of such conversion occurring after Step 2 and prior to Step 7. It is intended that a deduction will be claimed pursuant to section 165(g)(3) of the Internal Revenue Code on the consolidated U.S. federal income tax return of the applicable Debtors for the tax year that includes the Effective Date in respect of the tax basis in the stock of the entities converted pursuant to this Step 3.

| Debtors | Jurisdiction |
|---|---|
| Rite Aid of Michigan, Inc. | Michigan |
| Rite Aid of Connecticut, Inc. | Connecticut |
| Rite Aid of Georgia, Inc. | Georgia |
| Rite Aid of Kentucky, Inc. | Kentucky |
| Rite Aid of New Hampshire, Inc. | New Hampshire |
| Rite Aid of North Carolina, Inc. | North Carolina |
| Rite Aid of South Carolina, Inc. | South Carolina |
| Rite Aid of Vermont, Inc. | Vermont |
| Rite Aid of Washington, D.C., Inc. | Washington, D.C. |
| Rite Aid of Delaware, Inc. | Delaware |
| Rite Aid of Indiana, Inc. | Indiana |
| Rite Aid of Maine, Inc. | Maine |
| Rite Aid of Maryland, Inc. | Maryland |
| Rite Aid of New York, Inc. | New York |
| Rite Aid of Ohio, Inc. | Ohio |
| Rite Aid of Tennessee, Inc. | Tennessee |
| Rite Aid of Virginia, Inc. | Virginia |
| Rite Aid of West Virginia, Inc. | West Virginia |
| Rite Aid Drug Palace, Inc. | Delaware |
| The Lane Drug Company | Ohio |
| Rite Aid Online Store, Inc. | Delaware |
| Rite Aid Payroll Management, Inc. | Delaware |
| Harco, Inc. | Alabama |
| K&B, Incorporated | Delaware |
| Thrifty Payless, Inc. | California |
| Broadview and Wallings-Broadview Heights, Ohio, Inc. | Ohio |
| Drug Palace, Inc. | Maine |
| GDF, Inc. | Maryland |
| Lakehurst and Broadway Corporation | New Jersey |
| Rite Aid Hdqtrs. Funding, Inc. | Delaware |
| Rite Investments Corp. | Delaware |
| Rite Aid Transport, Inc. | Delaware |
| Rx Choice, Inc. | Delaware |
| Rx USA, Inc. | Delaware |
| 4042 Warrensville Center Road Warrensville Ohio, Inc. | Ohio |
| 5277 Associates, Inc. | Washington |

| 5600 Superior Properties, Inc. | Ohio |
|---|---|
| The Jean Coutu Group (PJC) USA, Inc. | Delaware |
| RediClinic Associates, Inc. | Delaware |

**Step 4.**     Prior to the Effective Date, the Debtors will file, or cause to be filed, U.S. Internal Revenue Service Form 8832 for the following entity, electing for such entity to be classified as an entity disregarded as separate from its owner for U.S. federal income tax purposes, with the effective date of such election occurring after Step 2 and prior to Step 7. It is intended that a deduction will be claimed pursuant to section 165(g)(3) of the Internal Revenue Code on the consolidated U.S. federal income tax return of the applicable Debtors for the tax year that includes the Effective Date in respect of the tax basis in the stock of the entity converted pursuant to this Step 4.

| **Debtor** | **Jurisdiction** |
|---|---|
| Hunter Lane, LLC | Delaware |

**Step 5.**     Prior to the Effective Date, the Debtors shall form the Liquidating Trust and the Liquidating Trustee shall execute the Liquidating Trust Agreement. It is intended that the Liquidating Trust be treated for U.S. federal income tax purposes as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Internal Revenue Code, except as otherwise provided for in the Plan.

**Step 6.**     Prior to the Effective Date, (i) each of the following Debtors (which shall comprise the "Reorganized Debtors" under the Plan, as of the Effective Date) shall transfer to the Liquidating Trust any property owned by such Reorganized Debtor that constitutes Specified Excluded Assets or otherwise does not constitute Reorganized Debtor Assets and (ii) each Wind-Down Debtor shall transfer all property owned by such Wind-Down Debtor that does not constitute Reorganized Debtor Assets to the Liquidating Trust. It is intended that, for U.S. federal income tax purposes, any transfer of property to the Liquidating Trust pursuant to this Step 6 will be deemed to occur as (i) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (ii) a second-step transfer by such Holders to the Liquidating Trust.

| **Debtor** | **Jurisdiction** |
|---|---|
| New Rite Aid, LLC | Delaware |
| Rite Aid Corporation | Delaware |
| Rite Aid Hdqtrs. Corp. | Delaware |
| Rite Aid of New Jersey, Inc. | New Jersey |

**Step 7.**     Prior to the Effective Date, the Debtors will file with the Bankruptcy Court a notice of abandonment of the Debtors' equity interests in the following entities and the Bankruptcy Court shall have approved such abandonment, thereby abandoning all equity interests in such entities prior to the Effective Date. It is

intended that a deduction will be claimed on the consolidated U.S. federal income tax return of the applicable Debtors for the tax year that includes the Effective Date in respect of the tax basis in all of the assets that are abandoned pursuant to this Step 7 (including interests in entities treated as partnerships for U.S. federal income tax purposes) other than the equity interests of the entities converted pursuant to Steps 3 and 4 (the treatment of which is addressed separately in those steps).

| Debtor | Abandoned Entity | Jurisdiction |
|---|---|---|
| Rite Aid Corporation | JCG (PJC) USA, LLC | Delaware |
| Rite Aid Corporation | Rite Aid of Michigan, Inc. | Michigan |
| Rite Aid Corporation | Rite Aid of Connecticut, Inc. | Connecticut |
| Rite Aid Corporation | Rite Aid of Georgia, Inc. | Georgia |
| Rite Aid Corporation | Rite Aid of Kentucky, Inc. | Kentucky |
| Rite Aid Corporation | Rite Aid of New Hampshire, Inc. | New Hampshire |
| Rite Aid Corporation | Rite Aid of North Carolina, Inc. | North Carolina |
| Rite Aid Corporation | Rite Aid of South Carolina, Inc. | South Carolina |
| Rite Aid Corporation | Rite Aid of Vermont, Inc. | Vermont |
| Rite Aid Corporation | Rite Aid of Washington, D.C., Inc. | Washington, D.C. |
| Rite Aid Corporation | Rite Aid of Delaware, Inc. | Delaware |
| Rite Aid Corporation | Rite Aid of Indiana, Inc. | Indiana |
| Rite Aid Corporation | Rite Aid of Maine, Inc. | Maine |
| Rite Aid Corporation | Rite Aid of Maryland, Inc. | Maryland |
| Rite Aid Corporation | Rite Aid of New York, Inc. | New York |
| Rite Aid Corporation | Rite Aid of Ohio, Inc. | Ohio |
| Rite Aid Corporation | Rite Aid of Tennessee, Inc. | Tennessee |
| Rite Aid Corporation | Rite Aid of Virginia, Inc. | Virginia |
| Rite Aid Corporation | Rite Aid of West Virginia, Inc. | West Virginia |
| Rite Aid Corporation | Rite Aid Drug Palace, Inc. | Delaware |
| Rite Aid Corporation | The Lane Drug Company | Ohio |
| Rite Aid Corporation | Rite Aid Online Store, Inc. | Delaware |
| Rite Aid Corporation | Rite Aid Payroll Management, Inc. | Delaware |
| Rite Aid Corporation | Harco, Inc. | Alabama |
| Rite Aid Corporation | K&B, Incorporated | Delaware |
| Rite Aid Corporation | Thrifty Payless, Inc. | California |
| Rite Aid Corporation | Hunter Lane, LLC | Delaware |
| Rite Aid Corporation | Broadview and Wallings-Broadview Heights, Ohio, Inc. | Ohio |
| Rite Aid Corporation | Drug Palace, Inc. | Maine |
| Rite Aid Corporation | GDF, Inc. | Maryland |
| Rite Aid Corporation | Grand River & Fenkell, LLC | Delaware |
| Rite Aid Corporation | Lakehurst and Broadway Corporation | New Jersey |
| Rite Aid Corporation | Rite Aid Hdqtrs. Funding, Inc. | Delaware |

| Rite Aid Corporation | Rite Investments Corp. | Delaware |
|---|---|---|
| Rite Aid Corporation | Rite Aid Transport, Inc. | Delaware |
| Rite Aid Corporation | Rx Choice, Inc. | Delaware |
| Rite Aid Corporation | Rx USA, Inc. | Delaware |
| Rite Aid Corporation | 4042 Warrensville Center Road Warrensville Ohio, Inc. | Ohio |
| Rite Aid Corporation | 5277 Associates, Inc. | Washington |
| Rite Aid Corporation | 5600 Superior Properties, Inc. | Ohio |
| Rite Aid Hdqtrs. Corp. | RediClinic, LLC | Delaware |
| Rite Aid Hdqtrs. Corp. | Rite Aid of Pennsylvania, LLC | Delaware |
| Rite Aid Hdqtrs. Corp. | Rite Aid Specialty Pharmacy, LLC | Delaware |

**Step 8.**     Immediately prior to the occurrence of the Effective Date, the Debtors shall terminate the employment of each employee of the Debtors that shall become Reorganized Debtors, other than employees who McKesson and the Debtors have mutually identified as being employed in connection with operation of the Central Fill Facility.

**Step 9.**     On the Effective Date, pursuant to Section II.F of the Plan, McKesson will (i) receive in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, its McKesson 503(b)(9) Claims, 100% of the new equity of Reorganized New Rite Aid and (ii) contribute $20,000,000 *plus* Cure Costs indicated on Exhibit B-1 to the Schedule of Assumed Executory Contracts and Unexpired Leases (or such other Cure Costs as agreed between McKesson, the Debtors, and the applicable contract counterparty, as applicable) to the Wind-Down Debtors in consideration of the covenants and releases under the RSA and the Plan. On the Effective Date, pursuant to Section III.B.6 of the Plan, the Intercompany Interests held by New Rite Aid in Rite Aid Corporation, and the Intercompany Interests held by Rite Aid Corporation in each of Rite Aid of New Jersey, Inc. and Rite Aid Hdqtrs. Corp, shall be Reinstated. It is intended that the limitation on tax attributes under section 382(a) of the Internal Revenue Code will not apply as a result of the transactions that occur pursuant to the Plan because, among other reasons, the transaction in clause (i) of this Step 9 will qualify for the exception to such limitation under section 382(l)(5) of the Internal Revenue Code, and such exception was not applied, and will not be applied, to any prior ownership change of any Debtor within the prior two years.

The tax returns of the Debtors and the Liquidating Trust (including the tax returns to be filed by the Liquidating Trustee pursuant to the Plan) will be filed consistent with this Restructuring Steps Memorandum and will reflect, as applicable, that the entities abandoned or converted pursuant to Steps 3, 4, and 7 have been abandoned or liquidated for U.S. federal and applicable state and local income tax purposes effective as of the time of such abandonment or conversion.

**Step 10**.   On the Effective Date, each Holder of an Allowed Prepetition FILO Claim will receive in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, its Allowed Prepetition FILO Claim, its Pro Rata share of the FILO Cash Distribution. The intended U.S. federal income tax treatment of this step is discussed in the Disclosure Statement.

<u>Exhibit 1</u>

**Reorganized Debtor Assets**

The following shall comprise the "<u>Reorganized Debtor Assets</u>":

- All assets of the Debtors, other than executory contracts and unexpired leases, primarily used in the operation of the Central Fill Facility and reasonably necessary to the operation of the Central Fill Facility in the ordinary course of business prior to the Debtors' chapter 11 cases.

- All permits of/held by (i) the Debtors designated to become Reorganized Debtors and (ii) the Debtors designated to become Wind-Down Debtors that are used in the operation of the Central Fill Facility to the extent such permits are transferrable.

- All personal property and real estate owned by the Debtors and located at the Central Fill Facility as of the Effective Date, excluding any inventory.

- All deposits and prepaid amounts primarily relating to the Central Fill Facility, including, for the avoidance of doubt, vendor and utility deposits.

- All surety bonds primarily relating to the Central Fill Facility.

- All remaining escrow balances or collections on behalf of the Central Fill Facility.

- The executory contracts and unexpired leases set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases including, for the avoidance of doubt, the lease for the Central Fill Facility.

- All intellectual property owned by any of the Debtors, including patents, industrial designs, inventions, database rights, works of authorship, design rights, commercial secrets, software, and copyrights, but excluding any intellectual property identified as a Specified Excluded Asset in Exhibit 2 hereto.

<u>Exhibit 2</u>

**Specified Excluded Assets**

The following shall comprise the "<u>Specified Excluded Assets</u>":

- Cash and cash equivalents in bank accounts and cash registers, including, but not limited to, (i) amounts in the Debtors' operating accounts, (ii) amounts in any reserve, segregated and escrow accounts held or owned by the Debtors (*e.g.*, PNW Escrow, P-Card Collateral, Guggenheim Fee Account, Employee Expense Account, Liquor License escrowed sale proceeds, Utility Deposit Account, and Stub Rent Escrow Account), and (iii) cash and cash proceeds from the return of any drawn or undrawn Letters of Credit;

- Inventory.

- Purchased Assets, which shall be treated in accordance with the McKesson APA.

- Liquor licenses and remaining collections or escrow balances related thereto;

- Unless otherwise released by the Plan or assigned to the Reorganized Debtors as set forth in this Restructuring Steps Memorandum, all accounts receivables that are owed or that may in the future owe money to any Debtor or Wind-Down Debtor under any contractual arrangement, regardless of whether such Entity is expressly identified in the Plan, the Plan Supplement, or any amendments hereto or thereto, including, but not limited to: (i) GER / BER PBM receivables from prior and current plan years; (ii) contingent accounts receivable claims related to Change Healthcare; (iii) disputed past-due accounts receivable associated with Medi-Cal; (iv) outstanding amounts from the Debtors' previous asset sales of prescription files, inventory, leased or other real property, furniture, fixtures and equipment; (v) Health Plan rebates; (vi) credit card holdbacks; and (vii) any and all intercompany receivable balances;

- Any and all residual front-end inventory balances or collections on behalf thereof;

- Owned real estate, collections or escrow balances related to owned property;

- Any and all remaining leases, escrow balances or collections, except for the Central Fill Facility;

- Any and all prepaid assets and amounts, including (i) vendor deposits (excluding, for the avoidance of doubt, those vendor deposits primarily relating to the Central Fill Facility), (ii) professional fee retainers, (iii) other amounts reimbursable from professionals (*e.g.*, SB360 reconciliation reimbursements) and (iv) reimbursable insurance premiums;

- Any and all remaining unsold fixtures and equipment, other than such located at the Central Fill Facility;

- The following intellectual property: (a) the Debtors' https://www.riteaid.com/ website; (b) any rights with respect to the use of the Rite Aid brand name; and (c) the Debtors' front-end customer list;

- Any and all refunds of taxes paid by the Debtors prior to the Effective Date of the Plan; and

- Any and all Retained Causes of Action as defined in the Plan that are to be retained by the Wind-Down Debtors pursuant to the Retained Causes of Action Schedule, including any proceeds from Retained Causes of Action that were sold pursuant to the *Order Approving Sale of the Retained Preference Claims to RAD Sub-Trust A, Pursuant to Section 363 of the Bankruptcy Code and Granting Related Relief* [Docket No. 2878].

**<u>Exhibit D-1</u>**

**Changed Pages Only Redline of the Revised Restructuring Steps Memorandum Against the
Original Restructuring Steps Memorandum Filed at Docket No. 3218**

| Rite Aid Corporation | Rite Aid Transport, Inc. | Delaware |
| Rite Aid Corporation | Rx Choice, Inc. | Delaware |
| Rite Aid Corporation | Rx USA, Inc. | Delaware |
| Rite Aid Corporation | 4042 Warrensville Center Road Warrensville Ohio, Inc. | Ohio |
| Rite Aid Corporation | 5277 Associates, Inc. | Washington |
| Rite Aid Corporation | 5600 Superior Properties, Inc. | Ohio |
| Rite Aid Hdqtrs. Corp. | RediClinic, LLC | Delaware |
| Rite Aid Hdqtrs. Corp. | Rite Aid of Pennsylvania, LLC | Delaware |
| Rite Aid Hdqtrs. Corp. | Rite Aid Specialty Pharmacy, LLC | Delaware |

**Step 8.**   Immediately prior to the occurrence of the Effective Date, the Debtors shall terminate the employment of each employee of the Debtors that shall become Reorganized Debtors, other than employees who McKesson and the Debtors have mutually identified as being employed in connection with operation of the Central Fill Facility.

**Step 9.**   On the Effective Date, pursuant to Section II.F of the Plan, McKesson will (i) receive in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, its McKesson 503(b)(9) Claims, 100% of the new equity of Reorganized New Rite Aid and (ii) contribute $20,000,000 *plus* **Cure Costs indicated on Exhibit B-1 to the Schedule of Assumed Executory Contracts and Unexpired Leases (or such other Cure Costs as agreed between McKesson, the Debtors, and the applicable contract counterparty, as applicable)** to the Wind-Down Debtors in consideration of the covenants and releases under the RSA and the Plan. On the Effective Date, pursuant to Section III.B.6 of the Plan, the Intercompany Interests held by New Rite Aid in Rite Aid Corporation, and the Intercompany Interests held by Rite Aid Corporation in each of Rite Aid of New Jersey, Inc. and Rite Aid Hdqtrs. Corp, shall be Reinstated.  It is intended that the limitation on tax attributes under section 382(a) of the Internal Revenue Code will not apply as a result of the transactions that occur pursuant to the Plan because, among other reasons, the transaction in clause (i) of this Step 9 will qualify for the exception to such limitation under section 382(l)(5) of the Internal Revenue Code, and such exception was not applied, and will not be applied, to any prior ownership change of any Debtor within the prior two years.

The tax returns of the Debtors and the Liquidating Trust (including the tax returns to be filed by the Liquidating Trustee pursuant to the Plan) will be filed consistent with this Restructuring Steps Memorandum and will reflect, as applicable, that the entities abandoned or converted pursuant to Steps 3, 4, and 7 have been abandoned or liquidated for U.S. federal and applicable state and local income tax purposes effective as of the time of such abandonment or conversion.

**Exhibit E**

**New Board of Directors Disclosures**

[*Attached*]

## Section 1129(a)(5) Disclosures Regarding Directors and Officers

In accordance with Article IV.B.1 of the Plan and consistent with the requirements of section 1129(a)(5) of the Bankruptcy Code, the Debtors hereby disclose the identities and affiliations of the individuals proposed to serve as directors and officers of the Reorganized Debtors on the Effective Date and the identity of any insiders that will be employed or retained by the Reorganized Debtors, as well as the nature of any compensation for such insiders.

## I. Disclosures Regarding Directors of the Reorganized Debtors

As of the date of this Plan Supplement, the Debtors expect the New Board to include the following directors:

- **Gene Cavacini.** Gene Cavacini serves as the President of U.S. Pharmaceutical Distribution for McKesson. In this role, he leads McKesson's pharmaceutical sales, brand sourcing and manufacturer relations, distribution, customer service operations and controlled substance monitoring across the United States. Gene oversees a team of over 8,000 employees responsible for delivering one-third of the nation's medicines, solidifying his reputation as a thought leader in the healthcare supply chain industry. In 2002, Gene began his career at McKesson as a Retail Sales Executive and, within a few years, rose to Vice President of Sales for the community pharmacy segment across six different markets. Since then, he's continued to hold positions of increasing responsibility including Vice President and General Manager for the Memphis and Oklahoma City distribution centers. He also previously served as Senior Vice President of the Northeast region, where he managed full operations for more than 1,150 employees across seven distribution centers spanning over 15 states. Gene currently serves as the Chairman of McKesson's Employee Political Action Committee (PAC) a bipartisan initiative that enables eligible employees to collectively support congressional candidates and, where permitted, state candidates who are attuned to the industry and its regulatory environment. He also serves as an executive sponsor for McKesson's women-focused employee resource group—Women Empowered. Gene was born and raised in the Philadelphia area and received a Bachelor of Science in Biology from Ursinus College in Collegeville, Pennsylvania. When he's not working, Gene enjoys spending time with his wife, Barb, and their three daughters.

- **Joan Eliasek.** Joan Eliasek serves as President, North American Pharmaceutical Distribution for McKesson. In her role, Joan leads the North American Pharmaceutical segment, which ensures the safe and reliable delivery of medicines and therapies across the U.S. and Canada, and partners with stakeholders across the healthcare ecosystem to deliver insights, products, technology and services that help make quality care more accessible and affordable. Joan joined McKesson in 1995 and has held a variety of leadership roles across the company, including operations, sales, marketing and supplier management. Most recently, Joan served as President, McKesson Canada, leading McKesson's portfolio of businesses in Canada, including pharmaceutical distribution operations, Specialty Health and McKesson's network of independent pharmacies comprised of I.D.A., Guardian, Remedy'sRx, The Medicine Shoppe, Uniprix and Proxim. Prior to that, Joan served as Senior Vice President, Customer Experience, for McKesson's Medical-Surgical business unit, leading operations, customer service, materials management, sales administration and data management. Earlier in her career, Joan held multiple management positions in field operations at

Baxter Healthcare Corporation. Joan has served on several boards in the healthcare industry, including Healthcare Industry Distributors Association (HIDA), HIDA Educational Foundation and Global Healthcare Exchange. She is also a long-time advisor to the Professional Women in Healthcare (PWH) board. In 2018, Joan was the first recipient of the Anne Eiting Klamar Leadership Award of Distinction by PWH. Joan was also inducted into the Repertoire Medical Distribution Hall of Fame in 2023. Joan received her Bachelor of Arts in Political Science and Business Administration from the University of Iowa.

- **Matt Johnson.**  Matt Johnson serves as the Senior Vice President & Chief Financial Officer of North American Pharmaceutical Distribution for McKesson. In this role, he oversees financial strategy and operations for North American Pharmaceutical Distribution. Matt joined McKesson in June 2020 as Senior Vice President & Chief Financial Officer for Ontada, bringing over two decades of financial leadership experience across diagnostics, biotech, pharmaceutical supply chain, and data innovation. In addition, Matt previously served as Senior Vice President for Internal Audit at McKesson until the end of May 2025, in which role he oversaw audit strategy and governance for McKesson. Matt received a Bachelor of Science in Biochemistry from the University of Tennessee and a Master of Business Administration from the Owen Graduate School of Management at Vanderbilt University.

**<u>Exhibit G</u>**

**Liquidating Trust Agreement**

**LIQUIDATING TRUST AGREEMENT**

**Dated as of [_], 2025**

*Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates*

## LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date (defined below), is entered into pursuant to the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (as may be further amended, supplemented, or otherwise modified from time to time, the "**Plan**"),[1] in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") by the Trustee identified on the signature pages hereof (the "**Trustee**").

## <u>RECITALS</u>

**WHEREAS**, the Plan contemplates the creation of the Liquidating Trust (the "**Trust**");

**WHEREAS**, the Confirmation Order [Docket No. [_]] was entered by the Bankruptcy Court on November [24], 2025;

**WHEREAS**, pursuant to the Plan, as of the Effective Date, the Trust is established to provide for distributions of the Liquidating Trust Assets to the Beneficiaries (as defined below) in accordance with the Plan, the Confirmation Order, and this Trust Agreement;

**WHEREAS**, the Trustee shall administer the Trust in accordance with the terms of the Plan, the Confirmation Order, and this Trust Agreement; and

**WHEREAS**, pursuant to the Plan, the Trust is intended to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations or under applicable Internal Revenue Service ("**IRS**") guidelines, and a "grantor trust" for United States federal

---

[1]    All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, as applicable, and such definitions are also incorporated herein by reference.

income tax purposes, pursuant to Sections 671 through 679 of the Internal Revenue Code (the

"**IRC**"), with the Beneficiaries treated as the grantors of the Trust, except with respect to any

Disputed Ownership Fund pursuant to Section 5.3(d) hereof.

NOW, **THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

1.1      <u>Creation and Name</u>.   There is hereby created a trust known as the "RAD

Liquidating Trust."  The Trustee of the Trust may transact the business and affairs of the Trust in

the name of the Trust, and references herein to the Trust shall include for all purposes the Trustee

acting on behalf of the Trust and for the benefit of (a) the Holders of DIP Claims

(the "**DIP Beneficiaries**") and (b) Holders of Allowed Administrative Claims (other than

Professional Fee Claims), Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed

Other Secured Claims, and any unpaid Settled Priority Claims which become entitled to

distributions after the Effective Date under the Plan (the "**Priority Beneficiaries**" and together

with the DIP Beneficiaries, the "**Beneficiaries**").  It is the intention of the Trustee that the Trust

qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury

Regulations and that this Trust Agreement constitute the governing instrument of the Trust, except

with respect to any Disputed Ownership Fund.

1.2      <u>Appointment of Trustee</u>.  The Trustee is hereby appointed as the Trustee of the

Trust on the Effective Date and agrees to accept and liquidate the Liquidating Trust Assets in trust

on behalf of, and for the benefit of, the Beneficiaries subject to the terms of the Plan, the

Confirmation Order, and this Trust Agreement.

2

     **1.3**      **Purposes.**  The purposes of the Trust are to, in each case, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Trust, in accordance with applicable Treasury Regulations:

          (a)     receive the Liquidating Trust Assets pursuant to the terms of the Plan and the Confirmation Order;

          (b)     with the primary purpose of liquidating and distributing (as applicable) the assets transferred to it, hold, manage, protect, and, subject to Section 3.2 hereof, invest the Liquidating Trust Assets, which includes any income or gain earned thereon and proceeds derived therefrom, and monetize any non-liquid Liquidating Trust Assets, in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement for the benefit of the Beneficiaries;

          (c)     administer, reconcile, dispute, object to, compromise, or otherwise resolve all Disputed Claims;

          (d)     make distributions to Beneficiaries in accordance with the Plan, Confirmation Order, and this Trust Agreement;

          (e)     endeavor to make timely distributions and not unduly prolong the duration of the Trust;

          (f)     administer the Wind-Down in accordance with the Plan;

          (g)     abandon, liquidate, and reduce to Cash any non-Cash Liquidating Trust Assets;

          (h)     maximize recoveries for the benefit of the Beneficiaries;

          (i)     qualify at all times as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund;

(j)        engage in any lawful activity that is appropriate, and in furtherance of, the

purposes of the Trust to the extent consistent with the Plan, the Confirmation Order, and this Trust

Agreement; and

(k)        be deemed to be substituted as the party in lieu of the Wind-Down Debtors

(or, solely with respect to Causes of Action which vest in the Wind-Down Debtors and become

Liquidating Trust Assets pursuant to the Plan and Restructuring Steps Memorandum which were

previously held by the Reorganized Debtors, the Reorganized Debtors) in all matters, including (i)

motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, if any,

and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside

of the Bankruptcy Court, in each case without the need or requirement for the Trust to file motions

or substitutions of parties or counsel in each such matter; *provided* that any actions taken pursuant

to the foregoing authority shall be consistent in all respects with the Plan and any order of the

Bankruptcy Court prior to the Effective Date, including Article X of the Plan.

**1.4**        **Transfer of Assets.**  Pursuant to, and in accordance with Article IV.C of the Plan,

the Trust has received (or will receive, on or before the Effective Date), the Liquidating Trust

Assets.  The Liquidating Trust Assets will be transferred to the Trust free and clear of any liens,

interests, encumbrances, or other claims by the Debtors, the Reorganized Debtors, the Wind Down

Debtors, any creditor, or other entity including, but not limited to, the purchasers of any of the

Debtors' assets.  No other entity shall have any interest, legal, beneficial or otherwise, in the

Liquidating Trust Assets upon the assignment and transfer of such assets to the Trust except as set

forth in this Trust Agreement.

**1.5**        **Acceptance of Assets and Assumption of Liabilities.**

4

(a)      In furtherance of the purposes of the Trust, the Trust hereby expressly accepts the transfer to the Trust of the Liquidating Trust Assets in the time and manner as, and subject to the terms, contemplated in the Plan and Confirmation Order.

(b)      In furtherance of the purposes of the Trust, except as otherwise provided herein or in the Plan or Confirmation Order, the Trust shall have and retain all rights and defenses the Debtors had with respect to any Disputed Claims immediately before the Effective Date to the extent necessary to administer such Claims in accordance with this Trust Agreement, the Plan, and the Confirmation Order.

(c)      Notwithstanding anything to the contrary herein, no provision herein shall be construed or implemented in a manner that would cause the Trust to fail or cease to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(d)      In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**1.6      Jurisdiction.**  The Bankruptcy Court shall have continuing jurisdiction over the Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

<h1 style="text-align:center">ARTICLE II</h1>

<h2 style="text-align:center">POWERS, TRUST ADMINISTRATION, AND REPORTING</h2>

**2.1      Powers.**

(a)      The Trustee shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.3 above, the Plan, and the Confirmation Order. Subject to the

limitations set forth in this Trust Agreement, the Plan, and the Confirmation Order, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law, or as otherwise specified herein, or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court, including the Bankruptcy Court, in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited by the terms of this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have the power to:

(i)     receive, hold, preserve, and liquidate the Liquidating Trust Assets and exercise all rights with respect thereto, as long as such management is consistent with the Trust's status as a "liquidating trust" taxable as a grantor trust for United States federal income tax purposes and which actions are merely incidental to its liquidation and dissolution with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust;

(ii)     invest the monies held from time to time by the Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)     act on behalf of the Trust, including having the right to take all actions and execute all agreements, instruments and other documents, and exercise all rights and privileges previously held by the Debtors necessary or convenient to implement the provisions of the Plan, the Confirmation Order, and this Trust Agreement;

6

(iv)      administer, oversee, and take all actions necessary to effect the Wind-Down, subject to the terms of the Plan;

(v)      with respect to any Liquidating Trust Assets, exercise in a manner not inconsistent with the Plan, the Confirmation Order, and this Trust Agreement, all power and authority that may be, or could have been, exercised in compliance with Revenue Procedure 94-45, commence or continue all proceedings (including any Retained Causes of Action transferred to the Trust) that may be or could have been, commenced or continued and take all actions that may be or could have been taken by any member, officer, director or shareholder of each Debtor with respect to such Liquidating Trust Assets with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders including, without limitation, the dissolution of any Wind-Down Debtor in accordance with the terms of the Plan (but excluding, for the avoidance of doubt, any Cause of Action that (A) is released, waived, barred or enjoined pursuant to Article X of the Plan, or (B) is retained by or transferred to the Reorganized Debtors in accordance with the Schedule of Retained Causes of Action);

(vi)      manage, monitor, and enforce all of the Wind Down Debtors' and the Estates' rights, and interests with respect to any Liquidating Trust Assets under the Plan, the Confirmation Order, and this Trust Agreement, and other agreements of the Debtors, and any other orders of the Bankruptcy Court;

(vii)      establish, maintain, and adjust such operating, reserve, and trust account(s) as are necessary and appropriate to carry out the terms of this Trust Agreement, the Plan, and the Confirmation Order, and to authorize and make disbursements of or from the Liquidating Trust Assets, in accordance with the Plan and this Trust Agreement;

7

(viii)    authorize and make, through the Disbursing Agent, to the extent one is retained, distributions to the Beneficiaries provided for or contemplated under the Plan or this Trust Agreement;

(ix)    authorize and cause to be made distributions from the Professional Compensation Escrow Account to Holders of Professional Fee Claims in accordance with the terms of the Plan and the Confirmation Order and, solely to the extent provided for under the Plan, distributions from the Administrative / Priority Claim Reserve, Wind-Down Reserve, or Distributable Assets in satisfaction of the same;

(x)    make decisions, without further Bankruptcy Court approval but subject in all respects to the terms of the Plan and Confirmation Order, regarding the retention or engagement of professionals, employees and consultants by the Trust and the Trustee, to be compensated in accordance with Article VII.A of the Plan;

(xi)    reconcile, object to, compromise, and settle any Disputed Claims, and sue and participate, as a party or otherwise, in any judicial administrative, arbitrative, or other proceeding as required to reconcile, administer, or defend against the Disputed Claims, *provided* that, pursuant to Article IX.A of the Plan, the Liquidating Trustee may settle and compromise any Disputed Claim without supervision or approval of the Bankruptcy Court free of any restriction of the Bankruptcy Code, Bankruptcy Rules, and the guidelines and requirements of the U.S. Trustee, other than those restrictions imposed by the Plan, the Confirmation Order, or this Trust Agreement;

(xii)    prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax and information returns required with respect to the Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) or otherwise, make tax elections by and on behalf of the Trust, pay taxes, if any, payable by the Trust, cause all taxes

8

payable by the Trust, if any, to be paid exclusively out of the Trust's assets, and represent the interest and account of the Trust before any taxing authority in all matters including, without limitation, any dispute, action, suit, proceeding, or audit;

(xiii)   in the event that the Trust shall fail to qualify as a "liquidating trust" taxable as a grantor trust for United States federal income tax purposes, take any and all necessary actions as it shall deem appropriate to have such assets treated as held by another "liquidating trust" taxable as a grantor trust for United States federal income tax purposes, and, if no such "liquidating trust" taxable as a grantor trust treatment is available, as another grantor trust for United States federal income tax purposes;

(xiv)   take all other actions not inconsistent with the provisions of the Plan, the Confirmation Order, and this Trust Agreement that the Trustee deems reasonably necessary or desirable with respect to administering the Plan and Trust;

(xv)   implement and/or enforce all provisions of the Plan and Confirmation Order, including entering into any agreement or executing any document required by, or consistent with, the Plan, the Confirmation Order, or this Trust Agreement;

(xvi)   abandon in the reasonable business judgment of the Trustee (and with the consent of the Required DIP Co-Collateral Agents) and in any commercially reasonable manner, including through donation to a charitable organization of its choice, any Liquidating Trust Asset; *provided*, *however*, that such charitable organization shall not have any connection to the Trustee or to the Debtors;

(xvii)   prosecute, dismiss, and/or settle any Retained Causes of Action assigned to the Trust, with or without approval of the Bankruptcy Court, and exercise, participate in, or initiate any proceeding before the Bankruptcy Court or any other court of appropriate

9

jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding, and pursue to settlement or judgment of such Retained Causes of Action;

(xviii)    purchase or create and carry all insurance policies and pay all insurance premiums and costs the Trustee deems necessary or advisable;

(xix)      collect and liquidate and/or distribute all Liquidating Trust Assets pursuant to the Plan, the Confirmation Order and this Trust Agreement;

(xx)      hold any legal title to any and all of the Liquidating Trust Assets;

(xxi)      if any of the Liquidating Trust Assets are situated in any state or other jurisdiction in which the Trustee is not qualified to act as trustee:  (A) nominate and appoint a Person duly qualified to act as trustee in each such state or jurisdiction and require from each such trustee such security as may be designated by the Trustee in his or her sole discretion; (B) confer upon such trustee all the rights, powers, privileges and duties of the Trustee hereunder, subject to the conditions and limitations of this Trust Agreement, the Plan, and the Confirmation Order, except as modified or limited by the Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws or the state or jurisdiction in which the trustee is acting shall prevail to the extent necessary); (C) require such trustee to be answerable to the Trustee for all monies, assets and other property that may be received in connection with the administration of such property; and (D) remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution by the Trustee of a written instrument declaring such trustee removed from office, and specifying the effective date and time of removal;

10

(xxii)    obtain and receive the proceeds or benefits of any and all Insurance Policies of the Debtors providing coverage with respect to Retained Causes of Action assigned or transferred to the Trust;

(xxiii)    undertake all administrative functions of the Chapter 11 Cases, including the payment of Statutory Fees and ultimate closing of the Chapter 11 Cases in accordance with the Plan and Confirmation Order;

(xxiv)    exercise such other powers as may be vested in or assumed by the Trustee pursuant to the Plan, this Trust Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan and the Confirmation Order;

(xxv)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement, the Plan, or the Confirmation Order; and

(xxvi)    in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, representatives, and any other parties.  No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below.

(d)    The Trust shall not have the power to guarantee any debt of other persons.

11

**2.2**    **General Administration.**

(a)    The Trustee shall act in accordance with the Plan, the Confirmation Order, and this Trust Agreement.  In the event of any inconsistency between the Plan (without reference to this Trust Agreement) and this Trust Agreement, the terms of this Trust Agreement shall control (unless stated otherwise in this Trust Agreement or in the Confirmation Order).  In the event of any inconsistency between this Trust Agreement and the Confirmation Order, the Confirmation Order shall control.

(b)    The Trustee shall (i) timely file such tax returns and pay any taxes imposed on the Trust in accordance with Section 5.3 hereof, (ii) comply with all applicable reporting and withholding obligations in accordance with Section 5.4 hereof, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Trust as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund, and (iv) take no action that could cause the Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(c)    Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his position as such.

**2.3**    **Reporting.**

(a)    The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

(b)    The Trustee shall file with the Bankruptcy Court, and provide to the Beneficiaries, quarterly reports when they become due, in a form reasonably acceptable to the U.S.

12

Trustee, which reports shall include a separate schedule of disbursements made by the Liquidating Trust on behalf of the Debtors during the applicable period, attested to by the Trustee, an authorized representative of the Trustee, or the Reorganized Debtor, as applicable;

(c)     The Trustee shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee with respect to each Debtor's Chapter 11 Case until such Chapter 11 Case has been closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

(d)     Pursuant to Section 5.3(a) hereof, within a reasonable time following the end of the taxable year, the Trust shall send to each Beneficiary a separate statement setting forth such Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on his/her applicable income tax return.

## ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1     Accounts.**

(a)     The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each a "**Financial Institution**").

(b)     Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in, or relationship with, the Reorganized Debtors or their Affiliates, if applicable.  Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(c)     The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to Section 3.1(b) above.

13

(d)     The Trustee may, from time to time (but at all times subject to the terms of the Plan and Confirmation Order), create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Beneficiaries and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Liquidating Trust Assets, and except as specifically designated as such in accordance with the provisions of Section 5.3(d) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or applicable Treasury Regulations.

**3.2     Investment Guidelines.**

(a)     The Trustee may invest the Liquidating Trust Assets, provided, however, that the scope of any investment shall be limited to include only those investments permitted to be made by a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations or under applicable IRS guidelines, whether set forth in IRS rulings, revenue procedures (including Section 3.09 of Revenue Procedure 94-45), other IRS pronouncements, or otherwise.

(b)     In the event the Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Plan, the Confirmation Order, and this Trust Agreement.  This Section 3.2(b) is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Liquidating Trust Assets.

(c)      Cash proceeds received by the Trust in connection with its monetization of

the non-liquid Liquidating Trust Assets shall be invested in accordance with this Section 3.2 until

needed for the purposes of the Trust as set forth in Section 1.3 above.

**3.3**      **Payment of Operating Expenses.**  All operating expenses of the Trust, including

the fees and expenses of the Trustee and other professionals retained on behalf of the Trust, shall

be paid from the Wind-Down Reserve in accordance with the Wind-Down Budget, the Plan, the

Confirmation Order, and this Trust Agreement, which may be replenished from time to time with

the consent of the Required DIP Co-Collateral Agents in accordance with Article VIII.C of the

Plan.   None of the Trustee, the Beneficiaries, nor any of their officers, agents, advisors,

professionals or employees shall be personally liable for the payment of any operating expense or

other liability of the Trust.  Except as expressly set forth in the Plan, none of the Debtors or the

Wind-Down Debtors, as applicable, nor any of their officers, agents, advisors, professionals or

employees shall be liable for the payment of any operating expense or other liability of the Trust

or the Trustee.  Under no circumstance shall the Reorganized Debtors nor any of their officers,

agents, advisors, professionals or employees be liable for the payment of any operating expense or

other liability of the Trust or the Trustee.  To the extent any Cash is remaining in the Wind-Down

Reserve as of the Dissolution Date, such amounts shall constitute Distributable Assets in

accordance with Article VIII.C of the Plan.

**3.4**      **Distributions to Beneficiaries.**

(a)      The Trustee shall make or cause to be made distributions to DIP

Beneficiaries from the Distributable Assets and Priority Beneficiaries from the Administrative /

Priority Claims Reserve in accordance with, subject to, and at the time or times set forth in, this

Trust Agreement, the Plan and the Confirmation Order, but not less frequently than once annually,

15

starting on the Effective Date, unless the Trustee determines, in its reasonable discretion, that making such a distribution is impracticable in light of the anticipated Cash needs of the Trust going forward, or that, in light of the Cash available for distribution, making a distribution would not warrant the incurrence of costs in making the distribution or funds are otherwise not available to distribute; *provided*, *however*, that the Trust's discretion may not be exercised in a manner inconsistent with the express requirements of the Plan.  With respect to distributions for which the Trustee is the Disbursing Agent in accordance with Article VIII.E of the Plan, the Trustee shall make distributions on such times as provided for under Article VIII.E of the Plan.  In any such case, the Trustee (or its successor or appointee acting as Disbursing Agent, as applicable), shall be entitled and subject to the rights and obligations of the Disbursing Agent set forth in Article VI of the Plan, and shall make such distributions in accordance with such terms.  The Trustee shall not, when acting as the Disbursing Agent, be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(b)    The Trust may withhold or deduct from amounts distributable to any Person or Entity any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding in accordance with Section 5.4 below).

(c)    Cash payments to foreign Beneficiaries may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(d)    On the Dissolution Date and with the consent of the Required Co-Collateral Agents, the Trustee shall have the authority to direct the remaining Liquidating Trust Assets, if any, to a tax-exempt organization as selected by the Trustee in his or her discretion.

16

## ARTICLE IV

## TRUSTEE

**4.1   Number.**   There shall be one (1) Trustee who shall be the person or entity named on the signature pages hereof.

**4.2   Terms of Service.**

(a)   The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the Trust pursuant to Section 6.2 below.

(b)   The Trustee may resign at any time upon written notice with such notice being filed with the Bankruptcy Court.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)   The Trustee may be removed by the Bankruptcy Court in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard prior to such removal.  Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the Trust, or (ii) a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder.

(d)   In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, a new Trustee shall be selected by the Required DIP Co-Collateral Agents, with notice of such selection to be filed with the Bankruptcy Court.

(e)        Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further action. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)        Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the Trust pursuant to Section 6.2 below.

**4.3        Compensation and Expenses of the Trustee.**

(a)        The Trustee and his or her agents shall be entitled to receive reasonable compensation for services rendered on behalf of the Trust, subject to the Wind-Down Budget and in accordance with the compensation terms set forth on Exhibit A hereto, which shall be subject to periodic review and modification by the DIP Agent in consultation with the Trustee.

(b)        Any professionals retained by the Trustee in accordance with the Plan, the Confirmation Order, and this Trust Agreement shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, with the terms of such compensation to be determined by the Liquidating Trustee and such professionals, subject to the Wind-Down Budget.  The payment of fees and expenses of the Trustee and its professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to Bankruptcy Court approval.

**4.4**      **Standard of Care; Exculpation.**

(a)      As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, and (ii) the officers, employees, consultants, advisors, attorneys, and agents of each of the Trust and the Trustee.

(b)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of, or due to, the implementation or administration of the Plan, the Confirmation Order, or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their wilful misconduct, bad faith, gross negligence or fraud.

(c)      To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; *provided, however*, that with respect to the Trust Indemnified Parties the duties of care and loyalty are not eliminated

but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

**4.5     Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of, or affording protection to, Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder.  Any successor Trustee shall succeed to, and hold the same respective rights and benefits of, the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds, or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

20

(e)     In the exercise or administration of the Trust, the Trust Indemnified Parties (i) may act directly or through their respective agents, advisors, or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**4.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs, but excluding taxes in the nature of income taxes imposed on compensation paid to such persons) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of, or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Distributable Assets.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or

proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust from the Distributable Assets in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.  The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)     The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, in his or her sole discretion, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

22

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**4.7      Trustee Independence.**  The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors or any of the purchasers of the Debtors' assets. The Trustee shall also not act as an attorney, agent, or other professional for any Beneficiary.

**4.8      No Bond.**  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court or the Trustee decides, in his or her sole discretion, that such bond is in the best interests of the Trust.

**4.9      Burden of Proof.**  In any proceeding brought by any of the Debtors, or any other person who is bound by this Trust Agreement challenging any action, determination or failure to act of the Trustee in discharge of his or her duties under this Trust Agreement on the basis that such action, determination or failure constitutes bad faith, gross negligence, willful misconduct or fraud, the person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act constituted bad faith, gross negligence, willful misconduct, or fraud. Notwithstanding anything to the contrary in this Trust Agreement or any duty otherwise existing at law or equity, each determination, action or failure to act of the Trustee in the discharge of his or her duties under this Trust Agreement is, to the extent consistent with this Trust Agreement, hereby deemed to not constitute a breach of this Trust Agreement or any duty hereunder or existing at law, in equity or otherwise.

**4.10      Reliance by the Trustee.**  The Trustee may absolutely rely, and shall be fully protected in acting or refraining from acting if he or she relies upon any resolution, statement,

23

certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he or she has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile or e-mail transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy his or herself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of bad faith, gross negligence, willful misconduct, or fraud in respect of the Trustee's duties as found by a Final Order, or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if applicable, not acting) thereon. The Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Trust Agreement, the Plan, the Confirmation Order, or any other document executed in connection therewith, and the Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

**4.11**    **Books and Records**.  The Trustee shall be free, pursuant to the terms of the Data Retention Plan, to destroy, cause to be destroyed, or otherwise dispose of any books and records or copies thereof in its possession that the Trustee deems not necessary for the continued administration of the Plan, without further order from the Bankruptcy Court.

**4.12**    **Privilege**.

(a)    Subject to the terms of the Plan (and pursuant to Article IV.C.4 of the Plan) and the Confirmation Order, all of the Debtors' privileges (the "**Privileges**"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections (the "**Transferred Privileges**") shall be

transferred, assigned and delivered to the Liquidating Trust, without waiver, limitation or release, and shall vest with the Trust on the Effective Date and be jointly held by the Reorganized Debtors and the Trust on and after the Effective Date; *provided*, *however*, that notwithstanding the foregoing, Transferred Privileges do not include Privileges relating in any way to any rights, claims, or Causes of Action released under the Plan. The Trust and Reorganized Debtors shall each hold and be the beneficiary of all Transferred Privileges and entitled to assert all Transferred Privileges. No Privilege shall be waived by disclosures to the Trustee of the Debtors' documents, information or communications subject to any privilege, protection or immunity or protections from disclosure jointly held by the Reorganized Debtors and the Trust.

(b)      Notwithstanding anything herein to the contrary, the Trust, Wind-Down Debtors, and the Reorganized Debtors shall each hold and be the beneficiary of all Transferred Privileges and entitled to assert all Transferred Privileges. No Privilege shall be waived by disclosures to the Trustee of the Debtors' documents, information or communications subject to any privilege, protection or immunity or protections from disclosure jointly held by the Debtors and the Trust.

## ARTICLE V

## TAX MATTERS

**5.1      Treatment of Trust Assets Transfer.** For all United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes), all Parties shall treat any transfer of the Liquidating Trust Assets to the Trust as (a) a transfer of the Liquidating Trust Assets (subject to any obligations related to those assets) directly to the Beneficiaries (based on the relative fair market value of each Beneficiary's respective Claims), followed by (b) the transfer by such Beneficiaries of such Liquidating Trust Assets to the Trust in exchange for their respective beneficial interests in the Trust (other than the Liquidating Trust Assets allocable to

25

Disputed Claims and held as a "disputed ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations ("**Disputed Ownership Fund**")).  Accordingly, the Beneficiaries shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors within the meaning of Section 677 of the IRC and deemed owners of their respective shares of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Disputed Ownership Fund).

  5.2 **Income Tax Status**.

   (a) For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and other than as provided pursuant to Section 5.3(d) hereof, this Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671 through 679 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

   (b) The Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

  5.3 **Tax Returns**.

   (a) The "taxable year" of the Trust shall be the "calendar year" as such terms are defined in Section 441 of the IRC, unless the Trustee determines in good faith to use a different tax year in the interests of all Beneficiaries to the extent permitted under the IRC and the Treasury Regulations thereunder.  In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Trustee shall file with the IRS annual tax returns for the Trust on Form 1041 as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. In

addition, the Trustee shall file in a timely manner for the Trust such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. Within a reasonable time following the end of the taxable year, the Trust shall send to each Beneficiary a separate statement setting forth such Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on his/her applicable income tax return.

(b)     To the extent applicable, allocations of the Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items in respect of any assets allocable to, or retained on account of, the Disputed Ownership Fund) among the Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time, and without regard to any restrictions on distributions set forth in the Plan or this Trust Agreement) if, immediately prior to such deemed distribution, the Trust had distributed all its other assets (valued at their tax book value), to the Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust.  Similarly, taxable loss of the Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets).  The tax book value of the Liquidating Trust Assets for purposes of this Section 5.3(b) shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.  Notwithstanding the foregoing, to the extent applicable, the Trustee shall be permitted to allocate taxable income in such other equitable manner

27

as it may determine in good faith taking into account the interests of the Beneficiaries as a whole (and their relative interests).

(c)     The Trust shall be responsible for payment, from the Wind-Down Reserve, of any taxes imposed on the Trust (including any taxes imposed on the Disputed Ownership Fund) or the Liquidating Trust Assets.  In accordance therewith, any taxes imposed on the Trust or its assets shall be paid from the Wind-Down Reserve.

(d)     The Trustee may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a Disputed Ownership Fund pursuant to Section 1.468B-9(c)(2)(ii) of the Treasury Regulations, and to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If such a Disputed Ownership Fund election is made, all parties (including the Trustee and the Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistent with the foregoing.  The Trust shall file all income tax returns with respect to any income attributable to the Disputed Ownership Fund and shall pay from the Wind-Down Reserve, all U.S. federal, state and local income taxes attributable to such Disputed Ownership Fund based on the items of income, deduction, credit, or loss allocable thereto.

5.4     **Withholding of Taxes and Reporting Related to Trust Operations.**  The Trust shall comply with all withholding, deduction and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Trust shall be subject to any applicable withholding, deduction and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, deduction, payment, and reporting requirements. Notwithstanding the above, each Beneficiary that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Beneficiary by any

28

taxing authority, including income, withholding, and other tax obligations, on account of any such distribution. All amounts properly withheld or deducted from distributions to a Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such Beneficiary shall be treated as if distributed to such Beneficiary. To the extent that the operation of the Trust or the liquidation of the Liquidating Trust Assets creates a tax liability imposed on the Trust, the Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Trust payable without Bankruptcy Court order. Any federal, state, local or foreign withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Beneficiaries shall be required to provide any information necessary to effect the withholding and reporting of such taxes. The Trustee may require each Beneficiary to furnish to the Trust (or its designee) its social security number, or employer or taxpayer identification number as assigned by the IRS, and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BEN-E, or Form W-9, as applicable) (the "**Tax Documents**"). The Trustee may condition any and all distributions to any Beneficiary upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Trustee reasonably requests, and in accordance with the Plan and Confirmation Order. The Trustee may refuse to make a distribution to any Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Beneficiary within one hundred and eighty (180) days of the Trustee's request, the Trustee shall make such distribution to which such Beneficiary is entitled, without interest; and, *provided*, *further*, that, if the Trustee fails to withhold in any respect of amounts received or distributable with respect to any Beneficiary and the Trustee is later held liable for the amount of such withholding, such Beneficiary shall reimburse the Trustee for such

liability. If a Beneficiary fails to complete and return to the Trustee (or Disbursing Agent, as applicable) the appropriate Tax Documents within one hundred one hundred and eighty (180) days of any such request by the Trustee (or Disbursing Agent, as applicable), then such Holder shall have its Claim forfeited and shall be forever barred, estopped, and enjoined from asserting any such Claim against the Estates. In such cases, any Cash held for payment on account of such Claims shall be treated as Liquidating Trust Assets, free of any Claims of such Holder with respect thereto.

**5.5**    **Valuation.**    As soon as possible after the Effective Date, the Trustee shall make a good faith valuation of the Liquidating Trust Assets, which shall be subject to the DIP Agent's approval (not to be unreasonably withheld or delayed).  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal and applicable state and local income tax purposes. The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Trust that are required by any governmental unit for taxing purposes.

**5.6**    **Expedited Determination of Taxes.**    The Trustee may request an expedited determination of taxes of the Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the termination of the Trust.

**ARTICLE VI**

**GENERAL PROVISIONS**

**6.1**    **Irrevocability.**    To the fullest extent permitted by applicable law, the Trust is irrevocable.

**6.2**    **Term; Termination.**

30

(a)     The term for which the Trust exists shall commence on the Effective Date and shall terminate pursuant to the provisions of this Section 6.2.

(b)     The Trustee shall make continuing efforts to monetize any non-liquid Liquidating Trust Assets.

(c)     The Trustee and the Trust shall be discharged or dissolved, as the case may be, with the consent of the Required DIP Co-Collateral Agents and at such time on or after the Dissolution Date that is reasonable based on all the facts and circumstances, including that: (i) the Trustee determines that the pursuit of additional Retained Causes of Actions which are Liquidating Trust Assets is not likely to yield sufficient additional Cash to justify further pursuit of such Causes of Action, or (ii) all distributions of Cash and other Liquidating Trust Assets required to be made by the Trustee under the Plan, the Confirmation Order, and this Trust Agreement have been made in accordance with provisions of the Plan, the Confirmation Order, and this Trust Agreement, *provided, however*, that in no event shall the Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made prior to the fifth (5th) anniversary without the need for a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Trust as a "liquidating trust" for United States federal income tax purposes, determines that a fixed period extension, not to exceed five (5) years, is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets.  Any extension must be approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.

(d)     The Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, *provided* that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that

remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c) as set forth in Article IV.I of the Plan.

**6.3**     **Amendments.**  Any amendment to, or modification of, this Trust Agreement may be made in writing and only pursuant to an order of the Bankruptcy Court; *provided, however*, the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (a) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (b) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity.  Notwithstanding the foregoing, no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way that could jeopardize, impair, or modify the Trust's "liquidating trust" status.

**6.4**     **Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.5**     **Notices.**

(a)     Notices to Beneficiaries shall be given in accordance with such address for each such Holder as indicated on the Debtors' records as of the date of any such distribution.

(b)     Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Trust:

    [Trustee]

With a copy (which shall not constitute notice) to Counsel to the Trustee:

    [Trustee Counsel]

To the Reorganized Debtors:

    McKesson Corporation
    Law Department
    6555 North State Highway 161
    Irving, Texas 75039
    Attn:  Chief Counsel, Strategic Accounts
    Email Address:  intakelitigation@mckesson.com

With a copy (which shall not constitute notice) to:

    Sidley Austin LLP
    One South Dearborn Street
    Chicago, Illinois 60603
    Attn:  Dennis M. Twomey; Jackson T. Garvey; Ian C. Ferrell
    Email Addresses:  dtwomey@sidley.com; jgarvey@sidley.com;
    iferrell@sidley.com

(c)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

**6.6**       **Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Trustee, and their respective successors and assigns, except that neither the Trust, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in accordance with Section 4.2(d) above.

**6.7**       **Limitation on Trust Interests for Securities Law Purposes.** The Beneficiaries' interests in the Trust (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.8**       **Exemption from Registration.**  The Parties hereto intend that the interests of the Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.  If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of such interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations or that the issuance of such interests shall be exempt from the registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act, regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**6.9**      **Entire Agreement; No Waiver.**  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the Confirmation Order), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10**      **Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11**      **Governing Law.**  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; *provided, however*, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Trust, the Trustee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to, or regulate in, a manner inconsistent with the terms hereof:  (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal

35

property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust;
(e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations
on the permissible nature, amount, or concentration of trust investments or requirements relating
to the titling, storage, or other manner of holding of Liquidating Trust Assets; (g) the existence of
rights or interests (beneficial or otherwise) in Liquidating Trust Assets; (h) the ability of beneficial
owners or other persons to terminate or dissolve the Trust; or (i) the establishment of fiduciary or
other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial
owners that are inconsistent with the limitations on liability or authorities and powers of the
Trustee set forth or referenced in this Trust Agreement.

6.12    **Effectiveness.**  This Trust Agreement shall become effective on the Effective Date.

IN WITNESS WHEREOF, the Trustee has executed this Trust Agreement this [_] day of
[November,] 2025.

**TRUSTEE**

_____

36

**Exhibit A**

Liquidating Trustee Identity / Compensation

Identity:  Eric Kaup

Compensation:

- Wind-Down Consultant Fee: For each calendar day the Liquidating Trustee provides assistance or review in connection with the Debtors' wind-down planning prior to the Effective Date, he will earn a per diem fee of $2,500.00, payable in arrears on the Effective Date.

- Monthly Fee: $75,000.00 for the first six months following the Effective Date, $50,000.00 for the following six months, and thereafter, the lesser of (i) actual hourly charges and (ii) $50,000 per month.

- Incentive Fee: With respect to certain eligible proceeds: the Incentive Fee shall equal the sum of (i) 0.75% of the first $10.0 million in eligible proceeds, plus (ii) 1.75% of eligible proceeds in excess of $10.0 million but less than $25.0 million, plus (iii) 2.75% eligible proceeds in excess of $25.0 million but less than $75.0 million, plus (iv) 3.75% eligible proceeds in excess of $75.0 million.  If the Incentive Fee exceeds $2 million, 50% of aggregate monthly fees shall be credited against the Incentive Fee.

- Expenses:  Reimbursement of reasonable and documented expenses.

The foregoing terms are subject in all respects to the terms reflected in the final form of engagement letter as agreed between the Debtors, Liquidating Trustee, and DIP Agent.

## Exhibit G-1

**Changed Pages Only Redline of the Revised Liquidating Trust Agreement Against the Original Liquidating Trust Agreement Filed at Docket No. 3218**

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date (defined below), is entered into pursuant to the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* (as may be further amended, supplemented, or otherwise modified from time to time, the "**Plan**"),[1] in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") by the Trustee identified on the signature pages hereof (the "**Trustee**").

## RECITALS

**WHEREAS**, the Plan contemplates the creation of the Liquidating Trust (the "**Trust**");

**WHEREAS**, the Confirmation Order [Docket No. [_]] was entered by the Bankruptcy Court on ~~October~~**November** [~~_~~**24**], 2025;

**WHEREAS**, pursuant to the Plan, as of the Effective Date, the Trust is established to provide for distributions of the Liquidating Trust Assets to the Beneficiaries (as defined below) in accordance with the Plan, the Confirmation Order, and this Trust Agreement;

**WHEREAS**, the Trustee shall administer the Trust in accordance with the terms of the Plan, the Confirmation Order, and this Trust Agreement; and

**WHEREAS**, pursuant to the Plan, the Trust is intended to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations or under applicable Internal Revenue Service ("**IRS**") guidelines, and a "grantor trust" for United States federal

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, as applicable, and such definitions are also incorporated herein by reference.

(a)_____The Trustee and his or her agents shall be entitled to receive reasonable compensation for services rendered on behalf of the Trust, subject to the Wind-Down Budget and in accordance with the compensation terms set forth on Exhibit A[2] hereto, which shall be subject to periodic review and modification by the DIP Agent in consultation with the Trustee.

(b)      Any professionals retained by the Trustee in accordance with the Plan, the Confirmation Order, and this Trust Agreement shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, with the terms of such compensation to be determined by the Liquidating Trustee and such professionals, subject to the Wind-Down Budget.  The payment of fees and expenses of the Trustee and its professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to Bankruptcy Court approval.

### 4.4      Standard of Care; Exculpation.

(a)_____As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, and (ii) the officers, employees, consultants, advisors, attorneys, and agents of each of the Trust and the Trustee.

(b)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and

---

[2]  Note:  The Compensation of the Liquidating Trustee shall be disclosed in a subsequent filing.

**Exhibit A**

**Liquidating Trustee Identity / Compensation**

**Identity:  Eric Kaup**

**Compensation:**

- **Wind-Down Consultant Fee: For each calendar day the Liquidating Trustee provides assistance or review in connection with the Debtors' wind-down planning prior to the Effective Date, he will earn a per diem fee of $2,500.00, payable in arrears on the Effective Date.**

- **Monthly Fee: $75,000.00 for the first six months following the Effective Date, $50,000.00 for the following six months, and thereafter, the lesser of (i) actual hourly charges and (ii) $50,000 per month.**

- **Incentive Fee: With respect to certain eligible proceeds: the Incentive Fee shall equal the sum of (i) 0.75% of the first $10.0 million in eligible proceeds, plus (ii) 1.75% of eligible proceeds in excess of $10.0 million but less than $25.0 million, plus (iii) 2.75% eligible proceeds in excess of $25.0 million but less than $75.0 million, plus (iv) 3.75% eligible proceeds in excess of $75.0 million.  If the Incentive Fee exceeds $2 million, 50% of aggregate monthly fees shall be credited against the Incentive Fee.**

- **Expenses:  Reimbursement of reasonable and documented expenses.**

**The foregoing terms are subject in all respects to the terms reflected in the final form of engagement letter as agreed between the Debtors, Liquidating Trustee, and DIP Agent.**

**<u>Exhibit H</u>**

**Data Retention Plan**

Data Retention Plan

Scope of Data Inventory:  The categories of books and records referred to in this Data Retention Plan are non-exhaustive.  For the avoidance of doubt, this Data Retention Plan applies to any and all remaining personal, financial, employee, human resources, operational, legal, compliance, and other data, information, and correspondence, whether stored in "hard copy" or electronically and wherever located, comprising the Debtors' books and records (collectively, "Data Inventory") as of the Effective Date; *provided* that this Data Retention Plan shall not apply to any Data Inventory acquired by the Reorganized Debtors pursuant to the Plan (the "Reorganized Debtor Data Inventory"), which may be treated by the Reorganized Debtors in accordance with applicable nonbankruptcy law without further notice to or action by the Bankruptcy Court, and the Reorganized Debtors shall not have any obligations to any parties under this Data Retention Plan with respect to such acquired Data Inventory; *provided*, *further* that the Reorganized Debtor Data Inventory shall not include any PHI or PII (each as defined below).[1]

Notice Period:  Except as expressly provided in this Data Retention Plan or otherwise ordered by the Bankruptcy Court, pursuant to section 554 of the Bankruptcy Code, the Wind-Down Debtors are authorized to take any actions necessary or proper to abandon, dispose of, and/or destroy all Data Inventory (notwithstanding any otherwise applicable state law retention requirements) on February 1, 2026 (the period from the Effective Date through such date, "Notice Period"); *provided*, *however*, that the Debtors are authorized to decommission their mainframe system (the "Mainframe") and abandon and destroy Data Inventory hosted on the Mainframe (the "Mainframe Data") as of December 31, 2025 (the "Mainframe Termination Date").  The costs of retaining Data Inventory during the Notice Period (or, with respect to the Mainframe Data, through the Mainframe Termination Date) shall be borne by the Wind-Down Debtors.

Treatment of Sensitive Information:  The Data Inventory includes certain data which may be (a) protected health information ("PHI") subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") or (b) personally identifiable information ("PII"). Except as expressly provided for in this Data Retention Plan, PHI and PII shall be abandoned and destroyed in accordance herewith, *provided* that any Data Inventory containing PHI or PII which is abandoned in accordance with the terms hereof shall be shredded, removed, or otherwise appropriately destroyed in accordance with HIPAA and industry standard security requirements related to destruction.  On and after the earlier of (a) December 31, 2025 or (b) the date, if any, on which the Debtors transfer the MedChart Data to MedChart (each as defined below), the Debtors will be deemed to no longer maintain or control a Designated Record Set (as defined at 45 C.F.R. § 164.501) or similar state law equivalent.  At such time, the Debtors shall cease to have obligations pursuant to 45 C.F.R. § 164.524, 45 C.F.R. § 164.526, and 45 CFR 164.528, as well as any similar state or local law which would require the Debtors to permit or facilitate access to PHI or PII to any third party, to permit a third party to request amendments or changes thereto, or

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2517].

to request any accounting related to such information (including information related to disclosures of such information).

Data Inventory to be Retained or Transferred:  The following Data Inventory shall be retained and/or transferred solely to the extent set forth below:

| Category | Terms of Retention or Transfer |
|---|---|
| McKesson TSA Data | Prior to the expiration of the Notice Period, the Wind-Down Debtors and McKesson shall negotiate in good faith to determine the scope of Data Inventory, if any, necessary for the Wind-Down Debtors to comply with their obligations under the Transition Services Agreement (the "McKesson TSA Data"), if any; *provided*, *however*, that neither the foregoing obligation to negotiate in good faith nor any other provision of this Data Retention Plan shall be construed or interpreted to require the Wind-Down Debtors to incur any cost or expense on account of the retention or transfer of the McKesson TSA Data beyond the Notice Period, and the Transition Services Agreement, if any, shall control with respect to such costs; *provided*, *further*, that nothing in this Data Retention Plan shall limit any Wind-Down Debtor's obligations under the Transition Services Agreement. <br><br> If the Wind-Down Debtors and McKesson reach an agreement with respect to the scope and terms of retention or transfer of the McKesson TSA Data prior to the expiration of the Notice Period, they shall file a stipulation setting forth such scope and terms. <br><br> If the Wind-Down Debtors and McKesson are unable to reach an agreement with respect to the scope and/or terms of retention of the McKesson TSA Data prior to the expiration of the Notice Period (a "McKesson TSA Data Retention Dispute"), such McKesson TSA Data Retention Dispute shall be resolved in accordance with the Data Dispute Resolution Procedures (as defined below). <br><br> Notwithstanding anything to the contrary in this Data Retention Plan, the Wind-Down Debtors may not transfer, abandon or otherwise dispose of any McKesson TSA Data or any Data Inventory that is subject to a McKesson TSA Data Retention Dispute without McKesson's prior written consent unless the Wind-Down Debtors will retain and be able to provide McKesson with copies of any such McKesson TSA Data or Data Inventory after such sale, transfer or other disposition. |

|  | Nothing herein shall limit any obligation of the Wind-Down Debtors, Plan Administrator and/or Liquidating Trustee to cooperate in providing McKesson with access to any Data Inventory under the Transition Services Agreement, the Plan or any other Definitive Document. |
|---|---|
| Litigation Trust Data | The Wind-Down Debtors shall, within thirty (30) days of the Effective Date, use reasonable efforts to collect, copy, and transfer, to the applicable trust(s) (collectively, the "Trusts") party to that certain Rite Aid Litigation Trust Cooperation Agreement (the "Cooperation Agreement") entered into pursuant to the chapter 11 plan confirmed in the 2023 Cases (as defined in the Disclosure Statement) Data Inventory consisting of data that:<br><br>    (a) is relevant to pursue and/or litigate any Assigned Claims and/or Assigned Insurance Rights or to reconcile and administer Tort Claims (as defined in the Cooperation Agreement);<br><br>    (b) is requested by the applicable Trust prior to the expiration of the Notice Period or such other deadline set by order of the Court; and<br><br>    (c) the Wind-Down Debtors believe in good faith (i) not to contain PHI or PII ("Non-Protected Trust Data") *or* (ii) to contain PHI or PII ("Protected Trust Data" and, together with Non-Protected Trust Data, the "Trust Data");<br><br>*provided* that any transfer of Protected Trust Data shall be made only in accordance with applicable law, including any order of the Bankruptcy Court.  Prior to the expiration of the Notice Period (or such other deadline as ordered by the Court), the Wind-Down Debtors and the Trusts shall negotiate in good faith to determine the terms for transferring Protected Trust Data.<br><br>Other than as consented to by the Wind-Down Debtors in their sole discretion or as provided in any order of the Bankruptcy Court, any reasonable and documented administrative, professional, or other costs incurred on account of any transfer of Data Inventory to the Trusts (or retention of Data Inventory after expiration of the Notice Period or, with respect to Mainframe Data, after the Mainframe Termination Date, if such retention is undertaken on the basis of a request made or dispute raised by a Trust) shall be the sole responsibility of the Trust(s) requesting or demanding the applicable transfer or retention, including pursuant to the Data Dispute Resolution Procedures; *provided* that each Trust acknowledges and agrees that such costs shall include, in addition to the costs paid by |

the Wind-Down Debtors to service providers and other third parties in connection with the ongoing retention of Data Inventory after the expiration of the Notice Period, that these costs may include reasonable additional amounts on account of professional and employee costs, subject to the express terms of any order of the Bankruptcy Court entered subsequently to the Confirmation Order; *provided*, *however*, that the Trusts shall not be responsible for (i) costs associated with the retention of Data Inventory after the expiration of the Notice Period, if such retention is the result of the Wind-Down Debtors' failure to use their reasonable efforts and good faith to transfer such Trust Data to the applicable Trust(s) prior to the expiration of the Notice Period, or (ii) costs arising out of the Wind-Down Debtors' abandonment of Data Inventory; *provided*, *further*, for the avoidance of doubt, that this provision does not affect or modify the requirements set forth in this Data Retention Plan that any such transfer comply with applicable law.  Any costs incurred specifically at the request of any Trust shall be the responsibility of the requesting Trust(s).[2]

No Trust Data to be transferred to the Trusts shall include any McKesson TSA Data or any Data Inventory that is subject to a McKesson TSA Data Retention Dispute without McKesson's prior written, consent unless the Wind-Down Debtors will retain and be able to provide McKesson with copies of any such McKesson TSA Data or Data Inventory after such sale, transfer or other disposition.

If the Wind-Down Debtors and the Trusts reach an agreement with respect to the scope of the Trust Data and/or the terms of any transfer thereof prior to the expiration of the Notice Period, they shall file a Transfer Notice setting forth such scope and terms.

If the Wind-Down Debtors and the Trusts are unable to reach an agreement with respect to the scope and/or terms of the transfer of the Trust Data prior to the expiration of the Notice Period, such disagreement shall be resolved in accordance with the Data Dispute Resolution Procedures.

---

[2]   The Trusts acknowledge and agree that the Debtors have provided them with notice that, if the Trusts wish to preserve access to certain Data Inventory warehousing services beyond the Notice Period, a requesting Trust must provide notice to the Debtors in writing of such request on or before December 19, 2025.  The Trusts acknowledge and agree that any costs associated with access to these Data Inventory warehousing services beyond the Notice Period in response to any such request from a Trust shall be the responsibility of the requesting Trust, notwithstanding anything to the contrary in this Data Retention Plan; *provided* that, prior to confirming such a request, the Debtors shall disclose any such costs to a requesting Trust in writing for such Trust's confirmation and acceptance, which shall be a condition precedent to any extension of such access period by the Debtors.

| | The Trusts' rights with respect to the Data Inventory are limited to those set forth in this Data Retention Plan and any applicable order of the Bankruptcy Court, and effective as of the Effective Date, the Cooperation Agreement shall be deemed terminated and of no force or effect; provided, however, that the *Form of Confidentiality Agreement, Stipulated Protective Order and Qualified Protective Order Governing Claims Records and Other Discovery Material Transferred Pursuant to Rite Aid Litigation Trust Cooperation Agreement*, dated January 23, 2025 (the "Protective Order") shall remain in effect and shall govern the transfer of Trust Data. Other than as set forth in this Data Retention Plan or any applicable order of the Bankruptcy Court, the Wind-Down Debtors shall have no further obligation to the Trusts to retain, transfer, or otherwise refrain from abandoning and destroying any Data Inventory, which destruction and abandonment shall be deemed authorized pursuant to this Data Retention Plan and the Confirmation Order. |
|---|---|
| MedChart | Prior to the earlier of (i) December 31, 2025; or (ii) the occurrence of the Notice Period, the Wind-Down Debtors and MedChart US Inc. ("MedChart") shall negotiate in good faith with respect to the terms (the "MedChart Terms") of the transfer to and/or retention by MedChart of some or all of the Data Inventory (the "MedChart Data") to MedChart.[3] |
| | If the Wind-Down Debtors and MedChart reach an agreement with respect to the scope of the MedChart Data and/or the MedChart Terms prior to the expiration of the Notice Period, they shall file a Transfer Notice setting forth such scope and terms. |
| | If the Debtors and MedChart are unable to reach an agreement with respect to the MedChart Terms or the scope of the MedChart Data, such disagreement will be resolved in accordance with the Data Dispute Resolution Procedures. |
| | For the avoidance of doubt, no continued provision of services by MedChart or transfer of any or all of the MedChart Data to MedChart shall modify or affect the relief provided to the Debtors pursuant to this Data Retention Plan, including, without limitation, (a) the section titled "Treatment of Sensitive Information" *supra* or (b) the Debtors' deemed abandonment of and entitlement to destroy Data Inventory following the expiration of the Notice Period pursuant to the terms of this Data Retention Plan, subject to the Data Dispute Resolution Procedures. |

---

[3]   As indicated on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtors shall have assumed MedChart's contract on the Effective Date pursuant to the Confirmation Order.

| Subpoena | If any valid subpoena is served upon or transmitted to the Wind-Down Debtors by any party (a "Subpoena Counterparty") prior to the expiration of the Notice Period, no Data Inventory responsive to such subpoena (the "Subpoena Data") shall be abandoned or disposed of prior to resolution thereof either consensually, in which case the Wind-Down Debtors shall file a Retention or Transfer Notice, or pursuant to the Data Dispute Resolution Procedures. The Wind-Down Debtors and the Subpoena Counterparty shall continue to comply with the Protective Order to the extent it governs the subject matter of any such subpoena. |
|---|---|
| Sales | The Wind-Down Debtors may, in their discretion (and subject to the other terms and conditions of this Data Retention Plan), seek approval to sell and/or transfer any Data Inventory to any third party by filing a Transfer Notice detailing the terms of any such transfer pursuant to the procedures set forth below. |
| Retention or Transfer Notice | In the event that the Wind-Down Debtors and any third party consensually agree to the retention or transfer of Data Inventory, the Wind-Down Debtors shall file a Retention or Transfer Notice with the Bankruptcy Court, indicating:<br><br>• The nature of the Data Inventory to be transferred or retained;<br><br>• The identity of the transferee (if applicable) with respect to such Data Inventory;<br><br>• The terms of such retention or transfer, including consideration provided by any applicable transferee with respect to such Data Inventory, if any;<br><br>• Whether the proposed transfer, if any, results in the transfer of any PII or PHI;<br><br>• If the proposed transfer, if any, results in the transfer of any PII or PHI the relevant safeguards and limitations on use or disclosure that will be implemented to protect the privacy and security of such information; and<br><br>• If the proposed transfer results in the transfer of any PII or PHI, that and how the proposed transfer satisfies the requirements of applicable law, which may include the third party agreeing to the Protective Order, expanding the scope of the Protective Order, or stipulating agreement to a separate |

|  | qualified protective order, which meets the HIPAA requirements set forth at 45 C.F.R. § 164.512(e).[4] |
|  | Upon the filing and service of any Retention or Transfer Notice, parties in interest shall have fourteen (14) days from the date of service (the "<u>Retention or Transfer Objection Deadline</u>") to file and serve any objections to the proposed retention or transfer.  If no timely objection to a Retention or Transfer Notice is filed and served by such date, the Wind-Down Debtors are authorized to consummate the proposed transfer in accordance with the terms of the Retention or Transfer Notice, and such retention or transfer shall be deemed approved without further order of the Bankruptcy Court.  If a timely objection is filed and served with respect to a Retention or Transfer Notice prior to the Retention or Transfer Objection Deadline, the Wind-Down Debtors may schedule a hearing to consider such objection, and shall not consummate the applicable transfer of Data Inventory until such objection is resolved by agreement of the Wind-Down Debtors and objecting party or by order of the Bankruptcy Court. |
| Data Dispute Resolution Procedures | In the event that the Wind-Down Debtors and (a) McKesson, (b) the Trusts, (c) MedChart, or (d) any Subpoena Counterparty (each of (a), (b), (c), and (d), a "<u>Retention Counterparty</u>") are not able to reach a consensual resolution with respect to the scope and terms of a transfer of Data Inventory required pursuant to this Data Retention Plan (including, without limitation, (a) any disagreement with respect to the framework necessary to render any transfer of Protected Trust Data or MedChart Data consistent with the terms of applicable law as required under this Data Retention Plan and (b) an assertion by the Debtors in good faith that complying with a request for Mainframe Data would logistically (*i.e.*, irrespective of any disputes regarding the legality of the requested transfer) require that the Debtors continue to maintain the Mainframe past the Mainframe Termination Date, which assertion shall be provided by the Debtors promptly upon receipt of the applicable request), the Retention Counterparty shall, prior to expiration of the Notice Period or, with respect to Mainframe Data, prior to the Mainframe Termination Date, file a notice indicating the scope of Data Inventory subject to such disagreement (the "<u>Disputed Data</u>"). |
|  | If any such timely notice is filed prior to the expiration of the Notice Period, the Wind-Down Debtors shall not transfer (without retaining native copies), abandon, or dispose of the applicable Disputed Data until the applicable disagreement is resolved by (a) consensual |

---

[4]   The Wind-Down Debtors shall not in any circumstance be required or permitted to transfer any PHI other than in accordance with applicable law including, without limitation, 45 CFR § 164.512(e).

| | |
|---|---|
| | resolution as between the Wind-Down Debtors and applicable Retention Counterparty, in which case such parties shall comply with the requirements with respect to a Retention or Transfer Notice, or (b) order of the Bankruptcy Court, in each case subject to the provisions of this Data Retention Plan allocating the costs of retention of Data Inventory after the Notice Period (or, with respect to Mainframe Data, after the Mainframe Termination Date).<br><br>For the avoidance of doubt, any party that, pursuant to these Data Dispute Resolution Procedures requires the Wind-Down Debtors to refrain from decommissioning the Mainframe on or after the Mainframe Termination Date shall indemnify the Wind-Down Debtors for any and all costs incurred on account of the operation of the Mainframe through the date which is 45 calendar days following the date on which the applicable dispute is resolved and the Wind-Down Debtors are authorized to initiate decommissioning of the Mainframe, with all parties deemed to be on notice that these indemnified costs shall include that the Wind-Down Debtors shall be obligated to make, without limitation, an approximately $2.3 million payment to effect the renewal of an annual software license if the Mainframe has not been decommissioned by February 1, 2025. |
| Compliance with Law | The Wind-Down Debtors shall not in any circumstance be required or permitted to transfer any PHI other than in accordance with applicable law including, without limitation, 45 CFR § 164.512(e).<br><br>In the event that the Bankruptcy Court determines that, given the nature of the applicable Data Inventory or proposed or requested transfer thereof, Data Inventory may not be transferred in accordance with applicable law, the Debtors shall be under no further obligation to retain such Data Inventory and shall be authorized to dispose of it in accordance with this Data Retention Plan. |

**<u>Exhibit H-1</u>**

**Changed Pages Only Redline of the Revised Data Retention Plan Against the Original Data
Retention Plan Filed at Docket No. 3218**

Data Retention Plan

<u>Scope of Data Inventory</u>:  The categories of books and records referred to in this Data Retention Plan are non-exhaustive.  For the avoidance of doubt, this Data Retention Plan applies to any and all remaining personal, financial, employee, human resources, operational, legal, compliance, and other data, information, and correspondence, whether stored in "hard copy" or electronically and wherever located, comprising the Debtors' books and records (collectively, "<u>Data Inventory</u>") as of the Effective Date; *provided* that this Data Retention Plan shall not apply to any Data Inventory acquired by the Reorganized Debtors pursuant to the Plan (the "<u>Reorganized Debtor Data Inventory</u>"), which may be treated by the Reorganized Debtors in accordance with applicable nonbankruptcy law without further notice to or action by the Bankruptcy Court, and the Reorganized Debtors shall not have any obligations to any parties under this Data Retention Plan with respect to such acquired Data Inventory; *provided*, *further* that the Reorganized Debtor Data Inventory shall not include any PHI or PII (each as defined below).[1]

<u>Notice Period</u>:  Except as expressly provided in this Data Retention Plan or otherwise ordered by the Bankruptcy Court, **pursuant to section 554 of the Bankruptcy Code,** the Wind-Down Debtors are authorized to take any actions necessary or proper to abandon, dispose of, and/or destroy all Data Inventory ~~on the date which is thirty (30) days following~~**(notwithstanding any otherwise applicable state law retention requirements) on February 1, 2026 (the period from** the Effective Date ~~(the~~**through such date,** "Notice Period**"); *provided*, *however*, that the Debtors are authorized to decommission their mainframe system (the "Mainframe") and abandon and destroy Data Inventory hosted on the Mainframe (the "Mainframe Data") as of December 31, 2025** (the "Mainframe Termination Date"**)**.  The costs of retaining Data Inventory during the Notice Period **(or, with respect to the Mainframe Data, through the Mainframe Termination Date)** shall be borne by the Wind-Down Debtors.

<u>Treatment of Sensitive Information</u>:  The Data Inventory includes certain data which may be (a) protected health information ("<u>PHI</u>") subject to the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>") or (b) personally identifiable information ("<u>PII</u>").  Except as expressly provided for in this Data Retention Plan, PHI and PII shall be abandoned and destroyed in accordance herewith, *provided* that any Data Inventory containing PHI or PII which is abandoned in accordance with the terms hereof shall be shredded, removed, or otherwise appropriately destroyed in accordance with HIPAA and industry standard security requirements related to destruction.  On and after **the earlier of (a)** December 31, 2025 **or (b) the date, if any, on which the Debtors transfer the MedChart Data to MedChart (each as defined below),** the Debtors will be deemed to no longer maintain or control a Designated Record Set (as defined at 45 C.F.R. § 164.501) or similar state law equivalent.  At such time, the Debtors shall cease to have obligations pursuant to 45 C.F.R. § 164.524, 45 C.F.R. § 164.526, and 45 CFR 164.528,

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *First Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates* [Docket No. 2517].

as well as any similar state or local law which would require the Debtors to permit or facilitate access to PHI or PII to any third party, to permit a third party to request amendments or changes thereto, or to request any accounting related to such information (including information related to disclosures of such information).

<u>Data Inventory to be Retained or Transferred</u>:  The following Data Inventory shall be retained and/or transferred solely to the extent set forth below:

| **Category** | **Terms of Retention or Transfer** |
|---|---|
| McKesson TSA Data | Prior to the expiration of the Notice Period, the Wind-Down Debtors and McKesson shall negotiate in good faith to determine the scope of Data Inventory, if any, necessary for the Wind-Down Debtors to comply with their obligations under the Transition Services Agreement (the "<u>McKesson TSA Data</u>"), if any; *provided, however*, that neither the foregoing obligation to negotiate in good faith nor any other provision of this Data Retention Plan shall be construed or interpreted to require the Wind-Down Debtors to incur any cost or expense on account of the retention or transfer of the McKesson TSA Data beyond the Notice Period, and the Transition Services Agreement, if any, shall control with respect to such costs; *provided, further*, that nothing in this Data Retention Plan shall limit any Wind-Down Debtor's obligations under the Transition Services Agreement.<br><br>If the Wind-Down Debtors and McKesson reach an agreement with respect to the scope and terms of retention or transfer of the McKesson TSA Data prior to the expiration of the Notice Period, they shall file a stipulation setting forth such scope and terms.<br><br>If the Wind-Down Debtors and McKesson are unable to reach an agreement with respect to the scope and/or terms of retention of the McKesson TSA Data prior to the expiration of the Notice Period (a "<u>McKesson TSA Data Retention Dispute</u>"), such McKesson TSA Data Retention Dispute shall be resolved in accordance with the Data Dispute Resolution Procedures (as defined below).<br><br>Notwithstanding anything to the contrary in this Data Retention Plan, the Wind-Down Debtors may not transfer, abandon or otherwise dispose of any McKesson TSA Data or any Data Inventory that is subject to a McKesson TSA Data Retention Dispute without McKesson's prior written consent unless the Wind-Down Debtors will retain and be able to provide McKesson |

| | |
|---|---|
| | with copies of any such McKesson TSA Data or Data Inventory after such sale, transfer or other disposition.<br><br>Nothing herein shall limit any obligation of the Wind-Down Debtors, Plan Administrator and/or Liquidating Trustee to cooperate in providing McKesson with access to any Data Inventory under the Transition Services Agreement, the Plan or any other Definitive Document. |
| Litigation Trust Data | The Wind-Down Debtors shall, within thirty (30) days of the Effective Date, use reasonable efforts to collect, copy, and transfer, to the applicable trust(s) (collectively, the "Trusts") party to that certain Rite Aid Litigation Trust Cooperation Agreement (the "Cooperation Agreement") entered into pursuant to the chapter 11 plan confirmed in the 2023 Cases (as defined in the Disclosure Statement) Data Inventory consisting of data that:<br><br>(a) is relevant to pursue and/or litigate any Assigned Claims and/or Assigned Insurance Rights or to reconcile and administer Tort Claims (as defined in the Cooperation Agreement);<br><br>(b) is requested by the applicable Trust prior to the expiration of the Notice Period or such other deadline set by order of the Court; and<br><br>(c) the Wind-Down Debtors believe in good faith (i) not to contain PHI or PII ("Non-Protected Trust Data") *or* (ii) to contain PHI or PII ("Protected Trust Data" and, together with Non-Protected Trust Data, the "Trust Data");<br><br>*provided* that any transfer of Protected Trust Data shall be made only in accordance with applicable law**, including any order of the Bankruptcy Court**.  Prior to the expiration of the Notice Period (or such other deadline as ordered by the Court), the Wind-Down Debtors and the Trusts shall negotiate in good faith to determine the terms for transferring Protected Trust Data.<br><br>Other than as consented to by the Wind-Down Debtors in their sole discretion or as provided in any order of the Bankruptcy Court, any reasonable and documented administrative, professional, or other costs incurred on account of any transfer of Data Inventory to the Trusts (or retention of Data Inventory after expiration of the Notice Period **or, with respect to Mainframe Data, after the Mainframe Termination Date**, if such retention is undertaken on the basis of a request made or dispute raised by a Trust) shall be the sole responsibility of the Trust(s) requesting or demanding the |

applicable transfer or retention, *including pursuant to the Data Dispute Resolution Procedures; provided that each Trust acknowledges and agrees that such costs shall include, in addition to the costs paid by the Wind-Down Debtors to service providers and other third parties in connection with the ongoing retention of Data Inventory after the expiration of the Notice Period, that these costs may include reasonable additional amounts on account of professional and employee costs, subject to the express terms of any order of the Bankruptcy Court entered subsequently to the Confirmation Order*; *provided*, *however*, that the Trusts shall not be responsible for *(i) costs associated with the retention of Data Inventory after the expiration of the Notice Period, if such retention is the result of the Wind-Down Debtors' failure to use their reasonable efforts and good faith to transfer such Trust Data to the applicable Trust(s) prior to the expiration of the Notice Period, or (ii)* costs arising out of the Wind-Down Debtors' abandonment of Data Inventory. ~~Other than as consented to by the Wind-Down Debtors in their sole discretion or as provided in any order of the Bankruptcy Court, any reasonable and documented administrative, professional, or other costs incurred on account of any transfer of Protected Trust Data to the Trusts shall be the sole responsibility of the Trust(s) requesting or demanding the applicable transfer or retention~~; *provided*, *further*, for the avoidance of doubt, that this provision does not affect or modify the requirements set forth in this Data Retention Plan that any such transfer comply with applicable law. *Any costs incurred specifically at the request of any Trust shall be the responsibility of the requesting Trust(s).*[2]

No Trust Data to be transferred to the Trusts shall include any McKesson TSA Data or any Data Inventory that is subject to a McKesson TSA Data Retention Dispute without McKesson's prior written, consent unless the Wind-Down Debtors will retain and be able to provide McKesson with copies of any such McKesson TSA Data or Data Inventory after such sale, transfer or other disposition.

---

[2] *The Trusts acknowledge and agree that the Debtors have provided them with notice that, if the Trusts wish to preserve access to certain Data Inventory warehousing services beyond the Notice Period, a requesting Trust must provide notice to the Debtors in writing of such request on or before December 19, 2025. The Trusts acknowledge and agree that any costs associated with access to these Data Inventory warehousing services beyond the Notice Period in response to any such request from a Trust shall be the responsibility of the requesting Trust, notwithstanding anything to the contrary in this Data Retention Plan; provided that, prior to confirming such a request, the Debtors shall disclose any such costs to a requesting Trust in writing for such Trust's confirmation and acceptance, which shall be a condition precedent to any extension of such access period by the Debtors.*

| | If the Wind-Down Debtors and the Trusts reach an agreement with respect to the scope of the ~~Remaining~~ Trust Data and/or the terms of any transfer thereof prior to the expiration of the Notice Period, they shall file a Transfer Notice setting forth such scope and terms. |
| --- | --- |
| | If the Wind-Down Debtors and the Trusts are unable to reach an agreement with respect to the scope and/or terms of the transfer of the ~~Remaining~~ Trust Data prior to the expiration of the Notice Period, such disagreement shall be resolved in accordance with the Data Dispute Resolution Procedures. |
| | The Trusts' rights with respect to the Data Inventory are limited to those set forth in this Data Retention Plan and any applicable order of the Bankruptcy Court, and effective as of the Effective Date, the Cooperation Agreement shall be deemed terminated and of no force or effect; provided, however, that the *Form of Confidentiality Agreement, Stipulated Protective Order and Qualified Protective Order Governing Claims Records and Other Discovery Material Transferred Pursuant to Rite Aid Litigation Trust Cooperation Agreement*, dated January 23, 2025 (the "Protective Order") shall remain in effect and shall govern the transfer of Trust Data.  Other than as set forth in this Data Retention Plan or any applicable order of the Bankruptcy Court, the Wind-Down Debtors shall have no further obligation to the Trusts to retain, transfer, or otherwise refrain from abandoning and destroying any Data Inventory, which destruction and abandonment shall be deemed authorized pursuant to this Data Retention Plan and the Confirmation Order. |
| **MedChart** | **Prior to the earlier of (i) December 31, 2025; or (ii) the occurrence of the Notice Period, the Wind-Down Debtors and MedChart US Inc. ("MedChart") shall negotiate in good faith with respect to the terms (the "MedChart Terms") of the transfer to and/or retention by MedChart of some or all of the Data Inventory (the "MedChart Data") to MedChart.[3]** |
| | **If the Wind-Down Debtors and MedChart reach an agreement with respect to the scope of the MedChart Data and/or the MedChart Terms prior to the expiration of the Notice Period, they shall file a Transfer Notice setting forth such scope and terms.** |
| | **If the Debtors and MedChart are unable to reach an agreement** |

---

[3] **As indicated on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtors shall have assumed MedChart's contract on the Effective Date pursuant to the Confirmation Order.**

| | |
|---|---|
| | **with respect to the MedChart Terms or the scope of the MedChart Data, such disagreement will be resolved in accordance with the Data Dispute Resolution Procedures.**<br><br>**For the avoidance of doubt, no continued provision of services by MedChart or transfer of any or all of the MedChart Data to MedChart shall modify or affect the relief provided to the Debtors pursuant to this Data Retention Plan, including, without limitation, (a) the section titled "Treatment of Sensitive Information" *supra* or (b) the Debtors' deemed abandonment of and entitlement to destroy Data Inventory following the expiration of the Notice Period pursuant to the terms of this Data Retention Plan, subject to the Data Dispute Resolution Procedures.** |
| Subpoena | If any valid subpoena is served upon or transmitted to the Wind-Down Debtors by any party (a "Subpoena Counterparty") prior to the expiration of the Notice Period, no Data Inventory responsive to such subpoena (the "Subpoena Data") shall be abandoned or disposed of prior to resolution thereof either consensually, in which case the Wind-Down Debtors shall file a Retention or Transfer Notice, or pursuant to the Data Dispute Resolution Procedures.   The Wind-Down Debtors and the Subpoena Counterparty shall continue to comply with the Protective Order to the extent it governs the subject matter of any such subpoena. |
| Sales | The Wind-Down Debtors may, in their discretion (and subject to the other terms and conditions of this Data Retention Plan), seek approval to sell **and/or transfer** any Data Inventory to any third party by filing a Transfer Notice detailing the terms of any such transfer pursuant to the procedures set forth below. |
| Retention or Transfer Notice | In the event that the Wind-Down Debtors and any third party consensually agree to the retention or transfer of Data Inventory, the Wind-Down Debtors shall file a Retention or Transfer Notice with the Bankruptcy Court, indicating:<br><br>• The nature of the Data Inventory to be transferred or retained;<br><br>• The identity of the transferee (if applicable) with respect to such Data Inventory;<br><br>• The terms of such retention or transfer, including consideration provided by any applicable transferee with |

| | |
|---|---|
| | respect to such Data Inventory, if any; |
| | • Whether the proposed transfer, if any, results in the transfer of any PII or PHI; |
| | • If the proposed transfer, if any, results in the transfer of any PII or PHI the relevant safeguards and limitations on use or disclosure that will be implemented to protect the privacy and security of such information; and |
| | • If the proposed transfer results in the transfer of any PII or PHI, that and how the proposed transfer satisfies the requirements of applicable law, which may include the third party agreeing to the Protective Order, expanding the scope of the Protective Order, or stipulating agreement to a separate qualified protective order, which meets the HIPAA requirements set forth at 45 C.F.R. § 164.512(e).[24] |
| | Upon the filing and service of any Retention or Transfer Notice, parties in interest shall have fourteen (14) days from the date of service (the "Retention or Transfer Objection Deadline") to file and serve any objections to the proposed retention or transfer.  If no timely objection to a Retention or Transfer Notice is filed and served by such date, the Wind-Down Debtors are authorized to consummate the proposed transfer in accordance with the terms of the Retention or Transfer Notice, and such retention or transfer shall be deemed approved without further order of the Bankruptcy Court.  If a timely objection is filed and served with respect to a Retention or Transfer Notice prior to the Retention or Transfer Objection Deadline, the Wind-Down Debtors may schedule a hearing to consider such objection, and shall not consummate the applicable transfer of Data Inventory until such objection is resolved by agreement of the Wind-Down Debtors and objecting party or by order of the Bankruptcy Court. |
| Data Dispute Resolution Procedures | In the event that the Wind-Down Debtors and (a) McKesson, (b) the Trusts, ~~or~~ (c) **MedChart, or (d)** any Subpoena Counterparty (each of (a), (b), ~~and~~ (c)**, and (d)**, a "Retention Counterparty") are not able to reach a consensual resolution with respect to the scope and terms of a transfer of Data Inventory required pursuant to this Data Retention Plan (including**, without limitation, (a)** any disagreement with respect to the framework necessary to render any transfer of Protected Trust Data **or MedChart Data** consistent with the terms of applicable law as required under this Data Retention |

---

[24] The Wind-Down Debtors shall not in any circumstance be required or permitted to transfer any PHI other than in accordance with applicable law including, without limitation, 45 CFR § 164.512(e).

| | |
|---|---|
| | Plan **and (b) an assertion by the Debtors in good faith that complying with a request for Mainframe Data would logistically (*i.e.*, irrespective of any disputes regarding the legality of the requested transfer) require that the Debtors continue to maintain the Mainframe past the Mainframe Termination Date, which assertion shall be provided by the Debtors promptly upon receipt of the applicable request**), the Retention Counterparty shall, prior to expiration of the Notice Period **or, with respect to Mainframe Data, prior to the Mainframe Termination Date**, file a notice indicating the scope of Data Inventory subject to such disagreement (the "<u>Disputed Data</u>"). <br><br> If any such timely notice is filed prior to the expiration of the Notice Period, the Wind-Down Debtors shall not transfer **(without retaining native copies)**, abandon, or dispose of the applicable Disputed Data until the applicable disagreement is resolved by (a) consensual resolution as between the Wind-Down Debtors and applicable Retention Counterparty, in which case such parties shall comply with the requirements with respect to a Retention or Transfer Notice, or (b) order of the Bankruptcy Court, in each case subject to the provisions of this Data Retention Plan allocating the costs of retention of Data Inventory after the Notice Period. **(or, with respect to Mainframe Data, after the Mainframe Termination Date).** <br><br> **For the avoidance of doubt, any party that, pursuant to these Data Dispute Resolution Procedures requires the Wind-Down Debtors to refrain from decommissioning the Mainframe on or after the Mainframe Termination Date shall indemnify the Wind-Down Debtors for any and all costs incurred on account of the operation of the Mainframe through the date which is 45 calendar days following the date on which the applicable dispute is resolved and the Wind-Down Debtors are authorized to initiate decommissioning of the Mainframe, with all parties deemed to be on notice that these indemnified costs shall include that the Wind-Down Debtors shall be obligated to make, without limitation, an approximately $2.3 million payment to effect the renewal of an annual software license if the Mainframe has not been decommissioned by February 1, 2025.** |
| Compliance with Law | The Wind-Down Debtors shall not in any circumstance be required or permitted to transfer any PHI other than in accordance with applicable law including, without limitation, 45 CFR § 164.512(e). <br><br> In the event that the Bankruptcy Court determines that, given the |

## **Exhibit I**

### **Conformed Wind-Down Budget**

<u>Amendments to Wind-Down Budget Filed at Docket No. 3300</u>. The Wind-Down Budget is hereby amended to add the blue double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u> ), as set forth in the marked copy of the Wind-Down Budget attached hereto as <u>Exhibit I</u> .

| | Pre-Effective Date DIP Period | At Closing / Effective Date[1] | Post Effective Date Period | | | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11/16 - 12/12 | 12/12 | 12/15 - 12/31 | Q1 CY26 | Q2 CY26 | Q3 CY26 | Q4 CY26 | CY27 | Later | Pre-Effective / Closing | Post-Effective | Aggregate |
| **Receipts** | | | | | | | | | | | | |
| Operating Receipts | $ - | $ - | $ 8.3 | $ 63.0 | $ 7.4 | $ 3.0 | $ 3.6 | $ 7.2 | $ - | $ - | $ 92.5 | $ 92.5 |
| Liquidating Receipts | 34.8 | 20.0 | 17.6 | 18.9 | 2.9 | 3.4 | 1.4 | 14.7 | 3.6 | 54.8 | 62.5 | 117.4 |
| **Total Receipts** | $ 34.8 | $ 20.0 | $ 25.8 | $ 81.9 | $ 10.3 | $ 6.4 | $ 5.1 | $ 22.0 | $ 3.6 | $ 54.8 | $ 155.1 | $ 209.9 |
| **Disbursements** | | | | | | | | | | | | |
| **DIP Disbursements** | | | | | | | | | | | | |
| Operating Disbursements | $ (20.1) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ (20.1) | $ - | $ (20.1) |
| Non-Operating Disbursements | (9.7) | (5.2) | - | - | - | - | - | - | | (14.9) | - | (14.9) |
| **Total DIP / ED** | $ (29.8) | $ (5.2) | $ - | $ - | $ - | $ - | $ - | $ - | | $ (35.0) | $ - | $ (35.0) |
| **Admin / Priority Claims Reserve** | | | | | | | | | | | | |
| Unpaid DIP Admin Claims[2] | $ - | $ - | (1.7) | (2.8) | - | - | - | - | | $ - | (4.5) | (4.5) |
| Other A/P Reserves | - | - | (4.7) | (1.2) | - | - | - | - | | - | (5.9) | (5.9) |
| **Total Admin / Priority Claims Reserve** | $ - | $ - | (6.4) | (4.1) | - | - | - | - | | $ - | (10.4) | (10.4) |
| **Wind Down Reserve** | | | | | | | | | | | | |
| Operating Expenses | $ - | $ - | (0.3) | (0.8) | - | - | - | - | | $ - | (1.1) | (1.1) |
| Trustee and Professional Costs | - | - | (0.5) | - | - | - | - | - | | - | (0.5) | (0.5) |
| Other | - | - | (0.8) | (1.9) | - | - | - | - | | - | (2.7) | (2.7) |
| **Total Wind Down Reserve** | $ - | $ - | (1.6) | (2.7) | - | - | - | - | | $ - | (4.3) | (4.3) |
| **Total Disbursements** | $ (29.8) | $ (5.2) | $ (7.9) | $ (6.8) | $ - | $ - | $ - | $ - | $ - | $ (35.0) | $ (14.7) | $ (49.7) |
| **Net Cash Flow** | $ 5.0 | $ 14.9 | $ 17.9 | $ 75.1 | $ 10.3 | $ 6.4 | $ 5.1 | $ 22.0 | 3.6 | $ 19.9 | $ 140.4 | $ 160.2 |

*Note: Wind-Down Budget assumes any valid Administrative Claims contemplated in the pre-Effective Date period (i.e. DIP Budget) that remain unpaid upon the occurrence of the Effective Date increase or decrease the Administrative / Priority Claims Reserve accordingly.*

*[1] While actual disbursements from the Administrative / Priority Claims Reserve and Wind-Down Reserve amounts are presented as post-Effective Date, both the Administrative / Priority Claims Reserve and the Wind-Down Reserve will be fully funded no later than the Effective Date as part of the flow of funds at closing.*

*[2] Without prejudice to the rights of the Liquidating Trustee to object to any Claim, to the extent that Claims Filed in respect of occupancy-related costs, e.g., including 365(d)(3) obligations, arising under the "Unpaid DIP Admin Claims" line item (collectively, the "Asserted Occupancy-Related Claims") exceed $4.5 million as of the Claims Bar Date, then Specified Receipts as received shall be retained in the*

*Administrative / Priority Claims Reserve in an amount together with amounts already budgeted under the "Unpaid DIP Admin Claims" line item such that the sum of these amounts is equal to 1.5x of the Asserted Occupancy-Related Claims.  The Liquidating Trustee shall maintain this ratio as it reconciles the Asserted Occupancy-Related Claims.*