**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
arosenberg@paulweiss.com
aeaton@paulweiss.com
chopkins@paulweiss.com
smitchell@paulweiss.com

*Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RITE AID, LLC, *et al.*, | Case No. 25-14861 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DEBTORS' OBJECTION TO THE JOINT MOTION OF RAD SUB-TRUST A AND RAD SUB-TRUST B FOR ENTRY OF AN ORDER (I) AUTHORIZING AND DIRECTING THE DEBTORS TO SHARE DATA CONTAINING PROTECTED INFORMATION PURSUANT TO THE 2023 PLAN; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this objection (this "Objection") to the relief requested in the *Joint Motion of RAD*

*Sub-Trust A and RAD Sub-Trust B For Entry of an Order (I) Authorizing and Directing the Debtors*

*to Share Data Containing Protected Information Pursuant to the 2023 Plan; and (II) Granting*

---

[1] The last four digits of Debtor New Rite Aid, LLC's tax identification number are 1843. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid2025. The location of Debtor New Rite Aid, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 200 Newberry Commons, Etters, Pennsylvania 17319.

*Related Relief* [ECF No. 3166] (the "Motion").[2]   In support of this Objection, the Debtors

respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Trusts' Motion seeks to compel the Debtors to accommodate the Trusts' prior

requests for the release of more than 33 trillion fields of patient data, consisting of protected health

information ("PHI"), personally identifiable information ("PII"), and individually identifiable

health information ("IIHI") personal information (collectively, "Patient Data").   Only a tiny

fraction of these patients' data appears potentially relevant to the claims that the Trusts seek to

litigate.

2.      The Debtors have been able to engage in constructive conversations with

Sub-Trust A regarding its more limited and reasonable data requests, which do *not* seek the

turnover of large volumes of raw Patient Data.   The Debtors therefore believe it is possible they

will reach a consensual resolution with respect to the data requested by Sub-Trust A.   However,

Sub-Trust B continues to insist on the dangerous, wholesale turnover of patient prescription

records.   Sub-Trust B—which has no obligations to the patients whose private information is at

issue, is not a healthcare provider, and has not demonstrated that it is capable of securing this data

in line with industry requirements—is seeking to obtain these records in direct contravention of

the limitations put in place to protect patients and minimize unnecessary sharing of Patient Data

under the 2023 Plan documents and Protective Order.[3]   There is no precedent for the transfer of a

data set of this size from an entity regulated by HIPAA to an unregulated entity, nor precedent for

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3]     *See* Sub-Trust B RFP, defined and discussed *infra*.

the Motion's proposed framework that the data would be subject to the discretionary review of the recipient Trusts, which have no fiduciary obligation to the patients in question.

3.       In response to the Debtors' efforts to design an adequate screening and retention protocol, the Trusts have previously stated that they "have limited funds and do not possess the resources required" in order "to pay a third-party to screen for any data to the Trusts which contains Protected Information or Privileged Information."  Mot. at 4.  If this is true, it is clear they cannot be relied upon to manage an enormous volume of sensitive Patient Data that even large-scale healthcare providers struggle to protect.

4.       The Debtors have worked with Sub-Trust A to design a cost-effective resolution, permitting the use of an in-house data vendor subject to the oversight and direction of a court-appointed patient ombudsperson (the "Patient Ombudsperson").  The Debtors believe such a resolution can be achieved within appropriate bounds given the more limited scope of the data Sub-Trust A is requesting.

5.       The Trusts acknowledge that, in the Plan and Confirmation Order, "the Court required the Trusts to request only such PHI as 'reasonably necessary to pursue the Assigned Claims,'" Mot. at 8, but Sub-Trust B now proposes that they be granted unfettered access to PHI and make determinations as to what information is relevant to their claims themselves,[4] without having ever presented any evidence (or argued in their Motion) that the massive quantities of Patient Data they seek is reasonably necessary to pursue the claims assigned to them, and as described *infra*, the express terms of the Cooperation Agreement indicate that no party ever anticipated Sub-Trust B would require or be provided with this data.

---

[4]    While the Proposed Order attached to the Motion requires the turnover of "reasonably necessary" data, Mot. Ex. A at 2, the Trusts evidently wish to make the determination as to what is "reasonably necessary" themselves, without further review of the Debtors, Mot. Ex. A at 5.  This is concerning given Sub-Trust B's broad requests to date, as discussed *infra*.

6.      The Motion suggests that what the Debtors are asking—that the Trusts fund a protocol for the review and filtration of Patient Data by a qualified third party, independent of the Trusts, that undertakes appropriate obligations to protect patient privacy—is new.  It is true that, when the Cooperation Agreement was negotiated, the parties' expectation was that the Debtors would continue in operation and therefore host the data that the Trusts would be permitted to request on their own secure, dedicated systems, and with the benefit of the Debtors' experience in managing their HIPAA obligations.  Given the Debtors' liquidation, the Debtors are no longer capable of doing so in perpetuity.  But it was *always* the parties' understanding—as memorialized in the Cooperation Agreement—that the Trusts would pay the costs of having the Debtors' counsel review the data the Trusts request and filter out any unnecessary PHI to protect patient privacy. The Debtors' position on the necessity of such a process now is entirely consistent with the original protocol the Trusts signed up to.

7.      For the reasons set forth below, the Debtors respectfully ask the Court, if an agreement is reached with Sub-Trust A regarding an appropriate framework, enter an agreed form of Order[5] (a) providing that Sub-Trust A may (i) host limited data responsive to its requests at a vendor affiliated with its counsel upon demonstrating appropriate security certifications and satisfying other HIPAA-related criteria and (ii) receive legally permissible subsets of Patient Data, if any, from within this data set only after an appropriate screening process, all under the oversight of the Patient Ombudsperson, and (b) denying the Motion with respect to Sub-Trust B so as to protect the hundreds of millions of patients whose raw prescription data Sub-Trust B seeks.

---

[5]    The Debtors anticipate that agreeing to a revised form of Order with respect to Sub-Trust A will be feasible prior to the hearing on the Motion, but negotiations remain in process as of the filing of this Objection.

## RELEVANT BACKGROUND

### I.     The 2023 Plan and Confirmation Order.

8.     The Debtors first filed for bankruptcy on October 15, 2023.  On August 16, 2023, the Court entered the 2023 Confirmation Order confirming the 2023 Plan.  *In re Rite Aid Corp.*, No. 23-18993, ECF No. 4532.  Pursuant to the 2023 Confirmation Order, the Debtors transferred the "Litigation Trust Assets" to the Trusts.  The Trusts were obligated to administer such assets to holders of "non-Tort General Unsecured Claims" and holders of "Tort Claims."

9.     Pursuant to the 2023 Confirmation Order, the Debtors were required to "reasonably cooperate" with the Trusts to permit distributions to holders of General Unsecured Claims and Tort Claims.  2023 Confirmation Order at ¶ 116.  The Court recognized that certain PHI and IIHI may need to be disclosed to further this cooperation, such that the Court permitted disclosure of Patient Data pursuant to 45 C.F.R. § 164.512(e)(1)(i).  *Id.* at ¶ 254.  Such disclosure was not unlimited, however: "Recipients [i.e., the Trusts] shall request only such IIHI from the Debtors as reasonably necessary to pursue the Assigned Claims[.]" *Id.* at ¶ 254(a).

10.     The Court also instructed that "Recipients must maintain the privacy and security of all such IIHI in accordance with applicable law and appropriate administrative, technical and physical safeguards." *Id.* at ¶ 254(b).

11.     The 2023 Plan and Confirmation Order also specified that the Debtors' obligation to provide information containing PHI or privileged content is limited to that which is "relevant to the Assigned Claims and Assigned Insurance Rights assigned, transferred, or otherwise vested to or in the [Trusts]," 2023 Plan Art. IV.E.6, and made it clear that the Debtors have a duty to challenge overbroad requests for Patient Data which is not "reasonably necessary to pursue to the Assigned Claims," with any "disagreement between the parties with respect to whether requested

IIHI is 'reasonably necessary'" being subject to resolution by the Bankruptcy Court.  2023 Confirmation Order at 254.

**II.     The Cooperation Agreement.**

12.     In furtherance of their respective obligations, and as contemplated by the 2023 Plan, the parties entered into the Rite Aid Litigation Trust Cooperation Agreement (the "Cooperation Agreement") to further define their respective data sharing rights and obligations and the sharing of costs with respect thereto.[6]

13.     The Cooperation Agreement provides:

> "Upon request by the Trust, the Debtors shall reasonably cooperate by providing access to the Debtors' books, records, and documents related to topics relevant to Assigned Claims, Assigned Insurance Rights, or Tort Claims.  **For the avoidance of doubt, this Agreement does not allow direct access to the Debtors' electronic health records**."

Cooperation Agreement § 1.1(d) (emphasis added); *see also* Protective Order, ECF No. 5588 at 1.1(d) (same).

14.     None of the Cooperation Agreement, the Protective Order negotiated pursuant to the Cooperation Agreement and so-ordered by this Court, the 2023 Plan or the 2023 Confirmation Order [ECF No. 4532] contemplated that all Patient Data would be made available to the Trusts. Rather, at all stages, the relevant agreements and orders contemplated that, consistent with the recognized rules of production of protected health information in litigation set forth in 45 CFR § 164.512, the Trusts would make requests, and the Debtors would review those requests, exclude unnecessary Patient Data consistent with the "minimum necessary" rule, exclude privileged information not relevant to Assigned Claims or Assigned Insurance Rights, and produce the remaining data.  Consistent with this, both the Cooperation Agreement (§ 3.1) and the Protective

---

[6]    A copy of the Cooperation Agreement and its riders and appendices is attached hereto as Annex 1.

Order (¶ 29) specifically contemplate the corrective steps to be taken in the event the Debtors

inadvertently produce privileged information outside of the Assigned Claims.  In other words, the

parties contemplated that not all information would be disclosed.  The 2023 Confirmation Order

itself began with the premise that the Trusts would only seek Patient Data as was "reasonably

necessary," not all Patient Data.[7]  The Cooperation Agreement included the same requirement,

stating that "the [Trusts] shall request no more PHI or [IIHI] from the Reorganized Debtors than

the [applicable Trust] determines is reasonably necessary" to pursue Assigned Claims, Assigned

Insurance Rights, or Tort Claims.  Cooperation Agreement at 1.1(a).

15.    The Cooperation Agreement also specified how the parties were to allocate costs

when identifying what data could be shared: "The Reorganized Debtors shall be promptly

reimbursed by the Trust for reasonable and documented costs and expenses, including (i) costs

associated with allocating time of employees on projects requiring an allocation of employee time

in connection with this Agreement [and] fees and expenses of Professionals . . . incurred in

connection with providing their cooperation hereunder[.]"  Cooperation Agreement § 3.3(a).[8]

16.    The Cooperation Agreement further specified categories of data the Debtors agreed

to conduct searches for and, subject to the other terms of the Cooperation Agreement and the

Protective Order—including the cost-reimbursement and PHI filtration provisions—produce to the

---

[7]    While the Confirmation Order provides that production of Patient Data was required where "relevant" to the
Litigation, that general reference was subject to the qualifier that relevancy was "as described below," and
immediately followed by the requirement that only "reasonably necessary" data be requested.  2023 Confirmation
Order at 254.

[8]    The Cooperation Agreement also specifies certain categories of information for which the Debtors agreed to bear
the costs of review and production.  *Id.* § 3.3(b).  The Debtors believe they have completed the production of all
or substantially all such information—most of it before the present cases were filed—and have communicated
this to the Trusts.  The Trusts have not contested this conclusion.  The Debtors therefore believe that substantially
all the information at issue in the Motion is information with respect to which the Trusts bear the financial burden
of review and production.

Trusts.  For the most part, these records were limited to those generated between 2017 and the conclusion of the Debtors' 2023 bankruptcy.  *Id.* at 16 n.5.

17.    In particular, with respect to Assigned Insurance Rights,[9] the Cooperation Agreement contemplated that the Debtors would search for, review, and produce six discrete categories of information:

(i)    All Documents responsive to insurance-related discovery and informal information requests made in connection with the Debtors' chapter 11 proceedings that were withheld or redacted by the Debtors on the basis of a purported privilege or alleged confidentiality.

(ii)    All invoices from the Debtors' outside counsel or other professionals related to Opioid Claims or other Tort Claims.

(iii)    Documents sufficient to show the Debtors' payment of invoices from outside counsel or other professionals related to Opioid Claims or other Tort Claims, including the payment date, payment amount, invoice number, payor, and payee.

(iv)    Any and all memoranda, analyses, presentations from outside or in-house counsel, or any other work product (whether or not privileged) regarding insurance coverage for Opioid Claims or other Tort Claims.

(v)    All Documents concerning or reflecting the Debtors' satisfaction of any self-insured retentions under the Debtors' Insurance Policies for Opioid Claims or other Tort Claims.

(vi)    Copies of all liability insurance policies of any third party where any Debtor has been listed or otherwise identified as an additional insured, and which may provide coverage relating to the Debtors' marketing, dispensing, and/or sale of opioids and/or other Products that are the subject of any Tort Claims.

*See* Cooperation Agreement at 22-23.  The Cooperation Agreement does not make any reference to the provision of large volumes of unfiltered patient records in connection with the Trusts' pursuit

---

[9]    Sub-Trust B is responsible only for the pursuit of a subset of the 2023 Debtors' "Assigned Insurance Rights" under the 2023 Plan.  *See* Litigation Trust Agreement at 2, *In re Rite Aid Corp.*, No. 23-18993, ECF No. 4793, Ex. I.

of Assigned Insurance Rights, as Sub-Trust B now requests, discussed in connection with the Sub-Trust B RFP *infra*.

### III.    The Data the Trusts Seek to Access.

18.    Sub-Trust A, which is responsible for pursuing both Assigned Claims and certain Assigned Insurance Rights primarily seeks access to emails, corporate governance records, employment records, legal records, and financial records, for purposes of pursuing the Assigned Claims.  The Debtors believe some of these categories of information—particularly, but not limited to, emails—are likely to contain PHI and other Patient Data.  Some of these categories also contain privileged information not relevant to the Assigned Claims.  Given the relatively reasonable scope of Sub-Trust A's requests relative to the claims previously assigned to it, and because Sub-Trust A does not seek the turnover of any raw Patient Data, the Debtors and Sub-Trust A have been able to negotiate constructively and anticipate reaching an agreement with respect to a screening and production protocol.  Any agreement will reflect the Debtors' strongly-held view that, even though Sub-Trust A does not seek the turnover of any Patient Data, data requests must be screened to ensure that Patient Data is unlikely to be advertently produced or, if any such Patient Data is produced, that it is securely stored and administered in compliance with HIPAA.

19.    Sub-Trust B, which is responsible only for the pursuit of a subset of Assigned Insurance Rights, has requested, among other things, access to the Debtors' entire structured data set for all Rite-Aid patient prescriptions that were maintained electronically since 1999—more than 33 trillion data fields, all of which is, by definition, Patient Data—for purposes of pursuing the Assigned Insurance Rights.  Sub-Trust B has been explicit in demanding that any data produced *not* be subject to the review and designation requirements of the Protective Order.  Specifically, Sub-Trust B recently served the Debtors with a subpoena with document requests including, *inter*

*alia*, "[a]ll opioid prescriptions filled or issued by Rite Aid, ***whether or not those Documents contain PHI/PII or You contend they are subject to some other privilege***." The fulsome *Rite Aid Sub-Trust B's Request for Production of Documents to New Rite Aid, LLC* (the "Sub-Trust B RFP") is attached hereto as Annex 2. Requests 4-7 include the same demand that the Debtors disclose information "whether or not those Documents contain PHI/PII or [the Debtors] contend they are subject to some other privilege."

20.     In total, the Debtors estimate this raw prescription data comprises approximately 305 terabytes. As described *infra*, Sub-Trust B has not agreed to any of the Debtors' proposals regarding an adequate independent screening process for the relevance or, with respect to Patient Data, necessity, of the massive swaths of information requested. Sub-Trust B has also not offered the Debtors any evidence that its proposed data vendor could securely store, let alone review or screen, this quantity of sensitive information. Accordingly, the Motion should be denied with respect to Sub-Trust B and, in the absence of a proposal which at least comports with applicable law and the terms of the 2023 Plan documents and Cooperation Agreement, the Debtors should be permitted to destroy Patient Data in accordance with the Data Retention Plan.[10]

**IV.     The Trusts' Proposals for Maintaining Data Security.**

21.     The Debtors have continued to discuss what they view as an acceptable framework for managing Patient Data with the Trusts. The Debtors have maintained over the course of these (at least) months-long discussions that, on account of the Debtors' impending wind-down, a qualified third party would need to be identified to conduct the Patient Data review and analysis of trust data requests required under the Cooperation Agreement, 2023 Plan documents, and Protective Order, and that any vendor retaining this sensitive data would need to demonstrate that

---

[10]     *Notice of Filing of First Amended Plan Supplement* [ECF No. 3305] at Ex. H.

it could securely store and reliably screen it, concerns exacerbated by the massive quantities of data requested in, *e.g.*, the Sub-Trust B RFP. These requirements are consistent with applicable law and the Protective Order.[11] The Debtors have also been consistent in their position that, irrespective of whether their chapter 11 cases resulted in confirmation of a plan, no funds would be available to pay for this retention and screening, and that the Trusts would need to bear the associated costs.

22.      The Debtors have also consistently maintained that, given their radically changed circumstances subsequently to confirmation of the 2023 Plan and entry of the Protective Order, they lacked the personnel and other resources required to conduct the necessary review of the massive data sets collectively requested by the Trusts discussed *supra*. The response from the Trusts, instead of identifying any *bona fide* third-party data custodian that is equipped to reliably and securely host and review the applicable data, has been to repeatedly insist (as they do in the Motion) that the Debtors simply turn the requested data over to the Trusts' counsel directly, without screening and secure retention that they cannot, or will not, pay any third-party provider to conduct.

23.      As discussed *supra,* the Debtors believe they will reach an agreed resolution which provides for adequate safeguarding and screening of any Patient Data that may be contained within the categories of information Sub-Trust A seeks. Sub-Trust B, however, has not shown that its proposed data vendor has obtained industry-recognized certifications ordinarily required of entities that host large volumes of PHI, such as ISO, SOC 2 or HITRUST, and neither Sub-Trust B nor its counsel owes any discernable duties to the Debtors' former patients.[12] Under applicable law,

---

[11]    *See, e.g.,* Protective Order at 7.c, requiring a "reasonable review for PHI or Other Individually Identifiable Health Information Material."

[12]    As noted *supra*, the Debtors have attempted to negotiate a solution permitting the Trusts' counsels or their affiliated data retention vendors to store the raw data while preserving the ability for a *bona fide* Patient Data

however, the Debtors do owe these patients a duty not to indiscriminately produce their Patient

Data. Sub-Trust B's repeated requests that the Debtors turn over hundreds of terabytes of Patient

Data to the Trusts wholesale, without adequate (or any) review, is thus not only inconsistent with

the terms of the 2023 Plan documents and Cooperation Agreement (none of which are, at this

point, valid sources of authority which are enforceable against the Debtors as discussed *infra*), but

also in conflict with applicable law intended to safeguard the privacy of the Debtors' prior patients.

## LEGAL ARGUMENT

24.      The Court should sustain this Objection and deny the relief sought in the Motion.

*First*, because the 2023 Plan, 2023 Confirmation Order, and Cooperation Agreement are

unenforceable against the Debtors as set forth in the *Debtors' (I) Memorandum of Law in Support*

*of (A) Final Approval of the Disclosure Statement and (B) Confirmation of the Second Amended*

*Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates and (II)*

*Omnibus Reply to Objections Thereto* [ECF No. 3298] (the "Confirmation Reply") in section IV.C

thereof.  *Second*, because the relief requested in the Motion would require the Debtors to share

Patient Data in contravention of applicable law and far in excess of the retention and production

contemplated under the Cooperation Agreement, the Protective Order, the 2023 Plan, and the 2023

Confirmation Order.

### I.      The 2023 Plan, 2023 Confirmation Order, and Cooperation Agreement are Unenforceable Against the Debtors on Account of These Chapter 11 Cases.

25.      The Debtors' arguments set forth in section IV.C of the Confirmation Reply with

respect to these issues are incorporated by reference as though fully set forth herein. To the extent

the applicability or strength of the Debtors' positions with respect to the unenforceability of the

---

screening process for data requests under the oversight of a patient ombudsperson; this proposal was rejected by
the Trusts.

2023 Plan, 2023 Confirmation Order, and Cooperation Agreement have changed, they have been buttressed by the intervening confirmation of the Plan and approval of the Data Retention Plan.[13]

26.    As demonstrated by the months'-long discussions the Debtors' advisors have engaged in with the Trusts, including the resolution of the Trusts' confirmation objection and subsequent efforts to reach a consensual resolution with respect to the Motion, the Debtors are not seeking to completely deny the Trusts access to requested information on this basis. However, to the extent a consensual resolution cannot be reached, the Trusts' efforts to force the Debtors' estates to incur potential liability for transferring sensitive patient data solely on the basis of these documents (and no other legal authority is cited) are inappropriate as a matter of bankruptcy law for the reasons set forth in the Confirmation Reply.

**II.    The Trusts' Proposed Order Does Not Comply with HIPAA.**

27.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Clinical and Economic Health Act ("HITECH"), is the federal health privacy law governing the authorized uses, disclosures, and acquisitions of PHI and IIHI. 42 U.S.C. § 1320(d) *et seq.*; 45 C.F.R. §§ 160 and 164. HIPAA itself is bifurcated into three distinct rules, the Privacy Rule (45 C.F.R. § 160 and Subparts A and E of § 164), the Security Rule (45 C.F.R. § 160 and Subparts A and C of § 164) and the Breach Notification Rule (45 C.F.R. §§ 164.400-414).

28.    The Privacy Rule details which entities are regulated by HIPAA, what information is protected, and how that information can be used and disclosed. Specifically, HIPAA imposes strict privacy, security, and breach notification requirements on covered entities and their business

---

[13]    Each as defined in the *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Technical Modifications)* [ECF No. 3445].

associates.  45 C.F.R. §§ 164.102-103.  A "covered entity" is a health plan, a health care clearinghouse, or a health care provider who transmits health information in electronic form in connection with a HIPAA-covered transaction.  45 C.F.R. § 160.103.  A "business associate" is a person who, on behalf of a covered entity, creates, receives, maintains, or transmits PHI for a function regulated under HIPAA.  *Id.*  Such functions include claims processing, data analysis, processing or administration, utilization review, quality assurance, patient safety activities, billing, and others.  *Id.*  Once a covered entity or business associate controls, possesses, or has access to PHI, then HIPAA (or more stringent state privacy law, as applicable) governs all subsequent uses of that PHI.  45 C.F.R. §§ 160.203(b) and 164.502(a).

29.     All of the Patient Data here was, in the first instance, held or controlled by Rite Aid Corporation ("Rite Aid") or one of its affiliates.  Rite Aid is a HIPAA-covered entity, and its affiliates are either independently covered entities or business associates of Rite Aid.  Such data has been held and maintained consistent with the Security Rule, ensuring the data was subject to appropriate administrative, physical, and technical safeguards.

30.     A primary HIPAA concept is that absent an authorization compliant with 45 C.F.R. § 164.508 or a specific exception to the Privacy Rule applies, only the minimum necessary PHI may be produced to satisfy a specific request for PHI.  45 C.F.R. §§ 164.502(b) and 164.514(d). Even with a court order, a covered entity may only produce PHI "expressly authorized" by the order.  45 CFR § 164.512(e)(1)(i).  While the 2023 Confirmation Order authorizes the disclosure of Patient Data which is (a) "reasonably necessary" and (b) responsive to requests which were made in good faith as related to the litigation assigned to the requesting Trust,[14] comparing the "minimum necessary" and "reasonably necessary" standards is, with respect to the Sub-Trust B

---

[14]   2023 Confirmation Order at 254.

requests (including as expressly set out in the Sub-Trust B RFP) a distinction without a difference: the massive swaths of Patient Data requested by Sub-Trust B are neither reasonably nor minimally necessary to the Assigned Insurance Rights which Sub-Trust B is responsible for prosecuting, nor has Sub-Trust B attempted to make a showing otherwise. This "minimum necessary rule" both protects individual patients from overbroad requests for their PHI, and also protects all patients at a covered entity from intrusive requests for their PHI when an applicable exception to produce it does not apply; the "reasonably necessary" terminology used in the 2023 Confirmation Order should be construed narrowly as intending to have a consistent effect. *See* 45 C.F.R. §§ 164.502(b) and 164.514(d).

31.    The Court's Protective Order is consistent with this approach. 2023 Cases ECF No. 5588 ¶¶ 10-16, 18. The Court specifically notes that Patient Data requires "special protection from disclosure" such that parties receiving Patient Data "must maintain the privacy and security of [such data] received pursuant to this order **in accordance with applicable law and appropriate administrative, technical, and physical safeguards.**" *Id.* ¶ 18. When such information is sent, disclosed, or shared, "the Trust shall review the document . . . and shall ensure any such filing, quotation, sending, disclosing, or sharing involves the minimum [data] necessary[.]" *Id.* And when Patient Data released to the Trust needs to be filed in court, such data must be filed "under seal with any court" and include "only the minimum [data] necessary for the purpose of the Litigation[.]" *Id.* at ¶ 16.

32.    That is to say, even when Patient Data is released to the Trusts, there must be a mechanism to protect patient privacy for all of the individuals whose Patient Data is not relevant to an Assigned Claim or an Assigned Insurance Right. The Debtors have consistently expressed this, which has resulted in the ongoing negotiations about how the data would be kept securely and

privately after the Debtors' wind down, and who would be responsible for filtering the data, so that the resulting narrow dataset could be produced to the Trusts consistent with patient privacy requirements central in both HIPAA and state medical privacy laws.

33.    The Motion asks this Court for an exception to its prior orders and HIPAA because the Trusts have "limited funds and do not possess the resources" to pay a qualified third party to protect the information they seek.  Mot. at 4.  That fact—that maintaining appropriate security measures and hiring a third-party vendor to appropriately manage the data is too expensive—is the primary reason the data should be destroyed in accordance with the Debtors' proposed Data Retention Plan if the Trusts cannot demonstrate that they have identified and are willing to pay for (a) a vendor qualified to host the massive quantities of sensitive data requested and (b) an arrangement in which that vendor can reasonably take positions adverse to the Trusts for purposes of complying with the screening and necessity requirements of the Protective Order and 2023 Confirmation Order.  The Debtors have sought to accomplish this, and as noted throughout, anticipate reaching a consensual resolution with Sub-Trust A that permits it to access the information it needs in a manner protective of patient rights and in accordance with applicable law; Sub-Trust B, however, has rejected the Debtors' proposals to ensure the security of raw Patient Data, in each case because these proposals were deemed to be too expensive.  If the Trusts have neither the funding nor framework to appropriately handle this data, the Court should not order it to be turned over because such a production imperils millions of patients' personal information. The Trusts do not, and cannot, cite to any legal authority standing for the proposition that their interest in Patient Data supersedes the privacy interests of the patients protected by HIPAA.

34.    The Patient Data includes sensitive information for tens of millions of Americans, the vast majority of whom will have no say in the outcome of the bankruptcy, let alone this motion.

Allowing either Trust to access this data without notice, opportunity to object, and without reasonably expected safeguards designed in accordance with applicable law would be an impermissible intrusion upon patients' privacy rights.

### III.    The Debtors Have Proposed Two Potential Solutions.

35.    Operationally, even if the Court ordered the data to be turned over to the Trusts, there are numerous steps that must occur to secure the data.  The volume of data at issue–more than 305 terabytes in total—is far more than the Trusts can independently review or manage.  Even large law firms would typically balk at hosting the amount of data held by the Debtors from a firm governance perspective.  Only by working with an experienced and certified third-party vendor (or, with respect to the more limited data Sub-Trust A requests, a Patient Ombudsperson) may the data be appropriately stored in a secure manner and reviewed and released appropriately so the Trusts may receive the data in accordance with the Court's prior orders and HIPAA.  Alternatively, if the Trusts insist that they cannot obtain the data in a HIPAA-compliant manner, then the data should be destroyed to ensure that the non-parties' privacy remain intact in accordance with the Data Retention Plan.

### A.    The Trusts Must Engage an Appropriate HIPAA-Compliant Vendor to Satisfy this Court's Prior Orders and HIPAA.

36.    While destruction of the data is the best solution from a patient privacy and security perspective, if the Court orders production of the dataset, there are a number of important steps that should be outlined in the Court's Order; the Debtors anticipate reaching agreement with Sub-Trust A regarding the terms of such an order regarding Sub-Trust A's data requests, which will be provided to the Court if so.

37.     Any such order should require the recipient Trusts to have a vetted and appropriate vendor to receive and evaluate the Patient Data, acting as a *de facto* business associate, to protect for patient privacy and security.

38.     Although the vendor would not be a "business associate" of the Trusts in a technical sense, because the Trusts are not regulated by HIPAA, the Court should require that the vendor meet all of the obligations of a qualifying business associate (*e.g.*, maintaining industry-standard data security protocols).   Likewise, the Trusts should be subject to all applicable breach notification requirements if there is a privacy or security event that would qualify as a reportable breach had it been done by the Debtors in the first instance.

39.     The Trusts have previously insisted that utilizing an independent third-party would be prohibitively expensive, and, as in months past, instead continued to demand that data be turned over directly to the Trusts' counsel or affiliated vendors.   This is unworkable as proposed in the Motion:  any requirement that the vendor (or, as the Trusts proposed in the Motion, the Trusts themselves) be responsible for screening and evaluating the Trusts' requests as limited to "reasonably necessary" to pursue the relevant litigation is meaningless if the relevant party cannot take an adverse position to the Trusts.   In seeking to accommodate the Trusts' need to use their counsel or affiliated parties to host data inventory, the Debtors have suggested that the Patient Ombudsperson be appointed to act as an independent third-party reviewing the Trusts' data requests and ensuring Patient Data is appropriately excluded from what is produced to the Trusts; to ensure the integrity of the process, any affiliated vendor would be required to take instruction

from the Patient Ombudsperson and not from the Trusts or their counsel.[15]  Sub-Trust A has

engaged constructively on this proposal; it was rejected by Sub-Trust B.

40.     In all events, the Trusts should bear the costs of this arrangement, and the Debtors

understand that pending resolution of other issues, Sub-Trust A may be amenable to reimbursing

costs incurred in connection with a third-party review and screening process; Sub-Trust B has

refused to do so.  The Trusts have already committed to bearing the costs related to the review of

data shared pursuant to the Cooperation Agreement, subject to inapplicable exceptions.

Specifically, as discussed *supra*, the Trusts must bear "costs associated with allocating time of

employees on projects requiring an allocation of employee time in connection with this Agreement

[and] fees and expenses of Professionals . . . incurred in connection with providing their

cooperation hereunder[.]"   Cooperation Agreement at § 3.3(a).   More fundamentally, any

incremental step taken beyond the safest and most cost-effective solution—near-term destruction

of this data—would be undertaken for the Trusts' benefit.

> **B.     The Data Retention Plan Provides the Trusts with Ample Time to Formulate
> Alternative Proposals Prior to the Destruction of Data.**

41.     If Sub-Trust B is unwilling or unable to pay a vendor to provide security safeguards

for the Patient Data, then the data should be destroyed, as contemplated in the Debtors' Data

Retention Plan.  Denial of the Motion is not, of course, the equivalent of an order requiring that

the relevant data be destroyed immediately:  through the consensual resolution of the Trusts'

objection to confirmation of the Plan, the Debtors and Trusts were able to agree on a framework

for the Data Retention Plan providing for the cost-free retention of the relevant data until February

1, 2025.  Sub-Trust B (and, if a resolution is not reached with respect to Sub-Trust A, Sub-Trust

---

[15]   To be clear, the Debtors consider even this framework to be insufficient for the safe management of the raw
prescription records Sub-Trust B seeks.  Thus, Sub-Trust B's requests cannot be accommodated under any
framework unless they are narrowed dramatically.

A as well) has ample time to continue to work towards an acceptable solution.  The wholesale, direct turnover contemplated in the Motion, however, is unacceptable.

## **RESERVATION OF RIGHTS**

42.      The Debtors continue to review the arguments raised by the Motion, as well as any associated discovery sought or evidence adduced in connection with this Objection.  The Debtors accordingly reserve all rights to amend or modify this Objection and present additional evidence and legal argument at any hearing this Court holds to consider the Motion.

## **CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that the Court (a) sustain this Objection, (b) deny the relief sought in the Motion, and (c) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

20

Dated:  December 3, 2025

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:      arosenberg@paulweiss.com
            aeaton@paulweiss.com
            chopkins@paulweiss.com
            smitchell@paulweiss.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## **Annex 1**

Cooperation Agreement

*EXECUTION VERSION*

## RITE AID LITIGATION TRUST COOPERATION AGREEMENT

  In connection with the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Technical Modifications)* [Dkt. No. 4352, Exh. A], dated August 15, 2024, including all exhibits and schedules thereto, and as the same may from time to time be supplemented, amended, or modified, and as confirmed (the "**Plan**") by order of the U.S. Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), this agreement (the "**Agreement**") is made, effective as of the Effective Date of the Plan, by and among (i) the Master Trust (the "**Trust**"), and any GUC Sub-Trusts established under the Plan, including Sub-Trust A and Sub-Trust B,[1] and (ii) Rite Aid Corporation and its affiliates that are debtors-in-possession or, post-Effective Date, Reorganized Debtors or Wind-Down Debtors as applicable (collectively, the "**Debtors**") (each a "**Party**" or collectively the "**Parties**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

### RECITALS

  **WHEREAS**, Article IV.E.3. of the Plan contemplates that a Litigation Trust Cooperation Agreement will be executed among the Parties;

  **WHEREAS**, pursuant to Article IV.E.6. of the Plan, the Debtors shall provide reasonable cooperation necessary to (a) maximize the value of the Assigned Claims, (b) prosecute the Assigned Insurance Rights, and (c) reconcile and administer Tort Claims, as more fully set forth in Article IV.E.6 and herein;

  **WHEREAS**, pursuant to the Plan and Confirmation Order, this Agreement has been ordered and approved by the Bankruptcy Court as a binding court order; and

  **WHEREAS**, in consideration of the above-stated premises, the mutual covenants contained herein, and for good and valuable consideration, the Parties agree as follows:

### ARTICLE I
### TRANSFER OF CLAIM RECORDS

**Section 1.1**.

  a. The Debtors shall use reasonable efforts to collect, copy, and transfer to the Trust (and/or applicable GUC Sub-Trust), Documents[2] or information requested by the Trust under the terms of this Agreement that are relevant to pursue and/or litigate any Assigned Claims and/or Assigned Insurance Rights or to reconcile and administer Tort Claims (collectively, Documents and information transferred under this Agreement are "**Claim Records**"). The Trust (and/or applicable GUC Sub-Trust) shall request no more PHI[3] or other individually identifiable health information (collectively "**IIHI**")

---

[1] References to the Trust include reference to any GUC Sub-Trusts.

[2] "**Document**" refers, as applicable, to documents, communications, and physical evidence that is in the possession, custody, or control of the Debtors, including reasonably available metadata associated with such documents.

[3] "**PHI**" or "**protected health information**" shall have the same definition as "protected health information" as set forth in 45 C.F.R. § 160.103 and includes, but is not limited to, names, addresses, prescription numbers, health plan

*EXECUTION VERSION*

      from the Reorganized Debtors than the Trust (and/or the applicable GUC Sub-Trust) determines is reasonably necessary to address, pursue and/or litigate any Assigned Claims, Assigned Insurance Rights, or Tort Claims, and the Parties will otherwise confer in the manner described in paragraph 254 of the Confirmation Order.

b.    The Debtors shall conduct a reasonable search for and, if identified by that reasonable search, transfer the Claim Records identified on **Exhibit A** hereto reasonably promptly. The Debtors will confer with the Trust about the parameters for the review and/or production of Claims Records identified on Exhibit A and the time and expenses associated with that work.

c.    The Debtors also shall conduct a reasonable search for and, if identified by that reasonable search, transfer the Claim Records identified on **Exhibit B** hereto reasonably promptly. The Debtors will confer with the Trust about the parameters for the review and/or production of Claims Records identified on Exhibit B and the time and expenses associated with that work.

d.    Upon request by the Trust, the Debtors shall reasonably cooperate by providing access to the Debtors' books, records, and documents related to topics relevant to Assigned Claims, Assigned Insurance Rights, or Tort Claims. For the avoidance of doubt, this Agreement does not allow direct access to the Debtors' electronic health records.

e.    Upon request by the Trust, the Debtors shall reasonably cooperate by proposing search parameters (which, depending on the request, may include search terms and custodians and/or ad hoc document criteria) designed to reasonably identify and collect Claim Records (including electronically stored information ("**ESI**")) relevant to Assigned Claims, Assigned Insurance Rights, or Tort Claims. In searching for Claim Records in response to a request under this Agreement, the Debtors shall reasonably consult with available, relevant personnel to attempt in good faith to identify and propose search parameters to reasonably identify the requested information.

f.    For Claim Records related to the Assigned Claims, the Trust shall have one year after the Effective Date to make requests to the Debtors for relevant Documents and information (including ESI), which period of time can be extended by either consent of the Debtors, which shall not be unreasonably withheld, or an order of the Bankruptcy Court. The Debtors shall use methods designed to minimize the costs of collection, production, and export of such Claim Records (including, non-exclusively, (i) the procedures for collection and production of ESI, as set forth in Section 1.3(e) of this Agreement, and (ii) the procedures for production of PHI and IIHI, described in paragraph 254 of the Confirmation Order), and to enable productions in response to the Trust's requests to be made reasonably promptly.

---

numbers, and dates related to an individual, other than year, such as the date of dispensing. The Parties acknowledge that PHI is IIHI that is protected under the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act of 2009 (together with their implementing regulations, "**HIPAA**"), including, for example, customer pharmacy records and claims information.

*EXECUTION VERSION*

g. For Claim Records known or reasonably believed to be relevant to the Assigned Insurance Rights or Tort Claims, the Debtors shall take commercially reasonable measures to preserve Documents and information (including ESI) for a period of five years following the Effective Date, which period of time can be extended by either consent of the Debtors, which shall not be unreasonably withheld, or an order of the Bankruptcy Court. The Debtors shall use methods designed to minimize the costs of collection, production, and export of such Claim Records (including, non-exclusively, (i) the procedures for collection and production of ESI, as set forth in Section 1.3(e) of this Agreement, and (ii) the procedures for production of IIHI described in paragraph 254 of the Confirmation Order), and to enable productions in response to the Trust's requests to be made reasonably promptly.

h. To the extent that Claim Records alone are insufficient to respond to requests for discovery made to the Trust or Sub-Trusts in any action or proceeding litigating the Assigned Claims or Assigned Insurance Rights by other parties to such proceedings, such other parties may seek discovery directly from the Debtors and the Debtors shall use reasonable efforts to search, collect, and produce additional Documents, information and/or ESI in order to aid the Trust in sufficiently responding to such discovery requests, in the same manner the Trust would be required to do so with respect to its own documents, subject to any otherwise applicable evidentiary objections.

i. For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Trusts shall not be liable for any costs associated with the provision of the register of General Unsecured Claims, including Tort Claims, or any costs associated with providing the Trusts access to the proof of claim documents related to General Unsecured Claims, including Tort Claims, as set forth in the Confirmation Order.

j. Each of the foregoing subsections (a) through (g) are subject to the cost-reimbursement obligations of the Trust.

k. All Parties' objections, contentions, and arguments regarding relevance, burden, and privilege are preserved; *provided, however*, that the obligation to cooperate to maximize the value of the Assigned Claims and prosecute the Assigned Insurance Rights shall be paramount.

**Section 1.2**. The Debtors shall take reasonable measures to preserve, or cause to be preserved, unless and until they are transferred to the Trust or GUC Sub-Trust, Documents or information (including ESI) known or reasonably believed to be relevant to the Assigned Claims, Assigned Insurance Rights, and/or Tort Claims for a period of five years following the Effective Date, subject to the Trustees' ability to seek extensions to the preservation period from the Debtors, which shall not be unreasonably refused by the Debtors, or by Bankruptcy Court order. This shall include Documents or information subject to a litigation hold in prepetition litigation related to (i) any Tort Claim, (ii) any other General Unsecured Claim, or (iii) any Assigned Claim.

3

*EXECUTION VERSION*

**Section 1.3**.  Privileged and/or Confidential Materials

a.  Any attorney-client privilege, work-product protection, mediation privilege, or other privilege, protection, or immunity ("**Privilege**") relevant to the Assigned Claims or Assigned Insurance Rights or Tort Claims (the "**Privileged Materials**") shall be extended to and shared with the Trust and GUC Sub-Trusts as of the Effective Date.[4] Subject to Section 1.4 of this Agreement, this extension of Privileges encompasses Privileges held by any of the Debtors, including any predecessors, committees or sub-committees, or other designated entities or persons related to the Debtors.  This provision and the extension of such Privileges constitutes agreement that the Trust and GUC Sub-Trusts are the successor in interest to the Debtors solely with respect to the Assigned Claims, Assigned Insurance Rights, and Tort Claims and that there is otherwise a common legal interest between the Debtors and the Trust and GUC Sub-Trusts with respect to the Assigned Claims, Assigned Insurance Rights, and Tort Claims in connection with the sharing of and provision of access to Claim Records to the extent they are protected by any Privilege, including for purposes of confidentiality restrictions.  The Trust's or any GUC Sub-Trust's receipt of any Privileged Materials shall be without waiver and in recognition of the successorship interest in prosecuting Assigned Claims or Assigned Insurance Rights and/or reconciling and administering Tort Claims on behalf of the Debtors' Estates.

b.  Any rights to Claim Records containing confidential or highly confidential information, including IIHI, or other materials containing IIHI ("**Confidential Materials,**" and together with Privileged Materials "**Protected Materials**"), shall be extended to and shared with the Trust and GUC Sub-Trusts as of the Effective Date, provided the sharing is otherwise consistent with applicable law; for the avoidance of doubt, the Parties acknowledge that such extension and sharing of rights is consistent with HIPAA for uses and disclosures of PHI made pursuant to relevant orders of this Bankruptcy Court.  This extension of rights encompasses rights held by any of the Debtors, including any predecessors, committees or sub-committees, or other designated entities or persons related to the Debtors.  This provision and the extension of such rights constitutes agreement that the Trust and GUC Sub-Trusts are the successor in interest to the Debtors solely with respect to the Assigned Claims, Assigned Insurance Rights, and Tort Claims.

c.  For the avoidance of doubt, the Debtors, on the one hand, and the Trust and GUC Sub-Trusts, on the other hand, shall share ownership of all applicable Privileges that may attach to the Privileged Materials shared pursuant to this Agreement and shall reasonably consult with one another with respect to the potential waiver of any

---

[4] None of the Debtors or the Reorganized Debtors or the Debtors' Personnel (as defined below) shall be liable for violating any confidentiality or privacy protections as a result of transferring Claim Records or other books and records to the Trust and/or any GUC Sub-Trusts.  The Debtors and the Reorganized Debtors shall only disclose IIHI (including PHI) to the Trust and/or any GUC Sub-Trusts pursuant to paragraph 254 of the Confirmation Order, and the Recipients shall handle IIHI so received in accordance with paragraph 254 of the Confirmation Order and the Protective Order as defined herein.

privilege, including, without limitation, in accordance with the terms of Section 1.3(f) of this Agreement.

d.   For the avoidance of doubt, if the Trust or any GUC Sub-Trust is ordered to disclose any Protected Materials by any court over the Trust's or any GUC Sub-Trust's objection (and the Trust and GUC Sub-Trust otherwise complied with Section 1.3(f) of this Agreement), then it shall not be a violation of this Agreement for the Trust or GUC Sub-Trust to comply with such order.  In the event the Trust or any GUC Sub-Trust becomes aware that a motion has been or is expected to be filed seeking disclosure of any Protected Materials, the Trust or GUC Sub-Trust shall promptly notify the Debtors in accordance with this Agreement.

e.   ***Potential Privilege Procedures***.  In order to expedite the efficient transfer of Claim Records, the Debtors shall utilize reasonable methods, including metadata, to identify and minimize the cost of producing ESI that may be subject to a Privilege.  Such Claim Records will be transferred with Bates-stamps or other labels that identify them as "**Potentially Privileged Materials**."  Before disclosing, citing, quoting, summarizing, communicating, or otherwise sharing any Potentially Privileged Materials outside the Trust, the Trust or GUC Sub-Trust shall notify and consult with the Debtors regarding whether the Claims Records in question may be subject to a Privilege.  No Potentially Privileged Materials can be disclosed to third parties without the Debtors' express written consent, which the Debtors cannot unreasonably withhold, or an order from the Bankruptcy Court.  To the extent there are Claims Records that are not stamped Potentially Privileged Materials but a Professional of the Trust or GUC Sub-Trust reasonably believes there may be a Privilege claim regarding such Claim Records, the Trust or GUC Sub-Trust also shall confer with the Debtors about such Claim Records. For the avoidance of doubt, nothing in this subsection restricts or limits the ability of the Trust or any GUC Sub Trust to use any Potentially Privileged Material for internal analysis; this subsection applies only to disclosing, citing, quoting, summarizing, communicating, or otherwise sharing any Potentially Privileged Materials with third parties outside of the Trust or GUC Sub-Trust and their Professionals.

f.   ***Use of Privileged or Potentially Privileged Materials***.  Pursuant to this subsection, if the Trust or any GUC Sub-Trust intends on disclosing, citing, quoting, summarizing, communicating, or otherwise sharing Privileged Materials or Potentially Privileged Materials with anyone other than the Trust and GUC Sub-Trust and their Professionals, it shall give the Debtors at least thirty (30) Business Days' prior notice (unless exigent circumstances do not afford time for such notice, in which case the Trust or GUC Sub-Trust shall provide as much notice as reasonably possible) of (a) the Privileged Materials or Potentially Privileged Materials to be disclosed, cited, quoted, summarized, communicated, or shared; (b) the intended recipients of such disclosure; and (c) the purpose for such disclosure (collectively, (a)-(c) constitute "**Privilege Disclosure Notice**").  The Privilege Disclosure Notice shall identify the response deadline consistent with this paragraph.  Following receipt of the Privilege Disclosure Notice, the Debtors' consent to disclosure shall not be unreasonably withheld.  To the extent the Debtors do not respond within fifteen (15) days of receipt of the Privilege Disclosure Notice, or respond within fifteen (15) days of receipt of the Privilege

Disclosure Notice but indicate that they do not consent to the disclosure described in the Privilege Disclosure Notice, then either the Trust, any GUC Sub-Trust, or the Debtors may file a motion to enforce this Agreement or for a protective order in the Bankruptcy Court, and such issue shall be resolved by the Bankruptcy Court before the Privileged Materials or Potentially Privileged Materials are used or disclosed to third parties.  In connection with such a motion, the Trust, any GUC Sub-Trust, and/or the Debtors may submit the Privileged Materials or Potentially Privileged Materials referenced in the Privilege Disclosure Notice to the Bankruptcy Court for review *in camera* in connection with deciding the motion.  The foregoing sentence is without prejudice to any Party's right to contest whether *in camera* review and/or consideration of the at-issue materials by the Bankruptcy Court is appropriate.

g.  The Trust and/or the GUC Sub-Trust will maintain Claim Records produced and identified by the Debtors as Privileged Materials and Potentially Privileged Materials in a segregated location and/or document workspace at the cost of the Trust.

h.  For the avoidance of doubt, nothing in this Agreement limits or reduces the Parties' obligations with respect to discovery under applicable law, including any obligation to produce documents responsive to discovery requests served in any action or proceeding litigating the Assigned Claims and/or Assigned Insurance Right and to sufficiently identify documents withheld for privilege and the basis for withholding them.

**Section 1.4**.    To the extent any Claim Records shareable with the Trust are in the physical possession of a third party and not also in the possession of the Debtors (and the Debtors agree they are Claim Records shareable with the Trust), the Debtors shall provide reasonable cooperation and not unreasonably withhold consent to enable the Trust or GUC Sub-Trusts to obtain such Claim Records from the third party for the purposes set forth in Section 1.6 of this Agreement; provided that, to the extent Privileged Materials are shared between or among the Debtors and a third party pursuant to the protections of common interest or similar doctrine, the Debtors will use reasonable efforts to transfer such Claim Records to the Trust or GUC Sub-Trusts in accordance with, and subject to, the other provisions in this Agreement and any applicable protective orders.

**Section 1.5**.    To the extent that any Claim Records are subject to a protective order or other confidentiality restriction, the Debtors shall produce such requested productions to the extent permitted by, and subject to, any applicable protective orders or confidentiality restrictions, and shall undertake reasonable efforts to facilitate such production or to obtain any requisite consent; *provided*, *however*, that for purposes of any protective order or confidentiality restriction, the Debtors shall use methods designed to minimize the costs of collection, production, and export of such Claim Records, subject to applicable law.

**Section 1.6**.    Subject to the provisions on Privileged Materials in Section 1.3 above, the Trust or GUC Sub-Trusts shall use any Claim Records that are provided by the Debtors pursuant to this Agreement solely for the purposes of (i) processing, evaluating, defending, resolving, liquidating, and/or paying the General Unsecured Claims (including Tort Claims); (ii) investigating, preserving, prosecuting, and resolving the Assigned Claims or Assigned Insurance Rights; (iii) responding, at the Trust's or GUC Sub-Trust's reasonable discretion and consistent with applicable law and protective orders, to third-party requests for Documents in

*EXECUTION VERSION*

connection with the reconciliation and administration of the General Unsecured Claims (including Tort Claims); (iv) responding, at the Trust's or GUC Sub-Trust's reasonable discretion, to requests for Documents made by holders of General Unsecured Claims (including Tort Claims) ("**Claimants**") subject to entry of a qualified protective order that complies with 45 C.F.R. § 164.512(e)(1)(v) ("**Qualified Protective Order**"); and (v) responding, at the Trust's or GUC Sub-Trust's reasonable discretion and consistent with applicable law, to requests for Documents and/or other discovery arising in any action or proceeding in pursuit of the Assigned Claims or Assigned Insurance Rights. The Parties shall use their best efforts to agree upon the form of a Qualified Protective Order on or before September 12, 2024, after which point any Party may seek relief from the Bankruptcy Court for the entry of a Qualified Protective Order.

Section 1.7.    After the Effective Date of the Plan, at the time of the transfer of any Claim Records, the Debtors will provide the Trust with a factually accurate declaration that establishes, to the greatest extent practicable, the authentication of the Claim Records that were in the Debtors' possession, custody, or control. The Trust or GUC Sub-Trust may make further reasonable requests to the Debtors to authenticate certain Claim Records, which authentications the Debtors will provide in good faith so long as reasonably practicable. Authentication requests are subject to the Trust's cost-reimbursement obligations set forth in this Agreement.

Section 1.8.    The Parties each hereby authorize the Official Committee of Tort Claimants and the Official Committee of Unsecured Creditors, and their respective agents and Professionals, to provide to the Trust all data and any other information concerning the Assigned Claims, Assigned Insurance Rights or Tort Claims that were provided by the Debtors, directly or indirectly, to the Official Committee of Tort Claimants, the Official Committee of Unsecured Creditors, or their respective agents or Professionals on or prior to the Effective Date, notwithstanding any agreement or stipulation entered into prior to the Effective Date to the contrary.

Section 1.9.    Notwithstanding any other provision in this Agreement, the Debtors shall not be required to produce or make available for inspection (a) any document or information that the Parties agree is not relevant to a Claim Record, (b) any privileged document or communication that the Parties agree is not relevant to a Claim Record, or (c) any Claim Records that the Debtors are under a legal obligation on account of personal privacy issues of an employee or contractual obligation to refrain from providing to a third party, whether or not privileged; *provided, however*, that the Trust retains the right to challenge any such determination to maximize the value of the Assigned Claims and/or prosecute the Assigned Insurance Rights, and paragraph 254 of the Confirmation Order is incorporated by reference here.

Section 1.10.    Except as otherwise provided for herein, nothing in this Agreement shall require any Party or third party to create any new documents or to compile or organize any data contained in existing Documents into any new documents; *provided, however*, that nothing in this Agreement affects the Debtors', Reorganized Debtors', Trust's, or GUC Sub-Trusts' obligations to create new documents or compile or organize data contained in existing Documents into any new documents with respect to discovery in any action or proceeding litigating the Assigned Claims and/or Assigned Insurance Rights if and to the extent required under applicable law, including any obligation to produce documents responsive to discovery requests served in such

proceedings and to sufficiently identify documents withheld for privilege and the basis for withholding them.

## ARTICLE II
## COOPERATION ON TESTIMONY AND PERSONNEL

**Section 2.1.**   With respect to the cooperation of current or former employees, directors, officers, agents, or other representatives of the Debtors (collectively the "Debtors' Personnel," as further defined below), the Debtors agree to reasonably cooperate with the Trust and GUC Sub-Trusts on the terms set forth below in connection with, and in anticipation of, the litigation or related prosecution, including, without limitation, arbitration or mediation, of any Assigned Claims or Assigned Insurance Rights and reconciliation and administration of Tort Claims and subject to the cost-reimbursement obligations of the Trust as well as objections and contentions regarding relevance, burden, and Privilege; *provided, however*, that the obligation to cooperate to maximize the value of the Assigned Claims and prosecute the Assigned Insurance Rights shall be paramount.

a. Until the conclusion of any litigation, arbitration, mediation, or other proceeding on the Assigned Claims or Assigned Insurance Rights or the reconciliation and administration of Tort Claims, including, during and until the exhaustion of any and all related appeals, and upon written request (including via email) by the Trust (or its Professionals) or any GUC Sub-Trust (or its Professionals) made with reasonable advance notice, the Debtors shall use reasonable efforts to provide the Trust, the GUC Sub-Trusts, and their respective Professionals, with reasonable access, on an informal basis, to (i) individuals then currently employed by or affiliated with the Debtors, (ii) former employees, officers, or directors who have continuing obligations to cooperate with the Debtors without the need for the Debtors to serve formal process (e.g., subpoenas) to secure their cooperation, (iii) then current Professionals or advisors of the Debtors, or (iv) former Professionals or advisors of the Debtors who have continuing obligations to cooperate with the Debtors  (collectively, (i) through (iv), the **"Debtors' Personnel"**). For the purposes of this subsection, the Debtors shall appoint a designated person(s) to whom such requests by the Trust and GUC Sub-Trusts shall be made.

b. In the event that the Trust or the GUC Sub-Trusts, in the course of prosecuting the Assigned Claims or Assigned Insurance Rights or reconciling and administering Tort Claims, makes a formal request for testimony in a proceeding (including but not limited to by way of a subpoena, a request for a *de bene esse* deposition, a request for deposition testimony, or similar process) from (i) the Debtors, and/or (ii) the Debtors' Personnel, the Debtors shall use reasonable efforts to make the requested testifier(s) available to the Trust or GUC Sub-Trusts, including for live testimony at trial.

c. In the event that a named party in any action or proceeding litigating the Assigned Claims or Assigned Insurance Rights, other than the Trust or the GUC Sub-Trusts, serves a discovery request or demand for testimony in such a proceeding (including but not limited to by way of a subpoena, a request for a *de bene esse* deposition, or other request for deposition testimony, or similar process) from (i) the Debtors, and/or the Debtors' Personnel, the Debtors shall use reasonable efforts to make the requested testifier(s) available to such party, including for live testimony at trial, in the same

8

*EXECUTION VERSION*

manner the Trust would be obligated to do so with respect to individuals employed by or affiliated with the Trust, subject to any applicable evidentiary objections.

d.   The Debtors further agree to reasonably cooperate with requests from the Trust and GUC Sub-Trusts to identify and request cooperation from witnesses or other individuals on topics related to Claim Records; provided, however, that the obligation to cooperate to maximize the value of the Assigned Claims and prosecute the Assigned Insurance Rights shall be paramount.

## ARTICLE III
## MISCELLANEOUS

**Section 3.0.**   This Agreement shall expire only for reasons expressly permitted in this Agreement and only upon either (a) the termination of the Trust in accordance with its governing documents or (b) an order of the Bankruptcy Court.

**Section 3.1.**   <u>Preservation of Privileges and Defenses; Inadvertent Production</u>.   To the extent the Debtors inadvertently transfer to the Trust or GUC Sub-Trusts any Documents that the Debtors contend are exempted from transfer pursuant to this Agreement because they (i) constitute Protected Materials that are not relevant to the Assigned Claims, Assigned Insurance Rights or Tort Claims, or (ii) are later discovered by the Trust to constitute Protected Materials that are not relevant to the Assigned Claims, Assigned Insurance Rights or Tort Claims (each of (i) and (ii), an "**<u>Inadvertently Provided Document</u>**"), the Debtors may, in writing (including via email) request the return of any Inadvertently Provided Document.   A request for the return of an Inadvertently Provided Document shall identify the specific Document and the basis for clawing back such Document, in whole or in part, from production.   Further, with respect to any Inadvertently Provided Document under item (ii) of this paragraph, the Debtors, if appropriate, shall within ten (10) Business Days provide a version of the Document to the Trust or GUC Sub-Trusts that redacts only any privileged information that is unrelated to the Assigned Claims or Assigned Insurance Rights or Tort Claims.

If the Debtors request the return of any Inadvertently Provided Document in the custody of the Trust or GUC Sub-Trusts, then the Trust or GUC Sub-Trusts (as applicable) shall either (a) within ten (10) Business Days (i) return, delete, or destroy the Inadvertently Provided Document and all copies thereof, (ii) undertake reasonable measures to obtain or confirm the deletion or destruction of any copies it produced to other parties, and (iii) delete or destroy all notes or other work product reflecting the content of such Inadvertently Provided Document, or, alternatively, (b) within ten (10) Business Days of receipt of such a request, challenge such request in accordance with this Agreement, but, in the event of a challenge, neither the Trust, GUC Sub-Trusts, nor any other third-party shall be entitled to contend that the provision of the Inadvertently Provided Document pursuant to this Agreement constituted a waiver of any applicable privilege(s), protection(s), or immunity.   In the event the Trust or GUC Sub-Trust commences a challenge in connection with the Debtors' request for return of an Inadvertently Provided Document, then the Trust need not take the steps described in subsection (a) of this paragraph until such challenge has been fully resolved, but the Trust or GUC Sub-Trusts may not use or disclose the Inadvertently Provided Document (or work product reflecting the contents of the Inadvertently Provided Document) unless and until the challenge is resolved in the Trust's or GUC Sub-Trust's favor.

9

*EXECUTION VERSION*

Under Rule 502 of the Federal Rules of Evidence, all Privileges respecting any Inadvertently Provided Document are fully preserved.

**Section 3.2**. <u>Confidentiality</u>

a. The Parties promptly shall petition the Bankruptcy Court for a confidentiality agreement and Qualified Protective Order that governs the use and disclosure of IIHI and, without limiting the protections applicable to IIHI, shall provide for the ability to designate Claim Records and other information produced pursuant to this Agreement as "Confidential" or "Highly Confidential." Prior nondisclosure agreements, attorneys' eyes' only agreements, or other confidentiality agreements respecting prior productions shall be superseded by the Qualified Protective Order, and the Trust and GUC Sub-Trusts may use Claim Records received under this Agreement pursuant to the terms of the Qualified Protective Order.

b. For the avoidance of doubt, the Trust and GUC Sub-Trusts, and their respective trustees and Professionals, are permitted to receive and review all Claim Records transferred under this Agreement and pursuant to any Qualified Protective Order.

**Section 3.3**. <u>Costs</u>.

a. The Reorganized Debtors shall be promptly reimbursed by the Trust for reasonable and documented costs and expenses, including: (i) costs associated with allocating time of employees on projects requiring an allocation of employee time in connection with this Agreement; *provided, however*, that the identification of such projects, and estimation and identification of costs associated with them, shall be agreed upon among the Parties, without costs to the Trust, in advance of the incurrence of any such costs (and such costs shall be incurred only after estimated and known and approved by the Trust); and (ii) fees and expenses of Professionals (at the applicable rates charged by such professionals) incurred in connection with providing their cooperation hereunder; but, for the avoidance of doubt, not including any costs incurred in connection with insurance archival efforts, the costs of which are to be paid by the Debtors. The Debtors shall cooperate with reasonable requests by the Trust to provide good faith estimates of costs and expenses they will incur prior to incurring such costs and expenses. With respect to the time of the Reorganized Debtors' employees on projects requiring an allocation of employee time, the Trust agrees that it shall use reasonable efforts to minimize the use of such employee time in connection with advancing the goal and purpose of the Trust, and the Trust and the Reorganized Debtors shall agree on a mutually acceptable and reasonable process by which the Reorganized Debtors will provide the Trust with estimates of employee time and costs to be incurred in connection with such projects (including both the number of employees and the quantum of expected time and costs per employee) before any employee time is incurred, and employee time will be incurred thereafter only if the Trust has approved of the relevant estimates; *provided*, that the Reorganized Debtors shall not incur employee time in connection with such projects in the interim pending approval of the Trust. The Reorganized Debtors shall invoice the Trust monthly for such costs and expenses and the Trust shall pay such invoices as follows: (1) the Trust shall (A)

identify any objections to an invoice or any portion thereof no later than thirty (30) calendar days following receipt of such invoice and (B) pay the undisputed portions of any invoice no later than thirty (30) calendar days following receipt of such invoice; and (2) in the event of a dispute between the parties as to payment of an invoice or any portion thereof (an "**Invoice Dispute**"), the Parties shall (A) meet and confer in good faith to resolve the dispute within seven (7) calendar days of the Trust identifying such dispute, (B) if a full or partial resolution is reached with respect to an Invoice Dispute following the Parties' meet-and-confer, the Trust shall pay the resolved portion of any invoice within seven (7) calendar days of reaching such resolution, (C) if a full resolution of the Invoice Dispute is not reached, either Party may seek an expedited resolution of any remaining issues before the Bankruptcy Court, and no Party shall object to the moving Party's request for a hearing before the Bankruptcy Court on an expedited basis, and (D) if the Bankruptcy Court determines that the Trust is required to pay any portion of a disputed invoice, the Trust shall pay such amounts within seven (7) calendar days of such determination.

b.  The Debtors shall bear the costs (i) for providing post-Effective Date only those specific Claim Records requested on Exhibits A and B as to which no email searches are needed, that have not yet been delivered to the Trust and/or its Professionals, and those specific Claim Records are separately agreed upon by the Parties; (ii) associated with the retention of Documents needed to transfer to the Trust the Claim Records identified in Exhibits A and B hereto that are discovered upon a reasonable search; and (iii) associated or in connection with Documents and things that the Debtors desire to keep or would otherwise incur in the ordinary course of business, consistent with historical practices and applicable law.  With respect to any Claim Records or other Documents and information not covered by the foregoing sentence, the Trust may, in its discretion, elect to preserve such Documents and information (or retain access, through the Debtors' systems, to such Documents and information), in whole or in part, and subject to the other provisions of this Agreement; provided, that if the Trust so elects, the Trust shall bear the additional document retention costs associated with the preservation of such Documents and information, provided that the Debtors shall use commercially reasonable methods to preserve or retain access to such Documents and information, and, provided further, that the Debtors will advise the Trust prior to seeking to delete, destroy, discard, or abandon any Documents not addressed by the first sentence of this paragraph to the extent they are Claim Records to ensure the Trust has an opportunity to make such an election, and provided further that in no event shall the Debtors delete, destroy, discard, or abandon any Document constituting a Claim Record without first giving the Trust a reasonable opportunity to demand the production of that Document.

c.  In any action or proceeding litigating the Assigned Claims or Assigned Insurance Rights, the person(s) responsible for bearing costs associated with responding to discovery, subpoenas or similar requests for information or testimony made by parties other than the Trust or Sub-Trusts to the Reorganized Debtors or any of their respective current or former employees, professionals, directors, managers or members, to the extent such person(s) are obligated to comply with such discovery, subpoenas or similar

**EXECUTION VERSION**

requests, shall be determined under the Federal Rules of Bankruptcy Procedure, or similar rules in, and/or by the judge(s) presiding over, such action or proceeding. All Parties' rights regarding the responsibility for costs associated with responding to such third-party discovery, subpoenas or similar requests are reserved.

**Section 3.4.**    Pre-Effective Date Cooperation.  After the Confirmation Date and prior to the Effective Date, the Debtors shall reasonably cooperate, except that such cooperation shall be afforded to the Committees and their Professionals in advance of the formation and retention of Professionals by the Trust, as is consistent with, and reasonably necessary to, comply with and satisfy closing conditions.

**Section 3.5.**  A material breach of obligations of the Trust under this Agreement, including a failure by the Trust to promptly reimburse the Reorganized Debtors in accordance with Section 3.3(a), may constitute an event of default and any Party may seek an order from the Bankruptcy Court, on an expedited basis, (i) for a determination as to whether a material breach and/or an event of default has occurred, (ii) if the Bankruptcy Court determines a material breach and/or event of default has occurred, providing the remedy for such material breach and/or event of default (including with respect to any cure periods, if any—except insofar as such cure period is set forth in 3.3(a)(D)) (any such order of the Bankruptcy Court described in this subclause (i) and (ii), a "**Bankruptcy Court Breach Order**"), and/or (iii) terminating or permitting a cessation of performance under this Agreement as a result of an event of default following the expiration of any cure periods, if applicable.  At any time following—but at no time prior to—the entry of a Bankruptcy Court Breach Order finding that a breach and/or an event of default by the Trust has, in fact, occurred under this Agreement, and the expiration of any cure periods set forth in Section 3.3(a)(D) or the Bankruptcy Court Breach Order, the Reorganized Debtors may cease performance under this Agreement if and as permitted by the Bankruptcy Court Breach Order, provided that the Debtors provide the Trust with two business days' notice of the exercise of this right in connection with an undisputed, unpaid invoice.  Notwithstanding the foregoing, the Reorganized Debtors may cease performance under this Agreement immediately following the Trust's failure to timely pay (1) any undisputed portion of an invoice or (2) any disputed portion of an invoice that becomes resolved among the Parties or pursuant to a decision of the Bankruptcy Court, in each case, within the time periods set forth in Section 3.3(a) and without the need to obtain a Bankruptcy Court Breach Order.  The Reorganized Debtors shall resume performance upon the Trust paying the undisputed portion of the invoice (as to subparagraph (1)) or the resolved portion of the invoice (as to subparagraph (2)) or, subject to the terms of any Bankruptcy Court Breach Order, any amount determined in any Bankruptcy Court Breach Order (as described in romanette (iii) above).  Except as set forth herein, all Parties' rights are reserved with respect to the pursuit of or defense against any Bankruptcy Court Breach Order.

**Section 3.6.**    Solely to the extent any prepetition contractual or other obligations of the Debtors under the Insurance Policies are not being specifically undertaken by the Trust or GUC Sub-Trusts in connection with the Plan, and except as otherwise provided in the Plan, the Debtors shall have an obligation to continue such prepetition contractual or other obligations under such applicable Insurance Policies; provided, however, that nothing herein shall obligate the Debtors to take any action(s) with respect to the Unassigned Insurance Policies.

*EXECUTION VERSION*

**Section 3.7**.    The Parties agree to cooperate reasonably and share information as necessary and appropriate to facilitate insurance billing by any of the Parties hereto, and/or the resolution of any insurance-related dispute, subject to appropriate protections for confidential information.

**Section 3.8**.    Notices. All notices, requests, or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be effective when served by electronic mail.  The Trust and the Reorganized Debtors shall exchange notice blocks within 30 days of the Effective Date of the Plan.

**Section 3.9**.    Effectiveness.  This Agreement shall become effective upon the Effective Date of the Plan, except as noted in Section 3.4.  Without limiting the foregoing, to the extent Claim Records are transferred prior to the Effective Date of the Plan pursuant to Section 1.1 of this Agreement, this Agreement also shall apply and be deemed effective in connection with such transfers.

**Section 3.10**.    Dispute Resolution.  In the event of a dispute concerning this Agreement (a "**Dispute**"), such Dispute shall be fully and finally resolved by the Bankruptcy Court.  The Parties agree to identify a time and cost-efficient process to raise disputes with the Bankruptcy Court, including but not limited to the writing of short letters outlining the Parties' respective positions, subject to such court's procedures and consent, *provided that* the Parties agree to keep at least one chapter 11 case open until the termination of the Trust in accordance with its governing documents.

**Section 3.11**.    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

**Section 3.12**.    Governing Law. This Agreement shall be construed in accordance with the laws of the State of New York, without regard to any conflict of law principles that would result in the application of laws of any other jurisdiction.

**Section 3.13**.    Severability; Validity.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but to the extent that any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless doing so would alter the fundamental agreements expressed in this Agreement, and to such end, the provisions of this Agreement are agreed to be severable.

**Section 3.14**.    No Partnership Agreement.    Nothing contained in this Agreement shall create or be deemed to create an employment, agency, fiduciary, joint venture, or partnership relationship between any of the Parties, on the one hand, or any of such other Parties' employees, on the other hand.

**Section 3.15**.    No Waiver.  The Parties agree that no failure or delay by any Party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, and that no

*EXECUTION VERSION*

single or partial exercise thereof will preclude any other or further exercise thereof or the exercise of any right, power, and privilege hereunder.

**Section 3.16**.  Entire Agreement.  This Agreement, together with the Plan and any Qualified Protective Order, contains the entire agreement of the Parties concerning the subject matter hereof and supersedes all prior representations and agreements between or among the Parties as to such subject matter.  For the avoidance of doubt, the Parties acknowledge and agree that paragraph 254 of the Confirmation Order remains in full force and effect, including as relevant to this Agreement. No modification of this Agreement or waiver of the terms and conditions hereof will be binding upon the Parties unless approved in writing by the Parties.  Notwithstanding the foregoing, nothing in this Agreement (a) limits or otherwise waives the rights of the Trust or GUC Sub-Trusts to seek discovery from the Debtors pursuant to applicable law or (b) limits or otherwise waives the rights of the Debtors to object to any such discovery.

**Section 3.17**.  Authorization.  Each of the undersigned individuals represents and warrants that they have the power and authority to enter into this Agreement and bind their respective companies or trusts as authorized representatives.

**Section 3.18**.  Titles.  The section titles used herein are for convenience only and shall not be considered in construing or interpreting any of the provisions of this Agreement.

**Section 3.19**.  Binding Effect.  The Parties agree that this Agreement is for the benefit of and shall be binding upon the Parties and their respective representatives, transferees, successors, and assigns.

**Section 3.20**.  Reporting.  If (a) the Reorganized Debtors deliver an estimate to the Trust of expected reimbursable expenses exceeding $50,000 for a project pursuant to Section 3.3(a) and the Trust decides to proceed with that project or (b) the actual outstanding reimbursable expenses exceed $50,000 for a project previously approved by the Trust pursuant to Section 3.3(a), then, in each case, upon the reasonable request of the Reorganized Debtors, the Trust shall provide to the Reorganized Debtors a statement confirming that the amount of unrestricted cash on hand held by the Trust is sufficient and available to pay outstanding and/or projected reimbursable expenses, as applicable.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective representatives thereunto duly authorized as of the Effective Date of the Plan.

*[Signature Page and Exhibits Follow.]*

14

*EXECUTION VERSION*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective representatives thereunto duly authorized as of the Effective Date of the Plan.

RITE AID CORPORATION, ON BEHALF OF
THE DEBTORS AND REORGANIZED
DEBTORS


_____*/s/ Jeffrey S. Stein*_____
By:    Jeffrey S. Stein
       Chief Executive Officer
       Chief Restructuring Officer
       Rite Aid Corporation


THOMAS A. PITTA, AS TRUSTEE OF THE
RAD SUB-TRUST A


_____


THOMAS A. PITTA, AS TRUSTEE OF THE
RAD MASTER TRUST


_____


ALAN D. HALPERIN, AS TRUSTEE OF THE
RAD MASTER TRUST


_____


ALAN D. HALPERIN, AS TRUSTEE OF THE
RAD SUB-TRUST B


_____

*EXECUTION VERSION*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective representatives thereunto duly authorized as of the Effective Date of the Plan.

RITE AID CORPORATION, ON BEHALF OF THE DEBTORS AND REORGANIZED DEBTORS

By: _____

THOMAS A. PITTA, AS TRUSTEE OF THE RAD SUB-TRUST A

_____

THOMAS A. PITTA, AS TRUSTEE OF THE RAD MASTER TRUST

_____

ALAN D. HALPERIN, AS TRUSTEE OF THE RAD MASTER TRUST

_____

ALAN D. HALPERIN, AS TRUSTEE OF THE RAD SUB-TRUST B

_____

*EXECUTION VERSION*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective representatives thereunto duly authorized as of the Effective Date of the Plan.

RITE AID CORPORATION, ON BEHALF OF THE DEBTORS AND REORGANIZED DEBTORS

_____

By:

THOMAS A. PITTA, AS TRUSTEE OF THE RAD SUB-TRUST A

_____

THOMAS A. PITTA, AS TRUSTEE OF THE RAD MASTER TRUST

_____

ALAN D. HALPERIN, AS TRUSTEE OF THE RAD MASTER TRUST

_____, solely as Trustee

ALAN D. HALPERIN, AS TRUSTEE OF THE RAD SUB-TRUST B

_____, solely as Trustee

*EXECUTION VERSION*

## EXHIBIT A

| | *Tort Related Documents*[5] |
|---|---|
| 1. | All Documents produced by the Debtors in any and all Opioid Claim[6] litigation. |
| 2. | A list of all Opioid Claim litigation from 2000 to the present. |
| 3. | Documents that would have been reviewed, and either produced or withheld as privileged by the Debtors in any Opioid Claim litigation but for the bankruptcy stay, where the Debtors had previously agreed with plaintiffs on search terms, date ranges, and custodians.  For the avoidance of doubt, this means Documents (i) already collected by the Debtors and (ii) identifiable by search terms, custodians, and time periods for which the Debtors had reached agreement with plaintiffs prior to the bankruptcy stay. |
| 4. | All Document productions received by the Debtors from other parties in any and all Opioid Claim litigation. |
| 5. | All Documents produced and presentations made by the Debtors in connection with any federal or state investigation or subpoena concerning the marketing, distribution, dispensing, or sale of opioids, including but not limited to the Department of Justice, the Drug Enforcement Administration, or any state attorneys' general or board of pharmacy. |
| 6. | All Documents that were identified or created in anticipation of litigation by the Debtors, their outside counsel, or other professionals as relevant to any Opioid Claims and/or opioid-related activities (*e.g.*, summaries of open legal matters provided to board and committee members, other privileged board materials, legal memoranda or presentations from outside or in-house counsel, deposition prep binders, and "hot docs" binders or similar compilations) from 2013 to the Present. |
| 7. | All internal reports of "red flags" or other compliance reports related to any Opioid Claims and/or the Debtors' opioid-related activities. |
| 8. | All Documents that were withheld or redacted on the basis of a purported privilege or alleged confidentiality in any and all Opioid Claim litigation.<br><br>All Documents that were withheld or redacted on the basis of a purported privilege or alleged confidentiality in connection with any federal or state investigation or subpoena concerning the marketing, distribution, dispensing, or sale of opioids, including but not limited to the Department of Justice or any state attorneys' general or board of pharmacy. |

[5] The date range for all Tort Related Documents is from 2017 to the Present unless otherwise stated in the context of a particular request.  However, to the extent a request seeks Documents produced or withheld in connection with any Opioid Claim litigation, or in connection with any investigation or subpoena concerning the Debtors' opioid-related activities, the request seeks all Documents produced or withheld, regardless of the Document date.  The date range for Documents related to other claims is 2019 to the present unless otherwise stated in the context of a particular request.
[6] Capitalized terms not otherwise defined shall have the meaning ascribed to such term in the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Technical Modifications)* or in the Cooperation Agreement.

*EXECUTION VERSION*

| | | |
|---|---|---|
| | | All Documents responsive to liability or opioid-related requests that were withheld or redacted on the basis of a purported privilege or alleged confidentiality in connection with the Debtors' chapter 11 proceedings. |
| | | All privilege logs created by the Debtors in response to any discovery request or subpoena in connection with any and all Opioid Claim litigation, or any federal or state investigation concerning the marketing, distribution, dispensing, or sale of opioids, including but not limited to the Department of Justice or any state attorneys' general or board of pharmacy, to the extent such privilege logs exist. |
| | 9. | All quantifications of historical opioid liability relating to the Debtors from 2013 through the Petition Date,[7] to the extent they exist and/or are in the Debtors' possession, custody, or control and can reasonably be located. |
| | 10. | All of the requests for production of Documents, interrogatories, requests for admission, and/or subpoenas directed to the Debtors, and any/all of the Debtors' written discovery responses, in any Opioid Claim litigation. |
| | 11. | Exhibits, exhibit lists, written memoranda, or presentations from in-house counsel, outside-counsel, or consultants, and final versions of expert reports (or drafts to the extent never finalized) analyzing claims and causes of action that were produced in any Opioid Litigation and/or prepared for use or potential use in any Opioid Claim litigation. |
| | 12. | All deposition transcripts, affidavits, declarations, and sworn statements of employees and directors of the Debtors obtained in the course of, or in anticipation of, Opioid Claim litigation. |
| | | All memorandum, summaries, and/or notes from formal or informal interviews of employees and directors of the Debtors obtained or created in the course of, or in anticipation of, Opioid Claim litigation.  For the avoidance of doubt, this request includes Documents prepared by the Disinterested Directors, during the Debtors' chapter 11 proceedings. |
| | 13. | All dismissal orders and executed releases, including settlement agreements, involving the Debtors, in all Opioid Claim litigations or investigations, including but not limited to any settlements with the DEA, DOJ, or any state board of pharmacy or other investigative body. |
| | 14. | All Documents produced and/or presented to the any federal agency related to any of the Opioid Claims and/or the Debtors' opioid-related activities, including any communications with the DEA, any "Letters of Admonition" the Debtors' received from the DEA, and any presentations made to the DEA, as well as all documents produced in connection with *U.S. ex rel. White, et al v. Rite Aid Corp., et al.*, 21-cv-01239-CEF (N.D. Ohio) and the DOJ investigation that preceded the government's intervention in that case. |

---

[7] "Petition Date" shall mean October 15, 2023.

*EXECUTION VERSION*

| 15. | All Documents produced to any state board of pharmacy related to any of the Opioid Claims and/or the Debtors' opioid-related activities, including any communications with the state board of pharmacy. |
| 16. | All materials of any boards of directors (including committees and/or subcommittees) related to the Debtors' opioid-related activities and/or the Opioid Claims, including but not limited to agendas, minutes, decks, and/or presentations received by or created by any of such boards, committees, or subcommittees. |
| 17. | All materials of the Corporate Compliance Committee and the Pharmacy Compliance Sub-Committee,[8] including Documents sufficient to identify the members of those committees, meeting agendas, meeting minutes, presentations, and related materials concerning any Opioid Claims and/or the Debtors' opioid-related activities. |
| 18. | Any and all memoranda, analyses, presentations from outside or in-house counsel, or any other work product (whether or not privileged) regarding potential breach of fiduciary duty claims or exposure related to the Debtors' opioid-related activities. |
| 19. | Documents from 2013 to 2014, including any and all memoranda, analyses, presentations from outside or in-house counsel, or any other work product (whether or not privileged) regarding the Debtors' decision to cease distribution of opioids. |
| 20. | All Documents tracking the percentages of overrides of controlled substance "red flags" on prescriptions (e.g., excessive quantities of controlled substances prescribed, early fills of controlled substances requested). |
| 21. | All Documents tracking the numbers of "trinity" prescriptions (e.g., drug combinations of benzodiazepines, opioids, and muscle relaxants) dispensed by the Debtors' pharmacies. |
| 22. | Documents sufficient to show pharmacist or pharmacy technician staffing and employee numbers at the Debtors' pharmacies. |
| 23. | All Documents tracking the number of controlled substance prescriptions of Schedule II and Schedule III drugs filled per store, per district, per region, and nationwide from 2013 to the Present. |
| 24. | All Documents tracking average prescription fill speeds of the Debtors' pharmacists, pharmacy technicians, and pharmacies, including any data collected, received, reviewed, or tracked with respect to prescription fill speed, as well as any policies or procedures with respect to prescription fill speed. |
| 25. | All policies, procedures, training materials, or guides concerning the Debtors' Naloxone dispensing programs, policies, and initiatives, including how Naloxone prescriptions were accounted for in a pharmacy's overall prescription count and how Naloxone dispensing numbers were accounted for in a pharmacist's, pharmacist technician's, district leader's, or other pharmacy employee's bonus or performance evaluations. |

[8] Corporate Compliance Committee and Pharmacy Compliance Sub-Committee are defined as referenced in Debtors' September 30, 2019 "Board Report to Stockholders on Oversight of Risk Related to Opioids."

*EXECUTION VERSION*

| 26. | All Documents related to the Board Report to Stockholders on Oversight of Risk Related to Opioids,[9] the shareholder resolution and other events leading to the creation of said Report, and the board's oversight of Debtors' opioid-related activities and related risks before and after the Report was issued in 2019. |
|---|---|
| 27. | All internal or external audits or investigations concerning the Debtors' opioid-related activities. |
| 28. | All policies, procedures, practices, training materials, and any/all amendments thereto concerning the Debtors' opioid-related activities. |
| 29. | Any trial offers, savings cards, or e-coupons offered or accepted with respect to controlled substance prescriptions and all Documents tracking the quantities of controlled substance prescriptions dispensed to customers using cash and discount scripts. |
| 30. | Any incentive or bonus plans applicable to pharmacists, including but not limited to any "Pay for Performance" plans, as well as Documents sufficient to show how the Customer and Associate Experience Indicator component of pharmacists bonus policies was calculated. |
| 31. | All requests that employees in the Debtors' Regulatory Affairs department made to employees in the Debtors' Third Party Industry Relations department to delete or remove notes from a prescriber profile regarding controlled substances prescribing practices. |
| 32. | All reports the Debtors received from McKesson identifying any suspicious controlled substance orders or Debtor stores with suspicious controlled substance purchasing trends or orders, as well as Documents sufficient to identify the Debtors' response to the same and any policies, procedures, or protocols regarding ordering controlled substances from McKesson, including any policies, procedures, or protocols for ordering quantities above McKesson's Schedule II thresholds. |
| 33. | Documents sufficient to identify which medications or combinations of medications triggered the Debtors' automated six-step "High Alert Controlled Substance Validation Process," also referred to as the "red flag" process, as set forth in Debtors' Board Report to Stockholders on Oversight of Risk Related to Opioids, from 2017 to the Present, and Documents sufficient to identify the number of prescriptions filled from 2017 to the Present notwithstanding the fact that they triggered the Debtors' automated red flag process. |
| 34. | Unredacted copies of all RACS/ServiceNow data from 01/01/2012 to the Present related to opioid prescribers or prescriptions. |

---

[9] "Board Report to Stockholders on Oversight of Risk Related to Opioids" means the report the Board released on September 30, 2019, titled "Rite Aid Corporation Board Report to Stockholders on Oversight of Risk Related to Opioids," previously available on the Rite Aid website under the heading "Corporate—Governance—Board Report on Opioids Oversight."

*EXECUTION VERSION*

| | |
|---|---|
| 35. | All "High Alert Follow Up Requests"[10] and any responses to such High Alert follow Up Requests related to the Debtors' opioid-related business. |
| 36. | All suspicious order monitoring data related to the Debtors' opioid-related activities from 2013 to Present. |
| 37. | Documents sufficient to identify all employees in the Debtors' Government Affairs, Regulatory Affairs, State Government Affairs, and/or Federal Affairs departments, and the titles for all such employees, whether any such employees were "officers" of the Debtors, and for those employees who were officers, which individuals, if any, were employed by the Debtors as of the Petition Date. |
| 38. | Documents sufficient to identify all members of the "Review Committee,"[11] whether any such members were "officers" of the Debtors, and for those members who were officers, which individuals, if any, were employed by the Debtors as of the Petition Date, as well as the number of times the Review Committee met; the number of prescriber reviews conducted by the Review Committee and the resolution of any such prescriber reviews; any policies, protocols, guidelines, or procedures employed by the "Review Committee" in conducting its reviews; and any minutes, agendas, or other Documents prepared, reviewed, or considered by the "Review Committee." |
| 39. | Documents sufficient to identify the number of Debtor employees and/or contractors assigned to review RACS/ServiceNow tickets for each of the years from 2017 to the Present. |
| 40. | Copies of all "Monitor Lists," "Follow-Up Lists," and/or "Shut Off Lists"[12] from 2017 to the Present. |
| 41. | Documents sufficient to identify the number of controlled substance prescriptions filled from 2017 to the Present for any prescribers on the Debtors' "Monitor List," "Follow-Up List," or Shut Off List" during that same time period. |
| 42. | All internal controlled substances audits, including any annual audits, store controlled self-assessments (CSA), and/or independent store compliance audits, performed on the Debtors' pharmacies, including all controlled substance reviews completed by local and district pharmacy management to validate completion of required corrective actions from prior audits. |
| 43. | All prescription data or sales information regardless of date for opioid, talc, valsartan, metformin, acetaminophen, phenylephrine, benzene, and zantac/ranitidine-containing products, including, but not limited to, the type and amount of product dispensed or sold, the date the product was dispensed or sold, the |

---

[10] "High Alert Follow Up Request" shall have the meaning ascribed to it in the documents Debtors produced at Debtors-00862352.

[11] "Review Committee" shall have the meaning ascribed to it in the "SN ticket flow chart" Debtors produced at Debtors-00862345 and the Response to February 4, 2020 Civil Investigative Demand Debtors produced at Debtors-00925200.

[12] "Monitor List" or "Follow-Up List" means the list of prescribers identified for additional review in response to a ServiceNow ticket "Reporting Suspicious Prescriber," as set forth in the "SN ticket flow chart" Debtors produced at Debtors-00862345. "Shut Off List" means the list of prescribers notified that Rite Aid would no longer fill their controlled substance prescriptions as set forth in the "SN ticket flow chart" Debtors produced at Debtors-00862345.

*EXECUTION VERSION*

| | | name of the patient or purchaser for whom the product was dispensed or sold, the location from which the product was dispensed or sold, the prescriber associated with the prescription, and all other information available in the NextGen dispensing system.[13] |
|---|---|---|
| | 44. | Any Document, including any formal or informal memoranda or Communications, discussing, analyzing, considering any rule, regulation, or policy related to opioid compliance, including for Rite Aid, doctors, patients, manufacturers, wholesalers, downstream sales, or others, whether prepared by Rite Aid, any professionals of Rite Aid, or any other party |
| | 45. | Any Document discussing, analyzing, considering, any risks related to opioids, any liability related to opioids, or compliance or non-compliance with any rule, regulation, or policy related to opioids, whether in respect of Rite Aid, any other pharmacy, any individual employee, any doctors or patients, or any other party, whether prepared by Rite Aid, any professionals of Rite Aid, or any other party |
| | *Indemnification Claims* | |
| | 1. | Names and other identifying information for all contractual counterparties to contracts related to the Debtors' marketing, distribution, dispensing, and/or sale of opioids and/or other Products that are the subject of any Tort Claims. |
| | 2. | Any and all McKesson supply agreements, including any and all agreements between McKesson and any opioid manufacturer(s). |
| | 3. | Any and all agreements related to indemnification rights the Debtors may have regarding the Debtors' marketing, distribution, dispensing, and/or sale of opioids and/or other Products that are the subject of any Tort Claims. |
| | 4. | Any and all demands for indemnification made by the Debtors to any other entity or Person related to Opioid Claims or other Tort Claims. |
| | 5. | Any and all requests for indemnification made to the Debtors by any other entity or Person related to the Debtors' marketing, distribution, dispensing, and/or sale of opioids and/or other Products that are the subject of any Tort Claims. |
| | 6. | Any and all correspondence regarding indemnification and/or rights to indemnification related to Opioid Claims or other Tort Claims. |
| | 7. | Any and all demands for indemnification made by the Debtors to Walgreens or any of its affiliates. |
| | 8. | Any and all correspondence with Walgreens or any of its affiliates or professionals regarding demands for indemnification and/or rights to indemnification. |
| | 9. | Any and all memoranda, analyses, presentations from outside or in-house counsel, or any other work product (whether or not privileged) regarding indemnification and/or |

---

[13] The Debtors shall have the discretion to decide between (i) producing such prescription data and sales information to the Trust consistent with the terms of the Trust Cooperation Agreement or (ii) preserving it for reasonable access by the Trust at a later date as necessary.

|   | rights to indemnification from Walgreens and/or any other entity or Person related to Opioid Claims or other Tort Claims. |
|---|---|
| | *Prepetition Secured Debt Transaction[14] Related Claims* |
| 1. | All materials of any boards of directors (including committees and/or subcommittees) concerning the Prepetition Secured Debt Transactions or any other contemplated secured debt transactions from 2018 through the Petition Date. |
| 2. | All Documents that were identified or created in anticipation of litigation by the Debtors or their outside counsel and professionals as relevant to any Prepetition Secured Debt Transactions (*e.g.*, privileged board materials or legal memoranda or presentations from outside or in-house counsel). |
| 3. | All Documents relating to the purpose, or effect of the Prepetition Secured Debt Transactions. |
| 4. | All Documents relating to requests for, proposals related to, analysis of, or alternatives considered in respect of the Prepetition Secured Debt Transactions. |
| 5. | All Documents and Communications relating to the finances respecting the Prepetition Secured Debt Transactions, including all Documents respecting the solvency, or insolvency, of the Debtors at the time of each of the Prepetition Secured Debt Transactions. |
| 6. | All Documents related to any Prepetition Secured Debt Transactions that were withheld or redacted on the basis of a purported privilege or alleged confidentiality in connection with the Debtors' chapter 11 proceedings. |
| | *Assigned Insurance Rights Documents* |
| 1. | All Documents responsive to insurance-related discovery and informal information requests made in connection with the Debtors' chapter 11 proceedings that were withheld or redacted by the Debtors on the basis of a purported privilege or alleged confidentiality. |
| 2. | All invoices from the Debtors' outside counsel or other professionals related to Opioid Claims or other Tort Claims. |
| 3. | Documents sufficient to show the Debtors' payment of invoices from outside counsel or other professionals related to Opioid Claims or other Tort Claims, including the payment date, payment amount, invoice number, payor, and payee. |

---

[14] The "Prepetition Secured Debt Transactions" include:  (i) the credit facilities (the "2018 Credit Facilities") entered into pursuant to the Credit Agreement, dated as of December 20, 2018 (as amended most recently as of December 1, 2022); (ii) the 7.500% Senior Secured Notes due 2025 (the "2025 Notes") issued pursuant to the Indenture dated February 5, 2020; (iii) the 8.000% Notes due 2026 (the "2026 Notes") pursuant to the Indenture dated as of ; and (iv) the cash tender offers commenced by the Debtors on June 13, 2022 (the "June 2022 Cash Tender") and November 3, 2022 (the "November 2022 Cash Tender") to purchase the 2025 Notes.

*EXECUTION VERSION*

| 4. | Any and all memoranda, analyses, presentations from outside or in-house counsel, or any other work product (whether or not privileged) regarding insurance coverage for Opioid Claims or other Tort Claims. |
|----|----|
| 5. | All Documents concerning or reflecting the Debtors' satisfaction of any self-insured retentions under the Debtors' Insurance Policies for Opioid Claims or other Tort Claims. |
| 6. | Copies of all liability insurance policies of any third party where any Debtor has been listed or otherwise identified as an additional insured, and which may provide coverage relating to the Debtors' marketing, dispensing, and/or sale of opioids and/or other Products that are the subject of any Tort Claims. |
| | *Claims regarding the Retention of Officers and/or Executives* |
| 1. | All Documents responsive to executive compensation discovery and informal information requests made herein or in connection with the Debtors' chapter 11 proceedings that were withheld or redacted by the Debtors on the basis of a purported privilege or alleged confidentiality or otherwise subject to a purported privilege or alleged confidentiality. |
| 2. | All written or recorded consents, resolutions, minutes, agendas, transcriptions, or notes of meetings of the board of directors of each Debtor, any committee or subcommittee thereof, including the compensation committee, and any meeting materials or presentations referenced therein or considered in any way by such, boards, committees or subcommittees concerning: <br><br> a. retention awards made by the Debtors to officers of the company in or after July 2023 ("Summer/Fall 2023 Retention Awards"); and <br><br> b. any payments made by the Debtors or any affiliate in connection with Summer/Fall 2023 Retention Awards ("Summer/Fall 2023 Retention Payments") |
| 3. | All Documents concerning communications of any members of the Debtors' boards of directors concerning (a) the Summer/Fall 2023 Retention Awards, and (b) the Summer/Fall 2023 Retention Payments. |
| 4. | All Documents concerning any consideration, contemplation, analysis, assessment, or discussion of the Summer/Fall 2023 Retention Awards or Retention Payments, including Documents concerning any plan or program under which any award was made. |
| 5. | Spring 2023 retention incentive agreements with Jessica Kazmaier and Christine Rose. |
| 6. | Summer 2023 retention incentive agreements with Steven Bixler. |
| 7. | Retention incentive agreements from any time period in 2023 with Sugandha Khandelwal. |
| 8. | Retention incentive agreements from other time periods in 2023, including Fall 2023, with Christine Bassett, Chris DuPaul, Jessica Kazmaier, Rand Greenblatt, and Thomas Sabatino, if any. |

*EXECUTION VERSION*

| 9. | Retention incentive agreements from any time period in 2023 with senior vice presidents of the Debtors. |
|---|---|
| 10. | Employment agreements with Christine Bassett, Steven Bixler, Chris DuPaul, Rand Greenblatt, Sugandha Khandelwal, Pamela Kohn, William Miller, Dev Mukherjee, Christine Rose, and Jeanniey Walden. |
| 11. | Minutes of compensation committee meetings held on 4/28/23, 7/12/23, 10/11/23, and 1/25/24. |
| 12. | Presentations, decks, or packages for compensation committee meetings held on 4/28/23, 6/23/23, and 7/12/23. |
| | *Claims regarding Directors and Officers* |
| 1. | A list of all officers of Rite Aid Corporation and Rite Aid Hdqtrs, Inc. from January 1, 2021 to the present, along with information sufficient to identify the employer of each such officer and the dates of employment of each such officer, including, without limitation, whether such officer was employed by any Debtor on the Petition Date. |
| 2. | A list of all directors of Rite Aid Corporation and Rite Aid Hdqtrs, Inc. from January 1, 2021 to the present, along with information sufficient to identify the Debtor board on which each such director served, the dates of service of each such director, and, with respect to each such director, whether such director is anticipated to continue to serve as a director after the Effective Date. |
| | *Scheduled Claims and Other Assigned Claims* |
| 1. | For each Scheduled Claim, the identity of Debtors' attorneys and their current contact information. |
| 2. | For each Scheduled Claim being litigated, copies of (i) all filed pleadings, (ii) all discovery demands and responses served, and (ii) all Documents collected for production by any Debtor, produced by any Debtor, or received in productions from any other parties. |
| 3. | Any and all memoranda, analyses, presentations from outside or in-house counsel, or other work product prepared (whether or not privileged) regarding Scheduled Claims. |
| 4. | A list of the Debtors' membership in any proposed or certified class in pending class actions, whether or not such class action is identified on the Scheduled Claims. |
| | Project Eagle Related Claims[15] |
| 1. | All meeting minutes, presentations, decks, resolutions, notes, consents, or other materials of any boards of directors of the Debtors (including committees and/or subcommittees) concerning Project Eagle from January 1, 2014 to December 31, 2016. |
| 2. | Any projections, estimates, analyses, forecasts, valuations, models, or appraisals by the Debtors or any professionals retained by or on behalf of the Debtors relating to |

---

[15] "Project Eagle" refers to the Debtors' acquisition by merger of Envision Pharmaceutical Holdings, LLC, the pharmacy benefit management and related businesses in June 2015.

*EXECUTION VERSION*

| | Project Eagle, including, without limitation, Documents concerning any assessment of the target company, the development of a purchase price, and/or modeling of any combined company pro forma. |
|---|---|
| 3. | All Documents received from or on behalf of the target company in connection with Project Eagle. |
| 4. | A summary of compensation paid to Debtors' advisors in connection with Project Eagle, including, without limitation, amounts paid to Citigroup Global Markets, Inc., and/or Citibank, N.A., as investment banker, financial advisor, author of fairness opinion, underwriter, and lender, and any flow of funds that shows which Debtor entities made such payments. |
| | *Project Baron Related Claims*[16] |
| 1. | All meeting minutes, presentations, decks, resolutions, notes, consents, or other materials of any boards of directors of the Debtors (including committees and/or subcommittees) concerning Project Baron from January 1, 2019 to December 31, 2021. |
| 2. | Any projections, estimates, analyses, forecasts, valuations, models, or appraisals by the Debtors or any professionals retained by or on behalf of the Debtors relating to Project Baron, including, without limitation, Documents concerning any assessment of the target company, the development of a purchase price, and/or modeling of any combined company pro forma. |
| 3. | All Documents received from or on behalf of the target company in connection with Project Baron. |
| 4. | A summary of compensation paid to Debtors' advisors in connection with Project Baron, including, without limitation payments made to Moelis & Company, and any flow of funds that shows which Debtor entities made such payments. |
| | *Albertsons Transaction Related Claims* |
| 1. | All meeting minutes, presentations, decks, resolutions, notes, consents, or other materials of any boards of directors of the Debtors (including committees and/or subcommittees) concerning any planned, potential, or terminated merger transaction with Albertsons Companies, Inc. ("Albertsons"), from January 1, 2017 to December 31, 2018. |
| 2. | Any projections, estimates, analyses, forecasts, valuations, models, or appraisals by the Debtors or any professionals retained by or on behalf of the Debtors relating to any planned, potential, or terminated merger transaction with Albertsons, including, without limitation, Documents concerning any assessment of Albertsons' business, the development of a purchase price, and/or modeling of any combined company pro forma. |

---

[16] "Project Baron" refers to the Debtors' acquisition of The Bartell Drug Company and/or related pharmacy businesses in December 2020.

| | |
|---|---|
| 3. | All Documents received from or on behalf of Albertsons in connection with any planned, potential, or terminated merger transaction with Albertsons. |
| 4. | All agreements and communications with proxy advisory services companies in connection with any planned, potential, or terminated merger transaction with Albertsons. |
| 5. | A summary of compensation paid to Debtors' advisors in connection with any planned, potential, or terminated merger transaction with Albertsons. |
| | *PBM Business Related Claims* |
| 1. | A summary of historical direct and indirect renumeration ("DIR") fees paid to pharmacy benefit management companies (each a "PBM"), organized by PBM and by year, from January 1, 2017 to the present (and, in excel format, if available). |
| 2. | Copies of all agreements with any PBM in effect at any time since January 1, 2017, including network agreements, provider manuals, and/or performance plans. |
| 3. | Correspondence reflecting or concerning the negotiation of any agreements with PBMs from January 1, 2017 to the present. |
| 4. | Annual performance payment reports relating to DIR fees paid to any PBM, from January 1, 2017 to the present. |
| 5. | Claim-level data sufficient to calculate gross margins for Part D claims for each PBM (in machine-readable format), excluding patient names, addresses, SSNs, email, phone numbers, or other personally identifiable information, but including: <br><br>     a.  All claim-level revenue and cost data fields necessary to calculate gross margins for these claims (e.g., ingredient costs, dispensing fees, copay, drug acquisition costs); and <br><br>     b.  Standard claim data fields (e.g., date, drug name, NDC, BIN, PCN, Group #, AWP). |
| 6. | Analyses quantifying the effect of DIR fees on Debtors' pharmacies profitability, to the extent any have been performed by Debtors or on their behalf. |
| 7. | Reports or studies on ways to improve patient adherence and outcomes, to the extent any have been prepared or performed by Debtors or on their behalf. |
| 8. | Data showing any quantifiable costs Debtors have incurred in connection with any performance programs, including, without limitation, call centers to monitor or improve patient adherence, development and implementation of software to monitor or improve performance metrics, and/or other resources devoted or used to monitor or improve or react to performance metrics. |

*EXECUTION VERSION*

**EXHIBIT B**

|     | *Prepetition Secured Debt Transaction[17] Related Claims* |
| --- | --- |
| 46. | All Documents concerning the Opioid Claims[18] or Tort Claims as they relate to the Prepetition Secured Debt Transactions. |
| 47. | All Documents concerning the sources of funding for any cash transfers made in connection with the exchange transaction relating to the 2026 Notes, the June 2022 Cash Tender, or the November 2022 Cash Tender, including but not limited to the Debtors' use of proceeds incurred under the 2018 Credit Facilities to fund any portion of such cash transfers. |
| 48. | All Documents concerning alternatives to any of the exchange transactions related to the 2025 Notes and the 2026 Notes, the June 2022 Tender Offer, and the November 2022 Tender Offer, including but not limited to Documents concerning the Debtors' decision not to pursue or effectuate any proposed or contemplated alternatives to any of these transactions. |
|     | *Claims regarding McKinsey & Co. and the McKinsey Agreements[19]* |
| 1. | Copies of each of the following agreements between McKinsey and Rite Aid Headquarters Corporation: (i) the Consulting Agreement and (ii) the Existing Agreements described at pages 25-26 of the Performance Acceleration Agreement, in each case together with all amendments, modifications, restatements, supplements or other agreements relating to them. |
| 2. | All Documents concerning the negotiation of the Performance Acceleration Agreement. |

---

[17] The "Prepetition Secured Debt Transactions" include: (i) the credit facilities (the "2018 Credit Facilities") entered into pursuant to the Credit Agreement, dated as of December 20, 2018 (as amended most recently as of December 1, 2022); (ii) the 7.500% Senior Secured Notes due 2025 (the "2025 Notes") issued pursuant to the Indenture dated February 5, 2020; (iii) the 8.000% Notes due 2026 (the "2026 Notes") pursuant to the Indenture dated as of ; and (iv) the cash tender offers commenced by the Debtors on June 13, 2022 (the "June 2022 Cash Tender") and November 3, 2022 (the "November 2022 Cash Tender") to purchase the 2025 Notes.

[18] Capitalized terms not otherwise defined shall have the meaning ascribed to such term in the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (With Further Modifications)* or in the Cooperation Agreement.

[19] The "McKinsey Agreements" include: (i) the Consulting Agreement between Rite Aid Hdqrts. Corp. and McKinsey & Company, Inc. United States, on behalf of itself and its affiliates ("McKinsey") dated February 14, 2019, as referenced in the Termination Agreement (the "Consulting Agreement"); (ii) the McKinsey Performance Acceleration Agreement between Rite Aid Hdqrts. Corp. and McKinsey, effective as of December 23,2022, and as described in the Termination Agreement (the "Performance Acceleration Agreement"); (iii) the Termination and Transition Services Agreement between Rite Aid Hdqrts. Corp. and McKinsey effective as of September 14, 2023 (the "Termination Agreement"); and (iv) the Existing Agreements as described in the Performance Acceleration Agreement (the "Existing Agreements").

*EXECUTION VERSION*

| 3. | All Documents concerning the Debtors' evaluation, market-testing or analysis of the Performance Acceleration Agreement and any fees, charges or costs projected or estimated to be payable or otherwise incurred under it. |
|---|---|
| 4. | All pitch materials, engagement letters, and other Documents concerning consultants or other professional service providers considered or interviewed by the Debtors to provide services comparable to those provided for in the Performance Acceleration Agreement. |
| 5. | All Documents concerning the Debtors' decision or determination to enter the Performance Acceleration Agreement. |
| 6. | All Documents concerning the consideration, review, and approval of the McKinsey Agreements and their terms by the Debtors' officers or boards of directors, and/or committees thereof, including but not limited to any materials considered or advice received by such bodies. |
| 7. | All Documents concerning the negotiation, determination, composition, and calculation of fees paid or payable in respect of each Initiative.[20] |
| 8. | Documents sufficient to show the Baseline,[21] Initiative Value,[22] "annualized pretax impact," and Performance Fees[23] for each Initiative, whether they are one-time or recurring, and associated monthly value forecasts. |
| 9. | Documents sufficient to show the Realized L5 Impact[24] of each Initiative. |
| 10. | All Documents concerning the fees or payments related to the Existing Agreements and the IDP SOW[25]. |
| 11. | A copy in native format of the WAVE[26] tool together with all information concerning each RAMP Initiative subject to the Performance Acceleration Agreement, including but not limited to the Baselines, L4 projected benefits and L5 realized benefits.[27]  For any Initiative still not executed, what is the current status: (i) failed; (ii) still pending some level of execution; or (iii) being redone, fixed or approached differently as part of the A&M engagement. |
| 12. | All Documents concerning the nature, extent, and financial or other impact of any delay in realizing the "annualized pretax impact" of any Initiative used to compute Performance Fees under the Performance Acceleration Agreement. |

---

[20] "Initiative" has the meaning ascribed to it in the Performance Acceleration Agreement, including the meanings of One-Time Impact Initiatives, Multiple Impact Initiatives, and Recurring Impact Initiatives under the Performance Acceleration Agreement.

[21] "Baseline" has the meaning ascribed to it in the Performance Acceleration Agreement.

[22] "Initiative Value" has the meaning ascribed to it in the Performance Acceleration Agreement.

[23] "Performance Fees" has the meaning ascribed to it in the Performance Acceleration Agreement.

[24] "Realized L5 Impact" means, for each Initiative, the actual accrued or realized impact or L5 impact.

[25] "IDP SOW" has the meaning ascribed to it in the Performance Acceleration Agreement.

[26] "WAVE" has the meaning ascribed to it in the Performance Acceleration Agreement.

[27] "L4" has the meaning ascribed to it in the Performance Acceleration Agreement. "L5" has the meaning ascribed to it in the Performance Acceleration Agreement.

*EXECUTION VERSION*

| 13. | All Documents concerning each payment of the "$156.5M in payments" described in document D937215 previously produced by the Debtors. |
| 14. | Invoice number USFIR0068425SH as described in the Termination Agreement. |
| 15. | All Documents concerning the negotiation, calculation and determination of the following with respect to each Initiative:  the (i) Baseline, (ii) Initiative Value, (iii) "annualized pretax impact", and (iv) Performance Fees, including but not limited to Documents from the RAMP Office[28]. |
| 16. | All Documents concerning the Letter of Credit,[29] including how, when, and by whom the draws were approved. |

---

[28] "RAMP Office" has the meaning ascribed to it in the Performance Acceleration Agreement.
[29] "Letter of Credit" has the meaning ascribed to it in the Performance Acceleration Agreement.

**<u>Annex 2</u>**

Sub-Trust B RFP

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz, Esq.<br>Ross J. Switkes, Esq.<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>rswitkes@shermansilverstein.com<br><br>*Local Counsel to the Rite Aid Sub-Trust B* | **GRANT & EISENHOFER P.A.**<br>Gordon Z. Novod, Esq.<br>Meagan Farmer, Esq.<br>485 Lexington Ave.<br>29th Floor<br>New York, NY 10017<br>Tel: (646) 722-8500<br>gnovod@gelaw.com<br>mfarmer@gelaw.com<br><br>*Co-Counsel to the Rite Aid Sub-Trust B* |
| **GILBERT LLP**<br>Kami E. Quinn, Esq.<br>Daniel I. Wolf, Esq.<br>Beth A. Koehler, Esq.<br>700 Pennsylvania Ave., SE<br>Suite 400<br>Washington, DC  20003<br>Tel: (202) 772-2336<br>quinnk@gilbertlegal.com<br>wolfd@gilbertlegal.com<br>koehlerb@gilbertlegal.com<br><br>*Co-Counsel to the Rite Aid Sub-Trust B* | **MCKOOL SMITH**<br>Kyle A. Lonergan, Esq.<br>James H. Smith, Esq.<br>1301 Avenue of the Americas<br>32nd Floor<br>New York, NY  10019<br>Tel: (212) 402-9400<br>klonergan@mckoolsmith.com<br>jsmith@McKoolSmith.com<br><br>*Co-Counsel to the Rite Aid Sub-Trust B* |
| In re NEW RITE AID, LLC, *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No.: 25-14861 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J. |

## RITE AID SUB-TRUST B'S REQUEST FOR PRODUCTION
## OF DOCUMENTS TO NEW RITE AID, LLC

Pursuant to, including without limitation, Rules 26 and 45 of the Federal Rules of Civil

Procedure (the "Federal Rules"), as made applicable hereto by Rules 7026, 9014, 9016 of the

Federal Rules of Bankruptcy Procedure (the "Federal Bankruptcy Rules"), and the Local Rules of

the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), Rite Aid

Sub-Trust B ("Sub-Trust B"), by and through its undersigned counsel, hereby directs the following first set of requests for production to New Rite Aid, LLC ("New Rite Aid") (the "Requests") in connection with the subpoena served herewith. Please produce on a rolling basis all Documents and Communications (as defined below) and things requested herein, in accordance with the definitions and instructions set forth herein and all applicable Federal Rules, Federal Bankruptcy Rules, and Local Rules. Documents available in electronic format should be produced to Stephanie Seymour (seymours@gilbertlegal.com), and Documents that are unavailable in an electronic format should be produced by first class or overnight mail to Gilbert LLP, Attn: Beth A. Koehler, 700 Pennsylvania Avenue, SE, Suite 400, Washington, DC 20003. The written responses to these Requests, and production of the Documents responsive to the Requests shall be completed on or before **December 19, 2025, at 4:30 pm ET.**

These Requests are to be read in accordance with the instructions and definitions that follow. These Requests are provided without prejudice to, or waiver of, Sub-Trust B's rights to conduct further discovery at a later date.

## **INSTRUCTIONS**

1. Each Request below shall operate and be construed independently, and unless otherwise indicated, no Request limits the scope of any other Request. Unless otherwise stated with respect to a particular Request, the Relevant Period applicable to each Request is from 1996 to the present, and includes all Documents and Communications (defined below) concerning that period, even if obtained, prepared, or published outside that period.

2. In reviewing files for Documents responsive to the Requests, You are required not only to search for Documents and Communications in Your possession but also to search for Documents and Communications that are in the possession of Your present or former attorneys,

accountants, agents, or anyone else acting on Your behalf or under Your control, except to the

extent you believe those Documents or Communications are privileged.  If You are not in

possession of Documents or Communications responsive to any Request, so state in writing in

response to the Request.

3.      Any Document, Communication, or other information sought to be identified or

obtained within the scope of these Requests that is withheld on the basis of a claim of privilege,

work product protection, or any other grounds should be identified in writing by date, title/file

name/"re line"/subject, addressee/to/cc/bcc, addressor/from, document type, and topic covered

and listed with a statement of the grounds alleged for withholding such document,

communication, or other information, including any common interest or joint defense privilege

claimed.  New Rite Aid shall provide its initial privilege log(s) within 5 days after withholding

any Documents in response to the Requests.

4.      For the purposes hereof, the reference to any entity shall include any and all past

or present officers, directors, Employees, associates, consultants, attorneys, representatives, and

agents or any other Person or entity representing such entity or acting on its behalf as well as any

and all affiliate entities, predecessors and successors in interest, and their respective officers,

directors, Employees, associates, consultants, attorneys, representatives, and agents.

## <u>DEFINITIONS</u>

The following definitions of terms apply to the Requests.  Unless otherwise defined herein,

all words and phrases used herein shall be accorded their usual meaning and shall be interpreted

in their common, ordinary sense.

1.      "**All**," "**each**," "**every,**" and "**any**" shall each be construed as all and each.

2.      "**And**" and "**or**" shall include the other as necessary to make a Request inclusive

rather than exclusive.

3.      "**Communications**" means the transmittal, in any form (Including spoken and written words, conversations, conferences, discussions, talks, and reports), of information (Including facts, ideas, theories, inquiries, opinions, conclusions, and concepts), whether transmitted physically, Including in a letter or note, in person, or by electronic device, Including telephone, text message, e-mail, direct message, instant messenger, facsimile, or otherwise.  For the avoidance of doubt, this may encompass various electronic platforms Including Bloomberg messages, chat messages, Instant Bloomberg chat messages, social media messages (*e.g.*, Facebook), WhatsApp chat messages, GroupMe chat messages, or other messaging platforms.

4.      "**Concerning**" means relating to, referring to, describing, evidencing, or constituting.

5.      "**Debtors**" means Rite Aid Corporation and/or New Rite Aid, LLC and the affiliated debtors and debtors in possession of each identified in (i) the above-captioned adversary proceeding, (ii) *In re Rite Aid Corp, et al.*, Case No. 23-18993 (Bankr. N.J.) and (iii) *In re New Rite Aid, LLC, et al.*, Case No. 25-14861 (Bankr. N.J.) including their directors, advisors (including counsel), agents, Employees, representatives, successors, and all other Persons acting or purporting to act on their behalf or otherwise subject to their control. The term Debtors refers to all such Debtors collectively.

6.      "**Delaware Coverage Action**" means *Rite Aid Corp., et al. v. ACE American Ins. Co., et al.*, C.A. No. N19C-04-150 EMD CCLD, pending in the Superior Court of the State of Delaware.

7.      "**Document**"  or "**Documents**" as used herein shall mean all Communications and all materials within the full scope of Rule 7034 of the Federal Rules of Bankruptcy Procedure and includes any written, printed, typed, or other graphic matter of any kind or nature, however

produced or reproduced, whether or not sent or received, wherever located, Including drafts and copies bearing notations or marks not found on the original and includes, but is not limited to, all memoranda, inter-office communications, electronic mail ("emails"), invoices, reports, financial reports, balance sheets, profits and loss statements, notes, transcripts, letters, social media posts, messages (Including text, instant, Bloomberg chats, sound recordings of any type and memoranda of or relating to telephone conversations, and oral communication), studies, analyses, evaluations, projections, accounts, work papers, statements, summaries, opinions, ledgers, journals, statistical records, questionnaires, drawings, surveys, charts, graphs, magazines, newspapers, booklets, circulars, bulletins, notices, minutes or transcripts of meetings, contracts, licenses, agreements, expense account reports, receipts, written Communications of any type, disks, printouts, and other data compilations from which information can be obtained and any and all tangible matters of whatever description.   The word "Document" specifically includes, but is not limited to, all electronically stored information ("ESI"), as that term is defined and interpreted under Rule 7034 of the Federal Rules of Bankruptcy Procedure.   ESI includes, but is not limited to, any type of information that can be stored electronically in any type of hardware, is intended to be broad enough to cover all current types of computer-based information and includes, but is not limited to, information stored on Employees' computers or laptops, the company's servers and network drives, home computers, backup storage media such as CDs, DVDs, USBs, or external hard drives, and hand-held devices such as iPhones.   The information can be created from any type of program, such as Word, Excel files, PowerPoint presentations, emails, PDF files, and/or video or audio recordings, databases, etc.   All designated Documents are to include all attachments and enclosures.

8.     **"Employee"** means any former or present Employee, officer, claims or monitoring

counsel, other agent, representative, consultant, office, committee, department, division, or group within or retained by You, Including those at corporate or division headquarters, or at regional or local offices or stores anywhere in the world.

9.     "**Including**" or "**Includes**" (whether or not capitalized) means including or includes without limitation.

10.    "**Insurer**" means any insurance company that issued, sold, or subscribed, or that otherwise may have an obligation under any Policy or Policies, and all of each such Insurer's corporate subgroups, parent corporations, assignees, agents, legal representatives, trustees, directors, officers, Employees, predecessors and successors in interest, subsidiaries (Including direct and indirect subsidiaries), affiliates, and divisions.

11.    "**New Rite Aid LLC**" means the Debtors in *In re New Rite Aid, LLC, et al.*, Case No. 25-14861 (Bankr. N.J.).

12.    "**Opioid Claims**" means any opioid-related claim alleged against Rite Aid.

13.    "**Opioid Lawsuits**" means any opioid-related lawsuit brought against Rite Aid.

14.    "**Other Tort Claims**" means any Tort Claims channeled to Sub-Trust B that are neither One-Step Tort Claims (Tort Claims that meet a definition set forth on Exhibit A(ii) to the Sub-Trust B Agreement) or Two-Step Tort Claims (Tort Claims that meet a definition set forth on Exhibit A(i) of the Sub-Trust B Agreement). "Other Tort Claims" include, but are not limited to, slip and fall claims, improper filling of prescription claims, and other non-Opioid, talc or valsartan tort claims.

15.    "**Person**" means any natural person or any legal entity, Including any business or governmental entity or association.

16.    "**PHI**" means "Protected Health Information" as defined by the Health Insurance

Portability and Accountability Act or HIPAA.

17.      **"PII"** means "Personally Identifiable Information" including a Person's name, address, and Social Security Number.

18.      **"Policies"** shall mean the (a) Policies identified in Exhibit A to the Answer, Counterclaims, and Cross-Claims in *Mangus et al v. Rite Aid Corporation et al.*, Adv. Case No. 24-01211 (Bankr. D.N.J.) [Dkt. 47], as well as (b) any other Policies sold, issued, subscribed from 2000 to the present to Debtors, or covering one or more policy periods from 2000 to the present under which one or more Debtors may have been entitled to insurance coverage or other benefits.

19.      **"Rite Aid"** means Rite Aid Corporation and/or New Rite Aid, LLC, and all of their corporate subgroups, direct or indirect parents, assignees, agents, legal representatives, trustees, directors, officers, Employees, affiliates, predecessors and successors in interest, direct or indirect subsidiaries, divisions, subdivisions, and any affiliates and subsidiaries as well as each of their respective present and former officers, directors, advisors, agents, Employees, representatives, predecessors and successors, and all other Persons acting or purporting to act on their behalf or otherwise subject to their control.

20.      **"You"** or **"Your"** and variants thereof refer to Rite Aid.

21.      The definitions described above shall apply regardless of whether such term is capitalized or not capitalized.

22.      Any references to a Person shall be deemed to include such Person's agents, accountants, advisors, Employees, attorneys and other professionals, officers, directors, direct or indirect shareholders, members, representatives, affiliates, subsidiaries, predecessors, successors, assigns, or any other individual or entity acting or purporting to act on behalf of such Person.

23.     Any references to a corporation, partnership, proprietorship, association, organization or any other business or legal entity shall be deemed to include the corporation's, partnership's, proprietorship's, association's, organization's, or other business or legal entities' agents, accountants, advisors, Employees, attorneys, officers, directors, direct or indirect shareholders, members, representatives, affiliates, subsidiaries, predecessors, successors, assigns, or any other Person acting or purporting to act on behalf of the corporation, partnership, proprietorship, association, organization, or other business or legal entity.

24.     The use of any singular noun shall be construed to include the plural, and vice versa, and a verb in any tense shall be construed as the use of the verb in all other tenses.

## **INSTRUCTIONS**

1.      These instructions incorporate by reference the requirements and duties of the Federal Bankruptcy Rules, the Federal Rules, and the Local Rules.

2.      Each Request shall be deemed to be continuing in nature.  If at any time additional Documents responsive to the Requests come into Your possession, custody, or control or are brought to Your attention, prompt supplementation of Your response to these Requests is required.

3.      You are requested to produce all Communications, Documents, and information requested herein that are within Your possession, custody, or control or in the possession, custody, or control of Your current and former officers, directors, agents, Employees, representatives, Affiliates, Professionals, or any other Person or entity acting or purporting to act on Your behalf.

4.      In the event that no Document or thing exists which is responsive to a particular Request, a written response indicating the same shall be provided.

5.      All references to any entity shall include prior business names, any "D/B/A" of such entity, and any predecessors of such entity.

6.      All Documents shall be produced in a searchable form (*e.g.*, OCR), with metadata, Including the date created/sent, author, recipients, cc-copies, bcc-blind copies, and whether the document contains redactions.  You shall produce electronically stored information in its native format Including previous drafts and metadata.  If electronically stored information cannot be located in its native electronic form, then You shall produce electronically stored information in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

7.      If the response to any Request consists, in whole or in part, of an objection on the basis of or including burdensomeness, then provide those documents that can be produced without undue burden.  For such documents that are too burdensome to produce, describe the process or method required to obtain said documents, the quantity and location of the documents involved, and the estimated costs of the search.

8.      Any document, communication, or other information sought to be identified or obtained within the scope of these Requests that is withheld on the basis of a claim of privilege, work product protection, or any other grounds should be identified in writing by date, title/file name/"re line"/subject, addressee/to/cc/bcc, addressor/from, document type, and topic covered and listed with a statement of the grounds alleged for withholding such document, communication, or other information, Including any common interest or joint defense privilege claimed.  Rite Aid shall provide its initial privilege log(s) within 5 days after withholding any documents in response to the Requests.

9.      If Your response to any Request is any other objection, You must indicate if information is being withheld based on the objection(s), provide all information not covered by the objection, and state the specific basis of the objection.  Any ground for objection not stated will be waived.  If an objection is made only to part of a Request, indicate that part in Your written

response and state Your objection and the ground(s) therefore.

10.     If any Document or Communication responsive to these Requests has been destroyed, state when the Document or Communication was destroyed, identify the Person who destroyed the Document or Communication, and the Person who directed that it be destroyed. Additionally, detail the reasons for the destruction, describe the nature of the Document or Communication, identify the Persons who created, sent, received, or reviewed the Document or Communication, and state in as much detail as possible the contents of the Document or Communication.

11.     Documents should be produced in the manner they are kept in the ordinary course of business.  In producing Documents, all Documents that are physically attached to each other, or segregated or separated from other Documents, when originally located, should be produced as is.

12.     By serving these Requests, Sub-Trust B expressly reserves all rights, does not waive any of their rights, and expressly reserves the right to modify or otherwise to supplement these Requests.

13.     For the purposes of these Requests, unless otherwise stated in an individual Request, the relevant time period is January 1, 1996 through present.

## DOCUMENT REQUESTS

1.     All Documents requested from Rite Aid by any party in the Delaware Coverage Action.

2.     Copies of all Policies issued to Rite Aid from 1999-2024 that potentially provide coverage for Opioid Claims and/or Opioid Lawsuits.

3.     Copies of all Policies issued to other entities from 1999-2024 that named Rite Aid as an additional insured that potentially provide coverage for Opioid Claims and/or Opioid

Lawsuits.

4.      All Documents collected or reviewed by Rite Aid in connection with responding to discovery requests served on Rite Aid in the Delaware Coverage Action, whether or not those Documents contain PHI/PII or You contend are subject to some other privilege. This Request Includes, but is not limited to, databases originally maintained by Rite Aid's counsel that were removed to hard drives within the past two years.

5.      All opioid prescriptions filled or issued by Rite Aid, whether or not those Documents contain PHI/PII or You contend they are subject to some other privilege.

6.      All Documents from Rite Aid's outside counsels' case files in connection with the Opioid Lawsuits, the Opioid Claims, and/or Delaware Coverage Action, whether or not those Documents contain PHI/PII or You contend they are subject to some other privilege.

7.      All Documents in Rite Aid's possession, custody or control relating in any way to the Other Tort Claims, including but not limited to Documents in the files of Rite Aid's outside counsels' case files, whether or not those Documents contain PHI/PII or You contend they are subject to some other privilege.