**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE**

| | |
|---|---|
| In re:<br><br>Thirft Drug, Inc.<br>New Rite Aid, LLC (25-14861)(Jointly Administered) | Chapter 11<br><br>Case Number:  25-14853 |

NOTE:  This form should not be used for an unsecured claim arising prior to the commencement of the case.  In such instances, a proof of claim should be filed.

Name of Creditor: Star Capital Partners, LLC
(The person or other entity to whom the debtor owed money or property.)

Name and Addresses Where Notices Should Be Sent:
Star Capital Partners, LLC
c/o Mark A. Roney, Esq.
Hill Wallack LLP
21 Rosel Road
Princeton, NJ 08543

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:  Store No. 10496

Check here if this request:
☐ replaces a previously filed request, dated:
☐ amends a previously filed request, dated:

**1.  BASIS FOR CLAIM**

☐ Goods Sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe briefly)  Amount due on lease during post-petition administration of debtor's estate 503(b)(1)(A)

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensations (Fill out below)

Provide last four digits of your social security number _____

**2.  DATE DEBT WAS INCURRED:** 5/23/25, 8/11/2025 & 8/11/25

**3.    TOTAL AMOUNT OF REQUEST AS OF ABOVE DATE:** $25,171.09 _____

☐ Check this box if the request includes interest or other charges in addition to the principal amount of the request.  Attach itemized statement of all interest or additional charges.

**4.    Secured Claim**
☐  Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:

☐ Real Estate          ☐ Motor Vehicle
☐ Other (Describe briefly) _____

Value of Collateral:  $_____

☐  Check this box if there is no collateral or lien securing your claim.

**5. Credits:**  The amount of all payments have been credited and deducted for the purposes of making this request for payment of administrative expenses.

**6. Supporting Documents**: *Attach copies of supporting documents*, such as purchase orders, invoices, itemized statements of running accounts, contracts as well as any evidence of perfection of a lien.

DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.
If the documents are voluminous, attach a summary.

**7. Date-Stamped Copy**:  To receive an acknowledgment of the filing of your request, enclose a self-addressed envelope and copy of this request.

THIS SPACE IS FOR COURT USE ONLY

Date:

December 8, 2025

Sign and print below the name and title, if any, of the creditor or other person authorized to file this request (attach copy of power of attorney, if any).

*Shimon T. Brudny*
Shimon Tzvi Brudny, Managing Member

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

NOTE:  The filing of this request will not result in the scheduling of a hearing to consider payment of your administrative claim but will result in the registry of your administrative claim with the Bankruptcy Court. If you wish to have a hearing scheduled on your claim, you must file a motion in accordance with D.N.J. LBR 3001-1(b).        *rev.8/1/15*

Store: 6382R

THIS LEASE, made this ___22nd___ day of ___April_____, 1999, by and between NORTH

NEW PROSPECT ASSOCIATES, LLC, a New Jersey limited liability company, hereinafter referred to as "Landlord,"

and ECKERD CORPORATION, a Delaware corporation, hereinafter referred to as "Tenant":

### WITNESSETH:

**Premises**

    SECTION 1. A. Landlord, for and in consideration of the covenants, conditions, agreements and stipulations herein contained, does hereby lease to Tenant, and Tenant does hereby take and hire from Landlord, those certain premises consisting of building and land, as shown on the site plan marked Exhibit "A" attached hereto and made a part hereof, upon property located at the northwesterly corner of Aldrich Road (a/k/a Route 636) and New Prospect Road (a/k/a Route 641), with an address of 1 North New Prospect Avenue, situated in the City of Jackson, County of Ocean, State of New Jersey, and legally described in Exhibit "B" attached hereto.

    B. The land and building (with area inside walls of 10,908 square feet) shown on Exhibit "A" are hereinafter referred to as the "Leased Premises".

    C. Tenant shall be permitted to use the Leased Premises for the operation of a drug store and/or for any other lawful purpose or purposes, including, but not limited to, an Express Photo and/or photo processing center, a postal substation or package mailing center, and an optical center for the practice of opticianry and optometry. Tenant may also sell alcoholic beverages for off-premises consumption as long as Tenant, at its own cost and expense, obtains any permits or licenses required for the same. Landlord warrants that, other than the sale of alcoholic beverages for off-premises consumption, the Leased Premises are properly zoned to allow each of the specific uses described above and that there are no recorded restrictions which would prohibit or restrict the Tenant from using the Leased Premises for any of the specific uses described above.

**Term**

    SECTION 2. A. The term of this Lease shall commence concurrently with rent commencement as provided in Section 4.A., hereinafter referred to as the "Commencement Date," and shall end at midnight twenty (20) years later, hereinafter referred to as the "Termination Date."

    B. Because of the admittedly seasonal aspect of Tenant's business operations, it is mutually agreed that Tenant shall not be obligated to initially open for business between November 15 and January 31. Minimum Rent (as defined in Section 4.B.) shall not begin to be payable until February 1 if possession of the Leased Premises is made available to Tenant for initial store opening at any time between November 15 and January 1. The foregoing provisions shall have no effect upon continued payment of rental following Tenant's initial store opening. Notwithstanding the foregoing in this Section 2.B., if Tenant opens for business between November 15 and January 31, Rent shall begin to be payable when Tenant opens for business.

    C. Landlord and Tenant agree to execute, acknowledge and deliver instruments to each other in recordable form certifying the Commencement Date and Termination Date of this Lease.

**Option Periods and Surrender**

    SECTION 3. A. Tenant, if not in default beyond any applicable cure period, has the option to renew this Lease for four (4) successive five (5) year periods on the same terms and conditions herein contained, provided Tenant gives Landlord six (6) months notice of its election to exercise an option prior to the end of the term hereof or extended term. Should Tenant neglect to exercise an option on the applicable date as above specified, Tenant's right to exercise said option shall not expire until fifteen (15) days after notice, by Landlord, of Tenant's failure to exercise said option.

    B. Tenant will deliver up and surrender to Landlord possession of the Leased Premises upon the expiration or termination of this Lease in good condition and repair (loss by casualty and ordinary wear and decay excepted and except for any conditions which, under the provisions of this Lease, Landlord is required to remedy).

**Rent**

    SECTION 4. A. Rent shall begin to be payable hereunder thirty (30) days after the Leased Premises are completed by Landlord in accordance with the provisions of this Lease and possession thereof has been tendered to Tenant, or the date Tenant opens for business, whichever occurs earlier.

If Landlord fails to have the Leased Premises completed and ready for Tenant's occupancy on the Completion Date (as defined in Section 6.B.), then and in that event, Tenant shall be entitled to a credit against the Minimum Rent established herein equal to the number of days of Landlord's delay in presenting the completed Leased Premises.

B. Tenant shall pay to Landlord at the address hereinafter set forth Minimum Rent during the initial lease term in the amount of Two Hundred Forty-Eight Thousand One Hundred Sixty-Six and No/100 Dollars ($248,166.00) per year, payable in equal monthly installments of Twenty Thousand Six Hundred Eighty and 50/100 Dollars ($20,680.50). Minimum Rent during each option period, if exercised pursuant to Section 3.A. above, shall be as follows:

For the first option period        $250,684.00 per year;   $20,907.00 per month

For the second option period    $256,338.00 per year;   $21,361.50 per month

For the third option period       $261,792.00 per year;   $21,816.00 per month

For the fourth option period     $267,246.00 per year;   $22,270.50 per month

All monthly payments of Minimum Rent shall be paid in advance on the first day of each and every calendar month during the term of this Lease. If the term shall commence on a day other than the first day of a month, then Rent shall be prorated for the balance of the said month on a per diem basis.

C. Minimum Rent as provided in Section 4.B. shall be considered sufficient consideration for the term of this leasehold, and nothing contained in this Lease shall be construed as requiring Tenant to continuously operate at the Leased Premises.   Notwithstanding the foregoing, in addition to the payment of Minimum Rent, Tenant covenants and agrees to pay to Landlord as additional rent for each Lease Year of the term hereof, on the Gross Receipts (as defined in Section 5) made in such Lease Year from Tenant's business or businesses conducted on the Leased Premises, a sum equivalent to the amount by which two percent (2%) of Gross Receipts exceed the Minimum Rent paid by Tenant for such Lease Year, hereinafter referred to as "Percentage Rent."   Notwithstanding the foregoing, in no event shall Tenant be obligated to pay more in Percentage Rent than the amount of Minimum Rent paid by Tenant during any Lease Year.   Throughout this Lease "Rent" shall mean both Minimum Rent and Percentage Rent.

Tenant shall pay the sales or use tax, if any, assessed against the rentals payable hereunder. The amount of any sales or use taxes on rentals payable by Tenant during any Lease Year shall be deducted from the amount of Percentage Rent for that year payable by Tenant to Landlord.

D. For purposes of calculating the Percentage Rent due hereunder, Tenant's Lease Year shall run concurrently with each year of the term of the Lease per Section 2.A. hereof.   If Tenant is open for business during any period when Minimum Rent is abated as provided in this Section 4, all Gross Receipts during such period shall be added to the Gross Receipts of the first Lease Year for the purpose of calculating Percentage Rent, if any, as provided in Section 4.C.

E. There shall be a charge of Fifty and No/100 Dollars ($50.00) payable to Landlord by Tenant for each check returned to Landlord due to insufficient funds of Tenant.   Tenant shall have a grace period of fifteen (15) days for the payment of Minimum Rent as set forth in Section 4.B. above.   After such fifteen-day grace period, a late charge shall begin to accrue at the rate of twelve percent (12%) per annum, which amount of late charge shall be pro rated in accordance with the number of days in a month past the grace period that the Minimum Rent, as set forth in Section 4.B., is late.

## Gross Receipts

SECTION 5.   A. "Gross Receipts" is hereby defined as revenue received from all business conducted by Tenant on the Leased Premises for cash or credit except as follows:

B. Gross Receipts shall not include: Sales of merchandise for which cash has been refunded or allowance made; the sales price of merchandise returned by customers for exchange; the amount of any luxury, excise, sales, use or gross receipts tax imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers; sales of magazines, newspapers and tobacco products; services provided to customers for which Tenant derives no profit, including the operation of a drivers license bureau (if any) or utilities payment center (if any); the operation of a blood laboratory station (if any); sales to Senior Citizens; sales to nursing homes and nursing home patients; merchandise transferred between stores owned or controlled by Tenant; discount sales to employees of Tenant and its affiliates; discount sales to doctors; fees derived from the professional services of an optometrist; all eyewear sold under an industrial safety eyeglass program; one-half (1/2) of the gross receipts collected between the hours of midnight and eight o'clock in the morning; charges made for customers' alterations and repairs; financing or carrying charges on balances due on repossessed items and trade-in allowances; gift wrapping charges; telephone commissions; sales of public transportation tickets; any funds derived from a state-supported lottery system; postage and delivery charges to customers; amounts received as coupons; layaway items not

paid for and not delivered; the amount of any credit sales deemed uncollectible by Tenant; sales of merchandise ordered through the use of mail order catalogs or filled through catalog order channels operated by Tenant or by a parent, subsidiary or affiliated corporation of Tenant, regardless of the place of the order, payment or delivery; receipts from snack bars and cafeterias operated solely for the use of Tenant's employees, weighing machines, vending and other coin machines maintained for the convenience of Tenant's employees and the incidental convenience of customers, amusement devices and public telephones; premiums, commissions, payments and other amounts received from or in connection with (i) the sale of policies of insurance, mutual funds, stocks, bonds and other securities, travelers' checks, money orders, and similar items, (ii) the making of personal loans, (iii) the operation of savings plans; (iv) the cashing or issuing of checks; (v) the sale or rendition of any and all other financial services, and (vi) the sale of postage stamps, fishing and hunting licenses, and tickets (including but not limited to, those customarily sold by travel and theater agencies); sales of any items (not among those listed above) which are owned by others than Tenant, its departmental lessees, concessionaires, or licensees and for which Tenant receives a commission or brokerage fee, provided, however, that there shall be included in net retail sales the amounts received as commission or brokerage fees on such sales; and sales of prescription items pursuant to third party prescription plans. For the purposes of this Section, third party prescription plans shall be deemed to be those health benefit plans under which all or any portion of the cost of prescription items and pharmaceuticals is paid or reimbursed by a governmental agency, insurance carrier, health maintenance organization, union, trust or benefit organization, employer or employer group, or any similar organization pursuant to an agreement between Tenant and such organization.

C. Tenant shall submit to Landlord on or before the ninetieth (90th) day following the end of each Lease Year a statement showing the amount of Gross Receipts during the preceding Lease Year. Upon delivery of such statement, Tenant shall pay to Landlord any Percentage Rent required by Section 4.C.

D. Tenant shall make available to Landlord at Tenant's Florida headquarters Tenant's business records of its Gross Receipts for the preceding Lease Year. Not more than once each year, Landlord may, at its own expense, examine and audit Tenant's records for the sole purpose of ascertaining the amount of such Gross Receipts from the Leased Premises during the preceding Lease Year. Landlord shall notify Tenant and proceed with such audit within ninety (90) days after receipt of Tenant's statement. Should Landlord fail to examine and audit said records within the above ninety (90) day period, Landlord shall have no further right of access to the records of Tenant, and Tenant's statement shall be deemed final.

E. Landlord agrees that all information concerning Tenant's affairs shall remain confidential and shall not be divulged or published by Landlord, except to the mortgagee of the Leased Premises.

## Construction

SECTION 6. A. Landlord will, at its own expense, prepare and deliver to Tenant five (5) sets of detailed plans and specifications for construction of the Leased Premises in accordance with guide plans furnished by Tenant and identified as Phase II-A dated October 16, 1997. Landlord acknowledges receipt of Tenant's guide plans heretofore delivered by Tenant. Such construction plans shall be subject to approval by Tenant, initialed by the parties hereto and considered a part hereof. Tenant shall have forty-five (45) days from receipt of the complete construction plans and either approve or disapprove such plans and, in the event that Tenant does not approve such plans, shall mark changes to such plans. If Tenant does not approve or disapprove such plans within such forty-five (45) day period, Landlord shall provide written notice to Tenant, in accordance with this Lease, stating in such notice that Tenant shall have an additional twenty (20) days after receipt of such notice to either approve or disapprove the plans and stating that, if Tenant fails to do so within such twenty (20) day period, the plans shall be deemed approved. If Landlord fails to provide notice in the form stated above, the plans shall not be deemed approved. The approved plans shall hereinafter be referred to as the "Plans." If Landlord elects to proceed with construction prior to obtaining Tenant's approval of the Plans, any changes required by Tenant shall be at Landlord's sole cost and expense.

B. Immediately upon execution of this Lease, Landlord shall proceed with due diligence to obtain requisite permitting for development of the Leased Premises, including any sign variance required pursuant to the terms of Section 9.E. hereof. Landlord shall commence construction no later than April 1, 1999 and shall complete the Leased Premises (which completion is subject to Section 29 hereof) in accordance with the Plans no later than one hundred eighty (180) days from the date of commencement of construction (hereinafter referred to as the "Completion Date"). Notwithstanding the foregoing commencement of construction date of April 1, 1999, if Landlord cannot obtain the requisite permitting for development of the Leased Premises on or before April 1, 1999, and Landlord has proceeded with due diligence to obtain such permitting, Landlord shall have until June 1, 1999 to obtain such permitting and to commence construction. Landlord shall provide Tenant at least thirty (30) days prior written notice of commencement of construction and shall deliver to Tenant complete copies of at least three (3) bids (or such lesser number of bids as Tenant may deem acceptable in Tenant's sole discretion) submitted to Landlord in connection with such construction. At least sixty (60) days prior to the Completion Date, written notice shall be given by Landlord to Tenant that the Leased Premises will be completed and ready for Tenant's occupancy. Any general contractor, project architect or civil

engineer retained by Landlord to perform Landlord's construction obligations hereunder shall be approved in advance by Tenant. Landlord shall obtain from the authority having jurisdiction the street address to be assigned to the Leased Premises and provide Tenant with such information in writing no later than thirty (30) days after commencement of construction. If construction is delayed for a period of six (6) months or longer, and Tenant does not terminate this Lease as provided in Section 6.D. hereof, plans shall be resubmitted by Landlord for approval by Tenant prior to construction or recommencement of construction. In addition, if there is any required change to the Plans as originally approved by Tenant, the necessity of the change, the nature of the change, and the cost of the change shall be mutually agreed upon by the parties hereto, and the change shall be in the form of a written change order or a written invoice, as applicable.

C. The Leased Premises shall be deemed to have been fully completed and ready and available for occupancy by Tenant when all of the following have been accomplished: (a) a certificate of occupancy or an equivalent use permit is issued by and obtained from the governmental authority having jurisdiction; (b) the architect who prepared the plans and specifications has certified in writing to Tenant that the Leased Premises have been completed in accordance with the plans and specifications approved by Landlord and Tenant as set forth in this Section 6; (c) Landlord has tendered possession of the Leased Premises to Tenant with the store absolutely cleaned, including the cleaning and waxing of floors; (d) all mechanical systems servicing the Leased Premises have been completed and are in good working condition; and, (e) the Leased Premises are free and clear of all liens as provided in Section 16 of this Lease, and Landlord has delivered to Tenant satisfactory evidence of Landlord's title to the Leased Premises and non-disturbance agreements, if applicable, in accordance with Section 14 of this Lease. Landlord agrees to provide Tenant with two (2) copies of an as-built survey of the Leased Premises within thirty (30) days after the Commencement Date (the "As-Built Survey"). The As-Built Survey shall include, without limitation, a metes and bounds legal description, all easements, utilities, and public and private right-of-ways. In the event Landlord fails to provide Tenant with the copies of the As-Built Survey as provided herein, Tenant may have an As-Built Survey prepared and offset the cost of such survey and the two (2) copies thereof against Rent due or becoming due under this Lease. Landlord warrants that the Leased Premises shall be free from defects in materials or workmanship for a period of one (1) year following the Commencement Date. Upon completion of the Leased Premises as provided herein, Landlord will not thereafter paint, decorate or change the architectural treatment of any part of the exterior of the Leased Premises, nor make any structural alterations, additions or changes to the Leased Premises without Tenant's prior written approval, which approval shall not be unreasonably withheld or delayed.

D. If Landlord shall fail to commence construction or deliver the Leased Premises to Tenant in the manner provided herein and within the time limits set forth herein, then Tenant may, at its option, cancel this Lease by giving Landlord thirty (30) days written notice. Acceptance by Tenant of delivery of the Leased Premises prior to the Completion Date shall be at the option of Tenant, such acceptance not to be unreasonably withheld.

E. At Tenant's sole risk, Landlord will afford Tenant reasonable access to the Leased Premises prior to the Commencement Date for the purpose of inspecting, measuring, installing or arranging for the installation of fixtures, but only to the extent that such activity proceeds without interfering with Landlord's contractors, subcontractors, and their respective employees. By giving Tenant access to the Leased Premises prior to the Commencement Date, Landlord assumes no responsibility whatsoever for injury to persons entering the Leased Premises, or damage to property brought in, or upon, the Leased Premises, nor shall Landlord be entitled to any rent by reason of such access. Tenant agrees to indemnify and hold Landlord harmless from and against any and all claims and demands arising out of such access, unless such claims or demands are due to the negligence of Landlord, its agents, employees or contractors.

**Exterior Facilities**

SECTION 7. A. Prior to the Commencement Date, Landlord shall construct the sidewalks, service drives, parking aisles, driveways, streets and parking area and provide adequate water drainage (hereinafter referred to as the "Exterior Facilities") as shown on Exhibit "A". The area provided for the parking of automobiles shall be sufficient to accommodate not less than (i) sixty-three (63) full-sized automobiles with spaces striped on nine foot (9') centers for each car and (ii) an additional nine (9) parking spaces for full-sized automobiles, as shown on Exhibit "A", with spaces striped on nine foot (9') centers for each car, in the event Tenant determines, in Tenant's sole discretion, that Tenant requires the additional nine (9) parking spaces. All sidewalks shall be concrete and all service drives, parking aisles, driveways, streets and parking areas shall be graded, leveled and paved with concrete or asphalt, clearly marked with painted lines, and repainted as required. Landlord agrees there shall be unobstructed use of sidewalks, driveways and roadways for automotive and pedestrian traffic to and from the Leased Premises and adjacent public streets and highways. All of the Exterior Facilities, and any signs owned or permitted by Landlord, shall be constructed in a good and workmanlike manner by Landlord and shall be maintained by Tenant, at its sole cost and expense. Maintenance of the Exterior Facilities by Tenant shall include maintenance and replacement of landscaping after the first year of this Lease, sweeping and cleaning of the Exterior Facilities, maintenance of the parking lot, driveways and sidewalks, maintenance and repair of the parking lot lights and fixtures, snow removal, refuse removal, maintenance of the drainage facilities, pest control and other maintenance of the Exterior Facilities

-4-

which is not the responsibility of Landlord under this Lease. In no event shall Tenant be responsible for the replacement of any part or parts of the Exterior Facilities or for any capital repairs to any part or parts of the Exterior Facilities pursuant to this Lease.

B. Landlord shall provide paved driveways at the rear of the Leased Premises as shown on Exhibit "A" in order to provide convenient public access to the delivery or service entrances. Such driveways shall be of sufficient width so as to permit the passage and turning of trailer trucks and other commercial vehicles.

## Ingress and Egress

SECTION 8. Landlord warrants as a consideration for this Lease that it will initially provide and maintain for the term of this Lease and any extension thereof, ingress and egress facilities to public highways in the number and the locations depicted on Exhibit "A", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control. No easement from any third party is required to provide direct access between the Leased Premises and any public highway bordering the Leased Premises at the access points shown on Exhibit "A".

## Signs and Antenna

SECTION 9. A. Landlord agrees that Tenant shall have the right at its own cost and expense to erect and maintain signs advertising its business and the services it provides on the exterior of the Leased Premises. Any signs erected by Tenant shall conform to the requirements of local ordinances and codes, shall conform to the signs depicted in the signage package set forth in Exhibit "C" which is attached hereto and made a part hereof by this reference, and shall be signs generally used by Tenant to advertise its business from time to time, including, but not limited to, its standard capsule sign. The signs, other than building signage, are to be located as shown on Exhibit "A". By executing this Lease, Landlord confirms that it has reviewed and approved Tenant's signage package set forth in Exhibit "C".

B. Tenant shall be permitted, as soon as possible after the date hereof, to install sign foundations with conduits as shown in the Plans and at the locations shown on Exhibit "A" upon which Tenant may install its readerboards and sign panels. Landlord shall extend electrical service to such pylon signs as soon as practical thereafter.

C. Landlord shall not, without Tenant's written consent, utilize or permit others to utilize the exterior of the Leased Premises, or the space above it, for sign display purposes.

D. Tenant may install satellite receiving/transmitting equipment on the roof of the Leased Premises provided such installation does not penetrate the roof or otherwise adversely affect the integrity of the roof structure and shall be made in accordance with applicable municipal rules, regulations, codes and ordinances. Tenant agrees to indemnify and hold Landlord harmless from and against any and all claims and demands arising from the installation, removal or repair of such equipment, unless such claims or demands are due to the negligence of Landlord, its agents, employees or contractors.

E. If any variances from governmental sign codes or zoning ordinances are required in order for Tenant to install its signs as depicted on the Plans or at the locations shown on Exhibit "A," Landlord shall obtain such variances. If governmental authority denies permits for, or approval of, any sign, Landlord shall notify Tenant in writing at least twenty (20) days prior to commencement of construction and Tenant may cancel this Lease at any time prior to commencement of construction (or at any time if Landlord has failed to deliver the written notice described herein).

## Maintenance and Repairs

SECTION 10. A. Except for all repairs made necessary by reason of fire, casualty, the elements or Landlord's default under the terms of this Lease, Tenant, at its own cost and expense, will keep in good order and repair the interior and exterior of the building on the Leased Premises, including the mechanical equipment and systems furnished by Landlord exclusively serving the Leased Premises, the routine maintenance of the heating, ventilating, and air-conditioning system exclusively serving the Leased Premises (the "HVAC"), the replacement of the compressor and other major components of the HVAC system (but only after the first year of the Lease term), and the sprinkler system. Notwithstanding the foregoing, Landlord shall make all necessary repairs to the Leased Premises, including all fixtures and systems (except for fixtures and systems installed by Tenant) located therein, for a period of one (1) year following the Commencement Date; provided, however, Landlord shall not be required to make any repairs necessitated by the negligence of Tenant, its agents or employees. Following said one (1) year period, Landlord agrees to provide to Tenant a warranty manual letter and to assign to Tenant all warranties for any labor and materials used on or in the Leased Premises.

B. Landlord, at its own cost and expense, shall maintain in good operating condition (including making all necessary repairs and replacements to accomplish the same) the roof and structural members of the building on the Leased Premises, any water, plumbing, gas or electrical lines or conduits permanently embedded in the walls, floor or ceiling, and any repairs to the Leased Premises necessary to make the same watertight. Landlord shall also make all repairs required due to Landlord's

failure to comply with the terms of this Lease.  Notwithstanding the foregoing, if any of the aforementioned repairs are made necessary by reason of Tenant's use or occupancy of the Leased Premises in any manner inconsistent with the reasonable use and occupancy thereof, or by reason of alterations made by Tenant, such repairs shall be made by Tenant at its own cost and expense.

C. In the event the need for emergency repairs arises, and such repairs are the obligation of Landlord, Tenant, in its sole discretion, may proceed to have such repairs promptly made and if Landlord fails to reimburse Tenant for such repair costs within thirty (30) days after receipt of request for reimbursement and documentation showing Tenant's payment of such repairs from Tenant, Tenant may deduct the cost of such repairs from Rent due or to become due. Tenant shall use reasonable efforts to give Landlord telephonic or such other notice as may be practical under the circumstances prior to making such emergency repairs.  By undertaking the performance of Landlord's repair obligations pursuant to this paragraph, Tenant assumes no responsibility for the performance of future repairs which are the obligation of Landlord.

## Utilities

SECTION 11. Tenant shall pay, directly to the provider thereof with no surcharge paid to Landlord, for all sewerage and trash disposal services, water, gas, heat, electric current and other utilities consumed by it, in or upon the Leased Premises, at rates set by local public utility as approved by public authority having jurisdiction. Landlord warrants that all such utilities and services are available to the Leased Premises.  Landlord agrees to furnish the Leased Premises with separate meters for measuring consumption of water and electricity.

## Tenant's Right To Make Changes

SECTION 12.  A. Tenant, at its own expense during the term of the Lease, may make any alterations to the Leased Premises which it may deem necessary, except changes which would impair the structural integrity of the Leased Premises, unless approved by Landlord, but it shall make all permitted changes in accordance with all applicable governmental regulations. Tenant, at its own expense during the term of the Lease, may make any additions to the Leased Premises, which it may deem necessary, with the prior written approval of Landlord and any municipality, if such municipality's approval is required.  Landlord's approval shall not be unreasonably withheld, conditioned or delayed. All salvage from such work shall belong to Tenant. All permanent improvements shall belong to Landlord.

B. If Tenant makes any additions to the Leased Premises, there shall be an appropriate adjustment to the Minimum Rent based upon the rent amount per square foot in effect at the time such addition is completed multiplied by the number of square feet of retail space added to the Leased Premises.

C. All trade fixtures and equipment and other personal property owned by Tenant and installed or placed by it in the Leased Premises may be removed by Tenant at any time during the term or, provided Tenant gives Landlord prior reasonable notice, within fifteen (15) days after the expiration thereof. Tenant agrees to repair any damage to the Leased Premises occasioned by such removal.

## Casualty Insurance and Damage To Premises

SECTION 13. A. Tenant shall at all times during the term of this Lease and any renewals thereof maintain "all risk" insurance on the Leased Premises insuring against all risks of physical loss or damage in the amount of one hundred percent (100%) of the full replacement cost of the improvements located on the Leased Premises. Any premium payment made by Tenant under this Section shall be a non-cumulative credit against any Percentage Rent due under Section 4.C. of this Lease during its term or any renewals thereof.

B. Except as otherwise provided in Section 13.C. below, in the event the Leased Premises shall be partially damaged or totally destroyed by fire or other disaster, Tenant shall promptly cause same to be restored, subject to such changes as Tenant may reasonably require and Landlord reasonably approves prior to commencement of reconstruction. Due allowance shall be made for (1) reasonable time necessary (not to exceed one hundred eighty (180) days) for Tenant to adjust the loss with insurance companies; and (2) delay occasioned by strikes, lockouts, and conditions beyond the reasonable control of Tenant, provided such delay does not exceed six (6) months without Landlord's consent.

C.  Should the Leased Premises, or a portion thereof, be rendered untenantable by fire or other disaster, the Rent shall be reduced proportionably from the date of the damage to the date of restoration of the Leased Premises; provided that any such reduction shall only be to the extent that Landlord is reimbursed pursuant to claims made by the Landlord under the business interruption insurance which Tenant at its discretion may obtain.  No Rent shall accrue for any portion of the Leased Premises unless Tenant is able to conduct its usual business on that portion of the Leased Premises which remains tenantable, but only to the extent that Landlord is reimbursed pursuant to claims made by the Landlord under the business interruption insurance provided for in Section 13.A. above. Notwithstanding anything to the contrary contained herein, if such damage occurs during the last two (2) years of the term of this Lease and the cost of restoration of the Leased Premises would be more

than one-third (1/3) of the replacement value of the Leased Premises, as certified by a registered architect, Landlord and Tenant shall each have the right to terminate this Lease by written notice to the other given within thirty (30) days after such occurrence. If this Lease is terminated then all insurance proceeds attributable to the Leased Premises shall be paid to Landlord and Landlord alone shall have the right to settle any claim with the insurance carrier with respect thereto. If Landlord elects to terminate this Lease, such termination shall not be effective if Tenant elects (within ten (10) days after receipt of Landlord's notice of termination) to renew this Lease by exercising any remaining options which are described in Section 3. If, at the date of the fire or other disaster, Tenant shall have paid any rent in advance, Tenant shall be entitled to a proportionate refund. Notwithstanding anything to the contrary set forth in this Section 13.C., Tenant shall carry rent loss insurance in connection with the Leased Premises, and Minimum Rent hereunder shall not abate for the reasons set forth in Section 13.C. to the extent that Tenant's rent loss insurance covers the same.

D. Provided this Lease is not terminated as set forth in this Section 13, the term of this Lease shall be automatically extended for a period of time equal to the period of time the Leased Premises are totally untenantable due to fire or other disaster.

## Landlord Representations and Warranties

SECTION 14. A. Landlord warrants that it is, or before the Commencement Date, will be, the owner in fee of the Leased Premises; that the Leased Premises are not presently subject to any liens or mortgages, and that Landlord has full right and title to execute and perform this Lease. So long as this Lease is in force and effect, Landlord agrees that it will not permit the disturbance of, nor interference with, Tenant's quiet enjoyment of the Leased Premises in accordance with the terms of this Lease.

B. Prior to the Commencement Date, Landlord shall furnish Tenant with satisfactory evidence of Landlord's title. If on the date Landlord acquires title to the Leased Premises the Leased Premises, or any part thereof is subject to any mortgage, deed of trust or other encumbrance in the nature of a mortgage, which is prior and superior to this Lease, Landlord will deliver to Tenant in form and substance reasonably satisfactory to Tenant, an agreement duly executed by such mortgagee or trustee, obligating such mortgagee or trustee or any successor thereto to be bound by this Lease and by all of Tenant's rights hereunder, provided Tenant is not in default beyond any applicable cure period under the terms of this Lease.

C. Landlord has or will obtain a title insurance policy insuring the Leased Premises and any easements benefiting the Leased Premises. Landlord represents and warrants that with respect to any exceptions to the title to the Leased Premises that: (i) nothing contained in any of said exceptions prohibits or restricts Landlord from performing any or all of its obligations under this Lease during the full term hereof, (ii) none of said exceptions adversely affects or interferes with Tenant's enjoyment of the Leased Premises, and (iii) there are no easements under, above or through the building to be constructed on the Leased Premises. Landlord further represents and warrants that the driveway easement located on the easterly boundary of the Leased Premises, as shown on Exhibit "A", shall be fully contained within the twenty foot (20') side setback.

D. Landlord warrants that physical possession of the Leased Premises shall be delivered to Tenant by Landlord free of asbestos, radon, PCB and other toxins and/or hazardous materials as defined by CERCLA (42 U.S.C. Section 9601, et seq.). Landlord hereby agrees to defend, indemnify and save harmless Tenant from and against any and all claims and demands arising out of a breach of the foregoing warranty.

## Assignment and Subletting

SECTION 15. A. Tenant shall have the right to assign this Lease or sublet the Leased Premises at any time. Tenant shall give notice of any and all assignments and subleases to Landlord, together with a copy of the applicable instrument; provided, however, that any use of the Leased Premises by an assignee or sublessee shall comply with Section 1.C. of this Lease and with the law.

B. No assignment of this Lease or subletting of the Leased Premises shall relieve Tenant of its obligations under this Lease.

C. In the event Landlord assigns this Lease, Landlord shall remain liable and responsible for all obligations and covenants accruing before the assignment's effective date and such assignee shall agree to be liable and responsible for all obligations and covenants accruing on and after the effective date.

## Mechanics Liens

SECTION 16. When completed, Landlord will ensure that the Leased Premises are free and clear of all claims of lien by mechanics and materialmen for and on account of labor and materials furnished in and about the construction by Landlord. Thereafter, if any mechanic's or other liens, or order for the payment of money arising through the fault of either party, shall be filed against the Leased Premises or additions, alterations or extensions thereto, such party shall cause the same to be canceled and discharged of record, by bond or otherwise, and shall also defend and pay damages and attorney fees, if any, on behalf of the other, for any action, suit or proceeding which may be brought

thereupon for the enforcement of such lien, liens or orders. Upon failure of the defaulting party to comply with the provisions of this Section, the other party may, after thirty (30) days notice, do so on the defaulting party's behalf, and all sums thereby expended by the other party shall on demand be paid to it by the party in default. In the event Landlord is the defaulting party, Tenant may offset against Rent due or to become due all sums expended by Tenant as a result of Landlord's failure to comply with this Section.

## Law, Regulations

SECTION 17.    Except to the extent any order, rule, regulation or requirement of any governmental body relates to a) the roof or structural parts of the Leased Premises, b) water, sprinkler, gas or electrical lines or conduits permanently embedded in the walls, ceiling or floor of the Leased Premises, c) the exterior of the Leased Premises, or d) any condition which existed prior to the Commencement Date, Tenant agrees to comply with all orders, rules, regulations and requirements of any governmental body relating to the manner of Tenant's use and occupancy of the Leased Premises, or alterations made by the Tenant, and Tenant will pay all costs and expenses incidental to such compliance and will indemnify and save harmless Landlord therefrom. In the event compliance with any governmental orders, rules, regulations or requirements is not the responsibility of Tenant as provided in this Section, Landlord shall comply with such orders, rules, regulations and requirements at its sole cost and expense and will indemnify and save Tenant harmless therefrom.

## Insurance

SECTION 18.  A. Tenant, in its name and at its own expense, shall procure and continue in force, general liability insurance against damages occurring in the Leased Premises during the term of this Lease and any extension thereof. Such insurance shall be in an amount not less than Three Million Dollars ($3,000,000) combined single limit for bodily injury and property damage. Such insurance shall name Landlord as an additional insured in respect to the Leased Premises.

B. Tenant covenants to keep in good order and repair the plate glass in the Leased Premises, and to replace all broken glass with same quality as that broken; provided, however, should damage or breakage occur due to structural fault (provided such structural fault occurs during the first year of the Lease term), or the fault or neglect of Landlord, then Landlord shall be responsible for replacing the damaged or broken glass.

C. Should Tenant desire to carry coverage described in Section 18.A. under a "blanket" policy or policies covering other properties of Tenant, its parent corporation, its subsidiaries, or controlling or affiliated corporations, or of any assignee of this Lease, and/or self-insure in whole or in part, such shall be deemed compliance with Tenant's obligations under this Section, as to both original coverage and renewals.

D. Landlord agrees to defend, indemnify and save harmless Tenant from and against any and all claims and demands whether from injury to person, loss of life, or damage to property, occurring within the Leased Premises as may result from any injury or damage caused by acts or omissions of Landlord.

E. Tenant agrees to defend, indemnify and save harmless Landlord from and against any and all claims and demands whether from injury to person, loss of life, or damage to property, occurring within the Leased Premises, excepting, however, such claims or demands as may result from any injury or damage caused by acts or omissions of Landlord.

## Waiver of Subrogation

SECTION 19.  A. Tenant hereby agrees not to assign to any insurance company any right or cause of action for damage to the property of Tenant located in the Leased Premises which Tenant now has or may subsequently acquire against Landlord during the term of this Lease, and expressly waives all rights of recovery for such damage.

B. Landlord hereby agrees not to assign to any insurance company any right or cause of action for damages to the property of Landlord located in the Leased Premises which Landlord now has or may subsequently acquire against Tenant during the term of this Lease, and expressly waives all rights of recovery from such damage.

C. It is specifically understood this Section shall only apply (1) where such insurance as described herein allows the insured to enter into an agreement waiving recovery rights, and (2) to the extent insurance proceeds are recovered.

## Default

SECTION 20.  A. Each of the following shall be deemed a default by Tenant and a breach of this Lease:

1. Any of the following which shall result in final adjudication against Tenant:

-8-

a) The filing of a bankruptcy petition by or against Tenant for adjudication, reorganization or arrangement;

b) Any proceedings for dissolution or liquidation of Tenant; or

c) Any assignment for the benefit of Tenant's creditors.

2. Failure to:

a) pay Rent for a period of fifteen (15) days after receipt of notice; or

b) perform any other covenant or condition of this Lease for a period of thirty (30) days after receipt of notice.

B. In the event of any default of Tenant, Landlord shall serve written notice upon Tenant that Landlord elects to terminate this Lease upon a specified date not less than thirty (30) days after the date of serving of such notice. This Lease shall then expire on the date so specified as if that date had been originally fixed as the expiration date of the term herein granted unless such steps have, in good faith, been commenced promptly by Tenant to rectify the same, and are prosecuted to completion with diligence and continuity. If the matter in question shall involve building construction, and if Tenant shall be subject to unavoidable delay by conditions beyond the control of Tenant, Tenant's time to perform shall be extended for a period commensurate with such delay, provided such delay does not exceed six (6) months without Landlord's consent.

C. Upon termination of this Lease for Tenant's default, Landlord or its agents may immediately or at any time thereafter, re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by a suitable action or proceeding at law, or by force or otherwise, without being liable for any damages therefor, subject, however, to Tenant's right to remove trade fixtures and personal property, after notice to Landlord, within fifteen (15) days after termination of the Lease. No re-entry by Landlord shall be deemed an acceptance of a surrender of this Lease. Thereafter, Landlord may in its own behalf, relet any portion of the Leased Premises for any period of the remaining term for any reasonable sum to any reasonable tenant for any reasonable use or purpose. In connection with any such reletting, Landlord may make such changes to the Leased Premises and may grant such concessions of free rent as may be reasonably appropriate or helpful in effecting such lease.

## Rent Under Default

SECTION 21. In the event this Lease shall be terminated for Tenant's default, Landlord's sole remedy shall be to recover from Tenant, in addition to any damages becoming due hereunder, the following:

An amount equal to the amount of all rents reserved under this Lease for the remainder of the initial term or the option period then in effect, as the case may be, less the net rent, if any, collected by Landlord on reletting the Leased Premises (the "Rent Reserved"), which shall be due and payable, by Tenant to Landlord, on the several days on which the rents reserved in this Lease would have become due and payable. Net rent collected on reletting by Landlord shall be computed by deducting from the gross rents collected all reasonable expenses incurred by Landlord in connection with the reletting of the Leased Premises, including broker's commission and the cost of repairing, renovating or remodeling the Leased Premises, but not including the cost of performing any covenant required to be performed by Landlord.

As clarification of the immediately preceding paragraph, in the event of any default by Tenant, and after the expiration of all applicable periods for curing such default, Landlord shall have the right to sue for the Rent Reserved. In the event that Landlord shall obtain a judgment against Tenant, Tenant, in accordance with the immediately preceding paragraph, shall pay the Rent Reserved (or such lesser amount if such lesser amount is awarded pursuant to a judgment) which shall continue to be due and payable, by Tenant to Landlord, on the several days on which the Rent Reserved would have become due and payable under this Lease. Nothing contained herein shall be construed as Landlord having a right to accelerate the payment of the Rent Reserved under this Lease.

## Entry of Landlord

SECTION 22. Subject to Tenant's reasonable security requirements, Landlord may at reasonable times and upon reasonable notice, inspect, alter or repair the Leased Premises when necessary for its safety or preservation. Landlord may show the Leased Premises to others at any reasonable time within nine (9) months immediately preceding the expiration of this Lease.

## Tenant's Right To Cure Landlord's Default

SECTION 23. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to the Leased Premises and to which this Lease shall be subordinate or Landlord shall fail to make any other payment which Landlord is obligated to pay under this Lease, and such default continues uncured for seven (7) days after notice thereof to Landlord, or, except as expressly provided in Section 10.C. relative to Tenant's right to make repairs on behalf of Landlord, in the event Landlord shall fail to perform any other obligation specified in this Lease including but not limited to the failure to properly maintain the Exterior Facilities as provided in Section

-9-

33 hereof and such default continues uncured for thirty (30) days after notice thereof to Landlord, Tenant may, but shall not be required to, cure such default on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant in curing such default, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness and any such withholding from Rent as provided in this Section 23 or elsewhere in this Lease shall not constitute a default by Tenant in the payment of Rent unless Tenant shall fail to pay such amount withheld within thirty (30) days after final adjudication that such amount withheld is owing to Landlord. Notwithstanding anything to the contrary contained in this Lease, if any such default as is described in this Section 23 continues uncured for forty-five (45) days after initial notice thereof by Tenant, Tenant may terminate this Lease at any time thereafter.

### Notices

SECTION 24. All notices and rental checks shall be forwarded to Landlord in care of B & R Realty Group, Inc., 3101 US Highway #9, Old Bridge, New Jersey 08857, until Tenant is notified otherwise in writing. Landlord's federal tax identification number is 22-3586987. All notices given to Tenant hereunder shall be forwarded to Tenant at Eckerd Corporation, Store #6382R P. O. Box 4689, Clearwater, Florida 33758, Attention: Real Estate Department, with a copy to the Regional Real Estate Director, Store #6382R, 8 Queen Anne Court, Langhorne, Pennsylvania 19047, until Landlord is notified otherwise in writing. Notices delivered to the Leased Premises shall not constitute notice to Tenant under the terms of this Lease. Notices to each shall be be by certified mail, return receipt requested, or by bonded overnight courier, and shall be effective upon receipt or refusal to accept delivery.

### Lease Subordination and Notices to Mortgagees

SECTION 25. A. Tenant agrees to subordinate this Lease to the lien of any mortgage or blanket mortgage placed on the Leased Premises, provided only that so long as this Lease is in full force and effect, with regard to any such mortgage or blanket mortgage (1) Tenant's tenancy will not be disturbed, nor will this Lease be affected by any default under such mortgage; (2) the rights of Tenant hereunder shall expressly survive and shall not be cut off; and (3) this Lease shall, in all respects, continue in full force and effect.

B. If Landlord is in full compliance with the provisions of this Lease, Tenant will, upon demand and without cost, execute an instrument necessary to effectuate such subordination. Landlord and Tenant acknowledge that the form of instrument attached hereto as Exhibit "D" and made a part hereof shall be acceptable to the parties for such subordination.

C. Any notices required or permitted to be given to Landlord under this Lease shall also be given to any mortgagee whose name and address Landlord has provided to Tenant in writing. Such mortgagee shall have the right, but not the obligation, to cure any default by Landlord within the same time period as may be granted Landlord under any provision in this Lease.

### Exclusive

SECTION 26. Landlord agrees that it will not directly or indirectly lease, rent, sell or otherwise permit any property in which it has any interest (direct or indirect) located within one thousand (1,000) feet of any exterior boundary of the Leased Premises, to be used as a drug store or a business which sells or dispenses prescription drugs, without the written permission of Tenant. If the mortgagee of the Leased Premises becomes the landlord, the provisions of this Section 26 shall not apply for so long as it shall remain the landlord.

### Short Form Lease

SECTION 27. The parties hereto do mutually agree that a short form of this Lease will be executed for the purpose of recording. Such short form shall be recorded ahead of any mortgage hereafter placed on the Leased Premises or any part thereof, and Tenant agrees to subordinate this Lease to the lien of any mortgage placed on the Leased Premises as set forth herein, provided that the requirements regarding non-disturbance of Tenant as set forth in this Lease are satisfied in each instance of subordination.

### Eminent Domain

SECTION 28. A. If the entire building on the Leased Premises shall be taken by reason of condemnation or under eminent domain proceedings, Landlord or Tenant may terminate this Lease as of the date when possession of the building is taken. If a portion of the building shall be taken under eminent domain or by reason of condemnation and if in the opinion of Tenant, reasonably exercised, the remainder of the building is no longer suitable for Tenant's business, this Lease, at Tenant's option, to be exercised by notice to Landlord within sixty (60) days of such taking, shall terminate; any unearned rents paid or credited in advance shall be refunded to Tenant. If this Lease is not so terminated, Landlord forthwith and with due diligence, shall restore the building. Until so restored, Minimum Rent shall abate to the extent that Tenant shall not be able to conduct business in a reasonable manner, and thereafter Minimum Rent for the remaining portion of the term of this Lease shall be proportionately reduced (based on the reduced square foot floor area of the building).

-10-

B.  In the event any part of the parking areas of the Leased Premises shall be taken by reason of condemnation or under eminent domain or if as a result of any taking of the Leased Premises or other property subject to an easement benefiting the Leased Premises any driveway or curb cut access to the Leased Premises will be closed, and if in the opinion of Tenant, reasonably exercised, the Leased Premises are no longer suitable for Tenant's business, this Lease, at Tenant's option by notice to Landlord within sixty (60) days of such taking shall terminate.  If this Lease is not terminated, Landlord, at Landlord's expense, shall restore the remaining Leased Premises and parking areas to a proper and usable condition.  However, Tenant shall not have such right to terminate this Lease if Landlord provides alternate parking areas which are reasonably acceptable to Tenant.  Until so restored, Minimum Rent shall abate to the extent that Tenant shall not be able to conduct business at the Leased Premises in a reasonable manner, and thereafter Minimum Rent for the remaining portion of the term of this Lease shall be proportionally reduced (based on the effect such taking has on Tenant's business at the Leased Premises).

C.  For purposes of this Section 28, the term "condemnation or under eminent domain proceedings" shall include conveyances and grants made in anticipation of or in lieu of such proceedings.

## Force Majeure

SECTION 29.  Anything in this Lease to the contrary notwithstanding, neither Landlord nor Tenant shall be in default of the performance of any provisions of this Lease to the extent such performance shall be delayed or prevented by strike, war, act of God, or other cause beyond the control of party seeking to excuse such performance; provided, however, no such excusable delay shall exceed six (6) months.  The obtaining of requisite permitting as set forth in Section 6.B. of this Lease shall not be construed as an excusable delay for the purposes of this Section 29 (except for the additional 60 days to commence construction as set forth in Section 6.B).  The respective monetary obligations of the parties hereunder shall not be subject to this Section 29.

## Severability

SECTION 30.  If any term or provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

## Obligation of Successors

SECTION 31.  All of the provisions hereof shall bind and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns, and all covenants, conditions and agreements contained herein shall be construed as covenants running with the land.

## Taxes

SECTION 32.  A.  Landlord shall promptly deliver to Tenant, upon receipt, all general real estate tax bills for the Leased Premises.  Tenant shall pay such tax bills directly to the taxing authority.

B.  Provided the tax bills are delivered to Tenant by Landlord in a timely manner, Tenant agrees to pay all general real estate taxes before delinquency; and Landlord shall not be obligated to pay any penalty for delinquent payment.  Any payment due hereunder shall be prorated as of the termination or expiration date of this Lease.

C.  Any payment made by Tenant under this Section shall be a non-cumulative credit against any Percentage Rent due under Section 4.C. of this Lease during its term or any renewals thereof.

SECTION 33.  Intentionally deleted.

## Miscellaneous

SECTION 34.  A.  The captions in this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

B.  This Lease shall be construed in accordance with applicable law of the state in which the Leased Premises are located.

C.  The occurrence of any abatement of Minimum Rent as provided herein in any Lease Year shall not reduce the annual Percentage Rent breakpoint set for such Lease Year.

D.  Tenant agrees, from time to time but no more often than twice per lease year, upon (i) not less than thirty (30) days' prior written request by Landlord, and (ii) payment by Landlord of a One Hundred Fifty and No/100 Dollar ($150.00) fee to cover legal and administrative costs incurred by Tenant in processing such request, to execute and deliver to Landlord a written certificate stating (a) whether this Lease has been modified or amended and, if so, identifying any such modification or amendment; (b) whether Rent and other charges have been paid more than thirty (30) days in advance

of the date when due and, if so, the date to which they have been paid in advance; and (c) whether to the best of Tenant's knowledge, any uncured default exists on the part of Landlord and, if so, specifying the nature of such default.

E.  One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same or any other covenant, term or condition; nor shall any delay or omission by either party to seek a remedy for any breach of this Lease or to exercise a right accruing to such party by reason of such breach be deemed a waiver by such party of its remedies or rights with respect to such breach.  The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any similar act.

F.  Neither Tenant nor its officers, directors, shareholders, agents, or employees shall be liable for any liability, claims, suits, fines, penalties, causes of action, costs, expenses (including, but not limited to, attorneys' fees and court costs) or damages with respect to compliance with the Industrial Site Recovery Act, N.J.S.A. 13:1K-et seq. ("ISRA"), unless ISRA is applicable to the Leased Premises and Tenant due to the fact that Tenant, its employees, agents representatives, or contractors stored, disposed of, used, transported or otherwise handled hazardous substances or wastes at the Leased Premises or on the property of which the Leased Premises is a part, regardless of whether or not the triggering event is the termination of this Lease or a transfer of Tenant's interest therein or any other "triggering event" applicable to Tenant.  In no event will Tenant be liable to comply with ISRA due to the use, storage, discharge, disposal, transportation or the handling of hazardous substances or wastes by any other tenant, if any, of the property on which the Leased Premises is located.

## Exculpation

SECTION 35.  Tenant agrees that, except for damages arising out of any fraudulent misrepresentation on the part of Landlord, Tenant shall look solely to the estate and property of Landlord in the Leased Premises (which shall include any condemnation award or casualty proceeds payable to Landlord) for the satisfaction of Tenant's remedies, including, without limitation, the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms and provisions of this Lease to be observed and/or performed by Landlord.

## Environmental Compliance

SECTION 36.  (1)  Tenant shall not use, generate, manufacture, produce, store, release, discharge or dispose of, on, under or about the Leased Premises, or transport to or from the Leased Premises, any Hazardous Substance (as defined below).  Tenant shall keep and maintain the Leased Premises in compliance with Environmental Laws (as defined below).  Notwithstanding the foregoing, Tenant may use, store and sell in reasonable amounts and in accordance with applicable laws such cleaning products, automotive products and other products as are normally used, stored or sold in Eckerd Drug Stores from time to time, including, without limitation, chemicals and materials used in connection with photoprocessing.

(2)  Landlord and Tenant shall each give the other party prompt notice of any of the following of which the party in question has actual knowledge: (i) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Leased Premises or the migration thereof from or to other property; (ii) all claims made or threatened by any third party against Tenant, Landlord or the Leased Premises relating to any loss or injury resulting from any Hazardous Substance; and (iii) discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Leased Premises that could cause the Leased Premises or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Leased Premises under any Environmental Law or any regulation adopted in accordance therewith.

(3)  "Environmental Law" shall mean any federal, state, or local law, statute, ordinance or regulation pertaining to health, industrial hygiene, or the environmental conditions on, under or about the Leased Premises, including without limitation the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended from time to time ("CERCLA"), 42 U.S.C. Sections 9601 et seq., and the Resource Conservation and Recovery Act of 1976, as amended from time to time ("RCRA"), 42 U.S.C. Sections 6901 et seq.  The term "Hazardous Substance" shall include without limitation: (i) those substances included within the definition of "hazardous substances", "hazardous materials", "toxic substances", or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801 et seq., and in the regulations promulgated pursuant to said laws; (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (iii) such other substances, materials and wastes which are or become regulated under applicable local, state, or federal law, or which are classified as hazardous or toxic under federal, state or local laws or regulations; and (iv) any material, waste or substance which is (1) petroleum (2) asbestos (3) polychlorinated biphenyls (4) designated as a "hazardous substance" pursuant to Section 311 of the Clean Air Act, 33 U.S.C. Section 1251 et seq., or listed pursuant to Section 307 of the Clean Air Act, (5) flammable explosive, or (6) radioactive materials.

## Reversion

**SECTION 37.** Upon the termination of this Lease and any leasehold estate created herein, Landlord's reversionary interest in the Leased Premises shall be free and clear of any lien created by Tenant. This provision shall not apply to a judgment obtained by the Tenant against the Landlord.

**IN WITNESS WHEREOF,** the parties hereto have caused this Lease to be executed under seal by their respective duly authorized representatives as of the day and year first above written.

"LANDLORD"

WITNESSES as to Landlord:

Printed Name: _Jo Ann Rux_

Printed Name: _____

NORTH NEW PROSPECT ASSOCIATES, LLC, a New Jersey limited liability company

By: X _Ben Rosen_
Name: _Ben Rosenblum_
Title: _Member_

"TENANT"

WITNESSES as to Tenant:

Printed Name: _Barbara Elleson_

Printed Name: _Bonnie J. Barnhill_

ECKERD CORPORATION, a Delaware corporation

By: _____
Gerald D. Martin, Vice President
_Thomas M. Nash_

Landlord (Cont)

_Steven Blitz_
Member

_Harry Rosenblum_
MEMBER

_Mark Brechman_
Member

j:\legal\leases\6382r.doc

Exhibit "B"

## LEGAL DESCRIPTION

Beginning at a concrete monument found in the northerly line of Aldrich Road (60' R.O.W.)(Ocean County Route No. 636) Said point being the common corner of Lots 17 and 18, Block 127.05 and also being distant 298.76 feet from the intersection of the aforesaid northerly line of Aldrich Road extended with the easterly line of New Prospect Road (54.75' R.O.W.) (Ocean County Route No. 641) extended; and running thence

(1.)  South 68° 25' 30" West, along the aforesaid northerly line of Aldrich Road, 56.65 feet to the point of curvature; thence

(2.)  Westerly, still along the northerly line of Aldrich Road, along a curve to the left, having a radius of 985.37 feet (central angle 12°37'04") and an arc distance of 217.00 feet to a point; thence

(3.)  South 89°19' 13" West, still along the northerly line of Aldrich Road, a distance of 34.89 feet to a point in the aforesaid easterly line of New Prospect Road; thence

(4.)  North 45° 41' 30" West, along the aforesaid easterly line of New Prospect Road, a distance of 282.50 feet to a point; thence

(5.)  North 68° 25' 30" East, along the common line of Lots 18 and 19 then 8 then 7 then 8 Block a distance of 419.92 feet to an angle point; thence

(6.)  South 21° 34' 30" East, along the common line of Lots 18 and 8 then 17 a distance of 246.50 feet to THE POINT AND PLACE OF BEGINNING

CONTAINING 92,263 SQ FT OR 2.118 AC

~~SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD, IF ANY.~~

BEING KNOWN as Tax Map Lot 18, Block 127.05 on the official tax map of the Township of Jackson, Ocean County, NJ

BEING more particularly shown on a map entitled "ALTA / ACSM Land Title Survey of Tax Map Lot 18 Block 127.05 Township of Jackson Ocean County New Jersey" prepared by Michael G. Zilinski, PLS for the firm of Kenderian Zilinski Associates dated 8/12/98 and revised through 8/13/98.

## FIRST LEASE AMENDMENT

**THIS FIRST LEASE AMENDMENT** (the "First Amendment") is made and entered into as of this 14th day of May. 2019 ("Execution Date"), by and between **NORTH NEW PROSPECT ASSOCIATES LLC**, a New Jersey limited liability company, having an address at 3101 U.S. Highway #9 Old Bridge, NJ 08857, Attention: Steve Blitzer ("Landlord") and **ECKERD CORPORATION**, a Delaware corporation, having an address at c/o Rite Aid Corporation, 30 Hunter Lane, Camp Hill, Pennsylvania 17011, Attention: Secretary ("Tenant")

### WITNESSETH:

**WHEREAS**, Landlord and Tenant have entered into that certain Lease Agreement dated April 22, 1999 (the "Original Lease"), as modified by Letter Agreement dated as of May 19, 1999 ("Letter Agreement" and together with the Original Lease, the "Lease") pursuant to which Landlord leases to Tenant certain premises located at 1 North New Prospect Avenue, situated in the Township of Jackson, County of Ocean, State of New Jersey 08527 (the "Premises"), as more particularly described in the Lease; and

**WHEREAS**, Tenant's current term is set to expire on and as of November 29, 2019 and Tenant holds four (4) five (5) year renewal options under the Lease; and

**WHEREAS**, Landlord and Tenant desire to modify and amend certain terms and conditions of the Lease as hereinafter provided for in this First Amendment.

**NOW, THEREFORE**, in consideration of the Premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be bound thereby, the parties do hereby agree as follows:

1.  **Defined Terms**. Capitalized terms which are used in this First Amendment and are not otherwise defined shall have the same respective meanings ascribed to such terms in the Lease.

2.  **Remaining Current Term; Minimum Rent**. Landlord and Tenant hereby agree to modify the amount of minimum rent due from Tenant effective as of Execution Date and ending November 29, 2019 (the "Remaining Current Term"). Notwithstanding anything in the Lease to the contrary, during the Remaining Current Term, Tenant shall pay minimum rent in the amount of Two Hundred Twenty-Eight Thousand Three Hundred Twelve and 72/100 Dollars ($228,312.72) per annum, payable in equal monthly installments in the amount of Nineteen Thousand Twenty-Six and 06/100 Dollars ($19,026.06).

3.  **Extended Term; Minimum Rent**. Landlord and Tenant hereby agree to extend the current Lease term commencing on November 30, 2019 and ending on March 31, 2029 (the "Extended Term"). Notwithstanding anything to the contrary set forth in the Lease, during the Extended Term, Tenant shall pay minimum rent in the amount of Two Hundred Twenty-Eight Thousand Three Hundred Twelve and 72/100 Dollars ($228,312.72) per annum, payable in equal monthly installments in the amount of Nineteen Thousand Twenty-Six and 06/100 Dollars

($19,026.06).. For the avoidance of all doubt, Tenant retains its four (4) five (5) year options remaining under the current Lease.   The Tenant accepts the Premises in its present "as is" condition for the Extended Term.

     **4.**     **Estoppel.** Landlord and Tenant acknowledge and affirm that as of the date of this First Amendment, neither the Tenant nor the Landlord is in default under any of the terms, covenants, conditions or provisions of the Lease and neither the Landlord nor the Tenant has any offsets, claims or defenses against the other party with respect to any obligation or duty of each arising pursuant to the Lease.

     **5.**     **Third Party Consent.** Landlord warrants and represents that the consent to this First Amendment of any ground lessor, mortgagee, other lending institution or any other entity or individual having an interest in the Premises is not necessary.  Landlord further agrees to indemnify, defend and hold Tenant harmless from and against any losses or claims arising from Landlord's failure to obtain consent to this First Amendment from any such ground lessor, mortgagee, lending institution or other entity or individual.

     **6.**     **Brokers.** Each party represents to the other that neither party has dealt with any broker in such a manner as to incur any liability for any commission, fee or compensation whatsoever in connection with this First Amendment, and each shall indemnify the other against any loss, cost or expense resulting from any such claim and shall hold the other harmless from any liability in connection with such claim as may result from their dealing with any brokers.

     **7.**     **Authority.** Landlord and Tenant represent and warrant to the other party that the Tenant and the Landlord is duly authorized to conduct business in the State of New Jersey and has the full and sole right, capacity, power and authority to enter into this First Amendment.

     **8.**     **Counterparts.** This First Amendment may be executed in one or more electronic or original counterparts, all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page by fax transmission or by e-mail in PDF format shall be as effective as delivery of a manually signed counterpart.

     **9.**     **Full Force and Effect.** Except as specifically modified hereby, all of the terms, covenants and conditions of the Lease shall remain in full force and effect and shall be binding on the parties hereto, their successors and assigns. To the extent that there is a conflict between the provisions of this First Amendment and the provisions of the Lease, the provisions of this First Amendment shall govern and control.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties have caused this First Amendment to be executed as of the day and year first above written.

WITNESS:

LANDLORD:

**NORTH NEW PROSPECT ASSOCIATES, LLC**

*Lisa Blitzer*

By: *Steven Blitzer*
~~Steven Blitzer~~
Managing Member

WITNESS:

TENANT:

**ECKERD CORPORATION**

*Linda L. Brown*

By: _____
Name: Joseph J. Notarianni, Jr.
Its: Vice President

**ACKNOWLEDGED AND CONSENTED TO BY:**

LENDER: *Provident Bank*

By: _____
Name: *Paul Barrood*
Title: *Vice President*

- 3 -

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES ("Assignment") is made as of the 5th Day of December, 2023 by and between North New Prospect Associates. LLC a New Jersey limited liability company ("Assignor") and Star Capital Partners, LLC, a New Jersey limited liability company ("Assignee").

Whereas, Assignor has sold to Assignee on this date the "Rite Aid" drug store located at 1 North New Prospect Road, Jackson, New Jersey (hereinafter referred to as the "Property"); and

Whereas, in connection with such sale Assignee has agreed to assume responsibility as landlord for leases of the tenants at the Property, and Assignor and Assignee wish to evidence their agreement with respect thereto.

NOW, THEREFORE, for and in consideration of the sum of Ten and 00/XX ($10.00) Dollars and other good and valuable consideration in hand paid by each party hereto to the other party hereto, Assignor and Assignee, intending to be legally bound, hereby agree as follows:

A.      1.      Assignor, by its execution hereof, hereby assigns to Assignee all of the leases and tenancy agreements for tenants at the Property, as set forth on Exhibit "A" attached hereto (the "Leases"). Assignor hereby represents that Exhibit "A" is a true, complete and accurate rent roll for the Property. The Tenant, through successors and merger is now Rite Aid and on October 15, 2013, Rite Aid filed for Bankruptcy protection under case number 23-18993.

2.      Assignor hereby agrees to hold Assignee harmless from and against any and all loss, cost or damage including reasonable attorney's fees that Assignee may incur by reason of Assignor's failure to perform any obligations and duties of Assignor under the Leases on and before the date hereof, or by reason of a breach of any of the warranties and representations of Assignor herein set forth.

3.      Assignee, by its execution hereof, hereby accepts this Assignment and agrees to hold Assignor harmless from and against any and all loss, cost or damage including reasonable attorney's fees that Assignor may incur by reason of Assignee's failure to perform any obligations and duties of Assignee under the Leases on and after the date hereof, or by reason of a breach of any of the warranties and representations of Assignee herein set forth.

4.      There is no security deposit and therefore Assignee is not responsible for the repayment and refund of the refundable security deposits. and interest to the respective tenants of the Property, solely in accordance with Exhibit "A" hereto and to the extent that Assignor's warranties and representations contained herein are true and correct, Assignee agrees to hold Assignor harmless from and against any loss, cost or damage resulting from or arising out of Assignee's failure to perform in accordance with this Paragraph.

5.      Assignor hereby warrants and represents to Assignee that except for the security deposits and interest set forth on Exhibit "A" annexed hereto, there are no other security deposits and there is no interest owing with respect to any security deposits. Assignor agrees to hold Assignee harmless from and against any loss, cost or damage resulting from or arising out of Assignor's breach of the warranties and representations contained in this Paragraph.

6.      Assignor hereby warrants and represents to Assignee that the leases provided to Assignee are true, complete and correct, and there have been no prior assignments of the Leases, and that neither the

Leases nor the Deposits made thereunder are subject to any liens, security interest or adverse claims except for a collateral assignment of lease to the current lender which loan will be paid off at the time this Assignment of Lease is executed  except this provision shall not apply to any matter arising in or out of the Bankruptcy set forth above.  Assignor makes no statement or representation as to the viability of the Tenant or the status of the Lease.  The Lease is being assigned "as is" with no representations or warranties of any kind whatsoever.

      7.     This Assignment and the warranties and representations herein contained shall be binding upon and shall inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

      IN WITNESS WHEREOF, Assignor and Assignee have signed, sealed and delivered this Assignment as of the day and year first above written.

ASSIGNOR:

North New Prospect
Associates, LLC


By: _____
Name:  Steven Blitzer
Title:  Managing Member

ASSIGNEE:

Star Capital Partners, LLC

By: _____
Name: Shimon T. Brudny
Title: Manager

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** (this "***Amendment***") is made effective July 16, 2024, (the "***Effective Date***") by and between Star Capital Partners, LLC, ("***Landlord***"), and THRIFT DRUG, INC., a Delaware corporation ("***Tenant***," and together with the Landlord, the "***Parties***" and each, a "***Party***").

## RECITALS

**WHEREAS**, Landlord and Tenant are parties to that certain lease agreement dated April 22, 1999 (as amended from time to time thereafter, the "***Original Lease***"), with respect to that certain premises located at 1 North New Prospect Road Jackson, New Jersey 08527, which premises is defined and more particularly described in the Lease (the "***Premises***");

**WHEREAS**, Landlord, as successor-in-interest to North New Prospect Associates, LLC, and Tenant, are parties to that certain First Lease Amendment dated May 14, 2019 (the "***May 2019 Amendment***") (hereinafter, the Lease and the May 2019 Amendment may collectively be referred to as the "Lease");

**WHEREAS**, on October 15, 2023, Tenant and certain of its debtor affiliates (collectively, the "***Debtors***") commenced a case (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "***Bankruptcy Code***") which is now pending in the United States Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***"). The Chapter 11 Cases are being jointly administered under Case Number 23-18993; and

**WHEREAS**, Landlord and Tenant desire to modify certain terms and conditions of the Lease, effective as of the Restructuring Effective Date (as hereinafter defined), as amended by this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Landlord and Tenant hereby agree as follows:

## AGREEMENT

1.    Capitalized Terms. Capitalized terms used and not otherwise defined herein shall have the respective meaning assigned to such terms in the Lease.

2.    Effective Date. This Amendment, and each of its amendments, modifications, and waivers with respect to the Lease as set forth herein, shall be effective on the date that the Lease is assumed or assigned in the Chapter 11 Cases, pursuant to entry of an order by the Bankruptcy Court approving the assumption of the Lease and confirming the Debtors' chapter 11 plan of reorganization in the Chapter 11 Cases (the "***Restructuring Effective Date***"). In the event the Restructuring Effective Date does not occur, this Amendment shall be null and void in all respects, and nothing in this Amendment shall give rise to any claim, causes of action, or damages (compensatory or consequential) against either Party. Tenant hereby agrees to assume the Lease pursuant to section 365 of the Bankruptcy Code.

3.    Lease Modification.

(a)    Section 3 of the May 2019 Amendment is hereby amended as follows: Landlord and Tenant hereby agree that the current Lease term shall terminate on July 31, 2025 (the "***Current Term***"). Notwithstanding anything to the contrary set forth in the Lease, during the Current Term, Tenant shall pay

1

minimum rent in the amount of Two Hundred Twenty-Eight Thousand Three Hundred Twelve and 72/100 Dollars ($228,312.72) per annum, payable in equal monthly installments in the amount of Nineteen Thousand Twenty-Six and 06/100 Dollars ($19,026.06).  Tenant, if not in default beyond any applicable cure period, shall have one (1) five (5) year renewal option under the Lease (the "***Renewal Option***"), the term of which shall run from August 1, 2025 through July 31, 2030 (the "**Renewal Option Term**").  Tenant acknowledges and agrees that its renewal options as set forth in the Original Lease (Section 3) and in Section 3 of the May 2019 Amendment are amended by this Section 3(a).  The Lease shall terminate on July 31, 2025 unless on or before 5:00 p.m. on Wednesday, April 30, 2025, Time Being of the Essence (and such date being strictly construed notwithstanding any equitable or other principles or decision which may alter this time and date) Landlord receives written notice from Tenant that Tenant has elected to renew this Lease (the "**Renewal Option Notice**").  In the event Tenant fails to timely serve on Landlord the Renewal Option Notice, this Lease shall automatically terminate on July 31, 2025.  In the event Tenant serves the Renewal Option Notice so it is received by Landlord on or before 5:00 p.m. on Wednesday, April 30, 2025, Time Being of the Essence, then this Lease shall renew for the Renewal Option Term, and Minimum Rent for the Renewal Option Term shall be Two Hundred Seventy-five Thousand Dollars ($275,000.00) per annum.

(b)      Section 4 of May 2019 Amendment is hereby  amended as follows: In the event the Tenant timely serves on Landlord the Renewal Option Notice as required under Paragraph 3(b) of this Amendment, this Lease shall automatically renew for the Renewal Option Term, and Tenant shall within fifteen (15) days of issuance of the Renewal Option Notice provide to Landlord an estoppel certificate in form and substance substantially as required by Miscellaneous Section 34(D) of the Lease, and without limiting the foregoing, affirm that, neither the Tenant nor the Landlord is in default under any of the terms, covenants, conditions or provisions of Lease and neither the Landlord nor the Tenant has any offsets, claims or defenses against the other party with respect to any obligation or duty of each arising pursuant to the Lease; *provided* that, if Tenant fails to provide an estoppel certificate within fifteen (15) days of issuance of the Renewal Option Notice, Landlord will provide written notice to Tenant of failure to comply with this section and Tenant shall be allowed a period of an additional five (5) business days after receipt of such written notice to deliver the estoppel certificate."

(c)      <u>Attorneys' Fees</u>.  Landlord further acknowledges and agrees that, notwithstanding anything to the contrary in the Lease, Landlord shall not be entitled to receive from Tenant or its affiliates (or charge as rent due from Tenant or its affiliates) any attorneys' fees incurred by Landlord in connection with this Amendment.

(d)      Notwithstanding any provision in the Lease or this Amendment to the contrary, Tenant agrees that it shall provide a minimum of three (3) full calendar' months written notice to Landlord prior to any termination of this Lease or vacation and surrender of the Premises.

4.      <u>Authority</u>.  Each Party represents and warrants that it has the authority and power to enter into this Amendment and that this Amendment constitutes a legal, valid and binding obligation of that Party.

5.      <u>Notices.</u>

(a)      Notwithstanding anything to the contrary contained in the Lease, any notices required or permitted to be sent to Tenant under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

If by Certified Mail:
THRIFT DRUG, INC.
P.O. Box 3165
Harrisburg PA 17105

Attn: Legal Department

If by Overnight Courier:
THRIFT DRUG, INC.
200 Newberry Commons
Etters PA 17319
Attn: Legal Department

(b)    Notwithstanding anything to the contrary contained in the Lease any notices required or permitted to be sent to Landlord under the Lease shall be sent by nationally recognized overnight courier or United States certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| Name: | STAR CAPITAL PARTNERS LLC |
| Address: | 127 Valley Road<br>Jackson, NJ 08527 |
| Email: | starcapitalpartnersnj@gmail.com, stbrudny@gmail.com |
| Telephone: | 732-397-7935 |

With a copy to:

Managing Partner
Hill Wallack LLP
27 Roszel Road
Princeton, NJ 08540

6.    <u>Miscellaneous</u>.

(a)    This Amendment may be executed in counterparts, each of which shall constitute an original, and which together shall constitute one and the same agreement.  This Amendment may be executed or delivered by electronic or facsimile means, and copies of executed signature pages stored electronically in portable document format (.pdf) shall be binding as originals.  Neither Party shall record this Amendment without the express prior written consent of the other Party.  Additions, modifications and/or alterations to the language of this Amendment are subject to written approval of the Parties.

(b)    Subject to the other terms of this Amendment, each of Landlord and Tenant agree to execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the modifications, waivers and amendments contemplated by this Amendment.

(c)    This Amendment, and all covenants contained herein, shall be binding and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.

(d)    The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provisions, which shall remain in full force and effect.

(e)      Except as amended by this Amendment, the Lease is unamended and shall remain in full force and effect.  Except as modified by this Amendment, all of the terms and provisions of the Lease remain unchanged and in full force and effect and Landlord and Tenant hereby ratify and confirm same. Landlord and Tenant acknowledge and agree that the Lease, as modified by this Amendment, sets forth the entire agreement between Landlord and Tenant and there are no other agreements, understandings, undertakings, representations, or warranties among the Parties with respect to the subject matter hereof except as set forth herein.  In case of any conflict between the terms and provisions of the Lease and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

*[signature pages follow]*

4

Rite Aid Store No. 10496

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment effective as of the Effective Date.

**<u>LANDLORD</u>:**

STAR CAPITAL PARTNERS LLC.

By: *Shimon T. Brudny*
Name: Shimon T. Brudny
Title:   Managing Member

**<u>TENANT</u>:**

THRIFT DRUG, INC.

By:      */s/ Paul Davidovicz*
Name:  Paul Davidovicz
Title:   GVP Store Development

Docusign Envelope ID: F761C9B5-165D-42EA-B137-2B4749C2C7



CORPORATE OFFICE
200 Newberry Commons, Etters, PA 17319

Legal Department

April 24, 2025

**VIA FEDERAL EXPRESS**
STAR CAPITAL PARTNERS LLC
127 Valley Road
Jackson, NJ 08527

Re:   **NOTICE OF EXERCISE OF LEASE RENEWAL OPTION
      1 North New Prospect Road
      Jackson, New Jersey
      Rite Aid #10496**

Sir/Madam:

Please be advised that THRIFT DRUG, INC. will be exercising one of its remaining options to extend the term of the Lease for the referenced premises for an additional five years. Our new term will commence on August 1, 2025, and will expire on July 31, 2030.

Please note that Rite Aid's address for Legal notices has changed. Therefore, effective immediately all future legal notices as required by the terms of the Lease in connection with the above-referenced store should be sent to the following address:

c/o Rite Aid Corporation                 c/o Rite Aid Corporation
Post Office Box 3165                      200 Newberry Commons
Harrisburg, Pennsylvania 17105           Etters, Pennsylvania 17319
Attention: Legal                         Attention:  Legal

While your acknowledgment of receipt of this notice is not required for its validity, we request that you do so by signing and scanning via email a copy of this letter to Legal.Realestate@riteaid.com.

Very truly yours,
THRIFT DRUG, INC.

*Tracy Verastegui*

Tracy L. Verastegui
Vice President, Real Estate

Acknowledged:

By:_____

cc:  Managing Partner, Hill Wallack LLP, 27 Roszel Road, Princeton, NJ 08540

# 2025 FINAL/2026 PRELIMINARY TAX BILL
## TOWNSHIP OF JACKSON, OCEAN COUNTY

| BLOCK NUMBER | LOT NUMBER |
|---|---|
| 5901 | 7 |

Property    1 N NEW PROSPECT ROAD
Building    1SCBA    11421
Additional
Land Dimens.  2.08 AC
Bank            Mortgage          Tax Acct    13026

### ASSESSED VALUATION INFORMATION

LAND:    1872000    IMPROVEMENTS:    1510000    TOTAL:    3382000
EXEMPTIONS:            NET TAXABLE VALUE:    3382000

STAR CAPITAL PARTNERS LLC
127 VALLEY ROAD
JACKSON NJ  08527

### EXPLANATION OF TAXES

| DESCRIPTION | RATE PER $100 | AMOUNT OF TAX |
|---|---|---|
| COUNTY TAX | 0.266 | 8996.12 |
| COUNTY LIBRARY TAX | 0.027 | 913.14 |
| COUNTY HEALTH TAX | 0.016 | 541.12 |
| COUNTY OPEN SPACE TAX | 0.011 | 372.02 |
| DISTRICT SCHOOL TAX | 0.782 | 26447.24 |
| LOCAL MUNICIPAL TAX | 0.254 | 8590.28 |
| MUNICIPAL OPEN SPACE TX | 0.030 | 1014.60 |
| FIRE DIST 3 | 0.107 | 3618.74 |

| 2025 TOTAL TAX | 1.493 | 50493.26 |
|---|---|---|

2025 NET TAX                50493.26
LESS 2025 PREV. BILLED      40339.52
BALANCE OF 2025 TAX         10153.74

| 2025 3RD QTR DUE AUG 1, 2025 | 2025 4TH QTR DUE NOV 1, 2025 | 2026 1ST QTR DUE FEB 1, 2026 | 2026 2ND QTR DUE MAY 1, 2026 |
|---|---|---|---|
| 9,105.33 | 10,153.74 | 12,623.32 | 12,623.31 |

### INFORMATION FOR TAX PAYERS

MAKE CHECK PAYABLE TO:    TOWNSHIP OF JACKSON

MAIL TO:    JACKSON TOWNSHIP TAX COLLECTOR
            95 WEST VETERANS HIGHWAY
            JACKSON, NJ 08527-3409

** IMPORTANT NOTICE**
FINAL TAX BILL INCLUDES 4TH Q 2025
1ST Q & 2ND Q 2026.
ALL ADJUSTMENTS HAVE BEEN MADE
FOR TAX APPEALS AND ARE REFLECTED
ON THE 4TH Q 2025
POSTMARK NOT ACCEPTED.
10 DAY GRACE PERIOD.

### 2026 PRELIMINARY TAX

PRELIMINARY TAX IS
EQUAL TO ONE HALF OF
2025 TOTAL NET TAX          25,246.63

DISTRIBUTION OF TAXES BEFORE REAP

| County Taxes | 21.43% | $ 10822.40 |
|---|---|---|
| School Taxes | 52.38% | $ 26447.24 |
| Municipal Taxes | 19.02% | $ 9604.88 |
| OTHER | 7.17% | $ 3618.74 |

State Aid Used to Offset Local Property Taxes: The budgets of the government agencies funded by this tax bill include State aid used to reduce property taxes. State aid offset information for current year municipal tax bills will start becoming available at the end of August. To find the amount of State aid used to offset property taxes on this parcel (based on its assessed value), visit https://www.nj.gov/dca/dlgs/resources/Property_Tax_info.shtml.

---

## TOWNSHIP OF JACKSON
## OCEAN COUNTY                2026-2

TAX COLLECTOR'S STUB - DETACH AND RETURN WITH YOUR CHECK
2026 2ND QUARTER TAX DUE MAY 1, 2026

| BLOCK NUMBER 5901 | LOT NUMBER 7 | QUALIFICATION | BANK CODE |
|---|---|---|---|

| TAX ACCOUNT NUMBER 13026 | TAX BILL NUMBER | TAX AMOUNT DUE | DUE MAY 1, 2026 |
|---|---|---|---|
| | | | 12623.31 |

| INTEREST | |
| CASH | |
| CHECK | |
| TOTAL | |

STAR CAPITAL PARTNERS LLC
1 N NEW PROSPECT ROAD

## TOWNSHIP OF JACKSON
## OCEAN COUNTY                2026-1

TAX COLLECTOR'S STUB - DETACH AND RETURN WITH YOUR CHECK
2026 1ST QUARTER TAX DUE FEBRUARY 1, 2026

| BLOCK NUMBER 5901 | LOT NUMBER 7 | QUALIFICATION | BANK CODE |
|---|---|---|---|

| TAX ACCOUNT NUMBER 13026 | TAX BILL NUMBER | TAX AMOUNT DUE | DUE FEBRUARY 1, 2026 |
|---|---|---|---|
| | | | 12623.32 |

| INTEREST | |
| CASH | |
| CHECK | |
| TOTAL | |

STAR CAPITAL PARTNERS LLC
1 N NEW PROSPECT ROAD

---

## TOWNSHIP OF JACKSON
## OCEAN COUNTY                2025-4

TAX COLLECTOR'S STUB - DETACH AND RETURN WITH YOUR CHECK
2025 4TH QUARTER TAX DUE NOVEMBER 1, 2025

| BLOCK NUMBER 5901 | LOT NUMBER 7 | QUALIFICATION | BANK CODE |
|---|---|---|---|

| TAX ACCOUNT NUMBER 13026 | TAX BILL NUMBER | TAX AMOUNT DUE | DUE NOVEMBER 1, 2025 |
|---|---|---|---|
| | | | 10153.74 |

| INTEREST | |
| CASH | |
| CHECK | |
| TOTAL | |

STAR CAPITAL PARTNERS LLC
1 N NEW PROSPECT ROAD

## TOWNSHIP OF JACKSON
## OCEAN COUNTY                2025-3

TAX COLLECTOR'S STUB - DETACH AND RETURN WITH YOUR CHECK
2025 3RD QUARTER TAX DUE AUGUST 1, 2025

| BLOCK NUMBER 5901 | LOT NUMBER 7 | QUALIFICATION | BANK CODE |
|---|---|---|---|

| TAX ACCOUNT NUMBER 13026 | TAX BILL NUMBER | TAX AMOUNT DUE | DUE AUGUST 1, 2025 |
|---|---|---|---|
| | | | 9105.33 |

CREDIT:    9105.33-
AMT DUE:        0.00

| INTEREST | |
| CASH | |
| CHECK | |
| TOTAL | |

STAR CAPITAL PARTNERS LLC
1 N NEW PROSPECT ROAD

**Bank of America** 🇺🇸

Online Banking

---

**Star Capital Partners 4927: Account Activity Transaction Details**

---

|  |  |
|--:|:--|
| **Post date:** | 05/23/2025 |
| **Amount:** | -15,774.27 |
| **Type:** | Other payment |
| **Description:** | Jackson Township DES:7329281200 ID:3898983148 INDN:Star Capital Partners CO ID:0000079161 WEB |
| **Merchant name:** | JACKSON TOWNSHIP |
| **Merchant information:** | |
| **Transaction category:** | Uncategorized: Uncategorized |

# CHASE ○ *for* BUSINESS ®

Printed from Chase for Business

---

## Transaction details

---

## Ink Unlimited (...7393)

## $9,150.83
Sale

📅 Aug 12, 2025
Transaction date

Aug 13, 2025
Posted date

 JACKSON TWP

---

| | |
|---|---|
| Description | JACKSON TWP |
| Also known as | JACKSON TWP |
| Merchant type | Tax payments |
| Method | Online, mail or phone |
| Card number | (...7393) |
| Category | Bills & utilities |

---

### Rewards earned with this transaction

| | |
|---|---|
| + 1.5% (1.5 Pts)/$1 earned on all purchases | 13,726 |
| Total Ultimate Rewards® points | 13,726 |

---

Transaction details may be preliminary or incomplete and may not match the transaction as it appears on your periodic statement, which is the official record of your account activity.



NJCourts | Pay Ticket | MCCS



| Welcome | Search |

## Complaint Detail

Back | New Search

| Case: **SC 2025 22615** | Court: **1511** | Type: **Complaint** | Defendant: **STAR CAPITAL PARTNERS LLC** | Status: **Disposed** |

### Defendant Information

| Name: **STAR CAPITAL PARTNERS LLC** | Gender: | Eyes: |

### Court Information

| Court Date: **07/09/2025** | Court Time: **04:00 PM** | Court Room: **VH99** |

### Assessed Totals

| Assessed Total: **$283.00** | Balance Due: **$0.00** | Last Payment Date: **08/10/2025** |

### Complaint Information

| Complaint Number: **SC 2025 22615** | Issue Date: **06/03/2025** | Offense Date: **06/03/2025 09:00 AM** | Arrest Date: |
| Court: **1511 - JACKSON TWP MUNICIPAL COURT** | | Agency & Officer ID: **1511 7009** | Police Case No: |
| Mun. Of Offense: **1511** | Co-Def Count: **0** | | |
| Complainant: **WILLIAM CAMPBELL** | | | |
| Transferred To: | | Transferred From: | |
| Reason: | | | |
| Status: **Disposed** | Time Payment: **Paid in Full** | Warrant: | Bail: |
| Last Action Date: **07/09/2025** | | | |

### Charge Information

234-10

| Description: HOUSING STANDARDS - RENTAL/LEASE-MAINTENANCE |
| Charge Status: **Time payment** | Degree: **No Degree** |

### Disposition Information

| Plea: **Guilty** | Plea Date: **07/09/2025** | Disposition Date: **07/09/2025** | Finding: **Guilty** |
| Conditional Discharge Status: | | License Surrendered: **No** | Modify Type: |
| Disposition Comments: **HEARD VIA ZOOM** | | | |

| Item | Assessed |
|------|----------|
| Fine | $250.00 |
| Cost | $28.00 |
| Misc Total | $5.00 |
| **Total** | **$283.00** |

| Num | Miscellaneous Fees | Amount |
|-----|--------------------|--------|
| 1 | Automation Fee | $2.00 |
| 2 | ATS Modernization Fund | $3.00 |
| **Miscellaneous Total** | | **$5.00** |

### Additional Information

| Involved Persons | Payment | Time Payment |

### Time Payment Information

| Amount Per Payment: **$283.00** | Starting Date: **08/11/2025** | Frequency per Payment: **1 days** |
| Complete Payment Due Date: **08/12/2025** | | |
| Assessed Total: **$283.00** | Paid Total: **$283.00** | Balance Due: **$0.00** |

Back | New Search

Copyright © 2012 New Jersey Judiciary

**Bank of America** 〰️

**Star Capital Partners 4927: Account Activity Transaction Details**

| | |
|---:|:---|
| **Post date:** | 08/11/2025 |
| **Amount:** | -291.49 |
| **Type:** | Debit card |
| **Purchaser:** | SHIMON T BRUDNY |
| **Description:** | JACKSON TWP MUNICIPAL C 08/10 PURCHASE 732-928-1205 NJ DEBIT CARD *8178 |
| **Merchant category:** | Government Services (not elsewhere classified) |
| **Merchant category code:** | 9399 |
| **Merchant name:** | JACKSON TWP MUNICIPAL C [?] |
| **Merchant information:** | 732-928-1205,NJ |
| **Online purchase:** | Y |
| **Transaction category:** | Cash, Checks & Misc: Other Expenses |